E-FILED
Friday, 25 October, 2019  09:59:47 PM
Clerk, U.S. District Court, ILCD

042447/19344/PEH/DSF

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

WILLIAM KENT DEAN,

        Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC., DR.
ABDUR NAWOOR and UNKNOWN
HEALTHCARE EMPLOYEES,

        Defendants.

Case Number  17-cv-3112

Judge Sue E. Myerscough

Magistrate Judge Tom Schanzle-Haskins

## MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendants, DR. ABDUR NAWOOR, DR. REBECCA EINWOHNER,

KATHY GALVIN and WEXFORD HEALTH SOURCES, INC., by and through their attorneys,

CASSIDAY SCHADE LLP, and, pursuant to Federal Rule of Civil Procedure 56 and CDIL-LR

7.1(D), hereby submit their Motion for Summary Judgment, stating as follows:

## INTRODUCTION

On April 12, 2019, Plaintiff, an inmate within the Illinois Department of Corrections

(IDOC) and incarcerated at Taylorville Correctional Center (Taylorville) filed this case under 42

U.S.C. §1983.  Doc. 73.  Specifically, Plaintiff alleged constitutional and state law claims arising

out of alleged delays in his diagnosis, surgery, and oncological management for renal cell

carcinoma (RCC) at Taylorville.  Following adequate time for discovery, no reasonable jury

could find Defendants violated Plaintiff's Eighth Amendment rights where they appropriately

investigated his complaints, ordered appropriate diagnostic testing, made appropriate specialist

referrals, and deferred to those specialists on the plan of care and the timing of that plan of care.

Plaintiff's unfounded belief the process should have played out more quickly does not support

deliberate indifference by any individual Defendant or Wexford.  Moreover, Defendants Einwohner and Galvin are entitled to summary judgment on Plaintiff's state-law medical malpractice claims where Plaintiff has not disclosed appropriate expert testimony to prove deviation from the standard of care.  Finally, Defendant Wexford should be granted summary judgment on the institutional negligence claim, due to the appropriateness of the care provided by Dr. Nawoor and the treating subspecialists.

**UNDISPUTED MATERIAL FACTS**

1.      Plaintiff is an inmate within the IDOC, whose claims arise out of Taylorville. Doc. 72, par. 6.

2.      Dr. Nawoor is a physician licensed in Illinois and has been employed by Wexford as the medical director at Taylorville since December 2015.  Exhibit A, deposition of Abdur Nawoor, pg. 24, 54-55, 66-67.

3.      Dr. Nawoor's practice experience is in internal medicine and pulmonology. Exhibit A, deposition of Abdur Nawoor, pg. 59.

4.      Dr. Nawoor's job responsibilities include providing direct patient care to inmates at Taylorville.  Exhibit A, deposition of Abdur Nawoor, pg. 59.

5.      Dr. Einwohner is a physician licensed to practice medicine in Pennsylvania. Exhibit B, deposition of Rebecca Einwohner, pg. 87-88.

6.      Dr. Einwohner is trained and board certified in nephrology, the treatment of diseases of the kidneys.  Exhibit B, deposition of Rebecca Einwohner, pg. 30-31.

7.      At the relevant time, Dr. Einwohner was a telemedicine physician for Wexford. Exhibit B, deposition of Rebecca Einwohner, pg. 35.

8.      Kathy Galvin is a registered nurse in Illinois.  Exhibit C, deposition of Kathy Galvin, pg. 27-28.

9.      Ms. Galvin was director of nursing/site manager at Taylorville at the time relevant to the Complaint.  Exhibit C, deposition of Kathy Galvin, pg. 15.

10.     As director of nursing, Ms. Galvin ensured Wexford and IDOC policies were followed and supervised 15 nurses, the medical records director, two staff assistants, a dental assistant, and a mental health assistant. Exhibit C, deposition of Kathy Galvin, pg. 29-30, 32.

11.     At Taylorville, Ms. Galvin did not provide patient care and was not a diagnosing entity.  Exhibit C, deposition of Kathy Galvin, pg. 36, 58, 90.

12.     Dr. Nawoor saw Plaintiff on December 23, 2015, for complaints of blood in his urine (hematuria).  Exhibit A, deposition of Abdur Nawoor, pg. 204, 207.

13.     Dr. Nawoor's subjective history for the December 23, 2015, encounter says "chronic recurrent hematuria and history of renal stones. Denies any pain or fever.  Had seen nephrologist three months before that.  Had CT of abdomen about a year ago."  Exhibit A, deposition of Abdur Nawoor, pg. 208.

14.     On December 23, 2015, Dr. Nawoor physically examined Plaintiff, palpating his abdomen and kidney, which elicited no pain.  Exhibit A, deposition of Abdur Nawoor, pg. 209.

15.     On December 23, 2015, Dr. Nawoor assessed Plaintiff as having hematuria most likely from stones.  Exhibit A, deposition of Abdur Nawoor, pg. 209-211.

16.     The assessment was made by considering both the presentation and physical findings.  Exhibit A, deposition of Abdur Nawoor, pg. 210.

17.     Dr. Nawoor believed Plaintiff's December 2015 hematuria was most likely due to a kidney stone, given his history of stones.  Exhibit A, deposition of Abdur Nawoor, pg. 210-11.

18.      On December 23, 2015, Dr. Nawoor ordered a complete blood count to look for infection or anemia due to blood loss, urine dipstick, and urine strain to look for stones, with encouragement to increase fluids.  Exhibit A, deposition of Abdur Nawoor, pg. 211-12.

19.      The urine dipstick confirmed blood in the urine.  Exhibit A, deposition of Abdur Nawoor, pg. 213.

20.      The urine strain is done to see if the patient is passing stones through the urine. Exhibit A, deposition of Abdur Nawoor, pg. 213-14.

21.      Plaintiff refused the urine strain.  Exhibit A, deposition of Abdur Nawoor, pg. 214.

22.      Dr. Nawoor encouraged increased fluids to flush the kidneys if Plaintiff had a kidney stone.  Exhibit A, deposition of Abdur Nawoor, pg. 214.

23.      Plaintiff had a history of kidney stones with lithotripsy procedure.[1]  Exhibit A, deposition of Abdur Nawoor, pg. 215-16; Exhibit D, deposition of Nivedita Dhar, pg. 72; Exhibit A, Plaintiff's medical records, Bates 817, 838-39.

24.      Plaintiff had most recently undergone CAT scans of his abdomen/pelvis in August 2014 and July 2015.  Exhibit E, Plaintiff's medical records, Bates 437-38, 838-39, 1272-73.

25.      Those tests revealed no abnormalities, other than kidney stones.   Exhibit E, Plaintiff's medical records, Bates 437-38.

26.      On January 7, 2016, Dr. Einwohner saw Plaintiff in the renal teleclinic for follow-up consultation  Exhibit B, deposition of Rebecca Einwohner, pg. 207-209.

---

[1] Lithotripsy is a procedure to destroy kidney stones using sound waves.  Exhibit F, deposition of Stephen Ritz, pg. 115.

27.     As of the time she saw Plaintiff on January 7, 2016, Dr. Einwohner was aware Plaintiff's medical history included lithotripsy and kidney stones.   Exhibit B, deposition of Rebecca Einwohner, pg. 213-14, 224.

28.     On January 7, 2016, Plaintiff complained of a history of painless hematuria for five days that resolved.  Exhibit B, deposition of Rebecca Einwohner, pg. 215-17.

29.     Dr. Einwohner's note for January 7, 2016, states her plan was "to discuss with collegial for evaluation of hematuria."  Exhibit B, deposition of Rebecca Einwohner, pg. 224.

30.     On January 7, 2016, Dr. Einwohner emailed to Dr. Ritz, the Wexford physician that does utilization management collegial reviews for Illinois prisons, that read:

---

**Rebecca Einwohner**

| | |
|---|---|
| **From:** | Rebecca Einwohner |
| **Sent:** | Thursday, January 07, 2016 11:51 AM |
| **To:** | Stephen Ritz |
| **Cc:** | Becky Adams |
| **Subject:** | Taylorville patient Dean, William ho past lithiasis with repeat hematuria--? collegial and investigation |

Hi Steve
I just saw patient Dean, W N21885 from Taylorville.
He reports intermittent hematuria with clots over the past couple weeks.  He has passed ca ox stones in the past and has had urology consults with lithotripsy.

His onsite UA dip showed hematuria last month and I'm requesting a UA with micro. The last ct 7/15 had calculi when an inpatient.

I suggest
Collegial review with Dr. Butler with consideration of re-imaging and urology eval.


Rebecca Einwohner, MD. Nephrology
Wexford Health Sources
RAISE the Standard
Desk Number 412-937-8590x337
Virtual Fax 412-539-0437

---

Exhibit 7 to Exhibit B, deposition of Rebecca Einwohner, pg. 227; Exhibit F, deposition of Stephen Ritz, pg. 66.

31.    The purpose of Dr. Einwohner's January 7, 2016, email to Dr. Ritz was to generate a collegial review with Dr. Nawoor about Plaintiff's symptoms.  Exhibit B, deposition of Rebecca Einwohner, pg. 233-34.

32.    On January 13, 2016, Dr. Nawoor and Dr. Ritz of Wexford discussed Plaintiff in collegial review and determined to get a renal ultrasound.  Exhibit A, deposition of Abdur Nawoor, pg. 228-29.

