EXHIBIT C     E-FILED
Friday, 25 October, 2019 09:59:50 PM
Clerk, U.S. District Court, ILCD

KATHY GALVIN

March 27, 2019

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                  SPRINGFIELD DIVISION

 3  WILLIAM KENT DEAN,                )
                                      )
 4            Plaintiff,              )
                                      )
 5        -vs-                        )  Civil Action
                                      )  No:  17-cv-3112
 6  WEXFORD HEALTH SOURCES,           )
    INC., DR. ABDUR NAWOOR, DR.       )
 7  REBECCA EINWOHNER, NURSE          )
    KATHY GALVIN, and LISA            )
 8  MINCY,                            )
                                      )
 9            Defendants.             )
    _____

10

11  DEPOSITION OF:      KATHY GALVIN

12  DATE:               March 27, 2019

13  TIME:               9:00 a.m. to 1:52 p.m.

14  LOCATION:           Christian County Courthouse
                        Law Library
15                      101 South Main Street
                        Taylorville, Illinois
16
    TAKEN BY:           Plaintiff
17
    REPORTER:           Deborah A. Krotz, CSR, RMR, CRR
18                      CSR No. 0084-001848

19

20

21

22

23

24
```

KATHY GALVIN                                    March 27, 2019

```
 1                    STIPULATION

 2                    -----------

 3        IT IS HEREBY EXPRESSLY STIPULATED AND agreed

 4   by and between the parties that the deposition of

 5   KATHY GALVIN may be taken at Christian County

 6   Courthouse, Law Library, 101 South Main Street,

 7   Taylorville, Illinois, on the 27th day of

 8   March, 2019, before Debbie A. Krotz, pursuant to the

 9   Rules of the Supreme Court and the Rules of Civil

10   Procedure governing said depositions.

11            It is further stipulated that the

12   signature of the witness is waived.

13            It is further stipulated that the necessity

14   for calling the Court Reporter for impeachment

15   purposes is waived.

16

17

18

19

20

21

22

23

24
```

KATHY GALVIN                                          March 27, 2019

```
                                                          Page 3
 1  APPEARANCES:

 2  For the Plaintiff:      NATHANIEL K.S. WACKMAN, ESQ.
                            Jenner & Block, LLP
 3                          353 North Clark Street
                            Chicago, IL 60654
 4                          E-mail:  nwackman@jenner.com

 5  For the Defendants,
    Wexford Health Sources,
 6  Inc., Dr. Abdur Nawoor,
    Dr. Rebecca Einwohner,
 7  Nurse Kathy Galvin,
    and Lisa Mincy:         JOSEPH N. RUPCICH, ESQ.
 8                          Cassiday Schade, LLP
                            111 North Sixth Street - 2nd Floor
 9                          Springfield, IL 62701
                            E-mail:  jrupcich@cassiday.com
10
    For the Defendant,
11  Illinois Department
    Of Corrections:         KATHRYN BOYLE, ESQ.
12                          Office of the Illinois Attorney
                            General
13                          500 South Second Street
                            Springfield, IL 62706
14                          E-mail: kboyle@atg.state.il.us
                            E-mail: jtyrrell@atg.state.il.us
15

16

17

18

19

20

21

22

23

24
```

KATHY GALVIN                                          March 27, 2019

Page 4

```
 1                     I N D E X

 2  WITNESS:                                      PAGE:

 3  KATHY GALVIN

 4  DIRECT EXAMINATION BY MR. WACKMAN:              7

 5  RE-CROSS EXAMINATION BY MR. RUPCICH:          162

 6  RE-DIRECT EXAMINATION BY MR. WACKMAN:         175

 7  RE-CROSS EXAMINATION BY MR. RUPCICH:          181

 8

 9                   E X H I B I T S

10

11     EXHIBIT          DESCRIPTION            PAGE:

12  Galvin            15-page Memorandum dated     44
    Deposition        January 20, 2016, Bates
13  Exhibit No. 1     stamped IDOC No. 001217
                      through 001231
14
    Galvin            43-page document entitled    48
15  Deposition        Answer to Plaintiff's Second
    Exhibit No. 2     Amended Complaint with
16                    Affirmative Defenses

17  Galvin            five-page Performance         51
    Deposition        Appraisal Form for Kathy
18  Exhibit No. 3     Galvin, evaluation period
                      9/1/15 to 9/1/16
19
    Galvin            five-page Performance         54
20  Deposition        Appraisal Form for Kathy
    Exhibit No. 4     Galvin, evaluation period
21                    9/1/14 to 9/1/15

22  Galvin            two-page document entitled    71
    Deposition        Offender Outpatient Progress
23  Exhibit No. 5     Notes dated 12/23/15, Bates
                      stamped IDOC Taylorville Med
24                    Recs 001340 and 001341
```

KATHY GALVIN                                    March 27, 2019

Page 5

```
 1   Galvin           one-page ultrasound report      82
     Deposition       from Anton Johnson, M.D.,
 2   Exhibit No. 6    dated 2/2/2016

 3   Galvin           one-page document entitled      89
     Deposition       Offender Outpatient Progress
 4   Exhibit No. 7    Notes dated 2-10-16, Bates
                      stamped IDOC Taylorville Med
 5                    Recs 001346

 6   Galvin           three-page document entitled    92
     Deposition       Offender Outpatient Progress
 7   Exhibit No. 8    Notes Bates stamped IDOC
                      Taylorville Med Recs 001349
 8                    through 001351
     Galvin           one-page document entitled      93
 9   Deposition       Medical Special Services
     Exhibit No. 9    Referral and Report, Bates
10                    stamped IDOC Taylorville Med
                      Recs 001076
11
     Galvin           14-page Memorandum dated March  99
12   Deposition       10, 2016, Bates stamped IDOC
     Exhibit No.      No. 001249 through 001262
13   10

14   Galvin           one-page document entitled      104
     Deposition       Offender Outpatient Progress
15   Exhibit No.      Notes, Bates stamped IDOC
     11               Taylorville Med Recs 001356
16
     Galvin           15-page Memorandum dated April  121
17   Deposition       26, 2016, Bates stamped IDOC
     Exhibit No.      No. 000150 through 000164
18   12

19   Galvin           13-page Memorandum dated May    125
     Deposition       24, 2016, Bates stamped IDOC
20   Exhibit No.      No. 000165 through 000177
     13
21
     Galvin           one-page document entitled      130
22   Deposition       Offender's Grievance dated
     Exhibit No.      5/16/2016
23   14

24
```

KATHY GALVIN                                          March 27, 2019

```
 1   Galvin              one-page document entitled      132
     Deposition          Offender's Grievance dated
 2   Exhibit No.         5/16/2016 (entire page shown)
     15
 3
     Galvin              16-page Memorandum dated June    137
 4   Deposition          28, 2016, Bates stamped IDOC
     Exhibit No.         No. 000178 through 000193
 5   16

 6   Galvin              one-page document entitled      143
     Deposition          Offender Outpatient Progress
 7   Exhibit No.         Notes, Bates stamped IDOC
     17                  Taylorville Med Recs 001390
 8
     Galvin              one-page document entitled      148
 9   Deposition          Offender Outpatient Progress
     Exhibit No.         Notes, Bates stamped IDOC
10   18                  Taylorville Med Recs 001478

11   Galvin              one-page document entitled      149
     Deposition          Illinois Department of Public
12   Exhibit No.         Health Uniform
     19                  Do-Not-Resuscitate (DNR)
13                       Advance Directive, Bates
                         stamped IDOC No. 000610
14
     Galvin              one-page document entitled      155
15   Deposition          Offender Outpatient Progress
     Exhibit No.         Notes, Bates stamped IDOC
16   20                  Taylorville Med Recs 001477

17   Galvin              one-page document entitled      156
     Deposition          Medication Administration
18   Exhibit No.         Record, Bates stamped IDOC
     21                  Taylorville Med Recs 001579
19

20

21

22

23

24
```

KATHY GALVIN                                    March 27, 2019

Page 7

 1   THEREUPON,

 2                      KATHY GALVIN,

 3   a witness, having been first duly sworn, upon her

 4   oath, commencing at 9:00 a.m., testified as follows:

 5                   DIRECT EXAMINATION

 6   BY MR. WACKMAN:

 7       Q.    Ms. Galvin, we just met, but, again, my

 8   name is Nate Wackman.  I represent William Dean, the

 9   Plaintiff in this lawsuit.  I don't know if we want

10   to put other appearances on the record real briefly.

11             MS. BOYLE:  Kathryn Boyle from the

12             Illinois Attorney General's Office on

13             behalf of Mr. Tyrrell who is in a

14             different deposition today.

15             MR. RUPCICH:  Joseph Rupcich for the

16             deponent.

17   BY MR. WACKMAN:

18       Q.    Ms. Galvin, would you please state your

19   whole name just for the record.

20       A.    It's Kathy Elaine Galvin.

21       Q.    And what's your date of birth?

22             MR. RUPCICH:  Could we not put that on the

23             record?

24             MR. WACKMAN:  Sure.

KATHY GALVIN                                    March 27, 2019

Page 8

    1              MR. RUPCICH:  We will give it to you if
    2         you need it, but since she worked in the
    3         prison --
    4              MR. WACKMAN:  Fine.  Fine by me.
    5              MR. RUPCICH:  Personal addresses, family
    6         members we like to keep non-public.
    7              MR. WACKMAN:  Makes sense.  That's fine
    8         with me.
    9  BY MR. WACKMAN:
   10      Q.    And, Ms. Galvin, where are you currently
   11  employed?
   12      A.    I'm not.
   13      Q.    You're not employed?
   14      A.    No.
   15      Q.    Have you ever been deposed before?
   16      A.    One other time.
   17      Q.    Okay.  And was that recently?
   18      A.    No.
   19      Q.    Okay.  So since you haven't been deposed
   20  for a while, I just want to go through a few ground
   21  rules, very basic.  You may remember them.  You may
   22  not.  As you know, you're under oath today.
   23      A.    Mmm-hmm.
   24      Q.    So it's the same effect as testifying in

KATHY GALVIN                                   March 27, 2019

Page 9

1   court.  In other words, you need to tell the truth.

2   If you don't tell the truth, there can be

3   consequences.  Do you understand that, ma'am?

4        A.    I do.

5        Q.    And it's important to have a clear record

6   of today's deposition, which is why we have a court

7   reporter taking down all the answers, and so what

8   we're going to need you to do is respond audibly, a

9   "yes" or a "no" or an answer to all my questions.

10  No head shakes, no head nods, et cetera.  Do you

11  understand that?

12       A.    I do.

13       Q.    Okay.  Another one that hopefully I'll do

14  my best not to violate and you try not to violate,

15  too, is that we need to please let me finish my

16  question before you answer.  I will endeavor to

17  allow you to finish your answer before I start my

18  next question.  Do you understand that?

19       A.    Yes.

20       Q.    Okay.  And if you don't understand a

21  question, please ask me, and I can rephrase it or

22  clarify.  But if you answer a question, I'm going to

23  assume you understood the question that I asked.

24       A.    Okay.

KATHY GALVIN                                    March 27, 2019

1     Q.    Do you understand that?

2     A.    Yes.

3     Q.    Okay.  And if at any point you want to

4  take a break, please go ahead and ask.  We can take

5  a break anytime that you'd like or anybody would

6  like, obviously.  The only thing we ask is that if

7  there's a question pending, you answer the question

8  that's pending before you take a break.

9     A.    Okay.

10    Q.    And I think that is it.  Do those all make

11 sense?

12    A.    Yes, they do.

13    Q.    Do you have any questions about the

14 deposition or the procedure today?

15    A.    No.

16    Q.    Is there any reason you can't testify

17 truthfully or accurately today?

18    A.    No.

19    Q.    You mentioned a moment ago that you have

20 been previously deposed, ma'am.  Can you tell me

21 about that?

22    A.    I quit.

23    Q.    Okay.

24    A.    And it was financial --

KATHY GALVIN                                    March 27, 2019

Page 11

```
 1      Q.    Okay.

 2      A.    -- is the reason I left.

 3      Q.    And by "quit," quit where?

 4      A.    I quit Taylorville Correctional.

 5  Wexford -- employment -- was my employer.

 6      Q.    And there was a deposition as a result of

 7  that?

 8      A.    No.

 9      Q.    Oh, okay.  I'm sorry.  I had asked you the

10  circumstances under which you had been deposed

11  before.

12      A.    Oh, I'm sorry.  I had been named in

13  another case, and I did the deposition.

14      Q.    Okay.  Another case related to your job as

15  a nurse for Wexford?

16      A.    No.  Related to as Site Manager and

17  Director of Nursing.

18      Q.    Okay.  At Taylorville Correctional Center?

19      A.    Yes.

20      Q.    Do you remember when that deposition

21  occurred?

22      A.    Approximately three years ago.

23      Q.    Okay.  So three years ago would have been

24  2016?
```

KATHY GALVIN                                                    March 27, 2019

Page 12

```
 1     A.     Mmm-hmm.

 2     Q.     Does that sound about; correct?

 3     A.     Approximately.

 4     Q.     Okay.  And were you a defendant in that

 5  case or a witness?

 6     A.     I was named in it.

 7     Q.     Okay.  A named defendant?

 8     A.     Correct.

 9     Q.     Okay.  And were you represented by counsel

10  in that case?

11     A.     Yes.

12     Q.     Was it counsel from Cassiday?

13     A.     Yes.

14     Q.     And do you remember anything else about

15  that case?

16     A.     No.

17     Q.     Okay.  Do you remember what happened with

18  that case?

19     A.     I didn't know until today what had

20  happened to it.

21     Q.     And what happened with that case?

22     A.     It was declined.

23     Q.     Okay.  Do you know if it was settled?  I'm

24  assuming we can get the --
```

KATHY GALVIN                                    March 27, 2019

Page 13

1           MR. RUPCICH:  Dismissed.

2           MR. WACKMAN:  Dismissed?  Okay.  Do you

3           have the information on that case, Joe,

4           that we could get from you?

5           MR. RUPCICH:  Yes.

6           MR. WACKMAN:  Perfect.

7           MR. RUPCICH:  Olis v. Els.

8           MR. WACKMAN:  I'm sorry.  Can you spell

9           that again?

10          MR. RUPCICH:  Olis, O-L-I-S, v. ELS,

11          E-L-S.  Sangamon County.

12          MR. WACKMAN:  Circuit Court?

13          MR. RUPCICH:  Yes.  It was dismissed

14          against our clients last year.

15          MR. WACKMAN:  Okay.

16  BY MR. WACKMAN:

17     Q.   What was the basic allegation?

18     A.   I don't even remember.

19     Q.   You don't recall?

20     A.   No.

21          MR. RUPCICH:  It was an optometry case.

22  BY MR. WACKMAN:

23     Q.   Okay.  Ms. Galvin, did you review any

24  documents in preparation for this deposition today?

KATHY GALVIN                                    March 27, 2019

Page 14
1      A.      Yes, I did.  I looked at a note that I had

2   entered.  I seen a QI that I had put in, because I

3   was QI Coordinator.

4      Q.      Okay.  And what do you mean by "QI"?

5      A.      QI is Quality Improvement.  The State of

6   Illinois requires a report monthly, and it's a

7   combination of everything that happens in

8   Healthcare.

9      Q.      Were those documents given to you by your

10  attorney?

11     A.      No.  I just reviewed it.

12     Q.      Okay.  Independent --

13             MR. RUPCICH:  Showed to you by your

14             attorney?

15             THE WITNESS:  Right.

16             MR. RUPCICH:  Not given.  I think that's

17             the ...

18             MR. WACKMAN:  I think you're right.

19  BY MR. WACKMAN:

20     Q.      Okay.  Did you independently review any

21  documents -- by that, I mean not shown to you by

22  your attorney -- in preparation for this deposition?

23     A.      No.

24     Q.      Did you prepare any documents or take any

KATHY GALVIN                                          March 27, 2019

Page 15

1  notes in preparation for this deposition?

2      A.    No.

3      Q.    Okay.  And did you have any conversations

4  with anybody besides your lawyer in preparation for

5  this deposition?

6      A.    No.

7      Q.    All right.  So I'm going to start going

8  through your work background, Ms. Galvin.  So you

9  said you're not currently working; is that correct?

10     A.    Correct.

11     Q.    What was your last job?

12     A.    It was Taylorville.

13     Q.    Director of Nursing at Taylorville?

14     A.    Right.

15     Q.    I want to come back to being Director of

16 Nursing at Taylorville, because we're going to spend

17 some time on that.  What years were you Director of

18 Nursing at Taylorville?

19     A.    I'd say '11.  2011 until time left.  And

20 that's an approximate.

21     Q.    And when did you formally leave?

22     A.    June 13th, 2018.

23     Q.    Okay.  What job did you do before you were

24 Director of Nursing at Taylorville?

KATHY GALVIN                                    March 27, 2019

Page 16

 1     A.    I was a staff nurse.

 2     Q.    At Taylorville?

 3     A.    Yes.

 4     Q.    And when did you start as a staff nurse at

 5  Taylorville?

 6     A.    I believe it was August.  I can't remember

 7  the year.

 8     Q.    Do you have an idea of how long you were

 9  employed there?

10     A.    Let's go with 2003, approximately.

11     Q.    And you were a Wexford employee at that

12  time?

13     A.    Yes.

14     Q.    And what were your duties as a staff nurse

15  at Taylorville?

16     A.    It depended upon your assignment.

17     Q.    Okay.  Why don't we start with your most

18  recent assignment, and you can tell me what your

19  duties were.

20     A.    I could not tell you more recently,

21  because there is several positions and assignments.

22  You could have been Med nurse that day.  You could

23  have been Infirmary nurse that day.  You could have

24  been Doc Line nurse that day.

KATHY GALVIN                                    March 27, 2019

Page 17

1      Q.     Okay.  Did you handle all those
2   assignments while you were at Taylorville?
3      A.     Yes.
4      Q.     I'm sorry; the last one was Doc Line
5   nurse?
6      A.     Doctor's Line.  You assisted the doctor
7   and took off orders.
8      Q.     Okay.  So why don't you tell me what the
9   duties of the Med nurse were when you fulfilled the
10  --
11     A.     The Med nurse is you pull up medication
12  for each individual and document that you have
13  pulled them up and administered them to the
14  offender.
15     Q.     Okay.  Are there any other duties for the
16  Med nurse?
17     A.     You do count, because it is a security --
18  so you have to count all needles and all controlled
19  medications.
20     Q.     Okay.  And what other duties are there for
21  a Med nurse?
22     A.     That's it.
23     Q.     Okay.  What about for an Infirmary nurse?
24     A.     An Infirmary nurse is the nurse that cares

KATHY GALVIN                                    March 27, 2019

Page 18

1  for the patients in the infirmary and document into

2  the chart and administer their medications.

3      Q.    Okay.  And what do you mean by "the

4  infirmary," just to be clear?

5      A.    The infirmary Taylorville Correction has,

6  at the time that I was working, we had a seven-bed

7  infirmary, five in the main and two isolation cells.

8  And those patients, depending upon the orders, the

9  nurse would go in, care, document, and administer

10  medication.

11      Q.    Okay.  Are those all the duties as an

12  Infirmary nurse?

13      A.    No.  She also assists in pulling labs.

14      Q.    And what do you mean by "pulling labs"?

15      A.    By taking -- Being a phlebotomist, which

16  is pulling bodily fluids, blood tests, urinalysis.

17      Q.    Okay.  Are there any other duties for an

18  Infirmary nurse?

19      A.    All nurses have to respond to emergencies.

20      Q.    Okay.  Any other duties of an Infirmary

21  nurse?

22      A.    No.

23      Q.    How about a Doc Line nurse or a Doctor's

24  Line nurse?

KATHY GALVIN                                    March 27, 2019

Page 19

1    A.    The Doc Line nurse, the doctor's nurse
2  would take vitals.  If the doctor was just seeing as
3  a follow-up, they would prepare the paperwork by
4  putting the M.D. note, date, time, and vitals signs
5  and reason for the patient being there.
6          If it was for a clinic, which there are
7  numerous clinics, they would pull that form, address
8  it, date and time it, and do the required vital
9  signs and weight.
10   Q.    And what do you mean by -- Maybe we should
11  just be more clear.  What do you mean by Doctor's
12  Line?
13   A.    Doctor's Line is the nurse assisting the
14  doctor to ensure that all paperwork is initiated and
15  completed.
16   Q.    Okay.  Is that the nurse who assists the
17  doctor at sick call?
18   A.    Yes.
19   Q.    Okay.  So besides assisting the doctor at
20  sick call or assisting one of the clinics, does the
21  Doctor's Line nurse have any other duties?
22   A.    No.
23   Q.    Generally, as a staff nurse at
24  Taylorville, did your duties involve being familiar

KATHY GALVIN                                          March 27, 2019

Page 20

1  with medical terms and terminology?

2      A.    Yes.

3      Q.    And generally as a staff nurse at

4  Taylorville, did your duties involve understanding

5  and reading medical records and charts?

6      A.    No, you would not have to read them.  You

7  only took off the orders and made your initial

8  notes.

9      Q.    I guess I'm unclear about how you don't

10 have to read them.  Can you explain what you mean?

11     A.    A nurse is not a diagnosing entity;

12 therefore, they would not read up on the client or

13 read past records.

14     Q.    Is that a Wexford policy?

15     A.    I do not know if it's a Wexford policy.

16     Q.    What is the basis for your understanding

17 that a nurse's duties do not include reading up on

18 past patient records?

19     A.    Because we are not diagnosing and ordering

20 entities.

21     Q.    So what I'm trying to understand, though,

22 is why do you think that to be the case?

23     A.    Because we are not diagnosing and ordering

24 entities.

KATHY GALVIN                                      March 27, 2019

Page 21

1      Q.      Okay.  Is that --

2      A.      We have to go to the doctor's order.

3      Q.      Is that how you're trained?

4      A.      Yes.

5      Q.      Who trained you that way?

6      A.      No one trained me at that way.

7      Q.      Okay.  Well, you just told me you are

8  trained that way.

9      A.      No, I'm not trained that way.  There is no

10 need for a nurse to review case history due to not

11 being a diagnosing entity.

12     Q.      I guess what I'm asking is where did you

13 learn that?

14     A.      I can't say.

15     Q.      Okay.  Did your duties as a staff nurse at

16 Taylorville involve obtaining approvals for

17 medications to be administered to patients?

18     A.      That -- Yes, that would be the doctor's

19 order.

20     Q.      Okay.  If I reference "hematuria," do you

21 know what I'm referring to?

22     A.      Yes, I do.

23     Q.      What is hematuria?

24     A.      Blood in the urine.

KATHY GALVIN                                    March 27, 2019

Page 22

```
 1      Q.     What can it be a symptom of?
 2      A.     There again, I'm not a diagnosing entity,
 3  but it could be from injury, kidney stone, kidney
 4  and bladder cancer.
 5      Q.     Are there any other --
 6      A.     Not that I'm aware of at this time.
 7      Q.     I'm sorry.  Let me ask the whole question.
 8  I paused because I was thinking about it.  Are the
 9  there any other things that hematuria could be a
10  symptom of?
11             MR. RUPCICH:  I'll make a foundational
12             objection.
13  BY MR. WACKMAN:
14      Q.     You can answer.
15      A.     Those are the ones I know of.
16      Q.     And how do you know that those things are
17  symptoms of hematuria?
18      A.     Medical knowledge.
19      Q.     And where did you gain that medical
20  knowledge?
21      A.     At medical school.
22      Q.     Did you also gain that knowledge through
23  your years of experience as a nurse?
24      A.     At times.
```

KATHY GALVIN                                    March 27, 2019

Page 23

1     Q.    Do you know how hematuria is diagnosed?

2     A.    By a urine specimen.

3     Q.    I'm sorry.  Just let me go back for a

4   moment.  When you say injury can be a symptom of

5   hematuria, what do you mean by that?

6     A.    A kidney injury.

7           MR. RUPCICH:  I think what she said is

8           hematuria can be a symptom of kidney

9           injury.

10          THE WITNESS:  Mmm-hmm.

11          MR. WACKMAN:  Yes.  I think you're

12          correct.  I'll reask the question.

13   BY MR. WACKMAN:

14    Q.    When you say a urine specimen is the

15   method of diagnosing the cause of hematuria, what do

16   you mean by that?

17    A.    Visual, because it's going to show.  And

18   then you have dipstick, which is a chemical stick

19   which will show it if there's minute in the urine.

20    Q.    Are there any other ways that you're aware

21   of to diagnose hematuria?

22    A.    It goes to the laboratory.

23    Q.    What do you mean by, "It goes to the

24   laboratory"?

KATHY GALVIN                                    March 27, 2019

Page 24
```
 1     A.     All labs from Taylorville Correctional go

 2  to the University of Illinois to be ran.

 3     Q.     Do you know what tests they do there?

 4     A.     No, I do not.

 5     Q.     Okay.  Did your duties as a staff nurse at

 6  hematuria involve providing care for patients

 7  suffering from hematuria?

 8     A.     As Doctor had ordered.

 9            MR. RUPCICH:  Can you read that back?

10            That question ...

11            (The requested portion of the record was

12            read.)

13            MR. RUPCICH:  Did you mean "at

14            Taylorville"?

15            MR. WACKMAN:  Yes.  I'm sorry.

16            MR. RUPCICH:  Why don't you ask it again.

17  BY MR. WACKMAN:

18     Q.     Yes.  Did your duties at Taylorville as a

19  staff nurse involve providing care for patients

20  suffering from hematuria?

21     A.     Per doctor's orders.

22     Q.     Did your duties as a staff nurse at

23  Taylorville involve providing care for patients who

24  passed large blood clots in their urine?
```

KATHY GALVIN                                          March 27, 2019

Page 25

 1     A.     Per doctor's orders.

 2     Q.     Did your duties as a staff nurse at

 3  Taylorville involve providing care for patients with

 4  kidney stones?

 5     A.     As Doctor ordered.

 6     Q.     Did your duties at Taylorville as a staff

 7  nurse involve providing care for patients with

 8  kidney cancer?

 9     A.     As Doctor ordered.

10     Q.     Did your duties at Taylorville as a staff

11  nurse involve any tasks involved in referring

12  patients to outside specialists?

13     A.     No.  That was per Doctor.

14     Q.     And did your duties as a staff nurse at

15  Taylorville involve scheduling procedures such as CT

16  scans or surgeries?

17     A.     No.  Doctor ordered; Medical Records

18  Director scheduled.

19     Q.     Where were you employed before you were a

20  staff nurse at Taylorville?

21     A.     Memorial Hospital.

22     Q.     Memorial Hospital.  And do you remember

23  the years you were employed there?

24     A.     No, I don't.

KATHY GALVIN                                    March 27, 2019

Page 26

1     Q.    What was your title at Memorial Hospital?

2     A.    I was a cardiac nurse.

3     Q.    How many years approximately were you

4  employed?

5     A.    One.

6     Q.    One year?  And why did you leave?

7     A.    The employment in Taylorville.

8     Q.    Did you quit?

9     A.    Yes.

10    Q.    Were you fired?

11    A.    No.

12    Q.    What were your duties as a cardiac nurse

13  at Memorial Hospital?

14    A.    It was to supervise patients with cardiac

15  complaints.

16    Q.    Where did you work before Memorial

17  Hospital?

18    A.    I was not a nurse at that time.

19    Q.    What did do you?

20    A.    I worked at Sangamon Paper Company.

21    Q.    What did you do there?

22    A.    I was a machine operator.

23    Q.    Did you go to nursing school?

24    A.    Yes, I did.

KATHY GALVIN                                    March 27, 2019

Page 27

1     Q.     Where did you go to nursing school?

2     A.     Lincoln Land Community College.

3     Q.     And where is that?

4     A.     In Springfield.

5     Q.     When did you graduate from there?

6     A.     Either 2002 or 2003.

7     Q.     And did you learn medical terms and

8  terminology in school?

9     A.     Yes.

10           MR. RUPCICH:  Make sure you let him

11           finish.  You're getting a little quick.

12           THE WITNESS:  I know.

13  BY MR. WACKMAN:

14     Q.     Did you learn how to read medical charts

15  and medical records in nursing school?

16     A.     Yes.

17     Q.     Did you go to college separately from

18  nursing school?

19     A.     No.

20     Q.     Have you ever earned any other degrees

21  besides your nursing degree?

22     A.     No.

23     Q.     Are you currently a registered nurse?

24     A.     Yes.

Page 28

1    Q.    How long have you been a registered nurse?

2    A.    16 or 17 years.

3    Q.    And do you have a continuing education

4  requirement to keep your license current?

5    A.    Yes.

6    Q.    What is that requirement?

7    A.    It's 20 CEUs.

8    Q.    I'm sorry?

9    A.    Continued Education.  20 Continued

10  Education hours.

11    Q.    And how do you fulfill that?

12    A.    I -- The last time, I did it on line.

13    Q.    You take classes on line?

14    A.    You don't take classes.  They send you a

15  book, and you read the book, answer the questions,

16  and send it off.

17    Q.    How do you keep current on developments in

18  nursing?

19    A.    I have not since I left my employment.

20    Q.    Since you left Taylorville?

21    A.    Right.

22    Q.    While you were working at Taylorville as

23  Director of Nursing, how did you keep current on

24  developments in nursing?

Page 29

1    A.    Through my CEUs, and review certain cases.

2    Q.    If you had a question while you were

3  Director of Nursing at Taylorville, was there a

4  particular book or reference manual you would refer

5  to?

6    A.    No.

7    Q.    So let's switch over now to your job as

8  Director of Nursing.  You said you believe you

9  started that position in 2011; is that correct?

10   A.    Yes.

11   Q.    What days and hours did you work in that

12  position?

13   A.    I was on call 24 hours a day.  My original

14  hours were 8:00 a.m. to 4:00 p.m.

15   Q.    Did you have Saturdays and Sundays off?

16   A.    Yes.

17   Q.    How many people did you supervise as

18  Director of Nursing?

19   A.    20 or under.

20   Q.    Were they all nurses?

21   A.    No.

22   Q.    How many nurses did you supervise?

23   A.    15.

24   Q.    Who else did you supervise besides nurses?

KATHY GALVIN                                    March 27, 2019

Page 30

 1     A.     Medical Records Director, two staff

 2  assistants, a dental assistant, and a mental health

 3  assistant.

 4     Q.     You said you supervised the Medical

 5  Records Director.  Was that the person you just

 6  identified as being in charge of scheduling?

 7     A.     My supervision was as to attendance.

 8     Q.     Can you explain what you mean by that?

 9     A.     As Site Manager Director of Nursing,

10  Wexford has a set schedule on discipline as to when

11  people call off and use sick time, and the

12  discipline has to be given.

13     Q.     But your only function as the supervisor

14  of the Medical Records Director was as to when they

15  showed up to work?

16     A.     And ensure he did his job, yes.

17     Q.     So you also supervised the Medical Records

18  Director in their job performance?

19     A.     Correct.

20     Q.     Were there any aspects of the Medical

21  Records Director's job that you did not supervise?

22     A.     No.  I never had a problem.

23     Q.     Did the Medical Records Director have any

24  other supervisors?

KATHY GALVIN                                          March 27, 2019

```
 1      A.    We all have more supervisors, because

 2 there is a Regional Supervisor who was Shawn Cates.

 3      Q.    Did the Medical Records Director at

 4 Taylorville have any other immediate supervisors?

 5      A.    No.

 6      Q.    Who is Shawn Cates?

 7      A.    Shawn Cates was our Regional Supervisor.

 8      Q.    I'm sorry; is that Mr. or Ms. Cates?

 9      A.    Ms.

10      Q.    Did Ms. Cates have a more formal title?

11      A.    Yes.  She was Regional.

12      Q.    And who did Ms. Cates supervise, to your

13 knowledge?

