

1          UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF ILLINOIS

3              SPRINGFIELD DIVISION

4

5            CASE NO. 17 CV 3112

6

7

8   WILLIAM KENT DEAN                    )
                                         )
9           Plaintiff,                   )
                                         )
10      VS.                              )
                                         )
11  WEXFORD HEALTH SOURCES, INC.,        )
    DR. ABDUR NAWOOR, DR. REBECCA        )
12  EINWOHNER, NURSE KATHY GALVIN,       )
    AND LISA MINCY                       )
13                                       )
            Defendants.                  )
14  _____/

15          DEPOSITION OF STEPHEN RITZ, D.O.
                  30(B)(6) NOTICE

16

17      DEPOSITION taken before me, Brenda J. Brink, a

18  Notary Public within and for the Commonwealth of

19  Pennsylvania, on the 16th Day of August, 2019,

20  pursuant to Notice and at the time and place therein

21  specified, to be used pursuant to the Rules of Civil

22  Procedure or by agreement of counsel in the aforesaid

23  cause of action, pending in the United States

24  District Court for the Central District of Illinois,

25  Springfield Division.

**Page 2**

```
1          APPEARANCES
2    On Behalf of Plaintiff(s):
3    Nathaniel K.S. Wackman, Esquire
     Chloe E. Holt, Esquire
4    Jenner & Block LLP
     353 N. Clark Street
5    Chicago, Illinois  60654
     312-222-9350
6    nwackman@jenner.com
     cholt@jenner.com
7
8    On Behalf of Defendant(s),
     Wexford Health Sources, Inc., et al:
9
     Joseph N. Rupcich, Esquire
10   Cassiday Schade LLP
     111 North 6th Street, Suite 200
11   Springfield, Illinois  62701
     217-572-1714
12   jrupcich@cassiday.com
13
     (Via Telephone)
14   On Behalf of Defendant(s),
     Illinois Department of Corrections:
15
     Philip Andrews, Esquire
16   Office of the Illinois Attorney General
     500 South Second Street
17   Springfield, Illinois  62706
     217-524-3889
18   pandrews@atg.state.il.us
19
20
21
22
23
24
25
```

**Page 4**

```
1
2
3
4             STIPULATIONS
5
6         It is stipulated and agreed by and between
7    counsel for the parties hereto that the deposition
8    may be taken at this time, 1:19 p.m., August 16,
9    2019, in the offices of AKF Reporters, Inc., 436
10   Boulevard of the Allies, Pittsburgh, Pennsylvania.
11        It is further stipulated and agreed by and
12   between counsel that the deposition may be taken in
13   shorthand by Brenda J. Brink, a Notary Public for the
14   Commonwealth of Pennsylvania, and may be by her
15   transcribed with the use of computer-assisted
16   transcription; that the witness's signature to the
17   finished transcript of his deposition may be and is
18   hereby waived by agreement of the parties; and that
19   the deposition may be thereupon used on behalf of the
20   parties in the aforesaid cause of action as fully and
21   to the same extent as if written in the presence of
22   the witness and subscribed by the witness in the
23   presence of the court reporter.
24
25
```

**Page 3**

```
1
2
3             INDEX
4
5    CROSS EXAMINATION BY MR. WACKMAN - PAGE 5
6    DIRECT EXAMINATION BY MR. RUPCICH - PAGE 58
7    RECROSS EXAMINATION BY MR. WACKMAN - PAGE 61
8
9
10   PLAINTIFF'S EXHIBITS INTRODUCED:
11   EXHIBIT 1 - PAGE 6
12   EXHIBIT 2 - PAGE 10
13   EXHIBIT 3 - PAGE 15
14   EXHIBIT 4 - PAGE 51
15   EXHIBIT 5 - PAGE 64
16
17   DEFENDANT'S EXHIBITS INTRODUCED:  NONE
18
19
20
21
22
23
24
25
```

**Page 5**

```
1              WHEREUPON,
2              STEPHEN RITZ, D.O.,
3              of lawful age, being by me first duly
4              sworn to testify the truth, the whole
5              truth, and nothing but the truth, as
6              hereinafter certified, deposes and
7              says as follows:
8    CROSS EXAMINATION:
9    BY MR. WACKMAN:
10   Q.   Dr. Ritz, my name is Nate Wackman,
11        W-A-C-K-M-A-N.  I represent William Dean, the
12        plaintiff in this lawsuit.  Put appearances
13        back on the record.
14              MS. HOLT:  Chloe Holt for the
15        plaintiff.
16              MR. RUPCICH:  Joe Rupcich for the
17        defendants, Wexford.
18              MR. WACKMAN:  Phil?
19              MR. ANDREWS:  Oh, I'm sorry.
20        Phillip Andrews on behalf of the IDOC
21        defendants.
22   Q.   And Mr.--- excuse me, Dr. Ritz, previous to
23        this deposition, we took your individual
24        deposition, and there were a series of ground
25        rules in effect; you'll tell the truth, you'll
```

Page 6

1       tell me if you understood a question.  Do you
2       recall those?
3  A.   Yes.
4  Q.   I'm not going to go back through them.  Can we
5       agree that those are still in effect for this
6       deposition?
7  A.   Yes.
8       (Whereupon Plaintiff's Exhibit 1 was marked.)
9  Q.   What the court reporter is marking as Exhibit 1
10      and handing to you is the multipage document,
11      which is the Notice of your 30(b)(6) deposition
12      today.  Have you seen this before, Dr. Ritz?
13  A.   Not that I can directly recall, no.
14  Q.   If you turn to the second to last page of this
15      document, you will see a list of subjects of
16      examination.  You should take a moment and
17      review those subjects of examination.
18  A.   Okay.
19  Q.   Are you prepared to testify about Wexford's
20      knowledge as to each of these topics in today's
21      deposition?
22  A.   To the best of my ability, yes.
23  Q.   How did you prepare for today's deposition, Dr.
24      Ritz?
25  A.   I spoke to counsel.

Page 7

1  Q.   Did you speak to anybody besides counsel?
2  A.   No.
3  Q.   How many times did you speak with your counsel?
4  A.   I believe two or three.
5  Q.   In preparation for this corporate deposition?
6  A.   I think it was just once regarding this, yes.
7  Q.   Did you take any notes in preparation for your
8      deposition today?
9  A.   No.
10  Q.   Did you do anything, just to round this out,
11      did you do anything besides your one meeting
12      with counsel to prepare for today's deposition?
13  A.   No.
14  Q.   The first topic of examination refers to
15      utilization management.  Can you tell me, what
16      does Wexford mean by utilization management?
17  A.   In general, utilization management refers to
18      the reviewing the requests for medical
19      services, pharmacologic services, imaging
20      services, all medically-related service for
21      medical necessity and clinical appropriateness.
22  Q.   Why does Wexford practice utilization
23      management?
24  A.   Because one of things that Wexford is tasked
25      with is making sure that the resources that are

Page 8

1       being utilized for the medical care of our
2       inmate patients are being utilized in a
3       medically necessary and clinically appropriate
4       manner.  We're tasked with this as under our
5       contract with our clients, and it's one of the
6       things that we do for our clients.
7  Q.   When did Wexford adopt utilization management?
8  A.   I don't know specifically, but to my knowledge,
9      some form of utilization management has been
10      provided by the company for its clients for a
11      number of years.
12  Q.   Who within Wexford made the decision to adopt
13      utilization management?
14  A.   I--- I don't know.
15  Q.   How did Wexford evaluate utilization management
16      prior to its adoption?
17  A.   That was prior to my tenure and based upon my
18      knowledge and history, I really could not
19      answer that question.
20  Q.   Does Wexford consider utilization management a
21      medical necessity?
22  A.   I'm not sure I understand the question.
23  Q.   Does Wexford consider utilization management
24      essential to providing medical services to
25      inmates at the Illinois Department of

Page 9

1       Corrections?
2            MR. RUPCICH:  Object to vague.
3  A.   I'm not sure I'd use the term essential.  I
4      think that Wexford would consider that
5      utilization management is one component of the
6      services that we provide to our clients in the
7      management of our inmate patients.
8  Q.   Does Wexford consider utilization management
9      essential to Wexford's own business?
10  A.   I'm not sure---
11           MR. RUPCICH:  I'm going to object to
12      vague and outside the scope of the 30(b)(6)
13      Notice.
14  A.   I'm not sure I understand the question.
15  Q.   So Wexford is a business; correct?
16  A.   As I guess, as the common understanding of what
17      a business is, I suppose, yes.
18  Q.   Does Wexford consider an essential part of its
19      business to be using utilization management?
20           MR. RUPCICH:  Object to vague and
21      outside the scope of the Notice.
22  A.   Again, I think that I answer that by saying
23      that Wexford believes that utilization
24      management is one component of a variety of
25      services and value that we provide to our

1    clients.
2  Q.  **How do financial considerations factor into**
3      **Wexford's utilization management?**
4  A.  From the standpoint in terms of my role and my
5      knowledge of the UM process, financial
6      considerations do not go into any clinical
7      decision making for any particular client, any
8      particular patient, or any particular patient
9      population facility.  Utilization management is
10     tasked with making a determination on the
11     medical necessity and clinical appropriateness
12     of care.
13     (Whereupon Plaintiff's Exhibit 2 was marked.)
14 Q.  **So what the court reporter just handed you is**
15     **marked as Plaintiff's Exhibit 2.  This is a**
16     **screenshot of Wexford's public facing web site.**
17     **And as you can see from the date stamp at the**
18     **bottom, this was taken August the 12th, 2019.**
19         **And I will direct you to the first**
20     **sentence here under utilization management,**
21     **where it says, "Wexford Health's comprehensive**
22     **utilization management program balances**
23     **clinical needs with cost containment."  What**
24     **does Wexford mean by cost containment in that**
25     **sentence?**

1  A.  Cost containment in this context is generally
2      referring to the reduction of unnecessary
3      costs, usually relating to waste, redundancy,
4      care that's being provided in the wrong venue
5      by the wrong provider, and, perhaps at the
6      wrong time.
7  Q.  **But cost containment is a part of utilization**
8      **management in Wexford's view?**
9  A.  It is, insofar as it is the result of care
10     that's provided in a medically necessary and
11     clinically appropriate manner by the
12     appropriate consultant in the right venue at
13     the right time.
14 Q.  **Is collegial review a part of utilization**
15     **management?**
16 A.  Yes, it is.
17 Q.  **And what is collegial review at a very high**
18     **level?**
19 A.  At a high level, collegial review is the
20     process that Wexford utilizes to allow
21     doctor-to-doctor discussion of referrals for
22     off-site services, and also for the providers
23     to have a forum to discuss challenging cases
24     and just the general challenges of their job.
25 Q.  **Is collegial review designed to reduce off-site**

1      care costs?
2  A.  Well, as I just attested, one of the results of
3      the collegial process will be, in my
4      experience, to reduce off-site care costs that
5      would result from medically unnecessary or
6      clinically appropriate care.
7  Q.  **So in Wexford's view, the reduction in off-site**
8      **care costs is a result of collegial review, but**
9      **it is not the driver or a driver of collegial**
10     **review?**
11 A.  Yes, I think that's a fair way to categorize
12     it.
13 Q.  **How does collegial review result in fewer**
14     **requested off-site referrals?**
15 A.  Well, often what happens, once our providers
16     have participated in several collegial reviews,
17     they understand what generally is more expected
18     of them with respect to managing patients on
19     site.  So this especially applies to medical
20     directors who, perhaps, who don't have an
21     extensive corrections background.
22         They will see after undergoing the
23     collegial review process what is expected with
24     respect to managing certain cases on site, and
25     what needs to go off site, truly, in such that

1      they then themselves will not be submitting
2      requests that are medically--- or not medically
3      necessary or clinically inappropriate.
4  Q.  **So to summarize, providers--- to summarize,**
5      **there are fewer off-site referrals, because as**
6      **providers participate in the collegial review**
7      **process, they essentially learn what will be**
8      **approved and what will not be approved?  Is**
9      **that a fair way to summarize?**
10 A.  Yes, but I would add that they learn what will
11     be approved and what likely will not be
12     approved, not based upon cost drivers, but
13     based upon clinical considerations of medical
14     necessity and clinical appropriateness.
15 Q.  **And some of those are specific to the**
16     **corrections context; is that correct?**
17 A.  Yes.
18 Q.  **And what are those, in particular, that are**
19     **specific to the corrections context?**
20 A.  Certainly, and especially in Illinois, the
21     expectation is that where significant primary
22     care evaluation and management resources are
23     available on site, and including full infirmary
24     services at a majority of the facilities, that
25     those be utilized first and exhausted within a

Page 14

1   reasonable way clinically, prior to pursuing
2   services out~-- outside of the facility.
3   Q.   Is part of the utilization management team's
4        job to ensure that on site resources are
5        exhausted before off site resources?
6   A.   Yes, although we don't directly control that,
7        but certainly as part of our review of any
8        request for services off site, part of what
9        goes into that review and sometimes in an
10       ensuing discussion, will be whether or not the
11       on-site services have been utilized, and to
12       what degree, and what the result of them were.
13  Q.   How does collegial review result in a decrease
14       in specialty consults?
15  A.   Well, in my experience, both with Wexford and
16       dealing with our corrections population, and
17       also with my experience out in the community
18       and in general with utilization management,
19       there is a number of pressures that the system
20       in the United States applies that encourages
21       oftentimes early and oftentimes medically
22       unnecessary and clinically inappropriate
23       specialty services, imaging services, and
24       pharmacologic services prior to reasonable
25       primary care services being applied and

Page 15

1   exhausted.  And this applies both to, again, to
2   the corrections population.  They're no
3   different than what we see out in the
4   community.
5   Q.   You can set that one aside, Doctor.
6        (Whereupon Plaintiff's Exhibit 3 was marked.)
7   Q.   The court reporter just handed to you what is a
8        multipage exhibit that does not bear Bates
9        stamp.  It does say Exhibit G-2 at the top.  It
10       is entitled Utilization Management Guidelines,
11       Region, Illinois.  Is this the guideline
12       governing utilization management and collegial
13       review currently in effect at Wexford?
14  A.   Yes, I believe it to be so.  And specifically
15       for Illinois.
16  Q.   And if we flip to Page 2 of this exhibit, the
17       date of effectiveness is January 14th, 2016.
18       So, in other words, this policy has been in
19       place since that date; is that correct?
20  A.   Yes.
21  Q.   I just want to flip through a few items in this
22       policy, Doctor.  The first, this identifies the
23       region as Illinois.  Is it correct that this
24       policy governs utilization management and
25       collegial review in the State of Illinois only?

