

Page 1

1             UNITED STATES DISTRICT COURT

2         FOR THE CENTRAL DISTRICT OF ILLINOIS

3                 SPRINGFIELD DIVISION

4

5               CASE NO. 17 CV 3112

6

7

8   WILLIAM KENT DEAN                    )
                                         )
9           Plaintiff,                   )
                                         )
10      VS.                              )
                                         )
11  WEXFORD HEALTH SOURCES, INC.,        )
    DR. ABDUR NAWOOR, DR. REBECCA        )
12  EINWOHNER, NURSE KATHY GALVIN,       )
    AND LISA MINCY                       )
13                                       )
            Defendants.                  )
14  _____/

15         DEPOSITION OF STEPHEN RITZ, D.O.

16

17      DEPOSITION taken before me, Brenda J. Brink, a

18  Notary Public within and for the Commonwealth of

19  Pennsylvania, on the 16th Day of August, 2019,

20  pursuant to Notice and at the time and place therein

21  specified, to be used pursuant to the Rules of Civil

22  Procedure or by agreement of counsel in the aforesaid

23  cause of action, pending in the United States

24  District Court for the Central District of Illinois,

25  Springfield Division.

**Page 2**

```
 1          APPEARANCES
 2  On Behalf of Plaintiff(s):
 3  Nathaniel K.S. Wackman, Esquire
    Chloe E. Holt, Esquire
 4  Jenner & Block LLP
    353 N. Clark Street
 5  Chicago, Illinois  60654
    312-222-9350
 6  nwackman@jenner.com
    cholt@jenner.com
 7
 8  On Behalf of Defendant(s):
 9  Joseph N. Rupcich, Esquire
    Cassiday Schade LLP
10  111 North 6th Street, Suite 200
    Springfield, Illinois  62701
11  217-572-1714
    jrupcich@cassiday.com
12
13  (Via Telephone)
    On Behalf of Defendant(s):
14
    Philip Andrews, Esquire
15  Office of the Illinois Attorney General
    500 South Second Street
16  Springfield, Illinois  62706
    217-524-3889
17  pandrews@atg.state.il.us
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2
 3              INDEX
 4
 5  CROSS EXAMINATION BY MR. WACKMAN - PAGE 5
 6  DIRECT EXAMINATION BY MR. RUPCICH - PAGE 110
 7
 8
 9  PLAINTIFF'S EXHIBITS INTRODUCED:
10  EXHIBIT 1 - PAGE 9        EXHIBIT 10 - PAGE 79
11  EXHIBIT 2 - PAGE 25       EXHIBIT 11 - PAGE 86
12  EXHIBIT 3 - PAGE 25       EXHIBIT 12 - PAGE 89
13  EXHIBIT 4 - PAGE 27       EXHIBIT 13 - PAGE 91
14  EXHIBIT 5 - PAGE 56       EXHIBIT 14 - PAGE 97
15  EXHIBIT 6 - PAGE 60       EXHIBIT 15 - PAGE 99
16  EXHIBIT 7 - PAGE 64       EXHIBIT 16 - PAGE 102
17  EXHIBIT 8 - PAGE 65       EXHIBIT 17 - PAGE 107
18  EXHIBIT 9 - PAGE 66
19
20  DEFENDANT'S EXHIBITS INTRODUCED:  NONE
21
22
23
24
25
```

**Page 4**

```
 1
 2
 3
 4            STIPULATIONS
 5
 6          It is stipulated and agreed by and between
 7  counsel for the parties hereto that the deposition
 8  may be taken at this time, 9:04 a.m., August 16,
 9  2019, in the offices of AKF Reporters, Inc., 436
10  Boulevard of the Allies, Pittsburgh, Pennsylvania.
11          It is further stipulated and agreed by and
12  between counsel that the deposition may be taken in
13  shorthand by Brenda J. Brink, a Notary Public for the
14  Commonwealth of Pennsylvania, and may be by her
15  transcribed with the use of computer-assisted
16  transcription; that the witness's signature to the
17  finished transcript of his deposition may be and is
18  hereby waived by agreement of the parties; and that
19  the deposition may be thereupon used on behalf of the
20  parties in the aforesaid cause of action as fully and
21  to the same extent as if written in the presence of
22  the witness and subscribed by the witness in the
23  presence of the court reporter.
24
25
```

**Page 5**

```
 1          WHEREUPON,
 2          STEPHEN RITZ, D.O.,
 3          of lawful age, being by me first duly
 4          sworn to testify the truth, the whole
 5          truth, and nothing but the truth, as
 6          hereinafter certified, deposes and
 7          says as follows:
 8  CROSS EXAMINATION:
 9  BY MR. WACKMAN:
10  Q.   Good morning.  My name is Nathaniel Wackman,
11       W-A-C-K-M-A-N, and I represent the plaintiff,
12       William Dean in this matter.  Do we want to put
13       other appearances on the record?
14          MS. HOLT:  Chloe Holt for the
15       plaintiff.
16          MR. RUPCICH:  Joe Rupcich for the
17       deponent, R-U-P-C-I-C-H.
18          MS. HOLT:  Phillip Andrews here on
19       behalf of the IDOC defendants.
20  Q.   Would you please state your name, sir?
21  A.   Stephen Ritz.
22  Q.   And would you mind spelling your first name,
23       because I've seen it spelled with both a V and
24       a P-H in this litigation?
25  A.   S-T-E-P-H-E-N.
```

1  Q.  And you're currently employed by Wexford
2      Health?
3  A.  Yes.
4  Q.  What's your address in Wexford Health?
5  A.  I'd have to look at it.  I don't have it
6      memorized.
7  Q.  All right.  Fair.  What city do you currently
8      live in, Doctor?
9  A.  I live in the Pittsburgh area.
10 Q.  Okay.  Doctor, you've been deposed before,
11     isn't that correct?
12 A.  Yes.
13 Q.  And since you've been deposed before, I'm just
14     going to quickly run through a few ground rules
15     today.  First of all, you realize that you're
16     under oath, so that that is the same--- your
17     testimony today is the same as if you were
18     testifying in court and that you swear to tell
19     the truth; do you understand that?
20 A.  Yes.
21 Q.  And as you know, it's important that there be a
22     clear record of this deposition.  So I'm going
23     to ask you a series of questions, and I just
24     ask that you respond audibly, yes or no, to all
25     my questions.  No head shakes or head nods or

1      anything like that; is that okay?
2  A.  Yes.
3  Q.  And related to that is that you please allow me
4      to finish my question before you start
5      answering, and I will try to allow you to
6      finish your answer before I start a new
7      question.  That just keeps a nice, clear
8      transcript for the court reporter; is that
9      okay?
10 A.  Yes.
11 Q.  And if you don't understand a question, just
12     let me know, and I'll rephrase it.  But if you
13     answer a question, I'm going to assume you
14     understood it; is that okay?
15 A.  Yes.
16 Q.  And if any point during this deposition you
17     want break, just say.  We can take a break any
18     time, and I'll probably try to take a break
19     about once every hour.  And the only thing I
20     ask is that if there's a question pending, that
21     you answer the question before we go on break;
22     do you understand that?
23 A.  Yes.
24 Q.  And that all makes sense?  Do you have any
25     questions about the deposition procedures

1      today?
2  A.  No.
3  Q.  Okay.  And is there any reason you cannot
4      testify truthfully and accurately today?
5  A.  No.
6  Q.  Just briefly, Doctor, in terms of preparing for
7      the deposition today, did you prepare any
8      documents in preparation for this deposition
9      today?
10 A.  I didn't prepare any documents, no.
11 Q.  Okay.  Did you take any notes in preparation
12     for this deposition today?
13 A.  No.
14 Q.  Did you speak with anyone besides Mr. Rupcich,
15     your counsel, in preparation for this
16     deposition today?
17 A.  No.
18 Q.  Did you -- and I--- let me be clear.  When I'm
19     asking you these questions, I'm asking you in
20     your personal capacity, not as a representative
21     for Wexford.  Did you speak with anybody about
22     your deposition today?
23 A.  No.
24 Q.  So can I have the court reporter mark Exhibit
25     1?

1      (Whereupon Plaintiff's Exhibit 1 was marked.)
2  Q.  And this is a copy of CV, which Mr. Rupcich
3      sent us last week.  Does this CV accurately
4      represent your experience and education and
5      publications?  And feel free to review it.
6  A.  To the best of my knowledge, yes.
7  Q.  And on Page 6 of this CV -- it's double-sided,
8      so it's the last page -- it says at the very
9      bottom, that this was last revised in July of
10     2018; is that correct?
11 A.  Yes.
12 Q.  Is there any additional information that should
13     be included in your CV since July of 2018?
14 A.  Not that I can think of, no.
15 Q.  Okay.  And I'll just run through it real quick
16     here.  Are there any appointments and positions
17     -- that's the category beginning on the first
18     page of this CV.  Are there any appointments
19     and positions that are not listed on this CV?
20 A.  No.
21 Q.  Any clinical and hospital appointments not
22     listed on this CV?
23 A.  No.
24 Q.  Any honors--- or, excuse me, any presentations?
25     And that's beginning on Page 4, presentations

1    that are not listed on the CV?
2  A.   No.
3  Q.   Are there any~~~ directing you now to Page 6
4       again~~~ any certifications or licensures that
5       are not listed on this CV?
6  A.   No.
7  Q.   I want to ask you just one question about your
8       CV, and then we'll go on.  And that's on Page
9       6.  Directing you to the top of the
10      certification and licensure section.  It says
11      that you became a certified corrections health
12      professional in April of 2015; is that correct?
13 A.   Yes.
14 Q.   What is that certification?
15 A.   That's a certification that's given after
16      taking a test.  I believe it's given by the
17      NCCHC, that~~~ essentially it~~~ it gives one a
18      credential that you have that's in addition to
19      your regular medical experience with respect to
20      specific issues relating to corrections.
21 Q.   And the NCCHC, what is that?
22 A.   That's the National Commission on Correctional
23      Health Care.
24 Q.   And to become certified, do you have to do
25      anything besides take a test?

1  A.   No, you don't.
2  Q.   And what subjects does the test cover?
3  A.   I don't recall.
4  Q.   Do you recall any topics that the test covered?
5  A.   Just, I think, basic issues relating to things
6       such as chronic care clinics, specific issues
7       relating to the care of inmates that are
8       unusual or comparing to care in the community,
9       such things.
10 Q.   Okay.  How does correctional health care differ
11      from care in the community, such that it would
12      need a separate test and certification?
13 A.   Well, I mean, that's a very broad question.  I
14      guess, just overall, I would say that the
15      inmate population has some unique needs, in my
16      experience, just relating to the~~~ their
17      general level of care that many of them have
18      received prior to incarceration and issues
19      relating to their lifestyle choices and things
20      like that.
21 Q.   Does that test cover any subjects related to
22      planning care for inmates?
23 A.   I don't recall.  I took the test four years
24      ago.
25 Q.   Okay.  I think you can set No. 1 aside.  So I'd

1       like to start by talking about your work at
2       Wexford.  When did you start working for
3       Wexford?
4  A.   2014.
5  Q.   What title do you currently hold at Wexford?
6  A.   I'm the corporate medical director for
7       utilization management.
8  Q.   And have you ever held any title besides that
9       at Wexford?
10 A.   I believe my initial job title with them was
11      telemedicine physician and State medical
12      director for UM for the Pennsylvania contract.
13 Q.   Okay.  When did you become the corporate
14      medical director for utilization management?
15 A.   In the fall of 2014.
16 Q.   What is utilization management?
17 A.   Well, overall, utilization management, as it's
18      defined in the community as it's done, and we
19      essentially do it the same way is looking at
20      the medical necessity and clinical
21      appropriateness for utilization of medical
22      services.
23 Q.   And when you refer to in the community, what do
24      you mean?
25 A.   Well, utilization management is broadly done

1       out in the community, outside of the
2       corrections setting by most payers, by
3       government.  Utilization management is
4       ubiquitous in the United States health care
5       system.
6  Q.   But when you just used in the community, what
7       you meant was health care outside the
8       correctional system?
9  A.   Yes, when I say the community, that's what I'm
10      referring to.
11 Q.   Answering in your personal capacity, do you
12      know why Wexford uses utilization management?
13 A.   Well, I think all entities that are involved in
14      providing health services, it's utilized to
15      make sure that the services that are being
16      utilized, the resources that are being
17      utilized, in this instance, the resources of
18      our~~~ our clients, in this case, the State of
19      Illinois, are medically necessary and
20      clinically appropriate.
21 Q.   What are your duties as the corporate medical
22      director for utilization management?
23 A.   In general, to advise senior leaderships on
24      utilization management, trends, both in the
25      community and within our different books of

1 business. I also do the collegials for many of
2 our sites in Illinois. I also will fill in and
3 do collegials in any of our contracts when
4 there's a vacancy or vacation.
5 Q. When you refer to senior leadership in your
6 last answer, who do you mean?
7 A. The senior leadership of our company.
8 Q. Can you be more specific?
9 A. This would be the CEO, the CAO, the CFO, the
10 CMO.
11 Q. And those are business people?
12 A. Except for the CMO, yes.
13 Q. And what is the CMO?
14 A. The chief medical officer.
15 Q. How often do you advise them?
16 A. I mean, there's no set formal process. I'm
17 available to answer any of their questions.
18 It's not really formalized.
19 Q. And what sort of trends do you advise senior
20 leadership on?
21 A. What we're seeing in terms of utilization
22 trends out in the community, and utilization
23 trends can be things from imaging to hospital
24 resources, utilization, pharmacy. And then how
25 that compares to what we're seeing. The

1 strategies that are being utilized in the
2 community to manage these UM processes, these
3 types of things.
4 Q. You just referenced utilization trends, in
5 terms of imaging. Can you give me an example
6 of a time in which you advised senior
7 leadership on the utilization management trend
8 having to do with imaging?
9 A. I mean, one that comes up is -- that we
10 commonly see is the utilization of MRI for back
11 pain. It's something that in the community,
12 there are certain standards that have been
13 established by specialty organizations, by
14 governmental entities. And these reflect the
15 evidence, the best evidence as to when these
16 services should be utilized. So we try to make
17 sure that the way that we manage the request
18 for lumbar MRI are in alignment for these types
19 of guidelines.
20 Q. Why is senior leadership interested in those
21 trends?
22 A. Well, because really, one of the things that
23 our company does is we provide health care
24 resources to our clients. And so, certainly,
25 it's germane to what they need to be aware of.

1 And as one of clinicians of the company, one of
2 my jobs is to educate them on these things.
3 Q. And how often would you say you're educating
4 them on these things?
5 A. As I attested earlier, there's no formal
6 process. I mean, they may call me, ask me
7 about a specific thing that they're seeing.
8 They may call me and ask me about a specific
9 test, like lumbar MRI. It's really, like I
10 said, there's no set formal meetings or
11 anything with them where I discuss these things
12 specifically.
13 Q. When they call you to discuss a utilization
14 management trend, is it because of a trend they
15 are seeing, in terms of care Wexford is
16 providing under the contract?
17 A. Yes.
18 Q. So they might call you and say, for instance,
19 you've been referring to MRIs for lumbar, they
20 might call you and say we're seeing a lot of
21 requests or we're paying for a lot of MRIs for
22 lumbar issues; is that consistent with the best
23 evidence in the community?
24 A. Yeah. It's not so much a concern about the
25 payment. From--- because I don't really get

1 involved in the payment processes. They may
2 say in a certain contract, we're seeing a lot
3 of MRIs at a certain site. Why is that?
4 That's something that a clinician needs to look
5 at and answer.
6 Q. You referred to books of business in one of
7 your prior answers. I believe it was about
8 advising on utilization management trends. Can
9 you tell me what you mean by books of business?
10 A. The different state contracts and prison--- or
11 jail contracts, rather, that we have.
12 Q. Are you responsible for any particular state in
13 your job as corporate medical director for
14 utilization management?
15 A. Illinois, I do right now about two-thirds of
16 the collegials. So I essentially function as
17 the state UM medical director for our Illinois
18 contract, since it is our largest contract.
19 Q. Who is your supervisor, as the corporate
20 medical director for utilization management?
21 A. I report to Thomas Lehman, L-E-H-M-A-N, who's
22 the chief medical or--- I believe we call it
23 the corporate medical officer.
24 Q. And who is Mr.--- excuse me--- who is Dr.
25 Lehman's supervisor?

1   A.   I don't know who he immediately reports to.
2   Q.   Is there any higher medical officer at Wexford
3        than Dr. Lehman?
4   A.   No.
5   Q.   And who reports to you as corporate medical
6        director for utilization management?
7   A.   I don't have any direct formal reports with
8        respect to their--- their job duties.  From a
9        clinical standpoint, the state medical
10       directors report to me.  I should--- let me
11       specify, the state utilization management
12       medical directors report to me that way.
13  Q.   And for Illinois, how many state medical
14       directors for utilization management are there?
15  A.   Well, as I had attested earlier, there aren't
16       any.  I function as that role.
17  Q.   What sort of training specific to your job
18       duties did you go through when you became the
19       corporate medical director for utilization
20       management?
21  A.   Training provided by Wexford?
22  Q.   Correct.
23  A.   No specific training.  I came into Wexford with
24       a background, which is one of the reasons why
25       they hired me for this position.

1   Q.   And what sort of background did you come into
2        Wexford with that was a reason they hired you?
3   A.   Well, I had an extensive background in family
4        medicine, clinically, academically, also in
5        urgent care.  And I also taught policy at
6        fellowship at the University of Pittsburgh.
7        And then I was a medical director for one of
8        the largest Blue Cross Blue Shield plans
9        centered here in Pittsburgh for several years.
10  Q.   Did you receive any training in Wexford's
11       utilization management system when you started
12       at Wexford?
13  A.   I received some mentoring by some of the
14       existing physician leaders, in terms of just
15       the operational process and how the collegial
16       process works, as part of my orientation.
17  Q.   Would you describe that training as more
18       informal?
19  A.   Yes.
20  Q.   Would you describe it as on-the-job training?
21  A.   Yes, I think that's fair, yes.
22  Q.   You mentioned that you, previous to Wexford,
23       had been a medical director at a Blue Cross
24       Blue Shield; is that correct?
25  A.   Yes.

1   Q.   When you were there, were you doing utilization
2        management?
3   A.   Yes.
4   Q.   How does the utilization management that you
5        did at Blue Cross and Blue Shield differ from
6        the utilization management you now do at
7        Wexford?
8   A.   There's probably more similarities than
9        differences, because, again, it--- the main
10       task of UM is to look at request for service in
11       the context of medical necessity and clinical
12       appropriateness.  So that was the essence of
13       the job.
14            The other things that I did at--- when I
15       was at Highmark, which is the Blue Cross Blue
16       Shield plan here was I was involved in direct
17       provider engagement, regarding UM issues
18       with--- especially with respect to certain
19       projects that I was involved in regarding
20       imaging and emergency medicine imaging
21       utilization, and also policy development.
22            So I don't really get involved too much in
23       those particular areas with Wexford, because
24       it's really not a part of what we do.  But with
25       respect to the looking at specific cases, with

1        respect to medical necessity clinical
2        appropriateness, in the context of evidence and
3        existing policy, I did that while I was at
4        Highmark and I also do that here at Wexford.
5   Q.   You mentioned in one of your previous answers
6        that you taught policy at the University of
7        Pittsburgh; is that correct?
8   A.   Yes.
9   Q.   And I believe you testified that that was one
10       reason why Wexford wanted to hire you; is that
11       correct?
12  A.   I believe, because my experience of--- when I
13       say policy at the University of Pittsburgh, it
14       was overall medical policy, health care policy,
15       and just general issues relating to health care
16       policy throughout the world and the United
17       States.  Just I think that general global
18       knowledge was one of the reasons I've been told
19       that I was hired for my current position.
20  Q.   I want to switch to collegial review and the
21       collegial review process.  I believe you just
22       testified that you do about two-thirds of the
23       collegial reviews in Illinois; is that correct?
24  A.   Right now, yes.
25  Q.   How much of your time is spent on collegial

1   reviews?

2   A.   That's probably about 80 percent of my time.

3   Q.   So in a 40-hour week, you would say you spend

4        32 hours a week on collegial review?

5   A.   Approximately.

6   Q.   And how many, if you know, collegial reviews do

7        you typically conduct in a day?

8   A.   It probably averages about four to five sites a

9        day.

10  Q.   When you say sites, what do you--- what are you

11       referring to?

12  A.   Prison facilities.

13  Q.   And how many facilities are you responsible for

14       doing collegial review at, overall?

15  A.   Me personally?

16  Q.   You personally?

17  A.   As I attested, it's about two-thirds.  I

18       believe Illinois right now has about 28 to 29

19       active facilities.  So I think that I'm doing

20       probably about 20 of them.  And the reason that

21       this varies based upon the--- where I'm needed

22       to cover for other contracts.  I share the

23       responsibilities with Dr. Hector Garcia for

24       Illinois.  So sometimes, he'll do a few more

25       for me or I will do some for him, based upon

1        our coverage needs.

2   Q.   So the other third of Illinois's collegial

3        reviews are done by Dr. Hector Garcia?

4   A.   That's correct.

5   Q.   What is collegial review?

6   A.   Collegial review is a process that Wexford uses

7        to review the requests or referral requests, as

8        we call them, for off-site care.  It also has a

9        function of having a forum that the clinicians

10       can talk doctor to doctor about both of

11       referral cases and also other cases that

12       they're seeing.

13            As many of our doctors work alone in

14       remote facilities.  So the collegial is an

15       opportunity for them to have another doctor to

16       talk to regarding the cases and challenges that

17       they face.

18  Q.   Turning real briefly to our prior topic.  How

19       long would you say a collegial review typically

20       is for a site?

21  A.   It really can vary.  Some last five minutes,

22       others will go an hour and 15 minutes.  They

23       really vary.

24  Q.   So based on your answer about what collegial

25       review is, the primary function of collegial

1        review is to discuss and approve referral

2        requests for off-site care; is that correct?

3   A.   I don't think I'd use the term primary

4        function.  I think it's one function, yes.

5   Q.   And the other function is to allow

6        doctor-to-doctor conversations about the care

7        Wexford is providing to inmates?

8   A.   I'm not sure I'd say regarding how Wexford is

9        providing.  Really more--- it's really more a

10       doctor-doctor conversation regarding, hey, how

11       would you manage this case or, hey, I have this

12       interesting case I'm not sure what to do with;

13       what do you think.  And based upon my academic

14       experience in primary care, of course, a lot of

15       our doctors are providing primary care

16       services, I sometimes will have a little

17       perspective to offer; that's all.

18  Q.   Does Wexford have policies that govern

19       collegial review?

20  A.   They have guidelines that are, I believe,

21       available that outline the process itself.

22       (Whereupon Plaintiff's Exhibits 2 and 3 were

23       marked.)

24  Q.   So the court reporter just handed you two

25       exhibits.  The first, which is marked Exhibit 2

1        is a multipage document.  Does not bear a Bates

2        stamp, but it does bear a stamp of Exhibit G on

3        the front cover.  It is entitled The

4        Utilization Management Policies and Procedures,

5        Region, Illinois.  And if you turn to Page 2,

6        it's date of effectiveness is July 1st, 2014.

7             And she also handed you what has been

8        marked as Exhibit 3.  It is also a multipage

9        document.  It similarly does not have a Bates

10       stamp, but does bear a stamp, Exhibit G-2 on

11       the front cover.  And on Page 2, its date of

12       effectiveness is January 14th, 2016.

13            Dr. Ritz, in your previous answer, you

14       referred to guidelines that govern collegial

15       review.  Are these the guidelines that govern

16       collegial review?

17  A.   I believe so.  I would have to look at

18       specifically.  I'm not versed by memory to the

19       contents of these documents.  I don't really

20       refer to them very often.  But, yes, I believe

21       collegial is covered in these.

