E-FILED
Friday, 25 October, 2019 09:59:54 PM
Clerk, U.S. District Court, ILCD

# Discovery Deposition
# of **BRUCE BARNETT, MD**

**Date:** September 26, 2019

**Case:** Dean v. Wexford



**Phone: 312-977-1777**

U.S. DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

WILLIAM KENT DEAN,                )
                                  )
                Plaintiff,        )
                                  )
        vs.                       )
                                  )   No. 17-CV-3112
WEXFORD HEALTH SOURCES,           )
INC., DR. ABDUR NAWOOR,           )
DR. REBECCA EINWOHNER, NURSE      )
KATHY GALVIN, and LISA            )
MINCY,                            )
                                  )
                Defendants.       )

        The discovery deposition of

BRUCE P. BARNETT, M.D., taken under oath on

September 26, 2019, at 353 North Clark Street, 45th

Floor, Chicago, Illinois, pursuant to the Rules of the

Supreme Court of Illinois and the Code of Civil

Procedure, before Tracy B. Eggert, a notary public in

and for the County of Cook and State of Illinois,

pursuant to notice.

## Page 2

APPEARANCES:

JENNER & BLOCK LLC, by
MR. WILLIAM M. STROM and
MS. CHLOE HOLT
353 North Clark Street
45th Floor
Chicago, Illinois  60654
(312) 222-9350
    Appeared on behalf of the Plaintiff;

CASSIDAY SCHADE LLP, by
MR. JOSEPH N. RUPCICH
111 North Sixth Street
Suite 200
Springfield, Illinois  62701
(217) 572-1714
    Appeared on behalf of the Defendant,
    Wexford Health Sources, Inc.;

OFFICE OF THE ATTORNEY GENERAL, by
MR. JEREMY TYRRELL (via videoconference)
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62701
(217) 782-1090
    Appeared on behalf of the Defendant,
    State of Illinois.

## Page 3

### I N D E X

| Witness: | Page |
|---|---|
| BRUCE P. BARNETT, M.D. | |
| Examination by: | |
| Mr. Rupcich | 4, 171 |
| Mr. Tyrrell | 162 |
| Mr. Strom | 166, 172 |

### E X H I B I T S

| Number | Page |
|---|---|
| 1 | 23 |
| 2 | 87 |
| 3 | 87 |
| 4 | 90 |
| 5 | 95 |

## Page 4

1    (Witness sworn.)
2        BRUCE P. BARNETT, M.D.,
3    called as a witness herein, having been first duly
4    sworn, was examined and testified as follows:
5        EXAMINATION
6        BY
7        MR. RUPCICH:
8    Q   Please state your name.
9    A   Bruce Philip, P-h-i-l-i-p, one "L," Barnett,
10   B-a-r-n-e-t-t.
11   Q   What is your business address?
12   A   My business address is 611 High Street in
13   Dedham, Massachusetts 02027.
14   Q   And what is that business?
15   A   Well, that's just a mailing address for me.
16   I am currently practicing as a consultant, so I'm
17   working mostly out of my home.
18   Q   No longer in California then?
19   A   Correct.
20   Q   Have you ever been deposed before?
21   A   Yes.
22   Q   I'm not going to waste your time with all the
23   basic ground rules I give a lay witness.  Suffice it
24   to say, if you need a break at any time, just let me

## Page 5

1    know and we can go off the record, okay?
2    A   Yes.
3    Q   Are you currently a licensed physician?
4    A   Yes.
5    Q   In what states?
6    A   California.
7    Q   How long have you had an active medical
8    license in California?
9        (Phone ringing.)
10   BY MR. RUPCICH:
11   Q   My question was, how long have you had an
12   active medical license in California?
13   A   I believe since 1978.
14   Q   Continuous to present?
15   A   Correct.
16   Q   Never been suspended, on probation, anything
17   like that?
18   A   No.
19   Q   Have you ever been licensed in any other
20   state besides California to practice medicine?
21   A   Massachusetts.
22   Q   When was that?
23   A   That was just after completing medical school
24   until I left the state for practice in California from

## Page 6

1    1975 to '78, I believe.

2        Q   Did you go to school in Massachusetts?

3        A   I did.

4        Q   Are you also a licensed attorney; did I see

5    that on your CV?

6        A   I am, yes.

7        Q   What states are you licensed to practice law

8    in?

9        A   California. I passed the bar for other

10   states, but I've only paid dues to be licensed in

11   California.

12       Q   You have an active license in California to

13   practice law currently?

14       A   I do.

15       Q   Do you currently practice law?

16       A   No.

17       Q   How long have you been out of the practice of

18   law?

19       A   Since 2004.

20       Q   But you've kept your license and your

21   continuing legal education up over that time?

22       A   I have.

23       Q   In your capacity as a physician -- you're an

24   M.D.; right?

## Page 7

1        A   Yes.

2        Q   Have you ever been named in any lawsuits in

3    your professional capacity as a physician?

4        A   Ever?

5        Q   Ever.

6        A   Yes.

7        Q   How many times approximately?

8        A   Probably my name has been in maybe twelve

9    lawsuits. I've been a medical director, so I often

10   was named with the principals.

11       Q   Medical director as in a facility medical

12   director or a medical director over multiple

13   facilities?

14       A   Both circumstances.

15       Q   Have all of the lawsuits, the approximately

16   twelve or so against you, arisen out of your work in a

17   correctional medical field?

18       A   No.

19       Q   Okay. Explain that to me.

20       A   Sure. The bulk of those lawsuits go back

21   about twenty years when I was a chief medical officer

22   and CEO and president of an organization in the San

23   Fernando Valley which I founded called Family Medical

24   Group. And there were 100 employed physicians, both

## Page 8

1    part-time and full-time, in that group, and multiple

2    lawsuits occurred naming one or more of those

3    physicians. And as owner of the medical group, my

4    name was often included in the lawsuit.

5            I've had three suits filed that included

6    my name in the corrections environment -- either two

7    or three. And on those cases as well, my name was

8    mentioned as a supervising physician, although I

9    believe in two of them, my name was also included as a

10   treating physician.

11       Q   In two of the three correctional cases?

12       A   Yes.

13       Q   Backing up to the community health -- you

14   said you found an organization?

15       A   No, it was called Family Medical Group.

16       Q   That was in the community though?

17       A   That was a community, correct.

18       Q   Did your name come up in those lawsuits

19   solely in your capacity as the president or CEO and

20   not due to patient care?

21       A   There was a mix. Mostly -- I would say at

22   least half of them was because I was the medical

23   director or had some supervisory role. And then the

24   other half, I would say, was connected to some degree

## Page 9

1    with an allegation of my participation in the care.

2        Q   So you did provide direct clinical care

3    for -- did you say Family Medical Group?

4        A   Yes.

5        Q   And when you were in corrections, did you

6    provide direct patient care?

7        A   Yes.

8        Q   Do you recall the medical issue involved in

9    the corrections cases?

10       A   Yes. Do you want me to go through those?

11       Q   If you could.

12       A   I only recall three. In one of the three, an

13   inmate alleged that I had some relationship to the

14   policies and procedures by which a computer was stolen

15   from a car that contained medical information about

16   him.

17       Q   Okay.

18       A   Yeah. And that ended up dropped, and I had

19   nothing -- obviously nothing to do with that anyway.

20       Q   Okay.

21       A   In another case, the inmate had alleged I

22   failed to provide him with an MRI in a timely fashion,

23   and that was dismissed in a matter of an MSJ because,

24   in fact, the medical record proved that, if anything,

Page 10

1  I expedited the MRI and he was completely mistaken.
2  Q  What was the condition for which the MRI was
3  ordered?
4  A  The patient had been treated for a
5  meningioma. And when I saw him, he was having
6  headaches. And I wanted to make sure the MRI that had
7  been scheduled by another doctor got done quickly, and
8  so I expedited that and made sure it got done more
9  quickly than otherwise would have been done.
10  Q  How did you do that?
11  A  I contacted another physician who worked on a
12  full-time basis because I was only there part-time,
13  and I communicated with him. And I also communicated
14  with the chief medical officer by email to make them
15  aware of my concern that this particular study be done
16  more promptly than they may have otherwise planned on
17  doing and then followed up within a few days to make
18  sure that that, in fact, happened. So he did get the
19  study, and fortunately everything went well. As I
20  said, my name was dropped in the MSJ.
21  Q  Do you recall the time frame between when
22  that MRI was originally ordered and when it was
23  completed?
24  A  I believe it was a few weeks or it could have

Page 11

1  been -- I think it was a few weeks, which is why I
2  said it's time to get it done.
3  Q  So after a few weeks, he was still waiting?
4  A  To my best recollection, it was around that
5  sort of time. It wasn't many months, and it certainly
6  wasn't a matter of a couple of days where I had no
7  reason to be concerned.
8  Q  And this is when you were providing part-time
9  care at a correctional facility?
10  A  Yes.
11  Q  In your experience, would it sometimes take
12  weeks to get diagnostic testing done that had been
13  ordered?
14  A  It's a complex question. Sometimes it
15  depends on the test. So if I may give a little more
16  of an expanded answer to that question because the
17  answer is neither yes nor no as you posed it.
18  Q  Okay. Why can't you answer it yes or no?
19  A  Okay. Well, a lot has to do with the primary
20  care physician's advocacy. And the system is designed
21  in California and elsewhere -- because I have worked
22  in other prison systems -- to --
23  Q  Have you worked in Illinois at all?
24  A  I haven't worked in Illinois, no.

Page 12

1  Q  Sorry. Go ahead.
2  A  But generally speaking -- and this is also
3  true in community medicine -- a test can be either
4  routine, urgent, or emergent. And in California,
5  there are very specific standards in the prison system
6  because it's been set up under federal receivership
7  now. So it's been observed and codified that an
8  emergency is the same day the person goes to the
9  emergency room.
10  Urgent is within two weeks. If you're
11  calling for it urgently and it's not done within two
12  weeks, then it's outside the parameters.
13  And a routine can, on its face, take up
14  to ninety days. And so it's up to the clinician to
15  determine in his or her own best judgment whether that
16  gap between two weeks and ninety days is such that it
17  doesn't serve the patient to wait the full
18  ninety days. It may be way too long.
19  So the answer to your question is, yes,
20  it can take a while for studies to get done. If
21  they're not considered urgent, they may not be done
22  for ninety days and that may be acceptable.
23  Q  But it depends on the patient situation is
24  what you're saying?

Page 13

1  A  Right. It depends on patient situation, and
2  it depends upon the physician's engagement. A
3  physician can order something and then look away and
4  not follow up to see when it's done. And then with no
5  one advocating or pushing for a sooner exam,
6  especially in prisons, the exam could be later because
7  there is that process of putting the person in a van,
8  taking them out with custody. So left to its own
9  devices, it can take a while for studies to get done
10  that might have been done faster in the community.
11  Q  Would you agree that in the prison setting,
12  the doctor is the one that makes the initial order for
13  the study or outside consultation?
14  A  Yes.
15  Q  And would you agree that typically scheduling
16  staff and not the doctor schedule the appointment with
17  the outside specialist?
18  A  I wouldn't agree with that necessarily. I
19  mean --
20  Q  Okay.
21  A  Again, that's one of those questions that's
22  not a good yes or no because the physician is
23  responsible for getting the study done. It's his
24  patient. It's his order. And he cannot -- he or she

Page 14

1  should not leave it to the schedulers to just get it
2  done on their terms because they're not doctors.  They
3  don't know how urgent it is.
4      Q   But wouldn't it be -- if the doctor considers
5  it a routine referral, then that, according to, I
6  guess, what California does, it would be reasonable to
7  have that done within ninety days?
8      MR. STROM:  I'm going to object to the form.
9      THE WITNESS:  Should I answer as best I can?
10     MR. STROM:  Yeah.
11     THE WITNESS:  Whether or not it's reasonable for
12  the physician to wait ninety days for a test to be
13  done is entirely related to the condition that he's
14  ordering.  It may not be reasonable.  It most
15  definitely -- even if he calls it routine, it may not
16  be reasonable to wait ninety days.
17     See, the problem is that you tend to
18  have like these arbitrary delineations.  Emergency, we
19  all understand, same day.
20     Urgent, that's pretty clear, too, within
21  a week or so.  It's not an emergency.
22     But the range that people could be
23  studied after that is very long.  I mean, ninety days
24  would not be reasonable in a lot of cases.  Even

Page 15

1  though you might not need to do it within a week, you
2  might not want to wait ninety days.
3  BY MR. RUPCICH:
4      Q   Okay.
5      So if I'm a physician and I think this
6  should probably be done in -- within sixty days, I
7  would just mark it urgent so it's done in two weeks.
8  But if I'm going to make something routine, I would
9  necessarily be okay with it taking the whole time
10  frame.  Is that not how it works?
11     MR. STROM:  I object to form.
12     MR. RUPCICH:  Do you understand my question?
13     THE WITNESS:  Exactly.  And there is a solution
14  to that.  That's exactly how it comes up.  And what I
15  have done and what I believe is the standard of care
16  is, faced with those particular delineations, you
17  don't feel it's an emergency and you don't want to
18  overwhelm the system with everything being done within
19  two weeks because then if it doesn't get done in two
20  weeks, it's out of compliance and the system can break
21  down.
22     But you'd say regular, but then you
23  put an adviso in (phonetic) or advisement -- I don't
24  know if adviso is a word -- advisement and say the

Page 16

1  test needs to be done within three weeks.  See, two
2  weeks is not quite necessary, but you don't want it
3  more.  So you put it in there and you follow up and
4  make sure that it is done.  You're not willing
5  to -- as a physician in this circumstance that I
6  believe you're hypothesizing, you're not willing to
7  wait for even two months.  You're willing to wait
8  three weeks, but that's about it.  And then you put
9  that in there if that were the case.
10     Now, there may be other situations where
11  three months is fine, and we can go into lots of
12  examples.  But I'm thinking about the cases where you
13  want an answer soon, but you don't want to stress the
14  system by making it happen necessarily within two
15  weeks.
16  BY MR. RUPCICH:
17     Q   And is this under like a consent decree in
18  California?
19     A   The receivership was set up to deliver
20  standardized care which was improved over what had
21  previously been delivered.  And there's a whole bunch
22  of regulations which included these particular
23  categories, which is emergency, urgent, and up to
24  ninety days.

Page 17

1      There's no written context or
2  recommendation or orders that tell the doctor what to
3  do if it's not really urgent, but you don't want to
4  wait ninety days.  So there's no such thing as a
5  consent decree about that, but there is a very
6  formalized set of parameters against which performance
7  is measured, which considers the emergent, urgent, and
8  routine categories.
9      Q   Were these set up by like a court monitor, if
10  you know?
11     A   Yes.
12     Q   A medical monitor?
13     A   They were set up, to my best understanding,
14  by the organization that was developed following the
15  finding by the Court that the care was not
16  constitutional.  That organization is called the
17  California Correctional Health Care Services,
18  originally called California -- I think it was CPHCS,
19  California Physician (sic) Health Care Services.
20  Currently, if you Google it and you look for it, it's
21  CCHCS.  Under CCHCS and its previously-named
22  iterations, a whole set of operating guidelines were
23  established which then were approved by the Court, and
24  these were amongst those operational guidelines.

## Page 18

1  Q  So let me make sure I understand.  A Court
2  determined that care in the California State Prison
3  System did not meet constitutional standards; right?
4  That was the first thing that happened?
5  A  Yes.
6  Q  And as part of the remedy to cure systemic
7  deficiencies in the provision of medical care in the
8  California prisons, the California Department of
9  Corrections, I suppose, hired this company that you're
10  referring to to develop policies and procedures that
11  would comply -- or bring the state into compliance
12  with what the Court found was wrong?
13  A  Very close.
14  Q  Okay.
15  A  What they did was, they split off -- there
16  were physicians and nurses and a whole healthcare
17  entity -- a healthcare apparatus in the California
18  Department of Corrections.  And pursuant to the court
19  order, that contingent of personnel and staff and
20  resources was split from the California Department of
21  Corrections and put under the direction of a
22  court-appointed receiver who now could oversee the
23  operation which had been split from C --
24  Q  So they split -- they split the provision of

## Page 19

1  medical services from the State of California?
2  A  They split it -- it's still under the State
3  of California, and it's not a hired entity.  It's a
4  California State entity.  But, operationally, it's no
5  longer reporting to the correctional authorities.
6  It's reporting to its own hierarchy.
7  Q  Okay.  So that's why it has a dot.gov
8  website.  I couldn't figure that out.
9  A  Yes.
10  Q  Okay.
11  A  That's -- and to make it so you understand
12  how it works, that separation is starting to dissolve
13  time -- over time -- where the government -- I'm
14  sorry -- the courts are allowing that portions of the
15  medical apparatus is being returned to the
16  correctional services.  So if I'm not mistaken, I
17  think dental services are first coming back.
18  Q  I see.
19  A  And then, you know, there will be medical and
20  mental health services.  And eventually it will all be
21  back to the way it used to be when they deem that the
22  care now is constitutional.
23  Q  You're familiar with companies like Corizon,
24  Centurion, Wexford; right?

## Page 20

1  A  Yes, like them.  I've never dealt with
2  Wexford, but I have dealt with Corizon.
3  Q  But this -- what you're talking about in
4  California is a different solution?
5  A  Yes.
6  Q  It's essentially an in-house solution to
7  create a separate oversight of the medical; is that
8  kind of --
9  A  I don't want to characterize it myself as
10  solution or not solution, but I would say it's not
11  a --
12  Q  Model?
13  A  It's a model.  It's an apparatus or a
14  mechanism which is not handing medical care to a
15  private entity.  It's not a privatization of the
16  health care, and it's not a for-profit system.  It's
17  really very nearly what has been done before, but they
18  established a different hierarchy for reporting
19  purposes and for monitoring.
20  Q  And you worked for this entity?
21  A  I did.  I'm retired for a few months now.
22  Q  So that would make you an employee of the
23  State of California?
24  A  During the time -- for ten years, I was an

## Page 21

1  employee of the State of California.
2  Q  I don't think we got through -- one of the
3  lawsuits was over some computer.  The other one was
4  over this MRI of the brain.  And then there was a
5  third?
6  A  Yeah.  The third one I can't remember because
7  all of these lawsuits were dismissed.  But the third
8  one, I believe, was -- I believe was a complaint about
9  not getting the pain medicine he wanted.
10  But -- that's my best recollection.  I could be
11  mistaken.
12  Q  Do you know when Correctional -- CCHC or
13  CCPHC -- there look to be two of them.
14  A  It's CCHCS.
15  Q  Uh-huh.
16  A  And the other version, I believe, was CPHCS.
17  Q  It's the same thing now?
18  A  Yeah, they just changed the name.
19  Q  Do you know when it came into existence?
20  A  It's about fourteen years ago.
21  Q  Were you involved --
22  A  It's pretty new.
23  Q  -- from the beginning?
24  A  No.  That's why -- no.  I came in about two

Page 22

1   or three years after it started.
2      Q    Were you involved in the development of
3   policies, guidelines, to be implemented in the
4   California Department of Corrections?
5      A    Yes, some.
6      Q    Would those be like clinical guidelines,
7   policies and procedures, what?
8      A    Clinical guidelines.
9      Q    For management of various ailments?
10     A    Well, specifically, I was on the task force
11  for the development of a pain management protocol.
12  And the pain management guideline that was first
13  developed was, I think, about six years ago. I mean,
14  that's one set of guidelines which actually bears my
15  name, so I can point to that.
16             Otherwise, there are lots of committee
17  meetings when I was working in an administrative
18  capacity where I was one of the members of the
19  committee -- I was a member of a committee that was
20  deciding on what drugs to make formulary, what drugs
21  to remove, what drugs would be unallowed because
22  they're dangerous. That's another area of my interest
23  and engagement.
24     Q    Did you treat patients with this -- one more

