EXHIBIT J     E-FILED
Friday, 25 October, 2019 08:58:55 PM
March 25, 2019
Clerk, U.S. District Court, ILCD

CHAD CHRISTER

```
                                                      Page 1
 1             IN THE UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF ILLINOIS
 2                    SPRINGFIELD DIVISION

 3   WILLIAM KENT DEAN,                )
                                       )
 4          Plaintiff,                 )
                                       )
 5      vs.                            )  No. 17-CV-3112
                                       )
 6   WEXFORD HEALTH SOURCES, INC., DR. )
     ABDUR NAWOOR, DR. REBECCA         )
 7   EINWOHNER, NURSE KATHY GALVIN,    )
     and LISA MINCY,                   )
 8                                     )
            Defendants.                )
 9

10

11

12

13

14

15
                 DEPOSITION OF CHAD CHRISTER
16          TAYLORVILLE CORRECTIONAL FACILITY
                  1144 ILLINOIS ROUTE 29
17               TAYLORVILLE, ILLINOIS
                     MARCH 25, 2019
18                     1:00 P.M.

19

20

21

22

23            Reported and Transcribed by:
         Rhonda Rhodes Bentley, CSR #084-002706
24

25
```

CHAD CHRISTER                                        March 25, 2019

Page 2

```
 1              INDEX
 2 APPEARANCES:
 3 For the Plaintiff: (Appearing via
   videoconference)
 4     Chloe Holt
       JENNER & BLOCK
 5     Attorneys at Law
       353 North Clark Street
 6     Chicago, Illinois 60654-3456
       (312) 222-9350
 7     cholt@jenner.com
 8 For the Defendants Wexford Health Sources, Inc.,
   Dr. Abdur Nawoor, Dr. Rebecca Einwohner, and
 9 Nurse Kathy Galvin:
       Joseph Rupcich
10     Cassiday Schade LLP
       Attorneys at Law
11     111 North Sixth Street, Suite 200
       Springfield, Illinois 62701
12     (217) 572-1714
       jrupcich@cassiday.com
13
14 For the Defendant Lisa Mincy:
       Jeremy Tyrrell
15     ASSISTANT ATTORNEY GENERAL
       500 South Second Street
16     Springfield, Illinois 62701
       (217) 782-1841
17     jtyrrell@atg.state.il.us
18
19
20
21
22
23
24
25
```

Page 3

```
 1          INDEX - CONTINUED
 2 EXAMINATION BY:                      PAGE
   Ms. Holt......................................5, 69
 3 Mr. Rupcich...................................64
 4 EXHIBITS:   DESCRIPTION                   PAGE
   Exhibit 1    4/26/16 QI Meeting Minutes.......22
 5 Exhibit 2    5/24/16 QI Meeting Minutes.......44
   Exhibit 3    6/28/16 QI Meeting Minutes.......46
 6 Exhibit 4    7/28/16 QI Meeting Minutes.......47
   Exhibit 5    8/23/16 QI Meeting Minutes.......48
 7 Exhibit 6    9/27/16 QI Meeting Minutes.......50
   Exhibit 7    10/25/16 QI Meeting Minutes......51
 8 Exhibit 8    11/22/16 QI Meeting Minutes......53
   Exhibit 9    1/24/17 QI Meeting Minutes.......56
 9 Exhibit 10   2/28/17 QI Meeting Minutes.......57
   Exhibit 11   3/28/17 QI Meeting Minutes.......58
10 Exhibit 12   4/25/17 QI Meeting Minutes.......60
   Exhibit 13   5/23/17 QI Meeting Minutes.......63
11 Exhibit 14   Authorization....................38
12
              (Exhibits attached.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              STIPULATION
 2
 3        IT IS HEREBY EXPRESSLY STIPULATED AND
 4 AGREED by and between the parties that the
 5 DEPOSITION of CHAD CHRISTER may be taken on MARCH
 6 25, 2019, at the Taylorville Correctional
 7 Facility, 1144 Illinois Route 29, Taylorville,
 8 Illinois, pursuant to the applicable Supreme
 9 Court rules, local rules, and the Code of Civil
10 Procedure governing said depositions.
11
12        IT IS FURTHER STIPULATED that the
13 necessity for calling the Court Reporter for
14 impeachment purposes is waived.
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              1:09 p.m.
 2        MS. HOLT:  Thank you, Mr. Christer,
 3 for being here.  My name is a Chloe Holt.  I'm
 4 one of the attorneys representing the plaintiff
 5 in this lawsuit, Mr. William Kent Dean, and we'll
 6 just go ahead and get started with some questions
 7 on your background.  Could you, please, state
 8 your name?
 9        THE COURT REPORTER:  I need to swear
10 him in first.
11        MS. HOLT:  Sorry about that.
12        CHAD CHRISTER,
13 having first been duly sworn, testifies as
14 follows:
15              EXAMINATION
16 BY MS. HOLT:
17     Q.    Could you, please, state your name
18 for the record.
19     A.    Chad Christer.
20     Q.    All right.  And what's your date of
21 birth?
22        MR. RUPCICH:  Well, hold on a second.
23 I don't want to put that in the record.  This is
24 a prison case.  If it is relevant somewhere, we
25 could provide it under a protective order.
```

CHAD CHRISTER                                          March 25, 2019

Page 6

1  Personal information, addresses, family members,
2  let's avoid that if you don't mind.
3  BY MS. HOLT:
4      Q.    Yes, sure.  That's fine.  Where are
5  you currently employed, and what is your
6  position?
7      A.    I'm currently employed at Taylorville
8  Correctional Center.  I work for Wexford Health
9  Sources, medical records director.
10     Q.    All right.  And have you ever been
11  deposed before?
12     A.    I have not.
13     Q.    Okay.  All right.  Well, because
14  you've not been deposed before, I just want to
15  run through a few ground rules before we really
16  get started.  So you are under oath today, and
17  that has the same effect as if you were
18  testifying in a court.  Do you understand that?
19     A.    Yes.
20     Q.    And it is important that there be a
21  clear record of today's deposition.  I'm going to
22  be asking you a series of questions, and to
23  ensure that there is a clear transcript, please
24  respond audibly to all of my questions.  No head
25  nods or head shakes, and I'll try and do the

Page 7

1  same.  Please try to allow me to finish my
2  question before you begin to answer.  I will try
3  to do so the same.  I think with the video delay
4  we won't have a huge issue with that.  If you
5  don't understand any questions that I ask, just
6  let me know and I'll rephrase.  If you don't say
7  anything, I will assume you understood the
8  question.  Do you understand that?
9      A.    Yes.
10     Q.    If at point you would like to take a
11  break, just let your counsel or me know, and we
12  will accommodate you, but please note if there is
13  a question pending, please answer before we take
14  a break.  Does all of that make sense?
15     A.    Yes.
16     Q.    Thank you.  Do you have any questions
17  about any of the procedures we'll follow today?
18     A.    No.
19     Q.    Okay.  Is there any reason that you
20  cannot testify truthfully and accurately today?
21     A.    No.
22     Q.    Did you review any documents in
23  preparation for this deposition?
24     A.    I reviewed the quality improvement
25  minutes that were previously given to our -- my

Page 8

1  counsel.  Also Springfield Clinic documents, and
2  I also refreshed my memory on my monthly calendar
3  from 2016.
4      Q.    Okay.  Did you have any conversations
5  with anyone other than your counsel about this
6  deposition?
7      A.    No.
8      Q.    All right.  So let's go back to your
9  work with Wexford.  You said you're currently
10  employed by Wexford; is that correct?
11     A.    Yes.
12     Q.    When did you start there?
13     A.    April 11, 2016.
14     Q.    And what is your job title?
15     A.    Medical records director.
16     Q.    What are your job duties?
17     A.    My job duties are to oversee setting
18  of appointments for the offenders, making sure
19  all the documents in the medical record are
20  accurate, and -- I've got a long list.
21     Q.    All right.  So your duties involve
22  maintaining the medical records?
23     A.    Yes.
24     Q.    Do your duties involve, I guess, any
25  tasks and scheduling appointments for inmates

Page 9

1  with doctors outside the prison?
2      A.    Yes, that's my primary job duty is to
3  make all appointments.
4      Q.    Do your duties involve attending
5  quality improvement meetings?
6      A.    Yes, on a monthly basis.
7      Q.    Okay.  Do your duties involve
8  participating in collegial reviews?
9      A.    Yes.
10     Q.    Do your duties ever consist of
11  providing any input during any collegial reviews?
12     A.    My only input is to get whatever
13  documentation is asked for during the collegial
14  review process.
15     Q.    Okay.  Are you involved in obtaining
16  approvals for medications, appointments or
17  treatments?
18     A.    I attend the collegial process.  That
19  is my extent of all of that.
20     Q.    Okay.  Is there anything else you do
21  at Wexford that we haven't covered?
22     A.    Not really.
23     Q.    Okay.  Where were you employed before
24  Wexford?
25     A.    At Children's Hospital in St. Louis.

CHAD CHRISTER                                    March 25, 2019

Page 10

1    Q.    Okay.  What was your job title there?
2    A.    Trauma registrar.
3    Q.    What were your duties there?
4    A.    Basically it was to review all
5  accidents that children were in and input those
6  into the Illinois and Missouri databases.
7    Q.    Okay.  Why did you leave that job?
8    A.    To be closer to family.
9    Q.    And did you attend college?
10   A.    Yes.
11   Q.    Where?
12   A.    Richland Community College.
13   Q.    Did you obtain a degree?
14   A.    Associate's degree.
15   Q.    In what?
16   A.    Health information.
17   Q.    Have you ever earned any
18 certifications?
19   A.    I have an RI, which is a Registered
20 Health Information Technician.
21   Q.    Can you explain what that means?
22   A.    That's the credential that is given
23 by AHIMA, the organization that oversees medical
24 record information and basically allows me to
25 perform my duties to make sure that I follow all

Page 11

1  the privacy acts such as HIPAA.
2    Q.    Okay.  Have you ever taken any other
3  classes or any other sort of post high school
4  education?
5    A.    I also have a degree in respiratory
6  therapy.
7    Q.    Okay.  Do you do anything else to
8  keep current on developments in your field?
9    A.    I look over current information on
10 the AHIMA website and do corresponding CEUs to
11 keep current.
12   Q.    Let's go back to your position as
13 medical records director at Wexford.  Can you
14 tell me more about what you do with respect to
15 the actual medical records?
16   A.    On a day-to-day make sure that all of
17 the paperwork that is generated by the physician
18 and the nurses is accurate and placed into the
19 chart, make sure that they are secured at all
20 times.
21   Q.    Okay.  How did the medical records
22 get to you?
23   A.    The charts are taken out of the
24 office to the doctor's examination room.  Once
25 he's completed, the documents are brought back

Page 12

1  along with the charts, and then I will put the
2  paperwork into the chart in the appropriate spot
3  and then put them back on the shelf.
4    Q.    How soon do the records typically get
5  back to you after a patient has an appointment?
6    A.    Same day.
7    Q.    Okay.  And is this all in paper or is
8  there any sort of electronic system?
9    A.    Our system is all paper.
10   Q.    Okay.  Do you review the medical
11 records for compliance or substance?
12         MR. RUPCICH:  Object to vague.
13 Compliance with what?
14 BY MS. HOLT:
15   Q.    Sure.  I'll rephrase.  Do you review
16 the medical records to ensure that they are
17 compliant with Wexford policies or procedures?
18   A.    Yes, make sure that everything has a
19 date, time, signature, and documented in the SOAP
20 format.
21   Q.    Can you explain what the SOAP format
22 is?
23   A.    Subjective, Objective, Assessment and
24 Plan.
25   Q.    Thank you.  Are there any other

Page 13

1  policies or procedures that pertain to the
2  medical records that you keep track of?
3    A.    No, not that I can think of.
4    Q.    Okay.  If a record that gets to you
5  isn't compliant with any of those policies or
6  procedures, what do you do?
7    A.    I will take back whatever part is
8  lacking, let's say a signature, and if it's a
9  physician signature.  I'll take it to the doctor
10 to get it signed, or if it's a nurse, take it
11 back to them to get a signature.
12   Q.    Is there anyone else besides you that
13 handles the medical records in -- I guess within
14 your department?
15   A.    I have a medical records clerk.
16   Q.    Are you involved in setting any of
17 the policies or procedures that Wexford has?
18   A.    No.
19   Q.    Do you know if any policies or
20 procedures about medical records have changed
21 since you started at Wexford?
22   A.    Not to my knowledge.
23   Q.    Are you involved in training any
24 other employees at Wexford?
25   A.    I would train any new hires that came

CHAD CHRISTER                                    March 25, 2019

---

Page 14

1  into the medical records department, and we
2  currently just have one medical records clerk.
3        Q.    Okay.  Do you ever provide any input
4  for employee performance reviews related to
5  compliance with medical records?
6        A.    No.
7        Q.    Do you ever interact with the
8  patients directly?
9        A.    On occasion.  My interaction is very
10 limited.  It's usually if they've requested for
11 medical records, or --
12       Q.    Okay.
13       A.    -- if they have a question regarding
14 appointments, they may stop me in the hall.
15       Q.    And how frequently do you schedule
16 patients for outside appointments or procedures?
17            MR. RUPCICH:  Object to vague.
18 BY MS. HOLT:
19       Q.    Okay.  Would you say that you
20 schedule patients for outside appointments or
21 procedures on a daily basis?
22       A.    Yes.
23       Q.    Can you describe the process for
24 that?
25       A.    Once I have the approval for the

---

Page 15

1  particular specialty that is required, then I
2  will call the office and let them know I have a
3  new patient that needs to be seen, and they will
4  set up a date and time.
5        Q.    Who gets you the approval that you
6  need?
7        A.    That is done during the collegial
8  process.
9        Q.    Okay.  And how does it get, I guess,
10 to your hands in your office?
11       A.    I will get an email that will contain
12 all of the authorization numbers for each
13 particular appointment that is needed.
14       Q.    Okay.  Would you be able to make an
15 appointment without the authorization numbers?
16       A.    No.
17       Q.    How do you know who to contact to
18 schedule an appointment?
19       A.    I have a list of all the providers
20 for each specialty in my office.
21       Q.    Do you keep track of your contacts
22 with outside providers?
23       A.    The contacts I make -- I will make
24 little notes to myself if I've left a message or
25 if I'm waiting to hear back from somebody.

