E-FILED
EXHIBIT M
Friday, 25 October, 2019  09:59:57 PM
Clerk, U.S. District Court, ILCD

# THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

WILLIAM KENT DEAN,

           Plaintiff,

      v.

WEXFORD HEALTH SOURCES, INC., DR.
ABDUR NAWOOR, DR. REBECCA
EINWOHNER, NURSE KATHY GALVIN,
and LISA MINCY,

           Defendants.

Case No. 17-CV-3112
Judge Sue E. Myerscough
Magistrate Judge Tom Schanzle-Haskins

## PLAINTIFF WILLIAM KENT DEAN'S RESPONSES TO DEFENDANT WEXFORD HEALTH SOURCES, INC.'S INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff William Kent Dean, by his attorneys, hereby submits the following objections and responses to Defendant Wexford Health Sources, Inc.'s ("Wexford") Interrogatories Directed to Plaintiff (the "Interrogatories"), as set forth below.

### PRELIMINARY STATEMENT

Mr. Dean's investigation and discovery in this matter are ongoing. The responses below reflect Mr. Dean's continuing review and analysis of the factual record underlying the allegations in the Third Amended Complaint and are made without the benefit of complete discovery and production from Defendants. Mr. Dean is still pursuing a complete production of discovery materials from Defendants.

Accordingly, all responses pursuant to these Interrogatories are based only upon such information and documents that are presently available and specifically known to Mr. Dean. All responses are provided without prejudice to Mr. Dean's rights to (i) supplement these responses;

(ii) assert different factual or legal contentions as additional facts are ascertained and analysis is conducted; and (iii) amend or withdraw any response accordingly. Further discovery, independent investigation, or other analysis may lead to the discovery of additional information, which may lead to revisions, supplements, additions, or changes to these responses pursuant to Federal Rule of Civil Procedure 26.

Mr. Dean makes no implied admissions in the responses below. That Mr. Dean has responded or objected to an Interrogatory in whole or in part should not be taken to mean that Mr. Dean admits the existence of any facts stated in or assumed by the Interrogatory or that such response or objection constitutes evidence admissible against Mr. Dean. Mr. Dean is responding to Defendant Wexford's Interrogatories as Mr. Dean reasonably understands the language of the Interrogatories.

## GENERAL OBJECTIONS APPLICABLE TO EACH INTERROGATORY

Mr. Dean asserts the following General Objections to each of Defendant Wexford's Interrogatories. Any Specific Objection to Defendant Wexford's Interrogatories shall not be construed as a waiver of these General Objections.

1.      Mr. Dean objects to the Interrogatories, including their overt or implied instructions and definitions, to the extent that they seek to impose greater burdens on Mr. Dean than those required by the Federal Rules of Civil Procedure and the local Rules of the United States District Court for the Central District of Illinois (collectively, "the Rules"), and/or the orders entered by this Court.

2.      Mr. Dean objects to the Interrogatories as premature to the extent that they call for or seek to exclude the future disclosure of his experts' rebuttal opinions (if any). Pursuant to the Court's order on October 3, 2019, Defendants' expert disclosure deadline is October 8, 2019, and



the deadline by which Defendants' experts must be deposed is October 18, 2019. Mr. Dean's investigation is ongoing. Mr. Dean has reserved, (*see* Barnett Rpt. at 3; Dhar Rpt. at 1; Metwalli Rpt. at 2), and continues to reserve, the right to supplement his experts' opinions, including rebuttal opinions, until expert discovery has concluded.

3.      Mr. Dean objects to the Interrogatories to the extent that they are premature contention interrogatories. Fact and expert discovery in this matter are still ongoing. "[E]fficiency prescribes that the parties should not be obligated to answer contention interrogatories repeatedly, and that because one of the chief purposes of contention interrogatories is to narrow the issues of trial, fairness dictates that parties not be forced to prematurely take a position, which would force an artificial narrowing of the issues, instead of an informed pairing down." *U.S. ex rel. Tyson v. Amerigroup Ill., Inc.*, 230 F.R.D. 538, 542 (N.D. Ill. 2005). Accordingly, "[c]ontention interrogatories are often better answered after parties are near the end of discovery because they are better able to give complete responses." *Whitchurch v. Canton Marine Towing Co.*, No. 16-cv-3278, 2017 WL 1165988, at *2 (C.D. Ill. Mar. 23, 2017) (Schanzle-Haskins, M.J.) (citing *Ziemack v. Centel Corp.*, 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995)); *see also* Fed. R. Civ. P. 33(b) advisory committee's notes (1970) ("[I]nterrogatories involving mixed questions of law and fact may create disputes between the parties which are best resolved after much or all of the other discovery has been completed[.]"). To the extent the Interrogatories call for or seek to exclude the future disclosure of Mr. Dean's experts' rebuttal opinions (if any), they are premature. Mr. Dean's investigation is ongoing. Mr. Dean has reserved, (*see* Barnett Rpt. at 3; Dhar Rpt. at 1; Metwalli Rpt. at 2), and continues to reserve, the right to supplement his experts' opinions, including rebuttal opinions, until expert discovery has concluded.

4.      Mr. Dean objects to the Interrogatories to the extent that they seek or require the disclosure of information which has been withheld or excluded from discovery by the attorney–client privilege, the attorney work-product doctrine, the limitations of Federal Rule of Civil Procedure 26(b)(4), or any other applicable privilege or immunity. Nothing in these responses is intended to be or should be construed as waiver of any privilege.

5.      Mr. Dean objects to the extent that any of the requested information is publicly available or solely within the custody, possession, or control of Defendant Wexford or the other Defendants, making it overly burdensome and, in some cases, impossible for Mr. Dean to fully respond to the Interrogatories.

6.      Mr. Dean objects to the Interrogatories to the extent that Defendant Wexford's inclusion of an "Attestation" page imposes or implies any obligation for Mr. Dean to provide a sworn attestation or other statement under oath that he has personally read and avows the truth or correctness of the responses provided according to the best of his information, knowledge, and belief. The Federal Rules of Civil Procedure do not require any represented party to attest personally to the truth or correctness of responses in discovery. *See* Fed. R. Civ. P. 26(g). Instead, Rule 26 imposes the requirement to sign on counsel. *See id.*

## RESPONSES AND SPECIFIC OBJECTIONS

1.      Identify the factual bases for the contention at Count I, paragraph 77 of the Third Amended Complaint Dr. Severino instructed/said/wrote/or otherwise indicated Mr. Dean's surgery was to be done immediately and any testimonial or documentary evidence that supports this contention. If such evidence is in medical records, identify the specific Bates or page number.

If such evidence is in deposition testimony, identify the deposition, page, and line. If such evidence is in documents not produced, please produce it.

**ANSWER:** The contention that Dr. Severino instructed/said/wrote/or otherwise indicated that Mr. Dean's surgery was to be done immediately is supported by at least the following facts:

- Mr. Dean testified that Dr. Severino told him at the time he was given his diagnosis that he would need to have surgery as soon as possible – within no more than a few weeks. *See* Dean Tr. 91:10–16, 92:14–16, 237:3–17; *see also* IDOC Taylorville Med Recs 001082 (noting "Pt will need to be scheduled for surgery"); Galvin Dep. Ex. 15; Severino Tr. 29:2–11 (explaining that a surgery like this would be scheduled "[a]s soon as we can get everybody on board").

- Dr. Severino's office originally scheduled the surgery for May 11, 2016 – within four weeks of Mr. Dean's diagnosis. *See* IDOC Taylorville Med Recs 001085; Christer Tr. 40:13–14.

- Dr. Severino's office requested cardiac clearance for Mr. Dean in the first week of May. IDOC Taylorville Med Recs 001100. Cardiac clearance was needed within 7-10 days of surgery. Springfield Clinic William K. Dean 15.

- When submitting the Wexford approval form for Mr. Dean's surgery, Dr. Nawoor marked the request as "urgent." *See* IDOC Taylorville Med Recs 001086. The decision to mark the request as "urgent" was made after Felicia Waterman, a Wexford employee who assisted with scheduling procedures, spoke with Julia Thornton, a nurse at Dr. Severino's office, and represented to Thornton that she was putting in an urgent request to Wexford to get approval for the surgery. Springfield Clinic William K. Dean 109.

- Dr. Severino did not deny that the surgery was urgent. Severino Tr. 50:13–17.

2. Identify the factual bases for the contention in Count I, paragraph 77 of the Third Amended Complaint, Dr. Nawoor disregarded Dr. Severino's instruction that Mr. Dean undergo surgery immediately and any testimonial or documentary evidence that supports this contention. If such evidence is in medical records, identify the specific Bates or page number. If such evidence is in deposition testimony, identify the deposition, page, and line.

**ANSWER:** Dr. Nawoor has served as Mr. Dean's primary care physician, and Medical Director at the Taylorville Correctional Center, since December 2015. *See* Dean Tr. 22:21–

22, 60:15–17; Nawoor Tr. 24:9–12, 202:22–203:3. As the Site Medical Director and as Mr. Dean's treating physician, Dr. Nawoor is responsible for making referrals for outside medical appointments and procedures. *See* IDOC-Wexford Contract, Exhibit III at 7, 10.

- Dr. Severino's office did not act to schedule the surgery until it received approval from Wexford. *See* IDOC Taylorville Med Recs 001092 (note from Dr. Severino's office to Wexford: "Once approved, please call Julie [to schedule the surgery]"); Springfield Clinic William K. Dean 103 (similar).

- Health Care Unit Administrator Lisa Mincy testified that Dr. Nawoor, among others, appreciate the risk of the delay in Mr. Dean's surgery and that Dr. Nawoor, among others, found it "very concerning" that Mr. Dean's surgery took so long to be performed after his diagnosis for cancer. Mincy Tr. 193:19–23, 194:4–10. Indeed, the delay was discussed at the monthly "quality improvement meetings" attended by Dr. Nawoor. *Id.* Dr. Nawoor was present at each quality improvement meeting from Mr. Dean's diagnosis with cancer until his surgery. *See* IDOC No. 000150-64 (April), 000165-77 (May), 000178-93 (June).

- Notwithstanding this concern, Dr. Nawoor never told Chad Christer, the Wexford employee responsible for scheduling the procedure, that the surgery should be scheduled sooner. Christer Tr. 42:23–43:1.

