E-FILED
Friday, 25 October, 2019 11:59:18 PM
Clerk, U.S. District Court, ILCD

June 26, 2018

```
 1            IN THE UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF ILLINOIS
 2                  SPRINGFIELD DIVISION

 3   WILLIAM KENT DEAN,              )
                                     )
 4        Plaintiff,                 )
                                     )
 5        vs.                        ) Case No. 17-cv-3112
                                     )
 6   WEXFORD HEALTH SOURCES, INC.,   )
     DR. ABDUR NAWOOR, DR. REBECCA   )
 7   EINWOHNER, NURSE KATHY GALVIN   )
     and LISA MINCY,                 )
 8                                   )
          Defendants.                )
 9
```

10          The deposition of WILLIAM KENT DEAN,

11   taken in the above-entitled cause on the 26th day

12   of June, 2018, at the Taylorville Correctional

13   Center, 1144 Illinois Route 29, Taylorville,

14   Illinois, pursuant to Notice at the hour of 9:00

15   a.m.

16

17

18

19

20

21

22

23   Reported by:   Lisa Hahn Peterman, CSR, RMR

24   License No.    084-002149

Page 2

```
 1  APPEARANCES:
 2  JENNER & BLOCK
    353 North Clark Street
 3  Chicago, Illinois 60654
    312-222-9350
 4  wstrom@jenner.com
    BY:  WILLIAM M. STROM, ESQ.
 5       Representing the Plaintiff;
 6  CASSIDAY SCHADE, LLP
    111 North 6th Street, Suite 200
 7  Springfield, Illinois 62701
    217-572-1714
 8  dfornoff@cassiday.com
    BY:  DANIEL S. FORNOFF, ESQ.
 9       Representing the Wexford Defendants;
10  OFFICE OF THE ATTORNEY GENERAL
    STATE OF ILLINOIS
11  500 South 2nd Street
    Springfield, Illinois 62704
12  217-782-1090
    mkclarkjoseph@atg.state.il.us
13  BY:  MARY KAITLIN CLARK-JOSEPH, ESQ.
         Representing the Defendant, Lisa Mincy.
14
15  ALSO PRESENT VIA VIDEOCONFERENCE:
16       JEREMY SAWYER, JENNER & BLOCK
         NATHANIEL WACKMAN, JENNER & BLOCK
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2  WITNESS                      EXAMINATION
 3  WILLIAM KENT DEAN
 4     By Mr. Strom                   4
 5
 6
 7
 8           E X H I B I T S
 9  DEPOSITION EXHIBIT               MARKED
10  DEAN EXHIBITS
11     Exhibit No. 1                  31
12     Exhibit No. 2                  42
13     Exhibit No. 3                  64
14     Exhibit No. 5                  101
15     Exhibit No. 4                  153
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1             (Actual Start Time:  9:14 a.m.)
 2             WILLIAM KENT DEAN, the plaintiff herein,
 3  produced, sworn and examined on his own behalf,
 4  testified and deposed as follows:
 5                  DIRECT EXAMINATION
 6  BY MR. STROM:
 7      Q.   Good morning, Mr. Dean.
 8      A.   Good morning.
 9      Q.   I'm William Strom.  For the sake of the
10  record, I am counsel for Mr. Dean, the plaintiff
11  in this case, Dean vs. Wexford, et. al, and here with
12  us at Taylorville Correctional Center today is also,
13  in person, counsel for defendants Wexford and the
14  Wexford employees, Daniel Fornoff.
15             Joining us by videoconference are my
16  colleagues on behalf of Mr. Dean, Nathaniel Wackman,
17  who is an associate at Jenner & Block, and Jeremy
18  Sawyer, who is a summer law clerk at Jenner & Block
19  and a current Harvard law student, and then also
20  joining us by videoconference is Mary Kaitlin
21  Clark-Joseph from the Attorney General's Office of
22  the State of Illinois on behalf of defendant, Lisa
23  Mincy.
24             Counsel, if there's anything that I've
```

Page 5

```
 1  missed in identifying all of us for the record,
 2  please feel free to speak up.
 3             We are here for the stenographic
 4  deposition of William Kent Dean.  It is also being
 5  recorded by video from my office remotely on this
 6  videoconference feed.
 7             The purpose of doing this is to take
 8  what's known as, if you'll permit me, a de bene esse
 9  deposition, a wellbeing deposition in the plain
10  English, and the purpose of a de bene esse
11  deposition is to preserve testimony in the event of
12  the unavailability of a witness for trial.
13             Mr. Dean, as I think is undisputed, has
14  the diagnosis of stage IV metastatic kidney cancer,
15  and so the purpose of this deposition is in equal
16  parts fulfilling the regular expectations of fact
17  discovery in this case, but also for the purpose of
18  preserving his testimony in the event he is too sick
19  or otherwise cannot attend the trial itself.
20             Did counsel for any of the defendants wish
21  to make a record on this point?
22             MR. FORNOFF:  None for me.
23             MS. CLARK-JOSEPH:  No, thank you.
24             MR. STROM:  Okay.  Thank you.
```

Page 6

BY MR. STROM:

2      Q.   So with those formalities aside, good
3 morning, Mr. Dean.

4           Could you go ahead and please state and
5 spell your full name for the record?

6      A.   William Kent Dean.  W-I-L-L-I-A-M; middle
7 name Kent, K-E-N-T; last name Dean, D-E-A-N.

8      Q.   Mr. Dean, have you ever been deposed
9 before?

10     A.   No, sir.

11     Q.   So I'm going to start off to talk about
12 some ground rules.  The first thing that you need to
13 know is that you're under oath.  As you know, this
14 oath has the same effect and the same potential
15 penalties as if you were testifying to a court or in
16 front of a jury.  Do you understand that?

17     A.   Yes, sir.

18     Q.   And it's important that there be a clear
19 record of today's deposition.  I'm going to ask you
20 a series of questions, and to make sure that there
21 is a clear transcript of your answers, I want you to
22 respond audibly, so using your voice as opposed to
23 nodding or shaking your head to every question.
24 Okay?

Page 7

1      A.   Yes, sir.

2      Q.   And relatedly, please make sure to allow
3 me or any person asking you a question to finish the
4 question before you begin to answer and I'll try to
5 allow you to always finish your answer before I ask
6 the next question.

7      A.   Yes, sir.

8      Q.   If you don't understand a question, I want
9 you to just let me know that you don't understand
10 and I'll do my best to rephrase it, and if you don't
11 say anything, I'll just assume that I need to try
12 again and ask it in a way that's clearer.  Okay?

13     A.   Okay.

14     Q.   If there's any point that you'd like to
15 take a break, I just want you to let me know that
16 and we can accommodate that.  I know that your
17 medications may cause you to need to use the
18 facilities or that you may otherwise get tired over
19 the course of your deposition, so the only rule
20 about breaks is that you can't take a break while
21 there's a question still pending, meaning that you
22 need to answer the question before we can take a
23 break.  Do you understand that?

24     A.   Yes, sir.

Page 8

1      Q.   Do you have any questions about everything
2 that I've just laid out so far?

3      A.   No, sir.

4      Q.   Okay.  I know that as I've mentioned,
5 you're on some medications, Mr. Dean.  Do you have
6 any reason to think that those medications will make
7 you unable to testify truthfully or accurately
8 today?

9      A.   No, sir.

10     Q.   Okay.  And I know that you are currently
11 regularly undergoing chemotherapy.  Do you have any
12 reason to believe your chemotherapy will make it
13 difficult or make you unable to testify truthfully
14 and accurately today?

15     A.   No, sir.

16     Q.   Is there any other reason that you can't
17 testify truthfully and accurately today?

18     A.   No, sir.

19     Q.   Okay.  So we're going to start off with
20 some background questions about you.

21          Mr. Dean, when were you born?

22     A.   August 29, 1960.

23     Q.   And where?

24     A.   Ottawa, Illinois.

Page 9

1      Q.   And where did you grow up?

2      A.   I grew up in Ottawa.

3      Q.   Can you tell us a little bit about your
4 childhood, your family?

5      A.   I grew up on the corner of one of the
6 busiest intersections in the state, and I rode my
7 bicycle everywhere and played football.  I loved
8 racing, still do.

9          I pretty much had a normal childhood, I
10 would think.  My parents both worked and I probably
11 didn't lack for too many things.

12     Q.   And where did your parents work?

13     A.   They worked at Libbey-Owens-Ford factory.
14 They make glass windshields for GM cars and trucks.

15     Q.   And where was Libbey-Owens-Ford glass
16 factory located?

17     A.   It's actually in the town right next to
18 us.  Even though they're connected, it's Naplate,
19 Illinois.

20     Q.   And where did you attend school?

21     A.   Jefferson Grade School, Central High
22 School, which is the middle school, and then Ottawa
23 Township High School.

24     Q.   And what years -- or I'm sorry.  Did you

1  graduate from Ottawa Township?
2      A.   Yes.
3      Q.   Okay.  And what year did you graduate?
4      A.   1978.
5      Q.   And what sorts of things did you spend
6  your time on during high school?
7      A.   Well, I liked shop.  I wasn't really
8  academic.  Sports a lot, wrestling, football, and
9  typical thing, cars, and my wife that I still am
10  with to this day, so I met her in '77.
11     Q.   So you met your wife during high school?
12     A.   Yes.
13     Q.   How old were you at the time?
14     A.   I was 17.
15     Q.   And how old was she?
16     A.   Sixteen.
17     Q.   And she was also at Ottawa High School?
18     A.   Yes, one year behind me.
19     Q.   Did you hold any jobs while you were in
20  high school?
21     A.   Well, I worked -- well, that's where I met
22  her was at Illinois Valley -- Illinois Laundry and
23  Cleaners, I think is what it was called.  I was head
24  washman, and she was like a sorter for the different

1  laundry that came in.
2      Q.   Okay.  And you've referred to her as your
3  wife.  You eventually married her.  Let's get her
4  name for the record, please.
5      A.   Cynthia Susan Dean.
6      Q.   And when did you and Sue marry?
7      A.   1982, September 22nd.
8      Q.   And are you still married, Mr. Dean?
9      A.   Yes, sir.
10     Q.   Do you and Sue have any children together?
11     A.   One.  My son, William.
12     Q.   And how old is William?
13     A.   Thirty-five.
14     Q.   And does he live with you?
15     A.   No.  He lives in Edgewater, Florida.
16     Q.   And what does he do for a living?
17     A.   He's a professional musician.
18     Q.   Oh.  What instrument does he play?
19     A.   Percussion, drums mostly.
20     Q.   Okay.  And he supports himself
21  professionally playing percussion?
22     A.   Yes, sir.
23     Q.   Okay.  What sort of educational background
24  did you get after high school?

1      A.   I went to auto body repair school.  That's
2  pretty much it.
3      Q.   Okay.  And what sort of work did you go
4  into when you first graduated from high school?
5      A.   When I first graduated from high school, I
6  was still working at the laundry and cleaners.
7           I became a union laborer.  I worked that
8  job for awhile, and then we moved to Florida and I
9  opened up a furniture store and a moving company.
10     Q.   So let's break that down just a little
11  bit.  When did you become a union laborer?
12     A.   I'm going to say it was 1980.
13     Q.   Okay.  And so you worked at the laundry
14  from the time you were in high school -- you
15  graduated in '78 -- until 1980?
16     A.   I had other various jobs in between there.
17  I worked at a grocery store, Marcel's Salvage, and I
18  think I worked at Green Pontiac-Olds in Morris.
19     Q.   Okay.
20     A.   I think that was the name.  That was a
21  long time ago.
22     Q.   Okay.  And in 1980, you said that you --
23  tell me again what job you took in 1980.
24     A.   Union laborer.

1      Q.   And how long were you a union laborer for?
2      A.   Two and a half years.
3      Q.   Okay.  So that brings us to approximately
4  1982 or so, is that right?
5      A.   Uh-huh.
6      Q.   And if I'm doing my math correctly, it was
7  around that time your son William was born?
8      A.   Yes.
9      Q.   And so what did you do after you left your
10  work as a union laborer?
11     A.   Well, I went to prison at one time from
12  '82 until '83 for one year for selling cocaine.
13     Q.   Okay.
14     A.   And then when I got out, I worked various
15  different jobs, construction, nonunion.
16     Q.   Okay.  You said that you moved to Daytona
17  Beach?
18     A.   Yeah, 1990.
19     Q.   1990.  And what did you do in Daytona
20  Beach?
21     A.   We opened up a furniture store; sold
22  mattresses, bedroom sets, and futons.
23     Q.   And was there any other line of work that
24  your store or your business also did?

Page 14

1    A.    Well, I also did a moving service where,
2  you know, you could call me and contract me out to
3  move your apartment, or I also worked for decorators
4  and stuff like that doing their moves.
5    Q.    How long did you live in Daytona Beach
6  for?
7    A.    Well, we still have a residence there, but
8  from 1990 to 2000.
9    Q.    And in 2000, where did you move?
10   A.    Back to Illinois.
11   Q.    And back to Ottawa?
12   A.    Yes.
13   Q.    Why did move back to Illinois?
14   A.    Somebody made us an offer on the store and
15  we sold it, and I came back to Ottawa to start
16  working in the concrete business.
17   Q.    And did you work in that concrete
18  business?
19   A.    Yes.
20   Q.    For how long?
21   A.    Approximately a year.
22   Q.    And why did you stop working at the
23  concrete business?
24   A.    Well, I had undiagnosed sleep apnea and I

Page 15

1  was very tired all the time, and then they diagnosed
2  me with my heart problems and stuff like that.
3    Q.    And when was that?
4    A.    2001.  April of 2001.
5    Q.    Okay.  From April 2001, what was your next
6  job?
7    A.    I went to prison in 2001 --
8    Q.    Okay.
9    A.    -- until 2007 for selling cocaine.
10   Q.    Let's talk a little bit about why you're
11  presently incarcerated, Mr. Dean.  In 2010, you
12  pleaded guilty to a felony drug offense, is that
13  right?
14   A.    Yes, sir.
15   Q.    And that's the conviction you're currently
16  incarcerated for?
17   A.    Yes, sir.
18   Q.    And you are currently incarcerated at
19  Taylorville state prison, correct?
20   A.    Yes, sir.
21   Q.    Mr. Dean, you alluded a little bit to your
22  health conditions over the years, and so I'd like to
23  talk a little bit about those.  Can you give us an
24  overview of your health?

Page 16

1    A.    Well, in 2001, I was diagnosed with
2  cardiomyopathy and congestive heart failure, and
3  then they discovered I had sleep apnea, but I also
4  have high blood pressure, degenerative disc disease.
5        I have -- I don't know the medical term
6  for it, but it's called drop foot, and I have type 2
7  diabetes.  I currently have high cholesterol because
8  of a reaction from my chemotherapy.
9    Q.    Okay.  So you said you were diagnosed with
10  congestive heart failure and other heart ailments in
11  2001?
12   A.    Yes.
13   Q.    And is that diagnosis still valid?  Do you
14  still suffer from those ailments?
15   A.    Yes.
16   Q.    You also mentioned degenerative disc
17  disease.  Can you tell us about your symptoms from
18  that?
19   A.    I have lower back pain, and that also
20  pinches a nerve and it makes my hip hurt real bad.
21  Basically, the way I'm told, that's arthritis in my
22  back from all the years of moving furniture.
23   Q.    And when were you diagnosed with
24  degenerative disc disease?

Page 17

1    A.    That wasn't until I started having CAT
2  scans for my cancer.
3    Q.    So the diagnosis came in what year?
4    A.    2016.
5    Q.    Did you suffer from back pain before 2016?
6    A.    Yes.  That's why I'm in a wheelchair.
7    Q.    If you recall, when did you start
8  suffering from back pain?
9    A.    Since 2000, I've suffered with it all the
10  time, but I still walked with a cane, and
11  approximately April 2015 I fell in the unit and they
12  gave me a wheelchair.
13   Q.    And so you have used the wheelchair to get
14  around since April of 2015?
15   A.    Yes.
16   Q.    You mentioned type 2 diabetes.  When were
17  you diagnosed with that?
18   A.    I believe it was 2002.
19   Q.    And do you recall the circumstances where
20  you were -- when you were diagnosed?
21   A.    I had a couple of blood tests taken for my
22  heart and all that stuff, and I had what they call a
23  CBC, complete blood count, and my glucose levels
24  were high, so then they started checking it.

1    Q.   And what sort of treatment do you have for
2  type 2 diabetes?
3    A.   Right now, I am currently on Lantus.
4  That's a 24-hour acting Insulin, or similar to
5  Insulin, a shot, and I also take ten milligrams of
6  Glipizide twice a day.
7    Q.   And the Lantus is an injection?
8    A.   Yes.
9    Q.   And the second drug you mentioned that you
10  take twice a day, is that a pill?
11    A.   Yes, that is a pill.
12    Q.   And you have been treated continuously,
13  more or less, for your type 2 diabetes since 2002?
14    A.   Yes.  I was on Metformin before the cancer
15  but the chemotherapy that -- well, I only have one
16  kidney, and one kidney is hard to keep up when you
17  take Metformin.  I guess it's hard on your kidney,
18  so they took me off that and put me on the insulin.
19    Q.   Okay.
20    A.   I had been on other insulins before the
21  Lantus, but they did not work and the Lantus has me
22  under control now.
23    Q.   Okay.  Stepping back for a moment, you
24  mentioned your diagnosis with congestive heart

1  failure and other heart ailments in 2001.  What sort
2  of treatment did you begin to receive then?
3    A.   Pills.  Pills.  I believe it was Coreg and
4  Cozaar, which I'm still on.
5    Q.   Are you still on both of those two drugs?
6    A.   Yes.  Over the years it's been different
7  milligram amounts but...
8    Q.   And has your treatment for that condition
9  been more or less continuous since 2001?
10    A.   Yes.  I've always been on the pills since
11  then.
12    Q.   You also mentioned that you've been
13  diagnosed with high cholesterol.  Do I remember
14  correctly you said that's related to the cancer
15  drugs you're taking?
16    A.   Yes, it's one of the side effects.  It
17  raises your cholesterol.  I had been on cholesterol
18  drugs before, but the diet we have here is pretty
19  cholesterol friendly, I guess, and I was off them
20  for awhile.
21    Q.   Okay.  And so when were you first
22  diagnosed or when did you first start taking
23  cholesterol controlling drugs?
24    A.   I'm going to say it was 2002.  2001, 2002.

1    Q.   And when did you go off of the cholesterol
2  controlling drugs because of the diet available to
3  you?
4    A.   2012 to 2014, I would say.
5    Q.   Okay.  And are you currently taking
6  anything to control your cholesterol?
7    A.   Yes, Zocor.
8    Q.   When did you start the Zocor treatment
9  that you're currently on?
10    A.   I want to say it was like about eight
11  months ago.  It was after I started the Torisel and
12  they noticed a rise in my cholesterol.
13    Q.   I see.  Are there any other medical
14  conditions that we haven't discussed yet?
15    A.   I had two heart attacks in December -- not
16  December, I'm sorry -- 2015 July; and then I had a
17  pacemaker installed while I was at the hospital.
18  I'm also anemic, too.
19    Q.   When were you diagnosed with anemia?
20    A.   This -- I believe it was after the cancer.
21    Q.   Do you know approximately what date or
22  what time of year?
23    A.   My red blood cells were low, so I'm going
24  to say somewhere between December '15 and April

1  2016.
2    Q.   And did you have the pacemaker installed
3  in July of 2015?
4    A.   Yes.
5    Q.   Okay.  Mr. Dean, have you regularly
6  visited doctors over the course of the last 16
7  years, 17 years, for these medical conditions we've
8  discussed?
9    A.   Yes.
10    Q.   About how often would you say, on average,
11  over the last 17 years have you visited a doctor?
12    A.   When I was in the world, I would see my
13  personal doctor once every two or three months, the
14  doctor in Ottawa, Illinois.
15    Q.   And were there times when you saw a doctor
16  more frequently than that?
17    A.   In 2001, yeah, I was seeing them quite
18  often until everything was under control, blood
19  tests, that type of stuff.
20    Q.   And your earlier testimony was that in
21  2001, that's when you were diagnosed with congestive
22  heart failure?
23    A.   Yes.
24    Q.   So your appointments in 2011 were about

1  that condition and related conditions?
2      A.   Yes.
3      Q.   Have you seen a doctor about your back
4  pain before your diagnosis?
5      A.   No.  Chiropractor but not a medical
6  doctor.
7      Q.   And you mentioned "in the world," which I
8  understand you to be saying when you're not
9  incarcerated?
10     A.   Yes, sir.  I'm sorry for the slang.
11     Q.   No problem.
12          While incarcerated, how often have you
13 seen doctors overall on average?
14     A.   Well, we have clinics every four months, I
15 believe, so unless I go to sick call, I only see
16 them every four months.
17     Q.   But you do see them every four months
18 regardless of how you're feeling?
19     A.   Yes.  Right now, because I go on a writ
20 every week for my chemotherapy, I have to see the
21 doctor when I come back.  So, right now, I usually
22 see Dr. Nawoor once a week, usually Thursday
23 afternoon, or within five days of when I get back,
24 they usually have me see him just to check that I'm

1  okay, I guess, for my chemotherapy.  I'm not sure
2  what the regulations are but I know it's a
3  regulation that they do that.
4      Q.   Okay.  And since you started to talk a
5  little bit about your current medical treatments, in
6  overview, what is your current course of treatment
7  for your cancer?
8      A.   Right now, I receive chemotherapy once a
9  week -- I believe it's a drug called Torisel -- and
10 if my math is correct, I think I'm on my 63rd time
11 for chemo for that.  Altogether, I've been out 97
12 times.
13     Q.   And you leave Taylorville in order to
14 receive your chemotherapy, is that right?
15     A.   Yes.  I go to Decatur Cancer Center.
16     Q.   And when do you usually go out for those
17 treatments?
18     A.   Thursday mornings.
19     Q.   And that's every Thursday morning?
20     A.   Yes.
21     Q.   And then you regularly visit with
22 Dr. Nawoor afterward?
23     A.   Normally, I see him that afternoon.  If
24 not, Friday or Monday or Tuesday.

1      Q.   How long do your chemotherapy treatments
2  usually last?
3      A.   Approximately, by the time they put the IV
4  in me and get all the medications, it's about two
5  and a half hours of actual having the needle in me,
6  but I think the drugs themselves are only like an
7  hour and ten minutes, but there's a long wait in
8  between.
9      Q.   And do you have the chance to visit with a
10 physician each Thursday?
11     A.   I see Dr. Guaglianone every other week.
12     Q.   And in the weeks when you don't see
13 Dr. Guaglianone, who do you see?
14     A.   The nurses.
15     Q.   And the nurses are responsible for
16 administering your cancer drug?
17     A.   Yes.  They insert the IV and they take my
18 vitals.  You know, first, they take my vitals, then
19 they insert the IV, and then they'll set up all the
20 machines and all that type of stuff.
21     Q.   How long do you have the chance -- during
22 the course of a chemotherapy treatment, how long do
23 you have the chance to talk to the nurses or the
24 doctors?

1      A.   The nurses in and out, probably four or
2  five times.  If I need to talk to them, they'll stay
3  there and answer any questions I have or any needs
4  that I have.  I can call them at any time with the
5  call button.  The doctor, I usually spend 15, 20
6  minutes with him every other Thursday.
7      Q.   And can you talk to the doctor if you need
8  to, even if you're not scheduled to?
9      A.   I've never tried.  I would think that I
10 could at least get a message to him and he could
11 determine whether I needed to speak to him or not.
12     Q.   Okay.  And so am I accurate in summarizing
13 what you've said, in saying that over the course of
14 about two and a half hours of chemotherapy
15 treatment, you have four or five opportunities to
16 talk to a nurse every week?
17     A.   Yes.
18     Q.   And every other week you're talking to
19 Dr. Guaglianone?
20     A.   Yes.
21     Q.   When you go to the doctor,
22 Dr. Guaglianone's office, what sorts of
23 conversations do you typically have?
24     A.   Well, he asks me how I'm feeling.  He

1  looks at my blood tests, which don't always arrive,
2  and we go over the results of that, and he
3  determines if I'm going to have chemo that week or
4  not.
5          So far everything's been good. I've only
6  had to miss one because of any complications.
7      Q.   And you mentioned the blood tests don't
8  always arrive. Where are they arriving from?
9      A.   Well, Taylorville Correctional Center
10 takes my blood on Monday. I do not know where they
11 send them to, but they're supposed to be in my
12 packet when I go out, but they aren't often there.
13 I'd say the success rate of them -- that being in my
14 packet is about 66 percent.
15     Q.   Okay. When the blood test results are not
16 there, are you still able to receive chemotherapy?
17     A.   Yes. There is a delay there or they take
18 my blood tests there, but the blood tests that they
19 take need to be a fasting blood test, so they aren't
20 as accurate as they could be.
21         MR. FORNOFF: I'm going to object to that
22 on foundation.
23         MR. STROM: Okay.
24 BY MR. STROM:

1      Q.   You mentioned there was one occasion when
2  you weren't able to receive treatment.
3      A.   Uh-huh.
4      Q.   Do you recall the circumstances?
5      A.   I'd had an infection on my nose and it
6  swelled up -- my eyes, my nose and everything -- and
7  I was sent out to the emergency room, and I was in
8  the emergency room and Dr. Guaglianone stated that
9  it was probably from complications from my
10 chemotherapy, that my immune system is down, and so
11 he decided not to give me the chemo that week
12 because I was in the hospital during my day that I
13 would have received it.
14     Q.   And you say you were sent out. You were
15 sent out from Taylorville to the ER?
16     A.   Yes.
17     Q.   So you were in the ER on a Thursday when
18 you were regularly scheduled?
19     A.   I think it was a Wednesday, I believe.
20     Q.   So you returned from the ER before?
21     A.   No. They admitted me for five days.
22     Q.   And so you were in the ER on the Thursday
23 that you were scheduled for your treatment?
24     A.   I believe I was in my room that day. I

1  think I was in ER -- and I could be wrong. I
2  believe that was a Wednesday afternoon. My
3  treatment was scheduled for the following morning
4  and he decided he wasn't going to do it.
5      Q.   You were in your room at the hospital?
6      A.   Yes.
7      Q.   Sorry about that. I just wanted to make
8  sure I was clear on the story.
9      A.   No, that's okay. I'm not sure that it was
10 a Wednesday, though.
11     Q.   Sure. What you do know is that you were
12 in the hospital at the point in time that you should
13 have been scheduled for your cancer treatment.
14     A.   Yes. If I may, it was the day after
15 Christmas.
16     Q.   Okay.
17     A.   Last year.
18     Q.   2017?
19     A.   That I went to the emergency room, yes.
20     Q.   Have you ever had a conversation with a
21 doctor that your cancer medication was not working?
22     A.   Yes.
23     Q.   And can you tell us about those -- about a
24 conversation you recall along those lines?

1      A.   Well, I had my CAT scan for the first
2  treatment that they were giving me, which was
3  Votrient, and an hour before my scheduled writ to go
4  out to see the doctor again, I was called over to
5  the healthcare unit, and Dr. Nawoor and Director of
6  Nursing, Kathy Galvin, were in the room, and they
7  told me the results of my CAT scan and they said
8  that they would like me to sign a release for
9  treatment to stop the treatment, and I said that I
10 wouldn't stop the treatment and that I was going to
11 see Dr. Guaglianone and we'd let him do that, and
12 then they tried to get me to sign a Do Not
13 Resuscitate, a DNR, and I did sign it as a
14 refusal for -- you know, in other words, I wanted to
15 be resuscitated -- but that day they told me that if
16 I signed the release that they would keep me
17 comfortable until the end.
18     Q.   And let's talk about a time when you
19 talked with Dr. Guaglianone about your drug
20 treatments. Did you have that conversation ever
21 with Dr. Guaglianone about a drug treatment that was
22 or was not working?
23     A.   Yes. An hour and a half later, I was at
24 Dr. Guaglianone's office, and he said, yes, it's not

1  working.  We're going to start you on another drug
2  called Opdivo.  And at that time I asked him, Well,
3  what if this does not work?  He said, We have many
4  treatments that we can try.  We're going to find one
5  that works.  Hopefully, we'll find one that works.
6      Q.   And you're currently taking Torisel, you
7  testified earlier?
8      A.   I believe that's the name for it, yes.
9      Q.   How is the Torisel treatment working for
10  you?
11     A.   It's been working fine since May of 2017
12  was my first dose, May 5th.  Every time, it's showed
13  it's either shrank the tumors slightly or stayed the
14  same.  I believe the goal is to not let it grow, so
15  all those were positive results.
16     Q.   And in your conversations with
17  Dr. Guaglianone, do you believe that you have a
18  choice about what your treatment options are?
19     A.   I don't understand.
20     Q.   Does Dr. Guaglianone ever tell you you
21  must follow a certain course of treatment?
22     A.   I think -- I don't think he says I have
23  to.  I mean, I do not believe that I could say,
24  well, I want to do this.  I'm pretty sure that I'm

1  going to go exactly with what he said because I
2  trust his judgment.
3      Q.   So you listen to his advice and you follow
4  it?
5      A.   Certainly.  I'm sorry.  Yes, I do.
6      Q.   So we've talked a little bit about your
7  cancer diagnosis and I would like to talk a little
8  bit about the history of that diagnosis now.
9           You know, before we do that, let's talk a
10  little bit about some more of your medical history
11  that's related.  I'm going to now introduce what's
12  been marked for identification as Dean Exhibit 1.
13          (Dean Exhibit Number 1 was marked for
14               identification.)
15          Mr. Fornoff, that is the packet, the first
16  one on top there, that's marked with the date 2014.
17          MR. FORNOFF:  Okay.
18  BY MR. STROM:
19     Q.   Mr. Dean, you can take that copy of
20  Exhibit Number 1.  Mr. Dean, what does this document
21  appear to be in front of you?
22     A.   It's my daily planner, personal diary, or
23  whatever you would like to call it.
24     Q.   And is it the original copy of that?

1      A.   This one, no.
2      Q.   So it's a photocopy of your daily planner?
3      A.   Yes, sir.
4      Q.   And I'd like you to take a moment to look
5  at it to make sure that it is a true and accurate
6  photocopy of your daily planner as you remember it.
7      A.   Yes, it is.
8           MR. FORNOFF:  I'm sorry.  Could I ask, was
9  this provided in you guys' Rule 26 disclosures?
10          MR. STROM:  We have an obligation to
11  supplement with this.
12          MR. FORNOFF:  Okay.
13          MR. STROM:  Yeah.
14  BY MR. STROM:
15     Q.   So Mr. Dean, I would like to direct your
16  attention, please, to in Exhibit 1, the section for
17  July 29th.
18     A.   Okay.
19     Q.   I apologize.  We don't have a question
20  pending, correct?
21          MR. FORNOFF:  Not that I recall, Bill.
22          MR. STROM:  Could we take just a
23  two-minute break, because this is the one exhibit
24  for which I don't have a complete copy for myself.

1  Before I start, I want to pull it up on my laptop.
2           (A brief recess was taken.)
3  BY MR. STROM:
4      Q.   Mr. Dean, you're ready?
5      A.   Yes, sir.
6      Q.   So I have tendered to the witness what's
7  been previously marked for identification as
8  Defendant's Exhibit Number 1.  Mr. Dean, you have
9  identified this as a fair and accurate photocopy of
10  your 2014 daily planner or personal diary, is that
11  right?
12     A.   Yes, sir.
13     Q.   And who writes in this diary?
14     A.   I do.
15     Q.   Anyone else?
16     A.   No.  I do.
17     Q.   Do you show it to anyone else?
18     A.   Not until I showed you.
19     Q.   And when you take notes in it, when do you
20  typically take those notes?
21     A.   I try to write down all my healthcare
22  stuff and, like, when I get schedules for football
23  or racing or birthday events, you know, any holiday
24  type thing.

1    Q.   And so when you have a doctor's visit,
2  when do you write down what happened at that
3  doctor's visit?
4    A.   Well, sometimes I write down that it's
5  going to happen but I also write down -- not
6  always -- I try to write down afterwards.
7    Q.   And how far afterwards?
8    A.   Usually that day.
9    Q.   And how long have you been doing this for?
10   A.   Since 2010.
11   Q.   And why did you start doing it?
12   A.   I don't know.  I guess because -- just so
13  I could remember things:  I've had a blood test
14  here, my blood pressure was this or -- and I like to
15  tell my wife everything so I can go back over it and
16  if anything ever happened to me, she could see it.
17   Q.   So is it your regular practice to write
18  down what happened at your doctors' appointments?
19   A.   Most of the time, yes.
20   Q.   When you say "most of the time," when --
21  are there times that you don't write things down?
22   A.   Yeah.  Sometimes I'm frustrated and I
23  don't think about writing it down.  Pretty much
24  that's when I don't do it.

1    Q.   When you're frustrated and you don't write
2  it down, do you return later to write it down?
3    A.   Sometimes.
4    Q.   And have you kept these diaries, including
5  notes from your medical appointments, in the regular
6  course of seeing a doctor?
7    A.   Only since I've came to prison.
8    Q.   And that was in what year?
9    A.   2010.
10   Q.   Okay.  Do these notes describe generally
11  your medical history since 2010?
12   A.   Yes.
13   Q.   And do they include recordings of your
14  past or your present symptoms -- then present
15  symptoms?
16   A.   Yes.
17   Q.   Do you ever write down what the doctor
18  tells you about the causes?
19   A.   I don't understand.
20   Q.   Do you write down things like, The doctor
21  says that I'm having a symptom because I have a
22  certain diagnosis?
23   A.   Yes.
24   Q.   Okay.  And do you share your notes and

1  your diagnoses with your wife generally?
2    A.   Only verbally.  She hasn't ever seen this.
3    Q.   Would you want her to receive them in the
4  event that you didn't have them any longer?
5    A.   Yes.
6    Q.   So I've directed your attention to July
7  29th of 2014 in Defense [Dean] Exhibit Number 1.  I
8  want to step back for just a moment to July 21st,
9  which is on the same page or on an adjacent page.
10   A.   Same page.
11   Q.   July 21st, what does the note there say?
12        MR. FORNOFF:  I'm just going to make an
13  objection for the record -- it's hearsay -- for
14  these documents, for his diary.  Rather than object
15  every single time about any hearsay, we'll just make
16  a standing objection, if that's okay with you.
17        MR. STROM:  I understand the objection,
18  sure.
19        And Ms. Clark-Joseph, do you join in the
20  objection?
21        MS. CLARK-JOSEPH:  I was going to say yes,
22  if I could join in that objection.  I appreciate it.
23        MR. STROM:  I understand we believe that
24  this is going to qualify under Federal Rule of

1  Evidence 803(6) as a -- as a record kept in the
2  regular practice of the activity of his medical
3  treatments and also under 803(4) as a record made
4  that's pertinent to a medical diagnosis, but we
5  understand the objection.
6        MR. FORNOFF:  Sure.
7        MR. STROM:  And it's fine to note for the
8  record that it's a standing objection.
9  BY MR. STROM:
10   Q.   So on July 21st, Mr. Dean, what is the
11  notation there?
12   A.   Seen Dr. E, which is short for
13  Dr. Einwohner; ordered outside urologist visit for
14  my kidney stones -- well, it doesn't say kidney
15  stones, but it is for my kidney stones.
16   Q.   And the order for outside urologist for
17  your kidney stones, what were your symptoms when you
18  visited with Dr. Einwohner on July 21st?
19   A.   Microscopic traces of blood in my urine.
20   Q.   And how did you meet with Dr. Einwohner at
21  that time?
22   A.   Through the video TeleMed.
23   Q.   So she was not present in person?
24   A.   No.

1    Q.   Did she speak to you at all about any
2 medical records or tests that she had related to the
3 microscopic traces of blood in your urine?
4    A.   It was seen in the blood test and that she
5 was concerned about it.
6    Q.   And you also told her -- did you also tell
7 her about your symptoms?
8    A.   No, because I didn't -- you couldn't see
9 the blood in the urine.  I did not know that I had
10 that.
11    Q.   Okay.  And so she referred you to a
12 urologist.  Did you see a urologist?
13    A.   Yes.  I believe I seen Dr. Baron.  I
14 believe it was on the 29th.
15    Q.   And was that here at Taylorville?
16    A.   It was at the Springfield Clinic in
17 Taylorville, the city of Taylorville.
18    Q.   And that was on July 29th; that's your
19 testimony?
20    A.   Yes.
21    Q.   What happened on July 29th, if you recall?
22    A.   It was just an initial visit and kind of
23 went over history, that type of stuff.  I believe he
24 ordered a CAT scan and other tests, blood tests, I

1 believe.  He ordered an x-ray and a CAT scan.
2    Q.   He ordered an x-ray and a CAT scan?
3    A.   Uh-huh.
4    Q.   Did you have an x-ray and a CAT scan that
5 day?
6    A.   No, not that day.
7    Q.   Do you recall when you did receive an
8 x-ray or a CAT scan at that time?
9    A.   I don't remember when it was.  I'm sure
10 it's written down in following pages.
11    Q.   Okay.  Would it refresh your recollection
12 to look at those pages to figure out when that was?
13    A.   Sure.
14    Q.   I can help you out by pointing you to
15 October 29th.
16    A.   Yeah.  It says I stayed at the healthcare
17 the night before.
18    Q.   The night before October 29th?
19    A.   Yeah.  So on the 30th, they writted me to
20 St. John's -- well, that isn't the CAT scan, I don't
21 believe.  That was actual treatment, lithotripsy.
22    Q.   Actual treatment for the --
23    A.   Kidney stones.
24    Q.   -- kidney stones?

1    A.   Yes.  I don't know if I wrote down the CAT
2 scan.
3    Q.   Okay.  But you did receive lithotripsy on
4 October 30th?
5    A.   Yes, on October 30th.
6    Q.   And it's your understanding -- it was your
7 understanding at that time that that was for your
8 kidney stones?
9    A.   Yes, right kidney.
10    Q.   In between July 29th and October 30th, did
11 you experience any symptoms that you noticed related
12 to your kidney stones?
13    A.   A little bit of lower back pain.
14    Q.   And was that distinctive -- was it
15 different from the lower back pain due to your
16 degenerative disc disease?
17    A.   Yes.  I'm sorry.  It was off to the side
18 just slightly.
19    Q.   And so you recall -- do you recall that
20 you underwent the lithotripsy on October 30th?
21    A.   Yes.
22    Q.   And do you recall what the result was?
23    A.   It wasn't -- it was what you call a sonic
24 type of treatment where they break it up, and it

1 didn't break it up far enough that I couldn't
2 urinate it out.
3    Q.   And so what happened next with that kidney
4 stone incident?
5    A.   I believe we had another sonogram and an
6 x-ray and then they set me up for another
7 lithotripsy.  I don't recall the date of that but I
8 had two of those, because the first one did not
9 work.
10    Q.   So would it refresh your recollection to
11 look at your notes?
12    A.   Yes.
13    Q.   I can direct you to November 11th.
14    A.   Yes, uh-huh.
15    Q.   And does that refresh your recollection
16 about when that happened?
17    A.   Yes.
18    Q.   What happened on November 11th?
19    A.   I had the same exact treatment at
20 St. John's -- or St. John's Hospital in Springfield.
21    Q.   And when you say "same exact treatment,"
22 you mean on November 11 -- or the lithotripsy,
23 correct?
24    A.   Yes.

1    Q.   Do you recall what the result of that
2  lithotripsy on November 11th was?
3    A.   It definitely crushed it enough that I
4  could expel it.
5    Q.   And do you recall when you expelled it?
6    A.   No.
7    Q.   Okay.
8    A.   I remember doing it, but I don't remember
9  the day because it hurt.
10   Q.   I want to back up just for a second
11 because I may have misled you, Mr. Dean.  On
12 November 11th, did you actually receive the
13 treatment?
14   A.   It says I need procedure again, so
15 apparently I didn't have it that day.  I'm sorry.
16   Q.   That's all right.  That was my fault for
17 misleading you.  I misunderstood my notes.
18   A.   That was a long time ago.
19   Q.   So what we can do is go ahead and
20 introduce what's been marked for identification as
21 Dean Exhibit Number 2.
22        (Dean Exhibit Number 2 was marked for
23        identification.)
24        MR. STROM:  Mr. Fornoff, this is the one

1  that says 2015 on the cover.  I'm handing it to the
2  witness.
3  BY MR. STROM:
4    Q.   Mr. Dean, I've handed you what's been
5  marked for identification as Defense [Dean] Exhibit
6  Number 2.  Do you recognize this document?
7    A.   Yes, sir.
8    Q.   What is it?
9    A.   Once again, it's my personal diary, daily
10 planner.
11   Q.   And number 2, from what year does this
12 personal diary come from?
13   A.   2015.
14   Q.   And I want you to take a look at it, and
15 can you tell me, please, is it a true and accurate
16 copy or photocopy of your 2015 daily planner and
17 diary?
18   A.   Yes, uh-huh.  Yes, it is.
19   Q.   Who wrote in this diary, Mr. Dean?
20   A.   Just I did.
21   Q.   Did anybody else?
22   A.   No, sir.
23   Q.   Has anybody else seen this diary before?
24   A.   Other than you, after I filed my lawsuit,

1  no.
2    Q.   And did you also record things in this
3  diary at or near time that they happened?
4    A.   Yes, sir.
5    Q.   Was it part of your regular practice to
6  keep this diary in the year 2015?
7    A.   Yes, sir.
8    Q.   And what sorts of things did you record in
9  here?
10   A.   Any medical stuff that I had going on,
11 schedules for football, racing, once again,
12 birthdays, special events for the family.
13   Q.   So I'd like to direct your attention to
14 the page for January 2015 that includes the date of
15 January 1st.
16        MR. FORNOFF:  Just for the record, I'll
17 have a standing objection on hearsay on Exhibit 2 as
18 well.
19        MS. CLARK-JOSEPH:  And I'll join.  Thank
20 you.
21        MR. STROM:  Understood.
22        THE WITNESS:  2015, you said?
23 BY MR. STROM:
24   Q.   January 2015.  January 1st is the date on

1  that page.
2    A.   Okay.  All right.
3    Q.   Mr. Dean, did you make these records --
4  why did you make these records?
5    A.   To keep track of what actually happened so
6  I could be reminded, and also if anything ever
7  happened to me, my wife could kind of get an idea of
8  what my life was like.
9    Q.   Did you ever look at these notes before
10 you had a doctor's appointment?
11   A.   I don't understand.
12   Q.   When you knew that you had a doctor's
13 appointment coming up, did you ever look at these
14 notes to help remind you what happened last time?
15   A.   Sometimes.
16   Q.   And your notes today include notes that
17 describe your medical history?
18   A.   Yes.
19   Q.   Do they include notes that describe your
20 past and your present symptoms?
21   A.   Yes.
22   Q.   And do they include notes about what the
23 doctor told you the cause of those symptoms was?
24   A.   Yes, sir.

Page 46

1    Q.   Okay.  So I've directed you to the page
2  that includes January 1st, 2015, and there is a
3  section on the right-hand side of the page that says
4  "notes."
5    A.   Uh-huh.
6    Q.   I want you to take a look at what's
7  written there in the "notes" column there.  Does
8  that refresh your recollection as to when your
9  procedure of lithotripsy for your kidney stones at
10 the time took place?
11   A.   Somewhat, yes, because I think it's been
12 copied backwards or whatever, because the preceding
13 page, the page before, it says that I had an x-ray
14 showing it's still there, but it's half the size
15 that it was.
16   Q.   And can you indicate what date that note
17 is on?
18   A.   January 12th.
19   Q.   Okay.  Turning back to the page with
20 January 1st of Defense [Dean] Exhibit Number 2, in
21 that "notes" column, I see about halfway down the
22 page where it says, Second surgery, 12-30-14.  Do
23 you see that?
24   A.   Yes.

Page 47

1    Q.   And it's followed by, in parenthesis,
2  1-12-15, x-ray, closed parenthesis.  Do you see
3  that?
4    A.   Yes.
5    Q.   What does 1-12-15 refer to there?
6    A.   I guess I don't know if that was the day
7  that I had my -- I think I was told that I was going
8  to have a second surgery is what I believe that is.
9    Q.   You just talked about what it said on the
10 previous page?
11   A.   Uh-huh.
12   Q.   On January 12th?
13   A.   Uh-huh.
14   Q.   Is that the same x-ray?
15   A.   Yes.
16   Q.   Okay.  And so that x-ray was checking on
17 your kidney stones diagnosis, is that right?
18   A.   Yes.
19   Q.   Okay.  And so does this refresh your
20 recollection here on the page with January 1st in
21 the notes column about when you actually had that
22 surgery?
23   A.   Well, on the preceding page, it said I had
24 my med writ for lithotripsy, left at 5:00 a.m.  We

Page 48

1  were on lockdown at the time, and I can't read in
2  the back.  About 1:30, it says.  I had to stay
3  overnight in healthcare.
4         It's their policy that if you've been put
5  under any type of anesthesia or anything, they spend
6  the night afterwards.
7    Q.   So on that previous page, January 2015,
8  that includes the date January 4th, can you indicate
9  where on that page you were just reading from?
10   A.   I was reading from -- well, okay -- just
11 above January 6th.  So, in other words, I think
12 that's the notes from the preceding month, which
13 would be exactly December 30th.
14   Q.   I'm sorry.  We went around in a circle but
15 I've figured it out.
16   Q.   Right.  So that's under the column marked
17 Tuesday, is that right?
18   A.   Yeah.  Why I did that is because I went
19 from January '14 to the 2015 one, so I write stuff
20 that happened previously so I don't have to go all
21 the way back.  That's where I was confused.  I'm
22 sorry about that.
23   Q.   That's no problem.  I just want to make
24 sure I'm following okay.

Page 49

1         So it's your testimony that you received
2  surgery for your kidney stones on December 30th,
3  correct?
4    A.   Yes, sir.
5    Q.   And then you had an x-ray to follow up on
6  that on January 12th, correct?
7    A.   Yes.
8    Q.   And that x-ray said that it was your
9  testimony that the kidney stones were still there
10 but they were smaller, is that right?
11   A.   Yeah.  In half, it says.
12   Q.   And you also testified you eventually
13 passed those kidney stones?
14   A.   Yes.
15   Q.   Okay.  I want to direct your attention in
16 Defense [Dean] Exhibit Number 2 to April of 2015,
17 which is the page that has the date April 1st at the
18 top of the page.
19   A.   Uh-huh.
20   Q.   And direct your attention to April 26th on
21 that page.
22   A.   Okay.
23   Q.   You have a note there.  Does it refresh
24 you about what happened with your kidney stones?

Page 50

1    A.   Yes, it does.
2         Q.   And what do you now recall?
3    A.   That I was standing at the urinal
4    urinating, and it stopped and there was very bad
5    pain and I -- how would you say it -- beared down
6    and it shot out and it hit the back of the toilet
7    instead of in the toilet.  So, therefore, I was able
8    to collect it.
9         Q.   And when you say "it," you mean the kidney
10   stone?
11   A.   Yes, sir.
12        Q.   Did you have further kidney stones from
13   that incident after April 26th?
14   A.   It felt like I did, but none that I could
15   collect and none that I could see, but they hurt
16   coming out.
17        Q.   Okay.  I'd like to direct your attention
18   now to the page from June 2015 in which the date
19   June 1st appears near the top; June 2nd, June 3rd,
20   also.
21   A.   Yes.
22        Q.   It says there that you saw Dr. E.  Is that
23   Dr. Einwohner again?
24   A.   Yes, Dr. Einwohner.

Page 51

1         Q.   And do you recall what that visit -- in
2    June of 2015, was it?
3    A.   Well, it was my normal kidney clinic but I
4    had told her about -- because I had already talked
5    to Dr. Gowan about my heart, and he didn't want to
6    pay attention, and so I told her about my heart,
7    that it was going fast, about retaining water, about
8    stopping my Coreg, and I had edema, which I wrote
9    down as swelling.  She wants Dr. Gowan to check up
10   or follow up on my heart problems, get an EKG, and
11   also wants to follow up on liver failure.
12        In 2001, I had reported about my liver
13   failure.  That's when they discovered my
14   cardiomyopathy and congestive heart failure and also
15   wants to see me in one to one and a half months.
16        Q.   Okay.  And why did you tell Dr. Einwohner
17   about these things?
18   A.   Well, sometimes when you talk to our
19   physician here at Taylorville Correctional Center,
20   how do you put it, they don't always want to believe
21   your symptoms, and so normally, Dr. Einwohner, if I
22   told her something, she would believe me and she
23   would help me out, and at this point she ordered a
24   follow-up with Dr. Gowan, so I guess it was more she

Page 52

1    was my go-to when I had a problem.
2         Q.   On the next page, also June 2015,
3    marked -- or it includes at the top Thursday,
4    July -- or excuse me.
5         Let me start over, next page, Defense
6    [Dean] Exhibit Number 2, June 2015, the dates at the
7    top include Thursday, June 4th.
8    A.   Okay.
9         Q.   Just below that, there's a note that says,
10   "16th day since seen Dr. E."  Is that right?
11   A.   It says, Seen doctor and he ordered a
12   wheelchair for me.
13        Q.   Oh, I see.
14   A.   Yes.  That's my -- instead of writing
15   A-N-D, I make that little symbol.
16        Q.   Understood.  Sorry for misreading that.
17        And so was it part of your regular
18   practice to take notes about the duration between
19   when you received a diagnosis from the doctor and
20   when you received treatment?
21   A.   Yes.
22        Q.   Why did you do that?
23   A.   Just to keep track on the amount of time.
24        Q.   Again, in Defendant's Exhibit Number 2, I

Page 53

1    want to direct your attention to July of 2015 and
2    the page that includes Thursday July 2nd at the top.
3    A.   Okay.
4         Q.   You have a note there.  Do you recall what
5    happened on July 2nd of 2015?
6    A.   Yeah.  It was about 5:45 in the morning.
7    I was in the shower at my usual time and I was
8    feeling real bad, and it's a handicapped shower, and
9    I was done with my actual shower and I was trying to
10   dry off and I was sitting down and everything just
11   went purple, for lack of a better description, and
12   the next thing I know, I wake up and I'm on the
13   floor facedown and my heart was beating real hard
14   and I had chest pains.
15        I got up after a few minutes and completed
16   dressing, made it back to my bed, laid in my bed for
17   what seemed like 10 or 15 minutes.  I had chest
18   pains again real bad and told one of the guys next
19   to me.  He helped me get in my chair and took me to
20   what we call the control unit where the officers sit
21   and I told him what was going on, that I believe I
22   was having a heart attack.  I could barely speak.
23        And they called healthcare, and I recall
24   it was Nurse Randy that came got me.  He rushed me

1  over to healthcare, gave me oxygen.  I could breathe
2  little bit and he gave me an EKG and he said the EKG
3  shows that I didn't have a heart attack.  And he
4  said, "I seen you.  You were having a heart attack
5  for sure."
6          So he said, "Lay in the bed."  He put me
7  in the bed and he said, "Lay there," and he called
8  Dr. Gowan at the time -- he was there, our
9  physician -- and they said to send me out.
10         Well, they called the ambulance.  That
11 means call an ambulance.  The ambulance got there.
12 They asked me if I could get onto the stretcher
13 myself, and I said, "Well, I think I can," and I
14 stood up and I had another heart attack and/or what
15 felt like one -- I'm not a doctor -- but I couldn't
16 breathe.  My chest hurt real bad and they had got me
17 on a stretcher and administered oxygen, took my
18 vitals, put me in the ambulance and took me to
19 Taylorville Memorial Hospital.
20         There they ran a series of tests and they
21 determined that there was definitely something wrong
22 and they sent me to St. John's Hospital in
23 Springfield.
24     Q.   And what was your diagnosis from this

1  incident?
2      A.   Well, they definitely -- my complete -- at
3  the end, it was a diagnosis that I had a heart
4  attack.  There's two different types.  There's what
5  they call plumbing -- you know, your arteries are
6  clogged -- or there's electrical, and my electrical
7  was what was causing my heart attack.  The different
8  nerve endings or whatever that makes your heart
9  work, they were both working at the same time, so my
10 heart would just stop.
11     Q.   And that's your personal understanding of
12 what you were told about your diagnosis?
13     A.   Yes.
14     Q.   Do you recall what treatment came after
15 those heart attacks?
16     A.   They determined within a day that I
17 definitely needed a pacemaker, but during the time I
18 was staying there, when I was laying down, my blood
19 pressure was pretty much normal.  Sitting up, it was
20 kind of worse, but if I stood up, it just dropped
21 down to nothing and I'd pass out.  I don't know if
22 that was ever determined exactly why that was going
23 on.
24     Q.   Do you recall when you -- or I'm sorry.

1  Let me start over.
2          Did you receive a pacemaker?
3      A.   Yes.
4      Q.   Do you recall when that was?
5      A.   I believe it was July 5th.
6      Q.   Does looking at your notes refresh your
7  recollection?
8      A.   It was a Thursday.  I don't think I got it
9  until the Monday, so that was on the 2nd.  Yeah, I
10 think they had to wait all weekend to do it, which
11 would have been on the 6th.
12     Q.   And you just looked at Defense [Dean]
13 Exhibit Number 2, July 6, 2015?
14     A.   Uh-huh.
15     Q.   Okay.
16     A.   Yes, sir.
17     Q.   I'm going to direct your attention to
18 Defense [Dean] Exhibit 2, please, to December of
19 2015, and looking at the page that has Thursday,
20 December 3rd, 2015, at the top.  Directing your
21 attention to Saturday, December 19th, do you recall
22 what happened on Saturday, December 19th?
23     A.   Yeah.  I woke up and I started urinating
24 blood.

1      Q.   Can you tell us a little bit more about
2  what you saw?
3      A.   When I urinated, the toilet was not
4  completely blood red, but it was half and half, and
5  at the time I thought it was probably kidney stones
6  because I've had blood in my urine before.
7      Q.   Have you had blood in your urine before
8  that you actually saw?
9      A.   Yes.  Back in 2003, I had blood in my
10 urine.
11     Q.   And did you have kidney stones in 2003?
12     A.   They never diagnosed it.  It was at the
13 correctional center and they never did diagnose it.
14     Q.   Okay.  So on December 19th, you saw blood
15 in your urine, is that right?
16     A.   Yes, sir.
17     Q.   And then you made this note, is that
18 correct?
19     A.   Yes.
20     Q.   When did you make this note; do you
21 remember?
22     A.   That same day.
23     Q.   And what did you think?
24     A.   I thought I was having kidney stone

Page 58

problems again.
**Q. What sorts of emotions did that bring up for you?**
A. I was kind of concerned. It's always scary going under. I thought I was going to have to have another procedure.
**Q. And when you say "going under," you mean having anesthesia?**
A. Yes.
**Q. Did you do anything that day about it?**
A. No, I didn't do anything that day about it at all.
**Q. What did you do next about the blood in your urine on December 19th?**
A. Drank more water, trying to hopefully that that would flush out the stone.
**Q. And when did you next see blood in your urine?**
A. The next day, which would have been the 20th.
**Q. And was it every time that you urinated?**
A. Yes.
**Q. Was urination painful on the 19th or the 20th?**

Page 59

A. Not at the time, no.
**Q. Did you have any lower back pain like you had had before?**
A. No.
**Q. When did you next have blood in your urine?**
A. On the 21st.
**Q. And was it painful?**
A. No, not at the time.
**Q. It wasn't painful to pass?**
A. No.
**Q. And you didn't have any back pain?**
A. No back pain.
**Q. Did you eventually seek medical treatment about the blood in your urine in December of 2015?**
A. Well, on December 22nd, I had a visit with my wife and I told her what was going on. She said, "I need you to go to sick hall," and so I went to sick hall that night, and on the 23rd, I seen Dr. Nawoor.
**Q. And do you recall if you had blood in your urine on December 22nd?**
A. On the 22nd, yes, all day, a.m., and during my visit.

Page 60

**Q. How often were you urinating in general on those days?**
A. I'm going to say probably -- I take water pills, so I urinate quite frequently. I'm going to say ten times.
**Q. And do you recall, was there blood in your urine each time?**
A. Yes.
**Q. Did you have any painful urination before you went to see the doctor on December 23rd, 2015?**
A. Not before I seen the doctor.
**Q. When you saw the doctor, that was December 23rd, is that right?**
A. Yes, sir.
**Q. And how long -- who did you see?**
A. I seen Dr. Nawoor. He was just new then. He had probably been here a month.
**Q. And do you recall how long you met with him?**
A. That day, approximately 15 minutes.
**Q. And what did you talk about?**
A. We talked about the blood in my urine. He was concerned about it, wanted to order a blood test, and I asked him, "So, Doctor, do you think

Page 61

it's stones?" He said, "It's stones or cancer."
**Q. And was there anyone else present for that conversation?**
A. There was always a nurse in the room at the time, but I don't recall what nurse was in the room.
**Q. Did he ask you any questions?**
A. Not at the time. Well, other than up to that point, yeah, he asked me -- how would I say it, you know, what the urine looked like, because he hadn't seen a sample yet, and I told him that it was red -- you know, not completely red, but at the time it was a pinkish color.
**Q. So he didn't see any samples that day?**
A. Not that day.
**Q. Did he ask you about pain?**
A. He asked me had I had pain where my kidneys were, and I said no.
**Q. Did he ask you about pain in urination?**
A. No.
**Q. Did he perform any other kind of physical examination on you that day?**
A. No, he didn't touch me.
**Q. And you said he ordered tests, is that**

Page 62

1  right?
2      A.   He ordered a blood test.
3      Q.   Did he order any urine tests?
4      A.   Yes, I'm sorry, a blood and a urine test.
5      Q.   And did he tell you what he thought was
6  the likely cause?
7      A.   I asked him if it was stones, and he said,
8  "It's stones or cancer."  That's just before I
9  walked out the door.
10     Q.   And was a nurse present when he said that?
11     A.   I would have to say yes.  They were always
12  in the room at the time.  They've changed their
13  policy since then.  There's no nurses in there.
14     Q.   What directions did Dr. Nawoor give you
15  during that visit on December 23rd?
16     A.   Just to drink more water.
17     Q.   Did he prescribe any medication?
18     A.   No, sir.
19     Q.   Did he say anything about -- and I'm going
20  to butcher the word -- the litho --
21     A.   Lithotripsy?
22     Q.   Yes, the lithotripsy.  Did he say anything
23  about that at that visit?
24     A.   No, sir.

Page 63

1      Q.   Did he say anything else about what you
2  should do to manage the blood that was appearing in
3  your urine?
4      A.   No, sir.
5      MR. STROM:  Mr. Dean, would you like to
6  take a bathroom break at this time?
7      THE WITNESS:  Yes, I could.
8      MR. STROM:  Okay.  We'll go off the record
9  for a moment.
10         (A brief recess was taken.)
11 BY MR. STROM:
12     Q.   So Mr. Dean, we were talking about your
13  visit on December 23rd with Dr. Nawoor, and do you
14  recall what your next doctor's visit related to the
15  blood in your urine was?
16     A.   The next doctor visit, I don't know.  I
17  know I had a urine sample and blood test on the
18  28th.
19     Q.   And that was related to your -- I'm
20  sorry -- to your symptoms of blood in your urine?
21     A.   Yes.  And Dr. Nawoor had ordered it on
22  that day.
23     MR. STROM:  Okay.  I'm going to go ahead,
24  and for the record, I have been referring to my

Page 64

1  exhibits on behalf of plaintiff, Mr. Dean, as
2  defense exhibits, when, in fact, what I mean is
3  plaintiff's exhibits.
4      I'll go ahead and use Mr. Dean's name
5  because it begins with a D and maybe that will help
6  me.
7      So I'm going to go ahead and pass to
8  Mr. Dean what's been marked for identification as
9  Dean Exhibit 3.
10     (Dean Exhibit Number 3 was marked for
11     identification.)
12 BY MR. STROM:
13     Q.   Mr. Dean, take a look at that document,
14  and once you see what it is, if you would please
15  identify for the record what it is.
16     A.   It's my daily planner, personal diary.
17     Q.   From what year?
18     A.   From 2016.
19     Q.   And is this a fair and accurate photocopy
20  of your daily planner diary from 2016?
21     A.   Yes.
22     Q.   Who wrote in this diary, Mr. Dean?
23     A.   Just I did.
24     Q.   And has anyone else seen it before?

Page 65

1      A.   Not until I submitted it to you.
2      Q.   And did you take the notes in this diary
3  near the time of the events that you recorded?
4      A.   Yes, either exact day or shortly
5  thereafter.
6      Q.   And was this part of your regular practice
7  of recording the events in your diary?
8      A.   Yes, since 2010.
9      Q.   What kind of events did you record?
10     A.   Any healthcare related thing, NASCAR,
11  football, family holidays, birthdays, that type of
12  stuff.  Even -- sometimes I even put I had a
13  haircut, because we get haircuts on schedules.
14     Q.   And Mr. Dean, where did you get these
15  daily planners from?
16     A.   My wife had sent them in to me.  Every
17  year she sends me one.
18     Q.   Did she ever write anything in their notes
19  to you in advance?
20     A.   Always put something in the front.
21     Q.   Did she ever put down dates or holidays or
22  family days for you?
23     A.   Some of them, I think, she's written dates
24  in there, but most of them she knows that I know

1  them all by now.

2     Q.    So your wife may or may not have written
3  something in the 2014 that was marked as December
4  Exhibit 1?

5     A.    I don't think she was doing it by then,
6  but she may have.  If it's good handwriting, it's
7  her.

8     Q.    And she may have written things like
9  family holidays in the 2015 that was marked Dean
10 Exhibit 2?

11    A.    Maybe.

12    Q.    And same for Dean's Exhibit 3?  For 2016,
13 she may have?

14    A.    Yes, sir.

15    Q.    And it was part of your routine practice
16 to keep notes about your medical treatment and your
17 symptoms?

18    A.    Yes, sir.

19    Q.    Did you -- do those notes about your
20 medical treatment describe your medical history?

21    A.    I don't understand that.

22    Q.    Does it describe the symptoms that you
23 were experiencing at the time?

24    A.    Not always, but if there was something

1  bad, yes.

2     Q.    Did it describe past symptoms in some
3  instances?

4     A.    Some instances, yes, sir.

5     Q.    And did it describe your understanding of
6  your conversations with your doctors about the
7  causes of those symptoms?

8     A.    Yes, sir.

9     Q.    Okay.  After December 28th of 2015, do you
10 recall when your next visit with the doctor was
11 about blood in your urine?

12    A.    Not without looking at my notes.

13    Q.    In Dean Exhibit 3, I want to direct your
14 attention to January of 2016, the page that has
15 January 1st, 2016, at the top, and the date
16 Thursday, January 7th.

17    A.    Okay.

18    Q.    Mr. Dean, does this refresh your
19 recollection about when your next doctor's
20 appointment was about blood in your urine?

21    A.    Yes.  That was with Dr. Einwohner.

22    Q.    And was that via teleconference again?

23    A.    TeleMed, yes.

24    Q.    And how long did you meet with

1  Dr. Einwohner that day?

2     A.    Usually, those run anywhere from a half
3  hour to 45 minutes.

4     Q.    And did she ask you any questions?

5     A.    Yes.

6     Q.    What questions did she ask you?

7     A.    Well, her normal things:  How am I
8  feeling, past history, which she does every time,
9  pretty repetitive with that.  Basically things like
10 that.  She did not know at the time that I was
11 urinating blood.

12    Q.    What did you tell her about how you were
13 feeling?

14    A.    I told her that I was urinating blood.
15 She asked if I was having any pain in my kidney
16 areas, and I said, No, not at the time.

17    Q.    And had you urinated blood since December
18 23rd on -- as of January 7th, 2016?

19    A.    Pretty much every day.  Some days I
20 didn't.  Some days it would go away.

21    Q.    Had you experienced any pain in your back
22 in the area of your kidney?

23    A.    No, sir.

24    Q.    You said she asked you about your medical

1  history.  What questions about your medical history
2  did she ask?

3     A.    Everything from, you know, like when --
4  cardiomyopathy, that type of stuff.  Pretty much the
5  same questions every time, how I've been feeling.

6     Q.    Did she ask you questions about history of
7  kidney ailments?

8     A.    Yes.

9     Q.    What questions -- what were your answers
10 to those questions?

11    A.    That I hadn't had any pain but that I was
12 urinating blood.

13    Q.    Did she ask you at all about your prior
14 kidney stones diagnosis?

15    A.    No.

16    Q.    What did she tell you in response to your
17 answers about the blood in your urine at that time?

18    A.    I believe she said that she would refer me
19 back to Dr. Nawoor.

20    Q.    Did she tell you what she thought was
21 wrong?

22    A.    No, she didn't.  I asked her and she said
23 it could be stones.

24    Q.    Did she schedule any tests at that time?

1       MR. FORNOFF: Objection, foundation. Go
2  ahead and answer.
3  BY MR. STROM:
4       Q.   You can answer.
5       A.   I believe she ordered a urine test,
6  because there was no record of the blood in the
7  urine test that I took on the 28th.
8       Q.   Do you know if she scheduled any
9  examinations at that time?
10      A.   Outside examinations?
11      Q.   Any examinations.
12      A.   No.  No.
13      Q.   You don't know, or you know that she did
14 not?
15      A.   No, she did not.
16      Q.   Do you know if she took any -- did she say
17 that she was going to take any further steps to
18 determine what was wrong?
19      A.   That she wanted to see me a little bit
20 sooner than the average three months.
21      Q.   What timeline did she say she wanted to
22 see you?
23      A.   Within a month, month and a half.
24      Q.   Did she say anything about something

1  called collegial review?
2       A.   No, not at all.
3       Q.   Did she prescribe any medications?
4       A.   No, not at all.
5       Q.   Did she describe any treatments that you
6  could take yourself or that she recommended?
7       A.   None.  None at all.
8       Q.   Do you recall when your next doctor visit
9  was about the symptoms of blood in your urine?
10      A.   Not without looking at my notes.
11      Q.   Okay.  I want to direct your attention to
12 the next page, February 2016, the page in Dean
13 Exhibit 3 that includes February 1st at the top of
14 the page and the date February 8th.
15      A.   I seen Dr. Einwohner that day.  She went
16 through the same myriad of questions and it wasn't
17 very productive.
18      Q.   When you say "it wasn't very productive,"
19 what do you mean by that?
20      A.   She had no answers and she prescribed
21 nothing and she ordered no -- any tests or anything.
22      Q.   What were your feelings at the time?
23      A.   By my notes, I could tell I was very
24 frustrated.

1       Q.   And I understand that it is a little
2  impolite, but go ahead, Mr. Dean.  What in your
3  notes tells you that you were frustrated?
4       A.   I wrote, "dumb bitch."
5       Q.   And did you expect anyone was going to see
6  that you had written that?
7       A.   No, only myself.  Well, maybe my wife in
8  future days.
9       Q.   And you talked about the blood in your
10 urine on that date?
11      A.   Yes.
12      Q.   And had you had further incidents of blood
13 in your urine since January 7th, 2016?
14      A.   Yes.
15      Q.   How frequent?
16      A.   It was on and off.  Some days it was
17 really heavy, some days it wasn't.
18      Q.   Have you had any other symptoms related to
19 the blood in your urine?
20      A.   No pain, anything like that.  No blood
21 clots up to that point.
22      Q.   No blood clots that you had passed in your
23 urination?
24      A.   No.

1       Q.   And no pain in your back near your
2  kidneys?
3       A.   No.
4       Q.   Did she say anything on February 8th about
5  what she thought the problem might be?
6       A.   Once again, she had no answers to what it
7  could be and she didn't know if it was stones
8  because I asked -- I was praying that it was stones,
9  so I'd always ask.
10      Q.   When you say you were praying it was
11 stones, why was that?
12      A.   Because I didn't want it to be cancer.
13      Q.   After February 8th, did you continue to
14 have blood in your urine?
15      A.   Yes.
16      Q.   Did you have any other symptoms after
17 February 8th?
18      A.   Later on, I started getting blood clots.
19      Q.   And what was the difference between the
20 blood in your urine you saw before and the blood
21 clots?
22      A.   The blood clots were very, very painful.
23      Q.   Painful to pass when urinating?
24      A.   Painful to pass.  It would stop my stream

Page 74

1   and then it would splatter all over.  In my opinion,
2   it looked like somebody had cleaned an animal or a
3   murder scene or whatever in the toilet.
4       Q.   And so blood clots are not purely liquid
5   blood, is that right?
6       A.   No, it was solid.  If I could describe
7   them, they were similar to a gummy worm sometimes,
8   long and stringy; other times, kind of like a snail,
9   kind of thick and sluggish looking.
10      Q.   And about how frequently did you have
11  blood clots in your urine?
12      A.   Not always, but probably about half the
13  time.
14      Q.   Did Dr. Einwohner -- and I apologize if
15  I've asked you this already -- did Dr. Einwohner
16  prescribe any medication on February 8th?
17      A.   No, sir.
18      Q.   Did she give you any directions about self
19  treatment?
20      A.   No.
21      Q.   Did she tell you to drink more water?
22      A.   I don't recall.
23      Q.   When did you next go to see a doctor?
24      A.   I seen Dr. Nawoor on the 10th.

Page 75

1       Q.   And what did you see Dr. Nawoor on the
2   10th about?
3       A.   I believe it was about the blood in my
4   urine.  It could have been for my diabetic clinic.
5   I couldn't think of the word clinic.
6       Q.   Do you know if it was a regularly
7   scheduled appointment?
8       A.   I believe he was seeing me about my blood,
9   so I believe he scheduled me.
10      Q.   Okay.  And about how long did you visit
11  with Dr. Nawoor on February 10th?
12      A.   I'm going to say 15 minutes.  15 to 20
13  minutes is the average.
14      Q.   Did he ask you any questions that day?
15      A.   He asked if I was still urinating blood,
16  and I told him yes.
17      Q.   Anything else?
18      A.   He told me he was going to try to order a
19  CAT scan that day.
20      Q.   A CAT scan of your kidney?
21      A.   Well, he didn't say specifically kidneys.
22  I assumed it was that.
23      Q.   Was there anyone else present for that
24  appointment?

Page 76

1       A.   There was always a nurse in the room.  I
2   don't know what nurse.  I never wrote that down.
3       Q.   Okay.  Were there nurses present when you
4   would meet by tele clinic or TeleMed with
5   Dr. Einwohner?
6       A.   Yes, always.
7       Q.   Was there a nurse present in person with
8   you, or were they -- sorry.  I'll ask this question.
9   Were they present in person with you?
10      A.   Yes.  They were in the room with me.
11      Q.   Was there anyone present in person with
12  Dr. Einwohner?
13      A.   No.  She was in an office behind her desk.
14  If there was, I could not see them.
15      Q.   On February 10th, did you tell Dr. Nawoor
16  about the blood clots?
17      A.   I don't know if I had them at that point.
18  I was still urinating blood for sure.  I don't see
19  that it said any blood clots because I definitely
20  wrote down I had the blood clots.
21      Q.   Did Dr. Nawoor say anything, then, on
22  February 10th about what he thought your diagnosis
23  was?
24      A.   He wasn't sure what it could be.  Once

Page 77

1   again, it could be stones or cancer, but he wanted
2   to order a CAT scan, and I gave him a urine sample
3   and he looked at that.  If I recall, Nurse --
4   Director of Nursing, Kathy Galvin, and Healthcare
5   Administrator, Lisa Mincy, looked at this sample
6   before it was brought in to Dr. Nawoor.  Of course,
7   it was not analyzed yet but it was a visual -- you
8   know, you could see the blood that was there, and I
9   think there was some solids in it at the time.
10      Q.   Were you present when they looked at that
11  sample?
12      A.   Yes.  There's a room that they draw blood
13  in and the bathroom was right outside that room.  I
14  gave them a sample.  They brought it in there and
15  held it up to the light to see if they could see any
16  solids in it.  You almost couldn't see through it.
17      Q.   You mentioned Dr. Nawoor said he wanted to
18  order for you a CAT scan, correct?
19      A.   Yes.
20      Q.   Did he describe any other treatments he
21  was recommending for you?
22      A.   No, sir.
23      Q.   Did he prescribe any medications?
24      A.   No, sir.

1    Q.   Did you continue to urinate blood after
2  February 10th in your appointment with Dr. Nawoor?
3    A.   Yes.
4    Q.   And when was your next visit to the
5  doctor?
6    A.   On February 16th.  To the doctor, I don't
7  know, to healthcare.  I urinated a lot of blood,
8  showed the officer.  The officer said, Go to
9  healthcare.
10    Q.   Do you recall were there clots by that
11  point?
12    A.   I don't think there were yet.  It was very
13  heavy that day.  I mean, it looked solid red.
14    Q.   The blood was very heavy on the 16th?
15    A.   Yes.  My urine looked completely red, not
16  partial, not diluted to me.
17    Q.   And how do you remember that?
18    A.   It was frightening, scary.
19    Q.   Is there anything else that's helping you
20  to remember that day?
21    A.   I don't understand.
22    Q.   My question, I guess, is, does your diary,
23  your planner here, help you to remember that that
24  was the date?

1    A.   It says that there's heavy blood that day.
2    Q.   Okay.
3    A.   That I went to -- I wrote tons of blood,
4  and once again, that day -- I seen him that day and
5  he said he would try to order a CAT scan for the
6  second time.
7    Q.   Do you recall when you next saw
8  Dr. Nawoor?
9    A.   No.  Without looking, no.
10    Q.   I'll direct your attention in Dean Exhibit
11  Number 3 to February of 2016, the top of the page
12  says February 4th, and the date I'll direct your
13  attention to is February 26th.  Do you see that,
14  Mr. Dean?
15    A.   Yes.
16    Q.   Does that help you to refresh your
17  recollection about when you saw Dr. Nawoor next?
18    A.   Yes.
19    Q.   And what do you recall about that visit?
20    A.   He said that he would call on Monday, I
21  guess, to Pittsburgh.  He said he was going to call
22  Pittsburgh Monday to try to order the CAT scan
23  again.
24    Q.   And what's your understanding about why he

1  was calling Pittsburgh?
2    A.   From what I understand, they have to get
3  approval to send you out for any type of procedure
4  outside the facility.
5    Q.   When you say "they have to get approval,"
6  who do you mean?
7    A.   The healthcare doctor here in Taylorville
8  Correctional Center.
9    Q.   And who do they have to get approval from?
10        MR. FORNOFF:  Objection, speculation.
11  BY MR. STROM:
12    Q.   To your knowledge.
13    A.   He referred to it as "calling Pittsburgh."
14    Q.   Do you have an understanding today about
15  what that means?
16    A.   My understanding is that they call
17  Pittsburgh and they have what they call a collegial,
18  which, to me, is a meeting where two or three people
19  get together and decide if that's the proper course
20  of treatment.
21    Q.   And your testimony is that "they" do this.
22  I'm just trying to clarify for the record who "they"
23  are.
24    A.   I believe it's Wexford executives or

1  doctors.
2    Q.   Okay.  So it's decisionmakers affiliated
3  with Wexford to your knowledge?
4    A.   Yes.
5    Q.   Okay.  Do you recall when you next saw
6  Dr. Nawoor?
7    A.   In looking at my notes, I'd say it's March
8  1st.  Once again, he said he would call again.
9    Q.   And had you been urinating blood in
10  between your last visit with Dr. Nawoor on February
11  26th and that visit on March 1st?
12    A.   Yes, sir.
13    Q.   How do you know that?
14    A.   Because I write down every time.  For
15  example, on February 18th, I wrote, "Less but still
16  heavy."  You know, the next one, still on the 19th,
17  "Slightly better, still red."  On the 20th, "Blood."
18  25th, "Blood."  I guess we're over on the back page
19  for that, but every day I wake up and I'd write down
20  whether I had blood in my urine and also I wrote a
21  vulgar word for whether I had defecated.  Once
22  again, I didn't think anyone would see this.
23    Q.   Understandable.  On March 1st, you saw
24  Dr. Nawoor again, is that right?

1    A.   Yes.

2    Q.   And about how long did you meet with him?

3    A.   Fifteen minutes.

4    Q.   Do you recall who else was there, if
5    anyone?

6    A.   I know there was a nurse in the room
7    because they were still doing that at that time.

8    Q.   And did he ask you any questions?

9    A.   If I was still urinating blood, and I told
10   him yes.  He asked if I had any pain.  I said,
11   "There's no lower back pain or anything like that,"
12   and I just expressed my concerns that something's
13   really wrong; we need to do something.

14   Q.   And what did he tell you that day that he
15   felt was wrong?

16   A.   Once again, he thought it could either be
17   stones or cancer.

18   Q.   Did he repeat that every time that you met
19   with him or was that -- I'll leave it at that.  Did
20   he repeat that every time?

21   A.   Yes.

22   Q.   Is it possible there were times he didn't
23   say that but you just sort of assumed that was the
24   ongoing case?

1    A.   He very well could have not said it one or
2    two of the times.

3    Q.   Did he schedule any tests or examinations
4    that day?

5    A.   No, just said that he would call again.

6    Q.   And by "call again," what was he -- who
7    was he calling?

8    A.   I guess he was calling for approval to
9    Pittsburgh.

10   Q.   And what was he trying to get approval of
11   that day?

12   A.   For a CAT scan.

13   Q.   Did he describe any further steps he was
14   planning to take that day?

15   A.   No.

16   Q.   Did he talk at all about the planned
17   urology appointment that you had on that day?

18   A.   No.

19   Q.   Do you recall a planned urology
20   appointment that you had?

21   A.   Not on that day.

22   Q.   Do you recall a planned urology visit that
23   you might have had in the month of March 2016?

24   A.   I believe it was like the 10th, I think.

1    Yeah, on the 10th of March, I seen Dr. Severino in
2    Springfield Clinic in Taylorville, the town of
3    Taylorville.

4    Q.   And about how long did you meet with
5    Dr. Severino for?

6    A.   It was approximately 15 minutes.

7    Q.   How long -- did you meet with anyone else
8    on this date?

9    A.   No.

10   Q.   Any nurses?

11   A.   At his office, the nurse came in and did
12   the usual vitals, that type of stuff.

13   Q.   About how long was your total visit to
14   Dr. Severino's office?

15   A.   Actually, at his whole facility waiting in
16   the lobby and everything, probably an hour and 15
17   minutes.

18   Q.   And you met with Dr. Severino for about 15
19   minutes?

20   A.   Yes.

21   Q.   Did he ask you any question?

22   A.   He asked what my symptoms were, if I had
23   any pain.  I told him about my previous history of
24   stones, and from there, he said he was going to

1    order a CAT scan, and I don't know the name of the
2    scope, but it's a scope where they go up your penis.

3    Q.   And did he say anything about what he
4    thought your diagnosis was?

5    A.   I asked, and he said, No, we're going to
6    let the CAT scan tell us what it is.

7    Q.   Did he ask you -- or what did you tell him
8    about your symptoms up to that point?

9    A.   That I'd been urinating blood on and off;
10   most of the time it was steady and that it was very
11   heavy at times.  Sometimes it was a little bit less
12   than the normal, I mean the norm of being completely
13   red, and now it's -- sometimes it's diluted.

14   Q.   Had you had any blood clots up to that
15   point?

16   A.   I don't believe so.  I don't see anywhere
17   where it said the clots yet.

18   Q.   Was urinating blood painful?

19   A.   A little bit, because there were solids,
20   but I wouldn't call them clots.  It was more like a
21   cloudy type, almost like -- I don't know how to
22   describe it other than solids.

23   Q.   And did you have any pain in your kidney
24   area up to that point?

1    A.    No, sir.
2    Q.    I want to direct your attention to March
3 22nd of 2016.  That's on the page that has March 1st
4 and 2nd at the top of the page in Dean Exhibit
5 Number 3.
6    A.    Uh-huh.
7    Q.    On March 22nd, it says, Blood test, plus
8 urine tests, question mark.  Can you describe what
9 it is that you're making a note of here?
10    A.    I believe it's from the 21st they ordered
11 a blood test and I just put a question mark, why
12 haven't I had it yet?
13    Q.    So sometimes you would write down notes
14 about something that was prescribed and hadn't
15 happened yet?
16    A.    Yes.
17    Q.    On the next page, directing your attention
18 in Dean Exhibit Number 3 to March 24th, that's on
19 the page that has March 3rd at the top.
20    A.    Uh-huh.
21    Q.    There's a note there that says, CBC blood
22 test.  Urine test finally.  Can you describe why you
23 made that note?
24    A.    Because they finally did it.

1    Q.    What did they finally do?
2    A.    Took my blood test and a urine test.
3    Q.    They took a blood test and urine test that
4 had been ordered on March 21st, is that right?
5    A.    Yes.
6    Q.    When did you next see a doctor, Mr. Dean?
7    A.    I don't think it was until April.  I seen
8 Dr. Nawoor on the 18th of April.
9    Q.    Do you recall seeing --
10    A.    I'm sorry.  I don't remember when I had my
11 CAT scan but I seen Dr. Severino -- I'm trying to
12 remember the dates.  I think I had my CAT scan on
13 the 12th of April and then on the 14th of April, I
14 seen Dr. Severino.
15    Q.    And before we get to that, do you recall
16 seeing Dr. Einwohner on March 3rd?
17    A.    March 30th?  I would have to look at my
18 notes.  Yes.
19    Q.    And about how long did you meet with
20 Dr. Einwohner on March 30th?
21    A.    Half hour to 45 minutes.
22    Q.    And did she ask you questions?
23    A.    Yes.  She asked me, you know, the normal
24 history questions, you know, and then she asked me

1 if I was still urinating blood.  "Yes, I am."
2          She ordered a PSA, which my understanding
3 is that it's for your prostate.
4    Q.    What did you tell her about your symptoms
5 on March 30th?
6    A.    That I'm still urinating blood, and some
7 days it's very heavy and some days it's lighter.
8    Q.    Did you at that time have any blood clots
9 yet?
10    A.    I don't recall if they had started yet.  I
11 know I started writing them down.  There were solids
12 in it but it wasn't as painful as they were whenever
13 they were big blood clots.
14    Q.    Did she ask you about back pain in the
15 area of your kidneys?
16    A.    Yes.  Once again, I told her no.
17    Q.    You testified recalling that you had a CAT
18 scan on April 12th, correct?
19    A.    Yes.
20    Q.    And where did that CAT scan take place?
21    A.    Taylorville Hospital, Memorial Hospital.
22    Q.    And who was there -- who administered the
23 CAT scan?
24    A.    The CAT scan doctor.  I mean, Dr. Severino

1 had ordered it but I assume they call them a CAT
2 scan -- radiologist.
3    Q.    So it was not Dr. Severino?
4    A.    No.
5    Q.    Did you see Dr. Severino that day?
6    A.    No.
7    Q.    Had you continued to urinate blood from
8 March 30th to April 12th?
9    A.    Most days.  Some days it was clear.
10    Q.    When did you next talk to any doctor about
11 the symptoms of blood in your urine?
12    A.    On April 14th, I seen Dr. Severino.
13    Q.    And was that again at Taylorville
14 Hospital?
15    A.    I said Taylorville Hospital.  It's
16 connected to Springfield Memorial.  They're two in
17 the same building, so really it was in Springfield
18 Memorial section, so yes.
19    Q.    And that's located in Taylorville?
20    A.    Yes.
21    Q.    And that was April 14th?
22    A.    April 14th.
23    Q.    How long did you visit with Dr. Severino
24 that day?

1    A.   It was approximately 20 minutes, maybe 25.
2        Q.   Did he ask you any questions that day?
3    A.   That day, he didn't ask me any questions.
4  I was scheduled for the scope that day.  The nurse
5  took my vitals and I said I was scared for the
6  scope.  He says, Oh, you don't have to have a scope,
7  and I was elated that I didn't have to.  That's one
8  of my biggest fears.  And I waited for the doctor to
9  come in and the doctor came in and said, "We've got
10 real bad news."
11       Q.   Not to put too fine a point on it, but
12 what were you afraid of with the scope?
13       A.   That's one of my biggest fears in life.
14 I'm not scared of too many things, but the scope
15 going up my penis is very scary for me.
16       Q.   Were you scared of pain?
17       A.   Not really scared of pain.  I'm just --
18 the thought of it was just scary.
19       Q.   You said just a moment ago that
20 Dr. Severino said that there was bad news?
21       A.   Yes.
22       Q.   What was that bad news on April 14th?
23       A.   He said I have cancer, renal cell
24 carcinoma, and it's really bad.

1        Q.   And did he tell you more about what he
2  meant by "really bad?"
3    A.   He said that it engulfed almost all my
4  whole kidney and it was in my -- I could be wrong --
5  the minor vena cava.  It was slightly in my minor
6  vena cava.  That's the vein going to the heart, he
7  told me.
8        Q.   Did he say anything else about your
9  diagnosis?
10       A.   He said that -- he asked me if I had any
11 questions.  I says, Well, yeah.  How soon are we --
12 what are we going to do about?  He said, "We're
13 going to do surgery."  I said, "How soon?"  He said,
14 "As soon as possible."  He said, "We're going to
15 have get another surgeon involved, possibly two
16 weeks.  At best, two weeks."
17       Q.   And did he tell you why another surgeon
18 would have to get involved?
19       A.   Because of the vein that was going up to
20 my heart that he wanted to have another surgeon
21 present to be able to help handle that.
22       Q.   Do you recall what kind of a surgeon he
23 said should be there?
24       A.   Cardiovascular.

1        Q.   Did he tell you anything about -- anything
2  else about your diagnosis that day?
3    A.   He said that I had a 15 to 25 percent
4  chance of dying on the table and probably a 35
5  percent chance of living five years.
6        Q.   Was there anyone else present when he told
7  you these things?
8    A.   The nurse wasn't in there, but there was
9  two COs, CO Ross, Correctional Officer Ross, and I'm
10 probably butchering his name, but Correctional
11 Officer Stirrett.
12       Q.   And when did he tell you that the surgery
13 would take place?
14       A.   He said as soon as possible, no more than
15 two weeks.  He said, "It needs to come out right
16 away."
17       Q.   After April 14th, when did you next go to
18 see a doctor?
19       A.   Outside of the facility?
20       Q.   Any doctor.
21       A.   Without looking at my notes, I don't know.
22       Q.   Did you see Dr. Severino within five
23 days -- excuse me.  Let me strike that.
24            Did you see Dr. Nawoor within five days of

1  your visit of Dr. Severino?
2    A.   Yes.
3        Q.   Do you recall looking at your notes to
4  refresh your recollection when that was?
5    A.   On the 18th.
6        Q.   I want to step back for a moment to talk
7  further about your visit with Dr. Severino on April
8  14th.  Did he say anything about your other health
9  conditions during that visit?
10       A.   I don't understand.
11       Q.   Did you talk at all about your heart
12 condition that day?
13       A.   Not that day.
14       Q.   Did you talk at all about your diabetes
15 that day?
16       A.   Not that day.
17       Q.   Did he talk at all about your degenerative
18 disc condition in your back that day?
19       A.   No.
20       Q.   Did you ever talk with Dr. Severino about
21 your other health condition?
22       A.   Yes.  On the initial visit, we went over
23 my medical history.
24       Q.   And when you say "the initial visit," that

1   was April 12th of 2016?
2       A.   I believe it was March 10th, I think.
3       Q.   The earlier visit with him?
4       A.   Yes, the very first visit.
5       Q.   Understood.  Did you ever have a
6   conversation with Dr. Severino about your other
7   medical conditions and risks of surgery?
8       A.   Maybe on the 14th he said that we'd have
9   to make sure that my heart could take it.
10      Q.   Moving then to your next doctor's
11  appointment with Dr. Nawoor on Monday, April 18th.
12  Do you recall how long you met with Dr. Nawoor that
13  day?
14      A.   Approximately 15 minutes.
15      Q.   And did he ask any questions that day?
16      A.   Asked if I was still urinating blood.
17      Q.   And what did you tell him?
18      A.   I told him yes.
19      Q.   And did he prescribe any medication for
20  you that day?
21      A.   No, sir.
22      Q.   Did he ask you about pain?
23      A.   Yes.
24      Q.   What did you tell him?

1       A.   I told him no pain in the kidney area.  He
2   asked if I had pain in the kidney area and I said
3   no.
4       Q.   Did he ask you about pain in urinating
5   blood?
6       A.   No.
7       Q.   Did you tell him at all about the pain in
8   urinating blood?
9       A.   I said that I have trouble urinating
10  sometimes.  It was starting to block the stream once
11  in awhile.
12      Q.   Did he say anything about your surgery
13  that day?
14      A.   I asked him if it was scheduled.  He said,
15  "Nothing new."
16      Q.   Directing your attention on the page for
17  April 2016 that includes April 3rd near the top.  At
18  the bottom of that page, April 24th, you have a note
19  there that says, "Blood started 4:00 a.m. in urine."
20      A.   Uh-huh.
21      Q.   Were you experiencing liquid blood in your
22  urine at that time?
23      A.   Yes.
24      Q.   Do you know if you were experiencing blood

1   clots in your urine yet?
2       A.   Not big ones, little ones.
3       Q.   On the next day, the note says, "Susan
4   called frickin' Kathy."  Can you tell us what you
5   meant by that?
6       A.   She said she was going to call Nurse --
7   Director of Nursing, Kathy Galvin, and ask her what
8   was going on.
9       Q.   And you say "She said she was going to
10  call."  Who's she?
11      A.   Where it says, "She said it's approved but
12  not scheduled," Kathy Galvin told her that we had
13  been approved by Wexford, but they had not scheduled
14  it yet.
15      Q.   And I'm sorry.  Who's Susan again, for the
16  record?
17      A.   That's my wife.
18      Q.   So your wife spoke with Kathy Galvin?
19      A.   Yes.
20      Q.   And then you spoke with your wife?
21      A.   Maybe not that day, but I call her every
22  other day.
23      Q.   Okay.  Directing your attention to the
24  next page, still April 2016, the date April 28th.

1   It's a Thursday, so it appears on the page where
2   April 1st is at the top of Dean Exhibit 3.  What's
3   the note there on April 28th say?
4       A.   I wrote that it's been two weeks.
5   Dr. Severino said it would be two weeks and then
6   nothing done, no word, and then the abbreviation for
7   what the -- I can't say that word.
8       Q.   That's fine.
9       A.   There are ladies present.
10      Q.   You can read that.
11      A.   WTF.
12      Q.   What were your feelings at the time?
13      A.   Frustrated, worried, scared.
14      Q.   Directing your attention next to
15  Wednesday, May 4th, on the following page,
16  Wednesday, May 4th of 2016, the note says "DON."
17  Who's DON?
18      A.   Director of Nursing, Kathy Galvin.
19      Q.   "DON said I was scheduled."  Do you recall
20  scheduled for what?
21      A.   My wife had called her and she said that I
22  was scheduled for surgery.
23      Q.   Surgery for your kidneys?
24      A.   For my cancer.

1    Q.   The next page on May 6th, 2016, did you
2  meet with a doctor that day?
3    A.   Yeah.  They sent me out to the cardio
4  doctor at Prairie Health -- I think I'm saying it
5  right -- Prairie Heart Center.  There's two of them
6  in Springfield, but this is at the one connected
7  with St. John's Hospital.
8    Q.   And did you meet with a cardiologist
9  physician that day?
10   A.   Yes.  I can't remember his name.  I think
11 it was Dr. Pathak.
12   Q.   And do you recall how long you met with
13 that doctor for?
14   A.   In the room with himself, probably 20
15 minutes.
16   Q.   And did he ask you any questions?
17   A.   He asked me how I was feeling and how my
18 heart felt, if I'd been short of breath.  Just in
19 general, stuff like that, past history.
20   Q.   And what did you tell him?
21   A.   I told him that I pretty much feel that
22 I'm okay in that area.  I hadn't been short of
23 breath or anything like that.  Ever since my
24 pacemaker, my heart's been doing real well.

1    Q.   Did you talk with him at all about your
2  diagnosis with kidney cancer?
3    A.   Yes.  He said that that's why he was
4  seeing me to approve me for surgery, whether my
5  heart could take it or not.
6    Q.   Do you know whether he approved you that
7  day?
8    A.   I don't know if he told me that he
9  approved me that day because he ordered an
10 echocardiogram and that type of stuff, and I believe
11 I had it that same day.  I don't think I got the
12 report ever.
13   Q.   I want to direct your attention to your
14 notes from May 14th, 2016.  That's on the previous
15 page, the page that has Sunday, May 1st, at the top.
16   A.   Uh-huh.
17   Q.   Sunday, May 15th.  Did you experience any
18 blood in your urine that day?
19   A.   Yeah, I had a complete blockage.  I
20 couldn't urinate.  I started to urinate and it
21 stopped and I had to try as hard as I could to get
22 it to come out and it splattered everywhere.
23        We have urinals that are approximately
24 four-foot wide and I had to clean the whole urinal

1  area and the toilet.  I wrote down that it looked
2  like a murder scene, and it did.
3    Q.   And there was liquid blood in your urine?
4    A.   Liquid blood, solid, gummy-bear-looking
5  things and big slug-looking-things in there.  It was
6  the most painful thing I ever did.
7    Q.   How did you feel?
8    A.   Scared.
9    Q.   What was the pain like?
10   A.   It was almost indescribable because it's
11 in your private areas, and like I said, it's where a
12 guy's worst pain is.  You can get your arm cut or
13 somewhere else, but when it comes to there, it's
14 just terrible.
15   Q.   What did you do after you experienced that
16 pain on Sunday, May 15th?
17   A.   I don't remember if I went to sick hall or
18 not.  It's just been a common occurrence and I just
19 hoped it didn't happen again.
20   Q.   The next day, the note on Monday, the
21 16th, says you put in an emergency grievance, I
22 believe it says.
23   A.   Yeah.
24   Q.   What does that mean?

1    A.   Short for grievance.  I wrote an emergency
2  grievance to the warden to try to expedite my
3  surgery, any treatment or surgery that would
4  alleviate the deal with the blood in my urine and
5  the clots and the cancer.
6    Q.   And I'm going to go ahead and tender to
7  the witness what's been marked for identification as
8  Dean Exhibit 5.  I apologize for going out of order
9  here a little bit, but it's a single page.
10        (Dean Exhibit Number 5 was marked for
11        identification.)
12        Mr. Dean, do you recognize this document?
13   A.   Yes.  It's the grievance I wrote to the
14 warden.
15   Q.   And is it a fair and accurate copy of this
16 grievance?
17   A.   Yes.
18        MR. FORNOFF:  Just for the record, I'm
19 going to object to hearsay on the grievance as well,
20 and I'm not sure if we had a running objection on
21 Exhibit 3, but just so we have that clear as well,
22 for the record.
23        MS. CLARK-JOSEPH:  I'll join as well.
24 BY MR. STROM:

1    Q.    So Mr. Dean, what was your purpose in
2 filing this grievance?
3    A.    To try to expedite my surgery.
4    Q.    And have you filed grievances before?
5    A.    Probably filed, up to that point, about
6 four grievances.
7    Q.    Have you filed an emergency grievance
8 before?
9    A.    Never.
10    Q.    What's your understanding for a regular
11 grievance about what the process is?
12    A.    Well, you mark down what you believe your
13 problem is and you ask for what remedy you would
14 like.
15    Q.    And in your past experience with other
16 grievances, how -- who do you give it to?
17    A.    You put it in the grievance box for the
18 counselor.
19    Q.    And do you know, then, who looks at it
20 next?
21    A.    I believe the counselor looks at it and
22 determines where it needs to go from that point.
23    Q.    Does the counselor, in your experience,
24 make an indication about what to do with the

1 grievance?
2    A.    I don't understand that.
3    Q.    In your experience, does the counselor
4 say, This grievance is good and this person is
5 entitled to relief?
6    A.    No.
7    Q.    So in your experience, the role of the
8 counselor is simply to pass on the grievance?
9    A.    Yes, determine who it needs to go to and
10 possibly get an answer from them.
11    Q.    Have you had a medical grievance before?
12    A.    Never.
13    Q.    What's your understanding about where a
14 medical grievance is supposed to go?
15    A.    An emergency grievance is supposed to go
16 to the chief executive officer of the facility,
17 which would be the warden, number one warden.
18    Q.    And I just want to make sure you're
19 answering the question that I'm asking for any
20 medical grievance, not just for medical ones. Where
21 does an emergency grievance go first?
22    A.    Normally, it would go to the counselor,
23 and the counselor may call Director of Nursing,
24 Kathy Galvin, and Kathy Galvin will give her the

1 right counselor to write it in and sign it and give
2 it back.
3    Q.    And so you receive that back from the
4 counselor in an ordinary medical grievance. Is that
5 the procedure that's supposed to be followed?
6    A.    Yes.
7    Q.    Is the procedure different for an
8 emergency grievance?
9    A.    I still put it in to the counselor, the
10 counselor expedites it to the warden, and then the
11 warden contacts the Director of Nursing, and the
12 Director of Nursing will tell her what she thinks
13 the thing is and whether it's correct or not, and
14 then the warden makes the determination.
15    Q.    In your experience with grievances in
16 general, how long does -- how long does it take for
17 you to get a response usually?
18    A.    If it's not an emergency grievance, it
19 might be anywhere from a week to four weeks,
20 depending on what it's about.
21    Q.    And you said you decided to put this in as
22 an emergency grievance. Why did you make that
23 decision?
24    A.    Because nothing had been moving at that

1 point. It felt like we were getting lied to and
2 nothing was happening, and we were way past the two
3 weeks that Dr. Severino had said that I needed to
4 have this done.
5    Q.    What's your understanding -- you used the
6 word "expedited." What's your understanding of the
7 timeline for an emergency or an expedited grievance?
8    A.    I don't understand exactly.
9    Q.    How long did you expect it to take to get
10 a response on your emergency grievance?
11    A.    No more than a week.
12    Q.    How do you indicate to a counselor that a
13 grievance is an emergency grievance?
14    A.    I think you check that it's an emergency
15 grievance.
16    Q.    And did you check that on this form?
17    A.    Yeah, on the bottom right-hand corner. It
18 says -- yes, expedite emergency grievance.
19    Q.    And did you receive a response from the
20 counselor?
21    A.    Not from the counselor -- not from my
22 counselor. Another counselor hand delivered it two
23 days later.
24    Q.    And when you say "two days later," that

Page 106

1 was on May 18th, is that right?
2      A.   17th.
3      Q.   May 17th.
4      A.   Yeah, 18th.  I'm sorry.
5      Q.   Okay.
6      A.   She had signed it -- the warden had signed
7 it on the 17th but they didn't get it to me until
8 the 18th.
9      Q.   Okay.
10     A.   Approved it.
11     Q.   The grievance was approved, is that right?
12     A.   Yes.
13     Q.   You say you won the grievance on May 18th.
14 When did you next see a doctor?
15     A.   Without looking at my stuff, I don't know.
16 I'm sure it was Dr. Nawoor next.  I seen
17 Dr. Einwohner on the 27th.  It looks like on the
18 25th of May -- 26th of May, I'm sorry -- and I had
19 seen Dr. Einwohner on the TeleMed.
20     Q.   Directing your attention to your notes on
21 Thursday, May 19th.
22     A.   Okay.  It said Susan had called the
23 warden, but you usually talked to her secretary and
24 that's who she talked to.

Page 107

1      Q.   And do you know why -- did your wife tell
2 you why she was calling the warden?
3      A.   To find out what the answers were.  She
4 probably did not know at the time that I had won and
5 that she approved my grievance -- not that I had won
6 anything.  All I did was get an answer that she was
7 trying to expedite it, and she told my wife at the
8 time that healthcare's been contacted.
9           MR. FORNOFF:  Object to hearsay.  I'm not
10 exactly sure -- who it was that she said?
11 BY MR. STROM:
12     Q.   Do you know who your wife spoke with on
13 the 24th?  Did she tell you?
14     A.   I don't know her name.  It's the warden's
15 secretary.
16          MR. FORNOFF:  I'll object to hearsay,
17 basically that testimony.
18          MS. CLARK-JOSEPH:  I'll join.
19 BY MR. STROM:
20     Q.   Directing your attention to May 24th,
21 that's a Tuesday, on the previous page.  Do you know
22 if your wife made any further calls?
23     A.   It says, Susan called the warden and the
24 warden called the healthcare unit, told them to get

Page 108

1 moving on this.
2          MR. FORNOFF:  I'm going to object to
3 hearsay on what the warden said.
4          MS. CLARK-JOSEPH:  I'll join if we don't
5 already have a standing objection.
6 BY MR. STROM:
7      Q.   Mr. Dean, directing your attention to May
8 25th, did you see anyone in the healthcare unit on
9 May 25th?
10     A.   I don't believe I did.
11     Q.   Do you know if your wife made any calls on
12 May the 25th?
13     A.   My wife said she called Lisa Mincy, the
14 healthcare administrator.
15     Q.   And did your wife tell you what they
16 talked about?
17     A.   Yeah.  She asked her about if the surgery
18 had been scheduled, and Lisa Mincy at the time had
19 said that it had not been scheduled yet.
20     Q.   Do you know if your wife called anyone
21 else?
22     A.   She called Dr. Severino's office to ask if
23 anybody's even contacted them yet.
24     Q.   And what did your wife --

Page 109

1          MR. FORNOFF:  Object to hearsay.
2 BY MR. STROM:
3      Q.   You can answer.
4      A.   They told her that no one from Taylorville
5 Correctional Center has contacted them yet.
6      Q.   As of May 25th, Mr. Dean, were you aware
7 that you had been scheduled for surgery yet?
8      A.   No.
9      Q.   Directing your attention to Thursday, May
10 26th, did you see a doctor that day?
11     A.   I seen Dr. Einwohner.
12     Q.   And how long did you see her for?
13     A.   30 to 45 minutes.
14     Q.   Did she ask you any questions?
15     A.   The same history questions that she goes
16 over every time.
17     Q.   And what were your answers to those
18 questions?
19     A.   I told her my history and all that stuff;
20 you know, I had the stones, and basically verifying,
21 you know, past history that she was talking to me, I
22 guess.  I'm not sure why she asks the same questions
23 over and over.
24     Q.   You told her about your history of kidney

Page 110

1 stones?

2     A.   Yes.

3     Q.   Did you tell her about your history of

4 urinating blood?

5     A.   Yes, once again.

6     Q.   Did you tell her about your diagnosis with

7 cancer?

8     A.   Yes, and she did not even know that I had

9 cancer at that time.

10     Q.   What did she tell you about -- what did

11 she tell you during that visit?

12     A.   Well, she said that with my blood tests

13 that I was anemic, and she ordered iron pills, asked

14 some more stupid questions, such as, We have to find

15 out where I'm losing blood.

16     Q.   Did you tell her where you thought you

17 were losing blood from?

18     A.   I told her that I've been urinating blood

19 for five months; that I believe that's where I'm

20 probably losing my blood from.

21     Q.   Did she order any tests?

22     A.   She ordered a stool sample test.  She

23 wanted to take samples of my stool to see if that's

24 where I was losing my blood from.

Page 111

1     Q.   Did you have a stool sample test?

2     A.   No.

3     Q.   Why not?

4     A.   It's pretty obvious to me where I was

5 losing my blood from.  I seen it every day -- bright

6 red, painful.  At that point I was fed up with what

7 was going on.

8     Q.   When was your next visit with the doctor?

9     A.   Once again, without looking at the notes,

10 I seen Dr. Severino on the 9th.

11     Q.   Did you have any testing before you saw

12 Dr. Severino on June 9th?

13     A.   On June 8th, I had had a CAT scan at

14 Taylorville Memorial Hospital.

15     Q.   And was the CAT scan of your kidneys?

16     A.   Yes.

17     Q.   And when you saw Dr. Severino on June 9th,

18 how long did you visit with him for?

19     A.   Approximately 20 to 25 minutes.

20     Q.   And did he ask you any questions about

21 your symptoms up to that point?

22     A.   He asked me if I was still urinating

23 blood, and pain.

24     Q.   And what did you tell him?

Page 112

1     A.   I told him, yes, definitely urinating

2 blood -- big, heavy blood clots.

3     Q.   Did you ask him about pain in the area of

4 your back and your kidneys?

5     A.   No, not at that point.

6     Q.   Were you experiencing pain in the area of

7 your kidneys?

8     A.   At some point between the time I seen him

9 that time and the time before I was experiencing

10 some pain, but it was my total back, pretty much

11 upper body in the back, but only for a day or so.

12     Q.   Do you recall when that was?

13     A.   No.  I know it's in my notes somewhere.

14     Q.   Did you tell him about that painful

15 experience of passing the blood clots?

16     A.   Yes.

17     Q.   What did he tell you about your diagnosis

18 that day?

19     A.   He said that I had a worse chance of dying

20 on the table and -- but he thinks if he can cut it

21 all out, that in his words, I'll roll out of prison

22 in five years.

23     Q.   Do you happen to recall what he said your

24 chances of dying on the table were?

Page 113

1     A.   He said that it was 50 percent.

2     Q.   Did he describe why he thought that was

3 your chance of dying on the table?

4     A.   That the blood clot that was in my vena

5 cava -- I may be calling it the wrong thing -- was a

6 lot farther than they thought it was.  It was like a

7 half-inch from my heart because we had waited so

8 long, and if anything broke loose that I could die

9 instantly.

10     Q.   And he said that if you didn't -- what was

11 your prognosis if you didn't die on the table?  What

12 would happen to you going forward?

13          MR. FORNOFF:  Objection to what

14 Dr. Severino says, but go ahead.

15          MS. CLARK-JOSEPH:  I'll join if we don't

16 have a standing objection.

17 BY MR. STROM:

18     Q.   What's your understanding, Mr. Dean, of

19 what your prospects were going forward if you did

20 not die on the table?

21     A.   I asked him if I would need chemo and

22 radiation, and he said, "We're going to cut it out

23 and you won't need nothing."

24     Q.   And when you say "cut it out," you mean

Page 114

1   cut out the cancer?

2       A.   Yes.

3       Q.   And when he said you "wouldn't need

4   nothing," you mean you wouldn't need any

5   chemotherapy?

6       A.   Yes.

7       Q.   Did he talk at all about the time that had

8   elapsed since your last visit with Dr. Severino?

9       A.   When I came in -- when he came in the

10  room, his first words to me were, "I thought you

11  decided not to have the surgery."

12      Q.   And did he -- what's your understanding

13  about why he said that?

14      A.   Because no one had contacted him.

15          MR. FORNOFF:  Just so we have a standing

16  objection on Dr. Severino's hearsay and I'm going to

17  object to speculation on that.

18          MS. CLARK-JOSEPH:  I'll join.

19          MR. STROM:  I understand the objection.  I

20  want to just make clear for the record, I think

21  these are verbal acts that relate to diagnosis, and

22  so, therefore, an exception.  They don't go to the

23  truth of the matter asserted, but I understand the

24  objection.

Page 115

1           MR. FORNOFF:  Sure.

2   BY MR. STROM:

3       Q.   Mr. Dean, directing your attention to your

4   notes from June 20th.  That's a Monday.  So it

5   appears at the top of Dean Exhibit 3 -- on the page

6   where at the top of Dean Exhibit 3 is, June the

7   5th --

8       A.   Okay.

9       Q.   -- on June 20th, you have a note that

10  says, "Seeing chest cracker."  Who is the chest

11  cracker?

12      A.   I think that's -- I may be pronouncing

13  that wrong -- the thoratic doctor.  He's the one

14  that's going to cut my chest open.

15      Q.   Is it thoracic doctor?  Does that ring any

16  bells for you?

17      A.   That very well could be that's the

18  pronunciation.

19      Q.   And how long did you visit with the

20  thoracic doctor for?

21      A.   Probably a half hour.

22      Q.   Did the thoracic doctor ask you any

23  questions?

24      A.   Past history, that type of stuff.  General

Page 116

1   initial visit type questions.

2       Q.   Did the thoracic doctor talk to you about

3   your heart condition?

4       A.   Yeah.  He had asked me what my previous

5   diagnoses were and stuff like that.

6       Q.   And what did you tell him?

7       A.   I told him I had cardiomyopathy and

8   congestive heart failure, that I had heart attacks,

9   and that I had a pacemaker put in.

10      Q.   Did he say anything about what that would

11  mean for your surgery?

12          MR. FORNOFF:  Standing objection on the

13  hearsay for the thoracic doctor as well.

14          THE WITNESS:  I don't think that at that

15  point, I don't think he's concerned with that.  I

16  think that was the cardio doctor.  I think the

17  cardio doctor sent me to him.  That's my

18  understanding of that.

19  BY MR. STROM:

20      Q.   What's your understanding of why you

21  needed to see the thoracic doctor?

22      A.   Just so he could determine -- you know,

23  give me a little update or maybe information on how

24  the surgery was going to go; that he was going to

Page 117

1   cut me from all the way up my sternum all the way up

2   to the top and that it would be spread open.

3       Q.   And did he approve you for surgery that

4   day?

5       A.   Yes.

6       Q.   When did you next see a doctor?

7       A.   I seen Dr. Nawoor on the 23rd.

8       Q.   And how long did you see Dr. Nawoor for

9   that day?

10      A.   Approximately 15 minutes.

11      Q.   Did he ask you questions that day?

12      A.   That's what the -- however you said that

13  guy's name, the chest cracker, what he had said and

14  if he approved me.

15      Q.   And what did you tell Dr. Nawoor about

16  your visit with the thoracic doctor?

17      A.   I said that he actually had told me that

18  everything was okay on his end.

19      Q.   And what did Dr. Nawoor tell you about

20  your treatment?

21      A.   I don't understand.

22      Q.   What did Dr. Nawoor tell you about what

23  was scheduled to happen next?

24      A.   He didn't say anything about it being

Page 118

1  scheduled yet.
2      Q.   Did he tell you about what the next step
3  would be when it happened?
4      A.   No.
5      Q.   Did he mention any hospitals where you
6  might go for your surgery?
7      A.   He did say that it was approved for
8  Memorial in Springfield.
9      Q.   But he didn't tell you a date?
10     A.   No.
11     Q.   Do you know why he didn't tell you a date?
12     A.   No.  I can only speculate that it wasn't
13  scheduled yet.
14     Q.   Were you continuing to have blood in your
15  urine, Mr. Dean?
16     A.   Yes, and blood clots a lot of time.
17     Q.   And the pain of passing those blood clots
18  was ongoing?
19     A.   Yes.
20     Q.   Do you know when your next visit with the
21  doctor was?
22     A.   No, I don't know.  I'm trying to recall.
23     Q.   Would it refresh your recollection to look
24  at your notes there?

Page 119

1      A.   Yes.  I'm looking at July 2016 and it says
2  I seen Dr. Einwohner on the 13th, and all I have
3  written down was, "Once again, nonproductive."
4      Q.   I want to direct your attention to three
5  days before that on July 10th.  Sunday, July 10th, I
6  see that you have a note about some blood again.  Is
7  that blood in your urine again?
8      A.   Yeah.  Every morning I'd put whether -- at
9  that point I was starting to put a.m. and p.m. to
10  separate them because sometimes it would be clear in
11  the morning or in the evening and vice versa.
12     Q.   And you have another note about your
13  symptoms.  What other symptoms were you experiencing
14  at that time?
15     A.   At that time I was experiencing bad back
16  pain and I wasn't sleeping very well and didn't have
17  much of an appetite.
18     Q.   Sorry for interrupting you.
19     A.   I'm sorry.
20     Q.   That's okay.  Was your back pain in the
21  area of your kidneys?
22     A.   No, all over.  Generally the whole back.
23     Q.   Directing your attention to Tuesday, July
24  12th, in Exhibit Dean 3.

Page 120

1      A.   Yeah.  It says I seen the heart doctor for
2  the second time to be okayed for surgery.
3      Q.   Was that a heart doctor outside of the
4  Taylorville facility?
5      A.   It was at St. John's.  I think it's
6  Prairie Heart.  I'm not sure of that exact name
7  because there's two of them.
8      Q.   And the heart doctor told you that day
9  that you were cleared for surgery?
10     A.   I don't believe he told me that I was
11  cleared.  I think that come through Dr. Nawoor.
12     Q.   Okay.  And directing your attention to
13  Thursday, July 14th.
14     A.   Okay.
15     Q.   You have a note there about a visit to the
16  healthcare unit?
17     A.   Yeah.  I had to have an x-ray of my lungs.
18     Q.   And was that done in the healthcare unit
19  at Taylorville Correctional Center?
20     A.   Yes.
21     Q.   And what was the result that you were told
22  about?
23     A.   The x-ray technician, who was not a
24  radiologist, said I should be good to go.

Page 121

1      Q.   Was that the official call --
2      A.   No.
3      Q.   -- on whether you were good to go?
4      A.   No, it was just his opinion.
5      Q.   When did you receive the official word
6  that you were good to go for your surgery?
7      A.   I don't know if I ever did really ever
8  say, yes, I was approved.
9      Q.   When did you have surgery, Mr. Dean?
10     A.   July 19th.  I knew I was having it --
11  something happening, because on July 18th, I went to
12  the B of I.  They take your picture before you go
13  out, so I knew I was going out for some other type
14  of whether, whether it be surgery.  Once again, I was
15  praying it would be surgery.
16     Q.   And the B of I, is that a division of the
17  Department of Corrections?
18     A.   Yeah, the Bureau of Information.
19     Q.   And you said they took your photograph?
20     A.   Yes, they update your photograph.
21     Q.   And when does the B of I update your
22  photograph?
23     A.   They usually do that at 8:00 a.m. in the
24  morning.

1    Q.   Every day?
2    A.   No, no.  Only when you're going out for a
3  writ.
4    Q.   Did they do it for every writ?
5    A.   Not any longer.  I would be wasting a lot
6  of their time to do that.
7    Q.   So you went to B of I to have your
8  photograph taken on July 18th?
9    A.   Yes.
10   Q.   And that was -- you said that that -- you
11  said that you were praying it was because of your
12  surgery?
13   A.   Yes.
14   Q.   Can you clarify for us, what's the
15  connection between the B of I photograph and your
16  surgery?
17   A.   Well, I knew I was going out on another
18  writ.  I knew I had seen the cardiologist, the chest
19  cracker, for lack of the right word, and so I was
20  just hoping it was getting to that point that it was
21  finally going to happen.
22   Q.   And what happened on July 19th?
23   A.   On July 19th, I was taken out for my
24  surgery.

1         MR. STROM:  Should we go ahead and take a
2  break at this time so Mr. Dean can get his lunch?
3         MR. FORNOFF:  Yeah, that's fine.  I have
4  no problem.
5         MR. STROM:  Does that work for you, Katie?
6         MS. CLARK-JOSEPH:  That's fine.  Do you
7  know about how long?
8         MR. STROM:  Why don't we call it 15?
9         (A fifteen minute recess was taken.)
10        Okay.  We're ready to go back on the
11  record.
12        Madam Court Reporter, could you read to us
13  the last question asked and the answer given,
14  please?
15        (The court reporter read back the
16         previous question and answer into the
17         record.)
18  BY MR. STROM:
19   Q.   Mr. Dean, did you, in fact, undergo
20  surgery for your kidney on July 19, 2016?
21   A.   Yes, sir.
22   Q.   And about how long did that surgery last?
23   A.   I'm under the understanding it was ten
24  hours.

1    Q.   And during that ten hours, what's your
2  understanding of what took place?
3    A.   They cut me open laterally, I guess -- I
4  don't know, this way across my -- I don't know, I'm
5  not supposed to make hand gestures -- from side to
6  side, and then they cut through my sternum.  They
7  laid it open, pulled it down, they stopped my
8  heart -- well, not stopped my heart but put me on
9  heart bypass, cooled me down, and then they started
10  the surgery.
11   Q.   And what's your understanding of why they
12  had to put you on heart bypass?
13   A.   Because the blood clot had progressed --
14  the blood clot tumor had progressed up the vena cava
15  to within a half-inch of my heart so they couldn't
16  just cut me open here.  They had to be able to have
17  access.  They had to open me up that way.
18   Q.   And what do you recall about waking up
19  after surgery?
20   A.   I remember they woke me up and said -- I
21  had a big tube in my mouth and said, "Don't
22  swallow," and that's the first thing you wanted to
23  do was swallow, and then I don't know how much
24  longer after that they called my wife after they

1  pulled the tube out of my throat and I got to talk
2  to her for a few minutes, and I don't really
3  remember anything for about two days after that.
4    Q.   Do you recall whether the tube in your
5  throat was painful?
6    A.   Not while it was in.  When they pulled it
7  out, yes.
8    Q.   Was it uncomfortable while it was in?
9    A.   Yes, because you wanted to swallow and you
10  couldn't.
11   Q.   Do you recall any other pain that you had
12  when you first woke up from surgery?
13   A.   Yeah, the incisions were real painful.
14   Q.   And when you say "incisions," you mean the
15  incision across your belly?
16   A.   Yeah, across that way, because I had 64
17  staples, and every time you moved, it felt like they
18  were moving.
19   Q.   And did you have pain in the incision that
20  went over your sternum?
21   A.   Not so much.
22   Q.   Did you have pain in your sternum itself?
23   A.   Not during my hospital visit, because they
24  had me on Fentanyl or some type of IV painkiller.

1      Q.    Did you at any time after your surgery
2  suffer pain from the incision over your sternum?
3      A.    Yes.
4      Q.    What kind of pain?
5      A.    Just it's -- if you make too sharp of a
6  move, it just felt like it was ripping open.
7      Q.    Did you at any time after your surgery
8  experience pain from your sternum being cut open?
9      A.    More so when the staples were in than when
10 it wasn't in.
11     Q.    Did you experience, for lack of a better
12 way of putting it, bone pain from your sternum?
13     A.    Yes, because there's a permanent wire in
14 there and you could just feel it.  When you make the
15 wrong moves, you can feel it.
16     Q.    Is that from your pacemaker?
17     A.    No.  This is from the surgery.
18     Q.    Oh, does the wire close your sternum
19 again?
20     A.    Yes.  My understanding it's permanent in
21 there, the wire that's holding it together.
22     Q.    You received painkillers while you were in
23 the hospital?
24     A.    Yes, until -- I believe it was Fentanyl

1  for -- like I was there for ten days and I think I
2  was on Fentanyl for six to seven of them and then
3  they put me on Tramadol.
4      Q.    Did you notice any side effects from the
5  painkillers that you were receiving, the Fentanyl?
6      A.    Well, it stopped the pain, but it put me
7  to sleep, too, so...
8      Q.    And you testified that you don't recall
9  much from the first two days after your surgery.
10 Why is that?
11     A.    Because I guess they just had me on enough
12 painkiller that I don't remember it.
13     Q.    Do you remember during your stay in the
14 hospital a conversation with the doctor about
15 reducing your painkiller?
16     A.    Not until maybe day six or seven.
17     Q.    And that's when you were changed over from
18 one painkiller to another, is that right?
19     A.    Yes.
20     Q.    Did you talk with any doctors that you
21 recall during the first time you woke up?
22     A.    They would be before or after my phone
23 call with my wife, because I'm kind of cloudy on
24 that.  Dr. Severino came in.  He says that

1  everything went fine with my kidney but they had
2  found cancer on my liver.
3      Q.    Do you recall having heard anything about
4  your liver before that surgery?
5      A.    No.
6      Q.    What did Dr. Severino say about -- did
7  Dr. Severino say anything about whether the surgery
8  was successful?
9      A.    He said the removal of the kidney was and
10 the clot in my vena cava -- once again, it may not
11 be the correct word -- was removed fine.  It was
12 hard to -- I think his exact words were, "The kidney
13 was impacted but, you know, it took a lot of work,
14 but they've removed it."
15     Q.    Did you talk with any other doctors during
16 that first time you woke up?
17     A.    The first time I woke up, I don't think
18 so.
19     Q.    Did you talk with any other doctors
20 besides Dr. Severino during your stay post
21 operation?
22     A.    Yes, the heart doctor that assisted him in
23 the surgery.
24     Q.    And what did the heart doctor have to say

1  about the success of the surgery?
2          MR. FORNOFF:  I'm just going to object to
3  the heart doctor.  I can't remember if we had a
4  standing objection.  I know we did with
5  Dr. Severino.  I'm going to state it, just in case.
6          MS. CLARK-JOSEPH:  I'll join, just in
7  case.
8          MR. STROM:  And just for the record, I'll
9  have the same response.
10         THE WITNESS:  He said everything went
11 fine.  He kind of described it, what was going on,
12 and he said that when they had my heart on heart
13 bypass that they had to cut the vein open and that
14 Dr. Severino's finger was in the vein from my
15 kidney, and his fingers were in the vein because
16 they had to really work to get it out, and that
17 their fingers were in my -- touching in my vein from
18 my kidney to my heart after they removed it.
19         Just to be clear, I guess they were using
20 their fingers to determine if they had it all out.
21 BY MR. STROM:
22     Q.    And that's while the blood was bypassed?
23     A.    Yes.
24     Q.    Okay.  How long did you stay in the

1 hospital post operation?

2     A.   I stayed ten days. It was supposed to be

3 eight days, but on the eighth day, they determined

4 from a blood test protein or something in my blood,

5 some type of thing, that I had a small heart attack.

6     Q.   **Do you recall when that heart attack**

7 **happened?**

8     A.   No. They just said that, because whatever

9 the results were that they seen that they believed

10 that I had a small heart attack.

11     Q.   **Do you recall -- you said that was in**

12 **about the eighth day that you were there?**

13     A.   I was supposed to go home on the eighth

14 day, and they were getting me ready to leave and

15 they came in the room and said that you're staying.

16     Q.   **And it's your memory that that was on the**

17 **basis of a blood test?**

18     A.   Yes.

19     Q.   **Do you recall having any symptoms from**

20 **your heart disease during that ten days that you**

21 **were in the hospital?**

22     A.   No, I don't recall.

23     Q.   **Do you recall having any symptoms from**

24 **your lower back degenerative disc condition while**

1 you were in the hospital?

2     A.   No.

3     Q.   **Do you recall whether the doctor said**

4 **anything to you about your diabetes during your stay**

5 **in the hospital?**

6     A.   No.

7     Q.   **Do you recall what date you were released**

8 **from the hospital?**

9     A.   I'm going to say it was the 29th, 28th or

10 29th.

11     Q.   **Would your notes help you to recall**

12 **exactly the date?**

13     A.   Yep, 28th.

14     Q.   **And do you recall, did you visit with a**

15 **doctor on the day that you were discharged?**

16     A.   I think the general, whatever they call

17 it, somebody who oversees the whole thing, I think

18 he came in.

19     Q.   **And about how long did you visit with that**

20 **doctor for?**

21     A.   Approximately ten minutes.

22     Q.   **And did that doctor give you any**

23 **instructions?**

24     A.   Not that I recall.

1     Q.   **What was your understanding leaving the**

2 **hospital on July 28th, what would happen next with**

3 **your recovery?**

4     A.   That I would have my staples removed in

5 seven days and I would see Dr. Severino and have

6 them removed in seven days.

7     Q.   **Did they give you any prescriptions to**

8 **take during those seven days that you would wait**

9 **before you saw Dr. Severino again?**

10     A.   They changed my Tramadol to ibuprofen.

11     Q.   **Did they give you any prescriptions?**

12     A.   Other than my normal ones that I came in

13 with, they may have adjusted them. They may have

14 discontinued a couple of them at the time. But they

15 were just the normal drugs that I normally took --

16 cholesterol, diabetes, you know, that type of stuff.

17     Q.   **When you came back to Taylorville, did you**

18 **return to your cell as usual?**

19     A.   No, I stayed in the healthcare unit.

20     Q.   **And about how long did you stay in the**

21 **healthcare unit before returning to your cell?**

22     A.   I think it was -- without looking at my

23 notes, I think it was like 14 days.

24     Q.   **How did you feel during that time?**

1     A.   Uncomfortable.

2     Q.   **Can you tell me more about what you mean?**

3     A.   Well, every time you moved, the staples

4 would grind together, and after day seven and they

5 weren't removed, the skin started growing over the

6 staples, so they were painful, even more painful

7 every time you moved. It was hard getting out of

8 bed because you had already been cut open and

9 everything. You kind of had to roll out of bed,

10 that type of stuff.

11     Q.   **So you had pain along your incisions?**

12     A.   Yes.

13     Q.   **What was the pain like?**

14     A.   Like a real bad pinching pain or even

15 ripping of the skin, because the skin started

16 growing over some of the ones on the end, and when

17 you moved, the skin would rip and it would bleed

18 slightly.

19     Q.   **How did you sleep during that time?**

20     A.   Not very well.

21     Q.   **When did you have your staples out?**

22     A.   I think it says I got them out on the

23 10th. It was pretty much 14 days later, because on

24 day seven I asked the DON, Director of Nursing

1  Galvin, why I hadn't had them done yet, and she
2  checked and she says, "Oh, it hasn't even been
3  scheduled."
4      Q.  I'm sorry if you already said that.  What
5  was the date that you had those staples out?
6      A.  I think it was the 10th.  Yes, the 10th.
7      Q.  And did your notes refresh your
8  recollection about that date?
9      A.  Yes.
10     Q.  After you had the staples removed, did you
11  experience further pain with your incisions?
12     A.  Not as much, but yes, slightly.  It was a
13  relief to have those staples out, because like I
14  said, the skin was growing over them.
15     Q.  After your surgery -- so stepping back to
16  July 19th, did you experience any blood in your
17  urine?
18     A.  None that I could see.
19     Q.  Did you have any tests of urine samples
20  done while you were hospitalized?
21     A.  I believe so, because they collected all
22  my urine, but I'm not clear on what they were doing
23  with it.
24     Q.  And did you pass any blood clots during

1  that hospital stay?
2      A.  None whatsoever.
3      Q.  When you returned to Taylorville, did you
4  see any blood in your urine while you were staying
5  in the healthcare unit?
6      A.  No, sir.
7      Q.  Did you pass any blood clots?
8      A.  No, sir.
9      Q.  Did you experience any pain related to
10  specifically where your kidney was?
11     A.  No.
12     Q.  Were there any other symptoms from your
13  postoperative 14 days in the healthcare unit you
14  haven't described yet?
15     A.  Other than the mental pain of, every time
16  I went to the bathroom, I was scared that it was
17  going to be blood clots again.
18     Q.  When did you get discharged from the
19  healthcare unit at Taylorville?
20     A.  I believe it was either the 10th or the
21  11th of July, 2016 -- no, August, I'm sorry, because
22  I got back on the 28th.  So it was 14 days later.
23     Q.  And I see in your notes from August 7th,
24  it looks like it's written across August 7th, 8th,

1  9th, "chest pain."
2      A.  Yes.
3      Q.  Do you recall experiencing chest pain on
4  August 7th, 8th, and 9th?
5      A.  Yeah.  It was from rolling out of bed, and
6  it was making it very uncomfortable in that incision
7  area because this didn't have staples, it was super
8  glued.  It was super glued.  He said something about
9  gluing it.
10     Q.  Do you recall, did glue have to be removed
11  as part of your postoperative care when your staples
12  were removed?
13     A.  By me.  It started flaking off and I had
14  to peel it off.  Nothing that the doctor had to do.
15     Q.  On August 14th, you have a note that says,
16  "Felt bad in the a.m."  Can you tell us more about
17  what that means?
18     A.  I don't know why I would have felt bad.  I
19  just in general didn't feel good that day.
20     Q.  Okay.  Do you recall when your next visit
21  with the doctor at Taylorville Correctional Center
22  was?
23     A.  No.  Without looking at it, I don't see
24  it.  I see that I seen a heart doctor as a follow-up

1  on the 24th.
2      Q.  Would it refresh your recollection to look
3  on August 17th?
4      A.  Oh, yes.
5      Q.  Who did you see that day?
6      A.  Dr. Nawoor.
7      Q.  Do you recall about how long?
8      A.  The average is 15 to 20 minutes.
9      Q.  Did he see you for any longer since you
10  were post-op?
11     A.  No.
12     Q.  Do you recall if he asked you any
13  questions?
14     A.  He probably asked me if I had pain, that
15  type of stuff.  He told me that I was set up to see
16  an oncologist, didn't know when.  That was during
17  the diabetic clinic, so I wasn't scheduled for
18  post-op or anything like that.  Every three to four
19  months they get you in.
20     Q.  Is there something about what's in your
21  notes there that made you recall that it was during
22  the diabetic clinic?
23     A.  Yeah.  It says at the bottom, diabetic
24  clinic, plus my A1C results, which is from your

Page 138

1  diabetic clinic.
2      Q.    Got it.  You mentioned February 24th.  Did
3  you see a doctor -- you mentioned August 24th.  Did
4  you see a doctor on August 24th?
5      A.    Well, I think I was supposed to see the
6  doctor then.  It says heart doctor follow-up and
7  I've got a question mark, so I don't think I seen
8  him.  I was supposed to see him after so long.  I
9  may have went out.  I may have not been complete on
10  my notes, because at some point I did go see him
11  only for probably 15 minutes in his office and
12  everything went well.  He wanted to look at my scar,
13  kind of pulled at it a little bit.  He asked if it
14  hurt.  I said, "Slightly."  He said, "That's
15  normal."
16      Q.    Were you continuing to take ibuprofen
17  during the time period between when you were
18  released from the healthcare unit and when you saw
19  that heart doctor approximately August 24th?
20      A.    Yes.  Sometimes I wouldn't take it.  It
21  just depended on how bad the pain was.
22      Q.    You were only able to take it as you
23  needed it?
24      A.    Yes.

Page 139

1      Q.    Do you recall about how frequently you
2  were taking it?
3      A.    Not as much as I was while I was in the
4  hospital part because I try not to take painkillers.
5      Q.    While you were in the healthcare unit,
6  between when you came back from the outside hospital
7  until August 10th, did you decide when you took your
8  painkiller?
9      A.    Yeah.  I could take it as needed.
10      Q.    Did you take it more frequently during
11  that period when you were in the healthcare unit?
12      A.    Yes.
13      Q.    Do you recall about how often you were
14  taking it?
15      A.    No.
16      Q.    When did you finally see an oncologist?
17      A.    The 26th -- well, the oncologist.  Yeah, I
18  seen him -- it says I seen him on the 26th and he
19  ordered a CAT scan and we'll go from there.
20      Q.    And I see that you have a note that
21  starts -- oh, yeah, there.  I'm not sure that I can
22  decode it.  Can you tell us what you meant there?
23      A.    I don't know.  Let's see if I can.  Oh,
24  yeah.  It says I had signs of cancer on the liver in

Page 140

1  second CAT scan, and I wrote "WTH," because
2  Dr. Severino had told me that he had found the
3  cancer during the surgery.
4      Q.    And with respect to -- Mr. Dean, I think
5  it might be WTF?
6      A.    WTF, yes.
7      Q.    When did you next see a doctor for
8  anything?
9      A.    I seen the eye doctor on the 30th of
10  August.
11      Q.    What happened at that visit?
12      A.    He did -- I probably seen him because of
13  my diabetic clinic, and he dilated my eyes and he
14  seen that I had two little microscopic drops of
15  blood in my eye, in my left eye, and he said that he
16  was concerned about that and he wanted to schedule
17  me to go out to see a specialist.
18      Q.    Did he schedule you to go out to see a
19  specialist?
20      A.    Not only did he schedule me to see a
21  specialist, I went out on an emergency writ the next
22  morning.
23      Q.    So that is August 31st?
24      A.    Yes.

Page 141

1      Q.    And what kind of a specialist did you see?
2      A.    Bard Optical in Peoria, I guess.  He's an
3  optical doctor, an eye doctor.
4      Q.    And what did that doctor tell you about
5  your diagnosis?
6      A.    He said that there is definitely a couple
7  of microscopic drops of blood in my eye and that he
8  believes -- because I told him about my history of
9  the surgery, all that stuff, and he said it may be
10  related to the trauma of the surgery, and he said
11  that we're not going to do anything right now, we'll
12  see him in four weeks, which I never seen him again.
13      MR. FORNOFF:  I'm just going to object to
14  the eye doctor on hearsay.
15      MS. CLARK-JOSEPH:  I'll join.
16      MR. STROM:  And same response for it being
17  an oral act of making the diagnosis.
18      MR. FORNOFF:  Sure.
19  BY MR. STROM:
20      Q.    I want to direct your attention to
21  September 9th of 2016.  Unfortunately, our
22  pagination is a little more friendly on this
23  particular exhibit now, so it's a little easier to
24  describe.  Friday, September 9th, did you see a

Page 142

1  doctor that day, Mr. Dean?
2      A.   No.  I just went for the CAT scan.
3      Q.   Okay.  And that CAT scan was on your
4  kidneys?
5      A.   I believe it was chest and abdomen.  It
6  may have been on my head also.  Chest and abdomen
7  for sure.
8      Q.   And what was the result of that CAT scan?
9      A.   I had had the CAT scan early in the
10 morning.  I returned to Taylorville Correctional
11 Center, seen Dr. Nawoor, because, you know, I went
12 out for a writ -- that's standard procedure -- went
13 back to my unit, and I was on the phone with my
14 wife, and they said I had to go back to healthcare
15 right away, that it was important.
16           I went back there, and Dr. Nawoor informed
17 me that Decatur Memorial had called and said that I
18 had a PE blood clot, pulmonary embolism blood clot.
19 I guess it was a bad one.  It was something like
20 saddle pulmonary embolism, and they took me by state
21 car, just like a regular writ, back to the hospital,
22 Decatur Memorial Hospital.
23     Q.   And were you admitted at Decatur Memorial
24 Hospital?

Page 143

1      A.   Yes, I was admitted, and on that day in
2  that afternoon.  Probably, actually, I didn't get
3  admitted until 6 o'clock.  I sat in the emergency
4  room for a little while.
5      Q.   Do you know where the pulmonary embolism
6  was seen?
7      A.   Somewhere in my lungs.  I don't know.
8  I've never seen that report.
9      Q.   Do you happen to know if it was on the
10 same side as your kidney surgery?
11     A.   No.
12     Q.   You don't know, or you know that it was
13 not on the same side?
14     A.   No, I don't know what side it was on.
15     Q.   How long were you admitted to the hospital
16 for?
17     A.   I believe that was ten days.
18     Q.   And while you were in the hospital, what
19 kind of treatment did you receive?
20     A.   They started me on, I believe -- I'm not
21 sure if it was the correct drug -- I think it's
22 heparin, and that was to alleviate the blood clot,
23 to break it up and then also get my blood thinned
24 out to where I could start on Coumadin.  They

Page 144

1  decided that I was going to be on warfarin or
2  Coumadin.  I think one's the generic name and one's
3  the real name.
4      Q.   And what was that going to treat?
5      A.   That was going to make my blood thinner,
6  so I guess it makes it so I have a 90 percent chance
7  of not getting another blood clot.
8      Q.   At that time had you been prescribed any
9  drugs to treat your cancer?
10     A.   No.
11     Q.   When did you return to Taylorville
12 Correctional Center?
13     A.   Approximately ten days later.
14     Q.   So is that about the 18th of September?
15     A.   Yeah.  I got back about 11:00 p.m. at
16 night.  He got me out of here at 9:30 or so and --
17     Q.   And when did you next see a doctor?
18     A.   I'm sure I seen him the next morning on
19 his rounds, because when you're in the infirmary, he
20 comes around every morning.
21     Q.   So when you got back to Taylorville, you
22 went back to the healthcare unit again?
23     A.   Yes.  I stayed in the infirmary in the
24 healthcare.

Page 145

1      Q.   And in your notes on September 21st, you
2  have a note about Dr. Severino.  Did you see him
3  that day?
4      A.   No.  That was the six-week date, that I
5  was supposed to see him in six weeks.  I've never
6  seen him since.  I was supposed to have a six-week
7  follow-up, he said.
8      Q.   When did you get out of the healthcare
9  unit following the pulmonary embolism
10 hospitalization?
11     A.   I got out of there the very next morning,
12 probably 10 o'clock.
13     Q.   And so that is the 20th, is that right?
14     A.   No, I think it was the 19th.  I got back
15 on the 18th at 11:00 p.m., so you've got to stay
16 overnight, and when I woke up, he did his rounds,
17 said I was okay to go, and went from there.
18     Q.   Okay.  When did you next see a doctor
19 about anything?
20     A.   It had to be a couple of days later
21 because they determined with the blood test that I
22 was way over the level of Coumadin I was supposed to
23 have.
24     Q.   Did they tell you about how that happened?

1    A.    No.  They didn't say how it happened.
2    Q.    And when did you see a doctor about your
3  Coumadin levels being high?
4    A.    I don't know if I wrote it down, but I
5  know I had to write it down somewhere.
6    Q.    Would the note on September 27th there
7  help refresh your recollection when that happened?
8    A.    Yeah.  Healthcare, stayed, Coumadin.  They
9  kept me overnight.  I'm glad you seen it.  They kept
10  me overnight, and I think I stayed for two days, and
11  the antidote for the Coumadin is they give you
12  vitamin K and it lowers it, and so they had me on
13  that to lower it.
14    Q.    Were there any side effects from being on
15  vitamin K?
16    A.    None that I recall.
17    Q.    How did you feel with your Coumadin levels
18  elevated?
19    A.    I didn't really notice.
20    Q.    Did you feel well during that stay in the
21  healthcare unit?
22    A.    Then I did, but I kind of started feeling
23  sick a little bit later.
24    Q.    And what symptoms did you notice about how

1  you were feeling?
2    A.    Just kind of nauseated, didn't really have
3  much of an appetite.
4    Q.    What was the next thing that happened
5  outside Taylorville Correctional Center to follow up
6  on your operation?
7    A.    I had already seen the oncologist before
8  that happened and he ordered a biopsy, and so I went
9  to Decatur Memorial and had a biopsy.  I don't know
10  what date it was.
11    Q.    Would it refresh your recollection to look
12  at October in Dean Exhibit 3?
13    A.    Yes.  Yeah, I had to quit taking Coumadin
14  for the thing I'd sent.  It must have been -- so I
15  must have spent the night afterwards, so it must
16  have been on October 3rd.  12:40 p.m., it says.
17    Q.    That's when you had your biopsy done?
18    A.    Yes.
19    Q.    Did you meet with the doctor that day?
20    A.    No.
21    Q.    Do you know what the result of your biopsy
22  was?
23    A.    Not then, no.
24    Q.    Do you know now what the result of that

1  biopsy was?
2    A.    Yeah.  It was positive for liver cancer --
3  well, kidney cancer on my liver.
4    Q.    Do you recall when you received that
5  diagnosis?
6    A.    I don't think it was until the -- I didn't
7  actually find out about it until the 19th of
8  October.
9    Q.    And what is it that makes you remember
10  that it was then?
11    A.    I see it there in my notes there, I seen
12  Dr. G. -- not to be confused with earlier I have a
13  Dr. G in there, and that's Dr. Gowan, but from this
14  point on, I called him Dr. G, and he prescribed me
15  Votrient.
16    Q.    And this Dr. G is Dr. Guaglianone,
17  correct?
18    A.    Dr. Guaglionone, yes.
19    Q.    And he talked about Votrient that visit?
20    A.    Yes.  He was going to prescribe Votrient
21  as a first treatment.
22    Q.    What's your understanding about what
23  Votrient is?
24    A.    It's a pill and has many side effects and

1  it's supposed to shrink the cancer or keep it, at
2  least, at bay, for lack of a better term, not spread
3  anymore.
4    Q.    What side effects does it have?
5    MR. FORNOFF:  Object to speculation and
6  foundation that he can testify about the side
7  effects of Votrient.
8    MR. STROM:  Let me re-ask the question.
9  BY MR. STROM:
10    Q.    Mr. Dean, what side effects did you
11  experience taking Votrient?
12    A.    Well, my hair's brown now and it was
13  completely white -- everything, eyebrows, eye
14  lashes, everything, if you can use your imagination.
15    I hadn't vomited since 1982, and I vomited
16  all the time, and I had no appetite, no energy,
17  constipation.  Just in general it felt like I was
18  dying from just the drug alone.
19    Q.    You were prescribed Votrient on October
20  19th is your testimony?
21    A.    Yes.
22    Q.    Do you recall when you first started
23  taking Votrient?
24    A.    I believe I got my first dose November

1  18th, if I recall.  That's without looking at my
2  notes.
3      Q.   Would your notes help you to recall
4  exactly when?
5      A.   Yep, on the 18th.
6      Q.   Did you see a doctor in the healthcare
7  unit at Taylorville between October 19th and
8  November 18th?
9      A.   Yes.  I probably seen them more than once,
10 but I see on the 8th, Dr. Nawoor had to see me
11 because he said that his superiors wanted me to read
12 the side effects to me himself.
13     Q.   Had Dr. Guaglianone told you about the
14 side effects during your visit with him?
15     A.   Maybe in general, not really.
16     Q.   Did you hear anything after November 8th
17 about approval of the Votrient?
18     A.   He told me on the 8th that it was not
19 approved, and then I wrote a couple times not
20 approved or no word yet, and on the 14th, I was told
21 it was approved.  As soon as it gets here, I can
22 take it in the a.m.  That was on the 14th.
23     Q.   And on November 21st you have a note
24 there.  Can you read that note out loud?

1      A.   Yeah, "sicker than a dog."
2      Q.   What else does it say there?
3      A.   "Side effects."
4      Q.   And those side effects were the nausea you
5  were describing before?
6      A.   Yes.
7      Q.   Vomiting also?
8      A.   Vomiting, no appetite, couldn't barely get
9  out of bed.  The first two days there was nothing,
10 and that was the third day and it just felt like I
11 took a beating that day.
12     Q.   Do you recall how long those side effects
13 lasted?
14     A.   Until I got off the drug three months
15 later.
16     Q.   On -- yes, on November 3rd of 2016, you
17 have a note.  It says, "Feels better, no appetite."
18     A.   On the 30th?
19     Q.   I think it's on the previous page.
20     A.   Some days I could eat a little bit.  I
21 remember it was before Thanksgiving I couldn't eat.
22 I'd feel better, no appetite.  Yeah, I could get out
23 of bed and make it.
24          We have -- our bedrooms or cells or

1  whatever you want to call them, there's 20 men.  You
2  get up and you go down this long hallway and there's
3  doors that push open.  I was so tired and lack of
4  energy and strength that I could barely push the
5  door open to get through the door, so I must have
6  been feeling a little bit better just to make it
7  through there.
8      Q.   So you mentioned the weakness you've just
9  described, nausea, vomiting.  Are there other
10 symptoms that you remember having after you started
11 the Votrient treatment?
12     A.   General body pain all over and the hair
13 changing color.
14     Q.   Anything else?
15     A.   Not that I can recall.  That's tough to
16 think about anything else happening.
17     Q.   I want to call your attention to December
18 14th, 2016, in your diary.  Can you read that note
19 on December 14th?
20     A.   It says, "I'm still here," so that means I
21 didn't die in surgery and still alive and because I
22 put it -- you know, stuff out six months -- and you
23 know, How's things going, that type of thing.  It
24 was something that I entered long before December

1  14th.
2      Q.   And with respect -- Mr. Dean, can you read
3  it one more time to make sure that we're looking at
4  the same spot?
5      A.   It says, Am I still here, question mark,
6  underlined three times.
7      Q.   Do you recall what you were thinking when
8  you wrote that in advance in your diary?
9      A.   If I would have been dead.
10     Q.   What else did you think about?
11     A.   What would my wife do without me, my kid,
12 just our family and things you're going to miss and
13 thinking, I shouldn't have even been there because
14 of all the delays.  I should have never even been
15 having the chemo or anything.
16     Q.   I'd like to tender to the witness what's
17 been marked for identification as Exhibit Dean 4.
18          (Dean Exhibit Number 4 was marked for
19          identification.)
20          MR. STROM:  On the front of it, Dan, it
21 says, 2017 Monthly Planner.
22          MR. FORNOFF:  Just for the record, before
23 we get into it, the same running objection to
24 hearsay.

1          MR. STROM:  Understood.  Same responses?
2          MS. CLARK-JOSEPH:  I'll join as well.
3    BY MR. STROM:
4          Q.   Mr. Dean, can you identify for the record
5    what this document is?
6          A.   It's my daily planner, you know, diary,
7    that I took notes on, different -- what days,
8    healthcare problems, schedules for football and
9    racing and things such as that.
10         Q.   What year is it from?
11         A.   2017.
12         Q.   Who wrote in this notebook?
13         A.   Well, my wife wrote the note in the
14   beginning.  I'm not sure.  Maybe not.  Maybe not on
15   this one, but in general I did unless she wrote in
16   some pertinent dates, and I don't see a note on this
17   one.
18         Q.   Is this a fair and accurate copy of your
19   diary from 2017?
20         A.   Yes.
21         Q.   And the notes that you made in this
22   notebook, do you generally make those notes at the
23   time that they took place?
24         A.   Yes.

1          Q.   Was this part of your regular practice to
2    keep notes about your medical condition?
3          A.   Yes.  All the way back to 2010, I did
4    this.
5          Q.   And you kept these notes in that regular
6    course?
7          A.   Uh-huh.  Yes, sir.
8          Q.   And you'd refer to these notes also
9    sometimes before you met with a doctor?
10         A.   Yes.
11         Q.   And these notes describe your medical
12   history, including the symptoms and the diagnoses
13   that you heard about?
14         A.   Yeah, and pretty much an outline of it.
15         Q.   And does it also describe your past or
16   your present symptoms?
17         A.   Sometimes.
18         Q.   And do the notes sometimes include the
19   causes as you heard about them from your doctors of
20   those symptoms?
21         A.   Yes.
22         Q.   Did you make all of the recordings in your
23   notebooks when the memories were fresh in your mind?
24         A.   Yes.

1          Q.   And the notes that you took, they
2    reflected what you remembered --
3          A.   Yes.
4          Q.   -- accurately?
5          A.   Yes.
6          Q.   I apologize for the pages here in Dean
7    Exhibit 4.  We've got this problem again with the
8    months being split up.
9               Mr. Dean, do you recall how long you took
10   Votrient for?
11         A.   I believe it was close to three months.
12         Q.   And what kind of a drug is Votrient?  How
13   do you -- let me strike that.  How is Votrient
14   administered?
15         A.   Orally, by pill.
16         Q.   And how often did you take Votrient by
17   pill?
18         A.   Once a day.
19         Q.   Did you have to leave Taylorville
20   Correctional Center to take it?
21         A.   No.
22         Q.   And what time of day did you take it
23   usually?
24         A.   I took it at night, 8:00 p.m. -- around

1    8:00 p.m.  It depended on the schedule.  It might
2    have been 8:30, but generally 8 o'clock.
3          Q.   Were you getting other medications at the
4    same time?
5          A.   Not from the med line, no.  Everything
6    else I have is in a blister pack that I keep in my
7    personal items.
8          Q.   And so does that mean that your medication
9    for your back pain is in the blister pack?
10         A.   Yes.  Could I go back to that?  I do
11   take -- I did take my Coumadin at the med line, too.
12   I'm sorry.
13         Q.   That's okay.  And the Coumadin, you
14   testified before it's your understanding that that
15   was a blood thinner?
16         A.   Yes.
17         Q.   Mr. Dean, why did you stop taking
18   Votrient?
19              MR. FORNOFF:  Object to speculation.
20              MR. STROM:  I'll strike it and I'll
21   rephrase.
22   BY MR. STROM:
23         Q.   Mr. Dean, do you recall when you stopped
24   taking Votrient?

1    A.   I don't the exact day, but they called me
2 in healthcare and told me that the CAT scan came
3 back and that it wasn't working.
4    Q.   So there was a CAT -- it's your testimony
5 there was a CAT scan before you went off of
6 Votrient?
7    A.   Yes.
8    Q.   Do you recall when that was?
9    A.   I don't remember the day.
10   Q.   Would your notes in Exhibit 4 help to
11 refresh your recollection?
12   A.   Yes.  I don't think in February that I was
13 that accurate with my stuff.
14   Q.   When you say you weren't that accurate in
15 February, why not?
16   A.   Because I was still on the Votrient and it
17 was killing me.
18   Q.   I asked you about if you recall when the
19 CAT scan was and then I interrupted you.  My
20 apologies.  Do you recall when it was, based on your
21 notes there?
22   A.   No, I don't see it on there.
23   Q.   If you look at February 10th, it only says
24 2017 at the top of that page.  It's the page before

1 the page that says March at the top.  Do you see a
2 note there on February 10th about the CAT scan?
3    A.   Okay, yes.
4    Q.   Did you have a CAT scan on February 10th?
5    A.   Yes.  I must have had it on that day but I
6 was questioning when I would see Dr. G about the
7 results.
8    Q.   Do you recall when you saw Dr. G for the
9 results on that CAT scan?
10   A.   No, I don't recall.
11   Q.   Have you seen Dr. G as of February 21st?
12   A.   February 21st.
13   Q.   You might have to look at the prior page
14 for February 21st of Dean Exhibit 4.
15   A.   Oh, it's March.  I'm sorry.
16   Q.   That's okay.
17   A.   March 21st, Dr. G visit for CAT scan
18 results.
19   Q.   And then turning the page, February 24th,
20 had you seen Dr. G by then?
21   A.   Apparently, no.  I took blood tests for
22 him to see, you know, what the blood tests were
23 like.
24   Q.   Do you remember roughly when you saw Dr. G

1 about your CAT scan results?
2    A.   I'm going to say it had to be in March.
3    Q.   And if you look in --
4    A.   Yeah.  I'm thinking it was probably in --
5    Q.   If you look at your notes from March 2nd,
6 it does not say March at the top of the page, just
7 2017.  Do you see any notes there that refresh your
8 recollection about when you saw Dr. G?
9    A.   Yeah, Dr. G.  My cancer got worse, took me
10 off Votrient and is changing me to Opdivo.  IV
11 starts -- it says next week but I also added up on
12 the top, Dr. Nawoor tried to talk me into signing a
13 release to stop treatment.  That was like an hour
14 before I went out for the -- for the Dr. Guaglianone
15 writ.
16        The nurse, Director of Nursing, Kathy
17 Galvin, was in there, and they told me that if I
18 signed a release for no more treatment that they
19 would keep me comfortable with pain medication, and
20 when I wouldn't do that, they wanted me to sign a Do
21 Not Resuscitate release, and I said I wouldn't do
22 that either, but I signed it as refusing -- that I
23 wanted to be resuscitated.  I guess I'm saying that
24 right.

1    Q.   So you did not sign a release to stop
2 treatment, is that right?
3    A.   No, I did not sign it.
4    Q.   And with the Do Not Resuscitate, the DNR,
5 if we can call it that, you signed it to refuse the
6 DNR, meaning you wanted to continue to receive
7 resuscitative treatment; correct?
8    A.   Yes.  I think my exact words were, If
9 you've got an extension cord, you could get me out
10 the front door and you can unplug it.
11   Q.   And by the front door, you mean the front
12 door to --
13   A.   The prison, because I didn't want to die
14 in prison.
15   Q.   Did you stop Votrient treatment on
16 Thursday, March 2nd?
17   A.   Yes.
18   Q.   Did you start Opdivo treatment on
19 Thursday, March 2nd?
20   A.   No.  He said it would start the next week,
21 but I don't think I started for almost a month on
22 that one, maybe three weeks.  I'm not exactly sure
23 how long it was.
24   Q.   Did you see --

1    A.    Oh, yeah.  It started on -- so he ordered
2 it on the 2nd and I started on the 22nd.
3    Q.    And did you look at something there in
4 your notes to refresh your recollection about the
5 dates?
6    A.    Yes, I looked at March 22nd.  It says, "No
7 side effects."  I hadn't started having side effects
8 from that yet, but it did give me some side effects.
9 I was kind of nauseated in the afternoon, but it was
10 a great relief from Votrient to that.  I could deal
11 with that.  I didn't have much appetite in the
12 afternoon.
13    Q.    What was the method by which the Opdivo
14 was given to you?
15    A.    It was IV treatment.
16    Q.    And how often did you receive IV
17 treatments of Opdivo?
18    A.    I believe it was every two weeks.
19    Q.    And that started on Wednesday, March 22nd,
20 of 2017?
21    A.    Yes.
22    Q.    When did you first start to notice the
23 nausea side effect from the Opdivo?
24    A.    Probably a week or two into it.  It took a

1 little while for it -- the fact that I was off the
2 Votrient, I was still having a few side effects from
3 that, and then the relief of not having them side
4 effects.
5         I didn't really notice the nausea until
6 later on, but there was no vomiting or kind of a
7 loss of appetite.  I could force myself to eat, but,
8 you know, it wasn't like, Oh, I'm hungry; let's eat.
9    Q.    During the course of your treatment on
10 Votrient, did you have any more blood in your urine?
11    A.    No.
12    Q.    Did you have any other blood clots that
13 you urinated?
14    A.    No.
15    Q.    Did you have any pain in your back in the
16 area of your kidneys?
17    A.    No.
18    Q.    How long did you have Opdivo treatments
19 for?
20    A.    I believe that was close to three months
21 also.
22    Q.    Do you recall approximately when you went
23 off of Opdivo?
24    A.    It would be sometime in June, so I don't

1 know exactly.  I guess they took me off of it on the
2 5th of May.
3    Q.    And can you direct us to where you looked
4 in your notes there to refresh your recollection?
5    A.    Yeah, May of 2017.  The pages starts with
6 Thursday, the 4th.  It says I had my CT scan.
7         Okay.  So my notes point to the 12th I got
8 results from the CT scan.  Opdivo not working.
9 Started Torisel.  That's once a week.  Go figure.
10 It got approved that day.
11    Q.    I'm going to step back in the timeline
12 just a little bit.  Your testimony was that you
13 started Opdivo -- excuse me -- that you were
14 prescribed Opdivo on March 2nd, 2017; correct?
15    A.    Yes.
16    Q.    And that you first started to receive
17 Opdivo on March 22nd, 2017?
18    A.    Yes.
19    Q.    Did you complain about this delay in
20 treatment?
21    A.    Yes.
22    Q.    What was your complaint?
23    A.    In general, I had asked Kathy Galvin --
24 Director of Nursing, Kathy Galvin -- about what was

1 going on.  My wife had called.  You wanted to know
2 if I made those notes?
3    Q.    Did you file a grievance about it?
4    A.    No.  Did I?  I don't think I did.  Yes, I
5 did.  I put in an emergency grievance to warden.
6    Q.    Where are you looking?
7    A.    It must be March 2017 on the 16th.
8    Q.    And what are you reading there that
9 reminds you you put in an emergency grievance?
10    A.    It just says down at the bottom, it says,
11 Dr. S received release, you know, trying to get his
12 records, but then I put the line across it and then
13 put in, "Emergency grievance to warden."
14    Q.    Did you receive a response on that
15 emergency grievance?
16    A.    Not as quickly as before, but yes, I did.
17 By the time I got my response back, I had started
18 it, so it was a moot point.
19    Q.    So it was after March 22nd of 2017?
20    A.    That I got the results back in, yes.  I
21 don't know if I wrote down when I got them.
22    Q.    We started to talk about how you stopped
23 the Opdivo treatment, correct?
24    A.    Yes.

1    Q.   Do you recall why you stopped the Opdivo
2    treatment?
3         A.   The CAT scan results showed that it worked
4    on my lymph nodes on my lungs but it didn't do
5    anything for my liver.
6         Q.   And when you say that it worked, what's
7    your understanding of what "working" means?
8         A.   Well, it shrank my -- I guess it shrank or
9    kept at bay, no growth for the lymph nodes or the
10   lungs, but the tumor increased in size in the liver.
11        Q.   What was the next drug that you were
12   prescribed?
13        A.   Torisel.
14        Q.   And your testimony -- tell us again,
15   please, when were you prescribed Torisel.
16        A.   On the -- what month is that?  May 22nd --
17   or May 12th.  I'm sorry.  May 12th.
18        Q.   When did you receive your first dose of
19   Torisel?
20        A.   Actually, that day.  Well, yeah.  I got it
21   approved that day, I think.  I don't know.  I think
22   I actually started it that day.  It was
23   instantaneous, where all the other ones were a long
24   wait.

1    Q.   Do you recall when you filed this lawsuit,
2    Mr. Dean?
3         A.   Sometime in April.
4         Q.   Why did you decide to file this lawsuit?
5         A.   Because I felt I was harmed, that it
6    delayed -- my cancer had spread from the first CAT
7    scan to the second CAT scan; that it should have
8    been scheduled and it wasn't scheduled, and my
9    cancer had spread from just being in my kidney and
10   my vena cava and my lymph nodes and my lungs.  I
11   just felt that I was wronged.  And so the seven
12   months of urinating blood and finally the blood
13   clots, it just felt that I was under harm and felt
14   like I was being punished, tortured.
15        Q.   Mr. Dean, can you tell us a little bit
16   about what your cancer treatment is like right now?
17        A.   I go once a week for Torisel; pretty much
18   leave at 9 o'clock and get there at 10:00.  This
19   Thursday I'll see Dr. Guaglianone.  He'll give an
20   update what the blood tests are like, that type of
21   stuff, take my vitals, talk about if I have anything
22   new happening.  I pretty much tell him every time I
23   have a bad rash and itching and blushing all over my
24   chest and my back and pretty much itch all the time.

1    Q.   What's your understanding about where that
2    rash comes from?
3         A.   I've read on the side effects that it is
4    from that, and Dr. Guaglianone has expressed that
5    that is a known side effect.
6         Q.   Known side effect of...
7         A.   Of Torisel.
8         Q.   Are there any other side effects that you
9    believe to be coming from your Torisel?
10        A.   Well, the Torisel makes my pancreas not
11   work as well as it could, so I've had to go on
12   insulin injections for that.  It's raised my
13   cholesterol level, which is another known side
14   effect, and it's also caused my creatinine level to
15   increase, and it's kind of like on the border
16   whether it -- it's almost to the point it's almost
17   too high, they don't know what they're going to do,
18   if he's going to decrease it, change me to something
19   else, because it is working on my tumors.  It's
20   either keeping them at bay or shrinking them.  Every
21   time up until the last CAT scan, it shrank them.
22   The last CAT scan, the way I read the radiology
23   report, it said that they're the same size.
24        Q.   Do you recall when that last CAT scan was?

1         A.   Approximately two months ago so...
2         Q.   April of 2018?
3         A.   Yeah.  April, I believe.
4         Q.   And how is the Torisel administered?
5         A.   IV.
6         Q.   And where is it administered?
7         A.   Anywhere at my hand or arms.
8         Q.   And where do you go to have it
9    administered?
10        A.   Decatur Cancer Center in Decatur.  I
11   believe it's on McKinley Street.
12        Q.   Do you have a regular schedule for that
13   course of treatment?
14        A.   It's every Thursday.  I believe my
15   appointment's at 10 o'clock.
16        Q.   Are there any other side effects that you
17   notice from the Torisel?
18        A.   No.  I have an appetite, all that type of
19   stuff.  My hair's changed back to normal color.
20   There was a possibility I could lose my hair but I
21   didn't, and other than that, other than the itching
22   and then the other things that, you know, they
23   already mentioned, you know, the pancreas not
24   working, the cholesterol, it's not near as bad as

1  the Votrient, the Opdivo.
2      **Q.   How do you feel mentally when you come**
3  **back from having chemotherapy on Thursdays?**
4      A.   Frustrated, like I shouldn't have to do
5  this.
6      **Q.   Does the chemotherapy affect your thinking**
7  **or your memory?**
8      A.   I have short-term memory loss on Thursdays
9  and Fridays.
10         MR. FORNOFF:  I'm going to object to
11 speculation and foundation for testifying about
12 memory loss from a drug.
13 BY MR. STROM:
14     **Q.   Do you notice any symptoms with your**
15 **memory on Thursdays and Fridays?**
16     A.   Yes.  I have a hard time remembering, you
17 know, people's names -- not, say, your name -- but
18 we'll be talking about somebody from the past that
19 maybe went home a month ago.  It's like, well, yeah,
20 that guy.  I can't -- stuff like that.  And then all
21 of a sudden, it will come to me sometimes.
22     **Q.   Mr. Dean, if you make it to your release**
23 **date -- let me back up.  Do you have a release date**
24 **from Taylorville Correctional Center?**

1      A.   Yeah.  Right now, it is June 24th, 2021.
2      **Q.   That's almost exactly three years from**
3  **today?**
4      A.   Yes.
5      **Q.   If you make it to your release date, what**
6  **do you plan to do for work?**
7      A.   I don't plan -- I don't think I'll be able
8  to do anything except for maybe being a Wal-Mart
9  greeter.  I plan on trying to get Social Security
10 disability.
11     **Q.   What resources are going to be available**
12 **to you when you get out?**
13     A.   Well, my wife will be there to take care
14 of me, to get me to my appointments, and my son, if
15 he has to, will come up and help me out.  He's
16 already indicated he'd move back if he had to.
17     **Q.   You testified earlier that your son is a**
18 **working musician?**
19     A.   Yes.
20     **Q.   Is your wife working?**
21     A.   Right now she's currently on workmen's
22 comp.  She broke her arm on the job.
23     **Q.   And what job was that?**
24     A.   Supervisor of housekeeping, and she also

1  cleans a laundromat as a part-time job, and that's
2  where she broke her arm is at the part-time job.
3      **Q.   While you're incarcerated, Mr. Dean, who**
4  **pays for your medical care?**
5      A.   I believe Wexford does, Wexford Health
6  Sources.
7      **Q.   When you're released, do you know if you**
8  **will have mandatory supervised release?**
9      A.   Yes.
10     **Q.   Do you know whether there will be**
11 **healthcare available to you during mandatory**
12 **supervised release?**
13     A.   I understand that you can possibly get a
14 state medical card.
15     **Q.   Do you expect -- or do you know if that**
16 **state medical card will cover your cancer treatment?**
17     A.   That I'm not sure of.
18         MR. STROM:  Mr. Dean, would you like to
19 take a short break?
20         THE WITNESS:  Sure.
21           (A brief recess was taken.)
22 BY MR. STROM:
23     **Q.   Mr. Dean, what's your relationship like**
24 **with Dr. Nawoor today?**

1      A.   Cordial.
2      **Q.   Do you still see him?**
3      A.   Yes, I see him weekly.
4      **Q.   And when you say cordial, what's that mean**
5  **to you?**
6      A.   Well, I'm always polite to him.  He seems
7  to always be polite to me.
8      **Q.   Have you ever blown up at each other?**
9      A.   Never.
10     **Q.   Have you ever sworn at him, for lack of a**
11 **better way of putting it?**
12     A.   Never.
13     **Q.   Do you see Dr. Einwohner?**
14     A.   No.
15     **Q.   When was the last time that you saw**
16 **Dr. Einwohner?**
17     A.   They had me try to start seeing her again.
18 I don't remember when it was.  It's been about five
19 or six months since I stopped seeing her because I
20 didn't feel it was ever a productive visit or
21 anything.
22     **Q.   Do you still see Nurse Kathy Galvin?**
23     A.   Nurse Galvin, the last time I seen her was
24 approximately a week and a half ago and she was told

Page 174

1  to leave the property and she can't come back.
2  **Q.    You were seeing her as part of your visits**
3  **to the healthcare unit before that?**
4     A.    Yeah.  She would always be wandering in
5  and out.
6  **Q.    Did you -- what was your relationship like**
7  **with her?**
8     A.    I was always polite to her.  If she spoke
9  to me, I spoke to her.  We went through a little
10 period of time that we didn't speak to other each --
11 I'm not sure why, if I did something to her -- but I
12 never lost my temper to any healthcare staff ever.
13 **Q.    Not before you filed your Complaint in**
14 **this case?**
15    A.    Not before and not after.
16 **Q.    And you've never sworn at Nurse Galvin?**
17    A.    Never.
18 **Q.    And you've never sworn at Dr. Einwohner?**
19    A.    Never.
20 **Q.    What are your feelings about doctors these**
21 **days?**
22    A.    Other than Dr. Guaglianone, I don't have
23 much faith in my healthcare system right now.
24 **Q.    Why is that?**

Page 175

1     A.    Well, I relate it to like if you had a car
2  and you took your car to a mechanic and the mechanic
3  returned your car, would you go back to that
4  mechanic?  But I don't have the choice.  I've got to
5  go see the guy, so that's why I'm always polite to
6  him.  You're never going to get anything by being
7  mad or angry.  I try to talk in a nice, calm tone
8  all the time to him and he seems responsive to that,
9  and it's just the way I am.
10 **Q.    And how about Nurse Mincy?  Have you seen**
11 **Lisa Mincy since your treatment?**
12    A.    No.
13 **Q.    Since your surgery?**
14    A.    No, no.  I don't know when she took a
15 different job, but I haven't seen her since.  She
16 has not been on the property.
17 **Q.    During the time that you did see her, did**
18 **you ever blow up with her?**
19    A.    No, sir.
20 **Q.    Did you ever swear at her?**
21    A.    No, sir.
22 **Q.    Did you ever express your frustration to**
23 **the doctors or nurses you saw about how your**
24 **treatment was going?**

Page 176

1     A.    I had asked them numerous times what the
2  delay was and I always got some type of answer.
3  **Q.    Reflecting on your experience as a cancer**
4  **survivor, what has this experience -- being**
5  **diagnosed with cancer been like for you?**
6     A.    I don't really understand.  What do you
7  mean?
8  **Q.    What feelings do you experience when you**
9  **think about your cancer diagnosis and treatment?**
10    A.    I think that -- sometimes I think that it
11 could have been better, I shouldn't be in this
12 position, but I just try to roll with the punches
13 every day.
14    MR. STROM:  I think I'm going to stop
15 there and tender the witness for cross examination
16 effectively.
17    MR. FORNOFF:  Katie, do you have anything
18 you want to do today?  I think we're going to
19 reserve and wait until tomorrow.  I don't know for
20 sure, but Joe Rupcich may decide to come.  I've had
21 our secretary make arrangements for the gate pass
22 for him, but if you want to go now, I think we're
23 going to wait until tomorrow.
24    MS. CLARK-JOSEPH:  I prefer to wait until

Page 177

1  tomorrow so I have a chance to look over those
2  exhibits, if that's okay with you, Bill.  I know
3  we're about an hour before the scheduled end time of
4  2:30 right now.  I don't anticipate that I'll have
5  lengthy questions tomorrow, so I don't think there
6  would be an issue with time, but what about you,
7  Danny?
8     MR. FORNOFF:  No, I can't imagine that we
9  would -- we've come very close.  We've covered a lot
10 today and I don't think we need to repeat, so I
11 wouldn't anticipate us coming -- you know, I think
12 we will probably be done before noon tomorrow,
13 honestly.
14    MR. STROM:  And before our discussions
15 before this, guys, you know I'm not going to be
16 raising asked and answered objections, especially on
17 the what I'll call the touch file type stuff.  If
18 you need to make sure, for your own sake, you clear
19 up background information or dates and those sorts
20 of things, we're reserving, of course, asked and
21 answered for things that you yourselves ask and
22 answer during the course of your questioning.
23    MR. FORNOFF:  Sure.
24    MR. STROM:  And then I might take a little

Page 178

1   bit of redirect, since effectively what we're doing
2   here is the courtroom testimony structure, so --
3   and, of course, give you the opportunity for any
4   within the scope of recross.  So...
5           MR. FORNOFF:  Absolutely, sure.
6           MR. STROM:  Okay, great.
7           We'll go off the record.
8               (Deposition suspended at 1:30 p.m.
9               until Wednesday, June 27, 2018.
10              Signature reserved.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 179

1   IN RE:  WILLIAM KENT DEAN vs. WEXFORD HEALTH
            SOURCES, INC., etc., et al.
2   U.S. Legal Support Job No. 704091
3           I, WILLIAM KENT DEAN, Deponent herein, do
    hereby certify that I have read the foregoing
4   deposition and that it is a true and accurate
    transcription of the questions asked of me and the
5   answers given by me, with the following change(s):
6   PAGE LINE        CHANGE             REASON
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
                    _____
22                     WILLIAM KENT DEAN
23
24  LHP          Date_____

Page 180

1   STATE OF ILLINOIS   )
                        )   SS
2   COUNTY OF MACON     )
3           I, LISA HAHN PETERMAN, a Notary Public,
4   Certified Shorthand Reporter, and Registered Merit
5   Reporter in and for the County of Macon, State of
6   Illinois, DO HEREBY CERTIFY, that pursuant to
7   agreement between counsel there appeared before me
8   on June 26, 2018, at the Taylorville Correctional
9   Center, 1144 Illinois Route 29, Taylorville,
10  Illinois, WILLIAM KENT DEAN, who was first duly
11  sworn by me to testify to the whole truth of his
12  knowledge touching upon the matter in controversy
13  aforesaid so far as he should be interrogated
14  concerning the same; that he was examined and
15  examination was taken down in shorthand by me and
16  afterwards transcribed by stenographic means; that
17  the deposition is a true record of the testimony
18  given by the witness; and that the signature of the
19  deponent is reserved.
20          IN WITNESS WHEREOF, I have hereunto set my
21  hand and affixed my Notarial Seal this 6th day of
22  June, 2018.
23                  _Lisa Hahn Peterman_____
                    Notary Public, CSR and RMR
24  CSR #84-2149

Page 181

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                  SPRINGFIELD DIVISION

 3   WILLIAM KENT DEAN,              )
                                     )
 4              Plaintiff,           )
                                     )
 5         -vs-                      )   Civil Action
                                     )   No:  17-cv-3112
 6   WEXFORD HEALTH SOURCES,         )
     INC., DR. ABDUR NAWOOR, DR.     )
 7   REBECCA EINWOHNER, NURSE        )
     KATHY GALVIN, and LISA          )
 8   MINCY,                          )
                                     )
 9              Defendants.          )
     _____

10
     VOLUME II OF
11   DEPOSITION OF:    WILLIAM KENT DEAN

12   DATE:             June 27, 2018

13   TIME:             9:00 a.m. to 1:40 p.m.

14   LOCATION:         Taylorville Correctional Center
                       1144 Illinois Route 29
15                     Taylorville, Illinois

16   TAKEN BY:         Defendants

17   REPORTER:         Deborah A. Krotz, CSR, RMR, CRR
                       CSR No. 0084-001848
18

19

20

21

22

23

24
```

Page 182

```
 1              STIPULATION
 2              -----------
 3      IT IS HEREBY EXPRESSLY STIPULATED AND agreed
 4 by and between the parties that the deposition of
 5 WILLIAM KENT DEAN may be taken at Taylorville
 6 Correctional Center, 1144 Illinois Route 29,
 7 Taylorville, Illinois, on the 27th day of
 8 June, 2018, before Debbie A. Krotz, pursuant to the
 9 Rules of the Supreme Court and the Rules of Civil
10 Procedure governing said depositions.
11      It is further stipulated that the
12 signature of the witness is not waived.
13      It is further stipulated that the necessity
14 for calling the Court Reporter for impeachment
15 purposes is waived.
16
17
18
19
20
21
22
23
24
```

Page 184

```
 1              I N D E X
 2 WITNESS:                                PAGE:
 3 WILLIAM KENT DEAN
 4 CROSS EXAMINATION BY MR. FORNOFF:         185
 5 CROSS EXAMINATION BY MS.                  301
   CLARK-JOSEPH:
 6
   RE-DIRECT EXAMINATION BY MR. STROM:       338
 7
   RE-CROSS EXAMINATION BY MR. FORNOFF:      345
 8
 9        N O  E X H I B I T S  M A R K E D
10
11
     EXHIBIT      DESCRIPTION          PAGE:
12
13
14 Note:  No exhibits were marked during the June 27,
15 2018, examination.  However, Dean Exhibits 1, 2, 3,
16 4, and 5, which were marked on June 26, 2018, were
17 referenced.
18
19
20
21
22
23
24
```

Page 183

```
 1 APPEARANCES:
 2 For the Plaintiff:   WILLIAM M. STROM, ESQ.
                        and NATHANIEL WACKMAN, ESQ.
 3                      and JEREMY SAWYER, Law Clerk
                        Jenner & Block
 4                      353 North Clark Street
                        Chicago, IL 60654
 5
   For the Defendants,
 6 Wexford HealthSources,
   Inc., Dr. Abdur Nawoor,
 7 Dr. Rebecca Einwohner,
   Nurse Kathy Galvin:  DANIEL S. FORNOFF, ESQ.
 8                      and JOSEPH N. RUPCICH, ESQ.
                        Cassiday Schade, LLP
 9                      111 North Sixth Street
                        2nd Floor
10                      Springfield, IL 62701
11 Via Teleconference
   For the Defendant,
12 Lisa Mincy:          MARY KAITLYN CLARK-JOSEPH, ESQ.
                        Office of the Illinois
13                      Attorney General
                        500 South Second Street
14                      Springfield, IL 62701
15
16
17
18
19
20
21
22
23
24
```

Page 185

```
 1 THEREUPON,
 2              WILLIAM KENT DEAN,
 3 a witness, having been first duly sworn, upon his
 4 oath, commencing at 9:29 a.m., testified as
 5 follows:
 6              CROSS EXAMINATION
 7 BY MR. FORNOFF:
 8      Q.   Mr. Dean, I know we met yesterday, but
 9 just for the record and clarity's sake, I'm Dan
10 Fornoff.  I'm also here with Joe Rupcich.  We
11 represent the Wexford Defendants in this case.
12 Present also with us today is William Strom on your
13 behalf.  And we also have Nathaniel Wackman and
14 Jeremy Sawyer appearing by video on behalf of the
15 Plaintiff.  And then appearing on video on behalf
16 of Lisa Mincy, we have Mary Kaitlyn Clark-Joseph.
17      We kind of covered the ground rules
18 yesterday, if you could tell me that you recall
19 those.  I mean, the same ground rules apply.  I
20 don't think we need to go over them again, do you?
21      A.   No, sir.  I recall.
22      Q.   All right.  I mean, you did a good job
23 yesterday as far as for clarity, waiting until the
24 end of the question to answer, and verbalizing, so
```

1    I'm not concerned about any of that.
2            You understand, again, though, that you
3    just took an oath to tell the truth, just as if you
4    were in a court of law.  There's nothing that would
5    impair your ability to tell the truth today?
6        A.   I'm a little light-headed, but ...
7        Q.   Okay.  And why are you light-headed?
8        A.   My blood levels are low.  They kept me in
9    Healthcare overnight last night.
10       Q.   Okay.  And do you think that would impair
11   your ability to tell the truth?
12       A.   I do not believe so.
13       Q.   Well, if you need a break or anything at
14   any point, something to do with that, any water or
15   anything, let us know, and we'll take a break;
16   okay?
17       A.   Yes, sir.
18       Q.   I just want to go into some basics.  We
19   covered a lot of the background stuff yesterday,
20   but I had a few questions I'd like to follow up on.
21           Your initial Complaint that you filed on
22   April 21st, 2017, did you write that yourself?
23       A.   Yes.
24       Q.   Did you have any help writing that?

1        A.   I had some advice.
2        Q.   And when you say you had some advice, was
3    that from another inmate?
4        A.   Yes, sir.
5        Q.   Here at Taylorville?
6        A.   Yes, sir.
7        Q.   And to what extent do you mean advice?  I
8    mean, did he tell you what to write or was it more
9    --
10       A.   He told me where to get the forms and that
11   type of stuff.
12       Q.   So when we look at your Complaint that was
13   filed, it's Docket No. 1, that's your handwriting?
14       A.   No, sir.  I let him print it up.  I did it
15   in my handwriting.  My handwriting is very sloppy.
16       Q.   Do you know, what was this individual's
17   name?
18       A.   I don't recall.
19       Q.   Does he still have a copy of what you
20   wrote?
21       A.   No, sir.
22       Q.   Do you know, when you were talking to this
23   inmate and he was helping you write this up, did
24   you give him something handwritten to write to go

1    off of?
2        A.   Yes.
3        Q.   Okay.  Do you have a copy of what you gave
4    that inmate to write your Complaint?
5        A.   No, sir.
6        Q.   How about your grievances?  Did you write
7    those yourself?
8        A.   Yes, sir.
9        Q.   Did you have any help with those?
10       A.   No, sir.
11       Q.   Now I'm sure you're probably aware that
12   your Counsel has since entered an appearance on
13   your behalf, and they filed an Amended Complaint
14   and then a Motion For Leave to File a Second
15   Amended Complaint.  Have you seen those documents?
16       A.   Yes.
17       Q.   Have you had the opportunity to take a
18   look, read through those?
19       A.   Yes.
20       Q.   So one of the other things that I wanted
21   to follow up on with you is yesterday we talked a
22   little bit about your work history, and we kind of
23   went from basically when you were in high school
24   and graduated high school up to current.  One of

1    the things I may have just missed and you may have
2    went over it, but from 2007 to 2010, you were not
3    incarcerated during that time; correct?
4        A.   No, sir.
5        Q.   And were you employed?
6        A.   Yes, sir.
7        Q.   Okay.  Can you tell me --
8        A.   Not for all three years, but ...
9        Q.   Okay.  Could you provide, just let me know
10   the dates of what you were working and where you
11   were working?
12       A.   I'm not sure of the day that I was
13   actually employed.  I would say October of '07.
14   Maybe sooner.  That was for Seneca Pharmacy.
15       Q.   What kind of work did you do for Seneca
16   Pharmacy?
17       A.   I delivered pharmaceutical drugs to state
18   facilities and nursing homes.
19       Q.   And how long did you stay at Seneca
20   Pharmacy?
21       A.   Approximately 18 months.
22       Q.   So late 2008 do you think you would have
23   ended that job?
24       A.   Yeah, real late.

1    Q.    Did you do anything from late 2008 to
2  2010?
3    A.    No, sir.
4    Q.    Were you on unemployment or any kind of
5  benefits?
6    A.    No, sir.
7    Q.    Did you file tax returns those years?
8    A.    Yes, sir.
9    Q.    Did you have any other source of income
10  from when you ended your employment with Seneca
11  Pharmacy until 2010?
12   A.    No, sir.
13   Q.    So prior to your current incarceration,
14  you mentioned that you had two prior other
15  incarcerations.  Were both of those in the Illinois
16  Department of Corrections?
17   A.    Yes, sir.
18   Q.    Did you file any claims regarding your
19  medical care during those incarcerations?
20   A.    No, sir.
21   Q.    Did you receive medical care during those
22  incarcerations?
23   A.    Basic.
24   Q.    Based on your medical records, is it fair

1  to say that you understand or at least are
2  knowledgeable on how to obtain medical care within
3  the Department of Corrections?
4         MR. STROM:  I'm going to object to the
5         form.  You can answer.
6         THE WITNESS:  Yes, sir.
7  BY MR. FORNOFF:
8    Q.    Can you tell me how do you obtain medical
9  care at Taylorville Correctional Center?
10   A.    You go to sick call three times, and then
11  you're put in to see the doctor.  Each time you pay
12  a $5 co-pay.
13   Q.    Is that always true that you have to be
14  seen three times before you see a doctor?
15   A.    It depends if they deem it an emergency.
16   Q.    Can you recall a time where you were
17  placed to see a doctor after, say, one time?
18   A.    Yes.
19   Q.    When you would see a physician within the
20  Illinois Department of Corrections, what kind of --
21  Strike that.
22         If you were having any kind of pain or
23  medical issue, would you tell a doctor when you
24  were being seen?

1    A.    Yes.
2    Q.    If you were in pain, would you seek care?
3    A.    Yes, sir.
4    Q.    If you were put in to see a physician and
5  you were being seen for, say, a rash, but you were
6  also having pain, would you tell the physician that
7  you were in pain?
8    A.    I would, yes, sir.
9    Q.    Even if that pain is not associated with
10  your rash?
11   A.    Yes.
12   Q.    So we went through your medical conditions
13  yesterday, and I just want to go through briefly
14  again and touch on some of them to make sure that I
15  have everything accurate.  You mentioned that you
16  had or were diagnosed with congestive heart failure
17  in 2001; is that accurate?
18   A.    Yes, sir.
19   Q.    You were also diagnosed with high blood
20  pressure in 2001; is that accurate?
21   A.    Yes, sir.
22   Q.    In 2001, you were diagnosed with sleep
23  apnea, as well; correct?
24   A.    It may have been 2002.

1    Q.    Were you incarcerated at the time that you
2  were diagnosed with high blood pressure and
3  congestive heart failure?
4    A.    No, sir.
5    Q.    Do you recall the location or physician
6  who diagnosed you with congestive heart failure and
7  high blood pressure?
8    A.    Ottawa Township Hospital.  My personal
9  physician was Dr. Love.  There may be other
10  physicians that were working in cooperation with
11  him for that diagnosis at the hospital.
12   Q.    To your recollection, was Dr. Love at
13  Ottawa Township Hospital the individual who
14  diagnosed you with sleep apnea?
15   A.    No.
16   Q.    Do you recall who was the physician or
17  treater who diagnosed you with sleep apnea?
18   A.    I was seeing doctors at Loyola Medical
19  University, and they set me up for a test.  And I
20  do not recall the doctor's name.
21   Q.    Were you referred to Loyola from Ottawa
22  Township Hospital?
23   A.    No, sir.
24   Q.    How did you end up at Loyola?

Page 194

```
 1    A.    No confidence in Ottawa Township Hospital.
 2 I went up there on my own.
 3    Q.    What made you lack confidence in Ottawa
 4 Township Hospital?
 5    A.    Small-town hospital.  And I was still
 6 feeling ill, problems.
 7         THE COURT REPORTER:  I'm sorry.  The last
 8         phrase you said?
 9         THE WITNESS:  Small-town hospital.  And I
10         was still feeling ill, problems.
11         I'll speak louder.  I'm sorry.
12 BY MR. FORNOFF:
13    Q.    So is it fair to say you had some bias
14 based on the fact that they were located in a small
15 town?
16         MR. STROM:  I'm going to object to the
17         form.  You can answer.
18         THE WITNESS:  Yes.
19 BY MR. FORNOFF:
20    Q.    Did you ever make any complaints about
21 your care in Ottawa?
22    A.    No.
23    Q.    What didn't you like about your care
24 specifically at Ottawa?
```

Page 195

```
 1    A.    I just wanted a second opinion.
 2         I'm sorry.  I said I'd talk louder.
 3    Q.    So one of the other conditions you
 4 mentioned was called "drop foot."  I'm not familiar
 5 with that.  Is that accurate?  Is that what you
 6 said?
 7    A.    Yes.
 8    Q.    Okay.
 9    A.    I'm sure it's not a medical term.
10    Q.    Okay.
11    A.    But it's --
12    Q.    Can you explain what it is to you?
13    A.    Yes, sir.  It is when I walk -- when I was
14 walking, my right foot, I guess the way to explain
15 this is going to be kind of visual, you keep a beat
16 with your foot, and my left foot, I can do this.  I
17 can't raise my right foot.  So when I walk, it
18 slaps, and my muscles are dead in the front of my
19 leg.  I was told it was from a pinched nerve in my
20 back.
21    Q.    Was that also in 2001?
22    A.    No, sir.
23    Q.    Can you tell me when that was?
24    A.    That was in Pinckneyville Correctional
```

Page 196

```
 1 Center in approximately 2013.
 2    Q.    And, to your knowledge, you did receive
 3 some sort of formal diagnosis of what the condition
 4 was?
 5    A.    The nurse practitioner told me what it
 6 was, and he issued me a cane.
 7    Q.    Did you receive any other type of
 8 treatment for it?
 9    A.    For drop foot?
10    Q.    Correct.
11    A.    No.
12    Q.    The next condition that we talked about
13 was Type II diabetes.  You were diagnosed with that
14 in 2002; is that correct?
15    A.    Yes.
16    Q.    And where was your diagnosis?
17    A.    Loyola Medical Center.
18    Q.    To your recollection, was that at around
19 the same time or by the same physician that
20 diagnosed you with sleep apnea?
21    A.    Yes, sir.
22    Q.    Are you currently on any medication for
23 Type II diabetes?
24    A.    Yes, sir.
```

Page 197

```
 1    Q.    What medication is that?
 2    A.    Orally, I take glipizide 10 milligrams
 3 twice a day, and once a day I take an injection of
 4 Lantus.
 5    Q.    Lantus.  Is that an insulin?
 6    A.    I do not know if it's an insulin.
 7    Q.    Do you know, are you on any insulin?
 8    A.    I do not believe so, other than if Lantus
 9 is an insulin.  I'm not sure.
10    Q.    Is your condition currently controlled?
11    A.    No.
12    Q.    What do you mean by that?
13    A.    My A1C levels were really elevated.  And I
14 just started the Lantus within the last month and a
15 half, so I don't know if my A1C levels have been
16 lower or not.  That's an every-four-month thing.
17 I'm sorry to interrupt like that.
18    Q.    Have you been diagnosed with any diabetic
19 neuropathy or ulcers or any other condition
20 associated with diabetes?
21    A.    No, sir.
22    Q.    Have you been on medication consistently
23 for diabetes since you were diagnosed in 2002?
24    A.    Yes, sir.
```

1    Q.    Has it remained consistent, or was there
2    any kind of adjustment to your medications that you
3    recall?
4    A.    There's been adjustments.
5    Q.    And you said when your A1C level became
6    elevated, was it Dr. Nawoor who changed and added
7    the Lantus for you?
8    A.    Yes.
9    Q.    Are you seen here on diabetes clinic
10   regularly?
11   A.    Yes.
12   Q.    Is that every four months?
13   A.    Approximately.
14   Q.    If you have an issue that is related to
15   your diabetes, can you sign up for sick call to be
16   seen?
17   A.    Yes.
18   Q.    And if you have an issue with your
19   diabetes, do you sign up for sick call?
20   A.    Yes.
21   Q.    In your experience when you've had an
22   issue and signed up for sick call, were you seen?
23   A.    Yes.
24   Q.    You testified yesterday that you typically

1    when you were out, when you were not incarcerated,
2    you would go three to four months between exams.
3    Is that accurate?
4    A.    Approximately.
5    Q.    And, do you recall, were you going for
6    regularly-scheduled appointments for your
7    conditions, or were you going based off of an
8    as-needed basis?
9    A.    I don't understand.
10   Q.    Sure.  What I'm trying to say is here
11   you're scheduled for chronic clinics; correct?
12   A.    Mmm-hmm.
13   Q.    Okay.  So no matter what, no matter how
14   you're feeling, you go to those clinics on a
15   regular time period; correct?
16   A.    Yes.
17   Q.    When you were out, did you do the same
18   thing?
19   A.    I believe they were regular-scheduled.
20   Q.    Do you know what condition were they
21   regularly-scheduled for?
22   A.    I don't understand.
23   Q.    Well, you just said that they were
24   regularly-scheduled, your exams, correct, when you

1    were outside of prison?
2    A.    Mmm-hmm.  Yes, sir.
3    Q.    What were you -- What condition were these
4    appointments being regularly-scheduled for?
5    A.    My diabetes and heart problems.
6    Q.    Is it the same treater that would see you
7    regularly for your diabetes and your heart
8    problems?
9    A.    My personal doctor, yes.
10   Q.    Primary care physician?
11   A.    Yes.  I guess that's the way you'd say it.
12   Q.    And was that at Ottawa, or was that at
13   Loyola?
14   A.    Ottawa.  Excuse me.  Ottawa.
15   Q.    And did you continue to see that
16   individual at Ottawa even though you lacked
17   confidence in his ability to treat you?
18   A.    I don't understand that.
19   Q.    Okay.  Well, earlier, you testified and
20   told me that you sought other care at Loyola
21   because you lacked confidence in the physician's
22   ability to treat you at Ottawa; correct?
23   A.    Yes.
24   Q.    Okay.  Did you continue to see that

1    individual even after you sought care at Loyola?
2    A.    Yes.  I did see my primary care physician.
3    Q.    So even though you lacked confidence in
4    this individual, you continued to go to him?
5    A.    I more or less lacked confidence in the
6    hospital in general.
7    Q.    But you would agree, though, that you did
8    continue seeing him even though you lacked
9    confidence in the hospital in the area in which
10   this individual was working?
11   A.    Yes.
12   Q.    So yesterday you talked to us about high
13   cholesterol.  Do you recall that?
14   A.    Yes, sir.
15   Q.    Do you remember the date in which --
16   approximately the year in which you were diagnosed
17   first with high cholesterol?
18   A.    I'm sure it was 2001.
19   Q.    I know when you were diagnosed, you said
20   that you were put on medication initially; correct?
21   A.    Yes, sir.
22   Q.    And I'm just guessing, was it in Ottawa
23   that you were diagnosed with high cholesterol, or
24   was it Loyola?

1   A.   I don't recall.
2        Q.   And do you recall how long you were on
3   medication for high cholesterol?
4   A.   No, I don't recall.
5        Q.   Now you testified that at least when you
6   arrived to IDOC that the meal or the meals, the
7   food that you were being provided by IDOC has
8   helped to reduce your cholesterol; correct?
9   A.   Yes.
10       Q.   And, in fact, at some point, you were
11  taken off cholesterol medication because your
12  cholesterol had been reduced; is that accurate?
13  A.   Yes, sir.
14       Q.   And now you're currently on medication
15  again for high cholesterol; correct?
16  A.   Yes, sir.
17       Q.   And you testified you believe that's
18  because of the current chemotherapy that you're
19  receiving?
20  A.   Yes, sir.
21       Q.   And your basis for believing that, was
22  that informed by a physician of yours?
23  A.   Yes.  Dr. Guaglianone had also run the
24  form that tells you all the side effects directed

1   by Dr. Guaglianone.
2        Q.   Just to confirm, Guaglianone is -- or Dr.
3   Guaglianone is your oncologist; correct?
4   A.   Yes, sir.
5        Q.   And Dr. Severino, he was the urologist;
6   correct?
7   A.   I don't know his title.  He was my
8   surgeon.
9        Q.   Okay.  Do you have a history of obesity or
10  morbid obesity?
11  A.   Yes.
12       Q.   And how long have you been -- or I guess
13  when was your first diagnosis of obesity or morbid
14  obesity by a physician; do you recall?
15  A.   No.
16       Q.   How long in your opinion or to your
17  knowledge have you been obese?
18            MR. STROM:  Object to the form.  You can
19            answer.
20            THE WITNESS:  2000 to ...
21  BY MR. FORNOFF:
22       Q.   Did you ever receive -- Go ahead.  I'm
23  sorry.
24  A.   Yeah, basically 2000.

1        Q.   Has any individual ever given you medical
2   advice on your obesity?
3   A.   Yes.
4        Q.   Okay.  Do you recall what kind of advice
5   you received?
6   A.   Usually.
7        Q.   Were you able to follow that advice?
8   A.   Until I had cancer.
9        Q.   Do you recall what your weight was in the
10  year 2000?
11  A.   Not exactly, I don't.
12       Q.   How about when you entered IDOC?  Do you
13  have an approximate approximation of your weight?
14  A.   310.
15       Q.   And prior to December 2015, do you recall
16  what your weight was?
17  A.   Not exactly.
18       Q.   As you sit here today, what's your weight?
19  A.   264.
20       Q.   And how tall are you?
21  A.   Five-ten.
22       Q.   So one of your other conditions that we
23  talked about was degenerative disc disease.  Do you
24  recall that?

1   A.   Yes, sir.
2        Q.   And you said you were formally diagnosed
3   with that in 2015; is that accurate?
4   A.   Yes.
5        Q.   But you've had fairly consistent back pain
6   since 2001; is that fair to say?
7   A.   Yes, sir.
8        Q.   And prior to entering Illinois Department
9   of Corrections, from what I recall -- correct me if
10  I'm wrong -- but you testified yesterday that the
11  treatment that you received for your back prior to
12  2015 prior to this diagnosis was chiropractic; is
13  that correct?
14  A.   Yes, sir.
15       Q.   To your knowledge, were you ever diagnosed
16  or given -- Strike that.
17            Do you know, were you ever provided an
18  X-ray on your spine?
19  A.   Chiropractor took one, yes.
20       Q.   Have you received any within IDOC?
21  A.   Yes.
22       Q.   Do you recall the results of those?
23  A.   No.
24       Q.   How about, do you recall any physician

1  telling you specifically where the issue is in your
2  spine?  Was it lower?  Upper?  Do you recall
3  anything like that?
4      A.    No.
5      Q.    Is your back pain typically lower or
6  typically upper back?
7      A.    Lower.
8      Q.    And has it been consistently lower since
9  2000?
10     A.    Yes.
11     Q.    Have you received any medication for your
12 degenerative disc disease?
13     A.    Ibuprofen.  Also Tramadol at one time.
14     Q.    Do you recall who prescribed you the
15 Tramadol?
16     A.    Either the nurse practitioner at Taylor --
17 I mean Pinckneyville Correctional Center or Dr.
18 Shah.  I don't recall which one.  They were both in
19 the room.
20     Q.    And what specifically was the condition or
21 the pain?  What was going on with your condition at
22 the time that led them to prescribe Tramadol?
23     A.    I could not stand up very long.
24     Q.    Has your condition since improved since

1  that visit?
2      A.    After I got the chair, yes.
3      Q.    Do you recall when you got the chair?
4      A.    I got the chair in Taylorville
5  Correctional Center approximately three years ago.
6      Q.    And prior to that, you never had the
7  wheelchair?
8      A.    No.
9      Q.    Are you able to stand currently?
10     A.    For short periods of time.
11     Q.    So you're able to ambulate for short
12 periods of time.  What is a short period of time to
13 you?
14           MR. STROM:  Objection; mischaracterizes
15           his testimony.
16           THE WITNESS:  Answer?
17           MR. STROM:  (Counsel nods head
18           affirmatively).
19           THE WITNESS:  Long enough to go to the
20           bathroom.
21 BY MR. FORNOFF:
22     Q.    Okay.  And I'll reask that.  You said you
23 were able to stand -- I'm sorry -- for short
24 periods of time.  Is it your testimony still that

1  it's just long enough to go to the bathroom?
2      A.    Yes.
3      Q.    All right.  Do you take showers or baths?
4      A.    Showers.
5      Q.    Are you able to stand in the shower or is
6  there some sort of assistance?
7      A.    They're handicapped showers.  There's
8  benches and railings.
9      Q.    Have you ever been prescribed any physical
10 therapy or exercises?
11     A.    Physical therapy in Pinckneyville
12 Correctional Center for approximately nine months.
13     Q.    Were you ever given a home exercise
14 program or anything like that?
15     A.    A handout, yes.
16     Q.    How about any stretches?
17     A.    Once again, on the handout.
18     Q.    And do you continue to do those?
19     A.    As much as possible.
20     Q.    Do you have any idea of how many times a
21 week you do those?
22     A.    Three times, maybe.
23     Q.    Have you ever been diagnosed with a
24 hernia?

1      A.    Yes.
2      Q.    Do you recall when?
3      A.    Two times.
4      Q.    Two times?
5      A.    Yes.
6      Q.    Can you tell me approximately the dates of
7  those times?
8      A.    I was around three years old.  And during
9  the CAT scans -- I don't know the first one -- it
10 says I have an umbilical hernia.
11     Q.    And this was when you were three years
12 old?
13     A.    The first one was -- I don't know what
14 kind of hernia it was.  It was in the pubic region.
15 But the second one was sometime after I got a CAT
16 scan for cancer that said that I had an umbilical
17 hernia.
18     Q.    Do you recall ever being diagnosed with a
19 right inguinal hernia?
20     A.    I don't understand.
21     Q.    Do you recall anyone ever telling you or
22 informing you that you had a right inguinal hernia?
23     A.    I don't know if I've ever heard those
24 words.

1    Q.    How about lung cancer?  Have you ever had
2  lung cancer?
3    A.    Before this diagnosis of cancer?
4    Q.    I'm sorry.  Yes.  That was my fault.
5  Before this diagnosis of cancer in December or the
6  diagnosis in April 2016, have you ever been
7  diagnosed with lung cancer?
8    A.    No, sir.
9    Q.    Are you a former smoker?
10    A.    No, sir.
11    Q.    Do you recall ever being diagnosed with
12  liver failure?
13    A.    I believe that's what took me to the
14  hospital in 2001.
15    Q.    When you say "the hospital in 2001," is
16  that Ottawa?
17    A.    Yes, sir.
18    Q.    To your recollection, was there any kind
19  of formal diagnosis or -- Was there any kind of
20  formal diagnosis?
21    A.    I don't recall.
22    Q.    Do you recall whether you received any
23  treatment for that?
24    A.    I don't recall that either.

1    Q.    To your knowledge, have you ever been
2  diagnosed with any type of cancer prior to the most
3  recent diagnosis?
4    A.    No, sir.
5    Q.    You have a history of kidney stones;
6  correct?
7    A.    Yes, sir.
8    Q.    And you testified that you had blood in
9  your urine prior to December 19th, 2015; correct?
10    A.    Yes.
11    Q.    Do you remember testifying yesterday that
12  the only time you recall visible blood in your
13  urine was 2003?
14    A.    Approximately, yes.
15    Q.    You weren't incarcerated at that time; is
16  that correct?
17    A.    Pardon me?
18    Q.    You were not incarcerated in 2003;
19  correct?
20    A.    I was.
21    Q.    You were incarcerated in 2003?
22    A.    Yes.
23    Q.    Where were you at that time?
24    A.    East Moline Correctional Center.

1    Q.    Yesterday, from what you testified, it
2  sounded like that was never diagnosed formally;
3  correct?
4    A.    I believe it wasn't.
5    Q.    It just went away on its own then?
6    A.    No.
7    Q.    Okay.  Could you explain that?
8    A.    They did not order tests.
9    Q.    Okay.  So did you continue to urinate
10  blood for an extended period of time?
11    A.    No, sir.
12    Q.    Okay.  So it did go away on its own?
13    A.    That I could see, yes.
14    Q.    And you said it wasn't painful?
15    A.    No, sir.
16    Q.    Did you have any pain at that time?
17    A.    Back pain.
18    Q.    Was that associated with your degenerative
19  disc disease?
20    A.    I believe so.
21        I could use a bathroom break whenever you
22  can stop.
23        MR. FORNOFF:  You just answered my
24        question, so we might as well take one

1        now.
2        MR. STROM:  Sounds good.
3        (Whereupon at this point in the
4        proceedings, a recess was held from 10:04
5        a.m. to 10:12 a.m., after which the
6        following proceedings were conducted:)
7  BY MR. FORNOFF:
8    Q.    We can go back on the record.  Thank you.
9        Do you recall approximately how many times
10  you were diagnosed with kidney stones between 2000
11  and 2010?
12    A.    No.
13    Q.    Would you say it was multiple times?
14    A.    I don't know if I was ever diagnosed with
15  kidney stones between then and then.
16    Q.    But you would agree that you had chronic
17  hematuria or blood in your urine; correct?
18        MR. STROM:  Objection; form.
19        THE WITNESS:  Answer it?
20        MR. STROM:  Yes.
21        THE WITNESS:  Yes.  Once.  Maybe more than
22        once.  A couple of times just briefly.
23  BY MR. FORNOFF:
24    Q.    When you say "a couple of times just

1  briefly," was that -- How were you aware that it
2  was a couple of times briefly?
3      A.   I don't understand what you mean by that.
4      Q.   Okay.  So you said at least once, a couple
5  of times briefly that you had blood in your urine;
6  correct?
7      A.   Yeah.  I don't know if it was more than
8  one day.  But it was the day I arrived at East
9  Moline Correctional Center.  That morning, I woke
10 up and I was urinating blood.
11     Q.   And that was in 2003?
12     A.   Yes.
13     Q.   And then from 2003 to 2010, to your
14 knowledge, you never had any blood in your urine?
15     A.   Not that I could see.
16     Q.   Not visible?
17     A.   Yes.
18     Q.   Was any ever reported to you that you took
19 a urinalysis or a urine dipstick test and it
20 confirmed you had blood in your urine?
21     A.   I don't recall.
22     Q.   Do you recall being seen at Ottawa
23 hospital in 2007?
24     A.   Yes.

1      Q.   And, do you remember, was that for kidney
2  stones or any other condition associated with
3  kidney stones?
4      A.   I had reported that I had kidney stones
5  while I was in prison, and then he ordered this
6  test, but I believe it was something to do with my
7  bladder.
8      Q.   Did they do any testing or tell you any
9  kind of formal diagnosis?
10     A.   They tested.  I don't know if I ever got
11 the results, formal, the results.
12     Q.   So prior to being released from your
13 incarceration in 2007, it sounds to me like you
14 were diagnosed with kidney stones or you had some
15 sort of associated medical problem; is that
16 accurate?
17     A.   I don't know if I was ever diagnosed with
18 them.
19     Q.   Okay.  That's fair.  Why did you first
20 seek treatment?
21     A.   I was urinating blood the first day I got
22 to East Moline Correctional Center.
23     Q.   So you got to East Moline Correctional
24 Center in 2003?

1      A.   Mmm-hmm.
2      Q.   And you were urinating blood; correct?
3      A.   Yes.
4      Q.   You were released in 2007?
5      A.   Yes.
6      Q.   And prior to your release, you sought
7  treatment for urinating blood; is that accurate?
8      A.   Yes.
9      Q.   And then you went to Ottawa when you were
10 released in 2007 to continue your treatment?
11     A.   Yes.
12     Q.   So can you explain the four-year gap?  I
13 mean, were you receiving treatment consistently
14 within IDOC during that time period for urinating
15 blood?
16          MR. STROM:  Object to the form.
17          THE WITNESS:  No.  I didn't receive
18          treatment.
19 BY MR. FORNOFF:
20     Q.   So you urinated blood a couple of times
21 maybe and you told me when you first arrived in
22 2003 and then decided four years later to seek
23 treatment at Ottawa?
24          MR. STROM:  Object to the form.

1          THE WITNESS:  I told my primary physician
2          about it and he said that we will schedule
3          a test.
4  BY MR. FORNOFF:
5      Q.   And to your knowledge, you never saw any
6  blood in your urine, any visible blood in your
7  urine in between 2003 and 2007 when you told your
8  doctor in Ottawa?
9          MR. STROM:  Object to the form.
10         THE WITNESS:  I don't believe so.
11 BY MR. FORNOFF:
12     Q.   So, to your recollection, did he provide
13 any tests?
14     A.   One test.
15     Q.   Do you recall what kind of test it was?
16     A.   I had to take stuff to empty my bowels
17 out, and they scanned -- I don't know what the name
18 of it is, but I believe it was for my -- if I
19 evacuated my bladder all the way.
20     Q.   And, to your knowledge, you were never
21 given those test results?
22     A.   Not that I know of.
23     Q.   So you don't know whether you received any
24 kind of formal diagnosis?

1    A.    No.  I didn't receive a diagnosis that I
2  recall.
3    Q.    Do you recall having kidney stones or any
4  kind of blood in your urine after 2010?
5    A.    Visual blood?  No.
6    Q.    Aside from December 19th, 2015, I assume?
7    A.    Yes.
8    Q.    So let's go between then.  From 2010 to
9  December 19th, 2015, to your knowledge, you never
10  had any visible blood in your urine?
11    A.    Repeat the dates again.
12    Q.    Sure.  From 2010 when you entered IDOC
13  until December 19th, 2015, you had no visible blood
14  in your urine; is that correct?
15    A.    Correct.  I didn't have any visible blood.
16    Q.    To your knowledge, were you ever informed
17  that you had blood in your urine?
18    A.    Yes.
19    Q.    Do you recall, was that on multiple
20  occasions?
21    A.    I don't recall.
22    Q.    Was it more than once?
23    A.    I don't recall.
24    Q.    Do you, by chance -- Could you look at

1  your Exhibit 1 from yesterday.  It was your journal
2  from 2014.
3         MR. STROM:  Just to make a quick record, I
4    don't have my own full copy of that with
5    me today, so I'll do my best to follow
6    along.
7         MR. FORNOFF:  If you need to see it, just
8    let me know.  I can throw you over mine.
9         MR. STROM:  I appreciate that.
10         MR. FORNOFF:  Whatever we need to do.
11         MR. STROM:  Thanks, Dan.
12         MR. FORNOFF:  No problem.
13  BY MR. FORNOFF:
14    Q.    Can you look at January 3rd for me?
15    A.    Yes.
16    Q.    And can you tell me or read for me what
17  that middle portion on January 3rd says?
18    A.    It says, "Had blood in urine for Dr. E."
19         No.  It "had blood," which means blood
20  test, "and urine for Dr. E."  And 3:00 a.m. is when
21  they take them.
22    Q.    Do you know the results or have any idea
23  what those blood tests resulted in?
24    A.    No.  I know I was going to see her.

1  That's why she orders them beforehand.
2    Q.    If your medical records said on
3  January 26th, 2012, that you've had chronic
4  hematuria since 2003, would that be inaccurate?
5    A.    Repeat that again, please.
6    Q.    If your medical records were to say that
7  you've had chronic hematuria since 2003, would that
8  be inaccurate?
9    A.    Inaccurate or accurate?  I didn't --
10    Q.    Inaccurate.
11    A.    I don't understand the "hematuria."  I
12  don't understand that term.
13    Q.    Okay.  Well, what I'm saying is blood in
14  your urine.
15    A.    Well, I guess what I'm trying to say is
16  does it mean visible blood or microscopic traces of
17  blood?
18    Q.    Both.
19    A.    I know I had probably been told I had
20  microscopic traces of blood in 2012.
21    Q.    And prior to 2012, you don't remember ever
22  being told that you had at least microscopic traces
23  of blood in your urine?
24    A.    Not since 2003 at East Moline Correctional

1  Center that I recall.
2    Q.    Did you do any kind of urinalysis or
3  anything to your recollection in 2003?
4    A.    I'm sure I gave a urine sample.
5    Q.    You don't recall any other kind of testing
6  that was given to you in 2003?
7    A.    I was given a prostate exam for the same
8  problem.
9    Q.    So you recall being told at least at some
10  point in 2012 that you had at least microscopic
11  traces of blood in your urine; is that accurate?
12    A.    Yes.
13    Q.    How about in 2013?  Do you recall a
14  urinalysis where you were informed that you had
15  blood in your urine?
16    A.    I don't recall.
17    Q.    You don't recall?  If your medical records
18  said on February 23rd, 2013, that you took a
19  urinalysis and it was positive for blood in your
20  urine, do you believe that would be accurate?
21    A.    I would have to see it.  But it could be.
22    Q.    How about if you took a urinalysis on
23  May 4th, 2013, and it noted that you had a large
24  amount of blood in your urine, would that be

1  accurate?
2      A.    May 4th, 2013?  Was that the date you
3  said?
4      Q.    Correct, sir.
5      A.    I don't recall.
6      Q.    Do you have any reason to believe it would
7  be inaccurate?
8      A.    I don't recall.
9      Q.    You don't recall whether there's a reason
10 to believe it would be inaccurate or accurate?
11     A.    I don't understand.
12     Q.    Okay.  Do you have any basis to believe
13 that a urinalysis result would be incorrect?
14     A.    No, I don't think so.
15     Q.    So when we looked at your Exhibit 1, which
16 was your diary from 2014, on January 3rd, you
17 testified that you had a blood and urine test.  Do
18 you recall the results of your urinalysis?
19     A.    H-m-m.  Well, if I look at it, it says Dr.
20 E renewed my vitamin pills, said my kidney function
21 was improved, though I -- they said though I drank
22 tons of tea and coffee.
23           So it didn't say anything about
24 urinalysis.  And I don't -- No, I don't know.

1      Q.    If you look at the entire month of January
2  for me, do you see any other doctor visits or
3  anything like that?
4      A.    I'm seeing Nurse Practitioner Rector on
5  the 8th.
6      Q.    And did you write down what that was for?
7      A.    Well, it says my A1C.  I did not write
8  that it was diabetic clinic, but I always get my
9  A1C results during my diabetic clinic.
10          At the time, I believe they had combined
11 diabetic clinic and blood pressure clinics, and
12 that's probably why I have my blood pressure
13 written down also.
14     Q.    So aside from January 8th and January 9th
15 where you see Dr. E, do you see any other
16 indication that you saw the doctor or any kind of
17 sick call?
18     A.    On the 2nd, Angel is the nurse
19 practitioner, and so I spoke to her, whether I seen
20 her formally or I seen her at my place of work in
21 the correctional center.  I don't know if I seen
22 her formally in the office.
23     Q.    Did you see any indication in January of
24 2014 that you were experiencing any kind of pain?

1      A.    No, sir.
2      Q.    I'm sorry?
3      A.    No, sir.
4      Q.    You testified yesterday about what you
5  would write in this book.  And is it accurate to
6  say that if you were experiencing some sort of
7  discomfort or pain that you would typically write
8  that in this diary?
9      A.    No.
10     Q.    No, you wouldn't?
11     A.    Not always.  Back pain has been consistent
12 since 2001.  I would write up every page.
13     Q.    Well, you testified yesterday that back
14 pain -- your lower back pain was different than
15 when you had kidney stone pain; correct?
16     A.    Yes.
17     Q.    Okay.  And so if you had kidney stone
18 pain, it's fair to say that that would have been
19 reflected somewhere in this diary in January of
20 2014?
21     A.    Repeat that again, please.
22     Q.    Sure.  So you testified just now that if
23 you had back pain, since it was so consistent that
24 was associated with your degenerative disc disease,

1  that you wouldn't write it every day in here; is
2  that right?
3      A.    Yes, sir.  I would not write that every
4  day.
5      Q.    But the pain associated with kidney stones
6  was a different type of pain; correct?
7      A.    Yes, sir.  It is a different type of pain.
8      Q.    So if you would have had that pain, it
9  would have been out of the ordinary; correct?
10     A.    Yes.  It would be out of the ordinary.
11     Q.    And so isn't it true that you would have
12 reflected that in this diary?
13     A.    Yeah.  I believe I would have reflected it
14 in the diary.
15     Q.    So if I told you that on January 20th,
16 2014, your blood urinalysis that you took was
17 positive for blood, do you have any reason to
18 believe that's inaccurate?
19     A.    Rephrase that.
20     Q.    Sure.  If your urinalysis taken
21 January 14th, 2014, showed positive for blood, do
22 you have any reason to believe that that is
23 inaccurate?
24     A.    I don't believe it would be inaccurate.

1    Q.    So would you agree with me that if I told
2 you you tested positive for blood in your urine in
3 January 2014, but at the same time you weren't
4 experiencing any kind of kidney pain; is that fair?
5    A.    I believe so.
6    Q.    Okay.  So you would at least agree with me
7 that there was times where you had blood in your
8 urine or blood was present in your urine where you
9 didn't experience any kind of kidney pain; is that
10 fair?
11   A.    Yes.
12   Q.    Can you tell me, you transferred to
13 Taylorville in March of 2014; is that accurate?
14   A.    Yes, sir.  I transferred then.
15   Q.    Do you recall having a renal ultrasound in
16 July of 2014?  And since you have your book, go
17 ahead and look and see if you recall having that.
18   A.    July.
19   Q.    Well, first, is it fair to say that you
20 don't have an independent recollection of 2014?
21 You have to rely on your notes to answer my
22 questions for 2014; is that fair?
23   A.    For the dates, yes.
24   Q.    Do you have an independent recollection of

1 whether you received a renal ultrasound in July of
2 2014?
3    A.    I don't know if it was July.
4    Q.    Do you believe that you received one in
5 2014?
6    A.    Yes.
7    Q.    And would you agree that as a result of
8 that ultrasound, you ultimately received
9 lithotripsy in October of 2014?  Does that sound
10 accurate?
11   A.    I believe that would be accurate.
12   Q.    And is it true that after that time, you
13 had a second lithotripsy on December 30th, 2014?
14 Does that sound accurate?
15   A.    That sounds accurate, yes, sir.
16   Q.    Can you tell me, what did you receive
17 those lithotripsies for?
18   A.    What was the procedure done for?  Was that
19 what you were asking?
20   Q.    Correct.
21   A.    Kidney stones.
22   Q.    Do you recall, independently first, and
23 then we'll go to your notes if you can't recall, do
24 you recall seeing Dr. Einwohner in March of 2015?

1    A.    No.
2    Q.    Okay.  Can we look at Exhibit 2?
3          And what you're looking at now, Exhibit 2,
4 that is your diary, your daily calendar for 2015;
5 is that fair?
6    A.    Yes, sir.
7    Q.    Okay.  If you could, take a look at
8 March 19th, 2015.
9    A.    March 19th.  Is that what you said, sir?
10   Q.    Yes, sir.
11   A.    March 19th?
12   Q.    Yes.
13   A.    Okay.
14   Q.    Does that indicate that you saw Dr.
15 Einwohner on that day?
16   A.    Unless I'm looking on the wrong page, I
17 don't see it on the 19th.
18   Q.    Do you know, is there anything else that
19 you see in March that indicates that you did see
20 Dr. E or Dr. Einwohner, I'm sorry?
21   A.    In my side notes, it says, "Took blood for
22 Dr. E on March 9th, second time in 30 days."
23         MR. STROM:  While there's no question
24         pending, I just want to make a

1         clarification for the record, and that is
2         I have electronic copies now of these
3         exhibits that I'm referencing, so I have
4         complete copies.
5 BY MR. FORNOFF:
6    Q.    So if there's a medical record that was
7 entered on March 19th, 2015, that indicates that
8 you saw Dr. Einwohner, do you have any reason to
9 believe that that would be inaccurate?
10   A.    No.  I don't believe it would be
11 inaccurate.
12   Q.    Is it possible that at that time maybe you
13 just didn't enter it in your diary?
14   A.    Very possible.
15   Q.    Do you recall reporting in March 2015 that
16 you had passed some hard particles around the end
17 of January 2015?
18   A.    I don't recall that.
19   Q.    Do you recall at any point independently
20 in your memory passing some hard particles after
21 those two lithotripsies in 2014?
22   A.    Yes, I did pass hard particles after the
23 lithotripsies.
24   Q.    Do you recall, was there any bleeding

1  associated with that?

2      A.     No visible.

3      Q.     All right.  Do you recall self-reporting

4  to Dr. Einwohner that you had passed some hard

5  particles and had some bleeding?

6      A.     I very well could have, but I don't

7  recall.

8      Q.     And -- But to your recollection, you saw

9  no visible blood when you passed these particles?

10     A.     I don't recall seeing blood.

11     Q.     Do you recall in July of 2015 whether you

12 received a CT scan on your abdomen and pelvis?

13     A.     The dates again, sir?

14     Q.     I said July 2015.  I can be more specific

15 if you'd like.

16     A.     Please be specific.

17     Q.     So what I see in your medical records was

18 July 2nd, 2015, you received a CT on your abdomen

19 and pelvis.  Do you recall that?

20     A.     I don't know if those are the correct

21 dates, but I know I had a CT for my kidney stones

22 at some point.

23     Q.     It was -- Was it around July 5th, 2015,

24 that you received your pacemaker?

1      A.     Yes.

2      Q.     Do you recall independently the

3  approximate dates which you were hospitalized in

4  July for that?

5      A.     Yes.  Now, it does come back.  I came -- I

6  went to the hospital July 2nd.

7      Q.     Do you recall receiving some testing when

8  you went to the hospital on July 2nd?

9      A.     Yes, I do.

10     Q.     And do you recall whether you received a

11 CT scan on that day?

12     A.     I don't recall, but I know I had a myriad

13 of tests.

14     Q.     And, ultimately, you remained in the

15 hospital and received the pacemaker on, was it

16 July 5th, 2015?

17     A.     I believe it was the 6th.  It was a

18 Monday.

19     Q.     If I were to tell you that your medical

20 records stated you received a CT of your abdomen

21 and pelvis on July 3rd, 2015, do you have any

22 reason to believe that would be inaccurate?

23     A.     No.  I don't believe it would be

24 inaccurate.

1      Q.     Do you recall being told or informed that

2  your had any type of kidney stone while you were in

3  the hospital for your heart condition?

4      A.     I do not recall being told that I had a

5  kidney stone.

6      Q.     Do you recall passing any kidney stones

7  between July 2015 and December 2015?

8      A.     No, I do not recall passing kidney stones

9  then.

10     Q.     To your knowledge, would that be something

11 that you would typically place in your diary?

12     A.     Yes.

13     Q.     And is that because it was painful to pass

14 a kidney stone?

15     A.     Yes.  It is very painful.

16     Q.     Okay.  So that would stand out and be

17 something that you put in your diary; correct?

18     A.     If it was large enough, yes.

19     Q.     To your knowledge, between July and

20 December 2015, is there any indication in your

21 diary that you did pass a kidney stone?

22     A.     Without looking, I don't think I entered

23 anything like that.  I can look, if you'd like.

24     Q.     Sure.

1      A.     What was the end date, sir?

2      Q.     December 2015.

3      A.     Nothing about stones.  Large blood clots,

4  yes.  Stones, no.

5      Q.     Large blood clots.  Can you tell me, when

6  did you have entries for large blood clots?

7      A.     The one I see is on the 24th of December.

8      Q.     So it was after the initial December 19th,

9  2015, urination where you saw visible blood in your

10 urine?

11     A.     Mmm-hmm.

12            MR. RUPCICH:  Is that a "yes"?

13            THE WITNESS:  Yes, sir.  I'm sorry.

14 BY MR. FORNOFF:

15     Q.     How about between December 2015 and

16 April 2016?  Do you recall whether you passed any

17 kidney stone?

18     A.     No kidney stones that I recall.

19     Q.     As I remember, yesterday you testified

20 that you were having visible blood in your urine

21 fairly consistently during that time period, but

22 the clots didn't start until after April 2016.  Is

23 that accurate?

24     A.     I may have said that, but I wasn't

1  completely accurate on that maybe, because I do
2  have an entry on December 24th that said I had a
3  large blood clot.  But up to that point, I didn't
4  write anything else about blood clots.
5      Q.    If you had passed a kidney stone, would
6  you have told medical staff that you did so?
7      A.    Yes.  If I had passed a kidney stone, I
8  definitely would have told them.
9      Q.    I'm going to switch up the topic for just
10  a minute and talk to you about something else.  I
11  want to talk to you about your grievances; okay?
12      A.    Yes, sir.
13      Q.    Is it fair to say when you filed your
14  Complaint, you were complaining about a delay in
15  diagnosis; is that accurate?
16      A.    Yes.
17      Q.    A delay in obtaining surgery; is that
18  fair?
19      A.    Yes, that is -- A delay in surgery, yes.
20      Q.    A delay in receiving Votrient; is that
21  accurate?
22      A.    I believe so.
23      Q.    And a delay in receiving Opdivo; is that
24  also accurate?

1      A.    I believe so, yes.
2      Q.    And you filed two grievances; is that
3  correct?
4      A.    I don't recall the number.
5      Q.    You don't recall the number?
6      A.    I don't know if I filed one for the Opdivo
7  or not.
8      Q.    Okay.  Well, have you kept copies of all
9  your grievances that you filed?
10      A.    In my records, yes.
11      Q.    In your records.  To your recollection,
12  have you seen more than two?
13      A.    I believe so.
14      Q.    You believe there was a third?
15      A.    Yes.
16      Q.    All right.  Well, yesterday we went over
17  one of them, and that was labeled as Exhibit 5.  Do
18  you recall going over that?
19      A.    Yes.  The emergency grievance.
20      Q.    Can you take a look at that grievance for
21  me that's labeled Exhibit 5?
22      A.    Yes, I can.  Mmm-hmm.
23      Q.    Is that your handwriting?
24      A.    Yes.

1      Q.    You testified earlier you did this on your
2  own; is that right?
3      A.    Yes, sir.
4      Q.    Okay.  And the date that this was filed
5  was May 16th, 2016; correct?
6      A.    Yes.  I filed it May 16th.
7      Q.    Would you agree that this grievance was
8  filed as a result of your alleged delay in
9  obtaining surgery?  Is that accurate?
10      A.    Yes, I did file it because of my delays.
11      Q.    And the relief requested, you wrote,
12  "Surgery!  Get HCU Wexford to stop dragging this
13  out and give me surgery"; is that accurate?
14      A.    I don't see that on there.
15            Oh, yeah I do see it.  I'm sorry.  Yes.
16  That is accurate.
17      Q.    Would you agree that you didn't mention
18  Kathy Galvin's name in this grievance?
19      A.    I did not mention Kathy Galvin.
20      Q.    How about Dr. Einwohner?
21      A.    No, I did not mention Dr. Einwohner.
22      Q.    How about Dr. Nawoor?
23      A.    No, I did not mention Dr. Nawoor.
24      Q.    Is there any complaint in this grievance

1  about your alleged delay in diagnosis of cancer?
2      A.    No.
3      Q.    Do you recall testifying yesterday that
4  Dr. Severino told you that you required surgery
5  within two weeks?
6      A.    He said, "ASAP.  No more than two weeks."
7      Q.    Okay.  And when he told you that, that was
8  on your April 14th, 2016, visit; is that accurate?
9      A.    Yes, it was April 14th.
10      Q.    And in this grievance, if you look five
11  lines down, would you agree that you wrote, "He
12  said, 'It needs to be in no more than a few
13  weeks!'"?
14      A.    Yes, I did write that.
15      Q.    So, to your knowledge, do you believe it
16  was a few weeks or no more than two weeks?
17      A.    To me, a few weeks is two weeks.
18      Q.    So you put that in quotes.  Do you believe
19  that's more likely the accurate statement of what
20  he said, or is it what you said prior?
21      A.    I believe it's close to what he said.
22      Q.    So the other grievance that I am tracking
23  that you have that I've seen was filed on
24  March 16th, 2017.  Do you recall that grievance?

1    A.    I don't know if the date's accurate, but
2  ...
3    Q.    If I show you the grievance, would that
4  help refresh your recollection?
5    A.    Yes, sir.
6    Q.    Is that your handwriting on that
7  grievance?
8    A.    Yes.
9    Q.    Okay.  It's your recollection -- Did you
10 do this on your own, as well?
11   A.    Yes.
12   Q.    And you filed this grievance; is that
13 accurate?
14   A.    Yes.
15   Q.    And the date of this grievance is
16 March 16th, 2017?
17   A.    Yes, it is.
18   Q.    Does this look like an accurate reflection
19 of your grievance?
20   A.    Give me a second to read it over.
21         Yes, it is my writing and it's accurate.
22   Q.    Can you tell me generally what's the
23 complaint in that grievance?
24   A.    That there was a delay in approving my

1  treatment for the immunotherapy treatment Opdivo.
2    Q.    Do you see any complaint in there that you
3  didn't receive your Votrient timely?
4    A.    No, sir.
5    Q.    To your knowledge, did you file a
6  grievance about a delay in obtaining Votrient?
7    A.    I don't recall filing a delay on that.  I
8  may have.
9    Q.    You don't know for sure?
10   A.    No.  I don't recall.
11         Do you need this back?
12   Q.    I'm going to talk to you about the alleged
13 delays in obtaining Votrient and Opdivo.  We went
14 over them yesterday in a little bit of detail.  If
15 you need your journals to remember that date,
16 that's fine.  Just let me know, and we'll put those
17 in front of you; okay?
18         Do you remember testifying that you were
19 prescribed Votrient on October 19th, 2016?  Is that
20 the accurate?
21   A.    I believe so.
22   Q.    Was that the first time that you were
23 informed that you may require chemo; is that true?
24   A.    I think the chemo had been discussed

1  before that.
2    Q.    It had been discussed but not prescribed;
3  is that accurate?
4    A.    Yes.
5    Q.    So the first time that you were actually
6  prescribed chemotherapy was on October 19th, 2016;
7  correct?
8    A.    Not correct.
9    Q.    Not correct.  Okay.  Can you tell me when
10 was the first time that chemotherapy was
11 prescribed?
12   A.    I believe it was for the Opdivo, whatever
13 day that was.  Votrient is a pill.  I don't believe
14 it's chemotherapy, to my knowledge.  I'm not a
15 medical doctor, but I don't believe that that's
16 chemotherapy.
17   Q.    Okay.  Well, let's just cancel that.  I'll
18 start over.  That was my fault.
19         On October 19th was the first time you
20 were prescribed any medication to treat your
21 cancer; correct?
22   A.    Yes.
23   Q.    Okay.  And that was the first time, to
24 your knowledge, that a medication for cancer may be

1  necessary; correct?  Or an alternative treatment
2  besides surgery?
3    A.    Incorrect.
4    Q.    Okay.  Explain, please.
5    A.    I knew that I was going to have to have
6  some type of treatment.  There was a CAT scan
7  needed to be done.  You know, before they could do
8  anything, there had to be tests and everything like
9  that.
10   Q.    When you went into surgery, did you
11 believe you were going to need any kind of
12 treatment afterwards, aside from medical testing?
13 I'm talking about either medication, chemotherapy,
14 additional surgery, anything like that?
15   A.    From what I recall Dr. Severino telling
16 me, that when the surgery is over, I should be good
17 to go.
18   Q.    So, no?
19   A.    No, I don't believe I was going to have to
20 have it.
21   Q.    Okay.  And the first time you were
22 informed that you needed additional treatments,
23 whether it be a pill, chemotherapy, additional
24 surgery, anything like that was October 19th, 2016;

1  correct?

2      A.    No, that's not correct.

3      Q.    Okay.  When was the first time you were

4  told you were going to need additional treatment?

5      A.    When I woke up from surgery, Dr. Severino

6  indicated that they had found cancer on my --

7  possible cancer on my liver; that he was going to

8  have to have a follow-up and we'd go from there.

9      Q.    So on the day when you woke up and he told

10  you that, did he say, "We need to give you

11  chemotherapy"?

12      A.    He did not say chemotherapy.

13      Q.    Did he say, "We need to give you any kind

14  of medication"?

15      A.    No.  He just said he was going to follow

16  up with an oncologist.

17      Q.    Do you recall, did you see an oncologist?

18      A.    Yes, eventually.

19      Q.    Do you recall seeing Dr. Guaglianone on

20  September 22nd, 2016?

21      A.    I'm not sure of the date without looking.

22      Q.    Go ahead and ...

23      A.    2016?

24            MR. STROM:  Exhibit Dean No. 3.

1            THE WITNESS:  September 22nd, you said,

2            sir?

3  BY MR. FORNOFF:

4      Q.    Yes.

5      A.    Let me see.  I don't have it written down

6  as the 22nd.

7      Q.    So if you look at the 15th of September,

8  it looks to me like --

9      A.    Oh, yes, it is.  It's above there.  I was

10  looking at the 22nd.  I'm sorry.  Oncologist.

11  September 22nd.  He ordered a biopsy.

12      Q.    And do you recall whether he informed you

13  that a liver biopsy was necessary prior to using

14  Votrient?

15      A.    I don't recall if those were the exact

16  words.

17      Q.    If that's located or present in his

18  medical note, do you have any reason to believe

19  that would be inaccurate?

20      A.    No, I wouldn't have any reason to believe

21  it would be inaccurate.

22      Q.    Do you know, is it correct that you were

23  given a liver biopsy on October 3rd, 2016?

24      A.    October 3rd?  Biopsy?  Yes.  12:40 p.m.

1      Q.    And then you would agree on October 19th,

2  2016, you were prescribed Votrient; is that

3  correct?

4      A.    Yes.

5      Q.    Okay.  And you would agree that your first

6  treatment was on November 21st, 2016; is that

7  accurate?

8      A.    No.  That's not accurate.

9      Q.    Okay.  Can you tell me when your first

10  treatment was?

11      A.    December -- or November 18th, 2016.

12      Q.    I remember you testified yesterday that

13  you were sick almost immediately; is that correct?

14      A.    48 hours later, yes.

15      Q.    And you at one point -- You said it turned

16  your hair white; is that correct?

17      A.    Yes.

18      Q.    Okay.  And you had vomiting; correct?

19      A.    Yes, sir.

20      Q.    And at one point, I remember you

21  testifying yesterday that you felt like you were

22  dying; is that correct?

23      A.    Yes.  That would be the term I used.

24      Q.    Now, if you recall, on March 2nd, 2017,

1  Votrient was discontinued; is that correct?

2      A.    I'm not accurate on the date without

3  looking, but ...

4      Q.    But you would agree that approximately

5  three months later, the Votrient was discontinued;

6  correct?

7      A.    Approximately three months later, I had a

8  CAT scan, and it indicated that it was not working.

9      Q.    So you would agree that the Votrient -- or

10  at least you were informed that the Votrient was

11  ineffective; is that correct?

12      A.    Yes, it's correct.  I was informed that it

13  wasn't working.

14      Q.    Could you tell me then what harm there was

15  in the alleged delay of obtaining Votrient, if it

16  was ineffective?

17            MR. STROM:  Object to the form.  You can

18            answer.

19            THE WITNESS:  It was one more month that I

20            could have been on a different drug that

21            worked.

22  BY MR. FORNOFF:

23      Q.    So you -- Once you were discontinued off

24  Votrient, you went to Opdivo; is that correct?

1   A.   Eventually.
2   Q.   To your recollection, was Opdivo
3   prescribed on March 2nd, 2017?
4   A.   Without looking at the records, I would
5   not know if the date was accurate.
6   Q.   Okay.  And if you were able to look at
7   your journal, would that refresh your recollection?
8   A.   Yes.
9   Q.   Will you provide Exhibit 4, I believe?
10       MR. STROM:  Exhibit Dean 4, that's right.
11       THE WITNESS:  Yes, I would say prescribed
12       that on the 2nd.
13  BY MR. FORNOFF:
14  Q.   And to your recollection, what was the
15  first day that you received it?
16  A.   First day I received it -- it's written
17  down somewhere.  I seen this yesterday -- on the
18  22nd of March.
19  Q.   And from my understanding, what you
20  testified to yesterday, Opdivo was essentially
21  administered every two weeks by IV; is that
22  correct?
23  A.   Yes, it was by IV.
24  Q.   And you left the facility to go get that

1   IV; is that correct?
2   A.   Yes.  Medical writ to Decatur Medical
3   Center.
4   Q.   And you would agree that, again, Opdivo
5   was eventually discontinued because it was
6   ineffective for at least a portion of your cancer;
7   is that correct?
8   A.   Yes, that's correct.  It didn't work on
9   all of it.
10  Q.   Okay.  And to your recollection, was that
11  discontinued on May 12th, 2017?
12  A.   Without looking, I wouldn't know, but --
13  Q.   You can go ahead and ...
14  A.   It says on May 12th, "Got results
15  from CAT scan.  Opdivo not working.  Started
16  Torisel.  It's once a week."
17  Q.   And to your recollection, Torisel was
18  started on that day; is that correct?
19  A.   Yes.  I believe I got my first IV that
20  day.
21  Q.   And now are you continued on Torisel
22  today?
23  A.   To this day, yes.
24  Q.   And you go once a week for Torisel?

1   A.   Yes.  I go tomorrow.  Every Thursday I go.
2   Q.   So you were prescribed Opdivo on
3   March 2nd, 2017.  The first time you obtained it
4   was March 22nd, 2017.  And ultimately, it was
5   discontinued on May 12th of 2017 because it was
6   ineffective.
7        So could you tell me again what harm did
8   you obtain by the alleged delay if medication was
9   ineffective?
10       MR. STROM:  Object to the form.
11       THE WITNESS:  Well, if you add up the
12       first one and the second one, we're almost
13       at two months that I could have been on
14       the Torisel and it would have been
15       working.
16  BY MR. FORNOFF:
17  Q.   Do you recall testifying yesterday about
18  your understanding of collegial review?
19  A.   Yes.  I do recall.
20  Q.   And you recall saying that it's your
21  belief there had to be a collegial review to get or
22  obtain approval for certain treatments?
23  A.   I do believe that would be accurate.
24  Q.   And isn't it true that you're -- you don't

1   know -- I think you labeled the term
2   "decisionmakers" that were on the phone -- but you
3   don't know who the decisionmakers are?
4   A.   I definitely do not know who they are.
5   Q.   Is it fair to say that you're unaware of
6   what conversations were going on behind the scenes
7   to get approval for your medications?
8   A.   I would say that would be a fair statement
9   that I do not know who or when they were talking
10  about.
11  Q.   Do you recall testifying yesterday that
12  Kathy Galvin and Dr. Nawoor tried to convince you
13  to stop treatment and sign a do-not-resuscitate
14  form?
15  A.   Yes, sir, I do recall that.
16  Q.   Do you recall when that was?
17  A.   That was on May 2nd, an hour before I went
18  for my medical writ when Dr. Guaglianone prescribed
19  me Opdivo.
20  Q.   So it would have been May 2nd, 2017; is
21  that accurate?
22  A.   Yes, sir.
23  Q.   So on May 2nd, 2017, at that point, you
24  had been on two medications, Votrient and Opdivo,

Page 250

1  at that time; is that fair?
2      A.    State that again, sir.
3      Q.    So on May 2nd, 2017, after your surgery
4  and since at that time you had been on two
5  medications, Votrient and then Opdivo; is that
6  correct?
7      A.    That is inaccurate.
8      Q.    Okay.  What would be accurate?
9      A.    I was only on Votrient to that point.
10     Q.    On May 2nd, 2017, you were --
11     A.    May -- I'm sorry.  You said May 2nd?
12     Q.    That was the date that you gave me for
13 which that discussion with Dr. Nawoor and Kathy
14 Galvin occurred.  Is that accurate?
15     A.    No.  It's not accurate.  I assumed you
16 said March 2nd.  I did not listen to the question
17 correctly.
18     Q.    Okay.  That's all right.  That's not a
19 problem.  We'll just start that again.
20           So to your recollection, the discussion
21 with Kathy Galvin and Dr. Nawoor where you said
22 that they tried to convince you to stop treatment
23 and sign a do-not-resuscitate form, that occurred
24 on March 2nd, 2017?

Page 251

1      A.    March 2nd, yes, sir.  I'm sorry.
2      Q.    All right.  So is it fair to say that at
3  that time you had only been on the Votrient?
4      A.    Just one, the Votrient.
5      Q.    And, to your recollection, the Votrient
6  was ineffective; correct?
7      A.    They had stated that it wasn't.  I had not
8  talked to Dr. Guaglianone yet.  They read me the
9  radiology reports.
10     Q.    Do you have any reason to believe that
11 they read you a false radiology report?
12     A.    No, I don't have any reason to believe
13 that they would read a false radiology report.
14     Q.    Okay.  And so that radiology report
15 presumably said that the medication was
16 ineffective; is that correct?
17     A.    It said that it increased in size.
18     Q.    And at that time, on March 2nd, 2017, on
19 the Votrient, you were feeling or you described
20 that you felt like you were dying; is that
21 accurate?
22     A.    Yes.
23     Q.    Now isn't it true that when they discussed
24 with you treatment options, you weren't forced to

Page 252

1  stop treatment; is that correct?
2      A.    Who are you referring to as "they"?
3      Q.    Kathy Gavin and Dr. Nawoor.  They didn't
4  force you to stop treatment, did they?
5      A.    They just asked me to sign a release to
6  stop treatment.
7      Q.    But you weren't forced to sign that
8  release, were you?
9      A.    I wasn't forced to.  And I did not sign
10 it.
11     Q.    Okay.  And you said that they informed you
12 if you stopped treatment that they would make you
13 comfortable; is that right?
14     A.    Yes.  He said they would give me
15 medication to keep me comfortable.
16     Q.    So would you agree that they weren't --
17 they didn't force you to stop treatment, which is
18 obvious by the fact that you did change your
19 medication and get Opdivo; that you were given an
20 option of whether you wanted to stop treatment or
21 whether you wanted to continue and try alternative
22 methods; is that true?
23           MR. STROM:  Object to the form.
24           THE WITNESS:  I don't understand the

Page 253

1           question.
2  BY MR. FORNOFF:
3      Q.    Okay.  Let me see if I can reword that for
4  you.  So would you agree that if you weren't forced
5  to stop treatment, that you were at least given an
6  option of whether you wanted to try an alternative
7  treatment?
8      A.    As far as someone giving me an option,
9  they did not give me an option to try another
10 treatment.
11     Q.    Well, you did try another treatment; isn't
12 that correct?
13     A.    Yes.
14     Q.    So you would agree they didn't force you
15 to stop treatment; right?
16     A.    They did not force me to stop it.
17     Q.    Okay.  So wouldn't you agree that that
18 would be being given an option of whether you
19 wanted to continue treatment or stop treatment?
20     A.    I guess that would be fair.
21     Q.    Okay.  And isn't it true that you would
22 want your provider to give you options?  Is that
23 accurate?
24     A.    I definitely would want options.

1     Q.    Okay.  Would you want your provider to
2  tell you that there's only one thing; we're going
3  with that?  Or would you rather have him give you
4  options?
5     A.    I believe I answered that.  But I would
6  want options, yes.
7     Q.    Can you describe, what forms were they
8  trying to get you to sign?  Do you recall what
9  those forms said?
10    A.    They did not put it in front of me, but
11 they said it was a release to stop treatment.
12    Q.    All right.  And that was one form;
13 correct?
14    A.    Yes.
15    Q.    Okay.  And there was another one that was
16 a do-not-resuscitate form; is that accurate?
17    A.    Yes, they asked me if I would like to sign
18 a do-not-resuscitate form, and I said I wanted to
19 be resuscitated at all costs.
20    Q.    Do you remember seeing Dr. Guaglianone on
21 May 12th, 2017?
22    A.    Without seeing my records, I can't recall.
23    Q.    Would it refresh your recollection to look
24 at your records?

1     A.    Yes, sir.
2     Q.    Okay.  You can go ahead and look at your
3  records.  May 12th, 2017.
4     A.    May 12th, 2017.  Yes, I do see that.
5     Q.    Can you read for me, what does it say
6  there?
7     A.    "Got results from CT scan.  Opdivo not
8  working.  Started Torisel.  It's once a week.  Go
9  figure.  It got approved that day."
10    Q.    Do you remember that appointment with Dr.
11 Guaglianone?
12    A.    Yes.  I remember the appointment.
13    Q.    Do you remember any kind of discussion or
14 anything that was said on that day?
15    A.    I remember talking to him.
16    Q.    Do you recall discussing the pros and cons
17 of treatment?
18    A.    Not specifically.
19    Q.    Do you remember him discussing with you
20 whether or not to continue treatment or go with
21 comfort measures?
22    A.    I don't think comfort measures were ever
23 talked about.
24    Q.    Do you remember whether he discussed with

1  you whether you should continue treatment or try --
2  or go with any kind of -- Strike that.
3     Q.    Do you recall whether he gave you an
4  option of whether you wanted to continue with an
5  alternative treatment or stop treatment?
6     A.    I don't recall if he asked me if I wanted
7  to or not.
8     Q.    So if it's located or contained in his
9  medical note that it says, "We talked about the
10 pros and cons of treatment in addition to whether
11 or not to continue treatment or go with comfort
12 measures," do you have any reason to believe that
13 would be inaccurate?
14    A.    If it's in the writing, I would say no.
15    Q.    Do you believe it would be or was
16 inappropriate for Dr. Guaglianone to have that
17 discussion with you?
18           MR. STROM:  Object to the form.
19           THE WITNESS:  State that again, please.
20 BY MR. FORNOFF:
21    Q.    Do you believe it was inappropriate for
22 Dr. Guaglianone to discuss treatment options with
23 you?
24    A.    No.  I believe it was completely

1  appropriate.  He was my doctor.
2     Q.    Do you believe it was inappropriate for
3  him to suggest there's a possible option of
4  discontinuing treatment altogether and using
5  comfort measures?
6           MR. STROM:  Object to the form.
7           THE WITNESS:  Would you state that again,
8           please.
9  BY MR. FORNOFF:
10    Q.    Do you believe it was inappropriate for
11 him to suggest that there was an alternative method
12 of discontinuing treatment and using comfort
13 methods or comfort measures?
14    A.    I don't think it would be inappropriate if
15 that's what he thought.  He's the specialist.
16           Could we take a break again, please, sir?
17    Q.    Yes.  Absolutely.
18           (Whereupon at this point in the
19           proceedings, a recess was held from 11:18
20           a.m. to 11:26 a.m., after which the
21           following proceedings were conducted:)
22 BY MR. FORNOFF:
23    Q.    We'll go back on the record.
24           Mr. Dean, I just want to backtrack real

1  quick and go over a few of the issues we discussed
2  earlier.  I remember you testified that another
3  inmate wrote your Complaint based on something you
4  had provided him; correct?
5      A.    Yes.  He gave me advice on that.
6      Q.    Okay.
7      A.    And he did write it out in his
8  handwriting.
9      Q.    Okay.  And you said that you no longer
10 have a copy of what you gave him; is that right?
11     A.    I do not believe I do.
12     Q.    Okay.  Do you know what happened to that?
13     A.    No, I don't.  I tossed it when I was done.
14 Couldn't read it.  Sloppy.  You can see my
15 handwriting.
16     Q.    Before you filed your Complaint, did you
17 look at the version that he drafted?
18     A.    Yes.
19     Q.    Okay.  And did you happen to go line by
20 line through it and make sure that the content is
21 accurate compared to what you provided that other
22 inmate?
23     A.    Yes.
24     Q.    Okay.

1      A.    I believe so.
2      Q.    Did he make any changes, to your
3  knowledge?
4      A.    Not to my knowledge.
5      Q.    Did you make any changes on the actual
6  Complaint to what the other inmate wrote?
7      A.    No, sir.
8      Q.    When we talked earlier about your
9  employment history, you said that you were at
10 Seneca in 2007; is that right?
11     A.    Yes.
12     Q.    And that you left Seneca approximately the
13 end of 2008.  Is that accurate?
14     A.    I know it was 18 months after I started.
15     Q.    Can you tell me, why did you leave Seneca?
16     A.    I was off parole.
17     Q.    What exactly do you mean by that?  How did
18 parole affect your --
19     A.    Well, I needed to have a job for parole,
20 and I was carrying bags and everything else, and it
21 was painful, and I did what I had to do for my
22 situation.
23     Q.    So did you voluntarily end your employment
24 with Seneca?

1      A.    Yes.
2      Q.    Did you seek any other employment after
3  that?
4      A.    No.
5      Q.    How come?
6      A.    I was in pain all the time.  I was trying
7  to get Social Security Disability.
8      Q.    Were you paid on a salary at Seneca or
9  were you paid hourly?
10     A.    Hourly.
11     Q.    Do you remember what your wage was?
12     A.    I think I started out at 12, and I think I
13 ended up at $13 an hour.
14     Q.    You testified earlier -- I asked you I
15 think very generally did you file tax returns in
16 2007 through 2010.  Do you recall, was the answer
17 to that yes for all of those years?
18     A.    Yes.  My wife and I filed jointly.
19     Q.    Have you filed tax returns since 2010?
20     A.    My wife does.
21     Q.    Was the last year, I suppose, that you
22 would have income, then, would be 2008?  Is that
23 accurate?
24     A.    2008 or '09.

1      Q.    Possibly 2009?
2      A.    Yes.
3      Q.    Okay.  And would that be the last year
4  that you received a W-2 that would provide your
5  income for the year?
6      A.    No W-2.  I was 1099.
7      Q.    It's fair to say, though, since leaving
8  Seneca, you've had no income?
9      A.    No.
10     Q.    No, that's inaccurate, or you've had no
11 income since leaving Seneca?
12     A.    I've had no checks from any place.
13     Q.    No checks.  So is there a difference --
14 Did you receive money in an alternative manner?
15     A.    I'm in prison.
16     Q.    Okay.  Could you explain that a little
17 further for me?
18     A.    Well, my charge is selling cocaine.
19     Q.    Do you recall approximately what your
20 total earnings were for the last full year that you
21 were employed and received a 1099?
22     A.    No.
23     Q.    All right.  Would that information be
24 present on your 1099?  Would you agree that that is

Page 262

1   an accurate statement?
2       A.    Yes.
3       Q.    Do you have any approximate idea of what
4   it would be?  Was it above $20,000?
5       A.    Jointly, we filed for more than $20,000.
6       Q.    Okay.
7       A.    I don't know if mine was or not.
8       Q.    Okay.  Excluding your wife's salary from
9   there, whatever your wife earns, you have no
10  approximate idea of what your earnings were in the
11  last full year that you worked?
12      A.    I don't recall what it would be.
13      Q.    You talked about after you left your
14  employment at Seneca you wanted to apply for Social
15  Security Disability; is that correct?
16      A.    Yes.  I don't know if I ever did, but that
17  was the plan.
18      Q.    Okay.  So you are unaware of whether you
19  actually entered an application?
20      A.    I did not enter an application.  I spoke
21  to a couple of lawyers.
22      Q.    And, to your knowledge, what was the basis
23  of the disability in which you were going to try to
24  obtain Social Security?

Page 263

1       A.    Cardiomyopathy, congestive heart failure,
2   three times enlarged heart.  My back problems were
3   not diagnosed at the time.
4       Q.    Did you ever have a physician certify your
5   disability, to your knowledge?
6       A.    Specifically for Social Security?  No.
7       Q.    When you were talking about Dr.
8   Einwohner yesterday, at one point you said there
9   was a time where she was your go-to person; is that
10  correct?
11      A.    Yes, sir.
12      Q.    And when you say "go-to," can you explain
13  that for me a little bit?
14      A.    Well, could I go into detail?
15            MR. STROM:  (Counsel nods head
16            affirmatively).
17            THE WITNESS:  Okay.  So in prison, you go
18      to your primary care doctor, and sometimes
19      he tells you to drink more water and lose
20      weight.  That's his solution to every
21      problem.
22      And if I tell Dr. Einwohner I was having a
23      problem, he would -- she would refer me to
24      him for that problem, and then I would get

Page 264

1            looked at for that problem.
2   BY MR. FORNOFF:
3       Q.    So you would agree at one point, she was
4   very helpful in getting you seen for any kind of
5   problem that you had?
6       A.    Yes, at one point, she was very helpful.
7       Q.    Okay.  And then at some point you stopped
8   going to see Dr. Einwohner; isn't that true?
9       A.    Yes.
10      Q.    And is it true that you refuse visits or
11  exams with Dr. Einwohner now?
12      A.    Yes.
13      Q.    Do you recall the last time you saw Dr.
14  Einwohner?
15      A.    I don't recall the exact date, and I don't
16  know if I have it written down anywhere.  It would
17  be in like 2018, I believe.
18      Q.    You understand that you have kidney
19  problems; correct?
20      A.    I understand that, yes.
21      Q.    And you understand that Dr. Einwohner is a
22  renal specialist; is that accurate?
23      A.    Yes.
24      Q.    And yet you refuse to see her?

Page 265

1       A.    Yes, I refuse to see her.
2       Q.    Okay.  Despite being aware that she's a
3   specialist for your kidneys and that you have
4   kidney issues, you still refuse any kind of
5   treatment from her?
6       A.    Yes, I refuse because she wouldn't do
7   anything for me.
8       Q.    What do you mean by she wouldn't do
9   anything for you?
10      A.    Well, when -- Can I elaborate?
11            MR. STROM:  (Counsel nods head
12            affirmatively).
13            THE WITNESS:  December 19th, when I
14      started urinating blood, the 22nd, I went
15      to sick call.  23rd I seen Dr. Nawoor.  I
16      seen her approximately a week and a half
17      later.  I would have thought she would
18      have been told about it.  I had to tell
19      her about it.  I seen her various times
20      before my diagnosis of cancer.  I seen her
21      a week and a half after my diagnosis of
22      cancer.  Once again, she's my kidney
23      specialist.  She didn't even know I had
24      kidney cancer.

1  BY MR. FORNOFF:
2      Q.    You understand that she's not your cancer
3  specialist; correct?
4      A.    No, but she's my kidney specialist.
5      Q.    Okay.  And she's not your primary care
6  physician; correct?
7      A.    No, she's not my primary care.
8      Q.    And do you have any idea how she obtains
9  records or learns of your current health status?
10     A.    I would have no knowledge of that.
11     Q.    Yesterday, we went over four of your
12  diaries that we looked at, your daily calendar
13  entries.  I believe you testified that you had done
14  them since 2010; is that accurate?
15     A.    Yes, sir.
16     Q.    Do you have copies from 2010 to 2013?
17     A.    I don't believe I have all of the way back
18  to 2010.
19     Q.    Do you have an idea of what you do have?
20     A.    I think I've got 2014.  I may have 2013.
21     Q.    What happened to the other ones?
22     A.    I've transferred and stuff.  I've lost
23  them.
24     Q.    You said you may have 2013, though?

1      A.    I may have.
2      Q.    Would that be located in your housing unit
3  somewhere?
4      A.    In my correspondence box, if I have it.
5      Q.    So we've looked at some of your journals.
6  It looks like on at least some of them you kind of
7  doodle.  Is that fair?
8      A.    Definitely fair.
9      Q.    Okay.  And you did that on the covers of
10  some of them; is that accurate?
11     A.    Yes, sir.
12     Q.    Okay.  When did you do that?  When you got
13  them?
14     A.    Oh, no.  During the course of the year.
15     Q.    Okay.  And you testified that at some
16  points your wife may have entered some, or some of
17  the writing in there may be hers; is that accurate?
18     A.    Yes.  Mostly on the front cover.  But she
19  may have in some of these years did the dates, you
20  know, birth dates, anniversaries, stuff like that.
21     Q.    And we've went through -- I know we went
22  through in detail yesterday, and then we kind of
23  went through some of them today.  Would it be a
24  fair statement to say that you didn't always write

1  down everything; correct?
2      A.    No, I did not always write everything
3  down.
4      Q.    For example, you know, there was -- we
5  went over earlier a medical note where there was no
6  entry by you on that date.  And so is it fair to
7  say that you didn't track every single medical
8  visit?
9      A.    Yes, it's fair to say.
10     Q.    So would you agree if there's a conflict
11  between your diary and the medical record that the
12  medical record would more accurately reflect the
13  treatment that you obtained on that day?
14     A.    I would have to agree with that.
15     Q.    Could you tell me, what's the current
16  housing unit situation for you?  Are you housed in
17  a cell with one cellie?
18     A.    No.  I'm housed in a room -- I'm in a dorm
19  with -- The wing has 100 people.  There's five
20  rooms.  Each room has 20 people in it.
21     Q.    Is it set up like a bunk bed-type
22  situation, 20 to a room?
23     A.    Yes.  It would be 10 bunk beds in the
24  room.

1      Q.    And do you have a space for your specific
2  property?
3      A.    Yes.  Under my bed and at the end of my
4  bed.
5      Q.    And what is it?  Like a closet or a box of
6  some kind?  What --
7      A.    No.  It's a fiberglass box approximately
8  -- The property box is approximately 2-1/2 x 3
9  feet, and the correspondence box is approximately
10  -- I'm just guessing -- size 18 x 24.
11     Q.    Okay.  And you're allowed to keep those on
12  you?
13     A.    Yes.  Yes.  You have limited space.  Very
14  limited space.
15     Q.    Do you have locks for those?
16     A.    Yes.
17     Q.    Do you keep your calendar and the diary on
18  you at all times?
19     A.    On my person?
20     Q.    Yes.
21     A.    No, sir.  In my property.
22     Q.    Okay.  So you keep it locked up most of
23  the time?
24     A.    Yes, sir.  All the time.  I live in a den

1  of thieves.
2      Q.   On your 2017 planner, you wrote, "Stay
3  out! Personal" on that; fair?  On the cover of
4  that?
5      A.   Probably.
6      Q.   Did you have any concerns that anyone else
7  was looking through your planner?
8      A.   No.  I just doodle weird things once in a
9  while.
10     Q.   Okay.  As you sit here today, have any of
11 your physicians talked to you or given you a
12 prognosis on your condition?
13     A.   By prognosis, do you mean how much time do
14 I have left?
15     Q.   Yes.
16     A.   Dr. Severino indicated a couple of
17 different things, which he was my surgeon.  Dr.
18 Guaglianone will not give me a time.  I've asked.
19 He said, "It varies."
20     Q.   Has Dr. Guaglianone ever given you the
21 median or average survival rate for someone with
22 your condition?
23     A.   I don't believe he's ever gave a time.  I
24 seen in one of my records where he said,

1  "Prognosis: Fair."
2      Q.   Do you know, since the time that you were
3  diagnosed with this condition to now, has any
4  physician or treater given you or changed your
5  prognosis at all?
6      A.   I know I've changed from Stage III to
7  Stage IV.  There was a question whether I was Stage
8  III or IV when I came in.  I believe Dr.
9  Guaglianone said I'm Stage IV metastasized cancer.
10     Q.   But, to your knowledge, no one's ever told
11 you, you know, "This is how long we expect you to
12 live," and then changed that at a later date?
13     A.   No, other than Dr. Severino.  I think he
14 changed it once or twice.
15     Q.   Okay.  Could you explain that for me?
16     A.   I think at one time he said I had a
17 35 percent chance of living five years.  Another
18 time, he said if we resected the kidney, that I
19 should be able to roll out of prison, because at
20 the time I had five and a half years left.
21     Q.   Would you tell me your release date?
22     A.   Currently, it is 2021, June 24th.
23     Q.   Is it true that Dr. Nawoor put in a form
24 to have you released early due to your medical

1  condition?
2          MR. STROM:  Object to the foundation.
3          THE WITNESS:  Can I answer?
4          MR. STROM:  (Counsel nods head
5          affirmatively).
6          THE WITNESS:  I have no knowledge of that.
7          I wish he would.
8  BY MR. FORNOFF:
9      Q.   I just want to go over the treatment
10 overall from the start of your cancer or the start
11 of the symptoms until surgery.  This all started on
12 December 29th, 2015, when you saw blood in your
13 urine; is that accurate?
14     A.   Please state the date again.
15     Q.   December 19th, 2015.  Is that accurate?
16     A.   Yes, sir.
17     Q.   Okay.  And you didn't request care until
18 December 23rd, 2015; is that accurate?
19     A.   I went to sick call on the 22nd.
20     Q.   Okay.  So you requested care on the 22nd
21 then?
22     A.   Yes, sir.
23     Q.   Okay.  Why did you wait those three days?
24     A.   I was hoping it would stop.

1      Q.   So the first time you saw Dr. Nawoor for
2  this issue was on December 23rd, 2015; correct?
3      A.   December 23rd?  Yes, sir.  Correct.
4      Q.   And at that time, do you recall him
5  ordering a urinalysis and CBC?
6      A.   Yes, he did.
7      Q.   Okay.  Do you remember doing a urine
8  dipstick that day?
9      A.   I don't recall if he did.
10     Q.   Okay.  If it's in the medical records, is
11 it fair to say that that would be accurate?
12     A.   Yes.  It would be fair.
13     Q.   Do you remember on January 7th, 2016,
14 doing the second urinalysis?
15     A.   I don't recall the date.  But I know I did
16 another one.
17     Q.   Do you recall on February 2nd, 2015, doing
18 ultrasound?
19     A.   I don't recall the date, but I did do an
20 ultrasound.
21     Q.   If it's in your medical records that you
22 did an ultrasound on February 2nd, 2016, do you
23 have any reason to believe that's inaccurate?
24     A.   No.  I have no reason to believe it would

Page 274

1  be inaccurate.
2      Q.    Do you remember the results of that
3  ultrasound?
4      A.    I read them once and it said no mass was
5  seen in blood flow something.  It could be -- I'm
6  probably butchering it pretty bad.
7      Q.    If you'd look at what's labeled Exhibit 3
8  that was issued yesterday, I believe that was your
9  2016 monthly planner.  Can you tell me if there's
10  any entry on February 2nd, 2016?
11      A.    February 2nd.  Where was it?  Yes, it
12  says, "Urine mostly clear."
13      Q.    And that's on February 2nd, 2016?
14      A.    Oh, I'm sorry.  I was looking in January.
15      Q.    That's all right.  I think 2016 is one of
16  the ones that --
17      A.    Yeah, that's inverse or whatever.
18      Q.    It was kind of back to back, so ...
19      A.    February 2nd.  No, I have nothing.
20      Q.    Okay.  So you would agree that that day is
21  blank in your journal; correct?
22      A.    Yes.  Completely blank.
23      Q.    Okay.  And now if the medical results show
24  that you were given an ultrasound on February 2nd,

Page 275

1  2016, do you have any reason to believe that would
2  be inaccurate?
3      A.    No.  I don't have any reason to believe it
4  would be inaccurate.
5      Q.    When you filed your initial Complaint, I
6  noticed that you didn't mention the ultrasound.
7  Could you explain why?
8      A.    They didn't find any results for me to
9  write in there.
10      Q.    So you would agree that on February 2nd,
11  2016, the results of the ultrasound showed no renal
12  mass lesions or evidence of hydronephrosis?
13      A.    Yes.
14          MR. STROM:  Object to the form.
15  BY MR. FORNOFF:
16      Q.    You would agree, though?
17      A.    Yes.
18      Q.    So despite having a clear ultrasound on
19  February 2nd, 2016, would you agree that Dr. Nawoor
20  still referred you to see Dr. Severino, the
21  urologist?  That's true; correct?
22          MR. STROM:  Object to the form.  You can
23          answer.
24          THE WITNESS:  Eventually, he did.

Page 276

1  BY MR. FORNOFF:
2      Q.    What was the date that you first saw Dr.
3  Severino?  Do you recall?
4      A.    Without looking at my records, I wouldn't
5  know the exact date.  I'm guessing it was
6  March 10th.
7      Q.    Okay.  Could you look at your notes for me
8  and confirm?
9      A.    March 10th.  Yes, on March 10th.  I did
10  write down that I was going out to see -- excuse my
11  language -- "dick doctor" is what I wrote in my
12  notes.
13      Q.    Okay.  Do you have any idea of when you
14  were initially scheduled to see Dr. Severino for
15  the first time?
16      A.    No.  I do not have any idea when I was
17  scheduled.
18      Q.    Because you're unaware of how the
19  scheduling process works; is that true?
20      A.    I don't know how they schedule things.
21      Q.    So you don't know who schedules things
22  either, do you?
23      A.    I know Chad from Medical Records is the
24  one that does the work.

Page 277

1      Q.    Okay.  And by "the work," you mean --
2      A.    Phone calls, stuff like that.
3      Q.    If your medical records stated that you
4  were supposed to initially be seen by Dr. Severino
5  on March 21st, do you have any reason to believe
6  that would be inaccurate?
7      A.    I would say probably not.
8      Q.    You would agree that you were seen instead
9  on March 10th, 2016; is that right?
10      A.    I definitely seen him on March 22nd.  I
11  don't know if I was scheduled for the 21st or not.
12      Q.    So you saw Dr. Severino on March 10th,
13  2016.  And the next treatment that I can tell was
14  on April 12th, 2016, you received the CT scan of
15  your abdomen and pelvis; is that accurate?
16      A.    Yes.
17      Q.    And then to your knowledge, April 14th,
18  2016, was the day that you saw Dr. Severino again;
19  is that right?
20      A.    Yes, I did see him on April 14th.
21      Q.    And that was the day that you were
22  diagnosed or at least informed that you had cancer;
23  correct?
24      A.    Yes, sir.

1    Q.    And do you know, did Dr. Severino --
2  Strike that.
3         You would agree that Dr. Severino
4  determined that surgery was necessary; correct?
5    A.    Yes.
6    Q.    You would agree that he also determined
7  that he wanted you to see a vascular surgeon prior
8  to conducting the surgery; isn't that true?
9    A.    I don't know if that's accurate.
10   Q.    Do you know -- Did you see a vascular
11 surgeon?
12   A.    Eventually.
13   Q.    Is it true that on May 9th, 2016, you saw
14 a cardiac specialist to get clearance for your
15 surgery?
16   A.    For the first time, yes.
17   Q.    And to your knowledge, did Dr. Severino
18 request a second CT scan of your abdomen and pelvis
19 and chest prior to your surgery?
20   A.    To my knowledge, no. I believe it says
21 was Dr. Nawoor ordered it.
22   Q.    Do you have any idea or basis to believe
23 that Dr. Nawoor ordered it based on Dr. Severino's
24 recommendations?

1    A.    I would have no knowledge on who ordered
2  it or how that order went.
3    Q.    Would you agree that on June 8th, 2016,
4  you obtained a CT scan that was ordered?
5    A.    Yes, I did receive my second CAT scan that
6  day.
7    Q.    Would you agree that on June 14th, 2016,
8  you saw a Dr. Hazelrigg?
9    A.    H-m-m. June 14th? Hazelrigg? I don't
10 have it written down. But would he be the thoracic
11 -- however you say it -- the chest doctor?
12   Q.    The thoracic --
13   A.    Yeah.
14   Q.    I have trouble with that one, too. Do you
15 recall -- I know that you wrote that down somewhere
16 in your diary. We went over it yesterday. Do you
17 have a date your wrote it down?
18   A.    I have on June 20th, "Seen chest cracker.
19 Notching new." I believe by "nothing new," I meant
20 that he seen no complications.
21   Q.    All right. So you would agree that at
22 least at some point in June, possibly June 20th,
23 based on your diary, that you saw Dr. Hazelrigg,
24 the chest cracker; is that accurate?

1    A.    Yes.
2    Q.    Okay. Would you agree that on July 12th,
3  2016, you saw Dr. Pathak for a final cardiac
4  approval prior to the surgery?
5    A.    I believe it was July 12th, but I'd have
6  to double check. Yeah. "Seen heart doctor for
7  second time to be okayed for surgery."
8    Q.    Were you ever informed that you received a
9  second CT scan based on the fact that you were
10 unable to receive an MRI due to your pacemaker?
11   A.    Say it again one more time, please.
12   Q.    Were you ever informed that you were --
13 Well, we'll do it this way. Were you ever informed
14 that you were unable to get an MRI because of your
15 pacemaker?
16   A.    Yes. I was informed that I couldn't have
17 it because of my pacemaker.
18   Q.    Okay. In the alternative, there was
19 another CT scan. Is that how that worked, to your
20 knowledge?
21   A.    I don't believe a second one was ever
22 ordered because of that. The second one was
23 ordered because of the delays.
24   Q.    What's your basis for believing that?

1    A.    Well, he said he was going to take a CAT
2  scan and we'd go from there. And when I seen him
3  on June 9th, he didn't know -- I don't think he
4  went by the second CAT scan, because the second CAT
5  scan shows I have liver cancer or possible liver
6  lesions. I can't pronounce it, hypo
7  something-something. And he said that everything's
8  going to be good to go.
9    Q.    When you are saying "he," are you
10 referring to --
11   A.    Dr. Severino. I'm sorry.
12   Q.    You're all right. I just wanted to make
13 sure we had it clear for the record.
14        So the last treatment that we talked
15 about, you saw Dr. Pathak for cardiac approval, and
16 you agreed to that, correct, on July 12, 2016?
17   A.    Yes, sir. I did see Doctor -- I can't
18 pronounce his name -- Pathak.
19   Q.    And then on July 19th, 2016, that's when
20 your surgery was done; correct?
21   A.    Yes, sir. I had surgery on that day.
22   Q.    Do you recall how many individuals were
23 present for your surgery as far as the physicians?
24   A.    No. They wheeled me in, and I remember

1  seeing the clock, and I only seen Dr. Severino, and
2  then I woke up afterwards.
3      Q.    Have you since learned or has anyone ever
4  informed you how many physicians were present for
5  your surgery?
6      A.    My recollection was it was Dr. Severino.
7  I don't know the name of the cardiovascular
8  surgeon, and I don't know if Hazel, whatever you
9  said his name was, was there, but somebody in his
10 place was there.
11     Q.    So, to your knowledge, three physicians
12 were present?
13     A.    I believe that it was three surgeons.
14     Q.    Yesterday you testified that before
15 surgery you were informed that there was a
16 50 percent chance that you could die on the table;
17 is that right?
18     A.    Yes.  Dr. Severino indicated that my --
19 Originally, it was 15 to 25 percent chance.  But
20 because of the advancement of the vena cava, that I
21 had a 50 percent chance of dying on the table.
22     Q.    So you would agree that prior to surgery
23 that they needed to take the necessary precautions;
24 is that accurate?

1      A.    I would have to agree to that.
2      Q.    So you would agree that it was necessary
3  to see that cardiac specialist prior to the
4  surgery?
5      A.    Yes.
6      Q.    And you would agree that you needed those
7  CT scans prior to the surgery; is that accurate?
8      A.    Yes.
9      Q.    Okay.  And you would agree that you needed
10 to be cleared by Dr. Hazelrigg; is that accurate?
11     A.    Yes, I would agree to that.
12     Q.    And you would agree that you needed
13 cardiac approval from Dr. Pathak prior to entering
14 surgery?
15     A.    Yes.
16     Q.    And you would agree that all of those were
17 needed or were necessary to help prevent you from
18 dying on the table; is that accurate?
19           MR. STROM:  Object to the form.
20           THE WITNESS:  I don't know if it was going
21           to prevent me from dying on the table.
22           Because the heart doctor, I seen him just
23           if my heart was going to be strong enough
24           to survive surgery.

1  BY MR. FORNOFF:
2      Q.    Would you agree that that would at least
3  lessen the risk of you dying on the table to have
4  these approvals?
5           MR. STROM:  Object to the form.
6           THE WITNESS:  I don't know if it would
7           reduce the risk or not.  I couldn't agree
8           to that.
9  BY MR. FORNOFF:
10     Q.    Do you remember the date that you returned
11 to the facility?
12     A.    It was the 28th of July.
13     Q.    Do you remember, did you see Kathy Galvin
14 that day?
15     A.    I'm sure she was somewhere there.  In
16 fact, I did see her that day.  She had a very bad
17 cold, and she was by me.  I was thinking, oh,
18 that'll be fine.  I'll get a cold from -- as soon
19 as I return to Healthcare with all the stitches and
20 staples.
21     Q.    Do you recall seeing Dr. Nawoor on that
22 day?
23     A.    I don't actually recall seeing him, but
24 I'm sure I did.

1      Q.    Isn't it true that you thanked both Kathy
2  Galvin and Dr. Nawoor for the treatment in the
3  surgery?
4      A.    I don't recall that.
5      Q.    You don't recall thanking them when you
6  returned to the facility?
7      A.    No.
8      Q.    Do you recall feeling grateful to them for
9  getting you to the surgery?
10     A.    No.
11     Q.    How about do you recall feeling grateful
12 to them for any of the treatment that they
13 provided?
14     A.    Any treatment excluding the surgery?  Or
15 all of it?
16     Q.    Any treatment at all.
17     A.    She's done a few things for me.
18     Q.    Can you explain that?
19     A.    Out of the four times I had scabies since
20 I have been here, she may have gotten me in to see
21 Dr. Nawoor and got him to do something about it.
22           And the day after Christmas, I came over
23 there with a swelled nose and my eyes almost all
24 the way swollen.  She made sure that I had already

1  been scheduled to Dr. Nawoor. That's what I was
2  there for anyway. But she said that, "If you
3  haven't, I was going to get you in right then."
4      Q.    You said the day after Christmas. Was
5  that 2017?
6      A.    Yes.
7      Q.    Do you recall, were you hospitalized soon
8  after that? I think we --
9      A.    That day.
10     Q.    Okay. So you were sent out that day and
11 hospitalized. And that was the one time that you
12 did not receive your treatment; is that correct?
13 Your chemo treatment?
14     A.    Yes. That was the only time I've missed
15 it.
16     Q.    And that was at the basis of the
17 oncologist's recommendation?
18     A.    Yes.
19     Q.    Do you believe that Dr. Nawoor or Kathy
20 Galvin are responsible for the current state of
21 your health?
22           MR. STROM: Object to the form. You can
23           answer.
24           THE WITNESS: Yes.

1  BY MR. FORNOFF:
2      Q.    Is it your belief that the current state
3  of your cancer is attributed to something he did or
4  didn't do?
5            MR. STROM: Object to the form.
6            THE WITNESS: Something he didn't do.
7  BY MR. FORNOFF:
8      Q.    And what was that?
9      A.    Delay me treatment all the way through the
10 line and especially after the surgery -- after I
11 was diagnosed, surgery was never scheduled.
12     Q.    Okay. But you testified earlier that you
13 don't know who schedules any of those doctors;
14 isn't that true?
15     A.    I know when Kathy Galvin says something is
16 to be done, it gets done. So if she wanted me to
17 get out, she would have got me out. Also Lisa
18 Mincy. She was the Healthcare Administrator. They
19 both looked at my samples of urine the whole time.
20     Q.    Is it your belief that Kathy Galvin has
21 the ability to schedule you for a specialist's
22 appointment?
23     A.    I believe she has the ability to move it
24 along, expedite it.

1      Q.    Has any physician ever discussed with you
2  or informed you that you were harmed by the timing
3  of your surgery?
4            MR. STROM: Object to the form.
5            THE WITNESS: It's never been discussed
6            with any of the physicians.
7  BY MR. FORNOFF:
8      Q.    How about any specialists?
9            MR. STROM: Object again to the form.
10           THE WITNESS: No, sir.
11 BY MR. FORNOFF:
12     Q.    Has any specialist ever discussed with you
13 that your condition was negatively impacted by the
14 timing of your medications?
15           MR. STROM: Object to the form.
16           THE WITNESS: By the timing? No.
17 BY MR. FORNOFF:
18     Q.    Do you recall testifying yesterday that
19 after you were released on July 28th, 2016, that it
20 was your belief that you were supposed to return to
21 have your staples removed in seven days?
22     A.    Yes.
23     Q.    So it was seven days, to your knowledge?
24     A.    Yes. In seven days. I was supposed to

1  have the staples out in seven days.
2      Q.    And it was seven days after your release
3  from the facility?
4      A.    Yes.
5      Q.    And, to your knowledge, how many days did
6  it take?
7      A.    Approximately 13 to 14 days. On Day 7,
8  Nurse Galvin told me that it had not been scheduled
9  yet.
10     Q.    And then, ultimately, you did have your
11 staples removed, though; correct?
12     A.    Yes.
13     Q.    Did any physician or specialist tell you
14 that the delay, the alleged delay negatively
15 impacted your condition?
16           MR. STROM: Object to the form.
17           THE WITNESS: It wasn't discussed. I was
18           just glad to have them out.
19 BY MR. FORNOFF:
20     Q.    Was there any issue removing the staples?
21           MR. STROM: Object to the form.
22           THE WITNESS: I believe I had more pain
23           taking them out. The skin had grown over
24           a few of them.

1  BY MR. FORNOFF:
2      Q.    So you believe you went through more pain.
3  Do you know for sure?
4      A.    I know it was painful, and they said it
5  wouldn't have been if -- the nurse that was
6  extracting them said that usually skin doesn't grow
7  over them.
8      Q.    To your knowledge, did your surgery site
9  heal appropriately?
10         MR. STROM:  Object to the form.
11         THE WITNESS:  It's definitely healed.
12  BY MR. FORNOFF:
13     Q.    Did you have any type of infection?
14     A.    No.  No infection.
15     Q.    You talked about yesterday that you
16  testified there was some sort of glue or something
17  on the side.  Do you recall that?
18     A.    Yes.  On the part where they cut my
19  sternum, that doctor put it back together with
20  glue.  The part that Dr. Severino did all the way
21  across here, he stapled it together.
22     Q.    With there Steri-Strips put on; do you
23  know?
24     A.    Not until after the staples were taken

1  out.
2      Q.    How long did you use the Steri-Strips?
3      A.    I was told to leave them on until they
4  fell off.  And they eventually fell off.  A couple
5  of them fell off two or three days later.  The
6  remainder, probably within one week.
7      Q.    You testified about you pulled off the
8  glue; is that correct?
9      A.    There was parts that was flaking.  And,
10  yeah, I would just -- you know -- It looked like
11  dried skin.  Pulled it off, the glue.
12     Q.    Was that what you were advised to do?
13     A.    Yes.  I don't know if I was advised to.
14  But it was sticking up.  Your wash rag would catch
15  on them, that type of thing.
16     Q.    Do you recall in your time within IDOC
17  ever refusing treatment?
18     A.    Yes.
19     Q.    Do you have any idea approximately how
20  many times you refused treatment?
21     A.    Several.
22     Q.    If I were to say that your notes reflect
23  that you refused a nurse sick call visit on January
24  23rd, 2012, do you have any reason to believe

1  that's inaccurate?
2      A.    Say that again.
3      Q.    If your medical notes say that you refused
4  a nurse sick call visit on January 23rd, 2012,
5  would that be accurate?
6      A.    I'm sorry; say the date again.
7      Q.    January 23rd, 2012.
8      A.    That I refused -- Sick call visits are
9  something that I would initiate, so I can't imagine
10  that I could have refused something that I would
11  have to initiate.
12     Q.    Why do you refuse care?
13     A.    As I explained yesterday, when you take a
14  car to a mechanic and he messes your car up, do you
15  want to go back to that mechanic that you don't
16  trust in?  And I believe that -- I have no
17  confidence in Dr. Nawoor or any of his staff.
18     Q.    Do you have confidence in outside
19  specialists?
20     A.    I definitely have confidence in Dr.
21  Guaglianone.
22     Q.    Do you recall April 15th, 2013, refusing a
23  visit for a urology appointment?
24     A.    Say the date again.

1      Q.    April 15th, 2013.
2      A.    Yes.
3      Q.    You admit that you refused to go outside
4  for a urology appointment?
5      A.    Yes.
6      Q.    Now even though you refused that visit,
7  you were scheduled for another urology appointment
8  on June 4th, 2013.  Does that sound accurate?
9      A.    I'm not sure of the dates.  But I know I
10  was scheduled for a couple of them.  If you want me
11  to elaborate, I will.
12     Q.    Would you agree that that June 4th, 2013,
13  visit, the urology appointment, you refused that,
14  as well?
15     A.    June 4th -- I'm not sure of the date, but
16  ...
17     Q.    Do you recall being questioned by a nurse
18  about why you were refusing?
19     A.    Yes.
20     Q.    Okay.  Do you remember replying, "I'm
21  scared.  I don't want to go.  I'm not going now or
22  later."
23     A.    I don't know about the "or later."  But I
24  may have said that.  I know I said I was scared,

1  because I'm definitely scared to have the scope put
2  you know where.
3      Q.    And you understand that you were
4  instructed at that time that this was the second
5  time that you have canceled a urology appointment?
6      A.    Yes.
7      Q.    And you were informed at that time that
8  you probably won't be able to be rescheduled due to
9  refusals; do you recall that?
10     A.    I don't recall those words.
11     Q.    If your medical records reflect that, do
12 you agree that that's what happened?
13     A.    I would agree that's what she may have
14 wrote down.  I don't know if that's what she said.
15     Q.    So I know yesterday you said that you
16 trust Dr. Guaglianone; correct?
17     A.    Yes, I do trust Dr. Guaglianone.
18     Q.    I noticed you didn't mention Dr. Severino.
19 Have you lost confidence in Dr. Severino?
20     A.    Yes.
21     Q.    Why did you lose confidence in Dr.
22 Severino?
23     A.    Because I've read the radiology reports
24 that was of the CAT scan that was done on June 8th,

1  and it says that I definitely have some sort of
2  thing going on with my liver.  And during surgery,
3  I think he could have took a biopsy and sped up any
4  procedures that he should have and eventually were
5  done.  And he told me afterwards, after the
6  surgery, that he had -- "Oh, we found something
7  that looks like cancer on your liver."
8          So from my assumption, if he read that
9  radiology report, as you -- I'm sure you have a
10 copy of, you can see that it says I have something
11 on my liver, and he did nothing about it.
12     Q.    Prior to entering Taylorville, what
13 facility were you at?
14     A.    The very last one before Taylorville was
15 Pinckneyville Correctional Center.
16     Q.    Who was your physician at that location?
17     A.    Dr. Shah and also Nurse Angel Rector --
18 Nurse Practitioner Angel Rector; I'm sorry.
19     Q.    Did you have confidence in their ability
20 to treat you?
21     A.    In Nurse Angel Rector, yes.
22     Q.    How about Dr. Shah?
23     A.    No, sir.
24     Q.    Prior to -- was it Pinckneyville?  I'm

1  sorry.
2      A.    Pinckneyville Correctional Center, yes.
3      Q.    Prior to Pinckneyville, where were you?
4      A.    I was at Lawrence Correctional Center.
5      Q.    Who was your physician there?
6      A.    Dr. Fenoglio.
7      Q.    I'm not sure of the spelling on that one.
8  Do you have that one?
9      A.    I'm going to guess F-E-N -- I don't know.
10 F E N-N-O.
11     Q.    We'll find out.
12         MR. RUPCICH:  Fenoglio, F-E-N-O-G-L-I-O.
13 BY MR. FORNOFF:
14     Q.    What were your feelings on him as a
15 physician?
16     A.    I didn't have many thoughts about him.  I
17 didn't have any major medical things going on,
18 emergency type things going on at the moment.
19     Q.    When you were incarcerated in East Moline
20 in 2003, and you urinated blood, you said that you
21 did seek treatment; is that correct?
22     A.    Yes.
23     Q.    Do you remember who your physician was?
24     A.    I don't recall his name.  If I heard it, I

1  would know it.
2      Q.    Does Dr. William Rankin sound familiar?
3      A.    Rankin, yes.  It was Rankin.
4      Q.    Okay.  And what's your confidence in him
5  as a physician?
6      A.    Overall, not very much.
7      Q.    In 2007 when you were released to 2010
8  when you were incarcerated again in IDOC, were you
9  obtaining medical care in that time period?
10     A.    The dates again, sir?
11     Q.    From 2007 to 2010.
12     A.    Outside?  Yes.
13     Q.    And where were you seeking medical care at
14 that time?
15     A.    My primary care doctor, Dr. Love.  I had
16 been in Ottawa Community Hospital and Loyola
17 Medical Center.
18     Q.    So you would agree with me that your
19 treating physician in 2000 to -- when you were
20 incarcerated in 2003, your primary care, was that
21 Dr. Love; is that correct?  In Ottawa?
22     A.    State that again.
23     Q.    2000 to 2003 when you were out, it was Dr.
24 Love who was treating you, correct, at Ottawa

Page 298

1  Regional Health?
2      A.    I was incarcerated in 2002 and 2003.
3      Q.    Okay.  So Dr. Love was just 2000 and 2001?
4      A.    Yes.  And then from '07 to 2010.
5      Q.    I'm just trying to get an accurate
6  timeline for who your treating physicians were.  So
7  2000, 2001, it was Dr. Love at Ottawa; correct?
8      A.    Mmm-hmm.
9      Q.    Okay.  And that's a "yes"?
10     A.    Yes, it is a "yes."  I seen Dr. Harney one
11 time, which they used to be a group, and then Dr.
12 Harney sent me to Dr. Love, and then he became my
13 primary care.
14     Q.    And then from that point on, you were
15 incarcerated, and your primary care physician was
16 Dr. Rankin while at East Moline; correct?
17     A.    Yes.  I was at Menard -- what do you call
18 it -- the Menard, the medium security Menard.  I
19 don't know the doctor's name there for a month and
20 a half.  I was at Dixon for nine months.  I don't
21 remember the doctor there.  But when I did get to
22 East Moline Correctional Center, it was Dr. Rankin.
23     Q.    Do you remember being treated at all by a
24 physician at Dixon?

Page 299

1      A.    I seen him for clinics and that type of
2  stuff.
3      Q.    How about at Menard?  Do you remember
4  seeing any kind of physician at Menard?
5      A.    Yes.  But, once again, for a clinic.
6      Q.    Is that the only treatment that you
7  obtained while at Menard and Dixon?
8      A.    Yes.
9      Q.    And once you were released in 2007, your
10 primary care again from 2007 to 2010 would have
11 been Dr. Love?
12     A.    Yes.
13     Q.    Then when you were incarcerated in 2010,
14 was it Lawrence right off the bat?
15     A.    In R&C for 12 days.  I seen some sort of
16 physician as an intake, you know, physical, maybe.
17 And then Lawrence for 15 months, which would be Dr.
18 Fenoglio.  And then Pinckneyville would have been
19 Dr. Shah from 2012, I think, until March 2014.
20 That would have been Dr. Shah and Nurse
21 Practitioner Angel Rector.
22     Q.    And then here in Taylorville in 2014?
23     A.    Here in Taylorville, the first doctor I
24 seen that was on staff was Dr. Gauen.

Page 300

1      Q.    How do you feel about Dr. Gauen?  Are you
2  confident in his ability to treat you?
3      A.    He treated me for scabies and stuff.  I
4  would have to say yeah, he did all right.
5      Q.    And then Dr. Nawoor took over in
6  December 2015; is that accurate?
7      A.    No.  There was a doctor -- There were
8  several doctors.  I don't know the name of all of
9  them, but one of them was Dr. Maddox, and he
10 treated me for my third and fourth round of
11 scabies, and he allowed me to have them for seven
12 months the last time.
13     Q.    So were you confident in his ability to
14 treat you?
15     A.    No, sir.
16     Q.    Was it Dr. Nawoor then after Dr. Maddox?
17     A.    And then Dr. Nawoor came into the picture.
18 There were several others during the Maddox time
19 that they had come in that I don't recall their
20 names.  At least two others.
21        MR. FORNOFF:  All right.  Could we take a
22        break real quick?
23        MR. STROM:  Sure.
24        (Whereupon at this point in the

Page 301

1        proceedings, a recess was held from 12:25
2        p.m. to 12:32 p.m., after which the
3        following proceedings were conducted:)
4     MR. FORNOFF:  So we don't have any further
5     questions.  Thanks for your time, Mr.
6     Dean.  We've going to go turn it over
7     right now to Kaitlyn; okay?
8        THE WITNESS:  Thank you.  You're welcome.
9              CROSS EXAMINATION
10 BY MS. CLARK-JOSEPH:
11     Q.    Hi, Mr. Dean.  My name is Kaitlyn
12 Clark-Joseph.  I represent Defendant Lisa Mincy in
13 this case.
14     A.    Hello.
15     Q.    As you know, I'm appearing by video.  Can
16 you hear me okay?
17     A.    Yes, ma'am.  Loud and clear.
18     Q.    Okay.  Great.  I haven't noticed any
19 issues with a lag in the video or anything like
20 that, but if at any time you can't hear me or you
21 think that there's been some delay, you've missed
22 something I've said, please let me know, and I'll
23 do the same for you; okay?
24     A.    Yes, ma'am.

1    Q.    Now you named Lisa Mincy as a defendant in
2  this lawsuit; correct?
3    A.    Yes, ma'am, I did name her in the lawsuit.
4    Q.    And is it your understanding that Lisa
5  Mincy was previously the Healthcare Unit
6  Administrator at Taylorville Correctional Center?
7    A.    Yes.  I believe she was the Healthcare
8  Administrator.
9    Q.    And if I use the term "HCUA," will you
10 understand that that is referring to Healthcare
11 Unit Administrator?
12   A.    Yes, ma'am.  I believe that is correct.
13   Q.    Do you understand that Lisa Mincy became
14 HCUA at Taylorville on December 16th, 2015?
15   A.    I'm not sure of the date, but I know it
16 was around there.
17   Q.    Do you recall having any interactions with
18 Lisa Mincy prior to December 2015?
19   A.    No, ma'am, I do not recall any
20 interactions.
21   Q.    So as it relates to Lisa Mincy, do you
22 have any complaints in this case that begin prior
23 to December 2015?
24   A.    Not prior to 2015 -- December 2015, ma'am.

1    Q.    And do you understand that Lisa Mincy
2  served as Healthcare Unit Administrator until
3  January of 2017?
4    A.    I wouldn't know the exact date, but I know
5  she was there for approximately a year.
6    Q.    Do you recall having any interactions with
7  Lisa Mincy after January of 2017?
8    A.    No, I do not recall having any
9  interactions with her.
10   Q.    So as it relates to Lisa Mincy, do you
11 have any complaints in this case that take place
12 after January of 2017?
13   A.    Not after 2017 -- January 2017.
14   Q.    And you understand that Lisa Mincy is not
15 a doctor; is that fair?
16   A.    Yes, I know she's not a doctor.
17   Q.    Do you believe that Lisa Mincy is a nurse?
18   A.    My understanding, she's an RN.
19   Q.    A Registered Nurse?
20   A.    Yes, ma'am.
21   Q.    Do you believe Lisa Mincy to be a cancer
22 specialist?
23   A.    No, I do not believe she's a cancer
24 specialist.

1    Q.    Do you believe Lisa Mincy to be a kidney
2  specialist?
3    A.    I would have to say I don't believe she's
4  a kidney specialist.
5    Q.    You've described in your previous
6  testimony that you had appointments with a variety
7  of medical doctors; is that fair?
8    A.    Over the years, yes, I've seen a lot of
9  doctors.
10   Q.    Did you have any medical appointments with
11 Lisa Mincy?
12   A.    No.
13   Q.    Did Lisa Mincy ever personally provide you
14 with medical treatment?
15   A.    Other than looking at my urine samples,
16 she never did anything, you know, like, as a
17 medical treatment.
18   Q.    You don't recall Lisa Mincy ever providing
19 you with any kind of physical examination; is that
20 fair?
21   A.    Yes, that's a fair question.  She did not
22 provide me with a physical examination.
23   Q.    Did Lisa Mincy ever provide you with any
24 kind of diagnosis?

1    A.    No, she did not provide me with a
2  diagnosis.
3    Q.    And did Lisa Mincy ever provide you with
4  any kind of treatment or prescriptions?
5    A.    I don't believe she would be allowed to do
6  that.  She's a Registered Nurse.
7    Q.    So in this case, are you suing Lisa Mincy
8  for any medical treatment that she personally
9  provided to you?
10   A.    I don't understand.  Could you rephrase
11 that?
12   Q.    In this case, are you suing Lisa Mincy
13 based on any claims that she provided you with
14 medical treatment herself with which you disagree?
15   A.    More the lack of things that she did do --
16 didn't do.
17   Q.    Okay.  So you're suing her based on
18 alleged inactions by Ms. Mincy?
19   A.    Yes, ma'am.
20   Q.    In your Amended Complaint and your
21 Proposed Second Amended Complaint which have been
22 filed, is it fair to say that you alleged that Lisa
23 Mincy was responsible for your medical care?
24   A.    She's the Healthcare Administrator.  She

1   oversees the Healthcare Unit.
2       Q.      So you allege that because she oversees
3   the Healthcare Unit, as you understand it, she was
4   responsible in some way for your medical care?
5       A.      Yes.
6       Q.      But you've testified that she was not
7   personally responsible for providing medical
8   treatment to you directly; is that correct?
9               MR. STROM:  Object to the form.  You can
10              answer.
11              THE WITNESS:  I believe that she could
12              have facilitated -- I don't know how to
13              exactly say it -- that she could have
14              coordinated with the doctor to give me
15              some help.
16              She looked at my urine samples personally
17              with the blood clots and said, "Oh, yes,
18              there's blood clots in them," but did
19              nothing.
20  BY MS. CLARK-JOSEPH:
21      Q.      Is it your belief that she could order the
22  doctor to provide you with some specific treatment?
23      A.      I don't believe she could order the
24  doctor.  I believe that she could suggest -- put

1   her suggestion in.
2       Q.      Okay.  So you believe that Lisa Mincy in
3   her role as Healthcare Unit Administrator could
4   make suggestions to a physician?
5       A.      At least offer her opinion, yes.
6       Q.      And do you have any knowledge about
7   whether Lisa Mincy offered her opinion to any of
8   your treating physicians?
9       A.      To my knowledge, she did not.
10      Q.      I'm sorry.  You cut out a little bit.
11  Could you please repeat that for me?
12      A.      Yes, ma'am.  To my knowledge, she did not.
13      Q.      Is your knowledge based simply on what you
14  personally would have witnessed in terms of
15  conversations where Lisa Mincy was present?
16      A.      Yeah.  She was in the room also with
17  D.O.N. Galvin and Dr. Nawoor talking about my
18  situation, and none of them suggested sending me
19  out at that moment.
20      Q.      Do you recall the date or month that you
21  recall this meeting with Lisa Mincy, Kathy Galvin,
22  and Dr. Nawoor?
23      A.      I don't recall the dates or anything like
24  that.  At that time, they were in and out of the

1   doctor's office all the time.  That has since
2   stopped.  They don't interrupt the doctor any
3   longer.
4       Q.      And when you're referring to that time, is
5   it fair to say this was sometime between when you
6   first saw the blood in your urine on December 19th,
7   2015, and when you were first sent to an outside
8   specialist, I believe that was in February or March
9   of 2015 -- I'm sorry -- 2016?
10      A.      Yes.  They were in and out in between
11  those times.
12      Q.      And so you're saying that Lisa Mincy at
13  times was present for a portion of your medical
14  visit with Dr. Nawoor?
15      A.      Yes, that would be a fair statement.
16      Q.      From what I've seen in your personal
17  diaries that have been submitted as exhibits, I
18  have not seen notations that you made as to when
19  Lisa Mincy was present during your appointments
20  with Dr. Nawoor.  Does that seem fair to you?
21      A.      Yes.  I didn't notate any of the nurses or
22  anything that was in and out except for the one
23  time with Kathy Galvin.
24      Q.      So you did not keep any records of the

1   nurses who were present during appointments that
2   you had with Dr. Nawoor; is that correct?
3       A.      Yes.  That's a fair statement.  I didn't
4   write down the nurses that were in the unit -- in
5   the treatment room, examination room.
6       Q.      So you testified previously that you began
7   urinating blood on December 19th, 2015; is that
8   correct?
9       A.      Yes, ma'am, I started urinating blood on
10  the 19th of December, 2015.
11      Q.      And you continued urinating blood at least
12  intermittently until you received your surgery in
13  July 2016?
14      A.      Yes.  Some days it was very heavy.  Some
15  days it was almost -- Some days it was all the way
16  clear.  Some days it was slightly clear.
17      Q.      But that condition did not resolve until
18  after your surgery in July of 2016?
19      A.      I don't understand that question.
20      Q.      After your surgery in July of 2016, you no
21  longer were urinating blood; is that fair?
22      A.      No visible blood that I know of.
23      Q.      Do you know whether Lisa Mincy became
24  aware that you were urinating blood during the time

1 period we just discussed?

2      A.    Yes, ma'am.  She seen more than one urine

3 sample that I gave.

4      Q.    So do you know on what date Lisa Mincy

5 became aware that you were urinating blood?

6      A.    I wouldn't know the date, ma'am, no.

7      Q.    Is it fair to say that you did make

8 notations in your personal diaries as to the dates

9 on which you gave urine samples?

10     A.    I think I'm pretty accurate on most of the

11 days that I gave urine samples.

12     Q.    But --

13     A.    There was some days that I missed that I,

14 like, that I was sent over on not a code, per se,

15 but the officer called and got me sent over.  I may

16 not have recorded those.

17     Q.    But you did not make any notations as to

18 which providers, whether those be nurses or

19 doctors, reviewed your urine samples?

20     A.    No, ma'am.  I didn't write down who

21 actually looked at them.

22     Q.    Did you ever write down a notation

23 specifically indicating that Lisa Mincy had looked

24 at one of your urine samples?

1            MR. STROM:  Object to the foundation.  I

2            think he can testify as to what he saw.

3            But, obviously, we know that sometimes

4            doctors are looking at things behind the

5            scenes.  You can answer.

6            THE WITNESS:  I don't think I wrote down

7            that she looked at it specifically, no.

8 BY MS. CLARK-JOSEPH:

9      Q.    Is it your belief that she became aware

10 that you were urinating blood before you received

11 your cancer diagnosis?

12     A.    Yes, positively she seen my urine samples

13 before I was diagnosed with cancer.

14     Q.    I believe that yesterday you testified

15 that specifically on February 10th of 2016, you

16 believe that both Director of Nursing Kathy Galvin

17 and HCUA Lisa Mincy observed your blood sample --

18 I'm sorry -- your urine sample prior to giving it

19 to Dr. Nawoor; is that correct?

20     A.    Yes, I do believe.  I may have wrote that

21 down, too.

22     Q.    Do you still have Exhibit 3, which is your

23 2016 daily planner?

24     A.    Yes, ma'am, I do.

1      Q.    Okay.  Could you please take a look at

2 February 10th, 2016?

3      A.    February 10th.  February 2016.  Yeah, I'm

4 looking at it.

5      Q.    I see there that the final entry that you

6 listed on that date says, "Gave blood"?

7      A.    Yes.

8      Q.    Do you have any entry on that date about

9 providing a urine sample?

10     A.    No.  It doesn't say that I gave a urine

11 sample.  It just said that I had a lot of blood in

12 my urine.  By that, it says "a lot of blood."

13     Q.    Correct.  So you do have a notation on

14 February 10th saying "lot blood."  And does that

15 mean that there was a lot of blood in your urine?

16     A.    Yes, ma'am.

17     Q.    But, as you recall, you did provide a

18 urine sample on that date?

19     A.    I can't say for certain that I provided a

20 urine sample on that day.  If they gave blood, I'm

21 sure they took my urine sample.  I'm not sure, but

22 I would assume that they took my urine sample.

23     Q.    Okay.  And do you recall testifying

24 yesterday that it was on that date, February 10th,

1 2016, that Nurses Galvin and Mincy looked at one of

2 your urine samples?

3      A.    Yes, I do remember saying that.

4      Q.    Were you present during their viewing of

5 your urine sample?

6      A.    Yes.  The bathroom was right across from

7 the room that they take the -- where you take your

8 urine sample to.  And they take blood in that room.

9 And they held it up to the light and looked at it

10 and said, "Yes, there's definitely blood clots in

11 it."

12     Q.    Do you recall which of them said that?  Or

13 was it both of them that made that comment?

14     A.    At that time, I was pretty much

15 attached at the hip.  I'm not sure which one

16 actually said that.  But they both were in

17 agreement that there was blood clots.

18     Q.    In terms of what you witnessed, was it

19 simply a visual examination of your urine sample by

20 Nurses Mincy and Galvin?

21     A.    Yes.

22     Q.    Did you know approximately how long they

23 were looking at your urine sample?

24     A.    Not exactly how long.  It wasn't -- you

1  know -- It wasn't five minutes.  It could have been
2  anywhere from 10 seconds to a minute and a half.
3      Q.    Other than the comment that there was
4  blood in your urine, do you recall Lisa Mincy
5  saying anything else to you about your urine
6  sample?
7      A.    One of the two said, "There's definitely
8  blood clots in there."
9      Q.    Do you recall either of them saying
10  anything else to you --
11     A.    No.
12     Q.    -- at that time?
13     A.    No, not that I remember.
14     Q.    Did you ask Nurse Mincy any questions
15  regarding your urine sample?
16     A.    No, not that I recall.
17     Q.    Would you typically ask questions
18  regarding a urine sample or a urine test -- Would
19  you ask those questions of your doctor, Dr. Nawoor?
20     A.    Most of the time when I give a urine
21  sample, I set it on the counter, and they -- it's
22  just a normal-looking urine sample up to that
23  point, and so, no, I would never ask questions
24  about what was going on with it.  I would be told

1  the results, you know, in a visit after that.
2      Q.    And when you were told results at a
3  subsequent visit, would those results come from Dr.
4  Nawoor?
5      A.    Yes.
6      Q.    So other than the February 10th, 2016,
7  date that you previously testified about, as you
8  sit here today, do you remember any other specific
9  dates on which you allege that Lisa Mincy viewed
10  your urine samples?
11     A.    No specific dates.
12     Q.    Can you approximate how many times you
13  believe Lisa Mincy looked at your urine samples?
14     A.    At least twice.  Maybe more.
15     Q.    Could it have been as many as five times?
16     A.    It could have been.  Every time I gave
17  urine, it was kind of a group thing.  They would
18  look at it and say, "Oh, yes, there's blood in it."
19  Because it wasn't just -- you know -- Sometimes it
20  wasn't just partial urine and partial blood.
21  Sometimes it looked like it was all blood.
22  Sometimes it was partial.
23     Q.    Could it have been as many as 10 times?
24     A.    I'm not sure.  It could have been.

1      Q.    So is it fair to say that you believe Lisa
2  Mincy looked at your urine sample possibly between
3  two and ten times?
4      A.    That would be fair.  Yes, I would believe
5  she looked at it somewhere between two and ten
6  times.
7      Q.    So you were diagnosed or told of your
8  cancer diagnosis on April 14th of 2016; is that
9  correct?
10     A.    Yes, ma'am.
11     Q.    Do you know whether Lisa Mincy became
12  aware of that cancer diagnosis?
13     A.    I couldn't say for certain if she was
14  privy to that information or not.
15     Q.    So that you would not know on what date
16  Lisa Mincy could have become aware of your cancer
17  diagnosis?
18     A.    Yeah.  I could not tell you what date she
19  would know.
20     Q.    So you've testified that there were
21  occasions on which you would see Lisa Mincy during
22  your appointments with Dr. Nawoor; is that correct?
23     A.    Sometimes she was in the room.  Sometimes
24  she was in the waiting area, walking through,

1  speaking to patients -- inmates.
2      Q.    So were there times when you were in the
3  waiting area, as you just described, and you had
4  interactions with Lisa Mincy?
5      A.    Certainly, yes, I had interactions with
6  her in the waiting room.
7      Q.    Were those interactions in the waiting
8  room just kind of exchanges of pleasantries, or did
9  you have substantive discussions with her about
10  your medical conditions?
11     A.    I would say both.
12     Q.    In terms of substantive discussions with
13  Lisa Mincy while you were in the waiting room, can
14  you approximate a number of times that you had
15  those types of discussions?
16     A.    I couldn't give you an exact number.  I'm
17  sure it was several times.
18     Q.    So fair to say more than two times that
19  you had substantive discussions about your medical
20  conditions with Lisa Mincy while you were in the
21  waiting room?
22     A.    At least two, yes.
23     Q.    Could it have been as many as five times
24  that you had those kind of substantive discussions

1  with Lisa Mincy?
2       A.   Once again, I'd have to say at least two.
3  I couldn't tell you if it was five or ...
4       Q.   Do you know if these discussions took
5  place before your cancer diagnosis?
6       A.   Yes, before.
7       Q.   Can you recall anything specific that you
8  discussed with her in terms of your medical
9  conditions?
10      A.   Yes.  My question always was, "Do you
11  think it's stones -- kidney stones?"
12           And the answer was, "We think it could be.
13  We don't know.  Very possible."
14      Q.   I believe you testified earlier yesterday
15  that you also asked a similar question regarding
16  whether it was kidney stones to one or more of your
17  doctors; is that correct?
18      A.   I asked Dr. Nawoor.
19      Q.   And was there a reason that you also asked
20  that question to Lisa Mincy?
21      A.   Yeah, because I was hoping it was kidney
22  stones.  Because the first time I talked to Dr.
23  Nawoor, he said it was cancer or kidney stones.
24  And, of course, any human being would hope it was

1  kidney stones over cancer.  That would be my
2  opinion.
3       Q.   And so when you asked Lisa Mincy whether
4  it was kidney stones, were you hoping that she
5  could give you an answer just a little bit sooner
6  than when you actually saw Dr. Nawoor for your
7  appointment?
8       A.   Yes.  I was definitely seeking some good
9  news from her.
10      Q.   Any other substantive conversations or
11  questions that you remember asking Lisa Mincy other
12  than whether it was kidney stones?
13      A.   No.
14      Q.   Do you remember having -- I'm sorry -- Do
15  you remember asking any questions of Lisa Mincy
16  during the times where you've testified that she
17  was present in the room while you were having your
18  appointment with Dr. Nawoor?
19      A.   No.  I don't believe I directed any
20  questions to her.  She was just in the room and
21  listening to what was going on with Dr. Nawoor.  He
22  was asking the questions.
23      Q.   Is it fair to say that all of the
24  interactions you had with Lisa Mincy took place in

1  the Healthcare Unit at Taylorville?
2       A.   I think I've seen her on the wing before.
3  They come through and do safety checks.  But I
4  don't believe I had any other than pleasant
5  conversation, cordial, "How are you doing, ma'am,"
6  type things.
7       Q.   I believe in your Amended Complaint and
8  also your Proposed Second Amended Complaint, you
9  mentioned that you complained to providers,
10  including Mincy, about the blood clots in your
11  urine; is that fair?
12      A.   Yes.  I definitely told them I had blood
13  clots in my urine, and they seen that I had blood
14  clots in my urine.
15      Q.   Would these conversations about the blood
16  clots in your urine with Lisa Mincy have taken
17  place during the times that she was visually
18  examining your urine, as you previously discussed?
19      A.   I'm sure they happened then.  And I may
20  have told her in the lobby, "Hey, I'm having blood
21  clots, heavy blood clots."
22           But, you know, "What can we do?"
23      Q.   Okay.  So on the dates where you may have
24  told Lisa Mincy that you were having blood clots in

1  your urine, you said that you would ask her what
2  could be done about that?
3       A.   No.  I just asked her what she thought it
4  was.
5       Q.   What the cause was?
6       A.   Yes.  That's what I recall.  I asked her,
7  you know, "Do you think it would be kidney stones?
8  Could this be causing that?"
9       Q.   Also in your Amended Complaint, you
10  indicated that you repeatedly requested a referral
11  to an outside specialist; is that correct?
12      A.   Yes.
13      Q.   Were those requests for a referral to an
14  outside specialist made to Lisa Mincy at any time?
15      A.   I can't say if I specifically asked her or
16  not, but ...  I know I asked everybody over there,
17  you know, after so many months, I was like, "Can I
18  -- I need to go out."
19      Q.   So you recall asking various people within
20  the Healthcare Unit for a referral to an outside
21  specialist?
22      A.   Yes.
23      Q.   But you just testified that you don't
24  remember specifically asking Lisa Mincy for a

1  referral to an outside specialist?
2      A.    I'm not sure if she was the one I went to
3  to, you know, say -- ask that exact question.
4      Q.    So are there any other in-person
5  interactions with Lisa Mincy that you recall as you
6  sit here today other than those that we've just
7  discussed?
8      A.    Not that I can recall.
9      Q.    And, as you previously testified, you did
10 not typically note interactions or conversations
11 that you've had with nurses like Lisa Mincy in your
12 daily planners; is that fair?
13     A.    Yes.  I did not always write down, and
14 most of the time I didn't write anything about
15 nurses, unless it was Kathy Galvin.
16     Q.    Did you ever direct any written
17 correspondence to Lisa Mincy?
18     A.    Don't know if I sent requests or not,
19 ma'am.
20     Q.    In general, did you send written requests
21 to the Healthcare Unit at Taylorville?
22     A.    I have before.
23     Q.    Would those have been written requests,
24 other than kind of the standard sick call request

1  form?
2      A.    Yeah.  We have what they call Offender
3  Requests, and you state your problem and who you
4  want to talk to.
5      Q.    Okay.  So you've testified that you don't
6  recall whether you ever sent one of those written
7  Offender Request Forms to Lisa Mincy?
8      A.    Yes.  I'm not sure if I did or not.
9      Q.    If you did, would you have personally kept
10 a copy of such a request?
11     A.    I possibly could have.  I don't recall,
12 though.
13     Q.    If you kept any copies, would you still
14 have them in your personal property today?
15     A.    Some stuff is missing.  But, you know,
16 just -- you have so much space, and you throw away
17 stuff that you feel is insignificant, or it just
18 gets misplaced over a period of time.  So I would
19 say it's not there.
20     Q.    Do you have any complaints about Lisa
21 Mincy not responding to a written request by you?
22     A.    No.
23     Q.    I know you've testified earlier about at
24 least two specific grievances that you wrote;

1  correct?
2      A.    Yes, ma'am.
3      Q.    Did you have any written grievances to
4  which Lisa Mincy responded?
5      A.    No.
6      Q.    Were there any written grievances that you
7  submitted to which you believe that Lisa Mincy
8  should have responded?
9      A.    No.  In general, Nurse Galvin responded to
10 all healthcare grievances.
11     Q.    Did you write any grievances in which you
12 specifically complained about Lisa Mincy?
13     A.    Not specifically.  Healthcare in general.
14     Q.    Okay.  So you made complaints about the
15 Healthcare Unit in general?
16     A.    Yes.
17     Q.    But in your grievances, you did not
18 specifically name Lisa Mincy or perhaps her title,
19 Healthcare Unit Administrator?
20     A.    No.  I did not mention her specifically by
21 name or title.
22     Q.    So in this case, one of your allegations
23 is that there were delays in scheduling medical
24 appointments, referrals, your surgery; is that

1  correct?
2      A.    Yes.  I do believe that would be correct.
3      Q.    And are you suing Lisa Mincy for any
4  delays in scheduling?
5      A.    Suing Healthcare in general.  She's part
6  of the healthcare system.
7      Q.    So do you believe that Lisa Mincy had any
8  role in scheduling while she was Healthcare Unit
9  Administrator?
10     A.    I believe she could have expressed her
11 opinion whether I needed to go out or not.  So I
12 believe she had a role, in that terms.
13     Q.    Okay.  So your believe that she had a role
14 in simply determining whether or not you should go
15 outside of the facility for medical treatment?
16     A.    State that again, please, ma'am.
17     Q.    I believe that you just testified that
18 Lisa Mincy's role was in offering her opinion as to
19 simply whether or not you should go outside of
20 Taylorville for any medical treatment; is that
21 correct?
22     A.    I think she should have an opinion, yes.
23     Q.    Are you aware of any other role that Lisa
24 Mincy played while she was Healthcare Unit

1  Administrator in terms of scheduling appointments
2  or visits with outside specialists?
3      A.   No.  I don't know what her role would be
4  other than providing her opinion.
5      Q.   In terms of the delays that you're
6  complaining about in this case, are there any
7  specific delays that you attribute to Lisa Mincy?
8      A.   Specifically to her?  No.  But as
9  Healthcare Unit Administrator, yes.
10     Q.   And when you say in her role as Healthcare
11 Unit Administrator, are you again referring back to
12 your belief that she should or could offer her
13 opinion about the necessity of referrals?
14     A.   Yes.  The current Healthcare Administrator
15 does just exactly that.
16     Q.   And how do you know that the current
17 Healthcare Unit Administrator does that?
18     A.   I've spoken to her personally about
19 certain problems, and other inmates have of certain
20 problems, and she agrees to discuss the problem
21 with the doctor and come to some sort of
22 resolution; whether it's her opinion that's
23 followed, she at least expresses it.
24     Q.   And when you're referring to the current

1  Healthcare Unit Administrator discussing her
2  opinion with the doctor, you're again referring to
3  her opinion as to whether or not referral to
4  outside providers are needed?
5      A.   Yes, ma'am.
6      Q.   Do you know the name of the current
7  Healthcare Unit Administrator?
8      A.   Ms. Katie Hackney.
9      Q.   Do you know if she became Healthcare Unit
10 Administrator immediately after Lisa Mincy or
11 whether there was someone in between them serving
12 in that role?
13     A.   I think someone in between her and Ms.
14 Mincy.  Several, in fact, I believe.
15     Q.   Any other role that you believe Lisa Mincy
16 played in terms of delays in your scheduling or
17 treatment that you haven't previously just
18 mentioned?
19     A.   None that I can think of.
20     Q.   Yesterday, you testified that on May 25th,
21 2016, your wife called Lisa Mincy; is that correct?
22     A.   I believe it does.  Let me look at that.
23 I'm not sure of the exact date.  Yes.
24     Q.   Yes, please take a look at that and

1  refresh your recollection.
2      A.   Yes.  May 25th, 2016.  "Susan called
3  Mincy.  Said it's not scheduled yet.  WTF.  She's
4  calling Severino's office, John Howard Association,
5  and maybe lawyer."
6      Q.   Okay.  So the first part of that entry is
7  an indication that Susan, your wife, called Lisa
8  Mincy; is that correct?
9      A.   Yes, ma'am.  That would be correct.
10     Q.   And the next sentence, "She said it's not
11 scheduled yet," is that -- is it Lisa Mincy said
12 that your surgery was not scheduled yet?
13     A.   Yes.
14     Q.   And you did not participate in the
15 conversation with Susan, your wife, and Lisa Mincy;
16 is that correct?
17     A.   No.  I couldn't.  That would be against
18 IDOC rules, having a three-way call.
19     Q.   And so your understanding that Lisa Mincy
20 said your surgery was not scheduled yet came from a
21 report to you by your wife?
22     A.   Yes, ma'am.
23     Q.   Are you aware of anything else that was
24 said during that discussion between your wife and

1  Lisa Mincy?
2      A.   No small details.  I just wrote down that.
3      Q.   And do you have a complaint regarding Lisa
4  Mincy as it relates to this conversation with your
5  wife on May 25th?
6      A.   A written Complaint, ma'am?
7      Q.   No.  Just in terms of your lawsuit.  Any
8  complaints you have as you sit here today about
9  this conversation that Lisa Mincy had with your
10 wife on May 25th, 2016?
11     A.   No, not on the conversation of May 25th,
12 2016.
13     Q.   In your previous testimony yesterday and
14 earlier today, you had some discussion of something
15 called "collegial review"; is that correct?
16     A.   Yes, ma'am.
17     Q.   I'm sorry.  I think I may have missed
18 that.  Is that correct?
19     A.   Yes, ma'am.  It's correct.
20     Q.   Thank you.  And I believe yesterday you
21 testified that you understood collegial review to
22 involve Wexford decisionmakers in Pittsburgh; is
23 that correct?
24     A.   Yes, I do.  Yes, it is.

Page 330

1    Q.   Are you alleging any involvement by Lisa
2  Mincy in the collegial review process?
3    A.   I'm not sure if it's her responsibility to
4  call or not.
5    Q.   Okay.  So you do not know whether Lisa
6  Mincy participates in the collegial review process?
7    A.   Yeah.  I do not know if she does.
8    Q.   And just to clear that up, because I asked
9  the question poorly, you do not know whether Lisa
10  Mincy participated in the collegial review process
11  while she was HCUA of Taylorville; is that correct?
12    A.   Yes.  I don't believe she par -- I do not
13  know if she participates in the phone call.
14    Q.   In your Proposed Second Amended Complaint,
15  you have alleged that Defendant Lisa Mincy
16  overruled Dr. Nawoor's diagnoses, treatment
17  decisions, and recommendations for his patients; is
18  that correct?
19    A.   I'm not sure if I read it all the way
20  through.
21    Q.   Okay.  So you're saying that as you sit
22  here today, you're not sure that you read your
23  entire Second Amended Complaint?
24    A.   I did read it.  I went over it fast,

Page 331

1  though.
2    Q.   Okay.  So you're not sure whether that
3  allegation is included that Lisa Mincy overruled
4  Dr. Nawoor's diagnoses, treatment decisions, and
5  recommendations for his patients?
6    A.   I'm not sure if she did -- if I read that.
7    Q.   As you sit here today, are you alleging
8  that Lisa Mincy overruled Dr. Nawoor's diagnoses?
9    A.   I'm not sure if she did or not.  I know
10  nothing was done.
11    Q.   Are you alleging that Lisa Mincy overruled
12  Dr. Nawoor's treatment decisions as it relates to
13  you?
14        MR. STROM:  I'm going to object on
15        foundation and to form.
16        Mr. Dean does not have in front of him the
17        Proposed Second Amended Complaint.  If we
18        want him to review it to review the
19        specifics of his allegations, we can do
20        that; but I don't think he should be tied
21        to what he recalls from that Second
22        Amended Complaint in terms of what his
23        allegations are.  You can answer.
24  BY MS. CLARK-JOSEPH:

Page 332

1    Q.   Okay.  I can rephrase.  I can rephrase.
2        Mr. Dean, do you have any proof that
3  Defendant Mincy overruled Dr. Nawoor's treatment
4  decisions as it relates to you?
5    A.   I don't know if she overruled him.  All I
6  know is I didn't get treatment.
7    Q.   And do you know whether Lisa Mincy
8  overruled Dr. Nawoor's recommendations as it
9  relates to you?
10    A.   I don't know if she specifically overruled
11  it, but she's part of the team that should be
12  involved in this type of decision.
13    Q.   And, again, are you referring back to your
14  testimony earlier that you believe that Lisa Mincy
15  should have offered her opinion to your medical
16  doctors as to appropriate referral and treatment
17  for your conditions?
18    A.   Yes.  I believe she should have offered
19  her opinion.
20    Q.   As you sit here today, do you know what
21  Lisa Mincy's opinion was about your medical
22  conditions?
23    A.   She never expressed her opinion to me.
24    Q.   I'm sorry.  You cut out just a little bit.

Page 333

1  Did you say that she did not express her opinion to
2  you?
3    A.   She never made a definitive answer on what
4  she thought it was.  So she never expressed to me
5  her opinion whether I should go out or not go out.
6    Q.   You testified previously that your
7  complaints in this case include alleged delays in
8  receiving certain prescription medications and
9  chemotherapy; is that correct?
10    A.   Yes.  That's correct.
11    Q.   Is it your belief that Lisa Mincy was
12  responsible in any way for the delay of
13  prescription medications?
14    A.   As part of my team, I believe, yes, she
15  has some responsibility.
16    Q.   As you sit here today, do you know what
17  role, if any, Lisa Mincy played in terms of your
18  receiving prescription medications?
19    A.   No.  I don't know what role she would have
20  did to stop or to get it for me.
21    Q.   Are you suing Lisa Mincy because you
22  allege that she supervised other staff in her role
23  as Healthcare Unit Administrator?
24    A.   Yes, I believe she supervises other staff.

1    Q.    Can you be more specific about who you
2  believe she supervised while she was HCUA?
3    A.    Being Healthcare Administrator would
4  indicate to me that she's the one overseer of all
5  the things that happen there.
6    Q.    Okay.  So anyone who worked within the
7  Healthcare Unit, it was your understanding that
8  they were supervised in some way by Lisa Mincy as
9  Healthcare Unit Administrator?
10   A.    I believe she's the boss.
11   Q.    You testified yesterday and throughout
12 today about numerous complaints about staff members
13 within the Healthcare Unit, including various
14 doctors; is that fair?
15   A.    Mostly doctors, yes, and Kathy Galvin and
16 Lisa Mincy.
17   Q.    Do you have complaints about any other
18 specific Healthcare Unit staff members that you've
19 not discussed during your deposition up to this
20 point?
21   A.    As far as nurses and things like that?  Is
22 that what you're referring to?
23   Q.    Yes.  And to be more specific, I'm
24 referring to the time period beginning December

1  2015 when you first noticed the blood in your urine
2  to present, any other specific Healthcare Unit
3  staff members that you have specific complaints
4  about that have not been discussed yet in your
5  deposition?
6    A.    Well, one of the nurses, when I went --
7  was sent over by the officer -- her name is Angie.
8  I do not know her last name -- the officer seen
9  what was in the toilet.  He sent me over, called
10 over to send me over, and she told me that I could
11 wait 12 hours, that I wasn't going to die, to come
12 back to sick call the next day.  Angie something.
13 I don't know her last name.
14   Q.    I think you testified yesterday that there
15 was at least one occasion, maybe more than one,
16 where an officer noticed that there was blood in
17 your toilet --
18   A.    Yes, ma'am.
19   Q.    -- in your cell; is that correct?
20   A.    Yes, ma'am.
21   Q.    So that would be just what you were
22 referring to, an incident where an officer sent you
23 to the Healthcare Unit after noticing blood in your
24 urine?

1    A.    Yes.  It was Officer James.  I brought him
2  to the bathroom and showed him --
3    Q.    And you're saying --
4    A.    -- showed him what was going on, and he
5  said, "I'll make the call for you."
6    Q.    And you're saying on this particular day
7  that this officer saw the blood in your urine when
8  you were sent to the Healthcare Unit, this nurse
9  named Angie told you that you could wait another
10 12 hours before being seen for an appointment?
11   A.    Yes.  Our sick call was in morning that
12 week.  It alternates between morning and evening.
13 And it was evening time.  She told me that I could
14 wait 12 hours, that I wouldn't die.
15   Q.    And do you remember approximately when
16 this conversation happened with the nurse named
17 Angie?
18   A.    I don't remember.
19   Q.    What date?
20   A.    I don't remember the date.  I believe it
21 was sometime during February of 2016.
22   Q.    Any other specific individuals in the
23 Healthcare Unit who we have not discussed about who
24 you have complaints relating to this lawsuit?

1    A.    No other nurses did anything such as that.
2  They all did their job.  They reported on their
3  report and then went to the doctor, and, you know,
4  such as sick calls, you know, they made their --
5  whatever I told them, they wrote down.  I either
6  got referred to the doctor right away or I came
7  back to a second sick call or a third.
8    Q.    And do you believe that Lisa Mincy had any
9  knowledge of this incident with the nurse named
10 Angie?
11   A.    I would have no knowledge of whether she
12 did or didn't.
13   Q.    Other than the May 25th, 2016, entry in
14 your personal calendar where you mention Mincy by
15 name, are you aware of any other notes relating to
16 Lisa Mincy?
17   A.    No, I'm not aware of anything that I wrote
18 her down specifically.  I'm not saying there isn't,
19 but I don't recall.
20   Q.    Do you have any other complaints about
21 Lisa Mincy in this lawsuit that we have not yet
22 discussed?
23   A.    Other than her inaction to at least offer
24 her opinion to get me out, no.

1           MS. CLARK-JOSEPH:  Okay.  No further
2     questions for me.
3     Thank you, Mr. Dean.
4           THE WITNESS:  Thank you, ma'am.
5                 RE-DIRECT EXAMINATION
6     BY MR. STROM:
7     Q.    I have some brief redirect questions that
8     I think would last no more than ten minutes.  Mr.
9     Dean, do you think you'd like a break before those
10    redirect questions for 10 minutes?
11    A.    No.  We can do it.
12    Q.    Okay.  Mr. Dean, your testimony was that
13    your first visit to Dr. Severino was in March of
14    2016; correct?
15    A.    Yes.
16    Q.    Do you recall what the specific date of
17    that visit was?
18    A.    I believe it was March 10th.
19    Q.    Okay.  Of 2016?
20    A.    2016, yes, sir.  I'm sorry.
21    Q.    That's okay.
22          It was your testimony earlier today that
23    you recall refusing urology appointments in 2013.
24    Do you remember that?

1     A.    Yes, I do remember that.
2     Q.    Do you recall what you expected to happen
3     at those urology appointments?
4     A.    I don't know what you call it, but it's
5     the scope that goes up your penis.  And my biggest
6     fear in life is that.
7     Q.    And so it was your testimony earlier today
8     that you refused that?
9     A.    Yes.  I did refuse it.
10    Q.    Do you recall what the purpose of that
11    procedure -- Let me strike that and start over.
12          Do you recall what you were told about the
13    purpose of that procedure?
14    A.    It was to decide -- look at the -- I guess
15    it was to look at the kidney stones and maybe
16    remove them.
17    Q.    And you said, it's your testimony that
18    that is a fear of yours; correct?
19    A.    My biggest fear.
20    Q.    And what was your understanding about
21    alternatives that you had in terms of resolving the
22    problems with that kidney stone?
23    A.    I didn't know the name of it at the time,
24    but it was the lithotripsy.  I knew that that was

1     one option, or a surgery.
2           I'm not scared of that.  I'm scared of the
3     scope going up my private parts.
4     Q.    It was your testimony earlier today that
5     on February 10th, 2016, that some of your medical
6     care providers looked at a urine sample that
7     contained blood.  Do you recall that?
8     A.    Yes.
9     Q.    Do you recall that you testified that Lisa
10    Mincy looked at that sample?
11    A.    Her and Kathy Galvin.  Lisa Mincy was
12    holding it.
13    Q.    Did you see that urine sample on
14    February 10th, 2016?
15    A.    Yes.  I provided the urine sample, carried
16    it into the lab room/blood draw room, whatever you
17    want to call it.  The door was open.  I was
18    speaking to them as they were doing it, looking at
19    it, holding it up looking at it in the light.
20    Q.    What color was that urine sample; do you
21    recall?
22    A.    Basically, the color of blood.  It didn't
23    look like it was diluted at all.
24    Q.    Mr. Dean, it was your testimony that the

1     basis of your complaints relates to delays in your
2     treatment; is that a fair characterization?
3     A.    Yes, sir, that's fair.
4     Q.    And how would you describe some of
5     those -- Strike that.
6           What's your understanding of the nature of
7     those delays?
8     A.    State that again.
9     Q.    That was a bad question.  I really should.
10          You testified about the delays that you
11    believe occurred in your treatment; right?
12    A.    Yes, sir.
13    Q.    And part of your testimony is that you
14    believe you were delayed in getting an outside
15    referral; correct?
16    A.    Yes, I was definitely delayed.
17    Q.    Why do you think delays occurred in
18    receiving an outside referral?
19    A.    More than once, I've heard a staff, mainly
20    Kathy Galvin, saying that I'm cutting into their
21    bonus.
22    Q.    What does that mean to you?
23    A.    Apparently, they get a bonus for not --
24    for saving money, not providing services that are

Page 342

1  costly.
2      Q.   What's your understanding of the
3  scheduling process for a referral or for treatment
4  of some kind?
5      A.   I would think that the doctor would tell
6  them that it needs to be scheduled.  I believe he
7  has to call Pittsburgh, the decisionmakers, as I
8  said, and then it goes to Medical Records, and they
9  call and make the appointment.
10     Q.   After an appointment is scheduled, do you
11 believe that a doctor can change that appointment?
12 Do you believe that a doctor -- Let me start that
13 question over.
14          After an appointment is scheduled, do you
15 believe that a doctor working in the Healthcare
16 Unit can schedule that appointment or -- I'm going
17 to start over.  Excuse me.
18          After an appointment is scheduled, Mr.
19 Dean, do you believe that a doctor working in the
20 Healthcare Unit can cancel that appointment?
21          MR. FORNOFF:  Objection; foundation.
22          THE WITNESS:  I believe he could --
23          MS. CLARK-JOSEPH:  I'll join.
24          THE WITNESS:  I believe he could cancel

Page 343

1      it.
2  BY MR. STROM:
3      Q.   What's your basis for that belief?
4      A.   Well, he's the one that makes the
5  suggestions or the decisions on what's going to
6  happen and what's not going to happen.
7          I know when I go to a specialist, no
8  matter what the specialist says, it's just a
9  suggestion.  My primary care, who is now Dr.
10 Nawoor, has the final say over everything.
11     Q.   Mr. Dean, do you recall in general times
12 when you thought you were going to have an
13 appointment on a specific date, and it did not
14 happen on that specific date?
15     A.   Yeah.  There was many times I thought I
16 was going out for certain things, and it might end
17 up being another thing or I didn't go out at all.
18     Q.   And is it your belief that when that
19 happens, sometimes the cause could be a staff
20 member in the Healthcare Unit canceling?
21     A.   It could be.
22     Q.   Finally, you testified about the timeline
23 during which you believe Nurse Lisa Mincy was
24 responsible for your care.  Do you recall that?

Page 344

1      A.   Yes.
2      Q.   And I believe your testimony was you
3  believe she was responsible only during the times
4  that she was employed as the HCUA; correct?
5      A.   Yes.
6      Q.   And so if I recall correctly, those dates
7  were December of 2015 to January of 2017; is that
8  your recollection?
9      A.   Yes.  That's what I recall.
10     Q.   And so you don't have any claims or
11 complaints about Lisa Mincy after January 2017;
12 right?
13     A.   No, no complaints after January of 2017.
14     Q.   And do you believe that she had any role
15 in the prescriptions you received after January of
16 2017?
17     A.   As being part of my team, I think she
18 could be responsible as far as offering her
19 opinion, trying to speed things up, yes.
20     Q.   But just to be clear, do you believe that
21 she should have been speeding things up when she
22 was no longer employed as HCUA?
23     A.   No, not after she was not employed.  No.
24          MR. STROM:  Okay.  I don't have anything

Page 345

1      more.
2          Do you guys have recross?
3          MR. RUPCICH:  Can we just have one minute?
4          MR. STROM:  Certainly.
5          (A discussion was held off the record.)
6          MR. FORNOFF:  Back on the record.
7               RE-CROSS EXAMINATION
8  BY MR. FORNOFF:
9      Q.   I just have a couple of follow-up
10 questions for you, Mr. Dean.
11     A.   Sure.
12     Q.   You just testified that Kathy Galvin told
13 you that you were cutting into her bonus; is that
14 correct?
15     A.   Yes.  On numerous occasions she's said
16 that.
17     Q.   And these were occasions where you thought
18 there was something seriously wrong with your
19 health; is that accurate?
20     A.   Yes.
21     Q.   And it was at a time where she said this
22 when you thought you needed to be sent out, and
23 that's when she told you this?
24     A.   Not always directly to me, but to any

Page 346

1  inmate that was going to be sent out. "You're
2  cutting into my bonus," was the phrase. It was
3  always, "You're cutting into my bonus."
4      Q.    Okay. But she at least specifically told
5  it to you on multiple occasions?
6      A.    Yeah. "Dean, you're cutting into my
7  bonus." She calls me Dean.
8      Q.    And you understood it to mean that you're
9  cutting into her bonus by getting sent out for
10 additional care; is that the way you understood it?
11     A.    That's my opinion.
12     Q.    Okay. And would she have told you this at
13 a time period, as well, when you were diagnosed
14 with cancer?
15     A.    State that again.
16     Q.    All right. Did she say this to you at
17 least on an occasion where you were diagnosed with
18 cancer?
19     A.    After I was diagnosed? I don't know. I
20 don't believe so. I don't recall.
21     Q.    How about when you were urinating blood?
22     A.    During that time period between December
23 and March, yes.
24     Q.    So it's your understanding that she was

Page 347

1  informing you that she would rather obtain her
2  bonus than send you out for necessary care?
3      A.    I'm not sure what she was thinking. I
4  know she said it.
5      Q.    All right. You filed two grievances in
6  this case; correct?
7      A.    Yes.
8      Q.    At least?
9      A.    At least two.
10     Q.    Did you ever put that in a grievance?
11     A.    No.
12     Q.    Okay. Did you put it in your initial
13 Complaint that you filed?
14     A.    No.
15     Q.    Okay. How about your diary? Did you put
16 it in your diary?
17     A.    No, I don't think I wrote that in my
18 diary. No, sir.
19     Q.    So despite having someone tell you this,
20 that they were trying to avoid giving you care when
21 you believe your life was at risk, you didn't put
22 it in any of these?
23     A.    I didn't put a lot of things in my diary.
24     Q.    You didn't find it important enough to

Page 348

1  grieve it? You didn't find it important enough to
2  put it in your Compliant or your diary?
3      A.    No. I didn't think that would speed up my
4  process of getting surgery or sent out for a
5  referral.
6          MR. FORNOFF: I don't have anything else
7      for you, Mr. Dean.
8          MR. STROM: Ms. Clark-Joseph, do you have
9      anything?
10         MS. CLARK-JOSEPH: Nothing further for me.
11     No, thank you.
12         MR. FORNOFF: Signature?
13         MR. STROM: So we will reserve signature.
14 (Deposition concluded at 1:40 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 349

1              CERTIFICATE OF OATH
2
3  STATE OF ILLINOIS  )
4  COUNTY OF CHRISTIAN )
5
6          I, the undersigned authority, certify that
7  WILLIAM KENT DEAN personally appeared before me and
8  was duly sworn.
9          WITNESS my hand and official seal this
10 27th day of June, 2018.
11
12
13
14
15
16
17
18
19
20                    _____
                     Deborah A. Krotz, CSR, RMR, CRR
21                   Notary Public - State of Illinois
                     My Commission No:  781016
22                   My Commission Expires 6/27/2021
23
24

Page 350

```
 1              REPORTER'S DEPOSITION CERTIFICATE
 2
 3   STATE OF ILLINOIS   )
     COUNTY OF CHRISTIAN )
 4
          I, Deborah A. Krotz, Certified Shorthand
 5   Reporter of the State of Illinois, Registered Merit
     Reporter, Certified Realtime Reporter, and Notary
 6   Public in and for the State of Illinois at Large,
     certify that I was authorized to and did
 7   stenographically report the deposition of WILLIAM
     KENT DEAN on the 27th day of June, 2018, at
 8   Taylorville Correctional Center, 1144 Illinois
     Route 29, Taylorville, Illinois; that a review of
 9   the transcript was requested; and that the
     transcript is a true and complete record of my
10   stenographic notes.
11        I further certify that I am not a relative,
     employee, attorney, or counsel of any of the
12   parties, nor am I a relative or employee of any of
     the parties' attorneys or counsel connected with
13   the action, nor am I financially interested in the
     action.
14
          DATED this 10th day of July, 2018.
15
16
17
18
19
20                        _____
21                        Deborah A. Krotz, CSR, RMR, CRR
22
23
24
```

OFFICIAL SEAL
DEBORAH A. KROTZ
Notary Public - State of Illinois
My Commission Expires

Page 351

```
 1   SIGNATURE AND ERRATA SHEET - USLS Job No. 704092
        WILLIAM KENT DEAN -vs- WEXFORD HEALTH SOURCES,
 2      INC., DR. ABDUR NAWOOR, DR. REBECCA EINWOHNER,
           NURSE KATHY GALVIN, and LISA MINCY
 3      Do Not Write on Transcript--Enter Changes Here:
 4   Page #   Line #       Change      Reason for Change
 5   ____/_____/_____/_____
 6   ____/_____/_____/_____
 7   ____/_____/_____/_____
 8   ____/_____/_____/_____
 9   ____/_____/_____/_____
10   ____/_____/_____/_____
11   ____/_____/_____/_____
12   ____/_____/_____/_____
13   ____/_____/_____/_____
14
15   Under penalties of perjury, I declare that I have
     read Volume II of my deposition held June 27, 2018,
16   and that it is true and correct, subject to any
     changes in form or substance entered here.
17
18
     _____   _____
19      WILLIAM KENT DEAN            DATE
20
21   Subscribed and sworn to before me this _____ day of
22   _____, 2018.
23
                           _____
24                              Notary Public
```

```
1    IN RE:  WILLIAM KENT DEAN vs. WEXFORD HEALTH
             SOURCES, INC., etc., et al.
2    U.S. Legal Support Job No. 704091

3            I, WILLIAM KENT DEAN, Deponent herein, do
     hereby certify that I have read the foregoing
4    deposition and that it is a true and accurate
     transcription of the questions asked of me and the
5    answers given by me, with the following change(s):

6    PAGE LINE              CHANGE                    REASON
```

| | PAGE | LINE | CHANGE | REASON |
|---|---|---|---|---|
| 7 | 48 | 19 | from December '14 to the one, so I write stuff | wrong month |
| 8 | 54 | 17 | on a strechen and gave me Nitro, and Oxyen, took my | forgot ntro |
| 9 | 59 | 18 | "I need to go to sick call," and so I went to | call not Hall |
| 10 | 59 | 19 | sick call that night, and on th 23rd, I seen | call not Hall and not in |
| 11 | 70 | 6 | because there was no record of the blood and the | didn't see notes till later |
| 12 | 72 | 21 | Clot's since December 24th | didn't see it till later |
| 13 | 72 | 24 | Not since December 24th | misunderstood question |
| 14 | 76 | 17 | Yes, I told him about Clot's in urine | misunderstood question |
| 15 | 76 | 19 | that it said any blood clots, but I definitely | misunderstood question |
| 16 | 76 | 20 | had them it's in my medical records | didn't see notation till later |
| 17 | 85 | 16 | Yes, on December 24th I wrote Big Blood Clots | didn't see note till later |
| 18 | 85 | 17 | also small particles in my urine samples | wrong date |
| 19 | 159 | 17 | March 2nd, Dr G visit for CTscan Results | didn't include liver |
| 20 | 167 | 10 | vena cava, to my liver, lymph nodes, and lungs. I | |

```
21                    _____
22                         WILLIAM KENT DEAN
23
24   LHP              Date  8/7/18
```

Page 351

1    SIGNATURE AND ERRATA SHEET - USLS Job No. 704092
     WILLIAM KENT DEAN -vs- WEXFORD HEALTH SOURCES,
2    INC., DR. ABDUR NAWOOR, DR. REBECCA EINWOHNER,
           NURSE KATHY GALVIN, and LISA MINCY
3    Do Not Write on Transcript--Enter Changes Here:

4    Page #    Line #        Change        Reason for Change

5    _188_ / _19_ / _Yes, I skimmed through it_ / _only looked briefly_

6    _192_ / _8_ / _Yes, but Dr. only addresses your ht issue_ / _your There is one Thing only_

7    _216_ / _8_ / _Yes, in 2003_ / _did say 2003_

8    _234_ / _7_ / _I passed a large Kidney stone, and I_ / _I did pass stone_

9    _234_ / _8_ / _saved it for a DR Emuhorwer to any hs_ / _I did see it, it's in med records_

10   _270_ / _9_ / _While, like Cancer is a Pussy on 2016_ / _noticed it afterwords_

11   _277_ / _16_ / _I definitely seen him March 10th. I_ / _wow wrong date_

12   _330_ / _19_ / _I briefly skimmed through it, at that_ / _Its a more accurate answer_

13   _330_ / _20_ / _I didn't have a copy of my own yet,_ / _more accurate answer_

14

15   Under penalties of perjury, I declare that I have
     read Volume II of my deposition held June 27, 2018,
16   and that it is true and correct, subject to any
     changes in form or substance entered here.

17

18   _____          _8/8/18_____
19        WILLIAM KENT DEAN                      DATE

20

21   Subscribed and sworn to before me this _8th_ day of

22   _August_____, 2018.

23
        OFFICIAL SEAL
        SUSAN L. KEY            _____
24   Notary Public - State of Illinois        Notary Public
     My Commission Expires 5/12/2019