Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF ILLINOIS
 2                 SPRINGFIELD DIVISION

 3   WILLIAM KENT DEAN,                    )
                                          )
 4          Plaintiff,                     )
                                          )
 5      vs.                                ) No. 17-CV-3112
                                          )
 6   WEXFORD HEALTH SOURCES, INC., DR.    )
     ABDUR NAWOOR, DR. REBECCA            )
 7   EINWOHNER, NURSE KATHY GALVIN,       )
     and LISA MINCY,                       )
 8                                         )
            Defendants.                    )
 9

10

11

12

13

14           DEPOSITION OF LISA JO MINCY
        OFFICE OF THE ILLINOIS ATTORNEY GENERAL
15              3000 MONTVALE DRIVE
                SPRINGFIELD, ILLINOIS
16               OCTOBER 12, 2018
                   9:30 A.M.
17

18

19

20

21

22

23

24           Reported and Transcribed by:
25     Rhonda Rhodes Bentley, CSR #084-002706
```

```
 1                   INDEX
 2 APPEARANCES:
 3 For the Plaintiff:
       Nathaniel K.S. Wackman
 4     JENNER & BLOCK
       Attorneys at Law
 5     353 North Clark Street
       Chicago, Illinois 60654-3456
 6     (312) 222-9350
       nwackman@jenner.com
 7
   For the Defendants Wexford Health Sources, Inc.,
 8 Dr. Abdur Nawoor, Dr. Rebecca Einwohner, and
   Nurse Kathy Galvin:
 9     Terence Corrigan
       Cassiday Schade LLP
10     Attorneys at Law
       111 North Sixth Street, Suite 200
11     Springfield, Illinois 62701
       (217) 572-1714
12     tcorrigan@cassiday.com
13
   For the Defendant Lisa Mincy:
14     Jeremy Tyrrell
       ASSISTANT ATTORNEY GENERAL
15     500 South Second Street
       Springfield, Illinois 62701
16     (217) 782-1841
       jtyrrell@atg.state.il.us
17
18
19 ALSO PRESENT:
       McKensie Villarreal
20
21
22
23
24
25
```

```
 1             INDEX - CONTINUED
 2 EXAMINATION BY:                            PAGE
   Mr. Wackman.............................5, 208
 3 Mr. Corrigan...............................204
   Mr. Tyrrell................................207
 4
 5 EXHIBITS:    DESCRIPTION                    PAGE
   Exhibit 1    Answer...........................62
 6 Exhibit 2    Offender Outpatient Progress
                Notes (001340-001341)............82
 7 Exhibit 3    Offender Outpatient Progress
                Notes (001343)...................95
 8 Exhibit 4    Offender Outpatient Progress
                Notes (001346)..................116
 9 Exhibit 5    Transcript Excerpt..............124
   Exhibit 6    Offender Outpatient Progress
10              Notes (001348-001351)...........126
   Exhibit 7    Medical Furlough (001080-001082)136
11 Exhibit 8    Medical Furlough (001073-001079)138
   Exhibit 9    Offender Outpatient Progress
12              Notes (001356)..................152
   Exhibit 10   Medical Furlough (001083-001084)157
13 Exhibit 11   Final Report (001093-001094)....170
   Exhibit 12   Offender Outpatient Progress
14              Notes (001361-001363)...........173
   Exhibit 13   Offender Outpatient Progress
15              Notes (001364)..................179
   Exhibit 14   Offender's Grievance............185
16 Exhibit 15   Offender Outpatient Progress
                Notes (001379)..................191
17 Exhibit 16   MAR.............................197
18
19              (Exhibits attached.)
20
21
22
23
24
25
```

