E-FILED
Friday, 25 October, 2019 11:59:18 PM
Clerk, U.S. District Court, ILCD

**U.S. DISTRICT COURT FOR THE**
**CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

WILLIAM KENT DEAN,  )
    Plaintiff,  )
    vs.  )  NO. 17-cv-3112
      )  Judge Sue E. Myerscough
WEXFORD HEALTH SOURCES,  )
INC., DR. ABDUR NAWOOR  )  Magistrate Judge Tom
and UNKNOWN HEALTHCARE  )  Schanzle-Haskins
EMPLOYEES,  )
    Defendants.  )

**DEPOSITION**

    Deposition of **WILLIAM SEVERINO, M.D.**, taken
at the instance of Dr. Abdur Nawoor, Dr. Rebecca
Einwohner, Kathy Galvin and Wexford Health Sources,
Inc., Defendants, on February 8, 2019, commencing at
12:58 p.m. at Springfield Clinic 1st, 800 North First
Street, Second Floor, Springfield, Illinois, before
Cheryl A. Davis, a Certified Shorthand Reporter,
pursuant to Notice of Taking Deposition and the
stipulation attached hereto.

    **DAVIS REPORTING SERVICE**
    Cheryl A. Davis, CSR #084-001662
    Certified Shorthand Reporters
    3 Hickory Hills Drive
    Springfield, Illinois 62707
    (217) 546-6868

---

**INDEX**

| WITNESS | PAGE |
|---|---|

WILLIAM SEVERINO, M.D.
  Direct Examination by Mr. Rupcich    5
  Cross Examination by Ms. Holt    42
  Redirect Examination by Mr. Rupcich  62

| EXHIBITS | MARKED | IDENTIFIED |
|---|---|---|
| Exhibit 1 | 15 | 15 |
| Exhibit 2 | | 33 |

(The original exhibits were retained by the court
reporter and provided with all certified copies of
the transcript.)

---

**APPEARANCES**

MR. WILLIAM J. STROM
MS. CHLOE HOLT
Jenner & Block
353 North Clark Street
Chicago, Illinois 60654-3456
Telephone: 312/222-9350

    (Appearing on behalf of the Plaintiff)

MR. JOSEPH RUPCICH
Cassiday Schade, LLP
111 North Sixth Street
2nd Floor
Springfield, Illinois 62701
Telephone: 217/572-1714

    (Appearing on behalf of Defendants Dr. Abdur
Nawoor, Dr. Rebecca Einwohner, Kathy Galvin
and Wexford Health Sources, Inc.)

MR. JEREMY TYRRELL
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62701
Telephone: 217/785-4555

    (Appearing on behalf of Defendant Lisa
Mincy)

MS. THERESA M. POWELL
Heyl, Royster, Voelker & Allen
3731 Wabash Avenue
Springfield, Illinois 62711
Telephone: 217/522-8822

    (Appearing on behalf of Dr. William
Severino)

---

**STIPULATION**

    It is stipulated and agreed, by and between
the parties hereto, through their attorneys, that the
deposition of WILLIAM SEVERINO, M.D. may be taken
before Cheryl A. Davis, a Certified Shorthand
Reporter, upon oral interrogatories, on
February 8, 2019, A.D., at the instance of Dr. Abdur
Nawoor, Dr. Rebecca Einwohner, Kathy Galvin and
Wexford Health Sources, Inc., Defendants, commencing
at 12:58 p.m. at Springfield Clinic 1st, 800 North
First Street, Second Floor, Springfield, Illinois;

    That the oral interrogatories and the
answers of the witness may be taken down in shorthand
by the Reporter and afterwards transcribed;

    That all requirements of the Civil Practice
Act and the Rules of the Supreme Court as to dedimus,
and the reading over and signing of the deposition by
the witness, are expressly waived;

    That any objections as to competency,
materiality or relevancy are hereby reserved, but any
objection as to the form of the question is waived
unless specifically noted;

    That the deposition or any parts thereof may
be used for any purpose for which depositions are
competent, by any of the parties hereto, without
foundation proof;

    That any party hereto may be furnished
copies of the deposition at his or her own expense.

1 TRANSCRIPT OF DEPOSITION
2 (Whereupon the witness was sworn
3 by the court reporter.)
4 MR. RUPCICH: Good afternoon. My name is
5 Joe Rupcich. I represent Wexford Health Sources,
6 Dr. Nawoor, and several of the medical providers at
7 Taylorville Correctional Center.
8 WILLIAM SEVERINO, M.D.,
9 called as a witness herein, at the instance of Dr.
10 Abdur Nawoor, Dr. Rebecca Einwohner, Kathy Galvin and
11 Wexford Health Sources, Inc., Defendants, having been
12 first duly sworn on his oath, was examined and
13 testified as follows:
14 DIRECT EXAMINATION
15 BY MR. RUPCICH:
16 Q. Could you state your name?
17 THE WITNESS:
18 A. William Severino.
19 Q. What's your profession?
20 A. Physician.
21 Q. Licensed in the State of Illinois?
22 A. Correct.
23 Q. How long?
24 A. Do you include like when I was a resident

1 A. In general, when people ask me, I tell them
2 kidneys, bladder, in men prostates, genitalia in men
3 and women for that.
4 Q. So from the kidneys on down?
5 A. Kidneys on down. That's right. Top of the
6 kidney to the tip of the urethra.
7 Q. Where are you currently employed?
8 A. Springfield Clinic.
9 Q. You practice urology here at Springfield
10 Clinic?
11 A. Correct.
12 Q. Can you give me a description of your
13 practice here?
14 A. Yeah. We're -- or I -- you know, we're a
15 multispecialty clinic. Our clinic -- or our urology
16 department currently has three urologists. I'm one
17 of three. My specific practice is basically general
18 urology. So I don't focus on one thing per se. You
19 know, I do a lot of different -- a variety of things
20 within urology, men, women, some kids, for that.
21 Q. Consist of office visits as well as surgical
22 procedures?
23 A. Yeah. My current practice is probably
24 60 percent office, 40 percent surgery, roughly.

1 too?
2 Q. Let's say fully licensed after residency
3 going forward.
4 A. Since 2000.
5 Q. Since 2000.
6 A. Yeah.
7 Q. Do you have a particular specialty?
8 A. Yes.
9 Q. And what is that?
10 A. Urology.
11 Q. Are you board certified in urology?
12 A. Yes.
13 Q. Has your entire practice since 2000 been in
14 the field of urology?
15 A. Yes.
16 Q. Can you give me a general description of
17 what the practice of urology is?
18 A. Sure. Urology is a subspecialty. It's a
19 surgical subspecialty. It focuses on the urinary
20 tract of both men, women and children, both medical
21 issues as well as surgical issues.
22 Q. Involving the urinary tract.
23 A. Around the urinary tract.
24 Q. And the urinary tract would encompass what?

1 Q. And where do you have surgical privileges?
2 A. Currently I have them in Lincoln at Lincoln
3 Memorial Hospital. I have them in Taylorville at the
4 hospital over there. I have them across the street
5 at Memorial. I have them at our Ambulatory Surgery
6 Center on Sixth Street, and I have them in
7 Jacksonville as well at the hospital at Passavant.
8 Q. And have you had a chance to review the
9 records in this case?
10 A. Not recently, although previously I had
11 looked at them with Theresa.
12 Q. You performed a surgery on the patient in
13 this case; correct?
14 A. Correct.
15 Q. Where was that done?
16 A. Across the street at Memorial.
17 Q. Memorial.
18 A. Yeah.
19 Q. So as of the summer of 2016, you had
20 privileges at Memorial?
21 A. Correct.
22 Q. And did you list that currently as you do
23 surgeries there?
24 A. I do.

1  Q.  But not St. John's?
2  A.  I do not currently practice at St. John's.
3  Q.  How long has that been?
4  A.  You know, I think we stopped going there --
5  it's been about three or four years we stopped going
6  there.
7  Q.  How long have you been at the Clinic?  Did
8  you tell me that?
9  A.  I started here in the summer of 2000.
10  Q.  Do you see patients from the Illinois
11  Department of Corrections from time to time?
12  A.  Correct.
13  Q.  How are you referred patients from DOC?
14  A.  You know, that I can't honestly tell you.
15  They show up on my list, and we see them, I mean.
16  Q.  Somebody else handles that?
17  A.  Yeah.  I mean, literally they show up on my
18  list, and we take a look at them.  We see what comes,
19  take what comes.  I mean, we don't go advertising,
20  come to see us.  They show up.
21  Q.  Right, yeah.
22       So you have reviewed these records on the
23  patient William Kent Dean, but not --
24  A.  Not recently.

