E-FILED
Monday, 18 November, 2019  07:37:10 PM
Clerk, U.S. District Court, ILCD

042447/19344/PEH/DSF

U.S. DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | |
|---|---|
| WILLIAM KENT DEAN, | |
| Plaintiff, | No. 17-cv-3112 |
| v. | Judge Sue E. Myerscough |
| WEXFORD HEALTH SOURCES, INC., DR. ABDUR NAWOOR and UNKNOWN HEALTHCARE EMPLOYEES, | Magistrate Judge Tom Schanzle-Haskins |
| Defendants. | |

**REPLY TO RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Defendants, DR. ABDUR NAWOOR, DR. REBECCA EINWOHNER, KATHY GALVIN and WEXFORD HEALTH SOURCES, INC., by and through their attorneys, CASSIDAY SCHADE LLP, and for their Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment, states as follows:

**RESPONSE TO PLAINTIFF'S ADDITIONAL MATERIAL FACTS**

**Material and Undisputed**

Nos. 2, 3, 4, 5, 10, 12, 14, 23, 27, 29, 30,  41, 42, 52, 53, 54, 57, 58, 65, 66, 100, 103, 104, 120, 133, 135, 136, 137, 138, 142, and 143

**Material and Disputed**

None.

**Immaterial and Disputed**

Nos.  8, 9, 11, 13, 15, 16, 20, 22, 24, 32, 33, 35, 47, 48, 49, 51, 56, 59, 60, 61, 63, 71, 72, 74, 75, 95, 96, 97, 98, 99, 101, 102, 107, 109, 110, 111, 115, 116, 117, 118, 119, 129, 130, 131, 132, and 134.

**Immaterial and Undisputed**

Nos. 1, 6, 7, 17, 18, 19, 21, 25, 26, 28, 31, 34, 36, 37, 38, 39, 40, 44, 45, 46, 50, 55, 62, 64, 67, 68, 69, 70, 73, 76, 77, 78, 79, 80, 105, 106, 108, 112, 113, 114, 121, 122, 123, 124, 125, 126, 127, 128, 139, and 141.

**Unsupported by Cited Evidence and Therefore Disputed**

Nos. 8, 11, 13, 15, 16, 20, 22, 24, 32, 33, 49, 56, 59, 60, 63, 71, 72, 74, 75, 97, 99, 101, 102, 107, 109, 111, 129, and 134.

**Not Applicable to Wexford Defendants**

Nos. 43, 81-94, and 140

1. A 2015 CT scan of Mr. Dean showed a mass in the right kidney. Wexford MSJ Ex. K, Racenstein Tr. 33:23-34:4.

**RESPONSE: Immaterial and Undisputed.**

2. Mr. Dean began urinating blood on December 19, 2015. Mincy MSJ Ex. A, Dean Tr. 56:17-57:6.

**RESPONSE: Material and Undisputed.**

3. Mr. Dean presented with painless, gross hematuria on December 23, 2015. Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001341 (12/23/15 5:55 AM Medical Records Note).

**RESPONSE:       Material and Undisputed.**

4. Dr. Nawoor told Mr. Dean during his December 23, 2015 medical visit that the cause of his hematuria was "stones or cancer." Mincy MSJ Ex. 1, Dean Tr. 60:24-61:1.

**RESPONSE:       Material and Undisputed.**

5. Dr. Nawoor recognized on December 23, 2015 that Mr. Dean would need to see a urologist if his "hematuria persists." Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001339-40 (12/23/15 9:13 AM Medical Records Note).

**RESPONSE: Material and Undisputed.**

6. Painless hematuria is more suggestive of malignancy than hematuria with flank pain. Ex. D, Dhar Tr. 128:1-9.

**RESPONSE: Immaterial and Undisputed from the perspective of an urologist.  This is immaterial because the weighing of different potential causes in the differential diagnosis is beyond the Eighth Amendment's reach.  There is no evidence Dr. Nawoor or any named Defendant knew this.**

7.  The risk of finding malignancy in gross hematuria is approximately 40 to 50 percent, and is much greater than the risk of finding malignancy in microscopic hematuria. Wexford MSJ Ex. L, Severino Tr. 48:24-49:3.

**RESPONSE: Immaterial and Undisputed from the perspective of an urologist.  This is immaterial because there is no evidence Dr. Nawoor or any named Defendant knew these statistics.**

8.  Hematuria is to be considered malignant until proven otherwise. Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; Ex.4 at 293, Wexford Health Sources, Inc. Medical Guidelines, Region: Illinois (Oct. 21, 2014) (instructing providers to "[r]ule out malignancy").

**RESPONSE: Immaterial and Disputed.  This is a conflation of the protocol and is not supported by the cited evidence.  First, the guideline states in its introduction it sets forth no rules:  "Clinical pathways do not replace sound clinical judgment, nor are they to strictly apply to all patients.  The specific strategies and pathways presented in this manual provide a clinical management approach, but their application is a decision made by the practitioner accounting for individual circumstances."  Plaintiff's Exhibit 4 at 4. Moreover, it contains nothing remotely suggesting "Hematuria is to be considered malignant until proven otherwise."  It lists a number of treatments in a clinical pathway, one of which is "rule out malignancy."  It does not set forth a timeframe or standard of care.  The guideline does not provide a pathway for a patient with a history of hematuria and kidney stones such as Plaintiff, as his situation requires the exercise of clinical judgment.**

9.  Wexford's Medical Guidelines instruct its providers to rule out malignancy in patients who present with hematuria. Ex. 4 at 293, Wexford Health Sources, Inc. Medical Guidelines, Region: Illinois (Oct. 21, 2014).

**RESPONSE:  Immaterial and Disputed.  See response to No. 8.**

10.  The standard of care for hematuria is to perform a CT with contrast and a cystoscopy under the care of urologist, regardless of whether a patient has a history of kidney stones. Wexford MSJ Ex. D, Dhar Tr. 91:25-92:9; Wexford MSJ Ex. L, Severino Tr. 47:20-48:4; Wexford MSJ Ex. I, Metwalli Tr. 45:7-46:16.

**RESPONSE: Material and Undisputed.**

11. Dr. Einwohner wrote "Collegial review with Dr. Butler with consideration of re-imaging and urology eval." Ex. 5, Einwohner Records Bates #000061, 000063 ("case for collegial").  By "re-imaging," Dr. Einwohner meant a CT scan or other image that Mr. Dean had received

previously, not an ultrasound, which he had not received previously.  Wexford MSJ Ex. H, Barnett Tr. 149:1-5.

**RESPONSE:  Immaterial and Disputed.  This is not supported by the record.  Plaintiff's expert Dr. Barnett lacks a foundation of personal knowledge to speculate on whether Dr. Einwohner intended to exclude ultrasound when she used the word "reimaging."  See Fed. R. Evid. 602.  Moreover, Dr. Einwohner's deposition testimony makes very clear she considered "re-imaging" to include ultrasound:**

> **Q.      *** Is there an indication on this February 8, 2016 progress note that either of those two things happened [urinalysis or collegial review]?**
> **A.      Well, I think your question, please clarify for me, if anything happened, if there was a collegial review or urinalysis.  It looks like, based on this note, something did happen since last review because *there is a new imaging study on this note, the kidney ultrasound.***
> **Q.      *The kidney ultrasound?***
> **A.      *Yes.  *** (Emphases added).   Exhibit B, deposition of Rebecca Einwohner, pg. 242.**

12. When Dr. Einwohner requested collegial reviews, Dr. Nawoor was responsible for submitting the official request for review. Wexford MSJ Ex. A, Nawoor Tr. 236:15-22.

**RESPONSE:  Material and Undisputed.**

13. Dr. Ritz overruled Dr. Einwohner's recommendation for a urology referral and CT scan and "suggest[ed] [a] renal ultrasound."  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 0001343 (1/13/16 12:55pm Medical Records Note).

**RESPONSE:  Immaterial and Disputed.  This is not supported by the cited evidence.  See Response to No. 11.  The urology referral was made following the ultrasound.  Moreover, Dr. Einwohner's exact words were "consideration of re-imaging and urology eval."  See Defendants UMF 30.  She did not make an urgent referral or give indication of a hard and fast order such that it was unreasonable or deliberately indifferent to perform an ultrasound.  Her deposition testimony makes clear she considered ultrasound to be reimaging.**

14. An ultrasound is "one component" of Wexford's "typical" response and attempt to diagnose hematuria, with other components being the taking of a history, a physical examination, a urinalysis, and x-rays.  Wexford MSJ Ex. G, Ritz Tr. 72:22-73:2.

**RESPONSE:  Material and Undisputed.**

15. A CT scan is not a component of Wexford's "typical" response to diagnose hematuria. Wexford MSJ Ex. G, Ritz Tr. 72:22-73:2.

**RESPONSE:  Immaterial and Disputed.  This is a complete misrepresentation of the cited testimony, where Plaintiff asked a different question of Dr. Ritz and then inverted a**

**portion of the answer, while omitting the remainder to create this proposed additional material fact. Dr. Ritz's testimony was:**

Q. Is an ultrasound of the abdomen the typical way that would be evaluated?

A. It's one component of the evaluation.   But certainly, there's a primary care evaluation that would occur with intermittent hematuria prior to an ultrasound.

Q. And what do you mean by a primary care evaluation?

A. Well, history, physical, physical examination, I should say, on-site testing, such as urinalysis, which is referenced here. Sometimes X-rays. *And then consideration of further imaging based upon the findings related to the primary care workup on site.* (Emphasis added).

Clearly, Dr. Ritz's answer encompasses that further imaging could be indicated based on the treating physician's evaluation.

16. An ultrasound is cheaper for Wexford than other diagnostic imaging tests, Wexford MSJ Ex. K, Racenstein Tr. 41:5-6; Ex. 9, Little Tr. 23:13-21, 41:8-13

**RESPONSE: Immaterial and Disputed, as the cited testimony does not support this.  Dr. Racenstein is not a Wexford employee and has no foundation to testify to the compensation arrangement between IDOC and Wexford.  Fed. R. Evid. 602.  Nick Little's cited testimony does not support that ultrasound is "cheaper" than other diagnostic testing.  The cited testimony only says that blood tests, urine tests, and ultrasounds are part of Wexford's base compensation.   Plaintiff inverts this testimony to mean all other unidentified diagnostic tests are not part of Wexford's base compensation and are therefore more expensive. This is unsupported.**

17. An ultrasound is not the appropriate imaging technique to detect cancer because the ultrasound will be unable to detect over half of renal tumors whereas a CT scan with contrast will detect between 94.1%-100% of tumors.  Ex. 13, Dhar Expert Report at 5 ("Ultrasound has only a 40% sensitivity for identifying renal tumors, meaning that 60% of renal tumors could not be detected by ultrasound due to multiple factors, including operator dependence."); Wexford MSJ Ex. D, Dhar Tr. 123:23-124:18.  Wexford's own expert admits that "[Even i]f you have a good ultrasound, you will still need . . . a CT."  Ex. 38, Kosierowski Tr. 126:4-5.

