**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

|  |  |
|---|---|
| WILLIAM KENT DEAN,<br><br>        Plaintiff,<br><br>    v.<br><br>WEXFORD HEALTH SOURCES, INC., DR.<br>ABDUR NAWOOR, DR. REBECCA<br>EINWOHNER, NURSE KATHY GALVIN,<br>and LISA MINCY,<br><br>        Defendants. | Case No. 17-CV-3112<br><br>Judge Sue E. Myerscough<br><br>Magistrate Judge Tom Schanzle-Haskins |

**PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Craig C. Martin
Joel T. Pelz
William M. Strom
Nathaniel K.S. Wackman
Chloe E. Holt
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL  60654
(312) 222-9350
cmartin@jenner.com
jpelz@jenner.com
wstrom@jenner.com
nwackman@jenner.com
cholt@jenner.com

*Attorneys for William Kent Dean*

## TABLE OF AUTHORITIES

**Cases**

*American Pegasus SPC v. Clear Skies Holding Co.*,
 1:13-CV-03035-ELR, 2015 WL 10891937 (N.D. Ga. Sept. 22, 2015) ................................... 34

*Anderson v. Gulf Stream Coach*, *Inc.*,
 712 F.2d 1171 (7th Cir. 2011) ............................................................................................ 32

*Bagent v. Blessing Care Corp.*,
 224 Ill. 2d 154 (2007) ......................................................................................................... 39

*Beech Aircraft Corp. v. Rainey*,
 488 U.S. 153 (1988) ............................................................................................................ 34

*Berry v. Peterman*,
 604 F.3d 435 (7th Cir. 2010) ................................................................................. 14, 26, 28

*Burks v. Raemisch*,
 555 F.3d 592 (7th Cir. 2009) .............................................................................................. 40

*Campbell v. Kallas*,
 936 F.3d 536 (7th Cir. 2019) ......................................................................................... 14, 18

*Chambers v. Ingram*,
 858 F.2d 351 (7th Cir. 1988) .............................................................................................. 36

*Collins v. Seeman*,
 462 F.3d 757 (7th Cir. 2006) .............................................................................................. 14

*Conley v. Birch*,
 796 F.3d 742 (7th Cir. 2015) ................................................................................. 15, 17, 21

Daskalea v. District of Columbia*,*
 227 F.3d 433 (D.C. Cir. 2000) ............................................................................................ 34

*Duckworth v. Ahmad*,
 532 F.3d 675 (7th Cir. 2008) ......................................................................................... 16, 29

*Edwards v. Snyder*,
 478 F.3d 827 (7th Cir. 2007) ......................................................................................... 15, 17

*Estate of Clark v. Walker*,
 865 F.3d 544 (7th Cir. 2017) ......................................................................................... 28, 29

*Estelle v. Gamble*,
 429 U.S. 97 (1976) .............................................................................................................. 14

*Farmer v. Brennan*, 511 U.S. 825 (1994) ................................................................................. 14

*Gentry v. Duckworth*, 65 F.3d 555 (7th Cir. 1995) .................................................................. 13

*Gosha v. Robinson*,
 No. 2:17-cv-00336-WTL-DLP, 2018 WL 4963402 (S.D. Ind. Oct. 15, 2018) ...................... 26

*Grieveson v. Anderson*,
  538 F.3d 763 (7th Cir. 2008) ................................................................... 15, 17

*Hudson v. McHugh*,
  148 F.3d 859 (7th Cir. 1998) ............................................................................ 30

*Iskander v. Village of Forest Park*,
  690 F.2d 126 (7th Cir. 1982) ....................................................................... 1, 31

*Johnson v. Doughty*,
  433 F.3d 1001 (7th Cir. 2006) .......................................................................... 30

*Johnson v. Snyder*,
  444 F.3d 579 (7th Cir. 2006) ...................................................................... 29, 30

*Jones v. Chicago HMO Ltd. of Illinois*,
  730 N.E.2d 1119 (Ill. 2000) ............................................................................. 40

*Mata v. Saiz*,
  427 F.3d 745 (10th Cir. 2005) .......................................................................... 15

*McCormick v. City of Chicago*,
  230 F.3d 319 (7th Cir. 2000) ...................................................................... 31, 40

*Monell v. Department of Social Services*,
  436 U.S. 658 (1978) ......................................................................................... 31

*Palmer v. Franz*,
  928 F.3d 560 (7th Cir. 2019) ............................................................................ 13

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ......................................................................................... 28

*Petties v. Carter*,
  836 F.3d 722 (7th Cir. 2016) (en banc) ...................................................... passim

*Purtill v. Hess*,
  489 N.E.2d 867 (1986) ............................................................................... 36, 37

*Radke's Inc. v. Bastian*,
  No. 09-01258, 2011 WL 811377 (C.D. Ill. Mar. 2, 2011) ............................ 36, 41

*Ramos v. Pyati*,
  534 N.E.2d 472 (Ill. App. Ct. 1989) ................................................................. 36

*Reed v. McBride*,
  178 F.3d 849 (7th Cir. 1999) ...................................................................... 25, 30

*Rice v. Walker*,
  No. 06-3214, 2010 WL 1050227 (CD. Ill. Mar. 16, 2010) ................... 15, 16, 17, 29

*Roe v. Elyea*,
  631 F.3d 843 (7th Cir. 2011) ...................................................................... 18, 40

*Sherrod v. Lingle*,
  223 F.3d 605 (7th Cir. 2000) ...................................................................... 15, 16

*Shields v. Illinois Department of Corrections*,
  746 F.3d 782 (7th Cir. 2014) ............................................................ 1, 31

*United States v. Baptiste*,
  264 F.3d 578 (5th Cir. 2001), *on reh'g*, 309 F.3d 274 (2002) ................................ 24

*Walker v. Peters*,
  233 F.3d 494 (7th Cir. 2000) ............................................................ 15, 17

*Wells v. Coker*,
  707 F.3d 756 (7th Cir. 2013) ............................................................ 13

*White v. Pauly*, 137 S. Ct. 548 (2017) ...................................................... 29

*Williams v. Erickson*,
  962 F. Supp. 2d 1038 (N.D. Ill. 2013) .................................................... 40

*Woodward v. Correctional Medical Services of Illinois, Inc.*,
  368 F.3d 917 (7th Cir. 2004) ............................................................ 31

*Zaya v. Sood*,
  836 F.3d 800 (7th Cir. 2016) ............................................................ 15, 16, 28

**Statutes and Rules**

Fed. R. Civ. P. 56 ........................................................................ 13

Fed. R. Evid. 803 ................................................................ 34, 36, 39

**Other Authorities**

31 A.L.R.3d 1163 ........................................................................ 37

*Essentials of Correctional Nursing* (Lorry Schoenly & Catherine M. Knox, eds. 2013) ....... 38, 39

William Kent Dean respectfully submits this combined Memorandum in Opposition to separate Motions for Summary Judgment filed by: (1) defendants Wexford Health Sources, Inc. ("Wexford"), Dr. Abdur Nawoor, Dr. Rebecca Einwohner, and Kathy Galvin (collectively, "Wexford Defendants"), (Dkt. 100, hereinafter "Wexford MSJ"), and (2) defendant Lisa Mincy,[1] (Dkt. 101, hereinafter "Mincy MSJ"). The Wexford Defendants move for summary judgment on Count I against Dr. Nawoor, Counts II and VIII against Dr. Einwohner, Counts III and IX against Galvin, and Counts V and XI against Wexford—but not on Count VII against Dr. Nawoor for medical malpractice under Illinois law, nor on Count X against Wexford for its vicarious liability for Dr. Nawoor's medical malpractice under a theory of *respondeat superior*.[2] Mincy moves for summary judgment on Count IV, the sole count Mr. Dean directs against her.

## INTRODUCTION

Mr. Dean unquestionably has, and had, serious medical conditions that required urgent care to protect both the quality of his life and his potential life expectancy. Although each Defendant has denied responsibility for his medical care, apparently in hope of shifting the blame to someone else, there is ample evidence that each Defendant had responsibilities that, if discharged properly, would have alleviated, or eliminated, Mr. Dean's pain, suffering, progress of cancer, mental anguish, and other medical complications that have impaired his life to date and diminished his future life prospects. As discussed below, each defendant failed properly to discharge that responsibility, and each failure made conditions worse for Mr. Dean. In many instances, those

---

[1]  The Wexford Defendants and Mincy together are referred to as "Defendants."

[2]  References to the Counts or the Complaint throughout this brief refer to the Third Amended Complaint, (Dkt. 72), unless otherwise stated. Count VI was previously dismissed, (*see* Text Order, Nov. 16, 2018 (citing *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982))), and repleaded by Mr. Dean for purposes of preserving his good-faith argument for a change to Seventh Circuit law, including the abrogation of *Iskander*, for the reasons stated in *Shields v. Illinois Department of Corrections*, 746 F.3d 782, 795 (7th Cir. 2014).

failings resulted from placing cost-saving practices ahead of proper medical treatment. In others, the record shows a conscious effort to pass the buck in the face of full knowledge of a serious medical condition. Individually, and combined, the Defendants' conduct goes beyond mere negligence. Their repeated pattern of failure to adhere to applicable medical guidelines, to delay appropriate care—or at times to do nothing—more than justifies findings of deliberate indifference and medical negligence and requires that each Motion for Summary Judgment be denied.

Mr. Dean filed his initial complaint in this case on April 21, 2017, and the operative Third Amended Complaint, (Dkt. 72), was docketed April 12, 2019. No defendant moved to dismiss, except for Wexford's motion to dismiss the claim currently pleaded in Count VI, which this Court dismissed based solely on a legal ground. Defendants recognized that the allegations, if true, stated actionable legal claims. Their answers disputed the majority of the facts alleged. (*See* Dkts. 36, 40, 44, 59, 61, 75, 90.) At the close of discovery, including expert discovery, those factual disputes remain.

Mr. Dean's trial is set for December 10, 2019. As noted, the Wexford Defendants have not moved for summary judgment on all counts—nor could they, given the substantial disputes of material facts in this case. Those material factual disputes exist not only as to Counts VII and X, but as to all claims currently pending. The liability issues depend on an assessment of the facts and neither motion for summary judgment seriously challenges the existence of damages, including compensation for Mr. Dean's pain, suffering, mental anguish, and diminished life expectancy caused by Defendants' deliberate indifference and negligence in the face of his obvious symptoms and eventual diagnosis of cancer.

