**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

WILLIAM KENT DEAN,

             Plaintiff,

    v.

WEXFORD HEALTH SOURCES, INC., DR.
ABDUR NAWOOR, DR. REBECCA
EINWOHNER, NURSE KATHY GALVIN,
and LISA MINCY,

             Defendants.

Case No. 17-CV-3112

Judge Sue E. Myerscough

Magistrate Judge Tom Schanzle-Haskins

## APPENDIX: PLAINTIFF'S CDIL-LR 7.1(D)(2)(b) RESPONSES TO DEFENDANTS' STATEMENTS OF UNDISPUTED MATERIAL FACTS

William Kent Dean respectfully submits this Appendix containing its Responses to Defendants' Statements of Undisputed Material Facts, pursuant to Central District Local Rule 7.1(D)(2)(b). An index to the exhibits submitted in support is at the end of this appendix.[1]

**I.  Plaintiff's Response to Wexford Defendants'[2] Statement of Undisputed Material Facts**

    **A.  Undisputed Material Facts**

The following facts were taken from Wexford Defendants' Motion for Summary Judgment (Dkt. 100). The numbering from Wexford Defendants' Motion has been maintained. Mr. Dean acknowledges that these facts are undisputed and material:

---

[1] Within this Appendix, citations to "Ex. __" are to the exhibits to Mr. Dean's Response Memorandum In Opposition to Defendants' Motions for Summary Judgment, citations to "Wexford MSJ Ex. __" are citations to the exhibits to Wexford's motion for summary judgment, and citations to "Mincy MSJ Ex. __" are citations to the exhibits to Mincy's motion for summary judgment.

[2] As in Mr. Dean's Memorandum in Opposition to Defendants' Motions for Summary Judgment, Defendants Wexford Health Sources, Inc. ("Wexford"), Dr. Abdur Nawoor, Dr. Rebecca

1. Plaintiff is an inmate within the IDOC, whose claims arise out of Taylorville. Doc. 72, par. 6.

2. Dr. Nawoor is a physician licensed in Illinois and has been employed by Wexford as the medical director at Taylorville since December 2015. Exhibit A, deposition of Abdur Nawoor, pg. 24, 54-55, 66-67.

3. Dr. Nawoor's practice experience is in internal medicine and pulmonology. Exhibit A, deposition of Abdur Nawoor, pg. 59.

5. Dr. Einwohner is a physician licensed to practice medicine in Pennsylvania. Exhibit B, deposition of Rebecca Einwohner, pg. 87-88.

6. Dr. Einwohner is trained and board certified in nephrology, the treatment of diseases of the kidneys. Exhibit B, deposition of Rebecca Einwohner, pg. 30-31.

7. At the relevant time, Dr. Einwohner was a telemedicine physician for Wexford. Exhibit B, deposition of Rebecca Einwohner, pg. 35.

8. Kathy Galvin is a registered nurse in Illinois. Exhibit C, deposition of Kathy Galvin, pg. 27-28.

9. Ms. Galvin was director of nursing/site manager at Taylorville at the time relevant to the Complaint. Exhibit C, deposition of Kathy Galvin, pg. 15.

12. Dr. Nawoor saw Plaintiff on December 23, 2015, for complaints of blood in his urine (hematuria). Exhibit A, deposition of Abdur Nawoor, pg. 204, 207.

13. Dr. Nawoor's subjective history for the December 23, 2015, encounter says "chronic recurrent hematuria and history of renal stones. Denies any pain or fever. Had seen nephrologist three months before that. Had CT of abdomen about a year ago." Exhibit A, deposition of Abdur Nawoor, pg. 208.

14. On December 23, 2015, Dr. Nawoor physically examined Plaintiff, palpating his abdomen and kidney, which elicited no pain. Exhibit A, deposition of Abdur Nawoor, pg. 209.

18. On December 23, 2015, Dr. Nawoor ordered a complete blood count to look for infection or anemia due to blood loss, urine dipstick, and urine strain to look for stones, with encouragement to increase fluids. Exhibit A, deposition of Abdur Nawoor, pg. 211-12.

19. The urine dipstick confirmed blood in the urine. Exhibit A, deposition of Abdur Nawoor, pg. 213.

---

Einwohner, and Kathy Galvin are in this Appendix collectively referred to as "Wexford Defendants." Wexford Defendants and Defendant Lisa Mincy are referred to as "Defendants."

22. Dr. Nawoor encouraged increased fluids to flush the kidneys if Plaintiff had a kidney stone.  Exhibit A, deposition of Abdur Nawoor, pg. 214.

24. Plaintiff had most recently undergone CAT scans of his abdomen/pelvis in August 2014 and July 2015. Exhibit E, Plaintiff's medical records, Bates 437-38, 838-39, 1272- 73.

26.  On January 7, 2016, Dr. Einwohner saw Plaintiff in the renal teleclinic for follow-up consultation.  Exhibit B, deposition of Rebecca Einwohner, pg. 207-209.

27. As of the time she saw Plaintiff on January 7, 2016, Dr. Einwohner was aware Plaintiff's medical history included lithotripsy and kidney stones. Exhibit B, deposition of Rebecca Einwohner, pg. 213-14, 224.

28. On January 7, 2016, Plaintiff complained of a history of painless hematuria for five days that resolved.  Exhibit B, deposition of Rebecca Einwohner, pg. 215-17.

30. On January 7, 2016, Dr. Einwohner emailed to Dr. Ritz, the Wexford physician that does utilization management collegial reviews for Illinois prisons, that read:

---

**Rebecca Einwohner**

| | |
|---|---|
| **From:** | Rebecca Einwohner |
| **Sent:** | Thursday, January 07, 2016 11:51 AM |
| **To:** | Stephen Ritz |
| **Cc:** | Becky Adams |
| **Subject:** | Taylorville patient Dean, William ho past lithiasis with repeat hematuria--? collegial and investigation |

Hi Steve
I just saw patient Dean, W N21885 from Taylorville.
He reports intermittent hematuria with clots over the past couple weeks.  He has passed ca ox stones in the past and has had urology consults with lithotripsy.

His onsite UA dip showed hematuria last month and I'm requesting a UA with micro. The last ct 7/15 had calculi when an inpatient.

I suggest
Collegial review with Dr. Butler with consideration of re-imaging and urology eval.

Rebecca Einwohner, MD. Nephrology
Wexford Health Sources
RAISE the Standard
Desk Number 412-937-8590x337
Virtual Fax 412-539-0437

---

Exhibit 7 to Exhibit B, deposition of Rebecca Einwohner, pg. 227; Exhibit F, deposition of Stephen Ritz, pg. 66.

53. Plaintiff underwent a renal and bladder ultrasound on February 2, 2016. Exhibit A, deposition of Abdur Nawoor, pg. 254.

54. The interpreting radiologist reviewed the renal bladder ultrasound and reported "no mass lesions or evidence of hydronephrosis as to the right kidney." Exhibit A, deposition of  Abdur Nawoor, pg. 262; Exhibit E, Plaintiff's Medical Records, Bates 1680.

58.  The ultrasound was inconclusive as to kidney stones. Exhibit A, deposition of Abdur Nawoor, pg. 265-66.

59.  On February 8, 2016, Dr. Einwohner saw Plaintiff in renal teleclinic. Exhibit B, deposition of Rebecca Einwohner, pg. 235 and Exhibit 8 to Einwohner deposition.

60.  On February 8, 2016, Plaintiff reported he had no hematuria since January 16, 2016, but that today he noticed a slight pink tinge after passing a dark piece the day before. Exhibit B, deposition of Rebecca Einwohner, pg. 241, 247, 251.

61.  On February 8, 2016, Dr. Einwohner noted a renal ultrasound had been done since her last visit and showed no mass or renal calculi. Exhibit B, deposition of Rebecca Einwohner, pg. 236, 240.

63.  Dr. Einwohner wrote on February 8, 2016, to do a microscopic urinalysis to see if  the hematuria has resolved, to present the case for collegial, and to continue the stone prophylaxis. Exhibit B, deposition of Rebecca Einwohner, pg. 249, 251-52.

64.  Dr. Nawoor saw Plaintiff on February 10, 2016, following Plaintiff's ultrasound. Exhibit A, deposition of Abdur Nawoor, pg. 271.

65.  On February 10, 2016, Dr. Nawoor's note says in the subjective portion "History of intermittent hematuria, and the urine positive for blood, and was ordered by nephrologist, which is Einwohner.· No pain. We stopped his aspirin.· And the finding on exam was basically no pain -- no pain."  Exhibit A, deposition of Abdur Nawoor, pg. 272.

66.  On February 10, 2016, Dr. Nawoor's note says in the objective portion "normal rhythm, meaning heart rhythm, lungs clear, no swelling [edema], and the GI there's no mass found, no tenderness, no loin tenderness over the *** kidney." Exhibit A, deposition of Abdur Nawoor, pg. 275.

68.  Dr. Nawoor contacted Dr. Ritz at collegial on February 10, 2016, because he was concerned about Plaintiff's symptoms.  Exhibit A, deposition of Abdur Nawoor, pg. 276.

69.  Because of the unremarkable ultrasound, Dr. Nawoor wanted to investigate other causes of the hematuria in the ureters, bladder, or kidneys. Exhibit A, deposition of Abdur Nawoor, pg. 244.

70.  On February 10, 2016, Dr. Nawoor and Dr. Ritz determined Plaintiff needed further workup in the form of a cystoscopy and urology referral to discover where the blood was coming from---bladder, ureter, or kidney. Exhibit A, deposition of Abdur Nawoor, pg. 276-78; Exhibit G, deposition of Stephen Ritz, pg. 80.

71.  The purpose of the urology referral was for an urologist to look at Plaintiff's kidneys, ureters, and bladder for a possible cause of hematuria. Exhibit A, deposition of Abdur Nawoor, pg. 278.

4

74. Plaintiff's blood counts were checked on February 16, 2016, and February 26, 2016. Exhibit E, Plaintiff's Medical Records, Bates 1503, 1505.

77. Plaintiff saw urologist Dr. Severino on March 10, 2016. Exhibit A, deposition of Abdur Nawoor, pg. 278.

80. The medical record for February 25, 2016, reflects a plan for Dr. Nawoor "to speak to urologist 2/26/15 to possibly move up appt for cystoscopy." Exhibit E, Plaintiff's Medical Records, Bates 1349.

81. Springfield Clinic's records for March 1, 2016, indicate Dr. Nawoor called "requesting to see if pt can be seen sooner-pt has bleeding every day-please call ***." Exhibit 1  to Exhibit L, deposition of William Severino, pg. 119.

82. Springfield Clinic's records reflect a note for March 1, 2016, that states "TASK REASSIGNED" Previously assigned to Roszhart Nurse Staff Can Dr. Severino see next time in Taylorville? Dr. Roszhart not back until 3/15/16." Exhibit 1 to Exhibit L, deposition of William Severino, pg. 119.

83. Dr. Severino is an urologist practicing at Springfield Clinic in Springfield, Illinois. Exhibit L, deposition of William Severino, pg. 6.

84. Urology is a medical and surgical subspecialty focusing on the urinary tract from the kidneys to the urethra. Exhibit L, deposition of William Severino, pg. 6-7.

85. On March 1, 2016, Dr. Severino noted that he would have time to see Plaintiff on March 10, 2016. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 119.

86. Plaintiff's urology appointment was scheduled for March 10, 2016. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 119; Exhibit E, Plaintiff's Medical Records, pg. 1354;

87. Plaintiff saw Dr. Severino on March 10, 2016. Exhibit A, deposition of Abdur Nawoor, pg. 280; Exhibit L, deposition of William Severino, pg.15.

90. Dr. Nawoor approved Dr. Severino's plan on March 14, 2016. Exhibit E, Plaintiff's medical records, Bates 1076.

91. Dr. Nawoor and Wexford's Utilization Management Department approved Plaintiff's cystoscopy on or about March 22, 2016, and his CT IVP on or about March 30, 2016. Exhibit G, deposition of Stephen Ritz, pg. 87-88 and exhibit 11 to Ritz deposition, which is duplicative of Exhibit E, Bates 1081, 1084; Exhibit E, Plaintiff's medical records, Bates 1081, 1084.

92. On March 28, 2016, Plaintiff's CT was scheduled for April 12, 2016. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 116.

93. On March 30, 2016, Dr. Einwohner saw Plaintiff for renal teleclinic. Exhibit B, deposition of Rebecca Einwohner, pg. 257.

94. On March 30, 2016, Dr. Einwohner noted that since her last teleclinic, Plaintiff had seen an urologist and was to undergo diagnostic testing (CT IVP and cystoscopy) in April. Exhibit B, deposition of Rebecca Einwohner, pg. 258-60.

96. Plaintiff underwent a CT of the abdomen and pelvis on April 12, 2016. Exhibit A, deposition of Abdur Nawoor, pg. 283.

98. Dr. Severino saw Plaintiff for a follow-up appointment on April 14, 2016. Exhibit L, deposition of William Severino, pg. 17.

99. The CT showed cancer in the right kidney with potential invasion of the vena cava, which is the main vein of the entire body that drains blood back to the heart. Exhibit L, deposition of William Severino, pg. 18-19.

104. Plaintiff's medical records at Taylorville reflect that on April 14, 2016, the information Dr. Severino conveyed to the nurse about Plaintiff's situation being non-emergent was conveyed to Dr. Nawoor. Exhibit E, Plaintiff's medical records, Bates 1361.

105. Plaintiff underwent a chest X-ray at Taylorville on April 22, 2016. Exhibit E, Plaintiff's medical records, Bates 1364.

106. Dr. Nawoor participated in a collegial review on April 21, 2016, at which right renal nephrectomy surgery was approved for the mass in Plaintiff's kidney/IVC. Exhibit A, deposition of Abdur Nawoor, pg. 291-292; Exhibit G, deposition of Stephen Ritz, pg. 91-92 and Exhibit 13 to Ritz deposition, which is also Exhibit E, Bates 1085.

107. After approval of the surgery through collegial review, Chad Christer, Taylorville's medical records director, contacted Dr. Severino's office to schedule the surgery. Exhibit J, deposition of Chad Christer, pg. 37, 39.

108. On May 5, 2016, Dr. Nawoor participated in a collegial review at which Plaintiff was approved for a cardiology consultation to have Plaintiff's heart checked before undergoing a major operation. Exhibit A, deposition of Abdur Nawoor, pg. 293; Exhibit L, deposition of William Severino, pg. 27; Exhibit J, deposition of Chad Christer, pg. 67.

110. Plaintiff went to Prairie Heart Institute for his cardiac clearance appointment on May 6, 2016. Exhibit E, Plaintiff's medical records, Bates 1364.

113. On or about May 17, 2016, Ms. Galvin informed Plaintiff's IDOC counselor in response to an emergency grievance from Plaintiff dated May 16, 2016, claiming that his surgery had not been scheduled. Exhibit C, deposition of Kathy Galvin, pg. 133, exhibit 15 to Galvin deposition.

114. The counselor's May 17, 2016, response to Plaintiff's grievance was "Per Health Care Unit DON Galvin surgeon has been contacted to schedule a surgical date. Currently awaiting a response." Exhibit C deposition of Kathy Galvin, pg. 133, exhibit 15 to Galvin deposition.

115.  Ms. Galvin acquired the information on Plaintiff's surgery by contacting the medical records director and conveying the information to the counselor by phone. Exhibit C, deposition of Kathy Galvin, pg. 135-36.

119.  Plaintiff underwent a CT of the chest/abdomen/pelvis on June 8, 2016. Exhibit L, deposition of William Severino, pg. 33-34 and Exhibit 2 to Severino deposition.

120.  On June 9, 2016, Plaintiff saw Dr. Severino at Springfield Clinic. Exhibit L, deposition of William Severino, pg. 26.

126.  On or about June 14, 2016, Dr. Nawoor obtained approval in collegial review for Plaintiff to see Dr. Hazelrigg. Exhibit E, Plaintiff's medical records, Bates 1127; Exhibit A, deposition of Abdur Nawoor, pg. 293.

127. Springfield Clinic's records for June 14, 2016, state "I have this patient set up to see Dr. Hazelrigg on 6/20. After he sees, we can start coordinating surgery dates/times." Exhibit 1 to Exhibit L, deposition of William Severino, pg. 86.

128.  Plaintiff saw Dr. Hazelrigg on June 20, 2016. Exhibit A, Plaintiff's medical records, Bates 1379.

129.  On June 23, 2016, Julie, Dr. Severino's nurse, noted in the Springfield Clinic medical records she was checking when Plaintiff could be scheduled for surgery and that they would need to coordinate with Dr. Hazelrigg, Dr. Ryan, and Dr. Severino's schedules. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 82.

134. On or about June 28, 2016, Dr. Nawoor obtained approval through collegial review for the pre-operative cardiac clearance and surgery. Exhibit E, Plaintiff's medical records, Bates 1135.

135. On July 19, 2016, Plaintiff underwent right radical nephrectomy with IVC thrombectomy with median sternotomy, cardiopulmonary bypass with deep hypothermic circulatory arrest. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 14, 39, Exhibit 1 to Severino deposition, Bates 59.

138. Dr. Severino saw Plaintiff after surgery on August 11, 2016, and recommended he be "set up to see oncology." Exhibit L, deposition of William Severino, pg. 40; Exhibit 1 to Severino deposition, Bates 11.

139. On or about August 18, 2016, Dr. Nawoor obtained approval in collegial review for Plaintiff to have an oncology evaluation. Exhibit E, Plaintiff's medical records, Bates 1148; Exhibit D, deposition of Nivedita Dhar, pg. 111-112.

141. On October 19, 2016, Plaintiff was prescribed the medication Votrient as treatment for his cancer.  Exhibit A, deposition of Abdur Nawoor, pg. 299; Exhibit G, deposition of Stephen Ritz, pg. 94.

142. Dr. Nawoor wrote a prescription for Votrient on October 22, 2016. Exhibit C, deposition of Kathy Galvin, pg. 162, exhibit 21 to Galvin deposition.

143. Plaintiff's Votrient was approved as a non-formulary medication on November 14, 2016. Exhibit A, deposition of Abdur Nawoor, pg. 299; Exhibit C, deposition of Kathy Galvin, pg. 147-48; exhibit 21 to Galvin deposition; Exhibit G, deposition of Stephen Ritz, pg. 97-98, 113; Exhibit E, Plaintiff's medical records, Bates 1678.

144. Formulary medications are commonly prescribed medications that require no review and approval process to be given. Exhibit G, deposition of Stephen Ritz, pg. 94-95.

147. A non-formulary cancer medication would be reviewed for medical necessity and clinical appropriateness with reference to the National Comprehensive Cancer Network (NCCN) guidelines, which are standard guidelines used throughout the country. Exhibit G, deposition of Stephen Ritz, pg. 95-96.

149. IDOC's medication formulary does not have chemotherapeutic agents. Exhibit G, deposition of Stephen Ritz, pg. 110-11.

150. Drug formularies are common in managed care systems. Exhibit H, deposition of Bruce Barnett, pg. 50.

151. Plaintiff began taking Votrient on November 18, 2016. Exhibit A, deposition of

Abdur Nawoor, pg. 299-300.

153. Plaintiff was prescribed Opdivo on March 2, 2017. Exhibit G, deposition of Stephen Ritz, pg. 107 and Exhibit 17 to Ritz deposition, which is also Exhibit E, Bates 2058.

154. Opdivo is a non-formulary medication required to be approved through the nonformulary process. Exhibit G, deposition of Stephen Ritz, pg. 108-09.

155. Opdivo was approved through the non-formulary process on March 20, 2017. Exhibit G, deposition of Stephen Ritz, pg. 111.

### B. Disputed Material Facts

The following facts were taken from Wexford Defendants' Motion for Summary Judgment

(Dkt. 100). The numbering from Wexford Defendants' Motion has been maintained. Mr. Dean

disputes these facts but acknowledges they would be material:

**4. Dr. Nawoor's job responsibilities include providing direct patient care to inmates at Taylorville. Exhibit A, deposition of Abdur Nawoor, pg. 59.**

**Response:** Disputed to the extent the Wexford Defendants do not mention that Dr. Nawoor is responsible for providing direct patient care to Mr. Dean. *See* Wexford Undisputed Material Fact 1 (stating Mr. Dean is an inmate at Taylorville). ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████         In addition, as the primary care physician of inmates at Taylorville, Dr. Nawoor is also responsible for advocating for his patients to receive timely and appropriate care. Wexford MSJ Ex. H, Barnett Tr. 11:19-13:3, 119:1-5; Wexford MSJ Ex. I, Metwalli Tr. 90:9-14, 141:11-143:4; Ex. 3, ███████████████████████████ Ex. 2 at 11, 13, ████████████████

██████████████

**10. As director of nursing, Ms. Galvin ensured Wexford and IDOC policies were followed and supervised 15 nurses, the medical records director, two staff assistants, a dental assistant, and a mental health assistant. Exhibit C, deposition of Kathy Galvin, pg. 29-30, 32.**

<u>Response:</u> Galvin was also responsible for supervising sick call. Wexford MSJ Ex. C, Galvin Tr. 35:20-22. Galvin would additionally speak with patients about their health and/or care when they approached her. Wexford MSJ Ex. C, Galvin Tr. 35:23-36:2. ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

**15. On December 23, 2015, Dr. Nawoor assessed Plaintiff as having hematuria most likely from stones. Exhibit A, deposition of Abdur Nawoor, pg. 209-211.**

<u>Response:</u> This fact is disputed to the extent it suggests Dr. Nawoor was not aware that malignancy was a possible cause of Mr. Dean's hematuria. Hematuria is a common presentation of malignancy. Wexford MSJ Ex. D, Dhar Tr. 66:2-4. ████████████████████████████████████

████████████       Dr. Nawoor advised Mr. Dean during his December 23, 2015 medical visit that the cause of his hematuria was "stones or cancer." Mincy MSJ Ex. 1, Dean Tr. 60:24:61:1.

