# EXHIBIT 7

# Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services

# Report of the 2nd Court Appointed Expert

# Lippert v. Godinez

October 2018

Prepared by the Medical Investigation Team

Mike Puisis DO
Jack Raba, MD
Madie LaMarre MN, FNP-BC
Catherine M. Knox RN, MN, CCHP-RN
Jay Shulman, DMD, MSPH


PLAINTIFF'S EXHIBIT

## Table of Contents

Background .................................................................................................................. 2
Methodology ............................................................................................................... 2
IDOC Prisons Overview ............................................................................................... 6
Key Findings ................................................................................................................ 9
**Statewide Medical Operations** .................................................................................. 12
    Leadership, Staffing, and Custody Functions ......................................................... 12
    Wexford Provider Staffing and Physician Credentialing ......................................... 21
    Statewide Use of University of Illinois .................................................................... 31
**Statewide Overview of Major Services** ...................................................................... 32
    Clinical Space and Equipment ................................................................................ 32
    Medical Records .................................................................................................... 37
    Medical Reception ................................................................................................ 42
    Intrasystem Transfer ............................................................................................. 45
    Nursing Sick Call .................................................................................................... 48
    Chronic Care .......................................................................................................... 52
    Urgent/Emergent Care .......................................................................................... 59
    Specialty Consultations ......................................................................................... 62
    Infirmary Care ....................................................................................................... 69
    Pharmacy and Medication Administration ............................................................ 77
    Infection Control ................................................................................................... 84
    Mortality Reviews ................................................................................................. 91
    Dental Program ................................................................................................... 103
    Internal Monitoring and Quality Improvement ................................................... 118
**Recommendations** ................................................................................................. 121
    Key Recommendations of Second Court Expert .................................................. 121
    Organizational Structure, Facility Leadership, and Custody Functions ................ 122
    Clinic Space and Equipment ................................................................................ 124
    Medical Records .................................................................................................. 126
    Medical Reception .............................................................................................. 127
    Intrasystem Transfer ........................................................................................... 129
    Nursing Sick Call .................................................................................................. 129
    Chronic Care ........................................................................................................ 131
    Urgent/Emergent Care ........................................................................................ 133
    Specialty Consultations ....................................................................................... 135
    Infirmary Care ..................................................................................................... 137
    Pharmacy and Medication Administration .......................................................... 138
    Infection Control ................................................................................................. 140
    Mortality Reviews ............................................................................................... 146
    Dental Program ................................................................................................... 147
    Internal Monitoring and Quality Improvement ................................................... 150

# Background

This report is produced for the United States District Court for the Northern District of Illinois Eastern Division with respect to the litigation Don Lippert, et al. v. John Baldwin, et al. No. 10-cv-4603. The Court has asked for the Expert to:

> "Assist the Court in determining whether the Illinois Department of Corrections ("IDOC") is providing health care services to the offenders in its custody that meet the minimum constitutional standards of adequacy."[1]

The Court gave further direction. The Court asked the Expert to determine primarily whether any of the systemic deficiencies identified by the First Court Expert as reported in December of 2014 currently exist. The Court asked the current Expert, in the course of the evaluation, to identify any additional systemic deficiencies. Finally, the Court asked for assistance in forming recommendations to correct identified deficiencies. The Court asked the current Expert to consider the solutions proposed by the First Court Expert or to suggest alternate solutions. For newly identified deficiencies, the Court asked for new recommendations.

In order to form our opinion to answer these questions, the Expert, Michael Puisis DO, formed an investigative team consisting of Jack Raba MD, nurse practitioner Madie LaMarre MN, FNP-BC, Catherine Knox MN, RN, CCHP-RN, and dentist Jay Shulman DMD, MSPH.

# Methodology

The current Court Expert met with parties on December 18, 2017 to discuss his methodology and plan. The methodology explained to parties was one typically used by correctional experts in answering questions regarding adequacy of medical care in correctional settings. We interview staff and patients. We observe delivery of care as it occurs for selected processes. We review Administrative Directives, policies, and other documents such as budgets, staffing documents, quality improvement meeting minutes, and reports, etc. We tour facilities' areas where care is provided and observe the setting of care to determine the adequacy of resources that support care. Lastly, we review a sample of health records, including death records. From these interviews, tours, document reviews, and record reviews, we form our opinions and recommendations.

