# EXHIBIT 37

# Final Report of the Court Appointed Expert
# Lippert v. Godinez

December 2014

Prepared by the Medical Investigation Team

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

## Introduction

Towards the end of 2013, Dr. Ronald Shansky was nominated by the parties and appointed by the court in the Lippert matter as an expert pursuant to Rule 706 of the Federal Rules of Evidence. The order appointing him lays out the scope of the duties.

> "The expert will assist the court in determining whether the Illinois Department of Corrections ("IDOC") is providing health care service to the offenders in its custody that meet the minimum constitutional standards of adequacy."

It further goes on to say that the expert "will investigate all relevant components of the health care system except for program services and protocols that relate exclusively to mental health." Furthermore,

> "If systemic deficiencies in IDOC health care are identified he will propose solutions for consideration by the parties and the court. These proposed solutions, if any, will form the bases for future negotiations between the parties in an effort to craft a final settlement of this matter or alternatively, may be offered into evidence in the trial of this matter. Furthermore, the expert will not recommend specific treatment for individual offenders unless those recommendations relate to systemic deficiencies in the health care provided to offenders in IDOC custody."

The parties have also accepted Karen Saylor, M.D., Larry Hewitt, R.N. and Karl Meyer, D.D.S. as additional team members. The expert met with the parties in late 2013 and a second time in April of 2014. The first meeting focused on the methodology to be used as well as questions that either of the parties had with regard to the process. The April meeting was intended to be an update, having visited by that time approximately half of the facilities to be reviewed. The expert thought this would be valuable because the confidential draft report was not due until the site visits and mortality reviews had been completed and therefore there would have been no opportunity to jointly update the parties until they actually received the confidential draft report. Both parties have been extremely supportive of this process. We received full cooperation at each of the prisons we visited and are extremely appreciative of the local efforts to facilitate the process.

The investigative team was assigned an explicit task, "To assist the Court in determining whether the state of Illinois was able to meet minimal constitutional standards with regard to the adequacy of its health care program for the population it serves." In order to reach this conclusion, the parties determined that we should visit at least eight facilities, six of which were jointly selected by the parties. The investigative team concurs with the parties' selections, in that those six facilities have special responsibilities within the system and are critical to a determination as to whether, when the health care systems are most challenged, they are able to adequately meet that challenge. Three of the institutions reviewed functioned as reception centers. These facilities are critical in that they perform the initial evaluation upon entry into the system. Problems that they fail to identify are much more likely to either not be addressed or sometimes at a minimum, the identification and the interventions are significantly delayed. Three facilities were maximum-security facilities which house the most challenging of populations for

which to provide health care services. Finally, one of the six houses the system's special geriatrics unit, which also creates health care challenges. It has been our experience that when a system is able to meet constitutional standards at the most challenged institutions, it is very likely to meet constitutional standards at the less challenging facilities. The converse, however, in our experience has not proven to be true.

The State indicates that the investigation team should have utilized standards such as the National Commission on Correctional Health Care or the American Correctional Association as the basis for both our investigation and our recommendations. The leader of the investigative team served on the board of the National Commission on Correctional Health Care for 10 years. He has also been involved with the development of the standards for the last 20 years, serving on three of the task forces and advising the most recent task force. In addition, he has also been requested and has provided training to all of the NCCHC surveyors with regard to the quality improvement standard and how to survey it. He himself has done surveys in each of the last three years. All of the members of the investigative team believe that the National Commission on Correctional Health Care, through its standards, its surveys and its training, have contributed substantially over the past three to four decades in helping facilities improve the quality of health care. When the survey process occurs, about 80% of that process is focused on administrative matters; policies, procedures, contracts and other administrative matters. Approximately 20% of the survey process is focused on clinical care, and during that process the lead investigator has recently been asked to help redesign the methodology used to assess care issues. Investigations that are part of litigation and assist the court in determining whether and the extent to which "deliberate indifference to serious medical needs" may exist requires that the focus be overwhelmingly on clinical care issues. Thus, virtually all of the time that we spent, other than understanding how services are provided at each facility, dealt with interviewing staff and inmates, observing processes and reviewing medical records. For the purposes of the court, clinical care is of overwhelming importance and administrative issues, though important, are much, much less important.

