UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

WILLIAM KENT DEAN,            )
                              )
    Plaintiff,                )
                              )
    v.                        )   17-CV-3112
                              )
WEXFORD HEALTH SOURCES,       )
INC., et al.,                 )
                              )
                              )
    Defendants.               )

## ORDER

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE.**

Plaintiff, incarcerated in the Taylorville Correctional Center, pursues claims arising from alleged delays in the diagnosis and treatment of kidney cancer. Defendants move for summary judgment on all but the medical malpractice claim against Defendant Dr. Nawoor and the corresponding respondeat superior claim against Defendant Wexford Health Sources, Inc.[1]

The motions for summary judgment are denied. While a rational jury could find in Defendants' favor, a rational jury would not be compelled to do so.

---

[1] The respondeat superior claim against Wexford corresponding to the federal claims has been dismissed. 11/16/18 text order.

## Discussion

The Court views the admissible evidence in the light most favorable to Plaintiff, drawing reasonable inferences in Plaintiff's favor. The Court is not permitted to compare the strength of competing reasonable inferences. Stokes v. Board of Educ. of the City of Chicago, 599 F.3d 617 (7th Cir. 2010)("In deciding a motion for summary judgment, neither the district court nor this court may assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence."). Defendants bear the burden of showing that no disputed material fact exists for trial and that no reasonable juror could find for Plaintiff. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Bunch v. United States, 880 F.3d 938 (7th Cir. 2018)(movant must "'demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant ....'")(*quoted cite omitted*).

The events occurred in the Taylorville Correctional Center (Taylorville), where Plaintiff remains incarcerated. The parties agree that on December 23, 2015, Plaintiff presented to Defendant Dr. Nawoor (Taylorville's Medical Director) with gross hematuria (visible

blood in Plaintiff's urine). Dr. Nawoor ordered a complete blood count, urine strain (to check for kidney stones), and confirmed with a urine dipstick that Plaintiff had blood in his urine. Plaintiff had a history of kidney stones and treatment for kidney stones. Plaintiff had also had CT scans of his abdomen and pelvis in August 2014 and July 2015. Defendants maintain that these tests were normal, other than showing kidney stones, but one of Defendant's experts testified that the 2015 scan showed a mass in the upper pole of the right kidney. (Racenstein Dep. p. 34.)

Plaintiff saw Defendant Dr. Einwohner (a Wexford nephrologist) by video (telemedicine) on January 7, 2016. Plaintiff reported painless hematuria for five days that had resolved. Dr. Einwohner emailed a Wexford physician and asked for a "collegial review" to consider "re-imaging and urology eval." (Wexford Defs.' Undisp. Fact 30.) Plaintiff maintains that "re-imaging" meant a CT scan. Instead of a CT scan, Wexford approved an on-site renal and bladder ultrasound. The ultrasound was done on February 2, 2016, which was inconclusive as to kidney stones and reported "no mass lesions or evidence of hydronephrosis as to the right kidney." (Wexford Defs.' Undisp. Facts 30, 58.) Plaintiff does not dispute

that the radiologist reading the ultrasound "failed to recognize a diffuse infiltrative process in the right kidney." (Wexford Defs.' Proposed Fact 57). One of Plaintiff's experts testified that the ordering physicians should read the ultrasound themselves, though acknowledged that some do not. (Metwalli Dep. p. 60). Plaintiff maintains that the unusually large right kidney reported on the ultrasound called for an investigation into the cause of the size differential between the kidneys, including cancer as a possible cause. (Barnett Report p. 6; Racenstein Dep. p. 45).

A microscopic urinalysis ordered by Dr. Einwohner on February 8, 2016 showed blood in Plaintiff's urine. Dr. Nawoor then contacted Dr. Ritz for a collegial review, and the two determined that Plaintiff needed a urology referral and cystoscopy to determine the cause of the blood in Plaintiff's urine. (Wexford Defs.' Undisp. Fact 69.) Plaintiff saw an off-site urologist, Dr. Severino, on March 10, 2016. Medical records state that Dr. Nawoor tried to obtain an earlier appointment by contacting the off-site clinic. (Wexford Defs.' Undisp. Facts 80-82.)

