E-FILED
Monday, 25 November, 2019  08:36:27 PM
Clerk, U.S. District Court, ILCD

## THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| WILLIAM KENT DEAN,<br><br>        Plaintiff,<br><br>    v.<br><br>WEXFORD HEALTH SOURCES, INC., DR. ABDUR NAWOOR, DR. REBECCA EINWOHNER, NURSE KATHY GALVIN, and LISA MINCY,<br><br>        Defendants. | Case No. 17-CV-3112<br><br>Judge Sue E. Myerscough<br><br>Magistrate Judge Tom Schanzle-Haskins |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTIONS IN LIMINE

Defendants Wexford Health Sources, Inc. ("Wexford"), Dr. Abdur Nawoor, Dr. Rebecca Einwohner, and Kathy Galvin (collectively, "Wexford Defendants") and Lisa Mincy (together with Wexford Defendants, "Defendants") have timely filed a total of seven motions in limine: Wexford Defendants filed six motions in limine, (Dkt. 124), and Ms. Mincy has indicated that she joins Wexford Defendants' motions in full in addition to filing one motion in limine of her own, (*see* Dkt. 132). Motions in limine should be granted only as to "evidence that is clearly inadmissible for *any* purpose." *Abernathy v. E. Ill. R.R. Co.*, No. 3:15-cv-3223, 2017 WL 4330376, at *1 (C.D. Ill. Sept. 26, 2017) (emphasis added). Because Defendants have not met this exacting standard, their motions in limine should be denied.

### I.  Mr. Dean's expert reports are not intended to be admitted into evidence but should be marked as exhibits and used as appropriate at trial.

In their First Motion in Limine, Defendants move to exclude the expert reports prepared and disclosed in this case under Federal Rule of Civil Procedure 26(a)(2). Defendants contend that

Mr. Dean's experts' reports are inadmissible as hearsay, though none of Defendants' case authorities involved the exclusion of reports explicitly prepared by a party's retained expert *and* disclosed under Rule 26(a)(2). And in Defendants' cited case *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 727-30 (6th Cir. 1994), the Sixth Circuit held that it was *not* error for the trial court to admit an expert's report either under Federal Rule of Evidence 106's "rule of completeness" or for the purpose of rebutting the suggestion of inconsistency of testimony arising from the opposing party's cross-examination of the witness.

Mr. Dean has listed his retained experts' reports on his exhibit list principally for the purpose of identification to the Court and to Defendants. These experts' reports very likely will be referenced extensively during examination at trial by lawyers from both sides, and so they should be given exhibit numbers for purposes of identification. Each of these experts has been deposed by Defendants, and Mr. Dean intends that each will testify at trial, making moot the question of whether any *entire* report should be admitted as evidence for the truth of the matters it asserts. The decision whether portions of the reports may be admissible for other purposes, such as to establish consistency of experts' opinions, should be reserved for trial. But because the reports are not "clearly inadmissible for *any* purpose," *Abernathy*, 2017 WL 4330376, at *1 (emphasis added), the Court should deny Defendants' First Motion in Limine.

## II. Mr. Dean's medical literature comprises only published, peer-reviewed articles subject to judicial notice, and they should not be altogether excluded.

In their Second Motion in Limine, Defendants move to exclude "medical literature," by which they mean the published, peer-reviewed medical research articles upon which Plaintiff's experts relied to substantiate the premises of their expert opinions. Exclusion of these articles altogether would be inappropriate, as Defendants appear to be aware: Statements in learned treatises, like the articles, are admissible under an exception to the rule against hearsay if

appropriately called to the attention of an expert witness and "the publication is established as a reliable authority," whether by expert testimony or judicial notice. *See* Fed. R. Evid. 803(18). Once a learned treatise is established as a reliable authority, its contents may then be offered as substantive evidence for the truth of the matter asserted, *cf.* Fed. R. Evid. 801(c)(2), notwithstanding the learned treatise's status as "an exhibit," *see* Fed. R. Evid. 803(18).

