E-FILED
Friday, 20 December, 2019 03:35:54 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT E

# Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services

# Report of the 2nd Court Appointed Expert

# Lippert v. Godinez

October 2018

Prepared by the Medical Investigation Team

Mike Puisis DO
Jack Raba, MD
Madie LaMarre MN, FNP-BC
Catherine M. Knox RN, MN, CCHP-RN
Jay Shulman, DMD, MSPH

PTX193-0001

# Background

This report is produced for the United States District Court for the Northern District of Illinois Eastern Division with respect to the litigation Don Lippert, et al. v. John Baldwin, et al. No. 10-cv-4603. The Court has asked for the Expert to:

> "Assist the Court in determining whether the Illinois Department of Corrections ("IDOC") is providing health care services to the offenders in its custody that meet the minimum constitutional standards of adequacy."[1]

The Court gave further direction. The Court asked the Expert to determine primarily whether any of the systemic deficiencies identified by the First Court Expert as reported in December of 2014 currently exist. The Court asked the current Expert, in the course of the evaluation, to identify any additional systemic deficiencies. Finally, the Court asked for assistance in forming recommendations to correct identified deficiencies. The Court asked the current Expert to consider the solutions proposed by the First Court Expert or to suggest alternate solutions. For newly identified deficiencies, the Court asked for new recommendations.

In order to form our opinion to answer these questions, the Expert, Michael Puisis DO, formed an investigative team consisting of Jack Raba MD, nurse practitioner Madie LaMarre MN, FNP-BC, Catherine Knox MN, RN, CCHP-RN, and dentist Jay Shulman DMD, MSPH.

# Methodology

The current Court Expert met with parties on December 18, 2017 to discuss his methodology and plan. The methodology explained to parties was one typically used by correctional experts in answering questions regarding adequacy of medical care in correctional settings. We interview staff and patients. We observe delivery of care as it occurs for selected processes. We review Administrative Directives, policies, and other documents such as budgets, staffing documents, quality improvement meeting minutes, and reports, etc. We tour facilities' areas where care is provided and observe the setting of care to determine the adequacy of resources that support care. Lastly, we review a sample of health records, including death records. From these interviews, tours, document reviews, and record reviews, we form our opinions and recommendations.

During our five site visits we reviewed 362 medical records and 363 dental records.[2] In addition, we reviewed 33 death records. Dr. Puisis performed all mortality reviews. Findings in site visit record reviews corroborated findings in death reviews. Charts for urgent care, specialty care, and hospital care record review were chosen based on having an ambulatory care-sensitive

---

[1] Second Order Appointing Expert, United States District Court for the Northern District of Illinois Eastern Division, No. 10-cv-4603 filed 12/8/17.

[2] A table with details of record reviews is found at the end of this report as an appendix.

condition.[3] For all other site visit medical record reviews, records were chosen of patients that had an actual or potential serious medical needs. In the case of chronic illness,[4] records were chosen randomly by type of disease (e.g., diabetes, autoimmune, HIV, etc.) For nursing sick call, we selected records nursing sick call logs of patients with potentially serious medical needs such as shortness of breath or chest pain instead of persons complaining of athlete's foot or wanting a low bunk.

For mortality reviews, there were 174 deaths in 2016 and 2017. We asked for 89 records but only reviewed 33 records due to the truncated investigation. We excluded from selection nine suicide deaths, three overdose deaths, and one death from injury. Record selection was somewhat limited by the availability of records. We asked for death records when the Expert first met with the attorneys in December of 2017. We started receiving records on March 7, 2018. Initially we reviewed six records,[5] as they were the only records we had available. Twenty-one records were then chosen from sites we were visiting.[6] We then randomly chose two records from sites that the First Court Expert had visited.[7]  The remaining four records were chosen at random from sites that neither Expert visited. The only information available at the time of record selection was the name, date of death, age, facility, and cause of death. The cause of death was not provided for all patients; some patients had "natural causes," "cardiac arrest," or "unknown" listed as the cause of death. Autopsies were not available for all deaths; even when an autopsy was done it was not consistently available. We randomly chose more records from facilities we were visiting intending to allow for a comparison with observed care during site visits. We reviewed one to two years of documentation of care in these records.

Our mortality review consisted of describing episodes of care, and for each episode we identified errors using a classification of 18 different error types. This allowed us to identify common and systemic problems within the health program. Error types were summarized as an appendix in the mortality review document. We summarized the mortality reviews in a narrative summary, but also provided the spreadsheets used to document each individual episode of care reviewed so that reviewers can see the specific instances of care that formed our opinion in the narrative. The mortality reviews are integral to our opinion and should be reviewed. These documents are provided as an appendix.

