1         IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
2              SPRINGFIELD DIVISION

3   WILLIAM KENT DEAN,         )
                        )
4          PLAINTIFF,    )
                        )
5         VS.          )  17-CV-03112
                        )
6   WEXFORD HEALTH SOURCES,  )  JURY TRIAL
  INC., DR. ABDUR NAWOOR, DR.  )
7   REBECCA EINWOHNER, KATHY  )  SPRINGFIELD, ILLINOIS
  GALVIN, and LISA MINCY,    )
8                         )  VOL. 1
         DEFENDANTS.    )
9

10           TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE SUE E. MYERSCOUGH
       UNITED STATES DISTRICT JUDGE
11

12   DECEMBER 9, 2019

13   A P P E A R A N C E S:
  FOR THE PLAINTIFF:        CRAIG MARTIN
14                       JOEL PELZ
                      WILLIAM STROM
                      CHLOE HOLT
15                       NATHANIEL WACKMAN
                      JENNER & BLOCK
16                       353 N. CLARK STREET
                      CHICAGO, ILLINOIS
17

18   FOR DEFENDANTS           JOSEPH RUPCICH
  WEXFORD HEALTH SOURCE,    ALEXANDRA RICE
  DR. ABDUR NAWOOR,        CASSIDAY SCHADE.
19   REBECCA EINWOHNER        111 N. SIXTH STREET
  AND KATHY GALVIN:        SPRINGFIELD, ILLINOIS
20   FOR DEFENDANT LISA MINCY:   JEREMY TYRRELL
                      CLAYTON ANKNEY
21                       ATTORNEY GENERAL'S OFFICE
                      500 S. SECOND STREET
22                       SPRINGFIELD, ILLINOIS

23   COURT REPORTER:      KATHY J. SULLIVAN, CSR, RPR, CRR
                      COURT REPORTER
24                       600 E. MONROE
                      SPRINGFIELD, ILLINOIS
25                       (217)492-4810

1                          I N D E X

2    WITNESS                                    PAGE

3    WILLIAM KENT DEAN
     Direct Examination by Mr. Strom              39
4

5

6

7

8

9

                        E X H I B I T S
10
     PLAINTIFF'S EXHIBIT
11   NUMBER                    IDENTIFIED    ADMITTED

12   Exhibit 1                     47           49
     Exhibit 2                     72           74
13

14

15

16

17   DEFENDANTS' EXHIBIT
     NUMBER                    IDENTIFIED    ADMITTED
18

19

20

21

22

23

24

25

```
 1                     P R O C E E D I N G S

 2          *     *     *     *     *     *     *     *     *     *

 3              (Jury selection proceedings were reported but

 4              not transcribed.)

 5              (The following proceedings were held in open

 6              Court, outside the presence of the jury.)

 7                  THE COURT:  This is 17-3112, Dean versus

 8      Wexford.  We have for the plaintiff William Kent

 9      Dean, who is present in person, Craig Martin,

10      William Strom, Joel Pelz, Nathaniel Wackman, Chloe

11      Holt of Jenner and Block.  Dylan Green and Dan

12      Rooney.

13              For Dr. Nawoor, Dr. Einwohner, and is it Dr.

14      Galvin?

15                  MS. GALVIN:  No.  Nurse Galvin.

16                  THE COURT:  Nurse Galvin, Joe Rupcich and

17      Alexandra Rice from Cassiday Schade.  And for Nurse

18      Lisa Mincy, Clayton Ankney and Jeremy Tyrell from

19      the Office of the Attorney General.

20              I have been told that we have a juror, ████

21      ████, Number 39, who is in seat Number 5, who has

22      expressed his intimidation of the process, says he

23      does not wish to serve.

24              Would you like me to have him out and I could

25      question him further?
```

1      MR. RUPCICH:  Yeah, I think we probably

2  need to make some sort of record.  He did have

3  opportunity to bring up any issues, so I think that

4  would be appropriate.

5      At the risk of further intimidating him, I

6  guess.

7          THE COURT:  Mr. Tyrrell?

8          MR. TYRRELL:  Yeah, I'll agree with

9  Mr. Rupcich.

10         THE COURT:  Okay.  Mr. Martin?

11         MR. MARTIN:  We agree.

12         THE COURT:  All right.  If you'll bring him

13 out.

14     I'll sit down so as not to be intimidating.

15     (Juror entered the courtroom.)

16         THE COURT:  Good afternoon, ████████.

17         ████████  Good afternoon.

18         THE COURT:  I'm Sue Myerscough, I'm the

19 judge for this case.  Our jury clerk expressed you

20 have some concern about being on the jury.  Could

21 you tell me?

22         ████████  I'm sorry I didn't say anything

23 earlier.  This is my first time in this setting and

24 very intimidating.  I apologize for the

25 inconvenience.

1    I just started a new job over-the-road truck

2  driver last week.  And I am -- I bring in like

3  95 percent of my income for me, my wife, and my

4  three-year-old and my mother-in-law for mortgage,

5  bills, et cetera, everything like that.

6    So taking the days off is really setting us

7  back even just today.  So the company I work for,

8  they obviously understand and everything, but it's

9  just kind of freaking me out and my wife, you know,

10  getting caught up and everything like that.

11    THE COURT:  Are you sure your employer

12  doesn't pay you when you're doing jury duty?

13    ████████  I don't think so.  I spoke to

14  them about it, they just told me to call them and

15  let them know if they need to have me do out or stay

16  home.

17    THE COURT:  I should probably disclose to

18  the courtroom I went to law school with your boss.

19  And I tried many cases with his brother.  It's the

20  Tracy family.  Don Tracy is legal counsel for Dot

21  Foods.  And I went to law school with your boss's

22  wife, Jill Tracy; was a Senator here in the

23  legislature.

24    I hope that doesn't intimidate you further.

25    ████████  Oh, no.  Well, yes, but that's

1    okay.

2            THE COURT:  Well, Mr. Rupcich?  Any

3    questions?

4            MR. RUPCICH:  You understand that you're

5    not going to be required to do anything over these

6    next few days other than sit?  You don't have to

7    speak again, nobody is going to be questioning you

8    any further; right?

9            MR. MOORE:  Yes, sir.

10           THE COURT:  Mr. Tyrrell?

11           MR. TYRRELL:  I have no questions.

12           THE COURT:  Mr. Martin, Mr. Strom?

13           MR. MARTIN:  No, Your Honor.  We don't have

14    any questions.

15           THE COURT:  Okay.  May I have a sidebar.

16       (The following sidebar discussion was held at

17       the bench.)

18           THE COURT:  I can call Dot Foods and

19       see whether he'll be paid.  I think that

20       solves his situation.

21           MR. RUPCICH:  So it seems that he was

22       hoping he wouldn't get on the jury, and now

23       there's a hardship.  I'm not sure about the

24       intimidation.  Perhaps we could break and

25       have him call his employer to verify he'll

1    be paid.  Or we can just let him go.

2        THE COURT:  I'm not sure whether he

3    will be paid or not.  I've had a lot of Dot

4    Foods people on my juries, nobody has ever

5    told me that before, but --

6        MR. MARTIN:  We would be fine with you

7    calling the employer.  Perfectly

8    appropriate under the circumstances.

9        MR. RUPCICH:  But we can let him go.

10       THE COURT:  I'll just take a short

11   break and I'll call Don, if he's in.

12       MR. RUPCICH:  Okay.

13       THE COURT:  Mr. Moore, do you have any

14   problem with my calling Mr. Tracy and

15   asking him whether you would be paid for

16   this time period?

17       MR. MOORE:  No.

18       THE COURT:  Okay.  You can go ahead

19   and go back to the jury.  Thank you, sir.

20   Court is in recess.

21   (A break was taken.)

22       THE COURT:  Please be seated.  Court is

23   reconvened.

24   So after nine and a half minutes on the phone

25   with Dot Foods, I determined that Mr. Moore would

1    receive $12.50 an hour for up to 80 hours.  And that

2    may be less, it may be more than his usual pay

3    because it's based on the load that he gets paid,

4    not an hourly wage.

5        So I will have Mr. Moore come back out and tell

6    him that and then proceed.

7            MR. RUPCICH:  I mean, like I said, I'm

8    inclined to let the gentleman go.

9            THE COURT:  Mr. Martin?

10            MR. MARTIN:  I think you can let him know

11    that.  And then we'll give him the Gaelic shrug.  If

12    he wants to stay, he can stay, if he wants to go, he

13    can go.

14            MR. TYRRELL:  We're fine with him going or

15    staying.

16            THE COURT:  I'm worried about a two-week

17    trial, potentially, and only one alternate juror.

18            MR. MARTIN:  One income earner is tough.

19            THE COURT:  So the moral of the story is

20    make your spouses work.

21            MR. MARTIN:  Exactly.

22        (Juror entered the courtroom.)

23            THE COURT:  So, Mr. Moore, I'm sorry that

24    took so long, but I spoke to numerous people.  But

25    what I was assured is that you would instead receive

1  an hourly wage of $12.50 an hour for up to 80 hours

2  of your jury service, which might be more than what

3  you would ordinarily based on your trips.

4      So does that change things for you?

5          MR. MOORE:  That's fine, whatever works.  I

6  mean, obviously, I would like to go home and spend

7  time with family, but if that's -- if it's an

8  inconvenience --

9          THE COURT:  Well, what I will tell you,

10  what we will do is we will begin each day at nine,

11  We will break at noon.  We will give you an hour and

12  a half for lunch, 1:30.  And then 4:30 is as late as

13  we try to go.  So you should be home for dinner.

14          MR. MOORE:  That's fine.  I appreciate it.

15  Thank you.

16          THE COURT:  Do you have any questions?

17          MR. MARTIN:  No, Your Honor.

18          THE COURT:  Mr. Rupcich?

19          MR. RUPCICH:  No, Your Honor.

20          THE COURT:  Mr. Tyrrell?

21          MR. TYRRELL:  No, Your Honor.

22          THE COURT:  Okay.  Thank you.  You can go

23  back to the jury, we have a couple of things to take

24  care of.  Appreciate your information.

25      (The juror left the courtroom.)

1    THE COURT:  And I did thank them profusely

2    for the information, which was not easy to find the

3    answer to.

4        So then we have the objections to the Severino

5    deposition.  I think there are four.  The objections

6    are overruled.  In addition to the fact that they're

7    overruled, I think the deposition would read poorly

8    if we were to exclude that information.

9        Then we have the Lippert motion in limine and

10    the plaintiff's motion to preclude.

11        I have to be honest, I have not had an

12    opportunity -- I've read both motions and I've

13    looked at the major case, but I've not had a chance

14    to read all of the cases in support of the defense's

15    response.

16        I have read the case.  Did any of the cases

17    relate to the question of notice?  As opposed to

18    letting in the hearsay or any other purpose besides

19    notice?

20        MR. WACKMAN:  Your Honor, I believe the

21    only case we cited for notice -- I can approach?

22        THE COURT:  Oh, you don't have to, I can

23    hear you, she can hear you.

24        MR. WACKMAN:  I believe the only case we

25    cited on the topic of notice, Your Honor, was the

1    Sokn case, I believe.  S-o-k-n.  Just sort of the

2    general proposition that is an accepted form of

3    non-hearsay.  And we believe that the Shansky and

4    Puisis reports fall under that general heading quite

5    easily, Your Honor.

6                THE COURT:  So I think what I'm going to do

7    on both of these is I'm going to reserve ruling

8    until tomorrow.  I want to read the cases.

9        Mr. Rupcich, would you like to file a response?

10   Mr. Tyrrell?

11               MR. RUPCICH:  I was the movant.  They

12   responded.  You mean a reply to their response --

13               THE COURT:  Uh-huh, yes.

14               MR. RUPCICH:  I guess I'd like to consider

15   it.  I may just want to argue it tomorrow.  We're

16   talking not -- I understand they filed something

17   this morning.  I haven't seen that.

18               THE COURT:  You need to see that.  It's

19   plaintiff's response in opposition to Wexford's

20   seventh motion in limine, and it's this thick.

21               MR. MARTIN:  I think our staff handed him a

22   copy this morning.

23               MR. RUPCICH:  This is a separate motion

24   they filed this morning.  So what you -- I'm sorry,

25   Judge, what are you asking me do I want to respond

1    to?  They --

2              THE COURT:  What are you looking at?

3              MR. RUPCICH:  Well, they handed me

4    something that they filed this morning.  I know they

5    filed a response to my motion in limine --

6              THE COURT:  That's what I'm talking --

7              MR. RUPCICH:  -- Friday night.

8              THE COURT:  Right.

9              MR. RUPCICH:  I will argue that.

10             THE COURT:  Well, I don't want to keep the

11   jury waiting at this point.

12             MR. RUPCICH:  We can argue it tomorrow.

13             THE COURT:  Well, I'd like to know the

14   cases you're going to rely on ahead of time if you

15   can't file a reply.

16        And for that matter, counsel, and I should make

17   this clear, Mr. Martin, on the eve of trial, when

18   emergencies come up, please be sure to have my email

19   and send it to me.  So I could have read this before

20   this morning.  I got through them, but I would like

21   to have gotten the cases pulled and gotten them

22   read.  It was filed at 11:58 p.m. Friday night.

23   So --

24             MR. RUPCICH:  Yeah, the response.

25             THE COURT:  Right.

1          MR. RUPCICH:  I don't intend to file a

2     reply to the response to the motion in limine.  I

3     will stand on the case law on the Lippert report

4     that I cited in the motion as the movant.

5          THE COURT:  That's it.  Okay, you don't

6     want to reply.

7        All right.  So I will rule on those in the

8     morning, so do not make reference to them in opening

9     statements.

10       Will that pose any difficulties at this point?

11       Mr. Martin?

12          MR. MARTIN:  No, Your Honor.

13          THE COURT:  Mr. Rupcich?

14          MR. RUPCICH:  No, Your Honor.

15          THE COURT:  Mr. Tyrrell?

16          MR. TYRRELL:  No, Your Honor.

17          THE COURT:  And I assume that Mr. Rupcich

18     and Mr. Tyrrell are lead counsel?

19          MR. TYRRELL:  Yes.

20          THE COURT:  And you will be doing opening,

21     Mr. Martin?

22          MR. MARTIN:  Yes, Your Honor.

23          THE COURT:  Okay.  Are we ready for the

24     jury then?

25          MR. RUPCICH:  Oh, Judge, I have one thing,

1    may I?  Motion to exclude witnesses.

2             THE COURT:  Any objection?

3             MR. MARTIN:  Well, the only, I think,

4    factual witness in the courtroom is our client's

5    wife and so we would oppose that.  We want her to

6    stay here during the testimony.  That's Cynthia

7    Dean --

8             THE COURT:  I'm sorry, I didn't catch her

9    name.

10            MR. MARTIN:  Her name is Cynthia, but she

11   goes by Sue Dean.

12        And then expert witnesses will be sitting

13   during some of the fact testimony, of course.

14            MR. RUPCICH:  If Mrs. Dean apparently is a

15   fact witness, then she must be excluded, she's going

16   to testify to facts.  Experts don't testify to

17   facts, they can come and go as they please.

