1     IN THE UNITED STATES DISTRICT COURT
    FOR THE CENTRAL DISTRICT OF ILLINOIS
2      SPRINGFIELD DIVISION

3 WILLIAM KENT DEAN,     )
            )
4     PLAINTIFF,   )
            )
5     VS.     ) 17-CV-O3112
            )
6 WEXFORD HEALTH SOURCES, ) JURY TRIAL
 INC., DR. ABDUR NAWOOR, DR. )
7 REBECCA EINWOHNER, KATHY ) SPRINGFIELD, ILLINOIS
 GALVIN, and LISA MINCY,  )
8          ) VOL. 7
     DEFENDANTS.  )
9
      TRANSCRIPT OF PROCEEDINGS
10   BEFORE THE HONORABLE SUE E. MYERSCOUGH
     UNITED STATES DISTRICT JUDGE
11
 DECEMBER 17, 2019
12
 A P P E A R A N C E S:
13 FOR THE PLAINTIFF:   CRAIG MARTIN
           JOEL PELZ
14          WILLIAM STROM
           CHLOE HOLT
15          NATHANIEL WACKMAN
           JENNER & BLOCK
16          353 N. CLARK STREET
           CHICAGO, ILLINOIS
17
 FOR DEFENDANTS     JOSEPH RUPCICH
18 WEXFORD HEALTH SOURCE,  ALEXANDRA RICE
 DR. ABDUR NAWOOR,    CASSIDAY SCHADE.
19 REBECCA EINWOHNER    111 N. SIXTH STREET
 AND KATHY GALVIN:    SPRINGFIELD, ILLINOIS
20 FOR DEFENDANT LISA MINCY: JEREMY TYRRELL
           CLAYTON ANKNEY
21          ATTORNEY GENERAL'S OFFICE
           500 S. SECOND STREET
22          SPRINGFIELD, ILLINOIS

23 COURT REPORTER:   KATHY J. SULLIVAN, CSR, RPR, CRR
          COURT REPORTER
24          600 E. MONROE
          SPRINGFIELD, ILLINOIS
25          (217)492-4810

1

I N D E X

2

WITNESS                                                    PAGE

3
CHAD CHRISTER
Direct Examination by Ms. Rice                             1122
4
Cross Examination by Mr. Wackman                           1144
Redirect Examination by Ms. Rice                           1149
5
WILLIAM SEVERINO
6
(By deposition)                                            1150

7

8

9

E X H I B I T S

10
PLAINTIFF'S EXHIBIT
11
NUMBER                        IDENTIFIED    ADMITTED

12

13

14
DEFENDANTS' EXHIBIT
NUMBER                        IDENTIFIED    ADMITTED
15
Exhibit 1                        1123         1132

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1   * * * * * * * * * *

2

3   (The following proceedings were held in open

4   court outside the presence of the jury.)

5   THE COURT: So I am inclined, first of all,

6   to give the glossary that was tendered by the

7   plaintiffs. Do you have any specific objection to

8   the glossary?

9   MR. RUPCICH: There's been no testimony

10   specifically as to it. I --

11   THE COURT: You mean as to the document?

12   MR. RUPCICH: As to the document. I think

13   the jury has had the ability to take notes and

14   listen to the evidence. And I don't -- I've never

15   given a jury a glossary of terms, and I don't -- I

16   think they need to rely on the evidence that's come

17   in through the witnesses.

18   THE COURT: But this is simply a definition

19   that has been testified to, so I'm going to allow

20   it.

21   After reconsidering the evidence, I'm going to

22   agree as to the adverse inference. I'm not going to

23   give Court's 39.

24   Then I have additional plaintiff's proposed

25   instructions. Is there any objection --

1        MR. RUPCICH:  Judge, I'm sorry.  To be

2  clear, Court's 39 you are not giving?

3        THE COURT:  I am not giving.

4        MR. RUPCICH:  Are you giving a different

5  one in lieu of it?

6        THE COURT:  No.

7        MR. RUPCICH:  So 39 is withdrawn --

8        THE COURT:  I thought that was very clear,

9  Mr. Rupcich.  Did I not say what I think I said?

10        MR. RUPCICH:  No, you did.  I just -- I'm

11  sorry, I'm just trying to be clear.

12        THE COURT:  All right.  Plaintiff's 2A, any

13  objection?  It replaces Plaintiff's 2.

14        MR. RUPCICH:  Plaintiff's 2A?  I was just

15  handed these, Judge.

16        THE COURT:  So was I.

17    Now, just to be clear, Mr. Rupcich, do I have

18  defendants'?  I don't have any submission?

19        MR. RUPCICH:  I stand on the ones I

20  previously submitted.

21        THE COURT:  Okay.

22        MR. RUPCICH:  I don't think we need a

23  principal and agent instruction.  I don't think that

24  that issue is disputed.

25        THE COURT:  Mr. Martin?  Mr. Strom?

1    MR. STROM:  I can speak to that, Judge.

2    The testimony in this case, the evidence that's

3    come out in this case about principals and agents

4    pertains both to named defendants as well as to

5    other apparent agents, agents, employees, and

6    officers of defendant Wexford Health Sources, Inc.

7    There are Illinois IPI instructions available

8    which we have modified to include the parties in

9    this case, party names as well as the identities of

10   entities that have -- on which evidence has come in

11   during the course of the case.

12   So Plaintiff's 2A goes along with Plaintiff's 6

13   additional, Plaintiff's 7 additional.  And the

14   purpose here is that under some circumstances,

15   allegations can be brought as to the liability of a

16   principal based on its agents who are not parties to

17   the case.

18   And in our third amended complaint, Plaintiff's

19   Count 10--I'm tendering a copy as courtesy of that

20   third amended complaint, the operative complaint in

21   this case to the Court--Count 10 which is at page

22   30.  Plaintiff's allegations and plaintiff's counts

23   include and have long included discussion of the

24   liability of defendant Wexford based on the actions

25   of its agents, apparent agents and/or employees.

1   There's been a good deal of testimony and

2   evidence elicited as to who those agents or apparent

3   agents or employees may be beyond simply the named

4   defendants in this case.  So in order to conform

5   with our allegations as in our complaint here, we

6   believe that agency instructions such as this are

7   appropriate and needed.

8            THE COURT:  All right.  I'm going to give

9   2A, 6, and 7.

10           MR. RUPCICH:  Judge, may I be heard?

11           THE COURT:  Yes.  I thought you were just

12  heard.

13           MR. RUPCICH:  Well, I didn't -- this is a

14  totally new claim, an apparent agency claim.  I'm

15  not following.  What I'm -- what I'm thinking is

16  that they're going to intend to argue to the jury

17  that some outside radiologists were apparent agents

18  of Wexford.

19       Apparent agency is a separate claim, right?  It

20  has separate elements that the plaintiff would have

21  to prove that this entity was held out in a certain

22  fashion and that the plaintiff actually relied on

23  that.  There's been no evidence of any reliance of

24  any -- that this agency -- or these outside

25  radiologists were held out as part of Wexford.

1    The typical way that this comes about is in the
2    hospital setting where a doctor wears a lab coat
3    with the hospital's name on it, but is an employee
4    of an independent contractor.  There's been no
5    record developed on the relationship between any
6    outside, like St. John's Hospital, I mean, or
7    Illinois Radiologic Associates or Precise Ultrasound
8    insofar as they would be an apparent agent of
9    Wexford.  That has not been developed through any
10   evidence.  It was not framed in the final pre-trial
11   order.  And it's a completely different claim from
12   what's been presented at trial here.
13          THE COURT:  Mr. Strom?
14          MR. STROM:  Well, with respect to the
15   suggestion that this is a new claim or new theory,
16   it's right there in our Count 10 that we have
17   alleged that through its agents or apparent agents
18   that Wexford is liable for certain conduct.
19       What's more, I do think that evidence has been
20   amply presented to this Court and to the jury
21   regarding why it is that it's actually the
22   radiologists who are at fault.  It's actually the
23   radiology tech who's at fault.  That's evidence that
24   we have not sought to controvert as defendants have
25   brought it in.

1     And so the agency relationship, I suppose,

2 could be established or we could talk about the

3 contours of who the agents are.  But the suggestion

4 that there's been no evidence about apparent agency

5 belies the evidence that defendants have elicited as

6 to the radiology involvement in this case.

7     And Mr. Dean sits as though in a hospital there

8 at Taylorville.  He gets the medical care from

9 whoever shows up.  He doesn't have a choice about

10 that.  So whether or not he is relying on them, I

11 think at minimum is something that the jury can

12 determine based on this instruction.

13         MR. RUPCICH:  They would have to plead and

14 prove who the apparent agents are, rather than a

15 boilerplate apparent agency allegation.  This is a

16 specific claim.  I've tried them before.

17         THE COURT:  So have I.

18     So my recollection was that 50.02 is not to be

19 given if 50.11 is given.  And I'm looking at the

20 comment.  The notes rather.

21         MR. STROM:  You're referring to the IPI,

22 Judge?

23         THE COURT:  Yes.  That the agent is the

24 officer of the defendant corporation, this

25 instruction may be given in lieu of IPI 50.02.

1    MR. STROM:  So, Judge, the reason 50.11 is

2  included is because Dr. Ritz is also not a named

3  defendant.  Dr. Ritz is an officer of Wexford.  I

4  don't think there's been any effort to controvert

5  that fact.  And so this Plaintiff's 7 additional

6  pattern 50.11 goes to the conduct of Mr. Ritz and

7  Wexford's liability therefore.

8    THE COURT:  I'm gonna have to read the

9  notes because there are a number of cross-references

10  for all three of these.  We're gonna go ahead and

11  bring the jury in.  They're all ready, is that

12  right, Kevin?

13    COURT SECURITY OFFICER:  That's correct,

14  ma'am.

15    THE COURT:  Okay.

16    Mr. Strom, do you have the notes?

17    MR. STROM:  The IPI notes?  No.  I can get

18  them.

19    THE COURT:  I want you to take a look at

20  them.  I realize you're not my law clerk.  If you

21  will share these then with my law clerk.

22    (The jury entered the courtroom.)

23    THE COURT:  Good morning.  I'm glad to see

24  you all made it safely.  How bad were the roads

25  going back yesterday?

1    JUROR:  Not too bad.

2    THE COURT:  Yours were probably the worst.

3    Please be seated.

4    Mr. Rupcich, your next witness?

5    MR. RUPCICH:  We call Chad Christer.

6    (The witness was sworn.)

7    THE COURT:  If you'll step over here.

8    Please proceed.

9                    CHAD CHRISTER

10   called as a witness herein, having been duly sworn,

11   was examined and testified as follows:

12                  DIRECT EXAMINATION

13   BY MS. RICE:

14   Q.  Can you hear me okay?

15   A.  Yes.

16   Q.  Will you please state your name?

17   A.  Chad Christer.

18   Q.  And will you please spell your name?

19   A.  Last name or first name?

20   Q.  Both?

21   A.  C-h-a-d.

22   Q.  Hi, Mr. Christer.  Can you please tell us

23   where you currently work?

24   A.  I work at Taylorville Correctional Center.

25   Q.  Okay.  And what is your role at Taylorville

1    Correctional Center?

2         A.   Medical records director.

3         Q.   Are you an employee of Wexford Health

4    Sources?

5         A.   Yes.

6         Q.   How long have you been in medical records

7    director at Taylorville?

8         A.   Since April 11th, 2016.

9         Q.   Do you have any certifications for your role

10   there as the medical records?

11        A.   I have an RHIT certificate.

12        Q.   What is that?

13        A.   Registered Health Information Technologist.

14        Q.   How do you get that kind of credential?

15        A.   You do a two-year course of study in health

16   information management.  And then you have to take a

17   written test through AHIMA.  That's the governing

18   body of medical records.

19        Q.   And having that credential, what does that

20   give you the ability to do?

21        A.   Gives me the ability to perform my duties as

22   medical records director, privacy officer.  Just

23   helps to have a little bit of extra governance

24   throughout the states.

25        Q.   Okay.  What are your duties at Taylorville

1    as a medical records director?

2         A.  I maintain the medical record according to

3    IDOC policies, procedures.  I will assist the doctor

4    with referrals to submit to the collegial process.

5    And also schedule all the offenders for outside

6    specialty appointments.

7         Q.  Okay.  Your Honor, if I may approach the

8    witness?

9              THE COURT:  You may.

10        Q.  Sir, I'm gonna hand you a stack of papers

11   here that I've marked as Exhibit 1.  Can you take a

12   look through those records, please?

13        A.  Okay.

14        Q.  Okay.  You've testified that you're the

15   custodian of the medical records at Taylorville

16   Correctional Center; is that correct?

17        A.  Yes.

18        Q.  What I've handed you is an expert -- excerpt

19   from the medical records at Taylorville.  Do you

20   recognize these records?

21        A.  Yes.

22        Q.  Okay.  Are these records made by a person

23   with knowledge of the information contained within

24   the records?

25        A.  Yes.

 1        Q.   Okay.   Are they made at or near the time of

 2    the event?

 3        A.   Yes.

 4        Q.   Okay.   Is it in Taylorville's Correctional

 5    Center's regular practice to make these type of

 6    records?

 7        A.   Yes.

 8        Q.   And are these records kept in the ordinary

 9    business at Taylorville Correctional Center?

10        A.   Yes.

11        Q.   Okay.   Your Honor, at this time, I'd like to

12    move Exhibit 1 into evidence.

13             THE COURT:   Is it Defendant's 1?

14        Q.   I'm sorry, yes, Defendant's 1.

15             THE COURT:   Any objection?

16             MR. WACKMAN:   Yes, Your Honor, there is an

17    objection.   This is an excerpt of the records, as

18    the witness has just testified.   We have no idea how

19    this particular excerpt was chosen.   There's been --

20         So we make an objection on that grounds, on the

21    grounds of completeness.   We just simply have no

22    idea why these records are coming into evidence and

23    what they contain.

24             THE COURT:   I'll sustain the objection.

25    You may ask some more questions about the records.

1      Q.   Okay.   Are these records -- looking through

2   these records, are these the records of Mr. William

3   Kent Dean?

4      A.   Yes.

5      Q.   Okay.   And are these the records for the

6   relevant period of time -- are you aware of the

7   allegations in this complaint?

8      A.   Yes.

9      Q.   Okay.   Are these records from the period of

10   time that is the subject of the allegations in the

11   complaint?

12      A.   Yes.

13      Q.   Your Honor, if I may have a second --

14          THE COURT:   Could you be specific about the

15   time?

16      Q.   Okay, I'm sorry.   Are these records from the

17   period of December 2015 to present?

18      A.   Yes.

19      Q.   Okay.   If I may have a moment?

20          THE COURT:   Yes.

21      Q.   Your Honor, if we may have a sidebar.

22          THE COURT:   You may.

23   (The following sidebar discussion was held at

24       the bench, out of the hearing of the jury.)

25          THE COURT:   Does that obviate your

1    objection?

2         MR. WACKMAN:  Your Honor, we have a

3    continuing -- Your Honor, we have a

4    continuing objection about any records

5    coming in through this exhibit through this

6    witness that pre-date his date of

7    employment April 11, 2016.  We believe

8    that's consistent with the Court's motion

9    in limine ruling yesterday.

10        MR. RUPCICH:  A couple things --

11        MR. MARTIN:  There's one other -- we

12   might as well get them all out.  Not only

13   that, Your Honor, but to the extent this is

14   just a compilation of excerpts, I believe,

15   many of which have not been talked about

16   with regard to the jury --

17        THE COURT:  Is this a compilation or

18   is it the complete record?

19        MR. RUPCICH:  It's not --

20        MR. MARTIN:  Excerpts.

21        MR. RUPCICH:  So Mr. Strom and I sat

22   in my office last week and went through

23   these.  And so they're well aware of what

24   this is.  The whole thing is massive, so

25   what we pulled out what was relevant to our

1   case.  They've seen it.  Mr. Strom sat in

2   my office for a couple of hours and went

3   through it.

4   So the extent they're representing they

5   don't know what's in it, that's inaccurate.

6   Mr. Strom knows exactly what is in it.

7   We pulled what is relevant and what is

8   relevant to our case.  They've done similar

9   things with smaller segments of the medical

10  records.  So he's not going to testify to

11  the contents of them, but, you know, I

12  thought the medical records were coming in

13  by agreement, but since that agreement is

14  not valid anymore, we just want him to lay

15  the foundation and admit our medical

16  records.  And the things that our witnesses

17  have talked about through the course of

18  this case are in these records.

19      THE COURT:  So certainly he's a

20  medical records guy, he can testify to

21  medical records.  The only issue I have is

22  the excerpt issue.  Can we get Mr. Strom up

23  here.

24      MR. MARTIN:  Yes.

25      MR. STROM:  I'm sorry?

1      THE COURT:  Mr. Strom, Mr. Rupcich, if

2  I'm understanding him correctly, indicates

3  you went through records with him and

4  thought you had an agreement that these

5  would come in?

6      MR. STROM:  So scope of the agreement

7  has been a subject of a lot of conversation

8  at these sidebars.

9  The scope of the agreement said that yes,

10  these are records that are relevant.

11  However, we have concerns about this entire

12  packet going back to the jury without the

13  understanding that it was selected by

14  defense counsel unless each and every one

15  of the documents in here is going to be

16  testified to specifically.  The contents

17  here --

18      THE COURT:  Well, that's fine then.

19  We'll just simply make the record these are

20  excerpts and you can --

21      MR. RUPCICH:  I think that's already

22  been laid.

23      THE COURT:  I'm not sure.

24      MR. RUPCICH:  Right.  And you know,

25  the jury knows what specific records have

1    been testified to.  I just wanted our

2    exhibit in so that it's linked up to the

3    testimony of our witnesses.

4         THE COURT:  Yeah.

5         MR. RUPCICH:  Now, is there going to

6    be testimony to every one of those pages?

7    No.  But they cover the relevant time

8    period.

9         MR. STROM:  Is every one of those

10   pages intended to go back to the jury?

11        MR. RUPCICH:  I would say no.  We can

12   make a determination on that.

13        MR. MARTIN:  To our point, really to

14   cut through it, there's two big issues that

15   we have with these documents.  One is what

16   goes back to the jury should be records

17   that a witness with knowledge has talked

18   about.

19        THE COURT:  Right.

20        MR. MARTIN:  The other is, and we did

21   this in connection with the motion in

22   limine, this -- this Chad Christer gets

23   there on April 16th.  He should not be able

24   to testify about anything before the time

25   that he gets there.

1              THE COURT:  Well, he can get those

2      documents into evidence.

3              MR. MARTIN:  Yes, but he should not --

4              THE COURT:  He can't testify to what

5      he doesn't know.

6              MR. MARTIN:  He shouldn't be able to

7      talk about anything before April 11th.

8      He's obviously the records custodian, so

9      that's already been shown.

10             MR. RUPCICH:  We can have a separate

11     discussion about what goes back to the

12     jury.

13             THE COURT:  Yeah.  Okay.

14     (The following proceedings were held in open

15     court.)

16             THE COURT:  Please continue, Ms. Rice.

17 BY MS. RICE:

18     Q.  Thank you for bearing with us Mr. Christer.

19     I just want to clarify that these are excerpts

20     that have been selected by myself from the record of

21     Mr. Dean.  Do you understand that?

22     A.  Yes.

23     Q.  Your Honor, at this time, I would like to

24     renew my motion to admit Defendant's Exhibit 1 into

25     evidence.

1    THE COURT:   Subject to the same objection?

2    MR. WACKMAN:   Yes, Your Honor.

3    THE COURT:   All right.  I'm going to allow

4    defendant's into evidence.   Defendant's 1, excuse

5    me.

6    (Defendant's Exhibit 1 was admitted.)

7    Q.   Okay.   Mr. Christer, you can put those

8    records aside.  I know they're heavy.

9    So earlier, you detailed your duties as medical

10   director.   And one of the duties you said is you set

11   up outside medical appointments for offenders; is

12   that right?

13   A.   Yes.

14   Q.   Can you describe that for me?  What does the

15   process entail?

16   A.   The process will start with a referral

17   written by the physician and we'll submit to our

18   collegial process.   Once we have approval to go to

19   an outside specialist, I will call the specialist to

20   make an appoint.

21   Q.   That collegial process, do you participate

22   in that process in any way?

23   A.   I participate in the process by submitting

24   all the referrals to our utilization management

25   nurse.   And that would be all relevant documents

1  that will be needed to help the doctors come up with

2  a plan of care.

3      Q.  When you say relevant documents, what do you

4  mean by that?

5      A.  Any lab results, x-rays, ultrasounds, MRIs.

6      Q.  So are these documents from a patient's

7  chart?

8      A.  Yes.

9      Q.  Okay.  So you will pull the necessary

10 documents so the doctors can review during the

11 collegial process?

12     A.  Yes.

13     Q.  Okay.  Do you sit in on the collegial

14 discussions?

15     A.  I do.

16     Q.  Okay.  What is your role when you sit it on

17 the discussions?

18     A.  Main role is just to have the chart

19 available.  If there's any questions, I can find the

20 relevant information in the chart to help them make

21 their decision.

22     Q.  So you can -- you provide the -- if the

23 doctors have any questions, you can look through the

24 chart and, you know, pull out whatever information

25 they've requested?

1    A.  Yes.

2    Q.  Okay.  After -- if an outside procedure is

3 approved, then what is the next step?

4    A.  I have to wait to get an authorization

5 number from Wexford.  It usually comes 24 to

6 48 hours after the collegial process is done.  Once

7 I have that number, then I can call the specialist

8 to set up an appointment.

9    Q.  So typically, within 24 to 48 hours you're

10 making efforts to schedule the appointments?

11    A.  Yes.

12    Q.  Okay.  Now, in this case, we have talked

13 about a surgery for Mr. Dean, the plaintiff here.  I

14 believe the surgery was -- well, are you familiar

15 with Mr. Dean and his surgery?

16    A.  Yes.

17    Q.  Okay.  Now, I believe the surgery was

18 initially scheduled for May 11th, 2016.  Is this a

19 date that you scheduled?

20    A.  Yes.

21    Q.  Okay.  Now, the evidence has shown that the

22 surgery didn't proceed until July 2016.  Are you

23 aware of this?

24    A.  Yes.

25    Q.  Do you have an understanding as to why the

1    surgery did not go forward on May 11th?

2        A.  I received a call from Dr. Severino's office

3    stating that they wanted to have Mr. Dean undergo a

4    cardiac workup prior to surgery taking place.

5        Q.  So are you aware of the results of the

6    cardiac workup?

7        A.  He was initially cleared for his surgery.

8        Q.  Okay.  And then the surgery had to be

9    rescheduled?

10       A.  Yes.

11       Q.  Okay.  Are you aware of why it had to be

12   rescheduled after the cardiac clearance?

13       A.  The time frame between the cardiac clearance

14   and the date of the surgery was too short.  And

15   Dr. Severino wanted to confer with other surgeons

16   due to the complexity of the case.

17       Q.  So this was Dr. Severino's decision?

18       A.  Yes.

19       Q.  What -- do you know -- or how were you

20   notified that Dr. Severino wanted to push back the

21   date of the surgery?

22       A.  I received a call from his office.

23       Q.  Okay.  Did they tell you during that initial

24   call when the surgery would be --

25       A.  No.

1    Q.   -- rescheduled?

2    A.   No.

3    Q.   How did you find out when the surgery would

4    be rescheduled?

5    A.   They called me to confirm the date and time.

6    Q.   Do you recall when that conversation

7    occurred?

8    A.   Off the top of my head, I do not.

9    Q.   In between the time that you were notified

10   that the May 11 surgery was not going to proceed and

11   the time you found out the surgery was going to be

12   rescheduled, did you make any efforts to find out

13   the date of the surgery or to find out when things

14   were going to be scheduled?

15   A.   Yes.  I made several attempts to call

16   Dr. Severino's office.

17   Q.   Do you recall the substance of any of those

18   conversations?

19   A.   Most of the time I was just talking to the

20   receptionist and they passed along my message that I

21   was calling about surgery date.

22   Q.   I see.  You schedule other types of

23   procedures at Taylorville Correctional Center;

24   correct?

25   A.   Yes.

1      Q.   Okay.   One of those types of procedures is

2   an ultrasound procedure?

3           MR. WACKMAN:   Objection, Your Honor.

4   Motion in limine.

5           THE COURT:   Sidebar.

6           (The following sidebar discussion was held at

7           the bench, out of the hearing of the jury.)

8           THE COURT:   So this question goes to

9           the ultrasound that happened before he was

10          there?

11          MS. RICE:   That wasn't the scope of my

12          question.   I asked if he's currently

13          involved in the scope of the ultrasound.

14          MR. WACKMAN:   Your Honor, I'm not sure

15          how that would be relevant considering the

16          only ultrasound that Mr. Dean received was

17          before Mr. Christer arrived at Taylorville.

18          THE COURT:   How is it relevant?

19          MR. RUPCICH:   So he's continued to

20          work with the same company, Precise

21          Ultrasound, that does the onsite

22          ultrasounds and has for years at

23          Taylorville.   So he can discuss how he

24          schedules with them, the schedules they

25          work off of currently, the schedules they

1    worked off since he started in April.

2    Now, I guess it can go to the weight of his

3    testimony and saying you don't know if it

4    was different in February as opposed to

5    when he started in April, but certainly

6    it's relevant and probative how the prison

7    works with Precise Ultrasound to schedule

8    ultrasounds.

9         THE COURT:  Was there a problem with

10   the scheduling of the ultrasound?

11        MR. WACKMAN:  Well, Your Honor, we

12   think the ultrasound schedule, there was a

13   large gap in the scheduling.  The

14   ultrasound was approved at collegial 1/13,

15   it didn't happen until February 2nd.  And

16   part of the problem is there's no notes in

17   the chart about when it was scheduled, how

18   it was scheduled.

19   So this Rule 406 habit evidence that I know

20   we've discussed before where it's

21   impossible for us to actually test whether

22   these were happening according to the

23   routine practice.  I mean --

24        THE COURT:  Well, I guess we'll test

25   it with this witness.  I'm going to allow

1       it.

2       (The following proceedings were held in

3       open court.)

4    BY MS. RICE:

5       Q.  I have a short memory, can you read back my

6    last question.

7       (The requested material was read.)

8       Q.  Is that correct, is that one of the types of

9    procedures that you schedule in your role?

10      A.  Yes.

11      Q.  Okay.  What company do you use to schedule

12   ultrasounds at Taylorville?

13      A.  If it's gonna be done onsite, we use Precise

14   Specialty.

15      Q.  So that's a company, when you say onsite,

16   that comes to Taylorville Correctional Center?

17      A.  Yes.

18      Q.  How does the process work in scheduling them

19   to come to Taylorville Correctional Center to

20   perform an ultrasound?

21      A.  Once we have the approval, I will contact

22   Precise Specialties to let them know that we have

23   ultrasounds that need to be done.

24      Q.  Okay.  And what, I guess -- do they -- how

25   long does it take after you call them for them to

1    come to the site?

2         A.   The time frame can vary.  They cover all the

3    institutions.  They will put us on a list and when

4    they're in our area, they will notify me, usually a

5    week before, to let me know what date and time

6    they'll be onsite.

7         Q.   Typically, how long, in your experience,

8    does it take from the time you call Precise to

9    schedule an ultrasound to the time that ultrasound

10   is performed?

11        A.   Typically between two and three weeks.

12        Q.   Okay.  Now, the ultrasound tech that comes

13   to Taylorville to perform the ultrasound, are they

14   employed by Precise?

15        A.   Yes.

16        Q.   Okay.  So they are not employed by Wexford?

17        A.   No, they are not.

18        Q.   Okay.  Now, you're aware of Dr. Nawoor;

19   correct?

20        A.   Yes.

21        Q.   Do you work with Dr. Nawoor at Taylorville?

22        A.   Yes.

23        Q.   Okay.  Do you recall having any

24   conversations with Dr. Nawoor regarding Mr. Dean's

25   care?

1      A.   During the collegial process we would talk.

2   And after approvals were obtained, I would talk to

3   him about when the stuff was scheduled.

4      Q.   Okay.   So you would be in communication with

5   him about the scheduling of offsite procedures or

6   referrals?

7      A.   Yes.

8      Q.   Your Honor, if I may have a moment, please?

9           THE COURT:   You may.

10     Q.   Thank you.   Just a few more, Chad.

11     Do you recall if Dr. Nawoor ever asked you to

12   follow-up with Dr. Severino about scheduling the

13   surgery?

14     A.   Yes.

15          MR. WACKMAN:   Objection.   Hearsay, Your

16   Honor.

17          THE COURT:   Counsel?

18     Q.   I'm sorry?

19          THE COURT:   Counsel?

20     Q.   Your Honor, I asked if he recalled having

21   any kind of discussion.   That would be his personal

22   knowledge.

23          THE COURT:   Objection is overruled.

24     Q.   You do?

25     A.   Yes.

1      Q.  Can you tell me about what you remember from

2  any of those conversations?

3      A.  He --

4          MR. WACKMAN:  Objection, Your Honor.  This

5  calls for hearsay.

6          THE COURT:  It does.

7      Q.  Your Honor, I'm asking if he recalls based

8  on his -- the substance of any conversation that he

9  may have had with Dr. Nawoor.

10         THE COURT:  You don't both get to ask

11  questions.  I want a sidebar.

12     (The following sidebar discussion was held at

13     the bench, out of the hearing of the jury.)

14         MS. RICE:  It doesn't go to the truth,

15         it goes to the effect of Mr. Christer's

16         memory and the effect on him calling

17         Dr. Severino's office to schedule the

18         appointments.

19         MR. WACKMAN:  I'm not sure that

20         foundation has been laid, Your Honor.  I'm

21         not sure that's really at issue here.  I

22         mean she's asking -- the question on the

23         floor is what the substance of that

24         conversation was, it's being offered for

25         its truth.

1        THE COURT:  I'll give a limiting

2     instruction.

3        (The following proceedings were held in

4     open court.)

5        THE COURT:  This question does call for

6  hearsay, but it is not being offered for the truth

7  of the matter asserted, it's being offered for this

8  witness's state of mind and what he did.

9  BY MS. RICE:

10     Q.  Do you remember the question?

11     A.  Yes.

12     Q.  Okay.  Can you please answer.

13     A.  Yes.  Dr. Nawoor just asked me if there's

14  been any news about when the surgery would be

15  scheduled.

16     Q.  In response to your conversation with

17  Dr. Nawoor, did you then call Dr. Severino's office?

18  Would that prompt you to call to follow-up on the

19  scheduling?

20     A.  In one instance it did.  The other instance,

21  I had already made the call so I just relayed the

22  information to him.

23     Q.  I see.

24        One last thing.  Earlier you said something

25  about authorization numbers that are generated

1    through the collegial process.  Can you explain that

2    a little bit for me?

3         A.  The authorization number is just a number

4    that the providing -- the providers will know that

5    has been approved by the insurance process.

6    Typically, the providers will want that number prior

7    to any scheduling so they know they're gonna get

8    paid.

9         Q.  So would it be fair to say that that number

10   is used for billing purposes?

11        A.  Yes.

12        Q.  Okay.  So without having that authorization

13   number, outside providers are probably not going to

14   take the appointment because they don't know how

15   they will be paid?

16        A.  That's correct.

17             MR. WACKMAN:  Objection, Your Honor.

18   Speculation.

19             THE COURT:  The objection is overruled.

20             MS. RICE:  Okay.  No further questions,

21   Your Honor.

22             THE COURT:  Cross.

23                  CROSS EXAMINATION

24   BY MR. WACKMAN:

25        Q.  Good morning, Mr. Christer.

1     A.   Good morning.

2     Q.   You didn't begin working at Taylorville

3  until April 11th, 2016; is that correct?

