U.S. DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

WILLIAM KENT DEAN,

                Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC., et. al.,

                Defendants.

No. 17-cv-3112

Judge Sue E. Myerscough

Magistrate Judge Tom Schanzle-Haskins

## **AFFIDAVIT**

I, Sam Mezzich, being first duly sworn upon oath, state as follows:

1.      I am an adult citizen of the United States.  My current business address is: Coverys Specialty Insurance Company, One Financial Center, Boston, Massachusetts, 02111.  I have personal knowledge of the facts set forth in this affidavit.  If called upon to do so, I could competently testify thereto.

2.      I am President of Coverys Specialty Insurance Company.

3.      Coverys Specialty Insurance Company issued a professional liability insurance policy to Wexford Health Sources, Inc., ("Wexford"), providing insurance coverage to Wexford and its employees for damages for the period of time relevant to William Kent Dean's lawsuit, captioned 17 cv 3112.

4.      Specifically, Coverys Specialty Insurance Company issued policy number 5-10026 to Wexford Health Sources, Inc. providing professional liability coverage to Wexford and its employees with policy limits of $3,000,000.00, (Three Million dollars), per occurrence, plus post-judgment interest on that amount, attorneys' fees, and costs, for the period of time relevant to William Kent Dean's lawsuit.

5.      Coverys Specialty Insurance Company policy number 5-10026 provides liability coverage for $3,000,000.00 (Three Million Dollars) of the damages awarded by the jury, the post-judgment interest on that amount, attorneys' fees, and costs, should that judgment and award survive post-judgment motions and be affirmed on appeal.

6.      Attached to this affidavit as Exhibit 1 is the applicable insurance policy issued by

EXHIBIT B

Coverys Specialty Insurance Company to Wexford.

7.     $3,000,000.00 (Three Million Dollars) is available under this policy to satisfy any judgment, post-judgment interest, attorneys' fees, and costs awarded to Plaintiff after final resolution of all post-trial motions and appeals.

FURTHER, AFFIANT SAYETH NOT.

/s/ Sam Mezzich

NAME

SUBSCRIBED and SWORN to before me
this _8_ day of _January_, 20_20_

/s/ Diane M. Stickles

Notary Public

9368656 JTEUSCHE;BWEEKS



DIANE M. STICKLES
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires On
January 18, 2024

EXHIBIT 1 TO EXHIBIT A

Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The
Bantry Group
501 Holiday Drive, Foster Plaza 4
Pittsburgh, PA 15220

We at Coverys thank you for selecting us for your insurance service needs.  Backed by long
term financial strength and stability, we have protected our policyholders and defended good
medicine for over thirty years.  Enclosed you will find your commercial liability policy which
includes your declarations page along with policy coverage parts and endorsements that are
applicable to this insurance policy.

For additional information regarding Coverys' services, please see the following
enclosures:

| | |
|---|---|
| COV 013 01/15 | Patient Safety Organization Membership Fees Reimbursement |
| Risk Mgmt | Seize the Strategic Advantage with Coverys Risk Management |
| CO/MI-44 | Facility Consultation |
| CO/MI-45 | Physician Consultation |
| CO/MI-46 | Facility Resources and Education |
| CO/MI-47 | Physician Resources and Education |

Further, Coverys takes its responsibilities to its policyholders, and their obligations under the
Health Insurance Portability and Accountability Act of 1996 (HIPAA), seriously. Accordingly, we
have prepared and signed a business associate agreement that complies with all HIPAA
requirements and describes how we will use and safeguard the protected health information that
you provide to us. The agreement can be downloaded at www.coverys.com/CSICHIPAA.

Please review the information and consult Derek Jensen if you have any questions.

Derek Jensen, CPCU
Coverys Specialty Insurance Company
Phone (973) 993-1211
Cell (609) 610-8872
djensen@coverys.com



## COMMON POLICY DECLARATIONS
### Renewal Declarations

---

**FIRST NAMED INSURED AND ADDRESS:**

Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group
501 Holiday Drive, Foster Plaza 4
Pittsburgh, PA 15220

**PRODUCER:**

Boston Brokerage
24 Federal Street
Boston, MA 02110

---

**POLICY PERIOD:** **12/01/2016** to **12/01/2017** at 12:01 A.M. Standard Time at Named Insured address Above

**DESCRIPTION OF BUSINESS:**

Correctional Healthcare

---

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE COVERAGE STATED IN THIS POLICY.**

**\*\*\*THE POLICY SHALL NOT BE EFFECTIVE UNLESS THE FIRST INSTALLMENT PAYMENT\*\*\***
**\*\*\*IS RECEIVED ON OR BEFORE THE DUE DATE DISPLAYED ON THE INVOICE.\*\*\***

---

**COMMERCIAL LIABILITY POLICY**
**POLICY NO: 5-10026**

---

**THIS POLICY CONTAINS AGGREGATE LIMITS; REFER TO SECTION III. OUR LIMIT OF LIABILITY OF THE COVERAGE PART FOR DETAILS.**

| Coverage Parts | Coverage Type / Retroactive Date | Limits | | Deductibles |
|---|---|---|---|---|
| Healthcare Entity Professional Liability | Claims Made Retroactive Date: 10/01/2008 | $3,000,000 $10,000,000 | Per Claim Aggregate | $50,000 Per Claim Inclusive ALAE |
| Employee Benefits Liability | Claims Made Retroactive Date: 10/01/1997 | $1,000,000 $1,000,000 | Per Claim Aggregate | $1,000 |
| Commercial General Liability | Claims Made Retroactive Date: 10/01/2008 | See below | | $50,000 Per Claim Inclusive ALAE |
| Each Incident Limit | | $3,000,000 | | |
| General Aggregate | | $10,000,000 | | |
| Products-Completed Operations Aggregate | | $3,000,000 | | |
| Personal and Advertising Injury Limit (any one person or organization) | | $3,000,000 | | |
| Any One Fire for Fire Legal Liability | | $100,000 | | |
| Any One Fire for Fire Legal Liability (Bon Secours Hospital) Location | | $500,000 | | |

Sam Mezzich
President

Richard G. Hayes
Treasurer

---



| | | | |
|---|---|---|---|
| Hired and Non-Owned Automobile | $2,000,000 Per Claim $2,000,000 Aggregate | | |
| Amy one person medical expense | $5,000 | | |
| POLICY AGGREGATE | $20,000,000 | | |
| | | **Limits of Insurance** | |
| Professional Conduct Review | | $25,000 per claim $25,000 aggregate | Not Applicable |

## FORMS AND ENDORSEMENTS

| | |
|---|---|
| COM 001 CS 12/15 | Common Policy Terms |
| END 001 07/14 | Change Endorsement |
| COM 002 PA CS 03/15 | Pennsylvania Mandatory Amendments Endorsement |
| FPL 001C CS 03/15 | Entity Medical Professional Liability – Claims Made |
| MANUSCRIPT 001 | Correctional Medicine Endorsement – Deliberate Indifference, Civil Rights |
| FPL 003C CS 03/15 | Amendment to the Definition of Insured – Blanket Providers |
| CGL 001C CS 03/15 | Commercial General Liability Coverage Part - Claims Made Coverage Form |
| CGL 003 CS 03/15 | Hired and Non-Owned Automobile Coverage Part |
| CGL 008 07/14 | Public Relations Expense Reimbursement Endorsement |
| CGL 017 07/14 | Additional Insured – Designated Person or Organization |
| EBL 001C CS 03/15 | Employee Benefits Liability Coverage Part – Claims Made Coverage Form |
| PPL 001C CS 03/15 | Provider Medical Professional Liability Coverage Part- Claims Made Coverage Form |
| COM 003 CS 03/15 | Amendment to the Definition of Insured |
| COM 004 CS 03/15 | Service of Suit Endorsement |
| COM 005 07/14 | Exclusion of N, B, C or Acts of Terrorism; Cap on Losses of Certified Acts |
| COM 006 07/14 | Disclosure Pursuant to TRIA |
| COM 007 07/14 | Conditional Exclusion or Terrorism Relating to TRIA |
| MPL 008 07/14 | Coverage Territory Amendment |
| SMD 001C CS 03/15 | Sexual Misconduct Coverage Part |
| PLR 001C 09/16 | Professional Conduct Review Coverage Part |
| MANUSCRIPT 002 | Transfer of Rights BI-PD |
| MANUSCRIPT 003 | Reporting Endorsement Rate Factors |
| MANUSCRIPT 004 | 90 Day Cancellation or Non-Renewal Notice |

## COMMERCIAL LIABILITY POLICY PREMIUM:

Sam Mezzich
President

Richard G. Hayes
Treasurer



## REGULATORY LIABILITY AND INFORMATION SECURITY & PRIVACY POLICY

**POLICY NO: 5-10026**

| Coverage | Coverage Type / Retroactive Date | Limits of Liability | Deductibles |
|---|---|---|---|
| Regulatory Liability and Information Security & Privacy | Claims Made Retroactive Date: See DEC 008B | See DEC 008A | See DEC 008A |

### FORMS AND ENDORSEMENTS

| | |
|---|---|
| DEC 008A 08/15 | Regulatory Liability and Information Security & Privacy Coverage - Facility Limit Schedule |
| DEC 008B 07/14 | Regulatory Liability and Information Security & Privacy Coverage - Facility Schedule |
| CPP 001C CS 08/15 | Regulatory Liability and Information Security & Privacy Coverage – Claims Made Form |
| COV 006 08/15 | Privacy Breach Response Services Description |

**REGULATORY LIABILITY AND INFORMATION SECURITY & PRIVACY POLICY PREMIUM:**        **Included**

**TOTAL PREMIUM:**        ██████

Sam Mezzich
President

Richard G. Hayes
Treasurer



# COMMON POLICY TERMS

The following terms, exclusions, definitions and conditions apply to all of the Coverage Parts included in the POLICY except where specifically stated otherwise. These terms, exclusions, definitions and conditions apply in addition to the specific terms, exclusions, definitions and conditions stated in each Coverage Part. Various terms, exclusions, definitions and conditions in this POLICY restrict coverage.

Throughout these Common Policy Terms, the words YOU and YOUR refer to the INSURED as defined in the Coverage Parts included in this POLICY. The words WE, US, and OUR refer to the insurer named on the DECLARATIONS or an affiliated Coverys company. Capitalized words and phrases have special meaning as defined in these Common Policy terms and in the Coverage Parts included in the POLICY.

Read the entire policy carefully to determine YOUR rights and duties.

## Section I.　　Defense, Settlement and Claim Expenses

In addition to the provisions stated in Section IV. Defense, Settlement and Claim Expenses of the applicable Coverage Part, the following provisions apply:

A.　By accepting this POLICY or any benefits under this POLICY including the payment of any CLAIM EXPENSES on the INSURED'S behalf, the NAMED INSURED agrees that in the event it is determined that WE were not obligated under this POLICY to pay any such CLAIM EXPENSES, the NAMED INSURED shall be obligated to reimburse US for all such CLAIM EXPENSES. Such reimbursement must be made within thirty (30) days after WE send the NAMED INSURED a written demand for reimbursement. A failure to make such reimbursement shall be grounds for cancellation of this POLICY and any other policy issued by US to the NAMED INSURED. Such cancellation shall be in accordance with the terms of this POLICY, or such other policy. if applicable. If any such CLAIM EXPENSES were paid in connection with a CLAIM against more than one INSURED, the NAMED INSURED shall be required to pay a pro rata portion of the total CLAIM EXPENSES for each INSURED for whom there was no duty to pay CLAIM EXPENSES based upon the number of INSUREDS on whose behalf CLAIM EXPENSES were paid.

B.　WE shall not be obligated to pay any DAMAGES or CLAIM EXPENSES, to defend or to continue to defend any SUIT, including an appeal from any judgment entered against an INSURED, after the applicable Limit of Liability of this POLICY has been exhausted by the payment of settlements or judgments, even if the payment is not sufficient to satisfy the full amount of any such settlement or judgment.

C.　In the event that OUR duty to defend any pending SUIT, including any duty to appeal from any judgment against YOU, terminates because the applicable Limit of Liability of this POLICY has been exhausted, WE will provide YOU with thirty (30) days' notice before withdrawing from or ending OUR participation in or OUR funding of YOUR defense.

D.　No INSURED shall incur any CLAIM EXPENSES or make any settlements or assume any obligation without OUR prior written consent.

## Section II.　　Exclusions

This POLICY does not apply to any liability of an INSURED or to any DAMAGES, INCIDENT, OFFENSE, INJURY, medical expense, act, error, omission, CLAIM, SUIT, or LICENSING BOARD PROCEEDING:

A.　**Access or Disclosure of Confidential or Personal Information and Data-Related Liability**

　　a.　INJURY arising out of any actual or potential access to or disclosure of any person's or organization's confidential or personal information, including but not limited to patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or



b.      BODILY INJURY or PROPERTY DAMAGE arising out of any actual or potential loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate ELECTRONIC DATA that does not result from physical injury to tangible property.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by the NAMED INSURED or others arising out of that which is described in paragraphs a. or b. above.

This exclusion does not apply to DAMAGES because of BODILY INJURY, unless paragraph a. above applies.

**B.      Asbestos**

1.      Arising in whole or in part, either directly or indirectly, from:

   a.      Inhalation or ingestion of or exposure to;

   b.      The use in the construction or manufacture of any goods, products or structures of;

   c.      The manufacture, distribution, sale, resale, handling, installation, repair, removal, encapsulation, abatement, mitigation, replacement, disposal, release, discharge, dispersal, seepage, or migration of;

   asbestos or products containing asbestos or of asbestos contained in any material or in the air, ground or water.

2.      Arising in whole or in part, either directly or indirectly, from any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with paragraphs 1.a., b. or c. above.

3.      Arising from any actual or threatened INJURY or medical expenses that arise out of or would not have occurred but for asbestos.

This exclusion applies whether or not the asbestos is or was at any time:

1.      Airborne as a fiber or particle;

2.      Contained in a product;

3.      Carried or transmitted on clothing or by any other means; or

4.      Contained in, on or a part of:

   a.      Any building;

   b.      Any building material;

   c.      Any insulation product; or

   d.      Any component part of any building, building material or insulation product.

**C.      Billing Errors and Omissions**

Arising out of any erroneous or improper billing or any other billing-related acts or practices by any person.

**D.      Discrimination**

1.      Arising out of any discrimination of any form by any person, including without limitation, discrimination on the basis of race, ethnicity, national origin, alienage, age, gender, gender identity, disability, weight, religion, marital status, sexual orientation or status as a recipient of government benefits; or

2.      Arising out of the negligent or improper employment, retention, investigation, supervision, training or reporting of, or failure to report, any person whose conduct would be excluded by paragraph 1. above.



However, this exclusion shall not apply to the authorized activities of, or YOUR service as, a member of any formal accreditation, peer review or credentialing committee or board of a NAMED INSURED or a medical professional society if such activities are undertaken at the specific written request or instruction of the NAMED INSURED, unless YOU are found by a court, arbitrator or administrative agency to have knowingly engaged in unlawful conduct or gained an economic advantage to which YOU are not legally entitled and provided that if YOU are insured under any OTHER INSURANCE or otherwise entitled to indemnification for which YOUR indemnitor is insured, then this POLICY shall not apply to such CLAIM or SUIT, whether YOU are specifically named in such OTHER INSURANCE or not; provided, however that if the applicable Limit of Liability of this POLICY exceeds the applicable limit of liability of such OTHER INSURANCE, then this POLICY shall apply as excess insurance against such CLAIM or SUIT in an amount equal to the applicable Limit of Liability of this POLICY minus the applicable limit of liability of such OTHER INSURANCE. Regardless of any finding by a court, arbitrator or administrative agency, in the absence of such OTHER INSURANCE or indemnity and if not otherwise excluded from coverage by another provision of this POLICY, WE will defend YOU in a SUIT making such allegations based upon YOUR service on such committee or board.

E.   **Electronic Chatrooms or Bulletin Boards**

PERSONAL AND ADVERTISING INJURY arising out of any information in electronic form on a website the INSURED hosts, owns, or over which the INSURED exercises control, including but not limited to words, sounds, numbers, images, graphics, advertising, video, streaming content, web-casting, online forum, bulletin board or chat room content.

F.   **Electronic Data**

DAMAGES arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate ELECTRONIC DATA.

However, this exclusion does not apply to liability for DAMAGES because of BODILY INJURY.

G.   **Employment Practices**

Arising from or alleging INJURY to:

1.    Any person arising out of any:

a.    Refusal to employ or contract with any person;

b.    Termination of any person's employment or contract; or

c.    Employment-related practices, policies, acts or omissions, including without limitation coercion, demotion, failure to promote, evaluation, reassignment, discipline, defamation, harassment, retaliation, humiliation, or invasion of privacy of or against any current or past employee or employment applicant or any alleged violation of any whistle blower statute.

2.    The spouse, child, parent, brother or sister of that person described in paragraph 1. above as a consequence of INJURY to that person arising out of any of the acts or practices described in paragraphs 1. a., b., or c. above.

This exclusion applies:

1.    Whether the INSURED may be liable as an employer or in any other capacity; and

2.    To any obligation to share DAMAGES with or repay someone else who must pay DAMAGES because of the INJURY.

However, this exclusion shall not apply to the authorized activities of, or YOUR service as, a member of any formal accreditation, peer review or credentialing committee or board of a NAMED INSURED or a medical professional society if such activities are undertaken at the specific written request or instruction of the NAMED INSURED, unless YOU are found by a court, arbitrator or administrative agency to have knowingly engaged in unlawful conduct or gained an economic advantage to which YOU are not legally



entitled and provided that if YOU are insured under any OTHER INSURANCE or otherwise entitled to indemnification for which YOUR indemnitor is insured then this POLICY shall not apply to such CLAIM or SUIT, whether YOU are specifically named in such OTHER INSURANCE or not; provided, however that if the applicable Limit of Liability of this POLICY exceeds the applicable limit of liability of such OTHER INSURANCE, then this POLICY shall apply as excess insurance against such CLAIM or SUIT in an amount equal to the applicable Limit of Liability of this POLICY minus the applicable limit of liability of such OTHER INSURANCE. Regardless of any finding by a court, arbitrator or administrative agency, in the absence of such OTHER INSURANCE or indemnity and if not otherwise excluded from coverage by another provision of this POLICY, WE will defend YOU in a SUIT making such allegations based upon YOUR service on such committee or board.

H.    **Federal or State Tort Claims Act**

For which the INSURED is deemed to be an officer or employee of the Public Health Service pursuant to 42 U.S.C., § 233, et seq. or otherwise qualifies for indemnification, immunity or protection pursuant to the Federal Tort Claims Act or any federal, state or municipal tort claims statute or ordinance providing protection, immunity or indemnification to federal, state or municipal employees, officers or officials.

I.    **Known Claims and Circumstances**

With respect to any Coverage Part that provides coverage on a claims made basis:

1.    For, or in any way involving or arising out of, any actual or alleged facts or circumstances that were known or reasonably should have been known by the INSURED, before the RETROACTIVE DATE, to have the potential to give rise to a CLAIM, SUIT or LICENSING BOARD PROCEEDING that otherwise would be covered by this POLICY or involving or arising out of any INJURY that the INSURED knew had commenced, in whole or in part before the RETROACTIVE DATE; or

2.    For, or in any way arising out of, or in any way involving in whole or in part any actual or alleged INCIDENT, OFFENSE, act, error, omission, fact, circumstance or situation:

a.    Underlying, or alleged in any CLAIM, SUIT or administrative or regulatory proceeding including any LICENSING BOARD PROCEEDING initiated prior to the RETROACTIVE DATE;

b.    Which has been the subject of any notice to any insurer given before the effective date of this POLICY or under any other policy of insurance; or

c.    That was not disclosed to US in the POLICY APPLICATION or in any application submitted to US for prior acts or retroactive coverage and that the INSURED or a NAMED INSURED knew or should have known had the potential to give rise to a CLAIM, SUIT or LICENSING BOARD PROCEEDING covered by this POLICY.

Knowledge of an INCIDENT, OFFENSE, act, error, omission, fact, circumstance or situation by a NAMED INSURED'S EMPLOYEE shall not in itself constitute knowledge of that NAMED INSURED unless an EXECUTIVE OFFICER, partner or owner of that NAMED INSURED, or a person responsible for insurance matters for that NAMED INSURED has received notice of an INCIDENT or OFFENSE from the EMPLOYEE.

J.    **Nuclear Energy**

1.    With respect to which YOU are also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

2.    Arising out of the HAZARDOUS PROPERTIES of NUCLEAR MATERIAL and with respect to which:



a.    Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

b.    YOU are or, had this POLICY not been issued, would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or agency thereof, with any person or organization; or

3.    Arising out of the HAZARDOUS PROPERTIES of NUCLEAR MATERIAL if:

a.    The NUCLEAR MATERIAL is at any NUCLEAR FACILITY owned by, or operated by or on behalf of an INSURED or has been discharged or dispersed therefrom; or

b.    The NUCLEAR MATERIAL is contained in SPENT FUEL or WASTE at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of YOU; or

4.    Arising out of the furnishing by an INSURED of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any NUCLEAR FACILITY, but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion 4. applies only to PROPERTY DAMAGE to such NUCLEAR FACILITY and any property thereat.

As used in this exclusion:

HAZARDOUS PROPERTIES include radioactive, toxic or explosive properties.

NUCLEAR FACILITY means:

1.    Any NUCLEAR REACTOR;

2.    Any equipment or device designed or used for separating the isotopes of uranium or plutonium, processing or utilizing SPENT FUEL, or handling, processing or packaging WASTE;

3.    Any equipment or device for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the INSURED at the premises where such equipment or device is located consists of or contains more than twenty-five (25) grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and

4.    Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of WASTE, including the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

NUCLEAR MATERIAL means source material, special nuclear material or by-product material; "source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

NUCLEAR REACTOR means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

PROPERTY DAMAGE means:

1.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it;

2.    Loss of use of tangible property that is not physically injured provided such loss was caused by an INCIDENT. All such loss of use shall be deemed to occur at the time of the INCIDENT that caused it; or

3.    All forms of radioactive contamination of property.

SPENT FUEL means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.



WASTE means any waste material containing by-product material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content and resulting from the operation by any person or organization of any NUCLEAR FACILITY included under the first two sub-parts of the definition of NUCLEAR FACILITY.

This exclusion does not apply to any DAMAGES because of any CLAIM or CLAIMS by a patient of an INSURED made for BODILY INJURY caused by PROFESSIONAL SERVICES performed by the INSURED in the practice of nuclear medicine.

K. **Pollution**

1. Which would not have occurred, in whole or in part, but for the actual, alleged or threatened discharge, dispersal, seepage, migration, handling, storage, disposal, treatment, processing, release or escape of or exposure to any POLLUTANTS at any time and in, at or from any premises or location; or

2. Arising out of:

   a. Any request, demand or order or statutory or regulatory requirement that any INSURED or others test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of POLLUTANTS; or

   b. Any CLAIM, SUIT or proceeding by or on behalf of any person or governmental entity or authority for DAMAGES because of, or any loss, cost or expense for, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to, or assessing the effects of POLLUTANTS.

As used in this exclusion, POLLUTANTS means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, asbestos, acids, alkalis, chemicals, oil, gasoline or any other petroleum products or derivatives, waste or material to be recycled, reconditioned or reclaimed, regardless of where located.

With respect to the Commercial General Liability Coverage Part only, this exclusion does not apply to:

1. BODILY INJURY or PROPERTY DAMAGE arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of MOBILE EQUIPMENT or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the BODILY INJURY or PROPERTY DAMAGE arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such INSURED, contractor or subcontractor;

2. BODILY INJURY or PROPERTY DAMAGE sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by the NAMED INSURED or on the NAMED INSURED'S behalf by a contractor or subcontractor;

3. BODILY INJURY or PROPERTY DAMAGE arising out of smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify a building, or equipment that is used to heat water for personal use by the building's occupants or their guests;

4. BODILY INJURY or PROPERTY DAMAGE arising out of heat, smoke or fumes from a HOSTILE FIRE; or

5. BODILY INJURY or PROPERTY DAMAGE arising out of damage by fire to premises while rented to a NAMED INSURED or temporarily occupied by a NAMED INSURED with permission of the



owner. A separate limit of insurance applies to this coverage as described in Section III. Our Limit of Liability of the Commercial General Liability Coverage Part.

**L.    Sexual Misconduct, Abuse or Molestation**

Which, in whole or in part, arise out of or contain any allegations of any of the following by any person:

1.    Sexual intimacy, abuse, molestation, harassment, exploitation, assault, violation of professional boundaries or undue familiarity, or any conduct, gestures or written or oral statements of a sexual nature;

2.    Mishandling of transference or countertransference;

3.    The failure to terminate the healthcare provider-patient relationship with any person with whom an INSURED has had an intimate or sexual relationship or has engaged in any of the conduct referenced in paragraphs 1. or 2. above;

4.    The abandonment of a patient with whom an INSURED has had an intimate or sexual relationship or has engaged in any of the conduct referenced in paragraphs 1. or 2. above, or the failure to refer such patient to an appropriate healthcare provider; or

5.    The negligent or improper employment, retention, investigation, supervision, training or reporting of, or failure to report, any person whose conduct would be excluded by paragraphs 1. through 4. above.

This exclusion does not apply to DAMAGES or LEGAL EXPENSES covered by the Sexual Misconduct Coverage Part, if included in the POLICY.

**M.    Terrorism**

Arising directly or indirectly out of TERRORISM, including any action taken in hindering or defending against an actual or expected incident of TERRORISM regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

As used in this exclusion, TERRORISM means activities against persons, organizations or property of any nature:

1.    That involve the following or preparation for the following:

    a.    Use or threat of force or violence;

    b.    Commission or threat of a dangerous act; or

    c.    Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

2.    When one or both of the following apply:

    a.    The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

    b.    It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or to express opposition to) a philosophy or ideology.

**N.    Unauthorized Disclosure of Information**

Arising out of any actual or potential breach of privacy or confidentiality, including without limitation the actual or potential unauthorized access to, use, theft, loss, disclosure, disposal, transmission, collection or recording of information contained in or accessed with or by any computer or data processing or storage systems or any electronic device or of any medical, personal, financial or other confidential or protected information concerning any person or entity.



**O. Unfair Trade Practices**

Arising out of any:

1.  Price fixing, unfair competition, unfair trade practices or violation of a consumer protection statute or regulation;

2.  Dispute over fees, income or revenue;

3.  Inducement to enter into, interference with or dissolution or termination of any business or economic relationship; or

4.  Violations of any law (including but not limited to Title 15 of the United States Code or any similar state statute) that prohibits the unlawful restraint of trade, business or profession.

However, this exclusion shall not apply to the authorized activities of, or YOUR service as, a member of any formal accreditation, peer review or credentialing committee or board of a NAMED INSURED or a medical professional society, if such activities are undertaken at the specific written request or instruction of the NAMED INSURED, unless YOU are found by a court, arbitrator or administrative agency to have knowingly engaged in unlawful conduct or gained an economic advantage to which YOU are not legally entitled and provided that if YOU are insured under any OTHER INSURANCE or otherwise entitled to indemnification for which YOUR indemnitor is insured then this POLICY shall not apply to such CLAIM or SUIT, whether YOU are specifically named in such OTHER INSURANCE or not; provided, however that if the applicable Limit of Liability of this POLICY exceeds the applicable limit of liability of such OTHER INSURANCE, then this POLICY shall apply as excess insurance against such CLAIM or SUIT in an amount equal to the applicable Limit of Liability of this POLICY minus the applicable limit of liability of such OTHER INSURANCE. Regardless of any finding by a court, arbitrator or administrative agency, in the absence of such OTHER INSURANCE or indemnity and if not otherwise excluded from coverage by another provision of this POLICY, WE will defend YOU in a SUIT making such allegations based upon YOUR service on such committee or board.

**P. Violation of Statutes**

Arising out of:

1.  A willful, knowing, deliberate or intentional violation of any federal, state or municipal constitution, statute, ordinance, by-law, rule or regulation, regardless of whether or not the resulting injury was expected or intended. However, this paragraph 1. shall not apply to an INSURED if such violations were not committed by, at the direction of or with the knowledge of such INSURED;

2.  Any violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq., as amended, or any rules or regulations promulgated thereunder;

3.  Any violation of the Stark Act, 42 U.S.C. 1395nn, and any amendments thereto or rules or regulations promulgated thereunder, or of any federal, state or local self-referral laws, or any rules or regulations promulgated thereunder. However, this paragraph 3. shall not apply to a CLAIM by a patient of the INSURED for BODILY INJURY because of an INCIDENT in the performance of PROFESSIONAL SERVICES by the INSURED or someone for whom the INSURED is legally responsible;

4.  Any violation of the federal Anti-Kickback Statute, 42 U.S.C. 1320-7b(b), and any amendments thereto or rules or regulations promulgated thereunder, or of any federal, state or local anti-kickback law, or any rules or regulations promulgated thereunder;

5.  Any violation of the Health Insurance Portability and Accountability Act ("HIPAA") and any amendments thereto, or any rules or regulations promulgated thereunder or of any other federal or state statute or regulation protecting the confidentiality of or limiting or precluding the disclosure of any person's health or medical information;



6.   Any violation of the Gramm-Leach Bliley Act of 1999, and any amendments thereto or any rules or regulations promulgated thereunder or of any other federal or state statute or regulation protecting the confidentiality of or limiting or precluding the disclosure of any person's financial information;

7.   Any violation of the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and any amendments thereto, or any rules or regulations promulgated thereunder;

8.   Any violation of the False Claims Act, 31 U.S.C. §§ 3729 – 3733, and any amendments thereto, or any rules or regulations promulgated thereunder;

9.   Any violation of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq., and any amendments thereto; or

10.  Any violation of any statute, ordinance or regulation that requires notice to persons of any actual or potential unauthorized access to or disclosure of any of their personally identifiable non-public information or of any confidential or private information or other breach of privacy or the costs of providing any notice required under any such statute or of any credit monitoring.

Q.   **War**

Arising, directly or indirectly, out of:

1.   War, including undeclared or civil war;

2.   Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereignty or other authority using military personnel or other agents; or

3.   Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

With respect to the Commercial General Liability Coverage Part only, this exclusion does not apply to:

BODILY INJURY or PROPERTY DAMAGE arising out of damage by fire to premises while rented to a NAMED INSURED or temporarily occupied by a NAMED INSURED with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III. Our Limit of Liability of the Commercial General Liability Coverage Part.

R.   **Worker's Compensation**

1.   For which a NAMED INSURED or its insurers may be held liable under any worker's compensation, unemployment compensation or disability benefits law or under any similar law; or

2.   Arising out of or for any obligation of an INSURED under any worker's compensation, unemployment compensation or disability benefits law or under any similar law.

## Section III.    Defined Terms

A.   ADVERTISEMENT means a notice that is broadcast or published to the general public or specific market segments about a NAMED INSURED'S goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

1.   Notices that are published include material placed on the Internet or on similar electronic means of communication; and

2.   Regarding web sites, only that part of a web site that is about a NAMED INSURED'S goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

B.   AUTO means:



     1.     A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

     2.     Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

     However, AUTO does not include MOBILE EQUIPMENT.

C.     BODILY INJURY means mental anguish, physical injury, sickness, disease or death sustained by any person or persons.

D.     CLAIM means a written demand made or SUIT brought against an INSURED for DAMAGES including a demand received by an INSURED for DAMAGES as a result of an INCIDENT or OFFENSE.

E.     DAMAGES means all forms of compensatory sums which the INSURED is legally obligated to pay as damages including judgments, awards and settlements entered into with OUR prior written consent. DAMAGES also includes pre-judgment interest and any attorney's fees awarded against an INSURED attributable to DAMAGES covered by this POLICY.

     DAMAGES does not include CLAIM EXPENSES, government, civil or criminal fines, sanctions, penalties or taxes, doubled, trebled or multiplied DAMAGES, restitution, or the refund or disgorgement of sums paid to or earned by the INSURED or the cost of complying with any order or injunction.

F.     DECLARATIONS means the section of this POLICY entitled "Common Policy Declarations" that sets forth certain important information about the FIRST NAMED INSURED and this POLICY. The DECLARATIONS shall also include, if applicable, the Schedule of Insureds and any other attached Schedules.

G.     ELECTRONIC DATA means information, facts or programs stored as or on, created or used on, or transmitted by any electronic device, computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronic or electronically controlled equipment.

H.     EMPLOYEE means a full-time or part-time individual who is on a NAMED INSURED'S payroll and subject to the withholding of taxes by a NAMED INSURED.

I.     EXECUTIVE OFFICER means a person holding any of the officer positions created by a NAMED INSURED'S charter, constitution, bylaws or any other similar governing document.

J.     EXTENDED REPORTING PERIOD means the time after the cancellation or non-renewal of a Coverage Part during which CLAIMS that otherwise are covered by the Coverage Part may be first made and reported to US, and that is set forth in an endorsement, if any.

K.     FIRST NAMED INSURED means the individual or entity listed as such in the DECLARATIONS.

L.     HOME HEALTHCARE SERVICES means:

     1.     Nursing, occupational therapy, physical therapy, speech therapy, and rehabilitative therapy;

     2.     Medical social work;

     3.     Home health aide services;

     4.     Homemaker services provided to a patient or client of a NAMED INSURED by a certified Home Health Aide or Personal Care Attendant;

     5.     Nutrition counseling and dietary services;

     6.     Hospice care;

     7.     Intravenous therapy;

     8.     Maternal and child health care and pediatric care;

     9.     Mental health services and screening programs; and



10.      Adult day care services

whether or not the above services are performed in a residential setting or other location.

M.      HOSTILE FIRE means one which becomes uncontrollable or breaks out from where it was intended to be.

N.      IMPAIRED PROPERTY means tangible property, other than YOUR PRODUCT or YOUR WORK, that cannot be used or is less useful because:

1.      It incorporates YOUR PRODUCT or YOUR WORK that is known or thought to be defective, deficient, inadequate or dangerous; or

2.      A NAMED INSURED has failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of YOUR PRODUCT or YOUR WORK or YOUR fulfilling the terms of the contract or agreement.

O.      INCIDENT means any negligent act, negligent error or negligent omission including repeated exposure to substantially the same or related negligent acts, negligent errors or negligent omissions.

P.      INJURY means only BODILY INJURY, PROPERTY DAMAGE, or PERSONAL AND ADVERTISING INJURY.

Q.      LICENSING BOARD PROCEEDING means a civil regulatory proceeding by the state agency with jurisdiction to issue, revoke, suspend or restrict YOUR license to perform PROFESSIONAL SERVICES including any action in a court of law for judicial review of any order or decision or such agency concerning YOUR professional license. LICENSING BOARD PROCEEDING includes any investigation by such an agency of YOUR performance of PROFESSIONAL SERVICES and any complaint filed with or by such an agency concerning YOUR performance of PROFESSIONAL SERVICES.

LICENSING BOARD PROCEEDING does not include any proceeding concerning YOUR license to prescribe controlled substances or YOUR eligibility to participate in any federally or state-funded healthcare, insurance or payment program, including without limitation Medicare or Medicaid.

R.      LOADING OR UNLOADING means the handling of property:

1.      After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or AUTO;

2.      While it is in or on an aircraft, watercraft or AUTO; or

3.      While it is being moved from an aircraft, watercraft or AUTO to the place where it is finally delivered;

but LOADING OR UNLOADING does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or AUTO.

S.      MANAGED CARE ENTITY means a health maintenance organization, health insurance plan, physician-hospital organization, independent physician association or preferred provider association.

T.      MOBILE EQUIPMENT means any of the following types of land vehicles, including any attached machinery or equipment:

1.      Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2.      Vehicles maintained for use solely on or next to premises a NAMED INSURED owns or rents;

3.      Vehicles that travel on crawler treads;

4.      Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

     a.      Power cranes, shovels, loaders, diggers or drills; or

     b.      Road construction or resurfacing equipment such as graders, scrapers or rollers;



5.  Vehicles not described in paragraphs 1., 2., 3. or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    a.  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    b.  Cherry pickers and similar devices used to raise or lower workers;

6.  Vehicles not described in paragraphs 1., 2., 3. or 4. above maintained primarily for purposes other than the transportation of persons or cargo.

    However, self-propelled vehicles with the following types of permanently attached equipment are not MOBILE EQUIPMENT but will be considered AUTOS:

    a.  Equipment designed primarily for:

        i.   Snow removal;

        ii.  Road maintenance, but not construction or resurfacing; or

        iii. Street cleaning;

    b.  Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    c.  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, MOBILE EQUIPMENT does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered AUTOS.

U.  NAMED INSURED means the FIRST NAMED INSURED and any individual or entity designated as a NAMED INSURED for a particular Coverage Part in the DECLARATIONS or a Schedule attached to this POLICY. Such individual or entity will only be a NAMED INSURED for such Coverage Part as so designated.

V.  OFFENSE means any of the offenses listed in definition of PERSONAL AND ADVERTISING INJURY.

W.  OTHER INSURANCE means all other valid and collectible insurance, whether primary, excess, contingent or written on any other basis, including without limitation any captive insurance or self-insurance program or any risk retention group, whether or not subject to a deductible, co-payment or self-insured retention and whether or not an INSURED is specifically named as an INSURED on such OTHER INSURANCE.

X.  PERSONAL AND ADVERTISING INJURY means injury, including consequential BODILY INJURY, arising out of one or more of the following offenses:

    1.  False arrest, detention or imprisonment;

    2.  Malicious prosecution;

    3.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    4.  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    5.  Oral or written publication, in any manner, of material that violates a person's right of privacy;

    6.  The use of another's advertising idea in a NAMED INSURED'S ADVERTISEMENT; or

    7.  Infringing upon another's copyright, trade dress or slogan in YOUR ADVERTISEMENT.



Y.   POLICY means this insurance contract issued by US to the FIRST NAMED INSURED including the DECLARATIONS, Coverage Parts, Common Policy Terms, Endorsements, Schedules, and POLICY APPLICATIONS.

Z.   POLICY APPLICATION means each application, together with all attachments and other documents submitted to US by or on behalf of the FIRST NAMED INSURED in connection with the underwriting or issuance of this POLICY, including any endorsements. If no application was submitted for this POLICY, then POLICY APPLICATION shall mean the most recent application, together with all attachments and other documents submitted to US, in connection with the underwriting or issuance of any previous POLICY issued by US to the FIRST NAMED INSURED for which this POLICY is a renewal or replacement.

AA.  POLICY PERIOD means, with respect to the POLICY and to each Coverage Part, the period from the effective date of this POLICY to the expiration date of this POLICY as set forth in the DECLARATIONS or the cancellation date of the POLICY or of that Coverage Part, if applicable, whichever occurs first. With respect to each INSURED whose coverage begins after the effective date of the POLICY or whose coverage is cancelled before the end of the POLICY, POLICY PERIOD means the period from the effective date of that INSURED'S coverage through the termination or cancellation of that INSURED'S coverage.

BB.  PRODUCTS-COMPLETED OPERATIONS HAZARD:

1.   Includes all BODILY INJURY and PROPERTY DAMAGE occurring away from premises a NAMED INSURED owns or rents and arising out of YOUR PRODUCT or YOUR WORK except:

a.   Products that are still in the NAMED INSURED'S physical possession; or

b.   Work that has not yet been completed or abandoned. However, YOUR WORK will be deemed completed at the earliest of the following times:

i.    When all of the work called for in the NAMED INSURED'S contract has been completed.

ii.   When all of the work to be done at the job site has been completed if the NAMED INSURED'S contract calls for work at more than one job site.

iii.  When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

2.   Does not include BODILY INJURY or PROPERTY DAMAGE arising out of:

a.   The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by a NAMED INSURED, and that condition was created by the LOADING OR UNLOADING of that vehicle by any INSURED; or

b.   The existence of tools, uninstalled equipment or abandoned or unused materials.

CC.  PROFESSIONAL SERVICES means only the following:

1.   Medical, surgical, dental, chiropractic, osteopathic or nursing treatment including the furnishing of food or beverages in connection therewith;

2.   Furnishing or dispensing of medical, dental or surgical supplies or appliances;

3.   Handling of or performing postmortem examinations on human bodies;

4.   Furnishing beautician or barber services;

5.   Furnishing mental health, religious or other professional counseling services; or



6. Providing education or training of skills for the delivery of medical, surgical, dental or nursing treatment, but only if such education or training results in a CLAIM for BODILY INJURY to a patient of a NAMED INSURED.

7. With the exception of the Provider Medical Professional Liability Coverage Part, PROFESSIONAL SERVICES also means the following:

   a. HOME HEALTHCARE SERVICES;

   b. Administrative duties of a NAMED INSURED'S medical director and medical staff members but only while such persons are acting within the capacity and scope of their duties as such for the NAMED INSURED;

   c. Authorized activities of a formal accreditation, peer review or credentialing committee or board of a NAMED INSURED, including service by any person on behalf of the NAMED INSURED, as:

      i. A member of such committee or board of the NAMED INSURED;

      ii. A member of formal accreditation, peer review or credentialing committee or board of a medical professional society; provided such service is at the specific written request or instruction of the NAMED INSURED; or

      iii. A person charged with the duty of executing directives of a formal accreditation, peer review or credentialing committee or board of a NAMED INSURED.

8. For the purposes of the Provider Medical Professional Liability Coverage Part and Commercial General Liability Coverage Part, PROFESSIONAL SERVICES also means the following:

   a. Service by any INSURED as a member of a formal accreditation, peer review or credentialing committee of a hospital or professional society; and

   b. Review on behalf of a MANAGED CARE ENTITY or other healthcare insurer of any proposed or actual total or per unit charges, fees or rates for medical, hospital or other healthcare services, or of the necessity, quality or utilization of such healthcare services.

DD. PROPERTY DAMAGE means:

1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the INCIDENT that caused it.

For the purposes of this POLICY, ELECTRONIC DATA is not tangible property.

EE. RETROACTIVE DATE means the date stated as the Retroactive Date with respect to each NAMED INSURED listed in the DECLARATIONS. With respect to each NAMED INSURED, such date shall be the RETROACTIVE DATE with respect to that NAMED INSURED, and any other INSURED who shares in that NAMED INSURED'S Limit of Liability. However, if YOU are a SCHEDULED PROVIDER, the RETROACTIVE DATE means the date listed in the Schedule of Insureds with respect to YOU.

FF. SCHEDULED PROVIDER means a provider identified in the Schedule of Insureds attached to this POLICY.

GG. SUIT means:

1. A civil lawsuit filed in a court of law;

2. An arbitration proceeding to which the INSURED must submit or submits with OUR written consent; or

3. Any other alternative dispute resolution proceeding to which WE consent in writing.


SUIT shall not include an arbitration to which the INSURED must submit pursuant to a contract or agreement entered into by an INSURED without OUR consent.

SUIT shall not include any LICENSING BOARD PROCEEDINGS or any other municipal, state or federal administrative or regulatory proceedings.

HH.   VOLUNTEER means a person who is not a NAMED INSURED'S EMPLOYEE, and who donates his or her work and acts at the direction of and within the scope of duties determined by a NAMED INSURED, and is not paid a fee, salary or other compensation by a NAMED INSURED or anyone else for their work performed for a NAMED INSURED.

II.   YOUR PRODUCT:

1.   Means:

   a.   Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      i.   A NAMED INSURED;

      ii.   Others trading under a NAMED INSURED'S name; or

      iii.   A person or organization whose business or assets a NAMED INSURED has acquired; and

   b.   Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

2.   Includes:

   a.   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of YOUR PRODUCT; and

   b.   The providing of or failure to provide warnings or instructions.

3.   Does not include vending machines or other property rented to or located for the use of others but not sold.

JJ.   YOUR WORK:

1.   Means:

   a.   Work or operations performed by a NAMED INSURED or on a NAMED INSURED'S behalf; and

   b.   Materials, parts or equipment furnished in connection with such work or operations.

2.   Includes:

   a.   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of YOUR WORK; and

   b.   The providing of or failure to provide warnings or instructions.

## Section IV.      General Conditions

The insurance provided by this POLICY is subject to the following conditions:

A.   **Assignment.** Assignment of any INSURED'S interest under this POLICY will not bind US unless OUR consent is endorsed hereon.

B.   **Assistance and Cooperation of the Insured.** YOU must cooperate with US in the investigation and defense of CLAIMS and SUITS against YOU. Unless otherwise expressly provided by an Endorsement to



this POLICY, YOU must also cooperate in the settlement of CLAIMS and SUITS against YOU. Upon OUR request, YOU must attend hearings, depositions and trials and assist in securing and giving evidence, obtaining records and other information, and obtaining the attendance of witnesses. YOU may not, except at YOUR own cost, voluntarily make any payment, assume any obligation or incur any CLAIM EXPENSES. YOU shall not do anything before or after an INCIDENT or OFFENSE or circumstances indicating that a CLAIM may be asserted against YOU to prejudice the defense of any CLAIM or SUIT insured under this POLICY. YOU shall not enter into any oral or written contracts or agreements which in any way impair or waive OUR right of defense.

C.   **Authority of the First Named Insured.** The FIRST NAMED INSURED is authorized to act on behalf of all INSUREDS with respect to acceptance of this POLICY and any endorsements, the giving of notice of CLAIMS or circumstances that may give rise to a CLAIM, the giving or receiving of notice of cancellation or non-renewal, invoices for premiums, receiving unearned premium or dividends, agreeing to any changes in this POLICY and, unless otherwise expressly stated in a Coverage Part, exercising or declining the right to purchase an EXTENDED REPORTING PERIOD.

D.   **Bankruptcy or Insolvency.** Bankruptcy or insolvency of any INSURED or the INSURED'S estate will not relieve US of any obligations under this POLICY with respect to that INSURED.

E.   **Cancellation or Non-Renewal.** The FIRST NAMED INSURED may cancel this POLICY by returning it to US or by giving US advance written notice of when the cancellation is to take effect. WE may cancel or non-renew this POLICY by mailing to the FIRST NAMED INSURED at the FIRST NAMED INSURED'S last address as known by US, at least thirty (30) days advance notice of OUR intent to cancel or non-renew unless such cancellation is for non-payment of premium.

In the event any NAMED INSURED fails to pay any premium or reimburse any deductible or expense amounts owed to US, WE may cancel this POLICY by mailing notice to the FIRST NAMED INSURED at least ten (10) days in advance of the effective date of the cancellation. Proof of mailing will constitute proof of notice for purposes of this provision.

The effective date and hour of cancellation stated in the notice or the time of surrender of the POLICY will become the end of the POLICY PERIOD.

If this POLICY is cancelled, the FIRST NAMED INSURED may be entitled to a premium refund. However, WE are not required to make or offer any refund for any cancellation to be effective. If the FIRST NAMED INSURED cancels, the FIRST NAMED INSURED shall be responsible for payment of any earned premium calculated on a pro rata basis based on the period the POLICY was in effect plus 10% of the unearned premium for the original POLICY PERIOD stated in the DECLARATIONS. If the FIRST NAMED INSURED is due a refund the refund will be equal to any unearned premium calculated on a pro rata basis based on the period the POLICY was in effect, less 10% of any unearned premium for the original POLICY PERIOD stated in the DECLARATIONS. If WE cancel, WE will refund any unearned premium for the original POLICY PERIOD stated in the DECLARATIONS calculated on a pro rata basis.

Bankruptcy or insolvency of any NAMED INSURED will not preclude US from asserting OUR right to cancel or non-renew this POLICY.

F.   **Changes.** Notice to or knowledge of any agent or other person acting on OUR behalf will not effect a waiver or change to any terms or conditions of this POLICY or estop US from asserting any right under the terms and conditions of this POLICY. The terms and conditions of this POLICY can be waived or changed only by written endorsement signed by US.

G.   **Consent to Settle.** WE will not settle any CLAIM or SUIT against YOU without the NAMED INSURED'S written consent to settle. Such consent will be deemed to have been given if the NAMED INSURED does not notify US in writing of intent to withhold consent within thirty (30) days after WE send the NAMED INSURED written notice that WE recommend settlement. Such notice shall be deemed sufficient if mailed to the NAMED INSURED'S address listed on the DECLARATIONS unless the NAMED INSURED has



previously notified US in writing of a change in address. OUR notice will be deemed given on the date of mailing to such address.

If the NAMED INSURED consents to settlement or is deemed to have consented, then WE may settle the CLAIM or SUIT for such amount, up to the applicable Limit of Liability, and on such terms as WE, in OUR sole judgment, determine.

WE shall not be obligated to obtain consent to settle any CLAIM or SUIT against any INSURED:

1.      After a jury verdict, judgment or any other ruling by a court or arbitrator establishing that INSURED'S liability regardless of whether such verdict, judgment or ruling is subject to appeal or further judicial review;

2.      Arising out of any allegation of the actual or threatened sexual abuse of or any sexual misconduct or sexual activity with YOUR patient by YOU or by anyone for whom YOU are legally responsible while YOU or such person were performing PROFESSIONAL SERVICES as provided in the Sexual Misconduct Coverage Part, if attached;

3.      If the NAMED INSURED is deceased, has been declared legally incompetent by a court, or is bankrupt, or if a guardian, conservator or receiver has been appointed for the NAMED INSURED;

4.      From the estate, heirs, or the legal representative of any INSURED who is deceased, has been declared incompetent or is bankrupt; or

5.      If the NAMED INSURED is an individual and one or more of the following applies:

        a.      The NAMED INSURED is not a physician, surgeon, dentist, physician assistant or nurse practitioner; or

        b.      The NAMED INSURED'S professional license or license or registration to dispense or prescribe controlled substances is restricted, under suspension or has been revoked, surrendered or has otherwise terminated or is not in effect.

**H.      Declarations and Applications.** By accepting this POLICY, the FIRST NAMED INSURED represents and agrees on behalf of all INSUREDS that:

1.      The statements in the DECLARATIONS and POLICY APPLICATION are accurate and complete;

2.      The statements in the POLICY APPLICATION are their representations, those statements are material to the risk assumed by US and OUR decision to issue this POLICY, this POLICY is issued in reliance upon the truth and completeness of such statements and they are deemed to be incorporated into this POLICY;

3.      This POLICY embodies all agreements between YOU and US or any of OUR agents relating to this POLICY; and

4.      Misrepresentations made by any INSURED in the POLICY APPLICATION shall invalidate this POLICY as to all INSUREDS.

I      **Estates and Legal Representatives.** Coverage under this POLICY shall extend to CLAIMS made or SUITS brought against the estates, heirs and legal representatives of INSUREDS who are deceased or


against the legal representatives of INSUREDS who are incompetent, insolvent or bankrupt, but only in their capacity as a representative of the INSURED or the INSURED'S estate.

J.  **Government Access to Records.** In accordance with the requirements of Section 952 of the Omnibus Reconciliation Act of 1980, upon written request, WE will allow the Secretary of Health and Human Services and the Comptroller General of the United States access to the POLICY and necessary books, documents and records to verify the cost of this POLICY, to the extent required by law. Access will also be allowed to subcontracts between US and any related organization of OURS and to its books, documents and records. Such access will be provided for up to four (4) years after the services furnished under this POLICY end.

K.  **Inspection and Audit.** At OUR option WE may inspect YOUR property and operations and examine and audit YOUR books and records at any time. These inspections are for OUR benefit only. By OUR right to inspect, or by OUR making any inspection, WE make no representation that YOUR property or operations are safe, not harmful to health or comply with any law, rule or regulation.

L.  **Legal Action Against Us.** No legal action may be brought against US until there has been full compliance with all of the terms of this POLICY. In addition, no legal action may be brought against US until the amount of the INSURED'S obligation to pay has been finally determined either by judgment after trial and exhaustion of all appeals or expiration of the time for appealing from such a judgment or by a written settlement agreement between the claimant and US settling the CLAIM against the INSURED and releasing the INSURED from liability. No person or organization has any right under this POLICY to join US as a party or otherwise bring US into a SUIT asking for DAMAGES from an INSURED or to determine the INSURED'S liability.

Any disputes between the INSURED, any assignee of the INSURED or any person who is subrogated to the rights of the INSURED and US as to whether there is coverage under this POLICY must be filed in the courts of the United States of America.

M.  **Notice of Claim or Suit.** If a CLAIM is made or a SUIT is brought against YOU, YOU must immediately forward to US every demand, complaint notice, summons or other legal papers received by YOU or YOUR representatives in connection with the CLAIM or SUIT. YOU must also give immediate notice of the CLAIM or SUIT to all other insurers and persons who may be obligated to defend or indemnify YOU in connection with such CLAIM or SUIT.

N.  **Notice of Incident.** In the event of an actual or alleged INCIDENT or an OFFENSE that may result in a CLAIM or SUIT potentially covered by this POLICY, YOU must notify US in writing as soon as practicable. In the event of an actual or alleged INCIDENT or OFFENSE potentially covered by any OTHER INSURANCE or indemnitor, YOU must also give notice of the INCIDENT or OFFENSE to all other insurers and persons who may be obligated to defend or indemnify YOU in connection with such INCIDENT or OFFENSE.

Such notice, whether to US or to another insurer or indemnitor, shall contain:

1.  The identity of the INSUREDS involved;

2.  How, when and where the INCIDENT or OFFENSE took place;

3.  The names and addresses of any injured persons and witnesses; and

4.  The nature and location of any INJURY or damage.

O.  **Other Insurance.** Except where otherwise expressly stated in this POLICY, the insurance afforded by this POLICY is excess over all OTHER INSURANCE, except insurance specifically purchased and written to apply in excess over the specific limits of this POLICY and that specifically references this POLICY. WE shall not be obligated to contribute with any OTHER INSURANCE to the payment of any DAMAGES or CLAIM EXPENSES. YOU shall comply with the other conditions of the OTHER INSURANCE and do whatever is reasonably necessary to secure coverage for DAMAGES and CLAIMS EXPENSES potentially covered by OTHER INSURANCE.



1.   When this POLICY is excess over OTHER INSURANCE, WE will pay only OUR share of the amount of DAMAGES, if any, that exceeds the sum of:

    a.   The total amount that all such OTHER INSURANCE would pay for DAMAGES in the absence of this POLICY; and

    b.   The total of all deductibles, co-payments, self-insured amounts, retentions and retained limits under all of that OTHER INSURANCE and under this POLICY.

2.   When this POLICY is excess over any OTHER INSURANCE, WE will have no duty to defend YOU against any SUIT or to pay any CLAIM EXPENSES if any other insurer has a duty to defend YOU against that SUIT or to pay for any CLAIM EXPENSES, regardless of whether or not CLAIM EXPENSES are within the limits of liability of such OTHER INSURANCE or are subject to any deductible, co-payment, self-insured amount, retention or retained limit. If the applicable Coverage Part otherwise obligates US to defend a SUIT or pay CLAIM EXPENSES, if no other insurer defends YOU, WE will undertake to do so, but WE will be entitled to YOUR rights against all those other insurers.

P.   **Policy Headings.** The headings used in this POLICY, including the headings in these Common Policy Terms and in each Coverage Part are for convenience only and shall not limit or otherwise affect the terms and conditions of the POLICY.

Q.   **Premiums.** All premiums for this POLICY will be computed in accordance with OUR rules, rates and rating plans in effect with respect to the period for which the premiums are due.

The premium is due on the first day of the POLICY PERIOD or as invoiced by US. The POLICY shall not be effective unless the first installment payment is received on or before the due date stated on the invoice for the initial policy premium. If any subsequent premium is not paid when due, this POLICY, if not previously cancelled, will be terminated in accordance with the provisions of paragraph E. above.

The NAMED INSURED shall maintain records of such information as is necessary for premium computation and shall send copies of such records to US at such times during and after the POLICY PERIOD as WE may direct.

R.   **Terms Conformed to Statute.** If any term of this POLICY is in conflict with the statutes and regulations of the state where the POLICY is issued, that term shall be deemed to be amended to conform to such statutes and regulations.

In witness whereof, WE have caused these Common Policy Terms to be executed and attested.



          Sam Mezzich          Richard G. Hayes
           President            Treasurer



**Coverys Specialty Insurance Company**

Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group
501 Holiday Drive, Foster Plaza 4
Pittsburgh, PA 15220

# CHANGE ENDORSEMENT

| Policy Number: | Named Insured: | Policy Period: | Effective Date of Change: |
|---|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 – 12/01/2017 | 12/01/2016 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

It is hereby understood and agreed that the following revision(s) have been made to the above referenced policy:

The following is added to the Common Policy Terms form (COM 001) Section III Defined Terms; CC Professional Services means only the following:

9.      Care Management Activities; ongoing case management; development and implement of outcomes research and measurements; protocol development and implementation; disease management protocols; health education programs; utilization review including quality improvement activities.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above.

Gregg L. Hanson          Richard G. Hayes
President & CEO              Treasurer



# PENNSYLVANIA MANDATORY AMENDMENTS ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

Entity Medical Professional Liability Coverage Part
Provider Medical Professional Liability Coverage Part
Sexual Misconduct Coverage Part
Professional Conduct Review Coverage Part
Commercial General Liability Coverage Part
Employee Benefits Liability Coverage Part
Excess Medical Professional & Umbrella Liability Coverage Part

Subject to all other terms and conditions of the POLICY, it is agreed and understood that Section IV. General Conditions, E. Cancellation or Non-Renewal of the Common Policy Terms is replaced in its entirety with the following:

E.    Cancellation or Non-Renewal.

1.    The FIRST NAMED INSURED may cancel this POLICY by returning it to US or by giving US advance written notice of when the cancellation is to take effect.

If this POLICY has been in effect for less than sixty (60) days, WE may cancel this POLICY by mailing or delivering written notice of cancellation stating the effective date of such cancellation.

If this POLICY has been in effect for sixty (60) days or more, WE may cancel this POLICY by giving, mailing or delivering written notice of cancellation at least fifteen (15) days before the effective date of cancellation if WE cancel for one or more of the following reasons:

a.    Non-payment of premium; or

b.    Material misrepresentation which affects the insurability of the risk.

If WE cancel this POLICY for any other reason other than a. or b. above, it will be cancelled by mailing or delivering written notice of cancellation at least sixty (60) days before the effective date of cancellation.

Non-payment of premium includes any failure to reimburse US any deductible or expense amounts owed to US under the terms of the POLICY.

Written notice of cancellation, including the reason for cancellation, will be mailed or delivered to the FIRST NAMED INSURED at the last mailing address known to US. The mailing of notice by first-class mail will be sufficient proof of notice.

The effective date and hour of cancellation stated in the notice or the time of surrender of the POLICY will become the end of the POLICY PERIOD.

If this POLICY is cancelled, the FIRST NAMED INSURED may be entitled to a premium refund. However, WE are not required to make or offer any refund for any cancellation to be effective. If the FIRST NAMED INSURED cancels, the FIRST NAMED INSURED shall be responsible for payment of any earned premium calculated on a pro rata basis based on the period the POLICY was in effect plus 10% of the unearned premium for the original POLICY PERIOD stated in the DECLARATIONS. If the FIRST NAMED INSURED is due a refund the refund will be equal to any unearned premium calculated on a pro rata basis based on the period the POLICY was in effect, less 10% of any unearned premium for the original POLICY PERIOD stated in the DECLARATIONS. If WE cancel WE will refund any unearned premium for the original POLICY PERIOD stated in the DECLARATIONS calculated on a pro rata basis.



2     If WE decide not to renew this POLICY, sixty (60) days' advance written notice shall be given to the FIRST NAMED INSURED at the address shown in this POLICY. The notice shall include the reason for such non-renewal.

The mailing of notice by first-class mail will be sufficient proof of notice.

Bankruptcy or insolvency of any NAMED INSURED will not preclude US from asserting OUR right to cancel or non-renew this POLICY.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above.

<div style="text-align:center">

Sam Mezzich      Richard G. Hayes<br>
President          Treasurer

</div>



# ENTITY MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
# CLAIMS MADE COVERAGE FORM

Throughout this Coverage Part the words YOU and YOUR refer to the INSURED as defined in Section II. Definition of Insured. The words WE, US and OUR refer to the insurer named on the DECLARATIONS.

Capitalized words and phrases have special meaning as defined in the Common Policy Terms and this Coverage Part.

This Coverage Part is issued in return for the payment of premium and is subject to the DECLARATIONS and to all of the terms, conditions, definitions and exclusions stated in this Coverage Part and in the Common Policy Terms. Read the entire POLICY carefully to determine YOUR rights and duties and what is and is not covered.

## IMPORTANT NOTICE

## THIS IS A CLAIMS MADE COVERAGE PART.

**Coverage applies only to CLAIMS first made against the INSURED and reported to US during the POLICY PERIOD arising out of INCIDENTS taking place on or after the RETROACTIVE DATE stated in the DECLARATIONS. Please review this Coverage Part carefully and discuss the coverage with YOUR insurance agent.**

## Section I.          Entity Professional Liability

A.      **Insuring Agreement**

WE will pay on YOUR behalf those sums which YOU become legally obligated to pay as DAMAGES, up to the applicable Limits of Liability stated in the DECLARATIONS, because of a CLAIM for an INCIDENT in the performance of PROFESSIONAL SERVICES by YOU or someone for whom YOU are legally responsible. However, if YOU are an intern, extern, resident, fellow, medical, dental, osteopathic, or chiropractic doctor, who is not a SCHEDULED PROVIDER, this coverage shall not apply to any CLAIM against YOU for an INCIDENT in the performance of PROFESSIONAL SERVICES by YOU or by YOUR EMPLOYEE or agent, unless expressly stated otherwise.

This coverage applies only if:

1.      The INCIDENT takes place on or after the RETROACTIVE DATE and before the end of the POLICY PERIOD;

2.      A CLAIM for DAMAGES is first made against YOU and reported to US in writing during the POLICY PERIOD or any EXTENDED REPORTING PERIOD, if applicable; and

3.      Any SUIT for DAMAGES covered by this POLICY is brought within the Coverage Territory set forth in Section V. Coverage Territory.

WE shall have the right and duty to defend any SUIT brought against YOU seeking DAMAGES that are covered by this Coverage Part as further set forth in and subject to Section IV. Defense, Settlement and Claim Expenses.

B.      **Reporting A Claim Or Incident**

1.      As a condition precedent to OUR obligations under this Coverage Part, YOU must give written notice to US of any CLAIM made against YOU as soon as practicable and during the POLICY PERIOD or any applicable EXTENDED REPORTING PERIOD.

2.      If during the POLICY PERIOD an INSURED becomes aware of any actual or alleged INCIDENT or circumstances that may reasonably be expected to give rise to a CLAIM for DAMAGES potentially covered by this Coverage Part and gives written notice to US of such INCIDENT or



circumstances, then any CLAIMS subsequently made and reported to US as soon as practicable that are based upon or result from such INCIDENT or circumstances shall be considered first made and reported to US during the POLICY PERIOD.

3.   Written notice to US of a deposition as described in Section IV. Defense, Settlement and Claim Expenses, paragraph B.4. below, will be considered notice of an INCIDENT or circumstances under paragraph B.2. above with respect to any CLAIM made against YOU for an INCIDENT in the performance of those PROFESSIONAL SERVICES that are the subject of such deposition.

4.   The following shall not be considered notice of a CLAIM, INCIDENT or circumstance:

   a.   Reports made to US orally by or on behalf of any INSURED;

   b.   Reports, documents or surveys authored by or furnished to US in connection with any engineering, loss control, risk management, quality assurance services or any application for insurance; or

   c.   Notice given to any attorney retained or paid by US to defend YOU in any CLAIM or SUIT.

**C.   Reporting Period Option**

1.   If this Coverage Part or this POLICY is non-renewed or cancelled, the FIRST NAMED INSURED shall have the right to have issued an endorsement providing an EXTENDED REPORTING PERIOD during which CLAIMS otherwise covered by this Coverage Part may be first made against YOU and reported to US, if the FIRST NAMED INSURED:

   a.   Gives US written notice within thirty (30) days after such cancellation or non-renewal; and

   b.   Pays to US all premiums due for the POLICY, if any, and for the EXTENDED REPORTING PERIOD as established by OUR rules, rates and rating plans then in effect. Payment of any premium due for the POLICY and payment of the premium for the EXTENDED REPORTING PERIOD shall be made as invoiced by US, or the EXTENDED REPORTING PERIOD will terminate and not be reinstated.

   The EXTENDED REPORTING PERIOD applies only to INCIDENTS that take place on or after the RETROACTIVE DATE stated in the DECLARATIONS and prior to the cancellation or non-renewal of this Coverage Part. The applicable Limits of Liability stated in the DECLARATIONS as the Per Claim and Aggregate Limits at the time this Coverage Part is cancelled or non-renewed shall, subject to any endorsements providing for a deductible, be the Limits of Liability for all CLAIMS first made against any INSURED and reported to US during the EXTENDED REPORTING PERIOD.

2.   If this Coverage Part or this POLICY is non-renewed or cancelled, YOU shall have an AUTOMATIC EXTENDED REPORTING PERIOD of thirty (30) days immediately following the termination of this Coverage Part during which CLAIMS otherwise covered by this Coverage Part may be first made against YOU and reported in writing to US, but only if such CLAIM is not covered under an EXTENDED REPORTING PERIOD or under any other policy issued by any insurer, including any captive insurance program and whether or not subject to any deductible or self-insured retention.

   The AUTOMATIC EXTENDED REPORTING PERIOD applies only to INCIDENTS which take place on or after the RETROACTIVE DATE stated in the DECLARATIONS and prior to the cancellation or non-renewal of this Coverage Part. The Limit of Liability for this AUTOMATIC EXTENDED REPORTING PERIOD shall be part of, and not in addition to, the Limit of Liability.

   In the event that the FIRST NAMED INSURED fails to purchase an EXTENDED REPORTING PERIOD, no coverage is provided for any CLAIMS or SUITS first made against YOU or first reported to US after the AUTOMATIC EXTENDED REPORTING PERIOD.

   AUTOMATIC EXTENDED REPORTING PERIOD means the thirty (30) day period immediately following the termination of this Coverage Part during which all CLAIMS, arising from an


INCIDENT in the performance of PROFESSIONAL SERVICES on or after the RETROACTIVE DATE and prior to the end of the POLICY PERIOD and otherwise covered by this Coverage Part may be first made against YOU and reported to US. EXTENDED REPORTING PERIOD also includes the AUTOMATIC EXTENDED REPORTING PERIOD described above.

## Section II.    Definition of Insured

The following are INSUREDS under this Coverage Part:

A.    The FIRST NAMED INSURED and any entity listed in the Schedule of Insureds for this Coverage Part.

B.    Any subsidiary or affiliated company created or acquired by the NAMED INSURED after the effective date of this POLICY will qualify as a NAMED INSURED under this Coverage Part if there is no other similar insurance available to that organization. However, this coverage under this provision only applies:

    1.    If the NAMED INSURED acquires and maintains an ownership interest in such organization of 51% or more; and

    2.    For INCIDENTS in the performance of PROFESSIONAL SERVICES that occurred after the NAMED INSURED acquired or formed the affiliate or subsidiary.

Such subsidiary or affiliated company shall be an INSURED for not more than ninety (90) days after the creation or acquisition by the NAMED INSURED or until the end of the POLICY PERIOD, whichever is earlier, and only if during that time the FIRST NAMED INSURED:

    1.    Gives US written notice of such creation or acquisition;

    2.    Provides US all information WE request;

    3.    Obtains OUR written consent to cover such affiliate or subsidiary under this POLICY; and

    4.    Pays any additional premium required by US (including such additional premium as may be required for the period commencing upon such creation or acquisition).

C.    The NAMED INSURED'S partners, members, stockholders, elected or appointed officers, and members of the board of directors, board of governors or board of trustees, but only while such persons are acting within the capacity and scope of their duties as such for the NAMED INSURED. In no event shall such person be an INSURED under this POLICY for providing or failing to provide any PROFESSIONAL SERVICES to any patient, unless also an INSURED pursuant to paragraph E. below.

D.    The NAMED INSURED'S EMPLOYEES, students and VOLUNTEERS (except an intern, extern, resident, fellow, medical, dental, osteopathic, or chiropractic doctor), but only while such persons are acting within the capacity and scope of their duties as such for the NAMED INSURED.

E.    SCHEDULED PROVIDERS identified in the Schedule of Insureds for this Coverage Part but only while such providers are acting within the capacity and scope of their duties for the NAMED INSURED.

F.    Any INSURED in paragraphs D. or E. for PROFESSIONAL SERVICES rendered as a "Good Samaritan" in sudden and unforeseen emergencies outside the scope of his or her patient care duties for the NAMED INSURED and for which services no remuneration is demanded, expected or received.

Coverage as provided by this paragraph F. applies only to the extent that immunity for such "Good Samaritan" liability is not afforded by any "Good Samaritan" statute.

G.    The Medical Director and any medical staff member of the NAMED INSURED, including a department head or the chief of the medical staff, but only while acting solely within the capacity and scope of his or her administrative duties under the NAMED INSURED'S medical staff bylaws, rules and regulations, including such authority and responsibility as may be delegated to such medical staff member by the NAMED INSURED.

H.    Any person while acting in the scope and capacity of his or her duties as:



1. A member of a formal accreditation, peer review or credentialing committee or board of a NAMED INSURED;

2. A person charged with the duty of executing directives of such committee or board;

3. A person serving on a similar committee or board of a medical professional society at the specific written request or instruction of the NAMED INSURED;

4. Evaluating PROFESSIONAL SERVICES or conducting case management for purposes of determining whether payment or coverage for such PROFESSIONAL SERVICES will be authorized or paid for under any health care plan; or

5. Other services including quality assurance, disease management, claims processing and adjusting, enrollment or educational services.

I. Any person who was an INSURED as defined in paragraphs C. through H. above at the time that the INCIDENT took place.

## Section III.    Our Limit of Liability

A. The Aggregate Limit of Liability stated in the DECLARATIONS is the total limit of OUR liability for all DAMAGES, CLAIMS and SUITS to which this Coverage Part applies, regardless of the number of INSUREDS, CLAIMS made, SUITS brought, INCIDENTS alleged, persons injured or persons asserting CLAIMS.

B. The Per Claim Limit of Liability stated in the DECLARATIONS is the total amount that WE will pay for each CLAIM to which this Coverage Part applies, regardless of the number of INSUREDS, persons injured or persons asserting CLAIMS. The Per Claim Limit is subject to the Aggregate Limit of Liability stated in the DECLARATIONS.

C. Regardless of the number of CLAIMS made or SUITS brought, the number of persons injured or persons asserting CLAIMS (including without limitation CLAIMS and SUITS for loss of consortium, society or services), the number of INCIDENTS, the number of properties damaged, the number of INSUREDS involved or the number or nature of any injuries, the following will be deemed to be a single CLAIM:

1. All CLAIMS based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving or sharing one or more of the same or related INCIDENTS, PROFESSIONAL SERVICES, facts, circumstances, transactions, events, advice, decisions, course of treatment or exposure to the same general conditions;

2. All CLAIMS based upon or arising out of one or more INCIDENTS in the performance of PROFESSIONAL SERVICES to, for or concerning a woman or her unborn child(ren) or both during the course of a pregnancy (including pre-natal and post-natal care), labor or delivery; and

3. All CLAIMS based upon or arising out of one or more INCIDENTS in the performance of PROFESSIONAL SERVICES to, for or concerning a single patient.

In each circumstance described in paragraphs 1. through 3. above, all such CLAIMS first made during the POLICY PERIOD, any applicable EXTENDED REPORTING PERIOD or the effective period of an applicable professional liability policy or coverage part issued by US or any of OUR affiliated insurance companies will be deemed to have been first made and reported to US only during the effective period of the first such policy or coverage part when the first such CLAIM is first made. Any and all such CLAIMS shall be subject exclusively to one Per Claim Limit of Liability of that first policy or coverage part.

D. Unless otherwise stated in this Coverage Part:

1. If any INSURED is covered for any INCIDENT, DAMAGES, CLAIM or SUIT both under this Coverage Part and under any other coverage part or policy issued by US or any of OUR affiliated insurance companies, other than a coverage part or policy that expressly states that it is excess over this Coverage Part or POLICY, and except as provided in paragraph C. above, the maximum



total applicable Limits of Liability with respect to such INSURED under all such coverage parts and policies shall not exceed the largest single available Limit of Liability under any one such coverage part or policy. This limit applies:

   a.   To CLAIM EXPENSES if included in the Limit of Liability under this or any other coverage part or policy;

   b.   Regardless of whether or not such other coverage parts or policies have been issued for the same, a subsequent, prior or overlapping policy period; and

   c.   Regardless of whether or not such other coverage parts or policies provide coverage on the same terms and conditions as this Coverage Part.

E.   In no event shall more than one Per Claim Limit of Liability of this Coverage Part or the Per Claim Limit of Liability of more than one coverage part or policy issued by US or any of OUR affiliated insurance companies apply to any one INCIDENT, CLAIM or SUIT or any series of related INCIDENTS, CLAIMS or SUITS. Multiple INCIDENTS, CLAIMS or SUITS shall be deemed to be related if they arise out of, directly or indirectly result from or in any way involve or share one or more of the same or related INCIDENTS, PROFESSIONAL SERVICES, facts, circumstances, transactions, events, advice, decisions, course of treatment, claimants or exposure to the same general conditions.

## Section IV.   Defense, Settlement and Claim Expenses

In addition to the provisions stated in Section I. Defense, Settlement and Claim Expenses of the Common Policy Terms, the following provisions also apply:

A.   Subject to Section V. Coverage Territory below, WE shall have the right and duty to defend, with defense counsel selected by US, any SUIT brought against YOU seeking DAMAGES that are covered by this Coverage Part even if any of the allegations of the SUIT are groundless, false or fraudulent, and WE may make any investigation and settlement, subject to the Consent to Settle provision of the Common Policy Terms, of any INCIDENT, CLAIM or SUIT as WE deem expedient. WE may also pay all or any portion of any judgment against YOU even if such payment does not settle the CLAIM against YOU and YOUR appellate rights have not been exhausted.

B.   WE will pay CLAIM EXPENSES in addition to the applicable Limit of Liability. CLAIM EXPENSES mean only the following:

   1.   Defense costs and expenses incurred by US with respect to any SUIT against YOU that WE defend, all court costs taxed against YOU in any SUIT seeking DAMAGES covered by this Coverage Part, and post-judgment interest on that portion of any judgment covered by this Coverage Part which does not exceed the applicable Limit of Liability and that accrues through the date that WE pay, offer to pay or deposit into court that portion of such judgment. However, CLAIMS EXPENSES do not include any form of prejudgment interest or any attorneys' fees or attorneys' expenses taxed or awarded against YOU;

   2.   Premiums on bonds to release attachments in SUITS WE defend for an amount not in excess of the applicable Limit of Liability and premiums on appeal bonds with respect to that portion of any judgment covered by this Coverage Part not exceeding the applicable Limit of Liability of this Coverage Part. WE do not have to furnish or obtain these bonds;

   3.   Reasonable out-of-pocket expenses incurred by YOU at OUR request in assisting US in the investigation or defense of any CLAIM or SUIT against YOU, including YOUR actual loss of earnings, to a maximum of $500 for each INSURED per day, but only if such loss of earnings is not payable under any OTHER INSURANCE.

       WE shall not be obligated to pay or reimburse any expenses pursuant to this paragraph 3. for any deposition described in paragraph 4. below unless WE are defending a party to such SUIT and only to the extent permissible in the governing jurisdiction; and



4. If YOU are an individual, attorneys' fees and costs for an attorney retained and selected by US to represent YOU at a deposition taken in a SUIT to which YOU are not a party, but only if:

    a. WE determine in OUR sole discretion that it is reasonably likely based upon the information provided to US that YOU will be examined at that deposition about PROFESSIONAL SERVICES performed on or after the RETROACTIVE DATE by YOU or someone for whom YOU are legally responsible and the patient for whom such services were performed, or his or her estate, is a party to that SUIT;

    b. YOU have not been retained as an expert witness or consultant in such SUIT; and

    c. YOU notify US of the deposition in writing during the POLICY PERIOD and immediately upon YOUR receipt of a deposition subpoena or other notice of YOUR deposition.

5. WE will pay, $500 per loss to a maximum of $5,000 per POLICY PERIOD, PROPERTY DAMAGE to YOUR patient's tangible property if the PROPERTY DAMAGE results directly from an INCIDENT in the performance of PROFESSIONAL SERVICES by YOU or someone for whom YOU are legally responsible.

C. YOU may not incur any CLAIM EXPENSES nor make any settlements or assume any obligation without OUR prior written consent.

## Section V.     Coverage Territory

This Coverage Part applies to PROFESSIONAL SERVICES performed anywhere in the world. However, this Coverage Part does not apply to any DAMAGES sought or awarded in any SUIT brought and maintained outside of the United States of America, its territories or possessions or Canada, and WE shall not be obligated to defend or pay CLAIM EXPENSES with respect to any such SUIT.

## Section VI.     Exclusions

In addition to those exclusions found in Section II. Exclusions of the Common Policy Terms, this Coverage Part does not apply to any liability of an INSURED or to any DAMAGES, INCIDENTS, CLAIMS, or SUITS:

A. **Breach of Contract**

Arising out of any breach of contract. However, this exclusion shall not apply to CLAIMS or SUITS by a patient of a NAMED INSURED arising out of the performance of those services included in paragraphs 1. through 6. and 7a. through 7b. of the definition of PROFESSIONAL SERVICES in Section III. Defined Terms of the Common Policy Terms.

B. **Contractual Liability and Warranties**

1. For the liability of others assumed by an INSURED under any contract or agreement. However, this exclusion does not apply:

    i. To any liability assumed by an INSURED under any written contract, agreement or permit, arising out of an INCIDENT in the performance of PROFESSIONAL SERVICES by YOU or by YOUR EMPLOYEE provided that such written contract, agreement or permit was executed prior to such PROFESSIONAL SERVICES. However, if coverage is required by a written contract, agreement or permit with an INSURED, the most WE will pay is the amount of insurance required by the written contract, agreement or permit less all amounts payable by any OTHER INSURANCE available to the additional INSURED;  and

    ii. To any liability that the INSURED would have in the absence of such contract or agreement.



2. For the liability of an INSURED arising out of any express or implied warranties, or any representations or guarantees as to the level, quality or result of any goods, products or PROFESSIONAL SERVICES.

**C. Dishonest, Intentional or Criminal Acts**

Arising out of any dishonest, fraudulent, criminal or malicious acts or omissions or deliberate or intentional wrongdoing or bad faith committed or alleged to have been committed by any INSURED.

However, this exclusion shall not apply to an INSURED if such acts or omissions were not committed by, at the direction of or with the knowledge of such INSURED.

**D. Insured vs. Insured**

Brought against any INSURED:

1. By any other INSURED; or

2. By the spouse, child, parent, brother or sister of an INSURED, or any EMPLOYEE of a NAMED INSURED or by any other person seeking DAMAGES for loss of consortium, services or society as the result of injuries to any INSURED.

This exclusion applies to any obligation to share DAMAGES with or repay, defend, hold harmless, or indemnify someone else who must pay DAMAGES because of a CLAIM or INCIDENT.

However, this exclusion shall not apply to a CLAIM or SUIT for DAMAGES because of an INCIDENT in the performance of PROFESSIONAL SERVICES to the extent such DAMAGES are caused by an INJURY to an INSURED or EMPLOYEE of a NAMED INSURED, or to such person's spouse, child, parent, brother or sister, solely in that person's capacity as a patient of another INSURED.

In addition, this exclusion shall not apply to the authorized activities of, or YOUR service as, a member of any formal accreditation, peer review or credentialing committee or board of the NAMED INSURED or a medical professional society if such activities are undertaken at the specific written request or instruction of the NAMED INSURED, unless YOU are found by a court, arbitrator or administrative agency to have knowingly engaged in unlawful conduct or gained an economic advantage to which YOU are not legally entitled and provided that if YOU are insured under any OTHER INSURANCE or otherwise entitled to indemnification for which YOUR indemnitor is insured then this POLICY shall not apply to such CLAIM or SUIT, whether or not YOU are specifically named in such OTHER INSURANCE; provided, however that if the applicable Limit of Liability of this POLICY exceeds the applicable limit of liability of such OTHER INSURANCE, then this POLICY shall apply as excess insurance against such CLAIM or SUIT in an amount equal to the applicable Limit of Liability of this POLICY minus the applicable limit of liability of such OTHER INSURANCE. Regardless of any finding by a court, arbitrator or administrative agency, in the absence of such OTHER INSURANCE or indemnity and if not otherwise excluded from coverage by another provision of this POLICY, WE will defend YOU in a SUIT making such allegations based upon YOUR service on such committee or board.

**E. Managed Care Services**

Arising out of:

1. Review on behalf of a MANAGED CARE ENTITY, any healthcare insurer, or third-party administrator of any proposed or actual total or per unit charges, fees or rates for medical, hospital, prescription drug or other healthcare services or products of such healthcare services or

2. Design or implementation of programs which compensate health care providers based on process measures, achievement of documented quality of care metrics, cost efficiencies or patient outcomes or of any other compensation programs for health care services.

**F. Motor Vehicle, Watercraft or Aircraft**

Arising out of the ownership, maintenance, operation, use, LOADING OR UNLOADING of any AUTO, MOBILE EQUIPMENT, or any other motor vehicle, trailer, watercraft or aircraft.



However, this exclusion shall not apply to CLAIMS or SUITS for BODILY INJURY caused by the LOADING OR UNLOADING of patients of a NAMED INSURED, provided the INSURED has no OTHER INSURANCE applicable to such CLAIM or SUIT.

G.  **Property Damage**

For or arising out of:

1.  Any injury to, destruction of, or theft or loss of use of any form of property, whether tangible or intangible; or

2.  Any interference with or infringement of any person's rights or interests in any tangible or intangible property.

## Section VII.    Defined Terms

The capitalized words and phrases used in this Coverage Part have special meaning as defined in Section III. Defined Terms of the Common Policy Terms.

## Section VIII.    Conditions

The insurance provided by this Coverage Part is subject to the conditions included in Section IV. General Conditions of the Common Policy Terms.

In witness whereof, WE have caused this POLICY to be executed and attested.



|  Sam Mezzich | Richard G. Hayes |
| President | Treasurer |

# MANUSCRIPT ENDORSEMENT – 001

## AMENDATORY ENDORSEMENT - CIVIL RIGHTS VIOLATION

| Attached to and forming part of Policy Number: | Named Insured: | Effective Date: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDATORY ENDORSEMENT - CIVIL RIGHTS VIOLATION

This endorsement modifies insurance provided under the following:

COM 001 CS 12/15 Common Policy Terms

It is hereby understood and agreed that the policy is amended as follows:

Section III Definitions C. is amended by the addition of the following:

2. An allegation of a civil rights violation pursuant to the Civil Rights Act of 1871 (42 U.S.C. § 1983 *et seq.*) and amendments thereto, provided that such allegation is the result of any natural person receiving Professional Services.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms or conditions of the POLICY, other than as expressly stated above.



Sam Mezzich          Richard G. Hayes
President                   Treasurer



# AMENDMENT TO THE DEFINITION OF INSURED

| Policy Number: | First Named Insured: | Policy Period: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 – 12/01/2017 |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

Entity Medical Professional Liability Coverage Part

## SCHEDULE

| Name of Person or Organization | Party ID (if applicable) | Retroactive Date (if applicable) | Activities |
|---|---|---|---|
| All entities or organizations contracted with the Named Insured with respect to Correctional Medicine Services rendered by the insured | n/a | | Correctional Medicine Services |

Subject to all other terms and conditions of the POLICY, it is agreed and understood that Section II. Definition of Insured is amended to include as an INSURED the Person(s) or Organization(s) shown in the Schedule above, but only with respect to the activities indicated above.

This additional insured shall share in the Limits of Liability of the FIRST NAMED INSURED, and this extension of coverage shall not increase OUR Limit of Liability.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above.



|  |  |
|---|---|
| Sam Mezzich | Richard G. Hayes |
| President | Treasurer |



# AMENDMENT TO THE DEFINITION OF INSURED – BLANKET PROVIDERS

| Attached to and forming part of Policy Number: | First Named Insured: | Policy Period: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 – 12/01/2017 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

Entity Medical Professional Liability Coverage Part

Subject to all other terms and conditions of the POLICY, it is agreed and understood that Section II. Definition of Insured Paragraph D. is replaced in its entirety with the following:

D.     The NAMED INSURED'S EMPLOYEES, students and VOLUNTEERS but only while such persons are acting within the capacity and scope of their duties as such for the NAMED INSURED.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above.

Sam Mezzich
President

Richard G. Hayes
Treasurer



# COMMERCIAL GENERAL LIABILITY COVERAGE PART
# CLAIMS MADE COVERAGE FORM

Throughout this Coverage Part the words YOU and YOUR refer to the INSURED as defined in Section II. Definition of Insured. The words WE, US and OUR refer to the insurer named on the DECLARATIONS or an affiliated Coverys company.

Capitalized words and phrases have special meaning as defined in this Coverage Part or in the Common Policy Terms.

This Coverage Part is issued in return for the payment of premium and is subject to the DECLARATIONS and to all of the terms, conditions, definitions and exclusions stated in this Coverage Part and in the Common Policy Terms. Read the entire POLICY carefully to determine YOUR rights and duties and what is and is not covered.

## IMPORTANT NOTICE

## COVERAGES A AND B PROVIDE CLAIMS MADE COVERAGE.

**Coverage A and B applies only to CLAIMS first made against the INSURED and reported to US during the POLICY PERIOD arising out of INCIDENTS taking place on or after the RETROACTIVE DATE stated in the DECLARATIONS. Please review this Coverage Part carefully and discuss the coverage with YOUR insurance agent.**

## Section I.          Commercial General Liability

**Insuring Agreements**

A.      **Coverage A. Bodily Injury and Property Damage Liability**

1.      WE will pay on YOUR behalf those sums which YOU become legally obligated to pay as DAMAGES, up to the applicable Limits of Liability stated in the DECLARATIONS, because of a CLAIM for BODILY INJURY or PROPERTY DAMAGE caused by an INCIDENT to which this Coverage Part applies.

WE shall have the right and duty to defend any SUIT brought against YOU seeking DAMAGES that are covered by Coverage A as further set forth in and subject to Section IV. Defense, Settlement and Claim Expenses.

This coverage applies to BODILY INJURY or PROPERTY DAMAGE caused by an INCIDENT only if:

a.      The BODILY INJURY or PROPERTY DAMAGE did not occur before the RETROACTIVE DATE or after the end of the POLICY PERIOD;

b.      A CLAIM for DAMAGES because of the BODILY INJURY or PROPERTY DAMAGE is first made against YOU and reported to US in writing during the POLICY PERIOD or any EXTENDED REPORTING PERIOD, if applicable; and

c.      The BODILY INJURY or PROPERTY DAMAGE is caused by an INCIDENT that takes place in the Coverage Territory set forth in Section V. Coverage Territory and any SUIT for DAMAGES covered by Coverage A is brought within that Coverage Territory.

2.      DAMAGES because of BODILY INJURY include DAMAGES claimed by any person or organization for care, loss of services or death resulting at any time from the BODILY INJURY.



**B.** **Coverage B. Personal and Advertising Injury Liability**

1. WE will pay on YOUR behalf those sums which YOU become legally obligated to pay as DAMAGES, up to the applicable Limits of Liability stated in the DECLARATIONS, because of a CLAIM for PERSONAL AND ADVERTISING INJURY to which Coverage B applies.

   WE shall have the right and duty to defend any SUIT brought against YOU seeking DAMAGES that are covered by Coverage B as further set forth in and subject to Section IV. Defense, Settlement and Claim Expenses.

2. This coverage applies only to PERSONAL AND ADVERTISING INJURY caused by an OFFENSE arising out of a NAMED INSURED'S business, but only if:

   a. The OFFENSE is committed on or after the RETROACTIVE DATE and before the end of the POLICY PERIOD;

   b. A CLAIM for DAMAGES because of the PERSONAL AND ADVERTISING INJURY is first made against YOU and reported to US in writing during the POLICY PERIOD or any EXTENDED REPORTING PERIOD, if applicable; and

   c. The OFFENSE was committed in the Coverage Territory set forth in Section V. Coverage Territory and any SUIT for DAMAGES covered by Coverage B is brought within that Coverage Territory.

**C.** **Coverage C. Medical Payments**

1. WE will pay medical expenses as described below for BODILY INJURY caused by an accident:

   a. On premises a NAMED INSURED owns or rents;

   b. On ways next to premises a NAMED INSURED owns or rents; or

   c. Because of a NAMED INSURED'S operations.

   This coverage applies only if:

   a. The accident takes place during the POLICY PERIOD;

   b. The expenses are incurred and reported to US within one year of the date of the accident; and

   c. The injured person submits to examination, at OUR expense, by physicians of OUR choice as often as WE reasonably require, and provides those records and information that WE reasonably request.

2. WE will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance stated in the DECLARATIONS. WE will pay reasonable expenses for:

   a. First aid administered at the time of an accident;

   b. Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

   c. Necessary ambulance, hospital, professional nursing and funeral services.

**D.** **Reporting A Claim, Incident or Offense Under Coverages A and B**

1. As a condition precedent to OUR obligations under this Coverage Part, YOU must give written notice to US of any CLAIM made against YOU as soon as practicable and during the POLICY PERIOD or any applicable EXTENDED REPORTING PERIOD.

2. If during the POLICY PERIOD an INSURED becomes aware of any actual or alleged INCIDENT, OFFENSE or circumstances that may reasonably be expected to give rise to a CLAIM for DAMAGES potentially covered by this Coverage Part and gives written notice to US of such

Includes copyrighted material of Insurance Services Office, Inc., with its permission



INCIDENT, OFFENSE or circumstances, then any CLAIMS subsequently made and reported to US as soon as practicable that are based upon or result from such INCIDENT, OFFENSE or circumstances shall be considered first made and reported to US during the POLICY PERIOD.

3.     The following shall not be considered notice of a CLAIM, INCIDENT, OFFENSE or circumstance:

    a.     Reports made to US orally by or on behalf of any INSURED;

    b.     Reports, documents or surveys authored by or furnished to US in connection with any engineering, loss control, risk management, quality assurance services or any application for insurance; or

    c.     Notice given to any attorney retained or paid by US to defend YOU in any CLAIM or SUIT.

**E.**     **Reporting Period Option For Coverages A and B**

1.     If either WE or the FIRST NAMED INSURED cancels or non-renews this Coverage Part, the FIRST NAMED INSURED shall have the right to have issued an endorsement providing an EXTENDED REPORTING PERIOD during which CLAIMS otherwise covered by this Coverage Part may be first made against YOU and reported to US, if the FIRST NAMED INSURED:

    a.     Gives US written notice within thirty (30) days after such cancellation or non-renewal; and

    b.     Pays to US all premiums due for the POLICY, if any, and for the EXTENDED REPORTING PERIOD as established by OUR rules, rates and rating plans then in effect. Payment of any premium due for the POLICY and payment of the premium for the EXTENDED REPORTING PERIOD shall be made when due as invoiced by US, or the EXTENDED REPORTING PERIOD will terminate and not be reinstated.

The EXTENDED REPORTING PERIOD applies only to BODILY INJURY, PROPERTY DAMAGE and OFFENSES that take place on or after the RETROACTIVE DATE stated in the DECLARATIONS and prior to the cancellation or non-renewal of this Coverage Part. The applicable Limits of Liability stated in the DECLARATIONS at the time this Coverage Part is cancelled or non-renewed shall, subject to any endorsements providing for a deductible, be the limits of liability for all CLAIMS first made against any INSURED and reported to US during the EXTENDED REPORTING PERIOD.

2.     If this Coverage Part or this POLICY is non-renewed or cancelled, YOU shall have an AUTOMATIC EXTENDED REPORTING PERIOD of thirty (30) days immediately following the termination of this Coverage Part during which CLAIMS otherwise covered by this Coverage Part may be first made against YOU and reported in writing to US, but only if such CLAIM is not covered under an EXTENDED REPORTING PERIOD or under any other policy issued by any insurer, including any captive insurance program and whether or not subject to any deductible or self-insured retention.

The AUTOMATIC EXTENDED REPORTING PERIOD applies only to BODILY INJURY, PROPERTY DAMAGE and OFFENSES which take place on or after the RETROACTIVE DATE stated in the DECLARATIONS and prior to the cancellation or non-renewal of this Coverage Part. The Limit of Liability for this AUTOMATIC EXTENDED REPORTING PERIOD shall be part of, and not in addition to, the Limit of Liability.

In the event that the FIRST NAMED INSURED fails to purchase an EXTENDED REPORTING PERIOD, no coverage is provided for any CLAIMS or SUITS first made against YOU or first reported to US after the AUTOMATIC EXTENDED REPORTING PERIOD.

Includes copyrighted material of Insurance Services Office, Inc., with its permission



AUTOMATIC EXTENDED REPORTING PERIOD means the thirty (30) day period immediately following the termination of this Coverage Part during which all CLAIMS, arising from BODILY INJURY, PROPERTY DAMAGE and OFFENSES on or after the RETROACTIVE DATE and prior to the end of the POLICY PERIOD and otherwise covered by this Coverage Part may be first made against YOU and reported to US.  EXTENDED REPORTING PERIOD also includes the AUTOMATIC EXTENDED REPORTING PERIOD described above.

## Section II.        Definition of Insured

A.    The following are INSUREDS under this Coverage Part:

1.    The FIRST NAMED INSURED, any NAMED INSUREDS and any entity or person listed in the Schedule of Insureds attached to this Coverage Part.

2.    If the NAMED INSURED is:

a.    A partnership or joint venture, the NAMED INSURED'S partners are also INSUREDS, but only with respect to the conduct of the NAMED INSURED'S business.

b.    A limited liability company, the NAMED INSURED'S members are also INSUREDS, but only with respect to the conduct of the NAMED INSURED'S business. The NAMED INSURED'S managers are INSUREDS, but only with respect to their duties as the NAMED INSURED'S managers.

c.    An organization other than a partnership, joint venture or limited liability company, the NAMED INSURED'S EXECUTIVE OFFICERS and directors are INSUREDS, but only with respect to their duties as the NAMED INSURED'S officers or directors. The NAMED INSURED'S stockholders are also INSUREDS, but only with respect to their liability as stockholders of the NAMED INSURED.

d.    A trust, the NAMED INSURED'S trustees are also INSUREDS, but only with respect to their duties as trustees.

B.    Each of the following is also an INSURED under this Coverage Part:

1.    The NAMED INSURED'S VOLUNTEERS only while performing duties related to the conduct of that NAMED INSURED'S business, and a NAMED INSURED'S EMPLOYEES, other than a NAMED INSURED'S EXECUTIVE OFFICERS (if the NAMED INSURED is an organization other than a partnership, joint venture or limited liability company) or a NAMED INSURED'S managers (if the NAMED INSURED is a limited liability company), but only for acts within the scope of their employment by that NAMED INSURED or while performing duties related to the conduct of that NAMED INSURED'S business. However, none of these EMPLOYEES or VOLUNTEERS are INSUREDS for:

a.    BODILY INJURY or PERSONAL AND ADVERTISING INJURY:

i.    To a NAMED INSURED, to a NAMED INSURED'S partners or members (if the NAMED INSURED is a partnership or joint venture), to a NAMED INSURED'S members (if the NAMED INSURED is a limited liability company), to a co-EMPLOYEE while in the course of his or her employment or performing duties related to the conduct of a NAMED INSURED'S business, or to a NAMED INSURED'S other VOLUNTEERS while performing duties related to the conduct of that NAMED INSURED'S business;

ii.    To the spouse, child, parent, brother or sister of that co-EMPLOYEE or VOLUNTEER as a consequence of paragraph a.i. above; or

Includes copyrighted material of Insurance Services Office, Inc., with its permission



iii. For which there is any obligation to share DAMAGES with or repay someone else who must pay DAMAGES because of any injury described in paragraph a.i. or a.ii. above.

b. PROPERTY DAMAGE to property:

i. Owned, occupied or used by; or

ii. Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

the NAMED INSURED, any of a NAMED INSURED'S EMPLOYEES, VOLUNTEERS, any partner or member of a NAMED INSURED (if the NAMED INSURED is a partnership or joint venture), or any member of a NAMED INSURED (if the NAMED INSURED is a limited liability company).

2. Any person (other than a NAMED INSURED'S EMPLOYEE or VOLUNTEER), or any organization while acting as that NAMED INSURED'S real estate manager.

3. Any person or organization having proper temporary custody of a NAMED INSURED'S property if the NAMED INSURED dies, but only:

a. With respect to liability arising out of the maintenance or use of that property; and

b. Until the NAMED INSURED'S legal representative has been appointed.

C. Any subsidiary or affiliated company created or acquired by the NAMED INSURED, after the effective date of this POLICY will qualify as a NAMED INSURED under this Coverage Part if there is no other similar insurance available to that organization. However, this coverage under this provision only applies:

1. If the NAMED INSURED acquires and maintains an ownership interest in such organization of 51% or more;

2. For Coverage A, to BODILY INJURY or PROPERTY DAMAGE that occurred after the NAMED INSURED acquired or formed the affiliate or subsidiary; and

3. For Coverage B, to an OFFENSE committed after the NAMED INSURED acquired or formed the affiliate or subsidiary.

Such affiliate or subsidiary shall be an INSURED for not more than ninety (90) days after its creation or acquisition by the NAMED INSURED or until the end of the POLICY PERIOD, whichever is earlier, and only if during that time the FIRST NAMED INSURED:

1. Gives US written notice of such creation or acquisition;

2. Provides US all information WE request;

3. Obtains OUR written consent to cover such affiliate or subsidiary under this Coverage Part; and

4. Pays any additional premium required by US (including such additional premium as may be required for the period commencing upon such creation or acquisition).

D. Any person or entity who was an INSURED, as defined in paragraphs A.2. or B. above, at the time that the INCIDENT took place.

## Section III.    Our Limit of Liability

A. The Limits of Liability shown in the DECLARATIONS and the rules below fix the most WE will pay under this Coverage Part regardless of the number of INSUREDS, CLAIMS made or SUITS brought, or persons or organizations making CLAIMS or bringing SUITS.

Includes copyrighted material of Insurance Services Office, Inc., with its permission



B.     The General Aggregate Limit is the most WE will pay for the sum of:

    1.     Medical expenses under Coverage C;

    2.     DAMAGES under Coverage A, except DAMAGES because of BODILY INJURY or PROPERTY DAMAGE included in the PRODUCTS-COMPLETED OPERATIONS HAZARD; and

    3.     DAMAGES under Coverage B.

C.     The Products-Completed Operations Aggregate Limit is the most WE will pay under Coverage A for DAMAGES because of BODILY INJURY and PROPERTY DAMAGE included in the PRODUCTS-COMPLETED OPERATIONS HAZARD.

D.     Subject to paragraph B. above, the Personal and Advertising Injury Limit is the most WE will pay under Coverage B for the sum of all DAMAGES because of all PERSONAL AND ADVERTISING INJURY sustained by any one person or organization.

All CLAIMS arising out of PERSONAL AND ADVERTSING INJURY to the same person or organization that are first made against any INSURED during the policy period of more than one policy or coverage part or during any applicable EXTENDED REPORTING PERIOD issued by US or any of OUR affiliated companies, will be deemed to have been made at the time the first of those CLAIMS is made against any INSURED and shall be subject to a single Personal and Advertising Limit of Liability of the first such policy, coverage part or EXTENDED REPORTING PERIOD when the first such CLAIM is first made.

E.     Subject to paragraph B. or C. above, whichever applies, the Each Incident Limit is the most WE will pay for the sum of:

    1.     DAMAGES under Coverage A; and

    2.     Medical expenses under Coverage C

because of all BODILY INJURY and PROPERTY DAMAGE arising out of any one INCIDENT or multiple related INCIDENTS.

Regardless of the number of CLAIMS made, the number of persons injured or persons asserting CLAIMS (including without limitation CLAIMS for loss of consortium, society or services or death), the number of INCIDENTS, the number of properties damaged, the number of INSUREDS involved or the number or nature of any INJURIES, multiple INCIDENTS shall be related if they arise out of, directly or indirectly result from, or in any way involve or share one or more of the same or related acts, errors, omissions, facts, circumstances, transactions, events, advice, decisions or exposure to the same general conditions or arise from or involve BODILY INJURY to the same person or PROPERTY DAMAGE causing DAMAGES to the same person or organization.

Regardless of the number of CLAIMS made, the number of persons injured or persons asserting CLAIMS (including without limitation CLAIMS for loss of consortium, society or services or death), the number of INCIDENTS, the number of properties damaged, the number of INSUREDS involved or the number or nature of any INJURIES, in no event shall more than one Each Incident Limit of Liability of this Coverage Part or the Each Incident limit of liability of more than one policy or coverage part or any applicable EXTENDED REPORTING PERIOD issued by US or any of OUR affiliated insurance companies apply to any one INCIDENT or multiple related INCIDENTS. If multiple CLAIMS arising out of any one INCIDENT or multiple related INCIDENTS are first made during the policy period of more than one policy or coverage part or during any applicable EXTENDED REPORTING PERIOD issued by US or any of OUR affiliated companies, then all such CLAIMS will be deemed to have been made at the time the first of those CLAIMS is made against any INSURED and shall be subject to a single Each Incident Limit of Liability of the first such policy or coverage part or EXTENDED REPORTING PERIOD when the first such CLAIM is first made.

Includes copyrighted material of Insurance Services Office, Inc., with its permission



F.  Subject to paragraphs B. and E. above, the Damage To Premises Rented To The Named Insured Limit is the most WE will pay under Coverage A for DAMAGES because of PROPERTY DAMAGE to any one premises, while rented to a NAMED INSURED, or in the case of damage by fire, while rented to a NAMED INSURED or temporarily occupied by a NAMED INSURED with permission of the owner.

G.  Subject to paragraphs B. and E. above, the Medical Expense Limit is the most WE will pay under Coverage C for all medical expenses because of BODILY INJURY sustained by any one person.

## Section IV.    Defense, Settlement and Claim Expenses

In addition to those provisions found in Section I. Defense, Settlement and Claim Expenses of the Common Policy Terms, the following provisions apply to this Coverage Part:

A.  Subject to Section V. Coverage Territory below, WE shall have the right and duty to defend, with defense counsel selected by US, any SUIT brought against an INSURED seeking DAMAGES that are covered by this Coverage Part even if any of the allegations of the SUIT are groundless, false or fraudulent, and WE may make any investigation and settlement of any INCIDENT, CLAIM or SUIT as WE deem expedient. WE may also pay all or any portion of any judgment against YOU even if such payment does not settle the CLAIM against YOU and YOUR appellate rights have not been exhausted.

B.  WE will pay, with respect to any CLAIM WE investigate or settle, or any SUIT against an INSURED that WE defend under this Coverage Part, CLAIM EXPENSES in addition to the applicable Limit of Liability. CLAIM EXPENSES mean only the following:

   1.  Defense costs and expenses, incurred by US with respect to any SUIT against the YOU that WE defend, all court costs taxed against YOU in any SUIT seeking DAMAGES covered by this Coverage Part and post-judgment interest on that portion of any judgment covered by this Coverage Part which does not exceed the applicable Limit of Liability and that accrues through the date that WE pay, offer to pay or deposit into court that portion of such judgment. However, CLAIMS EXPENSES do not include any form of prejudgment interest or attorneys' fees or attorneys' expenses taxed or awarded against YOU;

   2.  Premiums on bonds to release attachments in SUITS WE defend for an amount not in excess of the applicable Limit of Liability and premiums on appeal bonds with respect to that portion of any judgment covered by this Coverage Part not exceeding the applicable Limit of Liability of this Coverage Part. WE do not have to furnish or obtain these bonds.

   3.  All reasonable out-of-pocket expenses incurred by YOU at OUR request in assisting US in the investigation or defense of any CLAIM or SUIT, including actual loss of earnings, to a maximum of $500 for each INSURED per day, but only if such loss of earnings is not payable under any OTHER INSURANCE.

   4.  Up to $250 for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. WE do not have to furnish these bonds.

C.  YOU may not incur any CLAIMS EXPENSES nor make any settlements or assume any obligation without OUR prior written consent.

D.  If WE defend an INSURED against a SUIT and an indemnitee of the INSURED is also named as a party to the SUIT, WE will defend that indemnitee if all of the following conditions are met:

   1.  The SUIT against the indemnitee seeks DAMAGES for which the INSURED has assumed the liability of the indemnitee in a contract or agreement that is an INSURED CONTRACT.  Such contract or agreement that is an INSURED CONTRACT was executed prior to a SUIT;

   2.  This Coverage Part applies to such liability assumed by the INSURED;

Includes copyrighted material of Insurance Services Office, Inc., with its permission



3.   The obligation to defend, or the cost of the defense of, that indemnitee has also been assumed by the INSURED in the same INSURED CONTRACT;

4.   The allegations in the SUIT and the information WE know about the INCIDENT are such that no conflict appears to exist between the interests of the INSURED and the interests of the indemnitee;

5.   The indemnitee and the INSURED ask US to conduct and control the defense of that indemnitee against such SUIT and agree that WE can assign the same counsel to defend the INSURED and the indemnitee; and

6.   The indemnitee:

  a.   Agrees in writing to:

    i.    Cooperate with US in the investigation, settlement or defense of the SUIT;

    ii.   Immediately send US copies of any demands, notices, summonses or legal papers received in connection with the SUIT;

    iii.  Notify any other insurer whose coverage is available to the indemnitee; and

    iv.   Cooperate with US with respect to coordinating OTHER INSURANCE available to the indemnitee; and

  b.   Provides US with written authorization to:

    i.    Obtain records and other information related to the SUIT; and

    ii.   Conduct and control the defense of the indemnitee in such SUIT.

So long as the above conditions are met, attorneys' fees incurred by US in the defense of that indemnitee, necessary litigation expenses incurred by US and necessary litigation expenses incurred by the indemnitee at OUR request will be paid as CLAIMS EXPENSES. Notwithstanding the provisions of paragraph A.2.b. of Section VI. Exclusions, such payments will not be deemed to be DAMAGES for BODILY INJURY and PROPERTY DAMAGE and will not reduce the Limits of Liability applicable to this Coverage Part.

OUR obligation to defend an INSURED'S indemnitee and to pay for attorneys' fees and necessary litigation expenses as CLAIM EXPENSES ends when WE have used up the applicable Limit of Liability in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in paragraph 6. above, are no longer met.

## Section V.      Coverage Territory

This Coverage Part applies to an INCIDENT that causes BODILY INJURY or PROPERTY DAMAGE or an OFFENSE only if the INCIDENT or OFFENSE occurs in:

A.   The United States of America (including its territories and possessions), Puerto Rico or Canada;

B.   International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in paragraph A. above; or

C.   All other parts of the world if the injury or damage arises out of:

  1.   Goods or products made or sold by a NAMED INSURED in the territory described in paragraph A. above;

  2.   The activities of a person whose home is in the territory described in paragraph A. above, but is away for a short time on a NAMED INSURED'S business; or

Includes copyrighted material of Insurance Services Office, Inc., with its permission



3.      OFFENSES that take place through the Internet or similar electronic means of communication

provided the INSURED'S responsibility to pay DAMAGES is determined in a SUIT on the merits brought and maintained in the territory described in paragraph A. above or in a settlement WE agree to in writing.

## Section VI.      Exclusions

In addition to those exclusions found in Section II. Exclusions of the Common Policy Terms, the following exclusions apply to this Coverage Part:

A.      The insurance provided by Coverage A of this Coverage Part does not apply to:

1.      **Aircraft, Auto or Watercraft**

BODILY INJURY or PROPERTY DAMAGE arising out of the ownership, maintenance, use or entrustment to others of any aircraft, AUTO or watercraft owned or operated by or rented or loaned to any INSURED. Use includes operation and LOADING OR UNLOADING.

This exclusion applies even if the CLAIMS against any INSURED that allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that INSURED, if the INCIDENT which caused the BODILY INJURY or PROPERTY DAMAGE involved the ownership, maintenance, use or entrustment to others of any aircraft, AUTO or watercraft that is owned or operated by or rented or loaned to any INSURED.

This exclusion does not apply to:

a.      A watercraft while ashore on premises the NAMED INSURED owns or rents;

b.      A watercraft the NAMED INSURED does not own that is:

i.      Less than 51 feet long; and

ii.      Not being used to carry persons or property for a charge;

c.      Parking an AUTO on, or on the ways next to, premises the NAMED INSURED owns or rents, provided the AUTO is not owned by or rented or loaned to the NAMED INSURED or the INSURED;

d.      Liability assumed under any INSURED CONTRACT for the ownership, maintenance or use of aircraft or watercraft; or

e.      BODILY INJURY or PROPERTY DAMAGE arising out of:

i.      The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of MOBILE EQUIPMENT if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

ii.      The operation of any of the machinery or equipment listed in paragraph 6.b. or 6.c. of Section III. Defined Terms, paragraph T. MOBILE EQUIPMENT in the Common Policy Terms.

2.      **Contractual Liability**

BODILY INJURY or PROPERTY DAMAGE for which the INSURED is obligated to pay DAMAGES by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for DAMAGES:

a.      That the INSURED would have in the absence of the contract or agreement; or

Includes copyrighted material of Insurance Services Office, Inc., with its permission



 b. Assumed in a contract or agreement that is an INSURED CONTRACT, provided the BODILY INJURY or PROPERTY DAMAGE occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an INSURED CONTRACT, reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an INSURED are deemed to be DAMAGES because of BODILY INJURY or PROPERTY DAMAGE, provided:

  i. Liability to such party for, or for the cost of, that party's defense has also been assumed in the same INSURED CONTRACT; and

  ii. Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which DAMAGES to which this insurance applies are alleged.

3. **Damage to Impaired Property or Property not Physically Injured**

PROPERTY DAMAGE to IMPAIRED PROPERTY or property that has not been physically injured, arising out of:

 a. A defect, deficiency, inadequacy or dangerous condition in YOUR PRODUCT or YOUR WORK; or

 b. A delay or failure by a NAMED INSURED or anyone acting on a NAMED INSURED'S behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to YOUR PRODUCT or YOUR WORK after it has been put to its intended use.

4. **Damage to Property**

PROPERTY DAMAGE to:

 a. Property a NAMED INSURED owns, rents, or occupies, including any costs or expenses incurred by a NAMED INSURED, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

 b. Premises a NAMED INSURED sells, gives away or abandons, if the PROPERTY DAMAGE arises out of any part of those premises;

 c. Property loaned to a NAMED INSURED;

 d. Personal property in the care, custody or control of the INSURED;

 e. That particular part of real property on which a NAMED INSURED or any contractors or subcontractors working directly or indirectly on a NAMED INSURED'S behalf are performing operations, if the PROPERTY DAMAGE arises out of those operations; or

 f. That particular part of any property that must be restored, repaired or replaced because YOUR WORK was incorrectly performed on it.

Paragraphs a., c. and d. of this exclusion do not apply to PROPERTY DAMAGE (other than damage by fire) to premises, including the contents of such premises, rented to a NAMED INSURED for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To a Named Insured as described in Section III. Our Limit of Liability.

Paragraph b. of this exclusion does not apply if the premises are YOUR WORK and were never occupied, rented or held for rental by a NAMED INSURED.

Includes copyrighted material of Insurance Services Office, Inc., with its permission



Paragraphs c., d., e. and f. of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph f. of this exclusion does not apply to PROPERTY DAMAGE included in the PRODUCTS-COMPLETED OPERATIONS HAZARD.

5. **Damage to Your Product**

PROPERTY DAMAGE to YOUR PRODUCT arising out of it or any part of it.

6. **Damage to Your Work**

PROPERTY DAMAGE to YOUR WORK arising out of it or any part of it and included in the PRODUCTS-COMPLETED OPERATIONS HAZARD.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on a NAMED INSURED'S behalf by a subcontractor.

7. **Employer's Liability**

BODILY INJURY to:

a. An EMPLOYEE of the INSURED arising out of and in the course of:

   i. Employment by the INSURED; or

   ii. Performing duties related to the conduct of the INSURED'S business; or

b. The spouse, child, parent, brother or sister of that EMPLOYEE as a consequence of paragraph a. above.

This exclusion applies whether the INSURED may be liable as an employer or in any other capacity, and to any obligation to share DAMAGES with or repay someone else who must pay DAMAGES because of the injury.

This exclusion does not apply to liability assumed by the INSURED under an INSURED CONTRACT.

8. **Expected or Intended Injury**

BODILY INJURY or PROPERTY DAMAGE expected or intended from the standpoint of the INSURED. This exclusion does not apply to BODILY INJURY resulting from the use of reasonable force to protect persons or property.

9. **Liquor Liability**

BODILY INJURY or PROPERTY DAMAGE for which any INSURED may be held liable by reason of:

a. Causing or contributing to the intoxication of any person;

b. The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

c. Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the CLAIM against any INSURED alleges negligence or other wrongdoing in:

a. The supervision, hiring, employment, training or monitoring of others by that INSURED; or

Includes copyrighted material of Insurance Services Office, Inc., with its permission


   b.    Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol

if the INCIDENT which caused the BODILY INJURY or PROPERTY DAMAGE, involved that which is described in paragraphs a., b. or c. above.

However, this exclusion applies only if a NAMED INSURED is in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on a NAMED INSURED'S premises, for consumption on a NAMED INSURED'S premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

10.   **Mobile Equipment**

BODILY INJURY or PROPERTY DAMAGE arising out of:

   a.    The transportation of MOBILE EQUIPMENT by an AUTO owned or operated by or rented or loaned to any INSURED; or

   b.    The use of MOBILE EQUIPMENT in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

11.   **Personal and Advertising Injury**

BODILY INJURY arising out of PERSONAL AND ADVERTISING INJURY.

12.   **Recall of Products, Work or Impaired Property**

DAMAGES claimed for any loss, cost or expense incurred by the NAMED INSURED or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

   a.    YOUR PRODUCT;

   b.    YOUR WORK; or

   c.    IMPAIRED PROPERTY

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions A.1., 3., 4., 5., 6., 8., 10., 11. and 13. do not apply to damage by fire to premises while rented to a NAMED INSURED or temporarily occupied by a NAMED INSURED with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III. Our Limit of Liability.

B.   The insurance provided by Coverage B of this Coverage Part does not apply to:

1.   **Breach of Contract**

PERSONAL AND ADVERTISING INJURY arising out of a breach of contract, except an implied contract to use another's advertising idea in a NAMED INSURED'S ADVERTISEMENT.

2.   **Contractual Liability**

PERSONAL AND ADVERTISING INJURY for which the INSURED has assumed liability in a contract or agreement. This exclusion does not apply to liability for DAMAGES that the INSURED would have in the absence of the contract or agreement.

3.   **Criminal Acts**



PERSONAL AND ADVERTISING INJURY arising out of a criminal act committed by or at the direction of the INSURED.

4.  **Infringement of Copyright, Patent, Trademark or Trade Secret**

    PERSONAL AND ADVERTISING INJURY arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in a NAMED INSURED'S ADVERTISEMENT.

    However, this exclusion does not apply to infringement, in a NAMED INSURED'S ADVERTISEMENT, of copyright, trade dress or slogan.

5.  **Insureds in Media and Internet Type Businesses**

    PERSONAL AND ADVERTISING INJURY committed by an INSURED whose business is:

    a.      Advertising, broadcasting, publishing or telecasting;

    b.      Designing or determining content of web sites for others; or

    c.      An Internet search, access, content or service provider.

    However, this exclusion does not apply to paragraphs X.1., 2. and 3. of the definition of PERSONAL AND ADVERTISING INJURY in Section III. Defined Terms of the Common Policy Terms.

    For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for a NAMED INSURED or others anywhere on the Internet, is not by itself considered the business of advertising, broadcasting, publishing or telecasting.

6.  **Knowing Violation of Rights of Another**

    PERSONAL AND ADVERTISING INJURY caused by or at the direction of the INSURED with the knowledge that the act would violate the rights of another and would inflict PERSONAL AND ADVERTISING INJURY.

7.  **Material Published with Knowledge of Falsity**

    PERSONAL AND ADVERTISING INJURY arising out of oral or written publication, in any manner, of material, if done by or at the direction of the INSURED with knowledge of its falsity.

8.  **Material Published Prior to Retroactive Date**

    PERSONAL AND ADVERTISING INJURY arising out of oral or written publication, in any manner, of material whose first publication took place before the RETROACTIVE DATE.

9.  **Quality or Performance of Goods – Failure to Conform to Statements**

    PERSONAL AND ADVERTISING INJURY arising out of the failure of goods, products or services to conform to any statement of quality or performance made in a NAMED INSURED'S ADVERTISEMENT.

10. **Unauthorized Use of Another's Name or Product**

    PERSONAL AND ADVERTISING INJURY arising out of the unauthorized use of another's name or product in a NAMED INSURED'S e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

11. **Wrong Description of Prices**

    PERSONAL AND ADVERTISING INJURY arising out of the wrong description of the price of goods, products or services stated in a NAMED INSURED'S ADVERTISEMENT.

Includes copyrighted material of Insurance Services Office, Inc., with its permission



C.   With respect to Coverage C, WE will not pay expenses for BODILY INJURY:

1.   If the expenses are for services rendered by any INSURED.

2.   To any INSURED, except a VOLUNTEER.

3.   To a person hired to do work for or on behalf of any INSURED or a tenant of any INSURED.

4.   To a person injured on that part of premises a NAMED INSURED owns or rents that the person normally occupies.

5.   To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

6.   Included within the PRODUCTS-COMPLETED OPERATIONS HAZARD.

7.   Excluded under Coverage A.

8.   To a person, whether or not an EMPLOYEE of any INSURED, if benefits for the BODILY INJURY are payable or must be provided under a worker's compensation or disability benefits law or a similar law.

D.   With respect to Coverages A, B, and C, this Coverage Part does not apply to:

1.   **Other Coverage Parts**

INJURY or medical expenses that are covered under any other Coverage Part of this POLICY other than INJURY covered by Coverage B of an Excess Medical Professional & Umbrella Liability Coverage Part, if included in this POLICY.

2.   **Professional Services**

INJURY or medical expenses arising out of the performance or rendering or failure to render any PROFESSIONAL SERVICES as defined or any other professional services.

3.   **Recording and Distribution of Material or Information in Violation of Law**

INJURY arising directly or indirectly out of any action or omission that violates or is alleged to violate:

a.   The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

b.   The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

c.   The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

d.   Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## Section VII.   Defined Terms

The capitalized words and phrases used in this Coverage Part have special meaning. In addition to those defined terms found in Section III. Defined Terms of the Common Policy Terms, the following definition also applies to this Coverage Part:

Includes copyrighted material of Insurance Services Office, Inc., with its permission



A. INSURED CONTRACT means:

    1. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to a NAMED INSURED or temporarily occupied by a NAMED INSURED with permission of the owner is not an INSURED CONTRACT;

    2. A sidetrack agreement;

    3. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

    4. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

    5. An elevator maintenance agreement;

    6. That part of any other contract, agreement, or permit, pertaining to a NAMED INSURED'S business (including an indemnification of a municipality in connection with work performed for a municipality) under which a NAMED INSURED assumes the tort liability of another party to pay for BODILY INJURY or PROPERTY DAMAGE to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

    Paragraph 6. does not include that part of any contract or agreement:

        a. That indemnifies a railroad for BODILY INJURY or PROPERTY DAMAGE arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

        b. That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

            i. Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

            ii. Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

        c. Under which an INSURED, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the INSURED'S rendering or failure to render professional services, including those listed in b. above, and supervisory, inspection, architectural or engineering activities.

## Section VIII.    Conditions

The insurance provided by this Coverage Part is subject to the conditions included in Section IV. General Conditions of the Common Policy Terms.

In witness whereof, WE have caused this POLICY to be executed and attested.



          Sam Mezzich          Richard G. Hayes
          President             Treasurer

Includes copyrighted material of Insurance Services Office, Inc., with its permission



# HIRED AND NON-OWNED AUTOMOBILE COVERAGE ENDORSEMENT

| Attached to and forming part of Policy Number: | First Named Insured: | Policy Period: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 – 12/01/2017 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

This endorsement modifies insurance provided under the following:

Commercial General Liability Coverage Part

Subject to all other terms and conditions of the POLICY, it is agreed and understood that:

A.  **Insuring Agreement**

Subject to the General Aggregate Limit and Each Occurrence Limit applicable to Coverage A, as shown on the DECLARATIONS, WE will pay those sums provided by this insurance that YOU are required to pay as DAMAGES or CLAIM EXPENSES provided by this insurance for BODILY INJURY or PROPERTY DAMAGE arising out of the:

1.  Maintenance or use of a HIRED AUTO by YOU or YOUR EMPLOYEES in the course of YOUR business; and

2.  Use of a NON-OWNED AUTO, by any person other than YOU, in the course of YOUR business.

B.  **Definition of Insured**

1.  For the purposes of this Endorsement, Section II. Definition of Insured is deleted in its entirety and replaced with:

a.  The FIRST NAMED INSURED, any NAMED INSUREDS and any entity or person listed in the Schedule of Insureds attached to this Coverage Part.

b.  Any person using a HIRED AUTO with YOUR permission;

c.  YOUR partners or EXECUTIVE OFFICERS but only while such NON-OWNED AUTO is being used in YOUR business; and

d.  Any other person or organization, but only for their liability because of acts or omissions of an insured under a., b., or c. above.

2.  For the purposes of this Endorsement, none of the following will be considered INSUREDS:

a.  Any person engaging in the business of his or her employer for BODILY INURY to any co-EMPLOYEE of such person injured in the course of employment, or to the spouse, child, parent, brother or sister of that co-EMPLOYEE as a consequence of such BODILY



INURY or for any obligation to share damages with or repay someone else who must pay damages because of the injury;

b.  Any partner or EXECUTIVE OFFICER for any AUTO owned by such partner or officer or a member of his or her household;

c.  Any person while employed in or otherwise engaged in duties in connection with an AUTO BUSINESS other than an AUTO BUSINESS you operate;

d.  The owner or lessee, of whom you are a sublessee, of a HIRED AUTO or the owner of a NON-OWNED AUTO or any agent or EMPLOYEE of any such owner or lessee; or

e.  Any person or organization for the conduct of any current or past partnership or joint venture that is not listed on the Schedule of Insureds for this Coverage Part.C.

**C.  Our Limit of Liability**

For the purposes of this Endorsement only, Section III. – Our Limit of Liability is amended to include:

Regardless of the number of CLAIMS MADE, HIRED AUTOS, NON-OWNED AUTOS, number of INSUREDS involved or the number or nature of any INJURIES, premiums paid, or vehicles involved in the INCIDENT, the most we will pay for all DAMAGES resulting from any one INCIDENT is the applicable limit shown in the DECLARATIONS.

**D.  Exclusions**

For the insurance provided by this Endorsement only:

1.  Subparagraphs 1., 2., 3., 4., 5., 6., 7., 9., 10. and 12. Section VI., Part A of the Commercial General Liability Coverage Part are deleted in their entirety.

2.  The following exclusions are added to Section VI. Exclusions,of the Commercial General Liability Coverage Part, paragraph A.:

This insurance does not apply to:

a.  BODILY INJURY or PROPERTY DAMAGE which YOU are obligated to pay DAMAGES by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for DAMAGES:

i.  That YOU would have in the absence of the contract or agreement; or

ii.  Assumed in a contract or agreement that is an INSURED CONTRACT, provided the BODILY INJURY or PROPERTY DAMAGE occurs subsequent to the execution of the contract or agreement.

b.  BODILY INJURY to:

i.  YOUR EMPLOYEE arising out of and in the course of:

a)  Employment by YOU; or

b)  Performing related duties related to the conduct of YOUR business; or

Activity No:

CGL 003 CS 03-15                    Date Produced:                                Page 2
Includes copyrighted material of Insurance Services Office, Inc. with its permission



        ii.        The spouse, child, parent, brother or sister of that EMPLOYEE as a consequence of the BODILY INJURY described in Paragraph 1. above.

This exclusion applies:

        i.        Whether YOU may be liable as an employer or in any other capacity; and

        ii.        To any obligation to share DAMAGES with or repay someone else who must pay DAMAGES because of INJURY.

This exclusion does not apply to:

        i.        Liability assumed by YOU under an INSURED CONTRACT; or

        ii.        BODILY INJURY arising out of and in the course of domestic employment by YOU unless benefits for such injury are in whole or in part either payable or required to be provided under any workers compensation law.

    c.        PROPERTY DAMAGE to:

        i.        Property owned or being transported by, or rented or loaned to YOU; or

        ii        Property in YOUR care, custody or control.

**E.**    **Defined Terms**

As used in this Endorsement:

1.        AUTO BUSINESS means the business or occupation of selling, repairing, servicing, storing, or parking AUTOS.

2.        HIRED AUTO means any AUTO YOU lease, hire, rent or borrow.  This does not include any AUTO YOU lease, hire, rent or borrow from any of YOUR EMPLOYEES or from any partner or YOUR EXECUTIVE OFFICERS or members of their households.

3.        NON-OWNED AUTO means any AUTO YOU do not own, lease, hire, rent or borrow which is used in connection with YOUR business.  This includes AUTOS owned by YOUR EMPLOYEES, YOUR partners or YOUR EXECUTIVE OFFICERS, or members of their households but only while used in YOUR business or YOUR personal affairs.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above.



        Sam Mezzich        Richard G. Hayes
        President           Treasurer

Activity No:

CGL 003 CS 03-15        Date Produced:        Page 3
Includes copyrighted material of Insurance Services Office, Inc. with its permission



## PUBLIC RELATIONS EXPENSE REIMBURSEMENT ENDORSEMENT

| Attached to and forming part of Policy Number: | First Named Insured: | Policy Period: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 – 12/01/2017 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following

      Commerical General Liablity Coverage Part

### SCHEDULE

| Per Event Limit of Insurance | Aggregate Limit of Insurance | Per Event Retention |
|---|---|---|
| $25,000 | $25,000 | $1,000 |

**Coverage under this Endorsement applies only to PUBLIC RELATIONS EXPENSE paid by the NAMED INSURED during the POLICY PERIOD or the policy period of a renewal policy issued by US, and only if the NAMED INSURED notifies US of the PUBLIC RELATIONS EVENT and the PUBLIC RELATIONS EXPENSE during the POLICY PERIOD or within the time set forth below. Please review this Endorsement carefully and discuss the coverage with YOUR Insurance Agent.**

Subject to all other terms and conditions of the POLICY, it is agreed and understood that:

A.    The following is added to Section I. Commercial General Liablity:

**Public Relations Expense Reimbursement Coverage**

WE will reimburse the NAMED INSURED up to the applicable Limit of Insurance stated in the Schedule above for those sums in excess of the Per Event Retention stated in the Schedule above for PUBLIC RELATIONS EXPENSES paid by the NAMED INSURED during the POLICY PERIOD of this POLICY or a policy issued by US that is a renewal of this POLICY due to a PUBLIC RELATIONS EVENT that first occurs during the POLICY PERIOD.

This coverage applies only if the NAMED INSURED notifies US in writing of the PUBLIC RELATIONS EXPENSES during the POLICY PERIOD of this POLICY or the policy period of a policy issued by US that is a renewal of this POLICY. However, if such PUBLIC RELATIONS EXPENSES are paid by the NAMED INSURED within thirty (30) days before the end of such POLICY PERIOD, then the NAMED INSURED may notify US in writing of such PUBLIC RELATIONS EXPENSES within thirty (30) days after the end of the POLICY PERIOD.

B.    For the purposes of the coverage provided by this Endorsement only, Section III. Our Limit of Liability is replaced by the following:

1.    OUR obligation to pay PUBLIC RELATIONS EXPENSES applies only to the amount of PUBLIC RELATIONS EXPENSES in excess of the Per Event Retention stated in the above Schedule and only if the Per Event Retention has actually been paid by the NAMED INSURED for a PUBLIC RELATIONS EVENT, without reimbursement by any other insurer or other entity. WE shall have no obligation, either to the NAMED INSURED or any other person or entity, to pay all or any portion of the Per Event Retention or any PUBLIC RELATIONS EXPENSES on the NAMED INSURED'S behalf. The Per Event Retention applies separately to each PUBLIC RELATIONS EVENT resulting in PUBLIC RELATIONS EXPENSE.



2.  Subject to the Per Event Retention**,** regardless of the number of PUBLIC RELATIONS EVENTS or NAMED INSUREDS, the Aggregate Limit of Liability stated in the Schedule above is the most WE will pay for all PUBLIC RELATIONS EXPENSE to which this Endorsement applies.

3.  Subject to the Per Event Retention, regardless of the number of NAMED INSUREDS, the Per Event Limit of Liability stated in the Schedule above is the most WE will pay for all PUBLIC RELATIONS EXPENSES for each PUBLIC RELATIONS EVENT.

4.  All PUBLIC RELATIONS EVENTS based upon, arising out of, or directly or indirectly resulting from or in any way involving or sharing one or more of the same or related PUBLIC RELATIONS EVENTS, facts, circumstances, transactions, acts, events, or course of conduct or exposure to the same general conditions shall be considered one PUBLIC RELATIONS EVENT for purposes of the Limits of Liability.

5.  All PUBLIC RELATIONS EXPENSES arising out of the same or related PUBLIC RELATIONS EVENTS shall be payable only under the policy in effect at the time that the PUBLIC RELATIONS EVENT first occurs and is reported to US.

6.  In no event shall more than one Per Event Limit of this Endorsement or the Per Event Limit of more than one policy issued by US or any of OUR affiliated insurance companies apply to one PUBLIC RELATIONS EVENT or series of related PUBLIC RELATIONS EVENTS.

7.  Subject to 6. above, if the NAMED INSURED is covered for or entitled to reimbursement of PUBLIC RELATIONS EXPENSES for a PUBLIC RELATIONS EVENT under both this Coverage Part and under any other coverage part or policy issued by US or any of OUR affiliated insurance companies, the maximum total appllicable Limits of Liability with respect to such NAMED INSURED under all such coverage parts and policies shall not exceed the largest singe available limit liability under any one such coverage part or policy. This limit applies:

    a.  Regardless of whether or not such other coverage parts or policies have been issued for the same, a subequent or overlapping policy period; and

    b.  Regardless of whether or not such other coverage part or policies provide coverage on the same terms and conditions as this Coverage Part.

C.  For purposes of this Endorsement only, Section VI. Exclusions is deleted and replaced with the following:

This Endorsement does not apply to and there is no coverage for any PUBLIC RELATIONS EXPENSES that in whole or in part are caused by or arise out of any investigation, allegations, complaint, indictment or proceeding concerning any actual, alleged or suspected:

1.  a.  Violation of any federal, state or local antitrust, restraint of trade, unfair competition, or price-fixing law, or any rules or regulations promulgated thereunder;

    b.  Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq., as amended, or any rules or regulations promulgated thereunder;

    c.  Violation of the Stark Act, 42 U.S.C. 1395nn, and any amendments thereto or rules or regulations promulgated thereunder, or of any federal, state or local self-referral laws, or any rules or regulations promulgated thereunder;

    d..  Violation of the federal Anti-Kickback Statute, 42 U.S.C. 1320-7b(b), and any amendments thereto or rules or regulations promulgated thereunder, or of any federal, state or local anti-kickback law, or any rules or regulations promulgated thereunder;

    e.  Violation of the Health Insurance Portability and Accountability Act ("HIPAA") and any amendments thereto, or any rules or regulations promulgated thereunder or of any other federal or state statute or regulation protecting the confidentiality of or limiting or precluding the disclosure of any person's health or medical information;



     f.     Violation of the Gramm-Leach Bliley Act of 1999, and any amended amendments thereto or any rules or regulations promulgated thereunder or of any other federal or state statute or regulation protecting the confidentiality of or limiting or precluding the disclosure of any person's financial information;

     g.    Violation of the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and any amendments thereto, or any rules or regulations promulgated thereunder;

     h.    Violation of the False Claims Act, 31 U.S.C. §§ 3729 – 3733, and any amendments thereto, or any rules or regulations promulgated thereunder;

     i.     Violation of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq., and any amendments thereto; or

     j.     Violation of any statute, ordinance or regulation that requires notice to persons of any actual or potential unauthorized access to or disclosure of any of their personally identifiable non-public information or of any confidential or private information or other breach of privacy or the costs of providing any notice required under any such statute or of any credit monitoring.

2.     Gaining of any profit, remuneration or advantage by the NAMED INSURED to which the NAMED INSURED was not legally entitled, including, but not limited to, heath care fraud or violation of any federal, state or municipal false claims act.

3.     Failure to meet any obligation for which the INSURED or any other insurer may be liable under worker's compensation, unemployment compensation, disability or any similar law.

4.     Failure to meet any obligation which the NAMED INSURED has assumed under a written or oral contract or agreement, other than an agreement with a patient or resident of the NAMED INSURED to provide PROFESSIONAL SERVICES

5.     Employment or labor related act or practice, including but not limited to any alleged wrongful dismissal, discharge, termination, harassment, discrimination, retaliation or misrepresentations to or of a current or former EMPLOYEE or applicant for employment, wrongful failure to employ or promote; wrongful discipline or any violation of any wage or hour law or regulation or any labor or labor relations statute or regulation or violation of any collective bargaining agreement; whether or not any such act, practice or alleged violation relates to terms or conditions of employment that allegedly affect patient safety.

6.     a.    Access to or disclosure of any person's or organization's confidential or personal information, including but not limited to patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

     b.    Loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate ELECTRONIC DATA.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, PUBLIC RELATIONS EXPENSES or any other loss, cost or expense incurred by YOU or others arising out of that which is described in Paragraph a. or b. above.

7.     Act or omission that violates or is alleged to violate:

     a.    The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

     b.    The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

     c.    The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or



       d.    Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

8.    Erroneous or improper billing or billing practices or any other billing-related act or practices.

9.    Ownership, maintenance or use of an AUTO or motor vehicle.

10.    a.    Discharge, dispersal, seepage, migration, handling, storage, disposal, treatment, processing, release or escape of or exposure to any POLLUTANTS or asbestos at any time and in, at or from any premises or location;

       b.    Violation of any statute, regulation or ordinance governing the use, handling, storage, disposal, treatment or processing of POLLUTANTA or asbestos;

       c.    Request, demand or order or statutory or regulatory requirement that any INSURED or others test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess the effects of POLLUTANTS or asbestos; or

       d.    Loss, cost or expense for, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to, or assessing the effects of POLLUTANTS or asbestos.

As used in this exclusion, POLLUTANTS means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, asbestos, acids, alkalis, chemicals, oil, gasoline or any other petroleum products or derivatives, waste or material to be recycled, reconditioned or reclaimed, regardless of where located.

D.    For the purposes of the coverage provided by this Endorsement, the following definitions apply:

1.    PUBLIC RELATIONS EVENT means any criminal investigation, criminal complaint, criminal indictment, government regulatory agency administrative proceeding (other than proceedings in the normal course of the NAMED INSURED'S business or routine, regular or periodic agency inspections, audits, reviews or licensing or credentialing certifications), alleging or arising out of the alleged or suspected violation of one or more state or federal statutes or regulations regarding:

       a.    Abuse of any of the NAMED INSURED'S patients or residents;

       b.    Reference and background checking of the NAMED INSURED'S potential employees; and

       c.    Any other statute or regulation applicable to YOUR operations intended to protect the rights or safety of the NAMED INSURED'S patients and residents.

2.    PUBLIC RELATIONS EXPENSES mean reasonable fees and costs incurred by the NAMED INSURED in the investigation, mitigation and/or defense a PUBLIC RELATIONS EVENT. PUBLIC RELATIONS EXPENSES include fees of attorneys, experts and consultants, including third-party media consultants and costs incurred in the management of public relations with respect to a PUBLIC RELATIONS EVENT.

PUBLIC RELATIONS EXPENSES do not include:

       a.    Any remuneration, salaries, wages, overtime, fees, loss of earnings or reimbursement of expenses paid on behalf of or owed to any INSURED or any of its EMPLOYEES or any lost income of any form suffered by any INSURED or any overhead expenses of any INSURED;

       b.    Any fines, penalties, awards, damages, restitution, costs, interest, attorney's fees or any other sums paid to any person or governmental or private entity as compensation for any actual or alleged INJURY or harm allegedly caused by any circumstances or events alleged in or giving rise to the PUBLIC RELATIONS EVENT, to settle any CLAIM or any allegations



against an INSURED, or that are awarded or imposed by any court or any governmental agency;

c.    Any attorneys' fees, costs or expenses arising out of or relating to a PUBLIC RELATIONS EVENT for which WE or another insurer has a duty to defend or to pay the INSURED'S defense costs, whether or not such duty is subject to a deductible, co-payment or self-insured retention; or

d.    Any costs or expenses incurred to provide notice of any actual or potential breach of privacy or theft, loss or unauthorized disclosure of or access to any confidential information, to detect or remedy the cause of any such breach of privacy or theft, loss or unauthorized disclosure of or access to any confidential information or for any credit monitoring services.

E.    For the purpose of the coverage provided by this Endorsement, the following conditions apply:

1.    In the event of any PUBLIC RELATIONS EXPENSE for which reimbursement is requested under this Endorsement, the NAMED INSURED shall provide US with such records and information that WE request relating to the PUBLIC RELATIONS EXPENSE and the PUBLIC RELATIONS EVENT that gave rise to such PUBLIC RELATIONS EXPENSE.

2.    The insurance provided by this Endorsement shall be excess over any OTHER INSURANCE applicable to any PUBLIC RELATIONS EXPENSE.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above.

<div style="background:black;height:4em;"></div>

Sam Mezzich          Richard G. Hayes
President           Treasurer



**Coverys Specialty Insurance Company**

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

| Policy Number: | First Named Insured: | Policy Period: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc; The Bantry Group | 12/01/2016 – 12/01/2017 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

Commercial General Liability Coverage Part

### SCHEDULE

| Name of Additional Insured Person(s) or Organization(s): |
|---|
| All entities or organizations contracted with the Named Insured with respect to Correctional Medicine Services rendered by the insured |

A. Section II. Definition of Insured is amended to include as an additional INSURED the person(s) or organization(s) shown in the Schedule above, but only with respect to liability for INJURY caused, in whole or in part, by a NAMED INSURED'S acts or omissions or the acts or omissions of those acting on a NAMED INSURED'S behalf:

　　1. In the performance of a NAMED INSURED'S ongoing operations; or

　　2. In connection with a NAMED INSURED'S premises owned by or rented to a NAMED INSURED.

However:

　　1. The insurance afforded to such additional INSURED only applies to the extent permitted by law; and

　　2. If coverage provided to the additional INSURED is required by a contract or agreement, the insurance afforded to such additional INSURED will not be broader than that which a NAMED INSURED is required by the contract or agreement to provide for such additional INSURED.

B. With respect to the insurance afforded to the additional INSUREDS shown in the Schedule above, if coverage provided to the additional INSURED is required by a contract or agreement, the most WE will pay on behalf of the additional INSURED is the amount of insurance:

　　1. Required by the contract or agreement; or

　　2. Available under the applicable Limit of Liability shown in the DECLARATIONS;

whichever is less.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above.



Gregg L. Hanson　　　　Richard G. Hayes
President & CEO　　　　　Treasurer

Includes copyrighted material of Insurance Services Office, Inc., with its permission



## EMPLOYEE BENEFITS LIABILITY COVERAGE PART
## CLAIMS MADE COVERAGE FORM

Throughout this Coverage Part the words YOU and YOUR refer to the INSURED as defined in Section II. Definition of Insured. The words WE, US and OUR refer to the insurer named on the DECLARATIONS or an affiliated Coverys company.

Capitalized words and phrases have special meaning as defined in the Common Policy Terms and this Coverage Part.

This Coverage Part is issued in return for the payment of premium and is subject to the DECLARATIONS and to all of the terms, conditions, definitions and exclusions stated in this Coverage Part and in the Common Policy Terms. Read the entire POLICY carefully to determine YOUR rights and duties and what is and is not covered.

## IMPORTANT NOTICE

## THIS IS A CLAIMS MADE COVERAGE PART.

**Coverage applies only to CLAIMS first made against the INSURED and reported to US during the POLICY PERIOD arising out of INCIDENTS taking place on or after the RETROACTIVE DATE stated in the DECLARATIONS. Please review this Coverage Part carefully and discuss the coverage with YOUR insurance agent.**

## Section I.     Employee Benefits Liability

A.   **Insuring Agreement**

WE will pay on your behalf those sums which YOU become legally obligated to pay as DAMAGES, up to the applicable Limits of Liability stated in the DECLARATIONS, because of a CLAIM for an INCIDENT in the ADMINISTRATION of a NAMED INSURED'S EMPLOYEE BENEFITS PROGRAM by YOU or someone for whom YOU are legally responsible.

This coverage applies only if:

1.   The INCIDENT takes place on or after the RETROACTIVE DATE and before the end of the POLICY PERIOD;

2.   A CLAIM for DAMAGES is first made against YOU and reported to US in writing during the POLICY PERIOD or any EXTENDED REPORTING PERIOD, if applicable; and

3.   Any SUIT for DAMAGES covered by this POLICY is brought within the Coverage Territory set forth in Section V. Coverage Territory.

WE shall have the right and duty to defend any SUIT brought against YOU seeking DAMAGES that are covered by this Coverage Part as further set forth in and subject to Section IV. Defense, Settlement and Claim Expenses.

B.   **Reporting A Claim Or Incident**

1.   As a condition precedent to OUR obligations under this Coverage Part, YOU must give written notice to US of any CLAIM made against YOU as soon as practicable and during the POLICY PERIOD or any applicable EXTENDED REPORTING PERIOD.

2.   If during the POLICY PERIOD an INSURED becomes aware of any actual or alleged INCIDENT or circumstances that may reasonably be expected to give rise to a CLAIM for DAMAGES

Includes copyrighted material of Insurance Services Office, Inc., with its permission



potentially covered by this Coverage Part and gives written notice to US of such INCIDENT or circumstances, then any CLAIMS subsequently made and reported to US as soon as practicable that are based upon or result from such INCIDENT or circumstances shall be considered first made and reported to US during the POLICY PERIOD.

3.    The following shall not be considered notice of a CLAIM, INCIDENT or circumstance:

    a.    Reports made to US orally by or on behalf of any INSURED;

    b.    Reports, documents or surveys authored by or furnished to US in connection with any engineering, loss control, risk management, quality assurance services or any application for insurance; or

    c.    Notice given to any attorney retained or paid by US to defend YOU in any CLAIM or SUIT.

## C.    Reporting Period Option

1.    If either WE or the FIRST NAMED INSURED cancels or non-renews this Coverage Part or this POLICY, the FIRST NAMED INSURED shall have the right to have issued an endorsement providing an EXTENDED REPORTING PERIOD during which CLAIMS otherwise covered by this Coverage Part may be first made against YOU and reported to US, if the FIRST NAMED INSURED:

    a.    Gives US written notice within thirty (30) days after such cancellation or non-renewal; and

    b.    Pays to US all premiums due for the POLICY, if any, and for the EXTENDED REPORTING PERIOD as established by OUR rules, rates and rating plans then in effect. Payment of any premium due for the POLICY and payment of the premium for the EXTENDED REPORTING PERIOD shall be made when due as invoiced by US, or the EXTENDED REPORTING PERIOD will terminate and not be reinstated.

The EXTENDED REPORTING PERIOD applies only to INCIDENTS that take place on or after the RETROACTIVE DATE stated in the DECLARATIONS and prior to the cancellation or non-renewal of this Coverage Part. The applicable Limits of Liability stated in the DECLARATIONS at the time this Coverage Part is cancelled or non-renewed shall, subject to any endorsements providing for a deductible, be the limits of liability for all CLAIMS first made against any INSURED and reported to US during the EXTENDED REPORTING PERIOD.

2.    If this Coverage Part or this POLICY is non-renewed or cancelled, YOU shall have an AUTOMATIC EXTENDED REPORTING PERIOD of thirty (30) days immediately following the termination of this Coverage Part during which CLAIMS otherwise covered by this Coverage Part may be first made against YOU and reported in writing to US, but only if such CLAIM is not covered under an EXTENDED REPORTING PERIOD or under any other policy issued by any insurer, including any captive insurance program and whether or not subject to any deductible or self-insured retention.

The AUTOMATIC EXTENDED REPORTING PERIOD applies only to INCIDENTS which take place on or after the RETROACTIVE DATE stated in the DECLARATIONS and prior to the cancellation or non-renewal of this Coverage Part. The Limit of Liability for this AUTOMATIC EXTENDED REPORTING PERIOD shall be part of, and not in addition to, the Limit of Liability.

In the event that the FIRST NAMED INSURED fails to purchase an EXTENDED REPORTING PERIOD, no coverage is provided for any CLAIMS or SUITS first made against YOU or first reported to US after the AUTOMATIC EXTENDED REPORTING PERIOD.

AUTOMATIC EXTENDED REPORTING PERIOD means the thirty (30) day period immediately following the termination of this Coverage Part during which all CLAIMS, arising from an

Includes copyrighted material of Insurance Services Office, Inc., with its permission



INCIDENT in the ADMINISTRATION of a NAMED INSURED'S EMPLOYEE BENEFITS PROGRAM on or after the RETROACTIVE DATE and prior to the end of the POLICY PERIOD and otherwise covered by this Coverage Part may be first made against YOU and reported to US. EXTENDED REPORTING PERIOD also includes the AUTOMATIC EXTENDED REPORTING PERIOD described above.

## Section II.    Definition of Insured

The following are INSUREDS under this Coverage Part:

A.    The FIRST NAMED INSURED, any NAMED INSUREDS and any entity listed in the Schedule of Insureds for this Coverage Part.

B.    If the NAMED INSURED is:

1.    A partnership or joint venture, the NAMED INSURED'S partners are also INSUREDS, but only with respect to the conduct of the NAMED INSURED's business.

2.    A limited liability company, the NAMED INSURED'S members are also INSUREDS, but only with respect to the conduct of the NAMED INSURED's business. The NAMED INSURED'S managers are INSUREDS, but only with respect to their duties as the NAMED INSURED'S managers.

3.    An organization other than a partnership, joint venture or limited liability company, the NAMED INSURED'S EXECUTIVE OFFICERS and directors are INSUREDS, but only with respect to their duties as the NAMED INSURED'S officers or directors. The NAMED INSURED'S stockholders are also INSUREDS, but only with respect to their liability as stockholders of the NAMED INSURED.

4.    A trust, the NAMED INSURED'S trustees are also INSUREDS, but only with respect to their duties as trustees.

C.    Any subsidiary or affiliated company created or acquired by the NAMED INSURED after the effective date of this POLICY will qualify as a NAMED INSURED under this Coverage Part if there is no other similar insurance available to that organization. However, this coverage under this provision only applies:

1.    If the NAMED INSURED acquires and maintains an ownership interest in such organization of 51% or more; and

2.    For INCIDENTS committed in the ADMINISTRATION of a NAMED INSURED'S EMPLOYEE BENEFITS PROGRAM that occurred after such creation or acquisition.

Such affiliate or subsidiary shall be an INSURED for not more than ninety (90) days after its creation or acquisition by the NAMED INSURED or until the end of the POLICY PERIOD, whichever is earlier, and only if during that time the FIRST NAMED INSURED:

1.    Gives US written notice of such creation or acquisition;

2.    Provides US all information WE request;

3.    Obtains OUR written consent to cover such affiliate or subsidiary under this Coverage Part; and

4.    Pays any additional premium required by US (including such additional premium as may be required for the period commencing upon such creation or acquisition).

D.    A NAMED INSURED'S EMPLOYEES but only while such persons are acting within the capacity and scope of their duties in the ADMINISTRATION of the NAMED INSURED'S EMPLOYEE BENEFITS PROGRAM for the NAMED INSURED.

Includes copyrighted material of Insurance Services Office, Inc., with its permission



E.  If the NAMED INSURED is an individual, any persons, organizations or EMPLOYEES having proper temporary authorization to administer the NAMED INSURED'S EMPLOYEE BENEFITS PROGRAMS if the NAMED INSURED dies, but only until the NAMED INSURED'S legal representative is appointed.

F.  Any person or entity who was an INSURED, as defined in paragraphs B., D. or E. above, at the time that the INCIDENT took place.

## Section III.  Our Limit of Liability

A.  The Limits of Liability shown in the DECLARATIONS and the rules below fix the most WE will pay under this Coverage Part regardless of the number of INSUREDS, CLAIMS made or SUITS brought, or persons or organizations making CLAIMS or bringing SUITS.

B.  The Aggregate Limit of Liability stated in the DECLARATIONS is the total limit of OUR liability for all DAMAGES, CLAIMS and SUITS to which this Coverage Part applies, regardless of the number of EMPLOYEE BENEFITS PROGRAMS, INSUREDS, CLAIMS made, SUITS brought, INCIDENTS alleged or persons asserting CLAIMS.

C.  The Per Claim Limit of Liability stated in the DECLARATIONS is the total amount that WE will pay for each CLAIM to which this Coverage Part applies, regardless of the number of INSUREDS or persons asserting CLAIMS. The Per Claim limit is subject to the Aggregate Limit of Liability stated in the DECLARATIONS.

D.  Regardless of the number of CLAIMS made or SUITS brought, the number of persons asserting CLAIMS, the number of INSUREDS named or the number of EMPLOYEE BENEFITS PROGRAMS involved, all CLAIMS based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving or sharing one or more of the same or related INCIDENTS, facts, circumstances, transactions, events, advice, decisions or exposure to the same general conditions will be deemed to be a single CLAIM.

Regardless of the number of CLAIMS made, the number of persons asserting CLAIMS (including without limitation CLAIMS by an EMPLOYEE and the EMPLOYEE'S dependents or beneficiaries), the number of INCIDENTS, the number of INSUREDS or the number of EMPLOYEE BENEFIT PROGRAMS involved, multiple INCIDENTS shall be deemed to be related if they arise out of, directly or indirectly result from, or in any way involve or share one or more of the same or related acts, errors, omissions, facts, circumstances, transactions, events, advice, decisions or exposure to the same general conditions.

In no event shall more than one Per Claim Limit of Liability of this Coverage Part or the Per Claim Limit of Liability of more than one policy or Coverage Part issued by US or any of OUR affiliated insurance companies apply to any one INCIDENT, CLAIM or SUIT or any series of related INCIDENTS, CLAIMS or SUITS in the ADMINISTRATION of a NAMED INSURED'S EMPLOYEE BENEFITS PROGRAM.

All such CLAIMS first made during the POLICY PERIOD, any applicable EXTENDED REPORTING PERIOD or the effective period of an applicable Employee Benefits Liability Coverage Part issued by US or any of OUR affiliated insurance companies will be deemed to have been first made and reported to US only during the effective period of the first such coverage part when the first such CLAIM is first made. Any and all such CLAIMS shall be subject exclusively to one Per Claim Limit of Liability of that first coverage part.

E.  The amount of DAMAGES paid under this Coverage Part shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the EMPLOYEE BENEFITS PROGRAM at issue in the CLAIM or SUIT.

## Section IV.  Defense, Settlement and Claims Expenses

Includes copyrighted material of Insurance Services Office, Inc., with its permission



In addition to those provisions found in Section I. Defense, Settlement and Claim Expenses of the Common Policy Terms, the following provisions also apply:

A.      Subject to Section V. Coverage Territory below, WE shall have the right and duty to defend, with defense counsel selected by US, any SUIT brought against an INSURED seeking DAMAGES that are covered by this Coverage Part even if any of the allegations of the SUIT are groundless, false or fraudulent, and WE may make any investigation and settlement of any INCIDENT, CLAIM or SUIT as WE deem expedient. WE may also pay all or any portion of any judgment against YOU even if such payment does not settle the CLAIM against YOU and YOUR appellate rights have not been exhausted.

B.      WE will pay, with respect to any CLAIM WE investigate or settle, or any SUIT against an INSURED that WE defend under this Coverage Part, CLAIM EXPENSES in addition to the applicable Limit of Liability. CLAIM EXPENSES mean only the following:

1.      Defense costs and expenses, incurred by US with respect to any SUIT against YOU that WE defend, all court costs taxed against YOU in any SUIT seeking DAMAGES covered by this Coverage Part and post-judgment interest on that portion of any judgment covered by this Coverage Part which does not exceed the applicable Limit of Liability and that accrues through the date that WE pay, offer to pay or deposit into court that portion of such judgment. However, CLAIM EXPENSES do not include any form of prejudgment interest or attorneys' fees or attorneys' expenses taxed or awarded against YOU;

2.      Premiums on bonds to release attachments in SUITS WE defend for an amount not in excess of the applicable Limit of Liability and premiums on appeal bonds with respect to that portion of any judgment covered by this Coverage Part not exceeding the applicable Limit of Liability of this Coverage Part. WE do not have to furnish or obtain these bonds.

3.      Reasonable out-of-pocket expenses incurred by YOU at OUR request in assisting US in the investigation or defense of any CLAIM or SUIT, including YOUR actual loss of earnings, to a maximum of $500 for each INSURED per day, but only if such loss of earnings is not payable under any OTHER INSURANCE.

## Section V.      Coverage Territory

This Coverage Part applies to an INCIDENT only if the INCIDENT occurs in the United States of America (including its territories and possessions), Puerto Rico or Canada.

## Section VI.      Exclusions

In addition to those exclusions found in Section II. Exclusions of the Common Policy Terms, this Coverage Part does not apply to any liability of an INSURED or any DAMAGES, INCIDENTS, CLAIMS or SUITS arising out of:

A.      **Available Benefits**

The denial of benefits under YOUR EMPLOYEE BENEFIT PROGRAMS to the extent that such benefits are available, with reasonable effort and cooperation of the INSURED, from the applicable funds accrued or other collectible insurance.

B.      **Bodily Injury, Property Damage, or Personal and Advertising Injury**

BODILY INJURY, PROPERTY DAMAGE or PERSONAL AND ADVERTISING INJURY.

C.      **Dishonest, Fraudulent, Criminal or Malicious Acts**

Arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission committed by any INSURED or the willful or reckless violation of any statute by any INSURED.

Includes copyrighted material of Insurance Services Office, Inc., with its permission



D.   **Failure to Perform a Contract**

Failure of performance or breach of contract by any insurer, health maintenance organization, or other provider of any of the benefits included within YOUR EMPLOYEE BENEFIT PROGRAMS or by any INSURED, whether acting in the capacity of an insurer or otherwise.

E.   **Inadequacy of Performance or of Investment Advice**

1.   Failure of any investment to perform;

2.   Errors or omissions in providing information on past or future performance of investment vehicles; or

3.   Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in any EMPLOYEE BENEFIT PROGRAM or the level at which to participate in any such plan or the selection of options available under any such plan.

F.   **Insufficiency of Funds**

Insufficiency of funds to meet any obligations under any plan included in any EMPLOYEE BENEFIT PROGRAMS, the failure to fund any plan included in any EMPLOYEE BENEFIT PROGRAMS or the inadequacy or absence of insurance, bonds or other security to protect the assets of any EMPLOYEE BENEFIT PROGRAMS.

G.   **Reduction in Benefits**

Any change or reduction in, or the elimination of, any benefit included in any EMPLOYEE BENEFITS PROGRAMS.

H.   **Taxes, Fines or Penalties**

Taxes, fines or penalties including those imposed under the Internal Revenue Code or any similar state or local law.

I.   **Workers' Compensation and Similar Laws**

Failure to comply with the provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

## Section VII.     Defined Terms

The capitalized words and phrases used in this Coverage Part have special meaning. In addition to those defined terms found in Section III. Defined Terms of the Common Policy Terms, the following definitions also apply to this Coverage Part:

A.   ADMINISTRATION means:

1.   Providing information to a NAMED INSURED'S EMPLOYEES, including their dependents and beneficiaries, with respect to eligibility for or the terms of that NAMED INSURED'S EMPLOYEE BENEFIT PROGRAMS

2.   Record-keeping in connection with a NAMED INSURED'S EMPLOYEE BENEFIT PROGRAMS; or

3.   Effecting, continuing or terminating any individual EMPLOYEE'S enrollment in any benefit included in a NAMED INSURED'S EMPLOYEE BENEFIT PROGRAMS.

However, ADMINISTRATION does not include handling payroll deductions.

B.   CAFETERIA PLANS mean plans authorized by applicable law to allow EMPLOYEES to elect to pay for certain benefits with pre-tax dollars.

Includes copyrighted material of Insurance Services Office, Inc., with its permission



C. EMPLOYEE, for the purposes of this Coverage Part, means an individual actively or formerly employed by a NAMED INSURED, on leave of absence or disabled, or retired from employment by a NAMED INSURED, but only if such individual is or was on a NAMED INSURED'S payroll and subject to the withholding of taxes by a NAMED INSURED.

D. EMPLOYEE BENEFIT PROGRAMS mean the following benefits provided to a NAMED INSURED'S EMPLOYEES, whether provided through a CAFETERIA PLAN or otherwise:

1. Group life insurance; group accident or health insurance; dental, vision and hearing plans; and flexible spending accounts; provided that no one other than an EMPLOYEE may subscribe to such benefits and such benefits are made generally available to those EMPLOYEES who satisfy the plan's eligibility requirements;

2. Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an EMPLOYEE may subscribe to such benefits and such benefits are made generally available to all EMPLOYEES who are eligible under the plan for such benefits;

3. Unemployment insurance, social security benefits, workers' compensation and disability benefits; and

4. Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies.

## Section VIII.    Conditions

The insurance provided by this Coverage Part is subject to the conditions included in Section IV. General Conditions of the Common Policy Terms.

In witness whereof, WE have caused this POLICY to be executed and attested.



Sam Mezzich            Richard G. Hayes
President               Treasurer

Includes copyrighted material of Insurance Services Office, Inc., with its permission



## PROVIDER MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
## CLAIMS MADE COVERAGE FORM

Throughout this Coverage Part the words YOU and YOUR refer to the INSURED as defined in Section II. Definition of Insured. The words WE, US and OUR refer to the insurer named on the DECLARATIONS or an affiliated Coverys company.

Capitalized words and phrases have special meaning as defined in the Common Policy Terms and this Coverage Part.

This Coverage Part is issued in return for the payment of premium and is subject to the DECLARATIONS and to all of the terms, conditions, definitions and exclusions stated in this Coverage Part and in the Common Policy Terms. Read the entire POLICY carefully to determine YOUR rights and duties and what is and is not covered.

### IMPORTANT NOTICE

### THIS IS A CLAIMS MADE COVERAGE PART.

**Coverage applies only to CLAIMS first made against the INSURED and reported to US during the POLICY PERIOD arising out of INCIDENTS taking place on or after the RETROACTIVE DATE stated in the DECLARATIONS. Please review this Coverage Part carefully and discuss the coverage with YOUR insurance agent.**

## Section I.          Provider Professional Liability

A.     **Insuring Agreement**

WE will pay on YOUR behalf those sums which YOU become legally obligated to pay as DAMAGES, up to the applicable Limits of Liability stated in the DECLARATIONS, because of a CLAIM for an INCIDENT in the performance of PROFESSIONAL SERVICES in YOUR specialty described in the DECLARATIONS by YOU or someone for whom YOU are legally responsible.

This coverage applies only if:

1.     The INCIDENT takes place on or after the RETROACTIVE DATE and before the end of the POLICY PERIOD;

2.     A CLAIM for DAMAGES is first made against YOU and reported to US in writing during the POLICY PERIOD or any EXTENDED REPORTING PERIOD, if applicable; and

3.     Any SUIT for DAMAGES covered by this POLICY is brought within the Coverage Territory set forth in Section V. Coverage Territory.

WE shall have the right and duty to defend any SUIT brought against YOU seeking DAMAGES that are covered by this Coverage Part as further set forth in and subject to Section IV. Defense, Settlement and Claim Expenses.

B.     **Reporting A Claim Or Incident**

1.     As a condition precedent to OUR obligations under this Coverage Part, YOU must give written notice to US of any CLAIM made against YOU as soon as practicable and during the POLICY PERIOD or any applicable EXTENDED REPORTING PERIOD.

2.     If during the POLICY PERIOD an INSURED becomes aware of any actual or alleged INCIDENT or circumstances that may reasonably be expected to give rise to a CLAIM for DAMAGES potentially covered by this Coverage Part and gives written notice to US of such INCIDENT or circumstances, then any CLAIMS subsequently made and reported to US as soon as practicable


that are based upon or result from such INCIDENT or circumstances shall be considered first made and reported to US during the POLICY PERIOD.

3. Written notice to US of a deposition as described in Section IV. Defense, Settlement and Claim Expenses, paragraph B.4. below, will be considered notice of an INCIDENT or circumstances under paragraph B.2. above with respect to any CLAIM made against YOU for an INCIDENT in the performance of those PROFESSIONAL SERVICES that are the subject of such deposition.

4. The following shall not be considered notice of a CLAIM, INCIDENT or circumstance:

   a. Reports made to US orally by or on behalf of any INSURED;

   b. Reports, documents or surveys authored by or furnished to US in connection with any engineering, loss control, risk management, quality assurance services or any application for insurance; or

   c. Notice given to any attorney retained or paid by US to defend YOU in any CLAIM or SUIT.

## C. Reporting Period Option

1. If this Coverage Part or this POLICY is non-renewed or cancelled, each NAMED INSURED shall have the right to have issued an endorsement providing an EXTENDED REPORTING PERIOD during which CLAIMS otherwise covered by this Coverage Part may be first made against and reported to US by that NAMED INSURED and any EMPLOYEES, students, VOLUNTEERS, and scheduled substitute (locum tenens) providers of that NAMED INSURED or any professional medical corporation owned solely by that NAMED INSURED as defined in Section II. Definition of Insured, A.5. below, if that NAMED INSURED:

   a. Gives US written notice within thirty (30) days after such cancellation or non-renewal; and

   b. Pays to US all premiums due, if any, for the POLICY with respect to that NAMED INSURED, if any, and for the EXTENDED REPORTING PERIOD as established by OUR rules, rates and rating plans then in effect. Payment of any premium due for that NAMED INSURED and the premium for the EXTENDED REPORTING PERIOD shall be made as invoiced by US, or the EXTENDED REPORTING PERIOD will terminate and not be reinstated.

2. If this Coverage Part or this POLICY is non-renewed or cancelled with respect to the coverage for a specific NAMED INSURED, that NAMED INSURED shall have the right to have issued an endorsement providing an indefinite EXTENDED REPORTING PERIOD during which CLAIMS otherwise covered by this Coverage Part may be first made against and reported to US by that NAMED INSURED and any EMPLOYEES, students, VOLUNTEERS, and scheduled substitute (locum tenens) providers of that NAMED INSURED or any professional medical corporation owned solely by that NAMED INSURED as defined in Section II. Definition of Insured, A.5. below, if that NAMED INSURED:

   a. Gives US written notice within thirty (30) days after such cancellation or non-renewal; and

   b. Pays to US all premiums due, if any, for that NAMED INSURED'S coverage under the POLICY, and for the EXTENDED REPORTING PERIOD as established by OUR rules, rates and rating plans then in effect. Payment of any premium due for that NAMED INSURED and the payment of premium for the EXTENDED REPORTING PERIOD shall be made as invoiced by US, or the EXTENDED REPORTING PERIOD will terminate and not be reinstated.

3. The EXTENDED REPORTING PERIOD applies only to INCIDENTS that take place on or after the RETROACTIVE DATE stated in the DECLARATIONS and prior to the cancellation or non-renewal of this Coverage Part. The applicable Limits of Liability stated in the DECLARATIONS as the Per Claim and Aggregate Limits at the time this Coverage Part is cancelled or non-renewed



shall, subject to any endorsements providing for a deductible, be the Limits of Liability for all CLAIMS first made and reported to US during the EXTENDED REPORTING PERIOD against any NAMED INSURED, to whom the EXTENDED REPORTING PERIOD applies, and any EMPLOYEES, students, VOLUNTEERS, and scheduled substitute (locum tenens) providers of that NAMED INSURED or any professional medical corporation owned solely by that NAMED INSURED as defined in Section II. Definition of Insured, A.5. below. However, the Aggregate Limit of Liability in the DECLARATIONS applies separately to the EXTENDED REPORTING PERIOD.

4.  If this Coverage Part or this POLICY is non-renewed or cancelled, YOU shall have an AUTOMATIC EXTENDED REPORTING PERIOD of thirty (30) days immediately following the termination of this Coverage Part during which CLAIMS otherwise covered by this Coverage Part may be first made against YOU and reported in writing to US, but only if such CLAIM is not covered under an EXTENDED REPORTING PERIOD or under any other policy issued by any insurer, including any captive insurance program and whether or not subject to any deductible or self-insured retention.

    The AUTOMATIC EXTENDED REPORTING PERIOD applies only to INCIDENTS which take place on or after the RETROACTIVE DATE stated in the DECLARATIONS and prior to the cancellation or non-renewal of this Coverage Part. The Limit of Liability for this AUTOMATIC EXTENDED REPORTING PERIOD shall be part of, and not in addition to, the Limit of Liability.

    In the event that the FIRST NAMED INSURED fails to purchase an EXTENDED REPORTING PERIOD, no coverage is provided for any CLAIMS or SUITS first made against YOU or first reported to US after the AUTOMATIC EXTENDED REPORTING PERIOD.

    AUTOMATIC EXTENDED REPORTING PERIOD means the thirty (30) day period immediately following the termination of this Coverage Part during which all CLAIMS, arising from an INCIDENT in the performance of PROFESSIONAL SERVICES on or after the RETROACTIVE DATE and prior to the end of the POLICY PERIOD and otherwise covered by this Coverage Part may be first made against YOU and reported to US.  EXTENDED REPORTING PERIOD also includes the AUTOMATIC EXTENDED REPORTING PERIOD described above.

## Section II.        Definition of Insured

A.  The following are INSUREDS under this Coverage Part:

1.  Each provider listed as a NAMED INSURED in the Schedule of Insureds for this Coverage Part.

2.  A NAMED INSURED'S EMPLOYEES, students and VOLUNTEERS (except an intern, extern, resident, fellow, medical, dental, osteopathic or chiropractic doctor), but only while such persons are acting within the capacity and scope of their duties as such for that NAMED INSURED.

3.  Any INSURED in paragraphs 1. or 2. for PROFESSIONAL SERVICES rendered as a "Good Samaritan" in sudden and unforeseen emergencies outside the scope of his or her patient care duties for the NAMED INSURED and for which services no remuneration is demanded, expected or received.

    Coverage as provided by this paragraph 3. applies only to the extent that immunity for such "Good Samaritan" liability is not afforded by any "Good Samaritan" statute.

4.  Subject to OUR pre-approval, any substitute (locum tenens) provider named in a Locum Tenens Schedule endorsed to this POLICY and such provider's EMPLOYEES while a NAMED INSURED is temporarily absent from professional practice and for no more than ninety (90) days total during any one POLICY PERIOD. Such persons are INSUREDS only while acting within the scope of their duties on behalf of that NAMED INSURED and no such person shall be an INSURED while substituting for a NAMED INSURED on a regular basis for any reason.



5.  A professional medical corporation owned solely by a single NAMED INSURED, but only if the corporation does not own, operate or manage any laboratory, hospital, long term care facility or any other healthcare facility or business enterprise other than the NAMED INSURED'S medical office practice. However, if such medical corporation operates a laboratory that provides PROFESSIONAL SERVICES solely to patients of the NAMED INSURED'S medical office practice, then the medical corporation is an INSURED.

6.  Any person or entity that was an INSURED, as defined in paragraphs 2. through 5. above, at the time that the INCIDENT took place.

B.  If the FIRST NAMED INSURED listed in the DECLARATIONS is a corporation or other entity, such corporation or entity shall not be an INSURED for any purpose under this Coverage Part. However, that corporation or entity is authorized to act on behalf of all INSUREDS with respect to acceptance of this POLICY and any endorsements (other than an EXTENDED REPORTING PERIOD Endorsement), the giving notice of CLAIMS or circumstances that may give rise to a CLAIM, the giving or receiving of notice of cancellation or non-renewal, receiving unearned premium or dividends, and agreeing to any changes in this POLICY.

## Section III.      Our Limit of Liability

A.  The Limits of Liability shown in the DECLARATIONS for this Coverage Part for the NAMED INSURED shall be shared with and apply jointly and not severally to that NAMED INSURED together with all of that NAMED INSURED'S EMPLOYEES, students, VOLUNTEERS and scheduled substitute (locum tenens) providers and any professional medical corporation owned solely by that NAMED INSURED as defined in Section II. Definition of Insured, A.5. above.

B.  The Aggregate Limit of Liability stated in the DECLARATIONS is the total limit of OUR liability for all DAMAGES, CLAIMS and SUITS to which this Coverage Part applies, regardless of the number of INSUREDS, CLAIMS made, SUITS brought, INCIDENTS alleged, persons injured or persons asserting CLAIMS.

C.  The Per Claim Limit of Liability stated in the DECLARATIONS is the total amount that WE will pay for each CLAIM to which this Coverage Part applies, regardless of the number of INSUREDS, persons injured or persons asserting CLAIMS. The Per Claim Limit is subject to the Aggregate Limit of Liability stated in the DECLARATIONS.

D.  Regardless of the number of CLAIMS made or SUITS brought, the number of persons injured or persons asserting CLAIMS (including without limitation CLAIMS and SUITS for loss of consortium, society or services), the number of INCIDENTS, the number of properties damaged, the number of INSUREDS involved or the number or nature of any injuries, the following will be deemed to be a single CLAIM:

1.  All CLAIMS based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving or sharing one or more of the same or related INCIDENTS, PROFESSIONAL SERVICES, facts, circumstances, transactions, events, advice, decisions, course of treatment or exposure to the same general conditions;

2.  All CLAIMS based upon or arising out of one or more INCIDENTS in the performance of PROFESSIONAL SERVICES to, for or concerning a woman or her unborn child(ren) or both during the course of a pregnancy (including pre-natal and post-natal care), labor or delivery; and

3.  All CLAIMS based upon or arising out of one or more INCIDENTS in the performance of PROFESSIONAL SERVICES to, for or concerning a single patient.

In each circumstance described in paragraphs 1. through 3. above, all such CLAIMS first made during the POLICY PERIOD, any applicable EXTENDED REPORTING PERIOD or the effective period of an applicable professional liability policy or coverage part issued by US or any of OUR affiliated insurance companies will be deemed to have been first made and reported to US only during the effective period of



the first such policy or coverage part when the first such CLAIM is first made. Any and all such CLAIMS shall be subject exclusively to one Per Claim Limit of Liability of that first policy or coverage part.

E.  Unless otherwise stated in this Coverage Part:

1.  If any INSURED is covered for any INCIDENT, DAMAGES, CLAIM or SUIT both under this Coverage Part and under any other coverage part or policy issued by US or any of OUR affiliated insurance companies, other than a coverage part or policy that expressly states that it is excess over this Coverage Part or POLICY, and except as provided in paragraph D. above, the maximum total applicable Limits of Liability with respect to such INSURED under all such coverage parts and policies shall not exceed the largest single available Limit of Liability under any one such coverage part or policy. This limit applies:

    a.  To CLAIM EXPENSES if included in the Limit of Liability under this or any other coverage part or policy;

    b.  Regardless of whether or not such other coverage parts or policies have been issued for the same, a subsequent, prior or overlapping policy period; and

    c.  Regardless of whether or not such other coverage parts or policies provide coverage on the same terms and conditions as this Coverage Part.

F.  In no event shall more than one Per Claim Limit of Liability of this Coverage Part or the Per Claim Limit of Liability of more than one coverage part or policy issued by US or any of OUR affiliated insurance companies apply to any one INCIDENT, CLAIM or SUIT or any series of related INCIDENTS, CLAIMS or SUITS. Multiple INCIDENTS, CLAIMS or SUITS shall be deemed to be related if they arise out of, directly or indirectly result from or in any way involve or share one or more of the same or related INCIDENTS, PROFESSIONAL SERVICES, facts, circumstances, transactions, events, advice, decisions, course of treatment, claimants or exposure to the same general conditions.

## Section IV.      Defense, Settlement and Claim Expenses

In addition to the provisions stated in Section I. Defense, Settlement and Claim Expenses of the Common Policy Terms, the following provisions also apply:

A.  Subject to Section V. Coverage Territory below, WE shall have the right and duty to defend, with defense counsel selected by US, any SUIT brought against YOU seeking DAMAGES that are covered by this Coverage Part even if any of the allegations of the SUIT are groundless, false or fraudulent, and WE may make any investigation and settlement, subject to the Consent to Settle provision of the Common Policy Terms, of any INCIDENT, CLAIM or SUIT as WE deem expedient. WE may also pay all or any portion of any judgment against YOU even if such payment does not settle the CLAIM against YOU and YOUR appellate rights have not been exhausted.

B.  WE will pay CLAIM EXPENSES in addition to the applicable Limit of Liability. CLAIM EXPENSES mean only the following:

1.  Defense costs and expenses incurred by US with respect to any SUIT against YOU that WE defend, all court costs taxed against YOU in any SUIT seeking DAMAGES covered by this Coverage Part, and post-judgment interest on that portion of any judgment covered by this Coverage Part which does not exceed the applicable Limit of Liability and that accrues through the date that WE pay, offer to pay or deposit into court that portion of such judgment. However, CLAIMS EXPENSES do not include any form of prejudgment interest or any attorneys' fees or attorneys' expenses taxed or awarded against YOU;

2.  Premiums on bonds to release attachments in SUITS WE defend for an amount not in excess of the applicable Limit of Liability and premiums on appeal bonds with respect to that portion of any judgment covered by this Coverage Part not exceeding the applicable Limit of Liability of this Coverage Part. WE do not have to furnish or obtain these bonds;



3.    Reasonable out-of-pocket expenses incurred by YOU at OUR request in assisting US in the investigation or defense of any CLAIM or SUIT against YOU, including YOUR actual loss of earnings, to a maximum of $500 for each INSURED per day, but only if such loss of earnings is not payable under any OTHER INSURANCE.

WE shall not be obligated to pay or reimburse any expenses pursuant to this paragraph 3. for any deposition described in paragraph 4. below unless WE are defending a party to such SUIT and only to the extent permissible in the governing jurisdiction; and

4.    If YOU are an individual, attorneys' fees and costs for an attorney retained and selected by US to represent YOU at a deposition taken in a SUIT to which YOU are not a party, but only if:

a.    WE determine in OUR sole discretion that it is reasonably likely based upon the information provided to US that YOU will be examined at that deposition about PROFESSIONAL SERVICES performed on or after the RETROACTIVE DATE by YOU or someone for whom YOU are legally responsible and the patient for whom such services were performed, or his or her estate, is a party to that SUIT;

b.    YOU have not been retained as an expert witness or consultant in such SUIT; and

c.    YOU notify US of the deposition in writing during the POLICY PERIOD and immediately upon YOUR receipt of a deposition subpoena or other notice of YOUR deposition.

C.    YOU may not incur any CLAIM EXPENSES nor make any settlements or assume any obligation without OUR prior written consent.

## Section V.      Coverage Territory

This Coverage Part applies to PROFESSIONAL SERVICES performed anywhere in the world. However, this Coverage Part does not apply to any DAMAGES sought or awarded in any SUIT brought and maintained outside of the United States of America, its territories or possessions or Canada, and WE shall not be obligated to defend or pay CLAIM EXPENSES with respect to any such SUIT.

## Section VI.      Exclusions

In addition to those exclusions found in Section II. Exclusions of the Common Policy Terms, this Coverage Part does not apply to any liability of an INSURED or to any DAMAGES, INCIDENTS, CLAIMS, or SUITS:

A.    **Alteration or Destruction of Records**

Brought against any INSURED who intentionally altered or destroyed any paper or electronic record or evidence relating to any PROFESSIONAL SERVICES that are the subject of a CLAIM or SUIT, including without limitation any patient or health care record, or who directed, consented to or permitted any such alteration or destruction. This exclusion shall not apply to:

1.    Any supplement or correction to a record if the author and date of the supplement or correction is stated on the record and the content of the original record has not been deleted or obliterated; or

2.    The destruction of any record that occurs after all applicable statutory and regulatory record retention periods have elapsed and when the INSURED is not on notice of a CLAIM or potential CLAIM or of an INCIDENT or circumstances that may reasonably be expected to give rise to a CLAIM.

B.    **Breach of Contract**

Arising out of any breach of contract. However, this exclusion shall not apply to CLAIMS or SUITS by a patient of a NAMED INSURED arising out of the performance of those services included in paragraphs 1. through 6. and 7a. through 7b. of the definition of PROFESSIONAL SERVICES in Section III. Defined Terms of the Common Policy Terms.



C.      **Contractual Liability and Warranties**

1.      For the liability of others assumed by an INSURED under any contract or agreement. However, this exclusion does not apply:

i.      To any liability assumed by an INSURED under any written contract, agreement or permit, arising out of an INCIDENT in the performance of PROFESSIONAL SERVICES by YOU or by YOUR EMPLOYEE provided that such written contract, agreement or permit was executed prior to such PROFESSIONAL SERVICES. However, if coverage is required by a written contract, agreement or permit with an INSURED, the most WE will pay is the amount of insurance required by the written contract, agreement or permit less all amounts payable by any OTHER INSURANCE available to the additional INSURED; and

ii.     To any liability that the INSURED would have in the absence of such contract or agreement.

2.      For the liability of an INSURED arising out of any express or implied warranties, or any representations or guarantees as to the level, quality or result of any goods, products or PROFESSIONAL SERVICES.

D.      **Dishonest, Intentional or Criminal Acts**

Arising out of any dishonest, fraudulent, criminal or malicious acts or omissions or deliberate or intentional wrongdoing or bad faith committed or alleged to have been committed by any INSURED.

However, this exclusion shall not apply to an INSURED if such acts or omissions were not committed by, at the direction of or with the knowledge of such INSURED.

E.      **Failure to Maintain Licensure**

Arising out of the performance of any PROFESSIONAL SERVICES:

1.      That takes place while YOUR professional license or the professional license of the person performing the PROFESSIONAL SERVICES is under suspension or has been revoked, surrendered or has otherwise terminated or is not in effect;

2.      That involves dispensing or prescribing controlled substances while YOUR license or registration to dispense such substances or the license or registration of the person dispensing or prescribing controlled substances is under suspension or has been revoked, surrendered or has otherwise terminated or is not in effect;

3.      That are not permitted pursuant to any probation or restriction of YOUR professional license or YOUR license or registration to dispense or prescribe controlled substances or pursuant to any probation or restriction of the professional license of the person performing the PROFESSIONAL SERVICES or the license or registration to dispense or prescribe controlled substances of the person dispensing or prescribing controlled substances; or

4.      By any person who is not duly licensed, certified or accredited to perform such PROFESSIONAL SERVICES at the time the PROFESSIONAL SERVICES are rendered if, under applicable law, those PROFESSIONAL SERVICES may only be performed by a professional licensed, certified or accredited to perform such services.

F.      **Insured vs. Insured**

Brought against any INSURED:

1.      By any other INSURED; or

2.      By the spouse, child, parent, brother or sister of an INSURED, or any employee of a NAMED INSURED or by any other person seeking DAMAGES for loss of consortium, services or society as the result of injuries to any INSURED.



This exclusion applies to any obligation to share DAMAGES with or repay, defend, hold harmless, or indemnify someone else who must pay DAMAGES because of a CLAIM or INCIDENT.

However, this exclusion shall not apply to a CLAIM or SUIT for DAMAGES because of an INCIDENT in the performance of PROFESSIONAL SERVICES to the extent such DAMAGES are caused by an INJURY to an INSURED or employee of a NAMED INSURED, or to such person's spouse, child, parent, brother or sister, solely in that person's capacity as a patient of another INSURED.

G.     **Motor Vehicle, Watercraft or Aircraft**

Arising out of the ownership, maintenance, operation, use, LOADING OR UNLOADING of any AUTO, MOBILE EQUIPMENT, or any other motor vehicle, trailer, watercraft or aircraft.

However, this exclusion shall not apply to CLAIMS or SUITS for BODILY INJURY caused by the LOADING OR UNLOADING of patients of a NAMED INSURED, provided the INSURED has no OTHER INSURANCE applicable to such CLAIM or SUIT.

H.     **Property Damage**

For or arising out of:

1.       Any injury to, destruction of, or theft or loss of use of any form of property, whether tangible or intangible; or

2.       Any interference with or infringement of any person's rights or interests in any tangible or intangible property.

# Section VII.        Defined Terms

The capitalized words and phrases used in this Coverage Part have special meaning as defined in Section III. Defined Terms of the Common Policy Terms.

# Section VIII.        Conditions

The insurance provided by this Coverage Part is subject to the conditions included in Section IV. General Conditions of the Common Policy Terms.

In witness whereof, WE have caused this POLICY to be executed and attested.

Sam Mezzich                     Richard G. Hayes
President                          Treasurer



## SERVICE OF SUIT ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies coverage provided under the following:

> Entity Professional Liability Coverage Part
> Provider Professional Liability Coverage Part
> Sexual Misconduct Coverage Part
> Professional Conduct Review Coverage Part
> Commercial General Liability Coverage Part
> Employee Benefits Liability Coverage Part
> Excess Medical Professional & Umbrella Liability Coverage Part

Subject to all other terms and conditions of this POLICY, it is agreed and understood that:

In the event of OUR failure or alleged failure to pay any amount claimed under this POLICY, WE, at the request of the FIRST NAMED INSURED, will submit to the jurisdiction of any court of competent jurisdiction and proper venue within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made upon state officer bearing the title 'Commissioner,' 'Director' or 'Superintendent' of Insurance of the state or commonwealth wherein the risk covered by this POLICY is located, and that in any suit instituted against it upon this POLICY WE will abide by the final decision of such Court or any Appellate Court in the event of an appeal. The state officer bearing the title 'Commissioner,' 'Director' or 'Superintendent' of Insurance of the state or commonwealth wherein the risk covered by this POLICY is located is hereby authorized and directed to accept service of process on behalf of US in any such suit and/or upon the FIRST NAMED INSURED'S request to give a written undertaking to the FIRST NAMED INSURED that they will enter a general appearance upon OUR behalf in the event such suit shall be instituted.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above.

Sam Mezzich
President

Richard G. Hayes
Treasurer



## EXCLUSION OF CERTIFIED NUCLEAR, BIOLOGICAL, CHEMICAL OR RADIOLOGICAL ACTS OF TERRORISM; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

| Attached to and forming part of Policy Number: | First Named Insured: | Policy Period: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 – 12/01/2017 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

Commercial General Liability Coverage Part
Excess Medical Professional & Umbrella Liability Coverage Part

Subject to all other terms and conditions of the POLICY, it is agreed and understood that:

A.  Section II. Exclusions, paragraph M. Terrorism of the Common Policy Terms is deleted and replaced with the following:

N.  Terrorism

ANY INJURY OR DAMAGE arising, directly or indirectly, out of a CERTIFIED ACT OF TERRORISM. However, this exclusion applies only when one or more of the following are attributed to such act:

1.  The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

2.  The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

3.  Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

B.  For the purposes of this Endorsement, the following definitions are added:

1.  ANY INJURY OR DAMAGE means any injury or damage covered under any Coverage Part to which this Endorsement is applicable, and includes but is not limited to BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY, "injury" or "environmental damage" as may be defined in any applicable coverage part.

2.  CERTIFIED ACT OF TERRORISM means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a CERTIFIED ACT OF TERRORISM include the following:

a.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

b.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.



C.    In the event of any incident of a CERTIFIED ACT OF TERRORISM that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

D.    If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and WE have met OUR insurer deductible under the Terrorism Risk Insurance Act, WE shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above

Sam Mezzich                    Richard G. Hayes
President                        Treasurer



# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

| Attached to and forming part of Policy Number: | First Named Insured: | Policy Period: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 – 12/01/2017 |

THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

This endorsement applies to insurance provided under the following:

    Commercial General Liability Coverage Part
    Excess Medical Professional & Umbrella Liability Coverage Part

## SCHEDULE

| Terrorism Premium (Certified Acts) | WAIVED |
|---|---|

A.    Disclosure of Premium

    In accordance with the federal Terrorism Risk Insurance Act, WE are required to provide the NAMED INSURED with a notice disclosing the portion of the NAMED INSURED'S premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of the NAMED INSURED'S premium attributable to such coverage is shown in the Schedule of this Endorsement.

B.    Disclosure of Federal Participation in Payment of Terrorism Losses

    The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

C.    Cap on Insurer Participation in Payment of Terrorism Losses

    If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and WE have met OUR insurer deductible under the Terrorism Risk Insurance Act, WE shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above



        Sam Mezzich        Richard G. Hayes
        President          Treasurer



## CONDITIONAL EXCLUSION OF TERRORISM
## (RELATING TO DISPOSITION OF
## FEDERAL TERRORISM RISK INSURANCE ACT)

| Attached to and forming part of Policy Number: | First Named Insured: | Policy Period: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 – 12/01/2017 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

Commercial General Liability Coverage Part
Excess Medical Professional & Umbrella Liability Coverage Part

Subject to all other terms and conditions of the POLICY, it is agreed and understood that:

A. Applicability of the Provisions of this Endorsement

   1. The provisions of this Endorsement become applicable commencing on the date when any one or more of the following first occurs. But if the NAMED INSURED'S POLICY (meaning the POLICY PERIOD in which this Endorsement applies) begins after such date, then the provisions of this Endorsement become applicable on the date the NAMED INSURED'S POLICY begins.

      a. The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act, has terminated with respect to the type of insurance provided under this Coverage Part or POLICY; or

      b. A renewal, extension or replacement of the Program has become effective without a requirement to make terrorism coverage available to the NAMED INSURED and with revisions that:

         i. Increase OUR statutory percentage deductible under the Program for terrorism losses (that deductible determines the amount of all certified terrorism losses WE must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses); or

         ii. Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or

         iii. Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this POLICY.

   2. If the provisions of this Endorsement become applicable, such provisions:

      a. Supersede any terrorism endorsement already endorsed to this POLICY that addresses "certified acts of terrorism" and/or "other acts of terrorism", but only with respect to an incident(s) of terrorism (however defined) which results in injury or damage that occurs on or after the date when the provisions of this Endorsement become applicable (for claims made policies, such an endorsement is superseded only with respect to an incident of terrorism (however defined) that results in a CLAIM for INJURY or damage first being made on or after the date when the provisions of this Endorsement become applicable); and

---

Activity No:

COM 007 07/14                     Date Produced: 07/16/2015                     Page 1

Includes copyrighted material of Insurance Services Office, Inc., with its permission



      b.      Remain applicable unless WE notify the NAMED INSURED of changes in these provisions, in response to federal law.

    3.      If the provisions of this Endorsement do NOT become applicable, any terrorism endorsement already endorsed to this POLICY that addresses "certified acts of terrorism" and/or "other acts of terrorism" will continue in effect unless WE notify the NAMED INSURED of changes to that endorsement in response to federal law.

B.    The following definitions are added and apply under this Endorsement wherever the term "terrorism", or the phrase "any injury or damage", are capitalized:

    1.      TERRORISM means activities against persons, organizations or property of any nature:

        a.      That involve the following or preparation for the following:

            i.      Use or threat of force or violence; or

            ii.      Commission or threat of a dangerous act; or

            iii.      Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

        b.      When one or both of the following apply:

            i.      The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

            ii.      It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

    2.      ANY INJURY OR DAMAGE means any injury or damage covered under any Coverage Part or POLICY to which this Endorsement is applicable, and includes but is not limited to BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY, "injury" or "environmental damage" as may be defined in any applicable coverage part or policy.

C.    The following exclusion is added to Section II. Exclusions of the Common Policy Terms:

Terrorism

Arising directly or indirectly by TERRORISM, including action in hindering or defending against an actual or expected incident of TERRORISM. ANY INJURY OR DAMAGE is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above



          Sam Mezzich         Richard G. Hayes
           President            Treasurer



**Coverys Specialty Insurance Company**

# COVERAGE TERRITORY AMENDMENT

| Attached to and forming part of Policy Number: | First Named Insured: | Policy Period: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2015 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies coverage provided under the following:

Entity Professional Liability Coverage Part
Provider Professional Liability Coverage Part

Subject to all other terms and conditions of this POLICY, it is agreed and understood that Section V. Coverage Territory is replaced in its entirety with the following:

**Coverage Territory**

This Coverage Part applies to PROFESSIONAL SERVICES performed anywhere in the world except the state of Maryland and only if any SUIT seeking DAMAGES is brought within the United States of America, its territories or possessions or Canada.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above.

Gregg L. Hanson
President & CEO

Richard G. Hayes
Treasurer



# SEXUAL MISCONDUCT COVERAGE PART

Throughout this Coverage Part, the words YOU and YOUR refer to the INSURED as defined in Section II. Definition of Insured. The words WE, US and OUR refer to the insurer named on the DECLARATIONS or an affiliated Coverys company.

Capitalized words and phrases have special meaning as defined in this POLICY.

This Coverage Part is issued in return for the payment of premium and is subject to the DECLARATIONS and to all of the terms, conditions, definitions and exclusions stated in this Coverage Part and in the Common Policy Terms. Read the entire POLICY carefully to determine YOUR rights and duties and what is and is not covered.

## IMPORTANT NOTICE

**This Coverage Part applies only to CLAIMS, SUITS or LICENSING BOARD PROCEEDINGS first commenced and reported to US during the POLICY PERIOD. In addition, LEGAL EXPENSES are subject to and reduce the applicable Limit of Liability. Please review this POLICY carefully and discuss the coverage with YOUR insurance agent.**

## Section I. Sexual Misconduct

A. **Insuring Agreement**

WE will pay on YOUR behalf those sums which YOU become legally obligated to pay as DAMAGES and LEGAL EXPENSES, up to the Limit of Liability stated in the DECLARATIONS, because of a CLAIM, SUIT or LICENSING BOARD PROCEEDING alleging the actual or threatened sexual abuse of or any sexual misconduct or sexual activity with YOUR patient by YOU or by anyone for whom YOU are legally responsible while YOU or such person were performing PROFESSIONAL SERVICES. This coverage only applies if:

1. The CLAIM, SUIT or LICENSING BOARD PROCEEDING arises from any INSURED who did not commit, have knowledge of, encourage or participate in the actual or threatened sexual abuse of or any sexual misconduct or sexual activity with YOUR patient by YOU or by anyone for whom YOU are legally responsible while YOU or such person were performing PROFESSIONAL SERVICES;

2. The CLAIM, SUIT or LICENSING BOARD PROCEEDING is first commenced against YOU during the POLICY PERIOD. No such CLAIM, SUIT or LICENSING BOARD PROCEEDING shall be deemed to be first commenced against YOU during the POLICY PERIOD as the result of notice to US of any INCIDENT, CLAIM or circumstances under any other Coverage Part of this POLICY or any other policy issued by US;

3. YOU give US written notice of the CLAIM, SUIT or LICENSING BOARD PROCEEDING during the POLICY PERIOD and as soon as practicable after YOU receive notice of such CLAIM, SUIT or LICENSING BOARD PROCEEDING. However, if YOU first receive notice of such CLAIM, SUIT or LICENSING BOARD PROCEEDING within sixty (60) days after this Coverage Part is cancelled or non-renewed, then YOU may notify US in writing of such CLAIM, SUIT or LICENSING BOARD PROCEEDING within sixty (60) days after the end of the POLICY PERIOD; and

5. Any SUIT for DAMAGES covered by this POLICY is brought within the Coverage Territory set forth in Section V. Coverage Territory of the Entity Medical Professional Liability Coverage Part Provider Medical Professional Liability Coverage Part, if attached to this POLICY.

The amount WE will pay for DAMAGES and LEGAL EXPENSES is limited as set forth in Section III. Limit of Liability.

B. **Notice of a** Claim, **Suit or Licensing Board Proceeding**



The following shall not be considered notice of a CLAIM, SUIT or LICENSING BOARD PROCEEDING:

1.  Reports made to US orally by or on behalf of any INSURED;

2.  Reports, documents or surveys authored by or furnished to US in connection with any engineering, loss control, risk management, quality assurance services or any application for insurance; or

3.  Notice given to any attorney retained or paid by US to defend YOU in any CLAIM or SUIT.

## Section II.    Definition of Insured

With respect to this Coverage Part, all persons who qualify as an INSURED in any Entity Professional Liability Coverage Part or Provider Professional Liability Coverage Part listed in the DECLARATIONS qualify as an INSURED under this Coverage Part. However, no provider named in any Locum Tenens Schedule, attached to or included in this POLICY, or such provider's EMPLOYEES shall be an INSURED under this Coverage Part.

## Section III.    Our Limit of Liability

A.  Subject to the Professional Liability Coverage Part Limit of Liability, the Aggregate Limit of Liability shown in the DECLARATIONS for this Coverage Part is the most WE will pay for any and all DAMAGES and LEGAL EXPENSES incurred for the defense of all CLAIMS, SUITS or LICENSING BOARD PROCEEDINGS first commenced during the POLICY PERIOD, regardless of the number of INCIDENTS, INSUREDS, patients, claimants or injuries involved or the number of CLAIMS, SUITS or LICENSING BOARD PROCEEDINGS commenced.

B.  With respect to those INSUREDS who qualify as an INSURED under a Provider Professional Liability Coverage Part included in this POLICY, if any, the Per Proceeding and Aggregate Limits of Liability shown in the DECLARATIONS for this Coverage Part for the NAMED INSURED shall be shared with and apply jointly and not severally to that NAMED INSURED together with all of that NAMED INSURED'S EMPLOYEES, students, and VOLUNTEERS and any professional medical corporation owned solely by that NAMED INSURED as defined in Section II. A. 5. Definition of Insured in the Provider Professional Liability Coverage Part.

C.  With respect to those INSUREDS who qualify as an INSURED under an Entity Professional Liability Coverage Part included in this POLICY, if any, the Per Proceeding and Aggregate Limits of Liability shown in the DECLARATIONS for this Coverage Part for the NAMED INSURED shall be shared with and apply jointly and not severally to all such INSUREDS.

D.  Subject to A., B. and C. above, the Per Proceeding Limit of Liability shown in the DECLARATIONS for this Coverage Part is the most WE will pay for DAMAGES and LEGAL EXPENSES incurred for the defense of any one CLAIM, SUIT or LICENSING BOARD PROCEEDING first commenced against an INSURED during the POLICY PERIOD.

E.  Subject to paragraph B. and C. above, all DAMAGES and LEGAL EXPENSES incurred in the defense of one or more related CLAIMS, SUITS or LICENSING BOARD PROCEEDINGS by the same or different persons or regulatory agencies that are first commenced against any INSURED and reported to US during the POLICY PERIOD or the effective period of any other policy issued by US or any of OUR affiliated companies will share in the same Per Proceeding Limit of Liability regardless of the number of policy periods, policies, coverage parts, INCIDENTS, INSUREDS, patients, claimants, regulatory agencies, CLAIMS, SUITS or LICENSING BOARD PROCEEDINGS involved. Multiple CLAIMS, SUITS or LICENSING BOARD PROCEEDINGS shall be considered related if they arise out of or allege one or more of the same or related INCIDENTS, PROFESSIONAL SERVICES, facts, circumstances, conduct, course of treatment or exposure to the same general conditions or involve any of the same patients.

## Section IV.    Defense, Settlement and Legal Expenses



In addition to the provisions stated in Section I. Defense, Settlement and Claim Expenses of the Common Policy Terms, the following provisions also apply:

We shall have the right and duty to defend, with defense counsel selected by US, any SUIT brought against YOU seeking DAMAGES that are covered by this Coverage Part even if any of the allegations of the SUIT are groundless, false or fraudulent, and WE may make any investigation and settlement of any INCIDENT, CLAIM or SUIT as WE deem expedient. WE may also pay all or any portion of any judgment against you even if such payment does not settle the CLAIM against YOU and YOUR appellate rights have not been exhausted.

## Section V.    Exclusions

This Coverage Part is subject to the exclusions set forth in Section II. Exclusions of the Common Policy Terms. In addition, this Coverage Part incorporates and is subject to all exclusions applicable to any Entity Professional Liability Coverage Part or Provider Professional Liability Coverage Part listed on the DECLARATIONS, and this Coverage Part does not apply to any CLAIM, SUIT or LICENSING BOARD PROCEEDING alleging any INCIDENT or conduct that is the subject of any such exclusion.

## Section VI.    Defined Terms

The capitalized words and phrases used in this Coverage Part have special meaning. In addition to those defined terms found in Section III. Defined Terms of the Common Policy Terms, the following definitions apply:

A.    LICENSING BOARD PROCEEDING means a civil regulatory proceeding by the state agency with jurisdiction to issue, revoke, suspend or restrict YOUR license to perform PROFESSIONAL SERVICES including any action in a court of law for judicial review of any order or decision of such agency concerning YOUR professional license. LICENSING BOARD PROCEEDING includes any investigation by such an agency of YOUR performance of PROFESSIONAL SERVICES and any complaint filed with or by such an agency concerning YOUR performance of PROFESSIONAL SERVICES.

LICENSING BOARD PROCEEDING does not include any proceeding concerning YOUR license to prescribe controlled substances or YOUR eligibility to participate in any federally or state-funded healthcare, insurance or payment program, including without limitation Medicare or Medicaid.

B.    LEGAL EXPENSES means fees and expenses for legal services necessary for YOUR defense of a CLAIM, SUIT or LICENSING BOARD PROCEEDING rendered by a licensed attorney or law firm retained by YOU. LEGAL EXPENSES do not include:

1.    Any fine, penalty, costs, attorneys' fees, restitution, DAMAGES or other sum awarded against YOU;

2.    Any fee or expense exceeding the reasonable and customary charges for similar legal services; or

3.    Any out-of-pocket expenses incurred by YOU, including loss of earnings.

## Section VII.    Conditions

The insurance provided by this Coverage Part is subject to the conditions included in Section IV. General Conditions of the Common Policy Terms.

In addition, if a CLAIM, SUIT or LICENSING BOARD PROCEEDING is commenced against YOU, YOU must:

A.    Send US copies of any demands, notices, summonses, or legal papers received in connection with the CLAIM, SUIT or LICENSING BOARD PROCEEDING as soon as practicable; and

B.    Authorize US to obtain and provide US with those records and other information relating to the CLAIM, SUIT or LICENSING BOARD PROCEEDING that WE request.



In witness whereof, WE have caused this POLICY to be executed and attested.



Sam Mezzich        Richard G. Hayes
President          Treasurer



# PROFESSIONAL CONDUCT REVIEW COVERAGE PART

Throughout this Coverage Part, the words YOU and YOUR refer to the INSURED as defined in Section II. Definition of Insured. The words WE, US and OUR refer to the insurer named on the DECLARATIONS.

Capitalized words and phrases have special meaning as defined in the Common Policy Terms and this Coverage Part.

This Coverage Part is issued in return for the payment of premium and is subject to the DECLARATIONS and to all of the terms, conditions, definitions and exclusions stated in this Coverage Part and in the Common Policy Terms. Read the entire POLICY carefully to determine YOUR rights and duties and what is and is not covered.

## IMPORTANT NOTICE

**This Coverage Part applies only to LICENSING BOARD PROCEEDINGS first commenced and reported to US during the POLICY PERIOD. Please review this POLICY carefully and discuss the coverage with YOUR insurance agent.**

## Section I.    Professional Conduct Review Legal Expenses

A.    **Insuring Agreement**

WE will reimburse YOU for LEGAL EXPENSES required for YOUR defense in a LICENSING BOARD PROCEEDING alleging an INCIDENT in the performance of PROFESSIONAL SERVICES for a patient by YOU. However, WE shall not be obligated to defend YOU in any such proceeding. This coverage applies only if:

1.    The LICENSING BOARD PROCEEDING is first commenced against YOU during the POLICY PERIOD. No such proceeding shall be deemed to be first commenced against YOU during the POLICY PERIOD as the result of notice to US of any INCIDENT, CLAIM or circumstances under any other Coverage Part of this POLICY or any other policy issued by US;

2.    YOU give US written notice of the LICENSING BOARD PROCEEDING during the POLICY PERIOD and as soon as practicable after YOU receive notice of such proceeding. However, if YOU first receive notice of such proceeding within sixty (60) days after this POLICY is cancelled or non-renewed, then YOU may notify US in writing of such proceeding within sixty (60) days after the end of the POLICY PERIOD. WE will not pay or reimburse YOU for any LEGAL EXPENSES incurred before YOU notify US of the proceeding; and

3.    Neither WE nor any other insurer has a duty to defend the LICENSING BOARD PROCEEDING or pay YOUR LEGAL EXPENSES for the LICENSING BOARD PROCEEDING.

The amount WE will pay for LEGAL EXPENSES is limited as set forth in Section III. Limit of Insurance.

B.    **Notice of a Licensing Board Proceeding**

The following shall not be considered notice of a LICENSING BOARD PROCEEDING:

1.    Reports made to US orally by or on behalf of any INSURED;

2.    Reports, documents or surveys authored by or furnished to US in connection with any engineering, loss control, risk management, quality assurance services or any application for insurance; or

3.    Notice given to any attorney retained or paid by US to defend YOU in any CLAIM or SUIT.

## Section II.    Definition of Insured

With respect to this Coverage Part, all individuals who qualify as an INSURED in any Entity Professional Liability Coverage Part or Provider Professional Liability Coverage Part listed in the DECLARATIONS qualify as an



INSURED under this Coverage Part. However, no provider named in any Locum Tenens Schedule, attached to or included in this POLICY, or such provider's EMPLOYEES shall be an INSURED under this Coverage Part.

## Section III.      Limit of Insurance

A.      The Aggregate Limit of Insurance shown in the DECLARATIONS for this Coverage Part is the most WE will reimburse for any and all LEGAL EXPENSES incurred for the defense of all LICENSING BOARD PROCEEDINGS first commenced during the POLICY PERIOD, regardless of the number of INCIDENTS, INSUREDS, patients, claimants or injuries involved or the number of LICENSING BOARD PROCEEDINGS commenced.

B.      With respect to those INSUREDS who qualify as an INSURED under a Provider Professional Liability Coverage Part included in this POLICY, if any, the Per Proceeding and Aggregate Limits of Insurance shown in the DECLARATIONS for this Coverage Part for the NAMED INSURED shall be shared by and apply jointly and not severally to that NAMED INSURED together with all of that NAMED INSURED'S EMPLOYEES, students and VOLUNTEERS.

C.      With respect to those INSUREDS who qualify as an INSURED under an Entity Professional Liability Coverage Part included in this POLICY, if any, the Per Proceeding and Aggregate Limits of Insurance shown in the DECLARATIONS for this Coverage Part for the NAMED INSURED shall be shared with and apply jointly and not severally to all such INSUREDS.

D.      Subject to A., B. and C. above, the Per Proceeding Limit of Insurance shown in the DECLARATIONS for this Coverage Part is the most WE will reimburse for LEGAL EXPENSES incurred for the defense of any one LICENSING BOARD PROCEEDING first commenced against an INSURED during the POLICY PERIOD.

E.      Subject to paragraph B. and C. above, all expenses incurred in the defense of one or more related LICENSING BOARD PROCEEDINGS by the same or different persons or regulatory agencies that are first commenced against an INSURED and reported to US during the POLICY PERIOD or the effective period of any other policy issued by US or any of OUR affiliated companies will share in the same Per Proceeding Limit of Insurance shown regardless of the number of policy periods, policies, coverage parts, INCIDENTS, INSUREDS, patients, claimants, regulatory agencies or LICENSING BOARD PROCEEDINGS involved. Reimbursement shall be paid only under the coverage part issued by US or any of OUR affiliated insurance companies in effect at the time the first such related LICENSING BOARD PROCEEDING is first commenced and reported to US in writing, and there shall be no coverage for or right to reimbursement under any other policy or coverage part issued by US or any of OUR affiliated insurance companies. Multiple LICENSING BOARD PROCEEDINGS shall be considered related if they arise out of or allege one or more of the same or related INCIDENTS, PROFESSIONAL SERVICES, facts, circumstances, conduct, course of treatment or exposure to the same general conditions or involve any of the same patients.

## Section IV.      Exclusions

This Coverage Part is subject to the exclusions set forth in the Section II. Exclusions of the Common Policy Terms. In addition, this Coverage Part incorporates and is subject to all exclusions applicable to any Entity Professional Liability Coverage Part or Provider Professional Liability Coverage Part listed on the DECLARATIONS, and this Coverage Part does not apply to any LICENSING BOARD PROCEEDING alleging any INCIDENT or conduct that is the subject of any such exclusion.  In addition, this Coverage Part does not apply to any LICENSING BOARD PROCEEDING arising out of:

A.      Failure to Comply with Prescribing Requirements

Arising out of willful, knowing, deliberate or intentional violation of any Drug Enforcement Agency, federal, state or municipal constitution, statute, ordinance, by-law, rule or regulation for the prescribing of controlled substances, regardless of whether or not the resulting injury was expected or intended.



## Section V.    Defined Terms

The capitalized words and phrases used in this Coverage Part have special meaning. In addition to those defined terms found in Section III. Defined Terms of the Common Policy Terms, the following definitions apply:

A.    LICENSING BOARD PROCEEDING means a civil regulatory proceeding by the state agency with jurisdiction to issue, revoke, suspend or restrict YOUR license to perform PROFESSIONAL SERVICES including any action in a court of law for judicial review of any order or decision or such agency concerning YOUR professional license. LICENSING BOARD PROCEEDING includes any investigation by such an agency of YOUR performance of PROFESSIONAL SERVICES and any complaint filed with or by such an agency concerning YOUR performance of PROFESSIONAL SERVICES.

LICENSING BOARD PROCEEDING does not include any proceeding concerning YOUR eligibility to participate in any federally or state-funded healthcare, insurance or payment program, including without limitation Medicare or Medicaid.

B.    LEGAL EXPENSES means fees and expenses for legal services necessary for YOUR defense of a LICENSING BOARD PROCEEDING rendered by a licensed attorney or law firm retained by YOU. LEGAL EXPENSES do not include:

1.    Any fine, penalty, costs, attorneys' fees, restitution, DAMAGES or other sum awarded against YOU;

2.    Any fee or expense exceeding the reasonable and customary charges for similar legal services; or

3.    Any out-of-pocket expenses incurred by YOU, including loss of earnings.

## Section VI.    Conditions

The insurance provided by this Coverage Part is subject to the conditions included in Section IV. General Conditions of the Common Policy Terms.

In addition, if a LICENSING BOARD PROCEEDING is commenced against YOU, YOU must:

A.    Send US copies of any demands, notices, summonses, or legal papers received in connection with the LICENSING BOARD PROCEEDING as soon as practicable; and

B.    Authorize US to obtain and provide US with those records and other information relating to the LICENSING BOARD PROCEEDING that WE request

In witness whereof, WE have caused this POLICY to be executed and attested.



Sam Mezzich          Richard G. Hayes
President                     Treasurer



**Coverys Specialty Insurance Company**

## MANUSCRIPT ENDORSEMENT – 002
## WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST
## OTHERS TO US

| Attached to and forming part of Policy Number: | First Named Insured: | Policy Period: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 – 12/01/2017 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following

Commercial General Liability Coverage Part

### SCHEDULE

| Name of Person(s) or Organization(s): |
|---|
| Organization which the First Named Insured has contracted for the purposes of delivery of correctional healthcare services |

Subject to all other terms and conditions of the POLICY, the following is added to Section IV. General Conditions, paragraph Q. Subrogation of the Common Policy Terms:

WE waive any right of recovery WE may have against the person or organization shown in the Schedule above because of payments WE make for an INCIDENT resulting in BODILY INJURY or PROPERTY DAMAGE arising out of YOUR ongoing operations. This waiver applies only to the person or organization shown in the Schedule above and only when required in a written contract or agreement with YOU.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms and conditions of the POLICY, other than as expressly stated above.



Gregg L. Hanson          Richard G. Hayes
President & CEO                Treasurer

Activity No:

MAN 002 07/14                    Date Produced:                    Page 1



# MANUSCRIPT ENDORSEMENT – 003

| Attached to and forming part of Policy Number: | Named Insured: | Effective Date: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 – 12/01/2017 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

REPORTING ENDORSEMENT RATE FACTORS – 75% one year; 100% two year; 125% three year; 150% four year; 150% for five year.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms or conditions of the POLICY, other than as expressly stated above.

Sam Mezzich
President

Richard G. Hayes
Treasurer



# MANUSCRIPT ENDORSEMENT – 004

| Attached to and forming part of Policy Number: | Named Insured: | Effective Date: |
|---|---|---|
| 5-10026 | Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 12/01/2016 – 12/01/2017 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

COM 001 CS 12/15 Common Policy Terms

It is hereby understood and agreed that the policy is amended as follows:

Section IV General Conditions E. is amended and replaced with the following:

**Cancellation or Non-Renewal.** The FIRST NAMED INSURED may cancel this POLICY by returning it to US or by giving US advance written notice of when the cancellation is to take effect. WE may cancel or non-renew this POLICY by mailing to the FIRST NAMED INSURED at the FIRST NAMED INSURED'S last address as known by US, at least thirty (90) days advance notice of OUR intent to cancel or non-renew unless such cancellation is for non-payment of premium.

In the event any NAMED INSURED fails to pay any premium or reimburse any deductible or expense amounts owed to US, WE may cancel this POLICY by mailing notice to the FIRST NAMED INSURED at least ten (10) days in advance of the effective date of the cancellation. Proof of mailing will constitute proof of notice for purposes of this provision.

The effective date and hour of cancellation stated in the notice or the time of surrender of the POLICY will become the end of the POLICY PERIOD.

If this POLICY is cancelled, the FIRST NAMED INSURED may be entitled to a premium refund. However, WE are not required to make or offer any refund for any cancellation to be effective. If the FIRST NAMED INSURED cancels, the FIRST NAMED INSURED shall be responsible for payment of any earned premium calculated on a pro rata basis based on the period the POLICY was in effect plus 10% of the unearned premium for the original POLICY PERIOD stated in the DECLARATIONS. If the FIRST NAMED INSURED is due a refund the refund will be equal to any unearned premium calculated on a pro rata basis based on the period the POLICY was in effect, less 10% of any unearned premium for the original POLICY PERIOD stated in the DECLARATIONS. If WE cancel, WE will refund any unearned premium for the original POLICY PERIOD stated in the DECLARATIONS calculated on a pro rata basis.

Bankruptcy or insolvency of any NAMED INSURED will not preclude US from asserting OUR right to cancel or non-renew this POLICY.

Nothing in this endorsement shall vary, alter, waive or extend any of the terms or conditions of the POLICY, other than as expressly stated above.





| Sam Mezzich | Richard G. Hayes |
|:---:|:---:|
| President | Treasurer |



# REGULATORY LIABILITY AND INFORMATION SECURITY & PRIVACY COVERAGE SCHEDULE

**ITEM 1. NAMED INSURED:**
Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group
501 Holiday Drive, Foster Plaza 4
Pittsburgh, PA 15220

**DESCRIPTION OF BUSINESS:** Correctional Healthcare

**PRODUCER:**
Boston Brokerage
24 Federal Street
Boston, MA 02110

**ITEM 2. POLICY PERIOD:** **12/01/2016** to **12/01/2017** at 12:01 A.M. Standard Time at Named Insured address above.

| ITEM 3. SUPPLEMENTARY PAYMENTS RETROACTIVE DATE: | 10/01/2008 |
|---|---|

| ITEM 4. LIMITS OF COVERAGE | LIMIT OF LIABILITY |
|---|---|
| | |
| A. Limit of liability applicable to **Coverage A**. This limit is part of, and not in addition to, the AGGREGATE LIMIT OF LIABILITY. | $100,000 |
| B. (1) PRIVACY BREACH RESPONSE AGGREGATE LIMIT OF COVERAGE applicable to **Coverage B** for all events first discovered by the INSURED and reported to US during the POLICY PERIOD. | 10,000 NOTIFIED INDIVIDUALS in the aggregate |
| (2) Aggregate sublimit of coverage available to **Coverage B** (1)(a). This limit is part of, and not in addition to, the AGGREGATE LIMIT OF LIABILITY. | $50,000 |
| C. Limit of liability applicable to **Coverage C**. This limit is part of, and not in addition to, the AGGREGATE LIMIT OF LIABILITY. | $50,000 |
| D. Limit of liability applicable to **Coverage D**. This limit is part of, and not in addition to, the AGGREGATE LIMIT OF LIABILITY. | $50,000 |
| E. (1) Regulatory Aggregate Limit of Liability applicable to **Coverage E**. This limit is part of, and not in addition to, the AGGREGATE LIMIT OF LIABILITY. | $100,000 |
| (2) Sublimit of liability applicable to DISCIPLINARY PROCEEDINGS under **Coverage E**. This sublimit is part of, and not in addition to, the Per INSURED Limit of Liability applicable to **Coverage E**. | $25,000 |

Sam Mezzich
President

Richard G. Hayes
Treasurer



| | | |
|---|---|---|
| F. | Limit of liability applicable to **Coverage F**. This limit is part of, and not in addition to, the AGGREGATE LIMIT OF LIABILITY. | $50,000 |
| G. | Limit of liability applicable to **Coverage G**. This limit is part of, and not in addition to, the AGGREGATE LIMIT OF LIABILITY. | $50,000 |
| H. | Limit of liability applicable to **Coverage H**. This limit is part of, and not in addition to, the AGGREGATE LIMIT OF LIABILITY. | $25,000 |
| I. | Limit of liability applicable to **Coverage I**. This limit is part of, and not in addition to, the AGGREGATE LIMIT OF LIABILITY. | $50,000 |
| J. | AGGREGATE LIMIT OF LIABILITY for **Coverages A, B (1)(a), C, D, E, F, G, H** and **I** (Aggregate for all coverages combined, including CLAIMS EXPENSES). | $100,000 |

PRIVACY BREACH RESPONSE AGGREGATE LIMIT OF COVERAGE and the sublimit set forth in 4.B.(1) above is separate from and in addition to the AGGREGATE LIMIT OF LIABILITY.

**ITEM 5. DEDUCTIBLES**

| | | |
|---|---|---|
| A. | **Coverages A, C** and **D**: Each CLAIM Deductible (including each CLAIM in the form of a REGULATORY PROCEEDING) including CLAIMS EXPENSES | $5,000 |
| B. | **Coverage B(1)**(a) & (b) combined: | $5,000 |
| | (2) Services provided under **Coverage B(1)(c)** | 250 individuals |
| C. | **Coverage E**: Each CLAIM Deductible, including CLAIMS EXPENSES | $25,000 |
| D. | **Coverage F**: Each EXTORTION THREAT Deductible | $5,000 |
| E. | **Coverage G**: Each SECURITY BREACH Deductible | $5,000 |
| F. | **Coverage H**: Each PUBLIC RELATIONS EVENT Deductible | $5,000 |
| G. | **Coverage I**: Each SECURITY BREACH Deductible | $5,000 |
| | WAITING PERIOD for **Coverage I** | 12 Hours |
| **ITEM 6. PREMIUM:** | | Included |



Sam Mezzich          Richard G. Hayes
President                Treasurer



# REGULATORY LIABILITY AND INFORMATION SECURITY & PRIVACY
## Schedule of Insureds for Limit Schedule DEC 008A

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THIS SCHEDULE AMENDS THE POLICY DECLARATIONS TO ADD EACH OF THE FOLLOWING AS A NAMED INSURED UNDER THE POLICY.**

| Named Insureds | Retroactive Date |
|---|---|
| Wexford Health Sources Inc. and Ballymore Medical Management, Inc.; The Bantry Group | 10/01/2008 |



Sam Mezzich
President

Richard G. Hayes
Treasurer



# REGULATORY LIABILITY AND INFORMATION SECURITY & PRIVACY CLAIMS MADE COVERAGE FORM

**This POLICY is not valid unless a DECLARATIONS page is attached.**

Throughout this POLICY the word INSURED means any person or organization qualifying under Section IV. Definition of Insured. The words WE, US and OUR refer to the insurer named on the DECLARATIONS or an affiliated Coverys company.

Capitalized words and phrases have special meaning as defined in this POLICY.

This POLICY is issued in return for the payment of premium and is subject to the DECLARATIONS and to all of the terms, conditions, definitions and exclusions stated in this POLICY. Read the entire POLICY carefully to determine your rights and duties and what is and is not covered.

# IMPORTANT NOTICE

**Coverages A, C, D and E of this POLICY provide coverage on a claims made and reported basis and apply only to CLAIMS first made against the INSURED during this POLICY PERIOD or the OPTIONAL EXTENSION PERIOD (if applicable) and reported to US during this POLICY PERIOD or as otherwise provided in Section X. Optional Extension Period of this POLICY. Amounts incurred as CLAIMS EXPENSES under this POLICY shall reduce and may exhaust the Limit of Liability and are subject to DEDUCTIBLES.**

**Coverages B, F, G and I of this POLICY provide coverage on an event discovered and reported basis and apply only to events first discovered by the INSURED and reported to US during this POLICY PERIOD or as set forth in Section XI., paragraph A.**

# MAKING A CLAIM UNDER THIS POLICY

**Please refer to Section XI. Conditions, paragraph A. for information on providing US with notice of CLAIM, LOSS, EXTORTION THREAT or circumstance that might lead to a CLAIM.**

## Section I.     Insuring Agreements

In return for the payment of premium and subject to all the terms of this POLICY and to the exclusions stated in Section VI. Exclusions:

A.     **Coverage A. Information Security & Privacy Liability**

1.     WE will pay on behalf of the INSURED those DAMAGES and CLAIMS EXPENSES, in excess of the DEDUCTIBLE and up to the applicable Limit of Liability, which the INSURED shall become legally obligated to pay because of any CLAIM, including a CLAIM for violation of a PRIVACY LAW, first made against any INSURED during this POLICY PERIOD or OPTIONAL EXTENSION PERIOD (if applicable) and reported in writing to US during this POLICY PERIOD or OPTIONAL EXTENSION PERIOD (if applicable) or as otherwise provided in Section XI. Conditions, paragraph A. of this POLICY for:

a.     Theft, LOSS, or UNAUTHORIZED DISCLOSURE of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION or THIRD PARTY CORPORATE INFORMATION that is in the care, custody or control of the INSURED, or an independent contractor of the INSURED that is holding, processing or transferring such information on behalf of the INSURED;

b.     One or more of the following acts that directly result from a failure of COMPUTER SECURITY to prevent a SECURITY BREACH:



        i.      The alteration, corruption, destruction, deletion, or damage to a DATA ASSET stored on COMPUTER SYSTEMS;

        ii.     The failure to prevent transmission of MALICIOUS CODE from COMPUTER SYSTEMS to THIRD PARTY COMPUTER SYSTEMS; or

        iii.    The participation by the INSURED'S COMPUTER SYSTEM in a DENIAL OF SERVICE ATTACK directed against a THIRD PARTY COMPUTER SYSTEM;

    c.     The INSURED'S failure to timely disclose an act described in paragraphs a. or b. above in violation of any BREACH NOTICE LAW;

    d.     Failure by the INSURED to comply with that part of a PRIVACY POLICY that specifically:

        i.      Prohibits or restricts the INSURED'S disclosure, sharing or selling of a person's PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION;

        ii.     Requires the INSURED to provide access to PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION or to correct incomplete or inaccurate PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION after a request is made by a person; or

        iii.    Mandates procedures and requirements to prevent the loss of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION;

        provided that the INSURED must, at the time of such act, error or omission have in force a PRIVACY POLICY that addresses those subsections above that are relevant to such CLAIM; or

    e.     Failure by the INSURED to administer an identity theft prevention program required by governmental statute or regulation or take necessary actions to prevent identity theft, including phishing.

2.    This coverage applies only if such theft, LOSS, or UNAUTHORIZED DISCLOSURE described in 1.a. above; such act or event described in 1.b. above; such act giving rise to the INSURED'S obligation under a BREACH NOTICE LAW described in 1.c. above; or such act, error or omission that constitutes a failure described in 1.d. or 1.e. above:

    a.     First takes place on or after the SUPPLEMENTARY PAYMENTS RETROACTIVE DATE and before the end of this POLICY PERIOD; and

    b.     Involves PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION of any patient to whom the INSURED has provided or is providing MEDICAL SERVICES on or after the SUPPLEMENTARY PAYMENTS RETROACTIVE DATE or any person who is legally responsible for payment for MEDICAL SERVICES rendered to the patient;

**B.    Coverage B. Privacy Breach Response Services**

1.    WE will provide PRIVACY BREACH RESPONSE SERVICES in excess of the DEDUCTIBLE and up to the applicable Limit of Liability, in response to the INSURED'S legal obligation to comply with a BREACH NOTICE LAW because of an event (or reasonably suspected event) described in Coverage A, paragraphs 1.a. or 1.b. that first takes place on or after the SUPPLEMENTARY PAYMENTS RETROACTIVE DATE and before the end of the POLICY PERIOD, is discovered by the INSURED and is reported to US during the POLICY PERIOD.

    PRIVACY BREACH RESPONSE SERVICES means the following:

    a.     Costs incurred by a computer security expert to determine the existence and cause of any SECURITY BREACH resulting in an actual or reasonably suspected theft, LOSS or UNAUTHORIZED DISCLOSURE of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION and the extent to which such information was accessed by an unauthorized person or persons; and fees charged by an attorney to determine the



applicability of and actions necessary to comply with BREACH NOTICE LAW due to an actual or reasonably suspected theft, loss or UNAUTHORIZED DISCLOSURE of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION.

Amounts covered by this paragraph a. shall not exceed the amount set forth in Section VIII. Limit of Liability and Coverage, paragraph A.3.b. in the aggregate for this POLICY PERIOD;

b.  Provision of notification to individuals who are required to be notified by the applicable BREACH NOTICE LAW; provided such individuals are patients to whom the INSURED has provided or is providing MEDICAL SERVICES on or after the SUPPLEMENTARY PAYMENTS RETROACTIVE DATE or persons who are legally responsible for payment for MEDICAL SERVICES rendered to the patient;

c.  In connection with a credit file or identity monitoring program, the offering of, at the INSURED'S option, of one of the credit monitoring or identity monitoring programs set forth in COV 006 Attachment A to this POLICY (the "Credit and Identity Monitoring Program") to NOTIFIED INDIVIDUALS residing in the United States whose PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION was compromised or reasonably believed to be compromised as a result of theft, LOSS or UNAUTHORIZED DISCLOSURE. Such offer will be provided in the notification communication provided pursuant to paragraph b. above. Such services will only be provided for events requiring notification to more NOTIFIED INDIVIDUALS than the number set forth in Item 5.B.2 of the DECLARATIONS. For events involving fewer NOTIFIED INDIVIDUALS, WE shall not be obligated to offer or provide any services;

d.  The offering of CALL CENTER SERVICES to NOTIFIED INDIVIDUALS; and

e.  Access to educational and loss control information provided by or on behalf of US at no charge to the INSURED.

PRIVACY BREACH RESPONSE SERVICES, are described more fully in COV 006 Attachment A to this POLICY, which is incorporated into and is part of this POLICY. In the event there is a change of law, regulation or enforcement that prevents US or OUR service providers from providing all or part of the PRIVACY BREACH RESPONSE SERVICES, WE will make reasonable efforts to substitute other services, but if this is not possible, WE shall not be obligated to provide such services.

2.  PRIVACY BREACH RESPONSE SERVICES will only be provided in excess of the applicable DEDUCTIBLE, shall not exceed the PRIVACY BREACH RESPONSE AGGREGATE LIMIT OF COVERAGE and shall not include any internal salary or overhead expenses of the INSURED.

C.  **Coverage C. Regulatory Defense and PENALTIES**

WE will pay on behalf of the INSURED those CLAIMS EXPENSES and PENALTIES in excess of the DEDUCTIBLE and up to the applicable Limit of Liability, which the INSURED shall become legally obligated to pay because of any CLAIM in the form of a REGULATORY PROCEEDING, first made against any INSURED during this POLICY PERIOD or OPTIONAL EXTENSION PERIOD (if applicable) and reported in writing to US during this POLICY PERIOD or OPTIONAL EXTENSION PERIOD (if applicable), or as otherwise provided in Section XI. Conditions, paragraph A. of this POLICY, resulting from a violation of a PRIVACY LAW and caused by an act described in Coverage A, paragraphs 1.a., 1.b. or 1.c. that first takes place on or after the SUPPLEMENTARY PAYMENTS RETROACTIVE DATE and before the end of the POLICY PERIOD.

D.  **Coverage D. Social Media Content Liability**

WE will pay on behalf of the INSURED those DAMAGES and CLAIMS EXPENSES, in excess of the DEDUCTIBLE and up to the applicable Limit of Liability, which the INSURED shall become legally obligated to pay resulting from any CLAIM first made against any INSURED during the POLICY PERIOD or the



OPTIONAL EXTENSION PERIOD (if applicable) and reported in writing to US during the POLICY PERIOD or OPTIONAL EXTENSION PERIOD (if applicable) or as otherwise provided in Section XI. Conditions, paragraph A. of this POLICY for one or more of the following acts first committed on or after the SUPPLEMENTARY PAYMENTS RETROACTIVE DATE and before the end of the POLICY PERIOD in the course of COVERED MEDIA ACTIVITIES:

1.  Defamation, libel, slander, trade libel, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or organization;

2.  A violation of the rights of privacy of an individual, including false light and public disclosure of private facts;

3.  Invasion of or interference with an individual's right of publicity, including commercial appropriation of name, persona, voice or likeness;

4.  Plagiarism, piracy, or misappropriation of ideas in breach of an implied contract;

5.  Infringement of copyright;

6.  Infringement of domain name, trademark, trade name, trade dress, logo, title, metatag, or slogan, service mark or service name; or

7.  Improper deep-linking or framing within electronic content.

E.  **Coverage E. Regulatory Liability**

WE will pay on behalf of the INSURED those DAMAGES and CLAIMS EXPENSES, in excess of the DEDUCTIBLE and up to the applicable Limit of Liability, which the INSURED shall become legally obligated to pay because of any CLAIM first made against any INSURED during the POLICY PERIOD or OPTIONAL EXTENSION PERIOD (if applicable) and reported in writing to US during the POLICY PERIOD or OPTIONAL EXTENSION PERIOD (if applicable), or as otherwise provided in Section XI. Conditions, paragraph A. of this POLICY, arising out of any WRONGFUL ACT.

F.  **Coverage F. Cyber Extortion**

WE will indemnify the INSURED for CYBER EXTORTION LOSS, in excess of the DEDUCTIBLE and up to the applicable Limit of Liability, incurred by the INSURED as a direct result of an EXTORTION THREAT first made against the INSURED during the POLICY PERIOD and reported to US as set forth in Section XI. Conditions, paragraph A.3., by a person, other than the INSURED'S employees, directors, officers, principals, trustees, governors, MANAGERS, members, management committee members, members of the management board, partners, contractors, outsourcers, or any person in collusion with the foregoing. Coverage under this Insuring Agreement is subject to the applicable conditions and reporting requirements, including those set forth in Section XI. Conditions, paragraph O. Obligations in the Event of an EXTORTION THREAT.

G.  **Coverage G. First Party Data Protection**

WE will indemnify the INSURED for DATA PROTECTION LOSS, in excess of the DEDUCTIBLE and up to the applicable Limit of Liability, incurred by the INSURED as a direct result of:

1.  Alteration, corruption, destruction, deletion or damage to a DATA ASSET; or

2.  Inability to access a DATA ASSET,

that first takes place during the POLICY PERIOD and is directly caused by a failure of COMPUTER SECURITY to prevent a SECURITY BREACH. Such SECURITY BREACH must take place on or after the SUPPLEMENTARY PAYMENTS RETROACTIVE DATE and before the end of the POLICY PERIOD, and the DATA PROTECTION LOSS must be reported to US as set forth in Section XI. Conditions, paragraph A.4., paragraph P.1.a. and paragraph P.2.

H.  **Coverage H. Crisis Management and Public Relations**


We will pay PUBLIC RELATIONS AND CRISIS MANAGEMENT EXPENSES incurred by the INSURED resulting from a PUBLIC RELATIONS EVENT, in excess of the DEDUCTIBLE and up to the applicable Limit of Liability.

1. PUBLIC RELATIONS EVENT means:

   a. The publication or imminent publication in a newspaper (or other general circulation print publication) or on radio or television of a covered CLAIM under this POLICY; or

   b. An incident described in Coverage A, paragraphs 1.a. or 1.b. involving five hundred (500) individuals or more which results in the provision of PRIVACY BREACH RESPONSE SERVICES, or which reasonably may result in a covered CLAIM under the POLICY and which the INSURED has notified to US as a circumstance under Section XI. Conditions, paragraph A.5. of this POLICY.

2. PUBLIC RELATIONS AND CRISIS MANAGEMENT EXPENSES shall mean the following costs approved in advance by US in OUR reasonable discretion, and which are directly related to mitigating harm to the INSURED'S reputation or potential LOSS covered by the POLICY resulting from the covered CLAIM or breach event:

   a. Costs incurred by a public relations or crisis management consultant;

   b. Costs for media purchasing or for printing or mailing materials intended to inform the general public about the event;

   c. Costs to provide government mandated public notices related to breach events (including such notifications required under HIPAA/Health Information Technology for Economic and Clinical Health Act ("HITECH")); and

   d. Other costs approved in advance by US.

   PUBLIC RELATIONS AND CRISIS MANAGEMENT EXPENSES must be incurred no later than twelve (12) months following the reporting of such CLAIM or breach event to US and within ninety (90) days following the first publication of such CLAIM or breach event.

I. **Coverage I. First Party Network Business Interruption**

We will indemnify the FIRST NAMED INSURED for:

BUSINESS INTERRUPTION LOSS, in excess of the applicable DEDUCTIBLE and up to the applicable Limit of Liability, incurred by the INSURED during the PERIOD OF RESTORATION or the EXTENDED INTERRUPTION PERIOD (if applicable) as a direct result of the actual and necessary interruption or suspension of COMPUTER SYSTEMS that first takes place during the POLICY PERIOD and is directly caused by a failure of COMPUTER SECURITY to prevent a SECURITY BREACH; provided that such SECURITY BREACH must first take place on or after the SUPPLEMENTAL PAYMENTS RETROACTIVE DATE and before the end of the POLICY PERIOD and the BUSINESS INTERRUPTION LOSS must be reported to US as set forth in Section XI. Conditions, paragraph A.4., paragraph P.1.b. and paragraph P.2.

## Section II.       Defense and Settlement of Claims

A. WE shall have the right and duty to defend, subject to all the provisions, terms and conditions of this POLICY:

   1. Any CLAIM against the INSURED seeking DAMAGES which are payable under the terms of this POLICY, even if any of the allegations of the CLAIM are groundless, false or fraudulent; or

   2. Under Coverage C, any CLAIM in the form of a REGULATORY PROCEEDING.

Defense counsel shall be mutually agreed upon between the NAMED INSURED and US, but in the absence of such agreement OUR decision shall be final.



B.  With respect to any CLAIM against the INSURED seeking DAMAGES or PENALTIES which are payable under the terms of this POLICY, WE will pay CLAIMS EXPENSES incurred with OUR prior written consent. The Limit of Liability available to pay DAMAGES and PENALTIES shall be reduced and may be completely exhausted by payment of CLAIMS EXPENSES. DAMAGES, PENALTIES, and CLAIMS EXPENSES shall be applied against the Each Claim DEDUCTIBLE payable by the INSURED.

C.  If the INSURED shall refuse to consent to any settlement or compromise recommended by US and acceptable to the claimant and elects to contest the CLAIM, OUR liability for any DAMAGES, PENALTIES and CLAIMS EXPENSES shall not exceed:

1.  The amount for which the CLAIM could have been settled, less the remaining DEDUCTIBLE, plus the CLAIMS EXPENSES incurred up to the time of such refusal; plus

2.  Fifty percent (50%) of any CLAIMS EXPENSES incurred after the date such settlement or compromise was recommended to the INSURED plus fifty percent (50%) of any DAMAGES above the amount for which the CLAIM could have been settled. The remaining fifty percent (50%) of such CLAIMS EXPENSES and DAMAGES must be borne by the INSUREDS against whom the CLAIM was made at their own risk and uninsured;

or the applicable limit of liability, whichever is less, and WE shall have the right to withdraw from the further defense thereof by tendering control of said defense to the INSURED. The portion of any proposed settlement or compromise that requires the INSURED to cease, limit or refrain from actual or alleged infringing or otherwise injurious activity or is attributable to future royalties or other amounts that are not DAMAGES (or PENALTIES for CLAIMS covered under Coverage C) shall not be considered in determining the amount for which a CLAIM could have been settled.

D.  WE agree that the INSURED may settle any CLAIM where the DAMAGES and CLAIMS EXPENSES do not exceed the DEDUCTIBLE, provided that the entire CLAIM is resolved and the INSURED obtains a full release on behalf of all the INSUREDS from all claimants.

E.  With respect to Coverage E only and subject to the Limit of Liability of this POLICY, WE shall reimburse the INSURED for all reasonable expenses, other than loss of earnings, incurred at OUR request.

## Section III.    Allocation

With respect to Coverage E only, if DAMAGES and/or CLAIMS EXPENSES covered by Coverage E and damages and/or claims expenses not covered by this POLICY are incurred, either because the CLAIM includes both covered and uncovered claims or because it includes both insured and uninsured parties, then WE and the INSUREDS agree to fairly and reasonably allocate such amount between covered DAMAGES and/or CLAIMS EXPENSES and uncovered damages and/or claims expenses.

In the event that a method of allocation cannot be agreed upon by US and the INSUREDS, then:

A.  In any arbitration, suit or other proceeding, no presumption shall exist concerning what is a fair and reasonable allocation;

B.  WE shall advance the amount of CLAIMS EXPENSES which WE deem fair and proper until a different amount is negotiated by the parties, determined pursuant to the arbitration process set forth in paragraph C. below, or determined judicially;

C.  WE, solely if requested by the INSUREDS, shall submit the dispute to binding arbitration. The rules of the American Arbitration Association shall apply solely with respect to the selection of the arbitration panel, which shall consist of one arbitrator selected by the INSUREDS, one arbitrator selected by US, and a third independent arbitrator selected by the first two arbitrators.

Any negotiated, arbitrated or judicially determined allocation of CLAIMS EXPENSES on account of a CLAIM shall be applied retroactively to all CLAIMS EXPENSES on account of such CLAIM, notwithstanding any prior advancement to the contrary. Any allocation or advancement of CLAIMS EXPENSES on account of a CLAIM shall not apply to or create any presumption with respect to the allocation of other DAMAGES on account of such CLAIM.



## Section IV. Definition of Insured

Only the following persons or entities described below are insured under this POLICY:

A.    The FIRST NAMED INSURED and any NAMED INSUREDS and INSUREDS as listed in the DECLARATIONS;

B.    A professional medical corporation owned solely by a NAMED INSURED listed on DEC 008D, if attached to the POLICY;

C.    Any HEALTHCARE FACILITY created or acquired by a NAMED INSURED listed on DEC 008B, if attached to the POLICY, after the effective date of this POLICY, but only if the NAMED INSURED'S ownership interest in such HEALTHCARE FACILITY is fifty-one percent (51%) or more.

Such HEALTHCARE FACILITY shall be an INSURED for not more than ninety (90) days after the creation or acquisition by the NAMED INSURED or until the end of the POLICY PERIOD, whichever is earlier, and only if during that time the FIRST NAMED INSURED:

1.    Gives US written notice of such creation or acquisition;

2.    Provides US all information WE request;

3.    Obtains OUR written consent to extend coverage provided by this POLICY; and

4.    Pays any additional premium required by US (including such additional premium as may be required for the period commencing upon said creation or acquisition).

D.    If the NAMED INSURED is a partnership, professional medical corporation or professional association, any elected or appointed officer(s), director(s), partner(s), member(s), shareholder(s), or owner(s) of a NAMED INSURED, but only while such persons are acting within the capacity and scope of their duties as such for the NAMED INSURED;

E.    If the NAMED INSURED is a HEALTHCARE FACILITY, the NAMED INSURED'S stockholders, elected or appointed officers, and members of the board of directors, board of governors or board of trustees, but only while such persons are acting within the capacity and scope of their duties as such for the NAMED INSURED.

F.    A NAMED INSURED'S employees, students and volunteers (except an intern, extern, resident, fellow, dental, osteopathic or medical doctor), but only while such persons are acting within the capacity and scope of their duties as such for the NAMED INSURED. Such persons are only INSUREDS under Coverages A, C, D and E of this POLICY; and

G.    Any person who previously qualified as an INSURED under paragraphs D., E. and F. above, but only with respect to his or her duties as such on behalf of the NAMED INSURED.

## Section V. Coverage Territory

This POLICY applies to CLAIMS made, WRONGFUL ACTS committed or LOSS occurring anywhere in the world, but only if such CLAIM is pursued in the United States of America, its territories or possessions or Canada.

## Section VI. Exclusions

This POLICY does not apply to any CLAIM or LOSS:

A.    That is covered, in whole or in part, by any portion of a medical professional liability policy issued by US or would be covered by any such policy but for the exhaustion of the applicable Limits of Liability of such policy.

B.    With respect to Coverages A, B, C, D, F, G, H and I only:



1. For, arising out of or resulting from BODILY INJURY or PROPERTY DAMAGE.

2. For, arising out of or resulting from any employer-employee relations, policies, practices, acts or omissions, or any actual or alleged refusal to employ any person, or misconduct with respect to employees, whether such CLAIM is brought by an employee, former employee, applicant for employment, or relative or domestic partner of such person.

   This exclusion shall not apply to an otherwise covered CLAIM under Coverage A, paragraphs 1.a., 1.b., or 1.c. by a current or former employee of the INSURED; or to the provision of PRIVACY BREACH RESPONSE SERVICES involving current or former employees of the INSURED.

3. For, arising out of or resulting from any contractual liability or obligation, or arising out of or resulting from breach of contract or agreement, either oral or written.

   This exclusion will not apply:

   a. Only with respect to Coverage A, paragraph 1.a., to any obligation to maintain the confidentiality or security of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION or of THIRD PARTY CORPORATE INFORMATION except for any obligation to, or agreement with, a financial institution, credit/debit card company, credit/debit card processor or independent service operator relating to the theft or compromise of credit, debit or prepaid card information;

   b. Only with respect to Coverage D, for misappropriation of ideas in breach of an implied contract; or

   c. To the extent the INSURED would have been liable in the absence of such contract or agreement.

4. For, arising out of or resulting from any actual or alleged antitrust violation, restraint of trade, unfair competition, or false or deceptive or misleading advertising or violation of the Sherman Antitrust Act, the Clayton Act or the Robinson-Patman Act, as amended;

5. For, arising out of or resulting from any actual or alleged false, deceptive or unfair trade practices.

   This exclusion does not apply to:

   a. Any CLAIM covered under Coverage A, paragraphs 1.a., 1.b., or 1.c. or Coverage C; or

   b. The provision of PRIVACY BREACH RESPONSE SERVICES covered under Coverage B;

   that results from a theft, loss or UNAUTHORIZED DISCLOSURE of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION, provided that no member of the CONTROL GROUP participated or is alleged to have participated or colluded in such theft, loss or UNAUTHORIZED DISCLOSURE.

6. For, arising out of or resulting from the actual or alleged unlawful collection or acquisition of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION by, on behalf of or with the consent or cooperation of the INSURED; or the failure to comply with a legal requirement to provide individuals with the ability to assent to or withhold assent (e.g. opt-in or opt-out) from the collection, disclosure or use of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION.

7. Arising out of or resulting from any criminal, dishonest, fraudulent or malicious act, error or omission, any intentional SECURITY BREACH, intentional violation of a PRIVACY POLICY or intentional or knowing violation of the law, if committed by such INSURED, or by others if the INSURED colluded or participated in any such conduct or activity. However, this POLICY shall apply to CLAIMS EXPENSES incurred in defending any such CLAIM alleging the foregoing until such time as there is a final adjudication, judgment, binding arbitration decision or conviction against the INSURED, or written admission by the INSURED, establishing such conduct, or a plea of nolo contendere or no contest, regarding such conduct, at which time the NAMED INSURED shall reimburse US for all CLAIMS EXPENSES incurred defending the CLAIM and WE shall have no further liability for CLAIMS EXPENSES.



Whenever coverage under this POLICY would be excluded, suspended or lost because of this exclusion relating to acts or violations by any INSURED, and with respect to which any other INSURED did not personally commit, personally participate in committing or personally acquiesce in or remain passive after having personal knowledge thereof, then WE agree that such coverage as would otherwise be afforded under this POLICY shall cover and be paid with respect to those INSUREDS who did not personally commit, personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of one or more act, error or omission described above. This exception to this exclusion is inapplicable to any CLAIM or circumstance that could reasonably be the basis of a CLAIM against the INSURED arising from an act, error or omission known to any present or former member of the CONTROL GROUP.

8.  For, arising out of or resulting from any actual or alleged:

a.  Infringement of patent or patent rights or misuse or abuse of patent;

b.  Infringement of copyright arising from, or related to, software code or software products other than infringement resulting from a theft or UNAUTHORIZED ACCESS OR USE of software code by a person who is not a RELATED PARTY;

c.  Use or misappropriation of any ideas, trade secrets or THIRD PARTY CORPORATE INFORMATION:

i.  By, or on behalf of, the INSURED; or

ii.  By any other person or entity if such use or misappropriation is done with the knowledge, consent or acquiescence of a member of the CONTROL GROUP;

or the disclosure, misuse or misappropriation of any ideas, trade secrets or confidential information that came into the possession of any person prior to the date he or she became an employee, officer, director, MANAGER, principal or partner of the INSURED; or

d.  Under Coverage A, paragraph 1.b., theft or UNAUTHORIZED DISCLOSURE of a DATA ASSET.

9.  For, in connection with or resulting from a CLAIM brought by, or on behalf of, the Federal Trade Commission, the Federal Communications Commission or any other state, federal, local or foreign governmental entity, in such entity's regulatory or official capacity; provided, this exclusion shall not apply to an otherwise covered CLAIM under Coverage C or to the providing of PRIVACY BREACH RESPONSE SERVICES under Coverage B to the extent such services are legally required to comply with a BREACH NOTICE LAW.

10.  For, arising out of or resulting from any of the following:

a.  Trading losses, trading liabilities or change in value of accounts; any loss, transfer or theft of monies, securities or tangible property of others in the care, custody or control of the INSURED;

b.  The monetary value of any transactions or electronic fund transfers by or on behalf of the INSURED which is lost, diminished or damaged during transfer from, into or between accounts; or

c.  The value of coupons, price discounts, prizes, awards or any other valuable consideration given in excess of the total contracted or expected amount.

11.  With respect to Coverages A, B and C only, for, arising out of or resulting from the distribution, exhibition, performance, publication, display or broadcasting of content or material in:

a.  Broadcasts, by or on behalf of, or with the permission or direction of any INSURED, including but not limited to, television, motion picture, cable, satellite television and radio broadcasts;



      b.     Publications, by or on behalf of, or with the permission or direction of any INSURED, including, but not limited to, newspaper, newsletter, magazine, book and other literary form, monograph, brochure, directory, screen play, film script, playwright and video publications, and including content displayed on an Internet site; or

      c.     Advertising by or on behalf of any INSURED.

This exclusion does not apply to the publication, distribution or display of the INSURED'S PRIVACY POLICY.

12.     For, arising out of or resulting from any act, error, omission, event, failure of COMPUTER SECURITY or SECURITY BREACH, committed or occurring prior to the effective date of this POLICY in respect of which any INSURED has given notice of a circumstance, which might lead to a CLAIM or LOSS, to the insurer of any other policy in force prior to the effective date of this POLICY or during this POLICY PERIOD.

13.     For, arising out of resulting from any of the following:

      a.     Any actual or alleged violation of the Fair Labor Standards Act of 1938, the National Labor Relations Act, the Worker Adjustment and Retraining Act of 1988, the Certified Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act of 1970, any similar law or legislation of any state, province or other jurisdiction, or any amendment to the above law or legislation, or any violation of any order, ruling or regulation issued pursuant to the above laws or legislation; or

      b.     Any actual or alleged discrimination of any kind including but not limited to age, color, race, sex, creed, national origin, marital status, sexual preference, disability or pregnancy.

This exclusion does not apply to any otherwise covered CLAIM under Coverage A, paragraphs 1.a., 1.b., or 1.c., or to providing PRIVACY BREACH RESPONSE SERVICES covered under Coverage B, that results from a theft, loss or UNAUTHORIZED DISCLOSURE of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION, provided that no member of the CONTROL GROUP participated, or is alleged to have participated or colluded, in such theft, loss or UNAUTHORIZED DISCLOSURE.

14.     For, arising out of or resulting from any actual or alleged acts, errors, or omissions related to any of the INSURED'S pension, healthcare, welfare, profit sharing, mutual or investment plans, funds or trusts, including any violation of any provision of the Employee Retirement Income Security Act of 1974 (ERISA) or any similar federal law or legislation, or similar law or legislation of any state, province or other jurisdiction, or any amendment to ERISA or any violation of any regulation, ruling or order issued pursuant to ERISA or such similar laws or legislation; however this exclusion does not apply to any otherwise covered CLAIM under Coverage A, paragraphs 1.a., 1.b., or 1.c., or to the providing of PRIVACY BREACH RESPONSE SERVICES under Coverage B, that results from a theft, loss or UNAUTHORIZED DISCLOSURE of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION, provided that no member of the CONTROL GROUP participated, or is alleged to have participated or colluded, in such theft, loss or UNAUTHORIZED DISCLOSURE.

C.     With respect to Coverage D only:

    1.     For, arising out of or resulting from the actual or alleged obligation to make licensing fee or royalty payments, including but not limited to the amount or timeliness of such payments;

    2.     For, arising out of or resulting from any costs or expenses incurred or to be incurred by the INSURED or others for the reprinting, reposting, recall, removal or disposal of any MEDIA MATERIAL or any other information, content or media, including any media or products containing such MEDIA MATERIAL, information, content or media;

    3.     Brought by or on behalf of any intellectual property licensing bodies or organizations, including but not limited to the American Society of Composers, Authors and Publishers, the Society of European Stage Authors and Composers or Broadcast Music, Inc;



4. For, arising out of or resulting from the actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products or services, cost guarantees, cost representations or contract price estimates, the authenticity of any goods, products or services, or the failure of any goods or services to conform with any represented quality or performance;

5. For, arising out of or resulting from any actual or alleged gambling, contest, lottery, promotional game or other game of chance; or

6. In connection with a CLAIM made by or on behalf of any independent contractor, joint venturer or venture partner of the INSURED arising out of or resulting from disputes over ownership of rights in MEDIA MATERIAL or services provided by such independent contractor, joint venturer or venture partner.

D. With respect to Coverage E only:

1. Based upon or arising out of:

   a. Any dishonest, fraudulent, criminal, intentional or malicious act by any INSURED;

   b. Any willful violation of any law, statute, ordinance, rule or regulation by any INSURED; or

   c. Any INSURED gaining any profit, remuneration or advantage to which such INSURED was not legally entitled.

   This exclusion shall not apply to any CLAIM brought under any federal or state statute, regulation or rule based on negligent and reckless conduct. For the purposes of determining the applicability of this exclusion, no WRONGFUL ACT of any INSURED shall be imputed to any other INSURED.

2. Arising out of any actual or alleged act, error, or omission in the rendering of or failure to render MEDICAL SERVICES by any INSURED, except with respect to:

   a. Any allegations of billing for MEDICAL SERVICES which were not rendered or were not medically necessary; or

   b. Any allegations of a negligent or reckless act, error or omission by an INSURED in violation of the Emergency Medical Treatment and Labor Act ("EMTALA") and any amendments thereto, or any rules or regulations promulgated thereunder.

3. For actual or alleged libel, slander, defamation, bodily injury, sickness, disease, death, false arrest, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy, or damage to or destruction of tangible property (including loss of use thereof).

4. Arising out of the actual or alleged publication or utterance of libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of an individual's right to privacy.

5. Arising out of actual or alleged plagiarism, misappropriation of likeness, breach of confidence, or misappropriation or infringement of any intellectual property right, including patent, trademark, trade secret, trade dress and copyright.

6. Based upon an express or implied warranty or guarantee, or breach of contract in respect of any agreement to perform work for a fee.

7. Arising out of employment discrimination, termination or other wrongful employment acts in violation of any municipal, state or federal civil rights law, regulation or ordinance.

8. Arising out of any actual or alleged ownership, operation, use, maintenance, loading, or unloading of any motor vehicle, trailer, watercraft, aircraft or helipad.

9. Arising out of any actual or alleged bodily injury, sickness, disease or death to any employee of any INSURED arising out of and in the course of employment by the INSURED; or any obligation for which the INSURED in its capacity as an employer and/or its insurer may be held liable under any workers' compensation, unemployment compensation, disability benefits law, or any similar law.



10. Arising out of the Employment Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto.

11. Arising out of or relating to any liability under any contract or agreement, whether written or oral, unless such liability would have attached to the INSURED in the absence of such contract or agreement.

12. Arising out of any actual or alleged:

    a. Insolvency, bankruptcy, conservatorship, rehabilitation, receivership, liquidation, or financial inability to pay of:

       i. Any INSURED acting as an insurer or reinsurer; or

       ii. Any other insurer, reinsurer, self-insurer, third party payor, managed care organization, health care plan, or other person or entity;

    b. Failure to obtain, effect, or maintain any form, policy, plan or program of insurance, stop loss or provider excess coverage, reinsurance, self-insurance, suretyship, or bond;

    c. Commingling or mishandling of funds; or

    d. Failure to collect or pay premiums, commissions, brokerage charges, fees or taxes.

13. For which any INSURED has given notice to any GOVERNMENT ENTITY, insurer of any other policy or self-insurance in force prior to the effective date of this POLICY, including notice of any circumstance which might lead to a CLAIM or LOSS.

14. For which any INSURED has given notice to a GOVERNMENT ENTITY during the POLICY PERIOD and has not provided notice to US in accordance with Section XI. Conditions, including notice of any circumstance which might lead to a CLAIM or LOSS.

15. Against any subsidiary designated in the DECLARATIONS or its past, present, or future employees, directors, officers, trustees, review board or committee members, or volunteers acting in their capacity as such, which are based upon, arise out of, directly or indirectly result from, are in consequence of, or in any way involve any fact, circumstance, situation, transaction, event, or WRONGFUL ACT or series of facts, circumstances, situations, transactions, events or WRONGFUL ACTS happening before the date such entity became a subsidiary.

16. Against any INSURED by any other INSURED. This provision shall not apply to any CLAIM brought by a qui tam plaintiff or brought under the False Claims Act (31 U.S.C. §3729 et seq.) or any similar state or local statute, ordinance or regulation.

17. Based upon or arising out of any INSURED gaining any profit, remuneration or advantage to which such INSURED was not legally entitled.

18. Arising from costs of complying with physical modifications to any premises or any changes to the INSURED'S usual business operations mandated by the Americans with Disabilities Act of 1990, including any amendments, or similar federal, state or local law.

19. Associated with implementation of any compliance program or any policies, procedures or practices relating to participation as a provider of MEDICAL SERVICES to a managed care organization or under a healthcare benefit program, whether initiated voluntarily or pursuant to direction by, order of, or in settlement with a government body, hospital, healthcare facility or managed care organization.

20. Based upon or arising out of any actual or alleged violation of any federal, state, or local anti-trust, restraint of trade, unfair competition, anti-kickback or price fixing law, or any rules or regulations promulgated thereunder.

E. With respect to Coverage F only, arising out of or resulting from:

    1. Any threat to physically harm or kidnap any person; or



2. Any threat to harm, take, or transfer property other than any DATA ASSET, even if such threat is made in conjunction with a threat to a DATA ASSET or by carrying out such threat, a DATA ASSET may be damaged, corrupted, altered, taken, disseminated or transferred.

F. With respect to Coverages F, G and I only, arising out of or resulting from:

1. Any criminal, dishonest, fraudulent, or malicious act, error or omission, any SECURITY BREACH, EXTORTION THREAT, or intentional or knowing violation of the law, if committed by any member of the CONTROL GROUP or any person in participation or collusion with any member of the CONTROL GROUP;

2. Any seizure, nationalization, confiscation, or destruction of COMPUTER SYSTEMS or DATA ASSETS by order of any governmental or public authority.

G. With respect to Coverage G and I only, arising out of or resulting from:

1. Any failure or malfunction of electrical or telecommunications infrastructure or services, provided that this exclusion shall not apply to any otherwise covered CLAIM or LOSS arising out of failure of COMPUTER SECURITY to prevent a SECURITY BREACH that was solely caused by a failure or malfunction of telecommunications infrastructure or services under the INSURED'S direct operational control;

2. Fire, flood, earthquake, volcanic eruption, explosion, lighting, wind, hail, tidal wave, landslide, act of God or other physical event; or

3. Any satellite failure.

H. For, arising out of or resulting from any related or continuing acts, errors, omissions or events, where the first such act, error, omission or event was committed or occurred prior to the SUPPLEMENTARY PAYMENTS RETROACTIVE DATE.

I. If any INSURED prior to the inception date of this POLICY knew or could have reasonably foreseen that such act, error or omission, event, failure of COMPUTER SECURITY or SECURITY BREACH might be expected to be the basis of a CLAIM or LOSS, including any circumstance which might lead to a CLAIM or LOSS.

J. For, arising out of or resulting from:

1. Any CLAIM made by any business enterprise in which any INSURED has greater than a fifteen percent (15%) ownership interest or made by any parent company or other entity which owns more than fifteen percent (15%) of any INSURED; or

2. The INSURED'S activities as a trustee, partner, member, MANAGER, officer, director or employee of any employee trust, charitable organization, corporation, company or business other than that of a professional medical corporation under Section IV. Definition of Insured, paragraphs D. or E. of this POLICY.

K. For, arising out of or resulting from the distribution of unsolicited email, direct mail, facsimiles, wiretapping, audio or video recording, or telemarketing, if such distribution, wiretapping or recording is done by or on behalf of the INSURED.

L. Arising out of or resulting from, directly or indirectly occasioned by, happening through or in consequence of: war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, confiscation, nationalization, requisition, destruction of or damage to property by or under the order of any government or public or local authority.

M. For, arising out of or resulting from any of the following:

1. Any actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced and Corrupt Organizations Act or RICO), as amended, or any regulation promulgated thereunder or any similar federal law or legislation, or law or legislation of any state,



province or other jurisdiction similar to the foregoing, whether such law is statutory, regulatory or common law; or

2.    Any actual or alleged violation of any securities law, regulation or legislation, including but not limited to the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Act of 1940, any state or provincial blue sky or securities law, any other federal securities law or legislation, or any other similar law or legislation of any state, province or other jurisdiction, or any amendment to the above laws, or any violation of any order, ruling or regulation issued pursuant to the above laws.

This exclusion does not apply to any otherwise covered CLAIM under Coverage A, paragraphs 1.a., 1.b., or 1.c., or to providing PRIVACY BREACH RESPONSE SERVICES covered under Coverage B, that results from a theft, LOSS or UNAUTHORIZED DISCLOSURE of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION, provided that no member of the CONTROL GROUP participated, or is alleged to have participated or colluded, in such theft, loss or UNAUTHORIZED DISCLOSURE.

N.    Either in whole or in part, directly or indirectly arising out of, resulting from, in consequence of or in any way involving:

1.    Asbestos, or any materials containing asbestos, in whatever form or quantity;

2.    The actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind; any action taken by any party in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, including investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins; and any governmental or regulatory order, requirement, directive, mandate or decree, that any party take action in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, including investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins.

WE will have no duty or obligation to defend any INSURED with respect to any CLAIM or governmental or regulatory order, requirement, directive, mandate or decree, which either in whole or in part, directly or indirectly, arises out of or results from, is in consequence of or in any way involves, the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind.

3.    The existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment, or that affects the value, marketability, condition or use of any property; or

4.    The actual, alleged or threatened discharge, dispersal, release or escape of POLLUTANTS; or any governmental, judicial or regulatory directive or request that the INSURED or anyone acting under the direction or control of the INSURED test for, monitor, clean up, remove, contain, treat, detoxify or neutralize POLLUTANTS. POLLUTANTS means any solid, liquid, gaseous or thermal irritant or contaminant, including gas, acids, alkalis, chemicals, heat, smoke, vapor, soot, fumes or waste. Waste includes but is not limited to materials to be recycled, reconditioned or reclaimed.

O.    1.    With respect to which an INSURED under this POLICY is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

2.    Resulting from the HAZARDOUS PROPERTIES of NUCLEAR MATERIAL and with respect to which:

a.    Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or



      b.     The INSURED is, or had this POLICY not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

3.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of NUCLEAR MATERIAL and arising out of the operation of a NUCLEAR FACILITY by any person or organization.

4.     Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the HAZARDOUS PROPERTIES OF NUCLEAR MATERIAL, if:

      a.     The NUCLEAR MATERIAL is at any nuclear facility owned by, or operated by or on behalf of, an INSURED or has been discharged or dispersed therefrom;

      b.     The NUCLEAR MATERIAL is contained in SPENT FUEL or WASTE at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an INSURED; or

      c.     The injury, sickness, disease, death or destruction arises out of the furnishing by an INSURED of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

As used in this exclusion:

HAZARDOUS PROPERTIES include radioactive, toxic or explosive properties.

NUCLEAR MATERIAL means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof.

SPENT FUEL means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

WASTE means any waste material containing by-product material and resulting from the operation by any person or organization of any nuclear facility included within the definition of NUCLEAR FACILITY under paragraphs 1. or 2. below.

NUCLEAR FACILITY means:

1.     Any NUCLEAR REACTOR;

2.     Any equipment or device designed or used for separating the isotopes of uranium or plutonium, processing or utilizing spent fuel, or handling, processing or packaging waste;

3.     Any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the INSURED at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and

4.     Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

NUCLEAR REACTOR means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.



In relation to liability arising outside the United States of America, its territories or possessions, Puerto Rico or the Canal Zone, this POLICY does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionizing radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

## Section VII.     Definitions

For the purposes of this POLICY:

A.     AGGREGATE LIMIT OF LIABILITY means the aggregate Limit of Liability for Coverages A, B.1.a., C, D, E, F, G, H and I. The PRIVACY BREACH RESPONSE AGGREGATE LIMIT OF COVERAGE is separate from and in addition to the AGGREGATE LIMIT OF LIABILITY.

B.     BODILY INJURY means physical injury, sickness, disease or death to any person, including any mental anguish or emotional distress resulting therefore.

C.     BREACH NOTICE LAW means any United States federal, state or territory statute or regulation that requires notice to persons whose PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION was accessed or reasonably may have been accessed by an unauthorized person. A BREACH NOTICE LAW also means a foreign statute or regulation that requires notice to persons whose PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION was accessed, or reasonably may have been accessed, by an unauthorized person; provided notification amounts covered under Coverage B, paragraph 1.b. as to all such applicable laws or regulations shall not exceed $100,000 in the aggregate for the POLICY PERIOD. The Credit and Identity Monitoring Program provided by Coverage B paragraph 1.c. shall not apply to persons notified pursuant to any such foreign statute or regulation.

D.     BUSINESS INTERRUPTION LOSS means the total of:

1.     INCOME LOSS and EXTRA EXPENSE during the PERIOD OF RESTORATION; and

2.     EXTENDED INCOME LOSS if the INCOME LOSS during the PERIOD OF RESTORATION is in excess of the applicable DEDUCTIBLE;

provided that BUSINESS INTERRUPTION LOSS shall not mean and Coverage I shall not cover any of the following: expenses arising out of any liability to any third party for whatever reason; legal costs or legal expenses of any type; LOSS incurred as a result of unfavorable business conditions, loss of market or any other consequential loss; or costs or expenses the INSURED incurs to identify and remove software program errors or vulnerabilities.

All BUSINESS INTERRUPTION LOSS resulting from multiple covered interruptions or suspensions of COMPUTER SYSTEMS that arise out of the same or a continuing SECURITY BREACH, from related or repeated SECURITY BREACHES, or from multiple SECURITY BREACHES resulting from a failure of COMPUTER SECURITY shall be deemed to be a single BUSINESS INTERRUPTION LOSS; provided, however, that a separate WAITING PERIOD shall apply to each PERIOD OF RESTORATION.

E.     CALL CENTER SERVICES means the provision of a call center to answer calls during standard business hours for a period of ninety (90) days following notification (or longer if required by applicable law or regulation) or an incident pursuant to Coverage B, paragraph 1.b. Such notification shall include a toll free telephone number that connects to the call center during standard business hours. Call center employees will answer questions about the incident from NOTIFIED INDIVIDUALS and will provide information required by HITECH media notice or by other applicable law or regulation. CALL CENTER SERVICES will only be available for incidents (or reasonable suspected incidents) involving more than the number of NOTIFIED INDIVIDUALS set forth in Item 5.B.2. of the DECLARATIONS.

F.     CLAIM means:

1.     With respect to Coverages A, B, C and D only:



a. A written demand received by any INSURED for money or services, including the service of a suit or institution of regulatory or arbitration proceedings; and

b. A written request or agreement to toll or waive a statute of limitations relating to a potential CLAIM described in paragraph a. above.

2. With respect to Coverage C only, institution of a REGULATORY PROCEEDING against any INSURED.

3. With respect to Coverage E only, any DISCIPLINARY PROCEEDING or any written demand brought by or on behalf of any GOVERNMENT ENTITY or brought by a COMMERCIAL PAYOR against an INSURED seeking DAMAGES for a WRONGFUL ACT, commencing an audit or investigation of a WRONGFUL ACT, or seeking injunctive relief on account of a WRONGFUL ACT. However, CLAIM does not include:

a. Any customary or routine billing inquiry, including any cost report, request for documentation to support a submission for payment or reimbursement, or other audit/reconciliation conducted by or on behalf of a GOVERNMENT ENTITY or a COMMERCIAL PAYOR;

b. Any criminal proceeding against an INSURED; or

c. Any written demand or civil proceeding brought by or on behalf of a private citizen against an INSURED. This paragraph c. shall not apply to a qui tam action commenced by a private citizen as the relator for a GOVERNMENT ENTITY.

Multiple CLAIMS arising from the same or a series of related or repeated acts, errors, omissions, events or WRONGFUL ACTS, or from any continuing acts, errors, omissions or events, or from multiple SECURITY BREACHES arising from a failure of COMPUTER SECURITY, shall be considered a single CLAIM for the purposes of this POLICY, irrespective of the number of claimants, proceedings or INSUREDS involved in the CLAIM. All such CLAIMS shall be deemed to have been first made at the time the first such CLAIM was first made.

G. CLAIMS EXPENSES mean:

1. Reasonable and necessary fees charged by an attorney designated pursuant to Section II. Defense and Settlement of Claims, paragraph A., or auditor designated and agreed by US in consultation with the INSURED;

2. All other legal costs and expenses resulting from the investigation, adjustment, defense and appeal of a CLAIM, suit, event or proceeding arising in connection therewith, or circumstance which might lead to a CLAIM, if incurred by US, or by the INSURED with OUR prior written consent; and

3. The premium cost for appeal bonds for covered judgments or bonds to release property used to secure a legal obligation, if required in any CLAIM against an INSURED. WE shall have no obligation to appeal or to obtain bonds.

CLAIMS EXPENSES do not include any salary, overhead or other charges by the INSURED for any time spent in cooperating in the defense and investigation of any CLAIM or circumstance that might lead to a CLAIM notified under this POLICY. In addition, with respect to Coverage E only, CLAIMS EXPENSES do not include any:

1. Fees, costs, or expenses incurred with respect to any criminal proceedings or actions against any INSURED; or

2. Any fees, costs or expenses associated with the adoption and implementation of any corporate integrity agreement, compliance program or similar provision regarding the operations of the INSURED'S business.

H. COMMERCIAL PAYOR means any entity which arranges for payment or reimbursement of expenses on account of MEDICAL SERVICES, including the following types of entities:



1.  Any entity, including an investor-owned insurance company, which indemnifies subscribers against expenses incurred for MEDICAL SERVICES;

2.  Any self-funded plan or any type of health plan where the risk for the cost of MEDICAL SERVICES is assumed, in whole or in part, by an employer rather than by an insurance company or managed care organization; or

3.  Any managed care organization, such as a health maintenance organization ("HMO"), preferred provider organization ("PPO"), point of service plan ("POS"), integrated delivery network ("IDN"), or any other type of entity which has all or some of the following characteristics:

    a.  Negotiated discount arrangements with selected providers;

    b.  Explicit criteria for selection of providers;

    c.  Financial or program incentives or penalties to enrollees who do not use selected providers; and

    d.  Provider risk-sharing arrangements.

I.  COMPUTER SECURITY means software, computer or network hardware devices, the function or purpose of which is to prevent UNAUTHORIZED ACCESS OR USE, a DENIAL OF SERVICE ATTACK against COMPUTER SYSTEMS, infection of COMPUTER SYSTEMS by MALICOUS CODE or transmission of MALICIOUS CODE from COMPUTER SYSTEMS. COMPUTER SECURITY includes antivirus and intrusion detection software, firewalls and electronic systems that provide access control to COMPUTER SYSTEMS through the use of passwords, biometric or similar identification of authorized users.

With respect to Coverages A, B and C only, COMPUTER SECURITY also means the NAMED INSURED'S written information security policies and procedures, the function or purpose of which is to prevent UNAUTHORIZED ACCESS OR USE, a DENIAL OF SERVICE ATTACK against COMPUTER SYSTEM, infection of COMPUTER SYSTEMS by MALICIOUS CODE or transmission of MALICIOUS CODE from COMPUTER SYSTEMS.

J.  COMPUTER SYSTEMS means computers and associated input and output devices, data storage devices, networking equipment and back up facilities:

1.  Operated by and either owned by or leased to the INSURED; or

2.  Operated by a third party service provider and used for the purpose of providing hosted computer application services to the INSURED, or for processing, maintaining, hosting or storing the INSURED'S electronic data, pursuant to written contract with the INSURED for such services;

3.  With respect to Coverage I only, operated by a third party service provider and used for the purpose of providing hosted computer application services to the INSURED or for processing, maintaining, hosting or storing the INSURED'S electronic data, pursuant to written contract with the INSURED for such services.

K.  CONTROL GROUP means:

1.  If the INSURED is a partnership, professional medical corporation or professional association, the individuals holding the following positions:

    a.  President;

    b.  Directors;

    c.  A principal or a partner with greater than ten percent (10%) ownership of the INSURED;

    d.  Executive officers, including the Chief Executive Officer, Chief Operating Officer, Chief Information Officer, Chief Security Officer, Chief Privacy Officer, and Chief Financial Officer;

    e.  General Counsel and staff attorneys employed by any such professional corporation, association or partnership;

CPP 001C CS 08/15                                                                                              Page 18



  f.  MANAGER;

  g.  Any individual in a substantially similar position as those referenced above, or with substantially similar responsibilities as those referenced above, irrespective of the exact title of such individual; and

  h.  Any individual who previously held any of the above referenced positions.

 2.  If the INSURED is a sole practitioner, the practitioner.

L. COVERED MEDIA ACTIVITIES means the display of MEDIA MATERIAL on any of the INSURED'S social media outlets including the INSURED'S website.

M. CYBER EXTORTION LOSS means:

 1.  Any EXTORTION PAYMENT that has been made under duress by or on behalf of the NAMED INSURED with OUR prior written consent, but solely to prevent or terminate an EXTORTION THREAT and in an amount that does not exceed the covered DAMAGES and CLAIMS EXPENSES that would have been incurred had the EXTORTION PAYMENT not been paid;

 2.  An otherwise covered EXTORTION PAYMENT that is lost in transit by actual destruction, disappearance or wrongful abstraction while being conveyed by any person authorized by or on behalf of the NAMED INSURED to make such conveyance; and

 3.  Fees and expenses paid by or on behalf of the NAMED INSURED for security consultants retained with OUR prior written approval, but solely to prevent or terminate an EXTORTION THREAT.

N. DATA ASSET means any software or electronic data that exists in COMPUTER SYSTEMS and that is subject to regular back up procedures, including computer programs, applications, account information, customer information, private or personal information, marketing information, financial information and any other information maintained by the INSURED in its ordinary course of business.

O. DAMAGES means:

 1.  With respect to Coverages A and D only, a monetary judgment, award or settlement. However, DAMAGES shall not include or mean:

  a.  Future profits, restitution, disgorgement of unjust enrichment or profits by an INSURED, or the costs of complying with orders granting injunctive or equitable relief;

  b.  Return or offset of fees, charges or commissions for goods or services already provided or contracted to be provided;

  c.  Any damages which are a multiple of compensatory damages, fines, taxes or loss of tax benefits, sanctions or penalties;

  d.  Punitive or exemplary damages, unless insurable by law in any applicable venue that most favors coverage for such punitive or exemplary damages;

  e.  Discounts, coupons, prizes, awards or other incentives offered to the INSURED'S customers or clients;

  f.  Liquidated damages to the extent that such damages exceed the amount for which the INSURED would have been liable in the absence of such liquidated damages agreement; or

  g.  Any amounts for which the INSURED is not liable, or for which there is no legal recourse against the INSURED.

 2.  With respect to Coverage E only, any civil monetary amount, award, settlement, or civil fines and penalties imposed by a GOVERNMENT ENTITY, and any interest accrued or imposed upon such amount. However, DAMAGES shall not include:



a. The return, disgorgement or restitution of fees, profits, charges or benefit payments to any COMMERCIAL PAYOR or governmental health benefit payor or program, and any interest accrued or imposed thereon;

b. Any overpayments by any INSURED to a GOVERNMENT ENTITY or COMMERCIAL PAYOR where payment is required by return or refund;

c. Any fees, costs or expenses associated with the adoption and implementation of any security measures, corporate integrity agreement, compliance program or similar provision regarding the operations of the INSURED'S business;

d. Matters deemed uninsurable by law;

e. Punitive and exemplary damages, taxes, criminal fines or penalties; however, this provision does not apply to any multiplied portion of a civil fine or penalty; or

f. Any costs associated, whether directly or indirectly, with the INSURED'S temporary or permanent loss of provider number(s) or the INSURED'S exclusion from participation in any COMMERCIAL PAYOR program or governmental health program, including, but not limited to, Medicare and/or Medicaid.

P. DATA PROTECTION LOSS means:

1. With respect to any DATA ASSET that is altered, corrupted, destroyed, deleted or damaged, the actual, reasonable and necessary costs and expenses incurred by the INSURED to restore a DATA ASSET from back-ups or from originals or to gather, assemble and recollect such DATA ASSET from other sources to the level or condition in which it existed immediately prior to its alteration, corruption, destruction, deletion or damage; or

2. With respect to any DATA ASSET that the INSURED is unable to access, the lesser of the actual, reasonable and necessary costs and expenses incurred by the INSURED to:

a. Regain access to such DATA ASSET; or

b. Restore such DATA ASSET from back-ups or originals or gather, assemble and recollect such DATA ASSET from other sources, to the level or condition in which it existed immediately prior to the INSURED'S inability to access it.

If such DATA ASSET cannot reasonably be accessed, restored, gathered, assembled or recollected, then DATA PROTECTION LOSS means the actual, reasonable and necessary costs and expenses incurred by the INSURED to reach this determination.

DATA PROTECTION LOSS shall not exceed, and shall not mean, any amount in excess of the amount by which the net profit before income taxes of the INSURED would have decreased had the INSURED failed to restore, gather, assemble or recollect as set forth in paragraphs 1. and 2. above.

A DATA PROTECTION LOSS will be deemed to occur at the time such alteration, corruption, destruction, deletion or damage to or inability to access a DATA ASSET is first discovered by the INSURED. All DATA PROTECTION LOSS that arises out of the same or a continuing SECURITY BREACH, from related or repeated SECURITY BREACHES, or from multiple SECURITY BREACHES resulting from a failure of COMPUTER SECURITY shall be deemed to be a single DATA PROTECTION LOSS.

DATA PROTECTION LOSS shall not mean, and there shall be no coverage under Coverage G for:

1. Costs or expenses incurred by the INSURED to identify or remediate software program errors or vulnerabilities or update, replace, restore, gather, assemble, reproduce, recollect or enhance a DATA ASSET or COMPUTER SYSTEMS to a level beyond that which existed prior to the alteration, corruption, destruction, deletion or damage of such DATA ASSET;

2. Costs or expenses to research or develop any DATA ASSET, including but not limited to trade secrets or other proprietary information;



3.   The monetary value of profits, royalties, or lost market share related to a DATA ASSET, including but not limited to trade secrets or other proprietary information or any other amount pertaining to the value of the DATA ASSET;

4.   Loss arising out of any liability to any third party for whatever reason; or

5.   Legal costs or legal expenses of any type.

Q.   DECLARATIONS means:

1.   DEC 008A Regulatory Liability and Information Security & Privacy Schedule of Limits – Facility;

2.   DEC 008B Regulatory Liability and Information Security & Privacy Schedule of Insureds for Limit Schedule DEC 008A;

3.   DEC 008C Regulatory Liability and Information Security & Privacy Schedule of Limits – Corporation and Provider; and

4.   DEC 008D Regulatory Liability and Information Security & Privacy Schedule of Insureds for Limit Schedule DEC 008C,

if attached to this POLICY.

R.   DEDUCTIBLE means the applicable deductible for each coverage as specified in the DECLARATIONS and Section IX. Deductible of this POLICY.

S.   DENIAL OF SERVICE ATTACK means an attack intended by the perpetrator to overwhelm the capacity of a computer system by sending an excessive volume of electronic data to such computer system in order to prevent authorized access to such computer system.

T.   DEPENDENT BUSINESS means any third party service provider that provides hosted computer application services to the INSURED or processes, maintains, hosts or stores the INSURED'S electronic data, pursuant to written contract with the INSURED for such services.

U.   DISCIPLINARY PROCEEDING means a civil regulatory proceeding by the state agency with jurisdiction to issue, revoke, suspend or restrict the INSURED'S license to perform MEDICAL SERVICES including any action in a court of law for judicial review of any order or decision or such agency concerning the INSURED'S professional license. DISCIPLINARY PROCEEDING includes any investigation by such an agency and any complaint filed with or by such an agency.

V.   EXTENDED INCOME LOSS means the INCOME LOSS during the EXTENDED INTERRUPTION PERIOD.

W.   EXTENDED INTERRUPTION PERIOD means the period of time that:

1.   Begins on the date and time that the PERIOD OF RESTORATION ends; and

2.   Terminates on the date and time the INSURED restores, or would have restored if the INSURED had exercised due diligence and dispatch, the net profit before income taxes that would have been earned by the INSURED directly through its business operations had the actual and necessary interruption or suspension of COMPUTER SYSTEMS not occurred.

provided that in no event shall the EXTENDED INTERRUPTION PERIOD mean more than or exceed thirty (30) days.

X.   EXTORTION PAYMENT means cash, marketable goods or services demanded to prevent or terminate an EXTORTION THREAT.

Y.   EXTORTION THREAT means a threat to breach COMPUTER SECURITY in order to:

1.   Alter, destroy, damage, delete or corrupt any DATA ASSET;

2.   Prevent access to COMPUTER SYSTEMS or a DATA ASSET, including a DENIAL OF SERVICE ATTACK or encrypting a DATA ASSET and withholding the decryption key for such DATA ASSET;



3.  Perpetuate a theft or misuse of a DATA ASSET on COMPUTER SYSTEMS through external access;

4.  Introduce MALICIOUS CODE into COMPUTER SYSTEMS or to third party computers and systems from COMPUTER SYSTEMS; or

5.  Interrupt or suspend COMPUTER SYSTEMS;

unless an EXTORTION PAYMENT is received from or on behalf of the INSURED.

Multiple related or continuing EXTORTION THREATS shall be considered a single EXTORTION THREAT for purposes of this POLICY and shall be deemed to have occurred at the time of the first such EXTORTION THREAT.

Z.  EXTRA EXPENSE means reasonable and necessary expenses that are incurred by the INSURED during the PERIOD OF RESTORATION to minimize, reduce or avoid an INCOME LOSS, provided:

1.  That such expenses are over and above those the INSURED would have incurred had no interruption or suspension of the COMPUTER SYSTEMS occurred; and

2.  Do not exceed the amount by which the INCOME LOSS in excess of the DEDUCTIBLE and covered under this POLICY is thereby reduced.

AA.  FIRST NAMED INSURED means the INSURED designated in Item 1. of the DECLARATIONS.

BB.  GOVERNMENT ENTITY means:

1.  Any department, agency, task force or other organization created by any federal, state or local law, executive order, ordinance or rule;

2.  Any department, agency, task force or other organization operated, funded or staffed, in whole or in part, by the federal or any state, county or local government; or

3.  Any organization operating as a Medicare Integrity Program Contractor in accordance with 63 F.R. 1590 (March 20, 1998) and pursuant to section 1893 of the Social Security Act (42 U.S.C. § 1395ddd).

CC.  GROUP SIZE means the total number of practitioners listed as NAMED INSUREDS on DEC 008D, if applicable, at the time the CLAIM is first made or the event is first discovered. If there are no such practitioners listed as a NAMED INSURED, then the GROUP SIZE is one (1).

DD.  HEALTHCARE FACILITY means a facility where MEDICAL SERVICES are provided regularly as the primary course of business.

EE.  INCOME LOSS means:

1.  The net profit before income taxes that the INSURED is prevented from earning through its business operations or the net loss before income taxes that the INSURED is unable to avoid through its business operations as a direct result of the actual and necessary interruption or suspension of COMPUTER SYSTEMS; and

2.  Fixed operating expenses incurred by the INSURED (including payroll), but only to the extent that

a.  Such operating expenses must necessarily continue during the PERIOD OF RESTORATION (or EXTENDED INTERRUPTION PERIOD, if applicable); and

b.  Such expenses would have been incurred by the INSURED had such interruption or suspension not occurred.

INCOME LOSS shall be reduced to the extent the INSURED or DEPENDENT BUSINESS (if applicable) is able, with reasonable dispatch and due diligence, to reduce or limit such interruption or suspension of COMPUTER SYSTEMS or conduct its business operations by other means.

In determining INCOME LOSS, due consideration shall be given to the prior experience of the INSURED'S business operations before the beginning of the PERIOD OF RESTORATION and to the probable business



operations the INSURED could have performed had no actual and necessary interruption or suspension occurred as result of a failure of COMPUTER SECURITY to prevent a SECURITY BREACH.

Income will be calculated on an hourly basis based on the INSURED'S net profit (or loss) and fixed operating expenses as set forth above.

FF.     LOSS means DAMAGES, CLAIMS EXPENSES, CYBER EXTORTION LOSS, DATA PROTECTION LOSS, PENALTIES, PUBLIC RELATIONS AND CRISIS MANAGEMENT EXPENSES, PRIVACY BREACH RESPONSE SERVICES and BUSINESS INTERRUPTION LOSS.

GG.     MALICIOUS CODE means any virus, Trojan horse, worm or any other similar software program, code or script intentionally designed to insert itself into computer memory, or onto a computer disk, and spread itself from one computer to another.

HH.     MANAGER means a manager of a limited liability company.

II.     MEDIA MATERIAL means any information in electronic form, including words, sounds, numbers, images or graphics and shall include advertising, video, streaming content, web-casting, online forum, bulletin board and chat room content, but does not mean computer software or the actual goods, products or services described, illustrated or displayed in such MEDIA MATERIAL.

JJ.     MEDICAL SERVICES means health care, medical care, or treatment provided to any individual, including but not limited to, any of the following:

1.      Medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care;

2.      The furnishing or dispensing of medications, drugs, blood, blood products, or medical, surgical, dental, or psychiatric supplies, equipment, or appliances in connection with such care;

3.      The furnishing of food or beverages in connection with such care;

4.      The provision of counseling or other social services in connection with such care; and

5.      The handling of, or the performance of post-mortem examinations on, human bodies.

KK.     NAMED INSURED means each HEALTHCARE FACILITY or provider listed as a NAMED INSURED in DEC 008B or DEC 008D, if attached to this POLICY.

LL.     NOTIFIED INDIVIDUAL means an individual person to whom notice is given or attempted to be given under Coverage B, paragraph 1.b. Any persons notified under a foreign BREACH NOTICE LAW shall not be considered NOTIFIED INDIVIDUALS.

MM.     OPTIONAL EXTENSION PERIOD means the period of time after the end of this POLICY PERIOD for reporting CLAIMS as provided in Section X. Optional Extension Period of this POLICY.

NN.     PENALTIES means:

1.      Any civil fine or money penalty payable to a governmental entity that was imposed in a REGULATORY PROCEEDING by the Federal Trade Commission, Federal Communications Commission or any other federal, state, local or foreign governmental entity, in such entity's regulatory or official capacity. The insurability of PENALTIES shall be in accordance with the law in the applicable venue that most favors coverage for such PENALTIES; and

2.      Amounts which the INSURED is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a REGULATORY PROCEEDING (including such amounts required to be paid into a "Consumer Redress Fund"). Such amounts shall not include payments to charitable organizations or disposition of such funds other than for payment of consumer claims for losses caused by an event covered by Coverage A, paragraphs 1.a., 1.b. or 1.c.;



but shall not mean costs to remediate or improve COMPUTER SYSTEMS, security or privacy practices, procedures or policies, audit, compliance or reporting costs, or costs to protect the confidentiality and/or security of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION from theft, LOSS or disclosure.

OO.   PERIOD OF RESTORATION means the time period that:

1.   Begins on the specific date and time that the actual and necessary interruption or suspension of COMPUTER SYSTEMS first occurred; and

2.   Ends on the specific date and time that the actual and necessary interruption or suspension of COMPUTER SYSTEMS ends, or would have ended had the INSURED or DEPENDENT BUSINESS (if applicable) acted with due diligence and dispatch;

provided that in no event shall the PERIOD OF RESTORATION mean more than or exceed thirty (30) days; and provided further that restoration of COMPUTER SYSTEMS will not end the PERIOD OF RESTORATION if such systems are actually and necessarily interrupted or suspended again within one hour of such restoration due to the same cause as the original interruption or suspension.

PP.   PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION means:

1.   Information concerning the individual that constitutes "nonpublic personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, and regulations issued pursuant to the Act;

2.   Medical or heath care  information concerning the individual, including "protected health information," as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations issued pursuant to the Act;

3.   Information concerning the individual that is defined as private personal information under statutes enacted to protect such information in foreign countries, for CLAIMS subject to the law of such jurisdiction;

4.   Information concerning the individual that is defined as private personal information under a BREACH NOTICE LAW; or

5.   The individual's driver's license or state identification number; social security number; unpublished telephone number; and credit, debit or other financial account numbers in combination with associated security codes, access codes, passwords or pins;

if such information allows an individual to be uniquely and reliably identified or contacted or allows access to the individual's financial account or medical record information.

PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION does not include publicly available information that is lawfully made available to the general public from government records.

QQ.   POLICY means the insurance contract issued by US to the NAMED INSURED including the DECLARATIONS.

RR.   POLICY PERIOD means the period of time between the inception date shown in the DECLARATIONS and effective date of termination, expiration or cancellation of this POLICY and specifically excludes any OPTIONAL EXTENSION PERIOD or any prior policy period or renewal period.

SS.   PRIVACY BREACH RESPONSE AGGREGATE LIMIT OF COVERAGE means the Limit of Coverage for the provision of PRIVACY BREACH RESPONSE SERVICES. The PRIVACY BREACH RESPONSE AGGREGATE LIMIT OF COVERAGE is separate from and in addition to the AGGREGATE LIMIT OF LIABILITY.

TT.   PRIVACY LAW means a federal, state or foreign statute or regulation requiring the INSURED to protect the confidentiality and/or security of PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION.

UU.   PRIVACY POLICY means the internal or publicly accessible written documents that set forth the INSURED'S policies, standards and procedures for collection, use, disclosure, sharing, dissemination and



correction or supplementation of, and access to, PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION.

VV. PROPERTY DAMAGE means physical injury to or destruction of any tangible property, including the loss of use thereof.

WW. REGULATORY PROCEEDING means a request for information, civil investigative demand or civil proceeding commenced by service of a complaint or similar filing brought by or on behalf of the Federal Trade Commission, Federal Communications Commission or any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity in connection with such proceeding.

XX. RELATED PARTY means an INSURED that is a partnership, professional medical corporation or professional association, and any past, present or future employees, directors, officers, MANAGERS, partners or natural person independent contractors of such partnership, professional medical corporation or professional association.

YY. SECURITY BREACH means:

1. UNAUTHORIZED ACCESS OR USE of COMPUTER SYSTEMS, including UNAUTHORIZED ACCESS OR USE resulting from the theft of a password from a COMPUTER SYSTEM or from any INSURED;

2. A DENIAL OF SERVICE ATTACK against COMPUTER SYSTEMS or THIRD PARTY COMPUTER SYSTEMS; or

3. Infection of COMPUTER SYSTEMS by MALICIOUS CODE or transmission of MALICIOUS CODE from COMPUTER SYSTEMS;

whether any of the foregoing is a specifically targeted attack or a generally distributed attack.

A series of continuing SECURITY BREACHES, related or repeated SECURITY BREACHES, or multiple SECURITY BREACHES resulting from a continuing failure of COMPUTER SECURITY shall be considered a single SECURITY BREACH and be deemed to have occurred at the time of the first such SECURITY BREACH.

ZZ. SUPPLEMENTARY PAYMENTS RETROACTIVE DATE means the date specified in Item 3. of the DECLARATIONS.

AAA. THIRD PARTY COMPUTER SYSTEMS means any computer systems that:

1. Are not owned, operated or controlled by an INSURED; and

2. Do not include computer systems of a third party on which an INSURED performs services. Computer systems include associated input and output devices, data storage devices, networking equipment and back up facilities.

BBB. THIRD PARTY CORPORATE INFORMATION means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not insured under this POLICY which is not available to the general public and is provided to the INSURED subject to a mutually executed written confidentiality agreement or which the NAMED INSURED is legally required to maintain in confidence. THIRD PARTY CORPORATE INFORMATION does not include PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION.

CCC. UNAUTHORIZED ACCESS OR USE means the gaining of access to or use of COMPUTER SYSTEMS by an unauthorized person or persons or the use of COMPUTER SYSTEMS in an unauthorized manner.

DDD. UNAUTHORIZED DISCLOSURE means the disclosure of, or access to, information in a manner that is not authorized by the NAMED INSURED and is without knowledge of, consent or acquiescence of any member of the CONTROL GROUP.


EEE. WAITING PERIOD means the period of time beginning when the PERIOD OF RESTORATION begins and expiring after the elapse of the number of hours set forth in Item 5.G. of the DECLARATIONS. A WAITING PERIOD shall apply to each PERIOD OF RESTORATION.

FFF. WRONGFUL ACT means:

    1. Presenting, or causing or allowing to be presented, by an INSURED any actual or alleged erroneous submission to a government health benefit payor or program or to a COMMERCIAL PAYOR from which an INSURED seeks payment or reimbursement for MEDICAL SERVICES provided or prescribed by a practitioner who is an INSURED;

    2. Any negligent or reckless act, error or omission by an INSURED in violation of any federal, state or local self-referral laws, or any rules or regulations promulgated thereunder;

    3. Any negligent or reckless act, error or omission by an INSURED in violation of the Health Insurance Portability and Accountability Act ("HIPAA") and any amendments thereto, or any rules or regulations promulgated thereunder; or

    4. Any negligent or reckless act, error or omission by an INSURED in violation of the Emergency Medical Treatment and Labor Act ("EMTALA") and any amendments thereto, or any rules or regulations promulgated thereunder.

## Section VIII. Limit of Liability and Coverage

For the purposes of this POLICY, regardless of the number of INSUREDS, CLAIMS, events, DATA PROTECTION LOSSES, BUSINESS INTERRUPTION LOSSES, SECURITY BREACHES, EXTORTION THREATS, PUBLIC RELATIONS EVENTS, REGULATORY PROCEEDINGS, DISCIPLINARY PROCEEDINGS, proceedings, persons or entities injured or asserting CLAIMS:

A. 1. The AGGREGATE LIMIT OF LIABILITY stated in Item 4.J. of the DECLARATIONS is OUR combined total Limit of Liability for all costs, DAMAGES, PENALTIES, CLAIMS EXPENSES, CYBER EXTORTION LOSS, DATA PROTECTION LOSS AND BUSINESS INTERRUPTION LOSS payable under Coverage A, B paragraph 1.a, C, D, E, F, G, H and I.

    2. The Limit of Liability set forth in Item 4.A. of the DECLARATIONS is the aggregate sublimit of liability for all sums payable under Coverage A and is part of and not in addition to the AGGREGATE LIMIT OF LIABILITY.

    3. a. The PRIVACY BREACH RESPONSE AGGREGATE LIMIT OF COVERAGE stated in Item 4.B.(1) of the DECLARATIONS is the maximum total number of NOTIFIED INDIVIDUALS to whom notification will be provided or attempted for all events or series of related events giving rise to an obligation to provide PRIVACY BREACH RESPONSE SERVICES covered under Coverage B regardless of the number of INSUREDS involved in the event or series of related events giving rise to an obligation to provide PRIVACY BREACH RESPONSE SERVICES.

        b. The sublimit of coverage stated in Item 4.B.(2) of the DECLARATIONS is the aggregate sublimit of coverage for all PRIVACY BREACH RESPONSE SERVICES incurred and services provided under Coverage B, paragraph 1.a., and is part of and not in addition to the AGGREGATE LIMIT OF LIABILITY.

        c. WE shall not be obligated to provide PRIVACY BREACH RESPONSE SERVICES, including any computer security expert costs, attorney's fees, notifications, credit or identity monitoring or any other services after the number of NOTIFIED INDIVIDUALS under Coverage B, paragraph 1.b. reaches the maximum number of NOTIFIED INDIVIDUALS set forth above and in Item 4.B.(1) of the DECLARATIONS. If the total number of individuals to be notified under this POLICY exceeds the maximum number of NOTIFIED INDIVIDUALS, the INSURED shall be responsible for providing and paying for notification and credit



monitoring services to such additional individuals in accordance with the procedures set forth in COV 006 Attachment A.

    d.    PRIVACY BREACH RESPONSE SERVICES under Coverage B will be provided by services providers from the program's list of approved services providers. In the event a services provider is unable or does not provide the services set forth in COV 006 Attachment A, WE will procure similar services from other sources, provided in such event the maximum WE will pay for the costs of procuring and providing all PRIVACY BREACH RESPONSE SERVICES under Coverage B, including attorney's fees, expert costs, notification costs and services for the Credit and Identity Monitoring Program shall be no more than the US Dollar equivalent within DECLARATIONS Item 4.B.(1) Limit of Liability.

4.    The Limit of Liability set forth in Item 4.C. of the DECLARATIONS is the aggregate sublimit of liability for all sums payable under Coverage C and is part of and not in addition to the AGGREGATE LIMIT OF LIABILITY.

5.    The Limit of Liability set forth in Item 4.D. of the DECLARATIONS is the aggregate sublimit of liability for all sums payable under Coverage D and is part of and not in addition to the AGGREGATE LIMIT OF LIABILITY.

6.    a.    The Regulatory Aggregate Limit of Liability stated in Item 4.E.(1) of the DECLARATIONS is OUR combined total Limit of Liability for all sums payable under Coverage E.

    b.    The Per INSURED Limit of Liability set forth in DEC 008C Item 4.E.(2) is the aggregate sublimit of liability payable under Coverage E and is part of and not in addition to the Regulatory Aggregate Limit of Liability.

    c.    The sublimit of coverage stated in DEC 008C Item 4.E.(3) or DEC 008A Item 4.E.(2) is the aggregate sublimit of coverage for all sums payable for DISCIPLINARY PROCEEDINGS under Coverage E and is part of and not in addition to the Per INSURED Limit of Liability.

7.    The Limit of Liability set forth in Item 4.F. of the DECLARATIONS is the aggregate sublimit of liability for all sums payable under Coverage F and is part of and not in addition to the AGGREGATE LIMIT OF LIABILITY.

8.    The Limit of Liability set forth in Item 4.G. of the DECLARATIONS is the aggregate sublimit of liability for all sums payable under Coverage G and is part of and not in addition to the AGGREGATE LIMIT OF LIABILITY.

9.    The Limit of Liability set forth in Item 4.H. of the DECLARATIONS is the aggregate sublimit of liability for all sums payable under Coverage H and is part of and not in addition to the AGGREGATE LIMIT OF LIABILITY.

10.    The Limit of Liability set forth in Item 4.I. of the DECLARATIONS is the aggregate sublimit of liability for all sums payable under Coverage I and is part of and not in addition to the AGGREGATE LIMIT OF LIABILITY.

11.    If multiple INSUREDS are jointly involved in the same CLAIM, then the maximum amount payable for such CLAIM, for all INSUREDS combined, shall not exceed the Maximum Aggregate Limit of Liability set forth in DEC 008C Item 4.K., if attached, or the Aggregate Limit of Liability set forth in DEC 008A Item 4.J., if attached, regardless of the number of INSUREDS involved or persons or organizations asserting CLAIMS.

B.    The Limit of Liability for the OPTIONAL EXTENSION PERIOD shall be part of and not in addition to the AGGREGATE LIMIT OF LIABILITY.

C.    WE shall not be obligated to pay any DAMAGES, PENALTIES, CLAIMS EXPENSES, CYBER EXTORTION LOSS, DATA PROTECTION LOSS, BUSINESS INTERRUPTION LOSS or PUBLIC RELATIONS AND CRISIS MANAGEMENT EXPENSES, or to undertake or continue the defense of any CLAIM, after the AGGREGATE LIMIT OF LIABILITY has been exhausted by payment of DAMAGES, PENALTIES, CLAIMS



EXPENSES, CYBER EXTORTION LOSS, DATA PROTECTION LOSS, BUSINESS INTERRUPTION LOSS or PUBLIC RELATIONS AND CRISIS MANAGEMENT EXPENSES, or after deposit of the AGGREGATE LIMIT OF LIABILITY in a court of competent jurisdiction. Upon such payment, WE shall have the right to withdraw from the further defense of any CLAIM under this POLICY by tendering control of said defense to the INSURED.

D.   If any INSURED is covered for any LOSS both under this POLICY and under any other policy issued by US or any of OUR affiliated insurance companies, other than a policy that expressly states that it is excess over this POLICY, the maximum total applicable limits of liability with respect to such INSURED under all policies, including this POLICY, for all LOSS shall not exceed the largest single available limit of liability under any one such policy, including this POLICY, regardless of whether or not such other policies have been issued for the same, a subsequent, prior or overlapping policy period and regardless of whether or not such other policies provide coverage on the same terms and conditions as this POLICY.

## Section IX.    Deductible

A.   With respect to Coverages A, C and D, the DEDUCTIBLE amount set forth in Item 5.A. of the DECLARATIONS applies separately to each CLAIM, event or group of related events giving rise to a CLAIM. The DEDUCTIBLE shall be satisfied by monetary payments by the NAMED INSURED of covered DAMAGES, CLAIMS EXPENSES or PENALTIES.

B.   The DEDUCTIBLE amount set forth in Item 5.B.of the DECLARATIONS applies separately to each CLAIM, event or group of related events, giving rise to an obligation to provide PRIVACY BREACH RESPONSE SERVICES. Under Coverage B, paragraphs 1.a. and 1.b., the Each Event DEDUCTIBLE set forth in Item 5.B.1 of the DECLARATIONS shall be satisfied solely by monetary payments by the NAMED INSURED for PRIVACY BREACH RESPONSE SERVICES. If an event requires notice to a number of NOTIFIED INDIVIDUALS equal to or greater than the number set forth in Item 5.B.2 of the DECLARATIONS, WE will provide the services set forth in Coverage B, paragraphs 1.c. and 1.d. to all NOTIFIED INDIVIDUALS subject to the Limit of Liability and other provisions of this POLICY.

C.   With respect to Coverage E, the DEDUCTIBLE amount set forth in Item 5.C. of the DECLARATIONS applies separately to each CLAIM, event or group of related events giving rise to a CLAIM. The DEDUCTIBLE shall be satisfied by monetary payments by the NAMED INSURED of covered DAMAGES or CLAIMS EXPENSES.

D.   The DEDUCTIBLE amount set forth in Item 5.D. of the DECLARATIONS applies separately to each EXTORTION THREAT. The DEDUCTIBLE shall be satisfied by monetary payments by the NAMED INSURED of covered CYBER EXTORTION LOSS.

E.   With respect to Coverage G, the DEDUCTIBLE amount set forth in Item 5.E. of the DECLARATIONS applies separately to each SECURITY BREACH. The DEDUCTIBLE shall be satisfied by monetary payments by the NAMED INSURED of covered DATA PROTECTION LOSS.

F.   With respect to Coverage H, the DEDUCTIBLE amount set forth in Item 5.F. of the DECLARATIONS applies separately to each PUBLIC RELATIONS EVENT. The DEDUCTIBLE shall be satisfied by monetary payments by the NAMED INSURED of covered PUBLIC RELATIONS EXPENSES AND CRISIS MANAGEMENT EXPENSES.

G.   With respect to Coverage I, the DEDUCTIBLE amount set forth in Item 5.G. of the DECLARATIONS applies separately to each SECURITY BREACH. The DEDUCTIBLE shall be satisfied by monetary payments by the NAMED INSURED of covered BUSINESS INTERRUPTION LOSS.

H.   Satisfaction of the applicable DEDUCTIBLE is a condition precedent to the payment by US of any amounts, or providing of any services hereunder, and WE shall be liable only for the amounts in excess of such DEDUCTIBLE, subject to OUR total Limit of Liability not exceeding the AGGREGATE LIMIT OF LIABILITY, the PRIVACY BREACH RESPONSE AGGREGATE LIMIT OF COVERAGE or any applicable Limit of Liability. The NAMED INSURED shall make direct payments within the DEDUCTIBLE to appropriate other parties designated by US.



## Section X.    Optional Extension Period

A.    In the event of the termination of this POLICY for any reason except the non-payment of premium, the NAMED INSURED shall have the right, upon payment in full of an additional premium, to have issued an endorsement providing an OPTIONAL EXTENSION PERIOD for twelve (12) months for CLAIMS first made against any INSURED and reported to US during the OPTIONAL EXTENSION PERIOD, and arising out of any act, error or omission committed on or after the SUPPLEMENTARY PAYMENTS RETROACTIVE DATE and before the end of the POLICY PERIOD, subject to the conditions set forth herein. In order for the NAMED INSURED to invoke the OPTIONAL EXTENSION PERIOD option, the payment of the additional premium for the OPTIONAL EXTENSION PERIOD must be paid within thirty (30) days of the termination of this POLICY. If notice of election of the OPTIONAL EXTENSION PERIOD and full premium payment is not given to US within such thirty (30) day period, there shall be no right to purchase the OPTIONAL EXTENSION PERIOD.

B.    The Limit of Liability for the OPTIONAL EXTENSION PERIOD shall be part of, and not in addition to, the applicable Limits of Liability for this POLICY PERIOD and the exercise of the OPTIONAL EXTENSION PERIOD shall not in any way increase the AGGREGATE LIMIT OF LIABILITY or any sublimit of liability. The OPTIONAL EXTENSION PERIOD does not apply to Coverages B, F, G and I.

C.    All notices and premium payments with respect to the OPTIONAL EXTENSION PERIOD option shall be directed to US.

D.    At the commencement of the OPTIONAL EXTENSION PERIOD, the entire premium shall be deemed earned, and in the event the NAMED INSURED terminates the OPTIONAL EXTENSION PERIOD for any reason prior to its natural expiration, WE will not be liable to return any premium paid for the OPTIONAL EXTENSION PERIOD.

## Section XI.    Conditions

The insurance provided by this POLICY is subject to the following conditions:

A.    **Notice of Claim, Loss or Circumstance That Might Lead to a Claim or Loss.**

1.    If any CLAIM is made against the INSURED, the INSURED shall forward as soon as practicable to US written notice of such CLAIM, together with every demand, notice, summons or other process received by the INSURED or the INSURED'S representative. In no event shall such notice to US be later than the end of this POLICY PERIOD or the end of the OPTIONAL EXTENSION PERIOD (if applicable). However, unless the INSURED cancels this POLICY, or WE cancel this POLICY for non-payment of premium, a CLAIM made against the INSURED within thirty (30) days prior to expiration of this POLICY shall be reported immediately, but in no event later than thirty (30) days after the end of this POLICY PERIOD.

2.    With respect to Coverage B, for a legal obligation to comply with a BREACH NOTICE LAW because of an event (or reasonably suspected event) described in Coverage A, paragraphs 1.a. or 1.b., such event or reasonably suspected event must be reported immediately after discovery by the INSURED. However, unless the INSURED cancels this POLICY, or WE cancel this POLICY for non-payment of premium, an event discovered by the INSURED within sixty (60) days prior to expiration of this POLICY shall be reported as soon as practicable, but in no event later than sixty (60) days after the end of this POLICY PERIOD. If this POLICY is renewed by US and PRIVACY BREACH RESPONSE SERVICES are provided because of such event or suspected event that was discovered by the INSURED within sixty (60) days prior to the expiration of this POLICY, and first reported during the sixty (60) day post-POLICY PERIOD reporting period, then any subsequent CLAIM arising out of such event or suspected event is deemed to have been made during the POLICY PERIOD.

3.    With respect to Coverage F, in the event of an EXTORTION THREAT to which this POLICY applies, the INSURED shall notify US immediately upon receipt of any EXTORTION THREAT, and shall



thereafter also provide written notice by telecopy, email or express mail within five (5) days following the EXTORTION THREAT.

4.  With respect to Coverage G, the INSURED must forward written notice to US immediately upon discovery of alteration, corruption, destruction, deletion or damage to or inability to access a DATA ASSET to which this POLICY applies. All covered DATA PROTECTION LOSS must be discovered and reported (in accordance with paragraph P.1.a. below) to US no later than six (6) months after the end of the POLICY PERIOD.

5.  If, during the POLICY PERIOD, the INSURED first becomes aware of any circumstance or WRONGFUL ACT that could reasonably be the basis for a CLAIM, the INSURED may give written notice to US as soon as practicable during the POLICY PERIOD. Such a notice must include:

    a.  The specific details of the act, error, omission, event or SECURITY BREACH that could reasonably be the basis for a CLAIM;

    b.  The injury or damage which may result or has resulted from the circumstance; and

    c.  The facts by which the INSURED first became aware of the act, error, omission, event or SECURITY BREACH.

    Any subsequent CLAIM made against the INSURED arising out of such circumstance or WRONGFUL ACT which is the subject of the written notice will be deemed to have been made at the time written notice complying with the above requirements was first given to US.

6.  If, during the POLICY PERIOD, the INSURED notifies any GOVERNMENT ENTITY of a WRONGFUL ACT the INSURED reasonably believes could give rise to a CLAIM and notifies US consistent with paragraph 5. above, WE shall indemnify the INSURED for DAMAGES and CLAIM EXPENSES which the INSURED becomes legally obligated to pay as a result of any CLAIM subsequently made against the INSURED arising out of the WRONGFUL ACT; provided always that the INSURED had no knowledge of such WRONGFUL ACT prior to the effective date of this POLICY and such WRONGFUL ACT took place subsequent to the applicable SUPPLEMENTARY PAYMENTS RETROACTIVE DATE.

7.  A CLAIM or legal obligation under paragraph 1. or 2. above shall be considered to be reported to US when written notice is first received by US of the CLAIM or legal obligation, or of an act, error, omission or event which could reasonably be expected to give rise to a CLAIM if provided in compliance with paragraph 5. or 6. above.

8.  With respect to Coverage I, the INSURED shall forward immediately to US written notice of the interruption or suspension of COMPUTER SYSTEMS to which this Insurance applies in the form of a telecopy, email or express mail. Such notice must be provided during the POLICY PERIOD, or no later than ten (10) days after the end of the POLICY PERIOD for interruptions or suspensions occurring within ten (10) days of the end of the POLICY PERIOD; provided, all covered BUSINESS INTERRUPTION LOSS must be reported to US (in accordance with paragraph P.1.b. below) no later than six (6) months after the end of the POLICY PERIOD.

B.  **Assistance and Cooperation.**

1.  WE shall have the right to make any investigation WE deem necessary, and the INSURED shall cooperate with US in all investigations, including investigations regarding the application for and coverage under this POLICY. The INSURED shall execute or cause to be executed all papers and render all assistance as is requested by US. The INSURED agrees not to take any action which in any way increases OUR exposure under this POLICY.

2.  Upon OUR request, the INSURED shall assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the INSURED because of acts, errors or omissions, incidents or events with respect to which insurance is afforded under this POLICY; and the INSURED shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.



3.  The INSURED shall not admit liability, make any payment, assume any obligations, incur any expense, enter into any settlement, stipulate to any judgment or award or dispose of any CLAIM without OUR written consent, except as specifically provided in Section II. Defense and Settlement of Claims, paragraph D.

4.  Compliance with a BREACH NOTICE LAW will not be considered as an admission of liability for purposes of this condition.

5.  Expenses incurred by the INSURED in assisting and cooperating with US do not constitute CLAIMS EXPENSES under this POLICY.

C.  **Subrogation.** If any payment is made under this POLICY and there is available to US any of the INSURED'S rights of recovery against any other party, then WE shall maintain all such rights of recovery. The INSURED shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The INSURED shall do nothing after an incident or event giving rise to a CLAIM or LOSS to prejudice such rights. Any recoveries shall be applied first to subrogation expenses, second to LOSS paid by US, and lastly to the DEDUCTIBLE. Any additional amounts recovered shall be paid to the NAMED INSURED.

D.  **Other Insurance.** The insurance under this POLICY shall apply in excess of any other valid and collectible insurance available to any INSURED, including any self-insured retention or DEDUCTIBLE portion thereof unless such other insurance is written only as specific excess insurance over the POLICY AGGREGATE LIMIT OF LIABILITY or any other applicable Limit of Liability of this POLICY.

E.  **Action Against Us.** No action shall lie against US or OUR representatives unless and until, as a condition precedent thereto, the INSURED shall have fully complied with all provisions, terms and conditions of this POLICY and the amount of the INSURED'S obligation to pay shall have been finally determined either by judgment or award against the INSURED after trial, REGULATORY PROCEEDING, arbitration or by written agreement of the INSURED, the claimant, and US.

    No person or organization shall have the right under this POLICY to join US as a party to an action or other proceeding against the INSURED to determine the INSURED'S liability, nor shall WE be impleaded by the INSURED or the INSURED'S legal representative.

    The INSURED'S bankruptcy or insolvency or of the INSURED'S estate shall not relieve US of OUR obligations hereunder.

F.  **Entire Agreement.** By acceptance of the POLICY, all INSUREDS agree that this POLICY embodies all agreements between US and the INSURED relating to this POLICY. Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change any part of this POLICY or stop US from asserting any right under the terms of this POLICY; nor shall the terms of this POLICY be waived or changed, except by endorsement issued to form a part of this POLICY signed by US.

G.  **Assignment.** The interest hereunder of any INSURED is not assignable. If the INSURED shall die or be adjudged incompetent, such insurance shall cover the INSURED'S legal representative as the INSURED as would be permitted under this POLICY.

H.  **Cancellation or Non-Renewal.** The NAMED INSURED may cancel or non-renew this POLICY by returning it to US or by giving US advance written notice of when the cancellation is to take effect. WE may cancel or non-renew this POLICY by mailing to the NAMED INSURED at the NAMED INSURED'S last address as known by US, at least thirty (30) days advance notice of OUR intent to cancel or non-renew, unless such cancellation is for nonpayment of premium.

    In the event the NAMED INSURED fails to pay any premium when due, WE may cancel this POLICY by mailing such notice to the NAMED INSURED at least ten (10) days in advance of the effective date of the cancellation. Proof of mailing will constitute proof of notice for purposes of this provision.

    The effective date and hour of cancellation stated in the notice or the time of surrender of the POLICY will become the end of the POLICY PERIOD. If this POLICY is cancelled, the NAMED INSURED may be entitled to a premium refund. However, WE are not required to make or offer any refund for any cancellation



to be effective. If the NAMED INSURED cancels, the NAMED INSURED shall be responsible for payment of any earned premium calculated on a pro rata basis based on the period the POLICY was in effect plus ten percent (10%) of the unearned premium for the original POLICY PERIOD stated in the DECLARATIONS. If the NAMED INSURED is due a refund the refund will be equal to any unearned premium calculated on a pro rata basis based on the period the POLICY was in effect, less ten percent (10%) of any unearned premium for the original POLICY PERIOD stated in the DECLARATIONS. If WE cancel WE will refund any unearned premium for the original POLICY PERIOD stated in the DECLARATIONS calculated on a pro rata basis.

Bankruptcy or insolvency of the NAMED INSURED will not preclude US from asserting OUR right to cancel or non-renew this POLICY.

I. **Singular Form of a Word.** Whenever the singular form of a word is used herein, the same shall include the plural when required by context.

J. **Headings.** The titles of paragraphs, sections, or provisions of or to this POLICY are intended solely for convenience and reference, and are not deemed in any way to limit or expand the provisions to which they relate and are not part of the POLICY.

K. **Warranty By The Insured.** By acceptance of this POLICY, all INSUREDS agree that the statements contained in the Application are their agreements and representations, that they shall be deemed material to the risk assumed by US, and that this POLICY is issued in reliance upon the truth thereof.

L. **Named Insured As Agent.** The NAMED INSURED shall be considered the agent of all INSUREDS, and shall act on behalf of all INSUREDS with respect to the giving of or receipt of all notices pertaining to this POLICY, the acceptance of any endorsements to this POLICY, and the NAMED INSURED shall be responsible for the payment of all premiums and DEDUCTIBLES.

M. **Authorization.** By acceptance of this POLICY, the INSUREDS agree that the NAMED INSURED will act on their behalf with respect to the giving and receiving of any notice provided for in this POLICY, the payment of premiums and the receipt of any return premiums that may become due under this POLICY, and the agreement to and acceptance of endorsements.

N. **Recovered Property.** If the INSURED or WE recover any property, money or DATA ASSETS after a LOSS payment is made, the party making the recovery must give prompt notice of the recovery to the other party. If the recovered property is money or other funds, the recovery shall be applied first to any costs incurred by US in recovering the property, second to loss payments made by US, and third to any DEDUCTIBLE payment made by the NAMED INSURED. If tangible property other than money or funds is recovered, then the NAMED INSURED may keep the recovered property and return the loss payment, plus any costs of recovery incurred by US, or keep the loss payment less the costs of recovery incurred by US and transfer all rights in the property to US.

O. **Obligations in the Event of an Extortion Threat.**

1. **Insured's Duty of Confidentiality.** The INSURED shall use its best efforts at all times to ensure that knowledge regarding the existence of this insurance for CYBER EXTORTION LOSS afforded by this POLICY is kept confidential. WE may terminate the insurance provided by this POLICY for CYBER EXTORTION LOSS upon ten (10) days written notice to the NAMED INSURED if the existence of insurance for CYBER EXTORTION LOSS provided by this POLICY becomes public knowledge or is revealed to a person making an EXTORTION THREAT through no fault of OURS.

2. **Insured's Obligation to Investigate Extortion Threat and Avoid or Limit Extortion Payment.** Prior to the payment of any EXTORTION PAYMENT, the INSURED shall make every reasonable effort to determine that the EXTORTION THREAT is not a hoax, or otherwise not credible. The INSURED shall take all steps reasonable and practical to avoid or limit the payment of an EXTORTION PAYMENT.

3. **Conditions Precedent.** As conditions precedent to this insurance for CYBER EXTORTION LOSS under the terms of this POLICY:



      a.     **Insured's Obligation to Demonstrate Duress.** The INSURED must be able to demonstrate that the EXTORTION PAYMENT was surrendered under duress.

      b.     **Notification of Police.** The INSURED shall allow US or OUR representative to notify the police or other responsible law enforcement authorities of any EXTORTION THREAT.

P.     **Proof and Appraisal of Loss.**

   1.     **Proof of Loss.**

      a.     With respect to Coverage G, before coverage will apply, the NAMED INSURED must:

         i.     Prepare and submit to US a written and detailed proof of LOSS sworn by the FIRST NAMED INSURED within ninety (90) days after the INSURED discovers a DATA PROTECTION LOSS, but in no event later than six (6) months following the end of the POLICY PERIOD (unless such period has been extended by OUR written consent). Such proof of loss shall include a narrative with full particulars of such DATA PROTECTION LOSS, including, the time, place and cause of the DATA PROTECTION LOSS, a detailed calculation of any DATA PROTECTION LOSS, the INSURED'S interest and the interest of all others in the property, the sound value thereof and the amount of DATA PROTECTION LOSS or damage thereto and all other insurance thereon; and

         ii.    Upon OUR request, submit to an examination under oath and provide copies of the underlying documents, data and materials that reasonably relate to or are part of the basis of the claim for such DATA PROTECTION LOSS.

      The costs and expenses of preparing and submitting a proof of loss, and establishing or proving DATA PROTECTION LOSS or any other LOSS under this POLICY shall be the INSURED'S obligation, and are not covered under this POLICY.

      b.     With respect to Coverage I, before coverage will apply, the NAMED INSURED must:

         i.     Prepare and submit to US a written and detailed proof of loss sworn by an officer of the FIRST NAMED INSURED within ninety (90) days after the INSURED sustains a BUSINESS INTERRUPTION LOSS (as applicable), but in no event later than six (6) months following the end of the POLICY PERIOD (unless such period has been extended by OUR written consent). Such proof of LOSS shall include a narrative with full particulars of such BUSINESS INTERRUPTION LOSS, including, the time, place and cause of the BUSINESS INTERRUPTION LOSS, a detailed calculation of any BUSINESS INTERRUPTION LOSS, the INSURED'S interest and the interest of all others in the property, the sound value thereof and the amount of BUSINESS INTERRUPTION LOSS or damage thereto and all other insurance thereon; and

         ii.    Upon OUR request, submit to an examination under oath and provide copies of the underlying documents, data and materials that reasonably relate to or are part of the basis of the CLAIM for such BUSINESS INTERRUPTION LOSS.

      The costs and expenses of preparing and submitting a proof of loss, and establishing or proving BUSINESS INTERRUPTION LOSS or any other LOSS under this POLICY shall be the INSURED'S obligation, and are not covered under this POLICY.

   2.     **Appraisal of Loss.** If WE and the NAMED INSURED do not agree on the amount of a LOSS, each party shall select and pay an appraiser or other qualified expert (the "Appraiser") to state the amount of the LOSS or reasonable expenses, and the Appraisers shall choose an umpire. If the Appraisers cannot agree on an umpire, WE or the NAMED INSURED may request a judge of a court having jurisdiction to make the selection. Each Appraiser shall submit the amount of the LOSS or reasonable expenses to the umpire, and agreement by the umpire and at least one of the Appraisers as to the amount of a LOSS shall be binding on all INSUREDS and US. The costs of



the umpire and any other costs other than the cost of the Appraisers shall be shared equally among US and the NAMED INSURED. This provision shall govern only the appraisal of the amount of a LOSS, and shall not control the determination of whether such LOSS is otherwise covered by the POLICY. WE will still retain and do not waive OUR rights to deny coverage or enforce any obligation under this POLICY.

In witness whereof, WE have caused this POLICY to be executed and attested.



Sam Mezzich                Richard G. Hayes
  President                    Treasurer



**Medical Professional Mutual Insurance Company**

# PRIVACY BREACH RESPONSE SERVICES DESCRIPTION

## Attachment A to Regulatory Liability and Information Security & Privacy Coverage Form

**This Attachment is part of the Regulatory Liability and Information Security & Privacy Coverage Form and is subject to its provisions, terms and conditions.**

The following describes the PRIVACY BREACH RESPONSE SERVICES (called the "Services" in this attachment) provided under the Regulatory Liability and Information Security & Privacy Coverage Form (referred to as "the POLICY" in this attachment). It should be read in conjunction with the POLICY. In the event of a breach or disclosure covered by this POLICY, Underwriters (referred to as "WE" or "US" in this attachment) will provide the INSURED (referred to as "YOU" in this attachment) with assistance to help YOU with the Services and with the investigation and notification process as soon as YOU notify us of a breach or suspected breach of information. The Services provided under the POLICY have been developed to help YOU be prepared to deal with a breach, to expedite the investigation and notification process and help ensure that YOUR response will comply with legal requirements and will be performed economically and efficiently. It is therefore important that in the event of a breach, YOU follow the program's requirements in this attachment, and that YOU communicate with US so that WE can assist YOU with handling the INCIDENT and with the Services. YOU must also assist and cooperate with US and any third parties involved in providing the Services, including responding to requests and inquiries in a timely manner and entering into third party contracts required for the provision of the Services.

The Services WE will provide consist of the following:

## Breach Response Services Group

After notifying US of an INCIDENT, YOU will be contacted by a member or OUR dedicated Breach Response Services team. OUR team will provide YOU with information to help YOU respond to the event, assist YOU in engaging service providers, answer questions YOU may have about the process, and provide YOU with assistance throughout the breach response process.

## Computer Security Expert Services

If the INCIDENT involves an electronic SECURITY BREACH requiring computer expert forensic and investigation services covered under Section I Insuring Agreements, B. Coverage B Privacy Breach Response Services, paragraph 1.a. of the POLICY, WE will pay the costs of a computer security expert selected by YOU in consultation with OUR Breach Response Services Group from the program's list of approved security experts. A different expert may be used if agreed in writing by US before any expert services are provided, but unless selected from the list or approved in advance by US, the costs of such an expert will not be covered. The expert will investigate the existence and cause of the SECURITY BREACH, and attempt to determine the extent to which such information may have been improperly accessed. The expert services will be for the purpose of helping to determine whether and the extent to which notification must be provided in the event of a SECURITY BREACH.

The computer security expert will require access to information, files and systems, and YOU must comply with the expert's requests and cooperate with the expert's investigation. Reports or findings of the expert will be made available to YOU, US and any attorney that is retained to provide advice with regard to the incident.

## Legal Services

If legal advice is required in the event of an actual or reasonably suspected LOSS, theft or UNAUTHORIZED DISCLOSURE of information covered under Coverage B, paragraph 1.a. of the POLICY, WE will pay the costs of an attorney to represent YOU to determine the applicability of and the actions necessary to comply with BREACH NOTICE LAWS. The attorney shall be selected by YOU in consultation with our Breach Response Services Group from the program's list of approved legal counsel. WE may consider appointing a different attorney if agreed in writing by US before any legal services are provided, but unless selected from the list or approved in advance by US, the costs of such attorney will not be covered under the Services.

 **Medical Professional Mutual Insurance Company**

## Notification

The POLICY covers notification to individuals who are required to be notified by the applicable BREACH NOTICE LAW as covered under Coverage B, paragraph 1.b. of the POLICY. The notification will be accomplished through a mailing (or email or other method if allowed by statute and if it is more economical to do so), and will be performed by a service provider retained by YOU in consultation with our Breach Response Services Group from the program's list of approved breach notification service providers who will work with YOU to provide the required notifications. As part of this process, YOU will need to provide the following information:

1. A notification letter must be prepared. Our Breach Services Group will be able to provide YOU with templates and assist YOU with the preparation process. Final form and content of the notice is to be prepared in consultation with legal counsel and approved by US. It is important for this letter to be prepared without delay and for YOU to promptly provide sign off for the final proof of the letter provided to YOU for review prior to copying and mailing. The notification letter will be in black and white and on two sided paper.

2. YOU will provide the list of names and addresses of the persons to be notified to the notification service provider in an Excel spreadsheet or other agreed format as specified by the notification service provider. This list will be updated by the notification service provider through use of the United States Postal Service ("USPS") database of address changes, and notifications will be provided to the most recent address on the USPS database. Any returned mail will be collected and provided to YOU at YOUR request, but the Services do not include any further tracing of individuals whose letter was returned by the Post Office. Mailing of notification letters will be staggered if needed to take into account call center resources.

It is important for YOU to follow the process set forth by OUR claims staff with regard to working with US and the notification vendor. These procedures have been prepared to streamline the notification process and help ensure it is performed correctly and efficiently. OUR claims staff will provide YOU with assistance with the process, but it is important that YOU respond timely to requests, approve letter drafts, and provide address lists and other information as required to provide the Services. It will be YOUR responsibility to pay any costs caused by YOUR delay in providing information or approvals necessary to provide the Services, mistakes in information YOU provide, changes to the letter after approval, or any other failure to follow the notification procedure if it increases the cost of the Services.

## Call Center Services

IF CALL CENTER SERVICES are covered under Coverage B, paragraph 1.d. of the POLICY, they will be provided by a provider selected by US in consultation with YOU from the program's list of approved services providers. Call center hours are Monday through Friday 9:00 a.m. to 7:00 p.m. Eastern time, except holidays.

To help ensure that the Services are provided effectively, YOU will need to cooperate by providing information about the breach that the call center employees may disclose to the NOTIFIED INDIVIDUALS. This will include a description of the INCIDENT and any answers to the frequently asked questions ("FAQs") that YOU would like the call center to be able to provide. If YOU would rather have NOTIFIED INDIVIDUALS contact YOU directly for information about the breach, WE can make this arrangement, but YOUR costs associated with handling such calls will not be covered by the POLICY. Also, if an individual has questions not addressed by the INCIDENT description in the FAQ list, the individual will be referred to YOU for further information at YOUR general number listed in the letterhead of the notification letter, or YOU may provide a different number for the call center employees to use for such referrals. YOUR costs of handling calls referred to YOU by the call center for additional information are not included in the Services and will not be covered by the POLICY.

## Credit and Identity Monitoring Program

In the event of an INCIDENT (or reasonably suspected INCIDENT) for which the Credit and Identity Monitoring Program is covered under Coverage B, paragraph 1.c., YOU may elect to offer either the Credit Monitoring Program


or Identity Monitoring Program described below to NOTIFIED INDIVIDUALS residing in the United States whose PERSONALLY IDENTIFIABLE NON-PUBLIC INFORMATION was compromised or reasonably believed to be compromised as a result of such INCIDENT:

    1.    Credit Monitoring Program

        ProtectMyID® Alert 3 Bureau Credit Monitoring Product

        For identified minors involved in the breach, YOU may elect to offer notified minors (through their parents or guardians) the Family Secure® credit monitoring product in lieu of the ProtectMyID® Alert product.

        Fraud resolution services are available to subscribers of either the ProtectMyID® Alert or the Family Secure® product.

        ProtectMyID® Alert, Family Secure® and the fraud resolution services will be provided by ConsumerInfo.com, Inc., an Experian company.

    2.    An Identity Monitoring Program

        Experian DataPatrol™, offered by Experian Limited, including resolution services for subscribers through ConsumerInfo.com, Inc.

To enroll in either the Credit File Monitoring Program or Identity Monitoring Program, NOTIFIED INDIVIDUALS must qualify for the applicable Program, complete the enrollment process and agree to the applicable terms and conditions. NOTIFIED INDIVIDUALS who successfully enroll in either the Credit File Monitoring Program or Identity Monitoring Program will have access to the services provided under such Program for 12 months from the date of their enrollment. Our Breach Response Services Group will assist YOU in determining which Program is most appropriate for responding to the INCIDENT.

## Allocation of Costs and Services in the Event of a Breach in Excess of Coverage Limitations

The POLICY provides coverage for up to the number of NOTIFIED INDIVIDUALS set forth in Item 4.B.(1) of the DECLARATIONS for all covered INCIDENTS discovered and reported during the POLICY PERIOD, as set forth in the DECLARATIONS and in Section VIII Limit of Liability and Coverage of the POLICY. In the unlikely event that one or more INCIDENTS covered by the POLICY aggregate to more than the PRIVACY BREACH RESPONSE AGGREGATE LIMIT OF COVERAGE, YOU will be responsible for paying for PRIVACY BREACH RESPONSE SERVICES with respect to the excess notifications, and such costs will not be covered by the POLICY. In the event of an INCIDENT involving notifications both within the NOTIFIED INDIVIDUALS notification limit and in excess of the NOTIFIED INDIVIDUALS notification limit, YOU agree that notification to all individuals to be notified will be provided by OUR notification service provider, and the costs will be allocated between US pro-rata based on the number of covered and non-covered notifications. The non-covered notifications will be selected randomly from the list of persons to be notified, and YOU agree to be responsible for the costs of credit monitoring services to be offered in the non-covered notifications. If YOU wish use the same Credit or Identity Monitoring Program for the non-covered notifications, WE will work with YOU to make arrangements with the service provider, but YOU will separately contract with such service provider and pay for services to be offered with the non-covered notifications. Alternatively, at YOUR option, YOU may contract with a different service provider for the services to be offered.