**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | |
|---|---|
| WILLIAM KENT DEAN, | |
| Plaintiff, | |
| v. | Case No. 17-CV-3112 |
| WEXFORD HEALTH SOURCES, INC., DR. ABDUR NAWOOR, DR. REBECCA EINWOHNER, NURSE KATHY GALVIN, and LISA MINCY, | Judge Sue E. Myerscough |
| | Magistrate Judge Tom Schanzle-Haskins |
| Defendants. | |

**PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR A
NEW TRIAL, MOTION FOR REMITTITUR, AND MOTION FOR SETOFF**

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................ 1

ARGUMENT ................................................................................................................ 20

I.   Defendants' Motion For Judgment As A Matter Of Law Fails To Meet The High
     Standard To Set Aside A Jury Verdict................................................................ 20

     A.   Defendants are not entitled to judgment on Mr. Dean's Eighth Amendment
          claim. ........................................................................................................ 20

     B.   Defendants are not entitled to judgment as a matter of law on compensatory
          damages. ................................................................................................... 25

     C.   Defendants are not entitled to judgment as a matter of law on punitive
          damages. ................................................................................................... 28

II.  Wexford Is Not Entitled To A New Trial. .......................................................... 29

     A.   The Court properly admitted the *Lippert* reports.................................... 30

     B.   The evidence supported Mr. Dean's argument regarding the progression of
          his cancer. ................................................................................................ 34

     C.   The Court properly admitted evidence about Dr. Nawoor's conduct.................. 36

     D.   The Court properly admitted Mr. Dean's calendars. ............................... 39

     E.   The Court properly admitted Mr. Dean's testimony about Dr. Severino's
          statements. ................................................................................................ 40

     F.   The Court properly admitted Dr. Barnett's opinion testimony............................ 41

     G.   Wexford's cumulative error argument is incorrect.................................. 43

     H.   The Court correctly instructed the jury.................................................... 44

          1.   The Seventh Circuit's Pattern Jury Instruction
               on deliberate indifference correctly states the law................................... 44

          2.   This Court properly refused Wexford's issue instructions
               on professional and institutional negligence............................................ 45

     *I.*  The jury's verdict was not against the manifest weight of the evidence. ............. 46

III. Defendants' Motion For Remittitur Should Be Denied. ................................... 46

     A.   The jury's award for emotional pain and suffering is not excessive and is
          rationally related to the evidence presented to the jury at trial.................... 46

     B.   Wexford is not entitled to remittitur of the punitive damages award. .................. 49

          1.   Defendants' conduct was reprehensible................................................... 50

          2.   The ratio of punitive damages to compensatory damages is
               appropriate in light of the facts and circumstances of this case................ 51

          3.   Defendants' "comparable cases" do not justify remittitur........................ 53

IV.  Defendants Are Not Entitled To Setoff. ........................................................... 55

CONCLUSION ............................................................................................................ 56

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Baugh v. Cuprum S.A. de C.V.*,
  845 F.3d 838 (7th Cir. 2017) ................................................................. 43

*Beard v. Wexford Health Sources, Inc.*,
  900 F.3d 951 (7th Cir. 2018) ............................................................. 49, 50

*Blount v. Stroud*,
  915 N.E.2d 925 (Ill. App. Ct. 2009) ..................................................... 53

*BMW of North America, Inc. v. Gore*,
  517 U.S. 559 (1996) ............................................................................... 54

*Burton v. City of Zion*,
  901 F.3d 772 (7th Cir. 2018) ............................................................. 37, 38

*Bynes v. Yockey*,
  No. 16L-1844 (Ill. Cir. Ct. 2015) .......................................................... 48

*Christmas v. City of Chicago*,
  682 F.3d 632 (7th Cir. 2012) ................................................................. 43

*Clanton v. United States*,
  2018 WL 3609225 (S.D. Ill. July 27, 2018) .......................................... 27

*Cobige v. City of Chicago*,
  No. 06 C 3807 (N.D. Ill. 2010) .............................................................. 54

*Collins v. Kibort*,
  143 F.3d 331 (7th Cir. 1998) ................................................................. 40

*Daniel v. Cook County*,
  833 F.3d 728 (7th Cir. 2016) ................................................................. 32

*Daskalea v. District of Columbia*,
  227 F.3d 433 (D.C. Cir. 2000) ............................................................... 25

*Davis v. Wisconsin Department of Corrections*,
  445 F.3d 971 (7th Cir. 2006) ................................................................. 30

*Dillon v. Evanston Hospital*,
  771 N.E.2d 357 (Ill. 2002) ..................................................................... 26

*Dominguez v. St. John's Hospital*,
  632 N.E.2d 16 (Ill. App. Ct. 1993) ........................................................ 26

*Donald v. Wexford Health Sources, Inc.*,
  266 F. Supp. 3d 1097 (C.D. Ill. 2017) ................................................... 52

*Draper v. Martin*,
  664 F.3d 1110 (7th Cir. 2011) ............................................................... 42

*E.E.O.C. v. AIC Security Investigations, Ltd.*,
  55 F.3d 1276 (7th Cir. 1995) ................................................................. 52

*Estelle v. Gamble*,
  429 U.S. 97 (1976) ................................................................................. 20

*Farmer v. Brennan*,
  511 U.S. 825 (1994)........................................................................... 44

*Farver v. Correctional Medical Services of Illinois, Inc.*,
  No. 00 C 6010 (N.D. Ill. 2003) ....................................................... 54

*Fox v. Barnes*,
  No. 09 C 5453 (N.D. Ill. 2013)......................................................... 54

*Gayton v. McCoy*,
  593 F.3d 610 (7th Cir. 2010) ...................................................... 42, 43

*Gracia v. Sigmatron International, Inc.*,
  102 F. Supp. 3d 983 (N.D. Ill. 2015) ....................................... 47, 48, 53

*Grieveson v. Anderson*,
  538 F.3d 763 (7th Cir. 2008) .............................................. 21, 22, 24, 25

*In re USA Commercial Mortgage Co.*,
  802 F. Supp. 2d 1147 (D. Nev. 2011) ............................................... 53

*Iskander v. Village of Forest Park*,
  690 F.2d 126 (7th Cir. 1982) ........................................................... 24

*Jackson v. Birkey*,
  2019 WL 585351 (C.D. Ill. Feb. 13, 2019)...................................... 29

*Johnson v. Howard*,
  24 F. App'x 480 (6th Cir. 2001) ...................................................... 52

*Jordan v. Binns*,
  712 F.3d 1123 (7th Cir. 2013) ................................................ 30, 34, 43

*Lampley v. Onyx Acceptance Corp.*,
  340 F.3d 478 (7th Cir. 2003)................................................. 47, 48, 54

*Lasley v. Moss*,
  500 F. 3d 586 (7th Cir. 2007) .......................................................... 44

*Lee v. Shepler*,
  2015 WL 12942245 (C.D. Ill. Sept. 25, 2015) ......................... 45, 48, 54

*Leichtenberg v. City of Leroy*,
  2012 WL 13005640 (C.D. Ill. June 15, 2012) .................................. 42

*Levi v. Bednarz*,
  2016 WL 3661098 (C.D. Ill. July 5, 2016) ...................................... 30

*Mathias v. Accor Economy Lodging, Inc.*,
  347 F.3d 672 (7th Cir. 2003) ........................................................... 52

*Murphy v. Gilman*,
  551 F. Supp. 2d 677(W.D. Mich. 2008) .................................... 52, 54

*Nicolas v. Berry*,
  No. 3:15-CV-00964 (S.D. Ill. 2018) ............................................... 54

*Otto v. Variable Annuity Life Insurance Co.*,
  134 F.3d 841 (7th Cir. 1998) ..................................................... 44, 45

*Pasquale v. Speed Products Engineering*,
654 N.E.2d 1365 (Ill. 1995) ................................................................. 55

*Passananti v. Cook County*,
689 F.3d 655 (7th Cir. 2012) ................................................... 20, 22, 23

*Petties v. Carter*,
836 F.3d 722 (7th Cir. 2016) (en banc) .............................. 20, 21, 22, 24

*Rainey v. Taylor*,
941 F.3d 243 (7th Cir. 2019) ................................................... 50, 52, 54

*Roe v. Elyea*,
No. 06-3034 (C.D. Ill. 2008)................................................................. 54

*Saccameno v. Ocwen Loan Servicing, LLC*,
372 F. Supp. 3d 609 (N.D. Ill. 2019) ............................................. 31, 33

*Saccameno v. U.S. Bank National Association*,
943 F.3d 1071 (7th Cir. 2019) ............................................................ 54

*Sherrod v. Lingle*,
223 F.3d 605 (7th Cir. 2000) ......................................................... 22, 24

*Shields v. Ill. Dep't of Corr.*,
746 F.3d 782 (7th Cir. 2014) ......................................................... 21, 24

*Simon Property Group, L.P. v. mySimon, Inc.*,
2003 WL 1807135 (S.D. Ind. Mar. 26, 2003)................................ 38, 39

*Smith v. Altman*,
2015 WL 5610750 (N.D. Ill. Sept. 21, 2015) ...................................... 55

*Smith v. Hunt*,
707 F.3d 803 (7th Cir. 2013) .............................................................. 38

*Snelson v. Kamm*,
787 N.E.2d 796 (Ill. 2003) .................................................................. 28

*Soltys v. Costello*,
520 F.3d 737 (7th Cir. 2008) ......................................................... 35, 36

*Spiller v. Brady*,
169 F.3d 1064 (7th Cir. 1999) ............................................................ 44

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
538 U.S. 408 (2003)................................................................... passim

*Synnott v. Burgermeister*,
2019 WL 4201574 (N.D. Ill. Sept. 5, 2019) ........................................ 49

*Thornton v. Garcini*,
928 N.E.2d 804 (Ill. 2010)................................................................... 47

*Tullis v. Townley Engineering & Manufacturing Co.*,
243 F.3d 1058 (7th Cir. 2001) ...................................................... 47, 48

*TXO Production Corp. v. Alliance Resources Corp.*,
509 U.S. 443 (1993)............................................................................ 52

*United States v. Adams*,
    628 F.3d 407 (7th Cir. 2010) ................................................................. 37, 48

*United States v. Al-Awadi*,
    873 F.3d 592 (7th Cir. 2017) ....................................................................... 44

*United States v. Brown*,
    822 F.3d 966 (7th Cir. 2016) ....................................................................... 39

*United States v. Goodapple*,
    958 F.2d 1402 (7th Cir. 1992) ..................................................................... 36

*United States v. Grady*,
    746 F.3d 846 (7th Cir. 2014) ....................................................................... 45

*United States v. Hedman*,
    630 F.2d 1184 (7th Cir. 1980) ..................................................................... 39

*United States v. Jones*,
    2014 WL 4287279 (C.D. Ill. Aug. 29, 2014) ............................................ 33

*United States v. McPartlin*,
    595 F.2d 1321 (7th Cir. 1979) ..................................................................... 39

*United States v. Ruiz*,
    249 F.3d 643 (7th Cir. 2001) ....................................................................... 39

*United States v. Velez*,
    46 F.3d 688 (7th Cir. 1995) ......................................................................... 35

*Waits v. City of Chicago*,
    2003 WL 21310277 (N.D. Ill. June 6, 2003) ............................................. 53

*Walsh v. Mellas*,
    837 F.2d 789 (7th Cir. 1988) ....................................................................... 29

*Ward v. United States*,
    No. 99C-6433 (N.D. Ill. 2000) .................................................................... 48

*Wheatley v. Factory Card & Party Outlet*,
    2014 WL 4947506 (C.D. Ill. Sept. 30, 2014) ............................................ 40

*Williams v. Dieball*,
    724 F.3d 957 (7th Cir. 2013) .................................................................. 33, 37

*Williams v. Patel*,
    104 F. Supp. 2d 984 (C.D. Ill. 2000) ..................................................... 48, 54

*Willis v. Lepine*,
    687 F.3d 826 (7th Cir. 2012) .................................................................. 31, 46

*Willow Inn, Inc. v. Public Service Mutual Insurance Co.*,
    399 F.3d 224 (3d Cir. 2005) ........................................................................ 53

*Wills v. Foster*,
    892 N.E.2d 1018 (Ill. 2008) ......................................................................... 56

*Wilson v. Wexford Health Sources, Inc.*,
    932 F.3d 513 (7th Cir. 2019) ....................................................................... 20

*Woodward v. Correctional Medical Services of Illinois, Inc.*,
   368 F.3d 917 (7th Cir. 2004) ............................................................... 51

*Zaya v. Sood*,
   836 F.3d 800 (7th Cir. 2016) ............................................................... 20

## **Statutes and Rules**

42 U.S.C. § 1988 ................................................................................ 52, 53

Fed. R. Civ. P. 50 ........................................................................................ 20

Fed. R. Civ. P. 59 .......................................................................... 29, 37, 46

Fed. R. Evid. 403 .......................................................................... 30, 33, 37

Fed. R. Evid. 404 ........................................................................................ 37

Fed. R. Evid. 803 .................................................................................. 39, 40

Fed. R. Evid. 807 ........................................................................................ 40

Defendants Dr. Abdur Nawoor, Dr. Rebecca Einwohner, and Wexford Health Sources, Inc., (together, "Defendants") filed a Renewed Motion for Judgment As A Matter Of Law, Or In The Alternative, Motion For A New Trial, Or In The Alternative Motion For Remittitur, And Motion For Setoff, (Dkt. 206), and a Memorandum Of Law in support of these combined motions, (Dkt. 207, hereinafter "Br."). Despite raising at least 17 distinct legal issues (many with sub-parts, most already rejected by this Court), Defendants little discuss what occurred at trial. The evidence at trial supported the jury's verdict in all respects, and each motion should be denied.

## FACTUAL BACKGROUND

The medical facts of this case have never been in serious dispute, though trial allowed a jury to put facts into context and observe the demeanor of witnesses, key components to a decision in any case. In December 2015, Mr. Dean began urinating visible blood without pain, a medical condition known as painless gross hematuria. Despite cardinal warning signs of urologic cancer and an incontrovertible (and uncontroverted) standard of care to diagnose the cause—CT imaging of the upper urinary tract and visualization of the bladder via cystoscopy—Defendants repeatedly failed to provide Mr. Dean *timely* diagnostic, surgical, and oncological treatment. The cause of Mr. Dean's gross hematuria was kidney cancer, a diagnosis Defendants acknowledged was possible from his first complaints of blood in his urine. As a consequence of Defendants' delays, Mr. Dean suffered needless pain and anguish, and his medical conditions worsened.

