IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| WILLIAM KENT DEAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17-CV-3112 |
| | ) | |
| WEXFORD HEALTH SOURCES, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE.**

Plaintiff, with the assistance of pro bono counsel, pursued claims arising from alleged delays in the diagnosis and treatment of Plaintiff's kidney cancer during his incarceration in Taylorville Correctional Center.

After a seven-day trial in December 2019, the jury found against three of the defendants, Wexford Health Sources, Inc., Dr. Abdur Nawoor, and Dr. Rebecca Einwohner, awarding $1 million dollars in compensatory damages and over $10 million dollars in punitive damages to Plaintiff.

Defendants[1] move for judgment in their favor or a new trial, or for a reduction of damages and a setoff. Plaintiff seeks attorneys' fees, expenses, and costs.

For the reasons below, the punitive damages against Wexford Health Sources, Inc., are reduced from ten million dollars to seven million dollars. The jury's verdict is otherwise upheld. Plaintiff's counsel is awarded $633,863.78 8 in fees and expenses, which is required to be paid from the jury's award. Plaintiff's counsel is also awarded $33,337.67 in statutory costs.

## Discussion

## I. Judgment as a matter of law is not warranted because legally sufficient evidence supports the verdict and the damages.

A motion for judgment as a matter of law requires the Court to decide if legally sufficient evidence was presented at trial to support the jury's verdict. In making that decision, the Court draws all reasonable inferences in favor of Plaintiff, the prevailing party, and disregards Defendants' evidence which the jury did not have to believe. The Court cannot weigh evidence or make credibility

---

[1] For ease of reference, when the Court uses the term "Defendants" in this order, the Court is referring to Defendants Wexford Health Source, Inc., Dr. Nawoor, and Dr. Einwohner. Defendant Mincy settled before the trial concluded, and the jury found in favor of Defendant Garst.

determinations. "[A] motion for a judgment as a matter of law can be granted only if the court—after viewing the evidence in the light most favorable to the non-movant—believes that the evidence 'supports but one conclusion—the conclusion not drawn by the jury.'" Mejia v. Cook County, 650 F.3d 631, 634 (7th Cir. 2011)(*quoting* Ryl–Kuchar v. Care Ctrs., Inc., 565 F.3d 1027, 1030 (7th Cir.2009)).

Defendants move for judgment as a matter of law on Plaintiff's Eighth Amendment claims for deliberate indifference to Plaintiff's serious medical needs and on the damages awarded. Defendants do not move for judgment as a matter of law on Plaintiff's negligence claims.

To uphold the Eighth Amendment verdict against a particular Defendant, sufficient evidence must have been presented for a rational juror to find that that the Defendant was deliberately indifferent to Plaintiff's serious medical need. Knowing and repeated delays in needed medical treatment, delays which serve no legitimate purpose, are evidence of deliberate indifference. *See* Goodloe v. Sood, 947 F.3d 1026, 1031 (7th Cir. 2020)("[O]ur cases likewise establish that 'inexplicable delay' in responding to an

inmate's serious medical condition can reflect deliberate indifference. . . . That is especially so if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering.")(internal cite omitted)(reversing summary judgment and finding that jury could infer deliberate indifference in three month delay to see specialist).

Deliberate indifference is a state of mind—a conscious disregard of an "'excessive risk to inmate health or safety.'" Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662 (7th Cir. 2016)(*quoting* Farmer v. Brennan, 511 U.S. 825, 837). "The state-of-mind element is measured subjectively: The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." Id. That a defendant *should* have known is not enough to prove deliberate indifference. "Should have known" falls into malpractice (negligence) territory, which is a state law claim, not a federal constitutional claim. Pierson v. Hartley, 391 F.3d 898, 902 (7th Cir. 2004)("Negligence on the part of an official does not violate the Constitution, and it is not enough that he or she should have known of a risk.").

Direct evidence of a person's state of mind is rarely available, particularly in a case like this, which involves inadequate medical attention rather than no medical attention at all. *See* Whiting, 839 F.3d at 662; Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016)("Rarely if ever will an official declare, 'I knew this would probably harm you, and I did it anyway!'"). More typically, actions and inactions over a period of time together form a picture of a deliberately indifferent state of mind, as in this case.

Defendant Dr. Nawoor argues that "Plaintiff identified no particular action or inaction that independently constituted deliberate indifference by Dr. Nawoor, instead relying on the entirety of his conduct between December 23, 2015 and May 4, 2017." [d/e 207, p. 2.] However, the totality of care provided by Dr. Nawoor is the focus, Petties, 836 F.3d at 728, not one particular action or inaction.

The jury heard testimony which allowed the rational conclusion that the only acceptable medical approach to a patient like Plaintiff presenting with painless and visible blood in his urine was a CT scan to rule out cancer. That was not done until months after Plaintiff presented with gross, painless hematuria. The jury

also heard ample evidence of how Dr. Nawoor shared personal responsibility for the delays in Plaintiff's receipt of the CT scan and other indisputably necessary tests and treatment, as detailed in Plaintiff's response. [d/e 228, p. 28].

Further, a defendant's demeanor and credibility on the stand—how the Defendant explains his or her actions or inactions—is an important factor in the deliberate indifference inquiry. Dr. Nawoor's demeanor allowed a reasonable inference that Dr. Nawoor was indifferent to Plaintiff's repeated pleas for help and Plaintiff's real and substantial risk of kidney cancer. That Dr. Nawoor provided some care did not preclude an inference of deliberate indifference against him.

The evidence of deliberate indifference against Defendant Dr. Einwohner was not as extensive as that against Dr. Nawoor but was still legally sufficient to support the verdict against Dr. Einwohner. A reasonable juror could have found that Dr. Einwohner, a nephrologist, knew that Plaintiff needed a CT scan and a urology referral but only suggested that course in an ambiguous email and did nothing further. Dr. Einwohner's demeanor at trial also could have been reasonably perceived as evasive and defensive.

As to Wexford Health Sources, Inc. ("Wexford"), the evidence allowed a reasonable inference that Wexford's practices were a moving force behind the delays and that Wexford knew that its practices would lead to inexplicable delays for an urgently needed diagnosis and treatment of life-threatening conditions.  This inference would have been reasonable with or without the admission of the Lippert reports.  Both Dr. Einwohner and Dr. Nawoor testified to the practices they were required to follow, including repeated collegial reviews which seemed to serve no purpose.  Wexford's representatives testified to the appropriateness of those practices even in a case like Plaintiff's, but the jury did not have to believe their testimony.  The jury could have believed that the practices presented an obvious risk to Plaintiff and other inmates presenting with potentially life-threatening conditions.  A reasonable juror could have found that those practices on their faces would obviously and inevitably delay urgently needed treatment for some inmates, including Plaintiff.  See Woodward v. Correctional Medical Services of Illinois, Inc., 368 F.3d 917, 930 (7th Cir. 2004)("The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger

municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act.")(quoted cite omitted). Judgment as a matter of law on the Eighth Amendment claims is denied.

