# Exhibit B

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                     SPRINGFIELD DIVISION

 3   WILLIAM KENT DEAN,            )
                                   )
 4             PLAINTIFF,          )
                                   )
 5        VS.                      )  17-CV-03112
                                   )
 6   WEXFORD HEALTH SOURCES,       )  JURY TRIAL
     INC., DR. ABDUR NAWOOR, DR.   )
 7   REBECCA EINWOHNER, KATHY      )  SPRINGFIELD, ILLINOIS
     GALVIN, and LISA MINCY,       )
 8                                 )
               DEFENDANTS.         )
 9
                    EXCERPT OF PROCEEDINGS
10          BEFORE THE HONORABLE SUE E. MYERSCOUGH
                 UNITED STATES DISTRICT JUDGE
11
     DECEMBER 9, 2019
12
     A P P E A R A N C E S:
13   FOR THE PLAINTIFF:           CRAIG MARTIN
                                  JOEL PELZ
14                                WILLIAM STROM
                                  CHLOE HOLT
15                                NATHANIEL WACKMAN
                                  JENNER & BLOCK
16                                353 N. CLARK STREET
                                  CHICAGO, ILLINOIS
17
     FOR DEFENDANTS               JOSEPH RUPCICH
18   WEXFORD HEALTH SOURCE,       ALEXANDRA RICE
     DR. ABDUR NAWOOR,            CASSIDAY SCHADE.
19   REBECCA EINWOHNER            111 N. SIXTH STREET
     AND KATHY GALVIN:            SPRINGFIELD, ILLINOIS
20   FOR DEFENDANT LISA MINCY:    JEREMY TYRRELL
                                  CLAYTON ANKNEY
21                                ATTORNEY GENERAL'S OFFICE
                                  500 S. SECOND STREET
22                                SPRINGFIELD, ILLINOISI

23   COURT REPORTER:     KATHY J. SULLIVAN, CSR, RPR, CRR
                         COURT REPORTER
24                       600 E. MONROE
                         SPRINGFIELD, ILLINOIS
25                       (217)492-4810
```

