E-FILED
Monday, 30 November, 2020  06:53:46 PM
Clerk, U.S. District Court, ILCD

# Exhibit C

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                    SPRINGFIELD DIVISION

 3   WILLIAM KENT DEAN,            )
                                  )
 4             PLAINTIFF,          )
                                  )
 5        VS.                      )  17-CV-03112
                                  )
 6   WEXFORD HEALTH SOURCES,       )  JURY TRIAL
     INC., DR. ABDUR NAWOOR, DR.   )
 7   REBECCA EINWOHNER, KATHY      )  SPRINGFIELD, ILLINOIS
     GALVIN, and LISA MINCY,       )
 8                                 )
               DEFENDANTS.         )
 9
                    EXCERPT OF PROCEEDINGS
10         BEFORE THE HONORABLE SUE E. MYERSCOUGH
                 UNITED STATES DISTRICT JUDGE
11
     DECEMBER 11, 2019
12
     A P P E A R A N C E S:
13   FOR THE PLAINTIFF:          CRAIG MARTIN
                                 JOEL PELZ
14                               WILLIAM STROM
                                 CHLOE HOLT
15                               NATHANIEL WACKMAN
                                 JENNER & BLOCK
16                               353 N. CLARK STREET
                                 CHICAGO, ILLINOIS
17
     FOR DEFENDANTS              JOSEPH RUPCICH
18   WEXFORD HEALTH SOURCE,      ALEXANDRA RICE
     DR. ABDUR NAWOOR,           CASSIDAY SCHADE.
19   REBECCA EINWOHNER           111 N. SIXTH STREET
     AND KATHY GALVIN:           SPRINGFIELD, ILLINOIS
20   FOR DEFENDANT LISA MINCY:   JEREMY TYRRELL
                                 CLAYTON ANKNEY
21                               ATTORNEY GENERAL'S OFFICE
                                 500 S. SECOND STREET
22                               SPRINGFIELD, ILLINOISI

23   COURT REPORTER:      KATHY J. SULLIVAN, CSR, RPR, CRR
                          COURT REPORTER
24                        600 E. MONROE
                          SPRINGFIELD, ILLINOIS
25                        (217)492-4810
</pre>

1                       I N D E X

2    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3    ABDUR NAWOOR            3

4                     E X H I B I T S

5    PLAINTIFF'S EXHIBIT
     NUMBER                    IDENTIFIED    ADMITTED
6    EXHIBIT 28                    64           66
     EXHIBIT 46                     6            7
7    EXHIBIT 56                   167          168
     EXHIBIT 60                    56           58
8    EXHIBIT 66                    98           99
     EXHIBIT 84                    12           13
9    EXHIBIT 93                   103          104
     EXHIBIT 96                   144          144
10   EXHIBIT 114                  133          133
     EXHIBIT 157                  115          115
11   EXHIBIT 166                  120          121
     EXHIBIT 181                  158          160
12   EXHIBIT 186                  117          121
     EXHIBIT 190                   69           69
13   EXHIBIT 375                  131          132
     EXHIBIT 376                  130          133
14   EXHIBIT 377                  135          135
     EXHIBIT 382                  137          137
15   EXHIBIT 384                  137          138
     EXHIBIT 385                  158          158
16   EXHIBIT 388                  138          139
     EXHIBIT 389                  142          143
17   EXHIBIT 402                  140          141
     EXHIBIT 404 THRU 406        152          155
18

19
     DEFENDANT'S EXHIBIT
20   NUMBER                    IDENTIFIED    ADMITTED

21

22

23

24

25

1           P R O C E E D I N G S

2        *    *    *    *    *    *    *    *    *    *    *

3        (Prior proceedings were reported but not

4        transcribed in this excerpt.)

5        (A recess was taken.)

6            THE COURT:  All right, let's bring the jury

7    in.

8        (The jury entered the courtroom.)

9            THE COURT:  Please be seated.  Court is

10   reconvened.

11       Our next witness.

12           MR. PELZ:  Thank you, Your Honor.  The

13   plaintiffs call Dr. Abdur Nawoor.

14           THE COURT:  Thank you, Mr. Pelz.

15       Please proceed.

16       Please swear the witness.

17       (The witness was sworn.)

18                   ABDUR NAWOOR

19   called as a witness herein, having been duly sworn,

20   was examined and testified as follows:

21                 DIRECT EXAMINATION

22   BY MR. PELZ:

23       Q.  Please state your name, sir.

24       A.  Yeah, I'm Dr. Abdur Nawoor.  A-b-d-u-r.

25   N-a-w-o-o-r.

1    Q.  Sir, are you employed by Wexford Health

2  Source, Inc.?

3    A.  Yes.

4    Q.  And do you sometimes refer to that just as

5  Wexford?

6    A.  Right.

7    Q.  Have you also, when talking to patients or

8  otherwise, just refer to that entity as Pittsburgh?

9    A.  Yes.

10    Q.  That's because that's where that corporation

11  is located?

12    A.  Right.

13    Q.  You are currently the medical director at

14  Taylorville Correctional Center; correct?

15    A.  Yeah, correct.

16    Q.  You have held that position since

17  December 2, 2015?

18    A.  Correct.

19    Q.  You are the only medical doctor there on a

20  regular basis; correct?

21    A.  Right.

22    Q.  And that's been true since December 2nd of

23  2015?

24    A.  Right.

25    Q.  The other medical personnel that are there

1    are nurses?

2        A.  Correct.

3        Q.  Occasionally you get a vacation or you need

4    to take a day off and someone substitutes for you?

5        A.  Correct.

6        Q.  Prior to December 2015, you had never met

7    Mr. Dean, had you?

8        A.  No.

9        Q.  You had no knowledge of who he was?

10       A.  No.

11       Q.  You had no knowledge of any of his medical

12   conditions?

13       A.  No.

14       Q.  You'd never seen him?

15       A.  No.

16       Q.  Now, when you began working for Wexford as

17   the medical director at Taylorville Correctional

18   Center, when you applied, you were retired?

19       (Court reporter requested clarification.)

20       Q.  I think he said for almost a year?

21       A.  Yeah, correct.

22       Q.  You had had a practice --

23       A.  Mm-hmm.

24       Q.  -- in Springfield for 38 years, was it?

25       A.  A little more than that.

1      Q.  You sold that practice at the end of 2014;

2  correct?

3      A.  Mm-hmm.

4      Q.  You then worked for, consulted with the

5  company you sold it to for a couple of months?

6      A.  Right.

7      Q.  And then you decided you really didn't want

8  to do that anymore; right?

9      A.  Yeah, I didn't like the way they were

10  running the place.

11      Q.  But somebody suggested you apply to be --

12  for a job with Wexford, and you decided to do it?

13      A.  Correct.

14      Q.  Let me show you what's been marked as

15  Plaintiff's Exhibit 46.

16      Sir, is Plaintiff's Exhibit 46 the application

17  you submitted to Wexford to obtain employment?

18      A.  Right.

19      Q.  Did you submit that in September of 2015?

20      A.  Right.

21      Q.  And you recognize this; right, sir?

22      A.  Mm-hmm.

23      Q.  The handwriting on there is yours?

24      A.  Right.

25      Q.  The -- the page that's -- there's a

1    résumé--I'm sorry--of ours that's contained within

2    that document as well, sir?

3        A.  Right.

4        Q.  Judge, we'd move admission of Plaintiff's

5    Exhibit 46, please.

6            THE COURT:  Any objection?

7            MR. RUPCICH:  Relevance.

8            MR. TYRRELL:  We'll join.

9            THE COURT:  Objection is overruled.  It is

10   admitted.

11       (Plaintiff's Exhibit 46 admitted.)

12       Q.  Can you -- Dylan, can you go to the third

13   page, I think it's going to be PTX3.

14       And that refers to your previous employer had

15   been PGA, which was Physicians Association Group?

16       A.  Right.

17       Q.  And you had worked there from July '76 to

18   December 2014?

19       A.  Yes.

20       Q.  And you left because you retired?

21       A.  Right.

22       Q.  Now also, as of the time you started --

23   well, withdrawn, let me go back.

24       You had been certified in internal medicine;

25   sir?

1      A.   Right.

2      Q.   And also in pulmonary?

3      A.   Right.

4      Q.   But as of December of 2015, you were no

5   longer certified in internal medicine; were you?

6      A.   That is correct.

7      Q.   Can we go to PTX05 please, Dylan.

8      Is that your résumé; sir?

9      A.   Mm-hmm.

10      Q.   That's the one you submitted to get your

11   application; right?

12      A.   Right.

13      Q.   Your medical training was not in the United

14   States, was it?

15      A.   No.

16      Q.   It was in Ireland?

17      A.   Dublin, yeah.

18      Q.   And your pre-medical education wasn't in the

19   United States, was it?

20      A.   No.

21      Q.   Where was that?

22      A.   Well, I was in Mauritius, a small island in

23   the Indian ocean.  But all our education is done

24   through Cambridge University in England.

25      Q.   You came to the United States after you got

1    out of the Ireland medical school; right?

2        A.  Right.

3        Q.  You did some residencies and some

4    internships and then landed in Springfield; correct?

5        A.  Eventually, yeah.

6        Q.  And that, as shown on your résumé, that

7    coming to Springfield is when you joined Physician's

8    Group Clinic in 1976?

9        A.  Correct.

10       Q.  Now, in 19 -- December of 2015, you had a

11   lot of responsibilities at Taylorville Correctional

12   Center, didn't you, sir?

13       A.  Yes.

14       Q.  You were working 40 hours a week; right?

15       A.  Correct.

16       Q.  Five days a week, eight hours a day; right?

17   Did you take weekends off or did the day off change?

18       A.  We get the weekend off, yeah.

19       Q.  And within that 40 hours a week, you would

20   spend 25 to 30 hours seeing patients?

21       A.  Correct.

22       Q.  The other 10 to 15 hours were a bunch of

23   administrative tasks you had; right, sir?

24       A.  Correct.

25       Q.  And in your mind, those other administrative

1   tasks had nothing to do with health care?

2      A.  No.

3      Q.  For you, health care was seeing the patient?

4      A.  That's correct.

5      Q.  When you -- in December of 2015, you were

6   regularly seeing 40 patients a day?

7      A.  Generally, yeah.

8      Q.  That later got reduced some because -- did

9   you complain about that being too much?

10      A.  Yes, I did.

11      Q.  And so later in your career at Taylorville

12   that was reduced to 25 to 30 a day?

13      A.  30.

14      Q.  But at 40 patients a day, and when you're

15   only spending 25 to 30 hours a week doing it, if we

16   do the math, that means less than ten minutes a

17   patient, doesn't it, sir?

18      A.  Basically.  But some patient -- depending on

19   what the patient is complaining of.  Sometimes I

20   spend a lot more than that.

21      Q.  Now, when Mr. Dean arrives in the -- did you

22   know Mr. Dean had been to the medical center the day

23   before on December 22nd and presented to a nurse?

24      A.  No, I don't remember that.

25      Q.  On the 23rd when he shows up, does he talk

1  first to a nurse?

2      A.  Yeah.  He has to see the nurse, take the

3  blood pressure and everything.  Vital signs anyway.

4      Q.  Then when he comes to see you, you do an

5  examination and talk to the patient; correct?

6      A.  First I find out what's going on.  Ask him

7  question about his history.

8      Q.  Now, when Mr. Dean showed up on

9  December 23rd, he told you he was urinating blood?

10     A.  Correct.

11     Q.  He also told you he was not in any pain?

12     A.  Correct.

13     Q.  You asked him -- you wanted to know if he

14  was in pain or not?

15     A.  That's correct.

16     Q.  Because whether he was in pain or not would

17  be important in trying to reach the right diagnosis?

18     A.  That's correct.

19     Q.  And you also did some palpatating him in the

20  kidney area to see if he was in pain?

21     A.  Right.

22     Q.  When you did that, he expressed no pain;

23  correct?

24     A.  Yeah.

25     Q.  Now, because you were so busy, before he

1  arrives there on the 23rd you didn't review any of

2  his medical history, did you, sir?

3       A.  No, no.

4       Q.  When you came in to work that morning, you

5  didn't know he was on the list?

6       A.  Not necessarily, no.

7       Q.  You had seen him once earlier in the month

8  in December?

9       A.  Yes, I did.  On the 8th.

10      Q.  And that was for a rash?

11      A.  That is correct.

12      Q.  But other than that one treatment for the

13  rash, you'd never provided any medical treatment to

14  Mr. Dean, had you?

15      A.  No.

16      Q.  Now, there is a -- there's procedures that

17  you follow at Taylorville Correctional Center?

18  Sometimes they're referred -- I think you've

19  referred to them as S-O-A-P?

20      A.  Yes.

21      Q.  What is S-O-A-P?

22      A.  It stands for subjective symptoms, objective

23  examination, A for assessment, and P for the plan of

24  treatment.

25      Q.  And you are -- for every patient you see,

1   you're supposed to enter on that patient's chart for

2   that visit something in the S-O-A-P; correct?

3        A.  Correct.

4        Q.  If we look at Plaintiff's Exhibit 84,

5   please.  Hang on a second.  I don't think there's

6   any objection; is that correct?

7             MR. RUPCICH:  84?

8        Q.  Yeah.

9             MR. RUPCICH:  No objection.

10            MR. TYRRELL:  No objection, Your Honor.

11            THE COURT:  This is actually 84, is

12  admitted.

13       (Plaintiff's Exhibit 84 admitted.)

14       Q.  Do you have it, sir?

15       A.  Yeah.

16       Q.  Put it up on the screen.  Thank you, Dylan.

17       Exhibit 84, the handwriting on the first page

18  except for the big writing hematuria, the rest of

19  that handwriting is yours; is that correct?

20       A.  Right.

21       Q.  And there's a signature toward the bottom on

22  the right.  That's yours?

23       A.  Mm-hmm.

24       Q.  And the other signature is one from the

25  nurse?

1     A. Right.

2     Q. And if you'd look at page 2 of Exhibit 84,

3 that is information that was taken from Mr. Dean by

4 the nurse before he saw you; correct?

5     A. Yeah, you're referring to January 13?

6     Q. I'm referring to December 23rd, 2015 --

7     A. Yeah.

8     Q. -- on the left-hand side it says 5:55 a.m.?

9     A. Right.

10     Q. At 5:55 in the morning, he reports to the

11 sick call and the nurse enters that information; is

12 that right, sir?

13     A. Mm-hmm.

14     Q. And the name of the nurse is down at the

15 bottom, on the bottom right?

16     A. Mm-hmm.

17     Q. Do you recognize the name of who that nurse

18 was that he saw that morning?

19     A. You are referring to 12/23rd; right?

20     Q. December 23rd.  Right here, sir?

21     A. Yeah.

22     THE COURT:  It's also on the screen to your

23 right, Doctor.

24     A. Oh, okay.  It says Sulcer, that's what it

25 says, yes.

1     Q.  What's the name of that nurse?

2     A.  Sulcer.  S-u-l-c-e-r.

3     Q.  And you see below that there's a payment

4  voucher circled yes?

5     A.  Mm-hmm.

6     Q.  Mr. Dean had to pay to come to sick call and

7  to see you?

8     A.  Mm-hmm.

9     Q.  Now, you were so busy in December of 2015

10 seeing 40 patients a day that sometimes you didn't

11 even have time to read the nurse's material before

12 you saw the patient; isn't that true?

13    A.  Invariably, yeah.  If they come to the sick

14 call, I have to read it and sign it.

15    Q.  Well, you don't read and sign anything on --

16 you don't sign anything on page 2, the 84-2, do you,

17 sir?

18    A.  Yeah, I didn't sign that one; that's

19 correct.

20    Q.  You did not sign it; right?

21    A.  Yeah, but did I see him.

22    Q.  You saw him, we know you saw him, because

23 let's go back to page 1?

24    A.  Mm-hmm.

25    Q.  And page 1 is where you have the S-O-A-P

1    that you entered that day; right, sir?

2        A.  Right.

3        Q.  In terms of the history of Mr. Dean, the

4    only thing you knew about his history on

5    December 23rd was what he told you under the S part

6    of that entry; right, sir?

7        A.  Yeah.

8        Q.  But what was absolutely certain to you that

9    day is that he was presenting with gross hematuria?

10       A.  Correct.

11       Q.  And gross hematuria means that the blood

12   that's in the urine is visible?

13       A.  Right.

14       Q.  As opposed to being microscopic?

15       A.  Yeah.

16       Q.  He told you that that condition had existed

17   for several days, did he not, sir?

18       A.  Mm-hmm.

19       Q.  And he told you he was passing a lot of

20   blood?

21       A.  Right.

22       Q.  He reported to you that he was having no

23   pain?

24       A.  Right.

25       Q.  And you confirmed that by testing to see

1   whether he was having pain --

2        A.  Right.

3        Q.  -- when you touched him in the area of the

4   kidney; right?

5        A.  Yes.

6        Q.  And you knew that was important?

7        A.  Right.

8        Q.  You also verified that he did have blood in

9   his urine by doing a dipstick; correct?

10       A.  Right.

11       Q.  So you knew that there wasn't any question

12  that it was fabricating or anything.  You confirmed

13  that he did have blood in his urine?

14       A.  Right.

15       Q.  Now, in December 25th -- December 23rd of

16  2015, did you know the recognized standard of care

17  for a patient reporting with gross hematuria and no

18  pain?

19       A.  Yes.

20       Q.  You knew the American Urological Association

21  standards for what you should do if a patient who's

22  over 50 years old shows up with gross hematuria and

23  reporting no pain?

24       A.  That's correct.

25       Q.  And you knew that that standard of care, the

1  number one thing you're supposed to do is to refer

2  to a urologist?

3       A.  Yes.

4       Q.  And you're supposed to do a CT scan for the

5  upper portion of the urinary tract and a cystoscopy

6  for the lower portion of the urinary tract?

7       A.  Eventually, that's right.

8       Q.  You knew that was the standard of care?

9       A.  Basically, yeah.

10      Q.  Basically?

11      A.  Yeah.  Well, it depends on the patient's,

12  you know, background, history.  His renal function.

13  And whether he was on any blood thinner at the time

14  or not.  And so you have to treat different patient

15  in different ways.  And besides, you know, as a

16  medical director, my job is I cannot send patient

17  out for CAT scan without consulting with Pittsburgh.

18  And that's why we have the collegial.

19      Q.  There's a lot in that answer, I think we

20  need to dissect it a little bit, sir.

21      A.  All right, sure.

22      Q.  The first thing you said was it depends on

23  the patient.

24      A.  Yeah.  How they present and their

25  background.

1    Q.  The only thing you knew about him that day

2    was what you have in those four lines --

3        A.  Right.

4        Q.  -- of S-O-A-P.  That's all you knew?

5        A.  Yes.

6        Q.  There's nothing in those four lines that

7    gives you any suggestion that you should deviate

8    from the recognized standard of care, is there,

9    Doctor?

10       A.  That's true, but --

11       Q.  That --

12       A.  Go ahead.

13       Q.  You answered the question.

14       You also -- the second part of your answer is

15   very interesting.  Because you've only been there a

16   month; right?

17       A.  That's correct.

18       Q.  But in that month, you knew already that you

19   couldn't send him to a urologist, could you?  Not on

20   your own?

21       A.  No.

22       Q.  If you -- even if you believed it was

23   medically necessary to send him to a urologist, you

24   couldn't do it without calling Pittsburgh?

25       A.  That's correct.

1      Q.  And if you believed that a CT scan was the

2   necessary approach, you couldn't do that on your

3   own?

4      A.  Huh-uh.

5      Q.  You couldn't do that without calling

6   Pittsburgh?

7      A.  Right.

8      Q.  And you couldn't do a cystoscopy, could you?

9      A.  That's right.

10     Q.  You couldn't do that until you talked to

11  Pittsburgh, could you?

12     A.  That's right.

13     Q.  But you knew based on -- I mean you've been

14  practicing medicine for over 35 years by that time?

15     A.  That's correct, I have.

16     Q.  You had no doubt in your mind that he needed

17  to see a urologist?

18     A.  Eventually, yes.

19     Q.  Eventually.  Yeah.  But -- you can't do it

20  right away because you gotta call Pittsburgh?

21     A.  That's right.

22     Q.  Right.  Everything has to be approved by

23  Pittsburgh?

24     A.  Yep.  That's true.

25     Q.  And you put in your -- you put in your

1  notes -- and on the right-hand side, it's not easy

2  to see, but see urologist; right?

3       A.  Mm-hmm.

4       Q.  Not eventually?

5       A.  Yeah.

6       Q.  That means after getting approval from

7  Pittsburgh?

8       A.  Right.

9       Q.  And you also said it was possible you could

10  send him to an emergency room?

