E-FILED
Monday, 30 November, 2020  06:53:46 PM
Clerk, U.S. District Court, ILCD

# Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                    SPRINGFIELD DIVISION

 3   WILLIAM KENT DEAN,              )
                                     )
 4              PLAINTIFF,           )
                                     )
 5         VS.                       ) 17-CV-03112
                                     )
 6   WEXFORD HEALTH SOURCES,         ) JURY TRIAL
     INC., DR. ABDUR NAWOOR, DR.     )
 7   REBECCA EINWOHNER, KATHY        ) SPRINGFIELD, ILLINOIS
     GALVIN, and LISA MINCY,         )
 8                                   )
                DEFENDANTS.          )
 9
                  EXCERPT OF PROCEEDINGS
10        BEFORE THE HONORABLE SUE E. MYERSCOUGH
                UNITED STATES DISTRICT JUDGE
11
     DECEMBER 12, 2019
12
     A P P E A R A N C E S:
13   FOR THE PLAINTIFF:            CRAIG MARTIN
                                   JOEL PELZ
14                                 WILLIAM STROM
                                   CHLOE HOLT
15                                 NATHANIEL WACKMAN
                                   JENNER & BLOCK
16                                 353 N. CLARK STREET
                                   CHICAGO, ILLINOIS
17
     FOR DEFENDANTS                JOSEPH RUPCICH
18   WEXFORD HEALTH SOURCE,        ALEXANDRA RICE
     DR. ABDUR NAWOOR,             CASSIDAY SCHADE.
19   REBECCA EINWOHNER             111 N. SIXTH STREET
     AND KATHY GALVIN:             SPRINGFIELD, ILLINOIS
20   FOR DEFENDANT LISA MINCY:     JEREMY TYRRELL
                                   CLAYTON ANKNEY
21                                 ATTORNEY GENERAL'S OFFICE
                                   500 S. SECOND STREET
22                                 SPRINGFIELD, ILLINOISI

23   COURT REPORTER:      KATHY J. SULLIVAN, CSR, RPR, CRR
                          COURT REPORTER
24                        600 E. MONROE
                          SPRINGFIELD, ILLINOIS
25                        (217)492-4810
```

2

1                    I N D E X

2  WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

3  REBECCA EINWOHNER       3

4

5

6

7

8

9

10               E X H I B I T S

11  PLAINTIFF'S EXHIBIT
    NUMBER                    IDENTIFIED   ADMITTED
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2        *    *    *    *    *    *    *    *    *    *    *
3           (Prior proceedings were reported but not
4           transcribed in this excerpt.)
5                THE COURT:  Your next witness?
6                MR. MARTIN:  The next witness is
7    Dr. Einwohner.
8           (The witness was sworn.)
9                THE COURT:  Pull out on the gate and then
10   step up.  Would you like some water?
11               THE WITNESS:  Yes, please.
12               THE COURT:  Please proceed, Mr. Martin.
13               MR. MARTIN:  Thank you.
14                    REBECCA EINWOHNER
15   called as a witness herein, having been duly sworn,
16   was examined and testified as follows:
17                    DIRECT EXAMINATION
18   BY MR. MARTIN:
19      Q.  Doctor, would you state and spell your name,
20   please?
21      A.  Dr. Rebecca Einwohner, E-i-n-w-o-h-n-e-r.
22      Q.  Thank you.
23      A.  You're welcome.
24      Q.  And you've been -- I think you've sat in the
25   courtroom during openings and during all the
```

1    testimony; correct?

2         A.  Yes.

3         Q.  Okay.  You earned your Bachelor of Science

4    from the University of California in 1991?  Correct?

5         A.  Correct.

6         Q.  In physiology?

7         A.  Correct.

8         Q.  You started at U Cal Berkeley; correct?

9         A.  Initially.

10        Q.  And graduated from UC Davis?

11        A.  Correct.

12        Q.  And physiology is the study of how a living

13   thing might work; correct?

14        A.  Correct.

15        Q.  You earned your MD from the New Jersey

16   Medical School at Rutgers; correct?

17        A.  Correct.

18        Q.  Graduated in 1997?

19        A.  Yes.

20        Q.  Did an internship at the University of

21   Pittsburgh Medical Center; correct?

22        A.  Yes.

23        Q.  That was a one-year internship from June '97

24   through June '98?

25        A.  Correct.

1    Q.  Did your residency at the University of
2  Pittsburgh Medical Center from June 1998 to
3  June 2000; correct?
4    A.  Yes.
5    Q.  And your residency was in the -- I hope I
6  say this right, nephrology?
7    A.  Residency would have been internal medicine.
8  The fellowship would have been in nephrology.
9    Q.  Okay.  Your post-residency work was your
10  fellowship; correct?
11    A.  Yes.
12    Q.  At the University of Pittsburgh Medical
13  Center from June 2000 to 2002; correct?
14    A.  Yes.
15    Q.  And that was in nephrology?
16    A.  Yes.
17    Q.  Okay.  And nephrology is the study of the
18  kidney and diseases of the kidney?
19    A.  Yes; on the medical side.
20    Q.  On the medical side as opposed to the --
21    A.  Surgical side.
22    Q.  Got it.  You were next in private practice
23  beginning in 2002; correct?
24    A.  Correct.
25    Q.  You were working at the Associates in Kidney

1    Disease and Hypertension from 2002 to 2003; correct?

2        A.  Correct.

3        Q.  As one of the physicians in that group;

4    correct?

5        A.  Yes.

6        Q.  And you left in 2003 because they downsized?

7        A.  Correct.

8        Q.  From 2003 through 2005, you were unemployed

9    and volunteered; correct?

10       A.  Correct.

11       Q.  And from 2005 to 2006, you worked for a

12   company called Exam Master writing test questions?

13       A.  I believe that's correct, that I started

14   around 2005, 2006.

15       Q.  And from 2007 through 2008, you volunteered

16   at a religious organization; correct?  Catholic

17   Charities?

18       A.  Catholic Charities Clinic.

19       Q.  And in 2008, you--if I understand

20   this--wound up taking two different jobs.  One was

21   for a federally qualified health center; correct?

22       A.  Yes.

23       Q.  And the other was for Wexford; correct?

24       A.  Yes.

25       Q.  And your job for the federally qualified

1   health center lasted from 2008 to about 2013;

2   correct?

3       A.  Correct.  The federally qualified health

4   center may not have started until 2000 -- early in

5   2009 or the very end of 2008.

6       Q.  Okay.  Thank you for that clarification.

7       A.  You're welcome.

8       Q.  The -- with respect to Wexford.  Obviously,

9   your deposition was taken in this case, and at the

10  time that our team took your deposition, you were

11  employed by Wexford.  Are you currently still

12  employed by Wexford?

13      A.  Starting in 2008 to the present, I've been

14  employed as a telemedicine physician on an as-needed

15  basis and that continues on an as-needed basis.

16      Q.  Okay.  Say that again for me, your words.

17  Tele --

18      A.  Telemedicine physician.

19      Q.  Thank you.

20      A.  You're welcome.

21      Q.  You're paid hourly?

22      A.  Correct.

23      Q.  You have no minimum hours?

24      A.  No, not to my knowledge.

25      Q.  And if I understand it, you also have no

1    benefits?

2         A.  Can you clarify?

3         Q.  No health benefits, for example, as a result

4    of this position?

5         A.  No.

6         Q.  Correct?

7         A.  No health benefits.

8         Q.  And then, Doctor, I'd just like to explore

9    with you for a moment a couple of things that were

10   unclear to me.  And that is telemedicine physician.

11   By the way, you live in the Pittsburgh area?

12        A.  Yes.

13        Q.  And Wexford is headquartered in one of the

14   Pittsburgh suburbs; right?

15        A.  Yes.

16        Q.  Okay.  The -- and Wexford is a for-profit

17   company; correct?

