E-FILED
Monday, 30 November, 2020  06:53:47 PM
Clerk, U.S. District Court, ILCD

# Exhibit E

Pages 24-46

PERRY GUAGLIANONE, M.D.                    December 04, 2019

 1    like?

 2         A.      He's middle aged, somewhat

 3    overweight.  He's usually in a wheelchair when he

 4    comes here.

 5         Q.      And do you recall when Mr. Dean first

 6    became your patient?

 7         A.      It was the -- March -- well,

 8    August 26th, 2016.

 9         Q.      And do you recall who referred him to

10    you?

11         A.      I think it was from Taylorville

12    Correctional.

13         Q.      And what was your understanding of

14    the reason for the referral?

15         A.      He had been diagnosed with metastatic

16    kidney cancer and had surgery and was referred here

17    for follow-up.

18         Q.      And the diagnosis of metastatic

19    kidney cancer, that diagnosis was made by another

20    doctor, correct?

21         A.      Correct.

22         Q.      And when he became your patient, did

23    you agree with that diagnosis?

24         A.      Yes.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

1        Q.      And when he first came to you for

2   follow-up from that surgery, tell me about what you

3   did to determine what appropriate oncologic

4   treatment, if any, was necessary?

5        A.      So we did a liver biopsy in October

6   of 2016 to confirm that he had metastatic disease.

7   But shortly after that time he was hospitalized for

8   a pulmonary embolus in September of 2016, shortly

9   after I saw him.

10       Q.      So you saw him first in August

11  of 2016, correct?

12       A.      Correct.

13       Q.      And when you saw him in August

14  of 2016, what did your first workup entail?

15       A.      Well, the planning for the liver

16  biopsy and then a CT scan and bone scan.

17       Q.      And did you ask him about his medical

18  history?

19       A.      Yes.

20       Q.      What sorts of questions did you ask

21  him?

22       A.      Confirming his recent surgeries and

23  his previous problems.

24       Q.      And --

PERRY GUAGLIANONE, M.D.                    December 04, 2019

```
 1        A.        Do you want to hear all the things
 2   that I --
 3        Q.        By his recent surgery, you mean his
 4   surgery to remove his kidney and --
 5        A.        Correct.
 6        Q.        And by his other problems, what other
 7   problems did you learn about?
 8        A.        That he had heart disease, he had
 9   history of ischemic cardiomyopathy, he's had
10   hypertension, diabetes, obesity, sleep apnea,
11   inguinal hernia repair, history of kidney stones.
12        Q.        And the inguinal hernia repair was
13   not relevant to his care, correct?
14        A.        Correct.
15        Q.        This history of sleep apnea was not
16   relevant to his care, correct?
17        A.        Not at that time, no.
18        Q.        When you heard that he had a history
19   of kidney stones, how did that affect his care for
20   kidney cancer from you going forward?
21        A.        It did not affect things.
22        Q.        And so did you talk with Mr. Dean
23   about his goals for his treatment?
24        A.        I guess I don't think of it in that
```

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 26

1    sense.  But the idea was to assess what his problem
2    was and what was necessary at that time.  So it was
3    more of a characterization of his disease.
4           Q.      So in August of 2016 you wanted to
5    characterize his disease; is that correct?
6           A.      Correct.
7           Q.      And did you talk with him about his
8    preferred course for treating his disease?
9           A.      At that time we had not yet done the
10   liver biopsy and so that was -- the workup was
11   being planned.  And then the discussion of use of
12   -- I think we discussed taking pills to control his
13   disease, that was discussed at that time.
14          Q.      When you say at that time, do you
15   mean after the liver biopsy?
16          A.      No.  It was initial -- my initial
17   note we discussed with the patients with metastatic
18   disease we often treat with pills.
19          Q.      And what kinds of pills are you
20   referring to at that time?
21          A.      Well, I note I had mentioned Votrient
22   or Sutent.  Eventually we went with Votrient.
23          Q.      And what is Votrient?
24          A.      It's a -- it's called a tyrosine

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 27

1    kinase inhibitor which tends to be active in kidney

2    cancer.

3         Q.      I see, okay.  So in the packet that

4    you have there there is a page that is marked at

5    the very lower right-hand corner PTX018-0001.  I

6    can, in a moment, tell you exactly how far into

7    that packet that is.  That marking's at the lower

8    right-hand corner.

9         A.      So what am I looking for?

10        Q.      It's marked PTX018-0001.  It is the

11   33rd page of Exhibit 3.

