E-FILED
Monday, 30 November, 2020 06:53:47 PM
Clerk, U.S. District Court, ILCD

# Exhibit E

Pages 47-69

PERRY GUAGLIANONE, M.D.                    December 04, 2019

1        Q.        Do you recall talking with somebody

2    at Wexford Health Sources about Mr. Dean's care?

3        A.        I've called Taylorville a couple

4    times.  I assume that's the same thing, is that

5    right?

6        Q.        I think that it kind of depends, I'm

7    not always sure.

8        A.        Okay.

9        Q.        When you said that you called

10   Taylorville, --

11       A.        I've talked with them a couple times,

12   Dr. Nawoor I think.

13       Q.        Okay.  In November of 2016 we

14   established that Mr. Dean -- let me start over.  In

15   looking at Exhibit 3 we talked about how in October

16   of 2016 you recommended Opdivo for Mr. Dean, do you

17   recall that?

18       A.        Was it October?  Let me see.  Are you

19   talking -- initially we discussed different

20   treatments.  And so we -- that wasn't the

21   first-line.  So the Opdivo was for second-line.

22       Q.        I'm sorry, I misspoke.  I meant to

23   say Votrient when I was talking about October

24   of 2016.  You did discuss Votrient with Mr. Dean in

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 47

1   October of 2016?

2        A.       Yes.

3        Q.       And do you recall talking with

4   anybody at Taylorville about Votrient after that

5   appointment with Mr. Dean?

6        A.       I don't remember.

7        Q.       Do you recall talking about an

8   alternative to Votrient with anybody at

9   Taylorville?

10       A.       I don't remember.

11       Q.       Would seeing any records from Mr.

12  Dean's care about alternative drugs refresh your

13  recollection about a conversation like that?

14       A.       It could be.  The initial note we

15  talked about a variety of different possibilities.

16  So Votrient was one out of several.  So I might

17  have mentioned that to somebody else too.  But I

18  don't remember how the whole conversation went.

19       Q.       So I'm going to hand you back

20  Exhibit 4.  And in the right-hand column the

21  handwriting there -- and I'm pointing here -- it

22  says, Dr. Ritz will be talking to the oncologist

23  about an alternative drug.

24       A.       Okay.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 48

1          Q.      Does that orient you in time to

2    talking about an alternative to Votrient?

3          A.      No.

4          Q.      Okay.  But you do recall discussing

5    an alternative to Votrient with somebody at

6    Taylorville responsible for Mr. Dean's care?

7                  MR. RUPCICH:  I'm going to object.

8    That misstates his testimony.

9                  THE WITNESS:  No.  I discussed that

10   with Mr. Dean.

11                 BY:  MR. STROM

12         Q.      You still have Exhibit 3 in front of

13   you, Doctor?

14         A.      Yes.

15         Q.      On the first page of Exhibit 3 it

16   should be marked at the bottom Cancer Care

17   Specialists Med Recs 000201; is that right?

18         A.      Yes.

19         Q.      This is an entry for November 8th of

20   2016?

21         A.      Yes.

22         Q.      And on November 8th, 2016 this is a

23   telephone encounter, do you see that?

24         A.      Yes.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 49

```
 1        Q.       What's a telephone encounter?
 2        A.       It's my nurse talking on the phone
 3   and taking a message.
 4        Q.       So this is a message taken by Carla
 5   A. Dignan, LPN?
 6        A.       Yes.
 7        Q.       And she wrote that Dr. Steve Ritz,
 8   Illinois Department of Corrections, asking for you
 9   to call him back.  Did you know then who Dr. Steve
10   Ritz was?
11        A.       No.
12        Q.       Did you call -- do you recall if you
13   called Dr. Ritz back?
14        A.       I don't recall.
15        Q.       This is dated 11-8-2016 after the
16   October appointment with Mr. Dean where you
17   discussed with him Votrient, correct?
18        A.       Yes.
19        Q.       Do you know whether Mr. Dean had
20   started Votrient as of November 8th?
21        A.       He started it on November 17th.
22        Q.       So he had not started it by
23   November 8th, correct?
24        A.       Not by my records, no.
```