33.    Collegial review is a process Wexford utilizes to allow doctor-to-doctor discussion of referrals for off-site services in the course of managing a patient's care.  Exhibit A, deposition of Abdur Nawoor, pg. 237-38; Exhibit F, 30(b)(6) deposition of Stephen Ritz, pg. 10, 22; Exhibit G, deposition of Stephen Ritz, pg. 51.

34.    Collegial reviews are held weekly between a site physician and Wexford Utilization Management.  Exhibit F, 30(b)(6) deposition of Stephen Ritz, pg. 23.

35.    Utilization management is a review of requests for medical services, pharmacological services, imaging services, all medically-related service for medical necessity and clinical appropriateness.  Exhibit F, 30(b)(6) deposition of Stephen Ritz, pg. 7.

36.    Wexford uses a utilization management process because its contract with the IDOC requires Wexford to ensure resources are used in a medically necessary and clinically appropriate manner.  Exhibit F, 30(b)(6) deposition of Stephen Ritz, pg. 7-8; Exhibit G, deposition of Stephen Ritz, pg. 53.

37.    The result of a collegial review will be approval of a proposed plan of care, non-approval and an alternative treatment plan, or a request for additional information.  Exhibit F, 30(b)(6) deposition of Stephen Ritz, pg. 50.

38.     Dr. Nawoor and Dr. Ritz decided to do ultrasound as an initial test based on the Plaintiff's history of lithotripsies to look for kidney stones or something in the ureter or bladder. Exhibit A, deposition of Abdur Nawoor, pg. 216; Exhibit G, deposition of Stephen Ritz, pg. 68-69.

39.     Blood in the urine is a common presentation of kidney stones.  Exhibit G, deposition of Stephen Ritz, pg. 116.

40.     Plaintiff's history of kidney stones puts him at higher risk for development of stones compared to people without a history of stone formation.  Exhibit H, deposition of Bruce Barnett, pg. 115.

41.     Ultrasound is a diagnostic procedure done by an outside radiologist who visits Taylorville approximately once per month to perform the tests on offenders for whom it has been ordered.  Exhibit A, deposition of Abdur Nawoor, pg. 177, 179; Exhibit G, deposition of Stephen Ritz, pg. 69.

42.     CT with contrast carries higher risk than an ultrasound because of the exposure to radiation and contrast dye.  Exhibit H, deposition of Bruce Barnett, pg. 121.

43.     The risks associated with exposure to contrast dye in CT with contrast are higher for a patient with decreased renal function.  Exhibit H, deposition of Bruce Barnett, pg. 121.

44.     Plaintiff had decreased renal function from kidney disease.  Exhibit H, deposition of Bruce Barnett, pg. 114-15.

45.     Ultrasound is a low-risk and non-invasive test that uses sound waves, not radiation, and can be done at the prison.  Exhibit G, deposition of Stephen Ritz, pg. 77-78; Exhibit H, deposition of Bruce Barnett, pg. 77-78.

46.      Whether an ultrasound is an appropriate step in the workup for hematuria is a matter of clinical judgment.  Exhibit I, deposition of Adam Metwalli, pg. 58-59; Exhibit D, deposition of Nivedita Dhar, pg. 62 (ultrasound is appropriate if you do not have enough evidence or order CT).

47.      Ultrasound is probative of kidney stones.  Exhibit G, deposition of Stephen Ritz, pg. 116[2]; Exhibit H, deposition of Bruce Barnett, pg. 122-123.

48.      The ultrasound was an appropriate part of the workup of Plaintiff's hematuria. Exhibit H, deposition of Bruce Barnett, pg. 127-28.

49.      The performing radiologist reads the results of the ultrasound.   Exhibit A, deposition of Abdur Nawoor, pg. 179.

50.      The medical records director will schedule an ultrasound by calling the facility that performs ultrasounds and making an appointment.  Exhibit C, deposition of Kathy Galvin, pg. 60-61, 78.

51.      The targeted completion date for an ultrasound by an outside vendor is six weeks or less.  Exhibit G, deposition of Stephen Ritz, pg. 71.

52.      After approval of a service through collegial review, the medical records director at Taylorville receives correspondence that contains an authorization number for the approved service and he then consults a list of providers to request the service.  Exhibit J, deposition of Chad Christer, pg. 15-16.

53.      Plaintiff underwent a renal and bladder ultrasound on February 2, 2016.  Exhibit A, deposition of Abdur Nawoor, pg. 254.

---

[2] The reporter transcribed "prohibitive," rather than "probative."

54.     The interpreting radiologist reviewed the renal bladder ultrasound and reported "no mass lesions or evidence of hydronephrosis as to the right kidney."  Exhibit A, deposition of Abdur Nawoor, pg. 262; Exhibit E, Plaintiff's Medical Records, Bates 1680.

55.     "No mass lesions" in the right kidney means the interpreting radiologist saw no abnormality in the kidney suggesting a tumor.  Exhibit A, deposition of Abdur Nawoor, pg. 262-63; Exhibit G, deposition of Stephen Ritz, pg. 83-84.

56.     "No evidence of hydronephrosis" in the right kidney meant there was no evidence of dilation of the kidney suggestive of obstruction in the ureters.  Exhibit A, deposition of Abdur Nawoor, pg. 264; Exhibit G, deposition of Stephen Ritz, pg. 83-84.

57.     The interpreting radiologist misread the ultrasound, and failed to recognize a diffuse infiltrative process in the right kidney.  Exhibit C, deposition of Nivedita Dhar, pg. 99; Exhibit K, deposition of Michael Racenstein, pg. 48-48.

58.     The ultrasound was inconclusive as to kidney stones.  Exhibit A, deposition of Abdur Nawoor, pg. 265-66.

59.     On February 8, 2016, Dr. Einwohner saw Plaintiff in renal teleclinic.  Exhibit B, deposition of Rebecca Einwohner, pg. 235 and Exhibit 8 to Einwohner deposition.

60.     On February 8, 2016, Plaintiff reported he had no hematuria since January 16, 2016, but that today he noticed a slight pink tinge after passing a dark piece the day before. Exhibit B, deposition of Rebecca Einwohner, pg. 241, 247, 251.

61.     On February 8, 2016, Dr. Einwohner noted a renal ultrasound had been done since her last visit and showed no mass or renal calculi.  Exhibit B, deposition of Rebecca Einwohner, pg. 236, 240.

62.     On February 8, 2016, Dr. Einwohner questioned whether Plaintiff had passed a kidney stone due to faint pink urine with no stone on the ultrasound but noted stones were likely to reoccur.  Exhibit B, deposition of Rebecca Einwohner, pg. 249.

63.     Dr. Einwohner wrote on February 8, 2016, to do a microscopic urinalysis to see if the hematuria has resolved, to present the case for collegial, and to continue the stone prophylaxis.  Exhibit B, deposition of Rebecca Einwohner, pg. 249, 251-52.

64.     Dr. Nawoor saw Plaintiff on February 10, 2016, following Plaintiff's ultrasound. Exhibit A, deposition of Abdur Nawoor, pg. 271.

65.     On February 10, 2016, Dr. Nawoor's note says in the subjective portion "History of intermittent hematuria, and the urine positive for blood, and was ordered by nephrologist, which is Einwohner.· No pain. We stopped his aspirin.· And the finding on exam was basically no pain -- no pain."  Exhibit A, deposition of Abdur Nawoor, pg. 272.

66.     On February 10, 2016, Dr. Nawoor's note says in the objective portion "normal rhythm, meaning heart rhythm, lungs clear, no swelling [edema], and the GI there's no mass found, no tenderness, no loin tenderness over the *** kidney."  Exhibit A, deposition of Abdur Nawoor, pg. 275.

67.     On February 10, 2016, Dr. Nawoor assessed Plaintiff as having "hematuria cause undetermined."  Exhibit A, deposition of Abdur Nawoor, pg. 276.

68.     Dr. Nawoor contacted Dr. Ritz at collegial on February 10, 2016, because he was concerned about Plaintiff's symptoms.  Exhibit A, deposition of Abdur Nawoor, pg. 276.

69.     Because of the unremarkable ultrasound, Dr. Nawoor wanted to investigate other causes of the hematuria in the ureters, bladder, or kidneys.  Exhibit A, deposition of Abdur Nawoor, pg. 244.

70.     On February 10, 2016, Dr. Nawoor and Dr. Ritz determined Plaintiff needed further workup in the form of a cystoscopy and urology referral to discover where the blood was coming from---bladder, ureter, or kidney.  Exhibit A, deposition of Abdur Nawoor, pg. 276-78; Exhibit G, deposition of Stephen Ritz, pg. 80.

71.     The purpose of the urology referral was for an urologist to look at Plaintiff's kidneys, ureters, and bladder for a possible cause of hematuria.  Exhibit A, deposition of Abdur Nawoor, pg. 278.

72.     On February 10, 2016, Plaintiff was not symptomatic, hypotensive, or otherwise presenting with emergency symptoms that required referral to the emergency department. Exhibit A, deposition of Abdur Nawoor, pg. 277.

73.     On February 10, 2016, Dr. Einwohner followed up with the utilization management nurse and was informed Plaintiff had been reviewed in collegial and was scheduled to go to urology.  Exhibit B, deposition of Rebecca Einwohner, pg. 254.

74.     Plaintiff's blood counts were checked on February 16, 2016, and February 26, 2016.  Exhibit E, Plaintiff's Medical Records, Bates 1503, 1505.

75.     Plaintiff was slightly anemic but not severely.  Exhibit H, deposition of Bruce Barnett, pg. 139.

76.     Plaintiff remained hemodynamically stable and without urinary drainage problem. Exhibit D, deposition of Nivedita Dhar, pg. 87-88.