14      A.    She had several sites.  She had

15 Taylorville.  I believe she had Vandalia, and

16 Decatur and Logan.

17      Q.    Did Ms. Cates supervise doctors?

18      A.    No.

19      Q.    Who did she supervise?

20      A.    She supervised all site managers.

21      Q.    Who else?

22      A.    She technically was over all of us.

23      Q.    What do you mean by "us"?

24      A.    The nurses, myself, staff assistants,
```

KATHY GALVIN                                    March 27, 2019

Page 32

1  Medical Director.

2      Q.    So just visualizing the chain of command,

3  you supervised the Medical Records Director, and Ms.

4  Cates supervised you?

5      A.    Yes.

6      Q.    Who evaluated you in your performance

7  reviews?

8      A.    Shawn Cates did.

9      Q.    And as Director of Nursing, what were your

10  job duties?

11      A.    I was to ensure that all Wexford policies

12  were followed, administrative and institutional

13  directives, and the supervision of staff.

14      Q.    How did you ensure that all Wexford

15  policies were followed?

16      A.    The Wexford policies come down to

17  institutional and administrative directives

18  governing the state for each one of us.

19      Q.    But how did you ensure that those policies

20  were followed?

21      A.    I reviewed charts to ensure documentation

22  was made.  I was QI Coordinator to report on all

23  functioning for the month of what had took place in

24  Healthcare.

KATHY GALVIN                                    March 27, 2019

Page 33

1    Q.    Were there any other ways you ensured all
2  Wexford policies were followed?
3    A.    No.
4    Q.    And you also said you supervised all
5  staff?
6    A.    Yes.
7    Q.    What do you mean by that?
8    A.    Supervision; I would assign duties and
9  review records as to whether notes were made and
10 audit the med room to ensure that the Med nurse was
11 signing off meds and that the control counts and
12 instrument counts were correct.
13   Q.    When you said "audit the med room to make
14 sure the Med Nurse was signing off meds," can you
15 explain what you mean?
16   A.    There's medical records.  They are called
17 Medical Administration Records, MAR, which has the
18 orders, the day of the month, and the times.  If
19 you're giving meds at 8:00 a.m., you need to have an
20 initial in there that you administered that
21 medication at 8:00 a.m.
22   Q.    And when you say "audit," how often did
23 you review these records?
24   A.    Every week.

KATHY GALVIN                                              March 27, 2019

Page 34

1     Q.     Every patient?

2     A.     Every patient.

3     Q.     So you reviewed the prescription records

4  for every patient every week?

5     A.     Correct.

6     Q.     And what were you looking for?

7     A.     That the medication had been administered

8  in a timely matter, that the MAR was signed by the

9  administering nurse, and the nurse's initials were

10  in the position.

11     Q.     And what would you do if any of those

12  things was deficient?

13     A.     I would talk with the nurse.

14     Q.     Was part of your audit ensuring that

15  medications which had been ordered were actually

16  being administered to the patients?

17     A.     Being administered in a timely manner.

18     Q.     How about was part of your audit ensuring

19  that prescriptions that had been written but not yet

20  approved were eventually approved?

21          MR. RUPCICH:  Object to the form; vague.

22          THE WITNESS:  No medication is

23          administered without a doctor's order.

24  BY MR. WACKMAN:

KATHY GALVIN                                        March 27, 2019

Page 35

1      Q.     What do you mean by "order" in terms of
2   medication?

3      A.     Doctor has to place an order before
4   medication can be administered.

5      Q.     So by "ordered," do you mean a
6   prescription?

7      A.     Yes.  There's prescriptions for all
8   medications.

9      Q.     How does that interact with the approval
10  process that Wexford goes through for certain
11  medications?

12     A.     I cannot tell you to -- what Wexford
13  approval is, because we had all medications as
14  written as administered.  I cannot state approval or
15  denial.  That is not my position.

16     Q.     How closely were you involved with
17  patients that came to sick call?

18     A.     I would see them in the front of
19  Healthcare.  They'd be sitting there.

20     Q.     Were part of your job duties to supervise
21  the sick call?

22     A.     Yes.

23     Q.     How often would you speak with individual
24  patients about their medical problems?

KATHY GALVIN                                                    March 27, 2019

Page 36

1    A.    If they asked me.  If they stopped and

2  asked me.

3    Q.    But not every patient?

4    A.    Never.

5    Q.    How often would you speak with the nurses

6  you supervised about individual patients?

7    A.    I cannot state that, because it would be

8  at varied times.  If a patient stopped me and asked

9  me a question, then I would talk to the nurse.

10    Q.    Were there any other circumstances under

11  which you would talk with a nurse about an

12  individual patient?

13    A.    No.

14    Q.    So only if a patient stopped and asked

15  you?

16    A.    Correct.

17    Q.    How about if a nurse had a question about

18  an individual patient?

19    A.    I'm not the attending nurse.  I'm not

20  working as a nurse.  I am Site Manager, Director of

21  Nursing, not patient care.

22    Q.    You said part of your duties were to

23  review the nurse's notes and charts; is that

24  correct?

KATHY GALVIN                                    March 27, 2019

Page 37

 1      A.      To ensure they were done in proper format,

 2    date, time, signature, with RN following their

 3    signature.

 4      Q.      What do you mean by "proper format"?

 5      A.      Proper format is we document in what is

 6    called SOAP:  Subjective, objective, assessment, and

 7    plan.

 8      Q.      Can you explain more about that?

 9      A.      That is the type of charting that we do.

10    I would have to ensure that it was followed

11    correctly and not just a sentence put in the chart.

12    The format had to be followed.

13      Q.      How often did you review the notes?

14      A.      I reviewed notes every day sporadically.

15    It may be in the infirmary, a note.  It may be a lab

16    note where they had -- I had to ensure that the lab

17    stamp was there, date, time, and what was drawn, and

18    a signature.

19      Q.      Did you review every note?

20      A.      No.

21      Q.      How did you choose which notes to review?

22      A.      If it was in the infirmary, I did an audit

23    every week to ensure that documentation was done.  I

24    would pull the -- I would pull the labs -- the

KATHY GALVIN                                    March 27, 2019

Page 38

1  records, because the charts hadn't been filed yet,
2  and before the files were filed away, I would review
3  them to ensure there was a stamp and procedure
4  followed.
5      Q.    How often would you audit the sick call
6  notes?
7      A.    That, again, was as needed.  I reviewed
8  charts all day -- it wasn't just infirmary, lab,
9  sick call -- to ensure that the proper format was
10 being done.
11     Q.    But how did you choose which notes to look
12 at?
13     A.    Just pulled the chart and looked at the
14 last entries.
15     Q.    For every patient?
16     A.    No.
17     Q.    How did you choose which patients to
18 review?
19     A.    If there was 15 charts there, I may pull
20 three.  I may pull five.
21     Q.    Was it totally random?
22     A.    It was totally random.
23     Q.    Were you more likely to review notes from
24 patients with more serious medical conditions?

KATHY GALVIN                                      March 27, 2019

Page 39

1      A.    No.

2      Q.    As Director of Nursing, did you work with

3  a Dr. Nawoor?

4      A.    Yes.

5      Q.    And during approximately what time period

6  did you work with Dr. Nawoor?

7      A.    I'm going approximate.  I believe Dr.

8  Nawoor came on staff December of '16.

9      Q.    Could it have been December of 2015?

10     A.    It could be.  I'm not exact.

11     Q.    To your knowledge, before starting at

12  Taylorville, had Dr. Nawoor ever worked in a

13  correctional facility?

14     A.    I knew that he had not.

15     Q.    And did you spend time helping Dr. Nawoor

16  become familiar with the healthcare procedures in a

17  correctional facility?

18     A.    Would you rephrase that, please?

19     Q.    Did you help Dr. Nawoor become familiar

20  with the procedures at Taylorville Correctional

21  Center?

22     A.    I helped Doctor, not with procedures; with

23  following the administrative and institutional

24  directives.

KATHY GALVIN                                    March 27, 2019

Page 40

1    Q.    How much time do you think you spent --

2    A.    I was with him every day.  Anytime he had

3  a question.

4    Q.    Were you with him all day?

5    A.    No.  I was in the building all day.

6    Q.    Did Dr. Nawoor have a lot of questions?

7    A.    At first, we all do in Corrections.

8    Q.    So Dr. Nawoor did have a lot of questions?

9    A.    As -- For policy and procedure, yes.

10   Q.    Do you think Dr. Nawoor had trouble

11 learning the policies and procedures at Taylorville

12 Correctional Center?

13   A.    I think he had trouble as to institutional

14 requirements.

15   Q.    What do you mean by "institutional

16 requirements"?

17   A.    Do not leave your keys in the door.  We

18 had -- With it being a correctional facility, we had

19 policies and procedures of certain things we could

20 bring in, could not bring in, things like that that

21 was security.

22   Q.    Do you mean anything -- When you reference

23 institutional requirements, do you mean anything

24 besides security policies?

Page 41

```
 1      A.    No.

 2      Q.    Did you find yourself frequently reminding

 3 Dr. Nawoor of the institutional requirements?

 4      A.    As I stated, there's a learning curve to

 5 security for all involved.

 6      Q.    So, yes, you did find yourself frequently

 7 reminding him of the institutional requirements?

 8      A.    I would have to remind him.

 9      Q.    How frequently, would you say?

10      A.    It determined -- At the beginning of his

11 tenure or at the end?

12      Q.    How about at the beginning?

13      A.    At the beginning, it's a learning curve.

14      Q.    Did you ever speak with Dr. Nawoor about

15 specific patients?

16      A.    I have.  If I was stopped by a patient and

17 he would tell me, "Doctor said this, this, and

18 this," and I would go in, because if it was a

19 medication that needed to be administered, I'd go in

20 and ask the doctor, and the patient would have to

21 wait until the order was signed off.

22      Q.    How often do you think you spoke with Dr.

23 Nawoor about specific patients?

24      A.    Occasionally.
```

KATHY GALVIN                                    March 27, 2019

Page 42

1      Q.    What's occasionally?

2      A.    Well, occasionally can be one today, none

3   today, one this week, none this week.

4      Q.    Were the only circumstances under which

5   you would speak with Dr. Nawoor about specific

6   patients if the patient approached you?

7      A.    If he approached me, because I was stopped

8   daily.

9      Q.    Have you ever disagreed with Dr. Nawoor

10   about the diagnosis for a patient?

11      A.    I am not a diagnosing entity.  I am an RN.

12   I follow all doctor's orders.

13      Q.    So that wasn't my question.  My question

14   was have you ever disagreed with Dr. Nawoor about

15   the diagnosis for a patient?

16      A.    I am not a diagnosing entity.  I am not a

17   doctor.  I am an RN.

18      Q.    So is that a "no"?

19      A.    That's a "no."

20      Q.    Okay.  Have you ever disagreed with Dr.

21   Nawoor about the treatment for a patient?

22      A.    No.

23      Q.    What did you think of Dr. Nawoor as a

24   physician?

KATHY GALVIN                                    March 27, 2019

Page 43

```
 1            MR. RUPCICH:  Object to the form and
 2            vague.
 3            MS. BOYLE:  I'll join.
 4            THE WITNESS:  It was not my place to judge
 5            Dr. Nawoor.  It was Dr. Matticks, who was
 6            his superior.
 7   BY MR. WACKMAN:
 8       Q.    You said that one of your duties as
 9   Director of Nursing was being the Quality
10   Improvement Coordinator?
11       A.    Yes.
12       Q.    What do you mean by Quality Improvement
13   Coordinator?
14       A.    I believe you have copies of them.  They
15   are a set format.  You report all sick calls, all
16   hospital patients out, all deaths, how many
17   medications you administer.  You go through pharmacy
18   audits.
19       Q.    What do you mean by "them"?
20       A.    Excuse me?
21       Q.    You said, "I believe you have" --
22       A.    You have copies of the QI reports.  And if
23   you look at them, they are set in set format
24   according to state protocol, and you answer each and
```

KATHY GALVIN                                    March 27, 2019

Page 44
1  every question.  You enter every patient that was

2  out.  Hopefully, you had no deaths, but you reported

3  it there.  Any fights, injuries, self-inflictions of

4  injury.

5      Q.    Is there a Quality Improvement Committee?

6      A.    Yes.  And they're listed at the top of

7  that form.

8      Q.    What is the purpose of the Quality

9  Improvement Committee?

10     A.    Quality Improvement is to ensure that the

11 Healthcare is running proper and that all -- how I

12 do want to say -- that it's functioning correctly.

13     Q.    How often does that committee meet?

14     A.    Once a month.

15     Q.    And you were on that committee; correct?

16     A.    Yes.

17     Q.    And your job on that committee was the

18 Quality Improvement Coordinator?

19     A.    Yes.

20           (Galvin Deposition Exhibit No. 1, 15-page

21           Memorandum dated January 20, 2016, Bates

22           stamped IDOC No. 001217 through 001231,

23           was marked for identification.)

24 BY MR. WACKMAN:

KATHY GALVIN                                    March 27, 2019

Page 45

1      Q.     For the record, this is a multi-page

2   document Bates stamped at the bottom IDOC No.

3   001217, and it runs to IDOC No. 001231.

4             Do you see -- I'm going to direct your

5   attention to the top, where it says, "From:  Quality

6   Improvement Coordinator."  Do you see that, Ms.

7   Galvin?

8      A.     Yes.

9      Q.     And that would have been you at this time,

10  January 20th, 2016?

11     A.     I believe I was then.

12     Q.     So did you prepare this particular

13  document?

14     A.     Yes.

15     Q.     And, again, just for the record, this

16  document is a Memorandum on Illinois Department of

17  Corrections letterhead.  It is dated January 20th,

18  2016.  It is entitled "January 20th, 2016 QI Meeting

19  Agenda."

20             And, Ms. Galvin, I assume that the QI

21  there refers to Quality Improvement?

22     A.     Yes.

23     Q.     And so this is what you were speaking

24  about when you said your job as Quality Improvement

KATHY GALVIN                                    March 27, 2019

Page 46

1  Coordinator was to prepare?

2      A.    Yes.

3      Q.    Did you have any other jobs as Quality

4  Improvement Coordinator?

5      A.    No.

6      Q.    Are these the only records of the Quality

7  Improvement meetings?

8      A.    Yes.

9      Q.    Was this prepared after a meeting had

10  occurred?

11      A.    No.  Prior to.

12      Q.    So this was an agenda for the meeting?

13      A.    Yes.

14      Q.    Were there minutes of the meetings?

15      A.    Yes.

16      Q.    They are separate from this?

17      A.    Yes.

18      Q.    Did you take notes at the committee

19  meetings?

20      A.    No, I did not.

21      Q.    Who did take notes at the committee

22  meetings?

23      A.    Medical Records Director Chad Chester did

24  if he was present.

KATHY GALVIN                                    March 27, 2019

Page 47

1      Q.      When did you stop working at Wexford?

2      A.      June 13th, 2018.

3      Q.      Why did you stop working there?

4      A.      As I stated, it was financial.

5      Q.      What do you mean by, "It was financial"?

6      A.      I had put in my intent to retire for

7   June 26th, I believe is the date.  It may have been

8   the 29th.  At that time, I had personal time off

9   that I had not taken.  I requested those days and

10  was told I could not take them since I was handing

11  in my resignation.

12          I then received a telephone call informing

13  me that since I had taken -- I was going to leave in

14  September of '17, and they gave me a bonus to stay

15  on, which I did not ask for.  And the telephone call

16  on June 13th was to inform me that since it had not

17  been a year from the bonus that they would be taking

18  my two-week paycheck, my PTO time, and any earned

19  time to my resignation date.

20          Mentally, I was able to figure it up, and

21  it well exceeded the sign-on bonus, so I left.  I

22  handed in my badge and left.

23     Q.      After that phone call?

24     A.      Yes.

KATHY GALVIN                                      March 27, 2019

Page 48

```
 1     Q.     Immediately after that phone call?

 2     A.     No.  I went out to smoke and calm down.

 3     Q.     And did you have any further contact with

 4 Wexford after you left on June 13th?

 5     A.     No.

 6            That's a lie.  I did contact them as to my

 7 401(k).

 8     Q.     Did Wexford end up actually taking that

 9 two-week check and all your PTO and all that?

10     A.     Plus a check I paid them for $434.

11     Q.     Was that to make it on the remainder of

12 the bonus?

13     A.     Mmm-hmm.

14     Q.     We will set aside that prior exhibit.  We

15 may return to it.

16            (Galvin Deposition Exhibit No. 2, 43-page

17            document entitled Answer to Plaintiff's

18            Second Amended Complaint with Affirmative

19            Defenses, was marked for identification.)

20 BY MR. WACKMAN:

21     Q.     I will have the court reporter hand you

22 the exhibit which has been marked as Exhibit 2.

23            So for the record, this is the Answer on

24 behalf of the Wexford Defendants, Dr. Nawoor, Ms.
```

KATHY GALVIN                                    March 27, 2019

Page 49
1  Galvin, Dr. Einwohner, Wexford Health Sources, Inc.,

2  to Mr. Dean's Second Amended Complaint in this case.

3           Ms. Galvin, have you ever seen this

4  document before?

5      A.   Yes.

6      Q.   When?

7      A.   Prior to our meeting.

8      Q.   Today, you mean?  Prior to the meeting?

9      A.   Yes.

10     Q.   And do you basically understand how to

11  read this document?

12     A.   Yes.

13     Q.   So you understand that the parts that

14  appear in bold and are referenced Response are the

15  response written by your attorneys and what's

16  immediately above it is the allegations that Mr.

17  Dean has made?

18     A.   Yes.

19     Q.   Okay.  I will direct your attention to

20  Paragraph 10.  It appears on Page 5 and actually

21  goes on to Page 6.

22           And the last sentence on Page 5 reads,

23  "Defendants deny Kathy Galvin is currently employed

24  by Wexford Health Sources, Inc.,"  and then on

KATHY GALVIN                                    March 27, 2019

Page 50

1  Page 6, says, "and affirmatively state she has

2  retired."

3      A.    Yes.

4      Q.    Do you consider the circumstances under

5  which you left Wexford as retirement?

6      A.    Yes.

7      Q.    Okay.  We're going to come back to this,

8  but you can set it aside for now.

9          Now, might not be a bad time for

10 10 minutes.  I'll take a look at the employment file

11 and see if there's anything I want to talk about in

12 there since I'm about to transition off.  So why

13 don't we go off the record.

14     A.    Ten minutes?

15     Q.    Ten, fifteen.

16         (Whereupon at this point in the

17         proceedings, a recess was held from 9:57

18         a.m. to 10:07 a.m., after which the

19         following proceedings were conducted:)

20 BY MR. WACKMAN:

21     Q.    We are back on the record.  On the break,

22 I just paged through the employee file, and I just

23 wanted to ask you about a couple of pieces of it,

24 Ms. Galvin, real briefly.  So I'm going to hand the

KATHY GALVIN                                      March 27, 2019

Page 51
1  court reporter in a moment what will be marked as

2  Exhibit 3.  And I apologize.  I don't have copies

3  for everybody, but I'll try to explain what we're

4  looking at.

5          This is a Performance Appraisal Form --

6  This is a multi-page document.  It doesn't have a

7  Bates stamp -- for Kathy Galvin.  The evaluation

8  period listed is 9-1-2015 to 9-1-2016.  In total, it

9  is five pages long.  I will have the court reporter

10  mark it as Exhibit 3.

11          (Galvin Deposition Exhibit No. 3,

12          five-page Performance Appraisal Form for

13          Kathy Galvin, evaluation period 9/1/15 to

14          9/1/16, was marked for identification.)

15  BY MR. WACKMAN:

16      Q.    Ms. Galvin, I will direct your attention

17  to Page 2.  I will direct your attention to the

18  bottom to Financial Responsibility.  And am I

19  correct that this is you being evaluated on how

20  effectively you managed control of the expenses at

21  Taylorville?

22      A.    Yes.

23      Q.    And you wrote, "Always trying to maintain

24  a budget of supplies and labor."

KATHY GALVIN                                    March 27, 2019

Page 52

1    A.    Correct.

2    Q.    So can you tell me just about your duties

3 in terms of maintaining a budget of supplies and

4 labor?

5    A.    That is ordering of required equipment,

6 all medical materials needed, such as bandages,

7 gauze.  When it comes to staffing, it's the

8 overtime.

9    Q.    And how would you manage that budget?

10    A.    Everybody has a set budget.  And I always

11 ordered everything that was needed.  It does not

12 reflect medications.  It is, such as I said, gauze,

13 Band-Aids, equipment.

14    Q.    When you said it doesn't reflect

15 medications, do those go on a different budget?

16    A.    I don't even believe they are budgeted.

17 They may be, but not to my awareness.

18    Q.    How would you manage the budget around

19 overtime?

20    A.    Overtime -- Taylorville was staffed --

21 When I told you 10 nurses, I got the staffing

22 changed to where I had 11 nurses.  Staffing is --

23 there is a set requirement.  Day shift is to have

24 three nurses.  Second shift is to have two nurses.

KATHY GALVIN                                    March 27, 2019

Page 53

1  And I got it changed to third shift had two nurses.

2  That was the requirement.  That was the

3  institutional requirement.  I carried four nurses on

4  days, three on second, and two on thirds.

5      Q.    When you say that was the institutional

6  requirement, do you mean that was the Wexford

7  staffing policy?

8      A.    No.  That's per the state.

9      Q.    So a policy from the Illinois Department

10 of Corrections?

11     A.    Yes.

12     Q.    If I refer to the Illinois Department of

13 Corrections as IDOC, do you understand what I mean?

14     A.    Yes.

15     Q.    Why did you carry more nurses than the

16 IDOC policy?

17         MS. BOYLE:  Objection to foundation.

18         THE WITNESS:  We had standard staffing,

19         and that's what I adhered to.

20         When I came in, we were four, three, and

21         one.  As I stated, I got it changed to

22         four, three, and two.

23 BY MR. WACKMAN:

24     Q.    What were the consequences if you were

KATHY GALVIN                                    March 27, 2019

Page 54

1  over budget?

2      A.    I never had no consequences.

3      Q.    Do you have any knowledge about what the

4  consequences could have been if you were over

5  budget?

6      A.    No, I do not.

7      Q.    I think you can set that aside, Ms.

8  Galvin.

9            So in a moment, I'm going to ask the court

10 reporter to mark your evaluation from the year

11 previous.  It's also a multi-page document, five

12 pages in total.  Your name appears at the top.

13 Evaluation period is 9-1-2014 to 9-1-2015.  This

14 will be Exhibit 4.  It also carries no Bates stamp.

15            (Galvin Deposition Exhibit No. 4,

16            five-page Performance Appraisal Form for

17            Kathy Galvin, evaluation period 9/1/14 to

18            9/1/15, was marked for identification.)

19 BY MR. WACKMAN:

20     Q.    And, here, I just want to look at the

21 first page, Ms. Galvin, under the heading Quality of

22 Work.  Your supporting comments are, "I perform all

23 duties required and asked of me by corporate and the

24 wardens of the institution to the best of my

KATHY GALVIN                                    March 27, 2019

Page 55

1  ability."

2          I just want to know who you mean by

3  "corporate."

4      A.    Corporate is Wexford.

5      Q.    Okay.  Who specifically are you referring

6  to there?

7      A.    I had to answer to my Regional, Shawn

8  Cates.

9      Q.    Anybody else?

10     A.    No.  Shawn Cates managed the site.

11     Q.    So when you say "corporate" in that

12 document, the person you mean is Shawn Cates?

13     A.    She is representing the corporate.

14     Q.    And what sort of duties would she require

15 and/or ask of you?

16     A.    There was multiple as being a DON and a

17 Site Manager.  That came into staffing, discipline,

18 ordering of materials.

19     Q.    Besides the duties we've already covered

20 as Director of Nursing, were there any other duties

21 that Ms. Cates required of you?

22     A.    No.  Just to ensure the site ran properly.

23     Q.    And what sort of duties would the wardens

24 of the institution require of you?

Page 56

 1            MS. BOYLE:  I'll object to foundation.

 2            THE WITNESS:  We are -- Corrections have

 3            an annual audit.  That annual audit is one

 4            reason why I would be looking at charts

 5            for date, time, signatures, because if we

 6            had a finding and a nurse was not signing

 7            RN, I would be told to ensure that the

 8            nurses were signing RN or date and time.

 9  BY MR. WACKMAN:

10     Q.    Were you ever disciplined during your time

11  working for Wexford?

12     A.    No.

13     Q.    I think you can set that document aside,

14  Ms. Galvin.

15            So I'd like to pivot now and talk just

16  generally about how people receive medical care in

17  Taylorville based on your knowledge and experience

18  as Director of Nursing of the staff that's there.

19            So if a patient has hematuria, how do they

20  receive care?

21     A.    It would be per doctor's order.  As the

22  urine was checked, dipstick done, sent to UIC, if

23  the dipstick had irregularities, you would inform

24  Doctor.  If it showed visibly hematuria, you would

KATHY GALVIN                                    March 27, 2019

Page 57
1   show Doctor.

2       Q.    So I want to take a step back actually and

3   ask if a patient has blood in their urine visibly,

4   how do they get care?  Who do they talk to first or

5   what do they do?

6             MR. RUPCICH:  Do you mean if the patient

7             sees it themself?

8             MR. WACKMAN:  Exactly.

9             MR. RUPCICH:  Okay.

10            THE WITNESS:  At that time, there's two

11            ways.  The housing unit would call and

12            say, "This patient has a problem."  "Send

13            him over."

14            If they don't have the officer call and

15            they report to nurse sick call, at that

16            time, a nurse sick call is done and

17            referred to Doctor.

18  BY MR. WACKMAN:

19      Q.    Would a patient complaining of hematuria

20  always see a doctor?

21      A.    Yes.

22      Q.    And as Director of Nursing, what was your

23  role in that process?

24      A.    Here again, I'm going to reply to the ADs

KATHY GALVIN                                    March 27, 2019

Page 58

1    and IDs.  If a patient went to nurse sick call, we

2    are required that if he is referred to Doctor, he is

3    seen in 72 hours or the next working day.  And the

4    reason for the 72 hours, if it occurred on Friday

5    night sick call, the doctor would not be present

6    until 7:30 Monday; therefore, he would be referred

7    the next working day.

8              If it occurred let's say a Thursday night,

9    he would be put on Doctor's Line for Friday.

10     Q.     Just to be clear, when you say ADs and

11   IDs, can you tell me what you mean?

12     A.     Administrative directives and

13   institutional directives.

14     Q.     So did you have any duties in that process

15   of a patient reporting to sick call and then being

16   referred to a doctor?

17     A.     No, I did not.  I was not the attending

18   nurse.

19     Q.     But you were the supervisor of the

20   attending nurse?

21     A.     I was not an attending nurse.  I did not

22   work in a nurse capacity.

23     Q.     But you were that nurse's supervisor;

24   correct?

KATHY GALVIN                                    March 27, 2019

Page 59

1      A.    Correct.

2      Q.    In your experience, how common is it for

3  patients at Taylorville to complain of hematuria?

4  How many cases did you see?

5            MR. RUPCICH:  Object to foundation.

6            THE WITNESS:  I know of some.  Kidney

7            stones.  People that were having kidney

8            stones that were transitioning down.

9  BY MR. WACKMAN:

10     Q.    So some cases, but you don't know how

11 frequent?

12     A.    No, I do not.

13     Q.    And if a patient complains of hematuria at

14 Taylorville, are you aware of what kind of

15 diagnostic tests are done?

16     A.    I am not an ordering entity.  The doctor

17 is the ordering entity.

18     Q.    You referred to a dipstick earlier.

19     A.    Yes.

20     Q.    Can you explain what you mean by that?

21     A.    A dipstick is the chemically -- urinalysis

22 stick.  And it'll tell you if you have blood in your

23 urine, how much protein, if you're spilling protein

24 and that.

KATHY GALVIN                                    March 27, 2019

Page 60