Page 16

1   A.   Yes.
2   Q.   How many states, different states does Wexford
3        have contracts with?
4   A.   Currently, we cover Illinois, Alabama, Indiana,
5        and West Virginia.
6   Q.   And is there a different utilization management
7        policy for each of those four states?
8   A.   In general, the policies and procedures are
9        very similar, with some differences based upon
10       the contractually required differences that
11       would be found from state to state.
12  Q.   So is it -- just to go back to my original
13       question, is it true that each state has a
14       different utilization management policy?
15  A.   In general, yes.
16  Q.   Why is that?
17  A.   I think largely to make sure that the UM
18       guidelines for any particular contract comply
19       with the requirements of that contract.  And
20       each contract and state has its own rules and
21       such about how utilization management is to be
22       applied.
23  Q.   What are the basic differences between
24       utilization management policy in the states in
25       which Wexford has contracts?

Page 17

1            MR. RUPCICH:  I'm going to object.
2        It's outside the scope of the Notice.
3   Q.   I'll withdraw that question.  I will rephrase
4        to say how does Illinois' utilization
5        management policy differ from other states in
6        which Wexford has a contract?
7            MR. RUPCICH:  Same objection.
8   A.   My experience, it essentially more refers to
9        the requirements of the turnaround for
10       decisions and who should be submitting certain
11       forms to whom and when.
12  Q.   On the second page of this document.  This is
13       signed by a Dr. Thomas Lehman.  Who is Dr.
14       Thomas Lehman?
15  A.   He's the corporate medical director for
16       Wexford.
17  Q.   And what is the Wexford Health medical advisory
18       committee?
19  A.   That is a committee that is tasked with
20       reviewing largely medical policies and
21       guidelines.
22  Q.   Who sits on that committee?
23  A.   I believe I'm on that committee.  Dr. Garcia,
24       Dr. Fisher, Dr. Lehman, of course.  I believe
25       the regional medical directors from the state

Page 18

1    contracts and the state UM medical directors.
2    And then there's a number of administrative
3    personal, who I believe do not have voting
4    rights.  I believe only the clinicians only
5    have voting rights.
6  Q.  Is Dr. Maddox on that committee?
7  A.  I believe so, yes.
8  Q.  And you, Dr. Ritz, are on that committee?
9  A.  Yes.
10 Q.  Did that committee create these guidelines?
11 A.  I don't know.  I don't think that they
12    developed the utilization management
13    guidelines.  I don't believe that that is under
14    their purview.
15 Q.  Who develops these utilization management
16    guidelines?
17 A.  Initially, again, these go back a number of
18    years, of course.  They were initially, I
19    believe, drafted by the administrative and
20    leadership staff, and then reviewed and
21    modified in time by that same staff, and also
22    by Dr. Lehman.
23 Q.  So did the administrative staff create this
24    version of the guidelines, which was effective
25    January 14th, 2016, in together with Dr.

Page 19

1    Lehman?
2  A.  I believe so, to the best of my knowledge, yes.
3  Q.  And when you say administrative staff, who are
4    you referring to?
5  A.  I believe it would be people involved from
6    the--- usually the vice president level at both
7    Wexford in a number of different departments,
8    and probably also the vice president level of
9    what we commonly term the operator for the
10    individual contract.
11 Q.  Are those--- can you name which departments
12    those vice presidents are a part of?
13 A.  I--- as I sit here today, I can't really name
14    them from memory, no.
15 Q.  There are business people involved in the
16    revision of these guidelines?
17 A.  I would think so, yes.
18 Q.  Are there financial people involved in the
19    revision of these guidelines?
20 A.  That, I'm not sure of.
21 Q.  Who has the--- if these guidelines.  Let me
22    withdraw that.  How are these guidelines
23    revised?  Who is responsible for the revision
24    of these guidelines?
25 A.  It would largely fall under, I think Dr.

Page 20

1    Lehman, largely, would.  Because he is the
2    signator on this document.  I think largely, it
3    would end up being his responsibility.
4  Q.  To the extent a Wexford employee seeks to
5    deviate from these guidelines, how do they go
6    about doing that?
7         MR. RUPCICH:  Object to vague.
8  A.  Yeah, I'm not sure I understand the question.
9  Q.  So if a Wexford employee wants to deviate from
10    these guidelines in some way, do they need to
11    go through a process to seek approval of that?
12         MR. RUPCICH:  Object to vague.
13 A.  Yeah, I think I just generally, if they would not
14    adhere to these guidelines, and, again, it
15    would be very contextual and circumstantial.
16    So I'm just speaking very generally here to try
17    to answer your question.  They would most
18    likely need to review this with their immediate
19    supervisor for some form of permission, I would
20    imagine.
21 Q.  Who makes the decision to revise these
22    guidelines?
23 A.  Again, as the signator, I think it would
24    ultimately be Dr. Lehman's responsibility to
25    decide on what changes, if any, would be

Page 21

1    appropriate.
2  Q.  Does the Wexford Health medical advisory
3    committee vote on the adoption of these
4    guidelines?
5  A.  Not to my knowledge or in my experience, no.
6    They really are more focused on the medical and
7    clinical guidelines as averse to the UM
8    guidelines, which essentially--- and these are
9    really more operational guidelines as averse to
10    clinical guidelines.
11 Q.  I want to direct your attention to Page 10 of
12    this document, which is the guideline on
13    referral requests/collegial review/alternate
14    treatment plan.  And the first sentence says,
15    refers to care that is medically necessary.
16    What does Wexford mean by medically necessary,
17    as used there?
18 A.  In this context, medically necessary would be
19    defined as services that are necessary under
20    multiple different evaluatory criteria.
21    Criteria such as the clinical experience of the
22    requesting and managing physician and the UM
23    physician.  Specialty guidelines, specialist
24    recommendations, governmental entities, such as
25    the US Preventative Services Task Force, and

Page 22

1     also recommendations of guidelines, such as the
2     NCCN and evaluation with clinical utilization
3     management support software algorithms, such as
4     InterQual.
5          But I will note that it's not necessarily
6     limited to those things.  Those are just some
7     of the things that are most commonly applied
8     and come to mind.
9  Q.  **How does Wexford measure what is medically**
10    **necessary?**
11         MR. RUPCICH:  Determine?
12  Q.  **Yeah, determine might be a better word.  How**
13    **does Wexford determine what is medically**
14    **necessary?**
15  A.  Well, I would fall back to the response that I
16    just gave.  I think it is a determination that
17    ensues after consideration of all of the things
18    that I just mentioned, and discussion by the UM
19    medical director and the medical director.
20  Q.  **I want to talk a little about the collegial**
21    **review process, which you already described**
22    **briefly in this deposition.  And I want to look**
23    **at part, still on Page 10, Roman numeral II A**
24    **1.  And that says that collegial reviews are to**
25    **be done at minimum on a weekly basis, although**

Page 23

1     **in more urgent cases, an immediate collegial**
2     **review should be undertaken by the site medical**
3     **director by calling the utilization management**
4     **medical director the day the patient is seen.**
5          **Is it true that a collegial review is**
6     **supposed to happen at minimum on a weekly**
7     **basis?**
8  A.  Yes.  In Illinois and, again, I would stipulate
9    that this is a guideline.  But in Illinois, we
10    generally scheduled collegial review calls on a
11    weekly basis for each site.
12  Q.  **Does Wexford track how often a collegial review**
13    **does not happen on a weekly basis?**
14  A.  I'm not aware of that being tracked
15    specifically.
16  Q.  **Does Wexford know how often a collegial review**
17    **does not occur on a weekly basis?**
18  A.  Again, all I can answer that question is saying
19    that I am not aware of any specific
20    documentation or tracking of that particular
21    data.
22  Q.  **If Wexford discovers that a collegial review is**
23    **not being done at minimum on a weekly basis,**
24    **are there any consequences for the employees**
25    **responsible?**

Page 24

1  A.  Well, certainly, I will state that it's not
2    common for collegials to not be done on a
3    weekly basis, because that is certainly our
4    operational expectation.  There are a number of
5    different factors that can interfere with that,
6    of course, which is why this is a guideline.
7    Things such as lockdowns, if the medical
8    director is ill, if the UM medical director is
9    ill.  Occasionally, a call cannot take place.
10    But that is very much the exception and not the
11    rule.
12         I guess, in theory, if a site was not
13    participating in or scheduling their
14    collegials, would there be consequences for the
15    individuals at the site?  I think absolutely,
16    there would be.  In my experience, has that
17    ever happened?  No.
18  Q.  **How often does it happen?  I'm referring to the**
19    **second part of this sentence, the part that's**
20    **bolded.  How often does it happen that an**
21    **immediate collegial review is initiated by the**
22    **site medical director calling the utilization**
23    **management medical director?**
24  A.  I get several calls a week in my role at
25    Illinois to discuss a case that either the site

Page 25

1     medical director wants to just review with me,
2     or that they feel needs to be dispositioned
3     immediately, so they don't want to have a
4     delay.  In that instance, we will discuss the
5     case, and I will make an immediate
6     determination with input from the medical
7     director.
8          And if their request is approved, then I
9     will usually communicate that to the UM nurse
10    at the site.  And then the process proceeds.
11  Q.  **Have you ever received one, a call like that**
12    **from Dr. Nawoor?**
13  A.  Yes.
14  Q.  **How does Wexford know how often Dr. Nawoor**
15    **utilizes this second--- this option of calling**
16    **immediately for collegial review?**
17         MR. RUPCICH:  This is--- I'll object
18    as not something we prepared to discuss or
19    research.
20  A.  That's not tracked anywhere, to my knowledge.
21  Q.  **Do you know if Dr. Nawoor ever made such a call**
22    **about the plaintiff in this lawsuit, William**
23    **Dean?**
24  A.  No, I don't.
25  Q.  **I want to refer real briefly to it's Page 12,**

Page 26

1    which covers urgent requests.  How is this
2    process for urgent requests different from the
3    process we were just discussing, where the site
4    medical director calls immediately for
5    collegial review?
6  A.   They essentially are the same.  It's just that
7    this particular process describes if the
8    medical director doesn't necessarily want to
9    call or feel that a phone call is necessary,
10    they can submit through the normal process,
11    that is a referral form to the UM nurse,
12    usually transmitted electronically or via fax,
13    with a checking off on the checked box on the
14    heading of the referral that it's urgent.
15         They can also E-mail.  They will sometimes
16    designate the UM medical~-- or, I'm sorry, the
17    site medical director will sometimes designate
18    one of their clerical staff or their nursing
19    staff to request an urgent referral for a
20    service.  And then that staff will transmit
21    that via E-mail to the UM nurse, who will then
22    E-mail it to the UM medical director for
23    review.
24         As this states here, the expectation would
25    be that it would be adjudicated usually within

Page 27

1    one to two business days.  In my experience,
2    and generally, my expectations from my team,
3    that all urgent requests will be adjudicated by
4    end of business on the same day.
5  Q.   So does Wexford provide any guidance to site
6    medical directors on what constitutes an urgent
7    medical service?
8  A.   Yes.  In general, but, of course, every case is
9    unique.  But there are some general guidelines
10    that we provide to them.  Sometimes in the form
11    of feedback, if they're giving us too many
12    requests that we don't agree are urgent, we
13    will give them some feedback and such on an
14    individual basis.  And that's usually the way
15    that that proceeds.
16         But they're~-- there's not any formal
17    guideline, in terms of what constitutes an
18    urgent and what doesn't.  Because, again, that
19    really requires~-- that's a clinical judgment
20    situation that we expect our medical directors
21    to exercise their best clinical judgment.
22  Q.   Do you know if Dr. Nawoor has ever gotten
23    feedback that he's requesting too many urgent
24    medical services?
25            MR. RUPCICH:  I'll object as to