22  Q.   Why don't you refer to them very often?

23  A.   I really believe from my experience that these

24       are really more operational documents for use

25       by the site for training, for the

1   administrative leadership, and, again, as I
2   said, they're really guidelines for how I do my
3   day-to-day job.  And certainly, they're not
4   things I refer to on a regular basis.
5   Q.   When you refer to these as operational
6        documents, do you mean that things are done
7        differently in day-to-day practice than they
8        are described in these policies?
9             MR. RUPCICH:  Guidelines?
10  Q.   Guidelines.
11  A.   In some instances, yes.
12  Q.   Can you give me examples?
13  A.   Again, as I think their name implies, I can't
14       really give you any specific examples.  I'm
15       certainly happy to answer questions regarding
16       any specific component of the guidelines.  But,
17       again, as their name implies, they are
18       guidelines.  They aren't going to be applied
19       step by step, letter by letter, word by word,
20       in every situation.  I can't really, as I sit
21       here today, come up with any specific example
22       of that.  But I'm certainly happy to answer any
23       questions about any specific component of this
24       that we would have.
25  Q.   Do you draw a distinction between something

1        that is a policy and something that is a
2        guideline?
3   A.   In my experience, it's really a matter of
4        semantics.  Unless someone tells me
5        specifically that a policy has to be adhered
6        to, in my experience, most of these documents
7        are guidelines.  They're something that we
8        aspire to.  They're something that can be used
9        for--- to evaluate a process.  But they aren't
10       something, again, that are to be followed word
11       by word, letter by letter, in every situation.
12  Q.   Does Wexford have any other policies or
13       guidelines that govern collegial review that
14       you are aware of?
15  A.   The clinical policies, the medical management,
16       the medical policies, I should say.  Those also
17       are considered in the--- globally in the
18       collegial process.
19       (Whereupon Plaintiff's Exhibit 4 was marked.)
20  Q.   The court reporter just handed you what's been
21       marked as Exhibit 4.  It's a multipage
22       document.  It does not bear a Bates stamp.  It
23       does have Exhibit F stamped on the front.  It
24       is entitled Medical Guidelines, Region,
25       Illinois.  If you flip to the second page, its

1        date of effectiveness, October 2014.  Are these
2        the medical guidelines that you were just
3        talking about?
4   A.   Yes.
5   Q.   And I should be clear for the record that
6        Exhibit 4 is an excerpt.  It is the first three
7        pages and then the urology guidelines, which
8        begin on Page 293 and go through 294 of this
9        document.  You can set 4 aside for a moment.
10       I'm actually going to go back to 3.  Exhibit 3
11       is the policy effective January 14th, 2016.  To
12       your knowledge, is this the current guideline
13       that is in effect for utilization management?
14  A.   To the best of my knowledge, yes.
15  Q.   And Exhibit 2 has a date of effectiveness of
16       July 1 of 2014.  Is it accurate to say that
17       Exhibit 2 was the guideline until it was
18       superseded by Exhibit 3?
19  A.   I believe so, yes.
20  Q.   And the title changed from Exhibit 2 to Exhibit
21       3.  Exhibit 2, the title is Utilization
22       Management Policies and Procedures.  And
23       Exhibit 3, the title is Utilization Management
24       Guidelines.  Answering in your personal
25       capacity, do you know the reason for the

1        change?
2   A.   I don't.
3   Q.   Does the change in title signify anything to
4        you?
5   A.   No, it doesn't.
6   Q.   When Wexford put into place the new guidelines,
7        Exhibit 3, did you receive any formal training
8        on the contents of these guidelines?
9   A.   Not that I recall.
10  Q.   Did you receive any summary or guidance
11       documents on changes in the guidelines?
12  A.   Not that I recall.
13  Q.   To the best of your personal knowledge, does
14       Wexford do any monitoring of compliance with
15       these guidelines?
16  A.   I know that, in general, my overall job
17       performance is discussed with me periodically
18       by Dr. Lehman.  And I can say that with---
19       based upon those discussions, as I remember
20       them, the general--- my general adherence to
21       the overall expectations of the UM process
22       would be part of that.  But it's not a formal
23       evaluation with respect to the contents of
24       these documents.
25  Q.   So as far as you know, the only monitoring of

STEPHEN RITZ, DO                                      August 16, 2019

1     your compliance with these policies is done
2     through your job evaluations with Dr. Lehman?
3  A.  To the best of my knowledge, yes.
4  Q.  This guideline, like the policy that is Exhibit
5     2, are labeled Region, Illinois.  Answering in
6     your personal capacity, why does Wexford have a
7     separate utilization management policy for
8     Illinois?
9  A.  I guess I would start by saying that I wasn't
10    involved in the development of these.  But in
11    my opinion, and in my experience with the
12    company, the UM process can vary from contract
13    to contract, based upon the clients'
14    expectations of how the process should work.
15  Q.  What other states do you conduct collegial
16    review for?
17  A.  Me personally?
18  Q.  You personally.
19  A.  Well, as I attested earlier, I can cover for
20    vacancies in any of our states and our jails.
21  Q.  How many states does Wexford cover?
22  A.  We currently have contracts with Indiana,
23    Alabama, West Virginia.
24  Q.  In addition to Illinois?
25  A.  In addition to Illinois.

1  Q.  And how does the collegial review process vary
2    between Indiana, Alabama, and West Virginia as
3    opposed to Illinois?
4  A.  In terms of functionally, the way that when I
5    fill in and perform it, there's really no
6    difference.  The only differences I would refer
7    to would be, perhaps, in terms of the
8    expectations of the turnaround times for
9    decisions can sometimes vary from contract to
10    contract.  But in terms of how collegial is
11    conducted, it's essentially conducted the same
12    way for all the contracts.
13  Q.  How do the states vary in terms of turnaround
14    times for decisions?
15  A.  Well, as I sit here today, I don't have that
16    memorized.  But I can tell you, some states may
17    require a turnaround of two to three days for a
18    decision, whereas other states may require
19    five.
20  Q.  Do you know which states require a turnaround
21    of two to three days for a decision?
22  A.  I believe Indiana now is requiring -- again, as
23    I sit here, I can't testify specifically, but
24    as I recall, Indiana, we have to do two calls
25    per week to be able to comply with the~-- that

1    client's turnaround time requirements.
2  Q.  Have you reviewed the utilization management
3    guidelines for Indiana, Alabama, and west
4    Virginia?
5  A.  Not in detail, no.
6  Q.  Could you testify about any differences between
7    the utilization management guidelines in those
8    states and the guidelines in Illinois?
9  A.  Not as I sit here from memory, no.
10  Q.  In your previous answer on utilization
11    management, you referred to two concepts.  One
12    was, correct me if I'm wrong, medical
13    necessity, and one was medical appropriateness?
14  A.  Clinical appropriateness.
15  Q.  Clinical appropriateness.  And could you say,
16    again, how those two concepts, medical
17    necessity and clinical appropriateness, are
18    related to the utilization management system?
19  A.  Well, utilization management, I think as its
20    name implies, is looking at the utilization of
21    health services or medications, devices.  And
22    part of looking at or managing the utilization
23    of those types of things, part of the process
24    of managing those things is looking at them
25    from a medical necessity standpoint, and a

1    clinically appropriate standpoint.  I certainly
2    can answer a specific questions regarding that.
3    But from a clinical standpoint, I think those
4    things are self-explanatory.
5  Q.  Not being a clinician myself, is there a
6    definition you could give of what medical
7    necessity means to you?
8  A.  With respect to me, and I guess I'll specify
9    with respect to my role as a UM physician for
10    Wexford, medical necessity can be determined by
11    several different factors.  Of course, it has
12    to be looked at in the context of any
13    individual patient's situation.  So there are
14    many different variables to that.
15       But, in general, we look at medical
16    necessity, we look at evidence-based care, we
17    look at recommendations of third parties,
18    especially governmental entities, like the US
19    Preventative Services Task Force.  We look at
20    the recommendations of specialty organizations.
21    We can look at the recommendations of clinical
22    utilization management software guidelines,
23    such as InterQual, and, of course, a very
24    important component to it is the experience of
25    clinicians taking care of the patient.

1  Q.  For the last criteria you just listed, when you
2      refer to clinicians, you mean yourself and the
3      site medical director?
4  A.  Well, the--- yes, the site medical director is
5      the one who is tasked, ultimately, with the
6      care of the patient.  We, in utilization
7      management, are not taking care of the patient.
8      But we certainly offer our opinions when
9      they're asked, and also, we offer our opinions
10     if they are required for the decision process
11     for a specific referral request.
12 Q.  One of the criteria you discussed, in terms of
13     medical necessity, was evidence-based medicine;
14     is that correct?
15 A.  Yes.
16 Q.  What do you mean by evidence-based medicine?
17 A.  Well, often, evidence-based medicine is medical
18     care that is--- has been proven to be medically
19     necessary and clinically appropriate often
20     through clinical trials, through best
21     practices, these types of things.
22 Q.  You referred to specialty organizations.  What
23     do you mean by specialty organizations?
24 A.  Medical specialty organizations, such as
25     radiology, orthopedics, family medicine.

1  Q.  Do you know what criteria you rely on to judge
2      medical necessity from a specialty
3      organization?  Let me withdraw that.  Do you
4      know what specialty organization you rely on to
5      judge medical necessity for urology?
6  A.  The--- I don't know what the specific urology
7      specialty organization is.  But certainly,
8      that's something we would--- we would look at.
9  Q.  You said you rely on recommendations from third
10     parties, specifically government agencies, and
11     you mentioned the US preventative services task
12     force; is that correct?
13 A.  Yes.
14 Q.  Are there any others you rely on for medical
15     necessity?
16 A.  Not as I sit here today.  That's the major
17     governmental entity that we look at.  It's
18     probably one of the standards in primary care.
19     Covers many things.
20 Q.  And you mentioned InterQual, what is InterQual?
21 A.  InterQual is a proprietary software tool of the
22     McKesson, which is M-C-K-E-S-S-O-N,
23     Corporation, that is utilized by many entities
24     that provide utilization management services to
25     determine the medical necessity and clinical

1      appropriateness based upon the algorithms of
2      the tool itself.
3  Q.  From your perspective as the utilization
4      management corporate medical director, how
5      does--- how does InterQual work?
6  A.  Essentially, InterQual helps us to determine,
7      because it's updated on a regular basis, for a
8      specific clinical intervention, whether or not
9      it meets the criteria that the algorithm has
10     been developed with.  So, again, it's just
11     another piece of information.  Mostly, the
12     valuable thing about InterQual is that it's
13     updated based upon the best evidence and
14     practices for any specific intervention.
15 Q.  What do you mean by clinical appropriateness?
16 A.  Well, whether any given intervention or therapy
17     is clinically appropriate.  In other words,
18     appropriate to apply to a specific patient in a
19     specific situation, I guess, is how I would
20     define it.
21 Q.  What criteria do you use to judge clinical
22     appropriateness?
23 A.  Well, all the aforementioned.  For medical
24     necessity.  But then, I think the clinical
25     appropriate piece, as I define it, is then

1      applying those things in the context,
2      especially, of the clinician's evaluation to
3      the patient, the specific patient, at the
4      specific point in time, and their specific
5      needs.  That's how I would define clinical
6      appropriateness.
7  Q.  How does a specific patient's needs factor in
8      the clinical appropriateness judgment?
9  A.  Well, obviously, every patient's situation is
10     different.  And, in some instances, if you just
11     look at the basic information on a patient,
12     such as their age, sex, and just their basic
13     medical history, a guideline or an algorithm
14     may say that applying a certain therapy would
15     be indicated.  But when you look at the
16     specific patient's situation, it may not be.
17 Q.  What are some common reasons that, if you
18     looked at a specific patient's situation, it
19     would not be appropriate to conduct a certain
20     treatment?
21         MR. RUPCICH:  Object to vague.
22 A.  I mean, I guess I can give one example might be
23     a patient who has back pain of one week's
24     duration who wants to get a advanced imaging
25     study, such as a lumbar MRI.  In that instance,

1    it would not be clinically appropriate before
2    the patient had other treatment or evaluation.
3    The MRI may be indicated at some point in time,
4    but in that particular time for that particular
5    patient, it wouldn't be clinically appropriate
6    to do.
7  Q.  **How does the judgment of clinical**
8      **appropriateness differ in the correctional**
9      **health care context from the context in the**
10     **community?**
11             MR. RUPCICH:  Object to vague.
12 A.  I'm not sure I understand the question.
13 Q.  **Let me ask a different question, which is does**
14     **the judgment of clinical appropriateness differ**
15     **in the correctional setting, like your work at**
16     **Wexford, as opposed to the setting as you**
17     **referred to in the community outside of**
18     **Wexford?**
19             MR. RUPCICH:  Object to vague.
20 A.  If I'm understanding the question, I'll answer
21     it to the best of my understanding.  In some
22     instances, it can because of the~-- some of the
23     unique challenges and circumstances that we
24     face in providing care to inmate patients.
25 Q.  **And what are those unique challenges and**

1    circumstances you referred to?
2  A.  It could be challenging to get services in the
3      community for inmate patients, because many
4      clinicians will not see inmate patients.  So
5      there can be -- sometimes it can take longer to
6      get services because there is somewhat a
7      limitation on availability.
8          There are security considerations for
9      sending inmate patients out of a facility.
10     Because whenever a patient is sent out, there
11     is a risk to the public.  It does take security
12     resources off site.  So that is one part of
13     the~-- when we look at the clinical challenges
14     that we face.  Those are probably the ones that
15     just come to mind, again, if I'm understanding
16     the question correctly.
17 Q.  **In terms of the security considerations, is**
18     **that a judgment that you make?**
19 A.  We don't make that, but we are tasked by the
20     client to consider that.  When we look at
21     managing any specific patient case, and I guess
22     what I'll~-- I'll give an example of that.  The
23     expectation of our clients, and I can say this
24     invariably across all our contracts, our
25     doctors utilize their capabilities from a

1    primary care standpoint that are available to
2    them to start and initiate workup and treatment
3    on site prior to sending patients off site.
4  Q.  **So in terms of providing care for inmates in**
5      **Illinois, there is a preference to conduct care**
6      **on site as opposed to care off site; is that**
7      **correct?**
8  A.  I wouldn't use the term preference.  I think I
9      would use the term expectation that the basic
10     primary care evaluation and management is
11     provided as the clinician is able to do and as
12     the services are available on site, and those
13     would be exhausted within reason prior to
14     considering sending a patient off site.
15 Q.  **And that is Wexford's expectation?**
16 A.  Our expectation would be and to align with the
17     client's expectations.  So in terms of where it
18     would align with the client's expectation, yes.
19 Q.  **And the client here is the Illinois Department**
20     **of Corrections?**
21 A.  Correct.
22             MR. RUPCICH:  It's about an hour,
23     Nate.  Do you want to take a break?
24             MR. WACKMAN:  Yeah, let's take a
25     break, because I'm about to switch topics.  So

1    why don't we go off the record?
2    (Discussion off the record)
3  Q.  **Dr. Ritz, can you explain how the collegial**
4      **review process works?**
5  A.  Yes.  The site, when they determined that there
6      may be a need for an off-site service, they
7      fill out a referral form.  The referral form is
8      then submitted to the nurse tasked with UM for
9      that specific site.  The nurse then compiles
10     that information and any other clinical
11     information that may be relevant to the
12     request.
13         The information is put into a spreadsheet,
14     which is then submitted to the UM doctor in
15     preparation for the collegial, which is usually
16     a phone call that involves the~-- usually the
17     site medical director and any other individuals
18     that he or she designates may be needed to be
19     on the call.  It's oftentimes a clerical and
20     sometimes nursing staff from the facility.  And
21     then the UM medical director and then the UM
22     nurse are also on the call from the Pittsburgh
23     corporate side.
24         Once the case is~-- the case is reviewed,
25     most cases can be approved at face value.  They

1  don't need to undergo discussion.  There are
2  cases that cannot necessarily be approved at
3  face value.  They require further discussion.
4  And those cases are discussed on a phone call.
5          And then at that point in time, the case
6  is either approved or an alternative treatment
7  plan is determined, or the case is pended,
8  because more information is needed, and then
9  they'll come back to it, usually, within the
10 following week.  Once the case is adjudicated
11 in one of those three manners, that is then
12 communicated back to the site.
13         If the service is approved, then the site
14 is tasked with arranging the services with the
15 appropriate consultant.  If an alternative
16 treatment plan is recommended, then the site is
17 tasked with enacting that alternative treatment
18 plan, then following up with any follow-up care
19 as-needed.
20 Q.  In that answer, you referred to a spreadsheet
21     that is generated?
22 A.  Yes.
23 Q.  Does that spreadsheet cover all the patients to
24     be discussed at collegial review for that site?
25 A.  Yes.

1  Q.  And what information for each patient is
2      contained in that spreadsheet?
3  A.  That can vary.  It's--- the expectation is that
4      all available information that would support
5      the request is submitted at that time.  And it
6      can be things such as consultant notes, imaging
7      reports, those types of things.
8  Q.  And they are--- are they placed, for instance,
9      just in the cell of a column?  Is there a cell
10     for imaging notes, and then---
11 A.  No.  The--- the cells in the spreadsheet are
12     just the nurse's summary of those documents.
13     The documents themselves are usually referenced
14     in the E-mail that's sent in preparation for
15     the call in a PDF document, if the nurse thinks
16     it's relevant.  Sometimes there are reams of
17     documents that are submitted.  Not all of them
18     are necessarily relevant.  And the nurse at his
19     or her discretion can put whatever in
20     preparation for the call that he or she deems
21     necessary.
22 Q.  Do you review that spreadsheet prior to the
23     collegial review call?
24 A.  Yes.
25 Q.  And do you review the supporting documentation

1      sent by the nurse prior to that collegial
2      review call?
3  A.  Yes.
4  Q.  Do you ever ask for additional documentation
5      that is not initially sent along before a
6      collegial review call?
7  A.  Sometimes, yes.
8  Q.  You referred to how some cases can be approved,
9      as you put it, at face value.  Can you describe
10     what you mean?
11 A.  Yes.  If a case is deemed to be medically
12     necessary and clinically appropriate, based
13     upon the information that's submitted, then
14     it's approved without further discussion,
15     unless the medical director wants to discuss
16     it.
17 Q.  And who makes that judgment that a case is
18     medically necessary, clinically appropriate,
19     and doesn't need further discussion?
20 A.  The utilization management team.  And usually,
21     the utilization management physician.
22 Q.  So for the collegial review calls that you
23     conducted where--- that Mr. Dean was a part of,
24     that was you who made that decision?
25 A.  I believe with the documents that I've

1      reviewed, yes, I believe I was involved in most
2      of the collegial reviews for Mr. Dean.
3  Q.  And generally, when--- I'll step back and ask a
4      more general question.  When you're conducting
5      a collegial review call, the decision to
6      approve something at face value or to discuss
7      it on the call is yours?
8  A.  Yes.
9  Q.  And when you refer to medical necessity and
10     clinical appropriateness, in terms of making
11     the decision to judge something on face value
12     or not, you're giving those terms the
13     definitions that we've discussed previously in
14     this deposition; correct?
15 A.  Yes, I--- yes.
16 Q.  Besides the spreadsheet and any documentation
17     sent along by the nurse, do you review any
18     other documentation prior to a collegial review
19     call?
20 A.  Sometimes we'll look up something if we need a
21     little bit more information on a specific
22     clinical issue.  We sometimes will look up---
23     you know, we'll Google something that maybe I
24     need more information on.  We'll utilize the
25     USPSTF web site, UpToDate, these types of

1 things.  So we'll sometimes do some background
2 work.
3 Q.  When you refer to UpToDate, what do you mean?
4 A.  UpToDate is a clinical decision software tool.
5 Q.  You previously looked at what was marked
6 Exhibit 4, which are the medical guidelines for
7 Illinois.  Do you review this prior to
8 collegial review calls?
9 A.  Generally, I don't use these very often,
10 because these from a primary care standpoint
11 are pretty straightforward and reflect the
12 experience base that I have, and our medical
13 directors have.  So I rarely consult these
14 guidelines.  I don't find them really to be
15 that helpful.
16 Q.  Why do you find them not helpful?
17 A.  Because they really reflected, in my
18 experience, what's really more of a common
19 sense approach to common problems that we see
20 from a primary care standpoint.  I do reference
21 them in specific instances, such as for very
22 specific conditions like cataract surgeries
23 that have very specific numerical requirements
24 that I haven't memorized.  I do reference them
25 then.  But in terms of general medical

1 management for common clinical conditions, I
2 don't generally reference them.
3 Q.  When a case is determined to be approved on
4 face value at collegial review, how is that
5 communicated to the site?
6 A.  At the time of the collegial call, and then
7 it's also memorialized in a document that is
8 sent back to the site.  And then it's also
9 memorialized at the WEX Care System, such that
10 an authorization number is provided so that
11 when a claim comes in for the service, the
12 claim matches the approval for the service.
13 Q.  Are you able to determine by looking at any of
14 the documents you just referenced, if the
15 collegial was discussed or merely approved at
16 face value?
17 A.  No, we don't usually memorialize that specific
18 component.
19 Q.  So when you're on the call and something is
20 approved at face value, you or whoever is going
21 through the list, which is, for instance, read
22 a patient's name, and you would say approved?
23 A.  Generally, yes.  And sometimes the site may
24 want to talk about the case, and maybe there's
25 another issue or something like that.  But in

1 general, in the interest of time and
2 efficiency, most of the time, there's no
3 discussion that's required for an approved
4 case.
5 Q.  When case is discussed at collegial review,
6 what sort of things are typically discussed?
7 A.  The patient's clinical situation, their exam
8 findings, their history, input from
9 consultants, previous evaluation for the
10 problem that has been provided, current
11 medications, these types of things.
12 Q.  Do you ever change your mind on a collegial
13 review call?
14 A.  I'm not sure I understand the question.
15 Q.  Is it ever the case that you go into a
16 collegial review call thinking that you will
17 recommend an alternative treatment plan as
18 opposed to a--- as opposed to approving the
19 service after discussion, and you change your
20 mind based on what's said on the call?
21 A.  Yes.
22 Q.  How often does that occur?
23 A.  I would say that happens quite frequently.
24 Because sometimes there are gaps between what
25 is submitted in documents and what can be

1 communicated verbally from doctor to doctor.
2 And if the doctor is able to fill those gaps
3 in, then we often will approve a service that
4 may not initially have been approvable based
5 upon the documents that were submitted.
6 Q.  Do you have a sense of how many collegial
7 review cases are approved at face value, as you
8 put it, without discussion at the collegial
9 review call?
10 A.  In my experience, it's running probably 85 to
11 90 percent are approved at face value.
12 Q.  For 90 percent of collegial review cases, you
13 approve it without any discussion at the
14 collegial review call itself?
15 A.  I'm not sure I would stipulate that specific
16 number.  And as I had attested earlier, there's
17 sometimes discussions that occur.  We don't
18 track when those discussions occur.  I couldn't
19 specific or attest as I sit here today as to
20 that number or agree with it.  There's
21 certainly some discussion regarding some
22 approved cases.  Sometimes there isn't.
23 Q.  Do you know how often you have these sort of ad
24 hoc discussions on cases that are otherwise
25 approved at face value?