Page 23

1   time give me the acronym -- C --
2      A    Well, I think the best acronym to use is
3   California Correctional Healthcare Services, CCHCS,
4   because I know that's current. And I know if you go
5   to that and look for a history and go backwards, you
6   can find the other names that had been used to
7   describe that.
8      Q    Did you provide direct patient care at CCHCS?
9      A    Yes, I did.
10     Q    What portion of your time was spent on
11  clinical work versus administrative work?
12     A    It depends on what years we're talking about.
13     Q    Did that change over time?
14     A    Yes.
15     Q    And you said you started in around 2009?
16     A    I started --
17     MR. RUPCICH:  We can mark this. It's got your
18  CV.
19     THE WITNESS:  Exactly. I can look at my CV and
20  give you that date. I started in 2007.
21             (Whereupon, Barnett Deposition
22              Exhibit No. 1 was marked for
23              identification.)
24

Page 24

1   BY MR. RUPCICH:
2      Q    This was all given to me as one. So I'll
3   hand you Exhibit 1. It includes your report and a few
4   additional parts. But if you can look at that, I
5   think it verifies what you have as your CV.
6      A    Yeah. This is my CV, and it shows my
7   professional experience, Physician and Surgeon 2007 to
8   2008 with the California Prison Healthcare Services.
9   So that's CPHCS. I made a mistake and called it
10  California Physician -- that was wrong -- California
11  Prison Healthcare Services.
12     Q    Couldn't have come up with a shorter name,
13  could they? All right.
14             And from 2007 to 2008, you were
15  providing clinical care to patients -- patient care?
16     A    Yes.
17     Q    Were you in an administrative role then?
18     A    No.
19     Q    After 2007-2008, how did your
20  responsibilities change?
21     A    I continued to provide direct clinical care.
22  I would say a substantial amount of care. But in
23  addition, I was supervising between four and forty
24  physicians who would report to me or for whom I was

Page 25

1   the hiring authority. I would assess on a regular
2   basis and write reports and provide guidance and
3   instructions and lectures, and that was from 2007
4   through 2011.
5      Q    How many physicians during that time were
6   employed by the State of California providing care in
7   corrections?
8      A    Rough number would be 300 physicians on the
9   medical side because there's a psychiatric mental
10  health service, which is actually separate, and I
11  don't know how many of those M.D.'s were there.
12     Q    So was it set up in a way that they divided
13  it up, perhaps regionally, and you had a supervisory
14  role over 40 or so physicians in a particular
15  geographic region?
16     A    Yes.
17     Q    And how many facilities did that cover?
18     A    I had been appointed to two different
19  regions. The first region, which was around 2010,
20  was -- before 2010, I was supervising the collection
21  of physicians who were traveling from prison to prison
22  to monitor the quality of care. So that was a quality
23  management group, and I was the chief medical officer
24  of that quality management group. And there were a

Page 26

1     half a dozen physicians in that group.
2         Q    So they would go prison to prison and look at
3     the quality of care being provided by the on-site
4     medical staff?
5         A    Correct.
6         Q    And you supervised that group?
7         A    Correct.  That was roughly 2008.  It
8     overlapped.  If you look at the dates, there's some
9     overlap because some of these functions overlapped.
10    But roughly from 2008 to 2010, I was doing that.
11            In 2010, I was promoted to a regional
12    position, and then I was responsible and considered
13    the hiring authority.  So I did the evaluations for
14    the physicians who were actually -- the chief medical
15    officers of four prisons, and those four prisons were
16    in the Central California area.
17        Q    That was starting in 2010?
18        A    That was starting in 2010.
19        Q    Did you still have clinical duties?
20        A    I did.  They weren't duties so much as
21    activities because I determined myself when I needed
22    to go and provide those services.  I would go from
23    prison to prison and actually deliver care if I was
24    concerned that one of the prisons that was in my group

Page 27

1     that I was supervising had fallen behind, let's say,
2     in meeting certain parameters of quality of visits, of
3     backlogs, if they were too backlogged and not
4     delivering care timely and sometimes for lack of
5     physicians to do the work.
6         Q    Vacancies?
7         A    Vacancies, exactly.  I would step in and just
8     pitch in.  So I wold just go and work there as a
9     doctor, just roll up my sleeves.
10            But mostly I was trying to supervise the
11    physicians who were overseeing the work of the on-site
12    doctors, and that was in the central region.
13            After I had done that for a while, they
14    needed me to do the same kind of work in the northern
15    region.  I did that until 2011.
16        Q    What happened in 2011?
17        A    2011, I joined the Office of Legal Affairs as
18    a physician consultant.
19        Q    Legal Affairs at the same entity?
20        A    Yes, the California Correctional Healthcare
21    Services.
22        Q    How did your duties change?
23        A    They needed -- they recognized at that time
24    that there was a real void in assisting the physicians

Page 28

1     who were either being sued by inmates or providing
2     medical input for the lawyers who were defending the
3     institutions when a claim was made that services were
4     inadequate, what are called Habeas petitions.  And
5     what would happen is, the Office of Legal Affairs kept
6     farming this stuff out to multiple physicians, none of
7     whom really had much legal expertise and none of whom
8     are really talking to each other to give a consistent
9     performance.  So by having me there as a full-time
10    medical consultant --
11        Q    On legal cases?
12        A    On the cases which were of legal
13    significance.  I don't want to just say legal cases
14    because there were frequently complaints from a
15    watch-dog organization called the Prison Law
16    Organization, PLO, who was part of the lawsuit that
17    set this whole thing up.  They were the plaintiffs in
18    the lawsuit.  And when those complaints came in, those
19    were completely medical complaints, but they were
20    coming into the office of the lawyers because this
21    whole thing was set up under a court order.  And they
22    needed doctors to explain what was being done right,
23    what was being done wrong.  And there was more than
24    enough work for me to do that.  And I also continued

Page 29

1     doing clinical work while I was there.
2         Q    So in 2011, you became, for lack of a better
3     term, a consultant on medical-legal issues for CCHCS;
4     is that a fair statement?
5         A    Yes, yes.
6         Q    And you continued to see patients?
7         A    Yes.
8         Q    How long did you do this job in legal
9     affairs?
10        A    Six years.
11        Q    So that -- is that up until 2017-2018?
12        A    Up until 2017.  The reason --
13        Q    Did you continue to see patients during that
14    time?
15        A    Yes, yes, I would say up until 2017.
16        Q    So you were a consultant, but never a
17    testifying -- obviously, you couldn't testify in these
18    cases; right?
19        A    No, I did.
20        Q    You did testify?
21        A    Yes.
22        Q    Frequently?
23        A    As frequently as is indicated, I think, in my
24    expert report.  I listed the cases in which I provided

Page 30

1  testimony -- either deposition testimony or trial
2  testimony within the last four years.  And then there
3  are other cases before that.  So --
4      Q  All right.
5         So those cases that you listed, those
6  weren't cases you were hired independently as an
7  expert like you were in this case; is that right?
8      A  Correct.
9      Q  Those were cases for CCHCS where you
10  consulted, and then the lawyers had you testify?
11      A  Well, I consulted in countless cases.  I
12  provided testimony when called upon to do so, either
13  for deposition or for trial, which would come up much
14  less frequently, much less frequently, but still it
15  was a few times a year.
16      Q  Were you testifying as a medical expert?
17      A  Yes.
18      Q  Okay.
19         So that -- did your duties between
20  medical-legal work and clinical work between 2011 and
21  2017 remain consistent?
22      A  Yes.
23      Q  And what changed in 2017?
24      A  Well, I should say there was some evolution

Page 31

1  as the office came to appreciate my skill-set and
2  value.  They would involve me in some new ventures
3  that might not have come up.  So, for example, I
4  recall testifying in at least one and maybe two cases
5  where it was a -- an employment issue that
6  needed -- there were some medical issues attached to
7  the worker's compensation that was being defended.
8  So, you know, there was an evolution.  But basically
9  the answer to your question is yes, but I wanted to
10  tell you that there was a little bit of evolution.
11         Then what happened in 2017 is that I
12  retired and moved to Massachusetts.
13      Q  And what have you been doing professionally
14  since 2017?
15      A  For about two years, I worked for the
16  California Correctional Healthcare Services in the
17  role of retired annuitant, which means that I was
18  retired, but they could still call upon me on an
19  hour-to-hour basis to help out when there was an
20  overload of materials that could not be handled by the
21  people on-site.  So I could from -- remotely, I could
22  assist in a number of different chores.
23         One of the things that evolved towards
24  the end of 2017 is the out-of-state prison system.

Page 32

1  That is, California had been declared an overcrowded
2  prison and the courts compelled California to reduce
3  the census, which California did, in part, by keeping
4  more people in jail, sending fewer to prison, but also
5  by shipping some of the least dangerous felons out of
6  state.
7      Q  Like an interstate compact or something?
8      A  Yeah.  They just found private prisons.  And
9  so I have some familiarity with private prisons, too,
10  that mechanism.  So they would use private prisons in
11  Mississippi and in Arizona.  There may have been one
12  long ago that I never went to in Illinois, but I know
13  that they had active ones in Mississippi and Arizona
14  and also in the State of California that were private
15  prisons.  But those private prisons needed to maintain
16  the standards that had already been set by the federal
17  court case.  So I would visit those private prisons to
18  assure that the inmates were getting the same quality
19  of care that the California Prison System had been.
20  Now, that's a big job because there are quite a few
21  places to visit, so I just pitched in to help the team
22  that was doing that.
23      Q  On an hourly basis?
24      A  I was doing that as an employee up until

Page 33

1  2017.  After 2017, I did a few of those visits on an
2  hourly basis, yes.
3         I also remotely assisted the Office of
4  Legal Affairs in responding to medical board
5  inquiries.  Doctors would be answering the medical
6  board who would send them a letter saying, Patient or
7  Inmate So and So has said the following, and to help
8  the doctor collect the information so the physician
9  wasn't distracted from his or her duties, I would put
10  a letter together that represented the patient's
11  experience in the chart so that the physician could
12  read through that and sign off on that and get
13  something out to the Medical Board without them having
14  to give up a whole day of work.
15         I did that work and also helped in a
16  couple of motions for summary judgment as an expert
17  declarant, okay?
18      Q  Uh-huh.
19      A  That was all through '17.  And as the CV
20  reflects, I was also an appointed neutral monitoring
21  medical expert observing jail healthcare delivery in
22  the case of Hernandez v. County of Monterey.
23      Q  Sir, you have been out of -- you haven't been
24  providing patient care since 2017; is that right?

Page 34

1    A   Well, I like to say I haven't been touching
2  patients physically. I don't like to say I am not
3  providing patient care because in a way, my
4  observations have actually been instrumental in
5  patients getting care. So I sometimes see things that
6  need to be addressed; and as a result of my
7  observations, the care is delivered.
8    Q   But you're not in the exam room anymore?
9    A   I am in an exam room, but very infrequently,
10  and I'm there as an observer. I'm not there as the
11  treating physician of record.
12    Q   How did you get appointed court monitor
13  in --
14    A   Hernandez v. Monterey?
15    Q   Right.
16    A   The same organization that had filed the
17  lawsuit against -- I shouldn't say against
18  anyone -- filed a lawsuit on behalf of the inmates in
19  California, that same organization had filed a lawsuit
20  on behalf of the inmates in the jail in Monterey for
21  basically the same reasons. And as the County of
22  Monterey came about reaching an agreement for
23  settlement of this lawsuit, the defendants included a
24  fee for service for a private medical group called the

Page 35

1  California Forensic Medical Group, CFMG. CFMG knew
2  who I was because I was the president of the
3  American -- sorry -- of the American Correctional
4  Health Services Association, ACHSA. I was president
5  of that organization in its California chapter. And
6  we had regular meetings, large conference once a year.
7      So they knew that I do medical-legal
8  stuff, and I'm a physician as well as a lawyer. The
9  people who were filing the lawsuit knew me because I'm
10  frequently answering their inquiries relative to their
11  California case. And it turns out that both these
12  parties -- both considered me to be a reasonable
13  choice to monitor so they could find somebody whom
14  could agree. They asked the judge if I would be
15  acceptable, and the judge agreed to it, and then I had
16  the job.
17    Q   Is that ongoing then?
18    A   It is.
19    Q   Have you done any written reports on the
20  Monterey County Jail?
21    A   I have.
22    Q   And those are, I guess, reviewed --
23  what -- do you go review a bunch of charts and visit
24  and look at the policies and procedures?

Page 36

1    A   So the question is, what are they?
2    Q   Right.
3    A   Okay. So the report is my analysis as to
4  whether or not the care provided for the time frame
5  I'm looking at -- and I look at every six months -- of
6  whether or not the care is substantially compliant
7  with the correction action plan that was put together
8  in the settlement. So I measure the compliance and
9  make a report as to whether or not it's substantially
10  compliant.
11    Q   Do you review outside care, the timeliness of
12  like the processes involved in outside referrals; is
13  that something you look at?
14    A   Yes, yes, yes.
15    Q   And that's included in your reports?
16    A   Yes.
17    Q   Are those reports confidential, or are those
18  part of the -- do you know if they're publicly filed?
19    A   That's a good question, and I would have to
20  research exactly -- or you might do the research. So
21  I don't know -- I don't know how or where those are
22  released. I know I submit them --
23    Q   I didn't see them on the docket.
24    A   Yeah. If you look at Hernandez v. Monterey,

Page 37

1  then you see whatever it is that they are revealing.
2  I'm going to say -- if I'm not being too expansive in
3  the answer to the question -- that because the
4  patient's names are only barely concealed because of
5  the nature of the report, it's hard to not tell you
6  enough information so you can find the patient -- you
7  have to at least have an ID number and such,
8  okay -- that there would be HIPAA issues associated
9  with the broad release of that. And so perhaps that's
10  why you don't see them.
11    Q   Prior to 2007, did you have any experience in
12  corrections, or is that when you first got involved?
13    A   Minimal experience and training. We'd visit
14  jail -- jail wards at USC, but minimal.
15    Q   You were in family practice for a long period
16  of time; is that right?
17    A   I was in family practice for about
18  fourteen years before I went to practice law and then
19  came back. So all together my family practice career
20  is probably thirty years, but I never stopped being a
21  family practitioner, if you understand. So I've been
22  a family practitioner for probably forty years.
23    Q   Did you continue to practice medicine while
24  you were a lawyer?

Page 38

1   A   Not in the same capacity.  I mean, I kept my
2   license, but I did not practice medicine during those
3   ten years.
4       Q   It looks like you went back in 2004 and
5   completed a family medicine residency?
6   A   Correct.
7       Q   Did you do any residency when you were in
8   medical school in the seventies?
9   A   Yes.  I did a residency, but I didn't
10  finish -- finish that.  So I finished it up.
11      Q   So you started a residency in -- at the time
12  of your -- you went to medical school, but didn't
13  complete it?
14  A   Yeah.  I mean, you're not describing it
15  really the way it works.  You go to medical school and
16  then you do an internship in those days and then you
17  pick a residency.
18      Q   Right.
19  A   And I did a year of residency.  And then as
20  the resume/CV shows, I went into emergency medicine
21  for a few years.  And at that time --
22      Q   What was your one-year residency?
23  A   I did -- actually I did a pediatric -- an
24  internship in pediatric medicine and a first-year

Page 39

1   residency in obstetrics and gynecology.
2       Q   How long was that residency program?
3   A   The program was a three-year program.
4       Q   And you left that program and went into
5   emergency medicine?
6   A   Correct.
7       Q   And why did you leave that OB program?
8   A   It was a real stress on my marriage.  The
9   hours were crazy.  My wife is a physician also.  And
10  it was -- at one point, it was either become a
11  gynecologist and get divorced or stay married and do
12  something else.
13      Q   So you practiced emergency medicine for
14  several years?
15  A   I did.
16      Q   Your residency in family medicine, is that
17  the only residency you've completed?
18  A   Correct.
19      Q   And then you became board certified after
20  completing the family medicine residency in the
21  2000's?
22  A   That's the way it works.
23      Q   You can't be board certified without the
24  residency?

Page 40

1   A   Well, correct.  That is true now.  There was
2   a time when you could be what's called grandfathered
3   in.  But in the last ten years or so, the only route
4   to an American board certification is post-residency.
5       Q   Is your board certification current?
6   A   Yes.
7       Q   Through when?
8   A   I think 2026.
9       Q   So you last recertified in 2016?
10  A   Correct.
11      Q   Do you have any experience in medical
12  oncology?
13  A   Yes.
14      Q   Explain that to me.
15  A   It's a cornerstone of family practice and
16  general practice, general medicine.  Cancer
17  prevention, the standards that are applied through
18  various authorities, between the American Academy of
19  Family Practice, the American College of Obstetrics
20  and Gynecology for that specialty, the American
21  Academy of Physicians, and certainly the Task Force
22  for the United States -- United Healthcare Services --
23  these all establish guidelines as to how we test for
24  cancer.  And any primary care provider, such as I am,

Page 41

1   must be familiar with the warning signs of cancer, the
2   appropriate screening tests for cancer, and the basics
3   in how cancer treatment is effective.  And those are
4   the -- the questions that we have to answer in passing
5   our board examinations include that material.
6       Q   So you have experience with cancer in family
7   practice?
8   A   Correct.
9       Q   You've never had the title of medical
10  oncologist?
11  A   No.
12      Q   You've never done a residency in oncology?
13  A   No.
14      Q   You've never done a fellowship in oncology?
15  A   Correct, I have never done a fellowship in
16  oncology.
17      Q   You've never had the title of urologist?
18  A   Correct.
19      Q   You didn't do residency, fellowship in
20  urology; fair to say?
21  A   Yes.
22      Q   I understand you're familiar with the general
23  concepts involved in the kidneys, ureter, and bladder
24  from being a family physician; correct?

Page 42

1    A   Correct.
2    MR. RUPCICH:  Are you familiar -- how long have
3    we been going?
4    THE WITNESS:  No, we're good.
5    MR. STROM:  Forty minutes.
6    BY MR. RUPCICH:
7    Q   We talked a little bit about your work as a
8    policy maker for CCHCS.  You said pain management -- I
9    think you worked on pain management guidelines?
10   A   Yes.
11   Q   Are you generally familiar with the clinical
12   administrative policies that CCHCS monitored or
13   implemented in the California Department of
14   Corrections?
15   A   Yes.
16   Q   Within the California Department of
17   Corrections, when you were working for CCHCS, did they
18   use Utilization Management or Utilization Review
19   Procedure?
20   A   Yes.
21   Q   Are you familiar with the term "collegial
22   review"?
23   A   I understand what it means in the context of
24   this case.

Page 43

1    Q   It's not used in California as collegial
2    review?
3    A   That term is not used.  There are equivalent
4    operations, but not under that term.
5    Q   How does Utilization Management work in the
6    California Department of Corrections?
7    A   I can speak to how it worked during the ten
8    years I was full-time employed there.
9    Q   Fair enough.
10   A   Okay.  And in full disclosure, my wife was
11   the director of that.
12   Q   Of Utilization Management in California?
13   A   Yes, yes.  She's a physician -- as I said,
14   she's a physician.  She was director.  So I not only
15   saw what I saw, but I heard what I heard from her.
16   Q   I'm not going to depose your wife.  You're
17   going to have to --
18   A   So I'll speak to my familiarity with it.  And
19   I need to be familiar in any case for my role in a
20   regional management position.
21   Q   In a general sense, what is it?
22   A   Okay.  Generally, there are procedures for
23   which a certain amount of oversight is required to
24   ensure appropriateness, a double-check, as you might

Page 44

1    say.  That would be --
2    Q   Are you talking about off-site services?
3    A   Off-site services are one, okay, and on-site
4    services of certain natures are others.  So drugs
5    which might be off the formulary would be delivered
6    on-site from the pharmacy, but would not be delivered
7    until a supervising or managing physician endorsed
8    that particular request.
9        So the way it works is a physician might
10   consider a certain test necessary, let's say, a CT
11   exam that's off-site.  That request then goes to the
12   supervising physician who would either endorse it or
13   reject it and say, I can't endorse this or approve of
14   this unless I have more information because I think
15   you're making a mistake, a mistake either in the
16   timing or in the type of test you're ordering, you
17   know, do something different.  So that's local, and
18   that takes place at the prison.  Other
19   circumstances --
20   Q   So it would be the treating physician and the
21   supervising or Utilization Management physician would
22   discuss the case?
23   A   On-site.
24   Q   On-site?