---

Page 16

1        Q.    Where do you make those notes?
2        A.    Usually on my calendar.
3        Q.    Typically how soon are you able to
4  schedule appointments or procedures?  By that I
5  mean how much time passes between when you
6  schedule the appointment and when it occurs?
7        A.    Can you rephrase?
8        Q.    Yeah.  So once you make an
9  appointment, how much time usually passes before
10 the patient is actually seen by the outside
11 doctor?
12       A.    That will vary on the specialty that
13 we are sending out.  Some will be within a
14 week.  Others can take several weeks.
15       Q.    Do you ever have any difficulty in
16 scheduling outside appointments?  Do you ever
17 encounter any problems?
18       A.    Typically we do not have any problems
19 scheduling.
20       Q.    And what happens after you schedule
21 the appointment?  Is there anyone you need to
22 notify?
23       A.    Once the appointment has been made, I
24 will keep track, type up a memo for the date and
25 time of when they're going to go out.  The week

---

Page 17

1  prior to them going out, that memo will be sent
2  out to the record office and the shift commanders
3  so they know that somebody needs to go out.
4        Q.    Does anyone help you schedule the
5  appointments?
6        A.    No.
7        Q.    Has there ever been a time where
8  anybody else has tried to schedule an outside
9  appointment?
10            MR. RUPCICH:  Object to vague and
11 overly broad.  If you can answer.
12 BY MS. HOLT:
13       Q.    Yeah.  You can answer.
14       A.    The only time would have been if I
15 was out sick.
16       Q.    If a doctor doesn't have an
17 appointment available in the near future, do you
18 look at other doctors or do you just make an
19 appointment with that doctor?
20       A.    If the appointment is a ways out, say
21 a couple months out, I may talk to our doctor,
22 Dr. Nawoor, ask him if that is okay, or if I need
23 to pursue trying to find another doctor.
24       Q.    Okay.  Can you think of any examples
25 where that happened?

---

CHAD CHRISTER                                          March 25, 2019

Page 18

1     A.    Not off the top of my head.
2          Q.    Okay.  If either you or a doctor
3    thinks that the patient's appointment needs to be
4    moved up, how would that work?
5          A.    I would first reach out to the
6    provider that I already have the appointment with
7    to see if -- to explain what the situation is, so
8    they get a better understanding of what we
9    actually need.  If they were unable to
10   accommodate, then I would reach out to another
11   physician of the same specialty.
12         Q.    What's the process for scheduling an
13   urgent appointment or procedure?  Is it any
14   different?
15         A.    If it's marked urgent, I still would
16   submit as we would a regular referral, but I
17   would also contact our utilization management
18   person to let them know we need to expedite a
19   referral.
20         Q.    Who defines the appointment or
21   procedure as urgent?
22         A.    The physician.
23         Q.    Okay.  And if a patient's appointment
24   with an outside doctor needed to be canceled, how
25   would that work?

Page 19

1     A.    I would call the doctor's office and
2    let them know that we needed to cancel the
3    appointment.
4          Q.    Okay.  And do your duties as a
5    medical records director involve being a member
6    of the quality improvement committee?
7          A.    Yes.
8          Q.    Can you describe what the quality
9    improvement is and what it does?
10         A.    The quality improvement committee is
11   basically looking at the statistics for each
12   month and also we will do various studies to see
13   if we can improve on certain aspects of the
14   medical care.
15         Q.    Were those the only purposes of the
16   committee?
17         A.    So far as I am aware.
18         Q.    And how often does the committee
19   meet?
20         A.    We meet monthly.
21         Q.    Where do the meetings take place?
22         A.    On-site here in the warden's
23   conference room.
24         Q.    And besides you, who else is on the
25   committee?

Page 20

1     A.    There's several members from the
2    state, our director of nursing, our doctor, our
3    warden, assistant warden of programs, healthcare
4    unit administrator, and representative from
5    pharmacy.
6          Q.    How do the meetings work?  I guess is
7    there an agenda?
8          A.    The agenda will be the different
9    studies that need to be reviewed for each month,
10   and then we will review all of the appointments
11   and referrals that happen for the month, and then
12   we look at all the statistics of the pharmacy,
13   dental procedures, nurse sick call, doctor sick
14   call.
15         Q.    Were the cost of treatment or
16   procedures ever discussed at these meetings?
17         A.    No.
18         Q.    Did you do anything to prepare for
19   these meetings?
20         A.    My only prep for the meeting is
21   supplying all of the appointment or appointments
22   for the month and then all of the alternative
23   treatment plans for the month.
24         Q.    And what sort of records of the
25   committee meetings exist?

Page 21

1     A.    We have meeting minutes for each
2    month.
3          Q.    Who is in charge of the meeting
4    minutes?
5          A.    Quality improvement coordinator,
6    which is our healthcare unit.
7          Q.    Who is that?
8          A.    Our healthcare unit administrator.
9          Q.    Did you ever take notes at these
10   meetings?
11         A.    No.
12         Q.    Do you know if anyone else took
13   notes?
14         A.    Just the minutes as far as I know.
15         Q.    And before you started at Wexford do
16   you know if anyone else attended the meetings to
17   represent them at the medical records department?
18         A.    The previous medical records director
19   would have attended.
20         Q.    Do you know, was that position vacant
21   before you started?
22         A.    It was.  I'm not sure how long
23   though.
24         Q.    Okay.  So if it were vacant for a
25   period of time before you started, would there

CHAD CHRISTER                                          March 25, 2019

Page 22

1  have been anyone attending during that time?
2          MR. RUPCICH:  Object to the
3  foundation.
4  BY MS. HOLT:
5          Q.    You can still answer.
6          A.    I really would not know since I was
7  not an employee at that time.
8          Q.    Okay.  Have you ever talked to anyone
9  about what was discussed at the quality
10  improvement committee meetings?
11          A.    Just Dr. Nawoor, to the director of
12  nursing, who were both on the committee.
13          Q.    Okay.  If we could look at
14  Plaintiff's Exhibit 1.  Have you ever seen this
15  document before?
16          A.    Yes, these are the quality
17  improvement committee meeting minutes.
18          Q.    So you do recognize this type of
19  document?
20          A.    Yes.
21          Q.    And is it the healthcare unit
22  administrator who prepares this document?
23          A.    Her or her assistant.
24          Q.    Okay.  Would anyone else edit or
25  revise this document?

Page 23

1          A.    No.
2          Q.    Who is this document distributed to?
3          A.    We don't distribute.  We'll hand it
4  out in the meeting itself to review.
5          Q.    Okay.  And what is the purpose of
6  this document?
7          A.    To keep track of the minutes of the
8  meeting.
9          Q.    Are there any other records besides
10  the meeting minutes from these meetings?
11          A.    No.
12          Q.    And did you review this document?
13          A.    I did.
14          Q.    Did you take any actions based on
15  reading this document?
16          A.    No.
17          Q.    Okay.  And just going through the
18  document itself, could you go over the list of
19  members present on page 1 and just explain who
20  everyone is.
21          A.    Cindy Hobrock was the state nursing
22  representative.  Kathy Galvin was the director of
23  nursing.  Alton Angus, mental health
24  representative.  Dr. Nawoor is our physician.
25  Lisa Mincy, healthcare unit administrator, and

Page 24

1  myself and Warden Smith.
2          Q.    And what about the members absent?
3          A.    Nichole Stonecipher is from pharmacy.
4  Dr. Tweedy, I believe, was mental health.  Don
5  Grimes is from pharmacy.  Shawn Cates is a
6  Wexford regional manager.  And Assistant Warden
7  Jones was the programs assistant warden.
8          Q.    Thank you.  In looking at section I,
9  Quality Improvement Studies, can you explain what
10  that means, and I guess what the purpose of the
11  section is.
12          A.    It is to look at various studies that
13  needed to be done.  The particular one for
14  pharmacy was an outcome.  It was looking to make
15  sure that the offenders received their
16  medications within 24 hours.
17          Q.    Who was responsible for the
18  information in this section?
19          A.    I believe the director of nursing was
20  responsible for that one.
21          Q.    And the same month to month, or would
22  that change?
23          A.    It would vary on the study.  Each
24  study would be different each month to look at
25  different aspects.

Page 25

1          Q.    Okay.  And moving on to page 2,
2  section II, Off-Site Offender Care Services, can
3  you explain what this section means and what its
4  purpose is?
5          A.    It is to look at who needed care in
6  an emergency room setting.
7          Q.    Is it only emergency room care?
8          A.    For section A it would be just
9  looking at emergency room visits.  B would look
10  at if anybody was admitted to the hospital.
11          Q.    I guess section C, Outside
12  consultations, why do you keep track of the
13  number of outside appointments?
14          A.    It's part of Wexford and IDOC's
15  standards to keep track of how many individuals
16  go out.
17          Q.    Do you know if there's a reason for
18  that?
19          A.    No.
20          Q.    In looking at section D, Utilization
21  Review, do you know why denials were faxed to the
22  agency medical director?
23          A.    That's to let the agency medical
24  director know, keep them in the loop of what's
25  going on as far as referrals.

CHAD CHRISTER                                      March 25, 2019

Page 26

1      Q.    Okay.  Moving to page 5 of page 5
2  which is the beginning of section III, Critical
3  Incidents, can you tell me a little bit more
4  about this section and the kind of information
5  that would be recorded in it.
6      A.    It would -- section A, would be for
7  any deaths that occurred on-site, section B would
8  be any new diagnoses or delayed diagnoses that
9  were discovered during that month, section
10  C would be the use of isolation.
11      Q.    I guess going back to section B, what
12  does delayed diagnosis mean?
13      A.    I'm not sure how they actually
14  classified delayed diagnosis.  I'd have to talk
15  to the nursing staff.
16      Q.    Thank you.  Next moving on to page 6,
17  can you continue telling me about the sections.
18      A.    Section D is infection control, and
19  that just -- the first part, IDPH reportables,
20  just means any diagnoses that need to be reported
21  to the Department of Public Health.
22      Q.    What does IDPH stand for?
23      A.    Illinois Department of Public Heath.
24      Q.    And OHS?
25      A.    Office of Health Services.

Page 27

1      Q.    What about just below, MRSA?
2      A.    MRSA is a particular strain of -- I
3  can't -- I can't think of the term for it, the
4  bacteria.  I can't think of what MRSA is the
5  acronym for.  I'd have to look that up.
6      Q.    No, thank you.  That's helpful
7  because I have no idea at all.  And moving on to
8  section IV, Safety and Risk Management, can you
9  tell me a little bit more about that section?
10      A.    The healthcare unit administrator has
11  to run emergency response drills.  So this is
12  where those drills will be captured.
13      Q.    Do you know how frequently those
14  drills happen?
15      A.    Off the top of my head I do not.  I'd
16  have to ask her how often they are done.  I
17  believe it's quarterly.
18      Q.    Okay.  And then what about the next
19  few subsections?
20      A.    Section B is any employees that
21  needed to see Health Services, and section C will
22  track all of the offender injuries.  Section D
23  will get into lab draws and our x-rays that are
24  done on-site.
25      Q.    What about section E?