- Dr. Nawoor, Mr. Dean's primary care physician, never discussed Mr. Dean's surgery or diagnosis with Dr. Severino. *See* Severino Tr. 60:15–61:22. In fact, on May 25, 2016, Dr. Severino's office told Mr. Dean's wife that no one from Taylorville Correctional Center had contacted them. Dean Tr. 108:20–109:5.

- Although Dr. Nawoor acknowledged that he has the ability to expedite the scheduling of medical appointments and procedures, *see, e.g.*, Nawoor Tr. 284:12–286:6; IDOC Taylorville Med Recs 001356; IDOC Taylorville Med Recs 001349; Wexford Utilization Management Guidelines at 10, 12, Dr. Nawoor never inquired into whether Mr. Dean's surgery could be expedited, or if it was possible to send Mr. Dean to a different doctor, *see* Nawoor Tr. 291:9–292:23; Christer Tr. 42:18–22; Galvin Tr. 143:8–11; Mincy Tr. 194:11–22.

- Mr. Dean filed an emergency grievance on May 16, 2016, requesting that his surgery be scheduled. Galvin Dep. Ex. 15. In response, Galvin told Mr. Dean that the surgeon had been "contacted to schedule a surgical date. Currently awaiting a response." *Id.*; *see also* Galvin Tr. 166:7–10. On or about May 24, 2016, the Warden told Mr. Dean's wife that she had told the healthcare unit to get moving on scheduling the procedure. Dean Tr. 107:20–108:1.

- When Mr. Dean saw Dr. Nawoor on June 23, 2016, Dr. Nawoor told him the surgery had been approved, but did not tell him it had been scheduled. Dean Tr. 117:22–118:10.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Dr. Nawoor disregarded Dr. Severino's instruction that Mr. Dean undergo surgery immediately, based on the degree to which Dr. Nawoor's actions or inaction caused or were themselves departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

3.    Identify the factual bases for the contention in Count I, paragraph 77 of the Third Amended Complaint Dr. Nawoor failed or otherwise delayed scheduling Mr. Dean's surgery for over three months and any testimonial or documentary evidence that supports this contention. If such evidence is in medical records, identify the specific Bates or page number. If such evidence is in deposition testimony, identify the deposition, page, and line.

**ANSWER:**    The ways in which Dr. Nawoor failed and/or delayed scheduling Mr. Dean's surgery are described in Mr. Dean's response to Interrogatory No. 2, and Mr. Dean additionally refers Defendants to that response and incorporates it in full in response to this Interrogatory. Mr. Dean additionally states as follows:

Dr. Nawoor has served as Mr. Dean's primary care physician, and Medical Director at the Taylorville Correctional Center, since December 2015. *See* Dean Tr. 22:21–22, 60:15–17; Nawoor Tr. 24:9–12, 202:22–203:3. As the Medical Director at the Taylorville Correctional Center, as well as Mr. Dean's primary care physician, Dr. Nawoor is responsible for ensuring treatment is administered in a timely fashion, and expected to be an advocate for his patients. *See* Barnett Tr. _____; Metwalli Tr. _____.

- Dr. Nawoor has the ability to, and is expected to, request immediate collegial reviews when a patient has an urgent need for treatment. *See* Wexford Utilization Management Guidelines at 10, 12; Ritz 30(b)(6) Tr. 24:20–25:10. Dr. Nawoor has initiated immediate collegial reviews for other patients. Ritz 30(b)(6) Tr. 25:11–13.

- Dr. Nawoor has the ability to expedite the scheduling of medical appointments and procedures. *See, e.g.,* Nawoor Tr. 284:12–286:6; Matticks Tr. 81:18-85:11; IDOC Taylorville Med Recs 001356; IDOC Taylorville Med Recs 001349; Wexford Utilization Management Guidelines at 10, 12.

None of these steps were taken with respect to Mr. Dean's surgery:

- Although Dr. Nawoor submitted an "urgent" request for a collegial review for Mr. Dean's surgery in April 2016, *see* IDOC Taylorville Med Recs 001086, Mr. Dean was forced to file an emergency grievance a few weeks

later when it became apparent that his surgery had not been scheduled, *see* Galvin Dep. Ex. 15.

- Kathy Galvin testified that she was not aware of Wexford employees who took "any steps to have Mr. Dean's cancer surgery scheduled sooner or moved up." Galvin Tr. 143:8–11. Lisa Mincy testified that besides Chad Christer's calls to Dr. Severino's office, she is "unaware" of any other steps taken to expedite Mr. Dean's surgery. Mincy Tr. 194:11–22; *see also* Christer 38:20–23.

Dr. Nawoor blamed the correctional system for the delay in Mr. Dean's surgery. Nawoor Tr. 298:13–15.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Dr. Nawoor failed to schedule or delayed in scheduling Mr. Dean's surgery, based on the degree to which Dr. Nawoor's actions or inaction caused or were themselves departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

4.     Identify the factual bases for the contention in Count I, paragraph 78, of the Third Amended Complaint Dr. Nawoor delayed in obtaining approval for Mr. Dean's cancer medications and any testimonial or documentary evidence that supports this contention. If such evidence is in medical records, identify the specific Bates or page number. If such evidence is in deposition testimony, identify the deposition, page, and line. If such evidence is in deposition testimony, identify the deposition, page, and line.

**ANSWER:**     As the Medical Director at the Taylorville Correctional Center, Dr. Nawoor is responsible for seeing patients at Taylorville with chronic medical problems. Nawoor Tr. 66:23-67:12. Dr. Nawoor sees patients with chronic medical issues "every day." Nawoor Tr. 68:9. Dr. Nawoor was responsible for making sure that Mr. Dean received his cancer medications, including Votrient and Opdivo. Galvin Tr. 148:2-5.

Dr. Guaglianone wrote Mr. Dean a prescription for Votrient on October 19, 2016. See Wexford's Answer and Affirmative Defenses to Third Amended Complaint ¶ 56. Dr. Nawoor made a Non-Formulary Drug Request dated that same day. IDOC Taylorville Med Recs 001678. Nevertheless, Dr. Nawoor contributed to the delay in the non-formulary approval and delivery of Mr. Dean's Votrient prescription in several ways:

8

- Dr. Nawoor did not discuss the Votrient prescription with Dr. Ritz at collegial review until November 2, 2019. IDOC Taylorville Med Recs 001477. Dr. Nawoor could have called Dr. Ritz directly if he felt that the non-formulary request needed to be "dispositioned immediately" so that there was no "delay" but took no such steps in this case. Ritz 30(b)(6) Tr. 24:18-25:7, 25:21-24.

- Dr. Nawoor did not discuss the Votrient prescription, including side effects and effectiveness of the drug, with Mr. Dean until November 8, 2019. IDOC Taylorville Med Recs 001478.

- Dr. Nawoor took no steps to expedite the non-formulary approval process or otherwise speed up the approval and administration of Votrient, despite the fact that this delay of almost a month was highly atypical and Director of Nursing Kathy Galvin testified that she had never seen a non-formulary approval process take so long. Ritz 30(b)(6) Tr. 24:18-25:7, 25:21-24; Galvin Tr. 160:2-4, 160:23-161:2, 161:15-20. Lisa Mincy raised the delay with her supervisor on October 28, 2016. *See* Dean v. Wexford, et al. (17-3112) IDOC No.: 001028 ("Is this not a lengthy amount of time before starting this medication or substituting another one?").

Mr. Dean's Votrient prescription was not approved until November 14, 2016 and did not receive his first dose until November 18, 2016. *See* Wexford's Answer and Affirmative Defenses to Third Amended Complaint ¶ 56. Dr. Nawoor considered this delay between the initial prescription and administration of the Votrient to be medically appropriate. Nawoor Tr. 301:18-302:1. Dr. Nawoor acknowledged that "the quicker you get treated, the better" but, according to him, "that's not the real world." Nawoor Tr. 303:4-7.

Mr. Dean was prescribed Opdivo on March 2 or 3, 2016. Ritz Tr. 111:13-15; IDOC No. 000124-25. Mr. Dean did not receive non-formulary approval for Opdivo until March 20, 2019. Ritz Tr. 111:11-20. Dr. Nawoor knew, based on the notes from Mr. Dean's oncologist, that Opdivo was necessary because Mr. Dean's cancer was not responding to Votrient. IDOC No. 000125; IDOC Taylorville Med Recs 001975, 002045. Once again, Dr. Nawoor took no steps to hasten the approval and administration of Mr. Dean's Opdivo despite having the ability to do so. Ritz 30(b)(6) Tr. 24:18-25:7, 25:21-24.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Dr. Nawoor delayed in obtaining approval for Mr. Dean's cancer medications, based on the degree to which Dr. Nawoor's actions or inaction caused or were themselves departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

5.     Identify the factual bases for the contention in Count II, paragraph 84 of the Third

Amended Complaint Dr. Einwohner was aware Dr. Severino instructed Mr. Dean undergo surgery

immediately and any testimonial or documentary evidence that supports this contention. If such

evidence is in medical records, identify the specific Bates or page number. If such evidence is in

deposition testimony, identify the deposition, page, and line.