```
 1              STIPULATION
 2
 3        IT IS HEREBY EXPRESSLY STIPULATED AND
 4 AGREED by and between the parties that the
 5 DEPOSITION of LISA JO MINCY may be taken on
 6 OCTOBER 12, 2018, at the Office of the Illinois
 7 Attorney General, 3000 Montvale Drive,
 8 Springfield, Illinois, pursuant to the applicable
 9 Supreme Court rules, local rules, and the Code of
10 Civil Procedure governing said depositions.
11
12        IT IS FURTHER STIPULATED that the
13 necessity for calling the Court Reporter for
14 impeachment purposes is waived.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              9:26 a.m.
 2              LISA JO MINCY,
 3 having first been duly sworn, testifies as
 4 follows:
 5              EXAMINATION
 6 BY MR. WACKMAN:
 7      Q.   Good morning, Ms. Mincy.  I'm
 8 Nathaniel Wackman, W-a-c-k-m-a-n.  I represent
 9 the plaintiff William Dean.
10           Do we want to put other appearances
11 on the record?
12      MR TYRRELL:  Ms. Mincy is here
13 present with her attorney Jeremy Tyrrell.
14      MR. CORRIGAN:  And Terry Corrigan for
15 everybody -- all the rest of the defendants.
16      MR. WACKMAN:  We also have a law
17 clerk for the Attorney General's office,
18 McKensie --
19      MS. VILLARREAL:  McKensie Villarreal,
20 V-i-l-l-a-r-r-e-a-l.  McKensie is
21 M-c-K-e-n-s-i-e.
22 BY MR. WACKMAN:
23      Q.   Ms. Mincy, would you please state
24 your full name for the record.
25      A.   Lisa Jo Mincy, M-i-n-c-y.
```

1     Q.    And your date of birth?
2     A.    10/19/1960.
3     Q.    And what is your home address, ma'am?
4     A.    ████████████████, Beardstown,
5 Illinois.
6     Q.    Okay. And where are you currently
7 employed?
8     A.    I'm currently employed for the
9 Illinois Department of Public Heath Office of
10 Healthcare Registration -- or Regulation.
11     Q.    And what is that address there?
12     A.    535 West Jefferson, Springfield,
13 Illinois.
14     Q.    And just to be clear, that's where --
15     A.    Fourth floor.
16     Q.    That's where you work?
17     A.    Yes, that's correct.
18     Q.    And have you ever been deposed
19 before, ma'am?
20     A.    No.
21     Q.    No. Okay. So since you haven't been
22 deposed before, I'll go over a few ground rules.
23 One we've just violated, which is that because
24 the court reporter needs to keep a clear record,
25 you and I try not to talk over each other as much

1 as possible. So if you can please wait until I
2 finish my question before you start answering,
3 and I will try to wait until you have stopped
4 answering before I begin my next question, and it
5 would probably be helpful too if you pause
6 briefly before answering to give counsel a chance
7 to object if he wants to do so.
8     A.    Okay.
9     Q.    And you understand that you're under
10 oath today, and that that's just like testifying
11 in a court of law in terms of you have an
12 obligation to tell the truth. Do you understand
13 that?
14     A.    Yes, I do.
15     Q.    And if you don't understand a
16 question that I ask, you should let me know, and
17 I'll do my best to rephrase that -- rephrase the
18 question, but if you don't say that you don't
19 understand the question, I'm just going to assume
20 that you understand it. Is that -- do you agree
21 to that?
22     A.    Yes.
23     Q.    Okay. And if at any point you'd like
24 to take a break, just let me know, and we can
25 take a break at any time. The only thing I ask

1 is that if a question is pending, if I've asked a
2 question, if you could just answer that question
3 before we take a break. Is that okay?
4     A.    Yes.
5     Q.    Okay. Does that all make sense?
6     A.    Yes.
7     Q.    Okay. Do you have any questions
8 about the procedures today?
9     A.    No.
10     Q.    Okay. And is there any reason that
11 you can't testify truthfully here today?
12     A.    No.
13     Q.    So you just said you haven't been
14 deposed. Have you ever testified at trial?
15     A.    I don't recall.
16     Q.    Okay. But you don't remember ever
17 having testified in any sort of trial?
18     A.    I do not remember at this time.
19     Q.    Okay. Do you recall ever having
20 submitted any sort of sworn or written statement
21 in connection with a trial or a lawsuit?
22     A.    Not that I recall.
23     Q.    Okay. And have you ever yourself
24 been a defendant in a lawsuit besides this one?
25     A.    In this type of lawsuit, is that what

1 you're asking, a mal -- like a malpractice suit
2 or anything like that? Could you please clarify?
3     Q.    In any type of lawsuit have you ever
4 been a defendant?
5     A.    Not that I recall.
6     Q.    Okay. Have you ever been the
7 plaintiff in a lawsuit? Have you ever sued
8 anybody?
9     A.    And a plaintiff is?
10     Q.    Have you ever sued anybody?
11     A.    Oh, yes. That would be a work comp
12 case and my husband's death case.
13     Q.    Those are two separate cases?
14     A.    Yes, I had a work comp case and then
15 my husband's death case.
16     Q.    Okay. Thank you. Did you review any
17 documents in preparation for this deposition?
18     A.    Of this case in --
19     Q.    Yes, ma'am.
20     A.    No.
21     Q.    Okay. Did you prepare or create any
22 documents in preparation for this deposition?
23     A.    No.
24     Q.    Okay. Did you ever have any
25 conversations with anybody besides your lawyer

1  about this deposition?
2      A.  No.
3      Q.  Okay.  I know you said you work for
4  the Illinois Department of Public Heath.  So when
5  did you start there?
6      A.  I started there January 16 of 2017.
7      Q.  Okay.  And what is your job title
8  there?
9      A.  It's healthcare -- it's HFSN is the
10 initials.  As a surveyor -- healthcare facilities
11 surveyor nurse.  That's what it is.
12     Q.  Okay.  And what are your duties as a
13 healthcare surveyor -- I'm sorry, HFSN?
14     A.  I'm sorry.  It's Health Surveillance
15 and Facilities Nurse.  I believe that's what the
16 letters mean.  My program is it's private pay/
17 private insurance.  I am part of the regulation.
18 I do the surveys to go out and make sure that
19 they are following our regulations, and I also go
20 out and license them.  Do the initial survey for
21 licensure.
22     Q.  Okay.  When you say "they," who are
23 you referring to?  You said you go out and survey
24 them.
25     A.  Oh, that would be the agencies that

1  are applying or the agencies that are currently
2  licensed by our program.
3      Q.  Okay.  And what sort of agencies are
4  they?
5      A.  That would be home services agency,
6  the home nursing agency, the home services
7  placement agency, and the home nursing placement
8  agency, and those are all private pay/private
9  insurance only.
10     Q.  Okay.  Do your duties involve
11 referring patients to outside specialists,
12 current duties?
13     A.  No.
14     Q.  Okay.  Do they involve scheduling
15 procedures for patients?
16     A.  No.
17     Q.  Okay.  Do they involve the diagnosis
18 of any or treatment of any illnesses, current
19 duties?
20     A.  No, nurses are not allowed to
21 diagnose.
22     Q.  Okay.  Do your current duties involve
23 being familiar with medical terms or terminology?
24     A.  Yes.
25     Q.  Okay.  Do they involve -- do your

1  current duties involve reading or understanding
2  medical charts?
3      A.  Yes.
4      Q.  Okay.
5      A.  For the agencies that we do.  We
6  review clients' records because they're called
7  clients.  We review the clients' records and make
8  sure that they are following our regulations.
9      Q.  And by clients, does that mean
10 patients?  Would that be another way to refer to
11 them?
12     A.  Yes, it would be -- they're patients,
13 but in the program they're referred to as
14 clients.  Home services is non-medical.
15     Q.  Okay.  And so what sort of review are
16 you doing?
17     A.  We look at the clients' charts for --
18 we look at their contracts to make sure their
19 contracts meet all of our regulations.  We review
20 their service plans, which is also known as a
21 care plan in nursing.  We manage -- we review
22 those service plans, and we compare them to what
23 the documentation is from their care givers.  So
24 the home nursing we review the doctors' orders
25 and make sure that they are following their care

1  plan and that all regulations are met.
2      Q.  You said you review the doctors'
3  orders and make sure that they are following the
4  care plan?
5      A.  That's correct.
6      Q.  The "they" there refers to the
7  doctors, that the doctors are following the care
8  plan?
9      A.  No, that the agency is following the
10 care plan, that their nurses are making sure that
11 all of the doctors' orders are followed.
12     Q.  Okay.  How do you -- how do you do
13 that?  Can you describe that process?
14     A.  Yeah, you read the doctors' orders,
15 and then you review their chart and make sure
16 that -- that whatever is -- there is
17 documentation for each of those that has been
18 done.
19     Q.  And if a doctor's order -- strike
20 that.  In your current position if a doctor's
21 order is not being followed based on your review
22 of the chart, what do you do?
23     A.  Then it would be part of our -- it
24 would be part of the deficiencies we would write
25 up, and we would also -- if there was a question

1 of how serious it was, then we would call back to
2 the superiors and ask what they wanted us to do
3 at that time.
4     Q.    And just to be clear, the people who
5 are following the doctor's order is the agency
6 that you're licensing?
7     A.    That's correct.
8     Q.    Okay.  Before your current position
9 with the Department of Public Health, where did
10 you work?
11     A.    I -- I worked at Taylorville
12 Correctional Center as their public service -- I
13 think it's public service administrator.  It's
14 PSA ADN was my job title.  I was the
15 administrator for healthcare only.
16     Q.    So you were the healthcare
17 administrator?
18     A.    Yes, that's correct.
19     Q.    Okay.  And when -- what were the --
20 excuse me.  Strike that.  What dates were you the
21 healthcare administrator at Taylorville?
22     A.    12/16/16 to 1/15/17.
23     Q.    You said 12/16/16?
24     A.    Yes -- oh, I'm sorry.  Let me
25 rephrase that.  12/16/15 to -- yes, to 1/15/17.

1     Q.    So you began working as a healthcare
2 administrator at the Taylorville Correctional
3 Center on December 16, 2015?
4     A.    I believe that is correct.
5     Q.    And you stopped working as a
6 healthcare administrator at the Taylorville
7 Correctional Center on January 15 of 2017?
8     A.    I believe that is correct.
9     Q.    I'd like to come back to that time
10 period, Ms. Mincy, and why don't you tell me what
11 job you did immediately before that.
12     A.    I was a corrections nurse 2 at
13 Jacksonville Correctional Center.
14     Q.    And where is Jacksonville medical or
15 Correctional Center?
16     A.    It's in Jacksonville, Illinois.
17     Q.    And is that an Illinois Department of
18 Corrections facility?
19     A.    Yes, it is.
20     Q.    And what were your -- excuse me.
21 Strike that.  How long did you work there?
22     A.    April 1, 2011, until I left there
23 1/15 wrong -- strike that.  12 -- oh, gosh.
24 12/15 -- it's the day before I started.  I
25 believe I said 12/15/15; is that correct?

1 Because I believe that's correct.
2     Q.    12/15/15 would be the day before you
3 started.  And what was your duties at the
4 corrections nurse at the Jacksonville center?
5     A.    We passed medicine.  We did
6 treatments.  We assisted with the doctor.  We
7 responded to emergencies.  I did the TB clinic
8 and was responsible for all the TB testing for
9 the inmates.  We took care of the infirmary, give
10 their medicines, their treatments.  I'm trying to
11 think if there's anything more we -- that's all I
12 can think of right now.
13     Q.    Let's go through those.  When you
14 said -- pass medicine was the first duty you
15 listed.  Can you describe that?
16     A.    We had a medication line.  I worked 3
17 to 11 shift, and so we had the insulin line and
18 then we gave our insulin, did our Accu-checks,
19 and then at the night med line, and I was the
20 major one that did that on my five days a week.
21 They would come to the window, and I would pass
22 medicines.  We also did segregation.  We'd go
23 over and make rounds on segregation also and pass
24 their medicines at that time.  Do their
25 treatments.  Assess any problems, if there was a

1 problem over there, or a problem outside within
2 the facility, we would assess those patients and
3 call the doctor and follow whatever the doctor
4 told us.
5     Q.    You said you did Accu-checks?
6     A.    That's correct.
7     Q.    What is an Accu-Chek?
8     A.    Accu-Chek is just the little machine
9 -- it's a finger prick, and then it tells their
10 blood sugar.
11     Q.    You said your next duty was -- you
12 said did treatments?
13     A.    Yes, that's correct.
14     Q.    Can you describe that?
15     A.    We had wound vacs.  The vacuums on
16 the wounds.  We would change those dressings if
17 they needed it.  We would -- we did creams for --
18 if they had stitches, if the doctor ordered
19 something put on the stitches, then we would do
20 the dressing changes.  I'm trying to think, and I
21 believe that would be -- that's all I can think
22 of at this time.  That's the type of things we
23 did.
24     Q.    And these are all treatments ordered
25 by a doctor?

1    A.    Very much so.  Yes.  It has to be.
2    Q.    You said assisted the doctor was one
3 of your duties?
4    A.    Yes, the doctor would run his clinic
5 time, and so it would fall over into our time
6 because I worked 3 to 11.  We'd come over --
7 because he didn't leave until 5.  So then we
8 would take over his line, and we would help his
9 patients with doing their vital signs and getting
10 them ready and getting the chart ready for the
11 doctor, and then when he came back, when he was
12 finished, we would take off those orders, and if
13 there was new medications, then we would order
14 them and make sure the treatments were written
15 down so that everybody was involved in what the
16 doctor wanted.
17        MR. TYRRELL:  Try and slow down a
18 little bit, Lisa, for the court reporter's sake.
19        THE WITNESS:  Oh, I'm sorry.
20        MR. TYRRELL:  No, it's fine.  I'll
21 remind you.
22 BY MR. WACKMAN:
23    Q.    You said you prepped patients for the
24 doctor?
25    A.    That's correct.

1    Q.    Can you describe that?
2    A.    That is taking vital signs, getting
3 the chart written down with the vital signs.  If
4 there was any paperwork the doctor needed --
5 because each clinic had special paperwork that
6 had to be in there, making sure that lab reports
7 were there, if it was required for that, and then
8 putting the patient in the room when -- actually
9 putting the chart in the room -- well, actually
10 giving the chart to the doctor before he entered
11 the room so he could prep before he saw his
12 patient.
13    Q.    What sort of lab reports were
14 required to be in the chart?
15    A.    It depended on the clinic itself or
16 if the doctor had ordered lab reports, special
17 lab reports for that patient, and it could be
18 something as simple as Coumadin would require the
19 PT/INR, so that he could see if the Coumadin was
20 at the level he needed -- that the patient
21 needed.
22    Q.    What is Coumadin?
23    A.    Coumadin is a blood thinner, and it
24 requires the testing of the PT/INR to be sure
25 that it's two to three times the limit of the

1 normal.
2    Q.    And when you say lab reports, you
3 mean the results of tests sent to a lab?
4    A.    That's correct.
5    Q.    You said you assisted with
6 emergencies?
7    A.    That's correct.
8    Q.    Describe that.
9    A.    If somebody was having chest pain, we
10 would -- they would call out a code, and we would
11 respond to that code with our -- whatever they
12 called for.  If it required a gurney, we took a
13 gurney.  It could be anything from a sprained
14 ankle to chest pain to a head trauma, and it
15 could be something as minor as the patient was
16 just dizzy.  They hadn't drank enough for that
17 day of water.
18    Q.    Did your duties involve referring
19 patients to outside specialists?
20    A.    We don't refer.  That's a doctor's
21 duty.
22    Q.    Did your duties involve assisting
23 doctors in referring patients to outside
24 specialists?
25    A.    No.  The only thing that we did was

1 we would -- let me think.  We never referred, but
2 doctor would write it in the orders, and then --
3 so that we would let the clinic nurse know that
4 there was a referral.  Whoever had that clinic --
5 because there was high risk clinics that were on
6 telemedicine, and so that they would know because
7 we had a book that we would put in for the
8 referrals so that they would be scheduled if it
9 was on telemedicine.
10    Q.    So what do you mean by clinic?
11    A.    Telemedicine clinic.  That's where
12 it's on the TV, and there could be a renal
13 specialist, there could be the psychiatrist.
14 That's the only two that I can think of at this
15 time.
16    Q.    So clinic is -- excuse me.  Strike
17 that.  When you say clinic, you're referring to
18 sort of a specialized group of patients that all
19 see a specialized group of doctors; is that fair?
20    A.    That's correct.  It would be somebody
21 that would be referred to that doctor by our
22 doctor.
23    Q.    So as a nurse at the Jacksonville
24 facility, when a doctor referred somebody to an
25 outside specialist, they would note that in the

1  order, correct?
2  　　A.　That's correct.
3  　　Q.　They would give that order to you?
4  　　A.　Yes.
5  　　Q.　And then you would alert the clinic
6  nurse --
7  　　A.　Yes.
8  　　Q.　-- that there was an outside
9  specialist needed?
10 　　A.　That's correct.
11 　　Q.　And what would the clinic nurse do if
12 you know?
13 　　A.　The clinic nurse would then schedule
14 them for that clinic when the next -- it -- if --
15 she would schedule them with that doctor for that
16 clinic.
17 　　Q.　Okay.  Did your duties as a
18 corrections nurse at the Jacksonville center
19 involve scheduling procedures?
20 　　A.　In-house procedures, and that would
21 be like an x-ray or if they needed labs because
22 we had our -- we were one of the few facilities
23 that actually had a lab tech come in, and so we
24 would schedule their labs.  If it was suture
25 removal, of course, they would be put in on the

1  doctor's line.  Anything in-house we scheduled.
2  　　Q.　Would that include a renal ultrasound
3  if it was done in-house?
4  　　A.　If it was done in-house, but not
5  everything is done in-house.
6  　　Q.　Okay.  What about if the procedure
7  could not be done in-house, would you schedule
8  patients for procedures then?
9  　　A.　No.
10 　　Q.　Do you know what hematuria is?
11 　　A.　Yes, I do.
12 　　Q.　What is hematuria?
13 　　A.　It's blood in the urine.
14 　　Q.　What can it be a symptom of?
15 　　A.　It can be a symptom of kidney stones.
16 It can be a symptom of a urinary tract infection.
17 It could be a symptom that your Coumadin level is
18 too high, and it could be a symptom of cancer.
19 　　Q.　Any specific type of cancer?
20 　　A.　It would have to be in the kidney or
21 the renal system.
22 　　Q.　Did your duties as a correctional
23 nurse at Jacksonville involve diagnosing
24 hematuria?
25 　　A.　We do not diagnose.  Nurses are not

1  allowed to.
2  　　Q.　Did it involve treating hematuria?
3  　　A.　No, we -- we're not allowed to treat
4  unless the doctor writes for the treatment.
5  　　Q.　But if the doctor wrote a treatment
6  for hematuria, would you implement that
7  treatment?
8  　　A.　Yes, if the doctor wrote for it.
9  　　Q.　Did your duties as a nurse at
10 Jacksonville involve treating kidney stones if a
11 doctor wrote such a treatment?
12 　　A.　Yes.
13 　　Q.　Okay.  And did your duties as a nurse
14 at Jacksonville involve treating cancer if a
15 doctor wrote such a treatment?
16 　　A.　If it -- yes.
17 　　Q.　Did your duties involve being
18 familiar with medical terms and terminology?
19 　　A.　Yes.
20 　　Q.　Did your duties as a nurse at
21 Jacksonville involve reading and understanding
22 medical charts?
23 　　A.　Yes.
24 　　Q.　Medical records?
25 　　A.　Yes.

1  　　Q.　Did your duties involve obtaining
2  approvals for medications?
3  　　A.　I don't recall ever having a problem
4  with getting our medications.  Like I don't
5  recall ever an instance such as that being a
6  nurse in Jacksonville.
7  　　Q.　You don't ever recall obtaining an
8  approval for a medication?
9  　　A.　Yes, I don't recall that, having to
10 do that.
11 　　Q.　And you already said that your duties
12 involved administering medications to patients;
13 is that correct?
14 　　A.　That is correct.
15 　　Q.　Why did you leave your job at
16 Jacksonville?
17 　　A.　I took a -- I moved up into the
18 PSA position at Taylorville.  I took an increase
19 in pay, and I took a change in job.
20 　　Q.　Okay.  What did you do before you
21 were a corrections nurse at Jacksonville?
22 　　A.　I was a corrections nurse at -- for
23 Wexford at Western Illinois Correctional Center.
24 　　Q.　And what were the dates of that?
25 　　A.　I wasn't full-time.  I was prn.  I

1 was as needed, but I worked a lot of full-time
2 hours because they were -- they didn't have
3 full-time staff. I -- I can't -- it's 2009, 2010
4 before I went to work for the state.
5     Q.    So you think around two years?
6     A.    Yes, that's correct.
7     Q.    And where is Western Illinois Medical
8 Center?
9     A.    It's Western Illinois Correctional
10 Center.
11     Q.    Excuse me. Western Illinois
12 Correctional Center. Where is that?
13     A.    Mt. Sterling, Illinois.
14     Q.    And when you say prn, you said you
15 weren't full-time. Do you know what prn means?
16     A.    Yes, as needed.
17     Q.    And where did you work before Western
18 Illinois Correctional Center -- excuse me.
19 Strike that. Returning to Western Illinois
20 Correctional Center briefly, were your duties the
21 same as they were at Jacksonville Correctional
22 Center?
23     A.    No because I was as needed, so I did
24 not have a clinic, but the rest of those duties
25 are basically the same. There's no difference

1 other than the clinic.
2     Q.    Can you describe what you mean when
3 you said you did not have a clinic?
4     A.    I -- yeah, I wasn't in charge of a
5 clinic like in Jacksonville I was in charge of
6 the TB testing and the TB clinic making sure that
7 everybody that was an inmate had their TB testing
8 done, performed, and everything was in the chart,
9 and if there was any problems with that, then we
10 went to the next step.
11     Q.    How do you get put in charge of a
12 clinic?
13     A.    It -- whoever the -- your -- for
14 Jacksonville it was because we did not have a
15 DON. So for Jacksonville the administrator
16 issued out the clinics.
17     Q.    Did just anybody get put in charge of
18 a clinic or --
19     A.    No. There was one nurse that was in
20 charge of the rest of the clinics but because the
21 TB clinic was so much about the TB testing, that
22 she put me in charge of that.
23     Q.    Before Western Illinois Correctional
24 Center where did you work?
25     A.    I briefly worked at St. John's ER.

1 Also during the time I worked for Wexford I was
2 also a travel nurse for the ER for an agency in
3 Missouri.
4     Q.    All of those positions were as a
5 nurse?
6     A.    That's correct.
7     Q.    And you held them all at the same
8 time?
9     A.    When Wexford did not have the hours
10 for me, then the agency -- I would go to my
11 agency, and then I would sign a contract with
12 them, and then I would work over there in
13 Missouri.
14     Q.    When did you work at the St. John's
15 ER?
16     A.    2008. I -- I don't want to guess, so
17 I can't tell you. I can just tell you it was in
18 the period of 2008, and I worked there
19 approximately nine months.
20     Q.    Why did you leave that job?
21     A.    I left the job because the
22 satisfaction of my care. I didn't feel that it
23 was the right job for me, and I didn't feel that
24 we were giving the kind of care that I preferred
25 to give.

1     Q.    What do you mean by that?
2     A.    We were overworked and understaffed,
3 and I didn't feel that my patients were getting
4 everything that they required from me as a nurse,
5 and I don't mean required as in my treatments or
6 my doctor's orders were failing. It was me as a
7 nurse. There's a certain standard there you have
8 as a nurse because you want to meet that standard
9 that you set for yourself.
10     Q.    And you feel that the St. John's ER
11 did not meet that standard?
12     A.    Yes, I wasn't able to give the kind
13 of care that I preferred to give.
14     Q.    And before St. John's you worked for
15 Wexford and for the agency. Where did you work,
16 or how long did you hold that job?
17     A.    For the agency it was a couple of
18 contracts. There were ten weeks each. I --
19 after I met my ten weeks, then they filled the
20 position they had. I was offered jobs in
21 Missouri with the hospitals that I did work at.
22     Q.    Where did you work before that?
23     A.    Oh, I worked for Culbertson Memorial
24 Hospital in Rushville, Illinois.
25     Q.    And what were the years you worked

1 there?

2      A.     I worked there full-time from 2010

3 until -- I'm sorry.  Strike that.  Let me think.

4 2000 to 2009 or 8.  I apologize it's H -- 8.

5      Q.     And you were a nurse at Culbertson?

6      A.     That's correct.

7      Q.     Were you a nurse in any specific unit

8 or division?

9      A.     I was -- at that time I was in

10 surgery.  I worked surgery for three years, and I

11 also on my days off in surgery and on my weekends

12 I would work the ER.  That was for the full-time

13 stint.  I worked at the hospital from '89 to

14 2000, from '89 to 1994 as full-time and '94 to

15 2000 as part-time or --

16      Q.     So in total you worked at Culbertson

17 from approximately 1989 to 2009?

18      A.     That's correct.

19      Q.     Okay.  And where did you work before

20 Culbertson?

21      A.     Before Culbertson I was an LPN so I

22 worked in nursing homes.

23      Q.     And for what length of time were you

24 an LPN?

25      A.     I was an LPN for eight years before I

1 finished my RN.

2      Q.     So from 1981 approximately to 1989

3 you were an LPN?

4      A.     That is correct.

5      Q.     And what do you mean by LPN?

6      A.     A licensed practical nurse.

7      Q.     Okay.  And what were your duties when

8 you were a licensed practical nurse?

9      A.     We weren't allowed to do IVs.  So we

10 could do oral medications, IV or oral

11 medications, injectables, intradermals, those

12 kind of medications, treatments, assessments and

13 on -- I worked in the nursing homes so we had our

14 med lines, we had our treatment lines, we oversaw

15 what the CNAs were doing, and at some point we

16 had CNA duties also if we finished our duties.

17 Then we had our own patients to take care of

18 hands-on.

19      Q.     Where did you go to nursing school?

20      A.     Spoon River College is my first

21 nursing school for my LPN, and then I went to

22 Carl Sandburg Community College for my ADN, and

23 that was '89, and graduated, and then I graduated

24 Chamberlain College of Nursing in 2008 -- 2008.

25      Q.     And what degree did you obtain from

1 Chamberlain?

2      A.     A bachelor's of nursing.

3      Q.     Okay.  And what degree did you obtain

4 from Carl Sandburg?

5      A.     An associate's degree in nursing.

6      Q.     And what degree did you obtain in

7 Spoon River?

8      A.     Spoon River I obtained a practical

9 nursing certificate.

10      Q.     And you said you graduated from Carl

11 Sandburg in 1989; is that correct?

12      A.     Correct.

13      Q.     When did you become a registered

14 nurse?

15      A.     1989.

16      Q.     Okay.  At either Carl Sandburg or

17 Chamberlain, did you take classes in the

18 diagnosis or treatment of hematuria?

19      A.     We are not allowed to diagnose as

20 nurses.  We are -- we are only allowed to do what

21 the doctor tells us to do unless it falls

22 under -- unless it's below that level, and below

23 that level I mean you could clean out -- if

24 somebody scraped themselves or then you were

25 expected to do first aid on it or stabilize

1 something in case they needed to go to the

2 hospital.

3      Q.     As a nurse you take no classes in

4 diagnosing medical issues; is that correct?

5      A.     That is correct.

6      Q.     At Carl Sandburg or Chamberlain did

7 you take classes in the treatment of hematuria?

8      A.     Not specifically in the treatment of

9 hematuria, but it would fall within our -- that

10 section.

11      Q.     And what section is that?

12      A.     The section of the urinary tract

13 system.  I mean we studied the system.  We

14 studied all the systems, and learned our -- the

15 labs reports and that and what to report to the

16 doctor.  That's where the -- we're the eyes and

17 the ears of the doctor.  So if there's a problem,

18 we would report to the doctors.

19      Q.     Did you take the classes that covered

20 the treatment of kidney stones?

21      A.     That would be part of that, what --

22 how to recognize what the symptoms were so we

23 could report them to the doctor.

24      Q.     So that's a yes?

25      A.     Not specifically for kidney stones,

1  but to recognize the problems within the urinary
2  tract system and what we needed to report.
3      Q.    Did you take classes that covered the
4  treatment of cancer?
5      A.    Not specifically for the treatment of
6  cancer.  It would be supportive care -- what we
7  were required to do as nurses.
8      Q.    But you did take classes covering
9  what you were required to do as nurses in
10 treating cancer or in supporting the treatment of
11 cancer?
12     A.    Yes.
13     Q.    Okay.  As a registered nurse do you
14 have a continuing education requirement?
15     A.    Yes.
16     Q.    Can you describe what that is?
17     A.    That's 20 hours of CEUs every two
18 years to keep our license up to date.
19     Q.    And you have been a registered nurse
20 continuously since 1989?
21     A.    That's correct.
22     Q.    So you have taken 20 hours of
23 continuing education every two years continuously
24 since 1989?
25     A.    No because it wasn't a requirement

1  until -- I -- I can't recall when it became a
2  requirement but after that requirement was in,
3  then I have been up to date.
4      Q.    Okay.  What sort of classes do you
5  take as part of your continuing education
6  requirement?
7      A.    The continuing education is anything
8  you want to take as long as it meets -- as long
9  as it's certified by the state.  It has to be
10 okayed by the state to fulfill that need.
11     Q.    What sort of classes do you like to
12 take?
13     A.    I like to take a variety of classes.
14 I -- it really depends because usually you
15 receive a book in the mail, and they give you
16 different classes, and then I pick what I like.
17 I like traumas.  I like to read about psych --
18 the psych portion of things now.  Psychiatric