1  Q.  Not recently.  Okay.
2  A.  I say whenever I spoke with those guys, I'd
3  say a month ago or whatever.
4  Q.  All right.
5  A.  You have the record.
6  Q.  And that was going to be my next question.
7  Other than Ms. Powell, have you spoke with any
8  lawyers about this case?
9  A.  Him and his partner.
10  Q.  Him being Mr. Strom?
11  A.  Yeah.  And that gentleman, whoever was on
12  the other -- I don't know who that was.
13       MR. STROM:  His name is Nathan Wackman.
14       THE WITNESS:  Yeah, that's right.
15  BY MR. RUPCICH:
16  Q.  And that was a phone call?
17  A.  That was a phone call.
18  Q.  You reviewed Mr. Dean's records in
19  preparation for that phone call or during the phone
20  call?
21  A.  During the phone call.
22  Q.  Do you remember anything about the phone
23  call or what the nature of it was, what it was about?
24  A.  Specifics, no, but it was generalities.

1  Q.  Concerning Mr. Dean's treatment at the
2  Clinic?
3  A.  Yeah.  It was just in general about what was
4  going on with him.
5  Q.  Did you give any opinions to your
6  recollection during the course of that call about
7  Mr. Dean's care, his prognosis, anything like that?
8  A.  Absolutely.
9  Q.  And what was it?
10  A.  If I remember correctly, when I saw him in
11  the office, I said if he wanted any chance of walking
12  out of prison, he would have to do that operation or
13  he would die in prison.  I explicitly told him there
14  was a chance he could die on the table and explicitly
15  told him that he might die afterwards very shortly.
16  And, you know, like I told them, I'm surprised he
17  made it out of the hospital.  I'm even more impressed
18  that he's still alive today after that.
19  Q.  Would it be fair to say that he's done well
20  postsurgically then?
21  A.  Thus far.  Thus far.
22  Q.  He's exceeded your expectations?
23  A.  He has.  He has.
24  Q.  Do you remember Mr. Dean independently of

1  the records?  Do you remember the man?
2  A.  Quite well.
3  Q.  And I represent doctors, and I hate when
4  lawyers quiz them on records without giving them the
5  records.  But generally what do you remember about
6  this fellow or --
7  A.  He was quite an animated fella, quite a
8  character.  I specifically remembering talking to him
9  and saying, you don't look like a criminal.  You
10  don't act like a criminal.  I asked him what he did,
11  what he was in for, and he was very up front about it
12  for that.
13  Q.  Do you have a recollection of his medical
14  course independent of the records?
15  A.  Roughly, yeah.  I mean, I know what we saw
16  him for, and I know what transpired after that.
17  Q.  Do you know how long it's been since you've
18  seen him?
19  A.  Probably a couple years.  Again, that's not
20  an exact, but I would suspect a couple of years.
21  Q.  I understand.  And --
22  A.  I'm sure I saw him after surgery at least
23  once.
24  Q.  And --

1    A.    Beyond that, I can't recall.

2    Q.    Were you surprised that he's still alive two

3  or so years later?

4    A.    Yeah, yeah, absolutely.

5    Q.    And why is that?

6    A.    He had a horrible disease, very horrible

7  disease for that.

8    Q.    Horrible in what sense?

9    A.    Renal cell cancer tends to behave terribly.

10  Even people that you think are going to do well

11  sometimes do terrible.  He had something that -- you

12  know, about as bad as you can see in terms of a

13  cancer of a kidney, you know, invasion into the vena

14  cava up toward the kidney.  You know, that's about as

15  big as it gets for that type of thing for that.

16    Q.    Do you mean it was aggressive?

17    A.    Yeah, yeah.  When you see a tumor that big

18  with that type of invasion, that by definition is an

19  aggressive disease.  A lot of people would not even

20  go near that.  They would send that somewhere else.

21  They wouldn't even -- they'd say, I'm afraid of this.

22    Q.    You mean not operate on him?

23    A.    Yeah.  They would never take that on.  They

24  would never even attempt that.

1    Q.    Because of the complexity of the procedure?

2    A.    Yeah, yeah, very complex.  As complex as it

3  gets.

4    Q.    Yeah, I saw that in your record.

5    A.    That is the most complex type of surgery you

6  can do, at least in urology, or in my opinion.

7    Q.    When you say that's the most complex type,

8  what do you mean by that?

9    A.    Major operation where they put him under

10  hypothermic cardiac arrest.  They basically bleed him

11  out, stop your heart.  You're dead for a half an hour

12  while you try to take the tumor out and then try to

13  bring you back for that.

14    Q.    How many times have you done a similar

15  procedure of that in your career?

16    A.    With a hypothermic cardiac arrest, this is

17  the first time we ever did that.  We've done other --

18  Kayla Thrombeck (phonetic spelling).  I mean, we

19  probably did about one a year.  You'll see about one

20  a year with that, for that.

21    Q.    This one was different because what?

22    A.    They hypothermic cardiac arrest, basically

23  stopped his heart, bled him out, and, you know, so

24  basically no bleeding for that.

1    Q.    And the purpose of that is to minimize

2  intraoperative bleeding?

3    A.    Yeah, yeah.  So you can try to get all the

4  tumor out without the person dying on the table.

5              (Whereupon Exhibit 1 was marked

6               for identification by the court

7               reporter.)

8    Q.    Doctor, I'm going to hand you Deposition

9  Exhibit 1.  I'd just ask you to flip through it.

10    A.    Sure.

11    Q.    And I'm going to ask you if they appear to

12  be Mr. Dean's records from the Clinic.

13    A.    Yeah.

14    Q.    Are you familiar with these type of records?

15    A.    Yeah, yeah.  These are our standard records.

16    Q.    The standard records made by people that

17  work at the Clinic?

18    A.    Correct.

19    Q.    Okay.  Could you flip to page 20, and I'm

20  going to ask you if that was your first visit with

21  Mr. Dean, March 10, 2016.

22    A.    Yeah, uh-huh.

23    Q.    What were you seeing him for?

24    A.    He came in with gross hematuria.

1    Q.    As a urologist, gross hematuria, is that a

2  nonspecific finding?

3    A.    It's just blood in the urine.  Yeah,

4  basically that's what it means.  Visible blood in the

5  urine.

6    Q.    Suggestive of anything in particular?

7    A.    There's a whole litany of things it can

8  mean.

9    Q.    What was your assessment of Mr. Dean at this

10  time?

11    A.    He had gross hematuria.  He needs evaluated

12  for that.

13    Q.    How did you work that up?

14    A.    Currently the standard of care for gross

15  hematuria is -- what I mention there is CT IVP and a

16  cystoscopy.

17    Q.    What's a CT IVP?

18    A.    That's basically a CAT scan of the kidneys

19  and the tubes that drain the kidneys.

20    Q.    And cystoscopy so you can check the --

21    A.    Bladder.

22    Q.    -- urethra and ureter and bladder?  Is that

23  --

24    A.    Yeah.

1     Q.   It says he's a patient of Dr. Baron,
2 B-A-R-O-N.  Who is that?
3     A.   That actually is a typo.  It should have
4 said former.  He was my partner that retired --
5     Q.   I see.
6     A.   -- for that.
7     Q.   So the standard of care was the CT IVP and
8 then the --
9     A.   Cystoscopy.
10     Q.   -- cystoscopy, and then you're going to
11 follow up with him after those -- after the CT?
12     A.   Yeah.  Usually how we do it, typically start
13 top down.  So we'll get the CT scan and see him back,
14 see if that shows anything, and then if -- you know,
15 and then go from there with the scope for that.
16     Q.   Okay.  And it looks like you followed up
17 with him on April 14, 2016, at page 18?  I numbered
18 them down there in the lower -- actually --
19     A.   Are they backwards?  I've got 19, 17.  Oh,
20 here is 18.  Yeah.  Yeah, here we go.
21     Q.   One of these I had my secretary make without
22 -- why don't you use this.  We'll switch the sticker.
23     A.   Sure.
24     Q.   That one is not double-sided.