**RESPONSE: Immaterial and Undisputed that an ultrasound *alone* is not a sufficient test to rule out cancer.  The question is whether it was an appropriate initial test of a workup for a patient with Plaintiff's history and presenting symptoms.**

18. A CT scan without contrast is the preferred test for detecting kidney stones because a renal ultrasound does not visualize the ureters, is operator dependent, and cannot detect small kidney stones. Wexford MSJ Ex. D, Dhar Tr. 74:1-75:18; Wexford MSJ Ex. I, Metwalli Tr. 55:21-58:11; Wexford MSJ Ex. K, Racenstein Tr. 39:18-40:5, 65:7-16.

**RESPONSE: Immaterial and Undisputed.  No CT without contrast alone was ordered for Plaintiff after onset of presenting symptoms in December 2015.  Defendants ordered an ultrasound and followed it with a urology referral and CT *with and without* contrast in April 2016.**

19. A CT with contrast is possible for "almost any patient."  Wexford MSJ Ex. H, Barnett Tr. 169:20-170:5 ("You can find a way to give contrast to almost any patient. You just use a different kind of contrast. . . . [T]he fact that someone has a slightly more elevated risk of an adverse reaction from contrast, if you have an important reason to do the study, virtually never bars a study from being done.").

**RESPONSE: Immaterial and Undisputed.  Defendants never took the position Plaintiff had an absolute contraindication to IV contrast.  Defendants' position was given Plaintiff's relative contraindication---decreased renal function---ultrasound was an appropriate first test to look for stones. Defendants' UMF 42-44.**

20. Defendants did not consider the risks of a CT with contrast when deciding on a course of care for Mr. Dean.  Wexford MSJ Ex. D, Dhar Tr. 96:11-15; Wexford MSJ Ex. E, IDOC Taylorville Med Recs 000437, 001681-82, 001683 (examples of records where Mr. Dean received CT with contrast).

**RESPONSE: Immaterial and Disputed.  The cited records do not support what Plaintiff puts forth as an additional material fact.  In the cited portion of Dr. Dhar's deposition she states Plaintiff had enough renal function that IV contrast was not an absolute contraindication.  The medical records Plaintiff cites likewise do not support this purported fact.  Bates 437 is a *non-contrast* study.  Moreover, that Dr. Severino ordered and performed the April 2016 CT with contrast does not in any way stand for a "fact" that Defendants did not consider the risks of CT with contrast when treating Plaintiff.**

21. Ultrasounds are less effective with obese individuals. Wexford MSJ Ex. I, Metwalli Tr. 57:19-58:1.

**RESPONSE: Immaterial and Undisputed.  Neither standard medical practice nor the Eighth Amendment requires a certain test in a given situation.  *Estelle v. Gamble*, 429 U.S. 97 (1976).  If this were the case, X-rays and ultrasounds would never be used because CTs and MRIs are more sensitive.**

22. A renal ultrasound is not sufficient to rule in kidney stones. Wexford MSJ Ex. H, Barnett Tr. 122:12-16.

**RESPONSE: Immaterial and Disputed.  This fact is directly contradicted by the cited testimony.  In the cited testimony, there was a misunderstanding where Dr. Barnett thought the question referred to an ultrasound ruling in a stone as the cause of *hematuria, not stones*.  This was clarified as follows:**

Q And you agree that a renal ultrasound is a sufficient test to rule in kidney stones?
A No, no.
Q You would not agree?
A No, I don't agree with that.
Q Weil, an ultrasound can pick up kidney stones; right?
A Yes.
Q A renal ultrasound doesn't rule out other causes necessarily of hematuria; correct?
A Correct.
Q But if you see calculus in the kidney, then you at least know the patient has stones?
A That's true if you see a stone in the kidney, but you don't see a stone on ultrasound.
Q I'm not saying necessarily, but if you find it, then it rules in stones?
A No, it does not rule in a stone as the cause of the bleeding. It doesn't tell you that much.
Q Right. But it rules in the presence of a stone?
A Yeah.  Ex. H, Barnett Tr. 122:12-16.

**It is clear from this portion of the deposition Dr. Barnett agreed that an ultrasound can rule in a kidney stone by showing its presence.  Plaintiff's citation to this testimony for the exact opposite fact should be rejected.**

23. If an ultrasound detects a stone, it has not necessarily identified the cause of hematuria. Wexford MSJ Ex. H, Barnett Tr. 123:1-9.

**RESPONSE:  Material and Undisputed.**

24. The ultrasound revealed a significantly larger right kidney, at 15.3 cm, compared to his normal-sized left kidney, at 13.1 cm.  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001680.

**RESPONSE: Immaterial and Unsupported by the cited evidence.  There is nothing in the citation that supports the discrepancy in size between the kidneys is "significant."**

25. It is a departure from the standard of care to rely on six-month-old imaging studies to determine the cause of new hematuria.  Ex. 38, Kosierowski Tr. 115:24-117:17; Wexford MSJ Ex. I, Metwalli Tr. 60:13-22 (primary care physician is "obligated" to review old images).

**RESPONSE: Immaterial and Undisputed.  No Defendant relied exclusively on a six-month old imaging study to determine the cause of Plaintiff's hematuria in December 2015. Defendants' point was the CT from July 2015, which was read by a radiologist as normal,**

while not definitive, is suggestive against kidney cancer, given the slow growth kinetics.  See Exhibit A, attached hereto, deposition of Richard Kosierowski, pg. 232-233.[1]

26. Dr. Einwohner's March 30 telemedicine appointment with Mr. Dean suffered from "technical problem[s]," specifically that "the telemonitor had no audio with the site," which led to a "very limited visit."  Wexford MSJ Ex. B, Einwohner Tr. 257:6-260:10.

**RESPONSE: Immaterial and Undisputed.  At this time, Plaintiff was already under the care of urologist Dr. Severino and scheduled for a CT on April 12.  Defendants' UMF 91-92.  Because the plans were set that would imminently lead to Plaintiff's diagnosis, this visit and any technical difficulties are immaterial.**

27. As of March 30, 2016, the status of Mr. Dean's hematuria was that Dr. Einwohner knew there was a "history of kidney stones, and there is an evaluation process that's undergoing to continue exploring a cause of his hematuria."  Wexford MSJ Ex. B, Einwohner Tr. 257:9-17.

**RESPONSE: Material and Undisputed.**

28. At the March 30, 2016 telemedicine, Dr. Einwohner asked Mr. Dean about back pain, Mincy MSJ Ex. A, Dean Tr. 88:14-16, which is "typical for a kidney stone," Wexford MSJ Ex. H, Barnett Tr. 124:23-125:3.

**RESPONSE: Immaterial and Undisputed.  See Response to No. 26.**

29. 12 days elapsed between the March 10, 2016 appointment at which Dr. Severino ordered a cystoscopy for Mr. Dean and the collegial review at which it was approved on March 22, 2016. Ex. 43, IDOC No. 000091; Ex.44, IDOC No. 000094.

**RESPONSE: Material and Undisputed.**

30. 20 days elapsed between the March 10, 2016 appointment at which Dr. Severino ordered a CT scan for Mr. Dean and the March 30, 2016 collegial review at which it was approved.  Ex. 43, IDOC No. 000091; Ex. 45, IDOC No. 000095.

**RESPONSE: Material and Undisputed.**

31. "[U]sually" such an "image sequence" comprised of both an ultrasound and then a CT scan would happen in "[a] matter of weeks, not a matter of months."  Wexford MSJ Ex. K, Racenstein Tr. 72:19-23.

**RESPONSE: Immaterial and Undisputed.  Dr. Racenstein was referring to the speed with which the tests could be turned around in his hospital (Alexan Brothers Medical Center) but clarified he was not speaking for all settings in the community.  Wexford MSJ Ex. K,**

---

[1] Defendants' expert Dr. Kosierowski's deposition transcript was not available at the time Defendants filed their Motion for Summary Judgment.  Plaintiff has attached a portion of the deposition to his Response.  Defendants therefore attach the entire deposition.

**Racenstein Tr. 74-76.  Dr. Racenstein testified he had no experience working in correctional healthcare.  Wexford MSJ Ex. K, Racenstein Tr. 24.**

32. By the time of April 14, 2016 diagnosis of cancer, the treatment-less months from his December 23, 2015 presentation with hematuria meant that Mr. Dean's hematuria warranted referral to the emergency department. Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001340 (12/23/15 9:13 AM Medical Records Note); Wexford MSJ Ex. A, Nawoor Tr. 212:3-5 ("[If] hematuria persists, we have to go to the ER.").  Based on the amount of time that passed between Mr. Dean's first presentation of hematuria and his diagnosis, it was appropriate to send him to the emergency room regardless of whether he was symptomatic, hypotensive, or otherwise presenting with "emergency" symptoms. Wexford MSJ Ex. H, Barnett Tr. 139:15-142:9; *see also* Wexford MSJ Ex. I, Metwalli Tr.

**RESPONSE:  Immaterial and Unsupported by cited evidence.  Neither Dr. Nawoor's testimony nor his note supports this as an additional fact.  Moreover, neither Dr. Barnett nor Dr. Metwalli disclosed the opinion that Plaintiff warranted emergency department referral in their Rule 26(a)(2)(B) expert reports, which require "a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered by the witness in forming them" and must be made at the times and in the sequence that the Court orders."  Rule 26(a)(2)(B), (D).  Review of these reports shows they do not include this opinion.  Exhibits B and C.**

33. Dr. Nawoor thought Mr. Dean's cancer diagnosis was an "urgent" situation and submitted an urgent request for collegial review of Mr. Dean's surgery. Ex. 15, IDOC Taylorville Med Recs 001086 (marking a referral form concerning Mr. Dean's surgery as urgent). The decision to mark the request as "urgent" was made after Felicia Waterman, a Wexford employee who assisted with scheduling procedures, spoke with Julia Thornton, a nurse at Dr. Severino's office, and represented to Thornton that she was putting in an urgent request to Wexford to get approval for the surgery. Ex. L, Springfield Clinic William K. Dean 109 (Ex. 1, Severino deposition). Dr. Severino also considered the surgery to be "urgent." Ex. L, Severino Tr. 50:13-21.

**RESPONSE:  Immaterial and Disputed. Dr. Nawoor marked the surgical referral as "urgent."  Dr. Severino's testimony does not support that he considered the surgery to be urgent, instead he repeated the word "urgent" in response to the question but demured on urgency and indicated proper preparation was paramount.  Plaintiff's counsel did not clarify.  The following is the cited portion:**

> **Q. And you stated earlier that the surgery was not an emergency, but would it be fair to say that it was urgent?**
> **A. Urgent, hey, when you can get it set up and scheduled correctly. I mean, you know, you want to get everything in order and, you know, have him see who he needed to be seen and all that. And once you can arrange those visits and get three guys together for ten hours in a cardiac operating room.  Ex. L, Severino Tr. 50:13-21.**

**Moreover, the records show Dr. Severino contacted the prison on April 14, 2016, to assure them the situation was non-emergent and that plans were set in motion for the procedure. Defendants' UMF 103-04.**

34. Dr. Nawoor could have sought approval of the surgery on the same day it was ordered by Dr. Severino through Wexford's procedure for immediate collegial review approvals, but Dr. Nawoor did not seek an immediate collegial review. Ex. F, Ritz 30(b)(6) Tr. 22:20-27:4.