The primary issue Defendants' motions raise is the sufficiency of the evidence to support the legal theories for their liability: deliberate indifference, or medical malpractice, a type of

professional negligence. But the issues of individual Defendants' liability, and the weight of the evidence demonstrating whether Defendants were deliberately indifferent or merely negligent, are matters committed to the jury as the ultimate finders of fact. There are more than enough disputed facts to preclude summary judgment as a matter of law under any theory of liability. These matters, along with the amount in damages owed to Mr. Dean, are issues for a trial. This Court should deny summary judgment.

## FACTUAL SUMMARY[3]

### I.    Initial Treatment and Diagnosis

Mr. Dean began urinating visible blood, a condition known as gross hematuria, on December 19, 2015. (Mincy UMF 23; AUMF 2.) On December 23, 2015, he first told his primary care health care providers at Taylorville Correctional Center, including Dr. Nawoor, about this alarming symptom. (Wexford UMF 12, 13; AUMF 3, 4.) Mr. Dean also told Dr. Nawoor that he was experiencing no pain in his back, flank, or loins, and he had no fever. (Wexford UMF 13.) At the end of Mr. Dean's clinic visit with Dr. Nawoor on December 23, Dr. Nawoor told Mr. Dean that the cause of the blood in his urine was "either stones"—meaning kidney stones, an acutely painful malady—"or cancer." (AUMF 4.) The Outpatient Progress Notes in Mr. Dean's medical charts from that day state that if his "hematuria persists," he "will have to . . . see [a] urologist eventually." (AUMF 5.)

---

[3] Mr. Dean's required responses to Defendants' statements of purportedly undisputed material facts under CDIL-LR 7.1(D)(2)(b) are set forth in full in the attached Appendix and provide a more complete list of the disputed fact issues that preclude summary judgment. Citations to the sections of the Appendix throughout this brief are formatted as follows: Undisputed Material Facts ("UMF"); Disputed Material Facts and responses ("DMF"); Disputed Immaterial Facts ("DIF"); Undisputed Immaterial Facts ("UIF"); and Plaintiff's Statement of Additional Undisputed Material Facts ("AUMF").

Despite his symptoms and the medical judgments reflected in his charts, Mr. Dean did not receive standard-of-care diagnostic measures, including seeing a urologist for a CT scan and a scheduled cystoscopy, until April 12, 2016, nearly four months later. (Wexford UMF 96, 98; Wexford DMF 38, 46, 48, 97; AUMF 10–24.) Following his December 23, 2015 encounter with Dr. Nawoor, Mr. Dean saw Dr. Einwohner, a Wexford nephrologist, on January 7, 2016, via renal teleclinic, a videoconference consultation pertaining to his kidney health, and complained of his grossly bloody urine. (Wexford UMF 26 & 28.) In records of this teleclinic consultation, Dr. Einwohner wrote a renal teleclinic order including the phrase "case for collegial." (AUMF 11.) Dr. Einwohner also wrote an email on January 7 to Wexford utilization management physician Dr. Stephen Ritz stating that Mr. Dean had reported "intermittent hematuria" and that he had "passed [kidney] stones in the past and has had urology consults with lithotripsy." (Wexford UMF 30; AUMF 11.) Dr. Einwohner further wrote in the email that she was "requesting a UA [urinalysis] with micro" and "suggest[ed] Collegial review with Dr. Butler with consideration of re-imaging and urology eval[uation]." (Wexford UMF 30; AUMF 11.) But Dr. Einwohner was not planning to discuss Mr. Dean's condition in the collegial review, nor did she intend to "generate" a collegial review. (Wexford DMF 29, 31; AUMF 11.) In fact, Dr. Einwohner had no intention to attend the collegial review to discuss Mr. Dean and has never participated in a collegial review for Mr. Dean. (Wexford DMF 29, 31; AUMF 64.) Accordingly, when Dr. Nawoor and Dr. Ritz discussed Mr. Dean at the scheduled January 13 collegial review, nearly a week later, Dr. Einwohner's "suggest[ion]" of re-imaging and urology evaluation was tabled in favor of a cheaper approach, an ultrasound of Mr. Dean's kidneys. (Wexford DMF 32, 38; AUMF 13.) Dr. Nawoor and Dr. Ritz purportedly determined to permit Mr. Dean an ultrasound, even though it *is not* the standard of care for hematuria, ███████████████████████████████████████████

4

██████, and it *would be less effective* for Mr. Dean due to his obesity. (Wexford DMF 38, 41; AUMF 9, 13–23.) Furthermore, Mr. Dean's ultrasound did not occur until three weeks later, February 2, 2016, despite the fact that the ultrasound could, and did, occur at Taylorville Correctional Center, without the need for the security or personnel considerations required to transport Mr. Dean for off-site care. (Wexford UMF 53; Wexford DMF 41; AUMF 133.)

After the ultrasound report indicated an inconclusive result for kidney stones and failed (as expected) to rule out malignancy, Mr. Dean had another teleclinic consultation with Dr. Einwohner on February 8. (Wexford UMF 58, 59; Wexford DMF 46; AUMF 17, 21.) In the record of this teleclinic consult, Dr. Einwohner wrote that a microscopic urinalysis should be done to see if Mr. Dean's hematuria had "resolved," even though he reported a renewed pink tinge to his urine and passing a "dark piece" the day before. (Wexford DMF 62; AUMF 134.) Dr. Einwohner also wrote both that the ultrasound had revealed "no stone" and that this was nevertheless a "likely stone recurrence." (UMF 134.) And once again, Dr. Einwohner wrote in Mr. Dean's teleclinic records, "present case for collegial" and "case for collegial Wed[nesday]," though she again had no plans to present Mr. Dean's case at the collegial review, had no plans even to attend the collegial review, and in fact did not attend any collegial reviews regarding Mr. Dean. (Wexford DMF 29, 31; AUMF 64, 134.) Moreover, even though Mr. Dean's hematuria had obviously not yet resolved, Dr. Einwohner also wrote that Mr. Dean should have his next renal teleclinic appointment in approximately two months, on March 31, 2016. (AUMF 134.)

Mr. Dean next saw Dr. Nawoor on February 10 to follow up on his ultrasound results. (Wexford UMF 64.) Dr. Nawoor's Outpatient Progress Notes from this follow-up consultation state that Mr. Dean's case would be discussed "at collegial [review] today," and Dr. Nawoor further recorded a plan to send Mr. Dean "to [a] urologist for cystoscopy." (Wexford UMF 135.)

But Mr. Dean did not see a urologist until a month later on March 10. (Wexford UMF 87.) Even then he did not undergo a cystoscopy, which would have conformed in part to the standard of care to determine the cause of his hematuria, nor did he have a CT scan done, with and without contrast dye, until another month had passed, on April 12. (Wexford UMF 91, 96; AUMF 10.)

## II.    Cancer Diagnosis and Surgery

Mr. Dean's cancer diagnosis was first reported on April 14, when his CT scan was read to find "enlargement of the right kidney with a large ill-defined hypoattenuating mass involving the majority of the right kidney" and a "nonenhancing [tumor] thrombus in the . . . vena cava . . . extend[ing] superiorly to the level of the superior aspect of the intrahepatic IVC," to within a short distance of Mr. Dean's heart. (Wexford UMF 99; AUMF 136.) The radiologic impression, based on these findings, was a "[f]aceless appearance of the right kidney with a large ill[-]defined mass in the upper pole of the right kidney with replacement of the majority of the right renal parenchyma. Findings are concerning for urothelial carcinoma versus less likely consideration of renal cell carcinoma"—kidney cancer. (AUMF 136.)

In the view of Mr. Dean's outside urologist, Dr. Severino, these findings made surgery medically necessary to remove his diseased kidney; short of surgery, he had a 0% chance to survive as long as his projected date of release from IDOC custody less than five years later. (AUMF 137.) Furthermore, the advancement of the tumor thrombus in the vena cava to within centimeters of Mr. Dean's heart—advancement that had progressed during the delay from December 23 to April 12—made this surgery significantly riskier and more complex. (AUMF 138.) Between Mr. Dean's cardiomyopathy and the threat the tumor thrombus posed after advancing so close to his heart, the surgery would require not only Dr. Severino's surgical skills to remove the kidney, but also a sternotomy to open up his chest cavity, and induced hypothermia and stoppage of his heart to permit the tumor thrombus to be removed. (Wexford UMF 99, 135; Wexford DMF 100; Wexford

UIF 102, 137; AUMF 138.) These additional, risky steps required the participation of a cardiothoracic surgeon and a vascular surgeon on a procedure that lasted over 10 hours. (Wexford UIF 137.) And as a result of the medical complexities occasioned by the December–April delay, and the logistical complexities to align the schedules of all the surgeons made necessary, Mr. Dean did not receive the medically necessary surgery to remove his cancerous kidney until July 19, 2016—over three months after his diagnosis of cancer, and nearly seven months after he first made Defendants aware of his grossly bloody urine. (AUMF 135.)

## III.    Post-Surgery Treatment

The surgery was successful in removing both Mr. Dean's diseased kidney and the tumor thrombus. (AUMF 135.) But the surgical trauma of the sternotomy and the induced hypothermia and stoppage of his heart—made necessary by Defendants' below-standard treatments and delays—extended Mr. Dean's recovery time and increased the pain and difficulty of his post-operative recovery. (AUMF 139.) And in addition to these medical challenges, Mr. Dean fell victim to Dr. Nawoor's complete oversight in seeking a post-operative oncology referral until Mr. Dean complained, and Mincy filed an incident report documenting Dr. Nawoor's failure. (AUMF 46.) As a result of all of these setbacks, as well as the medically unjustifiable delays in Wexford Defendants' approvals of the necessary drugs, Mr. Dean did not begin to receive systemic cancer therapy (*i.e.*, chemotherapy) under the care of an oncologist until on or about November 14, 2016, four months after the surgery. (Wexford UMF 143; *see also id.* 151.) And even after beginning systemic cancer therapy, Wexford Defendants' approval process caused further unnecessary delays. When Mr. Dean's first prescription, Votrient, was ineffective to treat his remaining cancer, Mr. Dean nevertheless had to wait another 3-4 weeks for Wexford Defendants' approval before receiving any treatment with the new prescription, Opdivo. (Wexford UMF 153, 155.)