**16. The assessment was made by considering both the presentation and physical findings. Exhibit A, deposition of Abdur Nawoor, pg. 210.**

<u>Response:</u> Disputed as to Dr. Nawoor's reliance on Mr. Dean's presentation and physical findings to conclude that the most likely cause of Mr. Dean's hematuria was kidney stones. Mr. Dean presented with gross, painless hematuria. Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001341 (12/23/15 5:55 AM Medical Records Note). Painless hematuria is more suggestive of malignancy than hematuria with flank pain. Ex. D, Dhar Tr. 128:1-9; █████████████████████
████     And, the risk of finding malignancy in gross hematuria is approximately 40 to 50 percent. Wexford MSJ Ex. L, Severino Tr. 48:24-49:3. These facts lead to an inference that Dr. Nawoor *ignored* Mr. Dean's presentation and his physical findings, and focused only on his medical history, when concluding the most likely cause of Mr. Dean's hematuria was kidney stones. *See Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc) (in summary judgment, all inferences must be drawn in favor of nonmovant).

**17.  Dr. Nawoor believed Plaintiff's December 2015 hematuria was most likely due to a kidney stone, given his history of stones.  Exhibit A, deposition of Abdur Nawoor, pg. 210-11.**

<u>Response:</u> This fact is disputed to the extent it suggests Dr. Nawoor was not aware that malignancy was a possible cause of Mr. Dean's hematuria.  Hematuria is a common presentation of malignancy.  Wexford MSJ Ex. D, Dhar Tr. 66:2-4.  Hematuria is to be considered malignant until proven otherwise.  Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; ███████████████████████ ████████████████████████████████████████████████████████████████  Dr. Nawoor advised Mr. Dean during his December 23, 2015 medical visit that the cause of his hematuria was "stones or cancer."  Mincy MSJ Ex. 1, Dean Tr. 60:24:61:1.

**25.  Those tests revealed no abnormalities, other than kidney  stones. Exhibit E, Plaintiff's medical records, Bates 437-38.**

<u>Response:</u>  Defendants' expert radiologist testified that the 2015 CT scan showed a mass in the right kidney.  Wexford MSJ Ex. K, Racenstein Tr. 33:23-34:4.

**29.  Dr. Einwohner's note for January 7, 2016, states her plan was "to discuss with collegial for evaluation of hematuria."  Exhibit B, deposition of Rebecca Einwohner, pg. 224.**

<u>Response:</u>  Disputed to the extent it suggests Dr. Einwohner intended to participate in a collegial review of Mr. Dean's case or discuss Mr. Dean with the physicians who participated in collegial reviews.  Dr. Einwohner never attended collegial reviews, and did not participate in any collegial reviews about Mr. Dean.  Wexford MSJ Ex. B, Einwohner Tr. 54:5-7; 253:12-254:6; Wexford MSJ Ex. A, Nawoor Tr. 239:8-15, 239:25-240:2.  Moreover, Dr. Einwohner did not have authority to even initiate collegial reviews.  Wexford MSJ Ex. A, Nawoor Tr. 236:15-22.  This task fell to Dr. Nawoor.  Wexford MSJ Ex. A, Nawoor Tr. 236:20-22.  Dr. Einwohner did not directly communicate with Dr. Nawoor.  Wexford MSJ Ex. A, Nawoor Tr. 232:8-12, 234:7-9, 257:1-4.  These facts lead to an inference that Dr. Einwohner did not plan "to discuss [Mr. Dean] with collegial," but rather to absolve herself of any responsibility for tracking, managing, and/or determining the cause of Mr. Dean's hematuria.  *See Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc) (in summary judgment, all inferences must be drawn in favor of nonmovant).

**31.  The purpose of Dr. Einwohner's January  7, 2016, email to Dr. Ritz was to generate a collegial review with Dr. Nawoor about Plaintiff's symptoms. Exhibit B, deposition of Rebecca Einwohner, pg. 233-34.**

<u>Response:</u>  Disputed as to the purpose of Dr. Einwohner's January 7, 2016 email to Dr. Ritz.  Dr. Einwohner does not participate in utilization management collegial reviews, Wexford MSJ Ex. B, Einwohner Tr. 54:5-7; 253:12-254:6; Wexford MSJ Ex. A, Nawoor Tr. 239:8-15, 239:25-240:2.  Dr. Einwohner does not have authority to initiate collegial reviews.  Wexford MSJ Ex. A, Nawoor Tr. 236:15-22.   Similarly, Dr. Einwohner could not order tests or make referrals.  Wexford MSJ Ex. B, Einwohner Tr. 234:15-18; *see also* Wexford MSJ Ex. B, Einwohner Tr. 109:24-110:7 (stating it would be reasonable to not follow up with a patient with hematuria for up to six months).  Dr. Einwohner did not plan on seeing Mr. Dean until a month after she sent this email.  Wexford MSJ Ex. B, Einwohner Tr. 224:12-20.  After a note in her records on January 11,

2016 that "[c]ase was discussed with UM medical," Wexford MSJ Ex. B, Einwohner Tr. 226:23:24, there are no records indicating she checked to see whether a collegial or referral occurred until her February 8, 2016 teleclinic appointment with Mr. Dean. This lack of follow up leads to an inference that the purpose of Dr. Einwohner's email to Dr. Ritz was to absolve herself of any responsibility for tracking, managing, and/or determining the cause of Mr. Dean's hematuria. *See Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc) (in summary judgment, all inferences must be drawn in favor of nonmovant).

**32. On January 13, 2016, Dr. Nawoor and Dr. Ritz of Wexford discussed Plaintiff in collegial review and determined to get a renal ultrasound. Exhibit A, deposition of Abdur Nawoor, pg. 228-29.**

<u>Response:</u> Disputed as to the inference that the decision to order a renal ultrasound for Mr. Dean was the result of a reasoned medical decision. Dr. Einwohner initiated the January 2016 collegial review, and recommended that Mr. Dean receive "re-imaging and urology eval." Ex. 5, Einwohner Records Bates #000061. By "re-imaging," Dr. Einwohner meant a CT scan or other image that Mr. Dean had received previously, not an ultrasound, which he had not received previously. Wexford MSJ Ex. H, Barnett Tr. 149:1-5. Dr. Ritz overruled Dr. Einwohner's recommendation for a urology referral and CT scan and "suggest[ed] [a] renal ultrasound." Wexford MSJ Ex. E, IDOC Taylorville Med Recs 0001343 (1/13/16 12:55pm Medical Records Note). Dr. Ritz and Wexford's Utilization Management focus on exhausting on-site resources before utilizing off-site resources, and on utilizing lower cost services. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 13:4-14:12; Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization Management (Ritz 30(b)(6) Deposition Exhibit 2) ("We identify and realize immediate reductions in inmate offsite care costs."). The standard of care for hematuria is to perform a CT with contrast and a cystoscopy. Wexford MSJ Ex. D, Dhar Tr. 91:25-92:9; Wexford MSJ Ex. L, Severino Tr. 47:20-48:4; Wexford MSJ Ex. I, Metwalli Tr. 45:7-46:16. A renal ultrasound is not always sufficient even to rule in kidney stones, Wexford MSJ Ex. D, Dhar Tr. 74:1-75:18; Wexford MSJ Ex. I, Metwalli Tr. 55:21-58:11; Wexford MSJ Ex. K, Racenstein Tr. 39:18-40:5, 65:7-16. These facts lead to an inference that Dr. Ritz decided to order a renal ultrasound as a cost containment measure, rather than because it was the proper course of care for Mr. Dean. *See Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc) (in summary judgment, all inferences must be drawn in favor of nonmovant).

**33. Collegial review is a process Wexford utilizes to allow doctor-to-doctor discussion of referrals for off-site services in the course of managing a patient's care. Exhibit A, deposition of Abdur Nawoor, pg. 237-38; Exhibit F, 30(b)(6) deposition of Stephen Ritz, pg. 10, 22; Exhibit G, deposition of Stephen Ritz, pg. 51.**

<u>Response:</u> The collegial review process additionally serves as a cost containment measure and is intended to reduce, limit, or delay offsite procedures and specialty consultations. Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization Management (Ritz 30(b)(6) Deposition Exhibit 2) (stating collegial review is "designed to reduce offsite care costs" and "results in fewer requested offsite referrals, a reduction in the percentage of referrals denied as inappropriate, and an overall decrease in specialty consults"); Ex. 7 at 10, Report of the 2nd Court Appointed Expert in *Lippert v. Godinez* (Ritz Dep. Ex. 6) ("The collegial review process of accessing specialty care is a patient safety hazard and should be abandoned until patient safety is ensured. . . . The Wexford system of

utilization management is ineffective and for many patients is a barrier to timely care. . . . Patients are not consistently referred for specialty care when it is warranted.").

**34. Collegial reviews are held weekly between a site physician and Wexford Utilization Management.  Exhibit F, 30(b)(6) deposition of Stephen Ritz, pg. 23.**

**Response:** 

Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 43:2-10.

Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 22:20-23:11. But Wexford does not track how often collegial reviews fail to happen on a weekly basis. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 23:12-15. Wexford has not punished employees when collegial reviews fail to happen on a weekly basis. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 23:22-24:17. Collegial reviews are conducted with greater frequency in other states where Wexford manages medical care in the prison system. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 31:1-32:1. Wexford also discourages doctors from seeking to have off-site care approved outside of the weekly collegial review meeting. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 27:5-21.

**35. Utilization management is a review of requests for medical services, pharmacological services, imaging services, all medically-related service for medical necessity and clinical appropriateness.  Exhibit F, 30(b)(6) deposition of Stephen Ritz, pg. 7.**

**Response:**  This misrepresents the primary purpose of "utilization management."  Wexford's utilization management program is, in large part, focused on cost containment rather than patient care.  Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization Management (Ritz 30(b)(6) Deposition Exhibit 2) ("Wexford Health's comprehensive utilization management (UM) program balances clinical needs with cost containment.  We identify and realize immediate reductions in inmate offsite care costs.").

**36. Wexford uses a utilization management process because its contract with the IDOC requires Wexford to ensure resources are used in a medically necessary and clinically appropriate manner.  Exhibit F, 30(b)(6) deposition of Stephen Ritz, pg. 7-8; Exhibit G, deposition of Stephen Ritz, pg. 53.**

**Response:** This misrepresents the function of "utilization management."  Wexford's utilization management program is in large part focused on cost containment, often at the expense of patient care.  Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization Management (Ritz 30(b)(6) Deposition Exhibit 2) ("Wexford Health's comprehensive utilization management (UM) program balances clinical needs with cost containment.  We identify and realize immediate reductions in inmate offsite care costs."); Ex. 7 at 10, Report of the 2nd Court Appointed Expert in *Lippert v. Godinez* (Ritz Dep. Ex. 6) ("The Wexford system of utilization management is ineffective and for many patients is a barrier to timely care. . . . Patients are not consistently referred for specialty care when it is warranted.").

12

**37. The result of a collegial review will be approval of a proposed plan of care, non-approval and an alternative treatment plan, or a request for additional information. Exhibit F, 30(b)(6) deposition of Stephen Ritz, pg. 50.**

<u>Response:</u>  Disputed to the extent it omits other results of the collegial review process, including the reduction of offsite procedures and specialty consultations, and that the collegial review process functions as a cost containment measure.  Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization Management (Ritz 30(b)(6) Deposition Exhibit 2) (stating collegial review is "designed to reduce offsite care costs" and "results in fewer requested offsite referrals, a reduction in the percentage of referrals denied as inappropriate, and an overall decrease in specialty consults").  Disputed to the extent it omits to mention that the collegial review process is designed to ensure on-site resources are exhausted before off-site resources are utilized.  Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 13:4-14:12.  Disputed to the extent it omits to mention that the collegial process encourages treating physicians to make less referrals for necessary outside care.  Wexford MSJ Ex. A, Nawoor Tr. 120:20-121:9; Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization Management (Ritz 30(b)(6) Deposition Exhibit 2).

**38. Dr. Nawoor and Dr. Ritz decided to do ultrasound as an initial test based on the Plaintiff's history of lithotripsies to look for kidney stones or something in the ureter or bladder. Exhibit A, deposition of Abdur Nawoor, pg. 216; Exhibit G, deposition of Stephen Ritz, pg. 68-69.**

<u>Response:</u>  Disputed as to the reasons why Dr. Ritz overruled Dr. Einwohner's recommendation for a urology referral and CT scan and "suggest[ed] [a] renal ultrasound."  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 0001343 (1/13/16 12:55pm Medical Records Note).  Dr. Ritz and Wexford's Utilization Management focus on exhausting on-site resources before utilizing off-site resources, and on utilizing lower cost services.  Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 13:4-14:12; Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization Management (Ritz 30(b)(6) Deposition Exhibit 2) ("We identify and realize immediate reductions in inmate offsite care costs.").  The standard of care for hematuria is to perform a CT with contrast and a cystoscopy, even if a patient has a history of kidney stones.  Wexford MSJ Ex. D, Dhar Tr. 91:25-92:9; Wexford MSJ Ex. L, Severino Tr. 47:20-48:4; Wexford MSJ Ex. I, Metwalli Tr. 45:7-46:16.  A CT scan without contrast, not a renal ultrasound, is the preferred test for detecting kidney stones because a renal ultrasound does not visualize the ureters, is operator dependent, and cannot detect small kidney stones.  Wexford MSJ Ex. D, Dhar Tr. 74:1-75:18; Wexford MSJ Ex. I, Metwalli Tr. 55:21-58:11; Wexford MSJ Ex. K, Racenstein Tr. 39:18-40:5, 65:7-16.  A renal ultrasound is not always sufficient even to rule in kidney stones.  Wexford MSJ Ex. D, Dhar Tr. 74:1-75:18; Wexford MSJ Ex. I, Metwalli Tr. 55:21-58:11; Wexford MSJ Ex. K, Racenstein Tr. 39:18-40:5, 65:7-16.  Ultrasounds are much less expensive than other diagnostic tests, such as CT scans.  Wexford MSJ Ex. K, Racenstein Tr. 41:5-6.  These facts lead to an inference that Dr. Ritz decided to order a renal ultrasound as a cost containment measure, rather than because it was the proper course of care for Mr. Dean.  *See Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc) (in summary judgment, all inferences must be drawn in favor of nonmovant).

**41. Ultrasound is a diagnostic procedure done by an outside radiologist who visits Taylorville approximately once per month to perform the tests on offenders for whom it has**

been ordered. Exhibit A, deposition of Abdur Nawoor, pg. 177, 179; Exhibit G, deposition of Stephen Ritz, pg. 69.

**Response:** Disputed to the extent it is not mentioned that an ultrasound is cheaper for Wexford than other diagnostic imaging tests, Wexford MSJ Ex. K, Racenstein Tr. 41:5-6; Ex. 9, ███████ ████████ and that Wexford has a strong preference for exhausting on-site services, including ultrasounds, before referring patients for outside appointments or procedures, Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 13:4-14:12.

**46. Whether an ultrasound is an appropriate step in the workup for hematuria is a matter of clinical judgment. Exhibit I, deposition of Adam Metwalli, pg. 58-59; Exhibit D, deposition of Nivedita Dhar, pg. 62 (ultrasound is appropriate if you do not have enough evidence or order CT).**

**Response:** Disputed to the extent it implies that Defendants properly exercised their clinical judgment in deciding to order an ultrasound for Mr. Dean. Wexford prefers to exhaust on-site resources before utilizing off-site services, and to utilize lower cost services. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 13:4-14:12; Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization Management (Ritz 30(b)(6) Deposition Exhibit 2) ("We identify and realize immediate reductions in inmate offsite care costs."). Hematuria is a common presentation of malignancy, Wexford MSJ Ex. D, Dhar Tr. 66:2-4, and hematuria is to be considered malignant until proven otherwise, Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; █████████████████████████████████████████████████████████████████████

The standard of care for hematuria is to perform a CT with contrast and a cystoscopy, even if a patient has a history of kidney stones. Wexford MSJ Ex. D, Dhar Tr. 91:25-92:9; Wexford MSJ Ex. L, Severino Tr. 47:20-48:4; Wexford MSJ Ex. I, Metwalli Tr. 45:7-46:16. Even if stones are suspected, a CT scan without contrast, not a renal ultrasound, is the preferred test for detecting kidney stones because a renal ultrasound does not visualize the ureters, is operator dependent, and cannot detect small kidney stones. Wexford MSJ Ex. D, Dhar Tr. 74:1-75:18; Wexford MSJ Ex. I, Metwalli Tr. 55:21-58:11; Wexford MSJ Ex. K, Racenstein Tr. 39:18-40:5, 65:7-16. A renal ultrasound is not always sufficient even to rule in kidney stones. Wexford MSJ Ex. D, Dhar Tr. 74:1-75:18; Wexford MSJ Ex. I, Metwalli Tr. 55:21-58:11; Wexford MSJ Ex. K, Racenstein Tr. 39:18-40:5, 65:7-16. Moreover, ultrasounds are less effective with obese individuals. Wexford MSJ Ex. I, Metwalli Tr. 57:19-58:1.

On the other hand, ultrasounds can be done on-site and are much less expensive than other diagnostic tests, such as CT scans. Wexford MSJ Ex. K, Racenstein Tr. 41:5-6 (testifying that an ultrasound might be the first test ordered because it is less expensive than a CT scan). These facts lead to an inference that the decision to order a renal ultrasound for Mr. Dean was made on the basis of cost and convenience, and was not a matter of clinical judgment. *See Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc) (in summary judgment, all inferences must be drawn in favor of nonmovant).

**48. The ultrasound was an appropriate part of the workup of Plaintiff's hematuria. Exhibit H, deposition of Bruce Barnett, pg. 127-28.**

**Response:**  This fact misstates the testimony of Dr. Barnett.  While Dr. Barnett agreed that, in the abstract, an ultrasound can be an appropriate part of a continuing workup for hematuria, Wexford MSJ Ex. H, Barnett Tr. 127:24-128:2, Dr. Barnett also testified that "timing is everything" and that you cannot separate out the steps that were taken from the time in which they were taken, Wexford MSJ Ex. H, Barnett Tr. 128:15-129:14.  Dr. Barnett additionally testified that "[t]he care was not right" because "the act of taking too long is a negligent act in and of itself."  Wexford MSJ Ex. H, Barnett Tr. 130:4-10.  Because of the delays in this case, Dr. Barnett testified that Defendants' workup of Mr. Dean's hematuria was not appropriate.  Wexford MSJ Ex. H, Barnett Tr. 130:1-10.  Dr. Dhar and Dr. Metwalli agreed.  Wexford MSJ Ex. D, Dhar Tr. 62:13-21 (renal ultrasound appropriate when patient presents with flank pain and you do not have enough evidence to order a CT scan), 74:9-15 (renal ultrasound not appropriate for diagnosing kidney stones), 75:24-76:6 (different imaging tests for hematuria need to be done "simultaneously"), 123:23-124:8 (renal ultrasound not appropriate for patient presenting with gross painless hematuria); Wexford MSJ Ex. I, Metwalli Tr. 56:22-59:14 (ultrasound not appropriate part of workup of hematuria if (1) the ordering physician does not read the results and (2) if it is not done alongside a cystoscopy and bilateral retrograde pyelogram; "in most cases [a renal ultrasound is not] going to be adequate"; "if you're going to use [an ultrasound], then you're obligated to do other studies in conjunction with it").

For additional reasons why an ultrasound was not an appropriate part of the workup of Mr. Dean's hematuria, see Mr. Dean's response to Disputed Material Fact #46.

**49. The performing radiologist reads the results of the ultrasound. Exhibit A, deposition of Abdur Nawoor, pg. 179.**

**Response:**  Treating physicians often elect to read the results of ultrasounds—or other images—themselves.  Wexford MSJ Ex. D, Dhar Tr. 40:7-16, 43:2-4; Wexford MSJ Ex. I, Metwalli Tr. 60:13-22 ("[Y]ou are obligated as an ordering physician to look at the films yourself.").  A treating physician reviewing the images might pick up things that the radiologist missed.  Wexford MSJ Ex. I, Metwalli Tr. 60:13-16.