During our five site visits we reviewed 362 medical records and 363 dental records.[2] In addition, we reviewed 33 death records. Dr. Puisis performed all mortality reviews. Findings in site visit record reviews corroborated findings in death reviews. Charts for urgent care, specialty care, and hospital care record review were chosen based on having an ambulatory care-sensitive

---

[1] Second Order Appointing Expert, United States District Court for the Northern District of Illinois Eastern Division, No. 10-cv-4603 filed 12/8/17.
[2] A table with details of record reviews is found at the end of this report as an appendix.

condition.[3] For all other site visit medical record reviews, records were chosen of patients that had an actual or potential serious medical needs. In the case of chronic illness,[4] records were chosen randomly by type of disease (e.g., diabetes, autoimmune, HIV, etc.) For nursing sick call, we selected records nursing sick call logs of patients with potentially serious medical needs such as shortness of breath or chest pain instead of persons complaining of athlete's foot or wanting a low bunk.

For mortality reviews, there were 174 deaths in 2016 and 2017. We asked for 89 records but only reviewed 33 records due to the truncated investigation. We excluded from selection nine suicide deaths, three overdose deaths, and one death from injury. Record selection was somewhat limited by the availability of records. We asked for death records when the Expert first met with the attorneys in December of 2017. We started receiving records on March 7, 2018. Initially we reviewed six records,[5] as they were the only records we had available. Twenty-one records were then chosen from sites we were visiting.[6] We then randomly chose two records from sites that the First Court Expert had visited.[7] The remaining four records were chosen at random from sites that neither Expert visited. The only information available at the time of record selection was the name, date of death, age, facility, and cause of death. The cause of death was not provided for all patients; some patients had "natural causes," "cardiac arrest," or "unknown" listed as the cause of death. Autopsies were not available for all deaths; even when an autopsy was done it was not consistently available. We randomly chose more records from facilities we were visiting intending to allow for a comparison with observed care during site visits. We reviewed one to two years of documentation of care in these records.

Our mortality review consisted of describing episodes of care, and for each episode we identified errors using a classification of 18 different error types. This allowed us to identify common and systemic problems within the health program. Error types were summarized as an appendix in the mortality review document. We summarized the mortality reviews in a narrative summary, but also provided the spreadsheets used to document each individual episode of care reviewed so that reviewers can see the specific instances of care that formed our opinion in the narrative. The mortality reviews are integral to our opinion and should be reviewed. These documents are provided as an appendix.

For dental records, the chart selection methodology is described in each element of the dental program.

The IDOC, in their comments on our report, asserted that the report "relies primarily on a subjective review of the health record" and failed to use "objective clinical measurements such

---

[3] Ambulatory care sensitive conditions (ACSC) are conditions that can be managed in an outpatient setting. HEDIS, the Agency for Healthcare Research and Quality (AHRQ) and quality improvement programs use ACSC to select records to review to assess whether hospitalization might be preventable or whether care reveals quality or systemic issues. For more information see the Prevention Quality Indicator Overview at https://www.qualityindicators.ahrq.gov/modules/pqi_overview.aspx.
[4] We presume that all patients with chronic illness have a potential or actual serious medical illness.
[5] Patients #1, 2, 3, 4, 5, and 6.
[6] Patients #7 through 27 inclusive.
[7] Patients #30 and 31; Pontiac had no deaths.

as those found with the Healthcare Effectiveness Data and Information Set ("HEDIS"[8]) guidelines or critical process assessments."[9] The IDOC does not participate in HEDIS measurement so there was no IDOC data to review with respect to HEDIS measures.[10] Moreover, quality improvement reports did not include objective data measures similar to HEDIS that might have informed us. IDOC lacks useable data for analysis of clinical care, which is evident in their quality improvement efforts. The First Court Expert in his analysis of the quality improvement program also identified this problem.[11]

In their comments on our reports, the IDOC asserted that we believed that prison health care systems should provide care "significantly in excess of what is available in the community" and that our report "takes the position that inmates are entitled to a perfect healthcare delivery system." We do not agree with those assertions. The benchmarks we use are community and correctional standards of care,[12] not a hypothetical standard "in excess of what is available in the community."