A recent article by Alex Friedmann published in *Prison Legal News,* October 2014, describes with specific citations about how the courts view specifically ACA accreditation, but also how the courts view accreditation in general. More commonly the courts have said that they do not rely in their determinations of constitutionality on the presence or absence of accreditation. We believe that this is based on the fact that the focus in constitutional disputes is overwhelmingly on clinical care matters, whereas in accreditation the focus is overwhelmingly on administrative issues. The wording of the constitutional definition of an Eight Amendment violation forces investigators, whether they be plaintiffs or defendants or working for both parties, to heavily focus on clinical care issues. Having said this is not meant in any way to diminish the value of the accreditation process, specifically with the National Commission on Correctional Health Care.

Having received the comments from both plaintiffs and defendants, it has been a challenge to integrate some of the comments into the final draft. The State has indicated it has done several things which are consistent with the investigative team's recommendation. Since we cannot verify where things are in the process, we are not addressing those things in the final report. Rather, any of the updates will be available to the Court in an appendix which includes both

plaintiff's and defendant's responses. On the other hand, where there are clarifications requested or alternatives proposed, we have attempted to be responsive. In some instances, the original paragraphs we feel were clear enough; in other instances, we have modified the original draft. We feel we have made a sincere effort to be responsive to the parties.

In order to perform such a review, it is necessary to utilize a variety of investigative strategies. We interviewed staff, we have interviewed inmates, we have observed care provided, we have reviewed policies and procedures and compared practice to the policies and procedures, we have reviewed minutes of meetings and we have reviewed selected records, including death records. In order to best describe a correctional health care program, we have found it useful to organize the institutional reviews along the lines of major services provided. This listing of services is not exhaustive; however, it enables a fairly comprehensive snapshot of how the program is functioning. The critical services begin with medical reception, which is designed to create an awareness and understanding of the medical needs of patients on entry to the system. We visited three reception centers; the main reception center, which is the Northern Reception Center, which receives inmates from Cook County; the reception process at the Logan Correctional Center, the major women's prison; and the Menard Correctional Center, which receives far fewer new inmates, especially those from Southern Illinois. An adjunct to the reception process for when patients are transferred from one facility to another is the intrasystem transfer process. Both reception and intrasystem transfer processes are designed to identify problems and insure continuity of care despite the potential disruption during a transfer. Other major services include nurse and provider sick call (primary care services), chronic care services, medication management services, scheduled offsite services (specialty consultations and procedures), unscheduled onsite and offsite services (urgent/emergent responses), infirmary services (onsite inpatient care), infection control services and dental services. All of these major service areas must be supported by an effective quality improvement program that not only self-monitors but also effectively identifies performance improvement needs and implements strategies that facilitate performance improvement. It is these services for which we will provide an overview in this confidential draft report and for which we will attach institutional appendices in which our specific findings within each institution are detailed. Finally, the report includes a review of 63 deaths by Dr. Saylor and Dr. Joe Goldenson, who was added to the team with the agreement of the parties in order to facilitate completion of the mortality reviews. In order to discuss services, we are forced to address both leadership issues as well as staffing issues, and the degree to which leadership or staffing were significantly problematic varies by institution. In the institutional appendices, we describe shortcomings in some detail.

## Leadership and Staffing

Leadership is a problem at virtually all of the facilities we visited. The question varied only with regard to degree. The reason why leadership is so important to a correctional health program is because they are responsible for setting the tone with regard to both structure and professional performance as well as insuring that the program effectively self-monitors and self-corrects so that problems are identified, addressed and ultimately eliminated. Through this self-correcting process potential harm to patients is continually mitigated. Without a strong and effective leadership team a program is much less able to identify the causes of systemic problems and to effectively address those problems by implementing appropriate targeted improvement

A majority of the records we reviewed contained neither an emergency room report nor, when patients were hospitalized, a discharge summary, despite the fact that these documents are crucial for appropriate continuity of care. Hospitals must be educated that compensation for a service cannot be provided as long as the service which includes the appropriate documentation has not been provided.