On March 10, 2016, Dr. Severino ordered a CT scan and a cystoscopy. Dr. Nawoor approved this plan four days later.

Wexford's "Utilization Management Department" approved the cystoscopy on March 22 and approved the CT on March 30, 2016.

Plaintiff had the CT scan on April 12, 2016. The CT "showed cancer in the right kidney with potential invasion of the vena cava, which is the main vein of the entire body that drains blood back to the heart." (Wexford Defs.' Undisp. Fact 99.) Through Wexford's review process, the surgery was approved on April 21, 2016; a cardiac consultation for the surgery was approved on May 5, 2016; and, and a consultation with a cardiothoracic surgeon was approved on June 14, 2016. Plaintiff had the surgery on July 19, 2016 which took many hours and required three surgeons.

On August 18, 2016, Dr. Nawoor obtained approval through the collegial review for an off-site oncology evaluation. On October 19, 2016, Plaintiff was prescribed a cancer medication (Votrient) which had to be approved through Wexford's pharmacy review process. Plaintiff began receiving Votrient on November 18, 2016. On March 2, 2017, Plaintiff was prescribed Opdivo, which was approved on March 20, 2017 through Wexford's pharmacy review process. Throughout this time, Defendant Galvin was a registered nurse acting as the Director of Nursing at Taylorville, and

Defendant Mincy was the Health Care Unit Administrator at Taylorville.

Plaintiff's expert, Dr. Barnett, opines that the above time-line for diagnosis and treatment was rife with unnecessary delays that taken together caused harm to Plaintiff: "[M]ore likely than not, Mr. Dean's cancer was contained within his kidney on December 23, 2015 and thus curable without the extended chemotherapy he is currently receiving, as it is indubitable that his cancer did grow and spread during 7 months until the cancer was removed." (Barnett Report p. 23.) Plaintiff does not appear to dispute that the delay in the actual scheduling of the surgery was in large part attributable to the surgeons' challenge in coordinating their own schedules and preparing for the complicated surgery. However, Plaintiff maintains that the delays that were attributable to Defendants allowed Plaintiff's cancer to progress, which in turn increased the complexity of the surgery and caused the difficulty in scheduling the surgery.

This case, then, is primarily about delays—whether there were unnecessary delays attributable to Defendants, and, if so, whether those delays, separately or taken together, caused Plaintiff harm.

The parties vigorously dispute these issues with cites to admissible evidence, which demonstrates the need for a trial. The Court will not wade into each dispute to weigh the strength of the inferences; that is the jury's job. The focus of the Court's inquiry is whether a reasonable juror could find in Plaintiff's favor.

Addressing the Eighth Amendment claims first, a reasonable juror could conclude that Wexford's policies and practices were deliberately indifferent to inmates like Plaintiff with potentially life-threatening illnesses and the need for fast diagnosis and treatment. According to Plaintiff, gross hematuria presents a 40-50% risk of malignancy, and painless hematuria like Plaintiff's is more suggestive of malignancy than hematuria with pain. (Barnett Report p. 17.) A reasonable juror could find that the practices and procedures regarding off-site care and the implementation of off-site recommendations are simply not designed for a nimble response to urgent needs. Drawing inferences in Plaintiff's favor, the individual Defendants knew this from their experience with those procedures. A reasonable juror could draw an inference of deliberate indifference from the absence of fast-track procedures for diagnosing and treating urgent, life-threatening medical conditions.

*See* Daniel v. Cook County, 833 F.3d 728, 734 (7th Cir. 2016)("An unconstitutional policy can include both implicit policies as well as a gap in expressed policies."); Jones v. City of Chicago, 787 F.2d 200 (7th Cir. 1986)("in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."). For example, a reasonable juror might wonder why any review process was necessary at all to implement Dr. Severino's recommendations and prescriptions, once the referral to Dr. Severino was approved. Dr. Severino's orders were standard and expected, looking at the record in Plaintiff's favor.