Mr. Dean has listed the published, peer-reviewed articles that appear on his exhibit list principally for the purpose of identification to the Court and to Defendants. Mr. Dean does not intend to attempt to introduce these articles into evidence where doing so would be contrary to the Federal Rules of Evidence or controlling Seventh Circuit precedent. Moreover, the admissible evidence from these published, peer-reviewed articles must be assessed at the time the evidence is offered. Defendants' suggestion that the "introduction of medical periodicals may confuse the jury or prejudice the Defendants by presenting myriad complicated, technical studies," and should therefore barred under Federal Rule of Evidence 403, is an argument against expert testimony before a lay jury altogether. As has been disclosed to Defendants, Mr. Dean's experts' reliance on these published, peer-reviewed articles runs to the purpose of establishing the factual premises of their expert opinions, such as the probability that gross hematuria corresponds to cancer of the genitourinary tract,[1] or the high reliability of CT scans to detect kidney cancers relative to ultrasound.[2] Mr. Dean's experts would not purport to have this evidence without their reliance upon reliable authority, including the articles cited. Nor are the probabilities for which these

---

[1]    *See* PTX197, Grossfeld G.D., Litwin M.S., Wolf J.S., et al: Evaluation of asymptomatic microscopic hematuria in adults: the American Urological Association best practice policy–part I: definition, detection, prevalence, and etiology. Urology 2001; 57: pp. 599-603.

[2]    *Compare* PTX199, Grossfeld GD, Carroll PR. Evaluation of asymptomatic microscopic hematuria. Urol Clin N Am 1998;25:661–76, *with, e.g.*, PTX200, O'Connor OJ, Fitzgerald E, Maher MM. Imaging of haematuria. AJR Am J Roentgenol 2010;195:263–7.

articles are offered beyond the ken of a lay jury. The contents of learned treatises are admissible evidence even where the learned treatises themselves cannot be admitted as exhibits, and the Court should evaluate whether the identified articles are reliable authorities when, and if, their contents are offered at trial.

Mr. Dean has marked the published, peer-reviewed articles for purposes of identification and intends to read admissible evidence from these articles into the record. Because these articles are not "clearly inadmissible for *any* purpose," *Abernathy*, 2017 WL 4330376, at *1 (emphasis added), Defendants' Second Motion in Limine should be denied.

**III.    Mr. Dean must be permitted to testify as to his experience of his illness and the allegations underpinning this action.**

In their Third Motion in Limine, Defendants move to exclude Mr. Dean from offering "lay medical testimony." Despite the participation of five expert witnesses retained by the parties, Defendants are apparently concerned that Mr. Dean's account of the time elapsed between his first presentation with gross hematuria and his eventual CT scan, diagnosis with kidney cancer, surgery to remove his cancerous kidney, and eventual referral to an oncologist will opine impermissibly on the "propriety and alacrity of his medical treatment," (Dkt. 124, at 8), or give "testimony regarding medical self-diagnosis," (*id.* at 7).

Mr. Dean must be permitted to testify as to his present sense impressions, as well as any opinions or inferences that are rationally based on his perception and helpful to a clear understanding of his testimony or a determination of a fact in issue. *See* Fed. R. Evid. 701. Mr. Dean's perceptions include Dr. Nawoor's December 23, 2015 statement that the cause of his hematuria was either "[kidney] stones or cancer," (Dkt. 111-1, at 47 ¶ 4)—a statement all Defendants have acknowledged is undisputed, (*see* Dkt. 116, at 1, 2 (Wexford Defendants characterize as "[m]aterial and [u]ndisputed"); Dkt. 121, at 2 (Mincy characterizes as

"[u]ndisputed and immaterial")). Accordingly, *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001), is inapposite: here, any testimony Mr. Dean might offer about the root cause of his hematuria comes from Dr. Nawoor's own assessment and Mr. Dean's subsequent diagnosis and treatment for cancer, not "self-diagnosis." Furthermore, Mr. Dean's perception of the time elapsed between his December 23, 2015 sick call visit with Dr. Nawoor and the moments when he was finally rendered appropriate care is germane to his asserted damages, including pain and suffering and mental anguish. Mr. Dean's prospective testimony about his subjective symptoms, his mental state, and how he felt are matters of personal knowledge well within his competence as a witness. *See, e.g.*, *Townsend v. Benya*, 287 F. Supp. 868, 875 (N.D. Ill. 2003); *Mickey v. Dargis*, No. 99 C 7281, 2004 WL 887361, at *2 (N.D. Ill. Apr. 23, 2004).