For dental records, the chart selection methodology is described in each element of the dental program.

The IDOC, in their comments on our report, asserted that the report "relies primarily on a subjective review of the health record" and failed to use "objective clinical measurements such

---

[3] Ambulatory care sensitive conditions (ACSC) are conditions that can be managed in an outpatient setting. HEDIS, the Agency for Healthcare Research and Quality (AHRQ) and quality improvement programs use ACSC to select records to review to assess whether hospitalization might be preventable or whether care reveals quality or systemic issues. For more information see the Prevention Quality Indicator Overview at https://www.qualityindicators.ahrq.gov/modules/pqi_overview.aspx.
[4] We presume that all patients with chronic illness have a potential or actual serious medical illness.
[5] Patients #1, 2, 3, 4, 5, and 6.
[6] Patients #7 through 27 inclusive.
[7] Patients #30 and 31; Pontiac had no deaths.

as those found with the Healthcare Effectiveness Data and Information Set ("HEDIS"[8]) guidelines or critical process assessments."[9] The IDOC does not participate in HEDIS measurement so there was no IDOC data to review with respect to HEDIS measures.[10] Moreover, quality improvement reports did not include objective data measures similar to HEDIS that might have informed us. IDOC lacks useable data for analysis of clinical care, which is evident in their quality improvement efforts. The First Court Expert in his analysis of the quality improvement program also identified this problem.[11]

In their comments on our reports, the IDOC asserted that we believed that prison health care systems should provide care "significantly in excess of what is available in the community" and that our report "takes the position that inmates are entitled to a perfect healthcare delivery system." We do not agree with those assertions. The benchmarks we use are community and correctional standards of care,[12] not a hypothetical standard "in excess of what is available in the community."

---

[8] The Healthcare Effectiveness Data and Information Set (HEDIS) is a performance measurement system managed by the National Committee for Quality Assurance (NCQA). There are over 90 HEDIS measures over six domains including safety, effectiveness, patient-centered, timely, efficient, and equitable. Large health maintenance organizations and practices use HEDIS to measure their performance. Data submission used for HEDIS reporting is strictly controlled and defined. These measures are a useful comparator between managed care organizations and other health organizations. These measures do not address acute or emergency care, access to specialty services, access to hospital care, access to an appropriate provider, timely access to a professional opinion and evaluation, access to medication, or many other areas specific to the correctional setting. These performance measures are useful but are not designed for correctional health care programs

[9] Letter via email from John Hayes and Michael Arnold, Office of the Attorney General to Dr. Puisis: Re: *Lippert v. Baldwin,* No. 10-cv-4603 – Defendants' comments to the Draft Report of the 2nd Court Appointed Expert, dated September 10, 2018.

[10] Although IDOC does not track HEDIS measures or participate in HEDIS, we made comments on and/or reviewed care in multiple areas that correspond to HEDIS measures. Our report documents record reviews or other investigations that identified quality of care and/or systemic issues in all of the following HEDIS measurement areas: Adult BMI assessment; Colorectal cancer screening; Care for older adults; Use of spirometry testing in the assessment and diagnosis of chronic obstructive pulmonary disease; Statin therapy for patients with cardiovascular disease and diabetes; Comprehensive diabetes care; Follow-up after emergency department visit for people with multiple high-risk chronic conditions; Medication management in the elderly; Fall risk management; Management of urinary incontinence in older adults; Influenza and pneumococcal vaccination status for older adults; Hospitalizations for potentially preventable complications; Acute hospitalization utilization; and Emergency Department utilization.

[11] On page 44 of the First Court Expert's summary report he states, "although some data was collected it was never used to measure performance against standards and therefore was not part of an effort to measure the quality of performance."

[12] As examples of references reflecting community standards of care, we utilized the U.S. Preventive Services Task Force Recommendations for Primary Care Practice; CDC Recommended Immunization Schedule for Adults Aged 19 Years or Older, United States, 2018; MMWR (2006) Prevention and Control of Tuberculosis in Correctional and Detention Facilities; Standards of Medical Care in Diabetes by the American Diabetes Association; 2013 American College of Cardiology/American Heart Association Guideline on the Treatment of Blood Cholesterol to Reduce Atherosclerotic Cardiovascular Risk in Adults; Global Initiative for Chronic Obstructive Lung Disease updated 2016; American College of Cardiology/American Heart Association Guidelines for the Management of Patients With Unstable Angina and Non-ST-Elevation Myocardial Infarction; Evidence-Based Guideline for the Management of High Blood Pressure in Adults, Report from the Panel Members Appointed to the Eighth Joint National Committee (JNC 8): Centers for Disease Control and Prevention; HIV Testing Implementation Guidance for Correctional Settings. 2009; National Commission on Correctional Health Care, 2014 Standards for Health Services in Prisons; HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, Last Updated May 24, 2018; American Association for the Study of Liver Diseases and Infectious Diseases Society of America; Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i); Guidelines for Infection Control in Dental Health-Care Settings--2003. MMWR, December 19, 2003/52(RR17):1:16; Stefanac SJ. Information Gathering and Diagnosis Development; American Dental Hygiene Association Standards for Clinical Dental Hygiene Practice Revised 2016; Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006); Correctional Dental Services. In M. Puisis (Ed.), <u>Clinical Practice in Correctional Medicine</u> (2nd edition); Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure.