18            THE COURT:  Mr. Martin, if you will ask

19   Mrs. Dean -- can you allow her to use your attorney

20   conference room?

21            MR. MARTIN:  Yes, we can.  Can we have her

22   here during openings, Your Honor?

23            THE COURT:  Yes.

24            MR. MARTIN:  Okay.

25            THE COURT:  Please bring in the jury.

1      Do you want me to reintroduce you to the jury

2   when they come in?

3           MR. MARTIN:  I think we can handle our

4   introductions, Your Honor.

5           THE COURT:  Okay.

6      (The jury entered the courtroom.)

7           THE COURT:  Please be seated.

8      Court is reconvened.  You have your note-taking

9   there in your envelope.  Be sure to put your juror

10  number or your name on it.  I think Judge

11  Schanzle-Haskins already told you that we will never

12  look at your notes.  They will be -- you will put

13  them back into your folder every night and they will

14  be kept by court security in a locked vault.  They

15  will not be looking at them.  So if you want to take

16  your grocery list and write it down, feel free.

17     All right.  We're going to do opening at this

18  time.  Mr. Martin will be first as he represents the

19  plaintiff.

20     I'm Judge Myerscough, by the way.  Sue

21  Myerscough.  Nice to meet you all.

22          MR. MARTIN:  Well, congratulations for

23  surviving voir dire and joining our jury.

24     Let me reintroduce myself and some of my

25  colleagues.  My name is Craig Martin.  Seated at

1   counsel table is my colleague, Bill Strom.  Our

2   client goes by Billy Dean.  Chloe Holt.  You'll see

3   that we play musical chairs a little bit.  Then

4   Dylan Green who runs the trial technology in the

5   courtroom.  He's quite experienced.  Dan Rooney is

6   our paralegal.

7        And then we'll see the men with mustaches and

8   beards go back on that table.  We have Joel Pelz,

9   one of my colleagues, and Nate Wackman, also one of

10  my colleagues.

11       And then if you look a little bit back, our

12  client's wife Cynthia Dean is right there.  She

13  actually goes by Sue.  Cynthia, if you will raise

14  your hand.

15       And the -- our client's sister-in-law, Marilyn

16  Martin.  No relation to Craig Martin.  But Marilyn

17  is right there.  So I learned that Cynthia's maiden

18  name was Martin.

19       The -- so let me begin by first recognizing

20  that it's a serious commitment for you all in

21  telling you that we appreciate your service on the

22  jury.

23       One of the things that came up earlier this

24  morning is that the American jury system, I always

25  call it part of the great Democratic experiment.

The American jury system really doesn't exist anywhere in the world.  It exists here in the United States.

And one of the things that is unique about our country and our jury system is that we believe, all of us, all -- especially the lawyers in the room, but we believe in empowering juries to make factual determinations.

So we have -- you know, you'll see witnesses, you'll see us argue with one another, but when push comes to shove or at the bottom line, however, you want to describe it, we entrust you to bring your common sense, your judgment, your experience to the factual situation that we give to you.

So thank you for being on the jury.

The --

THE COURT:  Mr. Martin, excuse me for interrupting.

We have hearing assistance devices that you can put over your ears.  Is anyone having trouble hearing Mr. Martin?

No.

If at any time you have any trouble, raise your hand, because sometimes people turn away from you or may cough -- somebody may cough in the middle.  So

1    please feel free.  This is your courtroom, you are

2    the jurors.

3         MR. MARTIN:  Thank you, Your Honor.

4         The -- as I thought about what to say to you in

5    opening, one of the things -- and I'll obviously go

6    over an overview of the facts, but one of the things

7    that I thought about is what is the case really

8    about?  So I'll just give you some words to think

9    about as you go through this.

10        One is cancer.  That's sort of a scary term for

11   many of us.  Cancer, the definition, by definition,

12   it's uncontrolled growth of cells in the human body.

13   It's a scary word.  Mr. Dean is afflicted with

14   cancer.

15        A second word is care.  What kind of care did

16   he get.  What kind of concern was there.  So we ask

17   you as you go listen to the evidence to think about

18   care.

19        A third concept that I'll ask you to think a

20   lot about during the trial is responsibility.  And

21   responsibility is a big concept in this case.  And

22   it's a big concept because you'll hear evidence and

23   you'll hear testimony and you'll see documents about

24   who took responsibility, who didn't take

25   responsibility, and what the meaning of systemic

1   responsibility is.

2        And you'll hear a lot about this Wexford Health

3   Care System.  It's sort of the 1984-like Orwellian

4   evidence about that particular health system.

5        I always think about responsibility and my mind

6   goes back to Harry Truman.  And I keep asking myself

7   where does the buck stop.  And that's a good

8   question to ask in this case.

9        The other concept that we'll ask you to think a

10   lot about is time.  Time and delayed time.  We all

11   know and the evidence will show you, but we all know

12   this anyway, that our lives are finite.  Nobody

13   lives forever.  We all only have so much time.  And

14   in this instance, the amount of time, you'll see the

15   evidence will show you, the amount of time that

16   Mr. Dean has left on this planet, in this life is

17   limited by the conduct of the defendants.

18        So let me also tell you at the beginning and

19   the outset, this is a constitutional case.  It's a

20   constitutional case largely because Mr. Dean is in

21   the care and custody of the -- because he is in

22   prison.  And so it's a constitutional case brought

23   under the 8th and 14th Amendments of the

24   Constitution as you heard earlier.

25        A little bit about Mr. Dean.  Mr. Dean is

1    59 years old.  He's from LaSalle County, Illinois.

2    He's been married to his wife Sue for nearly

3    40 years.  He has a son who I think will be here

4    tomorrow.  His son is about 35 years old.  He's

5    expecting his first grandchild soon.  He's an inmate

6    in Taylorville Correctional Center.  He was

7    convicted in 2012 related to the manufacturing and

8    delivering of a controlled substance, i.e. cocaine,

9    which we talked about a little bit this morning.

10   And he's currently on track to be released in

11   September 2020.

12        Now, let me tell you a little bit about the

13   defendants.  The defendant Wexford Health Services

14   is a company.  And that company has a contract with

15   the Illinois Department of Corrections to supply

16   medical services to folks that are imprisoned in the

17   State of Illinois at institutions including

18   Taylorville.

19        That contract -- by the way, it's a privately

20   held, for-profit company.  In 2015, for example,

21   you'll hear evidence that the amount of payment that

22   was expected under that contract to Wexford was

23   $133 million.  You'll hear evidence that that was a

24   $1.3 billion, ten-year contract.  So this is no

25   small company.  This is no small contract.  This is

1    big business.

2        You'll also hear evidence about Wexford and its

3    policies and how it operates.  Now, during voir

4    dire, I think it was great because I think I asked

5    three of you if you heard of these terms and I got

6    three nos.  But during voir dire, I asked about

7    utilization management and I asked about collegial

8    review to see if anybody knew anything about those

9    concepts.

10        I'll just park those for a moment because

11    you'll hear a lot of testimony about utilization

12    management and collegial review.  So keep those

13    terms in mind as we start to walk through the trial.

14        So that's defendant Wexford.  That's the

15    corporate institutional defendant.

16        There's four individual defendants.  I'm not

17    going to go through them in great detail.  One is

18    Dr. Nawoor.  He is an internist or primary care

19    physician assigned to Taylorville and works for

20    Wexford.  He failed to do his job.  That's what the

21    evidence will show you.

22        A second is Dr. Einwohner.  She is a

23    nephrologist, basically a kidney doctor, kidney

24    specialist, working out of another state,

25    Pennsylvania, who actually only sees people at

1    Taylorville by telemedicine, by video conference or

2    telephone call.  And she certainly was part of a

3    system that failed to take responsibility and do its

4    job.

5         There's Nurse Galvin who is a defendant.  She's

6    a Wexford nurse.  So all three of these folks are

7    employed by Wexford.  And she did not do her job

8    because she failed to keep Mr. Dean on schedule.

9    There were too many delays, as you'll see, in his

10   treatment.

11        And then finally, there is Nurse Mincy, who's

12   an IDOC nurse, Illinois Department of Corrections,

13   who serves essentially as a liaison between IDOC and

14   Wexford.  And she failed to serve appropriately as a

15   liaison.

16        Now, cancer.  Let's start with cancer as I

17   flagged for you at the beginning.  Mr. Dean has

18   Stage 4 metastatic kidney cancer.  That means that

19   the cancer started in his kidney.  He learned that

20   he had cancer after he began urinating visible

21   blood.  So visible blood in his urine, a symptom

22   known as hematuria.  I'll try to keep the jargon to

23   a minimum.

24        He first began experiencing it in late 2015,

25   December 19th were his first symptoms.

1   December 20th he talked to his wife about it.

2   December 23rd he went to sick call at the

3   Taylorville.

4       Stage 4, what does that mean?  Just to give you

5   the cancer tutorial.  It means cancer is advanced.

6   And in fact, at one point the cancer had essentially

7   taken over his entire kidney.  You'll hear testimony

8   about that.

9       Metastatic, what does that mean?  That means

10  that the cancer has spread and begun growing in

11  other parts of the body apart from Mr. Dean's

12  kidney, including lymph nodes, lungs, liver.  That's

13  metastatic.  So the cancer spreads in a so-called

14  metastatic way.

15      Mr. Dean is receiving chemotherapy.  It's very

16  expensive chemotherapy.  I think it's about -- the

17  evidence will show it's about $15,000 a month.

18  You'll hear evidence that Mr. Dean has gone through

19  several different drugs with regard to chemotherapy.

20  And you'll hear testimony and evidence about how the

21  cancer treatment process works.

22      And suffice to say in short, the way that

23  process works is that there are only so many drugs

24  that treat certain types of cancers.  And you'll see

25  that Mr. Dean is rapidly exhausting the number of

1    treatments for cancer.  They sort of peter out, they

2    stop working, and then things don't go so well.

3        So Mr. Dean, to be just blunt about it, you'll

4    hear testimony that his cancer will grow, it will

5    continue to grow, that it will ultimately kill him.

6        You'll hear testimony that Mr. Dean is

7    essentially -- has a race against the clock.  The

8    clock being the date that he's released from prison.

9    He does not want -- you'll hear him tell you that he

10   does not want to die in prison.  He would like to

11   pass away at home with his family.

12       So care and concern.  Care in this case.  Being

13   in prison, Mr. Dean didn't get to choose his

14   doctors, his doctors were chosen for him.  Being in

15   prison, Mr. Dean didn't get the opportunity to have

16   a second opinion and get to choose it.

17       But be that as it may, let's talk about the

18   timeline for a second and show you what the care

19   continuum looks like.  Dylan, if I could ask you to

20   go ahead and pull up the timeline.

21       So ladies and gentlemen of the jury, you're

22   gonna see, it's pretty cool in the sense that we'll

23   be able to do timelines and show you different

24   things.  This is not the be-all and end-all

25   timeline.  If we were going to show you the be-all

1     and end-all timeline, it would be cluttered.  So

2     what we wanted to do was give you a quick overview

3     of some of the key dates with regard to the

4     diagnosis and care that Mr. Dean received.  So this

5     is a short summary.  Although it may not seem that

6     short when you see it on the screen.

7          So what we have here, if you look over to the

8     left, is on December 19th, 2015, as I said, there is

9     bright red blood in his urine.  And that's when the

10    story essentially begins with regard to what

11    ultimately is the kidney cancer.

12         The -- Mr. Dean, on the 23rd, sees Dr. Nawoor,

13    primary care physician at Wexford at -- for Wexford

14    at Taylorville.  And Nawoor says kidney stones or

15    it's cancer.  So that's blood in the urine, that's a

16    the classic type of thing.

17         Now, what Dr. Nawoor did not do, he doesn't

18    send him or recommend that he go to a urologist.

19    Dr. Nawoor hears him explain there is no pain

20    associated with this.  Pain is not really

21    associated--you will hear testimony about this--with

22    blood coming from kidney cancer, pain is generally

23    associated with blood coming from kidney stones.

24         But the Judge will instruct you on this later

25    on, but we would say that the evidence will show you

1    that Dr. Nawoor, at this very early time when he

2    immediately sees this, fails to meet a standard of

3    care.  He fails to take care of Mr. Dean the way he

4    should.  The way somebody in the medical community

5    should.

6        So that's Dr. Nawoor at the very beginning of

7    our little process.  What we call 207 days.  The

8    207 days is simply from the time Nawoor sees him

9    until the time that they actually do surgery to

10   treat the cancer.

11       The next doctor he sees is Dr. Einwohner.  And

12   as I said, Dr. Einwohner is a nephrologist.  She

13   sees him by teleconference essentially.  She runs a

14   renal teleclinic.  She's, as I said, out of town,

15   not here.  And her specialty is diseases and health

16   of the kidney.  And he knew her, he had seen her

17   before because he had had a problem with kidneys as

18   a result of diabetes.

19       Mr. Dean told the doctor that he was urinating

20   visible blood.  She knew, as does everyone in the

21   medical profession and probably in life, that bloody

22   urine is a warning sign of cancer.  She also knew

23   what you do is refer somebody to a urologist.

24       Dr. Einwohner write on her renal teleclinic

25   form that this was a case for collegial.  She even

1    emailed the Wexford utilization management director,

2    Dr. Steven Ritz, that she suggested collegial review

3    with Dr. Butler with consideration of re-imaging and

4    urology evaluation.  Now, she never -- what she

5    didn't do, she didn't follow-up with regard to that

6    collegial review.

7         So if you look at the screen we have up here, I

8    just sort of take you to Dr. Nawoor on the 23rd and

9    Dr. Einwohner on the 7th.  Here's the first signs

10   and here's where it's the time to make the right

11   diagnosis to move in the right direction.  And that

12   doesn't happen.

13        Why that doesn't happen gets me to my Harry

14   Truman question, but we'll cover that as we go

15   through the trial.  But let me tell you a little bit

16   more about collegial review.  Because you'll see the

17   next entry on our little timeline is collegial

18   review.

19        Now, if I were to fill out -- if I gave you the

20   really busy chart and I filled out how many times

21   there was collegial review between the 23rd in 2015

22   and the time of the surgery, it would be ten times.

23   Ten.  Collegial review was done ten times.

24        But collegial review, let me see if I can

25   define it for you.  Wexford would tell you and the

1    evidence will tell you that Wexford would say that

2    their trademarked collegial review is a proactive

3    physician-led process designed to reduce offsite

4    care costs using video and/or telephone conference

5    calls, site clinicians, and Wexford health medical

6    directions and UM nurses to further review a

7    patient's medical history and determine the most

8    clinically appropriate, financially, financially

9    responsible approaches to the inmate health care

10    issues.  Collegial review results in fewer requested

11    offsite referrals, a reduction in the percentage of

12    referrals denied as inappropriate, and an overall

13    decrease in specialty consults.

14        So Wexford touts this process that they call

15    collegial review.  Which, you know, think about --

16    I'll ask you to think about as you go through the

17    trial, what should collegial review look like and

18    what did it look like here?