4     A.   That is correct.

5     Q.   Are you aware that Dr. Nawoor testified here

6  the other day that you scheduled Mr. Dean's

7  ultrasound that was held February 2nd, 2016?

8     A.   I'm not aware of that.

9     Q.   But that's not possible--right--because you

10 weren't working in Taylorville at that time?

11    A.   That's correct.

12    Q.   And are you aware that Dr. Nawoor testified

13 the other day that you were involved in scheduling

14 Mr. Dean's CT scan and cystoscopy in March 2016?

15    A.   I'm not aware of that.

16    Q.   And again, that's not possible because you

17 weren't working at Taylorville at that time?

18    A.   That's correct.

19    Q.   Are you aware that last week, Dr. Nawoor

20 testified that he didn't think you worked for

21 Wexford?

22    A.   I'm not aware of that.

23    Q.   Do you know why he doesn't think you work

24 for Wexford?

25    A.   I cannot answer that.

1    Q.  You testified that pursuant to Wexford's

2    policies, scheduling any outside procedure has to

3    wait on a collegial review; isn't that correct?

4    A.  That's correct.

5    Q.  And then you testified this morning that

6    even after that collegial review, again pursuant to

7    Wexford's policies, you have to wait for an

8    authorization number; is that correct?

9    A.  I don't have to wait for the authorization

10   number for Wexford's policies, that's for the

11   outside providers' policies.  They want the

12   authorization number prior to scheduling.

13   Q.  Okay.  And that itself takes another 24 to

14   48 hours after the collegial review?

15   A.  Yes.

16   Q.  And that was the process that needed to be

17   followed for each of the steps that had to go

18   through collegial review from the April diagnosis of

19   Mr. Dean's cancer through the July surgery; isn't

20   that correct?

21   A.  That's correct.

22   Q.  So that would be the cardiac consults?  Both

23   of them?

24   A.  Correct.

25   Q.  That would be the appointment with the chest

1   cracker?

2        A.   Correct.

3        Q.   And that would be the CT scan?

4        A.   Correct.

5        Q.   Each of those had to wait on collegial

6   review; correct?

7        A.   Yes.

8        Q.   And then had to wait another 24 to 48 hours;

9   correct?

10       A.   Correct.

11       Q.   You testified about the process by which

12  Precise Ultrasound schedules ultrasounds.   Or I

13  should say by which you schedule ultrasounds with

14  Precise?

15       A.   Yes.

16       Q.   But you have no idea how that process worked

17  in February of 2016; correct, because you didn't

18  work --

19       A.   No, I do not.

20       Q.   So Mr. Dean received an ultrasound from

21  Precise in February 2016.   You have no idea how that

22  process worked?

23       A.   No.

24       Q.   Precise has a contract with Wexford; is that

25  your understanding?

1    A.   That is my understanding.

2    Q.   And Precise comes onsite and they do the

3    ultrasounds onsite?

4    A.   Yes.

5    Q.   And they did it very regularly?

6    A.   Yes.

7    Q.   You testified just now that Dr. Nawoor asked

8    you about the scheduling of Mr. Dean's surgery and

9    that caused you to call Dr. Severino; is that

10   correct?

11   A.   Yes.

12   Q.   Do you remember giving a deposition in this

13   case?

14   A.   Yes.

15   Q.   And Ms. Holt took it?

16   A.   Yes.

17   Q.   And do you remember that Ms. Holt asked you

18   this question:  Did Dr. Nawoor ever express concern

19   to you about any delays in scheduling or wait for an

20   outside appointment?  And that you answered no?

21   A.   I do recall.

22   Q.   But today you're testimony is that

23   Dr. Nawoor asked you questions about the surgery and

24   you called -- and that caused you to call

25   Dr. Severino?

1    A.  Yes.

2    Q.  Just a moment to confer with counsel, Your

3 Honor?

4         THE COURT:  You may.

5         MR. WACKMAN:  We have no further questions

6 for this witness, Your Honor, at this time.

7         THE COURT:  Redirect?

8                REDIRECT EXAMINATION

9 BY MS. RICE:

10   Q.  Just one question.  When I asked you earlier

11 if you recalled any conversations with Dr. Nawoor

12 about scheduling the appointment, I want to clarify.

13   When you were asked during your deposition

14 about if he expressed any concern, is that different

15 from what you recalled?

16   A.  Yes, because he didn't initially express

17 concern about the surgery, he was just asking about

18 when it was scheduled.

19         MS. RICE:  Okay.  No further questions,

20 Your Honor.

21         THE COURT:  Any follow-up?

22         MR. WACKMAN:  No, Your Honor.

23         THE COURT:  May this witness be excused,

24 Ms. Rice?

25         MS. RICE:  Yes, Your Honor.

 1          THE COURT:  All right.  Thank you, sir.

 2      (The witness was excused.)

 3          THE COURT:  May we have the next witness?

 4          MR. RUPCICH:  We call Dr. William Severino

 5      by deposition.  We have a reader.

 6          THE COURT:  Your reader is?

 7          MR. RUPCICH:  The reader is Brad Taylor

 8      from our office.

 9          THE COURT:  All right.

10          MR. RUPCICH:  Go take a seat.  I'll bring

11      it up to you.

12          THE COURT:  How long is the deposition?

13          MR. RUPCICH:  The deposition, Judge, is 50

14      to 60 pages.  Do you want to break first?

15          THE COURT:  No, I think we'll break as we

16      always do.

17          MR. RUPCICH:  Okay.

18      (Deposition of Dr. William Severino read in

19      Open court.)

20              DIRECT EXAMINATION

21          MR. RUPCICH:  At page 5.

22      Q.  "Could you state your name?

23      A.  Brad Taylor.

24          MR. RUPCICH:  No, not you?

25      A.  Excuse me.  The witness.  Answer:  William

1    Severino.

2         MR. RUPCICH:  You just pretend we're having

3    a conversation, just read that, you don't have to

4    say answer.

5    William Severino.

6    Q.   "What's your profession?

7    A.   "Physician.

8    Q.   "Licensed in the State of Illinois?

9    A.   "Correct.

10   Q.   "How long?

11   A.   "Do you include like when I was a resident

12   too?

13   Q.   "Let's say fully licensed after residency

14   going forward?

15   A.   "Since 2000.

16   Q.   "Do you have a particular specialty?

17   A.   "Yes.

18   Q.   "And what is that?

19   A.   "Urology.

20   Q.   "Are you board certified in urology?

21   A.   "Yes.

22   Q.   "Has your entire practice since 2000 been in

23   the field of urology?

24   A.   "Yes.

25   Q.   "Can you give me a general description of

 1    the practice of urology is?

 2         A.  "Sure.  Urology is a subspecialty.  It's a

 3    surgical subspecialty.  It focuses on the urinary

 4    tract of both men, women, and children, both medical

 5    issues as well as surgical issues.

 6         Q.  "Involving the urinary tract?

 7         A.  "Around the urinary tract.

 8         Q.  "And the urinary tract would encompass

 9    what?`?

10         A.  "In general, when people ask me, I tell them

11    kidneys, bladders, in men prostates, genitalia in

12    men and women for that.

13         Q.  "So from the kidneys on down?

14         A.  "Kidneys on down.  That's right.  Top of the

15    kidney to the tip the urethra.

16         Q.  "Where are you currently employed?

17         A.  "Springfield Clinic.

18         Q.  "You practice urology here at Springfield

19    Clinic?

20         A.  "Correct.

21         Q.  "Can you give me a description of your

22    practice here?

23         A.  "Yeah.  We're -- or I, you know, we're a

24    multispecialty clinic.  Our clinic or our urology

25    department currently has three urologists.  I'm one

1   of three.  My specific practice is basically general

2   urology.  So I don't focus on one thing per se, you

3   know, I do a lot of different, a variety of things

4   within urology:  Men, women, some kids for that.

5        Q.  "Consist of office visits as well as

6   surgical procedures?

7        A.  "Yeah.  My current practice is probably

8   60 percent office, 40 percent surgery roughly.

9        Q.  "You performed a surgery on the patient in

10  this case; correct?

11       A.  "Correct.

12       Q.  "Where was that done?

13       A.  "Across the street at Memorial.

14       Q.  "How long have you been at the clinic?  Did

15  you tell me that?

16       A.  "I started here in the summer of 2000.

17       Q.  "Do you see patients from the Illinois

18  Department of Corrections from time to time?

19       A.  "Correct.

20       Q.  "How are you referred patients from DOC?

21       A.  "You know, that I can't honestly tell you.

22  They show up on my list and we see them, I mean.

23       Q.  "Somebody else handles that?

24       A.  "Yeah.  I mean literally they show up on my

25  list and we take a look at them.  We see what comes,

1  take what comes.  I mean, we don't go advertising

2  come to see us, they show up."

3         MR. RUPCICH:  Page 11.

4     Q.  "Did you give any opinions, to your

5  recollection, in the course of a call about

6  Mr. Dean's care, his prognosis, anything like that?

7     A.  "Absolutely.

8     Q.  "And what was it?

9     A.  "If I remember correctly, when I saw him in

10 the office I said if he wanted any chance of walking

11 out of prison, he would have to do that operation or

12 he would die in prison.  I explicitly told him there

13 was a chance he could die on the table.  And

14 explicitly told him that he might die afterwards

15 very shortly.  And you know, like I told him, I'm

16 surprised he made it out of the hospital.  I'm even

17 more impressed that he's still alive today after

18 that.

19    Q.  "Would it be fair to say he's done well

20 post-surgically then?

21    A.  "Thus far, thus far.

22    Q.  "He has exceeded your expectations?

23    A.  "He has, he has.

24    Q.  "Do you remember Mr. Dean independently of

25 the records?  Do you remember the man?

1        A.   "Quite well.

2        Q.   "Generally, what do you remember about this

3    fellow or --

4        A.   "He was quite an animated fellow.  Quite a

5    character.  I specifically remember talking to him

6    and saying, "You don't look like a criminal.  You

7    don't act like a criminal."  I asked him what he

8    did, what he was in for, and he was very upfront

9    about it for that.

10        Q.   "Do you have a recollection of his medical

11    course independent of his records?  Of the records?

12        A.   "Roughly, yeah.  I mean I know what we saw

13    for him and I know what transpired after that.

14        Q.   "Do you know how long it's been since you've

15    seen him?

16        A.   "Probably a couple years.  Again, that's not

17    an exact, but I would suspect a couple of years.

18        Q.   "I understand, and --

19        A.   "I'm sure I saw him after surgery at least

20    once.

21        Q.   "Were you surprised he's still alive two or

22    so years later?

23        A.   "Yeah, yeah, absolutely.

24        Q.   "And why is that?

25        A.   "He had a horrible disease, very horrible

1    disease for that.

2         Q.   "Horrible in what sense?

3         A.   "Renal cell cancer tends to behave terribly.

4    Even people that you think are going to do well

5    sometimes do terrible.  He had something that, you

6    know, about as bad as you can see in terms of a

7    cancer of the kidney.  You know, invasion of the

8    vena cava up toward the kidney, you know, that's

9    about as big as it gets for that type of thing for

10   that.

11        Q.   "You mean it was aggressive?

12        A.   "Yeah, yeah.  When you see a tumor that big

13   with that type of invasion, that by definition is an

14   aggressive disease.  A lot of people would not even

15   go near that.  They would send that somewhere else.

16   They wouldn't even -- they'd say, "I'm afraid of

17   this."

18        Q.   "You mean not operate on him?

19        A.   "Yeah, they would never take that on.  They

20   would never even attempt that.

21        Q.   "Because of the complexity of the procedure?

22        A.   "Yeah, yeah.  Very complex.  As complex as

23   it gets.

24        Q.   "Yeah, I saw that in your record.

25        A.   "That is the most complex type of surgery

1    you can do, at least in urology or in my opinion.

2         Q.  "When you say that's the most complex type,

3    what do you mean by that?

4         A.  "Major operation where they put him under

5    hypothermic cardiac arrest.  They basically bleed

6    him out, stop your heart.  You're dead for half an

7    hour while you -- while you try to take the tumor

8    out and then try to bring you back for that.

9         Q.  "How many times have you done a similar

10   procedure of that in your career?

11        A.  "With a hypothermic cardiac arrest, this is

12   the first time we ever did that.  We've done other

13   Kayla Thrombeck (phonetic).  I mean we probably did

14   about one a year, you will see about one a year for

15   that.

16        Q.  "This one was different because what?

17        A.  "The hypothermic cardiac arrest basically

18   stopped his heart, bled him out, and you know, so

19   basically no bleeding for that."

20        (Court reporter requested clarification.)

21        Q.  "And the purpose of that is to minimize

22   intraoperative bleeding?

23        A.  "Yeah, yeah.  So you can try to get all the

24   tumor out without the person dying on the table.

25        Q.  "Doctor, I'm going to hand you deposition

1   Exhibit 1.  I'd just ask you to flip through it?

2       A.  "Sure.

3       Q.  "I'm going to ask you if they appear to be

4   Mr. Dean's records from the clinic?

5       A.  "Yeah.

6       Q.  "Are you familiar with these type of

7   records?

8       A.  "Yeah, yeah.  They are our standard records.

9       Q.  "The standard records made by people that

10  work at the clinic?

11      A.  "Correct.

12      Q.  "Okay.  Could you flip to page 20.  And I'm

13  going to ask you if that was your first visit with

14  Mr. Dean, March 10, 2016?

15      A.  "Yeah, uh-huh.

16      Q.  "What were you seeing him for?

17      A.  "He came in with a gross hematuria.

18      Q.  "As a urologist, gross hematuria, is that a

19  non-specific finding?

20      A.  "It's just blood in the urine.  Yeah,

21  basically that's what it means, visible blood in the

22  urine.

23      Q.  "Suggestive of anything in particular?

24      A.  "There's a whole litany of things it can

25  mean.

1     Q.   "What was your assessment of Mr. Dean at

2   this time?

3     A.   "He had a gross hematuria.   He needs

4   evaluated for that.

5     Q.   "How did you work that up?

6     A.   "Currently, the standard of care for gross

7   hematuria is what I mentioned there is CT IVP and a

8   cystoscopy.

9     Q.   "What's a CT IVP?

10    A.   "That's basically a CAT scan of the kidneys

11  and the tubes that drain the kidneys.

12    Q.   "And cystoscopy so you can check the --

13    A.   "Bladder.

14    Q.   "Urethra and ureter and bladder, is that --

15    A.   "Yeah.

16    Q.   "So the standard of care was the CT IVP and

17  then cystoscopy?

18    A.   "Cystoscopy, yes.

19    Q.   "Cystoscopy.   And then you're going to

20  follow-up with him after those -- after the CT?

21    A.   "Yeah.   Usually how we do it, typically

22  start top down.   So we'll get the CT scan and see

23  him back, see if that shows anything.   And then if,

24  you know -- then go from there with the scope for

25  that.

1      Q.   "Okay.  And it looks like you followed up

2   with him on April 14, 2016, at page 18.  I numbered

3   them down there in the lower?

4      A.   "Are they backwards?  I've got 19, 17 -- oh,

5   here's 18.  Yeah, yeah, here we go.

6      Q.   "This visit was April 14, 2016?

7      A.   "Correct.

8      Q.   "Now, this is after the CT IVP, are you able

9   to tell?

10      A.   "According to my note, he had a CT urogram,

11   so yeah.

12      Q.   "Is that something you would have reviewed

13   the results of, read a radiology report, looked at

14   the film?

15      A.   "Both, both.

16      Q.   "Are you able to tell from your note what it

17   showed?

18      A.   "According to this, it looks like he had a

19   right kidney cancer with potential invasion of the

20   vena cava.

21      Q.   "What is the vena cava?

22      A.   "Main blood vessel or main vein of the body.

23   You know, basically all the blood from your lower

24   extremity drains in it to go back to the heart.

25      Q.   "And is it in the proximity of run by the

1    kidney that was affected?

2         A.  "Yeah, it's on the right side of the body.

3         Q.  "So is that like a direct metastasis from

4    the kidney or do you know?

5         A.  "Well, yeah.  It's complex, but with renal

6    cell carcinoma, one of the things you can do; it can

7    do is you can actually get a tumor or what we call a

8    tumor thrombus that actually grows into the venous

9    system.  There's a vein that drains the right kidney

10   that goes into the vena cava directly.  And so you

11   can actually get growth of tumor thrombus that goes

12   into the vein and then goes up the vena cava or to

13   go down and then, you know, can propagate proximally

14   or distally from there.

15        Q.  "And he had the thrombus to the vena cava?

16        A.  "From what we could tell.  Again, the films

17   weren't great.  It looks like, but for that.

18        Q.  "Did the cystoscopy, how did that fit into

19   this?

20        A.  "You know, I don't think we did a cystoscopy

21   at that time.  I can't remember if we did that.

22   Only because, hey, this is what we found on him

23   there.

24        Q.  "You didn't need to keep looking, you'd

25   found it?

1       A.   "Yeah.  As I say, this was a big problem.

2       Q.   "Now, you made plans for future diagnostic

3  -- you made some plans for future diagnostic testing

4  and consultation in this note; is that right?

5       A.   "Yeah.

6       Q.   "What was your plan going forward after

7  seeing this mass?

8       A.   "Yeah.  Typically, we see something

9  particularly that we think is in the vena cava, what

10  we've traditionally or a lot of times done is

11  coordinate or see a vascular surgeon.  Because

12  again, they can be very, very difficult dissection

13  to dissect out the vena cava.  Sometimes it has to

14  be reconstructed.  So a lot of times, we'll work

15  with one of the vascular surgeons as well.

16       Q.   "So that would be out of your particular

17  surgical expertise?

18       A.   "Well, I can do some of that, but you know,

19  we don't reconstruct inferior vena cavas every day.

20  I can sew a hole up in the vena cava if I had to,

21  but when you might have to replace it with a graft

22  or, you know, encounter massive bleeding, it's

23  probably the best to do those with people that do

24  that type of stuff every day.

25       Q.   "I see.  And this is a patient you would

1    have ordered an MRI on if he didn't have a

2    pacemaker?

3        A.   "Absolutely.  Yeah, yeah.  This would have

4    been one that just because they're probably a little

5    bit better in terms of being able to define the

6    exact extent of the tumor thrombus.

7        Q.   "But you weren't able to get that?

8        A.   "Yeah.  They don't like to do those with

9    pacemakers there for that.

10       Q.   "You wanted a chest x-ray?

11       A.   "Uh-huh.

12       Q.   "To look for additional metastasis?

13       A.   "Mainly, yeah, to see if there was anything

14   obvious.

15       Q.   "Now, this is what I think you mentioned

16   earlier.  We were able to resect this and it's

17   confined.  He might have -- or he will probably have

18   about a 35 percent chance five-year survival rate?

19       A.   "Yeah.

20       Q.   "And is that based off literature that

21   you're aware of?

22       A.   "Yeah, yeah.

23       Q.   "Where does that come from?

24       A.   "Literature, yeah.  I feel like the

25   literature plus experience for that.

1     Q.  "Would that be like a median survival rate

2   or just sort of --

3     A.  "Average.

4     Q.  "Average.

5     A.  "Yeah, yeah.  You would expect a high number

6   of people would die from this within five years.

7     Q.  "So was this a metastatic cancer based upon

8   what you were seeing at this time?

9     A.  "No.  We didn't see any obvious metastases

10  on scan for that there.

11    Q.  "Would the liver have been visible in this

12  scan?

13    A.  "They can be.  Although again, CTs sometimes

14  aren't perfect for livers as well.  And if he had

15  something huge in there, that would show up.  But if

16  he had, you know, a centimeter or two, they may not

17  show up on that type of thing.

18    Q.  "And I seem to recall from your operative

19  report that you saw a few spots on the liver?

20    A.  "I thought -- yeah, I vaguely remember that.

21  I thought it looked maybe metastasis for that.  Hard

22  to know.  I mean we didn't take a piece of his liver

23  out or anything.  But you know, hard to know for

24  sure on that.

25    Q.  "Is it possible that was there at the time

1    of this April CT, but small enough that it wasn't

2    visible?

3         A.   "Sure, yeah.   You know, CTs don't pick up

4    microscopic foci.   And you know, a millimeter or

5    centimeter foci, you know, they're not -- they

6    aren't perfect.

7         Q.   "So what's the plan going forward as of

8    April 14, 2016?

9         A.   "You know, this was one where, you know, we

10   had a vascular surgeon.   We get our vascular

11   surgeon.   And I think actually, it was the one we

12   typically use.   His name is Steve Ryan.   You know,

13   we have to -- we have him look at the films and get

14   him involved, and then try to coordinate it to get

15   it done at the hospital.

16        And this is where the -- that St. John's came

17   in.   You know, we had stopped going to -- it must

18   have been January of '16 when we stopped going to

19   St. John's.   That's why we wanted to see if we could

20   do it at Memorial.   That's probably with the prison.

21   I don't know.   Maybe they have a contract or did

22   have a contract.   But we didn't have privileges

23   there, so that's why we had to see if we could do it

24   across the street.

25        Q.   "And that's where you ended up --

1      A.   "Yep --

2      Q.   "-- doing it?

3      A.   "Yep.   They were able to let us do it.

4      Q.   "So there's something in this chart toward

5    the back called tasks.   Are you familiar with tasks?

6      A.   "Yeah, uh-huh.   Yeah.

7      Q.   "And they're some communication it looks

8    like between you and someone called Steve to look at

9    the CT.   Is that the vascular surgeon?

10      A.   "Steve Ryan, yeah, he's a vascular surgeon.

11      Q.   "What are tasks in your system?

12      A.   "You know, basically, they're just a way of

13    communicating with, you know, whether it's staff,

14    nurses, or the physicians.   You know, instead of

15    calling them on the phone, it goes -- you get a task

16    list and you type it in and it goes to them.   And so

17    literally, it pops up immediately.   In order to get

18    rid of it, you've got to read it.   So it almost is

19    a -- it's basically a backup plan to make sure stuff

20    doesn't get missed.

21      Q.   "And you can communicate internally with it?

22      A.   "Yeah, uh-huh, yeah.

23      Q.   "And then if you address the task, if will

24    stop bugging you?

25      A.   "Yeah.   I mean you have to -- there's a

1    thing called "done" a task.  You have to "done" it

2    for that.  Or if somebody sends you one, you can --

3    there's a reply.  You know, you can type them back

4    or whatever for that.  Or re-assign.  You can send

5    it to somebody else.

6         Q.  "So at page 106 of the exhibit it looks like

7    there's some correspondence there.  April 15, 2016,

8    Steve, if you could take a look at this CT?

9         A.  "Yeah, uh-huh.

10         Q.  "That's you communicating with the vascular

11    surgeon?

12         A.  "Correct.

13         Q.  "To have him look at -- from the perspective

14    of this issue with the vena cava?

15         A.  "Yeah.

16         Q.  "What other workup needed to be done on this

17    patient between April 14, 2016, and when he was

18    going to undergo surgery?

19         A.  "You know, as I recall, the other thing that

20    became, I think, and I may not be a hundred percent,

21    somehow cardiothoracic got involved.  Probably what

22    happened is Steve Ryan looked at the films and said

23    "Hey, this may go up pretty high."  So then had to

24    have him see a cardiac surgeon.

25         Because again, when you get into the chest, you

1    know, to get up to the heart there, we don't do

2    median sternotomies, you know.  So we needed to

3    potentially have somebody to get involved with that.

4        Q.  "A third surgeon?

5        A.  "Yeah, yeah.

6        Q.  "Okay.

7        A.  "And that may have been because Steve Ryan

8    looked at the films and said, "Hey, I think we

9    better have a cardiothoracic surgeon available or

10   help or whatever."

11       Q.  "Take a look at page 16.  It looks like your

12   next visit.  If you take a minute to look at it.

13   June 9, 2016; is that right?

14       A.  "Yeah, yeah, uh-huh.

15       Q.  "What was going on at this visit?

16       A.  "You know, this looks like we reviewed the

17   films with the radiologist.  And they thought maybe

18   it even, you know, went up really high which, you

19   know, is just above the diaphragm, which is right

20   below the heart.  And that's where we thought, hey,

21   we might have to have a cardiothoracic surgeon to be

22   able to get up above it.  Which would mean you have

23   to open up the chest for that.

24       Q.  "And that was in June.  I'm trying to find

25   that?

1       A.   "Yeah.   This would have been June 9th.

2       Q.   "Okay.

3       A.   "And it looks like he saw cardiology as

4  well.  And that's just to get his heart checked out

5  prior to a major operation.

6       Q.   "So that would have been between April 14

7  and June 9?

8       A.   "Yeah, yeah.

9       Q.   "Are you able to tell what other workup was

10 being done during that time, if any?

11      A.   "Well, the only thing I can say is it looks

12 like he saw cardiology sometime in between.  Whether

13 he saw somebody else, this is all I can say based on

14 this.

15      Q.   "I see it says in your note there was no

16 evidence of distant metastasis?

17      A.   "Yeah.

18      Q.   "Or metastatic disease.  That's again based

19 on your review of the CT and --

20      A.   "Mainly the report, but also we look at

21 those too for that.

22      Q.   "And I suppose the vascular surgeon's

23 review?  Had you spoken with the vascular surgeon?

24      A.   "That, I don't recall that.  You know, if I

25 did, I didn't put it in here.  I might have seen him

1  in passing or whatever, but I can't recall if I did

2  or not.

3      Q.  "So as of June 9, 2016, what's our plan at

4  this point, other than getting the cardiothoracic

5  surgeon involved?

6      A.  "Once we get them involved, then get him set

7  up and we try to do it.

8      Q.  "Is this an emergency surgery?

9      A.  "An emergency?  No, no.

10      Q.  "Explain the time frame in which you'd

11  schedule a surgery like this?

12      A.  "As soon as we can get everybody on board.

13  You know, get everybody seen and get it scheduled.

14  You know, this is a ten-hour case or whatever.

15  You've got to have three surgeons that are available

16  for ten hours on the same day.  There's a little bit

17  of complexity with that, because again, if it's not

18  done right, you're guaranteed to have a dead patient

19  on the table.

20      Q.  "Is that why you wanted these other surgeons

21  present?

22      A.  "Absolutely.

23      Q.  "To give the patient the best possible

24  chance for a good outcome?

25      A.  "That is correct.

1       Q.   "It looks like the surgery was done

2   July 19th?

3       A.   "Yeah.  Now, somewhere in there I think he

4   did see the cardiac surgeon.  But if I remember, he

5   saw one, but I think it turned out to be a different

6   one that actually did it because he was tied up in

7   something else, if I remember right.  I thought he

8   was going to see Hazelrigg.

9       Q.   "Yeah, some --

10      A.   "And I don't know if that came up.  But then

11  I think Gapalos was actually the one that was the

12  cardiac surgery involved.

13      Q.   "Somebody ordered another CT, if you look at

14  page 9?

15      A.   "Yeah.  Hazelrigg, yeah.

16      Q.   "So does that give you any more insight into

17  this?

18      A.   "Yeah.  He was the guy we wanted or was

19  going to see for the cardiothoracic part.

20      Q.   "Dr. Hazelrigg?

21      A.   "Uh-huh.

22      Q.   "And where does Dr. Hazelrigg work out of?

23      A.   "I think he's still with SIU School of

24  Medicine.  He's one of the heart surgeons.

25      Q.   "Who is Dr. Cokely?

1    A.  "Cokely?  He's a radiologist, and in my
2    opinion, the best radiologist we have in
3    Springfield.  He's our go-to guy.
4    Q.  "Look at page 102.  Then, at the very bottom
5    on June 1, 2016.
6    A.  "Okay, yeah.  So Cokely read it and wanted
7    another CT.
8    Q.  "So you had, in your opinion, the best
9    radiologist in Springfield look at the film?
10   A.  "Yeah.
11   Q.  "And he wanted another one?
12   A.  "Yep.  And he's our go-to guy, so if he says
13   he wants another scan --
14   Q.  "You get it for him?
15   A.  "He's our go-to guy; yeah.
16   Q.  "Do you know if you saw the follow-up CT?
17   A.  "That I can't say for sure.  I probably did,
18   but it was probably for certain the day of the
19   surgery.  I don't know if I saw that particular scan
20   after that though for that.
21   Q.  "I have a copy of it here.  I only made one.
22   I'm going to show it to you?
23   A.  "In fact, I don't even know --
24   Q.  "Because I don't see it in here.  No, again,
25   probably again this is how you know -- oh, I'm

1    sorry.

2        A.   "You know, again, I probably -- again, this

3    is how you know who.   This is my nurse, Julie

4    Thornton.   So my name, it doesn't look like I was in

5    on this conversation here per se.   Or didn't come to

6    my task list.

7        Q.   "The conversation that Dr. Cokely was

8    ordering the CT?

9        A.   "Yeah.   That would have been between Julie

10   and whoever else here.   So here's one, Steve Ryan to

11   me.   This one was up here, but then these were my

12   nurse down here.

13       Q.   "And you're still on the same page?   You're

14   at page 102, you're pointing to the --"

15            THE COURT:   Yeah.

16       Q.   "-- May 6, 2016, 7:02 a.m. back and forth

17   between you and Dr. Ryan?

18       A.   "Well, I'm looking here at June 1st, 2016,

19   about that Cokely wanting another CT.

20       Q.   "Okay?

21       A.   "Oh, yeah, this would have been me.   This

22   was Steve talking to me here.   And then I -- here's

23   where I say re-assign.   I had my nurse see this, you

24   know, saying, hey, we might want to have

25   cardiothoracic surgeon see.   So that's where we had

1    to get Hazelrigg involved.

2        Q.  "Okay.  So it's being moved forward as

3    additional surgeons are becoming involved and then

4    they have recommendations of what they need?

5        A.  "Yeah.  And another radiologist and another

6    CT scan.

7        Q.  "I'm going to have you take a look at

8    Exhibit 2.  Anything else you see in those tasks

9    that caught your interest?  There is one at page 119

10   that interested me?

11       A.  "Which one?

12       Q.  "Page 119, the first one, March 1, 2016,

13   9:27 a.m., Robin Dunn.  Do you know who that is?

14       A.  "I have no idea.  It might have been a

15   receptionist.

16       Q.  "Dr. Nawoor, physician.  Nurse call

17   requesting to see if patient can be seen sooner.

18   Patient has severe bleeding every day.  Please call.

19       Do you ever remember anything about moving up

20   the initial appointment?

21       A.  "No.  No, I don't.

22       Q.  "Take a look at Exhibit 2 for me, if you

23   would.  It's the second CT I'll represent.  Does

24   that appear to be correct?

25       A.  "Yeah.

1      Q.   "Is that something you think you've seen

2   before?

3      A.   "Probably.   Probably.

4      Q.   "Now, this one does note something with

5   respect to the liver?

6      A.   "Yeah.   They said widespread metastatic

7   disease.

8      Q.   "Do you have any opinion on why the prior CT

9   didn't?

10      A.   "It may have not been visible at that point

11   in time.

12      Q.   "Just the quality of the film?

13      A.   "It can be, yeah.   It can be the quality.

14   It could have been there, it could have been -- you

15   couldn't see it at the time of that.

16      Q.   "Otherwise --

17      A.   "You know, normally, it says who ordered --

18   yeah, okay.   I was going to say I didn't know who

19   ordered that.

20      Q.   "So that's the treating doctor, Dr. Nawoor?

21      A.   "Okay.

22      Q.   "It's not the surgeon?   It probably is

23   because --

24      A.   "I was going to say it's not us; yeah.

25      Q.   "Probably because the order went through the

1    treating doctor?

2         A.    "Sure.

3         Q.    "Take a look for me back in the chart at

4    page 59.   Is that the operative report?

5         A.    "Yes.   And this would have been -- this

6    would have been mine.   The other guys probably had

7    their own as well.

8         Q.    "That's your operative report?

9         A.    "This is from me, yeah.

10        Q.    "And this is the procedure you described to

11   me at the beginning of the deposition?