Remaining for the jury at trial was the matter of Defendants' subjective deliberate indifference to these medical facts and the matter of damages—factual questions committed to a jury's determination. Over the course of a seven-day trial, the jury took measure of Defendants' testimony and demeanor when questioned about Mr. Dean's medical care. Defendants were evasive, defensive, or arrogant about the decisions they had made, even when confronted with

their failures to adhere to the medical standard of care they acknowledged or the medical guidelines they had promulgated. Defendants' experts fared little better, confronted repeatedly with evidence they had not considered in giving their opinions. The jury found Defendants liable because, time and again, Defendants departed substantially from the medical standard of care to choose less effective and less costly medical measures, prioritizing low costs over Mr. Dean's health. Moreover, Defendants were unapologetic about their choices. They refused to take responsibility despite evidence these choices had harmed Mr. Dean. Mr. Dean's experts—three physicians, including one with substantial prison medical experience—testified credibly as to Defendants' departures from the standard of care, the absence of medical justification for these departures, and the ways these departures caused Mr. Dean to suffer needless pain and increased risk of death. And Mr. Dean testified, over two days, about the torment and fear he suffered for weeks and months, wondering whether his grossly bloody urine would ever stop, and once diagnosed with cancer, whether Defendants would provide treatment to give him any shot to outlive his remaining sentence.

At the heart of Defendants' choices was Wexford's "collegial review" policy. Collegial review, as applied to Mr. Dean, delayed his treatment each time Defendants failed to schedule collegial review meetings, used collegial review to disapprove standard-of-care medical measures in favor of less costly measures below the standard of care, and interposed layers of redundant approvals so as to slow Mr. Dean's diagnosis and treatment. Nevertheless, as at trial, Defendants continue to insist that "Wexford's utilization management department approved all [medical] requests," (Dkt. 207, at 4), and continue to ignore the essence of Mr. Dean's claims: "This case … is primarily about *delays*—whether there were unnecessary delays attributable to Defendants, and,

if so, whether those delays, separately or taken together, caused [Mr. Dean] harm." (Order, Dkt. 138, at 6 (emphasis added).)

In light of the overwhelming evidence of diagnostic and treatment delays, Defendants' unremorseful recount of their decisions, and Mr. Dean's testimony on his pain and suffering, the jury returned a verdict for Mr. Dean *on all counts* against Dr. Nawoor, Dr. Einwohner, and Wexford: against Dr. Nawoor on counts of deliberate indifference to serious medical need in violation of the Eighth Amendment and medical malpractice under Illinois law (Counts I and VII, Dkt. 72); against Dr. Einwohner on counts of deliberate indifference and medical malpractice (Counts II and VIII); and against Wexford on counts of deliberate indifference, *respondeat superior* liability for Dr. Nawoor's and Dr. Einwohner's medical malpractice, and institutional negligence under Illinois law (Counts V, X, and XI).

Defendants' post-trial briefing essentially ignores the trial record. Remarkably, Defendants have not offered even a cursory statement of facts to summarize the trial record. Extensive admissible documentary evidence and competent testimony from multiple witnesses, including Defendants themselves, supported the verdict in all respects. A summary of the testimony of the 18 witnesses at trial is instructive both in discussing the legal issues and in explaining the jury's verdict.

**Plaintiff's Witnesses**

Mr. Dean called 14 of the 18 witnesses during his case, including adverse examinations of each of the individual Defendants. (Notably, Defendants did not testify in their own case.)

**William Kent Dean (Plaintiff)**

Mr. Dean testified for over a day about the alarming symptoms of gross hematuria, the physical suffering he endured while his bloody urine went untreated, and his anguish and fear while Defendants delayed diagnosis and treatment. His symptoms were graphically unpleasant:

his urine contained bright red blood, and at times it included painful blood clots resembling "gummy worm[s]." (Tr.1 85:23-86:6, 87:1-3, 90:2-10.[1]) He had to strain, painfully, to pass urine with blood clots. (*Id.* 92:14-93:2.) He recounted one instance where his bloody urine splattered the toilet, resembling a "murder scene." (*Id.* 92:14-93:2, Tr.2 180:23-182:7.) Defendants did not treat these symptoms, which continued from December 19, 2015, to his July 19, 2016 surgery. (Tr.1 88:3-92:10.)

Mr. Dean testified that Defendants contributed to his pain and fear. Dr. Nawoor told him December 23, 2015, that the likely cause of his bloody urine was either kidney stones or cancer. (*Id.* 81:13-82:14.) Yet Mr. Dean was not diagnosed with cancer until April 14, 2016, and then waited another three months, to July 19, 2016, to have anything done about his cancer. (*Id.* 82:22-83:25, 94:13-97:11, 104:17-106:16; Tr.2 145:14-146:5, 161:18-162:13, 167:15-25.) He felt helpless, not knowing whether anyone was going to care for him. (Tr.2 147:12-18, 148:1-5, 148:17-149:3, 187:15-189:19, 192:10-20.) He feared dying in prison not only because it would mean dying alone, separated from his wife of nearly 40 years, but also because it would mean humiliation from others at Taylorville while his body gave out. (*Id.* 171:20-173:6, 258:5-22.) After surgery, Mr. Dean waited for Defendants to approve his oncologist's prescriptions, knowing he wanted to live but left to wonder whether Defendants would give him a fighting chance. (*Id.* 226:10-18.) His worst fears were stoked when, still awaiting his oncologist's prescriptions, he was twice asked to elect "Do Not Resuscitate" in an advance directive order or give up oncology in favor of comfort measures. (*Id.* 226:19-227:16, 253:18-258:4.)

Though Mr. Dean generally recounted his experience in an even-keeled, straightforward manner, his voice cracked, and he openly wept on occasion. Observing Mr. Dean's demeanor on

---

[1]  "Tr.[#]" in this brief refers to a numbered volume in the seven-volume trial transcript.

the witness stand and while facing them throughout trial, the jury was justified in crediting his testimony and awarding significant damages.

**William Martin Dean**

William Martin Dean, Mr. Dean's adult son and only child, corroborated Mr. Dean's testimony about the fear and harm he suffered due to Defendants' delays. He observed that Mr. Dean was "really stressed," "very concerned," and "very alarmed" about his symptoms. (Tr.2 272:19-24.) He described him as "stress[ed]," "certainly worried," and "frustrated" by delays he endured after his cancer diagnosis and leading up to the "risky surgery" Defendants' delays made necessary. (*Id.* 273:25-274:5.) Mr. Dean's son's testimony also gave context to Mr. Dean's emotions and the losses he suffered due to Defendants' conduct. Despite his cancer, Mr. Dean had put on a "strong face" as the "leader of the family." (*Id.* 275:4-8.) And Defendants' delays causes Mr. Dean future harm: Mr. Dean was "elated" to learn he could expect his first grandchild in 2020, (*id.* 275:12-24), but his diminished prognosis would shorten his time with his family.

**Dr. Adam Metwalli**

Dr. Metwalli, an expert urologic oncologist, testified that delays in Defendants' evaluation of Mr. Dean's grossly bloody urine from December 2015 to April 2016 were an unjustified departure from the medical standard of care that, beyond pain and suffering, harmed Mr. Dean during and after April 2016. Dr. Metwalli testified that Defendants' decision to deny Mr. Dean a CT scan and instead provide an ultrasound in January and February 2016 was a departure from the medical standard of care: "[A]n ultrasound is not considered an adequate test in the United States for the workup of hematuria. … [I]f your kidney function is reasonable, as Mr. Dean's was, [a CT scan] would be the test of choice." (Tr.2 403:5-17.) Every other physician at trial, including Defendants and Defendants' experts, acknowledged a CT scan was the recognized standard of care. Significantly, no evidence suggested that Defendants exercised clinical judgment when

5

deviating from this standard of care. As Dr. Metwalli opined, a doctor exercising clinical judgment must "decide whether or not the information you're [going to] get is worth the risk of the test itself" and "whether or not [a test is] likely to give you enough information to give you a diagnosis or something actionable." (*Id.* 402:22-403:4.) As Defendants' own conduct showed, the February 2016 ultrasound did not give any diagnosis or actionable information, and was used instead to delay a CT study until April 2016 on the basis of the studies' costs.

Dr. Metwalli also testified, unrebutted, that delays from December 2015 to April 2016 allowed his tumor thrombus to grow unchecked toward his heart. (*Id.* 343:23-347:8; 355:11-357:11; 361:23-363:12.) This worsened Mr. Dean's condition, decreased his chances of surviving surgery, and shortened his life expectancy. (*Id.* 384:11-386:2.) As Dr. Metwalli testified, "[o]nce [a tumor thrombus] goes above the diaphragm, you have to open up the chest and get control of the vena cava as it enters the heart … [T]hat becomes a lot more complicated. And the survival rate from the surgery itself as well as the survival rate from the disease itself decreases with each progressive level of the tumor thrombus." (*Id.* 363:3-12.) The progress of Mr. Dean's tumor thrombus made necessary a more complicated and painful surgery, including cracking open Mr. Dean's chest, stopping his heart, medically inducing hypothermia, and performing cardiopulmonary bypass. (*Id.* 370:5-371:10.) But for Defendants' delays, Mr. Dean's cancer could have been removed through an abdominal incision alone, a far less risky surgery. (*Id.* 361:23-363:12.) In summary, Mr. Dean "underwent a more complicated operation that required a longer recovery and was higher risk … because of the delay" in diagnosis and treatment. (*Id.* 380:8-13.)

The more complex surgery also made his recovery more painful, and Defendants' conduct permitted Mr. Dean's locally advanced tumor to "shower" cancer cells into his bloodstream, which could lead to metastasis. (*Id.* 381:3-8.) While Dr. Metwalli did not reach a conclusive opinion that

6

Defendants' delays caused Mr. Dean's aggressive tumor to metastasize, neither could he rule it out. (*Id.* 381:21-382:7; Tr.6 1095:20-22 (Defendants' expert Dr. Racenstein confirming "an aggressive cancer").) A timely CT scan, in January 2016, which Defendants denied, would have been necessary to reach that conclusion. Moreover, the advancement of Mr. Dean's untreated cancer likely made post-surgery chemotherapy less effective, because chemotherapy and other systemic therapies work better on smaller-volume tumor burdens. (Tr.2 386:7-389:3.)

**Dr. Nivedita Dhar**

Dr. Dhar, an expert urologist, testified that the American Urological Association's (AUA) standard of care for painless gross hematuria—a CT scan with and without contrast dye and cystoscopy, usually by a urologist—is the only recognized standard of care for any doctor, regardless of specialty. (Tr.3 432:23-433:1, 439:17-440:18, 441:5-445:8, 449:7-11, 460:19-23, 462:22-463:7.) She testified that both painless hematuria and grossly bloody urine are associated with a higher probability of cancer in an elderly patient like Mr. Dean, and the AUA standard of care requires all doctors to treat painless gross hematuria as cancer until proven otherwise. (*Id.* 435:25-437:20.) Furthermore, Dr. Dhar substantially undercut Defendants' contention that Mr. Dean's hematuria was "likely" another bout of kidney stones: because kidney stones and cancer can coincide, the AUA standard requires measures appropriate to detect cancer—CT and cystoscopy—whenever diagnosing hematuria. (*Id.* 438:7-23.)

Moreover, Dr. Dhar's testimony established that Defendants deviated from the standard of care even where Mr. Dean received appropriate diagnostic measures "eventually." (*Id.* 445:22-446:9.) It was egregious that Mr. Dean did not first see Dr. Severino, the treating urologist, until March 2016, or have a CT scan until April 12, 2016. (*Id.* 446:10-24.) It was a deviation from the standard of care when Mr. Dean received an ultrasound—an imaging study that can only detect approximately 50% of kidney masses, even when properly read—forestalling his CT scan, a study

3:17-cv-03112-SEM-TSH  # 228  Page 15 of 65

capable of detecting approximately 95-98% of kidney masses. (*Id.* 444:19-445:8, 448:7-18.) This deviation from the standard of care was unjustified for Mr. Dean, who had no history of complications with CT or radiologic contrast dye, despite Defendants' *post hoc* "concerns" about Mr. Dean's compromised renal function or incremental exposure to radiation. (*Id.* 445:9-21, 463:2-464:5.)

Dr. Dhar also corroborated Dr. Metwalli's testimony that Defendants' delays made Mr. Dean's eventual surgery riskier and more complex. (*Id.* 468:4-469:3.) Dr. Dhar testified that complex surgeries are rare because kidney cancers can, and should, routinely be diagnosed much earlier, when tumors are smaller. (*Id.*)

**Dr. Abdur Nawoor (Defendant)**

Dr. Nawoor, the medical director at Taylorville Correctional Center and Mr. Dean's primary care physician, testified at length about steps he took or failed to take when diagnosing and treating Mr. Dean's cancer. He acknowledged that, from Mr. Dean's first complaint of grossly bloody urine on December 23, 2015, he was aware this symptom was consistent with cancer, that he told Mr. Dean as much, and that he knew the AUA's guidelines for treating a patient of Mr. Dean's age with painless gross hematuria required referral to a urologist for a CT scan and a cystoscopy. (Nawoor Tr. 17:15-19:10, 40:13-41:1.) Despite seeing 40 patients a day at the time—for, on average, no more than approximately 10 minutes each—and spending the rest of his time on administrative tasks he believed had nothing to do with health care, including collegial review, (*Id.* 9:19-10:20.), Dr. Nawoor insisted that his "work-up" of Mr. Dean's case had been adequate, on the thin reed that Mr. Dean received the standard of care "eventually." (*Id.* 19:18-20:18, 35:15-37:24, 69:20-70:16.)

Damningly, Dr. Nawoor repeatedly acknowledged his myriad errors in caring for Mr. Dean, as more fully detailed in Part I.A, *infra*, while simultaneously testifying the failures in Mr.

Dean's care were "not [his] problem" or "fault" and refusing to take any personal responsibility. (*Id.* 44:11-15, 67:1-14, 72:24-76:24.) Instead, Dr. Nawoor consistently blamed "Pittsburgh" (the site of Wexford's corporate offices), collegial review, or the "Wexford system" for the deficient treatment. (*Id.* 19:22-21:8, 50:4-12, 63:1-13, 89:21-90:5.) He offered no justification for his failure to review Mr. Dean's medical records or provide necessary medical data to make "clinical judgment" at collegial review possible. (*Id.* 89:2-24, 145:1-147:19.) It was characteristic of his attitude and conduct when he described the collegial review process that delayed Mr. Dean's urology referral until February 2016—and the urology appointment itself until March 2016—as "just going through the motion." (*Id.* 56:1-7.) Even following Mr. Dean's cancer diagnosis, Dr. Nawoor continued to allow collegial review to slow-walk Mr. Dean's pre-surgery work-up and his post-surgical referral to oncology, even though he understood that doing so would occasion otherwise unnecessary and risky treatments, including having to crack Mr. Dean's chest. (*Id.* 110:17-112:23.)

Dr. Nawoor admitted the delays in treatment would never have happened outside the correctional context. (*Id.* 63:1-7.) Whether he feared Wexford's rebuke for too many outside referrals or he was content to watch others make decisions for Mr. Dean's medical care, Dr. Nawoor never treated Mr. Dean as he would have treated a patient in his former private practice. Moreover, the jury was entitled to assess Dr. Nawoor's testimony in the context of criticisms and formal rebukes in his personnel file at critical times during Mr. Dean's care, (*Id.* 162:23-169:10), as well as Dr. Nawoor's demeanor throughout trial—proceedings to which he appeared outwardly indifferent if not unaware. Defendants did not ask Dr. Nawoor a single question to rehabilitate his adverse examination or recall him as a witness.