Defendants also move for judgment as a matter of law on the compensatory damages awarded for disability and loss of a normal life/decreased life expectancy and future medical expenses and supplies. The jury awarded $100,000 for physical pain and suffering; $500,000 for emotional pain and suffering; $100,000 for disability and loss of normal life/diminished life expectancy; and, $300,000 for future medical care and supplies.

Defendants argue that no evidence supported damages for a decreased life expectancy or future medical care. However, Plaintiff's expert, Dr. Metwalli, testified that catching cancer earlier generally leads to better prognosis and survival, that the progression of Plaintiff's tumor thrombus would have been expected to be less if the CT had been done earlier, which would have positively impacted the prognosis and made the surgery less complicated. [*See, e.g.,* Metwalli Tr. [Vol. 2] 405:15-26; 406:1-6.] Even if the reduction of life expectancy could not be stated with a

reasonable degree of certainty, the $100,000 is supported by evidence of loss of a normal life—enduring a more complicated surgery, longer recovery from that surgery, and possibly unnecessary chemotherapy.

Sufficient evidence also supported the award of $300,000 in future medical expenses. Defendants do not dispute that the cancer medications cost $10,000-$15,000 per month. As Plaintiff points out, $300,000 assumes that Plaintiff had about 18 months to live at the time of the verdict. Defendants argue that Plaintiff would have had these expenses regardless, but a reasonable jury could have found that chemotherapy might not have been required or would have been required to a lesser extent, if the delays had not occurred.

Defendants also argue that judgment as a matter of law is warranted on punitive damages. The same evidence that supports the jury's finding of deliberate indifference also supports an award of punitive damages. <u>Woodward v. Correctional Medical Serv. of Ill., Inc.</u>, 368 F.3d 917, 930 (7th Cir. 2004). A reasonable juror could conclude that Defendants were recklessly, callously indifferent to the serious risk of substantial harm facing Plaintiff. Judgment as a

matter of law is denied as to the assessment of damages. However, the punitive damages will be reduced as discussed below.

## II.  A new trial is not warranted.  The verdict was not against the manifest weight of the evidence, and the trial was fair.

The new trial standard differs from the standard for judgment as a matter of law.  "'A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party.'"  <u>Martinez v. City of Chicago</u>, 900 F.3d 838, 844 (7th Cir. 2018)(quoted cite omitted); <u>Johnson v. Gen. Bd. of Pension & Health Benefits of the United Methodist Church</u>, 733 F.3d 722, 730 (7th Cir. 2013)("A new trial is appropriate where the verdict is against the clear weight of the evidence or the trial was not fair to the moving party.").[2]

### A.  Manifest Weight

Unlike the judgment as a matter of law standard, when assessing whether the verdict was against the manifest weight of the evidence, the Court "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial."  <u>Mejia v.</u>

---

[2] "Clear" and "manifest" are used interchangeably in this context.

<u>Cook County</u>, 650 F.3d 631, 634 (7th Cir. 2011). The Court considers all the evidence presented, disregarding only evidence "'reasonable persons could not believe'" because that evidence "'contradicts indisputable physical facts or laws.'" <u>Id.</u> at 633. (quoted cite omitted).

Though the standards differ, the same reasons set forth above for denying judgment as a matter of law also support the denial of a new trial. Considering all the evidence presented by both sides, the weight of the evidence and the witnesses' credibility strongly favored Plaintiff as to his claims against Dr. Nawoor and Wexford, in the Court's judgment. The verdict could have gone either way as to Dr. Einwohner, thus was not against the manifest weight of the evidence.

## B. Evidentiary Rulings

Defendants challenge multiple evidentiary rulings. Erroneous evidentiary rulings do not alone warrant a new trial. A new trial is warranted "'only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice.' . . . 'Evidentiary errors satisfy this standard only when a significant chance exists that they affected the outcome of the

trial.'" <u>EEOC v. Management Hospitality of Racine, Inc.</u>, 666 F.3d

422, 440 (7th Cir. 2012)(quoted and other cites omitted); <u>Burton v.

City of Zion</u>, 901 F.3d 772, 777 (7th 2018)("[T]here must be a

significant chance that the flawed ruling affected the outcome of the

trial.").

### 1. **<u>Lippert</u> Reports**

Defendants argue that admission of two expert reports from

another case, <u>Lippert v. Godinez</u>, 10-cv-4063 (N.D. Ill.), was error.

The reports were admitted as to notice, and the Court gave a

limiting instruction. The Court's limiting instruction advised that

Wexford disputed the truth of the reports and that the reports could

be considered "only in deciding whether Defendant Wexford Health

Sources, Inc., had notice and knowledge of the information in the

reports, not whether the information in the reports is true." [Jury

Instr., page 12.]

Recognizing that this ruling could have significance beyond

this case, the Court entered a written order explaining the reasons

for that ruling after the trial. [12/20/19 Order.] The Court assumes

familiarity with that order.

Defendants argue that the report authored in October 2018 (the Puisis report) could not have given notice to the events in this case, which all occurred before that report issued. The Puisis report, however, was a continuation of the 2014 report (the Shansky report). Both were relevant to Wexford's notice from independent court experts that its procedures, including collegial review, caused significant and unnecessary delays in the delivery of off-site care. *See* Hildreth v. Butler, 960 F.3d 420, 433 (7th Cir. 2020)(Hamilton, J., dissenting)(observing in dicta that the Lippert reports "would be admissible to show corporate knowledge of Wexford's policy failings and of the risks that inmates faced)(*citing* Daniel v. Cook County, 833 F.3d 728, 743 (7th Cir. 2016)[3]; Von Ryburn v. Obaisi, 2020 WL 3868715 (N.D.Ill.)(Lippert report admissible for nonhearsay purpose of notice)(*citing* Hildreth, this case, and Boyce v. Wexford Health Sources, Inc., 2017 WL 1436963, *15 n.12 (N.D. Ill.) (holding documents from other jail-condition case were "inadmissible hearsay to the extent they are offered to prove the truth of the statements they contain" but "may

---

[3] Judge Hamilton, Judge Rovner, and Judge Scudder recently dissented from the denial of rehearing en banc. Hildreth v. Butler, --- F.3d ---, 2020 WL 4815844 (7th Cir. 2020).

be admissible to show that the defendants were on notice of their contents")).

Defendants also argue that <u>Daniel v. Cook County</u>, 833 F.3d 728, 743 (7th Cir. 2016), which this Court cited to support admission of the reports as to notice, is distinguishable. In <u>Daniel</u>, a court-appointed monitor issued a report regarding the progress in meeting the conditions of an agreed order about the delivery of healthcare to Cook County Jail detainees. The Seventh Circuit stated that the agreed order and monitor's report were "inadmissible hearsay to the extent they are offered to prove the truth of the statements they contain, but they may be admissible to show that the defendants were on notice of their contents, or perhaps for other purposes." <u>Id.</u>; <u>J.K.J v. Polk County</u>, 960 F.3d 367, 379 (7th Cir. 2020)(municipality must be on notice that practice will cause constitutional violations). Wexford attempts to distinguish <u>Daniel</u> on the grounds that Wexford had no opportunity in <u>Lippert</u> to challenge the reports because Wexford was dismissed before the reports were filed. In <u>Daniel</u>, the defendant, Cook County, did have the opportunity to challenge the reports.