```
                        I N D E X

WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS
```

```
                       E X H I B I T S

GOVERNMENT'S EXHIBIT
NUMBER                              IDENTIFIED   ADMITTED




DEFENDANT'S EXHIBIT
NUMBER                              IDENTIFIED   ADMITTED
```

```
 1                    P R O C E E D I N G S
 2           *   *   *   *   *   *   *   *   *   *   *
 3         (Prior proceedings were reported but not
 4         transcribed in this excerpt.)
 5              THE COURT:  Thank you, Mr. Martin.
 6     Mr. Rupcich, your opening.
 7              MR. RUPCICH:  Thank you, Your Honor.  And
 8     may it please the Court?
 9              THE COURT:  Yes.
10              MR. RUPCICH:  Cancer is a scary word.
11     That's because it's a scary disease.  It's a tragic
12     disease when it strikes.  I would venture none of us
13     in this room won't be affected by it at some point
14     in our lives; friend, family member, ourselves.
15         And what makes cancer such a terrible and
16     formidable opponent is that it doesn't announce its
17     presence.  It attacks in stealth.  It doesn't come
18     with flashing lights, it doesn't come with an
19     announcement it's attacking its victim.  And that's
20     what makes it so difficult.
21         And the evidence in this case will show that
22     this is what happened to Mr. Dean.  This is what
23     cancer did to Mr. Dean.  It attacked him in silence,
24     unbeknownst to anyone.
25         One of the tragedies of cancer is that as it
```

1  creeps along destroying healthy tissue, replacing it
2  with something else, too often by the time it
3  decides to announce itself the damage has been done.
4  This is Mr. Dean's case.
5      But Mr. Dean was not alone in his fight against
6  cancer.  He had a team of medical professionals who
7  joined the fight against cancer with him.  The team
8  consisted of the defendants at Taylorville
9  Correctional Center.  It consisted of outside
10 specialists from Springfield Clinic.  Consisted of
11 an oncologist from Decatur.  And through their
12 efforts together, they fought back against
13 Mr. Dean's cancer, he beat the odds and he's still
14 sitting here.
15     And that's really what this case is about that
16 you're going to hear over the next few days, the
17 tragedy of cancer's attack, but also the triumphs of
18 modern medicine and its ability to fight back to
19 help patients.
20     I'd like to introduce you to the characters in
21 our story that we'll be telling you over the next
22 week or so.
23     First character is cancer itself.  Cancer is
24 the villain in this story.  Mr. Dean had a cancer
25 called renal cell carcinoma that attached his

1  kidney, it attacked the vein going from his kidney
2  to his heart.  And as you will see, it did this in
3  silence.  It did this before December 23rd, 2015.
4      We will bring in expert witnesses that will
5  explain the history of this disease to you.  The
6  fact that it is often present for years before it
7  becomes symptomatic.  And it creeps along and nobody
8  knows.  And Mr. Dean's cancer was this type of
9  cancer that was present 2014, 2015.
10     Dr. Nawoor is a family practitioner with close
11 to 40 years experience practicing in private
12 practice in Springfield.  He practices in family
13 medicine.  He treats people in a general medical
14 practice.  He started at Taylorville in December of
15 2015, a few weeks before Mr. Dean first presented
16 with the actual symptoms of his cancer.
17     Mr. Dean, obviously, is one of the central
18 players in this story.  No one is here to doubt the
19 pain Mr. Dean feels.  No one will question the fear.
20 No one will question the anguish he went through.
21 But we have to be careful not to misplace our
22 sympathy and not let it overwhelm our better
23 judgment.
24     The evidence in this case will show you
25 Mr. Dean had a long and complicated medical history.

1  He had a history of kidney stones going back for
2  years.  Presentation of those stones was blood in
3  his urine.  He had multiple surgical procedures to
4  treat those stones.  He had chronic blood in his
5  urine.
6      The evidence will show Mr. Dean had
7  complicating medical conditions.  He had decreased
8  function in his kidney.  He didn't clear waste like
9  a normal person.  He had heart problems, diabetes,
10 various co-morbid--that's what we call
11 them--conditions that made his situation stand unto
12 itself.  And it's important that we keep that in
13 mind as we talk about the actions that the medical
14 defendants took with respect to Mr. Dean.
15     Dr. Einwohner, her role is rather limited in
16 this story.  She saw Mr. Dean, as you saw,
17 January 7, February 8, and referred him to the
18 collegial process for determination of the next step
19 in his care.  And that's because she was off-site,
20 by video.  Acute issues, blood in the urine she will
21 tell you were addressed on site.
22     Our next person, Kathy Galvin.  She's a
23 registered nurse.  She works in a supervisory
24 capacity.  She supervised the nursing staff at
25 Taylorville.  She was not a direct provider of

1  clinical services to patients.  She made sure that
2  nursing staff delivered their services according to
3  the rules, policies, and regulations of the Illinois
4  Department of Corrections.
5       And Wexford Health, the employer of my clients.
6  Judging from the opening, you're going to hear a lot
7  of accusations made against Wexford Health; its
8  collegial review process.  But what I'd like you to
9  keep in mind as you consider this evidence is what