11       A.  Possibly.  I could do that without

12  consulting.

13       Q.  Now, you had the ability to call Pittsburgh

14  that day, didn't you?

15       A.  I could; yeah.

16       Q.  But you didn't?

17       A.  No, I didn't, because, you know, we're

18  supposed to do a collegial.  And I filled out the

19  form to talk to them.  And the following Wednesday,

20  12 -- I don't know what day that was, but --

21       Q.  Well, now, okay, we got some -- another

22  couple interesting things there.

23       You didn't talk to Pittsburgh until

24  January 13th of 2016; correct?

25       A.  Yeah.  So I had to fill out -- the procedure

1   is you fill out the form for collegial and it's
2   submitted to Pittsburgh.  And then we talk to them
3   the following Wednesday, whenever Wednesday comes,
4   and that's why there was a delay there.
5       Q.  Sir, from December 23rd to January 13th,
6   that's 21 days?
7       A.  Yeah, okay.
8       Q.  That's not the next Wednesday, is it, sir?
9       A.  No.
10      Q.  And fill out a form.  You didn't fill out
11  any form, did you?
12      A.  We had to do a collegial eventually, yeah.
13      Q.  Where's the form?
14      A.  There is no form there?
15      Q.  Have you seen any form that you filled out
16  in December of 2015?
17      A.  No, what I said was --
18      Q.  Wait a second, that's my question:  Have you
19  seen any form that you filled out asking for a
20  collegial in December of 2015?
21      A.  No, no.
22      Q.  Have you seen any form that you filled out
23  asking for a collegial in January of 2016?
24      A.  I don't know if it's in there, but I know I
25  can't talk to Pittsburgh until I fill out the form.

1     Q.  Well, in preparing to testify, did you

2  review all the records with respect to Mr. Dean?

3     A.  Yeah, right.

4     Q.  And you were deposed earlier in this case.

5  In preparing for that deposition, did you review the

6  records?

7     A.  Right.

8     Q.  When you were reviewing the records either

9  to prepare for your deposition or to give your

10  testimony here today, did you see any form, did you

11  see the form that you filled out and sent to Wexford

12  for a collegial?

13     A.  I'm sure I did.  It's not on here I don't

14  see.

15     Q.  In the past two weeks when you were getting

16  ready for this trial, did you see that form?

17     A.  No.

18     Q.  So let's talk about what you did do on the

19  23rd of December 2015.  You did not send him out to

20  a urologist because you couldn't?

21     A.  No.

22     Q.  You did not ask for a CT scan to be done

23  because you couldn't?

24     A.  Right.

25     Q.  You did not direct a cystoscopy to be done

1   because you couldn't?

2        A.  Yeah.

3        Q.  And in fact, he doesn't see a urologist

4   until March; correct?

5        A.  Mm-hmm.

6        Q.  He's not approved for a cystoscopy until the

7   middle of March; correct?

8        A.  Yeah.

9        Q.  And he's not approved for a CT scan until

10  March 30th, 2016 --

11       A.  Mm-hmm.

12       Q.  -- over 90 days later?

13       A.  Right.

14       Q.  And for the jury -- have you seen any

15  document where you made an effort, in that 90 days,

16  where you made an effort to get Pittsburgh to

17  approve that -- those tests that were consistent

18  with the standard of care?

19       A.  Yeah, I know I talked to them, you know.

20  First of all, when he came in he had -- continued to

21  have hematuria, I talked to Pittsburgh.

22       Q.  But when you talk to them, you're supposed

23  to create a record of that; right, sir?

24       A.  It should be in the chart.

25       Q.  It should be -- if you talked to them, it

1  should be in your charts?

2      A.  Yes.  And we say when we -- it says

3  collegial on January 13th.  And we talked about it

4  and we decided to do a renal ultrasound.  It's right

5  there.

6      Q.  Where is it at, sir?

7      A.  It's right there, in here.

8      Q.  Give us --

9      A.  January 13, '16.

10     Q.  All right.  That's on page PTX84-4.

11     A.  Right.

12     Q.  All right.  You can't -- you can't tell me

13  or the jury what you sent to Pittsburgh though, can

14  you?

15     A.  Say that again?

16     Q.  Have you seen what you actually sent to

17  Pittsburgh before that collegial?

18     A.  I -- we get on the phone, we say what the

19  problem is, and then we talk to every Wednesday.

20     Q.  Well, let's -- you didn't even talk to them

21  for three weeks; right?

22     A.  Well, that's January -- yeah, okay.

23     Q.  And there's no indication here of what you

24  sent to Pittsburgh, is there?

25     A.  Obviously, I did.  It says collegial with

1    Dr. Ritz here.

2       Q.  So you talked to them is what you said?

3       A.  No, I didn't talk to -- this was a

4 collegial.  I had to meet with them and talk to him

5 on the phone.

6       Q.  Isn't that what I just said?  I said you

7 talked to him on the phone?

8       A.  Yeah, on the phone.  That's what we do every

9 Wednesday.

10       Q.  And that's Dr. Ritz; right?

11       A.  Mm-hmm.

12       Q.  You didn't know Dr. Ritz before you started

13 at the Taylorville Correctional Center; right?

14       A.  No.

15       Q.  You knew he was at Wexford?

16       A.  Right.

17       Q.  Did you know he was one of the really senior

18 people at Wexford?

19       A.  Yes.

20       Q.  Did you know he was one of the top five

21 business executives at Wexford --

22       A.  That I don't know.  I know he was there, you

23 know.

24       Q.  Did you know he was in charge of utilization

25 management?

A.   Yeah.

Q.   And did you know and understand that utilization management is designed and intended to try to cut costs?

A.   Well, that was -- I never thought about all this, you know.  My job, I just do my job as a doctor, that's all.  I don't pay attention to utilization, whatever.  They come and see me, I treat them as a doctor.  That's all.

Q.   Isn't it your job as a doctor to treat them consistent with the recognized standard of care?

A.   Yes, correct.

Q.   Now, isn't it true, sir, that it wasn't you that suggested a collegial with respect to Mr. Dean, that it was instead Dr. Einwohner?

A.   Well, she -- you know, he saw Dr. Einwohner and -- you know, I was gonna do the collegial regardless whether Dr. Einwohner saw the patient or not.

Q.   And he saw Dr. Einwohner, if you look at 84-3.  Mr. Dean sees Dr. Einwohner on January 7th, 2016; right?

A.   Did you --

Q.   In January, did you know who Dr. Einwohner was?

1      A.   Sure, yeah.

2      Q.   What was her specialty?

3      A.   Nephrologist.

4      Q.   And that's a doctor who deals with the

5  kidneys; correct?

6      A.   Mm-hmm.

7      Q.   But you didn't make the reference to have

8  this teleclinic with Dr. Einwohner, did you?

9      A.   No.

10      Q.   That was just his regularly scheduled

11  meeting?

12      A.   That's correct.

13      Q.   Why didn't you, on the 23rd of December,

14  when he is presenting with gross hematuria, why

15  didn't you have him get an earlier meeting with

16  Dr. Einwohner?

17      A.   I didn't see any reason for it because --

18  and -- if somebody has hematuria, I can take care of

19  it and present it to collegial and then decide what

20  to do.   I mean she couldn't do anything anyway.   She

21  couldn't even send patient to collegial.

22      Q.   Well, she did, in fact --

23      A.   Suggested --

24      Q.   -- she's the one who started the collegial

25  process here, isn't she?

1      A.  I don't think so.  I mean I already had in
2  mind to do a collegial.
3      Q.  Well, you had it in mind, but you didn't put
4  thought into action, did you?
5      A.  But I didn't do a collegial because
6  Dr. Einwohner said.
7      Q.  But she made that suggestion two weeks after
8  you had seen him?
9      A.  Yeah.
10     Q.  And -- so -- and then you have that
11  collegial on January 13th?
12     A.  Mm-hmm.
13     Q.  What if any understanding did you have about
14  Dr. Ritz?  What was his specialty?
15     A.  Oh, I know what he was.  I mean he is family
16  practitioner.  As far as I know, he was with the
17  university somewhere in Pennsylvania there.  And he
18  was not a nephrologist anyway.
19     Q.  Well, you remember at your deposition you
20  said he was a nephrologist?
21     A.  Well, I made a mistake.  Anyway, I corrected
22  it.
23     Q.  Well, you corrected it after it was pointed
24  out to you by your lawyer; right?
25     A.  Yeah.

1       Q.  You didn't think he was a nephrologist when

2   you talked to him on the 13th?

3       A.  No.

4       Q.  You didn't think he was a urologist when you

5   talked to him on the 13th?

6       A.  That's correct.

7       Q.  And let's be absolutely clear; on

8   January 13th, Dr. Ritz has never seen Mr. Dean, has

9   he?

10      A.  As far as I know, yeah.

11      Q.  And as of January 13th, he didn't have the

12  historical records of Mr. Dean, did he?

13      A.  He does.  Every time we send collegial, I

14  write doubt exactly what the problem is.  And the

15  guy from the medical record office send him -- the

16  collegial and he reads it before we meet.

17      Q.  Doctor, have you seen any document that

18  shows that those materials were sent to Dr. Ritz

19  before this collegial?

20      A.  I don't know where it went.  Because I

21  cannot have a collegial without the form.

22      Q.  You don't know -- you don't know where it

23  went.  Have you made any effort to figure out where

24  it went?

25      A.  No, that's not my job.  All I do is fill it,

1    I will give it to the medical records, they take

2    care of it, send it to Dr. Ritz.  And sometimes he

3    looks at -- he looks at it, all the collegial that

4    day or the day before.

5        Q.  Now, your report on your collegial is what

6    we see on the first part of the 14th; right?

7        If we can highlight that top box?

8        A.  Mm-hmm.

9        Q.  It says, (as read:)  Collegial with

10   Dr. Ritz.  He suggests renal ultrasound.

11       A.  Right.

12       Q.  That's it, right?  That's it?

13       A.  Yeah.  We talked about it and we came to the

14   conclusion and we said, "well, let's do an

15   ultrasound."

16       Q.  There's nothing on there that gives me, the

17   Judge, or the jury any indication of what you

18   discussed with Dr. Ritz, is there?

19       A.  That's correct.

20       Q.  And the idea to go to a renal ultrasound as

21   opposed to sending him to a urologist made by

22   Dr. Ritz?

23       A.  Me and him, we talked about it.

24       Q.  What's it say?

25       A.  Yeah --

1          Q.  He suggests, right?

2          A.  -- he has to make the final decision.

3          Q.  Well, let's be clear how this process works;

4     right.  If he wants to do A and you want to do B,

5     you're gonna do A; right?

6          A.  Not necessarily.

7          Q.  Well, is it any time with respect to

8     Mr. Dean where you've wanted to do something and he

9     didn't want to do it and you won?

10         A.  Yeah.  Yeah, it has happened.

11         Q.  With Mr. Dean?

12         A.  Not Mr. Dean, other case.

13         Q.  Okay, not with Mr. Dean?

14         A.  No.  And the -- and the reason we decided to

15    go with renal ultrasound is because of his past

16    history of renal stones, two lithotripsy, and that's

17    the reason -- and then we --

18         Now, the other thing is his kidney function

19    wasn't the greatest either.  So we didn't want to go

20    with CAT scan right away.  So we said, "Let's do the

21    renal ultrasound first and see whatever we can see."

22    And in actual fact, the renal ultrasound was

23    abnormal.  And it was read as normal.  It was not

24    normal.  And if they had read it as abnormal, I

25    would -- next I would have done a CAT scan.

1     Q.  Let's stay back on the 13th right now.

2     A.  Yeah, okay.

3     Q.  Let's stay back here.

4     Nothing in your note reflects any of that

5  discussion you just talked about?

6     A.  Right.

7     Q.  There's no document that you have at

8  Taylorville medical center that reflects any of what

9  you just talked about, is there?

10     A.  No, not on this --

11     Q.  There's no document at Wexford that reflects

12  any of that that you just talked about, is there?

13        MR. RUPCICH:  Objection to the foundation.

14        THE COURT:  The objection is overruled.

15     A.  You're right.  I mean, I didn't write all

16  the thing, but we did discuss it and we have witness

17  here and it's been the case witness to that.

18     Q.  Well, Dr. Ritz was surely there; right?

19     A.  Yeah, he was on the phone.

20     Q.  And are you aware that Dr. Ritz as testified

21  he doesn't have any recollection at all of that

22  conversation?

23     A.  That's not true.

24     Q.  He didn't say that?

25     A.  I don't know whether he said that or not, I

don't know why he said that, because we had

collegial, I had to talk to him.

Q.  Now, in this case -- again, you gave a

deposition; right?

A.  Right.

Q.  And you -- it was on December 3rd and

December 4th of 2018?

A.  Mm-hmm.

Q.  You prepared for that deposition; right?

A.  Mm-hmm.

Q.  And after you gave the deposition, you had a

chance to read it and review it?

A.  Mm-hmm.

Q.  And at -- you could make corrections;

correct?

A.  I guess.  I don't know.

MR. RUPCICH:  Objection.  Foundation.

Q.  Well, do you know, sir?

A.  I don't remember making correction in it.

Q.  Well, at that deposition, you made up some

facts, didn't you; sir?

A.  I made up -- what facts are you talking?

Q.  Well, at that deposition, you said that you

had a collegial on January 19th, 2016?

A.  I don't remember saying that.  I said I had

a collegial on -- we had a collegial after the
ultrasound.

Q. Well, there was no collegial on
January 19th, was there?

A. I may have mistaken that, but I know after
the ultrasound, we had collegial.

Q. Well, at your deposition you said that on
the January 19th collegial, which never happened,
you said that you talked about a cystoscopy and a CT
scan. That never happened in January of 2016, did
it, sir?

MR. RUPCICH: Objection. Improper
impeachment, compound.

THE COURT: The objection is overruled.

A. I probably had the wrong date anyway. But
the bottom line is we did the ultrasound and then I
talked to another collegial with him and then we
decided to send him to urology.

Q. Right. And any -- the discussion of the
standard of care which is the CT scan and the
cystoscopy, those discussions didn't happen until
March of 2016, did they, sir?

A. With the urologist, yeah.

Then the -- on 2/10/16 here, I said, (as read:)
Discuss with doctors at collegial. Will be send to

1  urologist for cystoscopy.

2      Q.  Right.  Now, you thought he was gonna go for

3  a cystoscopy?

4      A.  Mm-hmm.

5      Q.  But in fact, the approval that comes out of

6  Pittsburgh said just go see a urologist, made no

7  mention of cystoscopy; isn't that true?

8      A.  That's what we talked about, that's why I

9  wrote it down here.

10     Q.  You wrote it down because you knew when he

11 went to see a urologist he was gonna -- the

12 urologist was going to say he needs to have a

13 cystoscopy?

14     A.  That's correct.

15     Q.  You knew that?

16     A.  Yeah.

17     Q.  Right.  And you knew that the urologist was

18 also gonna say he should have a CT scan?

19     A.  Eventually, yeah.

20     Q.  Eventually.  But when you approved the

21 urologist, there's no approval for a cystoscopy, is

22 there?

23     A.  No, but we couldn't do that unless we send

24 to urology, he said he suggests a cystoscopy, and

25 that has to go through the same thing to collegial

to approve the cystoscopy.

Q.  What do you mean you couldn't do that, sir?

A.  Do what?

Q.  You could have talked to -- you could have talked to Dr. Ritz and gotten approval to see a urologist and to do a cystoscopy --

A.  We did that.

Q.  -- and to do a CT scan, all in the same meeting?

A.  We did that.  Once we decide to go to -- and Chad is the guy from -- he does that.  He call and make an appointment with the urologist.

Q.  Under the Wexford practices is why you couldn't do it; right, sir?

A.  Do what?  The same --

Q.  You couldn't approve all three of those things at the same time?

A.  That's correct.

Q.  You had -- you only approved one thing at a time on these collegials?

A.  That's correct.

Q.  So we have to delay for the collegial to approve the urologist; right?

A.  That's correct.

Q.  And then we have to have another delay after

1   he's been to the urologist to approve the
2   cystoscopy; right?
3       A.  Not necessarily.  Once they're there, if the
4   urologist wants to have cystoscopy, they do it.
5       Q.  That's not what happened here, is it sir?
6       A.  No --
7       Q.  What --
8       (Parties speaking simultaneously, court
9       reporter requested clarification.)
10      Q.  After he went to the urologist, you had to
11  come back for another approval for the cystoscopy?
12      A.  Yeah.
13      Q.  And then you had to have yet another
14  approval for the CT scan?
15      A.  That's correct.
16      Q.  As a result of those, he doesn't get
17  approved for the CT scan until March 30th; right?
18      A.  Mm-hmm.
19      Q.  And once he gets that, he gets that CT scan
20  within two weeks?
21      A.  Mm-hmm.  Right.
22      Q.  And he gets the CT scan on April 12th?
23      A.  Okay.
24      Q.  And it's read promptly?
25      A.  Right.

1     Q.  And two days later he's told he's got

2  serious kidney cancer?

3     A.  Right.

4     Q.  So from the time of the approval of the CT

5  scan until a clean, clear diagnosis of kidney cancer

6  is two weeks?

7     A.  Mm-hmm.

8     Q.  And the reason it's three months later

9  instead of two weeks is because of delays caused by

10  Wexford practices; right?

11     A.  Well, that's what they do.  I mean I have to

12  comply with this.

13     Q.  That's what they do.

14     Let's go back to December 23rd, 2015.  You

15  order blood work?

16     A.  Mm-hmm.

17     Q.  You do the dipstick?

18     A.  Mm-hmm.

19     Q.  And you tell him to drink more water?

20     A.  Right.

21     Q.  That's it?

22     A.  Yeah, until -- I had to wait for the result

23  of the CBC and all that.  And I say, "If that

24  persists, we probably gonna have to send you to ER

25  and eventually see a urologist."

1  Q. The only -- the only -- two of those things

2 are testing; right? The dipstick is a test?

3  A. Mm-hmm.

4  Q. Drawing the blood, that's a test?

5  A. Mm-hmm.

6  Q. The only medical relief you give him is

7 drink water?

8  A. Yeah. I couldn't do anything else. I had

9 to find out why he was having hematuria.

10  Q. Right. And in order to do anything else,

11 you gotta go to Pittsburgh?

12  A. Eventually, yeah.

13  Q. Now, you knew, as a result of your medical

14 training, on December 23rd, 2015, that one of the

15 potential causes of the gross hematuria was cancer?

16  A. Yeah.

17  Q. Kidney cancer?

18  A. That's correct.

19  Q. So from the first day he presented, you were

20 totally aware that that was a potential cause?

21  A. I wrote that, recurring stone or possibly

22 cancer.

23  Q. And you told him that?

24  A. Yeah.

25  Q. Stone being kidney stones or cancer?

1   A. Right.

2   Q. Now, did you -- you treat patients. The

3 word cancer is scary?

4   A. It is.

5   Q. Did you counsel him at all with respect to

6 that potential of this scary cancer situation?

7   A. Well, we talked about it. I mean he knows

8 as much as anybody else what cancer means and what

9 he can expect from it, depending on the cancer.

10   Q. Did you tell him how long he'd have to wait

11 for a diagnosis?

12   A. No.

13   Q. Did you expect that he'd be nervous and

14 worried throughout the time --

15   A. Yeah.

16   Q. -- before he has a diagnosis?

17   A. Right.

18   Q. Did you give him any advice on how to deal

19 with that worry?

20   A. I think I said he was normal to me, I mean

21 he always talked to me and he didn't look stressed

22 or worried or suggest that, "Oh, I'm -- you know,

23 I'm very depressed, anxious about it." He didn't

24 look that way.

25   Q. Well --

1       A.  And he didn't even ask can I help you with

2   medication.  And I couldn't do that anyway, because

3   psychiatrist over there has to do that.

4           THE COURT:  Because who over there has to

5   do that?

6       A.  Psychiatrist.  I can't write any

7   psychiatrist drugs.

8       Q.  Look at the charts, Plaintiff's Exhibit 84.

9   After the -- he comes in on the 23rd, the third page

10  is -- indicates -- does that indicate that there's

11  the blood work and urine analysis being done?

12      A.  Mm-hmm.

13      Q.  So there was blood drawn on the 28th.  That

14  was after he met with you; right?

15      A.  Right.

16      Q.  Now, with respect to his meeting with

17  Dr. Einwohner.  Between December 23rd and

18  January 13th, you never talked to Dr. Einwohner, did

19  you?

20      A.  No.

21      Q.  In fact, with respect to the treatment of

22  Mr. Dean, you never talked to Dr. Einwohner, did

23  you?