18        A.  I believe so.

19        Q.  And it is the largest private provider of

20   health services to prison in the United States;

21   correct?

22             MR. RUPCICH:  Object to the foundation.

23        A.  I wouldn't know that.

24             THE COURT:  I'm sorry, I did not hear the

25   objection.

1          MR. RUPCICH:  Foundation, Judge.

2          THE COURT:  The objection is overruled.

3     Q.  With respect to your position, as I

4  understand it, you get up in the morning or whenever

5  you're gonna go work at Wexford and you go over to

6  their facility, and that's where you do your work,

7  you do your work in the offices of Wexford?  As

8  opposed to at home or somewhere else?

9     A.  I would say that the majority of the work,

10  yes, is done from the corporate office.

11     Q.  Okay.  And I also have that you actually

12  punch a clock when you go in and punch a clock when

13  you go out?

14     A.  Yes.

15     Q.  The -- and in terms of -- would you just

16  describe the Wexford offices for us?  Where are

17  they, what's the address that you go to, what's the

18  building like?

19     A.  Their office is in an office park.

20     Q.  And how many employees are working there on

21  a given day?

22     A.  I do not know the answer to that.

23     Q.  Okay.  And do you have your own office?

24     A.  There was a telesuite which is where I --

25          (Court reporter requested clarification.)

1      A.  There was a telesuite which is how -- where

2  I spent a lot of the time seeing patients on a video

3  monitor.  In between and in and out, if I wasn't

4  doing that, there was space to sit on the outside of

5  that room.

6      Q.  Okay.  And are you familiar with Dr. Ritz?

7      A.  Yes.

8      Q.  Do you see him in the office?

9      A.  Not always.

10      Q.  Sometimes?

11      A.  Sometimes, not always.

12      Q.  Okay.  And physically, he is on the same

13  floor as the telemedicine clinic, if you will?

14      A.  He was.

15      Q.  Okay.  With respect to the majority of your

16  time is focused on the teleclinic and the related

17  coordination of care; right?

18      A.  I think that's correct.

19      Q.  And the related coordination of care

20  includes charting and orders and communications with

21  nurses to follow-up on order clarifications and

22  tests and so forth; correct?

23      A.  Correct.  Perhaps reviewing files for other

24  requests.

25      Q.  Okay.  So in terms of -- I just to make sure

1   I've got this right, you are not a primary care

2   physician; correct?

3       A.  I am not.

4       Q.  Okay.  And you're not a urologist?

5       A.  I am not.

6       Q.  And you're not an oncologist?

7       A.  I am not.

8       Q.  Okay.  And part of your job responsibilities

9   at Wexford was to diagnose ailments of the kidneys;

10  correct?

11      A.  My job at Wexford was to support the primary

12  care doctors in a variety of requests regarding

13  medical kidney health.

14      Q.  To -- part of your job was to assist the

15  primary care doctors in the diagnosis of ailments

16  relating to the kidneys; correct?

17      A.  Yes.

18      Q.  So I use the word assist, you used the word

19  support in the question that you just answered.  Did

20  you -- with regard to your job responsibilities, do

21  you consider yourself in a support role or

22  assistance role to the primary care physician?

23      A.  I believe so.

24      Q.  Okay.  So would you agree with me that the

25  primary care physician is the person with the direct

1    patient -- or direct responsibility for the care and

2    treatment of a patient?

3        A.  I believe so.

4        Q.  So would you agree with me that in your role

5    at Wexford, that you, as a nephrologist and a

6    specialist, are not the person that is responsible

7    primarily for the care and treatment of patients?

8        A.  Again, it was in -- in a more supportive

9    role.  These were not -- these were supposed to be

10   chronic clinics, not acute clinics.  They were

11   supposed to be nephrology-focused.  And they were

12   meant to support the primary care.  All the other

13   things went back to the primary care doctor.  And

14   also, this was not a daily clinic.  So the primary

15   care doctors I believe really were the care and I

16   was the support to help with a variety of their

17   questions related to kidney health.

18       Q.  Right.

19       A.  Medical kidney health.

20       Q.  Right.  So your role at Wexford was to

21   support the primary care doctors; correct?

22       A.  Correct.

23       Q.  And --

24       A.  And sometimes I supported other --

25   pharmacists that might have a question or other

1   entities that might have questions related to kidney

2   health.

3        Q.  Right.  So fair to say -- and I get that

4   with regard to pharmacists, but fair to say that

5   your role at Wexford was a support role?

6        A.  I believe that's correct.

7        Q.  Okay.  And I think you had a couple of

8   things that you commented on.  One was that the

9   teleclinics that you did were not really there for

10  acute issues but were there for chronic issues?  So

11  someone with chronic kidney issues lasting over a

12  long period of time; right?

13       A.  I believe that's correct.

14       Q.  As opposed to some emergency situation?

15       A.  They were not set up for that.

16       Q.  Right.

17       The -- and in terms of assisting primary care

18  doctors, one of the things that you would do is

19  gather information to help them make a diagnosis;

20  correct?

21       A.  Yes.

22       Q.  And another thing that you might do is make

23  evaluations or studies that might be needed to help

24  them make a diagnosis; correct?

25       A.  Correct.  There was a lot of variability

1   about what type of input primary doctors needed.

2   Some of them needed different help interpreting

3   studies that they might have had on their own.  They

4   had a whole variety of things they needed.  And some

5   of them needed with evaluating -- many needed help

6   with just monitoring.  Helping them monitor tests.

7        Q.  Then in terms of depending on different

8   patients, you might recommend various diagnostic

9   studies or lab tests or imaging; correct?

10       A.  Perhaps.

11       Q.  So you agree with that?

12       A.  Yes.

13       Q.  Okay.  And --

14       A.  Those could all be subject to approval, by

15   the way.

16       Q.  Yeah, let me -- you anticipated my next

17   question because I wanted to ask you about that.

18       I've gone through -- I'm not gonna burden you

19   right now with paper, but I have gone through lots

20   of your -- the documents, the documents that were

21   produced to us in discovery.

22       And with regard to I see sometimes you

23   ordering -- what I think you are doing is ordering

24   urinary analysis, for example.

25       Do you, as a -- in your telemedicine job and

1  nephrology, do you have the ability to order a

2  urinalysis without any approval from anyone else?

3      A.  Let me see.  I -- there's more than one kind

4  of urinalysis and I don't know if your jury

5  understands that.  But --

6      Q.  Pick any kind of -- the most basic

7  urinalysis you can image.  Do you have the

8  authority to order --

9      A.  Urine is pee; right?  I think in later years

10  the sites maybe could do what they would call a

11  dipstick.  But I think I -- I think I could order

12  urinalysis, the different types where the nurse --

13  and I never saw any urine.  This was on a television

14  screen.  I did not see the urine samples, I only got

15  reports.

16      So some urinalyses just in a very basic way

17  could just tell you basic sugar and like that.  The

18  more detailed ones that had to be sent out, I think

19  I could order those.  And the other types of

20  urinalyses you could order all kinds of things in

21  urine.

22      Which were ordered, by the way, in this case.

23  And I believe those were non-formulary.  All sorts

24  of other --

25      Q.  Could you order those?  Without any approval

1    that's --

2         A.  I think those were subject to approval.

3         Q.  Approval by collegial review?

4         A.  No, I think that went through a different

5    review process of lab.  It was a different review

6    process for lab.  Some of them I could order, some

7    of them I could not.

8         Q.  Okay.  So we'll put urinalysis in the

9    category of some things you could order, some things

10   you couldn't order; fair enough?

11        A.  Okay.

12        Q.  Okay, you mean you agree?  Some things you

13   could order, some things you couldn't?

14        A.  Some things I could order, some things I

15   could not.

16        Q.  Okay.  So then let's talk about a CAT scan.

17   Did you have the authority to order a CAT scan for a

18   patient?  You alone, by the way.  Just to be clear,

19   you alone?