12        A.      All right.  I have it here.

13        Q.      So it will be near the end.

14        A.      It's the note from 10-19-16.

15        Q.      Yes.

16        A.      Okay.

17        Q.      And so in this note there's a section

18   at the bottom that says plan and discussion, do you

19   see that?

20        A.      Yes.

21        Q.      And there is a Number 1, it continues

22   on the next page with a Number 2.  But looking at

23   Number 1 on PTX018-0001, Number 1 has, in the

24   second sentence, discussed Votrient as a means of

PERRY GUAGLIANONE, M.D.                    December 04, 2019

1    trying to prevent further progression and spread,

2    do you see that?

3         A.      Yes.

4         Q.      At that time was trying to prevent

5    further progression and spread one of Mr. Dean's

6    medical goals?

7         A.      Yes.

8              MR. RUPCICH:  I'm going to show an

9    objection to undisclosed expert testimony.  I'll

10   just show a continuing objection so I don't have to

11   interrupt; is that fair?

12             MR. STROM:  I think that's fair.  I

13   think additionally there needs to be the

14   opportunity for me to cure any objection that you

15   may have here because it's unlikely Dr. Guaglianone

16   will be able to come for trial and because there

17   will be a ruling from the judge as to whether the

18   questions I'm asking tonight will be admissible as

19   part of the trial record.  And so this record, in

20   terms of what it reports, is distinct from any

21   expert opinion that this doctor can offer.  I'll

22   see if I can cure it with a different way of asking

23   the question but if you have an objection still to

24   make.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 29

1               MR. RUPCICH:  All right.

2               BY:  MR. STROM

3       Q.      Dr. Guaglianone, your plan and

4    discussion as of October 19th of 2016 was that you

5    discussed Votrient with Mr. Dean at that time,

6    correct?

7       A.      Correct.

8       Q.      And you discussed with Mr. Dean

9    things like trying to stop the progression and

10   spread of his cancer or no?

11      A.      Yes.

12      Q.      Did you talk with him about side

13   effects?

14      A.      Yes.

15      Q.      Did you talk with him about the

16   consequences of not taking Votrient to try to

17   prevent further progression and spread?

18      A.      I think that's probably implied in my

19   note but I don't see it directly documented.  But

20   that's, I would imagine if I remember correctly,

21   part of the discussion.

22      Q.      And generally, when you write things

23   like this is what you discussed with the patient,

24   do you also tell them the other side of that, if

PERRY GUAGLIANONE, M.D.                    December 04, 2019

1    they choose not to undergo certain treatment what

2    the consequences will be?

3         A.      Yes.  It's a choice to be made.

4    Especially when there's risks for side effects.

5         Q.      And what side effects were there

6    risks of?

7         A.      It's mostly -- this drug in

8    particular we worry about liver toxicity and

9    cardiac toxicity, fluid retention, and people get

10   skin rashes too.

11        Q.      And liver toxicity, that was

12   important to Mr. Dean?

13               MR. RUPCICH:  Object to the

14   foundation.

15               THE WITNESS:  I don't have a

16   recollection of specifically discussing liver

17   toxicity or his reaction to that.

18               BY:  MR. STROM

19        Q.      Let me see if I can ask that question

20   a little differently.  Did Mr. Dean's other health

21   concerns, other health conditions, make liver

22   toxicity an important side effect or important --

23   an important side effect to consider in the risk

24   matrix?

PERRY GUAGLIANONE, M.D.                    December 04, 2019

```
 1              MR. RUPCICH:  Object to vague and
 2   undisclosed expert testimony.
 3              MR. TYRRELL:  I'll join.
 4              THE WITNESS:  Answer?
 5              BY:  MR. STROM
 6       Q.     You may answer.
 7       A.     Yeah.  I mean, the issue of side
 8   effects are always expected.  And often we try to
 9   push a benefit and you don't know whether
10   somebody's going to get a side effect.  So often if
11   we watch things closely then side effects may not
12   be as big of a problem as we expect them to be.  He
13   does have liver metastases so you always worry
14   about liver function as a possible problem in the
15   future.
16       Q.     And so you were thinking about those
17   problems at that time?
18       A.     Sure.  Yeah.
19       Q.     You mentioned cardiac -- cardiac
20   toxicity.  Was that an important side effect to you
21   in considering Mr. Dean's other health concerns?
22              MR. RUPCICH:  Object to vague and
23   undisclosed expert testimony.
24              MR. TYRRELL:  I'll join.
```

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 32

1              THE WITNESS:  Yes, it was a

2    consideration.