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 50

1       Q.      Okay.  The 27th page of Exhibit 3 is
2  a letter.
3       A.      I'm there.
4       Q.      It does not have a number at the
5  bottom, instead it has a number at the top in the
6  middle of the page.  It says 81-1, Page 1 of 1.
7       A.      Is this it?
8       Q.      Are you looking at a letter that's
9  dated July 26, 2019?
10      A.      Yes.
11      Q.      Can you describe this letter
12 otherwise besides the date for us?
13      A.      It's 2019 it says.
14      Q.      Excuse me.  July 26th, 2019.
15      A.      Yes.
16      Q.      Can you describe this letter
17 otherwise?
18      A.      You want me to read it or what would
19 you want?
20      Q.      Generally describing who it's from,
21 who it's to.
22      A.      It's from me to Dr. Nawoor.
23      Q.      And it's dated July 26th, 2019, so
24 this year, correct?

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 51

1        A.      Yes.

2        Q.      The first sentence following the

3   salutation begins, I'm following William Dean for

4   metastatic kidney cancer, do you see that?

5        A.      Yes.

6        Q.      What does it mean when a doctor

7   writes that they are following a patient?

8        A.      I'm treating him.

9        Q.      And this letter further describes his

10  Torisel treatment, which he was on Torisel by that

11  time, correct?

12       A.      Correct.

13       Q.      And was his cancer responding to

14  Torisel as of July 26th, 2019?

15       A.      Yes.  It is around the time when we

16  got ready to change.

17       Q.      You wrote this letter on or about

18  July 26th, correct?

19       A.      Yes.

20       Q.      And you also wrote that his cancer

21  would eventually become resistant to treatment,

22  correct?

23       A.      Yes.

24       Q.      And you believed at the time you

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 52

1    wrote this letter that his cancer would take his

2    life?

3         A.      Yes.

4         Q.      And that's in part because it had

5    already become resistant to Votrient?

6         A.      Yes.

7         Q.      And that's also because it had also

8    become resistant to Opdivo, correct?

9         A.      Yes.

10        Q.      And that is therefore part of why you

11   were predicting that it would become resistant to

12   Torisel, correct?

13        A.      Yes.

14        Q.      I'd like to turn your attention to a

15   document that has been marked within Exhibit 3 as

16   Cancer Care Specialists Med Recs 000161.  This is

17   the third page of Exhibit 3.

18        A.      Okay.

19        Q.      This is an August 26th, 2016 note,

20   correct?

21        A.      Yes.

22        Q.      And under the bullet point -- or

23   under the heading plan and discussion at the top of

24   the page, Bullet Point Number 1, do you see that?

PERRY GUAGLIANONE, M.D.                    December 04, 2019

1        A.        Yes.

2        Q.        The second sentence begins -- or the

3    second sentence reads, we will try to obtain his

4    path reports to assess histology, do you see that?

5        A.        Yes.

6        Q.        Does path report there refer to a

7    pathology report?

8        A.        Yes.

9        Q.        And a pathology report is a report

10    that discusses the nature of the pathology that was

11    being studied, correct?

12        A.        It's the microscopic evaluation of

13    the cancer.

14        Q.        And what's histology?

15        A.        It's similar things.

16        Q.        Why did you write we will try to

17    obtain his path reports?

18        A.        Because I didn't have them at that

19    time.

20        Q.        Why not?

21        A.        They were done in Springfield.

22        Q.        And they hadn't yet been added to the

23    computer system?

24        A.        Correct.

PERRY GUAGLIANONE, M.D.                          December 04, 2019

Page 54

1        Q.        Do you know when the pathology report
2    was -- let me start over.  Do you know when the
3    pathology study was done?
4        A.        This was related to his initial
5    surgery before I met him.  And when I saw him
6    August 26th, 2017 I didn't have those reports.  I
7    received them somehow -- sometime during the time
8    that he was in the hospital in September for his
9    pulmonary embolus I was able to get his reports.
10       Q.        Near the bottom of that section,
11   three lines up, the section here on Bates 161 of
12   Exhibit 3, the section plan and discussion.  Three
13   lines up from the bottom of that section there's a
14   sentence that begins, we will try to assess, do you
15   see that?
16       A.        Yes.
17       Q.        The full sentence says, we will try
18   to assess his stage over this coming week when more
19   information is available.  When you wrote stage,
20   what did that mean?
21       A.        The -- he had advanced cancer that
22   was resected.  The question at that time was
23   whether there was any residual cancer left behind.
24       Q.        And if there was it would affect the

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 55

1    stage?