77.     Plaintiff saw urologist Dr. Severino on March 10, 2016.  Exhibit A, deposition of Abdur Nawoor, pg. 278.

78.     Plaintiff remained hemodynamically stable during the relevant time.  Exhibit H, deposition of Bruce Barnett, pg. 141-42

79.     After an appointment is approved, the medical records director at the prison contacts a specialist to schedule the appointment.  Exhibit A, deposition of Abdur Nawoor, pg. 283.

80.     The medical record for February 25, 2016, reflects a plan for Dr. Nawoor "to speak to urologist 2/26/15 to possibly move up appt for cystoscopy."  Exhibit E, Plaintiff's Medical Records, Bates 1349.

81.     Springfield Clinic's records for March 1, 2016, indicate Dr. Nawoor called "requesting to see if pt can be seen sooner-pt has bleeding every day-please call ***."  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 119.

82.     Springfield Clinic's records reflect a note for March 1, 2016, that states "TASK REASSIGNED" Previously assigned to Roszhart Nurse Staff Can Dr. Severino see next time in Taylorville?  Dr. Roszhart not back until 3/15/16."  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 119.

83.     Dr. Severino is an urologist practicing at Springfield Clinic in Springfield, Illinois.  Exhibit L, deposition of William Severino, pg. 6.

84.     Urology is a medical and surgical subspecialty focusing on the urinary tract from the kidneys to the urethra.  Exhibit L, deposition of William Severino, pg. 6-7.

85.     On March 1, 2016, Dr. Severino noted that he would have time to see Plaintiff on March 10, 2016.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 119.

86.     Plaintiff's urology appointment was scheduled for March 10, 2016.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 119; Exhibit E, Plaintiff's Medical Records, pg. 1354;

87.     Plaintiff saw Dr. Severino on March 10, 2016.  Exhibit A, deposition of Abdur Nawoor, pg. 280; Exhibit L, deposition of William Severino, pg.15.

88.     On March 10, 2016, Dr. Severino's plan of care for Plaintiff was to begin with a CT scan, see Plaintiff back, and then proceed with a cystoscopy, if necessary.  Exhibit L, deposition of William Severino, pg. 17.

89.     Dr. Severino did not order the CT on an expedited basis.  Exhibit H, deposition of Bruce Barnett, pg. 135.

90.     Dr. Nawoor approved Dr. Severino's plan on March 14, 2016.  Exhibit E, Plaintiff's medical records, Bates 1076.

91.     Dr. Nawoor and Wexford's Utilization Management Department approved Plaintiff's cystoscopy on or about March 22, 2016, and his CT IVP on or about March 30, 2016. Exhibit G, deposition of Stephen Ritz, pg. 87-88 and exhibit 11 to Ritz deposition, which is duplicative of Exhibit E, Bates 1081, 1084; Exhibit E, Plaintiff's medical records, Bates 1081, 1084.

92.     On March 28, 2016, Plaintiff's CT was scheduled for April 12, 2016.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 116.

93.     On March 30, 2016, Dr. Einwohner saw Plaintiff for renal teleclinic.  Exhibit B, deposition of Rebecca Einwohner, pg. 257.

94.     On March 30, 2016, Dr. Einwohner noted that since her last teleclinic, Plaintiff had seen an urologist and was to undergo diagnostic testing (CT IVP and cystoscopy) in April. Exhibit B, deposition of Rebecca Einwohner, pg. 258-60.

95.     Dr. Nawoor called Dr. Severino on April 1, 2016, to request an expedited appointment.  Exhibit A, deposition of Abdur Nawoor, pg. 289.

96.     Plaintiff underwent a CT of the abdomen and pelvis on April 12, 2016.  Exhibit A, deposition of Abdur Nawoor, pg. 283.

97.     One month to complete a CT does not fall below the standard of care.  Exhibit H, deposition of Bruce Barnett, pg. 136-37.

98.     Dr. Severino saw Plaintiff for a follow-up appointment on April 14, 2016.  Exhibit L, deposition of William Severino, pg. 17.

99.     The CT showed cancer in the right kidney with potential invasion of the vena cava, which is the main vein of the entire body that drains blood back to the heart.  Exhibit L, deposition of William Severino, pg. 18-19.

100.    As of April 14, 2016, Dr. Severino planned to consult with a vascular surgeon and coordinate with the vascular surgeon to perform surgery on Plaintiff for a right renal mass with a vena cava thrombosis.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 109.

101.    Dr. Severino requested a chest X-ray on Plaintiff.  Exhibit L, deposition of William Severino, pg. 21.

102.    Dr. Severino wanted a vascular surgeon to review the CT film to see if he could determine how high the tumor thrombus had gone up the IVC.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 106.

103.    Plaintiff's medical records at Taylorville reflect that on April 14, 2016, the prison received a telephone call from Dr. Severino, who stated "situation non-emergent.  Not usual for pt to throw embolis. IM may need rt nephrectomy, needs MRI to determine extent of problem but has pacemaker so unable to do this.  Plans are being set into motion for procedure.  May need vascular surg to assist [with] procedure depends on size of thrombus and where it is situated."  Exhibit E, Plaintiff's medical records, Bates 1361.

104. Plaintiff's medical records at Taylorville reflect that on April 14, 2016, the information Dr. Severino conveyed to the nurse about Plaintiff's situation being non-emergent was conveyed to Dr. Nawoor. Exhibit E, Plaintiff's medical records, Bates 1361.

105. Plaintiff underwent a chest X-ray at Taylorville on April 22, 2016. Exhibit E, Plaintiff's medical records, Bates 1364.

106. Dr. Nawoor participated in a collegial review on April 21, 2016, at which right renal nephrectomy surgery was approved for the mass in Plaintiff's kidney/IVC. Exhibit A, deposition of Abdur Nawoor, pg. 291-292; Exhibit G, deposition of Stephen Ritz, pg. 91-92 and Exhibit 13 to Ritz deposition, which is also Exhibit E, Bates 1085.

107. After approval of the surgery through collegial review, Chad Christer, Taylorville's medical records director, contacted Dr. Severino's office to schedule the surgery. Exhibit J, deposition of Chad Christer, pg. 37, 39.

108. On May 5, 2016, Dr. Nawoor participated in a collegial review at which Plaintiff was approved for a cardiology consultation to have Plaintiff's heart checked before undergoing a major operation. Exhibit A, deposition of Abdur Nawoor, pg. 293; Exhibit L, deposition of William Severino, pg. 27; Exhibit J, deposition of Chad Christer, pg. 67.

109. On May 5, 2016, Springfield Clinic's records reflect the vascular surgeon opined the tumor thrombus could extend above the hepatic vein and that it would be advisable to have the CT film further reviewed. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 102.

110. Plaintiff went to Prairie Heart Institute for his cardiac clearance appointment on May 6, 2016. Exhibit E, Plaintiff's medical records, Bates 1364.

111.    Plaintiff's surgery was initially scheduled by Dr. Severino for May 11, 2016, but was postponed by Dr. Severino because he wanted to have cardiac clearance and other specialists review Plaintiff's case.  Exhibit J, deposition of Chad Christer, pg. 65-66.

112.    Neither Wexford nor its employees postponed Plaintiff's renal nephrectomy surgery.  Exhibit J, deposition of Chad Christer, pg. 66.

113.    On or about May 17, 2016, Ms. Galvin informed Plaintiff's IDOC counselor in response to an emergency grievance from Plaintiff dated May 16, 2016, claiming that his surgery had not been scheduled.  Exhibit C, deposition of Kathy Galvin, pg. 133, exhibit 15 to Galvin deposition.

114.    The counselor's May 17, 2016, response to Plaintiff's grievance was "Per Health Care Unit DON Galvin surgeon has been contacted to schedule a surgical date.  Currently awaiting a response."  Exhibit C deposition of Kathy Galvin, pg. 133, exhibit 15 to Galvin deposition.

115.    Ms. Galvin acquired the information on Plaintiff's surgery by contacting the medical records director and conveying the information to the counselor by phone.  Exhibit C, deposition of Kathy Galvin, pg. 135-36.

116.    Springfield Clinic's records for May 25, 2016, state "Dr. Nawoor called and wants to know when procedure is going to be scheduled.  He asked as soon as you find out please call Chad the nurse at T'ville Correctional Center."  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 102.

117.    Taylorville's Medical Records Director called Dr. Severino's office on May 11, May 17, and May 23, 2017, about Plaintiff's surgery to make sure he remained "in the loop" on Plaintiff's care.  Exhibit J, deposition of Chad Christer, pg. 37-38.

118.   Springfield Clinic's records for June 1, 2016, indicate "Dr. Coakley reviewed the films and would like the patient to have another CT.  Patient needs a CT abd/pelv/chest with IV and oral contrast and to see Dr. Severino back in the office to review before deciding on appropriate surgery.  Need to call Chad at the prison and let him know so he can get approved and scheduled."  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 102.

119.   Plaintiff underwent a CT of the chest/abdomen/pelvis on June 8, 2016.  Exhibit L, deposition of William Severino, pg. 33-34 and Exhibit 2 to Severino deposition.

120.   On June 9, 2016, Plaintiff saw Dr. Severino at Springfield Clinic.  Exhibit L, deposition of William Severino, pg. 26.

121.   As of the June 9, 2016, visit and following the second CT, Dr. Severino was concerned the IVC thrombus had reached above the diaphragm and was close enough to the heart he should involve a cardiothoracic surgeon to open the chest to access the tumor from above.  Exhibit L, deposition of William Severino, pg. 27.