```
 1      Q.    Is that always the first -- In your
 2  knowledge and experience, is that always the first
 3  test done when a patient complains of hematuria at
 4  Taylorville?
 5      A.    If the blood is not visual, yes.
 6      Q.    And if the blood is visual?
 7      A.    Then it would be shown to the doctor.
 8      Q.    Do you have knowledge of how common it is
 9  for patients to receive an ultrasound when they
10  complain of hematuria at Taylorville?
11      A.    No, I do not.
12      Q.    Do you have knowledge of how common it is
13  for patients to receive a cystoscopy when they
14  complain of hematuria at Taylorville?
15      A.    No, I do not.
16      Q.    And do you have knowledge of how common it
17  is for patients to receive a CT scan when they --
18      A.    No.  All of those procedures are to be
19  ordered by the doctor.
20      Q.    Based on your knowledge and experience at
21  Taylorville, if a patient needed an ultrasound at
22  Taylorville, do you know how or are you familiar
23  with how the scheduling for that would work?
24      A.    You must -- It would be my Medical Records
```

KATHY GALVIN                                    March 27, 2019

Page 61

1  Director that scheduled.  And they would call the

2  facilities that would perform the tests and schedule

3  them.

4          Now, the Medical Director did not

5  schedule.  He called to have it scheduled.  And we

6  went by the institution's availability.

7      Q.    Are you familiar with a process referred

8  to as "collegial review"?

9      A.    Yes, I am.

10     Q.    What is collegial review?

11     A.    Collegial review is where the doctor

12 presents to a board of doctors what he is requesting

13 to be done.

14     Q.    And do you know what purpose collegial

15 review serves?

16     A.    No, I do not.

17     Q.    Generally, do you know what sorts of

18 procedures or tests it's required for?

19     A.    There's multiple.  It depends on the

20 patient's condition.

21     Q.    If collegial review is required for a

22 procedure, does the scheduling of that procedure

23 need to wait for the results of the collegial review

24 process?

KATHY GALVIN                                    March 27, 2019

Page 62

     1      A.     It depends on the severity.

     2      Q.     Okay.  Can you explain that?

     3      A.     If it's an emergent, the patient goes out

     4   to the hospital.

     5      Q.     If it's non-emergent, does the scheduling

     6   need to wait on the results of the collegial review

     7   process?

     8      A.     Yes.

     9      Q.     Who decides if it's emergent or

    10   non-emergent?

    11      A.     The doctor decides.

    12      Q.     That's entirely up to the doctor's

    13   discretion?

    14      A.     Yes.

    15      Q.     Is there any Wexford policy you're aware

    16   of on that matter?

    17      A.     No.  I do not know of none.

    18      Q.     Is there any IDOC policy that you're aware

    19   of that classifies procedures or conditions as

    20   emergent or non-emergent?

    21      A.     No, I do not.

    22      Q.     Are you aware if a renal ultrasound is a

    23   procedure the scheduling of which needs to wait on

    24   collegial review?

KATHY GALVIN                                    March 27, 2019

Page 63

 1      A.      It depends whether it's emergent or

 2  non-emergent.

 3      Q.      During your time at Taylorville, if a

 4  patient needed a cystoscopy, how would the

 5  scheduling for that work?

 6      A.      The doctor would schedule.  The doctor

 7  orders and requests scheduling.

 8      Q.      Okay.  So the doctor would order the

 9  cystoscopy?

10      A.      Yes.

11      Q.      Would the Medical Records Director then

12  schedule it?

13      A.      Yes.

14      Q.      And how would the Medical Records Director

15  do that?

16      A.      By calling the institutions that perform

17  the testing.

18      Q.      Is a cystoscopy the type of procedure for

19  which scheduling would need to wait on collegial

20  review?

21      A.      Depends on whether it's emergent or

22  non-emergent.

23      Q.      If a patient needed a CT scan, how would

24  the scheduling work for that, based on your

Page 64

1  experience as the Director of Nursing at

2  Taylorville?

3      A.    CT scans, you call the institution for

4  scheduling after approval.

5      Q.    You say "after approval."  What sort of

6  approval do you need?

7      A.    If it's non-emergent, it goes before

8  collegial.  And upon receiving approval from

9  collegial, then you call the institutions and

10  schedule.

11      Q.    And I'm sorry, Ms. Galvin.  Who do you

12  mean by "you" there?

13      A.    It would be the Medical Records Director

14  that would schedule.

15      Q.    Generally, when the Medical Records

16  Director is calling to schedule, do they call

17  multiple institutions to schedule, or is there sort

18  of a first choice?

19      A.    It depends on the availability.  Some can

20  be done at Taylorville.  Most are done in

21  Springfield.

22      Q.    How does the Medical Records Director

23  decide which institution to call for scheduling

24  purposes?

KATHY GALVIN                                    March 27, 2019

Page 65
1      A.      We would call -- He would call Taylorville
2   for the availability if they have the equipment and
3   the ability to perform the test.  If not, then we
4   would call Springfield.
5      Q.      When you refer to "Taylorville," what do
6   you mean?
7      A.      Taylorville Memorial Hospital.
8      Q.      And when you refer to "Springfield," what
9   do you mean?
10     A.      It would be Taylorville Memorial Hospital.
11     Q.      In Springfield?
12     A.      Yes.  Springfield Memorial.  I said
13  "Taylorville."
14             MR. RUPCICH:  Clarify that, would you?
15  BY MR. WACKMAN:
16     Q.      Not being local, I didn't catch that.
17             Were there times where an appointment was
18  not available at Taylorville within a reasonable
19  amount of time?
20             MR. RUPCICH:  Object to vague and
21             foundation.
22             MS. BOYLE:  I'll join.
23             THE WITNESS:  Not that I'm aware of.  But
24             had that happened, then it would be at

KATHY GALVIN                                          March 27, 2019

Page 66

1           Springfield Memorial.

2  BY MR. WACKMAN:

3     Q.    Based on your knowledge and experience as

4  Director of Nursing, who would make the decision

5  that an appointment was not available within a

6  reasonable amount of time?

7     A.    I don't know who would determine

8  reasonable amount of time, because there's no

9  definition of reasonable amount of time.

10    Q.    Is that the sort of decision you would

11  expect the doctor to make?

12    A.    Doctor is the ordering entity.  He is

13  primary caregiver.

14    Q.    Would the Medical Records Director be

15  responsible for communicating with the doctor about

16  when an appointment was scheduled?

17    A.    Yes.

18    Q.    But you can never remember an instance

19  where an appointment was determined to be not within

20  a reasonable amount of time?

21    A.    There is no determination on a reasonable

22  amount of time.

23    Q.    You can never remember an instance, based

24  on your experience as Director of Nursing, where the

KATHY GALVIN                                    March 27, 2019

Page 67

1  Medical Records Director declined to schedule an

2  appointment because it was too far out from the date

3  on which he was calling?

4      A.    No.

5      Q.    If a patient's appointment for a CT scan

6  needed to be moved to an earlier date for medical

7  need, how would the scheduling for that work?

8      A.    That would determine at the availability

9  of the performing institution.

10      Q.    If the performing institution did not have

11  the availability, what would happen?

12      A.    It would depend on whether it was emergent

13  or non-emergent.

14      Q.    What would happen if it were emergent?

15      A.    If it was emergent, the patient would go

16  to the ER.

17      Q.    And if it were non-emergent?

18      A.    Then we would have to wait for

19  availability.

20      Q.    At the original performing institution?

21      A.    At any, whether it be Taylorville

22  Memorial, Springfield Memorial, St. John's.  I

23  believe some had been done at Decatur Memorial.

24      Q.    So the Medical Records Director would be

KATHY GALVIN                                    March 27, 2019

Page 68

1  responsible for assessing availability at multiple

2  institutions?

3      A.    Yes.

4      Q.    Would the same process that you just

5  described for a CT scan be the process for a

6  cystoscopy if a cystoscopy needed to be moved to an

7  early date for medical need?

8      A.    That would be on the determination of the

9  ordering doctor, which would be a urologist, and it

10 would be to his determination as to how soon it

11 needs to be done.

12     Q.    So let's turn this now to Mr. Dean, the

13 Plaintiff in this lawsuit.  Do you know the

14 Plaintiff in this lawsuit, William Dean?

15     A.    Yes, I do.

16     Q.    And when did you first meet him?

17     A.    Upon his incarceration.  I'm not precise.

18 Approximately five years.

19     Q.    And when did you first learn about Mr.

20 Dean suffering from hematuria in December of 2015?

21     A.    I don't know exactly.  I know there is a

22 reference in there that a nurse showed me his urine.

23 There again, I'm not an ordering entity.  I'm not

24 the attending nurse.  Show it to the doctor.  Inform

March 27, 2019

Page 69
1   the doctor.

2      Q.    Do you think you first learned about Mr.

3   Dean suffering from hematuria in or around December

4   of 2015?

5      A.    I have no knowledge.

6      Q.    Do you recall what you first learned about

7   Mr. Dean suffering from hematuria?

8      A.    No, I do not.

9      Q.    Do you recall ever discussing Mr. Dean's

10  hematuria with anyone?

11     A.    No.  As I said, "Show it to the doctor."

12  If I was showed that urine, "Show it to the doctor."

13     Q.    So is it correct that you do not recall

14  ever discussing Mr. Dean's hematuria with anyone?

15     A.    Correct.

16     Q.    Do you recall ever speaking with Mr. Dean

17  about his hematuria?

18     A.    Not specifically about hematuria.  I have

19  spoke with Mr. Dean many a time.

20     Q.    Do you recall what treatments or

21  diagnostic tests Mr. Dean received for his

22  hematuria?

23     A.    No, I do not.

24     Q.    In your experience at Taylorville, was it

KATHY GALVIN                                        March 27, 2019

Page 70

1   typical that a patient complaining of hematuria was

2   not scheduled for an immediate ultrasound?

3              MR. RUPCICH:  Object to vague and

4              foundation.

5              MS. BOYLE:  I'll join.

6              THE WITNESS:  I cannot answer that.  Once

7              again, it's up to the attending doctor to

8              make that order.

9   BY MR. WACKMAN:

10      Q.    I'm just asking for your experience, Ms.

11   Galvin.

12      A.    Sir, we take care of 1,200 offenders that

13   rotate continuously with intake.  You cannot

14   remembering every offender.

15      Q.    In your experience, is it typical that a

16   patient complaining of hematuria not be scheduled

17   for an immediate CT scan?

18              MR. RUPCICH:  Object to the foundation --

19              THE WITNESS:  That is -- I have no

20              knowledge of it, sir.

21   BY MR. WACKMAN:

22      Q.    In your experience, is it typical that a

23   patient complaining of hematuria not be scheduled

24   for an immediate cystoscopy?

KATHY GALVIN                                    March 27, 2019

Page 71

 1          MR. RUPCICH:  Object to the form, vague,

 2          and lack of foundation.

 3          THE WITNESS:  Again, it's up to the

 4          ordering doctor.

 5          (Galvin Deposition Exhibit No. 5, two-page

 6          document entitled Offender Outpatient

 7          Progress Notes dated 12/23/15, Bates

 8          stamped IDOC Taylorville Med Recs 001340

 9          and 001341, was marked for

10          identification.)

11   BY MR. WACKMAN:

12      Q.    I'm going to I have the court reporter

13   hand you what has been marked as Exhibit 5.  This is

14   actually a multiple-page document Bates stamped IDOC

15   Taylorville Med Recs 001340 through 001341.  And I

16   actually want to focus on the second page, which is

17   1341, and ask if you are familiar with this type of

18   form.

19      A.    Yes.  It's a nurse sick call protocol.

20      Q.    And can you tell me what this form is used

21   for?

22      A.    This is used for nurse sick call.

23      Q.    Under what circumstances?

24      A.    Nurse sick call is open at 5:45 and

KATHY GALVIN                                    March 27, 2019

Page 72

1   7:00 -- 5:45 a.m., 7:00 p.m.  Open sick call for

2   everyone -- anyone that has a complaint to come to.

3       Q.    Do you see at the top where this form says

4   "Urinary Tract Infection"?

5       A.    Yes.

6       Q.    So I take it that this form is not filled

7   out for every person who shows up to nurse sick

8   call; is that correct?

9       A.    No.  There is many protocols.

10      Q.    So there are many versions of this form

11  for different complaints?

12      A.    Conditions, yes.

13      Q.    Under what circumstances is this version

14  of this form filled out?

15      A.    Because this is a urinary problem.

16      Q.    If a patient came to nurse sick call

17  complaining of blood in their urine, would this form

18  always be filled out?

19      A.    Yes.

20      Q.    Would any other forms always be filled

21  out?

22      A.    The only -- No other forms.  It would be a

23  SOAP note, as I testified prior to that, where the

24  nurse would have to place what the subject is

KATHY GALVIN                                    March 27, 2019

Page 73
1  stating, what the objective is, what her assessment

2  is, and what her plan is.

3      Q.    If you look at the first page of this,

4  which is 1340, is that a SOAP note, an example of a

5  SOAP note?

6      A.    That is Doctor's note.  And, as you see,

7  there's the S, the O, the A, and the P.

8      Q.    When a patient shows up to sick call

9  complaining of a urinary problem, does this form

10  take, the second page, 1341, does this form take the

11  place of a SOAP note?

12     A.    Yes.

13     Q.    You previously testified that one of your

14  jobs is to review nurse's notes?

15     A.    Yes.

16     Q.    So this would be the type of note you

17  would have reviewed for compliance with --

18     A.    Yes.

19     Q.    -- policies; isn't that correct?

20     A.    Yes.

21           MR. RUPCICH:  Make sure you let him

22           finish.  You're getting a little quick

23           again.

24  BY MR. WACKMAN:

KATHY GALVIN                                    March 27, 2019

Page 74

1      Q.      Eager to get out of here.

2              Is there any place on this form for a

3   nurse to fill in what they may call an "other"

4   category, as opposed to just circling and writing in

5   the boxes?

6      A.      No.  As you see, what are his symptoms?

7   She writes.  What is the color?  She writes.  She

8   gives you all the information.

9      Q.      Do you see at the bottom where, under A),

10  where R/O Urinary Tract Infection is circled?

11     A.      Mmm-hmm.  Mmm-hmm.

12     Q.      What does it mean by "R/O Urinary Tract

13  Infection"?

14     A.      Rule out.

15     Q.      And why would a nurse circle that?

16     A.      Because she's not a diagnosing entity.

17     Q.      Can you explain that a little more?

18     A.      Nurses do not diagnose.  So in the use of

19  this form, she has referred him to Doctor to rule

20  out a UTI due to urinating blood.

21     Q.      What is the box that says "Payment

22  voucher" and then there is a "yes" or a "no."  What

23  does that mean?

24     A.      This goes to -- All patients pay a $2

KATHY GALVIN                                        March 27, 2019

Page 75

1  nurse sick call fee.

2      Q.    So every time a patient goes to nurse sick

3  call, they have to pay $2?

4      A.    Unless they're indigent.

5      Q.    How do they pay that?

6      A.    They have funds on their books.

7      Q.    Are you aware how long that's been a

8  policy?

9      A.    As long as I have been there.

10     Q.    We can set this aside.

11           Did you attend the Quality Improvement

12  meeting in January of 2016, do you recall?

13     A.    If I was here at work, I attended.  It

14  will tell you at the top of the page whether I was

15  present.

16     Q.    Let's go back to Exhibit 1.  So this is

17  the agenda.  This would not tell you if you

18  attended; correct?

19     A.    Correct.

20     Q.    Okay.  This tells you the things that you

21  plan to discuss at that meeting; correct?

22     A.    Right.

23     Q.    Was it possible to vary from this agenda

24  and discuss other things?

KATHY GALVIN                                    March 27, 2019

Page 76

1      A.     No, we pretty much stayed to agenda.

2      Q.     So if a patient is not present on this

3  agenda, it's likely they were not discussed at the

4  meeting; is that correct?

5             MR. RUPCICH:  Objection; foundation.

6             MS. BOYLE:  I'll join.

7             THE WITNESS:  You need to clarify why I

8             would discuss specifically a patient to a

9             month's Quality Improvement.

10 BY MR. WACKMAN:

11     Q.     Were specific patients not discussed at

12 Quality Improvement meetings?

13     A.     Not unless it was questioned.

14     Q.     What do you mean by if it was questioned?

15     A.     If -- Because we had IDOC representative,

16 a Regional for the Medical Director for IDOC, if she

17 over-read something on a hospital -- a patient being

18 injured or a person going out to the emergency room;

19 otherwise, we would not.

20     Q.     You said if she over-read.  What do you

21 mean by that?

22     A.     In the review of this, if -- we tell a

23 patient's going to the ER and what they went out

24 for.  If the State Regional questioned something

KATHY GALVIN                                    March 27, 2019

Page 77

1  about that patient, then we would state -- answer

2  her question.

3           But this is not a round table to discuss

4  patients.  It's a reporting agenda.

5      Q.   You can set this one aside now.

6           If a patient was specifically discussed at

7  a Quality Improvement meeting, would that be

8  reflected in the meeting's minutes?

9      A.   Yes.

10     Q.   Are you aware that Mr. Dean received a

11 renal ultrasound in February 2016?

12     A.   I know that he had one.  I do not know

13 when.

14     Q.   But you recall that he had one?

15     A.   Yes.

16     Q.   Are you familiar with a renal ultrasound?

17     A.   Yes.

18     Q.   Can you describe it?

19     A.   Ultrasounds are done off of soft tissue,

20 and it projects an image as you scan the organ.

21     Q.   And what does a renal ultrasound detect,

22 if you know?

23     A.   It can detect multiple.  It could detect a

24 kidney stone stuck either in the bladder, the

KATHY GALVIN                                    March 27, 2019

Page 78

 1  kidney, or the ureter.

 2      Q.    Who was involved in the scheduling of Mr.

 3  Dean's ultrasound?

 4      A.    Dr. Nawoor would have to order it.  The

 5  Medical Records Director would schedule it according

 6  to the availability.

 7      Q.    Who was the Medical Records Director in

 8  February 2016?

 9      A.    I believe Chad was still there -- was just

10  coming in.  It was Chad Chester.

11      Q.    I'm sorry.  By Chad Chester, do you mean

12  Chad Christer?

13      A.    Christer, yes.

14      Q.    Who was the Medical Records Director

15  before Mr. Christer; do you recall?

16      A.    We went for a period of time without a

17  Medical Records Director.  And at that time, Felicia

18  Waterman would have been scheduling.

19      Q.    And who is Felicia Waterman?

20      A.    She's a staff assistant.

21      Q.    Do you recall how long you went without a

22  Medical Records Director?

23      A.    Well, we had -- We had Shanelle, and

24  Shanelle left.  And I want to say it was less than

KATHY GALVIN                                        March 27, 2019

Page 79

1  six months before we got Chad.

2      Q.    Why did you go a period of time without a

3  Medical Records Director?

4      A.    Because it is required licensure for a

5  Medical Records Director, and not everybody in this

6  area obtains that license.

7      Q.    So I understand your answer correctly,

8  there's a required license to be a Medical Records

9  Director?

10     A.    Yes, there is.

11     Q.    Did Ms. Waterman have that license?

12     A.    No.

13     Q.    So why was she able to serve as Medical

14  Records Director without the --

15     A.    She didn't serve as Medical Records

16  Director.

17     Q.    I'm sorry, Ms. Galvin.  Let me finish my

18  question.  Why was she allowed to serve as Medical

19  Records Director without the required license?

20     A.    She did not do -- serve as Medical Records

21  Director.  She assisted in getting scheduling.

22     Q.    Are you familiar with the requirements of

23  the Medical Records Director license?

24     A.    No, I'm not.

KATHY GALVIN                                    March 27, 2019

Page 80

 1      Q.      So you don't know if any of those
 2  requirements pertained to scheduling tasks?
 3      A.      No, I do not.
 4      Q.      Why did the -- I'm sorry.  Who was the
 5  Medical Records Director before Mr. Christer?
 6      A.      Shanelle -- I can't remember her last
 7  name.  It was Shanelle.
 8      Q.      Why did she leave?
 9      A.      Better employment.
10      Q.      What did you think of her as a Medical
11  Records Director?
12      A.      She was highly efficient.
13      Q.      What did you think of Mr. Christer as a
14  Medical --
15      A.      Highly efficient.
16      Q.      What did you think of Ms. Waterman as a
17  Medical Records --
18      A.      Highly efficient.
19      Q.      Why did you not make Ms. Waterman a
20  full-time Medical Records Director?
21      A.      She did not have the required license.
22      Q.      Do you know why she could not obtain it?
23      A.      She did not seek it.
24      Q.      Were you involved in any way in the

KATHY GALVIN                                    March 27, 2019

Page 81

1   scheduling of Mr. Dean's ultrasound?

2      A.    No, I was not.

3      Q.    Are you aware of what steps were taken to

4   schedule that ultrasound?

5      A.    No, I am not.

6      Q.    Did you take any steps to expedite that

7   ultrasound?

8      A.    No, I did not.

9      Q.    Are you aware of anyone who took any steps

10  to expedite the ultrasound?

11     A.    No, I am not.

12     Q.    Did you at any time delay that ultrasound?

13     A.    No, I did not.

14     Q.    Did you at any time cancel an appointment

15  for a renal ultrasound?

16     A.    I never canceled appointments.

17     Q.    You can never recall canceling an

18  appointment?

19     A.    I never cancel any appointments.

20     Q.    Did you ever find out what the results of

21  that ultrasound were?

22     A.    No, I did not.

23     Q.    Do you recall if you attended the Quality

24  Improvement meeting in February 2016?

KATHY GALVIN                                    March 27, 2019

Page 82

1    A.    If I was present, I did.

2    Q.    But you don't recall?

3    A.    No.  It was very rarely I took time off.

4    Q.    I'm sorry.  What do you mean by that?

5    A.    QI is scheduled for a certain date, and I

6  did not take very much personal time off.

7    Q.    So what you're saying is it's highly

8  likely --

9    A.    I was there.

10    Q.    -- that you attended every meeting?

11    A.    Yeah.

12    Q.    I remember reading in your file that you

13  said you never took a day off.

14    A.    Yeah.

15    Q.    I will show you what the court reporter is

16  going to mark as Exhibit 6.

17         (Galvin Deposition Exhibit No. 6, one-page

18          ultrasound report from Anton Johnson,

19          M.D., dated 2/2/2016, was marked for

20          identification.)

21  BY MR. WACKMAN:

22    Q.    This is a single-page document.  At the

23  top is the letterhead of Central Illinois

24  Radiological Associates.  Have you ever seen this

KATHY GALVIN                                    March 27, 2019

Page 83

1  document before?

2      A.    I may have, because I reviewed a lot of

3  charts.

4      Q.    Do you recall ever having --

5      A.    No, I do not.

6      Q.    -- seen this document before?  And just to

7  reiterate, under what circumstances would you have

8  reviewed this document?

9      A.    If, in my review, Doctor stamps it, dates

10  it, signs it, did he order it to be filed, or did he

11  want something else done.

12      Q.    So let's focus on the stamp at the bottom.

13  You were just pointing to it.

14      A.    Mmm-hmm.

15      Q.    This stamp was part of your audit of the

16  records that was part of your duties as Director of

17  Nursing --

18      A.    Yes.

19      Q.    -- is that correct?

20      A.    Yes.

21      Q.    And you reviewed compliance by filling in

22  each of these lines on the stamp; is that correct?

23      A.    By ensuring they were filled out.

24      Q.    By ensuring they were filled out?

KATHY GALVIN                                    March 27, 2019

Page 84

1    A.    (Witness nods head affirmatively).

2    Q.    So let's start from the top where it says,

3  "Date" -- that's an abbreviation for "received";

4  correct?

5    A.    Correct.

6    Q.    -- "HCU" and then there was a date that I

7  read as 2-3-2016.  Do you agree?

8    A.    Correct.

9    Q.    Do you recognize that handwriting?

10    A.    Yes.  That's Dr. Nawoor.

11    Q.    Very basically, what does that entry mean

12  in the stamp?

13    A.    It means that he seen it on 2-3-16.  He

14  signed it and ordered it to be filed.

15    Q.    And what does it mean that he ordered it

16  to be filed?

17    A.    He's done reviewing it.  To file it in the

18  chart.

19    Q.    And that line underneath which says

20  "Other," in what circumstances would that be filled

21  out?

22    A.    He could put on there to return to him a

23  chart or any other numerous medical requirements.

24    Q.    What other medical requirements would

Page 85

1  there be?

2      A.    Well, he could have put down there to see

3  patient if it had been a bad report, which would

4  have also coincided with his note.

5            But if he was not seeing the patient that

6  day, he could have wrote down here, "See patient,"

7  and we would have scheduled him.

8      Q.    So based on your experience, what does it

9  mean that "File" was checked?

10     A.    That he wanted it to be put in the

11 patient's chart.

12     Q.    With no further action?

13     A.    Correct.  At that time.

14     Q.    When you were reviewing these documents as

15 part of your audit --

16     A.    Mmm-hmm.

17     Q.    -- not this specific document.  Documents

18 like it -- would you read the document itself?

19     A.    No.

20     Q.    So your review was strictly for compliance

21 with the form?

22     A.    Correct.

23     Q.    And when you just described to me under

24 what circumstances a doctor would check "File," what

Page 86

1  is the source of that?  Is that a policy?

2      A.    It's a procedure.  He marked "File."

3      Q.    What is the source of that procedure?

4      A.    Doctor reviews all labs.  Upon the

5  receiving of the labs, he must stamp it, date it at

6  the time of review, sign it, and determine what he

7  wants to be done.  In this case, file it in chart.

8      Q.    Not to belabor the point, but is that

9  written down somewhere as a policy?

10      A.    Not to my knowledge.

11      Q.    I think we can set this one aside, too.

12            Are you aware that Mr. Dean was eventually

13  approved for a cystoscopy and CT scan?

14      A.    Yes.

15      Q.    What is a cystoscopy to the best of your

16  knowledge?

17      A.    It is a scope.

18      Q.    What do you mean by that?

19      A.    A scope of the ureters, the bladder, and

20  the kidneys.

21      Q.    And what does it diagnose, to the best of

22  your knowledge?

23      A.    It can diagnose any urinary condition.

24      Q.    Including cancer?

KATHY GALVIN                                    March 27, 2019

Page 87

1      A.      Including cancer.

2      Q.      And what is a CT scan, to the best of your

3 knowledge?

4      A.      A CT scan can be done with or without

5 contrast to show each organ.

6      Q.      What is a CT IVP?

7      A.      An IVP is with contrast.

8      Q.      And what does it diagnose?

9      A.      It can diagnose any urinary condition.

10     Q.      Including cancer?

11     A.      Including cancer.

12     Q.      Do you recall how you learned that Mr.

13 Dean was being scheduled for those procedures?

14     A.      No, because I would not have been involved

15 in that.

16     Q.      Were you involved in any way in scheduling

17 of the procedure?

18     A.      No.

19     Q.      Who was responsible for the scheduling of

20 that procedure?

21     A.      It would have been the Medical Records

22 Director.

23     Q.      Did you take any steps to expedite the

24 scheduling of those procedures?

KATHY GALVIN                                    March 27, 2019

Page 88

1    A.    Not to my knowledge.

2    Q.    So you don't recall?

3    A.    I should not have been involved.

4    Q.    Do you know if anybody took any steps to

5  expedite the --

6    A.    No, I do not.

7    Q.    -- scheduling of those procedures?

8          Did you at any time delay the scheduling

9  of those procedures?

10   A.    Never.

11   Q.    Did you talk to Mr. Dean about the

12  scheduling of those procedures?

13   A.    Only if he had asked me.

14   Q.    Do you recall talking to Mr. Dean about

15  the scheduling of those procedures?

16   A.    No, I do not.

17   Q.    Do you recall talking to Mr. Dean about

18  the scheduling of his ultrasound?

19   A.    No, I did not.

20   Q.    Do you recall -- I believe I already asked

21  this, but just to be sure, do you recall speaking

22  with Mr. Dean about his hematuria?

23   A.    No, I do not.

24   Q.    Do you recall speaking with Mr. Dean about

KATHY GALVIN                                    March 27, 2019

Page 89

1  the results of his ultrasound?

2      A.    No, I do not.

3      Q.    I will show you what's been marked as

4  Exhibit 7.

5            (Galvin Deposition Exhibit No. 7, one-page

6            document entitled Offender Outpatient

7            Progress Notes dated 2-10-16, Bates

8            stamped IDOC Taylorville Med Recs 001346,

9            was marked for identification.)

10  BY MR. WACKMAN:

11     Q.    This is a single-page document Bates

12  stamped IDOC Taylorville Med Recs 001346.

13           Do you recall if you have ever seen this

14  document before?

15     A.    No, I do not.

16     Q.    Is this the type of document you would

17  have reviewed as part of your audit?

18     A.    To ensure Doctor's signature and RN's

19  signature and date and time.

20     Q.    Would you have read the note itself during

21  your review?

22     A.    No, I would not have.

23     Q.    You said earlier, I believe, that part of

24  your review was to ensure compliance with the SOAP.

KATHY GALVIN                                    March 27, 2019

Page 90

1      A.     Correct.

2      Q.     Help me explain how you would ensure

3  compliance with SOAP if you didn't read the note

4  itself.

5      A.     I don't need to read the note.  Subject.

6  You have it.  Objective:  Lungs clear.  A:

7  Hematuria.  P, he has a plan.

8      Q.     So, literally, you're just making sure

9  that there is an entry next to S, O, A, and P?

10     A.     Correct.  Correct format.

11     Q.     All right.  You can set this aside, Ms.

12 Galvin.

13            Are you aware that Dr. Nawoor wanted to

14 move up Mr. Dean's cystoscopy?

15     A.     No, I am not.

16     Q.     Are you aware that Dr. Nawoor wanted to

17 move up Mr. Dean's CT scan?

18     A.     No, I am not.

19     Q.     At any time between December 2015 and

20 April 2016, were you worried that Mr. Dean had

21 cancer which was the cause of his hematuria?

22     A.     I am not a diagnosing entity.  I am a

23 Registered Nurse.  I am a Site Manager and Director

24 of Nursing.  I'm not an attending nurse.

KATHY GALVIN                                    March 27, 2019

Page 91

1    Q.    So is the answer to that question "no"?

2    A.    "No."

3    Q.    To the best of your knowledge, at any time

4  between December 2015 and April 2016, was Dr. Nawoor

5  worried that Mr. Dean had cancer --

6    A.    I cannot state what --

7    Q.    -- which was the cause of his hematuria?

8    A.    I cannot state what Doctor's thoughts

9  were.

10    Q.    You never had a conversation with him to

11  that effect?

12    A.    Not to my knowledge.

13    Q.    You don't recall?

14    A.    I do not recall.

15    Q.    To the best of your knowledge and

16  recollection, were any other Wexford or IDOC

17  employees worried that Mr. Dean had cancer which was

18  the cause of his hematuria?

19    A.    I cannot state to someone else's thoughts.

20    Q.    Do you recall ever learning anything like

21  that?

22    A.    No, I do not.

23    Q.    I will show you what's being marked by the

24  court reporter as 8.

KATHY GALVIN                                    March 27, 2019

Page 92

```
 1              (Galvin Deposition Exhibit No. 8,

 2              three-page document entitled Offender

 3              Outpatient Progress Notes Bates stamped

 4              IDOC Taylorville Med Recs 001349 through

 5              001351, was marked for identification.)

 6  BY MR. WACKMAN:

 7      Q.    And this is a multi-page document.  It

 8  also covers multiple dates in Mr. Dean's file.

 9  Bates stamps on it, IDOC Taylorville Med Recs

10  001349.  Let me make sure I said that correctly.

11  IDOC Taylorville Med Recs 001349, and it goes

12  through 001351.

13              To the best of your knowledge, have you

14  ever seen any pages of this document before?

15      A.    No.

16      Q.    You're confident you haven't, or you do

17  not recall?

18      A.    I do not recall.

19      Q.    But these are the type of documents you

20  may have reviewed as part of your audit; correct?

21      A.    Correct.

22      Q.    I think you can set that one aside.

23              I will show you what the court reporter

24  will mark as Exhibit 9.
```

KATHY GALVIN                                        March 27, 2019

Page 93

```
 1              (Galvin Deposition Exhibit No. 9, one-page

 2              document entitled Medical Special Services

 3              Referral and Report, Bates stamped IDOC

 4              Taylorville Med Recs 001076, was marked

 5              for identification.)

 6   BY MR. WACKMAN:

 7       Q.    This is a single-page document, Bates

 8   stamp IDOC Taylorville Med Recs 001076.  And do you

 9   recall if you've ever seen this document before?

10       A.    No, I do not.

11       Q.    Would you review this type of document as

12   part of your audit of the medical records?

13       A.    No.  This is a paper that goes out with

14   the patient when he sees the outside doctor.  When

15   it returns -- when the patient returns, these papers

16   go to Doctor.

17       Q.    Would this be placed in the patient's

18   file?

19       A.    Yes.  It's in chart.

20       Q.    But you're not responsible for reviewing

21   this document?

22       A.    No, I am not.

23       Q.    Why not?

24       A.    It's not my place.  It's the doctor's
```

KATHY GALVIN                                    March 27, 2019

Page 94

1  follow-up.

2      Q.    Is there a policy that covers what records

3  you review in your audit?

4      A.    No, there is not.

5      Q.    How do you know which records to review in

6  your audit as Director of Nursing?

7      A.    There is no specified.  I follow to the

8  ADs and the IDs.

9      Q.    And what do they say about records to

10  review?

11      A.    It is the stipulation that there is

12  multiple date, time, signature, M.D., DON, and if

13  the form is filled out completely.

14      Q.    So I guess my basic question is why

15  wouldn't you review this sort of form?

16      A.    Because I'm not a scheduling entity, and

17  I'm not an attending RN.

18      Q.    Would the scheduling entity review this

19  form?

20      A.    Once it was given to him from the doctor.

21      Q.    And what do you mean by "scheduling

22  entity"?

23      A.    It would be the Medical Records Director

24  once the doctor orders the test that the attending

Page 95

1  doctor is ordering or requesting.

2      Q.    So this form would go to the Medical

3  Records Director --

4      A.    Yes.

5      Q.    -- after that -- I'm sorry -- after the

6  doctor wrote the order?

7      A.    Correct.

8      Q.    And you're the Medical Records Director's

9  supervisor; is that correct?

10     A.    Yes.

11     Q.    So why would you not review this form?

12     A.    Because I have -- I am Site Manager and

13  DON.  I'm not instructed to ensure each piece of

14  paper is looked at.

15     Q.    How do you evaluate the Medical Records

16  Director's job performance?

17     A.    There is no evaluation of the medical

18  record other than does he come to work, does he

19  perform his duties.

20     Q.    How do you evaluate if the Medical Records

21  Director performs their duties?

22     A.    He performs all his duties in a timely

23  manner.

24     Q.    How do you evaluate that?

KATHY GALVIN                                          March 27, 2019

Page 96

```
 1     A.     By knowing that he does his job and he
 2  does it thoroughly.  And he cannot do anything
 3  without a doctor's order.
 4     Q.     How do you know if he does his job and
 5  does it thoroughly?
 6     A.     I don't know what you're asking.
 7     Q.     I think what I'm asking, Ms. Galvin, is
 8  you have to evaluate the Medical Records Director;
 9  correct?
10     A.     Correct.
11     Q.     On if he does his job in a thorough and
12  timely manner?
13     A.     Which he does.
14     Q.     How do you know that, though?
15     A.     We talked daily.  I knew what he was
16  doing.  If he was having trouble scheduling, he
17  would say so.  But this man is highly efficient.  I
18  never had any problems with him.
19     Q.     By "this man," you mean Chad Christer?
20     A.     Yes.
21     Q.     So based on the last answer you gave, your
22  evaluation of Mr. Christer depended on him telling
23  you if he had problems?
24     A.     If Mr. Chester told me that he had
```

March 27, 2019

Page 97

1   problems, yes.  But that office is a two-person

2   office.  It is also an office not unlike this, that

3   has, instead of books, has all the charts.  If I was

4   in there auditing charts and he was having a

5   problem, I would know about it.

6       Q.    What do you mean by "if he was having a

7   problem"?

8       A.    If he stated or was on the phone having

9   problems, put on hold, being told to wait to see if

10  they can get him a date, I would hear it.

11      Q.    You would hear it because you would

12  overhear the phone conversation?

13      A.    Yes.

14      Q.    How would you know about a problem if you

15  weren't in the medical records office at that time?

16      A.    He would come to me.

17      Q.    What about if the problem was not with the

18  institution Mr. Christer was trying to schedule it

19  at, schedule the procedure at, but with Mr. Christer

20  himself, how would you know about a problem like

21  that?

22      A.    I assure you everybody makes complaints if

23  they have problems with a person.  I have never had

24  a complaint on him.  Never.

Page 98

1    Q.    No patient ever complained to you about

2 scheduling?

3    A.    If they did, they did not know the

4 procedure.

5    Q.    What do you mean by that?

6    A.    That the doctor is the one that has to

7 order it and that you have to either have approval

8 or the availability of the testing.

9    Q.    So you never received a legitimate

10 complaint about scheduling in your time as Director

11 of Nursing at Taylorville?

12    A.    No, I did not.

13    Q.    And Mr. Christer always came to you if he

14 had a problem with scheduling; is that correct?

15    A.    He would come to me, and he would go to

16 Doctor.  If it was too far out, he'd make Doctor

17 aware of the time of being scheduled.  If Doctor

18 said, "That's too far out," then he would seek other

19 places to get it done.

20         MR. RUPCICH:  Could we take five?  Or do

21         you have much more?

22         MR. WACKMAN:  In general for the dep.?

23         MR. RUPCICH:  Yes.  We have been going

24         about an hour or so.  It's up to you.

KATHY GALVIN                                      March 27, 2019

Page 99

```
 1              MR. WACKMAN:  Why don't we take 10, and

 2              I'll try to figure that out.

 3              (Whereupon at this point in the

 4              proceedings, a recess was held from 11:20

 5              a.m. to 11:31 a.m., after which the

 6              following proceedings were conducted:)

 7   BY MR. WACKMAN:

 8       Q.    Back on the record.  Ms. Galvin, do you

 9   recall if you attended the Quality Improvement

10   meeting in March of 2016?

11       A.    I do not recall.

12              (Galvin Deposition Exhibit No. 10, 14-page

13              Memorandum dated March 10, 2016, Bates

14              stamped IDOC No. 001249 through 001262,

15              was marked for identification.)

16   BY MR. WACKMAN:

17       Q.    So the court reporter just handed you what

18   is marked as Exhibit 10, which is a multi-page

19   document Bates numbers IDOC No. 001249 through IDOC

20   No. 001262.

21              Do you recognize what this is?

22       A.    Yes.  It's a QI report.

23       Q.    And to be clear, these are the minutes

24   taken at the conclusion of the meeting; correct?
```

KATHY GALVIN                                              March 27, 2019

Page 100

1      A.     Yes.

2      Q.     Okay.  Does this document reflect that you

3  attended the March 2016 Quality Improvement meeting?

4      A.     Yes, I was there.

5      Q.     And how can you tell that?

6      A.     Because it says "Members Present," and I

7  am listed.

8      Q.     Okay.  And did you create this document?

9      A.     Yes.

10     Q.     How can you tell that?

11     A.     If I was the QI Coordinator at that time,

12  I created it.

13     Q.     Were you the QI Coordinator?

14     A.     I should have been.

15     Q.     Was Mr. Dean discussed at the March 2016

16  QI meeting?

17     A.     It does not say.  It does not say that he

18  was, sir.

19     Q.     And just to be clear, you just flipped

20  through the entire document?

21     A.     Yes.

22     Q.     You did not see that he was discussed --

23  Based on your review, you do not believe he was

24  discussed at that meeting?

KATHY GALVIN                                    March 27, 2019

Page 101

1      A.     I do not see that he was.

2      Q.     If he was discussed at that meeting, it

3   should be contained in this document; correct?

4      A.     Correct.

5      Q.     And you're the creator of this document;

6   correct?

7      A.     Correct.

8      Q.     Did you take notes during the meetings?

9      A.     I did not take notes.  It would have been

10  my Medical Records Director who took notes.

11     Q.     And looking at the Members Present line

12  here, who would have been the Medical Records

13  Director at that time?

14     A.     The person that would have took notes

15  there would have been Felicia Waterman.

16     Q.     In your experience, did Ms. Waterman's

17  notes always reflect everything that occurred at the

18  meeting?

19     A.     Yes, if it was discussed.

20     Q.     So if Mr. Dean was discussed at the

21  meeting, it should have been in Ms. Waterman's

22  notes?

23     A.     Correct.  But there would have been no

24  reason for Mr. Dean to be discussed.

Page 102

1     Q.     And what do you mean by that?

2     A.     Well, he would have to fall under one of

3  these categories; okay?  It would have been under

4  Critical Incident, whether he was one of those ...

5     Q.     Let's focus on that Critical Incident

6  category.  And for reference on this document, we're

7  looking at Page 001251.  I believe it's the third

8  page.

9     A.     Okay.

10     Q.     How is a critical incident defined?

11     A.     Well, a critical incident would have been

12  a fight, an injury, someone being removed to the

13  emergency room.

14     Q.     Here, it lists Mortality?

15     A.     Yes, or death.

16     Q.     And New or Delayed Diagnoses?

17     A.     Correct.

18     Q.     What does it mean by "delayed diagnosis"?

19     A.     A delayed diagnosis would be something

20  that was suspected but not proven.

21     Q.     So if there was a suspicion that somebody

22  had cancer, for instance --

23     A.     If the doctor had suspicions of it but he

24  had no proof of boundary.

Page 103

1    Q.    Dr. Nawoor attended this meeting; is that

2  correct?

3    A.    Yes.

4    Q.    So it would have been Dr. Nawoor's

5  suspicions; is that correct?

6    A.    Yes.

7    Q.    So to the best of your understanding, if

8  Dr. Nawoor suspected a person had cancer, it would

9  have appeared in this document?

10    A.    If he had trouble getting a diagnosis,

11  yes.

12    Q.    What do you mean by "trouble getting a

13  diagnosis"?

14    A.    Well, let's say that the patient went out

15  -- okay -- like the one you had on the scan, it was

16  all negative, but he still had that suspicion, and

17  then it came up after another test that it was

18  there, that would be a delayed diagnosis.

19    Q.    So is the diagnosis noted here and

20  discussed at the Quality Improvement meeting when it

21  is confirmed, for instance, confirmed to be cancer,

22  or --

23    A.    Not always, no.

24    Q.    -- when it's suspected?

KATHY GALVIN                                    March 27, 2019

Page 104

1    A.    No.  Because this is Quality Improvement.

2  It is -- Medical is private; okay?  So you have all

3  these non-medical people in here hearing this.  Even

4  though they have waived HIPAA, you don't discuss

5  cases to complete detail during a QI.  This is to

6  see if we're doing our job properly.

7    Q.    I think we can set this aside for right

8  now.

9          (Galvin Deposition Exhibit No. 11,

10         one-page document entitled Offender

11         Outpatient Progress Notes, Bates stamped

12         IDOC Taylorville Med Recs 001356, was

13         marked for identification.)

14  BY MR. WACKMAN:

15    Q.    So the court reporter just put in front of

16  you Plaintiff's Exhibit 11, which is a single-page

17  document.  IDOC Taylorville Med Recs 001356 is the

18  Bates.  Do you recall if you've ever seen this

19  document before?

20    A.    No, I do not.

21    Q.    But this is the type of document you would

22  have reviewed in your audit?

23    A.    Yes.

24    Q.    We can set this aside.

KATHY GALVIN                                    March 27, 2019

Page 105

1              When did you first learn that Mr. Dean had

2    cancer?

3        A.    I cannot recall.

4        Q.    Do you recall about when you learned it?

5        A.    No, I do not.

6        Q.    Do you know if you learned it shortly

7    after his diagnosis but before his surgery?

8        A.    Probably shortly before, because we would

9    have had to get him scheduled for the surgery.  And

10   we have to report to the Majors every time we have a

11   med writ or a hospital.  So we would always let the

12   Majors and the Warden know.

13       Q.    What do you mean by "the Majors"?

14       A.    The Majors run the camps.  The Warden is

15   over the city, but the Majors run the camp.  And

16   then it comes down to staffing, because you have to

17   have two officers anytime an offender goes out.

18       Q.    So you believe you would have learned

19   about Mr. Dean's cancer when they were trying to

20   schedule --

21       A.    Correct.

22       Q.    -- his surgery?

23       A.    Correct.

24       Q.    Do you recall who you learned about Mr.

Page 106

```
 1  Dean's cancer from?

 2      A.    No, I don't.

 3      Q.    Did you ever have any conversations with

 4  Mr. Dean about his cancer?

 5      A.    I talked to Mr. Dean numerous times about

 6  numerous subjects, not just his health.

 7      Q.    But did you ever speak with him about his

 8  cancer?

 9      A.    No, not to my recollection.

10      Q.    You don't recall speaking to him about --

11      A.    I don't recall.

12      Q.    Do you ever recall Mr. Dean telling you

13  his chances of recovery from his cancer?

14      A.    No, I do not.

15      Q.    Do you recall Mr. Dean ever telling you

16  about his chances of survival from his cancer?

17      A.    No, I do not.

18      Q.    What other conversations do you recall

19  having with Mr. Dean?