Page 28

1    outside the scope of the Notice.
2  A.   I~-- I'm not~-- I don't have any awareness of
3    that, no.
4  Q.   And I'll ask the same question from Dr.
5    Einwohner.  Do you know if she has ever
6    received that feedback?
7  A.   Not to my knowledge.
8  Q.   I wanted to flip back to Page 10, if we can,
9    Dr. Ritz.  And I will ask an initial question
10    that refers back to these things we've just
11    been talking about, which is fair to say that
12    Wexford provides two avenues to seek collegial
13    review within one to two business days?
14  A.   I~-- yes.  And I guess I would stipulate to
15    make sure I'm answering the question
16    appropriately, that would be the submission of
17    a referral form marked urgent or for the
18    medical director to call the UM medical
19    director to discuss the case.
20  Q.   I want to look at Roman II, and then it is III.
21    The paragraph beginning the collegial review
22    concerning an appropriate treatment plan.  But
23    I want to focus on the final sentence, which
24    says the site medical director and the UM
25    medical director agree upon a targeted date, in

Page 29

1    which this approved services should be
2    completed and communicate that date to the site
3    scheduler.  My initial question is, what
4    criteria do the site medical director and the
5    UM medical director use to come up with that
6    targeted date?
7  A.   That is another component that is very much
8    unique to each patient's context, and,
9    therefore, is within the clinical judgment of
10    the site medical director and the UM medical
11    director.
12  Q.   Is provider availability at a local level one
13    of the criteria?
14  A.   It can be.  It's a consideration, and it's a
15    variable.  But it's not a driver of that
16    determination.
17  Q.   What do you consider the drivers to be?
18  A.   The medical necessity and clinical
19    appropriateness of the timing of the service.
20  Q.   How about the cost of providing the service?
21    Is that considered at all in the targeted
22    completion date decision?
23  A.   No, it's not.
24  Q.   And because I believe we covered clinical
25    appropriateness in your individual deposition,

1    but not here, can you define what Wexford means
2    by clinical appropriateness at a high level?
3 A.  Yes. Essentially that a specific service is
4    clinically appropriate for a particular patient
5    at a particular point in time, based upon that
6    patient's unique needs relating to their
7    current medical problem and their medical
8    history.
9 Q.  And does medical necessity, as you just used
10   it, have the same definition as what we
11   discussed in this deposition just before
12   medically necessary as defined in these
13   guidelines?
14 A.  Essentially yes, with the distinction that in
15   some instances, a service that may appear to be
16   medically necessary may not always be
17   clinically appropriate.
18 Q.  And in what circumstances would that be?
19 A.  I think probably the best way to be would be to
20   give an illustrative example. A patient who,
21   perhaps, has a hernia that it may be medically
22   necessary under guidelines to repair it. But
23   if that patient is expected to die in a couple
24   of weeks, it would not be clinically
25   appropriate to repair it. I think that's the

1    way I would draw those distinctions.
2 Q.  Is the targeted completion date, as referenced
3    in Roman 2.3, supposed to be assigned for every
4    service approved at a collegial review?
5 A.  In general, I believe so, yes. That's a,
6    again, part of the clerical process that I
7    attested to in my personal deposition here.
8 Q.  And does it happen in every--- for every case
9    approved at collegial review?
10 A.  My understanding is, yes, it does.
11 Q.  Has Wexford done any studies or audits or
12   tracking of how often it is not assigned?
13 A.  Not to my knowledge.
14 Q.  There are any consequences for Wexford
15   employees if it is not assigned?
16 A.  I guess I would stipulate that I--- to my
17   knowledge, that it's not tracked, but in the
18   hypothetical, that it--- the expectation would
19   be that it was to be assigned, and an employee
20   did not assign it. Yes, I'm sure that there
21   would be some consequences, because that would
22   be part of their job responsibilities that they
23   would not be fulfilling.
24 Q.  Is it always assigned by the site medical
25   director and the UM medical director, or at

1    times is it assigned by a different Wexford
2    employee?
3 A.  Sometimes the UM nurses will be the ones who
4    assign that. Again, usually and fairly routine
5    and nonurgent situations. It's usually just
6    the site medical director, UM medical director,
7    who gets involved in those decisions if there's
8    some question from the UM nurse regarding the
9    timing or if there's specific clinical
10   circumstances that would require the
11   physician's input on it.
12 Q.  Can a procedure be scheduled before it is
13   approved at collegial review?
14 A.  It's not supposed to be, but sometimes it does
15   happen, yes.
16 Q.  In what circumstances does it happen?
17 A.  Occasionally, if there's a breakdown at the
18   site level where a request comes in, perhaps,
19   from a consultant for a specific procedure, and
20   the site goes ahead and schedules it without
21   going through the UM process. We usually, of
22   course, will find out about it after the fact,
23   because a claim will come in from the provider
24   for the service, but there's no matching
25   authorization for the service. In that

1    instance, a what's called~--- that's what we
2    term a retro, and we track the retros. They're
3    very, very few and far between.
4 Q.  Are there any consequences for that sort of
5    breakdown for the Wexford employees involved
6    that are responsible?
7 A.  Yes, if a site, if a person tasked with this at
8    a site would have repeated retro~--- what we
9    call retro off, I'm sure that there would be
10   some sort of remediate action, yes.
11 Q.  But as to the letter of Wexford's collegial
12   review policy~--- or excuse me, collegial review
13   guideline, a procedure is not supposed to ever
14   be scheduled before it's approved at collegial
15   review; is that correct?
16 A.  That's correct.
17 Q.  I want to look at II, Roman II, C 2, which is
18   on Page 11, and refers to the preferred
19   provider list. What is the preferred
20   provider list?
21 A.  The preferred provider list is a list of
22   providers that have contracted either with IDOC
23   or with Wexford to provide services to our
24   patients. Some of this is based upon contracts
25   that the IDOC may have with the provider, and

Page 34

1   DOC wants us to use that provider
2   preferentially, or a provider that we have a
3   contract with in an area.
4        Many times, it's hard to get providers to
5   agree to provide medical services to inmate
6   patients. And so if the preferred provider
7   list is utilized by the sites to give them
8   awareness of the providers in their area who
9   will see inmates, so that they don't have to
10  call around to multiple different facilities
11  only to be told that they won't see inmates.
12  That's generally the purpose of the preferred
13  provider list.
14  Q.  Besides a willingness to see inmates are there
15      any other criteria to be included on the
16      referred provider list?
17  A.  The only one that I'm aware of was as I just
18      attested is the DOC does have preferential
19      service relationship with the University of
20      Illinois Chicago, in the northern region. And
21      so that would be another example in
22      consideration. Client directed I guess would
23      be a better way to term it.
24  Q.  Under what circumstances can a treatment be
25      scheduled not using the preferred provider

Page 35

1   list?
2   A.  I guess in my experience, that can occur if
3       there's a very unique service that would
4       perhaps be required that is not provided by a
5       provider on the preferred provider list.
6       That's usually going to be the--- the time that
7       that would occur.
8   Q.  Are any special approvals needed for that?
9   A.  Generally not through UM because our job is
10      really just to see that it's medically
11      necessary, clinically appropriate. What we
12      will sometimes do is if there's that situation
13      where there's a unique service required, and
14      there may not be a provider on the preferred
15      provider list, we often will refer the site to
16      our contracting department, and the contracting
17      department then will reach out to a specific
18      provider in an effort to try to obtain service
19      agreement with them.
20  Q.  I want to look two down at Roman II C 4, which
21      says, appointments should be scheduled within
22      ten business days of approval and prioritized
23      by the targeted completion date on the launch
24      report. And I want to first ask a clarifying
25      question, which is simply, does this mean that

Page 36

1   the appointment needs to occur within ten
2   business days or just that it needs to be
3   scheduled within ten business days?
4   A.  That means that the expectation is the site
5       should have reached out and started the
6       scheduling process within ten business days.
7       Because, of course, we can't control getting
8       many services completed within ten business
9       days. And that's a--- a target that even in
10      the community would not be able to be completed
11      for many, many different services.
12  Q.  Does Wexford track how often appointments are
13      not scheduled within ten business days?
14  A.  To my knowledge, that particular data point is
15      not--- is not tracked by anything that I am
16      aware of. But what we do on the UM side is we
17      have the completion date, which is -- from a
18      practical standpoint is really the more
19      important date, rather than the actual
20      scheduling date. Which is, I think, why we
21      don't track that particular metric.
22  Q.  And when you say completion date, are you
23      referring to the targeted completion date that
24      we discussed that's encompassed in Roman---
25      excuse me, Roman I A 3, or are you talking

Page 37

1   about the 90-day date, which is in Roman II C
2   7, or are you talking about something else?
3   A.  Generally, I think I'm referring to C 7. That
4       90 days is the--- that's going to be the
5       longest generally that any service would be
6       expected to be targeted, because that's the
7       longest that an approval can be active within
8       our claims system. The targeted date, as we're
9       talking about in II C 4 is the date that the
10      service is expected to have been completed by.
11      And that is tracked, such that if a
12      service is not completed within the targeted
13      completion time frame, then the clerical staff
14      who's tasked with monitoring that reaches out
15      to the site to see, No. 1, if the service had
16      been completed, and we just weren't aware of it
17      or if it wasn't completed, why, if it's been
18      rescheduled, if it was refused by the patient.
19      There's a number of different things that can
20      impact that. And if it has been rescheduled,
21      then when will it be done.
22      And if there still can be no explanation
23      as to the disposition of the case, then it
24      usually is brought to the UM medical director's
25      attention for discussion at the next collegial.

Page 38

1  Q.  Did a conversation like the one you just
2      described between the UM staff and the site
3      medical staff occur in Mr. Dean's case?
4  A.  Not to my knowledge.
5  Q.  Does Wexford do anything to enforce the ten
6      business day scheduling policy in Roman II C 4?
7  A.  That particular piece, it doesn't really fall
8      under the enforcement or the purview of the UM
9      department.  That's really more of an
10     operational process.  So I really could not
11     answer that.  That would have to be answered by
12     operations at the state level.
13 Q.  Does Wexford do anything to enforce the 90-day
14     policy in Roman II C 7?
15 A.  We do in that if we note that a claim is coming
16     up, what we would call an aging claim to 90
17     days and there's been no~~~ I should say an
18     authorization is coming up to 90 days, and
19     there's been no corresponding claim, then that
20     will trigger a review as to whether the service
21     was completed.  Sometimes a service was
22     completed, and the provider just did not submit
23     a claim yet.
24         So, yes, we do monitor and track that.
25     Because in some instances, some services can't

Page 39

1      be completed within the 90 days, there's been a
2      delay, our provider's not available.  So we
3      have to extend out the authorization usually
4      for another 90 days.
5  Q.  How is the authorization extended out for
6      another 90 days?  What is the process for that?
7  A.  The nursing staff will be notified, the UM
8      nursing staff will be notified that the
9      authorization is aging, and there's been no
10     corresponding claim, and then they will usually
11     investigate that.  And they will inquire to the
12     site whether the authorization needs to be
13     either cancelled.
14         In some instances, an inmate, for example,
15     might release before a service can be
16     completed.  So in that instance, it would just
17     be cancelled.  If it wasn't completed, and it's
18     scheduled to be completed, then the
19     authorization would be extended usually for
20     another 90 days.
21 Q.  Does Wexford track how often services are not
22     completed within the 90 days?
23 A.  We don't track those specific time frames with
24     us but what we track is the expected or the
25     targeted completion date that's agreed to

Page 40

1      through part of the collegial process, and
2      whether or not the service has been provided
3      within that time frame.  That's the -- really
4      the most important clinical metric with respect
5      to providing the patient care, which is why we
6      track that and monitor it closely.
7  Q.  What was the targeted completion date for Mr.
8      Dean's surgery?
9  A.  I don't know.  I would have to look at the
10     documentation for that.
11 Q.  Do Wexford employees face consequences if
12     services are not completed by the targeted
13     completion date?
14 A.  Not to my knowledge.  They would not face
15     consequences insofar as generally, they're not
16     going to have direct control over that.  Now,
17     if for some reason, a service was not provided
18     within an expected completion date because of a
19     breakdown or lack of following process by an
20     individual employee, I -- certainly, there
21     would be some consequences for that.
22         But in general, with respect to targeted
23     completion dates for clinical services, there
24     are so many variables, many of which are
25     outside of our control, that no individual

Page 41

1      employee or any individual physician or anyone
2      else could really be held accountable for that.
3      (Whereupon Plaintiff's Exhibit 4 was marked.)
4  Q.  So the court reporter has just handed to you
5      what's been marked as Plaintiff's Exhibit No.
6      4, which is a multipage document.  It bears no
7      Bates stamp, but it is marked as Exhibit G, and
8      it is entitled Utilization Management Policies
9      and Procedures, Region, Illinois.  And on Page
10     what's marked as 1, but what is the second page
11     after the cover, it lists the date of
12     effectiveness as July 1, 2014.
13         And do you agree that this was the policy
14     that was in place immediately prior to Exhibit
15     3~~~ sorry, the effective policy which we were
16     talking about before, which was Exhibit 2, I
17     believe?
18 A.  Yes, I agree.
19 Q.  Am I right?  Exhibit~~~ the prior policy was
20     Exhibit 2, G 2?
21         MR. RUPCICH:  I think it's~~~ I have
22     it as 3.
23         MR. WACKMAN:  Okay.  3.
24         MR. RUPCICH:  Because this printout
25     was 2.