1  A.  I would say maybe a quarter of the time, the
2      doctors may just provide a little bit more
3      information or just say, yeah, for example,
4      we're sending this patient off, and I know you
5      approved this, but just to let you know,
6      they're also seeing another doctor next week
7      for another problem.  It's like, okay.  Just
8      more of a heads-up or an FYI.
9  Q.  For cases discussed at collegial review, how
10     often are they ultimately approved?
11 A.  I'm not sure that I could say as I sit here
12     today.  It varies from site to site, week to
13     week.  I mean, it's not something we really
14     track.  It's not memorialized.
15 Q.  How often do you decline the treatment sought
16     to be approved at collegial review would you
17     say?
18 A.  Well, I wouldn't utilize the term decline.
19     That's not a term that we use.  The term that
20     we would use as I attested earlier, would
21     either -- a case is either nonapproved, it's
22     either with an alternative treatment plan, or
23     it's pended to get more information.  And
24     referring back to my 85 to 90 percent approval
25     rate, that then translates to about a 10 to 15

1      percent, either ATP or more information needed.
2  Q.  To be clear, I had thought you had testified
3      that the 85 to 90 percent approval rate was the
4      number of cases on the collegial review list
5      that you approve at face value; is that right?
6  A.  I may not have understood the specifics.  I
7      took that question to be how many cases
8      ultimately that were requested are approved.
9      And I think also, as I attested, I can't recall
10     a specific number as to those that were not
11     approved at face value, but ultimately approved
12     by the end of the call.
13 Q.  Do you have a sense of how many are approved at
14     face value?
15 A.  As I attested earlier, it really varies from
16     case to case, week to week.  I can't really
17     give a specific number for that.  No, I really
18     don't have a sense for that.  It's not
19     something that we track.
20 Q.  Answering here in your personal capacity, what
21     medical purpose does collegial review serve?
22 A.  I think the medical purpose of it is to allow
23     the doctor-to-doctor discussion regarding the
24     management of the cases.
25 Q.  In terms of the approval aspect of the

1      collegial review discussion, what purpose does
2      that serve?
3  A.  Well, that is a reflection of the UM process in
4      and of itself, of looking at the medical
5      necessity and the clinical appropriateness of a
6      request for off-site services.  So if a case is
7      approved, then--- then it's basically met the
8      requirements of medical necessity and clinical
9      appropriateness according to the UM medical
10     director and the site medical director.
11 Q.  And in terms of the approval process at
12     collegial review, does that serve a medical
13     purpose?
14 A.  I'm sorry.  Can you repeat the question?
15 Q.  Yeah, let me try to clarify that.  The approval
16     process at collegial review, does that serve a
17     medical purpose?
18 A.  I think the only medical purpose that it may
19     serve is that it validates the--- the request
20     from a medical necessity and clinical
21     appropriateness standpoint for the site medical
22     doctor.
23 Q.  What do you mean by validates?
24 A.  Well, there's agreement that the service that
25     they're requesting is medical necessity---

1      medically necessary and clinically appropriate
2      according to the UM process and the UM doctor.
3  Q.  Does the approval process at collegial review
4      serve a business purpose for Wexford?
5          MR. RUPCICH:  Object to vague.
6  A.  I guess as I understand the question, I would
7      say it serves a business purpose in terms of
8      its--- it fulfills one of the requirements that
9      the client has for what Wexford provides to the
10     client.
11 Q.  And what is that purpose that the client
12     expects?
13 A.  That the services that are being provided are
14     medically necessity--- medically necessary and
15     clinically appropriate.
16 Q.  And that client is the Illinois Department of
17     Corrections in this case?
18 A.  Correct.
19 Q.  Are you familiar with a December 2014 report
20     prepared by a court-appointed expert named Dr.
21     Shansky in a piece of litigation known as
22     Lippert V. Godinez?
23 A.  I have familiarity with its existence, yes.
24 Q.  Do you know any of its conclusions specifically
25     about the collegial review and utilization

1  management process?
2  A.  Not as I sit here today.  I can't quote them.
3  Q.  Were you working at Wexford at the time of that
4  report's release?
5  A.  Yes.
6  Q.  And do you recall when you first learned about
7  that report?
8  A.  I don't recall, no.
9  Q.  Would you say it was in 2015?
10 A.  As I attested, I don't recall.
11 Q.  Do you recall how you first learned of the
12 report's existence?
13 A.  No, I don't.
14 Q.  To the best of your knowledge, is that report
15 well-known within Wexford?
16 A.  I'm not sure I would--- you'd have to define
17 well-known to me.  I don't know what you mean
18 by that.
19 Q.  If you were to refer to that report at a
20 meeting, would you expect most people would
21 know what you were talking about?
22 A.  If for the Illinois contract, yes.
23 Q.  And why is that?
24 A.  I'm not sure I understand the question.
25 Q.  I'll withdraw that question.  Is the report---

1  have you ever discussed that report with
2  anybody at Wexford?
3  A.  Yes.
4  Q.  How often?
5  A.  It's come up at different meetings through the
6  course of its--- since it was released.  And I
7  believe now, it's -- some of the terms of that
8  settlement are being enacted by the Department
9  of Corrections.
10 Q.  What sort of meetings has it come up at?
11 A.  We have monthly meetings where we review each
12 contract, and it's been discussed at the
13 Illinois meeting.
14 Q.  Who's present at that monthly meeting to review
15 the contract?
16 A.  It varies.  Sometimes senior leadership.  The
17 administrative leadership for that particular
18 contract.  The UM medical director, the
19 regional medical directors, the corporate
20 medical director, the staffing personnel, and
21 pharmacy.
22 Q.  When you say senior leadership was present at
23 that meeting, who do you mean?
24 A.  It varies from meeting to meeting.  But
25 sometimes the CEO, the CFO, the CAO.

1  Q.  Do you know if you've been present at a meeting
2  where those individuals you just identified
3  were also present where the Shansky report from
4  2014 was discussed?
5  A.  Yes, I believe some of them have been present
6  for some of the meetings where that topic was
7  discussed.
8  Q.  Is the chief medical officer, Dr. Lehman,
9  present at each of these monthly meetings?
10 A.  Most of them, yes.
11 (Whereupon Plaintiff's Exhibit 5 was marked.)
12 Q.  So the court reporter has just handed you
13 what's been marked as Exhibit 5.  This is an
14 excerpt of a much larger document.  It by
15 itself is several pages.  It is the cover page,
16 as well as by the documents--- by the original
17 documents, numbering Pages 28, 29, 30, 31, and
18 32.  It is entitled final report of the
19 court-appointed expert, Lippert V. Godinez.
20 It's dated December 2014, and it's authored by
21 Ron Shansky, M.D., and some other individuals.
22 Have you ever seen this before, Dr. Ritz?
23 A.  I believe I have seen this document, yes.
24 Q.  And this is the Shansky report that was issued
25 in 2014 that we were just discussing; is that

1  correct?
2  A.  I believe that's what it's referred to, yes.
3  Q.  So I want to refer to Page 28 in the larger
4  document, which is the second page of your
5  copy.  And I'll direct you there to the
6  heading, scheduled off-site services
7  consultations, and procedures.  That refers to
8  collegial review; is that correct?
9  A.  I think collegial review is part of what it
10 refers to, yes.
11 Q.  Collegial review is a consultation about
12 off-site services; is that correct?
13 A.  Yes, that's what Wexford's process is referred
14 to, that as I attested earlier, involves one
15 component of reviewing the medical necessity
16 and clinical appropriateness of off-site
17 services, but also providing a venue for
18 clinician-to-clinician discussion regarding
19 cases.
20 Q.  So, now, I want to look at the next page, which
21 is Page 29 in the original document, Page 3 in
22 the exhibit.  And I want to direct you to the
23 fourth full paragraph.  And I want to direct
24 you to the first sentence, which reads during
25 our review of records, we found breakdowns in

1  almost every area, starting with delays in
2  identification of the need for the off-site
3  services, delays in obtaining an authorization
4  number, delays in being able to schedule an
5  appointment timely, delays in obtaining
6  off-site paperwork, and delays or the absence
7  of any follow-up visit with the patient.
8       Were you aware that the Shansky report had
9  reached this conclusion about off-site service
10  consultations prior to today?
11 A.  Yes, as I attested, I have seen this document
12  before.
13 Q.  And have you discussed this conclusion with
14  anybody else at Wexford before?
15 A.  Not specifically, no.
16 Q.  Have you been present at a monthly contract
17  review meeting, where this conclusion was
18  discussed?
19 A.  I don't recall this specific conclusion being
20  discussed at any of the meetings, no.
21 Q.  Do you recall that the collegial review process
22  was ever discussed at one of those meetings
23  with specific reference to the Shansky report?
24 A.  No, I don't.
25 Q.  Do you recall what conclusions from the Shansky

1  report have been discussed at those monthly
2  contract review meetings?
3 A.  In my experience, none of the conclusions, the
4  detail of the conclusions of the Shansky report
5  were discussed at those meetings.
6 Q.  What was discussed about the Shansky report at
7  those meetings?
8 A.  I -- really just more the fact the process
9  existed, updating, in terms of the time frame
10  of how the legal proceedings were progressing,
11  that we got from the compliant, because we are
12  not a defendant in this case.  It was the
13  client that was.  Really just more logistical
14  matters were discussed at the meetings.  Not
15  any specific findings of the report that I can
16  ever recall.
17 Q.  We can set that aside.  Dr. Ritz, are you
18  familiar with a 2018 report prepared by a
19  court-appointed expert named Dr. Puisis in the
20  Lippert V. Godinez litigation?
21 A.  It's Dr. Puisis.  Yes, I am familiar with the
22  presence of that document.
23       MR. RUPCICH:  P-U-I-S-I-S.
24 Q.  Thanks.  Are you familiar with that report's
25  conclusions regarding collegial review?

1 A.  The details, as I sit here today, no.
2  (Whereupon Plaintiff's Exhibit 6 was marked.)
3 Q.  The court reporter has just handed you what has
4  been marked as Exhibit 6, which is, again, an
5  excerpt of a much larger document.  It is---
6  this exhibit is the cover page and Page 1 of
7  that larger document, or I should say Pages 1
8  through 11 of that larger document.  It doesn't
9  bear a Bates number.  It does have a case or
10  stamp at the top in Case 10 CV 04603.  It's
11  document 767 in that case.
12       And it is entitled statewide summary
13  report, including review of statewide
14  leadership and overview of major services.
15  Report of the second court-appointed expert,
16  Lippert V. Godinez.  It's dated October 2018.
17  The Pacer stamp indicates it was filed November
18  14th, 2018.  And Dr. Puisis, Mike Puisis is
19  the--- is listed as the primary author.
20       And I'd like to refer to you Page 10 of
21  this document.  Actually, let's look at Page 9
22  of this document.  And there, just the heading,
23  key findings, which continue on to Page 10.
24  And then Page 10, finding, fourth from the top
25  is the, quote, the collegial review process of

1  accessing specialty care is a patient safety
2  hazard and should be abandoned until patient
3  safety is ensured.  Dr. Ritz, are you familiar
4  with that conclusion of this document?
5 A.  Yes, I've--- I've heard and am familiar with
6  that.
7 Q.  And in what context have you heard it?
8 A.  I believe this was provided to us as by the
9  client, just in the regular updates of
10  regarding the Lippert case.
11 Q.  And what is your understanding of the basis for
12  Dr. Puisis' conclusion, that the collegial
13  review process is a patient safety hazard?
14 A.  If you're asking me to opine on what Dr.
15  Puisis' reasoning is, I can't do that.  So
16  could you clarify the question for me?
17 Q.  Yeah, that was a complicated question.  Let me
18  ask it this way.  Do you know why Dr. Puisis
19  thinks, based on his report, that the collegial
20  review process is a patient safety hazard?
21 A.  No.  You'd have to ask Dr. Puisis that.
22 Q.  Is this conclusion about the collegial review
23  process well-known at Wexford?
24       MR. RUPCICH:  Object to the form,
25  vague.

1  Q.  I'll withdraw that question.  Have you ever
2      discussed this conclusion with any other
3      Wexford employees?
4  A.  Yes.
5  Q.  Can you describe those discussions?
6  A.  As I recall, I spoke to Dr. Lehman regarding
7      this, and also our counsel regarding this.
8      Because in my view, this document is very
9      opinionated, it's biased, and it's
10     inflammatory.  And in the context of those
11     terms, we did have discussions regarding it,
12     and in terms of how we were going to monitor
13     what the~-- the client did with respect to the
14     settlement process.
15 Q.  Setting aside any conversations you had with
16     counsel about this document, do you recall your
17     conversation, what was said in your
18     conversation with Dr. Lehman about this
19     document?
20 A.  I don't recall the details of it, other than
21     the fact that our~-- our general consensus, he
22     and I, we thought the document, was biased, it
23     was selective in its review, and it was
24     inflammatory, and it was not reflective of our
25     experience with the collegial process.

1  Q.  Were you surprised by the conclusion about the
2      collegial review process?
3  A.  Yes, I was.
4  Q.  Do you recall when you first were made aware of
5      that conclusion?
6  A.  I don't, no.
7  Q.  Has that conclusion, specific conclusion about
8      the collegial review process ever been
9      discussed at one of the monthly contract review
10     meetings for Illinois?
11 A.  Not that I can recall.
12 Q.  You can set this one aside, too.  So, now, I
13     want to focus specifically~-- it's 10:53.  I'm
14     going to switch topics.  Does it make sense to
15     take five now?
16         MR. RUPCICH:  Why don't you keep
17     going for a bit?  Are you all right, Doctor?
18         THE WITNESS:  Yes.
19         MR. WACKMAN:  Philip, are you still
20     with us?
21         MR. ANDREWS:  Yeah, that's fine.
22 Q.  Let's switch over to Mr. Dean's care,
23     specifically.  Have you ever met Mr. Dean, Dr.
24     Ritz?
25 A.  No.

1  Q.  Have you ever spoken with Mr. Dean?
2  A.  No.
3      (Whereupon Plaintiff's Exhibit 7 was marked.)
4  Q.  The court reporter has just handed to you what
5      is marked as Exhibit 7.  It's a multipage
6      document.  It is the Wexford defendant's
7      supplemental Rule 26 disclosures.  It doesn't
8      have a Bates stamp.  It's dated July 25th,
9      2019.  And in here, Doctor, I want to direct
10     you to Page 2 of the disclosures themselves,
11     which is basically four pages in.  You've got
12     to keep going, Doctor.  Page 2 of the second
13     piece.  And Mr. Rupcich can add anything else
14     he wants here.  But just to~-- well, first of
15     all, do you know what this document is, Dr.
16     Ritz?
17 A.  I've seen it.
18 Q.  So Mr. Rupcich can add anything he wants here,
19     but basically, this document is, by the Federal
20     Rules of Civil Procedure, Wexford and the
21     Wexford defendants have to disclose people they
22     know of who have information subject~--
23     information about this case, basically.  And so
24     do you see that you are disclosed as a person
25     with information about this case at No. 4?

1  A.  Yes.
2  Q.  And do you see that it says, Dr. Ritz is likely
3      to have discoverable information regarding his
4      contacts with the plaintiff?
5  A.  Yes.
6  Q.  Have you had any contacts with the plaintiff,
7      William Dean?
8  A.  As I attested to earlier, no, I have not.
9  Q.  You can set this aside.  Do you recall
10     discussing Mr. Dean at a collegial review on
11     January 13th, 2016?
12 A.  I have no direct recollection, no.
13     (Whereupon Plaintiff's Exhibit 8 was marked.)
14 Q.  The court reporter has handed you what's been
15     marked as Plaintiff's Exhibit 8.  It's a
16     single-page document.  It's an E-mail.  The
17     Bates stamp is Einwohner, as in the defendant
18     in this case, records Bates 000061, and it is
19     an E-mail sent by Rebecca Einwohner, at least
20     the header reflects an E-mail sent by Rebecca
21     Einwohner January 7th, 2016.  Do you see that
22     you are listed in the to field, Doctor?
23 A.  Yes.
24 Q.  Do you agree that is you?
25 A.  Yes.

1 Q.   Do you recall receiving this E-mail?
2 A.   No.
3 Q.   Do you see that in this E-mail, Dr. Einwohner
4      suggested a collegial review on January 7th,
5      2016?
6 A.   I see that the E-mail dated on January 7th,
7      2016, references that she suggested a collegial
8      review be conducted, but not necessarily on
9      that date.
10 Q.  Who is Dr. Butler?
11 A.  I believe Dr. Butler was a physician who may
12     have been serving as the medical director for
13     the site at that time.  But I couldn't attest
14     to that as I sit here today specifically.
15 Q.  You can set that aside for right now, Doctor.
16     (Whereupon Plaintiff's Exhibit 9 was marked.)
17 Q.  So the court reporter just handed you what's
18     been marked as Plaintiff's Exhibit 9.  This is
19     a single page.  It bears a Bates stamp at the
20     top, which is IDOC No. 00088.  Do you recognize
21     this document, Doctor?
22 A.  I recognize the type of document.  I don't
23     recognize the specific document from my memory.
24 Q.  What is this type of document?
25 A.  This is a result of a Wexford collegial review

1      that provides an authorization number for a
2      specific request, in this instance, an
3      ultrasound of the abdomen.
4 Q.   Who generates this document?
5 A.   The UM nurse.
6 Q.   And does she generate it for every case that
7      comes through collegial review?
8 A.   Every approved case gets an authorization
9      number, yes.
10 Q.  And that's contained in this document?
11 A.  That's correct.
12 Q.  And do you approve this document after it's
13     created?
14 A.  No, I generally do not review these after
15     they're created.
16 Q.  How are you familiar with them, then?
17 A.  Well, I'm familiar with their existence as part
18     of the UM process.  And certainly, I've seen
19     many of them through the courses of my multiple
20     depositions in my role as~-- as the UM medical
21     director for Wexford.
22 Q.  Does this document refresh your recollection
23     about whether or not Mr. Dean had a collegial
24     review on January 13th, 2016?
25 A.  No, I have no direct memory or recollection of

1      any of the case discussions or collegials done
2      with Mr. Dean.  And I'll attest today as I sit
3      here that I review hundreds of cases a week at
4      multiple sites.  So my memory not being what it
5      used to be, I don't necessarily have any
6      specific recollection of any specific collegial
7      that I did at any point in time or any
8      discussion regarding Mr. Dean's case.
9 Q.   Based on your review of this document, can you
10     tell me whether or not Mr. Dean's case was
11     approved at face value on January 13th or
12     whether it was discussed further?
13 A.  I cannot attest to whether or not it was
14     discussed.  But all I can attest to based upon
15     this document is that it was approved.
16 Q.  So you see in the second line of the comments,
17     it says, discussed this patient in collegial,
18     1/13/2016 with Dr. Nawoor and Dr. Ritz.  The
19     use of the word discussed in that context does
20     not necessarily mean Mr. Dean was discussed as
21     opposed to being approved at face value; is
22     that right?
23 A.  That's correct.  That oftentimes is just a term
24     that is used by the UM nurse who had summarized
25     the case.

1 Q.   Who takes notes during a collegial review call?
2 A.   That's one of the functions of the UM nurse.
3 Q.   Do you ever take notes during a UM call?
4 A.   No.
5 Q.   Do you ever tell the nurse, for instance, to
6      make sure a particular piece of information
7      gets into her notes?
8 A.   Yes.
9 Q.   And can you tell me based on your reading of
10     this document what procedure was approved for
11     Mr. Dean at the January 13th collegial review?
12 A.  An ultrasound exam of the abdomen.
13 Q.  And can you tell me whether or not you can tell
14     if this was done on site or off site?
15 A.  As I sit here, I can't tell you whether it was
16     definitely done in any venue.  I can attest
17     what the document states and what is our
18     customary practice.  Is to get the ultrasound
19     services like this done on site by Precise,
20     which is an imaging vendor that we use
21     throughout the Illinois contract.
22 Q.  So when we refer to off-site services need to
23     be approved at collegial review, that includes
24     services done off site--- or excuse me, done on
25     site by non-Wexford and non-IDOC personnel; is

1   that correct?
2   A.   Yes.
3              MR. WACKMAN:  Why don't we take five
4   minutes now?  We'll go off the record.
5   (A recess was taken)
6   Q.   Dr. Ritz, looking back at Exhibit 9, the
7   collegial review notes here.  Do you see on
8   here a date by which the ultrasound is to be
9   completed?
10  A.   No.  That's generally not memorialized on this.
11  Q.   Is that memorialized anywhere?
12  A.   I believe there's a document that is compiled
13  by the UM nursing and clerical team that
14  references a targeted completion date for
15  approved services.
16  Q.   Do you--- who decides that targeted completion
17  date?
18  A.   In general, it's something that is based upon
19  the UM nurse's experience, input from the site,
20  and sometimes discussion.  But in a--- for most
21  approvals, these things that are not urgent,
22  there's a specific time frame, usually less
23  than 90 days, that would be expected.  And if a
24  service does not appear to have been completed
25  by that time, then it will usually trigger the

1   clerical review.  There's usually a person from
2   UM clerical team who reaches out to the
3   clerical team at the site to see if the
4   service, indeed, was completed, or if it hadn't
5   been, why not.
6   Q.   And you said the person who decides the
7   targeted completion date is typically the UM
8   nurse?
9   A.   That's one of their major functions for
10  non-urgent services.  Occasionally, again,
11  every case is unique.  But if there's an
12  instance where there seems to be more urgency
13  than apparent, that may be discussed at the
14  collegial, the point of approval, and the case
15  may be attempted to be completed in a time
16  frame that normally, it wouldn't have been,
17  perhaps sooner.
18  Q.   As the UM doctor, do you play any role in the
19  scheduling of procedures?
20  A.   No.
21  Q.   Do you know what a typical targeted completion
22  date for this type of procedure, an ultrasound
23  of the abdomen, would be?
24  A.   In my experience, that's probably going to be
25  generally six weeks or less.

1   Q.   And what is--- do you know what the basis for
2   that six-week number is?
3   A.   It's going to be based upon the availability of
4   the service, the clinical urgency of the
5   service, and the patient's unique history.  And
6   the patient's specific--- specific clinical
7   findings at the present time.
8   Q.   So we saw from the E-mail that was Exhibit 8,
9   and also indicated in this document, that Dr.
10  Einwohner suggested this collegial?
11  A.   That appears to be--- I'm sorry.
12  Q.   I was just going to ask, do you recall if Dr.
13  Einwohner attended this collegial?
14  A.   She didn't attend collegials, so I don't think
15  she did, no.
16  Q.   Has she ever attended a collegial that you've
17  been a part of?
18  A.   Not that I could recall.
19  Q.   It says here the patient reported intermittent
20  hematuria.  What is intermittent hematuria?
21  A.   Blood in the urine that's coming and going.
22  Q.   Is an ultrasound of the abdomen the typical way
23  that would be evaluated?
24  A.   It's one component of the evaluation.  But
25  certainly, there's a primary care evaluation

1   that would occur with intermittent hematuria
2   prior to an ultrasound.
3   Q.   And what do you mean by a primary care
4   evaluation?
5   A.   Well, history, physical, physical examination,
6   I should say, on-site testing, such as
7   urinalysis, which is referenced here.
8   Sometimes X-rays.  And then consideration of
9   further imaging based upon the findings related
10  to the primary care workup on site.
11  Q.   If we can look back, Doctor, at Exhibit 4,
12  which is the medical guidelines for Illinois.
13  In there, I want to look at Page 3 of the
14  Exhibit.  It's Page 293 of the overall
15  document.  And do you see -- this is entitled
16  urology guidelines.  And do you see where
17  hematuria is listed there at the bottom?
18  A.   Yes.
19  Q.   Can you sort of just describe how to read this,
20  just the hematuria part of this to a
21  nonclinician, I guess?
22  A.   Yes.  The first column is what the diagnosis
23  is.  That references the DX up at top.  That's
24  shorthand for diagnosis.  There's three
25  categories under hematuria.  Which would be

1  acute, painful, painless, and age greater than
2  50.  These are broad definitions and categories
3  of hematuria, when a clinician tries to work
4  through the evaluation of hematuria for a
5  patient.
6        The next column in that row is the primary
7  or unit.  RX is really, I read it means
8  intervention or evaluation.  So that would be
9  the primary what's done at the health care unit
10  level or the facility level.  That would be a
11  KUB, which is a kidneys, ureters, and bladder,
12  which is an X-ray, plain X-ray.  BUN/creatinine
13  is a blood test.  U/A is urinalysis.  And then
14  pain relief, I think, is self-explanatory,
15  usually with medications as indicated.
16        No. 2 would be to evaluate for glomerular
17  disease, which is specific intrinsic disease of
18  the kidneys.  Microscopic urinalysis to confirm
19  the positive dipstick.  And that oftentimes
20  would involve either looking at it under the
21  microscope, which some clinicians are able to
22  do.  Sometimes that needs to be sent out if the
23  clinician is not able it do it or if the
24  microscope is not available.
25        And then 3 is to rule out malignancy,

1        which is with the IVP, which is an intravenous
2  pyelogram, which generally is not done much
3  anymore.  It's an older test, or ultrasound.
4  Cystoscopy, which is a procedure done by a
5  urologist to look into the bladder, either in
6  the office or in the hospital setting.
7        And then the secondary intervention would
8  be -- the IVP once again is listed here, and
9  then secondly would be urology or a renal,
10  which would be nephrology referral.
11  Q.  And you testified earlier, I believe, that you
12      sometimes refer to these guidelines for
13      collegial review cases; is that correct?
14  A.  Yes, sometimes.  But, again, as I attested,
15      really more with guidelines that have very
16      specific and complex criteria, such as cataract
17      evaluation.  For more primary care level
18      management, I mean, I would offer today that
19      this evaluation is something, this process,
20      that any first year primary care resident would
21      know how to follow with respect to the
22      evaluation of hematuria.  So it's not something
23      I would generally need to refer to.
24  Q.  So for somebody who presented under these
25      guidelines, for somebody who presented with

1      hematuria, who is over 50, the first step would
2      be to rule out malignancy with either an IVP or
3      an ultrasound or A cystoscopy; is that correct?
4  A.  No, I don't agree with that.  I think the first
5      step would be to do the primary unit
6      prescription, which would include Nos. 1 and 2.
7      And, again, this being a guideline to consider
8      ruling out malignancy.  Malignancy being more
9      likely as we get older.
10  Q.  Is it correct that you sort of read this
11      guideline going across, so that the 3 under
12      hematuria corresponds to the 3 under primary
13      unit RX for hematuria, or is it more of a like
14      you do 1 and then you do 2, and then you do 3
15      for each case?
16  A.  I think it can be interpreted either way, in my
17      view.  Again, being a guideline.
18  Q.  So just to be clear, you're not totally sure
19      what the way the guideline is supposed to read,
20      if it's supposed to read, you do 1, 2, 3, every
21      case, or for people age greater than 50, you
22      skip right to No. 3?
23  A.  Correct.  I didn't write the guideline.  I
24      don't necessarily agree with it line by line.
25      I think, again, if a patient, for example, is

1      having painless hematuria, I would get Nos. 1,
2      and I would consider No. 2, and I would
3      consider No. 3.  But I wouldn't necessarily,
4      for example, not consider No. 3 in the example
5      of No. 2, painless hematuria.
6  Q.  Okay.  You can set that one aside.  In your
7      opinion, is an ultrasound when a patient has
8      intermittent hematuria an easy call for
9      collegial review?
10          MR. RUPCICH:  Object to the form,
11      vague and incomplete hypothetical.
12  A.  I'm not sure I understand the question with
13      respect to easy.
14  Q.  Is the recommendation for an ultrasound when a
15      patient has intermittent hematuria, the type of
16      case that you would approve at face value
17      during a collegial review?
18          MR. RUPCICH:  Objection.  Incomplete
19      hypothetical.  Is this meant to reflect Mr.
20      Dean's history?
21          MR. WACKMAN:  No, this is a general,
22      based on the doctor's experience.
23          MR. RUPCICH:  I object to vague and
24      incomplete hypothetical.  If you can answer.
25  A.  In my experience, yes, oftentimes, ultrasounds

1   are approved, because they are a low-risk test
2   for the patient, they don't involve radiation,
3   and they can be provided on site.  So the
4   patient can be evaluated on site without having
5   to go out of the facility.
6   Q.   Referring back to Exhibit 9, which is the notes
7        of that 1/13 collegial.  The top two lines of
8        the comments, which are Dr. Einwohner
9        evaluating patient and patient reported
10       intermittent hematuria, and then HX, which I
11       believe stands for history with lithotripsy,
12       12/30/14.  Are those the type of notes that you
13       would get in the spreadsheet before collegial
14       review?
15  A.   Those types of things are the types of things
16       that can be referenced in the spreadsheet if
17       they're submitted.
18  Q.   Do you often get more information?
19  A.   Well, that's very case specific.  Yes, some
20       cases, we would get more.  Some cases, no.
21       Some less.
22  Q.   What can hematuria be a symptom of?
23  A.   Of numerous different things.  I guess I can
24       list, common examples would be anywhere from a
25       simple bladder infection to urethral trauma, to

1   kidney stones, to intrinsic disease, so a
2   disease of the kidneys themselves, to cancer of
3   anywhere within the urinary tract.
4   Q.   After this collegial review on January 13th, do
5        you recall having any involvement with Mr.
6        Dean's ultrasound?
7   A.   No, I don't.
8   Q.   You can set that January 13th document aside,
9        Doctor.
10       (Whereupon Plaintiff's Exhibit 10 was marked.)
11  Q.   The court reporter just handed you what has
12       been marked as Exhibit 10.  It is a two-page
13       document.  It is double-sided.  It bears Bates
14       stamp IDOC No. 000091 through 92.  Can you tell
15       me what this first page is, Doctor?
16  A.   This is the Illinois Department of Corrections
17       medical special services referral and report
18       form.
19  Q.   Do you see this document?
20  A.   Yes.
21  Q.   How do you see this document?
22  A.   It's submitted as part of the collegial process
23       and then usually, it's scanned in in a PDF file
24       and submitted to me via E-mail in preparation
25       for the collegial call.