Page 45

1    A   Within the prison, depending on what kind of
2    case it is.  So --
3    Q   Is this done by telephone or --
4    A   It would be done in writing.  There might be
5    telephone conferences to clarify, and there may be
6    also in-person conferences where they have meetings.
7        But then there are also certain
8    conditions which are worthy of discussion at the
9    headquarters level, and that might include treatment
10   for hepatitis C because that's a prolonged process and
11   the expertise on that has been evolving so quickly.
12       Also, sex change operations, that's a
13   really modern and complicated matter which is not left
14   to the institution, but rather is brought to
15   headquarters for a decision.
16   Q   Okay.  Right.
17       But let's focus in on not -- let's stay
18   away from these complex cases that are addressed at
19   the headquarters level and stick more to like, you
20   know, testicular pain, let's send him to a urologist,
21   or persistent cough, send him to a pulmonologist -- I
22   don't know -- stuff like that.  So those are handled
23   in California when you were there between the treating
24   physician and a physician from Utilization Management?

Page 46

1    MR. STROM: I object to the form.
2    THE WITNESS: You're not describing exactly the
3    system, so I'll tell you in better terms. It's
4    handled between the physician who is making the
5    request, or in California, those requests could also
6    be made by a physician assistant who is licensed to
7    practice under supervision of a doctor or a nurse
8    practitioner, okay? These are considered primary care
9    providers in the California Prison System and also I
10   have found generally throughout America.
11         But then the supervising physician who
12   in California these days is called the chief medical
13   executive or a chief physician and surgeon --
14   depending on the size of the prison, the chief
15   physician and surgeon acts as an assistant to the
16   chief medical executive. They will provide or perform
17   a Utilization Management function. It's not fair to
18   call them Utilization Management physicians because
19   they do so much more, but someone has to sign off on
20   that form because it's a written request. And
21   one -- either of those will sign -- sign that form to
22   say, yes, approved.
23   BY MR. RUPCICH:
24        Q   Do they make that determination based upon

Page 47

1    the documentation provided to them?
2        A   In part, they use that, yes. They also often
3    make reference to authoritative standards. Having
4    seen the documentation provided, they still need to
5    ask their own questions of themselves -- is there
6    enough in this documentation provided to justify this
7    test or is there something in this documentation
8    provided that suggests there might even be another
9    test?
10        So the answer to your question is, yes,
11   they do, and they add their own judgment to the
12   equation.
13        Q   But they don't typically examine the patient
14   themselves?
15        A   Correct.
16        Q   And the purpose of this is to ensure the
17   appropriateness of the use of whatever service the
18   treating doctor is requesting?
19        A   Yes, to ensure the appropriateness and the
20   timeliness.
21        Q   What do you mean by that?
22        A   There are occasions when a physician could
23   put an order in for something on a routine basis; and
24   looking at the request, the reviewing physician could

Page 48

1    say, "This sounds more important and urgent than
2    routine."
3         And it can go the other way. They could
4    make the request as an urgent, and the physician could
5    say, "I don't see why this would be urgent," so they
6    might change it. So they would either reject it or
7    they could change the timing.
8        Q   I see.
9         Would that be according to those
10   parameters of routine, urgent, and emergent is what
11   you're saying? Is what you're saying the Utilization
12   Management physician could either make it more, I
13   guess, urgent or downgrade it to routine?
14        A   Yes, except I wouldn't call them the
15   Utilization Management physician. I would say the
16   physician working in a UM mode for that particular
17   purpose would either approve the request, approve the
18   request with some change in timing, or deny the
19   request, and sign as to that decision.
20        Q   Is the unnecessary use of outside resources,
21   reduction of that, one of the goals of Utilization
22   Management to your knowledge in California?
23        A   Yes.
24        Q   I thought I heard you mention drug

Page 49

1    formularies in the California Department of
2    Corrections when you worked there?
3        A   Yes.
4        Q   So there was a list of -- there was a
5    formulary list and then, I guess, obviously there were
6    things that were off of it?
7        A   Yes.
8        Q   Were you involved in the development of that
9    formulary?
10        A   Parts of it, yes.
11        Q   The pain medications?
12        A   Yes.
13        Q   Anything else?
14        A   I was on the committee, the Pharmacy
15   Committee, and there may have been other drugs which
16   came to review. And I can't remember off the top of
17   my head which of them we might have voted upon. But I
18   do know that in the area of pain medication, I
19   expressed my opinion and my suggestions were regarded
20   and incorporated into policy, particularly in regards
21   to when it comes to Indomethacin or Indocin is a drug
22   which is extremely potent and has dangers in its
23   application that exceed the benefits derived. And I
24   advocated for that drug to be removed from the

Page 50

1  formulary because it was potentially harmful, and they
2  did eventually remove it.
3      Q    What's the reason that a formulary existed in
4  California?
5      MR. STROM:  I object to form, foundation.
6  BY MR. RUPCICH:
7      Q    Do you know?  Do you know why?  I mean, I
8  think insurance companies have them.  California
9  Corrections has them.  Like why do they exist, if you
10  know?
11      MR. STROM:  I object to form, foundation.
12      THE WITNESS:  Is it okay if I answer that
13  question?
14      MR. RUPCICH:  If you know.  I'm asking you if you
15  know.
16      THE WITNESS:  I do know.
17      MR. RUPCICH:  Then that's the foundation.
18      THE WITNESS:  Okay.  And you'd like me to tell
19  you?
20      MR. RUPCICH:  I would.
21      THE WITNESS:  Okay.  I mean, it's not
22  just California.  Formularies are a pervasive element
23  in what we call managed care.  It's not just the
24  prison.  The prison system is a managed care

Page 51

1  organization.  People know Kaiser as a managed care
2  organization.  Health Net comes to mind also.  There
3  are many that have been out there that are no longer
4  in business because they've been absorbed or acquired.
5      But the concept is that drugs should
6  have a proven benefit before they're administered.
7  And there are many drugs which have dubious value, and
8  that's why in other countries as well, there's
9  formularies, drugs which are readily available because
10  they've been tested and tried and determined to be
11  efficacious.  And there are drugs which require a lot
12  of circumspect consideration before you administer
13  them because in many times, they will not be helpful.
14  So that when you want those drugs, it's best to make
15  sure that you know they're going to be necessary
16  before you administer them.  It's for the safety of
17  the patient.
18      And a side effect, as you would, or
19  let's even say that it's an equally important aspect
20  is a control of costs because if you can keep people
21  on drugs that are known to be effective and are less
22  expensive, then it's a win-win, so to speak, because
23  why spend more money to get extra sick?
24

Page 52

1  BY MR. RUPCICH:
2      Q    So -- well -- or if one drug is on the
3  formulary and one isn't and they're functionally
4  equivalent, it would make sense to use the one that's
5  cheaper; right?
6      A    If you have two drugs and they perform the
7  same service, then it makes all the sense I can think
8  of to use the one that's less expensive.  It's also if
9  you can buy a single drug in some bulk that makes it
10  less expensive because that's the drug you prefer and
11  that's the drug you're using, there's efficiencies in
12  scale.  I mean, there's multiple reasons for
13  formulary, but the main reason is patient safety.  And
14  then there is the benefit of reducing costs.
15      Q    In California, when you worked for CCHCS, did
16  requests for non-formulary medication go through
17  utilization review, if you know?
18      A    Well, you're calling it utilization review.
19  It's a form of utilization review, but it didn't have
20  to go to headquarters for that purpose because it was
21  something done under the protocols at the prison.  The
22  prison's leadership, either the chief medical
23  executive or the chief physician and surgeon, is
24  empowered to sign off on a request for a non-formulary

Page 53

1  drug with few exceptions.  There are some drugs which
2  are deemed either so unusual or so dangerous that I
3  think they still need to go to headquarters for an
4  approval if they're to be given at all -- very, very
5  few drugs like that.  Practically speaking, it's
6  something that's done at the prison.
7      Q    On-site?
8      A    On-site.
9      Q    The utilization review occurs on-site at the
10  facility where the recommendation or prescription
11  originated?
12      A    Correct.
13      Q    So your prisons in California have multiple
14  physicians staffing them?
15      A    Many physicians staffing, yes.
16      Q    Do you know if there are any guidelines on
17  use of advanced directives in the California
18  Department of Corrections when you were working there?
19      A    Yes.
20      Q    Were you involved in the development of
21  those?
22      A    I believe I was on the various committees
23  that would consider.  Unlike the document which is a
24  guideline for drugs, my name doesn't appear signed

Page 54

1   onto those.  So I don't believe I would lay claim to
2   having any authority in the final version of the
3   guidelines or protocols.
4       Q    Do they express a preference for having
5   patients complete advanced directives?
6       A    Yes.
7       Q    And that's something physicians in the
8   California Department of Corrections would be
9   encouraged to have their patients do?
10      A    Yes.
11      Q    Do you know what advanced directives were
12  used in California?
13      A    Yes.
14      Q    What?
15      A    They used a POLST, P-O-L-S-T, form.  It's a
16  standardized form that's used throughout the state.
17      Q    What does it stand for?
18      A    I would have to Google it.  P-O-L-S-T.  I
19  can't really right now, as you ask me, think of it.
20      Q    Yeah.
21      A    Patient --
22      Q    Something life-sustaining treatment probably?
23      A    Yeah, right, right.
24      Q    Do you know, is that similar to like -- is

Page 55

1   that like -- more like a power of attorney or is it
2   more like a DNR?
3       A    Well, DNR is just do not resuscitate orders.
4       Q    Do you guys have those?
5       A    Well, yes, you can do that without a POLST.
6   I mean, I consider myself something of an expert in
7   this field because I've lectured on it a number of
8   times and I've researched it prior to the lectures and
9   because it also interfaces with law, and I'm a lawyer.
10      Q    You're talking about advanced directives?
11      A    Correct.  And that's what we're really
12  talking about -- is it an advanced directive.  There
13  are different ways in which a patient can express his
14  or her wishes about what to do in the event of their
15  crippling and debilitating illness, and they can say
16  this in advance of the illness taking place.  POLST is
17  one way to do it.  Simply telling a doctor, "Do not
18  resuscitate me," and having the doctor write that is
19  enough.  Telling a friend and making the friend aware
20  and available to express that can be enough, as I
21  believe the Supreme Court determined in some cases.
22  You just have to have credible information as to the
23  wishes of the person when the wishes could be made
24  known.  POLST is a good way to do that.

Page 56

1       Q    Does California have a DNR form?
2       A    Yes.
3       Q    Is that something that physicians practicing
4   in the prisons have available if their patients want
5   to fill one of those out?
6       A    Yes.
7       Q    What situations is a DNR appropriate?
8       A    In all situations.  I mean, a DNR is a POLST
9   form.  That's the form.  It's most appropriate for
10  people who are of relatively advanced age, but there's
11  nothing wrong with letting someone who is even
12  40 years old or 50 years old or at any age express
13  their interest.  It's just -- it doesn't seem like a
14  pressing need when someone has a low likelihood of
15  being in that condition.
16      Q    If someone has a terminal illness, would it
17  be appropriate for the physician to have that
18  discussion about a DNR with them?
19      A    Yes.
20      Q    Was there use of telemedicine in the
21  California Department of Corrections when you worked
22  there?
23      A    Yes.
24      Q    How was it used in California?

Page 57

1       A    Multiple fashions.  Number one, a number of
2   experts are unable to attend a patient in the prison.
3   To get the patient to the expert is a laborious and
4   even hazardous engagement.  It's better to bring the
5   physician to the patient on a TV screen through a
6   video in some cases, and that's what's done.  It
7   avoids the complication of travel, and it avoids the
8   problem of trying to find someone in that locale.  So
9   the patient who is sitting in San Diego can talk to a
10  physician who is sitting in Los Angeles that way.  So
11  long answer to the question, number one, for specialty
12  services, okay?
13      Q    For specialty services?
14      A    Number two, for primary care services, when
15  there are insufficient primary care providers at that
16  location of that prison to meet the demand, they will
17  supplement the capacity with visits to physicians by
18  video link.
19      Q    So were there particular conditions that
20  California would arrange with specialists to manage,
21  say, like for hepatitis C, you had an infectious
22  disease doctor by video that would see patients or
23  maybe like you had a rheumatologist to see patients
24  who had lupus or something like that?  Was

Page 58

1 it -- explain that, if you know what I mean.
2    A   The circumstances under which people were
3 using video varied from prison to prison. So there
4 wasn't, to my knowledge, a rule as to who went to
5 video and who didn't because in some prisons, an
6 orthopedic surgeon actually physically made the visit
7 and came on-site. It was more convenient to do that.
8 In other prisons, that service was only available
9 through a video link.
10    Q   Okay.
11       So there wasn't a centralized source of
12 specialists across the State of California where you
13 had a specialist that saw patients at prisons all over
14 the State of California; is that --
15    A   Well, there was. There was a Department of
16 Telemedicine, and that department had a roster of
17 specialists in every field as well as primary care
18 doctors. And that particular department was run by a
19 physician executive, and it wasn't necessarily,
20 though, deployed at every prison. There was a central
21 place for telemedicine. Should you need, let's say, a
22 rheumatologist, as an example you mentioned, there's a
23 rheumatologist who was available by telemedicine. But
24 that particular prison might have a relationship with

Page 59

1 a rheumatologist that was coming on-site, so they
2 wouldn't need the telemedicine. And so that's -- like
3 I said, it varied from prison to prison how much
4 telemedicine was used.
5    Q   Were these telemedicine physicians with the
6 Department of Telemedicine State of California
7 employees?
8    A   No, generally not. The primary care
9 providers were universally full-time state employees.
10       The specialists, most of the time -- I'd
11 say 90 percent of them were independent contractors.
12 And there may be a few, such as hepatitis C experts,
13 who were so busy doing California work that California
14 may have been able to hire them full-time.
15    Q   So if I was an independent contractor, maybe
16 I have my own neurology practice, but I can make -- I
17 enter into some sort of contract with the State of
18 California to also see Corrections patients by
19 telemedicine; is that how it worked?
20    A   Correct.
21    Q   So the medical policies and guidelines for
22 the California Department of Corrections, when you
23 worked there, were provided by CCHCS; is that an
24 accurate statement?

Page 60

1    A   Yes and no. There's the California Code of
2 Regulations, the CCR, and even in some spaces -- some
3 places -- the California statutes contained references
4 to prison health care. There's also a medical
5 policies and procedures manual that's an operating
6 manual which is widely used. So there's multiple
7 places and statutes and regulations which regard --
8 Title 15 is the main overriding statutory directive.
9    Q   And then as supplemented by CCHCS guidelines,
10 policies, procedures?
11    A   Correct, that's essentially true. People
12 might quibble with the legalities of it, but
13 functionally that's how it would work.
14    Q   Are you familiar with the American Urologic
15 Association?
16    A   I know of it. I'm not a urologist.
17    Q   I understand that.
18    A   Yeah.
19    Q   You've heard of it?
20    A   Yes.
21    Q   Are you familiar with its guidelines?
22    A   I don't think I can lay claim to familiarity
23 with all of its guidelines.
24    Q   Would it be fair to say that the State of

Page 61

1 California does not follow the AUA treatment
2 guidelines?
3       MR. STROM: Objection to form and foundation.
4       MR. RUPCICH: At the time that you were there.
5       THE WITNESS: No, I wouldn't think that's fair to
6 say at all. Do you want me to explain?
7 BY MR. RUPCICH:
8    Q   Well, I assume what you're going to say is to
9 the extent they represent a standard of care, they
10 would be encompassed within the CCHCS and the State of
11 California guidelines?
12    A   Yes.
13    Q   Okay.
14       But as far as you know, they were not
15 used as a basis to create the guidelines in
16 California?
17       MR. STROM: Objection to form.
18       THE WITNESS: No, I don't believe that's a proper
19 statement.
20 BY MR. RUPCICH:
21    Q   Okay. Do you have any firsthand knowledge of
22 that?
23    A   Yes. My firsthand knowledge is I'm very
24 familiar with the guidelines that are out there. I

Page 62

1 helped write the guidelines for pain control, but I
2 also actually am named in their guidelines for the
3 physicians, and it's a guidebook for general care over
4 all the areas of interest, including urological,
5 dermatologic.  I think it was called the Survival
6 Guide For Physicians.
7    Q   Have you read the AUA guidelines?
8    A   I have read.  I can't repeat them verbatim.
9 But I particularly looked at them relative to this
10 case.  And I think it's fair to say based on my
11 experience writing guidelines for the State of
12 California is that every one of its guidelines is
13 consistent with the positions taken and the
14 recommendations made by every of the -- each of the
15 respective specialty organizations.  So there's no
16 discordance, and it's very careful to do so.  So I
17 can't imagine that there are recommendations within a
18 urological society's edicts that would be different
19 than what California would have recommended in its
20 guidelines.
21    Q   Are there urology clinical guidelines in
22 California when you were there?
23    A   For the care of patients?
24    Q   Correct.

Page 63

1    A   I'd have to look at the book to see what is
2 specifically recommended.  I didn't look at the
3 California guidelines for this particular matter.  I
4 looked at the Illinois guidelines or the ones that
5 were actually provided to me that's referenced in the
6 report from Wexford.
7    Q   As you sit here, you don't remember specific
8 urology treatment guidelines from your time in
9 California?
10    A   No.
11    Q   Does that seem like something there would
12 have been a specific treatment guideline on in
13 California, or do they not get that specific?
14    A   I just can't say whether or not they made
15 specific recommendations as to urologic conditions
16 aside from the standard textbooks referred to in the
17 course of providing health care.
18    Q   Are there clinical pathways provided to
19 California Department of Corrections' providers by
20 CCHCS on various conditions?
21    A   Yes, there are.
22    Q   That would be available for consultation?
23    A   Yes.  The guidelines are on-line.  You can
24 look them up.

Page 64

1    Q   California?
2    A   Yes.
3    Q   I wasn't able to find anything on urology,
4 but I was on the train using my iPad.
5        The second page of your resume -- I
6 guess I should have asked you.  It's dated May 15,
7 2018, your resume, it looks like at the bottom.  Are
8 there -- is this accurate, up to the present, or are
9 there any updates?
10    A   The resume hasn't changed substantially since
11 2018, but this is actually a 2019 update because on
12 Page 1, you can see I've actually noted from 2011 to
13 May 2019.
14    Q   Okay.
15    A   So I couldn't have said that -- the bottom
16 date should say 2019.
17    Q   So it's current then?
18    A   It is -- it is current.
19    Q   Okay.
20        Looking at the second page on your
21 publications and presentations, are any of these on
22 renal cancer, renal carcinoma, any of them touch on
23 that, or hematuria?
24    A   No.