Page 28

1      A.    E is just the annual radiological
2  safety, which they have to test the equipment
3  annually -- or biannually, excuse me.
4      Q.    So that probably wouldn't be
5  something that would be discussed every month,
6  it's just for reference?
7      A.    Yes, just for reference.
8      Q.    And then what about section F?
9      A.    F is safety and sanitation.  The
10  healthcare unit administrator will go around to
11  all the housing units and look for any major or
12  minor issues with the housing in general.
13      Q.    And then section G?
14      A.    Is just the quality control.  So lab,
15  they have certain requirements they have to do
16  each month, and those are as required.  So they
17  would just look in the book that they keep in the
18  lab to go over, make sure they've done
19  everything.  X-ray, just looking at the developer
20  and the temperature.  Dental, they just look at
21  the weekly support tests for the autoclave.  The
22  Accu-Chek monitors is for the blood glucose
23  machines.  And then any other equipment we may
24  have is performed per Denman's direction, and we
25  have to check the refrigerator temperatures

Page 29

1  daily.
2      Q.    Okay.  Thank you.  And I guess now
3  we're getting close to the bottom of page 7, but
4  we have section V, Routine Quality Improvement
5  Activities.  Can you tell me more about that
6  section?
7      A.    That section A is the treatment
8  protocols.  So there's protocols that the nurses
9  can follow for the sick call, and then this was
10  just an audit of how they're following the
11  protocol if there's any issues.
12      Q.    Okay.  Are there -- is everything
13  covered in this section, would that be discussed
14  at every meeting, or would it change month to
15  month?
16      A.    For this section we always review
17  protocols.  The number of nurses may vary each
18  month, but the information would be basically the
19  same.
20      Q.    Okay.  What about for the rest of the
21  subsections for Routine Quality Improvement
22  Activities?
23      A.    Audit Findings, internal or external,
24  that's just the audits that are done by staff
25  that are assigned, and if there's any findings,

CHAD CHRISTER                                    March 25, 2019

Page 30

1  then we'll go over them.  The C, Office of Health
2  Services, written communications, that's any
3  documentation that the agency medical director
4  may send out.
5       Q.    Okay.  Is there a section D?
6       A.    Looks like that probably should have
7  been Contract Monitoring.
8       Q.    And what is Contract Monitoring?
9       A.    That's for the healthcare unit
10 administrator to monitor the Wexford contract.
11      Q.    I guess what does that mean?  What
12 are they monitoring?  What are they looking for?
13            MR. RUPCICH:  Foundation.  Objection.
14 If you know.
15      A.    It's just to make sure that we have
16 the adequate staff needed to fulfill the
17 requirement.  So --
18 BY MS. HOLT:
19      Q.    Okay.
20      A.    At that particular time we had a
21 dentist vacancy.  We also had 1.4 vacancies for
22 nurse, and at that particular time my job was
23 vacant.
24      Q.    Thank you.  What about section E,
25 Aggregate Data.

Page 31

1       A.    The Aggregate Data looks at all the
2  clinics that are provided each month.  So that
3  first part three Hep C clinics were done, one
4  general clinic was also done, and then it gets
5  into each other type of clinic with the results.
6       Q.    And then moving on to page 9, it goes
7  into subsection F, Mental Health Report, can you
8  tell me a little bit more about that?
9       A.    The mental health representative at
10 the meeting would go all over all of the mental
11 health information, all of the offenders that
12 were seen either by the mental health staff
13 on-site or the psychiatrist on TELEMED.
14      Q.    Okay.  And then page 10 is subsection
15 G, Offender Satisfaction.  Can you tell me more
16 about what that keeps track of?
17      A.    Basically that would be the grievance
18 process.  So if any offenders are not happy with
19 how care is being provided or how they're being
20 charged $5 to see the doctor, it's that type of
21 information that gets processed there.
22      Q.    Okay.  Was there ever any discussion
23 about trying to lower the number of inmate
24 grievances regarding medical care, or were you
25 just mostly keeping track of the numbers?

Page 32

1       A.    We keep track, and there's always
2  discussion of how to improve.  It's an ongoing
3  process though.
4       Q.    Okay.  And then page 13 starts at
5  section VI, which is Miscellaneous.  Can you just
6  tell me more about what's covered under this
7  section?
8       A.    So it would cover the pharmacy and
9  any medication errors that may happen during the
10 month.
11      Q.    Would that include any, I guess, log
12 of patient prescriptions?
13      A.    Yes, it would cover prescriptions
14 that were ordered by a physician.
15      Q.    And then can you -- on page 14 can
16 you tell me about subsection B.
17      A.    This will be the Dental Report.  So
18 our dentist would go over all of the information
19 of procedures that he did for the month.
20      Q.    And subsection C, can you tell me
21 more about that?
22      A.    It's just a comparison of the monthly
23 statistics between the doctor, the nurse sick
24 call, dental, psychiatry, and optometry.
25      Q.    And those numbers are the number of

Page 33

1  visits?
2       A.    Yes.
3       Q.    Okay.  And can you then also tell me
4  what section D refers to.
5       A.    Section D refers to the wait time at
6  that particular month to see the eye doctor.
7       Q.    And then section E, can you tell me
8  more about that?
9       A.    It was credentials, and the
10 healthcare unit administrator kept track of all
11 the licensed individuals, when their licenses
12 would expire, when they need to be renewed, that
13 sort of thing.
14      Q.    Okay.  And then can you also explain
15 section F?
16      A.    F is the ADA monthly report, and
17 that's a report that the assistant warden of
18 programs, who's also the ADA coordinator, to keep
19 track of.
20      Q.    Okay.  And can you explain section G,
21 what's Warden's Issues mean?
22      A.    That's just a holder -- holding spot
23 for if the warden wants to address any problems
24 that they're seeing for the particular month.
25      Q.    All right.  And would that be the

CHAD CHRISTER                                        March 25, 2019

Page 34

1  same for sections H, I, and J?
2      A.    Yes.
3      Q.    What about sections K and L?
4      A.    K would be if the regional manager
5  Shawn Cates, if she had any issues that she
6  wanted to bring forth.  The same with the health
7  services representative, Cindy Hobrock.
8      Q.    Thank you.  And is this, I guess,
9  your standard form for the meeting minutes for
10 the quality improvement committee meeting
11 minutes?
12     A.    Yes.
13     Q.    Would all of the quality improvement
14 committee meeting minutes be in the same format?
15     A.    Yes.
16     Q.    All right.  And I guess just
17 generally have you told me about more or less all
18 of your responsibilities related to the quality
19 improvement committee meetings?
20     A.    Yes.
21     Q.    Okay.  Let's see.  Mr. Christer, how
22 are you doing?  Do you want to keep going, or do
23 you want to take a break?
24     A.    No, I'm fine.  Keep going.
25     Q.    So do you know the plaintiff in this

Page 35

1  lawsuit, William Kent Dean?
2      A.    Personally I do not.
3      Q.    Have you ever spoken to Mr. Dean's
4  wife about his medical care?
5      A.    No.
6      Q.    Do you know anything about Mr. Dean's
7  medical condition?
8      A.    Only from what I've been witness to
9  during the collegial process to get approvals for
10 appointments.
11     Q.    Did you ever hear anything about his
12 care from the time before you started at Wexford?
13     A.    No.
14     Q.    Do you know if Mr. Dean was discussed
15 at any of the quality improvement meetings prior
16 to when you started at Wexford?
17     A.    No, I do not.
18     Q.    And so you are involved in the
19 collegial review and scheduling appointments, but
20 is there anything else you do that's in any way
21 related to Mr. Dean's medical care?
22     A.    No.
23     Q.    So you participated in collegial
24 reviews that discussed Mr. Dean.  Can you tell me
25 approximately when those were?

Page 36

1      A.    Shortly after I started in April of
2  '16.
3      Q.    What do you recall about the
4  discussions from that collegial review?
5      A.    I would have to review all the
6  documentation to get a better understanding.
7      Q.    What documentation is there?
8      A.    There would be the chart.  It would
9  be the chart in general.
10     Q.    And do you know who scheduled
11 Mr. Dean's initial appointment with Dr. Severino
12 that took place in March of 2016?
13     A.    No, I do not know who did that prior
14 to my taking over the job.
15     Q.    Would there be any records of who
16 scheduled that appointment?
17     A.    I'm sure there probably is, but I do
18 not have access to that.
19     Q.    I want to talk about Mr. Dean's
20 surgery that he needed.  When did you first learn
21 that Mr. Dean needed to have surgery?
22     MR. RUPCICH:  Do you know off the top
23 of your head?
24     A.    No, off the top of my head I do not
25 remember.  I would have to look at documentation.

Page 37

1  BY MS. HOLT:
2      Q.    I guess approximately was it -- do
3  you know if it was -- do you know how soon it was
4  after you started at Wexford?
5      A.    I believe it was in that first month
6  after I started.
7      Q.    Can you describe the process of what
8  you did to schedule the surgery?
9      A.    We got approval through the collegial
10 process and then contacted Dr. Severino.
11     Q.    Do you remember who you spoke with
12 from Dr. Severino's office?
13     A.    No, I do not.
14     Q.    Did you only contact -- was that the
15 only time you had contact with Dr. Severino's
16 office?
17     A.    I had multiple conversations with his
18 office to set up the appointment.
19     Q.    Do you know approximately how many?
20     A.    I would have to refer to notes to get
21 a specific number.
22     Q.    Would that be in your monthly
23 calendar?
24     A.    I have three dates listed.
25     Q.    What are they?

CHAD CHRISTER                                    March 25, 2019

Page 38

1     A.    5/11/16, 5/17/16, and 5/23/16.
2     Q.    Would there have been any other
3  instances where you contacted Dr. Severino that
4  weren't recorded?
5     A.    There could have been.  That month
6  was a very busy month for sending people out.  I
7  may not have logged them all -- all my calls.
8     Q.    And were all of these contacts made
9  over the phone?
10    A.    Yes.
11    Q.    So you would never send an email to
12 Dr. Severino's office?
13    A.    No.
14    Q.    Have you now told me everything you
15 remember that you did with respect to scheduling
16 Mr. Dean's surgery?
17          MR. RUPCICH:  Object to vague and
18 overly broad.
19 BY MS. HOLT:
20    Q.    Is there anything else you remember
21 doing with respect to scheduling Mr. Dean's
22 surgery?
23    A.    No.
24    Q.    And can we look at Plaintiff's
25 Exhibit 14.  Have you seen this document before?

Page 39

1     A.    Yes.
2     Q.    Can you tell me what it is?
3     A.    This is the authorization for the
4  surgery for Mr. Dean.
5     Q.    And who prepares this document?
6     A.    It would be the utilization
7  management department for Wexford.
8     Q.    Would anyone else have edited or
9  revised it?
10    A.    No.
11    Q.    And who is this document sent to?
12    A.    Myself.
13    Q.    And what is its purpose?
14    A.    To give me the authorization ID
15 number to schedule the appointments.
16    Q.    Did you review this document?
17    A.    Just now.
18    Q.    When did you first receive this
19 document?
20    A.    It says April 22 of 2016.
21    Q.    Did you take any actions based on
22 reviewing this document?
23    A.    Action would have been to contact
24 Severino's office.
25    Q.    Okay.  Can you review the comments?

Page 40

1     A.    Is there a question?
2     Q.    Yes.  Sorry.  I was just giving you
3  time to look over it.  Can you look for me at the
4  end of fourth to last line, starts with
5  recommended, and can you read that for the
6  record?
7     A.    Recommended for right nephrectomy to
8  be done 5/11/16 at Memorial Medical Center by Dr.
9  Severino, Springfield Clinic, approved by Dr.
10 Ritz in collegial with Dr. Nawoor.
11    Q.    Thank you.  Do you know why it says
12 the surgery was to be done on 5/11/16?
13    A.    That is the initial date that Dr.
14 Severino was going to do the surgery.
15    Q.    So that wasn't what you scheduled,
16 that was just the initial recommended date?
17    A.    Dr. Severino had scheduled that
18 himself, and his office had contacted me with
19 that date.
20    Q.    At what point was that date changed?
21    A.    I do not have that specific date on
22 hand.
23    Q.    That's okay.  Do you remember, I
24 guess, the approximate order of events.
25    A.    I know that shortly after receiving

Page 41

1  the date of surgery was contacted by Dr.
2  Severino's office who recommended that he get
3  cardiac -- that Mr. Dean get cardiac clearance
4  prior to undergoing a surgery.
5     Q.    Would there be any record of that
6  call?
7     A.    No.
8     Q.    When you received that call, did you
9  then have to get approval for the cardiac
10 clearance?
11    A.    Yes.  There will be a record of the
12 collegial record.
13    Q.    Do you ever recall or do you recall
14 ever discussing Mr. Dean with any of the
15 defendants in this lawsuit meaning Dr. Nawoor,
16 Kathy Galvin, and Lisa Mincy?
17    A.    I talked about the case with Dr.
18 Nawoor.  We had communicated on a regular basis
19 as far as getting the appointment set up.
20    Q.    And do you remember anything else
21 about those conversations with Dr. Nawoor?
22    A.    No.
23    Q.    Were those conversations in person?
24    A.    Yes.
25    Q.    Did he ever ask you to do anything

CHAD CHRISTER                                          March 25, 2019

Page 42

1  with regards to Mr. Dean?
2       A.    As far as?
3       Q.    Scheduling appointments or anything
4  else?
5       A.    That's my major interaction with Dr.
6  Nawoor is only in regards to scheduling
7  appointments.
8       Q.    How frequently do you typically talk
9  to Dr. Nawoor about scheduling appointments?
10      A.    Daily.
11      Q.    Do you talk to Kathy Galvin or any
12 other person in the healthcare unit about
13 scheduling appointments?
14      A.    It's mainly Dr. Nawoor that I
15 interact with.  I will interact with the director
16 of nursing from time to time or the healthcare
17 unit administrator.
18      Q.    Did Dr. Nawoor ever ask you to move
19 up Mr. Dean's surgery or any other appointment
20 that he had?
21      A.    I do not recall him specifically
22 asking to move it up.
23      Q.    Did Dr. Nawoor ever express concern
24 to you about any delays in scheduling or any wait
25 for an outside appointment?