**ANSWER:**     Dr. Einwohner saw Mr. Dean, and assisted in providing him medical care, through
the renal teleclinic between Wexford's office in Pittsburgh, Pennsylvania, and the
IDOC facilities where Mr. Dean was incarcerated in Pinckneyville and Taylorville,
Illinois, beginning in 2012 and regularly through at least the time of his diagnosis
with renal cancer in April 2016. Einwohner Tr. 196:2-197:17; *id.* 14:18-16:8;
Einwohner Dep. Exs. 5 & 7; Dean Tr. 67:13-74:22; *id.* 87:15-88:16; 109:9-111:7.
Dr. Einwohner kept a patient file on Mr. Dean that included his medical records,
labeled "Einwohner Records Bates" #000001 through #000180 as they were
produced by Wexford Defendants in discovery. Einwohner Tr. 14:18-16:8; *see also*
Einwohner Records Bates 000001-000180. In keeping the patient file on Mr. Dean,
Dr. Einwohner initialed documents to show that she had received them and looked
at them. Einwohner Tr. 192:14-18. Dr. Einwohner initialed the records from Mr.
Dean's appointments with Dr. Severino dated March 10, 2016; April 12, 2016; and
April 14, 2016. Einwohner Records Bates 000043-48. She initialed the records
from Mr. Dean's May 6, 2016 appointment at Prairie Cardiovascular, which show
that Mr. Dean was referred for "preoperative cardiac clearance for kidney surgery
for kidney cancer" and that Dr. Himanshu Pathak of Prairie Cardiovascular
declared Mr. Dean "medically optimized from cardiac standpoint for his upcoming
kidney surgery" as of May 9, 2016. *Id.* 000052-56. Also among the documents in
Dr. Einwohner's file on Mr. Dean was a May 4, 2016 Utilization Management
record indicating that Mr. Dean had been diagnosed with a "r[ight] renal mass" that
was "likely renal ca[ncer]" and that he had been "recommended for [a] r[ight]
nephrectomy," pending "cardiac clearance." *Id.* 000050. This Utilization
Management record further showed that Mr. Dean was approved for a "cardiology
eval[uation]." *Id.* And Dr. Einwohner testified that she does not participate in
utilization management "collegial" conferences generally, and that she does not
recall participating in any collegials regarding Mr. Dean's care. Einwohner Tr.
54:5-7; 253:12-254:6. Taken together, these documents show that Dr. Einwohner
knew that Mr. Dean had been diagnosed with kidney cancer and that he was being
evaluated for readiness for what should have been an imminent surgery. Based on
the information she had and her history of treating Mr. Dean for his kidney
ailments, Dr. Einwohner knew of—or else was willfully blind to—Mr. Dean's need
for immediate surgery to remove his cancerous kidney.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita
Dhar, and Dr. Adam Metwalli also show that Dr. Einwohner knew, or else was
willfully blind to, Dr. Severino's instruction that Mr. Dean undergo surgery

immediately, based on the degree to which Dr. Einwohner's actions or inaction caused or were themselves departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

6.      Identify the factual bases for the contention in Count II, paragraph 85 of the Third Amended Complaint, Dr. Einwohner failed to schedule Mr. Dean's surgery for over three months and any testimonial or documentary evidence that supports this contention. If such evidence is in medical records, identify the specific Bates or page number. If such evidence is in deposition testimony, identify the deposition, page, and line. If such evidence is in deposition testimony, identify the deposition, page, and line.

**ANSWER:**   The documents and deposition testimony described and identified in response to Interrogatory No. 5 also provide the factual basis for this allegation. Additionally, Dr. Einwohner's patient file regarding Mr. Dean shows that Dr. Einwohner saw Mr. Dean through the renal teleclinic and noted that he had recently experienced blood in his urine—hematuria—on January 7, 2016; February 8, 2016; March 30, 2016; May 26, 2016; and July 13, 2016. Einwohner Records Bates 000038-000039, 000041-000042, 0000057-0000063. As multiple records show, Mr. Dean's surgery did not take place until July 19, 2016—three months after his April 2016 diagnosis, as shown in Dr. Einwohner's patient file regarding Mr. Dean. *See id.* 0000039; Springfield Clinic William K. Dean 32-35. Dr. Einwohner also testified that she did not participate in utilization management "collegial" conferences generally, and that she does not recall participating in any collegials regarding Mr. Dean's care. Einwohner Tr. 54:5-7; 253:12-254:6. She further testified that she was not involved in scheduling his surgery, despite being his doctor and knowledgeable about his kidneys' health dating back to 2012. *See id.* 266:5-267:16. Dr. Einwohner's failure to schedule Mr. Dean's surgery for over three months is further demonstrated by a lack of any evidence that she advocated that he be scheduled for surgery to treat— or even that he be evaluated using proper diagnostic measures to detect—his kidney cancer, despite her knowledge that the root cause of his hematuria could be cancer. *See id.* 134:20-22.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Dr. Einwohner failed to schedule Mr. Dean's surgery for over three months, based on the degree to which Dr. Einwohner's actions or inaction caused or were themselves departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

7.      Identify the factual bases for the contention in Count II, paragraph 85 of the Third Amended Complaint, Dr. Einwohner delayed approval of Mr. Dean's cancer medications and any

testimonial or documentary evidence that supports this contention. If such evidence is in medical records, identify the specific Bates or page number. If such evidence is in deposition testimony, identify the deposition, page, and line. If such evidence is in deposition testimony, identify the deposition, page, and line.

**ANSWER:**   Dr. Einwohner saw Mr. Dean, and assisted in providing him medical care, through the renal teleclinic between Wexford's office in Pittsburgh, Pennsylvania, and the IDOC facilities where Mr. Dean was incarcerated in Pinckneyville and Taylorville, Illinois, beginning in 2012 and regularly through at least the time of his diagnosis with renal cancer in April 2016. Einwohner Tr. 196:2-197:17; *id.* 14:18-16:8; Einwohner Dep. Exs. 5 & 7; Dean Tr. 67:13-74:22; *id.* 87:15-88:16; 109:9-111:7. Dr. Einwohner kept a patient file on Mr. Dean that included his medical records, labeled "Einwohner Records Bates" #000001 through #000180 as they were produced by Wexford Defendants in discovery. Einwohner Tr. 14:18-16:8; *see also* Einwohner Records Bates 000001-000180. In keeping the patient file on Mr. Dean, Dr. Einwohner initialed documents to show that she had received them and looked at them. Einwohner Tr. 192:14-18. Dr. Einwohner knew of Mr. Dean's diagnosis with kidney cancer. Einwohner Records Bates 000039. Yet, in spite of her role as Mr. Dean's doctor and specializing in the care of his kidney health, there is no evidence that Dr. Einwohner advocated that Mr. Dean receive timely treatment with cancer medications.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Dr. Einwohner delayed the approval of Mr. Dean's cancer medications, based on the degree to which Dr. Einwohner's actions or inaction caused or were themselves departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

8.    In Count III, paragraph 90, of the Third Amended Complaint, Plaintiff contends Kathy Galvin (1) repeatedly failed to effectively treat Mr. Dean's symptoms; (2) prevented timely changes to the diagnostic measures used and the treatment provided to Mr. Dean; and (3) interfered with Dr. Nawoor's recommendation for a prompt outside referral. For (1) through (3) identify the factual bases for these contentions against Nurse Galvin and any testimonial or documentary evidence that support these contentions. If such evidence is in medical records, identify the specific

Bates or page number. If such evidence is in deposition testimony, identify the deposition, page, and line.

**ANSWER:**     As Director of Nursing at the Taylorville Correctional Center, Kathy Galvin was responsible for ensuring that *all* of Wexford's policies and IDOC's institutional directives were followed by staff at Taylorville. Galvin Tr. 32:11-13. Wexford has policies and guidelines that medical procedures and off-site referrals are to be promptly scheduled. *See, e.g.,* Ritz 30(b)(6) Ex. 3 at 10-12; Ritz 30(b)(6) Tr. 22:20-41:3. Nurse Galvin was also responsible for supervising sick call and supervising the Medical Records Director, who in turn was responsible for scheduling procedures and off-site medical visits. Galvin Tr. 30:17-22, 35:20-22. For each of the delays that are the subject of Mr. Dean's Complaint, Nurse Galvin took no steps to ensure that Mr. Dean received treatment:

- Nurse Galvin took no steps to schedule or expedite Mr. Dean's renal ultrasound or ensure that it was scheduled or conducted. Galvin Tr. 80:24-81:11. This was despite the fact Nurse Galvin knew that hematuria is a symptom of kidney and bladder cancer. Galvin Tr. 21:23-22:3.

- Nurse Galvin took no steps to schedule or expedite Mr. Dean's cystoscopy or CT scan or ensure that it was scheduled or conducted. Galvin Tr. 87:12-88:3.

- Nurse Galvin took no steps to schedule or expedite Mr. Dean's surgery or to ensure that it was scheduled or conducted. Galvin Tr. 118:9-14, 119:17-19, 121:1-3, 143:8-11. This was despite the fact that Mr. Dean's wife called about the scheduling of the cancer surgery on April 25 and spoke with Kathy Galvin, who told her that the surgery had been "approved and scheduled." Galvin Tr. 114:1–9. It is also despite the fact that Mr. Dean filed an emergency grievance regarding the scheduling of his surgery in May 2017: "Get . . . Wexford to stop dragging this out and get me to surgery!" Galvin Ex. 15. Galvin's response to Mr. Dean was that the surgeon had been "contacted to schedule a surgical date. Currently awaiting a response." *Id.*; *see also* Galvin Tr. 166:7–10 (same). Galvin denied that she misled Ms. Dean during the April 25 phone call, claiming that she had been "told it was approved and scheduled." Galvin Tr. 166:11–167:2.

  Health Care Unit Administrator Lisa Mincy testified that Nurse Galvin, among others, appreciated the risk of the delay in Mr. Dean's surgery and that Nurse Galvin, among others, found it "very concerning" that Mr. Dean's surgery took so long to be performed after his diagnosis for cancer. Mincy Tr. 193:19–23, 194:4–10. Indeed, the delay was discussed at the monthly "quality improvement meetings" attended by Ms. Galvin, and Ms. Mincy. *Id.* Nurse Galvin was present at each quality improvement meeting from Mr. Dean's diagnosis with cancer until his surgery. *See* IDOC No. 000150-64 (April), 000165-77 (May), 000178-93 (June).

She also took no steps to supervise Chad Christer, the Medical Records Director at Taylorville Correctional Center who was primarily responsible for scheduling Mr. Dean's surgery. Nurse Galvin, who was Mr. Christer's direct supervisor, testified that she took minimal steps to supervise him and was completely unaware if he was having scheduling difficulties unless he brought them to her attention. Galvin Tr. 95:8–98:4,141:14–142:15.

- Nurse Galvin took no steps to expedite the non-formulary approval or administration of Mr. Dean's cancer medications Votrient and Opdivo. Galvin Tr. 161:15-162:6. This was despite being made aware of the need for non-formulary approval of these medications. Mincy Tr. 203:6-14.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Nurse Galvin repeatedly failed to effectively treat Mr. Dean's symptoms; prevented timely changes to the diagnostic measures used and the treatment provided to Mr. Dean; and/or interfered with Dr. Nawoor's recommendation for a prompt outside referral, based on the degree to which Nurse Galvin's actions or inaction caused or were themselves departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

9.     Identify the factual bases for the contention in Count III, paragraph 91, of the Third Amended Complaint Kathy Galvin "disregarded Dr. Severino's instruction that Mr. Dean undergo surgery immediately and when she failed to schedule Mr. Dean's surgery for over three months" and any testimonial or documentary evidence that supports this contention. If such evidence is in medical records, identify the specific Bates or page number. If such evidence is in deposition testimony, identify the deposition, page, and line.