19 nursing has become one of my favorite studies.
20     Q.    What do you mean by traumas?
21     A.    Trauma means anything -- it could be
22 -- one of the last ones I read was about
23 compartment syndrome, and that's when it's a
24 crush injury and how to recognize it, when to --
25 and what the treatment would be for it.  What

1  would the followed treatment be?  So we would
2  understand that.
3      Q.    Besides continuing education classes,
4  how do you keep current on developments in
5  nursing?
6      A.    Well, I've taken classes towards my
7  master's degree in nursing education.
8      Q.    Where are you taking those classes?
9      A.    Well, I took them through Chamberlain
10 College of Nursing, and unfortunately the prison
11 wouldn't allow me to do my hundred hours of
12 students teaching.  So I'm now going to Western
13 Governors University.
14     Q.    So you're currently taking classes,
15 or you're currently completing -- strike that.
16 You're currently completing the requirements for
17 a master's degree in nursing?
18     A.    Education.
19     Q.    A master's degree in nursing
20 education?
21     A.    That's correct.
22     Q.    When do you expect to complete that?
23     A.    2020.
24     Q.    And when did you start that?
25     A.    I started that March of this year.

1      Q.    If you have a question about your
2  job, do you have any books or references you look
3  at to help you answer that question?
4      A.    For my current job?
5      Q.    Yes, for your current job.
6      A.    For my current job I go to the
7  regulations, and then if I have a question I
8  refer -- I go straight to my supervisor.
9      Q.    Okay.  What about -- strike that.
10 What do you mean by the regulations?
11     A.    We have regulations that we require
12 for the -- it's a survey.  So it's an auditor
13 survey, and basically it is step by step what we
14 require like -- let's talk about contract.  What
15 is expected to be in that contract, and so we
16 step each one and make sure it's in that
17 contract.  If there's something in the contract
18 that could possibly vary that I don't -- that I
19 don't understand, then I would refer it to my
20 supervisor.
21     Q.    What about when you were a healthcare
22 administrator at Taylorville, if you had a
23 question about your job?
24     A.    Then I would talk to Cindy Hobrock.
25     Q.    Who is Cindy Hobrock -- I'm sorry.

1  Can you say the name again?
2      A.    Cindy Hobrock, H-o-b-r-o-c-k.
3      Q.    And who is Cindy Hobrock?
4      A.    I do not recall what her title was.
5  She was a regional -- I don't know if she was a
6  director.  I don't recall her title.
7      Q.    Did she work at Taylorville?
8      A.    No.  She would -- Cindy was available
9  by phone always, by email, and she came to
10  Taylorville once -- at least once a month to do
11  the quality assurance meetings.
12      Q.    How about books or references, would
13  you ever consult them if you would have a
14  question in your job at Taylorville?
15      A.    In my job at Taylorville, I had the
16  regulation, I could assess them online, the
17  regulations that referred to healthcare and all
18  of corrections.  We had administrative
19  directives, and then we also had institutional
20  directives.
21      Q.    And those administrative directives
22  are policies, IDOC -- strike that.  When I say
23  IDOC, do you understand me to say the Illinois
24  Department of Corrections?
25      A.    Yes, I do.

1      Q.    Okay.  Those administrative
2  directives are IDOC policies that apply across
3  IDOC?
4      A.    That's correct.
5      Q.    And just to be clear on the record,
6  when I say Taylorville, you understand that I
7  mean the Taylorville Correctional Center,
8  correct?
9      A.    Yes, I do.
10      Q.    Okay.  What are the institutional
11  directives?
12      A.    Institutional directives are the
13  administrative directives.  They may be tweaked a
14  little bit for that facility.  That facility the
15  administrator may or -- it's not just the
16  administrator, but it may be changed just a
17  little bit -- a little bit more specific for that
18  facility.
19      Q.    So if you had a question in your job
20  at Taylorville, you would consult either Cindy
21  Hobrock or the administrative directives or the
22  institutional directives; is that correct?
23      A.    That's correct, unless it was
24  something to do with security or something like
25  that, then I would contact my wardens.  Warden

1  Kim Smith.  I can't remember the name of -- it
2  was three wardens that we had.
3      Q.    Would you consult anything else or
4  anyone else than the things that we've just
5  discussed?
6      A.    If it was about -- if it was about
7  care, of course, I would consult with the doctor
8  because I would want to understand, but the
9  doctor that was there because we were -- you
10  couldn't really talk to the -- the specialist.
11  So it would -- but the doctor was in touch with
12  the specialist.  If he had a question he could
13  call the specialist.
14      Q.    When you were a nurse at Jacksonville
15  Correctional Center and you had a question, were
16  there any books or references you would consult?
17      A.    Yes, I -- I kept books.  I had like
18  lab book -- we had a lab book, we had a
19  medication book, we had a med/surg nursing book.
20  I had a correctional nursing book.
21      Q.    These are textbooks?
22      A.    Some are textbooks.  Some are just --
23  they're good reference books like the
24  correctional -- correctional nursing book was
25  basically what the duties of the correctional

1  nurse were.
2      Q.    Do you recall the title of the
3  correctional nursing book?
4      A.    It was called Correctional Nursing.
5      Q.    Do you recall anything else about it?
6      A.    No, I bought it online.  It was a
7  skinny little book.
8      Q.    Do you still own it?
9      A.    No, I do not.  I left it at
10  Jacksonville when I left.
11      Q.    What about the med/surg book, and by
12  med/surg, do you mean medical/surgical?
13      A.    Yes.  That was Jacksonville's.
14      Q.    Do you recall the title?
15      A.    I believe it was Lippincott's
16  Medical/Surgical nursing book.
17      Q.    Do you remember anything else about
18  it?
19      A.    No, it just covered what you would --
20  it basically was the same textbook that you would
21  use in nursing school like about 30 years prior
22  maybe.
23      Q.    Let's talk about your work at
24  Taylorville.
25      A.    Okay.

1    Q.    What unit at Taylorville did you work
2  in?
3    A.    I was the administrator for
4  healthcare.
5    Q.    How many people worked in the
6  healthcare unit?
7    A.    State people?
8    Q.    Let's start with state people.
9    A.    Me and then, of course, the security
10  officer until they hired my secretary.
11    Q.    So total -- in the healthcare unit
12  the entire time you worked there, three people
13  total worked there?
14    A.    For state.  That's correct.  That
15  were state employees.
16    Q.    How many non-state employees worked
17  there?
18    A.    Let's see.  The director of nurses,
19  three nurses on days, two nurses on nights, two
20  nurses on 11 to 7.  So I don't know how many -- I
21  really do not know how many RNs they employed for
22  Wexford.  So I really don't -- because I --
23  that's Wexford.  That's not me.
24    Q.    When you say DON, what does that
25  mean?

1    A.    Director of nurses.  And then, of
2  course, there was two in Medical Records, and a
3  staff assistant.
4    Q.    Let's return to Jacksonville
5  Correctional Center briefly.  When you worked
6  there you were an IDOC employee?
7    A.    When I was at Jacksonville?  That's
8  correct.  I was a state employee.
9    Q.    What are the responsibilities of the
10  healthcare unit at Taylorville?
11    A.    I had several reports to do.  We had
12  a meeting on Mondays and Fridays, and I was to
13  report on what occurred over the weekend, if
14  there was anybody sent out, if anything had
15  occurred in the medical unit.  On Fridays it was
16  basically how many injuries we had, how many
17  outside, if anybody had been sent outside.  I had
18  to report it during our administrative meeting.
19  We had -- I was in charge of quality assurance
20  meeting once a month for a time.  I had a
21  governor's report I had to do and a couple other
22  reports.  Basically I was there to monitor.  I
23  had to -- if Wexford was using anything like if
24  they had ordered anything or how much paper they
25  were using, then I had to -- I had to report if

1  I --
2    Q.    So your job at -- excuse me.  Strike
3  that.  Would it be fair to say your job at
4  Taylorville was monitoring Wexford?
5    A.    No.  I would say my job at
6  Taylorville was liaison to be sure that it was --
7  I don't agree with monitoring because I don't
8  agree with that term at all.  I believe I was the
9  liaison between Wexford and Cindy Hobrock's
10  position.  Cindy Hobrock was under Dr. Shicker
11  and then Dr. Meeks later on.  She was one of the
12  -- I believe it's a -- again I'm not going to
13  guess on what her title is.  I cannot recall.
14    Q.    But Cindy Hobrock is a state employee
15  at the regional level responsible for healthcare;
16  is that fair?
17    A.    That's correct.
18    Q.    So she oversees multiple facilities
19  besides Taylorville?
20    A.    Yes, she did.
21    Q.    Was she your boss?
22    A.    I had many bosses.  Cindy Hobrock was
23  one of them.  Dr. Shicker and then Dr. Meeks.  I
24  had the three wardens to answer to.  I believe
25  that's all the bosses that I can -- and the

1  majors because the majors actually -- they were
2  actually in charge of the facility.
3    Q.    Just returning to the healthcare
4  unit, broadly speaking, is that unit responsible
5  for the medical care of all the prisoners at
6  Taylorville?
7    A.    Yes.
8    Q.    You said your duties included
9  meetings on Mondays and Fridays?
10    A.    That's correct.  It would be all the
11  heads of the departments would meet with the
12  warden because it was an open communication, and
13  that's what the warden wanted and, of course, all
14  three wardens would be there, and the majors --
15  one of the majors would come in also.
16    Q.    Let's start with the Monday meeting.
17  Was that meeting held every Monday?
18    A.    Every -- normally every Monday unless
19  it fell on a holiday or there was something else
20  that came up.
21    Q.    And you attended from the healthcare
22  unit?
23    A.    That's correct, me and Kathy Galvin,
24  the director of nurses.
25    Q.    Did anybody else from the healthcare

1 unit attend besides you and Ms. Galvin?

2    A.    No.

3    Q.    **And you said people from other**

4 **departments in the Correctional Center attended**

5 **as well?**

6    A.    That's correct.  It would be all of

7 the department heads.  It was basically a

8 department head meeting.

9    Q.    **Okay.  And you had to give a report**

10 **at that meeting?**

11    A.    I had to report on -- Kathy and I

12 would report on who was sent out or if there was

13 any upcoming -- new upcoming people -- inmates

14 that were going to be referred out.  We would

15 give a report on that.

16    Q.    **What do you mean by sent out?**

17    A.    If they had a -- if they were

18 going -- if the doctor had ordered something that

19 couldn't be done in-house and it was scheduled

20 immediately, not really -- strike that.  Not

21 immediately.  It would be like they were going to

22 schedule it that week, and we needed -- let's say

23 it was somebody in a wheelchair, and we needed --

24 we needed to make sure that that wheelchair

25 accessible van was there.  So that's what we

1 would report on, and if there was anybody sent

2 out to the hospitals, and if there was, how many

3 were in the hospitals is what I recall.

4    Q.    **And you also said you would -- excuse**

5 **me.  You also said you would report on new**

6 **upcoming referrals?**

7    A.    If they were going outside, not to

8 the ones that are doing on telemedicine because

9 that was kept in-house.  The -- that was all kept

10 in-house.  That would be in our QA meetings, but

11 it would be referrals because security would have

12 to know, and they would have to know to be sure

13 that they had staff for it or if there was going

14 to be a procedure, so they would want to know how

15 long do you think he's going to be in the

16 hospital, and then we would give them -- if we

17 could, we would say overnight or whatever.  That

18 way the major could prepare for security to be

19 there and they weren't -- they would not be

20 understaffed at the prison.

21    Q.    **Did you report on anything else?**

22    A.    Not that I recall.

23    Q.    **Is it fair to say that the reports**

24 **you made at that Monday meeting were all forward**

25 **looking in that things that would happen over the**

1 next week?

2    A.    That's correct.

3    Q.    **Okay.  What about the Friday meeting?**

4    A.    The Friday meeting was just to sum up

5 what happened between Monday to Friday.  So

6 looking -- again this would be, as I recall, it

7 would be just how many we sent out, that kind of

8 thing.  A recap of what happened that would have

9 anything to do with the facility.

10    Q.    **Were the attendees at the Friday**

11 **meeting the same as the Monday meeting?**

12    A.    As I recall, yes.

13    Q.    **So from the healthcare unit you and**

14 **Ms. Galvin attended the Friday meeting?**

15    A.    That is correct.

16    Q.    **What level of detail would you give**

17 **at the Friday meeting about people who had been**

18 **sent out?**

19    A.    You don't give details because that's

20 medical records.  That's a HIPAA violation.  You

21 just -- basically anything that they needed to

22 know like the kitchen would need to know if they

23 were -- if they needed to make a lunch to send,

24 if they were going how far away they were going,

25 and you just gave basics.  You know, we sent one

1 out.  We sent one out that spent the night.  We

2 didn't even discuss names.  It was just basic

3 information that had to do with those other

4 departments.

5    Q.    **At the Monday meeting were names**

6 **discussed?**

7    A.    No, they were never discussed in

8 open -- in an open meeting like that.

9    Q.    **You mentioned quality assurance**

10 **meetings.**

11    A.    Uh-huh.

12    Q.    **What were those?**

13    A.    Quality assurance meetings it -- they

14 were all about the QIP program, quality

15 improvement program.  They would have -- from

16 what I can recall, it was anybody that was sent

17 out or anybody that had a referral, if there was

18 upcoming, you know, basically what was going on

19 with the patients that were being seen by outside

20 doctors or the specialists.  It would also give

21 numbers on how many people we sent out, how many

22 people -- how much time was spent in the

23 hospital, that -- that sort of thing that I can

24 recall.

25    Q.    **Who attended those meetings?**

1    A.    It would be the warden, Kim Smith, it
2  would be Kathy Galvin, myself, Medical Records,
3  Chad after he was hired.  I can't recall his last
4  name.  My secretary did when she started.  Cindy
5  Hobrock was always there.  I'm trying to think.
6  Oh, Felicia Waterman from Medical Records was
7  there.  I do not recall if she was there every
8  time.  It might have been in -- during the
9  absence before Chad was hired.  Dr. Nawoor was
10  there.  The second warden was there.  The third
11  warden was there when he started -- when he was
12  there, I should say, because our third warden of
13  office programs -- he was of programs.  He -- we
14  had an intermittent time where he was there and
15  then he went there.  I believe that is all.
16  That's all I can recall being there and then of
17  course myself.
18    Q.    Does ten people sound about right?
19    A.    It's -- I'm not going to say that's
20  how many was there each time.
21    Q.    How often were these meetings held?
22    A.    Every month.
23    Q.    On a specific day typically?
24    A.    I don't recall.  I can tell you
25  that -- what I can remember is around the second

1  week of the month is when they were held.  That
2  is what I can recall.
3    Q.    And details on patient's medical
4  conditions were discussed at these meeting?
5    A.    That is correct.  Not every patient
6  in the facility, but yes, the ones that had seen
7  outside referrals or were having testing done.
8  If it was ongoing condition, any type of
9  referral, they were in there.
10    Q.    And what sort of details were
11  discussed?
12    A.    It would be -- it was -- how to put
13  this?  If there was a pending surgery, it would
14  be on there.  If it was, gosh, what had occurred
15  at the previous doctor's appointment as far as
16  you know, where are we with this patient.  This
17  is what's going on.  They ordered labs.  What was
18  also on there is collegial review.  If it had
19  been to collegial review, it was on there is what
20  I can recall.
21    Q.    What do you mean by a pending
22  surgery?
23    A.    Any surgeries that were -- if the
24  doctor had written for surgery, then it would say
25  we are, you know, to schedule surgery or if

1  there's any pending surgeries, if there's a
2  surgery in the future that they're -- or if
3  they're thinking about doing surgery, what the
4  future plan was with the client is what I can
5  recall, or I apologize, with a patient.
6    Q.    When you say after -- it was
7  discussed after the surgery had been ordered --
8    A.    Uh-huh.
9    Q.    -- was that -- strike that.  Who
10  discussed the pending surgeries?
11    A.    All of the --
12    Q.    I'm sorry.  Strike that.  Who made --
13  I'm assuming somebody initiated the discussion on
14  a pending surgery?
15    A.    Yes.
16    Q.    Who was that?
17    A.    Whoever was running the meeting.
18  When I was there it was me, and then after me it
19  was Chad because Chad was given that duty.
20    Q.    After you left Taylorville?
21    A.    No, it was during the time because he
22  was hired for -- they had the head of Medical
23  Records is what I can recall, and so then the
24  warden gave that duty to him.
25    Q.    Is Chad's last name Christer?

1    A.    That's correct.
2    Q.    Do you know the -- do you know when
3  Chad was hired?
4    A.    I don't recall the date.
5    Q.    Do you know about how long in your
6  tenure at Taylorville he was hired?
7    A.    No, I really don't recall.
8    Q.    Okay.  So these meetings discussed
9  any pending surgeries?
10    A.    If there's any, yes, that's correct.
11  Anything that's going to go figure out -- well,
12  anything that was going to go outside, it was
13  very detailed on what we discussed because that's
14  what the warden wanted.  She wanted an open
15  communication so she was aware, and then
16  everybody that was involved was aware.  So that
17  if there was a question that -- because a
18  question at that time about care or anything,
19  then Cindy was there, and then she would talk to
20  Dr. Shicker or anything like that --
21    Q.    Okay.
22    A.    -- or she would ask questions of us,
23  what about this, to ensure that we were doing the
24  right thing and as much as we were going to do.
25    Q.    The "she" there is the warden?

1      A.     No, she's there as my boss with the
2    regional director.  She was right under
3    Dr. Shicker and Dr. Meeks after Dr. Shicker left.
4      Q.     Cindy Hobrock?
5      A.     That's correct.
6      Q.     Was Cindy present in person?
7      A.     Yes.
8      Q.     Okay.  And you said you'd also
9    discuss previous doctor's appointments?
10     A.     We would discuss -- let's see.  Okay.
11   She -- Cindy followed the cases like everybody --
12   all of us followed the cases.  So any case that
13   was going out, we -- and if there was -- Cindy
14   would make sure that we were -- basically we told
15   her what we had done and told the warden what we
16   had done.  You know, this is what's going on with
17   this client or with this -- I apologize -- with
18   this patient, and then Cindy would interact at
19   that time and ask us questions to make sure that
20   everything was being done because Cindy had been
21   with Corrections for over 20 years, and she had
22   been in that position a long time and knew
23   Dr. Shicker very well.  So there was open
24   communication there.  Dr. Shicker was very -- and
25   Dr. Meeks too were very involved in patient care.

1      Q.     You just said Cindy followed the
2    cases like we all followed the cases?
3      A.     Like me and Kathy Galvin, and if
4    there was ever a question, then it was always
5    funneled to Cindy because I would always contact
6    Cindy to make -- if I felt something was -- if I
7    saw something that I didn't -- maybe didn't agree
8    with or thought maybe there was a question on,
9    then I would call Cindy or I would -- well, I
10   would call Cindy and ask her about it.
11     Q.     Would you --
12     A.     Go ahead.  I'm sorry.  I apologize.
13     Q.     I'm sorry.  Were you finished?
14     A.     No, I'm done.
15     Q.     Would you say you followed your
16   patients very closely?
17     A.     I cannot -- I don't recall that
18   because there was a thousand people there.  So --
19   and I was not a case manager.  That's not what I
20   was hired for.  I think we -- I followed them --
21   I can't say closely.  I can't say I followed each
22   case closely, so I can't say that.
23     Q.     How about the cases that were
24   discussed at the quality assurance meeting, were
25   you following those closely?

1      A.     I can't say that I followed each of
2    those closely.
3      Q.     But some cases you followed closely?
4      A.     We had that -- that's part of that
5    quality assurance meeting was there.  And there
6    were times where I would go in if I had a
7    question -- I also ran -- I also as part of my
8    job at Taylorville I also talked -- I also ran a
9    line of -- I would get a kite from -- from the
10   inmates that were wanting to discuss different
11   things with me, and so that I ran a line for
12   those, at least three to four days a week.  I did
13   grievances also, but anyway that I would -- and
14   then I would call them in and I would discuss
15   what their problem was and what they felt.
16   Most -- the majority of those were about $5
17   copay.
18     Q.     You said a kite?
19     A.     A kite meaning a -- it was a slip
20   that's -- it's prison terminology.  It means a
21   slip that they put their name on and they wanted
22   to talk to me.
23     Q.     So if a prisoner wanted to talk to
24   you about a problem, they filled out a slip,
25   which is called a kite; is that correct?

1      A.     It's prison terminology, that's
2    correct.
3      Q.     And what would they put on the kite?
4      A.     They would just put on there need to
5    discuss something with you, and that's basically
6    -- or that was it.  They would just put I need to
7    talk to you.
8      Q.     Who would they give that kite to?
9      A.     That I do not know.
10     Q.     Okay.  Do you know what happened to
11   that kite after your discussion with the
12   prisoner -- person?
13     A.     I don't recall.
14     Q.     Do you think IDOC still has them?
15     A.     I -- I really do not know.
16     Q.     If IDOC still has them, who do you
17   think would have them?
18     A.     I really do not know.
19     Q.     Okay.  Going back to the quality
20   assurance meetings, are there notes -- did
21   somebody take notes at those meetings?
22     A.     Yes.
23     Q.     Who took notes at those meetings?
24     A.     I don't recall.
25     Q.     Was it --

1     A.     I just know there was notes.
2     Q.     Do you know what happened to those
3 notes after the meeting?
4     A.     Yes, they're retained.
5     Q.     Who retained them?
6     A.     It's -- it's in -- it's in Medical
7 Records is the only thing I can tell you.
8     Q.     Did you ever take notes at those
9 meetings?
10     A.     No.
11     Q.     Because you were leading the meeting?
12     A.     When I was leading the meeting, no,
13 because I had the packet.  There was always a
14 packet.
15     Q.     How long did the quality assurance
16 meetings last typically?
17     A.     One to three hours sometimes.
18     Q.     And they also discussed cases that
19 had gone to collegial review?
20     A.     Not each one.
21     Q.     What do you mean by collegial review?
22     A.     Collegial review is if the doctor --
23 once he's completed his assessment and once he's
24 done his testing, if he feels like that it needs
25 to go to an outside doctor or somebody that's

1 not -- like that we would have on the
2 telemedicine, then he would go take the case and
3 present it to collegial review, and that is a
4 Wexford thing, and then they would review it and
5 say -- and then tell him yes or no, and -- or
6 they would want more things done, and it's
7 reviewed by at least one doctor, if not a team of
8 doctors.  I was never involved in collegial
9 review so I don't really know how many doctors
10 there are during that.
11     Q.     Were there any doctors to your
12 knowledge that were always a part of the
13 collegial review?
14     A.     Not -- not that I recall.
15     Q.     Okay.  Were the doctors all there at
16 Taylorville, or would that be at other facilities
17 as well?
18     A.     They were on the phone because doctor
19 did collegial review weekly.
20     Q.     Collegial review would happen once a
21 week for all the cases that needed to go to
22 collegial review?
23     A.     Yes.
24     Q.     Okay.  Do you know if there are notes
25 from those collegial reviews?

1     A.     I do not recall.
2     Q.     You said that's a Wexford thing?
3     A.     Yes.
4     Q.     Do you imagine that if there are
5 notes from those collegial reviews, that Wexford
6 would retain -- would have them?
7     A.     I don't -- I really don't know.
8     Q.     Okay.  Do you know if -- strike that.
9 You said some cases that went to collegial review
10 were addressed at the quality assurance meeting?
11     A.     Yes, we would have a collegial review
12 report from what I can recall.  Just saying that
13 patient's name, the number and what occurred.
14     Q.     What do you mean by what occurred?
15     A.     Well, what occurred during
16 collegial -- collegial review requested more lab
17 tests and that sort of thing.  Collegial review
18 requested an ultrasound.  Whatever collegial
19 review wanted or -- that is what would be there.
20 It would be documented in the client's chart as
21 collegial review and whatever orders there were.
22 I'm sorry.  Patient chart.  I can't get past the
23 patient/client thing.
24     Q.     You said previous doctors'
25 appointments were discussed at the quality

1 assurance meeting?
2     A.     If it was pertinent because Cindy
3 would -- once it was -- if it had been somebody
4 that we had reviewed every month and we were
5 following the care of every month like they went
6 to collegial review, collegial review wanted lab
7 tests.  So then the next month it would be
8 reported -- you know, the lab tests were, and I
9 can't say it was just lab tests.  Or Cindy may
10 have questions because she was good at keeping
11 notes and remembering, you know, and then she
12 would question, you know, what about this, or
13 what about that, where are we at with this.
14     Q.     Was anything else discussed at
15 collegial review besides the things we've --
16     A.     I wasn't involved.
17     Q.     Strike that.  Was anything else
18 discussed at the quality assurance meetings
19 besides the things we've talked about?
20     A.     Not that I can recall.
21     Q.     Were documents brought to the quality
22 assurance meetings like medical records or
23 medical charts?
24     A.     Not unless it was requested.
25     Q.     Who would request it?

1      A.    Cindy.  And I do not recall that ever
2  happening to be honest with you.
3      **Q.    All right.  So you don't recall ever**
4  **looking at somebody's medical records or medical**
5  **charts during the quality assurance meetings?**
6      A.    I don't recall.
7      MR. WACKMAN:  Okay.  We've been going
8  for a little more than an hour.  Does anybody
9  want a break?
10      MR. TYRRELL:  I'm fine.
11      THE WITNESS:  No.
12      MR. WACKMAN:  I'll have the court
13  reporter mark this as Exhibit 1.
14      (Whereupon, Exhibit 1 was marked for
15  identification.)
16  BY MR. WACKMAN:
17      **Q.    For the record this is Ms. Mincy's**
18  **Answer to Mr. Dean's Second Amended Complaint**
19  **entered on the docket in this case as ECF No. 61.**
20  **Are you familiar with this document, Ms. Mincy?**
21      A.    I have seen it.
22      **Q.    Have you read it?**
23      A.    Not in its -- not in its entirety.
24      **Q.    Okay.  Do you understand basically**
25  **how it's organized?**

1      A.    It's chronological, isn't it?
2      **Q.    I guess what I mean is do you**
3  **understand that each paragraph contains an**
4  **allegation for Mr. Dean's lawsuit and then**
5  **underneath that your response in bold?**
6      A.    Yes.  I understand.
7      **Q.    If we could turn to page 11 -- I'm**
8  **sorry -- pages 6 to 7, not page 11.  Paragraph 11**
9  **on page 6.**
10      A.    Okay.
11      **Q.    Do you see at the bottom of that**
12  **paragraph where it says Mincy was responsible for**
13  **Mr. Dean's medical care while she was employed as**
14  **the Healthcare Unit Administrator at Taylorville?**
15      A.    I read that.
16      **Q.    All right.  If we can flip to page 7**
17  **in your response, do you see where you admit you**
18  **served as the Healthcare Unit Administrator at**
19  **Taylorville?**
20      A.    Yes.
21      **Q.    But you deny the remaining**
22  **allegations in this paragraph.  Do you see that?**
23      A.    Yes.
24      **Q.    Do you agree that you are denying**
25  **that you were responsible for Mr. Dean's medical**

1  **care while you were the Healthcare Unit**
2  **Administrator at Taylorville?**
3      A.    I'm a nurse.  I am not -- I am not
4  responsible for his medical care.  The doctor is
5  responsible for his medical care.
6      **Q.    And who is that doctor while you were**
7  **the Healthcare Administrator at Taylorville?**
8      A.    Dr. Nawoor, N-a-w-o-o-r.
9      **Q.    So you would say that Dr. Nawoor was**
10  **responsible for Mr. Dean's medical care?**
11      A.    That and the nursing staff in which I
12  didn't know -- I was not hired.  It was not part
13  of my job to do any nursing care while I was
14  there.  So I was not involved in the medications
15  or any treatments or scheduling or any of that
16  other than to keep the documentation to run the
17  QA meetings when I was there.  I didn't make the
18  appointments.  I didn't do any of that.
19      **Q.    You described earlier your duty as**
20  **primarily being a liaison between Wexford and**
21  **Cindy Hobrock?**
22      A.    That's correct.