1     A.   Sure.  Okay.
2     Q.   This visit was April 14, 2016?
3     A.   Correct.
4     Q.   Now, is this after the CT IVP?  Are you able
5 to tell?
6     A.   According to my note, he had a CT urogram,
7 so, yeah.
8     Q.   Is that something you would have reviewed
9 the results of?  read a radiology report?  looked at
10 the film?
11     A.   Both, both.
12     Q.   Are you able to tell from your note what it
13 showed?
14     A.   According to this, it looks like he had a
15 right kidney cancer with potential invasion of the
16 vena cava.
17     Q.   What is the vena cava?
18     A.   Main blood vessel or the main vein of the
19 entire body.  You know, basically all the blood from
20 your lower extremity drains in it to go back to the
21 heart.
22     Q.   And is it in the proximity of the -- run by
23 the kidney that was affected?
24     A.   Yeah.  It's on the right side of the body.

1     Q.   So is that like a direct metastasis from the
2 kidney, or do you know?
3     A.   Well, yeah.  It's complex, but with renal
4 cell carcinoma, one of the things that it can do is
5 you can actually get a tumor or what we call tumor
6 thrombus that actually grows into the venous system.
7 There's a vein that drains the right kidney that goes
8 into the vena cava directly, and so you can actually
9 get growth of tumor thrombus that goes into the vein
10 and then goes up the vena cava or can go down and
11 then, you know, can propagate proximally or distally
12 from there.
13     Q.   And he had the thrombus to the vena cava.
14     A.   From what we could tell.  Again, the films
15 weren't great, it looks like, but for that.
16     Q.   Did the cystoscopy -- how did that fit into
17 this?
18     A.   You know, I don't think we did a cystoscopy
19 at that time.  I can't remember if we did that, only
20 because, hey, this was what we found on him there.
21     Q.   Didn't need to keep looking.  You'd found
22 it.
23     A.   Yeah.  As I say, this was a big problem.
24     Q.   Now, you made some plans for future

1 diagnostic testing and consultation in this note.  Is
2 that right?
3     A.   Yeah.
4     Q.   What was your plan going forward after
5 seeing this mass?
6     A.   Yeah.  Typically, if we see something
7 particularly that we think is in the vena cava, what
8 we've traditionally or a lot of times done is
9 coordinate or see with a vascular surgeon because,
10 again, that can be very, very difficult dissection to
11 dissect out the vena cava.  Sometimes it has to be
12 reconstructed.  So a lot of times we'll work with one
13 of the vascular surgeons as well.
14     Q.   So that would be out of your particular
15 surgical expertise?
16     A.   Well, I can do some of that, but, you know,
17 we don't reconstruct vena cavas every day.  I can sew
18 a hole up in the vena cava if I had to, but when you
19 might have to replace it with a graft or, you know,
20 encounter massive bleeding, it's probably the best to
21 do those with people that do that type of stuff every
22 day.
23     Q.   I see.  And is this a patient that you would
24 have ordered an MRI on if he didn't have a pacemaker?

1    A.    Absolutely, yeah, yeah.  This would have
2    been one that -- just because they're probably a
3    little bit better in terms of being able to define
4    the exact extent of that tumor thrombus.
5    Q.    But you weren't able to get that.
6    A.    Yeah.  They don't like to do those with
7    pacemakers there for that.
8    Q.    You wanted a chest x-ray?
9    A.    Uh-huh.
10    Q.    To look for additional metastasis?
11    A.    Mainly, yeah, to see if there was anything
12    obvious.
13    Q.    Now, this is what I think you mentioned
14    earlier.  We were able to resect this and it's
15    confined.  He might have a -- or he will probably
16    have about a 35 percent/5-year survival rate.
17    A.    Yeah.
18    Q.    And is that based off of literature that
19    you're aware of?
20    A.    Yeah, yeah.
21    Q.    Or where does that come from?
22    A.    Literature.  Yeah, I feel like the
23    literature plus experience for that.
24    Q.    Would that be like a median survival rate or

1    just sort of --
2    A.    Average.
3    Q.    Average?
4    A.    Yeah, yeah.  You would expect a high number
5    of people would die from this within five years.
6    Q.    So was this a metastatic cancer based upon
7    what you were seeing at this time?
8    A.    No.  We didn't see any obvious metastases on
9    scan for that there.
10    Q.    Would the liver have been visible in the
11    scan?
12    A.    They can be, although, again, CTs sometimes
13    aren't perfect for livers as well.  And if he had
14    something huge in there, that would show up.  But if
15    he had, you know, a centimeter or two, they may not
16    show up on that type of thing.
17    Q.    And I seem to recall from your operative
18    report that you saw a few spots on the liver.
19    A.    I thought -- yeah, I vaguely remember that.
20    I thought it looked maybe metastases for that.  Hard
21    to know.  I mean, we didn't take a piece of his liver
22    out or anything, but, you know, hard to know for sure
23    on that.
24    Q.    Is it possible that was there at the time of

1    this April CT but small enough that it wasn't
2    visible?
3    A.    Sure, yeah.  You know, CTs don't pick up
4    microscopic foci and, you know, a millimeter or a
5    centimeter foci.  You know, they're not perfect.
6    Q.    So what's the plan going forward as of April
7    14, 2016?
8    A.    You know, this was one where, you know, we
9    have a vascular surgeon.  We get our vascular
10    surgeon, and I think actually it was the one we
11    typically use.  His name is Steve Ryan.  You know, we
12    have him look at the films and get him involved and
13    then try to coordinate to get it done at the
14    hospital, and this is where St. John's came in.
15    You know, we had stopped going to -- it must
16    have been January of '16 when we stopped going to
17    St. John's.  That's why we wanted to see if we could
18    do it at Memorial.  That's probably with the prison.
19    I don't know.  Maybe they have a contract or did have
20    a contract, but we didn't have privileges there, so
21    that's why we had to see if we could do it across the
22    street.
23    Q.    And that's where you ended up --
24    A.    Yep.

1    Q.    -- doing it.
2    A.    Yep.  They were able to let us do it.
3    Q.    So there's something in this chart toward
4    the back called tasks.  Are you familiar with tasks?
5    A.    Yeah, uh-huh, yeah.
6    Q.    And there's some communication, it looks
7    like, between you and someone you called Steve to
8    look at the CT.  Is that the vascular surgeon?
9    A.    Steve Ryan.  Yeah, he's a vascular surgeon.
10    Q.    What are tasks in your system?
11    A.    You know, basically they're just a way of
12    communicating with, you know, whether it's staff,
13    nurses, other physicians.  You know, instead of
14    calling them on the phone, it goes -- you get a task
15    list, and you type it in, and it goes to them.  And
16    so literally it pops up immediately.  In order to get
17    rid of it, you've got to read it.  So it almost is a
18    -- it's basically a backup plan to make sure stuff
19    doesn't get missed.
20    Q.    And you can communicate internally with it?
21    A.    Yeah, uh-huh, yeah.
22    Q.    And then if you address the task, it will
23    stop bugging you?
24    A.    Well, yeah.  I mean, you have to -- there's

1    a thing called "done" a task. You have to "done" it
2    for that. Or if somebody sends you one, you can --
3    there's a reply. You know, you can type them back or
4    whatever for that, or reassign. You can send it to
5    somebody else.
6        Q.    So at page 106 of the exhibit, it looks like
7    there's some correspondence there. 4/15/16, Steve,
8    if you could take a look at his CT.
9        A.    Yeah, uh-huh.
10       Q.    That's you communicating with the vascular
11   surgeon?
12       A.    Correct.
13       Q.    To have him look at it to -- from the
14   perspective of this issue with the vena cava?
15       A.    Yeah.
16       Q.    Vena cava? Am I --
17       A.    Vena cava, yeah.
18       MR. STROM: I'm sorry. What page was that?
19       MR. RUPCICH: 106.
20       MR. STROM: Thank you.
21   BY MR. RUPCICH:
22       Q.    What other workup needed to be done on this
23   patient between April 14, 2016, and when he was going
24   to go -- undergo surgery?