**RESPONSE: Immaterial and Undisputed. No evidence supports that the time between diagnosis and approval by utilization management affected the scheduling of the surgery, as the records show Plaintiff's workup was underway at this time and that Dr. Severino was not waiting on an approval. Defendants' UMF 101-03.**

35. The standard of care for managing renal cell carcinoma with tumor thrombus is not different for specialists versus primary care physicians. Wexford MSJ Ex. I, Metwalli Tr. 83:20-84:6.

**RESPONSE: Immaterial and Disputed. Defendants did not move for summary judgment on the medical malpractice claim against Dr. Nawoor. Moreover, this statement is entirely too broad to be able to be addressed. A primary care physician meets the standard of care by arranging appropriate workup, diagnostic testing, and specialist referral. Exhibit A, attached hereto, deposition of Richard Kosierowski, pg. 39. Clearly, Dr. Severino performs a different function, as he was the diagnosing entity and surgeon.**

36. At this April 21 Collegial Review, a "targeted completion date" of May 21, 2016 (one month later) was assigned to Mr. Dean's cancer surgery. Ex. 39, April 21 Launch Report.

**RESPONSE: Immaterial and Undisputed. When Wexford hoped to have the service completed is not material where the timing of the surgery was Dr. Severino's decision.**

37. The "targeted completion date" is, according to Wexford's Guidelines, assigned by the site medical director (in this case, Dr. Nawoor) and the Wexford Utilization Management Director (in this case, Dr. Stephen Ritz). Ex. 2 at 10, Wexford Health Sources, Inc. Utilization Management Guidelines, Region: Illinois (Jan. 14, 2016) (Ex. 3, Ritz 30(b)(6) deposition). The "targeted completion date" is the date when, in the judgment of Dr. Nawoor and Dr. Ritz, "the service is expected to be completed by." Ex. F, Ritz 30(b)(6) Tr. 37:8-10; Ex. 2 at 10, Wexford Health Sources, Inc. Utilization Management Guidelines, Region: Illinois (Jan. 14, 2016) (Ex. 3, Ritz 30(b)(6) deposition) ("The Site Medical Director and the UM Medical Director agree upon a targeted date in which the approved services should be completed and communicate that date to the Site Scheduler.").

**RESPONSE: Immaterial and Undisputed. The Wexford system of tracking referrals and targeting a date to have them completed cannot supersede the treating consultant's judgment as to the timing of a procedure. In explaining employees were not subject to adverse consequences if a targeted completion date was not met, Dr. Ritz recognized "in**

10

**general, with respect to targeted completion dates for clinical services, there are so many variables, many of which are outside of our control…" Ex. F, Ritz 30(b)(6) Tr. 40.**

38. The targeted completion date is not a static number, but instead depends on "the availability of the service, the clinical urgency of the service, [] the patient's unique history[,] [a]nd the patient's specific . . . clinical findings." Wexford MSJ Ex. G, Ritz Tr. 72:3-7.

**RESPONSE: Immaterial and Undisputed.  See Response to No. 37.**

39. Mr. Dean's wife called about the scheduling of the cancer surgery on April 25 and spoke with Kathy Galvin, who told her that the surgery had been "approved and scheduled." Wexford MSJ Ex. C, Galvin Tr. 114:1-9.

**RESPONSE: Immaterial and Undisputed.   Defendant Galvin's conversation with Plaintiff's wife about the scheduling of the surgery has no bearing on the legal issues at summary judgment.**

40. Mr. Dean filed an emergency grievance regarding the scheduling of his surgery on May 16, 2016: "Get . . . Wexford to stop dragging this out and get me to surgery!" Ex. 14, Dean May 17 Emergency Grievance (no Bates number) (Ex. 15, Galvin deposition).

**RESPONSE:  Immaterial and Undisputed.  Exhaustion of administrative remedies is not an issue.  Plaintiff's grievance is hearsay.**

41. Galvin's May 17, 2016 response to Mr. Dean's May 16, 2016 grievance was that the surgeon had been "contacted to schedule a surgical date. Currently awaiting a response." Ex. 14, Dean May 17 Emergency Grievance (no Bates number) (Ex. 15, Galvin deposition); Wexford MSJ Ex. C, Galvin Tr. 166:7-10 (same).

**RESPONSE:  Material and Undisputed.**

42. In response to Mr. Dean's May 2016 grievance, Galvin took no action besides answering the grievance, explaining that those were "the only steps [she] had to take."  Wexford MSJ Ex. C, 135:23-137:6.

**RESPONSE:  Material and Undisputed.**

43. Nurse Mincy spoke with Mr. Dean's wife on May 25, 2016 when she called to inquire about the scheduling of his surgery.  Mincy MSJ Ex. B, Mincy Tr. 188:3-189:6; Mincy MSJ Ex. A, Dean Tr. 327:20-328:2.

**RESPONSE:  N/A**

44. Mr. Dean saw Dr. Einwohner at renal teleclinic on May 26, 2016 and told her about his cancer diagnoses and Dr. Einwohner "did not even know that I had cancer at that time."  Mincy MSJ Ex. A, Dean Tr. 110:6-9.

**RESPONSE: Immaterial and Undisputed. Plaintiff was under the care of an urologist for his cancer at this time and was pending surgical intervention. There is no evidence the tele-nephrologist, Dr. Einwohner, needed to be involved.**

45. Dr. Einwohner's May 26, 2016 renal teleclinic notes state: "Since last visit learned post contrast CT scan that has [right] kidney cancer and is awaiting surgery." Ex. 20, Einwohner Bates #000042.

**RESPONSE: Immaterial and Undisputed. See Response to No. 44.**

46. On August 19, 2016, Mincy filed an Incident Report documenting the delay in scheduling Mr. Dean for an oncology appointment, and noting that if Mr. Dean had not inquired about his future treatment, the appointment may have been overlooked due to Dr. Nawoor's mistake. Ex. 40, IDOC No. 00860-61.

**RESPONSE: Immaterial and Undisputed. While it appears an oversight occurred, it was caught such that referral to oncology was requested by Dr. Severino on August 11, 2016, and obtained by Dr. Nawoor on August 18. Defendants' UMF 138-39. Plaintiff saw the oncologist on August 26, 2016. Defendants' UMF 140.**

47. On November 8, 2016, Dr. Nawoor and Nurse Galvin pressured Mr. Dean to sign an Illinois Department of Public Health Uniform Do-Not-Resuscitate (DNR) Advance Directive, which Mr. Dean signed directing medical personnel to resuscitate him. Mincy MSJ Ex. A, Dean Tr. 160:5-24; Ex. 42, IDOC No. 000610 (Dean DNR).

**RESPONSE: Immaterial and Disputed. Whether Dr. Nawoor and Ms. Galvin discussed end of life care/advanced directives is not material to the claims in this case. Moreover, Dr. Nawoor explained it was not "unusual" to do one and they explained it to Plaintiff. Exhibit A, deposition of Abdur Nawoor, pg. 139.**

48. Dr. Ritz had questions about and discussed the fact that Votrient was "expensive" with a Wexford pharmacologist before Mr. Dean's Votrient prescription was granted non-formulary approval. Wexford MSJ Ex. A, Nawoor Tr. 300:11-17; see also Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001477 (11/2/2016 note from Dr. Nawoor: "Dr. Ritz will be talking to the oncologist about alternative drug.").

**RESPONSE: Disputed and Immaterial. The full quote includes that Dr. Ritz had concerns about potential side effects of the medication. Ex. A, Nawoor pg. 300. Moreover, Votrient was approved and Plaintiff began taking it on November 18, 2016. Defendants' undisputed material fact 151.**

49. A CT scan on February 10, 2017, revealed that Votrient had not been effective at stopping Mr. Dean's cancer from growing. Dr. Guaglianone prescribed Opdivo on March 2, 2017. Wexford Ex. E, IDOC Taylorville Med Recs 002058.

3:17-cv-03112-SEM-TSH  # 116  Page 13 of 38

**RESPONSE: Immaterial and Disputed. This is not supported by the cited evidence. The record cited only states "progression of cancer on Votrient. Plan Opdivo Salvage Therapy Next Week." Wexford Ex. E, IDOC Taylorville Med Recs 002058. Plaintiff has disclosed no expert testimony to explain what this means. Plaintiff did not depose the treating oncologist. To say this sentence plucked from a Wexford documents stands for Votrient being "ineffective" is speculative. Defendants note in a letter explaining Plaintiff's prognosis, his oncologist said his cancer would "become resistant to treatment." Doc. 81-1 at 1. Therefore, it is possible the natural progression of cancer is to become resistant to medications. Without expert testimony, this is not part of the record.**

50. Wexford's pharmacologist, as part of the formulary review of Opdivo, reported that it would cost "around $15K per month (dosed IV every 2 weeks). It would need to be given off-site, so those charge would hit UM." Ex. 41 at 6, Opdivo Emails

**RESPONSE: Immaterial and Undisputed. See No. 48.**

51. Neil Fisher, Wexford's Corporate Medical Director for Quality Management and Pharmacy Services, suggested the idea of Mr. Dean going to hospice care instead of Opdivo. Ex. 41 at 4, Opdivo Emails

**RESPONSE: Immaterial and Disputed. See No. 48. Dr. Fisher's email says they need to have a discussion because "it will help with what we are trying to accomplish in this case…Hospice care may possibly be more appropriate but we should be discussing the options and the status of the patient." Plaintiff's Ex. 41 at 4, Opdivo Emails. As stated, Plaintiff received Opdivo. Moreover, there is nothing inappropriate about Plaintiff's healthcare providers discussing his case and treatment options. It is expected they do this.**

52. Dr. Ritz approved Opdivo "as no alternatives [were] available." Ex. 41 at 1, Opdivo Emails.

**RESPONSE: Material and Undisputed.**

53. Abdur Nawoor, M.D., Wexford's Site Medical Director for Taylorville is aware that hematuria is a symptom of cancer. Wexford MSJ Ex. A, Nawoor Tr. 192:16-17, 194:5-6 (describing "any form of cancer" including "any renal mass or cancer of the kidney" as well as cancers of the "ureter or bladder" as among the "commonest cause[s]" of hematuria).

**RESPONSE: Material and Undisputed.**

54. Dr. Nawoor is Mr. Dean's primary care physician. Wexford MSJ Ex. A, Nawoor Tr. 313:20-22.

**RESPONSE: Material and Undisputed.**

55. As the primary care physician of inmates at Taylorville, Dr. Nawoor is responsible for advocating for his patients to receive timely and appropriate care. Wexford MSJ Ex. H, Barnett

Tr. 11:19-13:3, 119:1-5; Wexford MSJ Ex. I, Metwalli Tr. 90:9-14, 141:11-143:4; Ex. 3, Matticks Tr. 83:2-9, 84:3-6, 157:1-8; Ex. 2 at 11, 13, Wexford Health Sources, Inc. Utilization Management Guidelines, Region: Illinois (Jan. 14, 2016) (Ex. 3, Ritz 30(b)(6) deposition).