IV.    **Factual Disputes Between the Parties**

The parties to this case dispute the importance of the foregoing timeline, and this dispute should be resolved by a jury. The December–April delay in diagnosing Mr. Dean's kidney cancer was inappropriately slow, giving rise to a permissible inference that Defendants were deliberately indifferent and negligent as to Mr. Dean's care. Furthermore, the parties dispute whether the December–April delay precipitated further avoidable delays, complications to Mr. Dean's health conditions and medical care, and needless pain and suffering. A jury is entitled to evaluate Mr. Dean's theory, that Mr. Dean did not undergo surgery to remove his cancerous kidney until July 19, 2016, over three months after diagnosis, because Defendants' delays in his diagnosis permitted his cancer and tumor thrombus to advance; that this advancement occasioned more invasive and riskier surgery that prolonged Mr. Dean's period of post-operative recovery; and that the prolonged recovery delayed his ability to begin oncologic care. Moreover, the parties have put forth competing experts' opinions as to whether the pre-diagnostic period, the time from diagnosis to surgery, and the post-surgical delays in treatment are both inexplicable and medically unwarranted.

The delay from Mr. Dean's December 23, 2015 appointment with Dr. Nawoor to his April 14, 2016 CT diagnosis by Dr. Severino was not only needless and entirely avoidable. This delay is also hotly in dispute in this case—its significance to show Defendants' deliberate indifference to Mr. Dean's serious medical needs, the lack of its conformity with medically acceptable standards of care, and the effects on Mr. Dean's future course of treatment and prognosis. Defendants in the main contend that there was no delay at all—that Wexford Defendants "appropriately investigated [Mr. Dean's] complaints, ordered appropriate diagnostic testing, made appropriate specialist referrals, and deferred to those specialists on the plan of care and the timing of that plan of care, (Wexford MSJ at 1)—and that Mincy was "entitled to rely on" others' medical

judgments, including those of Wexford Defendants, and acquiesce in the delays and denials of appropriate care to Mr. Dean, (Mincy MSJ at 9).

Mr. Dean, by contrast, contends that the December–April delay was a substantial deviation from the applicable standard of care evincing Defendants' deliberate indifference to his condition, and that this initial delay precipitated other delays to Mr. Dean's care, complications to his condition and the treatments he would need, and needless pain, suffering, and mental anguish for Mr. Dean. (*See* AUMF 59, 64, 66, 89.) But for the time elapsed from December 23, 2015, to April 12, 2016—while Mr. Dean's cancer grew and his prognosis became graver without any effective diagnostic, curative, or palliative measures—Mr. Dean would have faced a shorter wait to undergo surgical treatment, a less invasive surgery, a shorter post-operative recovery, an earlier start to systemic therapies under the care of an oncologist, and an improved prognosis for his cancer and for his life expectancy. Defendants' indifference and inaction throughout this period, and beyond, continually worsened Mr. Dean's prospects for survival.

Similarly, the parties also dispute the significance of the time that elapsed between Mr. Dean's diagnosis of kidney cancer on April 14 and his surgery on July 19. In the main, Defendants contend that this period is not evidence of their deliberate indifference or negligence, because they chose to defer to urologist Dr. Severino's plan of care, and Dr. Severino set this timeline to surgery based on his schedule and those of the additional surgeons. (Wexford DMF 112; *cf.* AUMF 59, 64, 66, 74, 89, 94.) But Mr. Dean contends that this delay and the additional surgeons would not have been necessary but for the fact that his condition worsened throughout the initial December–April delay attributable to Defendants alone. Moreover, far from deferral to the specialist, the evidence shows that Defendants intervened in on at least eight occasions between his diagnosis and his surgery, slowing Mr. Dean's course of care, through the process of collegial review. Even

9

if Defendants ultimately approved his surgery, these collegial review meetings belie the notion that Defendants had deferred to Dr. Severino on the timeline of treatment and had no ability to influence the scheduling of an earlier surgery date. And it is also permissible for a jury to infer that, despite the April 14 diagnosis and an original surgery date scheduled for May 11, the timing of Defendants' approval of the surgery and obtaining cardiac clearance two days late, on May 6, threw off the complex exercise of aligning all of the necessary surgeons' schedules. (Wexford UMF 110.)

The time elapsed between Mr. Dean's July 19 surgery and his referral to and ultimate systemic therapy under the care of an oncologist is likewise in dispute. Defendants contend that delays in this period were attributable to the non-formulary review process for medical necessity and clinical appropriateness. (Wexford MSJ at 33.) But non-formulary review does not explain Dr. Nawoor's failure to refer Mr. Dean to an oncologist in the first instance—an oversight about which an incident report was filed to report Dr. Nawoor's misconduct. (AUMF 46.) Nor does it suggest that Defendants sought to place Mr. Dean's care in the hands of an oncologist and defer to a specialist's medical judgment. Nor does it explain why conditional approvals of needed systemic therapies, including chemotherapy drugs, were beyond Defendants' ability or duty to provide for Mr. Dean's care once his surgery had been successful. (AUMF 59, 64, 66, 74, 89.) Nor do Defendants articulate any actual "penological interest" in any of these periods of inaction. A jury is entitled to weigh the evidence on either side to determine whether medical care delayed is medical care denied.

Meanwhile, Defendants do not dispute—and cannot dispute—that Mr. Dean's grossly bloody urine or his eventual cancer diagnosis were and are objectively serious medical conditions. (AUMF 6-9, 137, 140.) Nor does any Defendant deny personal knowledge of Mr. Dean's serious

medical conditions, or the duties each Defendant owed to Mr. Dean, as their patient, to observe medically appropriate standards of care in the face of these serious medical conditions. As such, the issues to be resolved in this case are entirely bound up in the parties' genuine factual disputes committed to a jury as the trier of fact: whether the Defendants' course of action in the face of Mr. Dean's medical condition was evidence of deliberate indifference, whether this same course of action breached Defendants' duties to adhere to medically appropriate standards of care, and whether Mr. Dean suffered injury as a result. None of these disputes can be resolved on summary judgment.

## V.   Plaintiff's Experts' Opinions

As shown in the above summary, and more fully in the Appendix's disputed facts, time after time the Defendants, and each of them, were faced with the choice of taking steps to provide treatment consistent with the professional standards of care or engaging in actions designed to delay, defer, or avoid care that might be costly. On each occasion, the Defendants chose the latter route. The Wexford Defendants towed the company line, following procedures that had little or no medical efficacy, but did reduce costs. And Mincy sat silent, reporting nothing, even as she feared the consequences of the unwarranted delay. This conduct is more than ample to establish deliberate indifference.

As a salient point of comparison, Mr. Dean's experts offer medical opinions as to how Mr. Dean's treatment could have gone differently, had Defendants not been indifferent and negligent as to his serious medical conditions. Dr. Bruce Barnett, a board-certified family medicine practitioner with 41 years' experience, including 12 years as a primary care provider or supervising physician in the corrections setting, opines that there is simply no excusing Defendants' departure from the standard of care when faced with hematuria: referral to a urologist for imaging studies, including CT scans of the kidneys and cystoscopy of the bladder, to rule out the possibility of

malignancy. This standard of care is articulated in guidelines promulgated by the American Urologic Association; it is supported by the opinions of Mr. Dean's expert urologist, Dr. Nivedita Dhar, and expert urologist–oncologist, Dr. Adam Metwalli; it is supported by the deposition testimony of Mr. Dean's treating urologist, Dr. Severino; and it is reflected in Wexford's own Urology Guidelines. (AUMF 9, 10.) Departures from this straightforward standard of care fairly support the inference that Defendants, and each of them, were deliberately indifferent to Mr. Dean's known, serious medical condition of grossly bloody urine. Such a determination is suitable for a jury alone to make and cannot be resolved on summary judgment. Likewise, Dr. Metwalli, a board-certified urologist with a specialty in treating kidney cancer, opines that a patient like Mr. Dean, including all of his complicating additional medical conditions, could have been hospitalized for the necessary medical supports to ensure he received prompt diagnostic testing and surgery. (AUMF 32.) In turn, timely diagnosis and treatment would have resulted in decreased risk in surgery, a decrease in post-operative healing time required, earlier treatment under the care of an oncologist, and improved life expectancy probability. Whether Defendants consciously disregarded the additional risks and harms their delayed decision-making could cause is also a determination committed to a jury as the triers of fact.

Defendants ask the Court to relieve them from liability and to take the decision away from the jury. They basically argue either: (1) it wasn't my job; or (2) I selected a course of action using medical judgment. But the facts belie each of these defenses. Each Defendant had a responsibility to make sure proper medical treatment was provided. And, as to the second point, doing nothing is not a medical judgment, nor is following policies that fly in the face of the proper standards of care. The jury should decide the true nature of Defendants' conduct.

## LEGAL STANDARD

Defendants' Motions should be denied if there is a genuine dispute as to any material fact or the movant is not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court should view all facts in the "light most favorable" to Mr. Dean, as the non-moving party, and "draw all reasonable inferences" in his favor. *Gentry v. Duckworth*, 65 F.3d 555, 558 (7th Cir. 1995). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Palmer v. Franz*, 928 F.3d 560, 563 (7th Cir. 2019) (citing *Wells v. Coker*, 707 F.3d 756, 760 (7th Cir. 2013)).

In prisoners' civil rights cases like this one, "[w]hile evidence of medical malpractice often forms the basis of a deliberate indifference claim," such as those Mr. Dean has pleaded in Counts I–VI, "plaintiffs must show more than mere evidence of [medical] malpractice to prove deliberate indifference." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc). Therefore, "it can be challenging to draw a line between an acceptable difference of opinion (especially because even admitted medical malpractice does not automatically give rise to a constitutional violation), and an action that reflects sub-minimal competence and crosses the threshold into deliberate indifference." *Id.* (footnotes and citations omitted). But the question of how much is too much is one of fact, not of law. Accordingly, "[w]hen a doctor says he did not realize his treatment decisions (or lack thereof) could cause serious harm to a plaintiff, *a jury* is entitled to weigh that explanation against certain clues that the doctor *did* know." *Id.* at 731 (first emphasis added). And "where evidence exists that the defendants knew better than to make the medical decisions that they did"—as here—"*a jury* should decide whether or not the defendants were actually ignorant to risk of the harm that they caused." *Id.* (emphasis added).