**50. The medical records director will schedule an ultrasound by calling the facility that performs ultrasounds and making an appointment. Exhibit C, deposition of Kathy Galvin, pg. 60-61, 78.**

**Response:**  Disputed to the extent it omits aspects of Wexford's procedure for scheduling services.  Wexford's Medical Records Director testified that it is Wexford's practice to schedule a procedure with another doctor if the original doctor is not available in a timely fashion.  Wexford MSJ Ex. J, Christer Tr. 17:20-23.  The Medical Records Director may also ask the original doctor to expedite an appointment when appropriate.  Wexford MSJ Ex. J, Christer Tr. 18:2-11.  If there is no availability, a patient could be sent to the emergency room.  Wexford MSJ Ex. C, Galvin Tr. 67 5:16.  The Medical Records Director is also capable of expediting referrals.  Wexford MSJ Ex. J, Christer Tr. 18:15-19.

15

**52. After approval of a service through collegial review, the medical records director at Taylorville receives correspondence that contains an authorization number for the approved service and he then consults a list of providers to request the service. Exhibit J, deposition of Chad Christer, pg. 15-16.**

**Response:** Disputed to the extent it omits aspects of Wexford's procedure for scheduling outside services and appointments. Wexford's Medical Records Director testified that it is Wexford's practice to schedule a procedure with another doctor if the original doctor is not available in a timely fashion. Wexford MSJ Ex. J, Christer Tr. 17:20-23. The Medical Records Director may also ask the original doctor to expedite an appointment when appropriate. Wexford MSJ Ex. J, Christer Tr. 18:2-11. If there is no availability, a patient could be sent to the emergency room. Wexford MSJ Ex. C, Galvin Tr. 67 5:16. The Medical Records Director is also capable of expediting referrals. Wexford MSJ Ex. J, Christer Tr. 18:15-19. Also disputed because the Medical Records Director attends collegial reviews and thus becomes aware of the need to schedule an appointment or service during the reviews. Wexford MSJ Ex. J, Christer Tr. 35:8-10.

**55. "No mass lesions" in the right kidney means the interpreting radiologist saw no abnormality in the kidney suggesting a tumor. Exhibit A, deposition of Abdur Nawoor, pg. 262- 63; Exhibit G, deposition of Stephen Ritz, pg. 83-84.**

**Response:** Disputed as to the veracity of the underlying statement that there was no abnormality in the kidney suggesting a tumor. The radiologist's report noted a significant difference in the sizes of Mr. Dean's kidneys that suggested a renal mass. Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001680 (2/2/16 Ultrasound Results); Wexford MSJ Ex. K, Racenstein Tr. 43:23-44:15; ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Kidney sizes are always recorded in ultrasound results, and a difference in kidney size of greater than one centimeter is "something that should be considered potentially pathologic." Wexford MSJ Ex. K, Racenstein Tr. 45:17-20.

**57. The interpreting radiologist misread the ultrasound, and failed to recognize a diffuse infiltrative process in the right kidney. Exhibit C, deposition of Nivedita Dhar, pg. 99; Exhibit K, deposition of Michael Racenstein, pg. 48-48.**

**Response:** Disputed to the extent it attempts to absolve Defendants of responsibility for failing to detect Mr. Dean's renal mass in the February 2016 ultrasound. Treating physicians often elect to read the results of ultrasounds—or other images—themselves. Wexford MSJ Ex. D, Dhar Tr. 40:7-16, 43:2-4; Wexford MSJ Ex. I, Metwalli Tr. 60:13-22 ("[Y]ou are obligated as an ordering physician to look at the films yourself."). A treating physician reviewing the images might pick up things that the radiologist missed. Wexford MSJ Ex. I, Metwalli Tr. 60:13-16. Moreover, the radiologist's report noted a significant difference in the sizes of Mr. Dean's kidneys that suggested a renal mass. Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001680 (2/2/16 Ultrasound Results); Wexford MSJ Ex. K, Racenstein Tr. 43:23-44:15; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Kidney sizes are always recorded in ultrasound results, and a difference in kidney size of greater than one centimeter is "something that should be considered potentially pathologic." Wexford MSJ Ex. K, Racenstein Tr. 45:17-20.

**62.  On February 8, 2016, Dr. Einwohner questioned whether Plaintiff has passed a kidney stone due to faint pink urine with no stone on the ultrasound but noted stone were likely to reoccur.**

**<u>Response:</u>**  This fact is disputed because neither the testimony cited nor the underlying document indicate that Dr. Einwohner questioned that Mr. Dean passed a kidney stone.  Dr. Einwohner had no grounds to doubt Mr. Dean's self-reported systems when she never once observed one of his urine specimens.  Wexford MSJ Ex. B, Einwohner Tr. 9:21-22.  Furthermore, the document appears to read "no stones on us but likely stones recurrence."  Ex. 5, Einwohner Records # 000060.  This language does not support defendants' purported undisputed material fact that stones were likely to reoccur, a forward looking statement.

**67.  On February 10, 2016, Dr. Nawoor assessed Plaintiff as having "hematuria cause undetermined."  Exhibit A, deposition of Abdur Nawoor, pg. 276.**

**<u>Response:</u>**  This fact is disputed to the extent it suggests Dr. Nawoor was not aware that malignancy was a possible cause of Mr. Dean's hematuria in February 2016.  Hematuria is a common presentation of malignancy.  Wexford MSJ Ex. D, Dhar Tr. 66:2-4.   Dr. Nawoor advised Mr. Dean during his December 23, 2015 medical visit that the cause of his hematuria was "stones or cancer."  Mincy MSJ Ex. 1, Dean Tr. 60:24:61:1.  The ultrasound did not rule out malignancy, as Dr. Nawoor recognized.  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001351 (2/26/16 Medical Records Note) (noting, after the ultrasound, that he would need to rule out bladder cancer as a cause of Mr. Dean's hematuria).

**73. On February 10, 2016, Dr. Einwohner followed up with the utilization management nurse and was informed Plaintiff had been reviewed in collegial and was scheduled to go to urology.  Exhibit B, deposition of Rebecca Einwohner, pg. 254.**

**<u>Response:</u>**  Undisputed that Dr. Einwohner was told this; disputed to the extent it suggests that this information established Mr. Dean was receiving adequate and timely care for his hematuria such that Dr. Einwohner did not need to be concerned or advocate for her patient.  As demonstrated in Mr. Dean's Responses to Wexford's Disputed Material Facts 46, 48, Mr. Dean was not at this time receiving timely or adequate care or diagnostic testing for his hematuria.  Mr. Dean did not see a urologist until March 10, 2016—one month after Dr. Einwohner made this note in Mr. Dean's medical records.  *See* Wexford Undisputed Material Fact 87.  It is not clear that Dr. Einwohner was aware of—or even inquired about—the date of Mr. Dean's urology appointment and whether that timing was appropriate.

**79.  After an appointment is approved, the medical records director at the prison contacts a specialist to schedule the appointment. Exhibit A, deposition of Abdur Nawoor, pg. 283.**

**<u>Response:</u>**  Disputed to the extent it omits aspects of Wexford's procedure for scheduling outside services and appointments.  Wexford's Medical Records Director testified that it is Wexford's practice to schedule a procedure with another doctor if the original doctor is not available in a

timely fashion.  Wexford MSJ Ex. J, Christer Tr. 17:20-23.  The Medical Records Director may also ask the original doctor to expedite an appointment when appropriate.  Wexford MSJ Ex. J, Christer Tr. 18:2-11.  If there is no availability, a patient could be sent to the emergency room. Wexford MSJ Ex. C, Galvin Tr. 67 5:16.  The Medical Records Director is also capable of expediting referrals.  Wexford MSJ Ex. J, Christer Tr. 18:15-19.

**88.  On March 10, 2016, Dr. Severino's plan of care for Plaintiff was to begin with a CT scan, see Plaintiff back, and then proceed with a cystoscopy, if necessary. Exhibit L, deposition of William Severino, pg. 17.**

**Response:** This fact is disputed to the extent it suggests that Dr. Severino did not intend to arrange for Mr. Dean to have a cystoscopy until after he received Mr. Dean's CT results.  Dr. Severino requested both tests simultaneously, and they were scheduled to be held two days apart.  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001078 (3/2016 Medical Special Services Referral and Report); Ex. 11, Springfield Clinic William K. Dean 21; Wexford MSJ Ex. L, Springfield Clinic William K. Dean 109 (3/2/16 3:21 pm Task Notes).  Because the CT scan identified a renal mass, the cystoscopy ultimately was not necessary.  Wexford MSJ Ex. L, Severino Tr. 18-23.  However, Dr. Severino did not wait for the results of the CT scan to schedule the cystoscopy.  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001078 (3/2016 Medical Special Services Referral and Report); Ex. 11, Springfield Clinic William K. Dean 21; Wexford MSJ Ex. L, Springfield Clinic William K. Dean 109 (3/2/16 3:21 pm Task Notes).

**95.  Dr. Nawoor called Dr. Severino on April 1, 2016 to request an expedited appointment. Exhibit A, deposition of Abdur Nawoor, pg. 289.**

**Response:**  It is unclear that this call ever occurred.  Dr. Severino does not recall ever speaking to Dr. Nawoor about Mr. Dean, even though Dr. Nawoor's deposition testimony was that he called and spoke with Dr. Severino and Dr. Severino moved an appointment for him.  Wexford MSJ Ex. L, Severino Tr. 60:15-62:2; Wexford MSJ Ex. A., Nawoor Tr. 289:6-17.  Furthermore, Springfield Clinic's medical records—which list several contacts between Dr. Severino and his staff and Wexford or IDOC staff concerning Mr. Dean's care—list no April 1 contact from Dr. Nawoor. Ex. 12, Springfield Clinic William K. Dean 61-119 (complete task record for Mr. Dean).

Medical records *written by Dr. Nawoor* indicate that Dr. Nawoor contacted Dr. Severino's office to see if he would "expedite [Mr. Dean's] appointment" and spoke with a nurse of Dr. Severino who said she would talk with Dr. Severino and "let [Dr. Nawoor] know what he decides."  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001356.  There are no records indicating that this nurse ever contacted Dr. Nawoor back.  Furthermore, there are no records indicating that Dr. Nawoor followed up with Dr. Severino or the nurse.

Finally, records indicate that Mr. Dean's cystoscopy appointment was not moved up.  Prior to purportedly contacting Dr. Severino's office, Mr. Dean's cystoscopy was scheduled for April 14, 2016.  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001355 (3/29/16 3:30 PM Medical Records Note).  Mr. Dean's cystoscopy appointment remained on April 14, though the procedure itself was cancelled after Mr. Dean was diagnosed with cancer.  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001360 (4/14/16 1645 hrs Note) ("[R]eturn from TMH cystoscopy Procedure not performed CT showed rt kidney mass with vena cava thrombis [sic]").

**97.  One month to complete a CT does not fall below the standard of care.  Exhibit H, deposition of Bruce Barnett, pg. 136-37.**

<u>Response:</u>  The CT did not take a month to complete.  It took nearly four months to complete from the date when the standard of care dictates that it should have been ordered; i.e., at the time of Mr. Dean's initial presentation with gross hematuria to Dr. Nawoor at sick call on December 23, 2015. Dr. Nivedita Dhar, Mr. Dean's expert witness on urology, testified that that under the standard of care, the CT should have been ordered upon Mr. Dean's initial presentation with gross hematuria on December 23, 2015 because a CT scan and cystoscopy are the proper "hematuria workup."  *See* Wexford MSJ Ex. D, Dhar Tr. 77:11-15 ("[T]he [American Urological Association] guidelines for a patient who's above the age of 50 who doesn't have contraindication to contract, is to image the upper tracts with a CT urogram and to visualize the lower with cystoscopy."); Ex. 13, Dhar Expert Report at 5 ("The standard of care for imaging in a hematuria workup is a multi-phasic CT urography.").  Dr. Bruce Barnett, Mr. Dean's witness on primary care and correctional medicine, agrees: "[T]he standard of care for gross hematuria is a CT and prompt cystoscopy."  Ex. H, Barnett Tr. 119:24-120:1; *see also* Ex. 10, ███████████████████████████████████████████████████████████████████████████████████████████████████████████  Dr. Severino, Mr. Dean's actual urologist and a witness designated to provide opinion/expert testimony by both Wexford and Nurse Mincy, agreed that the "standard of care for gross hematuria is . . . CT IVP and a cystoscopy."  Wexford MSJ, Ex. L, Severino Tr. 16:9-16; 45:13-46:2 (same); 62:9-11 (same).

It should have been ordered on December 23, 2015, when Mr. Dean presented to Dr. Nawoor at sick call with gross hematuria.  Because it was not actually completed until April 12, 2016, Mr. Dean had to wait nearly *four* months.  This falls far short of the standard of care, as Mr. Dean's expert witnesses will testify.  *See* Ex. 10, ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 13, Dhar Expert Report at 4-5 ("During this period from December 23 to April 12, Mr. Dean continued to have intermittent episodes of gross hematuria which, despite his repeated communications to the primary care providers, did not precipitate a prompt urologic evaluation. . . . A delay of almost three months for urologic consultation and evaluation of the upper and lower urinary tracts in a patient with gross hematuria is not consistent with AUA best practice guidelines. This departure from the standard of care was negligent and deliberately indifferent to Mr. Dean's serious medical needs.").

Furthermore, Wexford misstates the testimony of Dr. Barnett.  Dr. Barnett did not testify that a month to complete a CT is the standard of care.  To the contrary, Dr. Barnett testified that a two-week turnaround from the ordering of a CT to the CT being completed "is the right time."  Wexford MSJ Ex. H, Barnett Tr. 136:17.  He noted that there may be circumstances under which one month would be "reasonable if it's the best they could do" but under normal circumstances that is not adequate: "[I]f you put the request out and there's no effort made to get him into the urologist any sooner than two weeks, I believe that's below the standard of care."  Wexford MSJ, Ex. H, Barnett Tr. 137:3-6.  Moreover, Wexford's own radiologist expert testified that the series of images in this case, including the CT scan, took "a long time."  Wexford MSJ Ex. K, Racenstein Tr. 72:13-20. "[U]sually" such an "image sequence"—meaning the ultrasound and the CT scan—would happen

in "[a] matter of weeks, not a matter of months."  Wexford MSJ Ex. K, Racenstein Tr. 72:19-23. Here, the ultrasound alone took a month.

**103.   Plaintiff's medical records at Taylorville reflect that on April 14, 2016, the prison received a telephone call from Dr. Severino, who stated "situation non-emergent. Not usual for pt to throw embolis. IM may need rt nephrectomy, needs MRI to determine extent of problem but has pacemaker so unable to do this. Plans are being set into motion for procedure. May need vascular surg to assist [with] procedure depends on size of thrombus and where it is situated."  Exhibit E, Plaintiff's medical records, Bates 1361.**

**Response:**  The only evidence cited to support the fact that Dr. Severino made these statements is inadmissible hearsay subject to no exception.  Thus the fact is properly disregarded because it cannot be supported by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2).  Dr. Severino's statement was not made for the purposes of medical treatment or diagnosis under Fed. R. Evid. 803(4) because "Rule 803(4) does not purport to except, nor can it reasonably be interpreted as excepting, statements by the person providing the medical attention to the patient."  *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996) (citing *Gong v. Hirsch*, 913 F.2d 1269, 1273–74 & n. 5 (7th Cir.1990)).

Moreover, to the extent Wexford states it is undisputed that Mr. Dean's situation was "non-emergent," Mr. Dean disputes that fact.  The warden at Taylorville marked Mr. Dean's grievance regarding the scheduling of his surgery as "emergent" meaning that it needed to be addressed within 24 hours because the warden determined it concerned "a substantial risk of imminent personal injury or other serious or irreparable harm to self."  Ex. C, Galvin Tr. 133:15-17, 134:8-9; Ex. 14, Dean May 17 Emergency Grievance (no Bates number) (Ex. 15, Galvin deposition).

Moreover, to the extent Wexford states it is undisputed that Mr. Dean's situation was not "urgent" because Dr. Severino described it as "non-emergent" (meaning the treatment needed to occur within a day), Mr. Dean also disputes that fact.  Dr. Nawoor thought Mr. Dean's situation was "urgent."  Ex. 15, IDOC Taylorville Med Recs 001086 (marking a referral form concerning Mr. Dean's surgery as urgent).  The decision to mark the request as "urgent" was made after Felicia Waterman, a Wexford employee who assisted with scheduling procedures, spoke with Julia Thornton, a nurse at Dr. Severino's office, and represented to Thornton that she was putting in an urgent request to Wexford to get approval for the surgery.  Ex. L, Springfield Clinic William K. Dean 109 (Ex. 1, Severino deposition).  Dr. Severino also considered the surgery to be "urgent."  Ex. L, Severino Tr. 50:13-21.

**111.  Plaintiff's surgery was initially scheduled by Dr. Severino for May 11, 2016, but was postponed by Dr. Severino because he wanted to have cardiac clearance and other specialists review Plaintiff's case. Exhibit J, deposition of Chad Christer, pg. 65-66.**

**Response:**  It is disputed that Mr. Dean's surgery was ever scheduled for May 11.  Dr. Nawoor was unaware of any other date on which Mr. Dean's surgery was scheduled besides July 19, 2016, the date on which the surgery actually occurred.  Wexford MSJ Ex. A, Nawoor Tr. 292:9-23. Nurse Galvin similarly did not know that Mr. Dean was scheduled for surgery on that date. Wexford MSJ Ex. C, Galvin Tr. 130:8-11.

Furthermore, Springfield Clinic's "task" medical records do not appear to contain a single entry describing Mr. Dean's surgery as having been scheduled for May 11 (or any other date besides July 19). Ex. 12, Springfield Clinic William K. Dean 61-119 (complete task record for Mr. Dean). Contrast this lack of records for a May 11 surgery with the records for the July 19 surgery, where the task records contain multiple entries about scheduling the surgery and preparations for the surgery.  Wexford MSJ Ex. L, Springfield Clinic William K. Dean 82-83 (two pages of correspondence relating to scheduling and prepping the July 19 surgery).  This lack of records leads to an inference that the surgery was never scheduled for May 11 or any other date besides July 19.  *See Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc) (in summary judgment, all inferences must be drawn in favor of nonmovant).  Similarly, there are no notes in Mr. Dean's chart from April 14, 2016 (the day of his cancer diagnosis) until May 11 indicating that he was supposed to go for surgery on May 11.  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001359-69.  Once again, contrast this with another note planning for Mr. Dean to go on "medical furlough" for a medical appointment and it leads to the inference that a surgery was never scheduled for May 11 or any other date besides July 19.  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001364 (05/04/16 1415 hrs Medical Records Note).

Because it is disputed that this surgery was ever scheduled for May 11, Mr. Dean disputes that it was "postponed" for the reasons because it is impossible to "postpone" something never scheduled in the first place.

**112.  Neither Wexford nor its employees postponed Plaintiff's renal nephrectomy Surgery. Exhibit J, deposition of Chad Christer, pg. 66.**

**Response:**  As described above in the response to Wexford's Undisputed Material Fact No. 111, Mr. Dean's surgery was never scheduled for any date prior to the July 19 so it is impossible for Mr. Dean's surgery to have been "postponed."

To the extent Wexford is asserting that neither Wexford nor its employees delayed Mr. Dean's surgery, that is disputed.  All of the named individual Wexford employee defendants, as well as Wexford itself, delayed Mr. Dean's surgery.

Dr. Nawoor:  Dr. Nawoor has served as Mr. Dean's primary care physician, and Medical Director

at the Taylorville Correctional Center, since December 2015.  See Mincy MSJ Ex. A, Dean Tr. 22:21-22, 60:15-17; Wexford MSJ Ex. A, Nawoor Tr. 24:9-12, 202:22-203:3. ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████

It took one week from the time of Mr. Dean's diagnosis and Dr. Nawoor being informed that Mr. Dean would need surgery, *see* Wexford MSJ Ex. E, IDOC Taylorville Med Recs  001361, for the surgery to be approved at collegial review, *see* Wexford's Undisputed Material Fact No. 106.  Dr. Nawoor could have sought approval of the surgery on the same day it was ordered by Dr. Severino through Wexford's procedure for immediate collegial review approvals, but Dr. Nawoor did not take this step.  Ex. F, Ritz 30(b)(6) Tr. 22:20-27:4.  Dr. Nawoor knew that Wexford would not even contact the outside doctor to schedule the surgery until after collegial review approval was

obtained.  Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 32:12-33:10; IDOC Taylorville Med Recs 001092 (note from Dr. Severino's office to Wexford: "Once approved, please call Julie [to schedule the surgery]"); Springfield Clinic William K. Dean 103 (similar).  Thus, this week delay is directly attributable to Dr. Nawoor.