---

[8] The Healthcare Effectiveness Data and Information Set (HEDIS) is a performance measurement system managed by the National Committee for Quality Assurance (NCQA). There are over 90 HEDIS measures over six domains including safety, effectiveness, patient-centered, timely, efficient, and equitable. Large health maintenance organizations and practices use HEDIS to measure their performance. Data submission used for HEDIS reporting is strictly controlled and defined. These measures are a useful comparator between managed care organizations and other health organizations. These measures do not address acute or emergency care, access to specialty services, access to hospital care, access to an appropriate provider, timely access to a professional opinion and evaluation, access to medication, or many other areas specific to the correctional setting. These performance measures are useful but are not designed for correctional health care programs

[9] Letter via email from John Hayes and Michael Arnold, Office of the Attorney General to Dr. Puisis: Re: *Lippert v. Baldwin,* No. 10-cv-4603 – Defendants' comments to the Draft Report of the 2nd Court Appointed Expert, dated September 10, 2018.

[10] Although IDOC does not track HEDIS measures or participate in HEDIS, we made comments on and/or reviewed care in multiple areas that correspond to HEDIS measures. Our report documents record reviews or other investigations that identified quality of care and/or systemic issues in all of the following HEDIS measurement areas: Adult BMI assessment; Colorectal cancer screening; Care for older adults; Use of spirometry testing in the assessment and diagnosis of chronic obstructive pulmonary disease; Statin therapy for patients with cardiovascular disease and diabetes; Comprehensive diabetes care; Follow-up after emergency department visit for people with multiple high-risk chronic conditions; Medication management in the elderly; Fall risk management; Management of urinary incontinence in older adults; Influenza and pneumococcal vaccination status for older adults; Hospitalizations for potentially preventable complications; Acute hospitalization utilization; and Emergency Department utilization.

[11] On page 44 of the First Court Expert's summary report he states, "although some data was collected it was never used to measure performance against standards and therefore was not part of an effort to measure the quality of performance."

[12] As examples of references reflecting community standards of care, we utilized the U.S. Preventive Services Task Force Recommendations for Primary Care Practice; CDC Recommended Immunization Schedule for Adults Aged 19 Years or Older, United States, 2018; MMWR (2006) Prevention and Control of Tuberculosis in Correctional and Detention Facilities; Standards of Medical Care in Diabetes by the American Diabetes Association; 2013 American College of Cardiology/American Heart Association Guideline on the Treatment of Blood Cholesterol to Reduce Atherosclerotic Cardiovascular Risk in Adults; Global Initiative for Chronic Obstructive Lung Disease updated 2016; American College of Cardiology/American Heart Association Guidelines for the Management of Patients With Unstable Angina and Non-ST-Elevation Myocardial Infarction; Evidence-Based Guideline for the Management of High Blood Pressure in Adults, Report from the Panel Members Appointed to the Eighth Joint National Committee (JNC 8); Centers for Disease Control and Prevention; HIV Testing Implementation Guidance for Correctional Settings. 2009; National Commission on Correctional Health Care, 2014 Standards for Health Services in Prisons; HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, Last Updated May 24, 2018; American Association for the Study of Liver Diseases and Infectious Diseases Society of America; Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i); Guidelines for Infection Control in Dental Health-Care Settings--2003. MMWR, December 19, 2003/52(RR17):1:16; Stefanac SJ. Information Gathering and Diagnosis Development; American Dental Hygiene Association Standards for Clinical Dental Hygiene Practice Revised 2016; Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006); Correctional Dental Services. In M. Puisis (Ed.), Clinical Practice in Correctional Medicine (2nd edition); Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure.