**Recommendations:**
1. All facilities must track urgent/emergent services through using a logbook maintained by nursing which includes patient identifiers, the time and date, the presenting complaint, the location where the patient is seen, the disposition and when the patient is sent out, the return with the appropriate paperwork, including an emergency room report and appropriate follow up by a clinician.
2. Assessments must be performed by staff appropriately licensed to be responsible for that service.
3. Guidelines should be developed for nursing staff with regard to vital signs reflecting instability that require contacting a clinician.
4. When patients are sent offsite, work with hospitals to insure that the emergency room report is given to the officer to return to nursing with the patient.
5. Patients returning from an emergency trip must be brought to a nursing area for an assessment and if not placed in the infirmary, scheduled for an assessment by an advanced level clinician.
6. The Office of Health Services should provide guidance with regard to the types of clinical problems that require services beyond the capability of the infirmary, thus sending patients to the local hospital.
7. Insure that after the patient returns he is seen by a clinician within three days where there is documentation of a discussion of the findings and plan as described in the emergency room report.
8. The QI program should monitor timeliness and appropriateness of professional responses.
9. As an aspect of the QI program, review nursing and clinician performance to improve it.

## Scheduled Offsite Services (Consultations and Procedures)

As we understand the process for obtaining consultations and procedures, it begins with the timely identification of the need for a procedure or consultation, usually for diagnostic assistance. Review of death records has revealed some delays in the timeliness of identification.

Once the clinician has determined that there is a clinical basis for offsite services, they are required to submit a form which documents the clinical justification for obtaining the service.

This form is reviewed by the site Medical Director, who either concurs and presents it to the weekly collegial review telephone discussion or suggests an alternate plan of care to the ordering clinician. When an alternate plan of care is recommended, either by the Medical Director or the collegial review teleconference, there must be a discussion between the ordering clinician and the patient so that he/she is on board with the change in plan. The telephonic collegial review is performed weekly and so there should be no more than a one-week delay due to presentation at the collegial review.

During the collegial review, the Pittsburgh-based physician either approves the service or suggests an alternate plan. We have been told by several sites that this rate of approval varies dramatically based on which Pittsburgh-based physician happens to be receiving the phone call. Some approve at a much higher rate than others. For Dixon and Stateville, despite verbal approval received over the telephone, there is a substantial delay in Pittsburgh providing the authorization code to the University of Illinois. This delay can extend up to eight weeks or more. The scheduler at Dixon and at Stateville will call the University of Illinois scheduler, who works closely with them. Wexford changed the procedure so that the authorization is no longer given directly to the scheduler at the site; rather, it is given directly to the U of I scheduler, but as we indicated, this may occur up to eight weeks later. This is clearly not acceptable. Additionally, there are several specialties for which University of Illinois may not provide access for up to three or more months. In many instances, the services could be obtained much more timely by using a local service rather than the University of Illinois.

In most correctional settings, for scheduled offsite services, emergent consultation or procedures are sent out immediately, without any utilization review until after the fact. Urgent services are obtained in no more than 10 business days and routine services are generally obtained within 30 calendar days. From what we have seen, generally these measures are obtained when using local services. The extraordinary delays tend to revolve around the utilization of the University of Illinois.

Once the patient attends the appointment and receives the service, he should be returned to an onsite nurse with any accompanying paperwork, which should be given to the nurse. There are procedures for which one anticipates dictation and transcription and for these services a staff member at the institution must insure that the offsite paperwork is obtained timely. Finally, once the paperwork is available onsite, there should be a scheduled visit with the ordering clinician or Medical Director during which there is a documented discussion of the findings and plan.

During our review of records, we found breakdowns in almost every area, starting with delays in identification of the need for the offsite services, delays in obtaining an authorization number, delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork and delays or the absence of any follow-up visit with the patient. Additionally, although some of the facilities were tracking these steps fairly conscientiously, others were not, creating much less dependable outcomes. In the best of the eight facilities we reviewed, there were problems at one step or another in about 20% of the records. In other facilities, such as Dixon Correctional Center, there were problems with almost every record reviewed. What follows are examples of the differing types of problems we identified.