A reasonable juror could also agree with Plaintiff that the standard of care for Plaintiff was to bypass the ultrasound and go straight to obtaining a CT with contrast and a cystoscopy, regardless of Plaintiff's history for kidney stones. The ultrasound, while not outside the standard of care for all patients with hematuria, was arguably too risky for Plaintiff because Plaintiff had been experiencing intermittent, painless, gross hematuria for months before the ultrasound was even ordered. (Dhar Dep. p. 124.) According to Plaintiff, an ultrasound would not have ruled out cancer as the cause of the hematuria and so only delayed the

CT, which would have been necessary regardless of what the ultrasound showed. A reasonable juror could find that the decision to order the ultrasound instead of a CT scan in February 2016 was primarily driven by concern over costs rather than an exercise of professional judgment.

A reasonable juror could also agree with Plaintiff that the delays attributable to Defendants caused Plaintiff's condition to worsen, making the surgery more complex and difficult to schedule. As to after the surgery, Defendants argue that the delays in providing the prescribed chemotherapy caused no harm, but Dr. Barnett maintains that those drugs may not have even been necessary (or less so) if Plaintiff had received surgery sooner.

The cases cited by the Wexford Defendants, Duckworth v. Ahmad, 532 F.3d 675, 677 (7th Cir. 2008) and Whiting v. Wexford Health Sources, Inc., 839 F.3d 658 (7th Cir. 2016), are distinguishable.

Duckworth involved an inmate with gross hematuria who was not diagnosed with bladder cancer for 16 months. However, one of the defendants in Duckworth mistakenly believed that the inmate was already being treated by a urologist and ordered tests when

learning otherwise. The other defendant in <u>Duckworth</u> ordered several urine tests that did not show hematuria. In this case, no one mistakenly believed that Plaintiff was seeing a urologist, and the urine tests showed either gross or microscopic hematuria. In <u>Duckworth</u>, no defendant "actually 'drew the inference' that the [inmate's] symptoms posed a serious medical risk." 532 F.3d at 630. In this case, a reasonable juror could infer that Defendants suspected the cancer risk was significant from the start. According to Plaintiff, Defendant Dr. Nawoor acknowledged when Plaintiff first presented with gross hematuria that Plaintiff either had kidney stones or cancer.

In the other case cited by Defendants, <u>Whiting</u>, a prison doctor took two months to diagnose an inmate with non-Hodgkins lymphoma. In <u>Whiting</u>, "no expert testified that Dr. David's chosen course of [initial] treatment was a substantial departure from accepted medical judgment . . . ." 839 F.3d at   Here, Plaintiff does have that expert testimony.

The Defendants who are nurses (Galvin and Mincy) argue that they were not directly involved in Plaintiff's care and reasonably relied on Dr. Nawoor and Dr. Einwohner to make the treatment

decisions. A reasonable juror could agree. On the other hand, a reasonable juror could find that both nurses had the medical training to know that gross hematuria is a sign of cancer, and that processing Plaintiff's medical care through Wexford's standard procedures for off-site care put Plaintiff at a substantial risk of serious harm. A reasonable juror could conclude that Defendants Mincy and Galvin, who both held supervisory positions, had the authority to intervene in some fashion to reduce the delays. *See, e.g.,* Perez v. Fenoglio, 792 F.3d 768 (7th Cir. 2015)("While nurses may generally defer to instructions given by physicians, they have an independent duty to ensure that inmates receive constitutionally adequate care."); Holloway v. Delaware County Sheriff, 700 F.3d 1063, 1075 (7th Cir. 2012)(nurse's deference "'may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient.'")(*quoting* Berry v. Peterman, 604 F.3d 435, 443 (7th Cir. 2010)).

Defendant Mincy asserts qualified immunity. She is the only Defendant who might have qualified immunity because she is the only Defendant employed by the Illinois Department of Corrections. The Court must determine "'(1) whether the facts, taken in the light

most favorable to the plaintiff[ ], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation.'" Campbell v. Kallas, 936 F.3d 526, 545 (7th Cir. 2019)(quoted cite omitted). "Qualified immunity applies unless the specific contours of the right 'were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" Id. (quoted cite omitted).