As the Court recognizes, Mr. Dean's claims include an underlying complaint that the care he was given was inadequate because it was untimely. Far from "self-diagnosis," Mr. Dean's fear that his symptoms could be cancer-related were rationally based on Dr. Nawoor's own initial assessment and the eventual diagnosis by an appropriate specialist, urologist Dr. William Severino, and his perception of the lengthy waits he experienced between definitive steps in diagnosing and treating his cancer is helpful to a finder of fact in determining fact issues like causation or appropriate damages. Such testimony is not "clearly inadmissible for *any* purpose." *Abernathy*, 2017 WL 4330376, at *1 (emphasis added). Defendants' Third Motion in Limine should be denied.

## IV.   Mr. Dean has adequately disclosed expert opinions regarding diminished life expectancy.

In their Fourth Motion in Limine, Defendants move to preclude argument or evidence "that Defendants' conduct reduced his life expectancy," (Dkt. 124, at 8), on the purported grounds that Mr. Dean "has not disclosed any evidence that Defendants' conduct reduced his life expectancy,"

(*id.* at 10). But Defendants have simply neglected to cite the opinions and evidence Mr. Dean has disclosed on diminished life expectancy.

Specifically, Defendants do not acknowledge the full set of opinions, and the evidence on which they are based, that Mr. Dean's expert oncologist, Dr. Adam Metwalli, presented in his expert report and at his deposition. Defendants concede that Dr. Metwalli opined that the advancement of Mr. Dean's tumor thrombus during the extended period before his surgery led to the need for a more difficult and painful surgery. (*See* Dkt. 124, at 10; Metwalli Report, Dkt. 100-22.) This concession understates both the import of the advancing tumor thrombus and the extent of Dr. Metwalli's disclosed opinions. First, at deposition, Dr. Metwalli testified that the advancing tumor thrombus itself affected Mr. Dean's life expectancy:

Q:     That does not affect the patient's overall survival though?

A:     It does, actually. The level of the tumor thrombus does have prognostic significance, and certainly those who have tumor thrombus extension up into the mediastinum up toward the heart have a much worse survival at two years and five years than people who have tumor thrombi that are below the liver, and that's been well documented for decades. I mean, that's not new data at all.

* * *

Q:     Above diaphragm, and that's what the studies have said, tumor thrombus above diaphragm, overall survival is lower. Right?

A:     That's correct.

Q:     So what you're saying is catching this and doing the surgery before the thrombus became reached or got above the diaphragm would have resulted in a better outcome?

A:     Yeah. I mean, the data is pretty clear that that's a bigger operation. It has a higher complication rate and survival rates are lower. It's overall survival and cancer-specific survival, although, the cancer-specific survival data may be not as robust. It's there, you know, and part of it is that this is just a bigger operation. It's just much harder to recover from, and the more complications you have, the lower your survival is going to be at baseline irrespective of what the cancer is doing to you. So, I mean, it's a double whammy, really.

(Metwalli Dep. Transcr. at 76:1-10, 76:16-77:13.) In other words, the advancement of the tumor thrombus did not merely require a more dangerous surgery with a higher chance of death on the operating table. Rather, as Dr. Metwalli testified, medical studies have shown that a patient with a sufficiently advanced tumor thrombus can expect "a much worse survival [probability] at two years and five years." This is so as both a matter of exposure to surgical risk *and* as a matter of cancer-survival probabilities—as Dr. Metwalli put it, "a double whammy, really." The "added morbidity" from Mr. Dean's delayed surgery both resulted in a riskier surgery and advancement of a condition, the tumor thrombus, that also correlates with reduced life expectancy.

Furthermore, Dr. Metwalli testified at his deposition that delays to Mr. Dean's beginning chemotherapy also reduced his life expectancy:

Q:      So if his disease was metastatic as of April 12 of 2016, he was going to die from it?

A       Yes.

Q:      And if his disease was metastatic as of December 26, 2016, his disease was noncurable?