In addition to record reviews, we toured five facilities: Northern Reception Center (NRC), Stateville Correctional Center (SCC), Dixon Correctional Center (Dixon), Logan Correctional Center (LCC), and Menard Correctional Center (MCC). Four Experts visited each site; two doctors, a dentist, and a nurse. During each facility visit, we:
- Met with leadership of custody and medical
- Toured the medical services areas and housing units
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

The First Court Expert mentioned in his report that the State provided comments that the Investigative Team should utilize standards from the National Commission on Correctional Health Care (NCCHC) or the American Correctional Association (ACA) as the basis for their investigation. We agree with the First Court Expert's response that NCCHC standards are useful as a basis to evaluate IDOC Administrative Directives and certain processes of care. We do use the NCCHC standards for that purpose and mention this in this report. However, the request of the Court is to determine adequacy of care for serious medical needs. In order to do that, one must do more than evaluate whether Administrative Directives meet NCCHC standards. Adherence to NCCHC standards does not verify that quality of clinical care is adequate, which is arguably the most important aspect of determining adequacy of care. The limitations of the NCCHC standards as a sole measure for constitutional adequacy require additional investigative measures to answer the Court's request. Observation of actual practices at the facilities form the basis for evaluation of actual care as it is delivered, and review of records forms the basis for evaluation of clinical care.

To facilitate comparison with the First Court Expert's report, we have utilized similar headings of major services reviewed. We agree with the First Court Expert's organization of topics of study as presented in his table of contents. One change we made was to combine laboratory functions and clinic space and sanitation, and to include other diagnostic testing available onsite. These items are all support functions and were combined for that reason. We have added a section in the summary document discussing the statewide operations of the IDOC, UIC, and Wexford, the medical vendor, including a section on credentialing of physicians on a statewide basis. We also included a brief summary describing the statewide monitoring effort of the current medical contract.

The Second Order Appointing Expert gave authority to perform tours of eight facilities that had been reviewed by the First Court Expert. The Court's Order gave the Expert discretion to decline visiting any of the facilities if determined to be unnecessary. The Court's Order required the Expert to meet parties after the first 120 days of the investigation to establish a plan and timeline for concluding the review in a timely and cost-effective manner.

---

American Dental Association and U.S. Food and Drug Administration, 2012. For items for which there is no standard of care, we utilized information as found in Up-To-Date, an online medical reference.

We started this project intending to review eight facilities. At the 120 day meeting, the Expert discussed preliminary findings and announced that it was his opinion that review of the eight facilities was not necessary. The findings were consistently similar facility to facility and confirmed by the First Court Expert's findings. Review of death records from 12 facilities demonstrated consistently poor care and the evidence was so overwhelming that the Expert found it unnecessary to continue visiting the full complement of eight facilities. The Expert strongly believes that further visits would not add to our opinions, except for site-specific recommendations. We terminated visits after five facilities were visited. These included: NRC, SCC, Dixon, LCC, and MCC. It is our opinion that this complement of facilities is adequate to form an opinion of statewide services. The sample includes the main male and female reception centers, the center used to house geriatric patients, two of the three maximum security prisons, the largest IDOC facility (Menard Correctional Center), and facilities from Northern, Central and Southern areas of the state. We are confident that review of this group of facilities gives a representative sample of the IDOC health care system.

With respect to this report, for each section in which the First Court Expert had findings, we summarize his findings in a paragraph and make a subsequent statement whether his findings were still present or have been resolved. We then present our own findings. With respect to recommendations, we do the same. We list, verbatim, the First Court Expert's Recommendations and document whether we agree or not. If we disagree or had additional comments we add those. When we comment on the First Court Expert's Recommendations we do so in italics so our comments can be distinguished from the First Court Expert's comments.