19        In this instance, Dr. Einwohner suggests

20    re-imaging and urology evaluation.  And she says

21    that there should be a collegial review with regard

22    to that.  All right.  Well, Dr. Nawoor says kidney

23    stones or cancer.

24        And when you get to a collegial review, the

25    first collegial review, it's with somebody who's not

1    yet in the courtroom but hopefully we will see him

2    later on named Dr. Ritz.  And Dr. Ritz, at the

3    January 13, 2016, collegial review gets on the

4    phone, not with Dr. Einwohner but with Dr. Nawoor.

5    And Dr. Ritz makes a decision to go do an ultrasound

6    which would not show kidney cancer.

7        So right away they go in a direction that is

8    less expensive and isn't going to be able to -- is

9    not going to show what it needs to show.

10       So what happens next?  What happens next in the

11   timeline is after quite some delay, with cancer

12   growing in his body, metastasizing, if you will,

13   the -- Mr. Dean does not get to see a urologist

14   until the 10th -- March 10th of 2016.

15       The urologist recommends what's known as a

16   cystoscopy.  I'll call is cystoscopy.  It's a scope

17   that is inserted into a man's -- up your urethra,

18   your penis, to look at the bladder.  It's one of the

19   ways you can test what's really going on.  And they

20   also approve a CAT scan a week -- I think eight days

21   later.  And on April 12, 2016, finally, they have a

22   CAT scan that shows what's going on and it's cancer.

23       So that's the delay.  And that's sort of the

24   critical time period while the disease is

25   metastasizing within Mr. Dean's body.

1          In terms of what's gonna go on, what happens
2     next?  What happens next is you'll see that there's
3     this very long timeline that goes from the diagnosis
4     of cancer on the 12th of April to the surgery on the
5     19th in July.
6          I will tell you that I believe there are six or
7     seven different so-called collegial reviews during
8     that period of time that, by the way, not to be a
9     spoiler, but they're completely meaningless.
10    They're an attempt by Wexford to go to a low-cost
11    solution.  There's no evidence of any medical
12    necessity or even substantive medical discussions
13    that go on during them.
14         So during that period, during that slow period,
15    they go through lots of bureaucracy, faceless and
16    nameless red tape.  You'll see evidence of that.
17    And you'll hear Mr. and Mrs. Dean start to get quite
18    frustrated.  And you'll see lots of evidence about
19    their pressing for things to move quickly.
20         The reason they're pressing, they'll tell you,
21    is because they -- they know what you all know.
22    They know what we all know about cancer.  And that
23    is it's -- if it's aggressive, it can move quickly.
24    And that's what goes on with Mr. Dean.
25         The surgery.  Oh, let me tell you a little bit

1    about the diagnosis that complicates things.

2         By the time that he's diagnosed in April, I

3    guess three or four months after he begins

4    complaining about blood in his urine, by that time,

5    there is cancer in his kidney.  But there is also

6    something called a tumor thrombus in the inferior

7    vena cava that has cancer in it.

8         So those are big words.  What do they mean?

9    They mean that there's a vein -- there's many veins

10   in your body, there's the main vein that goes from

11   the bottom part of your body up to the heart is

12   called the vena cava.  A tumor thrombus is an

13   expansion of the vein or essentially a blood clot.

14        And this blood clot moves up the vena cava

15   toward his heart, and I understand and the evidence

16   I think will show you that it's within two inches of

17   his heart by the time they're going to do surgery on

18   him finally in July of 2016.

19        That -- it would be an understatement to say

20   that that progression of the tumor thrombus up the

21   vena cava was not a complication with regard to the

22   surgery because it required surgery to address that

23   as well as the kidney cancer.

24        You'll also hear evidence that the cancer had

25   metastasized to his liver which they learned

1    after -- sometime after the surgery.

2        By the way, during this entire time period,

3    he's not on chemotherapy drugs.  So he's not on

4    cancer-treating drugs because they have to do the

5    surgery first.

6        So what happens is the delay that goes on here

7    causes real harm to Mr. Dean.  From the time of his

8    first diagnosis or from the time of December, he has

9    the tumor thrombus, the cancer spreads to his liver,

10   his lymph nodes, and his lungs.  As I told you, the

11   tumor goes into the vena cava, this vein.  And all

12   of this essentially just means that his life by

13   virtue of their delay is shortened.

14       The -- in terms of his surgery, just to give

15   you a feel for what the evidence will be and how

16   serious the surgery was, Mr. Dean's operation takes,

17   I believe the evidence will show you, nine hours.

18   His operation is done in which his body is cooled,

19   his heart is stopped.  They literally go in through

20   the sternum.  So they wind up doing the same

21   procedure you do for open-heart surgery by cracking

22   his chest and flaying it open, because of the tumor

23   thrombus in part, in order to operate on the

24   kidneys.

25       So it is -- it is dangerous surgery.  It is

1    really dangerous surgery.  He survives it.  He's in

2    the hospital I think for eight or nine days.

3        They tell him, prior to his surgery, that if he

4    doesn't get the surgery, he's dead in five years

5    essentially.  And they tell him if you do get the

6    surgery, you're at about a 35 percent chance of

7    survival with it.  He opts to get the surgery and

8    they go ahead and do it.

9        So the question that we'll ask you or the

10   questions that we'll ask you to, you know, evaluate

11   the evidence and think about as we go through this

12   are reasonably straightforward at some level.

13       207 days is just too long; right?  It's just

14   too long to go ahead and diagnosis and treat this

15   disease.  The defendants have a lot of explaining to

16   do; right?  So you'll hear all kinds of explanations

17   for why this, why not that.  But the truth of the

18   matter is that the evidence will show you that

19   207 days is just way too long.

20       The evidence will also show you that Wexford,

21   as I said, is a for-profit private company that

22   engages in collegial reviews as part of utilization

23   management.  Utilization management being

24   essentially something -- gobbledegook essentially,

25   to explain how they try to control costs with regard

to the prison population and the administration of health care without sacrificing quality.

But part of that is this collegial review. And again, we will ask you to think about the evidence as you see -- as you see people testify and you see what was done or not done during collegial review.

The evidence could be but isn't that collegial review involves grand rounds of eight smart doctors getting in a room and talking to each other about what to do next. That would be pretty cool. The evidence, however, doesn't show that.

The evidence will show you that there's basically, with regard to Mr. Dean, Dr. Ritz, for example, he has no idea what if any collegial review was done with Mr. Dean. He just says, "We don't -- "I don't remember, I do collegial review all the time." You'll see there's no meaningful substantive reason that they did it other than delay and controlling cost.

So then we'll ask you to focus on the evidence with regard to responsibility. You'll hear this very complicated, right, fact pattern. And the facts will Mr. Dean has clarity of thought because he knows that he's got blood in his urine and he knows that he is sick. There's clarity of thought

1    when you're sick.  You want to get it fixed; right?

2    I don't know how many of you have been to doctors,

3    but that clarity of thought you'll hear come out in

4    his testimony.  You'll hear it come out when his

5    wife testifies.

6        There is no similar care or concern with regard

7    to the defendants as a collective or in their

8    individual capacities as well.  And you'll see a

9    system that Wexford put in place that it will not be

10   able to explain.  A system that just delayed and a

11   system which put cost over human life.

12       So, ladies and gentlemen, when we come back to

13   the closings in this case, when we come back to the

14   closings in this case and after you've seen the

15   evidence, we'll ask you to focus on who's

16   responsible for what was not done with regard to

17   Mr. Dean.

18       So thank you very much for listening to me.

19   That's the opening for the case.  And again, thank

20   you very much for your service on our jury.

21       (Defense counsel opening statement were

22       previously transcribed in a separate excerpt.)

23       (The following proceedings were held outside

24       The presence of the jury.)

25           THE COURT:  Two things outside the presence

1    of the jury.  Do you wish me to read the

2    stipulations before we begin with evidence?

3              MR. MARTIN:  Yes, Your Honor.  I think it's

4    appropriate.

5              MR. RUPCICH:  That's fine with me.

6              MR. TYRRELL:  That's fine.

7              THE COURT:  Okay.  And then, Mr. Martin,

8    how would you like your client to testify?  Would he

9    be better off testifying from his seat?  He may

10   testify from his wheelchair.  If he can make it up

11   the step, he can testify from the stand.

12             MR. MARTIN:  I think he can testify from

13   the stand.  He can walk and we can certainly get him

14   into the witness stand.

15             THE COURT:  Feel free to use the wheelchair

16   to bring him to the stand too.  We'll need to move

17   the podium.

18             MR. MARTIN:  Can we arrange him now while

19   the jury is out?

20             THE COURT:  Would you rather --

21             MR. MARTIN:  He will need a break.  Yes.

22             MR. RUPCICH:  Judge, could I add one thing?

23   I think I misunderstood.

24        As far as a reply to the motion in limine, I

25   did intend to stand on my argument on Lippert, but I

1    would like to respond -- reply to the accusations

2    made against me about discovery.

3            THE COURT:  Okay.  That's fine.

4        (A recess was taken.)

5            THE COURT:  Officers, when he finishes

6    testifying, we'll take the jury out and we will most

7    likely recess at that time before taking additional

8    evidence.

9        Do you have any additional evidence for today?

10           MR. MARTIN:  I think he's going to take us

11   to the end of the day.

12           THE COURT:  Well, you do have his wife too.

13           MR. MARTIN:  Yes, but she's going to

14   testify later in the trial.

15           THE COURT:  All right.  So we will probably

16   go through.

17       Are you ready for the jury, Mr. Martin?

18           MR. MARTIN:  Yes.  And it's Mr. Strom's

19   show now.

20           THE COURT:  Okay.  Is your mic on?

21           MR. STROM:  Yes, Your Honor.

22           THE COURT:  Joe, I wondered was the mic on

23   when you were giving your opening?

24           MR. RUPCICH:  Yeah, I double-checked it.  I

25   might have had it too low, I don't know.  Could you

1    not hear me?

2         THE COURT:   The jury could hear you because

3    you were facing them the whole time.   There were a

4    couple times when you moved where I wasn't sure if I

5    correctly heard.   I did figure out what you were

6    saying, especially because I had realtime.

7         MR. RUPCICH:   I'm kind of a soft talker at

8    times.   I'll try to move it up.

9         THE COURT:   I have that issue too.

10    (A discussion was held off the record.)

11         THE COURT:   All right.   Let's bring the

12    jury in.

13    (The jury entered the courtroom.)

14         THE COURT:   Please be seated.   Court is

15    reconvened.

16    These are stipulations that the parties have

17    agreed to.

18    Plaintiff is an inmate within the Illinois

19    Department of Corrections whose claims arise out of

20    Taylorville Correctional Center.

21    Dr. Nawoor is a physician licensed in Illinois

22    and has been employed by Wexford as the Medical

23    Director at Taylorville since December 2015.

24    Dr. Einwohner is a physician licensed to

25    practice medicine in Pennsylvania and Illinois.   At

1      the relevant time, Dr. Einwohner was a telemedicine

2      physician for Wexford.

3            Kathy Galvin is a registered nurse in Illinois.

4      Ms. Galvin was Director of Nursing Site Manager at

5      Taylorville at the time relevant to the complaint.

6            Lisa Mincy was the Health Care Unit

7      Administrator, HCUA, at Taylorville from

8      December 16, 2015, to January 15, 2017.

9            Chad Christer was the Medical Records

10     Supervisor and was responsible for scheduling

11     outside medical appointments.

12           Dr. Severino is a board-certified urologist,

13     which is a surgical subspeciality focusing on the

14     urinary tracts of men, women, and children.

15           Mr. Strom.

16           We need the witness to be sworn.

17                 THE CLERK:  Yes, Your Honor.

18           (The witness was sworn.)

19                       WILLIAM KENT DEAN

20     called as a witness herein, having been duly sworn,

21     was examined and testified as follows:

22                      DIRECT EXAMINATION

23     BY MR. STROM:

24           Q.  Mr. Dean, good afternoon.

25           To introduce myself briefly, my name is Bill

DEAN - DIRECT                                          40

1    Strom.  I'm from Galesburg, Illinois, and grow up in

2    Waukesha, Wisconsin.  And I represent, along with

3    the team you were introduced to, Mr. William Dean.

4        Mr. Dean, will you please spell and state your

5    name for the record?

6        A.  William Kent Dean.  W-i-l-l-i-a-m.  Middle

7    name Kent, K-e-n-t.  Last name is Dean, D-e-a-n.

8        Q.  And, Mr. Dean, let's start with just some

9    background questions to introduce you.  When were

10   you born?

11       A.  August 29 of 1960.

12       Q.  And where?

13       A.  Ottawa, Illinois.

14       Q.  Ottawa is in LaSalle County, Illinois?

15       A.  Yes.

16       Q.  Where did you grow up?

17       A.  I grew up in the same town.

18       Q.  And do you still consider Ottawa, Illinois

19   home?

20       A.  Yes, it's still my hometown.

21       Q.  Do you have family living in Ottawa right

22   now?

23       A.  Yes.  Just my wife really.  My dad moved to

24   Streator which is next door.  My sister lives over

25   that way too.

DEAN - DIRECT                                    41

1        Q.   And you said you grew up in Ottawa.  Can you

2   tell a little bit about your childhood?

3        A.   I grew up on the busiest corner in the State

4   of Illinois besides Chicago, Route 23 and Route 6.

5   And lived on the corner there and was a typical kid.

6   Rode my bicycle everywhere, cut lawns, shoveled

7   snow, that kind of stuff.

8        Q.   And in your childhood, who was in your

9   family home?

10       A.   My father, my mother, and my sister Becky.

11       Q.   Is your sister older or younger?

12       A.   She probably wouldn't want me to say this,

13   but she's five years older.

14       Q.   Did you go to school in Ottawa?

15       A.   Yes.  I went to grade school at Jefferson

16   School.

17       Q.   And then after grade school?

18       A.   Central School for 7th and 8th grade.  And

19   then I went to Ottawa Township High School for the

20   duration of my high school years.

21       Q.   What year did you graduate from Ottawa

22   Township High School, Mr. Dean?

23       A.   1978.

24       Q.   And during your teen years, what kind of a

25   teenage childhood did you have?

1      A.   I thought it was pretty good.   Both my
2  parents worked at a factory, you know.   They make
3  windshields --
4      (Court reporter requested clarification.)
5      A.   They both worked at a factory.   I thought we
6  had a pretty good life.   I always had what I needed.
7  Didn't lack anything.
8      Q.   And during your teen years, Mr. Dean, did
9  you do activities in school?
10      A.   Yeah.   Middle school I was in track, which
11  is hard to believe.   But then I also played football
12  7th and 8th grade.
13      Q.   And then in high school did you continue
14  with sports?
15      A.   High school I did mostly football and
16  wrestling.
17      Q.   And after high school, Mr. Dean, where did
18  you live then?
19      A.   I still lived in Ottawa.
20      Q.   And did you meet your wife--who the jury
21  heard a little bit about before--in Ottawa?
22      A.   Yes.
23      Q.   How did you meet your wife?
24      A.   I was working in Illinois Valley Cleaners,
25  Illinois Laundry Cleaners, I'm sorry.   I was a

1    washman and she was a laundry sorter.  And we fell

2    in love at first sight.