12        A.    "Uh-huh.

13        Q.    "One of the most complex you've ever been

14   involved in to this day?

15        A.    "Still is.

16        Q.    "Still is.   You say the maximum complex

17   modifier in terms of nephrectomy, tediousness, size,

18   and the fact it invaded all the way up to the --

19        A.    "His atrium; yeah.

20        Q.    "I don't know what that word is, but --

21        A.    "Atrium.

22        Q.    "Nine-hour case.   You were in surgery for

23   nine-hours?

24        A.    "Nine hours.

25        Q.    "Was there anything during the course of the

1    procedure that was surprising based on the

2    preoperative workup?

3         A.   "You know, as predicted, it was a difficult

4    case.  I mean -- and in fact, I even think I

5    mentioned, you know, how you have a big

6    desmoplastic, it means like fibrous type reaction,

7    scar stuck sort of.  It's maybe not a technical

8    term, stuck, but you know, a lot of times tissue

9    planes frees up very easily.  This did not.

10        Q.   "Go to page 37, line 8.

11        Can you remember what surgeons were actually

12   present for this nine-hour procedure?

13        A.   "Myself, Steven Ryan, and I think the heart

14   surgeon.  It was not Hazelrigg.  I think it -- I

15   don't know the guy's first name.  I think Galpados

16   would have been the cardiothoracic surgeon.

17        Q.   "How many people would have been on the

18   surgical team, like in the suite?  How big of a

19   group would you have had in there?

20        A.   "Probably ten.

21        Q.   "Ten?

22        A.   "You have an anesthetist.

23        Q.   "Anesthetist.

24        A.   "Anesthetists, pardon me.  Anesthesiologist.

25   Randy Sulvar was a resident at the time.  A couple

1    nurses.  You would have had a perfusionist for the

2    bypass part.  Steve Ryan, the heart surgeon.

3    Circulating nurse.  There would have been quite a

4    few for that.  There again, not all of them would be

5    working at the same time, but --

6         Q.  "I was trying to figure out when the surgery

7    was actually scheduled.  And I'm at page 83,

8    counsel.  Are you able to tell from that?

9         A.  "No.

10        Q.  "It says on 6/24 at 1:26 p.m., Chad at

11   Taylorville made aware of surgery time.  Does that

12   suggest as of that date, the surgery was scheduled?

13        A.  "Yeah.  She would have known on that day

14   that, hey, this is when Chad will schedule patient

15   to see cardiologist.  Yeah, I guess Chad is at the

16   correctional center.

17        Q.  "He is.  Right?

18        A.  "So Julie is my nurse that schedules, so she

19   obviously talked to him.

20        Q.  "Going back to 82?

21        A.  "Yeah.  Somewhere the 23rd, 24th.

22        Q.  "Somewhere around the 23rd, 24th of June,

23   the surgery was scheduled for the 19th of July?

24        A.  "Yeah.

25        Q.  "You first saw the patient, we agreed, on

1    March 10 of 2016?

2        A.   "Correct.

3        Q.   "And the cancer diagnosis came along with

4    the CT around April 12 to 14; is that what we saw?

5        A.   "Correct.

6        Q.   "He had surgery July 19, 2016; is that

7    right?

8        A.   "Yeah, uh-huh.

9        Q.   "Do you have an opinion on whether this was

10   a reasonable time frame from when you first saw this

11   patient to do the surgery?

12       A.   "You know, obviously, it took a lot of

13   coordinating and stuff.  I mean like I said, you

14   gotta do this right or you're guaranteeing the

15   patient will die on the table.  I mean you had

16   multiple physicians' time frames.  You know, we had

17   another radiologist look at it.  You know, there's a

18   lot of coordinating here.

19       Q.   "So is that a yes?

20       A.   "Yeah.  I mean I would argue I would rather

21   have scheduled correctly than have a patient die on

22   the table because you want to try and hurry up.  Oh,

23   let's just do it.

24       Q.   "Go to page 10, if you would.  Does it

25   appear to be an August 11, 2016, clinic visit?

1     A.  "Yeah.  That would have been post-op.  Yeah,

2   I did see him afterwards.

3     Q.  "Based on what -- when I look through the

4   records, this looks like the last time you saw him?

5     A.  "Yeah.

6     Q.  "Would you have handed him off to oncology

7   then?

8     A.  "Yeah.  We would have -- in fact, I think we

9   probably would have said, yeah, would probably have

10  him see oncology to be evaluated for that.

11    Q.  "And how was he doing as of August 11, 2016?

12    A.  "Unbelievably well.  Unbelievably well.

13    Q.  "Why do you say that?

14    A.  "He was talking to me and he was alive.  For

15  what he had done, that's impressive.

16    I mean maybe that sounds glib, but they stop --

17  you know, he had no blood flow to his brain for half

18  and hour or whatever.  The fact that he wakes up and

19  can talk to you, that's impressive.

20    Q.  "Let me ask you this:  The procedure and the

21  fashion it's done, are you aware of any literature

22  on the survival rate of that?

23    A.  "Specifically for hypothermic circulatory

24  arrest?  No, no.  That would be cardiac stuff.  Like

25  I said, that's the first one I've ever been involved

1   with for that.  But I know for the disease that he

2   has, it's not a very good outcome.  But then to

3   actually do that, I'm impressed he woke up and was

4   able to talk to us.

5       Q.  "It was kind of a hail Mary surgery; is

6   that --

7       A.  "I wouldn't go that far.  But you know, like

8   I told him, if he wanted a chance to walk -- and I

9   remember him telling me he wanted to walk out of

10  prison.  I remember him telling me that.  I think he

11  told me five years left.  And I said, well, without

12  trying this, there's a guarantee you won't walk out

13  of this.

14      Q.  "He would have died?

15      A.  "Died.

16      Q.  "Without the surgery?

17      A.  "For sure.  Yeah, for sure.

18      Q.  "That's all I have."

19          THE COURT:  Do plaintiffs have anything?

20          MR. PELZ:  He's gonna read it.

21          MR. RUPCICH:  You want me to read your

22  questioning?

23      Very good.

24      Q.  "Page 44.

25      "Mr. Dean came to you, he was presenting with

1    gross hematuria?

2         A.  "Yes.

3         Q.  "Can you describe gross hematuria again?

4         A.  "Yeah.  It's visible blood in the urine.

5         Q.  "Okay.

6         A.  "Yeah.

7         Q.  "And are there other types of hematuria?

8         A.  "Yeah.  There's microscopic which would be

9    not visible to the naked eye, but under the

10   microscope.  And then, you know, some people would

11   say pseudohematuria where they think they have blood

12   in the urine and it's not blood.

13        Q.  "Would you say hematuria is a serious

14   condition?

15        A.  "It can be, yeah.

16        Q.  "When would you say it is a serious

17   condition versus when it's not?

18        A.  "It's a serious condition when you find a

19   malignancy.

20        Q.  "Is any type of hematuria more serious than

21   another?

22        A.  "That's a difficult question, but yes and

23   no.  Yeah, it can be.  It can be life-threatening if

24   people lose massive amounts of blood quickly, you

25   know.  They can lose so much blood that they can

1    need transfused or their blood pressure may go low.

2        So yes, it can be a serious condition in terms

3    of immediate, oh yeah, they're bleeding to death.

4        Q.  "Does the amount of time a patient is

5    experiencing hematuria weigh into all that?

6        A.  "It may.

7        Q.  "I'm sorry.  Weigh into that at all.  My

8    mistake?

9        A.  "It may.  It may, yeah, yeah.  Like I said,

10   if somebody loses massive amounts of blood in one

11   day, you know, they can potentially have a poor

12   outcome, you know.  If they're requiring

13   transfusions or dropping their blood pressure for

14   that.

15       Q.  "And I guess if a patient presented with

16   hematuria and had been experiencing that for several

17   weeks and months, that would be more alarming than

18   if the patient had just started presenting with

19   hematuria?

20       A.  "You would work them up the same way.

21       Q.  "Okay.

22       A.  "I mean you do the same thing.  You do a

23   scan and scope regardless.

24       Q.  "And you said before that was the standard

25   of care?

1     A.   "That is the standard of care, yeah.   There

2   are little variations on that, but in general,

3   there's guidelines, the AUA guidelines.   That would

4   be the number one way to do it.

5     Q.   "And AUA is this --

6     A.   "American Urologist Association.   Our

7   governing body.

8     Q.   "And you just stated there were some

9   variations of the standard of care.   Could you

10  elaborate on those?

11    A.   "Yeah.   Occasionally, say somebody is

12  allergic to the IV contrast.   You might do an MRI of

13  the kidneys and upper tracts because the contrast

14  used with that typically doesn't cause allergic

15  reactions.

16        If somebody had poor kidney function and you

17  didn't want to give them IV contrast, you might do

18  an ultrasound of the kidneys.   But then to check the

19  tubes, you know, you might have to look in the

20  bladder and shoot contrast up from there.

21        So there could be minor variations.   But as we

22  discussed, you know, from the top to the tip, you've

23  kind of got to do something typically to evaluate

24  that to see if you can identify a significant

25  problem.

1    Q.  "Would there be any other reason to start

2    with an ultrasound other than what you just

3    mentioned?

4    A.  "Another reason?

5    Q.  "Yeah?

6    A.  "Yeah.  Well, yeah, I mean if you thought

7    maybe they, you know, couldn't like I say, tolerate

8    an MRI because it's a Type 2, you might do an

9    ultrasound because you're just out in the open for

10   that.  You know, some people get claustrophobic from

11   the MIR.

12   Q.  "But the standard of care --

13   A.  "Even a CT.  I mean some people moan about

14   it, but it's not that tight.

15   Q.  "But the standard of care is to start with

16   the CT scan?

17   A.  "If you could, yeah.  If you could safely do

18   one, if the kidney functions, they're not allergic,

19   that would be the ideal way of doing it.  And again,

20   those are guidelines.  That's why they're called AUA

21   guidelines.  They're not an absolute set in stone

22   type of thing for that.

23   Q.  "And would it affect your response to

24   hematuria if the patient had a history of kidney

25   stones or would it still be the same -- would it

1   still be kind of the same standard of care that you

2   just went over?

3        A.   "Yeah.  I mean, obviously, if somebody says,

4   "Oh, I've had stones and I've got blood in my

5   urine," yeah, that's probably going to be the number

6   one thing that pops in my head.  You would still

7   check them.  I mean, hey, you got a stone.  But if

8   somebody said, "Well, gee, I've had stones, and hey,

9   I've got blood in my urine."  You know a lot of

10  times, you know, kidney stones are -- it's a

11  recurrent problem.

12       Q.   "Okay?

13       A.   "A really recurrent problem.  So you

14  wouldn't be shocked if somebody came back with

15  another stone for that.

16       Q.   "Does gross hematuria indicate a likely

17  worse diagnosis than microscopic?

18       A.   "It can, but not always.  And that's -- some

19  people get confused on that.  You can have a tiny

20  amount of blood in the urine, meaning microscopic,

21  and have a horrible problem.  And you can have

22  literally a Bloody Mary and I've got nothing for

23  that with that.

24       Now, if you look at the literature though, in

25  terms of hey, microscopic hematuria in somebody that

1    has no symptoms, the risk of finding malignancy is

2    probably about 2.5 percent.

3         Q.   "Okay.

4         A.   "And when they have gross hematuria, it goes

5    up.  It is higher than that.

6         Q.   "Do you know approximately what that is?

7         A.   "Probably 40 to 50 percent.  Roughly for

8    that with that.  But again, we found plenty of

9    people with bad disease with, hey, you've got three

10   red blood cells in your urine and oh geez, you've

11   got bad bladder cancer or something like that.

12        Q.   "When you say literature, are you referring

13   to like guidelines or is there anything else that

14   you're referring to?

15        A.   "That would just be the general urological

16   literature, you know.  If you like read in the

17   Journal of Urology or whatever.

18        Q.   "Can I redirect your attention to pages 35

19   to 38 in Exhibit 1.  It's the CT results from

20   April 12th?

21        A.   "Yes."

22             THE COURT:  I think that says pages 37 and

23   38.

24             MR. RUPCICH:  "Did I misread it?  I'll

25   start over.

1    Q.  "Can I redirect your attention to Pages 37

2  and 38 in Exhibit 1.  It's the CT results from

3  April 12th?

4    A.  "Yes.

5    Q.  "So you testified before that it was

6  possible that the metastatic disease was there all

7  that time but was too small to be seen?

8    A.  "Yeah.

9    Q.  "And you stated before that that could have

10  been because of the imaging quality?

11    A.  "Yeah.

12    Q.  "Is it also possible that it was there but

13  just too small to be seen at that point in time?

14    A.  "Yes.

15    Q.  "Okay.  Can I also redirect your attention

16  to pages 18 and 19 of Exhibit 1.  Are these the

17  visit notes from April 14?

18    A.  "Yeah.

19    Q.  "During this visit, you went over Mr. Dean's

20  diagnosis and need to have surgery?

21    A.  "Correct.

22    Q.  "And you stated earlier that the surgery was

23  not an emergency, but would it be fair to say that

24  it was urgent?

25    A.  "Urgent?  Hey, when you can get it set up

1    and scheduled correctly.  I mean, you know, you want

2    to get everything in order, and you know, have him

3    see who he needed to be seen and all that.  And once

4    you can arrange those visits and get three guys

5    together for ten hours in a cardiac operating room.

6         Q.  "Yeah.  In the visit notes you also state

7    that Julie was going to work to see if he could have

8    surgery done at Memorial; is that correct?

9         A.  "Correct.

10        Q.  "What does that mean?  What did that entail?

11        A.  "Well, I can tell you what this means, but

12   if you wanted to, you would have to ask her exactly

13   what she meant.  My bet is is probably at the time

14   there was, and maybe I'm wrong, there might have

15   been a contract with the prison system that, hey,

16   for surgeries, they have to have them done at

17   St. John's.

18        Now, I don't know if that's a fact, but there

19   was some suggestion, oh, they have to do them at

20   Saints.  Well, I don't have privileges at

21   St. John's, so -- you know, we wanted to do it.

22   Well, you can't do it if you don't have privileges

23   there.  I would have had to find somebody else to do

24   it for him for that.

25        Q.  "So she would have been reaching out to the

1    hospital?

2         A.  "No, I don't think so.

3         Q.  "Okay.

4         A.  "I don't think so.  She probably would have

5    been working with the prison system to find out,

6    hey, you are going to let us do this here?  Can we

7    make an exception or whatever?  And again, there

8    maybe -- I don't know, there may be contract issues

9    with that.  I don't know.  But that's probably what

10   that I meant was that hey, they wanted us to go

11   there, but I can't go there.

12        Q.  "And can I direct you to page 106 in

13   Exhibit 1?

14        A.  "Yeah.

15        Q.  "And can you look at the entry on

16   April 21st?

17        A.  "Yeah, uh-huh.

18        Q.  "What does that say?

19        A.  "That means -- what I think it means, the

20   prison system said, hey, we can -- we don't have to

21   go to St. John's.

22        Q.  "Okay.

23        A.  "We can do it at Memorial.  Meaning I could

24   do it is what that means.  I don't have to send him

25   somewhere else.

1      Q.  "Okay.  And then as you said before, they

2   likely weren't working with the hospital?  At this

3   point?

4      A.  "I doubt it.  I doubt it.  I mean to me,

5   this just means, hey, she got the okay that, hey, we

6   can try to do this at Memorial.

7      Q.  "Okay?

8      A.  "And not have to go to St. John's for it.

9      Q.  "And can I direct your attention to Page 96

10  of Exhibit 1?

11     A.  "Yep.

12     Q.  "And do you know what that document is?

13     Sorry.  Do you recognize what that document is

14  what you're looking at?

15     A.  "Oh, right here.

16     Q.  "Yeah?

17     A.  "It's just a task list.

18     Q.  "And the document refers to Chad from

19  Taylorville?

20     A.  "Yeah.  I don't know who Chad is.

21     Q.  "You don't know who Chad is?

22     A.  "It must be a nurse at the corrections

23  facility but I don't know.  I'm not sure who he is.

24     Q.  "And then the next entry down it refers to

25  Dr. Nawoor.  Do you know who that is?

1      A.  "I'm assuming he's the prison doc, but I'm

2  not -- I would assume that's who it is.

3      Q.  "Okay.

4      A.  "I would assume that's who it is.

5      Q.  "Do you know why they would have been

6  contacting your office at this time?

7      A.  "Just to know when we were going to do the

8  case.  At least according to this that's -- he was

9  just calling to find out.

10     Q.  "So you did not take the calls?

11     A.  "No.

12     Q.  "Do you know who would have been responsible

13 for taking the calls?

14     A.  "The person that -- Tina Wise would have

15 been that person that took the call, which I think

16 is a receptionist.

17     Q.  "Receptionist?

18     A.  "I don't even know if she works for us

19 anymore.

20     Q.  "Would they have mentioned any of these

21 calls to you?

22     A.  "The receptionist.

23     Q.  "Yeah?

24     A.  "I don't even know who they are.

25     Q.  "Okay?

1    A.   "No.  I know that's sad, but I don't even

2    know.  I don't go out front, so --

3    Q.   "Are you -- are you aware of any other

4    contacts between -- other than the ones we've gone

5    over today, between your office and either staff or

6    doctors at Taylorville?

7    A.   "If they're in here, they would be in here.

8    At least with me, I wouldn't have had any other

9    contact with anybody.  And I say typically, if

10   there's a phone call, particularly Julie, my nurse,

11   she documents everything.  So if somebody called,

12   it's in there.

13   Q.   "Okay.

14   A.   "Even if it's frivolous, it's in there.

15   Q.   "Can I also redirect your attention to pages

16   59 and 60 from Exhibit 1?

17   A.   "Yeah.

18   Q.   "The surgery report?

19   A.   "Yeah, uh-huh.

20   Q.   "And you did, I believe, on Page 60, note

21   the possibility of metastatic disease?

22   A.   "Yeah, uh-huh.

23   Q.   "Can you describe again what you saw that

24   made you think that?

25   A.   "Yeah.  I think when we were, you know, the

1   right kidney sits basically below your liver.  And

2   so in order to get there, you've kind of got to move

3   that out of the way.  So if I remember correctly, I

4   think in looking, I saw some spots on the liver that

5   I probably assumed were metastases.

6       Q.  "Okay.

7       A.  "You can get scar and everything, but I

8   would suspect that they were metastases.  And I

9   think I probably noted that.  Maybe not.  Yeah, I

10  did note that up in the first paragraph of the

11  description of the procedure.

12      Q.  "And did you send some of the renal cells

13  for a biopsy?

14      I'm sorry.  And you did send some of the renal

15  cells for a biopsy; is that correct?

16      A.  "The whole specimen goes off to pathology

17  folks.

18      Q.  "But you didn't send any of the possible

19  metastases from the liver?

20      A.  "No, we didn't take a piece of the liver.  I

21  didn't want to take a piece of the liver.  The

22  problem is especially with that type of procedure,

23  you know, they have to anticoagulate them.  And the

24  liver can bleed a whole heck of a lot.  And if you

25  take a whack out of the liver, A, it's not going to

1   help them, but B, you might create a big problem

2   with bleeding afterwards.

3        I suppose I could have stuck a needle in it,

4   but again, you probably want to avoid getting

5   involved in bleeding of the liver.  That can be a

6   problem.

7        Q.  "Is it common for people with disease like

8   Mr. Dean to develop metastatic disease?

9        A.  "With what he had.

10       Q.  "Yeah?

11       A.  "They all get it.

12       Q.  "Okay?

13       A.  "Eventually they'll all get it for that.

14  And again, that's from experience.  I mean I've been

15  practicing 19 years.  Every person that I've seen

16  off the top of my head that's had disease this

17  extensive, they all eventually will get, if they

18  don't have it upfront, and most of them do, they

19  will get it for that.

20       Q.  "Uh-huh?

21       A.  "And again, that's just from 19 years of

22  experience.

23       Q.  "Do you ever recall saying or thinking that

24  if Mr. Dean's surgery was successful, he wouldn't

25  have to undergo further treatment such as

1    chemotherapy?

2         A.   "Do I recall that?  No.

3         Q.   "In your opinion, would that have been a

4    likely outcome?

5         A.   "That he would need more treatment?

6         Q.   "Yeah?

7         A.   "Absolutely.

8         Q.   "Absolutely?

9         A.   "Yeah.

10        Q.   "Do you ever recall saying or thinking that

11   you thought Mr. Dean decided not to have surgery?

12        A.   "Not to have the surgery?  No.  No.  He was

13   gung ho for it.

14        Q.   "Okay.

15        A.   "Like I said, I remember him telling me he

16   wanted to walk out of prison.  I said, "If you want

17   any chance of walking out of prison, you've got to

18   do this regardless of hey, you might not wake up."

19   He was pretty adamant about that.  He wants to walk

20   out of prison, not go out another one.

21        Q.   "Did any of the delays in scheduling ever

22   make you fear he had changed or would change his

23   mind?

24        A.   "Probably not, no.  I mean I don't -- the

25   last time I saw him, I don't -- I don't think I

1    talked to him after that, but I don't think he would

2    have changed his mind.  Or at least when I talked to

3    him, you know, the last time I talked to him at the

4    clinic, I would have probably not believed he would

5    have changed his mind.  Not from what he told me.

6         Q.  "I have just one final question.

7         A.  "Sorry.  What page are you on.

8         Q.  "60.

9         A.  "Okay.

10        Q.  "Line 12.

11        A.  "Sure.

12        Q.  "Did you ever have any contact with

13   Dr. Nawoor?

14        A.  "I don't recall.  I don't know that I ever

15   talked to him actually.

16        Q.  "Okay.  You don't recall any conversations

17   over the phone with him?

18        A.  "Not off the top of my head, but I mean it's

19   possible.  But I mean I can't really anything off

20   the top of my head.

21        Q.  "Sorry.  No conversations related to

22   Mr. Dean's case in person that you can recall?

23        A.  "Not that I can recall.  And I know there

24   was no emails."

25             MR. RUPCICH:  And this is back to me.

1   Q.   "Very briefly, Doctor.  You had said the

2   standard of care for gross hematuria is a CT?

3   A.   "CT urogram or CT IVP and a scope typically.

4   Q.   "And that's based on -- that's the standard

5   of care in urology?

6   A.   "Correct, set forth by the AUA.

7   Q.   "And those are guidelines?

8   A.   "That is important, they are guidelines,

9   they are not absolutes.

10  Q.   "So you would have to evaluate an individual

11  patient?

12  A.   "Sure.

13  Q.   "Take a history; correct?

14  A.   "Correct.

15  Q.   "Make an individualized judgment on the

16  specific clinical circumstances?

17  A.   "Correct.

18  Q.   "And the ordering of diagnostic testing

19  would be based on that particular patient's clinical

20  picture?

21  A.   "Correct.

22  Q.   "You were asked about whether gross

23  hematuria can, I think, pose a serious risk.  And

24  you had said well, if the patient is losing a lot of

25  blood?

1        A.    "Rapidly, uh-huh.

2        Q.    "Could lead to anemia?

3        A.    "Yeah, yeah, sure.

4        Q.    "Before you do surgery is there a workup of

5    blood counts?

6        A.    "In general, yes, but not for all surgeries.

7        Q.    "That's all."

8        And plaintiff says that's all from us.

9              THE COURT:    That completes the deposition?

10             MR. RUPCICH:    Thank you, Brad.

11             THE COURT:    That was a question?    That

12   completes the deposition?

13             MR. RUPCICH:    That completes the

14   deposition.

15             THE COURT:    All right.    We're going to give

16   the jury a ten-minute recess at this time.

17        (The jury left the courtroom.)

18        (A recess was taken.)

19             THE COURT:    Court is reconvened.    Are you

20   ready for your next witness?

21             MR. RUPCICH:    We have no other witnesses.

22             THE COURT:    All right.    Mr. Martin?

23             MR. MARTIN:    So subject to a document issue

24   where I think there's consensus, we're going to

25   rest.    But Mr. Strom has the issue for us.

1   MR. STROM:  So, Judge, at the moment, we

2   are locating a hard copy of what was Dr. Guaglianone

3   Deposition Exhibit 2.  It was a set of documents

4   from the Cancer Care Centers that he authenticated

5   during the course of his deposition.  And we would

6   seek to move that into evidence subject to

7   defendants have asked to take a look at that one to

8   refresh their memories, as well as ours, about what

9   exactly was in Dr. Guaglianone's deposition

10  Exhibit 2.  We are currently pulling a copy of that

11  and we'll have that shortly.

12      Been working through the break in order to have

13  that available as soon as we could, Judge.

14      MR. MARTIN:  But, Your Honor, to be fair,

15  it's a stack of medical records from Dr. G.  And the

16  intent is to put it into the record, but not

17  necessarily send it back to the jury.  And I think

18  Mr. Rupcich has no objection to that.  Subject to,

19  of course, looking at it.

20      MR. RUPCICH:  I agree.

21      THE COURT:  Okay.  So we have a number of

22  exhibits that were not admitted.  Plaintiff's 139,

23  164, 380, 381.  And 193 I took judicial notice and

24  it was admitted, but there was also a 194 which also

25  is similar excerpts as 193 from the Lippert report

1   and the Puisis report.

2        MR. MARTIN:  That was our mistake.  I

3   thought that that one we had asked to take judicial

4   notice of.  Apparently, we didn't make that clear.

5   Both of those, Shansky and Puisis, we would ask the

6   Court to take judicial notice of using those

7   excerpts only.

8        THE COURT:  Okay.  So what about the other

9   four?

10       MR. PELZ:  Can you give us those numbers?

11       THE COURT:  139, 164, 380, 381.

12       MR. RUPCICH:  139 was never discussed by

13  any witness.  The contract renewal.

14       THE CLERK:  I have it as marked.  I don't

15  know if it was displayed.  The 11th is what I have.

16       MR. RUPCICH:  Maybe it was through the

17  Little deposition.

18       MR. MARTIN:  We did it through testimony as

19  opposed to using the renewal, we used the contract

20  itself.  For completeness, that document probably

21  should be admitted.

22       THE COURT:  It was referenced.

23      Kathy, how hard would it be for you to find the

24  reference.

25       (Discussion was held off the record.)

1   MR. PELZ:  I think what happened was I
2   misspoke on the number.
3         THE CLERK:  I know 117 you withdrew.  That
4   you referenced and you didn't want 117.  So I didn't
5   put it down.  It was just misspoken.
6         MR. PELZ:  I believe what I handed
7   Dr. Nawoor was the contact, and that's 137 and not
8   139.  I may have misspoken as to the number.  I
9   believe the contract, not the renewals, but the
10  contract is in evidence.
11        THE CLERK:  I have the ones that were
12  marked but not admitted.  Copies of them.
13        MR. MARTIN:  The contract is 137.  And that
14  I have is in evidence.
15        THE CLERK:  Yes, 137 was admitted on the
16  12th in my record.
17        THE COURT:  So we need to discuss how we're
18  going to proceed.  We have maybe ten jury
19  instructions we have to go through and it's almost
20  eleven.  I could let the jury go now and come back
21  early for lunch and proceed with closings at that
22  time.
23        MR. MARTIN:  Makes sense, Your Honor.
24        MR. RUPCICH:  I think we need to rest in
25  front of the jury.

```
1          THE COURT:  Oh, I do too.  I'm going to
2    bring them back in and tell them what's going on.
3          MR. RUPCICH:  I just want to make sure that
4    the exhibits are lined up before I rest.  And I
5    think they are.  But I wanted to just address one
6    issue.  I don't know if you want to do that now.
7          THE COURT:  The issue concerning the
8    exhibits?
9          MR. RUPCICH:  With mine.  I just wanted to
10   make sure that Defense Exhibit 2 that just came in
11   through Severino in his dep is admitted.
12         THE COURT:  Okay.  You need to move to
13   admit it in front of the jury.  And I will allow it.
14         MR. RUPCICH:  Okay.
15         THE COURT:  Okay.  Mr. Martin?
16         MR. MARTIN:  Nothing.
17         THE COURT:  Okay.  Bring the jury back in.
18      (The jury entered the courtroom.)
19         THE COURT:  Please be seated.  Court is
20   reconvened.
21      Mr. Rupcich, any further evidence?
22         MR. RUPCICH:  Defendants move Defendant
23   Exhibit 2 from the Severino deposition in.
24         THE COURT:  Any objection?
25         MR. MARTIN:  No, Your Honor.
```

1    THE COURT:  Defendant's 2 is admitted.

2    (Defendant's Exhibit 2 was admitted.)

3    THE COURT:  Any further evidence?

4    MR. RUPCICH:  We have no further evidence

5    subject to the plaintiff resting their case.

6    THE COURT:  Okay.  Mr. Martin, any further

7    evidence?

8    MR. MARTIN:  No, Your Honor, subject to the

9    document issues that we discussed during the break,

10   the plaintiff would rest.

11   THE COURT:  All right.

12   MR. RUPCICH:  We rest.

13   THE COURT:  All right.  What we're going to

14   do next, we have jury instructions to go back

15   through to make sure they're correct.  We're going

16   to ask you to be back here -- we're going to give

17   you a little longer so you don't have to wait when

18   you get back.  So if you'll be back here at 1:00, we

19   will reconvene at that time with closing arguments

20   and jury instructions.  All right?

21   (The jury left the courtroom.)

22   THE COURT:  All right.  So back to the

23   exhibits.

24   MR. PELZ:  I have an answer on 380 and 381.

25   Those were the two medical articles.  I just asked

1  Dr. Nawoor about them, I was not asking they be

2  admitted into evidence.  So they were used for the

3  purpose we intended, not admitted.

4          THE COURT:  Okay.  What about 139 and 164?

5          MR. PELZ:  I'm pretty certain 164 is in

6  somewhere else.  But better safe -- better to have

7  belt and suspenders as opposed to either.  So I

8  would move 164 which is a portion of the files of

9  Dr. Einwohner on notes from the -- her discussion

10 January 7th with --

11     No, actually, I think this was on 2/8.

12         MR. RUPCICH:  Yeah, I think it's 2/8.

13         THE COURT:  Any objection, Mr. Rupcich?

14         MR. RUPCICH:  No, no objection.

15         THE COURT:  164 is admitted.

16    (Plaintiff's Exhibit 164 admitted.)

17         MR. PELZ:  And the last one --

18         THE COURT:  139.  Diane has --

19         MR. PELZ:  That's the contract renewal.  I

20 think that -- I may have misspoke as to the number,

21 but we're not --

22         THE COURT:  Well, look at the document here

23 that's marked as 139.

24         MR. PELZ:  Yes, let -- 137 is in, Diane?

25 Can you confirm 137 is in?

1  THE CLERK: Yes, 137 is in. According to

2  my records on the 12th. With no objection.

3  MR. MARTIN: For completeness, we would

4  move that it come into evidence.

5  THE COURT: 139?

6  MR. MARTIN: Yes, it's just the contract

7  renewal.

8  THE COURT: Any objection?

9  MR. RUPCICH: To 139 coming in?

10  THE COURT: Uh-huh.

11  MR. RUPCICH: Yeah. The only testimony was

12  that Dr. Nawoor had no idea what it was, so I don't

13  think there was a foundation for it to be admitted.

14  THE COURT: Mr. Martin?

15  MR. MARTIN: It doesn't need to come in

16  then.

17  THE COURT: All right. 139 will not be

18  admitted.

19  And then 194? 194, were you asking me to admit

20  it? With judicial notice?

21  MR. MARTIN: Yes, Your Honor. That is the

22  Puisis report or the Shansky report.

23  THE COURT: Any objection?

24  MR. RUPCICH: Yeah. We've had essentially

25  motions in limine briefing on this. We object based

1  on all the reasons we previously stated, including

2  that it's not appropriate for judicial notice.