9

Dr. Nawoor's denials of responsibility were simply not credible in light of his awareness of Mr. Dean's condition. The jury was entirely justified in concluding that Dr. Nawoor was liable to Mr. Dean and awarding greater punitive damages against Dr. Nawoor than requested. (*Compare* Tr.7 1334:6-11 (requesting $10,000 punitive damages), *with* Jury Verdict, Dkt. 180 ($25,000 punitive damages).)

**Cynthia Sue Dean**

Mrs. Dean, Mr. Dean's wife of nearly 40 years, testified to the pain, suffering, and mental anguish the delays caused Mr. Dean. Mr. and Mrs. Dean spoke by phone daily, and she visited him at Taylorville Correctional Center monthly. (Tr.4 479:1-8.) She described the phone call where Mr. Dean told her of his diagnosis as "devastating" for both of them, and she could hear how upset he was over the phone. (*Id.* 479:25-480:10.) At that time, Mr. Dean had five years remaining on his prison sentence, and they both understood that Mr. Dean had only a 35% chance to live that long. (*Id.* 480:11-24.) She further testified about the emotional pain when they learned Mr. Dean would need chemotherapy. (*Id.* 481:18-482:6.) But they were both determined that he would seek treatment for his cancer and fight to live. (*Id.* 482:2-6.)

Mrs. Dean also testified about their hopes for the future with their first grandchild expected in 2020. (*Id.* 483:23-484:14.) Her testimony and demeanor were entirely credible before the jury.

**Dr. Bruce Barnett**

Dr. Barnett, an expert in family medicine and corrections medicine, corroborated Drs. Metwalli's and Dhar's testimony: the standard of care for a patient with bloody urine, as recognized by the AUA, is CT imaging and cystoscopy, and this standard of care applies to general practitioners like Dr. Nawoor and specialists like Dr. Einwohner alike. (Tr.4 503:17-505:17.) Dr. Nawoor deviated from the standard of care beginning December 23, 2015, because he did not begin the process of seeking a CT scan or urology referral. (*Id.* 511:7-514:5.) Dr. Nawoor further

deviated from the standard of care when he participated in a collegial review that approved an ultrasound instead, forestalling the necessary CT scan and urology referral. (*Id.* 514:6-515:11.) Likewise, Dr. Einwohner deviated from the standard of care by failing to participate in collegial review and failing to follow up to ensure Mr. Dean was approved for necessary specialty care. (*Id.* 507:10-23, 521:14-522:19, 543:5-25)

As an expert in corrections health care, Dr. Barnett explained how policies and practices like collegial review should work, and how Wexford's dysfunctional collegial review process erected unnecessary barriers to Mr. Dean's care. (*Id.* 506:17-507:23, 514:24-515:11, 530:23-531:22, 539:18-540:3, 541:6-542:5.) He testified that Dr. Nawoor had the weekly opportunity to set Mr. Dean's case for collegial review but failed to gather necessary medical records or send proper documentation. (*Id.* 512:21-514:5.) He testified that Dr. Nawoor could have asked for a more urgent collegial review, or even ordered emergency care without advance approvals, to ensure Mr. Dean's hematuria was promptly diagnosed and treated. (*Id.*) Finally, he critiqued Defendants' failure to exercise clinical judgment where they deviated from the standard of care without adequate medical data. (*Id.* 615:23-616:10.)

**Nickolas Little**

Nickolas Little, Wexford's Vice President of Strategic Contracting and Compliance, testified by deposition designations. Little negotiated Wexford's contract with IDOC. (Tr.4 625:5-17.) His testimony confirmed that, under the IDOC contract, Wexford is responsible for paying for offsite care, including consultations with specialists, while the State of Illinois reimburses Wexford for ultrasounds and other services performed onsite at the IDOC correctional facilities. (*Id.* 630:11-17, 632:9-633:9.) Little also confirmed that collegial review is Wexford's method to manage Wexford's costs. (*Id.* 635:14-636:17.)

11

**Dr. Roderick Matticks**

Dr. Matticks, Wexford's lead regional medical director under its $1.4 billion IDOC contract and Dr. Nawoor's direct supervisor, explained Wexford's policies and guidelines during Mr. Dean's gross hematuria, cancer diagnosis, surgery, and post-surgery cancer care. (Tr.4 645:13-658:2; PTX102-103.) He affirmed that Dr. Nawoor was responsible as the Taylorville medical director to review requests for outside referrals and to document reasons for those requests and decisions made in collegial review using relevant medical records and forms designated in the utilization management policies and guidelines. (*Id.* 646:20-657:4; PTX102-0010-11; PTX103-0007-08.) Dr. Matticks confirmed that Defendants' document productions did not include several documents required by Wexford policy to be created or used during collegial review, (Tr.4 654:22-658:17)—demonstrating that collegial review process, as applied to Mr. Dean's care, broke down so badly as to evince Defendants' deliberate indifference to his medical needs.

**Dr. Rebecca Einwohner (Defendant)**

Dr. Einwohner, the Wexford-employed nephrologist who saw Mr. Dean in renal teleclinic from 2012 to 2016, testified she knew Mr. Dean's grossly bloody urine was a cardinal symptom of cancer and the standard of care called for a CT study to rule out cancer. (Einwohner Tr. 31:11-32:17, 39:24-41:3.) Dr. Einwohner confirmed her recommendation in January 2016 was to "get [Mr. Dean] to the urologist" to perform appropriate studies, including CT. (*Id.* 54:16-56:14.) She repeatedly agreed that Mr. Dean needed to see a urologist based on his initial symptoms. (*Id.* 39:24-41:25, 54:16-55:13.) She refused, however, to answer direct questions about whether Mr. Dean needed to see a urologist "quickly" and she blamed delays in his care on "onsite scheduling issues." (*Id.* 43:14-44:6, 55:8-58:10.) She eventually acknowledged she "would hope that urology would have been contacted within a couple weeks within the time frame after [she] had seen the patient in teleclinic" on January 7, 2016. (*Id.* 58:2-4.) Yet in spite of her awareness of cancer risk and the

standard of care, she sent only a single email to anyone at Wexford regarding her recommendation, and she never followed up to find out whether Mr. Dean received appropriate care. (*Id.* 33:10-24, 34:21-37:13, 39:13-23, 45:8-47:2.) In fact, Dr. Einwohner worked at the same office, on the same floor as Wexford's corporate medical director for utilization management, Dr. Stephen Ritz, who led the collegial review meetings. Yet she never walked down the hall to speak with him about Mr. Dean's care. (*Id.* 9:15-10:14; *id.* 58:11-18.)

Dr. Einwohner disclaimed personal responsibility for getting Mr. Dean referred to a urologist. She testified his grossly bloody urine was "an acute condition," "beyond the scope of … teleclinic." (*Id.* 43:14-44:2.) She never observed a single urine specimen to assess whether Mr. Dean's self-reports of bloody urine were accurate. (*Id.* 15:9-15.) She characterized her role as to "support and assist" and appeared to take for granted that she never participated in collegial review meetings, even concerning her patient's kidney health. (*Id.* 42:9-45:14.) At times during her testimony, Dr. Einwohner appeared exasperated by questions about what happened at collegial review, though it was impossible to say whether her reaction was to the questions, or to Wexford's practices that shut her out of the collegial review process. Either way, Dr. Einwohner had concluded that addressing Mr. Dean's grossly bloody urine was not her job.

Defendants' counsel chose to reserve the right to call her during Defendants' case rather than conduct any rehabilitative examination. Yet Dr. Einwohner never returned to the witness stand. Based on Dr. Einwohner's testimony and demeanor, the jury was entitled to find her deliberately indifferent to Mr. Dean's medical condition and award punitive damages in an amount greater than requested. (*Compare* Tr.7 1334:6-11 (requesting $10,000 punitive damages), *with* Jury Verdict, Dkt. 180 ($12,500 punitive damages).)

**Dr. Stephen Ritz**

Dr. Ritz, Wexford's corporate medical director for utilization management, testified he participated in "hundreds of" collegial review meetings per week, from his office in Pittsburgh, approving 85-90% of requests "at face value," at the time he disapproved the initial treatment of Mr. Dean's hematuria. (Tr.5 701:7-20, 748:4-7.) He repeatedly testified that he had no independent recollection of Mr. Dean's treatment, even when offered medical records to refresh his recollection. (*Id.* 702:8-703:15, 704:11-706:14.) Yet Dr. Ritz, and Defendants, credited collegial review, a process created by Wexford not required under its IDOC contract, for "approvals in every case" pertaining to his care. (*Id.* 748:8-19.) Similarly, despite insisting he had no memory of Mr. Dean's collegial reviews, he was certain that Dr. Einwohner's January 2016 email "suggest[ing]" a urology referral had not been a proper collegial review request or order, and he was equally certain that it was not his job to ensure that collegial review's approvals were promptly scheduled, nor that collegial review took place with access to all relevant patient information. (*Id.* 756:23-757:18, 834:17-835:23.)

Dr. Ritz's demeanor reflected his remove, in Pittsburgh, from Mr. Dean's course of care, and he did not help Defendants with obviously self-serving testimony or his evasiveness and outright attempts to deceive. For instance, Dr. Ritz contended he had only a little awareness of the *Lippert* litigation until confronted with the fact that he had given a deposition in *Lippert*. (*Id.* 750:4-751:17, 829:25-831:4.) He testified he was not involved in asking the State of Illinois to grant early release to the costliest IDOC inmates, before he was shown an email he sent to Wexford's CEO identifying inmates to be targeted and discussing strategy. (*Id.* 727:2-736:18.) And he denied that hospice care or comfort measures were ever discussed by Wexford utilization management personnel facing the cost of approving Mr. Dean's chemotherapy drugs until he was shown emails he sent and received on the subject. (*Id.* 766:5-773:18.)

14

**Lisa Mincy**

Lisa Mincy was IDOC's Taylorville Health Care Unit Administrator when Mr. Dean was diagnosed with kidney cancer. Mincy's testimony supported each of Mr. Dean's theories of Defendants' legal liability. She testified that Drs. Einwohner and Nawoor were aware that Mr. Dean's symptoms suggested cancer. (Tr.5 871:20-872:10.) She testified that upon learning Mr. Dean had grossly bloody urine, she had been reassured to learn Dr. Einwohner was monitoring his kidney health and Mr. Dean's case "had been through collegial [review]," (*id.* 871:20-874:11), though prompt treatment did not result. She testified that in April 2016, following the cancer diagnosis, Dr. Nawoor forgot to write an order for Mr. Dean to receive a chest X-ray to determine whether the cancer had spread to his lungs, and Dr. Nawoor refused to write the order until she insisted. (*Id.* 881:9-882:8). Consequently, Mr. Dean did not timely receive the chest X-ray: as Mincy wrote at the time, "[i]f the order had been written … by the previous Friday, the chest X-ray would have been completed on Monday or that very same day." (*Id.* 881:17-20; PTX395.)

Likewise, Mincy wrote an incident report in August 2016 after Dr. Nawoor failed to refer Mr. Dean to an oncologist, as recommended by Dr. Severino after Mr. Dean's surgery. (*Id.* 888:11-891:7; PTX180.) And Mincy corroborated the delay between the October 19, 2016 prescription for an anti-cancer drug, Votrient, and the date Mr. Dean received his first dose of Votrient, November 18, 2016. (*Id.* 891:8-895:11; PTX168.) This included an unexplained two-week delay causing Mincy enough concern that on October 29, she emailed her IDOC supervisor: "Is this not a lengthy amount of time before starting this medication … or substituting another one?" (*Id.* 892:3-894:2). Despite the obvious need for medication, Defendants took another 12 days before approving Votrient through the Wexford corporate pharmacy's non-formulary procedure, without participation from Dr. Nawoor, Dr. Einwohner, or his outside oncologist, Dr. Perry Guaglianone.

(*Id.* 766:5-773:18.) Defendants offered no evidence that Wexford took any action related to Mincy's reports of Mr. Dean's inadequate medical treatment.

**Kathy Galvin (Defendant)**

Galvin, the Wexford nurse who supervised sick call and the nurses at Taylorville, was found not liable by the jury. But her testimony confirmed that Dr. Nawoor, as the medical director at Taylorville, had the ability to call Wexford's offices in Pittsburgh, including Dr. Ritz, to seek out a collegial review discussion at any time. (Tr.5 847:11-24.) She testified that neither she nor anyone else took steps to get Mr. Dean an immediate collegial review and that she had responded to Mr. Dean's May 17 grievance without investigating or taking any other action because Mr. Dean's surgery by that time had been approved and was awaiting scheduling. (*Id.* 844:21-849:2.) She also corroborated Mr. Dean's testimony that he made clear to everyone involved in his care, including Defendants, that he wanted to pursue cancer treatment in order to live. (*Id.* 850:2-851:8.)

**Dr. Perry Guaglianone**

Dr. Guaglianone, Mr. Dean's oncologist, gave videotaped testimony. His testimony and the medical records he authenticated from the Cancer Care Center of Decatur corroborated the timing of his first involvement in treating Mr. Dean in August 2016, after Dr. Nawoor failed to refer Mr. Dean to an oncologist despite urologist Dr. Severino's recommendation. (Ex. A, Dec. 4, 2019 P. Guaglianone Dep. Tr. [hereinafter "Guaglianone Tr."] 23:5-21.) Dr. Guaglianone also testified Mr. Dean would not have needed systemic therapies like chemotherapy, and all their unpleasant side-effects, if surgery had happened in time to allow complete removal of Mr. Dean's cancer, before it had spread. (*Id.* 62:19-64:9.) Dr. Guaglianone's testimony and medical records also corroborated the delays in the timing of Mr. Dean's systemic therapies, including chemotherapy, to treat his cancer post-surgery, such as the unnecessary delay in Mr. Dean's first dose of Votrient on November 18, 2016, after it was first prescribed on October 19, 2016. (*Id.*

16

29:3-30:10,  49:15-24;  *cf.*  Tr.5  891:8-895:24  (Mincy);  PTX168.)  And  Dr.  Guaglianone

corroborated the fact that, during the same period Wexford personnel were emailing about whether

Mr. Dean should receive palliative or hospice care, contrary to Mr. Dean's uncompromising desire

to fight his cancer. (Guaglianone Tr.60:7-61:10, 66:15-67:8.)

**Defendants' Witnesses**

Defendants called four witnesses during their case: two experts, a medical records

administrator, and Mr. Dean's urologist, Dr. Severino.

**Dr. Richard Kosierowski**

Dr. Kosierowski, an expert oncologist, testified that someone other than Defendants had

missed earlier signs of Mr. Dean's kidney cancer and that it likely had already metastasized by his

first report of bloody urine on December 23, 2015. (Tr.6 936:7-9.) But on cross-examination, Dr.

Kosierowski acknowledged that Wexford had chosen the radiologists, and Defendants were each

among the "corrections medical community" and "medical team," that missed earlier signs of Mr.