That distinction is a distraction, though. The issue here is notice of the reports' statements, not the truth of those statements. Wexford had notice of the reports as their representatives admitted at trial and as is obvious from the docket sheet in Lippert. Daniels supports the admission of the Lippert reports as to notice.

Defendants also contend that the Lippert reports' statements were too inflammatory and unfairly prejudicial, outweighing any probative value as to notice, and that the Court "compounded the prejudice by vouching for the Lippert reports' reliability by erroneously taking judicial notice in front of the jury." [207, p. 9.] In particular, Defendants point to the Puisis report's conclusion that "[t]here was no improvement since the first Court's expert report. Our opinion is that the specialty care process of collegial review is a patient safety hazard and should be abandoned until such time that patient safety is ensured." This statement was relevant as to notice of the statements in the first expert report and also relevant to rebut the suggestion of a lack of notice that the same problems continued to exist at the time of the trial. The judicial notice taken was to the fact of the filing in Lippert, not to

the truth of the matter asserted in the filing.  That was made clear

through the Court's limiting instruction, which read:

> You have heard evidence about reports filed in a
> different case regarding the delivery of healthcare to inmates
> in the Illinois Department of Corrections. Defendant Wexford
> Health Sources, Inc., disputes the truth of those reports and
> has not admitted liability in that case. You may consider
> these reports only in deciding whether Defendant Wexford
> Health Sources, Inc., had notice and knowledge of the
> information in the reports, not whether the information in the
> reports is true. Remember, the issue is whether Defendants
> violated Plaintiffs rights as I describe those rights to you in
> these instructions.

[Final Jury Instructions, d/e 182, p. 12.]

The probative value of the <u>Lippert</u> reports as to notice was not

outweighed by the danger of unfair prejudice.  The reports'

statements are critical of Wexford but not inflammatory, and any

potential unfair prejudice was mitigated by the Court's limiting

instruction and by the opportunity of Wexford representatives to

testify that they disagreed with the reports' conclusions.

Further, even if admission of the <u>Lippert</u> reports was error,

ample other evidence supported a finding that Wexford's practices

were deliberately indifferent and that Wexford was on notice of this

problem.  The testimony of Wexford's own doctors supported the

conclusion that Wexford's practices caused delays in urgently

needed care for no legitimate reason.  Admission of the <u>Lippert</u>
reports did not affect the outcome of the trial to any significant
degree.

### 2.  Plaintiff's Closing Argument in Rebuttal

Defendants argue that the Court should have sustained
Defendants' objection to a statement by Plaintiff's counsel in
rebuttal that Plaintiff's disease became metastatic during
Defendants' delays. "Reversible error [in closing arguments] occurs
only if the statement was 'plainly unwarranted and clearly
injurious.'" <u>Smith v. Hunt</u>, 707 F.3d 803 (7th Cir. 2013)(quoted cite
omitted).

A reasonable juror could conclude that, had Plaintiff been
given a CT scan in the weeks after presenting with visible, painless
blood in his urine, he would have been diagnosed with cancer
months earlier and would have been able to have the surgery
months earlier.  While the experts could not pinpoint when the
cancer spread, a reasonable juror could conclude from the evidence
that the cancer continued to grow and spread between December
2015 and July 2016, when the surgery occurred, even if the cancer
was already spreading before December 2015.  The remark in

closing was not "plainly unwarranted" and, in any event, did not render the entire trial unfair.

Defendants maintain in a footnote to this section in their brief that the Court "allowed Plaintiff's counsel to improperly bolster the diminished life expectancy claim by letting counsel directly address the jury during evidence to 'introduce' Plaintiff's elderly father, who was not a witness, in an obvious attempt to garner sympathy and suggest that Deans live to an old age." [d/e 207, n. 1.] After a break in Plaintiff's direct testimony, the Court explained to the jury that one of Plaintiff's attorneys was not present because that attorney was with the doctor who would be testifying in the afternoon, and that other attorneys may be leaving for similar reasons at various times throughout the trial. Plaintiff's counsel then introduced Plaintiff's father and sister, who were sitting in the well near the table of Plaintiff's counsel. The Court permitted them to sit in the well in order to accommodate Plaintiff's father, who appeared frail, had difficulty hearing, and needed help from Plaintiff's sister to move about.

The Court allowed the introduction of Plaintiff's father and sister for the same reason the Court explained the absence of one of

Plaintiff's lawyers—so the jury would not be distracted speculating about why the people by Mr. Dean's table changed throughout the trial. The Court sees nothing improper or prejudicial about the introduction. [Tr. Vol. 3, pp. 199-203.]

Defendants also assert in a footnote that the Court allowed Plaintiff to testify that his life expectancy was going down every day he waited for surgery. Plaintiff testified that was his understanding about cancer: "[J]ust pretty much common sense the longer you wait, the bigger it's going to grow, the more it's going to spread. I didn't know anything about this spreading at this point." [Tr. Vol. 2 p. 190.] Mr. Dean was expressing the fear he felt at the time and that evidence was appropriately allowed.

### 3. Dr. Nawoor

Defendants also argue that character evidence was improperly admitted against Dr. Nawoor. Evidence was presented that, during the relevant time period in this case, Dr. Nawoor had been disciplined for sleeping on the job and had been reported for not following procedures and not ordering necessary follow-up care for Plaintiff and other inmates. At a sidebar, Defendants objected on

the grounds of hearsay, inadmissible character evidence, and lack of probative value. [Tr. Vol. 5, p. 877.]

The evidence was properly admitted to show that Dr. Nawoor's inaction towards Plaintiff was no accident. The evidence also was relevant to show that Dr. Nawoor was on notice of reports of his inattention in April 2016, when Plaintiff was diagnosed with cancer, and also in August 2016, after Plaintiff's surgery. Fed. R. Evid. 404(b)(evidence of other bad acts may be admissible to show intent, motive, lack of accident). These incidents are also evidence that Wexford knew about Dr. Nawoor's inattention and inadequate medical care to Plaintiff.

These incidents were probative of the deliberate indifference inquiry because the incidents tend to make it more probable that Dr. Nawoor and Wexford knew that Plaintiff was not getting adequate care and knew that the inadequate care would continue unless a change was made. The probative value of this evidence was not outweighed by the danger of unfair prejudice that the jurors would find against Dr. Nawoor because he was a "bad doctor," as Dr. Nawoor argues.

The Court also agrees with Plaintiff that the most damaging evidence against Dr. Nawoor was Dr. Nawoor's own testimony and demeanor throughout the trial. A reasonable juror could have found Dr. Nawoor's attitude disdainful and disinterested. Dr. Nawoor also appeared to be sleeping at times throughout the trial. A reasonable inference of deliberate indifference arose against Dr. Nawoor even without admission of these incidents.