10 was denied to Mr. Dean?  Ask yourself that as you
11 watch the medicine unfold.  Did they deny him any
12 services?  When you see the evidence, the one
13 conclusion?  No, they approved over and over.  In
14 fact, Mr. Martin said if he put all the collegials
15 up there, it would fill his screen.  I won't dispute
16 that.
17      This collegial review process that you will
18 hear maligned over the next week, the process
19 required by the Illinois Department of Corrections.
20 Wexford Health is required to do it by its client
21 the Department of Corrections.  Dr. Ritz will come
22 and explain it to you.
23      He'll explain that they discuss patient care.
24 They arrived at a decision that is both medically
25 necessary and clinically appropriate for the

1  patient.  And the medical facts in this case will
2  support that.
3     Now that you know the characters, I'd like to
4  give you our timeline.  Our timeline includes the
5  full picture.
6     Lexie, would you mind putting it up.
7     And this timeline includes the period from the
8  onset of Mr. Dean's illness through the present when
9  he continues to receive care.
10    The gold period, 2014-2015, represents the
11 silent, systematic disease, the onset of cancer.
12 The dirty, sneaky attack it pulls on Mr. Dean.  We
13 will have, like I said, our experts explain to you
14 what was going on during that period.  Suffice to
15 say, when that cancer showed its face in December,
16 the evidence will show it was already socked in
17 there.  You will not see evidence that this went
18 from a small, discrete mass to something different
19 during the period in 2015 on.
20    Now, it's very important that we focus on that
21 green period.  The green period is where the rubber
22 meets the road.  Where the ball was ostensibly in
23 the court of my clients to figure out what was going
24 on here.  And you'll see where that fits into the
25 overall history.  Small period.

1    Now, during the course of this trial, we will
2 fill in that period, that green period, with all the
3 care that was provided.  We will fill it in with the
4 steps that were taken to move Mr. Dean's care from
5 the onset of the symptoms to the end of that green
6 period on April 14th.  And that's when the diagnosis
7 is made.
8    And I will invite you, when you consider this
9 evidence, to remember time marches forward, not in
10 reverse.  Don't let yourself fall victim to what we
11 call the hindsight visor.  We know now what Mr. Dean
12 had.  And it's easy to go back sometimes and
13 criticize the play-calling when you know the final
14 score, okay?
15    So you have to consider what was available to
16 Dr. Nawoor as these events were happening.  And that
17 was that Mr. Dean had a history of blood in his
18 urine and stones.  As he worked the patient through,
19 he had to make decisions based on the medical facts
20 available to him at that time.
21    Now, I'd like to move onto the purple.  The
22 purple is the time from diagnosis to surgery, right?
23 Everybody with me?  It's a little far away.  Can you
24 make it bigger?  Not that big.
25    All right, we'll go with it.  That 206 days

1  that Mr. Martin just referenced in his opening,
2  you're going to hear the urologic surgeon,
3  Dr. William Severino from Springfield Clinic right
4  here in Springfield, Illinois, explain the steps he
5  took during that purple period.  The steps he took
6  to get Mr. Dean from his diagnosis all the way to on
7  the table for this nine-hour surgery where they
8  removed his kidney, drained blood from his body,
9  opened his chest, removed the tumor.
10         And what you'll see is Dr. Severino will tell
11  you he needed help.  He had to bring in additional
12  surgeons.  He had to bring in a vascular surgeon.
13  He had to bring in a cardiothoracic surgeon.  He had
14  to bring in a second radiologist.  He needed cardiac
15  clearance.  These things took time.
16         Dr. Severino's deposition will be read to you
17  in this case, and it will be clear that he was
18  calling the shots during this time.  Dr. Nawoor is a
19  family practitioner.  Consenting to do surgery and
20  how to do it was in the hands of a urologist, and he
21  did the surgery.
22         And as Mr. Martin said, there was a high
23  probability that Mr. Dean would die during that
24  surgery.  But the evidence will show -- maybe not
25  even the evidence, he's here.  He made it.  He beat

1  the 50/50 odds of dying on that table.
2       And Dr. Severino turned that care over to the
3  medical oncologist.  And that's the blue period.
4  And that oncologist has cared for Mr. Dean since
5  August 2016 all the way to the present.  Changing
6  medications, I think four at this point the evidence
7  will show.  The collegial review process approved
8  all of them, Mr. Dean got them.
9       And Dr. Guaglianone, who is that oncologist,
10 he'll tell you Mr. Dean's stable on the medication.
11 Is his diagnosis terminal?  Yes.  Yes, it is.  But
12 he's doing okay now.
13      A word on the standard of care.  You're going
14 to hear that phrase during this trial; probably more
15 than you'll ever want to.  What does it mean?  I'd
16 like to give you a suggestion for what we believe
17 the evidence will show standard of care is.  See,
18 it's an expectation.  It's an expectation for what
19 we think a doctor should do in a particular
20 situation.  It is not a particular result.  It's not
21 a particular test.  It's not a particular lab.  What
22 it is is the law's expectation that a doctor, when
23 presented with a situation, will gather the right
24 facts, consider them, examine the patient,