24      A.  No, I didn't.  There was no reason to.

25      Q.  Any communications with Dr. Einwohner, she

1   just calls and talks to one of the nurses at

2   Taylorville?

3        A.  Usually that's the procedure there.

4        Q.  And the -- then the nurse tells you what she

5   said?

6        A.  Yeah.

7        Q.  You don't see the workup notes from

8   Dr. Einwohner, do you?

9        A.  Yeah, I do.  The nurse will tell me what she

10  says, but the actual written thing I don't see

11  sometimes.

12       Q.  You -- it's the nurse that serves as the

13  go-between communications between you and

14  Dr. Einwohner?

15       A.  Yeah.

16       Q.  You didn't actually see the notes she had

17  with respect to any of her recommendations following

18  her meeting?

19       A.  Yes, I did.

20       Q.  Did you?

21       A.  I did see that note.

22       Q.  When?

23       A.  I don't know exactly when, but I know I saw

24  that note mentioning about collegial.

25       Q.  You saw that in your deposition; right?

1          A.  I don't remember if I see that then.

2          Q.  What was Dr. Einwohner recommending be done

3     at the collegial?

4          A.  The -- we wanted to see collegial and to do

5     a workup from the hematuria.

6          Q.  She wanted him to be sent to a urologist?

7          A.  Mm-hmm.  And that did happen eventually.

8          Q.  Eventually.  But at the collegial on

9     January 13th, she's not there; right?

10         A.  No.

11         Q.  The kidney specialist recommending urologist

12    isn't even invited to the collegial?

13         A.  That's not my problem.  Pittsburgh should

14    invite her.  They failed, that was -- and they never

15    do that.

16         Q.  Pittsburgh never does that?

17         A.  They don't invite consultant to the meeting.

18         Q.  Now, looking at these records, the medical

19    records here from Taylorville Correctional Center,

20    between December 23rd and January 13th, there is no

21    entry saying you do anything, is there, sir?

22         A.  Yeah, that's correct.

23         Q.  There's no indication that you reviewed

24    anything in his historical notes, is there?

25         A.  Historical notes.  What do you mean?

1      Q.  His past medical history?

2      A.  Oh, I knew his past medical history about,

3  you know, his diabetes and non-ischemic

4  cardiomyopathy, hypertension.  I knew all that.  And

5  kidney stones.

6      Q.  The only thing you know is what you put on

7  that S line, those four lines on your first page?

8  That's all you know?

9      A.  Yeah, but I mean he came with hematuria, why

10 would I write about his cardiac problem, his

11 hypertension.  There's no reason to.  I stick to

12 whatever he came to see me for.

13     Q.  Now, the ultrasound test, that test is done

14 on-site --

15     A.  Correct.

16     Q.  -- at the correctional center?

17     A.  Mm-hmm.

18     Q.  There's a technician who comes in and

19 administers the test?

20     A.  Right.

21     Q.  That's a technician that has been hired by

22 Wexford?

23     A.  Correct.

24     Q.  After the technician administers the test,

25 it has to be sent out to a radiologist to read the

1    test results; correct?

2         A.  Right.

3         Q.  Again, that's somebody hired by Wexford?

4         A.  Yeah.

5         Q.  But under the contract with the State of

6    Illinois, for those services Wexford gets reimbursed

7    by the State of Illinois for the ultrasound

8    expenses; correct?

9         A.  Yes.

10        Q.  As opposed to being sent out to the

11   urologist.  Those are expenses that Wexford itself

12   has to bear; correct?

13        A.  I guess.  But I'm not involved in this.

14        Q.  Well, you did know this was a big contract;

15   right?

16        A.  I'm aware of that, yeah.

17        Q.  Well, did you know that it's over

18   $130 million a year that Wexford is paid to provide

19   services in the State of Illinois?

20        A.  Absolutely not.  That's not why I was hired

21   for.

22        Q.  Well, what you did know for sure though was

23   that you had to follow whatever Wexford said the

24   practices were?

25        A.  Oh yeah, their policy; right.

1     Q.  Between December 23rd, 2015, and

2  January 13th, 2016, what did you do to help

3  Mr. Dean?

4     A.  Well, we had -- like I said, I told him to

5  make sure he drinks plenty of fluid.  If the

6  hematuria persists, he needs to come see me again.

7     Q.  And you knew, based on his meeting with

8  Dr. Einwohner, that the hematuria was persistent,

9  didn't you?

10     A.  Yeah, okay.

11     Q.  Now, following the collegial, you don't do

12  anything to try to set up the ultrasound, do you?

13     A.  We did do -- I mean the -- Chad is the one

14  that takes care of this.

15     Q.  Yeah, I should have -- my question was

16  inarticulate, I apologize.  You personally don't do

17  that?

18     A.  No.

19     Q.  Somebody else does that?

20     A.  Chad does that.

21     Q.  Now, you heard the testimony the last --

22  this morning and yesterday; correct?

23     A.  Yeah.

24     Q.  You heard Dr. Dhar?

25     A.  Yeah.

1     Q.  And you heard Dr. Metwalli?

2     A.  Right.

3     Q.  Both urological specialists?

4     A.  Yeah.

5     Q.  You heard their testimony about all the

6  reasons why an ultrasound is not the right test;

7  correct?

8     A.  Yeah.  It's not as sensitive as a CAT scan,

9  that's true.

10     Q.  Well, they said more than just that, didn't

11  they?

12     A.  Well, they did, yeah.  Okay.

13     Q.  They know more about that than you do, don't

14  they?

15     A.  Definitely.

16     Q.  But even what you know, did -- on

17  January 13th, did you tell Dr. Ritz what you know

18  about why a CT scan and a cystoscopy would be a

19  better form of finding out what's the problem here?

20     A.  Like I said, I present the case, what the

21  problem is, and we talk about it.  And he suggested

22  because of his kidney stone history, he wanted to

23  do -- we decided to do an ultrasound.

24     And like I said before, the ultrasound was not

25  normal.  It was reported as normal but it wasn't.

1  If they had -- if the radiologist would have read it

2  right, I would have gone and suggested doing a CAT

3  scan right away.  But that didn't happen.  And you

4  know, the urologist read this ultrasound wrong.  I

5  mean the radiologist.

6      Q.  It's your testimony that the radiologist

7  hired by Wexford misread the ultrasound?

8      A.  Looks that way.

9      Q.  You could have read the ultrasound?

10     A.  I'm not trained to read ultrasound.

11     Q.  Well, isn't it standard practice for the

12  doctor also to read the ultrasound?

13     A.  Absolutely not.

14     Q.  The -- let me ask a couple of questions,

15  deviate a little bit here.

16     You -- you're the primary care physician for

17  Mr. Dean; right?

18     A.  Correct.

19     Q.  You're his only option?

20     A.  Mm-hmm.

21     Q.  He can't go -- the first instance?  Right,

22  you're the only doctor there?

23     A.  Mm-hmm.

24     Q.  He doesn't get to pick, he gets you?

25     A.  Right.

1     Q.  And the -- in order for him to get any

2  outside treatment, he has to rely on you?

3     A.  Basically, yeah.

4     Q.  He has to rely on you because that outside

5  treatment can't happen without you presenting his

6  case and convincing Pittsburgh that it's the right

7  thing to do to get him off-site treatment?

8     A.  I mean we talk about it, but the final

9  decision has to come from Pittsburgh.  We discuss

10  this and that, what should be done, and they decide

11  what they want me to do.  I cannot tell them what to

12  do.

13     Q.  In December of 2015 and January of 2016, did

14  you believe you were responsible for Mr. Dean's

15  medical care?

16     A.  Of course.

17     Q.  You understand what it means to be

18  responsible for medical care; right?

19     A.  Yes, yes.  Of course I do.

20     Q.  And you understand that world

21  responsibility?

22     A.  Right.

23     Q.  You understand how it applies in the medical

24  context; right?

25     A.  Correct.

1     Q.  Do you know that in this lawsuit, you and

2  the other Wexford defendants deny that they were

3  responsible for his care?

4     A.  I wasn't even aware of that.

5     Q.  At least up until the time he sees

6  Dr. Severino, it's all Wexford people who are

7  involved in providing medical care to Mr. Dean;

8  right?

9     A.  Including me.  I mean I would be part of it.

10     Q.  Yes.  I mean you're an employee of Wexford?

11     A.  Right.

12     Q.  It's all employees -- other than some nurses

13  who are Department of Corrections nurses --

14     A.  Yeah.

15     Q.  -- everybody else is a Wexford employee or

16  officer?

17     A.  Right.

18     Q.  After he's sent to Dr. Severino,

19  Dr. Severino becomes part of the medical team;

20  right?

21     A.  Well, surgical team.

22     Q.  But under the circumstances here that Mr. --

23  for Mr. Dean's situation, Dr. Severino has real

24  limitations, doesn't he, sir?

25     A.  In regard to what?

Q. Well, he can't do anything that isn't
approved by Pittsburgh?

A. Basically, yeah.

Q. That's a little unusual, isn't it?

A. Well, I didn't make the policy, they make
their own policy. I'm just a hired medical doctor
there.

Q. And it's a result of those limitation -- he
sees Dr. Severino on March 10th?

A. Mm-hmm.

Q. All right. But he doesn't get a CT scan
until April 14th?

A. Mm-hmm.

Q. That's caused because he didn't have the
authority and ability to order that on his own;
isn't that true?

A. Well, that's true.

Q. You know promptly in early March that he
wants a CT scan and a cystoscopy; right?

A. Yeah.

Q. But Dr. Severino, just like Dr. Einwohner,
Dr. Severino, he's not invited into this collegial,
is he?

A. No.

Q. That's just you and Dr. Ritz?

1     A.  Right.

2     Q.  And some other non-doctors who are there --

3     A.  Right.

4     Q.  -- listening to what's going on?

5     A.  That's correct.

6     Q.  And those collegials aren't set up for

7  weeks?

8     A.  What do you mean?

9     Q.  Well, the collegial to approve the CT scan

10  doesn't happen for another 20 days.  March 30th?

11     A.  Yeah, it's my job to do collegial, and

12  whenever they want to discuss it it's up to them.

13     Q.  Well, it's your job to get it scheduled?

14     A.  Yeah.  The CT scan?

15     Q.  No, the collegial?

16     A.  Yeah.  I have to fill out the form, yes,

17  send it over there and we talk about it.  And we

18  did.

19     Q.  The form that nobody has seen?

20     A.  I don't know where these went.  I mean

21  the -- I have no idea.  Because I cannot have a

22  collegial without filling out the form and put down

23  the history whatever I want them to talk about.

24     Because there would be no collegial, you know,

25  unless I do that.

1      Q.  You could have set up a collegial right away

2  on March 10th?

3      A.  Collegial for what?

4      Q.  To approve a CT scan and a cystoscopy?

5      A.  Well, first of all, we send the consult for

6  Severino with intent on doing a cystoscopy and

7  because of an ultrasound, we thought the problem was

8  not in the kidney, probably in the bladder.  That's

9  what we talked about.  And he decided to do a CAT

10  scan.

11      Q.  Let's go back a little bit with respect to

12  the ultrasound.  We look at your notes on page 4 of

13  PTX84.  You meet with Mr. Dean on February 1st.

14  That's the day before the ultrasound is going to

15  take place; correct?

16      A.  Mm-hmm.

17      Q.  And that meeting, the only thing that you

18  noted is you tell him to have a full bladder?

19      A.  Right.

20      Q.  At least according to your note, you don't

21  say anything else?

22      A.  No, this -- this wasn't for him.  I wrote

23  this for the nurse to make sure that they do that.

24      I didn't meet with him that day, so I just

25  wrote this for the nurse -- I wrote a note for them

1  to make sure he has a full bladder.

2      Q.  Between December 23rd and February 2nd,

3  please tell me everything that you or anybody else

4  from Wexford did to try to determine the cause of

5  his hematuria or to rule out cancer?

6      A.  Yeah, we did what we -- like I said, we did

7  the ultrasound for --

8      Q.  I'm talking -- my time is really important

9  here, sir.  Before February 2nd?

10     A.  Yeah.

11     Q.  What did you or to your knowledge anyone

12  else from Wexford do to rule out cancer in that six

13  week period?

14     A.  Well, we didn't do a CAT scan, I know it.

15     Q.  You didn't do anything?

16     A.  We did --

17     Q.  In that six week period?

18     A.  We did ultrasound and we eventually send him

19  to get a consult with Severino.

20     Q.  Doctor, please, I'm talking -- ultrasound

21  doesn't happen until February 20th.  That's three

22  more weeks up the road.  I'm talking about

23  February 2nd.  Between December 23rd and

24  February 2nd, that six week period --

25     A.  Okay.

1    Q.  -- you go nothing to rule out cancer?

2    A.  No, we didn't do anything then because we

3    just going through the motion here about what we do

4    over there when people come with whatever.  And we

5    have to talk to them and then decide whether they

6    need to go somewhere having something done.  And

7    that's exactly what we do.

8    Q.  Well, you just heard Dr. Dhar testify this

9    morning that it should have been no more than two

10   weeks to get to the urologist, no more than two

11   weeks after that to get the CT scan, so that would

12   mean in four weeks, less than this six weeks --

13   A.  Yeah, but you do --

14   Q.  -- you could have gotten the diagnosis.  But

15   you couldn't do that here because of the policies

16   and practices of Wexford?

17   A.  That's correct.

18   Q.  And I misspoke.  Let's look -- I think the

19   radiologist was on the 2nd.  But radiologist is on

20   February 2nd.  But still, up until the radiologist

21   has come, that's that six week time period.

22   Now, the radiology report was prepared I think

23   on the 3rd of February?

24   A.  Mm-hmm.

25   Q.  When you look at PT -- Plaintiff's Trial

Exhibit 60.  There you go, sir.

Do you personally know why it took between the
February -- the January 13th collegial until
February 2nd to have the ultrasound?

A.  I don't -- like I say, once we decided that,
that's out of my hands.  Chad in medical record,
he's the one that schedule all this.  So I have
nothing to do with it.

Q.  And so you don't know why it took three
weeks?

A.  I have no idea.  It was probably you
don't -- the guy who does it, he goes around in
Illinois and do this thing and depends on his
schedule.

Q.  The -- this report, I think if I'm reading
this right, on the bottom would indicate the
ultrasound was done on the 2nd and that the report
was generated on the 3rd?  Is that what's down at
the bottom?

A.  No, that's when I got the report.  I signed
it.

Q.  Well, you signed it, it looks like, on the
8th?

A.  I see the 3rd.

Q.  That's 2/3?  I'm sorry, can we move PTX60

1    into evidence, Your Honor?

2         THE COURT:  Any objection?

3         MR. RUPCICH:  No.

4         MR. TYRRELL:  No objection.

5         THE COURT:  PTX60 is admitted.

6      (Plaintiff's Exhibit 60 admitted.)

7      Q.  What's the bottom here, the 2/3?  That's the

8    day you see it; correct?

9      A.  Yeah, that's the day I signed it, 2/3/16.

10      Q.  You think that's a 3 and not an 8?

11      A.  No, that's a 3.  That's my handwriting, I

12    should know that.

13      Q.  This report doesn't rule out kidney stones?

14      A.  That's correct.

15      Q.  It doesn't rule out cancer?

16      A.  Like I said, it didn't because it was read

17    wrong.

18      Q.  Now, you knew --

19      A.  Sir, it was read wrong.  And the expert will

20    let you know, will show you that.

21      Q.  You mean the expert that's been retained for

22    this case?

23      A.  That's correct.

24      Q.  And that's somebody who years later says

25    that it was read wrong; right?

1          A.  But it was.  Like I said, if it was read

2     properly, we would have done a CAT scan right away

3     and sent him to urology right away.  And this throw

4     us off track here.

5          Q.  You couldn't do any of that without going

6     back to Pittsburgh and getting their approval at

7     every step of the way; right?

8          A.  But this was read wrong, so there's nothing

9     we could do about it.  So if you have, they should

10    have gone after this radiologist, not me.

11         Q.  Well, it shows that there's a significantly

12    enlarged right kidney?

13         A.  Yeah, but then the final impression what

14    was?

15         Q.  Well, did you not read the whole report?

16         A.  Yeah, I did read the whole report.

17         Q.  And that is a significantly enlarged kidney?

18         A.  Well, it says a little more than usual.  13

19    being -- 13 something is normal.

20         Q.  Did you talk to the radiologist?

21         A.  No, I didn't.

22         Q.  Did you go back and ask him, "what's the

23    deal with this enlarged kidney?"

24         A.  No, I didn't call him --

25         Q.  Why not?

1          A.  -- because his final report is what I read.

2     So if he didn't think that was significant, then he

3     is radiologist, he's the specialist.

4          Q.  Did you think about getting a second opinion

5     given this enlarged right kidney?

6          A.  No, we didn't get a second opinion.

7          Q.  Are you familiar with the Wexford medical

8     guidelines?

9          A.  Some of it, yeah.

10         Q.  Do you have a copy of it in your office?

11         A.  Yeah.

12         Q.  You know that -- and one of the things in

13    the guidelines, it tells you what to do if you have

14    someone presenting with gross hematuria?

15         A.  Mm-hmm.

16         Q.  And if you have a patient presenting with

17    gross hematuria who is over 50 years old, one of the

18    things you're supposed to do, a primary thing you're

19    supposed to do is rule out cancer?

20         A.  That's correct.

21         Q.  You knew that this ultrasound would not be

22    able to rule out cancer, didn't you?

23         A.  Not necessarily.  Ultrasound is less

24    sensitive than a CAT scan, but it's not --

25         Q.  You understand -- you understand the term

1    rule out?

2         A.  Yeah.

3         Q.  Rule out means you're able to do something

4    that you then have a significant, almost

5    near-certain view that that isn't the problem;

6    right?

7         A.  Right.

8         Q.  And the ultrasound, even if it came back

9    fine, you still wouldn't be able to rule out cancer,

10   would you?

11        A.  That's correct.  That's why we went further

12   and got the urologist.

13        Q.  But you knew that even before you sent this

14   to ultrasound, that's what was gonna be the case?

15        A.  Right.

16        Q.  Now, you meet with Mr. Dean after the

17   ultrasound.  You meet with him on February 2nd?

18        A.  Mm-hmm.

19        Q.  I'm gonna ask you to look at page 5 of

20   Exhibit 84.  That's in front of you.

21        Maybe I got the page wrong.  I'm sorry, it's

22   page 7.  Bad handwriting.  Something you and I share

23   in common, Doctor.

24        A.  Okay.

25        Q.  It's mostly my wife that complains about

1    mine though.

2         You meet with him at 10:50 a.m.?  Or at least

3    he first comes in at 10:50 a.m.; is that right?

4         A.  Mm-hmm.

5         Q.  Do we know what time you met with him?

6         A.  It was -- that day -- yeah, it says 10:50,

7    so --

8         Q.  And again, we have this S-O-A-P here; right?

9         A.  Mm-hmm.

10        Q.  And the A, A is -- what is A again for us?

11        A.  Assessment.

12        Q.  Assessment.  As of February 10th, your

13   assessment was hematuria cause and then question

14   mark?

15        A.  Mm-hmm.

16        Q.  And that would be -- so it's hematuria

17   really cause unknown?

18        A.  Cause -- yeah, right.  At that point, yeah.

19        Q.  And so on February 10th, you know that he's

20   continuing to have bloody urines?

21        A.  Right.

22        Q.  In fact, you observed bloody urine that day?

23        A.  Mm-hmm.

24        Q.  Starting to get concerned?

25        A.  Sure.

1    Q.  Are you starting to think that that

2 eventually on the urologist maybe should be today?

3    A.  Not today.  Again, you know, in private

4 practice what I would do, but the way we have to do

5 it in Wexford system, I have to go to collegial.  I

6 can't just say, "Well, I'm gonna send you to

7 urologist."

8    And then we did discuss a plan and that's what

9 we did.  We -- again, because that ultrasound was

10 read wrong and both of us thought maybe the problem

11 was not in the kidney, maybe in the bladder.  That's

12 why we sent him to urologist for cystoscopy and

13 further workup.

14    Q.  Well, now I'm confused here, Doctor.  Maybe

15 others are, maybe it's just me.

16    So the -- the reading which says it doesn't

17 find abnormalities led you to immediately have a

18 collegial and get approval for a urologist?

19    A.  Right.

20    Q.  Are you saying that if it had said there

21 were abnormalities, you would have done something

22 different?

23    A.  I would have done a CAT scan first and then

24 sent him to urology.

25    Q.  You can't do that, can you?

1          A.  Yes, I can.  I can present it to Pittsburgh

2     and we get the okay -- and I'm sure they would.  If

3     that was read wrong.  Right, I mean.

4          Q.  Have we seen -- are there any place in your

5     records where he gets a CT scan without it being an

6     outside person first directing that be done?