20        A.  I think those things all have to go through

21   the UM process and everything had to generate an

22   approval number.

23        Q.  So the answer is no, you alone did not?

24        A.  I do not think so.  I think even if I had

25   recommended it, it would have had to get approved.

1      Q.  Okay.  And what about a referral to a

2  urologist?

3      A.  Even if it was a recommendation, ultimately

4  it would have -- I believe there would have had to

5  be an approval process.

6      Having said that, having said that, through the

7  years, the UM process may have changed.  If I were

8  to ever have ordered one, it still would have to

9  generate an authorization number.  And if there had

10  ever been a question, I would have had to speak to

11  somebody.

12      Q.  Okay.

13      A.  So even if it was a recommendation, it

14  still, to get going, would have had ultimately to

15  get an authorization number, otherwise, there would

16  have been no way to get the test done.

17      Q.  Right.  So you, Doctor, sitting in the

18  suburbs of Pittsburgh, did not have the authority by

19  yourself to order a CAT scan or to send a patient to

20  a urologist?

21      A.  In what year?

22      Q.  2015 and 2016?

23      A.  I don't believe that I could have done that

24  in 2015-2016.

25      Q.  It --

1        A.   Now, as it turns out, I first started seeing

2    this patient in perhaps May 2012.   And I do not know

3    if that perhaps the whole process, where it still

4    would have had to generate an authorization number,

5    but perhaps something might have changed over the

6    years.   I believe in the 2015-2016, that would all

7    have to be approved.

8        Q.   So I'm focused on 2015 and 2016 now.

9        So in 2015 and 2016, you alone did not have the

10   authority to order a CT scan or refer a patient to a

11   urologist; correct?

12       A.   No.

13       Q.   And your ability was to make -- you could

14   make a recommendation to the primary care physician

15   to do so; correct?

16       A.   Right.   So part of what I was doing when I

17   got this variety of requests from primary care

18   doctors and broadly speaking to support primary care

19   was to generate recommendations ultimately to get

20   back to review where they could determine a plan of

21   care.

22       Q.   So you could make a recommendation in 2015

23   and 2016 to a primary care physician to refer a

24   patient to a urologist or get a CAT scan; correct?

25       A.   I could make a recommendation.

 1      Q.  Okay.  The -- and with regard to 2015 and

 2  2016, an outside referral to a urologist needed to

 3  be approved by collegial review; correct?

 4      A.  I believe in 2016, the way to get a patient

 5  to urology was to communicate with the utilization

 6  management.

 7      Q.  So a -- in 2015 and 2016, a recommendation

 8  or a referral to a urologist at Wexford required the

 9  approval of collegial review; correct?

10      A.  That's my understanding.

11      Q.  And the same with respect to a CAT scan;

12  correct?

13      A.  I believe so.  I actually believe that would

14  have been all-encompassing.  Any recommendation for

15  imaging would have all had to go through the

16  process.

17      Q.  The collegial review process?

18      A.  I believe so.

19      Q.  Supported by the primary care physician and

20  also signed off by collegial review; correct?

21      A.  Correct.

22      Q.  Okay.  With regard to collegial review, you

23  have never participated in a collegial review

24  meeting or discussion at Wexford; correct?

25      A.  I did not recall participating in those

1    meetings.  The UM nurses I do recall speaking with,

2    but I don't recall being in meetings.

3        Q.  Right.  So you never personally participated

4    in a collegial review; correct?

5        A.  I don't recall being in those meeting.

6        Q.  And you never personally participated in a

7    collegial review for Mr. Dean; correct?

8        A.  I do not recall participating in those

9    discussions.  I do recall, after I saw him on

10   January 7th, I recall following up with a UM nurse

11   to ensure that that collegial was going to happen.

12   And again, later on, after the next visit in

13   February, again following up with the UM nurse to

14   make sure that the collegial.  And she confirmed.

15       Q.  Thank you, Doctor.  We'll get to that time

16   period.  It's gonna take us a little while, but

17   we'll get to that time period.

18            THE COURT:  Speaking of which, is now a

19   good time to give my court reporter a break?

20            MR. MARTIN:  This time period is a perfect

21   time, Your Honor, to give your court reporter a

22   break.

23            THE COURT:  Thank you.  Ten-minute recess.

24       (The jury left the courtroom.)

25       (A recess was taken.)

1          THE COURT:  Please be seated.

2      Before I call the jury back, I wanted to tell

3  you after reviewing the reports, I'm inclined to let

4  them in as to notice, but with restrictions as to

5  content.  Leaving out -- certainly out of the first,

6  which is Shansky, the specific instances that were

7  reviewed.

8      And then as to the second report, Pru --

9  That's not it.

10          MR. MARTIN:  It's going to be whatever you

11  say.

12          THE COURT:  The P word.

13          MR. RUPCICH:  Puisis.

14          THE COURT:  Puisis.  That I'm inclined to

15  let it in for the same purpose, but only a limited

16  amount as to the time in question.  It doesn't all

17  cover just the time in question.

18          MR. MARTIN:  Would it be helpful -- I mean

19  we, obviously, have two trial exhibits on each.  One

20  is the full trial exhibit, the other is a short

21  exhibit.  Would it be helpful for us to propose

22  tomorrow morning what we think you should let in, so

23  that we can have clarity --

24          THE COURT:  Yes.

25          MR. MARTIN:  Because it's actually -- it's

1    very little from those reports that we intend to get

2    into.

3            THE COURT:  Okay.  And we'll also discuss

4    the issue further at instruction conference, which

5    should be very short.

6        Did I tell you Judge Schanzle-Haskins is not

7    available in the morning?  He has a doctor's

8    appointment.  He's available at 9:00 or shortly

9    before.  I don't know, do you wish to have the jury

10   come in say at 9:30?

11           MR. MARTIN:  I think, Your Honor, we could

12   have a conversation right at -- I think it's

13   probably best to have the jury in at nine because of

14   the timing of the trial.  I also think that perhaps

15   we could have a conversation right at the end of

16   today.  We are making progress with the IDOC.

17       We're not -- I mean I don't want to get into

18   detail with Your Honor.

19           THE COURT:  Well, quite frankly, I do

20   settlement discussions too if the parties agree.

21           MR. MARTIN:  We would probably agree.

22           MR. TYRRELL:  We would agree as well, Your

23   Honor.  I think we can address it at the end of the

24   day after the jury is dismissed.

25           THE COURT:  All right.  Let's bring the

1    jury back.

2         (The jury entered the courtroom.)

3              THE COURT:  Please be seated.  Court is

4    reconvened.  Mr. Martin, please continue.

5              MR. MARTIN:  Thank you, Your Honor.

6    BY MR. MARTIN:

7         Q.  Doctor, right before the break we were

8    talking a little bit about collegial review.  And if

9    I understood your testimony, there's never been an

10   occasion generally or with respect to Mr. Dean where

11   you actually participated in a collegial review;

12   correct?

13        A.  I do not recall being in his collegial group

14   meetings, those once-a-week or so, I believe they

15   were, meetings between the primary care doctor,

16   utilization management director, where they gathered

17   all the data, they reviewed all that and came up

18   with a treatment plan.

19        Q.  So, Your Honor, I'd move to strike that

20   answer.

21             THE COURT:  The motion is granted.  That

22   answer is stricken.  That answer is struck.  And the

23   jury is directed to disregard.

24        Q.  So, Dr. Einwohner, prior to the break, we

25   were discussing collegial review.  And I wanted to

1   confirm that your testimony is that you did not

2   participate in any collegial reviews ever at Wexford

3   or any with respect to Mr. Dean; correct?

4        A.  Correct.  I don't recall being on those.

5        Q.  Thank you, Doctor.

6        A.  You're welcome.

7        Q.  Now, in terms -- I prepared a timeline, a

8   demonstrative timeline, and cleared it with our

9   opposing counsel to put it up on the screen.