3              BY:  MR. STROM

4       Q.       Why?

5              MR. RUPCICH:  Same objection.

6              THE WITNESS:  Potentially a serious

7    side effect of any kind, whether it's the drug

8    itself or a consequence of a drug such as an

9    infection, can cause heart failure in somebody who

10   already has problems with their heart.

11             BY:  MR. STROM

12      Q.       Staying here on this page in

13   Exhibit 3, under plan and discussion, Bullet Point

14   Number 1, you write, he is agreeable.  Do you see

15   that?

16      A.       Yes.

17      Q.       When you wrote that, what did you

18   mean by he is agreeable?

19      A.       That we discussed the pros and cons

20   of the treatment and he wished to proceed.

21      Q.       The next sentence says, we will plan

22   on starting 800 milligrams QD.  What does that

23   mean?

24      A.       That's the dose of Votrient, standard

PERRY GUAGLIANONE, M.D.                          December 04, 2019

Page 33

1    starting dose.

2           Q.      And can you explain what QD means?

3           A.      It's daily.

4           Q.      The next sentence begins, he is in

5    prison.  Do you see that sentence?

6           A.      Yes.

7           Q.      And let me read the sentence and ask

8    you to interpret it for us.  It says, he is in

9    prison, so it will have to be done through the

10   prison pharmacy.  What did you mean when you wrote

11   that sentence?

12          A.      As we're getting more and more access

13   to pills it's paid for in a different way than

14   through regular chemotherapy.  So it's a problem

15   with every patient I have, whether they're in

16   prison or not, that everyone has a different

17   pharmacy.  And you never know where their pharmacy

18   -- where their insurance is telling them to get

19   their pills taken.  So we had to go through the

20   prison pharmacy to see where they wanted us to --

21   or how they wanted us to get the pills.

22          Q.      And when you say how they wanted us

23   to get the pills, does that mean that you were

24   going to order the pills and give them to him?

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 34

1        A.        I was going to order the pills and he

2    would take them.

3        Q.        Was Votrient going to be a pill that

4    he took during visits to your office?

5        A.        No.  He takes it at where he lives.

6        Q.        This was the first pill that you had

7    prescribed for Mr. Dean; is that right?

8        A.        Yes.

9        Q.        Had you treated --

10       A.        Therapeutic anyway.

11       Q.        I'm sorry, I interrupted you.

12       A.        Therapeutic.  He was already on

13   Coumadin I think by that time.

14       Q.        Coumadin was a prescription that you

15   wrote for him?

16       A.        I don't know.  I might have.  I'm not

17   sure.

18       Q.        Did you have prior experience, before

19   October 19th, 2016, of prescribing a pill for a

20   patient through a prison pharmacy?

21       A.        I don't recall.  Not a lot of

22   experience, I guess.

23       Q.        When you wrote that, it will have to

24   be done through the prison pharmacy, what was your

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 35

1    expectation about when he could start taking

2    Votrient?

3          A.      As I said, sometimes the -- working

4    through the insurance, regardless of what insurance

5    it is, sometimes it takes days and sometimes it

6    takes weeks.  That's just my experience with

7    anyone.

8          Q.      And so in working through an

9    insurance company, whoever it might be paying for

10   the pills, it's your testimony that that timeline

11   varies, correct?

12         A.      Correct.

13         Q.      If that timeline is stretched out,

14   for whatever reason, you're aware that a patient

15   might complain about that?

16              MR. RUPCICH:  Object to vague.

17              THE WITNESS:  I'm not sure what

18   you're asking me.  What's the question?

19              BY:  MR. STROM

20         Q.      If the timeline from prescription to

21   the first doses for a patient is longer than

22   expected by that patient, a patient might complain

23   about that, mightn't he?

24              MR. RUPCICH:  Object to vague.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

```
 1                  MR. TYRRELL:  I'll join.
 2                  THE WITNESS:  That would be a
 3    reasonable assumption.
 4                  BY:  MR. STROM
 5        Q.       And you're aware that among the ways
 6    that a complaining patient might try to seek a
 7    remedy for a delay like that would be through the
 8    courts, correct?
 9                  MR. RUPCICH:  Object to lacking
10    foundation.
11                  MR. TYRRELL:  I'll join.  And vague.
12                  THE WITNESS:  I've never had a
13    patient do that before.
14                  BY:  MR. STROM
15        Q.       Let me see if I can ask the question
16    slightly differently.  If a patient is not happy
17    about the time that's elapsed between when a
18    prescription happens and when he or she receives
19    the first dose of that medication, medication that
20    you've prescribed, you're familiar with the fact
21    they may seek a remedy through the courts?
22                  MR. RUPCICH:  Object to the
23    foundation.
24                  THE WITNESS:  I'm not familiar with
```

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 37

 1    that, no.