2          A.      Yes.

3          Q.      And am I correct that it would be the

4    difference between Stage 3 and Stage 4?

5          A.      Yes.

6          Q.      Okay.  You wrote, when more

7    information is available.  Do you know what more

8    information you were waiting for at that time?

9          A.      That's when I was arranging the liver

10   biopsy and the scans and the path report he had

11   before, so I was trying to get everything together.

12         Q.      Okay.  I'd like to look next at a

13   July 13, 2017 entry that's on what's been marked as

14   Bates 350 in Exhibit 3.  I can direct you to where

15   in that packet that is in just a moment.  It

16   appears to be the 13th page of Exhibit 3.

17         A.      350?  Is it 350, is that what you

18   said?

19         Q.      350, that's right.

20         A.      Okay.

21         Q.      And this is an entry from July 13th,

22   2017?

23         A.      Yes.

24         Q.      Do you see the section on the page

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 56

1      that says assessment and plan?

2          A.      Yes.

3          Q.      And Bullet Point Number 1, metastatic

4      kidney cancer, that's his diagnosis, correct?

5          A.      Correct.

6          Q.      He is on Torisel, that's the drug he

7      was taking at that time, correct?

8          A.      Yes.

9          Q.      The next sentence writes, we tried to

10     get his CT scan over this week but it did not

11     happen.  Do you recall why it did not happen?

12         A.      I don't think I ever find a reason

13     why things do not happen but it did not happen,

14     so...

15         Q.      Do you have a CT scan here on the

16     premise of your office?

17         A.      Yes.

18         Q.      When you wrote we tried to get his CT

19     scan over this week but it did not happen, were you

20     trying to arrange for a CT scan here on your

21     premises?

22         A.      I believe that's the case, yes.  But

23     I'm not sure.

24         Q.      And you wrote, we will reorder this?

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 57

```
 1        A.       Yes.  Or it was done at -- I think
 2   his are being done at the hospital.
 3        Q.       Do you know why they weren't
 4   happening here?
 5        A.       Not specifically, no.
 6        Q.       I want to direct your attention to
 7   Exhibit 3, two pages earlier, to a page that has
 8   been marked with a Bates number ending in 344.
 9   This is an encounter date from July 20th, 2017.  Do
10   you see that?
11        A.       Yes.
12        Q.       Do you see the section for this
13   encounter of July 20th, 2017 on assessment and
14   plan?
15        A.       Yes.
16        Q.       Do you see the third line there, the
17   second word begins a sentence I have been trying,
18   do you see where I am?
19        A.       Yes.
20        Q.       That sentence reads, I have been
21   trying to get a CAT scan to assess response over
22   the past several weeks.  Do you recall how many
23   weeks you'd been trying to get a CAT scan?
24        A.       Not specifically.  But I think I was
```

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 58

1    frustrated at that time because it was taking so

2    long to get a scan.

3           Q.      As of July 20th of 2017, correct?

4           A.      Yes.

5           Q.      And at that time he was on his third

6    systemic therapeutic drug?  Or if you recall, he

7    was on Torisel at that time?

8           A.      He was on Torisel.

9           Q.      Directing your attention two pages

10   earlier, a document that's been marked with a Bates

11   number that ends in 195.  Here we have another

12   unfortunate discrepancy between the header that

13   says encounter date of 7-20-2017, because I believe

14   that this is a note pertaining to an encounter of

15   May 17, 2018.  If you look at the document that's

16   been marked with a Bates ending 193 as part of

17   Exhibit 3 a couple pages earlier there's a header

18   that says May 17th of 2018, do you see that?

19          A.      Yes.

20          Q.      And do you agree that here on

21   Page 194 we're still looking at information from

22   May 17 of 2018?

23          A.      I'll double check.  It looks like the

24   note from May 17th, 2018.

U.S. Legal Support, Inc.
(312) 236-8352

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 59

1          Q.        And do you see the section of that

2    note on Page 195 for the

3    laboratory/pathology/imaging notes?

4          A.        Yes.

5          Q.        There you've written, white count and

6    CBC are still pending.  He had these done at the

7    Taylorville prison.  I am still trying to get those

8    results.  Why did you write that?

9          A.        Because I didn't have them at the

10   time.

11         Q.        Do you recall why you didn't have

12   them at the time?

13         A.        Like I said, I don't know reasons why

14   but they weren't available.