122.   Springfield Clinic's records for June 10, 2016, indicate Dr. Severino wanted to speak to "either Dr. Hazelrigg or the nurse about [Plaintiff].  Would like to discuss before making appointment."  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 90.

123.   Dr. Hazelrigg is a cardiothoracic surgeon.  Exhibit L, deposition of William Severino, pg. 30.

124.   Springfield Clinic's records for June 10, 2016, state "info is on Dr. H desk to review" and "once H reviews films and gives me the OK, then we can start coordinating and scheduling for surgery."  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 90.

125.   Springfield Clinic's records for June 10, 2016, state Dr. Hazelrigg requested to see Plaintiff.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 90.

126.     On or about June 14, 2016, Dr. Nawoor obtained approval in collegial review for Plaintiff to see Dr. Hazelrigg.   Exhibit E, Plaintiff's medical records, Bates 1127; Exhibit A, deposition of Abdur Nawoor, pg. 293.

127.     Springfield Clinic's records for June 14, 2016, state "I have this patient set up to see Dr. Hazelrigg on 6/20.  After he sees, we can start coordinating surgery dates/times."  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 86.

128.     Plaintiff saw Dr. Hazelrigg on June 20, 2016.   Exhibit A, Plaintiff's medical records, Bates 1379.

129.     On June 23, 2016, Julie, Dr. Severino's nurse, noted in the Springfield Clinic medical records she was checking when Plaintiff could be scheduled for surgery and that they would need to coordinate with Dr. Hazelrigg, Dr. Ryan, and Dr. Severino's schedules.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 82.

130.     On June 23, 2016, Springfield Clinic's records indicate Dr. Hazelrigg's first date to participate in Plaintiff's surgery was July 18, 2016.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 82.

131.     On June 23, 2016, Springfield Clinic's records indicate Dr. Ryan's first date to participate in Plaintiff's surgery was July 19, 2016.   Exhibit 1 to Exhibit L, deposition of William Severino, pg. 82.

132.     On June 23, 2016, Springfield Clinic's records reflect Plaintiff's surgery was scheduled for July 19, 2016, and that Taylorville was notified.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 82-83.

133.    On June 23, 2016, Springfield Clinic's records reflect Plaintiff would be scheduled to see his cardiologist at Prairie Heart 7-10 days prior to the surgery.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 83.

134.    On or about June 28, 2016, Dr. Nawoor obtained approval through collegial review for the pre-operative cardiac clearance and surgery.  Exhibit E, Plaintiff's medical records, Bates 1135.

135.    On July 19, 2016, Plaintiff underwent right radical nephrectomy with IVC thrombectomy with median sternotomy, cardiopulmonary bypass with deep hypothermic circulatory arrest.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 14, 39,  Exhibit 1 to Severino deposition, Bates 59.

136.    Dr. Severino described Plaintiff's nine-hour surgery as the most complicated urologic surgery that can be done, in that the patient is bled out, their heart is stopped, the patient is essentially dead with no bleeding, the surgery is performed, and the tumor removed.   Exhibit L, deposition of William Severino, pg. 14, 36.

137.    Plaintiff's surgical team consisted of approximately 10 people, including three surgeons.  Exhibit L, deposition of William Severino, pg. 37.

138.    Dr. Severino saw Plaintiff after surgery on August 11, 2016, and recommended he be "set up to see oncology."  Exhibit L, deposition of William Severino, pg. 40; Exhibit 1 to Severino deposition, Bates 11.

139.    On or about August 18, 2016, Dr. Nawoor obtained approval in collegial review for Plaintiff to have an oncology evaluation.  Exhibit E, Plaintiff's medical records, Bates 1148; Exhibit D, deposition of Nivedita Dhar, pg. 111-112.

140.    On August 26, 2016, Plaintiff saw an oncologist.  Exhibit D, deposition of Nivedita Dhar, pg. 112.

141.    On October 19, 2016, Plaintiff was prescribed the medication Votrient as treatment for his cancer.  Exhibit A, deposition of Abdur Nawoor, pg. 299; Exhibit G, deposition of Stephen Ritz, pg. 94.

142.    Dr. Nawoor wrote a prescription for Votrient on October 22, 2016.  Exhibit C, deposition of Kathy Galvin, pg. 162, exhibit 21 to Galvin deposition.

143.    Plaintiff's Votrient was approved as a non-formulary medication on November 14, 2016.  Exhibit A, deposition of Abdur Nawoor, pg. 299; Exhibit C, deposition of Kathy Galvin, pg. 147-48; exhibit 21 to Galvin deposition; Exhibit G, deposition of Stephen Ritz, pg. 97-98, 113; Exhibit E, Plaintiff's medical records, Bates 1678.

144.    Formulary medications are commonly prescribed medications that require no review and approval process to be given.  Exhibit G, deposition of Stephen Ritz, pg. 94-95.

145.    Non-formulary medications are those not commonly used that may have high toxicity, drug interactions, or complications and must go through a pharmacy review process. Exhibit C, deposition of Kathy Galvin, pg. 159-60; Exhibit G, deposition of Stephen Ritz, pg. 94-95.

146.    The review process for non-formulary medications looks at medical necessity and clinical appropriateness of the medications and makes a recommendation on approval or non-approval.  Exhibit G, deposition of Stephen Ritz, pg. 94-95.

147.    A non-formulary cancer medication would be reviewed for medical necessity and clinical appropriateness with reference to the National Comprehensive Cancer Network (NCCN)

guidelines, which are standard guidelines used throughout the country. Exhibit G, deposition of Stephen Ritz, pg. 95-96.

148.    The length of the non-formulary review process depends on the availability of the clinical information, the input and discussion by the pharmacy team, need for additional information from the site, and need to review the information in the context of guidelines such as NCCN. Exhibit G, deposition of Stephen Ritz, pg. 97.

149.    IDOC's medication formulary does not have chemotherapeutic agents. Exhibit G, deposition of Stephen Ritz, pg. 110-11.

150.    Drug formularies are common in managed care systems. Exhibit H, deposition of Bruce Barnett, pg. 50.

151.    Plaintiff began taking Votrient on November 18, 2016. Exhibit A, deposition of Abdur Nawoor, pg. 299-300.

152.    Ms. Galvin had no knowledge of or involvement in Plaintiff's prescription for or receipt of Votrient. Exhibit C, deposition of Kathy Galvin, pg. 147-48, 161-62.

153.    Plaintiff was prescribed Opdivo on March 2, 2017. Exhibit G, deposition of Stephen Ritz, pg. 107 and Exhibit 17 to Ritz deposition, which is also Exhibit E, Bates 2058.

154.    Opdivo is a non-formulary medication required to be approved through the non-formulary process. Exhibit G, deposition of Stephen Ritz, pg. 108-09.

155.    Opdivo was approved through the non-formulary process on March 20, 2017. Exhibit G, deposition of Stephen Ritz, pg. 111.

156.    Wexford's Utilization Management Department did not non-approve or prescribe alternate treatment plans for any requested care for Plaintiff but instead approved everything that was requested. Exhibit G, deposition of Stephen Ritz, pg. 114.

# ARGUMENT

**A.     Summary Judgment Standard**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue on any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment, the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for a trial.  If Defendants meet their burden in showing there is no evidence to support Plaintiff's claim, Plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  In determining and evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the opposing party and draws all justifiable inferences in his favor.  A mere scintilla of evidence to support Plaintiff's position cannot create a genuine issue of material facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**B.     No Jury Could Find Defendants Nawoor, Einwohner, or Galvin Unconstitutionally Delayed Plaintiff's Diagnosis, Surgery, and Oncology Treatment as Alleged in Counts I-III**

To establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976); *see also Palmer v. Franz*, 928 F.3d 560, 563 (7th Cir. 2019); *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015).  To prevail on an Eighth Amendment claim, a plaintiff must show that the responsible prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 835, 837 (1994); *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999).

The plaintiff must first show that the medical condition was objectively real and sufficiently serious. *See Farmer*, 511 U.S. at 834, and *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Next, plaintiff must show that the state officials subjectively knew of the prisoner's sufficiently serious medical needs, and consciously disregarded them. *Farmer*, 511 U.S. at 837; *see also Walker v. Wexford Health Sources, Inc.*, 2019 U.S. App. LEXIS 30663 at 19 (7th Cir. 2019) (requiring Plaintiff to show that facts existed so Defendant could infer Plaintiff was in substantial risk of serious harm and that Defendant "did, in fact, draw that inference"); *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016); *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000) (noting that deliberate indifference required a Defendant to know of and disregard an "excessive risk to inmate health or safety"). This required showing for deliberate indifference is "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006), quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992).

Showing mere negligence or malpractice will not support a constitutional violation under the Eighth Amendment. *Roe*, 631 F.3d at 857. Instead, when assessing claims of deliberate indifference against a medical professional, the "professional judgment standard" applies. *See generally Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("[A] medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment); *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998). Put another way, a treatment decision based on professional judgment cannot evince deliberate indifference because professional judgment "implies a choice of what the defendant believed to be the best course of treatment." *Zaya v. Sood,* 836 F.3d 800, 805 (7th Cir. 2016). A doctor who claims to have exercised professional judgment is effectively asserting that

he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment. *Zaya,* 836 F.3d at 805. On the other hand, "where evidence exists that the defendant knew better than to make the medical decision he did, then summary judgment is improper and the claim should be submitted to a jury." *Petties*, 836 F.3d at 731.