20      A.    I have spoke to Mr. Dean about his wife.

21  When she would call, I would inform him that his

22  wife had called.  Mr. Dean also was going to be a

23  peer educator which talks about communicable

24  diseases.  And so he wanted to do that.  And I
```

KATHY GALVIN                                    March 27, 2019

Page 107

1  brought him on board as a trial to see how he would

2  do.  And he enjoyed -- He told me he enjoyed it.

3      Q.    What else do you recall speaking to Mr.

4  Dean about?

5      A.    I know he told me that his wife didn't

6  know about all the money he had and that if she did,

7  he wouldn't have none.

8      Q.    What else do you recall Mr. Dean telling

9  you about?

10     A.    Well, that's what I mean.  We -- I talked

11  to the offenders.  I listened to them.  That was

12  part of my job, you know, was communication so that

13  they -- I felt so that they felt that they had a

14  liaison in healthcare, that they weren't shut down

15  completely all the time.

16     Q.    Do you recall any other conversations with

17  Mr. Dean about his health specifically?

18     A.    He did tell me one time, he said, "Can you

19  believe it?  I'm still here."

20     Q.    Do you recall when he said that?

21     A.    No, I don't.

22     Q.    Do you recall if that was before his

23  cancer surgery?

24     A.    No.  It was after.  This is when he was

Page 108

1  going out on med writs all the time.

2      Q.    Do you recall any conversations before Mr.

3  Dean's cancer surgery about his health?

4      A.    No.

5      Q.    You said you would inform Mr. Dean when

6  his wife called?

7      A.    Yes.

8      Q.    How often did Mr. Dean's wife call?

9      A.    It varied.  If he was talking to her and

10 she knew something was coming up, she would call,

11 and I would talk to her, because the nurses don't

12 like talking to families.  So I always did that.

13 And I would put a note in chart that I spoke to her

14 that day.

15     Q.    How many times do you think you spoke with

16 Mrs. Dean?

17     A.    More than five and probably less than ten.

18     Q.    And do you recall what she would call

19 about?

20     A.    She would call about whether a procedure

21 was being scheduled, how he was doing.  With

22 security, you could verify that, "Yes, it's been

23 approved," or, "Yes, it's been scheduled, but I

24 can't tell you when, where, because of security."

Page 109

1    Q.    Do you recall any specific conversations

2   you had with her?

3    A.    No, I do not.

4    Q.    Were you the primary person who would

5   speak with family members when they would call?

6    A.    Yes.

7    Q.    Would anybody else speak with family

8   members when they would call?

9    A.    The nurses would if I was not available.

10  The healthcare administrator also would be if I was

11  not available.  And then you had some that didn't

12  want to talk to us and wanted to talk to the warden.

13   Q.    Okay.  You said Mr. Dean became a peer

14  educator?

15   A.    Yes.

16   Q.    Can you tell me about that?

17   A.    A peer educator is where offenders that

18  are coming into Corrections, you want to talk to

19  them about hep C, HIV, AIDS.  I usually attended

20  most of them instead of a staff nurse doing it.  You

21  want to make them aware that -- their living

22  conditions and how to stay healthy.  When you talked

23  about hep C, you talked about microscopic blood and,

24  "Don't use nobody's toenail clippers," and that kind

Page 110

1  of stuff.

2          But you gave them the medical facts on

3  HIV, hepatitis, all versions of hepatitis, and AIDS.

4      Q.    Who did you select as peer educators?

5      A.    I would look through their records,

6  because we were not allowed -- when we took the

7  chart, if they were a sex offender, we weren't

8  allowed to use them.  And Mr. Dean approached me

9  wanting to help.

10     Q.    Is that typically how peer educators were

11 selected?  They approached you?

12     A.    Yes.  They sent me a request.

13     Q.    And what made you select someone as a peer

14 educator?

15     A.    The sincerity.  You know, I had a lot I

16 couldn't take.  But I would take them.  I would give

17 them passes for a couple of times for them to watch

18 the other peer educators to see if they felt

19 comfortable doing it.  Then it is also required that

20 they do so many hours' training.  And it used to be

21 Pete Fox -- I don't know who it is now -- would do

22 the training and talk to them, and he would certify

23 them.

24     Q.    You just said sincerity was a

KATHY GALVIN                                    March 27, 2019

Page 111

1    qualification for a peer educator.  What do you mean

2    by that?

3         A.    Well, sincerity in wanting to do it.  And,

4    believe me, I've had people got up there and, "Ha,

5    ha, ha," you know, the jokester and that.  But

6    somebody that was wanting to give this information.

7              And when I left, Mr. Dean was still on my

8    passes seeing if he wanted to do it.

9         Q.    What do you mean "still on your passes"?

10        A.    I was having -- Like I said, I have them

11   go for a period of time, because you do it at

12   intake, and you do it at discharge.  So trying to go

13   around his schedule, see if that is -- you know --

14   have him attend, watch the other peer educators,

15   because there's a lot of information you have to

16   learn, too, medical information, and see if he was

17   comfortable with it.

18        Q.    What would be disqualifying to be a peer

19   educator?

20        A.    Sex offender.

21        Q.    Anything else?

22        A.    That, basically.  I had a very good peer

23   educator that got in trouble for gambling, so you

24   can't do that.

KATHY GALVIN                                    March 27, 2019

Page 112

1    Q.    Are there any other reasons you wouldn't
2  bring someone on as a peer educator?
3    A.    Well, there's a lot.  Like I said, getting
4  up there being a jokester.  The ones that want to
5  look like -- use the position for bargaining for
6  other things.  You know who they are.  You learn
7  them.  And he just seemed sincere, so I tried him.
8    Q.    Would you take a person on as a peer
9  educator if you didn't think they were trustworthy?
10   A.    No.
11   Q.    Would you take a person on as a peer
12  educator if you didn't think they were truthful?
13   A.    No.
14   Q.    Would you --
15   A.    Because it's informational for the
16  offenders, you know.  And, basically, what they're
17  giving is health information.  And when they give
18  that, they have got huge bulletins that they reach
19  to, and they read aloud to the offenders.  I was
20  there if they had a technical question.  So I would
21  answer the technical questions.
22   Q.    Would you say a peer educator is a
23  position of trust?
24   A.    He had my trust.

KATHY GALVIN                                    March 27, 2019

Page 113

1      Q.     Mr. Dean had your trust?

2      A.     No, a peer educator would have my trust.

3      Q.     And Mr. Dean was a peer educator?

4      A.     He was not certified.  He was still going

5   to see if he wanted to be a peer educator.

6      Q.     But to get to that point, did a person

7   have to have your trust?

8      A.     Yes.

9      Q.     So Mr. Dean had your trust?

10      A.     Somewhat.

11      Q.     What do you mean "somewhat"?

12      A.     Like I said, to that subject, to what he

13   wanted to do, I could trust him in that role.

14      Q.     Do you recall speaking with Mrs. Dean on

15   April 26th, 2016?

16      A.     No, I don't.

17      Q.     I'm sorry.  Strike that question, or let

18   me restate it since you've already answered it.  Do

19   you recall speaking with Mrs. Dean on April 25th,

20   2016?

21      A.     I do not recall specific dates.

22      Q.     Do you recall speaking with Mrs. Dean ever

23   and her inquiring about Mr. Dean's cancer surgery?

24      A.     Yes.

KATHY GALVIN                                          March 27, 2019

Page 114

1    Q.    How many times do you think you spoke with

2  her about Mr. Dean's cancer surgery?

3    A.    I know I spoke to her once pertaining to

4  the surgery.  She asked me if it was approved and

5  scheduled.  I asked her to please hold.  I went and

6  asked my Medical Records Director if it had been

7  approved and scheduled, and he stated, "Yes."  And I

8  came back and informed Mrs. Dean that it had been

9  approved and scheduled.

10    Q.    Who was the Medical Records Director you

11  spoke with?

12    A.    Mr. Chester.

13    Q.    Was it true that Mr. Dean's surgery had

14  been scheduled at that time?

15    A.    Yes, it was.

16    Q.    When had it been scheduled for?

17    A.    I don't know the date.

18    Q.    Do you recall any other times when you

19  spoke with Mrs. Dean about the scheduling of the

20  cancer surgery?

21    A.    No, I do not.

22    Q.    If you want to look back at Exhibit 2,

23  which is the Answer to Mr. Dean's Second Amended

24  Complaint.  I apologize for talking while I reached

Page 115

1  under the table.

2          And I can direct you in this to Page 14,

3  which is Paragraph 37.  And if you want to take a

4  moment and review both the allegation and the

5  response, and let me know when you're finished.

6          Is the conversation that you just

7  described the conversation described here?

8      A.    Not exactly, because she says here "but

9  not scheduled."

10     Q.    And, in fact, your testimony is you told

11  Ms. Dean during this conversation that the operation

12  had been scheduled?

13     A.    Approved and scheduled.

14     Q.    Approved and scheduled?

15     A.    (Witness nods head affirmatively).

16     Q.    And you relayed that to Mrs. Dean because

17  Mr. Christer told you the operation had been

18  scheduled?

19     A.    Correct.

20     Q.    Are you positive that the Medical Records

21  Director who told you that was Mr. Christer?

22     A.    Yes.

23     Q.    But you don't recall when it had been

24  scheduled for?

KATHY GALVIN                                    March 27, 2019

Page 116

1      A.    No.

2      Q.    Do you recall Ms. Dean's response?

3      A.    She just told me, "Thank you."

4      Q.    I think we can set this aside for right

5   now.

6            And not to belabor, but that is the only

7   specific conversation you recall with Ms. Dean about

8   the scheduling for the cancer surgery?

9      A.    Correct.

10     Q.    Is it possible there were other

11  conversations about --

12     A.    I had conversations prior to that where

13  she would call about his condition.  Or if he had

14  called her and told her something that had happened

15  out to the doctor's, I would talk to her about it.

16  And I would look in chart and be able to tell her.

17     Q.    Did you have conversations prior to that

18  one about the scheduling of Mr. Dean's cancer

19  surgery?

20     A.    I had conversations with her, but not

21  about scheduling.

22     Q.    What did you discuss in the conversations

23  that you recall?

24     A.    As I stated, it was specifically she told

KATHY GALVIN                                    March 27, 2019

Page 117

1   me something went on at the doctor's or something

2   that he said that happened; I would talk to her

3   about that situation.

4        Q.    What sort of things went on with the

5   doctors?

6        A.    If he went and he said that the doctor

7   wanted to do this and this testing -- and they spoke

8   frequently -- and then she would call and talk to me

9   saying that they wanted to do this and this,

10  schedule, and I would have to go through the report

11  and say, "Yes, they have requested these procedures

12  to be done."  And that would be it.

13       Q.    Do you recall ever taking any further

14  action based on a conversation with Ms. Dean?

15       A.    No.  No.

16       Q.    So you never went to Dr. Nawoor with any

17  of Ms. Dean's concerns?

18       A.    No.

19       Q.    And you never went to Mr. Christer with

20  any of Ms. Dean's concerns?

21       A.    No.

22       Q.    Did you ever raise any of Ms. Dean's

23  concerns with your supervisor, Shawn Cates?

24       A.    No, because it was not concerns.  It was

March 27, 2019

Page 118

1  questions.  She questioned.  She didn't voice

2  concerns.  She was more about knowing what had took

3  place and what's going to take place.

4       Q.    Who was responsible for scheduling Mr.

5  Dean's cancer surgery?

6       A.    It would be the Medical Records Director.

7       Q.    And you believe that was Chad Christer?

8       A.    Yes.

9       Q.    Did you discuss the scheduling of that

10  surgery with the Medical Records Director?

11       A.    No, I did not.

12       Q.    Did you assist in the scheduling of that

13  surgery with the Medical Records Director?

14       A.    No, I did not.

15       Q.    Do you know what steps the Medical Records

16  Director took to schedule that surgery?

17       A.    I know that it was scheduled, as I had

18  informed Ms. Dean.  It had been approved and

19  scheduled.  I know that it had to be rescheduled due

20  to more doctors -- specialists needed to be involved

21  in the surgery.

22       Q.    How did you learn it needed to be

23  rescheduled?

24       A.    Because we were trying to find a

Page 119

1  cardiologist and that to take the case.

2      Q.    When you say "we," who do you mean?

3      A.    Well, Mr. -- Chad did.  He had to do it.

4      Q.    So who told you it needed to be

5  rescheduled; do you recall?

6      A.    No, I do not.

7      Q.    And the reason it needed to be rescheduled

8  was because a cardiologist was required?  Is that

9  what you recall?

10     A.    I know that more specialists needed to be

11  involved in the surgery.

12     Q.    Do you recall even generally when it was

13  originally scheduled for?

14     A.    No, I do not, sir.

15     Q.    Do you recall when it was rescheduled for?

16     A.    No, I do not.

17     Q.    Did you assist in the rescheduling of the

18  surgery in any way?

19     A.    No, I did not.

20     Q.    Who rescheduled the surgery?

21     A.    Medical Records Director.

22     Q.    You previously testified that when the

23  Medical Records Director had a problem with

24  scheduling, he would bring it to you; is that

KATHY GALVIN                                    March 27, 2019

Page 120

1    correct?

2         A.    Correct.  But in this case, you have to go

3    by the availability of the specialist to be able to

4    do the surgery.

5         Q.    Did Mr. Christer raise a problem with the

6    scheduling of this surgery with you?

7         A.    No.

8         Q.    So is it a fair inference that Mr.

9    Christer didn't have a problem scheduling this

10   surgery?

11        A.    I cannot state that.

12        Q.    But he didn't bring a problem to your

13   attention?

14        A.    Correct.

15        Q.    Do you know if he brought a problem

16   scheduling the surgery to Dr. Nawoor's attention?

17        A.    I do not know if he did or not.

18        Q.    Do you know if Mr. Christer would bring

19   problems in scheduling to Dr. Nawoor and not to you?

20        A.    Yes, I do.

21        Q.    Why would he do that?

22        A.    To make Doctor aware.

23        Q.    But he wouldn't make you aware?

24        A.    Not all the time.

Page 121

1      Q.      To your knowledge, did anyone take any

2   steps to move up the date of Mr. Dean's surgery?

3      A.      I have no knowledge.  Like I said, this is

4   specialized surgery, needed specialists, needed

5   their schedule, their availability.  It's not like

6   -- It's a unique case.  He had to have the

7   availability of the other specialists.

8      Q.      Do you recall if you attended the Quality

9   Improvement meeting in April 2016?

10     A.      No, I do not.

11     Q.      I haven't handed you the minutes yet, so

12   those aren't going to be helpful.

13            (Galvin Deposition Exhibit No. 12, 15-page

14            Memorandum dated April 26, 2016, Bates

15            stamped IDOC No. 000150 through 000164,

16            was marked for identification.)

17   BY MR. WACKMAN:

18     Q.      I'm sorry.  Just to be clear on your

19   answer, you do not recall?

20     A.      No, I do not.

21     Q.      The court reporter just handed you what's

22   been marked as Plaintiff's Exhibit 12.  This is a

23   multi-page document.  The Bates stamp is IDOC No.

24   000150, and it goes until IDOC No. 000164.

KATHY GALVIN                                    March 27, 2019

Page 122

1              Ms. Galvin, what is this document?

2      A.    This is the meeting minutes to the QI for

3   April 26th.

4      Q.    And did you prepare this document?

5      A.    Yes.

6      Q.    And did you attend the April 26th QI

7   meeting?

8      A.    Yes.

9      Q.    Do you know why the State of Illinois

10   retains this document?

11             MS. BOYLE:  Objection to foundation.

12             THE WITNESS:  This document contains a lot

13             of vital information.  And with it being

14             quality control, this is how they are

15             aware of what the Healthcare Unit is

16             doing.

17   BY MR. WACKMAN:

18      Q.    Based on this document, can you tell if

19   Mr. Dean was discussed at the April 2016 QI meeting?

20      A.    There would be no reason for Mr. -- as I

21   stated in the past -- for Mr. Dean to be discussed

22   in any of these meetings unless he was under one of

23   these categories.

24      Q.    Let me direct you to Page 2, which is

KATHY GALVIN                                        March 27, 2019

Page 123

1   Bates stamped IDOC No. 000151.  Do you see in the

2   middle of the page where Mr. Dean is referenced?

3       A.   Yes.  And then if you will look, sir, it

4   says, "Outside consultations, referrals/procedures."

5   We would list every one that went out that month to

6   see a specialist.

7       Q.   Based on this note, can you tell what was

8   discussed about Mr. Dean at the QI meeting?

9            MR. RUPCICH:  Object to the foundation;

10           misstates.

11           MS. BOYLE:  I'll join.

12           THE WITNESS:  It doesn't say that he was

13           discussed.  It says that these are the

14           offenders that went outside to outside

15           consultants.

16  BY MR. WACKMAN:

17      Q.   Based on this document, is there any way

18  of telling whether Mr. Dean was discussed at the

19  meeting?

20      A.   No.

21      Q.   I want to direct your attention to Page 5

22  of this document, which is Bates stamped IDOC No.

23  000154.  Do you see at the bottom where it says

24  "New/Delayed Diagnoses"?

KATHY GALVIN                                    March 27, 2019

Page 124

1    A.    Yes.

2    Q.    Is Mr. Dean listed there?

3    A.    I have no way of knowing that, sir.

4    Q.    Because of the redactions?

5    A.    No.  They're blacked out.  I don't know

6  Mr. Dean is on there.  And you have to realize, this

7  is not just delayed.  This is new diagnoses, too.

8  These are diagnoses of other offenders that would

9  have been reported.

10    Q.    If Mr. Dean had been diagnosed with cancer

11  on April 13th, 2016, should he have been listed

12  under New Or Delayed Diagnoses?

13    A.    If we had it as a new diagnosis, yes.

14    Q.    Under what circumstances would it not --

15    A.    But it was --

16    Q.    I'm sorry, ma'am.  Let me finish my

17  question.

18    A.    Okay.

19    Q.    Under what circumstances would he not have

20  been listed under New or Delayed Diagnoses if he had

21  been diagnosed with cancer on April 13th, 2016?

22    A.    Okay.  You said April 13th?

23    Q.    Correct.

24    A.    This QI packet is for March.

KATHY GALVIN                                              March 27, 2019

Page 125

```
 1      Q.     So this only covers --

 2      A.     The previous month.

 3      Q.     -- the previous month.

 4      A.     Yes.

 5      Q.     So March 1 through March 31, 2016?

 6      A.     Yes.

 7      Q.     You can set that aside.

 8             (Galvin Deposition Exhibit No. 13, 13-page

 9             Memorandum dated May 24, 2016, Bates

10             stamped IDOC No. 000165 through 000177,

11             was marked for identification.)

12   BY MR. WACKMAN:

13      Q.     So what we're looking at is a multi-page

14   document.  What the court reporter has just handed

15   you is Plaintiff's Exhibit 13.  It is a multi-page

16   document, IDOC No. 000165, and it goes to 000177.

17             And I want to direct your attention,

18   ma'am, to Page 6 which is IDOC No. 000170.  And

19   actually, I realize -- Before we start there, what

20   month does this particular set of meeting minutes --

21      A.     This is May.  So it's April's.

22      Q.     And were you present at the --

23      A.     Yes.

24      Q.     -- May 2016 --
```

KATHY GALVIN                                    March 27, 2019

Page 126

 1          Ms. Galvin, let me finish my question.

 2  Were you present at the May 24th, 2016, QI meeting?

 3      A.   Yes.

 4      Q.   And did you prepare these minutes?

 5      A.   I should have, yes.

 6      Q.   And do you know who would have taken the

 7  notes for this meeting?

 8      A.   Mr. Christer should have.

 9      Q.   So directing your attention to Page 6,

10  which is IDOC No. 000170, do you see in the middle

11  "New or Delayed Diagnoses"?

12      A.   Yes.

13      Q.   And do you see Mr. Dean listed under that?

14      A.   No, I do not.

15      Q.   What explains that?

16      A.   The only thing I can explain is that I was

17  not notified of the new diagnosis at the time of

18  preparing this.

19      Q.   And who would have been responsible for

20  notifying you of the new diagnosis?

21      A.   Doctor would have.

22      Q.   I'm sorry?

23      A.   The doctor would have told me.

24      Q.   And that's Dr. Nawoor?

KATHY GALVIN                                          March 27, 2019

Page 127

1     A.    Yes.

2     Q.    What do you think accounts for him not

3  telling you?

4     A.    I cannot say why Doctor didn't tell me.

5     Q.    Do you see any indication in this document

6  that Mr. Dean was discussed at the May 24th Quality

7  Improvement meeting?

8     A.    No, I do not.

9     Q.    Let me direct to you Page 2, IDOC No.

10  000166.  Do you see at the bottom Mr. Dean is

11  referenced twice?

12     A.    Yes.

13     Q.    Do you have any way of telling if there

14  was any discussion about Mr. Dean in connection with

15  these references?

16     A.    No, because this is for outside consults

17  or procedures.  And he had two procedures done.

18     Q.    Do you recall if Mr. Dean was discussed at

19  this meeting?

20     A.    No, I do not.

21     Q.    When a new or delayed diagnosis is noted

22  on a form like this, is each one typically

23  discussed?

24     A.    No.  It's a reporting form is what this

Page 128

1   is.

2      Q.    So individual cases are only discussed if

3   one of the supervisors raises them?

4      A.    Correct.  If -- Only if the attendants of

5   the QI meeting -- That's the only way they would be

6   discussed.

7      Q.    And who were the supervisors present at

8   this QI meeting?

9      A.    You had Shawn Cates, my supervisor.  You

10  had Assistant Warden Zavala.  And the other person

11  was Healthcare Administrator Lisa Mincy, because

12  she's contract monitor, and the Regional, Cindy

13  Hobrock.

14     Q.    Who is Alton Angus?

15     A.    He is mental health.

16     Q.    Who is Nicole Stonecipher?

17     A.    She is my pharmacy tech -- or was my

18  pharmacy tech.

19     Q.    Who is Dr. Tweedy?

20     A.    Dr. Tweedy is mental health.

21     Q.    He is a psychiatrist or psychologist?

22     A.    It's a she.  And she's the Regional over

23  Alton.

24     Q.    Who is Don Grimes?

KATHY GALVIN                                    March 27, 2019

Page 129

```
 1     A.     Don Grimes is the pharmacist that inspects
 2  my pharmacy monthly.
 3     Q.     And who is Warden Smith?
 4     A.     Warden Smith is the current warden,
 5  Kimberly Smith.
 6     Q.     You can set both 12 and 13 aside.
 7            Did you ever discuss the scheduling of Mr.
 8  Dean's cancer surgery with Dr. Nawoor?
 9     A.     No, I did not.
10     Q.     Did you ever discuss the scheduling of Mr.
11  Dean's cancer surgery with Lisa Mincy?
12     A.     Not to my knowledge.
13     Q.     Did you ever discuss the scheduling of Mr.
14  Dean's cancer surgery with Chad Christer?
15     A.     I knew of it, but I don't know.  I know
16  that Chad and I spoke about it.  I knew we needed
17  more doctors involved.
18     Q.     But you don't recall who told you that?
19     A.     I don't recall.
20     Q.     Did you ever discuss the scheduling of Mr.
21  Dean's cancer surgery with your supervisor?
22     A.     No, I did not.
23     Q.     By that, I mean, Shawn Cates.
24     A.     No.
```

KATHY GALVIN                                    March 27, 2019

                                                    Page 130
 1      Q.    Did you ever discuss the scheduling of Mr.
 2  Dean's cancer surgery with any other Wexford
 3  employees?
 4      A.    No.  That would not have been my duty.
 5      Q.    Did you ever discuss the scheduling of Mr.
 6  Dean's cancer surgery with any other IDOC employees?
 7      A.    No.
 8      Q.    Do you recall if Mr. Dean was originally
 9  scheduled to have the cancer surgery on May 11th,
10  2016?
11      A.    No, I do not.
12      Q.    Do you recall if Mr. Dean ever filed a
13  grievance over the scheduling of his cancer surgery?
14      A.    No, I do not.
15            (Galvin Deposition Exhibit No. 14,
16            one-page document entitled Offender's
17            Grievance dated 5/16/2016, was marked for
18            identification.)
19  BY MR. WACKMAN:
20      Q.    I'm showing you what the court reporter
21  has marked as Plaintiff's Exhibit 14.  This is a
22  single-page document entitled "Illinois Department
23  of Corrections Offender's Grievance."  It does not
24  have a Bates stamp.

KATHY GALVIN                                        March 27, 2019

Page 131

 1              Do you recall if you've ever seen this

 2    document before?

 3       A.    No, I don't.

 4       Q.    Are you familiar with this type of

 5    document?

 6       A.    Yes.  And there's no Answer to this.

 7              MR. RUPCICH:  I will make a foundational

 8              objection.  This is an incomplete

 9              document.

10              MS. BOYLE:  I'll join.

11    BY MR. WACKMAN:

12       Q.    What do you mean by, "There's no Answer to

13    this"?

14       A.    At any time that an offender files a

15    grievance, they get an Answer to a grievance.

16       Q.    And that should be a second page?

17       A.    Well, it's usually on the first page.

18              (Mr. Rupcich handed Mr. Wackman a

19              document.)

20              MR. WACKMAN:  Counsel has just tendered to

21              me -- Do you mind if I mark this, Joe?

22              MR. RUPCICH:  No.  I printed it from the

23              Plaintiff's -- It's from the docket, I

24              think from the Complaint, Document 1.

KATHY GALVIN                                          March 27, 2019

Page 132

```
1            Do you see?

2            MR. WACKMAN:  Yes, I see.  Obviously, we

3            have it.  I don't know if the copy in our

4            file has the second page.  But we'll use

5            it, if you don't mind.

6            MR. RUPCICH:  Yes.  You can mark it.  It's

7            always a single page, though.  This looks

8            like it's blown up.

9            THE WITNESS:  Mmm-hmm.

10           (Galvin Deposition Exhibit No. 15,

11           one-page document entitled Offender's

12           Grievance dated 5/16/2016 (entire page

13           shown), was marked for identification.)

14           MR. RUPCICH:  Why don't we let the

15           Assistant Attorney General take a look at

16           that.

17  BY MR. WACKMAN:

18      Q.   What we're looking at is what has been

19  marked as Plaintiff's Exhibit 15.

20           MS. BOYLE:  It looks like -- Usually

21           there's a second page.  I'll make a note

22           of lack of additional page.  So they're

23           usually just one page.

24  BY MR. WACKMAN:
```

KATHY GALVIN                                    March 27, 2019

Page 133

1      Q.    So I'm handing to you what's been marked

2   as Plaintiff's Exhibit 15.

3      A.    Okay.

4      Q.    It is also a single-page document.  It

5   also says, "Illinois Department of Corrections

6   Offender's Grievance."  It also does not have a

7   Bates stamp.  However, it does have a Pacer header

8   at the top.

9            Have you seen this document before?

10     A.    Yes.  I've seen it.  The attorney showed

11  it to me.

12     Q.    Okay.  We will have to share; I apologize.

13     A.    That's okay.  Ms. Perry is a counselor.

14  So when -- This is the top half of this.  That's why

15  I said it's usually one page.  She would have called

16  me and told me about this, because it's marked

17  emergent by the Warden; okay?  And I responded to

18  her that the surgery is being scheduled.

19     Q.    So in the middle of this document where it

20  says, "Per Healthcare Unit D.O.N. Galvin" --

21     A.    Mmm-hmm.

22     Q.    -- "surgeon has been contacted to schedule

23  a surgical date."

24     A.    Correct.

Page 134

```
 1      Q.      "Currently awaiting a response"?
 2      A.      Correct.
 3      Q.      So you were notified of Mr. Dean's
 4 grievance regarding scheduling?
 5      A.      Right.
 6      Q.      And can you tell, based on this document,
 7 what time you -- when you were notified?
 8      A.      No.  No.  I can't.  Emergencies are
 9 usually handled within 24 hours if the Warden deems
10 it emergent.
11      Q.      So this was dated for response 5-18 --
12      A.      Right.
13      Q.      -- 2016?
14      A.      See, this was written on the 16th.  And we
15 gave a response on the 17th, so within the 24 hours.
16      Q.      So you were notified of this grievance --
17      A.      That he --
18      Q.      -- sometime between 5-16-2016 and
19 5-18-2016?
20      A.      No. 5-17.
21      Q.      Okay.  Sometime between 5-17-2016 and
22 5-18-2016?
23      A.      No.  Her response is dated 5-17.
24      Q.      So you were notified of this grievance on
```

KATHY GALVIN                                    March 27, 2019

Page 135

1  5-17-2016?

2      A.    Correct.  And I would not have read this

3  grievance.  She called me, and I told her, because

4  that's her response.

5      Q.    So she spoke with you on 5-17-2016.

6  Counselor Perry notified you of this grievance on

7  5-17-2016, and you responded that a surgery had not

8  been scheduled yet?

9      A.    No.  What I said, "Surgery has been" --

10 "Surgeon has been contacted to schedule a surgical

11 date.  Currently awaiting a response."

12     Q.    But a surgery had not been scheduled at

13 that time?

14     A.    Right.  For what reason, I don't know.

15     Q.    But, previously, you told Mrs. Dean that a

16 surgery had been scheduled?

17     A.    I had -- I don't know if this was after it

18 being scheduled and canceled and waiting for a

19 reschedule.

20     Q.    Based on this grievance, do you recall

21 what steps you took to schedule that surgery?

22     A.    I do not schedule.

23     Q.    What steps did you take, based on this

24 grievance?

KATHY GALVIN                                    March 27, 2019

Page 136

1    A.    I answered it -- this -- by -- I would

2  have went to my Medical Records Director, got the

3  information, and informed Ms. Perry that the surgeon

4  has been contacted and we're awaiting schedule.

5    Q.    Those are the only steps you took?

6    A.    That's the only steps I had to take.

7    Q.    What do you mean by those are the only

8  steps you had to take?

9    A.    All I had to do was answer the grievance.

10  Grievances are usually answered by the Healthcare

11  Administrator.  If the Healthcare Administrator is

12  not there and that's deemed emergent, I have to give

13  that offender an answer in 24 hours.

14    Q.    And that is your only duty in regards to

15  scheduling Mr. Dean's surgery?

16    A.    I do not schedule.  I am Site Manager and

17  supervisor over the nursing staff.  I am not a

18  scheduler.  I am not a Medical Records Director.

19    Q.    But you are the supervisor of the Medical

20  Records Director?

21    A.    That is not my duties.

22    Q.    But on May 17th, 2016, you were the

23  supervisor of the Medical Records Director?

24    A.    Yes.  And I gave a response.

KATHY GALVIN                                      March 27, 2019

Page 137

1      Q.      Why was it your duty to give a response?

2      A.      Because the only people that answer

3   grievances is the Healthcare Administrator and the

4   Director of Nursing.  And if we have had a

5   Healthcare Administrator, she was not available that

6   day.

7      Q.      I think we can set that document aside.

8      A.      Both of them?

9      Q.      Yes, yes.

10             Do you recall attending a Quality

11  Improvement meeting in May 2016?

12     A.      No, I don't.

13     Q.      We already discussed that one.

14     A.      Yes.

15     Q.      We discussed that one out of order.

16  Excuse me.

17             Do you recall attending the Quality

18  Improvement meeting in June 2016?

19     A.      No, I do not.

20             (Galvin Deposition Exhibit No. 16, 16-page

21             Memorandum dated June 28, 2016, Bates

22             stamped IDOC No. 000178 through 000193,

23             was marked for identification.)

24  BY MR. WACKMAN:

KATHY GALVIN                                    March 27, 2019

Page 138