Page 42

1        MR. WACKMAN:  Yeah, I messed up my
2    numbers somewhere.
3    Q.  Okay.  Exhibit 3, which is the policy currently
4        in force, and Exhibit 4 is the policy in force
5        now.  So I just want to ask you a couple
6        questions about changes made to the policy that
7        is Exhibit 3, the current policy, from the
8        policy---
9        MR. RUPCICH:  Guideline.
10   Q.  From the guideline--- from the policy that was
11       in place previously.  And the first one is
12       title, which was changed, as Mr. Rupcich notes
13       from policy to guideline.  And what was
14       Wexford's reasoning for that?
15   A.  I--- I'll stipulate that I wasn't actively
16       involved in that particular decision.  But
17       usually it's because policies and procedures
18       tend to imply that they are to be followed by
19       the letter, even though in the real world and
20       in point of fact, generally, that is not the
21       way that policies and procedures can be
22       implemented, such that I think the revision
23       was, and the addition of calling them
24       guidelines as averse to policies and procedures
25       is more reflective of the way they're applied

Page 43

1        from an operational standpoint.
2    Q.  So if you look--- going to be looking at Page 6
3        of the old policy.  And then Page 10 of the
4        current policy.  We discussed before that the
5        current policy has in II A 1, a requirement, or
6        a guideline that collegial reviews are to be
7        done at minimum on a weekly basis.  Do you
8        agree that there was no such policy or
9        guideline in the 2014 policy?
10   A.  Yes, I would agree.
11   Q.  And do you know or why did Wexford add the one
12       week collegial review minimum to the 2016
13       policy?
14       MR. RUPCICH:  Object as outside the
15       Notice that we were asked to prepare on.
16   A.  I don't know the answer to that.
17   Q.  Was there a problem with collegial reviews not
18       being completed in a timely fashion?
19       MR. RUPCICH:  Same objection.
20   A.  Not to my knowledge.
21   Q.  Has Wexford done any studies about whether the
22       2016 policy's addition of the one-week minimum
23       resulted in collegial reviews being completed
24       in a more timely fashion?
25       MR. RUPCICH:  Objection.  Outside

Page 44

1        the scope.
2    A.  Not to my knowledge.
3    Q.  As we had discussed previously in the 2016
4        policy, there is an avenue to seek immediate
5        collegial review at Roman II A 1 by the site
6        medical director, calling the UM medical
7        director.  Do you agree that there was no
8        similar or no provision for that in the 2014
9        policy?
10   A.  I would, but I would also stipulate that I had
11       been performing UM duties, as I had testified
12       in my personal deposition done today, since the
13       fall of 2014.  And at all times during my
14       tenure of doing collegials for the Illinois
15       contract, I was available for and have always
16       conducted phone discussions regarding urgent
17       collegials.  So even though that was not
18       codified in policy, it occurred.  I think that
19       the updated policy guideline was just
20       reflective of a process that had been
21       occurring.
22   Q.  Do you know why the 2016 policy added this
23       immediate collegial review provision?
24       MR. RUPCICH:  Objection as beyond
25       the scope.

Page 45

1    A.  I don't know specifically why, other than as I
2        just attested, it simply references a--- now, a
3        process that had been occurring.
4    Q.  And, Dr. Ritz, I have occasionally referred to
5        you in my questions during this deposition.  Do
6        you understand that when I refer to you during
7        this deposition, I am referring to Wexford?
8    A.  Yes.
9    Q.  And if I want to refer to you as Dr. Ritz, I
10       will try to make it as clear as possible.  Was
11       Wexford--- was this a problem with collegial
12       reviews that needed to occur immediately, not
13       occurring immediately that led Wexford to add
14       this provision?
15       MR. RUPCICH:  Objection.  Beyond the
16       Notice.
17   A.  Not that I was ever made aware of.
18   Q.  Has Wexford ever done any studies as to whether
19       this policy resulted in collegial reviews that
20       needed to happen immediately happening
21       immediately?
22   A.  Not that I'm aware of, no.
23   Q.  As we discussed previously at Roman II C 7,
24       there is a--- excuse me, Roman II C 4, there is
25       a provision that says, appointments should be

1   scheduled within ten business days of approval
2   and targeted by the--- excuse me, and
3   prioritized by the targeted completion date on
4   the launch report.  Do you agree with me that
5   there is no provision in the 2014 policy about
6   appointments needing to be scheduled by ten
7   business days?
8   A.   Yes, I would agree.
9   Q.   Do you know why that provision was added to the
10       2016 guidelines?
11  A.   I don't.  I can speculate based upon my
12       experience in the UM department that many of
13       the components of the updated guidelines had
14       already been in place, and the updated
15       guideline simply references and codifies those
16       processes that had already been in place.  Or
17       another way of saying it, just because it was
18       not on the old policy doesn't mean it wasn't
19       occurring.
20  Q.   Has Wexford studied whether this new policy
21       resulted in more prompt scheduling of approved
22       treatment?
23  A.   Not to my knowledge.
24  Q.   As we had previously discussed, Roman II A 3,
25       says that the site medical director and the UM

1   medical director will agree upon a targeted
2   date in which approved services should be
3   completed, and they will communicate that to
4   the site scheduler.  Do you agree that the 2014
5   policy does not contain a provision for the
6   site medical director and the UM medical
7   director to decide upon a targeted date for
8   completion?
9   A.   Yes, I would agree.
10  Q.   Why did Wexford add that to the 2016
11       guidelines?
12            MR. RUPCICH:  Object to beyond the
13       Notice.
14  A.   I can speculate that based upon my knowledge of
15       this process that it was designed to formalize
16       the UM process, such that these types of
17       metrics could be more easily tracked.  Again,
18       stipulating that just because the previous
19       guideline did not require it doesn't mean that
20       those clinical metrics weren't being met.  It
21       just meant that there may not have been a
22       mechanism with which to track them.
23  Q.   Was Wexford aware of a problem in having
24       approved services completed in a timely
25       fashion?

1            MR. RUPCICH:  Object.  Beyond the
2       scope.
3   A.   There were issues when I first came on board
4       that we did note that there was no process in
5       place to track these in a what I felt was a
6       meaningful way.  And so we did identify the
7       need to formalize the process so that we could
8       get more metrics regarding these processes.
9            I wouldn't characterize that there was
10       necessarily a problem in my view.  There was
11       just an opportunity to look at being able to
12       improve efficiencies and also our internal
13       tracking of these type of clinical metrics.
14  Q.   When you referred to we in that last answer,
15       who did you mean?
16  A.   The--- we as the utilization management
17       department at Wexford and my role as a Wexford
18       representative as the UM medical director and
19       also in my 30(b)(6) capacity here today.
20  Q.   And does that we include Dr. Lehman?
21  A.   Yes, he was involved in that.
22  Q.   Were there any specific pieces of information
23       that led Wexford to believe there was an issue
24       with the provision of timely care that led to
25       this policy?

1   A.   Well, again, I won't agree that there was
2       necessarily a problem or an issue.  There was a
3       lack of data and metrics to be able to track
4       the completion of approved services.  And that
5       is one metric that we felt was lacking.  And
6       that needed to be tracked from a quality
7       standpoint.
8            Again, stipulating, it doesn't mean that
9       there wasn't quality or that there was a
10       problem or an issue before, but that we needed
11       metrics going forward to be able to track these
12       things, to be able to optimize, and to be able
13       to demonstrate to clients that we were tracking
14       and monitoring this.
15  Q.   And since making this targeted completion date
16       policy, does Wexford track compliance with that
17       policy?
18  A.   Yes.
19  Q.   Is there an investigation done into instances
20       when the targeted completion date is not met?
21  A.   Yes.
22  Q.   And who does that investigation?
23  A.   Generally, that falls under a specific nurse
24       who tracks those authorizations and the
25       targeted completion dates such that if the

1    nurse notes on the review that a particular
2    authorization has~--- or doesn't have a matching
3    claim or that we are not made aware that the
4    service was provided, then that nurse will
5    reach out to the site to inquire as to, number
6    one, if the service had already been provided,
7    and we were just not aware of it, or, number
8    two, if the service had not been provided, why.
9         And then, thirdly, if the service has been
10   rescheduled at some point, when that will be.
11   And if they can't come up with a reasonable
12   answer as to why a service had not been
13   completed within the expected time frame, then
14   it will be brought to usually the UM medical
15   director's attention, and then discussed at the
16   next collegial.
17 Q.   And if there's no reasonable answer, are there
18      consequences or repercussions for the employees
19      that are involved?
20 A.   Not usually, because these, in my experience,
21      are not related to a problem with an employee.
22      They're usually relating to most commonly a
23      delay because of the availability of the
24      service in the community, a lockdown, inmates
25      often refuse care.  And sometimes because of

1    weather, a service has to be cancelled and then
2    rescheduled.
3         These are the types of things that, again,
4    are really not within our control.  But the
5    process exists such that it's a backstop to
6    make sure that something doesn't fall through
7    the cracks, so to speak.
8 Q.   We've been discussing a number of changes that
9      were brought about in the 2016 guidelines.  Did
10     Wexford provide training to its utilization
11     management employees on these new guidelines?
12           MR. RUPCICH:  Objection.  Outside
13     the scope.
14 A.   There were certainly trainings for both the
15     corporate UM staff and also the site staff as
16     it relates to many of the changes that we've
17     discussed here today, yes.
18 Q.   And did Wexford provide or write any summary or
19     guidance documents on these new policies and
20     distributed to employees?
21           MR. RUPCICH:  Objection.  Outside
22     the scope.
23 A.   I don't have an awareness of that, because it's
24     really more of an operational issue.  I can't
25     say that there wasn't.

1 Q.   Does Wexford expect its employees to follow
2      these guidelines?
3 A.   Insofar as they can be applied in the real
4      world and in any individual given situation and
5      context, yes.  As their name implies, they are
6      guidelines.
7 Q.   What do you mean by the real world, as you just
8      used in that answer?
9 A.   Well, in the real world, things happen where
10     sometimes a guideline doesn't cover every
11     eventuality and such in the real world.  So we
12     expect our employees to exercise their
13     professional judgment and common sense in the
14     discharge of their duties.
15 Q.   And when the 2014 policies were in place, did
16     Wexford expect its employees to follow those
17     policies?
18 A.   To the extent that I just attested the same
19     way, yes.
20 Q.   When Wexford has a specific time frame on
21     scheduling a collegial review or an approved
22     treatment, does Wexford expect the employee to
23     follow that guideline?
24 A.   In general, yes.
25 Q.   To the best of Wexford's knowledge, were the

1    utilization management guidelines and policies
2    in effect at the relevant times followed in
3    delivering care to Mr. Dean?
4 A.   Based upon my review, yes, I believe so.
5    (Whereupon Plaintiff's Exhibit 5 was marked.)
6 Q.   What you've just been handed has been marked
7      Plaintiff's Exhibit No. 5.  And this is a
8      response by the Wexford defendants to Mr.
9      Dean's request for production.  And I want to
10     direct you, Dr. Ritz, to the second page.  And
11     Mr. Rupcich can add to this description, but if
12     you haven't seen one of these before, generally
13     how they read is the part in bold under No. 5,
14     for instance, is what Mr. Dean asked Wexford to
15     give to him for this lawsuit.  And then as the
16     header implies, the response is Wexford's
17     response to that demand.
18         And so as you'll see in No. 5, Mr. Dean
19     asked for any and all policies, procedures,
20     protocols, manuals, white papers, consensus
21     statements, handbooks, treatises, and/or other
22     materials related to medical standards of care
23     and the management of conservative care,
24     diagnosing or treating patients, patient
25     referrals, and medication approval written by,