1   Q.   So is this one of the documents that you would
2        review prior to a collegial?
3   A.   Yes.
4   Q.   And then the second page is similar to the
5        document that we were just looking at, which
6        was Exhibit 9, which is the notes from a
7        collegial; is that correct?
8   A.   That's correct.
9   Q.   And this collegial occurred February 10th,
10       2016; does that look right?
11  A.   That's correct.
12  Q.   Do you recall discussing or approving Mr.
13       Dean's case at the collegial on February 10th,
14       2016?
15  A.   No, I don't.  As I've attested here several
16       times, I have no direct recollection of
17       discussing any of the care or results regarding
18       Mr. Dean.
19  Q.   And this document does not reflect--- refresh
20       your recollection in any way; is that correct?
21  A.   That's correct.
22  Q.   Looking at the first page of this document,
23       which is IDOC No. 000091, can you read or do
24       you--- do you see at the top under rationale
25       for referral, where Dr. Nawoor, who is

1   authoring this document, writes need to R/O
2   bladder cancer?
3   A.   Yes, I believe that's what it says.
4   Q.   Do you agree that's what that says?
5   A.   To the best of my ability to decipher the
6        handwriting, yes.
7   Q.   And R/O stands for what?
8   A.   Rule out.
9   Q.   So do you expect prior to the collegial on
10       February --
11            MR. RUPCICH:  Nate, this is March.
12            MR. WACKMAN:  Yeah, I'm just looking
13       at that.
14            MR. RUPCICH:  This is the result---
15            MR. WACKMAN:  Yeah.
16            MR. RUPCICH:  -- of this.
17            MR. WACKMAN:  Yeah, that's what
18       I'm--- that's--- I need to back up.
19  Q.   So as Mr. Rupcich, your counsel, points out,
20       this is the result of the February 10th
21       collegial here.  Would you expect that the need
22       to rule out bladder cancer was something
23       discussed at the February 10th collegial?
24  A.   I wouldn't agree with that.  As I've attested
25       to earlier, I don't recall what was actually

1    discussed.  Dr. Nawoor did write that in his
2    rationale, that was his opinion.  I have no
3    recollection of what was actually discussed.
4  Q.  Okay.  The second page of this document, which
5    is IDOC No. 000092, do you see a date on here
6    by which Mr. Dean is to see the urologist?  In
7    other words, a targeted completion date for the
8    urologist?
9  A.  No.  Targeted completion dates are not usually
10    memorialized on this document, as I attested
11    earlier.
12  Q.  Do you know what a typical targeted completion
13    date to see a urologist would be?
14  A.  I couldn't attest to what typical would be.
15    Because as I attested earlier, every case is
16    individual.
17  Q.  Can you tell based on this document if the
18    urologist referral referred to here was
19    approved at face value or was discussed at the
20    collegial on February 10th?
21  A.  No.  As I've attested, I have no recollection
22    as to what case--- cases that were approved
23    were discussed, and which were approved at face
24    value.  All I can attest to based on this
25    document is that it was approved.

1  Q.  Do you see in the comment section where it
2    says, this is five lines down at the end of
3    that line, no evidence of the hydronephrosis,
4    no evidence of lesions?
5  A.  Yes, I see that.
6  Q.  Why would those two things have been noted in
7    the collegial review notes?
8  A.  Those are two things that are commonly
9    commented on, either their absence or presence
10    by the radiologist who reads an ultrasound.
11  Q.  What is the significance of their absence?
12  A.  Well, the absence of hydronephrosis usually
13    implies that there's no obvious obstruction in
14    the drainage of the kidneys.  And no evidence
15    of lesions means that there's no visible
16    lesions on ultrasound, lesions being some type
17    of a--- usually a mass or something that is
18    identified that is not expected or doesn't
19    belong there.
20  Q.  So previously when we were discussing
21    hematuria, you described a wide range of
22    potential things that might cause it.  Would
23    the additional evidence that there's no
24    hydronephrosis and no lesions, what--- what
25    diagnoses could you rule out based on that set

1    of facts?
2  A.  Well, again, I think that is exhaustive.  I can
3    give you just my--- from a primary care
4    standpoint.  Looking at it, as I sit here
5    today, I think we can say that there's no
6    obstruction or hydronephrosis, which would be
7    common from a serious kidney stone, and that
8    there's no obvious mass or lesion evident on
9    ultrasound that would guide the care, such that
10    we would either continue management on site or
11    proceed with other management off site and
12    further testing.
13    In this instance, because there was no
14    obvious evidence of a stone that was causing
15    obstruction or any lesion, it was deemed
16    appropriate then to send the patient for a
17    urology evaluation for investigation of further
18    causes that could not be ascertained from a
19    primary care standpoint.
20  Q.  Following this collegial review, did you have
21    any further involvement in Mr. Dean's urology
22    referral?
23  A.  Not that I recall.
24  Q.  Earlier, we were talking about the scheduling
25    of procedures and the targeted completion date.

1    Are you ever made aware that a procedure or
2    treatment is unable to be scheduled within the
3    completion date, the targeted completion date?
4  A.  In some instances, that's brought to my
5    attention by the UM clerical staff if they
6    cannot get an answer and explanation as to why
7    a test has not been completed.  And it's
8    usually to request that we bring the case back
9    up for discussion at collegial, so that the
10    site can provide an explanation.
11  Q.  Do you ever recall that that series of events
12    that you just described occurred with Mr.
13    Dean's care?
14  A.  No.
15  Q.  And just to be clear, sir, no, you're confident
16    it didn't, or, no, you don't recall?
17  A.  No, I don't recall.
18  Q.  And just to be clear on the answer you gave
19    about when you're made aware of the inability
20    to schedule something by the targeted
21    completion date, it's when the site does not
22    have a good explanation for why it can't be
23    scheduled; is that correct?
24  A.  No, it's when the UM clerical staff, who is
25    tasked with monitoring that process has been

Page 86

```
 1      unable to get an adequate answer as to why.
 2   Q. From the site?
 3   A. Correct.  What we're essentially doing is
 4      making the doctor go back and look at the chart
 5      and discussing the case.  In that instance, we
 6      request, we will put that patient case on the
 7      collegial review schedule.  So it's kind of a
 8      reversal of the normal process.
 9   Q. And the purpose of that is to force the doctor
10      to basically reckon with why it hasn't been
11      scheduled yet?
12   A. I guess you could say that.  But it's usually
13      more the clerical staff who is going to have to
14      answer for it with the doctor.
15   Q. You can set that document aside, Doctor.
16      (Whereupon Plaintiff's Exhibit 11 was marked.)
17   Q. So what the court reporter just handed to you
18      has been marked as 11, Plaintiff's Exhibit 11.
19      It is two pages, so a multipage document, Bates
20      No. IDOC No. 000094 through 95.  And once
21      again, this is the notes from a collegial
22      review.
23         And my first question, Doctor, is whether
24      you can tell from these two documents whether
25      this is one collegial review or two collegial
```

Page 87

```
 1      reviews.  And the reason I ask is because they
 2      both seem to come from the urology follow-up on
 3      March 10th.  But since they're in different
 4      notes, I can't tell if this was two collegial
 5      reviews or one.  And I guess I--- let me
 6      withdraw--- well, I won't withdraw that
 7      question.
 8         Let me ask you a different question first,
 9      which is do you recall a collegial review
10      following a urologist visit on March 10th,
11      2016?
12   A. No.
13   Q. And does the--- do these documents refresh your
14      recollection in any way of a collegial review
15      following a urology visit by Mr. Dean on March
16      10th?
17   A. No.
18   Q. Can you tell if these were two separate
19      collegial reviews referenced in these two
20      documents or if they are two documents for the
21      same collegial review?
22   A. Based upon the fact that they are approximately
23      eight days apart, my suspicion is this is two
24      separate collegials.  But they do reference
25      back to services relating to the urology
```

Page 88

```
 1      appointment of 3/10.  They are approvals for
 2      two separate services, one for the cystoscopy
 3      itself, which has a separate code, in terms of
 4      payment, which is why it requires a separate
 5      authorization number.  And then the other one
 6      being for the CT of the abdomen and pelvis.
 7   Q. Do you know why there would have been two
 8      separate collegial reviews for these two
 9      procedures?
10   A. I don't.  In my experience, sometimes it's the
11      site will sometimes order things, not
12      necessarily in sequence.  There may be one
13      service that is noted to be required at one
14      collegial, and then the site will sometimes
15      either get notification from the consultant
16      that they want something in addition to that.
17      And then it would be reviewed at the following
18      collegial.
19         I can only speculate.  That's in my
20      experience, that's one reason why these occur.
21      These are only a week apart.  It's very common
22      for us to get requests for and to approve these
23      type of batched services, evaluating for one
24      particular problem over the course of one or
25      two collegials for non-urgent types of requests
```

Page 89

```
 1      like this.
 2      (Whereupon Plaintiff's Exhibit 12 was marked.)
 3   Q. The court reporter has handed to you what's
 4      being marked as Plaintiff's Exhibit No. 12.  It
 5      is not Bates numbered.  But it is the Wexford
 6      defendant's answers to interrogatories sent to
 7      them by Mr. Dean.  And it is dated May 17th,
 8      2018.  Have you ever seen this document before,
 9      Dr. Ritz?
10   A. Not that I directly recall by memory.
11   Q. So Mr. Rupcich can add whatever he likes.  But
12      basically---
13         MR. RUPCICH:  He's never seen this.
14   Q. Yeah, I don't expect he has.  I was just going
15      to explain that in case you're unfamiliar, what
16      happens is that we send Mr. Rupcich questions,
17      and he answers them for the defendants.  And,
18      really, what I want to look at is Page 2, Item
19      C.  Which you'll see is in response to the
20      question of who was required to approve or
21      otherwise had input on Mr. Dean's CT scan.
22         And the first sentence says Dr. Severino
23      know recommended the CT of
24      chest/abdomen/pelvis.  So Dr. Severino
25      recommended--- do you know who Dr. Severino is?
```

Page 90

1  A.  Only from reviewing these documents. I think
2      he is the urologist in reference to the case.
3  Q.  So if a urologist recommends a CT scan, would
4      that be an easy call for collegial review?
5  A.  Again, I guess I need you to define what you
6      mean by easy. I don't understand that term.
7  Q.  Excuse me. Let me withdraw that question. If
8      a urologist recommends a CT scan, would that be
9      something that could be approved at collegial
10     review at face value?
11         MR. RUPCICH: Object to vague,
12     incomplete hypothetical.
13 A.  Again, as I've attested, every case is unique,
14     and we review every request, whether it comes
15     from a consultant or from our doctors for
16     medical necessity and clinical appropriateness.
17     Given the circumstances here, all I can attest
18     is that it was approved.
19 Q.  And based on the two notes encompassed in
20     Exhibit 11, can you tell whether it was
21     actually discussed at the collegial review, or
22     whether it was just approved at face value?
23 A.  I have no recollection, so I could not attest
24     to whether it was discussed or just approved at
25     face value.

Page 91

1  Q.  And do you--- can you tell, based on either of
2      these documents, what the targeted completion
3      date for either the cystoscopy or the CT scan
4      would be?
5  A.  No, I can't.
6  Q.  Based on your experience, what would be expect
7      the targeted completion date to have been?
8  A.  Again, as I've attested, every case is unique.
9      In my experience, in a case like this, I would
10     expect these generally to be done within
11     probably 30 days or so. But I would also
12     give--- stipulate that those target dates are
13     just that, they're targets.
14         There's many variables, many that we can't
15     control, with respect to the availability of
16     services of the community, the scheduling, you
17     know, the consultant's schedule, security's
18     availability, transportation availability,
19     lockdowns. So there's numerous variables that
20     will go into that target date, many of which
21     that we have no control over.
22 Q.  I think you can set that one aside, Doctor.
23     (Whereupon Plaintiff's Exhibit 13 was marked.)
24 Q.  So what the court reporter has just handed you
25     has been marked as Plaintiff's Exhibit No. 13.

Page 92

1      It's a multipage document. It's Bates numbered
2      IDOC No. 000097 through 98. And if you look at
3      the second page, Doctor, it describes a
4      collegial review where a nephrectomy was
5      approved by you and Dr. Nawoor at collegial; do
6      you agree?
7  A.  Yes.
8  Q.  And can you tell when that collegial review
9      occurred?
10 A.  I can't tell exactly from the comments section.
11     I mean, it's date stamped 4/21/2016.
12 Q.  Do you recall this collegial review?
13 A.  I don't.
14 Q.  And does this document refresh your
15     recollection?
16 A.  No.
17 Q.  What is a nephrectomy?
18 A.  It's a removal of the kidney.
19 Q.  Is that--- do you have any way of telling if
20     Mr. Dean's case was actually discussed at a---
21     this collegial review, or if it was approved on
22     face value?
23 A.  I have no recollection of that.
24 Q.  And can you tell from this document one way or
25     the other?

Page 93

1  A.  No, I can't.
2  Q.  And do you, in your experience, is a
3      nephrectomy the type of thing that would be
4      discussed at a collegial review?
5  A.  Given the fact that there was a mass noted, and
6      that the consultant wanted to do the surgery, I
7      can't really see that this would undergo any
8      significant discussion. Because it's pretty
9      straight forward.
10 Q.  Straightforward. What do you mean by
11     straightforward?
12 A.  Straightforward with respect to there's a mass
13     in the kidney. The consultant feels that a
14     surgery needs to be done, and that's certainly
15     medically necessary and clinically appropriate.
16 Q.  Set that one aside. It's noon. I only have a
17     few more questions, I think, for this portion
18     of it. Is anybody looking to break, or should
19     we power through?
20         MR. RUPCICH: Doctor, do you want to
21     finish up this section, and then we'll break
22     for lunch, or would you like to break now?
23         THE WITNESS: So you're saying we'll
24     finish this part now, then go to the 30(B)(6)
25     afterwards or another section for the -- my

1    personal?
2                    MR. WACKMAN:  We can go off the
3    record real quick now.
4         (Discussion off the record)
5    Q.   Do you know what Votrient is, Doctor?
6    A.   It's a cancer drug.  I'm not sure I could say
7         specifically how it works, but I know it's used
8         to treat cancer.
9    Q.   And are you aware that Mr. Dean was prescribed
10        Votrient on October 19th, 2016 by his
11        oncologist, Dr. Guagianone?
12   A.   I have no reason to dispute those dates as
13        you've given them to me.
14   Q.   But you don't independently recall?
15   A.   I don't, no.
16   Q.   Are you familiar with Wexford's process for
17        approving nonformulary medications?
18   A.   Yes.
19   Q.   Can you describe what a nonformulary medication
20        is?
21   A.   Yes.  Generally, there are formulary
22        medications that are available to the providers
23        to be able to prescribe themselves without
24        having to undergo any formal review by the
25        pharmacy team.  These would be commonly-used

1    medications.  Any medicine that is not commonly
2    used or perhaps has a lot of toxicity or
3    potential interaction, complications, et
4    cetera, for patient safety purposes, the
5    nonformulary process exists, then the pharmacy
6    team has to evaluate that.
7         They also look at it for medical
8    necessity, clinical appropriateness, toxicity,
9    interaction, et cetera.  And that process,
10   then, makes a recommendation with respect to
11   either approval or nonapproval of--- of the
12   requested medication.
13   Q.   Is cost one of the things that's looked at in
14        deciding if a medication is formulary or
15        non-formulary?
16   A.   Cost is generally not a determinant, no.  It's
17        really the clinical efficacy, toxicity, these
18        types of things.  And in the instance of
19        chemotherapy medications or these newer cancer
20        agents, the monoclonal antibody agents, the
21        national guidelines, we usually utilize the
22        NCCN guidelines in our pharmacy program, which
23        are standard guidelines that are used
24        throughout the United States to determine
25        medical necessity and clinical appropriateness

1    of these potentially toxic and new agents.
2    Q.   Do you know what NCCN stands for?
3    A.   I believe it's the National Cancer Care
4         Network, I believe.
5    Q.   And how does the nonformulary process work on a
6         sort of basic level, Doctor?  Sorry, let me
7         make clear, for Wexford?
8    A.   For Wexford, when a medication that is not on
9         the formulary as defined as I just did, it's
10        identified, the request to use it, either on
11        site or by an off-site consultant.  The--- a
12        form is completed usually by the site medical
13        director, documenting the request, what it's
14        for, and then submitting any supporting
15        clinical documents.
16             That's then submitted to the pharmacy team
17        for review.  And then a review is performed and
18        a recommendation decision is provided to the
19        site, and sometimes to the requesting
20        clinician, if they're off site.
21   Q.   As the utilization management doctor, are you
22        involved in that process?
23   A.   Sometimes if the case needs to be discussed at
24        collegial, we do sometimes have nonformulary
25        requests reviewed, because the clinical

1    condition of the patient is always germane, but
2    sometimes we need to make sure that it has been
3    discussed and reviewed with the doctors who
4    know the patient best, which is the on-site
5    medical doctor.
6    Q.   How long does the nonformulary process
7         typically take?
8    A.   It varies, based upon a number of different
9         factors.  The availability of the information
10        to the clinical information, to determine the
11        medical necessity and clinical appropriateness
12        of the case.  The input and discussion by the
13        pharmacy team.  Some case requests are quite
14        complicated in terms of having to be reviewed
15        and to go back and forth getting information
16        from the site.  Or reviewing the information in
17        the context of guidelines such as NCCN.
18   Q.   Do you recall Mr. Dean's Votrient prescription
19        going through the nonformulary process?
20   A.   I don't have a direct recollection of it, no.
21        (Whereupon Plaintiff's Exhibit 14 was marked.)
22   Q.   You've been handed what's marked as Plaintiff's
23        Exhibit 14, which is a single-page document
24        entitled nonformulary drug request.  And it is
25        Bates No. IDOC Taylorville Med Recs 001678.  Do

1   you recognize this document, Dr. Ritz?
2   A.   I recognize what type of document it is. I
3        have no recollection or recognition of the
4        actual specific document itself as I sit here
5        now.
6   Q.   Is this a nonformulary request for Votrient for
7        Mr. William Dean?
8   A.   I--- assuming that the generic name that's
9        referenced here is Votrient, and I don't know
10       if it is, I would have to look that up. It
11       probably is, though.
12  Q.   I will just---
13  A.   Yes, that's what it is.
14  Q.   I was actually just going to also refer you to
15       the interrogatories, which I don't remember
16       which exhibit we marked that as, but---
17  A.   My counsel just found that on the public
18       domain. So that's what that is.
19  Q.   Just for the record, it was--- this document,
20       Bates 1678 is identified at Page 2 of the
21       interrogatory response, Item E as the
22       nonformulary request, as the document that
23       contains the nonformulary request for Votrient.
24            MR. RUPCICH: It's just panzopanib,
25       P-A-N-Z-O-P-A-N-I-B, which we'll stipulate is

1        the, I suppose the---
2   A.   The generic---
3            MR. RUPCICH: -- generic name?
4   A.   -- name for Votrient, yes.
5   Q.   Does this document refresh your recollection in
6        any way about your involvement in the
7        nonformulary process for Mr. Dean's Votrient
8        prescription?
9   A.   No.
10  Q.   Set this one aside, Doctor.
11       (Whereupon Plaintiff's Exhibit 15 was marked.)
12  Q.   So the court reporter has handed you what is
13       marked as Plaintiff's Exhibit 15. It is a
14       single-page document. It is Bates stamped IDOC
15       Taylorville Med Recs 001477. Do you recognize
16       this type of document, Dr. Ritz?
17  A.   Yes.
18  Q.   And what is this type of document?
19  A.   It's an IDOC outpatient progress note.
20  Q.   Would this come -- excuse me. Would this
21       commonly be referred to as a patient's chart?
22  A.   This is a chart note, yes.
23  Q.   And I wanted to direct your attention to the
24       very last entry on the right in the right
25       column under plans here. And can you read what

1        that third bullet point says?
2            MR. RUPCICH: Can you lay a
3        foundation of who and when this record is from?
4   Q.   Do you see, when is this record dated, Dr.
5        Ritz?
6   A.   11/2/16.
7   Q.   And do you recognize the handwriting that
8        created this note?
9   A.   I don't recognize it. It is stamped with Dr.
10       Nawoor's name. So I have no reason to believe
11       it's not his.
12  Q.   Can you read Dr. Nawoor's note from that date
13       that is in the bottom, the third bullet point
14       under plans on 11/2/2016?
15  A.   I'll attempt to. It's hard to decipher. I
16       believe it's Dr. Ritz will be talking to the
17       oncologist about--- I don't know what that word
18       is -- drug.
19  Q.   I read it as alternative. Would you agree it
20       could be alternative?
21  A.   I won't disagree with that. But I can't--- I
22       cannot discern what that says.
23  Q.   Does this refresh your recollection in any way
24       about the possibility or your involvement in
25       the nonformulary process for Votrient?

1   A.   No, it doesn't.
2   Q.   In what circumstances would you discuss an
3        alternative drug that a patient had been
4        prescribed?
5   A.   I will get involved sometimes if the pharmacy
6        team finds that the medication may not be
7        medically necessary and clinically appropriate
8        based upon their analysis of the request. And
9        that can be from any number of reasons relating
10       to--- sometimes the request is not in
11       accordance with the NCCN guidelines.
12            Sometimes the request is not apparently
13       clinically appropriate. For example, using a
14       very toxic drug for a patient who's extremely
15       ill. Wherein the toxicity may actually make it
16       so that the harms of the intervention or the
17       medication may outweigh the potential benefits.
18       These are the types of things that I sometimes
19       will get involved and either direct the medical
20       director to call and discuss these with the
21       oncologist to make sure they're aware of them,
22       or I sometimes will talk to the oncologist
23       myself.
24  Q.   Do you recall ever being involved in a
25       nonformulary or request due to the expense of

Page 102

1    the prescribed drug?
2  A.  Expense does not drive that equation.  No.
3      It's medical necessity and clinical
4      appropriateness.
5  Q.  Is expense a factor at all in that equation?
6  A.  It's not.  We look at, again, whether or not a
7      medication is indicated.  Usually the NCCN
8      guidelines are what we look at.
9      (Whereupon Plaintiff's Exhibit 16 was marked.)
10 Q.  What the court reporter's just handed to you is
11     marked as Plaintiff's Exhibit 16.  This is the
12     cover page and an excerpt of the deposition
13     testimony of Dr. Nawoor taken in this case
14     December 4th, 2018.  The appearances are on the
15     second page of this document, which is actually
16     labeled 151.  And then pages that we --
17     otherwise are a part of the expert -- excerpt,
18     excuse me, and are Pages 299 and 300 of the
19     transcript.
20         And I want to direct your attention to---
21     well, I suppose I direct your attention, first,
22     to Page 299, Lines 14 through 17, where it
23     establishes that where this portion of the
24     deposition is discussing Votrient; do you
25     agree?