Page 65

1    Q   Are your corrections -- it looks like
2 starting in approximately 2010, you started writing in
3 the area of correctional medicine?  And I'm looking at
4 Patient-Inmate Litigation/Malpractice - Defendable
5 Versus Defensive?
6    A   Just below that?
7    Q   Yeah.
8    A   Probably the first article is April of 2009,
9 Understanding Hypertension in the TTA.
10    Q   Okay.
11    A   TTA is Transitional Treatment Area.
12    Q   Would I be correct in saying that from that
13 April 2009 publication through the top of the page
14 with October 2015, that would encompass your writing
15 in the field of correctional medicine?
16    A   Yes.
17    Q   It looks like you published an article in
18 2015, Correctional Healthcare Quarterly Online on
19 California Federal Court, Distinguishing Deliberate
20 Indifference From Malpractice, the third one?
21    A   Yes.
22    Q   Is that like a case review that you wrote?
23    A   Yes.
24    Q   Have you done medical malpractice work as an

Page 66

1   attorney?
2   **A   Yes.**
3       Q   Have you done civil rights cases involving
4   deliberate indifference?
5   **A   Well, I haven't represented any inmate as an**
6   **attorney, if that's what you mean.**
7       Q   Well, an inmate, you know, somebody that got
8   wrongfully arrested; you haven't been a civil rights
9   plaintiff's attorney?
10  **A   Correct.**
11      Q   But you've been a plaintiff's attorney in
12  medical malpractice?
13  **A   Yes.**
14      Q   Have you been a defense attorney in medical
15  malpractice?
16  **A   Yes.**
17      Q   The basis of your knowledge of deliberate
18  indifference, so that would be, I guess, from law
19  school or from your research as an attorney?
20  **A   No.**
21      Q   Explain.
22  **A   Well, I've been asked to consult on dozens,**
23  **if not scores or even hundreds of cases where the**
24  **inmate is alleging deliberate indifference and**

Page 67

1   **malpractice or malpractice, both, one or the other.  I**
2   **mean, I've had a lot of exposure to that and called**
3   **upon to provide expert opinion as to whether or not**
4   **the complaint had merit in either malpractice or as**
5   **deliberate indifference.**
6       Q   Have you given expert testimony on whether a
7   particular defendant was deliberately indifferent or
8   not?
9   **A   Yes.**
10      Q   How many times?
11  **A   Well, in the last few years, it's what I've**
12  **listed in my expert report.  Probably -- well, repeat**
13  **the question because I want to get that right.**
14      Q   Yeah.
15          So you list a number of cases in your CV
16  that you've been involved in in the last four years;
17  right?
18  **A   Yes.**
19      Q   Did any of those involve deliberate
20  indifference as one of the claims?
21  **A   Yes.**
22      Q   Did all of them involve deliberate
23  indifference?
24  **A   Yes.**

Page 68

1       Q   You used the term "deliberate indifference"
2   in the report that we've made Exhibit, I guess, 1,
3   correct?
4   **A   I believe I did, yes.**
5       Q   What's your definition?
6   **A   This is actions or failure to act under**
7   **conditions wherein the actor, the physician, displays**
8   **an indifference or a lack of concern for the probable**
9   **consequences of his or her actions.**
10      Q   And where does that definition come from?
11  **A   Well, it's a medical interpretation of what I**
12  **understand the law to read, which has also to do with**
13  **not providing or being -- not providing care for a**
14  **significant condition or injury that is reasonable and**
15  **not being concerned with the outcome related to the**
16  **provision or lack of provision of that care.**
17          So, I mean, there are elements in the
18  **legal definition which I'll leave to the lawyers and**
19  **to the Court which entail a determination of whether**
20  **the injury was substantial, whether the person who is**
21  **making that determination had the frame of mind to be**
22  **indifferent because there's a requirement of what the**
23  **physician knows or should have known.**
24      Q   You can't give an opinion on what someone

Page 69

1   else subjectively knew; correct?
2   **A   Correct.**
3       Q   So you would leave that to the courts?
4   **A   Well, I mean, part of what I say and why I**
5   **say it in there is I'm using the evidence from the**
6   **medical record and from the depositions to inform me**
7   **as to what a person actually does know despite their**
8   **statement or what they really should know by my**
9   **training and education and how the actions which are**
10  **causing some significant harm are taken despite their**
11  **knowledge that this will cause harm.**
12          And I think that's really the definition
13  **is when a physician in prison either acts in a way**
14  **which will cause harm without regard to that harm or**
15  **fails to act knowing that their failure will cause**
16  **harm, that that is deliberate indifference.**
17      Q   Deliberate indifference is a legal
18  conclusion; correct?
19      MR. STROM:  Objection to the form and foundation.
20      MR. RUPCICH:  Okay.
21      THE WITNESS:  Well, deliberate indifference is a
22  legal term.  It's a term-of-art.  But as a practicing
23  physician, working in prisons, I'm familiar with it.
24  It's a concern that I have in each and every bit of

Page 70

1    work that I do, and it's a concern as a managing
2    physician that I have strongly encouraged or insisted
3    all of my subordinate physicians and physicians
4    working with me also understand and that I regularly
5    teach in classes and lectures.
6    BY MR. RUPCICH:
7        Q    Did you research deliberate indifference in
8    the course of writing your report in this case?
9        A    **I've been researching it for the last ten**
10   **years.**
11       Q    That wasn't my question.
12       A    **Did I specifically do new research that I**
13   **hadn't done before to produce this report?**
14       Q    Yes.
15       A    **No.**
16       Q    Did you update your research?
17       A    **Update my research, no.**
18       Q    As attorneys, wouldn't you agree it's
19   important that we update our research?
20       MR. STROM:  I object to the form and foundation.
21       MR. RUPCICH:  It's a yes or no.
22       THE WITNESS:  Yes, yes.
23   BY MR. RUPCICH:
24       Q    The basis of your knowledge of deliberate

Page 71

1    indifference, can you direct me to any particular case
2    you got it from?
3        MR. STROM:  I object to the form and foundation.
4        THE WITNESS:  The foundational case has always
5    been Estelle v. Gamble.
6    BY MR. RUPCICH:
7        Q    Okay.
8        A    **And I'm regularly looking at medical,**
9    **correctional, and legal literature just in the course**
10   **of maintaining my licensure.  I'm not aware of any**
11   **decisions which run counter to Estelle v. Gamble.  I**
12   **know there were multiple decisions thereafter which**
13   **were refinements, which I read, but can't state off**
14   **the top of my head.**
15       Q    Estelle vs. Gamble was in the 1970's, if I
16   remember correctly; right?
17       MR. STROM:  Objection to form and foundation.
18       THE WITNESS:  I believe so.
19   BY MR. RUPCICH:
20       Q    Have you educated yourself on how the State
21   of California has applied Estelle v. Gamble?
22       MR. STROM:  Same objection.
23       THE WITNESS:  Yes.
24

Page 72

1    BY MR. RUPCICH:
2        Q    Have you educated yourself on how the Seventh
3    Circuit Court of Appeals, in which this case is
4    located, has applied Estelle v. Gamble?
5        MR. STROM:  Same objection.
6        THE WITNESS:  I can't give you a citation from
7    the Seventh Court of Appeals off the top of my head.
8    I may have read them because I do read these, but I
9    can't give you a citation now.
10   BY MR. RUPCICH:
11       Q    Well, if you're going to give an opinion in a
12   court in the Seventh Circuit that someone acted with
13   deliberate indifference, wouldn't it be important for
14   you to have an understanding of the law of deliberate
15   indifference in the Seventh Circuit?
16       MR. STROM:  Objection to form and foundation.
17       THE WITNESS:  No.
18   BY MR. RUPCICH:
19       Q    It would not?
20       A    **No.**
21       Q    Why would that not be important?
22       A    **Because my opinion is an opinion based on the**
23   **law as I understand it applies nationally because it's**
24   **a federal standard, number one.**

Page 73

1            **Number two, I'm doing exactly what I**
2    **said.  I'm offering my best opinion based on the**
3    **evidence as to whether or not the behavior in this**
4    **case, whether it be a physician practicing in Illinois**
5    **or a physician practicing in California, manifested a**
6    **deliberate indifference to the condition of the**
7    **patient.  That's just my opinion.  I mean, I don't**
8    **feel I have to have a dissertation in the most recent**
9    **California case in order to offer that opinion.**
10   **That's not to say I'm not willing to look at any more**
11   **information that may be available, and I put that in**
12   **my expert report.  I'm very pleased to do that, and I**
13   **certainly will stand corrected if there's any aspects**
14   **of my expert report which are inconsistent with any**
15   **definition elsewhere of deliberate indifference.**
16       Q    So you made an assumption that deliberate
17   indifference in the Seventh Circuit is applied the
18   same way you were exposed to it in California?
19       MR. STROM:  Objection to the form and foundation,
20   misstates his evidence.
21       THE WITNESS:  No.
22   BY MR. RUPCICH:
23       Q    You didn't make an assumption?
24       A    **That's not what I did.**

Page 74

1      Q    Did you make a guess?
2      MR. STROM:  I object to the form and foundation.
3      THE WITNESS:  No, I didn't make a guess.
4  BY MR. RUPCICH:
5      Q    Yet you haven't read any cases in the Seventh
6  Circuit on deliberate indifference?
7      MR. STROM:  I object to the form and foundation,
8  misstates his testimony.
9      MR. RUPCICH:  How did I misstate his testimony?
10     MR. STROM:  I believe, Madam Court Reporter, if
11 you could read back Mr. Rupcich's statement.
12          (Whereupon, the record was read as
13          requested.)
14     MR. STROM:  If I recall correctly, his testimony
15 was that he has read Seventh Circuit cases, and there
16 might have been some proviso or some other context
17 which he had not.
18 BY MR. RUPCICH:
19     Q    To prepare your report in this case?
20     A    I don't have reference to any Seventh Circuit
21 cases relevant -- related to this report.
22     Q    Page 3 of your CV, your lectures and
23 presentations, do any of those involve either kidney
24 cancer, hematuria?  Take a look.

Page 75

1      A    There are articles here that I've written
2  which I could make a case are tangential or indirectly
3  related to kidney cancer, hematuria.
4      Q    Circle them.
5      A    Circle on this?
6      MR. RUPCICH:  Yeah, sure.
7          (Witness indicated.)
8  BY MR. RUPCICH:
9      Q    Okay.
10          Let's run through them starting with the
11 first one going from the top down, Treating Inmates
12 Following Use Of Force.
13     A    Yes.
14     Q    Explain what that -- how that may be related
15 to this -- to hematuria or kidney cancer?
16     A    Inmates who are exposed to trauma during the
17 use of force can suffer injuries to their back and to
18 the areas around the kidneys.  They complain of blood
19 in their urine.
20          Also, oftentimes, use of force is
21 provided by custody in the course of protecting
22 patients -- inmates -- one from the other.  So they're
23 beating each other up.  And that involves significant
24 trauma to the kidney area, and you can get blood in

Page 76

1  the urine following that trauma.
2          Those same inmates sometimes are being
3  taken from a cell against their wishes because they've
4  locked themselves in; they're mentally deranged.  And
5  in that condition, they are immobilized or they
6  over-exercise -- they do weird things -- and they get
7  a condition called rhabdomyolysis which also causes
8  blood in the urine.
9      Q    That's what the cross-filters get?
10     A    Yeah.  It's -- one needs to be tuned into the
11 physical condition after inmates have been exposed to
12 use of force and try to make a distinction between
13 what needs to be treated, what doesn't need to be
14 treated, and not be presuming that it's the custody's
15 use of force alone that may be important to review.
16 Next?
17     Q    Were there on-site renal ultrasounds
18 available -- let's just say on-site ultrasound
19 available in the California Department of Corrections?
20     A    In some prisons, yes.  I don't believe they
21 were available or readily available in all prisons.
22     Q    And an ultrasound, it's a diagnostic test;
23 right?
24     A    Yes.

Page 77

1      MR. STROM:  I object to the form and foundation.
2      THE WITNESS:  Well --
3  BY MR. RUPCICH:
4      Q    Do you know what an ultrasound is?
5      A    I do.
6      MR. STROM:  That's not the objection.  Would you
7  like me to state the basis?
8      MR. RUPCICH:  Sure.
9      MR. STROM:  So the basis -- could you read the
10 question back, please?
11          (Whereupon, the record was read as
12          requested.)
13     MR. STROM:  The form of the question is vague as
14 to what it's meant to be diagnosing, and the
15 foundation is in terms of what kind of diagnostic
16 needs.
17 BY MR. RUPCICH:
18     Q    Do you know what I meant?  An ultrasound is a
19 diagnostic test; is it not?
20     A    Well, it really is not just diagnostic.  I
21 mean, I can do a better job than just a yes or no on
22 that.
23     Q    All right.  Well, it's used as part of a
24 workup for various conditions; right?

Page 78

1     A  It can be, yes.
2     Q  Can be.  And it's non -- it doesn't use
3  radiation; is that a fair statement?
4     A  It uses sound waves.
5     Q  Right.  It's not invasive?
6     A  It's considered noninvasive.
7     Q  Put some goo on the part of the body and you
8  kind of wand over the area; is that kind of how it
9  works?
10    A  Yes.
11    Q  See, I could be an ultrasound tech.  All
12  right.
13        Second one, Drugs Inmates Do Better
14  Without?
15    A  Yes.
16    Q  So I'm guessing -- go ahead.
17    A  There are some drugs which will cause
18  significant side effects, one of which could be an
19  increase -- or decreased coagulation or a
20  coagulopathy, and you could end up with bleeding from
21  orifices that you wouldn't otherwise bleed from.
22        There are also drugs which are very
23  toxic to the kidneys, so you don't need those.  And
24  it's a real major hazard in the population in general

Page 79

1  and specifically amongst inmates who don't have good
2  self-control.  And you give them drugs to take in a
3  box or a bottle, and they'll overdo it.
4     Q  I gotcha.
5        So the connection here is that some
6  drugs are either by their nature or through
7  misadministration can be toxic to the kidneys?
8     A  Yes.
9     Q  Okay.  Opiate Therapy In Correctional
10  Care -- same thing, kidney damage?
11    A  Not so much.  I'm thinking that people have
12  used kidney stones as an excuse for opiates ever since
13  I've been in school.  And they make themselves bleed
14  and say, "Look at my blood from my kidney stone," if
15  they want to try to prove that or just complain of
16  kidney stone pain.  If they've had kidney stones
17  before, they keep saying, "I have kidney stone pain,"
18  and they ask for opiates.
19    Q  Understood.  Diagnosing Back Pain In
20  Correctional Environment?
21    A  Yes.  Well, that one, I think, on its face is
22  more clear to almost anyone that if your kidneys are
23  in the back and people have back pain, you should be
24  concerned about whether or not it's related to the

Page 80

1  kidneys.
2     Q  Understood.  Dissimulation Disorders?
3     A  Yes.  That goes back to the same kind of
4  concern that I have about making sure the opiate
5  therapy is properly administered.  And people say, "I
6  have kidney stones, I have back pain," or even blood
7  in the urine to get attention.  And the reality is
8  that inmates suffer with psychological conditions
9  which make their diagnosis more complicated because
10  they may be producing artificially the symptoms that
11  they want to attribute to a disease that they actually
12  don't even have.  That's what a dissimulation disorder
13  is, and that condition could include kidney disease.
14    Q  I see.  Let's just wrap up a couple things
15  and we'll take a break.
16        You've never gone to nursing school;
17  correct?
18    A  No.
19    Q  You don't have an LPN or RN license?
20    A  No.
21    Q  Never practiced nursing?
22    A  No.
23    Q  Have you ever practiced as a nephrologist?
24    A  No.

Page 81

1     Q  The expert work that you've done, I know you
2  did a fair amount of in-house work with CCHCS; that's
3  what I'm understanding, correct?
4     A  Correct.
5     Q  And then you've done work as the court
6  monitor in Monterey County?
7     A  Yes.
8     Q  And you're the expert in this case for
9  William Dean obviously?
10    A  Yes.
11    Q  Are there any other cases other -- that are
12  not covered by the list that I just rattled?
13    A  I mentioned, I believe, my expert report that
14  I've just been an expert in a civil case, which is
15  confidential under an arbitration agreement.
16    Q  Okay.
17    A  I provided an expert opinion in a case in New
18  Orleans where a -- and I've listed that case.
19    Q  Which is it?
20    A  That case is Nagel.  And that was a
21  relatively well-publicized case at least in that area
22  because it was settled for, I believe, a million
23  dollars against the prison on behalf of the family of
24  the deceased inmate who was a war hero and died while

Page 82

1    in custody.
2        Q   Who were you working for?
3        A   I was an expert on behalf of the defense for
4    the medical director in that case.
5        Q   Okay.  So Nagel, and there was a confidential
6    case, and then are there any others that we haven't
7    covered?
8        A   None that are recent.
9        Q   Okay.  By "recent," you mean the last four
10   years?
11       A   Last ten years.
12       Q   There are some outside expert work that
13   you've done more than ten years ago?
14       A   Actually, also, just in terms of expert work,
15   I've done consulting on the quality of care provided
16   for the Connecticut Prison System.  I reviewed their
17   records and produced a report.
18       Q   When?
19       A   That was about three years ago.
20       Q   Was that as part of another consent decree
21   case?
22       A   I don't know.  I was given that assignment
23   through a third party who had -- it was -- it may have
24   been -- I really won't say what it related to.  My

Page 83

1    concern was just to analyze the quality of care and
2    provide my report, and I'm sure that's confidential.
3        Q   Right.  Okay.
4        A   But then going back before ten years, there
5    were occasional personal injury cases or -- mostly
6    personal -- just a few -- where, you know, if I go
7    back during my career as a physician -- it might have
8    been the last forty years -- I was called upon either
9    as a percipient witness because I was a physician
10   involved or as an expert to opine.  And it was just a
11   few, and I can't recall their names.  And I believe
12   they were personal injury matters.
13       Q   How would you say the cases you've been
14   involved in break down as far as plaintiff versus
15   defense?
16       A   Well, when you say "involved in," as an
17   attorney or --
18       Q   No.
19       A   -- as a physician?
20       Q   As an expert, as a hired expert?
21       A   I'd say --
22       Q   And let's leave the in-house work aside
23   because that was all defense; right?
24       A   Yes, the in-house is all defense.  And,

Page 84

1    otherwise, it's 50/50.
2        Q   But it's only been a couple cases the last
3    few years?
4        A   Correct.
5        Q   Do you advertise your services as an expert
6    witness?
7        A   No.
8        Q   Don't have a website, anything like that?
9        A   No.
10       Q   Are you affiliated with any expert witness
11   locating services where you give them your name and
12   they find you, match you with lawyers?
13       A   No.
14       Q   You know what I'm talking about obviously?
15       A   Yes.
16       Q   What rate are you charging on this
17   case -- 350 an hour?
18       A   I wrote it down there.  It's 250 an hour.
19       Q   Is that your standard rate?
20       A   No.
21       Q   What's your standard rate?
22       A   My most recent rate is $500 an hour.
23       Q   Why are you doing 250 on this case?
24       A   Well, the person involved is a quasi-indigent

Page 85

1    individual, and I don't have a need to burden him with
2    the ordinary rate which I think would be
3    insurmountable.
4        Q   Is that 250 per hour across the board --
5    deposition, trial testimony?
6        A   Yes.
7        Q   Do you know how much -- let's start with how
8    many hours you've billed on this case to date?
9        A   I have a bill that I submitted already for
10   that.
11       MR. RUPCICH:  I didn't see it.
12       MR. STROM:  We can provide you a copy today.
13       THE WITNESS:  Do you want me to --
14       MR. RUPCICH:  He'll take care of it.
15       THE WITNESS:  You'll see that bill.
16       MR. RUPCICH:  Let's take a break.
17           (Whereupon, a recess was taken.)
18   BY MR. RUPCICH:
19       Q   How did you become involved in this
20   particular case?
21       A   Yeah.  That relates also to an expansion on
22   the answer to the question as to how many hours
23   because it's not reflected altogether in the document
24   you're going to see.

Page 86

1    I got involved in the case first because
2  of an inquiry I received by email from Mr. Strom who
3  got my name from a colleague of his that he went to
4  school with.  And I responded and I said yes, I would
5  be interested in helping out here and providing
6  services.  And I say it in that context because at the
7  time I did that, it was a pro bono case and it was a
8  preliminary status.  My services were provided at no
9  fee, and it led me to review medical records and
10  produce a statement in support of the lawsuit.
11  There's a technical term for it in
12  Illinois -- a declaration of some kind that needs to
13  be provided by a physician to get the ball rolling, so
14  to speak.  So the hours I put into that review and to
15  the production of that affidavit, which I signed, were
16  not charged.
17    But then following that, there was a
18  lull of many months, almost a year, I think, and then
19  Mr. Strom got back in touch with me and said they are
20  going to pursue litigation here and they would be
21  interested in retaining me as an expert, at which time
22  I signed a retaining expert letter establishing my fee
23  for those services from that date forward as 250 an
24  hour.