Page 43

1       A.    No.
2       Q.    Was Mr. Dean ever discussed at the
3  quality improvement meetings?
4       A.    Only in the context of if he was
5  going out for an appointment.
6       Q.    So who would have been in charge of
7  reporting on those appointments or the fact that
8  he was going out?
9       A.    I provide the information to the
10 quality improvement coordinator to be put into
11 the minutes.
12      Q.    And would that information just be in
13 the minutes, or was it actually discussed?
14      A.    It would just be in the minutes.
15      Q.    You know what, can we go back to
16 Plaintiff's Exhibit 1.  Can you remind us of what
17 this document is?
18      A.    The quality improvement meeting
19 minutes.
20      Q.    And if you turn to page 2, do you see
21 any mentions of Mr. Dean?
22      A.    For Outside consultations a
23 urology --
24      Q.    Sorry I interrupted you.  Can you
25 repeat that?

Page 44

1       A.    A urology evaluation.
2       Q.    Do you remember if that was discussed
3  or anything else?
4       A.    It was just listed.
5       Q.    Was Mr. Dean's surgery discussed
6  during this meeting?
7       A.    No.
8       Q.    Did you take any actions based on --
9  did you take any actions with respect to Mr. Dean
10 based on anything that was discussed during this
11 meeting?
12      A.    No.
13      Q.    All right.  Can we look at
14 Plaintiff's Exhibit 2 now.  Do you recognize this
15 document?
16      A.    Yes.
17      Q.    Can you tell me what it is?
18      A.    It's the quality improvement meeting
19 minutes for the May 24 meeting.
20      Q.    Of what year?
21      A.    2016.
22      Q.    And it uses the form you previously
23 told us about?
24      A.    Yes.
25      Q.    Can you turn to page 2.  Are there

Page 45

1  any mentions of Mr. Dean?
2       A.    There's two listings for Mr. Dean.
3       Q.    Can you tell me what they were?
4       A.    Those were for two outside
5  consultations.  One was a CT IVP, and the other
6  was for a cystoscopy.
7       Q.    And when did those outside procedures
8  take place?  Would that have taken place that
9  month?
10      A.    Yes, it would have happened in May.
11      Q.    Do you know if they -- if those
12 procedures were discussed in the meeting?
13      A.    They were just listed, not discussed.
14      Q.    Do you remember if Mr. Dean was
15 discussed in any way at all in that meeting?
16      A.    No.
17      Q.    No you don't remember, or no he
18 wasn't discussed?
19      A.    No, I do not remember.
20      Q.    Thank you.  In looking back at the
21 first page there are just a few new names under
22 members present.  Can you tell me who Felipe
23 Zavala is?
24      A.    He was the assistant warden of
25 operations.

CHAD CHRISTER                                          March 25, 2019

Page 46

1      Q.    And what about Felicia Waterman?
2      A.    She is the or at that time she was
3 the medical records staff assistant.
4      Q.    What were her dates of employment
5 with Wexford, or is she still there?
6      A.    She is still employed.  She is now a
7 mental health staff assistant.
8      Q.    Thank you.  And can we look at
9 Plaintiff's Exhibit 3 now.  Do you recognize this
10 document?
11     A.    Yes.
12     Q.    All right.  Can you tell me what it
13 is?
14     A.    QI meeting minutes for June 28, 2016
15 meeting.
16     Q.    And these meeting minutes were
17 prepared using the form you previously told us
18 about?
19     A.    Yes.
20     Q.    Can you turn to page 2.  Are there
21 any mentions of Mr. Dean on page 2?
22     A.    Yes, one listing for a cardiology
23 evaluation.
24     Q.    Do you remember if that -- if that
25 appointment was discussed during this meeting?

Page 47

1      A.    I do not recall if it was discussed.
2      Q.    Do you remember if Mr. Dean was
3 discussed at all at this meeting?
4      A.    I do not.
5      Q.    You do not recall?
6      A.    I do not recall.
7      Q.    Can we look at Plaintiff's Exhibit 4
8 now.  Do you recognize this document?
9      A.    Yes.
10     Q.    Can you tell me what it is?
11     A.    It's the QI meeting minutes for July
12 28, 2016, meeting.
13     Q.    And they were prepared using the form
14 you previously told us about?
15     A.    Yes.
16     Q.    Thank you.  Sorry.  I know this is a
17 little tedious.  Can you turn to page 3.  Are
18 there any mentions of Mr. Dean on page 3?
19     A.    Yes, there are three listings.  One
20 for a CT scan of the chest, abdomen, and pelvis,
21 one for a follow-up visit with Dr. Severino, and
22 one for a cardio-thoracic evaluation.
23     Q.    Do you know if any of those
24 appointments or procedures were discussed during
25 the meeting?

Page 48

1      A.    I do not recall if they were
2 discussed.
3      Q.    Do you recall if Mr. Dean was
4 discussed at all?
5      A.    I do not recall if he was discussed.
6      Q.    Do you recall if Mr. Dean's surgery
7 was discussed?
8      A.    I do not recall that either.
9      Q.    Can you turn to page 2.  Can you just
10 tell me a little bit more about the study for
11 August.
12     A.    Looking at are the orders signed off
13 by the doctor on-site the next working day or if
14 the orders were carried through.  So any time a
15 special- or any time an offender goes out to a
16 specialist, they'll bring back the
17 recommendations from that specialist.  Our
18 doctors review all of the orders and then write
19 out the orders that need to be done.
20     Q.    And can we look at Plaintiff's
21 Exhibit 5 now.  Do you recognize this document?
22     A.    Yes.
23     Q.    Can you tell me what it is?
24     A.    It's the quality improvement meeting
25 minutes for August 23, 2016.

Page 49

1      Q.    And were these prepared using the
2 form you previously told us about?
3      A.    Yes.
4      Q.    Looking on the first page at the
5 members present, can you tell me who Dr. Dana
6 Delong is?
7      A.    She is the regional mental health
8 physician.
9      Q.    What about Lynna Mitchell?
10     A.    She is the healthcare unit assistant
11 secretary.
12     Q.    And you are not listed as present at
13 this meeting.  Do you remember if you were
14 present or not?
15     A.    My name's not listed.  I probably was
16 not present.
17     Q.    Okay.  Can you look at page 3.  Are
18 there any mentions of Mr. Dean on page 3?
19     A.    Yes, there are two listings.  One for
20 cardiology evaluation and one for kidney removal.
21     Q.    Do you know if Mr. Dean's kidney
22 removal was discussed at all during this meeting
23 or at any other time amongst the committee
24 members?
25     A.    I do not recall as I was not present

CHAD CHRISTER                                    March 25, 2019

Page 50

1  for that meeting so I do not know.
2      Q.    Thank you.  Do you remember talking
3  to anyone about what happened at this meeting?
4      A.    No, I did not ask anybody about the
5  meeting.
6      Q.    Did you receive a copy of the minutes
7  at a later time?
8      A.    I received the meetings -- the
9  meeting minutes prior to the next meeting.
10     Q.    Okay.  Let's look at Plaintiff's
11 Exhibit 6.  Do you recognize this document?
12     A.    Yes.
13     Q.    Can you tell me what it is?
14     A.    The quality improvement meeting
15 minutes for September 27, 2016.
16     Q.    And were they prepared using the form
17 you previously told us about?
18     A.    Yes.
19     Q.    And looking on page 1 at the members
20 present, can you tell me who Jaclyn Thompson is?
21     A.    She is the mental health person.
22     Q.    Can you turn to page 2.  Are there
23 any mentions of Mr. Dean on page 2?
24     A.    Yes, one mention for a surgery
25 follow-up.

Page 51

1      Q.    What about on page 3?
2      A.    He also went for a second surgery
3  follow-up, an oncology eval, and he also went out
4  for an eye exam.
5      Q.    Do you remember if any of those
6  appointments were discussed during the meeting?
7      A.    No, I do not recall if they were
8  discussed.
9      Q.    Do you recall if Mr. Dean's surgery
10 was discussed?
11     A.    No, I do not recall if it was
12 discussed.
13     Q.    All right.  Can we move to
14 Plaintiff's Exhibit 7.  Do you recognize this
15 document?
16     A.    Yes.
17     Q.    Can you tell me what it is?
18     A.    It's the QI meeting minutes from
19 October 25, 2016.
20     Q.    And were they prepared using the form
21 you previously told us about?
22     A.    Yes.
23     Q.    Looking at page 1 there is no list of
24 members present.  Do you remember if you were at
25 this meeting?

Page 52

1      A.    I do not recall if I was present or
2  not.
3      Q.    Can you turn to page 2.  Are there
4  any mentions of Mr. Dean on page 2?
5      A.    Yes, two references to Mr. Dean, one
6  for a whole body bone scan and one for a CT scan.
7      Q.    What about under subsections A and B?
8      A.    Oh.  Yes.  One for an emergency room
9  visit for pulmonary embolus.
10     Q.    And on page 3 are there any mentions
11 of Mr. Dean?
12     A.    Yes, one for an oncology follow-up.
13     Q.    And what about on page 4?
14     A.    That would have been for a referral
15 for oncology follow-up.
16     Q.    Do you remember if any of these
17 appointments or procedures were discussed?
18     A.    No, I do not recall if anything was
19 discussed.
20     Q.    Do you recall learning anything about
21 these appointments or procedures at any other
22 point?
23     A.    Can you clarify?
24     Q.    Yeah.  Would there have been any
25 other discussion about these procedures or

Page 53

1  appointments outside of the meetings?
2      A.    No, there wouldn't.
3      Q.    Did you have any outside knowledge of
4  these appointments or procedures?
5      A.    What do you mean by outside
6  knowledge?
7      Q.    Just knowledge that you would have --
8  information that you would have learned not
9  during the meetings that you would have known
10 from somewhere else?
11     A.    I probably would have made the
12 appointments.  So I probably knew about it that
13 way.
14     Q.    Okay.  Do you know if Mr. Dean's
15 cancer medications would have been discussed at
16 this meeting?
17     A.    No, we would not have discussed that
18 here.
19     Q.    Sorry.  Can you clarify?
20     A.    That would have been discussed in a
21 collegial situation, not in the QI meeting.
22     Q.    Okay.  Thank you.  And can we look at
23 Plaintiff's Exhibit 8.  Do you recognize this
24 document?
25     A.    Yes.

CHAD CHRISTER                                    March 25, 2019

Page 54

1    Q.   Can you tell me what it is?
2    A.   It's the QI meeting minutes for
3 November 22, 2016.
4    Q.   And they were prepared using the same
5 form you previously told us about?
6    A.   Yes.
7    Q.   Looking at page 1 there are a few new
8 names under members present.  Can you tell me who
9 Shaw Cates is?
10   A.   Should have been Shawn Cates.  She
11 was the regional director.
12   Q.   What about Major Clarke?
13   A.   He was the acting AW of programs.
14   Q.   What about William Reich?
15   A.   He was our dentist.
16   Q.   And Dr. Matticks?
17   A.   He's the regional medical director.
18   Q.   And can you turn to page 2.  Are
19 there any mentions of Mr. Dean on page 2?
20   A.   One listing for a liver biopsy.
21   Q.   Do you remember making the
22 appointment for his liver biopsy?
23   A.   I don't specifically remember what
24 date I made that on, but yes, I do remember
25 making the appointment.

Page 55

1    Q.   Who did you make the appointment
2 with?
3    A.   I'm just looking at my calendar.
4    Q.   Yeah, take your time.
5    A.   It would have been with Decatur
6 Memorial Hospital.
7    Q.   In looking at page 3 of Plaintiff's
8 Exhibit 8 are there any mentions of Mr. Dean on
9 that page?
10   A.   Yes, one for outside consultation for
11 oncology follow-up.
12   Q.   And do you remember if either the
13 biopsy or the consultation were discussed at the
14 meeting?
15   A.   No, I do not recall if they were
16 discussed at the meeting.
17   Q.   Do you recall if they were discussed
18 at any other point in time?
19   A.   I do not recall any other time.  The
20 only time we would have talked would have been in
21 the collegial process.
22   Q.   Do you remember anything that was
23 said about the biopsy during the collegial
24 process?
25   A.   I do not recall.  I'd have to look at

Page 56

1 the documentation of the chart.
2    Q.   In looking at page 13, which is the
3 last page, it says the next quality improvement
4 meeting would be held on December 27.  Do you
5 know if that meeting was actually held?
6    A.   I do not believe it was because of
7 the holidays.
8    Q.   Okay.  Thank you.  And can we look at
9 Plaintiff's Exhibit 9.  Do you recognize this
10 document?
11   A.   Yes.
12   Q.   Can you tell me what it is?
13   A.   The QI meeting minutes for January
14 24, 2017.
15   Q.   And were the minutes prepared using
16 the same form you previously told us about?
17   A.   Yes.
18   Q.   And looking at page 3, are there any
19 mentions of Mr. Dean?
20   A.   Two mentions of Mr. Dean for
21 follow-up oncology.
22   Q.   Do you remember if those follow-up
23 appointments were discussed at the meeting?
24   A.   No, I do not recall if the follow-ups
25 were discussed.