**ANSWER**:     Nurse Galvin took no steps to schedule or expedite Mr. Dean's surgery or to ensure that it was scheduled or conducted. Galvin Tr. 118:9-14, 119:17-19, 121:1-3, 143:8-11. This was despite the fact that Mr. Dean's wife called about the scheduling of the cancer surgery on April 25 and spoke with Kathy Galvin, who told her that the surgery had been "approved and scheduled." Galvin Tr. 114:1–9. It is also despite the fact that Mr. Dean filed an emergency grievance regarding the scheduling of his surgery in May 2017: "Get . . . Wexford to stop dragging this out and get me to surgery!" Galvin Ex. 15. Galvin's response to Mr. Dean was that the surgeon had been "contacted to schedule a surgical date. Currently awaiting a response." *Id.*; *see also* Galvin Tr. 166:7–10 (same). Galvin denied that she misled Ms. Dean during the April 25 phone call, claiming that she had been "told it was approved and scheduled." Galvin Tr. 166:11–167:2.

Health Care Unit Administrator Lisa Mincy testified that Nurse Galvin, among others, appreciated the risk of the delay in Mr. Dean's surgery and that Nurse Galvin, among others, found it "very concerning" that Mr. Dean's surgery took so long to be performed after his diagnosis for cancer. Mincy Tr. 193:19–23, 194:4–10. Indeed, the delay was discussed at the monthly "quality improvement meetings" attended by Ms. Galvin, and Ms. Mincy. *Id.* Nurse Galvin was present at each quality improvement meeting from Mr. Dean's diagnosis with cancer until his surgery. *See* IDOC No. 000150-64 (April), 000165-77 (May), 000178-93 (June).

She also took no steps to supervise Chad Christer, the Medical Records Director at Taylorville Correctional Center who was primarily responsible for scheduling Mr. Dean's surgery. Nurse Galvin, who was Mr. Christer's direct supervisor, testified that she took minimal steps to supervise him and was completely unaware if he was having scheduling difficulties unless he brought them to her attention. Galvin Tr. 95:8–98:4,141:14–142:15.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Nurse Galvin disregarded Dr. Severino's instruction that Mr. Dean undergo surgery immediately and failed to schedule Mr. Dean's surgery for over three months, based on the degree to which Nurse Galvin's actions or inaction caused or were themselves departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

10.     Identify the factual bases for each of the contentions in Count III, paragraph 92, of the Third Amended Complaint Kathy Galvin "delayed in referring Mr. Dean to an outside specialist, delayed in scheduling a date for Mr. Dean's surgery, and delayed in obtaining approval for Mr. Dean's cancer medications" and any testimonial or documentary evidence that supports this contention. If such evidence is in medical records, identify the specific Bates or page number. If such evidence is in deposition testimony, identify the deposition, page, and line.

**ANSWER:**     As Director of Nursing at the Taylorville Correctional Center, Kathy Galvin was responsible for ensuring that *all* of Wexford's policies and IDOC's institutional directives were followed by staff at Taylorville. Galvin Tr. 32:11-13. Wexford has policies and guidelines that medical procedures and off-site referral are to be promptly scheduled. *See, e.g.*, Ritz 30(b)(6) Ex. 3 at 10-12; Ritz 30(b)(6) Tr. 22:20-41:3. Nurse Galvin was also responsible for supervising sick call and supervising the Medical Records Director, who in turn was responsible for scheduling procedures and off-site medical visits. Galvin Tr. 30:17-22, 35:20-22. For each of the delays that are the subject of Mr. Dean's Complaint, Nurse Galvin took no steps to ensure that Mr. Dean received treatment:

- Nurse Galvin took no steps to schedule or expedite Mr. Dean's renal ultrasound or ensure that it was scheduled or conducted. Galvin Tr. 80:24-81:11. This was despite the fact Nurse Galvin knew that hematuria is a symptom of kidney and bladder cancer. Galvin Tr. 21:23-22:3.

- Nurse Galvin took no steps to schedule or expedite Mr. Dean's cystoscopy or CT scan or ensure that it was scheduled or conducted. Galvin Tr. 87:12-88:3.

- Nurse Galvin took no steps to schedule or expedite Mr. Dean's surgery or to ensure that it was scheduled or conducted. Galvin Tr. 118:9-14, 119:17-19, 121:1-3, 143:8-11. This was despite the fact that Mr. Dean's wife called about the scheduling of the cancer surgery on April 25 and spoke with Kathy Galvin, who told her that the surgery had been "approved and scheduled." Galvin Tr. 114:1–9. It is also despite the fact that Mr. Dean filed an emergency grievance regarding the scheduling of his surgery in May 2017: "Get . . . Wexford to stop dragging this out and get me to surgery!" Galvin Ex. 15. Galvin's response to Mr. Dean was that the surgeon had been "contacted to schedule a surgical date. Currently awaiting a response." *Id.*; *see also* Galvin Tr. 166:7–10 (same). Galvin denied that she misled Ms. Dean during the April 25 phone call, claiming that she had been "told it was approved and scheduled." Galvin Tr. 166:11–167:2.

  Health Care Unit Administrator Lisa Mincy testified that Nurse Galvin, among others, appreciated the risk of the delay in Mr. Dean's surgery and that Nurse Galvin, among others, found it "very concerning" that Mr. Dean's surgery took so long to be performed after his diagnosis for cancer. Mincy Tr. 193:19–23, 194:4–10. Indeed, the delay was discussed at the monthly "quality improvement meetings" attended by Ms. Galvin, and Ms. Mincy. *Id.* Nurse Galvin was present at each quality improvement meeting from Mr. Dean's diagnosis with cancer until his surgery. *See* IDOC No. 000150-64 (April), 000165-77 (May), 000178-93 (June).

  She also took no steps to supervise Chad Christer, the Medical Records Director at Taylorville Correctional Center who was primarily responsible for scheduling Mr. Dean's surgery. Nurse Galvin, who was Mr. Christer's direct supervisor, testified that she took minimal steps to supervise him and was completely unaware if he was having scheduling difficulties unless he brought them to her attention. Galvin Tr. 95:8–98:4,141:14–142:15.

- Nurse Galvin took no steps to expedite the non-formulary approval or administration of Mr. Dean's cancer medications Votrient and Opdivo. Galvin Tr. 161:15-162:6. This was despite being made aware of the need for non-formulary approval of these medications. Mincy Tr. 203:6-14.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Nurse Galvin delayed in referring Mr.

16

Dean to an outside specialist, delayed in scheduling a date for Mr. Dean's surgery, and delayed in obtaining approval for Mr. Dean's cancer medications, based on the degree to which Nurse Galvin's actions or inaction caused or were themselves departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

11.   Identify each and every unconstitutional custom, policy, or practice Plaintiff references in Count V, paragraph 104, of the Third Amended Complaint, specifying whether each refers to an express policy, a widespread practice, or final policymaker's decision.

**ANSWER:**   At times relevant to Mr. Dean's claims, Wexford maintained the following unconstitutional customs, policies, or practices:

- Wexford's policy of responding in a deliberately indifferent fashion to gross hematuria for patients over the age of 50, which is an express policy and a widespread practice.

- Wexford's policy of subjecting outside referrals to the collegial review process, which is an express policy and a widespread practice.

- Wexford's policy of not timely scheduling or holding collegial reviews, which is an express policy and a widespread practice.

- Wexford's policy of not referring patients to off-site care, which is an express policy and a widespread practice.

- Wexford's policy of not timely scheduling off-site medical appointments and procedures, which is an express policy and a widespread practice.

- Wexford's policy of its patients not actually undergoing off-site care in a timely fashion, which is an express policy and a widespread practice.

- Wexford's policy of subjecting cancer medications to the non-formulary review process, which is an express policy and widespread practice.

- Wexford's policy of diffusing responsibility for a patient's medical care across multiple employees, which is an express policy and a widespread practice.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Wexford's customs, policies, and practices evinced deliberate indifference to Mr. Dean's serious medical needs, in violation of the Constitution, and caused departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

12.     For each unconstitutional custom, policy, or practice identified in response to interrogatory No. 11, identify (1) all factual bases for the existence of the policy custom, policy, or practice and (2) and any testimonial or documentary evidence that supports the policy's existence.

**ANSWER:**     Wexford's policy of responding in a deliberately indifferent fashion to gross hematuria for patients over the age of 50. The standard of care for a patient with hematuria is to order a CT IVP or CT urogram and a cystoscopy. Severino Tr. 16:14–16; Dhar Report at 4-6. Yet, Wexford's Regional Medical Director, Dr. Matticks, said a CT IVP and cystoscopy were merely "options to consider" when a patient presents with hematuria, while Dr. Ritz said he didn't "agree with" the guidelines and that in a case of "painless hematuria" he would only "consider" using them. Matticks Tr. 51:16–18; Ritz Tr. 46:5-47:2, 76:24-77:5. Moreover, Wexford has a preference for exhausting on-site services before ordering off-site tests, such as a CT IVP or CT urogram and cystoscopy, Ritz 30(b)(6) Tr. 13:20–14:2. Dr. Matticks suggested the guidelines might not even be consistent with current technology and practices. Matticks 30(b)(6) Tr. 80:8–11.

Wexford's policy of subjecting outside referrals to the collegial review process. This policy is contained in "Utilization Management Policies and Procedures, Region: Illinois" and "Utilization Management Guidelines, Region: Illinois." See Ritz 30(b)(6) Exs. 3, 4. This policy was described on Wexford's public facing website as of Aug. 12, 2019. See Ritz 30(b)(6) Ex. 2. Dr. Ritz, as corporate representative of Wexford, testified about the existence of this policy and custom. See Ritz 30(b)(6) Tr. 11:14-15:4.

Wexford's policy of not timely scheduling or holding collegial reviews. At the time of Mr. Dean's initial presentation with hematuria, the collegial review policy did not contain any requirement that a collegial review be held in a timely fashion. See Ritz 30(b)(6) Ex. 4; Ritz 30(b)(6) Tr. 43:2-10. Wexford added a provision that collegial reviews should be conducted weekly in January 2016. See Ritz 30(b)(6) Ex. 3; Ritz 30(b)(6) Tr. 22:20-23:11. But Wexford does not track how often collegial reviews fail to happen on a weekly basis. Ritz 30(b)(6) Tr. 23:12-15. Wexford has not punished employees which collegial reviews fail to happen on a weekly basis. Ritz 30(b)(6) Tr. 23:22-24:17. Collegial reviews are conducted with greater frequency in other states where Wexford manages medical care in the prison system. Ritz Tr. 31:1-32:1. Wexford also discourages doctors from seeking to have off-site care approved outside of the weekly collegial review meeting. Ritz 30(b)(6) Tr. 27:5-21.