23      **Q.    Can you describe a little more what**
24  **you mean by liaison?  Can you set that document**
25  **aside, ma'am.  We'll come back to that, but --**

1      A.    Okay.  Basically if there was a
2  problem, then I would -- then I could go to Cindy
3  with that problem if there was a question about
4  anybody's care that I felt was -- might not be --
5  that I was -- that I would question from what I
6  have as part of my background, or if I needed
7  equipment, or, you know, what Cindy thought about
8  it because Cindy had been in her position a lot
9  longer.  If I needed direction of what to do, I
10  would go to Cindy for the medical portion of it.
11      **Q.    Let's focus on what you just said.**
12  **You would go to Cindy if you questioned**
13  **somebody's care?**
14      A.    That's correct.
15      **Q.    Can you talk a little bit more about**
16  **that.**
17      A.    Okay.  If -- if I saw something that
18  I wasn't quite sure of with the care, then I
19  would, of course, talk to Dr. Nawoor, so give him
20  time to explain it to me, and then I would
21  consult with Cindy.
22      **Q.    And you said you did that based on**
23  **your background?**
24      A.    Yes.
25      **Q.    And by background, you mean your**

1  background as a correctional nurse?
2      A.   My background in nursing in general.
3      Q.   Do you have an estimate of how many
4  times you went to Cindy with a question about
5  care -- or excuse me.  Strike that, ma'am.  Do
6  you have an estimate of how many times you went
7  to Cindy questioning the care that was being
8  given?
9      A.   I don't recall.
10     Q.   Do you think it was more than ten?
11     A.   I don't really recall.  I really just
12  don't recall.
13     Q.   Do you recall any specific instances?
14     A.   I don't recall.
15     Q.   Do you recall ever going to Cindy
16  with a question about Mr. Dean's care?
17     A.   I don't recall ever going to Cindy
18  about Mr. Dean's care.  I do recall Mr. Dean
19  being discussed in quality assurance meetings.
20     Q.   What would Cindy do if you took a --
21  if you went to her questioning Wexford's care?
22          MR. CORRIGAN:  Objection.  Asking her
23  to speculate.
24          MR. TYRRELL:  You can answer.
25     A.   I don't -- I'm sorry.  Would you --

1  would you repeat the question?
2  BY MR. WACKMAN:
3      Q.   Yeah.  If you went to Cindy
4  questioning the care being provided, what would
5  Cindy do?
6          MR. CORRIGAN:  Same objection.
7      A.   Cindy would -- I would -- she would
8  ask maybe for more information about the patient,
9  and she would be specific what she wanted, and
10  then she might do that or she might take what I
11  have already told her to Dr. Shicker or it was
12  later Dr. Meeks and see what the doctor -- what
13  the state doctor said.
14  BY MR. WACKMAN:
15     Q.   What position did Dr. Shicker and
16  later Dr. Meeks hold?
17     A.   Medical director of IDOC, I believe.
18     Q.   Besides liaisoning with Wexford and
19  running the quality assurance meetings, what
20  other duties did you have as Healthcare Unit
21  Administrator?
22     A.   My duties were the reports, the
23  meetings, doing the line for the prisoners, the
24  grievances.  Later on when we had outbreak of
25  unknown mites, then I was involved with getting

1  -- checking everybody and helping control that.
2      Q.   Besides the Monday meetings, the
3  Friday meetings, and the quality assurance
4  meetings, did you -- were you responsible for any
5  other meetings?
6      A.   I had to do staff meetings with the
7  staff.  Once a month we also did -- Kathy and I
8  also did patient teaching once a month that was
9  required.  It was different subjects.  The
10  subjects were always given to us like hand
11  washing was one.  STDs were another one.  I don't
12  recall the rest.  To any inmate that signed up
13  for that.
14     Q.   Do you recall ever doing one of those
15  patient teachings on hematuria?
16     A.   No, I do not recall that.
17     Q.   Do you recall ever doing one on
18  kidney stones?
19     A.   No, I do not recall.
20     Q.   Do you recall ever doing one on
21  cancer?
22     A.   That was not one of them.
23     Q.   All right.
24     A.   I can -- that is not one of the
25  meetings.

1      Q.   You mentioned staff meetings.  Can
2  you describe what you mean by that?
3      A.   Staff meetings would just be -- it
4  was for the staff, and I should say for the
5  healthcare staff only, and it would be things
6  that if the warden had sent out a message to me
7  what to relay to the staff, updates that way.  If
8  Cindy needed to -- like something changed, then
9  that's when it would be updated.  If it was some
10  kind of teaching to be done or we needed to make
11  sure that the licenses were there and to make
12  sure that the license lookups were done, we would
13  be sure to remind them of that.  That sort of
14  thing.  That's all I recall from those meetings.
15     Q.   Were patients discussed at those
16  meetings?
17     A.   No.
18     Q.   What sort of reports did you -- were
19  you -- strike that.  What sort of reports were
20  you responsible for as Healthcare Unit
21  Administrator?
22     A.   I was responsible for the one -- the
23  two I can recall is what I call the governor's
24  report, and each prison had it.  We -- it's on
25  the shared drive, and it was about -- it wasn't

1 patient specific. They just wanted to know the
2 numbers, how many patients were sent out, how
3 many patients, how many days in the hospital they
4 had, that -- they wanted to know the numbers.
5 The other one I just recall was about -- I recall
6 it being on there about equipment that Wexford
7 would have ordered, something like that. That's
8 all I recall from that report.
9     Q.    Who would that report go to?
10    A.    I don't recall.
11    Q.    But that was not about patients
12 either?
13    A.    No, no patients were ever discussed
14 on that -- on either of those.
15    Q.    Okay. Let's talk about what you call
16 doing the line.
17    A.    Okay.
18    Q.    What do you mean by that?
19    A.    The doing the line was that would be
20 the -- the inmate line is -- the inmate line --
21 okay. Let me ask this. Which doing the line do
22 you want? Jacksonville or Taylorville? Because
23 there's two differences there.
24    Q.    Let's focus on Taylorville.
25    A.    Okay. Taylorville for me because

1 there was no patient care, no medications
2 involved. It would be just meeting with -- if
3 they sent the piece of paper in, they needed to
4 talk to me, then I would meet with them, and --
5 and try to answer their questions.
6     Q.    By "them" in that answer, you mean
7 the patients?
8     A.    I meant the inmates, yes.
9     Q.    The inmates. How often did you do
10 that?
11    A.    At least three times a week from what
12 I can recall.
13    Q.    And if someone wanted to meet with
14 you during that time period, what would they do?
15    A.    They would fill out the piece of
16 paper also known as a kite, and they would turn
17 it in, and then that would come to me in the mail
18 in the morning.
19    Q.    Okay.
20    A.    Unless it was something that the --
21 because it was something that the warden wanted,
22 then she would tell me ahead of time you need to
23 meet with this person, and so I would be sure to
24 call that person over there or one of the wardens
25 or a major, somebody above me.

1     Q.    Were there any guidelines about what
2 someone could meet with you about during that
3 process?
4     A.    Not -- not that I'm aware of.
5     Q.    Did you take notes during those
6 meetings?
7     A.    No. From what I recall, if it was a
8 discussion, like I said before, the majority of
9 those were about the $5 copays and how chronic
10 illness did not meet -- what a chronic illness
11 was, what the regs said the chronic illness was,
12 and I would have to explain it to them, and then
13 we would discuss it, and then they would -- I
14 believe, from what I can recall, I gave the slip
15 back to them. That's all I can remember about
16 those.
17    Q.    Was any paperwork generated from
18 those meetings?
19    A.    Meeting with the line?
20    Q.    Yes.
21    A.    Not that I'm aware of. It was just
22 that slip.
23    Q.    Did you have any other duties as a
24 Healthcare Unit Administrator that we haven't
25 discussed?

1     A.    Not that I can recall. Well, I take
2 that back. I always made rounds every day in the
3 infirmary and talked to each of the -- because
4 that was part of my duties to make sure who was
5 in the infirmary, and I would go back there and
6 say hello and talk to them.
7     Q.    What do you mean by the infirmary?
8     A.    The infirmary is the room in the back
9 that has beds. It's like the mini hospital.
10    Q.    You would talk to every patient in
11 the infirmary daily?
12    A.    And even the ones that couldn't talk
13 to me, yes, I would always step in and make sure
14 just to see how they were doing and how they were
15 feeling for the day.
16    Q.    Would you ever review their records
17 or charts during those rounds?
18    A.    If there was a question, I mean if
19 they asked me -- I can't recall a specific
20 incident but if there was ever a question,
21 upcoming surgery, of course, we can never give
22 dates, that kind of thing, what was going on with
23 their care, if they had a doctor, most of them
24 were is the doctor going to see me today, or is
25 he going to see me tomorrow, that kind of thing

1  that I can remember.
2       Q.    Are you familiar with William Dean?
3       A.    Yes, I am.
4       Q.    Did you ever talk to William Dean in
5  the infirmary?
6       A.    Yes, I did.
7       Q.    Do you recall what you spoke with him
8  about?
9       A.    I recall his -- his condition, and
10  that's mostly what we talked about because he
11  would -- like if he went out to the doctor the
12  day before and then would return after me, I'd
13  always go back there.  It's part of my daily
14  rounds, and then he usually would fill me in on
15  what the doctor was planning or what he found out
16  from the doctor, and I mean doctor -- I meant
17  referral to the outside.
18       Q.    When you referred to his condition,
19  what do you mean?
20       A.    His condition of the cancer.
21       Q.    Was Mr. Dean frequently in the
22  infirmary?
23       A.    I -- I can't say frequently.  I don't
24  recall how many times.  I just recall him being
25  back there that I spoke to him.

1       Q.    Do inmates live in the infirmary?
2       A.    Some of them do.
3       Q.    Did Mr. Dean ever live in the
4  infirmary?
5       A.    Not that I recall.
6       Q.    But you recall talking to Mr. Dean in
7  the infirmary about his cancer?
8       A.    That's correct.
9       Q.    Do you remember talking to Mr. Dean
10  in the infirmary before he had been diagnosed
11  with cancer?
12       A.    I remember getting introduced to
13  Mr. Dean after I started there because I remember
14  being introduced to him and the director of
15  nurses filling me in on -- about what his
16  condition -- not his condition -- what he was --
17  basically what his symptoms were, and the first
18  question that I asked was has he been referred to
19  the specialist, and at that time he'd already
20  seen Dr. -- I believe her name is Einwohner, and
21  that she -- he was under her care.
22       Q.    Was that Dr. Rebecca Einwohner?
23       A.    I can only tell you last name.
24       Q.    Does Einwohner sound correct?
25       A.    Yes, it was Einwohner or something.

1       Q.    Dr. Einwohner is a nephrologist; is
2  that right?
3       A.    I don't recall what her title was,
4  only that she was a specialist on his case for
5  his condition of the urinary tract problems,
6  so --
7       Q.    Do you recall when you first met
8  Mr. Dean?
9       A.    No, I can't -- I don't recall when I
10  first met him.  I -- I just don't recall.
11       Q.    Do you have an estimate of when you
12  first met Mr. Dean?
13       A.    I can't even estimate that.
14       Q.    Okay.  If you want to look at Exhibit
15  1, your answer to the second amended complaint,
16  and flip to page 10.  I'd like you to focus on
17  your response to paragraph 21.
18       A.    Okay.
19       Q.    Focus specifically on the middle of
20  that response.  Do you see where it says,
21  "Defendant admits that she first met with
22  Plaintiff once in early 2016"?  Do you see that?
23       A.    Yes.
24       Q.    And you understand then in that
25  response you are the defendant?

1       A.    Yes.  That timeline is probably
2  correct.
3       Q.    Okay.
4       A.    It's correct.  I will tell you this
5  because this was taken quite a while ago, and
6  whatever I said here would be -- but at this time
7  I really don't recall the exact month and year.
8       Q.    Okay.  And you met with Mr. Dean
9  before he had seen an outside specialist?
10       A.    Well, he had seen Dr. Einwohner.  You
11  mean outside as being sent out of the prison?
12       Q.    Correct.
13       A.    I -- I don't recall.  I don't recall
14  if he -- at the time that I met with him, I just
15  recall asking the question about has he seen the
16  specialist, and the reply was yes, he's under
17  Dr. Einwohner's care, the telemedicine for this,
18  and I said okay.  That's the only thing that I
19  recall.
20       Q.    Do you recall what prompted you to
21  ask that question?
22       A.    It was the fact that he had his
23  symptoms, the length of his symptoms.  I don't
24  recall the exact symptoms, but I do recall
25  thinking that he needed to be -- he needed to see

1 a specialist, and that again is based on my
2 medical knowledge.
3      Q.   Do you recall anything about the
4 symptoms you heard?
5      A.   I recall the hematuria.  That's all I
6 recall.
7      Q.   And what was it about the hematuria?
8      A.   It was the length of time that he had
9 had it.
10     Q.   What did that length of time -- what
11 -- strike that.  What about that length of time
12 made you think that he needed to see a
13 specialist?
14          MR. CORRIGAN:  Objection.  Misstates
15 the answer, which is his symptoms as a whole,
16 that he believed he needed to see a specialist.
17          MR. TYRRELL:  You can answer.
18     A.   Oh, okay.  I don't recall that he had
19 the whole -- the symptoms constantly.  What I
20 recall is that he had had them apparent -- I
21 don't even want to say apparently because what I
22 recall, basically the symptoms as a whole because
23 of the length of time.  Now, whether that length
24 of time, I don't recall it being constant, but I
25 recall it being more than once, and that's all I

1 recall about that, and the reason why I say that
2 is because what I felt at that time would be that
3 this patient needed to be seen by a specialist.
4 That's all I can -- that's all I recall.
5 BY MR. WACKMAN:
6      Q.   And it was mostly the length of time
7 that made you feel that way?
8      A.   From what I recall.
9      Q.   Do you remember a discussion at that
10 meeting about Mr. Dean's care?
11     A.   At which meeting?
12     Q.   For the hematuria.  Excuse me.
13 Strike that.  At the -- first time you met
14 Mr. Dean, do you recall a conversation about his
15 care up to that point for the hematuria?
16     A.   I don't recall.
17     Q.   Would you say you were concerned
18 about the length of time?
19     A.   Yes because it's why I asked my next
20 question was has he seen a specialist, and I was
21 told yes, he had seen Dr. -- was under
22 Dr. Einwohner's care.
23     Q.   Do you recall following up on whether
24 Mr. Dean saw a specialist after that?
25     A.   No because I was not hired as a case

1 manager.  I don't recall.  I just know that he
2 was under Dr. Einwohner's care, and that would be
3 the specialist after that because I'm a nurse.
4 I'm not a specialist.
5      Q.   Are there case managers at
6 Taylorville?
7      A.   No, there is not.
8      Q.   What do you mean by case manager?
9      A.   Case manager would be somebody that
10 would follow his case completely.  It would be
11 somebody that would know from start to finish
12 what was going on with that patient, would know
13 the care that was being given and would basically
14 know all -- read all the notes.
15     Q.   Are case managers -- strike that.
16 Are there case managers at other facilities?
17     A.   No, there are not.
18     Q.   Does anybody at Taylorville fulfill
19 the case manager responsibilities?
20     A.   Not -- I do not -- not that I'm aware
21 of.
22     Q.   Do you remember the next instance
23 when you spoke with Mr. Dean at the infirmary?
24     A.   I do not recall.
25     Q.   Do you remember if you spoke with

1 Mr. Dean at the infirmary between the time of
2 that first meeting and his cancer diagnosis?
3      A.   I don't recall.
4      Q.   Do you recall about how many times
5 you spoke with him after his cancer diagnosis?
6      A.   I don't recall.
7      Q.   Did you ever talk to Mr. Dean outside
8 of the infirmary?
9      A.   I don't recall.
10     Q.   Did you ever talk to Mr. Dean when
11 you were doing the line?
12     A.   Not that I recall.
13     Q.   Was that meeting -- was that first
14 meeting in the infirmary the first time you
15 became aware of Mr. Dean's hematuria?
16     A.   Yes.  Can we take a break for just a
17 quick second?
18          MR. WACKMAN:  Certainly.  Off the
19 record.
20          (Whereupon a break was taken.)
21 BY MR. WACKMAN:
22     Q.   Ms. Mincy, were you aware that
23 Mr. Dean visited the healthcare unit on December
24 23, 2015, complaining that he was urinating
25 blood?

1    A.   I don't recall, and again I wouldn't
2 have been involved because I wasn't involved with
3 direct care.
4    Q.   Okay.
5         (Whereupon, Exhibit 2 was marked for
6 identification.)
7        MR. CORRIGAN:  This is 2?
8 BY MR. WACKMAN:
9    Q.   This is 2.  For the record this is a
10 document entitled Illinois Department of
11 Corrections Offender Outpatient Progress Notes,
12 Taylorville Correctional Center.  It is a
13 multiple-page document Bates stamped IDOC
14 Taylorville Med Recs 001340 through 001341.
15    Ms. Mincy, do you recognize this type
16 of document?
17    A.   Yes.
18    Q.   What is this?
19    A.   This is the MD sick call, which MD
20 sick call was stamped because that would be part
21 of his clinic line.
22    Q.   More generally, is this an entry from
23 Mr. Dean's medical records at Taylorville?
24    A.   It appears to be.
25    Q.   Would you refer to this as Mr. Dean's

1 chart?
2    A.   I would refer to this as part of the
3 nursing notes that are in his medical file.
4    Q.   Would there have been another place
5 where doctors or nurses at Taylorville made notes
6 about Mr. Dean?
7    A.   Not that I'm aware of.
8    Q.   Okay.  Who generally prepares the
9 notes on this type of document?
10    A.   This would be your clinic -- not your
11 clinic nurse.  It would be whoever was in charge
12 of this line for that day would ensure that there
13 was a progress -- an empty progress note for the
14 doctor.
15    Q.   And staying with the first page of
16 this document, 1340, did you -- strike that.
17 While you were the administrator at Taylorville
18 did you have access to these notes?
19    A.   Yes, I had access to all the medical
20 records.
21    Q.   Did you regularly review medical
22 records?
23    A.   No, not that I recall.
24    Q.   Under what circumstances would you
25 review medical records?

1    A.   If the patient was questioning
2 something about -- in the line of when they would
3 send -- send the kite request to me, then I would
4 obtain the medical records, and then we would --
5 I would review whatever they were questioning.
6    Q.   What about at -- what about if you
7 spoke to a patient at the infirmary, would you
8 ever review records after you spoke with a
9 patient?
10    A.   If there was -- if he had -- if the
11 patient had questioned something and -- if they
12 had questioned something, yes, I would have
13 reviewed or -- yes, I would have reviewed them
14 on -- if they were questioning something.
15    Q.   What about after a patient or a
16 procedure was discussed at a quality assurance
17 meeting, would you ever review those records?
18    A.   Not that I recall.
19    Q.   Okay.  Do you know how to read this
20 type of document?
21    A.   Yes.
22    Q.   Okay.  At the top do you see there is
23 a column labeled Subjective, Objective,
24 Assessment?
25    A.   Yes.

1    Q.   Can you describe what those labels
2 mean?
3    A.   Subjective is what the patient tells
4 you.  Objective is what you see.  And assessment
5 is basically what -- is your assessment.  Not --
6 that would be your skin, your -- whatever --
7 can't talk to you, then that's what you would put
8 down.  That would be your assessment of the
9 patient.
10    Q.   Is it typically a nurse that is
11 filling those things in?
12    A.   No, this is a doctor's note on this
13 first page.  This is a doctor.  This is Dr.
14 Nawoor right there.  He stamped it.  He signed
15 it.  There's the date.  It was taken off by Megan
16 Eggiman.  She -- the nurse that took off the
17 orders because he wrote orders right here.
18    Q.   But nurses or doctors could make
19 these Subjective, Objective, Assessment notes?
20    A.   Yes, it would -- they were using the
21 SOAP format.  It's an old way of charting.
22    Q.   All right.  And do you see in that
23 column that there is -- in handwriting there's an
24 S, then there's writing after it?
25    A.   Yes.

1     Q.    That stands for subjective?

2     A.    That's correct.  That's what --

3 basically -- subjective is what the patient is

4 telling you.

5     Q.    I'm just trying to make a clear

6 record of how to read this document.

7     A.    That's okay.

8     Q.    So I'm just explaining that the O

9 with handwriting after it is the objective

10 portion of the document; is that correct?

11    A.    That is correct.

12    Q.    And the A with handwriting after it

13 is the assessment portion of the note; is that

14 correct?

15    A.    That is correct.

16    Q.    And then the next column over is

17 Plans.  Do you see that?

18    A.    Yes.

19    Q.    And what does -- what does that --

20 what does -- I'm sorry.  What is plans?

21    A.    Plans would be what the plan of care

22 is.  That would be your orders, your doctor's

23 orders of what needs to be like your medications,

24 anything the doctor orders at that time.

25    Q.    So typically that is a note prepared

1 by a doctor?

2     A.    On this case, yes.

3     Q.    What is the date on this document?

4     A.    This document was written on

5 12/23/15.

6     Q.    And you started explaining this is a

7 record from a sick call, correct?

8     A.    Not a sick call.  This would be the

9 doctor's line because it said MD Sick Call on

10 this first page.  That means he was -- that means

11 that Mr. Dean saw the doctor that day.

12    Q.    Okay.  What is a sick -- is there

13 something just referred to as a sick call?

14    A.    That is what they call our MD line

15 over there from what I remember.  Again I wasn't

16 involved with direct care so I'm not totally

17 familiar sometimes with what they do.  The one

18 behind it, this is a nurse wrote this one because

19 this was her -- as you can see it's specifically

20 for urinary tract infection.  This is the sheets

21 that we use.  These are universal to IDOC.

22    Q.    And what you're referring to when you

23 say a nurse wrote this one --

24    A.    Yes.

25    Q.    -- this is the second document, 1341

1 is the Bates stamp on that?

2     A.    That's correct.

3     Q.    Okay.  So when you say this is a

4 record from the MD Sick Call, can you describe

5 how a patient or inmate at Taylorville gets to

6 the MD Sick Call?

7     A.    On these two pages that you have

8 given me on this second one -- on the second page

9 it says 12/23/15, 5:55 a.m. because they use

10 military time.  The nurse saw this patient, and

11 she's got it right up here.  MD referral.  So she

12 referred him to the doctor because you can see

13 where it is circled, hematuria is present,

14 abnormal findings on urine dipstick.  So she

15 referred him.  So then this was the -- she

16 referred him to the doctor because it says right

17 there this is why these sheets are there so we

18 know -- as a correctional nurse, you know when to

19 refer them to the doctor.  It's above you.  So

20 then this patient got in to see the doctor at

21 9:13 a.m. the same day.

22    Q.    How would one -- how would a patient

23 or inmate at Taylorville get to see the nurse?

24    A.    They would sign up for nurse sick

25 call.

1     Q.    When did a patient or inmate at

2 Taylorville sign up for nurse sick call?

3     A.    Sick call was done every day.  So

4 they would sign up on the list or they might have

5 something where -- with -- I'm not going to

6 assume or anything, but a patient like this, he

7 had hematuria, so this -- if it started that day

8 or he felt like he needed to be seen, then he

9 could be called over as a special nurse sick call

10 like a chest pain or anything that -- anything

11 like a trauma, a chest pain.  Those are the only

12 things I can think of off the top of my head, but

13 they could be referred to the doctor the same

14 day.  It depends on how -- what the nurse felt on

15 her assessment.

16    Q.    What is urine dipstick?

17    A.    Urine dipstick is a -- it's a -- it's

18 a dipstick, and I'm surprised, it's not --

19 basically you have them give you a urine sample.

20 Then you take the dipstick out, you dip it in,

21 and you read it, and then you compare it to the

22 bottle.  It reads leukocytes, it reads glucose,

23 it reads blood.  Those are the only things -- oh.

24 Ketones.  What else does it read?  Those are the

25 only things I can recall.  There's several other

1  things.  It would give you -- it will -- like
2  with the hematuria, if -- sometimes when
3  hematuria is in the urine, then you can't see it,
4  and that's why you need a dipstick done because
5  it will show positive on it.
6      Q.    So an abnormal finding -- so excuse
7  me.  Strike that.  Blood in the urine would
8  produce an abnormal finding on the urine
9  dipstick?
10     A.    That's correct.
11     Q.    Have you ever seen this particular
12 document before or either of these particular
13 documents?
14     A.    Not that I can recall.  She also
15 states here -- if you read this document, she
16 also states here for diabetic, increased protein
17 levels in the urine.  So the increased protein
18 levels in the urine would also be an abnormal
19 finding.
20     Q.    What might increased protein in the
21 urine mean?
22     A.    That would be your diabetes.
23     Q.    What would it be indicative of?
24     A.    That the body is spilling proteins.
25 It's a -- basically digesting its proteins, and

1  it's spilling over in the blood.  I'm sorry, in
2  the urine.
3      Q.    Is it a symptom of anything?
4      A.    Just it could be that increased
5  protein levels in the urine are something because
6  she's got diabetic circled.  So it could be just
7  that the diabetes needs to be controlled better.
8      Q.    Okay.
9      A.    It also says he's had two kidney
10 stones procedures.  So hematuria's present.  So
11 kidney stones can also cause hematuria.
12     Q.    But so can cancer, correct?
13     A.    That is correct.
14     Q.    Do you see at the bottom the box with
15 nurse's signature written in it?
16     A.    Yes, I do.
17     Q.    Is that the nurse who prepared this
18 document?
19     A.    Yes, this would be the nurse that did
20 the assessment and did the document.
21     Q.    Do you recognize this signature?
22     A.    Yes, I don't recall her first name,
23 but I recall the last name.
24     Q.    What's the last name?
25     A.    Sulcer, S-u-l-c-e-r.

1      Q.    And to the best of your knowledge is
2  Nurse Sulcer a Wexford employee?
3      A.    Yes.
4      Q.    Is this the sort of thing that would
5  be discussed at a quality assurance meeting?
6      A.    No.
7      Q.    Why not?
8      A.    This -- because for just hematuria,
9  no, because this -- again this would be one of
10 those that would need to go to the doctor and
11 then let -- we didn't discuss everybody that had
12 a sick call.  Okay.  We knew the number of sick
13 calls that were held, the number of referrals off
14 those sick calls to the doctor that were -- you
15 know, that were performed, but this is not --
16 they were the more advanced things like he would
17 have been discussed later on after he was under
18 Dr. Einwohner's care and then whatever -- I don't
19 recall if we -- I don't recall numbers for the
20 high risk or the telemedicine clinics.  I don't
21 recall if that was part of quality assurance or
22 not.
23     Q.    Okay.  Do you see -- on the first
24 document Bates stamped 1340 under Plans do you
25 see the entry beginning, "if hematuria persists"?

1      A.    Yes, I see that.
2      Q.    Are you able to read the next few
3  lines?
4      A.    Okay.  The only thing I can make out
5  is see urologist eventually.  I can't make out
6  that little word in front of that.  That's the
7  only thing that I can make out of that.
8      Q.    And you said this -- these notes on
9  this first page Bates stamped 1340 were prepared
10 by Dr. Nawoor?
11     A.    That's correct.
12     Q.    Is that Dr. Nawoor's signature
13 underneath the notes?
14     A.    Yes.
15     Q.    Would a recommendation that if
16 hematuria persisted and a urologist should be
17 something that would be discussed at the quality
18 assurance meetings?
19     A.    No because he -- this is when the
20 urologist -- he put see urologist.  So this would
21 be -- could be done in-house because the
22 telemedicine doctor, Dr. Einwohner is -- I can't
23 say he was referred to her at that time.  I don't
24 know when they -- but this is something that
25 could have been handled in-house because they had

1 a doctor on staff by telemedicine that dealt with
2 the urinary tract.  Now, did it occur at that
3 time?  I do not know.
4          Q.     I think you can set that document
5 aside.  Are you aware that Mr. Dean was approved
6 for a renal ultrasound at a collegial review on
7 January 13, 2016?
8          A.     I don't -- I don't recall that.  I
9 don't recall if he was or he wasn't.  I -- I
10 don't recall.
11         Q.     Is that the sort of fact that would
12 be discussed at a quality assurance meeting?
13         A.     If he was sent out for it.  If --
14 meaning that it cannot be done in-house, he was
15 referred to the outside to have it done, then
16 that would be -- yes, that would be discussed.
17         Q.     Okay.
18         A.     Other than just to give a report that
19 this man had -- was sent out for a renal
20 ultrasound.
21         Q.     Okay.  If the renal ultrasound was
22 held on-site, an outside person coming in to give
23 it, would that be discussed at the quality
24 assurance meeting?
25         A.     I -- I don't recall if they were

1 discussed or not.
2          Q.     Do you recall if this renal
3 ultrasound was discussed at a quality assurance
4 meeting?
5          A.     I do not recall.