1        A.    You know, as I recall, the other thing that
2    became -- I think -- and I may not be 100 percent.
3    Somehow cardiothoracic got involved. Probably what
4    happened was Steve Ryan looked at the films and said,
5    hey, this may go up pretty high, and so then had to
6    have him see a cardiac surgeon because, again, when
7    you get into the chest, you know, to get up to the
8    heart there, we don't do median sternotomies, you
9    know, so we needed to potentially have somebody to
10   get involved with that.
11       Q.    A third surgeon.
12       A.    Yeah, yeah.
13       Q.    Okay.
14       A.    And that may have been because Steve Ryan
15   looked at the films and said, hey, I think we better
16   have a cardiothoracic surgeon available, or help or
17   whatever.
18       Q.    Take a look at page 16. It looks like your
19   next visit. If you can just take a minute to look at
20   it. June 9, 2016, is that right?
21       A.    Yeah, yeah, uh-huh.
22       MS. POWELL: You're on 17.
23       MR. RUPCICH: Well --
24       THE WITNESS: Yeah, but this is the --

1        MR. RUPCICH: -- the narrative is on this.
2        THE WITNESS: This is the part, yeah.
3        MS. POWELL: Okay.
4    BY MR. RUPCICH:
5        Q.    What was going on at this visit?
6        A.    You know, this looks like we reviewed the
7    films with the radiologist, and they thought maybe it
8    even, you know, went up really high, which, you know,
9    is just above the diaphragm which is right below the
10   heart, and that's where we thought, hey, we might
11   have to have a cardiothoracic surgeon to be able to
12   get up above it, which would mean you have to open
13   the chest up for that.
14       Q.    And that was in June. I'm trying to find
15   that.
16       A.    Yeah. This would have been June 9th.
17       Q.    Okay.
18       A.    And it looks like he saw cardiology as well,
19   and that's just to get his heart checked out prior to
20   a major operation.
21       Q.    So would that have been between April 14 and
22   June 9?
23       A.    Yeah, yeah.
24       Q.    Are you able to tell what other workup was

1    being done during that time, if any?
2        A.    Well, the only thing I can say is it looks
3    like he saw cardiology sometime in between. Whether
4    he saw somebody else, this is all I can say, based on
5    this.
6        Q.    I see that it says in your note there was no
7    evidence of distant metastasis.
8        A.    Yeah.
9        Q.    Or metastatic disease, and that's, again,
10   based upon your review of the CT and --
11       A.    Mainly the report, but also we look at those
12   too for that.
13       Q.    And I suppose the vascular surgeon's review?
14   Had you spoken with the vascular surgeon?
15       A.    That -- I don't recall for that. You know,
16   if I did, I didn't put it in here. I might have seen
17   him in passing or whatever, but I can't recall if I
18   did or not.
19       Q.    So as of June 9, 2016, what's our plan at
20   this point other than getting the cardiothoracic
21   surgeon involved?
22       A.    Once we get them involved, then get him set
23   up and we try to do it.
24       Q.    Is this an emergency surgery?

1    A.    An emergency?  No, no.

2    Q.    Explain the time frame in which you'd

3  schedule a surgery like this.

4    A.    As soon as we can get everybody on board,

5  you know, get everybody seen and get it scheduled.

6  You know, this is a ten-hour case or whatever.

7  You've got to have three surgeons that are available

8  for ten hours on the same day.  There's a little bit

9  of complexity in that with that because, again, if

10  it's not done right, you're guaranteed you'll have a

11  dead patient on the table.

12    Q.    Is that why you wanted these other surgeons

13  present?

14    A.    Absolutely.

15    Q.    To give the patient the best possible chance

16  for a good outcome?

17    A.    That is correct.

18    Q.    It looks like the surgery was done July 19.

19    A.    Yeah.  Now, somewhere in there I think he

20  did see the cardiac surgeon, but if I remember, he

21  saw one, but I think it turned out to be a different

22  one that actually did it because he was tied up in

23  something else, if I remember right.  I thought he

24  was going to see Hazelrigg.

1    Q.    Yeah.  Some --

2    A.    I don't know if that came up.  But then I

3  think Gopaldos was actually the one that was the

4  cardiac surgeon involved.

5    Q.    Somebody ordered another CT.  If you look at

6  page 90.

7    A.    Yeah, Hazelrigg, yeah.

8    Q.    So is that -- does that give you any more

9  insight into this?

10    A.    Yeah.  He was the guy we wanted or was going

11  to see for the cardiothoracic part.

12    Q.    Dr. Hazelrigg.

13    A.    Uh-huh.

14    Q.    And where does Dr. Hazelrigg work out of?

15    A.    I think he's still with SIU School of

16  Medicine.  He's one of the heart surgeons.

17    Q.    Who is Dr. Coakley?

18    A.    Coakley?  He's a radiologist and, in my

19  opinion, the best radiologist we have in Springfield.

20  He's our go-to guy.

21    Q.    Okay.  Look at page 102 then, at the very

22  bottom, on June 1, 2016.

23    A.    Okay.  Yeah.  So Coakley read it and wanted

24  another CT.

1    Q.    Okay.  So you had, in your opinion, the best

2  radiologist in Springfield look at the film.

3    A.    Yeah.

4    Q.    And he wanted another one.

5    A.    Yep.  And he's our go-to guy.  So if he says

6  he wants another scan --

7    Q.    You get it for him?

8    A.    He's our go-to guy.  Yeah.

9    Q.    Do you know if you saw the follow-up CT?

10    A.    That I can't say for sure.  I probably did,

11  but it was probably -- for certain the day of

12  surgery.  I don't know if I saw that particular scan

13  after that, though, for that.

14    Q.    I have a copy of it here.  I only made one.

15  I'm going to show it to you.

16    A.    In fact, I don't even know --

17    Q.    Because I don't see it in here.

18    A.    You know, again, I probably -- again, this

19  is how you know who -- this is my nurse, Julie

20  Thornton.  So my name -- it doesn't look like I was

21  in on this conversation here per se, or didn't come

22  to my task list.

23    Q.    The conversation that Dr. Coakley was

24  ordering the CT?

1    A.    Yeah.  That would have been between Julie

2  and whoever else here.  So here's one, Steve Ryan to

3  me.  This one was up here, but then these were my

4  nurse down here.

5    Q.    And you're still on the same page.  You're

6  at page 102.  You're pointing to the --

7    A.    Yeah.

8    Q.    -- May 6, 2016, 7:02 a.m. back and forth

9  between you and Dr. Ryan?

10    A.    Well, I'm looking here at 6/1/16, about that

11  Coakley wanting another CT.

12    Q.    Oh, okay.

13    A.    Oh, yeah, this would have been me -- this

14  was Steve talking to me here.  And then I -- here's

15  when I say reassign.  I had my nurse see this, you

16  know, saying, hey, we might want to have

17  cardiothoracic surgery see.  So that's where we had

18  to get Hazelrigg involved.

19    Q.    Okay.  So it's being moved forward as

20  additional surgeons are becoming involved, and then

21  they have recommendations of what they need?

22    A.    Yeah, and another radiologist and another CT

23  scan.

24    Q.    I'm going to have you take a look at

1   Exhibit 2.
2       A.   Can I grab my readers real quick?
3           MR. RUPCICH:  Absolutely.  We'll take a
4   break real quick.
5               (Whereupon a short recess was
6               taken.)
7   BY MR. RUPCICH:
8       Q.   Anything else you see in those tasks that
9   caught your interest?  There is one at page 119 that
10  interested me.
11      A.   Which one?
12      Q.   Page 119.  The first one, 3/1/16, 9:27 a.m.,
13  Robin Dunn.  Do you know who that is?
14      A.   I have no idea.  It might have been a
15  receptionist.
16      Q.   Caller:  Dr. Nawoo [sic], Physician; Nurse
17  Call.  Requesting to see if patient can be seen
18  sooner.  Patient has bleeding severely every day.
19  Please call.  Do you ever remember anything about
20  moving up the initial appointment?
21      A.   No.  No, I don't.
22      Q.   Take a look at Exhibit 2 for me, if you
23  would.  It's the second CT, I'll represent.  Does
24  that appear to be correct?