**RESPONSE: Immaterial and Undisputed. No "duty of advocacy" exists under the Eighth Amendment and this is therefore immaterial to the legal issues pertaining to Dr. Nawoor's Motion for Summary Judgment as to the Eighth Amendment claim.**

56. Dr. Nawoor feels that his hands are tied when it comes to prescribing non-formulary drugs or ordering lab work or off-site care. Wexford MSJ Ex. A, Nawoor Tr. 120:20-121:9.

**RESPONSE: Immaterial and Disputed. This is a misrepresentation of the testimony. The cited testimony was in reference to a performance evaluation of Dr. Nawoor. The exchange was as follows:**

> **Q.    Okay. And then the second statement that you have shown great improvement in the area of collegial review referrals, what does that mean to you?**
> **A.    All that means is, you know, make sure you refer -- I mean we talk every Wednesday about patient, okay -- patient that has problem or need more tests or whatever, and -- but initially I was kind of -- because I found that my hand was tied trying to do things, all this, you know, lab work and non-formulary, I wasn't used to that. So I was kind of referring a lot of patients to Pittsburgh to discuss with them. And -- but now I'm becoming more selective. That's exactly what that means. Wexford MSJ Ex. A, Nawoor 120:20-121:9.**

> **Dr. Nawoor was explaining some of the challenges he faced when he started in corrections, one of which was learning the non-formulary medication process.**

57. Dr. Nawoor is responsible for making referrals for outside medical appointments and procedures, conducting collegial reviews, submitting urgent requests for medical services, approving labs and other diagnostic tests requested by specialists, and determining when inmates need to visit the emergency room. See Ex. 1, IDOC-Wexford Contract, Exhibit III at 7, 10; Ex. 2 at 4, 5, 10, 11, 15, Wexford Health Sources, Inc. Utilization Management Guidelines, Region: Illinois (Jan. 14, 2016) (Ex. 3, Ritz 30(b)(6) deposition).

**RESPONSE: Material and Undisputed.**

58. Dr. Nawoor has the ability to request immediate collegial reviews when a patient has an urgent need for treatment. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 24:20-2510.

**RESPONSE: Material and Undisputed.**

59. Dr. Nawoor has the ability to expedite the scheduling of medical appointments and procedures.  Wexford MSJ Ex. A, Nawoor Tr. 284:12-286:6; Ex. 3, Matticks Tr. 81:18-85:11; Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001349, 001356.

**RESPONSE: Immaterial and Disputed; unsupported by the cited evidence.  The citation does not support that Dr. Nawoor can expedite the scheduling of appointments and procedures.  It supports that he can make the request.  Here, Dr. Nawoor did make such requests.  Defendants' undisputed material facts 81, 95, 116.  When a specialist sees a patient or does a procedure is up to the specialist.**

60. Dr. Nawoor found it "very concerning" that Mr. Dean's surgery took so long to be performed after his diagnosis for cancer.  Mincy MSJ Ex. B, Mincy Tr. 193:19-23, 194:4-10.

**RESPONSE: Immaterial and Disputed; unsupported by the cited evidence.  This is a distortion of Ms. Mincy's testimony, wherein her testimony she found it "very concerning" is attributed to Dr. Nawoor.  The full testimony is:**

> **Q.      That was going to be my next question. Do you recall discussing the fact do you recall in June 2016 discussing the fact that Mr. Dean was awaiting surgery that had been approved by collegial at the quality assurance meeting?**
>
> **A.      We discussed it when -- we were, yes.  We discussed it every meeting because we were still awaiting and everybody -- everybody was concerned.  I mean it was a very concerning thing because of patient awaiting surgery.  We understood that he was -- he had to get his team together and he had to be evaluated, and that's a process, to get more than one surgeon in a surgery suite, especially these specialized folks.**
>
> **Q      When you say everybody was concerned about it, who is everybody?**
>
> **A.      The wardens -- all three wardens, Kathy Galvin, myself, Cindy Hobrock, Dr. Nawoor asked about it. All of us that were involved that were nurses, all the -- I mean it was concerning.  Mincy MSJ Ex. B, Mincy Tr. 193-94.**

61. Dr. Nawoor never told Chad Christer, the Wexford employee responsible for scheduling the procedure, that the surgery should be scheduled sooner. Wexford MSJ Ex. J, Christer Tr. 42:23-43:1.

**RESPONSE: Immaterial and Disputed.  Chad Christer called on his own accord to stay "in the loop" on the scheduling.  Defendants' UMF 117.  Moreover, Dr. Nawoor personally called Dr. Severino's office in May 2016 to find out when the procedure would be scheduled.  Defendants' UMF 116.**

62. Dr. Nawoor never discussed Mr. Dean's surgery or diagnosis with Dr. Severino. See Wexford MSJ Ex. L, Severino Tr. 60:15-61:22.

**RESPONSE: Immaterial and Undisputed.  See Response to No 61.  There is no indication from any of the records Dr. Severino, who was managing the surgery, needed to talk to Dr. Nawoor.  Dr. Nawoor and his staff communicated with Dr. Severino's staff for scheduling purposes.  Defendants' UMF 81, 95, 1-7, 116-117.**

63. Dr. Nawoor never inquired whether Mr. Dean's surgery could be expedited, or if it was possible to send Mr. Dean to a different doctor.  Wexford MSJ Ex. A, Nawoor Tr. 291:9-292:23; Wexford MSJ Ex. J, Christer Tr. 42:18-22; Wexford MSJ Ex. C, Galvin Tr. 143:8-11; Mincy MSJ Ex. B, Mincy Tr. 194:11-22.

**RESPONSE: Immaterial and Disputed.   The cited portion of the transcript of Dr. Nawoor's testimony does not support this fact.  It says nothing of the sort.  The records are clear Dr. Nawoor did in fact call to check on the scheduling of the surgery.  Plaintiff does not dispute the records so reflect.  Plaintiff's Response to Defendants' UMF 116.**

64. Dr. Einwohner did not participate in utilization management collegial reviews generally, and does not recall participating in any collegials regarding Mr. Dean's care.  Wexford MSJ Ex. B, Einwohner Tr. 54:5-7; 253:12-254:6.

**RESPONSE: Immaterial and Undisputed.  Dr. Einwohner began seeing Plaintiff in 2012 for management of chronic hematuria with history of kidney stones.  Exhibit B, deposition of Rebecca Einwohner, pg. 35.  Dr. Einwohner suggested collegial review on January 7, 2016, and it happened the following day, resulting in re-imaging, as she had suggested. There is no suggestion Dr. Ritz and Dr. Nawoor, both physicians, were incapable of formulating a plan for Plaintiff's hematuria.  In fact, Dr. Ritz testified any first-year primary care resident would know the workup to follow for hematuria.  Exhibit G, deposition of Stephen Ritz, pg. 75.**

65. Dr. Einwohner initialed records in Mr. Dean's patient file to show that she had received them and looked at them. Wexford MSJ Ex. B, Einwohner Tr. 192:14-18.

**RESPONSE:  Material and Undisputed.**

66. Dr. Einwohner is "not involved in the scheduling of off site[]" medical appointments. Wexford MSJ Ex. B, Einwohner Tr. 266:23-267:2.

**RESPONSE:  Material and Undisputed.**

67. Kathy Galvin, R.N., Director of Nursing is aware that hematuria is a symptom of cancer. Wexford MSJ Ex. C, Galvin Tr. 21:23-22:4 (describing hematuria as a symptom of "kidney and bladder cancer.").

**RESPONSE: Immaterial and Undisputed.  However, in the cited portion of the Galvin transcript, before prefacing her answer by stating she is not a diagnosing entity, Nurse Galvin lists a number of things that could cause hematuria---injury, kidney stone, kidney and bladder cancer.  She did not say hematuria is *only* a symptom of cancer.**

68. Director of Nursing at the Taylorville Correctional Center, Galvin was responsible for ensuring that *all* of Wexford's policies and IDOC's institutional directives were followed by staff at Taylorville.  Wexford MSJ Ex. C, Galvin Tr. 32:11-13.

**RESPONSE: Immaterial and Undisputed.  Her job description to monitor Wexford and IDOC policy compliance provides no basis for personal involvement and is immaterial to her Motion for Summary Judgment.**

69. Galvin was responsible for supervising sick call.  Wexford MSJ Ex. C, Galvin Tr. 35:20-22

**RESPONSE: Immaterial and Undisputed.   Supervisory liability does not exist under §1983.  *Del Raine v. Williford*, 32 F.3d 1024, 1047 (7th Cir. 1994) (there is no supervisor or respondeat superior liability under §1983)**

70. Galvin was responsible for supervising all aspects of the work of the Medical Records Director at Taylorville.  Wexford MSJ Ex. C, Galvin Tr. 30:13-22.

**RESPONSE: Immaterial and Undisputed.  See Response to No. 69.**

71. Galvin took no steps to supervise Chad Christer, the Medical Records Director at Taylorville Correctional Center who was primarily responsible for scheduling Mr. Dean's surgery. Nurse Galvin, who was Mr. Christer's direct supervisor, testified that she took minimal steps to supervise him and was completely unaware if he was having scheduling difficulties unless he brought them to her attention. Wexford MSJ Ex. C, Galvin Tr. 95:8-98:4,141:14-142:15.

**RESPONSE: Immaterial and Disputed.  This is a gross misrepresentation Ms. Galvin's testimony.  First, her supervisory responsibilities are immaterial for the reasons stated in Response to AMF 70.   Moreover, there is nothing in the record that supports that unbeknownst to Chad Christer was not doing his job as far as scheduling appointments.  Further, Ms. Galvin testified she and Christer "talked daily" and that she "knew what he was doing."  Exhibit C, deposition of Kathy Galvin, pg. 96.  She described him as "highly efficient" but that if there was a problem with Christer she would find out when she audited medical charts.  Exhibit C, deposition of Kathy Galvin, pg. 97.**

72. Galvin herself was responsible for scheduling some appointments.  Wexford MSJ Ex. A, Nawoor Tr. 90:2-10.

**RESPONSE: Immaterial and Disputed.  This is a misrepresentation of the cited testimony.  Dr. Nawoor said Galvin supervises the nurses who schedule onsite appointments.  Regarding the sick call process, Dr. Nawoor said of Galvin "she just oversees it. That's what she does."  Wexford MSJ Ex. A, Nawoor Tr. 90:2-10**

73. Galvin reviewed every single medication record at Taylorville Correctional Center on a weekly basis during the time she was Director of Nursing, including in November 2016. Wexford MSJ Ex. C, Galvin Tr. 158:5-20.

**RESPONSE: Immaterial and Undisputed. The cited portion of the testimony refers to the medication administration records, not the medical records generally. It is unclear what materiality her review of medication administration records generally has to Defendants' Motion.**

74. Galvin was involved with and partially responsible for expediting appointments or procedures. Mincy MSJ Ex. B, Mincy Tr. 135:3-24.