13

## ARGUMENT

### I. Deliberate Indifference

#### A. Applicable case law

While "the Constitution does not mandate comfortable prisons, . . . neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The "Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Petties*, 836 F.3d at 727 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). To establish that insufficient medical care in prison violates the Eighth Amendment, a plaintiff must show that he "suffered from an objectively serious medical condition" and that the defendants responsible for his medical care were "deliberately indifferent to that condition." *Id.*; *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). A finding of deliberate indifference requires evidence that a defendant was subjectively aware of the serious medical condition and the risks associated with inaction but nevertheless consciously disregarded those risks and chose inaction or a treatment plan known to be inappropriate or ineffectual. *See Campbell v. Kallas*, 936 F.3d 536, 552 (7th Cir. 2019) (Wood, C.J., dissenting) (collecting case examples of conscious disregard including "ostentatious[]" inaction, "treatment . . . far outside of medical norms," "easier and less efficacious treatment," and "persist[ing] in a course of treatment known to be ineffective"). Contrary to Wexford Defendants' position, such evidence of a defendant's conscious disregard can be sufficient in many forms, *see id.*, and need not take the sole form of evidence "approaching a total unconcern for [the prisoner's] welfare in the face of serious risks," *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (affirming summary judgment for corrections officer who called crisis counselor on behalf of suicidal inmate, who assured corrections officer he would be all right until counselor arrived but nevertheless committed suicide).

14

While "an individual cannot be held liable unless he [or she] caused or participated in an alleged constitutional deprivation," this "personal responsibility requirement is satisfied if officials know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Rice v. Walker*, No. 06-3214, 2010 WL 1050227, at *6 (CD. Ill. Mar. 16, 2010) (Baker, J.) (internal citations and quotations omitted). And critically, whether an individual defendant had a deliberately indifferent state of mind, as is to be inferred from his or her action or inaction, is a factual question, not a legal question. *See, e.g.*, *Zaya v. Sood*, 836 F.3d 800, 808 (7th Cir. 2016) (whether defendant "consciously disregarded the risks of delaying" the plaintiff's medical care was "a question of fact that needs to be resolved by a jury"); *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000) (cited in Wexford MSJ at 23) ("Whether a prison employee acted with deliberate indifference presents a question of fact."); *see also Petties*, 836 F.3d at 728 (question of reasonable inference of deliberate indifference left to jury).

Among many articulations of the threshold to reach a jury, a plaintiff may defeat summary judgment where there is an issue of fact that defendants "fail[ed] to follow an existing protocol," *Petties*, 836 F.3d at 729 (quoting *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005)); that defendants chose an easier and less efficacious treatment, *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015); that defendants "persist[ed] in a course of treatment known to be ineffective," *Petties*, 836 F.3d at 730 (citing *Walker v. Peters*, 233 F.3d 494, 498 (7th Cir. 2000)); or that defendants caused an inexplicable delay in treatment which serves no penological interest, *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008); *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007). A plaintiff "is not required to show that he was literally ignored by prison staff to demonstrate deliberate indifference," *Petties*, 836 F.3d at 729, nor are the only actionable denials of care those in which

easy care was gratuitously denied, *see, e.g.*, *Petties*, 836 F.3d at 726 (ruptured Achilles tendon); *Sherrod*, 223 F.3d at 611-12 (appendicitis); *Rice*, 2010 WL 1050227, at *6 (cancer).

Here, Defendants do not dispute that gross hematuria and kidney cancer are objectively serious medical conditions. *See, e.g.*, *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) ("All the parties agree that gross hematuria is an objectively serious medical condition."); *Rice*, 2010 WL 1050227, at *6 ("Undoubtedly, the onset of cancer is a serious medical need."). Nor do they dispute that each of the Defendants was subjectively aware of Mr. Dean's serious medical conditions, including both his hematuria and his kidney cancer.  (AUMF 53, 60, 67, 75, 92-93, 140.)  Rather, Defendants dispute only whether the courses of inaction or ineffectual action they each chose evince their deliberate indifference. Accordingly, each of the Defendants' bids to resolve deliberate indifference claims on summary judgment must be denied as a classic presentation of a fact issue suitable for jury determination alone. *See Zaya*, 836 F.3d at 808; *Petties*, 836 F.3d at 728.

Moreover, much of Wexford Defendants' own case law shows that a jury should decide this case. To cite just a few examples, in *Sherrod* (cited in Wexford MSJ at 23), the Seventh Circuit reversed summary judgment granted to prison medical staff because the district court had effectively resolved factual determinations that should have gone to the jury about the defendants' treatment of the plaintiff, who suffered from a delayed diagnosis of his appendicitis. 223 F.3d at 611-12. *Petties* (cited throughout Wexford MSJ at 23, 28, 30, and 36) likewise reversed summary judgment granted to prison medical staff who had denied the plaintiff an immobilizing walking boot for his ruptured Achilles tendon but gave him a crutch and ice. 836 F.3d at 726. The defendant medical staff in *Petties* contended that they had followed "some of Wexford's protocol, but not all of it" to treat the plaintiff's Achilles tendon, and even made a referral to an outside specialist that

16

nevertheless took nearly six weeks to take place. *Id.* The Seventh Circuit nevertheless determined that this course of action raised sufficient genuine disputes of material fact suitable for a jury to decide.

As the following discussion will show, the evidence in this case supports a reasonable jury to conclude that the Defendants' actions were failures to follow existing protocol, *Petties*, 836 F.3d at 729, attempts to get by with ineffective but easy treatment, *Conley*, 796 F.3d at 747; *Walker*, 233 F.3d at 498, attempts to turn a blind eye to the treatment Mr. Dean needed, *Rice*, 2010 WL 1050227, at *6, or the cause of inexplicable delays, *Grieveson*, 538 F.3d 779; *Edwards*, 478 F.3d at 830–31.

### B.  Dr. Nawoor (Count I)

Dr. Nawoor contends that he is entitled to summary judgment on Count I because he exercised his medical judgment to take clinically appropriate steps towards diagnosing and treating Mr. Dean. (*See* Wexford MSJ 24-34.) He argues that the steps he took to diagnose Mr. Dean were clinically appropriate, and that the delays at issue in this lawsuit were "necessary steps in a process." (Wexford MSJ at 28.) Because there are genuine disputes of material fact as to whether either of those assertions is true, summary judgment is inappropriate.

Dr. Nawoor argues that "[i]t is important to contextualize Plaintiff's history and presentation," and notes that in December 2015, Mr. Dean (1) presented with gross hematuria, (2) had a history of kidney stones, and (3) had received two CT scans in the past two years, neither of which "identified any suspicious masses." (Wexford MSJ 24.) The Motion states that, based on these facts, he "initially believed" the cause of Mr. Dean's hematuria was kidney stones. (Wexford MSJ 24.) This representation of the facts omits key details (including both expert and non-expert evidence that creates factual disputes) and improperly elevates immaterial ones.

Before diagnosis, there is a genuine dispute of material fact as to whether Dr. Nawoor knew—but ignored the substantial risk—that cancer was the cause of Mr. Dean's hematuria. While Dr. Nawoor insists that he believed kidney stones were causing Mr. Dean's hematuria, Dr. Nawoor told Mr. Dean during his December 23, 2015 medical visit that the cause of his hematuria was "stones or cancer." (AUMF 4.) Dr. Nawoor also neglects to mention that Mr. Dean presented with gross, *painless* hematuria. (AUMF 3.) This fact is significant: Painless hematuria is more suggestive of malignancy (*i.e.*, cancer) than hematuria with flank pain, and gross hematuria is more suggestive of malignancy than microscopic hematuria. (AUMF 6, 7.) ███████████████ ████████████████████████████████████████████████████ ██████████████████████ (AUMF 9.) In light of these additional facts, a jury is entitled to infer that Dr. Nawoor's action was evidence of deliberate indifference, and that in fact nothing was done to rule out malignancy as the cause of Mr. Dean's hematuria until April 12, 2016. (*See* Wexford UMF 96.)

Furthermore, because Dr. Nawoor recognized that cancer was a possible cause of Mr. Dean's hematuria, he was obligated to address that risk instead of assuming Mr. Dean's hematuria was caused by kidney stones. *See Campbell*, 936 F.3d at 552 (Wood, J., dissenting) (noting that "it has long been established that the choice of an easier and less efficacious treatment a can demonstrate that the actor displayed deliberate indifference . . . rather than an exercise of professional judgment" (quoting *Roe v. Elyea*, 631 F.3d 843, 861 (7th Cir. 2011)). Yet, rather than taking appropriate steps to move Mr. Dean towards a diagnosis and definitive treatment, he approved a diagnostic test that, as even his expert concedes, is never, by itself, an appropriate workup for hematuria. (AUMF 17.) Instead of setting plans in motion to order the additional, necessary diagnostic tests or to send Mr. Dean to see a urologist, Dr. Nawoor waited until the results

of the ultrasound confirmed what was foreseeable from the time the ultrasound was ordered[4]—that it could not rule in or out malignancy *or* kidney stones as the cause of Mr. Dean's hematuria. (AUMF 17, 22-23; Wexford UMF 58.) In light of these additional facts, a jury is entitled weigh both parties' submissions and to determine whether the ultrasound was a "necessary step in the process" or a cost-saving stall tactic.

Dr. Nawoor places substantial weight on Mr. Dean's history of kidney stones to justify his actions. But Mr. Dean's history of kidney stones should not have affected the workup of Mr. Dean's hematuria if proper, non-indifferent procedures had been followed. Hematuria is considered malignant until proven otherwise, (AUMF 8-9), and the standard of care for hematuria—a CT IVP and cystoscopy—remains the same even if a patient has a history of kidney stones. (AUMF 10.) Dr. Nawoor also states he was entitled to rely on Mr. Dean's prior, unsuspicious CT scans. But Dr. Nawoor's own expert radiologist testified that the 2015 CT scan *did* show a renal mass. (AUMF 1.) And in any event, it is a dramatic departure from the standard of care to rely on six-month-old imaging studies to determine the cause of new hematuria. (AUMF 25.) At minimum, a treating physician seeking refuge in old imaging studies is "obligated" to review the actual images so that nothing—such as a renal mass—is missed. (AUMF 25.) A jury should decide whether Dr. Nawoor's unhurried approach was mere negligence or evidence of his deliberate indifference.

After diagnosis, there is a genuine dispute of material fact as to whether Dr. Nawoor showed deliberate indifference to Mr. Dean's serious medical needs in his minimal

---

[4] Dr. Nawoor states that he first "requested and obtained approval for a renal ultrasound on January 13, 2016." (Wexford MSJ 28.) This statement misrepresents the facts. Dr. Nawoor merely told Mr. Dean to increase fluids. (Wexford UMF 18, 22.) Dr. Einwohner referred Mr. Dean to collegial over two weeks later. (Wexford UMF 30.) Although Dr. Nawoor was responsible for submitting the official request for review on behalf of Dr. Einwohner, (AUMF 12), he did not independently determine a collegial review would be beneficial.

communications with Mr. Dean's outside urologist, Dr. Severino. Dr. Nawoor contends that he

"deferred" to Dr. Severino on the plan and the timing of surgery to remove Mr. Dean's cancerous

kidney. (Wexford MSJ at 1.) But in light of the unnecessary delays Dr. Nawoor's inaction had

already occasioned, a jury is entitled to weigh whether he appropriately deferred to Dr. Severino,

or whether the three-month delay from diagnosis to surgery is evidence that Dr. Nawoor sought to

"yield the field" and wash his hands of Mr. Dean's medical care. Primary care physicians owe a

duty to their patients of to advocate for their receiving timely and appropriate care. (AUMF 55.)