Furthermore, at this April 21 Collegial Review, a "targeted completion date" of May 21, 2016 (one month later) was assigned to Mr. Dean's surgery.  Ex. 39, April 21 Launch Report.  The "targeted completion date" is supposed to be assigned by the site medical director (in this case, Dr. Nawoor) and the Wexford Utilization Management Director (in this case, Dr. Stephen Ritz).  Ex. 2 at 10,



The "targeted completion date" is the date when, in the judgment of Dr. Nawoor and Dr. Ritz, "the service is expected to be completed by."  Ex. F, Ritz 30(b)(6) Tr. 37:8-10;

Here, despite Dr. Nawoor and Dr. Ritz assigning a date of May 21, Mr. Dean did not receive his surgery until July 19.

Health Care Unit Administrator Lisa Mincy testified that Dr. Nawoor, among others, appreciated the risk of the delay in Mr. Dean's surgery and that Dr. Nawoor, among others, found it "very concerning" that Mr. Dean's surgery took so long to be performed after his diagnosis for cancer.  Mincy MSJ Ex. B, Mincy Tr. 193:19-23, 194:4-10.  Indeed, the delay was discussed at the monthly "quality improvement meetings" attended by Dr. Nawoor. *Id.* Dr. Nawoor was present at each quality improvement meeting from Mr. Dean's diagnosis with cancer until his surgery.  *See* Ex. 16, IDOC No. 000150 (April).  Ex. 17, IDOC No. 000165 (May); Ex. 18, IDOC No. 000178 (June).

Dr. Nawoor never told Chad Christer, the Wexford employee responsible for scheduling the procedure, that the surgery should be scheduled sooner.  Wexford MSJ Ex. J, Christer Tr. 42:23-43:1.  Dr. Nawoor never discussed Mr. Dean's surgery or diagnosis with Dr. Severino. *See* Wexford MSJ Ex. L,  Severino Tr. 60:15-61:22.

Although Dr. Nawoor acknowledged that he has the ability to expedite the scheduling of medical appointments and procedures, *see, e.g.,* Wexford MSJ Ex. A, Nawoor Tr. 284:12-286:6; Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001349, 001356, Dr. Nawoor never inquired whether Mr. Dean's surgery could be expedited, or if it was possible to send Mr. Dean to a different doctor, *see* Wexford MSJ Ex. A, Nawoor Tr. 291:9-292:23; Wexford MSJ Ex. J, Christer Tr. 42:18-22; Wexford MSJ Ex. C, Galvin Tr. 143:8-11; Mincy MSJ Ex. B, Mincy Tr. 194:11-22.

Dr. Einwohner:  Dr. Einwohner saw Mr. Dean, and assisted in providing him medical care, through the renal teleclinic between Wexford's office in Pittsburgh, Pennsylvania, and the IDOC facilities where Mr. Dean was incarcerated in Pinckneyville and Taylorville, Illinois, beginning in 2012 and regularly through at least the time of his diagnosis with renal cancer in April 2016.  Wexford MSJ Ex. B, Einwohner Tr. 4:18-16:8, 196:2-197:17; Mincy MSJ Ex. A, Dean Tr. 67:13-74:22, 87:15-88:16; 109:9-111:7.

Dr. Einwohner initialed records in Mr. Dean's patient file to show that she had received them and looked at them. Wexford MSJ Ex. B, Einwohner Tr. 192:14-18. Dr. Einwohner saw Mr. Dean

through the renal teleclinic and noted that he had recently experienced blood in his urine—hematuria—on January 7, 2016; February 8, 2016; March 30, 2016; May 26, 2016; and July 13, 2016.  Ex. 19, Einwohner Records Bates 000038-000039; Ex. 20, Einwohner Records Bates 000041-000042; Ex. 21, Einwohner Records Bates 0000057-0000063.  Dr. Einwohner initialed the records from Mr. Dean's appointments with Dr. Severino dated March 10, 2016; April 12, 2016; and April 14, 2016. Ex. 22, Einwohner Records Bates 000043-48.  She initialed the records from Mr. Dean's May 6, 2016 appointment at Prairie Cardiovascular, which show that Mr. Dean was referred for "preoperative cardiac clearance for kidney surgery for kidney cancer" and that Dr. Himanshu Pathak of Prairie Cardiovascular declared Mr. Dean "medically optimized from cardiac standpoint for his upcoming kidney surgery" as of May 9, 2016.  Ex. 23, Einwohner Records Bates 000052-56.  Also among the documents in Dr. Einwohner's file on Mr. Dean was a May 4, 2016 Utilization Management record indicating that Mr. Dean had been diagnosed with a "r[ight] renal mass" that was "likely renal ca[ncer]" and that he had been "recommended for [a] r[ight] nephrectomy," pending "cardiac clearance." Ex. 24, Einwohner Records Bates 000050. This Utilization Management record further showed that Mr. Dean was approved for a "cardiology eval[uation]." *Id.* Dr. Einwohner testified that she does not participate in utilization management "collegial" conferences generally, and that she does not recall participating in any collegials regarding Mr. Dean's care.  Wexford MSJ Ex. B, Einwohner Tr. 54:5-7; 253:12-254:6. Taken together, these documents show that Dr. Einwohner knew that Mr. Dean had been diagnosed with kidney cancer and that he was being evaluated for readiness for what should have been an imminent surgery.  Based on the information she had and her history of treating Mr. Dean for his kidney ailments, Dr. Einwohner knew of—or else was willfully blind to—Mr. Dean's need for immediate surgery to remove his cancerous kidney, yet failed to take any steps to expedite or guarantee that surgery was scheduled.

<u>Nurse Galvin:</u>  As Director of Nursing at the Taylorville Correctional Center, Kathy Galvin was responsible for ensuring that *all* of Wexford's policies and IDOC's institutional directives were followed by staff at Taylorville.  Wexford MSJ Ex. C, Galvin Tr. 32:11-13. ██████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 22:20-41:3. Nurse Galvin was also responsible for supervising sick call and supervising the Medical Records Director, who in turn was responsible for scheduling procedures and off-site medical visits. Wexford MSJ Ex. C, Galvin Tr. 30:17-22, 35:20-22.

Nurse Mincy, the Taylorville Health Care Unit Administrator, testified that Galvin was involved in expediting appointments.  Mincy MSJ Ex. B, Mincy Tr. 135:3-24.  Nurse Galvin took no steps to schedule or expedite Mr. Dean's surgery or to ensure that it was scheduled or conducted. Wexford MSJ Ex. C, Galvin Tr. 118:9-14, 119:17-19, 121:1-3, 143:8-11.  This was despite the fact that Mr. Dean's wife called about the scheduling of the cancer surgery on April 25 and spoke with Kathy Galvin, who told her that the surgery had been "approved and scheduled."  Wexford MSJ Ex. C, Galvin Tr. 114:1-9. It is also despite the fact that Mr. Dean filed an emergency grievance regarding the scheduling of his surgery in May 2017: "Get . . . Wexford to stop dragging this out and get me to surgery!" Ex. 14, Dean May 17 Emergency Grievance (no Bates number) (Ex. 15, Galvin deposition). Galvin's response to Mr. Dean was that the surgeon had been "contacted to schedule a surgical date. Currently awaiting a response." *Id.*; Wexford MSJ Ex. C, Galvin Tr. 166:7-10 (same). Galvin denied that she misled Ms. Dean during the April 25 phone

call, claiming that she had been "told it was approved and scheduled." Galvin Tr. 166:11-167:2. Health Care Unit Administrator Lisa Mincy testified that Nurse Galvin, among others, appreciated the risk of the delay in Mr. Dean's surgery and that Nurse Galvin, among others, found it "very concerning" that Mr. Dean's surgery took so long to be performed after his diagnosis for cancer. Mincy Tr. 193:19-23, 194:4-10. Indeed, the delay was discussed at the monthly "quality improvement meetings" attended by Ms. Galvin, and Ms. Mincy. *Id.* Nurse Galvin was present at each quality improvement meeting from Mr. Dean's diagnosis with cancer until his surgery. *See* IDOC No. 000150 (April), 000165 (May), 000178 (June).  She also took no steps to supervise Chad Christer, the Medical Records Director at Taylorville Correctional Center who was primarily responsible for scheduling Mr. Dean's surgery.  Nurse Galvin, who was Mr. Christer's direct supervisor, testified that she took minimal steps to supervise him and was completely unaware if he was having scheduling difficulties unless he brought them to her attention. Wexford MSJ Ex. C, Galvin Tr. 95:8-98:4,141:14-142:15.

Wexford:  Wexford is responsible for the delay in Mr. Dean's care due to several of its policies or customs.

First, Wexford's policy is to subject outside referrals to the medically unnecessary collegial review process. ████████████████████████████████████████████████████████████████
████████████████████████████████████████████  ████████████████████████
████████████████████████████  This policy was described on Wexford's public facing website as of Aug. 12, 2019. Ex. 6, "Utilization Management" from Wexford website (Ex. 2, Ritz 30(b)(6) deposition). Dr. Ritz, as corporate representative of Wexford, testified about the existence of this policy and custom.  Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 11:14-15:4.  This policy results in a medically unnecessary delay in treatment. According to Dr. Ritz, the medical purpose of collegial review is "to allow doctor-to-doctor discussion regarding the management of cases." Wexford MSJ Ex. G, Ritz Tr. 51:20-24. But "most cases" are approved with no discussion at all. Wexford MSJ Ex. G, Ritz Tr. 41:24-42:4; 49:6-50:8. The "approval aspect" of collegial review serves primarily a business purpose. Wexford MSJ Ex. G, Ritz Tr. 52:15-53:15. It exists only to reduce off-site care, which is by its very nature more expensive and resource intensive for Wexford and IDOC. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 11:14-15:4. In Wexford's own words, the process is "designed to reduce offsite care costs."  Ex. 6, "Utilization Management" from Wexford website (Ex. 2, Ritz 30(b)(6) deposition).  As described above, Mr. Dean waited a week for his surgery to be approved at collegial review.

Second, Wexford's policy is to not timely schedule or hold collegial reviews. ██████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████  Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 43:2-10. ████████████
████████████████████████████████████████████████████████████████████████
████████████████████  Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 22:20-23:11.  This policy change demonstrates Wexford's knowledge of in the insufficiency of its prior policy.  Yet Wexford made no attempt to enforce this policy and thus it was a "paper policy" only that did not change the Wexford custom.  Wexford makes no effort to track how often collegial reviews fail to happen

on a weekly basis. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 23:12-15. Wexford has not punished employees which collegial reviews fail to happen on a weekly basis. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 23:22-24:17. Collegial reviews are conducted with greater frequency in other states where Wexford manages medical care in the prison system. Wexford MSJ Ex. G, Ritz Tr. 31:1-32:1. Wexford also discourages doctors from seeking to have off-site care approved outside of the weekly collegial review meeting. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 27:5-21.  As described above, Mr. Dean waited a week for his surgery to be approved at collegial review.  Only once that approval happened could Wexford even contact the outside doctor to schedule the surgery. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 32:12-33:10.  Wexford punishes employees who violate its policy of not scheduling outside medical appointments or procedures prior to collegial review approval, in marked contrast to other policies it does not punish employees for violating.  *Compare* Wexford MSJ Ex. F Ex. F, Ritz 30(b)(6) Tr. 33:4-10 (punishment for collegial review policy violation) *with* Wexford MSJ Ex. F Ex. F, Ritz 30(b)(6) tr. 40:11-41:3 (no punishment if services not completed by targeted completion date).

Third, Wexford's policy is to not timely schedule off-site medical appointments and procedures.



Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 45:23-46:8.

Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 35:20-36:11. But Wexford makes no attempt to track if this 10-day policy is actually followed. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 36:12-21. Wexford's corporate representative had no idea if Wexford made any attempt to enforce the 10-day policy. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 38:5-12.  Mr. Dean's surgery was not scheduled until June 23, 2016.  Ex. L, Springfield Clinic William K. Dean 82.

Fourth, Wexford's policy is to restrict its patients from actually undergoing off-site care in a timely fashion. But Wexford employees face no consequences if a procedure is not completed by the targeted completion date, indicating that the policy change is paper only.  *See* Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 40:3-5, 40:11-41:3  As described above, Mr. Dean's surgery was not completed by the "targeted completion date."

**116.  Springfield Clinic's records for May 25, 2016, state "Dr. Nawoor called and wants to know when procedure is going to be scheduled. He asked as soon as you find out please call**

Chad the nurse at T'ville Correctional Center." **Exhibit 1 to Exhibit L, deposition of William Severino, pg. 102.**

**Response:** Undisputed that Springfield Clinic's May 25, 2016 records state that Dr. Nawoor called on that date, disputed to the extent that the statement from Dr. Nawoor in these records is hearsay and cannot be offered in admissible form. *See United States v. Borrasi*, 639 F.3d 774, 780 (7th Cir. 2011).**117. Taylorville's Medical Records Director called Dr. Severino's office on May 11, May 17, and May 23, 2017, about Plaintiff's surgery to make sure he remained "in the loop" on Plaintiff's care. Exhibit J, deposition of Chad Christer, pg. 37-38.**

**Response:** Disputed that Taylorville's Medical Records Director made any calls to Dr. Severino's office May 11, 17, or 23, 2017. Ex. 12, Springfield Clinic William K. Dean 61-119 (complete task record for Mr. Dean). Disputed as to the fact that Taylorville's Medical Records Director made a call to Dr. Severino's office on May 11, 2016. Springfield Clinic's medical records indicate calls from Christer on May 17 and May 23, 2016, but there is no record of a call on May 11, 2016. Ex. 12, Springfield Clinic William K. Dean 61-119 (complete task record for Mr. Dean).

**132. On June 23, 2016, Springfield Clinic's records reflect Plaintiff's surgery was scheduled for July 19, 2016, and that Taylorville was notified. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 82-83.**

**Response:** The records cited to by Wexford indicate that Taylorville was not notified until June 24, 2016. *See* Wexford MSJ Ex. L, Springfield Clinic William K. Dean 83 (6/24/2016 1:26 PM task).

**140. On August 26, 2016, Plaintiff saw an oncologist. Exhibit D, deposition of Nivedita Dhar, pg. 112.**

**Response:** This fact must be disregarded by the Court because Wexford failed to include documentary evidence in support of this fact. The evidence cited is merely counsel's "represent[ation]" that Mr. Dean saw an oncologist on August 26. Because the evidence submitted by Wexford fails to support this purported undisputed fact, Wexford has "fail[ed] to meet [its] initial burden to 'put forth evidence showing the absence of a genuine dispute of material fact.'" *See Kremer v. City of Decatur*, 2014 WL 793465, at *2 (C.D. Ill. Feb. 26, 2014) (quoting *Carroll v. Lynch*, 698 F.2d 561, 564 (7th Cir. 2012)).

**145. Non-formulary medications are those not commonly used that may have high toxicity, drug interactions, or complications and must go through a pharmacy review process. Exhibit C, deposition of Kathy Galvin, pg. 159-60; Exhibit G, deposition of Stephen Ritz, pg. 94-95.**

**Response:** Non-formulary medications also tend to be more expensive than formulary medications. Ex. 9, ███████████ Wexford MSJ Ex. G, Ritz Tr. 104:7-105:20.

**146.  The review process for non-formulary medications looks at medical necessity and clinical appropriateness of the medications and makes a recommendation on approval or nonapproval.  Exhibit G, deposition of Stephen Ritz, pg. 94-95.**

**Response:**  The review process also examines the cost of the drug involved.  Wexford MSJ Ex. G, Ritz Tr. 104:7-105:20.  Dr. Ritz had questions about and discussed the fact that Votrient was "expensive" with the Wexford pharmacologist before Mr. Dean's Votrient prescription was granted non-formulary approval.  Wexford MSJ Ex. A, Nawoor Tr. 300:11-17; *see also* Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001477 (11/2/2016 note from Dr. Nawoor: "Dr. Ritz will be talking to the oncologist about alternative drug.").

**148. The length of the non-formulary review process depends on the availability of the clinical information, the input and discussion by the pharmacy team, need for additional information from the site, and need to review the information in the context of guidelines such as NCCN. Exhibit G, deposition of Stephen Ritz, pg. 97.**

**Response:**  The length of the non-formulary process may also be unexplained by these factors.  Nurse Galvin described the length of the non-formulary process for Mr. Dean's Votrient prescription as "not typical."  Wexford MSJ Ex. C, Galvin Tr. 160:2-5.  Nurse Galvin testified that she had never "seen a drug in [her] experience that took this amount of time to be approved."  Wexford MSJ Ex. C, Galvin Tr. 160:23-161:2.  Mincy raised the delay in approving Mr. Dean's cancer treatment to her supervisor, asking "[i]s this not a lengthy amount of time before starting this medicating or substituting another one?"  Ex. 25, Dean v. Wexford, et al. (17-3112) IDOC No.: 001028 (10/28/16 email from L. Mincy to C. Hobrock).

**152. Ms. Galvin had no knowledge of or involvement in Plaintiff's prescription for or receipt of Votrient.  Exhibit C, deposition of Kathy Galvin, pg. 147-48, 161-62.**

**Response:**  Galvin reviewed every single medication record at Taylorville Correctional Center on a weekly basis during the time she was Director of Nursing, including in November 2016.  Wexford MSJ Ex. C, Galvin Tr. 158:5-20.  Galvin testified that she "almost certainly" would have reviewed the medication record for Mr. Dean's Votrient prescription.  Wexford MSJ Ex. C, Galvin Tr. 158:18-20.

Furthermore, Nurse Mincy testified that Nurse Galvin was involved in the process when drugs not listed on the formulary needed to be ordered.  Mincy MSJ Ex. B, Mincy Tr. 203:6-14.

### C. Disputed Immaterial Facts

The following facts were taken from Wexford Defendants' Motion for Summary Judgment

(Dkt. 100). Mr. Dean disputes these facts, and he contends they are not material:

**11. At Taylorville, Ms. Galvin did not provide patient care and was not a diagnosing entity. Exhibit C, deposition of Kathy Galvin, pg. 36, 58, 90.**

<u>Response:</u> Galvin spoke with patients about their health and/or care when they approached her, Wexford MSJ Ex. C, Galvin Tr. 35:23-36:2, and ███████████████████████████████ ███████████████████████.

Whether Galvin provided patient care or was a diagnosing entity is not probative of whether evidence exists by which a jury could find that Galvin was deliberately indifferent to the serious medical need, or negligent in her care, of Mr. Dean. As the Director of Nursing, Galvin was responsible for ensuring that Wexford's policies and IDOC's institutional directives were followed by staff at Taylorville, including policies and guidelines that require medical procedures and off-site referrals are to be scheduled promptly. Wexford MSJ Ex. C., Galvin Tr. 32:11-13. Galvin was responsible for coordinating offender care, supervising the nursing staff, supervising the sick call, and supervising the Wexford staff member responsible for scheduling outside appointments. *See* Wexford MSJ Ex. C, Galvin Tr. 29:7-35:22; ██████████████████████████████████ ███████████████████████████████████████.

**47. Ultrasound is probative of kidney stones. Exhibit G, deposition of Stephen Ritz, pg. 116; Exhibit H, deposition of Bruce Barnett, pg. 122-123.**

<u>Response:</u> The proposed fact is both incorrect and not supported by the cited testimony. Dr. Ritz acknowledged that there are some circumstances in which an ultrasound is not probative of kidney stones, Wexford MSJ Ex. G, Ritz Tr. 116:12-15, and Dr. Barnett testified that a renal ultrasound is not sufficient to rule in kidney stones, Wexford MSJ Ex. H, Barnett Tr. 122:12-16. A CT scan without contrast is the preferred test for detecting kidney stones because a renal ultrasound does not visualize the ureters, is operator dependent, and cannot detect small kidney stones. Wexford MSJ Ex. D, Dhar Tr. 74:1-75:18; Wexford MSJ Ex. I, Metwalli Tr. 55:21-58:11; Wexford MSJ Ex. K, Racenstein Tr. 39:18-40:5, 65:7-16.

Whether or not an ultrasound can detect kidney stones is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean. The standard of care for hematuria is to perform a CT with contrast and a cystoscopy, regardless of whether a patient has a history of kidney stones. Wexford MSJ Ex. D, Dhar Tr. 91:25-92:9; Wexford MSJ Ex. L, Severino Tr. 47:20-48:4; Wexford MSJ Ex. I, Metwalli Tr. 45:7-46:16. Regardless of a patient's medical history, and even if a physician suspects kidney stones are causing a patient's hematuria, hematuria is to be considered malignant until proven otherwise. Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; ███████████████ ███████████████████████████████████████████████████████ And even if an ultrasound detects a stone, it has not

necessarily identified the cause of hematuria.  Wexford MSJ Ex. H, Barnett Tr. 123:1-9; Ex. 38, Kosierowski Tr. 105:18-23.  This is why an ultrasound, by itself, is not an appropriate workup for hematuria.  Wexford MSJ Ex. I, Metwalli Tr. 56:22-57:9, 59:11-14.