In addition to record reviews, we toured five facilities: Northern Reception Center (NRC), Stateville Correctional Center (SCC), Dixon Correctional Center (Dixon), Logan Correctional Center (LCC), and Menard Correctional Center (MCC). Four Experts visited each site; two doctors, a dentist, and a nurse. During each facility visit, we:

- Met with leadership of custody and medical
- Toured the medical services areas and housing units
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

The First Court Expert mentioned in his report that the State provided comments that the Investigative Team should utilize standards from the National Commission on Correctional Health Care (NCCHC) or the American Correctional Association (ACA) as the basis for their investigation. We agree with the First Court Expert's response that NCCHC standards are useful as a basis to evaluate IDOC Administrative Directives and certain processes of care. We do use the NCCHC standards for that purpose and mention this in this report. However, the request of the Court is to determine adequacy of care for serious medical needs. In order to do that, one must do more than evaluate whether Administrative Directives meet NCCHC standards. Adherence to NCCHC standards does not verify that quality of clinical care is adequate, which is arguably the most important aspect of determining adequacy of care. The limitations of the NCCHC standards as a sole measure for constitutional adequacy require additional investigative measures to answer the Court's request. Observation of actual practices at the facilities form the basis for evaluation of actual care as it is delivered, and review of records forms the basis for evaluation of clinical care.

To facilitate comparison with the First Court Expert's report, we have utilized similar headings of major services reviewed. We agree with the First Court Expert's organization of topics of study as presented in his table of contents. One change we made was to combine laboratory functions and clinic space and sanitation, and to include other diagnostic testing available onsite. These items are all support functions and were combined for that reason. We have added a section in the summary document discussing the statewide operations of the IDOC, UIC, and Wexford, the medical vendor, including a section on credentialing of physicians on a statewide basis. We also included a brief summary describing the statewide monitoring effort of the current medical contract.

The Second Order Appointing Expert gave authority to perform tours of eight facilities that had been reviewed by the First Court Expert. The Court's Order gave the Expert discretion to decline visiting any of the facilities if determined to be unnecessary. The Court's Order required the Expert to meet parties after the first 120 days of the investigation to establish a plan and timeline for concluding the review in a timely and cost-effective manner.

---

American Dental Association and U.S. Food and Drug Administration, 2012. For items for which there is no standard of care, we utilized information as found in Up-To-Date, an online medical reference.

We started this project intending to review eight facilities. At the 120 day meeting, the Expert discussed preliminary findings and announced that it was his opinion that review of the eight facilities was not necessary. The findings were consistently similar facility to facility and confirmed by the First Court Expert's findings. Review of death records from 12 facilities demonstrated consistently poor care and the evidence was so overwhelming that the Expert found it unnecessary to continue visiting the full complement of eight facilities. The Expert strongly believes that further visits would not add to our opinions, except for site-specific recommendations. We terminated visits after five facilities were visited. These included: NRC, SCC, Dixon, LCC, and MCC. It is our opinion that this complement of facilities is adequate to form an opinion of statewide services. The sample includes the main male and female reception centers, the center used to house geriatric patients, two of the three maximum security prisons, the largest IDOC facility (Menard Correctional Center), and facilities from Northern, Central and Southern areas of the state. We are confident that review of this group of facilities gives a representative sample of the IDOC health care system.

With respect to this report, for each section in which the First Court Expert had findings, we summarize his findings in a paragraph and make a subsequent statement whether his findings were still present or have been resolved. We then present our own findings. With respect to recommendations, we do the same. We list, verbatim, the First Court Expert's Recommendations and document whether we agree or not. If we disagree or had additional comments we add those. When we comment on the First Court Expert's Recommendations we do so in italics so our comments can be distinguished from the First Court Expert's comments.