**Delays in Perceiving the Need for the Service**
Illinois River Death Review. The patient, [REDACTED], entered IDOC in 2000 and began complaining of constipation in January 2011, when he weighed 195 pounds. The patient returned with a complaint of constipation in May 2011 and indicated that he had lost 10 pounds. At that point, the physician did not do a rectal exam. In December of the same year he indicated that he was losing weight and in fact he had lost more than 30 pounds and weighed 158. The doctor did perform a rectal exam but found no masses, although every subsequent physician did feel a mass.

29

She ordered lab tests, which showed a mild iron deficiency anemia. She then ordered stool cards to see if there was blood in the stool and these came back positive. Finally, he was referred for a colonoscopy, which on April 13, 2012 identified a large tumor in the rectum. Once the tumor was identified, his care was appropriate. However, he survived less than a year.

Hill Death Review. Patient [REDACTED] entered IDOC in 1984 and arrived at Hill Correctional Center in 2009, having stopped smoking two years earlier. His complaints began with left neck and chest pain in February 2012. In May 2012, he told a nurse he was coughing up blood, which he connected to a shoulder injury. He was seen a week later by the physician with multiple complaints, including weight loss, for which the medical record reveals a 30-pound weight loss. The physician saw the patient a little more than two weeks later and noted a left mobile quarter-sized mass in the left superclavicular area. He ordered iron and a chest x-ray. The chest x-ray revealed a focal opacity in the left lower lobe with tenting of the left hemidiaphragm. The Medical Director saw the patient in June and twice in July, and by August the patient's weight was down to 127 pounds. On August 20, he presented coughing up blood and the doctor ordered more blood tests, which showed his anemia worsening. It was not until August 31 that a CT scan was performed which showed "a very large carcinoma which extends through the superior portion of the left hemithorax, through the apex and involves the left anterior chest extending to the anterior plural surface and invading the mediastinum with tumors surrounding the ascending thoracic aorta, extending along the aortic arch and encircling the proximal descending thoracic aorta." This patient died of lung cancer on 1/30/13.

**Delay in Obtaining Timely Appointment**
Pontiac Death Review. The patient, [REDACTED], was a 42-year-old man who died of glioblastoma multiforme on 4/16/13. The tumor was first diagnosed in 2009, prior to his incarceration. He underwent excision in March 2009 and again in September 2010 for recurrence. He was admitted to IDOC in July 2012. He had a restaging MRI in October 2012 which showed no recurrence and his maintenance chemotherapy was discontinued.

A subsequent MRI on 2/1/13 showed recurrence of a low grade enhancing mass in his left temporal lobe and he was referred for neurosurgical consultation, but this was not scheduled until 4/10/13. However, on 4/1/13, he was found with altered consciousness and stroke-like symptoms and was taken to St. James Hospital, where CT showed significant edema around the mass and a 1 cm midline shift. He was transferred to UIC, where it was decided that the risks of surgery outweighed the benefits. The family decided to withdraw care on 4/15/13 and the patient died the next day.

A two-month delay in the neurosurgery consult is excessive, given the nature of the patient's diagnosis. Although his long-term survival would not likely have been much better, it seems likely that the delay allowed for enough tumor growth and associated swelling to preclude further treatment options for this patient and therefore shortened his survival.

**Delays in Processing the Approval**
This is the case of a patient from Dixon whose is a 65-year-old male with hypertension, asthma, GERD and a positive TB skin test. On 11/20/13, the clinician ordered a CT scan of the chest to rule out a mass. The patient was presented at the collegial review a little over two weeks later

30

and on 12/4, an approval was obtained. Three weeks later, the authorization number was provided. The report, therefore, was done on 2/12/14, which indicates "suspicious for cancer." A request for a pulmonary consult was made and approved two weeks before our arrival and yet an authorization number for this still has not been provided.

**Delays in Following Up an Abnormal Result**
This occurred at Hill Correctional Center from a patient who arrived at Hill on 3/29/13. This patient had hepatitis C and a prior positive skin test. On 3/21/13, he went out for an ultrasound of the abdomen as recommended by the hepatitis C specialist. The ultrasound showed multiple masses in the liver in December 2013. This was reviewed by the physician nine days after the service was performed. On 3/7/14, the hepatitis C specialist saw the patient and recommended a CT scan. The CT scan was done on 3/21/14, but there were no results in the medical record. The patient had also had an abnormal ultrasound several months earlier which no one had acted on. We finally obtained the CT results, which showed that they are likely benign tumors of the liver; however, this patient is fortunate that despite the absence of follow-up his health is probably not in jeopardy.