  Defendant Mincy was the Health Care Administrator and is a registered nurse. Drawing reasonable factual inferences in Plaintiff's favor, Defendant Mincy knew, from her training as a registered nurse, that Plaintiff's prolonged hematuria carried a substantial risk of cancer. As a registered nurse she also knew (drawing inferences in Plaintiff's favor) that the failure to promptly treat Plaintiff's kidney cancer once diagnosed put Plaintiff at a substantial risk of serious harm from cancer metastasis. A reasonable juror could find that Defendant Mincy knew from her experience as a health care administrator that the decisions of the Wexford doctors and nurses to process Plaintiff's care through the standard Wexford procedures would cause dangerous delays in

both diagnosis and treatment. Defendant Mincy did ask questions and raise concerns, but a reasonable juror could also find that she had the authority to take action given her authority to monitor the Wexford doctors and nurses and report concerns to IDOC officials. Further, Defendant Mincy was part of Plaintiff's health care team, and disputed material facts exist regarding each team member's authority and role.

Defendant Mincy argues that denying qualified immunity will mean that a non-treating administrator can "no longer rely upon the decision of a treating medical professional[] and would need to assume the duties of providing medical care outside the scope of her expertise and abilities." (d/e 101, p. 13.) However, Defendant Mincy's medical training as a registered nurse sets her apart from an administrator with no medical training. Her medical training enabled her to identify obvious health risks that a layperson could not. *See* Perez, 792 F.3d at 779 (nurse has independent duty to ensure that inmates receive constitutionally adequate care); Berry, 604 F.3d at 442 ("Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, . . . .").

Turning to the malpractice claims, Defendants Nurse Galvin and nephrologist Dr. Einwohner argue that Plaintiff has not proffered an expert licensed in their respective medical fields. Sullivan v. Edward Hosp., 209 Ill.2d 100 (2004)(foundational requirements for expert opinion are (1) "expert must be a licensed member of the school of medicine about which he proposes to testify; and, (2) expert must be "familiar with methods, procedures, and treatments ordinarily observed . . . .").

Dr. Barnett has a medical license, not a nurse's license, but that does not preclude Dr. Barnett from offering opinions based on his experience in correctional medicine about the role a prison health care administrator plays in the provision of health care for inmates. Dr. Barnett opines that Nurse Galvin (the Director of Nursing) was "negligent in providing inadequate oversight of the care provided to Mr. Dean . . . and displayed deliberate indifference to Mr. Dean's medical condition by failing to promote timely and efficacious treatment for Mr. Dean's persistent grossly bloody urine despite express knowledge of Mr. Dean's high risk of injury from cancer." (Barnett Report p. 9.) Dr. Barnett is not opining on nursing procedures like the doctor in Sullivan but instead on

correctional standards in the delivery of healthcare to inmates and the role each healthcare team member plays.  *See* <u>Petryshyn v. Slotky</u>, 387 Ill.App.3d 1112 (4th Dist. 2008)(physician could testify about "responsibilities of the individual surgical team members," including the nurses); <u>Petre v. Cardiovascular Consultants</u>, 373 Ill.App.3d 929, 941 (1st Dist. 2007)(foundational licensing requirement inapplicable where  "allegations of negligence concern communications between members of different schools of medicine acting as part of the same team.").

As to Dr. Einwohner, the nephrologist, both Dr. Barnett and Dr. Einwohner are licensed medical doctors, which satisfies the licensing requirement.  Dr. Barnett does not need to be a nephrologist to satisfy the licensing requirement.  <u>Jones v. O'Young</u>, 154 Ill.2d 39 (1992)(plaintiff's physician expert need not practice in the same specialty as defendant physicians); <u>Russo v. Corey Steel Co.</u>, 125 N.E.3d 1036 (1st Dist.)(2018)(physician was qualified to testify as to likelihood of needing future hip surgery even though physician was not orthopedic surgeon).

In sum, the parties have all done a good job of pointing out the weaknesses in each other's claims and defenses, but those

arguments belong in front of the jury.  Disputed issues of material fact remain for the jury's determination.

**IT IS ORDERED that Defendants' motions for summary judgment are denied.  [100, 101].**

**IT IS FURTHER ORDERED that Plaintiff's counsel has called chambers to ask whether Plaintiff will be returned to Taylorville Correctional Center each day of the trial and the procedure for ensuring that Plaintiff receives his medicines during the trial.  Defense counsel should be prepared to discuss these issues at the final pretrial conference.**

ENTERED:

FOR THE COURT:

                                          **s/Sue E. Myerscough**
                                       SUE E. MYERSCOUGH
                              UNITED STATES DISTRICT JUDGE