A:      That's correct. That does not necessarily mean, however, that his prognosis was the same, because we know that --

Q:      Can you explain that? Yeah.

A:      We know that what we call oligometastatic disease -- that just means small volume metastases -- tend to do better, respond better to systemic therapy and, therefore, have a longer survival than widely metastatic disease.

*  *  *

Q:      If I understood you correctly, patients with metastatic disease, they're going to die from their disease, but they may live longer with less metastasis?

A:      That's correct.

Q:      Than someone with greater metastasis?

A:      Yes. In general, that is case, and more important, I think, because that's like a time bias. Right? You know, if you have fewer metastases, you just are catching

them earlier in the progress of their disease. Once you have a bunch of metastases, you're just later in disease. You just kind of -- but more importantly, in general, patients with lower metastatic burden tend to have a better response to systemic therapies and longer durations of response to those therapies, and so they tend to just do better overall.

(Metwalli Dep. Transcr. at 118:4-17, 121:5-22.)

Mr. Dean's evidence of diminished life expectancy is precisely the sort of evidence on which Defendants expound in their Fourth Motion in Limine: evidence that, but for Defendants' actions causing delays to his surgical and chemotherapeutic care, Mr. Dean would not have sustained the same injury, a reduction in his life expectancy. (*See generally* Dkt. 124, at 8-10 (discussing cases requiring that a plaintiff show "an injury caused by the defendant" to succeed on Eighth Amendment or medical malpractice claims).) Both controlling Seventh Circuit precedent and Illinois rules of decision have recognized that a diminished life expectancy alone is a cognizable harm. *See, e.g.*, *Miranda v. Cty. of Lake*, 900 F.3d 335, 347 (7th Cir. 2018) (Plaintiff's estate "did not . . . bear the burden of proving that but for the medical defendants' inaction, [Plaintiff] would definitely have lived. It would have been enough for the [e]state to show that the resulting harm was a diminished chance of survival."); *Holton v. Memorial Hosp.*, 679 N.E.2d 1202, 1212-13 (Ill. 1997) ("To the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he or she should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery. . . . Disallowing tort recovery in medical malpractice actions on the theory that a patient was already too ill to survive or recover may operate as a disincentive on the part of health care providers to administer quality medical care to critically ill or injured patients.") (cited by Defendants, Dkt. 124, at 9-10); *see also Walton v. Dirkes*, 903 N.E.2d 18, 20-21 (Ill. App. 2009) ("[P]roximate cause may be established by evidence that the defendant's negligent conduct 'increased the risk of harm' to the patient or 'lessened the effectiveness' of the

patient's treatment."). Contrary to Defendants' argument, Mr. Dean does not need to show that he had "a survivable disease" to establish his damages from a diminished life expectancy.

This case is also distinguishable from Defendants' case *Patel v. Gayes*, 984 F.2d 214, 221 (7th Cir. 1993), in which the district court excluded expert testimony that defendants' actions preceded plaintiff's first heart attack, thereby allegedly increasing his risk of a second heart attack, which in turn would diminish his life expectancy or life span. The court excluded the expert testimony on the grounds that it was "too speculative." *Id.* Here, by contrast, Dr. Metwalli has opined on both a direct correlation between the condition of Mr. Dean's tumor thrombus and his life expectancy and a direct correlation between Mr. Dean's metastasized cancer and his life expectancy. Dr. Metwalli has, moreover, cited or referenced academic research underpinning these opinions. (*See, e.g.*, Metwalli Dep. Transcr. at 76:16-77:13, 118:4-17.) In these instances, as well as others, Dr. Metwalli's opinions as to Mr. Dean's diminished life expectancy have been adequately disclosed, and Defendants' counsel have had adequate opportunity—which they have used—to examine Dr. Metwalli on these opinions. Defendants' Fourth Motion in Limine should be denied.