## IDOC Prisons Overview

The Illinois Department of Corrections was established in 1970 to administer and operate state prisons, juvenile centers, and juvenile and adult parole services. In 2006, the Illinois Department of Juvenile Justice was formed, which separated the adult and juvenile correctional systems. In 1970, the IDOC operated seven adult prisons. Currently, the IDOC operates 25 adult prisons,[13] a facility for housing the severely mentally ill (Joliet Treatment Center), and four transition centers.[14] The population of Illinois prisons has increased from approximately 6000 inmates in 1974 to approximately 49,000 inmates in 2015,[15] an eight-fold increase in population. The most recent information given to us by the IDOC is that the correctional center population as of November 30, 2017 is 41,376.[16]

Illinois prisons are overcrowded. The latest data from 2015 comparing prisons nationwide show that, based on design capacity, Illinois is the second most overcrowded prison system in the

---

[13] NRC and SCC are considered one facility for custody purposes, but NRC and SCC now have separate medical programs. Therefore, for purposes of this report there are 26 facilities. When we refer to prisons with respect to the medical programs we will refer to 26 prisons.
[14] Agency Overview on the IDOC website found on December 16, 2017 at
https://www.illinois.gov/idoc/aboutus/Pages/IDOCOverview.aspx.
[15] Illinois Prison Overview, Illinois State Commission on Criminal Justice and Sentencing Reform, 2015, as found at http://www.icjia.org/cjreform2015/research/illinois-prison-overview.html.
[16] 180126 Presley Rated Capacity on November 30, 2017, provided to us by IDOC.

There is a direct correlation between the FTEs per 1,000 inmates and per-inmate annual spending. A low number of staff can reflect a more efficient system of care or understaffing with its attendant negative consequences for provision of health care. In our study, we found that in 2018 there were 25 employees per 1,000 inmates, which still places Illinois approximately in the lower 10% of state prison systems based on 2015 data. This will be discussed later in this report.

## Key Findings

Overall, the health program is not significantly improved since the First Court Expert's report. Based on record reviews, we found that clinical care was extremely poor and resulted in preventable morbidity and mortality that appeared worse than that uncovered by the First Court Expert.

Governance of the IDOC medical program is subordinated to custody leadership on a statewide level and at the facility level. The subordination of health care to custody leadership has resulted in a medical program that is not managed on sound medical principles and one that is without medical leadership.

The existing IDOC system of care was established to have a more robust central office capable of monitoring vendor activity. The IDOC central office has been progressively diminished over the years to the point where it is incapable of effective monitoring.

The medical program does not have a separate budget. The IDOC could not provide to us a document that included expenditures for medical care. Authorization and responsibility for medical expenditures does not reside with the health authority.

IDOC Administrative Directives are inadequate policies for this state system. The IDOC medical policies need to be refreshed, augmented, and address all National Commission on Correctional Health Care (NCCHC) standards.

The IDOC does not have a staffing plan that is sufficient to implement IDOC policies and procedures. The staffing plan does not incorporate a staff relief factor.

Custody staffing has also not been analyzed relative to health care delivery to determine if there are sufficient custody staff to deliver adequate medical care.

Budgeted staffing was increased but vacancy rates were higher than noted in the First Court Expert's report. Staff vacancy rates are very high.

The vendor, Wexford, fails to hire properly credentialed and privileged physicians. This appears to be a major factor in preventable morbidity and mortality, and significantly increases risk of harm to patients within the IDOC. This results from ineffective governance.

Wexford and the IDOC fail to monitor physician care in a manner that protects patient safety. There is no meaningful monitoring of nurse quality of care. If care is provided it is presumed to be adequate, when in fact it may not be adequate.

The inability to obtain consultation reports and hospital reports appears to be a long-standing system wide problem. This is a significant patient safety issue.

The collegial review process of accessing specialty care is a patient safety hazard and should be abandoned until patient safety is ensured.

Specialty care is not tracked with respect to whether it is timely. The Wexford system of utilization management is ineffective and for many patients is a barrier to timely care. The use of free care at UIC appears to have resulted in unacceptable delays. Waiting for unacceptable time periods for free care when care needs to be performed timelier has harmed patients.

Patients are not consistently referred for specialty care when it is warranted. We view this as a problem of hiring unqualified physicians and as a problem of the utilization process itself.

The paper medical record system creates significant barriers to delivery of safe health care, including inaccessibility of prior reports and prior diagnostic tests. The current paper medication administration records (MARs) are inconsistently filled out, filed, or able to be viewed by clinicians. The paper record also makes monitoring health care processes exceedingly difficult. An electronic medical record is needed.

Sanitation, maintenance, and equipping health care units is not standardized. Many clinical areas are inadequately sanitized.

The reception process does not ensure a thorough initial medical evaluation that will correctly identify all of a patient's problems in order to develop an appropriate therapeutic plan. Provider medical histories are inadequate. Follow up of abnormal findings is inconsistent. Laboratory tests and other studies needed for an initial evaluation of a patient's chronic illnesses are inconsistently obtained. Tuberculosis (TB) screening is improperly performed due to custody rules at NRC.