3        Q.   And that job, it was -- I believe you told

4    me before it was an industrial laundry?

5        A.   Yeah, it was commercial laundry.  I was

6    responsible for doing the laundry for like nursing

7    homes and hospitals, that kind of stuff.  Sheets,

8    blankets, gowns, stuff like that.

9        Q.   And your wife has been excused from the

10   courtroom, so you won't get in trouble.  What year

11   were you married?

12       A.   1982.  September 22nd.

13       Q.   About how old were you then?

14       A.   I was 22 years old.

15       Q.   And you're still married, isn't that right,

16   Mr. Dean?

17       A.   Yes, sir.

18       Q.   Do you and your wife have any children?

19       A.   One child.

20       Q.   And tell us about your one child?

21       A.   Well, he's 36 years old.  He's been playing

22   the drums since he was four years old.  He's in a

23   Grammy-nominated blues bands that's traveling all

24   over the country.  He's on tour right now.

25   Graduated top of his class in high school and made

1    it to college.  Pretty good kid.  Man now.  Still a

2    kid to me.

3         Q.  And your son, what's his name?

4         A.  William Martin Dean, but we call him Billy

5    or Bubba.  He might not like that.

6         Q.  Is Bubba a stage name by any chance?

7         A.  No, no, he doesn't like that.  Except for

8    when I call him that.

9         Q.  And your son, where does he live now?

10        A.  He lives in Atwater, Florida.

11        Q.  And does he have a family of his own there?

12        A.  Well, he just has a wife right now, but they

13   have a baby on the way.  My first grandchild.

14        Q.  And when are they due?

15        A.  Middle of February.

16        Q.  Mr. Dean, what kind of work have you done

17   over the years, just big picture, since high school?

18        A.  Since high school?  Well, I worked at the

19   cleaners until the end of high school, then I got a

20   construction job.  I -- my family opened a store

21   down in Florida, I ran that.  Had a moving company

22   that was associated with it.  I think before that I

23   was a union laborer for a couple of years, then we

24   decided to move to Florida with my parents and start

25   that.

1          After that, I was working at Sam's pharmacy.  I

2    was one of their delivery guys, I delivered

3    pharmaceutical drugs to institutions, mental health

4    institutions and nursing homes, stuff like that.

5          Q.    And I should have asked you about this

6    before.  You did testify you completed high school

7    at Ottawa; correct?

8          A.    Yes.

9          Q.    Did you do any additional education after

10   that?

11         A.    I did some vocational training.  I did auto

12   body repair at Kishwaukee Junior College.  Completed

13   that.

14         Q.    And let's talk briefly about why you're

15   presently incarcerated, Mr. Dean.  In 2010, you

16   committed the offense that led to your conviction in

17   2012 to which you pleaded guilty?

18         A.    Yes.

19         Q.    And that was a felony drug offense for

20   manufacturing and delivering cocaine?

21         A.    Yes.

22         Q.    Is that the conviction that you're currently

23   incarcerated for?

24         A.    Yes, it is.

25         Q.    Are there any other convictions that you're

DEAN - DIRECT                                    46

1    currently incarcerated for?

2        A.   No.

3        Q.   Where are you currently incarcerated?

4        A.   Taylorville Correctional Center in

5    Taylorville, Illinois.

6        Q.   And at Taylorville Correctional Center, do

7    you keep in touch with your wife and your son?

8        A.   Yes.  Every day I call my wife, once or

9    twice a week my son, couple times a week my dad.

10       Q.   And that's by telephone?

11       A.   Yes.

12       Q.   And when you're at Taylorville, how do you

13   pass your time?

14       A.   Well, currently, I'm enrolled in the geo

15   program which is a cognitive-behavioral program.  We

16   all call it the drug program there.  It's a

17   five-day-a-week class.  Normally I would live there,

18   but I don't live there right now, but I attend that

19   group.  And I also do lifestyle redirection classes.

20   It's like twice a week thing.

21       Q.   I would like to come back to talking about

22   those classes in a little bit.  Other things you do

23   just to make the time pass?

24       A.   Well, every morning I go to adaptive gym,

25   try to do whatever I can there.  Push my wheelchair

DEAN - DIRECT

1    around, whatever I can do with exercises.

2        Q.  Is there anything you like to do for fun?

3        A.  Well, I watch football and racing.  Talk to

4    my wife on the phone.

5        Q.  Dylan, we're going to go ahead and take a

6    look at what has previously been marked as

7    Plaintiff's Exhibit 1.  May I approach, Your Honor?

8            THE COURT:  Yes, you may.  And you need not

9    ask any further.

10       Q.  Thank you, Your Honor.  Does the Court wish

11   to have tendered a copy?

12           THE COURT:  I actually have copies, so if

13   it would be easier for you, I will just pull out my

14   own.

15       Q.  Whatever is easier for Your Honor.

16       Handing to Mr. Dean what's been marked for

17   identification as Plaintiff's Exhibit 1.  And we

18   have a view of page 1 of Plaintiff's Exhibit 1.

19           MR. TYRRELL:  I'm sorry, Your Honor.  It's

20   just what's projected to the jury has not been

21   admitted yet.  The document being shown to the jury

22   right now.

23       Q.  So, Mr. Dean, what did I just hand you

24   that's been previously marked for identification as

25   Plaintiff's 1?

1       A.   It's a daily planner, personal information,

2   that kind of thing.

3       Q.   Is it your daily planner?

4       A.   Yes, it's a copy of it.  It's my writing on

5   it.  My scribbling.

6       Q.   You recognize it?

7       A.   Yes.

8       Q.   And what year is it from?

9       A.   2014.

10      Q.   And is this a planner that you kept at or

11  about the time of events that appear in that

12  planner?

13      A.   Yes.

14      Q.   And you did that as a regular practice

15  during your time at Taylorville Correctional Center?

16      A.   Yeah.  I have been doing it probably since

17  first year I got there.  Well, first year I got in

18  prison.

19      Q.   And so at this time, I'd seek to admit

20  Plaintiff's Exhibit 1.

21           THE COURT:   Any objection?

22           MR. RUPCICH:   Objection to the foundation,

23  and hearsay.

24           MR. TYRRELL:   We'll also join, Your Honor,

25  on the hearsay.

DEAN - DIRECT                    49

1              THE COURT:   The objections are overruled.

2      You may proceed.

3          (Plaintiff's Exhibit 1 admitted.)

4          Q.  Dylan, if you could please put up, here's

5      page 1 of Plaintiff's Exhibit 1.

6          And as -- Mr. Dean, as you mentioned, this is

7      your diary from 2014.  I'd like to look please to

8      pages 24 and 25.  That's the month of September of

9      2014.

10         A.  Can I get my glasses on?

11         Q.  Yes, you may.

12         A.  Okay.

13         Q.  Mr. Dean, this appears to be September from

14     your 2014 planner?

15         A.  Yes, it is.

16         Q.  Okay.  I'd like to draw your attention and

17     the attention of the jury to the entry on

18     September 3rd on this page.  Here on page 24 of

19     Plaintiff's 1, September 3rd, it says, still few red

20     mark, should be okay.  Do you see that?

21         A.  Yes.

22         Q.  And that's referring -- what is that

23     referring to?

24         A.  I believe I -- one of the first or one of

25     the four times I had scabies, this is probably

DEAN - DIRECT                                50

1    talking about that they are going away.

2         Q.   And so is it your testimony that this is a

3    record of a medical condition?

4         A.   Yes.

5         Q.   Did you usually write down things about your

6    medical conditions in your planners?

7         A.   A lot of times.  Sometimes no.

8         Q.   Would you say more often than not?

9         A.   Yes, I would say so.

10        Q.   And when you were writing things down about

11   your medical conditions, you were writing them on

12   about the date that they happened as an ordinary

13   practice?

14        A.   Normally I do it the same day.  Sometimes

15   I'd think about it and do it the next day.

16        Q.   And if we could look then and draw

17   everyone's attention to the entry for September 15th

18   on this page.  Mr. Dean, would you read what's

19   written there?

20        A.   Okay.  It says, last one, pointing to

21   May 15th, diabetic clinic.  Susan visit that day.

22        Q.   And so this record reflects that you had a

23   diabetic clinic appointment that day?

24        A.   Yes.

25        Q.   And also that your wife Susan was visiting?

DEAN - DIRECT

1      A.  Yes.

2      Q.  I'd like to draw your attention next to the

3  entry for September 17th.

4      A.  Okay.  Phone on.  I don't know why I made --

5  maybe the phones were off.  Phone on again.

6  Anniversary card for Susan.  Reminding me to send it

7  out because the anniversary was the 22nd.

8      Q.  And so you'd also write reminders to

9  yourself about things coming up in the future in

10  your day planner?

11      A.  Yes.

12      Q.  I'd like to draw your attention to the entry

13  for September 22nd?

14      A.  Our 32nd anniversary.

15      Q.  So that's the anniversary for which you

16  wanted to send her a card?

17      A.  Yep.  Yes, sir.  I'm sorry.

18      Q.  Last one I'd like to look at on this -- for

19  the dates is September 28th.  You see that?

20      A.  Yes.

21      Q.  And what's reflected on September 28th?

22      A.  Well, the Bears were gonna play the Packers

23  at noon, and there was some type of Sprint Cup thing

24  called Sprint Cup, NASCAR race.

25      Q.  And you wrote that out as something you knew

1   was going to happen in the future?

2        A.   Yes.

3        Q.   And that's how we know that you didn't write

4   down the Bears were gonna lose?

5        A.   Yeah.

6        Q.   So then I'd like to look at page 25 of

7   Plaintiff's 1.  And here at the top of 25 there's a

8   notation, you see it's right here in the original

9   page.  And, Mr. Dean, if you could read what you've

10  written there in that portion of the page?

11       A.   A1C.  I had a question mark.  Diabetic

12  clinic, September 10th.  I thought it would be

13  around that time.

14       Q.   So you were making a prediction about when

15  you might be getting some medical care?

16       A.   Yes.

17       Q.   But you didn't know for certain?

18       A.   Not for certain.

19       Q.   Okay.  Like to look next at October from

20  this same planner, that's pages 26 and 27 of

21  Plaintiff's 1.  Mr. Dean, are you with me?

22       A.   Yes, sir.

23       Q.   And looking at the entries for October 29th,

24  30th, and 31st.  You see those entries?

25       A.   Yes.

1     Q.   Let's start with the 29th.   What does it say
2  there?
3     A.   HCU at 7:00 p.m., stay for a kidney stone.
4     Q.   And what does HCU stand for there?
5     A.   The Health Care Unit.
6     Q.   And why were you staying in the Health Care
7  Unit?
8     A.   I was gonna have a procedure the next day, I
9  believe, and they keep you overnight the night
10  before to make sure that you don't eat or drink
11  anything after a certain amount of time.   A certain
12  time of night.
13     Q.   And you say you were going to have a
14  procedure.   How do you know that?
15     A.   Well, I went to BMI the day before and I was
16  probably told I was gonna spend the night earlier
17  for the day to get my sleep-over bag, for lack of a
18  better term; some shower shoes, deodorant, that type
19  of stuff.
20     Q.   And what kind of procedure was it going to
21  be?
22     A.   I don't know the exact name of it, but it
23  involves a sonic blast where it blasts my kidney
24  stone.
25     Q.   So it was to treat kidney stones?

1    A.  Yes, sir.

2    Q.  And here in the last three days of October

3 of 2014, was Dr. Nawoor, the defendant, your doctor

4 at that time?

5    A.  No, sir.

6    Q.  How do you know that?

7    A.  He didn't start until 2015 in December.  And

8 I believe it was Dr. Gowan that worked then.

9    Q.  And, Mr. Dean, this is one instance in which

10 we see that you had kidney stones.  Let's take a

11 look at the 30th then.  On the 30th, can you read

12 what it says there?

13    A.  It says, got out of HCU at 8:45 a.m.

14    Q.  And let me back you up.  I think you might

15 have read at 31.  October 31.

16    A.  I'm sorry.  You're correct, I'm sorry.

17    Q.  Let's look at October 30.  And if you can

18 read that, please?

19    A.  Went to St. John's for lithotripsy, kidney

20 stone smashing, left 4:30 a.m., back at 12:15.

21    Q.  And so lithotripsy, kidney stone smashing,

22 is that the procedure that you were describing

23 before?

24    A.  Yes.

25    Q.  And you had lithotripsy on October 30th, is

1    that what that record means?

2         A.  Yes, sir.

3              THE COURT:  I'm sorry, Mr. Strom, what page

4    are you on?

5         Q.  Judge, we are at pages 26 and 27 of

6    Plaintiff's 1.  It's 26 and 27 as marked at the very

7    bottom of the page PTX.

8              THE COURT:  Uh-huh, I'm not seeing the

9    30th.

10        Q.  Dylan, do you want to take away the call out

11   for just a second --

12             THE COURT:  I've got it, Mr. Strom.

13        Q.  Mr. Dean, this is one instance in which you

14   have a record that you had kidney stones.  Do you

15   remember having kidney stones?

16        A.  Yes.

17        Q.  Do you remember any other instance in your

18   life where you had kidney stones?

19        A.  Not that I actually had the stones.  I had

20   traces -- microscopic traces of blood in my urine

21   that I couldn't see.

22        Q.  Okay.  So fair to say that you remember

23   having kidney stones in the past?

24        A.  Yes.

25        Q.  What are the symptoms when you have kidney

1    stones?

2        A.   Well, nausea.  Middle of the back pain.  Not

3    really lower, but not real high, it's kind of like

4    in the middle right where your kidneys would be.

5    Not in your spine, more towards the side in the rib

6    area and a little bit towards the spine.

7        Q.   So I want to break that down a little bit.

8    When you had kidney stones in the past, you had pain

9    in your back?

10       A.   Yes.

11       Q.   And you had pain in your back in the area

12   you expected to be where your kidney was located?

13       A.   Yes, sir.

14       Q.   And I believe before you said something

15   about blood in your urine just now, about

16   microscopic blood in your urine?

17       A.   Yes, they -- Dr. Nawoor told me that I had

18   microscopic blood in the urine at that time.

19       Q.   So at this time, Dr. Nawoor is not your

20   doctor treating you for kidney stones; correct?

21       A.   No, it was Dr. Gowan.

22       Q.   And when you had these kidney stones, could

23   you see blood in your urine?

24       A.   No.

25       Q.   And you couldn't see it because it was, as

1    you said, microscopic; right?

2        A.  Yeah.  To me, my urine was clear.  Or

3    normal, if you would.

4        Q.  You mentioned pain and you mentioned the

5    location of the pain when you had kidney stones.

6    Can you tell us about the pain?  Describe the pain

7    for us?

8        A.  Well, it was -- it wasn't really like my

9    back pain would be, it was more of a -- like you put

10   your fist and just kind of push it in on my rib cage

11   in the back there.  Didn't feel so much like it was

12   inside, it was more outside pain going -- radiating

13   from the back around to the sides.