3  You've heard me on this issue though.

4          THE COURT:  It's admitted.  And by it, I

5  mean 194.

6      (Plaintiff's Exhibit 194 admitted.)

7          THE COURT:  Defendant's 17 and 18 you do

8  not wish to have admitted?

9          MR. RUPCICH:  They're duplicative of 1.

10         MS. RICE:  Right.

11         MR. RUPCICH:  Correct.  They are contained

12  in our 1.

13         THE COURT:  Okay.  They will not be

14  admitted.

15     Let's go to Plaintiff's Exhibit 2A.

16         MR. MARTIN:  We're on jury instructions.

17  Court wants to discuss 2A.

18         THE COURT:  Thank you, Mr. Martin.

19     So 2A, the note says this instruction should

20  not be given where there is an issue of fact as to

21  agency or where there is an independent basis of

22  liability of the principal apart from the agency.

23  It is proper when agency is not an issue.

24     If either the existence of the agency or the

25  scope of the agency at a particular time is in

dispute as an issue of fact, and both principal and
agent are sued, then IPI 50.3 should be used.  But
if the principal is sued alone, then 50.04 should be
used.

        MR. STROM:  So, Judge, on Plaintiff's 2A,
the IPI notes, as I understood them, required or
suggested that this one be used where there is no
dispute as to agency, and agents and principals are
both being sued, as the Court has stated.  So as a
result, this has been modified to address the
defendants.  Defendant Wexford as principal and
defendants Dr. Nawoor, Dr. Einwohner, and Ms. Galvin
as agents.

    There are, however, other theories of defendant
Wexford's vicarious liability as pleaded in Count 10
of the operative complaint.  And so as a result,
this particular instruction needs to be given with
respect to those named defendants, but it is not the
only instruction that should be given in light of
the evidence that has been presented regarding who
those other non-party agents are according to that
evidence.

        THE COURT:  As in?

        MR. STROM:  Dr. Ritz, for example, is one
such officer, employee, or agent.  Dr. Ritz, as a

1  result would appropriately be identified instead in

2  Plaintiff's 6.  And Plaintiff's 6 additional should

3  be rewritten as such since it is based on IPI 50.02

4  and Dr. Ritz is not a named party.  We would

5  withdraw Plaintiff's 6 as it currently is stated and

6  rewrite it so that it simply says that Dr. Ritz was

7  among the agents of Defendant Wexford Health Sources

8  at the time.

9       If there is a dispute as to whether Dr. Ritz is

10  an officer or an agent of defendant Wexford Health

11  Sources for the relevant periods and for relevant

12  actions, it's my understanding that 50.04 from the

13  IPI could be used.  That one is to be used if there

14  is a dispute as to the agency of an -- of a

15  non-party agent who -- about whose conduct evidence

16  has been -- has been introduced.

17       And if the Court would like, I have copies of

18  IPI 50.04 I can provide.

19            THE COURT:  Mr. Rupcich?

20            MR. RUPCICH:  We don't --

21            THE COURT:  So you withdrew 6; correct?

22            MR. STROM:  Subject to its revision to take

23  out the named defendants and put in Dr. Ritz's name

24  instead.

25            MR. RUPCICH:  So to take out Nawoor,

1  Einwohner, and Galvin and put Ritz in lieu of them?

2       MR. STROM:  Correct.  Reading it off the

3  cuff, it would read:  As it relates to plaintiff's

4  claim for professional negligence in violation of

5  Illinois law, Dr. Steven Ritz was among the

6  defendant -- among the agents of defendant Wexford

7  Health Sources, Inc. at the time of this occurrence.

8  Therefore, any act or omission of Dr. Stephen Ritz

9  at the time was the act or omission of Wexford

10 Health Sources, Inc.

11     That's to conform to the allegations in Count

12 10 of the operative complaint.

13       THE COURT:  The note to 50.02 says this

14 instruction should not be given where there is an

15 issue of fact as to agency.  This instruction may be

16 used where the principal is sued alone.  The

17 principal is not sued alone.

18       MR. STROM:  With respect to Dr. Ritz, the

19 principal is sued alone.  With respect to the named

20 defendants, the principal is not sued alone.  Which

21 is why Plaintiff's 2A is a modification of IPI

22 50.04.

23       THE COURT:  Is the existence of the agency

24 at issue, Mr. Rupcich?

25       MR. RUPCICH:  The existence of Galvin,

1   Nawoor, Einwohner's agency is not disputed.  And I

2   guess, for purposes of this academic discussion,

3   Ritz either.

4           THE COURT:   So then this could be given?

5           MR. STROM:   For 50.02?

6           THE COURT:   Yes.

7           MR. STROM:   If there's no dispute as to

8   Dr. Ritz's agency, then 50.02 is the one.

9   Plaintiff's 6 as rewritten to include only his name.

10          THE COURT:   So 6A will be resubmitted.

11          MR. STROM:   Yes, Your Honor.

12          THE COURT:   Then 7 it would seem to me will

13  not be needed?  Which is 50.11?

14          MR. STROM:   Plaintiff's 7 is intended to

15  address the number of apparent agents about whom

16  evidence has been presented who are being blamed for

17  what occurred in this case, including the

18  radiologists and radiology technicians.

19      The evidence has been produced amply by

20  defendants in order to demonstrate that those

21  radiology technicians and radiologists were

22  apparently the ones who were responsible here with

23  respect to the ultrasound in February of 2016.

24      This, as re-written or as modified, this is IPI

25  50.11.  And plaintiffs have sought to modify it in

order to conform to the allegations in the operative

complaint.  It's intended to cover all potential

agents.  And so it doesn't specifically call out

radiologists or radiology technicians, but it does

cover those potential agents because there's a need

to do something about Count 10.

             THE COURT:  All right.

             MR. RUPCICH:  May I be heard, Judge?

             THE COURT:  Yes.

             MR. RUPCICH:  So I'm looking at the final

pre-trial order which replaces the pleadings as of

the time its entered by the Court.

        And the tenth issue of law the, the only one --

I'm sorry, ninth, whether Wexford is responsible

under respondeat superior for the professional

negligence of its employees Dr. Nawoor,

Dr. Einwohner, Nurse Galvin.  And then whether

Wexford was institutionally negligent in its care in

violation of Illinois law.

        There has been no issue framed as to whether

Wexford is liable on a respondeat basis for unnamed

parties' conduct, including Dr. Ritz.  There is no

issue framed as to an apparent agency claim which

would have to be laid out in this final pre-trial

order, whether X acted as an apparent agent of

1  defendant Wexford.

2      And if we knew that was a claim, we would have

3  had to, during the time the evidence was coming in,

4  those are issues that required evidence for

5  development and we would have defended those.

6      This is -- was not read to the jury in the

7  introduction to the case.  The concept that there

8  are now an apparent agent claim where we've had

9  really no notice that they were going to claim

10  outside vendors were apparent agents until, I guess,

11  a few minutes ago when we got this, is entirely

12  prejudicial, outside the final pre-trial order, and

13  outside the issues that we came here to try.

14      Now, there's one additional thing I'd like to

15  state.  The claims as they have been outlined start

16  12/23/15.  I'm getting the sense that there's --

17  that's in the complaint, that's the final pre-trial.

18  That there's going to be argument in this closing

19  trying to reach back beyond December 23rd, 2015, and

20  blame the defendants for things that are not framed

21  in this case.

22      And I want and I request, respectfully, that we

23  get clarity from the Court that the claims are the

24  claims as they are set out in the final pre-trial

25  and as they have been tried up until today.

1    THE COURT:  Can you put your hands on the

2 final pre-trial order easily?

3    MR. RUPCICH:  I have it.

4    THE COURT:  Mr. Strom, your response?

5    MR. STROM:  Yes, Your Honor.

6    First, this radiology service was something

7 that Wexford was contractually obligated to obtain.

8 It was part of the contract with the State of

9 Illinois, that this was part of the comprehensive

10 medical services provided.

11    THE COURT:  Show me where that is in the

12 evidence?

13    MR. STROM:  In the contract?

14    THE COURT:  Yes.

15    MR. STROM:  May we show it on the screen,

16 Judge?

17    THE COURT:  Yes.

18    MR. RUPCICH:  Can I talk?  Or no?

19    THE COURT:  I'm trying to read.

20    MR. RUPCICH:  Yes, ma'am.

21    THE COURT:  So referring to 2.2.3.18.

22 Vendor shall provide and be reimbursed for radiology

23 technician.

24    And then 2.2.3.18.2 says vendor shall provide a

25 radiologist who must be approved by IDOC.

1    Who is that radiologist in this case?

2            MR. STROM:  I believe that the evidence

3    shows that it's the employee of Precise.  Precise is

4    the company --

5            MR. RUPCICH:  No.  No.

6            THE COURT:  That's not the radiologist,

7    that's the technician.

8            MR. STROM:  There was a radiologist

9    technician who came to take --

10           MR. RUPCICH:  This is about x-rays.  That

11   section.  X-rays onsite.  They do onsite x-rays.

12           MR. STROM:  This portion of the contract

13   clearly talks about --

14           THE COURT:  Says (as read) shall provide

15   routine x-rays, fluoroscopies, and special studies

16   at the center.  If an offender requires a procedure

17   that is beyond the capability of the onsite

18   equipment, vendor shall refer the offender to an

19   offsite health care facility.

20           MR. STROM:  So among those onsite

21   capabilities, the onsite equipment, the evidence has

22   shown in this case is ultrasound.

23           MR. PELZ:  The radiologist shall forward a

24   written report.

25           THE COURT:  I didn't hear you, Mr. Pelz?

1    MR. PELZ:  I'm just asking to point out

2    that the radiologist shall forward a written report

3    to the center.  That's the person who is reading

4    what the technician comes in and does.

5    MR. RUPCICH:  But, Judge, the larger point

6    is it's not the contract that determines the issue

7    of apparent agency.  According to the Illinois

8    pattern instructions, the elements are related to

9    what the plaintiff perceives.

10   The principal held himself out as a provider of

11   complete care.  The plaintiff neither knew nor

12   should have had reason to know that the apparent

13   agent was not an employee of the principal.  Second,

14   plaintiff did not choose the apparent agent.

15   I mean this goes to the reliance of the

16   patient, it's not a contractual determination.  And

17   this requires a specific instruction with elements

18   on apparent agency that's in 1 -- I'm sorry, 105.11

19   of the IPI.

20   MR. STROM:  Mr. Rupcich is right in this

21   respect, our client didn't choose any of the

22   services he got here.  He didn't choose the

23   radiologist, he didn't choose the doctor, he didn't

24   choose the nurses.  And so whether he relied, it's

25   almost -- it's been established by what the facts

1   are in this case.

2        THE COURT:  So you're denying that the

3   technician who came and did the ultrasound was your

4   agent?

5        MR. RUPCICH:  Yes.

6        THE COURT:  I thought Doctor and several

7   others testified that they thought he worked for

8   Wexford?

9        MR. RUPCICH:  No, no.  Chad just testified

10  that Precise Ultrasound is an outside vendor.

11       THE COURT:  That's the first time I've

12  heard anything about an outside vendor named

13  Precise.

14     My court reporter is nodding in agreement.

15     No.

16  (A discussion was held off the record.)

17       MR. PELZ:  I believe Dr. Ritz testified, he

18  said that they had arranged, that they an agreement

19  with Precise.  And that's why when they were asking

20  for the urology in their note it says urology by

21  Precise.  Because that's who Wexford was in a

22  relationship with and that was Wexford's chosen

23  entity to come in and do the urology and to read

24  whatever was generated by the technician and issue a

25  report.  That was all to be done by Precise as had

1   been previously arranged and established by Wexford.

2           THE COURT:   So is there anyone else going

3   to be referenced besides the ultrasound provider?

4   In closing?

5           MR. MARTIN:   You mean in closing?

6       Rebuttal closing might be different than

7   opening closing, Your Honor, but in terms of the --

8   the storyline I think is that it's the ultrasound --

9   at least the storyline that I've heard during the

10  trial is that it's the ultrasound.  And it was also

11  a mistake on a CT scan that was done by Wexford and

12  its agents in the summer of 2015.  I think those are

13  the two relevant arenas where they are blaming a

14  radiologist who they went out and hired.

15          And from our client testified --

16          THE COURT:   That was evidence presented by

17  the defense?

18          MR. MARTIN:   The testimony with regard to

19  that I think is Dr. Einwohner in part.

20      I think the -- I'm not sure each of the

21  witnesses that testified about these -- the

22  radiology during the summer of 2015, but I think it

23  was -- my recollection is it's replete in the

24  testimony.

25          THE COURT:   There's certainly nothing in

the complaint that references that time period;

correct?

MR. MARTIN: The -- the core of our case

goes through the time period from December through

something else. I -- Mr. Strom has the complaint in

front of him. I don't know that the complaint goes

back that far in time. I know that the defendants'

theory goes back that far in time. So it's going to

come up during the closings because I think they

will go ahead and reference the radiology in 2015.

THE COURT: Is that correct, Mr. Rupcich?

MR. RUPCICH: Absolutely. The medical

history of the patient is the patient's medical

history, and it goes back several years with several

studies that were done at outside hospitals.

The claim -- there's never been any claim in

this case that this should have been diagnosed

earlier than 12/23/15, when he first presented. I

think, if I'm remembering, that's the first line of

their complaint, 12/23/15. I'd have to double-check

it, but it's right there in the front.

And you know, what it appears is they have

realized that there's a fairly large empty chair in

the form of some missed radiology reads that they

have known for -- since expert discovery, because we

disclosed -- we disclosed Racenstein's opinions of
what was on these films. And they could have had
these films.

But now that it's become clear that there are
several empty chairs, they're trying to hook them in
through a theory that is not encompassed in the
final pre-trial order, has not been properly proved
up. And you know, I'll move for Rule 50 on it. And
at that point, I think it would be granted because
there's been no proof of any apparent agency.

MR. MARTIN: So, Your Honor, I think the
first time that we -- the blame the radiology theory
comes up is in their expert reports after the close
of discovery. I don't think it's referenced in
their answer by way of defense. I don't think it's
referenced in the pre-trial. I think the first time
you see it is in their expert reports. And
obviously, they have dug in with regard to a theory
that it's somebody else's fault, including the
radiologist in the summer of 2015.

So, you know, look, it's -- you know, are we
gonna necessarily mention it in closing? Not
necessarily in the first part of our closing. But
if they go into it, you get right into this agency
theory that we are talking about right now. Which

1  is clearly pled in the complaint.  And you can

2  certainly conform -- certainly conform the legal

3  jury instructions to what the proofs have been at

4  trial.

5       So it's clearly an issue if they are going to

6  raise it and blame it on the radiologist in the

7  summer of 2015.  But it's their choice.  If they

8  don't -- if they're not raising it, we're not going

9  to talk about it.

10            THE COURT:  All right.  Then I will allow

11  the reference to the ultrasound technician in your

12  opening, but not the doctor who was the radiologist

13  in, was it July of 2015?

14            MR. MARTIN:  Yeah, it's July of 2015.  So I

15  will not mention anything that's -- there -- there

16  will be one little mention of it, Your Honor, just

17  to be clear.  There is the notion that there was a

18  re-imaging request and there's a reference to a

19  July 2015 CT scan in Dr. Einwohner's January 7th

20  note.

21            THE COURT:  That's acceptable, just no

22  agency discussions.

23            MR. MARTIN:  I'm not going to go back and

24  talk about that particular CT scan to cut that issue

25  off.

1   THE COURT:  All right.

2   So then let's go -- it seems to me you may be

3   modifying 7 as well.  So resubmit those when we come

4   back from lunch, the modifications.

5   Then --

6   MR. RUPCICH:  Judge, that imposes no

7   limitation on what I can argue, what you just

8   discussed with Mr. Martin; right?

9   THE COURT:  Right.

10   MR. RUPCICH:  Okay.

11   THE COURT:  We have 39A, which is the

12   Court's, about the collegial review process.  About

13   the documents.  That's refused, withdrawn,

14   et cetera.

15   Then we have 24A.  It's got changes to Court's

16   24B.  It's basically rearranging.  Is there any

17   objection to that?

18   MR. RUPCICH:  Yes.  We object to that and

19   we've offered our own Monell instruction in our

20   filings with the Court.

21   THE COURT:  Have I ruled on that?

22   MR. RUPCICH:  You refused it.

23   THE COURT:  Yeah.  So I'm going to give

24   Plaintiff's 24A over objection.

25   All right.  Plaintiff's 30, which is an

1   alternative to Court's 30; any objection?

2        MR. RUPCICH:  Yes.  There's been

3   insufficient evidence of diminished life expectancy

4   that he's experienced or reasonably certain to

5   experience in the future.  There's been no proof as

6   to what his life expectancy was, how it was

7   decreased, to what amount.  There's been no life

8   care planner, no actuarials.  It's pure speculation.

9   I believe there is an Illinois pattern instruction

10  on diminished life expectancy that explains to a

11  jury how that evidence is to be considered.

12       Also, present value of medical care and

13  supplies.  Zero evidence on that.  And that is

14  something I wanted to address with the Court as far

15  as arguments on that nature in closings.  But that's

16  my objection to that.

17       THE COURT:  So are you going to submit an

18  alternative?

19       MR. RUPCICH:  Well, Judge, the Court's

20  compensatory instruction that you sent last night I

21  don't object to.  So -- I think you circulated in

22  last evening.

23       THE COURT:  I did.

24       MR. RUPCICH:  It identified physical,

25  mental, emotional pain and suffering and disability,

1  loss of a normal life, and did not include these

2  other elements.

3          THE COURT:  All right.  We'll get to that.

4  I'm going to reserve on the Plaintiff's 30.

5      Verdict form.  Any objection?  Plaintiff's 37A.

6  And plaintiff, remember there's never a number on

7  verdict forms.

8          MR. RUPCICH:  I'm sorry.  I do object based

9  on the itemizations on the compensatory damage

10  blanks.  Same basis I just explained.

11         THE COURT:  I'm going to give 37A over

12  objection.

13     And behind Exhibit B we have Plaintiff's 2A.

14  Which is some modifications to their original 2.

15  Any objection?

16         MR. MARTIN:  Your Honor, I think by going

17  through what was behind Exhibit A, you've gone

18  through --

19         THE COURT:  These are the strike-outs?

20         MR. MARTIN:  This is just a redline of it,

21  yes.

22         THE COURT:  All right.

23     Then what about Plaintiff's 5 which was the

24  instruction Lisa Mincy that I gave?  Do you want me

25  to read that again?  Defendant Lisa Mincy is no

1    longer a defendant.

2         MR. RUPCICH:  Probably.

3         THE COURT:  All right.  Mr. Martin?

4         MR. STROM:  Yes.

5         MR. MARTIN:  Yes.

6         THE COURT:  All right.  Then Court's 38

7    about the reports.  Any objection?

8         MR. RUPCICH:  Yeah, I object to it.  You

9    know, I object to -- across the board on this.

10   But -- well, let me say this:  Since the evidence is

11   in and the Court has made that decision, I don't

12   object to this instruction.

13        THE COURT:  Do plaintiffs?

14        MR. STROM:  No objection.

15        THE COURT:  All right.  38 is given, no

16   objection.

17        Court's 39 is not being given.

18        We gave the alternative of Plaintiff's 24.  So

19   Court's 24B will not be given.  It's withdrawn.

20        And Court's verdict form is withdrawn.  Will

21   not be given.

22        Do we have any other jury instructions?

23        MR. STROM:  For plaintiffs, Judge, just two

24   questions about Court's draft jury instructions as

25   they were sent last night.

1    The first is Court's 18, which is page 24 of 53

2    of the document that was sent last night.  This is

3    the Seventh Circuit Pattern Instruction 1.25 --

4         THE COURT:  I have it.

5         MR. STROM:   -- separate consideration.

6    And so to read it into the record, (as read:)

7    You must give separate consideration to each claim

8    and each party in this case.  Although there are

9    four defendants, it does not follow if one is

10   liable, any of the others is also liable.

11        At the time that this instruction was

12   considered during pre-trial, there were four

13   individual defendants as well as the corporate

14   defendant.  There's some ambiguity here as to who

15   these four defendants named in Court's 18 are.

16        And additionally, as the Court is well aware,

17   there are plenty of vicarious liability theories in

18   this case.  So accordingly, if the four defendants

19   referenced here comprised Wexford Health Sources,

20   then the second sentence is a little bit misleading

21   on that point.

22        And I think there's lots of ways to cure it,

23   and we're open to the Court's suggestions about how

24   we would do so.

25        THE COURT:  Well, you submit one with

itemization and the correct number of defendants.
So call is 18A.

    Next question?

     MR. STROM:  Next questions pertains to the
very next page, page 35 of 53, Court's 19, which is
state is not a party.

     Similarly, at the time that the parties in
pre-trial that the Court discussed the jury
instructions, there was a defendant, Lisa Mincy, who
was employed by the State of Illinois.  There are no
long any employees of the State of Illinois.  And of
course, the State of Illinois has never been a party
to this case.  And so plaintiff is simply seeking
the Court's position and guidance on whether this
particular instruction should still be read.  We
don't have any objection to it if it will be.

       THE COURT:  Your position?

       MR. RUPCICH:  I still think it's
appropriate.  We give it in cases in which the state
is not a party just because of the context in which
the events took place, the State of Illinois
facility run by the Illinois Department of
Corrections.

       MR. STROM:  As I said, no objection from
plaintiff.

1    THE COURT:  Given.  Thank you for bringing
2  it up.  Next question?
3    MR. STROM:  If I may have just one moment?
4    MR. RUPCICH:  Judge, for my edification, is
5  there going to be an apparent agency instruction
6  given as to Precise Ultrasound?
7    THE COURT:  I don't know.  I haven't had
8  one submitted.
9    MR. RUPCICH:  Well, I'm not going to.
10    THE COURT:  Pardon?
11    MR. RUPCICH:  I won't be submitting one.
12  Do you want to hear me on Rule 50 before we --
13    THE COURT:  We will, yeah.
14    MR. MARTIN:  May we -- Your Honor, in
15  response, you said that you were withdrawing Court's
16  39 and Plaintiff's 24 would be given?
17    THE COURT:  Uh-huh.
18    MR. MARTIN:  We are having problems
19  locating Court's -- or Plaintiff's 24, even though
20  it's Plaintiff's 24.  Do you have that that we could
21  take a quick look at that?
22    THE COURT:  24B.  To succeed on Plaintiff's
23  Eighth Amendment claim.  Do you want to see it?
24    MR. MARTIN:  No.  If it's 24B, I have it,
25  Your Honor.

1    So, Your Honor --

2         THE COURT:  I'm sorry, I misspoke.  What I

3    gave was 24A, which changes to Court's number 24B.

4    Just to make sure we're all on the same page,

5    can we put it on the overhead?

6         MR. RUPCICH:  24B at page 32 and 33 is what

7    the Court intends to give; is that right?

8         THE COURT:  No, it's Plaintiff's 24A.

9         MR. RUPCICH:  So you withdrew your

10   instruction?

11        THE COURT:  Yes.  24A appears to be changes

12   to Court's number 24B.

13        MR. RUPCICH:  Okay.  That's what I have in

14   my notes.

15        THE COURT:  It's amazing how our

16   electronics become so many pieces of paper.

17   Off the record.

18   (A discussion was held off the record.)

19        MS. SHEEHAN:  So this is 24A, Plaintiff's

20   24A.  Is what was submitted this morning.

21        MR. MARTIN:  By us.

22        THE COURT:  Now, you know which one it is,

23   Mr. Martin?

24        MR. MARTIN:  Yes.  The part that I'm

25   confused by, Your Honor--and sorry to go back to

1　this topic--but at the beginning of this session,

2　the Court said after -- at least on my realtime is

3　"After reconsidering the evidence, I am going to

4　agree as to the adverse inference."

5　　　　　THE COURT:　That there is no adverse

6　inference.

7　　　　　MR. MARTIN:　So you're not -- you said,

8　"I'm not going to give Court's 39 that you handed

9　out last night."

10　　　　　THE COURT:　Yes.　Do you wish to preserve

11　your objection?　You may do so.

12　　　　　MR. MARTIN:　Yes, we object because our

13　view is that the -- the -- we object for all the

14　reasons we have already stated, Your Honor.　But to

15　be, you know, doubly clear, our view is that they

16　have had several witnesses testify about multiple

17　documents that they did not produce in discovery.

18　And that there should be some clarity with regard to

19　the jury's understanding of that.　It does not

20　necessarily have to be an "adverse inference"

21　instruction as the IPI is written, but I think it

22　does need to make clear that those documents, that

23　the jury should presume that those documents do not

24　exist, because they --

25　　　　And, Your Honor, they have had witnesses come

1  in and talk about pattern and practice with regard

2  to documents that exist with regard to collegial

3  review, yet they have failed to produce them in this

4  case.  So I think that in fairness, an instruction

5  that makes it clear to the jury that such

6  documents -- that the jury should presume that such

7  documents do not exist would be the way to address

8  that issue.

9      That's not a classic adverse inference

10  instruction, that's if the documents existed, they

11  should have produced them in discovery, so they

12  shouldn't be able to argue to the jury that the

13  documents existed under a pattern and practice.

14      So, Your Honor, it's our view that in order to

15  make it clear to the jury as to what happened here,

16  Your Honor should be giving an instruction somewhat

17  like that.  Which we have -- we did revise 39 a

18  little bit, Your Honor, after we saw it yesterday,

19  and submitted it.  The instruction that we revised

20  we think would be appropriate.  So that's our

21  position.

22          THE COURT:  I will allow you to argue.  I'm

23  not going to give the instruction.

24          MR. MARTIN:  Okay.  Thank you.

25          THE COURT:  All right.  I think that takes

care of jury instructions.

The exhibits. I want you to go through your exhibit list and either agree or disagree as to which exhibits will go back. The -- let's see this. This is the list of plaintiff's and the list for defendants'.

Why don't we make them copied.

I'm going to return to my office and make a packet of jury instructions for each of you.

MR. MARTIN: Thank you, Your Honor.

THE COURT: That I expect you to go over over the lunch hour.

Mr. Strom, when do you think you will have your revised instructions?

MR. STROM: Before 1:00, and certainly it could be done before that. 12:30 I can aim for.

THE COURT: Okay. Sounds good.

Court is in recess until 12:30. Were you going to send me some too, Mr. Rupcich?

MR. RUPCICH: No.

Let me think about -- on that -- there's discrepancy between now the compensatory instruction and the verdict form, so I want to see what you guys do.

THE COURT: Okay.

1    (A lunch recess was taken.)

2    THE COURT:  So the copies that I received

3  from you were not in Word, so those instructions

4  will have to be retyped by my law clerk.  Can we get

5  them in Word?

6    MR. PELZ:  I believe we can get them in

7  Word.  Can we get these in Word, the four I gave --

8    MR. STROM:  Yes.

9    THE COURT:  All right.  Let's go through

10  these jury instructions one more time.

11    I received some additional from plaintiffs.  I

12  received nothing from defense.  Does the defense

13  wish to submit anything?

14    MR. RUPCICH:  The only thing I was

15  considering was as to the compensatory and the

16  verdict form.  I wanted to see how the Court

17  modified based on the change to the verdict form

18  that you accepted the last time.  So as it related

19  to the various categories of damages.

20    THE COURT:  Okay.  So let's address

21  Plaintiff's 4A which is again the collegial process

22  documentary evidence.  If you'll remember, I kept

23  out, I believe it was marked Plaintiff's 4, which

24  was --

25    MR. RUPCICH:  Defense.

1    THE COURT:  Defendant's 4, which were

2    summaries.  But the doctor testified about them.  So

3    I think to give this would be misleading, so I'm

4    going to refuse it.  I'm not saying you can't argue

5    that there are documents missing.

6         Then I have 6A and 7A.  We reserved as to 2A.

7         Do we need to give 2A if I give 6A?  And does

8    it need to be --

9         2A will be given.

10        MR. STROM:  Judge, plaintiff's perspective

11   is that 2A pertains only to the named defendants,

12   whereas 6A pertains to Count 10's respondeat

13   superior liability as to the non-defendant

14   Dr. Stephen Ritz.  So each of them needs to be

15   given.

16        THE COURT:  That's what I just said.

17        MR. STROM:  I beg your pardon.  Thank you.

18        MR. MARTIN:  I have realtime in front of

19   me, so it's unfair.

20        MR. RUPCICH:  So 2A --

21        THE COURT:  2A is given.  6A is given.

22        MR. RUPCICH:  For the record, I object to

23   that because there wasn't an issue framed by the

24   final pre-trial or the issues presented to the jury

25   as to a claim against a non-party by and through the

1  employer.

2  THE COURT: 7A is different. Dr. Ritz is

3  an officer of the Wexford Health Services. And

4  Precise is a radiology service that was provided by

5  Wexford. I'm going to refuse 7A. I'm not

6  indicating you can't argue that they were agency --

7  agents under respondeat superior, but since there

8  was not a separate claim stated as to Precise, I

9  believe we're still under respondeat superior

10  agency. So 7A is refused.

11  MR. RUPCICH: And for the record, I've made

12  my objection on that point and I don't want to

13  interrupt the plaintiff's closing on that. As long

14  as my objection is preserved as to any argument

15  Precise is an agent of Wexford.

16  THE COURT: Yes, your argument will be

17  preserved.

18  MR. PELZ: Judge, just so I can make sure

19  this is on the record. In terms of this -- the

20  other agents involved and what claims are here and

21  what defenses are here, I think it should be -- it

22  should be pointed out on the record that the

23  assertion that somebody else did something wrong,

24  that is that the radiologist in February did

25  something wrong was never raised until October 8th

1  of this year.

2  It wasn't in the answer, it wasn't in any

3  responses to interrogatories, it wasn't in any --

4  you know, it wasn't identified in any sort of

5  response, it wasn't stated by any person who was

6  deposed. Nowhere in fact discovery was that issue

7  ever raised.

8  Now, we heard yesterday from Dr. -- Dr. K, that

9  he raised that issue with the lawyers when he was

10  first retained in January of 2019. If they were

11  intending to raise that, they should have identified

12  those. That also goes to the stuff -- everything

13  that happened in 2015. And it's even worse with

14  respect to that.

15  Now, I understand what Your Honor has already

16  ruled on that. They never ever claimed that any of

17  those people involved with 2015 had any relevant

18  evidence to this case. They didn't produce the

19  documents from those entities during the discovery

20  time. You know, we were never on any notice that

21  they were going to assert that that was some sort of

22  issue that was gonna have affect -- anything

23  relating to this trial. We couldn't possibly have

24  pled precisely what we have here because they never

25  told us -- they never even gave a hint that was

1   going to be nature of the defense.

2           THE COURT:  Until October.

3           MR. PELZ:  October 8 of 2019.

4           THE COURT:  Did you file a motion in

5   limine?

6           MR. PELZ:  Well, look, we filed -- we did

7   file some objections with respect to this.  We

8   also -- I mean, you could add to this we -- the

9   number one opinion from Dr. Kosierowski that he had

10  metastasis in December of 2015, that isn't even in

11  his report.  He admitted that.  That was never in

12  his report.

13      The real issue is here they never put anything

14  on notice.  And for them to come in and say, well,

15  it isn't -- it wasn't in our pleadings is wholly

16  unfair.  Because it was generally identified in the

17  pleadings.  We actually think that there shouldn't

18  be any reference to anything about 2014 or 2015.

19  Shouldn't be in the case, they never identified it.

20          THE COURT:  What about the July 2015 CT

21  scan?

22          MR. PELZ:  Never mentioned.

23          THE COURT:  Was that mentioned in October?

24          MR. PELZ:  Yeah, October.  First time we

25  hear anything about the July 15 CT scan having

anything to do with this case, October.  And even
after our expert reports.  Our experts didn't get to
address that issue.  Because we didn't get rebuttal
expert reports.

          THE COURT:  Mr. Rupcich?