Dean's cancer. (*Id.* 994:1-25.) He also acknowledged that he knew nothing of Defendants' trial

testimony the jury had heard. (*Id.* 995:7-998:16, 1027:12-1028:11.) Moreover, Dr. Kosierowski

implicitly criticized Wexford's renal teleclinic and collegial review procedures, testifying that his

employer, Corizon, required primary care providers to attend teleclinic appointments to hear

teleclinic specialists' insights. (*Id.* 966:6-968:19.) He did not know that Wexford neither had such

a policy nor otherwise arranged for meaningful clinical input from specialists like Dr. Einwohner.

(*Id.* 1021:15-1024:25.) With full information, Dr. Kosierowski characterized Defendants' medical

care accordingly: "There [was] plenty of blame to go [around]." (*Id.* 1036:7.)

**Dr. Michael Racenstein**

Dr. Michael Racenstein, Defendants' expert diagnostic radiologist, testified about the

imaging studies conducted before and after Mr. Dean's first complaints of grossly bloody urine.

Although called to try to establish that Defendants' delays caused Mr. Dean no harm, his testimony was mostly consistent with Mr. Dean's theory of the case: Dr. Racenstein confirmed that, as shown on the radiologist's report reviewed by Dr. Nawoor and Dr. Einwohner, the February 2016 ultrasound revealed that the right kidney, eventually diagnosed as cancerous, was abnormal because it was nearly two centimeters larger than his left kidney, a size difference Dr. Racenstein called "significant." (Tr.6 1081:1-1082:13.) Dr. Racenstein confirmed that competent doctors, especially a nephrologist like Dr. Einwohner, would recognize the significance and abnormality of the measurements of Mr. Dean's kidneys in the ultrasound to indicate a problem with the kidney, including the risk of cancer as more likely than any other potential kidney disorder. (*Id.* 1098:5-1100:6, 1101:15-1102:3.) Dr. Racenstein joined the other experts and Defendants themselves to establish the appropriate and necessary diagnostic test was a CT scan, (*id.* 1102:4-22), and it usually takes weeks, not months, for a patient to go from a report of grossly bloody urine to the ultrasound and then to the eventual CT scan, (*id.* 1103:20-1104:7). Dr. Racenstein agreed that Mr. Dean's wait for a CT scan was "surprisingly too long." (*Id.* 1105:25-1106:3.)

**Chad Christer**

Chad Christer, Wexford's medical records director at Taylorville who was responsible for scheduling outside medical appointments, also testified consistent with Mr. Dean's claims. Christer testified that he, not Dr. Nawoor, made calls to schedule Mr. Dean's surgery and various appointments needed for his clearance for surgery, and when calling for the surgery, Christer generally spoke to a receptionist, who he believed passed his message on to the urologist, Dr. Severino. (Tr.7 1136:9-21, 1141:11-1143:22.) Christer also testified that, consistent with Mr. Dean's theory that collegial review slowed his treatment and belying Defendants' assertions that they had deferred to specialists' judgment, so-called "authorization numbers" had to be generated for every discrete outside appointment needed to clear Mr. Dean for surgery, and that Christer

18

could not call to schedule outside appointments until the authorization number issued 24 to 48 hours after a new collegial review approval. (*Id.* 1146:1-1147:10.) Finally, Christer testified that he began working as the Taylorville medical records director in April 2016, and so he could offer no competent testimony regarding the initial, critical delays in Mr. Dean's diagnosis or the reasons Defendants knowingly deviated from the standard of care for gross hematuria. (*Id.* 1145:2-22.) His testimony, moreover, lent additional weight to the jury's apparent determination, as reflected in their judgment of liability and their imposition of punitive damages, that Dr. Nawoor's efforts to blame others for his failures in Mr. Dean's care were not credible.

**Dr. William Severino**

Testimony from Dr. Severino, the urologist who diagnosed Mr. Dean's cancer and surgically removed his cancerous kidney, was presented by deposition designations. Dr. Severino, like every other physician in this case, testified that the standard of care for hematuria is a CT scan and cystoscopy. (Tr.7 1159:1-25.) He testified that Mr. Dean's cancer was advanced and aggressive, that renal cancers "tend[] to behave terribly" in that they can quickly turn for the worse, and that surgery to remove his cancerous kidney and tumor thrombus was required if Mr. Dean did not want to die in prison. (*Id.* 1154:4-1156:14.) As a result, Dr. Severino testified he would want Mr. Dean's surgery scheduled as soon as reasonably possible with consideration of the necessary pre-surgery precautions. (*Id.* 1188:22-1189:5.) He testified he saw no indication of metastasis to Mr. Dean's liver as of April 12, 2016, though suspected liver metastases were visible at his July 19, 2016 surgery. (*Id.* 1193:15-1195:6.) But following the surgical removal of Mr. Dean's cancerous kidney, his probability to survive five years was approximately 35%. (*Id.* 1163:15-1164:6.)

19

## ARGUMENT

I.  **Defendants' Motion For Judgment As A Matter Of Law Fails To Meet The High Standard To Set Aside A Jury Verdict.**

Defendants renew their arguments for judgment as a matter of law on Mr. Dean's Eighth Amendment claims and his compensatory and punitive damages awards. Although referencing Rule 50, Defendants omit its rigorous standard: the Court must "construe[] the evidence strictly in favor of [Mr. Dean as] the party who prevailed before the jury and examine[] the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook Cty.*, 689 F.3d 655, 659 (7th Cir. 2012). In so doing, "the [C]ourt must disregard all evidence favorable to the moving party that the jury was not required to believe." *Id.* (quotations and citations omitted); *see also Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 517 (7th Cir. 2019). On this legal standard, there is no question the evidence established Defendants' liability for deliberate indifference. While Defendants point to evidence from the trial record, Defendants do not refute that Mr. Dean presented evidence to the jury supporting each element of his claim. Defendants' argument is insufficient as a matter of law.

A.  **Defendants are not entitled to judgment on Mr. Dean's Eighth Amendment claim.**

The "Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Insufficient medical care results where a plaintiff shows he "suffered from an objectively serious medical condition" and defendants were "deliberately indifferent to that condition." *Id.* Deliberate indifference is a subjective, factual question. *Zaya v. Sood*, 836 F.3d 800, 808 (7th Cir. 2016). Proving subjective deliberate indifference often turns on circumstantial evidence; "except in the most egregious cases, plaintiffs generally lack direct evidence of actual

20

knowledge." *Petties*, 836 F.3d at 728. Juries are asked to assess whether the "fail[ure] to follow an existing protocol," *id.* at 729, or an inexplicable delay in treatment serving no penological interest, *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008), constitutes deliberate indifference. A corporate defendant like Wexford may be found liable based on its policy, custom, or practice, or evidence of a series of bad acts, which raise the inference that such a policy exists. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014). Here, ample evidence supports the jury's verdict that each Defendant was deliberately indifferent.

   ***Dr. Nawoor.*** Defendants argue Mr. Dean "identified no particular action or inaction that independently constituted deliberate indifference by Dr. Nawoor, instead relying on the entirety of his conduct between December 23, 2015, and May 4, 2017." (Br. 2.) Non-exhaustively, the entirety of Dr. Nawoor's conduct in his treatment of Mr. Dean fell short in at least the following ways:

- failure to review Mr. Dean's medical history before December 23, despite notes about grossly bloody urine in his charts from his December 22 sick call visit, (*id.* 11:25-12:6), and failure to consider medical data from or consult with Dr. Einwohner, Mr. Dean's nephrologist since 2012, (Nawoor Tr. 42:16-44:17.);
- failure to set Mr. Dean's case for collegial review from December 23, 2015, to January 13, 2016, (*id.* 21:23-22:7);
- failure *altogether* to submit required paperwork to set Mr. Dean's case for collegial review in January 2016, or to provide or consider Mr. Dean's medical history or comorbidities necessary to the exercise of physicians' "clinical judgment" in collegial review, (*id.* 22:10-23:17);
- failure to schedule Mr. Dean's ultrasound until February 2, 2016, despite on-site availability of ultrasound equipment, (*id.* 54:11-56:7);
- failure to adhere to the standard of care, known to him, to address grossly bloody urine from December 23, 2015, to at least February 10, 2016, when a urology referral was approved in collegial review, and to as late as March 30, 2016, when a CT scan was finally approved in collegial review, (*id.* 17:15-18:9, 23:18-24:13);
- failure to write a timely order for a chest X-ray, after Mr. Dean's April 2016 diagnosis of kidney cancer, to rule out the possibility that cancer had spread to his lungs, (Tr.5 881:9-882:8 (Mincy testimony));
- failure to act on Dr. Severino's recommendation of an oncology referral until prompted to do so by Mincy (*id.* 888:11-891:7 (Mincy); PTX180);
- failure to advocate effectively for Mr. Dean to receive new anti-cancer drug prescriptions promptly, despite knowledge that Mr. Dean wished to fight his cancer and to take all necessary measures to live (Nawoor Tr. 158:16-162:22; PTX181; PTX385)

21

From this litany of errors and oversights, the jury was entitled to conclude that Dr. Nawoor was deliberately indifferent to Mr. Dean's grossly bloody urine and unjustifiably delayed his diagnosis and treatment. Dr. Nawoor's conduct included, at minimum, failures to follow both the recognized standard of care and Wexford's collegial review protocols, *Petties*, 836 F.3d at 729, and inexplicable delays in treatment serving no penological interest, *Grieveson*, 538 F.3d at 779.

Moreover, faced with a record devoid of evidence substantiating the defense of "clinical judgment," Dr. Nawoor testified that the purpose of the collegial review meetings was not clinical, but that he, and Wexford, were in fact not practicing medicine at all: "we [were] just going through the motion[.]" (Nawoor Tr. 56:1-7; *see also id.* 9:22-10:4 ("Q: And in your mind, those other administrative tasks had nothing to do with health care? A: No.").) This testimony was consistent with Mr. Dean's testimony that Dr. Nawoor had told him that, if he "were [Dr. Nawoor's] patient out in the [free] world, [he] would be in hospital" earlier than Wexford's policies and practices permitted. (Tr.1 107:11-21.) The jury was not required to credit Defendants' counter-arguments and excuses, particularly when presented with stark opposing testimony from Dr. Barnett, Dr. Dhar, and Dr. Metwalli that these risks did not merit a departure from the uncontroverted standard of care. *See Passananti*, 689 F.3d at 659.

Defendants did not ask Dr. Nawoor a single question to rehabilitate his testimony. The jury's conclusions about Dr. Nawoor's deliberate indifference were especially appropriate in light of Dr. Nawoor's demeanor throughout the trial suggesting his indifference to the trial itself; whether he was subjectively deliberately indifferent was, after all, a determination committed to the sole determination of the jury as the triers of fact. *See, e.g.*, *Petties*, 836 F.3d at 728; *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000).

***Dr. Einwohner.*** The evidence of Dr. Einwohner's deliberate indifference was extensive. Recognizing Mr. Dean's complaints of grossly bloody urine as a sign of possible cancer, Dr. Einwohner emailed Dr. Ritz about the need for collegial review and her "suggest[ion]" that he be referred to a urologist for "re-imaging." (PTX061-0061; Einwohner Tr. 31:1-32:22.) But Dr. Einwohner never followed up to find out whether her "suggest[ion]" to follow the recognized standard of care was accepted or implemented. (*Id.* 58:11-18; Tr.5 835:2-24 (Ritz).) The jury was not required to accept her testimony that she talked to a utilization management nurse to "make sure that the collegial [review]" happened, as no documentary evidence corroborated this testimony. (*See* Einwohner Tr. 19:22-20:14; *Passananti*, 689 F.3d at 659.) She never communicated with or sent anything to Dr. Nawoor, despite her extensive experience treating Mr. Dean and her expertise in kidney health and maladies. (Einwohner Tr. 34:3-37:13, 50:15-53:12.) She made a note about collegial review following her February 8, 2016 teleclinic appointment with Mr. Dean, (PTX061-0059-60), but took no steps to communicate her impressions or recommendations to Dr. Ritz or Dr. Nawoor, (Einwohner Tr. 33:20-39:23). By February 8, 2016, despite learning that Mr. Dean had not received a urology referral or a CT scan, Dr. Einwohner did nothing to advise Dr. Ritz or Dr. Nawoor that they had not followed her expert "suggest[ion]." She simply scheduled his next nephrology teleclinic appointment for March 31, 2016, seven weeks later. (PTX060-0059-60.)

The jury was entitled to evaluate this testimony in light of Dr. Einwohner's demeanor throughout the trial. Given her evasive responses to adverse examination, including regarding the appropriateness of the delays in Mr. Dean's care, (Einwohner Tr. 43:14-44:6, 55:8-58:10), the jury was entitled to conclude that she was well aware of the need for treatment, but did nothing to overcome Wexford's restrictions or "support or assist" the treatment of Mr. Dean's kidney

condition. At minimum, her failure to act contributed to inexplicable delays in treatment serving no penological interest. *Grieveson*, 538 F.3d at 779. The jury was likewise entitled to conclude that she was trying in vain to defend her own inaction to overcome Wexford's restrictions. The jury was entitled to draw *both* conclusions—that Wexford's policies and practices were a barrier to medical treatment conforming to the standard of care, but this barrier was no excuse for Dr. Einwohner's own deliberate indifference—as the jury's verdict suggests it did. *Petties*, 836 F.3d at 728; *Sherrod*, 223 F.3d at 611. Defendants' decision not to ask Dr. Einwohner any questions, whether to rehabilitate her or to present a competing explanation in their case, left the jury with ample unrefuted evidence to support its verdict.

**Wexford.** Drs. Nawoor and Einwohner testified their decisions were driven by Wexford's policies and practices, especially its use of collegial review.[2] Nowhere was the effect of these policies and practices clearer than in the way Wexford's collegial review requirements interposed redundant approvals, delaying treatment required under the standard of care. Wexford's collegial review approved ultrasound, despite its shortcomings, that forestalled the medically necessary referral to a urologist for CT imaging. (Tr.2 402:22-405:1 (Metwalli); Tr.3 444:19-445:8, 448:7-18 (Dhar).) Even after the urology referral, Wexford interposed another collegial review that delayed the CT imaging that Defendants knew would be necessary from Mr. Dean's first report of bloody urine. (Nawoor Tr. 23:18-24:13.) Later appointments with the urologist, the cardiologist, and the cardiothoracic surgeon were subject to separate approvals in collegial review despite the fact that these appointments were necessary to his already-approved kidney surgery. (*Id.* 112:16-

---

[2]    Moreover, should the Seventh Circuit overrule *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982), as suggested in *Shields v. Illinois Department of Corrections*, 746 F.3d at 795, Dr. Nawoor's and Dr. Einwohner's deliberate indifference, would support a *respondeat superior* verdict against Wexford.

113:1, 118:9-119:9.) Wexford structured collegial review such that Dr. Einwohner—a kidney specialist who had personally treated Mr. Dean's kidney conditions dating back to 2012—would have no opportunity to participate in the purported exercise of "clinical judgment" to approve his necessary care; she was never once invited to offer her opinions, let alone attend collegial review meetings. (Einwohner Tr. 49:25-52:20.) No one ensured Wexford's written policies to document the medical data considered or decisionmaking process used in collegial review were followed. (PTX102; PTX103; Tr.4 658:9-17 (Matticks).) Defendants produced no documents to show that any meaningful medical discussion occurred at any of the collegial review meetings in Mr. Dean's case.