### 4. Plaintiff's Calendars

Defendants also assert that Plaintiff's calendars on which Plaintiff kept notes should not have been admitted into evidence and that Plaintiff should not have been allowed to read from the calendars. The calendars were appropriate to refresh Plaintiff's recollection when needed, [*see, e.g.,* Tr. Vol. 2 169-170; Fed. R. Evid. 803(5)(recorded recollection)], but if refreshing recollection were the only use, Defendants are correct that the calendars should not have been admitted into evidence, and Plaintiff should not have read from them. Fed. R. Civ. P. 803(5); Beauty Enterprises, Inc. v. Gregory, --- Fed Appx. ---, 2020 WL 5089558 *3 (7th Cir. 2020)(not reported in Fed. Rptr.). The Court also agrees with Defendants that

the calendars did not meet the business records exception to hearsay under Fed. R. Evid. 803(6).

However, the residual exception under Federal Rule of Evidence 807 supports the admission of the calendars.  *See* <u>United States v. McPartlin</u>, 595 F.2d 1321, 1350 (7th Cir. 1979)(even if diary not admissible under business records exception, diary was admissible under residual exception or as co-conspirator statement).  Plaintiff's calendar entries were probative of Plaintiff's state of mind when he made the entries and the timing of that state of mind with the physical symptoms he was experiencing.  The entries were corroborated by medical records and other evidence, and Plaintiff was an in-court witness who could be and was cross-examined on those entries.  *See* 2019 *comment to Fed. R. Evid. 807* ("In deciding whether the statement is supported by sufficient guarantees of trustworthiness, the court should not consider the credibility of any witness who relates the declarant's hearsay statement in court."); <u>McPartlin</u>, 595 F.2d at 1350 ("Furthermore the degree of reliability necessary for admission is greatly reduced where, as here, the declarant is testifying and is available for cross-

examination, thereby satisfying the central concern of the hearsay rule.").

In any event, even if the Court erred, Defendants do not explain how that error prejudiced them. Regardless of the calendars' admissibility, Plaintiff would have been able to consult his calendar to refresh his recollection to answer any question. The substance of Plaintiff's testimony would have only taken longer to elicit but would not have changed. Further, many of the entries in the calendar itself about medical appointments were corroborated, and most of the other entries unsurprisingly reflected Plaintiff's frustration and fears, something which Plaintiff testified to himself without the calendar. Not admitting the calendars into evidence would have had no effect on the verdict.

### 5. Dr. Severino's Statements to Plaintiff

Defendants also argue that Plaintiff should not have been allowed to testify that Dr. Severino told Plaintiff that Plaintiff needed surgery "right away" and "as soon as possible." These statements were admissible to show the effect the statements had on Plaintiff's state of mind. United States v. Leonard–Allen, 739 F.3d 948, 954 (7th Cir. 2013) ("A witness's statement is not hearsay if the witness

is reporting what he heard someone else tell him for the purpose of explaining what the *witness* was thinking, at the time or what motivated him to do something.")(emphasis in original). Defendants assert that the statements were unfairly prejudicial, but Defendants had the opportunity and did rebut those statements with evidence that Dr. Severino did not characterize the surgery as emergent.

### 6. Dr. Barnett

Defendants argue that the Court improperly allowed Dr. Barnett, Plaintiff's expert in correctional medicine, to give unfounded and undisclosed testimony about the timing of presenting patients with advanced directives. Dr. Barnett testified that not providing Plaintiff with an opportunity to sign an advance directive before the surgery was a deviation from the standard of care. [Tr. Vol. 4, 549-50.] Instead, Plaintiff was presented with that opportunity in November 2016 when Plaintiff was receiving chemotherapy. Defendants maintain that Dr. Barnett's testimony improperly implied that Defendants were trying to save money on chemotherapy by obtaining Plaintiff's refusal for treatment.

Dr. Barnett testified in his deposition that he considered himself an expert in advanced directives and agreed that discussion

of a "do not resuscitate order" was appropriate if a patient is terminal. [Barnett Dep. 54-56.] Dr. Barnett's trial testimony was a natural extension of his deposition testimony and did not unfairly surprise Defendants. No prejudice resulted because Defendants had the opportunity to explain why the advance directive was not presented to Plaintiff until November. Further, this dispute was inconsequential in the overall trial. Striking Dr. Barnett's statement would have had no effect on the jury's decision.

Defendants also maintain that Dr. Barnett was improperly allowed to testify on Plaintiff's emotional injury and cancer growth. [Defs.' Mot. p. 15, d/e 207.] (Defendants cite to pages 548-550 of volume 3 of the transcript, but they appear to mean volume 4 because volume three does not contain those page numbers.) Dr. Barnett was asked whether Dr. Barnett had an opinion on how Plaintiff's consideration of an advance directive in November 2016 "contributed to Mr. Dean's pain, suffering, mental anguish." [Tr. Vol. 4, p. 550.] Dr. Barnett answered, over objection:

> "I do believe it indicates the – the severity of his condition. And it would be a naturally difficult thing for anyone to re-visit, which is your imminent mortality. And it comes with the territory if you have cancer, you're going to be scared, you're going to be worried. And each

intervening episode, a visit to the doctor, an x-ray report, they're all going to create anxiety. And this POLST [Physician's Order for Life-Sustaining Treatment] is going to create this anxiety that everyone needs to get through because they need this information. They need to know what do you want us to do.

Id. at 551.

This testimony stands for the unsurprising proposition that being confronted with one's mortality is upsetting, particularly when diagnosed with a terminal illness. The testimony was in further explanation of Dr. Barnett's opinion that Plaintiff should have been presented with the advance directive before Plaintiff's surgery, which, as was discussed above, was an issue that was inconsequential in the overall trial.

Defendants next assert that Dr. Barnett improperly testified to Defendants' mental states. Defendants cite to pages 500-506, but it is not clear which parts of those pages are at issue. The Court assumes that Defendants mean Dr. Barnett's testimony at page 506 [Tr. Vol. 4], that was based on Dr. Barnett's review of the medical records, depositions, and also based on hearing Dr. Nawoor's in-court testimony:

[I]t appears that the defendants were aware that the failure to follow the guidelines as even promulgated by Wexford itself was going to cause harm or put the patient at risk of greater harm because the patient was at risk from cancer and that was apparent – that was evident early on. And not treating cancer meant there would be an unmitigated propagation or growth of that cancer which would, of course, be harmful.

Dr. Barnett then explained that he drew this conclusion from Wexford's own guidelines calling for radiologic studies and cystoscopy on presentation of gross hematuria. Id.

An expert is not prohibited from opining on ultimate issues. Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue."); Pittman by and through Hamilton v. County of Madison, Ill., 970 F.3d 823, 829 (7th Cir. 2020)(expert testimony offering "outcome-determinative opinions" was not automatically barred). Dr. Barnett's opinion that he believed Defendants were aware of the danger of gross hematuria from Wexford's own policies assisted the jury and was admissible, in the Court's judgment. In any event, this testimony did not deprive Defendants of a fair trial.

As to Defendants' assertion that Dr. Barnett was not qualified to testify about "cancer growth kinetics," Defendants do not point the Court to what testimony they challenge. If they challenge, as Plaintiff guesses, Dr. Barnett's testimony to the effect that "untreated cancer continued to grow" [d/e 228, p. 50], that observation is within Dr. Barnett's experience as a physician.

## C. Jury Instructions

A new trial is warranted when a jury instruction inaccurately states the law, and the instruction prejudiced a party by confusing or misleading the jury. O'Donnell v. Caine Weiner Co., LLC, 835 F.3d 549, 553 (7th Cir. 2019).