25 synthesize the information and come up with a plan

of care that's related to what was presented.

Medicine isn't a flowchart.  If all doctors had to do was memorize diagnoses and plan of care, we wouldn't make them go to medical school for ten years.  Probably be more like law school, three years.

In this case, you have to understand when you talk of standard of care, there can be any number of things within the bounds of what would be reasonable for a particular situation.

I'll give you the example that's most obvious that was just addressed, the decision to do an ultrasound.  It is a sound wave test that bounces echo off of your organs and gives a picture of it; right?  They said and they will tell you Mr. Dean should have had a CT off the bat.  Well, they say the standard of care is a CT right away for blood in the urine.  The evidence will show the patient that presented to Dr. Nawoor had a medical history that made a CT a questionable test.  The radiation, the dye that's injected to do a CT was not entirely safe for Mr. Dean due to his reduced kidney function.

And this is what I talk about when I say it's patient-specific.  You have to understand the standard of care is not -- does not compel

1  particular results, it allows for the science and
2  the art of medicine to work together.
3      We believe the evidence will fill out that
4  timeline in green and in purple and show you all the
5  things that were done.  All the things that were
6  done to move Mr. Dean through the process and get
7  him the best result he could get.
8      I'd ask that you keep your focus on the medical
9  facts in this case, the medical facts that show what
10 was done, and not get distracted by the other stuff.
11 The medical facts will lead you to the truth.  And
12 the truth is all we're after here.  And the truth is
13 when you've seen all the evidence, Mr. Dean's here
14 today not despite my clients but because of them.
15     I'm Joe, she's Lexie.  We look forward to
16 presenting this case to you over the next week.
17 Thank you for your attention.
18         THE COURT:  Thank you, Mr. Rupcich.
19    Mr. Tyrrell.
20         MR. TYRRELL:  Thank you, Your Honor.
21         THE COURT:  Does anyone need a break before
22 Mr. Tyrrell argues?
23         MR. TYRRELL:  I promise I'll be very brief.
24         THE COURT:  Kathy?
25         COURT REPORTER:  I'm good.  Thank you.

1           MR. TYRRELL:  Good afternoon, ladies and
2    gentlemen of the jury.  As I told you earlier, my
3    name is Jeremy Tyrrell.  I along with my co-counsel
4    Mr. Ankney represent Lisa Mincy.
5        Ms. Mincy, unlike the other defendants in this,
6    wasn't employed by Wexford Health Sources.  She was
7    actually an employee of the Illinois Department of
8    Corrections at Taylorville.  And her title there was
9    health care unit administrator.
10       Now, Ms. Mincy can do a much better job of
11   explaining her job duties and responsibilities than
12   I can, but just for a general overview of what she
13   did, she started at Taylorville in December of 2015
14   as the health administrator.  She was there until
15   January of 2017.  With the pay cycles for the State
16   of Illinois, that ends up being a year and a month.
17   That's how long she was there.
18       Her job was to be the only Illinois Department
19   of Corrections official in the Health Care Unit.
20   Her job was to do reports, keep track of grievances
21   that were being submitted by offenders, and just
22   generally making sure everything is running
23   smoothly.
24       What her job didn't include was seeing patients
25   on a regular basis.  It didn't involve overruling

1   treatment decisions of medical professionals.  It
2   didn't involve sending people to outside doctors.
3   It didn't involve diagnostic testing.  That wasn't
4   her area of expertise.
5       You will hear testimony that Ms. Mincy has a
6   nursing degree.  But at Taylorville, she wasn't
7   normally serving as a nurse.  She was an
8   administrator, she was a supervisor, she made sure
9   the Health Care Unit was running smoothly.  She was
10  not responsible for providing the medical care to
11  Mr. Dean.
12      Rather, you'll hear from Ms. Mincy, she --
13  Ms. Mincy understood that Mr. Dean was being seen by
14  a primary care physician, Dr. Nawoor.  That he was
15  being seen by a specialist, that was Dr. Einwohner,
16  the nephrologist.  He was being seen by an
17  oncologist, he was being seen by a urologist, and
18  plenty of other surgeons.
19      You will hear from Ms. Mincy she had no reason
20  to disbelieve these other medical professionals and
21  jump in.
22      Over the course of the next couple of days, I
23  ask that you carefully consider the evidence, listen
24  to the evidence.  And I trust after you listen to
25  the evidence, you will find in favor of my client,

1  Lisa Mincy.
2      Thank you.
3          THE COURT:  Thank you, Mr. Tyrrell.  We
4  will give the jury a ten-minute break.
5      Sir, would you like a cough drop for your
6  cough?  Feel free to bring your waters back in with
7  you.  It's that time of year, unfortunately.
8      (The jury left the courtroom.)
9      (Additional proceedings were reported but not
10         transcribed in this excerpt.)
11
12  I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court
13  Reporter, certify that the foregoing is a correct
14  transcript from the record of proceedings in the
15  above-entitled matter.
16
17
18
19
20              This transcript contains the
21              digital signature of:
22
23              Kathy J. Sullivan, CSR, RPR, CRR
24              License #084-002768
25