7          A.  Not that I know of, no.

8          Q.  And you thought, based on your understanding

9     on February 10th, that collegial you had with

10    Dr. Ritz, and that's over there on the P side?

11         A.  Mm-hmm.

12         Q.  Let's highlight that full P side.  Down at

13    the bottom.  Discussed with Dr. Ritz?

14         A.  Yeah.

15         Q.  Sent to urologist for cystoscopy, right?

16    That's what you thought was gonna happen?

17         A.  Mm-hmm.

18         Q.  But that's -- that cystoscopy didn't happen?

19         A.  Mm-hmm.

20         Q.  If you look at Plaintiff's Exhibit 28.

21              THE COURT:  Mr. Pelz, would this be a good

22    time to break?  It's almost 12.

23         Q.  After I have him look at this.  It should be

24    very quick.

25         Doctor, are you familiar with this, at least

1   this type of document, sir?

2        A.  Yeah.

3        Q.  It's the -- it's -- it's a utilization

4   management it says at the top?

5        A.  Mm-hmm.

6        Q.  It's to site director.  That's you, right?

7        A.  Yeah.

8        Q.  What happens is somebody on the Pittsburgh

9   side who's listening in on the collegials types up

10  something with respect to what's being done and

11  sends it back out; right?

12       A.  Right.

13       Q.  Now, I think you testified that you

14  sometimes -- you don't usually look at these, do

15  you?

16       A.  Look at what?  This?

17       Q.  Yes.

18       A.  No, I know it's been approved at the

19  meeting, so I don't have to review it.

20       Q.  If you look at what gets sent out, and this

21  is you, this document is sent to you in your offices

22  in Taylorville; right, sir?

23       A.  Mm-hmm.  Right.

24       Q.  Based on what Pittsburgh put down, look at

25  the last two lines.

1    I'm sorry, Judge, first I want to move it into

2    evidence.  Plaintiff's Exhibit 28.

3         THE COURT:  Any objection?

4         MR. RUPCICH:  No objection.

5         MR. TYRRELL:  No objection.

6         THE COURT:  28 is admitted.

7    (Plaintiff's Exhibit 28 admitted.)

8    Q.  Go to the last two lines.  Discussed case in

9    collegial?

10   A.  Mm-hmm.

11   Q.  Discussed case in collegial, approved for

12   urology?

13   A.  Right.

14   Q.  No approval for cystoscopy?

15   A.  No, it said -- at the meeting, that's what

16   we talked about, but they didn't put it down here.

17   Q.  Well --

18   A.  That's the reason, like I keep saying,

19   because the ultrasound was read negative, we wanted

20   to look at the bladder.  And we talked about

21   cystoscopy, and for some reason they didn't put it

22   down here.

23   Q.  But isn't it true, sir, that if it doesn't

24   get put down here, it doesn't get done?

25   A.  Not necessarily.

Q.  Isn't it true that in this case, there wasn't any approval for cystoscopy, and you had to go through yet another collegial review to get an approval for a cystoscopy?

A.  Yeah, after -- you know, after Dr. Severino saw him.

Q.  And if you had looked at this when you got it sent back to you and noticed that inconsistency, you could have said, "Hey, Pittsburgh, what's going on?  We approved a cystoscopy."

A.  Yeah.

Q.  You didn't do that?

A.  No, I didn't -- because that's their fault, not mine.

MR. PELZ:  This is a good time to break, Judge.

THE COURT:  All right.  We're in recess until 1:30.

(The jury left the courtroom.)

(A lunch recess was taken.)

THE COURT:  Are we ready for the jury?

I should disclose before the jury comes back, I went to lunch at La Piazza--which I highly recommend--and three of our defendants were there. And I did recommend certain dishes for them and they

1  said they were wonderful.

2          MR. RUPCICH:  Didn't ask for a cigarette

3  though.

4          MR. MARTIN:  What did everybody have?

5          MS. MINCY:  I had the berry salad and then

6  I had cake afterwards.  I had berry salad and

7  spaghetti and I had cake afterwards.

8          THE COURT:  I had spaghetti and meatballs

9  and minestrone soup, and I did not have cake

10  afterwards.  I would guarantee that I would have

11  fallen asleep.

12          MR. PELZ:  Mr. Martin has approved that

13  kind of lunch budget for us.

14          THE COURT:  It's $10.

15      Bring the jury.

16      (The jury entered the courtroom.)

17          THE COURT:  Please be seated.  Good

18  afternoon.  Court is reconvened.  Mr. Pelz, please

19  continue.

20          MR. PELZ:  Thank you, Your Honor.

21  BY MR. PELZ:

22      Q.  Good afternoon, Dr. Nawoor.

23      A.  Good afternoon.

24      Q.  Earlier, this morning, we had I think at

25  least one or two questions I asked you about the

existence of medical guidelines for Wexford?

A. Mm-hmm.

Q. And I believe you said you knew they existed and that you had a copy; is that correct?

A. I do.

Q. I'd like to show you what we've marked as Plaintiff's Exhibit 190. Judge, I'm leaving your copy right here.

Are those the Wexford medical guidelines, sir?

A. Mm-hmm.

Q. And you are familiar with them, sir?

A. Yeah. Some of them.

Q. Your Honor, we'd move to have Plaintiff's Exhibit 190 admitted into evidence.

THE COURT: Any objection?

MR. RUPCICH: No objection.

MR. TYRRELL: No objection, Your Honor.

THE COURT: 190 is admitted.

(Plaintiff's Exhibit 190 admitted.)

Q. Did you look at those medical guidelines any time between December 23rd, 2015, when he presented with gross hematuria, and January 13th when you had your collegial with Dr. Ritz?

A. No.

Q. On January 13th, when you had your

1  collegial, did you know what the medical guidelines

2  said with respect to gross hematuria?

3      A.  Not -- yeah, I did, and -- yeah.

4      Q.  Without looking, can you tell us what do the

5  Wexford guidelines say you should do when someone

6  presents with hematuria?

7      A.  Like we did, we did blood count, urine.  And

8  depending on the case, you know, I have to present

9  the case to Wexford and discuss it, which we did.

10  And the -- then depending on the case, again, it

11  would depend what kind of procedure eventually we

12  would get.

13      Q.  You were aware that one of the guidelines

14  from Wexford, if somebody over 50 presents with

15  gross hematuria, is to rule out malignancy?

16      A.  Yeah.

17      Q.  Now, we also had a couple of questions about

18  the contract with the state.  I'm gonna refer you to

19  and ask --

20      Withdraw it.  Let's look at Plaintiff's

21  Exhibit 139.

22      Have you seen this document before, sir?

23      A.  Not particularly, no.

24      Q.  In your understanding -- withdrawn.

25      To the best of your recollection, have you ever

1    looked at the contract Wexford has with the State of

2    Illinois?

3        A.  No.

4        Q.  To the best of your recollection, you

5    haven't either paid attention to or known about the

6    financial -- any financial terms; correct?

7        A.  Correct.

8        Q.  To the best of your recollection, you don't

9    have any knowledge of who pays for what services or

10   what has to be done; right?

11       A.  That's correct.

12       Q.  Is it fair to say, Dr. Nawoor, that you

13   aren't going to be the witness that tells us that

14   the contract requires Wexford to do collegial

15   reviews?

16       A.  As far as I know, they are supposed to.

17       Q.  Do you know if that's based on the contract?

18       A.  That I don't know.

19       Q.  You've never looked at the contract to see

20   if there's anything in the contract that requires a

21   collegial review?

22       A.  Correct.

23       Q.  Now, it's also true that Wexford has

24   policies on collegial review?

25       A.  Mm-hmm.

1      Q.  Are you familiar with those policies?

2      A.  All I know I just have to fill out the form,

3  write down what I want to discuss, and that's about

4  it.  And then whatever we decide on, that's what

5  we're gonna do.

6      Q.  I'd like to provide to you Plaintiff's

7  Exhibit 103.

8      It's my understanding there is no objection it

9  103.  If that's right, I move 103 be admitted.

10         MR. RUPCICH:  Well, I believe there needs

11  to be a foundation that he's familiar with this

12  particular document for it to be admitted through

13  him.

14      Q.  So much for the list of no objections.

15      Have you seen this document before, sir?

16      A.  No.

17      Q.  No?

18      A.  Not that I know of.

19      Q.  You can look -- did you know that there were

20  collegial review guidelines that were effective as

21  of July 1, 2014?

22      A.  I started in '15, so I wasn't -- no, I

23  didn't know.

24      Q.  Well, do you know if these guidelines were

25  still in effect when you started in December of

1     2015?

2     A.  Yeah, I guess I did, yeah.

3     Q.  Did you know what the guidelines provided

4 with respect to collegial review?

5     A.  Yeah, at least what guidelines says.

6     Q.  What did you have to guide you with respect

7 to what you needed to do for collegial review?

8     A.  All I have to do is fill out the name and

9 numbers and write down the history of why I want to

10 present the case and what I would like to do, at

11 least suggest something.  And then meet with them

12 and discuss that at the collegial.

13     Q.  Did you know -- you were the site medical

14 director; right?

15     A.  Psych?  No.

16     Q.  Site, s-i-t-e.  You were the site medical

17 director?

18     A.  Yes.

19     Q.  You were the site medical director for

20 Taylorville Correctional Center?

21     A.  Yes.

22     Q.  Do you know that the site medical director

23 has to review all referral request forms?

24     A.  Yes.

25     Q.  Do you know if the site medical director

1    disagrees with any request, you had to mark

2    disagreed?

3         A.  Yeah.

4         Q.  Did you know that if you agreed with the

5    request, you had to provide things like baseline

6    mammograms, EEGs, and forward those to the

7    utilization department in Pittsburgh?

8         A.  Mm-hmm.

9         Q.  Did you know you had to contact the

10   utilization management physicians at the scheduled

11   time?

12        A.  Yeah.

13        Q.  Did you know that during that site -- during

14   the collegial review that there was supposed to be a

15   recommendation of care that should be reached as a

16   result of that?

17        A.  Yeah.

18        Q.  Did you -- these were supposed to be

19   documented; right, sir?

20        A.  In the chart you mean?

21        Q.  There should be a documented -- there should

22   be a piece of paper that reflects you did all this?

23        A.  Yes, it is.

24        Q.  Have you seen any of those pieces of paper

25   with respect to the care of Mr. Dean?

1      A.  All I know is I fill out the form and we

2  present the case.  And whatever is decided, I write

3  it in the progress note.  And we decided it was

4  denied or approved.

5      Q.  But the form you send, that's supposed to be

6  signed and dated by you; correct?

7      A.  Yes, that's correct.

8      Q.  So that document would let us know what's

9  the date that you actually made this request?

10      A.  Right.  Right.

11      Q.  Have you seen the form that tells us what

12  day you made the request before the January 13th

13  collegial?

14      A.  I just talk to my office over there and I

15  said -- did they misplace some of these things?  I

16  don't know.  They may have misplaced it, I don't

17  know.

18      Q.  You keep a copy of that form in Taylorville;

19  right?

20      A.  Yeah.

21      Q.  And there's also a copy of that form sent to

22  Pittsburgh; right?

23      A.  Right.

24      Q.  So that form should be in the files at

25  Taylorville?

1    A.  Of course.

2    Q.  That form should also be in the files in

3  Pittsburgh?

4    A.  Right.

5    Q.  Have you looked for any of those forms with

6  respect to Mr. Dean?

7    A.  I had no reason to.

8    Q.  In terms of this case, so that we could try

9  to know what it was you actually did, didn't you

10  think it would be helpful for us -- for everyone to

11  see those forms?

12    A.  I wrote down what exactly we talked about

13  and what was approved.

14    Q.  Well, your total what you wrote down for

15  January 13th is two lines?

16    A.  That's correct.

17    Q.  That's everything you talked about?

18    A.  No, that's not what we talk about.  We talk

19  about what was approved.  So that's what we talk

20  about.

21    Q.  And there's no document that shows us what

22  was sent to Mr. Ritz, is there?

23    A.  I don't -- they misplaced the paper, it's

24  not my fault.

25         THE COURT:  Excuse me, Mr. Pelz.  I need to

1   take a ten-second break.  Court is briefly in

2   recess.

3        (A recess was taken.)

4           THE COURT:  Please be seated.  Court is

5   reconvened.

6        I'm getting some test results.  Please

7   continue.

8        Q.  Did you understand that you were supposed to

9   send any supporting documentation that would be

10  necessary for that collegial review discussion?

11       A.  Yes.

12       Q.  Do you have any record of what you sent to

13  Pittsburgh in advance of January 13th, 2016?

14       A.  I'm pretty sure I said it was about

15  persistent hematuria.  And the -- we need to -- do a

16  little more -- talk a little more about what to do

17  next.  And since the ultrasound was negative, at

18  least read negative, that we need to at least talk

19  about either a urologist or a CAT scan.

20       Q.  Just to be clear, my question is talking

21  only about the January 13th collegial review.  And

22  my question is is there a record, a document, a

23  piece of paper with writing on it --

24       A.  There should be.

25       Q.  -- that shows what you sent?

1      A.  There should be.

2      Q.  The actual documents themselves should be

3  somewhere to show --

4      A.  Yeah.

5      Q.  -- what it was you sent to them?

6      A.  That's right.

7      Q.  Have you seen that?

8      A.  Yeah, I wrote it.  So if I wrote it, I've

9  seen it.

10      Q.  But we don't have it here.

11      A.  You don't have it, then the medical records,

12  they probably misplaced it, put it in the wrong -- I

13  don't know.

14      Q.  Well, does it seem odd to you that your

15  medical records and Wexford's medical records in

16  Pittsburgh both misplaced that?

17      A.  I don't know.  Because I know all I know is

18  documented -- I mean I said we talked about it in

19  the chart, so obviously, there must have been.  We

20  cannot talk to Wexford unless there is a form

21  filled.  So I don't know where that form went.

22      Q.  The approval or disapproval note, that's

23  supposed to come back to you; correct?

24      A.  The -- no.  What we did, we talk, and then

25  he tells us what he wants to do, not do.  And after

1    the talk, we -- I write it in the -- in the chart

2    what was decided.  That's about it.

3        Q.  He tells you -- he tells you.  That he is

4    Dr. Ritz?

5        A.  Yeah, both of us.

6        Q.  He tells you what he wants you to do?

7        A.  Say what we decided to do.  Both of us talk

8    about it and then we come to conclusion what should

9    be done.  Not him alone.

10       Q.  Isn't it true that the policies require that

11   they send back the written form showing what was

12   done?  What was approved and not approved?

13       A.  I've never seen it.  All I know, I write

14   down right away after that what was decided on.

15       Q.  And just to be clear, you don't think you've

16   ever seen the utilization management policies?

17       A.  Not really.

18       Q.  Now, Dr. Nawoor, you have some notes with

19   you?

20       A.  It's over there.

21       Q.  The notes, are those the notes you had, are

22   those similar or the same as the notes you had at

23   your deposition?

24       A.  No.  No.

25       Q.  Are those notes that you reviewed to prepare

1　　yourself to testify here today?

2　　　　A.  Yeah, that's what I did.  Look at the chart

3　　and I wrote down all the dates and whatever.

4　　　　Q.  And is that something you did just in the

5　　last week or so?

6　　　　A.  No, I did that a few months ago.

7　　　　Q.  Is it -- again, is it different than the

8　　notes you prepared and the dates you wrote down in

9　　advance of your deposition?

10　　　　A.  It's not different, no.

11　　　　Q.  But you did it again?

12　　　　A.  No, I didn't do it again, it's the same

13　　thing.  I did two, three months ago.

14　　　　Q.  Well, your deposition was a year ago.  Do

15　　you remember?

16　　　　A.  Right.

17　　　　Q.  So is that when you think it was?

18　　　　A.  Well, no, I -- I just reviewed the chart in

19　　the past three months or so.

20　　　　Q.  Well, now -- let me move to something else.

21　　I'll come back to that.

22　　　　Very briefly I want to ask some questions again

23　　about your knowledge of what Dr. Einwohner did on

24　　January 7th.  I'd like to hand the witness

25　　Plaintiff's Exhibit 164.

         Have you ever seen Plaintiff's Exhibit 164,
sir?
         A.  No.
         Q.  Do you know who is the author of the
written -- handwriting on Plaintiff's Exhibit 164?
         A.  I don't know the handwriting, but it's
Dr. Einwohner.
         Q.  You can tell from the nature of the document
that this is -- this comes from Dr. Einwohner's
files?
         A.  Yeah, that's printed at the end of it.
         Q.  If you look at the page that's Plaintiff's
Exhibit 164-5.  That's an email from Dr. Einwohner
to Dr. Ritz on January 7th.
         The January 7th email from Dr. Einwohner to
Dr. Ritz.  It's on page 5 of that exhibit.
         A.  Page 5.
         Q.  Thank you, Judge.
         Now, that email is sent to Mr. Ritz --
Dr. Ritz, with a copy, is it Ms. Adams or Dr. Adams?
         A.  Yeah.  I saw --
         Q.  Did you get this email?  Did you have this
email before you did the collegial review on
January 13th?
         A.  No.

1      Q.  So at the time you did the collegial review,

2  you didn't know what Dr. Einwohner had suggested,

3  did you?

4      A.  No.

5      Q.  Did Dr. Ritz, during that call, did he tell

6  you what Dr. Einwohner has suggested?

7      A.  Not really.

8      Q.  The page 4, that's the page in front of that

9  which says -- I'm sorry.

10     I want you to look at page 7.  So it's two

11  pages back, please, sir.  It says renal teleclinic

12  orders.

13      A.  Okay.

14      Q.  Had you seen -- withdrawn.

15     You'll note on the upper right-hand side

16  there's a date of 1/7/16, sir.  You're on the same

17  page with me?

18      A.  1/7/16, yeah.

19      Q.  Had you seen that prior to the January 13th,

20  2016, collegial?

21      A.  Not really.

22      Q.  So you didn't know that she had noted that

23  this should be a case for collegial?

24      A.  Yeah, I knew that.

25      Q.  How did you know?

A.  I saw that somewhere in the chart.

Q.  Look at the page in front of that, page 6.

A.  Okay.

Q.  Again, that's got a date of 1/7/16.  This is entitled renal progress note.

Had you seen the renal progress note prior to your collegial review on January 13th?

A.  No.

Q.  Did you think it might be important in discussing this case with Dr. Ritz to have the information and suggestions from the nephrologist, the kidney specialist who was treating Mr. Dean?

A.  Yeah, that would make sense.  But you know, the thing is, I'm an internist, nothing to do nephrologist.  But I do take care of renal problem. So I didn't really have to have Dr. Einwohner's input in there to deal with this case.  That's the reason I didn't look at it.  With all due respect to her.

Q.  In January of 2016, what was your understanding of what medical purpose was served by collegial review?

A.  Just to discuss the cases, whatever it is, whether it's hematuria or something else, chronic cough or whatever.

Q.  In terms of discussing the cases, at least
in your view, you didn't need to know or understand
what was being requested by the nephrologist; right?

A.  As far as I know.  And just for
documentation, right now we don't have a
nephrologist and I'm the one that's taking care of
all the renal problem.  So I'm well aware of, you
know, taking care of renal problem, I mean.

Q.  Isn't it true, Doctor, that in January of
2016, you understood that the purpose of this
process was for you to discuss the case and to be
told what they, that is Pittsburgh, wanted you to
do?

A.  We would discuss it.  Whatever we did
discuss at collegial, that's what we do.

Q.  Do you remember your deposition on
December 4th --

A.  Yeah, yeah.

Q.  Did you at that deposition testify that the
purpose was for you to discuss it and then to be
told what Pittsburgh wanted to do?

A.  Yeah.  So we discuss it and then we come to
a conclusion that's what they want to do, yeah.

Q.  Now, you remember that in advance of your
deposition, you did a little research?  You went and

1   found a couple of articles on kidney cancer?

2       A.  Mm-hmm.

3       Q.  I'll show you what's been marked as

4   Plaintiff's Exhibit 380 and 381.

5       Handing you what's been marked as Plaintiff's

6   Exhibit 380 and 381.  You brought those articles to

7   the deposition; right, sir?

8       A.  Right.

9       Q.  And the highlighting on those articles is

10  yours; correct?

11      A.  Right.

12      Q.  Exhibit 380, the title is Epidemiology,

13  Pathology, and Pathogenesis of Renal Cell Carcinoma;

14  right, sir?

15      A.  Right.

16      Q.  And Exhibit 381, the title of this article

17  is Clinical Manifestations, Evaluation, and Staging

18  of Renal Cell Carcinoma; right, sir?

19      A.  Right.

20      Q.  You thought it was important in advance of

21  your deposition to look at the medical literature

22  like this; right?