10       Mr. Green, could you pull up our timeline.

11       So, Doctor, I'm interested in focusing you on a

12  particular timeframe, and it's from December 23rd,

13  2015, through Mr. Dean's surgery on July 19th, 2016.

14  And we've put on this timeline some of the events

15  that have already been discussed in court through

16  other witnesses.  Okay?

17       A.  Okay.

18       Q.  Okay.  The -- and you know that Mr. Dean

19  went to sick call for blood in his urine, visible

20  blood in his urine, on December 23rd, 2015, to see

21  Dr. Nawoor?  You know that as of today; correct?

22       A.  As of today --

23       Q.  You didn't know as of the time?

24       A.  On January 7th I did not know that he had

25  been to sick call.

1    Q.  Correct.  So between December 23rd, 2015,

2 and January 7th, 2016, when you saw Mr. Dean in a

3 teleconference, Dr. Nawoor had not consulted with

4 you in any way, shape, or form about how Mr. Dean

5 presented on the 23rd of December; correct?

6    A.  I don't recall it from Dr. Nawoor, I don't

7 recall it from the site.  Sometimes --

8    Q.  -- no one told you?

9    A.  I do not recall anyone telling me.

10    Q.  Right.  And you had been, as you pointed out

11 earlier, you had been Mr. Dean's nephrologist all

12 the way from 2012 all the way to 2015, 2016?

13    A.  I had been doing the teleclinic and

14 assisting in his care during that time frame.

15    Q.  Right.  But nobody discussed anything with

16 you between the 23rd and the 7th; correct?

17    A.  I do not recall any communication.

18    Q.  Okay.  Doctor -- Mr. Rooney, if we could get

19 PTX061.  061-0061 through 63.  Thank you.

20    Doctor, you recognize PTX -- PTX061-061;

21 correct?

22    A.  Correct.

23    Q.  And that's an email from you to Stephen Ritz

24 dated January 7th, 2016; correct?

25    A.  Correct.

1    Q.  And then if you take a look at 0062 and

2  0063.  062 are your renal progress notes on

3  January -- dated January 7th, 2016; and 063, your

4  renal teleclinic orders dated January 7th, 2016.

5  You see those?

6    A.  I do.

7    Q.  Okay.  Your Honor, I'd move the admission of

8  PTX061.

9          THE COURT:  Any objection?

10          MR. RUPCICH:  One second, Your Honor,

11  please.  This is the 180-page document?

12          MR. MARTIN:  No.  It's PTX061-0061.

13          MR. RUPCICH:  Yeah.  No objection.

14          THE COURT:  Through 63?

15          MR. MARTIN:  Yes, correct.

16          MR. RUPCICH:  No objection.

17          THE COURT:  Mr. Tyrrell, you just said no

18  objection when I was speaking?

19          MR. TYRRELL:  Yes.  Sorry, Your Honor.

20          THE COURT:  61 is admitted.  Plaintiff's.

21      (Plaintiff's Exhibit 61 admitted.)

22    Q.  Okay.  So, Dr. Einwohner, let's just set the

23  stage for January 7th.  You see Mr. Dean by

24  teleclinic on January 7th, 2016; correct?

25    A.  Correct.

1      Q.  And at the time prior to seeing him on that

2  date, you did not know that he had what we've

3  described as bloody urine or gross hematuria;

4  correct?

5      A.  Correct.

6      Q.  And he presented on that day to you

7  describing painless gross hematuria; correct?

8      A.  It looks like on this note you could not

9  tell that it was gross.  It looks like he complained

10  of blood in the urine, five days, painless,

11  intermittent, clear, and returned clots.  I do not

12  see notation of gross hematuria.

13      Q.  He had visible blood in the urine?

14      A.  Well, I can see here on this note, yes, and

15  that's the story that we had.

16      Q.  Right.  And you have no doubt that he had

17  reported on that day that he had visible blood --

18      A.  He had complained that he had five days,

19  intermittent, painless, returned, cleared, and he

20  said clots.

21      Q.  So, Doctor, if I can turn you back to the

22  first page, your email?

23      A.  Yes.

24      Q.  Your email is prepared and sent after your

25  teleclinic with Mr. Dean; correct?

 1      A.  It is prepared and sent.  It is possible

 2   that it was started during the visit, but I cannot

 3   tell from the email.

 4      Q.  Okay.  With respect to, it is to Steven

 5   Ritz.  And we've heard who that is.  And it also

 6   gets CC to Becky Adams.  Who is Becky Adams?

 7      A.  Becky Adams--I don't know her role now--is a

 8   utilization nurse.  She was assigned to the site if

 9   she was included on that.

10      Q.  All right.  And the R-E line says, if you go

11   to the end, it says, (as read:)  Question collegial

12   and investigation.  Do you see that?

13      A.  I do.

14      Q.  And what -- by writing question collegial,

15   you were suggesting there be a collegial with

16   respect to Mr. Dean; correct?

17      A.  Correct.

18      Q.  And by writing investigation, you were

19   suggesting that the cause of his, I'll just call it

20   medical condition that day --

21      A.  Problem.

22      Q.  -- should be investigated?

23      A.  Correct.

24      Q.  The -- in terms of -- I want to go to the

25   sentence that says, (as read:)  His onsite UA dip

1    showed hematuria last month and I'm requesting a UA

2    with micro.

3        Do you see that sentence?  I'm on the email,

4    Doctor?

5        A.  Yes.

6        Q.  And that just means you're referring to he

7    saw you in December and the urinary analysis dip

8    showed blood in the urine last month in December of

9    2015; correct?

10            MR. RUPCICH:  Object.  That misstates the

11   testimony.

12       A.  I did not see him in December.  I had last

13   seen him in October of '15, I believe.  The UA dip

14   was reported by the nurse.

15       Q.  So you're referring to the December visit

16   that he had in Taylorville --

17       A.  The -- yes.  And on this note, per RN onsite

18   urinalysis and she stated that to me.  And there was

19   a request for a urinalysis.

20       Q.  Okay.

21            THE COURT:  So excuse me.  Mr. Rupcich,

22   does that clarify?  I didn't get to rule on your

23   objection.

24            MR. RUPCICH:  Yes, it does.  Thank you.

25       Q.  And then you, Doctor, are requesting a

1    urinary analysis with micro; correct?

2         A.  Correct.

3         Q.  Okay.  Then it says, (as read:)  The last

4    CT.  Let me just stop there.  CT means what?

5         A.  CAT scan.

6         Q.  Okay.  7/15.  7/15 is referring to when?

7         A.  July of 2015.

8         Q.  Okay.  (As read:)  Had calculi when an

9    inpatient.  And calculi is another word for kidney

10   stones?

11        A.  It could be kidney stones, but you could

12   technically have a calculus somewhere else in the

13   urinary system.  So it could have been a bladder

14   stone.  But calculi in this case referred to kidney

15   stones when he was hospitalized --

16        Q.  Right?

17        A.  -- had had a CAT scan.

18        Q.  So is it fair to say you are simply pointing

19   out by writing this that his last CAT scan in July

20   of 2015 showed kidney stones when he was an

21   inpatient?

22        A.  Correct.  And a reminder he had already had

23   an imaging study of one type.  Correct.

24        Q.  Right.  The CAT scan in 2015?

25        A.  Correct.

1      Q.  Then it says, (as read:)  I suggest

2    collegial review with Dr. Butler.

3        Dr. Butler.  At the time that you wrote this,

4    you thought that Dr. Butler was still the primary

5    care physician; correct?

6        A.  Correct.

7        Q.  However, you subsequently learned that

8    Dr. Nawoor had replaced Dr. Butler and was the

9    primary care physician?

10        A.  Correct.

11        Q.  Okay.  So collegial review with Dr. Butler

12    with consideration of re-imaging.  And re-imaging,

13    by that you mean re-imaging and doing the CT scan

14    again?