 2                    BY:  MR. STROM

 3        Q.        I'm sorry?

 4        A.        I'm not familiar with that as a

 5    remedy for slow prescription service.

 6        Q.        You're not familiar with patients

 7    suing their insurance company for not getting

 8    timely treatment?

 9                    MR. TYRRELL:  Object as relevance.

10                    THE WITNESS:  We have -- in our

11    pharmacy they -- we have a staff that is -- they're

12    trained to work through different insurance

13    companies and try to follow their rules in order to

14    get the pills as soon as possible.  So I don't

15    think I've ever had a patient go through the

16    courts.

17                    BY:  MR. STROM

18        Q.        And what --

19        A.        I wasn't sure whether that even

20    happened in this case, I'm not familiar with that.

21        Q.        And when you say our pharmacy, you're

22    talking about the pharmacy here at --

23        A.        Cancer --

24        Q.        The pharmacy at Cancer Care?

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 38

```
 1        A.       Right.

 2        Q.       But you weren't going through the

 3   pharmacy at Cancer Care for Mr. Dean?

 4        A.       Usually what I do is I'll send the

 5   prescription to our pharmacy at Cancer Care because

 6   then they can initiate the process of trying to get

 7   the drug available.  Because, like I said, it can

 8   go in ten different directions and they're good at

 9   tracking down who has to know.  And then it's an

10   issue of reimbursement and some insurance companies

11   will cover partially and then you have to get other

12   supplemental insurances to pay.  And these drugs

13   are very expensive and some people have several

14   different sources of payments for these

15   medications.

16        Q.       You're aware that people sometimes

17   end up in litigation with their insurance

18   companies?

19        A.       I would assume, yes.

20        Q.       In Exhibit 3 there should be a

21   document that's marked as Dean Cancer Care followed

22   by four zeroes and 406.  I can find that for you in

23   just a moment.

24        A.       I got it.  This is encounter date
```

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 39

1    March 2nd, 2017?

2         Q.       That's correct.  Here on Page -- I'll

3    call this 406 of Exhibit 3, do you see the section

4    that says assessment and plan?

5         A.       Yes.

6         Q.       And under that the first sentence

7    that you have written is metastatic kidney cancer

8    progressing on Votrient.  Do you see that?

9         A.       Yes.

10        Q.       What does that sentence mean?

11        A.       It's -- the cancer is continuing to

12   grow despite taking the pills.

13        Q.       So the Votrient does not appear to be

14   slowing or stopping the growth of the cancer?

15        A.       True.

16        Q.       The next sentence says, we discussed

17   other lines of therapy, it starts with that.  Do

18   you see that?

19        A.       Yes.

20        Q.       Why were you discussing other lines

21   of therapy?

22        A.       Because what we were using was not

23   working so we're looking for something else that

24   might work.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 40

1        Q.        And what did you decide to look at
2    instead?
3        A.        What we did or what we were talking
4    about doing, what's your question?  There's several
5    things mentioned in the note.  But do you want to
6    know what we actually did?
7        Q.        Yes.
8        A.        So I think after the Votrient we went
9    to Opdivo.
10       Q.        And why did you choose Opdivo?
11       A.        It had a nice side effect profile
12   with minimal toxicity and had evidence of response
13   in other people.
14       Q.        Three lines up from the bottom of
15   that section, assessment and plan, the line starts
16   the sentence, he states, do you see that?
17       A.        In the assessment and plan?
18       Q.        In the assessment and plan, that's
19   right.
20       A.        Oh, yes.
21       Q.        I'm looking three lines up, he states
22   that he is willing to.  Do you see that sentence?
23   I'm sorry, Doctor.
24       A.        Okay.  I've got it.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 41

1      Q.      Yeah.  He states that he is willing

2 to go with a second-line treatment is the sentence

3 we're both looking at now?

4      A.      Yes.

5      Q.      And what does that sentence mean?

6      A.      Well, first-line was Votrient and the

7 second-line would be something after that.