15         Q.        Do you know how long you had been

16   waiting at that time?

17         A.        I don't think there's anything in the

18   record that would answer that question.  I'm not

19   sure.

20         Q.        You don't recall how long you'd been

21   waiting for those particular reports?

22         A.        Usually when I had seen him on that

23   day that's when I'm looking for the results.

24         Q.        And why were you looking for the

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 60

1    results on that day?

2          A.      Because he was there.

3          Q.      And why did you need them when he was

4    there?

5          A.      To monitor for potential side

6    effects.

7          Q.      Your testimony earlier, as informed

8    by your records, was that the purpose of Mr. Dean's

9    treatment was to stop the growth and progression of

10   his cancer, do you recall that?

11         A.      Yes.

12         Q.      Was the purpose to extend his life?

13         A.      Yes.

14         Q.      Was the purpose to extend his life

15   expectancy?

16         A.      Well, expectancy is an issue about

17   what to anticipate in the future.  So you can

18   extend somebody's life and -- that's semantics I

19   guess.  You can extend somebody's life and that's

20   reality or you could tell them something and they

21   may have different expectations.  So I don't know

22   if that's a valid distinction.

23         Q.      As a matter of probability, would it

24   increase his life expectancy to receive those

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 61

1    treatments?

2         A.      All the --

3                 MR. RUPCICH:   I'm going to object as

4    to undisclosed expert testimony but go ahead.

5                 THE WITNESS:   In all the treatments

6    we discussed I've had benefits in some people but

7    not all people.   So with any treatment it would be

8    -- some people get good responses and some people

9    don't, so people who get good responses have a

10   better survival than people who respond to nothing.

11                BY:   MR. STROM

12        Q.      And so Mr. Dean was agreeing to this

13   treatment -- let me withdraw that.   Pardon my

14   question.

15                THE VIDEOGRAPHER:   I do need a tape

16   change.

17                MR. STROM:   Sure.

18                THE VIDEOGRAPHER:   Off the record,

19   7:02.

20                (At this point in the proceedings, a

21   short recess was taken, after which the following

22   proceedings were conducted;)

23                THE VIDEOGRAPHER:   On the record,

24   7:07.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 62

1                    BY:  MR. STROM

2          Q.       Dr. Guaglianone, there in Exhibit 3,

3     it's still in front of you, the third page of that

4     packet, it has been marked with a Bates number that

5     ends 161.

6          A.       Okay.

7          Q.       This is the encounter note from

8     August 26th of 2016, correct?

9          A.       Yes.

10         Q.       And on this page, we may have spoke

11    about this section a little already, there is the

12    heading plan and discussion, do you see that?

13         A.       Yes.

14         Q.       About a third of the way through that

15    section, the line where the first word is brain.

16    If you trace that over to the next full sentence it

17    begins with we discussed, do you see that?

18         A.       Yes.

19         Q.       The sentence says, we discussed that

20    if his cancer had been completely resected, there

21    would be no value in adjuvant treatment.  When you

22    wrote completely resected, can you explain that in

23    lay terms, please?

24         A.       If all the tumor was removed without

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 63

1    anything residual.

2         Q.      So no part of the tumor would be

3    remaining if it were completely resected?

4         A.      Yes.

5         Q.      The second half of that sentence,

6    there would be no value in adjuvant treatment.

7    What is adjuvant treatment?

8         A.      In different cancers it's been shown

9    that giving chemotherapy after resection can

10   improve the risk of recurrence.  So in kidney

11   cancer that's not a proven point.

12        Q.      And so adjuvant treatment is

13   chemotherapy?

14        A.      Broadly speaking.  But, you know,

15   could include any of these pills too or

16   immunotherapy.

17        Q.      So if I can try to make sure I'm

18   understanding, adjuvant treatment is some sort of

19   systemic therapy?

20        A.      Yes.

21        Q.      And it's a systemic therapy that

22   follows an attempt at complete resection of a

23   cancer?

24        A.      Yes.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 64

1          Q.        But when it comes to kidney cancer,

2    if it's completely resected, your testimony is that

3    there's no demonstrated benefit to that sort of

4    treatment following complete resection, correct?

5          A.        Yes.  At that appointment anyway.

6          Q.        And so if the cancer had been fully

7    removed there'd be no need for systemic therapies

8    like chemotherapy?