### 1. Dr. Nawoor

Plaintiff alleges Dr. Nawoor was responsible for a delayed cancer diagnosis, delayed surgery, and delayed oncologic treatment. Doc. 72; Exhibit M, Plaintiff's Answers to Defendants' interrogatories No. 1-4. Here, a jury would not have a basis to find Dr. Nawoor knew of and consciously disregarded Plaintiff's medical needs. It is important to contextualize Plaintiff's history and presentation beginning in December 2015 when he first presented to Dr. Nawoor. UMF 12-25. When Plaintiff complained of blood in his urine beginning on December 23, 2015, Dr. Nawoor initially believed it was consistent with Plaintiff's history of kidney stones, since he had multiple prior procedures done for stones in the recent past. UMF 15-17. This included CAT scans in 2014 and 2015 that had not shown any masses in the kidneys. UMF 23-25. Plaintiff's oncology expert verified renal cell cancer typically grows slowly and he would have expected it to be present for several years, including during the 2014 and 2015 CT films. Exhibit I, deposition of Adam Metwalli, pg. 39-40, 42-43. Therefore, Dr. Nawoor was presented with a patient with gross hematuria, a history of stones with lithotripsy to destroy them, and urology workup with two CAT scans in the last approximately two years. No studies identified any suspicious masses, which, based on the normal growth kinetics of kidney cancer, would be expected to be present. In late 2015 and early 2016 while other causes were not ruled out, stone recurrence was the most likely clinical entity to explain the hematuria.

Dr. Nawoor and Wexford arranged for Plaintiff to have an onsite renal ultrasound, a non-invasive diagnostic test that uses soundwaves to identify structures in the body.   UMF 23, 36. Plaintiff's experts suggest a CT with contrast would have been a better choice.  *See* Exhibit D, deposition of Nivedita Dhar, pg. 72.   However, there is no evidence use of an ultrasound was blatantly inappropriate suggesting the abandonment of medical judgment.  *Sherrod*, 223 F.3d at 619.  On the contrary, Plaintiff's experts, Dr. Metwalli and Dr. Barnett agreed an ultrasound can be an appropriate part of the workup, with Dr. Metwalli specifically stating it was a matter of "clinical judgment."  UMF 46.

Additionally, CT has risks associated with it ultrasound does not, specifically exposure to radiation and IV contrast.  UMF 42.  The risk associated with IV contrast is specifically relevant to Plaintiff, due to his history of kidney disease and decreased renal function.  UMF 43-44.  The decision on what diagnostic test to run is a classic example of medical judgment that does not give rise to an Eighth Amendment claim.  *See Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (stating that "[a]n MRI is simply a diagnostic tool, and the decision to forgo diagnostic tests is a classic example of medical judgment."), citing *Estelle,* 429 U.S. at 107.

Further, following the ultrasound, which was mis-read as unremarkable by the reviewing radiologist in early February, Dr. Nawoor arranged for a urology consultation for Plaintiff.  UMF 54-57, 68-71.  Dr. Nawoor testified that although the ultrasound was negative he still had no explanation for the hematuria and wanted an urologist to explore possible causes in the kidneys, ureters, and bladder.  UMF 68-69.  Plaintiff had this urology consultation on March 10, 2016, at which time Dr. Severino, Plaintiff's treating urologist, requested to perform a cystoscopy and a CT of the chest, abdomen, and pelvis.  UMF 87-89.  Dr. Nawoor approved this testing and the

CT was done on April 12, 2016, resulting in a diagnosis of renal cancer on or about April 12, 2016.  UMF 98-99.

Eighth Amendment cases alleging a delayed cancer diagnosis require evidence the defendant "knew better" than to pursue the chosen clinical course.  *See Whiting v. Wexford,* 839 F.3d 658 (7th Cir. 2016).  In  *Duckworth v. Ahmad,* 532 F.3d 675 (7th Cir. 2008), the plaintiff claimed a constitutional violation based on two physicians not immediately ordering a cystoscopy to rule out bladder cancer when he presented with hematuria.  The evidence showed the first physician didn't suspect cancer and the second physician knew of the cancer risk but thought that the plaintiff had another condition and pursued a course of treatment consistent with that diagnosis.  *Duckworth,* 532 F.3d at 680-81.  The plaintiff provided expert testimony from an experienced urologist that cancer should always be ruled out when a patient has blood in his urine.  *Duckworth,* 532 F.3d at 681.  The Seventh Circuit affirmed summary judgment, noting the expert's testimony showed only "how a reasonable doctor would treat Duckworth's symptoms, but it [did] not shed any light into [the defendant's] state of mind." *Duckworth, 532 F.3d at 681.*

Similarly, in *Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 660 (7th Cir. 2016), a plaintiff alleged deliberate indifference against a prison physician and his employer based on his cancer going undiagnosed for two months.  The Seventh Circuit affirmed summary judgment, observing finding lack of evidence the doctor "knew better" than to pursue the course of treatment he did.  *Whiting,* 839 F.3d at 663.  The Seventh Circuit noted the defendant physician considered the possibility of lymphoma but believed the plaintiff had an infection and treated him for that condition, delaying an invasive and potentially unnecessary biopsy until it was clear aggressive antibiotic treatment was not working. The Seventh Circuit observed that the decision

was not so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony.  *Whiting,* 839 F.3d at 663.

Plaintiff's standard of care and correctional medical expert agreed the individual steps taken in Plaintiff's workup between presentation and cancer diagnosis were clinically appropriate; it was the timeframe over which they played out with which Plaintiff's expert took exception.   Exhibit H, deposition of Bruce Barnett, pg. 130-32.   Specifically, this exchange occurred in Dr. Barnett's deposition:

> Q   We agreed the renal ultrasound was not an inappropriate part of this workup; correct?
> A   Correct.
>
> Q   We agree that a CT IVP and the cystoscopy were an appropriate part of this workup?
>  A   Yes.
>
>  Q   We agree that a urology referral was an appropriate part of this workup?
>  A   Yes.
>
>  Q   We agree that a right radial nephrectomy with whatever they did to him was an appropriate surgery for Mr. Dean to undergo?
> A   Correct.
>
> Q   We agree that referral to oncology was correct?
> A   Yes.
>
> ***
>
> Q   ***  And each of those steps that I've just outlined involved some exercise of medical decision-making by a medical professional; right?
>  A   Correct.
>  ***
>  Q   So if we don't disagree that those were all independently appropriate, what we do disagree on then is that they weren't done in a time frame that you think was reasonable; is that [fair] –
> ***
> THE WITNESS:  Yes.  Exhibit H, deposition of Bruce Barnett, pg. 130-32.

"[I]nexplicable delays in treatment which serves no penological interest can support an inference of deliberate indifference." *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (guards could be liable for delaying treatment of broken nose for a day and half); *Edwards v. Snyder*, 478 F.3d 827, 830-31 (7th Cir. 2007) (a plaintiff who painfully dislocated his finger and was needlessly denied treatment for two days stated a claim for deliberate indifference). Delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment. *Petties*, 836 F.3d at 730, citing *Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (given extreme ease of supplying sufferer of gastro-esophageal reflux disease with over-the-counter pills, failing to do so for two months created fact question over deliberate indifference).

Here, the purported delays Plaintiff attributes to Defendants are neither inexplicable nor without penological interest but were necessary steps in a process.  Calling the onset of symptoms until surgery a "delay" fails to account for the complexity, the intermediate steps necessary between diagnosis and surgery, and the steps Defendants took to move Plaintiff toward diagnosis and definitive treatment.

Dr. Nawoor requested and obtained approval for a renal ultrasound on January 13, 2016. UMF 32.  The approval is then taken by the medical records director, who schedules the test when the radiologist can do it.  UMF 52.  Here, the test was done February 2, 2016.  UMF 53. Following the test, on February 10, 2016, Dr. Nawoor called Dr. Ritz at Wexford utilization management rather than waiting for the regular collegial review.  UMF 68.  Dr. Ritz and Dr. Nawoor agreed on February 10, 2016, to send Plaintiff for urology referral.  UMF 70.  After an appointment was approved, the medical records director at the prison contacted a specialist to schedule the appointment.  Exhibit A, deposition of Abdur Nawoor, pg. 283.  Springfield

Clinic's records for March 1, 2016, reflect Dr. Nawoor called "requesting to see if pt can be seen sooner-pt has bleeding every day-please call ***."   UMF 81.   After Dr. Nawoor's call, Springfield Clinic provided a March 10, 2016, appointment date.   UMF 8.   Following Dr. Severino's March 10, 2016, visit with Plaintiff, he requested non-urgent cystoscopy and CT. UMF 88-89.   Dr. Nawoor approved Dr. Severino's plan on March 14, 2016, and both procedures were approved through utilization management.   UMF 91.   On March 28, 2016, the CT was scheduled for April 12, 2016.   UMF 92, 96.

On April 14, 2016, Dr. Severino determined Plaintiff would need surgical intervention of a right renal nephrectomy.   UMF 99-100.   This was accompanied by a telephone call from Severino documented in Plaintiff's medical records that the "situation was "non-emergent," that plans were being set in motion for the procedure, and that vascular surgery may need to be involved.   UMF 103.   Dr. Nawoor and Wexford approved the surgery on April 21, 2016.   UMF 106.   However, between April 21, 2016, and July 19, 2016, Plaintiff required significant workup directed by Dr. Severino.   Specifically, given the apparent complexity of the surgery, Dr. Severino contacted a vascular surgeon to assist with vena caval dissection.   UMF 100.   On May 5, 2016, the vascular surgeon suggested it would be prudent to have the April CT reviewed by a preferred radiologist.   UMF 109.   After reviewing the April CT, the records reflect that on June 1, the radiologist wanted another CT, which was performed on June 8, 2016.   UMF 118-19.