```
 1      Q.     So what the court reporter just handed to
 2  you has been marked as Plaintiff's Exhibit 16.  It's
 3  a multi-page document, IDOC No. 000178 through IDOC
 4  No. 000193.
 5             What is this document, Ms. Galvin?
 6      A.     These are the minutes of the QI meeting
 7  for June.
 8      Q.     And did you prepare these minutes?
 9      A.     I can't say whether I did this or not,
10  because QI Coordinator is assigned by the Warden,
11  and it usually goes to the Healthcare Administrator.
12  So I may have, and I may not have.
13      Q.     So help me understand that.  Because,
14  before, I thought you said you were the QI
15  Coordinator.
16      A.     I did not have a Healthcare Administrator
17  for over five years, so I did both positions.
18      Q.     Okay.  When did you get a Healthcare
19  Administrator?
20      A.     I do not remember.  It's when Ms. Mincy
21  come on board.
22      Q.     Okay.  But you were present at this
23  meeting?
24      A.     Yes.
```

Page 139

1      Q.    Do you recall if Mr. Dean was discussed at

2   this meeting?

3      A.    No, because, like I said, there's no

4   reason to discuss a patient each time a QI meeting

5   is held.

6      Q.    So I will direct you to Page 2, which is

7   IDOC No. 000179.  And you see Mr. Dean is referred

8   to there?

9      A.    Mmm-hmm.

10     Q.    Does this tell you anything about whether

11  or not Mr. Dean was discussed at this meeting?

12     A.    No, because there looks like there's

13  approximately 20 other offenders that went out that

14  month.

15     Q.    Okay.  Was the scheduling of Mr. Dean's

16  surgery discussed at this meeting, to your

17  recollection?

18     A.    I cannot state it was, but I very much

19  doubt it.

20     Q.    And why do you very much doubt it?

21     A.    Because, as I stated in the past, if Mr.

22  Dean's surgery had been scheduled, then the Majors

23  and the Wardens needed to be aware of it for

24  staffing, for the offender to be accompanied by two

KATHY GALVIN                                    March 27, 2019

Page 140

1  correction officers.

2      Q.    I'm not sure I understand that.  Can you

3  repeat it?

4      A.    It is professional courtesy to let the

5  Warden and the Major who does the scheduling of the

6  correction officers, it's professional courtesy to

7  give them a heads up and say, "Hey, so-and-so's

8  going to either Decatur, Effingham.  Possibly you're

9  going to get into some overtime.  I'm going to need"

10  -- you know -- It's just a professional courtesy.

11  That's why I said there's 20-plus men that went out

12  that month.  But you tried to be courteous so that

13  you didn't have a problem with staffing.

14      Q.    So what you're saying is that Mr. Dean --

15  the scheduling of Mr. Dean's surgery might have been

16  discussed with the Wardens or the Majors --

17      A.    Correct.

18      Q.    -- outside of the meeting?

19      A.    Correct.

20      Q.    But not at this meeting?

21      A.    Right.

22      Q.    I understand.

23      A.    Okay.

24      Q.    It's all new to me.

KATHY GALVIN                                    March 27, 2019

Page 141

1      A.     It's still replaying in my head, I'm

2  telling you.

3      Q.     Do you ever recall discussing with any

4  Wexford or IDOC employees the effect of any delay in

5  scheduling Mr. Dean's surgery on his health?

6      A.     No.

7      Q.     Do you recall when Mr. Dean actually had

8  his cancer surgery?

9      A.     No, I do not.

10     Q.     To the best of your knowledge, did Dr.

11  Nawoor take any steps to have Mr. Dean's cancer

12  surgery scheduled sooner or moved up?

13     A.     No, I do not.

14     Q.     To the best of your knowledge, did Chad

15  Christer take any steps to have Mr. Dean's cancer

16  surgery scheduled sooner or moved up?

17     A.     Mr. Christer would have went for the first

18  available date that they would have gave him.

19     Q.     How do you know that?

20     A.     If you ever -- You can put this on the

21  record.  Have you ever tried to schedule a procedure

22  that you need done?  It takes time.  Your doctor,

23  your primary doctor, tries to schedule with another

24  ...  They all have schedules.  So it's very

Page 142

1  difficult.

2         And I can tell you, due to the severity,

3  he would have took the first one he could have got.

4     Q.    I'm asking how you know that, though?

5     A.    I don't know that.

6     Q.    So you never asked him?

7     A.    No.

8     Q.    You never spoke with him about the

9  scheduling of Mr. Dean's cancer surgery?

10    A.    No.

11    Q.    Basically, you just trust Mr. Christer to

12 have done it correctly?

13    A.    I know that Mr. Christer done it

14 correctly.

15    Q.    How do you know that?

16    A.    Because I know of the hardship to getting

17 a scheduled appointment outside of Corrections.

18 Corrections are very hard to schedule.  You have to

19 find a doctor that will see them.  It is a very

20 trying task.

21    Q.    Do you know if Mr. Christer called

22 multiple doctors to schedule Mr. Dean's surgery?

23    A.    I know that he had the urologist on board.

24 The urologist wanted more specialists.  I do not

KATHY GALVIN                                    March 27, 2019

Page 143

 1  know if the urologist spoke to the other

 2  specialists, but I imagine he would have picked his

 3  team.

 4      Q.    To the best of your knowledge, did Ms.

 5  Mincy take any steps to have Mr. Dean's cancer

 6  surgery scheduled sooner or moved up?

 7      A.    I'm not aware.

 8      Q.    To the best of your knowledge, did any

 9  Wexford employees take any steps to have Mr. Dean's

10  cancer surgery scheduled sooner or moved up?

11      A.    Not that I'm aware of.

12           MR. WACKMAN:  Why don't we take a little

13           break and go off the record.

14           (Whereupon at this point in the

15           proceedings, a recess was held from 12:35

16           p.m. to 12:51 p.m., after which the

17           following proceedings were conducted:)

18           MR. WACKMAN:  We're back on the record.

19           (Galvin Deposition Exhibit No. 17,

20           one-page document entitled Offender

21           Outpatient Progress Notes, Bates stamped

22           IDOC Taylorville Med Recs 001390, was

23           marked for identification.)

24  BY MR. WACKMAN:

KATHY GALVIN                                    March 27, 2019

Page 144

1        Q.      Ms. Galvin, I handed you what's been

2    marked by the court reporter as Plaintiff's

3    Exhibit 17.  It's a single-page document from Mr.

4    Dean's Offender Outpatient Progress Notes Bates

5    stamped IDOC Taylorville Med Recs 001390.  And do

6    you recognize this document, ma'am?

7        A.      Mmm-hmm.

8        Q.      What is this document?

9        A.      This is a progress note out of a patient's

10   chart.  And I made the note of what he had had done.

11       Q.      So this entry dated 7-20-2016, you made

12   this note?

13       A.      Yes.

14       Q.      And that's your signature at the bottom

15   there?

16       A.      Right.

17       Q.      Why did you make this note?

18       A.      Well, if the patient is out in the

19   hospital, a note has to be made daily by someone,

20   and it should be the nurse.  So what I did is I got

21   the update on him and placed it in chart.

22       Q.      Do you have any recollection why it was

23   you and not his nurse who did it?

24       A.      Well, if he wasn't in the infirmary and

KATHY GALVIN                                    March 27, 2019

Page 145

1  was outside at the hospital, an entry has to be

2  made.  Now, Doctor made an entry.  But, as you see,

3  it was the next day.  So I had no day with an entry.

4  So I put an entry as to what the procedure had done

5  and what Mr. Dean went through.

6      Q.    And you can review the note if you need

7  to.  This note concerns Mr. Dean's cancer surgery;

8  is that correct?

9      A.    Correct.

10     Q.    And the note reflects that the cancer

11 surgery occurred on July 19th, 2016; is that

12 correct?

13     A.    Well, yes.

14     Q.    And we previously spoke about how Mr. Dean

15 was diagnosed with cancer in April 2016,

16 specifically, April 13, 2016; is that correct?

17            MR. RUPCICH:  Object to the foundation.

18            MS. BOYLE:  I'll join.

19            THE WITNESS:  I don't know what date he

20            was diagnosed.

21 BY MR. WACKMAN:

22     Q.    Well, we previously spoke about

23 conversations with Mr. Dean's wife about the

24 scheduling of his cancer surgery in April 2016;

Page 146

1    isn't that correct?

2        A.    Correct.

3        Q.    So it took from at least April 25th, 2016,

4    to July 19th, 2016, for Mr. Dean to receive cancer

5    surgery; isn't that correct?

6        A.    Correct.

7        Q.    Do you have any idea why it took so long?

8              MR. RUPCICH:  Object to the form;

9              foundation.

10             MS. BOYLE:  I'll join.

11             THE WITNESS:  As I stated, you have to

12             have the doctors and scheduling.  And he

13             required three other doctors.

14   BY MR. WACKMAN:

15       Q.    How do you know he required three other

16   doctors?

17       A.    Just by -- I was talking to my attorney.

18   And I knew that he needed a cardiologist, but

19   evidently there was more involved in the case.

20       Q.    But you didn't know that at the time that

21   the surgery was being scheduled that he required

22   those other doctors; isn't that right?

23       A.    No.  I knew of one more.

24       Q.    Are there any steps that could have been

KATHY GALVIN                                    March 27, 2019

Page 147
1  taken to expedite Mr. Dean's surgery or move it up?

2          MR. RUPCICH:  Object to the foundation.

3          THE WITNESS:  I cannot state that.

4  BY MR. WACKMAN:

5      Q.    I think we can set this document aside.

6            Ms. Galvin, are you familiar with the drug

7  Votrient?

8      A.    No, I am not.

9      Q.    Are you aware that Mr. Dean was prescribed

10 Votrient on --

11     A.    No, I am not.

12     Q.    --October 19, 2016?

13     A.    No, I am not.

14     Q.    Do you want to take a look at Exhibit 2,

15 which is the Complaint and the Answer?

16            And I'll direct you to Page 20, Ms.

17 Galvin, specifically Paragraph 53.  And you see in

18 the Response where it says, "Defendants admit

19 Plaintiff was prescribed Votrient on October 19th,

20 2016"?

21     A.    (Witness nods head affirmatively).

22     Q.    But just to restate, you do not recall

23 being aware that Mr. Dean was prescribed Votrient on

24 that date?

KATHY GALVIN                                    March 27, 2019

Page 148

1     A.    No.

2     Q.    Based on your knowledge and experience at

3 Taylorville, who would have been responsible for

4 making sure Mr. Dean received his Votrient?

5     A.    The doctor.  Because even though this

6 doctor ordered it, once he's inside the institution,

7 this doctor is not in IDOC.  Dr. Nawoor would have

8 had to order it.

9     Q.    So Dr. Nawoor would have had to order the

10 drug that Dr. Guaglianone, who is Mr. Dean's cancer

11 doctor --

12    A.    Correct.

13    Q.    -- prescribed for him?

14    A.    Yes.

15    Q.    Did you ever discuss Votrient with Mr.

16 Dean?

17    A.    No.

18    Q.    Were you ever present at an appointment

19 with Dr. Nawoor where he discussed Votrient with Mr.

20 Dean?

21    A.    No.

22    Q.    You can set the Complaint aside.

23          (Galvin Deposition Exhibit No. 18,

24          one-page document entitled Offender

KATHY GALVIN                                        March 27, 2019

Page 149

1              Outpatient Progress Notes, Bates stamped

2              IDOC Taylorville Med Recs 001478, was

3              marked for identification.)

4    BY MR. WACKMAN:

5      Q.    The court reporter just handed you what's

6    been marked as Plaintiff's Exhibit 18, which is a

7    single-page document from Mr. Dean's Offender

8    Outpatient Progress Notes, and the Bates number at

9    the bottom is IDOC Taylorville Med Recs 001478.

10             And then I'm also going to go ahead and

11   have the court reporter mark the next exhibit.

12             (Galvin Deposition Exhibit No. 19,

13             one-page document entitled Illinois

14             Department of Public Health Uniform

15             Do-Not-Resuscitate (DNR) Advance

16             Directive, Bates stamped IDOC No. 000610,

17             was marked for identification.)

18   BY MR. WACKMAN:

19     Q.    And this will be Plaintiff's Exhibit 19,

20   which is a single-page document entitled "Uniform

21   Do-Not-Resuscitate Advance Directive."  And this is

22   Bates number -- it's a little difficult to read --

23   IDOC No. 000610.

24             But I want to look first at Exhibit 18,

Page 150

1  which is the sick call note, Ms. Galvin.  And do you

2  see under the S in the sick call note that the note

3  discusses Votrient?

4       A.    Mmm-hmm.

5             MR. RUPCICH:  "Yes"?

6             THE WITNESS:  Yes.

7  BY MR. WACKMAN:

8       Q.    Do you see -- I direct your attention to

9  sort of towards the bottom on the right, it says --

10 I believe it says, "DNR discussed and signed by

11 patient"?

12      A.    Yes.

13      Q.    Is that your reading of Dr. Nawoor's

14 handwriting there?

15      A.    Yes.

16      Q.    And what is the date of this note?

17      A.    November 8th of '16.

18      Q.    And then let's look at 19 -- Exhibit 19.

19 And what is the date on this DNR?

20      A.    November 8th of '16.

21      Q.    And this is signed by you; correct?

22      A.    Yes.  It witnessed it.

23      Q.    Okay.  So were you present for at least

24 some of this 11-8 appointment?

KATHY GALVIN                                      March 27, 2019

Page 151

1    A.    No.  No.

2    Q.    Okay.  So explain to me that, why you are

3  so confident?

4    A.    This nurse is the second-shift nurse.  She

5  was probably being orientated to days and working

6  with another nurse.

7          The DNR needed to be witnessed.  So I came

8  in and witnessed it.

9    Q.    So you were not present for this whole

10  meeting?

11    A.    No.

12    Q.    You only stepped in when the DNR needed to

13  be witnessed?

14    A.    Correct.

15    Q.    Is that your recollection, or is that just

16  sort of what you think probably happened?

17    A.    That's what I think happened.

18    Q.    Okay.  Were you there when Dr. Nawoor

19  explained this DNR to Mr. Dean?

20    A.    Yes.

21    Q.    So what is a DNR?

22    A.    It's a do-not-resuscitate.  It's kind of a

23  complicated form.  But every terminally-ill patient,

24  the hospital will address a DNR, but we needed one

Page 152

1  for IDOC.

2         Now they have one now that the hospital

3  honors that comes to us and we do it.  But at this

4  time, we had nothing on Mr. Dean, so we had to get a

5  DNR as to what his wishes were if something was to

6  happen.

7     Q.    Did you try to convince Mr. Dean to sign

8  this as do not attempt to resuscitate?

9     A.    No, I did not.

10    Q.    Do you recall if Dr. Nawoor tried to get

11 Mr. Dean to sign this as do not attempt to

12 resuscitate?

13    A.    I do not recall that.

14    Q.    Do you recall anything about the

15 discussion with Mr. Dean regarding this DNR?

16    A.    As I stated to my attorney, I would have

17 -- if he did not understand it, I would have

18 explained it to him.  "If you quit breathing, do you

19 want us to do CPR?  Do you know what CPR is?"  And

20 then I would have read all three of these under

21 B for him to determine.

22         Now, in his note to Doctor, he wanted

23 everything done.  As you can see, Doctor says, "He

24 wants everything done."

Page 153

1      Q.     I'm sorry.  Can you show me where you see

2    that, Ms. Galvin?  And we're looking at Exhibit 18.

3      A.     (Witness indicating).

4      Q.     I see there.  Right at the bottom beneath

5    the DNR note?

6      A.     Yeah.

7      Q.     Where it says, "Discussed and signed by

8    patient," the note says, "He wants everything done"?

9      A.     Yes.  So I would have explained to him

10   what CPR is, and I would have read to him what the

11   three majors are.  And since he wanted everything

12   done, I read to him what intubation and mechanical

13   ventilation is.

14     Q.     Do you recall what Mr. Dean said about

15   this DNR, if anything?

16     A.     No, I don't.

17     Q.     Do you recall what Dr. Nawoor said about

18   this DNR, if anything?

19     A.     No, I do not.

20     Q.     And you don't recall what you said?

21     A.     No, I do not.

22     Q.     I think we can set these two aside.

23            Let's take a look back at the Complaint,

24   Exhibit 2.  Or I should say the Answer.  I keep

KATHY GALVIN                                    March 27, 2019

Page 154
1  calling it the Complaint.  The Answer.  Excuse me.

2           And let's look at Page 21, Paragraph 56.

3  And if you want to read that to yourself, Ms.

4  Galvin, just let me know when you're ready.

5           MR. RUPCICH:  Did you read all of it?

6           THE WITNESS:  Mmm-hmm.  I'm a scanner.

7           I'm sorry.  Too many medical records.

8           MR. RUPCICH:  You read the Response?

9           THE WITNESS:  Yes.

10          MR. RUPCICH:  Okay.

11  BY MR. WACKMAN:

12     Q.    So what I want to ask about in the

13  Response, Ms. Galvin, is where it says, "Defendants

14  admit Dr. Nawoor and Kathy Galvin discussed possible

15  alternative treatments and advanced directives with

16  Plaintiff," do you see that?

17     A.    I see that.

18     Q.    And I want to ask what would have been

19  meant by "alternative treatments"?

20     A.    That would have been the explanation of A,

21  B, and C on this form.

22     Q.    So "alternative treatments" does not mean

23  alternative cancer treatments?

24     A.    No.  I would not have been involved in

KATHY GALVIN                                    March 27, 2019

Page 155

1  that.

2      Q.    It does not mean drugs besides Votrient?

3      A.    No.

4      Q.    Okay.  We can set that aside.

5            (Galvin Deposition Exhibit No. 20,

6            one-page document entitled Offender

7            Outpatient Progress Notes, Bates stamped

8            IDOC Taylorville Med Recs 001477, was

9            marked for identification.)

10 BY MR. WACKMAN:

11     Q.    I'm showing you what's been marked by the

12 court reporter as Exhibit 20, a single-page excerpt

13 from Mr. Dean's Offender Outpatient Progress Notes

14 Bates stamped IDOC Taylorville Med Recs 001477.

15           Do you recall if you've ever seen this

16 before?

17     A.    No, I do not.

18     Q.    But this is the type of thing you would --

19     A.    I would have looked at.

20     Q.    -- reviewed as part of your audit?

21     A.    (Witness nods head affirmatively).

22     Q.    I want to direct your attention to the

23 bottom right, the entry at the bottom right above

24 Dr. Nawoor's stamp.  And do you agree that says,

KATHY GALVIN                                    March 27, 2019

Page 156

1    "Dr. Ritz will be talking to the oncologist about

2    alternative drug"?

3        A.    Yes.

4        Q.    And that reference to an alternative drug

5    is not the "alternative treatments" that is referred

6    to in the Answer?

7        A.    No.

8        Q.    Did you know that there was discussions of

9    an alternative drug for Mr. Dean?

10       A.    No.

11       Q.    I think you can set that aside.

12             (Galvin Deposition Exhibit No. 21,

13             one-page document entitled Medication

14             Administration Record, Bates stamped IDOC

15             Taylorville Med Recs 001579, was marked

16             for identification.)

17   BY MR. WACKMAN:

18       Q.    So this is what the court reporter has

19   marked as Plaintiff's Exhibit 21.  It is a

20   single-paged record entitled "Medication

21   Administration Record."  The Bates stamp is IDOC

22   Taylorville Med Recs 001579.

23             And you would have reviewed this as part

24   of your audit of medication records; is that

KATHY GALVIN                                    March 27, 2019

Page 157

1  correct, Ms. Galvin?

2      A.      Correct.

3      Q.      Do you know if you've ever reviewed this

4  document before?

5      A.      I do -- No, I cannot say for sure I did.

6      Q.      But I believe you previously testified,

7  and please correct me if I'm wrong, that you

8  reviewed every prescription record on a weekly

9  basis?

10     A.      But I am looking specifically for

11 administrative nurse down at the bottom here.

12     Q.      That's P. Smith here?

13     A.      Well, it's P. Smith here.  But it was

14 Michelle Hughes that initiated it.

15     Q.      Okay.

16     A.      Okay?  What I'm looking for is her

17 initials, her signature, to ensure whether the

18 medicine had been given.  And, as you see, each time

19 she has a code up there.  And see where she put

20 "ERROR" "ERROR"?

21     Q.      Mmm-hmm.

22     A.      And then on the 16th and 17th, she has a

23 6.

24     Q.      Mmm-hmm.

KATHY GALVIN                                    March 27, 2019

Page 158

1    A.    If you had the back copy of this, that is

2  a code for the medication.  And I am -- I'm going on

3  recall.  I'm saying the medication was not in stock

4  at the time on the 16th and 17th.

5    Q.    So your review of this record, which you

6  don't recall reviewing this record, but this is the

7  type of record you reviewed weekly?

8    A.    Yes.

9    Q.    And you reviewed every single one of these

10  records weekly?

11    A.    Yeah, 1,200.

12    Q.    And this covers -- Looking at the bottom,

13  this covers the month of November 2016?

14    A.    Correct.

15    Q.    And you were Director of Nursing at

16  Taylorville?

17    A.    Correct.

18    Q.    So you almost certainly would have

19  reviewed this record?

20    A.    Yeah.

21    Q.    Okay.  The only thing you were reviewing

22  for is compliance with putting the signature in and

23  then the initials being when the medication was

24  administered?

KATHY GALVIN                                    March 27, 2019

Page 159

 1    A.      Correct.

 2            MR. RUPCICH:  Can we take one minute?  I'm

 3            sorry.

 4            MR. WACKMAN:  Yes.  Let's go off the

 5            record.

 6            (A discussion was held off the record.)

 7            MR. WACKMAN:  Let's go back on the record.

 8    BY MR. WACKMAN:

 9    Q.      So you would have had no reason to review

10    whether this record reflects that Mr. Dean was

11    correctly receiving the medications that were

12    ordered for him?

13    A.      Correct.  Because I have the order dated

14    10-22; okay?  And also awaiting non-formulary

15    approval was approved for four months.  So once we

16    get that non-formulary approval, then we get the

17    medication.

18    Q.      Do you know what it means for

19    non-formulary approval?

20    A.      It's not on the IDOC drugs listed.  And

21    with it being a cancer drug, which I'm surmising

22    that's what it is by looking at this and the

23    patient, that what is on formulary is automatically

24    given.  Non-formulary has to be approved before we

Page 160

1    can get it.

2         Q.    Do you know if it's typical for a

3    non-formulary drug to take several weeks to be

4    approved?

5         A.    It's not typical.

6               Now, another thing, when was the approval?

7    Because I don't have the date of approval there.

8    See?

9         Q.    It says, "11-14" next to Approved.

10        A.    Yeah, so, you know, I don't know when it

11   was submitted.  So it was approved on 11-14.  And we

12   administered it on 11-18.

13        Q.    Why do you think it was not typical?

14        A.    Why it was not what?

15        Q.    You just said you didn't think it was

16   typical for it to take several weeks to be approved.

17        A.    It isn't.  They may -- A lot of times,

18   other than cancer drugs, they may recommend an

19   alternative drug with the same action.

20        Q.    Mmm-hmm.

21        A.    And I've never seen it on a cancer drug,

22   though.

23        Q.    Have you ever seen a drug in your

24   experience that took this amount of time to be

Page 161

1    approved?

2        A.    No.

3        Q.    When it says, "Original Order," is it your

4    understanding that that is the date that Dr. Nawoor

5    entered the order?

6        A.    It would have to be the date that he

7    ordered it.

8        Q.    And by "he," you mean Dr. Nawoor?

9        A.    Yes.  That would be the date on the

10   prescription itself.

11       Q.    And then this reflects that Mr. Dean did

12   not actually receive a dosage of this until

13   November 18th; is that correct?

14       A.    Correct.

15       Q.    Did you ever speak with Dr. Nawoor about

16   Mr. Dean's prescription of Votrient?

17       A.    No, I did not.

18       Q.    Did you ever speak with Dr. Nawoor about

19   the administration of Votrient to Mr. Dean?

20       A.    No, I did not.

21       Q.    Did you ever speak with any Wexford

22   employee about Mr. Dean's Votrient prescription?

23       A.    No, I did not.

24       Q.    Did you ever speak with any Wexford

KATHY GALVIN                                    March 27, 2019

Page 162

1  employee about the administration of Mr. Dean's

2  Votrient?

3      A.    No, I did not.

4      Q.    Did you take any steps to assist in Mr.

5  Dean's Votrient being approved?

6      A.    That was not my position to do.

7            MR. WACKMAN:  I think that's all I have.

8                 RE-CROSS EXAMINATION

9  BY MR. RUPCICH:

10     Q.    I'm sorry.  I have a couple of questions.

11           Ms. Galvin, you were asked just recently

12  about non-formulary requests.  Are you familiar with

13  that process?

14     A.    Yes.

15     Q.    Is that something that needs to be -- a

16  form that needs to be filled out or --

17     A.    A form is filled out by the doctor.  And

18  it is sent to the pharmacy.  And the pharmacy gets

19  the approval.

20     Q.    So when you looked at Exhibit 21 that had

21  an original date of 10-22-16 on Votrient, you had

22  said that would be the date Dr. Nawoor wrote a

23  prescription?

24     A.    Correct.

KATHY GALVIN                                    March 27, 2019

Page 163

1      Q.      Would that prescription be then
2  accompanied with a non-formulary request?
3      A.      It would.  And Doctor had to fill out the
4  non-formulary.  So he may have wrote the script, and
5  we possibly had to take it to him the next day to
6  get it.  But no more delay than that.
7      Q.      And then there would be a process to
8  approve that non-formulary medication?
9      A.      Correct.
10     Q.      A process you weren't involved in?
11     A.      No.  I was not involved.
12     Q.      Your testimony is you don't have specific
13 recollection of discussing Mr. Dean's advance
14 directive with him?
15     A.      No.  I just know what I would have done.
16 I would have come in, because I wasn't the attending
17 nurse.
18     Q.      You had a custom and practice for
19 presenting information on DNRs to patients?
20     A.      Yes.
21     Q.      And that was typically how you did things?
22     A.      Well, with this doctor, because he talked
23 so low, so quiet, that he -- and he was hard to hear
24 and understand at times.  So all DNRs have to be

KATHY GALVIN                                        March 27, 2019

Page 164

1  witnessed.  And I feel they have to be explained.

2      Q.    Did you attend multiple physician/patient

3  encounters with Dr. Nawoor and a patient that

4  involved a DNR?

5      A.    Oh, yes.  Anybody that we had terminal.

6      Q.    Was it part of your practice to encourage

7  a patient to choose any particular option over

8  another as far as life-sustaining treatment?

9      A.    No.

10     Q.    Was it part of your process to encourage

11  them to decline life-prolonging treatment?

12     A.    No.

13     Q.    Was that something Dr. Nawoor did?

14     A.    Not that I was aware of.

15     Q.    You never saw him do that?

16     A.    I never seen him do it.

17     Q.    You were shown in the Answer to the

18  Complaint, which is Exhibit 2, where it referenced

19  April 25, 2016, you having a call with Mrs. Dean.

20  Do you recall that?

21           MR. WACKMAN:  Page 14.

22           MR. RUPCICH:  Thank you.

23           THE WITNESS:  Yes.

24  BY MR. RUPCICH:

KATHY GALVIN                                    March 27, 2019

Page 165

1     Q.    Right.  And you spoke with her on

2  April 25, 2016.  And your testimony was that you

3  informed her the operation had been approved, and

4  you also said it had been scheduled?

5     A.    Correct.

6     Q.    Okay.  And you were shown -- Well, let me

7  say I believe it was your testimony that you were

8  aware at some point the surgery was rescheduled?

9     A.    (Witness nods head affirmatively).

10    Q.    Is that right?