Page 54

1    relied upon, or used by any of the defendants.
2         And the first sentence of Wexford's
3    response was, defendants did not rely on
4    policies and procedures in providing care to
5    plaintiff, but relied on their judgment.  And
6    my question is if Wexford stands by that
7    statement?
8    A.   Yes, I think that we do, in that as I've
9         attested we don't rely on policies and
10        procedures to provide care.  We will reference
11        policies and procedures as guidelines, as a
12        component of the care.  But we don't rely on
13        them, which is why I think I will stand behind
14        the statement that we don't rely on them.  We
15        reference them, we will utilize them in some
16        instances, and not in others.  But policies,
17        procedures, and guidelines never trump the
18        judgment of a clinician.
19   Q.   Is Wexford familiar with the report written by
20        Dr. Shansky in December 2014 in the Lippert V.
21        Godinez litigation, which we referred to at
22        some length your deposition this morning.  Was
23        Wexford aware of that report?
24             MR. RUPCICH:  I'm going to make an
25        objection.  This is not within the scope of the

Page 55

1    Notice.  The Notice is three specific topics,
2    and this is not even tangentially related to
3    it.
4             MR. WACKMAN:  Is he going to answer?
5             MR. RUPCICH:  If he's prepared to---
6        if he feels he's prepared to speak about it.
7    A.   I will -- yes, the answer to the question, I am
8         or Wexford is aware of the document, yes.
9    Q.   And I just have one limited follow-up question,
10        which is did the conclusions and findings of
11        that report influence any of the changes in the
12        policies that we have discussed in this
13        deposition at some length?
14             MR. RUPCICH:  Same objection.
15   A.   No, it didn't, to my knowledge.
16             MR. WACKMAN:  Let go off the record
17        for a moment.
18        (Discussion off the record)
19   Q.   Go back on the record.  And, Dr. Ritz, we
20        talked about the targeted completion date for
21        some length in this deposition.  Where is that
22        date in the medical records?
23   A.   I don't believe that it's memorialized in the
24        medical record itself or in WEX Care.  It's
25        memorialized in the UM clerical process that

Page 56

1    tracks that.
2    Q.   Is it memorialized in something called a launch
3        report?
4    A.   I believe so, yes.
5    Q.   Is that the only place it is memorialized?
6    A.   I believe it's also memorialized in spreadsheet
7         documents at the--- at Wexford UM corporate
8         that tracks that--- the nurse as I attested to
9         earlier, who's tasked with actually monitoring
10        these things.  I believe that they keep a log,
11        spreadsheet logs with these targeted completion
12        dates that they update on a realtime basis on a
13        daily basis.
14   Q.   And who has~-- where did those launch reports,
15        or who generates those launch reports?
16   A.   Those are generated in UM, and they are sent to
17        the sites.
18   Q.   And are--- so is the answer to that question
19        that the UM nurse generates them?
20   A.   Yes, the UM nurse is involved with that, and
21        then there are clerical support staff that also
22        help with the actual logistics of sending it to
23        the respective sites.
24   Q.   And have you seen a launch report before?
25   A.   Yes.

Page 57

1    Q.   You're familiar with what they look like?
2    A.   Yes, I haven't looked at one in a while, but
3         I'm familiar with them.
4    Q.   Let me ask you to turn to Page 3--- I'm sorry,
5        Exhibit 3, which is the UM management
6        guidelines, the current ones, and Page 27.
7        This is an example of a launch report.  Does
8        this--- is this what a launch report looks
9        like, from your recollection?
10   A.   Yes.
11   Q.   And is the targeted completion date bolded like
12        that?
13   A.   Yes.
14   Q.   Is the targeted completion date always filled
15        in?
16   A.   To my knowledge, it's supposed to be, yes.
17   Q.   Do you know if it's possible to send the launch
18        report without the targeted completion date
19        being filled in?
20   A.   I don't know the answer to that.  I -- again,
21        my understanding and knowledge is that the
22        expectation is that every approved referral
23        request has a targeted completion date assigned
24        to it.
25             MR. WACKMAN:  I think that is all

Page 58

1        the questions we have for right now.
2   DIRECT EXAMINATION:
3   BY MR. RUPCICH:
4   Q.   Very quickly.  Doctor, you had mentioned,
5        typically, procedures should not be or
6        consultations shouldn't be scheduled before
7        they are presented to utilization management;
8        correct?
9   A.   Yes.
10  Q.   Does that apply to emergency services?
11  A.   No, that's the one exception.
12  Q.   All right.  So when you say--- what you were
13       speaking of is nonemergency services?
14  A.   Yes.
15  Q.   In emergency, a doctor can send--- on site can
16       send a patient to a hospital?
17  A.   That's correct.  There is no prospective
18       utilization management process for emergencies.
19  Q.   If there's a global authorization given for 90
20       days, say that number that's generated, that's
21       good for billing purposes for 90 days; is that
22       what you mean?
23  A.   Yes.  In our claims system.  The--- the
24       authorization is good for 90 days.
25  Q.   And is that separate from the target date for

Page 59

1        the service to be completed?
2   A.   Yes.
3   Q.   Now, what happens if you give a -- UM generates
4        a target date of 45 days for a surgery, and the
5        surgeon schedules it on the 60th day?
6   A.   That would fall within the 90 days, so the
7        authorization would still apply.  But if it was
8        expected to be completed within the 45th day,
9        then it would trigger a review by the UM
10       service completion nurse to investigate as to
11       why it hadn't been completed within the
12       expected targeted time frame.
13  Q.   I assume that happens from time to time, where
14       the outside provider has a time frame that
15       differs from what UM generates?
16  A.   It does.  Not infrequently.
17  Q.   And if a surgeon scheduled a surgery on the
18       95th day, where the authorization would have
19       expired, does that have to go back through
20       utilization management, or can it just be
21       extended?
22  A.   It can be extended.  In that instance, often
23       the--- because it will have often exceeded its
24       targeted completion date if it gets to 90 days.
25       Many times the UM clerical nurse for service

Page 60

1   completion will find out from the site that the
2   service had not been completed, and then they
3   will tell the UM nurse that the service has now
4   been extended out for, if it's going to be the
5   95th day.  So then the UM nurse would just
6   extend the authorization out for another 90
7   days.
8        It wouldn't necessarily--- to answer your
9   question, it wouldn't necessarily require it to
10  go back through collegial unless there was for
11  some reason, the UM nurse or the service
12  completion clerical nurse were not able to get
13  an answer as to why the service had not been
14  completed.
15  Q.   And should there be an entry in WEX Care where
16       that UM nurse extended that authorization out
17       further?  Would that be reflected in WEX Care?
18  A.   It usually is, yes.
19              MR. RUPCICH:  That's all.
20              MR. WACKMAN:  Phil, do you have any
21       questions?
22              MR. ANDREWS:  No, no questions from
23       me.
24  RECROSS EXAMINATION:
25  BY MR. WACKMAN:

Page 61

1   Q.   Let me ask you one quick follow-up to Mr.
2        Rupcich's questions, Doctor, which is what is
3        WEX Care?
4   A.   WEX Care is the UM and claims management
5        software platform that has been utilized for
6        Wexford for those two purposes.
7              MR. WACKMAN:  I don't think we have
8        any more questions.  I will just put on the
9        record that, Joe, we'll make a formal request,
10       but I don't think we've seen these launch
11       reports for Mr. Dean's care, so I'm going to
12       ask that they be produced.
13              MR. RUPCICH:  Put them in the
14       request you're making.
15              MR. WACKMAN:  Yeah, I'll put them in
16       the request.
17              MR. RUPCICH:  You do have the WEX
18       Care notes, though?
19              MR. WACKMAN:  I believe we have the
20       WEX Care notes, yes.
21              MR. RUPCICH:  Okay.
22              MR. WACKMAN:  But I will check on
23       that.
24              MR. RUPCICH:  I mean, you do.
25              MR. WACKMAN:  I don't--- I know I

Page 62
1   haven't seen anything that looks like this.  I
2   think that's what we're going to want.  But
3   other than that, I think we're ready to go off
4   the record, unless anybody else has anything.
5              MR. RUPCICH:  I have nothing else.
6   Doctor, signature?
7              THE WITNESS:  I'll waive.
8              MR. RUPCICH:  Waive signature.  That
9   will conclude the deposition.  Thanks everyone.
10  (Signature having been waived, the deposition
11  was concluded at 3:07 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                                      Page 63
1   COMMONWEALTH OF PENNSYLVANIA     )
                                     )   CERTIFICATE
2   COUNTY OF ALLEGHENY              )  SS:
3        I, Brenda J. Brink, RPR and Notary Public in and
4   for the Commonwealth of Pennsylvania, do hereby
5   certify that the witness, Stephen Ritz, D.O., was by
6   me first duly sworn to testify to the truth; that the
7   foregoing deposition was taken at the time and place
8   stated herein; and that the said deposition was
9   recorded stenographically by me and then reduced to
10  printing under my direction, and constitutes a true
11  record of the testimony given by said witness.
12       I further certify that the inspection, reading
13  and signing of said deposition were waived by counsel
14  for the respective parties and by the witness.
15       I further certify that I am not a relative or
16  employee of any of the parties, or a relative or
17  employee of either counsel, and that I am in no way
18  interested directly or indirectly in this action.
19       IN WITNESS WHEREOF, I have hereunto set my hand
20  and affixed my seal of office this 23rd day of
21  August, 2019.
                              /s/ Brenda J. Brink
22                     _____
23                           Notary Public
24
25

**1**

**1** 6:8,9 22:24 37:15
41:10,12 43:5 44:5

**10** 21:11 22:23
28:8 43:3

**11** 33:18

**12** 25:25

**12th** 10:18

**14th** 15:17 18:25

**2**

**2** 10:13,15 15:16
33:17 41:16,20,25

**2.3** 31:3

**2014** 41:12 43:9
44:8,13 46:5 47:4
52:15 54:20

**2016** 15:17 18:25
43:12,22 44:3,22
46:10 47:10 51:9

**2019** 10:18

**27** 57:6

**3**

**3** 15:6 36:25 41:22,
23 42:3,7 46:24
57:5

**30(b)(6)** 6:11
9:12 48:19

**3:07** 62:11

**3~--** 41:15 57:4

**4**

**4** 35:20 37:9 38:6
41:3,6 42:4 45:24

**45** 59:4

**45th** 59:8

**5**

**5** 53:5,7,13,18

**6**

**6** 43:2

**60th** 59:5

**7**

**7** 37:2,3 38:14
45:23

**9**

**90** 37:4 38:16,18
39:1,4,6,20,22
58:19,21,24 59:6,24
60:6

**90-day** 37:1 38:13

**95th** 59:18 60:5

**A**

**ability** 6:22

**absolutely**
24:15

**accountable**
41:2

**action** 33:10

**active** 37:7

**actively** 42:15

**actual** 36:19
56:22

**add** 13:10 43:11
45:13 47:10 53:11

**added** 44:22 46:9

**addition** 42:23
43:22

**adhere** 20:14

**adjudicated**
26:25 27:3

**administrative**
18:2,19,23 19:3

**adopt** 8:7,12

**adoption** 8:16
21:3

**advisory** 17:17
21:2

**age** 5:3

**aging** 38:16 39:9

**agree** 6:5 27:12
28:25 34:5 41:13,18
43:8,10 44:7 46:4,8
47:1,4,9 49:1

**agreed** 39:25

**agreement**
35:19

**ahead** 32:20

**Alabama** 16:4

**algorithms** 22:3

**and/or** 53:21

**Andrews** 5:19,
20 60:22

**answering**
28:15

**appearances**
5:12

**applied** 14:25
16:22 22:7 42:25
52:3

**applies** 12:19
14:20 15:1

**apply** 58:10 59:7

**appointment**
36:1

**appointments**
35:21 36:12 45:25

46:6

**appropriately**
28:16

**appropriatene
ss** 7:21 10:11
13:14 29:19,25 30:2

**approval** 20:11
35:22 37:7 46:1
53:25

**approvals** 35:8

**approved** 13:8,
11,12 25:8 29:1
31:4,9 32:13 33:14
46:21 47:2,24 49:4
52:21 57:22

**area** 34:3,8

**are~--** 56:18

**assign** 31:20 32:4

**assigned** 31:3,
12,15,19,24 32:1
57:23

**assume** 59:13

**attention** 21:11
37:25 50:15

**attested** 12:2
31:7 34:18 45:2
52:18 54:9 56:8

**audits** 31:11

**August** 10:18

**authorization**
32:25 38:18 39:3,5,
9,12,19 50:2 58:19,
24 59:7,18 60:6,16

**authorizations**
49:24

**availability**
29:12 50:23

**avenue** 44:4

**avenues** 28:12

**averse** 21:7,9
42:24

**aware** 23:14,19
34:17 36:16 37:16
45:17,22 47:23
50:3,7 54:23 55:8

**awareness** 28:2
34:8 51:23

**a~--** 36:9 45:2,24

**B**

**back** 5:13 6:4
16:12 18:17 22:15
28:8,10 55:19 59:19
60:10

**background**
12:21

**backstop** 51:5

**balances** 10:22

**based** 8:17 13:12,
13 16:9 30:5 33:24
46:11 47:14 53:4

**basic** 16:23

**basis** 22:25 23:7,
11,13,17,23 24:3
27:14 43:7 56:12,13

**Bates** 15:8 41:7

**bear** 15:8

**bears** 41:6

**beginning** 28:21

**behalf** 5:20

**believes** 9:23

**billing** 58:21

**board** 48:3

**bold** 53:13

**bolded** 24:20
57:11

**bottom** 10:18

**box** 26:13

**breakdown**
32:17 33:5 40:19

**briefly** 22:22 25:25

**brought** 37:24 50:14 51:9

**business** 9:9,15, 17,19 19:15 27:1,4 28:13 35:22 36:2,3, 6,8,13 38:6 46:1,7

**C**

**call** 24:9 25:11,21 26:9 28:18 33:9 34:10 38:16

**called** 56:2

**called~--** 33:1

**calling** 23:3 24:22 25:15 42:23 44:6

**calls** 23:10 24:24 26:4

**cancelled** 39:13, 17 51:1

**capacity** 48:19

**care** 8:1 10:12 11:4,9 12:1,4,6,8 13:22 14:25 21:15 40:5 48:24 50:25 53:3,22,23 54:4,10, 12 55:24 60:15,17 61:3,4,11,18,20