Page 103

1  A.  That's what it appears to be, yes.
2  Q.  And then on Page 300, you'll see at Lines 11
3      through--- well, Dr. Nawoor's answer
4      encompasses Lines 11 through 24.  But the first
5      sentence is--- includes the phrase, "Dr. Ritz
6      had some question about this Votrient and
7      whether it has a lot of side effects, and I
8      guess he was -- any cancer drug is expensive,
9      and he wanted to talk to the pharmacologist in
10     Pittsburgh and discuss that, and they
11     eventually approved it."
12         My reading of this is that Dr. Nawoor was
13     testifying that expense was part of the
14     nonformulary process for this drug, Votrient.
15     Do you agree that that's reflected by his
16     testimony?
17              MR. RUPCICH:  I'll object to the
18     foundation.  And if you need to review the
19     whole thing, you can do that.
20 A.  All I can stipulate here is that Dr. Nawoor was
21     expressing his interpretation of the
22     interaction, and I think his opinion.  I can't
23     attest to what he was thinking or what his
24     basis for that is.
25 Q.  Again, your testimony, Doctor, is that expense

Page 104

1      or cost of cancer drugs does not enter into the
2      nonformulary process; is that correct?
3  A.  Not into the nonformulary, in terms of the
4      medical necessity and clinical appropriateness
5      of the utilization of a medication, no, it
6      doesn't.
7  Q.  You don't consider cost at all in your
8      nonformulary reviews?
9  A.  Not in terms of the final analysis and
10     approval, no, I don't.
11 Q.  Do you consider it at any point in the
12     nonformulary review?
13 A.  At some point, the pharmacy team may see that
14     an agent--- in cost--- they do look at relative
15     cost, especially if the guidelines--- and when
16     I refer to the guidelines, I'm talking about
17     the NCCN guidelines.  Many times, the
18     guidelines will have two or three or four
19     potential alternatives.  And one agent may be
20     more costly than another.
21         And, again, we will look at whether an
22     agent that may be less costly is equally
23     effective.  Then the lower cost agent, as long
24     as the oncologist would agree to use it, that
25     that would be the one that generally we would

Page 105

1      utilize.  Again, assuming that it's medically
2      necessary and clinically appropriate.
3          So I want to make sure that we understand
4      for the record, that cost is not the
5      determinant in terms of whether or not an agent
6      is ultimately approved.  Only medical necessity
7      and clinical appropriateness is.
8          And in my experience, many times,
9      consultants have very little understanding,
10     first of all, they don't understand our
11     formulary, and they also don't necessarily
12     understand the relative cost of some of these
13     newer agents.  And the difference can be quite
14     significant for a medication that will be as
15     equally as effective, and as indicated,
16     according to the guidelines.
17         But that--- that particular piece of that
18     may trigger the review by the pharmacy team.
19     But it does not go into the ultimate decision
20     on whether the medication's approved.
21 Q.  Do you--- do you ever speak with the
22     prescribing doctor directly in the course of
23     the nonformulary approval process?
24 A.  Occasionally, I do, yes.
25 Q.  Would a discussion of whether a less costly

1  drug be equally effective to the one that was
2  prescribed be one of the things you discussed
3  with prescribing doctors before?
4  A.  Yes.  As I attested earlier, if our pharmacy
5  team identifies that, according to the
6  guidelines, there may be a lower-cost agent
7  that is equally effective and would fulfill the
8  patient's needs, that will be discussed as part
9  of the overall discussion with the oncologist
10  and--- or I should say oncologist in this
11  instance.  And, again, if they agree to use the
12  lower-cost agent, then oftentimes that's what
13  we will proceed with.  If they don't, and
14  sometimes, they don't, then we respect what
15  they want to do, and we proceed with the agent
16  they feel is most medically necessary and
17  clinically appropriate.
18  Q.  What is Opdivo, Doctor?
19  A.  It's a medication that's used to treat cancer.
20  Q.  Are you aware that Mr. Dean was prescribed
21      Opdivo on March 2nd, 2017?
22  A.  I don't have any direct recollection, but I
23  have no reason to doubt that date as you
24  stated.
25      (Whereupon Plaintiff's Exhibit 17 was marked.)

1  Q.  This is a multipage document, Plaintiff's
2      Exhibit 17.  It's just been handed to you by
3      the court reporter, and it covers Bates numbers
4      IDOC No. 000124 through 126.  And I want to
5      focus on 125, which is the second page.  And is
6      this the--- or what is this document, Dr. Ritz?
7  A.  This is the summary page of a collegial request
8  for services.
9  Q.  And is that your signature at the bottom or is
10     that just somebody writing your name or is that
11     you writing your name?
12  A.  No, that's not my signature.  The nurses have
13  signature privileges for me for these
14  documents, just because it's required that a
15  name be on there.
16  Q.  Does that signify anything to you, the fact
17     that your name was written on this document?
18     We haven't seen that previously on these.
19  A.  No, some of the nurses choose to follow the
20  protocol.  Others, I guess, don't.
21  Q.  So I want to focus on the last four lines of
22     this note here, and I'm going to read them.
23     Excuse me, last five lines.  Which says, "Per
24     oncology note, progression of cancer on
25     Votrient.  Plan Opdivo salvage therapy next

1  week.  Received a referral request for oncology
2  F/U for chemo.  Case reviewed by Dr. Ritz.  Not
3  approved for chemo/oncology F/U at this time.
4  Request for Opdivo must go through nonformulary
5  process."
6      F/U is follow up; is that correct?
7  A.  Yes.
8  Q.  And can you interpret what I just read for me?
9  A.  Yes.  In essence, we were not able to approve
10  this at face value, because the case needed to
11  go through the nonformulary process.
12  Occasionally, the sites will submit something
13  directly to us at UM that actually needs to go
14  through the nonformulary process.  And so we
15  identified that, this request fell under
16  that--- that heading.  And so we essentially
17  directed the site that it needed to go through
18  the nonformulary.
19  Q.  And do you have any way of telling whether or
20     not this was actually discussed at the
21     collegial review or whether it was merely---
22     excuse me, rather it was directed to the
23     nonformulary process without discussion?
24  A.  In my experience, and I have no direct
25  recollection, I'll stipulate that.  But in my

1  experience in these instances, when we're not
2  able to approve something at face value, then
3  usually there is some conversation that ensues,
4  and most likely in this instance, we looked at
5  the clinical information and told the site that
6  this is a request that needs to go through the
7  nonformulary process.  We don't have the
8  authority to approve it, because it requires
9  that separate process.
10  Q.  And the separate process, just to be completely
11     clear, is the nonformulary process that we
12     previously discussed in this deposition, rather
13     than--- I'm sorry, that's the nonformulary
14     process being---
15  A.  Correct.
16  Q.  -- referred to here?
17  A.  Yes.
18  Q.  And what the site had attempted to do was have
19     this approved, and the prescription started
20     following collegial review?
21  A.  Correct.
22  Q.  And why did it have to go through the
23     nonformulary process, as opposed to the
24     collegial review process?
25  A.  Because usually that's for medications that are

1    going to be provided either in some way, shape,
2    or form off site that are not formulary
3    medications, or even if they're oral
4    medications, they're going to be provided on
5    site. If they're not in the formulary, they
6    generally have to the through the nonformulary
7    process.
8              MR. WACKMAN: If we could go off the
9    record for one moment, ma'am?
10   (Discussion off the record)
11             MR. WACKMAN: I'm done.
12             MR. RUPCICH: I have a couple of
13   questions.
14   DIRECT EXAMINATION:
15   BY MR. RUPCICH:
16   Q.   Are you familiar at all with the IDOC, with the
17        formulary followed in the State of Illinois?
18   A.   Basic understanding of it, yes.
19   Q.   Do you know if it has formulary chemotherapy
20        drugs?
21   A.   I don't believe it does, no.
22   Q.   You believe all chemotherapeutic agents are all
23        formulary?
24   A.   Yes. I'm not familiar with any
25        chemotherapeutic drugs that are formulary on

1    the IDOC.
2    Q.   I'm going to just work backwards. Starting
3         with Exhibit 17, which I think you have in
4         front of you, are you able to tell if Opdivo
5         was approved through the nonformulary process?
6    A.   Yes. On the document that's Bates stamped
7         000126, it states that the case was reviewed
8         and approved by Dr. Ritz for Opdivo chemo. And
9         that was--- yes, so ultimately to answer your
10        question, it was approved.
11   Q.   Can you tell approximately when that happened?
12   A.   It looks like this is date stamped 3/20/17.
13   Q.   And the original can came through on or about
14        March 3rd, if we look at 000125?
15   A.   That's what it appears to be, yes.
16   Q.   Took around seven days from when the site
17        initially submitted it through collegial
18        instead of nonformulary to sort it out and
19        approve it?
20   A.   It looks like 3/3 to 3/20 would be 17 days.
21        Yes.
22   Q.   To circle back to your discussion of cost as it
23        relates to in this instance, chemotherapeutic
24        agents, did I understand you that the decision
25        of whether to approve, say, a chemotherapeutic

1    agent is based on medical necessity, clinical
2    appropriateness?
3    A.   Yes.
4    Q.   After that decision's made, the specific agent
5         used may involve consideration of cost at that
6         point after the decision to give the drug is
7         made in sort of deciding which among various
8         drugs may be appropriate?
9    A.   Yes. If there are several different drugs,
10        according to the guideline, that would
11        potentially meet the patient's needs, then
12        assuming that the consultant agrees, it usually
13        makes sense to use the lowest cost agent that
14        will meet the patient's needs. But the cost is
15        not what determines whether or not the medicine
16        is approved or not.
17   Q.   Understand. Okay. Exhibit 11. I'm sorry, go
18        to 14. Just going in reverse order. Exhibit
19        14 was a nonformulary request for Votrient; is
20        that right?
21   A.   Yes.
22   Q.   Are you able to tell from this document when
23        Votrient was approved, the nonformulary was
24        approved through the pharmacy?
25   A.   It would appear that it was approved on

1    11/14/16, I believe.
2    Q.   And that's based off of the stamp the
3         pharmacist and the date in the bottom right?
4    A.   Yes.
5    Q.   And then it looks like there's a fax indication
6         at the top for November 14, 2016?
7    A.   Yes.
8    Q.   All right. Doctor, Exhibit 11, I think we can
9         agree that this was the UM approval of the CT
10        in March of 2016?
11   A.   Yes.
12   Q.   Now, there's handwriting at the bottom. Well,
13        just to be specific, 3/22/16, does that appear
14        to be the date that UM, I guess, generated the
15        authorization number for the CT? Oh, I'm
16        sorry, I'm looking at the cystoscopy. Let's go
17        to the back page. March 30, 2016,
18        authorization number for CT of abdomen and
19        pelvis?
20   A.   Yes.
21   Q.   Okay. And then there's handwriting at the
22        bottom, TMH 12:30 4/12/16; do you see that?
23   A.   Yes.
24   Q.   Do you know what that means?
25   A.   I can't attest specifically. In my experience,

1     usually that is referencing when the test
2     probably was scheduled to be performed.  But I
3     can only speculate that.
4  Q.  According to--- you said UM.  Any time frames
5     that UM imposes upon or encourages for
6     diagnostic testing, would an approval of
7     3/30/2016, and a CT on April 12th be within
8     what UM would consider reasonable turnaround
9     for something like this?
10 A.  In my experience for a non-urgent case, yes.
11 Q.  As you went through Mr. Dean's history and
12    contacts with UM to prepare yourself, did you
13    come across any requests that were actually
14    ATPd or alternative treatment planned for Mr.
15    Dean?
16 A.  No, I didn't.
17 Q.  So everything was eventually approved?
18 A.  Yes.
19 Q.  All right.  Exhibit 4, Page 3, those are the
20    medical guidelines, Illinois.
21 A.  Okay.
22 Q.  I'm at Page 3.  And you had told us that these
23    are guidelines; right, rather than firm
24    policies?
25 A.  That's correct.

1  Q.  And, actually, if you go to the preface in the
2     third paragraph, that's actually spelled out
3     there, is it not?
4  A.  Yes, it is.
5  Q.  And what does it say?
6  A.  It says, "Clinical pathways do not replace
7     sound clinical judgment, nor are they intended
8     to strictly apply to all patients.  The
9     specific strategies and pathways presented in
10    this manual provide a clinical management
11    approach, but their application is a decision
12    made by the practitioner accounting for
13    individual circumstances."
14 Q.  Right.  Now, when you took up Mr. Dean's first
15    collegial that we've discussed that was in
16    Exhibit 9, where the recommendation was to get
17    an on-site renal bladder ultrasound?
18 A.  Yes.
19 Q.  There was a history that was provided of the
20    patient that included intermittent hematuria
21    and history of lithotripsy 12/30/14; right?
22 A.  Yes.
23 Q.  What's lithotripsy?
24 A.  That's a destruction of kidney stones using
25    sound waves.

1  Q.  So the history you would have been provided
2     included that this man had kidney stones in the
3     past?
4  A.  Yes.
5  Q.  And I think you had said that blood in the
6     urine is a pretty non-specific finding;
7     correct?
8  A.  That's correct.
9  Q.  But one of the things you said it could be
10    consistent with is kidney stones?
11 A.  Most commonly, it is, yes.
12 Q.  Most commonly.  An ultrasound of the abdomen
13    would be prohibitive of kidney stones; is that
14    right?
15 A.  Yes, in most circumstances.
16 Q.  And continuing on Exhibit 19, it looks like
17    this was taken up and discussed between you and
18    Dr. Nawoor January 13, 2016?
19 A.  That's Exhibit 19, you said?
20 Q.  9, I'm still on 9.
21 A.  Okay.  I'm sorry, can you repeat the question?
22 Q.  Yeah.  The discussion between you and Nawoor
23    that resulted in the decision to get an on-site
24    renal bladder ultrasound, that discussion was
25    January 13, 2016?

1  A.  Yes.
2  Q.  And there's handwriting down underneath that
3     that says, done 2/2/16 on site?
4  A.  Yes.
5  Q.  And I'd like you to assume for purposes of this
6     question that done means the ultrasound; okay?
7  A.  Okay.
8  Q.  An approval or plan to get an ultrasound
9     nonurgently on 1/13/16 that was done on 2/2/16,
10    would that be within what UM would consider
11    reasonable time frame to achieve that
12    diagnostic test?
13 A.  Yes.
14 Q.  And actually, the date of this document is
15    1/19/16.  Now, would that be when the form
16    would have been transmitted with the
17    authorization number back to the site; do you
18    know that?
19 A.  Possibly.  That is the date that this was
20    inputted into the system.  So I believe the
21    nurses have five full business days.  And so---
22 Q.  The UM nurses?
23 A.  The UM nurses, yes.  So in terms of when it was
24    transmitted, I'm not sure that I could attest
25    to that.  I'm not really privy to that part of

1    the clerical process.

2  Q.  Do you have an understanding if off site or

3    diagnostic--- even on-site diagnostic tests

4    that go through UM can be scheduled until the

5    site has the authorization number?

6  A.  I believe that they can, but it's not something

7    that is usually encouraged.  I mean, we will

8    sometimes tell them that, for example, if the

9    ultrasound is coming in a day or two, that they

10    can -- they have the verbal approval, and we

11    will get the authorization into the system.

12    But, in general, my understanding is the

13    expectation is that they will have the

14    authorization, the formal authorization ID in

15    hand before they formally schedule things.

16  Q.  And when you say ultrasound's going to be on

17    site, you're talking about there's -- Precise

18    is scheduled to be here in two days, we have

19    someone that needs one, let's kind of get this

20    on the calendar?

21  A.  Correct.

22  Q.  You were asked about the Lippert report,

23    L-I-P-P-E-R-T, and some criticisms directed at

24    the collegial process by the authors of those

25    reports; do you recall that?

1  A.  Yes.

2  Q.  Do you have an understanding that, I think you

3    mentioned the Department of Corrections,

4    actually settled the Lippert case?

5  A.  That's my understanding, yes.

6  Q.  And as part of that settlement, there were---

7    the Department made agreements to change

8    certain policies and procedures related to

9    medical care?

10  A.  That's my understanding, yes.

11  Q.  Do you have an understanding of if the

12    collegial process, if the department abandoned

13    the collegial review process in the settlement

14    of the Lippert case?

15  A.  Not that I'm aware of, no.  My understanding is

16    the collegial process will continue.

17  Q.  When Mr. Wackman was asking you about the

18    Wexford book of business, you had mentioned

19    contracts with states, Indiana, Illinois,

20    Alabama, and, I think it was West Virginia?

21  A.  Yes.

22  Q.  In addition to those, does Wexford also have

23    clients in particular counties or jails?

24  A.  Yes.

25  Q.  And those would be separate contracts from what

1    may exist with one of these four states you've

2    identified?

3  A.  That's correct.

4  Q.  And collegial, or utilization management may

5    also work -- or would work with those jail

6    contracts?

7  A.  Yes.

8          MR. RUPCICH:  Okay.  I'm done.

9          MR. WACKMAN:  Phil?

10          MR. ANDREWS:  I have no questions.

11          MR. WACKMAN:  I think we're done

12    with this portion of the deposition.  Off the

13    record--- or, well, sorry.

14          MR. RUPCICH:  Well, let's just, to

15    tie this up.  Doctor, do you -- I think this is

16    about as clean a transcript as I've ever seen.

17    So do you want to review it or---

18          THE WITNESS:  No, I'll waive it.

19          MR. RUPCICH:  He'll waive.

20          THE WITNESS:  Yeah.

21          MR. RUPCICH:  That will conclude.

22          MR. WACKMAN:  That works.  Let's go

23    off the record.

24    (Signature having been waived, the deposition

25    was concluded at 12:54 p.m.)

1  COMMONWEALTH OF PENNSYLVANIA    )

                           )  CERTIFICATE

2  COUNTY OF ALLEGHENY      )  SS:

3      I, Brenda J. Brink, RPR and Notary Public in and

4  for the Commonwealth of Pennsylvania, do hereby

5  certify that the witness, Stephen Ritz, D.O., was by

6  me first duly sworn to testify to the truth; that the

7  foregoing deposition was taken at the time and place

8  stated herein; and that the said deposition was

9  recorded stenographically by me and then reduced to

10  printing under my direction, and constitutes a true

11  record of the testimony given by said witness.

12      I further certify that the inspection, reading

13  and signing of said deposition were waived by counsel

14  for the respective parties and by the witness.

15      I further certify that I am not a relative or

16  employee of any of the parties, or a relative or

17  employee of either counsel, and that I am in no way

18  interested directly or indirectly in this action.

19      IN WITNESS WHEREOF, I have hereunto set my hand

20  and affixed my seal of office this 23rd day of

21  August, 2019.

22                      /s/ Brenda J Brink

23                      Notary Public

24

25

**0**

**000061** 65:18
**000091** 79:14 80:23
**000092** 82:5
**000094** 86:20
**000097** 92:2
**000124** 107:4
**000125** 111:14
**000126** 111:7
**00088** 66:20
**001477** 99:15
**001678** 97:25
**04603** 60:10

**1**

**1** 8:25 9:1 11:25 28:16 60:6,7 76:6, 14,20 77:1
**1/13** 78:7
**1/13/16** 117:9
**1/13/2016** 68:18
**1/19/16** 117:15
**10** 50:25 60:10,20, 23,24 79:10,12
**10:53** 63:13
**10th** 80:9,13 81:20,23 82:20 87:3,10,16
**11** 60:8 86:16,18 90:20 103:2,4 112:17 113:8
**11/14/16** 113:1
**11/2/16** 100:6
**11/2/2016** 100:14

**12** 89:2,4
**12/30/14** 78:12 115:21
**125** 107:5
**126** 107:4
**12:30** 113:22
**12:54** 120:25
**12th** 114:7
**13** 91:23,25 116:18,25
**13th** 65:11 67:24 68:11 69:11 79:4,8
**14** 97:21,23 102:22 112:18,19 113:6
**14th** 25:12 28:11 60:18
**15** 23:22 50:25 99:11,13
**151** 102:16
**16** 102:9,11
**1678** 98:20
**17** 102:22 106:25 107:2 111:3,20
**17th** 89:7
**19** 116:16,19
**19th** 94:10
**1st** 25:6

**2**

**2** 24:22,25 25:5,11 28:15,17,20,21 30:5 64:10,12 74:16 76:6,14,20 77:2,5 89:18 98:20
**2/2/16** 117:3,9
**20** 22:20
**2014** 12:4,15 25:6 28:1,16 53:19 56:4, 20,25

**2015** 10:12 54:9
**2016** 25:12 28:11 65:11,21 66:5,7 67:24 80:10,14 87:11 94:10 113:6, 10,17 116:18,25
**2017** 106:21
**2018** 9:10,13 59:18 60:16,18 89:8 102:14
**2019** 64:9
**24** 103:4
**25th** 64:8
**26** 64:7
**28** 22:18 56:17 57:3
**29** 22:18 56:17 57:21
**293** 28:8 73:14
**294** 28:8
**299** 102:18,22
**2nd** 106:21

**3**

**3** 24:22 25:8 28:10, 18,21,23 29:7 57:21 73:13 74:25 76:11, 12,14,20,22 77:3,4 114:19,22
**3/10** 88:1
**3/20** 111:20
**3/20/17** 111:12
**3/22/16** 113:13
**3/3** 111:20
**3/30/2016** 114:7
**30** 56:17 91:11 113:17
**30(B)(6)** 93:24
**300** 102:18 103:2

**31** 56:17
**32** 22:4 56:18
**3rd** 111:14

**4**

**4** 9:25 27:19,21 28:6,9 46:6 64:25 73:11 114:19
**4/12/16** 113:22
**4/21/2016** 92:11
**40-hour** 22:3
**4th** 102:14

**5**

**5** 56:11,13
**50** 74:2 76:1,21

**6**

**6** 9:7 10:3,9 60:2,4

**7**

**7** 64:3,5
**767** 60:11
**7th** 65:21 66:4,6

**8**

**8** 65:13,15 72:8
**80** 22:2
**85** 49:10 50:24 51:3

**9**

**9** 60:21 66:16,18 70:6 78:6 80:6

115:16 116:20
**90** 49:11,12 50:24 51:3 70:23
**92** 79:14
**95** 86:20
**98** 92:2

**A**

**abandoned** 61:2 119:12
**abdomen** 67:3 69:12 71:23 72:22 88:6 113:18 116:12
**ability** 81:5
**about~---** 100:17
**absence** 58:6 83:9,11,12
**academic** 24:13
**academically** 19:4
**accessing** 61:1
**accordance** 101:11
**accounting** 115:12
**accurate** 28:16
**accurately** 8:4 9:3
**achieve** 117:11
**active** 22:19
**actual** 98:4
**acute** 74:1
**ad** 49:23
**add** 64:13,18 89:11
**addition** 10:18 30:24,25 88:16 119:22

**additional** 9:12 44:4 83:23

**address** 6:4

**adequate** 86:1

**adhered** 27:5

**adherence** 29:20

**adjudicated** 42:10

**administrative** 26:1 55:17

**advanced** 37:24

**advise** 13:23 14:15,19

**advised** 15:6

**advising** 17:8

**aforementioned** 36:23

**again~---** 10:4

**age** 5:3 37:12 74:1 76:21

**agencies** 35:10

**agent** 104:19,22, 23 105:5 106:6,12, 15 112:1,4,13

**agents** 95:20 96:1 105:13 110:22 111:24

**agent~---** 104:14

**agree** 49:20 65:24 76:4,24 81:4,24 92:6 100:19 102:25 103:15 104:24 106:11 113:9

**agreement** 52:24

**agreements** 119:7

**agrees** 112:12

**Alabama** 30:23 31:2 32:3 119:20

**algorithm** 36:9 37:13

**algorithms** 36:1

**align** 40:16,18

**alignment** 15:18

**alternative** 42:6, 15,17 48:17 50:22 100:19,20 101:3 114:14

**alternatives** 104:19

**analysis** 101:8 104:9

**Andrews** 5:18 63:21 120:10

**and~---** 106:10

**answering** 7:5 13:11 28:24 30:5 51:20

**answers** 17:7 21:5 89:6,17

**antibody** 95:20

**anymore** 75:3

**any~---** 10:3

**apparent** 71:13

**apparently** 101:12

**appearances** 5:13 102:14

**appears** 72:11 103:1 111:15

**application** 115:11

**applied** 26:18

**apply** 36:18 115:8

**applying** 37:1,14

**appointment** 58:5 88:1

**appointments** 9:16,18,21

**approach** 46:19 115:11

**appropriateness** 12:21 20:12 21:2 32:13,14,15,17 36:1,15,22 37:6,8 38:8,14 45:10 52:5, 9,21 57:16 90:16 95:8,25 97:11 102:4 104:4 105:7 112:2