Page 87

1    Q   Do you know when you came on as a paid
2  expert?
3    A   Yes, it's in the letter.  So I think it's a
4  letter that was provided to you.  If not, I can find
5  it.
6        (Whereupon, Barnett Deposition
7         Exhibit No. 2 was marked for
8         identification.)
9    MR. RUPCICH:  I'm going to hand you Deposition
10  Exhibit 2.  Is that the letter?
11    THE WITNESS:  Yes.
12    MR. STROM:  And, Joe, I'm passing back to you a
13  copy of Dr. Barnett's invoice.
14        (Whereupon, Barnett Deposition
15         Exhibit No. 3 was marked for
16         identification.)
17  BY MR. RUPCICH:
18    Q   I'm going to hand you Barnett 3.  That's your
19  invoice in this case?
20    A   Yes.
21    Q   What's the date?
22    A   September 23, 2019.
23    Q   Does that bill encompass all of your billed
24  charges for this case?  And by "billed," I mean from

Page 88

1  the time you stopped being pro bono and started
2  charging up to the present?
3    A   Yes.
4    Q   There's no earlier bill?
5    A   No.
6    Q   Very good.  I don't see a charge for record
7  review on there in my brief glance.
8    A   Correct.
9    Q   Explain that.
10    A   The expert report, which amounts to
11  nineteen hours, included review of records.  And I did
12  extensive medical record review in order to generate
13  the affidavit.  In fact, I would say most of my record
14  review was -- let me put it this way.  I spent more
15  hours in record review to produce the affidavit than I
16  needed to spend to produce the report.
17    Q   Okay.  So did you have -- what records did
18  you review to produce the affidavit?
19    A   I reviewed all the medical records delivered
20  to me documenting Mr. Dean's medical care while
21  incarcerated.
22    Q   Did that consist of all of his medical
23  records, or is it something less?
24    A   Well, that's Part A.  And Part B were medical

Page 89

1  records subsequent to his incarceration, but only up
2  to approximately 2018.
3    Q   So your initial review was all medical
4  records?
5    A   Medical records, yes.
6    Q   Do you know as you sit here if what you
7  reviewed initially -- what you initially reviewed was
8  less than the full medical records up to the time -- I
9  guess up to 2018?
10    A   Based on my education and training and
11  experience, what I was looking at, at least for the
12  time that he was incarcerated, were the complete
13  medical records in their entirety to my best
14  knowledge.
15    Q   Did you request any additional records as
16  part of your initial review?
17    A   I may have asked for and received some
18  medical records describing his care after his release
19  from prison.  I don't know that I received a complete
20  record because those are hospital records from
21  outside, and I had a hard time tracking the continuous
22  dates for those records because I wouldn't really know
23  what he was doing on the outside so well as I could
24  appreciate that.  When you're in prison, the records

## Page 90

1  tend to have a continuity that satisfied me that they
2  were complete.
3              (Whereupon, Barnett Deposition
4              Exhibit No. 4 was marked for
5              identification.)
6  BY MR. RUPCICH:
7      Q   Look at Barnett 4. It looks like an email
8  from May 19, 2018, from Mr. Strom; is this to you?
9      A   Yes.
10     Q   Do you remember receiving this email?
11     A   I can't remember these exact words, but I do
12 know I received something like this. And,
13 yes -- yeah, I think this is something that I recall.
14     Q   Okay.
15         So in looking at the text of it, it
16 says, "This is the second message promised sent
17 through my firm's secure file-transfer website. I
18 have no expectations about your review of Mr. Dean's
19 full medical record provided here. Instead, I provide
20 these additional documents only to satisfy any
21 lingering questions you may have after review of the
22 "care package" of selected records I sent by email";
23 did I read that right?
24     A   Yes.

## Page 91

1      Q   What is the care package of selected records?
2      A   I believe my initial review at the very
3  earliest stage contained the documents that Mr. Strom
4  or others in this firm believe were completely more on
5  point to the claims being made by Mr. Dean. So that's
6  the package that related to significant aspects of his
7  care. And it does say selected records, so it's not
8  the entire file. It's just what I said.
9      Q   Do you know how -- how many records it was?
10     A   No. I mean, I don't recall exactly how many
11 pages. It was less than his complete file. It was a
12 substantial number of pages, but it was much less than
13 his complete file.
14     Q   So you were provided the balance of his
15 medical file on May 19, 2018; is that a fair
16 statement?
17     MR. STROM: I object to the form.
18 BY MR. RUPCICH:
19     Q   You were provided additional records?
20     A   Yes, I was provided additional records.
21     MR. RUPCICH: Bill, have we been provided the
22 care package?
23     MR. STROM: Yes, cited in the appendix to the
24 expert reports.

## Page 92

1      MR. RUPCICH: That's the care package?
2      MR. STROM: Yes.
3      MR. RUPCICH: It's cited or attached?
4      MR. STROM: It's cited in the appendix, and it
5  should be among our productions. Care package is
6  found at Bates Dean, hyphen, Expert, hyphen, 12 to 64.
7      MR. RUPCICH: So 52 pages?
8      MR. STROM: 53.
9      MR. RUPCICH: Thank you.
10 BY MR. RUPCICH:
11     Q   So I'm still a little confused on the time
12 frame. Do you know when -- was your initial review
13 completed before or after you received this May 2018
14 email?
15     MR. STROM: I object to the form.
16     THE WITNESS: I'd have to look at my -- the date
17 on the affidavit to tell you. You might know or it's
18 in your files. I probably have that. It's a copy
19 that I'm sure you were sent, right?
20     MR. STROM: It's part of the record attached to
21 the third-amended complaint.
22     MR. RUPCICH: Right. It's redacted.
23     THE WITNESS: Because there's a date on
24 there -- is there?

## Page 93

1      MR. RUPCICH: It looks like May 26, 2018. I'm
2  looking at the second-amended complaint, Doc 53 at 33.
3      MR. STROM: Our operative complaint is the
4  third-amended complaint; correct?
5      MR. RUPCICH: Yeah. Was there a separate 622, or
6  was it just the same one?
7      MR. STROM: There was a separate 622. Docket 72.
8      THE WITNESS: I believe it was May 26, 2018.
9  Yep, that makes sense. That makes a lot of sense now.
10 Okay.
11 BY MR. RUPCICH:
12     Q   And then after coming on as a paid expert on
13 or about June 14, 2019, did you then review additional
14 records, or had you already reviewed depositions?
15     A   No, I had not already reviewed depositions.
16 The depositions hadn't been done as far as I knew on
17 May 19th, so --
18     Q   I'm talking about June 2019.
19     A   Correct. So I received -- following my
20 engagement, according to the terms of this letter, I
21 received additional documents, which included
22 depositions.
23     Q   And so your time, as we said, from June 14,
24 2019, to September 2019 would be review of records in

Page 94

1   conjunction with writing your report?
2       A   Yes.
3       Q   If you look at Exhibit 1, I believe at the
4   very back, there's an appendix?
5       A   Yeah, I have that, Exhibit A.  Do you want me
6   to look at that and save you some time to pass yours
7   to me?
8       Q   Okay.  I have one here.  I had one.  I lost
9   it.
10          So my question is, are these the records
11  in Exhibit A, the index and materials relied on that
12  you reviewed?
13      A   Yes.
14      Q   Are you able to state with any specificity
15  what was reviewed after June 14, 2019, and what was
16  reviewed before?
17      MR. STROM:  I object to the form.
18      THE WITNESS:  Yeah, with some specificity.  I
19  would say that the dep -- I reviewed the depositions
20  after I was engaged in June of 2019.
21      MR. STROM:  I apologize.  But I just want to make
22  a record on something, and that is that Dr. Barnett
23  has the amended expert's appendix which was produced
24  to you last week Friday with our Supplemental Rule 26.

Page 95

1   It supersedes the expert's appendix that was attached
2   to his report when it was initially disclosed.
3       MR. RUPCICH:  Then let's just make mine 5.
4           (Whereupon, Barnett Deposition
5               Exhibit No. 5 was marked for
6               identification.)
7   BY MR. RUPCICH:
8       Q   Amended Index Of Materials Plaintiff's Expert
9   Considered, is that what you're looking at?
10      A   Yes.
11      Q   And you believe the depositions were reviewed
12  after June 19 of 2019?
13      A   Yes.
14      Q   Anything else?
15      A   I'm going to do this starting on Page 1.  I
16  think everything on Page 1 was part of the larger
17  medical records delivered to me in May of 2018.
18          On Page 2, there are depositions and
19  collegial UM notes.  I believe I saw those as well in
20  2019.  I'm not certain because I think they're part of
21  the medical record, but I reviewed them again
22  following the June 2019 engagement letter, as I did as
23  well on Page 3, there are more collegial notes and
24  depositions.

Page 96

1       A   On Page 4, the Utilization Management
2   Policies/Medical Guidelines I reviewed after June
3   of 2019 and prior to my production of the expert
4   report.
5       Q   If it says produced March 27, 2019, we can
6   fairly assume that was reviewed by you after --
7       A   There you go.
8       Q   Is that -- do you agree?
9       A   I guess my memory serves me correctly, yes.
10      Q   I can agree with that.
11      A   Okay.  And that's pretty much what it amounts
12  to is the depositions, the medical guidelines,
13  Utilization Management guidelines, Utilization
14  Management policies were all reviewed by me after June
15  of 2019.
16      Q   Okay.  I want to look at your report.  Do you
17  have it handy there?
18      A   I have it in front of me.
19      Q   For the record, it's Exhibit 1, but you can
20  use yours.
21      A   Yeah.
22      Q   This is a report that you produced, according
23  to your bill, in August of 2019?
24      A   Yes.

Page 97

1       Q   And that would have been based on your review
2   of the records in Exhibit 5?
3       A   Yes.
4       Q   Have you reviewed any records since -- or
5   that are not included in Exhibit 5?
6       A   No, to the best of my ability to recall and
7   to my belief.
8       Q   Yeah, there's a lot.
9       A   Yeah.
10      Q   Did you ask for any additional documents
11  after June 2019 to complete your review?
12      A   Well, I did ask for the depositions, although
13  I don't know that they weren't forthcoming anyway.  I
14  mean, I'm not saying the only reason I got them was
15  because I asked for them.
16      Q   I understand.
17      A   And I -- I may have asked for updated
18  information from outside providers since he's no
19  longer incarcerated to bring me current as to his
20  condition, but I don't recall whether I asked for
21  those or whether they were provided for me anyway.
22      Q   Okay.
23          Is this a complete statement of the
24  opinions that you arrived at after reviewing the

Page 98

1  records?

2  A  Yes.

3  Q  And did you write this report?

4  A  Absolutely, yes.

5  Q  So you have a familiarity with Mr. Dean's

6  records at this point?

7  A  Yes.

8  Q  You have familiarity with his medical

9  history?

10  A  Yes.

11  Q  And you have familiarity with his care

12  between December 2015 and November 2016?

13  A  Yes.

14  Q  And do you know what your task or your

15  assignment was in this case, what you were supposed to

16  do?

17  A  Yes.

18  Q  What?

19  A  I was supposed to provide a medical opinion

20  as to the quality of care provided to Mr. Dean by the

21  defendants with regards to whether that care met

22  applicable standards of care, in other words, was

23  reasonable, was the practice -- did the practice

24  comport with what a reasonable practitioner in the

Page 99

1  same circumstances would be doing, whether the care or

2  lack of care caused any damage, and also whether the

3  care provided or lack of care demonstrated what I

4  could believe or had reason to believe was

5  indifference.

6  Q  And after your review of the records, your

7  conclusion was that Dr. Nawoor was negligent?

8  A  Yes.

9  Q  And Dr. Einwohner was negligent?

10  A  Yes.

11  Q  And Wexford was deliberately indifferent?

12  A  Yes.

13  Q  Kathy Galvin was both negligent and

14  deliberately indifferent?

15  A  Yes.

16  Q  Your conclusion was that all named defendants

17  were both negligent and deliberately indifferent;

18  correct?

19  A  I need to know, again, the names of all the

20  defendants because I reviewed depositions of people

21  who I don't think are named as defendants.

22  Q  Correct.

23  A  So I believe you're correct that as to the

24  defendants named in this lawsuit, I describe them as,

Page 100

1  in my opinion, being negligent and having manifested

2  deliberate indifference to the plaintiff's condition.

3  Q  And you also concluded that non-defendant

4  Dr. Ritz was negligent and deliberately indifferent?

5  A  Yes.

6  Q  And you concluded that Dr. Matticks,

7  M-a-t-t-i-c-k-s, was deliberately indifferent?

8  A  Yes.

9  Q  Did you arrive at any opinions on

10  Dr. Severino?

11  A  No.

12  Q  Why not?

13  A  Dr. Severino is not a defendant.

14  Q  Neither is Dr. Ritz.

15  A  Dr. Ritz is, as I understand it, an employee

16  of Wexford.  But to answer your question about

17  Dr. Severino, because he wasn't an employee and he

18  wasn't a named defendant and because I'm not a

19  urologist, I didn't offer an opinion in this expert

20  report.

21  Q  You felt that because he's a urologist and

22  you're trained in family practice, it wouldn't be

23  appropriate for you to critique his care?

24  MR. STROM:  I object to the form.

Page 101

1  THE WITNESS:  No.  Actually, I do have an opinion

2  as to Dr. Severino's care in my capacity as a primary

3  care provider who works with specialists, including

4  urologists.  It's just I didn't provide that opinion

5  in this report because it wasn't my understanding that

6  that opinion would be called for or relevant.  But I

7  do have an opinion.

8  BY MR. RUPCICH:

9  Q  What is it?

10  A  I think Dr. Severino provided care within the

11  standards of care for urology as an expert consulting

12  with the primary care providers.  Yeah, his care is

13  what I'm used to seeing by specialists in that

14  environment typically interacting with primary care

15  providers.

16  Q  Dr. Severino recommended surgery on or about

17  April 14th of 2016; is that right?

18  A  It was after the CT IVP was done.

19  Q  On April 12th?

20  A  Right.  So sometime after that, I think

21  within a short period of time, he said there should be

22  surgery, yes.

23  Q  Yeah.  And that surgery was done on July 19,

24  2016?

Page 102

1    A   Correct.
2    Q   And you're critical of the defendants for the
3  period of time between ordering the surgery and the
4  surgery being performed, if I read your report
5  correctly; is that right?
6    A   Yes.
7    Q   But you're not critical of Dr. Severino for
8  that period of time between when he ordered surgery
9  and when he performed it?
10    A   Well, correct, I did not provide a critique
11  in my report.  This is the report I provided in accord
12  with the requirements or needs for expertise as a
13  primary care provider.  I told you I have an opinion
14  that's outside this report, and I can provide that to
15  you if you want.  But I don't have in this report any
16  critique of Dr. Severino.
17    Q   Right.
18        You told me that you believe he met the
19  standard of care for a urologist, that's your opinion;
20  right?
21    A   For a urologist working in a correctional
22  environment, yes.
23    Q   He met the standard of care for the patient
24  that he diagnosed with a clear cell renal carcinoma on

Page 103

1  or about April 14th and that he operated on July 19 of
2  2016; correct?  That's your belief?
3    A   I already expressed that that delay
4  was -- that delay was not within the standard of care.
5    Q   For who?
6    A   For the team of people taking care of him at
7  the time.
8    Q   The team included Dr. Severino; correct?
9    A   Correct.
10    Q   And his team of surgeons; correct?
11    A   Well, I don't know how many more people work
12  with Dr. Severino besides Dr. Severino.  So when you
13  say team of surgeons, he had an assistant, but I don't
14  know how that assistant was involved.
15    Q   Did you read his deposition?
16    A   Yeah, I did.  I did, uh-huh.
17    Q   Do you remember that he recruited a vascular
18  surgeon?
19    A   I recall it was a complicated case because it
20  had invaded the inferior vena cava, so it was a
21  difficult case.  And, yes, I guess there would be that
22  team.
23    Q   And he recruited a cardiothoracic surgeon?
24    A   I can't recall all the names, but there was a

Page 104

1  team.  It was a complicated case.
2    Q   Right.
3        And Dr. Severino explained that the
4  period of time between when that diagnosis was made
5  and when the surgery occurred was reasonable in his
6  mind; did you see that?
7    A   Yes.
8    Q   And you would agree with that?
9    A   I'm not a urologist, and I would agree -- I
10  would defer to Dr. -- I would defer to Dr. Severino,
11  his judgment, as to the immediate need for surgery
12  once the diagnosis was made relative to the risks of
13  embarking on the surgery with too much alacrity.
14  There's that balance, and I'm not a surgeon, and I
15  haven't done these cases as a surgeon.  My comment
16  about --
17    Q   None of my clients are surgeons; correct?
18    A   Correct.
19    Q   And you said just now that you would defer to
20  Dr. Severino to conduct that workup to get the patient
21  to surgery, if I understood you; is that correct?
22    A   Yes.
23    Q   So why can't Dr. Nawoor, who is a family
24  practitioner, defer to Dr. Severino?

Page 105

1    A   Well, he can.  If he's communicating with
2  Dr. Severino about the timing for the surgery and if
3  Dr. Severino is comfortable with and says this is when
4  the surgery should be done, then that's up to
5  Dr. Severino.
6    Q   Right.
7        Because primary care providers, family
8  practitioners, internists, don't tell surgeons when to
9  do surgery; do they?
10    A   No.
11    Q   And if Dr. Severino felt that he needed to
12  work that patient up and the earliest he could get him
13  into surgery was July 19, 2016, it would be reasonable
14  for Dr. Nawoor to rely on Dr. Severino to make that
15  judgment?
16    A   Yes.
17    Q   And if Dr. Severino met his standard of care
18  as far as the time frame for conducting that surgery,
19  there's no way Dr. Nawoor or any of the other
20  defendants could have deviated from theirs for not
21  making Severino do it faster?
22    MR. STROM:  I object to the form.
23    THE WITNESS:  You're asking me to make legal
24  distinctions, so I don't want to, you know, be

## Page 106

1   answering outside of my expertise.  I really can't
2   answer that question.  My report deals with multiple
3   parties and reviews multiple records, and I'm
4   comfortable with my opinion as it is framed in these
5   pages.
6   BY MR. RUPCICH:
7        Q   How do we square the criticism of the
8   non-surgeon defendants in this case over the time it
9   took to do the surgery from April to July with the
10  fact that Severino was the one in charge?
11       A   I square -- in my opinion, the way I square
12  it or relate to it is the delay to not have the CT
13  scan until April is not Severino's issue --
14       Q   We'll talk about that.  That's not what I'm
15  talking about.
16       A   Okay.  So had the case not been delayed until
17  April, the extent of disease which required so much
18  more time to elucidate, evaluate, and engage wouldn't
19  have been three months.  I mean, by the time the CT
20  scan was done --
21       Q   What do you base that opinion you just gave
22  me on -- that it would not have taken three months to
23  work him up if they had done a CT earlier in 2016?
24       A   Well, I'm speaking in terms of what I think

## Page 107

1   is more likely than not, and I appreciate that there's
2   probably other experts on this case who may have their
3   opinion.  So I can just give you my opinion and let
4   it -- let it take whatever value it is attributed to.
5   But the tumor continues to grow if it's not treated.
6        Q   At what rate?
7        A   Well, that's something that the experts can
8   relate to.
9        Q   If you don't know at what rate the tumor
10  grows, how can you extrapolate where it would have
11  been three months earlier?
12       A   I can't really know without the reports from
13  radiology to tell me.
14       Q   So you're guessing?
15       A   So I'm -- I'm making an educated guess based
16  on my education, training, and experience that cancers
17  grow over time.
18       Q   At what rate do clear cell renal carcinomas
19  grow?
20       A   Well, I understand they do grow relatively
21  slowly over time, not like overnight type of stuff.
22       Q   Did you do any literature review on the rate
23  of growth -- the median or mean rate of growth of
24  clear cell renal carcinoma?