Page 57

1    Q.   Would they have been discussed in the
2 collegial process as well?
3    A.   Yes.
4    Q.   Do you remember what was said about
5 them?
6    A.   I'd have to refer to the
7 documentation in the chart.
8    Q.   So just anything that was said would
9 be reflected in the medical records?
10   A.   Yes.
11   Q.   Do you know if Mr. Dean's specific
12 cancer medications were discussed, either
13 Votrient or Opdivo?
14   A.   I would have to see -- look at the
15 chart to see what was discussed at that
16 particular time.
17   Q.   Thank you.  Let's move to Plaintiff's
18 Exhibit 10.  Do you recognize this document?
19   A.   Yes.
20   Q.   Can you tell me what it is?
21   A.   QI meeting minutes for February 28,
22 2017.
23   Q.   And would the minutes have been
24 prepared using the same form you previously told
25 us about?

CHAD CHRISTER                                    March 25, 2019

Page 58

1    A.    Yes.
2         Q.    And can you turn to page 3 and tell
3    me if there was any mention of Mr. Dean?
4         A.    One mention of Mr. Dean for an
5    oncology follow-up.
6         Q.    Do you recall if that appointment was
7    discussed during the meeting?
8         A.    No, I do not recall if it was
9    discussed.
10        Q.    I guess in general would any of the
11   outside consultations, referrals, or procedures
12   that took place during the month be discussed at
13   the meeting?
14        A.    Typically they're just listed as a
15   reference of who went out for the month.  We
16   typically do not talk about individual cases
17   during the QI process.
18        Q.    Looking at Plaintiff's Exhibit 11
19   now, do you recognize this document?
20        A.    Yes.
21        Q.    Can you tell me what it is?
22        A.    It's the QI meeting minutes from
23   March 28, 2017.
24        Q.    And they were prepared using the same
25   form you previously told us about?

Page 59

1    A.    Yes.
2         Q.    Can you turn to page 2.  Looking at
3    subsection D it looks like there was a study on
4    specialty referral.  Was this the same study that
5    was referred to before that we talked about?
6         A.    Yes.
7         Q.    Can you, I guess, explain what's
8    reported here?
9         A.    The study covers all offenders that
10   went out for a specialty appointment off-site,
11   and once they come back from that visit, the
12   doctor needs to write the orders within one day
13   after return, and we had 34 offenders that went
14   out, 30 charts were reviewed, 28 had orders
15   written within the five days, one did not have
16   orders for lab work until a few days before the
17   visit, one did not have an order for eye drops
18   that were increased, and then there were four
19   that were actually paroles, we didn't get to
20   review the charts.
21        Q.    Okay.  Do you know why this study was
22   done?
23        A.    It's part of an ongoing process.
24   Each month a different study is done, and
25   specialty referrals is one of the ones we have to

Page 60

1    review throughout the year.
2         Q.    What was your role in this study?
3         A.    To review the charts.
4         Q.    Did anyone help with you that?
5         A.    No.
6         Q.    Did you take any notes or keep any
7    other records from this study?
8         A.    No.
9         Q.    And why were you repeating it?
10        A.    We repeated it -- I do believe 2016
11   there was a similar study done, and we were not a
12   hundred percent compliant.  So it gets repeated.
13        Q.    Okay.  And turning to page 4 do you
14   see any mentions of Mr. Dean?
15        A.    One mention of Mr. Dean for his CT
16   scan, chest, abdomen, and pelvis.
17        Q.    And do you recall if that was
18   discussed at all during the meeting?
19        A.    I do not recall if it was discussed.
20        Q.    Let's look at Plaintiff's Exhibit 12.
21   Do you recognize this document?
22        A.    Yes.
23        Q.    Can you tell me what it is?
24        A.    It's the QI meeting minutes for April
25   25, 2017.

Page 61

1         Q.    And the minutes were prepared using
2    the same form you previously told us about?
3         A.    Yes.
4         Q.    Looking at page 2 back at the
5    specially referral study, is there anything
6    different for this month from the last month?
7         A.    Just the sample size, and the
8    previous study we were 93 percent compliant, this
9    one we were 90 percent compliant.
10        Q.    Do you make any recommendations based
11   on these findings?
12        A.    Usually for these we will tweak the
13   process of how referrals are seen once they come
14   back from the visit.
15        Q.    Who, I guess, decides what tweaks are
16   made?
17        A.    The director of nursing and the
18   healthcare unit administrator.
19        Q.    Okay.  And can you turn to pages 4
20   and 5 and tell me if you see any mentions of
21   Mr. Dean.
22        A.    Page 4 one listing for oncology
23   follow-up, and on page 5 oncology follow-up and
24   chemo.
25        Q.    And do you recall if Mr. Dean's

CHAD CHRISTER                                          March 25, 2019

Page 62

1  cancer or chemotherapy were discussed at this
2  meeting?
3      A.    No, I do not recall if they were
4  discussed at this meeting.
5      Q.    And can you turn to page 13 -- or
6  sorry, I mean page 14.  Sorry.  Under Offender
7  Satisfaction, do you see any mention of Mr. Dean?
8      A.    Yes.
9      Q.    Can you explain what that entry
10 means?
11     A.    Mr. Dean had filed a grievance about
12 the medical treatment and his outside treatment
13 that he was getting, and the healthcare unit
14 administrator found that there was no merit to
15 the grievance.
16     Q.    Do you recall if that was discussed
17 at the meeting?
18     A.    That would have been discussed, but I
19 do not recall the specifics.
20     Q.    Thank you.  Do you remember any other
21 discussion of Mr. Dean at this time?
22     A.    No, I do not.
23     Q.    Was Mr. Dean's lawsuit discussed in
24 this meeting?
25     A.    No.

Page 63

1      Q.    Okay.  And can we look at Plaintiff's
2  Exhibit 13.  Do you recognize this document?
3      A.    Yes.
4      Q.    Can you tell me what it is?
5      A.    It's the QI meeting minutes for May
6  23, 2017.
7      Q.    And were the minutes prepared using
8  the same form you previously told us about?
9      A.    Yes.
10     Q.    I'm looking at page 2 section D.  Can
11 you tell me about the results of the specialty
12 referral study from this month?
13     A.    The sample size was different.  There
14 were 32 reviewed, and we were 94 percent
15 compliant.
16     Q.    In looking at pages 4 and 5, do you
17 see any mentions of Mr. Dean?
18     A.    On page 4 oncology follow-up and
19 chemo, and page 5 oncology follow-up and chemo.
20     Q.    And do you remember if those
21 appointments would have been discussed at the
22 meetings?
23     A.    No, I do not recall if they were
24 discussed.
25     Q.    Do you remember if Mr. Dean's lawsuit

Page 64

1  was discussed at this meeting?
2      A.    I do not recall if it was discussed.
3      Q.    And looking back at page 1 again can
4  you tell me who Bree-Hager is?
5      A.    She is the social worker that works
6  in Clinic Services.
7      Q.    Okay.  I guess do you remember
8  discussing Mr. Dean's medical condition with
9  anyone since you started at Wexford?
10     A.    Not outside of the collegial process
11 or with Dr. Nawoor.
12           MS. HOLT:  Okay.  Thank you.  That's
13 all the questions I have.
14           MR. RUPCICH:  I have a couple for
15 clarification.
16           EXAMINATION
17 BY MR. RUPCICH:
18     Q.    Mr. Christer, when we looked at these
19 QI, I think we agreed they contain data on
20 send-outs?
21     A.    Yes.
22     Q.    And is that data that you said you
23 would compile and bring to a meeting?
24     A.    Yes.
25     Q.    So if we were -- like let's take, for

Page 65

1  example, the last exhibit, which is Plaintiff's
2  13, which is May 23, 2017, meeting, would the
3  data be from April 2017?
4      A.    Yes, the data would be from the month
5  prior to the meeting.
6      Q.    All right.  So when we see Mr. Dean's
7  name in the C QI as having a liver biopsy, it
8  would have been in the preceding month where it
9  was --
10     A.    Yes.
11     Q.    What do you remember about generally
12 the process between when Mr. Dean was recommended
13 for surgery and when he had the surgery, from
14 your perspective in the medical records?
15     A.    As far as?
16     Q.    Scheduling.
17     A.    The scheduling was done in a timely
18 manner.
19     Q.    It was originally, I guess, Dr.
20 Severino who scheduled it for May 11, 2016.  Do
21 you remember that?
22     A.    Yes.
23     Q.    Do you remember what happened after
24 that that caused the surgery to not happen until
25 July of 2017 -- '16?

CHAD CHRISTER                                          March 25, 2019

Page 66

1    A.    Dr. Severino wanted to have a cardiac
2  workup and wanted to have other specialists look
3  at the case due to the complexity of it.
4    Q.    And to be clear, neither you in
5  medical records, Dr. Nawoor, Wexford, postponed
6  that surgery?
7    A.    No, we did not.
8          MR. RUPCICH:  Counsel, you had asked
9  about the cardiac workup, and I'm going to ask
10 him about page 1100 and page 1364 in the medical
11 records.  Do you have those, or do you want to
12 take a minute to find them?
13         MS. HOLT:  Yeah, I would take a
14 minute to find them.  You said page 1100?
15         MR. RUPCICH:  Sure.  1100 and 1364.
16 We can just go off the record for a minute if
17 anyone needs a break if that's all right.
18         MS. HOLT:  That sounds good.
19         (Whereupon a break was taken.)
20 BY MR. RUPCICH:
21   Q.    Okay.  Mr. Christer, I'm going to ask
22 you to look at Mr. Dean's medical records page
23 1100 -- and we can provide these to the court
24 reporter.  What are we -- Exhibit 15, I guess
25 we're at.  Yeah.  Take a look at page 1100, if

Page 67

1  you would, and tell me if you recognize that
2  document?
3    A.    I do.
4    Q.    What is it?
5    A.    It is the authorization number for
6  the cardiology evaluation.
7    Q.    Is this one of the documents
8  generated and sent to you as medical records
9  director to schedule an appointment?
10   A.    Yes.
11   Q.    Does it include a reason for why the
12 cardiology eval was being scheduled or --
13   A.    Yes, it does.
14   Q.    What does it say?
15   A.    It says, Site called and reported
16 that Urology is requesting cardiac clearance due
17 to patient's extensive cardiac history."  It's
18 approved by Dr. Garcia in collegial with Dr.
19 Nawoor.
20   Q.    Is this the collegial document that
21 relates to what you were talking about previously
22 about the cardiology consult being requested by
23 urology?
24   A.    Yes.
25   Q.    I'd like you to look at Exhibit --

Page 68

1  we'll call it 16, which is page 1364 of
2  Mr. Dean's medical records.  Do you see a
3  progress note for May 4, 2016?
4    A.    Yes.
5    Q.    Whose note is it?
6    A.    It's my note.
7    Q.    What does it say?
8    A.    Says that the medical records note:
9  Medical furlough is scheduled on 5/6/16 at 1:30
10 p.m. at Prairie Heart Institute for a cardiology
11 eval.
12   Q.    Is this -- go ahead.
13   A.    No.
14   Q.    Is this your note of scheduling the
15 cardiology consult?
16   A.    Yes, signed by myself.
17   Q.    Does it relate back to the Exhibit 15
18 that I just showed you?
19   A.    Yes, it does.
20   Q.    You were asked at the beginning about
21 policy for the maintenance of medical records.
22 Do you know if that's IDOC's policies that govern
23 the medical records in the prison or Wexford's?
24   A.    IDOC.
25   Q.    You were asked previously about

Page 69

1  Wexford policies on medical records, but if I'm
2  understanding, they would be IDOC's policies?
3    A.    Yes.
4          MR. RUPCICH:  No other questions.
5          MR. TYRRELL:  I have no questions.
6              FURTHER EXAMINATION
7  BY MS. HOLT:
8    Q.    I just have one final follow-up.  You
9  mentioned before that you contacted Dr.
10 Severino's office more than once.  Can you
11 explain why you had to make multiple contacts?
12   A.    Just from the fact that I was not
13 getting the response back so I just wanted to
14 follow up to make sure that I was still in the
15 loop of care for Mr. Dean.
16         MS. HOLT:  Okay.  No further
17 questions.
18         MR. RUPCICH:  Sir, you have the
19 option -- did you have anything else?
20         MR. TYRRELL:  I have nothing else.
21         MR. RUPCICH:  I have nothing else.
22 You have the option to review your testimony to
23 make sure your testimony was taken down
24 correctly.  I think it was really clean.  As far
25 as I'm concerned you would be okay waiving that,

Page 70

1  and --
2            THE WITNESS:  Okay.
3            MR. RUPCICH:  -- not reviewing it for
4  accuracy if you're okay with that.
5            THE WITNESS:  That's fine.
6            MR. RUPCICH:  Okay.  He'll waive.
7            THE COURT REPORTER:  Ms. Holt, are
8  you going to order the transcript?
9            MS. HOLT:  Yes.
10            THE COURT REPORTER:  Do you want
11  electronic?
12            MS. HOLT:  E-tran.  It's
13  Cholt@jenner.com.
14            THE COURT REPORTER:  Thank you.
15            (The deposition was concluded at 2:48
16  p.m., and the signature of the deponent was
17  waived.)
18
19
20
21
22
23
24
25