Wexford's policy of not referring patients to off-site care. This policy is carried out by subjecting all off-site care to the collegial review process, which "results" in a reduction of off-site referrals. Ritz 30(b)(6) Tr, 11:25-15:4; Ritz Tr. 23:24-24:2; 57:11-19; *see also* Ritz 30(b)(6) Exs. 2, 3, 4. Off-site care is not supposed to be

scheduled before it is approved at collegial review. Ritz 30(b)(6) Tr. 32:12-15. Wexford punishes employees who schedule off-site care before it is approved at collegial, in sharp contrast to the lack of punishment meted out to employees who fail to meet the deadline articulated in Wexford's policies and guidelines. Ritz 30(b)(6) Tr.

Wexford's policy of not timely scheduling off-site medical appointments and procedures. At the time of Mr. Dean's initial presentation with hematuria, Wexford's policy did not contain any requirement that off-site care be scheduled in a timely fashion. *See* Ritz 30(b)(6) Ex. 4; Ritz 30(b)(6) Tr. 45:23-46:8. In 2016, Wexford added a provision requiring that appointments be scheduled within 10 days. *See* Ritz 30(b)(6) Ex. 3; Ritz 30(b)(6) Tr. 35:20-36:11. But Wexford makes no attempt to track if this 10-day policy is actually followed. Ritz 30(b)(6) Tr. 36:12-21. Wexford's corporate representative had no idea if Wexford made any attempt to enforce the 10-day policy. Ritz 30(b)(6) Tr. 38:5-12.

Wexford's policy of its patients not actually undergoing off-site care in a timely fashion. At the time of Mr. Dean's initial presentation with hematuria, Wexford's policy did not contain any specific requirements that off-site care be delivered in a timely fashion. *See* Ritz 30(b)(6) Ex. 4. In 2016, Wexford added provisions requiring that procedures be assigned a "targeted completion date" and be completed within 90 days. *See* Ritz 30(b)(6) Ex. 3. But Wexford employees face no consequences if a procedure is not completed by the targeted completion date, despite the fact that having the procedure done by that date is "the most important clinical metric with respect to providing patient care." *See* Ritz 30(b)(6) Tr. 40:3-5, 40:11-41:3. Wexford does not track how often procedures are not completed within the 90-day period. Ritz 30(b)(6) Tr. 39:21-40:6.

Wexford's policy of subjecting cancer medications to the non-formulary review process. All chemotherapeutic drugs, such as Votrient and Opdivo, are non-formulary. Ritz Tr. 110:16-111:1. Certain "commonly-used" medications are on Wexford and IDOC's formulary, meaning that providers can prescribe them without a formal review by Wexford's pharmacy team. Ritz Tr. 94:21-95:1. All other drugs must go through the "non-formulary" process where they are reviewed for "medical necessity, clinical appropriateness, toxicity, interaction[s]." Ritz Tr. 95:7-12. The pharmacy team will also consider cost in some circumstances when deciding which medication to approve. Ritz Tr. 104:11-105:20. The non-formulary process requires the site medical director to complete a request form and forward supporting documentation to the pharmacy team for review. Tr. 96:5-20.

Wexford's policy of diffusing responsibility for a patient's medical care across multiple employees. Kathy Galvin is the director of nursing and the supervisor of the Medical Records Director, the person responsible for scheduling appointments, yet disclaimed basically any responsibility for ensuring that person promptly scheduled appointments and responded to one question about why she didn't review a certain form by noting "I'm not a scheduling entity, and I'm not an attending RN." Galvin Tr. 94:14-17, 135:20-137:6. Moreover, Nurse Galvin noted that following

up on Mr. Dean's grievance about the scheduling of his surgery was "not my dut[y]." Galvin Tr. 136:21. Lisa Mincy, the health care unit administrator, noted that though she recognized, based on her medical knowledge, that Mr. Dean needed to see a specialist to diagnose and treat his hematuria, she did not follow up with him to see if he actually saw a specialist because it wasn't her job because she "wasn't hired as a case manager." Mincy Tr. 77:13-80:1. By "case manager" Mincy meant "somebody that would follow his case completely.  It would be somebody that would know from start to finish what was going on with that patient, would know the care that was being given and would basically know all -- read all the notes." Mincy Tr. 80:8-14. Mincy testified that neither Taylorville nor other facilities has someone who performs that job. Mincy Tr. 80:5-21. *See also, e.g.,* Einwohner Tr. 155:20–156:2, 159:24–160:21 (not her job to deal with kidney-related pain); Mincy Tr. 194:11–22 (no one else tried to schedule Mr. Dean's surgery "because that was Chad's job"). Dr. Nawoor appears to lack understanding of his role as primary care physician. Although he testified that he feels his hands are tied when it comes to getting treatment for patients, Nawoor Tr. 120:24–121:9, Dr. Matticks, Wexford's corporate representative, testified that the treating physicians are expected to advocate for their patients, Matticks Tr. 83:2–9, 84:3–6, 157:1–8.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Wexford's customs, policies, and practices evinced deliberate indifference to Mr. Dean's serious medical needs, in violation of the Constitution, and caused departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

13. Identify all the factual bases for the contention Defendant Wexford was deliberately indifferent as alleged in Count V of the Third Amended Complaint.

**ANSWER:**  Wexford's policy of responding in a deliberately indifferent fashion to gross hematuria for patients over the age of 50. Mr. Dean did not undergo the appropriate imaging for his gross hematuria until April 2016. IDOC Taylorville Med Recs 001082, 001093-94; Dhar Report at 2-6; Galvin Ex. 6; IDOC No. 000088. Wexford and its employees are aware that one potential cause of hematuria is cancer. Galvin Tr. 21:20-22:4; Ritz Tr. 78:22-79:3; Nawoor Tr. 191:16-194:16.

Wexford's policy of subjecting outside referrals to the collegial review process. This policy is deliberately indifferent because it results in a medically unnecessary delay in treatment. According to Dr. Steven Ritz, the medical purpose of collegial review is "to allow doctor-to-doctor discussion regarding the management of cases." Ritz Tr. 51:20-24. But "most cases" are approved with no discussion at all. Ritz Tr. 41:24-42:4; 49:6-50:8. The "approval aspect" of collegial review serves primarily a business purpose. Ritz Tr. 52:15-53:15. It exists only to reduce off-site care, which is by its very nature more expensive and resource intensive for Wexford and IDOC. Ritz 30(b)(6) Tr. 11:14-15:4. In Wexford's own words, the process is "designed to reduce offsite care costs." Ritz 30(b)(6) Ex. 2.

Wexford's policy of not timely scheduling or holding collegial reviews. Mr. Dean waited six days for his January 13, 2016 collegial review. *See* IDOC No. 000088; IDOC Taylorville Med Recs 001340-44; Einwohner Record Bates # 00061. Mr. Dean waited two days for his February 10, 2016 collegial review. IDOC Taylorville Med Recs 001340-44; IDOC No. 000091. Mr. Dean waited 12 and 20 days for his March 22 and March 30, 2016 collegial reviews. Ritz Tr. 87:18-88:6; IDOC No. 000094-95. Mr. Dean waited six days for his April 20, 2016 collegial review. IDOC No.000097-98.

Wexford's policy of not referring patients to off-site care. Mr. Dean was not sent off-site to see a urologist until March 10, 2016. IDOC Taylorville Med Recs 001076. Prior to this, he received an on-site ultrasound which was inadequate to diagnose either kidney stones or cancer. Dhar Tr. 74:9-16, 74:21-2; Dhar Expert Report at 4-6. Wexford and IDOC have a strong preference for on-site care. Ritz 30(b)(6) Tr. 11:14-15:4; Ritz 30(b)(6) Ex. 2.

Wexford's policy of not timely scheduling off-site medical appointments and procedures. Mr. Dean was not sent off-site to see a urologist until March 10, 2016 and did not receive a CT scan and cystoscopy until April 2016. IDOC Taylorville Med Recs 001076, 001082. Prior to this, he received an on-site ultrasound which was inadequate to diagnose either kidney stones or cancer. Dhar Tr. 74:9-16, 74:21-2; Dhar Expert Report at 4-6. After Dr. Severino stated that Mr. Dean needed surgery on April 14, 2016, he did not receive surgery until July 19, 2016. IDOC Taylorville Med Recs 001082. Wexford and IDOC have a strong preference for on-site care. Ritz 30(b)(6) Tr. 11:14-15:4; Ritz 30(b)(6) Ex. 2.

Wexford's policy of its patients not actually undergoing off-site care in a timely fashion. Mr. Dean was not sent off-site to see a urologist until March 10, 2016 and did not receive a CT scan until April 2016. IDOC Taylorville Med Recs 001076, 001082. Prior to this, he received an on-site ultrasound which was inadequate to diagnose either kidney stones or cancer. Dhar Tr. 74:9-16, 74:21-2; Dhar Expert Report at 4-6. After Dr. Severino stated that Mr. Dean needed surgery on April 14, 2016, he did not receive surgery until July 19, 2016. IDOC Taylorville Med Recs 001082. Wexford and IDOC have a strong preference for on-site care. Ritz 30(b)(6) Tr. 11:14-15:4; Ritz 30(b)(6) Ex. 2.

Wexford's policy of subjecting cancer medications to the non-formulary review process. Mr. Dean's Opdivo and Votrient perscriptions were subjected to the non-formulary process. IDOC Taylorville Med Recs 001477, 001678; IDOC No. 000124-26; Nawoor Tr. 300:2-24.

Wexford's policy of diffusing responsibility for a patient's medical care across multiple employees. Wexford is on notice of this practice and the harm it causes. *See, e.g.*, *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 785-786 (7th Cir. 2014); Ron Shansky, MD et al., *Final Report of the Court-Appointed Expert, Lippert v. Godinez* (Dec. 2014), *available at* https://www.aclu-il.org/sites/default/files/wysiwyg/lippert_v_godinez_expert_report.pdf; Mike

Puisis, DO et al., *Statewide Summary Report including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court-Appointed Expert, Lippert v. Godinez* (Oct. 2018), https://www.aclu-il.org/sites/default/files/field_documents/lippert_-_report_of_second_court-appointed_expert.pdf. Wexford's policy caused a lapse in referral to an outside expert in Mr. Dean's own case. IDOC No. 000860-61.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Wexford's customs, policies, and practices evinced deliberate indifference to Mr. Dean's serious medical needs and caused departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

14.     Identify any testimonial or documentary evidence that supports that Wexford was deliberately indifferent as alleged in Count V of the Third Amended Complaint. If such evidence is in medical records, identify the specific Bates or page number. If such evidence is in deposition testimony, identify the deposition, page, and line.