6          Q.     Would the fact that an outside person
7 came to Taylorville to administer renal
8 ultrasound be something that would be discussed
9 at either the Monday or the Friday meeting?
10         A.     No.  That would be kept in -- if --
11 we had -- let me think what we had.  We had
12 radiology tech come in, we would have to give the
13 numbers that he saw.  I don't recall what other
14 tests were done there, but we would give the
15 numbers that would be part of the numbers as far
16 as the quality assurance.
17         Q.     Okay.
18         A.     That would be it.  I believe that is
19 part of our quality assurance is how many of
20 these tests were performed.
21               (Whereupon, Exhibit 3 was marked for
22 identification.)
23 BY MR. WACKMAN:
24         Q.     The court reporter just passed you
25 what's been marked as Exhibit 3 from this

1 deposition.  It is a single page document.  It
2 says Offender Outpatient Progress Notes
3 Taylorville Correctional Center on the top.  At
4 the bottom Bates stamped IDOC Taylorville Med
5 Recs 001343.  Do you recognize this type of
6 document?
7          A.     Yes, this is a progress note or
8 nursing note, doctor note, from -- a medical
9 record.
10         Q.     Okay.  And it's the same format as
11 the Exhibit 2 we just looked at; is that correct?
12         A.     No.  It does not have the SOAP except
13 for the entry of 2/2.  I can't make out whether
14 it's 2/1 or 2/2/16 where the RN actually did the
15 SOAP.
16         Q.     Where are these documents -- these
17 notes like this one like the Exhibit 2 we just
18 looked at, where are they maintained?
19         A.     These are maintained in the medical
20 records under the nurse's notes or progress
21 notes.
22         Q.     And where are those medical records
23 maintained?
24         A.     Those medical records are maintained
25 in the medical -- within the Healthcare Unit.

1          Q.     So if you wanted to look at this
2 document while you were the Healthcare Unit
3 Administrator at Taylorville, what would you have
4 to do?
5          A.     I would go in to the medical records
6 and I would go by his number, and then I would
7 pull the chart and I would have access to it.
8          Q.     Okay.  Have you ever seen -- strike
9 that.  I'd like to focus on the top entry in this
10 chart.
11         A.     Uh-huh.
12         Q.     Do you see the date on that entry?
13         A.     Yes.
14         Q.     What is the date on that entry?
15         A.     1/13/16.
16         Q.     Okay.  Have you ever seen this
17 particular entry before?
18         A.     Not that I recall.
19         Q.     Okay.  Can you read what it says at
20 that entry?
21         A.     Yes.  It says collegial with
22 Dr. Ritz.  He suggested renal ultrasound.  Dr.
23 Nawoor signed it and Eggiman, the nurse, took it
24 off.
25         Q.     What do you mean the nurse took it

1 off?

2     A.    Any time a doctor writes notes, a
3 nurse has to sign it off meaning that she has to
4 sign, and all of those doctor's orders, she's
5 liable for those doctor's orders after she signed
6 them off.  When you put your name on that, then
7 if there's anything missing, it goes on that
8 nurse.

9     **Q.    What do you mean if there's anything**
10 **missing?**

11    A.    Well, let's say there's 15 orders and
12 the doctor ordered a medication and the nurse did
13 not put it on the medication administration
14 record, doses were missed, then it would fall
15 back on that nurse because she did not ensure
16 that those medical -- that all of the orders were
17 taken off.

18     **Q.    So when the doctor gives orders and**
19 **it is written on this document, it is on the**
20 **nurse to make sure those orders are implemented;**
21 **is that correct?**

22    A.    That is correct.

23     **Q.    And who is Nurse Eggiman?**

24    A.    She is an employee of Wexford and one
25 of the registered nurses at Taylorville.

1     **Q.    Do you know her first name?**

2    A.    Megan.

3     **Q.    Megan.  And do you spell her last**
4 **name to the best of your knowledge,**
5 **E-g-g-e-m-a-n?**

6    A.    I believe it's E-g-g-i-m-a-n.

7     **Q.    Who is Dr. Ritz?**

8    A.    Dr. Ritz apparently -- well, by the
9 documentation here, Dr. Ritz was the doctor in
10 collegial review.

11     **Q.    Do you know by looking at this entry**
12 **if anybody else attended this collegial review**
13 **besides Dr. Nawoor and Dr. Ritz?**

14    A.    No, I do not.

15     **Q.    Would it be noted here if someone**
16 **did, another doctor did?**

17    A.    I -- I have no -- I can't say.  I
18 really do not know.

19     **Q.    What do you take it to mean where the**
20 **document says he suggests renal ultrasound?**

21    A.    That Dr. Ritz gave the -- because it
22 says collegial with Dr. Ritz, that suggests would
23 be in reference to Dr. Ritz because Dr. Nawoor is
24 writing this, that he wanted -- that Dr. Ritz
25 okayed for a renal ultrasound to be completed for

1 Mr. Dean.

2     **Q.    Do you know Dr. Ritz's full name?**

3    A.    No.

4     **Q.    Do you know where he is located?**

5    A.    No.

6     **Q.    Do you know if he is an employee of**
7 **Wexford?**

8    A.    If -- no, I don't -- I do not know
9 that.

10     **Q.    Do you know anything about him**
11 **besides his name?**

12    A.    No.

13     **Q.    Is he a doctor you're familiar with**
14 **from your time at Taylorville?**

15    A.    No, because if he was in collegial --
16 I have no idea who those doctors are.

17     **Q.    Okay.  What is a renal ultrasound?**

18    A.    Renal ultrasound is -- basically
19 they're using the ultrasound to highlight the
20 renal, the kidneys, and the entire urinary tract.

21     **Q.    What is it used to diagnose?**

22    A.    It can be used to find if there's --
23 if there's any kidney stones, if there's any
24 blockages, if there's any -- it could be -- if
25 it's a tumor, it could be used to find if there's

1 a problem with a kidney functioning, if the
2 kidney's too small.  If there's any deformities
3 in that -- that's -- it depends on, of course,
4 what they're looking for.

5     **Q.    Can you tell why it was ordered here?**

6    A.    I cannot.

7     **Q.    If we could move on that same**
8 **document, Bates stamped 1343, to the -- two**
9 **entries down.**

10    A.    Okay.

11     **Q.    Do you see an entry marked 2/2/16 at**
12 **1330?**

13    A.    I see an entry.  Whether it says 2/2
14 or 2/1, I'm not quite sure, but yes, the 1330 is
15 also -- it also says RN note.  Is that the one
16 you're talking about?

17     **Q.    Yeah, that's a good point.  It is not**
18 **clear.  Would you agree it is clear it was either**
19 **February 1 or 2 of 2016?**

20    A.    I would agree with that.

21     **Q.    Okay.  And 1330 and is marked RN**
22 **note, would you agree with that?**

23    A.    That is correct.

24     **Q.    Okay.  What does that note say?**

25    A.    Okay.  What it says is RN note,

1 subjective, this -- at this time basically
2 there's nothing the patient told her. Objective
3 she informed inmate to have a full bladder -- she
4 informed the inmate to have a full bladder for
5 on-site ultrasound on 2/20 -- on 2/2/16. Her
6 assessment was pretest orders. Her plan was
7 ultrasound tomorrow on-site.
8     Q.    So just to review that briefly.
9 Under S the 0 -- or 0 with a slash through it
10 means nothing, no -- no subjective?
11     A.    Yeah, there was -- that is correct.
12     Q.    All right. The I/M in the sentence
13 informed -- informed I/M to have a full bladder,
14 I/M means inmate?
15     A.    That is correct.
16     Q.    And so this document pertains to
17 William Dean, that would pertain to William Dean?
18     A.    That is correct.
19     Q.    And U/S in the sentence or in the
20 clause, I should say, to have a full bladder for
21 on-site U/S, you read U/S to mean ultrasound?
22     A.    Yes.
23     Q.    And by on-site, as in on-site
24 ultrasound, what does that mean?
25     A.    That means it was going to be done in

1 -- within the prison.
2     Q.    If we could move to the next entry
3 down, which is clearly marked 2/2/16. Do you
4 agree with that?
5     A.    Yes.
6     Q.    Can you read that entry?
7     A.    Yes. Renal bladder sono completed.
8     Q.    Okay. What is a renal bladder sono?
9     A.    Renal bladder sonogram which is the
10 same as an ultrasound.
11     Q.    So renal sono is sonogram?
12     A.    Was completed.
13     Q.    And do you see who signed that entry?
14     A.    I cannot read that.
15     Q.    Going back briefly to the entry above
16 it, who signed on that entry?
17     A.    The RN note entry?
18     Q.    Correct.
19     A.    That would be Megan Eggiman.
20     Q.    Were you aware that Mr. Dean received
21 a renal ultrasound on February 2?
22     A.    I do not recall.
23     Q.    Okay. Is that something that would
24 be discussed at a quality assurance meeting?
25     A.    No, not on a regular basis because

1 this was done in-house. So no.
2     Q.    Who would have been aware that
3 Mr. Dean received a renal ultrasound on February
4 2?
5         MR. CORRIGAN: Objection to the
6 extent it asks her to speculate.
7         MR. TYRRELL: You can answer.
8     A.    I can answer?
9         MR. TYRRELL: Yes.
10     A.    Okay. That would be the nurses
11 because they would need to be aware of it because
12 Megan had -- that's why Megan had written here on
13 the 2/1 or 2 RN note that she informed him
14 knowing that the ultrasound was going to be
15 tomorrow. So they would have had to make sure
16 that he had followed up, made sure he had a full
17 bladder for that ultrasound.
18 BY MR. WACKMAN:
19     Q.    In your experience would the fact
20 that a renal ultrasound was held be something Dr.
21 Nawoor would be aware of?
22     A.    Yes.
23         MR. CORRIGAN: Objection. Asking her
24 to speculate.
25         MR. TYRRELL: You can answer.

1     A.    Okay. In this matter, Dr. Nawoor was
2 aware because on 2 -- the one above that, it says
3 1/20 2/1/16, Dr. Nawoor writes, "Patient needs to
4 have a full bladder for ultrasound in a.m."
5 BY MR. WACKMAN:
6     Q.    Okay. And just to be clear, you're
7 referring to the entry between 1/13, the doctor's
8 note collegial with Dr. Ritz and the entry RN
9 note on 2/1 or 2/2, that middle entry labeled
10 2/1/16 was prepared by Dr. Nawoor; is that
11 correct?
12     A.    That is correct.
13     Q.    And how do you read that?
14     A.    Patient needs to have a full bladder
15 for his ultrasound in a.m., and then Megan
16 Eggiman signed that order off.
17     Q.    You would agree that this ultrasound
18 was approved at collegial review on 1/13/2016
19 based on your reading of this document?
20     A.    Based on this document, yes.
21     Q.    Do you have any doubt that it was
22 actually approved on 1/13/2016 based on this
23 document?
24     A.    I have no doubt since it's
25 documented.

1      Q.     If something were entered on this
2 document or a document like this, would you have
3 any doubt that it truly occurred on that date?
4      A.     Can you clarify that?
5 BY MR. WACKMAN:
6      Q.     Yeah.  That wasn't a very good
7 question.  If you read something in a -- in one
8 of these progress notes, would you have any
9 reason to doubt that that thing actually occurred
10 on the date the progress note said it occurred?
11      A.     No.
12      Q.     And why is that?
13      A.     Because it's written here.  When --
14 the one thing that nurses are taught that you
15 document, and you document the correct date that
16 it occurred, whatever entry you're making.  Now,
17 if I was going to go -- if this is speaking about
18 nurses in general, what they're taught is if they
19 have something they forgot to chart, then they
20 may go in and they put the date that they're
21 charting it at that time, but then they will put
22 back note and then the date for what when it
23 occurred, and that is not in this.  It says the
24 date and the time right there.
25      Q.     And you would agree that Mr. Dean had

1 a renal ultrasound on the 2nd of February 2016?
2      A.     Yes.
3      Q.     By my calculation that means the
4 renal ultrasound occurred 20 days after it was
5 approved.  Do you agree with that?
6      A.     Let's see.  You're getting to math
7 here.  Now I'm going to have to really figure
8 this out.  Not quite 20, but yes.  It was not
9 quite 20.
10      Q.     Would you be comfortable saying
11 approximately 20?
12      A.     I don't feel comfortable saying
13 approximately anything, but it's not quite 20.
14 13.  So maybe I misfigured.
15      Q.     Why do you think it took -- I will
16 represent to you that this is 20 days.
17      A.     Okay.
18      Q.     Why do you think it took 20 days for
19 the ultrasound to be held after it was approved
20 at collegial review?
21      MR. CORRIGAN:  Objection to asking
22 her to speculate.
23      MR. TYRRELL:  You can answer.
24      A.     Okay.  I don't recall on whether
25 this -- the renal -- the ultrasounds were done on

1 a regular basis.  I don't recall.  I don't recall
2 if this was something they -- I don't know if
3 this was somebody they had to call in special and
4 that's the only date they could get them in
5 there.  I really can't -- I mean that is the only
6 thing I can tell you.  I just don't recall.
7 BY MR. WACKMAN:
8      Q.     In your experience at Taylorville is
9 that a typical period of time between approval
10 and an ultrasound -- renal ultrasound being
11 administered?
12      A.     I don't recall ever seeing another --
13 even recalling another renal ultrasound.  So --
14      Q.     Does that sort of delay surprise you?
15      A.     Not -- for testing, no.  This does
16 not surprise me.  20 days is not surprising.  On
17 the outside it could be a month or more.  So this
18 does not -- this is really within the limit of --
19 I mean I don't -- this is not surprising to me at
20 all.
21      Q.     How could the ultrasound have been
22 expedited so it could have been held sooner?
23      A.     Well, if it could have been done
24 sooner, if Dr. -- after Dr. Nawoor presented the
25 case to Dr. Ritz, then Dr. Ritz can say renal

1 ultrasound stat.  It would be documented stat
2 which means it needs to be done right now.  So
3 then it would have been referred out to
4 another -- an outside hospital to be done, but
5 that again is between -- I'm not involved.  I was
6 never involved with the collegial discussion.
7      Q.     So in your experience based on your
8 knowledge of Taylorville Correctional Center, Dr.
9 Nawoor would have had to mark the ultrasound as
10 stat to have it done sooner?
11      A.     That is correct, but Dr. Ritz
12 would -- would have had to give the okay for that
13 as being stat.
14      Q.     So Dr. Ritz would have had to have
15 approved the expedited ultrasound?
16      A.     They would have felt the need to have
17 it done immediately.
18      Q.     And who would have been responsible
19 for setting up that expedited ultrasound?
20      A.     It would have -- after it was
21 written, then it would have gone to the nurse and
22 the nurse would have -- then the nurse would have
23 started the scheduling -- would have notified the
24 majors, because if they're going to send him out
25 immediately, then you have to notify security to

1  make sure that they have -- and if this was a
2  time that Kathy was there.  They probably -- they
3  would have went to Kathy with it too, the
4  director of nurses and let -- let her know.
5      Q.    So Nurse Eggiman would have been
6  responsible for scheduling the expedited
7  ultrasound; is that correct?
8      A.    That's correct if it was written, but
9  it was not written that way.
10     Q.    And by Kathy, you mean Kathy Galvin?
11     A.    Yes.
12     Q.    And who is Kathy Galvin?
13     A.    She's the director of nurses.  She
14 works for Wexford.
15     Q.    But she works at the Taylorville
16 Correctional Center?
17     A.    That is correct.
18     Q.    And she is a defendant in this
19 lawsuit?
20     A.    I don't recall.
21     Q.    If we refer back to Exhibit 1, which
22 is your answer to the second amended complaint,
23 page 6, paragraph 10, do you see where it says,
24 "Defendant Nurse Kathy Galvin is a nurse employed
25 by Wexford.  At all times relevant to this

1  action, Nurse Galvin served as Director of
2  Nursing at Taylorville."
3      A.    Yes.
4      Q.    Is that the Kathy you're speaking of
5  in your previous answer?
6      A.    Yes.
7      Q.    Okay.  Do you know what
8  hydronephrosis is?
9      A.    Hydronephrosis is -- it's in the
10 kidneys.  It's -- it's basically when the nephron
11 is bigger than what it's supposed to be because
12 it's filled with water.  Hydronephrosis.  With it
13 being -- I'm just breaking down the word.  The
14 nephrosis would mean it's something that's
15 ongoing, would mean it's a chronic -- a chronic
16 condition.
17     Q.    Do you know what hydronephrosis is a
18 symptom of?
19     A.    No, that I do not know.
20     Q.    Okay.
21     A.    Again that would be for a doctor, not
22 a nurse.
23     Q.    Referring to Exhibit 1, which is your
24 answer to the second amended complaint --
25     A.    What page?

1      Q.    Page 11.  Excuse me.  I'm looking at
2  paragraph 24 on page 11.  Do you see where it
3  says, "Mr. Dean received a renal ultrasound on
4  February 2, 2016.  The results showed, quote, "no
5  mass lesions or hydronephrosis," unquote, and,
6  quote, "normal flow of blood on Doppler,"
7  unquote.  The lack of hydronephrosis, the
8  swelling of the kidneys caused by obstructed
9  urine flow, is not consistent with a diagnosis of
10 kidney stones."  Do you see that?
11     A.    Yes.
12     Q.    And do you see that your response in
13 the answer was, "Defendant admits the allegations
14 contained in this paragraph."
15     A.    Yes.  I do see that.  And the reason
16 why would be what I'm reading is the first one.
17 The results showed no mass lesions -- no mass
18 lesions is the key words there -- and normal
19 blood flow on the Doppler.  The hydronephrosis --
20 again that's a doctor -- that's more -- higher
21 medical than what I've got.  The swelling of the
22 kidneys caused by obstructive urine flow.  Okay.
23 It's a swelling of the kidney.  It's not
24 consistent with a diagnosis of kidney stones.
25 But again it goes back to mass lesions.

1      Q.    What's significant about mass
2  lesions?
3      A.    Mass lesions would mean -- no mass
4  lesions or hydronephrosis, which means that
5  there's nothing that really showed up there even
6  though it's on the normal flow of blood.  And the
7  lack -- swelling of the kidney -- okay.  Boy.
8  Okay.  No mass lesions or hydronephrosis because
9  it's got normal blood flow.  So that would tell
10 me that there's no mass lesions there and the
11 hydronephrosis just is -- I mean I was reading
12 about the no mass lesions.  The swelling of
13 kidneys caused by obstructive was not consistent.
14 The only -- for me diagnosis of kidney stones,
15 and I don't diagnose, the symptoms of kidney
16 stones is hematuria, right flank pain.  I'm
17 sorry -- yeah, right or left flank pain, that
18 comes to the front.  That to me is a kidney
19 stone.  And not all kidney stones are the same.
20 It depends on the person.
21     Q.    For diagnosis of kidney stones based
22 on your training and experience as a nurse, would
23 you expect to see mass lesions in the renal
24 ultrasound?
25     A.    Usually we don't see the renal

1 ultrasounds.  I mean that's not -- that's above
2 us.  They would read them and tell us what was in
3 them.  A mass lesion, to me -- again I'm not
4 trained to read them, and I'm not -- this is
5 above me.  This goes to the doctor.  But I mean I
6 agree with -- just like I wrote it, agrees --
7 admits the allegations.  The lack of
8 hydronephrosis, swelling of the kidney caused by
9 obstructed urine flow is not consistent with --
10 if it didn't show anything on there, then --
11 usually kidney stones you can spot because it's
12 going to be a blockage.  It possibly could cause
13 a mass because you might have a big huge kidney
14 stone as compared to little tiny ones that you
15 can see, but I mean that's -- just rereading
16 this, that's all I can say.  Do you have any more
17 questions?
18        Q.    What is the basis of your knowledge
19 about hydronephrosis for -- excuse me -- the lack
20 of hydronephrosis not being consistent with a
21 diagnosis of kidney stones?
22        A.    Because of the kidney stone can
23 block.  If the kidney stone -- a kidney stone can
24 sit in there and not cause any problems, but the
25 hydronephrosis is when the kidney stone moves

1 down into the ureters, and then it blocks that
2 and then the urine would back up, and then your
3 kidney would swell because it's not got any place
4 for the urine to go.
5        Q.    Where did you learn that?
6        A.    Nursing school.
7        Q.    Do you believe that's something that
8 all nurses would know?
9              MR. CORRIGAN:  Objection.  Asking her
10 to speculate what somebody else knows.
11             MR. TYRRELL:  You can answer.
12        A.    I believe so.
13 BY MR. WACKMAN:
14        Q.    Do you believe that is something all
15 doctors would know?
16             MR. CORRIGAN:  Objection.  Asking her
17 to speculate.
18             MR. TYRRELL:  But you can answer.
19        A.    I -- I would believe so.
20 BY MR. WACKMAN:
21        Q.    Okay.  Was this finding from the
22 renal ultrasound on February 2, 2016, discussed
23 at one of the quality assurance meetings?
24        A.    Not that I recall.
25        Q.    Do you recall learning it at the

1 time?
2        A.    I do not recall.
3        Q.    You can set that document aside.  Are
4 you aware that Mr. Dean visited sick call on
5 February 2 -- excuse me.  Strike that.  Are you
6 aware that Mr. Dean visited sick call on February
7 10 complaining of hematuria?
8        A.    Again I didn't do direct medical
9 care.  I wasn't there for each sick call, so I do
10 not recall when he would have visited sick call.
11 I would have to refer to the chart for that.
12        Q.    Do you recall if you were present at
13 that specific sick call on February 10?
14        A.    I do not recall.
15             (Whereupon, Exhibit 4 was marked for
16 identification.)
17 BY MR. WACKMAN:
18        Q.    The court reporter handed you what's
19 been marked Exhibit 4.  Exhibit 4, single page
20 document entitled IDOC Offender Outpatient
21 Progress Notes Bates stamped IDOC Taylorville Med
22 Recs 001346.  Have you seen this particular
23 document before?
24        A.    I do not recall.
25        Q.    Okay.  What is the date on this

1 document?
2        A.    2/10/16.
3        Q.    And would you agree this document
4 pertains to William Dean?
5        A.    Yes.
6        Q.    Okay.  And who prepared these notes?
7        A.    Prepared as in -- could you clarify?
8        Q.    Who wrote these notes?
9        A.    Oh.  Well, this note was written by
10 Dr. Nawoor.
11        Q.    Okay.  And is his signature at the
12 bottom right of this document?
13        A.    Yes.
14        Q.    And whose signature is below his, can
15 you tell?
16        A.    Carol Mansfield, M-a-n-s-f-i-e-l-d.
17        Q.    And who is Carol Mansfield?
18        A.    She's a registered nurse at
19 Taylorville Correctional Center.  She's employed
20 by Wexford.
21        Q.    Okay.  Do you see under her signature
22 there is a date and then under that there is a
23 notation?  Do you see that?
24        A.    Yes.
25        Q.    Do you know what that notation is?

1          A.     Under her name is the date and 11
2    a.m.
3          Q.     What does this document show?
4          A.     This document shows it's stamped MD
5    Sick Call but she wrote it under a MD note, which
6    means that this would be just a regular doctor
7    visit, and the doctor requested it because it
8    says per MD.
9          Q.     And what are those numbers underneath
10   per MD?
11         A.     That would be the vital signs of
12   Mr. Dean.
13         Q.     Okay.  And can you read the
14   subjective note there?
15         A.     History of intermittent hematuria.
16   Urine positive for blood, 2/5/16.  Ordered by
17   nephrologist.  I do not know what the next two
18   things -- two words are after that.  It's any
19   pain.  He has stopped his ASA for now.  ASA is in
20   reference to aspirin.
21         Q.     Are you familiar with Dr. Nawoor's
22   handwriting?
23         A.     Yes.
24         Q.     Are you fairly confident that you can
25   accurately read it?

1                 MR. CORRIGAN:  Objection.  The
2    witness has already testified that she can't read
3    portions of it.
4                 MR. TYRRELL:  You can answer.
5          A.     I can read portions of it.
6    BY MR. WACKMAN:
7          Q.     Would you -- strike that.  Do you
8    understand that when I ask you to read something,
9    you should only read things that you are
10   confident you know what they say?
11         A.     Yes.
12         Q.     Okay.  Do you see where under the
13   Plans notation there, can you read the portions
14   of that you can read?
15         A.     The first line I cannot read that.
16   The only word I can read out of that is the
17   middle, and it's urine.  Number two will be
18   discussing him -- again cannot read that, but as
19   collegial today -- at -- at collegial today.
20   Urine grossly bloody.  Signed by Dr. Nawoor.
21   Second -- you want me to read the second plan
22   because there's two plans?
23         Q.     Yes, please.
24         A.     Discussed with Dr. Ritz at collegial.
25   Patient will be sent to urologist for cysto --

1    cystoscopy.
2          Q.     The abbreviation PT in the sentence,
3    "PT will be sent to urologist," that you just
4    read, PT means patient; is that correct?
5          A.     That is correct.
6          Q.     Okay.  What do you understand the
7    notation that urine grossly bloody to me?
8          A.     To me would be that you'd be able to
9    see the blood in the urine.  It would be
10   wine-colored or maybe tinged a little red, but
11   you would be able to visually see it.
12         Q.     So do you take this note in your
13   experience at Taylorville to mean that Dr. Nawoor
14   observed Mr. Dean's urine to be grossly bloody?
15                MR. CORRIGAN:  Objection to the
16   question.  She's already testified she can't read
17   portions of the note that she read.  You're
18   asking her to speculate as to what Dr. Nawoor
19   meant.
20                MR. TYRRELL:  You can answer.
21         A.     Okay.  From the note I would -- I
22   don't want to say guess.  I don't want to say
23   assume.  Doctor either saw the urine grossly
24   bloody.  I would -- I would think that he
25   visually saw it, or the nurse reported it to him

1    if she did a dipstick, but again this is my
2    interpretation and not what -- I can only tell
3    you what I read it as.  It was seen by someone, a
4    medical professional.
5          Q.     What is a cystoscopy?
6          A.     That is when they take the scope and
7    go up into the urinary tract and visualize it
8    with the scope.
9          Q.     What does it diagnose?
10         A.     It can -- it's used for a lot of
11   different things.  I -- it just basically can see
12   if there's a mass, there's a blockage.  It can
13   tell them if the sphincter is weak, and that's --
14   I'm familiar with a cystoscopies because I worked
15   surgery for three years, and I helped Dr. Wilson
16   do them, and majority of them that we did was
17   because women had bladder leakage.  Men too.  And
18   that's mostly what we did.
19         Q.     Can they diagnose cancer?
20         A.     You can't -- I can't diagnose cancer.
21   The doctor would if he saw something, if he
22   actually visualized something.  He could take a
23   piece of it and then send it off to Pathology,
24   and then Pathology would -- you know, would test
25   it and see what the cells were.

1    Q.    In your experience is a cystoscopy
2 used to diagnose kidney stones?
3    A.    Not that I can recall.
4    Q.    So in your experience no?
5    A.    In my experience if it was used to be
6 kidney stones, then that is why they would do the
7 cystoscopy because they would look up there and
8 see if there was a blockage.  It would be done --
9 a lot of the cystoscopies again that I'm familiar
10 with it are done either because there's too much
11 urine coming out all the time or it's a small
12 flow.
13    Q.    In your experience at Taylorville is
14 a urologist a specialist that a patient would
15 need to be sent out for?
16    A.    A urologist again -- they could have
17 been done by Dr. Einwohner.  With saying that, it
18 would be doctor -- the collegial could decide if
19 Einwohner was the right doctor for that or not.
20 I mean her specialty is nephrology, that is her
21 area, but again that would be collegial to
22 decide, not for me to decide if they wanted
23 somebody else.
24    Q.    Can you tell by this note if Mr. Dean
25 was going to see Dr. Einwohner or another

1 urologist?
2    A.    I cannot tell by this note.
3    Q.    Would this encounter at sick call be
4 the sort of thing that was discussed at a quality
5 assurance meeting?
6    A.    The collegial would be, yes.  We
7 would discuss -- that would be part of the
8 quality assurance because it would be collegial,
9 it would be -- this patient was ongoing.  I mean
10 we're looking at one to two months.  We've
11 already -- I don't know when he was referred to
12 Dr. Einwohner, so -- because collegial review was
13 done, it would be charted in the quality
14 assurance notes, and then just basically that he
15 was referred to urologist and what was going to
16 occur, is it going to be Dr. Einwohner, but this
17 one has a cystoscopy.  So he's going to have to
18 go to an outside doctor because Dr. Einwohner
19 cannot do that over the TV.
20    Q.    Do you recall this encounter being
21 discussed at a quality assurance meeting?
22    A.    I don't -- I don't recall.
23    Q.    But based on your experience with
24 quality assurance meetings, you're confident it
25 was?

1    A.    I am confident to say if it was
2 discussed, it would have been in the notes of
3 that quality assurance.
4    Q.    Do you -- you already testified you
5 do not recall being present for this sick call.
6 Are you sure?
7    A.    I don't recall.
8    Q.    Okay.  You can set that document
9 aside, ma'am.
10         (Whereupon, Exhibit 5 was marked for
11 identification.)
12 BY MR. WACKMAN:
13    Q.    I'm showing you what has been marked
14 as Exhibit 5 --
15    A.    Okay.
16    Q.    -- which is an excerpt from the
17 deposition of William Dean, the plaintiff in this
18 lawsuit.  The deposition was taken in this
19 lawsuit, and it is a four-page document, does not
20 bear a Bates number.  I should say this excerpt
21 is a four-page document.  I'd like to focus your
22 attention on the third page of this document,
23 that is marked page 76 of the deposition overall.
24 This part of the deposition was taken June 26,
25 2018.  It was a multi-day deposition.  Do you

1 see -- if you could just review from line 15 on
2 page 76 all the way to line 16 on page 77.  Just
3 take your time and review it.