1       A.   Yeah.
2       Q.   Is that something you think you've seen
3   before?
4       A.   Probably, probably.
5       Q.   Now, this one does note something with
6   respect to the liver.
7       A.   Yeah.  They said widespread metastatic
8   disease.
9       Q.   Do you have any opinion on why the prior CT
10  didn't?
11      A.   It may have not been visible at that point
12  in time.
13      Q.   Just the quality of the film?
14      A.   It can be, yeah.  It can be the quality.  It
15  could have been there.  It could have been you
16  couldn't see it at the time for that.
17      Q.   Otherwise --
18      A.   You know, normally it says who ordered --
19  yeah.  Okay.  I was going to say, I didn't know who
20  ordered that.
21      Q.   So that's the treating doctor, Dr. Nawoor.
22      A.   Okay.
23      Q.   It's not the surgeon.  It probably is
24  because --

1       A.   I was going to say, it's not us, yeah.
2       Q.   Probably because the order went through the
3   treating doctor.
4       A.   Sure.
5       Q.   Take a look for me back in the chart at
6   page 59.  Is that the operative report?
7       A.   Yes.  And this would have been -- this would
8   have been mine.  The other guys probably had their
9   own as well.
10      Q.   That's your operative report.
11      A.   Yeah, this is from me, yeah.
12      Q.   And this is the procedure you described to
13  me at the beginning of the deposition.
14      A.   Uh-huh.
15      Q.   One of the most complex you've ever been
16  involved in to this day?
17      A.   Still is.
18      Q.   Still is.
19           You say the maximum complex modifier in
20  terms of nephrectomy, tediousness, size, and the fact
21  that it invaded all the way up to the -- ooh.
22      A.   His atrium, yeah.
23      Q.   I don't know what that word is, but.
24      A.   Atrium?

1       Q.   (Points on Exhibit 2.)
2       A.   Oh.  That's so when you bill, you know,
3   there's a standard level, and if it exceeds what
4   would be.  You know, a normal, you know,
5   straightforward case, you can maxi -- you know, you
6   can up the cost, the fee.
7       Q.   I thought that was a medical term.
8       A.   No, no.  It's just to try to get paid more
9   money for it.
10      Q.   I gotcha.  Understand.  Nine-hour case.  You
11  were in surgery for nine hours.
12      A.   Nine hours.
13      Q.   Was there anything during the course of the
14  procedure that was surprising based upon the
15  preoperative workup?
16      A.   You know, as predicted, it was a difficult
17  case, I mean.  And, in fact, I even think I
18  mentioned, you know, how you have a big desmoplastic.
19  It means like fibrous-type reaction, scar stuck sort
20  of.  It's maybe not a technical term, stuck, but, you
21  know, a lot of times tissue planes free up very
22  easily.  This did not.
23           MR. STROM:  Dr. Severino, would you mind
24  just repeating that "d" word that you used?

1    THE WITNESS:  Desmoplastic.
2    MR. STROM:  And could you spell that for the
3 court reporter, please?
4    THE WITNESS:  D-E-S-M-O-P-L-A-S-T-I-C.
5    MR. STROM:  Thank you.
6    Sorry, Joe.
7    MR. RUPCICH:  No.  Thank you.
8    Q.    And do you remember what surgeons were
9 actually present for this nine-hour procedure?
10    A.    Myself, Steve Ryan, and I think the heart
11 surgeon -- it was not Hazelrigg.  I think it -- I
12 don't know the guy's first name.  I think it's
13 Gopaldos would have been the cardiothoracic surgeon.
14    Q.    How many people would have been on the
15 surgical team like in the suite?  Like how big a
16 group would you have had in there?
17    A.    Probably ten.
18    Q.    Ten?
19    A.    You have an anesthetist, anesthesiologist.
20 Randy Sulaver was a resident at the time.  A couple
21 nurses.  You would have had the perfusionist for the
22 bypass part.  Steve Ryan, the heart surgeon.
23 Circulating nurse.  There would have been quite a few
24 for that.  There again, not all of them would be

1 working at the same time, but.
2    Q.    I was trying to figure out when the surgery
3 was actually scheduled, and I'm at page 83, counsel.
4 Are you able to tell from that?
5    A.    No.
6    Q.    It says on 6/24 at 1:26 p.m., Chad at
7 Taylorville aware of surgery time.  Does that suggest
8 as of that date the surgery was scheduled?
9    A.    Yeah.  She would have known on that date
10 that, hey, this is when -- Chad will schedule patient
11 to see his cardiologist.  Yeah, I guess Chad is at
12 the correctional center.
13    Q.    He is, right.
14    A.    So Julie is my nurse that schedules, so she
15 obviously talked to him.
16    Q.    Going back a page to 82?
17    A.    Yeah, somewhere the 23rd, 24th.
18    Q.    Somewhere around the 23rd, 24th of June, the
19 surgery was scheduled for the 19th of July?
20    A.    Yeah.
21    Q.    You first saw the patient, we agreed, on
22 March 10 of 2016.  Isn't that right?
23    A.    Correct.
24    Q.    And the cancer diagnosis came along with the

1 CT around April 12th to 14th.  Is that what we saw?
2    A.    Correct.
3    Q.    He had surgery July 19, 2016.  Is that
4 right?
5    A.    Yeah, uh-huh.
6    Q.    Do you have an opinion on whether this was a
7 reasonable time frame to -- from when you first saw
8 this patient to do the surgery?
9    A.    You know, obviously it took a lot of
10 coordinating and stuff.  I mean, like I said, you've
11 got to do this right or you're guaranteed the patient
12 will die on the table.  I mean, you had multiple
13 physicians' time frames.  You know, we had another
14 radiologist look at it.  You know, there's a lot of
15 coordinating here.
16    Q.    So is that a yes?
17    A.    Yeah.  I mean, I would argue I would rather
18 have it scheduled correctly than have a patient die
19 on the table because you want to try to hurry up, oh,
20 let's just do it.
21    Q.    Go to page 10, if you would.  Does it appear
22 to be an August 11, 2016, Clinic visit?
23    A.    Yeah.  This would have been post-op, yeah.
24 So I did see him afterwards.

1    Q.    Based on what when I looked through the
2 records, this looks like the last time you saw him?
3    A.    Yeah.
4    Q.    Would you have handed him off to oncology
5 then?
6    A.    Yeah.  We would have -- in fact, I think we
7 probably would have said -- yeah, want to probably
8 have him see oncology to be evaluated for that.
9    Q.    And how was he doing as of August 11, 2016?
10    A.    Unbelievably well, unbelievably well.
11    Q.    Why do you say that?
12    A.    He was talking to me and he was alive.  For
13 what he had done, that's impressive.
14    MR. RUPCICH:  I don't have any other
15 questions.
16    MR. STROM:  Okay.
17    THE WITNESS:  I mean, maybe that sounds
18 glib, but they stop -- you know, he had no blood flow
19 to his brain for a half an hour or whatever.  The
20 fact that he wakes up and can talk to you, that's
21 impressive.
22 BY MR. RUPCICH:
23    Q.    Let me ask you this.  That procedure and the
24 fashion its done, are you aware of any literature on

1  the survival rate of that?
2      A.    Specifically for hypothermic circulatory
3  arrest, no, no.  That would be cardiac stuff.  Like I
4  said, that's the first one I've ever been involved
5  with for that.  But I know for the disease that he
6  has, it's not a very good outcome.  But then to
7  actually do that, I'm impressed that he woke up and
8  was able to talk to us.
9      Q.    It was kind of a Hail Mary surgery?  Is
10 that --
11     A.    I wouldn't go that far, but, you know, like
12 I told him, if he wanted a chance to walk -- and I
13 remember him telling me, he wanted to walk out of
14 prison.  I remember him telling me that.  I think he
15 told me five years left.  I said, well, without
16 trying this, there's a guarantee you won't walk out
17 of prison.
18     Q.    He would have died --
19     A.    Died.
20     Q.    -- without the surgery.
21     A.    For sure.  Yeah, for sure.
22           MR. RUPCICH:  That's all I have.
23           MR. STROM:  Should we take five minutes?
24           MR. RUPCICH:  If you'd like.