**RESPONSE: Immaterial and Disputed. This is a misrepresentation of Mincy's testimony. The cited portion of the deposition was a question about whose responsibility it was if Dr. Nawoor had wanted Plaintiff's cystoscopy expedited:**

> **Q.  In your experience if Dr. Nawoor wanted the cystoscopy moved up, who would have been responsible for that?**
> **A.  It would have been the -- it would have went to the nurse if the doctor -- if he had ordered it to be moved up, the nurse taking it off would have scheduled it and possibly notified Kathy Galvin because she was the director of nurses of what was going on.**
> **Q.  In your experience why would that nurse have notified Kathy Galvin?**
> **A.  Because Kathy seemed to be in anybody going out -- she was responsible for anybody going out is the way I understood it –**
> **Q.  Okay.**
> **A.  -- to Wexford. That's the only way I understood it.**
> **Q.  What was the basis for your understanding?**
> **A.  Because they would tell her if somebody was going out.· Just things I witnessed myself. Mincy MSJ Ex. B, Mincy Tr. 135.**

75. Galvin attended a quality assurance meeting at Taylorville where the delay in Mr. Dean's surgery was discussed, found it "very concerning," and "agreed" that the delay in the surgery was "a longer span that what we felt was necessary." Mincy MSJ Ex. B, Mincy Tr. 175:19-176:9, 193:19-23, 194:4-10.

**RESPONSE: Immaterial and Disputed. In the testimony that follows the cited portion, Ms. Mincy said "Chad was working on -- get -- having getting that surgery done. He was working relentlessly by making contact, and he was put off by Dr. Severino's office." Mincy MSJ Ex. B, Mincy Tr. 176. The fact Nurse Galvin was aware of concerns about the length of time it was taking to get the surgery done is immaterial where she was aware steps were being taken to address it. See also Response to AMF 60 regarding "very concerning" being erroneously attributed to people other than Mincy.**

76. Nurse Galvin took no steps to schedule or expedite Mr. Dean's surgery or to ensure that it was scheduled or conducted. Galvin Tr. 118:9-14, 119:17-19,121:1-3,143:8-11.

**RESPONSE: Immaterial and Undisputed. Chad Christer was the site scheduler, not Nurse Galvin. Exhibit J, deposition of Chad Christer, pg. 14-15.**

77. Galvin never spoke with Dr. Nawoor about the scheduling of Mr. Dean's surgery. Wexford MSJ Ex. C, Galvin Tr. 129:7-9.

**RESPONSE: Immaterial and Undisputed. See Response to AMF 76.**

78. Galvin never spoke with her supervisor about the scheduling of Mr. Dean's surgery. Wexford MSJ Ex. C, Galvin Tr. 129:20-24.

**RESPONSE: Immaterial and Undisputed. See Response to AMF 76.**

79. Galvin never spoke with any other Wexford employees about the scheduling of Mr. Dean's surgery, stating "[t]hat would not have been my duty." Wexford MSJ Ex. C, Galvin Tr. 130:1-4.

**RESPONSE:   Immaterial and Undisputed. See Response to AMF 76.**

80. Galvin never spoke with any IDOC employees about the scheduling of Mr. Dean's surgery. Wexford MSJ Ex. C, Galvin Tr. 130:5-7.

**RESPONSE: Immaterial and Undisputed. See Response to AMF 76.**

81. Lisa Mincy is a registered nurse and has been for 30 years. Mincy MSJ Ex. B, Mincy Tr. 34:19-21.

**RESPONSE:** N/A

82. Nurse Mincy was responsible for administering the medical grievance system at Taylorville and "doing the line," which was a less formal medical grievance system, at Taylorville. Mincy MSJ Ex. B, Mincy Tr. 67:18-24, 70:15-71:5.

**RESPONSE:** N/A

83. Nurse Mincy would speak with patients that had questions about their medical care while she was "doing the line" at Taylorville. Mincy MSJ Ex. B, Mincy Tr. 70:15-71:5.

**RESPONSE:** N/A

84. Nurse Mincy personally met with and reviewed the care of every inmate in the Taylorville infirmary every day. Mincy MSJ Ex. B, Mincy Tr. 72:23-74:1.

**RESPONSE:** N/A

85. Nurse Mincy spoke with Mr. Dean about his cancer diagnosis in the Taylorville infirmary on at least one occasion. Mincy MSJ Ex. B, Mincy Tr. 74:2-75:21.

**RESPONSE:** N/A

86. Nurse Mincy was present during a February 10, 2016 sick call and viewed a bloody urine sample that Mr. Dean provided. Mincy MSJ Ex. A, Dean Tr. 76:21-77:9.

**RESPONSE:** N/A

87. Nurse Mincy was present at sick call and viewed Mr. Dean's urine samples on multiple occasions.  Mincy MSJ Ex. A, Dean Tr. 315:6-316:6.

**RESPONSE:** N/A

88. Nurse Mincy was present for some of Mr. Dean's medical visits with Dr. Nawoor. Mincy MSJ Ex. A, Dean Tr. 308:12-15.

**RESPONSE:** N/A

89. Nurse Mincy served as a liaison between Wexford and the IDOC regional health care administrator, Cindy Hobrock, and was responsible for raising the issue with Hobrock if Mincy ever felt there was a "question about somebody's care" or "saw something that I wasn't quite sure of with the care" based on Mincy's "background" as a nurse.  Mincy MSJ Ex. B, Mincy Tr. 44:14-17, 64:19-66:2.

**RESPONSE:** N/A

90. Nurse Mincy had questions about Mr. Dean's medical care on multiple occasions, including when she became concerned by his chronic gross hematuria after speaking with him about it and questioned whether he had seen a specialist, Mincy MSJ Ex. B, Mincy Tr. 75:9–80:4, and when she became concerned by the delay in scheduling his surgery and questioned the delay in quality assurance meetings, Mincy MSJ Ex. B, Mincy Tr. 174:11–176:23.

**RESPONSE:** N/A

91. Mincy never raised these questions about Mr. Dean's care directly with Hobrock.  Mincy MSJ Ex. B, Mincy Tr. 766:15-19.

**RESPONSE:** N/A

92. Nurse Mincy spoke with Mr. Dean about his hematuria on at least one occasion in the infirmary and became concerned about the length of time his hematuria had gone on for.  On this occasion, Mincy was informed that Dr. Einwohner was seeing Mr. Dean and she didn't inquire anymore into Mr. Dean's care because she "was not hired as a case manager."  Mincy MSJ Ex. B, Mincy Tr. 75:9-81:16.

**RESPONSE:** N/A

93. Mincy attended a quality assurance meeting at Taylorville where the delay in Mr. Dean's surgery was discussed and Mincy found the delay "very concerning," and "agreed" that the delay in the surgery was "a longer span that what we felt was necessary."  Mincy MSJ Ex. B, Mincy Tr. 175:19-176:9, 193:19-23, 194:4-10.

**RESPONSE:** N/A

94. Nurse Mincy took no steps to expedite Mr. Dean's surgery.  Mincy MSJ Ex. B, Mincy Tr. 194:11-22.

**RESPONSE:** N/A

95. "[N]urses working in prisons have a duty to advocate for appropriate medical care to inmates with obvious medical needs." Ex. 10, Barnett Expert Report at 21.

**RESPONSE:  Immaterial and Disputed.  The Eighth Amendment incorporates no "duty of advocacy" for medical staff.  The Eighth Amendment prohibits deliberate indifference to a serious medical need, not failure to sufficiently advocate.  *See Farmer v. Brennan*, 511 U.S. 835, 837 (1994).  To the extent this is intended to be a nursing standard of care opinion, Dr. Barnett is unqualified to give such an opinion because he has never practiced nursing.  *See Sullivan v. Edward Hosp.* 209 Ill. 2d 100 (2004).**

96. Wexford is aware that hematuria for patients over 50 is a symptom of cancer.  Ex. 4, Wexford Health Sources, Inc., Medical Guidelines, Region: Illinois at 293 (no Bates) (Ex. 4, Ritz deposition) (specifically instructing Wexford medical providers to "[r]ule out malignancy" when presented with hematuria in a patient older than 50).

**RESPONSE:  Immaterial and Disputed.  Plaintiff presents this statement as if hematuria is only a symptom of cancer.  This guideline includes cancer as part of the consideration in the clinical workup.**

97. Steven Ritz, D.O., Wexford's Utilization Management Director is aware that hematuria for patients over 50 is a symptom of cancer.  Wexford MSJ Ex. G, Ritz Tr. 76:8-9, 78:22-79:3 (describing "cancer of anywhere within the urinary tract" as a symptom of hematuria and noted that, in terms of hematuria, malignancy is "more likely as we get older.").

**RESPONSE:  Immaterial and Disputed.  This is a distortion of Ritz's testimony.  This was the exchange:**

**Q.**     **What can hematuria be a symptom of?**
**A.**     **Of numerous different things.  I guess I can list, common examples would be anywhere from a simple bladder infection to urethral trauma, to kidney stones, to intrinsic disease, so a disease of the kidneys themselves, to cancer of anywhere within the urinary tract.  Wexford MSJ Ex. G, Ritz Tr. 78-79.**

**Further, this excerpt comes from Ritz's individual capacity deposition.  He is not a defendant and his subjective knowledge is immaterial.**

98. Roderick Matticks, M.D., Wexford's Illinois Medical Director, is aware that hematuria for patients over 50 is a symptom of cancer.  Ex. 3, Matticks Tr. 54:15-55:6 (describing "cancer within the urogenital tract, bladder cancer, kidney cancer" and "all sorts of different types of

cancers" as the "one primary consideration one would think about" when a patient "older than 50" presented with hematuria).

**RESPONSE:  Immaterial and Disputed.  See Response to No. 97.  Matticks listed a number of potential causes of hematuria in addition to cancer.  Plaintiff's Ex. 3, Matticks Tr. 54.**

99. Dr. Ritz identified only one "medical purpose" for the collegial review process: "allow[ing] doctor-to-doctor discussion regarding the management of cases."  Wexford MSF Ex. G, Ritz Tr. 51:20-24; Wexford UMF No. 33.

**RESPONSE:   Immaterial and Disputed.   This is a misrepresentation of Dr. Ritz's testimony.   Defendants do not dispute this was the answer to the specific question. However, generally Dr. Ritz described the process as existing to review requests for medical services, pharmacological services, imaging services, all medically-related service for medical necessity and clinical appropriateness.   Exhibit F, 30(b)(6) deposition of Stephen Ritz, pg. 7.**

100.       "[M]ost cases which are heard at collegial review are approved with no discussion at all."  Wexford MSJ Ex. G, Ritz Tr. 41:24-42:4; 49:6-50:8.

**RESPONSE:  Material and Undisputed.**

101.       The collegial review process is a cost containment measure and is primarily intended to reduce, limit, and delay offsite procedures and specialty consultations. Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization Management (Ritz 30(b)(6) Deposition Exhibit 2) (stating collegial review is "*designed* to reduce offsite care costs" and "results in fewer requested offsite referrals, a reduction in the percentage of referrals denied as inappropriate, and an overall decrease in specialty consults") (emphasis added).