This duty is especially salient for primary care physicians working in a correctional setting, like

Dr. Nawoor, who are coordinating with outside specialists like Dr. Severino or Dr. Guaglianone,

Mr. Dean's oncologist—specialists with no experience or practical knowledge of the additional, if

necessary, hurdles to obtaining specialty medical care for IDOC inmates. (AUMF 123.)

There is also a genuine dispute as to the material facts underpinning the effectiveness of

Dr. Nawoor's contention that he or other Defendants were in fact deferring to Dr. Severino's

treatment plan as the specialist. Following Mr. Dean's first urology appointment on March 10, Mr.

Dean's outside treatment, purportedly in the hands of Dr. Severino as the specialist, was

nevertheless subject to Wexford's utilization management through the process of collegial review

on at least eight occasions, including:

- Following the March 10 urology consult, Mr. Dean's cystoscopy—along with CT imaging, the undisputed medical standard of care—was not approved through utilization management until March 22 (AUMF 29);

- Likewise, the CT imaging was not approved through utilization management until March 30 (AUMF 30);

- Following his diagnosis of kidney cancer on April 14, he was not approved for surgery to remove his cancerous kidney until April 21 (Wexford UMF 98, 99, 104, 106)—at which time the surgery was to be done May 11;

- Despite a request from Dr. Severino for cardiac clearance for surgery by no later than May 4, (AUMF 142), cardiac clearance on May 6 for the May 11 surgery, and

an additional request for further follow-up appointments regarding the surgical plan after Dr. Severino decided to involve a cardiothoracic surgeon, another four approvals had to be made through utilization management on June 2 (twice), June 14, and June 28 to make Mr. Dean's surgery possible—including an additional cardiology clearance after the May 6 clearance had effectively expired (AUMF 143).

Although treatments were approved in each of these collegial reviews, their number and frequency fairly raise the inference that neither Dr. Nawoor nor other Defendants left the treatment or its timing up to Dr. Severino and were instead injecting medically unnecessary delays into otherwise medically necessary consultations and testing.

Finally, Dr. Nawoor claims he did not delay Mr. Dean's cancer medications after surgery. (Wexford MSJ at 33.) This claim, too, is subject to genuine disputes of material fact. First, there is evidence that, in addition to Mr. Dean's medical need, cost was a significant factor considered in the non-formulary review process. *See* (AUMF 127.) Second, the timeline to approve Mr. Dean's cancer medications was unusually (and inappropriately) lengthy. (AUMF 124, 125; Wexford UMF 142, 143, 151, 153-55.) Third, although Dr. Nawoor seeks refuge in his purported deferral to the specialists as to both "the plan of care and the timing of that plan of care," (Wexford MSJ at 1), Mr. Dean's treatments with both Votrient and Opdivo were subjected to unnecessary delays in Wexford's lengthy approval processes, when Dr. Nawoor and Wexford Defendants could have initiated conditional pre-approval of post-surgical treatments to avoid delays or breaks in his continuity of care. *Cf. Conley*, 796 F.3d at 748 (reversing grant of summary judgment where jury could reasonably infer defendant doctor knew how infrequently prison made diagnostic x-rays appropriate to plaintiff's complaints available to inmates). And fourth, while Mr. Dean's treatment with Votrient and Opdivo, predating the commencement of this lawsuit, were subject to lengthy approval processes, his treatment with Torisel was approved the same day it was prescribed, May 4, 2017—less than two weeks after he filed his initial complaint. (AUMF 129.) Again, it is a

question committed to a jury whether these lengthy approvals were evidence of Dr. Nawoor's deliberate indifference when he was not facing the prospect of legal liability.

Because there are substantial material, factual disputes about whether Dr. Nawoor's conduct was constitutional, summary judgment is inappropriate.

### C.  Dr. Einwohner (Count II)

Similarly, Dr. Einwohner seeks summary judgment on Count II on the premise that she, too, exercised medical judgment to take clinically appropriate steps towards diagnosing and treating Mr. Dean. (*See* Wexford MSJ 34-36.) Dr. Einwohner contends that she saw Mr. Dean twice between his first complaints of grossly bloody urine and his first appointment with the outside urologist, Dr. Severino, and that each time she wrote notes or emails regarding a potential referral to a urologist. (*Id.* at 34.) Having written these notes and emails, Dr. Einwohner contends, she could not be found to be deliberately indifferent to Mr. Dean's condition. (*Id.* at 34-35.) But Mr. Dean saw Dr. Einwohner more times than the two described by her summary judgment argument, and each of these visits provides evidence which creates a genuine factual dispute about whether Dr. Einwohner's care (or lack thereof) was deliberately indifferent.

As Mr. Dean's nephrologist, Dr. Einwohner was uniquely situated among Mr. Dean's care team to advocate for the diagnosis and treatment of problems with Mr. Dean's kidneys. (Wexford UMF 6; *see Petties*, 836 F.3d at 729 (describing how specialists are uniquely situated to tend to certain medical problems, and doctors can be found deliberately indifferent if they fail to defer to them).) Indeed, Mincy, upon hearing Mr. Dean had been experiencing chronic hematuria, was put at ease when she was subsequently informed that he was under the care of a nephrologist. (AUMF 92.) Mincy's ease was unwarranted, however, because Dr. Einwohner did not take basic steps to ensure that Mr. Dean's ailment was promptly treated or even detected.

Most egregiously, Dr. Einwohner "persist[ed] in a course of treatment" she knew "to be ineffective." *See Petties*, 836 F.3d at 729-30. In her summary judgment argument, Dr. Einwohner makes much of her limited interactions with Mr. Dean as protecting her from Eighth Amendment liability. Yet those limited interactions underscore the factual issue on that point. Dr. Einwohner saw Mr. Dean three times between January 7 and March 30. (Wexford UMF 26-30, 59, 63, 93.) Twice she referred him to the ineffectual collegial review process which, because she did not attend, was just a discussion of Mr. Dean's symptoms between two non-kidney specialists. (AUMF 64; Wexford UMF UMF 26-30, 59, 63.) Because Einwohner was not there to advocate for Mr. Dean, for instance, her January recommendation that he see a urologist was disregarded. (AUMF 13.) Then in her March 30 appointment with Mr. Dean—two weeks before he was diagnosed with kidney cancer—"technical problem[s]" caused the visit to be "very limited." (AUMF 26.) Mr. Dean's hematuria persisted through each visit, yet she continued to treat this case as if it was kidney stones up until the point Mr. Dean was diagnosed with cancer. (AUMF 27-28.) There is at least a factual issue about whether Dr. Einwohner's "persistence" in the course of Mr. Dean's treatment was evidence of her deliberate indifference.

Likewise, Dr. Einwohner's summary judgment argument makes much of her non-involvement in scheduling Mr. Dean's surgery. (Wexford MSJ at 36.) That's precisely the point. She was his kidney specialist and had a unique appreciation for his condition. Yet she was unaware that Mr. Dean's cancer had even been diagnosed with cancer, suggesting she was paying little attention to Mr. Dean's health conditions, (AUMF 44), and after learning that Mr. Dean was still "awaiting surgery," she took no steps to expedite its scheduling, (AUMF 45, 66). At the very least, upon learning about Mr. Dean's cancer, there is a factual issue whether Dr. Einwohner should have made an attempt to participate in collegial review meetings for Mr. Dean for the first time expedite

surgery. A jury is entitled to weigh Dr. Einwohner's ignorance and inaction in evaluating whether she was deliberately indifferent to Mr. Dean's medical needs.

Finally, Dr. Einwohner attempts to "adopt[] Dr. Nawoor's arguments on issues from after" Mr. Dean's cancer diagnosis. But Dr. Nawoor's arguments as to why he is not liable for deliberate indifference are "fact-specific" and thus cannot be summarily adopted by a co-defendant. *See United States v. Baptiste*, 264 F.3d 578, 586 n.6 (5th Cir. 2001), *on reh'g*, 309 F.3d 274 (2002). This Court should reject Dr. Einwohner's attempt to do so.

In sum, these factual issues on whether Dr. Einwohner's conduct was constitutional make summary judgment inappropriate.

### D.  Kathy Galvin (Count III)

Galvin's primary arguments why she is entitled to summary judgment is that she had almost "no direct involvement" in Mr. Dean's care, (Wexford MSJ at 36), and that, to the extent she did have direct involvement, she was entitled to defer to the treatment plans of Drs. Nawoor and Severino, (Wexford MSJ at 37). Both of these contentions are subject to genuine factual disputes, making summary judgment inappropriate.

Contrary to Wexford's contentions, there is evidence that Galvin was directly and intimately involved with Mr. Dean's care. Most importantly, Galvin discussed complaints about the scheduling of Mr. Dean's surgery with both Mr. Dean and his wife. Galvin spoke with Mr. Dean's wife on April 25 when she called about the scheduling of his cancer surgery and told the wife that the surgery had been "approved and scheduled," which was false. (AUMF 39; DMF 111; DMF 132.) It is reasonable for a jury to infer that Galvin gave this false information to cover up her misconduct. When pressed further, Galvin responded to Mr. Dean's formal grievance that Wexford "stop dragging this out and get me to surgery!" by telling him Wexford was "awaiting" a response on a surgery date, attempting to shift the blame to someone else. (AUMF 41.) Prison

24

officials who receive grievances complaining of inadequate medical treatment yet do not do what is within their power to investigate and address them are deliberately indifferent. *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999). There is, at the very least, a genuine factual dispute over whether that occurred here. *Id.* (reversing grant of summary judgment).

Furthermore, Galvin was the supervisor over sick call, where Mr. Dean initially presented with his hematuria on December 23, 2015. (AUMF 69; Wexford UMF 12.) Galvin was responsible for scheduling some appointments herself and also supervised the person responsible for scheduling appointments off-site, Taylorville's Medical Records Director. (AUMF 70, 72.) Furthermore, Galvin was responsible for ensuring that all Wexford and IDOC policies were followed in the health care unit at Taylorville. (AUMF 68.) This included the policies that were violated in this case and caused Mr. Dean harm, including the requirement that collegial reviews be held at least weekly so that procedures promptly can be approved. (AUMF 104.)