**51. The targeted completion date for an ultrasound by an outside vendor is six weeks or less.  Exhibit G, deposition of Stephen Ritz, pg. 71.**

<u>Response:</u>  Wexford neglects to mention that, although Dr. Ritz testified that a "typical" targeted completion date for an ultrasound would be six weeks or less, he also testified that "if there's an instance where there seems to be more urgency than apparent, . . . the case may be attempted to be completed in a time frame that, normally, it wouldn't have been, perhaps sooner."  Wexford MSJ Ex. G, Ritz Tr. 71:6-25.  The targeted completion date is not a static number, but instead depends on "the availability of the service, the clinical urgency of the service, [] the patient's unique history[,] [a]nd the patient's specific . . . clinical findings."  Wexford MSJ Ex. G, Ritz Tr. 72:3-7.

The targeted completion date for an ultrasound is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean.  The targeted completion date is essentially meaningless because, as Wexford's corporate representative testified, although Wexford monitors whether services are completed before their target completion dates, "there are so many variables . . . that no individual employee or any individual physician or anyone else could really be held accountable" when a service is not completed before the target completion date.  Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 40:22-41:2.

**72.  On February 10, 2016, Plaintiff was not symptomatic, hypotensive, or otherwise presenting with emergency symptoms that required referral to the emergency department.  Exhibit A, deposition of Abdur Nawoor, pg. 277.**

<u>Response:</u>  Although Mr. Dean may not have been experiencing "emergency" symptoms, because more than six weeks had passed without Mr. Dean receiving treatment or a diagnosis, Mr. Dean's hematuria warranted referral to the emergency department.  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001340 (12/23/15 9:13 AM Medical Records Note); Wexford MSJ Ex. A, Nawoor Tr. 212:3-5 ("[If] hematuria persists, we have to go to the ER.").  Based on the amount of time that passed between Mr. Dean's first presentation of hematuria and his diagnosis, it was appropriate to send him to the emergency room regardless of whether he was symptomatic, hypotensive, or otherwise presenting with "emergency" symptoms.  Wexford MSJ Ex. H, Barnett Tr. 139:15-142:9.

Whether Mr. Dean was presenting with emergency symptoms is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean.  The fact that Mr. Dean was hemodynamically stable does not mean that Defendants acted appropriately in delaying his care.  Wexford MSJ Ex. H, Barnett Tr. 134:17-135:2.

**89. Dr. Severino did not order the CT on an expedited basis. Exhibit H, deposition of Bruce Barnett, pg. 135.**

**Response:**  Wexford misstates the testimony of Dr. Barnett they rely upon.  Dr. Barnett did not testify that Dr. Severino did not order the CT on an expedited basis.  To the contrary, Dr. Barnett testified that he "[didn't] know that [Dr. Severino] actually put a time frame on it" and that he was "not aware that [Dr. Severino] was explicit in when he wanted to do it or that anyone asked him."  Wexford MSJ Ex. H, Barnett Tr. 135:7-17.

This fact is immaterial because the time frame in which Dr. Severino ordered the CT is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean.  Dr. Severino is not a defendant and whether his conduct adhered to the standard of care is not at issue.  And, as Dr. Metwalli explained, when it comes to scheduling outside appointments or procedures for inmates, the onus is on those within the prison healthcare system to ensure the appointment or procedure is scheduled in a timely manner because outside physicians, such as Dr. Severino, have a limited "ability to make these things happen with a patient who's in an entirely different system."  Wexford MSJ Ex. I, Metwalli Tr. 85:1-19; 92:6-18, 93:12-94:2 ("[A]t the end of the day, the people who had the capability of making these things happen in a timely fashion are the [prison] doctors.").

**100.  As of April 14, 2016, Dr. Severino planned to consult with a vascular surgeon and coordinate with the vascular surgeon to perform surgery on Plaintiff for a right renal mass with a vena cava thrombosis.  Exhibit 1 to Exhibit L, deposition of William Severino, pg. 109.**

**Response:**  This fact must be disregarded by the Court because Wexford failed to include documentary evidence in support of this fact because it does not reference a vascular surgeon, much less consulting and coordinating with one for surgery.  Ex. L, Springfield Clinic William K. Dean 109 (Ex. 1, Severino deposition).  Because the evidence submitted by Wexford fails to support this purported undisputed fact, Wexford has "fail[ed] to meet [its] initial burden to 'put forth evidence showing the absence of a genuine dispute of material fact.'"  *See Kremer v. City of Decatur*, 2014 WL 793465, at *2 (C.D. Ill. Feb. 26, 2014) (quoting *Carroll v. Lynch*, 698 F.2d 561, 564 (7th Cir. 2012)).

This fact is immaterial because the precise workup that Dr. Severino wanted to conduct prior to surgery is not at issue in this case.  Dr. Severino is not a defendant and whether his conduct adhered to the standard of care is not at issue.

**101.  Dr. Severino requested a chest X-ray on Plaintiff. Exhibit L, deposition of William Severino, pg. 21.**

**Response:**  This fact must be disregarded by the Court because Wexford failed to include documentary evidence in support of this fact.  The cited deposition testimony on supports that Dr. Severino "wanted a chest x-ray."  Ex. L, Severino Tr. 21:8-9.  It does not say that Dr. Severino requested or ordered a chest x-ray.  Because the evidence submitted by Wexford fails to support this purported undisputed fact, Wexford has "fail[ed] to meet [its] initial burden to 'put forth evidence showing the absence of a genuine dispute of material fact.'"  *See Kremer v. City of*

*Decatur*, 2014 WL 793465, at *2 (C.D. Ill. Feb. 26, 2014) (quoting *Carroll v. Lynch*, 698 F.2d 561, 564 (7th Cir. 2012)).

This fact is immaterial because the precise workup that Dr. Severino wanted to conduct prior to surgery is not at issue in this case. Dr. Severino is not a defendant and whether his conduct adhered to the standard of care is not at issue.

**109. On May 5, 2016, Springfield Clinic's records reflect the vascular surgeon opined the tumor thrombus could extend above the hepatic vein and that it would be advisable to have the CT film further reviewed. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 102.**

**Response:** The only evidence cited to support the fact that the vascular surgeon made these statements is inadmissible hearsay subject to no exception. Thus the fact is properly disregarded because it cannot be supported by admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). Dr. Severino's statement was not made for the purposes of medical treatment or diagnosis under Fed. R. Evid. 803(4) because "Rule 803(4) does not purport to except, nor can it reasonably be interpreted as excepting, statements by the person providing the medical attention to the patient." *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996) (citing *Gong v. Hirsch*, 913 F.2d 1269, 1273–74 & n. 5 (7th Cir.1990)).

This fact is immaterial because a consulting surgeon's opinions about what was "advisable" are not at issue in this case. Neither this vascular surgeon nor Dr. Severino are defendants and whether their conduct adhered to the standard of care is not at issue.

**130.  On June 23, 2016, Springfield Clinic's records indicate Dr. Hazelrigg's first date to participate in Plaintiff's surgery was July 18, 2016. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 82.**

**Response:** Undisputed that Springfield Clinic's June 23, 2016 records so indicate, disputed to the extent that the message from an SIU employee on June 23, 2016 at 12:16 PM regarding scheduling is hearsay and cannot be offered in admissible form. *See United States v. Borrasi*, 639 F.3d 774, 780 (7th Cir. 2011).

This fact is immaterial because the schedules of the surgeons that Dr. Severino wanted to assist him are not at issue in this case. Neither Dr. Severino nor Dr. Hazelrigg are defendants in this case and whether their conduct adhered to the standard of care is not at issue.

**131. On June 23, 2016, Springfield Clinic's records indicate Dr. Ryan's first date to participate in Plaintiff's surgery was July 19, 2016. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 82.**

**Response:** Undisputed that Springfield Clinic's June 23, 2016 records so indicate, disputed to the extent that the message from regarding Dr. Ryan's schedule from June 23, 2016 at 1:53 PM regarding scheduling is hearsay and cannot be offered in admissible form. *See United States v. Borrasi*, 639 F.3d 774, 780 (7th Cir. 2011).

This fact is immaterial because the schedules of the surgeons that Dr. Severino wanted to assist him are not at issue in this case. Neither Dr. Severino nor Dr. Ryan are defendants in this case and whether their conduct adhered to the standard of care is not at issue.

**133. On June 23, 2016, Springfield Clinic's records reflect Plaintiff would be scheduled to see his cardiologist at Prairie Heart 7-10 days prior to the surgery. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 83.**

**Response:**  The records cited by Wexford indicate, at most, that Taylorville's Medical Records Director, Chad Christer, told Springfield Clinic that he would try to schedule Mr. Dean to see a cardiologist 7-10 days prior to the procedure, not that any such appointment was actually scheduled or that Christer had the ability to guarantee that scheduling. *See* Wexford MSJ Ex. L, Springfield Clinic William K. Dean 83 (6/24/2016 1:26 PM task).

This fact is immaterial because the precise workup that Dr. Severino wanted to conduct prior to surgery is not at issue in this case. Dr. Severino is not a defendant in this case and whether his conduct adhered to the standard of care is not at issue.

**156. Wexford's Utilization Management Department did not non-approve or prescribe alternate treatment plans for any requested care for Plaintiff but instead approved everything that was requested. Exhibit G, deposition of Stephen Ritz, pg. 114.**

**Response:**  Mr. Dean's Opdivo prescription was non-approved through the collegial review process, where it was originally sent. Wexford MSJ Ex. G, Ritz Tr. 107:21-109:9. Mr. Dean's February 2, 2016 ultrasound was an alternate treatment plan. Dr. Einwohner initiated the January 2016 collegial review, and recommended that Mr. Dean receive "re-imaging and urology eval." Ex. 5, Einwohner Records Bates #000061. By "re-imaging," Dr. Einwohner meant a CT scan or other image that Mr. Dean had received previously, not an ultrasound, which he had not received previously. Wexford MSJ Ex. H, Barnett Tr. 149:1-5. Dr. Ritz overruled Dr. Einwohner's recommendation for a urology referral and CT scan and "suggest[ed] [a] renal ultrasound." Wexford MSJ Ex. E, IDOC Taylorville Med Recs 0001343 (1/13/16 12:55pm Medical Records Note).

This is immaterial because Mr. Dean's allegations all relate to Wexford's failure to timely schedule him for essential procedures and appointments. There are no allegations in this lawsuit that Wexford failed to approve certain procedures and appointments.

### D.  Undisputed Immaterial Facts

The following facts were taken from Wexford Defendants' Motion for Summary Judgment

(Dkt. 100). Mr. Dean does not dispute these facts, but he contends they are not material:

**20.  The urine strain is done to see if the patient is passing stones through the urine. Exhibit A, deposition of Abdur Nawoor, pg. 213-14.**

**Response:** The purpose of a urine strain is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need of Mr.

Dean.  A urine strain is "not very accurate" and is not used by experts in the field.  Wexford MSJ Ex. D, Dhar Tr. 67:24-68:5, 123:13-22.  Moreover, hematuria is to be considered malignant until proven otherwise, and a urine strain is not a diagnostic tool and thus cannot detect malignancy. Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13, 123:4-12; Ex. 4 at 293, ██████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████

**21. Plaintiff refused the urine strain. Exhibit A, deposition of Abdur Nawoor, pg. 214.**

**Response:** Mr. Dean's refusal of the urine strain is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean.  A urine strain is "not very accurate" and is not used by experts in the field.  Wexford MSJ Ex. D, Dhar Tr. 67:24-68:5, 123:13-22.  Even though a urine strain can sometimes detect kidney stones, the detection of kidney stones does not necessarily mean you have identified the cause of a patient's hematuria.  Wexford MSJ Ex. H, Barnett Tr. 122:20-123:13; Ex. 38, Kosierowski Tr. 105:18-23..

**23. Plaintiff had a history of kidney stones with lithotripsy procedure.   Exhibit A, deposition of Abdur Nawoor, pg. 215-16; Exhibit D, deposition of Nivedita Dhar, pg. 72; Exhibit A, Plaintiff's medical records, Bates 817, 838-39.**

**Response:** Mr. Dean's history of kidney stones is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean.  The standard of care for hematuria is to perform a CT with contrast and a cystoscopy, regardless of whether a patient has a history of kidney stones.  Wexford MSJ Ex. D, Dhar Tr. 91:25-92:9; Wexford MSJ Ex. L, Severino Tr. 47:20-48:4; Wexford MSJ Ex. I, Metwalli Tr. 45:7-46:16.  Regardless of a patient's medical history, hematuria is to be considered malignant until proven otherwise.  Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; ████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████

**39.  Blood in the urine is a common presentation of kidney stones. Exhibit G, deposition of Stephen Ritz, pg. 116.**

**Response:** Whether hematuria can be caused by kidney stones is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean.  Hematuria is also a common presentation of kidney cancer.  Wexford MSJ Ex. D, Dhar Tr. 66:2-4.  Hematuria is to be considered malignant until proven otherwise.  Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; ██████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████  The standard of care for hematuria is to perform a CT with contrast and a cystoscopy, regardless of whether kidney stones are the suspected cause of hematuria.  Wexford MSJ Ex. D, Dhar Tr. 91:25-92:9; Wexford MSJ Ex. L, Severino Tr. 47:20-48:4; Wexford MSJ Ex. I, Metwalli Tr. 45:7-46:16.  And, kidney stones may be present alongside, but not causing, hematuria.  Wexford MSJ Ex. H, Barnett Tr. 122:20-123:13; Wexford MSJ Ex. I, Metwalli Tr. 46:12-16.

**40. Plaintiff's history of kidney stones puts him at higher risk for development of stones compared to people without a history of stone formation. Exhibit H, deposition of Bruce Barnett, pg. 115.**

**Response:** Whether Mr. Dean was at a higher risk for developing kidney stones as compared to people without a history of kidney stones is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean.  Mr. Dean was at a higher risk for developing kidney cancer for the same reasons he was at a higher risk for developing kidney stones.  Wexford MSJ Ex. H, Barnett Tr. 166:18-167:3. The standard of care for hematuria is to perform a CT with contrast and a cystoscopy, regardless of whether a patient has a history of kidney stones.  Wexford MSJ Ex. D, Dhar Tr. 91:25-92:9; Wexford MSJ Ex. L, Severino Tr. 47:20-48:4; Wexford MSJ Ex. I, Metwalli Tr. 45:7-46:16.  Regardless of a patient's medical history, hematuria is to be considered malignant until proven otherwise.  Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; ███████████████████████████████ ████████████

**42.  CT with contrast carries higher risk than an ultrasound because of the exposure to radiation and contrast dye.  Exhibit H, deposition of Bruce Barnett, pg. 121.**

**Response:**  The suggested fact misstates and is not supported by the cited evidence.  Moreover, whether a CT with contrast carries higher risk as compared to an ultrasound is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean.  Defendants have pointed to no facts suggesting Defendants weighed the risks of a CT with contrast against the risks of an ultrasound when deciding on a course of care for Mr. Dean.  This makes sense, because "[y]ou can find a way to give contrast to almost any patient. You just use a different kind of contrast. . . . [T]he fact that someone has a slightly more elevated risk of an adverse reaction from contrast, if you have an important reason to do the study, virtually never bars a study from being done." Wexford MSJ Ex. H, Barnett Tr. 169:20-170:5.  Moreover, the risks associated with CT with contrast did not prevent Mr. Dean from receiving a CT with contrast on multiple occasions before and after the removal of his right kidney. *See, e.g.*, Ex. 26, IDOC Taylorville Med Recs 000435-36 (2/8/13 CT with contrast); Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001681-82 (4/12/16 CT with contrast); Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001683-85 (6/8/16 CT with contrast); Ex. 27, DEAN-CANCER-CARE 000550-53 (5/5/17 CT with contrast); Ex. 28, DEAN-CANCER-CARE 000560-64 (9/9/16 CT with contrast); Ex. 29, DEAN-CANCER-CARE 000645-48 (2/10/17 CT with contrast).

**43.  The risks associated with exposure to contrast dye in CT with contrast are higher for a patient with decreased renal function.  Exhibit H, deposition of Bruce Barnett, pg. 121.**

**Response:**  The suggested fact misstates and is not supported by the cited evidence.  Moreover, whether the risks associated with a CT with contrast are higher for a patient with decreased renal function is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean. "You can find a way to give contrast to almost any patient. You just use a different kind of contrast. . . . [T]he fact that someone has a slightly more elevated risk of an adverse reaction from contrast, if you have an important reason to do the study, virtually never bars a study from being

34

done." Wexford MSJ Ex. H, Barnett Tr. 169:20-170:5. Moreover, Defendants have pointed to no facts suggesting Defendants considered the risks of a CT with contrast when deciding on a course of care for Mr. Dean. Moreover, Mr. Dean's renal health was not compromised to the point where he would not be able to undergo a CT with contrast, such as would make it appropriate to rely on a renal ultrasound. Wexford MSJ Ex. D, Dhar Tr. 123:23-124:18. Mr. Dean received a CT with contrast on multiple occasions before and after the removal of his right kidney, *see, e.g.*, Ex. 26, IDOC Taylorville Med Recs 000435-36 (2/8/13 CT with contrast); Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001681-82 (4/12/16 CT with contrast); Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001683-85 (6/8/16 CT with contrast); Ex. 27, DEAN-CANCER-CARE 000550-53 (5/5/17 CT with contrast); Ex. 28, DEAN-CANCER-CARE 000560-64 (9/9/16 CT with contrast); Ex. 29, DEAN-CANCER-CARE 000645-48 (2/10/17 CT with contrast), and his oncologist, Dr. Guaglianone, additionally relies on CT scans without contrast to monitor the progression of his disease, *see, e.g.*, Ex. 30, DEAN-CANCER-CARE 000544-46 (7/25/17 CT without contrast); Ex. 31, DEAN-CANCER-CARE 000641-44 (10/23/17 CT without contrast); Ex. 32, DEAN-CANCER-CARE 000541-43 (12/28/17 CT without contrast); Ex. 33, DEAN-CANCER-CARE 000633-35 (4/4/18 CT without contrast); Ex. 34, DEAN-CANCER-CARE 000532-34 (8/21/18 CT without contrast); Ex. 35, DEAN-CANCER-CARE 000629-32 (12/17/18 CT without contrast); Ex. 36, DEAN-CANCER-CARE 000622-24 (3/19/19 CT without contrast).

**44. Plaintiff had decreased renal function from kidney disease. Exhibit H, deposition of Bruce Barnett, pg. 114-15.**

**Response:** Mr. Dean's decreased renal function is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean. The workup for hematuria is the same regardless of a patient's medical history, Wexford MSJ Ex. D, Dhar Tr. 91:25-92:9; Wexford MSJ Ex. L, Severino Tr. 47:20-48:4; Wexford MSJ Ex. I, Metwalli Tr. 45:7-46:16, and hematuria is considered malignant until proven otherwise for all patients, Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; Ex. 4 at 293, ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Moreover, Mr. Dean's renal health was not compromised to the point where he would not be able to undergo a CT with contrast, such as would make it appropriate to rely on a renal ultrasound. Wexford MSJ Ex. D, Dhar Tr. 123:23-124:18. "[A] slightly more elevated risk of an adverse reaction from contrast, if you have an important reason to do the study, virtually never bars the study from being done." Wexford MSJ Ex. H, Barnett Tr. 169:24-170:3. In fact, Mr. Dean has received a CT with contrast on multiple occasions. *See, e.g.*, Ex. 26, IDOC Taylorville Med Recs 000435-36 (2/8/13 CT with contrast); Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001681-82 (4/12/16 CT with contrast); Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001683-85 (6/8/16 CT with contrast); Ex. 27, DEAN-CANCER-CARE 000550-53 (5/5/17 CT with contrast); Ex. 28, DEAN-CANCER-CARE 000560-64 (9/9/16 CT with contrast); Ex. 29, DEAN-CANCER-CARE 000645-48 (2/10/17 CT with contrast).

**45. Ultrasound is a low-risk and non-invasive test that uses sound waves, not radiation, and can be done at the prison. Exhibit G, deposition of Stephen Ritz, pg. 77-78; Exhibit H, deposition of Bruce Barnett, pg. 77-78.**

**Response:** This description of an ultrasound is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean. That an ultrasound is low-risk, non-invasive, and capable of being done at the prison does not bear on whether it was the appropriate diagnostic test to order, by itself, to determine the cause of Mr. Dean's hematuria. Moreover, there is no evidence that Defendants decided to order an ultrasound for Mr. Dean *because* it was low-risk and non-invasive. Mr. Dean concedes it is material that an ultrasound can be done at the prison, as the reduced cost appears to be the only reason this course of treatment was followed. *See* Responses to Wexford's Disputed Material Facts 32, 38, 46.

**75. Plaintiff was slightly anemic but not severely. Exhibit H, deposition of Bruce Barnett, pg. 139.**

**Response:** The extent to which Mr. Dean was anemic at this point in time is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean. Hematuria is considered malignant until proven otherwise, Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; ███████████ ████████████████████████ and Defendants did not rule malignancy in or out for almost four months. Based on the amount of time that passed between Mr. Dean's first presentation of hematuria and his diagnosis, it was appropriate to send him to the emergency room to ensure he received timely diagnostic testing, regardless of Mr. Dean's iron levels. Wexford MSJ Ex. H, Barnett Tr. 139:15-142:9.