## IDOC Prisons Overview

The Illinois Department of Corrections was established in 1970 to administer and operate state prisons, juvenile centers, and juvenile and adult parole services. In 2006, the Illinois Department of Juvenile Justice was formed, which separated the adult and juvenile correctional systems. In 1970, the IDOC operated seven adult prisons. Currently, the IDOC operates 25 adult prisons,[13] a facility for housing the severely mentally ill (Joliet Treatment Center), and four transition centers.[14] The population of Illinois prisons has increased from approximately 6000 inmates in 1974 to approximately 49,000 inmates in 2015,[15] an eight-fold increase in population. The most recent information given to us by the IDOC is that the correctional center population as of November 30, 2017 is 41,376.[16]

Illinois prisons are overcrowded. The latest data from 2015 comparing prisons nationwide show that, based on design capacity, Illinois is the second most overcrowded prison system in the

---

[13] NRC and SCC are considered one facility for custody purposes, but NRC and SCC now have separate medical programs. Therefore, for purposes of this report there are 26 facilities. When we refer to prisons with respect to the medical programs we will refer to 26 prisons.

[14] Agency Overview on the IDOC website found on December 16, 2017 at https://www.illinois.gov/idoc/aboutus/Pages/IDOCOverview.aspx.

[15] Illinois Prison Overview, Illinois State Commission on Criminal Justice and Sentencing Reform, 2015, as found at http://www.icjia.org/cjreform2015/research/illinois-prison-overview.html.

[16] 180126 Presley Rated Capacity on November 30, 2017, provided to us by IDOC.

nation. Alabama is the most overcrowded.[17] That 2015 data showed that Illinois had a population at 145% of capacity. Since 2015, the population has been reduced by several thousand. Still, as of November 30, 2017, the IDOC is at 131% of rated capacity. It houses 41,376 inmates in facilities rated to hold 31,525 inmates.[18]

Many IDOC facilities are old and hard to maintain. The state, on several occasions, has attempted to close some of these older facilities, including SCC, Pontiac, and Vandalia. In recent years parts of the Stateville Correctional Center, including the old Roundhouse building, have been closed. Of its 25 adult prisons, only four were opened in the 21st century, and two of these facilities (Decatur and Sheridan) were older facilities that were rehabilitated. Thirty-eight percent of inmates in IDOC reside in facilities built before 1981. Two of the facilities housing approximately 11% of the IDOC population were built in the 19th century (MCC 1878 and Pontiac 1871), and two facilities were built in the early 20th century (Vandalia 1921 and SCC 1925). All of the male maximum security beds in the IDOC are in structures built in the 19th century or early 20th century (MCC 1878, Pontiac 1871, and SCC 1925). Maximum security facilities house approximately 7500 inmates (approximately 17% of the IDOC population) who spend more in-cell time. These structures make delivery of medical care more difficult and less efficient, are difficult to maintain, and may negatively affect inmate health in a variety of ways. These health-related effects include heat exposure issues, particularly at the Menard facility, and potential for rodents and vermin. In addition, these facilities present challenges in health care delivery, including access to care, medication administration, and providing ordered medical care. As our reports show, we found some of these problems in the older facilities we visited. We did note an additional egregious issue at NRC, where inmates are locked down 24 hours a day except for four hours per week. In some cells, inmates had no functioning lights for weeks at a time, inhibiting nurses' ability to properly identify inmates when administering medications. These conditions are a serious obstacle to health care access.

With respect to IDOC health care costs, a 2017 study detailed costs of health care in state prison systems between 2010 and 2015.[19] In 2015, the average per inmate per year health care spending for persons in state prisons in the U.S. was $5,720. Illinois spent $3,619. This was 37% below national average. Nationwide, per capita expenditures for health care for state prisoners ranged from a low of $2,173 to a high of $19,796. Illinois ranked seventh lowest in the U.S. in terms of per capita spending per inmate per year as noted in the table below.[20] We were given information from the IDOC Chief Financial Officer that for 2017 the annual spending per inmate increased to approximately $4800 per inmate per year, but there is no comparable data for

---

[17] Appendix Table 1, Prison facility capacity, custody population, and percent capacity, December 31, 2015, as found in Prisoners in 2015, Bureau of Justice Statistics, US Department of Justice, December 2016, NCJ 250229 located on the web at https://www.bjs.gov/content/pub/pdf/p15.pdf.
[18] 180126 Presley Rated Capacity on November 30, 2017, as provided by IDOC.
[19] Data from Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017, as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.
[20] We note that the Kaiser Family Foundation reported that Illinois civilians had per capita health care expenditures of $8,262. This can be compared to the $3,619 per capita health expenditures per inmate per year. Health Care Expenditures per Capita by State of Residence for 2014 for the Illinois civilian population is found at https://www.kff.org/other/state-indicator/health-spending-per-capita/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

other state prison systems nationwide.[21] IDOC Spending in 2017 is still below the average 2015 spending of prisons nationwide.