**Problems with Follow Up**
This is a patient at Menard who was found to have an elevated prostate screening test and was referred to the urology clinic. He was seen there on April 8 and a recommendation was made for a transrectal-guided biopsy. This was referred to collegial review and was approved. The patient was seen and hopefully informed, but there is no note that documents the patient was aware of what was planned. We could not find any subsequent information other than the fact that a bone scan had been ordered, but there is no discussion with the patient regarding the bone scan. Nothing has happened regarding the prostate biopsy. There was also a delay in receiving any report from the offsite service.

Finally, at every facility, there were examples of patients who had received consultations or procedures but no follow up with the patient had occurred. This was quite common at some facilities, including Stateville and Dixon, and less common at others, although it was found almost universally at a rate of at least between 20% and 50% of all scheduled offsite services.

**Recommendations:**
1. The entire process, beginning with the request for services, must be tracked in a logbook, the fields of which would include date ordered, date of collegial review, date of appointment, date paperwork is returned and date of follow-up visit with clinician. There should also be a field for approved or not approved, and when not approved, a follow-up visit with the patient regarding the alternate plan of care.
2. Presentation to collegial review by the Medical Director must occur within one week.
3. When a verbal approval is given, the authorization number must be provided within one business day to the onsite scheduler.
4. When a scheduled routine appointment cannot be obtained within 30 days, a local resource must be utilized.
5. Scheduling should be based on urgency. Urgent appointments must be achieved within 10 days; if emergent, there should be no collegial review and there should be immediate send out. Routine appointments should occur within 30 days.

31

6. When the patient receives the service, the paperwork and the patient must be returned to the appropriate nursing area so that the nurse can identify what the needs are.
7. When the patient returns without a report, a staff member should be assigned to contact offsite services and obtain a report.
8. Either a nurse or the scheduler must be assigned responsibility for retrieving offsite service paperwork timely and this should be documented in the offsite service tracking log.
9. Nurses should contact clinicians for any orders.
10. When patients are scheduled for appointments, they should be put on a hold for as long as clinically necessary to complete the appointment before being transferred.
11. When the paperwork is obtained, an appointment with the ordering clinician or Medical Director must be scheduled within one week.
12. That encounter between the patient and the clinician must contain documentation of a discussion of the findings and plan.

## Infirmary

Each facility has an area designated as an infirmary within the health care unit except the NRC. To clarify, the NRC has an area designed and constructed as an infirmary but has chosen to not utilize the area since opening. As a result, inmates confined in the NRC are moved to the Stateville infirmary when that level of care is required.

Each of the infirmaries is staffed with at least one registered nurse 24 hours a day, seven days a week with the exception of Dixon, when one 11 pm to 7 a.m. shift every two weeks is staffed with a licensed practical nurse. It is our recommendation that all infirmaries are staffed 24 hours a day, seven days a week with at least one registered nurse available when patients are present.

It was observed there was no security staff presence in the Stateville and Dixon infirmaries. Security staff were posted outside the unit and made routine rounds through the infirmary; however, in the event of a security emergency, security staff would have to be called to report to the unit. It is our recommendation that at least one security staff member should be posted in the infirmary at all times.

Our review of infirmary care revealed deficiencies with regard to policy, practice and physical plant issues. In terms of policy issues, perhaps the most glaring is the lack of a description of the scope of services that can safely be provided in the infirmary setting. We encountered numerous examples of patients who were admitted to the infirmary with potentially or actually unstable conditions which should have been referred to a higher level of care (i.e., outside hospital). In several instances, this resulted in actual harm to the patients.

For example at Menard, Patient [REDACTED] had a history of cirrhosis and was admitted to the infirmary with recurrent active GI bleeding. Despite evidence of substantial blood loss, the patient was not sent to the hospital until the following day; he died at the hospital two days later.

At Illinois River, Patient [REDACTED] was admitted to the infirmary with rapidly progressive paralysis of the lower half of his body. Despite his requests to be sent to the hospital because he

32