**V.    Defendants' other lawsuits and employment discipline histories are relevant to and probative of Mr. Dean's theories of Wexford's direct deliberate indifference and institutional negligence.**

In their Fifth Motion in Limine, Defendants move to preclude Mr. Dean from offering evidence or referencing other lawsuits involving Defendants or discipline Defendants have received from their employer, on the grounds that such evidence is either irrelevant or else constitutes inadmissible character evidence under Federal Rule of Evidence 404(b). On relevance, Defendants contend, without citation, that the lawsuits against them are evidence of nothing more than the fact that, "[a]s inmates, Defendants' patients are a particularly litigious subset of the population." (Dkt. 124, at 11.) Other inferences are possible from these past lawsuits and from

other studies of the medical care Defendants provide to Illinois Department of Corrections inmates. *E.g.*, PTX193, Report of the Second Court Appointed Expert in *Lippert v. Godinez*, Oct. 2018; PTX194, Final Report of the Court Appointed Expert in *Lippert v. Godinez*, Dec. 2014; *see also, e.g.*, Shannon Heffernan, "For Some Illinois Prisoners, One Good Eye is Enough," WBEZ Chicago, Nov. 19, 2019, https://www.npr.org/local/309/2019/11/19/780757859/for-some-illinois-prisoners-one-good-eye-is-enough; Taylor Elizabeth Eldridge, "Why Prisoners Get the Doctors No One Else Wants," The Appeal, Nov. 8, 2019, https://theappeal.org/why-prisoners-get-the-doctors-no-one-else-wants/ (last visited Nov. 25, 2019). Such inferences include the non-propensity inference, which Mr. Dean seeks to establish in support of Count V of his operative Complaint, that Wexford's policies and practices evince deliberate indifference to the obvious and serious medical needs of these inmates. Such evidence may also be offered to demonstrate lack of mistake or modus operandi on Wexford's part: their policies resulted in consistent delays in Mr. Dean's care not due to oversight or negligence alone, but rather because they are part of a pattern of Wexford prioritizing cost savings over inmate healthcare.

Defendants' personnel files are also relevant for similar reasons. "Numerous courts have held that the personnel files and complaint histories of [defendants] are relevant in § 1983 actions . . . particularly where, as here, plaintiffs allege a *Monell* policy, practice, and custom claim," and "disciplinary records containing any similar factual allegations may be relevant and admissible under Rule 404(b) to prove motive, intent, and/or modus operandi." *Vodak v. City of Chicago*, 2004 WL 1381043, at *5 (N.D. Ill. May 10, 2004). Here, Defendants' personnel files and disciplinary histories are relevant to Defendants' intent—or more precisely, their subjective indifference to written policies or regulations that were in place, at least nominally, for the sake of inmate safety and health. Dr. Nawoor's personnel file, for example, tends to corroborate a theory

that at the outset of his employment with Wexford—December 2015, also the time when Mr. Dean's gross hematuria first cropped up—Dr. Nawoor was naïve as to the realities of rendering appropriate medical care in the correctional setting, more or less "retired on the job" at Wexford, and indifferent to the consequences of his ineffectiveness or inability to get up to speed with the expectations of his new job. Furthermore, Dr. Nawoor's personnel file and disciplinary records are relevant to his competence to practice medicine, a matter that could be relevant to both the deliberate indifference and the medical malpractice claims. *See, e.g.*, *Beard v. Obaisi*, No. 11-CV-3360, 2012 WL 5305357, at *2-*3 (C.D. Ill. Oct. 25, 2012). Such theories are not inadmissible propensity evidence, but rather go to Dr. Nawoor's subjective state of mind—an element of Mr. Dean's § 1983 claims.

Fundamentally, evidence of past lawsuits and disciplinary actions may be relevant to the inquiry either of Defendants' policies and practices or of other, non-propensity inferences as to Defendants' decisions. Additional justifications may arise at trial, such as an argument that Defendants were unaware of any problems with specific policies, or that no complaints had ever been made as to a Defendant's past conduct. Defendants have not identified even the number of prior incidents or lawsuits on which it seeks to preclude evidence, let alone any underlying facts which may (or may not) distinguish these incidents or lawsuits from the instant case. The Court should reserve for trial the decision whether to admit or exclude this evidence. Defendants' Fifth Motion in Limine should be denied.