The chronic disease system promotes fragmentation of care and fails to adequately address all of a patient's problems from the perspective of the patient. Patient problems are lost to follow up or are not addressed in the context of a patient's complement of diseases.

The chronic care disease guidelines need to be updated. Alternatively, contemporary existing guidelines by major specialty organizations should be used in lieu of IDOC-specific chronic care

problems with follow up of the consultation by facility staff. The First Court Expert found that the rate of approval by Wexford corporate utilization physicians is variable and dependent on the physician reviewer. He also noted that at Dixon and SCC there were substantial delays in obtaining authorization for offsite specialty care, especially for care obtained at UIC. Consultation reports are often not obtained.

**Current Findings**

There was no improvement since the First Court Expert's report. Our opinion is that the specialty care process of collegial review is a patient safety hazard and should be abandoned until such time that patient safety is ensured.

Specialty care is needed when a patient requires a special service or consultation that is unavailable at the facility. This is managed by Wexford Health Sources Inc. in a process called collegial review. In this process, whenever a physician or mid-level provider believes that a special service is necessary, the provider refers the patient to the Medical Director of the facility. If the Medical Director believes that the service is necessary, then the patient is referred for collegial review. A significant problem with this aspect of the process is that only 20% of Medical Directors are board certified in primary care and only about half have finished residency training in primary care. Therefore, there are many Medical Directors who have not been trained on when to appropriately refer for consultation. We found this problem repeatedly in record reviews. In our opinion, these deficiencies are due to lack of training or to overly restrictive barriers to specialty care. These episodes of care would not be found on the specialty care tracking log as they were never referred.

The collegial review is a phone conference call attended by a utilization physician in Pittsburgh, the facility Medical Director, and the scheduling clerk from the facility. At these calls, the corporate utilization physician reviews the list of referrals from the facility over the prior week. The utilization physician either approves or denies the referral. If a service is approved, the facility scheduling clerk then schedules the patient for the service. If a service is denied, the utilization physician is to provide an alternate treatment plan for the facility. After the specialty consultation service occurs, a follow up by a facility provider is to occur within five days. This visit is to include evaluation of the consult report and any follow up concerns. Each of these steps (referral, collegial review approval or alternative treatment plan, appointment, and follow up) are to be documented in the medical record. Though it is not a requirement of the administrative directives, each of these steps is tracked in logs maintained by the scheduling clerks.

We listened in on one of these collegial review conference calls and spoke to staff about the calls at other sites. The calls are brief. One scheduling clerk said sometimes the calls are canceled because the utilization physician believes all referrals are appropriate. The same clerk said that typically the calls take 10 minutes. The call we witnessed had no clinical collegial discussion about individual cases but was more of an approval process in which the utilization physician states approval or recommends getting another test before the approval is made.

There is a lack of guidance in policy with respect to specialty care. The IDOC-Wexford contract has no specifications with respect to timeliness of specialty care. There is no administrative directive (AD) on specialty care, including timeliness of care. AD 04.03.103 Offender Health Care Services describes the requirements of obtaining specialty care. With the exception of a requirement that the vendor Utilization Management Unit will review all referrals within five working days, there are no timelines associated with obtaining specialty care. None of the facilities tracked timeliness of specialty consultations. Dixon did perform a one-time study of timeliness of UIC consultations, which showed significant delays.

Medical records we reviewed did not consistently contain documentation of all benchmark events including referral, collegial review, alternate treatment plans, appointment, or follow up, even though documentation in the medical record is either required or implied because these benchmarks are medical events that need to be documented in the medical record. This made verification of specialty care impossible.

Each site had a tracking log detailing the benchmark dates of specialty care. None of the tracking logs was complete and some were inaccurate. Tracking logs were similar but not standardized. These tracking logs were under Wexford management. The purpose of tracking logs is both to manage current referrals to ensure scheduling occurs and to review logs for the purpose of ensuring that all steps of the process are occurring as expected. We noted that tracking logs showed significant errors. At Dixon, 22% of consultations on the tracking log did not have a referral date. At MCC, 44% of referrals in 2017 did not have a referral date documented on the tracking log and only 53% had the date the appointment was completed documented. Because of lack of information on these tracking logs, we found them unreliable. Some were inaccurate. At SCC for a three month period on the log, 7% of collegial reviews were documented as occurring *before* the date of referral, which is not possible. Also, at SCC for a period in January of 2017, 60 consultations were documented as being completed before the referral was made. These impossible scenarios imply that the tracking log is not accurately maintained and make the log unreliable for validation of knowing whether referrals are timely.