14       Q.  And on a scale from 1 to 10, what's the

15   worst that your kidney pain could be from kidney

16   stones?

17       A.  Well, I've experienced at least a 10 one

18   time.  I couldn't get out of bed for two days.

19       Q.  And on a scale from 1 to 10, what was sort

20   of the lowest that it was when you weren't noticing

21   it or maybe -- let me withdraw that question and ask

22   it again.

23       What was the lowest on a scale of 1 to 10 that

24   your kidney pain was?

25       A.  Say a 3.

DEAN - DIRECT                          58

1      Q.   So it was noticeable at 3?

2      A.   Yeah, it was always there.

3      Q.   And so you underwent a shock wave therapy

4  that you discussed before, lithotripsy as it's

5  recorded in your diary.  Do you remember that

6  lithotripsy?

7      A.   Yes.

8      Q.   And you went to a hospital for it.

9      A.   I went to St. John's in Springfield.

10     Q.   Can you tell us anything about what the

11 procedure was like?

12     A.   Well, I got there early with the

13 correctional officers and we waited in a waiting

14 room.  They prepped me.  The nurse come in, the

15 surgery nurse came in and said that they had to get

16 the shackles off of me and stuff.  They did that.

17     That took me to the operating room.  They had

18 me on a table that had a cutout, for lack of --

19 yeah, it was a cutout here.  I'm not good at

20 drawing.  It was probably 10 inches by 10 inches.

21 And it looked like there was a cannon, but there

22 wasn't a hole in it.  It was covered on the top.

23 That's to me was the sonic blast shock waves

24 whatever it was.

25     Q.   So, Mr. Dean, let me ask you a couple of

DEAN - DIRECT                                    59

1    specific questions about what that experience was

2    like.  Did you have to have anesthesia for this

3    procedure?

4         A.  Yes.  I don't think I was all the way out,

5    but I did have anesthesia.

6         Q.  So you had some form of general anesthesia?

7         A.  Yes.

8         Q.  But it might not have knocked you all the

9    way unconscious?

10        A.  I believe I still heard the music playing in

11   the operating room.

12        Q.  Did you have any kind of local anesthesia

13   too?

14        A.  Not that I know of.

15        Q.  Do you know about how long the procedure

16   might have lasted?

17        A.  I guess it was probably about a half-hour.

18        Q.  Do you remember having any pain from the

19   procedure afterwards?

20        A.  I don't remember any pain afterwards.

21        Q.  After you had that procedure, did you still

22   continue to experience pain from a kidney stone like

23   you were describing before?

24        A.  Yes.  Not right away, it came back after a

25   couple of months.

DEAN - DIRECT                60

1        Q.   After one of these procedures -- let me

2    start the question over.   Have you ever passed a

3    kidney stone?

4        A.   Yes, but it was not after that procedure.

5    It was after the next one.

6        Q.   And so when passing a kidney stone, is that

7    a painful experience?

8        A.   Very painful.

9        Q.   And where is the pain?

10       A.   It's in my penis.   You want me to elaborate?

11   I was urinating and the flow was coming out and then

12   it stopped.   And you could feel it in there, it was

13   real sharp.   Felt like it was cutting me.   And I had

14   to make a decision at that point to live with that

15   pain split second or to try to blow it out, for lack

16   of a better word.   And I pressed -- beared down as

17   hard as I could and it came out and hit the back of

18   the toilet.   That's how I was able to collect it.

19       Q.   And so when you had that kidney stone, on a

20   scale of 1 to 10, what was the pain like when

21   passing it?

22       A.   That was at least a 10 or more.

23       Q.   How many times do you think that you've --

24   had passed a kidney stone?

25       A.   Big one like that, only once.   But I think I

DEAN - DIRECT                    61

1    passed other little, small ones that had no trouble

2    coming out.  You could feel them coming out but not

3    the stoppage like that one was.

4         Q.  Was there pain associated with passing the

5    smaller?

6         A.  Yes, you could feel it.

7         Q.  What was the pain on a scale from 1 to 10

8    for those?

9         A.  I would say a 6.  It was painful, but not

10   almost pass out pain.

11        Q.  And do you remember feeling pain from those

12   smaller kidney stones also in the area of your back

13   before passing them?

14        A.  Yes.

15        Q.  I'd like to look next in Plaintiff's

16   Exhibit 1 at pages 30 and 31 for December of 2014.

17        Mr. Dean, do you see where I'm looking now?

18        A.  Yes.

19        Q.  And I'd like to call your attention on page

20   31 of Exhibit 1 to a section that's labeled Notes?

21        A.  Yes.

22        Q.  Do you see that?

23        A.  Yes, sir.

24        Q.  That section is coming from over here in the

25   right-hand side of the page and it's been blown up a

DEAN - DIRECT                                    62

1    little bit for visibility.

2         Can you read for us, please, the first two

3    lines under the word Notes?

4         A.   Kidney stone removal on 10/30/14.

5         Q.   And that corresponds to what we were just

6    looking at in October?

7         A.   Yes, sir.

8         Q.   And then in the next box, can you read for

9    us there?

10        A.   Scabies August 7th.  August 17th.  Scabies

11   August 7th first, I had a number one there.  That's

12   the first time I did the cream, I think at that

13   time.  Then August 17th, you do a second round two

14   weeks later, approximately two weeks later.

15        And right in that side area it says, lye

16   allergies.  I was thinking it might have been from

17   the state laundry soap, but obviously, it wasn't

18   because of the scabies treatment they gave me.

19        Then October 13th, I got scabies again and they

20   gave me a third round of cream.  And approximately

21   ten days later, October 23rd, I got the fourth round

22   of cream.

23        Q.   And in the next box?

24        A.   First kidney procedure October 30th.

25        Q.   So that again pertains to the same incident

1    with kidney stones from before?

2        A.  Yes.

3        Q.  And then the final box below that.  Let's go

4    a couple lines at a time.  The first two lines, can

5    you read that?

6        A.  All right.  Diabetic clinic, 12/9/14.  And

7    it says 7.8.

8        Q.  Okay.  So there was a diabetic clinic on

9    12/9, meaning December 9th?

10       A.  Yes.

11       Q.  And what is 14 7.8 or 147.8.

12       A.  Well, 14 is the year.  12/9/14.  And the 7.8

13   was what my A1C was at that time.

14       Q.  Understood.  What's A1C if you know?

15       A.  It's some type of test that they take and it

16   measures your glucose levels over a three or four

17   month period.

18       Q.  So it relates to your diabetes?

19       A.  Yes, sir.

20       Q.  Last two lines in this box, moved here

21   April 25th.  Moved here, what does moved here

22   April 25th mean?

23       A.  I'm not sure.  Moved here April 25th.

24   Probably to the Health Care Unit or something.  I

25   don't know.

DEAN - DIRECT                                    64

1        Q.   Okay.   So it has something to do with your

2   activities at Taylorville Correctional Center; is

3   that fair?

4        A.   Yes.

5        Q.   And so you were keeping these notes.   Tell

6   us -- tell me why it is that you put these notes

7   here on December 2014?

8        A.   Well, because it's the end of the year and I

9   want to make sure I transfer them to the next year.

10  Because my dear wife sends me one every year and I

11  start over with some of the pertinent notes that I

12  have.

13       Q.   So we've had a chance to talk a little bit

14  about your health conditions; not just the kidney

15  stones, where we talked about your treatment, but

16  we've talked about your health conditions generally.

17       Thank you, Dylan.

18       I'd like to talk a little bit about some of

19  those health conditions.

20       So, Mr. Dean, can you tell about one of your

21  chronic health conditions?   And you can choose?

22       A.   I have cardiomyopathy.

23       Q.   And what do you understand cardiomyopathy to

24  be?

25       A.   My understanding, it's the left side of my

1    heart doesn't work well.  It pulls in all the

2    blood -- your heart is a pump.  It pulls in all the

3    blood on the right side.  And my left side is weak,

4    so it doesn't push all the blood out that a normally

5    functioning heart would do.

6         Q.  And do you have any other heart conditions?

7         A.  I have congestive heart failure was

8    diagnosed at the same time.

9         Q.  And when were those conditions diagnosed?

10        A.  Around 2001.

11        Q.  Any other health -- any other heart

12   conditions besides cardiomyopathy?

13        A.  Well, I got a pacemaker with a

14   defibrillator.  I got that in 2000 -- July 2015.

15        Q.  Is that related to those other heart

16   conditions that you just mentioned?

17        A.  I'm not sure if it's related.  I had two

18   heart attacks at the time and they put it in.

19        Q.  And those two heart attacks, when did they

20   happen approximately, if you remember?

21        A.  It was July -- I believe it was July 2nd.

22   And I was in the shower about 5:30 in the morning on

23   the wing.  And I was in there by myself, and it's a

24   handicap shower, they have rails and seats.

25        And I got done with my shower after I was

DEAN - DIRECT                                    66

1    feeling real bad, and I sat down and I was trying to

2    dry off.   Which I would normally sit down to dry

3    off.   The wall is in front of me, and I seen purple

4    and the next thing I know I woke up on the shower

5    floor.

6         Q.   And one thing I would like to be clear

7    about.   These two heart attaches, did they happen

8    around the same time -- the same date?

9         A.   Yes.   After the first one, I pulled myself

10   off the floor.   You can see in there, but not all

11   the way in.   And at that time of morning, no one is

12   really out there.

13        I gathered myself and got dressed and got my

14   wheelchair and went back to my room.   And I want to

15   say 20, 25 minutes later, maybe less, I started

16   experience chest pain.   The first time I don't

17   associate chest pain, just blacked out.   And the

18   second time, it was chest pain.   I got myself in the

19   wheelchair and one of the guys was up, and I said,

20   "Can you get me to the front, I think I'm having a

21   heart attack."

22        Q.   And, Mr. Dean, were you hospitalized for

23   those heart attacks?

24        A.   Yes.

25        Q.   Okay.   Let's talk about some of your other

1    health conditions briefly.  We saw in your notes

2    information about a diabetic clinic.  You're

3    diagnosed with diabetes, sir?

4        A.  Yes.

5        Q.  And do you recall about when you were

6    diagnosed with diabetes?

7        A.  2002.

8        Q.  Do you happen to know is it Type 1 or Type 2

9    diabetes?

10       A.  It's Type 2.

11       Q.  So what does that mean for your health

12   generally?  From your experience?

13       A.  Well, it means I got to control my diet.  I

14   take oral medication up to a certain point and now I

15   take shots because I only have one kidney.

16       Q.  And, Mr. Dean, does your diabetes affect

17   other parts of your body that you experience?

18       A.  Yes.  You get rashes, stuff like that.

19       Q.  And do you know anything or have you

20   experienced anything with your diabetes having an

21   effect on your kidneys?

22            MR. RUPCICH:  Object to the foundation.

23            THE COURT:  The objection is overruled.

24       A.  I'm sure -- well, with the metformin I was

25   taking, they had to take me off that because they

1    said it hurt my kidney function.

2        Q.   Do you have any other problems with your

3    kidneys, Mr. Dean?

4        A.   At the time I don't -- right now I don't

5    believe so.

6        Q.   Have you ever been diagnosed with some sort

7    of malady of the kidneys?  Some sort of sickness of

8    the kidneys?

9        A.   Not that I know of.

10        Q.   But you do have kidney problems owing to

11    your diabetes?

12        A.   Diabetes.  Mostly it was from my -- the last

13    course of treatment I was taking for my cancer.

14        Q.   Okay.  Any other health problems that you're

15    aware of?

16        A.   I had degenerative disc disease, that's why

17    I can't walk very well.  I use the wheelchair a lot.

18    And a neurological problem in my back that causes me

19    to have drop foot where I can't lift my toe.  If I'm

20    walking, I'll drag my feet, my right foot.

21        Q.   And, Mr. Dean, you've talked about some

22    chronic health conditions, your heart conditions

23    diagnosed in 2001 and your diabetes diagnosed in

24    2002.  Did you see doctors regularly about those

25    conditions?

1      A.   Yes.

2      Q.   Do you have an estimate over the years about

3   how often you've seen doctors for those chronic

4   conditions?

5      A.   Well, they schedule clinic every three to

6   four months.  If something was wrong, I would make

7   an appointment, but --

8      Q.   So we've also talked about and heard a lot

9   about already your diagnosis with cancer.  That's

10   the next illness I'd like to talk about, the next

11   disease I'd like to talk about.

12      What's your understanding of what kind of

13   cancer you were diagnosed with?

14      A.   Renal cell carcinoma.

15      Q.   And to you, in using laymen's terms, what

16   does that mean?

17      A.   Kidney renal -- I'm sorry, cancer on my

18   kidney.

19      Q.   And have you been diagnosed with a specific

20   stage of cancer in your kidney?

21      A.   When I originally seen the oncologist, he

22   thought it might be Stage 3.  But as soon as they

23   did a CAT scan, they said it was Stage 4.

24      Q.   And have the doctors told you anything else

25   about the characteristics of your cancer?

DEAN - DIRECT                    70

```
 1        A.   That it is -- well, they'll never be able to
 2   get rid of it.  I have to have treatment either
 3   daily with a pill, weekly with IVs, or biweekly,
 4   whatever it is.  That will never go away, it will
 5   just -- the only goal is to keep it from growing and
 6   spreading.
 7        Q.   And so in talking about growing and
 8   spreading, have you heard the term metastasis
 9   before?
10        A.   Yes.
11        Q.   And what does that term mean to you?
12        A.   It means my cancer has spread to other
13   organs.
14        Q.   And you're aware that part of your diagnosis
15   is metastasis of that cancer?
16        A.   Yes, sir.
17        Q.   You mentioned this cancer isn't going to be
18   cured.  What does that mean to you?
19        A.   It means I'm gonna take meds until I die.
20        Q.   Your doctors told you anything about when
21   you're gonna die?
22        A.   Dr. Guaglianone told me -- I always ask him
23   but he won't say specifically that he has a time,
24   but he says the average person lives two years.
25        Q.   Who is Dr. Guaglianone?
```

DEAN - DIRECT

1      A.   Dr. Guaglianone is my oncologist.

2      Q.   He's currently your treating oncologist?

3      A.   Yes, sir.

4      Q.   You're currently being treated for cancer?

5      A.   Yes, sir.

6      Q.   How are you currently being treated for

7   cancer?

8      A.   Right now I take a drug, I'm probably gonna

9   kill the name, but it's Cabozantinib or something.

10      Q.   Fair to say it's not the Cabo that you'd

11   prefer at this point?

12      A.   Exactly.

13      Q.   Okay.  So what kind of a drug is

14   Cabozantinib?

15      A.   I understand it's a chemo treatment, but

16   it's a pill that I take orally daily.

17      Q.   You take it once a day?

18      A.   Yes.

19      Q.   And how long have you been taking

20   Cabozantinib for?

21      A.   I started taking it September 6th.

22      Q.   September 6th of this year?

23      A.   This year--I'm sorry--yes.

24      Q.   And had you taken any other cancer drugs

25   before that?