          MR. RUPCICH:  Yeah, so they've had these
medical records since 2017.  And I don't think
there's any doubt that Jenner and Block is rife with
resources.  If they didn't take the time to look at
the records, to have an expert review the films in a
timely fashion to determine who they wanted to sue,
that is not my fault.

     What I did -- and I think the records we got
showed that they didn't retain an oncology expert
until September.  Well, you know, I had one in
January.  I developed this defense and I disclosed
in accordance with the deadlines the Court set out.

          Now, for -- I'm not aware of any mechanism in
the Federal Rules of Civil Procedure, any of the
case management orders of this Court, that would
require me to tell them how I defend -- how I intend
to defend the causation issue in this case before
the deadline set out by the Court.  And that's
exactly what I did.

          MR. PELZ:  I'm gonna check with Mr. Strom

1  or Mr. Strom can correct me, but I asked this

2  question the other day.  It's not true that we had

3  these records of the 2014 and 2015 or that we had

4  these films in 2017.  We got the records on the 2014

5  and 2015 issues in August 2019, after the close of

6  all fact discovery.  And none of those people were

7  identified as potentially relevant witnesses.

8       If they knew that they were going to raise this

9  defense, they would have known that all of those

10  people involved in those 2014 and 2015 examinations

11  would be relevant witnesses who might have relevant

12  testimony.  It would be mandatory that they

13  disclosed them in disclosure.  It wasn't done.

14           MR. RUPCICH:  They had -- I'm sorry.

15           MR. PELZ:  The films -- the films, we

16  didn't get the films until September of 2019.  And

17  either days before or after -- well, it's after, we

18  had to issue our expert reports.  Those films were

19  never made available to us, we didn't have them.

20           MR. RUPCICH:  These are not Wexford films.

21  I subpoenaed these.  They could have subpoenaed

22  these at any time during discovery.  My expert said

23  he wanted them, I subpoenaed them.  For them to tell

24  the Court that it was up to me to subpoena records

25  from outside hospitals that we have no control over

when they very easily could have done that from the time they got involved in this case. I am not the gatekeeper to those films. I got them, and when I got them, I had them copied by the service across the street and I gave them to them.

THE COURT: What service is across the street?

MR. RUPCICH: It's literally right there.

THE COURT: Star Printing?

MR. RUPCICH: Yes. They will copy radiology films. And they're fast.

THE COURT: All right. I'm already ruled.
Plaintiff's 18A, alternative to Court's 18.
Any objection?

MR. RUPCICH: I think Wexford should be included. I think the Court had it right before. Wexford is a party.

THE COURT: Okay. I will give Court's 18.
I refused Plaintiff's 7A. Are we going to give Plaintiff's 7?
And it was refused because of Precise being in 7A.
Do you wish to give 7?

MR. MARTIN: Yes. Yes, Your Honor.

THE COURT: It's 50.11. Respondeat

1  superior.

2          MR. RUPCICH:  Oh, this piggybacks on my

3  objection to the instruction including writs.

4  However, if the Court is going to give that

5  instruction, then I think this is appropriate.

6          THE COURT:  Okay.  So 7 is given.  Over

7  sort of an objection.

8          MR. RUPCICH:  I would say it should say

9  agent.  Apparent agent should be removed.

10          THE COURT:  Well, then submit to me that

11  modification.  In Word.

12      All right.  We still have Plaintiff's 30.  I

13  preserved as to Plaintiff's 30.  Any objection?

14          MR. RUPCICH:  I think that's pattern, isn't

15  it?

16          THE COURT:  It's an alternative to Court's

17  30.

18          MR. RUPCICH:  Yes, I --

19          THE COURT:  Court's is more specific.

20          MR. RUPCICH:  Yeah.  I object to theirs in

21  that Plaintiff's 30 includes those elements of

22  damages that I objected to because there wasn't

23  evidence.

24          THE COURT:  Well, so does the Court's,

25  doesn't it?

1    MR. RUPCICH:  I don't think so.

2    MR. STROM:  Court's does not include

3  diminished life expectancy or present value of the

4  medical care and supplies that Mr. Dean is

5  reasonable certain to need in the future.  Among

6  other things, it's reflected by the cost of the

7  cancer drugs that was introduced into evidence

8  during the course of plaintiff's case in chief.

9    THE COURT:  All right.  I'm going to give

10  Plaintiff's 30.  I'm showing Court's 30 as

11  withdrawn.

12    So I believe I've ruled on all of the jury

13  instructions.  Do you agree, Mr. Pelz?

14    MR. PELZ:  I think so, Judge.  I want to

15  ask Mr. Strom, he was our jury instruction

16  specialist.

17    THE COURT:  All right.  Then let me show

18  you the order in which I will read them.  Do you

19  wish me to read them before closing or after

20  closing?

21    MR. MARTIN:  I think before closing, Your

22  Honor.

23    THE COURT:  Mr. Rupcich?

24    MR. RUPCICH:  That's fine.

25    THE COURT:  If you will step up.  Have you

1    been able to put them together yet?  You don't have

2    Word?  Can you simply copy theirs.  Photocopy theirs

3    and put them in the packet.

4         Joe, can you do yours real quick?  I'm very

5    short-staffed today.  I have one law clerk and one

6    clerk.

7              MR. STROM:  Ms. Sheehan, I spent the email

8    with the Microsoft --

9              THE COURT:  We're just missing one.

10        Can you revise his, taking out apparent.

11        Thank you, Mr. Strom.

12             MR. PELZ:  May we address exhibits?

13             THE COURT:  You may.

14             MR. PELZ:  As to plaintiff's exhibits, I

15   believe with respect to the 415, is that

16   Guaglianone -- Guaglianone's deposition Exhibit

17   Number 2.  There were the pages 6 -- 593 through

18   598.  They were what Dr. Guaglianone produced to us,

19   but he had some records of another patient in there.

20   Those should be taken out.

21             THE COURT:  Okay.  You got that?

22             MR. PELZ:  Those will be taken out of the

23   pages of the exhibit.  And we are not suggesting

24   that that stack needs to go back to the jury.  In

25   terms of others.

1    So -- because that also relates to Defendant's

2  Exhibit 1.  We have -- we have no problem with it

3  being admitted so that it could be used or referred

4  to, but in our review of Defendant's Exhibit 1,

5  other than pages that were used and are also already

6  in the record as some plaintiff's exhibit, there

7  isn't any testimony about any of these other pages.

8  It can come in, but I don't think it should go back

9  to the jury if there wasn't any testimony about it.

10      THE COURT:  Did it already come in?  Has it

11  been admitted?

12      MR. PELZ:  It was admitted with our saying

13  we had -- we wanted to reserve the question of

14  whether it could go to the jury.

15      THE COURT:  Okay.  That's fine.

16      MR. PELZ:  But it was admitted.  I'm not

17  trying to revisit the admission question.

18      THE COURT:  But you're sure that the

19  information contained and referred to at trial is in

20  other exhibits?

21      MR. PELZ:  That's what I was told by the

22  people who went through this.  I -- if they can

23  identify any other pages in here that were referred

24  to, no problem, those can go to the jury.

25      THE COURT:  Okay.  Mr. Rupcich, is that

1    fine?

2          MR. RUPCICH:  We can talk about that.  The

3    records are in evidence, I can refer to what is in

4    evidence.  We can have a separate discussion of what

5    goes back to the jury.

6          THE COURT:  Well, this is that discussion.

7    We're having it.  Do you object to keeping this from

8    going to the jury?

9          MR. RUPCICH:  No, I want -- if we're

10   sending medical records to the jury, the medical

11   records go to the jury.  That's my position.

12         THE COURT:  Aren't these documents

13   contained in Defendant's Exhibit 1 in evidence

14   elsewhere?

15         MR. RUPCICH:  Not in their entirety.  Parts

16   of them have been admitted through exhibits of the

17   plaintiff.  But these are the medical records of the

18   relevant time in chronological order.  It's really

19   the key document that tracks Mr. Dean's care.

20         THE COURT:  Is it in full?

21         MR. RUPCICH:  It is in full as far as --

22         THE COURT:  Is that his medical record?

23         MR. RUPCICH:  It's not the full thing.

24         THE COURT:  For the time period in

25   question?

1    MR. RUPCICH:  Right.  With a few of the

2  records from before December 2015 as relevant to

3  testimony we heard on his medical history.

4    THE COURT:  Okay.

5    MR. RUPCICH:  These are what Mr. Strom and

6  I went through two weeks ago.

7    THE COURT:  I will allow it to go back to

8  the jury.

9    MR. PELZ:  I think these are the Court's.

10    THE COURT:  Can we bring the jury in?

11    THE CLERK:  They haven't went through

12  plaintiff's, Judge.

13    THE COURT:  Gone through plaintiffs?

14    THE CLERK:  Gone through plaintiff's

15  exhibits.

16    THE COURT:  Any objection to plaintiff's

17  exhibits going to the jury?

18    MR. RUPCICH:  Some --

19    THE COURT:  And I want to make sure, is 415

20  admitted?  Madam Court Reporter, I haven't ruled?

21    (A discussion was held off the record.)

22    THE COURT:  Plaintiff's 415 is admitted

23  minus the documents previous referenced by Mr. Pelz.

24    All right.

25    MS. SHEEHAN:  And 415 is not going back to

1     the jury; correct, Judge?

2            THE COURT: So separate it. 415 is not

3     going back to the jury.

4            MR. RUPCICH: Okay.

5            THE COURT: Correct, Mr. Pelz?

6            MR. PELZ: We're not insisting it go back.

7     We're okay with it not going back. Although if

8     everything else is going back --

9            MR. RUPCICH: That's fine with me.

10           THE COURT: Okay, we'll give 415 to the

11     jury.

12     My court clerk is copying the jury

13     instructions.

14           MR. RUPCICH: Just send them all back.

15           MR. MARTIN: Send them all back.

16           THE COURT: So nothing is being reserved?

17           MR. MARTIN: Send it all back.

18           THE COURT: Okay. Diane, is the cart big

19     enough?

20     I want you and Mr. Pelz to go through the jury

21     instructions before I call the jury in.

22     Mr. Strom, he just nominated you.

23     And do I need to limit your closing? How long

24     do you think yours will be Mr. Martin?

25           MR. MARTIN: Four hours. That's a joke.

1  I'll be pretty efficient.

2          THE COURT:  Just make a guess.  I know
3  you're always wrong.

4          MR. MARTIN:  45 minutes.

5          THE COURT:  Mr. Rupcich is always wrong.
6  It's nothing personal, it's just lawyers.

7          MR. RUPCICH:  Less than that.

8          THE COURT:  And in rebuttal?

9          MR. MARTIN:  Another two hours.  Probably
10  10, 15 minutes.

11          MR. RUPCICH:  Judge, I have to preserve my
12  record on a Rule 50.

13          THE COURT:  Oh you do.

14          MR. RUPCICH:  If you want to hear the
15  argument or -- yes.

16          THE COURT:  You may.

17          MR. RUPCICH:  Defendants move for judgment
18  as a matter of law under -- they rested on rebuttal
19  too, right?  We're done?

20          THE COURT:  Yes.

21          MR. RUPCICH:  Judgment as a matter of law
22  under Rule 50 of the Federal Rules of Civil
23  Procedure.  First, on the Eighth Amendment claims.
24  The Eighth Amendment requires reckless disregard,
25  conscious disregard of a patient in the face of

serious risks of harm.

The evidence here has shown a medical workup. Dr. Metwalli testified and admitted that whether to order an ultrasound as opposed to another test is a matter of clinical judgment. That was his testimony.

When something comes down to a matter of clinical judgment, that takes it out of the realm of the Eighth Amendment and places it squarely in the field of state medical malpractice. And that goes all the way back to Estelle versus Gamble in the 70s.

And the evidence in this case shows a clinical workup. It shows the patient was worked through. On the individual claims, specifically as it relates to Dr. Einwohner, two involvements that she had, January 7 and February 8. On both occasions, she referred the patient to the collegial process that generated a review and diagnostic testing and urology referral. That is not deliberate indifference, that is taking steps to move the patient forward. She did not ignore anything. She did what she could do within the system that got the result and got the ball into the right court.

Now, as to Dr. Nawoor, the case law I cited in

my summary judgment motion, and the case is escaping

me, wit -- Whiting.  Whiting discusses fact patterns

very similar.  Failure to diagnosis cancer.  There

has to be evidence that the party knew better than

what they were doing.  And Dr. Nawoor testified,

"Well, I thought it was either stones or cancer."

He investigated stones, ruled that out, and then

moved on.  And the -- the Seventh Circuit has said

that's not a basis for deliberate indifference.

There's a significant personal involvement

issue as to Kathy Galvin.  Her involvement was very

minimal.  I don't think there was any evidence she

had any direct clinical involvement with the

patient.  She spoke with the patient's wife over the

phone during the period the patient was under the

care of Dr. Severino between April and July.

There is no basis upon which a jury could find

against the defendants on an Eighth Amendment claim.

This is the same as to the Monell claim against

Wexford.  While they have attacked the process that

generated these collegial reviews, there is no

dispute that Mr. Dean got through the process in --

in a period of time he got a diagnosis, got surgery,

and has -- has survived.  And there's no evidence

that the specific failings they've alleged in the

collegial process--which I'm not exactly sure what
they are other than the process exists--was known to
Wexford such that they could have or should have
known about it and fixed it.

I would move on institutional negligence.
There's a claim against Wexford for institutional
negligence.  That's a direct claim of negligence
against a health care provider as distinct from
respondeat superior.

Am I talking too fast, Kathy?

And there's been no expert testimony to
establish an institutional standard of care in this
case.  The standard of care they have established
and argued for throughout the evidence is the
urologic standard of care for referral for CT IVP
and cystoscopy.  There's been no proof of an
institutional standard of care that was deviated by
defendant Wexford.  Deviated by from defendant
Wexford.

Okay.  Medical malpractice against Kathy
Galvin.  The testimony of the medical non-nursing
expert, Dr. Barnett.  He ended up settling upon
Kathy Galvin should have told Dr. Nawoor, who should
have contacted Dr. Severino, the surgeon, to hurry
along Dr. Severino, but Dr. Severino was acting

1  appropriately.

2      So really, I'm not sure what it amounts to

3  other than a convoluted chain of causation that was

4  not supported by any recognizable standard of care

5  that would require a nurse to do this.  She should

6  be let out of this case in its entirety.

7      Punitive damages I would move on the Eighth

8  Amendment claims.  The standard to support punitive

9  damages, knowing reckless conduct similar to my

10  Eighth Amendment claim is lacking in this case.  The

11  most that can be said is that the process could have

12  worked quicker.  There's no evidence of malicious

13  conduct.  There's no evidence of reckless disregard.

14  There's no evidence upon which a jury could find a

15  basis to want to punish a defendant for any actions

16  in this case.

17      I'm out of breathe and I think that's it.  If I

18  can think for one second.

19          THE COURT:   Motion is denied.

20          MR. RUPCICH:   Thank you.

21          THE COURT:   All right.  Take these jury

22  instructions.  I have moved Mincy back, so the pages

23  aren't in order.  Mincy is page 2 of 54, but it's

24  coming right after 26 and right before 27.

25      So make sure you agree with the order in which

1  the jury instructions are in addition to any other

2  issues you might see in the jury instructions.

3          MR. RUPCICH:  Did you ask any questions of

4  the witnesses?

5          THE COURT:  I did ask one question.  I

6  think it was a spelling or something.

7          MR. MARTIN:  Yes, one or two.  But I

8  thought the same thing, but you did ask.

9          MR. RUPCICH:  Okay, that's fine.

10      Might I suggest we move the Lisa Mincy

11  instruction from the front to after page 22, which

12  is you must give separate consideration as to each

13  party in the case.  There are four defendants.  It

14  does not follow if one is liable, any of the others

15  are liable.  And then it would seem that it might

16  fit, Lisa Mincy is no longer a defendant rather --

17          THE COURT:  I already moved it after Page

18  26 and before page 27.

19          MR. RUPCICH:  Did I miss that?

20          THE COURT:  I said that on the record.

21          MR. RUPCICH:  I'm sorry, Judge.

22          THE COURT:  All right.

23      The order of the jury instructions?

24          MR. MARTIN:  Yes, Your Honor.  We're --

25  plaintiff is fine with it.

1    MR. RUPCICH:  Agreed.

2    THE COURT:  Okay.  May we bring the jury

3    in?

4    MR. RUPCICH:  As far as I'm concerned, yes.

5    THE COURT:  Mr. Martin?

6    MR. MARTIN:  Yes, Your Honor.

7    THE COURT:  All right.

8    I see our Clerk of the Court has come up.  You

9    really want to hear me read the jury instructions?

10   I'll buzz you when I'm done.

11   (The jury entered the courtroom.)

12   THE COURT:  Please be seated.  Court is

13   reconvened.  At this time, I'm going to read you the

14   jury instructions.  This will take me a bit of time.

15   They will be put up on the screen so you can read

16   them on the giant screen.  And then you will be

17   given a copy to take back to deliberations with you.

18   Can everybody hear me alright?  My voice is a

19   little raspy today.

20   Members of the jury, you have seen and heard

21   all the evidence and will hear the arguments of the

22   attorneys.  Now I will instruct you on the law.

23   You have two duties as a jury.  Your first duty

24   is to decide the facts from the evidence in the

25   case.  This is your job and yours alone.  Your

second duty is to apply the law that I give you to
the facts.  You must follow these instructions even
if you disagree with them.  Each of the instructions
is important and you must follow all of them.

Perform these duties fairly and impartially.
Do not allow sympathy, prejudice, fear, or public
opinion to influence you.  You should not be
influenced by any person's race, color, religion,
national ancestry, or sex.

Nothing I say now and nothing I said or did
during the trial is meant to indicate any opinion on
my part about what the facts are or about what your
verdict should be.

During this trial, I may have asked a witness a
question myself.  Do not assume that because I asked
questions, I hold any opinion on the matters I asked
about or on what the outcome of the case should be.

The evidence consists of the testimony of the
witnesses, the exhibits admitted in evidence, and
the stipulations.  A stipulation is an agreement
between both sides that certain facts are true.

Certain things are not to be considered as
evidence.  I will list them for you:

First, if I told you to disregard any testimony
or exhibits or struck any testimony or exhibits from

the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded.

Third, questions and objections or comments by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection and you should not infer from my rulings that I have any view as to how you should decide the case.

Fourth, the lawyers' opening statements and closing arguments to you are not evidence. Their purpose is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyers said, you're memory is what counts.

During the trial certain testimony was presented to you by video. You should give this testimony the same consideration you would give it had the witnesses appeared and testified here in court.

During the trial, certain testimony was presented to you by the reading of a deposition, depositions, or video recordings of depositions. You should give this testimony the same

consideration you would give it had the witnesses

appeared and testified here in court.

You have heard witnesses give opinions about

matters requiring special knowledge or skill.  You

should Judge this testimony in the same way that you

judge the testimony of any other witness.  The fact

that such person has given an opinion does not mean

that you are required to accept it.  Give the

testimony whatever weight you think it deserves,

considering the reasons given for the opinion, the

witness's qualifications, and all of the other

evidence in the case.

Any notes you have taken during this trial are

only aids to your memory.  The notes are not

evidence.  If you have not taken notes, you should

rely on your independent recollection of the

evidence and not be unduly influenced by the notes

of other jurors.  Notes are not entitled to any

greater weight than the recollections or impressions

of each juror about the testimony.

Diane, the screen is flashing on occasion.  Is

it flashing up here also?  The big screen.  Yes.

Any ideas?

THE CLERK:  It usually means a loose

connection somewhere.

1    THE COURT:  In determining whether any fact

2  has been proved, you should consider all of the

3  evidence bearing on the question regardless of who

4  introduced it.

5    During the course of this trial, I may have

6  instructed you that I admitted certain evidence for

7  a limited purpose.  You must consider this evidence

8  only for the limited purpose for which it was

9  admitted.

10    For instance, you heard evidence that plaintiff

11  has been convicted of a crime.  You may consider

12  this evidence only in deciding whether plaintiff's

13  testimony is truthful in whole, in part, or not at

14  all.  You may not consider this evidence for any

15  other purpose.

16    You have heard evidence about reports filed in

17  a different case regarding the delivery of health

18  care to inmates in the Illinois Department of

19  Corrections.  Defendant Wexford Health Sources, Inc.

20  disputes the truth of those reports and has not

21  admitted liability in that case.  You may consider

22  these reports only in deciding whether defendant

23  Wexford Health Sources, Inc. had notice and

24  knowledge of the information in the reports, not

25  whether the information in the reports is true.

1  Remember, the issue is whether defendants violated

2  plaintiff's rights as I describe those rights to you

3  in these instructions.

4      You should use common sense in weighing the

5  evidence and consider the evidence in light of your

6  own observations in life.  In our lives, we often

7  look at one fact and conclude from it that another

8  fact exists.  In law, we call this inference.  A

9  jury is allowed to make reasonable inferences.  Any

10  inference you make must be reasonable and must be

11  based on the evidence in the case.

12      You may have heard the phrases "direct

13  evidence" and "circumstantial evidence".  Direct

14  evidence is proof that does not require an

15  inference, such as the testimony of someone who

16  claims to have personal knowledge of a fact.

17  Circumstantial evidence is proof of a fact or a

18  series of facts that tends to show that some other

19  fact is true.

20      As an example, direct evidence that it is

21  raining is testimony from a witness who says, "I was

22  outside a minute ago and I saw it raining."

23  Circumstantial evidence that it is raining is the

24  observation of someone entering a room carrying a

25  wet umbrella.

1  The law makes no distinction between the weight

2  to be given to either direct or circumstantial

3  evidence.  You should decide how much weight to give

4  to any evidence.  In reaching your verdict, you

5  should consider all the evidence in the case

6  including the circumstantial evidence.

7      It's blinking more.

8      You must decide whether the testimony of each

9  of the witnesses is truthful and accurate in part,

10 in whole, or not at all.  You must decide what

11 weight, if any, you give to the testimony of each

12 witness.

13     In evaluating the testimony of any witness,

14 including any party to the case, you may consider,

15 among other things;

16     The ability and opportunity the witness had to

17 see, hear, or know the things that the witness

18 testified about;

19     The witness's memory;

20     Any interest, bias, or prejudice the witness

21 may have;

22     The witness's intelligence;

23     The manner of the witness while testifying; and

24     The reasonableness of the witness's testimony

25 in light of all the evidence in the case.

1    You may consider statements given by a party or

2  witness under oath before trial as evidence of the

3  truth of what he or she said in the earlier

4  statements as well as in deciding what weight to

5  give his or her testimony.

6    With respect to other witnesses, the law is

7  different.  If you decide that before the trial, one

8  of these witnesses made a statement not under oath

9  or acted in a manner that is inconsistent with his

10  or her testimony here in court, you may consider the

11  earlier statement or conduct only in deciding

12  whether his or her testimony here in court was true

13  and what weight to give to his or her testimony here

14  in court.

15    In considering a prior inconsistent statement

16  or conduct, you should consider whether it was

17  simply an innocent error or an intentional falsehood

18  and whether it concerns an important fact or an

19  important detail.

20    In this case, plaintiff was an incarcerated

21  individual at the time of the incident.  All parties

22  are equal before the law.  An incarcerated

23  individual is entitled to the same fair

24  consideration that you would give any individual

25  person.

It is proper for a lawyer to meet with any witness in preparation for trial.

You may find the testimony of one witnesses or a few you witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial.

You must give separate consideration to each claim and each party in this case. Although there are four defendants, it does not follow that if one is liable, any of the others is also liable.

Neither the State of Illinois nor the Illinois Department of Corrections is a party to this lawsuit.

Nurse Lisa Mincy is no longer a defendant in this case. You should not consider any claims against Nurse Mincy. Do not speculate on the reasons. Your focus must be on the remaining parties. You may consider Nurse Mincy's testimony just as you may consider the testimony of any other witness.

1  THE CLERK:  Judge, would you like me to

2  turn it off and back on?  That's his suggestion.

3  THE COURT:  Yes.

4  Technology is wonderful when it works.

5  Defendants Einwohner and Galvin are being sued

6  as individuals and I may refer to them in these

7  instructions as individual defendants.

8  Plaintiff must prove by a preponderance of the

9  evidence that an individual defendant was personally

10  involved in the conduct that plaintiff complains

11  about.  You may not hold an individual defendant

12  liable for what others did or did not do.

13  You may have heard evidence about whether a

14  defendant's conduct violated a Wexford for or

15  Illinois Department of Corrections rule, regulation,

16  policy, or guideline.  You may consider this

17  evidence in your deliberations, but remember that

18  the issue is whether plaintiff's rights were

19  violated as I describe later in these instructions,

20  not whether a Wexford or Illinois Department of

21  Corrections rule, regulation, policy, or guideline

22  might have been violated.

23  When I say that a party must prove something by

24  a preponderance of the evidence or when I use the

25  expression "if you find" or "if you decide things",

this is what I mean:  When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

Plaintiff claims that defendants violated plaintiff's Eighth Amendment right under the United States Constitution.  To succeed on plaintiff's Eighth Amendment claim against an individual defendant, plaintiff must prove each of the following four things by a preponderance of the evidence against that defendant.

1.  Plaintiff had a serious medical need.  A serious medical need is a condition that a doctor says requires treatment or something so obvious that even someone who is not a doctor would recognize that it requires treatment.

2.  Defendant was aware that plaintiff had a serious medical need or strongly suspected facts showing a strong likelihood that plaintiff had a serious medical need but refused to confirm whether these facts were true.  You may infer this from the fact that the need was obvious.

3.  Defendant consciously failed to take reasonable measures to provide treatment for the serious medical need.

Plaintiff does not have to show that defendant

1  ignored him or provided no care.  If defendant

2  provided some care, plaintiff must show that

3  defendant knew his or her actions likely would be

4  ineffective or that defendant's actions were clearly

5  inappropriate.

6      In deciding whether defendant failed to take

7  reasonable measures, you may consider the

8  seriousness of plaintiff's medical need, how

9  difficult it would have been for defendant to

10  provide treatment, and whether defendant had

11  legitimate reasons related to safety or security for

12  failing to provide treatment.

13      You may infer that defendant consciously failed

14  to take reasonable measures if defendant's action or

15  failure to act was such a substantial departure from

16  accepted professional judgment, practice, or

17  standards that it showed a complete abandonment of

18  medical judgment.

19      If defendant relied on the opinion of a medical

20  professional, then defendant did not consciously

21  fail to take reasonable measures unless it was

22  obvious that following the medical professional's

23  opinion would cause harm to plaintiff.

24      4.  As a result of defendant's actions or

25  inaction, plaintiff was harmed or was subjected to a

significant risk of harm.

Plaintiff may prove that defendant harm him with evidence that his condition worsened as a result of defendant's conduct or that he suffered prolonged unnecessary pain as a result of defendant's conduct.

If you find that plaintiff has proved each of these things by a preponderance of the evidence against a defendant under consideration, then you must decide for plaintiff and against that defendant on this claim.

If, on the other hand, you find that plaintiff has failed to prove any of these things by a preponderance of the evidence against a defendant under consideration, then you must decide for that defendant on this claim.

To succeed on plaintiff's Eighth Amendment claim against the corporation defendant Wexford Health Sources, Inc., plaintiff must prove each of the following four things by a preponderance of the evidence.

1.    Reasonable measures were not taken to provide treatment for plaintiff's serious medical need.

2.    A policy by Wexford Health Source, Inc.

1  caused the lack of reasonable measures to be taken

2  to provide treatment for plaintiff's serious medical

3  need.

4      The term "policy" means a custom that is

5  persistent and widespread so that it is the standard

6  operating procedure of Wexford Health Sources, Inc.

7  A persistent and widespread pattern may be a custom

8  if Wexford Health Sources, Inc., has not formally

9  approved it so long as policy proves that a

10 policy-making official knew of the pattern and

11 allowed it to continue.

12     3.  The lack of reasonable measures to treat

13 plaintiff's serious medical need was a known or

14 obvious consequence of the application to plaintiff

15 of the policy described in Paragraph 2.

16     As a result of the policy described in

17 Paragraph 2, plaintiff was harmed or was subjected

18 to a significant risk of harm.  Plaintiff may prove

19 that he was harmed with evidence that his condition

20 worsened as a result of the policy or that he

21 suffered prolonged, unnecessary pain as a result of

22 the policy.

23     If you find that plaintiff has proved each of

24 these things by a preponderance of the evidence

25 against Wexford Health Sources, Inc., then you must

1  decide for plaintiff on this claim.

2  If, on the other hand, you find that plaintiff

3  has failed to prove any one of these things by a

4  preponderance of the evidence, then you must decide

5  for Wexford Health Sources, Inc. on this claim.

6  In addition to plaintiff's Eighth Amendment

7  claims, plaintiff claims that Defendants Nawoor,

8  Einwohner, and Galvin were professionally negligent

9  in violation of Illinois law.  To succeed on this

10  claim against a particular defendant, plaintiff has

11  the burden of proving each of the following three

12  things by a preponderance of the evidence.

13  1.  Defendant acted or failed to act in one of

14  the ways claimed by plaintiff, and that in so acting

15  or failing to act, defendant was professionally

16  negligence.

17  2.  Plaintiff was injured.

18  3.  Defendant's professional negligence was a

19  proximate cause of the injury to plaintiff.

20  If you find that plaintiff has proved each of

21  these things by a preponderance of the evidence

22  against a defendant under consideration, then you

23  must decide for plaintiff and against that defendant

24  on this claim.

25  If, on the other hand, you find that plaintiff

1  has failed to prove any one of these things by a

2  preponderance of the evidence against a defendant

3  under consideration, then you must decide for that

4  defendant on this claim.

5      When I use the term "professional negligence",

6  this is what I mean:  A doctor or nurse must possess

7  and use the knowledge, skill, and care ordinarily

8  used by a reasonably careful doctor or nurse.  The

9  failure to do something that a reasonably careful

10  doctor or nurse would do or the doing of something

11  that a reasonably careful doctor or nurse would not

12  do under circumstances similar to those shown by the

13  evidence is professional negligence.

14      The phrase "deviation from the standard of

15  care" means the same thing as "professional

16  negligence".  The law does not say how a reasonably

17  careful doctor or nurse would act under these

18  circumstances.  That is for you to decide.

19      In reaching your decision, you must rely upon

20  opinion testimony from qualified witnesses and

21  evidence of professional standards.  You must not

22  attempt to determine how a reasonably careful doctor

23  or nurse would act from any personal knowledge you

24  may have.

25      Plaintiff's remaining claim is a claim for

institutional negligence against Wexford Health

Sources, Inc., which is a violation of Illinois law.

To succeed on this claim against Wexford Health

Sources, Inc., plaintiff has the burden of proving

each of the following three things by a

preponderance of the evidence.

　　　　1.　Wexford Health Sources, Inc. acted or

failed to act in one of the ways claimed by

plaintiff, and that in so acting or failing to act,

Wexford Health Sources, Inc. was institutionally

negligent.

　　　　2.　Plaintiff was injured.

　　　　3.　Wexford Health Source, Inc. institutional

negligence was a proximate cause of the injury to

plaintiff.

　　　　If you find that plaintiff has proved each of

these things by a preponderance of the evidence,

then you must decide for plaintiff on this claim.

　　　　If, on the other hand, you find that plaintiff

has failed to prove any one of these things by a

preponderance of the evidence, then you must decide

for Wexford Health Sources, Inc. on this claim.

　　　　Defendant Wexford Health Sources, Inc., and

Defendants Nawoor, Einwohner, and Galvin are sued as

principals and agents.　Defendant Wexford Health

Sources is the principal and Defendants Nawoor,
Einwohner, and Galvin are the agents.