Defendants' failure to adhere to Wexford's own written policies was alone sufficient to sustain the jury's verdict of *Monell* liability for deliberate indifference. *See, e.g.*, *Daskalea v. District of Columbia*, 227 F.3d 433, 442-43 (D.C. Cir. 2000). Proof of Wexford's direct liability was even starker here, where the collegial review was designed to omit meaningful input from his nephrologist and delayed Mr. Dean's care by requiring multiple additional approvals for steps that were already approved.[3] The delays occasioned served no penological interest, *Grieveson*, 538 F.3d at 779; Wexford does not even attempt to articulate one. The trial's factual record provided ample support for the jury's verdict. *See* Fed. R. Civ. P. 50.

**B.  Defendants are not entitled to judgment as a matter of law on compensatory damages.**

Defendants renew their arguments—rejected prior to and at trial—that Mr. Dean should not be allowed to ask for or receive damages for loss of normal life/diminished life expectancy

---

[3]   The suggestion that collegial review added "just 23 days" to Mr. Dean's treatment timeline, (Br. 4), is unsupported. (*See* Tr.7 1291:15-1292:18 (Plaintiff's closing argument regarding 207 days' delay)).

and for future medical expenses. Defendants fail to explain why the evidence does not support the jury verdict.

Defendants first argue that because Illinois law required Dr. Metwalli to testify "to a reasonable degree of medical certainty" on diminished life expectancy and his "testimony on life expectancy was entirely speculative and undeveloped," this category of damages was precluded.[4] (Br. 5.) This argument misstates the evidence actually presented at trial and the full scope of the category of damages at issue. Defendants ignore substantial expert testimony on how the delays in Mr. Dean's care and the advancement of cancer resulted in loss of normal life or diminished life expectancy. (Tr.2 361:23-363:12, 363:3-12, 370:5-371:10, 380:8-13, 384:11-386:2 (Metwalli); Tr.3 468:4-469:3 (Dhar).) Moreover, under Illinois law, "[a] plaintiff can obtain compensation for a future injury that is not reasonably certain," *Dillon v. Evanston Hosp.*, 771 N.E.2d 357, 370 (Ill. 2002). There is "no magic to the phrase [reasonable degree of medical certainty]." *Dominguez v. St. John's Hosp.*, 632 N.E.2d 16, 19 (Ill. App. Ct. 1993). Expert testimony need only be "based upon specialized knowledge and experience and grounded in recognized medical thought." *Id.*

The trial evidence demonstrated that Defendants' actions interfered with Mr. Dean's normal life and reduced his life expectancy. In April 2016, Dr. Severino told Mr. Dean he had only a 35 percent chance of surviving five years, a number grounded in "[medical] literature plus [Dr. Severino's] experience." (Tr.7 1163:15-1164:6.) After learning he had metastatic disease, he was told the average survival time for individuals with his disease was two years. (Tr.2 302:12-23; *see id.* 384:22-385:2.) Dr. Metwalli testified that "earlier stage disease has a better survival and prognosis overall than later-stage disease," that "higher stage disease has lower survival … [a]nd

---

[4]   Defendants made a similar argument in their Fourth Motion in Limine, which this Court denied. (*See* Dkt. 124, at 8-10; Dkt. 152.)

delays like [the ones in this case] lead to hi[gh]er staging and … did in this case," and that the progression of Mr. Dean's tumor thrombi caused his survival rate in general and his chances of survival from the surgery to decrease. (*Id.* 363:3-12, 385:16-386:2.) Dr. Guaglianone testified that Mr. Dean's disease will take his life, (Guaglianone Tr. 51:24-52:3), and chemotherapy may have been unnecessary had the surgery occurred earlier, (*id.* 62:19-64:9). This testimony was not "speculative and undeveloped," but was based on these medical professionals' experience and knowledge, and established a direct correlation between Mr. Dean's metastasized cancer and his life expectancy. Thus, it was reasonable for the jury to find that Mr. Dean's life expectancy decreased as a result of Defendants' conduct. Its relatively modest award of $100,000 was proper.

Defendants also fail to address evidence supporting other considerations properly factored into the jury's award for disability and loss of normal life/diminished life expectancy, including Mr. Dean's past and future need to receive chemotherapy or other cancer treatments, (Guaglianone Tr. 51:9-52:13); *see also Clanton v. United States*, 2018 WL 3609225, at *15-*16 (S.D. Ill. July 27, 2018) (past and future need for dialysis treatments helped justify award of $4 million for past and future loss of normal life); the severity of the surgery he was required to undergo due to the delay in his diagnoses, which necessarily required Mr. Dean to endure a longer recovery time, (Tr.2 385:3-8); and the increased risk that he would die in prison, (*Id.* 171:20-172:9; Guaglianone Tr. 66:15-67:8).

Defendants contend they are entitled to judgment as a matter of law with respect to future medical expenses on the grounds that Mr. Dean "introduced no evidence of (1) the cost of medication Plaintiff is taking or (2) how long he is expected to live based on actuarial tables or other evidence." (Br. 5.) Defendants claim Plaintiff's counsel was "guessing in closing argument when asking for $1,800,000 in future medical expenses." (*Id.*) These arguments are incorrect.

First, the evidence established that the cost of Mr. Dean's cancer medications was approximately $10,000-$15,000 a month. (*See* PTX181; PTX404; PTX406; Tr.5 772:21-25; Nawoor Tr. 148:4-8.) These numbers were not "guesses," but rather came directly from Wexford's pharmacy department, witnesses, and documents. Second, as stated above, testimony at trial made clear that Mr. Dean's disease is terminal, and will kill him once he stops responding to treatment. (*See* Tr.2 384:22-385:2, 390:4-7; Tr.7 1163:15-1164:6; Guaglianone Tr. 51:20-52:13.) Mr. Dean will continue treatment until the cancer takes his life. (Tr.2 228:7-21; Tr.3 484:15-22.)

Mr. Dean asked the jury to award what Mr. Dean would need to pay for his cancer treatments for the rest of his life. Mr. Dean asked for $1.8 million, giving Mr. Dean 10 years to live, based on the $15,000/month cost of his cancer medications. (Tr.7 1330:2-14.) This Court instructed the jury to award the costs of medical care Mr. Dean "is reasonably certain to need and receive in the future." (Dkt. 187, at 42.) The jury rejected the amount proffered by Mr. Dean's counsel, instead awarding Mr. Dean $300,000 for future medical expenses, a number that estimates Mr. Dean has about a year and a half to live. The jury's award of damages for future medical expenses was supported by ample evidence. *See Snelson v. Kamm*, 787 N.E.2d 796, 807, 817 (Ill. 2003) (affirming jury's award of future medical expenses where the award "related to [plaintiff's] current expenses … per month for [treatment], which would continue for the remainder of his … life expectancy").

**C.  Defendants are not entitled to judgment as a matter of law on punitive damages.**

Defendants argue that "[t]he evidence was insufficient to support an award of punitive damages" because "no evidence existed [showing] Defendants were motivated by evil motive or intent, or engaged in callous or reckless indifference to Plaintiff's Constitutional rights." (Br. 5-6.) Defendants acknowledge (Br. 6) the "standard required to demonstrate an Eighth Amendment violation meets the punitive damages standard." *Walsh v. Mellas*, 837 F.2d 789, 801-02 (7th Cir.

1988). Consequently, "[t]he jury's conclusion that the Defendants acted with deliberate indifference in violation of the Plaintiff's Eighth Amendment rights is, *per se*, a sufficient basis to sustain an award of punitive damages." *Jackson v. Birkey*, 2019 WL 585351, at *6 (C.D. Ill. Feb. 13, 2019).

Moreover, the evidence of Defendants' deliberate indifference constitutes the disregard that forms the basis of a punitive damages award. Dr. Nawoor's testimony and demeanor were a textbook illustration of callousness. Dr. Einwohner could not justify her failure to take medically necessary actions and repeatedly asserted it "wasn't her job." Wexford's corporate representatives, Dr. Ritz and Dr. Matticks, were arrogant and indifferent to Mr. Dean's plight. No one took responsibility for the botched medical treatment Mr. Dean received, seeking instead to blame others, including Mr. Dean. Remarkably, as damaging as the evidence was at trial, the cold record fails to do justice to how harmful Defendants' testimony was to their own defense. The jury, charged with evaluating witnesses' testimony in light of their interest or bias as well as their manner while testifying, rendered a verdict reflecting this.

Defendants assert Mr. Dean *eventually* received a diagnosis and treatment (Br. 2-4), but fail to acknowledge the impact of the repeated *delays* attributable to Wexford's harmful, cost-motivated, collegial review system. This Court observed the witnesses' testimony and demeanor, and recognized the careful attention the jury paid to the evidence. The jury was entitled to find Defendants' actions constituted indifferent and reprehensible conduct. The trial record "does not negate the jury's award of punitive damages." *Jackson*, 2019 WL 585351, at *6.

## II.   Wexford Is Not Entitled To A New Trial.

Wexford moves for a new trial under Rule 59(a) on three grounds: evidentiary errors, jury instruction errors, and that the verdict is against the manifest weight of the evidence. To be entitled to a new trial for evidentiary or jury instruction errors, Wexford must show that this Court actually

erred and that those errors "had a substantial effect on the jury's verdict and the result was inconsistent with substantial justice." *Jordan v. Binns*, 712 F.3d 1123, 1137 (7th Cir. 2013); (Br. 7.). To get a new trial based on the manifest weight of the evidence, Wexford must demonstrate that no "reasonable basis exists in the record to support" the jury's verdict. *Levi v. Bednarz*, 2016 WL 3661098, at \*2 (C.D. Ill. July 5, 2016) (Myerscough, J.). A "new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice … or shocks [the] conscience." *Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 979 (7th Cir. 2006). Wexford's arguments do not meet these standards.

### A. The Court properly admitted the *Lippert* reports.

Wexford asserts that admission of the so-called *Lippert* reports was "farcical." (Br. 9.) That ignores the careful and fact-intensive nature of this Court's decision to admit the *Lippert* reports. After careful review of Mr. Dean's arguments why the Shansky and Puisis Reports were admissible for a variety of hearsay and non-hearsay purposes, this Court admitted both reports for the purpose of notice and read the jury a limiting instruction. (Tr.5 666:19-23.) After trial, this Court issued a written order underscoring its holding that "the reports are admissible … to show notice to Defendants (particularly, to Wexford) that court-appointed experts had reported systemic problems with the process for obtaining offsite diagnostic tests and offsite care, the same issues in this case." (Dkt. 190, at 3.) "[N]otice," this Court continued, "is relevant to the deliberate indifference inquiry on the Eighth Amendment claim." (*Id.*) The Court evaluated the Reports under Rule 403 and held their admission was not unfairly prejudicial because "Defendants were free to and did offer evidence disputing the reports' conclusions, and the jury was instructed to consider the reports only as to notice of the reports' findings, not for the truth of those findings." (*Id.* 3-4.) This Court's ruling was correct, and Wexford's arguments, addressing only parts of the Court's ruling, must fail.

30

Initially, Wexford makes no argument that the Shansky Report was improperly admitted. Any such argument is waived. *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012). Moreover, that argument fails. The Shansky Report was authored in 2014 and described "breakdowns" of collegial review in detail. (*See* PTX193-0029.) Dr. Ritz testified that top executives at Wexford were "certainly aware" of the Shansky Report's conclusions about collegial review. (Tr.5 753:17-18; *see also id.* 741:12-14, 752:15-22 (same).) This information is thus properly the subject of notice and not hearsay. *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 647-49 (N.D. Ill. 2019).

In addition to lacking citation to authority, effectuating waiver, *Kalpedia v. City of Peoria*, 2013 WL 12374682, at *7 (C.D. Ill. Jan. 31, 2013), Wexford's argument that the Puisis Report was improperly admitted fails on the merits. Wexford fails to grasp that the Shansky and Puisis Reports were part of a continuing investigation by a district court in into Wexford's practices, including its collegial review practice. As this Court held, (Dkt. 190, at 2), Dr. Puisis investigated the period 2015-2017, the key period in this case, as a continuation of Dr. Shansky's work: he was "primarily" to determine "whether any of the systemic deficiencies identified by [Shansky] … currently exist." (*See* PTX193-0003.) The Puisis Report's admission, therefore, does not depend upon its "truth or falsity" because its relevance is based on Wexford's awareness of the ongoing investigation, including Dr. Shansky's pointed critique and Dr. Puisis's inevitable conclusion that problems with collegial review would persist unless Wexford made "improvement[s]." (PTX193-0010-12.) Wexford was on notice of the ongoing "concerns" the district court's appointed experts expressed, and thus a report published after the events in question was admissible for notice. *Saccameno*, 372 F. Supp. 3d at 647-49. This Court cited *Saccameno* in its order, (Dkt. 190, at 3), but Wexford's brief does not address it.

31

In addressing the Seventh Circuit's statement in *Daniel v. Cook County*, 833 F.3d 728 (7th Cir. 2016), that an independent prison healthcare expert's report might be admissible for notice, Wexford argues that, unlike here, the defendant in *Daniel* "had [the] opportunity to contest the findings and conclusion[s] within that litigation." (Br. 9.) Wexford knows full well that the order appointing Dr. Shansky gave Wexford the full opportunity to participate in meetings and commenting on draft reports, further demonstrating its actual notice. (*See* Dkt. 159, at 3-4, 20-22 & Ex. D (response to Wexford's Motion in Limine No. 7).)[5] Wexford made the tactical decision to not intervene in the Puisis Report's drafting or contest its conclusions. Wexford knew of the ongoing investigation in *Lippert*: Dr. Puisis and his team describe listening in on a collegial review phone call between Wexford employees. (*See* PTX193-0064.) In light of the history of the *Lippert* litigation, the court certainly would have afforded Wexford the opportunity to intervene to address Dr. Puisis' findings. Wexford should not be able to exclude the Report by pointing to its own tactical decision not to intervene.