### 1. Deliberate Indifference and Reasonableness

Defendants take issue with the adjective "reasonable" used in the Court's jury instruction setting forth the elements for the Eighth Amendment claim. The Court's instruction required Plaintiff to prove that he had a serious medical need, that a Defendant was aware of the serious medical need, and that the Defendant "consciously failed to take reasonable measures to provide treatment for the serious medical need." The instruction then listed

factors to consider in determining whether reasonable measures were taken. [Final Jury Inst., d/e 182, pp. 27-28.) This instruction was based on the Seventh Circuit pattern instruction 7.17 (2017 rev.).

Defendants argue that reasonableness is a negligence standard and that the instruction allowed the jury to find an Eighth Amendment violation based on negligent conduct. The instructions on the negligence claim also incorporated the concept of reasonableness, defining negligence as the "failure to do something that a reasonably careful doctor or nurse would do . . . ." [Jury Inst. p. 34.]

The concept of a reasonable response has been part of Eighth Amendment law for decades. <u>Farmer v. Brenan</u>, 511 U.S. 825 (1994)("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."(*cites omitted);* <u>Walker v. Wexford Health Sources, Inc.</u>, 940 F.3d 954, 965 (7th Cir. 2019)(affirming summary judgment where prisoner doctor made "reasonable medical judgment"); <u>Sanville v. McCaughtry</u>, 266 F.3d 724, 740–41 (7th Cir.2001) ("[t]o

be liable under the Eighth Amendment for an inmate's suicide, 'a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act'").

The definitions of negligence and deliberate indifference do overlap in their use of the concept of reasonableness but part ways in the subjective element required. No subjective element is required in a negligence claim. A prison doctor could be found negligent even if he or she was unaware of having responded unreasonably to an inmate's medical condition. In contrast, a prison doctor could be found deliberately indifferent only if he or she was aware of having responded unreasonably. The word "consciously" makes all the difference. *See* 7th Cir. Pattern Instruction 7.17 (2017 rev.)(requiring awareness of serious medical need and conscious failure to take reasonable measures to treat that need). The Seventh Circuit pattern instruction accurately states the law.

## 2.  Issues Instruction

Defendants assert that the Court erred by not giving their tendered issues instruction for the negligence claims, listing the actions or inactions which Plaintiff contended constituted negligence. *See* Illinois Pattern Jury Instruction 20.01.

A federal court is not required to give a state law pattern instruction. Schwartz v. American Honda Motor Co., Inc., 710 F.2d 378, 382 (7th Cir. 1983)(giving federal instruction over Illinois pattern instruction was not grounds for reversal where instruction given was not faulty and did not cause prejudice); Welch v. United States, 604 F.3d 408, 421 n.15 (7th Cir. 2010)("Illinois Pattern jury instructions are not binding.")(quoting People v. Peete, 743 N.E.2d 689, 695 (Ill. 2001)).

An issues instruction in some cases could assist the jury but not in this case. In this case, an issues instruction accurately stating each alleged act of negligence would have been sprawling, confusing, and possibly misleading. *See, e.g.,* Plaintiff's partial list of Dr. Nawoor's failings, d/e 228 p. 28; Howat v. Donelson, 305 Ill.App.3d 183 (5th Dist. 1999)(reversing for giving misleading issues instruction). The issues in the case were explained to the jury in the statement of the case and presented thoroughly during the trial.

No issues instruction was needed, and the jury instructions accurately set forth the elements of the negligence claims.

## III. A Remittitur of the Compensatory Damages Awarded is not Warranted.

The jury awarded $100,000 for Plaintiff's physical pain and suffering, $100,000 for disability/loss of normal life/diminished life expectancy, $300,00 in future medical expenses, and $500,000 for emotional pain and suffering. Defendants argue that the Court must remit the $500,000 for emotional pain and suffering to $100,000 or less.

These awards were based on both the federal and state claims, so whether federal or state law applies is unclear. Both parties cite federal law.[4] The legal standard is "whether the jury's verdict is rationally related to the evidence and 'whether the award is roughly comparable to awards made in similar cases.'" Green v. Howser, 942 F.3d 772, 781 (7th Cir. 2019)(*quoting* Adams v. City of Chicago, 798 F.3d 539, 543 (7th Cir. 2015). The "monstrously excessive" factor quoted by the parties "is simply another way of expressing

---

[4] The difference appears to be that Illinois law does not require a comparison to other awards. Rainey v. Taylor, 941 F.3d 243, 253 (7th Cir. 2019)("Under Illinois law it's neither necessary nor appropriate to evaluate a jury's compensatory award against awards in similar cases; a comparative analysis is not part of the state framework.").

the 'rational connection' factor," according to <u>Green</u>, 942 F.3d at

n.2, though more recent Seventh Circuit opinions seem to make the

rational-connection and monstrously-excessive inquiries

overlapping but independent.  *See* <u>Vega v. Chicago Park District</u>,

954 F.3d 996, 1008 (7th Cir. 2020); <u>Kaiser v. Johnson and Johnson</u>,

947 F.3d 996, 1019 (7th Cir. 2020).  Here, the difference is

immaterial, if there is a difference.  The compensatory damages are

rationally related to the evidence and are not monstrously

excessive.

A rational juror could believe that Dr. Nawoor told Plaintiff

from Plaintiff's first report of painless, visible urine in Plaintiff's

blood that Plaintiff could have cancer.  Plaintiff testified extensively

to his emotional distress for the months that followed before

Plaintiff was properly tested, and then more months after that to

have surgery, and then more delays after that for the necessary

follow-up and chemotherapy.  At one point during the trial, Mr.

Dean broke down crying, testifying that he felt that his inability to

obtain medical care was his fault because if he were not in prison,

then he could have walked into any emergency room to obtain a

diagnosis and treatment.  A juror could have reasonably found this

testimony sincere and compelling. <u>Tullis v. Townley Eng. & Mfg. Co.</u>, 243 F.3d 1058, 1068 (7th Cir. 2001)(jury has the role of assessing credibility on emotional distress testimony).

As for comparisons to other cases, Defendants cite cases which award less money or which award more money but which Defendants maintain had more evidence of metastasis or harm. Plaintiff aligns his case with the cases awarding more damages and points out additional cases which support his award. On this record, the Court cannot conclude that $500,000 is so far outside the norm that the jury's judgment must be disturbed.

## IV. The punitive damages against Wexford are remitted to 7 million dollars.

The jury awarded $10 million in punitive damages against Wexford. Wexford argues that this amount is unconstitutionally excessive.

This inquiry turns on the reprehensibility of Wexford's conduct, the difference between the harm or potential harm suffered and the punitive damages, and the difference between the punitive damages and civil penalties allowable or imposed in comparable cases. <u>Green</u>, 942 F.3d at 782 (<i>citing</i> <u>State Farm Mut.</u>

Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003)).  The degree of reprehensibility is the most important, measured by the nature of the harm and the nature of the conduct.  In particular, relevant factors are whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Id. (*quoting* State Farm, 538 U.S. at 419).