23      A.  Correct.

24      Q.  Now, on December 23rd, 2015, did you look

25  into any medical literature like this?

         A.  Yeah, I looked up-to-date at home.  I looked
at it.
         Q.  What medical literature did you look at on
December 23rd?
         A.  The -- you mean on the deposition?
         Q.  No.  On December 23rd, 2015 --
         A.  When I first --
         Q.  -- the day you first saw him --
         A.  All right.
         Q.  -- did you go and look for medical
literature and pull the medical literature and
review it?
         A.  No, I didn't.  Not that day.
         Q.  And you didn't do that at any time between
December 23rd and January 13th, did you, sir?
         A.  No.  I did, like I said, when I was at home
I look at the up-to-date.  Not an actual article.
         Q.  Well, is it true -- or is it correct,
Dr. Nawoor, you thought it was more important to
look at the medical literature for your deposition
than you did for when you were treating Mr. Dean?
              MR. RUPCICH:  Object to compound.
              THE COURT:  The objection is overruled.
         A.  The bottom line, I was well aware -- I
didn't even have to look at, I knew exactly.  I've

1   done this for 40 years, so I know exactly what

2   needed to be done.

3        Q.  Well, when -- you were well aware of the

4   recognized standard of care --

5        A.  Right.

6        Q.  -- for a patient presenting with gross

7   hematuria?

8        A.  Mm-hmm.

9        Q.  Now, I think we -- before lunch we were

10  talking about that there had been approval of the

11  referral to a urologist; right?

12       A.  Right.

13       Q.  And that approval came on February 10th?

14       A.  Mm-hmm.

15       Q.  The actual appointment with the urologist

16  didn't happen until March 10th; right?

17       A.  Yeah.

18       Q.  What -- did you do anything between

19  February 10th and March 10th to assist in the

20  treatment of Mr. Dean?

21       A.  Yeah, I mean a couple of times I talked to

22  Dr. Severino trying to expedite, you know.

23       Q.  Is there any document in writing that shows

24  that you actually talked to Dr. Severino?

25       A.  It's in the chart.

1      Q.  Well, the chart says you're going to talk to

2  him?

3      A.  No, I did talk to him.

4      Q.  Is there any document that shows that?

5      A.  On the phone I talked to him, but there was

6  no document.

7      Q.  Well, after you talked to him, shouldn't you

8  put that in the chart?

9      A.  Yeah, but -- I didn't, but I did talk to

10  him.  It's written I told him to expedite the

11  things.

12      Q.  Well, if Dr. Severino says he doesn't recall

13  ever speaking to you, is he just mistaken?

14      A.  I guess he is because I know because I wrote

15  that I told him, you know, I want this to expedite

16  this.

17      Q.  Well, the appointment got scheduled for

18  March 10th; right?

19      A.  Mm-hmm.

20      Q.  And it actually didn't occur until

21  March 10th; right?

22          MR. RUPCICH:  I'm going to object.  This is

23  misleading, misstating the evidence.  He's trying to

24  trick the witness.

25          THE COURT:  The objection is overruled.

1     A.  Now, can you rephrase your question, please?

2     Q.  We know that you don't actually do the

3 scheduling?

4     A.  No, I don't.

5     Q.  And we know that the appointment was

6 scheduled for March 10th?

7     A.  That's correct.

8     Q.  And you said that that was gonna be too long

9 and you tried to get it quicker; right?

10    A.  Yeah.

11    Q.  But after whatever you did or didn't do,

12 that appointment never changed, did it?

13    A.  No.

14    Q.  That appointment is now occurring two and a

15 half months after Mr. Dean first presented with

16 grossly bloody urine?

17    A.  Mm-hmm.

18    Q.  It's one and a half months after the

19 ultrasound that was wholly inconclusive; right?

20    A.  Mm-hmm.

21    Q.  And what prevented this from happening

22 faster, your view, was it was the system that

23 prevented you from getting an earlier appointment?

24    A.  Well, that's true.

25    Q.  Because you can't do anything to expedite

1  the process without talking to Pittsburgh?

2      A.  That's right.

3      Q.  You have to talk to Pittsburgh and you have

4  to get approval from utilization management?

5      A.  Mm-hmm.

6      Q.  Let's talk a little bit about -- go back in

7  time a little bit about when you told Mr. Dean that

8  it could be -- it could be stones or cancer; right?

9      A.  Mm-hmm.

10     Q.  The fact that there was no pain, that

11  indicates cancer is more likely; right, sir?

12     A.  Not necessarily.

13     Q.  Well, let's walk through what you would know

14  from all your training.  The lack of pain is

15  inconsistent with kidney stones?

16     Let me -- the lack of pain plus blood is

17  inconsistent with kidney stones?

18     A.  Not necessarily.

19     Q.  Well, okay.  Isn't it true that if the

20  kidney stone is just sitting there --

21     A.  That's right.

22     Q.  -- you wouldn't have pain.  But if the

23  kidney stone is just sitting there, you also

24  wouldn't have blood?

25     A.  Yeah, probably.

1        Q.  Because the blood -- if it's kidney stones,

2    the blood is caused because the kidney stone is

3    moving?

4        A.  That's correct.

5        Q.  And if the kidney stone is moving, we're

6    gonna have pain?

7        A.  That's correct.

8        Q.  You also knew that he was having clots in

9    his blood; right?

10       A.  Mm-hmm.

11       Q.  That's what he reported to you?

12       A.  Right.

13       Q.  And isn't it true that in all your

14   experience, you had never seen blood clots from a

15   kidney stone?

16       A.  Not that I have.

17       Q.  Now, if we go back to -- do you still have

18   Plaintiff's Exhibit 84 in front of you, sir?

19       A.  Yeah.

20       Q.  If you could look at pages 11 and 12 of 84.

21       A.  Okay, I got 11.

22       Q.  All right.  So if you look at page 11,

23   Mr. Dean presents and comes to the sick call the day

24   before in the late afternoon it looks like, at 4:30?

25       A.  Mm-hmm.

1      Q.  And after that then you see him the
2  following morning; right?
3      A.  Mm-hmm.
4      Q.  As of this time, he is still having bloody
5  urine?
6      A.  Right, mm-hmm.
7      Q.  That's gross hematuria which you confirmed
8  while he was there with you on the 26th?
9      A.  Right.
10      Q.  As of February 26th, there still -- he
11  hasn't been seen by a urologist; right?
12      A.  Mm-hmm.
13      Q.  He hasn't been scheduled for a CT scan?
14      A.  No.
15      Q.  And he hasn't been scheduled for a
16  cystoscopy?
17      A.  Right.
18      Q.  Did you tell him at that meeting while you
19  were there that you needed to -- you were gonna call
20  Pittsburgh?
21      A.  Mm-hmm.
22      Q.  Is there any evidence that you actually did
23  call Pittsburgh at any time between February
24  the 10th and March 10th?
25      A.  Not that I'm aware of anyway.

1   Q.  Now, did you learn at or about this time,

2 sir, that Mr. Dean's wife was becoming very

3 concerned?

4   A.  Yeah.

5   Q.  Was it reported to you that she was making

6 calls to the Health Care Unit?

7   A.  Yes, yeah.

8   Q.  As part of the patient care, is it important

9 to communicate with the family and make sure the

10 family knows what's going on?

11   A.  Yeah, she knew -- she knew what was going

12 on.

13   Q.  Did you ever talk to her?

14   A.  I talked to her once, yeah, I did.  This was

15 before she went -- he went for his surgery.

16   Q.  Did you talk to her at any time --

17   A.  Actually, you know, I was talking to him.

18 And he asked me to put his wife on, can I take to

19 his wife.  And I'm not supposed -- I wasn't supposed

20 to do that, so I didn't talk.

21   Q.  Did -- are you prohibited from using your

22 own phone, the phone in the medical center, to call

23 his wife?

24   A.  No.

25   Q.  Did you ever do that?

1      A.  I don't remember that.

2      Q.  Now, you knew the day he was going to see

3  Dr. Severino, that is March 10th; correct?

4      A.  Mm-hmm.

5      Q.  Were you monitoring and trying to find out

6  what he learned from Dr. Severino when he went

7  there, sir?

8      A.  We always see him after he goes for, what do

9  they call it, med writ anyway, so I have to see him.

10     Q.  Have you ever seen Dr. Severino's medical

11 records?

12     A.  No.

13     Q.  Were you aware that Dr. Severino, on

14 March 10th, indicated that he wanted to do a CT scan

15 and cystoscopy?

16     A.  I'm aware of that.

17     Q.  And that wasn't at all surprising to you,

18 was it?

19     A.  No.

20     Q.  Because that's the recognized standard of

21 care?

22     A.  Yeah.  Yeah.

23     Q.  But neither of those two procedures could be

24 done until there was a collegial review and approval

25 from Pittsburgh; right?

1    A.  Right.

2    Q.  In fact, you couldn't even start to try to

3  schedule the appointment until there was approval

4  from Pittsburgh; right?

5    A.  That's right.

6    Q.  When did you request a collegial to try to

7  get approval for a CT scan and a cystoscopy?

8    A.  When we had -- when -- like I said, I'm

9  going back here.  And when the ultrasound was

10  negative, that's what we decided, to send him to

11  urology for a cystoscopy since the ultrasound was

12  negative.  Thought that blood was coming from the

13  bladder rather than the kidney since it was read as

14  normal.

15    Q.  Let me ask my question again.  When did you

16  first request the collegial after March 10th?  When

17  did you first request it?

18    A.  After March 10?

19    Q.  Yes.  After he comes back and after you know

20  Dr. Severino has ordered a CT scan and cystoscopy,

21  when did you make the request for collegial?

22    A.  I'm not sure.  I don't remember anyway.

23    MR. RUPCICH:  Can we approach?

24    THE COURT:  Yes, you may.

25    (The following sidebar discussion was held at

1        the bench, out of the hearing of the jury.)

2        MR. RUPCICH:  The witness has an incomplete

3   set of medical records.  He's being asked to find

4   something that's not in the records he was given.

5   This is unfair.

6        THE COURT:  What was he asked to look at

7   that he doesn't have?

8        MR. RUPCICH:  He's asked to look at the

9   note where he got Dr. Severino's recommendations.

10  And it's not this here.  But it exists.

11        MR. PELZ:  What I'm asking him is when did

12  he make the request for a collegial.  Right?  Here's

13  what we know -- when did he make the request, send

14  something asking for a collegial review.  Right?

15  This directly goes to our issue with the document

16  production and our request for the instruction.

17  There should be, based on his testimony, there

18  absolutely should be a document that he prepared

19  showing that he requested a collegial review to

20  discuss this.  No such document exists.  Or at least

21  it wasn't produced.

22        THE COURT:  What page are you saying is

23  missing from this medical record?

24        MR. RUPCICH:  You want me to go --

25        THE COURT:  Mm-hmm.

1      Is Dr. Barnett going to be here for the rest of

2  the trial?

3           MR. PELZ:  No.  He's going to be here

4  through his testimony.  Hopefully, we would get it

5  done tonight or early tomorrow morning.  At least

6  that's the current plan.

7           THE COURT:  Is this from the progress notes

8  that are the exhibit that I'm looking at?  84.

9           MR. RUPCICH:  It's not in what he's got the

10  doctor looking at.

11           THE COURT:  No, I asked if this was part of

12  the progress notes that are reflected in 84?

13           MR. RUPCICH:  No.

14           THE COURT:  This is a different document.

15           MR. RUPCICH:  Right.  So he's -- the

16  problem is the doctor is being quizzed to find

17  something in a set of medical records that's

18  incomplete.  And the record isn't there.  If they

19  want to ask:  Do you have an independent

20  recollection of the date, that's fine.  But this is

21  severely unfair to quiz him on.

22           MR. PELZ:  Can I see what document --

23           THE COURT:  He provided the doctor with his

24  notes from his treatment of Dr. -- of Mr. Dean and

25  he's asking him questions from that and his memory.

1    He can do that.

2         MR. PELZ:  This is actually the next

3    document I intend to use, Judge.  I think it's a

4    different version of it, but it's the same document

5    I intend to show him next.

6         THE COURT:  Okay.

7       (The following proceedings were held in open

8       court.)

9       Q.  Could you read back my last question?

10      (The requested material was read.)

11      Q.  Let's look at Plaintiff's Exhibit 66, sir.

12      You have that in front of you, sir?

13      A.  Yeah.

14      Q.  This is a medical special services referral

15   and report form, sir?

16      A.  Mm-hmm.

17      Q.  Now, you filled out part of this; right,

18   sir?

19      A.  Yeah, the top part.

20      Q.  Let me ask, you recognize this document;

21   right, sir?

22      A.  Yeah.

23      Q.  And it's part of the Taylorville medical

24   records?

25      A.  Yeah.

1          Q.  I move admission of Plaintiff's Exhibit 66,
2     Judge.
3               THE COURT:  Any objection?
4               MR. RUPCICH:  No objection.
5               MR. TYRRELL:  No objection.
6               THE COURT:  66 is admitted.
7          (Plaintiff's Exhibit 66 admitted.)
8          Q.  Put it up please, Dylan.
9          So somebody from Taylorville wrote William
10    Dean, put his name on there and his ID number;
11    right?
12         A.  Yeah.
13         Q.  That's not your handwriting?
14         A.  No.
15         Q.  The next part, referred to, that's your
16    handwriting; right, sir?
17         A.  Right.
18         Q.  Tell us what it says?
19         A.  Says urologist.  And the -- need to see.
20    And he still has hematuria, weeks, need to rule out
21    bladder cancer.
22         Q.  And you dated that --
23         A.  3/3/16, yeah.
24         Q.  You dated that before he went to the
25    urologist?

 1      A.  Yeah.

 2      Q.  Then there are findings.  Do you know who

 3 wrote those?

 4      A.  That I don't know.  He's scheduled for -- I

 5 don't -- I'm not sure who wrote that.

 6      Q.  Well, who signs it underneath there, under

 7 that section?

 8      A.  Yeah, it's -- I did, yeah.

 9      Q.  No, right there.  Under where it says

10 patient needs scheduled for CT IVP and office

11 cystoscopy?

12      A.  Yeah, I signed this and approved it, yeah.

13      Q.  Getting ahead of me, Doctor, sorry.  On

14 those findings, that's Dr. Severino who writes that;

15 right, sir?

16      A.  Yes.

17      Q.  And that CT IVP, that's the CT scan that we

18 have been talking about?

19      A.  Right.

20      Q.  And the cystoscopy -- the CT IVP, that goes

21 to the upper part of the urinary system?

22      A.  Right.

23      Q.  And the cystoscopy, that deals with the

24 bottom part --

25      A.  Yes.

Q.  And the cystoscopy could be done in the office; right?

A.  Yes.

Q.  So if Dr. Severino had been approved to do it, he could have done that on March 10; right?

A.  Right.

Q.  But he hadn't yet been approved to do it, had he?

A.  Sometimes when we send people to consultant, if they feel there's something to be done, they can do it without an approval.

Q.  Well, he didn't think he could, did he?

MR. RUPCICH:  Objection to the foundation.

Q.  Withdrawn.

He's writing back to you to get approval to do this; right, sir?

A.  Right.  And it was done.

Q.  And he sends it to you on March 10th?

A.  Mm-hmm.

Q.  You approve it --

A.  Right.

Q.  -- on March 14th?

A.  That's correct.

Q.  But that approval isn't good enough, is it, sir?

1    A.  Well, I mean this came to me on that date,

2    that's why I signed it.  That's the day I saw this.

3    Q.  Four days after he goes to Dr. Severino, you

4    don't see him until the 14th?

5    A.  We are supposed to see them within five

6    days.

7    Q.  Did you think given the concern about the

8    cancer here that maybe you should have saw him the

9    first day he came back?

10    A.  I had no control on this.  When this come

11    through depends on the schedule, when they put the

12    patient to see me.

13    Q.  In any event, you approved that they should

14    do a CT scan and a cystoscopy?

15    A.  Right.

16    Q.  But again, your approval really almost isn't

17    worth anything because it's no good unless it's

18    approved by Pittsburgh?

19    A.  Well, that's true.

20    Q.  So I'm going back to my earlier question.

21    You know now you approved it, your approval isn't

22    good, you've got to get approval from Pittsburgh.

23    When do you write to Pittsburgh saying please

24    approve this?

25    A.  Yeah, but it was done though.

1    Q.  When do you write to Pittsburgh and say

2    please approve this?

3    A.  This goes back to the medical records, Chad

4    takes care of this.

5    Q.  When do you write to Pittsburgh and say

6    please approve this?

7    A.  This is what I said, this goes back to

8    Pittsburgh, Chad email or FAX it to them.

9    Q.  When did Chad send this to --

10   A.  That I don't know, that's his schedule.  I

11   don't know.

12   Q.  Did you do anything to make sure Chad did it

13   promptly?

14   A.  No, I didn't.

15   Q.  There isn't a collegial held to try to

16   approve these until March 22nd; correct?

17   A.  Mm-hmm.

18   Q.  Let's look at Plaintiff's Exhibit 93.  Here

19   you go, sir.

20   Thank you, Judge.

21   You recognize Plaintiff's Exhibit 93, sir?

22   A.  Yeah.

23   Q.  This is another example of the utilization

24   management notes that are prepared by somebody in

25   Pittsburgh at the end of the collegial review

1    process?

2         A. Mm-hmm.

3         Q. And these notes sometimes just track, from

4    time to time it's got things from earlier collegial

5    reviews and then what happened at the most recent

6    one is added at the bottom; right?

7         A. Yeah.

8         Q. So if -- I want to look at -- I'm sorry, can

9    we move into evidence Plaintiff's Exhibit 93.

10             THE COURT:  Any objection?

11             MR. RUPCICH:  No objection.

12             MR. TYRRELL:  No objection, Your Honor.

13             THE COURT:  93 is admitted.

14        (Plaintiff's Exhibit 93 admitted.)

15        Q. I want to look at the bottom four lines.

16        A. Mm-hmm.

17        Q. All right.  Those are the lines that deal

18   with what's happening after the ultrasound; right,

19   Doctor?

20        A. Right.

21        Q. So after the ultrasound, there was an

22   updated urinalysis done on February 8th; right?

23        A. Yes.

24        Q. And that urinalysis again shows there was

25   blood.

1          A.  Right.

2          Q.  And then the case was discussed at collegial

3     on 2/10 with you and Dr. Ritz; right, sir?

4          A.  Mm-hmm.

5          Q.  And at that collegial the only thing that is

6     approved is an appointment with the urologist;

7     right?

8          A.  Right.

9          Q.  And at the appointment with the urologist on

10    3/10, it's recommended for a cystoscopy; right?

11         A.  Right.

12         Q.  I mean that's what we just saw in the

13    document that came back from Dr. Severino, he

14    recommended a cystoscopy; right?

15         A.  Right.

16         Q.  And then on February -- on March 22nd, at

17    the collegial, it's approved after referral review?

18         A.  Right.

19         Q.  The cystoscopy?

20         A.  Right.

21         Q.  What's referral review?

22         A.  Well, the fiscal people, when I refer them,

23    they will do the referral review.

24         Q.  Is there any difference between the referral

25    review and the collegial review?

1        A.  Not that I'm aware of.

2        Q.  All right.  Now, you approved it on

3    March 14th.  We saw from the last document you

4    approved it on March 14th; right?

5        A.  Right.

6        Q.  Why did it take eight days to set up the

7    collegial?

8        A.  Well, we do it -- I don't know what day this

9    was, but it's usually done every Wednesday.  So

10   we -- just because I got this, I can't just write

11   let's have collegial the next day.  That's not the

12   way it works.

13       Q.  Well, if the 22nd is a Wednesday, that would

14   mean that the 15th was also a Wednesday.

15       A.  Possible, yeah.  Okay.

16       Q.  Well, it's not a possibility, it's a

17   matter --

18       A.  15, okay.

19       Q.  Right.  So if you had sent your request out

20   on the 14th, you could have heard it on the 15th?

21       A.  I guess.

22       Q.  And the only thing discussed and approved on

23   this collegial is the cystoscopy; right?

24       A.  Mm-hmm.

25       Q.  There's no approval of the CT scan?

         A.  No, it wasn't.

         Q.  Why not?

         A.  Because I told you before, the ultrasound
was normal, we both thought that the problem was in
the bladder.

         Q.  Well, the urologist, he didn't say just do a
cystoscopy --

         A.  I know that.

         Q.  -- he said do both?

         A.  He did -- he did do CT scan.

         Q.  He said do both right now?

         A.  Mm-hmm.

         Q.  Didn't he?

         A.  He didn't say right now.  He said do both,
but he didn't say right now.

         Q.  In fact, on the 14th, you approved both?

         A.  Yes, I did.

         Q.  But Pittsburgh didn't?

         A.  Yeah.  So.

         Q.  Pittsburgh waits yet another week to
consider the CT scan; right?  And look at
Plaintiff's Exhibit 84 at page 16.  It's not until
3/29 that the CT IVP is being discussed and
approved; right?  According to your notes?