15        A.  It does not specify.

16        Q.  You did not specify, but what did you mean?

17        A.  By not specifying, it would allow for the

18    interpretation of the full clinical picture at the

19    time.  By not specifying right here, saying that I

20    wanted a collegial, that I wanted a urology eval and

21    I wanted imaging.  Allowed the urologist to assist

22    in selecting the appropriate study.  Allowed the

23    primary care doctor who would have been in on the

24    collegial call to take my notes and consider also

25    that an MRI could not have been done if there was a

1    pacemaker and defibrillator in place because those

2    don't work with MRIs.  And would have allowed the

3    full clinical picture consideration to ultimately

4    come up with a decision which was what would the

5    urologist want for the right test.

6        Q.  So your recommendation with respect to

7    January 7th was to suggest that Mr. Dean should see

8    a urologist; correct?

9        A.  Correct.

10       Q.  And your recommendation was also to suggest

11   that there should be some appropriate images of his

12   kidney and urinary track taken; correct?

13       A.  Correct.  Some type of imaging.  I didn't

14   know which would be yet --

15       Q.  For the urologist to decide?

16       A.  I would hope so.  I wanted the patient to

17   get to the urologist and UM was the way to do it.

18       Q.  So your view and your recommendation as a

19   nephrologist and somebody who had seen Mr. Dean for

20   probably three years by then was to send him to a

21   urologist; correct?

22       A.  Correct, urology.

23       Q.  And then you were basically saying let the

24   urologist decide on what studies to do; correct?

25       A.  Well, again, the collegial review process

1    also took into consideration the primary care doctor

2    who --

3         Q.  Dr. Nawoor?

4         A.  Well, it was -- also he had changed primary

5    care doctors.  However, the primary care doctor and

6    all the input from the site.  The site puts in their

7    input.  And they have all the records and the data.

8    That's what it's supposed to be.  And come up with a

9    treatment plan.

10        Q.  Yeah.  So let's talk about that for a

11   moment.  You send -- we know today that -- from

12   Dr. Nawoor, you were in the courtroom when

13   Dr. Nawoor talked about it, that there was a

14   collegial review with regard to Mr. Dean.  I think

15   we put it on the -- we put it on the timeline if we

16   go back to that.  It happened on January 13th.  It

17   happened between Dr. Nawoor, as he said the other

18   day, and Dr. Ritz.  You know that today; right?

19        A.  Now I know, yes.

20        Q.  Okay.  So in terms of that particular

21   collegial review, your contribution to it that

22   you -- you know that you sent this email to

23   Dr. Ritz, so he had at least this email; correct?

24        A.  Correct.

25        Q.  Okay.  Whether he reviewed it or not we'll

1    find out when we talk to Dr. Ritz.  But you know

2    that you sent this email to Dr. Ritz.

3        Did you consult with Dr. Nawoor with regard to

4    any of this?  Or did you send him any documents

5    directly?

6        A.  The end of every visit generally in

7    teleclinic, the nurse was a very big part of the

8    teleclinic.  And usually before I sent the nurse,

9    there was always a note that was scanned.  And there

10   was always a plan reviewed with the nurse.  Which

11   was, again, part of the full picture to get this --

12   this is going to be a case, this likely needs to get

13   some next steps going, please communicate this to

14   your doctor.  And during that time, figuring out the

15   next steps, please let doctor know.  Please contact

16   me if needed.  Communication points usually went

17   through the clinic nurse.

18       Q.  Respectfully, Your Honor, I would move to

19   strike the entire answer.

20           THE COURT:  The answer is struck.

21       Q.  So, Doctor, my question is, did you

22   provide -- did you talk to Dr. Nawoor after the 7th

23   about your consultation with Mr. Dean?

24       A.  I do not recall talking to Dr. Nawoor --

25       Q.  Did you send Dr. Nawoor any documents

 1    regarding your consultation with Mr. Dean?

 2         A.  This note went with everyone.

 3         Q.  This note what?

 4         A.  This note went to his site, and my

 5    understanding is that --

 6         Q.  Doctor, I'm sorry, that's not my question.

 7    Your Honor, I ask you to admonish the witness to

 8    actually answer the questions.

 9              THE COURT:  The question is did you send

10    Dr. Nawoor any documents regarding your consultation

11    with Mr. Dean?

12         A.  The clinic note was sent to the site.

13         Q.  Right.  That wasn't my question.  My

14    question was did you send Dr. Nawoor any documents

15    with regard to your consultation with respect to

16    Mr. Dean on the 7th?

17         A.  The teleclinic note was the consult note.

18         Q.  Right.  Did you -- you didn't send that to

19    Dr. Nawoor; right?

20         A.  It gets sent to the medical -- it gets sent

21    to the medical unit.

22         Q.  My question is simply, Doctor, whether you

23    sent it to the doctor sitting right here.  Did you

24    send it to him?

25         A.  My understanding of how I was supposed to

1    communicate that to him was to send it to the

2    medical unit and they give it to him.

3         Q.  Doctor -- Your Honor, I'd move to strike the

4    answer once again.

5              THE COURT:  I think it is responsive.  I'm

6    not going to strike it.

7         Q.  Okay.  Doctor, did you pick up the telephone

8    and call Dr. Nawoor and tell him what was going on?

9         A.  I do not recall speaking to Dr. Nawoor.

10        Q.  Okay.  So you had no direct communication?

11   In fact, you never had direct communication with

12   Dr. Nawoor about Mr. Dean, did you?

13        A.  I don't recall.

14        Q.  And you never sent any documents directly to

15   Dr. Nawoor?  Directly to Dr. Nawoor?

16             MR. RUPCICH:  I'll object to vague.

17             THE COURT:  The objection is overruled.

18        A.  The communication that I was supposed to be

19   sending was the one-page teleclinic note to the

20   site.  What I was also supposed to be doing was

21   communicating with the nurse, which I did.  And with

22   the UM as needed, which I did.

23        Q.  And when you said that's what you're

24   supposed to be doing, is that Wexford's policies

25   that you're not allowed to communicate directly with

1     the primary care physician that you're assisting in

2     making diagnosis?

3          A.  You're asking about the communication that I

4     had, what document I was supposed to send.  I

5     believe I was supposed to send a one-page document

6     follow-up clinic note.

7          Q.  Is there some policy that Wexford had that

8     prevented you from communicating directly with the

9     primary care physician?

10         A.  I don't recall that.

11         Q.  You don't recall anything that prevented you

12    from communicating directly with him?

13         A.  I don't recall that.

14         Q.  So, Doctor, the -- Mr. Dean, your

15    recommendation that you made on the 7th for Mr. Dean

16    to see a urologist went to collegial on the 13th and

17    it was not approved; correct?

18         A.  My recollection is that I followed up four

19    days after that visit with UM nurse to confirm that

20    the case would be discussed.  She told me it would

21    be discussed and I followed up with the utilization

22    management nurse.

23         Q.  Who was that?

24         A.  Becky.

25         Q.  And then on the 13th, there was a collegial

1    review and your recommendation for a referral to a

2    urologist was not approved; correct?

3         A.  It does not appear to be approved yet.

4         Q.  It was not approved.  They had a collegial,

5    they had a collegial, looks like they had a

6    collegial six days later, and they instead -- they

7    didn't approve a urologist and they sent him for a

8    reasonable ultrasound; correct?

9         A.  He had a renal ultrasound; correct.

10        Q.  Okay.  No approval of a urologist then?

11        A.  It did not look like it was approved yet.

12        Q.  Right.  And then you saw Mr. Dean again by

13   teleconference on the 8th, February 8th of 2016;

14   correct?

15        A.  Correct.

16        Q.  And you know sitting here today that there

17   was a renal ultrasound done on February 2nd, 2016;

18   correct?

19        A.  Correct.

20        Q.  And in fact, two days before you saw

21   Mr. Dean on February 10th, you came to have a copy

22   of the results of that renal ultrasound; correct?

23        A.  I don't recall exactly what day I got the

24   kidney ultrasound.