8      Q.      And the following line, the sentence

9 beginning we will make arrangements, do you see

10 that sentence?

11      A.      Yes.

12      Q.      The sentence reads, we will make

13 arrangements to start Opdivo, hopefully, this

14 coming week.  Why did you write hopefully?

15      A.      For the same reason about Votrient

16 and about every other drug we use, everything has

17 to get pre-approved.  We can't do anything without

18 pre-approval.

19      Q.      At that time were you thinking about

20 what the pre-approval process had looked like for

21 Mr. Dean with Votrient?

22      A.      I don't think I was thinking

23 backwards.  But everything is a new process, so...

24      Q.      And you've alluded to this already.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 42

1    But the last sentence of that section says it will

2    have to get pre-approved, do you see that?

3           A.      Yes.

4           Q.      Did you have in mind who would have

5    to do the pre-approval at that time?

6           A.      Not specifically, no.  There are

7    other people who do that.

8           Q.      Going backwards in the packet,

9    Exhibit 3, to Page 402.  Are you on Page 402 with

10   me, Doctor?

11          A.      Yes.

12          Q.      Page 402, at the top I note that it

13   says encounter date 3-2-2017.  Do you see that?

14          A.      Yes.

15          Q.      If you'll flip back one more page to

16   Page 401 of Exhibit 3 it appears there's a header

17   there with an encounter date of 3-22-2017, do you

18   see that?

19          A.      Yes.

20          Q.      So on Page 402 of Exhibit 3 these are

21   notes from the encounter date of 3-22 despite that

22   header, would you agree?

23          A.      I think he was seen on both days, --

24          Q.      Correct.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 43

```
 1        A.        -- 3-2 and 3-22.

 2        Q.        Correct.  I just want to confirm that

 3   what we're looking at on Page 402 comes from

 4   March 22nd of 2017.

 5        A.        Looks like all of this is from 3-22.

 6        Q.        Page 402 is?

 7        A.        Yes.

 8        Q.        Okay.  And so in -- on Page 402 of

 9   Exhibit 3 there's a section near the top that says

10   history of present illness, do you see that?

11        A.        Yes.

12        Q.        And that section notes that he's

13   there for follow-up?

14        A.        Correct.

15        Q.        And the fourth line begins with, he

16   had progression on Votrient, do you see that?

17        A.        Yes.

18        Q.        That sentence he had progression on

19   Votrient, that's the continued growth of the cancer

20   we discussed before, correct?

21        A.        Correct.

22        Q.        And we tried to start him on Opdivo.

23   Why did you write we tried to start him on Opdivo?

24        A.        'Cause it says we went through an
```

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 44

1    appeals process and it was finally -- the grammar's

2    not quite right.  But we were finally able to get

3    him treated, was finally approved.

4          Q.      What did you know then about the

5    appeals process he went through?

6          A.      Usually I'm not involved with that.

7    Our business office goes through that.  Sometimes

8    they ask me to call or write a letter or something.

9          Q.      In this instance, do you remember how

10   you learned that there had been an appeals process?

11         A.      No, I don't recall.

12         Q.      Why did you write he is finally able

13   to be treated?

14         A.      'Cause that's the day we started the

15   treatment, on the 22nd of March.

16         Q.      Following that sentence it says, it's

17   noted his liver metastases had worsened on 2-10-17

18   CT scan.  Do you see that?

19         A.      Yes.

20         Q.      Is that because the Votrient also was

21   not treating --

22         A.      The Opdivo was not.  He was -- no, he

23   was on Votrient, right.

24         Q.      The Votrient was not treating the

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 45

1    metastases on his liver?

2          A.      Correct.

3          Q.      I'm handing you now what I'd like the

4    Court Reporter, please, to mark for identification

5    as Exhibit 4.

6                  (At which time, Guaglianone

7    Deposition Exhibit Number 4 was marked for

8    identification, and the following proceedings were

9    conducted;)

10                 BY:  MR. STROM

11         Q.      Exhibit 4 is not a document that

12   comes from your records, correct?

13         A.      Correct.

14         Q.      Exhibit 4 has a notation at the

15   bottom PTX117, do you see that?

16         A.      Yes.

17         Q.      And do you see that there is -- let

18   me start -- let me stop for just a moment.  You can

19   put down Exhibit 4 for just a moment and let me ask

20   you.  Do you recall talking with Dr. Ritz about the

21   care for Mr. Dean?

22         A.      No.

23         Q.      Do you know who Dr. Ritz is?

24         A.      No.