9          A.        Right.

10          Q.        The next sentence says, if he has

11    active disease.  Do you see where I'm looking?

12          A.        Yes.

13          Q.        Sentence reads, if he has active

14    disease, then there are a variety of treatments

15    available for stabilization.  What does active

16    disease mean in that sentence?

17          A.        If his cancer's growing.

18          Q.        And at this time you had not yet done

19    the liver biopsy, correct?

20          A.        Correct.

21          Q.        And so you didn't yet know if all of

22    the cancer in his system had been completely

23    resected, correct?

24          A.        Correct.

PERRY GUAGLIANONE, M.D.                          December 04, 2019

Page 65

1        Q.        And so this sentence pertains to what

2    the plan will be if it's found that the liver

3    biopsy detects cancer; is that right?

4        A.        Or if not, either way.

5        Q.        This sentence means that if the liver

6    biopsy detected cancer then there were a variety of

7    treatments that you would discuss at that time?

8        A.        Yes.

9        Q.        And when you say a variety of

10   treatments available for stabilization, what does

11   stabilization mean?

12       A.        Not cure but preventing growth of the

13   disease.

14       Q.        So preventing further increase in

15   size?

16       A.        Size and spread.

17       Q.        Preventing spread to other organs?

18       A.        Yes.

19       Q.        We discussed before notes from your

20   encounters with Mr. Dean in which he agreed to

21   certain treatments, right?

22       A.        Yes.

23       Q.        And in agreeing to those treatments

24   he was looking to stop the growth and spread of his

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 66

1   cancer, correct?

2       A.      Yes.

3               MR. RUPCICH:  Object to the

4   foundation, but...

5               BY:  MR. STROM

6       Q.      The purpose in those treatments was

7   to extend his life so that he could leave prison

8   alive?

9               MR. RUPCICH:  Object to the

10  foundation.

11              THE WITNESS:  That wasn't our stated

12  purpose at that time, no.  We're dealing with more

13  immediate issues at that time, so...

14              BY:  MR. STROM

15      Q.      The purpose was to extend his life --

16      A.      Well, --

17      Q.      -- with treatments?

18      A.      For whatever -- that's the intention.

19      Q.      And so if his life were extended by

20  one month at the end at some point it would

21  increase the probability he'd walk out of prison

22  alive?

23              MR. RUPCICH:  Object to the

24  foundation, vague.

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 67

 1                    MR. TYRRELL:  I'll join.

 2                    THE WITNESS:  For whatever -- however

 3      he spends his life, yes.

 4                    BY:  MR. STROM

 5           Q.      And he wanted to fight his cancer so

 6      that he could walk out of prison?

 7           A.      He has mentioned that on several

 8      occasions.

 9           Q.      And that's why he was determined to

10      undertake treatment that included side effects?

11                    MR. RUPCICH:  Object to the

12      foundation.

13                    MR. TYRRELL:  Join.  Also

14      speculation.

15                    THE WITNESS:  Even if he were not in

16      prison I think -- this is the treatment people

17      would do even if they weren't in prison.

18                    BY:  MR. STROM

19           Q.      The last document I want to direct

20      your attention to has been marked with a Bates

21      number ending 388.  That is going to be the 18th

22      page in your packet there, which is Exhibit 3.  We

23      discussed this encounter note before, I believe,

24      pertaining to May 12th of 2017?

PERRY GUAGLIANONE, M.D.                    December 04, 2019

Page 68

1         A.       I believe so, yes.

2         Q.       And here on the page that's been

3    marked with a Bates number ending in 388 of

4    Exhibit 3, you see the section with the header

5    assessment and plan?

6         A.       Yes.

7         Q.       And do you see Bullet Point Number 3

8    under assessment and plan?

9         A.       Yes.

10        Q.       The third line of Bullet Point Number

11   3, it's a line that begins with the word cancer, do

12   you see that line?

13        A.       The sentence that says hopefully?

14        Q.       This is the section assessment and

15   plan, I think we're looking at that section

16   together.

17        A.       Yes.

18        Q.       Bullet Point Number 3.

19        A.       Yes.

20        Q.       And then two lines down from the

21   Bullet Point Number 3, so the third line of Bullet

22   Point Number 3, --

23        A.       Oh, I see.

24        Q.       -- cancer is brought under control.

U.S. Legal Support, Inc.
(312) 236-8352