After the second CT and June 9, 2016, office visit, Dr. Severino was concerned the IVC tumor thrombus was close enough to the atrium of the heart he could not remove it from the abdomen and would need to come in from above, requiring the involvement of a cardiothoracic surgeon.   UMF 120-21.   Springfield Clinic's records for  Springfield Clinic's records for June 10, 2016, state Dr. Hazelrigg requested to see Plaintiff, which Dr. Nawoor obtained approval for

on or about June 14, 2016.  UMF 125-26.  Plaintiff saw Dr. Hazelrigg on June 20, 2016.  UMF

128.  Springfield Clinic's records for June 23, 2016, demonstrate the coordination of the

schedules of Plaintiff's three surgeons to perform the surgery on July 19, 2016, as the vascular

surgeon's first available date as of June 23, 2019, was July 19.  UMF 129-133.

When asked about the timeframe between his first visit with Plaintiff on March 10, 2016,

and surgery, Dr. Severino testified:

> Q. You first saw the patient, we agreed, on March 10 of 2016. Isn't that right?
> A. Correct.
>
> Q. And the cancer diagnosis came along with the CT around April 12th to 14th. Is
> that what we saw?
> A. Correct.
>
> Q. He had surgery July 19, 2016. Is that right?
> A. Yeah, uh-huh.
>
> Q. Do you have an opinion on whether this was a reasonable time frame to --
> from when you first saw this patient to do the surgery?
> A. You know, obviously it took a lot of coordinating and stuff. I mean, like I said,
> you've got to do this right or you're guaranteed the patient will die on the table. I
> mean, you had multiple physicians' time frames. You know, we had another
> radiologist look at it. You know, there's a lot of coordinating here.
>
> Q. So is that a yes?
> A. Yeah. I mean, I would argue I would rather have it scheduled correctly than
> have a patient die on the table because you want to try to hurry up, oh, let's just do
> it.  Exhibit L, deposition of William Severino, pg. 38-39.

The Seventh Circuit has consistently said failing to follow a specialist's advice without

exercising professional judgment can violate the Eighth Amendment.  *Petties*, 836 F.3d at 728-

31; *Perez v. Fenoglio*, 792 F.3d 768, 777-79 (7th Cir. 2015); *Zaya,* 836 F.3d 800.  However,

since deliberate indifference requires a mental state approaching criminal recklessness (*Arnett v.

Webster,* 658 F.3d 742, 759 (7th Cir. 2011)), a doctor who refers a patient to a specialist and

relies on the specialist's treatment recommendations cannot have the required mental state unless

he knows the specialist's plan of care is so blatantly inappropriate as to evidence intentional

mistreatment likely to seriously aggravate the prisoner's condition (*Sherrod*, 223 F.3d at 619).

Plaintiff has not disclosed expert testimony that would suggest Dr. Severino's plan of

care or timeframe for carrying out that plan was blatantly inappropriate.  In fact, Plaintiff's

experts contorted themselves to avoid criticizing Dr. Severino.  Plaintiff's urologic surgeon, *the*

*same sub-specialty as Dr. Severino,* testified:

> Q *** Are you critical of Dr. Severino for the time it took from when he decided
> to do the surgery until when he did the surgery?
> A No.
> Q That was a reasonable timeframe to get that patient, Mr. Dean into surgery?
> A The surgery should have been done earlier.
> Q The surgery should have been done earlier by Dr. Severino?
> A This patient had a renal mass, it had to be removed.
> Q Right.
> A And from April 12 to July, that's a significant delay. So the surgery should have
> been done at an earlier time.
> Q Based upon what?
> A Based upon the size of the tumor, the extent of you know, it was already in the
> IVC at that point already an aggressive mass.
> Q But you're not critical of Dr. Severino for that delay?
> A I think my role is to tell you there is a delay. I don't know how that delay
> happened.
> Q Okay, I got you. So all you're saying is April 12 to July 29 is too long.
> A Correct.
> Q I'm sorry, July 19 is too long. But you know don't know why it took that long.
> A Correct.  Exhibit D, deposition of Nivedita Dhar, pg. 81-82.

> Plaintiff's primary care provider and correctional medicine expert testified:

> Q   What is [your opinion as to Dr. Severino's care in your capacity as a primary
> provider who works with specialists, including urologists?
> A   I think Dr. Severino provided care within the standards of care for urology as
> an expert consulting with the primary care providers.  Yeah, his care is what I'm
> used to seeing by specialists in that environment typically interacting with
> primary care  providers.  Exhibit H, deposition of Bruce Barnett, pg. 101.

Dr. Barnett then explained he was not in a position to criticize a urologist specifically on the

timing of the surgery after the diagnosis was made and that he would defer to Dr. Severino and

that Dr. Nawoor could defer to Dr. Severino "[i]f he's communicating with Dr. Severino about the timing for the surgery and if Dr. Severino is comfortable with and says this is when the surgery should be done, then that's up to Dr. Severino."  Exhibit H, deposition of Bruce Barnett, pg. 104.  The record supports that Taylorville staff were involved in scheduling appointments. Taylorville's Medical Records Director called Dr. Severino's office on May 11, May 17, and May 23, 2017, about scheduling the surgery.  UMF 117.  Additionally, Springfield Clinic's records for May 25, 2016, state "Dr. Nawoor called and wants to know when procedure is going to be scheduled."  UMF 116.

Finally, Plaintiff's third expert, urologic oncologist Dr. Metwalli, also attempted to absolve Dr. Severino from blame for the alleged delay and instead blame Defendants:

> Q. Are you critical of Dr. Severino for the period of time that elapsed from diagnosis to surgery?
> A. I think that it is too long to wait. I think there are a number of people who deserve, you know, some scrutiny for that.  I do know that having dealt with patients who are in the Department of Corrections, getting things done in a timely fashion is very difficult and unlike in your normal urologic practice where you know the referring doctors well. They're in your community. You know the cardiologist who's probably taking care of this guy and you can pick up the phone. That kind of accessibility does not exist for someone like Dr. Severino who's not actually, you know, within the DOC system, but is, rather, being used as a consultant. *So I think that while under ordinary circumstances, I might be more critical of Dr. Severino, I think in this case, I think the Department of Corrections and their system is really where the criticism lies, because it seems to me like this should have been done in a more condensed timeframe than it was and the people who are responsible for seeing to that are the Department of Corrections doctors.* (Emphases added).  Exhibit I, deposition of Adam Metwalli, pg. 84-85.

When pressed on the factual basis for his belief the surgery was delayed because of Defendants, Dr. Metwalli could point to nothing specific.  Exhibit I, deposition of Adam Metwalli, pg. 89-104.

Cases finding unconstitutional delays involve situations in which the inmate's issue could have been easily addressed by the defendant but gratuitously was not.  They are not situations of administrative or bureaucratic difficulties in scheduling the patient for outside treatment or extensive workups required by treating specialists.  *See Alvarez v. Wexford Health Sources*, 2016 U.S. Dist. Lexis 167747 *18 (N.D. Ill.) (delayed referral for ankle injury did not support delay in seeing the specialist exacerbated the plaintiff's injury or unnecessarily prolonged his pain, and the doctor was not responsible for the delay and may not even have known about it because he had no responsibility for scheduling the appointment once he made the referral).  *Harvey*, 2015 U.S. Dist. LEXIS 164776, 2015 WL 8329876, at *5; *but see Walker,* 293 F.3d at 1038 *Grieveson*, 538 F.3d 763; *Edwards v. Snyder,* 478 F.3d 827 (7th Cir. 2007); *Miller v. Campanella,* 794 F.3d 878 (7th Cir. 2015); *Berry v. Peterman,* 604 F.3d 435 (7th Cir. 2010) (ease of referring patient for dental examination made delay possible violation); *Arnett v. Webster,* 668 F.3d 742 (2011).

Plaintiff also alleges a constitutional violation based on alleged delays in receiving the medications Votrient and Opdivo after surgery.  Doc. 72, par. 55-62.  Specifically, Plaintiff claims a constitutional violation based on delays of less than a month between prescription and receipt of Votrient and Opdivo.  *Id.*  However, the record developed in discovery shows neither chemotherapy drug was on IDOC's medication formulary and had to go through a non-formulary review process for medical necessity and clinical appropriateness with respect to issues of patient safety, side effects, toxicity, and review of NCCN guidelines.  UMF 141-55.  This is not an inexplicable delay serving no penological interest.

Moreover, section 1983 is a tort statute, so the defendant must breach a duty owed to the plaintiff, who must suffer cognizable legal harm. *Babcock v. White*, 102 F.3d 267, 271 (7th Cir.

1996).  Plaintiff has disclosed no expert testimony that supports harm from a delay in receipt of Votrient or Opdivo.  Dr. Dhar and Dr. Barnett oncological treatment to an oncologist.  Exhibit D, deposition of Nivedita Dhar, pg. 85; Exhibit H, deposition of Bruce Barnett, pg. 131.  Plaintiff's urologic oncologist offered no opinions on Plaintiff's cancer medications.  *See* Exhibit N, Metwalli Rule 26(a)(2) report.  Absent expert testimony supporting harm from the alleged delay in medication, Plaintiff's claim fails.  *See Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007).