11    A.    Yes.

12    Q.    Now when you spoke with Mrs. Dean, I

13  think, did you say you went and verified with Chad?

14    A.    Yes.

15    Q.    Now as it relates to the grievance

16  response, that was ...

17          MR. WACKMAN:  15.  She's got it in the

18          stack.

19  BY MR. RUPCICH:

20    Q.    So as of April 25, 2016, it is your

21  testimony you verified that that surgery was

22  approved and scheduled?

23    A.    Correct.

24    Q.    Now as it relates to Exhibit 15, you

KATHY GALVIN                                          March 27, 2019

1  provided information to the counselor to respond to

2  a grievance on May 17, 2016?

3      A.    Correct.

4      Q.    And I believe your testimony was your

5  process would have been again to go check with Chad?

6      A.    Correct.

7      Q.    And then information that you provided to

8  the counselor was that they were waiting on response

9  from the surgeon?

10     A.    Correct.

11     Q.    So as of the time of this grievance

12 response that you gave May 17, 2016, the surgery was

13 not scheduled at that time?

14     A.    The surgery had been scheduled, and then

15 the need for more medical assistants.

16     Q.    Okay.  So you can infer from the

17 information you gave to the counselor May 17, 2016,

18 this was at the time the surgery had been called off

19 by the surgeon?

20     A.    Right.  And her response is, "Surgical

21 date currently awaiting response."

22     Q.    So if there were to be a suggestion the

23 information you gave to Mrs. Dean on April 25, 2016,

24 was incorrect, what would your response to that be?

Page 167

1    A.    No.  I was told it was approved and

2 scheduled.

3    Q.    Do you have any recollection of any

4 encounters with Mr. Dean after his surgery where he

5 expressed how he felt about having gone through the

6 surgery or --

7    A.    None.

8    Q.    Nothing?

9    A.    None.

10    Q.    No gratitude that he expressed to Dr.

11 Nawoor or anything like that?

12    A.    All I can go is on hearsay.  Dr. Nawoor

13 would say he was grateful.

14    Q.    You didn't personally witness it?

15    A.    No.  I didn't witness it.

16    Q.    When we look at the QI minutes, they list

17 a Felicia Waterman at certain points; correct?

18    A.    Correct.

19    Q.    And then at some point, she stops

20 appearing, and Chad appears?

21    A.    Correct.

22    Q.    Would that coincide with when Chad took

23 over as Medical Records Director?

24    A.    Correct.

KATHY GALVIN                                    March 27, 2019

Page 168

1    Q.    Do you know when you were Director of
2 Nursing at Taylorville if ultrasounds were ever done
3 on-site?
4    A.    Yes.  Ultrasounds were done by Jim.  I
5 can't even think of -- Dawson.  Was that his last
6 name?  He would come on site.  And he would have a
7 note and record if it had been done.
8    Q.    Do you know anything about the scheduling
9 of ultrasounds done on-site, as opposed to off-site
10 diagnostic testing?
11    A.    If it was something that Doctor stated
12 could be done on-site, then we would schedule them
13 all to be on-site.  But Dr. Nawoor made that
14 determination.
15    Q.    I want you to look at IDOC Taylorville
16 Medical Records 1343 for February 2nd, 2016.
17    A.    Mmm-hmm.
18    Q.    Do you recognize the nurse?
19    A.    Yeah.
20    Q.    Who is that?
21    A.    That's Megan Eggiman.  She is now the DON.
22    Q.    Okay.  And it reads, "Informed inmate to
23 have full bladder for on-site ultrasound 2-2-16."
24 Do you see that?  Is that what that means?

KATHY GALVIN                                    March 27, 2019

Page 169

 1     A.     Well, that -- No, that ain't what that

 2   means, because it says, "Ultrasound tomorrow

 3   on-site."

 4     Q.     So does that give you any clue as to where

 5   they were going to do the ultrasound?

 6     A.     Yes.  At Correctional.

 7     Q.     At Corrections?

 8     A.     And you should right on that date find a

 9   note from Jim.  Okay.  Yeah.  "Renal bladder.  Jim

10   Dawson," yeah, 2-2.

11     Q.     "Sonogram completed."

12     A.     Yeah.

13     Q.     Same date?

14            MR. WACKMAN:  Is that the same record?

15            MR. RUPCICH:  Same page.  1343.

16   BY MR. RUPCICH:

17     Q.     Now if you look at the next page, 1344,

18   February 5, 2016, there's a medical records note,

19   "Ultrasound report was e-mailed to Dr. Einwohner?

20     A.     Einwohner, yeah.

21     Q.     Do you recognize who made that entry?

22     A.     Felicia did.

23     Q.     Felicia Waterman?

24     A.     Yes.

KATHY GALVIN                                          March 27, 2019

Page 170

1     Q.     And I think previously there had been some

2  confusion or some testimony over whether Chad was

3  involved with the scheduling of this February 2016

4  ultrasound.  Does this give you any indication one

5  way or another?

6     A.      If Felicia e-mailed it, the only way I

7  would know is if Chad wasn't off -- wasn't working

8  that day and Dr. Einwohner requested it.  And she

9  would have sent it to her.

10    Q.     Okay.  So this doesn't necessarily mean

11 Chad was not Medical Records Director at this time?

12    A.     No.  Chad, from the time he walked in, was

13 Medical Records Director.

14    Q.     Got it.

15           Take a look at Exhibit 10, which is the

16 March 10, 2016, QI.

17    A.     Mmm-hmm.

18    Q.     And I think what we clarified was the data

19 in a March QI would have been February data?

20    A.     Correct.

21    Q.     But the meeting is in March?

22    A.     Correct.

23    Q.     Members present.  Is Chad listed?

24    A.     No, he's not.

Page 171

 1      Q.      Is Felicia Waterman?

 2      A.      Yes, she is.

 3      Q.      So would that suggest to you that in

 4   February, Chad wasn't there?

 5      A.      Correct.

 6      Q.      Would that suggest to you he wasn't the

 7   Medical Records Director in February 2016?

 8      A.      Correct.  Or he was out at that time.

 9      Q.      You were asked about your supervision of

10   Chad Christer in your role as DON.  Do you remember

11   that?

12      A.      Yes.

13      Q.      And you were asked how you would know he

14   was I guess not doing his job if he didn't tell you.

15   Do you remember that line of questioning?

16      A.      Yeah.

17      Q.      If Chad wasn't doing his job as it relates

18   to medical records, would those records be a mess?

19      A.      Oh, they'd be a total mess.  Not only

20   that, you would have the offenders writing these

21   grievances, I would be stopped in the hallway, and I

22   would have Doctor coming to me, too.

23      Q.      So part of what Chad did was make sure the

24   notes got to the chart?

Page 172

1     A.     Correct.

2     Q.     And if that wasn't happening, is that

3  something you think you would have found out?

4     A.     Oh, yeah.

5     Q.     And that didn't happen?

6     A.     No.

7     Q.     Now one of Chad's other roles was to

8  schedule approved appointments?

9     A.     Correct.

10     Q.     If Chad was not scheduling them, is that

11  something you think you would have found out?

12     A.     Yes.

13     Q.     Did that ever happen?

14     A.     No.

15     Q.     You were asked about the co-pay for

16  nursing sick call; do you remember that?

17     A.     Yes.

18     Q.     Are you familiar with the co-pay system?

19     A.     Oh, yeah.

20     Q.     Do you know who imposed the co-pay,

21  Wexford or the State?

22     A.     No.  That's the State.  And I misquoted

23  and said $2.  I believe it's $5 now.  When I came on

24  board, it was 2.

KATHY GALVIN                                    March 27, 2019

Page 173
1      Q.    You were asked about specific nursing
2   protocols, and you were shown one for urinary tract
3   infection.
4      A.    Mmm-hmm.
5      Q.    Is there a specific protocol when you were
6   there for hematuria?
7      A.    No.  There is now.
8      Q.    Have you ever heard of Dr. Severino?
9      A.    I know Dr. Severino.
10     Q.    You know Dr. Severino?
11     A.    (Witness nods head affirmatively).
12     Q.    Is he a surgeon that was used by
13  Taylorville for urology when you worked there?
14     A.    That, I believe, was the only time that I
15  knew of Dr. Severino working for Wexford and IDOC.
16     Q.    And how are you familiar with him then?
17     A.    Dr. Severino was my son's urologist.
18     Q.    Are you familiar with his reputation as a
19  urologist?
20     A.    He's fabulous.
21     Q.    And that's based upon your experience and
22  things you've heard?
23     A.    Oh, yeah.  Yeah.  He -- he is a urologist
24  that puts his patients first and goes over and

KATHY GALVIN                                    March 27, 2019

Page 174

1  beyond what he has to.

2      Q.     I'm almost done.  You were asked about

3  hematuria and being able to see blood observable in

4  a specimen.

5      A.     Yeah.

6      Q.     Do you know if it's possible for blood to

7  be in urine but not be grossly observable?

8      A.     Yes.  That's when I said the dipstick will

9  determine it, the chemical stick.  Because it won't

10  be visible to the human eye, but it will show up on

11  the dipstick.

12     Q.     It can be microscopic?

13     A.     Yes.

14     Q.     Are there any LPNs at Taylorville?

15     A.     Not at Taylorville.

16     Q.     All RNs?

17     A.     All RNs.

18     Q.     Did you supervise Dr. Nawoor on clinical

19  issues?

20     A.     I do not supervise the doctor.

21     Q.     I think we have established that.  I think

22  you said Dr. Matticks did that?

23     A.     Dr. Roderick Matticks is his supervisor.

24     Q.     And Cates was over nursing?

KATHY GALVIN                                    March 27, 2019

Page 175

1    A.    Cates is over the site.

2          MR. RUPCICH:  All right.  That's my

3          questions.

4          MS. BOYLE:  I don't have any questions.

5                RE-DIRECT EXAMINATION

6  BY MR. WACKMAN:

7    Q.    I have a couple of follow-ups on Joe's

8  questions.

9          MR. RUPCICH:  If you need any of those

10         records ...

11         MR. WACKMAN:  I appreciate that.

12  BY MR. WACKMAN:

13    Q.    Your counsel asked you about Plaintiff's

14  Exhibit 21, which is the Votrient scheduling record.

15  And I believe your testimony was, correct me if I'm

16  wrong, that non-formulary approval would accompany

17  the doctor's order or maybe be submitted the next

18  day; is that correct?

19    A.    It may have been.  If Doctor just wrote

20  out the script and we needed a non-formulary and he

21  did not fill it out, we would have took it to him

22  and told him we needed a non-formulary.

23    Q.    But in your experience, if non-formulary

24  approval was required, it would be submitted no

Page 176

1    later than one day after the order was placed?

2       A.    Right.

3       Q.    So for this, referring to Exhibit 21, the

4    order was placed on October 22nd.  The non-formulary

5    approval would have been submitted at the latest by

6    October 23rd?

7       A.    Correct.

8       Q.    I want to look briefly at Plaintiff's

9    Exhibit 15, which I think Joe has in his stack or

10   may have in his stack.

11            I believe in response to your counsel's

12   questions, you testified that based on your review

13   of this document, and also based on your

14   recollection of your April 25th phone call with Mrs.

15   Dean where you told her the surgery had been

16   approved and scheduled, that you could infer that

17   the surgery you referenced in that April 25th phone

18   call was called off by the surgeon.

19      A.    Correct.

20      Q.    Is that a fair summary of the testimony

21   you gave in response to Counsel's question?

22      A.    Correct.

23      Q.    But that's just an inference.  You don't

24   know that for certain; correct?

KATHY GALVIN                                    March 27, 2019

Page 177

1     A.     No, I don't know it for sure.

2     Q.     Okay.  You discussed with your counsel,

3  answered some questions about the scheduling of the

4  location of the ultrasound, that it was an on-site

5  ultrasound we established?

6     A.     Mmm-hmm.

7     Q.     Would the scheduling process be any

8  different for a procedure that happens on-site

9  versus a procedure like a CT scan which happens

10 off-site?

11    A.     Well, the person that -- Jim Dawson that

12 took them, he was very good at getting out there

13 once it was ordered.  Where, at a facility, we would

14 have to wait for them to have an opening to get in.

15    Q.     Was Jim Dawson the only person who did

16 ultrasounds at Taylorville?

17    A.     Yes.

18    Q.     Okay.  So you had to wait on his

19 availability?

20    A.     Right.

21    Q.     So if there was a three-week wait for an

22 ultrasound --

23    A.     No.

24    Q.     Well, let me finish.  If there was a

KATHY GALVIN                                    March 27, 2019

Page 178

1  three-week wait for an ultrasound, it would be

2  because of Mr. Dawson's availability; is that

3  correct?

4      A.    I have never heard of a three-week wait.

5  Mr. Dawson does ultrasounds all over the state of

6  Illinois for IDOC.  And he's located 20 miles from

7  here.

8      Q.    I want to take a look at Plaintiff's

9  Exhibit 6.  And you previously testified, I believe,

10  that you're familiar with this sort of document?

11     A.    Mmm-hmm.

12     Q.    Can you tell, based on this document, if

13  Mr. Dawson was the one who took the ultrasound?

14     A.    No.  I would just have to coincide with

15  the dates, because Mr. Dawson took the ultrasounds

16  and then sends it to Central Illinois Radiology for

17  a reading.

18     Q.    I should have said you agree this is the

19  results --

20     A.    Yes, yes.

21     Q.    -- of Mr. Dean's ultrasound on

22  February 2nd, 2016?

23     A.    Yeah.

24     Q.    You agree?

KATHY GALVIN                                    March 27, 2019

Page 179

1      A.    Yes.

2      Q.    And is there any way of telling, based on

3  this document, if the ultrasound happened on-site or

4  not?

5      A.    No.

6      Q.    Your counsel asked you questions about

7  your supervision of Chad Christer and asked you

8  specifically -- I believe your testimony was that if

9  Mr. Christer was not scheduling appointments

10  properly, is that something that would have been

11  found out, and you answered yes.

12      A.    Yes.

13      Q.    And my question about that, do you agree

14  that that's a fair summary of your testimony?

15      A.    Yes.

16      Q.    And my question about that is how would

17  you have found out?

18      A.    The inmates would have stopped me.  They

19  would have been asking, "Am I going out to a

20  doctor?"

21            You always have to tell them, "I can't

22  tell you when."  But I would go in and find out.

23  And not only would it be the inmates, it would be

24  the doctor.

KATHY GALVIN                                    March 27, 2019

Page 180

1      Q.      Do you think another way you would have
2   found out is if inmate family members were calling
3   you to talk about scheduling?
4      A.      The -- I've only had one or two of those
5   calls.  And Ms. Dean was one of them.
6      Q.      But is that potentially another way you
7   would have found out?
8      A.      Oh, yes, it would have been.  "When is it
9   scheduled?"  Yeah.
10      Q.      Would another way you would have found out
11   if Chad was not properly scheduling is offender
12   grievances being filed?
13      A.      Yes.
14      Q.      Offender grievances like Mr. Dean's
15   offender grievance?
16      A.      Yes.
17      Q.      You said you're familiar with Dr.
18   Severino?
19      A.      Yes.
20      Q.      And you have a high opinion of him?
21      A.      Great.
22      Q.      Do you think Dr. Severino -- Well, why
23   don't you just give me your opinion of Dr. Severino.
24   Why don't you just tell me again what you think of

KATHY GALVIN                                    March 27, 2019

Page 181

1  Dr. Severino.

2      A.    I consider him way above most doctors.

3  He's personable.  He cares about patient care.  He's

4  precise.  And the only way I can tell you is through

5  a reference.

6            As I told you, he was my son's.  My son

7  was a quadriplegic.  The nurse that entered his

8  catheter blew his urethra.  Dr. Severino, from that

9  day on, came to Taylorville to change my son's

10 catheter every 30 days.  That is the dedication he

11 has to patients.

12           MR. WACKMAN:  I don't think I have any

13           more questions.

14                 RE-CROSS EXAMINATION

15 BY MR. RUPCICH:

16     Q.    Very briefly, and we'll get you on your

17 way.  You said "references."  Other than your own

18 experience with Dr. Severino, have you heard other

19 people in the community talk about him?

20     A.    No.

21     Q.    1678.  I'm just looking for the date.

22           Ms. Galvin, could you look at Page 1678 of

23 the medical records and tell me if you recognize

24 what this document is?

KATHY GALVIN                                    March 27, 2019

Page 182

 1    A.    It's a non-formulary medication.

 2    Q.    Non-formulary Drug Request?

 3    A.    Right.

 4    Q.    Is this the type of request you were

 5  speaking about that --

 6    A.    Yes.  It has to accompany each script.

 7    Q.    And this one is for Mr. Dean?

 8    A.    Yes.

 9    Q.    Who is the doctor signing it?

10    A.    Nawoor.

11    Q.    What medication is it for?

12    A.    I can't read his writing.  Can you?  It

13  has to be the cancer drug, but I think it's another

14  name for the cancer drug.

15    Q.    A generic name?

16    A.    Yes.

17    Q.    Okay.  Fair enough.  What date did Dr.

18  Nawoor put on this?

19    A.    10-19.

20    Q.    And then do you know what the bottom part

21  of the form is?

22    A.    It says, "Currently being reviewed by

23  Wexford.  Approved for four months per Wexford," and

24  it's dated the 14th of November.

KATHY GALVIN                                    March 27, 2019

Page 183

1      Q.     2016?

2      A.     Yes.

3      Q.     And that would correspond to Exhibit 21

4   where it said, "Approved 11-14 for four months"?

5      A.     Yes.

6      Q.     So, according to this, it looks like Dr.

7   Nawoor submitted the non-formulary --

8      A.     Correct.

9      Q.     -- on October 19th, 2016?

10     A.     Correct.

11            MR. RUPCICH:  I don't have any more

12            questions.

13            MS. BOYLE:  I don't have any questions.

14            MR. WACKMAN:  I don't think I have

15            anything else.

16            MR. RUPCICH:  I think we can waive.

17            (Deposition concluded at 1:52 p.m.)

18

19

20

21

22

23

24

1                    CERTIFICATE OF OATH

2

3  STATE OF ILLINOIS    )

4  COUNTY OF CHRISTIAN )

5

6          I, the undersigned authority, certify that

7  KATHY GALVIN personally appeared before me and was

8  duly sworn.

9          WITNESS my hand and official seal this

10  27th day of March, 2019.

11

12

13                    /s/ Deborah A. Krotz

14        _____

15        Deborah A. Krotz, CSR, RMR, CRR
          Notary Public - State of Illinois
          My Commission No:  781016
16        My Commission Expires 6/27/2021

17

18              OFFICIAL SEAL
                DEBORAH A. KROTZ
                Notary Public - State of Illinois
                My Commission Expires 6/27/2021
19

20

21

22

23

24

Page 185

1              REPORTER'S DEPOSITION CERTIFICATE

2

3  STATE OF ILLINOIS    )
   COUNTY OF CHRISTIAN )
4
        I, Deborah A. Krotz, Certified Shorthand
5  Reporter of the State of Illinois, Registered Merit
   Reporter, Certified Realtime Reporter, and Notary
6  Public in and for the State of Illinois at Large,
   certify that I was authorized to and did
7  stenographically report the deposition of KATHY
   GALVIN on the 27th day of March, 2019, at Christian
8  County Courthouse, County Board Room, Taylorville,
   Illinois; that a review of the transcript was not
9  requested; and that the transcript is a true and
   complete record of my stenographic notes.
10
        I further certify that I am not a relative,
11 employee, attorney, or counsel of any of the
   parties, nor am I a relative or employee of any of
12 the parties' attorneys or counsel connected with the
   action, nor am I financially interested in the
13 action.

14      DATED this 5th day of April, 2019.

15

16

17                        /s/ Deborah A. Krotz

18                        _____

                          Deborah A. Krotz, CSR, RMR, CRR
19

20

21

22

23

24

KATHY GALVIN

March 27, 2019
Index: $2..20

## Exhibits

**EX 0001 K. Galvin 032719**
4:13 44:20 75:16

**EX 0002 K. Galvin 032719**
4:15 48:16,22 114:22 147:14 153:24 164:18

**EX 0003 K. Galvin 032719**
4:18 51:2,10,11

**EX 0004 K. Galvin 032719**
4:20 54:14,15

**EX 0005 K. Galvin 032719**
4:23 71:5,13

**EX 0006 K. Galvin 032719**
5:2 82:16,17 178:9

**EX 0007 K. Galvin 032719**
5:4 89:4,5

**EX 0008 K. Galvin 032719**
5:7 92:1

**EX 0009 K. Galvin 032719**
5:9 92:24 93:1

**EX 0010 K. Galvin 032719**
5:12,13 99:12,18 170:15

**EX 0011 K. Galvin 032719**
5:15 104:9,16

**EX 0012 K. Galvin 032719**
5:17,18 121:13,22

**EX 0013 K. Galvin 032719**
5:20 125:8,15

**EX 0014 K. Galvin 032719**
5:22,23 130:15,21

**EX 0015 K. Galvin 032719**
6:2 132:10,19 133:2 165:24 176:9

**EX 0016 K. Galvin 032719**
6:4,5 137:20 138:2

**EX 0017 K. Galvin 032719**
6:7 143:19 144:3

**EX 0018 K. Galvin 032719**
6:9,10 148:23 149:6,24 153:2

**EX 0019 K. Galvin 032719**
6:12 149:12,19 150:18

**EX 0020 K. Galvin 032719**
6:15,16 155:5,12

**EX 0021 K. Galvin 032719**
6:18 156:12,19 162:20 175:14 176:3 183:3

## $

**$2** 74:24 75:3 172:23

**$434** 48:10

**$5** 172:23

## -

**--october** 147:12

## 0

**000150** 121:15,24

**000151** 123:1

**000154** 123:23

**000164** 121:15,24

**000165** 125:10,16

**000166** 127:10

**000170** 125:18 126:10

**000177** 125:10,16

**000178** 137:22 138:3

**000179** 139:7

**000193** 137:22 138:4

**000610** 149:16,23

**001076** 93:4,8

**001217** 44:22 45:3

**001231** 44:22 45:3

**001249** 99:14,19

**001251** 102:7

**001262** 99:14,20

**001340** 71:8,15

**001341** 71:9,15

**001346** 89:8,12

**001349** 92:4,10,11

**001351** 92:5,12

**001356** 104:12,17

**001390** 143:22 144:5

**001477** 155:8,14

**001478** 149:2,9

**001579** 156:15,22

## 1

**1** 44:20 75:16 125:5 131:24

**1,200** 70:12 158:11

**10** 49:20 50:10 52:21 99:1,12,13,18 170:15,16

**10-19** 182:19

**10-22** 159:14

**10-22-16** 162:21

**10:07** 50:18

**11** 15:19 52:22 104:9,16

**11-14** 160:9,11 183:4

**11-18** 160:12

**11-8** 150:24

**11:20** 99:4

**11:31** 99:5

**11th** 130:9

**12** 121:13,22 129:6

**12/23/15** 71:7

**12:35** 143:15

**12:51** 143:16

**13** 125:8,15 129:6 145:16

**13-page** 125:8

**1340** 73:4

**1341** 71:17 73:10

**1343** 168:16 169:15

**1344** 169:17

**13th** 15:22 47:2,16 48:4 124:11,21,22

**14** 115:2 130:15,21 164:21

**14-page** 99:12

**14th** 182:24

**15** 29:23 38:19 132:10,19 133:2 165:17,24 176:9

**15-page** 44:20 121:13

**16** 28:2 39:8 137:20 138:2 150:17,20

**16-page** 137:20

**1678** 181:21,22

**16th** 134:14 157:22 158:4

**17** 28:2 47:14 143:19 144:3 166:2,12,17

**17th** 134:15 136:22 157:22 158:4

**18** 148:23 149:6,24 153:2

**18th** 161:13

**19** 147:12 149:12,19 150:18

**19th** 145:11 146:4 147:19 183:9

**1:52** 183:17

## 2

**2** 48:16,22 51:17 114:22 122:24 127:9 139:6 147:14 153:24 164:18 172:24

**2-10-16** 89:7

**2-2** 169:10

**2-2-16** 168:23

**2-3-16** 84:13

**2-3-2016** 84:7

**2/2/2016** 82:19

**20** 28:7,9 29:19 44:21 139:13

147:16 155:5,12 178:6

**20-plus** 140:11

**2002** 27:6

**2003** 16:10 27:6

**2011** 15:19 29:9

**2015** 39:9 68:20 69:4 90:19 91:4

**2016** 11:24 44:21 45:10,18 75:12 77:11 78:8 81:24 90:20 91:4 99:10,13 100:3,15 113:15,20 121:9,14 122:19 124:11,21 125:5,9, 24 126:2 130:10 134:13 136:22 137:11,18,21 145:11,15,16,24 146:3,4 147:12,20 158:13 164:19 165:2,20 166:2,12, 17,23 168:16 169:18 170:3,16 171:7 178:22 183:1, 9

**2018** 15:22 47:2

**20th** 45:10,17,18

**21** 154:2 156:12,19 162:20 175:14 176:3 183:3

**22nd** 176:4

**23rd** 176:6

**24** 29:13 125:9 134:9,15 136:13

**24th** 126:2 127:6

**25** 164:19 165:2,20 166:23

**25th** 113:19 146:3 176:14,17

**26** 121:14

**26th** 47:7 113:15 122:3,6

**28** 137:21

**29th** 47:8

**2nd** 168:16 178:22

---

**3**

**3** 51:2,10,11

**30** 181:10

**31** 125:5

**37** 115:3

---

**4**

**4** 54:14,15

**401(k)** 48:7

**43-page** 48:16

**4:00** 29:14

---

**5**

**5** 49:20,22 71:5,13 123:21 169:18

**5-16-2016** 134:18

**5-17** 134:20,23

**5-17-2016** 134:21 135:1,5,7

**5-18** 134:11

**5-18-2016** 134:19,22

**5/16/2016** 130:17 132:12

**53** 147:17

**56** 154:2

**5:45** 71:24 72:1

---

**6**

**6** 49:21 50:1 82:16, 17 125:18 126:9 157:23 178:9

---

**7**

**7** 89:4,5

**7-20-2016** 144:11

**72** 58:3,4

**7:00** 72:1

**7:30** 58:6

---

**8**

**8** 91:24 92:1

**8:00** 29:14 33:19, 21

**8th** 150:17,20

---

**9**

**9** 92:24 93:1

**9-1-2014** 54:13

**9-1-2015** 51:8 54:13

**9-1-2016** 51:8

**9/1/14** 54:17

**9/1/15** 51:13 54:18

**9/1/16** 51:14

**9:00** 7:4

**9:57** 50:17

---

**A**

**a.m.** 7:4 29:14 33:19,21 50:18 72:1 99:5

**abbreviation** 84:3

**ability** 55:1 65:3

**accompanied** 139:24 163:2

**accompany** 175:16 182:6

**accounts** 127:2

**accurately** 10:17

**action** 85:12 117:14 160:19

**additional** 132:22

**address** 19:7 151:24

**addresses** 8:5

**adhered** 53:19

**administer** 18:2,9 43:17

**administered** 17:13 21:17 33:20 34:7,16,17,23 35:4, 14 41:19 158:24 160:12

**administering** 34:9

**administration** 33:17 156:14,21 161:19 162:1

**administrative** 32:12,17 39:23 58:12 157:11

**administrator** 109:10 128:11 136:11 137:3,5 138:11,16,19

**admit** 147:18 154:14

**ADS** 57:24 58:10 94:8

**advance** 149:15, 21 163:13

**advanced** 154:15

**Affirmative** 48:18

**affirmatively** 50:1 84:1 115:15 147:21 155:21

**accompany** 165:9 173:11

**agenda** 45:19 46:12 75:17,23 76:1,3 77:4

**agree** 84:7 155:24 178:18,24 179:13

**ahead** 10:4 149:10

**AIDS** 109:19 110:3

**allegation** 13:17 115:4

**allegations** 49:16

**allowed** 79:18 110:6,8

**aloud** 112:19

**alternative** 154:15,19,22,23 156:2,4,5,9 160:19

**Alton** 128:14,23

**Amended** 48:18 49:2 114:23

**amount** 65:19 66:6,8,9,20,22 160:24

**and/or** 55:15

**Angus** 128:14

**annual** 56:3

**answers** 9:7

**Anton** 82:18

**anytime** 10:5 40:2 105:17

**apologize** 51:2 114:24 133:12

**appearances** 7:10

**appeared** 103:9

**appearing** 167:20

**appears** 49:20 54:12 167:20

KATHY GALVIN

**appointment**
65:17 66:5,16,19
67:2,5 81:14,18
142:17 148:18
150:24

**appointments**
81:16,19 172:8
179:9

**Appraisal** 51:5,
12 54:16

**approached**
42:6,7 110:8,11

**approval** 35:9,
13,14 64:4,5,6,8
98:7 159:15,16,19
160:6,7 162:19
175:16,24 176:5

**approvals** 21:16

**approve** 163:8

**approved** 34:20
86:13 108:23 114:4,
7,9 115:13,14
118:18 159:15,24
160:4,9,11,16 161:1
162:5 165:3,22
167:1 172:8 176:16
182:23 183:4

**approximate**
15:20 39:7

**approximately**
11:22 12:3 16:10
26:3 39:5 68:18
139:13

**April** 90:20 91:4
113:15,19 121:9,14
122:3,6,19 124:11,
21,22 145:15,16,24
146:3 164:19 165:2,
20 166:23 176:14,
17

**April's** 125:21

**area** 79:6

**aspects** 30:20

**assessing** 68:1

**assessment**
37:6 73:1

**assign** 33:8

**assigned** 138:10

**assignment**
16:16,18

**assignments**
16:21 17:2

**assist** 118:12
119:17 162:4

**assistant** 30:2,3
78:20 128:10
132:15

**assistants** 30:2
31:24 166:15

**assisted** 17:6
79:21

**assisting** 19:13,
19,20

**assists** 18:13
19:16

**Associates**
82:24

**assume** 9:23
45:20

**assuming** 12:24

**assure** 97:22

**attempt** 152:8,11

**attend** 75:11
111:14 122:6 164:2

**attendance**
30:7

**attendants**
128:4

**attended** 75:13,
18 81:23 82:10 99:9
100:3 103:1 109:19
121:8

**attending** 36:19
58:17,20,21 68:24
70:7 90:24 94:17,24
137:10,17 163:16

**attention** 45:5
49:19 51:16,17
120:13,16 123:21
125:17 126:9 150:8

155:22

**attorney** 7:12
14:10,14,22 132:15
133:10 146:17
152:16

**attorneys** 49:15

**audibly** 9:8

**audit** 33:10,13,22
34:14,18 37:22 38:5
56:3 83:15 85:15
89:17 92:20 93:12
94:3,6 104:22
155:20 156:24

**auditing** 97:4

**audits** 43:18

**August** 16:6

**automatically**
159:23

**availability** 61:6
64:19 65:2 67:8,11,
19 68:1 78:6 98:8
120:3 121:5,7
177:19 178:2

**awaiting** 134:1
135:11 136:4
159:14 166:21

**aware** 22:6 23:20
59:14 62:15,18,22
65:23 75:7 77:10
81:3,9 86:12 90:13,
16 98:17 109:21
120:22,23 122:15
139:23 143:7,11
147:9,23 164:14
165:8

**awareness**
52:17

——————

**B**

——————

**back** 15:15 23:3
24:9 50:7,21 57:2
75:16 99:8 114:8,22
143:18 153:23
158:1 159:7

**background**
15:8

**bad** 50:9 85:3

**badge** 47:22

**Band-aids** 52:13

**bandages** 52:6

**bargaining**
112:5

**based** 56:17
60:20 63:24 66:3,23
85:8 96:21 100:23
117:14 122:18
123:7,17 134:6
135:20,23 148:2
173:21 176:12,13
178:12 179:2

**basic** 8:21 13:17
94:14

**basically** 49:10
84:11 111:22
112:16 142:11

**basis** 20:16 157:9

**Bates** 44:21 45:2
51:7 54:14 71:7,14
89:7,11 92:3,9 93:3,
7 99:13,19 104:11,
18 121:14,23 123:1,
22 125:9 130:24
133:7 137:21
143:21 144:4 149:1,
8,16,22 155:7,14