**case** 24:25 25:5 27:8 28:19 31:8 37:23 38:3

**cases** 11:23 12:24 23:1

**categorize** 12:11

**certified** 5:6

**challenges** 11:24

**challenging** 11:23

**changed** 42:12

**characterize** 48:9

**check** 61:22

**checked** 26:13

**checking** 26:13

**Chicago** 34:20

**Chloe** 5:14

**circumstances** 30:18 32:10,16 34:24

**circumstantial** 20:15

**claim** 32:23 38:15,16,19,23 39:10 50:3

**claims** 37:8 58:23 61:4

**clarifying** 35:24

**clear** 45:10

**clerical** 26:18 31:6 37:13 55:25 56:21 59:25 60:12

**client** 10:7 34:22

**clients** 8:5,6,10 9:6 10:1 49:13

**clinical** 7:21 10:6,11,23 13:13,14 21:7,10,21 22:2 27:19,21 29:9,18,24 30:2 32:9 40:4,23 47:20 48:13

**clinically** 8:3 11:11 12:6 13:3 14:1,22 30:4,17,24 35:11

**clinician** 54:18

**clinicians** 18:4

**closely** 40:6

**codified** 44:18

**codifies** 46:15

**collegial** 11:14, 17,19,25 12:3,8,9,

13,16,23 13:6 14:13 15:12,25 22:20,24 23:1,5,10,12,16,22 24:21 25:16 26:5 28:12,21 31:4,9 32:13 33:11,12,14 37:25 40:1 43:6,12, 17,23 44:5,23 45:11,19 50:16 52:21 60:10

**collegials** 24:2, 14 44:14,17

**committee** 17:18,19,22,23 18:6,8,10 21:3

**common** 9:16 24:2 52:13

**commonly** 19:9 22:7 50:22

**communicate** 25:9 29:2 47:3

**community** 14:17 15:4 36:10 50:24

**company** 8:10

**completed** 29:2 36:8,10 37:10,12, 16,17 38:21,22 39:1,16,17,18,22 40:12 43:18,23 47:3,24 50:13 59:1, 8,11 60:2,14

**completion** 29:22 31:2 35:23 36:17,22,23 37:13 39:25 40:7,13,18,23 46:3 47:8 49:4,15, 20,25 55:20 56:11 57:11,14,18,23 59:10,24 60:1,12

**compliance** 49:16

**comply** 16:18

**component** 9:5, 24 29:7 54:12

**components** 46:13

**comprehensive** 10:21

**conclude** 62:9

**concluded** 62:11

**conclusions** 55:10

**conducted** 44:16

**consensus** 53:20

**consequences** 23:24 24:14 31:14, 21 33:4 40:11,15,21 50:18

**conservative** 53:23

**consideration** 22:17 29:14 34:22

**considerations** 10:2,6 13:13

**considered** 29:21

**constitutes** 27:6,17

**consultant** 11:12 32:19

**consultations** 58:6

**consults** 14:14

**containment** 10:23,24 11:1,7

**context** 11:1 13:16,19 21:18 29:8 52:5

**contextual** 20:15

**contract** 8:5 16:18,19,20 17:6 19:10 34:3 44:15

**contracted** 33:22

**contracting** 35:16

**contracts** 16:3, 25 18:1 33:24

**contractually** 16:10

**control** 14:6 36:7 40:16,25 51:4

**conversation** 38:1

**corporate** 7:5 17:15 51:15 56:7

**correct** 9:15 13:16 15:19,23 33:15,16 58:8,17

**corrections** 9:1 12:21 13:16,19 14:16 15:2

**cost** 10:23,24 11:1,7 13:12 29:20

**costs** 11:3 12:1,4, 8

**counsel** 6:25 7:1, 3,12

**couple** 30:23 42:5

**court** 6:9 10:14 15:7 41:4

**cover** 16:4 41:11 52:10

**covered** 29:24

**covers** 26:1

**cracks** 51:7

**create** 18:10,23

**criteria** 21:20,21 29:4,13 34:15

**CROSS** 5:8

**current** 30:7 42:7 43:4,5 57:6

## D

**D.O.** 5:2

**daily** 56:13

**data** 23:21 36:14 49:3

**date** 10:17 15:17, 19 28:25 29:2,6,22 31:2 35:23 36:17, 19,20,22,23 37:1,8, 9 39:25 40:7,13,18 41:11 46:3 47:2,7 49:15,20 55:20,22 57:11,14,18,23 58:25 59:4,24

**dates** 40:23 49:25 56:12

**day** 23:4 27:4 38:6 59:5,8,18 60:5

**days** 27:1 28:13 35:22 36:2,3,6,9,13 37:4 38:17,18 39:1, 4,6,20,22 46:1,7 58:20,21,24 59:4,6, 24 60:7

**dealing** 14:16

**Dean** 5:11 25:23 53:3,14,18

**Dean's** 38:3 40:8 53:9 61:11

**December** 54:20

**decide** 20:25 47:7

**decision** 8:12 10:7 20:21 29:22 42:16

**decisions** 17:10 32:7

**decrease** 14:13

**defendants** 5:17,21 53:8 54:1,3

**define** 30:1

**defined** 21:19 30:12

**definition** 30:10

**degree** 14:12

**delay** 25:4 39:2 50:23

**delivering** 53:3

**demand** 53:17

**demonstrate** 49:13

**department** 8:25 35:16,17 38:9 46:12 48:17

**departments** 19:7,11

**deposes** 5:6

**deposition** 5:23,24 6:6,11,21, 23 7:5,8,12 22:22 29:25 30:11 31:7 44:12 45:5,7 54:22 55:13,21 62:9,10

**describes** 26:7

**description** 53:11

**designate** 26:16,17

**designed** 11:25 47:15

**determination** 10:10 22:16 25:6 29:16

**determine** 22:11,12,13

**developed** 18:12

**develops** 18:15

**deviate** 20:5,9

**diagnosing** 53:24

**die** 30:23

**differ** 17:5

**differences** 16:9,10,23

**differs** 59:15

**direct** 10:19 21:11 40:16 53:10 58:2

**directed** 34:22

**directly** 6:13 14:6

**director** 17:15 22:19 23:3,4 24:8, 22,23 25:1,7 26:4,8, 17,22 28:18,19,24, 25 29:4,5,10,11 31:25 32:6 44:6,7 46:25 47:1,6,7 48:18

**director's** 37:24 50:15

**directors** 12:20 17:25 18:1 27:6,20

**discharge** 52:14

**discovers** 23:22

**discuss** 11:23 24:25 25:4,18 28:19

**discussed** 30:11 36:24 43:4 44:3 45:23 46:24 50:15 51:17 55:12

**discussing** 26:3 51:8

**discussion** 11:21 14:10 22:18 37:25 55:18

**discussions** 44:16

**disposition** 37:23

**dispositioned** 25:2

**distinction** 30:14

**distinctions** 31:1

**distributed** 51:20

**DOC** 34:1,18

**doctor** 15:5,22 58:4,15 61:2 62:6

**doctor-to-doctor** 11:21

**document** 6:10, 15 17:12 20:2 21:12 41:6 55:8

**documentation** 23:20 40:10

**documents** 51:19 56:7

**don't~~~** 61:25

**drafted** 18:19

**draw** 31:1

**driver** 12:9 29:15

**drivers** 13:12 29:17

**duly** 5:3

**duties** 44:11 52:14

## E

**E-MAIL** 26:15,21, 22

**earlier** 56:9

**early** 14:21

**easily** 47:17

**effect** 5:25 6:5 15:13 53:2

**effective** 18:24 41:15

**effectiveness** 15:17 41:12

**efficiencies** 48:12

**effort** 35:18

**Einwohner** 28:5

**electronically** 26:12

**emergencies** 58:18

**emergency** 58:10,15

**employee** 20:4,9 31:19 32:2 40:20 41:1 50:21 52:22

**employees** 23:24 31:15 33:5 40:11 50:18 51:11, 20 52:1,12,16

**encompassed** 36:24

**encourages** 14:20

**end** 20:3 27:4

**enforce** 38:5,13

**enforcement** 38:8

**ensues** 22:17

**ensuing** 14:10

**ensure** 14:4

**entities** 21:24

**entitled** 15:10 41:8

**entry** 60:15

**essential** 8:24 9:3,9,18

**essentially** 13:7 17:8 26:6 30:3,14

**essentially~~~** 21:8

**evaluate** 8:15

**evaluation** 13:22 22:2

**evaluatory** 21:20

**eventuality** 52:11

**every~~~** 31:8

**examination**

5:8 6:16,17 7:14
58:2 60:24

**exceeded** 59:23

**exception** 24:10
58:11

**excuse** 5:22
33:12 36:25 45:24
46:2

**exercise** 27:21
52:12

**exhausted**
13:25 14:5 15:1

**exhibit** 6:8,9
10:13,15 15:6,8,9,
16 41:3,5,7,14,16,
20 42:3,4,7 53:5,7
57:5

**Exhibit~~~** 41:19

**exists** 51:5

**expect** 27:20
52:1,12,16,22

**expectation**
13:21 24:4 26:24
31:18 36:4 57:22

**expectations**
27:2

**expected** 12:17,
23 30:23 37:6,10
39:24 40:18 50:13
59:8,12

**experience** 12:4
14:15,17 17:8 21:5,
21 24:16 27:1 35:2
46:12 50:20

**expired** 59:19

**explanation**
37:22

**extend** 39:3 60:6

**extended** 39:5,
19 59:21,22 60:4,16

**extensive** 12:21

**extent** 20:4 52:18

**F**

**face** 40:11,14

**facilities** 13:24
34:10

**facility** 10:9 14:2

**facing** 10:16

**fact** 32:22 42:20

**factor** 10:2

**factors** 24:5

**fair** 12:11 13:9
28:11

**fairly** 32:4

**fall** 19:25 22:15
38:7 44:13 51:6
59:6

**falls** 49:23

**familiar** 54:19
57:1,3

**fashion** 43:18,24
47:25

**fax** 26:12

**feedback** 27:11,
13,23 28:6

**feel** 25:2 26:9

**feels** 55:6

**felt** 48:5 49:5

**fewer** 12:13 13:5

**filled** 57:14,19

**final** 28:23

**financial** 10:2,5
19:18

**find** 32:22 60:1

**findings** 55:10

**Fisher** 17:24

**flip** 15:16,21 28:8

**focus** 28:23

**focused** 21:6

**follow** 52:1,16,23

**follow-up** 55:9
61:1

**force** 21:25 42:4

**form** 8:9 20:19
26:11 27:10 28:17

**formal** 27:16 61:9

**formalize** 47:15
48:7

**forms** 17:11

**fort** 33:10

**forum** 11:23

**forward** 49:11

**found** 16:11

**frame** 37:13 40:3
50:13 52:20 59:12,
14

**frames** 39:23

**fulfilling** 31:23

**full** 13:23

**G**

**G-2** 15:9

**Garcia** 17:23

**gave** 22:16

**general** 7:17
11:24 14:18 16:8,15
27:8,9 31:5 40:22
52:24

**generally** 11:1
12:17 20:13,16
23:10 27:2 34:12
35:9 37:3,5 40:15
42:20 49:23 53:12

**generated** 56:16
58:20

**generates**
56:15,19 59:3,15

**give** 27:13 30:20
34:7 53:15 59:3

**giving** 27:11

**global** 58:19

**Godinez** 54:21

**good** 58:21,24

**governing** 15:12

**governmental**
21:24

**governs** 15:24

**ground** 5:24

**guess** 9:16 24:12
28:14 31:16 34:22
35:2

**guidance** 27:5
51:19

**guideline** 15:11
21:12 23:9 24:6
27:17 33:13 42:9,13
43:6,9 44:19 46:15
47:19 52:10,23

**guidelines**
15:10 16:18 17:21
18:10,13,16,24
19:16,19,21,22,24
20:5,10,14,22 21:4,
7,8,9,10,23 22:1
27:9 30:13,22 42:24
46:10,13 47:11
51:9,11 52:2,6 53:1
54:11,17 57:6