**approvable** 49:4

**approval** 47:12 50:24 51:3,25 52:11,15 53:3 71:14 95:11 104:10 105:23 113:9 114:6 117:8 118:10

**approvals** 70:21 88:1

**approve** 24:1 45:6 49:3,13 51:5 67:12 77:16 88:22 89:20 108:9 109:2,8 111:19,25

**approved** 41:25 42:2,6,13 44:8,14 47:3,15,20,22 48:3 49:7,11,22,25 50:5, 10,16 51:8,11,13 52:7 67:8 68:11,15, 21 69:10,23 70:15 78:1 82:19,22,23,25 90:9,18,22,24 92:5, 21 103:11 105:6,20 108:3 109:19 111:5, 8,10 112:16,23,24, 25 114:17

**approving** 48:18 80:12 94:17

**approximately** 22:5 87:22 111:11

**April** 10:12 114:7

**area** 6:9 58:1

**areas** 20:23

**are~---** 43:8

**arranging** 42:14

**as-needed** 42:19

**ascertained** 84:18

**aspect** 51:25

**aspire** 27:8

**assume** 7:13 117:5

**assuming** 98:8 105:1 112:12

**as~---** 67:20

**ATP** 51:1

**ATPD** 114:14

**attempt** 100:15

**attempted** 71:15 109:18

**attend** 72:14

**attended** 72:13, 16

**attention** 85:5 99:23 102:20,21

**attest** 49:19 66:13 68:2,13,14 69:16 82:14,24 90:17,23 103:23 113:25 117:24

**attested** 16:5 18:15 22:17 30:19 49:16 50:20 51:9,15 54:10 57:14 58:11 65:8 75:14 80:15 81:24 82:10,15,21 90:13 91:8 106:4

**at~---** 20:14

**audibly** 6:24

**author** 60:19

**authored** 56:20

**authoring** 81:1

**authority** 109:8

**authorization**

**arranging** 47:10 58:3 67:1,8 88:5 113:15,18 117:17 118:5,11,14

**authors** 118:24

**availability** 39:7 72:3 91:15,18 97:9

**averages** 22:8

**aware** 15:25 27:14 58:8 63:4 85:1,19 94:9 101:21 106:20 119:15

**a~---** 48:18 70:20 83:17 92:20

---

## B

**back** 15:10 28:10 37:23 42:9,12 45:3 47:8 50:24 70:6 73:11 78:6 81:18 85:8 86:4 87:25 97:15 111:22 113:17 117:17

**background** 18:24 19:1,3 46:1

**backwards** 111:2

**base** 46:12

**based** 22:21,25 23:24 24:13 29:19 30:13 36:1,13 44:12 48:20 49:4 61:19 68:9,14 69:9 70:18 72:3 73:9 77:22 82:17,24 83:25 87:22 90:19 91:1,6 97:8 101:8 112:1 113:2

**basic** 11:5 37:11, 12 40:9 96:6 110:18

**basically** 52:7 64:11,19,23 86:10

**basically~---** 89:12

**basis** 26:4 36:7

61:11 72:1 103:24

**batched** 88:23

**Bates** 25:1,9 27:22 60:9 64:8 65:17,18 66:19 79:13 86:19 89:5 92:1 97:25 98:20 99:14 107:3 111:6

**bear** 25:1,2,10 27:22 60:9

**bears** 66:19 79:13

**begin** 28:8

**beginning** 9:17, 25

**behalf** 5:19

**being~~~** 109:14

**belong** 83:19

**benefits** 101:17

**be~~~** 72:11

**biased** 62:9,22

**bit** 45:21 50:2 63:17

**bladder** 74:11 75:5 78:25 81:2,22 115:17 116:24

**blood** 72:21 74:13 116:5

**Blue** 19:8,23,24 20:5,15

**book** 119:18

**books** 13:25 17:6, 9

**bottom** 9:9 73:17 100:13 107:9 113:3, 12,22

**break** 7:17,18,21 40:23,25 93:18,21, 22

**breakdowns** 57:25

**briefly** 8:6 23:18

**bring** 85:8

**broad** 11:13 74:2

**broadly** 12:25

**brought** 85:4

**bullet** 100:1,13

**BUN/ CREATININE** 74:12

**business** 14:1, 11 17:6,9 53:4,7 117:21 119:18

**Butler** 66:10,11

**but~~~** 98:16

———

**C**

**calendar** 118:20

**call** 16:6,8,13,18, 20 17:22 23:8 41:16,19,22 42:4 43:15,20,23 44:2,6 45:5,7,19 47:6,19 48:13,16,20 49:9,14 51:12 69:1,3 77:8 79:25 90:4 101:20

**calls** 31:24 44:22 46:8

**can't~~~** 100:21

**cancer** 79:2 81:2, 22 94:6,8 95:19 96:3 103:8 104:1 106:19 107:24

**CAO** 14:9 55:25

**capabilities** 39:25

**capacity** 8:20 13:11 28:25 30:6 51:20

**care** 10:23 11:6,7, 8,10,11,17,22 13:4, 7 15:23 16:15 19:5 21:14,15 23:8 24:2, 6,14,15 33:16,25 34:6,7,18 35:18

38:9,24 40:1,4,5,6, 10 42:18 46:10,20 47:9 61:1 63:22 72:25 73:3,10 74:9 75:17,20 80:17 84:3,9,19 85:13 96:3 119:9

**case** 13:18 24:11, 12 39:21 41:24 42:5,7,10 44:11,17 47:3,24 48:4,5,15 50:21 51:16 52:6 53:17 59:12 60:9, 10,11 61:10 64:23, 25 65:18 67:6,8 68:1,8,10,25 71:11, 14 76:15,21 77:16 78:19 80:13 82:15 85:8 86:5,6 89:15 90:2,13 91:8,9 92:20 96:23 97:12, 13 102:13 108:2,10 111:7 114:10 119:4, 14

**cases** 20:25 23:11,16 41:25 42:2,4 44:8 49:7,12, 22,24 50:9 51:4,7, 24 57:19 68:3 75:13 78:20 82:22

**case~~~** 82:22

**cataract** 46:22 75:16

**categories** 73:25 74:2

**category** 9:17

**causing** 84:14

**cell** 43:9

**cells** 43:11

**centered** 19:9

**CEO** 14:9 55:25

**certification** 10:10,14,15 11:12

**certifications** 10:4

**certified** 5:6 10:11,24

**cetera** 95:4,9

**CFO** 14:9 55:25

**challenges** 23:16 38:23,25 39:13

**challenging** 39:2

**change** 29:1,3 48:12,19 119:7

**changed** 28:20

**chart** 86:4 99:21, 22

**chemo** 108:2 111:8

**chemo/ oncology** 108:3

**chemotherape utic** 110:22,25 111:23,25

**chemotherapy** 95:19 110:19

**chest/ abdomen/ pelvis** 89:24

**chief** 14:14 17:22 56:8

**Chloe** 5:14

**choices** 11:19

**choose** 107:19

**chronic** 11:6

**circle** 111:22

**circumstances** 38:23 39:1 90:17 101:2 115:13 116:15

**city** 6:7

**Civil** 64:20

**claim** 47:11,12

**clarify** 52:15 61:16

**clean** 120:16

**clear** 6:22 7:7 8:18 28:5 51:2 76:18 85:15,18 96:7 109:11

**clerical** 41:19 70:13 71:1,2,3 85:5, 24 86:13 118:1

**client** 39:20 40:19 53:9,10,11,16 59:13 61:9 62:13

**client's** 32:1 40:17,18

**clients** 13:18 15:24 39:23 119:23

**clients'** 30:13

**clinical** 9:21 12:20 18:9 20:11 21:1 27:15 32:14, 15,17 33:3,21 34:20 35:25 36:8,15,21,24 37:5,8 38:7,14 39:13 41:10 45:10, 22 46:4 47:1 48:7 52:5,8,20 57:16 72:4,6 90:16 95:8, 17,25 96:15,25 97:10,11 102:3 104:4 105:7 109:5 112:1 115:6,7,10

**clinically** 13:20 19:4 33:1 34:19 36:17 38:1,5 44:12, 18 53:1,15 93:15 101:7,13 105:2 106:17

**clinician** 17:4 33:5 40:11 74:3,23 96:20

**clinician's** 37:2

**clinician-to-clinician** 57:18

**clinicians** 16:1 23:9 33:25 34:2

39:4 74:21

**clinics** 11:6

**CMO** 14:10,12,13

**code** 88:3

**collegial** 19:15
21:20,21,23,25
22:4,6,14 23:2,5,6,
14,19,24,25 24:19
25:14,16,21 27:13,
18 30:15 31:1,10
41:3,15 42:24 43:23
44:1,6,22 45:2,5,18
46:8 47:4,6,15 48:5,
12,16 49:6,8,12,14
50:9,16 51:4,21
52:1,12,16 53:3,25
57:8,9,11 58:21
59:25 60:25 61:12,
19,22 62:25 63:2,8
65:10 66:4,7,25
67:7,23 68:6,17
69:1,11,23 70:7
71:14 72:10,13,16
75:13 77:9,17 78:7,
13 79:4,22,25 80:2,
7,9,13 81:9,21,23
82:20 83:7 84:20
85:9 86:7,21,25
87:4,9,14,19,21
88:8,14,18 90:4,9,
21 92:4,5,8,12,21
93:4 96:24 107:7
108:21 109:20,24
111:17 115:15
118:24 119:12,13,
16 120:4

**collegials** 14:1,3
17:16 68:1 72:14
87:24 88:25

**column** 43:9
73:22 74:6 99:25

**comment** 83:1

**commented**
83:9

**comments**
68:16 78:8 92:10

**Commission**
10:22

**common** 37:17
46:18,19 47:1 78:24
84:7 88:21

**commonly**
15:10 83:8 95:1
99:21 116:11,12

**commonly-
used** 94:25

**communicated**
42:12 47:5 49:1

**community**
11:8,11 12:18,23
13:1,6,9,25 14:22
15:2,11 16:23
38:10,17 39:3 91:16

**company** 14:7
15:23 16:1 30:12

**compares** 14:25

**comparing** 11:8

**compiled** 70:12

**compiles** 41:9

**completed** 70:9,
24 71:4,15 85:7
96:12

**completely**
109:10

**completion**
70:14,16 71:7,21
82:7,9,12 84:25
85:3,21 91:2,7

**complex** 75:16

**compliance**
29:14 30:1

**compliant** 59:11

**complicated**
61:17 97:14

**complications**
95:3

**comply** 31:25

**component**
26:16,23 33:24
47:18 57:15 72:24

**concepts** 32:11,
16

**concern** 16:24

**conclude** 120:21

**concluded**
120:25

**conclusion**
58:9,13,17,19 61:4,
12,22 62:2 63:1,5,7

**conclusions**
53:24 58:25 59:3,4,
25

**condition** 97:1

**conditions**
46:22 47:1

**conduct** 22:7
30:15 37:19 40:5

**conducted**
31:11 44:23 66:8

**conducting**
45:4

**confident** 85:15

**confirm** 74:18

**consensus**
62:21

**consideration**
73:8 112:5

**considerations**
39:8,17

**considered**
27:17

**consistent**
16:22 116:10

**consult** 46:13

**consultant**
42:15 43:6 88:15
90:15 93:6,13 96:11
112:12

**consultant's**
91:17

**consultants**
48:9 105:9

**consultation**
57:11

**consultations**
57:7 58:10

**contacts** 65:4,6
114:12

**contained** 43:2
67:10

**contents** 25:19
29:8,23

**context** 20:11
21:2 33:12 37:1
38:9 61:7 62:10
68:19 97:17

**continue** 60:23
84:10 119:16

**continuing**
116:16

**contract** 12:12
16:16 17:2,18
30:12,13 31:9,10
54:22 55:12,15,18
58:16 59:2 63:9
69:21

**contracts** 14:3
17:10,11 22:22
30:22 31:12 39:24
119:19,25 120:6

**control** 91:15,21

**conversation**
24:10 62:17,18
109:3

**conversations**
24:6 62:15

**copy** 9:2 57:5

**corporate** 12:6,
13 13:21 17:13,19,
23 18:5,19 36:4
41:23 55:19

**Corporation**
35:23

**correct** 6:11 9:10
10:12 18:22 19:24
21:7,11,23 23:4
24:2 32:12 34:14

35:12 40:7,21 45:14
53:18 57:1,8,12
67:11 68:23 70:1
75:13 76:3,10,23
80:7,8,11,20,21
85:23 86:3 104:2
108:6 109:15,21
114:25 116:7,8
118:21 120:3

**correctional**
10:22 11:10 13:8
38:8,15

**corrections**
10:11,20 13:2 40:20
53:17 55:9 79:16
119:3

**correctly** 39:16

**corresponds**
76:12

**cost** 95:13,16
104:1,7,15,23
105:4,12 111:22
112:5,13,14

**costly** 104:20,22
105:25

**cost~---** 104:14

**counsel** 8:15
62:7,16 81:19 98:17

**counties** 119:23

**couple** 110:12

**courses** 67:19

**court** 6:18 7:8
8:24 24:24 27:20
56:12 60:3 64:4
65:14 66:17 79:11
86:17 89:3 91:24
99:12 102:10 107:3

**court-
appointed** 53:20
56:19 59:19 60:15

**cover** 11:2,21
22:22 25:3,11
30:19,21 42:23
56:15 60:6 102:12

**coverage** 23:1

**covered** 11:4
25:21

**covers** 35:19
107:3

**created** 67:13,15
100:8

**credential** 10:18

**criteria** 34:1,12
35:1 36:9,21 75:16

**criticisms**
118:23

**Cross** 5:8 19:8,23
20:5,15

**CT** 88:6 89:21,23
90:3,8 91:3 113:9,
15,18 114:7

**current** 21:19
28:12 48:10

**customary**
69:18

**CV** 9:2,3,7,13,18,
19,22 10:1,5,8
60:10

**cystoscopy**
75:4 76:3 88:2 91:3
113:16

**D**

**D.O.** 5:2

**date** 25:6,11 28:1,
15 66:9 70:8,14,17
71:7,22 82:5,7,13
84:25 85:3,21 91:3,
7,20 92:11 100:12
106:23 111:12
113:3,14 117:14,19

**dated** 56:20 60:16
64:8 66:6 89:7
100:4

**dates** 82:9 91:12
94:12

**day** 22:7,9 118:9

**day-to-day**
26:3,7

**days** 31:17,21
70:23 87:23 91:11
111:16,20 117:21
118:18

**Dean** 5:12 44:23
45:2 63:23 64:1
65:7,10 67:23 68:2,
20 69:11 80:18 82:6
87:15 89:7 94:9
98:7 106:20 114:15

**Dean's** 63:22
68:8,10 77:20 79:6
80:13 84:21 85:13
89:21 92:20 97:18
99:7 114:11 115:14

**December** 53:19
56:20 102:14

**decides** 70:16
71:6

**deciding** 95:14
112:7

**decipher** 81:5
100:15

**decision** 31:18,
21 34:10 44:24
45:5,11 46:4 96:18
105:19 111:24
112:6 115:11
116:23

**decision's**
112:4

**decisions** 31:9,
14

**decline** 50:15,18

**deemed** 44:11
84:15

**deems** 43:20

**defendant** 59:12
65:17

**defendant's**
64:6 89:6

**defendants**
5:19 64:21 89:17

**define** 36:20,25
37:5 54:16 90:5

**defined** 12:18
96:9

**definition** 33:6

**definitions**
45:13 74:2

**delays** 58:1,3,4,5,
6

**department**
40:19 53:16 55:8
79:16 119:3,7,12

**deponent** 5:17

**deposed** 6:10,13

**deposes** 5:6

**deposition** 6:22
7:16,25 8:7,8,12,16,
22 45:14 102:12,24
109:12 120:12,24

**depositions**
67:20

**describe** 19:17,
20 44:9 62:5 73:19
94:19

**describes** 92:3

**designates**
41:18

**destruction**
115:24

**detail** 32:5 59:4

**details** 60:1 62:20

**determinant**
95:16 105:5

**determine** 35:25
36:6 47:13 95:24
97:10

**determined**
33:10 41:5 42:7
47:3

**determines**

112:15

**developed**
36:10

**development**
20:21 30:10

**devices** 32:21

**diagnoses**
83:25

**diagnosis**
73:22,24

**diagnostic**
114:6 117:12 118:3

**diagnostic~---**
118:3

**differ** 11:10 20:5
38:8,14

**difference** 31:6
105:13

**differences**
20:9 31:6 32:6

**differently** 26:7

**dipstick** 74:19

**direct** 18:7 20:16
57:5,22,23 64:9
65:12 67:25 80:16
97:20 99:23 101:19
102:20,21 106:22
108:24 110:14

**directed** 108:17,
22 118:23

**directing** 10:3,9

**directly** 89:10
105:22 108:13

**director** 12:6,12,
14 13:22 17:13,17,
20 18:6,19 19:7,23
34:3,4 36:4 41:17,
21 44:15 52:10
55:18,20 66:12
67:21 96:13 101:20

**directors** 18:10,
12,14 46:13 55:19

**disagree** 100:21

**discern** 100:22

**disclose** 64:21

**disclosed** 64:24

**disclosures**
64:7,10

**discoverable**
65:3

**discretion** 43:19

**discuss** 16:11,13
24:1 44:15 45:6
101:2,20 103:10

**discussed**
29:17 34:12 42:4,24
45:13 47:15 48:5,6
50:9 55:1,12 56:4,7
58:13,18,20,22
59:1,5,6,14 62:2
63:9 68:12,14,17,
19,20 71:13 81:23
82:1,3,19,23 90:21,
24 92:20 93:4 96:23
97:3 106:2,8 108:20
109:12 115:15
116:17

**discussing**
56:25 65:10 80:12,
17 83:20 86:5
102:24

**discussion** 41:2
42:1,3 44:14,19
48:3,19 49:8,13,21
51:23 52:1 57:18
68:8 70:20 85:9
93:8 94:4 97:12
105:25 106:9
108:23 110:10
111:22 116:22,24

**discussions**
29:19 49:17,18,24
62:5,11 68:1

**disease** 74:17
79:1,2

**dispute** 94:12

**distinction**
26:25

**doctor** 6:8,10 8:6
23:10,15 41:14
49:1,2 50:6 52:22
53:2 63:17 64:9,12
65:22 66:15,21
71:18 73:11 79:9,15
86:4,9,14,15,23
91:22 92:3 93:20
94:5 96:6,21 97:5
99:10 103:25
105:22 106:18
113:8 120:15

**doctor's** 77:22

**doctor-doctor**
24:10

**doctor-to-
doctor** 24:6 51:23

**doctors** 23:13
24:15 39:25 50:2
90:15 97:3 106:3

**document** 25:1,
9 27:22 28:9 43:15
47:7 56:14,23 57:4,
21 58:11 59:22
60:5,7,8,11,21,22
61:4 62:8,16,19,22
64:6,15,19 65:16
66:21,22,23,24
67:4,10,12,22 68:9,
15 69:10,17 70:12
72:9 73:15 79:8,13,
19,21 80:5,19,22
81:1 82:4,10,17,25
86:15,19 89:8 92:1,
14,24 97:23 98:1,2,
4,19,22 99:5,14,16,
18 102:15 107:1,6,
17 111:6 112:22
117:14

**documentation**
43:25 44:4 45:16,18

**documenting**
96:13

**documents** 8:8,
10 25:19,24 26:6
27:6 29:11,24
43:12,13,17 44:25
47:14 48:25 49:5
56:17 80:1 86:24

87:13,20 90:1 91:2
96:15 107:14

**documents~~~**
56:16

**does~~~** 36:5

**domain** 98:18

**double-sided**
9:7 79:13

**doubt** 106:23

**drainage** 83:14

**draw** 26:25

**drive** 102:2

**drug** 94:6 97:24
100:18 101:3,14
102:1 103:8,14
106:1 112:6

**drugs** 104:1
110:20,25 112:8,9

**due** 101:25

**duly** 5:3

**duration** 37:24

**duties** 13:21 18:8,
18

**DX** 73:23

**E**

**E-MAIL** 43:14
65:16,19,20 66:1,3,
6 72:8 79:24

**earlier** 16:5 18:15
30:19 49:16 50:20
51:15 57:14 65:8
75:11 81:25 82:11,
15 84:24 106:4

**easy** 77:8,13 90:4,
6

**educate** 16:2

**educating** 16:3

**education** 9:4

**effect** 28:13

**effective** 28:11
104:23 105:15
106:1,7

**effectiveness**
25:6,12 28:1,15

**effects** 103:7

**efficacy** 95:17

**efficiency** 48:2

**Einwohner**
65:17,19,21 66:3
72:10,13 78:8

**emergency**
20:20

**employed** 6:1

**employees** 62:3

**enacted** 55:8

**enacting** 42:17

**encompassed**
90:19

**encompasses**
103:4

**encouraged**
118:7

**encourages**
114:5

**end** 51:12 83:2

**engagement**
20:17

**ensues** 109:3

**ensured** 61:3

**enter** 104:1

**entities** 13:13
15:14 33:18 35:23

**entitled** 25:3
27:24 56:18 60:12
73:15 97:24

**entity** 35:17

**entry** 99:24

**equally** 104:22
105:15 106:1,7

**equation** 102:2,5

**essence** 20:12
108:9

**essentially**
10:17 12:19 17:16
31:11 36:6 86:3
108:16

**established**
15:13

**establishes**
102:23

**evaluate** 27:9
74:16 95:6

**evaluated** 72:23
78:4

**evaluating** 78:9
88:23

**evaluation**
29:23 37:2 38:2
40:10 48:9 72:24,25
73:4 74:4,8 75:17,
19,22 84:17

**evaluations**
30:2

**events** 85:11

**eventually**
103:11 114:17

**evidence** 15:15
16:23 21:2 36:13
83:3,4,14,23 84:14

**evidence-
based** 33:16
34:13,16,17

**evident** 84:8

**exam** 48:7 69:12

**examination**
5:8 73:5 110:14

**examples** 26:12,
14 78:24

**excerpt** 28:6
56:14 60:5 102:12,
17

**excuse** 9:24
17:24 69:24 90:7
99:20 102:18
107:23 108:22

**exhausted**
40:13

**exhaustive** 84:2

**exhibit** 8:24 9:1
24:25 25:2,8,10
27:19,21,23 28:6,
10,15,17,18,20,21,
23 29:7 30:4 46:6
56:11,13 57:22
60:2,4,6 64:3,5
65:13,15 66:16,18
70:6 72:8 73:11,14
78:6 79:10,12 80:6
86:16,18 89:2,4
90:20 91:23,25
97:21,23 98:16
99:11,13 102:9,11
106:25 107:2 111:3
112:17,18 113:8
114:19 115:16
116:16,19

**exhibits** 24:22,25

**exist** 120:1

**existed** 59:9

**existence** 53:23
54:12 67:17

**existing** 19:14
21:3

**exists** 95:5

**expect** 54:20
81:9,21 89:14 91:6,
10

**expectation**
39:23 40:9,15,16,18
43:3 118:13

**expectations**
29:21 30:14 31:8
40:17

**expected** 70:23
83:18

**expects** 53:12

**expense** 101:25 102:2,5 103:13,25

**expensive** 103:8

**experience** 9:4 10:19 11:16 21:12 24:14 25:23 27:3,6 30:11 33:24 46:12, 18 49:10 59:3 62:25 70:19 71:24 77:22, 25 88:10,20 91:6,9 93:2 105:8 108:24 109:1 113:25 114:10

**expert** 53:20 56:19 59:19 60:15 102:17

**explain** 41:3 89:15

**explanation** 85:6,10,22

**expressing** 103:21

**extensive** 19:3

**extremely** 101:14

**F**

**F/u** 108:2,3,6

**face** 23:17 38:24 39:14 41:25 42:3 44:9 45:6,11 47:4, 16,20 49:7,11,25 51:5,11,14 68:11,21 77:16 82:19,23 90:10,22,25 92:22 108:10 109:2