## Page 108

1        A   No, I did not.
2        Q   Wouldn't it be important to know that if
3   you're going to give an opinion that speculates what
4   this tumor was doing a month earlier, three months
5   earlier?
6        MR. STROM:  I object to the form.
7        THE WITNESS:  So it is important, and I made
8   clear in my report that I don't have that measure and
9   that I'm only stating as a matter of common sense that
10  an earlier diagnosis would be better and that it
11  didn't help his cause and his condition any for it to
12  be delayed.
13       But my criticisms relate to the extent
14  of his discomfort, pain, psychiatric -- psychological
15  as well as physical during the time from December when
16  he was peeing gross blood clots until April when a
17  diagnosis was made.
18  BY MR. RUPCICH:
19       Q   Did you see anything in any record where he
20  attributed pain to his hematuria?
21       A   Yes.
22       Q   You did?
23       A   Yeah, I did.  In fact, I described it in my
24  report.  He describes it as uncomfortable.  He says it

## Page 109

1   hurts to pass -- and it does hurt to pass clots of
2   blood through the urethra.  I don't think any man
3   would be doubting that.
4        Q   It appeared to me as it was described
5   repeatedly as painless hematuria?
6        A   Well, there was -- it was painless compared
7   to what you get with kidney stones.  And so I describe
8   it as a discomfort and not a pain of the same level of
9   kidney stones.  Kidney stone pain passage is like
10  giving birth to a child is what I've understood.  It's
11  extremely -- you're writhing in pain.  Whereas passing
12  clots of blood through the urethra is an uncomfortable
13  sensation.  Most of his discomfort over the course of
14  months, I believe, was psychic, not physical.  But --
15       Q   Psychic meaning?
16       A   He was scared to death that he was dying
17  because he was passing blood.  He made it clear to his
18  doctors over and over again, "This is making me
19  nervous, I'm scared."  His wife even engaged them in
20  that discussion.
21       Q   Do you have any mental health training?
22       A   Yes.
23       Q   Explain that.
24       A   Well, it's an integral part of your training

Page 110

1  as a family physician.  You can't pass the boards if
2  you don't know mental health at all because there's
3  too many mental health questions.  I shouldn't say you
4  can't pass the boards, but it would be difficult.  In
5  fact, what's been said of family physicians is that
6  probably half of the patients that you see on any
7  given day are there almost, one would say, as worried
8  well.  They're not dying of anything.  They don't need
9  treatment as much as reassurance.  And so making sure
10  you can discern the difference between those people
11  who are in a healthy way worried between the people
12  who are pathologically worried because they have an
13  underlying depression as a serious illness, that needs
14  to be considered in every one of your patients.  And
15  so mental health training is important.  And many
16  physicians who are practicing family medicine are
17  treating patients with antidepressants as well.
18        Q   Fair enough.
19            Did you see anything in the records that
20  suggested Mr. Dean was receiving mental health
21  treatment secondary to his medical issues?
22        A   I don't recall that he was regularly seeing a
23  psychiatrist or psychologist.
24        Q   So if he had distress from a psychiatric

Page 111

1  standpoint, it didn't rise to a level where he was
2  receiving care for it?
3        A   I could only say that it didn't generate a
4  psychiatric referral, a psychiatry referral.  I'm not
5  saying that he wasn't severely enough stressed to
6  deserve one.  He probably was.  Someone needed to help
7  him with his psychiatric -- it could have been his
8  family practitioner who could have given him
9  reassurance because I don't think he did give him
10  enough reassurances.  And in the absence of
11  reassurances from his family doctor, referral to
12  psychology would have been appropriate.  But I can say
13  that he was not referred that I could see.
14        Q   Okay.  Psychic distress would be common with
15  a cancer diagnosis; is that a fair statement?
16        A   No.
17        Q   So there was something in particular about
18  Mr. Dean's cancer diagnosis that caused stress above
19  and over a typical cancer diagnosis?
20        A   Well, it's a question that I can't answer
21  easily yes or no, and that's why I said no because
22  it's incomplete.  Obviously, to me, it's axiomatic
23  that if someone tells you you have cancer, it creates
24  anxiety.  And so in some ways, your answer is yes.

Page 112

1        But the kind of anxiety he felt, I
2  think, goes beyond that, and the circumstances that
3  create this is he wasn't really told what he had or
4  what he was going to do about it.  He was afraid he
5  had cancer.
6        Q   When are you talking about?
7        A   Before April, before the CT.  This man is
8  peeing blood and clots, and he's reasonably convinced
9  that something is going on very serious and he's not
10  getting a response from anyone as to what it is that's
11  happening.  And I have to use my own humanity as well
12  as my medical training when I deal with patients and
13  put myself in their position.  And if I'm passing
14  clots of blood through my urethra, I'm going to be
15  sick with worry and especially if the doctor won't
16  tell me why the blood is coming out.
17        Q   All right.  So he saw Dr. Severino on
18  March 10 of 2016; right?
19        A   I have to go back to the Bates on that.
20        Q   Bill will tell me if I'm wrong.
21        A   I have a chronology here, too.  Yes, he
22  did -- March 10, 2016.
23        Q   So would it be your belief, at that point, he
24  received counseling from Dr. Severino that would have

Page 113

1  addressed the anxiety he was feeling?
2        A   Again, yes and no.
3        Q   Well, in April, early April, he found out he
4  had cancer; correct?
5        A   April 12th.
6        Q   Right.
7            So after that point, are you attributing
8  additional psychic stress to the defendants above what
9  a cancer patient would typically experience?
10        A   Yes.
11        Q   Explain that.
12        A   Well, he's waiting -- I'm not
13  attributing -- I'm not attributing blame in this
14  statement.  I'm just making it as an observation that
15  when he knows he has cancer, he's going to be very
16  nervous about what are you going to do about it.  I
17  still think it's better than it was before because at
18  least he knows that his condition is defined and it's
19  on the radar.
20        Q   Well, he knew he was going to have surgery?
21        A   Right, that's right.  But until the surgery
22  is done, I'm sure he's got an anxiety.
23        Q   How is that the defendants' fault?
24        A   I didn't say -- I didn't say that.

Page 114

1    Q   Okay.
2    A   I said clearly what I just said to you.  I
3  think the record -- I'm not trying to attribute blame
4  at this point to that statement.
5    Q   All right.  Mr. Dean prior to December 2016
6  had a history of kidney stones; correct?
7    A   Yes.
8    Q   He had undergone at least two lithotripsies;
9  right?
10   A   Yes.
11   Q   He was obese?
12   A   Yes.
13   Q   What was his age?  He was close to 60, wasn't
14 he?
15   A   Yes.
16   Q   He had cardiomyopathy?
17   A   Yes.
18   Q   Hypertension?
19   A   Yes.
20   Q   Diabetes?
21   A   Yes.
22   Q   Renal insufficiency?
23   A   Well, yes.  He was 55 years old, and most
24 diabetics have some renal insufficiency at that age.

Page 115

1    Q   He has some level of kidney disease, some
2  degree?
3    A   Yes.
4    Q   Would you agree that he was at risk for the
5  development of kidney stones?
6    A   Well, yes.  If he had -- anyone who forms
7  kidney stones once is at risk for getting more kidney
8  stones.
9    Q   And his comorbidities placed him at increased
10 risk of developing stones as compared to people
11 without those comorbidities?
12   A   Somewhat -- mostly because he's already had
13 kidney stones overwhelmingly is his factor that makes
14 him at risk for more kidney stones.
15   Q   He's a stone-maker?
16   A   Yes.
17   Q   When you looked through the records, he had
18 undergone prior workups by urology for his kidney
19 stones; correct?
20   A   Yes, he had.
21   Q   And you looked at some of those records or, I
22 guess, all of them, right, that were provided to you?
23   A   Yes.
24   Q   He underwent a CT with contrast in February

Page 116

1  of 2013; did you see that?
2    A   Was it with contrast in 2013?
3    Q   Yeah.  I'll show it to you.  That's Bates
4  IDOC Taylorville Med Recs 435.
5    A   CT of pelvic with contrast, and this is done
6  on 2-8-13.  Got it.
7    Q   And not read as having any masses?
8    A   Right.  It doesn't say no masses, but the
9  report is -- speaks for itself.
10   Q   The absence of mention of masses --
11   A   No masses in the kidney.  No diagnosis is
12 made of cancer.
13   Q   Right.  And he had another CT, this time
14 without contrast, in August of 2014?
15   A   I think it's 2015 actually, but you have the
16 exact date there.  The date on this is August 2014,
17 and this is CT of abdomen and pelvis.
18   Q   And that's Page 437 in the medical records?
19   A   Yes.  And the impression is basically stones
20 in the kidney and stones in the gallbladder.
21   Q   Okay.  And then as you mentioned, he had
22 another workup in August of 2015; right?
23   A   Right.
24   Q   And lithotripsy for stones?

Page 117

1    A   Yes.
2    Q   That was done by urology?
3    A   Yes, he was followed by a urologist at that
4  time.
5    Q   And there was a presentation of hematuria in
6  August of 2015 with that referral; right?
7    A   It was microscopic.
8    Q   Microscopic hematuria?
9    A   Correct.
10   Q   Would you not expect a urologist that worked
11 him up to investigate that hematuria?
12   A   I believe in doing his CT scan, he did --
13 microscopic hematuria.
14   Q   So he did a CT in August of 2015 as part of
15 the workup for stones?
16   A   Yes.
17   Q   With a patient presenting with hematuria, if
18 you're the primary care provider, you refer to
19 urology, wouldn't you expect that urologist to rule
20 out cancer?
21   A   It depends on the circumstances, and I might
22 expect him to provide care that should be within the
23 standard of care for a urologist.
24   Q   Okay.

Page 118

1      A   And expect that he's not ignoring the
2   possibility of cancer in the process of looking at
3   someone, yes.
4      Q   You wouldn't expect that urologist to focus
5   only on the stones as the cause of the hematuria
6   without ruling out other causes; right?
7      A   Well, I would look to see what the urologist
8   note sent back to me. I mean, what I would expect and
9   what I observed might be two different things.
10     Q   What would you expect? That's my question.
11     A   I expect the urologist to consider all the
12  causes of hematuria and make a diagnosis that would be
13  appropriate for his evaluation.
14     Q   Which would include ruling out more serious
15  conditions than stones?
16     A   Yes.
17     Q   And if your patient was returned to you with
18  a diagnosis of stones, it would be reasonable for you
19  to assume they had ruled out more serious conditions?
20     A   No.
21     Q   No?
22     A   Not me -- if you're asking me what I do.
23     Q   How about a reasonably prudent physician?
24     A   Well -- and I don't think

Page 119

1   either. A reasonably prudent physician will be an
2   advocate for his patient so that the consultant's work
3   is not an excuse for the PCP to abandon his advocacy
4   and his role as an overseer. Consultants make
5   mistakes. They make oversights.
6      Q   Do you believe this consultant in August 2015
7   made a mistake?
8      A   I don't -- I don't know whether he misread
9   the CT scan at that time. It's possible. I'm not a
10  urologist, so I'm not offering an opinion as to what
11  that urologist did or didn't do. And I'm not saying
12  that the PCP in 2015 either was negligent. That's not
13  in my opinion at all.
14     Q   Well --
15     A   So I'm just answering your question, and
16  you're following up with something else, another
17  question. So --
18     Q   That's what I do.
19     A   Right. But you understand I'm answering one
20  question, and then there's other questions. So my
21  answers aren't inconsistent, I don't believe.
22     Q   Okay. Your report says the standard of care
23  for hematuria is a prompt CT and cystoscopy?
24     A   My report says that the standard of care for

Page 120

1   gross hematuria is a CT and prompt cystoscopy.
2      Q   If it's microscopic, that's different?
3      A   Yes.
4      Q   Explain.
5      A   Well, microscopic hematuria can be caused by
6   trauma, can be caused by high fever, it can be caused
7   intermittently by the passage of a stone. I think
8   there's more dispute.
9          There is a school of thought which would
10  say that even microscopic hematuria demands a
11  cystoscopy as well as a CT with and without contrast.
12  But I've also read that there's some dispute in that
13  approach because if the person's hematuria is
14  microscopic and well-documented to have been resolved
15  with a cause for that resolution, then the cystoscopy
16  might not be necessary and it also might be related to
17  the person's risk factors.
18         So what is clear is gross hematuria
19  always demands a CT and a cystoscopy. I found no
20  exceptions to that. And I think most people would say
21  that microscopic hematuria also deserves a cystoscopy
22  in a certain age group, over 50, even if you believe
23  that the cause has been explained. But that
24  particular approach is not universal.

Page 121

1      Q   Mr. Dean never had a cystoscopy from
2   Dr. Severino?
3      A   Well, no, he didn't -- he didn't.
4      Q   Because the CT answered the question?
5      A   Yes.
6      Q   Okay. You had said earlier you agreed that
7   an ultrasound is a noninvasive test; right?
8      A   Correct.
9      Q   A CT with contrast is a more invasive test?
10     A   It's more invasive.
11     Q   And there's risks with a CT with contrast
12  that are not present on an ultrasound?
13     A   Correct.
14     Q   There's exposure of the patient to ionizing
15  radiation?
16     A   Yes.
17     Q   The dye -- the injected dye can -- poses a
18  risk to some patients as well; is that correct?
19     A   Yes.
20     Q   Particularly patients with decreased renal
21  function?
22     A   It can be a greater risk, yes.
23     Q   Right.
24         So an obese patient with cardiomyopathy,

Page 122

1  hypertension, diabetes, and decreased renal function
2  would be at higher risk than your average patient in a
3  CT with contrast?
4      A   Yes.
5      Q   Do you ever in your practice order renal
6  ultrasound for suspicion of stones?
7      A   Yes.
8      Q   You agree that on December 26, 2015, kidney
9  stones would have appropriately been on the
10 differential diagnosis?
11     A   It's in the differential diagnosis, yes.
12     Q   And you agree that a renal ultrasound is a
13 sufficient test to rule in kidney stones?
14     A   No, no.
15     Q   You would not agree?
16     A   No, I don't agree with that.
17     Q   Well, an ultrasound can pick up kidney
18 stones; right?
19     A   Yes.
20     Q   A renal ultrasound doesn't rule out other
21 causes necessarily of hematuria; correct?
22     A   Correct.
23     Q   But if you see calculus in the kidney, then
24 you at least know the patient has stones?

Page 123

1      A   That's true if you see a stone in the kidney,
2  but you don't see a stone on ultrasound.
3      Q   I'm not saying necessarily, but if you find
4  it, then it rules in stones?
5      A   No, it does not rule in a stone as the cause
6  of the bleeding.  It doesn't tell you that much.
7      Q   Right.  But it rules in the presence of a
8  stone?
9      A   Yeah.
10     Q   I'm not saying it's the end of the workup;
11 right?
12     A   Yeah.  If you see a stone, then the person
13 has a stone.
14     Q   Right.  In your opinion, is an ultrasound
15 part of any reasonable workup for kidney stones?
16     MR. STROM:  I object to the form.
17     THE WITNESS:  No, not necessarily.  It depends.
18     MR. RUPCICH:  Does it depend --
19     THE WITNESS:  It depends, right.  I can't answer
20 the question with a yes or no because it would be
21 misleading to just simply say yes and leave it at
22 that.  That would be wrong.
23 BY MR. RUPCICH:
24     Q   It depends on the patient?

Page 124

1      A   It depends on the patient.  It depends
2  on -- yes, it depends on the patient.  It depends on
3  the circumstances.
4      Q   The history of the patient?
5      A   Yes, yes.
6      Q   The presentation of the patient?
7      A   Yes.
8      Q   The comorbidities of the patient?
9      A   Yes.
10     Q   When you were working in California, were
11 renal ultrasounds used for suspicion of kidney stones?
12     A   Yes.
13     Q   That was done within the California
14 Department of Corrections?
15     A   It was done -- to my understanding, my
16 training and experience, it's done everywhere.
17     Q   And do you think that's a deviation from the
18 standard of care?
19     A   No, no.
20     Q   If the specific clinical situation dictates
21 the use of that test?
22     A   Yes.
23     Q   Give me an example of a specific clinical
24 situation that would dictate the use of an ultrasound

Page 125

1  for suspicion of kidney stones.
2      A   If someone has flank pain, and it -- it's
3  typical for a kidney stone.  Getting an ultrasound to
4  demonstrate the extent to which there is dilation of
5  the ureter and possibly an enlargement of the kidney
6  to reflect a hydronephrosis would be helpful to
7  determine whether or not more intervention was
8  necessary and would confirm -- would be consistent
9  with a kidney stone, so you get the information.
10     Also, if the person seems to have more
11 subtle signs of flank pain and you want to, as an
12 initial study, see what you have, you could get that
13 test done relatively quickly and it might be
14 reassuring if you saw something normal, completely
15 normal, that there's no obstruction, that if the
16 person had the stone, it's passed.  It also would tell
17 you if the bleeding continues microscopically or
18 otherwise that you need to start looking for the cause
19 because the normal ultrasound didn't give you an
20 answer.
21     So there's uses for that test.  But like
22 most tests, they're just data points, and they're not
23 making a diagnosis.  The diagnosis is made by a
24 collection of multiple sources of data.  So you use it

Page 126

1  **as a tool, but it's not the end of your investigation.**
2      Q    There's an element of judgment that has to go
3  into when to use this test?
4      **A    Yes.**
5      Q    And it's a data point along with the history,
6  the presentation that you, as the practitioner, have
7  to synthesize and figure out what to do next?
8      **A    Yes.**
9      Q    I think we can agree Mr. Dean first presented
10  with gross hematuria on 12-26 of '15?
11      **A    Yes.**
12      MR. STROM:  I'm sorry, Joe, did you say 12-26?
13      MR. RUPCICH:  Is that not right?  I have 12-26.
14  I should say 12-23, my apologies.
15  BY MR. RUPCICH:
16      Q    12-23 of '15, we agree?
17      **A    Yeah.**
18      Q    And you had pointed out in your report that
19  this presentation was different from how he presented
20  with kidney stones in the past?
21      **A    Yes.**
22      Q    That also does not necessarily mean it's not
23  kidney stones; right?
24      **A    No.**

Page 127

1      Q    They could present different clinically in
2  this instance than they did in the past?
3      **A    Correct.**
4      Q    Mr. Dean underwent this renal ultrasound on
5  February 2nd of 2016; do you see that date?
6      **A    I'm sorry, what was the date on that?**
7      Q    2-2-16.
8      **A    Yes, correct.**
9      Q    And then he was approved for a urology
10  appointment on February 11 of 2016, so about nine days
11  later?
12      **A    Yes.**
13      Q    And that period of time from 12-23 to when
14  they approved him on 2-11 of 2016, is it your belief
15  that was too long?
16      **A    From 12-23 until the approval for the --**
17      Q    The urology on 2-11.
18      **A    Yes, I believe that was too long.**
19      Q    And it's your belief that the ultrasound that
20  was ordered in the middle of that period was not an
21  appropriate test for this patient?
22      **A    It was not an appropriate test by itself for**
23  **this patient.**
24      Q    Was it appropriate as part of a continuing

Page 128

1  workup?
2      **A    Yes.**
3      Q    Okay.  So Mr. Dean had -- was recommended for
4  a CT IVP and cytoscopy on March 10 of 2016; right?
5      **A    Yes.**
6      Q    And you don't have any quarrel with that
7  recommendation; right?
8      **A    Correct.**
9      Q    And that was approved by the doctors at
10  Wexford; correct?
11      **A    Correct.**
12      Q    And he underwent that CT IVP and was
13  diagnosed around April 12 of 2016?
14      **A    Yes.**
15      Q    So can we agree the steps they took were
16  appropriate; it's just the time frame we disagree
17  about?
18      MR. STROM:  I object to the form.
19      MR. RUPCICH:  If you understand.
20      THE WITNESS:  Ultimately, yes, this is about time
21  frame.
22  BY MR. RUPCICH:
23      Q    It's not the clinical decision-making that
24  we're disputing here; it's the time that elapsed to

Page 129

1  arrive at the diagnosis?
2      MR. STROM:  I object to the form.
3      THE WITNESS:  I think, you know, I can't agree
4  with that because you're artificially separating the
5  two as if -- as if you can separate icing on the cake.
6  They're connected.  The cake is inedible if the icing
7  is horrible, even if the cake itself is good, because
8  they're connected.  If you're going to delay the
9  implementation of testing that's necessary to produce
10  a diagnosis, then the care itself is poor.  It's not
11  like you can just say, Well, the timing -- it's just
12  the timing.  And the care is fine, but it's just the
13  timing.  No, the care is not fine because the
14  timing -- one could say the timing is everything.
15  BY MR. RUPCICH:
16      Q    You could immediately order an inappropriate
17  test; correct?  You could do the wrong thing right off
18  the bat?
19      **A    Right.**
20      Q    Or you could wait and order the correct test?
21      MR. STROM:  I object to the form.
22      THE WITNESS:  Yes.
23  BY MR. RUPCICH:
24      Q    Okay.