Page 71

1            CERTIFICATION
2
3            I, Rhonda Rhodes Bentley, CSR, a
   Certified Shorthand Reporter (IL), do hereby
4  certify that CHAD CHRISTER came before me on
   MARCH 25, 2019, and swore before me to testify to
5  the truth, the whole truth and nothing but the
   truth regarding his knowledge touching upon the
6  matter in controversy.
7            I do further certify that I did take
   stenographic notes of the questions propounded to
8  said witness and his answers thereto and that
   said notes were reduced to typewritten form under
9  my direction and supervision.
10            I do further certify that the
   attached and foregoing is a true, correct and
11  complete copy of my notes and that said testimony
   is now herewith returned.  I do further certify
12  that said deposition was taken at the Taylorville
   Correctional Facility, 1144 Illinois Route 29,
13  Taylorville, Illinois.
14            I do further certify that I am not
   related in any way to any of the parties involved
15  in this action and have no interest in the
   outcome thereof.  Dated at Divernon, Illinois,
16  MARCH 29, 2019.
17
18
19            Rhonda Rhodes Bentley
                _____
20            Rhonda Rhodes Bentley, CSR
                CSR# 084-002706
21
22
23
24
25

CHAD CHRISTER

**$**

**$5** 31:20

**1**

**1** 22:14 23:19 43:16 50:19 51:23 54:7 64:3

**1.4** 30:21

**10** 31:14 57:18

**11** 8:13 58:18 65:20

**1100** 66:10,14,15, 23,25

**12** 60:20

**13** 32:4 56:2 62:5 63:2 65:2

**1364** 66:10,15 68:1

**14** 32:15 38:25 62:6

**15** 66:24 68:17

**16** 36:2 65:25 68:1

**1:09** 5:1

**1:30** 68:9

**2**

**2** 25:1 43:20 44:14, 25 46:20,21 48:9 50:22,23 52:3,4 54:18,19 59:2 61:4 63:10

**2016** 8:3,13 36:12 39:20 44:21 46:14 47:12 48:25 50:15 51:19 54:3 60:10 65:20 68:3

**2017** 56:14 57:22 58:23 60:25 63:6 65:2,3,25

**22** 39:20 54:3

**23** 48:25 63:6 65:2

**24** 24:16 44:19 56:14

**25** 51:19 60:25

**27** 50:15 56:4

**28** 46:14 47:12 57:21 58:23 59:14

**2:48** 70:15

**3**

**3** 46:9 47:17,18 49:17,18 51:1 52:10 55:7 56:18 58:2

**30** 59:14

**32** 63:14

**34** 59:13

**4**

**4** 47:7 52:13 60:13 61:19,22 63:16,18 68:3

**5**

**5** 26:1 48:21 61:20, 23 63:16,19

**5/11/16** 38:1 40:8, 12

**5/17/16** 38:1

**5/23/16** 38:1

**5/6/16** 68:9

**6**

**6** 26:16 50:11

**7**

**7** 29:3 51:14

**8**

**8** 53:23 55:8

**9**

**9** 31:6 56:9

**90** 61:9

**93** 61:8

**94** 63:14

**A**

**abdomen** 47:20 60:16

**absent** 24:2

**access** 36:18

**accidents** 10:5

**accommodate** 7:12 18:10

**Accu-chek** 28:22

**accuracy** 70:4

**accurate** 8:20 11:18

**accurately** 7:20

**acronym** 27:5

**acting** 54:13

**Action** 39:23

**actions** 23:14 39:21 44:8,9

**Activities** 29:5, 22

**acts** 11:1

**actual** 11:15

**ADA** 33:16,18

**address** 33:23

**addresses** 6:1

**adequate** 30:16

**administrator** 20:4 21:8 22:22 23:25 27:10 28:10 30:10 33:10 42:17 61:18 62:14

**admitted** 25:10

**agency** 25:22,23 30:3

**agenda** 20:7,8

**Aggregate** 30:25 31:1

**agreed** 64:19

**ahead** 5:6 68:12

**AHIMA** 10:23 11:10

**alternative** 20:22

**Alton** 23:23

**Angus** 23:23

**annual** 28:1

**annually** 28:3

**appointment** 12:5 15:13,15,18 16:6,9,21,23 17:9, 17,19,20 18:3,6,13, 20,23 19:3 20:21 36:11,16 37:18 41:19 42:19,25 43:5 46:25 54:22,25 55:1 58:6 59:10 67:9

**appointments** 8:18,25 9:3,16 14:14,16,20 16:4,16 17:5 20:10,21 25:13 35:10,19 39:15 42:3,7,9,13 43:7 47:24 51:6 52:17,21 53:1,4,12 56:23

63:21

**approval** 14:25 15:5 37:9 41:9

**approvals** 9:16 35:9

**approved** 40:9 67:18

**approximate** 40:24

**approximately** 35:25 37:2,19

**April** 8:13 36:1 39:20 60:24 65:3

**aspects** 19:13 24:25

**Assessment** 12:23

**assigned** 29:25

**assistant** 20:3 22:23 24:6,7 33:17 45:24 46:3,7 49:10

**Associate's** 10:14

**assume** 7:7

**attend** 9:18 10:9

**attended** 21:16, 19

**attending** 9:4 22:1

**attorneys** 5:4

**audibly** 6:24

**audit** 29:10,23

**audits** 29:24

**August** 48:11,25

**authorization** 15:12,15 39:3,14 67:5

**autoclave** 28:21

**avoid** 6:2

**AW** 54:13

CHAD CHRISTER

March 25, 2019
Index: aware..court

**aware** 19:17

**B**

**back** 8:8 11:12,25 12:3,5 13:7,11 15:25 26:11 43:15 45:20 48:16 59:11 61:4,14 64:3 68:17 69:13

**background** 5:7

**bacteria** 27:4

**based** 23:14 39:21 44:8,10 61:10

**basically** 10:4, 24 19:11 29:18 31:17

**basis** 9:6 14:21 41:18

**begin** 7:2

**beginning** 26:2 68:20

**biannually** 28:3

**biopsy** 54:20,22 55:13,23 65:7

**birth** 5:21

**bit** 26:3 27:9 31:8 48:10

**blood** 28:22

**body** 52:6

**bone** 52:6

**book** 28:17

**bottom** 29:3

**break** 7:11,14 34:23 66:17,19

**Bree-hager** 64:4

**bring** 34:6 48:16 64:23

**broad** 17:11

38:18

**brought** 11:25

**busy** 38:6

**C**

**calendar** 8:2 16:2 37:23 55:3

**call** 15:2 19:1 20:13,14 29:9 32:24 41:6,8 68:1

**called** 67:15

**calls** 38:7

**cancel** 19:2

**canceled** 18:24

**cancer** 53:15 57:12 62:1

**captured** 27:12

**cardiac** 41:3,9 66:1,9 67:16,17

**cardio-thoracic** 47:22

**cardiology** 46:22 49:20 67:6, 12,22 68:10,15

**care** 19:14 25:2,5, 7 31:19,24 35:4,12, 21 69:15

**carried** 48:14

**case** 5:24 41:17 66:3

**cases** 58:16

**Cates** 24:5 34:5 54:9,10

**caused** 65:24

**Center** 6:8 40:8

**certifications** 10:18

**CEUS** 11:10

**Chad** 5:12,19

**change** 24:22 29:14

**changed** 13:20 40:20

**charge** 21:3 43:6

**charged** 31:20

**chart** 11:19 12:2 36:8,9 56:1 57:7,15

**charts** 11:23 12:1 59:14,20 60:3

**check** 28:25

**chemo** 61:24 63:19

**chemotherapy** 62:1

**chest** 47:20 60:16

**children** 10:5

**Children's** 9:25

**Chloe** 5:3

**Cholt@jenner.com.** 70:13

**Christer** 5:2,12, 19 34:21 64:18 66:21

**Cindy** 23:21 34:7

**clarification** 64:15

**clarify** 52:23 53:19

**Clarke** 54:12

**classes** 11:3

**classified** 26:14

**clean** 69:24

**clear** 6:21,23 66:4

**clearance** 41:3, 10 67:16

**clerk** 13:15 14:2

**clinic** 8:1 31:4,5 40:9 64:6

**clinics** 31:2,3

**close** 29:3

**closer** 10:8

**college** 10:9,12

**collegial** 9:8,11, 13,18 15:7 35:9,19, 23 36:4 37:9 40:10 41:12 53:21 55:21, 23 57:2 64:10 67:18,20

**commanders** 17:2

**comments** 39:25

**committee** 19:6, 10,16,18,25 20:25 22:10,12,17 34:10, 14,19 49:23

**communicated** 41:18

**communications** 30:2

**Community** 10:12

**comparison** 32:22

**compile** 64:23

**completed** 11:25

**complexity** 66:3

**compliance** 12:11,13 14:5

**compliant** 12:17 13:5 60:12 61:8,9 63:15

**concern** 42:23

**concerned** 69:25

**concluded** 70:15

**condition** 35:7 64:8

**conference** 19:23

**consist** 9:10

**consult** 67:22 68:15

**consultation** 55:10,13

**consultations** 25:12 43:22 45:5 58:11

**contact** 15:17 18:17 37:14,15 39:23

**contacted** 37:10 38:3 40:18 41:1 69:9

**contacts** 15:21, 23 38:8 69:11

**context** 43:4

**continue** 26:17

**contract** 30:7,8, 10

**control** 26:18 28:14

**conversations** 8:4 37:17 41:21,23

**coordinator** 21:5 33:18 43:10

**copy** 50:6

**correct** 8:10

**Correctional** 6:8

**correctly** 69:24

**cost** 20:15

**counsel** 7:11 8:1, 5 66:8

**couple** 17:21 64:14

**court** 5:9 6:18 66:23 70:7,10,14

**cover** 32:8,13

**covered** 9:21
29:13 32:6

**covers** 59:9

**credential** 10:22

**credentials**
33:9

**Critical** 26:2

**CT** 45:5 47:20 52:6
60:15

**current** 11:8,9,11

**cystoscopy**
45:6

**D**

**daily** 14:21 29:1
42:10

**Dana** 49:5

**data** 30:25 31:1
64:19,22 65:3,4

**databases** 10:6

**date** 5:20 12:19
15:4 16:24 40:13,
16,19,20,21 41:1
54:24

**dates** 37:24 46:4

**day** 12:6 48:13
59:12

**day-to-day**
11:16

**days** 59:15,16

**Dean** 5:5 35:1,14,
24 36:21 39:4 41:3,
14 42:1 43:2,21
44:9 45:1,2,14
46:21 47:2,18 48:3
49:18 50:23 52:4,5,
11 54:19 55:8
56:19,20 58:3,4
60:14,15 61:21
62:7,11,21 63:17
65:12 69:15

**Dean's** 35:3,6,21
36:11,19 38:16,21
42:19 44:5 48:6
49:21 51:9 53:14
57:11 61:25 62:23
63:25 64:8 65:6
66:22 68:2

**deaths** 26:7

**Decatur** 55:5

**December** 56:4

**decides** 61:15

**defendants**
41:15

**defines** 18:20

**degree** 10:13,14
11:5

**delay** 7:3

**delayed** 26:8,12,
14

**delays** 42:24

**Delong** 49:6

**denials** 25:21

**Denman's** 28:24

**dental** 20:13
28:20 32:17,24

**dentist** 30:21
32:18 54:15

**department**
13:14 14:1 21:17
26:21,23 39:7

**deponent** 70:16

**deposed** 6:11,14

**deposition** 6:21
7:23 8:6 70:15

**describe** 14:23
19:8 37:7

**developer** 28:19

**developments**
11:8

**diagnoses** 26:8,
20

**diagnosis**
26:12,14

**difficulty** 16:15

**direction** 28:24

**directly** 14:8

**director** 6:9 8:15
11:13 19:5 20:2
21:18 22:11 23:22
24:19 25:22,24 30:3
42:15 54:11,17
61:17 67:9

**discovered**
26:9

**discussed**
20:16 22:9 28:5
29:13 35:14,24
43:2,13 44:2,5,10
45:12,13,15,18
46:25 47:1,3,24
48:2,4,5,7 49:22
51:6,8,10,12 52:17,
19 53:15,17,20
55:13,16,17 56:23,
25 57:1,12,15 58:7,
9,12 60:18,19 62:1,
4,16,18,23 63:21,24
64:1,2

**discussing**
41:14 64:8

**discussion**
31:22 32:2 52:25
62:21

**discussions**
36:4

**distribute** 23:3

**distributed** 23:2

**doctor** 13:9 16:11
17:16,19,21,23
18:2,24 20:2,13
31:20 32:23 33:6
48:13 59:12

**doctor's** 11:24
19:1

**doctors** 9:1
17:18 48:18

**document**
22:15,19,22,25
23:2,6,12,15,18
38:25 39:5,11,16,
19,22 43:17 44:15
46:10 47:8 48:21
50:11 51:15 53:24
56:10 57:18 58:19
60:21 63:2 67:2,20