**ANSWER:**   Please see the response to Interrogatory No. 13, which contains a listing of the evidence underlying the factual bases for Wexford's deliberate indifference.

15.     As it relates to Count VII of the Third Amended Complaint identify (1) what standard of care Dr. Nawoor failed to meet, (2) all instances in which Dr. Nawoor failed to meet the standard of care, (3) on each instance identified what the standard of care required Dr. Nawoor to do, and (4) the identity of all individuals who will testify that Dr. Nawoor deviated from the applicable standard of care.

**ANSWER:**   Dr. Nawoor's actions and inaction failed to provide Mr. Dean with, or to allow Mr. Dean access to, medical treatment that met the standard of care—to provide or to promote timely and effective diagnosis and treatment to Mr. Dean's persistent, grossly bloody urine, or its underlying cause, kidney cancer—on an ongoing basis, on multiple occasions, and during multiple overlapping periods, including at least the following:

- From December 23, 2015, when Mr. Dean first reported his painless, gross hematuria to Dr. Nawoor, to November 14, 2016, when Mr. Dean received his first dose of cancer-fighting drugs;

  o Dr. Nawoor should have known that the standard of care for hematuria included referral to a urologist and appropriate diagnostic imaging

studies, including CT scan with contrast (or an equivalent imaging study with contrast) and cystoscopy, to rule out the possibility of urologic cancers. And in fact Dr. Nawoor *did* know this standard of care, as he wrote in Mr. Dean's medical records that he should "see urologist eventually," and he *did* know the root cause of Mr. Dean's symptoms could be cancer, as he told Mr. Dean at the December 23, 2015 appointment that he had "either kidney stones or cancer."

- o During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite diagnostic procedures to detect and the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

- o For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; Dr. Adam Metwalli; and Dr. William Severino.

- From Mr. Dean's December 23, 2015 report of painless, gross hematuria to Dr. Nawoor, to July 19, 2016, when Mr. Dean received surgical treatment to remove his cancerous kidney;

  - o During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite diagnostic procedures to detect and the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

  - o For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; Dr. Adam Metwalli; and Dr. William Severino.

- From Mr. Dean's December 23, 2015 report of painless, gross hematuria to Dr. Nawoor, to April 12, 2016, when Mr. Dean for the first time received imaging studies (CT scan) adequate to the standard of care to diagnose his cancer;

  - During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite diagnostic procedures to detect and the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

  - For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; Dr. Adam Metwalli; and Dr. William Severino.

- On and after February 2, 2016, when an ultrasound was performed on Mr. Dean's kidneys and bladder and revealed a significantly larger right kidney, at 15.3 cm, compared to his normal-sized left kidney, at 13.1 cm.

  - On and after this date, the standard of care required that Dr. Nawoor review the results of the ultrasound for any ostensible detection of abnormality causing or contributing to Mr. Dean's grossly bloody urine and that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite diagnostic procedures to detect and the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

  - For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; Dr. Adam Metwalli; and Dr. William Severino.

- From March 10, 2016, when Mr. Dean first saw a urologist, Dr. Severino, to the April 12, 2016 imaging studies (CT scan) that detected Mr. Dean's kidney cancer;

- o  This period of delay does not correspond to any arguable medical need for Mr. Dean, and it does not conform to Wexford's practice, as articulated in Wexford's testimony through its Rule 30(b)(6) corporate representative Dr. Roderick Matticks, that a treating doctor may seek accelerated review of a proposed course of treatment subject to collegial review where the treatment is necessary. *See* Matticks Tr. 81:18-85:11.

- o  During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite diagnostic procedures to detect and the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

- o  For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; Dr. Adam Metwalli; and Dr. William Severino.

- From April 14, 2016, when results first became available from the April 12, 2016 imaging studies (CT scan), to Mr. Dean's July 19, 2016 surgery to remove his cancerous kidney;

  - o  During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite surgical treatments and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

  - o  For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Nivedita Dhar and Dr. Adam Metwalli.

- From the April 14, 2016 availability of results from imaging studies (CT scan), to August 15, 2016, during which time Dr. Nawoor had taken no steps to refer Mr. Dean for an oncology consult despite Dr. Severino's diagnosis that Mr. Dean had kidney cancer;

25

- o During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

- o For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From Mr. Dean's July 19, 2016 surgery to remove his cancerous kidney to August 15, 2016, when a collegial review was first requested to consider a potential oncology referral, despite the July 19, 2016 pathology report from Mr. Dean's surgery verifying the diagnosis of kidney cancer;

  - o During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

  - o For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From the August 15, 2016 request for a collegial review for potential oncology referral, to August 17, 2016, when a collegial review was conducted and the oncology referral was approved;

  - o This period of delay does not correspond to any arguable medical need for Mr. Dean, and it does not conform to Wexford's practice, as articulated in Wexford's testimony through its Rule 30(b)(6) corporate representative Dr. Roderick Matticks, that a treating doctor may seek accelerated review of a proposed course of treatment subject to collegial review where the treatment is necessary. *See* Matticks Tr. 81:18-85:11.

- o During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

- o For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From Mr. Dean's July 19, 2016 surgery to remove his cancerous kidney to his first dose of cancer-fighting drugs on November 14, 2016;

  - o During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

  - o For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From the August 17, 2016 collegial review and approval of the oncology referral to August 26, 2016, when Mr. Dean first saw an oncologist;

  - o This period of delay does not correspond to any arguable medical need for Mr. Dean, and it does not conform to Wexford's practice, as articulated in Wexford's testimony through its Rule 30(b)(6) corporate representative Dr. Roderick Matticks, that a treating doctor may seek accelerated review of a proposed course of treatment subject to collegial review where the treatment is necessary. *See* Matticks Tr. 81:18-85:11.

  - o During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The

standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

o For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From Mr. Dean's August 26, 2016 oncology appointment to his first dose of cancer-fighting drugs on November 14, 2016;

    o During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

    o For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From October 19, 2016, when Mr. Dean's oncologist first wrote a prescription for Mr. Dean to receive cancer-fighting drugs to Mr. Dean's first dose of cancer-fighting drugs on November 14, 2016;

    o This period of delay does not correspond to any arguable medical need for Mr. Dean, and it does not conform to Wexford's practice, as articulated in Wexford's testimony through its Rule 30(b)(6) corporate representative Dr. Roderick Matticks, that a treating doctor may seek accelerated review of a proposed course of treatment subject to collegial review where the treatment is necessary. *See* Matticks Tr. 81:18-85:11.

    o During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs,

28

and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

o For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From Mr. Dean's oncologist's October 19, 2016 prescription for cancer-fighting drugs to November 2, 2016, when Dr. Nawoor and others first considered in collegial review whether Mr. Dean's prescription would be authorized;

    o This period of delay does not correspond to any arguable medical need for Mr. Dean, and it does not conform to Wexford's practice, as articulated in Wexford's testimony through its Rule 30(b)(6) corporate representative Dr. Roderick Matticks, that a treating doctor may seek accelerated review of a proposed course of treatment subject to collegial review where the treatment is necessary. *See* Matticks Tr. 81:18-85:11.

    o During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

    o For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From the November 2, 2016 collegial review to Mr. Dean's first dose of cancer-fighting drugs on November 14, 2016.

    o This period of delay does not correspond to any arguable medical need for Mr. Dean, and it does not conform to Wexford's practice, as articulated in Wexford's testimony through its Rule 30(b)(6) corporate representative Dr. Roderick Matticks, that a treating doctor may seek accelerated review of a proposed course of treatment subject to collegial review where the treatment is necessary. *See* Matticks Tr. 81:18-85:11.

    o During this period, the standard of care required that Dr. Nawoor advocate persistently for Mr. Dean to receive the requisite

pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Nawoor seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

o For this period, testimony that Dr. Nawoor's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

16.    As it relates to Count VIII of the Third Amended Complaint identify (1) what standard of care Dr. Einwohner failed to meet, (2) all instances in which Dr. Einwohner failed to meet the standard of care, (3) on each instance identified what the standard of care required Dr. Einwohner to do, and (4) the identity of all individuals who will testify that Dr. Einwohner deviated from the applicable standard of care.

**ANSWER:**    Dr. Einwohner's actions and inaction failed to provide Mr. Dean with, or to allow Mr. Dean access to, medical treatment that met the standard of care—to provide or to promote timely and effective diagnosis and treatment to Mr. Dean's persistent, grossly bloody urine, or its underlying cause, kidney cancer—on an ongoing basis, on multiple occasions, and during multiple overlapping periods, including at least the following:

● From January 7, 2016, when Mr. Dean first reported his painless, gross hematuria to Dr. Einwohner, to September 26, 2016, when Mr. Dean refused to attend renal teleclinic with Dr. Einwohner;

o Dr. Einwohner should have known that the standard of care for hematuria included referral to a urologist and appropriate diagnostic imaging studies, including CT scan with contrast (or an equivalent imaging study with contrast) and cystoscopy, to rule out the possibility of urologic cancers. And in fact Dr. Einwohner *did* know this standard of care, as she wrote in a January 7, 2016 email to Dr. Stephen Ritz that she "suggest[ed] . . . urology eval[uation]," and she *did* know that the root cause of Mr. Dean's hematuria could be cancer, as she wrote in her renal progress note only that the "hematuria *may be related* to [kidney] stones[.]"

o During this period, the standard of care required that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite diagnostic

procedures to detect and the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by her or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

o   Dr. Einwohner's ongoing use of single-page renal teleclinic notes to record her observations, the results of testing she ordered, and her plan for Mr. Dean's care resulted in cramped, illegible writing that failed to communicate her medical opinions to other members of Mr. Dean's primary care team. She testified that her own notes did not permit even her to conclude whether she was recording current or historical symptoms or diagnoses when writing the renal teleclinic notes. It was a deviation from the standard of care for Dr. Einwohner to create Mr. Dean's medical records in a manner that not even she could interpret reliably.

o   At no point did Dr. Einwohner so much as attend a collegial review meeting regarding Mr. Dean's painless, gross hematuria, despite her role as a nephrologist and treating physician through the renal teleclinic. It was a deviation from the standard of care for her not to attend collegial review meetings where matters under her specialty, nephrology, were in discussion, and when her renal teleclinic notes, the only medium by which she sought to communicate with her colleagues, were illegible and not subject to reliable interpretation.

o   At no point did Dr. Einwohner perform her own microscopic or even gross visual examination of the grossly bloody urine specimens Mr. Dean provided during her care of him. Instead she consistently accepted laboratory reports in lieu of her own investigation, a deviation from the standard of care.

o   For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; Dr. Adam Metwalli; and Dr. William Severino.