4    A.    Okay.
5    Q.    Does this refresh your recollection
6 in any way about the February 10 sick call?
7    A.    I don't recall this.
8    Q.    You don't recall being present at the
9 February 10 sick call at all?
10    A.    I don't recall it, no.
11    Q.    Do you recall ever hearing Dr. Nawoor
12 tell Mr. Dean he either had, quote, "stones or
13 cancer," unquote?
14    A.    I don't recall.
15    Q.    Okay.  Do you recall Dr. Nawoor
16 saying that he wanted to order a CAT scan?
17    A.    I don't recall that.
18    Q.    You can set that document aside.
19         MR. CORRIGAN:  This deposition marked
20 as an exhibit?
21         MR. WACKMAN:  Here.
22         MR. CORRIGAN:  Yes.
23         MR. WACKMAN:  It was.  Exhibit 5.
24    A.    Break.
25         MR. WACKMAN:  Take a break.  Off the

1 record.
2                    (Whereupon a break was taken.)
3                    (Whereupon, Exhibit 6 was marked for
4 identification.)
5 BY MR. WACKMAN:
6         Q.    Handing you what's been marked as
7 Exhibit 6 to this deposition.  It's a multi-page
8 document titled on the first page Offender
9 Outpatient Progress Notes, Taylorville
10 Correctional Center.  It's Bates stamped IDOC
11 Taylorville Med Recs 001348.  The second page is
12 001349.  The third page is 001350, and the fourth
13 and final page is 001351.  Do you know if you've
14 ever seen any of these pages before, Ms. Mincy?
15 Take your time to look at them.
16        A.    I cannot recall seeing these
17 specifically, and I did not document in these.
18        Q.    Do you see at the top in Offender
19 Information, do you see the name written there?
20        A.    Yes.
21        Q.    What name is that?
22        A.    Last name Williams, first name Dean.
23        Q.    And what is the ID number on these
24 records?
25        A.    N as in Nancy 21885.

1        Q.    What is that ID number?
2        A.    That would pertain to his prison ID
3 number, Mr. Dean Williams' prison ID number.
4        Q.    Is that unique to the inmate?
5        A.    Yes.  He will retain that no matter
6 how many times he comes -- that I'm aware of, the
7 way I was told, told that he will retain that ID
8 number.  No matter how many times he comes back
9 to prison, he will always have the same number.
10 That is what I understand.
11        Q.    Is that the same as his IDOC number,
12 do you know?
13        A.    No, I do not know.
14        Q.    Can you turn to the last page of this
15 document, Bates stamped 1351.  Do you see the
16 offender information there?
17        A.    To the last page, 1351, is that the
18 one you're talking about?
19        Q.    Correct.
20        A.    Okay.  Yes.  It's N -- you're asking
21 me about his ID number?
22        Q.    I'm just asking if you see the
23 offender information on the top.
24        A.    Yes, it's last name Dean, first name
25 William, ID number is N as in Nancy 21885.

1        Q.    You agree that the first and the last
2 pages pertain to the same individual because the
3 ID numbers are the same?
4        A.    Yes.
5        Q.    Returning to the first page Bates
6 stamped 1348, do you see the top line says MD
7 note?
8        A.    Yes.
9        Q.    What is an MD note?
10        A.    That again would be -- with the MD
11 note, this would be the doctor's -- the MD note
12 would be the doctor's documentation.  He is
13 documenting -- did he see him at that time?  I
14 cannot tell you that this was -- this was in his
15 line because it's not stamped MD Sick Call along
16 with MD note.  I can only tell you that MD note
17 means that Dr. Nawoor wrote this.
18        Q.    What are other circumstances under
19 which a doctor would make an MD note that don't
20 involve being at sick call?
21        A.    If he would -- if he was reviewing
22 records as far as like your labs, any testing,
23 notes from referrals, that would, then he might
24 make that note there or if there's any changes in
25 the patient.

1        Q.    Can you tell from this note why it
2 was written?
3        A.    On 2/16/16, 9 a.m., is that the one
4 you're referring to?
5        Q.    That's correct.
6        A.    All right.  It says his S was frank
7 hematuria, will be seeing urology.  Cannot read
8 the rest.
9        Q.    Do you see that label beneath it says
10 "To:  UIC - Main Lab"?
11        A.    Yes.
12        Q.    What is that?
13        A.    That would be if they sent off some
14 kind of lab test, and in the plan it says CBC
15 today, 2/12/16.  Then that could be for that CBC
16 because that was ordered that day.  So it would
17 be in reference to that CBC, which is a complete
18 blood count.
19        Q.    Why would a patient get a complete
20 blood count?
21        A.    A complete blood count --
22        MR. CORRIGAN:  Objection.  You're
23 asking the witness to speculate about why the
24 doctor did something.
25 BY MR. WACKMAN:

1      Q.     Let me strike that question.  In
2  your -- are you familiar with what a complete
3  blood count is?
4      A.     Yes.
5      Q.     In your experience what is a complete
6  blood count used for?
7      A.     A complete blood count is when
8  treating anyone that is even in the hospital,
9  that is one of the tests that they use.  It
10  monitors if they're becoming anemic.  If they
11  have an infection, it can give you that
12  information.  It can also tell you if allergies
13  are present.  You -- basic complete blood count
14  can give you a lot of information.
15      Q.     You can turn to the second page Bates
16  stamped 1349, and if you can focus on the RN
17  note, which is the bottom entry.  Do you see
18  that?
19      A.     Yes.
20      Q.     Can you read the Subjective,
21  Objective, Assessment portion of that note?
22      A.     Are you referring to 2/25/16, 1700?
23      Q.     I am.  Thank you, Ms. Mincy.
24      A.     You're welcome.  S says there was no
25  subjective.  This was a telephone order from Dr.

1  Nawoor.  Reason: Gross, bloody hematuria.  The
2  orders were received.  Her assessment was
3  hematuria.  Her plan, it says right above it, per
4  Dr. Nawoor.  So this was telephone orders from
5  Dr. Nawoor.
6      Q.     Can I stop you right there, ma'am.
7  What it does it mean telephone orders from Dr.
8  Nawoor?
9      A.     That means that -- that this nurse
10  reported to Dr. Nawoor about the gross, bloody
11  hematuria and then she received orders from him
12  directing her what to do.
13      Q.     And what is the plan?
14      A.     Okay.  These were, as it says above,
15  per Dr. Nawoor.  So these were Dr. Nawoor's
16  orders to her.  Plan is CBC completed in the
17  morning -- in the a.m.  Send back to Healthcare
18  Unit No. 6.  Will be seen in MD Sick Call, MDSC,
19  which means MD Sick Call, tomorrow 2/26/15.  Dr.
20  Nawoor to speak to urologist 2/26/15 to possibly
21  move up appointment for cystoscopy.  Diana Smith,
22  RN, for Wexford signed off.
23      Q.     If you can go to the last page of
24  this document.
25      A.     Okay.

1      Q.     Are you aware that Mr. Dean went to
2  sick call with hematuria on February 26?
3      A.     I do not recall.
4      Q.     Okay.  Do you recall if that was
5  discussed at the quality assurance meeting?
6      A.     I do not recall, and on a normal
7  basis because he went to sick call would not be
8  something unless it was in referring to the
9  urologist.  So I can't even speculate either way
10  or the other about that.
11      Q.     Were you aware at the time -- by the
12  time, I mean February 2016 that Dr. Nawoor was
13  interested in possibly moving up the appointment
14  for the cystoscopy?
15      A.     As I stated previously, I wasn't
16  aware of this patient until March.  This is in
17  February.  So I would not be aware of any of
18  this.
19      Q.     You stated you weren't aware of this
20  patient until March?
21      A.     Well, that's what I stated
22  previously.
23      Q.     I believe, Ms. Mincy, we only talked
24  about early 2016.
25      A.     Okay.  Early 2016 would be correct.

1  Whether it was February or March, I believe
2  though that I stated and I may be wrong, I may
3  have read it wrong, because I don't -- I do not
4  recall the date when I first saw this patient.
5  So I don't want to speculate on something that I
6  may -- I mean I believe that I stated in here
7  when I became initially aware of that patient,
8  was introduced to him and --
9           MR. CORRIGAN:  Can we point out for
10  the record when she said "here," she's referring
11  to her Answer?
12           MR. WACKMAN:  Yes.
13  BY MR. WACKMAN:
14      Q.     Is there a reason you think it would
15  be March, Ms. Mincy?  Do you recall March?
16      A.     I don't really recall.  I just recall
17  reading that, and I may have read it wrong out of
18  here, but I do -- because I think you posed a
19  question to me.  I believe I remember you posing
20  a question to me, and --
21      Q.     If you can focus on Exhibit 1, which
22  is your answers, the amended second complaint,
23  page 10, paragraph 21.
24      A.     Okay.
25      Q.     Your response where you state,

1 "Defendant admits that she first met with
2 Plaintiff once in early 2016." Do you see that?
3      A.   Yes.
4      Q.   Is that what you're referring to?
5      A.   That is what I'm referring to.
6      Q.   Okay.  So you do not recall if it was
7 March or another month?
8      A.   I don't recall the exact month at
9 this time, but this was, of course, written
10 before when I would have had a better --
11 closer -- a better memory of it because the time
12 has -- there's been a couple years gone by at
13 this point.
14      Q.   Do you recall if Dr. Nawoor's desire
15 to move the cystoscopy up was discussed at the
16 quality assurance meeting?
17      A.   I do not recall.
18      Q.   In your experience is that the type
19 of thing that would be discussed at the quality
20 assurance meeting?
21      A.   Not necessarily meaning to move it up
22 -- could be because the doctor's going on
23 vacation, not our -- not Dr. Nawoor but the --
24 he, you know, could have been notified by the
25 outside doctor that he was going to be on

1 vacation.  I -- I can't even begin to guess on
2 that one.
3      Q.   In your experience if Dr. Nawoor
4 wanted the cystoscopy moved up, who would have
5 been responsible for that?
6      A.   It would have been the -- it would
7 have went to the nurse if the doctor -- if he had
8 ordered it to be moved up, the nurse taking it
9 off would have scheduled it and possibly notified
10 Kathy Galvin because she was the director of
11 nurses of what was going on.
12      Q.   In your experience why would that
13 nurse have notified Kathy Galvin?
14      A.   Because Kathy seemed to be in --
15 anybody going out -- she was responsible for
16 anybody going out is the way I understood it --
17      Q.   Okay.
18      A.   -- to Wexford.  That's the only way I
19 understood it.
20      Q.   What was the basis for your
21 understanding?
22      A.   Because they would tell her if
23 somebody was going out.  Just things I witnessed
24 myself.
25      Q.   Okay.  Are you aware that Mr. Dean

1 saw a urologist on March 10, 2016?
2      A.   I am not aware of the date.
3      Q.   You can set this document aside.
4      A.   I don't recall dates.
5      Q.   Is that the sort of thing that would
6 have been discussed at the quality assurance
7 meeting?  I'm sorry.  Strike that question.  Do
8 you recall that being discussed at the quality
9 assurance meeting?
10      A.   I do not recall that specifically.
11 If it was -- I do not recall that specific thing
12 being discussed at a quality assurance meeting.
13      Q.   Okay.  Is that the type of thing that
14 would be discussed at a quality assurance
15 meeting?
16      A.   That would be the type -- from what I
17 can recall, it would be part of the collegial
18 review, what was going on and the result of that.
19 That's what I recall being in the quality
20 assurance meetings.
21           (Whereupon, Exhibit 7 was marked for
22 identification.)
23 BY MR. WACKMAN:
24      Q.   Showing you what's been marked by the
25 court reporter as Deposition Exhibit 7.  It is a

1 multi-page document.  It bears the seal of the
2 Illinois Department of Corrections at the top.
3 It is Bates stamped IDOC Taylorville Med Recs
4 00180 and it goes until 001082.  Just for the
5 record, that first Bates stamp number is 001080.
6           Do you recognize this type of
7 document?  Do you recognize this type of
8 document, Ms. Mincy?
9      A.   Yes, I do.
10      Q.   What is this type of document?
11      A.   This is -- we would give -- I would
12 sign these, and they would give them out to
13 the -- to the inmate -- well, actually no,
14 they -- okay.  This did not go to the inmate.
15 This -- from what I can recall, this went to
16 security because you never gave the inmate the
17 date or the time because of breach of security.
18 So this would be something that would be with
19 their pack -- would be sent to security, so that
20 they would schedule for these, and then they
21 would bring this over and -- because it
22 specifically says pick up packet from Healthcare
23 before you leave the institution, which means
24 that portion of the medical records that are
25 going.

1      Q.    Ms. Mincy, do you want to set that
2  document aside --
3      A.    Okay.
4      Q.    -- because I got out of order
5  internally.
6            (Whereupon, Exhibit 8 was marked for
7  identification.)
8  BY MR. WACKMAN:
9      Q.    The court reporter has just handed to
10 you what's been marked Deposition Exhibit No. 8,
11 also a multi-page document, also bearing a seal
12 of the Illinois Department of Corrections at the
13 top.  This document is Bates stamped IDOC
14 Taylorville Med Recs 001073 through 1079 is the
15 final page.  This is the same type of document as
16 the document we just looked at, Deposition
17 Exhibit 7; is that correct, Ms. Mincy?
18     A.    That is correct.
19     Q.    Okay.  And have you seen this
20 document before?
21     A.    I don't -- it's got my signature on
22 it, so I would have to have seen it before.
23     Q.    Okay.  And just to confirm, your
24 signature appears at the bottom of this document
25 on the line labeled Health Care Unit

1  Administrator?
2      A.    Yes.
3      Q.    And what does this document say?
4      A.    This document says William Dean,
5  offender N21885, reason for an evaluation,
6  appointment date is March 10, 2016, be there at
7  11 a.m.
8      Q.    Okay.
9      A.    Springfield Clinic, Taylorville
10 office, Dr. Severino, 600 North Main,
11 Taylorville, Illinois 62568, phone number
12 217-528-7541.  You want me to go any further?
13     Q.    No.  That's fine.  Thank you.
14     A.    Okay.
15     Q.    Is it correct to say that this
16 document indicates that Mr. Dean is scheduled to
17 go to the Springfield Clinic in Taylorville on
18 March 10, 2016?
19     A.    Yes, this would be notification to
20 the assistant warden of programs that we're -- we
21 have a pending med furlough.
22     Q.    Okay.  And is it correct that that
23 means he is leaving the Taylorville Correctional
24 Center and going to another facility?
25     A.    Not to another correctional facility.

1  This would be to the Springfield Clinic at the
2  Taylorville office.
3      Q.    But he is leaving the Taylorville
4  Correctional Center to go to this appointment?
5      A.    Yes.
6      Q.    Is this the sort -- this appointment
7  referenced in Deposition Exhibit 8, is this the
8  sort of -- was this appointment -- excuse me.
9  Strike that.  Was this appointment represented in
10 Deposition Exhibit 8 discussed in the quality
11 assurance meeting?
12     A.    I don't recall.  I don't recall if
13 this specific one was, but again this is an
14 outside for collegial, and I don't recall
15 directly on this one, but again normally yes.
16     Q.    And just to be clear for the record,
17 when was this document prepared, this top
18 document 1073 on the Bates stamp?
19     A.    The date is March 2, 2016.
20     Q.    Do you know when you signed it?
21     A.    No, I do not recall when I signed it.
22     Q.    Would it have been between March 2,
23 2016, and March 10, 2016?
24     A.    Yes.
25     Q.    Okay.  Do you know who Dr. Severino

1  is?
2      A.    Dr. Severino was or is a surgeon that
3  was seeing -- going to see Dr. -- or I'm sorry --
4  he was a surgeon that was going to see Mr. Dean
5  that I can recall.
6      Q.    Do you know what Dr. Severino's
7  specialty is?
8      A.    That I do not recall.
9      Q.    Okay.  Is it fair to say that
10 between -- is it fair to say that you signed this
11 document between March 2 and March 10 of 2016?
12     A.    Yes, it is fair to say that.
13     Q.    Okay.  And so is it correct to say
14 that between March 2, 2016, and March 10 of 2016
15 you knew that Mr. Dean was going to see a surgeon
16 outside of Taylorville Correctional Center?
17     A.    The day I signed it, I can -- okay.
18 I do not directly recall the date.  It would have
19 to have been -- it could have been March 10.  It
20 was safe to say somewhere between March 2 and
21 March 10, but I cannot guarantee that it was
22 March 2 or the 3rd or the 4th.  The only thing I
23 can tell you is I signed the document and the
24 appointment was on March 10.
25     Q.    Okay.  Did you know at the time why

1  Mr. Dean was going to see Dr. Severino?
2      A.    I do not recall.  I really do not
3  recall that.
4      Q.    Okay.  Is this the sort of
5  appointment that would be discussed at either the
6  Monday or the Friday meeting?
7      A.    No.  Only that we had one going out.
8  So that -- that security would be aware how many
9  we had going out but no names or why they were
10  going.  It would just be one is going to
11  Springfield Clinic, and then they would receive
12  this and know who was going.  That's what I
13  recall.
14     Q.    And in either the Monday or Friday
15  meeting, if I recall your earlier testimony
16  correctly, it would have been either you or Kathy
17  Galvin who stated that one was going out to this
18  appointment; is that correct?
19     A.    Yes.
20     Q.    Okay.
21     A.    And then we would recap -- I don't
22  know what day March 10, 2016, fell on, but we
23  would notify them on Monday how many we had going
24  out what date, and then Friday we would recap who
25  went out, how many went out for number wise, and

1  then if there was anything going on on the
2  weekend, which usually not.  Nothing that I can
3  recall ever on a weekend that was occurring, that
4  we would discuss prior to.
5      Q.    Okay.  If you can turn to the second
6  page, Bates stamped 1074, do you recognize this
7  type of document?
8      A.    Yes.
9      Q.    What is this type of document?
10     A.    This is an office outpatient visit.
11  So this is an outpatient visit.  I recognize it.
12  It's for the -- to the site director and HSA.  I
13  recognize it, but I can't really tell what you
14  it's for other than down here it states -- it
15  gives the comments here that Dr. Einwohner's
16  evaluating the patient, and the patient reported
17  -- it gives a brief description, and down here it
18  says that the date, the name and Taylorville for
19  the appointment -- Springfield Clinic
20  appointment.  So this would be like -- this would
21  be a referral is the easiest way to say it.
22     Q.    So what do you mean by referral?
23     A.    This would be Dr. Einwohner sending
24  this patient out -- or not Dr. Einwohner.  This
25  is just documenting what has been seen by the

1  patient, what the problems have been seen, and
2  then this would be saying that when the -- it's a
3  referral -- outside referral type document.  That
4  would go so that the receiving doctor would --
5  could review this and then the other medical
6  records that are pertinent to that --
7      Q.    Okay.
8      A.    -- for the visit.
9      Q.    Have you seen this particular
10  document before?
11     A.    I don't recall.
12     Q.    Okay.  Would this 1074 -- this type
13  of document, 1074, the referral, accompany the
14  front document, 1073, the furlough?
15     A.    That would be part of the packet.
16     Q.    Okay.
17     A.    That it discusses down here, pick up
18  packet from Health Care before you leave the
19  institution.  That would be part of the packet
20  that would go to the doctor.
21     Q.    When you signed this front document,
22  1073, would the entire packet be together at that
23  point?
24     A.    No.  No.  This was just me signing
25  that there was going to be an outgoing.

1      Q.    Okay.
2      A.    And what the date and time was.  It
3  required the administrator's signature.
4      Q.    Did you typically see the entire
5  packet at any point?
6      A.    I don't recall.  I don't recall ever
7  seeing the packets in their entirety.  Again that
8  is nursing care.  When I was working at
9  Jacksonville, the nurses saw that because they
10  would receive them back because it would contain
11  orders and possible things you needed to discuss
12  with the doctor.
13     Q.    If you could turn to the fourth page
14  of the documents, Bates stamped 1076, it says
15  Medical Special Services Referral and Report at
16  the top.  Are you familiar with this type of
17  document?
18     A.    Yes.
19     Q.    What type of document is this?
20     A.    This would be what the doctor would
21  complete, and it basically sums up the patient,
22  and then it would be -- he would have presented
23  it to -- had already -- if it was outward going,
24  he would have presented it to collegial because
25  it says approve, and then it says his name, and

1 the date it was approved.
2     **Q.    So when it was -- and we're referring**
3 **to the bottom of this document in the section**
4 **marked Facility Medical Director Use Only.  When**
5 **it was approved, does that mean it was approved**
6 **by collegial?**
7     A.    Yes.
8     **Q.    Okay.  Have you ever seen this**
9 **particular document before?**
10     A.    I do not recall this document.
11     **Q.    Is it correct to say this document**
12 **goes with the packet to the specialist?**
13     A.    I -- I don't -- I can't say because
14 this document is one of those it's for -- it has
15 orders, but it would have already been set up
16 with a doctor and should be discussed or should
17 have been discussed in other places too.  So it's
18 possible it could have went and it's possible it
19 couldn't have went because it might have been
20 contained somewhere else.
21         Yes, it is contained somewhere else.
22 Your plan's right there on your final.  Uh-huh,
23 because it says call to schedule.  So this is one
24 of those that a nurse may see fit to include it
25 and a nurse may see fit not to.  It's extra

1 paperwork that really doesn't need to be there.
2     **Q.    Do you see the top -- I'd like to**
3 **focus on the top portion of the document.  Do you**
4 **see where Urgent has been checked?**
5     A.    Yes.
6     **Q.    In your experience what does checking**
7 **the box Urgent mean?**
8     A.    The doctor felt at the time that this
9 patient needed to have -- what I'm reading here,
10 he referred to the urologist, and so him checking
11 Urgent he felt it was a -- he needed to --
12 urgently to be seen by the urologist.
13     **Q.    Do you know if there's any specific**
14 **criteria to determine when a doctor checks the**
15 **box Urgent?**
16     A.    That I do not know.
17     **Q.    Can you read the -- let me back up.**
18 **Have you reviewed this type of document before?**
19 **Have you seen this type of document before?**
20     A.    Yes.
21     **Q.    In what context?**
22     A.    In the context of Jacksonville
23 Correctional Center when I was one of the nurses.
24     **Q.    How many times do you think you've**
25 **seen this sort of document before?**

1     A.    I have no idea.  I do not recall how
2 many times I've seen it.
3     **Q.    Would you say you saw it regularly**
4 **during your time at Jacksonville?**
5     A.    I wouldn't say regularly, but these
6 are things that if you're sending somebody out
7 and they're going to do collegial review right
8 here, so it would depend on if -- I didn't do the
9 doctor's line all the time at Jacksonville.  So I
10 may not see this for a while.  So I can't say
11 regularly that I saw it, but I do recognize the
12 document.
13     **Q.    Do you see where it says "Rationale**
14 **for Referral"?**
15     A.    Yes.
16     **Q.    Can you read that line or both those**
17 **lines?**
18     A.    Yes.  I can read parts of it.  Okay.
19     **Q.    What parts can you read?**
20     A.    History of frank hematuria, unknown,
21 unknown.  Weeks.  Need to rule out bladder
22 cancer.
23     **Q.    So in that second line where it says**
24 **R/O, R/O is rule out?**
25     A.    That is correct.

1     **Q.    And what is the date on this**
2 **document?**
3     A.    Which date?  There's three dates.
4     **Q.    The date on which doctor -- the**
5 **doctor completed the top section.**
6     A.    Okay.  The top section is 3/3/16.
7 The next -- you want me to tell you what the next
8 section is?
9     **Q.    Please.**
10     A.    The next section would be Dr.
11 Severino.  He referred back and wrote his orders,
12 and this was done on 3/10/16.
13     **Q.    And what were his orders from what**
14 **you see in this document?**
15     A.    Patient needs scheduled for CTT --
16 looks like a V, but I'm pretty sure, it's VP, and
17 office cystoscopy and BMP.  Call 528-7541 to
18 schedule.  So this would have been sent out with
19 a packet because it's got Dr. Severino's
20 signature and date on it, and then because you --
21 we -- the doctors couldn't just send out.  They
22 had to go to collegial, and that's what the
23 bottom portion is, and the reason why it's dated
24 3/14/16 is because doctor would have took this --
25 Dr. Severino recommendations and took them to

1  collegial and presented it to them, and that's
2  why it says approved because that would have been
3  approved for the testing that Dr. Severino
4  recommended on 3/14/16.
5      Q.    In your experience at Taylorville how
6  did -- strike that.  Referring to the things that
7  -- the procedures that Dr. Severino wanted
8  scheduled in your experience at Taylorville, how
9  would those things have been scheduled?
10     A.    Well, after they were approved on
11 3/14, then they would have been scheduled then
12 because Dr. Severino ordered them.  They would
13 have been ordered.  That's why it's got the
14 number to schedule them where he preferred, and
15 then they would have been scheduled.  Is that
16 what --
17     Q.    Who would have done the scheduling?
18     A.    Oh, it would have been a -- it would
19 have been one of the nurses, whoever took these
20 orders off, the receiving nurse.
21     Q.    Okay.  Can you tell from this
22 document who took these orders?
23     A.    No, I cannot, but again this -- these
24 orders aren't ours.  This is just a
25 recommendation.  Okay.  And then doctor would

1  have to -- doctor would have to review this and
2  then approves it because this is going outside --
3  and then present it to collegial.  So they would
4  not be signed off because these aren't our docs.
5  You have to -- our docs meaning -- referring to
6  Wexford doctors and IDOC docs.  These are not our
7  doctors.  It's no different on the outside than
8  when you're receiving from an outside hospital.
9  So this would go to our doctor, and he took it to
10 collegial to see if this could be done, and then
11 they would be scheduled.  So it would be approved
12 on the day he reviewed this and reviewed this
13 with -- I'm not going to say unless I can see it
14 for sure, but anyway he would have chart -- he
15 would have written an order for it once he got it
16 okayed.  Now, whether he saw the patient that day
17 or not, I do not know, or he just went ahead and
18 wrote the order to schedule it.  I do not have
19 that in front of me, and I'm not going to guess.
20     Q.    Is the fact that in your experience
21 -- strike that.  Do you recall Mr. Dean being
22 scheduled for these procedures being discussed at
23 the quality assurance meeting?
24     A.    I do not recall specifically, but
25 again this is something that would -- because

1  it's collegial going out and returning from a
2  collegial visit.  So it would be -- it should be
3  in the notes.  There's no should -- it would be
4  in the notes of those QA meetings, and we would
5  have reviewed it as a whole.
6      Q.    Okay.  Are you aware that Mr. Dean
7  went to sick call on April 1, 2016?
8      A.    I don't recall.  Again I didn't do
9  sick call.
10     Q.    Okay.
11     A.    Are you finished with these?
12     Q.    Yes.  Well, keep 7, the one labelled
13 April 14 that we haven't talked about yet.
14     A.    Okay.
15         (Whereupon, Exhibit 9 was marked for
16 identification.)
17 BY MR. WACKMAN:
18     Q.    This is 9 -- Exhibit 9.  This is a
19 single paged document titled at the top Offender
20 Outpatient Progress Notes.  It is Bates labeled
21 IDOC Taylorville Med Recs 001356.  I want to
22 focus on the entry at 4/1 of '16, the MD Sick
23 Call entry.  Do you see that, Ms. Mincy?
24     A.    Yes.
25     Q.    First off, have you ever seen this

1  document before?
2      A.    I don't recall.
3      Q.    Okay.
4      A.    Not this specific one.
5      Q.    Do you see under Plans at that entry
6  at that date where it says "discussed with
7  Severino -- excuse me -- discuss with Dr.
8  Severino to see if we can expedite his
9  appointment"?
10     A.    Yes.
11     Q.    Do you agree that's what that says?
12     A.    Yes.
13     Q.    And who is the patient being
14 discussed in that note?
15     A.    William Dean, N21885.
16     Q.    Okay.  To your knowledge do you know
17 if anything was done to expedite that
18 appointment?
19     A.    I do not know.
20     Q.    In your experience at Taylorville who
21 would have been responsible for expediting that
22 appointment?
23     A.    This is -- okay.  Looking at the
24 entire note, Dr. Scott -- history of hematuria,
25 scheduled to see Dr. Severino for cystoscopy in

1 two weeks.

2     **Q.   You're reading from the S portion of**
3 **the note?**

4     A.   Yes, that's correct. I can't make
5 out the word -- no visible hematuria. So because
6 of what's in the note, doctor felt it needed to
7 be expedited because he's got hematuria with a
8 hemoglobin of 9.5, which is lower than normal.
9 Okay. So doctor would have written this, and
10 then the nurse would have -- Chad made the
11 appointments. So it would have went to Chad
12 Christer to make the appointment. So that's who.
13 If Chad was there. Whoever was in charge of that
14 position, then it may have been Kathy. I do not
15 recall who was in charge at this time, would have
16 been responsible, but your nurse would have been
17 Patty Smith, RN, to notify, and I do not know how
18 they notify each other.

19     **Q.   You referred to this position in your**
20 **answer right now referring to Chad's position?**

21     A.   Yes, that would be Medical Records
22 supervisor.

23     **Q.   Do you know who handled that position**
24 **before Chad?**

25     A.   It was empty. Right after I started

1 there was -- I don't recall her name. There was