1           MR. STROM:  Yeah.
2                 (Whereupon a recess was taken
3                 from 1:49 p.m. to 1:59 p.m.)
4           CROSS EXAMINATION
5  BY MS. HOLT:
6      Q.    Dr. Severino, we met before, but as a
7  reminder, my name is Chloe Holt, and I'm here with my
8  colleague Bill Strom, and we represent the plaintiff,
9  William Kent Dean, and I just have a few follow-up
10 questions from your earlier testimony.
11     A.    Sure.
12     Q.    You testified before that you've treated
13 inmates from the Illinois Department of Corrections
14 facilities.  Was that correct?
15     A.    Correct.
16     Q.    Do you know how regularly?
17     A.    You know, maybe a patient a month, maybe one
18 a month, or every other month maybe.
19     Q.    From different institutions or usually from
20 the same facility?
21     A.    Different.
22     Q.    Different ones?
23     A.    Different, uh-huh.
24     Q.    Do you know which ones?

1      A.    Yeah.  There's one, I think, in Rushville.
2  I think there's one in Lincoln, and those are the two
3  off the top of my head.
4      Q.    Okay.
5      A.    I wouldn't know their names, but I know
6  there's one -- there might be two west of here.
7  Maybe Mt. Sterling and then Lincoln.  I know there's
8  a prison up there.
9      Q.    Okay.
10     A.    So we see them from, you know, various
11 places.
12     Q.    Okay.  What kind of conditions do you
13 usually treat them for?
14     A.    From the prisons?  I'm trying to think off
15 the top of my head.  There was one inmate that had a
16 testicular cancer that we saw.  There was another
17 inmate that had -- you know, an older guy, difficulty
18 urinating.  Another one recently that had prostate
19 issues, elevated PSA.  I'm trying to think.  We've
20 seen a couple female inmates.  Probably, you know, I
21 don't know, a kidney stone or something like that.
22 Just off the top of my head, I'd say maybe one every
23 month or every other month maybe for that.
24     Q.    Okay.  You also testified earlier that when

1  Mr. Dean came to you, he was presenting with gross
2  hematuria.
3      A.    Yes.
4      Q.    Can you describe gross hematuria again?
5      A.    Yeah.  It's visible blood in the urine.
6      Q.    Okay.
7      A.    Yeah.
8      Q.    And are there any other types of hematuria?
9      A.    Yeah.  There's microscopic, which would be
10 not visible to the naked eye but under the
11 microscope.  And then, you know, some people would
12 say pseudohematuria where they think they have blood
13 in their urine and it's not blood.
14     Q.    Would you say that hematuria is a serious
15 condition?
16     A.    It can be.  Yeah.
17     Q.    When would you say it is a serious condition
18 versus when it's not?
19     A.    It's a serious condition when you find a
20 malignancy.
21     Q.    Is any type of hematuria more serious than
22 another?
23     A.    That's a difficult question, but yes and no.
24 Yeah, it can be.  It can be life-threatening.  If

1 people lose massive amounts of blood quickly, you
2 know, they can lose so much blood that they can need
3 transfused or their blood pressure may go low. So,
4 yes, it can be a serious condition in terms of
5 immediate, oh, yeah, they're bleeding to death.
6     Q.    Does the amount of time a patient is
7 experiencing hematuria weigh into that at all?
8     A.    It may. It may, yeah, yeah. Like I said,
9 if somebody loses massive amounts of blood in one
10 day, you know, they can potentially have a poor
11 outcome, you know, if they're requiring transfusions
12 or a drop in their blood pressure for that.
13     Q.    And, I guess, if a patient presented with
14 hematuria and been experiencing that for several
15 weeks and months, would that be more alarming than if
16 a patient had just started presenting with hematuria?
17     A.    You would work them up the same way.
18     Q.    Okay.
19     A.    I mean, you do the same thing. You do scan
20 and scope regardless.
21     Q.    And you said before, that was the standard
22 of care?
23     A.    That is the standard of care, yeah. There
24 are a little variations on that, but in general

1 there's guidelines, the AUA guidelines. That would
2 be the number one way to do it.
3     Q.    And AUA is the --
4     A.    American Urological Association, our
5 governing body.
6     Q.    And you just stated that there were some
7 variations of the standard of care. Could you
8 elaborate on those?
9     A.    Yeah. Occasionally, say somebody is
10 allergic to the IV contrast. You might do an MRI of
11 the kidneys and upper tracts because the contrast
12 used with that typically doesn't cause allergic
13 reactions. If somebody had poor kidney function and
14 you didn't want to give them IV contrast, you might
15 do an ultrasound of the kidneys. But then to check
16 the tubes, you know, you might have to look in their
17 bladder and shoot contrast up from below. So there
18 can be minor variations. But, as we discussed, you
19 know, the top -- from the top to the tip, you've kind
20 of got to do something typically to evaluate that, to
21 see if you can identify a significant problem.
22     Q.    Would there be any other reason to start
23 with an ultrasound other than what you just
24 mentioned?

1     A.    Another reason?
2     Q.    Yeah.
3     A.    Yeah. Well, yeah. I mean, if you thought
4 maybe they, you know, couldn't, like I say, tolerate
5 an MRI because it's a tight tube, you might do an
6 ultrasound because you're just out in the open for
7 that. You know, some people get claustrophobic from
8 an MRI.
9     Q.    But the standard of care --
10     A.    Even a CT, I mean, some people moan about
11 it, but it's not that tight.
12     Q.    But the standard of care is to start with a
13 CT scan?
14     A.    If you could, yeah. If you could safely do
15 one, if the kidney functions, they're not allergic,
16 that would be the ideal way of doing it. And again,
17 those are guidelines. That's why they're called AUA
18 guidelines. They're not an absolute set-in-stone
19 type of thing for that.
20     Q.    And would it affect your response to
21 hematuria if the patient had a history of kidney
22 stones, or would it still be kind of the same
23 standard of care that you just went over?
24     A.    Yeah. I mean, obviously, if somebody says,

1 oh, I've had stones and I've got blood in my urine,
2 yeah, that's probably going to be the number one
3 thing that pops in your head. You would still check
4 them. I mean, hey, you got a stone? But if somebody
5 said, well, geez, I've had stones and, hey, I've got
6 blood in my urine, you know, a lot of times, you
7 know, kidney stones are -- it's a recurrent problem.
8     Q.    Okay.
9     A.    A really recurrent problem. So you wouldn't
10 be shocked if somebody came back with another stone
11 for that.
12     Q.    Does gross hematuria indicate a likely worse
13 diagnosis than microscopic?
14     A.    It can, but not always. And that's -- some
15 people get confused on that. You can have a tiny
16 amount of blood in the urine, meaning microscopic,
17 and have a horrible problem, and you can have
18 literally a bloody Mary, and I've got nothing for
19 that with that. Now, if you look at the literature,
20 though, in terms of, hey, microscopic hematuria, in
21 somebody that has no symptoms, the risk of finding
22 malignancy is probably about 2.5 percent.
23     Q.    Okay.
24     A.    When they have gross hematuria, it goes up.

1  It's higher than that.
2      Q.   Do you know approximately what that is?
3      A.   Probably 40 to 50 percent.
4      Q.   Okay.
5      A.   Roughly, for that, with that.  But, again,
6  we've found plenty of people with bad disease with,
7  hey, you've got three red cells in your urine and,
8  oh, geez, you've got bad bladder cancer or something
9  like that.
10     Q.   And when you say literature, are you
11 referring to like guidelines, or is there anything
12 else that you're referring to?
13     A.   That would just be the general urological
14 literature, you know, if you like read in the Journal
15 of Urology or whatever.
16     Q.   Can I redirect your attention to pages 37
17 and 38 in Exhibit 1?  It's the CT results from April
18 12th.
19     A.   Yes.
20     Q.   So you testified before that it was possible
21 that the metastatic disease was there at that time,
22 but it was too small to be seen.
23     A.   Yeah.
24     Q.   And you stated before that that could have

1  been because of the imaging quality?
2      A.   Yeah.
3      Q.   Is it also possible that it was there but
4  just too small to be seen at that point in time?
5      A.   Yes.
6      Q.   Okay.  Can I also redirect your attention to
7  pages 18 and 19 of Exhibit 1?  These are the visit
8  notes from April 14th.
9      A.   Yeah.
10     Q.   During this visit you went over Mr. Dean's
11 diagnosis and the need to have surgery.
12     A.   Correct.
13     Q.   And you stated earlier that the surgery was
14 not an emergency, but would it be fair to say that it
15 was urgent?
16     A.   Urgent, hey, when you can get it set up and
17 scheduled correctly.  I mean, you know, you want to
18 get everything in order and, you know, have him see
19 who he needed to be seen and all that.  And once you
20 can arrange those visits and get three guys together
21 for ten hours in a cardiac operating room.
22     Q.   Yeah.  In the visit notes you also state
23 that Julie was going to work to see if he could have
24 surgery done at Memorial.  Is that correct?