**RESPONSE:  Disputed and Immaterial.  Plaintiff has contorted and misrepresented this document by quoting portions of it out of context and omitting the portions that emphasize the emphasis on the clinical appropriateness of decisionmaking.  The webpage at the very top states "Wexford Health's comprehensive utilization management (UM) program balances clinical needs with cost containment.  We identify and realize immediate reductions in inmate offsite care costs, as well as in related transportation and security costs, *without creating any negative impact on the quality of patient care*."  (Emphases added).  Plaintiff's Response to Motion for Summary Judgment, Exhibit 6.  The subsection on collegial review states in its entirety:**

> **Includes Collegial Review^SM, a proactive, physician-led process designed to reduce offsite care costs. Using video and/or telephone conference calls, site clinicians and Wexford Health Medical Directors and UM Nurses confer to review the patient's medical history and determine the most clinically appropriate and financially responsible approaches to inmate health care issues. Collegial Review^SM results in fewer requested offsite referrals, a**

**reduction in the percentage of referrals denied as inappropriate, and an overall decrease in specialty consults."** *Id.*

102.    The "approval aspect" of collegial review serves primarily a business purpose. Wexford MSJ Ex. G, Ritz Tr. 52:15-53:15.

**RESPONSE:  Immaterial and Disputed.  Plaintiff has misrepresented this testimony and added the word "primarily" where it does not appear in the deposition.  In the portion of the deposition referenced the following was said:**

> **Q.     Does the approval process at collegial review serve a business purpose for Wexford?**
> **MR. RUPCICH:  Object to vague.**
> **A.      I guess as I understand the question, I would say it serves a business purpose in terms of its~-- it fulfills one of the requirements that the client has for what Wexford provides to the client.**
> **Q.     And what is that purpose that the client expects?**
> **A.      That the services that are being provided are medically necessity~-- medically necessary and clinically appropriate.**
> **Q.     And that client is the Illinois Department of Corrections in this case?**
> **A.      Correct.  Wexford MSJ Ex. G, Ritz Tr. 52:15-53:15**

103.    Approval at collegial review is required before a patient can be scheduled for or receive off-site medical care.  Wexford MSJ Ex. G, Ritz Tr. 23:5-17; Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 32:12-15.

**RESPONSE:  Material and Undisputed.**

104.    Under IDOC's contract with Wexford, collegial review occurs once a week.  Wexford MSJ Ex. F, Ritz  30(b)(6)Tr. 23:5-11.

**RESPONSE:  Material and Undisputed.**

105.    At the time of Mr. Dean's initial presentation with hematuria, the collegial review policy did not contain any requirement that a collegial review be held in a timely fashion. See Ex. 8 at 6-7, Wexford Health Sources, Inc. Utilization Management Policies and Procedures, Region: Illinois (July 1, 2014) (Ex. 4, Ritz 30(b)(6) deposition); Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 43:2-10. Wexford added a provision that collegial reviews should be conducted weekly in January 2016. Ex. 2 at 10-12, Wexford Health Sources, Inc. Utilization Management Guidelines, Region: Illinois (Jan. 14, 2016) (Ex. 3, Ritz 30(b)(6) deposition); Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 22:20-23:11.

**RESPONSE:  Immaterial and Undisputed that the policy did not address the timeframe of collegial review; however, the IDOC-Wexford contract provided they happened weekly. See Response to AMF 104.**

106.    Wexford makes no effort to track how often collegial reviews fail to happen on a weekly basis. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 23:12-15.

**RESPONSE:  Immaterial and Undisputed.**

107.    In Dr. Ritz's experience at the UM Medical Director, there are no consequences for employees if collegial reviews are not held on a weekly basis.  Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 23:24:17.

**RESPONSE:  Immaterial and Disputed.  Dr. Ritz testified to the exact opposite of what is represented here.  Here is the actual testimony:**

> **Q.    If Wexford discovers that a collegial review is not being done at minimum on a weekly basis, are there any consequences for the employees responsible?**
> **A.    Well, certainly, I will state that it's not common for collegials to not be done on a weekly basis, because that is certainly our operational expectation.· There are a number of different factors that can interfere with that, of course, which is why this is a guideline. Things such as lockdowns, if the medical director is ill, if the UM medical director is ill.  Occasionally, a call cannot take place.  But that is very much the exception and not the rule.  *I guess, in theory, if a site was not participating in or scheduling their collegials, would there be consequences for the individuals at the site?· I think absolutely, there would be.*  In my experience, has that ever happened?· No. (Emphases added).  Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 23-24.**

108.    Collegial reviews are conducted with greater frequency in other states where Wexford manages medical care in the prison system. Wexford MSJ Ex. G, Ritz Tr. 31:1-32:1.

**RESPONSE:  Immaterial and Undisputed.  Dr. Ritz testified this is based on the requirements of the state with whom Wexford is working.  Wexford MSJ Ex. G, Ritz Tr. 30-31.  Whether other clients have requirements for conducting collegial review in less than a week, as opposed to a week as Illinois requires, is immaterial to the claims in this case.**

109.    Wexford discourages doctors from seeking to have off-site care approved outside of the weekly collegial review meeting. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 27:5-21.

**RESPONSE:  Immaterial and Disputed.  The deposition citation does not support what it is put forth to represent.  The colloquy concerned "urgent" collegial referrals:**

> **Q.    So does Wexford provide any guidance to site medical directors on what constitutes an urgent medical service?**
> **A.    Yes. In general, but, of course, every case is unique. But there are some general guidelines that we provide to them.  Sometimes in the form of feedback, if they're giving us too many requests that we don't**

> agree are urgent, we will give them some feedback and such on
> an individual basis. And that's usually the way that that proceeds.
> But they're~-- there's not any formal guideline, in terms of what
> constitutes an urgent and what doesn't. Because, again, that really
> requires-- that's a clinical judgment situation that we expect our
> medical directors to exercise their best clinical judgment. **Wexford
> MSJ Ex. F, Ritz 30(b)(6) Tr. 27.**

110.    Wexford's utilization management program is, in large part, focused on cost containment
rather than patient care. Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization
Management (Ritz 30(b)(6) Deposition Exhibit 2).

**RESPONSE: Disputed and Immaterial. See Response to AMF 101.**

111.    Wexford punishes employees who violate its policy of not scheduling outside medical
appointments or procedures prior to collegial review approval, in marked contrast to other
policies it does not punish employees for violating. *Compare* Wexford MSJ Ex. F Ex. F, Ritz
30(b)(6) Tr. 33:4-10 (punishment for collegial review policy violation) *with* Wexford MSJ Ex. F
Ex. F, Ritz 30(b)(6) tr. 40:11-41:3 (no punishment if services not completed by targeted
completion date).

**RESPONSE: Disputed and Immaterial. This is a misrepresentation Dr. Ritz's testimony.
He did not testify there would be no consequences for failure to meet a targeted completion
date if the failure was within the employee's control; he said the opposite. This was his
exact testimony:**

> **Q.     Do Wexford employees face consequences if services are not
>          completed by the targeted completion date?**
> **A.     Not to my knowledge. They would not face consequences insofar as
>          generally, they're not going to have direct control over that. Now, if
>          for some reason, a service was not provided within an expected
>          completion date because of a breakdown or lack of following process
>          by an individual employee, I -- certainly, there would be some
>          consequences for that. But in general, with respect to
>          targeted completion dates for clinical services, there are so many
>          variables, many of which are outside of our control, that no
>          individual employee or any individual physician or anyone else could
>          really be held accountable for that. Ex. F, Ritz 30(b)(6) tr. 40:11-41:3.**

**He also accounted for delays that were out of the control of a Wexford employee.**

112.    At the time of Mr. Dean's initial presentation with hematuria, Wexford's policy did not
contain any requirement that off-site care be scheduled in a timely fashion. See Ex. 8 at 6-7,
Wexford Health Sources, Inc. Utilization Management Policies and Procedures, Region: Illinois
(July 1, 2014) (Ex. 4, Ritz 30(b)(6) deposition); Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 45:23-
46:8. In 2016, Wexford added a provision requiring that appointments be scheduled within 10

days. See Ex. 2 at 10-12, Wexford Health Sources, Inc. Utilization Management Guidelines, Region: Illinois (Jan. 14, 2016) (Ex. 3, Ritz 30(b)(6) deposition); Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 35:20-36:11. But Wexford makes no attempt to track if this 10-day policy is actually followed. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 36:12-21.

**RESPONSE:  Immaterial and Undisputed.  This was Wexford's Utilization Management policy.  The absence of specific language does not support that offsite services were not required to be scheduled in a medically appropriate fashion at the discretion of the site medical director.**

113.    Wexford's policy on collegial reviews prior to Jan. 14, 2016 contained no requirement that collegial reviews were held on a weekly basis or at any other time interval.  Wexford MSJ Ex. F, Ritz 30(b)(6) 43:2-10; Ex. 8, Wexford Health Sources, Inc. Utilization Management Policies and Procedures, Region: Illinois (July 1, 2014) (Ex. 4, Ritz 30(b)(6) deposition).

**RESPONSE:  Immaterial and Undisputed.  Dr. Ritz testified the timing requirement for collegial review was decided by Wexford's clients.  Wexford MSJ Ex. G, Ritz Tr. 30-31. Illinois' required weekly collegial reviews.  Wexford MSJ Ex. F, Ritz  30(b)(6)Tr. 23:5-11.**

114.    Wexford added a requirement that collegial reviews be held on a weekly basis in the collegial review guidelines dated Jan. 14, 2016.  Ex. 2 at 10, Wexford Health Sources, Inc. Utilization Management Guidelines, Region: Illinois (Jan. 14, 2016) (Ex. 3, Ritz 30(b)(6) deposition).

**RESPONSE:  Immaterial and Undisputed.**

115.    In December 2014, Dr. Ron Shansky, a *court-appointed expert selected by the parties*, authored a report in the litigation *Lippert v. Godinez*, which sought to determine whether the health care provided to inmates in IDOC was constitutionally deficient.  The report contained Shansky's findings, conclusions, and recommendations on health care in IDOC.  Ex. 37 at 3-5, Ron Shansky, MD et al.. Final Report of the Court-Appointed Expert, Lippert v. Godinez (Dec. 2014) (excerpts).

**RESPONSE:  Immaterial and Disputed.  This is an expert's opinions from other litigation. Defendants have had no chance in this litigation to challenge the opinions.  The report is hearsay and cannot be used to oppose summary judgment.  Perez v. Wexford Health Sources, Inc., 2019 U.S. Dist. LEXIS 192347 (District courts have repeatedly held that the Lippert Report is inadmissible and may not be used to defeat summary judgment).**

116.    The Shansky report found that for "scheduled offsite services" and the collegial review process: "During our review of records, we found breakdowns in almost every area, starting with delays in identification of the need for the offsite services, delays in obtaining an authorization number, delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork and delays or the absence of any follow-up visit with the patient."  Ex. 37 at 28-29, Ron Shansky, MD et al.. Final Report of the Court-Appointed Expert, Lippert v. Godinez (Dec. 2014) (excerpts).

**RESPONSE:  See Response to AMF 115.**

117.    The Shansky report recommended that "Presentation to collegial review by the Medical Director must occur within one week."  See Ex. 37 at 31, Ron Shansky, MD et al.. Final Report of the Court-Appointed Expert, Lippert v. Godinez (Dec. 2014) (excerpts).