The direct involvement led Galvin to appreciate that Mr. Dean needed surgery for his cancer immediately. (AUMF 67.) Yet Galvin took absolutely no steps to schedule or expedite Mr. Dean's surgery. (AUMF 74-76.) She refused to lift a finger in the face of Mr. Dean's emergency grievance, merely answering the grievance that the surgery date was pending and later testifying that is all she did because those were the "only steps [she] had to take." (AUMF 40-42.) This despite the fact that Galvin was the supervisor of the individual responsible for scheduling the surgery, (AUMF 70), and had the ability to expedite appointments, (AUMF 74). Furthermore, Galvin conducted essentially no supervision of the Medical Records Director who was responsible for scheduling the surgery. (AUMF 71.) She never discussed the delay in the surgery specifically with Dr. Nawoor or with her supervisor or any other Wexford or IDOC employees, stating "[t]hat would have not been my duty." (AUMF 77-80.)

25

Contrary to Wexford's crabbed view of deliberate indifference law, there are genuine factual disputes on whether Galvin's inaction violated Mr. Dean's constitutional rights. There is evidence that Galvin's portrayal of herself as merely deferring to Drs. Nawoor and Severino is simply a cover for the fact that she had both responsibility for the scheduling function and responsibility and ability to expedite appointments, and yet did not choose to do anything in the face of the extreme delay between Mr. Dean's diagnosis and surgery. Unlike the defendant nurse granted summary judgment in *Gosha v. Robinson*, No. 2:17-cv-00336-WTL-DLP, 2018 WL 4963402, at *6 (S.D. Ind. Oct. 15, 2018) (cited in Wexford MSJ at 36-37), Galvin did not take action between December 23, 2015, and April 12, 2016, nor between Mr. Dean's diagnosis on April 14 and his surgery on July 19, to "confirm[] that he had been seen for [treatment of his hematuria and cancer] recently and treatment was proceeding as ordered."[5] On the contrary, Galvin was "concerned" by the delay in the surgery and thus had a duty to not simply defer to Drs. Nawoor or Severino on the scheduling, but to take "appropriate action, whether by discussing [her] concerns with" the doctors or with appropriate senior officials or taking steps to expedite. *Berry*, 604 F.3d at 443 (as cited in Wexford MSJ at 37) (reversing grant of summary judgment to nurse who failed to take any action in face of unreasonable treatment by prison physician). Instead, Galvin did nothing. Under these circumstances, there is a genuine factual dispute if Galvin's inaction comported with the Constitution. Summary judgment for Galvin is inappropriate.

---

[5] Notably, the *Gosha* case involved a grant of summary judgment to defendants after the plaintiff, who was proceeding *pro se*, failed to respond at all to defendants' motions for summary judgment, thereby conceding by rule all undisputed material facts as presented by the defendants; though he was still entitled as the non-moving party that all inferences be drawn in his favor, the court did not "consider allegations in [the complaint] as evidence opposing the motion for summary judgment." *See* 2018 WL 4963402, at *1.

### E.  Lisa Mincy (Count IV)

Like Galvin, Mincy asserts she is entitled to summary judgment because she relied upon the judgment of treating physicians and because there is no evidence she was involved in the delay in scheduling Mr. Dean's surgery. (Mincy MSJ at 9.) But like Galvin, both of those assertions are subject to genuine material factual disputes and summary judgment must be denied.

It is "undisputed," Mincy contends, that she "did not provide direct patient care to" Mr. Dean. (Mincy MSJ at 10.) In reality, that is far from undisputed. Mincy is a registered nurse and holds herself out as such. (DMF 12; AUMF 81.) Consistent with her thirty years of nursing experience, there is significant evidence that Mincy provides direct patient care generally to Taylorville inmates, including Mr. Dean. (DMF 14.) Mincy attended multiple sick calls where Mr. Dean was complaining of hematuria and she viewed the bloody urine samples he produced. (AUMF 86-87.) She was present for some of his medical visits with Dr. Nawoor. (AUMF 88.) Mincy met with and reviewed the care for every patient in Taylorville's infirmary on a daily basis as part of her duties. (AUMF 84.) As part of these visits, Mincy spoke with Mr. Dean about his hematuria, prior to his cancer diagnosis, and then about his cancer diagnosis on a separate occasion. (AUMF 85, 90, 92.) Furthermore, relying on her background as a nurse, one of Mincy's job responsibilities is to act as a liaison between IDOC and Wexford in raising "questions" about the care of individual patients. (AUMF 89.) Mincy is also in charge of both the inmate grievance system and "doing the line," a type of more informal grievance system which brought her into frequent contact with patients and their families, including Mr. Dean's wife, who spoke with Nurse Mincy in May 2016 about the scheduling of Mr. Dean's surgery. (AUMF 43, 82.) In short, there is evidence to create a material factual dispute about whether Nurse Mincy provided "direct patient care" to Mr. Dean.

As was the case with Kathy Galvin, there is evidence that these "direct" interactions with Mr. Dean led Mincy to appreciate that Mr. Dean needed surgery for his cancer immediately. (AUMF 90, 93, 140.) Yet, like Galvin, Mincy didn't take a single step to expedite Mr. Dean's surgery. Despite the fact that one of Mincy's core job responsibilities was to address problems with individual care, she took no steps in the face of the extreme delay between Mr. Dean's diagnosis and his surgery. (AUMF 89, 91, 92, 94.) Mincy essentially argues she has an absolute shield against liability because she deferred to Mr. Dean's treating physicians and she was serving in a non-medical position. (Mincy MSJ at 10-11.) But if Mincy was "concerned" by Mr. Dean's care—as she undisputedly was—she had a responsibility to do *something*. *See Berry*, 604 F.3d at 443. And, as established above, Nurse Mincy was not serving in a non-medical position; several of her major duties involved drawing on her nursing background and providing direct patient care. In sum, there are substantial material, factual disputes about whether Mincy's conduct was constitutional and summary judgment is inappropriate.

Nor is Mincy entitled to summary judgment on the asserted basis of qualified immunity. The defense of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Zaya*, 836 F.3d at 807 (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A defendant is entitled to qualified immunity if either, (1) a constitutional right would not have been violated on the facts alleged, or (2) the right alleged to have been violated was not clearly established in existing, controlling precedent. *Estate of Clark v. Walker*, 865 F.3d 544, 550 (7th Cir. 2017). On the first prong, the facts of this case make it unsuitable for resolution on summary judgment. As discussed above, Mr. Dean's medical conditions unquestionably were serious and known to Mincy. Thus, whether a constitutional right

28

has been violated turns in part on Mincy's mental state. As discussed, whether Mincy had a culpable state of mind is committed to the jury's determination.

On the second prong, "a case directly on point" may be sufficient but is not necessary for a plaintiff to defeat summary judgment, *see White v. Pauly*, 137 S. Ct. 548, 551 (2017); prisoners' constitutional right to non-indifferent medical care "need not be litigated and then established disease by disease or injury by injury," *Estate of Clark*, 865 F.3d at 553. Mincy does not dispute that existing, controlling case law clearly established Mr. Dean's right to appropriate and timely diagnostic, surgical, and medical care for first his gross hematuria and then his cancer—nor could she. *See, e.g.*, *Duckworth*, 532 F.3d at 679 (7th Cir. 2008) ("All the parties agree that gross hematuria is an objectively serious medical condition."); *Rice*, 2010 WL 1050227, at *6 ("Undoubtedly, the onset of cancer is a serious medical need."). Instead, Mincy contends that a finding that she is not entitled to qualified immunity would upend Seventh Circuit precedent, exposing her to liability as a "non-treating administrator." (*See* Mincy MSJ at 13-14.) Specifically, Mincy asserts that because she "essentially served in a non-medical administrative position," she was "entitled to rely upon the decisions" of Mr. Dean's "treating medical professionals," including Dr. Nawoor, Dr. Einwohner, and Galvin. (*Id.* at 10-11.)

But Mincy's role as Health Care Unit Administrator, that role's attendant responsibilities, and Mincy's conduct under the circumstances in this case are all distinguishable from the "non-medical administrative positions" of defendants in the Seventh Circuit precedent she cites. In *Johnson v. Snyder*, 444 F.3d 579, 585-86 (7th Cir. 2006), for example, the defendant Health Care Unit Administrator, also a registered nurse, was entitled to summary judgment where she had addressed the need for mobility accommodations for the plaintiff, an amputee, by reviewing the plaintiff's medical records and issuing a recommendation to ameliorate the plaintiff's mobility

challenges in the prison showers. The Seventh Circuit affirmed summary judgment, holding that these actions "[did] not constitute deliberate indifference." *Id.* at 586. Here, by contrast, Mincy did not review Mr. Dean's medical records and, despite her role as liaison between IDOC and Wexford personnel, took no action to ensure that he received appropriate, timely diagnostic and surgical measures for his kidney cancer. Likewise, Mincy's inaction in the face of Mr. Dean's serious medical need compares unfavorably with the actions of the non-treating health care administrator defendant in *Johnson v. Doughty*, 433 F.3d 1001, 1016 (7th Cir. 2006), who "took [the plaintiff's inguinal hernia] seriously, investigated the situation, referred [the plaintiff] to a doctor," and only then "reasonably relied on the doctors' professional opinions." And the *Doughty* defendant was found not liable at a bench trial after denial of a motion for summary judgment. *Id.* at 1014-15.

Moreover, controlling Seventh Circuit precedent provides that a corrections official can face liability for deliberate indifference to an inmate's serious medical need even where the corrections official has no direct role in medical treatment. *See, e.g.*, *Reed*, 178 F.3d at 854-56 (reversing summary judgment to non-medical prison official aware of plaintiff's serious medical condition and deprivation through letters and grievances); *Hudson v. McHugh*, 148 F.3d 859, 863-64 (7th Cir. 1998) (reversing dismissal as to non-medical jail intake officers who did not take action to ensure epileptic plaintiff received anti-seizure drugs). *A fortiori*, Mincy's training as a nurse, her responsibilities in Taylorville's medical quality improvement meetings, and her role as a "liaison" between IDOC personnel and Wexford's medical personnel raise factual issues as to her inaction and her subjective state of mind that, if true, would establish her liability for deliberate indifference, making summary judgment on the basis of qualified immunity inappropriate. *See Petties*, 836 F.3d at 733-34.