**76. Plaintiff remained hemodynamically stable and without urinary drainage problem. Exhibit D, deposition of Nivedita Dhar, pg. 87-88.**

**Response:** Whether Mr. Dean was stable and not experiencing a urinary drainage problem is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean. The fact that Mr. Dean was hemodynamically stable does not mean that Defendants acted appropriately in delaying his care. Wexford MSJ Ex. H, Barnett Tr. 134:17-135:2. Hematuria is considered malignant until proven otherwise, Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; ███████████ ████████████████████████████████████ Based on the amount of time that passed between Mr. Dean's first presentation of hematuria and his diagnosis, it was appropriate to send him to the emergency room to ensure he received timely diagnostic testing, regardless of whether he remained hemodynamically stable. Wexford MSJ Ex. H, Barnett Tr. 139:15-142:9.

**78.  Plaintiff remained hemodynamically stable during the relevant time. Exhibit H, deposition of Bruce Barnett, pg. 141-42**

**Response:** Whether Mr. Dean was hemodynamically stable is not probative of whether evidence exists by which a jury could find that Defendants were deliberately indifferent to the serious medical need, or negligent in their care, of Mr. Dean.   The fact that Mr. Dean was hemodynamically stable does not mean that Defendants acted appropriately in delaying his care. Wexford MSJ Ex. H, Barnett Tr. 134:17-135:2.  Hematuria is considered malignant until proven otherwise, Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; ███████████████████████ ███████████ and Defendants did not rule malignancy in or out for almost four months.  Based on the amount of time that passed between Mr. Dean's first presentation of hematuria and his referral to an urologist, it was appropriate to send him to the emergency room to ensure he received timely diagnostic testing, regardless of whether he remained hemodynamically stable. Wexford MSJ Ex. H, Barnett Tr. 139:15-142:9.

**102.  Dr. Severino wanted a vascular surgeon to review the CT film to see if he could determine how high the tumor thrombus had gone up the IVC. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 106.**

**Response:**  This fact is immaterial because the precise workup that Dr. Severino wanted to conduct prior to surgery is not at issue in this case.  Dr. Severino is not a defendant and whether his conduct adhered to the standard of care is not at issue.

**118.  Springfield Clinic's records for June 1, 2016, indicate "Dr. Coakley reviewed the films and would like the patient to have another CT. Patient needs a CT abd/pelv/chest with IV and oral contrast and to see Dr. Severino back in the office to review before deciding on appropriate surgery. Need to call Chad at the prison and let him know so he can get approved and scheduled." Exhibit 1 to Exhibit L, deposition of William Severino, pg. 102.**

**Response:**  This fact is immaterial because the precise workup that Dr. Severino or Dr. Coakley wanted to conduct prior to surgery is not at issue in this case.  Neither Dr. Severino nor Dr. Coakley are defendants and whether their conduct adhered to the standard of care is not at issue.

**121.  As of the June 9, 2016, visit and following the second CT, Dr. Severino was concerned the IVC thrombus had reached above the diaphragm and was close enough to the heart he should involve a cardiothoracic surgeon to open the chest to access the tumor from above. Exhibit L, deposition of William Severino, pg. 27.**

**Response:**  This fact is immaterial because the precise workup that Dr. Severino wanted to conduct prior to surgery is not at issue in this case.  Dr. Severino is not a defendant and whether his conduct adhered to the standard of care is not at issue.

**122.  Springfield Clinic's records for June 10, 2016, indicate Dr. Severino wanted to speak to "either Dr. Hazelrigg or the nurse about [Plaintiff]. Would like to discuss before making appointment." Exhibit 1 to Exhibit L, deposition of William Severino, pg. 90.**

**Response:**  This fact is immaterial because the precise workup that Dr. Severino wanted to conduct prior to surgery is not at issue in this case.  Dr. Severino is not a defendant and whether his conduct adhered to the standard of care is not at issue.

**123. Dr. Hazelrigg is a cardiothoracic surgeon. Exhibit L, deposition of William Severino, pg. 30.**

**Response:**  This fact is immaterial because the precise workup that Dr. Severino wanted to conduct prior to surgery and the identity of the surgeons he wanted to assist him are not at issue in this case.  Neither Dr. Severino nor Dr. Hazelrigg are defendants in this case and whether their conduct adhered to the standard of care is not at issue.

**124.  Springfield Clinic's records for June 10, 2016, state "info is on Dr. H desk to review" and "once H reviews films and gives me the OK, then we can start coordinating and scheduling for surgery." Exhibit 1 to Exhibit L, deposition of William Severino, pg. 90.**

**Response:**  This fact is immaterial because the precise workup that Dr. Severino wanted to conduct prior to surgery and the identity of the surgeons he wanted to assist him are not at issue in this case.  Neither Dr. Severino nor Dr. Hazelrigg are defendants in this case and whether their conduct adhered to the standard of care is not at issue.

**125.  Springfield Clinic's records for June 10, 2016, state Dr. Hazelrigg requested to see Plaintiff. Exhibit 1 to Exhibit L, deposition of William Severino, pg. 90.**

**Response:**  This fact is immaterial because the precise workup that Dr. Severino wanted to conduct prior to surgery and the identity of the surgeons he wanted to assist him are not at issue in this case.  Neither Dr. Severino nor Dr. Hazelrigg are defendants in this case and whether their conduct adhered to the standard of care is not at issue.

**136.  Dr. Severino described Plaintiff's nine-hour surgery as the most complicated urologic surgery that can be done, in that the patient is bled out, their heart is stopped, the patient is essentially dead with no bleeding, the surgery is performed, and the tumor removed. Exhibit L, deposition of William Severino, pg. 14, 36.**

**Response:**  Whether or not this surgery is the most complicated urologic surgery in Dr. Severino's opinion is immaterial to the issue of whether Wexford delayed scheduling that surgery.

**137. july 1 Plaintiff's surgical team consisted of approximately 10 people, including three surgeons. Exhibit L, deposition of William Severino, pg. 37.**

**Response:**  The number of surgeons and other people on Mr. Dean's surgical team is immaterial to the issue of whether Wexford delayed in scheduling that surgery.

38

## II.    Plaintiff's Response to Mincy's Statement of Undisputed Material Facts

### A.  Undisputed Material Facts

The following facts were taken from Mincy's Motion for Summary Judgment (Dkt. 101).

The numbering from Mincy's Motion has been maintained. Mr. Dean acknowledges that these

facts are undisputed and material:

5.   Lisa Mincy was the Health Care Unit Administrator ("HCUA") at Taylorville from December 16, 2015, to January 15, 2017. (Deposition of Lisa Mincy, attached hereto as Exhibit 2, 14:19–15:8.)

9.   As HCUA, Ms. Mincy reported to Cindy Hobrock—a regional IDOC medical administrator—the IDOC medical director, the wardens at Taylorville, and the correctional majors at Taylorville. (Ex. 2, 44:14–45:2.)

23. Plaintiff claims he began urinating blood at Taylorville on December 19, 2015. (Doc. 72, ¶ 20.)

24. Plaintiff claims he showed Ms. Mincy urine samples reflecting gross hematuria on multiple occasions but is unable to identify any specific occasion other than on February 10, 2016. (Ex. 1, 315:6–22.)

25. Plaintiff claims Ms. Mincy, Dr. Nawoor, and Kathy Galvin examined a urine sample from Plaintiff on February 10, 2016, and observed blood clots in the urine. (Ex. 1, 76:15–77:16.)

27. Shortly after meeting Plaintiff, Ms. Mincy recalls being informed about Plaintiff's conditions and recalls being concerned about the length of time Plaintiff had experienced hematuria. (Ex. 2, 75:9–80:4.)

29. Ms. Mincy understood Dr. Einwohner to be a specialist and understood Plaintiff was under the care of Dr. Einwohner for his hematuria (Ex. 2, 75:9–80:4.)

32. Ms. Mincy recalls learning Plaintiff needed surgery to remove a right kidney mass and that this was discussed during quality assurance meetings. (Ex. 2, 165:21–166:19.)

33. Plaintiff needing surgery to remove a right kidney mass was discussed during multiple quality assurance meetings. (Ex. 2, 174:11–176:23.)

35. Chad Christer was the medical records supervisor and was responsible for scheduling outside medical appointment. (Ex. 2, 153:20–154:22.)

38. Ms. Mincy repeatedly asked Mr. Christer about scheduling Plaintiff's surgery and Mr. Christer provided Ms. Mincy with dates of calls he made to Dr. Severino's office. (Ex. 2, 194:23–195:18.)

39. Dr. Severino is a board certified urologist—which is surgical subspecialty focusing on the urinary tracts of men, women, and children. (Deposition of Dr. Severino, attached hereto as Exhibit 3, 6:11–21.)

41. Plaintiff had an aggressive disease which required very complex surgery. (Ex. 3, 13:16–14:6.)

## B. Disputed Material Facts

The following facts were taken from Mincy's Motion for Summary Judgment (Dkt. 101).

The numbering from Mincy's Motion has been maintained. Mr. Dean disputes these facts but

acknowledges they would be material:

**7. As HCUA, Ms. Mincy's job duties and responsibilities included completing reports, presenting data and information at meetings, and serve as the liaison between medical administrators for the Illinois Department of Corrections ("IDOC") and the contractual medical providers at Taylorville. (Ex. 2, 43:9–44:17.)**

**Response:** Undisputed that Nurse Mincy's job duties included these things, but disputed that this is a complete list. For instance, Nurse Mincy was also responsible for administering the medical grievance system and "doing the line," which was a less formal medical grievance system, at Taylorville. Mincy MSJ Ex. B, Mincy Tr. 67:18-24, 70:15-71:5. Nurse Mincy also personally met with and reviewed the care of every inmate in the Taylorville infirmary every day. Mincy MSJ Ex. B, Mincy Tr. 72:23-74:1.

**8. As HCUA, Ms. Mincy attended quality assurance meeting where information on outside referrals, upcoming outside appointments, hospitalization of offenders was discussed. (Ex. 2, 49:9–50:17.)**

**Response:** This is not an exhaustive list of the topics discussed at quality assurance meetings. Patients with "ongoing condition[s]" were also discussed, as were all patients who had been to collegial review. Mincy MSJ Ex. B, Mincy Tr. 51:3-20. All "pending surgeries," meaning where a "doctor had written for surgery" or even if they were "thinking about doing surgery" with a patient, were discussed. Mincy MSJ Ex. B, Mincy Tr. 51:21-52:5.

**10. Ms. Mincy was not responsible for Plaintiff's medical care. (Ex. 2, 63:24–64:5.).**

**Response:** Nurse Mincy testified that, as part of the duties of her role as liaison between the medical administrators for IDOC and Wexford, she was responsible for communicating with IDOC's regional medical administrator, Cindy Hobrock, if she ever "questioned somebody's care" due to her "background" as a nurse. Mincy MSJ Ex. B, Mincy Tr. 64:23-66:2. Because her duties included the duty to bring medical care concerns to the specific attention of senior IDOC officials, she was "responsible" for the care of all the inmates at Taylorville.

Nurse Mincy raised questions about Mr. Dean's medical care on multiple occasions, including when she became concerned by his chronic gross hematuria and questioned whether he had seen a specialist, Mincy MSJ Ex. B, Mincy Tr. 75:9–80:4, and when she became concerned by the delay

in scheduling his surgery and questioned the delay in quality assurance meetings, Mincy MSJ Ex. B, Mincy Tr. 174:11–176:23.  Despite these concerns she failed to communicate these issues to senior IDOC officials.

**11. Dr. Nawoor—the doctor at Taylorville—and the nursing staff were responsible for the provision of medical care to Plaintiff. (Ex. 2, 63:24–64:18.)**

**Response:**  Undisputed that Dr. Nawoor and the nursing staff were responsible for the provision of medical care to Plaintiff.  Disputed that this constitutes an exhaustive list of those IDOC and Wexford employees responsible for Mr. Dean's medical care.  Nurse Mincy was responsible for Mr. Dean's medical care, as explained in the response to Mincy's Undisputed Material Fact No. 10.

Nurse Mincy also was responsible for Mr. Dean's medical care, as evidenced by the fact that she raised questions about Mr. Dean's medical care on multiple occasions, including when she became concerned by his chronic gross hematuria and questioned whether he had seen a specialist, Mincy MSJ Ex. B, Mincy Tr. 75:9–80:4, and when she became concerned by the delay in scheduling his surgery and questioned the delay in quality assurance meetings, Mincy MSJ Ex. B, Mincy Tr. 174:11–176:23.  Yet, she failed to communicate these issues to senior IDOC officials.

**12. Ms. Mincy's job duties and responsibilities did not include the provision of nursing care. (Ex. 2, 64:9–18.)**

**Response:**  As described in response to Mincy's Undisputed Material Fact No. 10, one of Nurse Mincy's job duties was to bring concerns about medical care to the attention of senior IDOC officials based on Nurse Mincy's "background" as nurse.  Furthermore, Nurse Mincy continues to refer to herself as a nurse when discussing her role in healthcare at Taylorville.  Mincy MSJ Ex. B, Mincy Tr. 64:3 ("I'm a nurse."), 80:3-4 ("I'm a nurse.  I'm not a specialist.").

Nurse Mincy was also responsible for the provision of nursing care to Mr. Dean, as evidence by the fact that she raised questions about Mr. Dean's medical care on multiple occasions, including when she became concerned by his chronic gross hematuria and questioned whether he had seen a specialist, Mincy MSJ Ex. B, Mincy Tr. 75:9–80:4, and when she became concerned by the delay in scheduling his surgery and questioned the delay in quality assurance meetings, Mincy MSJ Ex. B, Mincy Tr. 174:11–176:23.

**13. As HCUA, Ms. Mincy was not involved with medications, treatments, scheduling, or making appointments—except to document it when required to present in meetings. (Ex. 2, 64:9–18.)**

**Response:**  As described in response to Mincy's Undisputed Material Fact No. 10, one of Nurse Mincy's job duties was to bring concerns about "medications, treatments, scheduling or making appointments" to the attention of senior IDOC officials in order to try to rectify the situation of inadequate medication, treatment, scheduling, or appointments.

Nurse Mincy was involved in Mr. Dean's treatment: she raised questions about Mr. Dean's medical care on multiple occasions, including when she became concerned by his chronic gross hematuria and questioned whether he had seen a specialist, Mincy MSJ Ex. B, Mincy Tr. 75:9–

80:4, and when she became concerned by the delay in scheduling his surgery and questioned the delay in quality assurance meetings, Mincy MSJ Ex. B, Mincy Tr. 174:11–176:23.

**14. As HCUA, Ms. Mincy did not provide direct patient care. (Ex. 2, 81:22–82:3.)**

**Response:**  As described in response to Mincy's Undisputed Material Fact No. 10, one of Nurse Mincy's job duties was to bring concerns about "medications, treatments, scheduling or making appointments" to the attention of senior IDOC officials in order to try to rectify the situation of inadequate medication, treatment, scheduling, or appointments.  This was a form of direct patient care.

Nurse Mincy provided direct patient care to Mr. Dean on at least one occasion, when she was present during a February 10, 2016 sick call and viewed a bloody urine sample that Mr. Dean provided.  Mincy MSJ Ex. A, Dean Tr. 76:21-77:9.

Furthermore, Nurse Mincy provided other forms of direct patient care.  For instance, Nurse Mincy would speak with patients that had questions about their medical care while she was "doing the line" at Taylorville.  Mincy MSJ Ex. B, Mincy Tr. 70:15-71:5.  Nurse Mincy also personally met with and reviewed the care of every inmate in the Taylorville infirmary every day.  Mincy MSJ Ex. B, Mincy Tr. 72:23-74:1.

**19. Ms. Mincy relied upon medical doctors to make diagnoses. (Ex. 2, 206:5–24.)**

**Response:**  Disputed because Nurse Mincy had the ability to bring individual issues to senior IDOC leadership in order to fix any problems.  Mincy MSJ Ex. B, Mincy Tr. 64:23-66:2.

**28. Given this concern, Ms. Mincy asked medical staff if Plaintiff had been referred to a specialist and Ms. Mincy was informed that Plaintiff was under the care of Dr. Einwohner. (Ex. 2, 75:9–80:4.)**

**Response:**  Undisputed that Mincy was told Mr. Dean was under the care of Dr. Einwohner; disputed because Mincy neglects to mention that she was told this by Defendant Galvin, and because Mincy did not attempt to verify the accuracy of this statement by Galvin.  Mincy MSJ Ex. 2, Mincy Tr. 75:9:80:6.   As demonstrated in Mr. Dean's Responses to Wexford's Disputed Material Facts 29 and 31, Dr. Einwohner was not tracking or managing Mr. Dean's hematuria.

**30. Ms. Mincy relied upon Plaintiff's treating physicians to provide Plaintiff medical care for his hematuria. (Ex. 2, 75:9–80:4.).**

**Response:**   This fact must be disregarded by the Court because Mincy failed to include documentary evidence in support of this fact because the cited deposition testimony does not say that Mincy relied upon Mr. Dean's treating physicians to provide Mr. Dean medical care for his hematuria.  Because the evidence submitted by Mincy fails to support this purported undisputed fact, Mincy has "fail[ed] to meet [its] initial burden to 'put forth evidence showing the absence of a genuine dispute of material fact.'"  *See Kremer v. City of Decatur*, 2014 WL 793465, at *2 (C.D. Ill. Feb. 26, 2014) (quoting *Carroll v. Lynch*, 698 F.2d 561, 564 (7th Cir. 2012)).

**31. At some point, Ms. Mincy became aware Plaintiff had been diagnosed with cancer but she does not recall when she became aware of this diagnosis. (Ex. 2, 163:2–164:11.)**

**Response:** Undisputed that Nurse Mincy does not "recall" when she became aware of Mr. Dean's cancer diagnosis, but disputed that date is not knowable.  She was aware by at least May 24, 2016, when Mr. Dean's CT scan and cystoscopy were included in the meeting minutes at a quality assurance meeting at which she was present.  Ex. 17, IDOC No. 00165 (meeting minutes).

**36. Ms. Mincy recalls Mr. Christer "working relentlessly" to schedule Plaintiff's surgery and being "put off by Dr. Severino's office." (Ex. 2, 174:11–176:23.)**

**Response:** Disputed that Mr. Christer "work[ed] relentlessly" to schedule Mr. Dean's surgery when he recalls and has records of contacting Dr. Severino's office zero times in April, three times in May, zero times in June, and zero times in July.  Wexford MSJ Ex. J, Christer Tr. 37:14-38:7.  Springfield Clinic's records are in accord.  Ex. 12, Springfield Clinic William K. Dean 61-119 (complete task record for Mr. Dean).

**37. Ms. Mincy informed the wardens and Cindy Hobrock about the delay in Plaintiff going for the surgical procedure but understood the scheduling was outside of her control because it was up to the surgeons. (Ex. 2, 174:11–176:23.)**

**Response:**  Disputed that scheduling was outside of Nurse Mincy's control because it was up to the surgeons because IDOC and Wexford, as the entities with responsibility for Mr. Dean's medical care, had control over when Mr. Dean was first seen by an outside doctor and surgical specialists and whether he would see a different doctor to expedite the scheduling.  Mincy MSJ Ex. B, Mincy Tr. 64:4-8.

**43. Dr. Severino admits there were delays in getting Plaintiff scheduled for surgery because it was determined that three surgeons—Dr. Severino, a cardiothoracic surgeon, and a vascular surgeon—needed to available for ten hours on the same day to perform the procedure. (Ex. 3, 28:24–29:17.)**

**Response:** Disputed that Dr. Severino was the cause or the sole cause of the delay in scheduling Mr. Dean's surgery.  As described in response to Wexford's Undisputed Material Fact No. 112, Wexford and Dr. Nawoor, Dr. Einwohner, and Nurse Galvin were also responsible for the delays in Mr. Dean's surgery and that answer is incorporated here.  Furthermore, Nurse Mincy was responsible for delays in Mr. Dean's surgery.  Nurse Mincy was aware that the surgery had been delayed in being scheduled and that it was medically urgent that Mr. Dean have surgery.  Mincy MSJ Ex. B, Mincy Tr. 174:11-176:9.  Nurse Mincy took no steps to expedite the scheduling of Mr. Dean's surgery, Mincy MSJ Ex. B, Mincy Tr. 194:11-22, despite her responsibilities for patient care, as described above in response to Mincy's Undisputed Material Facts Nos. 10-19.

**44. Dr. Severino opined the delay from March 10, 2016 (the decision to operate), to July 19, 2016 (the date of the surgery), was a reasonable amount of time because the surgeons "had**

to do it right" or it was "guaranteed the patient would die on the table." (Ex. 3, 38:21–39:20.)