| Ten Lowest Per Capita Expenditures for Health Care in US State Prison Systems in 2015 | |
|---|---|
| State | Per Capita Annual |
| Louisiana | $2,173 |
| Alabama | $3,234 |
| Indiana | $3,246 |
| Nevada | $3,246 |
| South Carolina | $3,478 |
| Arizona | $3,529 |
| Georgia | $3,610 |
| Illinois | $3,619 |
| Kentucky | $3,763 |
| Mississippi | $3,770 |

For most state systems, the number of employees, age, and percent of female population were the largest drivers of cost of prison health programs. The Federal Bureau of Prisons assessed that institutions with the highest percentages of aging inmates spent five times more per inmate on medical care and 14 times more per inmate on medication than institutions with the lowest percentage of aging inmates. The National Institute of Corrections estimates that inmates over age 55 cost, on average, two to three times more than the expense for all other inmates.[22] Based on this same 2017 report, Illinois has the seventh *lowest* rate of persons over age 55 (8.5%). As well, in 2015 IDOC had a female population of 5.8%, the ninth *lowest* rate of females incarcerated in state prison systems. These two factors should lower the costs of care somewhat, but are not so great as to account for the difference in IDOC cost from the mean health expenditure of state prison systems.[23]

Staffing appears to be the biggest contributor to the low IDOC spending on health care. In fiscal year 2015, Illinois has the second lowest number of full-time equivalent (FTE) health care workers (19.3 per 1,000 inmates) of all 50 state prison systems. The range of FTEs per 1,000 in the 50 state systems range from 18.6 FTEs per 1,000 inmates to 86.8 FTEs per 1,000 inmates.[24]

---

[21] In his deposition, Mr. Brunk the Chief Financial Officer for the IDOC stated on pages 12-13 that the total expenditures on health care in the IDOC were approximately $203 million. Using a population of approximately 42,000 the expenditures per inmate per year would be approximately $4,800.

[22] Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017 as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

[23] Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017 as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

[24] Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017 as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

There is a direct correlation between the FTEs per 1,000 inmates and per-inmate annual spending. A low number of staff can reflect a more efficient system of care or understaffing with its attendant negative consequences for provision of health care. In our study, we found that in 2018 there were 25 employees per 1,000 inmates, which still places Illinois approximately in the lower 10% of state prison systems based on 2015 data. This will be discussed later in this report.

## Key Findings

Overall, the health program is not significantly improved since the First Court Expert's report. Based on record reviews, we found that clinical care was extremely poor and resulted in preventable morbidity and mortality that appeared worse than that uncovered by the First Court Expert.

Governance of the IDOC medical program is subordinated to custody leadership on a statewide level and at the facility level. The subordination of health care to custody leadership has resulted in a medical program that is not managed on sound medical principles and one that is without medical leadership.

The existing IDOC system of care was established to have a more robust central office capable of monitoring vendor activity. The IDOC central office has been progressively diminished over the years to the point where it is incapable of effective monitoring.

The medical program does not have a separate budget. The IDOC could not provide to us a document that included expenditures for medical care. Authorization and responsibility for medical expenditures does not reside with the health authority.

IDOC Administrative Directives are inadequate policies for this state system. The IDOC medical policies need to be refreshed, augmented, and address all National Commission on Correctional Health Care (NCCHC) standards.

The IDOC does not have a staffing plan that is sufficient to implement IDOC policies and procedures. The staffing plan does not incorporate a staff relief factor.

Custody staffing has also not been analyzed relative to health care delivery to determine if there are sufficient custody staff to deliver adequate medical care.

Budgeted staffing was increased but vacancy rates were higher than noted in the First Court Expert's report. Staff vacancy rates are very high.