## VI.     Mr. Dean does not intend to offer evidence contrary to Federal Rule of Evidence 411.

In their Sixth Motion in Limine, Defendants move to preclude Mr. Dean from offering evidence or otherwise referencing the fact that Defendants may be insured or indemnified against liability. The Court should deny the motion. Mr. Dean agrees that Federal Rule of Evidence 411 governs the admissibility of evidence of this kind and has no intention of offering evidence of

insurance or indemnity unless Defendants' introduction of evidence or argument opens the door to insurance or indemnity evidence. For example, Mr. Dean may introduce evidence of Defendants' insurance or indemnity against liability if Defendants "plead[ ] poverty at trial in an attempt to reduce any prospective compensatory or punitive damages award." *E.g.*, *Dyson v. Szarzynski*, No. 13 CV 3248, 3014 WL 7205591, at \*7-\*8 (N.D. Ill. Dec. 18, 2014). In like fashion, Mr. Dean should also be permitted to introduce evidence or make argument regarding Defendants' insurance or indemnity against liability if Defendants were to suggest to the jury that an award in Mr. Dean's favor would be a drain on State resources or, worse still, a hit to jurors' own pocketbooks—arguments Mr. Dean has elsewhere timely moved in limine to preclude. (*See generally* Plaintiff's Motion in Limine to Exclude Argument or Evidence that Plaintiff's Medical Care is a Burden on Taxpayers or the Public, Dkt. 128.) In either instance (and perhaps in others as well), evidence of Defendants' insurance or indemnity against liability would substantially cure any unfair prejudice resulting from Defendants' evidence or arguments. Because motions in limine should be granted only as to "evidence that is clearly inadmissible for *any* purpose," *Abernathy*, 2017 WL 4330376, at \*1 (emphasis added), Defendants' Sixth Motion in Limine should be denied.

**VII.    Plaintiff does not intend to offer argument prohibited by the rules of evidence or controlling Seventh Circuit precedent.**

Ms. Mincy separately moves in limine for an order prohibiting any "Golden Rule" appeal. (Dkt. 132.) Mr. Dean has no intention of offering any argument prohibited by the Federal Rules of Evidence or controlling Seventh Circuit precedent. The Court should nevertheless deny this motion and decline to enter an order on the "Golden Rule" appeal to avoid ambiguity or confusion as to the jury's role as finders of fact. Certain of the Court's proposed jury instructions, which no party has challenged, provide that the jury "should use common sense in weighing the evidence and consider the evidence in light of [their] own observations in life," (Dkt. 109, at 10 (citing 7th Cir.

Pattern 1.11(same))), and that "[t]here is no exact standard for setting the damages to awarded on account of pain and suffering," (Dkt. 109, at 37 (citing 7th Cir. Pattern 7.27)). Mr. Dean's counsel fully expects to refer to the Court's instructions to the jury on what the law requires, including these unchallenged jury instructions if approved to be given by the Court. Absent clarity as to what "magic words" Mr. Dean's counsel must eschew to both avoid a failure of proof and follow the Court's jury instructions, an order prohibiting any "Golden Rule" appeal would be unavoidably vague. The Court should deny Ms. Mincy's motion in limine.

## CONCLUSION

For the foregoing reasons, Mr. Dean respectfully requests that the Court deny Defendants' First through Seventh Motions in Limine, (Dkts. 124, 132).

Dated:  November 25, 2019                          Respectfully Submitted,

                                                   ____/s/ Craig C. Martin_____
                                                   Craig C. Martin
                                                   Joel T. Pelz
                                                   William M. Strom
                                                   Nathaniel K.S. Wackman
                                                   Chloe E. Holt
                                                   JENNER & BLOCK LLP
                                                   353 N. Clark St.
                                                   Chicago, IL  60654
                                                   (312) 222-9350
                                                   cmartin@jenner.com
                                                   jpelz@jenner.com
                                                   wstrom@jenner.com
                                                   nwackman@jenner.com
                                                   cholt@jenner.com


                                                   *Attorneys for William Kent Dean*

### **CERTIFICATE OF SERVICE**

I, William M. Strom, hereby certify that on November 25, 2019, I caused the foregoing

**Pllaintiff's Memorandum in Opposition to Defendants' Motions in Limine** to be served on all

counsel of record listed via the Court's ECF system.

   /s/ William M. Strom
William M. Strom
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL  60654
(312) 222-9350
wstrom@jenner.com

*Attorney for William Kent Dean*