The Administrative Directives require that the specialty care benchmarks are to be documented in the medical record. We did not find alternative treatment plans documented in the progress notes of the medical record. These are typically included in utilization doctor's approval sheet in the consultation section of the medical record, but it is never clear how the primary provider incorporates this into actual practice. At NRC, because we were not provided a tracking log, we attempted to verify all specialty care benchmarks in the medical record. Only 14 (63%) of 22 consultations had a referral. Only three (14%) had a collegial review documented. Only nine (41%) had an approval. Only 15 (65%) were seen within five days in follow up of the consultation. As a result, using the medical record, we were unable to verify that benchmarks for specialty care occur as expected.

A major but unmonitored problem with specialty care is underutilization. The First Court Expert found the same problem and described it as delays in perceiving a need for the service. This can occur when physicians are unaware that a specialty procedure or consultation is necessary or

when the utilization process is so restrictive that providers fail to refer because they believe that it will not be approved. We were unable to specifically identify the cause in the IDOC but have definitively identified that it occurs. On the 33 death records reviewed, we noted 95 instances when a procedure should have been requested but was not, and 81 instances where specialty consultations should have been requested but were not. This is a large number of unrecognized specialty care referral in just 33 patients and demonstrates significant underutilization. This does not include need for radiologic studies such as CT scans. We view this deficiency as a result of improperly trained physicians and a learned process of not requesting care. This lack of referral places patients at risk of harm and has caused preventable morbidity and mortality. This is a systemic problem that appears at all facilities we investigated. In multiple cases on record reviews, patients who needed referral were not referred. Some resulted in death. Others resulted in morbidity with delayed diagnosis. These cases are found in record reviews of individual sites and in mortality reviews.

Underutilization is incorporated into IDOC practice. For example, the IDOC has no formal policy on colorectal cancer screening. Community standards are to screen non-high risk patients for colon cancer beginning at age 50 with either highly sensitive fecal occult blood tests, colonoscopy, CT colonography, or flexible sigmoidoscopy. The IDOC does not provide this screening and has no written guideline. AD 04.03.101 Offender Physical Examination requires periodic examinations every five years until age 30, every three years between ages of 30 and 39, and every two years for persons 40 years and older. Policy requires an annual TB skin test and females are screened with Papanicolaou (PAP) test and a screening mammogram at appropriate ages. There are no other recommendations for screening tests, which is not consistent with current standards.[119] Current IDOC practice for colorectal cancer screening, not clarified in policy, is to perform digital rectal examination at the annual or biannual examinations with fecal occult blood testing. Digital rectal examination with or without single office-based guaiac fecal occult blood testing is not adequate screening for colorectal cancer and is not recommended. At Danville, a patient who was only offered digital rectal examinations for colorectal cancer screening died from complications of advanced colorectal cancer.[120] We viewed this death as preventable. Another 56-year-old man who developed locally invasive rectal cancer described below is another example.

Current standard of care for all persons with COPD and asthma is to have spirometry or full pulmonary functions tests. Asthma and COPD are different diseases which have different monitoring objectives. Yet in IDOC they are treated the same, resulting in inappropriate care. Almost no patients we reviewed with either COPD or asthma have evidence of referral for spirometry or pulmonary function testing. This is inadequate management and inconsistent with contemporary standards of care.

---

[119] Routine screening recommendations are provided by the US Preventive Services Task Force as found at https://www.uspreventiveservicestaskforce.org/Page/Name/recommendations.

[120] Mortality Review Patient #1.

It is recommended that persons with cirrhosis have screening upper endoscopy to evaluate for varices; treatment with beta-blocker medication if varices are identified; and referred for screening ultrasound every six months to screen for hepatocellular carcinoma. These screening tests are only occasionally completed in IDOC and this practice is not codified in policy or in clinical guidelines. It appears that many facility physicians do not understand how to care for persons with cirrhosis and do not order these tests when indicated.

We also noted that a significant number of consultations occur without evidence of a report.[121] The IDOC refers patients to consultants and to hospitals, but when those consultations and hospitalizations are completed, the IDOC does not obtain a report of the consultation or hospitalization in a significant number of these referrals. This is a patient safety risk. When a report is not present, the providers will be unaware of other recommended testing or consultations, and will be unaware of the consultant or hospital findings that have a significant impact on therapeutic plans.

Even when consultation and hospital reports are obtained, they are not always reviewed. An example was at NRC. We reviewed 22 consultations; only eight consultation reports were present. On these eight reports there were 19 recommendations of consultants which were not carried out. This may have been due to the extremely dysfunctional medical record system at NRC.