1          A.   Yes.

2          Q.   About how many other cancer drugs had you

3     taken before that?

4          A.   Three.

5          Q.   And I want to talk about each of those in

6     just a moment.

7          When were you first diagnosed with kidney

8     cancer?

9          A.   Diagnosed with kidney cancer was April 14th,

10    2016.

11         Q.   Was that the first time you knew something

12    was wrong?

13         A.   No.  No.

14         Q.   Okay.  And why do you say no?

15         A.   Because I had been urinating blood red

16    urine, sometimes with large blood clots, since

17    December 24th was the first time I had blood clots.

18    First time I had red urine, I mean red urine, was

19    December 19th.

20         Q.   And, Mr. Dean, did you write about your

21    symptoms in a planner in 2015?

22         A.   Yes.

23         Q.   I'd like to turn next to what's been marked

24    for identification as Plaintiff's Exhibit 2.  Before

25    we put it up, tender to the witness.

1          Mr. Dean, you can hold onto Exhibit 1 there.

2     You can set it on the floor.  We won't be looking at

3     it.

4          Mr. Dean, this document that I've handed you

5     that has been marked for identification as

6     Plaintiff's Exhibit 2; what is it?

7          A.  Once again, it's my daily planner that my

8     wife had sent me that year.

9          Q.  And it's your daily planner for 2015?

10         A.  Yes, sir.

11         Q.  And it has -- do you recognize this as your

12    handwriting?

13         A.  Yes, it's my handwriting.

14         Q.  And you recall keeping a diary for 2015?

15         A.  Yes.

16         Q.  And did you write the events at or about the

17    time they occurred or you expected them to occur in

18    2015?

19         A.  Yes, normally same day sometimes.  For

20    instance, when we go back to 2014, I probably

21    entered all that stuff after I got back from the

22    outside hospital.

23         Q.  So same practice of continuing to record

24    things in your 2015 diary?

25         A.  Yes.

1      Q.  I'm sorry.  You understand if I call it your

2   diary or your planner, same idea to you?

3      A.  Same thing.  It's kind of like the same

4   thing.

5      Q.  And so you recalled that your first -- your

6   first incidents of blood in your urine were from

7   December of 2015 just now?

8      A.  Yes.

9      Q.  I'd like to direct your attention -- before

10   we do, I would like to move Exhibit 2 into evidence,

11   please.

12          THE COURT:   Any objection.

13          MR. TYRRELL:  Yes, Your Honor.  Defendants

14   object for hearsay and relevance.

15          MR. RUPCICH:  I would join that objection

16   and add lack of foundation for personal knowledge.

17   Under Rule 602, plaintiff must testify from personal

18   knowledge rather than documents.

19          THE COURT:   Plaintiff's 2 is admitted over

20   objection.

21      (Plaintiff's Exhibit 2 admitted.)

22      Q.  Turning, Mr. Dean, your attention in

23   Plaintiff's 2 to pages 33 and 34 pertaining to

24   December of 2015.

25      Mr. Dean, in your version, your paper version

DEAN - DIRECT                                    75

1   there, 33 and 34 appear back-to-back.  But we have

2   both pages here laid open for December of 2015.

3   Does that look like the record that you kept in your

4   diary of December of 2015?

5        A.  Yes, sir.

6        Q.  I would like to draw your attention to a

7   two-week period that begins December 13th.  Do you

8   see where I'm looking?

9        A.  December 13th, yes.

10       Q.  So for you, it's going to be on the two

11   sides of that page because we're going to look at

12   both those two weeks.

13       So let's look at the first week beginning with

14   Sunday, December 13th.

15       A.  Okay.

16       Q.  And here I'd like to draw your attention to

17   the entry for December 19th, because I believe you

18   were testifying before about December 19th.  You see

19   that date?

20       A.  Yes.

21       Q.  And there at the top of the entry for

22   December 19th -- I'm sorry, let me start over.

23       There in the entry for December 19th you've got

24   a couple different entries.  You've got one that

25   says something about pills, but below that you've

DEAN - DIRECT                                    76

1    drawn a line.  Do you see where I'm looking?

2        A.  Yes.

3        Q.  Could you tell us what it reads below line?

4        A.  Blood in urine.

5        Q.  Okay.  Blood in urine.  How did you know

6    that what you were looking at -- excuse me, let me

7    back up.

8        Do you remember having blood in your urine that

9    day?

10       A.  Yes.

11       Q.  Do you remember what it looked like?

12       A.  Yes.

13       Q.  What did it look like?

14       A.  It was at least -- to me it looked like it

15   was at least half blood.  It was more red than it

16   was pinkish.

17       Q.  It was more red than it was pinkish.  Was

18   there yellow color?

19       A.  Not that I could see.

20       Q.  Did you talk with anyone about blood in your

21   urine?

22       A.  That day?  No.

23       Q.  Did you talk with anyone about blood in your

24   urine the next day?

25       A.  I'm sure I told my friends, Dale Reeves and

DEAN - DIRECT                              77

1   Jamie Balsom.

2       Q.  And did you ever talk with your wife about

3   blood in your urine?

4       A.  I didn't tell her until the 21st because I

5   was trying not to scare her.

6       Q.  What did you say to her at that time?

7       A.  I told her on the phone that I had been

8   urinating blood and I was hoping that I must be

9   having the stones again I thought, because, you

10  know, that's my first thought.  I mean I never had

11  blood like that, but I just -- I guess that was my

12  hope, was that it was gonna be stones.

13      Q.  Why did you relate it to kidney stones?

14      A.  Well, I'd had kidney stones before, but I'd

15  never had any visual blood like that.  But maybe it

16  advanced, I don't know.

17      Q.  And what did your wife say to you, if you

18  remember?

19      A.  She said, "Well, you better go to sick

20  call."

21      Q.  So did you go to sick call?

22      A.  I had a visit with her first thing in the

23  morning and our sick call was at 7:00 at night.  I

24  was already past.  We can only go at 7:00

25  a.m. -- or 7:00 p.m. or 5:45 p.m.  That week for us

1    was 7:00 p.m., and it was already past that.

2         Q.  So you didn't go to sick call on the 21st?

3         A.  No.

4         Q.  Did you go to sick call on the 22nd?

5         A.  Yes, I did.

6         Q.  And I want to talk a little bit about sick

7    call so everybody understands what sick call means.

8    When you go to sick call, what happens?

9         A.  Well, you go to Health Care Unit first.  And

10   the minute you get there, you sign a form that

11   they're gonna take $5 out of your account, your

12   trust fund account.

13        Q.  So when you sign the form saying they're

14   going to take $5 out of your trust fund account,

15   that $5, where does it come from?

16        A.  Comes out of the -- well, let's say you're a

17   person who's unfortunate, you don't get any money

18   sent in, prisoners get $15 a month.  Or maybe only

19   10.  The average of us get $15 a month.  And we pay

20   a third of our monthly income to see the doctor if

21   we only go to sick call once.

22        Q.  So the $5 co-pay is charged each time you go

23   to sick call?

24        A.  Yes.

25        Q.  And that $5 represents -- that's $5 out of

1    15 that everyone gets on a monthly basis?

2         A.   Some only get 10.   Some get more, 30 I

3    guess.

4         Q.   And you get 15 a month?

5         A.   Yes.

6         Q.   Do you get money from any other sources?

7         A.   Yes.   My wife sends me money and my dad

8    sends me money.

9         Q.   And when they send you money on a given

10   instance, what's usual?   What do they usually send

11   you?

12        A.   Probably around that time my wife was

13   sending me 50 and my dad was sending me 50 a month.

14             THE COURT:   Did you say 50 or 15?

15        A.   50, ma'am.   I'm sorry.

16        Q.   So you were getting $15 a month from the

17   State of Illinois plus about $100 dollars a month

18   from your wife and your husband -- or your wife and

19   your father combined; is that right?

20        A.   Yes.

21        Q.   Okay.   So you sign the form and it says that

22   you're gonna pay this $5 out of your trust fund

23   account.   What happens next?

24        A.   Well, you wait in line and then you finally

25   see the nurse.   Sometimes it's quick, sometimes it's

DEAN - DIRECT                          80

1    a little while.  And they determine through a series

2    of -- they got papers with questions on them that

3    they need to fill out.  And if it's a serious enough

4    incident, you might get to see the doctor the next

5    day.

6         Q.  So after you've paid $5, you're going to see

7    a nurse?

8         A.  Yes.

9         Q.  And after you see the nurse, the nurse will

10   decide if you see a doctor?

11        A.  Yes.  She'll determine through a series of

12   questions whether it's important enough.

13        Q.  And what did the nurse decide that day; do

14   you remember?

15        A.  She allowed me to see the doctor the next

16   day.

17        Q.  She allowed you to see the doctor the next

18   day, meaning December 23rd?

19        A.  Yes.

20        Q.  Could she have allowed you to see the doctor

21   that day?

22        A.  No, because it was already 7:00 p.m. and he

23   was at home.

24        Q.  And did you see a doctor on December 23rd?

25        A.  Yes, I did.

1       Q.   Who did you see?

2       A.   Dr. Nawoor.

3       Q.   Dr. Nawoor, Abdur Nawoor, your treating

4   physician by this point?

5       A.   Yes.

6       Q.   And do you recall what time of day you met

7   with him that day?

8       A.   I don't remember the exact time.  I'm gonna

9   say it was in the morning.

10      Q.   Do you recall about how long you met with

11  him more?

12      A.   15 to 20 minutes.

13      Q.   And at the start of your appointment, what

14  did you -- did you talk with him about what was --

15  what you were there for?

16      A.   Yeah, I told him that I was urinating blood.

17  And told him that, you know, how heavy it was.  And

18  pretty much explained that I was -- really worried

19  about it.

20      Q.   You told him that upfront?

21      A.   Yes.

22      Q.   And what did he say to you, if you remember?

23      A.   He said, "Well, we're gonna have to

24  determine what it is."  I said, "Well, you know I

25  have a history of kidney stones."  Because he wasn't

1    my treating doctor at the time.  I said, "Doctor, do

2    you think it's kidney stones?"  He said, the way I

3    remember his exact words were it's stones or cancer.

4        Q.   And so he did not tell you that he knew

5    about your history of kidney stones?

6        A.   No.  I told him.

7        Q.   And that's because he hadn't treated you for

8    kidney stones in the past?

9        A.   No.

10       Q.   And when you asked him whether he thought it

11   might be kidney stones, his response was that it was

12   kidney stones or cancer?

13       A.   Yeah.  He didn't say kidney stones, he said

14   stones or cancer.

15       Q.   Did he perform any physical examination on

16   you?

17       A.   He may have put a stethoscope on my back and

18   chest.  I don't remember.

19       Q.   Did he tap where your kidney is in your

20   back?

21       A.   No.

22       Q.   Did he tell you whether he thought it was

23   one or the other?

24       A.   No.

25       Q.   Did he tell you -- or did he prescribe any

DEAN - DIRECT                                          83

1    medication?

2         A.   No.

3         Q.   Did he tell you what kind of a treatment

4    plan he had in mind for you?

5         A.   Said that we'd take a blood test and a urine

6    test.

7         Q.   Did he tell you what would happen after

8    that?

9         A.   No.

10        Q.   Did he recommend anything to you that you

11   might do to manage the blood in your urine?

12        A.   He said, "Try to drink more water, whatever

13   it is might flush out."

14        Q.   Did you drink more water like Dr. Nawoor

15   asked you to?

16        A.   Yes.

17        Q.   Did it get better?

18        A.   No.   Not at all.

19        Q.   Can you explain what you mean by that?

20        A.   Well, the very next day, it was even heavier

21   blood.   The urine looked like it was straight blood

22   and there was large blood clots in it.

23        Q.   When you say the next day, that's

24   December 24th?

25        A.   Yeah.   Day before Christmas.

DEAN - DIRECT                          84

1        Q.   Dylan, can you show us, please, the second

2   week there.  Or sorry, the last week beginning with

3   December 20th.  I see it's up there now.  Thank you.

4        And so calling your attention to your entry

5   here on the 24th of December.  Do you see where I'm

6   looking, Mr. Dean?

7        A.   Yes.

8        Q.   Can you read for us what it says there?

9        A.   Worse.  Big blood clots.

10       Q.   You mentioned before that you got your

11  diaries from your wife Susan?

12       A.   Yes.

13       Q.   How did she get them to you?

14       A.   She mailed them to me.

15       Q.   I'd like to take a look with you, since

16  we're all the way at the end of December of 2015, at

17  what's been previously marked as Plaintiff's

18  Exhibit 3.

19       Mr. Dean, handing you what's been marked for

20  identification as Plaintiff's Exhibit 3, take a look

21  at this document.  What it is?

22       A.   My daily planner.

23       Q.   From what year?

24       A.   2016.

25       Q.   How do you know it's yours?

DEAN - DIRECT

A.   I can tell from my writing and my dumb sense of humor on the front.

Q.   And you can tell it's from 2016 how?

A.   First of all, it says on the front.  And if you turn to the inside, it has 2016 on all the pages.

Q.   And does this appear to be your full planner from 2016?

A.   Yes.  And the other way I can tell it's 2016 is you will notice when I wrote in the zero and then right below it --

Q.   Why don't you read that for us?

A.   I wrote, cancer is a pussy.

Q.   What were you feeling at that time?

A.   I'm sure I didn't write it in January, but I was thinking, well, I gotta be positive.  So I was lashing out at it.

Q.   I'd like to draw your attention, please, to -- you know what, before we look at this exhibit, let's talk a little bit more about your symptoms. Because you described a change in your symptoms that I think is interesting.

So when you first urinated blood, can you tell us what you saw when you first urinated blood?

A.   My urine wasn't yellow, it was reddish tint.

1    Not pink, more reddish than pink.

2         Q.   So the urine itself was a different color

3    than you were accustomed to?

4         A.   Yes.

5         Q.   And it was red in color?

6         A.   Yes.

7         Q.   Did you ever have urine of a different color

8    during the time that you knew you had blood in your

9    urine?

10        A.   Sometimes it would be less red, sometimes it

11   was more red.  Where -- at that point on the 19th,

12   all the way through the 23rd, you could see still

13   the white of the toilet.  You know, it was

14   translucent, I guess, even though it was red.  But

15   on the 24th, it was so red, you couldn't see the

16   bottom of the toilet.  The only reason I knew there

17   were blood clots in it was because I seen them come

18   out.  You could visibly see them.

19        Q.   So on the 24th, you noticed visible blood

20   clots in your urine?

21        A.   Yes.

22        Q.   Did you notice anything else that day?

23        A.   Other than the color; no.

24        Q.   You saw blood clots though; right?

25        A.   Yes.

DEAN - DIRECT                          87

1       Q.    What did the blood clots look at?

2       A.    Some of them were two or three inches.    They

3   reminded me of a gummy worm.