If you find that Defendant Nawoor, Einwohner,
or Galvin is liable for professional negligence,
then you must find that defendant Wexford Health
Sources, Inc. is also liable for professional
negligence.

As it relates to plaintiff's claim for
professional negligence against Defendant Wexford
Health Source, Inc. in violation of Illinois law,
Dr. Stephen Ritz was among the agents of Defendant
Wexford Health Sources, Inc. at the time of this
occurrence. Therefore, any act or omission of
Dr. Stephen Ritz at the time was the act or omission
of Defendant Wexford Health Sources, Inc.

Defendant's Wexford Health Sources, Inc. is a
corporation and can only act through its officers or
employees. As it relates to plaintiff's claims for
professional negligence in violation of Illinois
law, any act or omission of any agent, officer, or
employee of Defendant Wexford Health Sources, Inc.
within the scope of his or her agency relationship
or employment is the act or omission of Defendant
Wexford Health Sources, Inc.

When I say institutional negligence, I mean

that Wexford Health Sources, Inc. failed to do

something that a reasonably careful institution

providing health care to incarcerated persons would

do or doing something that such an institution would

not do under circumstances similar to those shown by

the evidence.

In deciding whether Wexford Health Sources,

Inc. was negligent, you may consider opinion

testimony from qualified witnesses, evidence of

professional standards, and other evidence presented

in this case.  The law does not say how a reasonably

careful institution would act under these

circumstances.  That is for you to decide.

When I use the expression proximate cause, I

mean a cause that in the natural and ordinary course

of events produced the plaintiff's injury.  It need

not be the only cause, nor the last or nearest

cause.  It is sufficient if it combines with another

cause resulting in the injury.

If you find that plaintiff has proved any of

his claims against any of the defendants, then you

must determine what amount of damages, if any,

plaintiff is entitled to recover.  Plaintiff must

prove his damages by a preponderance of the

evidence.  If you find that plaintiff has failed to

prove any of his claims, then you will not consider the question of damages.

If you find in favor of a plaintiff, then you must determine -- that should say of plaintiff, then you must determine the amount of money that will fairly compensate plaintiff for any injury you find he sustained as a direct result of the lack of medical care. These are called compensatory damages.

A plaintiff may only recover compensatory damages once for his alleged harm, even if you find against more than one defendant.

Plaintiff must move his damages by a preponderance of the evidence. Your award must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money. They include both the physical and mental aspects of injury even if they are not easy to measure.

You should consider the following types of compensatory damages:

1. The physical and mental and emotional pain and suffering.

2. Disability, loss of a normal life, diminished life expectancy that Mr. Dean has

experienced and is reasonable certain to experience
in the future.  The present value of the medical
care and supplies that he is reasonable certain to
need and receive in the future.

No evidence of the dollar value of physical and
mental and emotional pain and suffering or
disability, loss of a normal life has been or needs
to be introduced.  There is no exact standard for
setting the damages to be awarded on account of pain
and suffering.  You are to determine an amount that
will fairly compensate Mr. Dean for the injury he
has sustained.

If you find against a particular defendant on
plaintiff's Eighth Amendment claim, you may but are
not required to assess punitive damages against that
defendant.  The purposes of punitive damages are to
punish a defendant for his or her conduct and to
serve as an example or warning to that defendant and
others not to engage in similar conduct in the
future.

Plaintiff must prove by a preponderance of the
evidence that punitive damages should be assessed
against a defendant.  You may assess punitive
damages only if you find that his or her conduct was
malicious or in reckless disregard of plaintiff's

rights.

Conduct is malicious if it is accompanied by ill will or spite or is done for the purpose of injuring plaintiff. Conduct is reckless disregard of plaintiff's rights if, under the circumstances, defendant simply did not care about plaintiff's safety or rights.

If you find that punitive damages are appropriate, then you must use sound reasoning in setting the amount of those damages. Punitive damages, if any, should be in an amount sufficient to fulfill the purposes that I have described to you, but should not reflect bias, prejudice, or sympathy towards either party.

In determining the amount of any punitive damages, you should consider the following factors:

The reprehensibility of defendant's conduct;

The impact of defendant's conduct on plaintiff;

The relationship between plaintiff and defendant;

The likelihood that defendant would repeat the conduct if an award of punitive damages is not made;

The relationship of any award of punitive damages to the amount of actual harm the plaintiff suffered.

Upon retiring to the jury room, you must select a presiding juror. The presiding juror will preside over your deliberations and will be your representative here in court.

A verdict form has been prepared for you. Take this verdict form to the jury room, and when you have reached unanimous agreement on the verdict, your presiding juror will fill in and date the form and all of you will sign it.

Throughout this trial several documents, photographs, or other tangible evidence have been admitted as exhibits for you to consider during your deliberations. These exhibits, where appropriate, will be provided to you when you retire to the jury room to begin your deliberations. Do not mark, highlight, write on, or otherwise alter the exhibits in any way. These exhibits are part of the official record of this case and must be maintained in the same condition as they were originally presented to you. If you alter these exhibits in any way during the course of your deliberations, you must notify the Court immediately.

I do not anticipate you will need to communicate with me. If you do need to communicate with me, the only proper way is in writing. The

writing must be signed by the presiding juror or if he or she is unwilling to do so, by some other juror.  The writing should be given to the Court Security Officer, who will give it to me.  I will respond either in writing or having you return to the courtroom so I can respond orally.

If you do communicate with me, you should not indicate in your note what your numerical division is, if any.

During your deliberations, you must not communicate with or provide information to anyone by any means about this case.  You may not use any electronic device or media such as a telephone, cell phone, Smart phone, iPhone, Blackberry, or computer, the internet, any internet service, any text or instant messaging service or any internet chat room, blog, or website such as Facebook, MySpace, LinkedIn, YouTube, or Twitter to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

The verdict must represent the considered judgment of each juror.  Your verdict about, whether for or against the parties, must be unanimous.  You should make every reasonable effort to reach a

1  verdict.  In doing so, you should consult with one

2  another, express your own views, and listen to

3  opinions of your fellow jurors.

4      Discuss your differences with an open mind.  Do

5  not hesitate to re-examine your own view and change

6  your opinion if you come to believe it is wrong, but

7  you should not surrender your honest beliefs about

8  the weight or effect of evidence solely because of

9  the opinions of other jurors or for the purpose of

10  returning a unanimous verdict.

11      All of you should give fair and equal

12  consideration to all the evidence and deliberate

13  with the goal of reaching an agreement that is

14  consistent with the individual judgment of each

15  juror.  You are impartial judges of the facts.

16      The verdict form reads as follows:

17      Verdict form.

18      1.  We, the jury, find as follows on

19  plaintiff's Eighth Amendment claims:

20      Place an X on the appropriate line for each

21  claim.  We have a line for Abdur Nawoor for

22  plaintiff or for defendant.  Rebecca Einwohner for

23  plaintiff for defendant.  Kathy Galvin for plaintiff

24  for defendant.  Wexford Health Sources, Inc.

25  For plaintiff, for defendant.

1        And then 2.  We, the jury, find as follows on

2   plaintiff's professional negligence claims:

3        And each of the defendants is listed for

4   plaintiff or for defendant as I just indicated under

5   Paragraph 1.

6        3.  We, the jury, find as following on

7   plaintiff's institutional negligence claim:

8        Once again, you have each of the individual

9   defendants and for plaintiff or for defendant.

10       Then, if you found for plaintiff on any of his

11  claims, fill in below the compensatory damages you

12  award.

13       If you find against plaintiff on all of

14  plaintiff's claims, skip parts 4 and 5 because you

15  will not award damages.

16       And then there is a line:  We, the jury, award

17  the plaintiff, William Dean, compensatory damages

18  for physical pain and suffering that he experienced

19  in the amount of.

20       And then the next is:  We, the jury, award the

21  plaintiff, William Dean, compensatory damages for

22  the emotional pain and suffering that he experienced

23  in the amount of.

24       We, the jury, award the plaintiff, William

25  Dean, compensatory damages for the disability and

loss of normal life, diminished life expectancy that he experienced and will experience in the future in the amount of.

And then: We, the jury, award the plaintiff, William Dean, compensatory damages for the medical care and supplies he will need in the future in the amount of.

It goes on.

If you find against one or more defendants on plaintiff's Eighth Amendment claims, in addition to any compensatory damages awarded above, you may but are not required to award punitive damages against that particular defendant.

If you found in favor of all defendants on plaintiff's Eighth Amendment claims, skip part 5 because you may not award punitive damages. You cannot award punitive damages on the negligence claims.

5. Having found against a particular defendant on plaintiff's Eighth Amendment claim, we fix plaintiff's punitive damages against that defendant, if any, at follows:

And you have Abdur Nawoor, Rebecca Einwohner, Kathy Galvin, Wexford Health Sources, Inc. followed by dollar sign and blank lines.

1    Final:  We, the jury, having reached a

2  unanimous agreement on plaintiff's claims sign blow.

3  That's a line for date, the presiding juror, and the

4  rest of the jury.

5      Closing, Mr. Martin.

6          MR. MARTIN:  Yes, Your Honor.  Thank you.

7      If I can take a moment to get a microphone

8  and --

9          THE COURT:  Why don't we give the jury a

10  five-minute break.  You won't have a break for a

11  while, I'll make it a ten-minute break.

12      (The jury left the courtroom.)

13          THE COURT:  Will there be use of any

14  demonstrative evidence during closing?

15          MR. MARTIN:  Yes, there will be

16  demonstrative evidence.  We have a little PowerPoint

17  presentation which we showed the other side.

18          THE COURT:  Okay.  And Mr. Rupcich, did you

19  show --

20          MR. RUPCICH:  We showed them our

21  PowerPoint, and then I have some of the documents

22  admitted in evidence cued up on my trial pad.

23          THE COURT:  Have you shown them which ones?

24          MR. RUPCICH:  Which ones I plan to use on

25  my trial pad?

1   THE COURT:  Yes.

2   MR. RUPCICH:  I have not told them that.

3   They're all in evidence, I can show them if Your

4   Honor would like.

5   MR. MARTIN:  Yeah, I'll take a look at

6   them.

7   (A recess was taken.)

8   THE COURT:  Mr. Dean, are you okay?

9   THE PLAINTIFF:  Yes, ma'am.

10  THE COURT:  Now I really mean it, please

11  bring in the jury.

12  (The jury entered the courtroom.)

13  THE COURT:  I note that you do not have

14  your note pads.  Do you all have them?  Okay.

15  Does anybody need a new one?  All right.

16  Mr. Martin.  Please be seated.  Not you,

17  Mr. Martin, you're closing, please.

18  MR. MARTIN:  Thank you, Your Honor.

19  And ladies and gentlemen of the jury, thank you

20  for your time and your attention during the trial.

21  Obviously, we've been asking questions of

22  witness, but again, my name is Craig Martin, along

23  with my colleagues, we represent and Mr. and

24  Mrs. Dean, or Mr. Dean, in the lawsuit.

25  And I want to, on behalf of all them, I want to

thank you for your time and attention during trial,

for taking notes, for listening to the witnesses,

for not falling asleep. We really appreciate it.

We know it's a significant commitment.

In the opening statements, I talked about some

concepts and I talked about some timelines. And to

reorient you as to where I think we are, I thought

I'd show you the timeline that I put up in the

opening statement just to have it up in front of you

so you could visualize the timeline that I think

you've become very familiar with through the course

of the evidence in the trial.

Now, in the opening, I talked a little bit and

I said that the case really was about some words and

some concepts. And one of them was cancer. We've

obviously heard a lot of testimony and we've seen

documents, even images, with respect to cancer. And

it's very -- the evidence very clearly establishes

that Mr. Dean has -- had kidney cancer, has kidney

cancer. That it went up his vena cava into his

thrombus which you heard about at length from

different people. That it metastasized to his

liver. And that it is not curable.

The evidence -- now, I'll talk about the

evidence as opposed to what some of the speculation

1  was.  But the evidence clearly established that on

2  our timeline, Mr. Dean came in in December, started

3  having bloody urine or gross hematuria, and that

4  that was the first time Mr. Dean had had bloody

5  urine or gross hematuria.

6      The timeline establishes and the evidence

7  establishes very clearly that Mr. Dean was

8  conclusively diagnosed with kidney cancer on

9  April 10th, 2016, through the use of a CAT scan.

10      That CAT scan, as testified to by many people,

11  showed that there was -- that this kidney cancer in

12  his kidney was serious, that it had taken over the

13  kidney.  That the tumor thrombus in his vena cava

14  was up a little bit below the diaphragm.  And it

15  didn't show any evidence of metastasis, metastatic

16  disease in the liver.

17      And obviously, you, as members of the jury,

18  heard various doctors testify and speculate one way

19  or the other as to whether there was metastatic

20  disease in his liver at that particular point in

21  time, but there's no hard evidence that there was.

22      By the time you get to June of 2016, there then

23  is hard evidence.  There's a change.  There's hard

24  evidence that there is metastatic disease in his

25  liver.  Which essentially becomes a death sentence

1  for Mr. Dean.

2      Then obviously, as you know, he had this very

3  serious surgery on July 19th.  You heard -- you've

4  heard testimony about how serious it was.  And he

5  survived it.  He's been on chemotherapy drugs of one

6  type or another since.  And he's here with us today.

7  Somewhat to the surprise of some of his medical

8  doctors.  And that's great.

9      That's what we've heard about cancer when you

10  strip away the testimony and you focus on the true

11  evidence.

12      I also talked about care in the initial

13  discussion of the case.  And the reason I talked

14  about care is I was talking about that for two

15  different reasons.  I was trying to communicate and

16  foreshadow two different concepts.

17      One was I was trying to foreshadow the common

18  concept as people of caring for one another.  I

19  wasn't talking about it at some level standards of

20  care or medical standards of care or anything like

21  that, I was just trying to communicate that this

22  case involves care.  And as you -- as the case

23  unfolds, it involves care really in two different

24  ways.

25      One, it involves who cared for Mr. Dean, who

cares for Mr. Dean.  Who's empathetic in a human
fashion for Mr. Dean.  And it also involves the
medical testimony that you heard from lots of
doctors about the so-called standard of care.  What
a reasonable doctor would do under the various
medical guidelines, what -- how you would treat
this.

And with regard to the standard of care,
consistently, the medical professionals came in and
told you that you needed to get somebody who
presented this way to a urologist and also to a CAT
scan.  And they also told you this cystoscopy--which
I still can't say--would have also been a way to get
at whether it was bladder cancer.

But it was very clear from the medical
professionals that testified, with save a few, save
Dr. K, who I don't really understand what he was
saying about the standard of care, but the medical
professionals essentially said get him to a
urologist, get him a CAT scan.  And they also said
do it fast.

And you saw, you even saw yesterday, the
radiologist that drove in from Chicago who said, you
know, it's a matter of weeks, not a matter of
months.  You've heard from witnesses consistently

1   that said address this quickly.

2       However, when you reflect upon your common

3   experience with life and you, as members of the

4   jury, that's one of the things that we like about

5   jurors, we like the notion that you bring your

6   common experiences to this.  It's no secret that

7   when someone has a diagnosis of cancer or the

8   symptoms that are likely to lead to cancer--blood in

9   the urine, gross hematuria--that you deal with the

10  issue quickly.  It's -- it's no secret to so many of

11  things you who have lived.

12      So that's care.

13      Then the other concept that I asked you to

14  think about during the trial was responsibility.

15  And what that means.

16      Responsibility, and we'll go through this in

17  plenty of detail, but as you listen to the witnesses

18  and those who were responsible for Mr. Dean, who

19  were supposed to be caring for him--and by that I

20  mean the individuals as well as the institution--you

21  didn't hear any of them say "I'm responsible."  You

22  heard comments quite -- quite remarkably different

23  from that.

24      So I -- I talked about Harry Truman in the

25  opening.  I like that line.  I think it's too little

1    used in society as we exist today.  But where does

2    the buck stop?  Who is really responsible?  And you

3    didn't hear from the defendants that they were

4    responsible.  In fact, you heard quite different

5    stories from them.

6         So then the other concept that I asked you to

7    focus on in the opening--which I really didn't

8    explain very much--was collegial review and

9    systemic, I used the words systemic responsibility.

10   Institutional responsibility.

11        And there's been a lot of testimony about the

12   so-called collegial review process.  But just to

13   help you understand that testimony, we put

14   together -- I not only have the timeline from

15   opening, I have a couple of other things to show you

16   that will give you a sense of collegial review; what

17   it really meant in this case.

18        Dylan, if you -- Mr. Green, if you could go two

19   slides forward.

20        So one thing that we charted out was we charted

21   out the diagnostic collegial review delays.  And,

22   you know, we tried to do this in as straightforward

23   a way as we good given the documents and the

24   testimony.

25        But as you'll recall from the testimony,

1   Dr. Nawoor writes in his notes urologist, get him to

2   a urologist, words to that effect.  Dr. Einwohner --

3   that's on the 23rd of 2015, December 23rd.

4       Dr. Einwohner on January 7, 2016, get him to a

5   urologist.  You remember that testimony in that

6   document.  You'll see it again shortly.  And it took

7   them 49 days to have collegial review approve a

8   urology referral.  Standard of care, get him to a

9   urologist, 49 days to even get to collegial review.

10      By the way, no evidence in collegial review of

11  any substantive medical conversation.

12      Re-imaging.  Dr. Einwohner wrote down a

13  suggestion, it was characterized as a suggestion,

14  for reimaging.  Six days to get it to collegial

15  review.  And whether reimaging meant CAT scan,

16  ultrasound, MRI, she wrote down reimaging, so we

17  give them the benefit of the doubt.  Dr. Ritz

18  doesn't do CAT scan, doesn't comply with standard of

19  care, but instead, they send him to a renal

20  ultrasound.  Six days to collegial review.

21      Cystoscopy.  Also part of the standard of care.

22  Not until he actually sees a urologist on the 10th

23  of March is that recommended and it takes 12 days to

24  get to collegial review.

25      CAT scan.  Not until he sees the urologist on

the 10th is a CAT scan formally recommended in their
process.  And it takes 20 days to get it to a
collegial review.

     And then we also put in the so-called
scheduling days, the time between collegial review
and the actual date of service just to give you a
sense of it.

     So when you take a look at that timeline,
collegial review adds substantial delay into
Mr. Dean's care.

     Now, let me show you one other slide.  Dylan,
Mr. Green, if you could flip to the next slide.

     The other thing that we put up -- we put
together to just give you a sense of why we're
talking about this institutional issue and collegial
review is collegial review is not just collegial
review for one thing.  It's not just simply he comes
in and he has bloody urine, and then they say, "Oh,
we better go to collegial review."  And at collegial
review they'll do -- we'll do what they're supposed
to do.

     Collegial review is built into essentially
every decision that is made with regard to Mr. Dean.
So if you look at every decision that is made, we
just laid it out here from the urologist to the

1  ultrasound to the cystoscopy, the CAT scan, all the
2  way through things like cardiac clearance, it is
3  built into every little decision that a medical
4  doctor makes.  Collegial review, it's got to go to
5  Pittsburgh to Dr. Ritz, who doesn't remember
6  anything about this particular case and who
7  reviews -- does 200 collegial reviews a week.

8       So we were very focused on collegial review
9  because we believe that the evidence shows you that
10  it introduced substantial delays without any
11  purpose.  Or for the purpose of controlling costs or
12  minimizing costs.

13       So, Dylan, if you could go back to our
14  timelines, the second one.  There we go.

15       So we'll leave you with this overview before I
16  start getting into the evidence.  With respect to it
17  was 207 days for Mr. Dean to get from the
18  presentation of bloody urine to the actual surgery.
19  There are, I think, about ten collegial reviews in
20  between there.  There are huge delays initially with
21  regard to the diagnosis; despite the recommendations
22  even of the two doctors that are sitting here as
23  defendants.

24       And you heard testimony with regard to weeks,
25  not months, to get this done.  So if you actually

followed the standard of care that the medical
professionals testified about, Mr. Dean would have
been in for a CAT scan, in with a urologist in a
matter of weeks.  He would have been diagnosed with
cancer.  And they would have gotten him to surgery
as quickly as possible.

By the way, to be clear, there's nothing
scientific about my 47 days that I put there.
Right?  So it's not the case that I'm telling you
the standard of care is 47 days, all I'm trying to
tell you is 207 was way too long given the testimony
that you heard here.  And whether it should be
47 days or 64 days, I can't tell you, but I can tell
you that the doctors and the medical professionals
that testified with regard to the standard of care
basically said you get a fellow like this in for
surgery as quickly as you can.  You get him into
diagnostics as quickly as you can.

So those are our -- kind of a refresher on
where we were with respect to opening.

With regard to where we are as we start our
closing with respect to the case, I want to talk to
you and introduce just sort of a new concept because
it really will infiltrate where we go with our
closing.

1    The -- in the opening I think I explained, and
2  I truly mean that the -- the concept of a jury
3  system is this great American -- great American
4  experiment.  That other countries do not have a jury
5  system.  That -- and as the Judge just instructed
6  you, you are the ones that find the facts.  You are
7  the ones that apply the law to the facts of this
8  case.  You are actually empowered.  We empower you
9  to do the right thing.  To follow -- to apply the
10  laws to the facts of the situations.
11    And in this case, I will -- want to talk to you
12  about how you use that empowerment.  What you do
13  with it in this case.  And what I mean by that is
14  how you change this.  How you prevent this from
15  happening again to some other Mr. Dean out there.
16    And in this case, this jury trial is different
17  than many jury trials because when you think about
18  empowerment and what your role is, it's a little bit
19  special in this case because you're empowered to fix
20  a wrong and prevent it in the future.  But you're
21  also empowered in a way that Mr. Dean was not
22  empowered.
23    We've explained to you very clearly that
24  Mr. Dean--and it's obviously, right--he is in
25  prison.  He is in prison for a cocaine charge.  He's

supposed to get out in 2020.  The -- he is not
empowered.  He was not empowered to choose his
doctors.  He was not empowered to do anything.
Nobody told him about collegial review.  His wife
was calling the medical professionals and she was
getting not even a runaround, she was just getting
ignored.

He was sitting in a cell bleeding, I should say
it was bloody urine, and he couldn't do anything
about that.  He couldn't go to an emergency room, he
couldn't go to another doctor, he couldn't do
anything about that.  He had to sit in his cell and
bleed.

So he was not empowered, you are empowered.

So those are my only concepts.  Now let me just
review a little bit of the facts and the evidence to
refresh you on some of the things that we went
through at trial.

The case is about -- like all cases, this is a
personal case.  It involves human beings at the most
fundamental, their most vulnerable moments.  That
certainly involves Mr. Dean and his family at their
most fundamental and vulnerable moments.  And it
would be impossible for me to say, impossible for me
to say that my heart doesn't go out to people who

had to come in and testify in this case.

Listening to Mrs. Dean as she testified that "he's the love of my life and I want him to live." Listening to her say, "I need him with me."  That the diagnosis was devastating.  That she had been together with him for 42 years.  And understanding that he is in prison and she is here is meaningful.

Seeing Mr. Dean's son.  I call him little Mr. Dean, but his nickname is Bubba.  So seeing Bubba, if you will, come in and support his dad and testify is meaningful.  This case is about the stuff of human beings.

Hearing Mr. Dean tell you -- tell us that he had blood clots where his blood had clotting and gummy worms coming out.  Hearing him tell you that it was blood all over the urinal in kind of a graphic way.  That he was told by Dr. Nawoor that it was kidney stones or cancer, but they did nothing about it for literally months.

Listening to his feeling of helplessness. Listening to him essentially plead and tell you and tell all of us that he wants to get out of prison before he dies is meaningful.  In fact, even Mr. Rupcich, during his opening, said the pain, the suffering, the anguish is real.  That's definitely

1  true.

2      He certainly is paying a debt to society with

3  regard to the time that he spends in prison.  But

4  his debt to society was not a sentence of the death

5  penalty, which is essentially what Wexford gave him.

6      Dr. Nawoor actually told him, as you will --

7  may recall him saying, "If you were my patient out

8  in the world, you'd be in the hospital right now."

9      So that's the Deans.

10      Let me focus a moment on the defendants and

11  transition a bit to the evidence with regard to

12  Dr. Nawoor.

13      But before I get there, let me just -- you

14  heard a little bit about this as we were examining

15  witnesses.  One of the things that is really

16  critical and I want to remind you of, because I

17  don't have the video to show you, can't recreate the

18  days as we go back in time.  But one of the things

19  that's really important is you get to observe people

20  testify.  Their nature, the way they act on the

21  stand, the way they answer questions.  You get to

22  observe them.

23      Mr. Dean testified, he was cross-examined, he

24  was the same Mr. Dean when he testified and was

25  cross-examined.  He, as a matter of fact, went

through the issues that we have seen in this case.
I'm sure it was difficult.  But he went through it
and you were able to observe his demeanor.  And, you
know, I would suggest to you that he was candid,
truthful, direct, and testified about a subject that
I can't imagine testifying about.

The -- now, to focus on and transition to the
defendants.  I'd like to first start with
Dr. Nawoor.  The -- Dr. Nawoor is obviously an
individual defendant.  He's also an agent, employee
of Wexford.  And Dr. Nawoor testified, he was called
by us, we had him testify.  The plaintiff -- I'm
sorry, the defendant did not recall him to have him
testify any more.  They could have, they didn't.
But he was called by us.

And you saw Dr. Nawoor's demeanor and his
engagement during the testimony.  You saw the way he
responded to the questions.  And if I can use the
phrase, if you come back to care, care, I'm not
talking about standard of care, did he care?  You
were able to observe him as he testified to try to
determine did this man care.

I have some -- if we could go to
Dr. Nawoor's -- one of the benefits that we have is
the trial transcript from certain of the witnesses.

And this is some of the clippings from the trial
transcript with regard to Dr. Nawoor.

So he says that, in this little clip, as you
may recall from his testimony, that he understands
that he's responsible for Mr. Dean's medical care.

Dylan, if you could flip to the next one.

He then says, when he's questioned rather
vigorously--you probably noticed during the trial
that my partner with the bow tie on is a vigorous
questioner.  When he's questioning rather vigorously
by Mr. Pelz and he's asking about whether or not you
did anything to rule out cancer, which everybody
agrees is one of the things that, you know, you go
test for when there's blood in the urine, he says,
(as read:)  No, we didn't do anything then because
we just going through the motion here about what we
do over there when people come with whatever.  And
we have to talk to them and decide whether they need
to go somewhere or have something done.  And that's
exactly what we do.  We go through the motions.

And Mr. Green, if you could flip to the next
slide.

That transitions to what was repeated many
times in Dr. Nawoor's testimony and that is
everything -- you can flip to the next slide.

1 Everything goes through Pittsburgh.

2     In this little clip, Mr. Pelz is asking him

3 about Dr. Severino.  And he asks him about something

4 Dr. Severino could do, what his limitations were.

5 And Dr. Nawoor says everything goes through

6 Pittsburgh.

7     Mr. Green, the next slide.

8     The next slide is, again, he says, (as read:)

9 Again, you know, in private practice what I would

10 do, but the way we have to do it in the Wexford

11 system, I have to go to collegial.  I can't just

12 say, well, I'm gonna send you to a urologist.  It's

13 got to go through Pittsburgh.

14     Mr. Green, the next slide.

15     Again, he's talking about the delay with regard

16 to getting appointments, ultrasounds and so forth.

17 And Dr. Nawoor says -- agrees that you can't do

18 anything to expedite the process without going

19 through or talking to Pittsburgh.

20     The next slide, Mr. Green.

21     And again, with respect to you'll see they're

22 talking about CT scans and so forth.  He says again

23 you're -- your approval isn't worth anything unless

24 it goes through Pittsburgh.  That's all true.

25     Mr. Green, the next slide.

1    So then he again asks him, in this context
2    talking about Dr. Severino, the surgery decisions,
3    it's all got to go through Pittsburgh.
4    Next slide.
5    Now, in terms of -- so with regard to
6    everything that the medical professionals are doing,
7    it is subject to this Wexford system of collegial
8    review and Pittsburgh, which as you can see from the
9    timelines adds substation delay into this system.
10   Then when you ask the question:  (As read:)
11   Dr. Nawoor, do you take personal responsibility at
12   all?  And let's see what he says in respect -- with
13   regard to those questions.
14   The -- go to the last one.
15   The kidney specialist recommending urologist
16   isn't even invited to the collegial.  That's not my
17   problem, he says, Pittsburgh should invite her.
18   They failed and they never did that.
19   Next slide.
20   You go back and he looks at this, (as read:)
21   And if you look at when it was sent back to you and
22   you noticed this inconsistency, you could have said,
23   "Hey, Pittsburgh, what's going on, we approved the
24   cystoscopy."  Yeah.  You didn't do that.  No, I
25   didn't do that because that's their fault, not mine.

1    Next slide with regard to Dr. Nawoor.

2    When you -- this goes to a point that we'll

3    cover in great detail, there are no real records

4    with regard to collegial review, no meaningful

5    records.  When he's writing down two lines on

6    January 13th and they say that's everything you

7    talked about and we question him about where are the

8    documents, he says, (as read:)  I don't know.  They

9    misplaced the paper.  It's not my fault.

10    Next slide.  We'll stop there.

11    So my point with regard to Dr. Nawoor is I

12    wanted to remind you of his testimony in three

13    regards.  One is that he says that the patient is

14    under his care.  Two is that he basically says that

15    everything I do is meaningless because everything

16    has got to go through Pittsburgh; he doesn't make

17    the decisions.  And three is he -- when he's

18    confronted with regard to responsibility he says,

19    "It's not my fault."

20    Dr. Nawoor also, as you may recall, testifies

21    that he's fully aware of the American Urological

22    Guidelines on how to treat a 50-year-old patient who

23    presents with gross hematuria and no pain.  And he

24    gives no justifications for deviating from those

25    standards.  And in fact, Dr. Nawoor, in his notes on

the 23rd, his first note is go to a urologist.

So Dr. Nawoor has substantial responsibility here.

The next defendant that I want to talk about is -- oh, let me -- Mr. Green, if you could just put up PTX84 and 61 as we transition into Dr. Einwohner.

You'll recall, just to refresh you, you'll recall the note on the left is the note on the 23rd with regard to see urologist, and then on the right is the January 7th email from Einwohner to Ritz saying, I suggest collegial review with Dr. Butler--you recall the testimony was Dr. Butler wasn't there anymore, Dr. Nawoor was the treater, she didn't even know that--with consideration of reimaging and urology eval.

So Dr. Einwohner, and again, if you come back and you think about the demeanor of folks who testified, Dr. Einwohner was slow -- I should say slow to answer questions. Paused incredibly long with regard to questions. It was difficult to kind of understand what she was trying to say.

But one of the things that -- by the way, she, like Dr. Nawoor, we called her. They didn't call her. They could have called her in their case. If she had something to explain, she could have come up

and testified.  We called her because we wanted you
to understand what happened.

In terms of she had been treating Mr. Dean in
the Wexford system since 2012 and she was an expert
nephrologist.  She was actually a kidney doctor.  So
you saw -- look, you saw some of the anger, to be
honest, in some of Mr. Dean's diary entries with
regard to Dr. Einwohner.  I think and I hope you can
understand why someone may feel that way.  If you're
seeing a kidney doctor since 2012 and you wind up
with kidney cancer, you might think that kidney
doctor wasn't exactly treating you so well.

So with regard to Dr. Einwohner, what's her
testimony look like?

Mr. Green.

So Dr. Einwohner, it's kind of interesting
testimony, folks, because Dr. Einwohner says, I
wanted him to see a urologist.  She sees him on the
7th and she knows the standard of care is to go see
a urologist.  And she says, I wanted him to go see a
urologist, but I was not empowered, did not have the
ability to do that in the Wexford system.  And I
wrote an email to Dr. Ritz, who is literally works
on the same floor, so that he could see a urologist.