Wexford offers other meritless arguments against the admission of the Reports. First, Wexford manufactures a purported "concession" from Mr. Dean's counsel that the Puisis Report could not be admitted for notice (Br. 8), but the immediately preceding sentence refutes Wexford's position: Mr. Dean's counsel expressly states Mr. Dean intends to "use both … reports" for "notice." (Tr.3 418:1-5.) Second, Mr. Dean did not "improperly use the reports as substantive expert testimony," (Br. 9), because this Court admitted the reports for "notice" only and carefully

---

[5]    Wexford's omission of its involvement in the Shansky Report and its calculated non-intervention in the Puisis Report is reminiscent of Wexford's attempts to mislead this Court and the jury about its involvement in the *Lippert* litigation. Wexford represented to the Court that it "was not a party to Lippert," (*see* Tr.5 668:15-16), before conceding that it was a named party, (*see id,* 737:1-738:3). And Dr. Ritz testified that he "wasn't involved in the" *Lippert* litigation, before admitting he was deposed in the case. (*Id.* 830:23-831:1.)

crafted a limiting jury instruction. (Dkt. 187, at 12 (jury instruction).) Furthermore, Mr. Dean's closing argument reiterated that the reports "go to the issue—as the judge instructed you—of whether Wexford knew that it had problems … with its collegial review process." (Tr.1312:11-15.) This "explanation for the statement's alleged admissibility, which the jury heard, served as an additional 'instruction' about how to receive" the reports, further limiting any prejudice. *United States v. Jones*, 2014 WL 4287279, at *9 (C.D. Ill. Aug. 29, 2014) (Myerscough, J.). Third, Wexford's argument that Mr. Dean's counsel talked about the Reports too much and used language from those reports that was too strong fails, because there is no authority for the proposition that a party can only discuss a statement admitted for notice purposes a certain number of times or has to tone down the language. Wexford invokes language from Rule 403, but its "barebones" and "conclusor[y] argument is waived because it fails to expand on how that careful balancing test applies here or grapple with this Court's careful analysis of the 403 issue. *Williams v. Dieball*, 724 F.3d 957, 962 (7th Cir. 2013); (Dkt. 190, at 3-4). As this Court noted, Dr. Ritz testified about Wexford's disagreement with the conclusions of the Shansky and Puisis Reports. (Tr.5 828:2-18.) This Court placed no limitations on testimony or evidence Wexford could introduce regarding its knowledge of, response to, or disagreements with the concerns in the Reports. Wexford's argument that this Court erred by taking judicial notice of the Reports is meritless because courts regularly take judicial notice of the fact of filings in other courts. *See Saccameno*, 372 F. Supp. 3d at 649-51.

Finally, Wexford argues that the admission of the *Lippert* reports was prejudicial because they were the "only evidence supporting the *Monell* element of corporate deliberate indifference." (Br. 10.) On the contrary, Mr. Dean presented substantial evidence, most notably in the testimony of Dr. Nawoor and Dr. Ritz, (*e.g.*, Nawoor Tr. 56:1-7 ("just going through the motion")), from

which the jury could conclude that Wexford's collegial review process was medically unnecessary and a cover for foisting the cheapest (and often most ineffective) care on inmates. *Jordan* 712 F.3d at 1138 ("As a general rule, errors in admitting evidence that is merely cumulative of properly admitted evidence are harmless."). For instance:

- Dr. Nawoor contrasted that in "private practice" he could have immediately sent a patient suffering from hematuria to a urologist, but under Wexford's policies he needed to send that patient to collegial review before the urologist. (Nawoor Tr. 19:22-25, 63:1-7.)
- Dr. Nawoor testified that the only medical purpose for collegial review was to "discuss cases." (*Id.* 83:20-25.) Dr. Ritz testified similarly. (Tr.5 777:5-10.)
- Dr. Ritz testified that 85 to 90 percent of collegial review cases are not actually discussed at all and are instead approved "at face value." (*Id.* 748:4-7.)
- Wexford's own website described collegial review as "process designed to reduce offsite care costs." (PTX142-0001.)

Beyond this testimony, there is no question that the Shansky Report, which covered the same ground as the Puisis Report, was properly admitted. Because the jury's verdict is supported by substantial, admissible evidence, any error in admitting the Puisis Report was harmless.[6] Wexford is not entitled to a new trial.

## B. The evidence supported Mr. Dean's argument regarding the progression of his cancer.

Wexford complains that Mr. Dean's closing argument improperly claimed his cancer metastasized from December 2015 (when Mr. Dean first presented to Dr. Nawoor) to July 2016 (when Mr. Dean finally had surgery). (Br. 10.) This assertion of error fails on multiple levels. First, argument is proper if supported by any evidence in the record, or by a reasonable inference from record evidence. Thus, Wexford must demonstrate there was "no evidence" that Mr. Dean's cancer

---

[6]   Both reports were also admissible for their truth under the public records exception and the residual exception to hearsay and other grounds. (Dkt. 159.) As Mr. Dean demonstrated at length during the trial, Wexford's failure to retain or produce relevant documents deprived Mr. Dean of evidence about the failings of collegial review and admission of these reports would be an appropriate remedy.

metastasized during this period. *United States v. Velez*, 46 F.3d 688, 691-92 (7th Cir. 1995).

Second, Wexford must show that the *entire* trial was "rendered unfair" by a fleeting comment on

the evidence which comprised 28 words. *Id.* The Seventh Circuit has "repeatedly" emphasized that

"improper comments during closing argument rarely amount to reversible error." *Soltys v.*

*Costello*, 520 F.3d 737, 744 (7th Cir. 2008).

Wexford's argument fails at both steps. First, Mr. Dean's counsel's statement was

supported by extensive evidence, as this Court recognized when it overruled Wexford's objection

to the closing argument. Most notably, Dr. Severino, Mr. Dean's urologist, testified that he did not

see any metastasis on Mr. Dean's April 2016 CT scan. (Tr.7 1164:67-10). Dr. Racenstein,

Wexford's own radiology expert, testified that he "did not see any evidence" of metastatic disease

while reviewing the April 2016 CT scan. (*Id.* 1088:2-5.) In July 2016, Dr. Severino believed that

Mr. Dean's cancer had metastasized based on observations during surgery. (*Id.* 1164:18-24.) Dr.

Gualiagnone testified that Mr. Dean's cancer likely metastasized before his July 2016 surgery.

(Guaglianone Tr. 62:19-65:18.). Given this evidence, Mr. Dean's counsel had ample basis to argue

"the medical evidence that's real as opposed to the speculative medical evidence shows you that

he gets metastatic disease during that period." (Tr.7 1365:5-8.)

The testimony of Dr. Kosierowski, on which Wexford's argument relies, was thoroughly

"speculative." Dr. Kosierowski admitted on cross-examination that his opinion that Mr. Dean had

metastatic disease prior to December 2015 was not based on Mr. Dean's images, but instead on

the "natural history" of metastatic disease more generally. (Tr.6 1026:24-1027:6.) Dr. Kosierowski

testified that his "natural history" approach did not allow him to "prove [the presence of metastatic

disease] for any one individual patient." (*Id.* 953:2.) And Wexford's characterization of Dr.

Metwalli's testimony is simply wrong. He did not testify that "metastasis pre-dated Defendants'

care by several years." (Br. 10.) In fact, he testified that it was "possible" that proper care of Mr.
Dean beginning in December 2015 "would have prevented the liver metastasis." (Tr.2 381:21-25.)
At most, the Kosierowski testimony created a fact issue—one the jury was entitled to resolve in
Mr. Dean's favor, especially once it observed Dr. Kosierowski's uncertain, hesitant demeanor
under cross-examination compared with steadfast, informed presentations from Mr. Dean's
experts.

Even if this Court were to conclude that such arguments were improper, this is far from the
rare case justifying reversal. The jury was instructed that "closing arguments … are not evidence"
and that "[i]f the evidence as you remember it differs from what the lawyers said, your memory is
what counts." (Dkt. 187, at 5 (final jury instructions).) The Seventh Circuit has consistently held
that it presumes the jury obeyed such an instruction, which "mitigate[s] any harm that may
otherwise have resulted." *Soltys*, 520 F.3d at 745. Moreover, the 28-word statement was fleeting.
"This single reference," even if improper, when judged "in light of the entire closing argument,
does not cross the line of excessiveness nor impair the jury's calm and detached search for the
truth." *United States v. Goodapple*, 958 F.2d 1402, 1410 (7th Cir. 1992) (affirming denial of new
trial).

Finally, Wexford suggests Mr. Dean's counsel sandbagged by "wait[ing] until rebuttal" to
raise this argument. (Br. 10.) But Wexford's counsel had argued in closing that there was "no
dispute" that "this disease was most likely metastatic as of December 23, 2015." (Tr.7 1338:9-19.)
As described above, that was a mischaracterization of the testimony, which Mr. Dean's counsel
was entitled to rebut.

**C. The Court properly admitted evidence about Dr. Nawoor's conduct.**

Wexford's argument that admission of evidence about Dr. Nawoor's conduct during the
relevant period was "irrelevant" and "improper character evidence," (Br. 12), has been waived

twice over. Both Wexford's motion in limine (and its trial objections based on that motion) and its Rule 59 motion fail to describe the documents it sought to exclude in any detail and fail to offer any argument beyond boilerplate invocations of the standards under Rule 403 and 404(b). (Br. 11-12; Dkt. 124, at 10-11); *Williams*, 724 F.3d at 962.

In any event, the evidence Wexford identifies was properly admitted as "direct evidence" of the care Dr. Nawoor provided to Mr. Dean, and thus 404(b) is not applicable. *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010). Even if considered under the 404(b) framework, this evidence shows Dr. Nawoor's "lack of accident" or "absence of mistake" regarding Mr. Dean. *Burton v. City of Zion*, 901 F.3d 772, 777 (7th Cir. 2018).

Evidence that Dr. Nawoor was disciplined for sleeping on the job in August 2016 is directly relevant to Mr. Dean's allegations that Defendants, including Dr. Nawoor, were deliberately indifferent during the follow-up to Mr. Dean's surgery from July 2016 to March 2017. (Nawoor Tr. 168:16-25.) It was no accident that Dr. Nawoor did not push harder to ensure Mr. Dean had necessary post-surgery resources; the evidence shows that Dr. Nawoor did not follow rules and guidelines, which is why he did not adequately engage the collegial review process in the ordinary course, let alone on a more urgent basis. Similarly, testimony that Dr. Nawoor was disciplined during the relevant period is direct evidence that he did not follow rules and guidelines to provide proper care to his patients. This evidence demonstrates Dr. Nawoor's "lack of accident" or "absence of mistake": he was so unconcerned about the rules that he would fall asleep right at work, and Mr. Dean's case was no one-time mistake. The evidence that Dr. Nawoor abandoned his medical duty by sleeping on the job or deliberately flouting medical rules refutes Wexford contention that Nawoor was exercising "medical judgment" in treating Mr. Dean, or that his deviations from the standard of care were mere negligence.

Nurse Mincy's email is likewise "direct evidence" because it discusses how employees had to badger Dr. Nawoor to order a pre-surgery chest X-ray for Mr. Dean in April 2016, mere days after he was diagnosed with cancer. (*See* PTX395-0002.)

Moreover, the evidence is proof that Wexford *itself* was aware of the inadequate care that Dr. Nawoor was providing to Mr. Dean and other patients, which is direct evidence of Wexford's deliberate indifference and institutional negligence. Wexford knew its employees were providing inadequate care. It continued to entrust those employees with the care of Mr. Dean nonetheless.

Wexford's accusation that this Court "failed to conduct" the analysis required by *Burton v. City of Zion*, 901 F.3d 772, is a red herring. *Burton* only requires this Court to ascertain "the relevance of other-act evidence directly, using the Federal Rules of Evidence as a guide," precisely what this Court did when admitting the evidence. *Id.* at 778.

Finally, any error in admitting the evidence was harmless. *See Smith v. Hunt*, 707 F.3d 803, 811 (7th Cir. 2013). The jury observed nearly a full day of testimony from Dr. Nawoor. Dr. Nawoor's testimony was highly damaging to him. He was regularly confused and non-responsive in his answers and would often trail off when answering questions. At one point, the court reporter had to assist Dr. Nawoor in navigating a straight-forward paper exhibit he had been handed, and one juror could be seen shaking his head in seeming disbelief. The jury also observed Dr. Nawoor seated at counsel table for the entire trial. He was frequently inattentive and even occasionally asleep. *See Simon Prop. Grp., L.P. v. mySimon, Inc.*, 2003 WL 1807135, at *2 (S.D. Ind. Mar. 26, 2003). In deciding whether a new trial is warranted, this Court is to consider "all of the evidence at trial, including the trial judge's observations of witness demeanor and juror reaction to those witnesses." *Id.* A few disciplinary records, even if wrongfully admitted, were not prejudicial compared to the jury's observation of Dr. Nawoor over the multi-day trial. The jury had before it

a "substantial amount of evidence" that Dr. Nawoor was deliberately indifferent. It is thus highly unlikely that the snippets of evidence Defendants challenge substantially affected the jury's view of Dr. Nawoor and "changed the outcome of the trial." *Id.*

### D. The Court properly admitted Mr. Dean's calendars.

Wexford challenges this Court's admission of Mr. Dean's calendars because Mr. Dean was "not engaged in regular business activity" and "acknowledged not writing entries in his calendar contemporaneously and omitting things at his discretion." (Br. 13.) These arguments fail.

The Seventh Circuit has held an individual's "desk calendars" documenting important dates and appointments can be admitted under Rule 803(6). *United States v. McPartlin*, 595 F.2d 1321, 1347-48 (7th Cir. 1979); *United States v. Hedman*, 630 F.2d 1184, 1197-98 (7th Cir. 1980). Mr. Dean's unremarkable acknowledgment that he didn't write every single life event in his calendar and that some entries were not recorded contemporaneously does not undermine the calendars' admission. *McPartlin* affirmed admission of desk calendars where some events were recorded "non-contemporaneously" and did not purport to be an absolutely exhaustive account of the individual's life. 595 F.2d at 1347-49. The Seventh Circuit has repeatedly affirmed admission of business records under these circumstances, holding these considerations "go to the weight of the evidence, not its admissibility." *United States v. Brown*, 822 F.3d 966, 973 (7th Cir. 2016).

Mr. Dean's calendars were admissible under other hearsay exceptions. Many of his entries were "present sense impressions" under Rule 803(1) because they "described an event or condition without calculated narration" perceived by Mr. Dean and the description was made immediately after the event. *United States v. Ruiz*, 249 F.3d 643, 646-47 (7th Cir. 2001). (*See, e.g.*, PTX003-0018 (entry the day of his cancer diagnosis).) Other entries are statements of a "then-existing mental, emotional, or physical condition" under Rule 803(3). Mr. Dean frequently recorded his raw reactions to his various doctor's visits. *See, e.g.*, PTX003-0020 (May 5, 2016 entry questioning

whether he will have surgery the following day and noting that the blood in his urine was heavy that day). Still other entries were admissible under Rule 803(4)'s exception for statements made for medical diagnosis. Mr. Dean often recorded detailed notes on what he told doctors. (*See* PTX003-0020 (May 26, 2016 visit with Dr. Einwohner.) Finally, the calendars were admissible under Rule 807's residual exception because they were "more probative" documentary evidence on Mr. Dean's actions and state of mind than "any other evidence" and were supported by "sufficient guarantees of trustworthiness" as their contents were corroborated by medical records and other witnesses' testimony.

Wexford asserts Mr. Dean "read" from the calendars instead of testifying from personal knowledge, but Wexford has no evidence besides its counsel's "say-so." And even if he did, there is nothing inappropriate about a witness reading a portion of an admitted document and providing further explanation or context.

Finally, any error would be harmless, as the Seventh Circuit held in *Collins v. Kibort*, the lone case Wexford cites in support of this argument, because substantial evidence supported the jury's verdict. 143 F.3d 331, 337-39 (7th Cir. 1998) (Br. 13.). Mr. Dean's testimony about the key events in this case was based on personal knowledge, did not require him to "read" from his diaries, was far more detailed than his calendars, and was highly credible.