Here, all of these factors support a punitive damage award. Plaintiff suffered physical harm; Defendants were indifferent to Plaintiff's health; Plaintiff was vulnerable financially and at the mercy of Defendants; the delays were repeated, not isolated; and, intentional malice could be inferred from Wexford's relentless and rigid application of corporate practices which served no legitimate purpose.

Further, the jury could have reasonably found from the testimony at trial, including Defendants' own witnesses, that Wexford continues to be indifferent to how its practices put inmates

with potentially life-threatening diseases at a substantial risk of serious harm.  A reasonable jury could have gotten the impression that a substantial punitive damages award was required to deter Wexford from similar conduct in the future.  The 1:1 ratio that Wexford seeks would arguably not deter or serve as adequate punishment.

The Supreme Court has stated that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." State Farm, 538 U.S. at 425.  A higher ratio could be warranted in the right circumstance, for example if compensatory damages are small or the conduct is "particularly egregious." Id.  "[E]ven if the punitive award is higher than those in comparable cases, this guidepost generally deserves less weight than the other two." Rainey v. Taylor, 941 F.3d 243, 255 (7th Cir. 2019).  That makes sense, because comparing cases is an imprecise endeavor at best. Reading the facts of another trial on paper is quite different than experiencing the trial first hand. Many of the factors that inform a punitive damages award do not translate well to paper.

The ratio of punitive damages in this case was 10:1. This is higher than the Supreme Court's "single digit" remark and higher than the ratios cases cited by Defendants where significant compensatory damages were awarded. *See, e.g.,*, Epic Systems Corp. v. Tata Consultancy Services Ltd., 2020 WL 4882891 (7th Cir. 2020)($140 million for unjust enrichment, reducing punitives to, at most, $140 million)(1:1 ratio, though this is distinguishable because the compensatory damages were much higher than the $1 million in this case).

Plaintiff points out that the cases cited by Defendants involved less egregious facts or only economic damage. Plaintiff cites cases in which a 10:1 ratio or greater was sustained. *See* TXO Prod. Corp. v. Alliance Res. Corp, 509 U.S. 443, 453 (1993)($19,000 compensatory, $10 million punitive (526:1)(plurality, fraudulent plan to take back royalties); Mathias v. Accor Economy Lodging, Inc., 347 F.3d 672 (7th Cir. 2003)(reinstating punitive damages of $186,000 to the $5,000 compensatory damages awarded for being bitten by bed bugs at a motel); Johnson v. Howard, 24 Fed.Appx 480, 486-87 (6th Cir. 2001)($30,000 compensatory, 3 million punitive where inmate savagely beaten with hands behind back);

<u>Murphy v. Gilman</u>, 551 F.Supp. 2d 677, 685-86 (W.D. Mich.)($250,000 compensatory, 2.5 million punitive where inmate died from dehydration).

Plaintiff also argues that the fees and costs awarded become part of the compensatory damages, thus reducing the ratio between punitive and compensatory damages. The cases cited for that proposition, however, are cases in which the plaintiff was actually compensated with an attorney fee award. Here, because of the Prison Litigation Reform Act, the award of attorney fees will come from the judgment and reduce the amount of money received by Plaintiff. Adding the fee award to the compensatory damages for purposes of the punitive damages analysis is not warranted.

After careful consideration of the evidence, the Supreme Court's guidelines, and roughly comparable cases, the Court concludes that ten million dollars in punitive damages is unconstitutionally excessive. The Court is upholding the entire compensatory damage award of 1 million dollars, a substantial amount. The cases cited by Plaintiff in which the ratio was 10:1 or greater had smaller compensatory damage awards, justifying a higher punitive damage award to fairly represent the egregiousness

of the misconduct. The cases cited by Defendants and additional cases of which the Court is aware do not support a 10:1 ratio where the compensatory award is 1 million. *See, e.g.*, <u>Estate of Moreland v. Dieter</u>, 395 F.3d 747 (7th Cir. 2005)($29 million compensatory, $27.5 million punitive damages awarded; excessive force against jail detainee caused detainee's death)(though this could be distinguished by the fact that $27.5 million is an extraordinary amount to begin with); <u>Fox ex. rel Fox v. Barnes</u>, 2013 WL 2111816 (N.D. Ill. 2013)($11 million compensatory; $1 million in punitive damages; inmate's seizure caused permanent mental damage)(though Wexford settled out for 14 million); <u>Degorski v. Wilson</u>, 2014 WL 3511220 (N.D.Ill.)($225,000 compensatory, $226,000 punitive damages; inmate's face fractured by repeated punching by guard); <u>McCroy v. IDOC</u>, 02-CV-3171 (C.D. Ill)(inmate lost eye; jury awarded $810,000 compensatory and $90,000 punitive damages); <u>Williams v. Patel</u>, 104 F.Supp.2d 984 (C.D. Ill. 2000)(1 million compensatory damages, punitive damages remitted to $750,000; inmate lost eye).

The Court concludes that the punitive damages should be remitted to $7 million dollars. This amount recognizes the

reprehensibility of Wexford's conduct and the harm Plaintiff

suffered, should be sufficient to deter future similar conduct, and

also stays within the bounds of due process, in the Court's

judgment.  A seven to 1 ratio is still more than most of the other

cases cited above, but a higher ratio is justified by the evidence that

supported a reasonable conclusion that Wexford's practices will

foreseeably continue to cause constitutional violations unless there

is a change.

## V.  Defendants have not shown that they are entitled to a set-off.

Defendant Mincy, who was employed by the Illinois

Department of Corrections, settled for $10,000 early in the trial.

Defendants argue that they are entitled to reduction of the award by

this amount to prevent double recovery on the Eighth Amendment

claim.

This issue is more complicated than Wexford's analysis.  *See*

Fox ex rel. Fox v. Barnes, 2013 WL 2111816 (N.D. Ill.

2013)(discussing whether state or federal law applies, different

methods of calculating set-off under federal law, whether settlement

allocating proceeds to certain damages was in good faith, and the

non-settling party's burden of demonstrating set off is required).

Defendants have not met their burden of showing that they are

entitled to a setoff.

## VI. Plaintiff's Motion for Attorneys' Fees and Expenses

42 U.S.C. § 1988(b) allows the Court to allow "the prevailing

party, . . . a reasonable attorney's fee as part of the costs . . . ." in

certain actions, including actions under 42 U.S.C. § 1983 like this

one.  Calculating a reasonable fee begins with the

"lodestar" method--multiplying the reasonable hours expended by a

reasonable hourly rate. <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433

(1983).  The lodestar amount may then be revised in either direction

upon consideration of additional factors not considered in

determining the lodestar.  <u>World Outreach Conference Center v.

City of Chicago</u>, 896 F.3d 779, 783 (7th Cir. 2018).

However, Congress has placed limits on the attorneys' fees

recoverable on civil rights cases filed by prisoners.  42 U.S.C. §

1997e(d).  A verbatim recitation of those limits will be more

accurate than a paraphrase attempt:

**(d) Attorney's fees**

(1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that—

(A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and

(B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or

(ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

(2) Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.

(3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18 for payment of court-appointed counsel.