         A.  Right.

1          Q.   And I go back to Exhibit 93.   Second page of

2     Exhibit 93, so 93-2.   And this is the approval of

3     the CT scan that gets entered on the UM notes on

4     March 30th; right?

5          A.   Right.

6          Q.   Now, you haven't done the cystoscopy yet;

7     right?

8          A.   Yeah.

9          Q.   There's no reason this couldn't have been

10    approved at the same time on March 22nd, is there?

11         A.   No, that's true.

12         Q.   And there's no reason that collegial

13    couldn't have happened on March 15th if the 22nd is

14    a Wednesday?

15         A.   Yeah.

16         Q.   Look at Plaintiff's Exhibit 84, page 18.   If

17    you look at the note, the entry for 4/6/16, does

18    that indicate to you that the appointment for the CT

19    scan is set up as of April 6th?

20         A.   That says April 12th.

21         Q.   On the left-hand side it says 4/6/16, and it

22    notes there's a furlough scheduled for April 12th?

23         A.   Right.

24         Q.   So the -- why does it take seven days to set

25    up this appointment?

1      A.  I have no control on that.  You know, the

2  nurse or the medical record takes care of those

3  things.

4      Q.  Well, let's look at the timeline a little

5  bit here and let's make sure.  CT scan is approved

6  on March 29th or 30th; right, sir?

7      A.  Mm-hmm.

8      Q.  And it's -- it's scheduled as of April 6th;

9  correct?

10      A.  Right.

11      Q.  So it's actually been able to be done within

12  six days after being scheduled; right?

13      A.  Mm-hmm.

14      Q.  It's done only 12 or 13 days after it was

15  approved; right?

16      A.  Right.

17      Q.  But it's done 33 days after Dr. Severino

18  ordered it --

19      A.  Right.

20      Q.  -- right?  Correct?

21      A.  That's right, yeah.

22      Q.  It takes 20 days for you to get collegial

23  review approval?

24      A.  Mm-hmm.

25      Q.  Twice as long as it does to schedule and get

1  the job actually done; right, sir?

2      A.  Yeah.

3      Q.  You're concerned about it this time, aren't

4  you, sir?

5      A.  Of course I'm concerned.  That's why twice

6  I -- you know, I talked to Severino to expedite

7  things.  And a lot of those things is out of my

8  control because, you know, the medical records and

9  the nurse does all this.  Especially the medical

10 records, Chad, he does the scheduling.  And I have

11 no idea when, you know.  And these things, you know,

12 take some time to happen.

13     Q.  Well, between March 10th and March 30th,

14 there's -- it's not Dr. Severino who needs to

15 expedite it, sir, it's Pittsburgh?

16     A.  Okay.

17     Q.  Now, you learned the CT scan gets done on

18 April 12th?

19     A.  Mm-hmm.

20     Q.  You get the results very promptly; right,

21 sir?  Within a day or two?

22     A.  Yeah.

23     Q.  And you learn that Mr. Dean has advanced

24 kidney cancer?

25     A.  Right.

Q. You learn that there's a tumor thrombus --

A. Right.

Q. -- into the vena cava with some spreading into the lymph nodes; is that correct?

A. Mm-hmm.

Q. And at least as of the 12th, the assessment is that the liver is normal; right?

A. Mm-hmm.

Q. Now, if the CT scan had been done in January, they'd have found the cancer, wouldn't they?

A. Say that again?

Q. If the CT scan had been done in January, you'd have found the cancer?

A. Possibly, yes.

Q. And if the CT scan had been done in January and they found the cancer, the surgery could have been done without having to break open his chest?

MR. RUPCICH: Object to the foundation.

A. That I can't -- that's an assumption, that's not a fact.

Q. Well, haven't you -- didn't you talk to Dr. Severino?

A. Yeah.

Q. Didn't you hear the testimony of

Dr. Metwalli?

    A.  Yeah.

    Q.  And isn't it true that in that earlier time period, the thrombus hadn't advanced past the diaphragm --

    A.  Right.

    Q.  -- so you could do a surgery that didn't require you to go into the upper area?

    A.  Yes.

    Q.  And it's the upper area that causes you to have to crack the chest?

    A.  Yes.

    Q.  And it's the advancement of the cancer that causes you to have to bring in the thoracic surgeon?

    A.  Yes.

    Q.  And it's the advancement of the cancer and the thoracic surgeon that causes the scheduling complications that causes this not to be done until July.  Is that right?

    A.  That's not only -- you know, I mean they had to get cardiology involved, cardiac surgeon involved.  All this takes time.  They have to do echocardiogram.  And this didn't happen overnight.

    Q.  Because every one of those things has to be approved through collegial review; right?

     A.  Well, that's true.

     Q.  If they had done the surgery in February,
Mr. Dean's life would be dramatically different,
wouldn't it, Doctor?

     A.  Again, that's an assumption.

     Q.  Now, have you ever looked at the records of
Dr. Severino?

     A.  Right here?

     Q.  Any of his medical records?  Either at the
time or as part of this case have you ever looked at
the medical records of Dr. Severino?

     A.  You mean in our chart or his records?

     Q.  His records?

     A.  No.

     Q.  All right.  Let's look at -- on Plaintiff's
84, look at page 22.  There's a note, a nurse's note
on April 14th.  That's -- none of that's in your
handwriting, is it?

     A.  No.

     Q.  This note indicates that the call from
Dr. Severino, that call was with a nurse; right?

     A.  Right.

     Q.  One of the nurses in Taylorville?

     A.  Mm-hmm.

     Q.  You know from what the nurse talked to

1    Dr. Severino, that they're gonna need a right

2    nephrectomy; correct?

3         A.   Right.

4         Q.   You know they're gonna need an MRI?

5         A.   This patient could not have MRI.

6         Q.   Right.  So they have to do something other

7    than MRI?

8         A.   Yes.

9         Q.   You know there are additional things that

10   are going to have to be done to set up this surgery;

11   correct?

12        A.   That's right.

13        Q.   And you know, your medical staff and you

14   know that you may need a vascular surgeon?

15        A.   Right.

16        Q.   You know that on April 14th?

17        A.   Right.

18        Q.   Now, you know that to get a vascular surgeon

19   involved, you can't do that, can you?

20        A.   No.

21        Q.   You have to get approval?

22        A.   Yeah.  First of all, you have to find out

23   who the vascular surgeon is.  And Severino was doing

24   that.

25        Q.   But one of the other things you've got to do

1    is you've got to once again write to Pittsburgh,

2    make the request to get a vascular surgeon?

3         A.  Right.

4         Q.  When would you do that?

5         A.  After we get that information.

6         Q.  What information?

7         A.  What you just read there.  And as far as I

8    know, you know, cardiac surgeon, cardiology was

9    approved.

10        Q.  Now, let's look -- do you recall when you

11   had the collegial review?

12        A.  No.  I can't recall that, no.

13        Q.  All right.  Let's look at Plaintiff's

14   Exhibit 157, please.

15        Have you -- are you familiar with Plaintiff's

16   Exhibit 157?

17        A.  Yeah.

18        Q.  Utilization management notes?

19        A.  Yeah.

20        Q.  I move for admission of Plaintiff's

21   Exhibit 157.

22             THE COURT:  Any objection?

23             MR. RUPCICH:  No objection.

24             MR. TYRRELL:  No objection, Your Honor.

25             THE COURT:  157 is admitted.

1          (Plaintiff's Exhibit 157 admitted.)

2          Q.  There's a collegial review that occurs on

3     either April 20th or April 21st; correct, Doctor?

4          A.  Yeah.

5          Q.  And that is seeking approval to have a

6     nephrectomy done?

7          A.  Mm-hmm.

8          Q.  That was approved by you and Dr. Ritz in a

9     collegial either the 20th or 21st; would that be

10    right?

11         A.  Yeah.

12         Q.  Look at Exhibit 84-24, I think that's your

13    notes?

14         A.  Yeah.

15         Q.  And your notes show that there was -- all it

16    says is surgery approved at collegial; right?

17         A.  That's correct.

18         Q.  So based on what you knew in April, the

19    thought was that this surgery could be done without

20    having to break open his chest; isn't that true,

21    sir?

22         A.  On 4/25?

23         Q.  Yes.

24         A.  I wasn't aware of that.

25         Q.  Well, the -- if we look again at 157.  If we

1  look at 157, it's approved that this surgery is

2  going to be done May 11th?

3      A.  Mm-hmm, right.

4      Q.  So as of April 21st, it's the belief and

5  understanding of Dr. Severino, you, and Dr. Ritz

6  that this can be done in three weeks; right?

7      A.  Mm-hmm.

8      Q.  And the only reason that doesn't happen is

9  because they find out that the tumor thrombus has

10  advanced?

11      A.  Yeah.

12      Q.  And the reason the tumor thrombus advanced

13  is because it wasn't -- he didn't get the CT scan

14  earlier and he wasn't scheduled to have the surgery

15  earlier; correct?

16      A.  Yeah, okay.  Well, all right.

17      Q.  Now, there's no approval for a vascular

18  surgeon on this collegial review, is there, sir?

19      A.  No, but it's -- Dr. Severino was doing all

20  that himself.  Talking to the cardiac surgeon and

21  cardiologist.

22      Q.  But he can't arrange to have it done until

23  Pittsburgh approves the vascular surgeon; right?

24      A.  I mean if the patient is in the hospital

25  already, he can do that.

1    Q.  But he's not in the hospital?

2    A.  But I mean he can.  As far as I know, he had

3    already talked to the cardiac surgeon.

4    Q.  Well, let's look at Plaintiff's Exhibit 186.

5         MR. RUPCICH:  Judge, might this be a time

6    for afternoon break?  Just a suggestion.

7    Q.  Can I just finish this exhibit?

8         THE COURT:  Yes, you may.

9    Q.  186.

10    This is a utilization management about a

11    collegial review that occurred on May 4th, 2016;

12    right?

13    A.  Mm-hmm.

14    Q.  This time it's not Dr. Ritz, it's

15    Dr. Garcia.  And this approves bringing in someone

16    with cardio experience; right?

17    A.  Well, he's a cardiologist for Wexford.

18    Q.  All right.  They wanted a cardiological

19    evaluation; right?

20    A.  Right.

21    Q.  Why wasn't this approved earlier?

22    A.  Because this got brought up after they

23    decided to do surgery.  You know, I mean there was

24    no reason if we are doing -- this was cardiac

25    surgeon, cardiology came up because of the surgeon.

1    Q.  Well, you already knew on April 20th that
2    they were gonna do surgery?
3    A.  Right.
4    Q.  You could have approved this same thing on
5    April 20th, couldn't you?
6    A.  Not me.  I mean --
7    Q.  Well, Pittsburgh could have?  Wexford could
8    have?
9    A.  Yeah.
10       MR. PELZ:  Do you want to take that break,
11   Judge?
12       THE COURT:  Yes, ten-minute recess.
13   (The jury left the courtroom.)
14   (A recess was taken.)
15       THE COURT:  Gentleman, I don't know if
16   you're having the problem I'm having, it's hot in
17   here.  If you wish to take your jackets off, I just
18   took mine off.  I still have to wear this.
19       MR. MARTIN:  Your Honor, one quick question
20   or point.  If possible, going a little bit later if
21   we could get -- if it's convenient to stretch it out
22   to five today given the pacing of the trial.  We
23   have Dr. Barnett who is going to go on next.
24   Tomorrow he I think leaves for the airport for St.
25   Louis at about noon.

1          THE COURT:  At about?

2          MR. MARTIN:  At about noon.

3          THE COURT:  I have not requested additional

4     staff after hours.  I will have a conversation.

5        (The jury entered the courtroom.)

6          THE COURT:  Please be seated.  Court is

7     reconvened.

8        Mr. Pelz, please continue.

9     BY MR. PELZ:

10       Q.  Good afternoon, Dr. Nawoor.

11       A.  Good afternoon.

12       Q.  We just had the discussion about the

13    approval on May 4th to get a cardiologist involved.

14    I would like to show you what's been marked as

15    Plaintiff's Exhibit 166.

16       And I call your attention -- if the first

17    instance I call your attention to in the right-hand

18    side, about a third of the way down the page, it

19    indicates Taylorville -- a stamp with Taylorville

20    Correctional Center and a date received of 5/12/16?

21       A.  Mm-hmm.

22       Q.  Would that indicate to you that this

23    document was sent to and received by Taylorville

24    Correctional Center?

25       A.  Well, that's the day I saw this.

1       Q.  In fact, you saw it because it's got your

2   initials and a checkmark showing you saw it on

3   May 12?

4       A.  Mm-hmm.

5       Q.  This is the report from the cardiologist who

6   saw him?

7       A.  Yes.

8       Q.  And the cardiologist saw him on May 6th;

9   correct, sir?

10      A.  Mm-hmm.

11      Q.  I move admission of Plaintiff's Exhibit 166,

12  Judge.

13          MR. RUPCICH:  No objection.

14          MR. TYRRELL:  No objection.

15          THE COURT:  166 is admitted.

16      (Plaintiff's Exhibit 166 admitted.)

17          THE COURT:  Did you mean to move 186?

18      Q.  I'm sorry, which one, Judge?

19          THE COURT:  186.

20      Q.  Yes, I move admission of 186.

21          THE COURT:  186 is admitted.

22          MR. RUPCICH:  No objection.

23          MR. TYRRELL:  No objection.

24          THE COURT:  Thank you.

25      (Plaintiff's Exhibit 186 admitted.)

Q.  Now, we -- withdrawn.

It only took two days to schedule and get him
seen by the cardiologist after approval; correct?

A.  Mm-hmm.

Q.  From the 4th to the 6th?

A.  Right.

Q.  The collegial review time to get that was
longer than it really took to schedule the
appointment with the doctor; right?

A.  Looks that way, yeah.

Q.  Do you recall seeing Mr. Dean on May 9th?
And I'd refer you to Plaintiff's Exhibit 84 at page
29.

A.  Yeah.

Q.  As of May 9th, you tell him -- well, you
know that Mr. Dean is going to need a CT of his
chest -- a CAT scan of his chest?

A.  Mm-hmm.

Q.  That's what you put in the right-hand column
there, CT of chest?

A.  Right.

Q.  When does that CT get approved, Doctor?

A.  I'm not sure about that.  I know it was
approved, it was negative anyway.  As far as I know.

Q.  We'll get to that.  I think we'll find that.

1      Are you aware that on May 16th, Mr. Dean filed
2  an emergency grievance?
3      A.  Yeah.
4      Q.  That was Plaintiff's Exhibit 5.  Did you
5  come to learn about that grievance, sir?
6      A.  Yes.
7      Q.  What if any role did you play in addressing
8  that grievance?
9      A.  Yeah, I know everything was in the works for
10 surgery and cardiology and cardiac surgeon been
11 consulted.  And we couldn't expedite it anymore than
12 that.
13     Q.  Dr. Nawoor, the facts that Mr. Dean put in
14 that grievance, where it said summary of grievance,
15 those facts were true, weren't they?
16     A.  Yeah.
17     Q.  Do you recall if the warden called the HCU
18 and said get things going?
19     A.  Yeah, I remember that.
20     Q.  If you look -- getting back to Exhibit 84,
21 and if you could look at page 30 of that exhibit,
22 please, sir.
23     Indicates that there had been discussions with
24 Dr. Severino about working with another doctor to
25 get the surgery scheduled.  You made a notation,

1   that's on the bottom, right-hand side; right?

2       A.  Dr. Coakley is a radiologist.

3       Q.  Once again, that would have to be approved

4   by Wexford; right?

5       A.  Yeah.  But I don't think this happened

6   anyway.

7       Q.  Were you aware of what consultations during

8   that time period -- what consultations during this

9   time period in May of 2016 were being had by

10  Mr. Dean with Dr. Einwohner?

11      A.  No.

12      Q.  In any event, you weren't talking to

13  Dr. Einwohner?

14      A.  No.

15      Q.  Did you ever learn that Dr. Einwohner had

16  told Mr. Dean she couldn't help?

17      A.  No, I'm not aware of that.

18      Q.  Looks like at Plaintiff's Exhibit 84 at page

19  35.  On 6 -- the entry for 6/2, that's your

20  handwriting?

21      A.  Yes.

22      Q.  Do you know if you saw Mr. Dean that day?

23      A.  Yeah.

24      Q.  And it indicates you're gonna have to --

25  somebody is gonna have to order another CT?

1          A.  Mm-hmm.

2          Q.  Once again, did that require approval by

3     Wexford?

4          A.  Right.

5          Q.  If you look at the earlier -- the page in

6     front of that, page 34?

7          A.  Mm-hmm.

8          Q.  Withdrawn.  Go back to page 29 of

9     Exhibit 84.

10         As we saw -- I'll wait until you get there.

11    Sorry, Doctor.

12         A.  Okay.

13         Q.  On page -- if we look at page 29, we know

14    that as of 5/9, you knew there was gonna have to be

15    a CT of the chest; right?

16         A.  Yes.

17         Q.  And as of June 2nd, that still hadn't

18    happened?

19         A.  Correct.

20         Q.  And then if we'll look at Plaintiff's

21    Exhibit 186.  It's 186, the second page.  We looked

22    at the first page before; 186 the second page.

23         So knowing that he needed a CT scan on 5/9, the

24    collegial review for approval of that doesn't happen

25    until June 2nd?

1     A.  Mm-hmm.

2     Q.  Why would -- these circumstances, why are

3 you waiting four weeks to get approval for this?

4     A.  To get approval for?

5     Q.  The CT scan?

6     A.  I waited four weeks?

7     Q.  Yeah.  We know -- we saw on the document

8 that as of May 9th, you knew he was gonna need a CT

9 scan.  And it doesn't get approved until June 2nd?

10    A.  I'm not quite sure what happened here.

11    Q.  Well, in fact, after it's approved on

12 June 2nd, it actually gets done on June 8th?

13    A.  Mm-hmm.

14    Q.  And you can see that on Exhibit 84.  On page

15 6 of Exhibit 84.  He has a medical writ and he goes

16 out on 6 -- oh, on 6/8 he has a medical writ and he

17 goes out and that's to get his CT scan; right?

18    A.  Right.

19    Q.  So it took a month to get it through

20 collegial review and less than a week to actually

21 schedule and have it happen; right, sir?

22    A.  Right.

23    Q.  Now, you knew, did you not, that Mr. Dean

24 had been told by Dr. Severino that he -- if he

25 didn't get this surgery done, he had a zero percent

1    chance of living five years?

2        A.  That's true.

3        Q.  He had a zero percent chance of ever being

4    alive and being out of prison?

5        A.  Mm-hmm.

6        Q.  Now, you learn at some point that the -- the

7    tumor thrombus has advanced and that that's gonna

8    require a cardiothoracic surgeon; correct?

9        A.  Mm-hmm.

10       Q.  Am I correct, if you look at Plaintiff's

11   Exhibit 186, please.  Does he have that -- do you

12   have 186?

13           THE COURT:  Which page?

14       Q.  On the fifth page on 6/14, this is a medical

15   note on 6/14.  Look really at the bottom entry,

16   because the bottom entry is what gets discussed on

17   6/14.  Is that right, sir?

18       A.  Yeah.

19       Q.  On that date, you knew that it had been

20   recommended that he see Dr. Hazelrigg?  That's the

21   thoracic surgeon?

22       A.  Right.

23       Q.  Because he may need assistance with the

24   tumor removal?

25       A.  Right.

1      Q.  And that's not approved until 6/14; correct?

2      A.  Looks like it, yeah.

3      Q.  Now, it says -- can you look earlier up

4   there on the one -- talking about the requesting of

5   the CT of the chest.  And it says, (as read:)  Per

6   note sent in from site.

7      Do you know what that note is?

8      A.  Is that the same one on page 5?

9      Q.  Yeah, on page 5, a few lines further up.

10     A.  Request CT of chest, pelvis, abdomen.  Is

11  that what you're talking about?

12     Q.  I'm talking about the note sent in from

13  site.  Have you ever seen that note?

14     A.  This note?  I may have.  I don't remember

15  it.

16     Q.  Do you know if you sent it or somebody else

17  sent it?

18     A.  Again, you know, sometimes this come from

19  Pittsburgh or sometimes from the medicine record.

20  And I don't remember seeing all this.

21     Q.  Well, you agree with me that we don't know

22  what the note says unless we could see it; correct?