25        Q.  Okay.  So let me ask you this, Doctor:  You

1    said that about four days later, you had a

2    conversation with Becky Adams.  So that's

3    January 7th to January 11th.  And you said to make

4    sure that your recommendation was considered at the

5    collegial review.

6        Then after that, from the 11th until the next

7    time you saw Mr. Dean, did you speak with Dr. Ritz

8    or Dr. Nawoor about Mr. Dean's case?

9        A.  At that point, the recommendations to get to

10   urology and the workup in progress as suggested, as

11   far as I knew they were being worked up.  I don't

12   recall any calls in between.

13       Q.  Okay.  Did you -- did you come to learn that

14   a renal ultrasound had been approved?

15       A.  I don't recall when I knew that it was

16   approved for it.

17       Q.  Did you ever lodge an objection to that or

18   say, "That's the wrong decision, you should be

19   sending him to a urologist as I, the specialist

20   nephrologist have told you?"

21       A.  Before the next visit?

22       Q.  Yeah.

23       A.  I don't recall that.

24       Q.  So you'd agree that visible blood in the

25   urine can indicate kidney cancer; correct?

1        A.  Visible blood in the urine could indicate

2   various things.  It is not clear yet what was

3   causing the blood in his urine.  And the workup was

4   in progress and I made my suggestions to go to

5   urology.

6        Q.  I'm with you.  And -- but you agree that

7   visible blood in the urine can indicate kidney

8   cancer; correct?

9        A.  It could.

10        Q.  And as a medical doctor, you would want to

11   rule that out; correct?

12        A.  It is one of the things.  And I had

13   suggested to get to a urologist.

14        Q.  Right.  So that a urologist could have

15   conducted the appropriate tests and ruled it out and

16   ruled it in?

17        A.  To get to a urologist for the appropriate

18   evaluation.

19        Q.  Right.  And in fact, Mr. Dean did not get to

20   a urologist for two months after you -- two months

21   and a few days after you saw him; correct?

22        January 7th to March 10th; correct?

23        A.  Slight discrepancy in days.  I believe at

24   one point I was told that he had actually seen on

25   March 3rd.  But yes.

1      Q.  But you've sat through the trial, you know
2   it was March 10th?
3      A.  Yes.
4      Q.  The -- let's go ahead and put up
5   PTX061-0180.
6      Oh, this is also in evidence already as
7   PTX060-001.  But I'm using PTX061-08.
8      Okay.  So Mr. Rooney, do you have that
9   document?
10     Dr. Einwohner, I'm gonna give you what
11  represents the document production from you.  And
12  I'm gonna open it to show you PTX061--give me one
13  moment--080.
14     A.  Is this the same as the document on the
15  screen.
16     Q.  It is.  Here it is.  This is the result of
17  the renal ultrasound; correct?
18     A.  Correct.
19     Q.  And you've heard some of the testimony with
20  regard to the renal ultrasound; correct?  Here in
21  court?
22     A.  Yes.
23     Q.  And if you take a look at the right kidney
24  findings, it says that it's -- right kidney is 15.2
25  times 7.2 times 9 centimeters.  Do you see that?

1        A.  I do.

2        Q.  And then the left kidney is 13.3 times 5.8

3    times 7.0.  Do you see that?

4        A.  I do.

5        Q.  When you -- did you physically examine these

6    results, this report, in February of 2016?

7        A.  Could you clarify what you just said,

8    please?

9        Q.  Did you examine this report in February of

10   2016?

11       A.  I saw this report on February 8th of 2016.

12       Q.  Correct.  And did you review the sizes of

13   the kidneys?

14       A.  That is part of the report, yes.

15       Q.  So you did review it?

16       A.  Yes.

17       Q.  And did you go take a look at the underlying

18   film?

19       A.  I do not get underlying films.

20       Q.  You don't get underlying films?

21       A.  No.

22       Q.  Did you ask for them?

23       A.  No, that was not something that I got.

24       Q.  Did you ask for them?

25       A.  I do not recall asking for them.  That is

1    not something that I got.

2         Q.  You don't do that in the ordinary course?

3         A.  No.

4         Q.  You rely entirely on the report?

5         A.  Again, this is to support and assist.  This

6    is not the site.  This is not something that I

7    usually get.

8         Q.  So, Doctor, let me ask you a question about

9    that.  You're there to support and assist with

10   regard to the diagnosis.  Mr. Dean comes in on the

11   23rd, and then it takes until the 14th of April to

12   diagnose his kidney cancer; right?

13        A.  Yes.

14        Q.  So do you believe you bear any

15   responsibility with regard to the delays that we've

16   heard about in the diagnosis of Mr. Dean's kidney

17   cancer?

18             MR. RUPCICH:  Object to argumentative.

19             THE COURT:  The objection is overruled.

20        A.  I think my role when this came up was seeing

21   that something was beyond the scope of chronic

22   teleclinic, an acute condition, and trying to

23   encourage UM to review this and get the patient to

24   urology.  The scheduling and the delays and getting

25   those things there to other specialists, that was

1    not something I did, those were onsite scheduling

2    issues.

3        Q.  Onsite medical issues with a primary care

4    physician as well; correct?

5        A.  Could be.  And there could be scheduling

6    things with the site.

7        Q.  So let me ask you this:  On the 7th, were

8    you convinced -- you wrote that email.  Were you

9    absolutely convinced that the right suggestion was

10   to get him to a urologist?

11       A.  It wasn't clear what was going on.  He had

12   had kidney stones many times.  In fact, going back

13   to 2003.  It could have been that, in which case, a

14   urologist could have been the appropriate to help,

15   the appropriate specialist to help.  It could have

16   been something else.

17       Q.  Your medical judgment was to recommend that

18   he go see a urologist; right?

19       A.  Yes.

20       Q.  You stand by that on January 7th I assume

21   you stand by it today?

22       A.  I thought the appropriate care was to get

23   him to a urologist.

24       Q.  And the collegial review process and

25   Dr. Nawoor, along with Dr. Ritz, decided not to do

1   that; right?

2        A.  Eventually he did go --

3        Q.  Eventually he did.  But they decided not to

4   do that in the first collegial review?

5        A.  It doesn't look like it had initially.

6        Q.  It didn't.  So they decided against it, they

7   decided to go to the renal ultrasound.

8        So -- during this time period, did they ever

9   consult with you at all during -- the time period

10  that we have put up on the screen from the 23rd

11  through the surgery?

12       A.  I don't recall any additional in between

13  while the evaluation and workup was going on.  In

14  which case until I had a follow-up.

15       Q.  So did you consider bringing this -- you

16  said a moment ago that, you know, this was a more

17  acute case and it was not chronic the way he

18  presented on the 7th; right?

19       It was a more acute case the way he presented

20  on the 7th with visible blood in his urine?

21       A.  It seemed that it could have been an acute

22  case; yes.

23       Q.  Right.  Did you suggest to anyone other than

24  your January 7th note saying go see a urologist, did

25  you suggest to anyone that this is something that

1   needs to be addressed right away?

2       A.  I believe at the end of the visit,

3   everything -- well, first of all, there was

4   communication with Dr. Ritz.

5       Q.  Not by you, just by -- through that email,

6   right?  That's the only communication?

7       A.  Yes.  And usually at the end of every visit

8   with the clinic nurse.

9       Q.  You communicate with the clinic nurse?

10      A.  With the clinic nurse at the end of every

11  visit that this is the case, communicating this is

12  something doc should be knowing about, this is

13  collegial.  And I don't recall the specifics of

14  that, but usually at the wrap-up with the clinic

15  nurse and the opportunity to contact me.

16      Q.  The opportunity for Dr. Nawoor --

17      A.  Yes.

18      Q.  -- and Dr. Ritz to contact you?

19      A.  Yes, that's usually the wrap-up of every

20  visit.