Here, plaintiff's Pomplicated condition initially masqueraded as a more benign condition he had in the past.  The diagnosis and preoperative workup were done in conjunction with the appropriate specialist to manage Plaintiff's condition.  Rather than constituting a delay, the workup was necessary to ensure Plaintiff the best chance at a successful surgery and systemic oncologic treatment.  Dr. Nawoor is entitled to summary judgment on the Eighth Amendment claims.

### 2.  Dr. Einwohner

Plaintiff also blames Dr Einwohner for alleged delays in diagnosis of cancer, surgery, and oncologic treatment.  Doc. 72, at Count II; Exhibit M, Plaintiff's Answers to Defendants' interrogatories No. 5-7.  The evidence has demonstrated Dr. Einwohner was a telemedicine physician who saw Plaintiff remotely for kidney issues.  UMF 5-7.  During the time between when Plaintiff first presented with symptoms on December 23, 2016, and when he saw Dr. Severino on March 10, 2016, Dr. Einwohner saw Plaintiff twice.  At their first encounter on January 7, 2016, Dr. Einwohner, like Dr. Nawoor, knew Plaintiff's medical history included lithotripsy and kidney stones.  UMF 26-27.  On January 7, 2016, Dr. Einwohner knew Plaintiff complained to her of a history of painless hematuria for five days that had since resolved.  UMF 28.  Dr. Einwohner emailed to Wexford's utilization management physician, Dr. Ritz, telling him

of her recent visit with Plaintiff and suggesting a collegial review for consideration or re-imaging and urology consultation. UMF 30. The collegial review happened within a week and ultrasound was planned. UMF 32.

When Dr. Einwohner saw Plaintiff again on February 8, 2016, Plaintiff reported he had no hematuria since January 16, 2016, but had noticed a slight pink tinge after passing a dark piece the day before. UMF 59-60. Dr. Einwohner was aware a renal ultrasound had been done since her last visit and showed no mass or renal calculi and she considered whether Plaintiff had recently passed a stone. UMF 61. Dr. Einwohner wrote on February 8, 2016, to do a microscopic urinalysis to see if the hematuria has resolved, to present the case for collegial, and to continue the stone prophylaxis. UMF 63. Plaintiff's case was discussed in collegial review on February 10, 2016, and Plaintiff was approved for urology consultation. UMF 68. Dr. Einwohner verified this after the collegial review and charted it. UMF 73.

Plaintiff's prison practices expert initially claimed Dr. Einwohner had failed to suggest a CT or urology examination to her colleagues. Exhibit H, deposition of Bruce Barnett, pg. 144. However, when confronted with Dr. Einwohner's email to Dr. Ritz of January 7, 2016, Barnett then said Einwohner's email was not strongly worded enough and failed to generate a collegial review, which was again wrong. Exhibit H, deposition of Bruce Barnett, pg. 145. Finally, he claimed Dr. Einwohner was deliberately indifferent because the Wexford system did not allow her to personally order the CT or urology consultation but required her to have the primary care team do it. Exhibit H, deposition of Bruce Barnett, pg. 146-47. He agreed a collegial occurred two days after Dr. Einwohner saw Plaintiff on February 8, 2016, and requested Plaintiff be presented to collegial. Exhibit H, deposition of Bruce Barnett, pg. 150-51.

Barnett's criticisms are not of constitutional import and do not support deliberate indifference.  *Courts* look to the totality of an inmate's medical care when considering whether that care was reckless so as to evidence deliberate indifference to serious medical needs.  *Beatty v. Michael*, 2019 U.S. App. LEXIS 31681; *Petties*, 836 F.3d at 728.  Here, no jury could find Dr. Einwohner was criminally reckless to when she referred Plaintiff case to collegial review on the only two occasions she saw him before his diagnosis and collegial review followed shortly thereafter on both occasions.  This does not constitute ignoring Plaintiff, and no jury could find otherwise.

To the extent Plaintiff seeks to hold Dr. Einwohner responsible for delays in scheduling the surgery and prescribing chemotherapy drugs, no evidence exists she was involved.  Individual liability under § 1983 requires "personal involvement."  *See Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012) ("[I]ndividual liability under § 1983 is appropriate where the 'individual defendant caused or participated in a constitutional deprivation.'"), quoting *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003)).  Dr. Einwohner adopts Dr. Nawoor's arguments on issues from after Plaintiff's diagnosis.

### 3.  Nurse Galvin

Plaintiff also blames Nurse Galvin for alleged delays in diagnosis of cancer, surgery, and oncologic treatment.  Doc. 72, at Count II; Exhibit M, Plaintiff's Answers to Defendants' interrogatories No. 8-10.  However, Nurse Galvin employed as the director of nursing in an administrative capacity, supervising administrative staff at Taylorville.  She was not involved in direct patient care.  UMF 8-11.  Where a patient is under the care of a physician, a nurse generally may defer to the superior medical training of the physician unless it is apparent the

physician's orders will likely harm the patient. *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010); *Gosha v. Robinson*, 2018 U.S. Dist. LEXIS 176331 * 17-18.

Here, no question exists Plaintiff was under the care of Dr. Nawoor and Dr. Severino during the time Plaintiff seeks to hold a supervisory nurse responsible. Nothing in the extensive fact-pattern of workup, diagnosis, pre-operative clearance, surgery, and post-surgical care requires Nurse Galvin to intervene in the plan of care to discharge a constitutional duty. As of April 14, 2016, the medical records specifically reflect Dr. Severino having called Taylorville to let them know it was not an emergent situation and that plans were in the works. UMF 103. On or about May 17, 2016, Ms. Galvin informed Plaintiff's IDOC counselor in response to an emergency grievance from Plaintiff dated May 16, 2016, claiming that his surgery had not been scheduled. UMF 113-115. Beyond accurately telling the IDOC correctional counselor on or about May 17, 2016, that Taylorville was waiting for a surgery date from Dr. Severino, Nurse Galvin had no direct involvement. Nurse Galvin is entitled to summary judgment.

## C.   No Jury Could Find Wexford Deliberately Indifferent as Alleged In Count V

In Count V of the Complaint, Plaintiff alleges Eighth Amendment liability against Wexford. Doc. 72 at 24. The law in the Seventh Circuit treats a private corporation performing governmental functions such as Wexford as a municipality under §1983. *Iskander v. Village of Forest Park,* 690 F.2d 126, 128 (7th Cir. 1982). There is no *respondeat superior* liability for private corporations under §1983. *Shields v. Illinois Department of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014). Wexford cannot be liable under §1983 for the misdeeds of employees, as employees are responsible individually. *Lewis v. City of Chicago,* 496 F.3d 645, 656 (7th Cir. 2007). Instead, Wexford can only be liable for an unconstitutional policy or practice that

37

allegedly caused a constitutional deprivation. *Monell*, 436 U.S. at 691-92; *Palka v. City of Chicago,* 662 F.3d 428, 434 (7th Cir. 2011).

To establish municipal liability under *Monell*, a plaintiff must prove three things. First is the existence of an unconstitutional policy.  This can be done by showing either: (a) an express policy that, when enforced, causes a constitutional deprivation; (b) a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (c) that the constitutional injury was caused by a person with final decision policymaking authority.  *J.K.J. v. Polk Cty.*, 928 F.3d 576, 578 (7th Cir. 2019); *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). Second is that the municipality is culpable, which means the municipality's policymakers were deliberately indifferent to a known or obvious risk that a policy or custom would lead to constitutional violations. *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997) (citing *Canton*, 489 U.S. at 388). Third, the municipality's policy must "directly cause[] a deprivation of federal rights." *Id.* at 415. In other words, the municipality's own actions must be the "moving force" behind plaintiff's injuries. *Id.* at 404.

Here, Plaintiff has insufficient evidence to support a jury finding on any element of *Monell* liability.  First, Plaintiff's Eighth Amendment claim for denial of care fails as a matter of law due to the lack of unconstitutional care to Plaintiff over the period alleged, which defeats Plaintiff's *Monell* claim *ab initio*.  *See Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Second, Plaintiff has no evidence of the existence of an unconstitutional custom, policy, or practice that directly caused a constitutional violation.    Wexford served contention

interrogatories on Plaintiff to identify the factual basis for the allegations against it to determine

what evidence would be needed to rebut them.  Plaintiff identified:

- Wexford's policy of responding in a deliberately indifferent fashion to gross hematuria for patients over the age of 50, which is an express policy and a widespread practice.
- Wexford's policy of subjecting outside referrals to the collegial review process, which is an express policy and a widespread practice.
- Wexford's policy of not timely scheduling or holding collegial reviews, which is an express policy and a widespread practice.
- Wexford's policy of not referring patients to off-site care, which is an express policy and a widespread practice.
- Wexford's policy of not timely scheduling off-site medical appointments and procedures, which is an express policy and a widespread practice.
- Wexford's policy of its patients not actually undergoing off-site care in a timely fashion, which is an express policy and a widespread practice.
- Wexford's policy of subjecting cancer medications to the non-formulary review process, which is an express policy and widespread practice.
-  Wexford's policy of diffusing responsibility for a patient's medical care across multiple employees, which is an express policy and a widespread practice. Exhibit M, Plaintiff's Answers to Defendants' interrogatories No. 10.