156:14,21

**beginning**
41:10,12,13

**behalf** 7:13 48:24

**belabor** 86:8
116:6

**beneath** 153:4

**birth** 7:21

**blacked** 124:5

**bladder** 22:4
77:24 86:19 168:23
169:9

**blew** 181:8

**blood** 18:16 21:24
24:24 57:3 59:22
60:5,6 72:17 74:20

109:23 174:3,6

**blown** 132:8

**board** 61:12
107:1 138:21
142:23 172:24

**bodily** 18:16

**bold** 49:14

**bonus** 47:14,17,
21 48:12

**book** 28:15 29:4

**books** 75:6 97:3

**bottom** 45:2
51:18 74:9 83:12
123:23 127:10
144:14 149:9 150:9
153:4 155:23
157:11 158:12
182:20

**boundary**
102:24

**box** 74:21

**boxes** 74:5

**Boyle** 7:11 43:3
53:17 56:1 65:22
70:5 76:6 122:11
123:11 131:10
132:20 145:18
146:10 175:4
183:13

**break** 10:4,5,8
50:21 143:13

**breathing**
152:18

**briefly** 7:10 50:24
176:8 181:16

**bring** 40:20 112:2
119:24 120:12,18

**brought** 107:1
120:15

**budget** 51:24
52:3,9,10,15,18
54:1,5

**budgeted** 52:16

KATHY GALVIN

**building** 40:5

**bulletins** 112:18

---

**C**

**call** 19:17,20 29:13 30:11 35:17,21 38:5,9 47:12,15,23 48:1 57:11,14,15,16 58:1,5,15 61:1 64:3, 9,16,23 65:1,4 71:19,22,24 72:1,8, 16 73:8 74:3 75:1,3 106:21 108:8,10,18, 20 109:5,8 116:13 117:8 150:1,2 164:19 172:16 176:14,18

**called** 33:16 37:6 61:5 106:22 108:6 116:14 133:15 135:3 142:21 166:18 176:18

**calling** 63:16 64:16 67:3 154:1 180:2

**calls** 43:15 180:5

**calm** 48:2

**camp** 105:15

**camps** 105:14

**cancel** 81:14,19

**canceled** 81:16 135:18

**canceling** 81:17

**cancer** 22:4 25:8 86:24 87:1,10,11 90:21 91:5,17 102:22 103:8,21 105:2,19 106:1,4,8, 13,16 107:23 108:3 113:23 114:2,20 116:8,18 118:5 124:10,21 129:8,11, 14,21 130:2,6,9,13 141:8,11,15 142:9 143:5,10 145:7,10, 15,24 146:4 148:10 154:23 159:21

**capacity** 58:22

**cardiac** 26:2,12, 14

**cardiologist** 119:1,8 146:18

**care** 18:9 24:6,19, 23 25:3,7 36:21 56:16,20 57:4 70:12 181:3

**caregiver** 66:13

**cares** 17:24 181:3

**carried** 53:3

**carries** 54:14

**carry** 53:15

**case** 11:13,14 12:5,10,15,18,21 13:3,21 20:22 21:10 49:2 86:7 119:1 120:2 121:6 146:19

**cases** 29:1 59:4, 10 104:5 128:2

**Cassiday** 12:12

**catch** 65:16

**categories** 102:3 122:23

**category** 74:4 102:6

**Cates** 31:2,6,7,8, 10,12,17 32:4,8 55:8,10,12,21 117:23 128:9 129:23 174:24 175:1

**catheter** 181:8, 10

**cells** 18:7

**Center** 11:18 39:21 40:12

**Central** 82:23 178:16

**certified** 113:4

**160:**18,21 182:13, 14

**certify** 110:22

**cetera** 9:10

**CEUS** 28:7 29:1

**Chad** 46:23 78:9, 10,11,12 79:1 96:19 118:7 119:3 129:14, 16 141:14 165:13 166:5 167:20,22 170:2,7,11,12,23 171:4,10,17,23 172:10 179:7 180:11

**Chad's** 172:7

**chain** 32:2

**chances** 106:13, 16

**change** 181:9

**changed** 52:22 53:1,21

**charge** 30:6

**chart** 18:2 37:11 38:13 84:18,23 85:11 86:7 93:19 108:13 110:7 116:16 144:10,21 171:24

**charting** 37:9

**charts** 20:5 27:14 32:21 36:23 38:1,8, 19 56:4 83:3 97:3,4

**check** 48:9,10 85:24 166:5

**checked** 56:22 85:9

**chemical** 23:18 174:9

**chemically** 59:21

**Chester** 46:23 78:10,11 96:24 114:12

**choice** 64:18

**choose** 37:21 38:11,17 164:7

**Christer** 78:12, 13,15 80:5,13 96:19,22 97:18,19 98:13 115:17,21 117:19 118:7 120:5, 9,18 126:8 129:14 141:15,17 142:11, 13,21 171:10 179:7, 9

**Cindy** 128:12

**circle** 74:15

**circled** 74:10

**circling** 74:4

**Circuit** 13:12

**circumstances** 11:10 36:10 42:4 50:4 71:23 72:13 83:7 84:20 85:24 124:14,19

**city** 105:15

**clarified** 170:18

**clarify** 9:22 65:14 76:7

**classes** 28:13,14

**classifies** 62:19

**clear** 9:5 18:4 19:11 58:10 90:6 99:23 100:19 121:18

**client** 20:12

**clients** 13:14

**clinic** 19:6

**clinical** 174:18

**clinics** 19:7,20

**clippers** 109:24

**closely** 35:16

**clots** 24:24

**clue** 169:4

**co-pay** 172:15, 18,20

**code** 157:19 158:2

**coincide** 167:22 178:14

**coincided** 85:4

**college** 27:2,17

**collegial** 61:8,10, 11,14,21,23 62:6,24 63:19 64:8,9

**color** 74:7

**combination** 14:7

**comfortable** 110:19 111:17

**command** 32:2

**commencing** 7:4

**comments** 54:22

**committee** 44:5, 9,13,15,17 46:18,21

**common** 59:2 60:8,12,16

**communicable** 106:23

**communicatin g** 66:15

**communicatio n** 107:12

**community** 27:2 181:19

**Company** 26:20

**complain** 59:3 60:10,14

**complained** 98:1

**complaining** 57:19 70:1,16,23 72:17 73:9

**complains** 59:13 60:3

**complaint** 48:18 49:2 72:2 97:24 98:10 114:24 131:24 147:15

148:22 153:23 154:1 164:18

**complaints** 26:15 72:11 97:22

**complete** 104:5

**completed** 19:15 169:11

**completely** 94:13 107:15

**compliance** 73:17 83:21 85:20 89:24 90:3 158:22

**complicated** 151:23

**concerns** 117:17,20,23,24 118:2 145:7

**concluded** 183:17

**conclusion** 99:24

**condition** 61:20 86:23 87:9 116:13

**conditions** 38:24 62:19 72:12 109:22

**conducted** 50:19 99:6 143:17

**confident** 92:16 151:3

**confirmed** 103:21

**confusion** 170:2

**connection** 127:14

**consequences** 9:3 53:24 54:2,4

**consultants** 123:15

**consultations** 123:4

**consults** 127:16

**contact** 48:3,6

**contacted** 133:22 135:10 136:4

**contained** 101:3

**Continued** 28:9

**continuing** 28:3

**continuously** 70:13

**contract** 128:12

**contrast** 87:5,7

**control** 33:11 51:20 122:14

**controlled** 17:18

**conversation** 91:10 97:12 115:6, 7,11 116:7 117:14

**conversations** 15:3 106:3,18 107:16 108:2 109:1 116:11,12,17,20,22 145:23

**convince** 152:7

**Coordinator** 14:3 32:22 43:10,13 44:18 45:6 46:1,4 100:11,13 138:10, 15

**copies** 43:14,22 51:2

**copy** 132:3 158:1

**corporate** 54:23 55:3,4,11,13

**correct** 12:2,8 15:9,10 23:12 29:9 30:19 33:12 34:5 36:16,24 44:15 51:19 52:1 58:24 59:1 69:13,15 72:8 73:19 75:18,19,21 76:4 83:19,22 84:4, 5,8 85:13,22 90:1, 10 92:20,21 95:7,9 96:9,10 98:14 99:24 101:3,4,6,7,23 102:17 103:2,5 105:21,23 115:19

116:9 120:1,2,14 124:23 128:4 133:24 134:2 135:2 140:17,19 145:8,9, 12,16 146:1,2,5,6 148:12 150:21 151:14 157:1,2,7 158:14,17 159:1,13 161:13,14 162:24 163:9 165:5,23 166:3,6,10 167:17, 18,21,24 170:20,22 171:5,8 172:1,9 175:15,18 176:7,19, 22,24 178:3 183:8, 10

**correction** 18:5 140:1,6

**correctional** 11:4,18 24:1 39:13, 17,20 40:12,18 169:6

**Corrections** 40:7 45:17 53:10,13 56:2 109:18 130:23 133:5 142:17,18 169:7

**correctly** 37:11 44:12 79:7 92:10 142:12,14 159:11

**correspond** 183:3

**counsel** 12:9,12 131:20 175:13 177:2 179:6

**counsel's** 176:11,21

**counselor** 133:13 135:6 166:1, 8,17

**count** 17:17,18

**counts** 33:11,12

**County** 13:11

**couple** 50:23 110:17 162:10 175:7

**court** 9:1,6 13:12 48:21 51:1,9 54:9

71:12 82:15 91:24 92:23 99:17 104:15 121:21 125:14 130:20 138:1 144:2 149:5,11 155:12 156:18

**courteous** 140:12

**courtesy** 140:4, 6,10

**covered** 55:19

**covers** 92:8 94:2 125:1 158:12,13

**CPR** 152:19 153:10

**create** 100:8

**created** 100:12

**creator** 101:5

**critical** 102:4,5, 10,11

**CT** 25:15 60:17 63:23 64:3 67:5 68:5 70:17 86:13 87:2,4,6 90:17 177:9

**current** 28:4,17, 23 129:4

**curve** 41:4,13

**custom** 163:18

**cystoscopy** 60:13 63:4,9,18 68:6 70:24 86:13,15 90:14

────────

**D**

**D.O.N.** 133:20

**daily** 42:8 96:15 144:19

**data** 170:18,19

**date** 7:21 19:4,8 37:2,17 47:7,19 56:5,8 67:2,6 68:7 82:5 84:3,6 86:5 89:19 94:12 97:10

114:17 121:2 133:23 135:11 141:18 145:19 147:24 150:16,19 160:7 161:4,6,9 162:21,22 166:21 169:8,13 181:21 182:17

**dated** 44:21 45:17 71:7 82:19 89:7 99:13 121:14 125:9 130:17 132:12 134:11,23 137:21 144:11 159:13 182:24

**dates** 83:9 92:8 113:21 178:15

**Dawson** 168:5 169:10 177:11,15 178:5,13,15

**Dawson's** 178:2

**day** 16:22,23,24 29:13 33:18 37:14 38:8 40:2,4,5 52:23 58:3,7 82:13 85:6 108:14 137:6 145:3 163:5 170:8 175:18 176:1 181:9

**days** 29:11 47:9 53:4 151:5 181:10

**Dean** 7:8 49:17 68:12,14,20 69:3,7, 16,19,21 77:10 86:12 87:13 88:11, 14,17,22,24 90:20 91:5,17 100:15 101:20,24 105:1 106:4,5,12,15,19, 20,22 107:4,8,17 108:5,16 109:13 110:8 111:7 113:1, 3,9,14,19,22 114:8, 19 115:11,16 116:7 117:14 118:18 122:19,21 123:2,8, 18 124:2,6,10 126:13 127:6,10,14, 18 130:8,12 135:15 139:1,7,11 140:14 141:7 145:5,14 146:4 147:9,23

148:4,16,20 151:19
152:4,7,11,15
153:14 156:9
159:10 161:11,19
164:19 165:12
166:23 167:4
176:15 180:5 182:7

**Dean's** 49:2 69:9,
14 78:3 81:1 90:14,
17 92:8 105:19
106:1 108:3,8
113:23 114:2,13,23
116:2,18 117:17,20,
22 118:5 121:2
129:8,11,14,21
130:2,6 134:3
136:15 139:15,22
140:15 141:5,11,15
142:9,22 143:5,9
144:4 145:7,23
147:1 148:10 149:7
155:13 161:16,22
162:1,5 163:13
178:21 180:14

**death** 102:15

**deaths** 43:16
44:2

**Decatur** 31:16
67:23 140:8

**December** 39:8,
9 68:20 69:3 90:19
91:4

**decide** 64:23

**decides** 62:9,11

**decision** 66:4,10

**decline** 164:11

**declined** 12:22
67:1

**dedication**
181:10

**deemed** 136:12

**deems** 134:9

**defendant** 12:4,
7

**Defendants**
48:24 49:23 147:18
154:13

**Defenses** 48:19

**deficient** 34:12

**defined** 102:10

**definition** 66:9

**degree** 27:21

**degrees** 27:20

**delay** 81:12 88:8
141:4 163:6

**delayed** 102:16,
18,19 103:18 124:7,
12,20 126:11
127:21

**denial** 35:15

**dental** 30:2

**deny** 49:23

**dep** 98:22

**Department**
45:16 53:9,12
130:22 133:5
149:14

**depend** 67:12

**depended** 16:16
96:22

**depending** 18:8

**depends** 61:19
62:1 63:1,21 64:19

**deponent** 7:16

**deposed** 8:15,19
10:20 11:10

**deposition** 7:14
9:6 10:14 11:6,13,
20 13:24 14:22
15:1,5 44:20 48:16
51:11 54:15 71:5
82:17 89:5 92:1
93:1 99:12 104:9
121:13 125:8
130:15 132:10
137:20 143:19
148:23 149:12
155:5 156:12
183:17

**describe** 77:18

**detail** 104:5

**detect** 77:21,23

**determination**
66:21 68:8,10
168:14

**determine** 66:7
67:8 86:6 152:21
174:9

**determined**
41:10 66:19

**developments**
28:17,24

**diagnose** 23:21
74:18 86:21,23
87:8,9

**diagnosed** 23:1
124:10,21 145:15,
20

**diagnoses**
102:16 123:24
124:7,8,12,20
126:11

**diagnosing**
20:11,19,23 21:11
22:2 23:15 42:11,16
74:16 90:22

**diagnosis**
42:10,15 102:18,19
103:10,13,18,19
105:7 124:13
126:17,20 127:21

**diagnostic**
59:15 69:21 168:10

**difficult** 142:1
149:22

**dipstick** 23:18
56:22,23 59:18,21
174:8,11

**direct** 7:5 45:4
49:19 51:16,17
115:2 122:24
123:21 125:17
127:9 139:6 147:16
150:8 155:22

**directing** 126:9

**directive** 149:16,
21 163:14

**directives**
32:13,17 39:24
58:12,13 154:15

**Director** 11:17
15:13,15,17,24
25:18 28:23 29:3,8,
18 30:1,5,9,14,18,
23 31:3 32:1,3,9
36:20 39:2 43:9
46:23 55:20 56:18
57:22 61:1,4 63:11,
14 64:1,13,16,22
66:4,14,24 67:1,24
76:16 78:5,7,14,17,
22 79:3,5,9,14,16,
19,21,23 80:5,11,20
83:16 87:22 90:23
94:6,23 95:3,21
96:8 98:10 101:10,
13 114:6,10 115:21
118:6,10,13,16
119:21,23 136:2,18,
20,23 137:4 158:15
167:23 168:1
170:11,13 171:7

**Director's** 30:21
95:8,16

**disagreed** 42:9,
14,20

**discharge**
111:12

**discipline** 30:10,
12 55:17

**disciplined**
56:10

**discretion** 62:13

**discuss** 75:21,24
76:8 77:3 104:4
116:22 118:9 129:7,
10,13,20 130:1,5
139:4 148:15

**discussed** 76:3,
11 77:6 100:15,22,
24 101:2,19,20,24
103:20 122:19,21
123:8,13,18 127:6,
18,23 128:2,6

**discusses** 150:3

**discussing**
69:9,14 141:3
163:13

**discussion**
127:14 152:15
159:6

**discussions**
156:8

**diseases** 106:24

**dismissed** 13:1,
2,13

**disqualifying**
111:18

**DNR** 149:15
150:10,19 151:7,12,
19,21,24 152:5,15
153:5,15,18 164:4

**DNRS** 163:19,24

**do-not-
resuscitate**
149:15,21 151:22

**Doc** 16:24 17:4
18:23 19:1

**docket** 131:23

**doctor** 17:6 19:2,
14,17,19 24:8 25:5,
9,13,17 35:3 39:22
41:17,20 42:17
56:24 57:1,17,20
58:2,5,16 59:16
60:7,19 61:11 62:11
63:6,8 66:11,12,15
68:9,24 69:1,11,12
70:7 71:4 74:19
83:9 85:24 86:4
93:14,16 94:20,24
95:1,6 98:6,16,17
102:23 117:6
120:22 126:21,23
127:4 141:22,23
142:19 145:2 148:5,
6,7,11 152:22,23
162:17 163:3,22

168:11 171:22 174:20 175:19 179:20,24 182:9

**doctor's** 17:6 18:23 19:1,11,13,21 21:2,18 24:21 25:1 34:23 42:12 56:21 58:9 62:12 73:6 89:18 91:8 93:24 96:3 116:15 117:1 175:17

**doctors** 31:17 61:12 117:5 118:20 129:17 142:22 146:12,13,16,22 181:2

**document** 17:12 18:1,9 37:5 45:2,13, 16 48:17 49:4,11 51:6 54:11 55:12 56:13 71:6,14 82:22 83:1,6,8 85:17,18 89:6,11,14,16 92:2, 7,14 93:2,7,9,11,21 99:19 100:2,8,20 101:3,5 102:6 103:9 104:10,17,19,21 121:23 122:1,4,10, 12,18 123:17,22 125:14,16 127:5 130:16,22 131:2,5, 9,19,24 132:11 133:4,9,19 134:6 137:7 138:3,5 143:20 144:3,6,8 147:5 148:24 149:7, 13,20 155:6 156:13 157:4 176:13 178:10,12 179:3 181:24

**documentation** 32:21 37:23

**documents** 13:24 14:9,21,24 85:14,17 92:19

**Don** 55:16 94:12 95:13 128:24 129:1 168:21 171:10

**door** 40:17

**dosage** 161:12

**doubt** 139:19,20

**drawn** 37:17

**drug** 147:6 148:10 156:2,4,9 159:21 160:3,19,21,23 182:2,13,14

**drugs** 155:2 159:20 160:18

**due** 21:10 74:20 118:19 142:2

**duly** 7:3

**duties** 16:14,19 17:9,15,20 18:11, 17,20 19:21,24 20:4,17 21:15 24:5, 18,22 25:2,6,10,14 26:12 32:10 33:8 35:20 36:22 43:8 52:2 54:23 55:14, 19,20,23 58:14 83:16 95:19,21,22 136:21

**duty** 130:4 136:14 137:1

---

## E

**E-L-S** 13:11

**e-mailed** 169:19 170:6

**Eager** 74:1

**earlier** 59:18 67:6 89:23

**early** 68:7

**earned** 27:20 47:18

**education** 28:3, 9,10

**educator** 106:23 109:14,17 110:14 111:1,19,23 112:2, 9,12,22 113:2,3,5

**educators** 110:4,10,18 111:14

**effect** 8:24 91:11 141:4

**effectively** 51:20

**efficient** 80:12, 15,18 96:17

**Effingham** 140:8

**Eggiman** 168:21

**Einwohner** 49:1 169:19,20 170:8

**Elaine** 7:20

**Els** 13:7,10

**else's** 91:19

**emergencies** 18:19 134:8

**emergency** 76:18 102:13

**emergent** 62:3, 9,20 63:1,21 67:12, 14,15 133:17 134:10 136:12

**employed** 8:11, 13 16:9 25:19,23 26:4 49:23

**employee** 16:11 50:22 161:22 162:1

**employees** 91:17 130:3,6 141:4 143:9

**employer** 11:5

**employment** 11:5 26:7 28:19 50:10 80:9

**encounters** 164:3 167:4

**encourage** 164:6,10

**end** 41:11 48:8

**endeavor** 9:16

**enjoyed** 107:2

**ensure** 19:14 30:16 32:11,14,19,

21 33:10 37:1,10, 16,23 38:3,9 44:10 55:22 56:7 89:18,24 90:2 95:13 157:17

**ensured** 33:1

**ensuring** 34:14, 18 83:23,24

**enter** 44:1

**entered** 14:2 161:5 181:7

**entire** 100:20 132:12

**entities** 20:20,24

**entitled** 45:18 48:17 71:6 89:6 92:2 93:2 104:10 130:16,22 132:11 143:20 148:24 149:13,20 155:6 156:13,20

**entity** 20:11 21:11 22:2 42:11,16 59:16,17 66:12 68:23 74:16 90:22 94:16,18,22

**entries** 38:14

**entry** 84:11 90:9 144:11 145:1,2,3,4 155:23 169:21

**equipment** 52:5,13 65:2

**ER** 67:16 76:23

**ERROR** 157:20

**established** 174:21 177:5

**evaluate** 95:15, 20,24 96:8

**evaluated** 32:6 51:19

**evaluation** 51:7, 13 54:10,13,17 95:17 96:22

**eventually** 34:20 86:12

**evidently** 146:19

**exact** 39:10

**EXAMINATION** 7:5 162:8 175:5 181:14

**exceeded** 47:21

**excerpt** 155:12

**Excuse** 43:20 137:16 154:1

**exhibit** 44:20 48:14,16,22 51:2, 10,11 54:14,15 71:5,13 75:16 82:16,17 89:4,5 92:1,24 93:1 99:12, 18 104:9,16 114:22 121:13,22 125:8,15 130:15,21 132:10, 19 133:2 137:20 138:2 143:19 144:3 147:14 148:23 149:6,11,12,19,24 150:18 153:2,24 155:5,12 156:12,19 162:20 164:18 165:24 170:15 175:14 176:3,9 178:9 183:3

**expect** 66:11

**expedite** 81:6,10 87:23 88:5 147:1

**expenses** 51:20

**experience** 22:23 56:17 59:2 60:2,20 64:1 66:3, 24 69:24 70:10,15, 22 85:8 101:16 148:2 160:24 173:21 175:23 181:18

**explain** 20:10 30:8 33:15 37:8 51:3 59:20 62:2 74:17 90:2 126:16 151:2

**explained** 151:19 152:18 153:9 164:1

KATHY GALVIN

**explains** 126:15

**explanation** 154:20

**expressed** 167:5,10

**eye** 174:10

---

**F**

**fabulous** 173:20

**facilities** 61:2

**facility** 39:13,17 40:18 177:13

**fact** 115:10

**facts** 110:2

**fair** 120:8 176:20 179:14 182:17

**fall** 102:2

**familiar** 19:24 39:16,19 60:22 61:7 71:17 77:16 79:22 131:4 147:6 162:12 172:18 173:16,18 178:10 180:17

**families** 108:12

**family** 8:5 109:5,7 180:2

**February** 77:11 78:8 81:24 168:16 169:18 170:3,19 171:4,7 178:22

**fee** 75:1

**feel** 164:1

**Felicia** 78:17,19 101:15 167:17 169:22,23 170:6 171:1

**felt** 107:13 110:18 167:5

**fifteen** 50:15

**fight** 102:12

**fights** 44:3

**figure** 47:20 99:2

**file** 50:10,22 82:12 84:17 85:9,24 86:2, 7 92:8 93:18 132:4

**filed** 38:1,2 83:10 84:14,16 130:12 180:12

**files** 38:2 131:14

**fill** 74:3 163:3 175:21

**filled** 72:6,14,18, 20 83:23,24 84:20 94:13 162:16,17

**filling** 83:21

**financial** 10:24 47:4,5 51:18

**find** 41:2,6 81:20 118:24 142:19 169:8 179:22

**finding** 56:6

**fine** 8:4,7

**finish** 9:15,17 27:11 73:22 79:17 124:16 126:1 177:24

**finished** 115:5

**fired** 26:10

**five-page** 51:12 54:16

**flipped** 100:19

**fluids** 18:16

**focus** 71:16 83:12 102:5

**follow** 42:12 94:7

**follow-up** 19:3 94:1

**follow-ups** 175:7

**form** 19:7 34:21 43:1 44:7 51:5,12 54:16 71:1,18,20 72:3,6,10,14,17 73:9,10 74:2,19 85:21 94:13,15,19

**figure** 95:2,11 127:22,24 146:8 151:23 154:21 162:16,17 182:21

**formal** 31:10

**formally** 15:21

**format** 37:1,4,5, 12 38:9 43:15,23 90:10

**forms** 72:20,22

**formulary** 159:23

**found** 172:3,11 179:11,17 180:2,7, 10

**foundation** 53:17 56:1 59:5 65:21 70:4,18 71:2 76:5 122:11 123:9 145:17 146:9 147:2

**foundational** 22:11 131:7

**Fox** 110:21

**frequent** 59:11

**frequently** 41:2, 6,9 117:8

**Friday** 58:4,9

**front** 35:18 104:15

**fulfill** 28:11

**fulfilled** 17:9

**full** 168:23

**full-time** 80:20

**function** 30:13

**functioning** 32:23 44:12

**funds** 75:6

---

**G**

**gain** 22:19,22

**galvin** 7:2,7,18,20 8:10 13:23 15:8

**gain** 44:20 45:7,20 48:16 49:1,3,23 50:24 51:7,11,13,16 54:8, 15,17,21 56:14 64:11 70:11 71:5 79:17 82:17 89:5 90:12 92:1 93:1 96:7 99:8,12 104:9 121:13 122:1 125:8 126:1 130:15 132:10 133:20 137:20 138:5 143:19 144:1 147:6, 17 148:23 149:12 150:1 153:2 154:4, 13,14 155:5 156:12 157:1 162:11 181:22

**gambling** 111:23

**gauze** 52:7,12

**gave** 47:14 96:21 110:2 134:15 136:24 141:18 166:12,17,23 176:21

**general** 98:22 132:15

**General's** 7:12

**generally** 19:23 20:3 56:16 61:17 64:15 119:12

**generic** 182:15

**give** 8:1 110:16 111:6 112:17 136:12 137:1 140:7 169:4 170:4 180:23

**giving** 33:19 112:17

**good** 111:22 177:12

**governing** 32:18

**graduate** 27:5

**grateful** 167:13

**gratitude** 167:10

**Great** 180:21

**grievance** 130:13,17,23 131:15 132:12 133:6 134:4,16,24 135:3,6,20,24 136:9 165:15 166:2,11 180:15

**grievances** 136:10 137:3 171:21 180:12,14

**Grimes** 128:24 129:1

**grossly** 174:7

**ground** 8:20

**Guaglianone** 148:10

**guess** 20:9 21:12 94:14 171:14

---

**H**

**ha** 111:4,5

**half** 133:14

**hallway** 171:21

**hand** 48:21 50:24 71:13

**handed** 47:22 99:17 121:11,21 125:14 131:18 138:1 144:1 149:5

**handing** 47:10 133:1

**handle** 17:1

**handled** 134:9

**handwriting** 84:9 150:14

**happen** 67:11,14 152:6 172:5,13

**happened** 12:17,20,21 65:24 116:14 117:2 151:16,17 179:3

**happening** 172:2

**hard** 142:18 163:23

**hardship** 142:16

**HCU** 84:6

**head** 9:10 84:1 115:15 141:1 147:21 155:21 165:9 173:11

**header** 133:7

**heading** 54:21

**heads** 140:7

**health** 30:2 49:1, 24 106:6 107:17 108:3 112:17 128:15,20 141:5 149:14

**healthcare** 14:8 32:24 35:19 39:16 44:11 107:14 109:10 122:15 128:11 133:20 136:10,11 137:3,5 138:11,16,18

**healthy** 109:22

**hear** 97:10,11 163:23

**heard** 173:8,22 178:4 181:18

**hearing** 104:3

**hearsay** 167:12

**held** 50:17 99:4 139:5 143:15 159:6

**helped** 39:22

**helpful** 121:12

**helping** 39:15

**hematuria** 21:20,23 22:9,17 23:1,5,8,15,21 24:6, 7,20 56:19,24 57:19 59:3,13 60:3,10,14 68:20 69:3,7,10,14, 17,18,22 70:1,16,23 88:22 90:7,21 91:7, 18 173:6 174:3

**hep** 109:19,23

**hepatitis** 110:3

**Hey** 140:7

**high** 180:20

**highly** 80:12,15, 18 82:7 96:17

**HIPAA** 104:4

**history** 21:10

**HIV** 109:19 110:3

**Hobrock** 128:13

**hold** 97:9 114:5

**honors** 152:3

**hospital** 25:21, 22 26:1,13,17 43:16 62:4 65:7,10 76:17 105:11 144:19 145:1 151:24 152:2

**hour** 98:24

**hours** 28:10 29:11,13,14 58:3,4 134:9,15 136:13

**hours'** 110:20

**housing** 57:11

**huge** 112:18

**Hughes** 157:14

**human** 174:10

---

**I**

**idea** 16:8 146:7

**identification** 44:23 48:19 51:14 54:18 71:10 82:20 89:9 92:5 93:5 99:15 104:13 121:16 125:11 130:18 132:13 137:23 143:23 149:3,17 155:9 156:16

**identified** 30:6

**IDOC** 44:22 45:2,3

53:13,16 62:18 71:8,14 76:15,16 89:8,12 91:16 92:4, 9,11 93:3,8 99:14, 19 104:12,17 121:15,23,24 123:1, 22 125:10,16,18 126:10 127:9 130:6 137:22 138:3 139:7 141:4 143:22 144:5 148:7 149:2,9,16,23 152:1 155:8,14 156:14,21 159:20 168:15 173:15 178:6

**IDS** 58:1,11 94:8

**Illinois** 7:12 14:6 24:2 45:16 53:9,12 82:23 122:9 130:22 133:5 149:13 178:6, 16

**image** 77:20

**imagine** 143:2

**immediately** 48:1 49:16

**important** 9:5

**imposed** 172:20

**Improvement** 14:5 43:10,12 44:5, 9,10,18 45:6,21,24 46:4,7 75:11 76:9, 12 77:7 81:24 99:9 100:3 103:20 104:1 121:9 127:7 137:11, 18

**incarceration** 68:17

**incident** 102:4,5, 10,11

**include** 20:17

**Including** 86:24 87:1,10,11

**incomplete** 131:8

**incorrect** 166:24

**Independent** 14:12

**independently** 14:20

**indicating** 153:3

**indication** 127:5 170:4

**indigent** 75:4

**individual** 17:12 35:23 36:6,12,18 128:2

**infection** 72:4 74:10,13 173:3

**infer** 166:16 176:16

**inference** 120:8 176:23

**infirmary** 16:23 17:23,24 18:1,4,5,7, 12,18,20 37:15,22 38:8 144:24

**inform** 47:16 56:23 68:24 106:21 108:5

**information** 13:3 74:8 111:6,15, 16 112:17 122:13 136:3 163:19 166:1, 7,17,23

**informational** 112:15

**informed** 114:8 118:18 136:3 165:3 168:22

**informing** 47:12

**initial** 20:7 33:20

**initials** 34:9 157:17 158:23

**initiated** 19:14 157:14

**injured** 76:18

**injuries** 44:3

**injury** 22:3 23:4,6, 9 44:4 102:12

**inmate** 168:22 180:2

**inmates** 179:18, 23

**inquiring** 113:23

**inside** 148:6

**inspects** 129:1

**instance** 66:18, 23 102:22 103:21

**institution** 54:24 55:24 64:3,23 67:9, 10,20 97:18 148:6

**institution's** 61:6

**institutional** 32:12,17 39:23 40:13,15,23 41:3,7 53:3,5 58:13

**institutions** 63:16 64:9,17 68:2

**instructed** 95:13

**instrument** 33:12

**intake** 70:13 111:12

**intent** 47:6

**interact** 35:9

**intubation** 153:12

**involve** 19:24 20:4 21:16 24:6,19, 23 25:3,7,11,15

**involved** 25:11 35:16 41:5 78:2 80:24 87:14,16 88:3 118:20 119:11 129:17 146:19 154:24 163:10,11 164:4 170:3

**irregularities** 56:23

**isolation** 18:7

**issues** 174:19

**IVP** 87:6,7

KATHY GALVIN

March 27, 2019
Index: January..medical

**J**

**January** 44:21 45:10,17,18 75:12

**Jim** 168:4 169:9 177:11,15

**job** 11:14 15:11,23 29:7 30:16,18,21 32:10 35:20 44:17 45:24 95:16 96:1,4,11 104:6 107:12 171:14,17

**jobs** 46:3 73:14

**Joe** 13:3 131:21 176:9

**Joe's** 175:7

**John's** 67:22

**Johnson** 82:18

**join** 43:3 65:22 70:5 76:6 123:11 131:10 145:18 146:10

**jokester** 111:5 112:4

**Joseph** 7:15

**judge** 43:4

**July** 145:11 146:4

**June** 15:22 47:2,7,16 48:4 137:18,21 138:7

**K**

**Kathryn** 7:11

**Kathy** 7:2,20 49:23 51:7,13 54:17 154:14

**keys** 40:17

**kidney** 22:3 23:6,8 25:4,8 59:6,7 77:24 78:1

**kidneys** 86:20

**Kimberly** 129:5

**kind** 59:14 109:24 151:22

**knew** 39:14 96:15 108:10 129:15,16 146:18,23 173:15

**knowing** 96:1 118:2 124:3

**knowledge** 22:18,20,22 31:13 39:11 54:3 56:17 60:2,8,12,16,20 66:3 69:5 70:20 86:10,16,22 87:3 88:1 91:3,12,15 92:13 121:1,3 129:12 141:10,14 143:4,8 148:2

**L**

**lab** 37:15,16 38:8

**labor** 51:24 52:4

**laboratory** 23:22,24

**labs** 18:13,14 24:1 37:24 86:4,5

**lack** 71:2 132:22

**Land** 27:2

**large** 24:24

**latest** 176:5

**lawsuit** 7:9 68:13,14

**lawyer** 15:4

**learn** 21:13 27:7,14 68:19 105:1 111:16 112:6 118:22

**learned** 69:2,6 87:12 105:4,6,18,24

**learning** 40:11 41:4,13 91:20

**leave** 15:21 26:6 40:17 47:13 80:8

**left** 11:2 15:19 28:19,20 47:21,22 48:4 50:5 78:24 111:7

**legitimate** 98:9

**letterhead** 45:17 82:23

**liaison** 107:14

**license** 28:4 79:6,8,11,19,23 80:21

**licensure** 79:4

**lie** 48:6

**life-prolonging** 164:11

**life-sustaining** 164:8

**Lincoln** 27:2

**lines** 83:22

**Lisa** 128:11 129:11

**list** 123:5 167:16

**listed** 44:6 51:8 100:7 124:2,11,20 126:13 159:20 170:23

**listened** 107:11

**lists** 102:14

**literally** 90:8

**living** 109:21

**local** 65:16

**located** 178:6

**location** 177:4

**Logan** 31:16

**long** 16:8 28:1 51:9 75:7,9 78:21 146:7

**looked** 14:1 38:13 95:14 155:19 162:20

**lot** 40:6,8 83:2 110:15 111:15

112:3 122:12 160:17

**low** 163:23

**LPNS** 174:14

**Lungs** 90:6

**M**

**M.D.** 19:4 82:19 94:12

**machine** 26:22

**made** 20:7 32:22 33:9 49:17 110:13 144:10,11,19 145:2 168:13 169:21

**main** 18:7

**maintain** 51:23

**maintaining** 52:3

**Major** 140:5

**majors** 105:10, 12,13,14,15 139:22 140:16 153:11

**make** 10:10 22:11 27:10 33:13 48:11 66:4,11 70:8 73:21 80:19 92:10 98:16 109:21 120:22,23 131:7 132:21 144:17 171:23

**makes** 8:7 97:22

**making** 90:8 148:4

**man** 96:17,19

**manage** 52:9,18

**managed** 51:20 55:10

**Manager** 11:16 30:9 36:20 55:17 90:23 95:12 136:16

**managers** 31:20

**manner** 34:17 95:23 96:12

**manual** 29:4

**MAR** 33:17 34:8

**March** 99:10,13 100:3,15 124:24 125:5 170:16,19,21

**mark** 51:10 54:10 82:16 92:24 131:21 132:6 149:11

**marked** 44:23 48:19,22 51:1,14 54:18 71:9,13 82:19 86:2 89:3,9 91:23 92:5 93:4 99:15,18 104:13 121:16,22 125:11 130:17,21 132:13,19 133:1,16 137:23 138:2 143:23 144:2 149:3,6,17 155:9,11 156:15,19

**materials** 52:6 55:18

**matter** 34:8 62:16

**Matticks** 43:5 174:22,23

**means** 84:13 159:18 168:24 169:2

**meant** 154:19

**mechanical** 153:12

**med** 16:22 17:9,11,16,21 33:10,13,14 71:8,15 89:8,12 92:4,9,11 93:4,8 104:12,17 105:11 108:1 143:22 144:5 149:2,9 155:8,14 156:15,22

**medical** 20:1,5 22:18,19,21 25:17 27:7,14,15 30:1,4,14,17,20,23 31:3 32:1,3 33:16,17 35:24 38:24 46:23 52:6 56:16 60:24 61:4 63:11,14 64:13,15,22 66:14

KATHY GALVIN

March 27, 2019

67:1,6,24 68:7 76:16 78:5,7,14,17, 22 79:3,5,8,13,15, 18,20,23 80:5,10, 14,17,20 84:23,24 87:21 93:2,12 94:23 95:2,8,15,17,20 96:8 97:15 101:10, 12 104:2 110:2 111:16 114:6,10 115:20 118:6,10,13, 15 119:21,23 136:2, 18,19,23 154:7 166:15 167:23 168:16 169:18 170:11,13 171:7,18 181:23

**medication** 17:11 18:10 33:21 34:7,22 35:2,4 41:19 156:13,20,24 158:2,3,23 159:17 163:8 182:1,11

**medications** 17:19 18:2 21:17 34:15 35:8,11,13 43:17 52:12,15 159:11

**medicine** 157:18

**meds** 33:11,14,19

**meet** 44:13 68:16

**meeting** 45:18 46:9,12 49:7,8 75:12,21 76:4 77:7 81:24 82:10 99:10, 24 100:3,16,24 101:2,18,21 103:1, 20 121:9 122:2,7,19 123:8,19 125:20 126:2,7 127:7,19 128:5,8 137:11,18 138:6,23 139:2,4, 11,16 140:18,20 151:10 170:21

**meeting's** 77:8

**meetings** 46:7, 14,19,22 76:12 101:8 122:22

**Megan** 168:21

**members** 8:6 100:6 101:11 109:5, 8 170:23 180:2

**Memorandum** 44:21 45:16 99:13 121:14 125:9 137:21

**Memorial** 25:21, 22 26:1,13,16 65:7, 10,12 66:1 67:22,23

**men** 140:11

**mental** 30:2 128:15,20

**Mentally** 47:20

**mentioned** 10:19

**mess** 171:18,19

**met** 7:7

**method** 23:15

**Michelle** 157:14

**microscopic** 109:23 174:12

**middle** 123:2 126:10 133:19

**miles** 178:6

**Mincy** 128:11 129:11 138:20 143:5

**mind** 131:21 132:5

**minute** 23:19 159:2

**minutes** 46:14 50:10,14 77:8 99:23 121:11 122:2 125:20 126:4 138:6, 8 167:16

**misquoted** 172:22

**misstates** 123:10

**Mmm-hmm** 8:23 12:1 23:10 48:13 74:11 83:14

85:16 132:9 133:21 139:9 144:7 150:4 154:6 157:21,24 160:20 168:17 170:17 173:4 177:6 178:11

**moment** 10:19 23:4 51:1 54:9 115:4

**Monday** 58:6

**money** 107:6

**monitor** 128:12

**month** 32:23 33:18 44:14 123:5 125:2,3,20 139:14 140:12 158:13

**month's** 76:9

**monthly** 14:6 129:2

**months** 79:1 159:15 182:23 183:4

**Mortality** 102:14

**move** 90:14,17 121:2 147:1

**moved** 67:6 68:6 141:12,16 143:6,10

**multi-page** 45:1 51:6 54:11 92:7 99:18 121:23 125:13,15 138:3

**multiple** 55:16 61:19 64:17 68:1 77:23 92:8 94:12 142:22 164:2

**multiple-page** 71:14

**N**

**named** 11:12 12:6,7

**Nate** 7:8

**Nawoor** 39:3,6,8, 12,15,19 40:6,8,10

41:3,14,23 42:5,9, 14,21,23 43:5 48:24 78:4 84:10 90:13,16 91:4 103:1,8 117:16 120:19 126:24 129:8 141:11 148:7, 9,19 151:18 152:10 153:17 154:14 161:4,8,15,18 162:22 164:3,13 167:11,12 168:13 174:18 182:10,18 183:7

**Nawoor's** 103:4 120:16 150:13 155:24

**necessarily** 170:10

**needed** 38:7 41:19 52:6,11 60:21 63:4,23 67:6 86:6 118:20,22 119:4,7, 10 121:4 129:16 139:23 146:18 151:7,12,24 175:20, 22

**needles** 17:18

**negative** 103:16

**New/delayed** 123:24

**Nicole** 128:16

**night** 58:5,8

**nobody's** 109:24

**nods** 9:10 84:1 115:15 147:21 155:21 165:9 173:11

**non-emergent** 62:5,10,20 63:2,22 64:7 67:13,17

**non-formulary** 159:14,16,19,24 160:3 162:12 163:2, 4,8 175:16,20,22,23 176:4 182:1,2 183:7

**non-medical** 104:3

**non-public** 8:6

**note** 14:1 19:4 37:15,16,19 72:23 73:4,5,6,11,16 85:4 89:20 90:3,5 108:13 123:7 132:21 144:9, 10,12,17,19 145:6, 7,10 150:1,2,16 152:22 153:5,8 168:7 169:9,18

**noted** 103:19 127:21

**notes** 15:1 20:8 33:9 36:23 37:13, 14,21 38:6,11,23 46:18,21 71:7 73:14 89:7 92:3 101:8,9, 10,14,17,22 104:11 126:7 143:21 144:4 149:1,8 155:7,13 171:24

**notified** 126:17 134:3,7,16,24 135:6

**notifying** 126:20

**November** 150:17,20 158:13 161:13 182:24

**number** 149:8,22

**numbers** 99:19

**numerous** 19:7 84:23 106:5,6

**nurse** 11:15 16:1, 4,14,22,23,24 17:5, 9,11,16,21,23,24 18:9,12,18,21,23,24 19:1,13,16,21,23 20:3,11 21:10,15 22:23 24:5,19,22 25:2,7,11,14,20 26:2,12,18 27:23 28:1 33:10,14 34:9, 13 36:9,11,17,19,20 56:6 57:15,16 58:1, 18,20,21,22 68:22, 24 71:19,22,24 72:7,16,24 74:3,15 75:1,2 90:23,24 109:20 144:20,23 151:4,6 157:11

KATHY GALVIN

163:17 168:18 181:7