**guideline~~~**
42:10

**H**

**handbooks**
53:21

**handed** 10:14
15:7 41:4 53:6

**handing** 6:10

**happen** 23:6,13
24:18,20 31:8
32:15,16 45:20 52:9

**happened** 24:17

**happening**
45:20

**hard** 34:4

**has~~~** 50:2 56:14

**header** 53:16

**heading** 26:14

**Health** 17:17 21:2

**Health's** 10:21

**held** 41:2

**hereinafter** 5:6

**hernia** 30:21

**high** 11:17,19 30:2

**history** 8:18 30:8

**Holt** 5:14

**hospital** 58:16

**hypothetical**
31:18

**I**

**identifies** 15:22

**identify** 48:6

**IDOC** 5:20 33:22,
25

**II** 22:23 28:20 33:17
35:20 37:1,9 38:6,
14 43:5 44:5 45:23,
24 46:24

**III** 28:20

**ill** 24:8,9

**Illinois** 8:25 13:20
15:11,15,23,25 16:4
23:8,9 24:25 34:20
41:9 44:14

**Illinois'** 17:4

**illustrative**
30:20

**imagine** 20:20

**imaging** 7:19 14:23

**immediately** 25:3,16 26:4 41:14 45:12,13,20,21

**impact** 37:20

**implemented** 42:22

**implies** 52:5 53:16

**imply** 42:18

**important** 36:19 40:4

**improve** 48:12

**inappropriate** 13:3 14:22

**include** 48:20

**included** 34:15

**including** 13:23

**Indiana** 16:4

**individual** 5:23 19:10 27:14 29:25 40:20,25 41:1 52:4

**individuals** 24:15

**infirmary** 13:23

**influence** 55:11

**information** 48:22

**infrequently** 59:16

**initial** 28:9 29:3

**initially** 18:17,18

**initiated** 24:21

**inmate** 8:2 9:7 34:5 39:14

**inmates** 8:25 34:9,11,14 50:24

**input** 25:6 32:11

**inquire** 39:11 50:5

**instance** 25:4 33:1 39:16 53:14 59:22

**instances** 30:15 38:25 39:14 49:19 54:16

**interfere** 24:5

**internal** 48:12

**Interqual** 22:4

**investigate** 39:11 59:10

**investigation** 49:19,22

**involved** 19:5, 15,18 32:7 33:5 42:16 48:21 50:19 56:20

**issue** 48:23 49:2, 10 51:24

**issues** 48:3

**is~--** 25:17

**it's~--** 41:21

**items** 15:21

**it~--** 31:18

**I~--** 8:14 19:13 28:2,14 31:16 42:15

**J**

**January** 15:17 18:25

**job** 11:24 14:4 31:22 35:9

**Joe** 5:16 61:9

**judgment** 27:19, 21 29:9 52:13 54:5, 18

**July** 41:12

**K**

**knowledge** 6:20 8:8,18 10:5 19:2 21:5 25:20 28:7 31:13,17 36:14 38:4 40:14 43:20 44:2 46:23 47:14 52:25 55:15 57:16,21

**L**

**lack** 40:19 49:3

**lacking** 49:5

**largely** 16:17 17:20 19:25 20:1,2

**launch** 35:23 46:4 56:2,14,15,24 57:7,8,17 61:10

**lawful** 5:3

**lawsuit** 5:12 25:22 53:15

**leadership** 18:20

**learn** 13:7,10

**led** 45:13 48:23,24

**Lehman** 17:13, 14,24 18:22 19:1 20:1 48:20

**Lehman's** 20:24

**length** 54:22 55:13,21

**letter** 33:11 42:19

**level** 11:18,19 19:6,8 29:12 30:2 32:18 38:12

**limited** 22:6 55:9

**Lippert** 54:20

**list** 6:15 33:19,20, 21 34:7,13,16 35:1, 5,15

**lists** 41:11

**litigation** 54:21

**local** 29:12

**lockdown** 50:24

**lockdowns** 24:7

**log** 56:10

**logistics** 56:22

**logs** 56:11

**longest** 37:5,7

**looked** 57:2

**look~--** 43:2

**M**

**Maddox** 18:6

**made** 8:12 25:21 42:6 45:17 50:3

**majority** 13:24

**make** 16:17 25:5 28:15 45:10 51:6 54:24 61:9

**makes** 20:21

**making** 7:25 10:7,10 49:15 61:14

**management** 7:15,16,17,23 8:7,9, 13,15,20,23 9:5,7,8, 19,24 10:3,9,20,22 11:8,15 13:22 14:3, 18 15:10,12,24 16:6,14,21,24 17:5 18:12,15 22:3 23:3 24:23 41:8 48:16 51:11 53:1,23 57:5 58:7,18 59:20 61:4

**managing** 12:18,24 21:22

**manner** 8:4 11:11

**manuals** 53:20

**marked** 6:8 10:13,15 15:6 28:17

41:3,5,7,10 53:5,6

**marking** 6:9

**matching** 32:24 50:2

**materials** 53:22

**meaningful** 48:6

**means** 30:1 36:4

**meant** 47:21

**measure** 22:9

**mechanism** 47:22

**medical** 7:18,21 8:1,21,24 10:11 12:19 13:13 17:15, 17,20,25 18:1 21:2, 6 22:19 23:2,4 24:7, 8,22,23 25:1,6 26:4, 8,17,22 27:6,7,20, 24 28:18,24,25 29:4,5,10,18 30:7,9 31:24,25 32:6 34:5 37:24 38:3 44:6 46:25 47:1,6 48:18 50:14 53:22 55:22, 24

**medically** 8:3 11:10 12:5 13:2 14:21 21:15,16,18 22:9,13 30:12,16,21 35:10

**medically-related** 7:20

**medically~--** 13:2

**medical~--** 26:16

**medication** 53:25

**meeting** 7:11

**memorialized** 55:23,25 56:2,5,6

**memory** 19:14

**mentioned** 22:18 58:4

**messed** 42:1

**met** 47:20 49:20

**metric** 36:21 40:4 49:5

**metrics** 47:17,20 48:8,13 49:3,11

**mind** 22:8

**minimum** 22:25 23:6,23 43:7,12,22

**modified** 18:21

**moment** 6:16 55:17

**monitor** 38:24 40:6

**monitoring** 37:14 49:14 56:9

**morning** 54:22

**Mr.~--** 5:22

**multipage** 6:10 15:8 41:6

**multiple** 21:20 34:10

### N

**Nate** 5:10

**Nawoor** 25:12, 14,21 27:22

**NCCN** 22:2

**necessarily** 22:5 26:8 48:10 49:2 60:9

**necessarily~--** 60:8

**necessity** 7:21 8:21 10:11 13:14 29:18 30:9

**needed** 35:8 45:12,20 49:6,10

**needing** 46:6

**nonemergency** 58:13

**nonurgent** 32:5

**normal** 26:10

**northern** 34:20

**note** 22:5 38:15 48:4

**notes** 7:7 42:12 50:1 61:18,20

**Notice** 6:11 9:13, 21 17:2 28:1 43:15 45:16 47:13 55:1

**notified** 39:7,8

**not~--** 28:2 36:15

**no~--** 38:17

**number** 8:11 14:19 18:2,17 19:7 24:4 37:19 50:5,7 51:8 58:20

**numbers** 42:2

**numeral** 22:23

**nurse** 25:9 26:11, 21 32:8 49:23 50:1, 4 56:8,19,20 59:10, 25 60:3,5,11,12,16

**nurses** 32:3

**nursing** 26:18 39:7,8

### O

**object** 9:2,11,20 17:1 20:7,12 25:17 27:25 43:14 47:12 48:1

**objection** 17:7 43:19,25 44:24 45:15 51:12,21 54:25 55:14

**obtain** 35:18

**occasionally** 24:9 32:17 45:4

**occur** 23:17 35:2, 7 36:1 38:3 45:12

**occurred** 44:18

**occurring** 44:21 45:3,13 46:19

**off-site** 11:22,25 12:4,7,14 13:5

**oftentimes** 14:21

**on-site** 14:11

**one-week** 43:22

**operational** 21:9 24:4 38:10 43:1 51:24

**operations** 38:12

**operator** 19:9

**opportunity** 48:11

**optimize** 49:12

**option** 25:15

**original** 16:12

**out~--** 14:2

### P

**p.m.** 62:11

**papers** 53:20

**paragraph** 28:21

**part** 9:18 11:7,14 14:3,7,8 19:12 22:23 24:19 31:6,22 40:1 53:13

**participate** 13:6

**participated** 12:16

**participating** 24:13

**patient** 10:8 23:4 30:4,20,23 37:18 40:5 53:24 58:16

**patient's** 29:8 30:6

**patients** 8:2 9:7 12:18 33:24 34:6 53:24

**people** 19:5,15, 18

**performing** 44:11

**permission** 20:19

**person** 33:7

**personal** 18:3 31:7 44:12

**pharmacologic** 7:19 14:24

**Phil** 5:18 60:20

**Phillip** 5:20

**phone** 26:9 44:16

**physician** 21:22, 23 41:1

**physician's** 32:11

**piece** 38:7

**pieces** 48:22

**place** 15:19 24:9 41:14 42:11 46:14, 16 48:5 52:15 56:5

**plaintiff** 5:12,15 25:22 54:5

**Plaintiff's** 6:8 10:13,15 15:6 41:3, 5 53:5,7

**plan** 21:14 28:22

**platform** 61:5

**point** 30:5 36:14 42:20 50:10

**policies** 16:8 17:20 41:8 42:17,

21,24 51:19 52:15, 17 53:1,19 54:4,9, 11,16 55:12

**policy** 15:18,22, 24 16:7,14,24 17:5 38:6,14 41:13,15,19 42:3,4,6,7,10,13 43:3,4,5,8,9,13 44:4,9,18,19,22 45:19 46:5,18,20 47:5 48:25 49:16,17

**policy's** 43:22

**policy~--** 33:12 42:8

**population** 10:9 14:16 15:2

**practical** 36:18

**practice** 7:22

**preferential** 34:18

**preferentially** 34:2

**preferred** 33:18, 19,21 34:6,12,25 35:5,14

**preparation** 7:5,7

**prepare** 6:23 7:12 43:15

**prepared** 6:19 25:18 55:5,6

**presented** 58:7

**president** 19:6,8

**presidents** 19:12

**pressures** 14:19

**Preventative** 21:25

**previous** 5:22 47:18

**previously** 42:11 44:3 45:23 46:24

**primary** 13:21 14:25

**printout** 41:24

**prior** 8:16,17 14:1, 24 41:14,19

**prioritized** 35:22 46:3

**problem** 30:7 43:17 45:11 47:23 48:10 49:2,10 50:21

**procedure** 32:12,19 33:13

**procedures** 16:8 41:9 42:17,21, 24 53:19 54:4,10, 11,17 58:5

**proceeds** 25:10 27:15

**process** 10:5 11:20 12:3,23 13:7 20:11 22:21 25:10 26:2,3,7,10 31:6 32:21 36:6 38:10 39:6 40:1,19 44:20 45:3 47:15,16 48:4, 7 51:5 55:25 58:18