**facilities** 22:12, 13,19 23:14

**facility** 39:9 41:20 74:10 78:5

**fact** 59:8 62:21 87:22 93:5 107:16

**factor** 37:7 102:5

**factors** 33:11 97:9

**facts** 84:1

**fair** 6:7 19:21

**fall** 12:15

**familiar** 53:19 59:18,21,24 61:3,5 67:16,17 94:16 110:16,24

**familiarity** 53:23

**family** 19:3 34:25

**fax** 113:5

**February** 80:9, 13 81:10,20,23 82:20

**Federal** 64:19

**feel** 9:5 106:16

**feels** 93:13

**fell** 108:15

**fellowship** 19:6

**field** 65:22

**file** 79:23

**filed** 60:17

**fill** 14:2 31:5 41:7 49:2

**final** 56:18 104:9

**find** 46:14,16

**finding** 60:24 116:6

**findings** 48:8 59:15 60:23 72:7 73:9

**finds** 101:6

**fine** 63:21

**finish** 7:4,6 93:21, 24

**firm** 114:23

**flip** 27:25

**focus** 63:13 107:5,21

**follow** 75:21 107:19 108:6

**follow-up** 42:18 58:7 87:2

**force** 33:19 35:12 86:9

**form** 41:7 61:24 77:10 79:18 96:12 110:2 117:15

**formal** 14:16 16:5,10 18:7 29:7, 22 94:24 118:14

**formalized** 14:18

**formally** 118:15

**formulary** 94:21 95:14 96:9 105:11 110:2,5,17,19,23,25

**forum** 23:9

**forward** 93:9

**for~~~** 27:9

**found** 57:25 98:17

**foundation** 100:3 103:18

**fourth** 57:23 60:24

**frame** 59:9 70:22 71:16 117:11

**frames** 114:4

**free** 9:5

**frequently** 48:23

**From~~~** 16:25

**front** 25:3,11 27:23 111:4

**fulfill** 106:7

**fulfills** 53:8

**full** 57:23 117:21

**function** 17:16 18:16 23:9,25 24:4, 5

**functionally** 31:4

**functions** 69:2 71:9

**FYI** 50:8

**G**

**G-2** 25:10

**gaps** 48:24 49:2

**Garcia** 22:23 23:3

**gave** 85:18

**general** 11:17 13:23 21:15,17 29:16,20 33:15 45:4 46:25 48:1 62:21 70:18 77:21 118:12

**generally** 45:3 46:9 47:2,23 67:14 70:10 71:25 75:2,23 91:10 94:21 95:16 104:25 110:6

**general~~~** 29:20

**generate** 67:6

**generated** 42:21 113:14

**generates** 67:4

**generic** 98:8 99:3

**generic~~~** 99:2

**germane** 15:25 97:1

**give** 15:5 26:12,14 33:6 37:22 39:22 51:17 84:3 112:6

**give~~~** 91:12

**giving** 45:12

**global** 21:17

**globally** 27:17

**glomerular** 74:16

**Godinez** 53:22 56:19 59:20 60:16

**good** 5:10 85:22

**Google** 45:23

**govern** 24:18 25:14,15 27:13

**government** 13:3 35:10

**governmental** 15:14 33:18 35:17

**greater** 74:1 76:21

**ground** 6:14

**Guagianone** 94:11

**guess** 11:14 30:9 33:8 36:19 37:22 39:21 53:6 73:21 78:23 86:12 87:5 90:5 103:8 107:20 113:14

**guidance** 29:10

**guide** 84:9

**guideline** 27:2 28:12,17 30:4 37:13 76:7,11,17,19,23 112:10

**guidelines** 15:19 14:20 25:14, 15 26:2,9,10,16,18 27:7,13,24 28:2,7, 24 29:6,8,11,15 32:3,7,8 33:22 46:6, 14 73:12,16 75:12, 15,25 95:21,22,23 97:17 101:11 102:8 104:16,17,18 105:16 106:6 114:20,23

**guidelines~~~** 104:15

# H

**hand** 118:15

**handed** 24:24 25:7 27:20 56:12 60:3 64:4 65:14 66:17 79:11 86:17 89:3 91:24 97:22 99:12 102:10 107:2

**handwriting** 81:6 100:7 113:12, 21 117:2

**happened** 111:11

**happy** 26:15,22

**hard** 100:15

**harms** 101:16

**hazard** 61:2,13, 20

**he'll** 22:24 120:19

**head** 6:25

**header** 65:20

**heading** 57:6 60:22 108:16

**heads-up** 50:8

**health** 6:2,4 10:11,23 11:10 13:4,7,14 15:23 21:14,15 32:21 38:9 74:9

**heard** 61:5,7

**Hector** 22:23 23:3

**held** 12:8

**helpful** 46:15,16

**helps** 36:6

**hematuria** 72:20 73:1,17,20,25 74:3, 4 75:22 76:1,12,13 77:1,5,8,15 78:10, 22 83:21 115:20

**hereinafter** 5:6

**hey** 24:10,11

**higher** 18:2

**Highmark** 20:15 21:4

**hire** 21:10

**hired** 18:25 19:2 21:19

**history** 37:13 48:8 72:5 73:5 77:20 78:11 114:11 115:19,21 116:1

**hoc** 49:24

**hold** 12:5

**Holt** 5:14,18

**honors~~~** 9:24

**hospital** 9:21 14:23 75:6

**hour** 7:19 23:22 40:22

**hours** 22:4

**hundreds** 68:3

**HX** 78:10

**hydronephrosis** 83:3,12,24 84:6

**hypothetical** 77:11,19,24 90:12

# I

**I'LL~~~** 39:22

**I'M~~~** 81:18

**I'VE~~~** 61:5

**ID** 118:14

**identification** 58:2

**identified** 56:2 83:18 96:10 98:20 108:15 120:2

**identifies** 106:5

**IDOC** 5:19 66:20 79:14 80:23 82:5 86:20 92:2 97:25 99:14,19 107:4 110:16 111:1

**ill** 101:15

**Illinois** 13:19 14:2 17:15,17 18:13 21:23 22:18,24 25:5 27:25 30:5,8,24,25 31:3 32:8 40:5,19 46:7 53:16 54:22 55:13 63:10 69:21 73:12 79:16 110:17 114:20 119:19

**Illinois's** 23:2

**imaging** 14:23 15:5,8 20:20 37:24 43:6,10 69:20 73:9

**immediately** 18:1

**implies** 26:13,17 32:20 83:13

**important** 6:21 33:24

**imposes** 114:5

**inability** 85:19

**incarceration** 11:18

**include** 76:6

**included** 9:13 115:20 116:2

**includes** 69:23 103:5

**including** 60:13

**incomplete** 77:11,18,24 90:12

**independently** 94:14

**Indiana** 30:22 31:2,22,24 32:3 119:19

**indication** 113:5

**individual** 33:13 82:16 115:13

**individuals** 41:17 56:2,21

**infection** 78:25

**inflammatory** 62:10,24

**informal** 19:18

**information** 9:12 36:11 37:11 41:10,11,13 42:8 43:1,4 44:13 45:21, 24 50:3,23 51:1 64:22,23,25 65:3 69:6 78:18 97:9,10, 15,16 109:5

**initial** 12:10

**initially** 44:5 49:4 111:17

**initiate** 40:2

**inmate** 11:15 38:24 39:3,4,9

**inmates** 11:7,22 24:7 40:4

**input** 48:8 70:19 89:21 97:12

**inputted** 117:20

**instance** 13:17 16:18 37:25 43:8 47:21 67:2 69:5 71:12 84:13 86:5 95:18 106:11 109:4 111:23

**instances** 26:11 37:10 38:22 46:21 85:4 109:1

**intended** 115:7

**interaction** 95:3,9 103:22

**interest** 48:1

**interested** 15:20

**interesting** 24:12

**intermittent** 72:19,20 73:1 77:8, 15 78:10 115:20

**interpret** 108:8

**interpretation** 103:21

**interpreted** 76:16

**Interqual** 33:23 35:20,21 36:5,6,12

**interrogatories** 89:6 98:15

**interrogatory** 98:21

**intervention** 36:8,14,16 74:8 75:7 101:16

**intravenous** 75:1

**intrinsic** 74:17 79:1

**invariably** 39:24

**investigation** 84:17

**involve** 74:20 78:2 112:5

**involved** 13:13 17:1 20:16,19,22 30:10 45:1 96:22 101:5,19,24

**involvement** 79:5 84:21 99:6 100:24

**involves** 41:16 57:14

**issue** 45:22 47:25

**issued** 56:24

**issues** 10:20 11:5,6,18 16:22 20:17 21:15

**is~--** 34:18 41:24 60:5 72:1 103:5

**It's~--** 43:3

**Item** 89:18 98:21

**its~--** 53:8 55:6

**it~--** 10:17 20:9

**IVP** 75:1,8 76:2

**I~--** 8:18 45:15 87:5 98:8

## J

**jail** 17:11 120:5

**jails** 30:20 119:23

**January** 25:12 28:11 65:11,21 66:4,6 67:24 68:11 69:11 79:4,8 116:18,25

**job** 12:10 17:13 18:8,17 20:13 26:3 29:16 30:2

**jobs** 16:2

**Joe** 5:16

**judge** 35:1,5 36:21 45:11

**judgment** 37:8 38:7,14 39:18 44:17 115:7

**July** 9:9,13 25:6 28:16 64:8

**just~--** 98:12

## K

**key** 60:23

**kidney** 79:1 84:7 92:18 93:13 115:24 116:2,10,13

**kidneys** 74:11,18 79:2 83:14

**kind** 86:7 118:19

**knowledge** 9:6 21:18 28:12,14 29:13 30:3 54:14

**KUB** 74:11

## L

**L-E-H-M-A-N** 17:21

**L-I-P-P-E-R-T** 118:23

**labeled** 30:5 102:16

**larger** 56:14 57:3 60:5,7,8

**largest** 17:18 19:8

**lawful** 5:3

**lay** 100:2

**leaders** 19:14

**leadership** 14:5, 7,20 15:7,20 26:1 55:16,17,22 60:14

**leaderships** 13:23

**learned** 54:6,11

**legal** 59:10

**Lehman** 17:21 18:3 29:18 30:2 56:8 62:6,18

**Lehman's** 17:25

**lesion** 84:8,15

**lesions** 83:4,15, 16,24

**letter** 26:19 27:11

**level** 11:17 74:10 75:17 96:6

**licensure** 10:10

**licensures** 10:4

**lifestyle** 11:19

**likes** 89:11

**limitation** 39:7

**lines** 78:7 83:2 102:22 103:2,4 107:21,23

**Lippert** 53:22 56:19 59:20 60:16 61:10 118:22 119:4, 14

**list** 47:21 51:4 78:24

**listed** 9:19,22 10:1,5 34:1 60:19 65:22 73:17 75:8

**lithotripsy** 78:11 115:21,23

**litigation** 5:24 53:21 59:20

**live** 6:8,9

**lockdowns** 91:19

**logistical** 59:13

**long** 23:19 97:6 104:23

**longer** 39:5

**looked** 33:12 37:18 46:5 95:13 109:4

**lot** 16:20,21 17:2 24:14 95:2 103:7

**low-risk** 78:1

**lower** 104:23

**lower-cost** 106:6,12

**lowest** 112:13

**lumbar** 15:18 16:9,19,22 37:25

**lunch** 93:22

## M

**M-C-K-E-S-S-O-N** 35:22

**M.D.** 56:21

**made** 44:24 63:4 85:1,19 112:4,7 115:12 119:7

**main** 20:9

**major** 35:16 60:14 71:9

**make** 13:15 15:16 39:18,19 63:14 69:6 96:7 97:2 101:15,21 105:3

**makes** 7:24 44:17 95:10 112:13

**making** 45:10 86:4

**malignancy** 74:25 76:2,8

**man** 116:2

**manage** 15:2,17 24:11

**management** 12:7,14,16,17,25 13:3,12,22,24 15:7 16:14 17:8,14,20 18:6,11,14,20 19:11 20:2,4,6 25:4 27:15 28:13,22,23 30:7 32:2,7,11,18,19 33:22 34:7 35:24 36:4 40:10 44:20,21 47:1 51:24 54:1 75:18 84:10,11 96:21 115:10 120:4

**managing** 32:22,24 39:21

**manners** 42:11

**manual** 115:10

**March** 81:11 87:3, 10,15 106:21 111:14 113:10,17

**mark** 8:24

**marked** 9:1 24:23,25 25:8 27:19,21 46:5 56:11,13 60:2,4 64:3,5 65:13,15 66:16,18 79:10,12 86:16,18 89:2,4 91:23,25 97:21,22 98:16 99:11,13 102:9,11 106:25

**mass** 83:17 84:8 93:5,12

**matches** 47:12

**matter** 5:12 27:3

**matters** 59:14

**Mckesson** 35:22

**means** 33:7 74:7 83:15 113:24 117:6

**meant** 13:7 77:19

**Med** 97:25 99:15

**medical** 10:19 12:6,11,14,20,21 13:21 14:14 17:13, 17,20,22,23 18:2,5, 9,12,13,19 19:7,23 20:11 21:1,14 27:15,16,24 28:2 32:12,13,16,25 33:6,10,15 34:3,4, 13,17,24 35:2,5,14, 25 36:4,23 37:13 41:17,21 44:15 45:9 46:6,12,25 51:21,22 52:4,8,9,10,12,17, 18,20,21,25 55:18, 19,20 56:8 57:15 66:12 67:20 73:12 79:17 90:16 95:7,25 96:12 97:5,11 101:19 102:3 104:4 105:6 112:1 114:20 119:9

**medically** 13:19 34:18 44:11,18 53:1,14 93:15 101:7 105:1 106:16

**medication**  94:19 95:12,14 96:8 101:6,17 102:7 104:5 105:14 106:19

**medication's**  105:20

**medications**  32:21 48:11 74:15 94:17,22 95:1,19 109:25 110:3,4

**medicine**  19:4 20:20 34:13,16,17, 25 95:1 112:15

**meet**  112:11,14

**meeting**  54:20 55:13,14,23,24 56:1 58:17

**meetings**  16:10 55:5,10,11 56:6,9 58:20,22 59:2,5,7, 14 63:10

**meets**  36:9

**memorialize**  47:17

**memorialized**  47:7,9 50:14 70:10, 11 82:10

**memorized**  6:6 31:16 46:24

**memory**  25:18 32:9 66:23 67:25 68:4 89:10

**mentioned**  19:22 21:5 35:11,20 119:3,18

**mentoring**  19:13

**merely~~~**  108:21

**met**  52:7 63:23

**me~~~**  17:24

**microscope**  74:21,24

**Microscopic**  74:18

**Mike**  60:18

**mind**  5:22 39:15 48:12,20

**minutes**  23:21, 22 70:4

**moment**  28:9 110:9

**monitor**  62:12

**monitoring**  29:14,25 85:25

**monoclonal**  95:20

**monthly**  55:11, 14 56:9 58:16 59:1 63:9

**more~~~**  24:9

**morning**  5:10

**Mr.~~~**  17:24

**MRI**  15:10,18 16:9 37:25 38:3

**MRIS**  16:19,21 17:3

**multipage**  25:1, 8 27:21 64:5 86:19 92:1 107:1

**multiple**  67:19 68:4

**my~~~**  84:3

---

**N**

**named**  53:20 59:19

**Nate**  40:23 81:11

**Nathaniel**  5:10

**national**  10:22 95:21 96:3

**Nawoor**  68:18 80:25 82:1 92:5 102:13 103:12,20

116:18,22

**Nawoor's**  100:10,12 103:3

**NCCHC**  10:17,21

**NCCN**  95:22 96:2 97:17 101:11 102:7 104:17

**necessarily**  42:2 43:18 66:8 68:5,20 76:24 77:3 88:12 105:11

**necessity**  12:20 20:11 21:1 32:13, 17,25 33:7,10,16 34:13 35:2,5,15,25 36:24 45:9 52:5,8, 20 57:15 90:16 95:8,25 97:1 102:3 104:4 105:6 112:1

**necessity~~~**  52:25 53:14

**needed**  22:21 41:18 42:8 51:1 108:10,17

**nephrectomy**  92:4,17 93:3

**nephrology**  75:10

**Network**  96:4

**newer**  95:19 105:13

**nice**  7:7

**nods**  6:25

**non-formulary**  95:15

**non-idoc**  69:25

**non-specific**  116:6

**non-urgent**  71:10 88:25 114:10

**non-wexford**  69:25

**nonapproval**

95:11

**nonapproved**  50:21

**nonclinician**  73:21

**nonformulary**  94:17,19 95:5 96:5, 24 97:6,19,24 98:6, 22,23 99:7 100:25 101:25 103:14 104:2,3,8,12 105:23 108:4,11,14,18,23 109:7,11,13,23 110:6 111:5,18 112:19,23

**nonurgently**  117:9

**noon**  93:16

**normal**  86:8

**Nos**  76:6 77:1

**note**  99:19,22 100:8,12 107:22,24

**noted**  83:6 88:13 93:5

**notes**  8:11 43:6, 10 69:1,3,7 70:7 78:6,12 80:6 83:7 86:21 87:4 90:19

**notification**  88:15

**November**  60:17 113:6

**number**  47:10 49:16,20 51:4,10,17 58:4 60:9 67:1,9 72:2 88:5 97:8 101:9 113:15,18 117:17 118:5

**numbered**  89:5 92:1

**numbering**  56:17

**numbers**  107:3

**numerical**  46:23

**numerous**  78:23 91:19

**nurse**  41:8,9,22 43:15,18 44:1 45:17 67:5 68:24 69:2,5 71:8

**nurse's**  43:12 70:19

**nurses**  107:12,19 117:21,22,23

**nursing**  41:20 70:13

---

**O**

**oath**  6:16

**object**  37:21 38:11,19 53:5 61:24 77:10,23 90:11 103:17

**Objection**  77:18

**obstruction**  83:13 84:6,15

**obtaining**  58:3,5

**obvious**  83:13 84:8,14

**Occasionally**  71:10 105:24 108:12

**occur**  48:22 49:17,18 73:1 88:20

**occurred**  80:9 85:12 92:9

**October**  28:1 60:16 94:10

**off-site**  23:8 24:2 41:6 52:6 57:6,12, 16 58:2,6,9 69:22 96:11

**offer**  24:17 34:8,9 75:18

**office**  75:6

**officer** 14:14
17:23 18:2 56:8

**oftentimes**
41:19 68:23 74:19
77:25 106:12

**of~--** 21:12 95:11

**older** 75:3 76:9

**on-site** 73:6 97:4
115:17 116:23
118:3

**on-the-job**
19:20

**oncologist**
94:11 100:17
101:21,22 104:24
106:9,10

**oncology**
107:24 108:1

**Opdivo** 106:18,
21 107:25 108:4
111:4,8

**operational**
19:15 25:24 26:5

**opine** 61:14

**opinion** 30:11
77:7 82:2 103:22

**opinionated**
62:9

**opinions** 34:8,9

**opportunity**
23:15

**opposed** 31:3
38:16 40:6 48:18
68:21 109:23

**oral** 110:3

**order** 88:11
112:18

**organization**
35:3,4,7

**organizations**
15:13 33:20 34:22,
23,24

**orientation**
19:16

**original** 56:16
57:21 111:13

**orthopedics**
34:25

**or~--** 17:22 120:17

**our~--** 13:18
62:21

**outline** 24:21

**outpatient** 99:19

**outweigh** 101:17

**overview** 60:14

---

**P**

**P-A-N-Z-O-P-**
**A-N-I-B** 98:25

**P-H** 5:24

**P-U-I-S-I-S**
59:23

**p.m.** 120:25

**Pacer** 60:17

**pages** 28:7 56:15,
17 60:7 64:11 86:19
102:16,18

**pain** 15:11 37:23
74:14

**painful** 74:1

**painless** 74:1
77:1,5

**panzopanib**
98:24

**paperwork** 58:6

**paragraph**
57:23 115:2

**part** 19:16 20:24
29:22 32:22,23
39:12 44:23 57:9
67:17 72:17 73:20
79:22 93:24 102:17

103:13 106:8
117:25 119:6

**parties** 33:17
35:10

**past** 116:3

**pathways** 115:6,
9

**patient** 33:25
34:6,7 36:18 37:3,
11,23 38:2,5 39:10,
21 40:14 43:1 50:4
58:7 61:1,2,13,20
68:17 72:19 74:5
76:25 77:7,15 78:2,
4,9 84:16 86:6 95:4
97:1,4 101:3,14
115:20

**patient's** 33:13
37:7,9,16,18 47:22
48:7 72:5,6 99:21
106:8 112:11,14

**patients** 38:24
39:3,4,9 40:3 42:23
115:8

**payers** 13:2

**paying** 16:21

**payment** 16:25
17:1 88:4

**PDF** 43:15 79:23

**pelvis** 88:6
113:19

**pended** 42:7
50:23

**pending** 7:20

**Pennsylvania**
12:12

**people** 14:11
54:20 64:21 76:21

**percent** 22:2
49:11,12 50:24
51:1,3

**perform** 31:5

**performance**
29:17

**performed**
96:17 114:2

**periodically**
29:17

**person** 64:24
71:1,6

**personal** 8:20
13:11 28:24 29:13
30:6 51:20 94:1

**personally**
22:15,16 30:17,18

**personnel** 55:20
69:25

**perspective**
24:17 36:3

**pharmacist**
113:3

**pharmacologis**
**t** 103:9

**pharmacy** 14:24
55:21 94:25 95:5,22
96:16 97:13 101:5
104:13 105:18
106:4 112:24

**Phil** 120:9

**Philip** 63:19

**Phillip** 5:18

**phone** 41:16 42:4

**phrase** 103:5

**physical** 73:5

**physician** 12:11
19:14 33:9 44:21
66:11

**piece** 36:11,25
53:21 64:13 69:6
105:17

**Pittsburgh** 6:9
19:6,9 21:7,13
41:22 103:10

**place** 29:6

**plain** 74:12

**plaintiff** 5:11,15
65:4,6

**Plaintiff's** 9:1
24:22 27:19 56:11
60:2 64:3 65:13,15
66:16,18 79:10
86:16,18 89:2,4
91:23,25 97:21,22
99:11,13 102:9,11
106:25 107:1

**plan** 20:16 42:7,
16,18 48:17 50:22
107:25 117:8

**planned** 114:14

**planning** 11:22

**plans** 19:8 99:25
100:14

**play** 71:18

**point** 7:16 37:4
38:3 42:5 68:7
71:14 100:1,13
104:11,13 112:6

**points** 81:19

**policies** 24:18
25:4 26:8 27:12,15,
16 28:22 30:1
114:24 119:8

**policy** 19:5 20:21
21:3,6,13,14,16
27:1,5 28:11 30:4,7

**population**
11:15

**portion** 93:17
102:23 120:12

**position** 18:25
21:19

**positions** 9:16,
19

**positive** 74:19

**possibility**
100:24

**Possibly** 117:19

**potential** 83:22
95:3 101:17 104:19

**potentially** 96:1 112:11

**power** 93:19

**practice** 26:7 69:18

**practices** 34:21 36:14

**practitioner** 115:12

**Precise** 69:19 118:17

**preface** 115:1

**preference** 40:5,8

**preparation** 8:8,11,15 41:15 43:14,20 79:24

**prepare** 8:7,10 114:12

**prepared** 53:20 59:18

**preparing** 8:6

**prescribe** 94:23

**prescribed** 94:9 101:4 102:1 106:2, 20

**prescribing** 105:22 106:3

**prescription** 76:6 97:18 99:8 109:19

**presence** 59:22 83:9

**present** 55:14,22 56:1,3,5,9 58:16 72:7

**presentations** 9:24,25

**presented** 75:24,25 115:9

**pretty** 46:11 93:8 116:6

**preventative** 33:19 35:11

**previous** 19:22 21:5 25:13 32:10 48:9

**previously** 45:13 46:5 83:20 107:18 109:12

**primary** 23:25 24:3,14,15 35:18 40:1,10 46:10,20 60:19 72:25 73:3,10 74:6,9 75:17,20 76:5,12 84:3,19

**prior** 11:18 17:7 23:18 40:3,13 43:22 44:1 45:18 46:7 58:10 73:2 80:2 81:9

**Prison** 22:12

**prison~~~** 17:10

**privileges** 107:13

**privy** 117:25

**problem** 48:10 50:7 88:24

**problems** 46:19

**procedure** 64:20 69:10 71:22 75:4 85:1

**procedures** 7:25 25:4 28:22 57:7 71:19 84:25 88:9 119:8

**proceed** 84:11 106:13,15

**proceedings** 59:10

**process** 14:16 16:6 19:15,16 21:21 23:6 24:21 27:9,18 29:21 30:12,14 31:1 32:23 34:10 41:4 52:3,11,16 53:2,3 54:1 57:13 58:21 59:8 60:25 61:13,

20,23 62:14,25 63:2,8 67:18 75:19 79:22 85:25 86:8 94:16 95:5,9 96:5, 22 97:6,19 99:7 100:25 103:14 104:2 105:23 108:5, 11,14,23 109:7,9, 10,11,14,23,24 110:7 111:5 118:1, 24 119:12,13,16