Page 130

1    So there is a distinction to be made
2  between doing the wrong thing and doing the right
3  thing, but taking too long?
4    **A   Yes.  And what I'm saying is, the act of**
5  **taking too long is a negligent act in and of itself**
6  **that actually leads me to opine in this document that**
7  **the care was negligent overall.  I don't want to say,**
8  **"The care was fine, they just took too long to do it,"**
9  **because that actually makes no sense.  The care was**
10 **not right.**
11   Q   But you're reframing what I'm saying.
12   **A   Okay.**
13   Q   So if I'm understanding you, the negligent
14 act was the amount of time that passed?
15   MR. STROM:  I object to the form.
16   MR. RUPCICH:  No?  Am I wrong?
17   THE WITNESS:  No, no, that's correct.  That
18 is -- that is -- well, that's one of the negligent
19 acts.
20   MR. RUPCICH:  Okay.  Let's try it this way.
21 BY MR. RUPCICH:
22   Q   We agreed the renal ultrasound was not an
23 inappropriate part of this workup; correct?
24   **A   Correct.**

Page 131

1    Q   We agree that a CT IVP and the cystoscopy
2  were an appropriate part of this workup?
3    **A   Yes.**
4    Q   We agree that a urology referral was an
5  appropriate part of this workup?
6    **A   Yes.**
7    Q   We agree that a right radial nephrectomy with
8  whatever they did to him was an appropriate surgery
9  for Mr. Dean to undergo?
10   **A   Correct.**
11   Q   We agree that referral to oncology was
12 correct?
13   **A   Yes.**
14   Q   We agree that Votrient was an appropriate
15 medication for Mr. Dean to take?
16   **A   Well, I'm relying on the oncologist for that**
17 **opinion.  I'm not --**
18   Q   We're not going to dispute --
19   **A   I'm not going to dispute that there's**
20 **anything wrong with how they chose to treat the**
21 **cancer.**
22   Q   Fair enough.
23       And each of those steps that I've just
24 outlined involved some exercise of medical

Page 132

1  decision-making by a medical professional; right?
2    **A   Correct.**
3    MR. STROM:  I object to the form.
4    THE WITNESS:  Objection.  And I answer now,
5  correct?
6    MR. RUPCICH:  Yes.  Right?
7    THE WITNESS:  Yes.
8  BY MR. RUPCICH:
9    Q   So if we don't disagree that those were all
10 independently appropriate, what we do disagree on then
11 is that they weren't done in a time frame that you
12 think was reasonable; is that --
13   MR. STROM:  I object to the form.
14   MR. RUPCICH:  Is that fair?
15   MR. STROM:  I object to the form.
16   THE WITNESS:  Yes.
17   MR. RUPCICH:  What would you -- do you need a
18 break or anything?
19   THE WITNESS:  No.  I'm just wondering -- can we
20 go off the record for a second?
21   MR. RUPCICH:  Yeah, we can.
22       (Whereupon, a discussion was had
23        off the record.)
24

Page 133

1  BY MR. RUPCICH:
2    Q   What do you rely on to establish the standard
3  of care for the time frames that these events
4  unfolded?
5    **A   My training and experience.  The medical**
6  **record would indicate what I'm looking at in terms of**
7  **severity or circumstances.  The medical record gives**
8  **me indication as to what the differential diagnosis**
9  **is.  And I cite in the expert report the deposition**
10 **testimony of Dr. Severino, I believe Dr. Ritz,**
11 **actually Dr. Nawoor, Dr. Einwohner to some extent,**
12 **though not as much, and even Dr. Matticks, who all**
13 **describe renal cell carcinoma as well as bladder**
14 **cancer in one context or another as being in the**
15 **differential diagnosis with the knowledge that this**
16 **gentleman's gross hematuria puts him at a high risk**
17 **for having one of those two cancers.  Dr. Severino**
18 **even stating that in his experience, a patient like**
19 **Mr. Severino -- like Mr. Dean -- that 40 to 50 percent**
20 **of the patients who present like him end up having**
21 **cancer, okay?**
22 **      So in consideration of all of that to**
23 **what do I use to rely upon, I rely on all of that to**
24 **tell me that this is an urgent matter.  It's not**

Page 134

1    something that's routine. It's not something that
2    gets put off for thirty or sixty or ninety days. It's
3    something that's done within two weeks.
4        Q    That would be the two weeks that you
5    referenced in the CCHCS Urgent Protocol?
6        A    Correct. I mean, it's not related to the
7    protocol. I'm not relying on CCHCS at all. I'm just
8    saying it happens to be kind of an outer limit for
9    what I believe is reasonable, especially in prisons.
10   He's not going to be found dead in his room the next
11   day on account of this or predictably or even likely
12   in the way that someone with crushing chest pain might
13   die in the next six hours. That's an emergency.
14   That's the same day. Or someone with abdominal pain
15   consistent with appendicitis might be dead within
16   24 hours or very nearly dead.
17       Q    He was stable?
18       A    He was stable for a number of weeks. But
19   waiting more than two weeks, to me, makes no sense.
20   There's no value in that. And, to me, as my opinion,
21   I've been called to ask -- to produce -- it's
22   negligent to make a person wait more than two weeks to
23   do a further evaluation. And to the extent now that
24   the depositions established their knowledge that this

Page 135

1    person could have cancer, it seems indifferent to me.
2    And that's what I rely upon.
3        Q    Dr. Severino didn't order the CT or
4    cystoscopy stat, did he?
5        A    No.
6        Q    He ordered it on a routine turnaround?
7        A    Well, I don't know what their system is as to
8    routine. I don't know that he actually put a time
9    frame on it. Clearly, he didn't say you need to have
10   this done now or else you might be dead by the
11   morning. I mean, that's not what he did.
12           I also don't believe he says, "Let's do
13   this sometime in the next ninety days." He made a
14   request, "Let's get a CT and a cystoscopy done." I'm
15   not aware that he was explicit in when he wanted to do
16   it or that anyone asked him -- anyone called him to
17   discuss with him how soon should this be done.
18       Q    Well, it was done in around thirty days; is
19   that reasonable?
20       A    It's reasonable if it's the best they could
21   do. And I'm talking about in prison.
22       Q    There's some difficulties at times?
23       A    That's right. I mean, I personally think, in
24   my opinion, this falls in the urgent category, that

Page 136

1    having identified this as something that he now
2    believes has a fifty percent change of being
3    cancerous, it would have been good to get this done in
4    two weeks. It would have been preferable.
5            But I can't say that it falls below the
6    standard of care in the community for it to take as
7    long as a month. It's not ideal. But I think in
8    prisons, that's an outside. It could happen that it
9    takes a month before they get to tests.
10       Q    Okay.
11           So Wexford approved the urology
12   appointment on February 11, 2016. I think we already
13   went through that. And it happened on March 10 of
14   2016. Is that -- what -- 29 days -- well, I think
15   there's 28 days -- 28, 27 days to get that
16   appointment, is that a reasonable turnaround?
17       A    Again, I think two weeks is the right time.
18   I think if they can describe a reason why they
19   couldn't get the person in in two weeks, I think
20   that's what I'm concerned in my critique is that in
21   each of the steps, I don't see an effort being made to
22   expedite as I believe it should have been. They
23   should be trying to get this in in two weeks; and if
24   they can't, there should be a documentation that

Page 137

1    there's something they tried, but they couldn't do.
2    You do the best you can. It's not negligence or even
3    indifference if you're really trying. But if you put
4    the request out and there's no effort made to get him
5    into the urologist any sooner than two weeks, I
6    believe that's below the standard of care.
7        Q    Didn't -- did you see in the records where
8    Dr. Nawoor noted that he was calling to try to move up
9    the appointment?
10       A    Yes. And that's consistent with what I'm
11   saying, which is the system was not giving him the
12   appointment as soon as necessary. Even Dr. Nawoor
13   recognized that, and he had to intervene to move it
14   forward.
15       Q    That was an appropriate thing to do?
16       A    It was. But he shouldn't have had to do it
17   because since the person had blood in his urine, gross
18   hematuria, the appointment should have been made for
19   two weeks. He shouldn't have had to himself say, "My
20   God, you don't have an appointment soon enough."
21       Q    Well, as a prison provider, you don't dictate
22   the dates of appointments with specialists; they give
23   you appointments when they're available, right?
24       A    No, you do dictate to some extent. That's my

Page 138

1    point. If I were in this position at this point
2    knowing that -- and I would know that this person is
3    at high risk of bladder cancer or kidney cancer given
4    the extent of his constant bleeding -- I would contact
5    the appointment-making people. I would say he needs
6    to be in the urologist's office within the next two
7    weeks. That's what I did on that one case where the
8    person sued me, but it was dismissed because I did the
9    right thing. I made sure that the study I thought was
10   important did get done promptly.
11       Q   All right.
12           So whether February 11, 2016, to
13   March 10, 2016, is an unreasonable amount of time for
14   deciding to send him to a generalist depends upon
15   institutional difficulties and whether the provider
16   attempted to move it up?
17       A   My critique involves knowing whether or not
18   there was an attempt to move it up, whether or not the
19   institution had mechanisms for getting a more prompt
20   referral, and also whether the patient could have been
21   better served by sending him to the emergency room
22   because that's what you do. When you know someone
23   needs to be seen promptly because of the factors that
24   we talked about and you tried to get the person in

Page 139

1    more promptly and the answer is there's no way, the
2    doctor is not around, he's booked, he's completely
3    booked up, the option of taking someone who has been
4    actively bleeding for the last two, three months and
5    actually became somewhat anemic as a result --
6        Q   Slightly?
7        A   Slightly. So somewhat, so slightly.
8        Q   Slightly anemic; right? He wasn't
9    iron-deficiency anemic?
10       A   No, no. Well, I don't believe he was enough
11   to be iron-deficient yet. But in any case, he
12   certainly is not doing well with this bleeding. He's
13   not a happy camper, and there's no reason to be happy
14   if you keep bleeding through your urethra.
15           He can be sent -- in my experience, the
16   standard of care would be to send him to the emergency
17   room, call the emergency room and say, "This gentleman
18   has active bleeding, we can't get him into a
19   urologist, we need to get a CT now, and we need to
20   have him seen by urology in the hospital now." And
21   you end up taking something which you'd like to handle
22   on an outpatient basis, but you aren't able to do it,
23   you turn it into an emergency because your patient's
24   life is at stake. You just can't sit on this for

Page 140

1    months.
2        So it's -- I'm sorry for the long, long
3    answer, but I think what I'm trying to say is if you
4    can't get this done in two weeks, then you should
5    bring him to the emergency room.
6        Q   That's not in your report, is it?
7        A   No. I'm just criticizing that it was
8    negligent. I'm not in the report describing what I
9    would do, but --
10       Q   So you believe -- at what point in this
11   28 days are you going to pop him in a State vehicle
12   and send him to the hospital, to the Emergency
13   Department -- at Day 15?
14       A   So on February -- on that date, if it's been
15   six weeks since the bleeding started and it hasn't let
16   up, if he can't be seen by a urologist within two
17   weeks of that appointment, then he should be in the
18   emergency room.
19           What I would do personally -- because
20   I've been in a situation similar to this situation --
21   I would have sent him to the emergency room in
22   February and say this is going on too long. This is
23   six weeks already.
24       Q   Does that depend on the degree of the

Page 141

1    bleeding?
2        A   No. I think -- well, it does depend on the
3    degree of bleeding. The degree of the bleeding is
4    gross hematuria. It's a lot. If you're peeing red
5    blood into a toilet, I mean, every time you pee and
6    it's going on for six weeks, that is -- that's enough
7    to say if it hasn't stopped and we haven't been able
8    to get ahold of anyone to see this person really soon.
9            So I would be doing -- at the very, very
10   least, I would be talking to the urologist on the
11   phone right then and there.
12       Q   Wasn't it intermittent though?
13       A   Well, intermittent all the way through until
14   then, to me, is the same. It's not stopped. It's not
15   resolved. If you are intermittently peeing blood for
16   six weeks --
17       Q   Right. But you just said he's peeing blood
18   every time?
19       A   Well, okay. I don't know that every single
20   time he stepped up to the toilet, blood came out.
21       Q   He remains hemodynamically stable?
22       A   That's true.
23       Q   He was not going into shock?
24       A   No, no. That would be immediately ambulance

Page 142

1  within the hour.  You have the IV hooked up, and he'd
2  be treated.
3        So I want to answer your question, and
4  the answer is, when would it be appropriate to send
5  this person to the emergency room?  And I would say
6  given this set of facts, it would be if you aren't
7  able to get an appointment in February, then it's time
8  to just go to the emergency room to get it taken care
9  of.
10  Q    Between 12-23 of '15, when he first
11  presented, to February 11, 2016, when they approved
12  him for the urology appointment, we don't know what
13  his tumor was doing at that time, do we, where it was?
14  A    No.
15  Q    And it would be blindly guessing to say it
16  either had or had not metastasized at that time?
17  MR. STROM:  I object to the form.
18  THE WITNESS:  I'm going to defer -- I don't know.
19  I don't have any basis for knowing.  I don't have
20  scans during that time, so I don't know.  And that's
21  not -- that's the whole purpose of getting the scans
22  so we identify the disease and get the person to an
23  oncologist who has more experience with that.  And I
24  would defer then to an oncologist in this case to tell

Page 143

1  us what they believe they know.
2  BY MR. RUPCICH:
3  Q    There's two ways to figure it out:  You can
4  look at the natural history of the disease based on
5  studies and literature; right?
6  A    Yes.
7  Q    Or you can actually find it on scans; right?
8  A    Well, I think the first one is a bit of an
9  overstatement.  I think you can certainly -- what you
10  see is what you get.  If you're looking at scans, you
11  can actually document what was happening at that time.
12  It should show -- it will show the tumor.
13        The first statement you made, it's
14  really more about an expert's experience with how
15  these grow because the rate of growth is probably
16  different depending on the person and the whole story
17  behind them.  There's no single natural history that I
18  think necessarily applies to all persons.  It varies
19  from person to person, and the specialist might have
20  more insight into how they think the disease in this
21  particular person grew.
22  Q    Okay.
23  A    But I'd defer to them.
24  Q    All right.  Understood.

Page 144

1        Are you critical of Dr. Nawoor for
2  anything he did or did not do after the diagnosis?
3  Let's say up until the surgery just to be clear.  You
4  know what, I'll withdraw that question.
5  A    Okay.
6  Q    Go to Page 14 of your report.  I want to talk
7  about Dr. Einwohner.
8  A    On Page 14 is Dr. Nawoor.
9  Q    Sorry, 15.  I made a mistake.  And you
10  reviewed her deposition; correct?
11  A    Yes.
12  Q    And you reviewed her progress notes?
13  A    Yes.
14  Q    At the bottom of 16, you state that
15  Dr. Einwohner knew Mr. Dean should promptly --
16  sorry -- be seen promptly by a urologist, yet
17  Dr. Einwohner did not recommend a CT scan or urology
18  evaluation to her colleagues; do you see that?
19  A    Yes.
20  Q    Are you talking about her visit of January 7
21  of 2016?
22  A    Yes.
23  Q    But if she did recommend an imaging and
24  urology workup, would that change your opinion on

Page 145

1  Dr. Einwohner?
2  A    I'd have to see what you're talking about.
3  My impression in reading the medical notes was that
4  there was no recommendation.
5  Q    Have you seen that?
6  A    And I think I may have seen this, but I
7  didn't cite to it in the record because this is not
8  the same as herself ordering the CT and ordering the
9  urology because that is addressed in her deposition
10  and that's where I make my critique.
11        This is what it says:  "I suggest a
12  collegial review with Dr. Butler with consideration of
13  re-imaging and a urology evaluation."  This is a very
14  soft statement, and it's not sent to the primary care
15  provider.  It's sent to Steven Ritz.
16  Q    Well --
17  A    I had my expert opinion relative to the way
18  in which I expect a specialist to relate to the
19  primary care provider who is making the referral and
20  also as to how the specialist, knowing that the CT and
21  the urology evaluation is important, failed to order
22  that herself.  And her statement was -- I did see this
23  in a way because I'm reading what she spoke to under
24  oath and said she considered imaging and urology

Page 146

1   consultation, but she said she can only suggest and
2   she can't order the evaluation.
3       Q   Right.  It goes through Utilization
4   Management; right?
5       A   Right.
6       Q   So this email triggered a Utilization
7   Management; did it not?
8       A   No.
9       Q   It didn't?
10      A   No, I don't think it did.  It just said, "I
11  just suggest you talk about it."  If she had
12  written -- actually written an order, urology
13  evaluation and written an order, CT scan with and
14  without contrast, if she had written that order, then
15  that order would have, in most prison systems,
16  generated a review by the approving physician to
17  either approve her order or not approve it, and it
18  would get done.  She actually says that she's not
19  allowed to order anything.  She can't order the
20  evaluation, and she should be able to order the
21  evaluation subject to the approval.
22      Q   So you're critical of her because she didn't
23  have the ability to order it herself?
24      A   Yes, yes.

Page 147

1       Q   That she was deliberately indifferent because
2   the system in which she operated required her to
3   communicate the request to Utilization Management to
4   discuss it with the treating physician?
5       A   I am -- yes.  And because -- and the reason
6   for citing her performance is that she described the
7   process wherein she under oath says she never called
8   anyone to personally discuss this issue.  This is the
9   extent of her communication.
10      Q   So communication by email is insufficient in
11  your mind?
12      A   If it doesn't get the results that you know
13  are necessary, absolutely, absolutely.  There's no
14  follow-up.  This -- if anything, this email, to my way
15  of thinking, is further -- I don't mean to impune her
16  own motives, just as an objective statement that it
17  reflects a failure to care enough to follow up to see
18  what happens.  I mean, this email says -- if you want
19  to expand on it -- it says -- read between the
20  lines -- it says I'm worried this person could have
21  cancer and you need a urologist to find out, okay?
22  She throws that in the atmosphere and then forgets
23  about it.
24          She is not just a surgeon specialist, as

Page 148

1   Dr. Severino is, who gets the case and then is going
2   to do a surgery.  She's been following this patient
3   for his kidney condition.  She's like a second primary
4   care provider in a way.  She's like the primary care
5   for the kidneys.  She's not taking an interest in
6   what's happening to him.  She didn't follow this up
7   with, "Where is the imaging."  She should have been
8   calling the next week and saying, "Where is the
9   imaging, when am I going to see the imaging."
10      Q   Look at Page 1065 of the records.  Does that
11  appear to be a Utilization Management document from
12  January 2016?
13      A   Yes.  It's on January 19th.
14      Q   And does that indicate that --
15      A   I'm sorry.  Let me be precise.  So the
16  discussion -- the conference is on January 13th.
17      Q   And that's how many days after her email?
18      A   Yeah -- well, the next week, you have the
19  conference, right.
20      Q   Generated by her email?
21      A   Right -- well, yeah, they did a conference,
22  as she suggested, right.  "Large blood, decide will
23  get on-site renal blood or ultrasound."  Okay.  That's
24  my point.  She has already said that she needs a

Page 149

1   urologist.  She said re-imaging.  I don't
2   believe -- when it says re-imaging, I don't think
3   she's talking about an ultrasound because that wasn't
4   done before.  Re-imaging, I think she's talking about
5   let's get a CT again.  And it's not happening, and she
6   hasn't made an effort to see that it happens.
7   She -- I mean, I'm pretty clear in that critique.
8       Q   She put it in the hands of the treating
9   doctor and the Utilization Management physician?
10      A   Right.
11      Q   And in your mind --
12      A   She put it in the hands of Ritz, right.
13  Well, I think they both let her -- I think
14  Ritz -- both Ritz and Dr. Einwohner let this patient
15  down.
16      Q   You describe deliberate indifference as
17  knowing a patient faces a risk of harm and not doing
18  anything about it?
19      A   Exactly.
20      Q   She sent an email to the people that could do
21  something about it?
22      A   Well, it certainly boils down to a difference
23  of opinion.  That's why it's my opinion, and there
24  will be other opinions.  But in my opinion, for her to

Page 150

1   do this much and then not do more was indifferent.
2      Q   Okay.  You also criticized her --
3   Dr. Einwohner, E-i-n-w-o-h-n-e-r -- go to Page 11,
4   Number 6.
5      A   Page 11?
6      Q   Yes.
7      A   Yes, got it.
8      Q   All right.
9          That's in reference to February 8, 2016.
10  You state, "Dr. Einwohner failed to make definitive
11  diagnosis and acknowledges other causes."  When you
12  reviewed the record and her deposition, did you see
13  that she wrote, "Present to collegial"?
14     A   Yes.  That had been presented to collegial,
15  right.  She knew that it had been presented --
16     Q   No, no.  In her plan, "Present to collegial"?
17     A   Oh, on February 8th?
18     Q   Yeah.
19     A   Well, I don't know if I read it as saying,
20  "Present to collegial," or that she's acknowledging
21  that it's already been presented, but --
22     Q   Wouldn't -- if it was being acknowledged, it
23  would be in the medical history; right?
24     A   Well, her notes are very hard to read.