**documentation**
9:13 30:3 36:6,7,25
56:1 57:7

**documented**
12:19

**documents**
7:22 8:1,19 11:25
67:7

**Don** 24:4

**draws** 27:23

**drills** 27:11,12,14

**drops** 59:17

**due** 66:3 67:16

**duly** 5:13

**duties** 8:16,17,21,
24 9:4,7,10 10:3,25
19:4

**duty** 9:2

**E**

**E-TRAN** 70:12

**earned** 10:17

**edit** 22:24

**edited** 39:8

**education** 11:4

**effect** 6:17

**electronic** 12:8
70:11

**email** 15:11 38:11

**embolus** 52:9

**emergency**

25:6,7,9 27:11 52:8

**employed** 6:5,7
8:10 9:23 46:6

**employee** 14:4
22:7

**employees**
13:24 27:20

**employment**
46:4

**encounter** 16:17

**end** 40:4

**ensure** 6:23
12:16

**entry** 62:9

**equipment**
28:2,23

**errors** 32:9

**eval** 51:3 67:12
68:11

**evaluation** 44:1
46:23 47:22 49:20
67:6

**events** 40:24

**exam** 51:4

**examination**
5:15 11:24 64:16
69:6

**examples** 17:24

**excuse** 28:3

**exhibit** 22:14
38:25 43:16 44:14
46:9 47:7 48:21
50:11 51:14 53:23
55:8 56:9 57:18
58:18 60:20 63:2
65:1 66:24 67:25
68:17

**exist** 20:25

**expedite** 18:18

**expire** 33:12

**explain** 10:21
12:21 18:7 23:19

CHAD CHRISTER

March 25, 2019
Index: express..January

24:9 25:3 33:14,20
59:7 62:9 69:11

**express** 42:23

**extensive** 67:17

**extent** 9:19

**external** 29:23

**eye** 33:6 51:4
59:17

**F**

**fact** 43:7 69:12

**family** 6:1 10:8

**faxed** 25:21

**February** 57:21

**Felicia** 46:1

**Felipe** 45:22

**field** 11:8

**filed** 62:11

**final** 69:8

**find** 17:23 66:12,
14

**findings** 29:23,
25 61:11

**fine** 6:4 34:24 70:5

**finish** 7:1

**follow** 7:17 10:25
29:9 69:14

**follow-up** 47:21
50:25 51:3 52:12,15
55:11 56:21,22 58:5
61:23 63:18,19 69:8

**follow-ups**
56:24

**form** 34:9 44:22
46:17 47:13 49:2
50:16 51:20 54:5
56:16 57:24 58:25
61:2 63:8

**format** 12:20,21

34:14

**found** 62:14

**foundation** 22:3
30:13

**fourth** 40:4

**frequently** 14:15
27:13 42:8

**fulfill** 30:16

**furlough** 68:9

**future** 17:17

**G**

**Galvin** 23:22
41:16 42:11

**Garcia** 67:18

**general** 28:12
31:4 36:9 58:10

**generally** 34:17
65:11

**generated** 11:17
67:8

**give** 39:14

**giving** 40:2

**glucose** 28:22

**good** 66:18

**govern** 68:22

**grievance** 31:17
62:11,15

**grievances**
31:24

**Grimes** 24:5

**ground** 6:15

**guess** 8:24 13:13
15:9 20:6 24:10
25:11 26:11 29:2
30:11 32:11 34:8,16
37:2 40:24 58:10
59:7 61:15 64:7
65:19 66:24

**H**

**hall** 14:14

**hand** 23:3 40:22

**handles** 13:13

**hands** 15:10

**happen** 20:11
27:14 32:9 65:24

**happened** 17:25
45:10 50:3 65:23

**happy** 31:18

**He'll** 70:6

**head** 6:24,25 18:1
27:15 36:23,24

**health** 6:8 10:16,
20 23:23 24:4
26:21,25 27:21 30:1
31:7,9,11,12 34:6
46:7 49:7 50:21

**healthcare** 20:3
21:6,8 22:21 23:25
27:10 28:10 30:9
33:10 42:12,16
49:10 61:18 62:13

**hear** 15:25 35:11

**Heart** 68:10

**Heath** 26:23

**held** 56:4,5

**helpful** 27:6

**Hep** 31:3

**high** 11:3

**HIPAA** 11:1

**hires** 13:25

**history** 67:17

**Hobrock** 23:21
34:7

**hold** 5:22

**holder** 33:22

**holding** 33:22

**holidays** 56:7

**Holt** 5:2,3,11,16
6:3 12:14 14:18
17:12 22:4 30:18
37:1 38:19 64:12
66:13,18 69:7,16
70:7,9,12

**hospital** 9:25
25:10 55:6

**hours** 24:16

**housing** 28:11,
12

**huge** 7:4

**hundred** 60:12

**I**

**ID** 39:14

**idea** 27:7

**IDOC** 68:24

**IDOC's** 25:14
68:22 69:2

**IDPH** 26:19,22

**II** 25:2

**III** 26:2

**Illinois** 10:6 26:23

**important** 6:20

**improve** 19:13
32:2

**improvement**
7:24 9:5 19:6,9,10
21:5 22:10,17 24:9
29:4,21 34:10,13,19
35:15 43:3,10,18
44:18 48:24 50:14
56:3

**Incidents** 26:3

**include** 32:11
67:11

**increased** 59:18

**individual** 58:16

**individuals**
25:15 33:11

**infection** 26:18

**information** 6:1
10:16,20,24 11:9
24:18 26:4 29:18
31:11,21 32:18
43:9,12 53:8

**initial** 36:11
40:13,16

**injuries** 27:22

**inmate** 31:23

**inmates** 8:25

**input** 9:11,12 10:5
14:3

**instances** 38:3

**Institute** 68:10

**interact** 14:7
42:15

**interaction** 14:9
42:5

**internal** 29:23

**interrupted**
43:24

**involve** 8:21,24
9:4,7 19:5

**involved** 9:15
13:16,23 35:18

**isolation** 26:10

**issue** 7:4

**issues** 28:12
29:11 33:21 34:5

**IV** 27:8

**IVP** 45:5

**J**

**Jaclyn** 50:20

**January** 56:13

**job** 8:14,16,17 9:2 10:1,7 30:22 36:14

**Jones** 24:7

**July** 47:11 65:25

**June** 46:14

**K**

**Kathy** 23:22 41:16 42:11

**keeping** 31:25

**Kent** 5:5 35:1

**kidney** 49:20,21

**kind** 26:4

**knew** 53:12

**knowledge** 13:22 53:3,6,7

**L**

**lab** 27:23 28:14,18 59:16

**lacking** 13:8

**lawsuit** 5:5 35:1 41:15 62:23 63:25

**learn** 36:20

**learned** 53:8

**learning** 52:20

**leave** 10:7

**left** 15:24

**licensed** 33:11

**licenses** 33:11

**limited** 14:10

**Lisa** 23:25 41:16

**list** 8:20 15:19 23:18 51:23

**listed** 37:24 44:4 45:13 49:12,15 58:14

**listing** 46:22 54:20 61:22

**listings** 45:2 47:19 49:19

**liver** 54:20,22 65:7

**log** 32:11

**logged** 38:7

**long** 8:20 21:22

**looked** 64:18

**loop** 25:24 69:15

**Louis** 9:25

**lower** 31:23

**Lynna** 49:9

**M**

**machines** 28:23

**made** 16:23 38:8 53:11 54:24 61:16

**maintaining** 8:22

**maintenance** 68:21

**major** 28:11 42:5 54:12

**make** 7:14 9:3 10:25 11:16,19 12:18 15:14,23 16:1,8 17:18 24:14 28:18 30:15 55:1 61:10 69:11,14,23

**making** 8:18 54:21,25

**management** 18:17 27:8 39:7

**manager** 24:6 34:4

**manner** 65:18

**March** 36:12 58:23

**marked** 18:15

**Matticks** 54:16

**meaning** 41:15

**means** 10:21 24:10 25:3 26:20 62:10

**medical** 6:9 8:15, 19,22 10:23 11:13, 15,21 12:10,16 13:2,13,15,20 14:1, 2,5,11 19:5,14 21:17,18 25:22,23 30:3 31:24 35:4,7, 21 40:8 46:3 54:17 57:9 62:12 64:8 65:14 66:5,10,22 67:8 68:2,8,9,21,23 69:1

**medication** 32:9

**medications** 9:16 24:16 53:15 57:12

**meet** 19:19,20

**meeting** 20:20 21:1,3 22:17 23:4,8, 10 29:14 31:10 34:9,10,14 43:18 44:6,11,18,19 45:12,15 46:14,15, 16,25 47:3,11,12,25 48:24 49:13,22 50:1,3,5,9,14 51:6, 18,25 53:16,21 54:2 55:14,16 56:4,5,13, 23 57:21 58:7,13,22 60:18,24 62:2,4,17, 24 63:5 64:1,23 65:2,5

**meetings** 9:5 19:21 20:6,16,19,25 21:10,16 22:10 23:10 34:19 35:15 43:3 50:8 53:1,9 63:22

**member** 19:5

**members** 6:1

20:1 23:19 24:2 45:22 49:5,24 50:19 51:24 54:8

**memo** 16:24 17:1

**Memorial** 40:8 55:6

**memory** 8:2

**mental** 23:23 24:4 31:7,9,10,12 46:7 49:7 50:21

**mention** 50:24 58:3,4 60:15 62:7

**mentioned** 69:9

**mentions** 43:21 45:1 46:21 47:18 49:18 50:23 52:4,10 54:19 55:8 56:19,20 60:14 61:20 63:17

**merit** 62:14

**message** 15:24

**Mincy** 23:25 41:16

**mind** 6:2

**minor** 28:12

**minute** 66:12,14, 16

**minutes** 7:25 21:1,4,14 22:17 23:7,10 34:9,11,14 43:11,13,14,19 44:19 46:14,16 47:11 48:25 50:6,9, 15 51:18 54:2 56:13,15 57:21,23 58:22 60:24 61:1 63:5,7

**Miscellaneous** 32:5

**Missouri** 10:6

**Mitchell** 49:9

**monitor** 30:10

**monitoring** 30:7,8,12

**monitors** 28:22

**month** 19:12 20:9,11,22,23 21:2 24:21,24 26:9 28:5, 16 29:14,15,18 31:2 32:10,19 33:6,24 37:5 38:5,6 45:9 58:12,15 59:24 61:6 63:12 65:4,8

**monthly** 8:2 9:6 19:20 32:22 33:16 37:22

**months** 17:21

**move** 42:18,22 51:13 57:17

**moved** 18:4

**moving** 25:1 26:1,16 27:7 31:6

**MRSA** 27:1,2,4

**multiple** 37:17 69:11

**N**

**name's** 49:15

**names** 45:21 54:8

**Nawoor** 17:22 22:11 23:24 40:10 41:15,18,21 42:6,9, 14,18,23 64:11 66:5 67:19

**needed** 15:13 18:24 19:2 24:13 25:5 27:21 30:16 36:20,21

**nephrectomy** 40:7

**Nichole** 24:3

**nods** 6:25

**note** 7:12 68:3,5,6, 8,14

**notes** 15:24 16:1 21:9,13 37:20 60:6

**notify** 16:22
**November** 54:3
**number** 25:13
29:17 31:23 32:25
37:21 39:15 67:5
**numbers** 15:12,
15 31:25 32:25
**nurse** 13:10 20:13
30:22 32:23
**nurses** 11:18
29:8,17
**nursing** 20:2
22:12 23:21,23
24:19 26:15 42:16
61:17

**O**

**oath** 6:16
**Object** 12:12
14:17 17:10 22:2
38:17
**Objection** 30:13
**Objective** 12:23
**obtain** 10:13
**obtaining** 9:15
**occasion** 14:9
**occurred** 26:7
**occurs** 16:6
**October** 51:19
**off-site** 25:2
59:10
**offender** 25:2
27:22 31:15 48:15
62:6
**offenders** 8:18
24:15 31:11,18
59:9,13
**office** 11:24 15:2,
10,20 17:2 19:1
26:25 30:1 37:12,
16,18 38:12 39:24

40:18 41:2 69:10
**OHS** 26:24
**on-site** 19:22
26:7 27:24 31:13
48:13
**oncology** 51:3
52:12,15 55:11
56:21 58:5 61:22,23
63:18,19
**ongoing** 32:2
59:23
**Opdivo** 57:13
**operations**
45:25
**option** 69:19,22
**optometry**
32:24
**order** 5:25 40:24
59:17 70:8
**ordered** 32:14
**orders** 48:12,14,
18,19 59:12,14,16
**organization**
10:23
**originally** 65:19
**outcome** 24:14
**overly** 17:11
38:18
**oversee** 8:17
**oversees** 10:23

**P**

**p.m.** 5:1 68:10
70:16
**pages** 61:19
63:16
**paper** 12:7,9
**paperwork**
11:17 12:2

**paroles** 59:19
**part** 13:7 25:14
26:19 31:3 59:23
**participated**
35:23
**participating**
9:8
**passes** 16:5,9
**patient** 12:5 15:3
16:10 32:12
**patient's** 18:3,23
67:17
**patients** 14:8,16,
20
**pelvis** 47:20
60:16
**pending** 7:13
**people** 38:6
**percent** 60:12
61:8,9 63:14
**perform** 10:25
**performance**
14:4
**performed**
28:24
**period** 21:25
**person** 18:18
41:23 42:12 50:21
**Personal** 6:1
**Personally** 35:2
**perspective**
65:14
**pertain** 13:1
**pharmacy** 20:5,
12 24:3,5,14 32:8
**phone** 38:9
**physician** 11:17
13:9 18:11,22 23:24
32:14 49:8
**place** 19:21 36:12
45:8 58:12