• From Mr. Dean's January 7, 2016 report of painless, gross hematuria to Dr. Einwohner, to July 19, 2016, when Mr. Dean received surgical treatment to remove his cancerous kidney;

o   During this period, the standard of care required that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite diagnostic

procedures to detect and the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by her or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

- o For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; Dr. Adam Metwalli; and Dr. William Severino.

- From Mr. Dean's January 7, 2016 report of painless, gross hematuria to Dr. Einwohner, to April 12, 2016, when Mr. Dean for the first time received imaging studies (CT scan) adequate to the standard of care to diagnose his cancer;

  - o During this period, the standard of care required that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite diagnostic procedures to detect and the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by her or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

  - o For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; Dr. Adam Metwalli; and Dr. William Severino.

- On and after February 2, 2016, when an ultrasound was performed on Mr. Dean's kidneys and bladder and revealed a significantly larger right kidney, at 15.3 cm, compared to his normal-sized left kidney, at 13.1 cm, and especially on and after February 8, 2016, when Dr. Einwohner saw Mr. Dean by renal teleclinic and reiterated the ultrasound's findings in her corresponding renal progress note for Mr. Dean's medical records.

  - o On and after these dates, the standard of care required that Dr. Einwohner review the results of the ultrasound for any ostensible detection of abnormality causing or contributing to Mr. Dean's grossly

bloody urine and that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite diagnostic procedures to detect and the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required Dr. Einwohner to continue to seek the requisite diagnostic procedures to rule out cancer, and corresponding appropriate treatment, notwithstanding Mr. Dean's report that he had passed something unidentified in his urine stream. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by her or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

- o  For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; Dr. Adam Metwalli; and Dr. William Severino.

- From March 10, 2016, when Mr. Dean first saw a urologist, Dr. Severino, to the April 12, 2016 imaging studies (CT scan) that detected Mr. Dean's kidney cancer;

  - o  This period of delay does not correspond to any arguable medical need for Mr. Dean, and it does not conform to Wexford's practice, as articulated in Wexford's testimony through its Rule 30(b)(6) corporate representative Dr. Roderick Matticks, that a treating doctor may seek accelerated review of a proposed course of treatment subject to collegial review where the treatment is necessary. *See* Matticks Tr. 81:18-85:11.

  - o  During this period, the standard of care required that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite diagnostic procedures to detect and the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by her or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

  - o  For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; Dr. Adam Metwalli; and Dr. William Severino.

- From April 14, 2016, when results first became available from the April 12, 2016 imaging studies (CT scan), to Mr. Dean's July 19, 2016 surgery to remove his cancerous kidney;

  o During this period, the standard of care required that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite surgical treatments and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by her or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

  o For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Nivedita Dhar and Dr. Adam Metwalli.

- From the April 14, 2016 availability of results from imaging studies (CT scan), to August 15, 2016, during which time Dr. Einwohner had taken no steps to refer Mr. Dean for an oncology consult despite Dr. Severino's diagnosis that Mr. Dean had kidney cancer;

  o During this period, the standard of care required that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite surgical, pharmaceutical, and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by her or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

  o For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From Mr. Dean's July 19, 2016 surgery to remove his cancerous kidney to August 15, 2016, when a collegial review was first requested to consider a potential oncology referral, despite the July 19, 2016 pathology report from Mr. Dean's surgery verifying the diagnosis of kidney cancer;

  o During this period, the standard of care required that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney

cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by her or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

- o For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From the August 15, 2016 request for a collegial review for potential oncology referral, to August 17, 2016, when a collegial review was conducted and the oncology referral was approved;

  - o This period of delay does not correspond to any arguable medical need for Mr. Dean, and it does not conform to Wexford's practice, as articulated in Wexford's testimony through its Rule 30(b)(6) corporate representative Dr. Roderick Matticks, that a treating doctor may seek accelerated review of a proposed course of treatment subject to collegial review where the treatment is necessary. *See* Matticks Tr. 81:18-85:11.

  - o During this period, the standard of care required that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by her or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

  - o For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From Mr. Dean's July 19, 2016 surgery to remove his cancerous kidney to his September 26, 2016 refusal to attend renal teleclinic with Dr. Einwohner;

  - o During this period, the standard of care required that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by her or others'

inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

o   For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From the August 17, 2016 collegial review and approval of the oncology referral to August 26, 2016, when Mr. Dean first saw an oncologist;

   o   This period of delay does not correspond to any arguable medical need for Mr. Dean, and it does not conform to Wexford's practice, as articulated in Wexford's testimony through its Rule 30(b)(6) corporate representative Dr. Roderick Matticks, that a treating doctor may seek accelerated review of a proposed course of treatment subject to collegial review where the treatment is necessary. *See* Matticks Tr. 81:18-85:11.

   o   During this period, the standard of care required that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

   o   For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

- From Mr. Dean's August 26, 2016 oncology appointment to his September 26, 2016 refusal to attend renal teleclinic with Dr. Einwohner;

   o   During this period, the standard of care required that Dr. Einwohner advocate persistently for Mr. Dean to receive the requisite pharmaceutical and specialist treatments and care to treat his kidney cancer in a timely fashion according to the standard of care. The standard of care further required that Dr. Einwohner seek to avoid medically unnecessary delays, including those caused by his or others' inattentiveness to Mr. Dean's symptoms, diagnosis, or medical needs, and those resulting from directives, policies, or procedures implemented by either Wexford or the Illinois Department of Corrections that were and are unrelated to Mr. Dean's medical needs.

o For this period, testimony that Dr. Einwohner's actions and inaction deviated from the applicable standard of care will be provided by Dr. Bruce Barnett; Dr. Nivedita Dhar; and Dr. Adam Metwalli.

17.     As it relates to Count IX of the Third Amended Complaint identify (1) what standard of care Kathy Galvin failed to meet, (2) all instances in which Kathy Galvin failed to meet the standard of care, (3) on each instance identified what the standard of care required Kathy Galvin to do, and (4) the identity of all individuals who will testify that Kathy Galvin deviated from the applicable standard of care.

**ANSWER:**     Nurse Galvin failed to meet the standard of care in having Mr. Dean undergo a prompt and timely surgery for his cancer. Nurse Galvin repeatedly failed to meet this standard of care between April 14, 2016 and July 19, 2016 when she took no steps to schedule his surgery or expedite the scheduled surgery, despite being the supervisor of the Medical Records Director Chad Christer who was the surgery scheduler. For further details, see the responses to Interrogatories Nos. 8-10 above. Nurse Galvin performed no meaningful supervision of Mr. Christer during the time period identified. Galvin Tr. 94:14-98:19. Specific instances where she failed to meet the standard of care include her response to and inaction in the face of Mr. Dean's May 2016 emergency grievance, Galvin Tr. 130:12-137:7; Galvin Ex. 15, and her response to and inaction in the face of Ms. Dean's April 2016 phone call regarding the surgery scheduling, Galvin Tr. 113:14-118:3. The following individuals will testify that Nurse Galvin deviated from the standard of care: Dr. Barnett, Dr. Dhar, Dr. Metwalli, Lisa Mincy, Chad Christer, William Dean, Cynthia Dean.

18.     Identify by name the "agents, apparent agents, and/or employees" referenced in Count X, paragraph 132.

**ANSWER:**     The "agents, apparent agents, and/or employees" referenced in Count X, paragraph 132 of the Third Amended Complaint include, but are not limited to, the following individuals: Dr. Abdur Nawoor, Dr. Rebecca Einwohner, Nurse Kathy Galvin, Dr. Stephen Ritz, Dr. Roderick Matticks, Dr. Hector Garcia, Dr. Ralph Gauen, Nurse Megan Eggiman, Nurse Randy Emerson, Shawn Cates, Jim Dawson, Chad Christer, Felicia Waterman, Nicholas Little, Dr. Arthur Funk, Dr. Curtis Fisher, and Rhonda Dudley.

19.     Identify the actions or inactions of Defendant Wexford relied upon for Plaintiff's

claim of institutional negligence against Wexford in Count XI of the Third Amended Complaint.

**ANSWER:**     Wexford failed to adopt procedures to ensure its providers will properly respond
to a patient presenting with hematuria. The standard of care for a patient with
hematuria is to order a CT IVP or CT urogram and a cystoscopy. Severino Tr.
16:14–16. Yet, Wexford's Regional Medical Director, Dr. Matticks, said a CT
IVP and cystoscopy were merely "options to consider" when a patient presents
with hematuria. Matticks Tr. 51:16–18. Moreover, Wexford has a preference for
exhausting on-site services before ordering off-site tests, such as a CT IVP or CT
urogram and cystoscopy, Ritz 30(b)(6) Tr. 13:20–14:2. Dr. Matticks suggested the
guidelines might not even be consistent with current technology and practices.
Matticks 30(b)(6) Tr. 80:8–11.

Wexford failed to ensure its guidelines for responding to hematuria were followed.
Although Wexford publishes guidelines on how to treat patients presenting with
hematuria that lists CT IVP and cystoscopy as procedures to consider, as well as
urology consultations, Wexford Medical Guidelines at 293, Dr. Einwohner's initial
request for "re-imaging and urology eval" was denied by Dr. Ritz in a collegial
review, Einwohner Records Bates $000061; IDOC Taylorville Med Recs 001074.
Dr. Ritz, who is responsible for approving all off-site procedures such as a CT IVP
and cystoscopy, testified that he himself "rarely" consults Wexford's Medical
Guidelines. Ritz Tr. 46:9–15, 46:17–47:2.

Wexford failed to adopt adequate procedures for ensuring off-site referrals were
scheduled in a timely fashion. At the time of Mr. Dean's initial presentation with
hematuria, Wexford's policy did not contain any requirement that off-site care be
scheduled in a timely fashion. *See* Ritz 30(b)(6) Ex. 4; Ritz 30(b)(6) Tr. 45:23-46:8.