2 somebody in that position, but I do not recall
3 her name. She wasn't there very long after I got
4 there.

5     **Q.   Is the expediting or the desire to**
6 **expedite this appointment, excuse me, I should**
7 **say -- strike that. Was the desire to expedite**
8 **this appointment discussed at the quality**
9 **assurance meeting?**

10     A.   I don't recall.

11     **Q.   In your experience is it the type of**
12 **thing that would have been discussed at the**
13 **quality assurance meeting?**

14     A.   Quality assurance meetings were done
15 once a month. So if there was a change with -- a
16 change with the appointment, then this possibly
17 could have been in the QA meeting.

18     **Q.   Okay.**

19     A.   But I don't recall if it was.

20     **Q.   Okay. Can you set this document**
21 **aside too. Are you aware that Mr. Dean received**
22 **a CT scan on April 12?**

23     A.   I cannot -- I don't recall the date,
24 and I don't recall if there was a CT scan without
25 reviewing the record.

1     **Q.   Do you know what a CT scan is?**

2     A.   Yes.

3     **Q.   What is a CT scan?**

4     A.   It's a CAT scan. It's a test.

5     **Q.   All right.**

6     A.   That highlight different things in
7 the body depending on what -- what part of the
8 body you're going to get a CAT scan on.

9     **Q.   Is it used to in your -- strike that.**
10 **Based on your training and experience, is it used**
11 **to diagnose cancer?**

12     A.   In my -- with my medical knowledge,
13 it's used to -- how do I want to phrase this?
14 It's used to diagnose a problem. They're going
15 in one direction looking for a problem as in if
16 they were looking for bladder cancer, then they
17 would look for a tumor, and it could easily show
18 a tumor, recognize a problem because of the way
19 it takes the little slices and the -- the
20 radiologist that reads it recognizes whether
21 there's a -- something different in that, but to
22 diagnose specifically, they would require other
23 things done. From my medical -- from my
24 knowledge that's what I'm telling you, but then
25 again I'm not a doctor, I'm a nurse.

1     (Whereupon, Exhibit 10 was marked for
2 identification.)

3 BY MR. WACKMAN:

4     **Q.   This is 10 -- Exhibit 10.**

5     A.   Uh-huh.

6     **Q.   Exhibit 10 is a multi-page document.**
7 **The Illinois Department of Corrections seal is at**
8 **the top. Bates stamp is IDOC Taylorville Med**
9 **Recs 001083. The second page is 001084. Do you**
10 **recognize what is this first page, Ms. Mincy?**

11     A.   This first page is -- I signed. It's
12 a notification of an outside referral and tells
13 the date and time and where to take the patient
14 and what -- and who the patient is.

15     **Q.   Okay. Who is the patient?**

16     A.   William Dean.

17     **Q.   And what is the reason for the**
18 **referral?**

19     A.   He's going to radiology. If you --
20 you read the second page, it says, "Comments:
21 Received referral request for CT IVP. Patient
22 seen by urology on 3/10/16 and recommended test
23 for persistent hematuria. Approved by Dr. Ritz
24 in collegial with Dr. Nawoor.

25     **Q.   Okay. Can you -- let's refer just to**

1 the first page.

2     A.    Okay.

3     Q.    Have you seen the second page before?
4 I'm sorry. 1084. Do you know if you've ever
5 seen that page before?

6     A.    I don't recall this specific
7 document.

8     Q.    Okay. And you're confident you've
9 seen the first page because you signed it?

10     A.    If I signed it, I've seen it.

11     Q.    Under reason it says CT IVP. Do you
12 agree?

13     A.    Yes.

14     Q.    Do you know what CT IVP is?

15     A.    A CAT scan with IVP dye, intravenous
16 dye.

17     Q.    So do you agree that -- what is the
18 date of this document?

19     A.    The date of the document is April 5,
20 2016.

21     Q.    Do you agree that you signed this
22 document between April 5, 2016, and April 12,
23 2016?

24     A.    Between that, yes.

25     Q.    Okay. And so do you agree that

1 between April 5, 2016, and April 12, 2016, you
2 were aware that Mr. Dean was going to the
3 hospital in Taylorville to receive a CAT scan?

4     A.    When I received this document, I
5 would have known for sure. Anything prior to
6 that I can't say I knew prior to this, but the
7 date I signed this -- usually these were
8 signed -- I want to say the day before that we
9 sent them out. I remember getting a -- getting
10 them and because we didn't do them ahead of time.

11     Q.    Let me ask in a slightly different
12 way, which is do you agree that by April 12,
13 2016, you knew Mr. Dean was going to the hospital
14 in Taylorville to receive a CAT scan?

15     A.    I -- from looking at this document I
16 cannot -- I did not know other than -- well, yes,
17 I did. Yes, I will say yes because it says
18 reason CT IVP. So yes, I would have known that.

19     Q.    Do you recall from Exhibit 8 that
20 Mr. Dean's CAT scan had been approved on March
21 14, 2016?

22     A.    Can I have that back because I have 7
23 but I don't have 8? Okay. Now, can you please
24 repeat the question.

25     Q.    Yeah. Let me -- would you agree that

1 Exhibit 8 begins Bates stamp at the bottom 1073,
2 the very bottom, the stamp IDOC?

3     A.    Oh, yes, I agree.

4     Q.    And if you go to the page Bates
5 stamped at the bottom 1076.

6     A.    Yes, I see it.

7     Q.    And if you could just review this
8 page and tell me if you agree that Mr. Dean's CAT
9 scan was approved by Dr. Nawoor on March 14,
10 2016?

11     A.    Not by Dr. Nawoor. This would have
12 been collegial. This would have been
13 presentation to collegial. He was approved on
14 3/14/16.

15     Q.    You agree that -- strike that. You
16 agree that Mr. Dean's CAT scan was approved by
17 collegial on March 14, 2016?

18     A.    Yes.

19     Q.    You can set that aside. And then you
20 agree based on Exhibit 10 Bates stamped 1083 at
21 the bottom --

22     A.    All right.

23     Q.    -- that the CT scan was scheduled for
24 April 12, 2016?

25     A.    Yes.

1     Q.    I will represent to you that that is
2 29 days between approval and scheduling -- or
3 excuse me. Strike that. I will represent to you
4 that that is 29 days from the time that the CAT
5 scan was approved and the time that it was
6 scheduled to occur. Why do you think it took 29
7 in your experience at Taylorville -- excuse me.
8 Strike that. Do you know why it took 29 days for
9 the CT scan to be held?

10     A.    No, I don't recall.

11     Q.    Okay. In your experience at
12 Taylorville does that -- is that a long delay?

13     A.    There could be a lot of reasons why
14 it was that long. I cannot -- without knowing
15 all the -- everything that pertains to this, I
16 cannot even give you an answer to that because
17 was it because -- you know, there's a lot of ifs,
18 ands, or buts. I mean was he in the hospital at
19 this time for something, did he have something
20 else done? Without seeing that entire chart,
21 I -- I can't even speculate an answer for that.
22 I mean was he sick? Again I -- there could be a
23 lot of factors here, and without seeing that
24 entire chart, I cannot give you a -- I cannot
25 speculate an answer.

1    Q.    Based on your experience at
2  Taylorville how could this scan have been
3  expedited?
4         MR. CORRIGAN:  Objection.  The
5  witness has just testified she can't answer that
6  question.
7         MR. TYRRELL:  You can answer it.
8    A.    Okay.  I'm sorry.  Say the question
9  again.
10 BY MR. WACKMAN:
11   Q.    Based on your experience at
12 Taylorville -- I will rephrase slightly.  I will
13 withdraw the prior question and rephrase.  Based
14 on your experience at Taylorville how could a CT
15 scan be expedited?
16   A.    It would -- since it had been
17 approved, then if it could have been expedited,
18 then the nurse would have scheduled it, and she
19 would have got a date and a time, and then it
20 would have been done because it had already been
21 approved.  I mean everybody would have been
22 notified, and it would have been approved, and
23 that's why I can't speculate an answer about the
24 delay because without seeing the whole chart, I
25 don't know if there's anything -- you know, what

1  happened during this time.
2    Q.    Are you aware that on April 14,
3  Mr. Dean was diagnosed with cancer?
4    A.    I'm aware that he was diagnosed with
5  cancer.  Now, the exact date I don't recall
6  specifically at this time.
7    Q.    Would that -- do you recall if that
8  was discussed at a quality assurance meeting?
9    A.    The next question to me would be who
10 diagnosed him because if it's an outside doctor,
11 it would have been -- I would -- I don't want
12 to -- I don't want to guess.  I'm not going to
13 guess.  But if it's an outside doctor that
14 diagnosed him, then it would definitely be on
15 there.  With the cancer diagnosis and possible
16 treatments coming up, it possibly could have
17 been, but I can't say for sure because again this
18 is outside doctors versus inside doctors.
19        MR. WACKMAN:  Let's take a break.  Go
20 off the record.
21        (Whereupon a break was taken.)
22 BY MR. WACKMAN:
23   Q.    Go back on the record.  When we
24 broke, Ms. Mincy, we were talking about
25 Mr. Dean's cancer diagnosis.  Do you recall when

1  you learned Mr. Dean was diagnosed with cancer?
2    A.    I don't recall the exact dates.
3    Q.    Okay.
4    A.    I don't recall the time of year.  I
5  just recall him having a cancer diagnosis.
6    Q.    Do you recall how you learned about
7  it?
8    A.    No, I don't recall.
9    Q.    Okay.  Do you recall if you learned
10 about it at the quality assurance meeting?
11   A.    I don't recall.
12   Q.    Now we can refer to Exhibit 7
13 previously marked, which is the document
14 beginning IDOC Taylorville Med Recs 001080, and
15 if you can refer to the final page of that
16 document, which is marked 001082.  This is the
17 referral form you were speaking about before, not
18 the specific form but the type of form we were
19 speaking about before; is that correct, Ms.
20 Mincy?
21   A.    Yes.
22   Q.    Okay.  And do you see the note in the
23 middle from Dr. Severino?
24   A.    Yes.
25   Q.    Okay.  And do you agree that the

1  findings at the top reflect a right kidney mass
2  with a vena cava thrombus?
3    A.    Are you speaking of the findings that
4  Dr. Severino wrote back?
5    Q.    Yes.  I'm sorry.  That's what I
6  meant.
7    A.    Yes.  It says right kidney mass with
8  vena cava thrombosis on CT.  I can't make out the
9  next one -- the next two, and it says no
10 cystoscopy performed.  So it's no cystoscopy
11 performed.
12   Q.    Do you agree that Dr. Severino is
13 referring here to cancer?
14   A.    It is a mass.  It's not necessarily
15 cancer.
16   Q.    Okay.  And do you see where under
17 Recommendations and Plans, Dr. Severino wrote PT,
18 which we previously established meant patient,
19 will need to be scheduled for surgery?
20   A.    Yes.
21   Q.    Okay.  And beneath that in the
22 facility medical or excuse me -- strike that.  Is
23 this the sort of thing -- do you recall if this
24 diagnosis of a right kidney mass was discussed at
25 the quality assurance meeting?

1     A.   It was.
2     Q.   You recall that?
3     A.   I recall.
4     Q.   What do you recall about that?
5     A.   I just recall the right kidney mass
6  and Dr. Severino -- that Dr. Severino had found a
7  right kidney mass, and that he wanted -- he
8  wanted surgery scheduled, and then it was
9  scheduled -- what I recall is every month -- or
10 not every month, but in the next one too.
11 They -- we followed up on these people like if
12 he -- since he had a right kidney mass so we
13 would discuss him every month until he was
14 post-op, and then -- and then if everything was
15 going okay, then he didn't have any more outside
16 appointments, then his discussion would have no
17 doubt ended.  Might have -- on occasion somebody
18 might have referred back to him, but I don't
19 recall that and I wasn't there.
20    Q.   Do you see the date on Dr. Severino's
21 note?
22    A.   Yes.
23    Q.   What is that date if you can read it?
24    A.   It appears to be 4/18/16.
25    Q.   Okay.  Based on your knowledge of the

1  quality assurance meeting schedule -- strike
2  that.  Based on your recollection of the quality
3  assurance meeting where this was discussed, do
4  you remember who was present?
5     A.   No.  Again I was never part of
6  collegial review.
7     Q.   I'm talking about the quality
8  assurance meeting.
9     A.   Oh, the quality assurance meeting
10 would have been in the same ones as before, but
11 no, I do not remember specifically who was there.
12    Q.   Do you recall anyone who was
13 specifically there?
14    A.   I would have been there.  The warden
15 would have been there.  A number -- I can't say
16 whether number 2 would have been there.  Cindy
17 Hobrock would have definitely been there.  Kathy
18 would have been there -- Kathy Galvin, the
19 director of nurses, would have been there.  Dr.
20 Nawoor would have been there.
21    Q.   And just --
22    A.   Anybody else I don't recall.
23    Q.   And just to be clear on the record,
24 you are saying that you recall Dr. Nawoor was
25 present at the quality assurance meeting where

1  Mr. Dean's cancer diagnosis was discussed?
2     A.   I can't be specific that he was
3  there, but I don't recall him missing one, and if
4  somebody had a diagnosis like this, then he
5  would -- he would give -- I don't want to say
6  give his take on it.  I would say he would review
7  the case, you know, proceed on with what he
8  suspected was the plan of treatment.
9     Q.   Okay.  And you said that at this same
10 meeting your recollection is Kathy Galvin was
11 present?
12    A.   I believe so.  I can't say a hundred
13 percent because I can't recall every meeting who
14 was there, but on a normal basis she was there.
15    Q.   And you recall at that same meeting
16 it was discussed that Mr. Dean would need to be
17 scheduled for surgery?
18    A.   Yes because -- yeah, because it
19 was -- it's -- it's an outside factor.  So it
20 would be on collegial review.
21    Q.   Do you recall if a prognosis or
22 chance of survival was discussed at the quality
23 assurance meeting?
24    A.   At the quality assurance meeting I
25 don't recall if his chance of survival was

1  discussed.  I can tell you I know what his chance
2  of survival was because Mr. Dean told me.
3     Q.   And what was his chance of survival?
4     A.   He reported to me that it was a 50/50
5  chance.
6     Q.   And do you recall when he told you
7  that?
8     A.   No, I just recall him being in the
9  infirmary, and he'd been to see Dr. Severino, but
10 I don't recall how many days after.  I just
11 recall him telling me that.
12    Q.   Okay.  Did you tell anybody about
13 that -- your conversation with Mr. Dean?
14    A.   No because he was open about it.  All
15 the nurses knew because he discussed it openly
16 with the whole staff.
17    Q.   Did you ever hear -- I'm sorry?
18    A.   Go ahead.  I'm -- go ahead.
19    Q.   Did you ever hear him tell Dr. Nawoor
20 that he had a 50/50 chance?
21    A.   I wasn't in on his visits that I can
22 recall.
23    Q.   Did you ever hear him tell Nurse
24 Galvin?
25    A.   I never overheard it, but like I

1  said, it was common knowledge because he was open
2  with all of us.
3      Q.   I think you can set Exhibit 7 aside.
4          (Whereupon, Exhibit 11 was marked for
5  identification.)
6  BY MR. WACKMAN:
7      Q.   Exhibit 11 is a multi-page document.
8  It says Final at the top of both pages, begins
9  IDOC Taylorville Med Recs 001093 and continues.
10 Second page is 1094.  If you could just review
11 this document briefly, Ms. Mincy, and tell me if
12 you recognize it.
13     A.   I don't specifically recognize this
14 document because this would -- from what I'm
15 reviewing, it says it's signed -- electronically
16 signed by Dr. Severino, and this is something I
17 would not normally review.
18     Q.   Okay.  You do not recall ever seeing
19 this document before?
20     A.   I don't recall it, no.
21     Q.   Okay.  Do you know generally what
22 this document is?
23     A.   What it appears to be -- it appears
24 to be a summation of Dr. Severino's visit because
25 it says William Dean follows up today, so --

1      Q.   And can you tell the date of that
2  visit?
3      A.   4/14/16.
4      Q.   Okay.  And you previously testified
5  that you recall -- strike that.  Can you review
6  the notes and tell me what occurred at this
7  visit?
8          MR. CORRIGAN:  Objection.  There's no
9  foundation for this witness to testify what
10 occurred at a visit based on a document she
11 doesn't recognize.  The document speaks for
12 itself and the witness has testified she can't
13 add anything.
14 BY MR. WACKMAN:
15     Q.   Okay.  In that case I'll withdraw the
16 question and focus you on the second page of the
17 document.  Looking at the last two lines before
18 the signatures, do you see where it says, "He
19 understands if we are able to resect this and it
20 is confined, that he might -- we probably will
21 have about a 35 percent five-year survival rate.
22     A.   Yes, I see that.
23     Q.   Do you recall ever hearing that
24 particular piece of information before?
25     A.   This is the first knowledge I have of

1  that.
2      Q.   Okay.  Was this to the best of your
3  recollection discussed at the quality assurance
4  meeting?
5      A.   Again this is the first I'm seeing
6  that.
7      Q.   Is this the type of information that
8  would be discussed at the quality assurance
9  meeting based on your experience?
10     A.   I don't want to speculate.  The
11 quality assurance meetings were what is going on
12 at this point in time.  As survival rates and
13 that, I -- again I don't want to speculate.  So I
14 would say this is not something that we would
15 look at.
16     Q.   And by this is not something we would
17 look at, do you mean this document?
18     A.   No, not the document.  Well, this is
19 not a document we reviewed, but -- in the QA
20 meetings.  I mean the statistics about 35 percent
21 chance of a five-year survival rate.  This is the
22 first I've known about that.  I don't recall ever
23 being told that.  I don't recall that ever coming
24 up before.  The only thing I recall is Mr. Dean
25 telling me he had a 50/50 chance to make it

1  through surgery.
2      Q.   You can set that document aside,
3  ma'am.  We're done with that.
4          (Whereupon, Exhibit 12 was marked for
5  identification.)
6  BY MR. WACKMAN:
7      Q.   This has been marked as 12 -- Exhibit
8  12, a multi-page document titled on the first
9  page Offender Outpatient Progress Notes.  It's
10 IDOC Taylorville Med Recs 001361 is the first
11 Bates stamped on the first page, continues
12 through to 001363.  I'm going to have you turn to
13 the third page, ma'am, 1363.  I'm going to direct
14 your attention to the entry labeled -- the bottom
15 entry.  Can you see the date on that entry?
16     A.   4/20/16.
17     Q.   And who made that entry?
18     A.   Dr. Nawoor.
19     Q.   And what nurse signed off on that
20 entry?
21     A.   Randy Emerson, RN, for Wexford.
22     Q.   Okay.  And you said Ms. Emerson --
23     A.   Mr. Emerson.
24     Q.   Mr. Emerson.  Excuse me.  Mr. Emerson
25 is a Wexford employee?

1      A.    That's correct.
2      Q.    Can you see what it says under Plans
3  for that surgery?
4      A.    Yes.  Surgery approved at collegial.
5      Q.    And what patient does this refer to?
6      A.    William Dean.
7      Q.    And what is the ID number that this
8  refers to?
9      A.    N21 -- I'm sorry.  N as in Nancy
10  21885.
11      Q.    Do you recall discussing this -- the
12  approval of this surgery at the quality assurance
13  meeting?
14      A.    I do recall -- I do remember that --
15  that surgery had been approved, and that
16  surgery -- I just recall that surgery had been
17  approved.
18      Q.    Okay.  And do you recall what, if
19  anything, else was said about that during the
20  quality assurance meeting?
21      A.    Just that surgery had been approved,
22  and that's all I recall at that.  I recall -- I
23  don't know when he had his surgery, but I do know
24  that there was concern because Dr. Severino kept
25  putting off the date.  We would call -- Chad

1  Christer would have records of that of when he
2  called to make the appointment, and he was -- we
3  kept being put off.  I do recall that.  What we
4  were told is that Dr. Severino wanted a vascular
5  surgeon there.  He wanted a cardiovascular
6  surgeon there.  He wanted a team of doctors.
7      Q.    Do you recall where you learned that
8  information?
9      A.    Let me think.  Yes.  Chad Christer.
10  Because he was the one -- Chad was the one that
11  made the appointments for like surgeries and such
12  as that, and he's the one that kept contacting
13  Dr. Severino's office.
14      Q.    Do you recall when you learned that
15  from Mr. Christer?
16      A.    That -- I do not recall dates.  I
17  just remember talking to Chad on several
18  occasions and asking him about the surgery.
19      Q.    Do you recall if that information was
20  discussed at a quality assurance meeting?
21      A.    Yes.
22      Q.    Okay.
23      A.    Because there was concern of the
24  put-off -- I don't recall how long it went on
25  before he had surgery.  I just recall that it

1  was -- it was a longer span than what should have
2  been -- what we felt -- I felt was needed.  Kathy
3  agreed that -- Kathy Galvin agreed that it was a
4  longer span that what we felt was necessary so
5  that Chad was working on -- get -- having --
6  getting that surgery done.  He was working
7  relentlessly by making contact, and he was put
8  off by Dr. Severino's office.  That's what I
9  recall.
10      Q.    Did you take any steps based on that
11  -- strike that.  Based on that information, did
12  you take any steps to expedite the surgery?
13      A.    Every time that it was discussed, and
14  every QA meeting that we had after that, and what
15  was going on with it.  So my wardens knew, Cindy
16  Hobrock knew.  I'm not sure if she took it to
17  Dr. Shicker or not.  It was Dr. Shicker I believe
18  at the time.  I'm not sure if she discussed it
19  with him.  I just know it was a concern for all
20  us.  I mean there's nothing that I could
21  personally do because I can't -- for me to call
22  the doctor, the surgeon, it's not going to make a
23  difference.
24      Q.    Do you recall if any action was
25  discussed at the QA meeting around how to

1  expedite that surgery?
2      A.    I don't recall other than to keep --
3  I don't recall other than we kept tabs on it
4  because the -- the hard thing about this is when
5  you're locked in with a surgeon, you know, we're
6  waiting on the surgeon.  To change surgeons and
7  then we're going to have to go through the
8  barrage of testing again, that's going to put us
9  back even farther, and then we have the first
10  surgeon out there that says come on in for
11  surgery.  You know, it's -- to change surgeons in
12  midstream is -- it's very hard to do because
13  they're not going to take all the testing that
14  was done.  They're going to want their own
15  testing done.  That is my experience in the past.
16      Q.    Do you recall any discussion at the
17  quality assurance meetings about changing
18  surgeons?
19      A.    No, I don't recall because of the
20  fact of we were waiting on Dr. Severino and being
21  led to believe that it was going to be done soon.
22  I just recall that we were waiting on Dr.
23  Severino.  That's what I recall, and Chad was
24  making contact with Dr. Severino's office.
25      Q.    Do you recall how Chad was making

1  contact with Dr. Severino, if that was discussed
2  at the quality assurance meeting?
3      A.    Yeah, Chad would let us know that he
4  called Dr. Severino.
5      Q.    Are you aware that Mr. Dean actually
6  had his cancer surgery on July 19, 2016?
7      A.    I don't recall the date, but I do
8  recall -- let's see here.  I don't recall the
9  date when he had the surgery.  I really don't.
10 There was more things going on over there that
11 needed my attention, and that was during the time
12 of the outbreak and focusing on that, for the
13 entire camp was during that time, and other
14 things took my -- took my attention at that time.
15     Q.    What do you mean when you say the
16 outbreak?
17     A.    It was a mite outbreak.  They said it
18 was a mite outbreak, and so the entire camp had
19 to be -- everybody had to be viewed, everybody
20 had to be -- the doctor had to be involved.  We
21 had Cindy and the head of the nursing -- I don't
22 know what her -- I can't even think of her name,
23 but she came down.  We reviewed everybody for any
24 type of rash, we treated them, we monitored them.
25 They threw out all the mattresses, burned all the

1  mattresses.  They scrubbed the whole place down
2  housing unit by housing unit.
3      Q.    When you referred to the doctor in
4  your previous -- in your answer just now, do you
5  mean Dr. Nawoor?
6      A.    That's correct.
7      Q.    I'll represent to you that Mr. Dean
8  had his surgery on July 19, 2016.  Was that
9  surgery -- strike that whole -- do you recall if
10 the surgery -- Mr. Dean's surgery was discussed
11 at the quality assurance meeting?
12     A.    I don't recall, but -- I don't recall
13 if it was specifically discussed, but -- I just
14 want to say I don't recall because I really don't
15 recall.
16     Q.    Do you recall how you found out about
17 his surgery?
18     A.    I don't recall.
19     MR. WACKMAN:  You can set 12 aside.
20     (Whereupon, Exhibit 13 was marked for
21 identification.)
22 BY MR. WACKMAN:
23     Q.    13.  13 is a document titled Offender
24 Outpatient Progress Notes.  The Bates stamp is
25 IDOC Taylorville Med Recs 001364.  It's only a

1  page.  Focus your attention on the middle entry
2  dated 5/4/2016, 2 p.m.  Do you agree with that,
3  Ms. Mincy?
4      A.    Yes.
5      Q.    And do you agree that the Plan entry
6  there says cardiology consult approved by per
7  collegial?
8      A.    Yes.
9      Q.    Do you agree that this entry is
10 signed by Dr. Nawoor and Nurse Emerson?
11     A.    Yes.
12     Q.    And do you agree that this pertains
13 to Mr. William Dean, IDOC number N21885?
14     A.    Yes.
15     Q.    Do you recall this cardiology consult
16 being approved by collegial being discussed at
17 the quality assurance meeting?
18     A.    If it was an outside med furlough, it
19 would have been discussed.  Other than just to
20 say that he was -- he went to cardiology.  Now,
21 whether or not it was -- because it was a
22 cardiology eval, and from what it says up here,
23 because it was from the MD note up here because
24 they already knew he had renal cell carcinoma
25 because he had a pacemaker and CAD.  So they were

1  being sure -- prepping him for surgery is what
2  they were doing.
3      Q.    Okay.
4      A.    So they want a cardiology consult is
5  what I take from this.
6      Q.    So a cardio -- I don't -- would
7  someone in Mr. Dean's position need a cardiology
8  -- strike that.  Why would someone in Mr. Dean's
9  position need a cardiology consult?
10     MR. TYRRELL:  Object because it calls
11 for speculation, but you can answer.
12     A.    Okay.  I -- we know that he was --
13 well, let me refer back.  Well, he had a
14 pacemaker for one thing, and they already knew he
15 had renal cell.  The doctor had already
16 ordered -- Dr. Severino had already written for
17 -- let me refer back because I don't want to get
18 these dates wrong, and I do not want to give you
19 the wrong information.  When Dr. Severino
20 diagnosed --
21     MR. CORRIGAN:  For clarification when
22 you say you're going to look back, what are you
23 looking at?
24     A.    At --
25     MR. CORRIGAN:  Exhibit number,

1  please.
2      A.    Okay.  I haven't found it yet.
3            MR. CORRIGAN:  Oh, okay.
4      A.    Okay.  Okay.  Okay.  That would be
5  Exhibit No. 11.  It would be Dr. Severino's
6  final.  It says -- okay.  He needs a chest x-ray
7  to show there's no chest metastatic disease.  We
8  will have vascular surgery look at his films to
9  see if they can determine the extent of his caval
10 thrombus.  If they can't, he might need an IVC
11 cavogram.  So this -- so this was dated on 4/14,
12 and so they're preparing him for surgery because
13 it was the vena cava.  That would be your
14 vascular surgeon.  Also could be he probably
15 wanted -- I can't say probably because I don't
16 want to speculate, but with this type of surgery,
17 it's not uncommon to have a -- the extent of it,
18 it's not uncommon to have a team of doctors
19 because that one doctor doesn't want to be left
20 on his own in there, surgeon.
21 BY MR. WACKMAN:
22     Q.    Is the cardiology consult -- do you
23 recall the cardiology consult being discussed in
24 the quality assurance meeting?
25     A.    Other than it was scheduled, I -- I

1  do not recall.
2      Q.    But you do recall it being discussed
3  at --
4      A.    I can't say that I recall it
5  specifically.
6      Q.    Okay.
7      A.    But being it was an outside referral,
8  it was normal then for collegial to be involved
9  so it would be on the collegial report.
10     Q.    Were you aware that Mr. Dean filed a
11 grievance in May 2016 complaining that his
12 surgery had not been promptly scheduled?
13     A.    I don't recall.
14     Q.    You don't recall.  When you were
15 saying that you were responsible for -- I believe
16 we called it the line?
17     A.    Yes.
18     Q.    Offender grievances?
19     A.    Offender grievances were different.
20 A line was -- when they gave me the kite, the
21 line was because they had a problem or they
22 wanted to discuss something with me.
23     Q.    Okay.
24     A.    Grievances were when they would --
25 had something to grieve, and a lot of them were

1  the same because they didn't get the answer --
2  they might have come through me looking to get
3  their copays back because they saw it as a
4  chronic condition, but that's not what the
5  regulations -- they're specific about chronic,
6  and so then they would write a grievance and
7  other things.
8      Q.    So just for my understanding, the
9  grievances that you heard when we were discussing
10 that previously, are different from the more
11 formal offender grievance at the prison; is that
12 correct?
13     A.    I don't know -- I have no idea what
14 you mean by a more formal.  My -- my grievances
15 that I did were specific to healthcare.  I did
16 not do anything else but the healthcare ones.
17     Q.    Would all healthcare grievances have
18 come to you?
19     A.    Unless they went to the warden first,
20 and then if they went to the warden first, then
21 the warden would contact me and send them
22 directly to me.  She could decide if they were,
23 you know, emergency to be done.
24     Q.    Okay.  Would all -- would emergency
25 healthcare grievances go to you?

1      A.    All -- when I was doing grievances,
2  they all came to me as far as I know.  If it was
3  to do with healthcare, the way my understanding
4  was I did them.