1      A.   Correct.
2      Q.   What does that mean?  What did that entail?
3      A.   Well, I can tell you what this means, but if
4  you wanted to, you would have to ask her exactly what
5  she meant.  My bet is is probably at the time there
6  was -- and maybe I'm wrong.  There might have been a
7  contract with the prison system that, hey, for
8  surgeries, they have to have them done at St. John's.
9  Now I don't know if that's a fact, but there was some
10 suggestion, oh, they have to do them at Saints.
11 Well, I don't have privileges at St. John's, so.  You
12 know, we wanted to do it.  Well, you can't do it if
13 you don't have privileges there.  I would have had to
14 find somebody else to do it for him for that.
15     Q.   So would she have been reaching out to the
16 hospital?
17     A.   No, I don't think so.
18     Q.   Okay.
19     A.   I don't think so.  She probably would have
20 been working with the prison system to find out, hey,
21 are you going to let us do this here?  Can we make an
22 exception?  Or whatever.  And again, there may be --
23 I don't know -- there may be contract issues with
24 that.  I don't know.  But that's probably what that

1  meant, was that, hey, they wanted us to go there, but
2  I can't go there.
3      Q.   And can I direct you to page 106 in
4  Exhibit 1?
5      A.   Yeah.
6      Q.   And can you look at the entry on April 21st?
7      A.   Yeah, uh-huh.
8      Q.   What does that say?
9      A.   That means -- what I think it means is the
10 prison system said, hey, we can -- we don't have to
11 go to St. John's.
12     Q.   Okay.
13     A.   We can do it at Memorial, meaning I could do
14 it is what it means.  I don't have to send him
15 somewhere else.
16     Q.   Okay.  And then as you said before, they
17 likely weren't working with the hospital at this
18 point?
19     A.   I doubt it.  I doubt it.  I mean, to me this
20 just means, hey, she got the okay, that, hey, we can
21 try to do this at Memorial.
22     Q.   Okay.
23     A.   And not have to go to St. John's for it.
24     Q.   And can I direct your attention to page 96

1  of Exhibit 1?

2    **A.**  Yep.

3    **Q.**  And do you know what that document is?

4  Sorry.  Do you recognize what that document is, what

5  you're looking at?

6    **A.**  Oh, right here?

7    **Q.**  Yeah.

8    **A.**  It's just a task list.

9    **Q.**  And the document refers to Chad from

10  Taylorville.

11    **A.**  Yeah.  I don't know who Chad is.

12    **Q.**  You don't know who Chad is?

13    **A.**  It must be a nurse at the corrections

14  facility, but I don't know.  I'm not sure who he is.

15    **Q.**  And then the next entry down it refers to

16  Dr. Nawoor.  Do you know who that is?

17    **A.**  I'm assuming he's the prison doc, but I'm

18  not -- I would assume that's who it is.

19    **Q.**  Okay.

20    **A.**  I would assume that's who it is.

21    **Q.**  Do you know why they would have been

22  contacting your office at this time?

23    **A.**  Just to know when we were going to do the

24  case.  At least according to this, that's -- he was

---

1  just calling to find out.

2    **Q.**  So you did not take the calls.

3    **A.**  No.

4    **Q.**  Do you know who would have been responsible

5  for taking the calls?

6    **A.**  The person that -- Tina Wise would have been

7  that person that took the call, which I think is a

8  receptionist.

9    **Q.**  Receptionist.

10    **A.**  I don't even know if she works for us

11  anymore.

12    **Q.**  Would they have mentioned any of these calls

13  to you?

14    **A.**  The receptionist?

15    **Q.**  Yeah.

16    **A.**  I don't even know who they are.

17    **Q.**  Okay.

18    **A.**  No.  I know that's sad, but I don't even

19  know -- I don't go out front, so.

20    **Q.**  Are you aware of any other contacts

21  between -- other than ones we've gone over today

22  between your office and either staff or doctors at

23  Taylorville?

24    **A.**  If they're in here, they would be in here.

---

1  At least with me, I wouldn't have had any

2  contact with anybody.  And I say typically if there's

3  a phone call, particularly Julie, my nurse, she

4  documents everything, so.  If somebody called, it's

5  in there.

6    **Q.**  Okay.

7    **A.**  Even if it's frivolous, it's in there.

8    **Q.**  Can I also redirect your attention to

9  pages 59 and 60 from Exhibit 1?

10    **A.**  Yeah.

11    **Q.**  The surgery report.

12    **A.**  Yeah, uh-huh.

13    **Q.**  And you did, I believe on page 60, note the

14  possibility of metastatic disease.

15    **A.**  Yeah, uh-huh.

16    **Q.**  Can you describe again what you saw that

17  made you think that?

18    **A.**  Yeah.  I think when we were -- you know, the

19  right kidney sits basically below your liver, and so

20  in order to get there, you've kind of got to move

21  that out of the way.  So if I remember correctly, I

22  think in looking, I saw some spots on the liver that

23  I probably assumed were metastases.

24    **Q.**  Okay.

---

1    **A.**  You can get scar and everything, but I would

2  suspect that they were metastases.  And I think -- I

3  probably noted that.  Maybe not.  Yeah, I did note

4  that up in the first paragraph of the description of

5  the procedure.

6    **Q.**  And you did send some of the renal cells for

7  a biopsy.  Is that correct?

8    **A.**  The whole specimen goes off to the pathology

9  folks.

10    **Q.**  But you didn't send any of the possible

11  metastasis from the liver?

12    **A.**  No, we didn't take a piece of the liver.  I

13  didn't want to take a piece of the liver.  The

14  problem is, especially with that type of procedure,

15  you know, they have to anticoagulate them, and the

16  liver can bleed a whole heck of a lot.  And if you

17  take a whack out of the liver, you know, (a), it's

18  not going to help them, but, (b), you might create a

19  big problem with bleeding afterwards.  I suppose I

20  could have stuck a needle in it, but, again, you

21  probably want to avoid getting involved in bleeding

22  of the liver.  That can be a big problem.

23    **Q.**  Is it common for people with disease like

24  Mr. Dean to develop metastatic disease?

1    A.   With what he had?

2    Q.   Yeah.

3    A.   They all get it.

4    Q.   Okay.

5    A.   Eventually they'll all get it for that. And

6 again, that's from experience. I mean, I've been

7 practicing 19 years. Every person that I've seen,

8 off the top of my head, that's had disease this

9 extensive, they all eventually will get -- if they

10 don't have it up front, and most of them do, they

11 will get it for that.

12    Q.   Uh-huh.

13    A.   And again, that's just from 19 years of

14 experience.

15    Q.   Do you ever recall saying or thinking that

16 if Mr. Dean's surgery was successful, he wouldn't

17 have to undergo further treatment such as

18 chemotherapy?

19    A.   Do I recall that?

20    Q.   (Ms. Holt nods head up and down.)

21    A.   No.

22    Q.   In your opinion, would that have been a

23 likely outcome?

24    A.   That he would need more treatment?

1    Q.   Yeah.

2    A.   Absolutely.

3    Q.   Absolutely?

4    A.   Yeah.

5    Q.   Do you ever recall saying or thinking that

6 you thought Mr. Dean decided not to have the surgery?