**RESPONSE:  See Response to AMF 115.**

118.    Most Wexford employees who work on the IDOC contract are familiar with Shansky report.  Wexford MSJ Ex. G, Ritz Tr. 54:14-22.

**RESPONSE:  See Response to AMF 115.**

119.    The Shansky report has been discussed at the monthly meeting to discuss the Illinois contract, which is attended by senior leadership including the CEO, the CFO, and the Chief Administrative Officer, as well as the UM Medical Director, Regional Medical Directors, and the Corporate Medical Director.  The CEO, CFO, and CAO have been present at monthly meetings were the Shanksy report was discussed.  Wexford MSJ Ex. G, Ritz Tr. 55:10-56:7.

**RESPONSE:  See Response to AMF 115.**

120.    Wexford and IDOC have an "expectation that . . . basic primary care evaluation and management" is conducted "on-site" (at IDOC facilities) and that those resources are "exhausted within reason prior to considering sending a patient off site."  Wexford MSJ Ex. F, Ritz Tr. 40:4-21.

**RESPONSE:  Material and Undisputed.**

121.    Wexford is not responsible for paying for ultrasounds performed on site, see Ex. 9, Little 30(b)(6) Tr. 23:13-21, 41:8-13, but is responsible for paying for non-hospital based off-site referrals, diagnostic tests, and procedures, including chemotherapy, Ex. 9, Little 30(b)(6) Tr. 21:11-22:19.

**RESPONSE:  Immaterial and Undisputed.  No recommended offsite services for Plaintiff were declined.  Wexford MSJ Ex. G, Ritz Tr. 114.**

122.    Neither Wexford nor IDOC employ a case manager at Taylorville, meaning, "somebody that would follow [the patient's] case completely. It would be somebody that would know from start to finish what was going on with that patient, would know the care that was being given and would basically know all - read all the notes." Mincy MSJ Ex. B, Mincy Tr. 80:5-21.

**RESPONSE:  Immaterial and Undisputed.  It is unclear what Plaintiff references.  No expert testimony establishes a "case manager" as a medical necessity.**

27

123.   Specialists outside the correctional setting rely heavily on correctional medicine specialists to navigate and coordinate the scheduling and logistical difficulties in treating incarcerated patients.   Wexford MSJ Ex. I, Metwalli Tr. 84:17-85:19, 90:5-91:11, 93:9-94:2. Outside doctors have a limited "ability to make these things happen with a patient who's in an entirely different system." Wexford MSJ Ex. I, Metwalli Tr. 85:1-19; 92:6-18, 93:12-94:2 ("[A]t the end of the day, the people who had the capability of making these things happen in a timely fashion are the [prison] doctors.")

**RESPONSE:   Immaterial and Undisputed.   No evidence exists that Dr. Severino's treatment was compromised by the correctional setting environment.   He gave no such indication in his deposition, opining Plaintiff's workup was reasonable, given its complexity.   Exhibit L, deposition of William Severino, pg. 38-39.**

124.   Nurse Galvin described the length of the non-formulary process for Mr. Dean's Votrient prescription as "not typical." Wexford MSJ Ex. C, Galvin Tr. 160:2-5.

**RESPONSE:   Immaterial and Undisputed.   This statement did not necessarily encompass what would be typical for a cancer drug like Votrient.   She was speaking about the non-formulary process generally.   Moreover, her opinion as a nurse to what is "typical" does not bear on the legal issues in this case.   Moreover, Plaintiff has no evidence of harm from a purported delay of several weeks in starting Votrient.   See Defendants' Motion for Summary Judgment, p. 33-34.**

125.   Nurse Galvin testified that she had never "seen a drug in [her] experience that took this amount of time to be approved," referring to Mr. Dean's Votrient prescription Wexford MSJ Ex. C, Galvin Tr. 160:23-161:2.

**RESPONSE:   See Response to No. 124.**

126.   Galvin testified that she "almost certainly" would have reviewed the medication record for Mr. Dean's Votrient prescription. Wexford MSJ Ex. C, Galvin Tr. 158:18-20. Furthermore, Nurse Mincy testified that Nurse Galvin was involved in the process when drugs not listed on the formulary needed to be ordered. Mincy MSJ Ex. B, Mincy Tr. 203:6-14.

**RESPONSE:   Immaterial and Undisputed.**

127.   The formulary review process examines the cost of the drug involved. Wexford MSJ Ex. G, Ritz Tr. 104:7-105:20; Ex. 41 at 5-6, Opdivo Emails (no bates) ("There are many options, however most of them have the same relative cost. . . . .Opdivo would be around $15K per month (dosed IV every 2 weeks).  It would need to be given off-site, so those charges would hit UM.").

**RESPONSE:   Immaterial and Undisputed.   See Response to No. 124.   Additionally, Dr. Ritz explained that cost is *not* the determinant in whether a drug will be approved. Instead, the decision is made based on medical necessity and clinical appropriateness. After determining whether a drug will be approved, cost may be considered in selecting among equally effective medications.  Wexford MSJ Ex. G, Ritz Tr. 104-05.**

128.    On March 16, 2017, Mr. Dean filed an emergency grievance requesting prompt approval of his Opdivo prescription.  Ex. 46, IDOC Taylorville Grievances 000008-9

**RESPONSE:  Immaterial and Undisputed.  Plaintiff's grievance is hearsay and immaterial.  Moreover, Opdivo was approved through the non-formulary process the day Plaintiff's grievance was received:  March 20, 2017.   Defendants' Undisputed Material Fact 155.**

129.    On May 12, 2017, Dr. Guaglianone prescribed Torisel after a CT scan taken on May 5, 2017 showed that while Opdivo had successfully treated the cancer in Mr. Dean's lymph nodes, it had been ineffective against the cancer in Mr. Dean's liver.  Torisel was approved within an hour, and Mr. Dean received his first Torisel treatment that same day.  Ex. 47, Cancer Care Specialists Med Recs 000116.

**RESPONSE:  Immaterial and Disputed.  This fact is not supported by the cited evidence.  This is merely a note from Cancer Care Specialists.  It says nothing about approval through Wexford's utilization management process.  In fact, Plaintiff's medical records show it was retroactively approved after "provider started without preapproval."  Exhibit D, attached hereto, Bates 1752.**

130.    In July 2019, a CT scan revealed that Mr. Dean's disease was resisting Torisel.  Ex. 48, Strom email.

**RESPONSE:  Immaterial and Disputed.  Plaintiff's counsel has not disclosed himself as witness or qualified himself as an expert to give an opinion on medication resistance.  This should be disregarded.  Moreover, this references events well after the filing of the Third Amended Complaint.  Plaintiff has set out no supplemental complaint in accordance with Rule 15(d).**

131.    On or about August 9, 2019, Dr. Guaglianone prescribed Cabozantinib to treat Mr. Dean's disease.  Ex. 48, Strom email.

**RESPONSE:  See Response to AMF 130.**

132.    Mr. Dean did not begin receiving Cabozantinib until after August 29, 2019, the exact date being September 7, 2019.  Ex. 48, Strom email.

**RESPONSE:  See Response to AMF 130.**

133.    On-site procedures do not require the costs, security, transportation, or personnel considerations that off-site procedures do.  Wexford MSJ Ex. G, Ritz Tr. 38:25-39:16, 91:6-21; Ex. 38, Kosierowski Tr. 117:18-118:4.

**RESPONSE:  Material and Undisputed.**

134.    The records from the Feburary 8 renal teleclinic state that the ultrasound had "detected" "no stone" and that Mr. Dean's hematuria was a likely stone recurrence." She also wrote "present case for collegial" and "case for collegial Wed[nesday" in those same records. She also wrote that Mr. Dean's next renal teleclinic would be in two months on March 31, 2016. Ex 5., Einwohner Bates #000059-60.

**RESPONSE: Undisputed and Immaterial the words appear in the progress note; however, Plaintiff has cut up the note and strung together partial quotations to make it appear Dr. Einwohner incorrectly diagnosed stones after a renal ultrasound showed they were not present. This is not what the note or her testimony reflects. See Defendants UMF 59-63.**

135.    Dr. Nawoor's Outpatient Progress Notes from February 10, 2016 state that Mr. Dean's case would be discussed "at collegial today," and Dr. Nawoor further recorded a plan to send Mr. Dean "to [a] urologist for cystoscopy." Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001346.

**RESPONSE: Material and Undisputed.**

136.    Mr. Dean's April 12 CT scan showed a "enlargement of the right kidney with a large ill-defined hypoattenuating mass involving the majority of the right kidney" and a "nonenhancing [tumor] thrombus in the . . . vena cava . . . extend[ing] superiorly to the level of the superior aspect of the intrahepatic IVC," to within a short distance of Mr. Dean's heart. Mr. Dean's April 12 CT scan also showed "[f]aceless appearance of the right kidney with a large ill[-]defined mass in the upper pole of the right kidney with replacement of the majority of the right renal parenchyma. Findings are concerning for urothelial carcinoma versus less likely consideration of renal cell carcinoma"—kidney cancer. Ex. 49, IDOC Taylorville Med Recs 001095-96.

**RESPONSE: Material and Undisputed.**

137.    Surgery to remove Mr. Dean's cancer was medically necessary and without surgery he would die within five years. Wexford MSJ Ex. L, Severino 11:5-13.

**RESPONSE: Material and Undisputed.**

138.    The advancement of the tumor thrombus in the vena cava to within centimeters of Mr. Dean's heart made this surgery significantly riskier and more complex. Wexford MSJ Ex. L, Severino Tr. 14:1-13; Wexford MSJ Ex. N, Metwalli Expert Report at 2-3.

**RESPONSE: Material and Undisputed.**

139.    The complexity of Mr. Dean's cancer surgery extended Mr. Dean's recovery time and increased the pain and difficulty of his post-operative recovery. Ex. 38, Kosierowski Tr. 255:15-259:6; Wexford MSJ Ex. N, Metwalli Tr. 75:6-22.

**RESPONSE: Immaterial and Undisputed. The recovery time and morbidity associated with the surgery bears on no issues pertaining to summary judgment.**

140.   Nurse Lisa Mincy is aware that hematuria is a symptom of cancer.  Mincy MSJ Ex. B, Mincy Tr. 23:10-21.

**RESPONSE:** N/A

141.   Dr. Barnett is a medical doctor who completed an internship in medicine and practiced medicine in the correctional context for over 10 years.  Ex. 10, Barnett Report at 2 and Ex. A.