30

## II. *Monell* Liability for Wexford (Count V)

Wexford moves to dismiss Count V for its direct liability under Section 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, an entity like a municipality or a private-sector defendant standing in the shoes of the State, like Wexford, can be sued as a "person" under Section 1983. *Id.* at 690. But *Monell* foreclosed the possibility of the entity's vicarious liability for the constitutional torts of its employees, *id.* at 663 n.7, and the Seventh Circuit has extended *Monell* to prevent vicarious liability theories from proceeding against private-sector state actors as well. [6] *Iskander*, 690 F.2d at 128; *but see Shields*, 746 F.3d at 791-95 (calling into question the flawed legal and public policy reasoning underpinning *Iskander*). Instead, a *Monell* claim requires that a plaintiff plead and eventually prove that a Section 1983 defendant's own policy or custom directly caused a violation of the plaintiff's rights. *See, e.g.*, *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). A plaintiff may present evidence either that a policy, custom, or practice of deliberate indifference to medical needs caused injury, or else evidence of a series of bad acts that together raise the inference that such a policy exists. *Shields*, 746 F.3d at 796 (citing *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004)).

Wexford contends that Mr. Dean's § 1983 claims against Wexford fail for insufficient evidence on each element of *Monell* liability. (Wexford MSJ at 38.) Wexford is wrong. As an initial matter, Wexford asserts that Mr. Dean's claim against Wexford is insufficient due to the "lack of unconstitutional care to Mr. Dean over the period alleged." (Wexford MSJ at 38.) But as Mr. Dean has shown, there are genuine and material factual disputes over the delay in the diagnosis

---

[6] In Count VI, Mr. Dean brought a claim for Wexford's *respondeat superior* liability under Section 1983, on the basis of a good-faith argument that the Seventh Circuit's *Iskander* precedent should be overruled. This claim has been dismissed in this Court and repleaded for purposes of preserving the issue for appeal.

of Mr. Dean's cancer, treating Mr. Dean's cancer with surgery, and treating Mr. Dean's cancer with medications.

Wexford then asserts that Mr. Dean has "no evidence to support allegedly unconstitutional policies in the form of a widespread practice that applied to individuals other than him." (Wexford MSJ at 39.) This ignores Mr. Dean's interrogatory responses, which point out that every single one of Wexford's unconstitutional policies was an *express policy* in addition to a widespread practice. (Wexford MSJ at 39; Wexford MSJ Ex. M, Dean's Interrogatory Responses No. 11.) Wexford itself acknowledged these interrogatory responses by printing an excerpt in its summary judgment motion. (Wexford MSJ at 39.) Wexford's motion fails to argue that Mr. Dean cannot produce evidence of an express policy for each unconstitutional policy and thus Wexford's motion has waived a challenge to Mr. Dean's ability to show express policies. *Anderson v. Gulf Stream Coach*, *Inc.*, 712 F.2d 1171, 1182 (7th Cir. 2011) (defendant waived argument by failing to raise it in summary judgment motion). Because summary judgment is properly denied unless Wexford can demonstrate that it is undisputed that it had no express policies of the type Mr. Dean alleges, this is grounds enough to deny summary judgment.

In addition, the existence of policies in the form of widespread, unconstitutional practices is subject to genuine and material factual disputes. There is a factual dispute over whether Wexford has a widespread practice of responding in a deliberate indifferent fashion to gross hematuria for patients over 50. Wexford maintains that Mr. Dean has "no evidence" of this policy. But that ignores evidence that Wexford and its employees know gross hematuria for a patient over 50 is a blinking red light for cancer, (AUMF 53, 67, 96-98, 140), yet Wexford's "typical" response to hematuria in a patient over 50 is to attempt diagnosis with a series of tests that do not reliably detect cancer, (AUMF 10 14, 17, 21). This court need not accept Wexford's invitation (at 39) to

rule on whether one incident or three incidents or more incidents constitutes a widespread practice under *Monell* because this case is an example of Wexford's *typical* response to hematuria—*i.e.*, it likely implicates hundreds of cases. Wexford further argues that "[n]o basis exists" to support that Mr. Dean's hematuria was "ignored" based on "his extensive clinical workup." (Wexford MSJ at 39.) But as shown, the evidence of an "extensive clinical workup" is lacking. Indeed, to the extent that "workup" was anything more than the provision of an ultrasound, it came months too late. (*See* DMF 97.)

There is a genuine factual dispute over whether Wexford's use of its collegial review policy is unconstitutional as applied. There is evidence that collegial review serves no real medical purpose and that stated medical purpose (allowing "doctor-to-doctor" discussion of care) provides pretext because "most cases" at collegial review are not discussed at all. (AUMF 99-100.) Instead, collegial review's primary function is "cost containment," and its primary purpose is to increase Wexford's bottom-line by limiting the amount of off-site care Wexford has to pay for. (AUMF 101-02.) ███████████████████████████████████████████████████████

███████████████ it means that patients typically have to wait some period of time of up to a week before they can even begin an attempt to access any off-site care, (AUMF 103). This delay serves no medical purpose, only a Wexford business purpose, and thus is deliberately indifferent.

Contrary to Wexford's protestations, there is evidence that Wexford's failure to *timely* hold and schedule collegial reviews is a widespread practice that affected Mr. Dean. ███████████████

███████████████████████████████████████████████████████ Mr. Dean waited 12 days for one collegial review and 20 days for another, (AUMF 29-30). Wexford is aware that failing to timely hold and schedule collegial reviews is a widespread problem. ██████

███████████████████████████████████████████████████████ This

policy shortcoming was criticized in a report authored by a court-appointed expert in class-action litigation against IDOC alleging widespread medical care failures. (AUMF 115.[7]) The report specifically criticized "breakdowns" and "delays" in "almost every area" of the off-site scheduling and collegial review process. (AUMF 116.) In response, the report specifically recommended that Wexford hold collegial reviews at least once a week. (AUMF 117.) The conclusions in this report are well-known and widely discussed within Wexford. (AUMF 118-19.) After the report was released, ███████████████████████████████████ (AUMF 114.) But Wexford does nothing to enforce or track compliance with this policy. (AUMF 106-07.) It was thus little more than a paper policy, whereas the widespread practice of failing to timely hold collegial reviews—of which Wexford was well-aware thanks to the report—continued. *See Daskalea v. District of Columbia*, 227 F.3d 433, 442-443 (D.C. Cir. 2000) (Garland, J.) ("[A] 'paper' policy cannot insulate a municipality from liability where there is evidence, as there was here, that the municipality was deliberately indifferent to the policy's violation.").

Similarly, there is evidence sufficient to create a material factual dispute that Wexford maintains a widespread policy of failing to refer patients to off-site care or timely scheduling off-site appointments or procedures that affected Mr. Dean. After initially presenting with hematuria at Taylorville's sick call on December 23, 2015, (Wexford UMF 12), Mr. Dean waited over 40 days to receive an ultrasound, (Wexford UMF 53). Mr. Dean then waited over a month after the ultrasound to see a urologist, over a month after the urologist appointment to receive a CT scan,

---

[7] This Court should accept the report referred to here, the Shansky report, for the truth of the matters asserted because it is contains "factual findings from a legally-authorized investigation," Fed. R. Evid. 803(8)(A)(iii), which includes evaluative reports containing opinions and conclusions, *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988). Court-appointed experts are conducting "legally-authorized investigations" within the meaning of the rule. *Am. Pegasus SPC v. Clear Skies Holding Co.*, 1:13-CV-03035-ELR, 2015 WL 10891937, at *8 (N.D. Ga. Sept. 22, 2015).

and then almost three months to receive surgery for his cancer. (Wexford UMF 87, 96, 135.) Wexford maintains a widespread practice of "breakdowns" and "delays" in "almost every area" of the off-site scheduling and collegial review process, a fact widely known within Wexford. (AUMF 116.)

There is also evidence sufficient to create a material factual dispute of whether Wexford maintained a widespread practice of diffusing responsibility for inmate medical care so widely that no person truly has responsibility for actually seeing that a patient is cared for. *See Shields*, 746 F.3d at 795. Wexford and IDOC do not employ anyone to act as a "case manager," ensuring that patients receive the timely and appropriate care they require. (AUMF 122.) Instead, Dr. Nawoor is the "primary care" physician who is expected to advocate for patients, but he feels his hands are often tied in this role. (AUMF 55-56.) Nurse Galvin, who is both the supervisor of the Medical Records Director and a registered nurse, refuses to do scheduling (the Medical Records Director's primary job) or nursing. (AUMF 76.)

Finally, sufficient disputes of material fact also exist to permit a jury to conclude that a series of bad acts directed at Mr. Dean, and resulting in his inadequate diagnostic, surgical, and medical care fairly raise the inference that a policy of deliberate indifference exists. Far from a one-off misjudgment or a handful of isolated oversights, the story of Mr. Dean's kidney cancer shows Wexford Defendants' repeated and continual failures to address his medical needs despite their avowed knowledge of his potential condition and the risks that condition occasioned for his health, well-being, and quality of life.

All individual Defendants deny they were responsible. In sum, there are material factual disputes that Wexford maintains unconstitutional policies that injured Mr. Dean and summary judgment is inappropriate on Mr. Dean's § 1983 *Monell* claim against Wexford.

## III.    Medical Malpractice

Some of the Wexford Defendants have also moved for summary judgment as to claims of medical malpractice under Illinois law. Specifically, Wexford Defendants seek summary judgment on Count VIII against Dr. Einwohner, Count IX against Galvin, and a portion of Count X against Wexford for its vicarious liability based on the negligence of Dr. Einwohner and Galvin.[8] But genuine disputes of material fact preclude summary judgment on these claims.