**Response:**  Disputed that Dr. Severino testified that March 10, 2016 to July 19, 2016 was a reasonable amount of time for Mr. Dean's surgery.  Mincy MSJ Ex. C, Mincy Tr. 38:21–39:20. Dr. Severino never stated that amount of time was reasonable nor did he directly answer counsel's question asking whether that amount of time was reasonable.

**46. Ms. Mincy was not responsible for approving or getting Plaintiff's chemotherapy medications. (Ex. 2, 202:22–203:21.)**

**Response:**  As described in the response to Mincy's Undisputed Material Facts Nos. 10-19, Mincy had the ability to raise individual issues, such as a delay in the administration of Mr. Dean's chemotherapy medication, with senior IDOC leadership in order to rectify those issues.  Nurse Mincy failed to do so in this case.

### C.  Disputed Immaterial Facts

The following facts were taken from Mincy's Motion for Summary Judgment (Dkt. 101).

Mr. Dean disputes these facts, and he contends they are not material:

**15. As HCUA, Ms. Mincy was not responsible for scheduling procedures to take place outside of Taylorville. (Ex. 2, 207:24–208:2.)**

**Response:**  Disputed because Nurse Mincy had the ability to bring individual issues to senior IDOC leadership in order to fix any problems.  Mincy MSJ Ex. B, Mincy Tr. 64:23-66:2. Immaterial because Mr. Dean's Complaint contains no allegations that Nurse Mincy was personally responsible for scheduling procedures and thus it is not material that she was not responsible for scheduling such procedures.

**16. As HCUA, Ms. Mincy was not responsible for scheduling any procedures to take place inside of Taylorville. (Ex. 2, 208:3–6.)**

**Response:**  Disputed because Nurse Mincy had the ability to bring individual issues to senior IDOC leadership in order to fix any problems.  Mincy MSJ Ex. B, Mincy Tr. 64:23-66:2. Immaterial because Mr. Dean's Complaint contains no allegations that Nurse Mincy was personally responsible for scheduling procedures and thus it is not material that she was not responsible for scheduling such procedures.

**17. As HCUA, Ms. Mincy could not order diagnostic testing. (Ex. 2, 208:7–12.)**

**Response:**  Disputed because Nurse Mincy had the ability to bring individual issues to senior IDOC leadership in order to fix any problems.  Mincy MSJ Ex. B, Mincy Tr. 64:23-66:2. Immaterial because Mr. Dean's Complaint contains no allegations that Nurse Mincy was failed to order diagnostic testing.

**18. As HCUA, Ms. Mincy could not order a referral to a specialist. (Ex. 2, 208:13–19.)**

**Response:**  Disputed because Nurse Mincy had the ability to bring individual issues to senior IDOC leadership in order to fix any problems.  Mincy MSJ Ex. B, Mincy Tr. 64:23-66:2. Immaterial because Mr. Dean's Complaint contains no allegations that Nurse Mincy failed to order a referral to a specialist.

**21. Rather, Plaintiff is suing Ms. Mincy because of alleged inaction. (Ex. 1, 305:17–19.)**

**Response:**  Undisputed that Mr. Dean so testified in his deposition.  Disputed because Ms. Mincy is being sued for her deliberate indifference to Mr. Dean's serious medical condition, as evidenced by her failure to raise issues she noticed with his care with senior IDOC officials.  *See* Dkt. No. 72 ¶¶ 95-101 (3d Am. Complt.).  Immaterial how Mr. Dean characterized this lawsuit in his deposition, which was taken at the very beginning of discovery, over one year ago.

**22. Plaintiff is suing Ms. Mincy because he believes Ms. Mincy could have expressed an opinion about Plaintiff needing to go for outside medical treatment. (Ex. 1, 324:22–325:22.)**

**Response:**  Undisputed that Mr. Dean so testified in his deposition.  Disputed because Ms. Mincy is being sued for her deliberate indifference to Mr. Dean's serious medical condition, as evidenced by her failure to raise issues she noticed with his care with senior IDOC officials.  *See* Dkt. No. 72 ¶¶ 95-101 (3d Am. Complt.).  Immaterial how Mr. Dean characterized this lawsuit in his deposition, which was taken at the very beginning of discovery, over one year ago.

### D.  Undisputed Immaterial Facts

The following facts were taken from Mincy's Motion for Summary Judgment (Dkt. 101).

Mr. Dean does not dispute these facts, but he contends they are not material:

**1.  Plaintiff filed this lawsuit while incarcerated at Taylorville. (Doc. 72.)**

**Response:**  Whether or not Mr. Dean was incarcerated on the date he filed the lawsuit has no bearing on the merits of this case or Nurse Mincy's summary judgment motion.

**2.  Before being incarcerated at Taylorville, Plaintiff was diagnosed as having cardiomyopathy, congestive heart failure, high blood pressure, degenerative disc disease, "drop foot," type 2 diabetes, and obesity." (Deposition of Plaintiff, attached hereto as Exhibit 1, 15:21–16:8 & 203:9–24) (footnotes omitted).**

**Response:**  None of these conditions are relevant to whether Nurse Mincy was deliberately indifferent to Mr. Dean's serious medical need by not timely taking steps to ensure that he was scheduled for the appointments and procedures he needed.  As Nurse Mincy testified, as a nurse she does not diagnose patients, thus a patient history is irrelevant to her.  Mincy MSJ Ex. B, Mincy Tr. 11:17-21.

**3.  Prior to his incarceration at Taylorville, Plaintiff also experienced hematuria, with at least one occasion of gross hematuria. (Ex. 1, 211:12–214:12 & 221:9–12.)**

**Response:**  Mr. Dean's prior episodes of hematuria are not relevant to whether Nurse Mincy was deliberately indifferent to Mr. Dean's serious medical need by not timely taking steps to ensure that he was scheduled for the appointments and procedures he needed.  As Nurse Mincy testified, as a nurse she does not diagnose patients, thus a patient history is irrelevant to her.  Mincy MSJ Ex. B, Mincy Tr. 11:17-21.

**4.  In addition to the above conditions, Plaintiff has a history of kidney stones. (Ex. 1, 211:5–7.) (footnote omitted).**

**Response:**  Mr. Dean's history of kidney stones is not relevant to whether Nurse Mincy was deliberately indifferent to Mr. Dean's serious medical need by not timely taking steps to ensure that he was scheduled for the appointments and procedures he needed.  As Nurse Mincy testified, as a nurse she does not diagnose patients, thus a patient history is irrelevant to her.  Mincy MSJ Ex. B, Mincy Tr. 11:17-21.

**6.  Plaintiff is not suing Ms. Mincy for anything that happened before she became HCUA and not suing her for anything that happened after she stopped serving as the HCUA. (Ex. 1, 302:13–24 & 303:1–13.)**

**Response:**  There is no materiality to the claims which Mr. Dean has chosen not to assert in this lawsuit.

**26. Ms. Mincy does not recall when she first met Plaintiff, except that it was likely early 2016. (Ex. 2, 76:19–77:2.)**

**Response:**  It is immaterial whether or not Ms. Mincy recalls first meeting Mr. Dean.

**34. Ms. Mincy understood Dr. Severino—Plaintiff's surgeon—kept putting off the surgery because he wanted a team of doctors present for the procedure. (Ex. 2, 174:11–176:23.)**

**Response:**  Undisputed that Nurse Mincy so testified.  Immaterial because Dr. Severino's conduct is not issue in this case.

**40. Dr. Severino opined that there was a good chance Plaintiff would die during the surgical procedure to remove the right kidney mass, and was surprised Plaintiff made it out of the hospital and impressed Plaintiff was still alive at the time of Dr. Severino's deposition. (Ex. 3, 11:5–23.)**

**Response:**  Dr. Severino's opinions as to Mr. Dean's prognosis following the surgery and whether or not Mr. Dean would die during the surgery are immaterial because Dr. Severino's conduct is not at issue in this case.

**42. The procedure essentially involved Plaintiff being made to bleed out, stopping Plaintiff's heart, leaving Plaintiff dead for thirty minutes while the tumor is removed, and then trying to bring Plaintiff back to life. (Ex. 3, 14:7–13.)**

**Response:**  Whether or not this surgery is complicated is immaterial to the issue of whether Wexford delayed scheduling that surgery and whether Mincy failed to communicate issues with Mr. Dean's care of which she was aware.

**45. Plaintiff also believes Ms. Mincy was involved in a delay to receive chemotherapy medications but has no basis for this belief. (Ex. 1, 33:6–20.)**

**Response:**  Undisputed that Mr. Dean so testified in his deposition.  Immaterial because Mr. Dean's knowledge is not dispositive on this question, there is other evidence that Nurse Mincy was involved in this delay.

### III.    Plaintiff's Statement of Additional Undisputed Material Facts

1.   A 2015 CT scan of Mr. Dean showed a mass in the right kidney. Wexford MSJ Ex. K, Racenstein Tr. 33:23-34:4.

2.   Mr. Dean began urinating blood on December 19, 2015.  Mincy MSJ Ex. A, Dean Tr. 56:17-57:6.

3.   Mr. Dean presented with painless, gross hematuria on December 23, 2015. Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001341 (12/23/15 5:55 AM Medical Records Note).

4.   Dr. Nawoor told Mr. Dean during his December 23, 2015 medical visit that the cause of his hematuria was "stones or cancer." Mincy MSJ Ex. 1, Dean Tr. 60:24-61:1.

5.   Dr. Nawoor recognized on December 23, 2015 that Mr. Dean would need to see a urologist if his "hematuria persists." Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001339-40 (12/23/15 9:13 AM Medical Records Note).

6.   Painless hematuria is more suggestive of malignancy than hematuria with flank pain. Ex. D, Dhar Tr. 128:1-9.

7.   The risk of finding malignancy in gross hematuria is approximately 40 to 50 percent, and is much greater than the risk of finding malignancy in microscopic hematuria. Wexford MSJ Ex. L, Severino Tr. 48:24-49:3.

8.   Hematuria is to be considered malignant until proven otherwise. Wexford MSJ Ex. D, Dhar Tr. 91:7-92:13; Ex.4 at 293, ███████████
███████████████████████████

9.   ████████████████████████████████
███████████████████████████████████
████████████████████

10. The standard of care for hematuria is to perform a CT with contrast and a cystoscopy under the care of urologist, regardless of whether a patient has a history of kidney stones. Wexford MSJ Ex. D, Dhar Tr. 91:25-92:9; Wexford MSJ Ex. L, Severino Tr. 47:20-48:4; Wexford MSJ Ex. I, Metwalli Tr. 45:7-46:16.

11. Dr. Einwohner wrote "Collegial review with Dr. Butler with consideration of re-imaging and urology eval." Ex. 5, Einwohner Records Bates #000061, 000063 ("case for collegial"). By "re-imaging," Dr. Einwohner meant a CT scan or other image that Mr. Dean had received previously, not an ultrasound, which he had not received previously. Wexford MSJ Ex. H, Barnett Tr. 149:1-5.

12. When Dr. Einwohner requested collegial reviews, Dr. Nawoor was responsible for submitting the official request for review. Wexford MSJ Ex. A, Nawoor Tr. 236:15-22.

13. Dr. Ritz overruled Dr. Einwohner's recommendation for a urology referral and CT scan and "suggest[ed] [a] renal ultrasound." Wexford MSJ Ex. E, IDOC Taylorville Med Recs 0001343 (1/13/16 12:55pm Medical Records Note).

14. An ultrasound is "one component" of Wexford's "typical" response and attempt to diagnose hematuria, with other components being the taking of a history, a physical examination, a urinalysis, and x-rays. Wexford MSJ Ex. G, Ritz Tr. 72:22-73:2.

15. A CT scan is not a component of Wexford's "typical" response to diagnose hematuria. Wexford MSJ Ex. G, Ritz Tr. 72:22-73:2.

16. An ultrasound is cheaper for Wexford than other diagnostic imaging tests, Wexford MSJ Ex. K, Racenstein Tr. 41:5-6; Ex. 9, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17. An ultrasound is not the appropriate imaging technique to detect cancer because the ultrasound will be unable to detect over half of renal tumors whereas a CT scan with contrast will detect between 94.1%-100% of tumors. Ex. 13, Dhar Expert Report at 5 ("Ultrasound has only a 40% sensitivity for identifying renal tumors, meaning that 60% of renal tumors could not be detected by ultrasound due to multiple factors, including operator dependence."); Wexford MSJ Ex. D, Dhar Tr. 123:23-124:18. Wexford's own expert admits that "[Even i]f you have a good ultrasound, you will still need . . . a CT." Ex. 38, Kosierowski Tr. 126:4-5.

18. A CT scan without contrast is the preferred test for detecting kidney stones because a renal ultrasound does not visualize the ureters, is operator dependent, and cannot detect small kidney stones. Wexford MSJ Ex. D, Dhar Tr. 74:1-75:18; Wexford MSJ Ex. I, Metwalli Tr. 55:21-58:11; Wexford MSJ Ex. K, Racenstein Tr. 39:18-40:5, 65:7-16.

19. A CT with contrast is possible for "almost any patient." Wexford MSJ Ex. H, Barnett Tr. 169:20-170:5 ("You can find a way to give contrast to almost any patient. You just use a different kind of contrast. . . . [T]he fact that someone has a slightly more elevated risk of an adverse reaction from contrast, if you have an important reason to do the study, virtually never bars a study from being done.").

48

20. Defendants did not consider the risks of a CT with contrast when deciding on a course of care for Mr. Dean.  Wexford MSJ Ex. D, Dhar Tr. 96:11-15; Wexford MSJ Ex. E, IDOC Taylorville Med Recs 000437, 001681-82, 001683 (examples of records where Mr. Dean received CT with contrast).

21. Ultrasounds are less effective with obese individuals. Wexford MSJ Ex. I, Metwalli Tr. 57:19-58:1.

22. A renal ultrasound is not sufficient to rule in kidney stones. Wexford MSJ Ex. H, Barnett Tr. 122:12-16.

23. If an ultrasound detects a stone, it has not necessarily identified the cause of hematuria. Wexford MSJ Ex. H, Barnett Tr. 123:1-9.

24. The ultrasound revealed a significantly larger right kidney, at 15.3 cm, compared to his normal-sized left kidney, at 13.1 cm.  Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001680.

25. It is a departure from the standard of care to rely on six-month-old imaging studies to determine the cause of new hematuria.  Ex. 38, Kosierowski Tr. 115:24-117:17; Wexford MSJ Ex. I, Metwalli Tr. 60:13-22 (primary care physician is "obligated" to review old images).

26. Dr. Einwohner's March 30 telemedicine appointment with Mr. Dean suffered from "technical problem[s]," specifically that "the telemonitor had no audio with the site," which led to a "very limited visit."  Wexford MSJ Ex. B, Einwohner Tr. 257:6-260:10.

27. As of March 30, 2016, the status of Mr. Dean's hematuria was that Dr. Einwohner knew there was a "history of kidney stones, and there is an evaluation process that's undergoing to continue exploring a cause of his hematuria."  Wexford MSJ Ex. B, Einwohner Tr. 257:9-17.

28. At the March 30, 2016 telemedicine, Dr. Einwohner asked Mr. Dean about back pain, Mincy MSJ Ex. A, Dean Tr. 88:14-16, which is "typical for a kidney stone," Wexford MSJ Ex. H, Barnett Tr. 124:23-125:3.

29. 12 days elapsed between the March 10, 2016 appointment at which Dr. Severino ordered a cystoscopy for Mr. Dean and the collegial review at which it was approved on March 22, 2016. Ex. 43, IDOC No. 000091; Ex.44, IDOC No. 000094.

30. 20 days elapsed between the March 10, 2016 appointment at which Dr. Severino ordered a CT scan for Mr. Dean and the March 30, 2016 collegial review at which it was approved.  Ex. 43, IDOC No. 000091; Ex. 45, IDOC No. 000095.

31. "[U]sually" such an "image sequence" comprised of both an ultrasound and then a CT scan would happen in "[a] matter of weeks, not a matter of months." Wexford MSJ Ex. K, Racenstein Tr. 72:19-23.

32. By the time of April 14, 2016 diagnosis of cancer, the treatment-less months from his December 23, 2015 presentation with hematuria meant that Mr. Dean's hematuria warranted referral to the emergency department. Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001340

(12/23/15 9:13 AM Medical Records Note); Wexford MSJ Ex. A, Nawoor Tr. 212:3-5 ("[If] hematuria persists, we have to go to the ER.").  Based on the amount of time that passed between Mr. Dean's first presentation of hematuria and his diagnosis, it was appropriate to send him to the emergency room regardless of whether he was symptomatic, hypotensive, or otherwise presenting with "emergency" symptoms. Wexford MSJ Ex. H, Barnett Tr. 139:15-142:9; *see also* Wexford MSJ Ex. I, Metwalli Tr.

33. Dr. Nawoor thought Mr. Dean's cancer diagnosis was an "urgent" situation and submitted an urgent request for collegial review of Mr. Dean's surgery. Ex. 15, IDOC Taylorville Med Recs 001086 (marking a referral form concerning Mr. Dean's surgery as urgent). The decision to mark the request as "urgent" was made after Felicia Waterman, a Wexford employee who assisted with scheduling procedures, spoke with Julia Thornton, a nurse at Dr. Severino's office, and represented to Thornton that she was putting in an urgent request to Wexford to get approval for the surgery. Ex. L, Springfield Clinic William K. Dean 109 (Ex. 1, Severino deposition). Dr. Severino also considered the surgery to be "urgent." Ex. L, Severino Tr. 50:13-21.

34. Dr. Nawoor could have sought approval of the surgery on the same day it was ordered by Dr. Severino through Wexford's procedure for immediate collegial review approvals, but Dr. Nawoor did not seek an immediate collegial review. Ex. F, Ritz 30(b)(6) Tr. 22:20-27:4.

35. The standard of care for managing renal cell carcinoma with tumor thrombus is not different for specialists versus primary care physicians.  Wexford MSJ Ex. I, Metwalli Tr. 83:20-84:6.

36. At this April 21 Collegial Review, a "targeted completion date" of May 21, 2016 (one month later) was assigned to Mr. Dean's cancer surgery. Ex. 39, April 21 Launch Report.

37. 

38.

39. Mr. Dean's wife called about the scheduling of the cancer surgery on April 25 and spoke with Kathy Galvin, who told her that the surgery had been "approved and scheduled."  Wexford MSJ Ex. C, Galvin Tr. 114:1-9.

40. Mr. Dean filed an emergency grievance regarding the scheduling of his surgery on May 16, 2016: "Get . . . Wexford to stop dragging this out and get me to surgery!" Ex. 14, Dean May 17 Emergency Grievance (no Bates number) (Ex. 15, Galvin deposition).

41. Galvin's May 17, 2016 response to Mr. Dean's May 16, 2016 grievance was that the surgeon had been "contacted to schedule a surgical date. Currently awaiting a response." Ex. 14, Dean May 17 Emergency Grievance (no Bates number) (Ex. 15, Galvin deposition); Wexford MSJ Ex. C, Galvin Tr. 166:7-10 (same).

42. In response to Mr. Dean's May 2016 grievance, Galvin took no action besides answering the grievance, explaining that those were "the only steps [she] had to take." Wexford MSJ Ex. C, 135:23-137:6.

43. Nurse Mincy spoke with Mr. Dean's wife on May 25, 2016 when she called to inquire about the scheduling of his surgery. Mincy MSJ Ex. B, Mincy Tr. 188:3-189:6; Mincy MSJ Ex. A, Dean Tr. 327:20-328:2.

44. Mr. Dean saw Dr. Einwohner at renal teleclinic on May 26, 2016 and told her about his cancer diagnoses and Dr. Einwohner "did not even know that I had cancer at that time." Mincy MSJ Ex. A, Dean Tr. 110:6-9.

45. Dr. Einwohner's May 26, 2016 renal teleclinic notes state: "Since last visit learned post contrast CT scan that has [right] kidney cancer and is awaiting surgery." Ex. 20, Einwohner Bates #000042.

46. On August 19, 2016, Mincy filed an Incident Report documenting the delay in scheduling Mr. Dean for an oncology appointment, and noting that if Mr. Dean had not inquired about his future treatment, the appointment may have been overlooked due to Dr. Nawoor's mistake. Ex. 40, IDOC No. 00860-61.

47. On November 8, 2016, Dr. Nawoor and Nurse Galvin pressured Mr. Dean to sign an Illinois Department of Public Health Uniform Do-Not-Resuscitate (DNR) Advance Directive, which Mr. Dean signed directing medical personnel to resuscitate him. Mincy MSJ Ex. A, Dean Tr. 160:5-24; Ex. 42, IDOC No. 000610 (Dean DNR).

48. Dr. Ritz had questions about and discussed the fact that Votrient was "expensive" with a Wexford pharmacologist before Mr. Dean's Votrient prescription was granted non-formulary approval. Wexford MSJ Ex. A, Nawoor Tr. 300:11-17; see also Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001477 (11/2/2016 note from Dr. Nawoor: "Dr. Ritz will be talking to the oncologist about alternative drug.").