The vendor, Wexford, fails to hire properly credentialed and privileged physicians. This appears to be a major factor in preventable morbidity and mortality, and significantly increases risk of harm to patients within the IDOC. This results from ineffective governance.

Wexford and the IDOC fail to monitor physician care in a manner that protects patient safety. There is no meaningful monitoring of nurse quality of care. If care is provided it is presumed to be adequate, when in fact it may not be adequate.

The inability to obtain consultation reports and hospital reports appears to be a long-standing system wide problem. This is a significant patient safety issue.

The collegial review process of accessing specialty care is a patient safety hazard and should be abandoned until patient safety is ensured.

Specialty care is not tracked with respect to whether it is timely. The Wexford system of utilization management is ineffective and for many patients is a barrier to timely care. The use of free care at UIC appears to have resulted in unacceptable delays. Waiting for unacceptable time periods for free care when care needs to be performed timelier has harmed patients.

Patients are not consistently referred for specialty care when it is warranted. We view this as a problem of hiring unqualified physicians and as a problem of the utilization process itself.

The paper medical record system creates significant barriers to delivery of safe health care, including inaccessibility of prior reports and prior diagnostic tests. The current paper medication administration records (MARs) are inconsistently filled out, filed, or able to be viewed by clinicians. The paper record also makes monitoring health care processes exceedingly difficult. An electronic medical record is needed.

Sanitation, maintenance, and equipping health care units is not standardized. Many clinical areas are inadequately sanitized.

The reception process does not ensure a thorough initial medical evaluation that will correctly identify all of a patient's problems in order to develop an appropriate therapeutic plan. Provider medical histories are inadequate. Follow up of abnormal findings is inconsistent. Laboratory tests and other studies needed for an initial evaluation of a patient's chronic illnesses are inconsistently obtained. Tuberculosis (TB) screening is improperly performed due to custody rules at NRC.

The chronic disease system promotes fragmentation of care and fails to adequately address all of a patient's problems from the perspective of the patient. Patient problems are lost to follow up or are not addressed in the context of a patient's complement of diseases.

The chronic care disease guidelines need to be updated. Alternatively, contemporary existing guidelines by major specialty organizations should be used in lieu of IDOC-specific chronic care

guidelines. These specialty organization guidelines are periodically updated and are based on latest scientific evidence. For the Office of Health Services to attempt to duplicate these guidelines is unrealistic.

The Administrative Directive for periodic examination [25] is inconsistent with current standards of preventive care.[26] Inmates are therefore not offered all preventive services that are typically offered to individuals in the community. The most important missed preventive care is colorectal cancer screening in individuals over 50 years of age.

Housing of the elderly and disabled is inadequate. The IDOC needs to perform an assessment of its geriatric and disabled population to determine housing needs for this population. It is likely that new or rehabilitated housing for this population is needed.

There is no active infection control program. Infection control practices lack guidance from a physician with expertise in infection control practices. This is evident in HIV testing, TB screening, and analysis of surveillance practices.

The quality improvement program operates on a legacy system of principles that no one any longer understands or effectively implements. No one in the IDOC has experience or knowledge of contemporary quality improvement methodology and practice. The quality improvement program is ineffective statewide.

The quality improvement program does not have a means to identify problems for study and does not associate identified problems with systemic processes.

Data for quality improvement is obtained by manually counting events. Logs tracking processes of care are either not maintained or maintained in a manner such that the data is not easily useable.

The methods of preparing and administering medications is not standardized across the system. There are pervasive and systemic issues with respect to medication administration that place inmates at risk of harm. When these occur, there is no system to identify or correct the systemic problem.

Overall, the dental program has not improved since the First Expert Report. Dental care continues to be below accepted professional standards and is not minimally adequate. Examinations are inadequate and routine care is provided without intraoral x-rays, a documented periodontal assessment, and a treatment plan. Periodontal disease is rarely diagnosed and treated.

---

[25] Offender Physical Examination; Illinois Department of Corrections Administrative Directive 04.03.101.
[26] As exemplified by the US Preventive Services Task Force Recommendations.