At NRC, only eight (36%) of 22 specialty consultations included a report. At SCC, only 19 (35%) of 35 consultations included a report in the medical record. At LCC, five (63%) of eight consultations included a report. At MCC, the scheduling clerk told us that approximately 50% of consultations will not have a report. When reports are not present, the providers will not know the status of the patient and may fail to understand recommendations, placing the patient at risk of harm. A referral sheet is sent with patients on all offsite referrals. Consultants usually, but not always, will write brief comments on these forms to communicate key items to the primary doctor. However, this is an unreliable system and is incomplete, as it does not give the full consultant report.

The contract between Wexford and the IDOC requires that the vendor is to meet with hospital and other providers to coordinate referral of inmates, including the reporting of test results and medical records.[122] The contract also requires that medical records are to contain hospital discharge summaries and reports of consultations.[123] Yet the IDOC has taken a position[124] that they have no control over consultants or outside hospitals, and therefore obtaining a report is beyond the IDOC's control. They were mainly speaking of hospital emergency room reports. We

---

[121] As an example, on 33 mortality review records, there were 137 episodes when records were unavailable from offsite specialty care or hospital care. This included both specialty consultation reports and hospital discharge summaries.
[122] Contract between Wexford Health Sources Inc. and State of Illinois Department of Healthcare & Family Services dated 5/6/11 and found at 2.2.3.11 on page 9.
[123] Contract between Wexford Health Sources Inc. and State of Illinois Department of Healthcare & Family Services dated 5/6/11 and found at 2.2.3.13.5 on page 10.
[124] Letter to First Court Expert regarding Defendants' comments regarding the confidential draft report of the First Court Expert dated 11/3/14 and signed by William Barnes on pages 22-23.

assumed that they hold the same position for consultation reports. They maintain that Wexford has implemented a system which provides the Medical Director with reliable and timely information so that appropriate care is provided. We did not find that this was accurate. There is no evidence in the five day follow up to consultations or in the follow up after hospitalizations that doctors consistently understood what occurred during the offsite event. If they did, they did not document it. At times, doctors would document that there was no report and made no changes to the therapeutic plan because information was still pending. This is a serious problem. In our experience managing contract medical services and a county-managed health program, we have always been able to negotiate with consultants and hospitals timely access to consultant and hospital reports. We view this as a failure of the vendor to perform and should be fixed via the oversight process.

A special situation exists with respect to use of UIC for consultant care. Years ago, UIC agreed to provide IDOC with a certain amount of free care. This amounted to 216 inpatient hospital admissions and 2160 outpatient visits per year. Only four facilities are permitted to participate: SCC, Dixon, Pontiac, and Sheridan. NRC and SCC are considered the same institution. Each facility is permitted to send approximately 520 patients a year for specialty consultations. For a variety of reasons, these specialty consultations are delayed. At Dixon, consultations to UIC average six months to complete and range from 100 days for a cardiology consultation to 239 days for a gastroenterology consultation. These delays have resulted in morbidity and mortality, and place the patients at significant risk of harm. There is no process to assess whether a patient's condition needs earlier attention. Because the cost of UIC is free and the cost of alternate care is borne by Wexford, there is significant incentive to send patients to UIC even if it results in delayed care.

An example of this was at SCC. The patient[125] was a 56-year-old who complained of blood in his stool on 11/8/16. A fecal occult blood test verified blood in his stool. The patient also had weight loss. The standard of care for a 56-year-old with weight loss and blood in the stool is prompt colonoscopy and possibly additional work up to exclude colon cancer. This man was not referred for colonoscopy; instead, he was referred for a gastroenterology appointment on 1/4/17, about two months later. The gastroenterology appointment did not occur until 7/7/17, about six months after the referral. The gastroenterologist recommended colonoscopy, which did not occur until 11/27/17, when a locally invasive rectal cancer was identified. This delay of over a year resulted in unnecessary spread of the cancer. Physicians were aware of the delay but there was no effort to schedule the patient to a local gastroenterologist for this procedure.

We reviewed aggregate specialty care visits for 2017. They are listed in the table below. Though the populations at SCC and MCC are similar in that they are both maximum security prisons without special medical missions, the referrals numbers and rates are quite different. We question whether the four times higher rate of referral at SCC is related to the free care provided at UIC. Dixon and SCC, which have free care at UIC, had the highest numbers and rates

---

[125] SCC Hospitalization Patient #6.

of referral. This implies that other sites may have suppressed referral rates because the cost of care is borne by the vendor.