4       Q.    How thick were these blood clots?

5       A.    At least a quarter-inch thick.

6       Q.    What color were they?

7       A.    They were -- they were like a dark purple.

8       Q.    So you've talked about colored urine, you've

9   talked about clots that reminded you of gummy worms,

10  I believe that you've mentioned a red color.    Did

11  you ever see actual blood, what looked like red

12  blood in your urine?

13      A.    Yes.    Sometimes it looked like straight

14  blood, not urine.

15      Q.    Did you ever notice anything else in your

16  urine?

17      A.    Other times there was small like -- I

18  wouldn't call them particles, but they were

19  solids -- I mean blood clots, but they were solids.

20      Q.    So solids that were smaller than the blood

21  clots you just describe?

22      A.    Almost like a coffee ground type look.

23      Q.    And so had you experienced each of these

24  different symptoms of blood in your urine between

25  December 19th and December 24th of 2015 to your

DEAN - DIRECT                                          88

1    memory?

2        A.   Yes.

3        Q.   And let's talk about each of them in turn.

4    With colored urine, whether it's pinkish or reddish

5    in color, when did you stop having that as a

6    symptom?

7        A.   A few -- sometime in January it started

8    clearing up.

9        Q.   Did you ever have it again after that?

10       A.   Oh, many times.

11       Q.   Okay.  And so I want to go in broad sweep.

12   When was the last time in your life that you had

13   that kind of coloration in your urine?

14       A.   I don't remember if I urinated -- had to be

15   July 19th, just before my surgery.  Because my

16   surgery started at almost 12:00, so I'm sure I

17   urinated a couple times that day.

18       Q.   And so fair to say that you had colored

19   urine, pink or red urine starting in December of

20   2015 going until July of 2016?

21       A.   Yes.

22       Q.   Did you have colored urine or pink or red

23   urine every month in there?

24       A.   No.  Not every day, but every month I did,

25   yes.

DEAN - DIRECT                    89

1       Q.   Every week?

2       A.   Sometimes it might go six or seven days and

3    it would look clear to me.  I'm sure there was

4    microscopic blood in there.

5       Q.   About how often over the course of that

6    period from December to July do you think that you

7    had that colored urine?

8       A.   I'm gonna say at least half the time.

9       Q.   At least half the time.  You talked a little

10   bit about clots.  Those clots being purplish gummy

11   worms.  How often did you have -- I'm sorry, let's

12   start over.

13       Those clots, you had those clots in December of

14   2015; is that right?

15       A.   Yes.

16       Q.   When did you stop having the clots in your

17   urine?

18       A.   I may not have had them the last week of the

19   surgery, but all throughout every month I had them

20   on and off.

21       Q.   So every month from December 2015 to

22   July 2016 you had the clots?

23       A.   Yes.

24       Q.   Did you have the clots more or less often

25   than you had colored urine?

1          A.   Less often than the colored urine.

2          Q.   Speaking of the colored urine, did you have

3    any pain with coloration in your urine alone?

4          A.   Only if a blood clot went through my

5    urethra.

6          Q.   So the clots were painful?

7          A.   Yes, very painful.

8          Q.   And the clots were painful to pass when you

9    were urinating?

10         A.   Yes.

11         Q.   Did you have any pain associated with these

12   symptoms in your back?

13         A.   No.

14         Q.   Did you have pain in your back when you

15   talked to Dr. Nawoor on December 23rd, if you

16   remember?

17         A.   No.

18         Q.   Did you have pain in your back when you had

19   the blood clots?

20         A.   No.

21         Q.   Let's talk next about red blood in the

22   urine.  Did you have any pain in passing red blood

23   in your urine?

24         A.   No, not at all.

25         Q.   Did you have any pain in your back when you

1    had red blood in your urine?

2        A.    Not at all.

3        Q.    About how -- when did you last have red

4    blood in your urine after you first saw it?

5        A.    I know I had it all the way up to the

6    surgery.  Maybe it was a couple days before it might

7    have cleared up.  I don't remember.

8        Q.    Did you have red blood in your urine every

9    month from December to July?

10        A.    Every month.

11        Q.    About how often?

12        A.    At least half the time, if not more some

13    months.  Some months I'm sure were heavier than

14    others.

15        Q.    So more often than you had the clots?

16        A.    Yes.

17        Q.    You mentioned other solids.  Did you ever

18    have pain associated with those solids?

19        A.    No, other than the mental thought of, you

20    know, oh, look at that, that's crazy.

21        Q.    When those solids came out, did you have

22    pain in your back?

23        A.    No, sir.

24        Q.    About how -- when did you last see those

25    solids in your urine?

DEAN - DIRECT                    92

1        A.   Had to be July.

2        Q.   Did you have solids in your urine like that

3   coffee ground-like solids that you mentioned every

4   month through July -- excuse me, from December

5   through July?

6        A.   Yes.

7        Q.   About how often did you have those coffee

8   ground-type solids?

9        A.   It was more than blood clots, but I would

10  say 30 to 40 percent of the time.

11       Q.   With the coffee ground-like solids, did you

12  have to strain to urinate?

13       A.   No, not with those.

14       Q.   Which of the symptoms did you have to strain

15  to urinate?

16       A.   With the large gummy worm-type clots.

17       Q.   When you had those kinds of clots and you

18  had to strain to urinate, did you have control over

19  your urination?

20       A.   No, sometimes it would stop my flow and I

21  would bear down once again.  And our urinals are

22  about four foot wide, and sometimes the urinal would

23  look like, for lack of a better term, a murder scene

24  because there would be so much pressure and so much

25  solid in it that it would splatter when it hit the

DEAN - DIRECT                          93

1    water and it would go up on the side walls of the

2    toilet and the side walls of the urinal.

3         Q.   You mentioned pain in passing those blood

4    clots.  Did you notice any other pain associated

5    with those blood clots?

6         A.   No.

7         Q.   Was your experience with this blood in your

8    urine different from the blood that you had in your

9    urine with kidney stones?

10        A.   Yeah, because with the kidney stones, I

11   couldn't see the blood, first off.  I could just

12   feel the pain in my back.

13        Q.   So you couldn't see the blood with your

14   kidney stones?

15        A.   No, never.

16        Q.   But you did have pain?

17        A.   Yes.

18        Q.   And you could see the blood now in

19   December 2015 through July 2016?

20        A.   Yes, sir.

21        Q.   And it came with no pain in your back?

22        A.   No pain.

23        Q.   At first, when you first saw this in

24   December of 2015, what did you think was going on?

25        A.   I was hoping it was stones.

DEAN - DIRECT                    94

1          Q.   Why were you hoping that?

2          A.   No one would want to have cancer.

3          Q.   So let's talk a little bit about that

4     timeline we've been discussing from December to

5     July.  I'm going to hand you what's been marked for

6     identification as Plaintiff's Exhibit 3.

7          Already have that one.  Sorry, this is on

8     return, isn't it.

9          Draw your attention, please, to page 12 of

10    Exhibit 3.  Before -- let me start all over.

11         Do you recall when you next saw a doctor, if at

12    all, about blood in your urine?

13         A.   I seen Dr. Einwohner early January, I think

14    it was the 7th.

15         Q.   Okay.  Would your diary help to confirm what

16    the date was?

17         A.   Yes.

18         Q.   Okay.  Go ahead and take a look at page 12.

19    Dylan, can you put that up.

20         Did you continue to have blood in your urine,

21    Mr. Dean, between December -- late December and then

22    in January 7th, 2016?

23         A.   Yes.

24         Q.   Okay.  How about large blood clots?

25         A.   I don't remember any blood clots after the

DEAN - DIRECT

1    24th for a while.

2        Q.   And you saw Dr. Einwohner that day?

3        A.   Yes.

4        Q.   Where did you see her?

5        A.   Seen her in a teleclinic.

6        Q.   And what's teleclinic?

7        A.   It's kind of a, lack of better term, I think

8    people would associate it with like FaceTime.  She's

9    on the TV, I'm on the TV at her end, and we could

10   talk to each other.

11       Q.   And so it's like video conference?

12       A.   Yes.

13       Q.   And about how long did you meet with her

14   that day?

15       A.   I'd say 35 to 45 minutes.

16       Q.   And did she ask you any questions?

17       A.   She starts the appointment out by asking

18   history questions, medical history.

19       Q.   And so did she ask you about kidney stones?

20       A.   No.

21       Q.   What did she ask you about?

22       A.   I mean she may have went over, you know, my

23   past history, saying I had stones, but she didn't

24   ask me if I had kidney stones then.

25       Q.   Did you tell her about the blood in your

DEAN - DIRECT                                    96

1    urine?

2        A.  I asked her if I was seeing her because

3    Dr. Nawoor had seen me, did he refer me to her.  She

4    said no, it was the regular clinic.

5        Q.  Did she -- so you told her about the blood

6    in your urine?

7        A.  Yes.

8        Q.  And what did she say, if you remember?

9        A.  She -- I asked her if she thought it could

10   be stones again.  And she said well, she wasn't

11   sure, that it could be.

12       Q.  Did she tell you anything else?

13       A.  At the end of it she told me that I was --

14   if I had any more probably to go to sick call.

15       Q.  Did she tell you anything to do to manage

16   the blood in your urine?

17       A.  No.

18       Q.  Did she tell you anything about plans for

19   testing or other treatments?

20       A.  I think at the time I took a blood test on

21   December 28th, and she said it wasn't there, so she

22   reordered a blood and urine test.

23       Q.  Do you know of any other tests she ordered

24   that day?

25       A.  None that I know of.

DEAN - DIRECT                              97

1          Q.    What was the next test that you had?

2          A.    I had a blood and urine test eventually.    I

3    don't know what day it would have been.

4          Q.    Okay.    Do you remember having an ultrasound?

5          A.    Yeah, I had an ultrasound, I think it was

6    early February.    February 2nd, if I recall.

7          Q.    Okay.    And Dr. Einwohner hadn't said

8    anything to you about an ultrasound, had she?

9          A.    No.

10         Q.    And had Dr. Nawoor?

11         A.    He may have.    I don't recall.

12         Q.    Did you continue to see blood in your urine

13   between the time you saw Dr. Einwohner on

14   January 7th and when you got the ultrasound on

15   February 2nd?

16         A.    Yes.

17         Q.    Who performed the ultrasound?

18         A.    I don't know the guy's name, but he said

19   that he traveled all the different prisons and he

20   just happened to be at ours at this time.

21         Q.    And so it wasn't one of your doctors at

22   Taylorville Correctional Center?

23         A.    No.

24         Q.    Did your doctors at Taylorville Correctional

25   Center ever learn about the results of that

1    ultrasound?

2         A.   Yes.

3              MR. RUPCICH:   Object to the foundation.

4         Q.   I can rephrase that.

5              THE COURT:   Okay.

6         Q.   Did your doctors at Taylorville Correctional

7    Center ever tell you about what -- about reviewing

8    the results from your ultrasound?

9         A.   Yes.

10        Q.   And what did they say?

11        A.   Said it had showed no mass, lesions, or --

12   and blood flow, something like that.  I had a copy

13   of it at one time.

14        Q.   And so did you talk with Dr. Einwohner about

15   the results of this ultrasound?

16        A.   I didn't see her again until February 8th.

17   And then we probably went over that.

18        Q.   Did you talk about the ultrasound with

19   Dr. Nawoor?

20        A.   Yes.

21        Q.   Did they tell you anything, either

22   Dr. Nawoor or Dr. Einwohner, about what would happen

23   next?

24        A.   Dr. Nawoor told me sometime right after that

25   that I needed a CAT scan.  CT scan, I'm sorry.

DEAN - DIRECT                99

1    Q.    Did Dr. Einwohner say anything about a CT

2  scan?

3    A.    Not that I recall.

4    Q.    Do you recall about when you saw Dr. Nawoor

5  and he told you you needed the CT scan?

6    A.    I think it was February 10th.

7    Q.    And were these meetings of a similar length

8  to the meetings you had with these doctors before?

9    A.    Yeah.    Usually 15, 20 minutes.

10    Q.    Did they tell you anything to manage the

11  blood in your urine?

12    A.    He may have said to drink more water.    Try

13  to drink more water at the time.

14    Q.    Did they ever prescribe anything?

15    A.    No, never.

16    Q.    Talked about a CT scan.    Did you ever

17  receive a CT scan?

18    A.    I didn't get one until April 12th.

19    Q.    Okay.    Before we talk about that CT scan --

20  well, who gave you that CT scan?

21    A.    I got the CT scan -- I don't know who

22  ordered it, but I got the CT scan at Decatur

23  Memorial Hospital.

24    Q.    And was it performed by Dr. Nawoor or

25  Dr. Einwohner?

DEAN - DIRECT                    100

1          A.  I'm sorry, can I -- it was at Taylorville

2    Memorial Hospital.

3          Q.  And you said that was April 12th?

4          A.  Yes.

5          Q.  Was it performed by Dr. Nawoor or

6    Dr. Einwohner?

7          A.  No.

8          Q.  Were they there?  Did you see them that day?

9          A.  No.

10         Q.  Who did you see that day?

11         A.  All I seen was the radiologist.  And I may

12   have seen Dr. Nawoor when I came back, because it's

13   common practice when you go out on medical writ you

14   need to see the doctor there within five days.  A

15   lot of times I'd see him as I came back.

16         Q.  Did you talk to any other doctors about that

17   CT scan?

18         A.  David -- Dr. Severino, two days later on the

19   14th.

20         Q.  Who is Dr. Severino?

21         A.  Dr. Severino is a urologist.

22         Q.  And had you seen Dr. Severino before

23   April 14th?

24         A.  I believe it was March 10th.

25         Q.  So you had seen him in between the

1  ultrasound and then when you went to get the CT

2  scan?

3      A.  Yes.  Now that I think about it, he ordered

4  the CT scan and the scope.

5      Q.  And during this time were you still

6  experiencing blood in your urine?

7      A.  Yes.

8      Q.  Still experiencing blood clots?

9      A.  Yes.

10     Q.  Still experiencing the pain of passing those

11 blood clots?

12     A.  Yes.

13     Q.  You mentioned seeing Dr. Severino on

14 April 14th.  Where did you see Dr. Severino that

15 day?

16     A.  In his office.

17     Q.  Where was his office?

18     A.  Springfield Clinic in Taylorville.  It was

19 his Taylorville office.

20     Q.  And what do you remember him saying to you

21 and you saying to him that day?

22     A.  Well, first the nurse told me I wasn't going

23 to have that scope before I seen him.  And I was

24 happy because that was one of my biggest fears.

25         Then he came in and the first thing he said, he

```
 1   said, "I have real bad news."  And I said, "What's
 2   that?"  He says, "You have renal cell carcinoma and
 3   it's really bad."
 4        Q.  And what's renal cell carcinoma?
 5        A.  Kidney cancer.
 6        Q.  What did Dr. Severino tell you should happen
 7   next, if anything?
 8        A.  He said if I wanted to --
 9            MR. RUPCICH:  I'm going to object to
10   hearsay.  Severino is not a defendant.
11        Q.  Let me see if I can rephrase the question.
12        Do you remember talking with Dr. Severino about
13   what would happen to treat your cancer?
14        A.  Yes.  He said we needed to do surgery.
15            MR. RUPCICH:  Move to strike.
16        Q.  Mr. Dean, what did you know on April 14th
17   about the plans to treat your cancer?
18        A.  He said that we would do surgery as soon as
19   possible, that it needed to come out right away.
20            MR. RUPCICH:  I'll object to hearsay again.
21        Q.  I think what we have here is the
22   conversation between a doctor and his patient for
23   diagnosis and treatment plan which is an exception
24   to the rule against admission of hearsay.
25            THE COURT:  You may testify to what your
```

1    knowledge of what your treatment plan was.