Dr. Ritz, with no explanation at all from

1  Dr. Ritz, sent him not for a -- not to a urologist,

2  not for a CAT scan, but sent him for an ultrasound;

3  a low-cost ultrasound vis-à-vis the other two

4  options.  And the other two options which would have

5  resulted in a diagnosis and treatment much sooner.

6      Dr. Einwohner clearly -- next slide.  Her

7  medical judgment as of January 7th is that he needs

8  to go see a urologist.

9      But then when you ask Dr. Einwohner, what about

10 that -- just to kind of keep this in context, I'm

11 talking about care and standard of care.  She's like

12 right there, go get him to a urologist.  The world

13 may have been very different for Mr. Dean, his life

14 may have been very different, had that happened.

15     But if you go to the next slide.  When you ask

16 her the question, are you responsible?  She

17 basically says, no.  She thinks her role, when this

18 came up was seeing that something was beyond the

19 scope of chronic teleclinic, acute condition, and

20 trying to encourage UM to review this and get the

21 patient to urology.

22     And you heard her -- I mean I hope you heard

23 her during her testimony say that her role was not

24 to do something, her role was to advise the primary

25 care physician on what to do.  Yet the evidence is

1  clear, from both her and Dr. Nawoor, that they never

2  even talked.  I don't even think we've seen an email

3  between the two of them.

4      She, on January 7th, didn't even know that he

5  was the doctor.  He never reached out to her.  Ritz

6  never reached out to her.  You would think that if

7  you're the nephrologist and the patient you've been

8  seeing for several years has, for the first time

9  every, bloody urine, that you might think to get him

10  to comply with the standard of care and make sure he

11  goes to a urologist, to make sure he gets a CAT

12  scan, the world would have been different for

13  Mr. Dean.

14      Now, in terms of Nurse Galvin.  Of the three

15  individual defendants, Nurse Galvin is the least

16  culpable.  That's clear.  What is her -- what did

17  she do wrong?

18      Nurse Galvin is a minor player in the story, so

19  we want to be clear with that.  Nawoor, Einwohner

20  major players; Nurse Galvin, minor player.  She

21  seemed like a very nice lady when she testified.

22  Mrs. Dean spoke with her many, many, many times

23  asking for her to intervene.  She didn't think it

24  was her place.

25      You heard from our expert, one of them, that of

1   course it's your place.  If you're a medical

2   professional, if you're a nurse, and you see this

3   unfolding, of course it's your place.  And that's

4   the principle problem that we have with Nurse

5   Galvin.

6       Where do we have a real big problem?  We have a

7   real big problem with Wexford.  You've heard us ask

8   time and time again of the Wexford witnesses, and

9   I'm not just talking about Dr. Nawoor and

10  Dr. Einwohner, but those -- those were the real

11  television doctors that came in.  Those doctors were

12  like out of central casting.  I wish we could find

13  witnesses like that when we do trials.

14      The corporate guys from Wexford came in and

15  testified without really knowing a lot about the

16  case.  And it was -- to me, it was a little bit

17  remarkable with regard to the things that they

18  didn't know.

19      They didn't know anything about when you asked

20  them whether Wexford was a private company, whether

21  Wexford made money, whether it was for profitable,

22  they didn't know anything about that even though one

23  of them runs Illinois.  One's the head of Illinois

24  medical director and the other is a top-five guy at

25  Wexford.

What is Wexford?

So Dylan if you could put up PTX137 just to refresh.

Wexford is big business. And it's -- has a number of contracts with prisons around the country. Prison systems. And in Illinois, they are the contractor with the IDOC.

The value of the Wexford contract is 1.3 billion dollars for ten years. And in the relevant year, that 2015-2016 time frame, was 133 million. You'll have the contact with you, it's PTX137. You can look at it if you're so inclined.

But Wexford essentially promises to take care of the prison population with regard to medical care in Illinois. And they are paid generously for it.

And one of the things that we tried to explain through the testimony of I think it was Dr. Little, was--who, if I'm recalling right, Dr. Little, we actually read his deposition; he did not come to testify--was that certain services are actually paid for by Wexford as part of a fixed-price contract and other services are passed on to the IDOC.

So when Wexford does services like a urologist or a CAT scan, to be just straight about it, it comes out of their profit margin. It reduces their

profit margin.  When patients use a lot of medical
services, and costly medical services, it comes out
of their profit margin.

So Wexford is a for-profit company that gets
paid 133 million or $1.3 billion from the State of
Illinois.

And, Dylan, if you could go to the next slide
with regard to --

You saw us -- we talked about utilization
management guidelines.  And what we page to--you'll
have these with you if you're -- if you're so
inclined to look at them--it's Plaintiff's
Exhibit 102 and 103.  And you'll recall that these
are the guidelines from 2014 and 2016.

They're entitled Utilization Management
Guidelines.  And then they have a couple of pages
where they outline the collegial review process and
how that process is supposed to work.  In theory at
least.

And with regard to the collegial review
process, one of the things that we have been very
focused on is we have no one that has come to this
trial and explained the collegial review process as
to Mr. Dean and how it had any medical value.  How
it had any substantive medical value.  As opposed to

1    a delay and ultimately a form of a rubber stamp

2    after delaying it.

3        The -- and in fact, if you look at the

4    collegial review process, the collegial review

5    process in their documents--first a policy document

6    and then a guideline--actually calls for a detailed

7    set of documents.  They're supposed to be -- you

8    know, as I said in opening, collegial review, if

9    you're gonna have a collegial review on a patient,

10   first you get all the doctors that know about this

11   patient in the room or on the phone.  You say, hey,

12   Dr. Einwohner, you've treated him for a while.  You

13   actually have specialists in the room or on the

14   phone and you think about whatever the problem is.

15       That wasn't this.  And in fact, the evidence is

16   that there's no documentation meaningful about

17   collegial review.  And there's -- you heard Dr. Ritz

18   who essentially said, I don't remember any collegial

19   review, I do 200 of them a week.  About 60 -- I

20   think 60 percent of his job is on collegial review.

21   He doesn't remember -- there's no evidence of any

22   documents in front of him, any files in front of

23   him.  There's no evidence of any meaningful

24   conversation that he had with regard to any of these

25   collegial reviews.  It's not medicine, it's

business.

And if you look at the next policy, the 2016 policy, the 2016 policy even contains additional documents with regard -- that should be generated in the collegial review process so that you can have a meaningful conversation. That didn't happen here.

If I could -- do you mind if I switch to the Elmo for just a moment? Sorry.

The best, the best that the defendants could do was produce documents that looked like this. They were site medical reviews from utilization management which were notes taken--notes taken a couple days later and were additive in some computer system, I think, from looking at the document; I don't really know--that said what happened. And that's it.

It's just check, check the box, unsigned documents. They reflect what -- what happened. They don't reflect any substantive medical conversation or any substantive medical judgment that went on. There's nothing--I like the word accretive. There's nothing that added value to the medical diagnosis or treatment of Mr. Dean. The only thing that was added was delay and constant delay because you had to go to Pittsburgh all the

1  time.

2      With respect to this collegial review process

3  has been the subject of a lot of criticism.  And the

4  folks at Wexford know that their collegial review

5  process has been subject to criticism.

6      So if we could put up PTX194.

7      So this is the Shansky report that we showed

8  you.  You turn to the next page, Mr. Green.

9      Shansky, just to refresh, it's another lawsuit.

10  They deny that this person is right.  This is an

11  independent expert provided to the Court; so not

12  working for either of the parties, independent.

13  This is 2014, I believe.

14      And Shansky--by the way this report spans

15  hundreds of pages, but we're just reducing a couple

16  of snippets for you.  They find breakdowns in almost

17  every area starting with delays in the

18  identification and need for offsite services.

19  Delays in obtaining authorization numbers, delays in

20  being able to schedule an appointment, delays in

21  obtaining offsite paperwork, and delays in the

22  absence of any follow-up visits with the patient.

23      Sounds pretty familiar, right?  So they know,

24  Wexford knows what its collegial process does.

25      If we could just turn to the next report.

1    Then you have this report in the same case.

2  Again, independent expert.  Again, Wexford doesn't

3  believe this at all.  They deny that any of this is

4  true.  But they all know about it.

5    Dr. Puisis and his team--go to the next

6  page--they conclude that the collegial review

7  process of accessing specialty care, i.e., a

8  urologist, is a patient safety hazard and should be

9  abandoned until patient safety is ensured.

10    And then the report goes on.  You'll actually

11  have these in the jury room.  And they will go to

12  the issue--as the Judge instructed you--of whether

13  Wexford knew that it had problems.  Whether it was

14  on notice that it had problems with its collegial

15  review process other than just this single lawsuit

16  that we are in.

17    The -- let me just give you a couple of quick

18  observations with regard to the corporate witnesses

19  from Wexford.

20    Dr. Matticks, who was the first person we

21  called, he was a short examination.  The pure

22  purpose of that examination, folks, was to put into

23  evidence, so that you could review them and we could

24  show them to you, the utilization management

25  guidelines.  Because when we asked Dr. Nawoor about

it, and Dr. Einwohner, neither one knew about them.
So we couldn't put them into evidence through them
because they didn't even know about them. So we had
to call this guy Dr. Matticks who is the Illinois
medical director. It was a very straightforward
point.

The other point with regard to him is you'll
see -- that we made was, you'll see this if you want
to go through it. In the opening statement,
Mr. Rupcich said collegial review is mandated by the
contract with the IDOC. That's not true. You can
look at the contract. There is no -- there's no
provision that says they have to use collegial
review.

And in fact, if you look at the contract, it
will explain what's going on a little bit because
cost-effectiveness underlies a lot of this. There's
a big emphasis on cost. Why? Fixed price contract,
reduced cost, bigger profit.

Then we have Dr. Ritz. Dr. Ritz, as I
mentioned, was the person involved in these
collegial reviews with no memory of those collegial
reviews. So he testified, as we -- I think we
showed you repeatedly during his deposition, that he
had no memories of any of these collegial reviews

with regard to Mr. Dean.

However, a little bit of inside baseball, okay? Inside baseball is this: When you have two treating physicians, Dr. Nawoor and Dr. Einwohner, who have so badly botched the case, and you want to have somebody kind of come in and backfill, well, you -- you take somebody like Dr. Ritz, who is involved with no memory because he was a rubber stamp, because he did 200 of these a day, his job was cost control. You have him come in and you say, oh, let's not talk about this case, let's talk about what you might usually do.

So his testimony is just essentially when you -- when you have the real people who are really doing things who can't explain what was going on, and you have a guy who does 200 of these a day, he's going could come in and talk about not this case, but he's going to talk about what I might usually do. But then when you look at the documents about how their process is supposed to work, there's nothing there. There's a nurse making notes, which is inconsistent with their process.

The other thing with regard to Dr. Ritz is -- and Dylan, I think if you could put up the Dr. Ritz documents.

He's on these emails -- he's on these emails
with regard to the chemotherapy drugs which cost
about $15,000 a month.  And this is -- he's in the
email chain.  I'm just showing you the excerpt of it
that you saw during the testimony.  The Wexford
people, in this case, Dr. Fisher, who's a big deal
there, sending to Becky -- oh, he is on this one.
Sending to Becky Adams and copying to Dr. Ritz.
These are senior officers there.

Everybody knows, you listened to the testimony,
that that man wants to get out of jail and he wants
to be alive when he gets out of jail.  That he's
willing to do anything.  He was willing to go
through that surgery so he can live after jail.  And
these folks, including Dr. Ritz, who theoretically,
if he actually knew anything about this patient,
which I don't think you can conclude that he knows
anything about him.  Theoretically, why would they
be talking about hospice care--and to the next
email--palliative care, instead of using
chemotherapy treatment that you knew -- who you knew
wanted to live.

In fact, you heard the kind of reading from
Dr. Severino, his treating physician, I think it was
Dr. G, as I call him, Guaglianone, testifying that

Mr. Dean expressed to everyone that he wanted to get
out of jail alive, that he wanted to live. Yet the
Wexford folks, as they delay his chemotherapy
through their process, are talking about putting him
in hospice care.

The -- let me turn and give you some comments
on the experts.

With respect to the experts, I'll go reasonably
quickly through this because you've heard the
testimony so recently.

Wexford's radiologist, who we had on the stand
for a very short period of time. Look, I mean he
said -- it's interesting because he said that you
wanted to get to -- to treat whatever this was
sooner rather than later. He said that it was an
aggressive cancer. He said that yesterday
afternoon, right after Dr. K told you that it was --
I can't say his last name, so I'm using Dr. K, their
previous expert who testified yesterday morning.
Who said it was a slow -- slow progressing cancer.
And that he even said that some cancers are just not
a matter of concern, which is concerning to me that
he would say that.

With regard to the radiologist, if you just
focus on the evidence with regard to the

radiologist, the evidence essentially was that the
June CT scan shows metastatic cancer, April does
not.  You can speculate whether it was there in
April, but it's speculation.

It also shows that the February -- February
ultrasound showed, as he said, an abnormally large
kidney that was -- it was two centimeters -- the
right kidney was two centimeters bigger plus it was
abnormally large.  That was on the face of the
report.  And Dr. Einwohner, as a rad -- I'm sorry, a
nephrologist, would have, should have known that it
was abnormally large.  Should have done something
about that too.

But that's just -- look, I mean what that
relates to basically is, you know, what's the best
defense sometimes is a good offense.  When you don't
want to take personal responsibility yourself, you
go just look for other people to blame.  In this
case, it's a little bit ironic, because they're
blaming themselves.  They're actually -- they
picked -- they picked the people that do that scan.
They picked them.  So it's a little bit odd that
they would blame the people that they selected in a
system that they entirely control, that Mr. Dean has
no control over.  It's not like he could go out and

get his own independent imaging.  So blaming
yourself, blaming your agents is probably not a very
good defense.

     With regard to Dr. K and his testimony.  I
think, again, if you consider the demeanor of
witnesses as they testify, Dr. K should have little
impact on what you might think of this case.  He
actually, at some level, contradicts most of the
medical testimony in the case in the sense that he
doesn't want to say that this -- that the standard
of care is what it was, and that is go to a
urologist, go to a CAT scan.

     And then let me just remind you of some of the
earlier testimony.  Some of the earlier testimony
with regard to some of our other experts.

     You had Dr. Metwalli.  And with respect to
Dr. Metwalli, and that was quite a while ago, he was
the doctor who appeared live from Washington, D.C.
on video.  And he essentially told you--and he was
an oncologist who is also a urologist--that the
delays in the initial and subsequent evaluation of
the visible blood in Mr. Dean's urine were too
prolonged, harming Mr. Dean.

     He told you that when a patient is diagnosed
with kidney cancer that is locally advanced and

extends into the blood vessels, then time is of the
essence to get that patient into surgery because of
the tumor thrombus issue and the showering of the
cells, the notion that they can travel through the
bloodstream and affect other parts of the body.

He told you the wait times in the case violated
the standard of care with regard to somebody in
Mr. Dean's condition.

He also, like every doctor in the case with the
exception of Dr. K, told you that the cancer was an
aggressive form of cancer.

We also presented you testimony, as you will
recall, from Dr. Dhar, who's the urologist who's
actually from a family of urologist, which I found
rather interesting. And she was very -- I thought
she was very clear in testifying that if a patient
presents with painless bloody urine or gross
hematuria, who is -- who's an elderly patient over
50--the only part I didn't like about her testimony
was that an elderly patient was over 50--the -- in
terms of the standard of care with regard to that
patient is to get them to a urologist and get them
for a CT scan. And then she talked about contrast
and non-contrast, as well as a cystoscopy.

And she testified and explained that the

1   conduct of the medical professionals in this case,

2   the Wexford medical professionals deviated from that

3   standard of care.

4        And then finally, we had testimony from

5   Dr. Barnett with respect to the standard of care.

6   And Dr. Barnett essentially tied the standard of

7   care for you to the American Urological Society and

8   the American Cancer Society.  And he explained that

9   the standard of care for a person over the age of 50

10  presenting with painless blood in the urine is a

11  cystoscopy and a CT scan.

12       So the medical testimony, in fact, at some

13  level, what they recommended, these doctors,

14  Dr. Nawoor and Einwohner recommended, in part was

15  consistent with that, but they just never followed

16  up to make sure that it was done in a timely manner.

17       The standard of care is almost uniformly

18  adopted, if you will, by all of the medical

19  professionals who have testified before you.

20       Then finally, you heard some testimony--which

21  was by video and by deposition transcript, if you

22  will, a deposition read--with regard to the two

23  treating physicians.  And to be quite honest about

24  that, I'm not gonna focus on it very much because

25  the two treating physicians, by the time they

testified in the case, I felt that you had the story line out. I thought we -- I thought and we thought that this is a fairly straightforward story line. They certainly were prominent actors in the story that unfolded here, but that they had -- you had the storyline down. And they filled in some of the details with respect to it.

So now I want to come back, ladies and gentlemen, and talk to you about the law and the verdict.

The -- the position that you're in is important and I want to be able to help you with it, help you understand our view.

We have -- you've listened to this factual situation. It's not -- well, it's not a pleasant factual situation. It's actually, to say it is unhappy would be a huge understatement.

However, to say that it is isolated would also be a huge understatement. Because it's not. What happened to Mr. Dean is not an isolated instance. He is a victim of the Wexford system, the -- and that has to change.

The -- so let me explain to you a little bit about the law. I'm not the one, by the way, who tells you about the law. The Court has instructed

1   you on the law.  So we have the Court's jury

2   instructions that she read to you.  You'll have them

3   when you deliberate, I believe.  Your Honor, is that

4   a correct?

5            THE COURT:  Yes.

6            MR. MARTIN:  You'll have those jury

7   instructions as you deliberate.  But I'll take you

8   through a couple of those to explain to you how they

9   work and what we suggest you should do and why we've

10  proven this case to you under the law.

11       So I'm gonna move to the Elmo, if that's okay.

12  I apologize for being a little lawyerly now, but I'm

13  going to be a little lawyerly now.

14       Let's see.  That's the first one.  The first

15  claim, the first legal claim that we make against

16  the individual defendants is what's known as an

17  Eighth Amendment claim.  The Eighth Amendment is the

18  cruel and unusual punishment claim.  And the

19  elements of in a claim the Court lays out for you.

20  So I put the elements in front of you.

21       The three -- the three basic elements, and

22  there be a fourth on the second page.  That the

23  plaintiff has a serious medical need.  I think that

24  that, in this case, is sort of a no-brainer.  That

25  the plaintiff has a serious medical need.

1    That the facts -- that the defendant was aware

2 of the facts that the plaintiff had a serious

3 medical need.  These defendants, these individual

4 defendants, the corporate defendant, although this

5 is the individual claims, certainly were aware of

6 that.

7    That the defendant -- the defendants failed to

8 consciously take reasonable measures.  They violated

9 the standard of care.  They did it in two ways:

10 They didn't give him the right treatment, they

11 didn't do it fast enough.  Everyone has told you

12 that.  And you can infer from your common sense if

13 you -- especially if you've had experience with

14 cancer or cancer treatment, that that's the way it

15 works.

16    And then you'll see that it says as a result of

17 defendant's action or inaction, plaintiff was harmed

18 or was subjected to a significant risk of harm.

19    It's certainly true that plaintiff was

20 subjected to a significant risk of harm.  And I

21 submit to you that plaintiff was harmed materially.

22 There's no evidence that plaintiff went into prison

23 with a life sentence, but there is evidence that if

24 he survives in the next year and actually does get

25 out of prison, he did get a life sentence while he

was there.

So that's the first claim. It's against the individual defendants under the Eighth Amendment, and those are the elements of that claim.

The second claim is against Wexford. The second claim is also an Eighth Amendment claim. And for the second claim, what we have to establish is that reasonable measures were not taken to provide treatment for plaintiff's medical need. Again, in this case that is a -- not a big hurdle. We've established that. What should have happened here is different than what did happen.

Wexford had a policy and a practice that made that happen. The policy and practice was collegial review. And that's the policy and practice that is under attack here by us. It is what caused--you saw when I put up that chart in the opening, or in the earlier part of the closing--the delays getting to collegial review during the diagnostic phase of this.

Had they diagnosed him in a timely and quick manner, like all of the medical professionals testified they should have, he may have gotten surgery in those 47 days I laid out there. Life would have been different for him. It's because of

that collegial review process which added no
substantive medical value.  Again, rubber stamp,
probably cost control, but didn't provide any value.

The lack of reasonable measures to treat a
serious medical need was known.  Again, that's
obvious in this case.

And then finally, very similar to the other
one, plaintiff was harmed or subjected to serious
risk of harm.

So if you go through those instructions, we
meet each one of them.

Then, if you go to -- there is a fourth claim
which is professional negligence against each of the
individual defendants:  Dr. Nawoor, Dr. Einwohner,
and our nurse.

With respect to this particular claim, this
basically is very similar in the sense that the
plaintiff was -- sorry, the defendants were
professionally negligent in that they didn't meet
the standard of care in the community.  So it goes
right back to the delay and failure to get him to a
urologist, failure to get him to a CAT scan.  And
then you get damages.

And then finally, the fourth claim that we have
in this case--and you'll be able -- you'll obviously

1    have these in the jury room, be able to go through

2    them--is that Wexford as an institution was

3    negligent.

4        Wexford was negligent in many, many, many ways.

5    They were negligent with regard to what their

6    doctors did.  They were negligent with respect to

7    their policy and their procedure and their custom

8    and their practice with regard to collegial review.

9    And they -- this negligence harmed the plaintiff.

10        So with respect to each of those claims, as you

11   correlate those or compare those to the evidence,

12   the evidence actually meets each of those claims.

13   And we establish each of those claims by a

14   preponderance of the evidence.  And in light of the

15   testimony in this case, ladies and gentlemen, we

16   don't think that that is a -- is a hard burden for

17   us to meet.

18        Now, there are two types of damages, broadly

19   speaking, in the case.  I'm going to go through each

20   of them, but I'm going to use the verdict form to go

21   through each of them.

22        And the damages that we will talk about in this

23   case are damages, as the Court instructed, that are

24   compensatory, to compensate Mr. Dean for the harm

25   done to him.  And the other damages are punitive.

1   Simply put -- and the Court's instruction is what

2   you should follow, but simply put, to punish the

3   defendant--and this is the individual defendant by

4   defendant--for what their conduct was or what their

5   conduct wasn't.

6       With regard to the compensatory damages, I'll

7   go through this.  You will have in the jury room,

8   and the Judge showed it to you, a verdict form to

9   fill out.  And this is just my copy of the verdict

10  form.

11      So I filled it out.  And what I've done is I

12  essentially, on the first page, I fill out that --

13  with regard to the two Eighth Amendment claims, the

14  one against the individuals, that you find for

15  plaintiff.  And that you find for plaintiff with

16  regard to Wexford as well.

17      With regard to the professional negligence

18  claims, I fill out that you find for plaintiff with

19  regard to the three individuals, and then you'll see

20  from the jury instructions that if any one of the

21  three individuals is liable, Wexford is

22  automatically liable under a legal doctrine.

23      And then with regard to the institutional

24  negligence claim, I fill out for plaintiff in regard

25  to that.

So while there are four technical claims--two,
Eighth Amendment claims and professional negligence
and then institutional negligence--they're broken
down into three questions here.  The first one being
Eighth Amendment, which actually comprises of two;
the second one being professional negligence which
comprises of one of the claims; and then the last
one, institutional negligence.

Then in terms of damages.  The damages numbers,
what you fill out on the damages form is your
decision.  It's not -- it's not my decision, it's
your decision.  But in terms of suggesting to you
what damages look like in a case like this, we have
some suggestions for you.  And some of them
scientific and some of them are not as scientific.

With regard to compensatory damages, physical
pain and suffering, we put down $1 million.

You listened to Mr. Dean, you heard his
testimony with regard to pain and suffering, the
physical pain and suffering.

With regard to emotional pain and suffering we
also put down $1 million.

And final, with regard to diminished life
expectancy, we also put down $1 million.

Now, Mr. -- if I could ask you to just flip

back to the screen so that Mr. Green can put up

Mr. Dean's calendar.

You'll recall that you saw this evidence during

the trial when Mr. Dean was testifying he kept these

calendars. And in the January and February time

frames, Mr. Dean wrote down all the times that he

had bloody urine. So he was -- you know, as he went

in on the 23rd, as he went through January and

February undiagnosed, untreated, as the defendants

breached their standard of care, Mr. Dean continued

to have visible blood in his urine which he

described in some -- at some level of graphic

detail.

With regard to the physical pain and suffering

as he went through that and the rest of the

treatment, with regard to the emotional suffering, I

don't know really how to value that. I put down a

million dollars because I don't really know how to

value that.

With regard to compensatory damages for his

diminished life expectancy with respect to Mr. Dean,

the doctors can't tell you that he's going to live

one month versus some other amount of time. But

they can tell you that it is terminal, that it's not

curable, and that his life is going to be different,

it's going to be shorter.

Then with respect to compensatory damages for medical care I wrote down $1.8 million. The reason that I wrote down 1.8 million is because we've heard -- we've seen evidence that chemotherapy drugs were about $15,000 a month for Mr. Dean. I, perhaps optimistically, gave him ten years to survive. So I did the math, it's $180,000 per year at $15,000 per month for chemotherapy drug. I ran it out ten years. I didn't increase the price of chemotherapy drugs and I didn't discount it back to present value, I just made that assumption. But that's the kind of thought process that went into that number, just to give you a sense of it.

Then with respect to punitive damages. We think that this is a case where punitive damages should and must be awarded. And why do we say that?

Wexford, the corporate -- the corporate higher-ups from Wexford, Mr. Ritz who flew in from Pittsburgh, medical director, they're not here today. They testified and they recognize that there have been -- they're on notice that their collegial review process is broken and that it's a patient safety hazard. And they've been on notice of that since 2014. They were put on notice of that again

in 2018.  They certainly were put -- well, maybe
they weren't.  I don't know if they heard a report
or listened with regard to what happened to
Mr. Dean, but it certainly has happened again here
and it has impacted his life.

     The conduct and the repeated conduct meets the
reprehensibility standard.  The impact of the
conduct on Mr. Dean is phenomenal.  In fact, it's
difficult to think of impact that could be greater
on a human being than what they did here.

     The relationship between plaintiff and
defendant is -- makes it so much worse.  The -- he
is completely within their control for medical care.
He can't do anything else, they completely control
it.  They didn't tell him what was going on.  I mean
think about -- think about -- this about this for a
moment.  When you are a --

     I mean look, it's your common experience, when
you have lived, when you've lived a life, one of the
things that you tell your children, that you tell
everyone is treat people with respect.  What does
that mean in this case?  Does it mean that you just
leave him bleeding in his cell, urinating blood, not
telling him that there's these collegial reviews,
not telling him that you're going to do treatment.

What does that mean to a human being?  And what does
that say about the humanness of the defendants in
the case.  The individual defendants as well as the
corporate defendant.  The corporate defendant that
hides in Pittsburgh on the other end of a telephone,
does 200 of these a day in order to control costs.
What does it say about the humanness of this
institution.  And how do you stop them from doing
this to someone else.

Mr. Dean -- I'm sorry, Mr. Dean, to say this.
Mr. Dean will be dead.  He will just be another
person who went through prison who they essentially
killed.  And once he's dead, I don't know that this
case will have any notoriety.  I don't know that it
will have any meaning to them.

In fact, as Mr. Pelz pointed out on
cross-examination, one of the ways that they could
reduce their costs would if he just died.  And in
fact, when you see those -- when you see the hospice
care document, when you see the palliative care
document, by people who should know that he wants to
live, you can infer that's the thought going through
their mind.

Mr. Green, if we could switch back again to the
PowerPoint presentation and if we could pull up the

clemency document.   There it is.

Here you have Stephen Ritz; Nick Little, senior at Wexford; Tom Lehman, Mr. Ritz's boss; and Dan Conn, the CEO.   And we showed you this email trail with Dr. Ritz.   They're talking about getting the most expensive patients out of prison.   The most complex cases, the sickest patients, the ones who have the highest utilization rates, the ones that are costing them money, that are eating into their profits.

By the way, they're not talking about, you know a non-violent, you know, offense.   They're -- it doesn't matter whether they're talking about murderers, rapists; it doesn't matter.   What they're talking about is how to save themselves money, how to make more profit.   So I don't know how you communicate a message to these people.

If we could switch back to the --

The likelihood that defendants would repeat the conduct if an award of punitive damages is not made.

We have those notice documents.   We know what independent experts -- seems to me that this is repeated and repeated, and they need a message.

The relationship of punitive damages to the harm that the plaintiff suffered.   Again, the

harm -- I don't know how to measure a human life.  I

don't know how to measure what they did to him.  But

the harm is -- I can't measure.

But we filled out the punitive damages form

like this, and I'll tell you why we did it:

With regard to Dr. Nawoor and Dr. Einwohner, we

filled out $10,000 each respectively for their

failures to meet reasonable care standards, for

their failures to advocate on behalf of their

patient, and for their failure to change the course

of the history of his human life.

With regard to Nurse Galvin.  As I said

earlier, our view on Nurse Galvin is much different.

We understand what her role is.  We thought she

should have done something.  We essentially

thought -- and we thought that she should have some

award against her that was more akin to a traffic

ticket.

With regard to Wexford, we didn't think a

traffic ticket would do it.  Traffic tickets are not

going to change their behavior.  We know that

Wexford has a $1.3 billion contract.  We know that

they get $133 million a year about--you'll be able

to see this in the contract--from the State of

Illinois from the Illinois Department of

Corrections.  We picked 1 percent of the
$1.3 billion.  We picked 10 percent of the yearly
revenue.

I don't know with regard to that -- I don't
know that that's enough to change their behavior.
But I know their behavior has to be changed.  I know
that what they did to Mr. Dean was wrong and
reprehensible.  And I know that they have been on
notice of this kind of conduct for a very long time,
since at least 2014, and they haven't changed.  They
need to be punished.  They need to change their
behavior.  It is not the way we treat people in the
society in which we leave.

So, folks, I'd like to thank you again for your
time, for your attention, for listening to me what
was probably too long.  But I appreciate it, our
client appreciates it, and so does our entire team.

Thank you.

THE COURT:  Thank you, Mr. Martin.

Does the jury need a break before Mr. Rupcich's
closing.

Yes, the jury does; several.  So if you will
take a ten-minute break.

Do not talk about the case at this time.

(The jury left the courtroom.)

1    (A recess was taken.)

2    (The jury entered the courtroom.)

3        THE COURT:  Court is reconvened.

4    Mr. Rupcich, your closing.

5        MR. RUPCICH:  Thank you.  May it please the

6    Court?

7        THE COURT:  Yes.

8        MR. RUPCICH:  Ladies and gentlemen of the

9    jury.  In my opening, I told you this would be a

10   case about two things.  It's about the tragedy

11   that's cancer, but it's also about the triumph and

12   the redemption that can come from medical treatment.

13       If you had paid attention to the medical facts

14   in this case--and I know you did because I watched

15   you, attentive the whole time--you paid attention to

16   those medical facts, that's the story we told over

17   the last week.

18       And it's a story that played out through the

19   witnesses, it's a story that played out through the

20   medical records, it's a story that played out

21   through the evidence.  And if you separate --

22       Get that down, thanks.

23       If you separate out the distractions, the

24   noise, and the smoke, and you focus on the facts and

25   medicine that was delivered to Mr. Dean, the answer

1   will be clear.

2       You see the villain in our story is cancer.

3   Cancer hurt Mr. Dean.  Cancer attacked Mr. Dean.

4   Cancer traumatized his family.  It's what it does.

5   It's what it does to so many families.  It wasn't my

6   clients, it was cancer.

7       But what you saw in the testimony of the

8   treating physicians, in the testimony of the

9   defendants is that they got Mr. Dean to a surgery.