### E.  The Court properly admitted Mr. Dean's testimony about Dr. Severino's statements.

Wexford's argument that this Court erred in admitting Mr. Dean's testimony that Dr. Severino told him he needed to have surgery "right away" and "as soon as possible" is a non-starter. As this Court recognized, Mr. Dean was permitted to "testify to what [his] knowledge of the treatment plan was" because it went to his "state of mind." (Tr.1 102:25-103:1); *see Wheatley v. Factory Card & Party Outlet*, 2014 WL 4947506, at *4 (C.D. Ill. Sept. 30, 2014) (Myerscough, J.). Mr. Dean suffered serious emotional distress as he waited for Wexford to diagnose and treat

40

him. Dr. Severino informed his state of mind that Wexford's delays were quite literally killing him.

Any error is harmless. Wexford's motion characterizes Mr. Dean's testimony as the "only evidence" that "Dr. Severino viewed the surgery as urgent." (Br. 14.) Mr. Dean never used the word "urgent" in his testimony. Moreover, Dr. Severino testified he wanted surgery done as soon as reasonably possible with consideration of the necessary pre-surgery precautions. (Tr.7 1188:22-1189:5.) That testimony is consistent with Mr. Dean's recollection that Dr. Severino used the words "right away" or "as soon as possible." There is no significant chance that the outcome of this seven-day trial was improperly altered by Mr. Dean's references to these recollections.

**F.    The Court properly admitted Dr. Barnett's opinion testimony.**

Wexford argues portions of the testimony of Mr. Dean's primary care expert, Dr. Bruce Barnett, were inadmissible. First, Wexford asserts this Court "allowed Dr. Barnett to give undisclosed opinion testimony on the standard of care for presenting a patient with an advance directive" for which he lacked evidentiary foundation. (Br. 14-15.) Dr. Barnett's advance directives opinion was disclosed at his deposition when Wexford's counsel asked him about "do not resuscitate" orders. (*See* Wexford MSJ Ex. H, Barnett Dep. Tr. 53:16-56:19.) In response, Dr. Barnett testified that he considered himself an expert on advance directives because he had lectured on and researched the topic. (*Id.* 55:6-9.) Wexford's counsel asked Dr. Barnett in "[w]hat situations is a DNR appropriate" and Dr. Barnett testified that it is appropriate "[i]n all situations." (*Id.* 56:7-8.) Wexford's counsel then elicited Dr. Barnett's opinion that it would be proper "[i]f someone has a terminal illness." (*Id.* 56:16-19.) Wexford's complaint that Dr. Barnett never disclosed his opinion that it was below the standard of care for Wexford to wait until after Mr. Dean's surgery to have him consider an advance directive ignores that Wexford solicited this precise opinion in

Dr. Barnett's deposition. (Tr.4 549:9-16.) It "cannot now complain" that he repeated the opinion at trial. *Leichtenberg v. City of Leroy*, 2012 WL 13005640, at *7 (C.D. Ill. June 15, 2012).

Second, Wexford's foundational objection that Dr. Barnett could not testify about the standard of care for advance directives because he did not know "all the circumstances" of the DNR that Mr. Dean signed in November 2016 is incorrect. Dr. Barnett reviewed Mr. Dean's medical records, as well as depositions and trial testimony. (Tr.4 502:11-503:6.) Any holes in Dr. Barnett's knowledge goes to his testimony's weight, not it admissibility.

Third, Wexford argues "Dr. Barnett was permitted over objection to testify on emotional injury and growth of cancer, despite no foundation for these opinions." (Br. 15.) The trial transcript Wexford cites, however, has nothing to do with "emotional injury" or "growth of cancer," And Mr. Dean's counsel are unable to identify the testimony Wexford challenges. The Court should find this argument waived. *Draper v. Martin*, 664 F.3d 1110, 1113 n.5 (7th Cir. 2011).

In any event, Dr. Barnett testified that he is a family medicine doctor with extensive experience treating patients both inside and outside of a correctional health care system. (Tr.4 486:25-490:5.) Dr. Barnett heard testimony from Mr. Dean and his primary care physician. That testimony and Dr. Barnett's observations of past patients and his training gave him a foundation to testify about Mr. Dean's emotional injuries. The case Wexford cites, *Gayton v. McCoy*, underscores this point. 593 F.3d 610 (7th Cir. 2010) (Br. 15.) In *Gayton*, the Seventh Circuit *reversed* a district court that had excluded a general practice physician's opinions on a patient's heart conditions. *Id.* at 619. The Seventh Circuit made clear that generally "a physician in general practice is competent to testify about problems that a medical specialist typically treats." *Id.* at 617. Dr. Barnett need not possess specialized "experience diagnosing or treating mental illness or emotional injuries" to testify about them.

42

Wexford also complains that Dr. Barnett testified about "cancer growth kinetics" without a proper foundation. (Br. 15.) Again, however, Wexford has not cited testimony it believes was erroneously admitted. Mr. Dean's counsel have found no testimony by Dr. Barnett on "cancer growth kinetics"—unless Defendants mean the three comments, totaling 11 lines, where Dr. Barnett mentioned that untreated cancer continues to grow. (*See* Tr.4 505:18-506:3, 509:1-15, 511:16-512:20.) Under *Gayton*, this was not error.

Finally, Wexford asserts Dr. Barnett impermissibly testified about defendants' mental state. (Br. 15.) Wexford cites one snippet of testimony, interrupted by Wexford's counsel's objection, referring to the defendants "knowing" something. (Tr.4 500:12.) The unfinished statement cannot possibly be error.

Even if this Court were to agree with any of Wexford's arguments, the purported errors were harmless. Dr. Barnett's opinion on the standard of care for advance directives addressed a tangential factual issue. Dr. Barnett's testimony about Mr. Dean's emotional injury was "cumulative" of the testimony of Mr. Dean and his wife. *Jordan*, 712 F.3d at 1138. And Dr. Barnett's fleeting mention of defendants' knowledge did not affect the outcome of this trial when the defendants and their representatives testified for hours on the subject. *Id.*

**G. Wexford's cumulative error argument is incorrect.**

Wexford argues the "cumulative effect" of this Court's purportedly erroneous rulings was "devastating" and denied Defendants a fair trial. (Br. 16.) A cumulative error argument must identify multiple trial errors and show "those errors, in the context of the entire trial, were so severe as to have rendered [the] trial fundamentally unfair." *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 848 (7th Cir. 2017). Wexford did neither, waiving the issue. Moreover, Wexford has failed to prove any trial error. "If there are no errors … there can be no cumulative error." *Christmas v. City of Chi.*, 682 F.3d 632, 643 (7th Cir. 2012).

43

**H. The Court correctly instructed the jury.**

"The crafting of jury instructions is largely a matter within [this Court's] discretion." *Spiller v. Brady*, 169 F.3d 1064, 1066 (7th Cir. 1999). Although instructions must not misstate the law, this Court "is not required to issue a perfect set of jury instructions." *Lasley v. Moss*, 500 F. 3d 586, 589 (7th Cir. 2007). When considering whether a new trial is warranted due to purported instruction error, this Court "is not to focus on minutiae in this review; instead, [it must] ask whether the instructions, when considered in their entirety and not in isolation, were sufficient to inform the jury of the applicable law," and whether a party was prejudiced. *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 847 (7th Cir. 1998) (internal quotation marks omitted).

**1. The Seventh Circuit's Pattern Jury Instruction on deliberate indifference correctly states the law.**

Wexford contends this Court's deliberate indifference instruction, taken verbatim from Seventh Circuit Pattern Jury Instruction 7.17, permitted the jury to find Defendants liable solely for failing to act reasonably. (Br. 17.) "[A] pattern instruction … is presumed to accurately state the law." *United States v. Al-Awadi*, 873 F.3d 592, 597 (7th Cir. 2017). Wexford cannot overcome that presumption.

The jury was instructed it could find defendants liable for deliberate indifference if defendants *consciously* failed to take reasonable measures. Wexford's argument ignores the word "consciously" in the instruction. The Court's pattern instruction follows *Farmer v. Brennan* almost word-for-word: when a defendant "knows that [a prisoner] face[s] a substantial risk of serious harm" yet "disregards that risk by failing to take reasonable measures to abate it" is what elevates conduct from negligence to deliberate indifference. 511 U.S. 825, 847 (1994) (Br. 17.) Considering the instructions in their entirety, there is no doubt that the instruction properly stated the law.

44

Another court in this District rejected a similar argument about this instruction in *Lee v. Shepler*, holding that "Defendants have not cited to any court which found the use of this instruction was reversible error" and that "[w]hile the Defendants do not like the use of the word 'reasonable,' this is the relevant standard and accurately reflects the Seventh Circuit case law." 2015 WL 12942245, at *17 (C.D. Ill. Sept. 25, 2015).

### 2. This Court properly refused Wexford's issue instructions on professional and institutional negligence.

Wexford next argues that this Court inappropriately instructed the jury on Illinois professional negligence by failing to give an instruction "which identified the issues made by the pleading on the allegations of professional and institutional negligence." (Br. 18.)

This Court properly instructed the jury by giving IPI instructions 21.02, 105.01, and 105.03.01, *not* IPI instruction 20.01. The instructions given "sufficient[ly] informed the jury of the applicable" law on professional and institutional negligence. *Otto*, 134 F.3d at 847. The notes and comments on use for these instructions given do not "require" this Court to give an issues instruction and Wexford has cited no case to the contrary. Thus these instructions could hardly have been an abuse of this Court's "considerable discretion" in formulating jury instructions. *United States v. Grady*, 746 F.3d 846, 848 (7th Cir. 2014).

Moreover, any error in refusing Wexford's proposed issues instructions did not prejudice Wexford, because they would have added little. As this Court will no doubt attest, after seven days of trial, the jury was thoroughly aware that Mr. Dean contended that the defendants failed to "order appropriate diagnostic testing," (Dkt. 134, at 13-15, 18) in the form of a CT scan or to "make an appropriate referral to" a urologist, (*id.*). Indeed, Mr. Dean's counsel informed the jury that these were the issues in closing arguments, stating that Mr. Dean had proven that the defendants "didn't meet the standard of care in the community. So it goes right back to the delay and failure to get

45

him to a urologist, failure to get him to a CAT scan. And then you get damages." (Tr.7 1325:16-23.)

Likewise on the institutional negligence claim, Wexford's proposed jury instruction framed the issues as that Wexford had failed to "maintain appropriate policies and procedures for" "specialty care and outside consultation," "approving non-formulary tests and medications," and "scheduling outside consultations." In other words, the areas of Wexford's business covered by the collegial review process. In closing, Mr. Dean's counsel told the jury that Mr. Dean had proved institutional negligence because Wexford was "negligent with respect to their policy and their procedure and their custom and their practice with regard to collegial review." (*Id.* 1326:6-9.)

*I.* **The jury's verdict was not against the manifest weight of the evidence.**

Wexford argues that the jury's verdict was against the manifest weight of the evidence "for the same reasons" that Wexford is entitled to judgment as a matter of law. (Br. 19.) That "threadbare" single-sentence argument fails to "develop any arguments about how the jury's verdict went against the manifest weight of the evidence." *Willis*, 687 F.3d at 836. That's waiver. *Id.*

Moreover, for all the reasons stated elsewhere in this response, the verdict was not against the manifest weight of the evidence, and Wexford is not entitled to a new trial under Rule 59(a).

**III.    Defendants' Motion For Remittitur Should Be Denied.**

**A.  The jury's award for emotional pain and suffering is not excessive and is rationally related to the evidence presented to the jury at trial.**

The jury awarded Mr. Dean $500,000 for the emotional pain and suffering he experienced. Defendants argue this amount is excessive and should be remitted, but a compensatory damages award should be upheld unless it is "monstrously excessive" and/or "there is no rational connection

3:17-cv-03112-SEM-TSH   # 228   Page 54 of 65

between the award and the evidence." *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 483-84 (7th Cir. 2003).

Defendants suggest the damages for emotional pain and suffering are not rationally connected to the evidence because "[n]o expert testimony separated the emotional distress of having cancer from emotional distress inflected by Defendants [and] [n]o mental health professional testified to any emotional injury." (Br. 20.) However, as this Court instructed the jury, without objection, "[t]here is no exact standard for setting the damages to be awarded on account of pain and suffering." (*See* Dkt. 187, at 43.) Further, neither Illinois nor federal law require expert testimony to support an award for emotional injury. *See, e.g.*, *Gracia v. Sigmatron Int'l, Inc.*, 102 F. Supp. 3d 983, 990-91 (N.D. Ill. 2015); *Thornton v. Garcini*, 928 N.E.2d 804, 809 (Ill. 2010). An award for emotional pain and suffering "can be supported … solely by a plaintiff's testimony." *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1068 (7th Cir. 2001).

Mr. Dean testified to his emotional distress—caused and exacerbated by Defendants—at great length. He described Dr. Nawoor telling him he had kidney stones or cancer, then failing to follow up for weeks; passing blood clots like "gummy worms"; his feelings of helplessness while waiting for his diagnosis; and his constant fear of dying in prison. Additionally, Mr. Dean testified—and Dr. Nawoor confirmed—that Defendants did nothing to address Mr. Dean's emotional distress. (Tr.2 145:2-146:9, 149:10-17, 154:13-19, 155:14-20, 164:9-14; Nawoor Tr. 41:13-42:7.) Dr. Barnett testified this failure to address Mr. Dean's fears as his disease progressed further, combined with Defendants' requests that he sign do-not-resuscitate forms, contributed to his distress. (Tr.4 550:10-551:5.) Mr. Dean's testimony was corroborated by testimony from his wife and son, who observed his distress firsthand. The jury's award for emotional pain and

suffering is well-supported by testimony from Mr. Dean, his family members, and medical professionals.

Because it is "within the jury's province to evaluate the credibility of witnesses who testify to emotional distress," a court reviewing a jury's damages award should "emphasize the importance o[f] the jury's role to observe and weigh live, in-court testimony of witnesses, first-hand." *Gracia*, 102 F. Supp. 3d at 991. Following that approach, the damages awarded by the jury for emotional pain and suffering are not "monstrously excessive" or "not rationally connected to the evidence," but rather, reflect that "[t]he jury was able to observe [Mr. Dean] when he was testifying and … found his testimony to be sincere and sufficient to convince them that he merited the award they gave him." *Tullis*, 243 F.3d at 1068-69; *see also Lee*, 2015 WL 12942245, at *13 (upholding damages award because "the jury had the benefit of observing the demeanor of both the Plaintiff and the Defendants on the stand … [and because] [t]he demeanor of some Defendants during the trial might have been interpreted as dismissive, and helped reinforce Plaintiff's claims").