(4) Nothing in this subsection shall prohibit a prisoner from entering into an agreement to pay an attorney's fee in an amount greater than the amount authorized under this subsection, if the fee is paid by the individual rather than by the defendant pursuant to section 1988 of this title.

In effect, this statute means that the attorneys' fees cannot exceed 150% of the jury award, which is not a problem here, since Plaintiff's fee request amounts to about 16% of the $8 million award. The parties appear to agree that the cap on the hourly attorney fee rate (150% of the Criminal Justice Act rate, or CJA rate), has ranged from $198.00 to $228.00 in this case. Twenty-five percent of the remitted judgment is roughly $2 million, which means that, even if the Court awards the total amount of attorneys' fees and expenses Plaintiff seeks, Defendants will not pay more out-of-pocket. This is different from a nonprisoner civil rights case in which the losing party pays the plaintiff's attorneys' fees in addition to the amount the jury awards.

Plaintiff seeks a total of $1,234,600.50 in attorneys' fees and $79,490.28 in nontaxable expenses.[5] Plaintiff's counsel does not seek reimbursement for any partner time [651 hours of reduction] and has further reduced the hours sought for reimbursement by 790.50. [d/e 230, p. 2; d/e 205, p. 3.] According to the fee petitions, the hours cut total a 31.37% reduction. The total attorney hours sought are 2,395, and the total paralegal hours

---

[5] Plaintiff's original petition was supplemented with additional fees and costs incurred after the trial.

sought (at $125/hour) are 758.25. According to Plaintiff, applying 150% of the applicable CJA rate to the attorney hours and $125 to the paralegal rate comes to $617,300.25. Plaintiff asks that this amount be doubled to fairly compensate them.

The first step is to determine whether the 2,395 attorney hours and 758.25 paralegal hours spent on this case were reasonable. For the most part, yes. Plaintiff's pro bono counsel were appointed in May 2017 and took the case through settlement talks, extensive and difficult fact and expert discovery, opposing a motion to dismiss, opposing an extensive summary judgment motion, opposing Defendants' attempts to move the trial date out, responding to and pursuing many motions in limine, and litigating a seven-day, contentious trial.

The Court is confident that these hours were necessary to prove the violation of Plaintiff's Eighth Amendment rights. This case was about a kind of deliberate indifference that is more subtle and insidious than the kind of deliberate indifference that screams out with obvious, easy-to-find evidence. The skill, resources, and tenacity of Plaintiff's attorneys are the reason Plaintiff was able to uncover and prove deliberate indifference. Plaintiff's counsel has

already culled substantial time from the fee petition.  The Court does not see that much further culling is necessary.

However, Defendants do point out some deductions that the Court will make.  The 15.5 hours spent on clemency and compassionate or geriatric release issues ($3,069 deduction)[6] will be deducted.  Four and ¼ hours will be deducted as duplicative for preparing a timeline ($841.50 reduction).  The time spent on mock closings by attorneys who did not give closing is deducted (13.25 hours, $2,623.50 reduction).  Mr. Strom's travel time to Chicago on December 14, 2019, the weekend after the trial started, is deducted (3 hours, $594.00).  Mr. Sawyer's hourly rate as a law student is reduced to $125, the same as the paralegal rate.  Mr. Sawyer's time spent reviewing materials and attending meetings and depositions is deducted (13.5 hours, $2,673 reduction).  The remainder of Mr. Sawyer's time in June 2018 (24.75 hours) was reasonable, but is reduced by $1,806.75 to reflect the reduction in hourly rate. Defendants assert that the hours spent by Attorney Chloe Holt when she was a law student should also be reduced, but Defendants have not set forth those entries in their response.

---

[6] Defendants do not set forth the applicable CJA rate when this time was billed, so the Court uses $198.00).

Defendants also point out block billing and time entries that they maintain are insufficiently described. The Court has reviewed those entries and finds that the work done is either described sufficiently in the entry or is clear when considered in context with the surrounding entries.

Defendants next argue that 61.25 attorney hours and 119.75 support hours reflect administrative tasks that are not appropriately billed as attorney or paralegal time. The Court has reviewed those entries and concludes that those entries do not, by and large, appear to be solely administrative tasks. The complexity and the amount of the evidence in this case required extensive organization by individuals with the legal training and familiarity with the case to understand how that evidence should be best organized and summarized to prepare for trial. The Court's count of entries that might be purely administrative amounts to 23.25 hours of support staff time, most of that occurring after the trial by Mr. Garcia. Removing that time results in a deduction of $2,906.25.

The Court has carefully reviewed the remainder of the time entries set forth in Defendants' response and finds the time spent

was directly and reasonably incurred to prove a violation of Plaintiff's Eighth Amendment rights. The rates are more than reasonable, given the PLRA limits. The lodestar is 2,345.5 attorney hours at a CJA rate of $198-$228 (depending on the time frame) and $125 for Mr. Sawyers time, plus 734.75 hours at a paralegal rate of $125. The total dollar amount deducted from the attorneys' fees is $11,607.75. The total dollar amount deducted from the paralegal fees is $2,906.25. These deductions leave a total fee award of $602,786.25.

Defendants assert that the fees should be denied or reduced because Plaintiff's counsel voluntarily took the case pro bono and benefited from the case's publicity and training opportunities for associates. A firm's commitment to pro bono work does not preclude a fee award, nor does the existence of intangible benefits from that work.

Defendants maintain that a reduction is in order to reflect that Plaintiff did not obtain a jury verdict against two Defendants. The jury returned a verdict in favor of Defendant Galvin, and Defendant Mincy settled before the trial concluded. These individuals' testimony, though, was important in proving the deliberate

indifference of the other Defendants, particularly of Dr. Nawoor and Wexford. The discovery against Defendants Mincy and Galvin would have been necessary even if they had not been named as Defendants, and their testimony at trial would also have been necessary. The Court will not deduct the time spent or the costs incurred relating to Defendants Mincy and Galvin.

Plaintiff asks that the lodestar be multiplied by two because the PLRA rates undervalue the superior representation and excellent results achieved in this case. However, "[t]here is a strong presumption that the lodestar calculation yields a reasonable attorneys' fee award." Pickett v. Sheridan Health Care Center, 664 F.3d 632, 639 (7th Cir. 2011).

Plaintiff cites a Ninth Circuit Court of Appeals case subject to the PLRA hourly rate which upheld a multiplier of two due to counsel's superior performance under extreme time pressure and to help attract competent counsel in the future. Kelly v. Wengler, 822 F.3d 1085 (9th Cir. 2016).[7] The district court cases cited by Plaintiff

---

[7] More recently, the Ninth Circuit has held in a PLRA case that the quality of performance and novelty/complexity of the issues are already factored into the lodestar and therefore cannot be considered when determining whether an enhancement is warranted. Parsons v. Ryan, 949 F.3d 443, 467 (9th Cir. 2020). Parsons, however, confirmed that the lodestar may be enhanced in a PLRA case.

which follow this approach are also in the Ninth Circuit. Plaintiff does not cite any cases in the Seventh Circuit addressing whether a lodestar enhancement is permissible in PLRA cases, nor has the Court found any. Defendants argue that a lodestar enhancement would be an end-run around the hourly rate limit.