23     A.  That is correct.

24     Q.  And it looks like there was a call from the

25  site it says below there?  We don't know who made

1    that call, do we?

2        A.  Not me, I know that.

3        But Dr. Hazelrigg did see the patient, so it

4    was approved.

5        Q.  Now, isn't it correct that as a result of

6    the delays, it became necessary for a second cardio

7    clearance; right?

8        A.  Cardio clearance, yeah.

9        Q.  And if you look at Exhibit 186, page 6.

10   That approval to do that second cardio clearance

11   also had to be approved at collegial review?

12       A.  Yeah.

13       Q.  And that didn't take place until June 28th?

14       A.  Mm-hmm.

15       Q.  Am I correct, sir that for every decision on

16   what to do between March 10th, when the patient,

17   Mr. Dean, sees Dr. Severino, and July 19th, when he

18   has his surgery, the decision on what to do and what

19   to approve was made by Pittsburgh and not you?

20       A.  Correct.

21       Q.  Because those are all non-formulary

22   decisions?

23       A.  Right.

24       Q.  Those are things that cost Wexford extra

25   money; right?

1    A.  That I don't -- I don't know that.

2    Q.  You don't know.  Okay.

3       Now, did you see -- when was the last time

4    before Mr. Dean went into surgery that you saw him?

5    A.  I think -- I usually see them when they come

6    to the infirmary anyway the night before.

7    Q.  Do you recall that the surgery was

8    July 19th?

9    A.  Right.

10   Q.  Do you recall that he was discharged and

11   came back to the correctional center on July 28th?

12   A.  That's correct, yeah.

13   Q.  Let me show you Plaintiff's Exhibit 376.

14      You were keeping track with the hospital of

15   when he would be discharged; correct?

16   A.  Correct.

17   Q.  You made a note on the 27th indicated he

18   wasn't going to be discharged, but you learned on

19   the 28th that then he would be discharged?

20   A.  The reason is apparently that's what they

21   say he had a small MI.

22   Q.  So it got delayed a day in terms of

23   discharge, but we can all agree he was discharged on

24   the 28th of July?

25   A.  Right.

Q. Now, you know, don't you, based on what you
learned about the surgery, that he's going to need a
follow-up appointment with the urologist,
Dr. Severino?

A. Right.

Q. And you know or strongly suspect that he's
also gonna need to see an oncologist, don't you?

A. Yes.

Q. The approval of a follow-up with the
urologist doesn't occur until August 3rd? A week
later?

A. Yeah.

Q. Why didn't you get approval for that the
first day he came back?

A. We don't usually do that the first day. You
know, the way it --

Q. Let me rephrase my question because I think
I phrased in artfully. I don't mean to actually
have the appointment the first day back, I mean give
approval so that he can go get an appointment?
Follow-up appointment?

A. Regardless of that, any time they come, they
have to see the doctor. It's a hundred percent, no
matter what.

Q. Let me just show you Plaintiff's 375. This

1    is a utilization management note of a collegial that

2    was held on August 3rd.

3         I move admission of Plaintiff's 375.

4              THE COURT:  Any objection?

5              MR. RUPCICH:  No objection.

6              MR. TYRRELL:  No objection.

7              THE COURT:  375 is admitted.

8         (Plaintiff's Exhibit 375 admitted.)

9         Q.  Can you put it up, please.

10        Am I correct that what happens on August 3rd is

11   he's approved for a follow-up meeting with

12   Dr. Gopaldas, and I believe he came in for Hazelrigg

13   and was actually the cardiac surgeon?

14        A.  Yes.

15        Q.  And also follow-up with Dr. Severino?

16        A.  Yes.

17        Q.  But on August 3rd there's no approval of an

18   oncologist; right?

19        A.  Yes.

20        Q.  And why not?

21        A.  He was just going to finish surgery.  I

22   think we were waiting.  And also, the -- we found we

23   did talk to Pittsburgh and to get an approval for

24   oncology.  And we -- Chad from -- had to find an

25   oncologist for him.  And that takes time.

1      Q.  Didn't Dr. Severino specifically recommend
2  the oncologist, Dr. Guaglianone?
3      A.  Not that I'm aware of.  Again, Chad is the
4  one that makes the appointment and called them.
5      Q.  Well, let's look at Plaintiff's Exhibit 114.
6          THE COURT:  Mr. Pelz, do you wish to have
7  admitted Plaintiff's 376?
8      Q.  Yes, Your Honor.
9          MR. RUPCICH:  376?  No objection.
10         MR. TYRRELL:  No objection.
11     Q.  Showing you what is marked as Plaintiff's
12  Exhibit 114.
13         THE COURT:  376 is admitted.
14     (Plaintiff's Exhibit 376 admitted.)
15     Q.  There is another utilization management form
16  following a collegial review.  You're familiar with
17  that, sir?
18     A.  I've seen that.
19     Q.  You participated in that collegial review?
20     A.  Yeah.
21     Q.  And this is part of what's in the file of
22  Taylorville medical center?
23     A.  Yeah.
24     Q.  I move Plaintiff's Exhibit 114.
25         THE COURT:  Any objection?

1          MR. RUPCICH:  No objection.

2          MR. TYRRELL:  No objection.

3          THE COURT:  114 is admitted.

4      (Plaintiff's Exhibit 114 admitted.)

5      Q.  And this is where Pittsburgh finally --

6  well, Pittsburgh approves an oncologist; right?

7      A.  Right.

8      Q.  Now, you -- couldn't you get approval of an

9  oncologist without knowing who it was?

10     A.  I couldn't do that, first of all --

11     Q.  You couldn't do that?

12         MR. RUPCICH:  Hold on.  Can you let him

13  finish his answer.  You keep cutting him off.

14     A.  Like anything else, first you say

15  oncologist, Chad would have to find somebody who

16  would like to -- who would be willing to see the

17  patient.  And so he -- he had to make phone calls

18  about this.  And the -- I couldn't expedite this or

19  call anybody.

20     Q.  Under the policies and practices of Wexford,

21  Chad can't even begin making those calls --

22     A.  No.

23     Q.  -- until it's approved; can he?

24     A.  That's correct.

25     Q.  And Chad begins making those calls on --

1    can't begin until after August 18th; correct?

2         A.  Mm-hmm.

3         Q.  And when he finally does make those calls,

4    he's able to get an appointment with Dr. Guaglianone

5    on August 26th?

6         A.  Right.

7         Q.  Can you give me 377.  Plaintiff's 377.

8         Doctor, I've handed you what's been marked

9    Plaintiff's Exhibit 377.  Are these Taylorville

10   Correctional Center medical center documents and do

11   they contain your handwriting?

12        A.  Right.

13        Q.  I move admission of Plaintiff's Exhibit 377.

14            THE COURT:  Any objection?

15            MR. RUPCICH:  No objection.

16            MR. TYRRELL:  No objection.

17            THE COURT:  377 is admitted.

18        (Plaintiff's Exhibit 377 admitted.)

19        Q.  Do those indicate that he has seen an

20   oncologist?

21        A.  Right.

22        Q.  Did you learn that the oncologist had

23   concluded that he had at least Stage III kidney

24   cancer?

25        A.  Correct.

Q. Were you aware that there were questions
regarding -- and indications that there had been
metastasis to the liver and the lungs?

A. Mm-hmm.

Q. You learned that in August?

A. Right.

Q. Did you ever learn that Dr. Guaglianone
was -- had some problems because he didn't have all
the -- of the patient's records?  Did you ever know
that?

A. I wasn't aware of his medical records
problem.

Q. Who would be responsible for making sure
that Dr. Guaglianone has all the necessary records
he needs?

A. As far as I know, Chad.

Q. Chad works at Taylorville Correctional
Center?

A. Yeah.

Q. And Chad -- I'm sorry, I didn't mean to
interrupt you, I apologize.

A. That's okay.

Q. Thank you.  And Chad is an employee of
Wexford?

A. I don't think so.  He is?

1      Q.  You're not sure?

2      A.  The -- no, I think he's with the state.  I

3  don't think he's with Wexford.

4      Q.  Did you learn that Dr. Guaglianone was going

5  to request another CT scan and a liver biopsy?

6      A.  Right.

7      Q.  Plaintiff's 382.  Show you what's been

8  marked as Plaintiff's Exhibit 382.  Utilization

9  management notes of 8/31/2016.

10     A.  Yeah.

11     Q.  Again, you're familiar with this document?

12     A.  Right.

13     Q.  I move admission of Plaintiff's Exhibit 382.

14         THE COURT:  Any objection?

15         MS. RICE:  No objection, Your Honor.

16         MR. TYRRELL:  No objection.

17         THE COURT:  382 is admitted.

18     (Plaintiff's Exhibit 382 admitted.)

19     Q.  This was approving a follow-up meeting with

20  the oncologist; correct?

21     A.  Mm-hmm.

22     Q.  But we haven't yet approved the additional

23  CT scan or the liver biopsy; right?

24     A.  No.

25     Q.  Gonna show you what's been marked as

1    Plaintiff's Exhibit 384.

2         Once again, utilization management notes

3    following a collegial review --

4         A.  Mm-hmm.

5         Q.  -- dated September 27th, 2016.  Are you

6    familiar with these documents?

7         A.  Yeah, this says 28, but anyway.

8         Q.  It is stamped delivered on the 28th.  The

9    date and time of the collegial seems to say the

10   27th?

11        A.  All right.

12        Q.  I move admission of Plaintiff's Exhibit 384.

13            THE COURT:  Any objection?

14            MR. RUPCICH:  No objection.

15            MR. TYRRELL:  No objection.

16        Q.  And it's not until --

17            THE COURT:  I only heard one.

18            MR. RUPCICH:  I'm sorry.  It with a two no

19   objections.

20            THE COURT:  Thank you.  It's admitted.

21        (Plaintiff's Exhibit 384 admitted.)

22        Q.  On September 27th we have approval of a

23   needle biopsy?

24        A.  Mm-hmm.

25        Q.  I'd like you to look at Plaintiff's

1  Exhibit -- I'm gonna hand you Plaintiff's

2  Exhibit 388.

3      These are Taylorville medical center notes --

4  records including notes from you; right, Doctor?

5      A.  Mm-hmm.

6      Q.  I move admission of Plaintiff's Exhibit 388.

7          THE COURT:  Any objection?

8          MR. RUPCICH:  No objection.

9          MR. TYRRELL:  No objection.

10         THE COURT:  388 is admitted.

11     (Plaintiff's Exhibit 388 admitted.)

12     Q.  And I want to refer to the bottom note which

13 I believe is in your handwriting, the one 9/12/16,

14 sir?

15     A.  Yeah.

16     Q.  As of 9/12/16, you had some indication that

17 there had been metastasis of the cancer to the

18 liver?

19     A.  That's correct.

20     Q.  You know as of that date that if there was

21 metastasis, he was going to need some kind of

22 systemic therapy or chemotherapy to address that?

23     A.  Right.

24     Q.  So knowing that on September 12th, do you

25 start on that day or any time within the next week

seeking approval of that chemotherapy or systemic
therapy drugs?

A.  Well, the thing is they had to go through --
that's what they told me, you have to talk to
pharmacy, there's some kind of pharmacy consult, and
discuss the side effects of the drugs, does it cause
side effects, and is it going to be worse than the
disease.  And then they approved it.  So I had
nothing to do with it.

Q.  But you don't even start that collegial
review process on September 12th, do you?

A.  That was already -- no, Dr. Guaglianone
already talked to them about the Votrient.  And
that's what they were discussing about.  And I had
no participation in this.

Q.  Well, let me show you Plaintiff's
Exhibit 402.

Doctor, Plaintiff's Exhibit 402 is a medical
special services referral and report form?

A.  Mm-hmm.

Q.  The -- does -- is your handwriting contained
on this?

A.  Yeah, on the bottom.

Q.  And your signature is at the bottom?

A.  Right.

1      Q.  I move admission of Plaintiff's Exhibit 402.

2          THE COURT:  Any objection?

3          MR. RUPCICH:  No objection.

4          MR. TYRRELL:  No objection.

5          THE COURT:  402 is admitted.

6      (Plaintiff's Exhibit 402 admitted.)

7      Q.  This is -- this is a -- a referral form to

8  get an appointment with Dr. Guaglianone; right?  You

9  fill out the top part; correct?

10     A.  Mm-hmm.

11     Q.  And is that August 25th that you fill it

12  out?

13     A.  Yeah, it looks that way.  Yeah, 25th.

14     Q.  The middle part is filled out by

15  Dr. Guaglianone?

16     A.  Mm-hmm.

17     Q.  He notes that there's kidney cancer and

18  potential metastasis?

19     A.  Mm-hmm.  It says plan liver biopsy.

20     Q.  He wants to do a liver biopsy?

21     A.  Right.

22     Q.  He asks for that on September 22nd?

23     A.  Yeah.

24     Q.  You approve that very same day?

25     A.  Right.

Q.  You think that makes a lot of sense under
these circumstances, this liver biopsy should take
place?

A.  Right.

Q.  But that doesn't get it done, does it?

A.  No.  Again, that has nothing to do with me.

Q.  It's got to go to Wexford for collegial
review?

A.  Right.

Q.  Let's go to Plaintiff's Exhibit 384.  I
think you already have that one.

A.  Okay.

Q.  Dr. Guaglianone says do it on
September 22nd?

A.  Mm-hmm.

Q.  You say do it on September 22nd.  Wexford
doesn't even consider it until September 27th.  Five
days later?

A.  Okay.

Q.  The liver biopsy is done on October 3rd;
right?

A.  Right.

Q.  So it took -- it took as long or longer to
get the collegial review as it did to actually get
the appointment, schedule it, and get it done;

right?

    A.  Mm-hmm.

    Q.  We can look at Plaintiff's Exhibit 389.

    Does Exhibit 389 from the Taylorville medical center contain an entry from you in your handwriting?

    A.  Yes.

    Q.  I move admission of Plaintiff's Exhibit 389.

      THE COURT:  Any objection?

      MR. RUPCICH:  No objection.

      MR. TYRRELL:  No objection.

      THE COURT:  389 is admitted.

    (Plaintiff's Exhibit 389 admitted.)

    Q.  And you -- that's -- he did go for the biopsy that day; correct, sir?

    A.  Mm-hmm.

    Q.  And you learned from that biopsy that, in fact, it was clear there had been metastasis to the liver; right?

    A.  Right.

    Q.  So at this point, there's no doubt he's going to need chemotherapy or systemic therapy?

    A.  Correct.

    Q.  Doctor, do you have a recollection of when you first made any request for an approval of a

1  cancer-treating drug?

2      A.  Well, I don't make approval.  I think the

3  approval was made by Pittsburgh and the pharmacy.

4      Q.  Right.  And I tried to -- I may have been

5  imprecise.  My question was when did you request

6  approval?

7      A.  That I'm not sure.  I'm not sure.  It was

8  done anyway.  And they -- like I said, they met and

9  talk about it and they finally approve it.

10     Q.  All right.  I'd like to show you Plaintiff's

11 Exhibit 96.

12     No, I didn't.  I don't have 96.

13     Is Plaintiff's Exhibit 96 a non-formulary drug

14 request form that Wexford had?

15     A.  Yeah.

16     Q.  And is the handwriting on the top your

17 handwriting?

18     A.  Yeah.

19     Q.  Okay.  I move for admission of Plaintiff's

20 Exhibit 96.

21         THE COURT:  Any objection?

22         MR. RUPCICH:  No objection.

23         MR. TYRRELL:  No objection.

24         THE COURT:  96 is admitted.

25     (Plaintiff's Exhibit 96 admitted.)

1      Q.  Now, the handwriting on the top part is

2   yours?

3      A.  Mm-hmm.

4      Q.  The second portion is blank.  And the third

5   portion requests non-formulary drug.  That's your

6   handwriting; right?

7      A.  Mm-hmm.

8      Q.  And I would -- I'll mess up the drug name.

9   What drug name do you put in there?

10     A.  Pazopanib.

11     Q.  Okay.  Is that in the same family as

12  Votrient?  And so this is the first prescription

13  he's getting which is Votrient?

14     A.  Votrient, yes.

15     Q.  All right.  You -- look -- can you tell me

16  the date that you approved this?  That's your

17  initials; right?

18     A.  Mm-hmm.

19     Q.  And then what's that date?

20     A.  This was approved by the pharmacy on

21  11/14/16.  I -- I don't approve that, the pharmacy

22  does.

23     Q.  But you have to send in this form?

24     A.  Right.

25     Q.  Correct?

         A.  Right.

         Q.  And what I'm looking for is I think the date
there is a date when you have decided, at least from
your perspective, you would approve this; right,
sir?

         A.  It looks like 10/19/16.

         Q.  That's what I thought, but I haven't been
good at reading dates on some of these.  So on 10/19
you signed this form?

         A.  Right.

         Q.  Now, what we see is if we look up on the fax
lines here, there's two fax lines.  Look at the fax
line for 10/24.  Got that?

         A.  10/24, okay.

         Q.  It's highlighted.  It's highlighted on the
screen right next to you, sir.

         A.  Oh, sorry, okay.

         Q.  That's being sent to a 412 number.  That's
Pittsburgh?

         A.  Right.

         Q.  So somebody sends this form to Pittsburgh on
the 24th?

         A.  Well, that's the pharmacy.

         Q.  Isn't the pharmacy in Erie?

         A.  Yeah, but I don't know, -- because I have

nothing to do.  All I wrote for it, they have to
approve it.  And pharmacy is involved in that.

Q.  All right.  So you approve it on the 19th.
It takes five days for somebody to send it to
Pittsburgh on the 24th; right?

A.  Mm-hmm.

Q.  And if we look down at the bottom, somebody
signs -- somebody from Wexford Health signs, looks
like a stamp, with a date of 10/24.  But they write
that it's currently being reviewed by Wexford.  So
there's another review that has to happen; right?
So the first Wexford people approve it on the 24th
of October?

A.  Right.

Q.  But they don't send it to Erie, Pennsylvania
for the other approval until November 14th?

A.  Again, I had nothing to do with it.

Q.  Why in the world does it take that long?

A.  That's the system.

Q.  It doesn't come back to you so that you know
that it's been approved until at least the 14th of
November; right?

A.  Yeah.

Q.  And I think we've heard testimony that the
first day he received it was the 16th of November.

Does that sound right?

    A.  Mm-hmm.

    Q.  Now, I want to show you Plaintiff's
Exhibit 168.  But before I do that, sir, you
testified at your deposition that the reason it has
to be sent for the second formulary -- non-formulary
drug approval is because these drugs are expensive?

    A.  It is expensive.

    Q.  I show you what's been marked as Plaintiff's
Exhibit 168.

    Did I move for exhibit -- Plaintiff's
Exhibit 96.  Did I move for admission?

        THE COURT:  Yes.

        MR. RUPCICH:  Hearsay, lack of foundation.

    Q.  I'm not asking for it to be admitted.  96
was the non-formulary.

        MR. RUPCICH:  Sorry.

    Q.  You have Plaintiff 168 in front of you?

    A.  Mm-hmm.

    Q.  This is an email authored by Nurse Mincy;
correct?

    A.  Yeah.

    Q.  You know who she is?

    A.  Yeah.

    Q.  She's here in court?

     A.  Mm-hmm.

     Q.  Did you ever see this email?

     A.  No.

     Q.  Did you know that she was raising the issues

that she raised in this email at the time in October

of 2016?

     A.  Yeah.

     Q.  You knew about it?  You knew there was an

issue with how long this process was taking?

     A.  Yeah.

     Q.  What was done?

     A.  Like I said, you know, the Pittsburgh and

pharmacy was talking about it before they approve

it.

     Q.  Do you know if anybody from Wexford got back

to Ms. Mincy?

     A.  That I'm not aware of.

     Q.  Did you ever get back to her and explain the

delay?

     A.  No.  For the delay, like I explain,

Pittsburgh was deciding -- talking about the drugs

before they approve it.  That's what the delay.

     Q.  Well, they're talking about this because

it's expensive; right?

     A.  That's partly, yeah, true.

1     Q.  You'd already approved it?

2     A.  Right.

3     Q.  When did -- when did you learn that the

4  Votrient stopped working?

5     A.  I have a date on my note over there, but the

6  problem was about four months later or so.

7  Something like that.  I don't have the facts here.

8     Q.  If I can take just one moment, Judge?

9        THE COURT:  Yes.

10    Q.  Were you aware in October or November that

11 Dr. Ritz and others were communicating about their

12 concern about Votrient and trying to use often

13 drugs?

14    A.  Yes, I'm aware.

15    Q.  Were you aware that they were concerned

16 about the expense?

17    A.  Yeah.

18    Q.  Were you aware they wanted to reach out to

19 Dr. Guaglianone to see if he could do something

20 cheaper?