21      Q.  I will tell you we don't have an email

22  responding to your email to Dr. Ritz.  Did he ever

23  email you back?

24      A.  I don't know that at this time.

25      Q.  Did he -- did he ever talk to you about this

1    case?

2        A.  I don't recall right now.

3        Q.  Are you aware -- we talked about what things

4    you could do and you couldn't do.  And obviously,

5    you couldn't send him to -- out for a urologist.  Do

6    you understand from your time at Wexford that when a

7    referral in the Illinois prison system or at

8    Taylorville is made to a specialist, that that

9    decreased the profit that Wexford makes under their

10   contract with the State of Illinois?

11       A.  I was not in on the contract stuff.  I was

12   not in on the finance stuff.  Anything I heard about

13   that is background.  I do not recall any specifics

14   about that.

15       Q.  You listened to that deposition testimony

16   that we read this morning from Mr. Little, didn't

17   you?

18       A.  I listened to the deposition this morning.

19   I don't -- I wasn't in on any contract negotiations,

20   any specifics about it, and I don't recall your

21   question about finances that you just brought up.

22       Q.  Let me ask you a few other questions.  Would

23   you -- Dr. Nawoor testified that you could not do

24   anything about Mr. Dean's situation.  Do you agree

25   with that?

1      A.  Which point in his care are you talking

2  about that I couldn't do anything?  Are you talking

3  about in 2012, when I evaluated --

4      Q.  I'm talking about December 23rd through

5  July 19th, 2016?

6      A.  What I could do when I -- when he urinated

7  blood and I -- tried to interpret the urinalysis

8  which I did ask for which did not appear to show

9  certain things that could have been causing

10  bleeding.  And to make my recommendations to review

11  the full clinical picture.  Hopefully, the back

12  records and all the back records of evaluation for

13  hematuria, the back records of urology consults, the

14  back records of imaging and so forth, and make my

15  recommendations including getting him to a

16  urologist.

17      Q.  So you simply had the power to recommend and

18  not to implement; correct?

19      A.  Not necessarily.

20      Q.  You had the power to recommend a urologist?

21      A.  Right.

22      Q.  Are you telling us that you could have

23  forced Wexford to have Mr. Dean see a urologist in

24  January?

25      A.  I do not believe -- I can make my

1    recommendation.

2        Q.  So you can't force Wexford to send him to a

3    urologist in January of 2015?

4        A.  I don't believe forcing is something that I

5    did in my job.

6        Q.  Right.  You couldn't -- you couldn't make it

7    happen?  In fact, did you hear Dr. Nawoor say that

8    you could not even send a patient to a collegial

9    yesterday?

10       A.  I don't recall him saying that I couldn't

11   send a patient to collegial.

12       Q.  Okay.  Do you agree with Dr. Nawoor that

13   these delays in Mr. Dean's medical care, treatment,

14   and diagnosis were caused by the Wexford policies?

15       A.  We've all listened to this -- to this

16   hearing for the past couple days.  And including

17   coordination of care with Dr. Severino trying to get

18   specialists.  It sounds like there were many things

19   that were involved in coordinating his care.

20       Q.  So you don't agree with Dr. Nawoor?

21       A.  Can you repeat your question, please?

22       Q.  Do you agree with Dr. Nawoor's statements

23   that the delays were caused by Wexford's policies?

24       A.  I'm uncertain what caused all of the delays.

25       Q.  Okay.  And do you agree with Dr. Nawoor when

1    he testified that the decisions at collegial were

2    made by Dr. Ritz ultimately?

3        A.  Well, I think that the -- what collegial

4    should have been, Dr. Nawoor should have been

5    putting in his input as well, including that he

6    presented -- because he saw the patient on-site.  He

7    saw the patient on-site, I did not.  He had the

8    actual urine, I did not.  I think those things and

9    all the back records and all the back everything

10   should have been in and available.

11       Q.  Right.

12       A.  To come to what was supposed to be a

13   collaborative and collegial discussion to come up

14   ultimately are a plan of care.

15       Q.  Okay.  So let's just pause on that for a

16   second.  With regard to the collegial process,

17   you're never involved, you never send things with

18   the exception of that January 7th email, you don't

19   send anything directly to Nawoor or Dr. Ritz.  And

20   you had seen Mr. Dean from 2012 all the way through

21   2015 and 2016.  You can't tell us that -- sitting

22   here today, you have no idea what Dr. Nawoor and

23   Dr. Ritz actually reviewed at any of these

24   collegials?

25       A.  Well, actually, I do know that he was

1    approved for urology which is what the UM nurse told

2    me in February, that he was approved to go to

3    urology.  And I know that cysto and IVP was reported

4    to me by the clinic nurse that that was planned and

5    again urology, and that was reported in March that

6    that was in the plans.

7        Q.  My question is you don't know what records,

8    what medical records they had in front of them when

9    they were making that decision or if they had no

10   medical records at all in front of them?

11       A.  I wasn't in on this collegial calls.

12       Q.  Right.  So you don't know?

13       A.  I was not in on those collegial calls.

14       Q.  So you don't know?

15       A.  I wasn't in the room with them when they do

16   those calls.

17       Q.  Right.  And you didn't deliver to them a set

18   of documents or medical records so that they could

19   fully evaluate the records?  You weren't invited to

20   those calls, you weren't in on those calls?  You

21   have no idea what they were doing; right?

22       A.  I don't know that I have no idea.  The last

23   clinic notes were supposed to be pulled up.  Not

24   necessarily on the case of this particular one, but

25   sometimes the nurses would say, "Do you have your

1    note?  Do you have this?"  I don't know on specific

2    calls what data they were having in front of them.

3    I know they were supposed to be having the data.

4        Q.  So you don't know if there was any

5    substantive medical discussion whatsoever between

6    Dr. Ritz and Dr. Nawoor at these collegial reviews;

7    correct?  You weren't there?

8        A.  I was not in on collegial reviews.

9        Q.  So you have no idea.  You just know you

10   weren't invited --

11       A.  No, sometimes things were reported to me

12   afterwards.  And the clinics were an opportunity

13   every time to catch up what's happened since last

14   visit.  That was routine, what's happened since last

15   visit.  Sometimes the nurses would report to me

16   what's happened since the last visit.  They would

17   tell me the collegial review.

18       Q.  They tell you a collegial review happened

19   and this is what happened?

20       A.  The nurses did report that.

21       Q.  Right.  But no -- you have no idea -- I'll

22   tell you, Dr. Ritz doesn't have any memory of any of

23   these collegial reviews with regard to Mr. Dean.  No

24   memory at all.  Dr. Nawoor, you heard what he has to

25   say.  You personally have no idea whether they ever

1    had a substantive conversation about Mr. Dean at all

2    because you weren't there?

3        A.  Well, the UM nurse told me when I followed

4    up on February --

5        Q.  That they had --

6        (Parties speaking simultaneously, court.

7        reporter requested clarification.)

8        A.  In February, when reviewed with the UM

9    nurse, that the collegial had happened and that

10   urology was happening, was going to happen.

11       Q.  Right.  You knew the result?

12       A.  Yes.

13       Q.  Right.  One moment.

14       So as everyone knows in the courtroom, my

15   colleagues have a question.  The -- by clinic nurse,

16   are you talking about a nurse at Taylorville or a

17   nurse in Pittsburgh?

18       A.  So utilization management nurses would have

19   been in the Pittsburgh office and teleclinic nurses

20   would have been at the site.

21       Q.  Okay.  So you're talking about both then it

22   sounds like?

23       A.  I have spoken about two kinds of nurses,

24   yes.  Utilization management nurses, of which I

25   believe we named Becky Adams was one that I

1    contacted was presented in this collegial, did this

2    case get reviewed.  That's a utilization management

3    nurse.

4        A teleclinic nurse is a nurse who appeared on

5    the screen with the patient and assisted with the

6    examination.  Caught me up first on any updates in

7    medical history, assisted with the examination,

8    assisted with medication review.  One of them

9    reported to me what the on-site readings were.