Plaintiff has no produced evidence to support the allegedly unconstitutional policies in

the form of a widespread practice that applied to individuals other than him.  "There is no clear

consensus as to how frequently [certain conduct] must occur to impose *Monell* liability, except

that it must be more than one instance, or even three." *Thomas v. Cook County Sheriff's Dep't*,

604 F.3d 293, 303 (7th Cir. 2006) (internal quotation marks omitted) (citations omitted).   To

properly plead a widespread practice, a plaintiff must plead facts that would show either the

application of a particular policy to many individuals or show many actions directed at a single

individual. *Hare v. Cnty. of Kane*, 2014WL 7213198, at *3 (N.D. Ill. Dec. 15, 2015).

The record reasonably explains the alleged deficiencies as they relate to Plaintiff.  First,

no evidence supports a widespread practice of ignoring hematuria in patients over 50, let alone a

widespread practice policymakers at Wexford knew of and ignored.  No basis even exists to

support Plaintiff's hematuria was ignored based on his extensive clinical workup.  Second, the

allegation collegial review is facially unconstitutional is not supported.   In fact, Plaintiff's correctional medical expert testified California, where he worked, used a very similar utilization management review process.   Exhibit H, deposition of Bruce Barnett, pg. 42-43.   Third, there is no evidence Wexford fails to schedule and hold collegial reviews.   Plaintiff had numerous requests for outside care go through collegial review and all were approved in less than one month, and most were approved within days.   UMF 32, 69, 91, 92, 106, 108, 126, 134.

Fourth, the record does not support a widespread policy of not referring patients for offsite care.   Plaintiff's record is rife with referrals and approvals for outside care.   The suggestion there is a widespread policy of not sending patients offsite is not supported by Plaintiff's course.   Fifth, there is absolutely no evidence Plaintiff's offsite appointments were not timely scheduled.   The record meticulously details the approvals and scheduling of the appointments with the outside consultants, and far from demonstrating deliberate indifference shows high-level coordination between outside consultants and Taylorville.   This applies equally to Plaintiff's sixth allegation that patients were not seen for offsite care in a timely fashion.   The fact appointments are not instantaneous when out of Wexford's control is not unconstitutional.

Seventh, Plaintiff appears to allege the use of a medication formulary for cancer medications is facially unconstitutional.   However, the non-formulary approval process serves patient safety and ensures the medical necessity and clinical appropriateness of a medication before it is prescribed.   UMF 146; Exhibit H, deposition of Bruce Barnett, pg. 48-52.   Dr. Barnett, Plaintiff's correctional medical expert, testified California uses a medication formulary, as do most managed care systems.   Exhibit H, deposition of Bruce Barnett, pg. 50-51.   Therefore, the mere fact it was used to process *and approve* Plaintiff's medications cannot provide a basis for *Monell* liability.

Finally, Plaintiff claims diffusing care over multiple medical providers is unconstitutional. In support, Plaintiff points to the fact Nurse Galvin testified she did not have responsibility for scheduling appointments and was not an attending nurse. Exhibit M, Plaintiff's Answers to Defendants' interrogatories No. 12. However, what Plaintiff characterizes as unconstitutional diffusing of responsibility is actually how efficiency is achieved in a bureaucracy, as the Seventh Circuit has recognized. *See Burks v. Raemisch,* 555 F.3d 592, 595 (7th Cir. 2009).

Plaintiff has failed to raise a genuine issue of material fact he was injured by an unconstitutional policy of Defendant Wexford and summary judgment must be entered.

**D.     Defendants Einwohner, Galvin, and Wexford are Entitled to Summary Judgment on Counts VIII, IX, and X for Medical Malpractice**

In Counts VIII, IX, and X, Plaintiff claims Illinois medical malpractice against Einwohner, Galvin, and Wexford. For this Motion, Defendants address Count X as it relates to Dr. Nawoor. The elements which must be proved by a plaintiff to establish medical malpractice are: (1) the standard of care by which the physician's treatment is measured; (2) a deviation from that standard; and (3) that the deviation proximately caused the plaintiff's injury. *Hooper v. County of Cook*, 366 Ill. App. 3d 1, 6, 851 N.E.2d 663 (2006); *Ramos v. Pyati*, 179 Ill. App. 3d 214, 220-221 (1989). Proof of these elements is made by expert testimony. *Ramos*, 179 Ill. App. 3d at 220-221. Federal Rule of Evidence 601 states that "… in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." Under Illinois law, specifically 735 ILCS § 5/8-2501, a court will determine whether a proposed expert can give standard of care evidence based on the factors in 735 ILCS § 5/8-2501.

Here, Plaintiff has not offered sufficient expert testimony as to the standard of care for a nephrologist like Dr. Einwohner or a registered nurse like Nurse Galvin.  Plaintiff's correctional medical expert testified he had never worked as a nephrologist or a nurse.  Exhibit H, deposition of Bruce Barnett, pg. 80.  Moreover, as it relates to Dr. Einwohner, as stated above Dr. Barnett incorrectly believed Dr. Einwohner did not request a CT or urology appointment and had to acknowledge on both January 7, 2016, and February 8, 2016, Dr. Einwohner requested collegial reviews done shortly after her encounters.  Exhibit H, deposition of Bruce Barnett, pg. 145-151.

In *Sullivan v. Edward Hosp*. 209 Ill. 2d 100 (2004), the Illinois Supreme Court outlined how Illinois' statutory factors would guide a determination of competency for medical professionals giving standard of care opinion evidence.  "[T]he health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify; and that the expert must be familiar with the methods, procedures, and treatments ordinarily observed by other health-care providers in either the defendant's community or a similar community." *Id*. at 114-15 (emphasis added).  If the plaintiff cannot satisfy these foundational requirements, "the trial court must disallow the expert's testimony." *Id*. at 115, quoting *Purtrill*, 111 Ill. 2d at 244. The Illinois Supreme Court held the doctor in *Sullivan* could not give standard of care opinion testimony on the nurse-patient standard of care because he had no nursing license. *Id*. at 123.

Here, Plaintiff has disclosed no nursing care expert and purports to have a doctor testify to the nurse-patient "duty of advocacy" from having worked with and read about nurses.  Exhibit H, deposition of Bruce Barnett, pg. 155-56.  This opinion goes squarely to the nurse-patient relationship and cannot be given by a non-nurse.  Without this incompetent testimony, Plaintiff cannot prove deviation from the standard of care by Nurse Galvin and she must be granted

summary judgment, as should Wexford to the extent Count X is based on either Dr. Einwohner's or Nurse Galvin's actions.

**E.    Defendant Wexford is Entitled to Summary Judgment on Count XI for Institutional Negligence**

In Count XI, Plaintiff alleges institutional negligence against Wexford based on ostensibly the same things upon which *Monell* liability is predicated.  Doc. 72 at 31; Exhibit M, Plaintiff's Answers to Defendants' interrogatories No. 19.  A claim of direct negligence "alleges that the employer was *itself* negligent." (Emphasis in original.) *Vancura v. Katris*, 238 Ill. 2d 352, 375, 939 N.E.2d 328, 343 (2010). An employer can be directly liable if the "employer's breach—not simply the employee's malfeasance—was a proximate cause of the plaintiffs injury." *Id. See also Reynolds v. Jimmy John's Enterprises*, LLC, 2013 IL App (4th) 120139, ¶ 27, 988 N.E.2d 984, 370 Ill. Dec. 628 (unlike a theory premised on vicarious liability, under which an employer is liable because of actions taken by its employee, "[a] claim of direct negligence 'alleges that the employer was *itself* negligent'") (emphasis in original).

Defendant Wexford adopts its arguments as to the *Monell* claim articulated above and requests summary judgment for institutional negligence.

## CONCLUSION

No genuine issue of material fact exists that would permit a reasonable jury to find deliberate indifference.  Plaintiff's constitutional claims require evidence Defendants knew better than to provide the care they did, which is not present on this record.  This court should grant summary judgment on all federal claims and remand any remaining state law claims to the Fourth Judicial Circuit, Christian County, Illinois.  *See* 28 U.S.C. § 1447(c); *Lunsford v. Bennett*, 17 F.3d 1574, 1583–84 (7th Cir. 1994) (upholding district court's decision to decline jurisdiction over state law claims after granting summary judgment on federal claims

WHEREFORE, for the above reasons, DR. ABDUR NAWOOR, DR. REBECCA EINWOHNER, KATHY GALVIN and WEXFORD HEALTH SOURCES, INC. respectfully requests this Honorable Court grant their Motion for Summary Judgment and grant such further relief as deemed appropriate.

Respectfully submitted,

CASSIDAY SCHADE LLP

By: /s/ Joseph N. Rupcich
    Attorneys for Defendant, DR. ABDUR
    NAWOOR, DR. REBECCA EINWOHNER,
    KATHY GALVIN and WEXFORD HEALTH
    SOURCES, INC.

Joseph N. Rupcich
ARDC No. 6283899
CASSIDAY SCHADE LLP
111 North Sixth Street, 2nd Floor
Springfield, IL 62701
(217) 572-1714
(217) 572-1613 (Fax)
Joseph N. Rupcich

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2019, I electronically filed the foregoing Motion for

Summary Judgment with the Clerk of the Court using the CM/ECF system.  The electronic case

filing system sent a "Notice of E-Filing" to the following:

Jeremy Tyrrell
Illinois Attorney General
500 South Second Street
Springfield IL 62701
(217) 782-9040
(217) 524-5091 (Fax)
jtyrrell@atg.state.il.us

Craig C. Martin, Esq.
William Strom, Esq.
Jenner & Block LLP
353 North Clark Street
Chicago IL 60654
(312) 923-2776
(312) 840-7776 (Fax)
cmartin@jenner.com
wstrom@jenner.com

/s/ Joseph N. Rupcich

9305888 JRUPCICH;JRUPCICH