**nurse's** 20:17 34:9 36:23 58:23 73:14

**nurses** 18:19 29:20,22,24 31:24 36:5 52:21,22,24 53:1,3,15 56:8 74:18 108:11 109:9

**nursing** 11:17 15:13,16,18,24 26:23 27:1,15,18,21 28:18,23,24 29:3,8, 18 30:9 32:9 36:21 39:2 43:9 55:20 56:18 57:22 64:1 66:4,24 83:17 90:24 94:6 98:11 136:17 137:4 158:15 168:2 172:16 173:1 174:24

### O

**O-L-I-S** 13:10

**oath** 7:4 8:22

**object** 34:21 43:1 56:1 59:5 65:20 70:3,18 71:1 123:9 145:17 146:8 147:2

**objection** 22:12 53:17 76:5 122:11 131:8

**objective** 37:6 73:1 90:6

**observable** 174:3,7

**obtain** 80:22

**obtaining** 21:16

**obtains** 79:6

**occasionally** 41:24 42:1,2

**occurred** 11:21 46:10 58:4,8 101:17 145:11

**October** 147:19 176:4,6 183:9

**off-site** 168:9 177:10

**offender** 17:14 70:14 71:6 89:6 92:2 104:10 105:17 110:7 111:20 131:14 136:13 139:24 143:20 144:4 148:24 149:7 155:6,13 180:11,14, 15

**Offender's** 130:16,23 132:11 133:6

**offenders** 70:12 107:11 109:17 112:16,19 123:14 124:8 139:13 171:20

**office** 7:12 97:1,2, 15

**officer** 57:14

**officers** 105:17 140:1,6

**Olis** 13:7,10

**on-site** 168:3,9, 12,13,23 169:3 177:4,8 179:3

**oncologist** 156:1

**one-page** 82:17 89:5 93:1 104:10 130:16 132:11 143:20 148:24 149:13 155:6 156:13

**open** 71:24 72:1

**opening** 177:14

**operation** 115:11,17 165:3

**operator** 26:22

**opinion** 180:20, 23

**opposed** 74:4 168:9

**option** 164:7

**optometry** 13:21

**order** 21:2,19 34:23 35:1,3 41:21 56:21 63:8 70:8 78:4 83:10 95:6 96:3 98:7 137:15 148:8,9 159:13 161:3,5 175:17 176:1,4

**ordered** 24:8 25:5,9,17 34:15 35:5 52:11 60:19 84:14,15 148:6 159:12 161:7 177:13

**ordering** 20:19, 23 52:5 55:18 59:16,17 66:12 68:9,23 71:4 95:1

**orders** 17:7 18:8 20:7 24:21 25:1 33:18 42:12 63:7 94:24

**organ** 77:20 87:5

**orientated** 151:5

**original** 29:13 67:20 161:3 162:21

**originally** 119:13 130:8

**Outpatient** 76:1 89:6 92:3 104:11 143:21 144:4 149:1, 8 155:7,13

**over-read** 76:17, 20

**overhear** 97:12

**overtime** 52:8, 19,20 140:9

### P

**p.m.** 29:14 72:1

143:16 183:17

**Pacer** 133:7

**packet** 124:24

**paged** 50:22

**pages** 51:9 54:12 92:14

**paid** 48:10

**paper** 26:20 93:13 95:14

**papers** 93:15

**paperwork** 19:3,14

**Paragraph** 49:20 115:3 147:17 154:2

**part** 34:14,18 35:20 36:22 83:15, 16 85:15 89:17,23 92:20 93:12 107:12 155:20 156:23 164:6,10 171:23 182:20

**parts** 49:13

**passed** 24:24

**passes** 110:17 111:8,9

**past** 20:13,18 122:21 139:21

**patient** 19:5 20:18 34:1,2,4 36:3, 8,12,14,18,21 38:15 41:16,20 42:6,10, 15,21 44:1 56:19 57:3,6,12,19 58:1, 15 59:13 60:3,21 62:3 63:4,23 67:15 70:1,16,23 72:16 73:8 75:2 76:2,8,17 77:1,6 85:3,5,6 93:14,15 98:1 103:14 139:4 144:18 150:11 151:23 153:8 159:23 164:3,7 181:3

**patient's** 61:20 67:5 76:23 85:11 93:17 144:9

**patients** 18:1,8 21:17 24:6,19,23 25:3,7,12 26:14 34:16 35:17,24 36:6 38:17,24 41:15,23 42:6 43:16 59:3 60:9,13,17 74:24 76:11 77:4 163:19 173:24 181:11

**paused** 22:8

**pay** 74:24 75:3,5

**paycheck** 47:18

**Payment** 74:21

**peer** 106:23 109:13,17 110:4,10, 13,18 111:1,14,18, 22 112:2,8,11,22 113:2,3,5

**pending** 10:7,8

**people** 9:17 30:11 56:16 59:7 104:3 111:4 137:2 181:19

**Perfect** 13:6

**perform** 54:22 61:2 63:16 65:3 95:19

**performance** 30:18 32:6 51:5,12 54:16 95:16

**performing** 67:9,10,20

**performs** 95:21, 22

**period** 39:5 51:8, 13 54:13,17 78:16 79:2 111:11

**Perry** 133:13 135:6 136:3

**person** 30:5 55:12 72:7 76:18 97:23 101:14 103:8 109:4 112:8,11

113:6 128:10
177:11,15

**personable**
181:3

**personal** 8:5
47:8 82:6

**personally**
167:14

**pertained** 80:2

**pertaining** 114:3

**Pete** 110:21

**pharmacist**
129:1

**pharmacy** 43:17
128:17,18 129:2
162:18

**phlebotomist**
18:15

**phone** 47:23 48:1
97:8,12 176:14,17

**physician** 42:24

**physician/
patient** 164:2

**picked** 143:2

**piece** 95:13

**pieces** 50:23

**pivot** 56:15

**place** 32:23 35:3
43:4 72:24 73:11
74:2 93:24 118:3

**places** 98:19

**Plaintiff** 7:9
68:13,14 147:19
154:16

**Plaintiff's** 48:17
104:16 121:22
125:15 130:21
131:23 132:19
133:2 138:2 144:2
149:6,19 156:19
175:13 176:8 178:8

**plan** 37:7 73:2
75:21 90:7

**point** 10:3 50:16
86:8 99:3 113:6
143:14 165:8
167:19

**pointing** 83:13

**points** 167:17

**policies** 32:11,
15,16,19 33:2
40:11,19,24 73:19

**policy** 20:14,15
40:9 53:7,9,16
62:15,18 75:8 86:1,
9 94:2

**portion** 24:11

**position** 29:9,12
34:10 35:15 112:5,
23 162:6

**positions** 16:21
138:17

**positive** 115:20

**possibly** 140:8
163:5

**potentially**
180:6

**practice** 163:18
164:6

**precise** 68:17
181:4

**preparation**
13:24 14:22 15:1,4

**prepare** 14:24
19:3 45:12 46:1
122:4 126:4 138:8

**prepared** 46:9

**preparing**
126:18

**prescribed**
147:9,19,23 148:13

**prescription**
34:3 35:6 157:8
161:10,16,22
162:23 163:1

**prescriptions**
34:19 35:7

**present** 46:24
58:5 75:15 76:2
82:1 100:6 101:11
125:22 126:2 128:7
138:22 148:18
150:23 151:9
170:23

**presenting**
163:19

**presents** 61:12

**pretty** 76:1

**previous** 54:11
125:2,3

**previously**
10:20 73:13 119:22
135:15 145:14,22
157:6 170:1 178:9

**primary** 66:13
109:4 141:23

**printed** 131:22

**prior** 46:11 48:14
49:7,8 72:23
116:12,17

**prison** 8:3

**private** 104:2

**problem** 30:22
57:12 72:15 73:9
97:5,7,14,17,20
98:14 119:23 120:5,
9,12,15 140:13

**problems** 35:24
96:18,23 97:1,9,23
120:19

**procedure**
10:14 38:3 40:9
61:22 62:23 63:18
86:2,3 87:17,20
97:19 98:4 108:20
141:21 145:4 177:8,
9

**procedures**
25:15 39:16,20,22
40:11,19 60:18
61:18 62:19 87:13,
24 88:7,9,12,15
117:11 127:17

**proceedings**
50:17,19 99:4,6
143:15,17

**process** 35:10
57:23 58:14 61:7,24
62:7 68:4,5 162:13
163:7,10 164:10
166:5 177:7

**professional**
140:4,6,10

**progress** 71:7
89:7 92:3 104:11
143:21 144:4,9
149:1,8 155:7,13

**projects** 77:20

**proof** 102:24

**proper** 37:1,4,5
38:9 44:11

**properly** 55:22
104:6 179:10
180:11

**protein** 59:23

**protocol** 43:24
71:19 173:5

**protocols** 72:9
173:2

**proven** 102:20

**provided** 166:1,
7

**providing** 24:6,
19,23 25:3,7

**psychiatrist**
128:21

**psychologist**
128:21

**PTO** 47:18 48:9

**Public** 149:14

**pull** 17:11 19:7
37:24 38:19,20

**pulled** 17:13
38:13

**pulling** 18:13,14,
16

**purpose** 44:8
61:14

**purposes** 64:24

**put** 7:10,22 14:2
37:11 47:6 58:9
84:22 85:2,10 97:9
104:15 108:13
141:20 145:4
157:19 182:18

**puts** 173:24

**putting** 19:4
158:22

---

**Q**

**QI** 14:2,3,4,5 32:22
43:22 45:18,20 82:5
99:22 100:11,13,16
104:5 122:2,6,19
123:8 124:24 126:2
128:5,8 138:6,10,14
139:4 167:16
170:16,19

**quadriplegic**
181:7

**qualification**
111:1

**quality** 14:5 43:9,
12 44:5,8,10,18
45:5,21,24 46:3,6
54:21 75:11 76:9,12
77:7 81:23 99:9
100:3 103:20 104:1
121:8 122:14 127:6
137:10,17

**question** 9:16,
18,21,22,23 10:7
22:7 23:12 24:10
29:2 36:9,17 40:3
42:13 44:1 77:2
79:18 91:1 94:14
112:20 113:17
124:17 126:1
176:21 179:13,16

**questioned**
76:13,14,24 118:1

**questioning**
171:15

**questions** 9:9
10:13 28:15 40:6,8
112:21 118:1
162:10 175:3,4,8
176:12 177:3 179:6
181:13 183:12,13

**quick** 27:11 73:22

**quiet** 163:23

**quit** 10:22 11:3,4
26:8 152:18

---

**R**

**R/o** 74:10,12

**Radiological**
82:24

**Radiology**
178:16

**raise** 117:22
120:5

**raises** 128:3

**ran** 24:2 55:22

**random** 38:21,22

**rarely** 82:3

**RE-CROSS**
162:8 181:14

**RE-DIRECT**
175:5

**reach** 112:18

**reached** 114:24

**read** 20:6,10,12,13
24:9,12 27:14 28:15
49:11 84:7 85:18
89:20 90:3,5 112:19
135:2 149:22
152:20 153:10,12
154:3,5,8 182:12

**reading** 20:5,17
82:12 150:13
178:17

**reads** 49:22
168:22

**ready** 154:4

**real** 7:10 50:24

**realize** 124:6
125:19

**reask** 23:12

**reason** 10:16
11:2 19:5 56:4 58:4
101:24 119:7
122:20 135:14
139:4 159:9

**reasonable**
65:18 66:6,8,9,20,
21

**reasons** 112:1

**recall** 13:19 69:6,
9,13,16,20 75:12
77:14 78:15,21
81:17,23 82:2 83:4
87:12 88:2,14,17,
20,21,24 89:13
91:13,14,20 92:17,
18 93:9 99:9,11
104:18 105:3,4,24
106:10,11,12,15,18
107:3,8,16,20,22
108:2,18 109:1
113:14,19,21,22
114:18 115:23
116:2,7,23 117:13
119:5,9,12,15
121:8,19 127:18
129:18,19 130:8,12
131:1 135:20
137:10,17 139:1
141:3,7 147:22
152:10,13,14
153:14,17,20
155:15 158:3,6
164:20

**receive** 56:16,20
60:9,13,17 146:4
161:12

**received** 47:12
69:21 77:10 84:3
98:9 148:4

**receiving** 64:8
86:5 159:11

**recent** 16:18

**recently** 8:17
16:20 162:11

**recess** 50:17
99:4 143:15

**recognize** 84:9
99:21 144:6 168:18
169:21 181:23

**recollection**
91:16 106:9 139:17
144:22 151:15
163:13 167:3
176:14

**recommend**
160:18

**record** 7:10,19,23
9:5 24:11 45:1,15
48:23 50:13,21
95:18 99:8 141:21
143:13,18 156:14,
20,21 157:8 158:5,
6,7,19 159:5,6,7,10
168:7 169:14
175:14

**records** 20:5,13,
18 25:17 27:15
30:1,5,14,17,21,23
31:3 32:3 33:9,16,
17,23 34:3 38:1
46:6,23 60:24
63:11,14 64:13,15,
22 66:14 67:1,24
78:5,7,14,17,22
79:3,5,8,14,15,19,
20,23 80:5,11,17,20
83:16 87:21 93:12
94:2,5,9,23 95:3,8,
15,20 96:8 97:15
101:10,12 110:5
114:6,10 115:20
118:6,10,13,15
119:21,23 136:2,18,
20,23 154:7 156:24
158:10 167:23
168:16 169:18
170:11,13 171:7,18
175:10 181:23

**recovery** 106:13

**Recs** 71:8,15
89:8,12 92:4,9,11
93:4,8 104:12,17
143:22 144:5 149:2,
9 155:8,14 156:15,
22

**redactions**
124:4

**refer** 29:4 53:12
65:5,8

**reference** 21:20
29:4 40:22 68:22
102:6 156:4 181:5

**referenced**
49:14 123:2 127:11
164:18 176:17

**references**
127:15 181:17

**Referral** 93:3

**referrals/
procedures**
123:4

**referred** 57:17
58:2,6,16 59:18
61:7 74:19 139:7
156:5

**referring** 21:21
25:11 55:5 176:3

**refers** 45:21

**reflect** 52:12,14
100:2 101:17

**reflected** 77:8

**reflects** 145:10
159:10 161:11

**Regional** 31:2,7,
11 55:7 76:16,24
128:12,22

**registered** 27:23
28:1 90:23

**reiterate** 83:7

**related** 11:14,16

**relates** 165:15,24
171:17

**relayed** 115:16

**remainder** 48:11

**remember** 8:21
11:20 12:14,17
13:18 16:6 25:22
66:18,23 80:6 82:12
138:20 171:10,15

172:16

**remembering**
70:14

**remind** 41:8

**reminding** 41:2,
7

**removed** 102:12

**renal** 62:22 77:11,
16,21 81:15 169:9

**repeat** 140:3

**rephrase** 9:21
39:18

**replaying** 141:1

**reply** 57:24

**report** 14:6 32:22
43:15 57:15 82:18
85:3 93:3 99:22
105:10 117:10
169:19

**reported** 44:2
124:9

**reporter** 9:7
48:21 51:1,9 54:10
71:12 82:15 91:24
92:23 99:17 104:15
121:21 125:14
130:20 138:1 144:2
149:5,11 155:12
156:18

**reporting** 58:15
77:4 127:24

**reports** 43:22

**represent** 7:8

**representative**
76:15

**represented**
12:9

**representing**
55:13

**reputation**
173:18

**request** 110:12
163:2 182:2,4

**requested** 24:11 47:9 117:11 170:8

**requesting** 61:12 95:1

**requests** 63:7 162:12

**require** 55:14,24

**required** 19:8 52:5 54:23 55:21 58:2 61:18,21 79:4, 8,19 80:21 110:19 119:8 146:13,15,21 175:24

**requirement** 28:4,6 52:23 53:2,3, 6

**requirements** 40:14,16,23 41:3,7 79:22 80:2 84:23,24

**requires** 14:6

**reschedule** 135:19

**rescheduled** 118:19,23 119:5,7, 15,20 165:8

**rescheduling** 119:17

**resignation** 47:11,19

**respond** 9:8 18:19 166:1

**responded** 133:17 135:7

**response** 49:14, 15 115:5 116:2 134:1,11,15,23 135:4,11 136:24 137:1 147:18 154:8, 13 165:16 166:8,12, 20,21,24 176:11,21

**Responsibility** 51:18

**responsible** 66:15 68:1 87:19 93:20 118:4 126:19 148:3

**restate** 113:18 147:22

**result** 11:6

**results** 61:23 62:6 81:20 89:1 178:19

**resuscitate** 152:8,12

**retains** 122:10

**retire** 47:6

**retired** 50:2

**retirement** 50:5

**return** 48:15 84:22

**returns** 93:15

**review** 13:23 14:20 21:10 29:1 33:9,23 36:23 37:13,19,21 38:2, 18,23 61:8,10,11, 15,21,23 62:6,24 63:20 73:14 76:22 83:9 85:20 86:6 89:21,24 93:11 94:3,5,10,15,18 95:11 100:23 115:4 145:6 158:5 159:9 176:12

**reviewed** 14:11 32:21 34:3 37:14 38:7 73:17 83:2,8, 21 89:17 92:20 104:22 155:20 156:23 157:3,8 158:7,9,19 182:22

**reviewing** 84:17 85:14 93:20 158:6, 21

**reviews** 32:7 86:4

**Ritz** 156:1

**RN** 37:2 42:11,17 56:7,8 94:17

**RN's** 89:18

**RNS** 174:16,17

**Roderick** 174:23

**role** 57:23 113:13 171:10

**roles** 172:7

**room** 33:10,13 76:18 102:13

**rotate** 70:13

**round** 77:3

**rule** 74:14,19

**rules** 8:21

**run** 105:14,15

**running** 44:11

**runs** 45:3

**Rupcich** 7:15,22 8:1,5 13:1,5,7,10, 13,21 14:13,16 22:11 23:7 24:9,13, 16 27:10 34:21 43:1 57:6,9 59:5 65:14, 20 70:3,18 71:1 73:21 76:5 98:20,23 123:9 131:7,18,22 132:6,14 145:17 146:8 147:2 150:5 154:5,8,10 159:2 162:9 164:22,24 165:19 169:15,16 175:2,9 181:15 183:11,16

---

**S**

**Sangamon** 13:11 26:20

**Saturdays** 29:15

**scan** 60:17 63:23 67:5 68:5 70:17 77:20 86:13 87:2,4 90:17 103:15 177:9

**scanner** 154:6

**scans** 25:16 64:3

**schedule** 30:10 61:2,5 63:6,12 64:10,14,16,17 67:1 78:5 81:4 97:18,19

105:20 111:13 117:10 118:16 121:5 133:22 135:10,21,22 136:4, 16 141:21,23 142:18,22 168:12 172:8

**scheduled** 25:18 61:1,5 66:16 70:2,16,23 82:5 85:7 87:13 98:17 105:9 108:21,23 114:5,7,9,14,16 115:9,12,13,14,18, 24 118:17,19 119:13 130:9 133:18 135:8,12,16, 18 139:22 141:12, 16 142:17 143:6,10 146:21 165:4,22 166:13,14 167:2 176:16 180:9

**scheduler** 136:18

**schedules** 141:24

**scheduling** 25:15 30:6 60:23 61:22 62:5,23 63:5, 7,19,24 64:4,23 67:7 78:2,18 79:21 80:2 81:1 87:16,19, 24 88:7,8,12,15,18 94:16,18,21 96:16 98:2,10,14 114:19 116:8,18,21 118:4, 9,12 119:24 120:6, 9,16,19 129:7,10, 12,20 130:1,5,13 134:4 136:15 139:15 140:5,15 141:5 142:9 145:24 146:12 168:8 170:3 172:10 175:14 177:3,7 179:9 180:3,11

**school** 22:21 26:23 27:1,8,15,18

**scope** 86:17,19

**script** 163:4 175:20 182:6

**second-shift** 151:4

**security** 17:17 40:21,24 41:5 108:22,24

**seek** 80:23 98:18

**sees** 57:7 93:14

**select** 110:4,13

**selected** 110:11

**self-inflictions** 44:3

**send** 28:14,16 57:12

**sends** 178:16

**sense** 8:7 10:11

**sentence** 37:11 49:22

**separate** 46:16

**separately** 27:17

**September** 47:14

**serve** 79:13,15, 18,20

**serves** 61:15

**Services** 93:2

**set** 30:10 43:15,23 48:14 50:8 52:10,23 54:7 56:13 75:10 77:5 86:11 90:11 92:22 104:7,24 116:4 125:7,20 129:6 137:7 147:5 148:22 153:22 155:4 156:11

**settled** 12:23

**seven-bed** 18:6

**Severino** 173:8, 9,10,15,17 180:18, 22,23 181:1,8,18

**severity** 62:1 142:2

KATHY GALVIN

**sex** 110:7 111:20

**shakes** 9:10

**Shanelle** 78:23, 24 80:6,7

**share** 133:12

**Shawn** 31:2,6,7 32:8 55:7,10,12 117:23 128:9 129:23

**shift** 52:23,24 53:1

**shortly** 105:6,8

**show** 23:17,19 57:1 68:24 69:11,12 82:15 87:5 89:3 91:23 92:23 153:1 174:10

**showed** 14:13 30:15 56:24 68:22 69:12 133:10

**showing** 130:20 155:11

**shown** 14:21 60:7 132:13 164:17 165:6 173:2

**shows** 72:7 73:8

**shut** 107:14

**sick** 19:17,20 30:11 35:17,21 38:5,9 43:15 57:15, 16 58:1,5,15 71:19, 22,24 72:1,7,16 73:8 75:1,2 150:1,2 172:16

**sign** 86:6 152:7,11

**sign-on** 47:21

**signature** 37:2, 3,18 89:18,19 94:12 144:14 157:17 158:22

**signatures** 56:5

**signed** 34:8 41:21 84:14 150:10, 21 153:7

**signing** 33:11,14 56:6,8 182:9

**signs** 19:4,9 83:10

**sincere** 112:7

**sincerity** 110:15, 24 111:3

**single** 132:7 158:9

**single-page** 82:22 89:11 93:7 104:16 130:22 133:4 144:3 149:7, 20 155:12

**single-paged** 156:20

**sir** 70:12,20 100:18 119:14 123:3 124:3

**site** 11:16 30:9 31:20 36:20 55:10, 17,22 90:23 95:12 136:16 168:6 175:1

**sites** 31:14

**sitting** 35:19

**situation** 117:3

**Smith** 129:3,4,5 157:12,13

**smoke** 48:2

**so-and-so's** 140:7

**SOAP** 37:6 72:23 73:4,5,11 89:24 90:3

**soft** 77:19

**son** 181:6

**son's** 173:17 181:6,9

**Sonogram** 169:11

**sooner** 141:12,16 143:6,10

**sort** 55:14,23 64:5, 17 66:10 94:15 117:4 150:9 151:16 178:10

**sorts** 61:17

**sound** 12:2

**source** 86:1,3

**Sources** 49:1,24

**speak** 35:23 36:5 41:14 42:5 106:7 109:5,7 161:15,18, 21,24

**speaking** 45:23 69:16 88:21,24 106:10 107:3 113:14,19,22 182:5

**Special** 93:2

**specialist** 120:3 123:6

**specialists** 25:12 118:20 119:10 121:4,7 142:24 143:2

**specialized** 121:4

**specific** 41:15,23 42:5 76:11 85:17 109:1 113:21 116:7 163:12 173:1,5

**specifically** 55:5 69:18 76:8 77:6 107:17 116:24 145:16 147:17 157:10 179:8

**specimen** 23:2, 14 174:4

**spell** 13:8

**spend** 15:16 39:15

**spent** 40:1

**spilling** 59:23

**spoke** 41:22 69:19 106:20 108:13,15 114:1,3, 11,19 117:7 129:16 135:5 142:8 143:1 145:14,22 165:1,12

**sporadically** 37:14

**Springfield** 27:4 64:21 65:4,8,11,12 66:1 67:22

**St** 67:22

**stack** 165:18 176:9,10

**staff** 16:1,4,14 19:23 20:3 21:15 24:5,19,22 25:2,6, 10,14,20 30:1 31:24 32:13 33:5 39:8 56:18 78:20 109:20 136:17

**staffed** 52:20

**staffing** 52:7,21, 22 53:7,18 55:17 105:16 139:24 140:13

**stamp** 37:17 38:3 51:7 54:14 83:12, 15,22 84:12 86:5 93:8 121:23 130:24 133:7 155:24 156:21

**stamped** 44:22 45:2 71:8,14 89:8, 12 92:3 93:3 99:14 104:11 121:15 123:1,22 125:10 137:22 143:21 144:5 149:1,16 155:7,14 156:14

**stamps** 83:9 92:9

**standard** 53:18

**start** 9:17 15:7 16:4,17 84:2 125:19

**started** 29:9

**starting** 39:11

**state** 7:18 14:5 32:18 35:14 36:7 43:24 50:1 53:8 76:24 77:1 91:6,8, 19 120:11 122:9 139:18 147:3 172:21,22 178:5

**stated** 41:4 47:4 53:21 97:8 114:7

116:24 122:21 139:21 146:11 152:16 168:11

**stating** 73:1

**stay** 47:14 109:22

**stayed** 76:1

**step** 57:2

**stepped** 151:12

**steps** 81:3,6,9 87:23 88:4 118:15 121:2 135:21,23 136:5,6,8 141:11,15 143:5,9 146:24 162:4

**stick** 23:18 59:22 174:9

**stipulation** 94:11

**stock** 158:3

**stone** 22:3 77:24

**Stonecipher** 128:16

**stones** 25:4 59:7, 8

**stop** 47:1,3

**stopped** 36:1,8, 14 41:16 42:7 171:21 179:18

**stops** 167:19

**strictly** 85:20

**Strike** 113:17

**stuck** 77:24

**stuff** 110:1

**subject** 72:24 90:5 113:12

**Subjective** 37:6

**subjects** 106:6

**submitted** 160:11 175:17,24 176:5 183:7

**suffering** 24:7, 20 68:20 69:3,7

**suggest** 171:3,6

**suggestion** 166:22

**summary** 176:20 179:14

**Sundays** 29:15

**superior** 43:6

**supervise** 26:14 29:17,22,24 30:21 31:12,17,19 35:20 174:18,20

**supervised** 30:4,17 31:20 32:3,4 33:4 36:6

**supervision** 30:7 32:13 33:8 171:9 179:7

**supervisor** 30:13 31:2,7 58:19,23 95:9 117:23 128:9 129:21 136:17,19,23 174:23

**supervisors** 30:24 31:1,4 128:3,7

**supplies** 51:24 52:3

**supporting** 54:22

**surgeon** 133:22 135:10 136:3 166:9,19 173:12 176:18

**surgeries** 25:16

**surgery** 105:7,9,22 107:23 108:3 113:23 114:2,4,13,20 116:8,19 118:5,10,13,16,21 119:11,18,20 120:4,6,10,16 121:2,4 129:8,11,14,21 130:2,6,9,13 133:18 135:7,9,12,16,21 136:15 139:16,22 140:15 141:5,8,12,16 142:9,22 143:6,10

**surgical** 133:23 135:10 166:20

**surmising** 159:21

**survival** 106:16

**suspected** 102:20 103:8,24

**suspicion** 102:21 103:16

**suspicions** 102:23 103:5

**switch** 29:7

**sworn** 7:3

**symptom** 22:1,10 23:4,8

**symptoms** 22:17 74:6

**system** 172:18

---

**T**

**table** 77:3 115:1

**takes** 141:22

**taking** 9:7 18:15 47:17 48:8 117:13

**talk** 34:13 36:9,11 50:11 56:15 57:4 88:11 108:11 109:12,18 110:22 116:15 117:2,8 180:3 181:19

**talked** 96:15 106:5 107:10 109:22,23 163:22

**talking** 88:14,17 108:9,12 114:24 146:17 156:1

**talks** 106:23

**task** 142:20

**tasks** 25:11 80:2

**Taylorville** 11:4,18 15:12,13,16,18,24 16:2,5,15 17:2 18:5 19:24 20:4 21:16 24:1,14,18,23 25:3,6,10,15,20 26:7 28:20,22 29:3 31:4,15 39:12,20 40:11 51:21 52:20 56:17 59:3,14 60:4,10,14,21,22 63:3 64:2,20 65:1,5,7,10,13,18 67:21 69:24 71:8,15 89:8,12 92:4,9,11 93:4,8 98:11 104:12,17 143:22 144:5 148:3 149:2,9 155:8,14 156:15,22 158:16 168:2,15 173:13 174:14,15 177:16 181:9

**team** 143:3

**tech** 128:17,18

**technical** 112:20,21

**technically** 31:22

**telephone** 47:12,15

**telling** 96:22 106:12,15 107:8 123:18 127:3,13 141:2 179:2

**tells** 75:20

**ten** 50:14,15 108:17

**tendered** 131:20

**tenure** 41:11

**terminal** 164:5

**terminally-ill** 151:23

**terminology** 20:1 27:8

**terms** 20:1 27:7 35:1 52:3

**test** 60:3 65:3 94:24 103:17

**testified** 7:4 72:23 73:13 119:22 157:6 176:12 178:9

**testify** 10:16

**testifying** 8:24

**testimony** 115:10 163:12 165:2,7,21 166:4 170:2 175:15 176:20 179:8,14

**testing** 63:17 98:8 117:7 168:10

**tests** 18:16 24:3 59:15 61:2,18 69:21

**themself** 57:7

**thing** 10:6 126:16 155:18 158:21 160:6

**things** 22:9,16 34:12 40:19,20 75:20,24 112:6 117:4 163:21 173:22

**thinking** 22:8

**thirds** 53:4

**thought** 138:14

**thoughts** 91:8,19

**three-page** 92:2

**three-week** 177:21 178:1,4

**Thursday** 58:8

**time** 8:16 15:17,19 16:12 18:6 19:4,8 22:6 26:18 28:12 30:11 37:2,17 39:5,15 40:1 45:9 47:8,18,19 50:9 56:5,8,10 57:10,16 63:3 65:19 66:6,8,9,20,22 69:19 75:2 78:16,17 79:2 81:12,14 82:3,6 85:13 86:6 88:8 89:19 90:19 91:3 94:12 97:15 98:10,17 100:11 101:13 105:10 107:15,18 108:1 111:11 114:14 120:24 126:17 131:14 134:7 135:13 139:4 141:22 146:20 152:4 157:18 158:4 160:24 166:11,13,18 170:11,12 171:8 173:14

**timely** 34:8,17 95:22 96:12

**times** 22:24 33:18 36:8 65:17 106:5 108:15 110:17 114:1,18 160:17 163:24

**tissue** 77:19

**title** 26:1 31:10

**today** 7:14 8:22 10:14,17 12:19 13:24 42:2,3 49:8

**today's** 9:6

**toenail** 109:24

**told** 21:7 47:10 52:21 56:7 96:24 97:9 107:2,5 115:10,17,21 116:3,14,24 119:4 126:23 129:18 133:16 135:3,15 167:1 175:22 176:15 181:6

**tomorrow** 169:2

**top** 44:6 45:5 54:12 72:3 75:14 82:23 84:2 133:8,14

**total** 51:8 54:12 171:19

**totally** 38:21,22

**tract** 72:4 74:10,12 173:2

**trained** 21:3,5,6,8,9

KATHY GALVIN

March 27, 2019
Index: training..work

**training** 110:20, 22

**transition** 50:12

**transitioning** 59:8

**treatment** 42:21 164:8,11

**treatments** 69:20 154:15,19,22, 23 156:5

**trial** 107:1

**trouble** 40:10,13 96:16 103:10,12 111:23

**true** 114:13

**trust** 112:23,24 113:1,2,7,9,13 142:11

**trustworthy** 112:9

**truth** 9:1,2

**truthful** 112:12

**truthfully** 10:17

**turn** 68:12

**Tweedy** 128:19, 20

**two-page** 71:5

**two-person** 97:1

**two-week** 47:18 48:9

**type** 37:9 63:18 71:17 73:16 89:16 92:19 93:11 104:21 131:4 155:18 158:7 182:4

**typical** 70:1,15,22 160:2,5,13,16

**typically** 110:10 127:22 163:21

**Tyrrell** 7:13

**U**

**UIC** 56:22

**ultrasound** 60:9,21 62:22 70:2 77:11,16,21 78:3 81:1,4,7,10,12,15, 21 82:18 88:18 89:1 168:23 169:2,5,19 170:4 177:4,5,22 178:1,13,21 179:3

**ultrasounds** 77:19 168:2,4,9 177:16 178:5,15

**unclear** 20:9

**underneath** 84:19

**understand** 9:3, 11,18,20 10:1 20:21 49:10,13 53:13 79:7 138:13 140:2,22 152:17 163:24

**understanding** 20:4,16 103:7 161:4

**understood** 9:23

**Uniform** 149:14, 20

**unique** 121:6

**unit** 57:11 122:15 133:20

**University** 24:2

**unlike** 97:2

**update** 144:21

**ureter** 78:1

**ureters** 86:19

**urethra** 181:8

**urinalysis** 18:16 59:21

**urinary** 72:4,15 73:9 74:10,12 86:23 87:9 173:2

**urinating** 74:20

**urine** 21:24 23:2, 14,19 24:24 56:22 57:3 59:23 68:22 69:12 72:17 174:7

**urologist** 68:9 142:23,24 143:1 173:17,19,23

**urology** 173:13

**UTI** 74:20

**V**

**vague** 34:21 43:2 65:20 70:3 71:1

**Vandalia** 31:15

**varied** 36:8 108:9

**vary** 75:23

**ventilation** 153:13

**verified** 165:13, 21

**verify** 108:22

**version** 72:13

**versions** 72:10 110:3

**versus** 177:9

**violate** 9:14

**visible** 174:10

**visibly** 56:24 57:3

**visual** 23:17 60:5, 6

**visualizing** 32:2

**vital** 19:8 122:13

**vitals** 19:2,4

**voice** 118:1

**Votrient** 147:7, 10,19,23 148:4,15, 19 150:3 155:2 161:16,19,22 162:2, 5,21 175:14

**voucher** 74:22

**W**

**Wackman** 7:6,8, 17,24 8:4,7,9 13:2, 6,8,12,15,16,22 14:18,19 22:13 23:11,13 24:15,17 27:13 34:24 43:7 44:24 48:20 50:20 51:15 53:23 54:19 56:9 57:8,18 59:9 65:15 66:2 70:9,21 71:11 73:24 76:10 82:21 89:10 92:6 93:6 98:22 99:1,7, 16 104:14 121:17 122:17 123:16 125:12 130:19 131:11,18,20 132:2, 17,24 137:24 143:12,18,24 145:21 146:14 147:4 149:4,18 150:7 154:11 155:10 156:17 159:4,7,8 162:7 164:21 165:17 169:14 175:6,11,12 181:12 183:14

**wait** 41:21 61:23 62:6,23 63:19 67:18 97:9 177:14,18,21 178:1,4

**waiting** 135:18 166:8

**waive** 183:16

**waived** 104:4

**walked** 170:12

**wanted** 50:23 85:10 90:13,16 106:24 109:12 111:8 113:5,13 117:7,9 142:24 152:22 153:11

**wanting** 110:9 111:3,6

**warden** 105:12, 14 109:12 128:10 129:3,4 133:17 134:9 138:10 140:5

**wardens** 54:24 55:23 139:23 140:16

**watch** 110:17 111:14

**Waterman** 78:18,19 79:11 80:16,19 101:15 167:17 169:23 171:1

**Waterman's** 101:16,21

**ways** 23:20 33:1 57:11

**week** 33:24 34:4 37:23 42:3

**weekly** 157:8 158:7,10

**weeks** 160:3,16

**weight** 19:9

**Wexford** 11:5,15 16:11 20:14,15 30:10 32:11,14,16 33:2 35:10,12 47:1 48:4,8,24 49:1,24 50:5 53:6 55:4 56:11 62:15 91:16 130:2 141:4 143:9 161:21,24 172:21 173:15 182:23

**wife** 106:20,22 107:5 108:6,8 145:23

**William** 7:8 68:14

**wishes** 152:5

**witnessed** 150:22 151:7,8,13 164:1

**words** 9:1

**work** 15:8 26:16 29:11 30:15 39:2,6 54:22 58:22 60:23

KATHY GALVIN

63:5,24 67:7 75:13
95:18

**worked**  8:2 26:20
39:12 173:13

**working**  15:9
18:6 28:22 36:20
47:1,3 56:11 58:3,7
151:5 170:7 173:15

**worried**  90:20
91:5,17

**writ**  105:11

**writes**  74:7

**writing**  74:4
171:20 182:12

**writs**  108:1

**written**  34:19
35:14 49:15 86:9
134:14

**wrong**  157:7
175:16

**wrote**  51:23 85:6
95:6 162:22 163:4
175:19

---

Y

---

**year**  13:14 16:7
26:6 47:17 54:10

**years**  11:22,23
15:17 22:23 25:23
26:3 28:2 68:18
138:17

---

Z

---

**Zavala**  128:10

3:17-cv-03112-JES-JEH  # 100-3   Page 205 of 206
Exhibit 95 to Galvin Deposition - EX C
3:17-cv-03112-SEM-TSH  # 1   Page 8 of 9

ILLINOIS DEPARTMENT OF CORRECTIONS
## OFFENDER'S GRIEVANCE

| Date: 5/16/2016 | Offender: (Please Print) Dean | ID#: N21885 |

| Present Facility: Taylorville Corr Ctr | Facility where grievance issue occurred: Taylorville Corr Ctr |

NATURE OF GRIEVANCE

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] ADA Disability Accommodation
- [ ] HIPAA
- [ ] Other (specify):

- [ ] Disciplinary Report: ___/___/___
  Date of Report          Facility where issued

**RECEIVED** (stamp)

Note:   Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Summary of Grievance (Provide information including a description of what happened, when and where it happened, and the name or identifying information for each person involved): I've been urinating blood since Dec 19th 2016. I've been to HCU many times after blood and urine tests I was sent to Dr. Severino at Springfield. I was given a CT scan. On March 18th 2016. Finally on April 14th 2016 Dr. Severino told me I have Kidney Cancer and it goes into a vein that leads to my lungs. He said we had a very deficit spreads. He said at that point I have a 35% chance to live 5 years. C/O Ross and C/O Sturatt were in the room they heard him. I asked him soon till surgery? He said "It needs to be in no more than a few weeks!" It's now almost 5 weeks later! With each passing day my life expectancy goes down! At times over the last 5 months the blood was so heavy there are large blood clots. So large I can barely pass them and when I do it is with great pain! The Heavy clots are back again. In the last 2 weeks. I have endured 5 months of physical and mental suffering I shouldn't be made to wait any longer! If they wait long enough it will spread all over and then it's to late!

Relief Requested: Surgery! Get HCU, Wexford to stop dragging this out and get me to Surgery!

[x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| Wade Dean (signature) | N21885 | 5/16/2016 |
| Offender's Signature | ID# | Date |

(Continue on reverse side if necessary)

---

### Counselor's Response (if applicable)

Date Received: 5/17/16

- [ ] Send directly to Grievance Officer
- [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: Per Health Care Unit D.O.N. Galvin, Surgeon has been contacted to schedule a surgical date. Currently awaiting a response.

| T. Perry | J. Perry (signature) | 5/18/16 |
| Print Counselor's Name | Counselor's Signature | Date of Response |

---

### EMERGENCY REVIEW

Date Received: 5/17/16

Is this determined to be of an emergency nature?

- [ ] Yes; expedite emergency grievance
- [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

| (signature) | 5/17/16 |
| Chief Administrative Officer's Signature | Date |

Distribution: Master File; Offender                  Page 1                          DOC 0046 (8/2012)

Galvin Dep
EXHIBIT NO. 15
Date: 3-27-19
Deb Krotz, RMR/CRR/CSR

**MEDICATION ADMINISTRATION RECORD**

**BOSWELL PHARMACY SERVICES**
814-629-1397 • Fax: 814-629-7644

EXHIBIT NO. 21
Date: 2-27-19
Deb Krotz, RMR/CRR/CSR
GALVIN Dep 21

| EFFECTIVE DATES | MEDICATIONS | HOUR |
|---|---|---|
| Original Order 10/22/2016 | VOTRIENT 200MG TAB NAWOOR, ABDUR TAKE 4 TABLET(S) BY MOUTH DAILY | 0800 |
| Discontinue 4/19/2017 | Waiting for non-formulary approval 4 capsules ×4 matter | 3000 |
| Original Order 10/19/2016 | WARFARIN SODIUM 1MG TAB SUB FOR: COUMADIN TAKE 1 TABLET(S) BY MOUTH DAILY (WITH 6MG=7MG) | 0800 |
| Discontinue 4/16/2017 | | |
| Original Order 10/19/2016 | WARFARIN SODIUM 6MG TAB SUB FOR: COUMADIN TAKE 1 TABLET(S) BY MOUTH DAILY (WITH 1MG=7MG) | 0800 |
| Discontinue 4/16/2017 | | |
| Original Order 10/27/16 Discontinue 2/26/17 | lasix 40 mg po Bd × 14 F | |
| Original Order 10/26/16 Discontinue | Coumadin 5mg po Bd × 3m. | 2000 |
| Original Order 10/31/16 Discontinue | Tylenol 500mg q6° po PRN may have 2@ HS × 1m. | |

Dose changed 11/6/16

Changed

Changed

Initial/Signature: DJ DJSmithian RN

Initial/Signature: JW JW Smith RN

Initial/Signature: W. Gathner

Initial/Signature: MN M Nugoor MD · NS NSDoogohn

Allergies: ACE INHIBITORS, ANTIHISTAMINE

Facility: TAYLORVILLE CORR. CTR

Charting for: 11/01/2016  Through: 11/30/2016

Inmate Name and Number: DEAN WILLIAM N21885
Form # 6182LMR (Rev. 08/13)

Reorder From: MED·PASS 800-438-8884