**processes** 46:16 48:8

**produced** 61:12

**production** 53:9

**professional** 52:13

**program** 10:22

**prompt** 46:21

**prospective** 58:17

**protocols** 53:20

**provide** 9:6,25 27:5,10 33:23 34:5 51:10,18 54:10

**provided** 8:10 11:4,10 35:4 40:2, 17 50:4,6,8

**provider** 11:5 29:12 32:23 33:19, 21,25 34:1,2,6,13, 16,25 35:5,14,15,18 38:22 59:14

**provider's** 39:2

**providers** 11:22 12:15 13:6 33:22 34:4,8

**providers~~~** 13:4

**providing** 8:24 29:20 40:5 54:4

**provision** 44:8, 23 45:14,25 46:5,9 47:5 48:24

**public** 10:16

**purpose** 34:12

**purposes** 58:21 61:6

**pursuing** 14:1

**purview** 18:14 38:8

**put** 5:12 61:8,13, 15

**Q**

**quality** 49:6,9

**question** 6:1 8:19,22 9:14 16:13 17:3 20:8,17 23:18 28:4,9,15 29:3 32:8 35:25 54:6 55:7,9 56:18 60:9

**questions** 42:6 45:5 58:1 60:21,22 61:2,8

**quick** 61:1

**quickly** 58:4

**R**

**reach** 35:17 50:5

**reached** 36:5

**reaches** 37:14

**read** 53:13

**ready** 62:3

**real** 25:25 42:19 52:3,7,9,11

**realtime** 56:12

**reason** 40:17 60:11

**reasonable** 14:1,24 50:11,17

**reasoning** 42:14

**recall** 6:2,13

**received** 25:11 28:6

**recollection** 57:9

**recommendations** 21:24 22:1

**record** 5:13 55:16,18,19,24 61:9 62:4

**records** 55:22

**RECROSS** 60:24

**reduce** 11:25 12:4

**reduction** 11:2 12:7

**redundancy** 11:3

**refer** 25:25 35:15 45:6,9

**reference** 54:10, 15

**referenced** 31:2

**references** 45:2 46:15

**referral** 21:13 26:11,14,19 28:17 57:22

**referrals** 11:21 12:14 13:5 53:25

**referred** 34:16 45:4 48:14 54:21

**referring** 11:2 19:4 24:18 36:23 37:3 45:7

**refers** 7:14,17 17:8 21:15 28:10 33:18

**reflected** 60:17

**reflective** 42:25 44:20

**refuse** 50:25

**refused** 37:18

**region** 15:11,23 34:20 41:9

**regional** 17:25

**related** 50:21 53:22 55:2

**relates** 51:16

**relating** 11:3 30:6 50:22

**relationship** 34:19

**release** 39:15

**relevant** 53:2

**relied** 54:1,5

**rely** 54:3,9,12,14

**remediate** 33:10

**repair** 30:22,25

**repeated** 33:8

**repercussions** 50:18

**rephrase** 17:3

**report** 35:24 46:4 54:19,23 55:11 56:3,24 57:7,8,18

**reporter** 6:9 10:14 15:7 41:4

**reports** 56:14,15 61:11

**represent** 5:11

**representative** 48:18

**request** 14:8 25:8 26:19 32:18 53:9 57:23 61:9,14, 16

**requested** 12:14

**requesting** 21:22 27:23

**requests** 7:18 13:2 26:1,2 27:3,12

**requests/ collegial** 21:13

**require** 32:10 47:19 60:9

**required** 16:10 35:4,13

**requirement** 43:5

**requirements** 16:19 17:9

**requires~~~** 27:19

**rescheduled** 37:18,20 50:10 51:2

**research** 25:19

**resources** 7:25 13:22 14:4,5

**respect** 12:18,24 40:4,22

**respective** 56:23

**response** 22:15 53:8,16,17 54:3

**responsibilities** 31:22

**responsibility** 20:3,24

**responsible** 19:23 23:25 33:6

**result** 11:9 12:5,8, 13 14:12,13

**resulted** 43:23 45:19 46:21

**results** 12:2

**retro** 33:2,9

**retros** 33:2

**retro~~~** 33:8

**review** 6:17 11:14,17,19,25 12:8,10,13,23 13:6 14:7,9,13 15:13,25 20:18 22:21 23:2,5, 10,12,16,22 24:21 25:1,16 26:5,23 28:13,21 31:4,9 32:13 33:12,15 38:20 43:12 44:5,23 50:1 52:21 53:4 59:9

**review/ alternate** 21:13

**reviewed** 18:20

**reviewing** 7:18 17:20

**reviews** 12:16 22:24 43:6,17,23 45:12,19

**revise** 20:21

**revised** 19:23

**revision** 19:16, 19,23 42:22

**rights** 18:4,5

**Ritz** 5:2,10,22 6:12,24 18:8 28:9 45:4,9 53:10 55:19

**role** 10:4 24:24 48:17

**Roman** 22:23 28:20 31:3 33:17 35:20 36:25 37:1 38:6,14 44:5 45:23, 24 46:24

**Roman~~~** 36:24

**round** 7:10

**routine** 32:4

**rule** 24:11

**rules** 5:25 16:20

**Rupcich** 5:16 9:2,11,20 17:1,7 20:7,12 22:11 25:17 27:25 41:21,24 42:9,12 43:14,19,25 44:24 45:15 47:12 48:1 51:12,21 53:11 54:24 55:5,14 58:3 60:19 61:13,17,21, 24 62:5,8

**Rupcich's** 61:2

**S**

**say~~~** 58:12

**scheduled** 23:10 32:12 33:14 34:25 35:21 36:3,13 39:18 46:1,6 58:6 59:17

**scheduler** 29:3 47:4

**schedules** 32:20 59:5

**scheduling** 24:13 36:6,20 38:6 46:21 52:21

**scope** 9:12,21 17:2 28:1 44:1,25 48:2 51:13,22 54:25

**screenshot** 10:16

**second~~~** 25:15

**seek** 20:11 28:12 44:4

**seeks** 20:4

**send** 57:17 58:16

**sending** 56:22

**send~~~** 58:15

**sense** 52:13

**sentence** 10:20, 25 21:14 24:19 28:23 54:2

**separate** 58:25

**series** 5:24

**service** 7:20 26:20 27:7 29:19,20 30:3,15 31:4 32:24, 25 34:19 35:3,13,18 37:5,10,12,15 38:20,21 39:15 40:2,17 50:4,6,8,9, 12,24 51:1 59:1,10, 25 60:2,3,11,13

**services** 7:19,20 8:24 9:6,25 11:22 13:24 14:2,8,11,23, 24,25 21:19,25 27:24 29:1 33:23 34:5 36:8,11 38:25 39:21 40:12,23 47:2,24 49:4 58:10, 13

**set** 15:5

**Shansky** 54:20

**side** 36:16

**signator** 20:2,23

**signature** 62:6, 8,10

**signed** 17:13

**significant** 13:21

**similar** 16:9 44:8

**simply** 35:25 45:2 46:15

**sit** 19:13

**site** 10:16 12:19, 24,25 13:23 14:4,5, 8 23:2,11 24:12,15, 22,25 25:10 26:3,17 27:5 28:24 29:2,4, 10 31:24 32:6,18,20 33:7,8 35:15 36:4 37:15 38:2 39:12 44:5 46:25 47:4,6 50:5 51:15 58:15 60:1

**sites** 34:7 56:17, 23

**sits** 17:22

**situation** 27:20 35:12 52:4

**situations** 32:5

**software** 22:3 61:5

**sort** 33:4

**speak** 7:1,3 51:7 55:6

**speaking** 20:16 58:13

**special** 35:8

**specialist** 21:23

**specialty** 14:14, 23 21:23

**specific** 13:15,19 23:19 30:3 32:9,19 35:17 39:23 48:22 49:23 52:20 55:1

**specifically** 8:8 15:14 23:15 45:1

**speculate** 46:11 47:14

**spoke** 6:25

**spreadsheet** 56:6,11

**staff** 18:20,21,23 19:3 26:18,19,20 37:13 38:2,3 39:7,8 51:15 56:21

**stamp** 10:17 15:9 41:7

**stand** 54:13

**standards** 53:22

**standpoint** 10:4 36:18 43:1 49:7

**stands** 54:6

**started** 36:5

**state** 15:25 16:11, 13,20 17:25 18:1 24:1 38:12

**statement** 54:7, 14

**statements** 53:21

**states** 14:20 16:2, 7,24 17:5 26:24

**STEPHEN** 5:2

**stipulate** 23:8 28:14 31:16 42:15 44:10

**stipulating** 47:18 49:8

**studied** 46:20

**studies** 31:11 43:21 45:18

**subjects** 6:15,17

**submission** 28:16

**submit** 26:10 38:22

**submitting** 13:1 17:10

**summarize** 13:4,9

**summary** 51:18

**supervisor** 20:19

**support** 22:3 56:21

**suppose** 9:17

**supposed** 23:6 31:3 32:14 33:13 57:16

**sure~~~** 9:10

**surgeon** 59:5,17

**surgery** 40:8 59:4,17

**sworn** 5:4

**system** 14:19 37:8 58:23

---

**T**

**talk** 22:20

**talked** 55:20

**talking** 28:11 36:25 37:2,9 41:16

**tangentially** 55:2

**target** 36:9 58:25 59:4

**targeted** 28:25 29:6,21 31:2 35:23 36:23 37:6,8,12 39:25 40:7,12,22 46:2,3 47:1,7 49:15, 20,25 55:20 56:11 57:11,14,18,23 59:12,24

**Task** 21:25

**tasked** 7:24 8:4 10:10 17:19 33:7 37:14 56:9

**team** 27:2

**team's** 14:3

**ten** 35:22 36:1,3,6, 8,13 38:5 46:1,6

**tend** 42:18

**tenure** 8:17 44:14

**term** 9:3 19:9 33:2 34:23

**terms** 10:4 27:17

**testified** 44:11

**testify** 5:4 6:19

**that~~~** 56:8

**theory** 24:12

**they're~~~** 27:16

**the~~~** 19:6,21 35:6 37:4 46:2 48:16 56:7 58:23 59:23

**things** 7:24 8:6 22:6,7,17 24:7 28:10 37:19 49:12 51:3 52:9 56:10

**thirdly** 50:9

**this~~~** 57:8

**Thomas** 17:13, 14

**those~~~** 19:11

**time** 11:6,13 18:21 30:5 35:6 37:13 39:23 40:3 50:13 52:20 59:12,13,14

**timely** 43:18,24 47:24 48:24

**times** 7:3 32:1 34:4 44:13 53:2 59:25

**timing** 29:19 32:9

**title** 42:12

**today** 6:12 7:8 19:13 44:12 48:19 51:17

**today's** 6:20,23 7:12

**told** 34:11

**top** 15:9

**topic** 7:14

**topics** 6:20 55:1

**to~~~** 55:5

**track** 23:12 33:2 36:12,21 38:24 39:21,23,24 40:6 47:22 48:5 49:3,11, 16

**tracked** 23:14 25:20 31:17 36:15 37:11 47:17 49:6

**tracking** 23:20 31:12 48:13 49:13

**tracks** 49:24 56:1, 8

**training** 51:10

**trainings** 51:14

**transmit** 26:20

**transmitted** 26:12

**treating** 53:24

**treatises** 53:21

**treatment** 21:14 28:22 34:24 46:22 52:22

**trigger** 38:20 59:9

**true** 16:13 23:5

**trump** 54:17

**truth** 5:4,5,25

**turn** 6:14 57:4

**turnaround** 17:9

**type** 48:13

**types** 47:16 51:3

**typically** 58:5

---

**U**

**ultimately** 20:24

**undergoing** 12:22

**understand** 8:22 9:14 12:17 20:8 45:6

**understanding** 9:16 31:10 57:21

**understood** 6:1

**undertaken** 23:2

**unique** 27:9 29:8 30:6 35:3,13

**United** 14:20

**University** 34:19

**unnecessary** 11:2 12:5 14:22

**update** 56:12

**updated** 44:19 46:13,14

**urgent** 23:1 26:1, 2,14,19 27:3,6,12, 18,23 28:17 44:16

**utilization** 7:15, 16,17,22 8:7,9,13, 15,20,23 9:5,8,19, 23 10:3,9,20,22 11:7,14 14:3,18 15:10,12,24 16:6, 14,21,24 17:4 18:12,15 22:2 23:3 24:22 41:8 48:16 51:10 53:1 58:7,18 59:20

**utilize** 54:15

**utilized** 8:1,2 13:25 14:11 34:7 61:5

**utilizes** 11:20 25:15

---

**V**

**vague** 9:2,12,20 20:7,12

**variable** 29:15

**variables** 40:24

**variety** 9:24

**understanding** 9:16 31:10 57:21

**venue** 11:4,12

**version** 18:24

**vice** 19:6,8,12

**view** 11:8 12:7 48:10

**Virginia** 16:5

**vote** 21:3

**voting** 18:3,5

---

**W**

**W-A-C-K-M-A-N** 5:11

**Wackman** 5:9, 10,18 41:23 42:1 55:4,16 57:25 60:20,25 61:7,15, 19,22,25

**waive** 62:7,8

**waived** 62:10

**wanted** 28:8

**waste** 11:3

**weather** 51:1

**web** 10:16

**week** 24:24 43:12

**weekly** 22:25 23:6,11,13,17,23 24:3 43:7

**weeks** 30:24

**West** 16:5

**WEX** 55:24 60:15, 17 61:3,4,17,20

**Wexford** 5:17 7:16,22,24 8:7,12, 15,20,23 9:4,8,15, 18,23 10:21,24 11:20 14:15 15:13 16:2,25 17:6,16,17 19:7 20:4,9 21:2,16 22:9,13 23:12,16,22 25:14 27:5 28:12 30:1 31:11,14 32:1

33:5,23 36:12 38:5,
13 39:21 40:11
43:11,21 45:7,13,18
46:20 47:10,23
48:17,23 49:16
51:10,18 52:1,16,
20,22 53:8,14 54:6,
19,23 55:8 56:7
61:6

**Wexford's** 6:19
9:9 10:3,16 11:8
12:7 33:11 42:14
52:25 53:16 54:2

**Wexford~---**
45:11

**white** 53:20

**William** 5:11
25:22

**willingness**
34:14

**withdraw** 17:3
19:22

**word** 22:12

**words** 15:18

**world** 42:19 52:4,
7,9,11

**write** 51:18

**written** 53:25
54:19

**wrong** 11:4,5,6

———————

**Y**

———————

**years** 8:11 18:18