**processes** 15:2 17:1

**professional** 10:12

**program** 95:22

**progress** 99:19

**progressing** 59:10

**progression** 107:24

**prohibitive** 116:13

**projects** 20:19

**proprietary** 35:21

**protocol** 107:20

**proven** 34:18

**provide** 15:23 35:24 50:2 85:10 115:10

**provided** 18:21 40:11 47:10 48:10 53:13 61:8 78:3 96:18 110:1,4 115:19 116:1

**provider** 20:17

**providers** 94:22

**providing** 13:14 16:16 24:7,9,15 38:24 40:4 57:17

**public** 39:11 98:17

**publications** 9:5

**Puisis** 59:19,21 60:18 61:18,21

**Puisis'** 61:12,15

**purpose** 51:21, 22 52:1,13,17,18 53:4,7,11 86:9

**purposes** 95:4 117:5

**put** 5:12 29:6 41:13 43:19 44:9 49:8 86:6

**pyelogram** 75:2

**Q**

**quarter** 50:1

**question** 7:4,7, 11,13,20,21 10:7 11:13 38:12,13,20 39:16 45:4 48:14 51:7 52:14 53:6 54:24,25 61:16,17 62:1 77:12 86:23 87:7,8 89:20 90:7 103:6 111:10 116:21 117:6

**questions** 6:23, 25 7:25 8:19 14:17 26:15,23 33:2 89:16 93:17 110:13 120:10

**quick** 9:15 94:3

**quickly** 6:14

**quote** 54:2 60:25

**R**

**R-U-P-C-I-C-H** 5:17

**R/o** 81:1,7

**radiation** 78:2

**radiologist** 83:10

**radiology** 34:25

**range** 83:21

**rarely** 46:13

**rate** 50:25 51:3

**rationale** 80:24 82:2

**reached** 58:9

**reaches** 71:2

**read** 47:21 73:19 74:7 76:10,19,20 80:23 99:25 100:12, 19 107:22 108:8

**reading** 69:9 103:12

**reads** 57:24 83:10

**real** 9:15 23:18 94:3

**realize** 6:15

**reams** 43:16

**reason** 8:3 19:2 21:10 22:20 28:25 40:13 87:1 88:20 94:12 100:10 106:23

**reasonable** 114:8 117:11

**reasoning** 61:15

**reasons** 18:24 21:18 37:17 101:9

**Rebecca** 65:19, 20

**recall** 11:3,4,23 29:9,12 31:24 51:9 54:6,8,10,11 58:19, 21,25 59:16 62:6, 16,20 63:4,11 65:9 66:1 72:12,18 79:5 80:12 81:25 84:23 85:11,16,17 87:9 89:10 92:12 94:14 97:18 101:24

118:25

**receive** 19:10 29:7,10

**received** 11:18 19:13 108:1

**receiving** 66:1

**recess** 70:5

**reckon** 86:10

**recognition** 98:3

**recognize** 66:20,22,23 98:1,2 99:15 100:7,9

**recollection** 65:12 67:22,25 68:6 80:16,20 82:3,21 87:14 90:23 92:15,23 97:20 98:3 99:5 100:23 106:22 108:25

**recommend** 48:17

**recommendation** 77:14 95:10 96:18 115:16

**recommendations** 33:17,20,21 35:9

**recommended** 42:16 89:23

**recommended~--** 89:25

**recommends** 90:3,8

**record** 5:13 6:22 28:5 41:1,2 70:4 94:3,4 98:19 100:3,4 105:4 110:9,10 120:23

**records** 57:25 65:18

**record~--** 120:13

**Recs** 97:25 99:15

**refer** 12:23 14:5 25:20,22 26:4,5 31:6 34:2 45:9 46:3 54:19 57:3 60:20 69:22 75:12,23 98:14 104:16

**reference** 46:20, 24 47:2 58:23 87:24 90:2

**referenced** 15:4 43:13 47:14 73:7 78:16 87:19 98:9

**references** 66:7 70:14 73:23

**referencing** 114:1

**referral** 23:7,11 24:1 34:11 41:7 75:10 79:17 80:25 82:18 84:22 108:1

**referred** 17:6 25:14 32:11 34:22 38:17 39:1 42:20 44:8 57:2,13 82:18 99:21 109:16

**referring** 13:10 16:19 22:11 50:24 78:6

**refers** 57:7,10

**reflect** 15:14 46:11 77:19

**reflected** 46:17 103:15

**reflection** 52:3

**reflective** 62:24

**reflects** 65:20

**reflect~--** 80:19

**refresh** 67:22 80:19 87:13 92:14 99:5 100:23

**Region** 25:5 27:24 30:5

**regional** 55:19

**regular** 10:19 26:4 36:7 61:9

**related** 7:3 11:21 32:18 73:9 119:8

**relates** 111:23

**relating** 10:20 11:5,7,16,19 21:15 87:25 101:9

**relative** 104:14 105:12

**release** 54:4

**released** 55:6

**relevant** 41:11 43:16,18

**relief** 74:14

**rely** 35:1,4,9,14

**remember** 29:19 98:15

**remote** 23:14

**removal** 92:18

**renal** 75:9 115:17 116:24

**repeat** 52:14 116:21

**rephrase** 7:12

**replace** 115:6

**report** 17:21 18:10,12 53:19 54:7,14,19 55:1 56:3,18,24 58:8,23 59:1,4,6,15,18 60:13,15 61:19 79:17 118:22

**report's** 54:4,12 59:24

**reported** 72:19 78:9

**reporter** 7:8 8:24 24:24 27:20 56:12 60:3 64:4 65:14 66:17 79:11 86:17

89:3 91:24 99:12 107:3

**reporter's** 102:10

**reports** 18:1,5,7 43:7 118:25

**report~--** 54:25

**represent** 5:11 9:4

**representative** 8:20

**request** 15:17 20:10 34:11 41:12 43:5 52:6,19 67:2 85:8 86:6 90:14 96:10,13 97:24 98:6,22,23 101:8, 10,12,25 107:7 108:1,4,15 109:6 112:19

**requested** 51:8 95:12

**requesting** 52:25 96:19

**requests** 16:21 23:7 24:2 88:22,25 96:25 97:13 114:13

**require** 31:17,18, 20 42:3

**required** 34:10 48:3 88:13 89:20 107:14

**requirements** 32:1 46:23 52:8 53:8

**requires** 88:4 109:8

**requiring** 31:22

**resident** 75:20

**resources** 13:16,17 14:24 15:24 39:12

**respect** 10:19 18:8 20:18,25 21:1 29:23 33:8,9 62:13

75:21 77:13 91:15 93:12 95:10 106:14

**respond** 6:24

**response** 89:19 98:21

**responsibilities** 22:23

**responsible** 17:12 22:13

**result** 66:25 81:20

**resulted** 116:23

**results** 80:17

**result~--** 81:14

**reversal** 86:8

**reverse** 112:18

**review** 9:5 21:20, 21 22:4,14 23:5,6,7, 19,25 24:1,19 25:15,16 27:13 30:16 31:1 41:4 42:24 43:22,23,25 44:2,6,22 45:5,17, 18 46:7,8 47:4 48:5, 13,16 49:7,9,12,14 50:9,16 51:4,21 52:1,12,16 53:3,25 55:11,14 57:8,9,11, 25 58:17,21 59:2,25 60:13,25 61:13,20, 22 62:23 63:2,8,9 65:10 66:4,8,25 67:7,14,24 68:3,9 69:1,11,23 70:7 71:1 75:13 77:9,17 78:14 79:4 80:2 83:7 84:20 86:7,22, 25 87:9,14,21 90:4, 10,14,21 92:4,8,12, 21 93:4 94:24 96:17 103:18 104:12 105:18 108:21 109:20,24 119:13 120:17

**reviewed** 32:2 41:24 45:1 88:17 96:25 97:3,14 108:2 111:7

**reviewing** 57:15 90:1 97:16

**reviews** 21:23 22:1,6 23:3 45:2 87:1,5,19 88:8 104:8

**revised** 9:9

**risk** 39:11

**Ritz** 5:2,21 25:13 41:3 56:22 59:17 61:3 63:24 64:16 65:2 68:18 70:6 89:9 98:1 99:16 100:5,16 103:5 107:6 108:2 111:8

**role** 18:16 33:9 67:20 71:18

**Ron** 56:21

**row** 74:6

**rule** 64:7 74:25 76:2 81:8,22 83:25

**rules** 6:14 64:20

**ruling** 76:8

**run** 6:14 9:15

**running** 49:10

**Rupcich** 5:16 8:14 9:2 26:9 37:21 38:11,19 40:22 53:5 59:23 61:24 63:16 64:13,18 77:10,18, 23 81:11,14,16,19 89:11,13,16 90:11 93:20 98:24 99:3 100:2 103:17 110:12,15 120:8,14, 19,21

**RX** 74:7 76:13

---

**S**

---

**S-T-E-P-H-E-N** 5:25

**safety** 61:1,3,13, 20 95:4

**salvage** 107:25

**same~--** 6:16

**scan** 89:21 90:3,8 91:3

**scanned** 79:23

**schedule** 58:4 85:20 86:7 91:17 118:15

**scheduled** 57:6 85:2,23 86:11 114:2 118:4,18

**scheduling** 71:19 84:24 91:16

**secondary** 75:7

**section** 10:10 83:1 92:10 93:21,25

**security** 39:8,11, 17

**security's** 91:17

**selective** 62:23

**self-explanatory** 33:4 74:14

**semantics** 27:4

**send** 84:16 89:16

**sending** 39:9 40:3,14 50:4

**senior** 13:23 14:5,7,19 15:6,20 55:16,22

**sense** 7:24 46:19 49:6 51:13,18 63:14 112:13

**sentence** 57:24 89:22 103:5

**separate** 11:12 30:7 87:18,24 88:2, 3,4,8 109:9,10 119:25

**sequence** 88:12

**series** 6:23 85:11

**serve** 51:21 52:2, 12,16,19 53:4

**serves** 53:7

**service** 20:10 41:6 42:13 47:11,12 48:19 49:3 52:24 58:9 70:24 71:4 72:4,5 88:13

**services** 12:22 13:14,15 15:16 24:16 32:21 33:19 35:11,24 39:2,6 40:12 42:14 52:6 53:13 57:6,12,17 58:3 60:14 69:19, 22,24 70:15 71:10 79:17 87:25 88:2,23 91:16 107:8

**serving** 66:12

**set** 11:25 14:16 16:10 28:9 59:17 63:12 65:9 66:15 77:6 79:8 83:25 86:15 91:22 93:16 99:10

**setting** 13:2 38:15,16 62:15 75:6

**settled** 119:4

**settlement** 55:8 62:14 119:6,13

**Severino** 89:22, 24,25

**sex** 37:12

**shakes** 6:25

**Shansky** 53:21 56:3,21,24 58:8,23, 25 59:4,6

**shape** 110:1

**share** 22:22

**Shield** 19:8,24 20:5,16

**shorthand** 73:24

**should~--** 18:10

**side** 41:23 103:7

**signature** 107:9, 12,13 120:24

**significance** 83:11

**significant** 93:8 105:14

**signify** 29:3 107:16

**similar** 80:4

**similarities** 20:8

**similarly** 25:9

**simple** 78:25

**single** 66:19

**single-page** 65:16 97:23 99:14

**sir** 5:20 85:15

**sit** 26:20 31:15,23 32:9 35:16 49:19 50:11 54:2 60:1 66:14 68:2 69:15 84:4 98:4

**site** 17:3 23:20 25:25 34:3,4 39:12 40:3,6,12,14 41:5,9, 17 42:12,13,16,24 45:25 47:5,8,23 50:12 52:10,21 66:13 69:14,19,25 70:19 71:3 73:10 78:3,4 84:10,11 85:10,21 86:2 88:11,14 96:11,12, 19,20 97:16 108:17 109:5,18 110:2,5 111:16 117:3,17 118:2,5,17

**sites** 14:2 22:8,10 68:4 108:12

**site~--** 69:24

**situation** 26:20 27:11 33:13 36:19 37:9,16,18 48:7

**six-week** 72:2

**skip** 76:22

**software** 33:22 35:21 46:4

**sooner** 71:17

**sort** 14:19 18:17 19:1 48:6 49:23 55:10 73:19 76:10 96:6 111:18 112:7

**sought** 50:15

**sound** 115:7,25

**so~--** 117:21

**speak** 8:14,21 105:21

**special** 79:17

**specialty** 15:13 33:20 34:22,23,24 35:2,4,7 61:1

**specific** 10:20 11:6 14:8 16:7,8 18:17,23 20:25 26:14,16,21,23 33:2 34:11 35:6 36:8,14, 18,19 37:3,4,7,16, 18 39:21 41:9 45:21 46:21,22,23 47:17 49:15,19 51:10,17 58:19,23 59:15 63:7 66:23 67:2 68:6 70:22 72:6 74:17 75:16 78:19 98:4 112:4 113:13 115:9

**specifically** 16:12 25:18 27:5 31:23 35:10 53:24 58:15 63:23 66:14 94:7 113:25

**specifically~--** 63:13

**specifics** 51:6

**specific~--** 72:6

**speculate** 88:19 114:3

**spelled** 5:23 115:2

**spelling** 5:22

**spend** 22:3

**spent** 21:25

**spoke** 62:6

**spoken** 64:1

**spreadsheet** 41:13 42:20,23 43:2,11,22 45:16 78:13,16

**staff** 41:20 85:5,24 86:13

**staffing** 55:20

**stamp** 25:2,10 27:22 60:10,17 64:8 65:17 66:19 79:14 113:2

**stamped** 27:23 92:11 99:14 100:9 111:6,12

**standard** 95:23

**standards** 15:12 35:18

**standpoint** 18:9 32:25 33:1,3 40:1 46:10,20 52:21 84:4,19

**stands** 78:11 81:7 96:2

**start** 7:4,6 12:1,2 30:9 40:2

**started** 19:11 109:19

**starting** 58:1 111:2

**state** 5:20 12:11 13:18 17:10,12,17 18:9,11,13 110:17

**stated** 106:24

**states** 13:4 21:17 30:15,20,21 31:13, 16,18,20 32:8 69:17 95:24 111:7 119:19 120:1

**statewide** 60:12, 13

**step** 26:19 45:3 76:1,5

**Stephen** 5:2,21

**stipulate** 49:15 91:12 98:25 103:20 108:25

**stone** 84:7,14

**stones** 79:1 115:24 116:2,10,13

**straight** 93:9

**straightforward** 46:11 93:10,11,12

**strategies** 15:1 115:9

**strictly** 115:8

**study** 37:25

**subjects** 11:2,21

**subject~~~** 64:22

**submit** 108:12

**submitted** 41:8, 14 43:5,17 44:13 48:25 49:5 78:17 79:22,24 96:16 111:17

**submitting** 96:14

**suggested** 66:4, 7 72:10

**summarized** 68:24

**summary** 29:10 43:12 60:12 107:7

**superseded** 28:18

**supervisor** 17:19,25

**supplemental** 64:7

**support** 43:4

**supporting** 43:25 96:14

**suppose** 99:1 102:21

**supposed** 76:19,20

**surgeries** 46:22

**surgery** 93:6,14

**surprised** 63:1

**suspicion** 87:23

**swear** 6:18

**switch** 21:20 40:25 63:14,22

**sworn** 5:4

**symptom** 78:22

**system** 13:5,8 19:11 32:18 47:9 117:20 118:11

---

**T**

**takes** 69:1

**taking** 10:16 33:25 34:7

**talk** 23:10,16 47:24 101:22 103:9

**talking** 12:1 28:3 54:21 84:24 100:16 104:16 118:17

**target** 91:12,20

**targeted** 70:14, 16 71:7,21 82:7,9, 12 84:25 85:3,20 91:2,7

**targets** 91:13

**task** 20:10 33:19 35:11

**tasked** 34:5 39:19 41:8 42:14,17 85:25

**taught** 19:5 21:6

**Taylorville** 97:25 99:15

**team** 44:20 70:13 71:2,3 94:25 95:6 96:16 97:13 101:6 104:13 105:18 106:5

**telemedicine** 12:11

**telling** 92:19 108:19

**tells** 27:4

**term** 24:3 40:8,9 50:18,19 68:23 90:6

**terms** 8:6 14:21 15:5 16:15 19:14 31:4,7,10,13 34:12 39:17 40:4,17 45:10,12 46:25 51:25 52:11 53:7 55:7 59:9 62:11,12 88:3 97:14 104:3,9 105:5 117:23

**test** 10:16,25 11:2, 4,12,21,23 16:9 74:13 75:3 78:1 85:7 114:1 117:12

**testified** 21:9,22 51:2 75:11

**testify** 5:4 8:4 31:23 32:6

**testifying** 6:18 103:13

**testimony** 6:17 102:13 103:16,25

**testing** 73:6 84:12 114:6

**tests** 118:3

**than~~~** 109:13

**that's~~~** 81:18

**that~~~** 10:17 92:19 105:17 108:16

**their~~~** 18:8

**then~~~** 43:10 52:7

**therapy** 36:16 37:14 107:25

**the~~~** 11:16 22:21 27:17 31:25 34:4 35:6 38:22 39:13 41:16 43:11 52:19 60:19 62:13 87:13 96:11 99:1 107:6

**thing** 7:19 16:7 36:12 93:3 103:19

**things** 11:5,9,19 14:23 15:3,22 16:2, 4,11 20:14 26:4,6 32:23,24 33:4 34:21 35:19 37:1 43:6,7 46:1 48:6,11 70:21 78:15,23 83:6,8,22 88:11 95:13,18 101:18 106:2 116:9 118:15

**thinking** 48:16 103:23

**thinks** 43:15 61:19

**Thomas** 17:21

**thought** 51:2 62:22

**through~~~** 103:3

**tie** 120:15

**time** 7:18 15:6 21:25 22:2 32:1 37:4 38:3,4 42:5 43:5 47:6 48:1,2 50:1 54:3 59:9 66:13 68:7 70:22,25 71:15 72:7 108:3 114:4 117:11

**timely** 58:5

**times** 31:8,14 80:16 104:17 105:8

**title** 12:5,8,10 28:20,21,23 29:3

**TMH** 113:22

**today** 6:15,17 8:1,
4,7,9,12,16,22
26:21 31:15 35:16
49:19 50:12 54:2
58:10 60:1 66:14
68:2 75:18 84:5

**told** 21:18 109:5
114:22

**tool** 35:21 36:2
46:4

**top** 10:9 60:10,24
66:20 73:23 78:7
80:24 113:6

**topic** 23:18 56:6

**topics** 11:4 40:25
63:14

**totally** 76:18

**toxic** 96:1 101:14

**toxicity** 95:2,8,17
101:15

**to~--** 64:14 101:10
102:20 114:4

**track** 49:18 50:14
51:19

**tract** 79:3

**training** 18:17,
21,23 19:10,17,20
25:25 29:7

**transcript** 7:8
102:19 120:16

**translates** 50:25

**transmitted**
117:16,24

**transportation**
91:18

**trauma** 78:25

**treat** 94:8 106:19

**treatment** 37:20
38:2 40:2 42:6,16,
17 48:17 50:15,22
85:2 114:14

**trend** 15:7 16:14

**trends** 13:24
14:19,22,23 15:4,21
17:8

**trials** 34:20

**trigger** 70:25
105:18

**truth** 5:4,5 6:19

**truthfully** 8:4

**turn** 25:5

**turnaround**
31:8,13,17,20 32:1
114:8

**Turning** 23:18

**two-page** 79:12

**two-thirds** 17:15
21:22 22:17

**type** 66:22,24
71:22 77:15 78:12
83:16 88:23 93:3
98:2 99:16,18

**types** 15:3,18
32:23 34:21 43:7
45:25 48:11 78:15
88:25 95:18 101:18

**typical** 71:21
72:22 82:12,14

**typically** 22:7
23:19 48:6 71:7
97:7

**U**

**U/a** 74:13

**ubiquitous** 13:4

**ultimate** 105:19

**ultimately** 34:5
50:10 51:8,11 105:6
111:9

**ultrasound** 67:3
69:12,18 70:8 71:22
72:22 73:2 75:3
76:3 77:7,14 79:6

83:10,16 84:9
115:17 116:12,24
117:6,8 118:9

**ultrasound's**
118:16

**ultrasounds**
77:25

**unable** 85:2 86:1

**undergo** 42:1
93:7 94:24

**underneath**
117:2

**understand**
6:19 7:11,22 38:12
48:14 53:6 54:24
77:12 90:6 105:3,
10,12 111:24
112:17

**understanding**
38:20,21 39:15
61:11 105:9 110:18
118:2,12 119:2,5,
10,11,15

**understood**
7:14 51:6

**unfamiliar** 89:15

**unique** 11:15
38:23,25 71:11 72:5
90:13 91:8

**unit** 74:7,9 76:5,13

**United** 13:4 21:16
95:24

**University** 19:6
21:6,13

**unusual** 11:8

**updated** 36:7,13

**updates** 61:9

**updating** 59:9

**Uptodate** 45:25
46:3,4

**up~--** 45:22

**ureters** 74:11

**urethral** 78:25

**urgency** 71:12
72:4

**urgent** 19:5 70:21

**urinalysis** 73:7
74:13,18

**urinary** 79:3

**urine** 72:21 116:6

**urologist** 75:5
82:6,8,13,18 87:10
90:2,3,8

**urology** 28:7
35:5,6 73:16 75:9
84:17,21 87:2,15,25

**USPSTF** 45:25

**utilization** 12:7,
14,16,17,21,25
13:3,12,22,24
14:21,22,24 15:4,7,
10 16:13 17:8,14,20
18:6,11,14,19 19:11
20:1,4,6,21 25:4
28:13,21,23 30:7
32:2,7,10,18,19,20,
22 33:22 34:6 35:24
36:3 44:20,21 53:25
96:21 104:5 120:4

**utilize** 39:25
45:24 50:18 95:21
105:1

**utilized** 13:14,16,
17 15:1,16 35:23

**V**

**vacancies** 30:20

**vacancy** 14:4

**vacation** 14:4

**vague** 37:21
38:11,19 53:5 61:25
77:11,23 90:11

**validates** 52:19,
23

**valuable** 36:12

**variables** 33:14
91:14,19

**varies** 22:21
50:12 51:15 55:16,
24 97:8

**vary** 23:21,23
30:12 31:1,9,13
43:3

**vendor** 69:20

**venue** 57:17
69:16

**verbal** 118:10

**verbally** 49:1

**versed** 25:18

**view** 62:8 76:17

**Virginia** 30:23
31:2 32:4 119:20

**visible** 83:15

**visit** 58:7 87:10,15

**Votrient** 94:5,10
97:18 98:6,9,23
99:4,7 100:25
102:24 103:6,14
107:25 112:19,23

**W**

**W-A-C-K-M-A-
N** 5:11

**Wackman** 5:9,
10 40:24 63:19 70:3
77:21 81:12,15,17
94:2 110:8,11
119:17 120:9,11,22

**waive** 120:18,19

**waived** 120:24

**wanted** 21:10
93:6 99:23 103:9

**was~--** 98:19
111:9

**waves** 115:25

**web** 45:25

**week** 9:3 22:3,4
31:25 42:10 50:6,
12,13 51:16 68:3
88:21 108:1

**week's** 37:23

**weeks** 71:25

**well-known**
54:15,17 61:23

**were~--** 119:6

**west** 30:23 31:2
32:3 119:20

**WEX** 47:9

**Wexford** 6:1,4
8:21 12:2,3,5,9
13:12 16:15 18:2,
21,23 19:2,12,22
20:7,23 21:4,10
23:6 24:7,8,18
27:12 29:6,14 30:6,
21 33:10 38:16,18
53:4,9 54:3,15 55:2
58:14 61:23 62:3
64:6,20,21 66:25
67:21 89:5 96:7,8
119:18,22

**Wexford's** 19:10
40:15 57:13 94:16

**what~--** 83:24

**when~--** 45:3

**where~---** 44:23

**wide** 83:21

**William** 5:12 65:7
98:7

**withdraw** 35:3
54:25 62:1 87:6
90:7

**withdraw~--**
87:6

**with~--** 20:18
29:18

**word** 26:19 27:10,

11 68:19 100:17

**words** 36:17 82:7

**work** 12:1 23:13
30:14 36:5 38:15
46:2 74:3 96:5
111:2 120:5

**working** 12:2
54:3

**works** 19:16 41:4
94:7 120:22

**workup** 40:2
73:10

**world** 21:16

**would~--** 35:8
54:16

**write** 76:23 82:1

**writes** 81:1

**writing** 107:10,11

**written** 107:17

**wrong** 32:12

---

**X**

---

**X-RAY** 74:12

**X-RAYS** 73:8

---

**Y**

---

**year** 75:20

**years** 11:23 19:9

**you~--** 22:10
70:16 80:24 91:1
105:21