Page 151

1   They're almost -- it would take an hour just to read a
2   single note the way she, you know, fills the pages and
3   scribbles.  And the other thing is --
4      Q   Well, let's just hold on.
5      A   Okay.  So it's hard.
6      Q   It's if in the Plan section, "Present to
7   collegial," that would suggest that that's a plan;
8   right?
9      MR. STROM:  I object to the form, foundation.
10     THE WITNESS:  That's fine.  I can accept that she
11  very well -- as a hypothetical -- here, I have it
12  right here.  "Dr. Einwohner's plan included sending
13  for collegial on the following Wednesday," okay?
14  That's on February 2nd.  So on Page 6, third
15  paragraph, so I see that, and I did see that.  And
16  we're in agreement -- I'm agreeing with you.  She did
17  say let's send it to collegial care.
18  BY MR. RUPCICH:
19     Q   All right.
20         You had mentioned in Dr. Matticks'
21  deposition, you were critical of a practice of only
22  allowing an inmate to address one complaint per visit?
23     A   Yes.
24     Q   Have you ever heard of or seen a policy or

Page 152

1   practice like that?
2      A   Yes.
3      Q   When, where?
4      A   I've heard people deploy that at California.
5      Q   Do you discourage it?
6      A   Yes.
7      Q   What if they're un-clinically-related
8   conditions, like, you know, "I've got a bunion on my
9   foot and I'm here for a head cold"?
10     MR. STROM:  I object to the form, incomplete
11  hypothetical.
12     MR. RUPCICH:  Well, that's just for an example.
13     THE WITNESS:  Okay.  The patient is not in a
14  position to know which of his complaints, no matter
15  how he may want to frame them to you, is necessarily
16  the more important one.  The bunion, what he thinks is
17  a bunion, you say I don't want to hear about your
18  bunion, if you don't consider it in some context, just
19  forget it, he could be talking about osteomyelitis,
20  which will kill him in the next week.  So you have to
21  hear every one of his complaints as quickly as you
22  need to and however you need to, including if you
23  can't handle them all, get him back real soon, the
24  next day, if necessary.  But even so, it's better to

Page 153

1   do it the same day.
2   BY MR. RUPCICH:
3      Q   Okay.
4          So if I'm understanding you, if this
5   policy is applied in a way that the patient is allowed
6   to communicate them and the provider can sort through
7   them, then that wouldn't necessarily be inappropriate?
8      MR. STROM:  I object to the form.
9      THE WITNESS:  I agree with that.
10  BY MR. RUPCICH:
11     Q   But if it was, "I've got a swollen lymph node
12  in my armpit and my groin," and I said, "I'm only
13  dealing with your armpit," well, then now we have a
14  problem?
15     A   That would be an extreme answer.  I mean, if
16  it's like, "I have a headache and I have a bunion and
17  I'm constipated," I say, "Wait, wait, I can only
18  handle one complaint, which one do you want to talk
19  about," that's not right.
20     Q   Right.
21         But you've provided care in prison.  You
22  know that patients will often unload a litany of
23  complaints?
24     A   They do.  And a policy that says, "Just tell

Page 154

1  me one complaint, don't tell me more," is a dangerous
2  policy.
3      Q   If it's don't -- if the policy isn't, "Don't
4  tell me multiple complaints," it's, "I will address
5  only one condition at a time and then you should come
6  back for other things," that could be appropriate?
7      MR. STROM:  I object to the form.
8      THE WITNESS:  I agree.
9  BY MR. RUPCICH:
10     Q   The standard of care for your criticism of
11 Kathy Galvin and, I guess, Lisa Mincy at Page 21, that
12 would be a nursing standard of care?
13     A   Yes.
14     Q   Have you ever given testimony in any court or
15 deposition or written opinion on the standard of care
16 for a nurse?
17     A   Yes.
18     Q   You have?
19     A   Yes.
20     Q   When?
21     A   That's the Flores case.  I think it's Paugh
22 v. Flores.  You have that listed in the cases I cite.
23     Q   And you were allowed to testify to the
24 standard of care for nurses?

Page 155

1      A   Within the correctional environment, yes.
2      Q   What state was that in -- California?
3      A   California, yes.
4      Q   The standard of care for Lisa -- for Lisa
5  Mincy or Kathy Galvin, where do you derive it from?
6      A   For Nurse Galvin?
7      Q   Yeah.
8      A   Well, my training and experience does include
9  the relationship the physicians and nurses have with
10 each other as a team providing health care.  The
11 primary care team includes the nurses.  But also my
12 experience over ten years involves -- in the
13 correctional environment -- the collegial working with
14 nurses to understand what their role is, what they're
15 supposed to do, and what they don't do.  And having
16 the additional benefit of my work in an organization,
17 the American Correctional Health Services Association,
18 as a member and as an officer working closely with
19 nurses in these conferences and even reviewing a
20 nursing textbook.
21     Q   So you've worked with nurses and you've
22 reviewed nursing textbooks?
23     A   Correct.  And the nursing textbook is as an
24 authority, which, by the way, is, I believe, the same

Page 156

1  text which is cited by Defendant Mincy.  And that
2  explicitly describes the duties of a nurse as an
3  advocate for the inmate's care, which is my experience
4  in the prison setting is that they are strong
5  advocates for the right kind of care.  They're not
6  supposed to watch someone suffer or be mistreated
7  without speaking up.
8      Q   During what period of time was Ms. Galvin not
9  meeting her standard of care as an advocate for the
10 patient?
11     A   My understanding from the -- from putting it
12 all together, which includes the depositions, is that
13 Nurse Galvin's engagement in this particular case was
14 largely when she took a phone call from Mrs. Dean and
15 noted the complaint that she feared for her husband's
16 life because he wasn't getting surgery.  And there
17 was -- yeah -- there was a delay in treating what she
18 knew was cancer.
19     Q   So we talked about this?
20     A   Yeah.  I mean, what happened before that
21 time, it appears -- and I need to take her at her face
22 value when she testifies under oath -- that she wasn't
23 tracking how much blood was passing or whether there
24 was a treatment that should or should not be given

Page 157

1  prior to the cancer diagnosis because she didn't even
2  know for sure, and she'd have to defer to Dr. Nawoor
3  on that much.
4      Q   Right.
5      A   But once she heard and she knew that there
6  was cancer, I found it peculiar that she testified
7  that pursuant to Wexford protocols, she didn't need to
8  do anything with the inmate's complaint except
9  document it.  She didn't need to bring it to
10 Dr. Nawoor's attention.  She didn't talk to him
11 about --
12     Q   What complaint?
13     A   Oh, that, "My husband has cancer, you're not
14 taking him to surgery."
15     Q   The wife's complaint?
16     A   The wife's complaint.
17     Q   So your understanding was the wife was
18 complaining or inquiring, I guess is a better word,
19 that the surgery hadn't happened yet?
20     A   Yeah.
21     Q   So that suggests that this occurred after
22 July 12, 2016, when Dr. Severino had decided this
23 surgery was appropriate?
24     A   After April.

Page 158

1   Q   After April?

2   A   So this is my statement in my expert report,

3   which I would stand with here -- I said she was

4   derelict in her duty to communicate with Dr. Nawoor

5   when she testifies that she knows blood in urine can

6   mean cancer. And I think she should have talked to

7   him and said, Dr. Nawoor, are you sure we're just

8   going to sit on this until whenever. This man might

9   have cancer. I think as a nurse --

10   Q   They all knew he had cancer?

11   A   They didn't know yet. Well, I suggested that

12   she was derelict. But I do say this: I say she's

13   especially derelict when Mr. and Mrs. Dean were

14   complaining of delays in surgery for known cancer, and

15   she didn't communicate with Dr. Nawoor about that.

16   She has a duty to tell Dr. Nawoor what his own

17   patients are telling her, and she said under oath she

18   didn't do that.

19       Now, my statement in here in which she's

20   derelict I do not believe amounts to calling her

21   intentionally -- or deliberately indifferent. And

22   it's probably important that I'm not using the

23   terms-of-art to say that she was negligent, although,

24   you know, if you push me, I think it was negligent for

Page 159

1   her to not communicate with the physician when

2   Mr. and Mrs. Dean give her information. Why is she

3   hiding it? I'm more concerned with her deposition

4   testimony that she understands Wexford protocols do

5   not require her to make an effort to fix a problem,

6   just require her to document the problem. And that,

7   to me, speaks to average indifference at Wexford more

8   so than her indifference.

9   Q   We already agreed that Dr. Severino was

10   deciding when to do the surgery, isn't that right,

11   after the diagnosis?

12   A   Correct. By the way, let me --

13   Q   No, let's just hold on.

14   A   Okay. Yes -- no, I agree with that. Dr. --

15   Q   Severino was --

16   A   Yes, he was.

17   Q   He was the one that was going to do the

18   surgery?

19   A   Yes, yes.

20   Q   The wife communicated that she thought it was

21   taking too long or something of that nature to Kathy

22   Galvin?

23   A   Yes.

24   Q   And it's your belief Kathy Galvin should have

Page 160

1   told Dr. Nawoor that the wife thinks it's taking too

2   long?

3   A   Yes.

4   Q   But if what Dr. Severino was doing was an

5   appropriate workup, which nobody has said it wasn't,

6   what does it amount to?

7   A   Yeah. Well, my description in the expert

8   report was that I did say she was -- Ms. Galvin was

9   negligent and deliberately indifferent to Mr. Dean's

10   condition. I'm not saying in here that that

11   particular act on her part caused any harm. So I

12   don't know that it's an actionable thing as a matter

13   of law, and that's for you lawyers, okay?

14       I really strongly feel that if a

15   directive nursing knows this man has cancer and she

16   hears he's still bleeding and the cancer surgery is

17   not being done and they don't know any idea of when

18   it's going to be done -- she's not going to fix that

19   problem obviously by herself. I don't see -- she's

20   not going to take a knife and do surgery. But her

21   deposition that she's not instructed to try to make

22   any effort to fix it or to communicate it, she just

23   writes it down somewhere and doesn't talk to

24   Dr. Nawoor, I find that violates the whole notion of

Page 161

1   primary care medicine and cooperation between nurses

2   and doctors towards the service to a patient. It's

3   just indifferent. It's, like, I'll write it down.

4   That's my opinion. We can talk about it and find me

5   to be wrong in my opinion, but that's my opinion.

6   Q   What if someone else was calling Severino to

7   check on the status of the surgery, does that absolve

8   Kathy?

9   A   If Kathy knows that someone else is taking

10   care of this issue, then, yes, she would be able to

11   tell me or say in the deposition, "I didn't make any

12   phone calls because I knew that this was being handled

13   by somebody else," and that would be -- I'd have no

14   problems with that.

15   MR. RUPCICH: Jeremy, I don't have any other

16   questions at this time. Do you want to ask some?

17   MR. TYRRELL: Yeah. Doctor, I only have like two

18   or three questions for you. I promise I'll be very

19   brief.

20   THE WITNESS: Thank you.

21   MR. TYRRELL: I'm by video conference. If, for

22   some reason, I cut out or you don't hear my entire

23   question, let me know so I can fix it, okay?

24   THE WITNESS: You got it. Done.

## Page 162

1    EXAMINATION
2    BY
3    MR. TYRRELL:
4       Q   What's your understanding of Lisa Mincy's
5    duties and responsibilities at Taylorville
6    Correctional Center?  And she's on Page 20 and 21 of
7    your report.
8       A   Thank you.  Okay.  Yes -- no, I understand
9    that she's not involved clinically except in an
10   administrative capacity.  And I state that I don't see
11   her in a position to be aware of, engaged, or indeed
12   have responsibility for decisions to diagnose and
13   treat.
14      Q   Right.  And, Doctor, I don't mean to cut you
15   off.  I just know you're --
16      A   Yeah, go ahead.
17      Q   Just kind of jumping to the end.  At the end
18   of your report, you also made the opinion that Lisa
19   Mincy is deliberately indifferent to Mr. Dean's
20   serious medical needs.  I guess my question is, what
21   do you think Lisa Mincy didn't do or should have done?
22      A   Okay.  What I wrote in my report, I said
23   it's Ms. Mincy's duty to assist Mr. Dean in obtaining
24   necessary medical care that Ms. Mincy knew was being

## Page 163

1    denied to Mr. Dean.
2       Q   So I guess how did Ms. Mincy know that
3    Mr. Dean was being denied medical care; what do you
4    base that on?
5       A   I don't know that.  That's why I wrote the
6    sentence --
7       Q   How did Ms. Mincy fail to assist -- sorry, go
8    ahead.
9       A   Let me tell you.  The reason I wrote the
10   sentence exactly as I wrote it was because I do not
11   know that she knew that Mr. Dean was being denied
12   medical care.  So this statement -- and I apologize if
13   there's any contradiction within the report
14   otherwise -- this statement basically says -- it does
15   not use the language that she was negligent or
16   deliberately indifferent.
17         What it says is that if she did know
18   that there was care that Mr. Dean was not receiving
19   that was necessary, for her to do nothing about it
20   would be a dereliction of her duty.  I don't know that
21   she knew that.  In fact, I say early-on in that brief
22   paragraph, brief evaluation, I said I would not expect
23   Ms. Mincy to have been aware of or engaged in any
24   decisions to diagnose and treat.

## Page 164

1    So the reason I only write two
2    paragraphs against everyone else is more of a
3    suggestion that I really can't find fault with
4    Ms. Mincy.  But if she --
5       Q   Just turning --
6       A   Go ahead.
7       Q   Sorry.  Turning to Page 24 then, the last
8    page of your report.
9       A   Yes.
10      Q   Again, the very last sentence where you
11   ultimately conclude that Ms. Mincy was deliberately
12   indifferent, you're withdrawing that opinion today?
13      A   Well, I'm kind of holding them jointly and
14   separately liable in my mind and that Ms. Mincy's
15   liability, so to speak, is conditional upon the state
16   of her knowledge, which I can't prove.  And so --
17      Q   Okay.
18      A   I would restate that and say I believe that
19   Wexford and its employees, including named supervising
20   Nurses Galvin and Mincy, and then in parentheses, to
21   the extent was aware of Mr. Dean's full condition,
22   closed parentheses, as well as the management -- blah,
23   blah -- failed to adequately oversee.  So that's my
24   reconciliation of that entirely, okay?  To the extent

## Page 165

1    that I don't know that she really could appreciate or
2    know what was happening because she can't be
3    micro-managing every patient in the building if she's
4    not the direct patient care person, then I'm not going
5    to say that she was liable in my mind.
6       Q   And, Doctor, I don't know if you knew this or
7    not, but does it change your opinion to know that
8    Ms. Mincy is not an employee of Wexford Health and
9    she's actually an employee of the State of Illinois?
10      A   Yes.  It means that to the extent that if she
11   did know and she failed to act, then that behavior is
12   not attributable to Wexford.  It's only unto herself,
13   right.
14         MR. TYRRELL:  Okay.  That's all the questions I
15   have.  Thanks, Doctor.
16         THE WITNESS:  Thank you.
17         MR. STROM:  Dr. Barnett, it's 4:58.  I want to be
18   respectful of your time.  I have a couple of limited
19   redirect questions, if you have time.
20         THE WITNESS:  Sure, sure.
21
22
23
24

Page 166

```
 1    EXAMINATION
 2    BY
 3    MR. STROM:
 4       Q   Do you recall that Mr. Rupcich asked you
 5    about the comorbidity of stones -- a history of
 6    stones?
 7       A   Yes.
 8       Q   And do you recall that you agreed with him
 9    that a new diagnosis of stones is consistent with the
10    history of stones?
11       A   Yes.
12       Q   And I believe that he said something along
13    the lines of like a stone-maker or some
14    stone-producer; is that --
15       A   Yes.
16       Q   -- more or less accurate?
17       A   Yes.
18       Q   Is a history of stones also consistent with a
19    higher risk of kidney cancer?
20       MR. RUPCICH:  I object to the foundation.
21       THE WITNESS:  I don't think that the history of stones
22    is in any way a bar to getting kidney cancer, and so I
23    don't know it increases the risk of kidney cancer.
24    His age and his diabetes and his obesity increase the
```

Page 167

```
 1    risk of kidney cancer.  So to the extent it's the same
 2    items that might increase his stone rates will also
 3    increase his cancer rates, so that goes.
 4           If he's the kind of person who is going
 5    to form stones, he's also the kind of person who has a
 6    somewhat increased risk of cancer, as I understand it.
 7    BY MR. STROM:
 8       Q   You recall that Mr. Rupcich asked you to look
 9    at the imaging reports from February of 2013?
10       A   Yes.
11       Q   And from August of 2014?
12       A   Yes.
13       Q   And from August of 2015?
14       A   Yes.
15       Q   And you recall that Mr. Rupcich also drew
16    your attention to the fact that Mr. Dean first
17    reported his gross hematuria on December 23, 2015;
18    correct?
19       A   Correct.
20       Q   Are any of those imaging reports prior to his
21    complaint of gross hematuria up to the standard of
22    care to diagnose the cause of gross hematuria on
23    December 23, 2015?
24       A   If I understand your question, do those -- do
```

Page 168

```
 1    those studies provide a rationale that is consistent
 2    with the standard of care for making diagnoses by
 3    which the physician would say you don't have cancer,
 4    then I would say no.  They do not -- you cannot use
 5    those -- the standard of care does not allow you to
 6    use those studies as a basis for making a diagnosis of
 7    cancer in 2015, December, as stated by Dr. Einwohner
 8    in January who says, "I think we need another CT scan
 9    and a cystoscopy." And she said that knowing that the
10    man already had have three CT scans.  She still said, as I
11    read her note, "We need another."  And so to that
12    extent, that's the standard of care.  She failed the
13    standard of care by not herself making sure that a CT
14    got done.
15       Q   You recall also that Mr. Rupcich in drawing
16    your attention to those imaging studies prior
17    to -- let's say prior to 2016, so 2015 and
18    prior -- you recall that he also drew your attention
19    to the fact that each was accompanied by a report of
20    microhematuria?
21       A   Yes, there was microhematuria during those
22    times.
23       Q   And you recall that the allegations in this
24    case revolve around Mr. Dean's complaints of gross
```

Page 169

```
 1    hematuria?
 2       A   Yes.
 3       Q   December 23, 2015, and after; correct?
 4       A   Yes.
 5       Q   Is it appropriate to rely on those imaging
 6    studies that predate the report of gross hematuria in
 7    order to make a diagnosis of the cause of that gross
 8    hematuria?
 9       MR. RUPCICH:  I object to the foundation.
10       THE WITNESS:  No.
11    BY MR. STROM:
12       Q   Do you recall that in some of those pre-2016
13    imaging studies that contrast was used?
14       A   Some, yes.  And in 2015, no contrast.
15       Q   And do you recall that no contrast was used
16    in 2016 -- I'm sorry.  I withdraw that question.
17           In your experience as a family
18    physician, what kind of -- what kind of patients are
19    not given contrast when getting imaging like this?
20       A   You can find a way to give contrast to almost
21    any patient.  You just use a different kind of
22    contrast.  There are ionic and non-ionic contrasts.
23    You can also premedicate the patient.  So the fact
24    that someone has a slightly more elevated risk of an
```