**plaintiff** 5:4
34:25
**Plaintiff's** 22:14
38:24 43:16 44:14
46:9 47:7 48:20
50:10 51:14 53:23
55:7 56:9 57:17
58:18 60:20 63:1
65:1
**Plan** 12:24
**plans** 20:23
**point** 7:10 40:20
52:22 55:18
**policies** 12:17
13:1,5,17,19 68:22
69:1,2
**policy** 68:21
**position** 6:6
11:12 21:20
**post** 11:3
**postponed** 66:5
**Prairie** 68:10
**preceding** 65:8
**prep** 20:20
**preparation**
7:23
**prepare** 20:18
**prepared** 46:17
47:13 49:1 50:16
51:20 54:4 56:15
57:24 58:24 61:1
63:7
**prepares** 22:22
39:5
**prescriptions**
32:12,13
**present** 23:19
45:22 49:5,12,14,
16,25 50:20 51:24
52:1 54:8
**previous** 21:18
61:8

**previously** 7:25
44:22 46:17 47:14
49:2 50:17 51:21
54:5 56:16 57:24
58:25 61:2 63:8
67:21 68:25
**primary** 9:2
**prior** 17:1 35:15
36:13 41:4 50:9
65:5
**prison** 5:24 9:1
68:23
**privacy** 11:1
**problems** 16:17,
18 33:23
**procedure**
18:13,21
**procedures**
7:17 12:17 13:1,6,
17,20 14:16,21 16:4
20:13,16 32:19
45:7,12 47:24
52:17,21,25 53:4
58:11
**process** 9:14,18
14:23 15:8 18:12
31:18 32:3 35:9
37:7,10 55:21,24
57:2 58:17 59:23
61:13 64:10 65:12
**processed**
31:21
**programs** 20:3
24:7 33:18 54:13
**progress** 68:3
**protective** 5:25
**protocol** 29:11
**protocols** 29:8,
17
**provide** 5:25
14:3 43:9 66:23
**provided** 31:2,
19

CHAD CHRISTER

March 25, 2019
Index: provider..sample

provider 18:6

providers 15:19, 22

providing 9:11

psychiatrist 31:13

psychiatry 32:24

Public 26:21,23

pulmonary 52:9

purpose 23:5 24:10 25:4 39:13

purposes 19:15

pursue 17:23

put 5:23 12:1,3 43:10

**Q**

QI 46:14 47:11 51:18 53:21 54:2 56:13 57:21 58:17, 22 60:24 63:5 64:19 65:7

quality 7:24 9:5 19:6,8,10 21:5 22:9, 16 24:9 28:14 29:4, 21 34:10,13,18 35:15 43:3,10,18 44:18 48:24 50:14 56:3

quarterly 27:17

question 7:2,8, 13 14:13 40:1

questions 5:6 6:22,24 7:5,16 64:13 69:4,5,17

**R**

radiological 28:1

reach 18:5,10

read 40:5

reading 23:15

reason 7:19 25:17 67:11

recall 36:3 41:13 42:21 47:1,5,6 48:1, 3,5,6,8 49:25 51:7, 9,11 52:1,18,20 55:15,17,19,25 56:24 58:6,8 60:17, 19 61:25 62:3,16,19 63:23 64:2

receive 39:18 50:6

received 24:15 41:8 50:8

receiving 40:25

recognize 22:18 44:14 46:9 47:8 48:21 50:11 51:14 53:23 56:9 57:18 58:19 60:21 63:2 67:1

recommendations 48:17 61:10

recommended 40:5,7,16 41:2 65:12

record 5:18,23 6:21 8:19 10:24 13:4 17:2 40:6 41:5, 11,12 66:16

recorded 26:5 38:4

records 6:9 8:15, 22 11:13,15,21 12:4,11,16 13:2,13, 15,20 14:1,2,5,11 19:5 20:24 21:17,18 23:9 36:15 46:3 57:9 60:7 65:14 66:5,11,22 67:8 68:2,8,21,23 69:1

refer 37:20 57:6

reference 28:6,7 58:15

references 52:5

referral 18:16,19 52:14 59:4 61:5 63:12

referrals 20:11 25:25 58:11 59:25 61:13

referred 59:5

refers 33:4,5

reflected 57:9

refreshed 8:2

refrigerator 28:25

regional 24:6 34:4 49:7 54:11,17

Registered 10:19

registrar 10:2

regular 18:16 41:18

Reich 54:14

relate 68:17

related 14:4 34:18 35:21

relates 67:21

relevant 5:24

remember 36:25 37:11 38:15,20 40:23 41:20 44:2 45:14,17,19 46:24 47:2 49:13 50:2 51:5,24 52:16 54:21,23,24 55:12, 22 56:22 57:4 62:20 63:20,25 64:7 65:11,21,23

remind 43:16

removal 49:20, 22

renewed 33:12

repeat 43:25

repeated 60:10, 12

repeating 60:9

rephrase 7:6 12:15 16:7

report 31:7 32:17 33:16,17

reportables 26:19

reported 26:20 59:8 67:15

reporter 5:9 66:24 70:7,10,14

reporting 43:7

represent 21:17

representative 20:4 23:22,24 31:9 34:7

representing 5:4

requested 14:10 67:22

requesting 67:16

required 15:1 28:16

requirement 30:17

requirements 28:15

respect 11:14 38:15,21 44:9

respiratory 11:5

respond 6:24

response 27:11 69:13

responsibilities 34:18

responsible 24:17,20

rest 29:20

results 31:5 63:11

return 59:13

review 7:22 9:14 10:4 12:10,15 20:10 23:4,12 25:21 29:16 35:19 36:4,5 39:16, 25 48:18 59:20 60:1,3 69:22

reviewed 7:24 20:9 59:14 63:14

reviewing 39:22 70:3

reviews 9:8,11 14:4 35:24

revise 22:25

revised 39:9

RI 10:19

Richland 10:12

Risk 27:8

Ritz 40:10

role 60:2

room 11:24 19:23 25:6,7,9 52:8

Routine 29:4,21

rules 6:15

run 6:15 27:11

RUPCICH 5:22 12:12 14:17 17:10 22:2 30:13 36:22 38:17 64:14,17 66:8,15,20 69:4,18, 21 70:3,6

**S**

safety 27:8 28:2,9

sample 61:7

CHAD CHRISTER

March 25, 2019
Index: sanitation..track

63:13

**sanitation** 28:9

**Satisfaction** 31:15 62:7

**scan** 47:20 52:6 60:16

**schedule** 14:15, 20 15:18 16:4,6,20 17:4,8 37:8 39:15 67:9

**scheduled** 36:10,16 40:15,17 65:20 67:12 68:9

**scheduling** 8:25 16:16,19 18:12 35:19 38:15,21 42:3,6,9,13,24 65:16,17 68:14

**school** 11:3

**secretary** 49:11

**section** 24:8,11, 18 25:2,3,8,11,20 26:2,4,6,7,9,11,18 27:8,9,20,21,22,25 28:8,13 29:4,6,7,13, 16 30:5,24 32:5,7 33:4,5,7,15,20 63:10

**sections** 26:17 34:1,3

**secured** 11:19

**send** 30:4 38:11

**send-outs** 64:20

**sending** 16:13 38:6

**sense** 7:14

**September** 50:15

**series** 6:22

**services** 25:2 26:25 27:21 30:2 34:7 64:6

**set** 15:4 37:18 41:19

**setting** 8:17 13:16 25:6

**Severino** 36:11 37:10 38:3 40:9,14, 17 47:21 65:20 66:1

**Severino's** 37:12,15 38:12 39:24 41:2 69:10

**shakes** 6:25

**Shaw** 54:9

**Shawn** 24:5 34:5 54:10

**shelf** 12:3

**shift** 17:2

**shortly** 36:1 40:25

**showed** 68:18

**sick** 17:15 20:13 29:9 32:23

**signature** 12:19 13:8,9,11 70:16

**signed** 13:10 48:12 68:16

**similar** 60:11

**Sir** 69:18

**Site** 67:15

**situation** 18:7 53:21

**size** 61:7 63:13

**Smith** 24:1

**SOAP** 12:19,21

**social** 64:5

**sort** 11:3 12:8 20:24 33:13

**sounds** 66:18

**Sources** 6:9

**special-** 48:15

**specialist** 48:16, 17

**specialists** 66:2

**specially** 61:5

**specialty** 15:1, 20 16:12 18:11 59:4,10,25 63:11

**specific** 37:21 40:21 57:11

**specifically** 42:21 54:23

**specifics** 62:19

**spoke** 37:11

**spoken** 35:3

**spot** 12:2 33:22

**Springfield** 8:1 40:9

**St** 9:25

**staff** 26:15 29:24 30:16 31:12 46:3,7

**stand** 26:22

**standard** 34:9

**standards** 25:15

**start** 8:12

**started** 5:6 6:16 13:21 21:15,21,25 35:12,16 36:1 37:4, 6 64:9

**starts** 32:4 40:4

**state** 5:7,17 20:2 23:21

**statistics** 19:11 20:12 32:23

**Stonecipher** 24:3

**stop** 14:14

**strain** 27:2

**studies** 19:12 20:9 24:9,12

**study** 24:23,24 48:10 59:3,4,9,21, 24 60:2,7,11 61:5,8 63:12

**Subjective** 12:23

**submit** 18:16

**subsection** 31:7,14 32:16,20 59:3

**subsections** 27:19 29:21 52:7

**substance** 12:11

**supplying** 20:21

**support** 28:21

**surgery** 36:20,21 37:8 38:16,22 39:4 40:12,14 41:1,4 42:19 44:5 48:6 50:24 51:2,9 65:13, 24 66:6

**swear** 5:9

**sworn** 5:13

**system** 12:8,9

**— T —**

**taking** 36:14

**talk** 17:21 26:14 36:19 42:8,11 58:16

**talked** 22:8 41:17 55:20 59:5

**talking** 50:2 67:21

**tasks** 8:25

**Taylorville** 6:7

**Technician** 10:20

**tedious** 47:17

**TELEMED** 31:13

**telling** 26:17

**temperature** 28:20

**temperatures** 28:25

**term** 27:3

**test** 28:2

**testifies** 5:13

**testify** 7:20

**testifying** 6:18

**testimony** 69:22,23

**tests** 28:21

**therapy** 11:6

**thing** 33:13

**thinks** 18:3

**Thompson** 50:20

**time** 12:19 15:4 16:5,9,25 17:7,14 21:25 22:1,7 30:20, 22 33:5 35:12 37:15 40:3 42:16 46:2 48:14,15 49:23 50:7 55:4,18,19,20 57:16 62:21

**timely** 65:17

**times** 11:20

**title** 8:14 10:1

**today** 6:16 7:17, 20

**today's** 6:21

**told** 34:17 38:14 44:23 46:17 47:14 49:2 50:17 51:21 54:5 56:16 57:24 58:25 61:2 63:8

**top** 18:1 27:15 36:22,24

**track** 13:2 15:21 16:24 23:7 25:12,15 27:22 31:16,25 32:1

33:10,19
**train** 13:25
**training** 13:23
**transcript** 6:23 70:8
**Trauma** 10:2
**treatment** 20:15, 23 29:7 62:12
**treatments** 9:17
**truthfully** 7:20
**turn** 43:20 44:25 46:20 47:17 48:9 50:22 52:3 54:18 58:2 59:2 61:19 62:5
**turning** 60:13
**tweak** 61:12
**tweaks** 61:15
**Tweedy** 24:4
**type** 16:24 22:18 31:5,20
**typically** 12:4 16:3,18 42:8 58:14, 16
**TYRRELL** 69:5, 20

**U**

**unable** 18:9
**undergoing** 41:4
**understand** 6:18 7:5,8
**understanding** 18:8 36:6 69:2
**understood** 7:7
**unit** 20:4 21:6,8 22:21 23:25 27:10 28:10 30:9 33:10 42:12,17 49:10

61:18 62:13
**units** 28:11
**urgent** 18:13,15, 21
**urology** 43:23 44:1 67:16,23
**utilization** 18:17 25:20 39:6

**V**

**vacancies** 30:21
**vacancy** 30:21
**vacant** 21:20,24 30:23
**vague** 12:12 14:17 17:10 38:17
**vary** 16:12 24:23 29:17
**VI** 32:5
**video** 7:3
**visit** 47:21 52:9 59:11,17 61:14
**visits** 25:9 33:1
**Votrient** 57:13

**W**

**wait** 33:5 42:24
**waiting** 15:25
**waive** 70:6
**waived** 70:17
**waiving** 69:25
**wanted** 34:6 66:1,2 69:13
**warden** 20:3 24:1,6,7 33:17,23 45:24
**warden's** 19:22 33:21

**Waterman** 46:1
**ways** 17:20
**website** 11:10
**week** 16:14,25
**weekly** 28:21
**weeks** 16:14
**Wexford** 6:8 8:9, 10 9:21,24 11:13 12:17 13:17,21,24 21:15 24:6 25:14 30:10 35:12,16 37:4 39:7 46:5 64:9 66:5 69:1
**Wexford's** 68:23
**wife** 35:4
**William** 5:5 35:1 54:14
**work** 6:8 8:9 18:4, 25 20:6 59:16
**worker** 64:5
**working** 48:13
**works** 64:5
**workup** 66:2,9
**write** 48:18 59:12
**written** 30:2 59:15

**X**

**X-RAY** 28:19
**x-rays** 27:23

**Y**

**year** 44:20 60:1

**Z**

**Zavala** 45:23