Wexford failed to adopt adequate procedures for facilitating urgent off-site
referrals.

- Although Wexford does have guidelines for submitting requests for urgent
medical care, Wexford Utilization Management Guidelines at 12, providers are
not educated on what constitutes an "urgent" request, Ritz 30(b)(6) Tr. 27:16–
18. Dr. Ritz, Wexford's corporate representative, testified that providers have
been given feedback that they're making too many urgent requests, and that
they then make less urgent requests. Ritz 30(b)(6) Tr. 27:8–15.

- Chad Christer, the Medical Records Director at Taylorville Correctional Center
was primarily responsible for scheduling Mr. Dean's surgery. Mr. Christer's
supervisor, Kathy Galvin, testified that she took minimal steps to supervise him
and was completely unaware if he was having scheduling difficulties unless he
brought them to her attention. Galvin Tr. 95:8–98:4,141:14–142:15.

- Although Wexford assigns target completion dates to outside appointments or procedures that are approved through the collegial review process, Wexford's corporate representative had no knowledge of whether Wexford tracks how often those target completion dates are not met. Ritz 30(b)(6) Tr. 31:11–23.

Wexford failed to ensure its procedures for ensuring inmates received timely referrals to outside specialists were followed.

- Wexford has policies and guidelines that medical procedures and off-site referral are to be promptly scheduled. *See, e.g.*, Ritz 30(b)(6) Ex. 3 at 10-12; Ritz 30(b)(6) Tr. 22:20-41:3. Providers have the ability to the ability to expedite the scheduling of medical appointments and procedures. *See, e.g.*, Nawoor Tr. 284:12–286:6; IDOC Taylorville Med Recs 001356; IDOC Taylorville Med Recs 001349; Wexford Utilization Management Guidelines at 10, 12. Moreover, a physician can send patients to the ER if it is impossible to schedule outside appointment in timely manner. Galvin Tr. 67:10–23.

- It is Wexford's policy that collegial reviews should be conducted weekly. *See* Ritz 30(b)(6) Ex. 3; Ritz 30(b)(6) Tr. 22:20-23:11.

- A urology consultation was first recommended for Mr. Dean on January 7, 2016. Einwohner Records Bates #000061. It was not approved in collegial until February 10, 2016. IDOC Taylorville Med Recs 001081. Mr. Dean's first appointment with Dr. Severino was not until March 10, 2016. Springfield Clinic William K. Dean 20-21.

- Mr. Dean did not timely receive an oncology referral after his surgery. Dr. Severino referred Mr. Dean to oncology on August 11, 2016. Dean v. Wexford, et al. (17-3112) IDOC No.: 000861. Contrary to Wexford policy, Mr. Dean's oncology referral was not discussed in collegial until August 18, 2016, only after Lisa Mincy filed an Incident Report to this effect. Dean v. Wexford, et al. (17-3112) IDOC No.: 000861 ("Per K. Galvin DON Dr. Nawoor had received a phone call from Dr. Severino about the plan of care for Inmate Dean, and that an Oncology visit would be needed, but Inmate Dean had not been scheduled with Collegial Review.").

Wexford failed to ensure its procedures for ensuring inmates received timely access to medications were followed.

- Certain "commonly-used" medications are on Wexford and IDOC's formulary, meaning that providers can prescribe them without a formal review by Wexford's pharmacy team. Ritz Tr. 94:21-95:1. All other drugs must go through the "non-formulary" process where they are reviewed for "medical necessity, clinical appropriateness, toxicity, interaction[s]." Ritz Tr. 95:7-12. The pharmacy team will also consider cost in some circumstances when deciding which medication to approve. Ritz Tr. 104:11-105:20. The non-formulary process requires the site medical director to complete a request form

and forward supporting documentation to the pharmacy team for review. Tr. 96:5-20.

- Mr. Dean was given a prescription for Votrient on October 19, 2016. *See* Wexford's Answer and Affirmative Defenses to Third Amended Complaint ¶ 56. Votrient is a non-formulary medication. Ritz Tr. 110:16-111:1.

- Dr. Matticks testified that some medications may take longer to obtain, but only medications where a delay would not "affect the outcome." Matticks 30(b)(6) Tr. 157:18–22; 158:24–159:25. Mr. Dean's disease is such that a delay in receiving his medication affects his outcome, but he did not receive his first dose of Votrient until November 18, 2016. *See* Wexford's Answer and Affirmative Defenses to Third Amended Complaint ¶ 56.

- Dr. Nawoor did not discuss Mr. Dean's Votrient prescription with Dr. Ritz at a collegial review until November 2, 2016. IDOC Taylorville Med Recs 001477. Dr. Nawoor could have called Dr. Ritz directly if he felt that the non-formulary request needed to be "dispositioned immediately" so that there was no "delay" but took no such steps in this case. Ritz 30(b)(6) Tr. 24:18-25:7, 25:21-24.

- Dr. Matticks testified that Wexford is unlikely to disagree with a specialist's prescription. Matticks 30(b)(6) Tr. 157:18–22. Yet, Dr. Ritz questioned Mr. Dean's oncologist's prescription, and spoke with him about possibly using an alternative medicine. Ritz Tr. 100:15–18.

- Lisa Mincy questioned the delay in getting Mr. Dean his cancer medication, and raised it with her supervisor on October 28, 2016. *See* Dean v. Wexford, et al. (17-3112) IDOC No.: 001028 ("Is this not a lengthy amount of time before starting this medication or substituting another one?"). Kathy Galvin testified that she had never seen a non-formulary approval process take so long. Galvin Tr. 160:2–4, 160:23–161:2, 161:15–20.

- Mr. Dean experienced similar delays when he received a prescription for Opdivo on March 2 or 3, 2016. Ritz Tr. 111:13-15; IDOC No. 000124-25. Mr. Dean did not receive non-formulary approval for Opdivo until March 20, 2019. Ritz Tr. 111:11-20. Dr. Nawoor knew, based on the notes from Mr. Dean's oncologist, that Opdivo was necessary because Mr. Dean's cancer was not responding to Votrient. IDOC No. 000125; IDOC Taylorville Med Recs 001975, 002045. Once again, Dr. Nawoor took no steps to hasten the approval and administration of Mr. Dean's Opdivo despite having the ability to do so. Ritz 30(b)(6) Tr. 24:18-25:7, 25:21-24.

Wexford's policies and practices diffuse responsibility for a patient's medical care across multiple employees, so that no one feels ultimately responsible for the well-being of patients. For example, Kathy Galvin is the Director of Nursing and the supervisor of the Medical Records Director, the person responsible for scheduling appointments, yet disclaimed basically any responsibility for ensuring that person

promptly scheduled appointments and responded to one question about why she didn't review a certain form by noting "I'm not a scheduling entity, and I'm not an attending RN." Galvin Tr. 94:14-17, 135:20-137:6. Moreover, Nurse Galvin noted that following up on Mr. Dean's grievance about the scheduling of his surgery was "not my dut[y]." Galvin Tr. 136:21. Lisa Mincy, the health care unit administrator, noted that thought she recognized, based on her medical knowledge, that Mr. Dean needed to see a specialist to diagnose and treat his hematuria, she did not follow up with him to see if he actually saw a specialist because it wasn't her job because she "wasn't hired as a case manager." Mincy Tr. 77:13-80:1. *See also, e.g.*, Einwohner Tr. 155:20–156:2, 159:24–160:21 (not her job to deal with kidney-related pain); Mincy Tr. 194:11–22 (no one else tried to schedule Mr. Dean's surgery "because that was Chad's job"). Dr. Nawoor appears to lack understanding of his role as primary care physician. Although he testified that he feels his hands are tied when it comes to getting treatment for patients, Nawoor Tr. 120:24–121:9, Dr. Matticks, Wexford's corporate representative, testified that the treating physicians are expected to advocate for their patients, Matticks Tr. 83:2–9, 84:3–6, 157:1–8.

The expert reports and deposition testimony by Dr. Bruce Barnett, Dr. Nivedita Dhar, and Dr. Adam Metwalli also show that Wexford's customs, policies, and practices caused Wexford's agents' actions or inaction that were, and were themselves, departures from the standard of medical care tantamount to gross negligence, recklessness, and/or deliberate indifference.

Mr. Dean additionally refers Defendants to his responses to Interrogatories Nos. 11 and 12 and incorporates them in response to this Interrogatory because Wexford's adoption of unconstitutional customs, policies, and practices constitutes an act of institutional negligence.

20.  Identify the factual bases for the each instance of institutional negligence identified in response to interrogatory 19 and any testimonial or documentary evidence that supports each instance of institutional negligence. If such evidence is in medical records, identify the specific Bates or page number. If such evidence is in deposition testimony, identify the deposition, page, and line.

**ANSWER:**  Please see the response to Interrogatory No. 19, which contains a listing of the evidence underlying the factual bases for Wexford's institutional negligence. Mr. Dean additionally refers Defendants to his responses to Interrogatories Nos. 11 and 12 and incorporates them in response to this Interrogatory.

/s/ Craig C. Martin\
Craig C. Martin (cmartin@jenner.com)\
Joel T. Pelz (jpelz@jenner.com)\
William M. Strom (wstrom@jenner.com)\
Nathaniel K.S. Wackman (nwackman@jenner.com)\
Chloe E. Holt (cholt@jenner.com)\
JENNER & BLOCK LLP\
353 N. Clark Street\
Chicago, IL 60654-3456\
Telephone: 312 222-9350\
Facsimile: 312 527-0484

*Attorneys for Plaintiff William Kent Dean*

## **CERTIFICATE OF SERVICE**

     I, William M. Strom, an attorney, certify that on October 9, 2019, I caused the foregoing **Responses to Defendant Wexford Health Sources, Inc.'s Interrogatories** to be served on all counsel of record, as listed below, via email and by sending the same by courier from Chicago, Illinois, with proper delivery fees prepaid. Under penalties as provided by law, I certify that the statements set forth herein are true and correct.

Joseph N. Rupcich
Cassiday Schade LLP
111 North 6th Street
Springfield, IL  62701
jrupcich@cassiday.com

Jeremy C Tyrrell
Office of the Attorney General
500 South Second Street
Springfield, IL  62706
jtyrrell@atg.state.il.us

                                  /s/ William M. Strom

                                  *An attorney for Plaintiff William Kent Dean*