5      Q.    And what period did you do grievances
6  between?
7      A.    Well, until I left in 1 of '17, and I
8  don't recall the -- I don't recall what month I
9  started doing them.
10     Q.    Do you know if you were doing them in
11 May of 2016?
12     A.    I can't say for sure.
13           (Whereupon, Exhibit 14 was marked for
14 identification.)
15 BY MR. WACKMAN:
16     Q.    14 -- Exhibit 14 is a single page
17 document entitled Illinois Department of
18 Corrections Offender's Grievance.  Does not have
19 a Bates stamp.  It is labeled -- well, do you
20 recognize this type of document?
21     A.    Yes, this is an offender grievance.
22     Q.    Okay.  And do you recognize this
23 specific document?
24     A.    I don't -- I don't recognize this --
25 I recognize the type, but I do not recognize this

1  specific grievance.
2       Q.      Okay.  Do you know if you've ever
3  seen this document before?
4       A.      I don't recall.
5       Q.      Okay.  Directing your attention to
6  where it says Nature of Grievance and medical
7  treatment is marked.  Do you agree?
8       A.      Yes because the relief requested is
9  surgery.  So it would be a medical treatment.
10      Q.      Is this the type of healthcare
11  grievance that would have gone to you?
12      A.      When I was doing them, yes.  This is
13  the type that would come to me.
14      Q.      The stamp on the right side --
15      A.      Uh-huh.
16      Q.      -- where it says TCC Warden --
17      A.      Uh-huh.
18      Q.      -- TCC, does that refer to
19  Taylorville Correctional Center?
20      A.      Yes.  That's the date received in the
21  warden's office.
22      Q.      Does this mean this grievance went to
23  the warden first?  Do you know?
24      A.      I don't know because, like I said, I
25  don't recognize this being one of the grievances

1  I did, but from the stamp that would tell me it
2  went to the warden first.
3       Q.      And you stated you're not aware --
4  you were not aware that Mr. Dean filed a
5  grievance about his surgery?
6       A.      I don't recall.
7       Q.      Do you recall if it was discussed at
8  the quality assurance meeting?
9       A.      About the grievances?
10      Q.      Uh-huh.
11      A.      The only thing I recall about
12  grievances were numbers of grievances that I did,
13  and sometimes there was 50 a month.  That's the
14  only thing I can recall.  This -- I mean that's
15  all I recall.
16      Q.      Were grievances the sort of thing
17  that were discussed at quality assurance
18  meetings?
19      A.      Not from what I can recall, and again
20  it would be numbers of grievances.  I don't
21  recall anything else being discussed.
22      Q.      Do you see under Relief Requested
23  where it says get HCU, Wexford to stop dragging
24  this out and get me the surgery?
25      A.      Yes.

1       Q.      What do you understand HCU to mean?
2       A.      Health Care Unit.
3       Q.      Okay.  You can set that aside.  We
4  might come back to that one.  Have you ever
5  spoken with Mr. Dean's wife?
6       A.      Yes.
7       Q.      Do you recall when that was?
8       A.      I don't recall the date.  I only can
9  recall that I spoke to her one time.
10      Q.      One time.  What do you recall about
11  that conversation?
12      A.      I recall the conversation occurred
13  because Kathy Galvin was not present in the
14  Health Care Unit that day.  Whether she was on
15  vacation -- Kathy is the one that always spoke to
16  her.  And I intercepted it that day, and I recall
17  that the conversation was about his -- about what
18  was going on with Mr. Dean.  I don't remember
19  exactly the words, but I do recall I went through
20  it with her.  I recall going -- talking to her
21  about what was going on, that we were waiting on
22  Dr. Severino to get the team together.  He wanted
23  a team of doctors with the surgery, and that's
24  what we were waiting on.  And I remember the
25  response from her was -- she made me feel like

1  that she was shocked that we were that far in the
2  process.  That's what I got from that, and I told
3  her that we would -- as soon as we knew
4  something, we would let her that the surgery was
5  scheduled, but we could not give her a date
6  because we were never allowed to give the date.
7       Q.      Do you recall what made you feel that
8  she had been -- she had -- she was shocked by
9  that information?
10      A.      I just recall that she hesitated, and
11  as I went through it all, I recall that she
12  was -- it's just her responses and the slowness
13  of her responses like she was shocked, literally
14  shocked about what -- how far we were in the
15  process.  That's the impression I got.
16      Q.      Do you recall anything Ms. Dean said
17  to you?
18      A.      I don't recall specifics on that,
19  just that was my interpretation of the call.
20      Q.      Do you recall about how long the
21  conversation took?
22      A.      Not specifically, no.  I don't
23  recall, and I did not write it down.
24      Q.      Did you take any notes on the
25  conversation?

1     A.    Not that I recall, and that's
2 uncommon, because anybody else that called in I
3 did not keep notes on them either.
4     Q.    Do you recall communicating to Nurse
5 Galvin that the call had taken place?
6     A.    I recall talking about it.  Again we
7 had open communication through Taylorville
8 Correctional Center, so yes.
9     Q.    Do you recall discussing the -- I'm
10 sorry.  Do you recall discussing the call at a
11 quality assurance meeting?
12    A.    No, I don't recall that.
13    Q.    Do you recall what you told Nurse
14 Galvin about the conversation?
15    A.    I recall discussing it with her, yes,
16 that I had intercepted the call and what I had
17 told her, and that's all I recall.
18    Q.    Do you recall what Nurse Galvin told
19 you?
20    A.    No, I --
21    Q.    Do you recall making any written
22 record of having had the conversation with Ms.
23 Dean?
24    A.    I don't recall, and again that was
25 normal because I intercepted a lot of phone

1 calls.
2         (Whereupon, Exhibit 15 was marked for
3 identification.)
4 BY MR. WACKMAN:
5     Q.    This is 15.  I'm showing you Exhibit
6 15, a single page document titled Offender
7 Outpatient Progress Notes, Bates stamp IDOC
8 Taylorville Correction center Med Recs 001379.
9 Directing your attention, Ms. Mincy, to the top
10 entry, can you tell me what the date on the top
11 entry is?
12    A.    It appears to be 6/16 of '16.
13    Q.    You agree that it's in June 2016?
14    A.    Yes.
15    Q.    And directing your attention to where
16 it says under Plans surgery approved by
17 collegial?
18    A.    Yes.
19    Q.    You agree that's what it says?
20    A.    I agree that's what it says.
21    Q.    And do you agree that this is signed
22 by Dr. Nawoor and Nurse Smith?
23    A.    I agree.
24    Q.    Do you recall -- do you see that
25 Nurse Smith's signature is marked 6/16/16?

1     A.    That's correct.
2     Q.    Does that lead you to believe that
3 the date of this entry was the same?
4     A.    That confirms it.  I mean from
5 looking at it, it appears to be 6/16 of '16.
6     Q.    Okay.
7     A.    At 2 p.m.
8     Q.    You recall that Mr. Dean's surgery
9 had previously been approved by collegial?
10    A.    I need to refer back because I can't
11 off the top of my head.
12    Q.    Okay.  So the document which would
13 discuss this is going to be Bates stamped 001363.
14 It is Exhibit 12 -- the last page of Exhibit 12.
15    A.    You want me to answer the question?
16    Q.    My question is just do you recall
17 that we had previously discussed --
18    A.    Reviewing Exhibit 7?
19    Q.    Exhibit -- reviewing Exhibit 12?
20    A.    Oh, okay.  Reviewing Exhibit 12, but
21 I mean if you refer back to Exhibit 7, that is
22 where it says needs chest x-ray.  Patient will
23 need to be scheduled for surgery by Dr. Severino,
24 and that doctor -- it was approved 4/18/16.
25    Q.    You agree --

1     A.    Collegial.
2     Q.    You agree that Mr. Dean's surgery had
3 previously been approved at collegial?
4     A.    For this surgery, yes.
5     Q.    So referring back to Exhibit 15 --
6     A.    Okay.  Wait a minute.  Because on
7 this entry, if you read above it, it says
8 awaiting surgery, approved by collegial meaning
9 that that's what he said.  We're awaiting surgery
10 and it had already been approved by collegial.
11 It wasn't a new approval.  It was just that we
12 were awaiting surgery.
13    Q.    That was going to be my next
14 question.  Do you recall discussing the fact --
15 do you recall in June 2016 discussing the fact
16 that Mr. Dean was awaiting surgery that had been
17 approved by collegial at the quality assurance
18 meeting?
19    A.    We discussed it when -- we were, yes.
20 We discussed it every meeting because we were
21 still awaiting and everybody -- everybody was
22 concerned.  I mean it was a very concerning thing
23 because of patient awaiting surgery.  We
24 understood that he was -- he had to get his team
25 together and he had to be evaluated, and that's a

1 process, to get more than one surgeon in a
2 surgery suite, especially these specialized
3 folks.
4     Q.   When you say everybody was concerned
5 about it, who is everybody?
6     A.   The wardens -- all three wardens,
7 Kathy Galvin, myself, Cindy Hobrock, Dr. Nawoor
8 asked about it.  All of us that were involved
9 that were nurses, all the -- I mean it was
10 concerning.
11     Q.   Besides Mr. Christer calling
12 Dr. Severino's office, are you aware of any steps
13 that any IDOC or Wexford employee at Taylorville
14 took to expedite Mr. Dean's surgery?
15     A.   I am not aware of -- I'm not aware of
16 anybody else being involved in that because that
17 was Chad's job.  Now, if one of us asked Chad to
18 call and make sure, then he would do it, but he
19 was the prime contact because he's the one that
20 scheduled them.  So for somebody else to step in
21 to his job would have made complete chaos.  So he
22 was the one responsible for that.
23     Q.   How do you know that Chad Christer
24 was calling Dr. Severino's office about the
25 surgery?

1     A.   I had several conversations with
2 Chad.  I cannot tell you dates because I would
3 walk in and say, "Chad, what's going on with Dr.
4 Severino?  When are we -- when's surgery?  Was
5 surgery ever scheduled?"  And he would tell me,
6 "I've called him on this date."  "I've called him
7 on this date."  I said -- and he was very
8 adamant, and he kept records of the dates, and he
9 could tell me the dates that he called that
10 doctor, Dr. Severino.
11     Q.   Have you seen -- you saw the records
12 of Chad's -- of Chad's?
13     A.   I never actually saw them.  It was a
14 verbal communication.  I don't recall if he had
15 it written on his calendar.  I don't recall if he
16 had it on a calendar on the computer.  I just
17 recall that he could -- he could tell me when he
18 called when I asked.
19     Q.   Okay.  Excuse me if I've already
20 asked you this, Ms. Mincy.  Mr. Christer is an
21 IDOC employee?
22     A.   No.  He's Wexford.
23     Q.   He's a Wexford employee?
24     A.   Uh-huh.  If you refer down here to
25 6/20, it even says C/O Duckett here to pick up

1 inmate packet.  Inmate to see cardiothoracic
2 surgeon.  Out on med writ.  And Dr. saw him --
3 doctor -- I can't make out the name, MD, and
4 basically he saw him upon return, and the
5 diagnosis renal mass.  Plan was awaiting surgery.
6 So this is when he saw the cardiothoracic
7 surgeon.
8     Q.   June 20, 2016, is when he saw the
9 cardiothoracic surgeon?
10     A.   That's what it says, yes.  Now, I
11 don't know if that was his first visit or if
12 there was a second visit.  I cannot tell you --
13 or a third visit.  I just can see what it says
14 here.  He went out to see the cardiothoracic
15 surgeon.
16     Q.   What led you to ask -- did your
17 conversations with Mr. Christer about the
18 scheduling of Mr. Dean's surgery occur in the
19 quality assurance meeting?
20     A.   Yes because there was always updates.
21 Chad gave updates on what was going on because
22 again that was changed over to Chad to run the
23 meetings, but that was always a question after
24 that surgery and why -- you know, what was going
25 on with it because everyone was concerned in the

1 meeting with what was going on with that.
2     Q.   Do you recall, did you also have
3 conversations with Chad outside the meeting?
4     A.   Yeah.  About the surgery?
5     Q.   Yes.
6     A.   Yes, because their office was right
7 across, and I would -- I don't -- it was often I
8 would walk in there and chat.  It might be -- I
9 don't want to speculate when it happened.  I can
10 just tell you it was often about I was asking him
11 what was going on with Dr. Severino and surgery.
12     Q.   And by that answer refers to
13 Mr. Dean's surgery?
14     A.   That's correct.
15     Q.   Okay.  I just want to switch gears
16 briefly.  I think --
17     (Whereupon, Exhibit 16 was marked for
18 identification.)
19 BY MR. WACKMAN:
20     Q.   So this is a single-paged document
21 marked Exhibit 16.  If you rotate it, you will
22 see that the Bates stamp is IDOC Taylorville Med
23 Recs 1579.  It's on the bottom, but it's actually
24 on the side.  Do you recognize this type of
25 document, Ms. Mincy?

1     A.     Yes, this is a standard Medication
2 Administration Record also known as an MAR.
3     **Q.     Okay. And are you familiar with this**
4 **type of document?**
5     A.     This is the same type of documents
6 I've used my entire nursing career, these types.
7     **Q.     And can you tell me how to read this**
8 **document?**
9     A.     Yes.
10     **Q.     Okay.**
11     A.     Original order was written on 10 --
12 let's start with the Votrient at the top.
13     **Q.     Let's focus on the Votrient.**
14     A.     Okay. The original order was written
15 on 10/22/16.
16     **Q.     Let me stop you there. What does it**
17 **mean original order?**
18     A.     That means when the doctor originally
19 wrote it.
20     **Q.     Okay. Okay. And then the medication**
21 **is Votrient?**
22     A.     200 milligram tablets. It was
23 written by Dr. Nawoor. Take four tablets by
24 mouth daily. The time was to be given at 8:00 in
25 the evening because it's 2000. They're on

1 military time.
2     **Q.     What does it mean when it says**
3 **awaiting for non-formulary approval?**
4     A.     This medication apparently must have
5 been not on our formulary because it is a
6 formulary that's written on what -- what the
7 doctor is able to get and what's already
8 authorized. Those medications would be things
9 such as Lasix, the Tylenol, the Coumadin, blood
10 pressure medicines, the standard array of
11 medications. That is -- it's no different than
12 your own insurance company. They may not
13 approve. They may approve -- just, for instance,
14 they may say you can't have Synthroid but you can
15 have Levothyroxine. Same drug. It's just one
16 costs more than the other. It's the same
17 standard thing across the board for that. So
18 this would be non-formulary. They were waiting
19 to get it okayed. It was approved on 11/14. It
20 was approved for four months is what it says.
21     **Q.     So based on your reading of this**
22 **document, what was approved was the Votrient, not**
23 **a substitute; is that correct?**
24     A.     Yes, I'm not aware -- I don't -- I
25 don't recognize Votrient. It's not one of the

1 drugs I recognize. So without looking it up, I
2 don't know what it's for. There would be -- yes,
3 it's not on formulary. So they would have to
4 wait to get approval.
5     **Q.     Okay. And can you tell by looking at**
6 **this document when it was actually approved?**
7     A.     It says 11/14, approved for four
8 months.
9     **Q.     Okay. And the columns to the right**
10 **of the -- of -- strike that. Let me go back. Do**
11 **you see Dr. Nawoor's name in the medications**
12 **field?**
13     A.     Yes, that means he wrote the order.
14     **Q.     Okay. I believe we covered that. Do**
15 **you -- looking at the columns at the left which**
16 **are numbered 1 to 31 --**
17     A.     Yes.
18     **Q.     -- what are those?**
19     A.     These are the days of the month.
20     **Q.     Okay. And what month does this**
21 **cover?**
22     A.     This is charting for 11/1/16 through
23 11/30/16. So this would be the month of
24 November.
25     **Q.     2016?**

1     A.     That's correct.
2     **Q.     And you can tell that by looking at**
3 **the bottom field charting for and through fields?**
4     A.     That is correct.
5     **Q.     Okay. And this is for William Dean,**
6 **IDOC N21885; is that correct?**
7     A.     That is correct.
8     **Q.     Do you see under the days -- well,**
9 **strike that. The days 14 through 29 all have the**
10 **-- are filled in for Votrient. Do you see that?**
11     A.     Yes.
12     **Q.     What is filled in in each box?**
13     A.     Initials of the nurse that gave it
14 except for the 14th, the 15th, the 16th and the
15 17th. I don't have what 6 is because 6 -- when
16 they wrote the number 6 above their initials and
17 circled it, it wasn't given and number 6 would
18 establish that reason why it wasn't given.
19     **Q.     How would I figure out what 6 is?**
20     A.     6 should be on the back of the MAR --
21 on the other side of the MAR.
22     **Q.     Okay. So there is a table on the**
23 **back of the MAR with codes, and 6 is one of the**
24 **codes, and that would tell you why it wasn't**
25 **given; is that correct?**

1    A.    From what I can recall, yes.  It's
2  been a long time since I seen -- a few years.
3    Q.    You're doing all right.  What about
4  14 and 15, you see those are circled with a slash
5  through them?
6    A.    Yes, that means it wasn't given.
7    Q.    Okay.  Can you tell why?
8    A.    And again 14 has a 6 above it, and 15
9  has -- I don't know.  It's an error.  It says
10 error.  So meaning the nurse knew that she didn't
11 give it so she wrote error above it, and then, of
12 course, 16 and 17 all -- both have 6s above it.
13   Q.    So I'll represent to you that there
14 are 23 days between the original order date and
15 the approval date for Votrient.
16   A.    Approximately.  I can't add days but
17 approximately.
18   Q.    Are you aware why it took 23 days for
19 this drug to be approved?
20   A.    I'm not involved -- was not involved
21 in this.
22   Q.    Okay.  Who was involved in that
23 process?
24   A.    This would be Wexford employees
25 because I don't have anything to do with ordering

1  the medication, I don't have anything to do with
2  this being non-formulary because I'm again State
3  and this is a Wexford.  This is their employees
4  giving it.  This is their employees ordering it,
5  and the PSA has nothing to do with this.
6    Q.    Are you aware of what employees are
7  involved in these processes at Taylorville?
8    A.    Ordering?  It would be the nurses to
9  order it and to find out it was non-formulary,
10 and then it would be the nurses to -- whoever
11 took the order off to let -- they would have let
12 Kathy know about it -- Kathy Galvin know about
13 it, and then it would have been -- I'm not sure
14 what their process is.  I can't -- what the
15 process was when I was in Jacksonville because I
16 don't ever recall having a problem with a
17 medication off the top of my head, but it would
18 either have to go back through collegial or would
19 have to go through the pharmacy, and, like I
20 said, I don't recall the processes of that for
21 Wexford.
22   Q.    Are you aware of the process by which
23 an inmate would get approval expedited or could
24 get approval expedited?
25   A.    No.

1    Q.    Do you believe that's a Wexford
2  process?
3    A.    For medication, yes, because this is
4  daily operations, and I wasn't involved in daily
5  operations.  That's why the State hired Wexford.
6    MR. WACKMAN:  Okay.  Let's take a
7  quick break, and we'll just take a quick break
8  and go off the record.
9         (Whereupon a break was taken.)
10        MR. WACKMAN:  Back on the record.  I
11 don't think I have anything further.
12        MR. CORRIGAN:  I actually had a
13 couple of things.
14              EXAMINATION
15 BY MR. CORRIGAN:
16   Q.    Just for clarification, you said
17 there were three state employees at the Health
18 Care Unit in Taylorville.  You, security person,
19 and your secretary.  That was not three people,
20 but three positions, correct?  What I mean is
21 there would be like separate security officers
22 during each shift?
23   A.    Oh, yeah.
24   Q.    And there would be a relief, and they
25 might change from day-to-day?  That's kind of a

1  compound question, but I think you understand
2  what I mean.
3    A.    I was the only person for the
4  healthcare administrator.  My secretary was the
5  only one for the secretary when she was hired
6  because I went in there without a secretary, and
7  then yes, the other -- the officer was a state
8  position.  So it definitely rotated with other
9  people.  It wasn't just one single person.
10   Q.    All right.  You were asked about
11 whether patients lived in the infirmary.  There's
12 multiple cells or bedroom, whatever, in the
13 infirmary?
14   A.    Uh-huh.
15   Q.    I just want to clarify the definition
16 of live.  There are a lot of patients that will
17 spend a night there, correct?
18   A.    Uh-huh, that's correct.
19   Q.    By live, you mean that they're there
20 for a longer period of time, correct?
21   A.    They're there for their entire stint.
22 When I left, there was a patient on a vent, and
23 he definitely wasn't going out because the
24 housing units -- it depends on their conditions.
25   Q.    Okay.

1    A.    Because if they had to have oxygen,
2 they weren't going out to the housing units with
3 oxygen.  They would do their entire time in the
4 infirmary.
5    Q.    You were asked about symptoms and
6 your diagnosis, and -- well, I think you
7 repeatedly said that you don't diagnose, but in
8 regard to -- such as an example, for example,
9 paragraph 24 of your answer, which is Exhibit 1,
10 where you indicated that certain conditions were
11 inconsistent with kidney stones.  I just want to
12 clarify.  If a doctor disagreed with you and said
13 if such and such a condition existed, those could
14 still be consistent with kidney stones, you
15 wouldn't disagree with the doctor, would you?
16    A.    No, because the doctor has more
17 medical training than I do.
18    Q.    And that was my whole point.  That's
19 your understanding but you're not making
20 diagnoses?
21    A.    That is correct.
22    Q.    And you would not expect any nurse to
23 make diagnoses?
24    A.    Oh, no.
25    Q.    The only other thing I had was with

1 respect to Dr. Nawoor's handwriting, you would
2 agree it's a little hard to read?
3    A.    Yes.
4    Q.    And if he told you on any of the
5 entries that you read they said something
6 different than what you read, you wouldn't
7 disagree with them?
8    A.    No, because it's his handwriting.
9         MR. CORRIGAN:  Okay.  That's all I
10 had.
11              EXAMINATION
12 BY MR. TYRRELL:
13    Q.    Ms. Mincy, I just have a couple of
14 questions, and they all relate at the time you
15 were the healthcare administrator at Taylorville
16 Correctional Center.  When you were the
17 healthcare administrator at Taylorville, was it a
18 common practice for you to sit in on nurse sick
19 call visits?
20    A.    No.
21    Q.    Was it a common practice to sit in on
22 the medical doctor sick call visits?
23    A.    No.
24    Q.    Just to clarify again, I believe you
25 testified that you were not responsible for

1 scheduling outside procedures; is that correct?
2    A.    That is correct.
3    Q.    Were you responsible for scheduling
4 any of the inside procedures that were done in
5 the procedure?
6    A.    No.
7    Q.    As healthcare administrator you
8 couldn't order diagnostic testing; is that
9 correct?
10    A.    That is correct.  I couldn't order
11 diagnostic tests because I'm not a doctor.  That
12 requires a doctor.
13    Q.    And you had no control over the
14 referral process when seeing an outside
15 specialist when you were the healthcare
16 administrator?
17    A.    No, I did not have any control.
18         MR. TYRRELL:  I think those are all
19 the questions I had in follow-up.
20              FURTHER EXAMINATION
21 BY MR. WACKMAN:
22    Q.    Just a couple.  You just testified
23 you were not responsible for scheduling outside
24 doctor visits; is that correct?
25    A.    That's correct.  That was not my

1 responsibility.
2    Q.    Can you describe to the best of your
3 knowledge who was responsible at Taylorville for
4 that process?
5    A.    For the outside doctor visits, it
6 would have been the Medical Records personnel.
7 It would have been Chad when he came, and I can't
8 remember what the other lady's name was.  I'm not
9 sure who stepped in on their position and did it
10 in that interim.  I can't tell you who because
11 that's Wexford employees, but that is who's
12 responsible for it.
13    Q.    And just to be clear, from your prior
14 testimony, is it correct that the nurse would
15 have first been responsible for giving the order
16 to Mr. Christer from Dr. Nawoor or a doctor?
17    A.    Oh, for the -- yes.
18    Q.    From the outside?
19    A.    Yeah, they would have notified him if
20 there was something that was needed.
21    Q.    Okay.
22    A.    Also, Chad did college -- well, Chad
23 would sit in on collegial too.  I know when Chad
24 was there, he would sit in on collegial at
25 different times.  I can't guarantee it was all

1 the time, but I do know that he was -- he would
2 sit in, and they would go through collegial when
3 they were presenting the cases so that Chad was
4 aware of. Because again anything outside the
5 doctor would have to take it to collegial to get
6 it okayed. So that's how Chad also knew.
7    **Q.   And for diagnostic testing, you**
8 **testified you were not responsible for scheduling**
9 **that.  Who was at Taylorville?**
10    A.   The diagnostic testing like the CT
11 testing, that would be also medical records.
12 When I said nurses before, the nurse that -- if
13 it was like a lab thing that needed to be drawn
14 right now and they needed to go out, that would
15 be something that -- and it was after hours, then
16 -- and the doctor needed it, then the nurse would
17 be responsible at that time.  If it was an
18 emergency, then that's what it would be, the
19 nurse would take control, and then because you're
20 not going to put it off if the doctor wants it
21 stat.
22    **Q.   But just to -- once again my**
23 **understanding is it goes from the nurse -- from**
24 **the doctor to the nurse and then to Medical**
25 **Records for diagnostic testing so the doctor**

1 **would order it.  The nurse would relay the order**
2 **to the Medical Records person, and they would**
3 **be -- they would schedule it?**
4    A.   Well, okay.  There's two processes --
5 maybe I should clarify this.  There's two
6 processes.  If it's in-house, the nurse would
7 take it off.  She would schedule it in-house.
8    **Q.   Okay.**
9    A.   Again if Chad was sitting in on the
10 or if -- as I recall, there was somebody sitting
11 in on collegial, it was never me with the doctor.
12 So that then -- when that order was received,
13 then it -- if it wasn't Chad, then Chad was
14 notified to or whoever was in charge of that in
15 that interim, was -- to schedule it outside.
16 Does that make -- I hope that makes sense because
17 there's actually two processes that went on.
18    **Q.   It does.  So if an order for testing**
19 **or a procedure was approved at collegial review,**
20 **there was a person, either Chad Christer, the**
21 **Medical Records director, or whoever had that**
22 **responsibility before him, who was actually there**
23 **for the collegial review and would go and**
24 **undertake scheduling, whatever that -- ordering**
25 **and scheduling that whatever that had been**

1 **approved; is that correct?**
2    A.   If it was Chad, Chad would do it.  If
3 Chad was there and was not the one doing it, then
4 they would refer it to Chad because that again --
5 all the outside referrals were followed by
6 Medical Records so that they could keep tabs on
7 them and they knew what was going on.
8    **Q.   Okay.  And before Chad arrived at**
9 **Taylorville, it was whoever was the Medical**
10 **Records person before him?**
11    A.   Yeah, or whoever was stepping in for
12 that, yes.
13    **Q.   And you don't recall who that person**
14 **was?**
15    A.   I don't recall the first lady's name,
16 I don't recall her name, and I don't recall who
17 was in the interim.  Again that's Wexford.
18 That's -- you know, that was being fulfilled by
19 Wexford and not my responsibility.
20    MR. WACKMAN:  Okay.  I think that's
21 all I have.
22    MR. CORRIGAN:  Nothing further.
23    MR. TYRRELL:  I got nothing else.
24 So, Ms. Mincy, the last question we have for you
25 since you're the deponent is you have the option

1 to review the transcript the court reporter is
2 going to prepare.  You can review it, note any
3 changes for the record.  You can't change a yes
4 to no, but if something is misspelled, you can
5 note that for the record and sign off on it.
6 Alternatively, you can waive that right today.
7 It's up to you.
8    THE WITNESS:  I waive it.  I don't
9 even -- my brain's fried.  I don't even want to
10 review it.
11    MR. TYRRELL:  So we're going to
12 waive.
13    THE COURT REPORTER:  Are you going to
14 order the transcript?
15    MR. WACKMAN:  Yes.
16    THE COURT REPORTER:  How do you want
17 it?
18    MR. WACKMAN:  Just regular delivery.
19 Electronic.
20    MR. TYRRELL:  E-tran.  No exhibits.
21    MR. CORRIGAN:  E-tran send to Joe
22 Rupcich.
23    (The deposition was concluded at 3:00
24 p.m., and the signature of the deponent was
25 waived.)

```
 1              CERTIFICATION
 2        I, Rhonda Rhodes Bentley, CSR, a
    Certified Shorthand Reporter (IL), do hereby
 3  certify that LISA JO MINCY, came before me on
    October 12, 2018, and swore before me to testify
 4  to the truth, the whole truth and nothing but the
    truth regarding her knowledge touching upon the
 5  matter in controversy.
 6            I do further certify that I did take
    stenographic notes of the questions propounded to
 7  said witness and her answers thereto and that
    said notes were reduced to typewritten form under
 8  my direction and supervision.
 9            I do further certify that the
    attached and foregoing is a true, correct and
10  complete copy of my notes and that said testimony
    is now herewith returned.  I do further certify
11  that said deposition was taken at the Office of
    the Illinois Attorney General, 3000 Montvale
12  Drive, Springfield, Illinois.
13            I do further certify that I am not
    related in any way to any of the parties involved
14  in this action and have no interest in the
    outcome thereof.  Dated at Divernon, Illinois,
15  October 25, 2018.
16
17
18           Rhonda Rhodes Bentley
             _____
19           Rhonda Rhodes Bentley, CSR
             CSR# 084-002706
20
21
22
23
24
25
```