7    A.   Not to have the surgery?

8    Q.   (Ms. Holt nods head up and down.)

9    A.   No. No, he was gung-ho for it.

10    Q.   Okay.

11    A.   Like I said, I remember him telling me he

12 wanted to walk out of prison. I said, if you want

13 any chance of walking out of prison, you've got to do

14 this, regardless of, hey, you might not wake up. He

15 was pretty adamant about that. He wants to walk out

16 of prison, not go out another way.

17    Q.   Did any of the delays in scheduling ever

18 make you fear he had changed or would change his

19 mind?

20    A.   Probably not. No. I mean, I don't -- the

21 last time I saw him, I don't -- I don't think I

22 talked to him after that, but I don't think he would

23 have changed his mind. Or at least when I talked to

24 him, you know, the last time I talked to him at the

1 Clinic, I would have probably not believed he would

2 have wanted to change his mind, not from what he told

3 me.

4    Q.   And just to check, Dr. Nawoor wouldn't have

5 had access to the task system. Is that correct?

6    A.   That I do not know.

7    Q.   Okay.

8    A.   I don't know what they're hooked into or at

9 that time. Things have changed, obviously. At that

10 time I don't know, you know, who was able to access

11 that.

12    Q.   Okay.

13    A.   I know at the time, you know, I could talk

14 with Steve Ryan. I don't even know if at that time

15 if Hazelrigg was able to get on this system or not,

16 three, two and a half years ago. I think they can

17 now.

18    Q.   Okay.

19    A.   But back then -- so I would bet he couldn't.

20 I would just imagine that he would not be hooked into

21 that system, but I don't know that for a fact for

22 that.

23    MS. HOLT: Okay. Well, I likely don't have

24 any further questions.

1    MR. STROM: Should we take just a

2 five-minute break and check real quick and then call

3 it for sure?

4    MR. RUPCICH: Yeah. I probably have three,

5 but, yeah.

6    MR. STROM: Yeah. We'll just make sure that

7 we're sewn up and then let you go ahead.

8    MR. STROM: Jeremy?

9    MR. TYRRELL: I don't have any questions.

10    (Whereupon a recess was taken

11    from 2:19 to 2:22 p.m.)

12    MS. HOLT: I just have one final question.

13    THE WITNESS: Sure.

14 BY MS. HOLT:

15    Q.   Did you ever have any contact with

16 Dr. Nawoor?

17    A.   I don't recall. I don't know that I ever

18 talked to him actually.

19    Q.   Okay. So you don't recall any conversations

20 over the phone with him?

21    A.   Not off the top of my head, but, I mean,

22 it's possible. But, I mean, I can't recall anything

23 off the top of my head.

24    Q.   What about any emails exchanged?

1   A.   With Nawoor?

2   Q.   Yes.

3   A.   In that I'm not text savvy, there would

4 definitely have been no emails. This is relatively

5 recent (witness holding up phone). So I know that

6 for a fact. There would have been no emails. Now,

7 could he have called? That's possible. I don't

8 recall. But I am pretty darn sure there was no

9 emails.

10  Q.   Have you ever met him in person, had any

11 face-to-face conversations?

12  A.   You know, I know there was a doc Ray Nawoor

13 that I think was an internist here in Springfield,

14 but I thought his name was R-A-Y. I don't know if

15 that's the same Rahmon Nawoor. I don't know if it's

16 the same person.

17  Q.   Okay. But no conversation --

18  A.   Ray Nawoor is a little guy.

19  Q.   Sorry. No conversations related to

20 Mr. Dean's case in person that you can recall?

21  A.   Not that I can recall. And I know there was

22 no emails.

23  Q.   Okay.

24  A.   So that I'm sure. I mean, if there's a

1 conversation, I don't recall. But I know there were

2 no e-mails for that.

3       MS. HOLT:  Well, thank you.

4       THE WITNESS:  Just because I don't email,

5 so.

6       MR. RUPCICH:  Very briefly, Doctor.

7              REDIRECT EXAMINATION

8 BY MR. RUPCICH:

9   Q.   You had said the standard of care for gross

10 hematuria is a CT?

11  A.   CT urogram or CT IVP and a scope typically.

12  Q.   And that's based on -- and that's standard

13 care in neurology.

14  A.   Correct, set forth by the AUA.

15  Q.   And those are guidelines.

16  A.   That is important. They are guidelines.

17 They are not absolutes.

18  Q.   So you would have to evaluate an individual

19 patient?

20  A.   Sure.

21  Q.   Take a history; correct?

22  A.   Correct.

23  Q.   And make an individualized judgment on the

24 specific clinical circumstances?

1   A.   Correct.

2   Q.   And the ordering of diagnostic testing would

3 be based on that particular patient's clinical

4 picture?

5   A.   Correct.

6   Q.   You were asked about whether gross hematuria

7 can, I think, pose a serious risk, and you had said,

8 well, if the patient is losing a lot of blood.

9   A.   Rapidly, uh-huh.

10  Q.   Could lead to anemia?

11  A.   Yeah, yeah, sure.

12  Q.   Before you do surgery, is there a workup of

13 blood counts?

14  A.   In general, yes, but not for all surgeries.

15  Q.   Would Mr. Dean have been taken into surgery

16 if he was anemic on this procedure?

17  A.   He might, yeah. Now, we were anticipating

18 blood loss. So, in fact, we probably typed and

19 crossed him for six or eight or ten units,

20 anticipating he was probably going to get blood for

21 that, so.

22  Q.   I mean going into surgery.

23  A.   If they're real low, we might transfuse them

24 ahead. You know, if somebody had a hemoglobin of

1 six, we're probably going to transfuse them ahead of

2 time. But, you know, if they're eight or ten and

3 they're not symptomatic, you know, we might start

4 with the understanding that he's probably going to

5 lose blood and we're probably going to give it.

6 Actually I think we used cell saver on this which,

7 again, basically any blood that he lost that we

8 sucked up, we could give his own blood back to him.

9 In fact, I think we -- yeah, we did use cell saver.

10 And still he got 11 units of blood, you know, but he

11 got a bunch back through the cell saver for that.

12  Q.   Any indication in the operative report that

13 he was dangerously low going into the procedure?

14  A.   In the operative report?

15  Q.   Yeah, or in any of the records that you saw.

16  A.   There would not be anything in the operative

17 report. And I didn't see it in -- there is

18 somewhere, probably in here in the notes, what his

19 pre-op hemoglobin was. I don't recall what it was.

20  Q.   That's what we would --

21  A.   But I'm sure it's got to be in there

22 somewhere because that would be something -- this guy

23 you would check that ahead of time.

24  Q.   So we would look for the preoperative

1  hemoglobin numbers.

2      **A.**   Yeah, or CBC.  It would be included in

3  there.

4      **Q.**   Okay.

5      **A.**   It's got to be in there.  I won't know what

6  it was off the top of my head, but I'd be shocked if

7  we didn't check it.

8          MR. RUPCICH:  That's all.

9          MR. STROM:  That's all from us.

10         MR. TYRRELL:  I have no questions.

11         MR. RUPCICH:  Signature?  Do you want to

12  review it?  Most doctors who are non-parties don't.

13         MS. POWELL:  Yeah, you don't want to read

14  it.

15         THE WITNESS:  I think she probably put what

16  I said.

17         MS. POWELL:  Yeah.

18         MR. RUPCICH:  All right.  He'll waive then.

19              FURTHER DEPONENT SAITH NAUGHT.

20                  (Time concluded:  2:26 p.m.)

DAVIS REPORTING SERVICE
217-546-6868

1  STATE OF ILLINOIS  )
                    )SS
2  COUNTY OF SANGAMON )

4          C E R T I F I C A T E

5      I, Cheryl A. Davis, a Certified Shorthand

6  Reporter, do hereby certify that prior to the taking

7  of the deposition herein, and on February 8, 2019,

8  the Deponent WILLIAM SEVERINO, M.D. was, by me, sworn

9  to testify to the truth in relation to the matter in

10  controversy herein.  That on said date the foregoing

11  deposition was taken down in shorthand by me and

12  afterwards reduced to typewritten form by me, and

13  that the foregoing transcript contains a true and

14  accurate translation of all such shorthand notes.

15      Given under my hand on this 21st day of February,

16  2019, at Springfield, Illinois.

_____

19      Certified Shorthand Reporter
        License No. 084-001662

DAVIS REPORTING SERVICE
217-546-6868