**RESPONSE:  Immaterial and Undisputed.**

142.   Dr. Severino requested cardiac clearance for surgery no later than May 4, 2016.  Ex. 50, IDOC No. 000099.

**RESPONSE:  Material and Undisputed.**

143.   Four approvals had to be made through utilization management on June 2 (twice), June 14, and June 28 to make Mr. Dean's surgery possible—including an additional cardiology clearance after the May 6 clearance had effectively expired.  Ex. 50, IDOC No. 000100-04

**RESPONSE:  Material and Undisputed.**

## ARGUMENT

### A.   Numerous Proposed Additional Material Facts are Unsupported or Contradicted by the Record and Should Not be Considered

When a motion for summary judgment is made and supported by the movant, Fed.R.Civ.P. 56(e) requires the nonmoving party to set forth specific facts, which demonstrate that genuine issues of fact remain for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 106 S. Ct. at 1355; the opposing party may not defeat the motion by merely relying on the allegations or denials in its pleadings. In addition, it is not the court's function to extensively review the record to ascertain whether a summary judgment should be granted or denied. In *Bombard v. Fort Wayne Newspapers, Incorporated,* 92 F.3d 560, 562 (7th Cir. 1996):

> It is not our function to scour the record in search of evidence to defeat a motion for summary judgment; we rely on the nonmoving party to identify with reasonable particularity the evidence upon which he relies. *Id.* The evidence relied upon must be competent evidence of a type otherwise admissible at trial. Thus, a party may not rely upon inadmissible hearsay in an affidavit or deposition to

oppose a motion for summary judgment. *Wigod v. Chicago Mercantile Exch.,* 981 F.2d 1510, 1518-19 (7th Cir.1992);  *see also* Fed. R. Civ. P. 56(e).

On review of the factual record involved in the summary judgment process, the Supreme Court in *Anderson, et. al. v. Liberty Lobby, Inc. and Willis A. Carto,* 477 U.S. 242 (1986), held that in determining whether a factual dispute exists on a motion for summary judgment, the court must be guided by the substantive evidentiary standards of the case applicable at trial; *See,* Fed.R.Civ.P. 56(e), which requires essentially that materials submitted vis-a-vis a summary judgment motion, must be admissible into evidence.  *Gouveia v. TC Invs., LLC* (In re Cahillane), 2009 Bankr. LEXIS 434, *12-13.

Here, numerous of Plaintiff's proposed additional material facts are either not supported by or contradicted by the cited evidence, specifically, Plaintiff's proposed additional material facts 8, 11, 13, 15, 16, 20, 22, 24, 32, 33, 49, 56, 59, 60, 63, 71, 72, 74, 75, 97, 99, 101, 102, 107, 109, 111, 129, and 134.  For example, Plaintiff proposes as additional material fact 15 that "[a] CT scan is not a component of Wexford's "typical" response to diagnose hematuria." Review of the cited transcript shows Plaintiff asked a different question of Dr. Ritz and then inverted a portion of the answer, while omitting the remainder to create this proposed additional material fact.  Dr. Ritz's testimony was:

> Q.    Is an ultrasound of the abdomen the typical way that would be evaluated?
> A.    It's one component of the evaluation.  But certainly, there's a primary care evaluation that would occur with intermittent hematuria prior to an ultrasound.
> Q.    And what do you mean by a primary care evaluation?
> A.    Well, history, physical, physical examination, I should say, on-site testing, such as urinalysis, which is referenced here. Sometimes X-rays.  *And then consideration of further imaging based upon the findings related to the primary care workup on site.*  (Emphasis added).

Clearly, Dr. Ritz's answer encompasses that further imaging could be indicated based on the treating physician's evaluation.

32

Plaintiff proposes in 107 an additional material fact that in Dr. Ritz's experience at the UM Medical Director, there are no consequences for employees if collegial reviews are not held on a weekly basis.  The actual testimony was:

Q.     If Wexford discovers that a collegial review is not being done at minimum on a weekly basis, are there any consequences for the employees responsible?

A.     Well, certainly, I will state that it's not common for collegials to not be done on a weekly basis, because that is certainly our operational expectation.· There are a number of different factors that can interfere with that, of course, which is why this is a guideline. Things such as lockdowns, if the medical director is ill, if the UM medical director is ill. Occasionally, a call cannot take place.   But that is very much the exception and not the rule.   *I guess, in theory, if a site was not participating in or scheduling their collegials, would there be consequences for the individuals at the site?· I think absolutely, there would be.*  In my experience, has that ever happened?· No.  (Emphases added).  Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 23-24.

In proposed additional material fact 111, Plaintiff states Wexford punishes employees who violate its policy of not scheduling outside medical appointments or procedures prior to collegial review approval, in marked contrast to other policies it does not punish employees for violating. However, this is the cited testimony stands for the opposite:

Q.     Do Wexford employees face consequences if services are not completed by the targeted completion date?

A.     Not to my knowledge. They would not face consequences insofar as generally, they're not going to have direct control over that. *Now, if for some reason, a service was not provided within an expected completion date because of a breakdown or lack of following process by an individual employee, I -- certainly, there would be some consequences for that.*   But in general, with respect to targeted completion dates for clinical services, there are so many variables, many of which are outside of our control, that no individual employee or any individual physician or anyone else could really be held accountable for that. (Emphases added). Ex. F, Ritz 30(b)(6) tr. 40:11-41:3.

Further, Plaintiff proposes additional material facts 115-119, citing the report of an expert in an unrelated matter:  *Lippert v. Godinez,* Case NDIL No. 13-cv-3656.  Defendants have had no opportunity to depose the expert in that case.  His opinions are hearsay, as numerous courts

have recognized. *Perez v. Wexford Health Sources, Inc*., 2019 U.S. Dist. LEXIS 192347 (district courts have repeatedly held that the Lippert Report is inadmissible and may not be used to defeat summary judgment).

Finally, in additional material facts 130-132, Plaintiff cites an email from his attorney, William Strom, to support the progression of his cancer. Plaintiff's counsel has not disclosed himself as either a fact or expert witness. Plaintiff's counsel's correspondence to the attorneys of record in this case is not evidence that can be used to oppose summary judgment. It should be stricken and disregarded.

**B.  Dr. Nawoor is Entitled to Summary Judgment on the Eighth Amendment Claim**

In his Motion for Summary Judgment, Dr. Nawoor cited *Whiting v. Wexford,* 839 F.3d 658 (7th Cir. 2016 and *Duckworth v. Ahmad,* 532 F.3d 675 (7th Cir. 2008), two cases remarkably on point to the allegations in this case that require affirmative evidence a doctor "knew better" than to pursue the course of treatment he or she pursued. Plaintiff has not addressed this controlling case law or attempted to distinguish it. In fact, it is not distinguishable, given the record support for the course of action Dr. Nawoor pursued: investigation of kidney stones, given the history and in light of recent unremarkable CT scan then proceeding to investigate other cases when kidney stones were not found. Plaintiff's position is that cancer was a more likely cause of Plaintiff's hematuria and that it should have been ruled out first; however this does not create an Eighth Amendment claim but instead goes to medical malpractice. Plaintiff's theory is contained in additional material fact 8, where citing a urology expert, Plaintiff proposes: "Hematuria is to be considered malignant until proven otherwise." The Seventh Circuit in *Duckworth* rejected the identical Eighth Amendment theory from a urologist that cancer should always be ruled out when a patient has blood in his urine. *Duckworth,* 532 F.3d at

681.   The Eighth Amendment claim against Dr. Nawoor amounts to a disagreement over the appropriate exercise of professional judgment, which fails as a matter of law.

## C.      Plaintiff has Failed to Provide Evidence he was Harmed by Purported Delays in Approval for Medications

In their Motion for Summary Judgment, Defendants argued Plaintiff had failed to provide evidence of harm from alleged delays of a month or less in receiving medications for cancer treatment.  Defendants' Motion, page 33-34.  In response, Plaintiff has not addressed this issue. Moreover, since Defendants filed their Motion, they received back the deposition transcript of their expert, Dr. Richard Kosierowski, a medical oncologist.  He opined such a short alleged delay had no impact on Plaintiff's treatment.   Exhibit A, attached hereto, deposition of Richard Kosierowski, pg. 277.

## D.      Wexford's Collegial Review Policy is Not Unconstitutional As Applied

Plaintiff argues Wexford's collegial review process serves no medical purpose and is a pretext for cost-containment for Wexford.  Response at 33.  However, as Dr. Ritz explained, utilization management is required by IDOC's contract with Wexford.  Wexford MSJ Ex. G, Ritz, 52-53.  In fact, the contract provides, in a section omitted from Plaintiff's exhibits, that Wexford's duties include requiring it to "aggressively manage all off-site services for appropriate utilization and cost-effectiveness."  Exhibit E, attached hereto, contract at 5.

Plaintiff cites email correspondence of Wexford Utilization Management when considering approval of non-formulary cancer medications.  AMF 50-52.  However, in context, this is entirely consistent with Dr. Ritz's explanation of how utilization management makes decisions on medications.   Dr. Ritz explained that cost is *not* the determinant in whether a drug will be approved.   Instead, the decision is made based on medical necessity and clinical appropriateness.  After determining whether a drug will be approved, cost may be considered in

selecting among equally effective medications.  Wexford MSJ Ex. G, Ritz Tr. 104-05.  This is what Wexford's email correspondence shows:  utilization management considering the medical necessity and clinical appropriateness of chemotherapy drugs v. hospice treatment and the pharmacy exploring whether there were more cost-effective options with similar function to Votrient.  Defendants note again that Votrient was found medically necessary and clinically appropriate and absent more cost-effective equivalent options, it was given.  This is no different than insurance company pharmacies approving generic drugs.

## CONCLUSION

No genuine issue of material fact exists that would permit a reasonable jury to find deliberate indifference.  Plaintiff's constitutional claims require evidence Defendants knew better than to provide the care they did, which is not present on this record.  This court should grant summary judgment on all federal claims and remand the state law claim against Dr. Nawoor and Wexford for respondeat to the Fourth Judicial Circuit, Christian County, Illinois.  *See* 28 U.S.C. § 1447(c); *Lunsford v. Bennett*, 17 F.3d 1574, 1583–84 (7th Cir. 1994) (upholding district court's decision to decline jurisdiction over state law claims after granting summary judgment on federal claims).

WHEREFORE, for the above reasons, Defendants, DR. ABDUR NAWOOR, DR. REBECCA EINWOHNER, KATHY GALVIN and WEXFORD HEALTH SOURCES, INC., respectfully request this Honorable Court grant their Motion for Summary Judgment or such other relief as deemed appropriate.

Respectfully Submitted,

CASSIDAY SCHADE LLP

By: /s/ Joseph N. Rupcich
      Attorneys for Defendants, DR. ABDUR
      NAWOOR, DR. REBECCA EINWOHNER,
      KATHY GALVIN and WEXFORD HEALTH
      SOURCES, INC.

Joseph N. Rupcich
6283899
CASSIDAY SCHADE LLP
111 North Sixth Street, 2nd Floor
Springfield, IL 62701
(217) 572-1714
(217) 572-1613 (Fax)
jrupcich@cassiday.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2019, I electronically filed the foregoing Reply to Response to Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system. The electronic case filing system sent a "Notice of E-Filing" to the following:

Jeremy Tyrrell
Illinois Attorney General
500 South Second Street
Springfield IL 62701

Craig C. Martin, Esq.
William Strom, Esq.
Jenner & Block LLP
353 North Clark Street
Chicago IL 60654


Under penalties as provided by law, I certify that the statements set forth herein are true and correct.


<u>/s/ Joseph N. Rupcich</u>

9326084 JRUPCICH;SPRESSLE