### A.  Applicable case law

To prevail on a claim of medical malpractice under Illinois law, a plaintiff must prove (1) the applicable standard of care; (2) that the defendant breached that standard of care; and (3) that the breach was a proximate cause of the plaintiff's injury. *Chambers v. Ingram*, 858 F.2d 351, 355 (7th Cir. 1988) (citing *Purtill v. Hess*, 489 N.E.2d 867, 872 (1986)). Proof of these elements *can be* made by expert testimony; it can also be made by reference to learned treatises. *See, e.g.*, *Ramos v. Pyati*, 534 N.E.2d 472, 475 (Ill. App. Ct. 1989); *see also* Fed. R. Evid. 803(18). For expert testimony to be competent to establish the standard of care, the expert witness must be "a licensed member of the school of medicine about which [the expert] proposes to express an opinion" and "familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community." *Purtill*, 489

---

[8] In its Section D, pertaining to Illinois law of medical malpractice, Wexford Defendants' Motion for Summary Judgment includes the statement: "For this Motion, Defendants address Count X as it relates to Dr. Nawoor." (Wexford MSJ, Dkt. 100 at 41.) But this statement appears to be in error, as Section D concludes that Wexford should be granted summary judgment "to the extent Count X is based on either Dr. Einwohner's or . . . Galvin's actions," and does not otherwise analyze Dr. Nawoor's conduct with respect to medical malpractice. Mr. Dean takes this to mean that Wexford Defendants do not move for summary judgment as to the entirety of Count X; in any event, summary judgment on Count X should be denied as to all defendants for the reasons stated elsewhere, and should be denied as to Dr. Nawoor because "[p]erfunctory and undeveloped arguments may be deemed waived and do not warrant consideration on the merits by the Court." *Radke's Inc. v. Bastian*, No. 09-01258, 2011 WL 811377, at *1 (C.D. Ill. Mar. 2, 2011).

N.E.2d at 872-73. Once these qualifications have been established, "it lies within the sound discretion of the trial court to determine if the witness is qualified and competent to state his opinion as an expert regarding the standard of care." *Id.* at 873.

### B.  Dr. Einwohner (Count VIII)

Summary judgment is inappropriate as to Count VIII for medical malpractice against Dr. Einwohner because genuine disputes of material fact exist as to her breach of the standard of care that applied to her as a teleclinic nephrologist. Wexford Defendants contend that Mr. Dean's expert, Dr. Barnett, is not competent to provide expert testimony as to Dr. Einwohner's negligence because Dr. Barnett has "never worked as a nephrologist," (Wexford MSJ at 42), but this is not the legal standard. On the contrary, Dr. Barnett and Dr. Einwohner are "licensed members of the [same] school of medicine," *Purtill*, 489 N.E.2d at 872-73—it is undisputed they are both medical doctors. *Cf.* 31 A.L.R.3d 1163, "Competency of general practitioner to testify as expert witness in action against specialist for medical malpractice" (1970) ("[A] general practitioner will not be held incompetent to testify in an action against a medical specialist solely on the ground that he is not also a specialist in that field[.]"). In their medical training, both Dr. Barnett and Dr. Einwohner completed internships in medicine. (AUMF 141.) And both Dr. Barnett and Dr. Einwohner have practiced medicine in the correctional context. (AUMF 141.)

Moreover, Wexford defendants do not (and cannot) contend that Dr. Barnett lacks sufficient expertise, after 12 years of providing or superintending corrections healthcare, to opine on Dr. Einwohner's adherence either to the general standard of care when an inmate–patient presents with symptoms outside the corrections physician's own medical sub-specialty, or to Wexford's own guidelines for the work-up and treatment of Mr. Dean's initial symptoms of gross hematuria. Wexford Defendants and Dr. Barnett agree—as do urologists Dr. Dhar and Dr. Metwalli—that the standard of care applicable to all practitioners, whether in primary care,

3:17-cv-03112-SEM-TSH   # 117   Page 42 of 46

nephrology, or any other sub-specialty, is a referral to a urologist for imaging and a cystoscopy—a standard of care that either a family medicine specialist like Dr. Barnett or a nephrologist like Dr. Einwohner could meet, and a standard of care on which Dr. Barnett is qualified to opine in the evaluation of specialists employed within the corrections healthcare context. (AUMF 10.) Whether Dr. Einwohner met this standard of care through her emails requesting collegial review meetings that she did not attend or her suggestion of referrals or testing that she did not order is a matter committed to the jury. *Petties*, 836 F.3d at 731. Summary judgment should be denied as to Count VIII.[9]

### C. Kathy Galvin (Count IX)

Likewise, summary judgment is inappropriate as to Count IX for medical malpractice against Galvin. Wexford Defendants give short shrift to Dr. Barnett's qualifications to offer his opinion as to the standard of care applicable to nurses in the correctional context: in addition to his 12 years working with and supervising nurses in the California correctional healthcare setting, Dr. Barnett also wrote a book review of the textbook *Essentials of Correctional Nursing* (Lorry Schoenly & Catherine M. Knox, eds. 2013) for the *Journal of Correctional Health Care*, the sole peer-reviewed medical journal focused on health care practices in jails and prisons. Furthermore, the textbook *Essentials of Correctional Nursing* was itself named by Mincy as a textbook known to nurses in the correctional setting, and the textbook itself reprints an American Nurses Association standard calling for a nurse's "advocacy in the care of individuals, families, communities, and the populations." *Id.* at 76. Furthermore, because "detainees and inmates in a correctional setting are totally dependent upon the facility's health professionals for their medical

---

[9] Wexford Defendants appear not to contest the existence of genuine issues of material fact as to whether Dr. Einwohner's negligence caused Mr. Dean injuries.

care[,] [t]hus, the responsibility of the nurses for assisting the incarcerated with their health care problems is increased." *Id.*

Mr. Dean has presented ample competent evidence from Dr. Barnett and *Essentials of Correctional Nursing*, a learned treatise, *see* Fed. R. Evid. 803(18), on the standard of care applicable to nurses in the corrections context, including Galvin. For the reasons stated above, genuine disputes of material fact persist as to whether Galvin failed to meet this standard of care causing Mr. Dean damages. Summary judgment should be denied as to Count IX.

### D. Wexford's *respondeat superior* liability (Count X)

Wexford moves for summary judgment on Count X for Wexford's *respondeat superior* liability for Dr. Einwohner's and Galvin's medical malpractice solely on the basis of the same contentions as to the purportedly undisputed material facts pertaining to Dr. Einwohner's and Galvin's individual conduct. (Wexford MSJ at 41-43.) Wexford concedes, therefore, that Dr. Einwohner and Galvin were at all relevant times Wexford's employees or agents acting within the scope of their employment or actual or apparent agency, subjecting Wexford to vicarious liability for Dr. Einwohner's or Galvin's legally actionable conduct under Illinois law. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163–64 (2007). Accordingly, as discussed above, genuine disputes of material fact as to Dr. Einwohner's and Galvin's breaches of their respective duties of care to Mr. Dean preclude summary judgment on the *respondeat superior* claim against Wexford in Count X for the same reasons summary judgment must be denied Dr. Einwohner on Count VIII or Galvin on Count IX.

### E. Wexford's institutional negligence (Count XI)

Wexford moves for summary judgment on Count XI for institutional negligence based on "its arguments as to the *Monell* claim" articulated in Count V. (Wexford MSJ at 43.) But institutional negligence and *Monell* claims are entirely separate causes of action. As discussed

above, a *Monell* claim requires that a plaintiff plead and eventually prove that a Section 1983 defendant's own policy or custom directly caused a violation of the plaintiff's rights. *See, e.g.*, *McCormick*, 230 F.3d at 324. Institutional negligence, by contrast, is a state law claim sounding in negligence, requiring a plaintiff to plead and eventually prove the existence of a duty of care on the part of the institutional defendant, the institutional defendant's breach of that duty, and damages. *See, e.g.*, *Jones v. Chicago HMO Ltd. of Illinois*, 730 N.E.2d 1119, 1128-29 (Ill. 2000). As Wexford is quick to point out, controlling case law dictates that evidence establishing medical negligence alone is insufficient to impose deliberate indifference liability under *Monell*. *See, e.g.*, *Roe*, 631 F.3d at 856-57. But logically, it does not follow that an argument of no liability under *Monell* necessarily entails no evidence of negligence. On the contrary, circumstances involving institutional deliberate indifference are merely a subset of circumstances of institutional negligence; where an institutional defendant has promulgated policies or practices that recklessly disregard known or obvious risks to prisoners' serious medical conditions, such policies also by necessity fall short of the applicable professional standard of care. *Cf. Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) ("Doing nothing *could* be simple negligence, but it also does not stretch the imagination to see that it might also amount to deliberate indifference."); *Williams v. Erickson*, 962 F. Supp. 2d 1038, 1044 (N.D. Ill. 2013) (denying motion to dismiss claim for institutional negligence under Illinois state law, on basis of defendant's contention that claim was attempt to replead a dismissed Section 1983 claim).

At minimum, Mr. Dean has shown that genuine disputes of material fact exist as to whether Wexford's policies and practices themselves evinced deliberate indifference to his serious medical needs—a set of factual circumstances still more serious than the breach of the standard of care Wexford owed to him to promulgate policies and promote customs that would lead to the timely

40

diagnosis and treatment of the cause of his gross hematuria and his kidney cancer. For its part, Wexford does not address the differences between *Monell* liability and institutional negligence, (*see* Wexford MSJ at 43), bordering on waiver. *Radke's Inc.*, 2011 WL 811377, at *1 ("Perfunctory and undeveloped arguments may be deemed waived and do not warrant consideration on the merits by the Court."). The Court should deny summary judgment on Count XI.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motions for Summary Judgment (Dkts. 100 & 101).


Dated:  November 8, 2019                    Respectfully Submitted,

                                            ____/s/ Craig C. Martin_____
                                            Craig C. Martin
                                            Joel T. Pelz
                                            William M. Strom
                                            Nathaniel K.S. Wackman
                                            Chloe E. Holt
                                            JENNER & BLOCK LLP
                                            353 N. Clark St.
                                            Chicago, IL  60654
                                            (312) 222-9350
                                            cmartin@jenner.com
                                            jpelz@jenner.com
                                            wstrom@jenner.com
                                            nwackman@jenner.com
                                            cholt@jenner.com


                                            *Attorneys for William Kent Dean*

## <u>CERTIFICATE OF SERVICE</u>

I, Nathaniel K.S. Wackman, hereby certify that I served a copy of **<u>Plaintiff's Response</u>**

**<u>Memorandum in Opposition to Defendants' Motions for Summary Judgment</u>** to counsel of

record listed below for the Defendants via electronic mail on November 8, 2019:

Joseph Rupcich
Cassiday Schade LLP
111 North 6th Street, Suite 200
Springfield, IL  62701
jrupich@cassiday.com


Jeremy Tyrrell
Office of the Illinois Attorney General
500 South Second Street
Springfield, IL  62706
jtyrrell@atg.state.il.ius



                                      <u>   /s/ Nathaniel K.S. Wackman  </u>
                                        Nathaniel K.S. Wackman
                                        JENNER & BLOCK LLP
                                        353 N. Clark St.
                                        Chicago, IL  60654
                                        (312) 222-9350
                                        nwackman@jenner.com

                                        *Attorney for William Kent Dean*