49. A CT scan on February 10, 2017, revealed that Votrient had not been effective at stopping Mr. Dean's cancer from growing. Dr. Guaglianone prescribed Opdivo on March 2, 2017. Wexford Ex. E, IDOC Taylorville Med Recs 002058.

50. Wexford's pharmacologist, as part of the formulary review of Opdivo, reported that it would cost "around $15K per month (dosed IV every 2 weeks).  It would need to be given off-site, so those charge would hit UM."  Ex. 41 at 6, Opdivo Emails

51. Neil Fisher, Wexford's Corporate Medical Director for Quality Management and Pharmacy Services, suggested the idea of Mr. Dean going to hospice care instead of Opdivo.  Ex. 41 at 4, Opdivo Emails

52. Dr. Ritz approved Opdivo "as no alternatives [were] available."  Ex. 41 at 1, Opdivo Emails.

53. Abdur Nawoor, M.D., Wexford's Site Medical Director for Taylorville is aware that hematuria is a symptom of cancer.    Wexford MSJ Ex. A, Nawoor Tr. 192:16-17, 194:5-6 (describing "any form of cancer" including "any renal mass or cancer of the kidney" as well as cancers of the "ureter or bladder" as among the "commonest cause[s]" of hematuria).

54. Dr. Nawoor is Mr. Dean's primary care physician.  Wexford MSJ Ex. A, Nawoor Tr. 313:20-22.

55. As the primary care physician of inmates at Taylorville, Dr. Nawoor is responsible for advocating for his patients to receive timely and appropriate care. Wexford MSJ Ex. H, Barnett Tr. 11:19-13:3, 119:1-5; Wexford MSJ Ex. I, Metwalli Tr. 90:9-14, 141:11-143:4; Ex. 3, ███████ ████████████████████████████████████████████████████████

56. Dr. Nawoor feels that his hands are tied when it comes to prescribing non-formulary drugs or ordering lab work or off-site care.  Wexford MSJ Ex. A, Nawoor Tr. 120:20-121:9.

57. ████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████

58. ████████████████████████████████████████████████████
█████████████████████████████████████████████

59. Dr. Nawoor has the ability to expedite the scheduling of medical appointments and procedures.  Wexford MSJ Ex. A, Nawoor Tr. 284:12-286:6; Ex. 3, ████████████████ Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001349, 001356.

60. Dr. Nawoor found it "very concerning" that Mr. Dean's surgery took so long to be performed after his diagnosis for cancer.  Mincy MSJ Ex. B, Mincy Tr. 193:19-23, 194:4-10.

61. Dr. Nawoor never told Chad Christer, the Wexford employee responsible for scheduling the procedure, that the surgery should be scheduled sooner. Wexford MSJ Ex. J, Christer Tr. 42:23-43:1.

62. Dr. Nawoor never discussed Mr. Dean's surgery or diagnosis with Dr. Severino. See Wexford MSJ Ex. L, Severino Tr. 60:15-61:22.

63. Dr. Nawoor never inquired whether Mr. Dean's surgery could be expedited, or if it was possible to send Mr. Dean to a different doctor.  Wexford MSJ Ex. A, Nawoor Tr. 291:9-292:23; Wexford MSJ Ex. J, Christer Tr. 42:18-22; Wexford MSJ Ex. C, Galvin Tr. 143:8-11; Mincy MSJ Ex. B, Mincy Tr. 194:11-22.

64. Dr. Einwohner did not participate in utilization management collegial reviews generally, and does not recall participating in any collegials regarding Mr. Dean's care.  Wexford MSJ Ex. B, Einwohner Tr. 54:5-7; 253:12-254:6.

65. Dr. Einwohner initialed records in Mr. Dean's patient file to show that she had received them and looked at them. Wexford MSJ Ex. B, Einwohner Tr. 192:14-18.

66. Dr. Einwohner is "not involved in the scheduling of off site[]" medical appointments. Wexford MSJ Ex. B, Einwohner Tr. 266:23-267:2.

67. Kathy Galvin, R.N., Director of Nursing is aware that hematuria is a symptom of cancer. Wexford MSJ Ex. C, Galvin Tr. 21:23-22:4 (describing hematuria as a symptom of "kidney and bladder cancer.").

68. Director of Nursing at the Taylorville Correctional Center, Galvin was responsible for ensuring that *all* of Wexford's policies and IDOC's institutional directives were followed by staff at Taylorville.  Wexford MSJ Ex. C, Galvin Tr. 32:11-13.

69. Galvin was responsible for supervising sick call.  Wexford MSJ Ex. C, Galvin Tr. 35:20-22

70. Galvin was responsible for supervising all aspects of the work of the Medical Records Director at Taylorville.  Wexford MSJ Ex. C, Galvin Tr. 30:13-22.

71. Galvin took no steps to supervise Chad Christer, the Medical Records Director at Taylorville Correctional Center who was primarily responsible for scheduling Mr. Dean's surgery. Nurse Galvin, who was Mr. Christer's direct supervisor, testified that she took minimal steps to supervise him and was completely unaware if he was having scheduling difficulties unless he brought them to her attention. Wexford MSJ Ex. C, Galvin Tr. 95:8-98:4,141:14-142:15.

72. Galvin herself was responsible for scheduling some appointments.  Wexford MSJ Ex. A, Nawoor Tr. 90:2-10.

73. Galvin reviewed every single medication record at Taylorville Correctional Center on a weekly basis during the time she was Director of Nursing, including in November 2016. Wexford MSJ Ex. C, Galvin Tr. 158:5-20.

74. Galvin was involved with and partially responsible for expediting appointments or procedures.  Mincy MSJ Ex. B, Mincy Tr. 135:3-24.

75. Galvin attended a quality assurance meeting at Taylorville where the delay in Mr. Dean's surgery was discussed, found it "very concerning," and "agreed" that the delay in the surgery was "a longer span that what we felt was necessary."  Mincy MSJ Ex. B, Mincy Tr. 175:19-176:9, 193:19-23, 194:4-10.

76. Nurse Galvin took no steps to schedule or expedite Mr. Dean's surgery or to ensure that it was scheduled or conducted. Galvin Tr. 118:9-14, 119:17-19,121:1-3,143:8-11.

77. Galvin never spoke with Dr. Nawoor about the scheduling of Mr. Dean's surgery.  Wexford MSJ Ex. C, Galvin Tr. 129:7-9.

78. Galvin never spoke with her supervisor about the scheduling of Mr. Dean's surgery. Wexford MSJ Ex. C, Galvin Tr. 129:20-24.

79. Galvin never spoke with any other Wexford employees about the scheduling of Mr. Dean's surgery, stating "[t]hat would not have been my duty."  Wexford MSJ Ex. C, Galvin Tr. 130:1-4.

80. Galvin never spoke with any IDOC employees about the scheduling of Mr. Dean's surgery. Wexford MSJ Ex. C, Galvin Tr. 130:5-7.

81. Lisa Mincy is a registered nurse and has been for 30 years.  Mincy MSJ Ex. B, Mincy Tr. 34:19-21.

82. Nurse Mincy was responsible for administering the medical grievance system at Taylorville and "doing the line," which was a less formal medical grievance system, at Taylorville. Mincy MSJ Ex. B, Mincy Tr. 67:18-24, 70:15-71:5.

83. Nurse Mincy would speak with patients that had questions about their medical care while she was "doing the line" at Taylorville. Mincy MSJ Ex. B, Mincy Tr. 70:15-71:5.

84. Nurse Mincy personally met with and reviewed the care of every inmate in the Taylorville infirmary every day.  Mincy MSJ Ex. B, Mincy Tr. 72:23-74:1.

85. Nurse Mincy spoke with Mr. Dean about his cancer diagnosis in the Taylorville infirmary on at least one occasion.  Mincy MSJ Ex. B, Mincy Tr. 74:2-75:21.

86. Nurse Mincy was present during a February 10, 2016 sick call and viewed a bloody urine sample that Mr. Dean provided.  Mincy MSJ Ex. A, Dean Tr. 76:21-77:9.

87. Nurse Mincy was present at sick call and viewed Mr. Dean's urine samples on multiple occasions.  Mincy MSJ Ex. A, Dean Tr. 315:6-316:6.

88. Nurse Mincy was present for some of Mr. Dean's medical visits with Dr. Nawoor.  Mincy MSJ Ex. A, Dean Tr. 308:12-15.

89. Nurse Mincy served as a liaison between Wexford and the IDOC regional health care administrator, Cindy Hobrock, and was responsible for raising the issue with Hobrock if Mincy ever felt there was a "question about somebody's care" or "saw something that I wasn't quite sure of with the care" based on Mincy's "background" as a nurse. Mincy MSJ Ex. B, Mincy Tr. 44:14-17, 64:19-66:2.

90. Nurse Mincy had questions about Mr. Dean's medical care on multiple occasions, including when she became concerned by his chronic gross hematuria after speaking with him about it and questioned whether he had seen a specialist, Mincy MSJ Ex. B, Mincy Tr. 75:9–80:4, and when she became concerned by the delay in scheduling his surgery and questioned the delay in quality assurance meetings, Mincy MSJ Ex. B, Mincy Tr. 174:11–176:23.

91. Mincy never raised these questions about Mr. Dean's care directly with Hobrock. Mincy MSJ Ex. B, Mincy Tr. 766:15-19.

92. Nurse Mincy spoke with Mr. Dean about his hematuria on at least one occasion in the infirmary and became concerned about the length of time his hematuria had gone on for. On this occasion, Mincy was informed that Dr. Einwohner was seeing Mr. Dean and she didn't inquire anymore into Mr. Dean's care because she "was not hired as a case manager." Mincy MSJ Ex. B, Mincy Tr. 75:9-81:16.

93. Mincy attended a quality assurance meeting at Taylorville where the delay in Mr. Dean's surgery was discussed and Mincy found the delay "very concerning," and "agreed" that the delay in the surgery was "a longer span that what we felt was necessary." Mincy MSJ Ex. B, Mincy Tr. 175:19-176:9, 193:19-23, 194:4-10.

94. Nurse Mincy took no steps to expedite Mr. Dean's surgery. Mincy MSJ Ex. B, Mincy Tr. 194:11-22.

95. 

96.

97. Steven Ritz, D.O., Wexford's Utilization Management Director is aware that hematuria for patients over 50 is a symptom of cancer. Wexford MSJ Ex. G, Ritz Tr. 76:8-9, 78:22-79:3 (describing "cancer of anywhere within the urinary tract" as a symptom of hematuria and noted that, in terms of hematuria, malignancy is "more likely as we get older.").

98. 

99. Dr. Ritz identified only one "medical purpose" for the collegial review process: "allow[ing] doctor-to-doctor discussion regarding the management of cases." Wexford MSF Ex. G, Ritz Tr. 51:20-24; Wexford UMF No. 33.

100.     "[M]ost cases which are heard at collegial review are approved with no discussion at all." Wexford MSJ Ex. G, Ritz Tr. 41:24-42:4; 49:6-50:8.

101.     The collegial review process is a cost containment measure and is primarily intended to reduce, limit, and delay offsite procedures and specialty consultations. Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization Management (Ritz 30(b)(6) Deposition Exhibit 2) (stating collegial review is "*designed* to reduce offsite care costs" and "results in fewer requested offsite referrals, a reduction in the percentage of referrals denied as inappropriate, and an overall decrease in specialty consults") (emphasis added).

102.     The "approval aspect" of collegial review serves primarily a business purpose. Wexford MSJ Ex. G, Ritz Tr. 52:15-53:15.



106.     Wexford makes no effort to track how often collegial reviews fail to happen on a weekly basis. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 23:12-15.

107.     In Dr. Ritz's experience at the UM Medical Director, there are no consequences for employees if collegial reviews are not held on a weekly basis. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 23:24:17.

108.     Collegial reviews are conducted with greater frequency in other states where Wexford manages medical care in the prison system. Wexford MSJ Ex. G, Ritz Tr. 31:1-32:1.

109.     Wexford discourages doctors from seeking to have off-site care approved outside of the weekly collegial review meeting. Wexford MSJ Ex. F, Ritz 30(b)(6) Tr. 27:5-21.

110.    Wexford's utilization management program is, in large part, focused on cost containment rather than patient care.   Ex. 6, Wexford Health Sources, Inc. Web Page on Utilization Management (Ritz 30(b)(6) Deposition Exhibit 2).

111.    Wexford punishes employees who violate its policy of not scheduling outside medical appointments or procedures prior to collegial review approval, in marked contrast to other policies it does not punish employees for violating. *Compare* Wexford MSJ Ex. F Ex. F, Ritz 30(b)(6) Tr. 33:4-10 (punishment for collegial review policy violation) *with* Wexford MSJ Ex. F Ex. F, Ritz 30(b)(6) tr. 40:11-41:3 (no punishment if services not completed by targeted completion date).

112.



113.

114.

115.    In December 2014, Dr. Ron Shansky, a *court-appointed expert selected by the parties*, authored a report in the litigation *Lippert v. Godinez*, which sought to determine whether the health care provided to inmates in IDOC was constitutionally deficient.   The report contained Shansky's findings, conclusions, and recommendations on health care in IDOC.  Ex. 37 at 3-5, Ron Shansky, MD et al.. Final Report of the Court-Appointed Expert, Lippert v. Godinez (Dec. 2014) (excerpts).

116.    The Shansky report found that for "scheduled offsite services" and the collegial review process: "During our review of records, we found breakdowns in almost every area, starting with delays in identification of the need for the offsite services, delays in obtaining an authorization number, delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork and delays or the absence of any follow-up visit with the patient."  Ex. 37 at 28-29, Ron Shansky, MD et al.. Final Report of the Court-Appointed Expert, Lippert v. Godinez (Dec. 2014) (excerpts).

117.    The Shansky report recommended that "Presentation to collegial review by the Medical Director must occur within one week."  See Ex. 37 at 31, Ron Shansky, MD et al.. Final Report of the Court-Appointed Expert, Lippert v. Godinez (Dec. 2014) (excerpts).

118.    Most Wexford employees who work on the IDOC contract are familiar with Shansky report.  Wexford MSJ Ex. G, Ritz Tr. 54:14-22.

119.    The Shansky report has been discussed at the monthly meeting to discuss the Illinois contract, which is attended by senior leadership including the CEO, the CFO, and the Chief Administrative Officer, as well as the UM Medical Director, Regional Medical Directors, and the Corporate Medical Director.  The CEO, CFO, and CAO have been present at monthly meetings were the Shanksy report was discussed.  Wexford MSJ Ex. G, Ritz Tr. 55:10-56:7.

120.    Wexford and IDOC have an "expectation that . . . basic primary care evaluation and management" is conducted "on-site" (at IDOC facilities) and that those resources are "exhausted within reason prior to considering sending a patient off site."  Wexford MSJ Ex. F, Ritz Tr. 40:4-21.

121.    ████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
███████████████

122.    Neither Wexford nor IDOC employ a case manager at Taylorville, meaning, "somebody that would follow [the patient's] case completely. It would be somebody that would know from start to finish what was going on with that patient, would know the care that was being given and would basically know all - read all the notes." Mincy MSJ Ex. B, Mincy Tr. 80:5-21.

123.    Specialists outside the correctional setting rely heavily on correctional medicine specialists to navigate and coordinate the scheduling and logistical difficulties in treating incarcerated patients.  Wexford MSJ Ex. I, Metwalli Tr. 84:17-85:19, 90:5-91:11, 93:9-94:2.  Outside doctors have a limited "ability to make these things happen with a patient who's in an entirely different system." Wexford MSJ Ex. I, Metwalli Tr. 85:1-19; 92:6-18, 93:12-94:2 ("[A]t the end of the day, the people who had the capability of making these things happen in a timely fashion are the [prison] doctors.")

124.    Nurse Galvin described the length of the non-formulary process for Mr. Dean's Votrient prescription as "not typical." Wexford MSJ Ex. C, Galvin Tr. 160:2-5.

125.    Nurse Galvin testified that she had never "seen a drug in [her] experience that took this amount of time to be approved," referring to Mr. Dean's Votrient prescription Wexford MSJ Ex. C, Galvin Tr. 160:23-161:2.

126.    Galvin testified that she "almost certainly" would have reviewed the medication record for Mr. Dean's Votrient prescription. Wexford MSJ Ex. C, Galvin Tr. 158:18-20. Furthermore, Nurse Mincy testified that Nurse Galvin was involved in the process when drugs not listed on the formulary needed to be ordered. Mincy MSJ Ex. B, Mincy Tr. 203:6-14.

127.    The formulary review process examines the cost of the drug involved. Wexford MSJ Ex. G, Ritz Tr. 104:7-105:20; Ex. 41 at 5-6, Opdivo Emails (no bates) ("There are many options, however most of them have the same relative cost. . . . .Opdivo would be around $15K per month (dosed IV every 2 weeks).  It would need to be given off-site, so those charges would hit UM.").

128.    On March 16, 2017, Mr. Dean filed an emergency grievance requesting prompt approval of his Opdivo prescription.  Ex. 46, IDOC Taylorville Grievances 000008-9

129.    On May 12, 2017, Dr. Guaglianone prescribed Torisel after a CT scan taken on May 5, 2017 showed that while Opdivo had successfully treated the cancer in Mr. Dean's lymph nodes, it had been ineffective against the cancer in Mr. Dean's liver. Torisel was approved within an hour, and Mr. Dean received his first Torisel treatment that same day.  Ex. 47, Cancer Care Specialists Med Recs 000116.

130.    In July 2019, a CT scan revealed that Mr. Dean's disease was resisting Torisel.  Ex. 48, Strom email.

131.    On or about August 9, 2019, Dr. Guaglianone prescribed Cabozantinib to treat Mr. Dean's disease.  Ex. 48, Strom email.

132.    Mr. Dean did not begin receiving Cabozantinib until after August 29, 2019, the exact date being September 7, 2019.  Ex. 48, Strom email.

133.    On-site procedures do not require the costs, security, transportation, or personnel considerations that off-site procedures do.  Wexford MSJ Ex. G, Ritz Tr. 38:25-39:16, 91:6-21; Ex. 38, Kosierowski Tr. 117:18-118:4.

134.    The records from the Feburary 8 renal teleclinic state that the ultrasound had "detected" "no stone" and that Mr. Dean's hematuria was a likely stone recurrence."  She also wrote "present case for collegial" and "case for collegial Wed[nesday" in those same records.  She also wrote that Mr. Dean's next renal teleclinic would be in two months on March 31, 2016.  Ex 5., Einwohner Bates #000059-60.

135.    Dr. Nawoor's Outpatient Progress Notes from February 10, 2016 state that Mr. Dean's case would be discussed "at collegial today," and Dr. Nawoor further recorded a plan to send Mr. Dean "to [a] urologist for cystoscopy." Wexford MSJ Ex. E, IDOC Taylorville Med Recs 001346.

136.    Mr. Dean's April 12 CT scan showed a "enlargement of the right kidney with a large ill-defined hypoattenuating mass involving the majority of the right kidney" and a "nonenhancing [tumor] thrombus in the . . . vena cava . . . extend[ing] superiorly to the level of the superior aspect of the intrahepatic IVC," to within a short distance of Mr. Dean's heart. Mr. Dean's April 12 CT scan also showed "[f]aceless appearance of the right kidney with a large ill[-]defined mass in the upper pole of the right kidney with replacement of the majority of the right renal parenchyma. Findings are concerning for urothelial carcinoma versus less likely consideration of renal cell carcinoma"—kidney cancer. Ex. 49, IDOC Taylorville Med Recs 001095-96.

137.    Surgery to remove Mr. Dean's cancer was medically necessary and without surgery he would die within five years.  Wexford MSJ Ex. L, Severino 11:5-13.

138.    The advancement of the tumor thrombus in the vena cava to within centimeters of Mr. Dean's heart made this surgery significantly riskier and more complex. Wexford MSJ Ex. L, Severino Tr. 14:1-13; Wexford MSJ Ex. N, Metwalli Expert Report at 2-3.

139.    The complexity of Mr. Dean's cancer surgery extended Mr. Dean's recovery time and increased the pain and difficulty of his post-operative recovery.  Ex. 38, Kosierowski Tr. 255:15-259:6; Wexford MSJ Ex. N, Metwalli Tr. 75:6-22.

140.    Nurse Lisa Mincy is aware that hematuria is a symptom of cancer.  Mincy MSJ Ex. B, Mincy Tr. 23:10-21.

141.    Dr. Barnett is a medical doctor who completed an internship in medicine and practiced medicine in the correctional context for over 10 years.  ████████████████████████

142.    Dr. Severino requested cardiac clearance for surgery no later than May 4, 2016.  Ex. 50, IDOC No. 000099.

143.    Four approvals had to be made through utilization management on June 2 (twice), June 14, and June 28 to make Mr. Dean's surgery possible—including an additional cardiology clearance after the May 6 clearance had effectively expired.  Ex. 50, IDOC No. 000100-04