| Site | Population | Referrals[126] per year | Referrals per 1000 | Denials per year | Denials per 1000 | % Denied |
|------|------------|-------------------------|--------------------|------------------|--------------------|----------|
| NRC  | 1681 | 242 | 144 | 8 | 5 | 3% |
| SCC  | 1183 | 1731 | 1463 | 87 | 74 | 5% |
| Dixon | 2298 | 1666 | 724 | 109 | 47 | 7% |
| LCC  | 1806 | 753 | 417 | 71 | 39 | 9% |
| MCC  | 3029 | 994 | 328 | 237 | 78 | 24% |

Dr. Meeks testified[127] that if the site Medical Director or HCUA feel that any request denied is necessary, it can be appealed directly to the Agency Medical Director. Dr. Meeks stated that over an eight-month period he thought he had received about 10-15 appeals on a statewide basis. It is our opinion based on record reviews that there are a substantial number of patients who are not referred for services who need them. We were unable to identify any data to show who appeals utilization decisions to the Agency Medical Director, but based on interviews it appears that the HCUA at the facility is the person who does this. But the HCUA is a nurse who is not trained to determine whether a referral is necessary. This manner of oversight is therefore flawed and will not adequately protect patient safety because this should be done by a physician, and needs to include review of care so that persons who never get referred but should be referred are identified.

Based on multiple record reviews, including mortality reviews, we have identified considerable morbidity and mortality associated with untimely or lack of referral for higher level of care. In review of 33 deaths, we found 93 episodes of care when a patient should have been referred to a hospital. Many of these delayed or failed hospital admissions contributed to patient death. While we believe that this occurs as a result of poorly qualified physicians, the utilization process appears to be a significant barrier to access to timely specialty and higher level of care. The defects in this cost containment mechanism effectively result in denial of necessary medical services that harm inmates. For that reason, we make a strong recommendation to abandon the collegial review process until patient safety can be ensured.

IDOC providers should be strongly encouraged to request specialty consultation when patients' clinical conditions are complicated, exceed the skills and training of the providers, or are not responding the initial treatment regimens. It would be in the best interest of the patient and the IDOC if there was a system wide specialty consultation plan that included contracts with specialty providers for face-to-face, telehealth, and e-consult consultation. IDOC should expand and build on the current telehealth program that provides ready access to HIV, hepatitis C, and renal consultation. The present relationship with the University of Illinois Chicago could be used

---

[126] Referral and denials were taken from the latest year's annual CQI reports provided to us by the IDOC.
[127] Page 23 30(b)(6) deposition of Dr. Meeks on July 25, 2017.

as a template to expand the number and type of specialty consultations that are readily available to IDOC providers.

## Infirmary Care

**First Court Expert Findings**
The First Court Expert noted in the final report that there were deficiencies in infirmary policies, practices, and physical plants. The expert stated that IDOC policies failed to provide a detailed description of the scope of services that could be safely provided in the infirmary setting and did not provide guidelines that would assist the clinical staff in determining which patients should be referred to the hospital and not be admitted to the infirmary. The report criticized the 23-hour observation policy that allowed nurses to directly admit patients to the infirmary for short term observation without contacting the provider or to discharge patients without arranging for post-observation follow-up. They report that Dixon did not have 24 hour/7 days per week registered nurse presence in the infirmary, and that there was no or only partial nurse call systems in five facilities. It was also noted that in some infirmaries, bedding linens were of poor quality and in short supply.

**Current Findings**
All five of the correctional centers inspected had infirmaries including NRC, SCC, Dixon, LCC, and MCC. The NRC infirmary was opened in 2016, two years after the First Court Expert's site visit.

The physical plants of the infirmaries were described in the section on Clinical Space and Equipment, which noted serious problems with the level of cleanliness, lack of adjustable hospital beds, torn mattresses, non-functioning negative pressure units in isolation rooms, the absence or incomplete distribution of nurse call devices, and unsafe shower rooms in many of the infirmaries.

There was overall compliance with timeliness of nursing admission notes, which were consistently written at the time of admission, and the frequency of nursing progress notes. Nursing progress notes were consistently entered no less than daily even when the policy required only weekly notes. There was varying compliance with the timeliness of provider admission notes, which were to be written within 48 hours of admission.[128] A number of provider admission notes were not entered in accord with this standard.[129] As also directed by the Offender Infirmary Services directive (see reference above), provider progress notes were to be written three times a week for "acute" admissions and weekly for "chronic" admissions. There was inconsistent compliance with this directive in the IDOC infirmaries.[130]

The Offender Infirmary Services Administrative Directive dated 9/1/2002 states that "the scope of infirmary services available on site shall be based upon the nature of offender population

---

[128] Offender Infirmary Services 04.03.120.
[129] NRC Infirmary Patients #1, 3, 4; Dixon Infirmary Patient #1.
[130] NRC Infirmary Patients #3, 4; Dixon Infirmary Patients #3, 5; MCC Infirmary Patient #2.