2        A.   Okay.   Well, the way I understood it, he

3    said that I needed to have surgery right away

4    because it was in my -- not my kidney, but not only

5    in my kidney, but it was in my vena cava.   But it

6    was only so far up, and we needed to do surgery so

7    they wouldn't have to split me open.   They would be

8    able to cut me below the ribs and take it out that

9    way.

10       Q.   So he described for you what to expect in

11   terms of what the surgery would entail?

12            MR. RUPCICH:   I have an objection.   He's

13   testifying to what the doctor told him and he said

14   this is what the doctor said.   I move to strike it.

15       Q.   Again, I think the plaintiff's understanding

16   about what the plan for treatment was pertains to

17   the conversations between the doctor and a patient

18   about diagnostics and plan for treatment which is

19   again an exception to the rule against hearsay.

20            THE COURT:   The objection is overruled.

21       Q.   So, Mr. Dean, you understood that you were

22   going to need surgery?

23       A.   That was my belief.

24       Q.   And what did you believe would happen if you

25   didn't have surgery?

1        A.   That I had zero percent chance of making it

2    out of prison.

3        Q.   And at that time, what timeline did you

4    believe you needed to make it out of prison?

5        A.   At that time, I had five and a half years

6    left.

7        Q.   What did you believe would happen if you did

8    get surgery?

9        A.   That I had a 35 percent chance of living at

10   that time, but I still had a chance.

11       Q.   And what did you understand was the plan for

12   that surgery?

13       A.   That -- my understanding was that we were

14   gonna need to get approval to have it at Springfield

15   Memorial.  I didn't know about any other surgeries

16   or anything, if that's what you're asking.

17       Q.   Mr. Dean, do you remember the next time that

18   you saw Dr. Nawoor after you had this diagnosis?

19       A.   I'm sure it was within that five-day period.

20       Q.   When you say that five-day period, what do

21   you mean?

22       A.   Well, you need to see the doctor within five

23   days of a medical writ.

24       Q.   And do you remember seeing him on that

25   occasion within that five day required period?

DEAN - DIRECT

1    A.  I'm sure it was.  I don't remember the exact

2  date though.

3    Q.  Do you remember meeting with him then?

4    A.  Yes.

5    Q.  Do you remember talking with him about your

6  cancer diagnosis?

7    A.  Yes.

8    Q.  And did he tell you anything about the

9  plan -- let me start over.

10    Did you talk with him about a plan for treating

11  your cancer?

12    A.  No.

13    Q.  He didn't talk to you about the surgery?

14    A.  Not about the surgery.  He may have said

15  that they needed to call Pittsburgh.

16    Q.  What does that mean to you?

17    A.  I believe that means that he had to call the

18  other doctors and get approval.

19    Q.  And by the other doctors, who did -- who are

20  these other doctors?

21    A.  I don't know their names.

22    Q.  What do you know about them?

23    A.  Well, they call it a collegial review.  And

24  they call once or twice a week and they present

25  their case to them.  And that person or persons

1    decide whether they're gonna do the procedure

2    recommended or not.

3         Q.   Do you know who these other doctors work

4    for?

5         A.   Wexford Health Sources.

6         Q.   And so as of that meeting within five days

7    talking with Dr. Nawoor, you didn't know anything

8    about when your surgery would be scheduled?

9         A.   No.

10        Q.   Do you know when you found out when your

11   surgery would be scheduled?

12        A.   Probably July.

13        Q.   So you didn't find out in May about when

14   your surgery would be scheduled?

15        A.   No.  I asked and I was told it was scheduled

16   and nothing ever happened.

17        Q.   Did you do anything about that?

18        A.   I filed an emergency grievance in May.  My

19   wife had called a few times either before or after

20   that grievance.  She may have called in April.

21        Q.   So you wrote a grievance and your wife

22   called?

23        A.   Yes.

24        Q.   Did you do anything else?

25        A.   Every time I seen him, I asked "what's going

1    on?"  I kept getting the answer, "We'll call, we'll

2    call or it's been approved, not scheduled."  Felt

3    like I was getting the runaround.

4         Q.  Did you continue to go to sick call?

5         A.  After that point I doubt if I went to sick

6    call.  Because I felt like it was useless.

7         Q.  Who did you ask about whether your surgery

8    had been approved?

9         A.  I directly asked Kathy Galvin, I directly

10   asked Mr. Nawoor, I directly asked Lisa Mincy.

11        Q.  And in what context did you ask them that if

12   you weren't going to sick call?

13        A.  I would be over there for another medical

14   appointment and they always walked through the

15   lobby.  But Nawoor was in his office.  I asked him,

16   in fact, one time in the lobby, and he said, "If you

17   were my patient out in the world, you would be in

18   hospital right now."

19        Q.  What do you mean by out in the world?

20        A.  Well, if you're in prison, everything you

21   refer to out in the free world is out in the world.

22        Q.  Mr. Dean, do you know -- have you heard any

23   specific terms for what kind of a teleclinic

24   Dr. Einwohner runs?

25        A.  I think it's referred to as a renal

DEAN - DIRECT                                    108

1    teleclinic.

2         Q.   Do you know what renal teleclinic means?

3         A.   I think renal means kidney.

4         Q.   So is it your understanding that renal

5    teleclinic is for the health of your kidneys?

6         A.   Yes.

7         Q.   Is it your understanding that Dr. Einwohner

8    was charged with the overseeing the health of your

9    kidneys?

10             MR. RUPCICH:   Object to the foundation.

11             THE COURT:   The objection is sustained.

12        Q.   Mr. Dean, you talked a little bit about how

13   you saw Dr. Einwohner regularly by teleclinic?

14        A.   Yes.

15        Q.   And you testified that that's called renal

16   teleclinic?

17        A.   Yes.

18        Q.   You understand that renal teleclinic means

19   pertaining to your kidneys?

20        A.   Yes.

21        Q.   Why were you seeing Dr. Einwohner?

22        A.   Every time -- the first time I talked with

23   her I was told I had microscopic traces of blood in

24   my urine.

25        Q.   And so -- and so why was that significant

1    to -- let me withdraw that question.

2         You were told that you had microscopic traces

3    of blood in your urine.  Why did you see

4    Dr. Einwohner about that?

5         A.  Because in my opinion, she's the kidney

6    person that they recommend you to.

7         Q.  Do you know what kind of a doctor

8    Dr. Einwohner is?

9         A.  I can't say it.  Nephrologist.

10        Q.  Do you know what a nephrologist is?

11        A.  I assume it's a kidney doctor.

12        Q.  Mr. Dean, when did you finally get surgery?

13        A.  July 19th I rolled in the operating room.

14   Last thing I remember is 11:58 on the clock.  It was

15   a big digital clock.

16        Q.  And going into the surgery, what did you

17   understand or what did you know before the surgery

18   about what was going to happen and what the plan

19   was?

20        A.  I know they needed to cut my chest open.

21   Split it open, they told me.  And split me across

22   the abdomen and dissect the kidney and get the tumor

23   out of my vena cava.  And I was gonna have heart

24   bypass.  Something about some cooling me down to

25   keep me -- ease around me or something.  I don't

DEAN - DIRECT                                    110

1    know the name of the term of it.

2         Q.   Did you know anything about the risks of a

3    surgery like that?

4         A.   That Dr. Severino said I 50 percent chance

5    of dying on the table.  That it went up from the

6    first time he wanted to do surgery.

7         Q.   Were you expecting any pain from the

8    surgery?

9         A.   Sure.

10        Q.   What kind of pain were you expecting?

11        A.   I figured my chest was gonna hurt.  The

12   stomach -- the surgical, you know, where they cut

13   me.

14        Q.   Were you expecting any risks related to the

15   cooling you talked about?

16        A.   Sure.  I'm sure there's always a risk

17   that -- you know, they're stopping my heart, putting

18   me on bypass, I might not come back.

19        Q.   Did you go into that surgery knowing about

20   how long it would last?

21        A.   I knew it was going to be a long time, but I

22   wasn't sure.

23        Q.   Did you go into that surgery knowing who

24   your surgeons would be?

25        A.   The only one I knew was Dr. Nawoor.  There

1    was another guy I seen, a thoracic doctor, but he

2    wasn't sure he was going to be there, Dr. Hazelrigg.

3    So I don't know to this day if he was there or

4    another one took his place.

5        Q.    And I think that you just said Dr. Nawoor,

6    but might have misspoken, because --

7        A.    I'm sorry, Dr. Severino.  Did I say Nawoor?

8    I'm sorry.

9        Q.    Did you know who -- did you know what

10    Dr. Severino's role was in your surgery?  Did he

11    tell you?

12        A.    That he would be the one cutting out my

13    kidney.

14        Q.    Did he say what the role of any other

15    surgeon would be?

16        A.    There was going to be a heart doctor there

17    and he was going to take care of the bypass and

18    anything related to my heart.

19        Q.    Do you know who was going to do the chest

20    cracking?

21        A.    I seen Dr. Hazelrigg for it, but I don't

22    know -- he said he may not be able to attend the

23    surgery, so it may have been somebody else.

24        Q.    And he was a thoracic surgeon?

25        A.    That sounds right.

DEAN - DIRECT                                    112

1          Q.   Were there any other surgeons that you
2    remember being involved?
3          A.   Not that I heard of.  Or knew beforehand.
4          Q.   Before the surgery, did you hear anything
5    about a vascular surgeon being involved?
6          A.   No.
7          Q.   Immediately after that surgery, what did you
8    feel like?
9          A.   Well, I didn't wake up for two days, so I
10   didn't feel nothing for those two days.  And they
11   had me on so much fentanyl, I probably didn't feel
12   nothing for the next three or four days.
13         I was glad to be alive.  They woke me up.  I
14   didn't know nothing for two days, so when they woke
15   me up they said, "Don't try to swallow or talk, you
16   got a tube in your mouth."  First thing you want to
17   do is swallow.  So I got over that.  And I had to be
18   awake for a few -- I don't know how long it was, I'm
19   guessing it was a few hours, and they finally pulled
20   the tube out of my throat.
21         Q.   After the medication wore off, what did it
22   feel like?
23         A.   Very sore in the chest area.  The staples
24   felt like it was a zipper across every time you
25   moved.  But I was still on fentanyl for a few days

DEAN - DIRECT

1    and then Tramadol.  And so that was relieving some

2    of the pain.

3        Q.  You testified you were expecting them to

4    crack your chest.  And then you saw that -- those

5    staples.  You also testified you were expecting them

6    to cut open your abdomen.  Did you see that they had

7    cut open your abdomen?

8        A.  Yeah.  The staples were on the abdomen.  But

9    the chest was I think glued together.  Some kind of

10   super glue or some kind of glue they put on it.

11   It's a different kind of scar, thicker than where

12   the staples were.

13       Q.  Did you have any pain in your abdomen?

14       A.  Yes.

15       Q.  Did you have any other kind of discomfort or

16   pain?

17       A.  I was constipated for a while.  Of course,

18   I'm laying in bed with shackles for ten days.

19   Shackles and cuffs.  Every time you moved it felt

20   like your stomach was going to separate, the wound.

21       Q.  Following your surgery, what did you learn

22   about your diagnosis?

23       A.  I remember Dr. Severino came in and he said

24   everything went well with my kidney, but while they

25   had me open, he seen something on my liver.  So it

1    might be a problem.

2         Q.   And when he said he saw something on your

3    liver, what did you understand that to mean?

4         A.   I assumed that it was cancer.

5              THE COURT:   Mr. Strom, is this a good place

6    to break?  It's 4:30?

7              MR. STROM:   Yes, Your Honor.

8              THE COURT:   Okay.   The jury is excused at

9    this time.  If you will be back a few minutes before

10   nine, we'll have some snacks for you, and then we'll

11   reconvene at nine.

12        All rise.

13        Leave your notepads on your chairs.   Court

14   security will pick them up and put them in the

15   vault.

16        (The jury left the courtroom.)

17             THE COURT:   Did you mean to move for

18   admission of 3?  You can do it in the morning in

19   front of the jury.

20             MR. STROM:   If I hadn't yet, yes.

21             THE COURT:   Why don't you be back at ten to

22   nine.

23        Mr. Rupcich, will you be filing something

24   tonight?

25             MR. RUPCICH:   Yeah.  I'll file something

1    tonight.  Was 3 admitted then?

2         THE COURT:  I do not think so.

3         MR. MARTIN:  It was not admitted yet.  He

4    can do it in the morning.

5         THE COURT:  Yes, I'd like you to do it in

6    front of the jury.

7         MR. MARTIN:  Your Honor, I do have a quick

8    question.  With respect to -- so we filed something

9    on Friday night late.  This morning we filed

10   something very early.  And you made a comment that

11   it's easier if we email it to you.

12      Do we have --

13        THE COURT:  I expect you to file it, but

14   when it's outside hours, yes, you have my email.

15        MR. MARTIN:  Okay.  So if -- there was

16   something that came up today that we may file

17   something on that relates to the motions that are

18   before you.  I need to look at a transcript to be

19   sure.  We'll email it to you in the event we do.  We

20   will also file it on ECF.

21        THE COURT:  Would you like to help your

22   client down?

23        MR. STROM:  Yes.

24      And, Your Honor, if we may ask one question of

25   the Court.  As you know, as all the parties

1    appreciate, Mr. Dean is in a wheelchair because of

2    his back pain.  And for that reason, would like to

3    ask respectfully leave of the court for Mr. Dean to

4    remain seated at times when others are asked to

5    stand, to all rise at times during proceedings.  And

6    to have his -- if that is -- leave is granted, to

7    have that fact explained to the jury so that they

8    understand no disrespect is meant by it if that's

9    permitted by the Court.

10              THE COURT:   Any objection?

11              MR. TYRRELL:   We can all remain seated,

12    that would resolve the jury, rather than tell the

13    jury borrow it.

14              THE COURT:   I will think about it.

15        Do you need help?

16              THE PLAINTIFF:  I better.

17              THE court:   And, Officers, will you remain

18    here until the Court Security tells you all of the

19    jurors are out of the building, okay?

20        All right.   Court is adjourned.   See you in the

21    morning.

22        (Court was recessed for the day.)

23

24

25

1

2

3

4    I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

5    Reporter, certify that the foregoing is a correct

6    transcript from the record of proceedings in the

7    above-entitled matter.

8

9

10

11

12              This transcript contains the

13              digital signature of:

14

15              Kathy J. Sullivan, CSR, RPR, CRR

16              License #084-002768

17

18

19

20

21

22

23

24

25