10  They did a ten-hour procedure.  Ten hours.  You just

11  heard Dr. Severino.  Mr. Dean was deceased for a

12  period of time.  They drained the blood from his

13  body and they brought him back after surgery.  And

14  they put him in the hands of an oncologist.  And

15  that oncologist has fought and fought for Mr. Dean.

16      And I will say there's credit that goes to

17  Mr. Dean too.  He's clearly a fighter.  He fought

18  this thing too, and he had help along the way.

19      Mr. Dean has told you throughout this case that

20  his goal was to walk out of prison.  To walk out on

21  his own terms.  And with the medical care he got,

22  the interventions he received, he told you he's

23  going to do that and he's going to realize that goal

24  of his.

25      All right, now I'm ready.

1    All right.  You've seen our timeline, we showed

2  it to you.  Now, this is extremely important that we

3  all understand this.  This cancer, this attack that

4  Mr. Dean was subject to started way back.  2014.

5  Estimated.  There was more or less agreement from

6  our expert Dr. Kosierowski and Dr. Metwalli, the

7  gentleman from Washington D.C.  He also agreed a

8  couple years.

9    And I want to clarify something.

10  Dr. Kosierowski did not say this was a slow-growing

11  cancer whereas our radiologist said it was fast.

12  What Dr. Kosierowski said is early, early, early.

13  Early on it grows slow.  Early on it's asymptomatic.

14    During this period, I want to be crystal clear

15  on one thing, there is no dispute; Dr. Metwalli said

16  it, Dr. Kosierowski said it, this disease was most

17  likely metastatic as of December 23rd, 2015.  Even

18  if you don't want to take it from our expert, take

19  it from theirs.

20    And the key point, the key point is there is

21  not a period of time where there is evidence that

22  this cancer went from treatable to untreatable.

23  What we are dealing with is a disease that was going

24  to take Mr. Dean's life no matter what.

25    So what of this cancer?  What of it during this

period?  As I told you, it was asymptomatic.  But
this was a nasty fella.  It was -- it was, as the
experts described it, attacked in a diffuse manner.
It wasn't the ping pong ball, it wasn't the ping
bong ball on the wall.  This thing attacked like a
spider and it ducked multiple radiologists and it
ducked multiple specialists.  And we aren't here to
say those radiologists blew it.  We're not here to
say those radiologists screwed up and dropped the
ball and it's their fault and not ours.  The point
is that goes to the insidiousness of this particular
disease.

     Crept along and it just wasn't seen.  Now, our
radiologist has the benefit of hindsight, right?  He
can put the study alongside each other and he can
put the picture together.  There's a famous saying,
life is lived forward and understood backward.  And
that's so apt when it comes to the diagnosis and
treatment of cancer.  Because only in hindsight do
these things become clear.  We can take films and we
can look back over time.  That's not how life works,
is it?  That's not how medicine works.  The events
happen as time moves along, like the arrow.

     All right.  It's getting ahead of me a little
bit.

So I want to talk about this period 12/23 to 4/14/16. And you saw, that's the little-bitty part in this big period that they're putting on the defendants. During this large period of five years, that period, they're saying, you should have diagnosed it then and maybe something would have been different. But there's no evidence anything would have been different.

They make it seem as though nothing was done during this time. And if you look at this zoom-in, as these things stack up, this, folks, is how medicine is practiced. It is a process. It moves forward in time. Presentation, labs ordered by this man, labs resulted, Dr. Einwohner sees the patient, collegial approves the ultrasound. They continue moving through this period of several months until they arrive at a diagnosis.

Now, it's very easy, using the fallacy of inevitability, as I'll call, to take that diagnosis and to work backwards and say, well, we know it. We know what it was at this time so it must have been obvious the whole time. It must have been obvious the whole time because we know it now.

That's not what happened.

This testimony on the standard of care takes

1    into account what's going on at the time.  All the

2    experts agreed on that; you have to take the

3    patient's full clinical picture.  And they keep

4    telling you the standard of care:  Ultrasound,

5    cystoscopy, urologist.  In a vacuum, yes.  In this

6    case, not quite so simple.  This man had a history

7    of blood in his urine, he had a history of kidney

8    stones.  He had a CT read as normal five months

9    earlier.  He had a contraindication, at least

10   relatively, to having another CT with contrast.

11        Now, when you take all those things together,

12   the history of stones, you put that together as the

13   doctor, what do you do?  What are you thinking?

14   It's most likely stones, that's what you're

15   thinking.

16        Even Dr. Metwalli said, well, the decision on

17   what diagnostic test to order is a matter of

18   clinical judgment.  You just heard Dr. Severino.  If

19   you don't want to take it from our expert, you don't

20   want to take it from their expert, take it from

21   Dr. Severino.  He said, yeah, they're guidelines,

22   but they're just guidelines.  They have to be

23   subject to what's going on with the individual

24   patient.  And in this situation, the patient's

25   history dictated something slightly different, a

1  less invasive test to start.

2      And the shame of it is the test they ordered

3  showed the cancer.  It was just in a fashion that

4  wasn't picked up by the radiologist because of the

5  strange nature of this mass.  So while they can

6  criticize that test until the cows come home, it was

7  a sufficient test.  It showed it.

8      And ultimately, what would have changed?  They

9  took that test, they didn't stop the workup.  They

10  didn't say, well, I don't know, I mean it says it's

11  normal, leave him alone.  No, they continued.  They

12  continued until they got an answer.

13      You were just told Mr. Dean was left to bleed

14  in his cell day by day.  Getting worse, bleeding

15  over and over.  You know he was exaggerating that.

16  He testified he had access to sick call every day.

17  Every single day he could have gone down there and

18  seen somebody.  He didn't.  He didn't.  He did not

19  go seek medical attention for what he said was this

20  extensive bleeding on a daily basis.

21      The reality is it was intermittent.  He kind of

22  conceded that.  Kind of came and went.  Mr. Dean

23  believed it was stones initially is what he said.

24  Hoping he would pass it.  And then there was a

25  period of about six weeks where he didn't have any

blood. I think he said that was at least all of
February and into part of March.

And then he told you, I had this issue on
May 15 of 2016, that looked like a murder scene.
Blood everyone, massive amounts of blood. Writes a
grievance the next day, doesn't mention it. Doesn't
mention it. Do we doubt he was bleeding? No.
Certainly he had blood. He's exaggerating that now.
And the facts as they played out at the time and his
actions in not seeking medical care and not writing
that in his grievance tell you that this was not the
degree of blood that he's now.

And we know that based on the lab results.
Based on the blood counts. Based on the testimony.
Did he ever become acutely anemic? Did he ever have
to go to the hospital for blood loss? No.
Dr. Kosierowski looked at the blood tests. Blood
counts remained relatively stable. He was never
really low like he was losing volumes of blood.

So the takeaway from that is he was not left in
his cell to bleed like you were just told. He bled
sporadically and chose not to seek medical
attention.

So when Dr. Nawoor is hammered away at for the
events between 12/23 and 1/11/16, when he saw --

when he went to collegial, you have to understand
this was a patient with a history of stones who
didn't come back after this.  He didn't come back
and say, Doc, this is still happening.  I'm still
having trouble.  So they're attributing a sense of
urgency to a problem that Mr. Dean was not
conveying.

All right, Lexie, let's move it along.

Diagnosis to the hand-off to surgery and the
hand-off to the oncologist.  I thought we were done
with this after Severino's dep.  They're still
attributing it to the defendants.  You heard
Severino.  Don't take my word for it, here's what he
said, me asking, (as read:)

Question:  Do you have an opinion on whether
this was a reasonable time frame from when you first
saw this patient to do the surgery?

I'm talking about March 30 to July 19, 2016.

Answer:  You know, obviously, it took a lot of
coordinating and stuff.  I mean, like I said, you've
got to do this right or you'll guarantee the patient
will die on the table.  I mean you had multiple
physicians' timeframes.  You know, we had another
radiologist look at it.  You know, there's a lot of
coordinating.

     Me:  So is that a yes?

     Yeah.  I mean I would argue I would rather have
it scheduled correctly than have a patient die on
the table because you want to try to hurry up, let's
just do it.  Don't want the patient to die on the
table.

     Mr. Martin just suggested to you this entire
workup could have been completed in 47 days.  The
patient would have died.  The patient would have
died, he would not be here if Mr. Martin had his way
on this schedule.  You should listen to
Dr. Severino, his expertise and his team and what
they did to make this happen.

     Dr. Severino had every opportunity in that
question I posed to him to say, Well, you know, I'd
like to do it sooner but the prison delayed me.
Wexford delayed me.  We had to take more time than
we needed because of the collegial process,
whatever.  He didn't say that.  He didn't say that.
He said, We did it on our timetable because we
needed to do it this way.

     Dr. Guaglianone.  You saw his video deposition.
Testified he got everything he needed to treat
Mr. Dean's cancer.  He said it took several weeks to
get approved, but he said, well --

1  You have to understand, the point is in the

2  grand scheme of things, we're talking minuscule

3  periods of time.

4  Good idea.

5  These are tiny timeframes in the life of a

6  cancer.  Dr. Guaglianone said this is kind of how it

7  works.  It's not corrections, he has to get approval

8  for these medications.

9  Keep it going.

10  Whether the patient is a prisoner or not,

11  insurance companies have to approve.  Was there a

12  couple week process of approval?  Sure.  Sure there

13  was.  And what they were doing in that process--you

14  saw the emails, you were just reminded of

15  them--consideration of palliative care.  Suggested

16  Wexford wanted the patient to die so they wouldn't

17  have to pay for the medication.  But you know that's

18  not what was going on.

19  You heard Dr. Ritz testify.  He made the

20  decision.  He made the decision to take the

21  medication.  Nobody twisted his arm and told him not

22  to.  But what they did is they made sure that he

23  understood what he was getting into.  The risks, the

24  benefits.  Dr. Guaglianone said he had the same

25  conversation.  It's okay for him, I guess, but not

for the Wexford physicians to consider the options,
to consider the medications, to make sure Mr. Dean
can make the decision he feels is right for him.

And that medication was approved. And every
medication was approved.

Those two independent experts, Dr. Guaglianone,
Dr. Severino, that Mr. Martin said just now,
unimportant, we didn't -- you already knew
everything you needed to know before their
testimony.

Well, those are two of the most important
characters in this story we told. They have no ax
to grind. They have -- nobody is paying them to
testify. We have our experts, they have their
experts. They could have criticized us had they
wanted to and they didn't. They both said, Wow,
they guy did great. I can't believe he survived.
Well, that's what Severino said. Guaglianone said,
He's responding, he's doing well, he's stable.
Neither one of them said their care was compromised
by anything that Wexford did.

Let's talk about Wexford. And this isn't just
about Wexford, they're putting the health care
system on trial. This is not a system Wexford
invented. Wexford did not invent the managed care

system.  As you've heard, all the experts had some involvement with it.  The plaintiff's expert Dr. Barnett used almost all the same procedures: Formulary, non-formulary, utilization management. That's the way health care is.  You know, right or wrong, this is the world we live in.  Wexford did not invent that system.

And while Mr. Martin told you that I gave you bad information in my opening about the Illinois Department of Corrections requiring collegial review, you can go look at page 5 of the contract. What it says is aggressive utilization management of outside resources cost control.  So it doesn't use the word collegial, it says aggressive utilization management.  Semantics.  Wexford does collegial review.  The client, the State of Illinois demands it.  And that's the way it is.

Is it clunky at times?  Sure.  Is it a perfect system?  Well, no, it's not a perfect system.  But if you want to put the system on trial and you want to criticize the system, this isn't the case for it. If that man had died waiting to get approval for surgery, okay.  But he didn't.  He got everything, he got it relatively quickly, and he's alive because of it.  This is not the case for this.

1    So I want to switch it up now, and I promise
2  I'm going to wrap up fairly soon.
3    They had their slide purporting delays
4  attributable to the collegial review process.  And
5  their slide attributes everything, including the
6  time for scheduling appointments, to Wexford.  And
7  it's not accurate.
8    You heard Chad Christer today, the records
9  custodian, tell you they have to get that
10  authorization number, pick up the phone, schedule
11  the appointment, and then the specialist will, you
12  know, give them the appointment.  Would we like
13  everything immediately?  Would we like to order a
14  lab and have it?  Would we like a specialist to take
15  the patient right now?  Well sure.  But that's not
16  gonna happen.  You have to transport, you have to
17  arrange, you have to schedule.
18    So let's -- let's really get down to where the
19  alleged delays actually were between December and
20  July.  And I just -- we are gonna count them
21  together here.
22    Lexie, let's go.
23    All right.  So Dr. Einwohner, July 7th, sends
24  an email, consider urology eval and re-imaging.
25  This, we know, trips the UM system because it goes

to Ritz.  All right?

All right, here we go.  Skip ahead.

Collegial review occurs 1/13/16.  Right?
Everybody with me?  Five days.  Okay?  Five days
they get that thing scheduled, approved for renal
ultrasound.

All right.  Let's go, keep going.

All right.  2/8/16, they got the renal
ultrasound a couple days later.  Einwohner, case for
collegial, 2/8.  When does it happen?  2/10.  Okay,
two days.  So now are at seven days that the ball
has been in the court of Wexford's collegial
process.

Okay.  This one is not as great, I will not lie
to you.  Dr. Nawoor writes this up March -- I can't
see it, Lexie.  Yeah, the 15th.  Okay.  The 15th, he
writes out referral to urology.

No, this is for the CT IVP and the cystoscopy.
Cystoscopy approved 3/22.  And then they did
separately the CT 3/30.  So to be generous, 16 days.
Two weeks they approved them separately.

So between January 7 and March 30th, you have
the ball in the court of collegial review UM for 21
of those days.

All right, let's move on.  Let's talk about

post-diagnosis.

All right. Dr. Severino recommended surgery 4/14. When's it approved? 4/21. But, it's set out until May 11. So I'm gonna say that's zero days delay because the surgery was scheduled out in the future, no one was waiting on anyone.

All right. Next.

June 1st, 2016, Dr. Severino sends a fax to the prison: I want another CT. That was because his preferred radiologist had asked for it; if you remember that. June 1, 2016, need a CT abdomen, pelvis, chest, IV oral contrast.

When it that one approved? June 2nd. All right, one day.

Keep going.

All right. That's not the next one. There's a Springfield Clinic record where Dr. -- there we go.

All right. 6/13/16, this is a task from Springfield Clinic. Dr. Hazelrigg wants to see the patient. It's the cardiothoracic or the chest cracker as we have colloquially referred to him. 6/13, they have to obtain pre-auth, right? When do they get it?

6/14. Okay, that's one day. All right, we're at two days during this period.

Go to the next one.

6/28/16.  This is the second cardiac clearance.
Dr. Severino is asking for a cardiac clearance to be
done seven to ten days prior to surgery.  The
surgery is July 19, the cardiac clearance is being
set retrospective to that.  Approved June 28.
That's zero days delay because this was approved
before it was done.

So I'll add them up for you.  We had 21 days
between January and diagnosis.  And I come up with
two days the ball was in utilization management's
court between diagnosis and surgery where outside
specialists were waiting on something that delayed
what they were doing.

They said 207 days.  I count 23 of those
207 days something was sitting and waiting in
utilization management.  That's about 9 percent of
the time.  So if you want to criticize the system
and you want to ask for $13 million to punish them
for taking a matter of days to approve things, this
is not the case for it.

I want to talk about Dr. Einwohner for a
moment.  They just put up some of her testimony.
You understand that she managed Mr. Dean on a
telemedicine basis from another state.  She didn't

have the ability to examine him, she didn't have the
ability to put hands on him.   She did not have the
ability, as they just put up there, to manage acute
conditions.   And this blood in the urine that he
complained about to her was beyond what she could do
from Pittsburgh on video.

        And our expert Dr. Kosierowski, I believe he's
the only one who testified he had telemedicine
experience.   Yeah, the consulting physician,
supporting physician doesn't take over the care.
They don't take over the management of the patient
from far away.   What they do is they make their
recommendations.   They make the recommendations and
that's exactly what she did.   Both times she made
her recommendation and it triggered the system and
it triggered the process and it was approved within
a matter of days.

        Her recommendation, re-imaging, urology.   She
did not specify in what order or in what time frame.
They got re-imaging.   She did not say need immediate
CT, need stat CT.   She said re-imaging, urology.
Both were done according to the clinical judgment of
the treating physician, Dr. Nawoor.

        And when you look at Dr. Severino getting
involved as of March 10 and ordering those CT and

cystoscopy.   Did he order any of them on a stat or
urgent basis?  No.   He didn't say, We need to turn
this around fast.   He just wrote it up.   And it was
done.

I don't have a lot to add about Kathy Galvin.
I think I would agree with Mr. Martin that she seems
like a nice lady.   Minimal involvement.   She's a
supervisor.   She can't do everything.   You know what
happens when people in management positions
insinuate themselves into the minutia and the
day-to-day operations of a large bureaucracy?
Things grind to a halt.   You have to do your job.
You have to keep your task in mind and make sure
that what you're doing if you're Kathy Galvin, if
you're a supervising employee, is that you follow
your tasks and not do what Dr. Barnett suggested
Kathy Galvin do which was tell Dr. Nawoor to call
Dr. Severino and tell Dr. Severino he needs to move
faster on surgery, even though, well, I think
Dr. Severino was working off an appropriate
timeframe anyway, but he still should have --

Okay.   We'll move on.

There's been a fair number of distractions from
the medical facts in this trial.   The medical facts
that are laid out in those records.   I'll call it

smoke.  Smoke clouds what we can see.  But if we
wait a minute, it clears.  The truth emerges.  The
truth in this case is that Mr. Dean is sitting there
not in spite of my clients but because of them.
That's the truth.

Whether Dr. Nawoor took a nap at his disk in
2018 is irrelevant, it's smoke and you clear it.  An
expert in another case criticized Wexford, doesn't
matter.  The facts in this case are the facts.
Nurse Mincy nitpicked Dr. Nawoor in emails.  Come
back to the facts.  Come back to the facts.

Wexford has a $1.3 million contract.  That's to
distract you.  Dr. Matticks told you the state
doesn't even pay them, so I don't know why we're
talking about that contract.

Wexford put in patients, considered putting in
patients for clemency.  Smoke.  It's a distraction.
What Dr. Ritz actually said was that we were looking
for the sickest inmates, and the proxy for the
sickest inmates is what it costs in medical care.
How else are we going to figure it out?  That's what
he was saying.  We can look this data up.
Otherwise, how are we going to identify them?  The
big, bad evil corporation was going to put sick
people in to get out of prison.  That's what they're

1    telling you.  That's what they're telling you.

2    Kicking these poor inmates out of prison.

3         I am not going to read the jury instructions to

4    you a third time.  I think you've seen them, I think

5    you understand them.  I trust you will give them due

6    consideration.

7         There's one thing I would like Lexie to put on

8    the Elmo which we believe is really important.  And

9    this comes from the deliberate indifference

10   instruction, the burden of proof instruction against

11   the individual defendants.  And it states (as read:)

12   You may infer that the defendant consciously failed

13   to take reasonable measures if defendant's action or

14   failure to act was such a substantial departure from

15   accepted professional judgment, practice, or

16   standards that it showed a complete abandonment of

17   medical judgment.  The inverse being they excised

18   their medical judgment, you can't find against them.

19   Because an exercise of medical judgment, like

20   deciding a renal ultrasound is appropriate for a

21   patient like Mr. Dean with decreased kidney

22   function, you can't find against them.  There's no

23   basis to find against them.  And all the experts

24   agreed these are matters of clinical judgment.

25        And as to the standard of care, you've heard it

over and over ad nauseam, and I will repeat it one
last time in succinct fashion.  It is not, it is not
a flowchart.  It is where art and science meet.  It
is where the training, the experience, the knowledge
come together to arrive at something in this
particular situation.  Because I can memorize a
guideline, but I don't know what I'm doing when it
comes to medicine.  I can memorize all day, but when
this patient comes through with a complicated
medical history, well, guidelines, that's not how it
works.  That is not how medicine is practiced.  And
everyone understands that.

    You have heard the story we've told over the
last week.  You've gotten to know the characters.
You know the villain, cancer.  You know the
supporting players.  You've heard almost the whole
story.  But there's still part that's left to be
written and that's where you come in.  And that's
the conclusion.  That's where you come in to write
the conclusion to this story and it comes on your
verdict form.

    And, folks, there is one result here that's
consistent with the evidence.  There's one result
that's consistent with the medical facts and not the
smoke that's filled this courtroom.  There was one

result that represents justice in this case for
everyone.   And the conclusion to this story is your
verdict for the defendants.   Mr. Dean can get on
being released from prison, seeing the birth of his
grandchild, and defendants can go back to practicing
medicine.

        It's truly been my pleasure to present this
case to you.   And wish you all the best.

                THE COURT:   Thank you, Mr. Rupcich.

        Mr. Martin, your rebuttal.

                MR. MARTIN:   So I was hoping that we would
have the first time in the case where Wexford would
actually take responsibility for their actions.   We
were hoping that they would say that there is a
problem with their system and that it should be
addressed.   That they would take some responsibility
for their actions in this case.

        I was surprised that they went in a slightly
different direction by actually blaming Mr. Dean.
Blaming the victim.   That he chose not to seek
medical attention.   That he was not conveying
urgency.   And essentially, telling us that his case
would be much stronger had he died.   That our case
would be much stronger, Mr. Dean, if you were not
here.   The no responsibility, blame the victim.

1      The Wexford system of collegial review is

2  not --

3      Mr. Green, could I ask you to put up PTX142.

4      The Wexford system of collegial review is not

5  dictated by the State of Illinois contract.  You can

6  please look at the State of Illinois contract,

7  PTX137.

8      This is another exhibit, this is the Wexford

9  website where it includes their trademarked

10  collegial review process that Wexford touts in which

11  they describe a process that did not happen here.

12  And they describe a process that other experts,

13  independent experts in other cases have said is a

14  patient safety hazard that results in huge delays.

15      So the Wexford system is on trial.

16      With regard to telemedicine and Dr. Einwohner.

17  We noted that Dr. Einwohner was always alone during

18  her telemedicine visits.  The expert that Wexford

19  put on the stand yesterday morning talked about

20  telemedicine and talked about how at the system that

21  he's involved in, the primary care physician is

22  always in the telemedicine visit.  So Wexford runs

23  it completely differently.

24      So to suggest that collegial review as being

25  part of the contract with State of Illinois is a

matter of semantics is just not true.  Collegial

review is unique to Wexford in terms of this system,

and it's used to impose delays and to reduce costs.

So let's go back, Mr. Green, if you would,

because I am quite surprised that I actually need to

take you through this evidence.  But given that --

given that counsel for Wexford decided to tell you a

story that is not supported by the evidence, I just

need to walk through it again with you all.

The -- look, with regard to collegial review,

there are two notes with regard to a urologist being

recommended.  One is by Dr. Nawoor, another is by

Dr. Einwohner.  Those notes are 12/23 and the other

one is January 7th.  Mr. Dean doesn't get collegial

review -- oh, by the way, you'll have these in your

room, but it's PTX84 and PTX61 that evidence that.

He does not get collegial review until

February 16th, 2016, that's PTX84 and PTX28.  That

is a 49-day delay until collegial review.

With regard to the re-imaging request.  The

re-imaging request from Einwohner which, by the way,

does not follow the Wexford policy because the

referral request is supposed to come from the

primary care physician.  The re-imaging request in

an email directed to Ritz and not even copied to the

1  primary care physician is PTX61 dated the 7th of --

2  January 7th, 2016.  And the consideration of that is

3  on January 13th at PTX84 and PTX27.

4      And the only notation with regard to that is

5  that Dr. Ritz--Dr. Ritz, not the treating

6  physician--who doesn't remember anything, couldn't

7  tell you anything about the patient.  Dr. Nawoor,

8  who actually didn't know the patient either and had

9  no medical history at the time of the collegial

10  review, didn't know anything about the patient, they

11  went to do an ultrasound.  They didn't know anything

12  about the patient at that time.  Mr. Pelz

13  established that on cross-examination of Dr. Nawoor.

14      So six days to collegial review for an

15  examination that is not what you should be doing

16  because it is not a urologist, it is not a CT scan.

17      With regard to the cystoscopy and the CAT scan,

18  you'll -- Mr. Rupcich just told you, and I think he

19  tried to show you a note that was in handwriting

20  that I personally couldn't read, that Dr. Nawoor had

21  recommended a cystoscopy and CAT scan.  Actually,

22  that comes from, not from him, but from

23  Dr. Severino, the urologist who was involved on

24  March 10th.

25      So the recommendation, the first recommendation

for a urologist after the time that Nawoor
recommends a urologist on the 23rd, Einwohner on the
7th is actually the 10th when they go to a
urologist, and that's at PTX066.

And the cystoscopy goes to collegial review on
the 22nd and is approved.  It is never scheduled.
The CT scan goes to collegial review 20 days later
on the 30th.  It is approved.  And then 13 days
later, I think 13 days later, it is scheduled.

So with regard to if you look at the critical
timeframe, the collegial review adds a tremendous
amount of time into the critical timeframe.

Now, with regard to there's a little bit of
discussion and you should rely on your memories as
opposed to what the lawyers tell you, but there is a
little bit of discussion about when metastatic
disease gets to the liver.  And there was some
suggestion by Wexford's counsel that Dr. Metwalli
suggested that it got there in December or earlier.
That's just not what he said.  What Dr. Metwalli
opined on during his trial testimony was he said he
could not -- could not determine whether there was
metastatic disease in the liver in April of 2016.

And as you know from the radiological reports
and actual testimony, when you focus on the

evidence, what people actually saw on the CT scans, the evidence is that in June of 2016, they have metastatic disease on the liver. In the April CT scan, they don't. And obviously, the ultrasound in February wouldn't have picked that up anyway.

With respect to the substantial departure or complete abandonment of medical judgment. That's exactly what they did. Dr. Nawoor knew that a radiologist -- sorry, knew that a urologist should be involved. He knew that on the 23rd. He knew that stones or cancer was present on the 23rd. And what he does repeatedly during his testimony is he essentially says, It's the system. It's Pittsburgh, it's the system. It's not my fault.

Dr. Einwohner, saying it slightly differently in different words, she knows on the 7th that he needs to get to a urologist. After all, she's been the person who has been treating him by telemedicine since 2012. She's the person who actually looked, by the way, at the ultrasound and saw that the kidney was two centimeters too big. And their own expert told you that if a nephrologist saw that, a nephrologist should know better. In fact, I found it on Google. So she says she --

MR. RUPCICH: I'm going to object. That's

1  not in evidence.

2          THE COURT:  The objection is overruled.

3          MR. MARTIN:  She says he should get to a

4  urologist, and then she basically says, Hey, look, I

5  just makes suggestions, I don't really do anything.

6  Well, she's been treating a patient since 2012, who

7  needs to see a urologist because he's bleeding, he's

8  got blood in his urine, and she doesn't make sure he

9  gets to a urologist.  She sends an email to the guy

10 down the hall, but she doesn't follow up.  He is her

11 patient, she's his kidney doctor.  If that's not

12 substantial departure and deliberate indifference to

13 his medical condition, I don't know what is.

14      I mean what -- what are they -- what are they

15 doing?  It's a complete relinquishment, a complete

16 abandonment.  They're doctors.  This is not the way

17 you treat a patient.

18      The -- I don't know -- I don't what else to

19 say.  I don't know how to get Wexford's attention.

20 I know that what they did to him with regard to

21 their collegial delay program -- collegial review.

22 I guess it's delay in my mind now.  But I know what

23 they did is wrong.  I know that they violated the

24 standard of care.  They even know that they violated

25 the standard of care because they suggested a

1 urologist. Yet they let some doctor, some corporate

2 guy in Pittsburgh, take them in a different

3 direction. They imposed all this delay during the

4 critical period of diagnosis.

5 And the medical evidence shows you, the medical

6 evidence that's real as opposed to the speculative

7 medical evidence shows you that he gets metastatic

8 disease during that period.

9 MR. RUPCICH: Object to facts not in

10 evidence on that, Judge.

11 THE COURT: The objection is overruled.

12 MR. MARTIN: When there is, you know --

13 counsel for Wexford in their opening said something

14 like cancer does not come, you know, with a siren

15 and red flashing lights. Well, ladies and

16 gentlemen, cancer for Mr. Dean came with red

17 flashing lights. It came with repeated blood in his

18 urine that he had never seen. And you know, they

19 say, Well, he didn't go to sick call enough. You

20 looked at his diaries, he writes it down. He's got

21 blood in his urine and they're not doing anything.

22 His kidney doctor is not doing anything, she's

23 completely relinquishing responsibility for his care

24 by saying all she does is do recommendations. What

25 about -- what about walking down the hall? What

1  about grabbing the guy in the parking lot and

2  saying, I have a patient that I've been seeing for

3  two or three years who's never had visible blood in

4  his urine and he's got blood in his urine, it's

5  either cancer or kidney stones, he just needs a CAT

6  scan, let's get it done.  Or he needs to see a

7  urologist, let's get it done.

8      These folks need a message.  They won't take a

9  message from us, they'll only take a message from

10  you.  You're the ones that are empowered to change

11  the Wexford system.  This is not the way we treat

12  humans.

13      Thank you, ladies and gentlemen.

14          THE COURT:  Thank you, Mr. Martin.

15      At this time, if you will take the jury.

16      We will send the exhibits and the jury

17  instructions to you.

18      (Court security officers were sworn.)

19      (The jury left the courtroom.)

20          THE COURT:  Will you go ahead and take the

21  jury instructions and exhibits.  Do you have a need

22  to look at them one more time?

23          MR. RUPCICH:  No.

24          THE COURT:  So the problem with

25  Dr. Metwalli's disk is that it's a medical program,

it is not just the evidence from Dr. Metwalli.  I've

asked our IT person to stay late and come up.

    Mr. Martin, I don't know whether you or your IT

person, Mr. Green, would be able to access should

the jury wish to see that.

                MR. MARTIN:  Are we off the record?

                THE COURT:  No, we were on the record.

                MR. MARTIN:  Mr. Green is also doing this

pro bono, Your Honor.  He flew in from Philadelphia

to help us with the trial.  So I'm a little bit -- I

can't tell him what to do.

                THE COURT:  Is he with your firm?

                MR. MARTIN:  No, he is independent.  He's

worked with us before.

                THE COURT:  Well, let's get Dustin to bring

whatever machine up that he has so Mr. Green can

look at it.

                MR. RUPCICH:  It needs a diacom viewer,

generally, to view the images.

                MR. GREEN:  Actually, the disks have a

viewer built into them.  There's an executable file

that will open those particular disks.

                THE CLERK:  I think he might have the

program loaded.  It's just --

                MR. MARTIN:  He can probably show somebody

1  how to use the program.

2        MR. GREEN:  I can.  Somebody from the

3  Court's staff, that would make sense.

4        THE COURT:  The impression I have from my

5  message is that our IT person, Dustin Henry, had

6  something to attend to away from the building, so he

7  won't be able to stay.

8        MR. MARTIN:  We'll figure something out.

9        THE CLERK:  Dustin is on his way up.

10     (Court reporter requested clarification.)

11        THE COURT:  We're still on the record, so

12  Kathy needs to hear.

13     All right.  Does anybody want to look at the

14  exhibits and the jury instructions?  There's a copy

15  for each of the jurors.

16        MR. RUPCICH:  Is that --

17        THE COURT:  That's the cart.  The glossary

18  is on top.

19     Okay.  We're in recess.

20     (A recess was taken.)

21     (Subsequent proceedings were reported and

22        transcribed in a separate volume of text.)

23

24

25

1

2    I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

3    Reporter, certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9

10                   This transcript contains the

11                   digital signature of:

12

13                   Kathy J. Sullivan, CSR, RPR, CRR

14                   License #084-002768

15

16

17

18

19

20

21

22

23

24

25