A court may also consider "whether the award is roughly comparable to awards made in similar cases," *Lampley*, 340 F.3d at 484, but "[t]here must be room for a jury's award to exceed the relevant range of cases." *Adams*, 798 F.3d at 545 ("To require that a jury's damages award be no bigger than previous awards in similar cases would make every such award ripe for remittitur."). This inquiry "is not as important as the review of the evidence in the case at hand." *Id.*

While Defendants cite cases with lower awards, they also cite cases with comparable or higher awards. *See Ward v. United States*, No. 99C-6433 (N.D. Ill. 2000) ($785,000 award for emotional distress); *Bynes v. Yockey*, No. 16L-1844 (Ill. Cir. Ct. 2015) ($430,000 award for past and future emotional distress); *Williams v. Patel*, 104 F. Supp. 2d 984, 996-97 (C.D. Ill. 2000) (remitting $1 million award for "pain, suffering, disfigurement, and disability" to $750,000). These

48

cases alone demonstrate that an award of $500,000 for emotional pain and suffering is not an outlier.[7] Wexford itself previously agreed to a consent judgment that included a *$3 million award* for emotional pain and suffering. *See* Ex. A, Consent Judgment, *Fox v. Barnes*, No. 1:09-cv-05453, Dkt. 396 (N.D. Ill. Oct. 25, 2012) ("Consent Judgment").

Thus, the grounds offered by Defendants do not justify remittitur.

### B. Wexford is not entitled to remittitur of the punitive damages award.

Defendants challenge the punitive damage award against Wexford. They do not—and cannot—challenge the punitive damage awards entered against Defendants Nawoor and Einwohner. The jury's punitive damages award should not be remitted. Punitive damages "punish blameworthy behavior and deter defendants from committing future bad acts." *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 953 (7th Cir. 2018). The determination of "the amount of money necessary to punish the defendants and deter others from engaging in similar misconduct 'is precisely the sort of judgment peculiarly within the province of the finder of fact,'" who observed indifference in Defendants' testimony and demeanor throughout a multi-day trial. *Synnott v. Burgermeister*, 2019 WL 4201574, at *10 (N.D. Ill. Sept. 5, 2019) (citation omitted) .

While the Constitution "prohibits the imposition of grossly excessive or arbitrary" punitive awards, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003), the award here is not excessive or arbitrary. Courts rely on three guideposts to make this determination: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed

---

[7]   In January 2020, an Illinois jury awarded $8.1 million to the estate of a woman who died of lung cancer after a delayed diagnosis caused her cancer to progress from Stage 1 to Stage 3. *See* Ex. B, *Wright v. Setaner*, No. 16 L 009693 (Ill. Cir. Ct. Dec. 18, 2019).

in comparable cases. *Id.* "[T]he more reprehensible a defendant's conduct … the higher the punitive damages" award should be. *Beard*, 900 F.3d at 953. Applying these guideposts to the facts, the jury's award of $10 million in punitive damages is not excessive.

### 1. Defendants' conduct was reprehensible.

The reprehensibility of the defendants' conduct is the "most important" factor in assessing a punitive damages award. *Rainey v. Taylor*, 941 F.3d 243, 254 (7th Cir. 2019). A district court should consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* (quoting *State Farm*, 538 U.S. at 419). Defendants do not address these factors, but instead merely state—again—that "Wexford approved everything requested through its collegial review process" and that "at most, [Mr. Dean] experienced brief delays" that did not "show[] malice toward [Mr. Dean]." (Br. 21.) This statement is blatantly misleading; ignores the harm caused by the unjustified delays and the failure to follow established medical protocol; and was rejected thoroughly by the jury.

Defendants' conduct toward Mr. Dean was quintessentially reprehensible. Mr. Dean suffered physical harm due to Defendants' deliberate indifference toward his serious medical condition; as a prisoner with no choice of healthcare provider, Mr. Dean was financially vulnerable; and Wexford repeatedly favored its financial bottom line over his health and determination to survive.

The trial record is replete with evidence of Defendants' malice. Under Wexford's contract with the State, it is obligated to provide inmates with all necessary healthcare services. (*See* PTX137.) Yet, the evidence showed that Wexford consistently prioritized its profits over the health

50

of the inmates it was responsible for, including Mr. Dean. Defendants ignored Mr. Dean's gross hematuria for weeks and ignored Dr. Einwohner's recommendation to refer him to a urologist. Instead, Wexford favored a cheap, onsite test that would not be able to rule out cancer. By the time Mr. Dean finally saw a urologist and received the proper diagnostic tests, his disease required extensive, life-threatening surgery. Even after surgery, Wexford continued to delay Mr. Dean's cancer treatments due to their cost—at one point suggesting he should forego his cancer treatments and instead be placed in hospice care to die in prison. These delays were largely attributable to Wexford's collegial review system. Although Wexford's corporate representative repeatedly denied at trial that collegial review was used to reduce healthcare costs, (*id.* 764:14-765:13, 772:21-773:2, 775:14-778:7, 828:19-829:12), Wexford advertises it as a mechanism "to reduce offsite care costs" *on its own website*, (PTX142). Mr. Dean was determined to walk out of prison alive, but Defendants—through collegial review—were determined to condemn him to die in prison. "[T]his evidence established a corporation that had little regard for the inmates whose care it was charged with," *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004), and entitled the jury to find Wexford's conduct was sufficiently reprehensible to warrant a large punitive damages award.

> **2.  The ratio of punitive damages to compensatory damages is appropriate in light of the facts and circumstances of this case.**

Defendants argue that the 10:1 ratio of punitive damages to compensatory damages fails to "comport[] with due process" because the punitive-to-compensatory damages ratio is in the double digits and because the compensatory award was substantial. (Br. 22.) However, the propriety of a particular punitive award is driven by the "facts and circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm*, 538 U.S. at 426. And as explained below, when Mr. Dean's

requested award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 is taken into account, as is proper, the ratio is less than 5:1.

Because "[t]he judicial function is to police a range, not a point," *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003), there is no "fixed ratio to limit punitive damages." *Rainey*, 941 F.3d at 255. While the Supreme Court rejected a 145:1 ratio in *State Farm*, 538 U.S. at 426, ratios higher than 10:1 have been upheld, *see, e.g.*, *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 453 (1993) (526:1); *Mathias*, 347 F.3d at 678 (37:1); *Johnson v. Howard*, 24 F. App'x 480, 486-87 (6th Cir. 2001) (10:1); *Murphy v. Gilman*, 551 F. Supp. 2d 677, 685-86 (W.D. Mich. 2008) (10:1), and ratios of 5:1 are commonly accepted, even where the compensatory award is "significant," *Rainey*, 941 F.3d at 255 (affirming an award of $6 million in punitive damages and $1.13 million in compensatory damages). In prisoner cases, it is important to keep in mind that "if a prisoner had been in the private sector, his economic damages would have been much higher." *Murphy*, 551 F. Supp. 2d at 686.

As outlined above, Defendants' conduct was egregious and reprehensible. Contrary to Defendants' assertion that the punitive damages awarded here "further[] no legitimate purpose" (Br. 22), the jury's award of punitive damages is "necessary to serve the objectives of deterrence and punishment." *E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1287 (7th Cir. 1995). As noted in Mr. Dean's closing arguments, the punitive damages awarded against Wexford amount to less than one percent of the revenue it stands to receive under its contract with the State of Illinois. (Tr.7 1334:19-1335:3.); *see also Donald v. Wexford Health Sources, Inc.*, 266 F. Supp. 3d 1097, 1102 (C.D. Ill. 2017) ("[A] defendant's wealth can be considered when evaluating punitive damages."). Moreover, the jury was able to gauge its damages awards in light of both the evidence and Defendants' own testimony and demeanor throughout trial, which ranged from indifference to

defiance of the duties they owed Mr. Dean. A higher award was justified here as necessary to deter Wexford from continuing its unconstitutional policies and practices.

Furthermore, the ratio of punitive damages to compensatory damages calculated by Defendants—10:1—does not account for Mr. Dean's request for attorneys' fees and costs pursuant to 42 U.S.C. § 1988. (*See* Dkt. 205.) These fees and costs are properly considered part of a plaintiff's compensatory damages amount when calculating the punitive damages ratio. *See, e.g.*, *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 236 (3d Cir. 2005); *In re USA Commercial Mortg. Co.*, 802 F. Supp. 2d 1147, 1188-89 (D. Nev. 2011); *Blount v. Stroud*, 915 N.E.2d 925, 943 (Ill. App. Ct. 2009) ("[T]he majority of the courts across the country … have agreed that an award of attorney fees should be taken into account as part of the compensatory damages factor in the *Gore* analysis").

Mr. Dean requested $1,181,354.23 in attorneys' fees and costs. If awarded in full and considered as part of Mr. Dean's compensatory damages, the correct ratio of punitive damages to compensatory damages is 4.6:1. A ratio of less than 5:1 is clearly "well within the range" of acceptable punitive damages awards. *Gracia*, 842 F.3d at 1025.

### 3. Defendants' "comparable cases" do not justify remittitur.

The third guidepost directs this Court to consider "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 416. However, "[a]wards in other cases [merely] provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive," *Gracia*, 842 F.3d at 1023; *see also Waits v. City of Chi.*, 2003 WL 21310277, at *6 (N.D. Ill. June 6, 2003) (purpose of comparison inquiry is to determine only whether a "defendant was given 'fair notice' as to its potential liability"). "[E]ven if the punitive award is higher than those in comparable cases, this guidepost generally deserves less weight than

the other two," *Rainey*, 941 F.3d at 255, and "[a] court should not substitute a jury's damages

verdict with its own figure merely because a case with similar facts has not yet arisen, or because

a plaintiff in a similar case was perhaps not able to plead his facts to the jury as well," *Lee*, 2015

WL 12942245, at *15 (quoting *Lampley*, 340 F.3d at 485).

The cases defendants rely on are too different to offer a meaningful comparison point as

the facts of these cases are far less egregious than the facts presented here. The first case,

*Saccameno v. U.S. Bank National Association*, involved allegations of wrongful loan servicing

and debt collection practices. 943 F.3d 1071, 1080 (7th Cir. 2019). Harm that is "purely economic

in nature" is rarely associated with "particularly reprehensible conduct." *BMW of N. Am., Inc. v.*

*Gore*, 517 U.S. 559, 576 (1996). *Roe v. Elyea* involved neither a terminal condition nor clear

monetary incentives. No. 06-3034 (C.D. Ill. 2008). Three cases involved denials of medical care

or failure to monitor over significantly shorter periods of time than the delays at issue in this case.

*See Fox v. Barnes*, No. 09 C 5453 (N.D. Ill. 2013) (two weeks); *Cobige v. City of Chi.*, No. 06 C

3807 (N.D. Ill. 2010) (two days); *Farver v. Corr. Med. Servs. of Ill. Inc.*, No. 00 C 6010 (N.D. Ill.

2003) (three weeks). The remaining cases involved denial of care for a single injury—not an

ongoing failure to diagnose and treat a terminal disease. *See Nicolas v. Berry*, No. 3:15-CV-00964

(S.D. Ill. 2018) (failure to treat injuries resulting from prison attack); *Williams*, 104 F. Supp. 2d

984 (failure to treat eye injury).

A high punitive damages awards can be given when warranted. *See, e.g.*, *Rainey*, 941 F.3d

at 255 ($6 million award). In *Murphy v. Gilman*, the court declined to remit the jury's $2.5 million

punitive damages award where the plaintiff was denied medical care and sufficient food and water,

leading to his death. 551 F. Supp. 2d at 685-86. Wexford previously consented to a judgment that

included a $4 million punitive damages award. *See* Ex. C, Consent Judgment, *Fox v. Ghosh*, No.

09-C-5453 (N.D. Ill. Oct. 25, 2012). It cannot now claim it did not have "fair notice" that its conduct could lead to high punitive damages.

Because Defendants' reprehensible conduct supports the jury's award of punitive damages and Defendants have offered no compelling reason for remittitur, Defendants' motion should be denied. Taking into account the requested fees and costs, the egregiousness of Defendants' conduct, the demeanor of Defendants and their witnesses, and the effect of Mr. Dean's status as a prisoner on his compensatory damages, the punitive damages awarded here are well within the range of what has been found to pass constitutional muster.

## IV.  Defendants Are Not Entitled To Setoff.

Defendants claim that setoff is required "to prevent double recovery" (Br. 23), but have not shown that any double recovery would result. Under Illinois law, "the party seeking the setoff bears the burden of proving what portion of a prior settlement was allocated or is attributable to the claim for which he is liable." *Pasquale v. Speed Prods. Eng'g*, 654 N.E.2d 1365, 1382 (Ill. 1995). Although Mr. Dean did bring an Eighth Amendment claim against Ms. Mincy, he brought other claims against Defendants Nawoor, Einwohner, and Wexford for which Ms. Mincy did not share in liability, including professional and institutional negligence under Illinois law. The judgment rendered against the Defendants for those claims are not eligible for setoff. Defendants have not even attempted to establish that any portion of the compensatory damages awarded against them was attributable solely to the Eighth Amendment claims (which might be eligible for setoff) as opposed to the state law claims (which are not). Meanwhile, punitive damages were assessed individually and cannot be offset.

Moreover, setoff is barred by the collateral source rule, which "protects collateral payments made to or benefits conferred on the plaintiff." *Smith v. Altman*, 2015 WL 5610750, at *3 (N.D. Ill. Sept. 21, 2015) (citation omitted). Ms. Mincy's settlement was as a collateral payment as Ms.

55

Mincy is a "source wholly independent of, and collateral to, [Defendants]." *Wills v. Foster*, 892

N.E.2d 1018, 1022 (Ill. 2008). Allowing setoff here would not prevent double recovery, as

Defendants halfheartedly claim, but would instead result in a windfall for Defendants.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Renewed Motion for

Judgment as a Matter of Law, Motion for a New Trial, Motion for Remittitur, and Motion for

Setoff. (Dkt. 206.)

Dated: February 5, 2020                    Respectfully Submitted,

                                              ___ /s/ Craig C. Martin_____
                                              Craig C. Martin
                                              Joel T. Pelz
                                              William M. Strom
                                              Nathaniel K.S. Wackman
                                              Chloe E. Holt
                                              JENNER & BLOCK LLP
                                              353 N. Clark St.
                                              Chicago, IL 60654
                                              (312) 222-9350
                                              cmartin@jenner.com
                                              jpelz@jenner.com
                                              wstrom@jenner.com
                                              nwackman@jenner.com
                                              cholt@jenner.com

                                              *Attorneys for William Kent Dean*

## <u>CERTIFICATE OF SERVICE</u>

I, William M. Strom, hereby certify that I caused a copy of **Plaintiff's Response Memorandum in Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law, Motion for a New Trial, Motion for Remittitur, and Motion for Setoff** and all exhibits to be served on all counsel of record via the Court's ECF system on February 5, 2020.

/s/ William M. Strom
William M. Strom
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
(312) 222-9350
wstrom@jenner.com

*Attorney for William Kent Dean*

## CERTIFICATION OF COMPLIANCE WITH COURT ORDER OF JANUARY 28, 2020

I certify this Memorandum of Law complies with the type volume limitation set in this Court's Text Order of January 28, 2020, limiting Plaintiff's response to 18,000 words, in that its body text, including point headings and footnotes, contains 17,748 words according to the word processing application used to prepare this document.

/s/ William M. Strom