This important question is a question for another day. The Court need not decide whether the hourly rate limit precludes an enhancement of the lodestar because the Court finds that the lodestar is reasonable. Plaintiff's counsel achieved extraordinary results, which the Court believes is already reflected in the lodestar.

Defendants also maintain that the travel costs and expert witness fees recoverable as nontaxable expenses are excessive. They assert that the partners did not need luxurious accommodations at $142.38 per night for the partners and that attorneys should have shared hotel rooms. The Court does not find $142.38 per night excessive and finds the need for separate rooms necessary and reasonable. Defendants point out that it appears that some of the hotel rooms were not used on the weekend. The Court will, therefore, deduct the cost of two nights for Mr. Wackman ($194.36) and one night for Mr. Pelz ($142.38). The Court will also

deduct Mr. Strom's $343.62 car rental and $244.89 for Dr. Barnett's nonrefundable airline ticket.

As for the expert expenses, Defendants assert that Dr. Dhar's expert charges of $29,512.50 are excessive and should be brought more in line with the payments to Plaintiff's other experts. Defendants do not dispute that expert witness fees are recoverable under § 1988, and Plaintiff cites a district court case concluding that expert witness fees are recoverable.

However, 42 U.S.C. § 1988(c) limits recovery of expert witness fees to cases brought pursuant to 42 U.S.C. § 1981 and 1981a, and this case was not brought under either of those sections. This case was brought under 42 U.S.C. § 1983, which means that expert fees are not recoverable under § 1988. Jackson v. Birkey, 2019 WL 2305135 * 6 (C.D. Ill.); Fields v. City of Chicago, 2018 WL 253716 * 11 (N.D. Ill. 2018); Thorncreek Apartments I, LLC v. Village of Park Forest, 2016 WL 4503559 * 11 (N.D. Ill. 2016). Expert witness fees are not recoverable under Fed. Rule of Civil Procedure 54 either. Chambers v. Ingram, 858 F.2d 351, 360 (7th Cir. 1988).

Accordingly, the expert fees of $47,487.50 will be deducted. Lastly, Defendants object to the $16.95 spent for a book co-

authored by Dr. Barnett, *Essentials of Correctional Nursing.*
Defendants argue that, "[i]n the event the Court taxes this cost to
Defendants, Plaintiff should give the book to counsel for
Defendants." [Rep. p. 52.] This expenditure was reasonably
necessary in vetting and qualifying Dr. Barnett as an expert. The
Court will not deduct this expense.

The total deductions for the expenses is $48,412.75.
Therefore, the total nontaxable expenses awarded as part of the fee
award is $79,490.28 minus $48,412.75, or $31,077.53.

The total amount awarded pursuant to 42 U.S.C. § 1988 is
$633,863.78 ($602,786.25 in attorney/paralegal fees plus
$31,077.53 in expenses). This is less than 25% of the jury award
and is, therefore, applied against the jury award.

## VII. Plaintiff's bill of costs is allowed in the amount of $33,337.67.

Plaintiff seeks $36,943.64 in costs pursuant to Federal Rule of
Civil Procedure 54(d) and 28 U.S.C. § 1920. Defendants bear the
burden of demonstrating a cost should be disallowed. Crosby v.
City of Chicago, 949 F.3d 358, 363 (7th Cir. 2020)("Challenging a
district court's award of costs is an uphill battle. 'We have made it

clear that Rule 54(d) creates a presumption that the prevailing party will recover costs, and that the ultimate decision to award costs is within the district court's discretion.'")(*quoted cite omitted*).

Defendants challenge the admission fees for Attorneys Holt and Wackman, which totaled $462.00. Defendants argue that they should not pay for these attorney admissions if these attorneys will continue to practice in this District. However, though this Court will sometimes allow pro hac vice admission for pro bono counsel, the Central District of Illinois does not generally allow pro hac vice admission, *see* United States v. Emergency Med. Assoc. of Ill., Inc., 436 F.3d 726, 730 (7th Cir. 2006)(affirming taxing of cost of pro hac vice admissions), and these attorneys' admissions were necessary for them to represent Plaintiff. These costs are allowed.

Defendants next challenge the amounts spent for serving Dr. Severino and Dr. Guaglianone—$75.00 for the standard service fee, $50.00 for same day service, and $45 and $90 (respectively) for tendering the witness fees ($385.00 total). The parties agree that costs for service are generally limited to the fee that would have been charged by the U.S. Marshal, which the parties agree is $65.00 per hour. The hours necessary to serve these two witnesses

are not set forth, so the Court awards $65 for each, totaling $130.00.  The Court cannot determine whether same day service was necessary or whether the advanced check fee represents the actual witness fees or a service charge.  Accordingly, only $130 will be allowed.

Defendants' argument that Plaintiff should not recover the costs related to Defendants Mincy and Galvin is rejected, for the reasons explained above.

Defendants next argue that the descriptions for the $14,584.65 in printing costs are too vague to determine whether the costs were necessary or reasonable.  Many of the entries state only "color copy" or "B&W copy," while a few entries contain more description.  Some description is necessary, but within reason.  <u>Northbrook Excess and Surplus Ins. Co. v. Procter & Gamble Co.</u> 924 F.2d 633, 643 (7th Cir. 1991)(party "was not required to submit a bill of costs containing a description so detailed as to make it impossible economically to recover photocopying costs. Rather, Commercial was required to provide the best breakdown obtainable from retained records.").

Defendants ask that the entire $14,584.65 be deducted, but certainly copies were necessary in this case. The copying entries which exceed $15.00 from November and December 2019 total $11,233.68, and this was during the time when the parties were in the midst of summary judgment, final pretrial, and trial proceedings. The Courts find that $11,233.68 was reasonable and necessary even with the lack of description during this time. Therefore, the copying charges allowed are reduced by $3,350.97 ($14,584.65 minus $11,233.68). Added to the reduction in service charges of $255, the total reduction of costs is $3,605.97, leaving an award of costs for $33,337.67.

**IT IS ORDERED:**

**(1) Defendants' motion to cite additional authority is granted. [250.] The Court has considered the additional authority.**

**(2) Defendants' motion for judgment as a matter of law, a new trial, remittitur, and setoff is granted in part and denied in**

part. [206.]  **The punitive damages are remitted to $7,000,000.00.[8] The motion is otherwise denied.**

**(3)  Plaintiff's motion for attorneys' fees and costs is granted in part. [205.]  Attorneys' fees are awarded in the amount of $602,786.25.  Nontaxable expenses are awarded in the amount of $31,077.53.  Accordingly, the total amount awarded pursuant to 42 U.S.C. § 1988 is $633,863.78.**

**(4)  Costs are awarded to Plaintiff in the amount of $33,337.67.**

**(5) The clerk is directed to file an amended judgment to reflect the award of costs and attorneys' fees.**

ENTERED: **September 28, 2020**

FOR THE COURT:　**s/Sue E. Myerscough**
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE

---

[8]Saccomeno v. U.S. Bank Nat'l Assoc., 943 F.3d 1071, 1092 (7th Cir. 2019)("a court is empowered to decide the [constitutionally] maximum permissible amount without offering a new trial.").