21    A.  I'm aware of that.  Nobody called me and

22 told me about it.

23    Q.  How did you learn about it?

24    A.  Because, again, the -- I got a lot of the

25 information from Chad anyway and -- nobody ever

called me and told me, but I knew they were talking

about it at pharmacy and Pittsburgh.

Q. Isn't that the reason for the delay between

October 19th when you approved it and November 14th

when Wexford finally approves it?

A. Right.

Q. Did you -- and this is in November of 2016.

Did you learn that the Wexford people were proposing

that Mr. Dean simply stop any kind of treatment and

go to palliative care?

A. No, I didn't hear that frankly.

Q. Well, right at this same time, don't you ask

him to execute a do not resuscitate form?

A. I probably did, but I don't know the actual

date.

Q. Well, let's go back and look at that.

It's Plaintiff's Exhibit -- actually, can I see

Plaintiff's Exhibit 117.

Judge, if I could take a five-minute break just

to get through this, I've got a few more exhibits.

THE COURT:  We will take a five-minute

recess.

(The jury left the courtroom.)

(A recess was taken.)

THE COURT:  Please bring in the jury.

1          (The jury entered the courtroom.)

2               THE COURT:  Please be seated.  Court is

3    reconvened.

4    BY MR. PELZ:

5         Q.  Dr. Nawoor, I'd like to show you what we've

6    marked as Plaintiff's Exhibits 404, 405, and 406.

7         Doctor, each of these has a series of emails

8    from the October, November 2016 time period.  Do you

9    know who Neil Fisher is?

10        A.  Yeah.

11        Q.  Who is he?

12        A.  Neil Fisher is just one of the doctors with

13   Wexford.  And he deals mostly with the drugs and the

14   pharmacology anyway.

15        Q.  Do you know who Becky Adams is?

16        A.  I have no idea.

17        Q.  You know who Mr. Ritz is obviously; right.

18        A.  Yeah.

19        Q.  He was the person you were regularly in

20   contact with on collegial reviews; correct?

21        Who is Michelle Marrone?

22        A.  Who is this.

23        Q.  Michelle -- on the 404, at the top, the

24   email is a Michelle Marrone.  Do you know who she

25   is?

           A.  I don't know her, no.

           Q.  By looking at even this first page, can you

     tell that these are emails relating to Mr. Dean's

     request to be treated with Votrient?

           A.  That's correct.

           Q.  I move admission of Plaintiff's 404, 405,

     and 406.

               MR. RUPCICH:  Objection on foundation.  The

     doctor is not a recipient on any of these emails.

               MR. TYRRELL:  We'll join.

               MR. PELZ:  They are all Wexford documents

     related to collegial review which he is part of the

     process.  They're talking about a collegial review

     information.  There isn't any doubt they came from

     Wexford files.  These are all Wexford people.

               THE COURT:  They were previously produced

     and not objected to?

               MR. PELZ:  Can we have a brief sidebar?

               THE COURT:  Mm-hmm.

          (The following sidebar discussion was held at

           the bench, out of the hearing of the jury.)

               MR. PELZ:  What I didn't want to say right

     now in front of the jury, Judge, is that these are

     documents that were produced to us last Friday.

               THE COURT:  You mean produced by

defendants?

MR. PELZ:  Yes.

THE COURT:  They were not objected to in any way?

MR. PELZ:  We sent them as part of our exhibit list.  We have never gotten objections to our exhibits.  What we've gotten was a statement these are approved.  That's what we got on our Plaintiff's exhibits.

MR. RUPCICH:  Approved and we retain objections to the ones we didn't essentially stipulate to.

THE COURT:  These you have not even responded to?

MR. RUPCICH:  I think they just added these to the list in the last day or two.

MR. PELZ:  We got them Friday, Judge.

MR. RUPCICH:  I'm not sure that's correct. They attached some of these to their motion for summary judgment.

MR. PELZ:  No, those are the ones from March.  We didn't get any of these from the November 2016 time.

MR. RUPCICH:  Well, at any rate, the foundation would still have to be through someone

who received the documents.  And it's not -- unless
they can lay it through him.

THE COURT:  Under the circumstances, the
objection is overruled.

(The following proceedings were held in open
court.)

THE COURT:  Plaintiff's 404, 405, and 406
are admitted.

(Plaintiff's Exhibit 404, 405 and 406
admitted.)

BY MR. PELZ:

Q.  You have 404 in front of you, sir?

A.  Mm-hmm.

Q.  The email chain runs from the latest in time
to the earliest in time, so if we want to go to the
start, we have to go to the last page of 404.  Go to
page 6.

The very first email, something is being sent
to Christina Pienkowski; is that correct?

A.  Mm-hmm.

Q.  Do you know who she is?

A.  No.

Q.  And there's no way to know what is sent
unless we saw the attachment; right?

A.  Right.

1       Q.  And then the email up from that comes from

2  Christina Pienkowski to Helen Feinstein.  Do you

3  know who she is?

4       A.  I have no idea.

5       I just want to make a comment here.  In the

6  decision of the treatment with the drug, I was out

7  of that loop.  They were just making their own

8  decision.  Pharmacy and Pittsburgh.  There was no

9  communication with me.

10      Q.  I appreciate and understand that, Doctor.

11  Thank you.

12      But let's look at the email from Helen

13  Feinstein to Becky Adams on October 24th.  Do you

14  see that email?

15      A.  This?  Yeah.

16      Q.  Now, Ms. Feinstein says what she thinks is

17  the patient is going to benefit more from palliative

18  care than from an aggressive treatment?

19      A.  Mm-hmm.

20      Q.  Did you talk to the people at Wexford and

21  tell them how much Mr. Dean wanted to stay alive?

22      A.  Well, that's why I approved the Votrient.

23      Q.  But after you approved it and you sent it

24  off, did you call them up and tell them, "This guy

25  doesn't want palliative care?"

```
 1        A.  They were aware of this.  And anyway, I
 2   don't know any of these people to call them anyway.
 3   Except Pittsburgh.  I mean the only one I would talk
 4   to probably is Dr. Ritz.  So they never call me
 5   and --
 6        Q.  Palliative would be a lot cheaper?
 7        A.  Correct.
 8        Q.  I mean if you look at page 404-6, Votrient
 9   costs $10,000 a month?
10        A.  I think it's 15, but anyway.
11        Q.  Well, it is certainly very expensive?
12        A.  Yeah.
13        Q.  And if we look at page 404-2 from Dr. Ritz,
14   he's saying that there's gonna be a collegial?
15        A.  Mm-hmm.
16        Q.  That day.  Did you participate in that
17   collegial?
18        A.  I don't know.  Like I say, they had me out
19   of that loop.  I don't know exactly.  They were just
20   talking about the drug.
21        Q.  And that -- so that collegial is scheduled
22   for November 9th; correct?
23        A.  Mm-hmm.
24        Q.  And your request that Mr. Dean execute a DNR
25   or sign a DNR occurs on November 8th.  I'll show you
```

what's previously admitted as Exhibit 57.

So at the same time that they're trying to get him to agree to palliative care and holding a collegial, you're trying to get a DNR executed by Mr. Dean; right?

A.  Mm-hmm.

Q.  Now, you learn, am I correct, in March of 2017, that the Votrient isn't working and there's -- it's being requested that he be moved to Opdivo?

A.  That's correct.

Q.  I want to show you what's been marked as Plaintiff's Exhibit 181.

Actually, first, what I'd like to show you is 385.

Did you participate -- withdrawn.

This is another utilization management form --

A.  Mm-hmm.

Q.  -- for collegial review on March 3rd of 2017?

A.  Right.

Q.  I move admission of Plaintiff's Exhibit 385.

THE COURT:  Any objection?

MR. RUPCICH:  No.

MR. TYRRELL:  No objection.

THE COURT:  385 is admitted.

1          (Plaintiff's Exhibit 385 admitted.)

2          Q.  You understood in March of 2017, that

3     Dr. Guaglianone had reported that the progression --

4     the cancer was still progressing on Votrient; right?

5          A.  Right.

6          Q.  And the plan for Opdivo was called salvage

7     therapy?

8          A.  Mm-hmm.

9          Q.  And he was planning to start that salvage

10    therapy next week; right?

11         A.  Right.

12         Q.  That -- that quote, that's from what was

13    reported by Dr. Guaglianone; right?

14         A.  Right.

15         Q.  And as of March 3rd, when Dr. Guaglianone

16    wants to go to the next drug which he views as

17    salvage therapy, Dr. Ritz refuses; right?

18         A.  That's correct according to this.

19         Q.  But Dr. Ritz says, "We can't do that, we

20    first have to go through the non-formulary process."

21         A.  Mm-hmm.

22         Q.  And that means more delay; right?

23         A.  Yeah.

24         Q.  And during that delay, the people at Wexford

25    are talking once again about how to save money?

1    A.  Oh, sure.

2    Q.  And they're talking once again about trying

3  to move him off of therapy and into hospice care?

4    A.  Mm-hmm.

5    Q.  So let's look at Plaintiff's Exhibit 181.

6    Am I correct, sir, that this is again an email

7  chain from people at Wexford relating to the

8  approval -- whether or not they're going to approve

9  the Opdivo?

10    A.  Yeah.

11    Q.  Were you involved in the collegials with

12  respect to Opdivo?

13    A.  Mm-hmm.

14    Q.  Move admission of Plaintiff's Exhibit 181.

15        THE COURT:  Any objection?

16        MR. RUPCICH:  Hearsay, foundation.

17        MR. TYRRELL:  We'll join.

18        THE COURT:  The objection is overruled.

19  181 is admitted.

20    (Plaintiff's Exhibit 181 admitted.)

21    Q.  Now, we know that the request was made at

22  least by the 3rd of March; correct?

23    A.  Mm-hmm.

24    Q.  And Dr. Guaglianone wanted to start the

25  therapy at least by the next week; right?

1    A. Correct.

2    Q. And as of March 13th -- and we know Dr. Ritz

3 refused?

4    A. Mm-hmm.

5    Q. He wants it to go through non-formulary;

6 right?

7    A. Right.

8    Q. I would like you to look on page 4.  181-4.

9 Look at the bottom there at the email from Neil

10 Fisher to Becky Adams and Stephen Ritz.

11    A. Mm-hmm.

12    Q. Dr. Fisher wants it to be discussed at

13 collegial.  Do you know if you were in that

14 collegial?

15    A. I don't really remember.  It could be, yeah.

16    Q. And Dr. Fisher --

17    A. Oh, okay.

18    Q. Dr. Fisher says in his view he ought to go

19 to hospice care?

20    A. Mm-hmm.

21       MR. RUPCICH:  Objection.  That misstates

22 the record.

23    Q. Well, let's see what happens.  (As read:)

24 Hospice care may be possibly more appropriate.

25       MR. RUPCICH:  Under the rule of

completeness --

Q. I'm happy to read it. (As read:) We should be discussing options and the status of the patient. Who is we?

A. Well, I guess Pittsburgh and the corporate medical director.

Q. Well, you know what Mr. Dean wants; right? You don't have any doubt he wants everything possible done to live every day he possibly can so that he can get out of prison?

A. Right.

Q. And you told them that?

A. Mm-hmm.

Q. What is it they don't get?

A. They obviously they don't. I mean --

Q. And if we go to the first page, we see finally on March 20th, Dr. Ritz says they're gonna approve it; right?

A. Mm-hmm, right.

Q. So he's gone two and a half weeks without any systemic therapy to help him stay alive; right?

A. Right.

Q. Now, Dr. Nawoor, you -- when you arrived at Taylorville in December 2015, you weren't particularly used to the correctional rules and

regulations; right?

     A.  No.

     Q.  And you think Wexford didn't do a very good
job of explaining those to you?

     A.  I agree.

     Q.  And so in the first year, there was some
adjustment problems?  At least from Wexford's view;
right?

     A.  That's correct.

     Q.  And you got a review at the end of the year
and they said, "well, they were having some problems
but you were improving."

          MR. RUPCICH:  There's a motion.  Can we
have a sidebar?

          THE COURT:  We can.

     (The following sidebar discussion was held
       at the bench, out of the hearing of the jury.)

          MR. RUPCICH:  There's a motion in limine
pending on this issue that you took under advisement
on his evaluations at this point, personnel files.

          MR. PELZ:  I can tell you what I'm going to
ask.  And I can tell you how he answered in his
deposition.  What I'm gonna ask is on his
evaluation, they complained about how he was
handling collegial reviews.  And his answer was yes,

they complained, they thought I was sending too many

cases to collegial review.

THE COURT:  I'll allow it.

(The following proceedings were held in open

court.)

Q.  Again, you recall that you got an evaluation

at the end of the first year, so that's

December 2016.  One of the things noted was that

there were some issues with collegial -- your

handling collegial review; correct?

A.  Mm-hmm.

Q.  And you -- what you understood, based on

your communications with Wexford, that what that was

referring to is they were complaining that you were

sending too many cases to collegial review?  They

were complaining that you were too often trying to

send somebody off-site for services; correct?

A.  Mm-hmm.

Q.  I'd like to show you what's been marked as

Plaintiff's Exhibit 395.

This -- it's an email with an attachment from

Ms. -- Nurse Mincy, correct, of April 22nd, 2016?

That's important.  Have you ever seen this?

A.  Not particularly.

Q.  Do you know --

1      A.  I don't know who the patient is.

2      Q.  Do you know -- the email is sent to

3  Mr. Matticks.  Do you know who he is?

4      A.  Yeah.

5      Q.  Who is he?

6      A.  He's a regional director.

7      Q.  And who does he work for?

8      A.  Wexford.

9      Q.  Were you aware of these issues that

10  Ms. Mincy was discussing with Mr. Matticks in April

11  of 2016?

12      A.  Not particularly.

13      Q.  Were you aware of any issues that were being

14  raised with respect to your treatment of Mr. Dean at

15  that time?

16      A.  No.  What month was that?  '16.

17      Q.  Well, without saying it, but can you read

18  what the email -- what the attachment says about the

19  treatment of Mr. Dean?

20      A.  That --

21      Q.  Don't read it aloud, just read it to

22  yourself.

23      Let me know when you're done.

24      A.  Okay.  I read the top part of it.

25      Q.  Did you -- did anybody from Wexford come to

1   you in April of 2016 addressing the problem raised

2   by Ms. -- Nurse Mincy?

3       A.  Not that I'm aware of.  This is new to me.

4       Q.  Did anybody from Wexford come to you

5   addressing any of the five problems that were raised

6   by Nurse Mincy?

7       A.  No.

8       Q.  Plaintiff's Exhibit 180.  I'll give you

9   that, sir.

10      Plaintiff's Exhibit 180 is an email from Nurse

11  Mincy, and one of the recipient is Shawn Cates.  Do

12  you know who Mr. Cates is?

13      A.  Yes.

14      Q.  Is he your supervisor?

15      A.  She was at the time.

16      Q.  She, I'm sorry.  She's the person who gave

17  you your evaluation?

18      A.  I guess.

19      Q.  Were you aware of this concern that was

20  raised by Nurse Mincy on August 19th, 2016?

21      A.  Mm-hmm.

22      Q.  Did you know about this?

23      A.  Not really.  This is all new to me.

24      Q.  Now, back in April, April 2016, that's a

25  pretty important time for Mr. Dean; right?

1    A.  Mm-hmm.

2    Q.  That's right after he's gotten his diagnosis

3  of cancer?

4    A.  Yes.

5    Q.  August of 2016, that's an important time for

6  Mr. Dean, he's just out of the hospital; right?

7    A.  Right.

8    Q.  And he's looking to try to get oncology

9  treatment so he can get some therapy for the

10  metastasis; right?

11    A.  Mm-hmm.

12    Q.  Did anybody from -- to your knowledge,

13  anybody from Wexford ever come to you about these

14  problems that were raised in this document

15  Plaintiff's 180?

16    A.  Really I don't know.  This is all new to me.

17    Q.  Now, you did -- did get a couple of

18  complaints about -- about your work of what you did;

19  right?  A more formal complaint.  Correct?

20    A.  Regarding what?

21    Q.  Let me show you what's been marked as

22  Plaintiff's Exhibit 56.

23    Now, Plaintiff's 56, the complaints addressed

24  there you did know about, didn't you, sir?

25    A.  This one I did.

Q. Ms. Cates, Shawn Cates, discussed those with you; correct?

A. Yeah.

Q. I move admission -- in fact, you signed this document; right, sir?

A. Right.

Q. I move for admission of Plaintiff's Exhibit 56.

THE COURT: Any objection?

MR. RUPCICH: Yeah, relevance, motion in limine.

THE COURT: Mr. Tyrrell?

MR. TYRRELL: We'll join.

THE COURT: Plaintiff's 56 is admitted.

(Plaintiff's Exhibit 56 admitted.)

Q. Now, there's two incidents in here, but I really only want to talk about the first. The first incident occurred on August 23rd, 2016; right, sir?

A. Mm-hmm.

Q. What happened on that date is you were found sleeping while you were at work?

A. I was in my office reading a magazine and I just dozed off.

Q. That --

A. That's all it was.

1     Q.  That's -- August, that's a pretty important

2  time, wasn't it, for Mr. Dean?

3     A.  What's that got to do with him?  I mean --

4     Q.  Well, isn't the document I just showed you

5  previously the complaint by Nurse Mincy in August?

6  That's at this same time period when she's

7  complaining about you not getting things done;

8  right?

9     I'm sorry, same time.  August 2016; right?

10     A.  Mm-hmm.

11     Q.  You have no doubt, do you, that at all times

12  after his surgery, Mr. Dean has made it absolutely

13  clear that his main goal is to walk or roll out of

14  prison alive?

15     A.  Mm-hmm.

16     Q.  And are you committed to doing everything

17  possible to make sure he can do that?

18     A.  Right.

19     Q.  That's why you have consistently approved

20  the systemic therapies --

21     A.  Right.

22     Q.  -- that have been requested; right?  And

23  you've done it right away; right?

24     A.  Mm-hmm.

25     Q.  And let's be clear, I mean this is

1    expensive; right?

2         A.  Mm-hmm.

3         Q.  And Wexford is a for-profit company; right?

4         A.  Right.

5         Q.  It's a private company, not a public

6    company; right?

7         A.  Right.

8         Q.  Do you know who the owners are?

9         A.  A bunch of people.  I don't know all of

10   them.

11        Q.  There's -- in terms -- you did -- are you

12   aware that Wexford keeps a list of their most

13   expensive inmates?

14        A.  That I -- I'm not aware of that.

15        Q.  Are you aware that Wexford has, you know,

16   looked at the possibility of trying to get those

17   people let out of jail to stop their expense?

18        A.  Again, I'm not aware of that.

19        Q.  Given what Mr. Dean absolutely wants, sir,

20   there's only three ways to stop the expense for

21   Wexford; right?

22        A.  Mm-hmm.

23        Q.  Get out of jail, that's one; right?  Get him

24   to refuse treatment, that's two; right?

25        A.  Yeah.

1     Q.  Or he dies?

2     A.  Mm-hmm.

3     Q.  And at every stage of this process, if we

4 just look at money, it would be better for Wexford

5 if Mr. Dean had died?

6     A.  Well, you can look at it that way.

7     Q.  Well, it would be --

8     A.  I wouldn't, but --

9     Q.  You wouldn't, you wouldn't.  I mean it would

10 have been better if he died before he got the

11 surgery?  Cheaper?

12     A.  Well --

13     Q.  It would have been cheaper if he died on the

14 table?

15     A.  Again, it's not my way of thinking.

16     Q.  And it would have been cheaper if he died by

17 not getting systemic therapy; right?

18     A.  Well, in general, yes.  But depends who is

19 making that decision.

20     Q.  One brief second.

21     I have no further questions at this time,

22 Judge.

23        THE COURT:  It's quarter to five.  I can't

24 imagine, are you going to have many questions for

25 this witness?

1          MR. RUPCICH:  I would prefer not to start

2    now.

3          THE COURT:  Will you be recalling him in

4    your case or examining him now?

5          MR. RUPCICH:  I probably will just recall

6    him in my case.  Could I have the evening to make

7    that decision?

8          THE COURT:  Sure.

9       All right.  We're going to break at this time.

10   Court is adjourned.  We will see you in the morning,

11   a few minutes before nine.

12      How were your snacks today?

13         JUROR:  Good.

14         THE COURT:  Good.

15      (The jury left the courtroom.)

16      (Court was recessed for the day.)

17

18

19

20

21

22

23

24

25

1

2    I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

3    Reporter, certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9

10                  This transcript contains the

11                  digital signature of:

12

13                  Kathy J. Sullivan, CSR, RPR, CRR

14                  License #084-002768

15

16

17

18

19

20

21

22

23

24

25