10   Sometimes urinalysis, things like that.  And also,

11   the contact there and also the last person at the

12   end of the teleconference visit.

13       Q.  So the other -- you sat here in the

14   courtroom while Dr. Dhar testified; correct?

15       A.  Yes.

16       Q.  And I think she repeatedly told us that when

17   there is visible blood or gross hematuria without

18   pain in an elderly patient, the standard of care was

19   to refer to a urologist, get a CAT scan with IVF and

20   a CAT scan without IVF, and do a cysto.  You heard

21   her say that?

22       A.  I heard her say that.

23       Q.  You agree with that?

24       A.  Well, the clinical plan also depends on the

25   full picture.  I agree that getting to the urologist

1    was the key part of that.  She was a urologist, I

2    agree with that.  That was the plan.  I left it to

3    the interpretation of just which tests.  I didn't

4    know which it would be.  Cysto, I don't believe was

5    in this recommendation, although cysto

6    recommendations had been years before for that

7    patient.

8         Q.  So you agreed with her in the sense that the

9    standard of care was to refer to a urologist and do

10   it quickly?

11        A.  Get to go a urologist.

12        Q.  And do it quickly?

13        A.  Get him to the urologist, yes.

14        Q.  And do it quickly?

15        A.  The scheduling, again, getting to a

16   urologist, getting it and getting UM, getting to a

17   urologist.

18        Q.  You disagree -- you don't think it needs to

19   be done quickly?

20        A.  It does need to be done, yes.

21        Q.  And by quickly, two weeks, one week?

22        A.  I don't have a time frame for you.  My

23   recommendation was get to urologist.  Get to UM and

24   get the patient to urology.

25        Q.  Right.  And then you heard Dr. Metwalli

1    testify that the delays in a urology referral, CAT

2    scan, and surgery detrimented Mr. Dean and violated

3    the standard of care?

4        Do you agree with him that the delays in

5    getting a urology referral violated the standard of

6    care?

7        A.  The standard of care, again, is always

8    supposed to be based on the full clinical picture

9    and individualized.  In this particular case, there

10   were different time frames and coordinations and

11   different considerations.  I agree that the patient

12   had to get to urology, and the way was to talk to

13   UM.  To be in touch with UM and encourage them to

14   get to urology.

15       Q.  Suppose you, Doctor -- we've talked a little

16   bit with your limited ability to do things within

17   the Wexford system.  Suppose this was just you.  And

18   you -- the patient presented and you made a

19   recommendation for him to see a urologist.  How

20   quickly would you want him to get to a urologist?

21           MR. RUPCICH:  Objection.  That calls for

22   speculation, lacks foundation.

23           THE COURT:  The objection is overruled.

24       A.  Are you talking about having to do the whole

25   transportation issue --

1     Q.  You're referring him -- just referring a

2  patient to a urologist.  How quick -- who presented

3  with these symptoms on January 7th.  How quickly

4  would you want him to see a urologist?

5     A.  I think what I would like to do would be to

6  get the urologist --

7     Q.  I'm sorry?

8     A.  I think what I would like to do would be to

9  get the urologist's input to have a suggestion for

10  when is the time frame.

11     Q.  So it sounds like you would want to talk to

12  a urologist right away?

13     A.  Well, perhaps it could be done by phone.

14  Perhaps --

15     Q.  So how quickly would you talk to that

16  urologist to get that input?  Would it be one day,

17  would it be two days, three days?

18     A.  I don't know.  I would hope that --

19     Q.  Would it be a month?

20     A.  I don't have a time frame for you.  It would

21  be soon.  I don't have a time frame for you.

22     Q.  So as a nephrologist who has practiced

23  medicine for quite some time, you actually don't

24  have a time frame?  You can't tell this jury what

25  the time frame should be if you were just doing this

1    yourself?

2        A.  I would hope that urology would have been

3    contacted within a couple weeks within the time

4    frame after I had seen the patient in teleclinic.

5    And before I had seen the patient and coordinated

6    and given an opportunity for all that care,

7    coordination and all that tests back, I would hope

8    that patient would have had contact with urology, at

9    least planning with urology before my next follow-up

10   after collegial review.

11       Q.  Okay.  Pittsburgh, you said that you ran

12   into Dr. Ritz sometimes.  Did you, in January of

13   2015 -- 2016, consider or think about going and

14   telling Dr. Ritz, "This guy really needs to get to a

15   urologist.  Let's just get this done."  Go to the

16   coffee bar, go to his office, see him where ever you

17   see him, "Let's get that done?"

18       A.  I don't recall that.

19       Q.  You heard from Dr. Barnett this morning.  I

20   assume you agree that a fundamental tenant of being

21   a doctor is to do no harm; correct?

22       A.  Yes.

23       Q.  Thank you.

24           THE COURT:  We're going to break at this

25   time.  If you'll be back tomorrow morning before

1    nine, we will reconvene in the morning.

2         You may step down, ma'am.

3         (The witness was excused.)

4         (The jury left the courtroom.)

5              THE COURT:  So, Mr. Tyrrell, you wish to do

6    something now on the record?

7              MR. TYRRELL:  I don't think we're ready to

8    put an actual statement on the record yet.  We were

9    hoping we could run some ideas with the Court off

10   the record for settlement purposes.

11             THE COURT:  Why don't we reconvene in my

12   chambers.

13             MR. MARTIN:  Yes, we'd be happy to.  I have

14   one other issue, Your Honor.

15             THE COURT:  Okay.

16             MR. MARTIN:  We filed a motion, as you

17   know, we filed this motion on the first day of trial

18   with regard to the production and integrity of the

19   document production in this case.

20        The Wexford witnesses, we believe, are just

21   making stuff up at this point, in light of the

22   documents -- in light of the document issues that

23   we've had.  This witness is just one of them.  And

24   then tomorrow we will have Dr. Ritz.  I think we'll

25   have Dr. Ritz.

1          We believe that it's time for a ruling on that

2    motion.  These documents, if you went through the

3    testimony today, the fellow, Dr. Matticks that I

4    called, and you compared it to Wexford's lawyers'

5    representations, excuse me, the documents that were

6    supposedly the documents with regard to collegial

7    review he said on the stand were not.

8          It was Exhibit -- Defendant's Exhibit 4 --

9              THE COURT:  I didn't get to see that

10   exhibit.

11             MR. MARTIN:  Yeah.  I --

12         And I forget -- Mr. Pelz, perhaps you can

13   remind me of my exact question is regard to

14   Defendant's Exhibit 4.

15             MR. PELZ:  You asked if the referral

16   requests should have come with any referral request

17   for a collegial, if any -- if there's any referral

18   remain information in what's been marked as

19   Defendant's Exhibit 4.  And he said no.

20             MR. MARTIN:  This exhibit was when we were

21   talking about this on Monday, this was the exhibit

22   that supposedly was the evidence of collegial review

23   process.  And was actually used by us in our

24   proposed jury instruction.  But now that the witness

25   has testified it's not, we think we have a very

1    serious document issue with regard to the case that

2    we deserve instruction that's either like the one we

3    proposed or if you would like us to propose another

4    one.  But we also think it should happen before

5    Dr. Ritz takes the stand.

6           THE COURT:  All right.  I'll give

7    Mr. Rupcich a chance to respond tomorrow at ten to

8    nine.

9           MR. RUPCICH:  I'm sorry?

10          THE COURT:  Ten to nine.  8:50.

11      All right.  Let's reconvene in chambers.

12          MR. MARTIN:  Thank you, Your Honor.

13      (Court was recessed for the day.)

14   I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

15   Reporter, certify that the foregoing is a correct

16   transcript from the record of proceedings in the

17   above-entitled matter.

18

19

20                This transcript contains the

21                digital signature of:

22

23                Kathy J. Sullivan, CSR, RPR, CRR

24                License #084-002768

25