E-FILED
Monday, 30 November, 2020  06:53:47 PM
Clerk, U.S. District Court, ILCD

# Exhibit G

pages 1-625

**Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services**

**Report of the 2nd Court Appointed Expert**

**Lippert v. Godinez**

October 2018

Prepared by the Medical Investigation Team

Mike Puisis DO

Jack Raba, MD

Madie LaMarre MN, FNP-BC

Catherine M. Knox RN, MN, CCHP-RN

Jay Shulman, DMD, MSPH

**PTX193-0001**

# Table of Contents

Background ................................................................................................................... 2

Methodology ................................................................................................................. 2

IDOC Prisons Overview ................................................................................................. 6

Key Findings ................................................................................................................. 9

Statewide Medical Operations .................................................................................. 12
    Leadership, Staffing, and Custody Functions ........................................................ 12
    Wexford Provider Staffing and Physician Credentialing ...................................... 21
    Statewide Use of University of Illinois ................................................................. 31

Statewide Overview of Major Services ...................................................................... 32
    Clinical Space and Equipment .............................................................................. 32
    Medical Records ................................................................................................... 37
    Medical Reception ............................................................................................... 42
    Intrasystem Transfer ........................................................................................... 45
    Nursing Sick Call .................................................................................................. 48
    Chronic Care ........................................................................................................ 52
    Urgent/Emergent Care ........................................................................................ 59
    Specialty Consultations ....................................................................................... 62
    Infirmary Care ..................................................................................................... 69
    Pharmacy and Medication Administration ........................................................... 77
    Infection Control .................................................................................................. 84
    Mortality Reviews ................................................................................................ 91
    Dental Program .................................................................................................. 103
    Internal Monitoring and Quality Improvement .................................................. 118

Recommendations .................................................................................................... 121
    Key Recommendations of Second Court Expert .................................................. 121
    Organizational Structure, Facility Leadership, and Custody Functions ................ 122
    Clinic Space and Equipment ................................................................................ 124
    Medical Records ................................................................................................. 126
    Medical Reception ............................................................................................. 127
    Intrasystem Transfer ......................................................................................... 129
    Nursing Sick Call ................................................................................................ 129
    Chronic Care ...................................................................................................... 131
    Urgent/Emergent Care ...................................................................................... 133
    Specialty Consultations ..................................................................................... 135
    Infirmary Care ................................................................................................... 137
    Pharmacy and Medication Administration ......................................................... 138
    Infection Control ................................................................................................ 140
    Mortality Reviews .............................................................................................. 146
    Dental Program .................................................................................................. 147
    Internal Monitoring and Quality Improvement .................................................. 150

PTX193-0002

# Background

This report is produced for the United States District Court for the Northern District of Illinois Eastern Division with respect to the litigation Don Lippert, et al. v. John Baldwin, et al. No. 10-cv-4603. The Court has asked for the Expert to:

> "Assist the Court in determining whether the Illinois Department of Corrections ("IDOC") is providing health care services to the offenders in its custody that meet the minimum constitutional standards of adequacy."[1]

The Court gave further direction. The Court asked the Expert to determine primarily whether any of the systemic deficiencies identified by the First Court Expert as reported in December of 2014 currently exist. The Court asked the current Expert, in the course of the evaluation, to identify any additional systemic deficiencies. Finally, the Court asked for assistance in forming recommendations to correct identified deficiencies. The Court asked the current Expert to consider the solutions proposed by the First Court Expert or to suggest alternate solutions. For newly identified deficiencies, the Court asked for new recommendations.

In order to form our opinion to answer these questions, the Expert, Michael Puisis DO, formed an investigative team consisting of Jack Raba MD, nurse practitioner Madie LaMarre MN, FNP-BC, Catherine Knox MN, RN, CCHP-RN, and dentist Jay Shulman DMD, MSPH.

# Methodology

The current Court Expert met with parties on December 18, 2017 to discuss his methodology and plan. The methodology explained to parties was one typically used by correctional experts in answering questions regarding adequacy of medical care in correctional settings. We interview staff and patients. We observe delivery of care as it occurs for selected processes. We review Administrative Directives, policies, and other documents such as budgets, staffing documents, quality improvement meeting minutes, and reports, etc. We tour facilities' areas where care is provided and observe the setting of care to determine the adequacy of resources that support care. Lastly, we review a sample of health records, including death records. From these interviews, tours, document reviews, and record reviews, we form our opinions and recommendations.

During our five site visits we reviewed 362 medical records and 363 dental records.[2] In addition, we reviewed 33 death records. Dr. Puisis performed all mortality reviews. Findings in site visit record reviews corroborated findings in death reviews. Charts for urgent care, specialty care, and hospital care record review were chosen based on having an ambulatory care-sensitive

---

[1] Second Order Appointing Expert, United States District Court for the Northern District of Illinois Eastern Division, No. 10-cv-4603 filed 12/8/17.

[2] A table with details of record reviews is found at the end of this report as an appendix.

PTX193-0003

condition.[3] For all other site visit medical record reviews, records were chosen of patients that had an actual or potential serious medical needs. In the case of chronic illness,[4] records were chosen randomly by type of disease (e.g., diabetes, autoimmune, HIV, etc.) For nursing sick call, we selected records nursing sick call logs of patients with potentially serious medical needs such as shortness of breath or chest pain instead of persons complaining of athlete's foot or wanting a low bunk.

For mortality reviews, there were 174 deaths in 2016 and 2017. We asked for 89 records but only reviewed 33 records due to the truncated investigation. We excluded from selection nine suicide deaths, three overdose deaths, and one death from injury. Record selection was somewhat limited by the availability of records. We asked for death records when the Expert first met with the attorneys in December of 2017. We started receiving records on March 7, 2018. Initially we reviewed six records,[5] as they were the only records we had available. Twenty-one records were then chosen from sites we were visiting.[6] We then randomly chose two records from sites that the First Court Expert had visited.[7] The remaining four records were chosen at random from sites that neither Expert visited. The only information available at the time of record selection was the name, date of death, age, facility, and cause of death. The cause of death was not provided for all patients; some patients had "natural causes," "cardiac arrest," or "unknown" listed as the cause of death. Autopsies were not available for all deaths; even when an autopsy was done it was not consistently available. We randomly chose more records from facilities we were visiting intending to allow for a comparison with observed care during site visits. We reviewed one to two years of documentation of care in these records.

Our mortality review consisted of describing episodes of care, and for each episode we identified errors using a classification of 18 different error types. This allowed us to identify common and systemic problems within the health program. Error types were summarized as an appendix in the mortality review document. We summarized the mortality reviews in a narrative summary, but also provided the spreadsheets used to document each individual episode of care reviewed so that reviewers can see the specific instances of care that formed our opinion in the narrative. The mortality reviews are integral to our opinion and should be reviewed. These documents are provided as an appendix.

For dental records, the chart selection methodology is described in each element of the dental program.

The IDOC, in their comments on our report, asserted that the report "relies primarily on a subjective review of the health record" and failed to use "objective clinical measurements such

---

[3] Ambulatory care sensitive conditions (ACSC) are conditions that can be managed in an outpatient setting. HEDIS, the Agency for Healthcare Research and Quality (AHRQ) and quality improvement programs use ACSC to select records to review to assess whether hospitalization might be preventable or whether care reveals quality or systemic issues. For more information see the Prevention Quality Indicator Overview at https://www.qualityindicators.ahrq.gov/modules/pqi_overview.aspx.
[4] We presume that all patients with chronic illness have a potential or actual serious medical illness.
[5] Patients #1, 2, 3, 4, 5, and 6.
[6] Patients #7 through 27 inclusive.
[7] Patients #30 and 31; Pontiac had no deaths.

PTX193-0004

as those found with the Healthcare Effectiveness Data and Information Set ("HEDIS"[8]) guidelines or critical process assessments."[9] The IDOC does not participate in HEDIS measurement so there was no IDOC data to review with respect to HEDIS measures.[10] Moreover, quality improvement reports did not include objective data measures similar to HEDIS that might have informed us. IDOC lacks useable data for analysis of clinical care, which is evident in their quality improvement efforts. The First Court Expert in his analysis of the quality improvement program also identified this problem.[11]

In their comments on our reports, the IDOC asserted that we believed that prison health care systems should provide care "significantly in excess of what is available in the community" and that our report "takes the position that inmates are entitled to a perfect healthcare delivery system." We do not agree with those assertions. The benchmarks we use are community and correctional standards of care,[12] not a hypothetical standard "in excess of what is available in the community."

---

[8] The Healthcare Effectiveness Data and Information Set (HEDIS) is a performance measurement system managed by the National Committee for Quality Assurance (NCQA). There are over 90 HEDIS measures over six domains including safety, effectiveness, patient-centered, timely, efficient, and equitable. Large health maintenance organizations and practices use HEDIS to measure their performance. Data submission used for HEDIS reporting is strictly controlled and defined. These measures are a useful comparator between managed care organizations and other health organizations. These measures do not address acute or emergency care, access to specialty services, access to hospital care, access to an appropriate provider, timely access to a professional opinion and evaluation, access to medication, or many other areas specific to the correctional setting. These performance measures are useful but are not designed for correctional health care programs

[9] Letter via email from John Hayes and Michael Arnold, Office of the Attorney General to Dr. Puisis: Re: *Lippert v. Baldwin,* No. 10-cv-4603 – Defendants' comments to the Draft Report of the 2nd Court Appointed Expert, dated September 10, 2018.

[10] Although IDOC does not track HEDIS measures or participate in HEDIS, we made comments on and/or reviewed care in multiple areas that correspond to HEDIS measures. Our report documents record reviews or other investigations that identified quality of care and/or systemic issues in all of the following HEDIS measurement areas: Adult BMI assessment; Colorectal cancer screening; Care for older adults; Use of spirometry testing in the assessment and diagnosis of chronic obstructive pulmonary disease; Statin therapy for patients with cardiovascular disease and diabetes; Comprehensive diabetes care; Follow-up after emergency department visit for people with multiple high-risk chronic conditions; Medication management in the elderly; Fall risk management; Management of urinary incontinence in older adults; Influenza and pneumococcal vaccination status for older adults; Hospitalizations for potentially preventable complications; Acute hospitalization utilization; and Emergency Department utilization.

[11] On page 44 of the First Court Expert's summary report he states, "although some data was collected it was never used to measure performance against standards and therefore was not part of an effort to measure the quality of performance."

[12] As examples of references reflecting community standards of care, we utilized the U.S. Preventive Services Task Force Recommendations for Primary Care Practice; CDC Recommended Immunization Schedule for Adults Aged 19 Years or Older, United States, 2018; MMWR (2006) Prevention and Control of Tuberculosis in Correctional and Detention Facilities; Standards of Medical Care in Diabetes by the American Diabetes Association; 2013 American College of Cardiology/American Heart Association Guideline on the Treatment of Blood Cholesterol to Reduce Atherosclerotic Cardiovascular Risk in Adults; Global Initiative for Chronic Obstructive Lung Disease updated 2016; American College of Cardiology/American Heart Association Guidelines for the Management of Patients With Unstable Angina and Non-ST-Elevation Myocardial Infarction; Evidence-Based Guideline for the Management of High Blood Pressure in Adults, Report from the Panel Members Appointed to the Eighth Joint National Committee (JNC 8): Centers for Disease Control and Prevention; HIV Testing Implementation Guidance for Correctional Settings. 2009; National Commission on Correctional Health Care, 2014 Standards for Health Services in Prisons; HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, Last Updated  May 24, 2018; American Association for the Study of Liver Diseases and Infectious Diseases Society of America; Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i); Guidelines for Infection Control in Dental Health-Care Settings--2003. MMWR, December 19, 2003/52(RR17):1:16; Stefanac SJ. Information Gathering and Diagnosis Development; American Dental Hygiene Association Standards for Clinical Dental Hygiene Practice Revised 2016; Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006); Correctional Dental Services. In M. Puisis (Ed.), Clinical Practice in Correctional Medicine (2nd edition); Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure.

PTX193-0005

In addition to record reviews, we toured five facilities: Northern Reception Center (NRC), Stateville Correctional Center (SCC), Dixon Correctional Center (Dixon), Logan Correctional Center (LCC), and Menard Correctional Center (MCC). Four Experts visited each site; two doctors, a dentist, and a nurse. During each facility visit, we:

- Met with leadership of custody and medical
- Toured the medical services areas and housing units
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

The First Court Expert mentioned in his report that the State provided comments that the Investigative Team should utilize standards from the National Commission on Correctional Health Care (NCCHC) or the American Correctional Association (ACA) as the basis for their investigation. We agree with the First Court Expert's response that NCCHC standards are useful as a basis to evaluate IDOC Administrative Directives and certain processes of care. We do use the NCCHC standards for that purpose and mention this in this report. However, the request of the Court is to determine adequacy of care for serious medical needs. In order to do that, one must do more than evaluate whether Administrative Directives meet NCCHC standards. Adherence to NCCHC standards does not verify that quality of clinical care is adequate, which is arguably the most important aspect of determining adequacy of care. The limitations of the NCCHC standards as a sole measure for constitutional adequacy require additional investigative measures to answer the Court's request. Observation of actual practices at the facilities form the basis for evaluation of actual care as it is delivered, and review of records forms the basis for evaluation of clinical care.

To facilitate comparison with the First Court Expert's report, we have utilized similar headings of major services reviewed. We agree with the First Court Expert's organization of topics of study as presented in his table of contents. One change we made was to combine laboratory functions and clinic space and sanitation, and to include other diagnostic testing available onsite. These items are all support functions and were combined for that reason. We have added a section in the summary document discussing the statewide operations of the IDOC, UIC, and Wexford, the medical vendor, including a section on credentialing of physicians on a statewide basis. We also included a brief summary describing the statewide monitoring effort of the current medical contract.

The Second Order Appointing Expert gave authority to perform tours of eight facilities that had been reviewed by the First Court Expert. The Court's Order gave the Expert discretion to decline visiting any of the facilities if determined to be unnecessary. The Court's Order required the Expert to meet parties after the first 120 days of the investigation to establish a plan and timeline for concluding the review in a timely and cost-effective manner.

---

American Dental Association and U.S. Food and Drug Administration, 2012. For items for which there is no standard of care, we utilized information as found in Up-To-Date, an online medical reference.

PTX193-0006

We started this project intending to review eight facilities. At the 120 day meeting, the Expert discussed preliminary findings and announced that it was his opinion that review of the eight facilities was not necessary. The findings were consistently similar facility to facility and confirmed by the First Court Expert's findings. Review of death records from 12 facilities demonstrated consistently poor care and the evidence was so overwhelming that the Expert found it unnecessary to continue visiting the full complement of eight facilities. The Expert strongly believes that further visits would not add to our opinions, except for site-specific recommendations. We terminated visits after five facilities were visited. These included: NRC, SCC, Dixon, LCC, and MCC. It is our opinion that this complement of facilities is adequate to form an opinion of statewide services. The sample includes the main male and female reception centers, the center used to house geriatric patients, two of the three maximum security prisons, the largest IDOC facility (Menard Correctional Center), and facilities from Northern, Central and Southern areas of the state. We are confident that review of this group of facilities gives a representative sample of the IDOC health care system.

With respect to this report, for each section in which the First Court Expert had findings, we summarize his findings in a paragraph and make a subsequent statement whether his findings were still present or have been resolved. We then present our own findings. With respect to recommendations, we do the same. We list, verbatim, the First Court Expert's Recommendations and document whether we agree or not. If we disagree or had additional comments we add those. When we comment on the First Court Expert's Recommendations we do so in italics so our comments can be distinguished from the First Court Expert's comments.

## IDOC Prisons Overview

The Illinois Department of Corrections was established in 1970 to administer and operate state prisons, juvenile centers, and juvenile and adult parole services. In 2006, the Illinois Department of Juvenile Justice was formed, which separated the adult and juvenile correctional systems. In 1970, the IDOC operated seven adult prisons. Currently, the IDOC operates 25 adult prisons,[13] a facility for housing the severely mentally ill (Joliet Treatment Center), and four transition centers.[14] The population of Illinois prisons has increased from approximately 6000 inmates in 1974 to approximately 49,000 inmates in 2015,[15] an eight-fold increase in population. The most recent information given to us by the IDOC is that the correctional center population as of November 30, 2017 is 41,376.[16]

Illinois prisons are overcrowded. The latest data from 2015 comparing prisons nationwide show that, based on design capacity, Illinois is the second most overcrowded prison system in the

---

[13] NRC and SCC are considered one facility for custody purposes, but NRC and SCC now have separate medical programs. Therefore, for purposes of this report there are 26 facilities. When we refer to prisons with respect to the medical programs we will refer to 26 prisons.

[14] Agency Overview on the IDOC website found on December 16, 2017 at https://www.illinois.gov/idoc/aboutus/Pages/IDOCOverview.aspx.

[15] Illinois Prison Overview, Illinois State Commission on Criminal Justice and Sentencing Reform, 2015, as found at http://www.icjia.org/cjreform2015/research/illinois-prison-overview.html.

[16] 180126 Presley Rated Capacity on November 30, 2017, provided to us by IDOC.

PTX193-0007

nation. Alabama is the most overcrowded.[17] That 2015 data showed that Illinois had a population at 145% of capacity. Since 2015, the population has been reduced by several thousand. Still, as of November 30, 2017, the IDOC is at 131% of rated capacity. It houses 41,376 inmates in facilities rated to hold 31,525 inmates.[18]

Many IDOC facilities are old and hard to maintain. The state, on several occasions, has attempted to close some of these older facilities, including SCC, Pontiac, and Vandalia. In recent years parts of the Stateville Correctional Center, including the old Roundhouse building, have been closed. Of its 25 adult prisons, only four were opened in the 21st century, and two of these facilities (Decatur and Sheridan) were older facilities that were rehabilitated. Thirty-eight percent of inmates in IDOC reside in facilities built before 1981. Two of the facilities housing approximately 11% of the IDOC population were built in the 19th century (MCC 1878 and Pontiac 1871), and two facilities were built in the early 20th century (Vandalia 1921 and SCC 1925). All of the male maximum security beds in the IDOC are in structures built in the 19th century or early 20th century (MCC 1878, Pontiac 1871, and SCC 1925). Maximum security facilities house approximately 7500 inmates (approximately 17% of the IDOC population) who spend more in-cell time. These structures make delivery of medical care more difficult and less efficient, are difficult to maintain, and may negatively affect inmate health in a variety of ways. These health-related effects include heat exposure issues, particularly at the Menard facility, and potential for rodents and vermin. In addition, these facilities present challenges in health care delivery, including access to care, medication administration, and providing ordered medical care. As our reports show, we found some of these problems in the older facilities we visited. We did note an additional egregious issue at NRC, where inmates are locked down 24 hours a day except for four hours per week. In some cells, inmates had no functioning lights for weeks at a time, inhibiting nurses' ability to properly identify inmates when administering medications. These conditions are a serious obstacle to health care access.

With respect to IDOC health care costs, a 2017 study detailed costs of health care in state prison systems between 2010 and 2015.[19] In 2015, the average per inmate per year health care spending for persons in state prisons in the U.S. was $5,720. Illinois spent $3,619. This was 37% below national average. Nationwide, per capita expenditures for health care for state prisoners ranged from a low of $2,173 to a high of $19,796. Illinois ranked seventh lowest in the U.S. in terms of per capita spending per inmate per year as noted in the table below.[20]  We were given information from the IDOC Chief Financial Officer that for 2017 the annual spending per inmate increased to approximately $4800 per inmate per year, but there is no comparable data for

---

[17] Appendix Table 1, Prison facility capacity, custody population, and percent capacity, December 31, 2015, as found in Prisoners in 2015, Bureau of Justice Statistics, US Department of Justice, December 2016, NCJ 250229 located on the web at https://www.bjs.gov/content/pub/pdf/p15.pdf.

[18] 180126 Presley Rated Capacity on November 30, 2017, as provided by IDOC.

[19] Data from Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017, as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

[20] We note that the Kaiser Family Foundation reported that Illinois civilians had per capita health care expenditures of $8,262. This can be compared to the $3,619 per capita health expenditures per inmate per year. Health Care Expenditures per Capita by State of Residence for 2014 for the Illinois civilian population is found at https://www.kff.org/other/state-indicator/health-spending-per-capita/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

PTX193-0008

other state prison systems nationwide.[21]  IDOC Spending in 2017 is still below the average 2015 spending of prisons nationwide.

| Ten Lowest Per Capita Expenditures for Health Care in US State Prison Systems in 2015 | |
|---|---|
| **State** | **Per Capita Annual** |
| Louisiana | $2,173 |
| Alabama | $3,234 |
| Indiana | $3,246 |
| Nevada | $3,246 |
| South Carolina | $3,478 |
| Arizona | $3,529 |
| Georgia | $3,610 |
| Illinois | $3,619 |
| Kentucky | $3,763 |
| Mississippi | $3,770 |

For most state systems, the number of employees, age, and percent of female population were the largest drivers of cost of prison health programs. The Federal Bureau of Prisons assessed that institutions with the highest percentages of aging inmates spent five times more per inmate on medical care and 14 times more per inmate on medication than institutions with the lowest percentage of aging inmates. The National Institute of Corrections estimates that inmates over age 55 cost, on average, two to three times more than the expense for all other inmates.[22] Based on this same 2017 report, Illinois has the seventh *lowest* rate of persons over age 55 (8.5%). As well, in 2015 IDOC had a female population of 5.8%, the ninth *lowest* rate of females incarcerated in state prison systems. These two factors should lower the costs of care somewhat, but are not so great as to account for the difference in IDOC cost from the mean health expenditure of state prison systems.[23]

Staffing appears to be the biggest contributor to the low IDOC spending on health care. In fiscal year 2015, Illinois has the second lowest number of full-time equivalent (FTE) health care workers (19.3 per 1,000 inmates) of all 50 state prison systems. The range of FTEs per 1,000 in the 50 state systems range from 18.6 FTEs per 1,000 inmates to 86.8 FTEs per 1,000 inmates.[24]

---

[21] In his deposition, Mr. Brunk the Chief Financial Officer for the IDOC stated on pages 12-13 that the total expenditures on health care in the IDOC were approximately $203 million. Using a population of approximately 42,000 the expenditures per inmate per year would be approximately $4,800.

[22] Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017 as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

[23] Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017 as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

[24] Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017 as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

There is a direct correlation between the FTEs per 1,000 inmates and per-inmate annual spending. A low number of staff can reflect a more efficient system of care or understaffing with its attendant negative consequences for provision of health care. In our study, we found that in 2018 there were 25 employees per 1,000 inmates, which still places Illinois approximately in the lower 10% of state prison systems based on 2015 data. This will be discussed later in this report.

## Key Findings

Overall, the health program is not significantly improved since the First Court Expert's report. Based on record reviews, we found that clinical care was extremely poor and resulted in preventable morbidity and mortality that appeared worse than that uncovered by the First Court Expert.

Governance of the IDOC medical program is subordinated to custody leadership on a statewide level and at the facility level. The subordination of health care to custody leadership has resulted in a medical program that is not managed on sound medical principles and one that is without medical leadership.

The existing IDOC system of care was established to have a more robust central office capable of monitoring vendor activity. The IDOC central office has been progressively diminished over the years to the point where it is incapable of effective monitoring.

The medical program does not have a separate budget. The IDOC could not provide to us a document that included expenditures for medical care. Authorization and responsibility for medical expenditures does not reside with the health authority.

IDOC Administrative Directives are inadequate policies for this state system. The IDOC medical policies need to be refreshed, augmented, and address all National Commission on Correctional Health Care (NCCHC) standards.

The IDOC does not have a staffing plan that is sufficient to implement IDOC policies and procedures. The staffing plan does not incorporate a staff relief factor.

Custody staffing has also not been analyzed relative to health care delivery to determine if there are sufficient custody staff to deliver adequate medical care.

Budgeted staffing was increased but vacancy rates were higher than noted in the First Court Expert's report. Staff vacancy rates are very high.

PTX193-0010

The vendor, Wexford, fails to hire properly credentialed and privileged physicians. This appears to be a major factor in preventable morbidity and mortality, and significantly increases risk of harm to patients within the IDOC. This results from ineffective governance.

Wexford and the IDOC fail to monitor physician care in a manner that protects patient safety. There is no meaningful monitoring of nurse quality of care. If care is provided it is presumed to be adequate, when in fact it may not be adequate.

The inability to obtain consultation reports and hospital reports appears to be a long-standing system wide problem. This is a significant patient safety issue.

The collegial review process of accessing specialty care is a patient safety hazard and should be abandoned until patient safety is ensured.

Specialty care is not tracked with respect to whether it is timely. The Wexford system of utilization management is ineffective and for many patients is a barrier to timely care. The use of free care at UIC appears to have resulted in unacceptable delays. Waiting for unacceptable time periods for free care when care needs to be performed timelier has harmed patients.

Patients are not consistently referred for specialty care when it is warranted. We view this as a problem of hiring unqualified physicians and as a problem of the utilization process itself.

The paper medical record system creates significant barriers to delivery of safe health care, including inaccessibility of prior reports and prior diagnostic tests. The current paper medication administration records (MARs) are inconsistently filled out, filed, or able to be viewed by clinicians. The paper record also makes monitoring health care processes exceedingly difficult. An electronic medical record is needed.

Sanitation, maintenance, and equipping health care units is not standardized. Many clinical areas are inadequately sanitized.

The reception process does not ensure a thorough initial medical evaluation that will correctly identify all of a patient's problems in order to develop an appropriate therapeutic plan. Provider medical histories are inadequate. Follow up of abnormal findings is inconsistent. Laboratory tests and other studies needed for an initial evaluation of a patient's chronic illnesses are inconsistently obtained. Tuberculosis (TB) screening is improperly performed due to custody rules at NRC.

The chronic disease system promotes fragmentation of care and fails to adequately address all of a patient's problems from the perspective of the patient. Patient problems are lost to follow up or are not addressed in the context of a patient's complement of diseases.

The chronic care disease guidelines need to be updated. Alternatively, contemporary existing guidelines by major specialty organizations should be used in lieu of IDOC-specific chronic care

guidelines. These specialty organization guidelines are periodically updated and are based on latest scientific evidence. For the Office of Health Services to attempt to duplicate these guidelines is unrealistic.

The Administrative Directive for periodic examination [25] is inconsistent with current standards of preventive care.[26] Inmates are therefore not offered all preventive services that are typically offered to individuals in the community. The most important missed preventive care is colorectal cancer screening in individuals over 50 years of age.

Housing of the elderly and disabled is inadequate. The IDOC needs to perform an assessment of its geriatric and disabled population to determine housing needs for this population. It is likely that new or rehabilitated housing for this population is needed.

There is no active infection control program. Infection control practices lack guidance from a physician with expertise in infection control practices. This is evident in HIV testing, TB screening, and analysis of surveillance practices.

The quality improvement program operates on a legacy system of principles that no one any longer understands or effectively implements. No one in the IDOC has experience or knowledge of contemporary quality improvement methodology and practice. The quality improvement program is ineffective statewide.

The quality improvement program does not have a means to identify problems for study and does not associate identified problems with systemic processes.

Data for quality improvement is obtained by manually counting events. Logs tracking processes of care are either not maintained or maintained in a manner such that the data is not easily useable.

The methods of preparing and administering medications is not standardized across the system. There are pervasive and systemic issues with respect to medication administration that place inmates at risk of harm. When these occur, there is no system to identify or correct the systemic problem.

Overall, the dental program has not improved since the First Expert Report. Dental care continues to be below accepted professional standards and is not minimally adequate. Examinations are inadequate and routine care is provided without intraoral x-rays, a documented periodontal assessment, and a treatment plan. Periodontal disease is rarely diagnosed and treated.

---

[25] Offender Physical Examination; Illinois Department of Corrections Administrative Directive 04.03.101.
[26] As exemplified by the US Preventive Services Task Force Recommendations.

PTX193-0012

There is no systemwide capital replacement plan for dental equipment. As examples, the panoramic x-rays taken at the R&C centers are inadequate and the x-ray devices are outdated. IDOC has no dentist on the Medical Director's staff and the clinical oversight of the dental program is inadequate.

Dental staffing is insufficient to provide adequate and timely care.

# Statewide Medical Operations

## Leadership, Staffing, and Custody Functions

**Methodology:** We interviewed the Agency Medical Director, the Regional Coordinators, the Regional Medical Coordinator, Chief of Programs and Support Services, the Wexford Vice President of Operations, the Wexford Director of Operations, two Wexford Regional Managers, and two Wexford Regional Medical Directors. We reviewed the table of organization, and reviewed selected documents. We obtained and reviewed staffing documents. We reviewed peer review documents and credentialing documents provided by Wexford.

### First Court Expert Findings

The First Court Expert found that leadership was a problem at all facilities visited. Many leadership positions were vacant. Some Wexford supervisory staff spent considerable time on Wexford corporate duties rather than on the operational assignments they were being paid for. Several physicians did not have primary care training and hiring of underqualified physicians was a problem. Clinical quality was variable and compounded by lack of clinical oversight, peer review, and access to electronic resources to access clinical information. Medical Directors spent little time in reviewing clinical practice of other providers or engaging in important administrative duties. Staffing deficiencies were present at several facilities but were facility specific. Nurses other than registered nurses (RNs) were performing independent assessments, which is not consistent with the State of Illinois Nurse Practice Act. The Office of Health Services was under-resourced and unable to provide clinical oversight. The First Court Expert was informed by State and vendor staff of problems [unspecified] with Wexford Regional Medical Directors. Professional performance review, mortality review, and quality improvement were described as extremely disappointing.

### Current Findings

We agree with the findings of the First Court Expert and note that, with minor exceptions, findings are the same. There have been staffing increases, particularly at NRC and SCC, but vacancies are increased. Staffing is deficient, in our opinion, even if vacancies were filled. The IDOC does not know how many staff are necessary because a staffing analysis has not been performed, even for development of Schedule E staffing budgets for contract medical services. There are fewer HCUA position vacancies. The HCUA leadership staff at all five facilities was very good. Physician leadership, however, is worse. We had additional findings regarding the governance of the health program, monitoring of clinical services, credentialing of physicians, and policy concerns. There is no centralized medical health authority that develops the budget,

determines recommended staffing levels, monitors the contract, and provides oversight of clinical care. Because operational control of the medical program is under the authority of the Wardens of individual facilities, processes can be established that are not consistent with appropriate medical management practices.

<u>Structure of Medical Services and IDOC Leadership</u>

The organizational structure of the IDOC health program was established in the 1980s and early 1990s. The program was structured so that the IDOC staff would maintain administrative control over the health program and have a variety of vendors provide physician staff and other staff the state was unable to provide. Staffing of the facilities was provided by contract medical vendors with a considerable number of state employees. Currently, dialysis services are provided at three facilities by NaphCare. University of Illinois at Chicago provides laboratory services statewide and statewide management of HIV and hepatitis C patients with anti-viral medication via telemedicine. Wexford Health Sources provides the remaining medical, dental, vision, and pharmacy services under the guidance of the IDOC Agency Medical Director and in accordance with their contract.

Currently, the IDOC medical program table of organization is not organized on a medical model. Governance of the IDOC medical program is subordinated to custody leadership on a statewide level and at the facility level. The health authority[27] is the Chief of Programs and Support Services, and is an ex-warden. The IDOC medical program has no named responsible physician,[28] although in practice some aspects of this responsibility appear to reside with the Agency Medical Director, who appears to be primarily a consultant. The budget of the health program is not a separate budget. At a facility level, wardens are the Chief Administrative Officer and are responsible for operations of the health program.

The health authority is not responsible for operational management of the statewide medical program. Instead, authority and responsibility are diffuse. This results in gaps in management, oversight, and monitoring, and leads to poor performance. The Office of Health Services is not responsible for determining staffing levels, budget needs, equipment needs, or oversight of the medical program.

The responsible health authority is the Chief of Program and Support Services, who reports to the Director. This is a custody position. The current organizational structure does not require that the health authority have health care education and training commensurate with the requirements of the position. Requirements of the health authority position are not explicit in the Office of Health Services policies. This position is currently filled by a licensed clinical psychologist who was previously with the Department of Mental Health in Chester, Illinois and recently was the Warden at Southwestern Illinois Correctional Center. She has ultimate responsibility for oversight of medical care and ensuring that systems are in place to ensure

---

[27] A health authority is a person responsible for health care services. This person arranges for all levels of health care and ensures that all levels of service are provided, and that care is accessible, timely, and of good quality.
[28] A responsible physician is a physician who has final authority regarding clinical issues.

adequate care. We have concerns with the health authority being a custody person, particularly because it can be filled with non-health care personnel without experience in managing a clinical medical program. In an interview with the Chief of Program and Support Services, she had minimal knowledge of operational features of the medical program, was not intimately involved in the medical budget, was not responsible for the medical contract, and was not involved in developing or managing staffing levels.

Custody personnel have considerable responsibilities over health care. In addition to the Chief of Program and Support Services being the health authority, Wardens have authority over medical operations on a facility level. An Assistant Director is responsible for implementation of the electronic medical record. Another Deputy Director, who was previously a nurse, is occasionally asked to develop staffing analyses of selected facility medical programs. This level of custody authority and involvement over management of the health program is considerable. Because oversight authority of the medical program is not medical staff, there is the risk that medical autonomy will be lost and that clinical operational processes will be disadvantaged with respect to custody processes and that clinical and operational independence will be lost. This is contrary to two fundamental NCCHC standards which are critical to an adequate correctional health care medical program.[29] We did see evidence of this with respect to medication administration and health request processes at several facilities. We also noted at NRC that inmates were locked in their cells, except for brief periods, for 24 hours a day. This is similar to a super-maximum prison and is excessive. This practice impaired the ability of nurses to adequately pass medication, read TB skin tests, and to appropriately access medical care. Despite this ongoing barrier to medical care as a result of this custody practice, there was no evidence of medical advocating for ways to appropriately perform their work. Because the Warden supervised the medical program, it is our opinion that medical staff were unlikely to advocate for improved care.

The IDOC Agency Medical Director reports to the Chief of Program and Support Services. The Agency Medical Director has limited responsibility with respect to the health program. He is responsible for formulation of statewide health care policy and chronic care guidelines. Through subordinates, he monitors and reviews medical services, but he has insufficient physician staff to perform adequate monitoring, especially for physician care. *He has no authority to manage operations of the health program.* He has no responsibility for the budget except in a consultative role. He participates in scoring prospective vendors of the medical contract and in reviewing staffing recommendations in the contract. But this is mostly an advisory and consultative role. According to his job description and interview, he does not function as the authority in establishing budgets, staffing levels, or equipment purchases. Although he appears to be the final clinical medical decision maker, one has to infer this responsibility because it is nowhere stated in his job description.

---

[29] P-A-02 Responsible Health Authority and P-A-03 Medical Autonomy, Standards for Health Services in Prisons 2014; National Commission on Correctional Health Care.

Each facility is managed by a health care unit administrator (HCUA), which is a state position. However, most facilities have a mix of state and Wexford employees. Because of co-employment rules,[30] the mixed staff creates supervisory confusion between Wexford and IDOC supervisors working under the HCUA. This is most evident at the NRC and SCC. The Wexford staff are supervised by Wexford employees who are not under supervision of the HCUA.

Each HCUA reports to the assistant warden of programs of the facility. Each facility medical program is therefore under the operational management responsibility of the Warden of the facility, not the Agency Medical Director. This means that medication administration or access to sick call, as examples, are under ultimate control of the Warden through the supervision of the HCUA. Wardens have no knowledge of how to manage medical program operations. This arrangement reduces the Office of Health Services to a consultative role as opposed to operational control. The Office of Health Services needs to have final authority over health care policies, not merely a consultative role.

The Office of Health Services has a staff of four employees assisting the Agency Medical Director in his monitoring function: an Agency Medical Coordinator who is a nurse and three Regional Coordinators who are also nurses. There is no dentist on staff. These individuals act mostly as regional resources to facility staff with respect to interpretation and implementation of the Administrative Directives and clinical guidelines. They also provide a monitoring function. Because they do not have authority to change operational practices, their monitoring function lacks the authority to direct operational changes, even if they disagree with how practices are being managed.

The Agency Medical Director monitors and reviews care through contract monitoring reports[31] and verbal reports of the Regional Coordinators. Contract monitoring reports are the responsibility of the HCUA. In the absence of the HCUA, the Assistant Warden of Programs at the facility is responsible for the contract monitoring report. The Agency Medical Director monitors the quality of doctors through review of credentials at annual CQI meeting, review of problematic peer reviews, and studies of the quality improvement meetings.[32] However, the credential reviews are inadequate, as will be described later in this report. The peer reviews are performed by Wexford doctors on each other and are ineffective. And the quality improvement studies do not monitor clinical quality of care.

Two of three of the Regional Coordinator positions are currently vacant and filled on an acting basis by HCUAs who are still responsible for managing their facility. While an HCUA filling in as a Regional Coordinator on short-term basis is reasonable, longer than 60-90 days is likely to result in reduced effectiveness at the HCUA's home facility. The Agency Medical Coordinator fills in

---

[30] Co-employment is a relationship between two or more employers whereby each has legal responsibilities to the same employee. In this case, line staff may be Wexford but have an IDOC supervisor and IDOC employees may have a Wexford supervisor. This created problems at multiple facilities we visited. This is particularly problematic with respect to scheduling and disciplinary issues.
[31] Page 26 Dr. Meeks 30(b)(6) deposition on July 25, 2017.
[32] Page 33 Dr. Meeks 30(b)(6) deposition on July 25, 2017.

**PTX193-0016**

periodically for one of the HCUAs when she is performing as a Regional Coordinator. When Regional Coordinators visit sites, they monitor clinical care but do not issue reports on their work. Each Regional Coordinator has a monthly phone call with the Agency Medical Director, Agency Medical Coordinator, and HCUAs, Assistant Wardens, and other staff in their region to discuss any issues. The Regional Coordinators do not engage in direct review of nursing practice at individual facilities that results in reports. We were told they occasionally review records of nursing care. We found no evidence of formal reports of oversight over nursing practice on a regional level. This includes oversight of nursing independent evaluations and medication administration practices.

On a regional level, because Regional Coordinators and the Agency Medical Coordinator are nurses, they are unable to monitor or review physician care, leaving a large gap in oversight of the quality of medical care. The Regional Coordinators perform mortality reviews using a structured format which result in reports, which were not made available to us. A Regional Coordinator, who is a nurse, testified that he reviews deaths and complicated medical cases.[33] In these reviews, he has never found care to be inadequate. We found many preventable deaths and inadequate care on most death reviews we performed, even ones at the facility supervised by the Regional Coordinator, who never found inadequate care. This work needs to be done by a physician, not a nurse, but the only physician in the Office of Health Services is the Agency Medical Director. The Agency Medical Director cannot monitor or review physician care at 26 facilities. The Agency Medical Director does not perform any mortality reviews. It would be difficult to impossible for him to review every death. The time allowed in his job description for monitoring physicians is less than 15 hours a week, which is inadequate time to monitor all physicians statewide. This task is not apparently performed by Wexford either. The Agency Medical Director told us that he has not received any communications from Wexford Regional Medical Directors with respect to problems identified in mortality review or peer review. As a routine, the IDOC Agency Medical Director stated in deposition that he does not review Wexford peer reviews except for isolated peer reviews for problematic providers.[34] As a result, oversight of facility physicians, including Medical Directors, is virtually non-existent. As this program is currently staffed, the Agency Medical Director is unable to effectively act in accordance with his job description, specifically to monitor medical care, especially physician care. IDOC oversight is inadequate and has not identified physician practice problems largely because of lack of physician oversight.

The IDOC has contracted with Wexford Health Sources Inc. for approximately 20 years. When IDOC first contracted out its medical services in the 1980s, the IDOC managed the contract. Sometime in the mid-2000s, the Illinois Department of Healthcare and Family Services (HFS) became responsible for letting this contract, including monitoring and oversight of the contract. The latest contract with Wexford was completed in 2011. Sometime after that contract was awarded, responsibility for monitoring and managing the contract returned to IDOC. The contract expired April 30, 2016 and provided for renewals of one or more years for a period of

---

[33] Page 34 Joseph Ssenfuma deposition on September 28, 2017.
[34] Page 33 Dr. Meeks 30(b)(6) deposition on July 25, 2017.

five additional years through 2021. The latest renewal of this contract signed in April of 2016 was signed by IDOC. HFS is no longer involved in letting the contract, choosing the vendor, or in monitoring the contract. This responsibility returned to the IDOC, which is not prepared to monitor this contract.[35]

With respect to monitoring medical care including physician care, there is a large gap. In the most recent contract with Wexford in 2011, the onsite Wexford Medical Director is assigned responsibility for monitoring the performance of medical personnel and is to report deficiencies to the HCUA.[36] However, the onsite Medical Director is a Wexford employee and therefore clinical monitoring is self-monitoring by the vendor, rather than independent monitoring by IDOC. Moreover, about half of the Medical Directors do not have primary care training and are unable to effectively give guidance on appropriate care. The IDOC is therefore depending on the vendor to monitor itself with respect to clinical physician care, but the vendor has hired persons who are not always trained sufficiently to understand what constitutes appropriate care.

The contract monitoring on the part of the state is inadequate. Formal contract monitoring is performed by HCUAs via the monthly contract monitoring reports.[37] The HCUA is the only IDOC staff that is specifically assigned for formal contract monitoring. HCUAs are provided a spreadsheet to use for this purpose. There are five performance targets that are assessed. The performance targets are:
- Whether all hours in the contract are fulfilled
- Whether all bills have been paid timely
- Whether there has been any Court finding of deliberate indifference
- Whether Administrative Directives have been complied with
- Whether Wexford met provisions of the contract.

We found no clinical quality of care items in contract monitoring reports of the five sites we visited, even when we noted significant clinical issues during our site visits. This is a major deficiency. No one is monitoring clinical care, particularly physician care. Even non-clinical deficiencies are not monitored adequately. Most sites had performance issues with respect to staffing and some Administrative Directive performance targets, yet the IDOC has never levied penalties against Wexford based on these performance targets.[38] Because of IDOC tardiness in invoice payments to Wexford, it has been difficult for IDOC to penalize Wexford for its infractions. While this has an element of fairness to the vendor, overall it contributes to lack of enforcement of the contract as a result of budgetary realities.

---

[35] 1299433 Deposition of Jared Brunk Chief Financial Officer of the IDOC. In this deposition in January of 2018, Mr. Brunk acknowledges that there was more than one person in the IDOC who thought that it would be useful to have additional contract monitoring on pages 80-83. This Chief Financial Officer could not describe how the contract is monitored.
[36] Item 2.2.2.21 Contract between Wexford Health Sources Inc. and IL Department of Healthcare & Family Services signed 5/6/11.
[37] 30(b)(6) deposition of Dr. Meeks on July 25, 2017 on page 26.
[38] Deposition of Jared Brunk, Chief Financial Officer of the IDOC conducted January 31, 2018.

PTX193-0018

The HCUA positions are filled by nurses. Nurses are not able to monitor clinical care of physicians, including appropriateness of referral, chronic care, and infirmary care. Several of the HCUAs remarked on their inability to monitor the clinical care of the Wexford physicians and were unaware of quality issues, even when they existed.[39] Because HCUAs cannot monitor physician care, the contract monitoring is ineffective and incomplete. The only monitoring of clinical performance of the physicians is Wexford peer review, in which Wexford physicians monitor other Wexford physicians. Many of these physicians are unqualified to practice primary care medicine. We found that these peer reviews are ineffective and fail to critically monitor physician performance. Peer reviews will be discussed later in this report.

Wexford has a regional management structure that contributes to the fractured organizational structure of the IDOC medical program. Administratively, there is a Wexford Director of Operations and five Regional Managers. Each Regional Manager is responsible for five facilities, with one Manager taking responsibility for six facilities. The clinical medical management structure includes two Regional Medical Directors, each being responsible for 13 facilities. The span of control of the two Wexford Regional Medical Directors is so large that it is very difficult to spend meaningful time on site at any facility, and in our opinion not possible to effectively supervise clinical care.

The Director of Operations and two of the five Regional Managers (50% of Wexford senior administrative management staff) are ex-wardens and have no training in provision of medical care. Because the IDOC HCUAs administratively manage operations at each facility, the Wexford administrative managers have no role in managing operations at any of the IDOC facilities. The Wexford view of duties and responsibilities[40] of the Regional Managers include:
- Oversee leadership of Health Services Administrators (HSA)[41] in the operation of facility health care units.
- Provide HSAs with management guidance strategies for regional growth and operational assistance.
- Oversee HSAs' resolution of health care unit personnel issues.
- Supervise the performance of the HSA and department heads, conducting annual evaluations.
- Instill a sense of accountability among the HSA team members through fair and consistent oversight of individual and organization performance standards.

These duties and responsibilities appear inaccurate and not applicable to IDOC. The Regional Managers do not oversee or supervise the HCUAs. The Regional Managers do not oversee health care unit personnel issues except for Wexford employees. The Regional Managers

---

[39] For example, we spoke to the HCUA at Dixon about a death. We found the death preventable. She was unaware that there were problems with the death. No one from Wexford had brought up clinical issues with respect to this death with her even though in our opinion problems were significant.

[40] There is no job description for this position. There is a position summary listing duties and responsibilities on the Wexford website which was advertising for a Regional Manager. This was provided to us as representative of a job description for the Regional Manager. This is found at https://jobs.wexfordhealth.com/search/jobdetails/regional-manager/73d40fc0-c935-47d4-b51f-b8095ad79af0?s_cid=ssEmail.

[41] We understood the term Health Service Administrator to be the same as Health Care Unit Administrator (HCUA).

PTX193-0019

appear to mainly act as intermediaries with respect to personnel issues, obtaining supplies and equipment, and other similar issues related to adjusted service requests (ASRs). They also act as customer relations functionaries. We were challenged in determining what they are actually responsible for. They do not participate in CQI, analysis of operational issues at the sites, resolution of operational issues, or other similar typical operational activity. They add little value to the operational effectiveness of the IDOC management structure with the exception of personnel issues of the Wexford staff.

The Regional Manager who was responsible for SCC, NRC, and Dixon Correctional Center told us that he knew of no consistent problems at these facilities; yet we found serious operational problems with medical records, medication administration, and evaluation of health requests. Physician care, follow up of specialty care, and intake evaluations were also inadequate. To not understand that there were problems is to be unengaged or indifferent to significant serious issues. At Menard Correctional Center, where there were also serious operational problems, the Regional Manager stated there were no problems and no areas of concern. These responses were not in line with problems identified by the HCUA. Neither Regional Manager we spoke with actively participates in quality improvement activities. One of the managers perceived his role as administering the contract. Despite significant operational issues at all sites we visited (e.g., lack of hospital and consultation reports, medication administration issues, staffing concerns, problems with medical records, and supply issues), these Regional Managers do not appear to be engaged in improving operations.

Based on interviews with HCUAs, neither the Regional Managers nor the Regional Medical Directors spend much time at the facilities, nor do they participate in solving significant problems. The most pressing problem of four of the five HCUAs was staffing and vacancies. HCUAs were universally unhappy with the effort of Wexford on these issues.

The Wexford Regional Medical Directors are responsible for ensuring that direct patient care is consistent with community standards and with contract requirements. They supervise the facility Medical Directors and are responsible for peer reviews of Medical Directors, and must ensure and/or conduct death reviews.[42] Since there is inadequate oversight by the IDOC over physicians, the supervision of Wexford Regional Medical Directors is the only oversight of physicians. Wexford is thereby evaluating its own performance and does this extremely poorly.

Although the Wexford Regional Medical Directors have a clinical supervisory role over their physicians, based on their job descriptions we could not verify that they perform this adequately, as they perform no peer review, mortality review, or formal written review of clinical work. According to the Agency Medical Director, he receives no formal communication regarding clinical oversight of Wexford physicians, including Regional Medical Director initiated peer review, mortality review, or other review of clinical care. There is no evidence we could find that verifies their oversight of physicians except their statements that they review the work of the physicians. Neither Regional Medical Director stated that clinical care review is on their

---

[42] Regional Medical Director's Responsibilities as provided by Wexford Health Sources.

list of major responsibilities or tasks, except for addressing questions of the physician staff. Because neither IDOC nor Wexford performs effective review of clinical care of physicians, poorly performing physicians continue to perform poorly without apparent oversight. We noted this on multiple chart reviews and mortality reviews.

Wexford Regional Medical Directors are also responsible for ensuring patient care is consistent with community standards.[43] Yet we found many examples of physicians providing care inconsistent with current standards of care that appear to be systemic practices. For example, IDOC does not provide colorectal cancer screening based on current standards of care and does not appear to routinely screen patients with cirrhosis for varices or hepatocellular carcinoma. Persons with chronic obstructive lung disease (COPD) are not provided pulmonary function testing, which is a cornerstone of management of COPD. The current management of lipid disorders is not in line with current standards or with the Office of Health Services treatment guideline. We will discuss these later in the Chronic Disease section of this report. These deficiencies need to be corrected because these deficiencies have caused morbidity and mortality. There is no evidence of participation of the Wexford Regional Medical Team in identifying these deficiencies to the IDOC or ensuring that their physicians are practicing based on contemporary standards of care.

With respect to facility leadership, administrative supervision by HCUAs at individual facilities has improved since the First Court Expert's visit. The IDOC HCUAs are responsible for administrative operational supervision of each facility. Of the 26 HCUA positions, all but one is now filled. However, two of the HCUAs also serve as acting Regional Coordinators, making them much less effective as HCUAs. Effectively, only 23 of 26 HCUA positions are filled. HCUAs were all competent and were engaged in solving administrative problems, even though some problems appeared unrecognized. This is one of the most significant and positive advances since the First Court Expert's report and is a strength that the program can build on.

Medical Directors are all Wexford positions. Of the 26 Medical Directors statewide, 8.5 (33%) are vacant.[44] This is an enormous vacancy rate for this key leadership position. Approximately only half of physicians have training in primary care, which will be discussed later in this report. This is a very small percentage of physicians trained in primary care. When a Medical Director is not trained in primary care it is very difficult to be responsible for monitoring performance of medical staff rendering direct patient care. An untrained physician is not likely to know how that care is supposed to be provided. We found that onsite monitoring of clinical care was very poor to nonexistent.

Director of Nursing (DON) positions can be either Wexford or IDOC. Fifteen (58%) of the DON positions are staffed by Wexford. Eleven (42%) are staffed by the IDOC. Seven (27%) of DON positions are vacant; four DON vacancies are Wexford positions and three DON vacancies are

---

[43] Regional Medical Director's Responsibilities as provided by Wexford Health Sources.
[44] Illinois Medical Vacancy Report with ASRs as of 6/18/18 provided by the Attorney General's Office from Wexford Health Sources. This report gives staffing at all facilities as of 6/18/18.

IDOC positions. Nursing staff can be either IDOC or Wexford, making it difficult, because of co-employment rules,[45] to properly supervise line staff.

Of the 78 leadership positions (Medical Director, DON, and HCUA) at the 26 facilities, 16.5 (21%) are vacant. The vacant positions are compounded by co-employment issues[46] and use of two HCUAs as Regional Coordinators. The leadership vacancies are significant on a statewide basis. The lack of Medical Directors is dramatic and is compounded by using physicians in these positions who are, in our opinion, unqualified by virtue of not having primary care training.

In summary, administrative supervision by HCUAs is adequate but clinical-medical supervision and management, particularly physician care, is inadequate and places patients at significant risk of harm. The clinical supervision at the facility level is inadequate based on Medical Director and DON vacancies, and poor qualifications of physicians.

<u>IDOC Policy</u>
The IDOC provides policy direction on clinical care through its Administrative Directives and chronic care guidelines. The medical Administrative Directives are a part of the larger IDOC Administrative Directives which include all custody policy. We will discuss the chronic disease guidelines in the section on Chronic Disease and dental guidelines in the Dental section. The Medical Administrative Directives are inadequate with respect to the breadth of guidance that is necessary for a correctional medical program. The IDOC has only 18 Administrative Directives. In comparison, the National Commission on Correctional Healthcare[47] has 68 standards, which is a minimum panel of policies for a large prison system. There are essential areas of service that are not governed by Administrative Directives and thereby are not guided by policy and not standardized statewide. Though each facility can have additional institutional policies and procedures, the lack of statewide guidance means that practices are not standardized. The Office of Health Services needs to be responsible for statewide policy guidance in all areas of service, with local policy following statewide policy. The 18 medical Administrative Directives are inadequate for this purpose. The National Commission on Correctional Health Care standards are a reasonable guideline to determine the scope of processes of care that should be governed by Administrative Directives.

## Wexford Provider Staffing and Physician Credentialing

It is our opinion that the quality of physicians in the IDOC is the single most important variable in preventable morbidity and mortality, which is substantial. The first step in provision of quality of care is to ensure appropriately credentialed medical staff. In its response to the First

---

[45] Co-employment means that there are two employers (IDOC and Wexford), each of whom has some legal responsibility for the same employees.
[46] When a State employee HCUA is responsible for managing the health care unit but staff are Wexford, there are some limitations with respect to discipline and assignment as a result of union rules. When a DON is a Wexford employee and staff nurses are state employees, the same occurs. These co-employment issues affect multiple facilities we visited.
[47] The National Commission on Correctional Healthcare is the leading organization establishing standards for correctional health programs.

**PTX193-0022**

Court Expert's report,[48] on page 4 an attorney for the State states that, "More than 80% of WHS' [Wexford Health Services] physicians are either Board Certified in Family Practice or Internal Medicine, or have more than 10 years of Family/Internal Medicine practice experience or correctional medical experience." This is a misleading statement that gives an inaccurate representation of the credentials of physicians. Credentialing information provided by Wexford shows that only six (20%) of the physicians are board certified in a primary care field. Because physicians typically work alone in these facilities, experience alone is no guarantee that performance will improve to be consistent with current standards of care. We document multiple preventable deaths in the mortality review section of this report. It is our opinion that poorly credentialed physicians contribute significantly to those preventable deaths.

Currently, there are 30 Wexford physicians working in IDOC facilities. Of these, only 16 (53%) have completed training in primary care. Of the 16 that completed primary care training, only six (20% of the 30) are board certified in primary care. Two doctors are obstetricians who work at LCC doing women's care, for which they are appropriately credentialed and privileged; one of these is board certified. These doctors only provide obstetrical and gynecological care, not primary care. Five physicians have an internship or a year or two of primary care training but did not complete a residency.[49]  The remaining seven include:

- One anesthesiologist
- One doctor with two years of occupational medicine
- One doctor with some training in pathology
- One doctor with a year of physical medicine
- One surgeon
- Two radiologists, one of whom did not complete residency training.

Credentialing is a process whereby a physician's qualifications are evaluated by reviewing their education, training, experience, licensure, malpractice history, and professional competence with respect to the work they will be expected to perform. Proper credentialing is the foundation of protecting patient safety. Credentialing must ensure that a physician is properly trained for the work they will be performing. Credentialing protects patient safety by preventing incompetent, *poorly trained*, or impaired physicians from engaging in patient care. In correctional facilities, the scope of practice required and the health care needs of patients are mostly primary care, which requires physicians who have residency training in a primary care field. However, the only requirement in the IDOC with respect to credentialing is to verify that a physician has a license. A Regional Coordinator testified that the only review of credentials is to verify that the doctor has a license, and that their training, board certification, or disciplinary history is not part of credentialing review.[50]

---

[48] Letter via email to Dr. Shansky, First Court Expert from William Barnes, representing the IDOC dated 11/3/14.
[49] This information comes from items 42Z9081-42Z8845-Part 1; 42Z9082-42Z8845-Part 2; 42Z9085-42Z8845-Part 4; 42Z9088-42Z8845-Part 3; and 42Z9090-42Z8845-Part 5. This credentialing information was provided by Wexford Health Sources, Inc.
[50] Deposition of Joseph Ssenfuma, Regional Coordinator, on September 28, 2017.

Privileges are the services and procedures that a physician is qualified to perform based on training and experience. The credentials and training of a physician determine what privileges that physician should have. As an example, a doctor who is trained and credentialed in general surgery can obtain privileges to perform appendectomies and cholecystectomies. A physician trained and credentialed in obstetrics can obtain privileges to deliver babies. Physicians trained and credentialed in internal medicine or family practice can obtain privileges to practice primary care. Physicians trained and credentialed in internal medicine cannot obtain privileges to deliver babies or perform appendectomies. And physicians trained and credentialed in radiology or general surgery cannot obtain privileges to provide primary care. Because the scope of practice and needs of the patients in a correctional medical program are primary care, physicians should be credentialed and privileged in primary care. In IDOC, physicians are credentialed to perform primary care even when they have no training in primary care. This is a serious problem with the credentialing process. For this reason, we agree with the First Court Expert that Medical Directors be board certified in a primary care specialty. Given the size of the IDOC facilities, there is only one physician on staff at most facilities. When this physician is not trained in primary care, there is no other available physician to care for the patient.

Because there are so many physicians who have not completed a primary care residency, the level of supervision of their care should be at a higher level than for board certified physicians. This is not the case. There is no special monitoring for this group. All physicians receive the same type of peer review.

Peer review is a means to monitor the quality of physician and other provider care, and thereby protects patient safety. Peer review of physicians in the community is typically of two types. One type of peer review is done on a routine basis for all physicians and is done as a monitoring device to ensure quality of care. This type of peer review is often called performance evaluation program or PEP. A second type of peer review is done when a member of the medical staff may have committed a serious gross or flagrantly unacceptable error or exhibits a serious character or behavior problem and needs to be evaluated with respect to possible reduction of privileges or referral to a medical board. The latter type of peer review is generally a formal quasi-legal procedure that has significant implications for the physician's employment and professional status. We found that the first type of peer review is done for all physicians and mid-level providers in the IDOC, but the second type of peer review does not appear to occur in IDOC, based on information made available to us. As will be detailed later in the mortality review section of this report, there were numerous grossly and flagrantly unacceptable episodes of care that should have resulted in peer review but did not. Peer review in the IDOC is ineffective, as physicians who commit repeated egregious medical errors continue to practice and continue to harm patients.

The first type of peer review which is performed by Wexford is a structured questionnaire performed by one Wexford physician on another Wexford physician. We noted at one facility that a general surgeon performed the peer review of the primary care work of a nuclear radiologist. It is our opinion that this type of performance evaluation is defective and unlikely to

result in meaningful evaluation, as neither doctor is adequately trained to practice primary care and would not be able to know when care was adequate.

Also, the peer review that is done is so poor that it is unlikely to identify problems. The Wexford peer review consists of a review of 10 single episodes of care for five areas of service. For each of these areas of service there are a series of questions ranging from 10 to 15. Some of the questions are not relevant to clinical quality, such as:

- Is the handwriting legible?
- Is the signature with professional designation legible?
- Is the patient enrolled in all relevant clinics?
- Are all medications written on a script?
- Does the clinic include pertinent vital signs?

While it is important to write a legible note, legibility does not evidence clinical competence. Many questions require an interpretation. For example, the question "Was treatment appropriate for this visit" requires that a physician know the appropriate treatment. The problem is that when only 20% of doctors are board certified and 23% have no training in primary care, many doctors will not know the appropriate treatment. Doctors performing these evaluations need to be expected to know what the appropriate treatment is, otherwise the test will not perform as expected. Also, these episodes of care are picked at random and may not include patients that have serious illness. When someone does not have a serious illness, it is difficult to test the clinician, because it is very difficult to make an error if there is no decision to make with respect to the treatment. Additionally, it appears that these reviews are not taken seriously and appear to be done merely because these are requirements of the contract. For these reasons, it is not surprising that almost all peer reviews were scored 100% adequate. When we compare these results with death chart reviews we performed, there is dramatic discrepancy. Most chart reviews we performed contained many errors. We reviewed the care provided over two years prior to the death. Of 33 death charts we reviewed, there were over 1700 errors. Many had serious errors. Some had egregious errors that resulted in death. We noted the same level of medical error in chart reviews we performed on site visits. The Wexford methodology of peer review does not appear to accurately review physician practice, based on a comparison to our record review of clinical care. This process is not working as intended.

The First Court Expert opined that Wexford hired underqualified physicians, and recommended that facility Medical Directors be trained in primary care and be board certified. We agree with this finding, based on the credentialing information above, and we agree with his recommendation.

In reviewing the Defendants' comments to the First Court Expert's Draft Report,[51] the Defendants challenged the assertion of the First Court Expert that Wexford Health Services has hired "underqualified clinicians." In their attempt to refute that assertion, the Defendants

---

[51] Re: Lippert v. Godinez – Defendants' comments regarding Confidential Draft Report via email dated November 3, 2014, authored by William Barnes.

stated that, "The community standard, as espoused by the American Medical Association, requires physicians to possess only a license to practice medicine." This is misleading and inaccurate. This statement implies that the current community standard of medicine is for physicians to only have a license to practice medicine, presumably in any field. We disagree. It is our opinion that the community standard in the U.S. is for physicians working in primary care to have residency training in a primary care field. One would never see a pathologist delivering babies. The Defendants' statement also implies that the American Medical Association (AMA) endorses their position. This statement of Defendants is neither the community standard nor is it a standard we could identify as espoused by the AMA.

It is true that it is legal for a doctor without residency training to open a private practice in the community and practice primary care medicine without any training in primary care. However, it is becoming increasingly uncommon, and particularly in urban areas, it is now extremely uncommon to find doctors without residency training in primary care who work in general practice. The standard in the community is for physicians in organized medical practices to undergo credentialing and privileging, and to have residency training consistent with their scope of practice.

With respect to the recommendation to hire board certified physicians, the State's response said,

> "This recommendation, along with any recommendations dictating specific training or certification for licensed correctional physicians, lacks any justification or support in state law and community, ACA, AMA, and NCCHC standards. Accordingly, this recommendation *exceeds minimum constitutional standards of adequacy*" [my emphasis].[52]

With respect to the assertion that use of board certified primary care physicians exceeds minimum constitutional standards of adequacy, we note as an example that there has been Federal Court intervention requiring use of primary care trained physicians when that training was necessary to protect inmate-patients. For years, the California Department of Corrections and Rehabilitation (CDCR) had poorly credentialed physicians, which resembled the current situation in the IDOC. In 2004, in the California prison system, many physicians were not trained in primary care; instead, they had training in surgery, radiology, gynecology, pathology, etc., similar to the IDOC situation in 2018. Many physicians had prior or current sanctions of their licenses and evidence of clinical incompetence by virtue of malpractice claims, which we were unable to evaluate for Wexford physicians. It was the opinion of the Court in California that the lack of qualified physicians resulted in increased morbidity and preventable death. We believe that the situation in California is similar to the situation in the IDOC. In California, as a result of that situation, the Federal Court issued an order[53] requiring the use of physicians who were

---

[52] Letter via email to Dr. Shansky, First Court Expert from William Barnes, representing the IDOC dated 11/3/14.

[53] Proposed Stipulated Order Re: Quality of Patient Care and Staffing; Marciano Plata, et al., v. Arnold Schwarzenegger, et al.; United States District Court Northern District of California No. C-01-1351 T.E.H., originally filed 9/17/04. In that order, the Court stated: "As of January 15, 2005, defendants shall not hire independent contractor primary care physicians who are not board-eligible or board certified in internal medicine or family practice." p. 3.

board certified or board eligible[54] in internal medicine or family practice.[55]  We note that in the California prison system in 2007, there were 18 preventable and 48 potentially preventable deaths, and in 2017, when all physicians were required to be board certified, there were 0 preventable deaths and 18 potentially preventable deaths.[56] Although there were other systemic improvements that helped reduce the number of preventable deaths, improvements in physician credentialing played the major role. Improving credentials of physicians and removal of unqualified physicians has been shown to reduce mortality.[57]

We have learned that in the mid-1980s, approximately 12 IDOC prison facilities were accredited by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO). At that time, the Agency Medical Director approved all facility Medical Directors and his requirement was that Medical Directors completed primary care training. Accreditation by JCAHO required privileging based on appropriate credentials. At that time, the IDOC placed into its Administrative Directives the requirement that all physicians have one-time primary source verification of their credentials, which was a requirement to verify training. The IDOC ended their accreditation with JCAHO but kept in the Administrative Directives the requirement of primary source verification. Over the years this practice was ignored and currently the HCUAs we interviewed do not even know what primary source verification is. The only credentialing review is to ensure at the annual CQI meeting that every physician has a license.

<u>Physician Staffing</u>
Physician staffing in IDOC is very poor. The Vice President of Operations for Wexford could not remember the last time there was a full physician staff. She thought in 2014 there was only one vacancy, but that was as close to full staffing as the program got. We noted earlier in this report that IDOC lacks adequately trained physicians. This is compounded by vacancies in physician positions. Persistent and ongoing vacancies in the Medical Director position title contribute significantly to physician staffing deficiencies. In addition to vacancies of Medical Directors, all five facilities we visited were missing a physician. Two facilities had replaced a physician position with a nurse practitioner because of the inability to fill physician positions. Statewide, the total days of missing Medical Directors totaled 22% of total days these positions were supposed to be filled,[58] an unacceptable vacancy rate.

Because of vacancies, physicians are moved from site to site as "Traveling Medical Directors." One of the facilities we investigated, NRC, had a Traveling Medical Director. This individual did

---

[54] Board eligible is a term used to describe a physician who has completed a residency training in a field and is therefore qualified to take a board certification test for that specialty. For example, a board eligible internist is one who has completed a residency in internal medicine and is qualified to take the board certification test but has not yet done so.

[55] Since this order, the California Department of Corrections and Rehabilitation, through the Receiver's office, requires board certification in family practice or internal medicine.

[56] Based on annual analyses of inmate deaths as reported by Dr. Imai, consultant to the medical receiver in California as found under the heading of Death Review at https://cchcs.ca.gov/reports/.

[57] Terry Hill, Peter Martello, Julie Kuo; A case for revisiting peer review: Implications for professional self-regulation and quality improvement. Plos One at https://journals.plos.org/plosone/article/file?id=10.1371/journal.pone.0199961&type=printable.

[58] Document 42P5621-IDOC Facilities lacking permanent medical directors 7-1-15 to 11-26-17 Bates number 550.

PTX193-0027

not participate meaningfully in quality improvement, did not show any evidence of oversight of the medical program, and had clinical issues.

The turnover of Wexford physicians is also very high. Of 33 physicians listed on a 9/19/14 report[59] by Wexford, only 18 (54%) are still working three and a half years later. The inability of Wexford to hire and *retain* qualified physicians is a serious problem and was mentioned as a significant problem by every HCUA we spoke with. There has been no formal analysis of this that we could find. The Vice President of Operations for Wexford told us that it was harder to recruit to corrections because of the impression that if you worked in corrections, you were a bad doctor. We disagree. In our opinion and from experience, recruitment in corrections depends on establishing conditions of work that are professional and foster a sense of providing a worthwhile service. When that occurs and when doctors are properly supported, qualified doctors can be found and retained in correctional environments and elsewhere.

At the five sites we visited, none had a long-tenured Medical Director. LCC had a Medical Director who had the longest tenure of the five facilities we inspected. She had been Medical Director since May of 2016. The Medical Director at Dixon started in October of 2017. The Medical Director at MCC has been in his position since June of 2017. One Medical Director was at Dixon for a short period of time before being moved to NRC. After several months at NRC, he was moved to SCC. About two months after being moved to SCC, he resigned. His position at NRC was filled in coverage by the ex-Medical Director at Hill, who the First Court Expert stated had identified clinical issues. This musical chairs rearrangement of Medical Director assignments is demonstration of the failure to create an environment likely to attract qualified physicians. The IDOC needs to determine why it is that their vendor cannot recruit and retain qualified physicians.

Physician leadership was not improved based on the First Court Expert's comment that,

"the Medical Directors were functioning in primarily clinical roles and spent little if any time reviewing the clinical practice of other providers or engaging in other important administrative duties."[60]

Several of the HCUAs spoke about poor physician quality as an issue. Two of the Medical Director positions were vacant. A coverage physician at one facility with a vacant Medical Director position did not participate meaningfully in quality work or in providing clinical leadership. In two of the remaining three facilities we visited, the HCUA spoke of having problems with the Medical Director. One was described as only doing chart reviews, not wanting to see patients, not reviewing deaths, and having to be urged to see patients. When leadership and quality of physicians is inadequate, patients are placed at risk because poor quality will not be identified or corrected.

---

[59] 40C0134- IL Physicians Report 9 19 14 Key Produced by Wexford Health Services.
[60] Final Report of the Court Appointed Expert, Lippert v. Godinez December 2014 p. 7.

<u>Non-Physician Staffing</u>

On a statewide basis, exclusive of dialysis and the HIV and hepatitis C telemedicine program, there are 1119.6 medical staff in the IDOC program, with an inmate population at mid-year 2017 of 43,075. This amounts to 26 staff per 1000 inmates, which places IDOC approximately in the lowest 10% of state prison systems in the country[61] with respect to staffing numbers *based on 2015 data*. Of the 1119.6 staff, 401 (36%) are employed by IDOC and 718.6 (64%) are employed by Wexford Health Sources. Of the 1119.6 medical staff, there are 245.8 (22%) vacancies, not including leave of absences, which would increase this number a few points. Wexford has an 18% vacancy rate for its 718.6 employees and IDOC had a 29% vacancy rate for its 401 employees. These are very high vacancy rates and compound a very low staffing level, making staffing a critical problem statewide. This was confirmed by HCUAs at sites we visited.

We compared facility staffing for mutually visited facilities. In 2014, the First Court Expert determined that for the five facilities we visited there were 303.41 budgeted positions, an 18% vacancy rate, and 25 staff per 1000 inmates.

**Positions, Vacancies, and Positions per 1000; First Court Expert's 2014 visit[62]**

| Facility | Positions | Vacancies | % Vacancy | Population | Staff per 1000 |
|----------|-----------|-----------|-----------|------------|----------------|
| SCC & NRC | 73.90 | 23 | 31% | 4078 | 18 |
| LCC | 62.21 | 4 | 6% | 1997 | 31 |
| Dixon | 66.30 | 18 | 27% | 2349 | 28 |
| MCC | 101 | 9 | 9% | 3750 | 27 |
| **Total** | **303.41** | **54** | **18%** | **12174** | **25** |

For the same five sites we visited, there were 405.05 budgeted positions. There were 99 (23.5%) vacancies. This is a very large vacancy rate, which makes it difficult to effectively operate a health program.[63] Four of the five facilities we visited had unacceptable vacancy rates.[64] We note several key differences in the staffing differences between 2014 and 2018. The population in the five facilities we reviewed decreased by 2177 (18%). The number of positions

---

[61] Prison Health Care: Costs and Quality, Pew Charitable Trusts, October 2017. We note that the staffing levels given in the Pew study reflect 2015 numbers. However, these 2018 IDOC staffing numbers still would rank Illinois in the lowest 10% of state prison systems comparing IDOC 2018 staffing to nationwide 2015 numbers.

[62] This table is constructed from data taken from tables presented in the First Court Expert's report.

[63] In Defendants' comments on our report they noted that there is a national nursing shortage and cite a survey of readily available health care facilities in the United States in January 2018 by Nursing Solutions, Inc. a recruitment firm. Defendants note that over 25% of the hospitals in this country who responded to the survey have Registered Nurse (RN) vacancy rates of greater than 10%. This same study reported that the average vacancy rate for Registered Nurses is 8.2%. In either case, nursing vacancies in the IDOC facilities we visited exceeded the average from this survey and were much more than the maximum of 12.5% used in the study.

[64] Except for LCC, all IDOC facilities had vacancy rates of 20% or greater. These vacancy rates are much higher than Federal Bureau of Prisons policy that establishes that vacancy rates not exceed 10% during any 18-month period (Program Statement P3000.03: Human Resources Management Manual, Chapter 3, page 11 obtained at https://www.bop.gov/PublicInfo/execute/policysearch#. There are no published reports comparing vacancy rates amongst health care providers working in state prison settings.

PTX193-0029

increased by 101.64 (33%).[65] The staff per 1000 inmates increased by 16 (64%). But the vacancy rate increased from 18% to 23.5%, a 30% increase.

**Positions, Vacancies, and Positions per 1000 Inmates; 2018 visits**

| Facility | Wexford and IDOC staff | Vacancies | % Vacancy | Population | Staff per 1000 |
|----------|------------------------|-----------|-----------|------------|----------------|
| SCC | 98.00 | 24 | 24% | 1183 | 83 |
| NRC | 69.00 | 29 | 42% | 1681 | 41 |
| LCC | 53.15 | 1 | 2% | 1806 | 29 |
| Dixon | 93.80 | 19 | 20% | 2298 | 41 |
| MCC | 91.10 | 26 | 29% | 3029 | 30 |
| **Total** | **405.05** | **99** | **23.5%** | **9997** | **41** |

While budgeted staffing increased at three of five facilities we visited, it decreased at two of five facilities. There are 44 additional staff working at these facilities than there were when the 2014 report was written.

Four of five facilities we visited had significant vacancy rates, as high as 42%, which are mostly nursing staff. Almost every HCUA told us that there were insufficient nursing staff. This was confirmed in the deposition of the Agency Medical Coordinator, who noted that over the past several years there have been nursing shortages at SCC, Pontiac, Decatur, Graham, Southwestern, and MCC.[66]

Most HCUAs told us that if all their positions were filled they believed that there would be adequate staff. We do not agree. The IDOC has not performed a staffing analysis based on expectations of the Administrative Directives and special care needs, including infirmaries and geriatric care. Relief factors have not been included in staffing considerations and budgeted staffing numbers do not appear to be adequate. In our opinion, despite increased nurse budgeted staffing and even when vacancies are filled, there will still be nursing shortages. The IDOC, in their comments on our report, assert that the IDOC in the current fiscal year and Wexford in the past year spent a total of $8,283,718 on overtime wages. We acknowledge that this is a significant expenditure. Based on our investigation, overtime is used to cover some but not all vacant shifts. However, reliance on overtime contributes to staff fatigue, increased errors, staff dissatisfaction and turnover as well as higher incidence of poor patient outcomes.[67] While we did not evaluate working conditions for staff, we did find ample evidence of error and

---

[65] Dixon appears to have had a significant increase in staffing, but as the HCUA related to us, this is artefactual, as 22 nurses were moved from the mental health program to the medical program but still had assignments in mental health. Their reassignments did not create increased staffing for the medical program, but gave the impression that there had been a large increase in staffing. If these 22 nurses are removed from the Dixon staffing, the actual increase in staffing would be 79.64 positions or a 26% increase, not a 33% increase.

[66] Deposition of Kim Hugo, Agency Medical Coordinator pp. 25-31, April 11, 2018.

[67] Institute of Medicine (2004) Keeping Patients Safe: Transforming the Work Environment of Nurses. National Academies Press, Washington, D.C., Stanton, M. (2004). Hospital nurse staffing and quality of care. Agency for Healthcare Research and Quality. Research in Action, Issue 14.

PTX193-0030

poor patient outcomes in our review of health care provided to IDOC prisoners. The use of overtime does not change our opinion that a staffing analysis is needed or that there is lack of adequate staffing.

The Wexford component of staffing is memorialized in a contract document called a Schedule E. Based on interviews with senior leadership of Wexford and IDOC, we could not determine who is responsible for developing staffing levels found in the Schedule E. The Wexford Vice President of Operations told us that the Schedule E staffing is the recommended staffing of the IDOC to which the vendor can make suggestions. Mr. Brunk, the Chief Financial Officer, told us that the Schedule E is developed by the Wexford Regional Manager and reviewed by the IDOC Office of Health Services. The Agency Medical Director told us that he had input into the Schedule E for new facilities but otherwise had no input into the Schedule E, and that Mr. Brunk or Wexford developed the Schedule E, which the Office of Health Services approved. The Chief of Programs and Support Services, who is the health authority, told us that the Agency Medical Director was responsible for development of the Schedule E. Development of the Schedule E is not in the job description of the Agency Medical Director. The lack of a central health authority, we believe, contributes to this confusion. Furthermore, the Schedule E as represented in the current contract does not include input from HCUAs, Regional Coordinators, or even the Agency Medical Director in addressing clinical needs in their facilities. Given these responses, it is our opinion that the Schedule E does not reflect actual staffing need, as it does not appear based on any staffing analysis we could identify after discussions with health leadership who we thought would be responsible for this document.

No one we spoke with has responsibility for determining if total staff (state and Wexford) is adequate. The IDOC Agency Medical Director and the Agency Medical Coordinator told us that an Assistant Warden of Programs (AWP) from Sheridan, who also was a nurse, was engaged in analyzing staffing at various sites, but the extent of this analysis was not known to the Agency Medical Director. The Illinois Nursing Association (INA) is the union for the registered nurses in the IDOC. The Agency Medical Coordinator participates on an INA standing committee that meets monthly to discuss INA related nursing issues. The INA has raised issues with respect to staffing at certain facilities. When this occurs, the AWP from Sheridan performs a staffing analysis, brings it to the standing committee, which then considers staffing recommendations, and forwards them the Agency Medical Director for review. Other than this effort, we could identify no analysis of staffing need state wide.

Based on conversations with senior IDOC leadership, staffing increases at NRC and SCC were a result of union negotiations. Senior IDOC Office of Health Services staff were not involved in this decision,[68] although a Regional Coordinator gave recommendations on how many nurses were needed. These increases were not based on a thorough staffing analysis, as relief factors were not used and because no positions other than RN positions were considered. At no facility has there been an analysis of staffing need based on adherence to the Administrative Directives. This creates a gap between clinical need and staffing levels that affects all facilities.

---

[68] See pages 14-16 of deposition of Kim Hugo, Agency Medical Coordinator, April 11, 2018.

Because we only visited a small number of facilities, the true staffing deficiency is unknown. The program should undertake a staffing analysis, considering all job classifications with relief factors. This was a recommendation of the First Court Expert and we agree with that recommendation. This analysis should not be performed by a custody person and probably should be performed by an outside expert.

We noted at four sites there were inadequate supervisory nurses. At MCC, SCC, Dixon, and LCC, we felt that budgeted supervisory nurse positions were inadequate. At Dixon, SCC, and LCC, the HCUA provides some nursing supervision due to vacancies.

Custody staffing was not addressed by the First Court Expert. At several facilities we visited, there were issues related to insufficient officer staffing to properly accompany nurses in medication administration or to escort patients for scheduled appointments. While we did not study this in depth and lack the ability to review officer staffing, the numbers of officers need to be sufficient to ensure that medical services can be timely and appropriately provided. For this reason, we believe that officer staffing with respect to medical services needs to be studied and additional officers hired as indicated.

## Statewide Use of University of Illinois

### Current Findings

The First Court Expert did not address services provided by University of Illinois at Chicago (UIC). UIC provides laboratory services statewide. We found no problems with laboratory services at any facility we visited. UIC also provides HIV and some hepatitis C services via telemedicine statewide. Everyone we spoke with commented on the high quality of these services. All patients with HIV are scheduled for care by UIC clinicians. The First Court Expert found that coordination of care between UIC and IDOC providers could be improved. We agree, but found that overall when patients are referred, care was of very good quality.

For hepatitis C, IDOC physicians evaluate patients with hepatitis C in a hepatitis C chronic clinic. We found that these clinics were not performing well. When patients reached a level of fibrosis that is equivalent to stage 3 fibrosis, the IDOC physician refers the patient to a Wexford internist, who evaluates whether the patient should be referred to UIC and whether any other testing needs to occur. In our opinion, this process only serves to delay access to hepatitis C care and we found multiple cases of delayed hepatitis C care that caused harm.

Furthermore, because IDOC physicians lack primary care training, they appear to not know how to manage cirrhosis. There is no evidence that patients with cirrhosis from hepatitis C obtain timely baseline esophagogastroduodenoscopy (EGD) to screen for varices or every six month ultrasound screening for hepatocellular carcinoma, which is a standard of care. We noted on death reviews a patient who died of bleeding varices who never had an EGD to screen for this condition.

As a result of these problems with referral for hepatitis C, it is our opinion that fewer people are treated than who should be treated based on barriers to referral for care. Once engaged at UIC, care appeared appropriate.

What was clear in reviewing the program at UIC was that credentialing of physicians is part of the hiring process at UIC and all physicians are qualified. Progress notes are reasonable and clinically adequate. Referrals are appropriate. There were no identified errors. The UIC medical school correctional program is a significant resource that has potential to provide qualified physicians to the IDOC correctional medical program. The UIC School of Medicine has a subsidiary school of medicine in Rockford which has a significant primary care program. The Southern Illinois School of Medicine is also a potential significant resource which is close to many of the southern Illinois prisons. As we will discuss later in the recommendations, we believe that the UIC program or some combination of state affiliated medical school programs can be the basis for improving physician quality in the IDOC system of care. This needs to be carefully explored. The UIC program also has potential to provide dialysis services. Telemedicine services can include specialty care some of which can reduce but not eliminate the need for transportation of inmates for offsite encounters. We believe that an affiliation with a university based program like UIC can reduce some costs by use of 340B pricing discounts.[69] The IDOC would be remiss in not exploring these options.

We note the UIC and SIU both have dental schools, which is a potential resource for oversight functions and possibly for direct service provision.

## Statewide Overview of Major Services

### Clinical Space and Equipment

**First Court Expert Findings**
In the final report, the First Court Expert noted that clinical space, sanitation, and equipment were problematic at virtually every facility. The report noted facilities that lacked designated space to conduct sick call in the housing units, did not have the clinical equipment needed to perform adequate examination and screening, and had examination areas that did not allow sufficient privacy or confidentiality during clinical encounters. There were nurse sick call and provider clinical spaces that did not have examination tables. In housing units without designated sick call rooms, nurses performed sick call duties at the cell doors without any potential for confidentiality and no opportunity to perform an adequate physical examination if so warranted.

System wide deficiencies in sanitation were identified. In many facilities, examination tables and stools, infirmary mattresses, and stretchers had cracked or torn impervious outer covers

---

[69] 340B pricing is a government sponsored price discount on pharmaceuticals that can be provided to disproportionate share hospitals that provide care to underserved populations. 340B pricing is currently used for the HIV/hepatitis C telemedicine program.

which did not allow proper cleaning and sanitation. Many facilities were not using paper barriers on exam tables which could be changed between patients nor, alternatively, was there evidence that the tables were cleaned with a sanitizing solution after each patient use. Some clinical examination rooms lacked handwashing sinks.

**Current Findings**

The experts inspected the physical plants and equipment in the medical care areas at the NRC, SCC, Dixon, LCC, and MCC. Overall, we found problems with nurse sick call rooms, infirmary spaces, and examination rooms in all facilities we visited. The dialysis unit at SCC is inadequate and needs renovation. These problems detracted from the ability to provide care.

<u>Nurse Sick Call Rooms</u>

The nurse sick call rooms in three of the five facilities have been situated in the housing units to increase access to care. In two facilities, the sick call rooms are located in a centralized health care building.

NRC has established nurse sick call rooms on the first floor of each of the three tiered cell houses. These rooms are also used by providers to perform intake physical examinations that were deferred during the intake process. Nurses commonly do sick call interviews cell by cell through closed doors, moving some patients to the sick call rooms, which have a few plastic chairs or four bolted metal chairs with shackles. The sick call rooms do not have examination tables or desks, and all clinical equipment is carried in the during sick call session. Not all rooms have sinks or soap and paper towels. The sinks were dirty and the floors poorly scrubbed. In this condition, these rooms are unacceptable for the performance of nurse sick call or provider intake physical examinations.

SCC established nurse sick call rooms in the all six housing units. The rooms are adequately sized and equipped, having examination tables with paper rolls. The oto-ophthalmoscopes in two of the six rooms were not functioning. These rooms were generally clean and organized. One room did not have a sink but sanitizing hand gel was available for hand cleaning.

Dixon primarily provides nurse sick call in two dedicated and two part-time rooms in the centralized health care unit (HCU). (There were two additional satellite sick call rooms in the distant disciplinary segregation building). One nurse sick call room in the HCU had two desks and two exam tables; this room lacked any auditory and visual privacy. The other three rooms did not have examination tables. Only two of the four rooms had sinks. Having two exam tables in one room and none in the other three is a barrier to the delivery of care and does not allow for adequate privacy and confidentiality.

LCC provides nurse sick call in the ambulatory care wing of centralized health care building. Two exam rooms and occasionally a third room were utilized for nurse sick call; all had sinks and were adequately equipped. The exam tables had small tears in the upholstery and one oto-ophthalmoscope was not functional. Due to the need to share the examination rooms with the

provider staff, there were times when there were not enough exam rooms to meet the nurse sick call needs of the women at LCC.

MCC has established seven clinical examination areas in the facility's cell houses that are used for daily nurse and intermittent provider sick call and chronic care. In cell houses with only a single examination room, nurse sick call and provider clinics cannot be provided simultaneously and have to be separately scheduled so as not to overlap. The condition of these satellite clinics varied from cell house to cell house. Some rooms were well maintained, others had cracked and peeling paint, uncovered electrical outlets and ceiling vents, boxes cluttering the exam area, and records and supplies stacked on exam tables during clinical sessions. One of the exam areas did not have a sink. Not all of the areas were properly equipped; some lacked oto-ophthalmoscopes, oximeters, peak flow testing mouthpieces, blood sugar testing devices, automated external defibrillators, and other supplies. One of the exam rooms in the East cell house was cramped by the presence of correctional items, including three large file cabinets, water damaged cardboard boxes, and an ancient refrigerator with a totally rusted door Unsealed emergency bags were found in a number of the clinical spaces.

Infirmary Space
NRC opened a 12-bed medical infirmary in 2016. The nursing station is in a converted storage closet with no sink, no electrical outlets, no phone, no computer, and only one desk for two to three nurses. The size and condition of this nurse station hampers the efficiency of the infirmary nursing staff. There were functioning patient nurse call devices at each infirmary bed. The monitoring panel in one of the two negative pressure isolation rooms was not operational. Even though the majority of the patients housed in the medical infirmary were chronically ill, and had clinical issues including frailty, disability, ambulation deficits, inability to provide self-care, or bladder or bowel incontinence, there were no adjustable hospital beds with safety rails in the infirmary. Many of the mattresses had torn covers and could not be properly sanitized. One patient with urinary incontinence had an uncovered porous foam egg crate cushion in lieu of a mattress that was odiferous, dirty, and could not be cleaned and sanitized. The weekly supply of clean linens was insufficient to meet the needs of the infirmary patient population of incontinent, diapered patients who frequently soil their sheets. The medical infirmary rooms were shabby and unacceptably dirty.

The SCC infirmary's nursing station's design does not allow direct line of sight of any of the 32 patient beds. Functional nurse call devices were in all of the two-bed rooms but not in the single bed medical rooms. The HEPA filters and negative pressure units in both the isolation rooms were non-functional; its filters and vents were clogged with dust. Low, fixed position beds were not suitable to allow appropriate examination or to meet the clinical needs of the patients housed on the infirmary. The head and leg sections could not be raised or lowered, beds had broken wire springs, and safety railings were broken. The condition of the infirmary beds created a safety hazard for the staff and patients. The tub room had large cracks in the floor and no safety grab bars, rendering it unusable. The rooms were inadequately cleaned. The cleanliness of the room varied based on the ability of the individual patients to assist with cleaning their rooms. Elderly, physically and mentally impaired individuals who were unable to

PTX193-0035

assist with cleaning their rooms had unacceptably dirty rooms. Only a single room with two more physically fit patients was judged to be adequately clean. Flies, gnats, and cockroaches were noted in patient rooms and in the corridor.

Dixon's second and third floors contain the infirmary, ADA housing unit, and the geriatric housing unit. The building's two elevators were broken; one had been disabled for a long time and the other had become non-operational on the day before the expert's visit. The malfunctioning of elevators created a major potential safety threat to the expeditious evacuation of these floors, given the clinical condition (elderly, frail, bedridden, physically ambulation impaired, etc.) of the patients housed on the health care building's upper floors. Most of the infirmary beds were functional, second-hand hospital beds with intact mattresses and adjustable sections. However, one patient with dementia had a broken bed with a middle section that sagged nearly to the floor. The infirmary rooms had nurse call devices and the negative pressure unit in the isolation room was functional. The ADA and geriatric units have fixed metal frame beds without adjustable sections with metal wire mattress supports. The wire mattress supports were commonly broken and replaced with strips of sagging tied bed sheets. The fixed metal beds must be replaced with more suitable beds; these beds are inadequate and put the safety and health of the geriatric patients at risk. Peeling paint, cracked wall plaster, rusted, dusty vents, and poorly ventilated showers were noted on both floors. As throughout the entire health care building, floor tiles are cracked and loose; this is major safety hazard for staff and the at-high-risk-for-fall patient population.

LCC's infirmary occupies one wing of the health care building. Relatively new hospital beds in excellent condition with adjustable height and head and leg sections were in all of the single (non-crisis) and double bed rooms. There were nurse call devices next to all the medical beds. The unit was clean and well organized. Both of the negative pressure units and the monitor at the nurse station were not functional, even though the nursing logs had previously indicated that they were operational.

MCC's infirmary is located on the third floor of the centralized health care building and can be reached by stairs or a single elevator. Overall, the infirmary was clean and in good repair. The heavy doors to the patient rooms are kept locked with individual padlocks. This is a safety hazard because emergency evacuation of the infirmary would be significantly delayed due to correctional staff having to open each of the padlocks. These padlocked rooms are also a safety hazard because there are no nurse call devices in any of the infirmary rooms; patients who are able to ambulate have to bang on the doors to get medical attention. Patients unable to ambulate have to call for help. The nurse station is in an enclosed room that is not within sight or sound of the patient rooms. Twenty three of the 26 beds were low, fixed-position metal beds without safety railings or adjustable heights and head and leg sections. The low to the ground fixed position beds made it difficult and even unsafe for the staff to properly examine and transfer patients into and out of bed. One patient with risk for falls slept on a mattress on the floor because there were no available beds with safety railings. The negative pressure units were operational, but the anterooms in these isolation rooms were cluttered and had overflowing waste bins. The shower room used by the infirmary's chronically and acutely ill

patients did not have safety grab bars; the ceiling vent in the shower rooms was clogged with lint and dirt.

Health Care Unit Space

The NRC health care unit did not have a sufficient number of exam rooms to accommodate the facility's four providers and the monthly UIC telemedicine specialty team. There are sessions when one provider has to be shifted into a cluttered interview/storage room without an examination table or clinical equipment. This is inappropriate for the use by clinical providers. Two additional examination rooms are needed to assure that access to clinical care is not hampered by the lack of examination space. The three exam rooms have non-adjustable exam tables and none had paper rolls. Sinks in all the rooms were crusted with mineral deposits, and uncovered paper memos were taped on the walls, creating a fire safety hazard. The wall mounted oto-ophthalmoscopes were non-functional in every exam room and in the treatment room. One portable scope was shared by the providers. Even though many infirmary and general population patients have physical disabilities, there was not a single adjustable exam table or an electric table in the clinic.

SCC's health care unit was reasonably clean and organized. The unit had two provider exam rooms and a telehealth room; if needed, the adjacent treatment room was used as a third provider room. The four-chair hemodialysis suite was in deplorable condition, with peeling paint; dirty, unbuffed floors; standing water on the floor of the deionization room; and an uncovered waste container. The front of refrigerator door was totally rusted and impossible to sanitize. The suite, deionization room, and the storage areas were cluttered, creating a safety and fire hazard. The space of the suite did not allow for the required separation of the hepatitis B infected dialysis patients. A very few of these egregious deficiencies had been noted on Monthly Safety and Sanitation reports, but no action had been taken by IDOC, Wexford, or the dialysis vendor to expeditiously correct these problems. The Hemodialysis Unit does not meet the community standards of care or the CDC guidelines for prevention of the infections in dialysis units (Reference CDC, Recommendations for Preventing the Transmission of Infections among Chronic Dialysis Patients). The Hemodialysis Unit should be closed until all these deficiencies in the physical plants and practice have been corrected; these conditions would not be tolerated in community dialysis centers.

Dixon's health care unit on the first floor of the health care building had three adequately equipped provider examination rooms with an additional telehealth room. There were sufficient exam rooms to accommodate all three providers at the same time. One of the examination tables did not have a paper roll. The provider offices in an adjacent corridor were reportedly to allow access to electronic medical references. The HCU was generally clean and well maintained; however, as in the entire health building, there were cracked and missing floor tiles throughout the first floor. This is a safety, sanitation, and infection control concern for patients and staff.

LCC's ambulatory health care unit occupied one wing of the health care building. Provider chronic care clinics, provider sick call, and OB-gynecology specialist clinics, along with nurse sick

call, are co-located in this area. The five examination rooms are not adequate to accommodate the 7.5 budgeted full-time equivalent providers and nurses assigned to provider and nurse clinical sessions. All of the examination rooms are adequately equipped; one oto-ophthalmoscope was not operational. One room did not have a sink, two of the five rooms did not have a paper barrier on the exam table. Emergency jump bags are kept in the health care unit and in a car used to transport nurses to distant cell houses on this large campus; these bags were noted to be unsealed. The facility's failure to restock and reseal the emergency bag after every use jeopardizes the next response to an emergency on the campus.

MCC's health care building's first and second floor houses radiology services, telehealth room, nurse staffed treatment room, dental suite, optometry, physical therapy, and support and administration offices. Nurse and provider sick call and chronic care clinics formerly provided in the four exam rooms on the first floor have been relocated to the cell houses. With the exception of the telehealth room, the examination rooms are not well maintained; examination tables and chairs have torn upholstery, oto-ophthalmoscopes were not functional, one of the rooms was cluttered with supplies. These rooms are used intermittently for nurse sick call and treatment room overflow, and should be kept in operational condition.

## Medical Records

**Methodology:**  We toured medical record areas, interviewed medical records personnel, and reviewed medical records.

### First Court Expert Findings
The First Court Expert found the quality of medical records poor at most facilities visited. This included problem lists not updated and cluttered with redundant, irrelevant information. MARs were incompletely filled out. "Drop filing" occurred mostly at NRC and LCC. The IDOC fails to file health requests in the medical record. Progress notes often contain no information with respect to history, examination, or clinical decision making. Illegible handwriting made many notes unreadable and unusable, except by the author.

### Current Findings
LCC has corrected the problems with drop filing. With that exception, there has been no improvement. We found several additional significant problems. These include:
- With the exception of MCC, charts are so large that they frequently come apart, making the record extremely difficult to use. This promotes loss of documents.
- Record rooms are too small to accommodate all records. Therefore, additional storage space is necessary, making finding an older document extremely cumbersome.
- Record rooms are not secure and therefore violate Administrative Directives and fail to follow Illinois Department of Human Services guidelines on protection of the medical record.
- There is not a standardized tracking system in place to sign out a record.

- Any staff member can access the records room and pull and re-file records. This promotes loss of records and does not safeguard confidentiality or use by unauthorized persons.
- Access to a medical record for use during clinical encounters is not universal.
- Data for use in quality improvement is obtained manually. This makes measurement of health care processes extremely cumbersome.
- We noted inability of the IDOC to find all documents in mortality records sent to us.
- Records of on-site dialysis are maintained separately from the IDOC medical records and the medical record fails to contain updated information about what is occurring in dialysis.

At the time of the First Court Expert visits in 2014, the IDOC was in the process of implementing an electronic medical record. This effort started at LCC and Decatur, the only two female facilities. The record was incompletely implemented; the electronic MAR was not implemented. After part of the electronic record was implemented at LCC and Decatur, the electronic record project was aborted. We did note on our review at LCC that there were some serious problems with the electronic record. This record defaults vital signs from the last vital signs obtained. The record will automatically present vitals in a note from months previous if no more recent vital signs were done. This is dangerous and should be stopped, as it is a patient safety issue.

The IDOC is considering implementation of a different electronic record. The IDOC has placed a custody Deputy Director in charge of the project to implement an electronic medical record. It is our opinion that someone with medical expertise and medical record expertise should head this effort, not custody personnel. No funding has been provided for this project.

A correctional health program generates large volumes of paper. Infirmaries, mental health units, the health request process, and administration of medication are hospital-like with respect to the volume of paperwork that is generated. As a result, inmates who remain incarcerated for a long period of time generate massive paper medical records. Three problems ensue. One problem is that there is no place to store all the paper record volumes so that they are easily accessible. A second problem is that the paper record comes apart, making use of the documents contained therein extremely cumbersome. The third problem is that the current volume of documents often does not contain all of the documents necessary to provide care. This can result in physicians acting without complete information about the patient. This is particularly true because of the frequency of changes in physician staff.

Almost all inmates with chronic illness or with mental health problems have multiple volume files, easily in the thousands of pages per inmate. Record rooms in the prison facilities do not have the capacity to store all volumes of the record. As a result, most of the volumes of records are placed in storage someplace on the grounds of the facility, but not always close to the medical unit. The most current volume of a record often does not contain a key test result, consultation report, hospital summary, or diagnostic test result that is necessary to understand the progress of the patient. In our own review of records, we had to frequently ask for additional volumes of the record. When this occurs, clerks have to go to the storage unit to find

the document. This delay is not workable if a provider is with the patient. The entire patient record should be available for use, but this would be exceedingly impractical using a paper record.

Also, the paper medical records frequently come apart. All paper documents are two-hole punched and held together by a plastic binding clip. The plastic clip is glued to a pressboard binder that is used for covers of the record. These covers are expandable. The thinning process is standardized except for when to initiate the thinning process. By IDOC rules, certain documents are carried forward to the current volume. The carry-forward documents often do not include critical test reports, consultation reports, or other clinical information that is critical to understanding the patient's diagnosis or therapeutic plan. Other than MCC, the IDOC has no rule on when to thin the record. Several facilities allowed records to expand well beyond two inches. One facility told us they could not afford to purchase the pressboard covers, so charts were not thinned when they should have been.

There are major problems with this process. Medical record volumes that may contain important information are not easily accessible. A newly thinned record may have insufficient medical record documents to properly care for the patient. Medical record volumes that are not thinned come apart. The plastic clips come undone and the clinician is left with a pile of paper that can easily become misplaced in the medical record. This promotes poor care.

None of the facilities we visited had a completely secure record room. Medical records are considered confidential and must be secure. The Illinois Department of Human Services guidelines for providers in maintaining a medical record state that medical records must be maintained in accordance with accepted medical standards which require confidentiality, secured by lock when not in use, and safeguarded against loss or use by unauthorized personnel.[70] Typically, when paper records are used, staff maintaining the record must keep the records in a locked room to which no one except authorized medical record employees have access. Records are pulled by medical records staff only. When a record is pulled, a placeholder is inserted into the space where the record was, containing information on where the record is. After-hours record use is strictly managed so that only authorized persons are permitted in the records room. None of the facilities we visited ensured that this happened at all times and in all circumstances.

The NRC record room was the worst of all facilities. Everyone had access to the record room. Any staff member could pull and refile records they used. Paper documents were not in a pressboard folder and sometimes were merely stapled together or in piles. When a pile of record documents was removed from the room, there was no indication where the record was. In chart reviews we conducted, it appeared that many documents were missing.[71] This arrangement is a patient safety hazard and needs to be corrected as soon as possible. We were

---

[70] Illinois Department of Human Services website as found at http://www.dhs.state.il.us/page.aspx?item=40657.

[71] We noted on four mortality records that there were parts of the record that were missing that made it impossible to evaluate the death. These records included Mortality Review Patient #11 from SCC/NRC; Mortality Review Patient #12 SCC/NRC; Mortality Review Patient #16 SCC/NRC; and Mortality Review Patient #31 Illinois River.

told that the State had funded additional clerical positions for this unit. However, the room size is so small that we do not believe that the room can accommodate any additional employees. This process will require significant work to remedy.

Some patient encounters occur without a medical record; this mostly pertains to nursing sick call at MCC and NRC. All patients need to be seen with a medical record. When patients are seen without a medical record, nurses write their note on a blank progress note without benefit of review of the patient's current problems, medications, or other significant information. The progress notes are filed later. This is inappropriate medical care and is likely to lead to mistakes, placing patients at risk of harm. All nursing and provider evaluations must occur with a medical record.

Some of the First Court Expert's findings are a result of use of a paper medical record and some are staffing and practice issues as well as medical record issues. The First Court Expert found deficiencies with problem lists. Problem lists are easier to maintain in an electronic record than in a paper record. However, in both electronic and paper records, the quality of the problem list is directly related to medical staff participation in maintaining it. The failure to maintain the problem lists in IDOC is a failure on multiple levels. Leadership has not instituted standardized practices with respect to who can enter a problem on the problem list. When providers do not work to place accurate problems in a standardized methodology on the list, the list also becomes inaccurate. While this problem is easier to correct with an electronic record, it is a matter of leadership, supervision, and practice, and is related to personnel and practice issues rather than medical record issues.

Incomplete MARs can be a staffing or process problem. When there are insufficient nurses to administer medications, the records can be incompletely filled out. Also, the practice of recording medication administration hours after medication has actually been administered, which occurs at several sites we visited, will result in inaccurate entries. This appears to be a staffing issue and a process issue. We believe that the burden of using, filing, and reviewing paper MARs is so great that it alone is a compelling argument for implementation of an electronic medical record. If paper records are to be continued in the IDOC, significant root cause analysis and process work needs to be done to discover what the problems are so that they can be fixed.

Paper requests for health care contain the patient's written complaint that nurses address in the sick call process. In our opinion, these written complaints are health record documents, as they describe the patient's problem. The IDOC does not include these in the medical record and discards them. These documents need to be included in the paper record or scanned to the electronic medical record.

The issue brought up by the First Court Expert that many practitioners fail to document a history, physical examination, or therapeutic plan is not a medical record problem in our opinion. This is a problem of physician quality. As an example, we noted one physician at SCC who was a surgeon and not primary care trained who, for six months, was following an

infirmary patient who had dementia. His entire note for 19 consecutive patient evaluations consisted of the statement, "No specific complain, no change, dementia, continue same care."

The patient was ultimately hospitalized for a cardiopulmonary condition but because the doctor failed to evaluate the hospital record it wasn't clear why the patient was hospitalized. Ultimately, the patient developed metastatic colon cancer not diagnosed until the patient had advanced disease. For almost a year following hospitalization, the doctor wrote the following note repeatedly, "No specific complaint, no change, dementia, post colectomy for metastatic ca [cancer]. Continue same care."

This repeated note was written during a time when the patient experienced falling repeatedly, developed incontinence, developed pustular otitis, and severe malnutrition and dehydration. This was negligence and incompetence of the provider and not a result of the medical record. Many notes failed to contain adequate history, physical examination, assessments, or development of therapeutic plans. In review of 33 death records, we found 276 episodes of care with inadequate history; 249 episodes of inadequate examination; and 228 episodes in which a therapeutic plan was inadequate. In our opinion, this is not a problem with the medical record, but is a problem of physician quality.

Illegible handwriting is an individual problem which is extremely difficult to correct with a paper medical record system. We noted problems with legibility at all sites except at LCC, where an electronic record is used.

We also note that use of a paper record means that accessing data from the record for the purpose of measuring performance must be done manually. This is extremely cumbersome and discourages quality investigations. An electronic record can significantly improve data use.

Dialysis is provided by a vendor. Even though dialysis occurs onsite at IDOC facilities, the records of dialysis are not incorporated in the medical record. We noted at SCC that the nephrologist will occasionally write a few comments on a referral form but these are not thorough or fully inform the status of the patient's condition or treatment. These dialysis records should either be incorporated into the record or a reasonable complete summary of the patient's status and treatment should be provided on a regular basis to update the medical record.

In summary, there were many problems with use of the paper record that will be difficult to correct. These include storage of important information due to excessive chart size, documentation on the MAR, ensuring confidentiality of the record, legibility, and functionality. It is our recommendation to implement an electronic medical record statewide to include electronic medication administration functions. The system should be designed and acquired so that the IDOC has easily accessible data for use in measuring performance. Data analysts who are expert in obtaining data from the electronic record for quality purposes should be employed.

PTX193-0042

## Medical Reception

The medical reception evaluation and treatment plan establishes a baseline for the patient's medical, mental health, and dental conditions, and serves as a blueprint for the patient's care following transfer to the patient's parent institution. Failure to identify and treat serious medical conditions at intake increases the risk of harm to patients and liability to IDOC. Our review showed that the medical reception process generally occurs timelier since the First Court Expert report; however, there are persistent issues related to the reliability of various processes (e.g., TB skin testing) and quality of medical reception evaluations. There are also issues related to the timeliness of follow-up of serious medical conditions. Our report confirmed findings of the previous report and identified previously undescribed problems.

**First Court Expert Findings**
The First Court Expert reviewed three reception centers, noting that the purpose of the medical reception process is to identify and treat acute and chronic medical and mental health problems, including communicable diseases, and to identify any special medical needs. The Court Expert found the following problems:

- IDOC forms do not elicit current symptoms (all facilities).
- Nurse screenings being performed in areas that were noisy and did not provide adequate privacy (LCC).
- Significant delays in performance of clinician history and physical examinations of newly arriving inmates, sometimes for more than a month (NRC).
- Lack of integration of TB and laboratory test results into the history and physical examination so that all medical conditions are timely diagnosed with an accompanying treatment plan for each condition and documentation on the problem list (NRC, Menard).
- Medical record disorganization that impeded clinicians' ability to identify and utilize clinical information to timely diagnose and treat patients appropriately (NRC).
- Delays in follow-up and treatment of chronic diseases and other medical conditions (NRC, MCC, LCC).

**Current Findings**
This review showed that improvements have taken place with respect to the timeliness of completion of the medical reception process at some facilities (NRC and LCC) but not uniformly across the system (MCC).

Record review showed that county jails forwarded medical transfer information that was available to health care staff at the time of arrival. However, NRC providers did not document that they reviewed the information and, in some cases, missed important medical diagnoses (e.g., prostate cancer, pancreatic cancer, pulmonic valve regurgitation) or medications for high blood pressure (e.g., hydrochlorothiazide). One such error resulted in death.

We noted two cases in mortality reviews that included significant problems with failing to review transfer information or to take an adequate history. In one case, a provider failed to

take an adequate history of a patient in the midst of getting valve replacement for a congenital anomaly.[72] The provider made the wrong diagnosis, failed to contact the patient's civilian doctor, and even failed to read a letter in the IDOC medical record from the patient's civilian doctor. As a result of this failure, the patient's planned surgery was never done, his condition was unrecognized in IDOC for six months, and the patient died from complications of his heart condition without having obtained surgery. Another patient from LCC was at Cook County Jail and was sent to Stroger Hospital for a pancreatic mass. A biopsy was non-diagnostic but the mass was strongly suggestive of pancreatic cancer and follow up was recommended.[73] The doctor at LCC presumed that the patient had a benign pancreatic mass and no follow up was initiated for five months. Pain medication history was also not taken and the patient was placed on inadequate doses of pain medication and suffered in pain over the last five months of her life.

Medical reception was conducted in clinic examination rooms that were not standardized with respect to medical equipment and supplies. There was no microscope available at LCC to the provider to diagnose vaginal infections.

Clinic examination room furniture was often in disrepair (e.g., torn exam table covers) and needs to be repaired or replaced. Exam tables did not have paper to use as a barrier between patients and there was no schedule of sanitation and disinfection activities. Exam rooms were dirty, and in some cases filthy. At NRC, the lack of a water softening system at the facility (reportedly due to budget issues) results in mineral deposit buildup on sinks and faucets, making disinfection difficult, if not impossible. At LCC, the nurse and clinician conduct the medical reception process in rooms that are small and difficult to clean. These conditions present a risk of infection to patients.

On the day of patient arrival, nurses perform a medical history, TB symptom screen, height and weight, vital signs, visual acuity, and plant a tuberculin skin test. Phlebotomists draw labs including hepatitis C and HIV opt out testing. At NRC we found that the scales were not calibrated.[74] Nurses incorrectly measured visual acuity by having the patient sit in a chair to read the visual acuity chart approximately 10 feet away instead of having the patient stand 20 feet away and testing visual acuity for each eye separately. NRC nurses incorrectly read tuberculin skin tests by having the patient show his arm in the cell window rather than palpating the patient's arm for induration. Tuberculin skin test results were not consistently documented in the health record. At LCC, nurses did not document urine pregnancy testing on all patients of childbearing age upon arrival.

Lab tests performed as part of intake screening routinely include serum chemistry, syphilis, and opt-out hepatitis C and HIV testing. Although HIV is supposed to be opt-out,[75] the

---

[72] Mortality Review Patient #2.
[73] Mortality Review Patient #20.
[74] One of the experts stepped on two scales which gave a 10 pound discrepancy between the scales.
[75] Opt-out testing means that testing will be performed unless the patient refuses the test. Opt-in testing means that the patient is offered testing and is performed only upon patient consent.

Administrative Directive (AD) requires that consent be obtained before drawing blood for HIV, which essentially renders the process as opt-in.[76] Opt-out testing is recommended by the Centers for Disease Control because it supports early identification and treatment. Data shows that significantly fewer inmates are being tested for HIV than hepatitis C infection.

A nurse performs the medical history. The IDOC Offender Medical History form is limited with respect to chronic diseases and does not include COPD, thyroid, kidney, liver, autoimmune diseases, or cancer. Importantly, as noted in the previous Court Expert report, the form also does not include a section for review of systems (e.g., chest pain, shortness of breath, abdominal pain, blood in stool, difficulty with urination, etc.) that are typically included in a comprehensive history and physical examination. This poses a risk that important medical diagnoses or symptoms of serious illness will be missed and not medically evaluated, increasing risk of harm to the patient.

The IDOC Offender Physical Examination form (DOC 0099, Rev. 11/20/12) includes a section for substance abuse, risk factors for blood borne infections (e.g., HIV and HCV), and TB symptoms, but does not include a section for chronic disease pertinent review of systems (e.g., chest pain, SOB, polyuria, polydipsia, neuropathy, etc.), which contributes to the assessment of disease control.

The timeliness of clinician history and physical examinations has generally improved. At NRC and LCC, a medical provider saw patients with acute or chronic diseases within 24 hours of arrival. At MCC, only 60% of examinations took place in seven days or less. Although timeliness of physical examinations has generally improved, clinicians did not consistently elaborate on positive findings noted by the nurse,[77] and the history and physical examinations were often cursory and lacking in quality. Because nurses complete the patient history, providers generally do not complete a thorough history leaving a gap of information about the patient's illnesses. In many cases, NRC clinicians simply noted the patient's diagnosis rather than perform a medical history, review of systems, and assess the patient's disease control. At LCC, record review shows a physician assistant was conscientious and did an excellent job.

Providers wrote orders to enroll patients into the chronic disease program in 30 days and assigned patients low bunk/gallery status as clinically indicated. At NRC, providers also ordered diagnostic tests (e.g., chest x-ray, EKG) and labs for some chronic diseases (e.g., thyroid, anticoagulation), but did not order HbA1C for any diabetics. At NRC, medical provider orders (EKG, chest x-ray, blood pressure monitoring, etc.) were not consistently implemented by nurses.

Clinicians usually ordered medications on the day of arrival; however, in some cases they did not provide continuity of care with respect to patients' chronic disease medications, either omitting or changing medications (e.g., insulin types) without documenting a clinical indication.

---

[76] Administrative Directive 04.03.11 Section5 II. F. 5. D.
[77] MCC Medical Reception Patients #12, 13 & 14.

PTX193-0045

MARs did not consistently reflect that the patients received the medications. At NRC, nurses gave some patients blister-packed medications from stock supplies but did not create a MAR and document that it was given to the patient. In some cases, nurses documented giving medication to the patient on the physician order form, but in other cases there was no documentation that the patient received the medication.

A clinical concern is that at NRC, three patients were being treated for heroin withdrawal at the time of admission, but the provider did not order Clinical Opiate Withdrawal Scale (COWS) monitoring to assess whether the patients' symptoms were improving or worsening, and that may have required changes in medication withdrawal regimens.

We observed a NRC dentist perform dental screening examinations without changing gloves between patients (See Dental Section).

With respect to follow-up, medical providers did not timely address abnormal lab test results and did not complete the initial chronic disease form when seeing patients at the first follow-up visit.

There are no mechanisms in place to monitor timeliness of the intake process or to evaluate the quality of intake screening, the health history, or physical examination. There were no CQI studies provided that indicate the intake screening is monitored for quality or timeliness. This is a high volume, high-risk area of health care delivery in the correctional setting and should be regularly reviewed as part of the CQI program.[78]

## Intrasystem Transfer

Our report confirmed findings of the previous Court Expert report and identified previously undescribed problems. Overall, we find that the timeliness of medical screening following transfer has improved, but there continue to be problems with the completeness of the forms and continuity of care following transfer. We also found that the CQI program does not consistently address continuity of care provided following intrasystem transfer.

**First Court Expert Findings**
The previous Court Expert found problems with the intrasystem transfer process at almost every facility resulting in discontinuity of care (e.g., medications, chronic disease follow-up). At Dixon, the process was so broken that despite having a special medical mission, nurses did not perform the process for two to three weeks after patients' arrival, resulting in discontinuity of care. The Court Expert also found that continuity of care following intrasystem transfer is not studied to identify and correct problems.

**Current Findings**

---

[78] National Commission on Correctional Health Care. 2014. Standards for Health Services in Prisons. Pp. 13-14.

PTX193-0046

IDOC Administrative Directive 04.03.103, Offender Health Care Services, does not include a policy and procedure for how custody and health care staff are to conduct the intrasystem transfer process. SCC Operations Policies and Procedures includes a Transfer Screening policy that is consistent with NCCHC Standards for Health Care Services in Prisons (P-E-03). However, the policy is not site-specific with respect to how custody notifies health care staff of inmates who are transferring into and out of the facility, which health care staff performs medical screening, how patients are to be enrolled into the chronic disease program, and the procedure for providing continuity of medications.

We found that institutions did not use a tracking log to document completion of required services following transfer into the facility (e.g., enrollment into the chronic disease program, periodic health assessments, etc.).

NRC does not receive a large volume of patients transferring into the facility. Inmates who transfer into NRC are typically scheduled to go out to court or receive specialized medical services in the Cook County area. At the time of our review there were 29 inmates at the facility for greater than 90 days. Of this number, 12 were for medical reasons, 12 were for parole board hearings, two were boot campers, two were pending WRITS and one was for discharge. A review of five records showed that all patients were timely seen upon arrival, but one of three eligible patients was not timely enrolled into the chronic disease program.

Transfers to SCC average less than 50 per month. Inmates received on transfer are brought to urgent care in the health care area for nurse screening before placement in population. The nurse reviews the sending facility transfer form and inquires if the inmate is currently receiving treatment or has any other immediate need for medical attention. The nurse then schedules the inmate for subsequent health care (i.e., enrollment in a chronic care clinic, initiation of medications, etc.) as needed. The nurse also provides a verbal explanation and handout about how to access health care at the facility.

SCC does not keep a log, list, or other method to track inmates received on transfer. A sample of 12 records was obtained from other sources. Ten of these inmates had health care requirements that needed continuation at SCC. The transfer process was complete in seven of the 10 charts reviewed of inmates with ongoing health care needs. One transfer summary did not list psychotropic medications that were prescribed, but these were identified by the nurse upon review of the chart and continued.[79] In another, there was no transfer summary for an inmate with diabetes and hypertension. The nurse who reviewed the chart noted his medical history, enrolled him in chronic care and ensured that his medications were continued.[80] In another chart reviewed, an inmate on prescribed psychiatric medications was not scheduled to see a provider urgently and no other attempt was made to continue medication upon his arrival at SCC.[81] Transfer screening at SCC has improved since 2014. However, record review revealed

---

[79] SCC Intrasystem Transfer Patient #11.
[80] SCC Intrasystem Transfer Patient #12.
[81] SCC Intrasystem Transfer Patient #10.

that for 30% of the inmates requiring continuity of care, transfer information was incomplete or care was not provided as prescribed. Continuity of care upon transfer needs to be more reliable. At SCC, the First Court Expert recommended that the CQI program address the intrasystem transfer process with respect to continuity of care. However, CQI minutes and related material for the calendar year 2017 showed no reports monitoring the continuity of care following transfer.

At Dixon, the process has improved since the previous Court Expert's report. All transferred inmates are brought to the dispensary upon arrival at DCC. Registered nurses review the transfer summary, take vital signs, and conduct a brief screening interview to identify any immediate medical needs and reconcile prescribed medications so that treatment can be continued. Each inmate receives an individual explanation from the nurse about how to request health care attention for urgent and routine medical needs. The next day these inmates are seen again by nurses, who complete a lengthier interview using the intake screening questions and review the medical record. At this encounter, the nurse ensures the problem list is up to date, completes any screening not done at intake, and identifies any pending referrals or appointments. Inmates who have chronic diseases are enrolled in chronic care clinic, and medication, treatments, and labs are ordered. At this second encounter, the nurse answers any questions and confirms the inmates' understanding of how to request care, procedures to receive KOP and pill line medications, and obtain refills.

A review of eight records showed opportunities for improvement. In two cases, the transfer summary did not include the name of the sending facility and information on TB screening.[82] In two cases, the inmate was not scheduled for a chronic care appointment within 30 days of arrival for an initial evaluation.[83] Five patients had medications which were provided without dose interruption when received at DCC.[84] However, one of these ran out two weeks after the transfer and was not reordered.[85] It was a KOP medication. It was not possible to ascertain if the discontinuity was because the inmate did not know how to request a refill, or the patient was lost to follow up. Two others were not taking medication at the time of transfer but were referred to a provider who ordered medication that was  within 24 hours.[86]

Our review showed that timeliness of intrasystem transfer has improved since the First Court Expert report. However, the completeness of these evaluations, as well as continuity of care following arrival, needs improvement. Given the number of errors and omissions found in the chart review that affect patient care, we recommend that health care leadership establish a process to monitor and provide feedback as part of the CQI program. When facilities send inaccurate or incomplete information on the intrasystem transfer form, the receiving facility should provide feedback to the sending facility. Errors and omissions should be subject to focused study to improve the accuracy of transfer information and continuity of patient care.

---

[82] DCC Intrasystem Transfer Patients #1 & 2.
[83] DCC Intrasystem Transfer Patients #2 & 3.
[84] DCC Intrasystem Transfer Patients #1, 2, 5, 6, 7, & 8.
[85] DCC Intrasystem Transfer Patient #1.
[86] DCC Intrasystem Transfer Patients #3 & 4.

PTX193-0048

## Nursing Sick Call

Our report confirmed findings of the previous Court Expert report and identified previously undescribed problems. Overall, we find that IDOC lacks an adequate system for access to care through nursing sick call, creating a systemic risk of harm to patients. The findings at NRC were particularly egregious, in part due to lockdown of the population 24 hours a day, and warrants immediate attention.

### First Court Expert Findings

The previous Court Expert found that nursing sick call ranged from problematic to significantly broken throughout the system, in that one or more of the elements required of a professional sick call encounter are missing. These elements are:

- Sick call request forms are available to inmates.
- Completed requests are placed directly by the inmate into a locked box or handed directly to a health care staff member.
- Completed requests are collected by a health care staff member.
- There is identified clinic space.
- The clinic space is appropriately equipped.
- The space provides patient privacy and confidentiality.
- Sick call, including paper triage, is conducted by a licensed RN whose education, licensure, and scope of practice permit independent assessments.
- Sick call is conducted pursuant to IDOC policies and procedures with regard to the use of approved treatment protocols at each encounter, use of over-the-counter (OTC) medication dosages only, and referrals follow-up as needed.
- A sick call system must ensure confidentiality from request to treatment.
- A sick call system which addresses all a patient's complaints or, at a minimum, prioritizes the complaints.
- A sick call log and tracking system has been developed and maintained.

Particularly problematic was that the sick call process permitted non-registered nurses to conduct sick call at many facilities. The Illinois Nurse Practice Act does not permit LPNs to perform independent nursing assessments, which is being done in IDOC. Moreover, in segregation units, nurses did not conduct meaningful assessments but rather talked to the patient through a solid steel door. There was no immediate review by an RN or physician to ensure that the LPN conducted an appropriate assessment. At Stateville and Pontiac, there was frequent and arbitrary canceling of sick call by custody staff. At Dixon, inmates were permitted to raise only one complaint per sick call visit. At NRC and Dixon, there was no sick call log. Hill Correctional Center's sick call system did have many of the required elements.

### Current Findings

IDOC Administrative Directive Offender Health Care Services 04.03.103 6. (a-c) addresses review of sick call requests. However, the policy provides insufficient operational guidance to staff regarding how to implement the sick call program. For example, the policy does not address what sick call request forms are to be used, how they are ordered, which staff is

responsible for ensuring that health care request forms are available to inmates, how inmates are to submit their requests to protect confidentiality, etc. The policy does not address where sick call is to be performed, by what level of staff, or the disposition of written health requests (i.e., scanning into the health record). Thus, the policy is inadequate. In addition, the policy is not consistent with NCCHC standards.

The previous Court Expert found standardization with respect to how inmates access nurse sick call; through submission of written health requests that nurses collected, triaged, and assigned a priority to be seen. We found lack of standardization in how inmates access health care in IDOC, with some institutions using a written health request process that is consistent with IDOC Administrative Directives and some institutions using a daily sign up system, which is not consistent with current Administrative Directives. The sign-up system (which does not include the nature of the patient's complaint), does not allow nurses to prioritize which patients should be seen first based upon the urgency of their complaint and does not result in scanning of the patient's complaint into the medical record. At LCC, staff retain sign-up sheets, which are the only record that the patient has requested to be seen; however, we found that multiple sign-up sheets were missing. This is a concern because then there is no medical-legal documentation that the patient requested health care.

In IDOC facilities, both RNs and LPNs perform sick call using Treatment Protocols. In the State of Illinois, LPNs are to practice "under the guidance of a registered professional nurse, or an advanced practice registered nurse, or as directed by a physician assistant, physician…to include *conducting a focused nursing assessment and contributing to the ongoing assessment of the patient performed by the registered professional nurse."* LPN's may also collaborate in the development and modifications of the RN or advanced practice registered nurse's (APRN) plan of care, implement aspects of the plan of care, participate in health teaching and counseling, and serve as an advocate for the patient by communicating and collaborating with other health service personnel.[87] However, Illinois scope of practice does not permit LPNs to perform assessments independent of an RN or higher level professional, as is currently being done in IDOC. Neither does the scope of practice permit LPNs to perform independent assessments according to protocols. LPNs do not have requisite education and training, including physical assessment skills, needed to perform independent assessments.[88] *Thus, some IDOC patients do not receive evaluations by health care staff licensed to perform independent assessments. This increases the risk of harm to patients.* In addition, we found that nurse to provider referrals are not made when clinically indicated, and when made are not timely performed.

Although we found some improvements in nursing sick call relative to the previous Court Experts report, these improvements were uneven across the system, with some facilities demonstrating significant improvement with access to care and others none at all.

---

[87] Illinois LPN Scope of Practice. Section 55-30.
[88] NCCHC defines Qualified Health Care Professionals to include nurses without distinguishing between registered and licensed practical nurses. However, RN and LPN practice must remain within their education, training, and scope of practice for their respective state.

PTX193-0050

The findings at NRC were the most egregious and warrant special mention. At NRC, there is no functional sick call system that provides timely access to care. Inmates are not provided approved health request forms to submit their requests; therefore, inmates write their requests on small scraps of paper or generic Offender Request forms. Inmates may or may not have pens or pencils to write their health requests. Staff reported that inmates could borrow a pen from another inmate, but an officer commented to a court expert: "Yes, but it will cost them a lunch tray."

Inmates cannot submit their requests confidentially by placing them in a locked box accessible only by health care staff. Instead, they place the piece of paper in a crack in the door that could be picked up by anyone walking by, even inmate porters on the unit. Sometimes officers pick up the forms and place them in open folders to be picked up later by a nurse. *Even if there were sick call boxes on each unit, inmates cannot submit their forms because throughout NRC inmates are locked down 24 hours a day except for four hours per week.*[89] _Thus, the institutional practice to lock offenders down 24 hours per day is a serious obstacle to access to care._

At NRC, health care staff does not collect health request forms on a daily basis. Staff does not date, time, and sign when health requests are received. Nurses do not triage patient health requests within 24 hours, nor do nurses document the urgency of the disposition (e.g. urgent, routine) on the request. The Director of Nurses reported that some nurses did not see patients and threw the health request away rather than file the request in the health record. For example, if a CMT/LPN triaging the request noted the patient had not yet had a physical examination, the request would be thrown away under the assumption that the complaint would be addressed at the time of the physical. Likewise, if the CMT/LPN noted that a provider saw the patient in the last day or two, the request would be thrown away under the assumption that the complaint had been addressed. Nurses do not assess patients with symptoms within 24 hours of triage according to IDOC administrative directives. Nurses are to have the health record available to them for a sick call encounter but during our tour, a nurse reported she was only able to locate three of 10 health records of patients she was scheduled to see. Nurses conduct sick call in inadequately equipped and supplied rooms in housing units without access to a sink for handwashing. This contributed to inadequate patient assessments. Nurses did not consistently refer patients to providers when clinically indicated and when made, referrals to providers did not timely take place.

At other facilities we found that some of the problems identified in the previous Court Expert's report had been resolved but other problems persisted.
- At SCC, access to sick call is through a combination of a written health request and sign-up system. Problems related to the frequency of sick call clinics and custody's failure to escort patients to clinic exam rooms have been resolved. Improvements were noted with the standardization of exam room equipment and supplies, and availability of the medical record at nursing encounters. However, issues persist with respect to LPNs conducting sick call; inadequate health assessments; inadequate privacy in segregation;

---

[89] This information was confirmed by correctional officers on the units and the Superintendent.

and failure of nurses to refer patients to providers in accordance with IDOC treatment protocols or to document the urgency of referrals (i.e., routine, urgent).

- At Dixon, access to nurse sick call is through a written health request. Problems related to confidentiality of sick call request forms have been resolved through installation of sick call boxes on the housing units. RNs are assigned to perform sick call, but LPNs are assigned when there are insufficient RNs available, exceeding their scope of practice. Dixon has implemented a sick call log that is used to monitor the timeliness and appropriateness of nursing decisions. Persistent problems from the previous report include health requests not being filed in the health record; inadequately equipped and supplied examination rooms; inadequate nurse assessments; lack of access to health records in X-house; nurses not triaging patients with dental pain; and patients not being timely seen by a provider or dentist in accordance with IDOC treatment protocols.

- At LCC, our review showed some improvement from the previous Court Expert's report but other issues persist. To access sick call, inmates sign up for sick call on a sheet of paper in the housing unit rather than submitting a written request with the nature of the complaint. Patients are supposed to be seen the following day; however, in a sample of records reviewed, 31% of patients were not seen due to no show, refusal, or lockdown. This is a concern because if nurses cannot see all patients within 24 hours, they need to be able to triage patients according to the urgency of their complaint. However, this is not possible because inmates do not document the nature of the complaint on the sign-up sheet. This is a serious disadvantage of the sign-up system versus the written request system, which also provides documentation in the medical record of the patient's complaint. Sick call tracking logs show extraordinarily high no-show or refusal rates, in some cases exceeding 50%. In X-building, where segregated inmates are housed, correctional officers do not escort inmates to a clinic area and nurses still perform cell-front assessments. An RN is assigned to perform sick call, but records also show that LPNs also performed sick call. Record review showed that some patients who require a medical diagnosis are assessed only by a nurse and not medically evaluated by a provider and/or do not receive ordered medical treatment.

- At MCC, our review found that some of the problems with sick call described in the previous Court Expert's report have been resolved while other problems persisted. Positively, the rooms used by nursing staff to conduct sick call are uniformly equipped and supplied. Many of the exam rooms have a Plexiglas door which ensures auditory privacy during the sick call encounter. However, we found that LPNs also performed independent assessments, nurses did not have the patient's record when performing patient assessments, assessments were inadequate, and referrals to providers were not timely.

PTX193-0052

## Chronic Care

### First Court Expert Findings

The First Court Expert found variable provider quality with respect to provision of medical care and that there was lack of oversight of the providers. He also found deficiencies in chronic care guidelines and policy. The First Court Expert's Report raised concerns about the organizational approach to the delivery of chronic care in the IDOC; patients were predominantly seen in single disease clinics that arbitrarily dictated that patients were seen only two to three times a year regardless of the their disease control. The First Court Expert found  patients with poorly controlled chronic illnesses who went many months without active management of their disease as they awaited the next disease specific clinic that were only scheduled for two-three months out of the year. This process created a fragmented and inefficient system of care for patients with chronic illnesses. The report also found fault with the lack of involvement of the primary care providers with monitoring the condition of patients with human immunodeficiency virus (HIV) between their intermittent telehealth visits with UIC specialists, the failure to define whether diabetic patients had type I or II diabetes, and the failure to synchronize the delivery of insulin with meal times. The First Court Expert found that the IDOC guidelines did not clearly define when Pap smear screening could be discontinued, when mammograms should be performed more frequently, and the need for increased Pap smear screening in women with HIV infection. The First Court Expert also noted that chronic obstructive pulmonary disease (COPD) and asthma were treated identically which is inappropriate. There were no guidelines for treatment of COPD. He noted that they found discontinuity of medication without anyone noticing, compounded by physicians evaluating patients in clinic without having access to the MAR. He also noted that patients frequently missed their HIV medications without any chronic care monitoring.

### Current Findings

We found that the IDOC now uses a UIC HIV chronic care guideline. Aside from this there have been no improvements based on the First Court Expert's findings.

The poor training and qualifications of physicians was the most important deficiency that resulted in significant morbidity and mortality with respect to managing chronic illness. The deficiencies of many providers based on record reviews  included not understanding how to diagnose or manage certain chronic illnesses, failure to timely or appropriately manage patients whose disease was not well controlled, failure to monitor key tests or other variables with respect to disease management, failure to identify or properly manage red-flag or other critical abnormalities involving chronic illness, failure to consistently document the rationale for clinical decisions and diagnoses in the chronic care patient progress notes, failure to document adequate histories, physical examinations or therapeutic treatment plans, failure to incorporate specialty recommendations with respect to management of chronic illness into a unified therapeutic treatment plan, failure to refer for specialty care when indicated, and failure to monitor medication management is a safe manner. Chronic disease guidelines, chronic disease procedure, schedules, forms, or other processes appear to fail to overcome the deficiencies of provider quality with respect to managing chronic care conditions in the IDOC.

PTX193-0053

A chronic medical condition is an illness that typically lasts longer than three months and requires medical management on a continuous basis. Typically, a primary care physician will address all of a patient's chronic illnesses at each visit. In IDOC the primary care physician will only manage a single disease at each chronic care visit. Typically, when a primary care physician encounters a condition they are incapable of managing they refer that patient to a specialist who knows how to manage the condition. In IDOC this often does not occur and patients are frequently not referred for specialty care when it appears indicated. Typically, when a specialist evaluates a patient, a primary care doctor will integrate the specialist's recommendations and findings into the care plan of the patient. In IDOC, the primary care doctors often do not even obtain specialty care reports and do not appear to consistently review or integrate specialty findings or recommendations into the patient's therapeutic plan. In IDOC, primary care physicians are poorly trained and do not appear to know how to diagnose or manage many chronic illnesses. Many illnesses appear to not be followed in chronic clinics and some conditions are not managed. The result is fragmented care that fails to address all of a patient's problems.

Four years ago, the First Court Expert found that most of the IDOC chronic care clinics addressed only a single disease and were conducted every four to six months. We found chronic care clinic schedules were unchanged. With the exception of a few multiple illness clinics (MIC) for a select group of conditions at Dixon and MCC, patients with multiple chronic illnesses continue to have their illnesses addressed in single disease clinics spread over the course of a year. The non-baseline chronic care clinics (asthma, cardiac/hypertension, diabetes, hepatitis C, high risk/HIV, seizure) are silos in which only a single disease is managed. The schedule for these clinics is inflexible and not based on the degree of control of a patient's illness.[90]

Failure to manage patients based on the degree of control of their illness has the potential to harm patients, as patients are evaluated on a fixed schedule irrespective of the degree of control of their illness. Therefore, persons who need greater attention because their disease is poorly controlled may not receive it. We view this as inefficient, wasteful, and potentially harmful. Patients should be evaluated as frequently as is necessary to establish disease control and not based on an inflexible schedule. Primary care doctors also need to coordinate care for the patient integrating treatment for all of the patient's conditions. When specialists manage a single illness, they typically list all of the patient's other medical conditions and medications, and consider the implication of all diseases on the condition being monitored. In the IDOC, every single disease is managed as if it is the only disease the patient has. Diseases are often interrelated, such as metabolic syndrome. Drug-drug interactions need to be considered in the

---

[90] IDOC's chronic care clinic annual schedule is generally, with some site variation, as follows: asthma (January and July,) diabetes (April, August, and December), cardiac/hypertension (A-L March and September; M-Z April and October), general medicine (May and November), hepatitis C (June and December), high risk/HIV (monthly), seizure (February and August), and TB (monthly, annual evaluation). LCC has combined two conditions, diabetes/lipids and diabetes/hypertension, for simultaneous evaluation in the initial baseline clinic but not in the follow-up chronic care clinic sessions. Dixon and Menard have created a limited number of multiple illness clinics that combine the treatment of diabetics with a few other chronic illnesses.

PTX193-0054

management of medications. Some illnesses have an effect on other illnesses. When IDOC providers evaluate patients in individual chronic care clinics, they do not list the patient's other illnesses and do not address any other conditions, even when a condition may not be in control or may have an impact on the condition being treated. There has been limited movement since the First Court Expert's Report to develop chronic care clinics that consolidate the evaluation of multiple illnesses in a single visit. Dixon and MCC have established a few combined illness clinics called MIC (multiple illness clinics); these clinics generally address diabetes and one or two other chronic illnesses. There was no evidence or communication during the site visits that combined illness clinics would continue to expand at Dixon or MCC or would be initiated at any other sites.

A single chronic disease clinic (General Medicine Clinic) is used as a vehicle to manage all diseases other than disease specific chronic illness clinics. But we found that there are many diseases that are not managed in IDOC chronic clinics and therefore are unmonitored. This included patients with cirrhosis, cancer, heart failure, substance abuse, and rheumatoid arthritis as examples. This is consistent with deficient problem lists. We found that problem lists were incomplete indicating that providers were unaware of all of the patient's problems. When patients were seen in either chronic clinics, routine provider clinics, or on an emergency basis, a complete list of problems was not documented and at no clinics did all of a patient's diseases receive monitoring.

Also, some diseases are monitored in a clinic that is inappropriate for their condition. As an example, COPD is a common respiratory condition affecting about five percent of the population and is the third-ranked cause of death in the United States.[91] IDOC treats COPD in the asthma clinic and utilizes identical forms and nomenclature for control and management as if COPD were the same disease as asthma. They are not the same disease even though there can be an overlap syndrome. Diagnosis, staging, and management of these two conditions are different. Yet in IDOC they appear to be treated the same. The First Court Expert commented on this but there has been no modification to guidelines, forms, or management practices based on our findings.

Some illnesses are managed in specialty clinics. All individuals with HIV and eligible patients cleared for treatment with hepatitis C are managed via telehealth by the UIC infectious disease telehealth clinic. UIC HIV telehealth clinics are held monthly. A monthly telehealth renal clinic staffed by a consulting nephrologist is scheduled as needed. Dialysis patients are seen monthly by a NaphCare nephrologist even though the nephrologist does not document his notes in the medical record. Hepatitis C is managed in the hepatitis C chronic clinic. When IDOC physicians deem a patient is a candidate for treatment the patient is referred to a Wexford corporate doctor who makes a decision on referral to UIC. This system has become a barrier to access to care for hepatitis C.

---

[91] UpToDate, Chronic obstructive pulmonary disease: Definition, clinical manifestations, diagnosis, and staging.

There are currently 2,500 active hepatitis C patients in the IDOC. Even though effective, short-course regimens of medications that result in a high percentage of cures have been developed and are in common use in the community, only 345 patients (3%) of the nearly 10,500 hepatitis C patients incarcerated in the IDOC between 2010 and 2016 were offered and received treatment.[92] An additional 125 patients have completed treatment from 2017 through June 2018.[93] At the present time, only 10 hepatitis C patients are currently receiving treatment. The low rates of treatment are primarily due to a restrictive screening protocol that limits patients' eligibility for treatment which was developed, in no small part, to control the costs of the medications. These eligibility restrictions limit hepatitis C treatment to patients who have developed advanced stages of liver fibrosis (cirrhosis). The failure to aggressively treat hepatitis C in the IDOC has negative public health and health care cost impacts, both in the IDOC and ultimately in the non-incarcerated communities of the Illinois. We support more aggressive treatment of hepatitis C and elimination of barriers to access to the UIC program.

Patients with uncontrolled or partially controlled chronic illnesses were not consistently well managed. When medications for chronic conditions were modified in chronic care clinics there was no follow up on the impact of this treatment adjustment until the next chronic care clinic which could be four to six months later. We noted some patients who were not followed up appropriately after a modification in the treatment plan.[94] Some patients whose chronic illnesses were complicated and difficult to control were not appropriately or timely referred to medical specialists for consultation.[95] The care of many diabetics was found to be flawed and put patients at risk for hypo and hyperglycemia, and ultimately for end organ damage.[96] Patients on Vitamin K antagonist anticoagulation medication (warfarin) were rarely well controlled. The adjustment of anticoagulation medication to attain a therapeutic level of anticoagulation was often not aggressively pursued, leaving the patient at risk for repeated clot formation. The logistics of testing and adjusting warfarin dosages placed a number of patients at risk.[97] IDOC should consider placing patients requiring long term anticoagulation on direct factor Xa inhibitor anticoagulants that do not require ongoing testing and dose adjustment. The current prescribing of warfarin puts patients and the institution at risk and we noted one death in a patient on warfarin who was not being properly monitored.[98] Providers virtually never documented in the chronic care progress notes that they had reviewed patients' MARs or communicated with nursing staff to assess the frequency of medication administration and patient compliance.[99] The failure of the chronic care providers to routinely monitor patient compliance with prescribed medication put the patient at notable risk for overprescribing and needlessly increasing medications dosages. Weights of patients were recorded with vital signs

---

[92] Email communication 12/28/2016 from DOC.
[93] UIC Liver Telemed Treatment Analytics.
[94] NRC Chronic Care Patients #1, 2, 10.
[95] NRC Chronic Care Patient #9; SCC Chronic Care Patients #7, 13; Dixon Chronic Care Patient #14; LCC Chronic Care Patients #4, 6; MCC Chronic Care Patient #2.
[96] Dixon Chronic Care Patient #13; LCC Chronic Care Patient #6; MCC Chronic Care Patient #9.
[97] SCC Chronic Care Patient #12; Dixon Chronic Care Patients #7, 10; MCC Chronic Care Patient #11.
[98] Patient #30 Death Review Records.
[99] NRC Chronic Care Patient #3; SCC Chronic Care Patients #6, 8; Dixon Chronic Care Patient #6; LCC Chronic Care Patient #10; MCC Chronic Care Patients #2, 8.

PTX193-0056

at most clinical encounters, but the chronic care providers seldom documented that they had reviewed weights for significant gains or losses. Weight loss in correctional settings is an ominous sign; patients with weight loss need to be aggressively evaluated for an underlying cause, which may include cancer, uncontrolled diabetes, hyperthyroidism, and other etiologies. The failure of chronic care, infirmary, and sick call clinical teams to monitor and address changes in patient weights can result in significant delays in the diagnosis of treatable medical conditions and illness in IDOC patients.[100]

The First Court Expert had significant concerns about the care provided to diabetics in the IDOC. The system wide failure of the providers to differentiate treatment differences between type I or type II diabetes and the IDOC universal practice of treating all diabetics on insulin with the same regimen of medications is not consistent with the level of care provided in the community and, in some circumstances, puts the patient at risk for hypoglycemic episodes. Type 1 and type 2 diabetes are different metabolic diseases and require different management. Type 1 diabetes occurs in patients who fail to produce sufficient insulin. These patients have an insulin deficiency. Type 2 diabetes is a metabolic condition of excess weight causing insulin resistance. The body fails to respond appropriately to insulin causing glucose levels in the blood to increase. The IDOC does not appear to differentiate these conditions with respect to use of insulin therapy. Every patient taking insulin prior to incarceration is automatically placed on a twice daily regimen of an injectable long acting insulin (either NPH or Humulin 70/30 insulin which combines a long and short acting insulin in a single injection) and a sliding scale short acting insulin. The standard of care is not to use pre-mixed insulins (70/30) in the treatment of type 1 diabetes. Use of pre-mixed insulins in type 2 diabetics is also not preferable if normal blood sugars are desired.[101] The sliding scale dosage is based on the results of capillary blood glucose (CBG) finger stick testing that is performed before every breakfast and dinner meal on all insulin using diabetics. This practice is inherently flawed.

Most type I diabetics will require three or four, not two, times per day CBG testing to determine the quantity of short acting insulin that is needed to be administered before meals. Most type II diabetics who cannot be adequately controlled on oral medication alone are typically placed a variety of long acting insulins, some of which are given once a day, others twice a day. Although some Type II diabetics will require the addition of pre-meal short acting insulin, most do not. Type II diabetics, even if they are on insulin, generally require intermittent but not twice a day CBG testing. Placing patients on unnecessary pre-meal CBG testing is not without risks. Short acting insulin alone or in combinations should be administered in close timing with meals to minimize the risk of a sudden drop in blood sugar. The timing of insulin administration and meal delivery in IDOC's large correctional facilities is consistently poorly coordinated and puts diabetics on short acting insulin at heightened risk of hypoglycemic attacks. IDOC exacerbates this risk by placing many insulin-using diabetics on 70/30 insulin, which contains a combination that is 70% long acting and 30% short acting. For example, a patient on 40 units of 70/30 insulin will receive 28 units of long acting and 12 units of short acting insulin with each injection.

---

[100] Dixon Chronic Care Patients #1, 10; Dixon Infirmary Patient #1; LCC Infirmary Patients #1, 4.
[101] See UpToDate® section on premixed insulins in General Principles of Insulin Therapy in Diabetes Mellitus.

PTX193-0057

Adding an additional sliding scale-determined two to eight or more units of rapid acting regular insulin to the patient's dose because the pre-meal CBG is elevated further increases the risk of sudden drops in blood sugar. This practice endangers the health of IDOC diabetics and should be reevaluated. IDOC should consult with an endocrinologist/diabetologist to review its current prescribing of insulin and the frequency of CBG testing.

The experts also noted that there was varying provider compliance with national diabetes standards of care concerning testing of urine protein and microalbuminuria, and the prescribing of medications to diminish the risk or progression of chronic kidney disease; annual eye evaluations for diabetic retinopathy; examination for diabetics' feet to prevent foot ulcers; sensory testing of lower extremities; administration of pneumococcal 23 vaccination; and the appropriate initiation of HMG CoA reductase inhibitors (statin) to minimize a diabetic's risk of cardiovascular disease. The care of diabetes in the IDOC does not consistently meet the standard of care provided to diabetics in the community.

The IDOC annual or biannual examinations fail to provide a number of nationally recommended preventive and screening interventions that are designed to prevent certain chronic illnesses. All patients with chronic illnesses including diabetes, asthma, COPD, chronic kidney disease, congestive heart failure, HIV infection, and other chronic conditions are to be vaccinated with the pneumococcal-23 vaccine.[102] A review of the medical records of 52 patients with chronic illnesses revealed that only eight (15.4%) had received the pneumococcal 23 vaccine. All adults 65 years of age and older are to be administered both the pneumococcal 23 and 13 vaccinations. Only three (14.3%) of 21 patients 65 years of age or older had been administered pneumococcal-23 and not a single one (0%) of these elderly individuals had been offered the pneumococcal 13 vaccine.[103] All HIV patients are also to receive the pneumococcal 13 and meningococcal disease vaccines. None (0%) of the 12 charts of patients with HIV had documentation that either pneumococcal 13 or meningococcal vaccines had been administered. The IDOC is putting its patients and staff at risk for preventable infections by not providing basic adult immunizations to its at-risk patients. This does not meet the community standard of care. IDOC is administratively negligent by not purchasing either pneumococcal 13 or meningococcal vaccines for use in its correctional facilities.

It is a national recommendation that all adults (men and women) 50 years of age or older are to be screened for colon cancer.[104] The charts of 50 IDOC patients with chronic illnesses who were 50 years of age or older were reviewed; none (0%) of these patients had been electively screened for colon cancer using any of the acceptable screening methodologies (colonoscopy, fecal immunochemical test, stool guaiac cards, flexible sigmoidoscopy with stool guaiac cards). IDOC is grossly negligent in not providing nationally recommended colon cancer screening to the incarcerated men and women 50 years of age or older in their facilities; this is resulting in preventable deaths and avoidable morbidity in the IDOC.

---

[102] CDC, Recommended Vaccination Schedule Adults 18 Years or Older, United State 2018 and IDOC Office of Health Services, Chronic Illness treatment Guidelines, Diabetes, Asthma  March 2016.
[103] CDC, Recommended Vaccination Schedule Adults 18 Years or Older, United State 2018.
[104] United States Preventive Service Task Force, Colorectal Cancer Screening, June 2016.

PTX193-0058

Women at LCC are generally being appropriately screened for cervical and breast cancer on a regular basis. The medical charts of 14 (93%) of 15 women had received a cervical cancer screening (Pap smear) in the last three years as per IDOC policy. However, the IDOC practice guidelines failed to note that women with HIV are to have annual Pap smears until three consecutive annual negative smears have been documented, and thereafter cervical cancer screening can be performed at three year intervals. One HIV patient was found have only one negative Pap smear and, as of three years later, had not received a repeat test. HIV patients are at high risk for cervical cancer; this woman was not being properly screened for cervical cancer. Four (80%) of five women over 45 years of age had received a mammogram in the last two years in accord with IDOC protocols.

A large number of patients assigned to chronic care clinics are at risk for or already have had a stroke, heart attack, or peripheral vascular disease. National[105] and IDOC standards[106] recommend that all at-risk patients over a certain age and patients with diabetes, high blood pressure, hyperlipidemia, other selective conditions have their 10-year risk of arteriosclerotic cardiovascular (ASCVD) calculated. If their risk is 7.5% or higher or they already had suffered a cerebral-cardiovascular event, they are to be prescribed a high dosage of a high intensity HMG CoA reductase inhibitor (statin) medication. Forty-eight medical records of chronic clinic patients over 50 years of age and others with a history of arteriosclerotic disease, diabetes, hypertension, hyperlipidemia, etc., were reviewed. IDOC providers had not calculated the 10-year ASCVD risk on any of these 48 patients. We assessed the 10-year risk for these 48 patients and noted that 46 of the 48 patients' scores exceeded the percentage that indicated that a high dosage of a high intensity statin be prescribed; only one of those patients whose risk was 7.5% or higher had been prescribed a high intensity statin, but it was not at the recommended level of intensity dosage. IDOC is failing to meet the national and its own standard of care by not calculating at risk patient's ASCVD 10-year risk and not prescribing the appropriate HMG CoA reductase inhibitor (statin) medication to minimize patients' future risk of heart attack, stroke, and peripheral arterial vascular disease.

Chronic care, provider sick call, and infirmary progress notes frequently lacked useful clinical information about the patient's clinical status. Providers rarely listed an alternative diagnosis that was being considered as a reason for a change in the patient's conditions or symptoms. We noted earlier that lack of training affected the ability of IDOC physicians to diagnose and manage chronic illnesses. This is compounded by lack of access to current electronic medical reference services that might assist them with the care of routine and complex patients. IDOC providers failed to consistently or appropriately seek the assistance of specialists in many patients whose complexity warranted additional advice which resulted in delays in diagnosing or initiating appropriate testing and treatment. Providers whose primary care skills are limited

---

[105] Stone NJ, Robinson JG, Lichtenstein AH, et al; 2013 ACC/AHA Guideline on the Treatment of Blood Cholesterol to Reduce Atherosclerotic Cardiovascular Risk in Adults: A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines; Circulation Nov 2013, 129 S1-S45 as found at https://www.ahajournals.org/doi/abs/10.1161/01.cir.0000437738.63853.7a.

[106] Office of Health Services, Chronic Illness Treatment Guidelines, Hyperlipidemia Guidelines March 2016.

would be expected and should be encouraged to more readily request consultation with specialists when they are unsure of a patient's diagnosis or treatment.

## Urgent/Emergent Care

The IDOC requires that all facilities be prepared and equipped to respond to medical emergencies in a timely and orderly fashion. This includes the ability to provide first aid and cardiopulmonary resuscitation by trained correctional staff until medical personnel arrive. Emergency response drills are to be conducted on each shift at least semi-annually, one of which must involve multiple casualties.[107] The IDOC-Wexford contract requires the vendor to provide emergency treatment procedures that include the provision of in-service training on first aid and emergency response, policies and procedures for emergency transfer and transport, 24-hour coverage by a physician and psychiatrist, immediate transfer capability, automatic external defibrillators (AED), and emergency response. The vendor is required to report all referrals for emergency services monthly.[108]

**First Court Expert Findings**
Findings of the First Court Expert for this service were that nurses and clinicians failed to identify when patients required emergency room services and/or hospitalization. Other findings were that patients were not assessed by nurses upon return from the emergency department or hospital, and that the record of offsite care was not obtained. Finally, some patients were not appropriately followed up by a primary care clinician. Unscheduled services were not tracked, and performance was not monitored.

The key criteria for the adequacy of unscheduled services defined by the First Court Expert include:

1. A nurse performs an initial assessment of any patient with an urgent or emergent need for health care attention.
2. The nurse contacts the appropriate clinician to discuss the findings and obtain direction for subsequent care.
3. If the patient is sent offsite, they are brought back to the medical unit with a report from the offsite provider, and seen by a nurse.
4. The nurse reviews the recommendations from the offsite provider and obtains orders as necessary. If no report accompanies the patient's return, the nurse contacts the offsite provider to obtain the report and treatment recommendations.
5. The nurse also assesses the patient, including vital signs, and determines if the patient can be discharged to population or, if unstable, the patient is admitted to the infirmary or another location where the patient can be cared for appropriately.
6. The patient is seen by a primary care physician for follow-up within the next few days.
7. A log of all unscheduled services is kept, and used to monitor and improve performance.

---

[107] IDOC Administrative Directive 04.03.108 Response to Medical Emergencies dated 9/1/2017.
[108] IDOC Wexford Contract 2.2.3.12, 2.2.3.19.1, 2.9.3.2.1.3.

PTX193-0060

**Current Findings**

Our findings are unchanged from those of the First Court Expert. Among charts reviewed that were obtained from lists of patients sent to the ED, seen in sick call, chronic care clinics, specialty care, and hospitalizations, we found numerous instances of incomplete nursing assessments and failure to contact a higher-level clinician,[109] patients returning without records from the offsite provider,[110] failure to assess patients upon their return from offsite care,[111] and lack of appropriate follow up by the primary care provider.[112] Here are a few recent examples:

- On 1/22/18, a 51-year-old woman with a history of asthma, hypertension, and chronic hepatitis C infection was seen urgently for burning in the center of her chest radiating to her throat, and vomiting.[113] The chest pain protocol instructed the nurse to call the provider urgently for patients with a history of hypertension. The LPN did not refer the patient to a provider, but instead ordered Pepcid. On 2/17/18, an LPN responded to an emergency called on the same woman. The patient was found sitting on the floor stating that she was dizzy. The nurse did not perform any cardiovascular review of systems (e.g., chest pain, SOB). The patient's vital signs were normal. The nurse determined that the patient should rest in her cell and did not contact a provider. Two days later the woman had another episode of chest pain and dizziness. The LPN who saw her urgently performed no cardiovascular review of systems. Vital signs were normal, but the patient's last EKG showed nonspecific T-wave abnormality. The LPN did not contact a provider. On three occasions LPNs responded to this patient's complaints of chest pain and never contacted a provider. The independent decisions made by the LPNs in this case are well beyond their scope of practice. The use of unqualified personnel, failure to conform to written direction and the failure to consult a higher-level clinician placed this woman at risk of harm from a cardiovascular emergency that could be avoided with appropriate and responsive clinical care.

- A nurse saw a patient on 4/16/2018 for a boil on his buttocks that had been present for one and a half weeks. The nursing assessment was incomplete. The nurse referred the patient to see the provider the next day. However, he was not seen for five days, at which point an antibiotic was ordered. No labs or wound care was ordered. The provider did order a follow-up appointment in four to five days. The patient was not seen for eight days and at this encounter was sent to the ED because he was having lower abdominal pain. There is an outbound note, but it contains minimal information. Upon his return, the inbound note documents the medications and dressing change recommendations that were on the patient discharge summary from the ED visit. He did not see a provider for another two days. The nursing assessment of this patient's

---

[109] Dixon Urgent/Emergent Patients #1-3; MCC Urgent/Emergent Patient #1; Sick Call Patients #1-2; Specialty Consultations and Hospitalization Patient #6.

[110] SCC Urgent/Emergent Patient #1; DCC Urgent/Emergent Patient #2; MCC Urgent/Emergent Patient #1; Specialty Consultations and Hospitalization Patients #6-9.

[111] SCC Urgent/Emergent Patients #1-3; DCC Urgent/Emergent Patients #2-3.

[112] SCC Urgent/Emergent Patients #1, 3, 5-7; Dixon Urgent/Emergent Patient #2; MCC Urgent/Emergent Patient #1; Sick Call Patient #4; Specialty Consultations and Hospitalization Patients #6-7.

[113] LCC Urgent/Emergent Patient #3.

condition was incomplete, access to definitive care was delayed, and he was treated symptomatically with antibiotics without a thorough evaluation. Documentation of the ED visit was not obtained from the hospital and he was not seen promptly upon his return to the facility. This is a patient whose condition deteriorated because it was not managed in a timely and clinically appropriate manner by nurses and providers.

- A patient with shortness of breath, dehydration, renal failure, and anemia was hospitalized for nearly a month.[114]  When he returned to the facility on 11/19/17, the nurse who admitted him to the infirmary assessed his condition visually but did not examine him or take vital signs. The nurse also did not review the patient discharge instructions that accompanied him or contact the facility physician for orders. The patient was seen the next day by a physician. While much of the hospital record was available, the physician only listed diagnostic possibilities and was not clear about the plan of care. The treatment plan consisted of monitoring and comfort care only. There is no documentation that the patient was seen by a physician for the next seven days. In the meantime, nurses documented clear signs that the patient's condition was worsening, including bloody stools, diminished lung sounds, pitting edema of the legs, poor oxygenation, and low blood pressure (98/62). When the provider was contacted, the nurses were instructed to continue monitoring the patient and report if his condition worsens.

  On 11/27/17 the physician documented in an encounter that the patient needed to be more compliant; the patient was demanding a change in his diet. Vital signs are described as stable;  also, that he had better aeration and his lower legs seemed improved. The provider took no steps to definitively treat the patient; instead continued monitoring and comfort care. There is no documentation that the patient agreed to palliative or hospice care. The patient was not seen by a provider the next day, even though he was bleeding from the mouth and had petechia on his trunk and upper extremities. The following day, 11/29/17, the provider saw the patient and mused about whether the dose of anticoagulant medication was correct. Ultimately, he ordered the patient transferred to the local emergency room. There is an outbound note written by a nurse, but it does not contain all the information relevant to the patient's ongoing care and there is no specific statement of the reason higher level care was being sought. The patient was admitted to the hospital from the ED and died 20 days later.

The review of 33 deaths corroborates the findings from the review of records of patients seen for urgent or emergent conditions. Errors made in urgent/emergent services provided to patients who later died included the failure by nurses to refer to a higher-level clinician,[115] failure to recognize patient instability and the need for hospitalization,[116] patients who were returned to the facility for whom the record of offsite care was never obtained or reviewed,[117]

---

[114] Dixon Urgent/Emergent Patient #1.
[115] See Mortality Review Patients #1, 7, 14, 15, 18, 23, 25 and 30.
[116] See Mortality Review Patients #7-9, 13, 17-19, 21-23, 25, 28-29, 32-33.
[117] See Mortality Review Patients #6, 9, 17, 21, 28.

and patients who did not receive adequate follow up and implementation of recommendations.[118]

Emergency equipment and supplies vary greatly from site to site. There are no standardized expectations for the type and amount of emergency response equipment that is to be available at each facility. All facilities had emergency response bags that are taken by responding health care providers to the site of an emergency. At Dixon, the contents and their location in the emergency response bags were standardized and listed on the outside. These bags were sealed with a numbered, breakable seal to signify that the bag was ready to use. This was not the case at any of the other facilities. At MCC, the contents of the bags are standardized but they are not sealed to indicate readiness for use. At SCC and NRC, the contents of the emergency response bags are poorly organized, poorly kept, and unsealed. All facilities except NRC check that the emergency response equipment is available and functional. At NRC, the AED had expired electrodes; at the other facilities, emergency equipment was checked and found functional. Mass disaster bags were available at NRC and MCC, but in both cases were dusty, dirty, and contained outdated supplies. These bags are not checked by health care staff regularly. Facilities also have first aid kits available in the housing units and program areas. We found that these were not always current and stocked.

Facilities varied in compliance with the IDOC requirement for emergency response drills. NRC had not conducted a drill for the eight months prior to our visit in January 2018; all other facilities were doing drills, but not in the frequency required by the AD. Except for Dixon, critiques of these drills were brief, not very thorough, and seldom were areas of needed improvement noted. None of the facilities developed plans for performance improvement in emergency response. Emergency response drills as well as the list of emergency visits are reported to the institution CQI committee, but there is no discussion of the information or evaluation of quality or performance measurement. While we were provided with lists of emergency visits at all facilities except NRC, the tracking tool recommended by the First Court Expert has not been implemented. There is no review of clinical care the patient received prior to unscheduled urgent or emergent health care encounters to determine if it could have been avoided; nor is care provided afterwards reviewed to ensure that a provider reviewed and acted upon recommendations timely.

## Specialty Consultations

**Methodology:** Interview personnel responsible for tracking/approval of specialty services. Review tracking logs. Perform record reviews of persons having specialty care needs.

### First Court Expert Findings
The First Court Expert found that every area of the specialty care process showed problems. This included delays in perceiving a need for specialty care; delays in obtaining an appointment; delays in processing approvals; delays in following up on abnormal consultation findings; and

---

[118] See Mortality Review Patients #20-21, 27, 32.

problems with follow up of the consultation by facility staff. The First Court Expert found that the rate of approval by Wexford corporate utilization physicians is variable and dependent on the physician reviewer. He also noted that at Dixon and SCC there were substantial delays in obtaining authorization for offsite specialty care, especially for care obtained at UIC. Consultation reports are often not obtained.

**Current Findings**
There was no improvement since the First Court Expert's report. Our opinion is that the specialty care process of collegial review is a patient safety hazard and should be abandoned until such time that patient safety is ensured.

Specialty care is needed when a patient requires a special service or consultation that is unavailable at the facility. This is managed by Wexford Health Sources Inc. in a process called collegial review. In this process, whenever a physician or mid-level provider believes that a special service is necessary, the provider refers the patient to the Medical Director of the facility. If the Medical Director believes that the service is necessary, then the patient is referred for collegial review. A significant problem with this aspect of the process is that only 20% of Medical Directors are board certified in primary care and only about half have finished residency training in primary care. Therefore, there are many Medical Directors who have not been trained on when to appropriately refer for consultation. We found this problem repeatedly in record reviews. In our opinion, these deficiencies are due to lack of training or to overly restrictive barriers to specialty care. These episodes of care would not be found on the specialty care tracking log as they were never referred.

The collegial review is a phone conference call attended by a utilization physician in Pittsburgh, the facility Medical Director, and the scheduling clerk from the facility. At these calls, the corporate utilization physician reviews the list of referrals from the facility over the prior week. The utilization physician either approves or denies the referral. If a service is approved, the facility scheduling clerk then schedules the patient for the service. If a service is denied, the utilization physician is to provide an alternate treatment plan for the facility. After the specialty consultation service occurs, a follow up by a facility provider is to occur within five days. This visit is to include evaluation of the consult report and any follow up concerns. Each of these steps (referral, collegial review approval or alternative treatment plan, appointment, and follow up) are to be documented in the medical record. Though it is not a requirement of the administrative directives, each of these steps is tracked in logs maintained by the scheduling clerks.

We listened in on one of these collegial review conference calls and spoke to staff about the calls at other sites. The calls are brief. One scheduling clerk said sometimes the calls are canceled because the utilization physician believes all referrals are appropriate. The same clerk said that typically the calls take 10 minutes. The call we witnessed had no clinical collegial discussion about individual cases but was more of an approval process in which the utilization physician states approval or recommends getting another test before the approval is made.

There is a lack of guidance in policy with respect to specialty care. The IDOC-Wexford contract has no specifications with respect to timeliness of specialty care. There is no administrative directive (AD) on specialty care, including timeliness of care. AD 04.03.103 Offender Health Care Services describes the requirements of obtaining specialty care. With the exception of a requirement that the vendor Utilization Management Unit will review all referrals within five working days, there are no timelines associated with obtaining specialty care. None of the facilities tracked timeliness of specialty consultations. Dixon did perform a one-time study of timeliness of UIC consultations, which showed significant delays.

Medical records we reviewed did not consistently contain documentation of all benchmark events including referral, collegial review, alternate treatment plans, appointment, or follow up, even though documentation in the medical record is either required or implied because these benchmarks are medical events that need to be documented in the medical record. This made verification of specialty care impossible.

Each site had a tracking log detailing the benchmark dates of specialty care. None of the tracking logs was complete and some were inaccurate. Tracking logs were similar but not standardized. These tracking logs were under Wexford management. The purpose of tracking logs is both to manage current referrals to ensure scheduling occurs and to review logs for the purpose of ensuring that all steps of the process are occurring as expected. We noted that tracking logs showed significant errors. At Dixon, 22% of consultations on the tracking log did not have a referral date. At MCC, 44% of referrals in 2017 did not have a referral date documented on the tracking log and only 53% had the date the appointment was completed documented. Because of lack of information on these tracking logs, we found them unreliable. Some were inaccurate. At SCC for a three month period on the log, 7% of collegial reviews were documented as occurring *before* the date of referral, which is not possible. Also, at SCC for a period in January of 2017, 60 consultations were documented as being completed before the referral was made. These impossible scenarios imply that the tracking log is not accurately maintained and make the log unreliable for validation of knowing whether referrals are timely.

The Administrative Directives require that the specialty care benchmarks are to be documented in the medical record. We did not find alternative treatment plans documented in the progress notes of the medical record. These are typically included in utilization doctor's approval sheet in the consultation section of the medical record, but it is never clear how the primary provider incorporates this into actual practice. At NRC, because we were not provided a tracking log, we attempted to verify all specialty care benchmarks in the medical record. Only 14 (63%) of 22 consultations had a referral. Only three (14%) had a collegial review documented. Only nine (41%) had an approval. Only 15 (65%) were seen within five days in follow up of the consultation. As a result, using the medical record, we were unable to verify that benchmarks for specialty care occur as expected.

A major but unmonitored problem with specialty care is underutilization. The First Court Expert found the same problem and described it as delays in perceiving a need for the service. This can occur when physicians are unaware that a specialty procedure or consultation is necessary or

when the utilization process is so restrictive that providers fail to refer because they believe that it will not be approved. We were unable to specifically identify the cause in the IDOC but have definitively identified that it occurs. On the 33 death records reviewed, we noted 95 instances when a procedure should have been requested but was not, and 81 instances where specialty consultations should have been requested but were not. This is a large number of unrecognized specialty care referral in just 33 patients and demonstrates significant underutilization. This does not include need for radiologic studies such as CT scans. We view this deficiency as a result of improperly trained physicians and a learned process of not requesting care. This lack of referral places patients at risk of harm and has caused preventable morbidity and mortality. This is a systemic problem that appears at all facilities we investigated. In multiple cases on record reviews, patients who needed referral were not referred. Some resulted in death. Others resulted in morbidity with delayed diagnosis. These cases are found in record reviews of individual sites and in mortality reviews.

Underutilization is incorporated into IDOC practice. For example, the IDOC has no formal policy on colorectal cancer screening. Community standards are to screen non-high risk patients for colon cancer beginning at age 50 with either highly sensitive fecal occult blood tests, colonoscopy, CT colonography, or flexible sigmoidoscopy. The IDOC does not provide this screening and has no written guideline. AD 04.03.101 Offender Physical Examination requires periodic examinations every five years until age 30, every three years between ages of 30 and 39, and every two years for persons 40 years and older. Policy requires an annual TB skin test and females are screened with Papanicolaou (PAP) test and a screening mammogram at appropriate ages. There are no other recommendations for screening tests, which is not consistent with current standards.[119] Current IDOC practice for colorectal cancer screening, not clarified in policy, is to perform digital rectal examination at the annual or biannual examinations with fecal occult blood testing. Digital rectal examination with or without single office-based guaiac fecal occult blood testing is not adequate screening for colorectal cancer and is not recommended. At Danville, a patient who was only offered digital rectal examinations for colorectal cancer screening died from complications of advanced colorectal cancer.[120] We viewed this death as preventable. Another 56-year-old man who developed locally invasive rectal cancer described below is another example.

Current standard of care for all persons with COPD and asthma is to have spirometry or full pulmonary functions tests. Asthma and COPD are different diseases which have different monitoring objectives. Yet in IDOC they are treated the same, resulting in inappropriate care. Almost no patients we reviewed with either COPD or asthma have evidence of referral for spirometry or pulmonary function testing. This is inadequate management and inconsistent with contemporary standards of care.

---

[119] Routine screening recommendations are provided by the US Preventive Services Task Force as found at https://www.uspreventiveservicestaskforce.org/Page/Name/recommendations.
[120] Mortality Review Patient #1.

PTX193-0066

It is recommended that persons with cirrhosis have screening upper endoscopy to evaluate for varices; treatment with beta-blocker medication if varices are identified; and referred for screening ultrasound every six months to screen for hepatocellular carcinoma. These screening tests are only occasionally completed in IDOC and this practice is not codified in policy or in clinical guidelines. It appears that many facility physicians do not understand how to care for persons with cirrhosis and do not order these tests when indicated.

We also noted that a significant number of consultations occur without evidence of a report.[121] The IDOC refers patients to consultants and to hospitals, but when those consultations and hospitalizations are completed, the IDOC does not obtain a report of the consultation or hospitalization in a significant number of these referrals. This is a patient safety risk. When a report is not present, the providers will be unaware of other recommended testing or consultations, and will be unaware of the consultant or hospital findings that have a significant impact on therapeutic plans.

Even when consultation and hospital reports are obtained, they are not always reviewed. An example was at NRC. We reviewed 22 consultations; only eight consultation reports were present. On these eight reports there were 19 recommendations of consultants which were not carried out. This may have been due to the extremely dysfunctional medical record system at NRC.

At NRC, only eight (36%) of 22 specialty consultations included a report. At SCC, only 19 (35%) of 35 consultations included a report in the medical record. At LCC, five (63%) of eight consultations included a report. At MCC, the scheduling clerk told us that approximately 50% of consultations will not have a report. When reports are not present, the providers will not know the status of the patient and may fail to understand recommendations, placing the patient at risk of harm. A referral sheet is sent with patients on all offsite referrals. Consultants usually, but not always, will write brief comments on these forms to communicate key items to the primary doctor. However, this is an unreliable system and is incomplete, as it does not give the full consultant report.

The contract between Wexford and the IDOC requires that the vendor is to meet with hospital and other providers to coordinate referral of inmates, including the reporting of test results and medical records.[122] The contract also requires that medical records are to contain hospital discharge summaries and reports of consultations.[123] Yet the IDOC has taken a position[124] that they have no control over consultants or outside hospitals, and therefore obtaining a report is beyond the IDOC's control. They were mainly speaking of hospital emergency room reports. We

---

[121] As an example, on 33 mortality review records, there were 137 episodes when records were unavailable from offsite specialty care or hospital care. This included both specialty consultation reports and hospital discharge summaries.

[122] Contract between Wexford Health Sources Inc. and State of Illinois Department of Healthcare & Family Services dated 5/6/11 and found at 2.2.3.11 on page 9.

[123] Contract between Wexford Health Sources Inc. and State of Illinois Department of Healthcare & Family Services dated 5/6/11 and found at 2.2.3.13.5 on page 10.

[124] Letter to First Court Expert regarding Defendants' comments regarding the confidential draft report of the First Court Expert dated 11/3/14 and signed by William Barnes on pages 22-23.

assumed that they hold the same position for consultation reports. They maintain that Wexford has implemented a system which provides the Medical Director with reliable and timely information so that appropriate care is provided. We did not find that this was accurate. There is no evidence in the five day follow up to consultations or in the follow up after hospitalizations that doctors consistently understood what occurred during the offsite event. If they did, they did not document it. At times, doctors would document that there was no report and made no changes to the therapeutic plan because information was still pending. This is a serious problem. In our experience managing contract medical services and a county-managed health program, we have always been able to negotiate with consultants and hospitals timely access to consultant and hospital reports. We view this as a failure of the vendor to perform and should be fixed via the oversight process.

A special situation exists with respect to use of UIC for consultant care. Years ago, UIC agreed to provide IDOC with a certain amount of free care. This amounted to 216 inpatient hospital admissions and 2160 outpatient visits per year. Only four facilities are permitted to participate: SCC, Dixon, Pontiac, and Sheridan. NRC and SCC are considered the same institution. Each facility is permitted to send approximately 520 patients a year for specialty consultations. For a variety of reasons, these specialty consultations are delayed. At Dixon, consultations to UIC average six months to complete and range from 100 days for a cardiology consultation to 239 days for a gastroenterology consultation. These delays have resulted in morbidity and mortality, and place the patients at significant risk of harm. There is no process to assess whether a patient's condition needs earlier attention. Because the cost of UIC is free and the cost of alternate care is borne by Wexford, there is significant incentive to send patients to UIC even if it results in delayed care.

An example of this was at SCC. The patient[125] was a 56-year-old who complained of blood in his stool on 11/8/16. A fecal occult blood test verified blood in his stool. The patient also had weight loss. The standard of care for a 56-year-old with weight loss and blood in the stool is prompt colonoscopy and possibly additional work up to exclude colon cancer. This man was not referred for colonoscopy; instead, he was referred for a gastroenterology appointment on 1/4/17, about two months later. The gastroenterology appointment did not occur until 7/7/17, about six months after the referral. The gastroenterologist recommended colonoscopy, which did not occur until 11/27/17, when a locally invasive rectal cancer was identified. This delay of over a year resulted in unnecessary spread of the cancer. Physicians were aware of the delay but there was no effort to schedule the patient to a local gastroenterologist for this procedure.

We reviewed aggregate specialty care visits for 2017. They are listed in the table below. Though the populations at SCC and MCC are similar in that they are both maximum security prisons without special medical missions, the referrals numbers and rates are quite different. We question whether the four times higher rate of referral at SCC is related to the free care provided at UIC. Dixon and SCC, which have free care at UIC, had the highest numbers and rates

---

[125] SCC Hospitalization Patient #6.

of referral. This implies that other sites may have suppressed referral rates because the cost of care is borne by the vendor.

| Site | Population | Referrals[126] per year | Referrals per 1000 | Denials per year | Denials per 1000 | % Denied |
|------|-----------|------------------------|--------------------|-----------------|------------------|----------|
| NRC | 1681 | 242 | 144 | 8 | 5 | 3% |
| SCC | 1183 | 1731 | 1463 | 87 | 74 | 5% |
| Dixon | 2298 | 1666 | 724 | 109 | 47 | 7% |
| LCC | 1806 | 753 | 417 | 71 | 39 | 9% |
| MCC | 3029 | 994 | 328 | 237 | 78 | 24% |

Dr. Meeks testified[127] that if the site Medical Director or HCUA feel that any request denied is necessary, it can be appealed directly to the Agency Medical Director. Dr. Meeks stated that over an eight-month period he thought he had received about 10-15 appeals on a statewide basis. It is our opinion based on record reviews that there are a substantial number of patients who are not referred for services who need them. We were unable to identify any data to show who appeals utilization decisions to the Agency Medical Director, but based on interviews it appears that the HCUA at the facility is the person who does this. But the HCUA is a nurse who is not trained to determine whether a referral is necessary. This manner of oversight is therefore flawed and will not adequately protect patient safety because this should be done by a physician, and needs to include review of care so that persons who never get referred but should be referred are identified.

Based on multiple record reviews, including mortality reviews, we have identified considerable morbidity and mortality associated with untimely or lack of referral for higher level of care. In review of 33 deaths, we found 93 episodes of care when a patient should have been referred to a hospital. Many of these delayed or failed hospital admissions contributed to patient death. While we believe that this occurs as a result of poorly qualified physicians, the utilization process appears to be a significant barrier to access to timely specialty and higher level of care. The defects in this cost containment mechanism effectively result in denial of necessary medical services that harm inmates. For that reason, we make a strong recommendation to abandon the collegial review process until patient safety can be ensured.

IDOC providers should be strongly encouraged to request specialty consultation when patients' clinical conditions are complicated, exceed the skills and training of the providers, or are not responding the initial treatment regimens. It would be in the best interest of the patient and the IDOC if there was a system wide specialty consultation plan that included contracts with specialty providers for face-to-face, telehealth, and e-consult consultation. IDOC should expand and build on the current telehealth program that provides ready access to HIV, hepatitis C, and renal consultation. The present relationship with the University of Illinois Chicago could be used

---

[126] Referral and denials were taken from the latest year's annual CQI reports provided to us by the IDOC.
[127] Page 23 30(b)(6) deposition of Dr. Meeks on July 25, 2017.

as a template to expand the number and type of specialty consultations that are readily available to IDOC providers.

## Infirmary Care

### First Court Expert Findings
The First Court Expert noted in the final report that there were deficiencies in infirmary policies, practices, and physical plants. The expert stated that IDOC policies failed to provide a detailed description of the scope of services that could be safely provided in the infirmary setting and did not provide guidelines that would assist the clinical staff in determining which patients should be referred to the hospital and not be admitted to the infirmary. The report criticized the 23-hour observation policy that allowed nurses to directly admit patients to the infirmary for short term observation without contacting the provider or to discharge patients without arranging for post-observation follow-up. They report that Dixon did not have 24 hour/7 days per week registered nurse presence in the infirmary, and that there was no or only partial nurse call systems in five facilities. It was also noted that in some infirmaries, bedding linens were of poor quality and in short supply.

### Current Findings
All five of the correctional centers inspected had infirmaries including NRC, SCC, Dixon, LCC, and MCC. The NRC infirmary was opened in 2016, two years after the First Court Expert's site visit.

The physical plants of the infirmaries were described in the section on Clinical Space and Equipment, which noted serious problems with the level of cleanliness, lack of adjustable hospital beds, torn mattresses, non-functioning negative pressure units in isolation rooms, the absence or incomplete distribution of nurse call devices, and unsafe shower rooms in many of the infirmaries.

There was overall compliance with timeliness of nursing admission notes, which were consistently written at the time of admission, and the frequency of nursing progress notes. Nursing progress notes were consistently entered no less than daily even when the policy required only weekly notes. There was varying compliance with the timeliness of provider admission notes, which were to be written within 48 hours of admission.[128] A number of provider admission notes were not entered in accord with this standard.[129]  As also directed by the Offender Infirmary Services directive (see reference above), provider progress notes were to be written three times a week for "acute" admissions and weekly for "chronic" admissions. There was inconsistent compliance with this directive in the IDOC infirmaries.[130]

The Offender Infirmary Services Administrative Directive dated 9/1/2002 states that "the scope of infirmary services available on site shall be based upon the nature of offender population

---

[128] Offender Infirmary Services 04.03.120.
[129] NRC Infirmary Patients #1, 3, 4; Dixon Infirmary Patient #1.
[130] NRC Infirmary Patients #3, 4; Dixon Infirmary Patients #3, 5; MCC Infirmary Patient #2.

and the prevalence of disease entities or disabilities that might benefit from infirmary services within the facility's population."[131] It has not been modified since the First Court Expert's visit. There are still no written policies that provide guidance to the IDOC clinical staff on which conditions or level of instability exceed the capabilities of the infirmaries and should be promptly referred to a hospital. Moreover, based on record reviews, the current complement of Wexford physicians does not appear to appreciate when patients are unstable and require hospitalization. This places patients at significant risk of harm. The lack of a clear scope of service contributed to admission of patients to the infirmaries whose presenting or ongoing conditions warranted referral to a higher level of care, whether to a hospital or a skilled nursing facility. Many of these failures to refer to a higher level of care resulted in death.[132]  Two examples of failure to refer to higher level of care based on infirmary record review during facility visits included the following.

A patient with recent assaultive head trauma and an episode of falling out of his bed presented with fluctuating altered mental status, disorientation, and confusion, and was admitted to the NRC infirmary.[133] The provider's admission note did not document a neurological exam, the bruises on the patient's head, the recent head trauma, and the past history of a cerebroventricle-peritoneal shunt. This patient's condition warranted direct referral to a hospital emergency room for brain imaging study (CT scan) and neurology evaluation to rule out an intracranial hemorrhage or increased intracranial pressure. This patient's clinical condition exceeded the capabilities of the infirmary and he should have been hospitalized. The care of this patient was negligent and did not reflect the standard of care in the community.

Another patient with a chronic draining leg ulcer was not able to be properly diagnosed and treated in the infirmary.[134] The indicated preliminary diagnostic testing and specialty consultation were not initiated. When the patient did not improve with the initial antibiotic regimen, she should have been hospitalized to have additional definitive diagnostic testing and the timely initiation of the proper intensive antibiotic treatment. Her complex non-healing leg ulcer, which most likely was due to chronic osteomyelitis, exceeded the scope of service that could be adequately diagnosed and managed in the IDOC infirmary setting.

At the time of the Experts' site visits, a high percentage of the patients in the infirmaries were physically and/or mentally impaired patients with dementia, traumatic brain injuries, advanced cardiovascular disease, and cerebrovascular disease. Many were incontinent of bladder and bowel and needed partial or full assistance with activities of daily living (ADLs), including toiletry, feeding, bathing, dressing, and transfers in and out of beds and chairs. This was especially true of the Dixon facility which includes a special mission of housing geriatric patients. Nine (50%) of the 18 patients in the Dixon infirmary were judged by the infirmary nursing staff as needing full or partial assistance with ADLs and would be better served in a

---

[131] Offender Infirmary Services, Administrative Directive 04.03.120.

[132] We noted in 33 mortality reviews that there were 93 episodes in 33 patients when the patient should have been referred to a higher level of care but was not. Many of these resulted in death.

[133] NRC Infirmary Patient #3.

[134] LCC Infirmary Patient #5.

skilled nursing facility.[135] Health care administrators, nursing leadership, and correctional staff leadership in a number of the facilities communicated their concerns about the increasing number of elderly mentally and physically disabled individuals in the IDOC and their concerns about the infirmaries' capability of caring for this complicated patient population. It was apparent that the IDOC is aware of the need for additional skilled nursing care facilities and geriatric care housing but has not taken action to address this problem.[136] In our opinion, the Dixon facility is inadequate as the principal housing placement for the geriatric and disabled population. There has been no evaluation to assess the number of persons needing geriatric care or skilled nursing placement within the IDOC and no apparent effort to correct existing inadequate housing for these individuals.

One example at NRC included a patient with diabetes, lymphoma on chemotherapy, deep vein thrombosis with an inferior vena cava filter, urinary incontinence, decubitus ulcer, and a hospitalization in 2017 for altered mental status, repeated falls, and cranial burr hole procedures who spent most of his day in bed.[137] He needed assistance with ADLs including straight catheterization to empty his bladder. He could not walk without assistance. He had a decubitus ulcer that appears to have developed while in the infirmary. His constant needs exceeded the capabilities of the NRC infirmary; he would be more appropriately housed in a skilled nursing facility.

An elderly, incontinent patient at SCC with dementia was noted having his diaper changed.[138] The staff stated that he required total care and constant observation. Later in the day, the patient was observed to be unattended and precariously laying half off the bed at significant risk for fall.

One long term patient in the Dixon infirmary with advanced dementia had developed contractures of his upper and lower extremities and deep, infected decubitus ulcers.[139] He required total care including gastric tube feeding, diapers, bathing, and dressing. The extreme contractures and recurrent pressure sores developed while he was in the infirmary. The manifestation of these findings indicated that the Dixon infirmary was incapable of providing the level of care that would be expected in a skilled nursing facility. Once the patient started to develop contractures, he should have been transferred to a skilled nursing facility in the community. These and other mentally and physically impaired patients have clinical and nursing care needs that cannot be adequately met in IDOC infirmaries. IDOC must either internally develop a certifiable skilled nursing facility that is properly designed, staffed, and equipped or transfer high risk chronic care patients to certified skilled nursing facilities in the community.

With the exception of LCC, the provider infirmary admission notes contained very limited history of the reason for admission, the diagnosis, any differential diagnoses, and only brief

---

[135] Verbal communication with Dixon infirmary nurse.
[136] Deposition of Kim Hugo, April 11, 2018 pp. 69-70.
[137] NRC Infirmary Patient #2.
[138] SCC Infirmary Patient was observed during rounds. His chart was not reviewed.
[139] Dixon Infirmary Patient #3.

PTX193-0072

diagnostic and treatment plans. With the exception of the infirmary at LCC which has an electronic medical record, the provider progress notes were commonly illegible. Provider progress notes commonly offered limited if any clinical information, did not include justification for modifications in treatment plan or medications, and were exceedingly brief with little clinical information. The assessment and plan in provider progress notes often repeatedly contained little more than phrases such as stable, no change in condition, or continue present management.[140] Other than limited notes about the illness that prompted the infirmary admission, there was virtually no documentation or clinical updates about any of the patients' other chronic illnesses including diabetes, hypertension, congestive heart failure, chronic kidney disease, etc. The provider progress notes during one SCC infirmary patient's seven month admission never commented, even once, on the status or control of his seizure disorder.[141] It was extremely difficult for Experts and other providers to understand the course of the patient's condition and the rationale for any of the modifications in treatment. A provider recently assigned to the SCC infirmary stated that the notes of the previous infirmary provider were incomprehensible and made it extremely difficult for him to comprehend the status of the patient and the treatment plan.[142] The lack of informative, comprehensive provider notes that legibly addressed both the acute and chronic needs and illnesses of each infirmary patient put the health and safety of infirmary patients at risk. The illegibility of the provider and some of the nursing notes provides strong justification for implementation of an electronic medical record in all IDOC facilities.

Some infirmary problem lists were missing, had erroneous entries, or failed to include key chronic illnesses.[143] Absent, inaccurate, or incomplete problems created a potential risk to the comprehensiveness and continuity of the care delivered to a patient housed in IDOC infirmaries.

The care provided to a number of infirmary patients, as identified during site visits, was found to be suboptimal and of poor quality. When the admitting diagnosis was not clear or the patient was not responding to the initial treatment, the providers failed to consider reasonable alternative diagnoses and order additional diagnostic tests to investigate the initial or other diagnoses. Patients were prescribed confusing regimens of antibiotics and other anti-infection agents. Chronic conditions were not aggressively managed, resulting in delays in attaining reasonable levels of control. This lack of clinical adequacy put the health of patients at risk. Examples of patients whose infirmary care was suboptimal are provided below.

---

[140] In Mortality Review Patient #9, over six months a doctor wrote an identical note 19 times despite fluctuating clinical condition of the patient. The note consisted of the sentence, "no specific complaint, no change, dementia, continue same care." After the patient had a cardiopulmonary event undocumented by the provider and colon cancer the provider over the course of approximately a year wrote the identical note repeatedly, "no specific complaint, no change, post colectomy for metastatic ca [cancer], continue same care." This was despite the patient having repeated falls and other clinical events described by nurses.

[141] SCC Infirmary Patient #2.

[142] Verbal communication from Dr. Roz Elazegui.

[143] SCC Infirmary Patients #1, 2, 3; LCC Infirmary Patient #5; MCC Infirmary Patient #1.

PTX193-0073

- A newly incarcerated diabetic patient entered NRC with a black toe and should have been immediately referred to a hospital emergency room.[144] However, he was placed in the general population and received no follow-up care until two weeks later, when he had to be emergently referred to the hospital. His hospital treatment included IV antibiotics for septicemia and surgical amputation of his infected gangrenous toe. Upon discharge from the hospital he was admitted to the NRC infirmary. After five weeks in the infirmary, the recommended follow-up appointments with vascular surgery and podiatry had not yet been scheduled. The infirmary provider notes were mostly illegible and contained limited clinical information about the post-hospital wound healing. Upon initial entry to NRC, this patient's syphilis test was found to be reactive with a high RPR titer of 1:124 treatment (active syphilis); he was not treated for syphilis prior to his hospitalization and was not identified as having active syphilis until 33 days after his admission to the SCC infirmary. The provider had not reviewed the intake laboratory testing when the patient was admitted to the infirmary. The delay in initiating the treatment of active syphilis was negligent and put the patient at risk for syphilitic complications.

- Another NRC infirmary patient with recent head trauma and a ventriculoperitoneal (VP) shunt that had been previously placed to treat hydrocephalus was admitted to the infirmary with altered mental status, confusion, and disorientation; he also had bruises and a hematoma on his head.[145] This patient should have been directly sent a hospital emergency room but was not. Ten days after admission to the infirmary, the provider had not performed a neurological exam and had not ordered a brain imaging study to rule out cerebral hemorrhage, subdural hematoma, and increased intracranial pressure. The care provided to this patient did not meet the standard of care in the community and was grossly and flagrantly unacceptable.

- Another NRC patient was an insulin using diabetic with a wired jaw on sliding scale insulin and a total liquid diet who had widely fluctuating blood sugars with episodes of marked hypoglycemia after injection of short acting regular insulin.[146] The provider did not comment on the possible impact of the patient's entirely liquid diet, which can result in extreme variations of blood sugar levels. The provider did not comment on whether this patient had type I or II diabetes. The continued use of sliding scale short acting insulin should have been discontinued in this patient. The lack of a clear plan about treating this diabetic who was temporarily unable to eat solid foods put this patient at risk. Consultation with a diabetic specialist was needed but had not been solicited. Treatment was also not ordered to address protein in the urine nor was the pneumococcal vaccine 23 administered; both these interventions are the standard of care for all diabetics. The care provided to this patient was substandard.

---

[144] NRC Infirmary Patient #1.
[145] NRC Infirmary Patient #2.
[146] NRC Infirmary Patient #4.

PTX193-0074

- A patient in the SCC infirmary had recurrent deep vein thromboses (DVT) and was prescribed chronic anticoagulation with warfarin.[147] After nine weeks of anticoagulation, the level of anticoagulation (INR testing) were still sub-therapeutic. The infirmary provider failed to more expeditiously increase warfarin dosage to achieve a therapeutic level. This patient was still at risk for a recurrent DVT after nine weeks at SCC. At one point, the UIC providers requested that the warfarin order be stopped and the anticoagulant be switched to injectable low molecular weight heparin in preparation for an upcoming surgical repair of the patient's post-operative abdominal wound. The infirmary provider discontinued the oral anticoagulant but failed to prescribe the injectable anticoagulant, leaving the patient without any blood thinning medication. The lack of aggressive management of his oral anticoagulation medication and the failure to immediately prescribe the temporary injectable anticoagulant put the patient at heightened risk for additional clot formation.

- Another SCC infirmary patient whose diagnoses included cardiovascular disease, diabetes, DVT, and seizure disorder had episodes of black outs and significant drops in blood pressure documented in the nursing notes.[148] The infirmary provider failed to document or address these occurrences of syncope in his progress notes. This patient should have been, but was not, assessed or tested for arrhythmia, atypical seizure, and orthostatic hypotension. The provider progress notes never once commented on the control of patient's seizure disorder. The patient also had a history a massive DVT but he had not been prescribed anticoagulant medication and the provider did not provide any rationale for not treating this potentially life threatening condition. The care provided to this infirmary patient was grossly and flagrantly unacceptable.

- Another SCC infirmary patient had a history of arteriosclerotic heart disease (ASHD), hypertension, and cerebral vascular accident (stroke).[149] For the last seven months he had multiple elevated blood pressure recordings documented in the infirmary record without any change being made in his antihypertension medication regimen. It was not until a new provider was assigned to the infirmary in 2018 and increased the blood pressure medication that the blood pressure finally become controlled. The management of this patient's hypertension was negligent and put the patient at increased risk for another stroke.

- A patient at LCC had repeatedly sought medical attention since late 2016 for abdominal pain, blood in her stool, mucous in her stool, change in her bowel patterns, and progressive weight loss.[150] She was seen repeatedly and had been presumptively started on antibiotics for diverticulitis; the nurses and providers consistently failed to comment on her steady loss of weight which was readily viewable in LCC's electronic medical record. Failing to note that the patient had already lost 29 pounds, one provider wrote

---

[147] SCC Infirmary Patient #1.
[148] SCC Infirmary Patient #2.
[149] SCC Infirmary Patient #4.
[150] LCC Infirmary Patient #1.

in July 2017 that this patient had no "red flags" for cancer. He was wrong; weight loss is a strong warning sign for cancer. Due to increased abdominal pain and blood in her stool, the patient was admitted to the infirmary in September 2018 and treatment for diverticulitis was continued. It was not until her twelfth day in the infirmary that a provider recognized that the patient had lost another 18 pounds during the infirmary admission and a total of 40 pounds since January 2017. Another 20 days passed before an abdominal CT scan revealed abnormalities consistent with colon cancer with metastases to abdominal lymph nodes and the liver. Biopsy at UIC Springfield verified the diagnosis of colon cancer and on 12/18/17, 73 days after her admission to LCC's infirmary, the patient had a hemicolectomy with a colostomy performed and she was started on chemotherapy. The pre-infirmary and infirmary care of this patient failed to meet the standards of care in the community. The failure of the providers in the clinics to recognize the patient's weight loss and symptoms as being suggestive of a malignancy was indifferent and grossly and flagrantly unacceptable. The slow scheduling of diagnostic tests and referrals while the patient was housed in the infirmary was inexcusable; the two and one-half month delay between infirmary admission and surgery potentially decreased the quality and duration of this patient's life.

Patients admitted to the infirmaries with less complicated conditions (post-op, basic wound care, no assistance with ADL's, etc.) were more likely to be adequately managed. However, patients with complicated conditions and multiple diagnoses that required close monitoring and diligent provider involvement were frequently noted to have received substandard levels of care. Some of these patients had clinical needs that exceeded the clinical experience and knowledge of the providers. IDOC providers do not have timely, if any, access to nationally respected, comprehensive, current electronic medical references when they need expedited answers to clinical questions. Most importantly, the negative impact of the provider's knowledge gap would have been lessened if the infirmary providers readily requested specialty consultation concerning diagnostic testing and treatment. There were multiple instances when the infirmary (and sick call and chronic care) providers failed to consult specialists when there were clear indications that clinical advice and assistance was needed. The infirmary providers either lacked the knowledge and competence to recognize that they needed clinical assistance or they were reluctant to seek outside consultation due to institutional culture and practice. The Wexford "collegial" process that required providers to submit justification for offsite specialty consultations and offsite (and some onsite) diagnostic tests only serves an administrative "gate keeper" function and is an unnecessary barrier that delays or prevents the scheduling of needed consultation.

Examples of infirmary patients whose clinical conditions should have generated a request for specialty consultation but for whom the provider failed to submit requests for this clinically warranted specialty assistance follow.

- A insulin requiring diabetic patient in the NRC infirmary with a wired, fractured jaw on a total liquid diet had widely fluctuating blood sugar levels that were not able to be

PTX193-0076

controlled by the infirmary provider.[151] This is an unusual clinical situation and the advice of an endocrinology specialist was needed but not requested. The infirmary provider's insulin orders put the patient at significant risk for hypoglycemia.

- Another patient  in the SCC infirmary with severe cardiovascular disease, peripheral artery disease, iliac artery stent, diabetes, seizure disorder, and a history of DVT had, over a seven month duration, episodes of black outs and significant drops in blood pressure recordings.[152] The infirmary provider ordered no interventions and failed to seek consultation with cardiac and vascular specialists. When a new infirmary provider was assigned to the infirmary, the patient was immediately referred to both cardiology and vascular surgery specialty clinics.

- A patient in LCC's infirmary had multiple chronic conditions including congestive heart failure, atrial fibrillation, and mitral valve replacement.[153] She developed persistent dark colored, draining, and itching sores. The infirmary provider's attempts to treat this skin problem were unsuccessful. The provider never considered that one of the patient's medications, known to cause itching and blistering skin lesions, could be the cause of her skin condition. Dermatology consultation should have been requested but was not. Over an eight month period in the infirmary, the patient's vital signs documented eight episodes of bradycardia (slow heart rates less than 60 beats per minute) that were never addressed in the provider's progress notes. No consideration was given to the decreasing one of the patient's medications that commonly causes bradycardia. The patient's severe chronic cardiac illnesses and her eight documented episodes of bradycardia never resulted in a referral to cardiology specialists. The patient was urgently hospitalized when her pulse rate increased to 130 beats per minute and her oxygen saturation suddenly dropped. While hospitalized she was found to have sick sinus syndrome, which can cause intermittent bradycardia and tachycardia; a cardiac pacemaker was implanted. This patient's conditions were complicated, yet specialty consultation with cardiology and dermatology were not solicited prior to her emergency hospitalization. Her intermittent episodes of bradycardia went unnoticed by the provider; it appears that the provider was not reviewing the vital signs that were frequently recorded by the nursing staff. The care provided to this patient was negligent. The failure to adequately monitor this patient and to seek timely specialty consultation for complex dermatological and cardiac conditions did not meet the standard of care in the community.

- Another patient in the LCC infirmary with blackened toes due to frost bite was treated with an array of antibiotics but was not immediately referred to a podiatrist as is the standard of care in the community.[154] Only after two months in the infirmary, when her right large toe became gangrenous was she referred to a podiatrist. The podiatrist

---

[151] NRC Infirmary Patient #4.
[152] SCC Infirmary Patient #2.
[153] LCC Infirmary Patient #2.
[154] LCC Infirmary Patient #3.

arranged for the toe to be surgically amputated. Immediate referral for podiatric consultation when the patient was admitted to the infirmary could potentially have prevented the need for the amputation.

- Another patient in the LCC infirmary had a history of recurrent DVT with pulmonary emboli and a chronic draining lower extremity leg ulcer.[155] During her infirmary stay, the patient was treated with five different antibiotics in six different, confusing combinations. The working diagnosis appears to have been osteomyelitis but this was never noted in the provider's treatment plan. The provision of multiple antibiotics in varying combinations without a definite diagnosis was not in accord with national standards of care and put the patient at risk for drug resistance and severe gastrointestinal complications. A definite workup for osteomyelitis, including bone probing, bone biopsy, and specialized bone scans, was never ordered. Infectious disease, orthopedic, and possibly dermatology consultation to clarify the diagnosis was needed but was not requested. The provider's extremely belated requests for infectious disease consultation for assistance with the choice of antibiotics, not to establish a diagnosis, was inappropriately denied by Wexford's collegial referral process. If even the appropriate preliminary diagnostic tests and consultations had been performed at the infirmary, this patient should have been hospitalized for definite diagnostic tests and intensive treatment. The failure to solicit specialty consultation during this patient's six month stay in the LCC infirmary without resolution of her draining leg ulcer and the inexplicable combinations of antibiotics and antifungal agents reflected poor understanding of this patient's possible diagnoses, and was incompetent.

## Pharmacy and Medication Administration

Prescription medication is a common form of medical treatment today. In the general community, 37% of adults aged 18-44 took a prescription drug in the last 30 days, 70% of adults aged 45-64 took a prescription drug in the last 30 days, and 91% of those aged 65 and older took a prescription drug in the last 30 days.[156] Persons incarcerated in correctional facilities are well known to have a greater disease burden than the general community.[157] A survey done by the Bureau of Justice Statistics of inmates in jails and prisons in 2011-2012 found that 66% of those in prison reported taking prescription medication for a chronic medical condition.[158]

---

[155] LCC Infirmary Patient #5.

[156] National Center for Health Statistics. (2017) Health, United States, 2016 with Chartbook on Long-term Trends in Health. Hyattsville, MD. https://www.cdc.gov/nchs/fastats/drug-use-therapeutic.htm.

[157] Nowotny. K., Rogers, R. & Boardman, J. (2017) Racial disparities in health conditions among prisoners compared with the general population. SSM-Population Health. 3; 487-496. Elsevier. Macmadu, A. & Rich, J. (2015) Correctional Health is Community Health. Issues in Science and Technology. 31 (1). Binswanger, I., Krueger, P., Steiner, J. (2009) Prevalence of chronic conditions among jail and prison inmates in the USA compared with the general population. Journal of Epidemiology and Community Health. 63(11):912-919.

[158] Maruschak, L. (2015) Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-2012. Bureau of Justice Statistics available at https://www.bjs.gov/index.cfm?ty=pbdetail&iid=5219.

PTX193-0078

The use of prescription medication in health care is governed by both state and federal regulations designed to provide protection for the patient, treating clinicians, and the general community. The safety of medications in the delivery of patient care has been a major area of emphasis since the 1990's, when the Institute of Medicine reported that medication errors were a significant contributor to morbidity and mortality.[159] Since then, numerous organizations, including the federal government and accreditation organizations, have studied the problem of medication safety and put forth guidelines that improve patient safety. These include computerized provider order entry, medication reconciliation, use of clinical pharmacists, patient-specific unit dose packaging, adherence to the "five-rights" of medication safety, bar code medication administration, and minimization of interruptions during all aspects of medication preparation and delivery.[160] The methods to deliver medication in correctional facilities are expected to be like those evident in the general community, including implementing changes to improve safety.

Availability and access to medications involves the cooperation of custody and other programs. Correctional officer support is essential to complete medication administration efficiently and safely. This includes providing escort, controlling movement, reducing distractions (e.g., television, noise levels, fights, etc.), accounting for missing inmates, and ensuring that inmates ingest medication that has been administered. Custody officer support needs to be guided by custody post orders or Administrative Directives that give standardized guidance to custody staff on how they are to cooperate with nurses when they administer medication. When this does not occur, nurses must individually negotiate with officers, resulting is varying levels of cooperation when nurses attempt to administer medication. This reduces standardization of practice, causes inefficiency and delay, and as a result increases risk of medication errors.

Medications may be only needed once a day, but a few medications may require as many as four to six doses in a 24-hour period. Correctional facilities may reduce some of the burden of medication administration by allowing inmates to keep and take their own medications as needed, but this is usually limited to groups of medications not likely to be misused and to inmates who are capable of self-administration. When inmates are unable or not allowed to take medication on their own, a nurse must administer each dose. There are also some patients who need closer monitoring of their clinical condition, such as when medications are first initiated, the patient is experiencing side effects, or the when the patient's condition is not improving. These patients should be scheduled for nurse administered medication.

Patient adherence with medication treatment is essential in achieving desired clinical outcomes. When patients do not receive medication as ordered, treatment is compromised. There are many reasons a patient in a correctional facility does not receive medications as prescribed. These can include the medication has not yet been received from the pharmacy, the nurse did not see that the medication was ready and available to administer, the officer

---

[159] Institute of Medicine. (1999) To err is human: building a safer health system. Washington DC: National Academy Press.
[160] Patient Safety Primer (2017) *Medication Errors* available at https://psnet.ahrq.gov/primers/primer/23. Agency for Healthcare Research and Quality, U.S. Department of Health and Human Services.

PTX193-0079

may not have released the inmate from his cell to obtain the medication, the inmate may be elsewhere (at court, in the visiting room, with an attorney, attending a program, working etc.), the inmate may have been transferred to another housing location or institution, or the inmate may not want to take the medication. Each of these reasons requires a different action by the nurse to ensure that the patient receives ordered treatment. For example, inmates may refuse medication, but if so, the nurse needs to refer the patient to a provider to discuss a change in the plan of care. If the inmate has been transferred, the nurse needs to locate the inmate and transfer his medication, or notify the new location that the inmate needs to receive medication, and so forth. Whenever an inmate is not present or refuses a prescribed dose of medication, the nurse must investigate further to determine what steps must be taken to continue the inmate's care. Each of these missed medications and the reason must also be documented on the MAR.

Nurses and correctional officers must work collaboratively to ensure that patients ingest medications, as medications that are diverted in the correctional setting become contraband and are a challenge to safety and security of operations. Correctional officers are responsible for preventing and eliminating contraband. A single pill or capsule is considered contraband when it is not being administered by a nurse or taken by an inmate as a keep on person (KOP) medication. It is important that policies and procedures clearly identify when it is not acceptable for medication to be in the possession of an inmate and that correctional staff are vigilant in monitoring for the presence of contraband and the potential for misuse or drug overdose.

**First Court Expert Findings**
The First Court Expert found no problems with the system to provide pharmacy/medication administration services. The Expert found discontinuity in medication treatment for individuals with chronic disease, which was unrecognized and not addressed by treating clinicians. This was because the MAR was not filed timely in the medical file and nurses did not notify providers when an inmate missed taking medication. The Expert also found at NRC that medication administration was significantly delayed because an officer was not assigned to escort the nurse, per policy.

**Current Findings**
We agree with the First Court Expert's findings. We have additional findings that evidenced a far worse situation from the First Court Expert's report. We found systemic medication administration practices that are unsafe and not consistent with community standards at every facility visited. We also found that some problems with medication are not recognized and those that are recognized are not addressed. The failure to rigorously monitor and address problems with medication treatment is a systemic issue that results in medication errors, resulting in adverse patient events and creating on ongoing risk of harm to patients.

<u>Pharmacy Services</u>
Most pharmaceuticals are provided by BosWell Pharmacy Services, an institutional pharmacy located in Pennsylvania. Orders are either faxed, or in the case of LCC, entered by computer.

Each order is verified by a pharmacist, the prescription filled, and the medication shipped to the institution, arriving the next day. Staff assigned to work in the medication storeroom at the institution track each medication that has been ordered, reconcile its receipt, and put it into the area used by nurses to prepare medication for administration. UIC provides medications to treat inmates with HIV and HCV via an interagency agreement. Each institution also has a "back-up" pharmacy in the local community which can fill prescriptions needed more urgently than can be delivered by BosWell. We did not find any significant issues with the availability or timeliness of prescribed medication supplied by either BosWell or UIC.

A consulting pharmacist visits each site regularly at least once a quarter to inspect the medication area and audit charts. The results of these reviews are included in the institution CQI meetings. We identified concerns when we inspected medication rooms. There was no schedule of sanitation and disinfection activities for the medication areas. At NRC and LCC, medication storage rooms were dirty and disorganized. At Dixon and LCC, we found multiple use containers (e.g., Lidocaine) that were open and not dated. We also found expired medication and testing material at these two facilities.

Policy and Procedure
IDOC provides minimal direction and guidance about how medications are ordered and administered. For example, it states that prescriptions must be signed by a physician or dentist; it does not state the elements of a complete order. Facilities have operational procedures for pharmacy services and medication administration. Procedures we reviewed were several years old and often not signed. While they do provide more specific directions about when and how medication will be accounted for and administered at the facility, they still are too general. For example, the operational procedure at LCC does not state the elements of a complete order. It also does not specify how the nurse administering medication is to identify that it is the correct inmate. Health care staff are therefore left to their own devices and there is no mechanism to insist upon legible, complete orders or instructions about how inmates are to be identified before receiving medication. This leads to variation and unsafe practices as described in the following paragraphs.

An example of how the absence of policy and procedure leads to poor practices is one we observed at MCC. Nurses used a list of inmates who are prescribed controlled substances to select and sign out medication from the cabinet where controlled substances are kept. All the medications were put into a collective cup. Once all the controlled substances were collected, the nurse took the cup to the medication room and, by visual identification only, selected which controlled substances each patient was to receive and put them into the respective patient envelope. Not only was the nurse dispensing; there was no accountability for the proper disposition of each medication and the potential for error magnified by not using the MAR to select medications. In another example, at LCC, unlicensed staff delivered KOP medications to inmates without the MAR present to verify the medication against the physician order and to document that the medication was administered. We found many MARs in which there was no documentation that the patient received ordered medication.

The IDOC has no Administrative Directives or post orders that provide guidance on how officers are to cooperate with nursing staff when nurses administer medication. At NRC, as an example, nurses individually negotiate for this cooperation when they administer medications. This practice at NRC resulted in the poor practices we observed at that facility. There needs to be a standardized procedure for officer cooperation with nurses during medication administration that ensures nurses are able to satisfactorily administer medication in accordance with accepted nursing practice.

Medication Orders

Dispensing and administration of medication must only be done under physician order. Illinois statute[161] requires that a physician prescription contain the name of the patient; the date when the prescription was issued; the name and strength of the drug or device prescribed; the quantity; the directions for use; the prescriber's name, address, and signature; and the DEA number for controlled substances. We did not find evidence that the prescription process in IDOC conforms to state regulation. Providers do not always write orders on the order form; we found multiple examples among charts reviewed of orders written on the physical exam form or on the lab results or in the progress notes, but a corresponding order was not written on the physician order form. It is the order form that is used to inform the pharmacy that there is a prescription to be filled, otherwise care is not implemented. Providers write orders that at times were not legible to the experts or the nurses working with the provider who wrote the order. Some orders were incomplete and documentation in the chart did not indicate the reason or intended goal of treatment.

Nurses are responsible for transcribing orders onto the MAR. At all facilities, we found orders which had not been transcribed onto the MAR or that were transcribed late. At NRC, nursing staff give KOP medication to inmates at intake without consistently transcribing the order and documenting administration of medication onto the MAR. Therefore, there was no documentation that the patient received ordered medical care. We also found instances of nurses overwriting new orders over old orders on the MARS at every facility. This is alteration of a legal record and should be ceased immediately. Finally, we observed nursing staff transcribing orders onto the MAR using the label on the blister pack instead of the original order; this is a poor practice because it does not identify dispensing errors.

Medication Administration

At all the facilities we visited, the process for medication administration was fraught with problems. None of the methods used to administer medication at the five facilities we visited ensure that the *five rights* of medication administration are observed. These are the *right patient*, the *right medication*, the *right dose*, the *right route,* and the *right time*. Problems which were universal included:

---

[161] Illinois Compiles Statutes; 225 ILCS 85/3 as found at
http://www.ilga.gov/legislation/ilcs/fulltext.asp?DocName=022500850K3.

1. Failure to identify that it was the right inmate, using two-part identification (e.g. use of identification badge and verification of date of birth or institution number).
2. Failure to verify that the inmate received the right medication in the right dose at the time of administration.
3. Lack of hand hygiene, cross contamination of the envelopes, and occasionally the pills themselves.
4. Untimely or failure to document medication administration to include the reason why an inmate did not receive a medication that was due.
5. Not observing the inmate to ensure that medication has been ingested.
6. Not accounting for missing inmates or arranging to administer the dose later.
7. Not signing the MARs so that it was possible to identify from the initials who had documented on the MAR.

Most medications are taken orally, in tablet or capsule form. These are packaged in 30-day blister packs that are labeled specifically for each patient. This is patient-specific unit dose packaging. This type of packaging reduces medication errors made by nurses in preparing and administering medication. At every facility we visited, this safety feature is totally abandoned because nurses take the pills out of the pharmacy dispensed package and put them in improperly labeled envelopes, which are repeatedly used, or medicine cups. This practice is known as pre-pouring and is widely recognized as unsafe. Nurses essentially duplicate what has already been done by the pharmacy, introducing the possibility of putting the wrong medication into the wrong patient envelope or another type of error. It also wastes the cost of packaging, which is expensive compared to other forms of stock medication.

We were told that pre-pour is necessary because doing it correctly takes too much time and, in some facilities, the physical plant makes it impossible to use a medication cart. We note that two of three of the IDOC maximum security facilities (MCC and Pontiac Correctional Center) were built in the 19th century, and the remaining maximum security facility (SCC) was built in the early 20th century. These facilities are so old that they are an impediment to appropriate administration of medication. Some areas do not have elevators and nurses are not able to use medication carts when they administer medications in many areas of these facilities. At NRC, inmates are essentially locked down 24 hours a day (except four hours per week), resulting in nurses delivering all medications cell to cell. Physical plant and operational practices are common reasons given for reluctance to adopt safer practices that meet nursing practice standards. However, IDOC is not so unique that these problems have never been experienced elsewhere and not been resolved. Other correctional systems have implemented patient specific unit dose systems and were able to address these types of problems in the process.

Because of these conditions, nurses make an accommodation to custody in using medication administration procedures (e.g., pre-pouring, not opening doors to properly identify inmates, and not having the MAR with them when they administer medication) that are not in keeping with current standards of nursing practice. Instead, custody should develop with the medical program an acceptable and safe alternative, given the existing physical plant barriers. In every facility, the Warden is the Chief Administrative Officer and the HCUA of the facility reports to

the Warden. This appears to have resulted in procedures that accommodate custody needs even when it results in medication administration practices that violate nursing practice standards.

Further, we observed nurses floating medication well in advance of administration, which alters the medication's properties, and crushing medication that was put in the reused envelopes, which contaminates other medications put into the envelope. These practices put inmates at risk of receiving ineffective treatment and adverse drug reaction.

<u>Medication Continuity</u>

Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed. Chronic disease medications are provided to patients either as "Keep on Person" (KOP) or each dose is administered by a nurse. We found many examples of patients whose ordered medications were never provided, were delayed starting, and were stopped because the patient had not been seen by a provider to renew medication. Record reviews indicated that appointments for chronic care are not scheduled to take place prior to expiration of chronic disease medication orders. As a result, providers often reorder medications without seeing the patient to conduct a clinical evaluation to determine whether the treatment plan should be continued or changed, based upon the how well the patient's chronic disease is controlled.

Facility policy and procedures[162] direct that the MAR be available with the medical record at the time of a chronic care provider visit. However, we saw no evidence that current MARs were available at the time a patient saw a provider. We also saw no evidence that providers review the MAR and discuss the patient's adherence as part of chronic care appointments. Facility policy and procedures[163] also instruct nurses to refer patients to a provider for evaluation and possible change in treatment if they refuse to take prescribed medication. In the records we reviewed, there were multiple examples of patients not taking medication as prescribed who were not referred for provider evaluation.

<u>Monitoring Performance</u>

Pharmacy audits and inspections, which are done routinely, document the problems described above. These reports are reviewed and included in the institution CQI meetings. They document ongoing problems system wide with medication, including: use of the envelope rather than MAR to prepare medication; failure to document medication given on the MAR; failure to transcribe orders onto the MAR; administering medication for which there was no order, or when the inmate was not present at the facility; administering medications that differ from the order; documenting in advance that medication was administered; and the presence of open, undated, multi-use containers of medication. There has been some coaching and

---

[162] LCC, SCC, and DCC Operations Policy and Procedure P. 107 Management of Chronic Disease and MCC Policy and Procedure V3-12 Medical management of offenders with a chronic condition. No policies and procedures were provided for NRC.
[163] LCC, SCC, and DCC Operations Policy and Procedure P. 128 Medication Services and MCC Policy and Procedure V 4-1 Pharmacy Services. No policies and procedures were provided for NRC.

PTX193-0084

counseling of individuals, but there has been no review or analysis done to identify root causes for these persistent failures, and no effort made to eliminate systemic causes of failure or improve performance through corrective action planning. In the meantime, inmates are subjected to delays and interruptions of treatment, unsanitary conditions, and medication errors.

We note that some of the root cause problems appear to be related to custody control of medical processes within the institution and the apparent reluctance of health staff to openly discuss with custody the need for their cooperation in the process of medication administration. The governing bodies of CQI committees at several facilities were mostly custody-trained staff. This is an impediment to effective monitoring of clinical processes, such as medication treatment. Participation and support of custody staff in CQI is very important; however, medical staff must direct and control the monitoring of health care and be able to drive necessary performance improvements.

## Infection Control

Infection control is an essential element of an adequate health care system. The inmate population has a high prevalence of communicable and infectious diseases. Because of the high prevalence of communicable diseases, a highly functioning infection control program must be in place to identify, track, and assist in management of these illnesses.

Approximately 4-6% of TB cases reported in the United States occur among people incarcerated at the time of diagnosis. The incarcerated population contains a high proportion of people at greater risk of TB than the overall population.[164]  In 2013, there were 36,064 persons with HIV infection in the civilian population of Illinois, with a population over 18 years old of 9.7 million or 0.4% of the population. In 2010-2015, IDOC had 686 inmates with HIV infection or 1.5% of its population.[165]  The IDOC HIV prevalence was almost four times as high as the civilian HIV prevalence. It is estimated that approximately 160,000 persons in Illinois have hepatitis C or about 1.6% of the Illinois population, as opposed to 5.6% known cases in IDOC and an estimated 10% overall estimated prevalence. The IDOC had at least 3.5-6.25 times the rate of hepatitis C infection of the civilian population. The burden of sexually transmitted disease, MRSA, and scabies are also typically higher in prison systems.

Conditions of confinement promote the spread of disease because of environmental conditions within the prisons. Inmates are housed in close quarters. In our IDOC Prison Overview section we spoke about how crowded the IDOC prisons are. The overcrowded conditions, particularly in antiquated facilities, promote transmission of multiple types of infections and contagious diseases. Individuals have no control over the quality of air they breathe via the facility ventilation system; they live in cells or dormitories that have been occupied by others and are

---

[164] TB in Correctional Facilities in the United States, Centers for Disease Control and Prevention as found at https://www.cdc.gov/tb/topic/populations/correctional/default.htm.
[165] HIV in Prisons, 2015 – Statistical Tables , Laura Maruschak and Jennifer Bronson, Ph.D., *BJS* Statisticians; August 2017, NCJ 250641, US, Department of Justice *Bureau of Justice Statistics.*

expected to clean their living area with supplies that are available; they are provided food prepared by inmate workers to eat with silverware and plates cleaned by inmate workers; they are provided linens and clothing that are washed by inmate workers or wash linens themselves with laundry soap that is available; they use toilets, sinks, and showers that are used by many others. Every one of these activities of daily living carries multiple opportunities for communicable or infectious disease transmission and illness for both staff and inmates. Infection control programs in the correctional setting establish and monitor procedures to prevent exposure to diseases that can be transmitted in the correctional setting. Infection control programs also identify sources of infection through screening and take steps to prevent or mitigate infection of others, to treat persons with infectious diseases, and improve the health and safety of staff and inmates by providing information on prevention, education on self-care, and immunizations.[166] These efforts require surveillance of disease by accurate statistical means, both for required reporting purposes and so that the IDOC medical program can understand how to study, plan, and prepare for the care they will need to provide. The infection control program is usually coordinated by a registered nurse with consultation from a designated provider with expertise in infectious diseases,[167] and supported by data collection methods that can reasonably track diseases within the prison system.

**First Court Expert Findings**

The First Court Expert found IDOC's infection control program was a moving target across the system, with some facilities having well developed infection control programs and other facilities having programs described as being in their infancy. Facility health care staff had been provided with an exposure control manual, but IDOC provided no oversight of infection control. At some facilities, no one was clearly designated with responsibilities for infection control, and the duties were simply added to those of the HCUA or DON. Other facilities had identified a specific nurse responsible for infection control, but the duties of the position had not been defined. In addition, no training in how to operate an effective infection control program had been provided to those individuals who had been assigned responsibility for infection control.

Examples of systemic issues described by the First Court Expert which occurred as a result of the disarray in infection control monitoring and lack of oversight from IDOC included the failure to launder bed linens of infirmary patients in water temperatures hot enough to destroy pathogens transmitted by blood and body fluids; negative pressure rooms that were not functional and not monitored to ensure that negative pressure was maintained to prevent transmission of airborne illnesses; lack of proper sanitation of medical equipment;  and lack of disinfection procedures to provide clean surfaces when examining patients.

**Current Findings**

The systemic issues described in the First Court Expert Report still occur today. While there has been some improvement in the use of paper barriers on examination tables, little else has

---

[166] Bick, J. (2006) Infection Control in the Correctional Setting. In M. Puisis, (Ed.) *Clinical practice of Correctional Medicine*. (2nd ed.) Philadelphia: Mosby Elsevier. 230-231.

[167] Lane, M. (2006) The infection control program. In M. Puisis, (Ed.) *Clinical practice of Correctional Medicine*. (2nd ed.) Philadelphia: Mosby Elsevier. 460-461.

changed with regard to the infection control program. The following summary of our findings reinforces the findings of the First Court Expert. We had multiple additional findings that give us concern.

The IDOC has had numerous recent outbreaks of contagious and infectious diseases. Since 2008, there have been several outbreaks of scabies in Illinois prisons. The latest was in Taylorville in 2016, in which the prison was locked down and 214 inmates were treated.[168] In 2012, a norovirus outbreak sickened 140 inmates at SCC.[169]  The numbers of inmates affected in these outbreaks reflects poorly on the surveillance and typical preventative measures enacted by infection control procedures to abort the contagion earlier and prevent the widespread infections that occurred at these facilities. An inmate at SCC also contracted Legionnaire's disease in 2015.[170] At the Danville Correctional Center, 78 persons were affected by histoplasmosis in 2013, likely from soil disruption. This outbreak was initially thought to be adenovirus, but required investigation by the federal Centers for Disease Control and Prevention and was found to be histoplasmosis.[171, 172]

Typically, outbreaks such as these are monitored and sometimes managed by the infection control program. Yet in the IDOC, there was no designated individual responsible for infection control at four of five facilities we visited, including at SCC, where one of the outbreaks described above occurred, as well as the isolated case of Legionnaire's disease. At SCC, infection control duties were dispersed amongst several staff nurses, the DON, and the HCUA, and the program was not effective. The norovirus outbreak at SCC was large, and typically early infection control measures would be expected to reduce the size of such an outbreak. At the same four facilities there were no schedules for routine sanitation and disinfection of health care areas. Basic maintenance of rooms was lacking. MCC has an extensive collection of policies and procedures that detail cleaning and sanitation of every room in the health care building.

At MCC, responsibility for infection control resides with one of the nursing supervisors. Her responsibilities are managing TB surveillance, performing sanitation inspections, ensuring food handlers are cleared for work, monitoring skin infections, interface with the Illinois Department of Public Health, monitoring negative pressure rooms, and monitoring hygiene in clinical spaces. In addition, she manages HIV and hepatitis C clinics, coordinates follow-up of patients treated for TB infection, and provides supervision of inmate peer educators. It is our opinion that the infection control nurse is an essential component of the health care program at IDOC facilities and is a full-time position.

---

[168] Scabies Outbreak Causes Temporary Lockdown of Taylorville Prison, Doug Finke, The State Journal Register, September 19, 2016.

[169] Norovirus Outbreak Hits Illinois Prison; Food Safety News December 29, 2012.

[170] Stateville Inmate Diagnosed with Legionnaire's Disease, Dawn Rhodes, Chicago Tribune August 12, 2015.

[171]    New details regarding illness among inmates at Danville Correctional Center. Found at https://www2.illinois.gov/idoc/news/2013/pages/danvilleccillness.aspx.

[172] Centers for Disease Control and Prevention website Outbreaks and Investigations lists Histoplasmosis in an Illinois Prison. Details given were that this occurred in August-September 2013 with 78 cases and likely related to disruption of soil containing bird droppings. Found at https://www.cdc.gov/fungal/outbreaks/index.html.

PTX193-0087

We observed significant challenges to safety and sanitation at every facility visited. For example, at SCC we observed cockroaches, gnats, and flies in the infirmary; the room used for hemodialysis (considered a sterile procedure) had peeling paint on the walls, there was standing water on the floor, and the garbage can was not covered. The kitchen/dining area was occupied by birds, and their droppings were evident on the walls and floors. At Dixon, all three floors of the medical building had missing floor tiles, which is a sanitation issue in an area dedicated to the delivery of health care.

NRC is the only facility among the five we visited that does not conduct monthly safety and sanitation inspections. At the other facilities, safety and sanitation inspections do not adequately identify problems requiring remediation. For example, we found faulty negative pressure isolation rooms and nonfunctional dental equipment that were not identified because they are not included in the safety and sanitation inspections. We also found furniture, equipment, and hard surfaces (floors, ceilings, sinks, cabinetry) were rusted, broken, or deteriorated in health care areas at all facilities, which had not been documented as issues needing repair on safety and sanitation rounds.

Moreover, review of safety and sanitation findings in the minutes of CQI meetings document the persistent failure or lengthy delay in remedying identified problems. Safety and sanitation inspections should inspect or monitor the condition, function, and annual certification of clinical equipment, functionality of the negative pressure rooms, integrity of bed and chair upholstery, completeness of medical cart and emergency response bag logs, the training of health care unit porters, and other health care issues.

The TB prevention and control program in IDOC is not effective. The hallmarks of an effective TB program in correctional facilities are: initial and periodic TB screening, successful treatment of TB disease and infection, appropriate use of airborne precautions, comprehensive discharge planning, and thorough and efficient contact investigation when a case of TB disease is identified.[173]

At IDOC, TB screening is improperly performed, treatment of infection is delayed, and negative pressure rooms (an airborne precaution) often are not functional or monitored. We did not evaluate TB discharge planning or contact investigation, although in the absence of an individual assigned responsibility for infection control, these interventions are most likely sporadic and haphazard as well. At NRC, nurses do not read tuberculin skin tests properly and only document results in the health record when they have time. Instead of inmates being escorted to the medical clinic for nurses to read their tuberculin skin tests, nurses must go cell to cell. In addition, NRC officers do not open the food port for inmates to extend their arm for nurses to palpate and measure the results of the test. Instead, nurses read the test by looking through the glass window of the cell door, which is inappropriate technique.[174] There was

---

[173] TB in Correctional Facilities at  https://www.cdc.gov/tb/topic/populations/correctional/, Epidemiology of Tuberculosis in Correctional Facilities 1993-2014 at https://www.cdc.gov/tb/publications/slidesets/correctionalfacilities/default.htm.
[174] A tuberculin skin test is read by manually palpating the size of induration of the test site with good overhead lighting. To read a tuberculin skin test through a glass window is inappropriate.

evidence in the review of records that other sites distrust TB screening performed at reception centers and rescreen inmates upon arrival at their parent facility. We also observed that nurses at Dixon merely look at the skin test site through the cell door rather than palpating and measuring induration in a well-lit area. We did not observe nurses reading tuberculin skin tests at all facilities, but based upon the two sites where we observed poor practices, we conclude that TB screening at IDOC is not adequate.

We reviewed the records of four patients who had completed treatment for latent TB infection. In three cases, the patient was subjected to multiple skin tests (which were positive) and multiple chest radiographs, which were unnecessary, before treatment was finally initiated. In the other case, treatment was initiated even though skin testing was ordered but never completed, based upon a history of a positive skin test reported by the inmate when he requested treatment initiation. Initiation of treatment for latent infection was haphazard and delayed.

Negative pressure isolation rooms were either not functional or the monitor was not working at three of the five sites we visited. At NRC, the monitor in one room was not working and in the other room the vent was taped shut, disabling the negative pressure. At SCC, neither room was functional and the equipment had not been serviced for years. At LCC, two of three rooms were not functional. Negative pressure rooms need to be maintained and ready for use; this is not the case in the IDOC, and places patients and staff at risk of airborne infection.

The UIC provides treatment of inmates with HIV and hepatitis C via telemedicine. For hepatitis C, UIC has no role in managing hepatitis C patients before referral and after antiviral treatment and has no role in screening for these diseases. UIC provides no assistance in managing other complications of hepatitis C including cirrhosis, varices, or ascites as examples. IDOC facility providers are responsible for that care but do not appear to know how to provide it. One or more nurses are designated at each site to coordinate these clinics and the care of these patients. The quality is highly dependent upon the interest and capability of each nurse assigned these responsibilities. There is no one identified to monitor or oversee the work of the clinic coordinators, who must negotiate with all the other users of the telemedicine space to schedule clinics timely. Coordination between the UIC infectious disease specialists and primary care providers is problematic, as evidenced in the example of one patient with HIV; the specialist recommended lowering the patient's dose of metformin (a medication used to treat diabetes) because of an interaction with one of the HIV medications prescribed.[175] The primary care provider at the facility responsible for the patient's diabetic care never acted on the recommendation. The HIV specialist reduced the dose of metformin at the next visit. The patient was at risk of clinical deterioration because of the primary care provider's omission for five months.

IDOC has adopted what it describes as opt-out HIV testing at intake, but policy and practice are not consistent with the use of this term. Opt-out testing is recommended by the Centers for

---

[175] Dixon Infection Control Patient #3.

Disease Control because it supports early identification and treatment.[176] The IDOC Administrative Directive still requires that consent be obtained before drawing blood for HIV, and in practice this consent is still obtained.[177] The practical effect is that fewer newly arriving inmates are screened for HIV as compared to hepatitis C. The IDOC should revise the Administrative Directive to eliminate the requirement for written consent and initiate opt-out HIV testing.

We also question the effectiveness of periodic screening programs for HIV and hepatitis C infections. We noted on one death review[178] a man who was not known to be HIV infected and was not offered HIV screening at two annual health evaluations we reviewed, despite having a history of multiple sexual partners, prior blood transfusions, and a history of sexually transmitted disease all of which were risk factors for HIV infection. He ultimately developed severe HIV disease, which was unrecognized for several years until he was finally admitted to a hospital, where he died of severe complications of his undiagnosed and untreated HIV disease. Sentinel cases such as these should prompt an investigation into why the system failed to timely screen, diagnose, and treat this patient, whose death was preventable. The infection control nurse should monitor results of HIV and HCV screening to verify that policies to screen for communicable diseases are effective.

All five of the facilities visited report cases of culture positive *Methicillin-resistant Staphylococcus Aureus* (MRSA) as is required by IDOC. However, only MCC tracks all skin and soft tissue infections (independent of whether a culture is performed) as recommended by the First Court Expert. In addition, tracking should include culture and sensitivity results to ensure correct antibiotic selection and housing location of the patient. Infection control nurses should review tracking results to identify clusters of infections by housing unit, perform additional case-finding, and identify environmental factors that may be promoting infection. Factors in correctional settings found to contribute to skin and soft tissue infections include sharing towels and soap, ineffective laundry practices, poor sanitation of exercise equipment and showering facilities, poor hygiene practices, unnoticed infections that leak pus, and poor access to medical care.[179] Tracking enables sources of infection to be identified and steps taken to eliminate factors associated with disease transmission. For example, at MCC one of two cases of skin infection reviewed was a patient who developed infection six days after hernia surgery and having been returned immediately to general population at the facility.[180] This case of soft tissue skin infection raises questions about the ability of the patient to adhere to wound care instructions and suggests consideration of a policy of admitting inmates to the infirmary only after it is determined that the patient is stable and able to adhere to wound care instructions.

---

[176] Opt-out testing means that testing will be performed unless the patient refuses the test. Opt-in testing means that the patient is offered testing and it is performed only upon patient consent. The IDOC has large rates of refusal of HIV testing, unlike other similar correctional centers that offer opt-out testing. Opt-out testing generally raises the rates of screening.

[177] Administrative Directive 04.03.11 Section5 II. F. 5. d.

[178] Mortality Review Patient #22.

[179] Smith, S. (2013) Infectious Diseases. In L. Schoenly and C. Knox (Eds.) *Essentials of Correctional Nursing*. New York: Springer. P. 189.

[180] MCC Infection Control Patient #7.

PTX193-0090

The IDOC requires a monthly report of communicable diseases and infection control data. This report includes items such as the number of MRSA cases, HIV and HCV tests performed, the number of tuberculin skin tests administered, the use of negative pressure rooms, etc. We found that these reports are submitted to the Quality Improvement Committee (QIC) and included in the monthly minutes. However, there is no trending or analysis of infection control data. There is no discussion in the infection control report or CQI minutes of, for example, why only half of incoming inmates are tested for HIV, given the statewide opt-out policy. A more notable example of the lack of introspection about communicable and infectious disease are three needle stick injuries which occurred in 2017 at Dixon, and the fact that there has been no focused review of these injuries to determine what measures would increase worker safety.

We found numerous examples of poor infection control practices on the part of health care professionals. At all facilities, inmates are not routinely provided eye protection during dental procedures. At NRC, the dentist examined patients without changing gloves between patients and reached into a bag of sterile mirrors to select one for use, contaminating all the other mirrors which were then used on subsequent patients. At SCC, the hemodialysis unit does not have a dedicated chair and technician for dialysis of patients who have hepatitis B, thereby exposing other dialysis patients to this blood borne infection. At NRC and SCC, paper barriers are not available to use on any of the examination tables and they are not cleaned between patients. Finally, the order in which instruments were sterilized was incorrect in four of five facilities we visited. The placement of sterilization equipment and procedures should proceed from dirty to sterilized. At four of five facilities we visited, the placement of the ultrasonic cleaner required clean instruments to pass over the dirty area, thus contaminating their sterilization. At SCC, sterilized instruments were removed from their packages and put in an open bin in the trauma room, making them clean, rather than sterile, instruments. The nursing supervisor could not explain why these instruments were clean rather than sterile.

Inmate porters are assigned to work in the health care areas of each of the five facilities we visited. At only two of the facilities had the inmate porters received training in how to clean and sanitize patient care areas, and how to take personal protective measures before working in the health care area. Only two facilities had vaccinated the inmate porters for viral hepatitis. The assignment of untrained and unvaccinated inmates to clean and sanitize health care areas exposes these inmates as well as patients receiving care to several infectious diseases with potentially serious health consequences, and is deliberately reckless.

Infirmary linens are still laundered in residential style washers and dryers at all the facilities we visited, except NRC. At NRC, a  log provided by the institution showed water temperatures were less than the 165°F required by AD 05.02.180 about 30% of the days reviewed. Water temperatures were not hot enough to effectively sanitize laundry from the infirmary at any facility we visited. We also observed furniture and equipment throughout each of the health care areas at every facility we visited that was torn, frayed, rusted, and corroded. These objects, including stretchers, exam tables, stools, cabinets, and work surfaces cannot be properly sanitized and are sources of communicable disease in a setting that treats and cares for patients who are ill, medically fragile, and immunocompromised. While some have been

identified as needing repair or replacement, the safety and sanitation rounds do not often include these health care areas and there is no effective tracking of the repair or replacement of these items. It is understood that it takes time to repair or replace worn equipment, but in IDOC the volume of items needing repair and the length of time that unacceptable conditions linger indicate pervasive and systemic problems with environmental controls to prevent communicable disease.

The First Court Expert noted that the Communicable and Infectious Diseases Coordinator in the Office of Health Services retired some time ago and that the position was never filled. That is true today as well. There is no one in the Office of Health Services who has responsibility statewide to direct and oversee infection control in the IDOC. The IDOC also does not have an infectious disease physician responsible for directing infection control activity within the department. The Infection Control Manual was last updated in 2012, and many of the resources in the manual are out of date or more current material is available. The facility health care programs have some policies and procedures for infection control, but we found these also not up to date. Nursing Treatment Protocols are also provided by the IDOC for possible infections such as scabies, rash, urinary infection, pediculosis, chicken pox, and skin infections. These were last updated in March 2017 and are adequate, but stand-alone rather than as part of a comprehensive infectious disease program. The need for statewide oversight is evident to resolve issues, such as the conflict between the IDOC practice of HIV opt-out testing and the AD, to eliminate the continued insufficient laundering of infirmary linens, to address the problem of needle stick injuries, to provide meaningful analysis of communicable disease surveillance, and to provide guidance to facility health care programs on infection control performance expectations.

## Mortality Reviews

**Methodology:** We interviewed the Agency Medical Director and senior leadership of Wexford, reviewed death summaries, and reviewed death records.

### First Court Expert Findings
The First Court Expert and his team evaluated a total of 63 deaths records. There were one or more significant lapses of care in 38 (60%) of cases. Of cases with significant lapses, 34 (89%) had more than one lapse. The internal IDOC mortality review process was seriously flawed. Reviews are performed by the doctor most closely involved in care of the patient. Twenty (52%) of death summaries were reviewed. In none were any lapses of care identified. Only a few deaths were reviewed by the Office of Health Services, but these were selected based on lapses identified by local review. The First Court Expert found that for many patients who were chronically ill with terminal conditions there were no resources in place to assist health care staff with management of end of life symptoms. As well, the First Court Expert found that once a patient signed a do-not-resuscitate order, they were no longer treated even for simple reversible illness.

### Current Findings

We confirmed all the First Court Expert's findings and found additional evidence of clinical lapses of care with respect to deaths. We added a perspective of preventable deaths because preventable deaths reflect the degree of harm to patients.

The U.S. Department of Justice (USDOJ) tracks inmate deaths.[181] For 2014, the latest year of available statistics, The IDOC had the sixth lowest mortality rate (182/100,000 inmates) of the 50 state systems. The average mortality rate of state correctional systems was 275 per 100,000 inmates. The IDOC, in their comments on our report, assert that "the low IDOC mortality rate would be representative of a health system functioning at or above the norm of its comparators."[182] However, these data are not adjusted[183] for any risk or variable. According to the Department of Justice authors, "overall mortality rates and mortality rates by state and by cause of death may not be directly compared between states due to differences in age, sex, race or Hispanic origin, and other decedent characteristics."[184] It is misleading to use crude mortality rates alone to compare quality of health care of different prison systems without any adjustment for these multiple variables.[185]  As the IDOC states later in their comments on our report, specifically about use of hepatitis C and age as they relate to mortality, "One would have to conduct an adjusted multivariable statistical analysis with complete and comparable data from all other state DOCs to examine the independent contributions of age and hepatitis C to the variation in mortality rates across systems." We agree with that statement and note that to the best of our knowledge, reliable risk, age, and sex adjusted mortality rates are not available, allowing for use of crude mortality data to compare medical care between state prison systems.

The Court has asked the Expert to "assist the Court in determining whether the Illinois Department of Corrections (IDOC) is providing health care services to the offenders in its custody that meet the minimum constitutional standard of adequacy." We have used mortality review to identify quality of care and systemic issues that can provide definitive information in

---

[181] Mortality in State Prisons, 2001-2014 – Statistical Tables; Margaret Noonan, US Department of Justice, Bureau of Justice Statistics, December 2016, NCJ250150.

[182] Letter via email from John Hayes and Michael Arnold, Office of the Attorney General to Dr. Puisis: Re: *Lippert v. Baldwin*, No. 10-cv-4603 – Defendants' comments to the Draft Report of the 2nd Court Appointed Expert dated September 10, 2018.

[183] Adjusting allows for comparison of different populations by reducing variations and to standardize populations. Adjustment is a statistical technique to reduce variability between populations when multiple variables affect the outcome. This allows for different populations to be compared.

[184] Page 2, bullet on Deaths reported by state in Mortality in State Prisons, 2001-2014 – Statistical Tables; Margaret Noonan, US Department of Justice, Bureau of Justice Statistics, December 2016, NCJ250150.

[185] To support the assertion that the IDOC mortality rate indicates above average medical care, the State references a study from Centers for Medicare & Medicaid Services (CMS). This study was a study of hospitalized patients. CMS used a "risk-standardized rate of mortality within 30 days of hospital admission" for their study and studied only patients over 65 years of age. According to the CMS report (Hospital-Side All-Condition, All-Procedure Risk-Standardized Mortality Measure: Draft Measure Methodology for Interim Public Comment prepared by Centers for Medicare & Medicaid Services (CMS) October 2016 as found at https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/MMS/Downloads/Hospital-Wide_All-Condition_All-Procedure_Risk-Standardized-Mortality-Measure_Public-Comment.pdf) they adjusted for case mix, types of conditions, and procedures of patients; did not include patients if 30-day mortality could not be reasonably considered a signal of quality; and did not include patients under 65 years of age. This methodology does not make the case that use of crude prison mortality can be used as a measure of quality of medical care, as the crude mortality rates did not adjust for any variables affecting prison populations.

answering the Court's question. We performed in-depth evaluations of 33 deaths. These mortality reviews identified numerous quality of care issues that are systemic and are important in answering the question required by the Court. These reviews demonstrate significant systemic and quality of care issues that were confirmed in site-visit record reviews, on-site observations, and interviews.

Of the deaths that occur, it is critical to understand whether mortality is preventable or demonstrates correctable errors. For this purpose, correctional programs typically perform organized mortality review. Organized mortality review should be performed for every death. Participants in this review should be senior physicians, administrative and nursing staff, and other senior leaders of relevant disciplines whose services may have had an impact on the death (e.g., pharmacy, mental health, etc.). Generally, most correctional centers include a custody representative in mortality review meetings. Persons directly responsible for care of the patient are interviewed for their perspective on the care they rendered. However, persons who cared for the patient should never be placed in positions of reviewing the death, as they could not be expected to give an unbiased review.

Mortality reviews typically review care as far back as necessary to understand the evolution of the patient's illness and can be six months to a year or more. Mortality reviews should be constituted as to identify errors and problems with care. These errors and problems need to be addressed in a follow-up manner (typically through quality improvement corrective actions or investigations) so as to prevent the error or problem from occurring again.

There were 174 deaths in the IDOC in 2016 and 2017.[186] We intended to review 89 death records but because of time limitations we were only able to review 33 (19%) deaths from 12 facilities, which is a sample of 46% of the IDOC facilities. Eleven of 33 deaths were preventable. Eight of 33 were possibly preventable. Nineteen (58%) of the 33 deaths reviewed were either preventable or possibly preventable. This is an extraordinary number of preventable or possibly preventable deaths and speaks to the ongoing serious harm to patients from care in the IDOC. We do not assert that this sample can be extrapolated to the entire population. However, even if there were only 19 preventable or possibly preventable deaths out of the 174 deaths, that would be 11% of the deaths, which is still a very high number. Our findings confirmed the First Court Expert's report that none of the Wexford death summaries identified any problems. All of the Wexford death summaries that we were provided were performed by physicians who were responsible for care of the patient and failed to identify any problems, even when grossly and flagrantly unacceptable care was provided.

We reviewed two years of care as documented in the health record for most of the 33 deaths. The reviews were detailed reviews of individual episodes of care. We have provided the spreadsheets which give detail on every episode of care reviewed as well as detailed narrative

---

[186] Defendants stated in their comments that we requested 174 death records, but this was inaccurate. There were a total of 174 deaths in 2016 and 2017. Of these deaths we chose 89 records to review. We asked to receive death records in December 2017, but did not receive records until March 2018 and received almost all records by April of 2018, well into our investigation.

summaries for each death.[187] We identified 1757 errors in care. Many of these were common errors, but many were serious. These errors reflect poor primary care knowledge and training. Most were related to primary care functions, such as taking adequate history, examining the patient, and developing a treatment plan, which accounted for almost half of errors. In our opinion, this demonstrates the lack of primary care training of the medical staff. About 8% of errors were nursing errors related to nurses not referring or consulting a physician for serious problems such as abnormal vital signs, red-flag symptoms or signs, or other serious abnormalities. Approximately 10% of errors were related to not referring a patient to a specialist or for special testing. This verifies our finding that significant underutilization occurs in the IDOC. About 5% of errors were related to not timely sending patients to a hospital for evaluation. Many of these errors contributed significantly to the deaths.

The 33 death record reviews contained 73 episodes of grossly and flagrantly unacceptable care. For a few record reviews, there was a repetitive pattern of inappropriate care that in aggregate constituted grossly and flagrantly unacceptable care. This type of care is so egregious that it would typically result in a peer review for possible reduction of privileges or referral to licensing boards for evaluation of sanction of their license. These are serious errors. A sampling of these included the following:

- A 30-year-old man was in the process of valve replacement surgery for a congenital heart condition when he was incarcerated.[188] IDOC physicians failed to contact his cardiologist and his planned surgery was never recognized, even though a letter from his civilian cardiologist recommending surgery was in the IDOC medical record. He was routinely referred to UIC cardiology, who requested an echocardiogram and old records because the history was uncertain. The echocardiogram report documented that valve surgery was indicated. This report was never obtained or reviewed. When the patient developed arrhythmia, hypotension, and near syncope, a doctor failed to take action. The patient's diagnosis was unknown for six months of incarceration and he died of complications of his congenital heart problem without IDOC physicians ever knowing what his diagnosis was.

- A patient had diabetes, decompensated cirrhosis, and an unknown skin condition.[189] She developed fever (101.8°F), hypotension (88/50), and periorbital swelling. Her condition indicated sepsis and warranted hospitalization, yet the patient was treated without a diagnosis with oral Bactrim, pushing fluids, and Tylenol with infirmary admission by phone consultation. The doctor stated he would consider laboratory tests and a chest x-ray in the morning. The next day, the doctor noted right upper quadrant pain with a distended abdomen. The doctor ordered routine labs and diagnosed fever. Two days after infirmary admission, the doctor referred the patient to a hospital when the blood pressure was 60/palpable. When the patient returned from the hospital there

---

[187] The spreadsheet detailing episodes of care is included as an appendix to this report. Also, a table of the breakdown of the 1757 errors is also listed as an appendix to the mortality narrative summary.
[188] Mortality Review Patient #2.
[189] Mortality Review Patient #6.

was no report and it was not clear that staff knew what occurred. The day the patient returned from the hospital, she vomited dark red emesis and was hypotensive (75/48). The only order was to "continue present management." The patient had repeated episodes (four) of bloody emesis during the night. The doctor was called at home but took no action. In the morning and when the patient was in shock, the doctor obtained a "do not resuscitate" (DNR) order from the patient. Her barely legible signature did not match her typical signature and the signature appeared to have been obtained under duress. After obtaining a DNR, the doctor sent the patient to the hospital, where no intervention was taken because of the DNR order. The patient expired of bleeding varices.

- A 51-year-old had headache, complaint of fever, and vomiting.[190] Treatment for this condition was infirmary admission, IV fluid, and intravenous antibiotics for presumed pharyngitis. These signs were inconsistent with pharyngitis. The patient continued to vomit, yet continued to be managed for pharyngitis. The provider ordered labs on the second infirmary day that were not done. Later, on the second day on the infirmary, the patient developed altered mental status and hypothermia, and was not responding. These are red-flag signs. The patient was not sent to a hospital despite signs of acute sepsis. No laboratory tests had yet been done after two days of infirmary housing. On the third infirmary day, the patient was found on the floor and would open his eyes only to severe stimulus. He was not sent to a hospital until he was found unresponsive and in shock (BP 68/palpable). The patient died in the hospital; there was no autopsy.

- A 45-year-old mentally ill man developed a firm neck mass.[191] He was initially diagnosed with parotitis, even though the parotid gland is on the face, not the neck, and the parotid gland demonstrated no evidence of infection. There was therefore a two month delay in diagnosing his neck cancer. After four months, the patient was still awaiting treatment when he passed out and had hypotension (60/40). This warranted hospitalization. The doctor diagnosed loss of consciousness; the plan was to place the patient on the infirmary for observation without ordering any diagnostic testing. Radiation therapy was started. About a month after radiation started, the patient was hospitalized for chemotherapy. A day after return from the hospital, the patient was found on the floor and was lethargic and unresponsive. A nurse called a doctor who ordered "neuro checks," but did not send the patient to a hospital. The following day, the patient had a single dilated pupil consistent with brain damage, a red-flag sign that should have resulted in immediate hospitalization. The doctor ordered morphine for unclear reasons. Later that day a doctor evaluated the patient and noted that the patient had a fall the day before. The doctor did not examine the patient and apparently failed to note the dilated pupil. The doctor took no action except to increase morphine. The following day the patient was found unresponsive and was sent to a hospital, where

---

[190] Mortality Review Patient #7.
[191] Mortality Review Patient #8.

he died. A hospital EKG showed that the patient was in atrial fibrillation. One of the side effects of atrial fibrillation is stroke, which may have accounted for the dilated pupil.

- A 24-year-old with mental illness swallowed two plastic sporks (combination spoon and fork) that was witnessed by a correctional officer.[192] A doctor did not evaluate the patient but ordered an x-ray, which would not likely show the ingested plastic item. The x-rays were normal. About two and a half months later, a nurse practitioner evaluated the patient. The NP failed to recognize a 33-pound weight loss, but the patient did tell the NP that he had swallowed a spork a long time ago and needed it removed. The NP made an assessment that the patient had an ingested spork but took no action. The patient remained untreated and eventually lost 54 pounds and had repeated episodes of abdominal pain with an inability to eat without pain, nausea, and diarrhea. Eventually the patient was found unresponsive, was sent to a hospital, and died. On autopsy, the two swallowed sporks were found having caused esophageal perforation, which was the cause of death.

- A 70-year-old man with atrial fibrillation and severe bradycardia needed and received a pacemaker.[193] Two years after the pacemaker was inserted, the patient experienced leg edema, weight gain, and had signs of heart failure (BNP 712; shortness of breath, orthopnea, and edema). Although the doctor noted a heart rate of 44 and questioned whether the pacemaker was functioning, the doctor took no action with respect to the pacemaker. An EKG showed aberrant ventricular conduction with ventricular escape, indicating pacemaker malfunction. The patient needed immediate hospital admission, but the doctor only admitted the patient to the infirmary and treated for heart failure on the infirmary. The patient continued to have low heart rate and began complaining of chest pain. If the pacemaker was functioning, the heart rate would not be expected to fall below the set point of the pacemaker, so it was clear the pacemaker was not functioning. Yet the doctor took no action. Two days later, the patient was found dead.

- A 75-year-old man experienced weight loss and anemia, yet was never offered colonoscopy.[194] He had pancytopenia, which corrected to anemia; and thrombocytopenia, low albumin, and weight loss, but was not evaluated for these problems. He had a prosthetic leg from prior amputation from osteomyelitis and the prosthesis was causing an ulcer. Wexford initially denied repair of the prosthesis but then authorized a limited repair, which failed to correct the problem. The patient began using a wheelchair because of the problem with the prosthesis. After using the wheelchair, the patient developed a pressure ulcer on his buttock which was inadequately monitored. The patient was kept in general population. The ulcer began draining pus and a sedimentation rate of 60 indicated possible osteomyelitis (infection of bone), yet no evaluation occurred. The pressure ulcer worsened, yet providers failed

---

[192] Mortality Review Patient #15.
[193] Mortality Review Patient #18.
[194] Mortality Review Patient #19.

PTX193-0097

to manage the pressure ulcer in accordance with contemporary standards, and appeared not to know how to manage the patient. Instead of referring to a skilled nursing unit, the patient was still housed for a long period of time in general population. Nurses described a tunneling wound draining pus and at one point even showing bone, yet providers failed to document a thorough examination of the wound and even described the wound as "healthy," without ordering any diagnostic studies to eliminate osteomyelitis. The patient lost 42 pounds. Despite these abnormal findings, the patient was kept in general population, where eventually a cell mate reported that the patient had not eaten in two days. A nurse placed the patient on the infirmary and called a doctor, who ordered IV antibiotics by phone without diagnosis. Later that day, the patient was found unresponsive and was sent to a hospital, where he died. He had overwhelming sepsis, with both bacteria and fungus growing in blood cultures, likely from his infected pressure ulcers.

- Another 72-year-old patient was inadequately evaluated over an eight-month period for abdominal pain, but eventually was sent to an emergency room, where a CT scan showed a large retroperitoneal mass consistent with cancer.[195] The patient was sent back to the prison with a recommendation for outpatient work up. One would expect this to be worked up within weeks. This did not occur. The patient had lost 50 pounds. Over three subsequent months a work up did not take place, although referrals were made. The patient was not monitored well. Eventually, while in general population, the patient developed pressure ulcers and had significant weight loss, yet he was not housed on the infirmary. Three months after the diagnosis of the mass, the patient was admitted to the infirmary only because *security* complained that he could not be managed in general population. He was admitted as a chronic care patient. The day following admission to the infirmary, a doctor noted that the patient was confused, which was a red-flag sign, but undertook no evaluation. This was a new diagnosis and the patient should have been hospitalized. Two days later, the patient remained confused and was incontinent but was still not evaluated or sent to a hospital. That day the patient became delirious and was talking to people in his cell who weren't there. A nurse referred the patient to mental health. Two days later, the patient still had no evaluation and was noted to be lethargic, confused, mumbling unintelligibly. A doctor took no action. Later that day the patient was sent to a hospital for lethargy and uneven respirations. The patient died in the hospital never having a diagnosis of his retroperitoneal mass found over three months ago.

- Another 46-year-old man had neutropenia[196] for over three years without appropriate evaluation.[197] The patient had intermittent fevers and altered mental status for over a year without appropriate evaluation. The patient had confusion and was incontinent without recognizing that it was inappropriate, yet evaluation for serious central nervous

---

[195] Mortality Review Patient #21.
[196] Neutropenia is a low white count. In this case the patient had low lymphocytes, one of the white blood cell types. This element, when low, is consistent with HIV infection and should have prompted that test.
[197] Mortality Review Patient #22.

system disorder was not done. The doctor, who was a surgeon, inappropriately believed that the patient had lupus, a collagen vascular disorder, which was an incompetent diagnosis and unquestionably related to his lack of primary care training. A rheumatologist initially refused to see the patient because the patient did not have serologic evidence of lupus. A rheumatologist eventually saw the patient almost a year later and again confirmed that the patient was unlikely to have lupus. Despite the confusion, the patient was kept in general population. Eventually, the doctor provided the patient with an assistive device without attempting diagnosis of his difficulty ambulating. The doctor took virtually no history and performed virtually no examinations for extended periods of time. The patient was mistakenly given methotrexate, a medication that can lower white counts. Eventually the patient was unable to walk and was given a wheelchair. When he developed severe hypoxemia (70%), hypotension (90/66) and tachycardia (128), he was sent to a hospital, where septic shock and HIV infection were diagnosed. He died in the hospital with an AIDS-related central nervous system disorder and disseminated systemic infection, never having been appropriately evaluated at the prison for his problem. The patient was described as having multiple pustular lesions on his left leg, right foot, right hip, penis, and abrasions on the hip and shoulder, none of which were recognized at the prison. The patient also had severe unrecognized malnutrition. We incidentally note that this patient was evaluated at least twice on annual examinations and had risk factors for HIV infection (blood transfusions, multiple sexual partners, and a sexually transmitted disease), and yet was never offered HIV testing.

- Another patient had hepatitis C and cirrhosis evident as early as June of 2012, yet facility providers failed to list cirrhosis as a problem and did not monitor the patient for this condition.[198] Doctors did not initially order tests typically ordered for cirrhosis (EGD to screen for varices and ultrasound to screen for hepatocellular carcinoma) and the patient was not monitored for ascites. In May of 2015, the patient eventually received an ultrasound, which showed a liver mass. A CT scan later that month confirmed a liver mass. The patient was referred for interventional radiology for a biopsy in August 2015, but this was denied by Wexford UM and instead an MRI was recommended. The reason was unclear, as a biopsy was indicated. An MRI was done in October but a biopsy was never done. The patient developed hypoxemia (oxygen saturation of 79%) with hypotension (96/64) and the patient was admitted to the infirmary, but should have been admitted to a hospital. The day following admission to the infirmary the patient developed fever, but no action was taken. The patient had massive ascites, fever, hypotension, and hypoxemia, yet was kept on the infirmary. The following day the patient again developed hypotension (88/60) and hypoxemia (84%) on four liters of oxygen and was sent to a hospital, where he died. The delay in transfer to a hospital contributed to his death. He also never had a biopsy of his liver mass and therefore never had a diagnosis.

---

[198] Mortality Review Patient #23.

- Another patient was being treated for a lymphoma but treatment was delayed four months.[199] The chemotherapy treatment resulted in low white counts, for which medication was prescribed (Granix) to be administered after chemotherapy to raise the white count. After one of the chemotherapy sessions, the patient failed to receive the Granix. After this error, the patient developed fever and inability to stand independently. This was a red-flag sign indicating infection and warranting hospitalization, but instead the patient was placed on a medical housing unit without any diagnostic intervention. Two days later the patient had nausea and diarrhea and fever of 101°F. This was a life-threatening status and red-flag warning, and the patient should have been admitted to a hospital; instead, a doctor started oral antibiotics without ordering laboratory tests (WBC, platelets, blood cultures, or other diagnostic tests for infection). The following day the patient was hypotensive (90/60) and felt sick, but no action was taken. On the third day on the medical housing unit the patient developed pus draining from his ear, a red-flag sign in a potentially neutropenic patient, yet the doctor only ordered a blood count and metabolic panel, tests which were never done. The following day the doctor again noted pus coming from the ear and ordered intravenous Levaquin for otitis externa, which is not a typical plan for otitis externa. This patient needed admission to the hospital, as he had life threatening status. He was not seen for three days when he was found unresponsive, bleeding from his mouth and penis, with a 101°F fever and in shock. He was finally hospitalized. The bleeding and fever were most likely due to complications of his chemotherapy, after which the patient failed to receive necessary medication. The patient apparently expired in the hospital.

- Another patient, a 66-year-old African American man with history of hypertension, high blood lipids, diabetes, asthma, and chronic kidney disease was only being monitored for hypertension, diabetes, asthma, and high blood lipids.[200] He had poorly controlled diabetes, was a smoker, and had hypertension yielding a 46% 10-year risk of heart disease or stroke, yet was only on a low-intensity statin. His diabetes was poorly controlled for two years. The patient had repeated episodes of shortness of breath with exertion yet was not evaluated with appropriate testing (EKG, echocardiogram, stress test, or pulmonary function test), even though the diagnosis was uncertain. Shortness of breath can be a sign of angina. On 1/28/16, a doctor saw the patient for chest pain with elevated blood pressure (169/94). The EKG was equivocal, showing non-specific STT wave changes, which can be consistent with angina. The doctor, however, noted no acute changes on the EKG and told the patient he would need a cardiac treadmill *after* he paroled. The doctor increased Norvasc for the blood pressure. This was indifferent, as work-up of the angina should not be delayed until the patient paroled. Ten weeks later, the patient experienced shortness of breath and oxygen saturation of 85%. A doctor started Lasix by phone, but the oxygen saturation decreased to the 60s. The

---

[199] Mortality Review Patient #25.
[200] Mortality Review Patient #28.

patient was sent to the hospital, but expired. Autopsy showed an active plaque rupture consistent with myocardial infarction.

- Another patient had prior traumatic injury resulting in a VP[201] shunt in his brain.[202] He also had seizure disorder and history of deep vein thrombosis. The patient also had an IVC filter,[203] but this was unrecognized at IDOC facilities. He was also treated with Coumadin, an anticoagulant, and aspirin. The reason for being on aspirin was not documented, but this placed the patient at risk for life-threatening bleeding. There was no indication for aspirin. IVC filters are typically used when there is a contraindication to anticoagulation, such as the repeated seizures the patient had. When an IVC filter is used in conjunction with anticoagulation medication, a specialist should be consulted. Typically, when an IVC filter is used, the patient is not treated with anticoagulation. The patient had repeated seizures but was nevertheless not sent to a neurologist, although doctors could not manage the seizures. The patient was transferred to the Hill facility; after transferring he experienced repeated seizures and was hospitalized. The patient was found to have pseudoseizures.[204] After hospitalization, the patient was admitted to the infirmary. On admission, a NP noted that the patient had ataxia and unequal pupils, which are red-flag signs of central nervous system disease. The patient had a recent normal CT scan in the hospital. Nevertheless, unequal pupils and ataxia, particularly in a patient with a VP shunt, are serious signs which warranted immediate re-hospitalization or confirmation with the hospital regarding the prior diagnoses. The patient was unsteady, and instead of hospitalizing the patient, the NP placed his mattress on the floor. The patient remained on the infirmary for three weeks. The patient experienced progressively deteriorating altered mental status. He was noted by nurses to be unable to stand, incontinent, and not responsive for several weeks. Yet during this time there was no adequate neurologic examination of the patient, despite his ataxia and unequal pupils. The patient also developed bruising over elbows, then buttock, back, arms, and legs. Yet despite being on Coumadin and aspirin, the doctor did not order an INR a test to measure whether the patient was over anticoagulated. The grossly and flagrantly unacceptable care continued for weeks until the patient began urinating blood. Still, the doctor only incompetently treated for a presumed UTI. The doctor still did not check an INR. The patient had gross bleeding for several days with bleeding from urine, from bruises on his back, from a nasal laceration, and in his stool. He developed bleeding around his eyes spontaneously. Still no action was taken. Finally, a nurse found the

---

[201] Normally, cerebrospinal fluid circulates in the ventricles of the brain. Due to injury or congenital abnormalities, there may be defects which cause the cerebrospinal fluid to accumulate, causing excess pressure on the brain. In order to resolve this, a drainage system is created to drain cerebrospinal fluid from the brain to the peritoneal cavity. This ventriculo-peritoneal (VP) shunt is subject to blockage and when a person has a VP shunt, any alteration of mental status should prompt evaluation of the shunt by brain imaging to ensure that excess fluid is not accumulating in the brain.

[202] Mortality Review Patient #30.

[203] An IVC filter is a filter placed in the inferior vena cava to block thromboses from the legs. Typically, when IVC filters are used, anticoagulation is not necessary. This patient probably had the IVC filter because of history of repeated seizures which placed the patient at risk for intracranial bleeding. Yet this IVC filter was unrecognized throughout his incarceration.

[204] This is seizure-like activity without corresponding EEG abnormalities of brainwaves, indicating that the episode is psychogenic.

PTX193-0101

patient unresponsive, with new bruises on his hip and head, and fixed pupils bilaterally. The patient was finally sent to a hospital. At the hospital, the INR was 10 and the patient had a massive subdural bleed causing a brain shift and herniation. The diagnosis was hypercoagulable state from Coumadin causing brain hematoma and herniation.

- Another patient was a 58-year-old man who was transferred to Robinson from Graham.[205] He had high blood pressure for at least seven months, but it was not treated. He also had elevated risk for heart disease for at least seven months, but was not treated with a statin. The patient was bleeding from his rectum, but never received a colonoscopy and was continued on non-steroidal medication. After being at Robinson for about six months, the patient experienced chest pain with nausea and dyspnea, with blood pressure 200/118 and pulse of 129. An EKG showed new onset atrial fibrillation with marked ST depression in lateral leads. This is consistent with acute coronary syndrome and warrants immediate hospitalization and cardiac catheterization. Even the automated reading said, "immediate clinical assessment of this individual is strongly recommended." Instead, a nurse called a doctor, who gave an order by phone for single doses of Inderal and clonidine. The patient was having acute coronary syndrome and should have been hospitalized for immediate catheterization. The following day, the doctor took a history of typical chest angina with exertional squeezing, chest pain associated with nausea, and shortness of breath. Another EKG was done, and the atrial fibrillation was no longer present. Instead of immediately obtaining cardiac catheterization or cardiology evaluation, the doctor started a statin and aspirin but no anti-angina medication. Weeks later, a family member called with concern that the patient was having chest pain when walking to the dining hall. An administrator scheduled a routine referral to a physician, who instead of admitting the patient for catheterization ordered the patient a wheelchair. The doctor added Norvasc for elevated blood pressure. This potentially could have increased the risk for myocardial infarction. The patient had another episode of exertional chest pain with shortness of breath diagnosed as chest wall pain. After another episode of chest pain, a nurse obtained an EKG that again showed ST segment depression consistent with acute ischemia, warranting immediate hospitalization and catheterization. Instead, a doctor ordered 23-hour observation without any intervention. The nurse told the patient to change his job assignment so he wouldn't have to work in a job that precipitated chest pain. Four days after this episode, the doctor referred the patient for a routine stress test. Instead of a stress test, the Wexford UM program had the patient referred for a routine cardiology appointment, which would ultimately delay the cardiac intervention. This appointment occurred a month later. The cardiologist recommended cardiac catheterization "in the near future." About two weeks later, the patient again developed chest pain. A nurse obtained an EKG that showed atrial fibrillation, which the nurse described as "A fib same as previous." This should have resulted in immediate hospitalization. Instead, a doctor ordered 23-hour observation without intervention. About six hours later, the patient was found on the floor with a forehead laceration and

---

[205] Mortality Review Patient #33.

surrounded by vomit. He had no pulse or respirations and was transferred to a hospital, where he was pronounced dead.

At least nine of 19 of preventable or possibly preventable deaths were cared for by poorly trained physicians. One preventable death involved care by a nuclear radiologist. Two involved care by a surgeon. Three preventable and two possibly preventable deaths involved care by another surgeon. Another death involved care by a doctor who had a year of training in pathology. The remaining doctors either had illegible signatures or we were unable to determine their training because we did not have credentials for them. It is our firm opinion that the lack of primary care physicians in the IDOC health care system is resulting in preventable deaths, which shows a gross departure from normal standards of care.

The IDOC leadership is unaware that they have preventable deaths. Both Dr. Meeks and a Regional Coordinator testified that the Regional Coordinators perform mortality review.[206] We have asked for but have not received these Regional Coordinator mortality reviews. The Agency Medical Director does not independently conduct mortality review. Dr. Meeks stated that Wexford performs a mortality summary, but there is no formal Wexford mortality review that we were provided. The Regional Coordinators are nurses and would not be able to effectively review physician care or identify if it was adequate or inadequate. These reviews, if done, are insufficient as mortality review. One of the Regional Coordinators, who is responsible for a region where we found preventable death, testified that none of the death reviews he performed indicated inadequate care.[207] Wexford does not perform mortality review; instead, it completes a death summary, which is a non-critical summary of the death. This is done by the Medical Director of the site who is often the same doctor who cared for the patient and who often was responsible for the incompetent care. The 2011 contract with Wexford has no requirement for mortality review; its only requirement is that there shall be documentation of deaths.[208] Wexford has no process to critically review deaths and therefore any critical clinical deficiencies are unnoticed and unmonitored, resulting in ongoing harm to patients in the IDOC.

Identification of errors can be perceived by the vendor as well as the IDOC as a liability concern. This possibility may result in failure to identify errors or to hide errors to reduce their liability and protect their reputation. If this occurs, significant errors remain unaddressed. The needs of the jurisdiction and vendor, however, should not be contraposed to the needs to protect patient safety. The system of mortality review should be constructed to protect patient safety. For these reasons, when vendors provide medical care, the hiring authority should lead or participate in mortality review to ensure that patients are protected and/or an independent evaluator should perform this review. In this respect, we agree with the First Court Expert on his recommendation to have an independent reviewer of all deaths.

---

[206] Page 34 deposition of Joseph Ssenfuma, Regional Coordinator, on September 28, 2017 and page 34, 30(b)(6) deposition of Dr. Meeks on July 25, 2017.
[207] Page 35 deposition of Joseph Ssenfuma, Regional Coordinator, on September 28, 2017.
[208] Item 7.1.2.1.2 Contract between Wexford Health Sources Inc. and Illinois Department of Healthcare and Family Services signed on 5/6/11.

## Dental Program

### Dental: Executive Summary

While aspects of the dental programs at some prisons we visited have improved and others have declined, the net result is a worsening of the dental programs since the First Court Expert's Report. Our visits confirmed most of the First Court Expert's findings and identified issues the First Court Expert did not mention. Based on the prisons we visited, IDOC dental care remains not minimally adequate; and it is substantially below accepted professional standards despite the four years the IDOC and Wexford had to remedy the previously identified program deficiencies.

### Dental: Staffing and Credentialing

**Methodology:** Reviewed staffing documents, interviewed dental staff, reviewed the Dental Sick Call Logs, and other documents.

**First Court Expert Findings**

Most staffing was adequate and in compliance with Administrative Directive 04.03.102, Section 9, a, b, and c. Glaring omissions were the lack of dental hygienists at Dixon and Henry Hill Correctional Centers. Dental hygienists are an essential part of the dental team.

**Current Findings**

Staffing has deteriorated since the First Court Expert's Report. We concur with the First Court Expert's finding that dental hygienists are essential members of the dental team and should be on staff at all IDOC facilities.[209] Notwithstanding the finding that staffing followed Administrative Directive 04.03.102, we found staffing (primarily dentist) shortages at several facilities due to IDOC's and Wexford's inability or unwillingness to fill vacancies timely.[210]

Adequate staffing requires the appropriate number and mix of dental personnel positions and that these positions be filled. While NRC and SCC appear to have adequate dental staffing to address patient treatment timely, this is not true for Dixon and MCC. In fact, in 2017 MCC prisoners had to wait more than 15 months for fillings and for dentures. Dixon staffing is particularly problematic, since there is no dental hygienist and staffing shortages have resulted in the clinic being closed Mondays for more than a year. It is noteworthy that the Dixon dental hygienist position has not been established despite the First Expert's finding that it is essential.

Among the dental program's systemic inadequacies we identified are under diagnosis and under treatment of dental disease. Consequently, when diagnosis and treatment become minimally adequate, the prevalence of diagnosed dental disease will be higher and necessitate

---

[209] Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006). Correctional Dental Services. In M. Puisis (Ed.), Clinical Practice in Correctional Medicine (2nd ed., pp. 556-564). Philadelphia, PA: Mosby Elsevier, p. 557 ("In prisons where routine dental care will be provided, the basic dental team should consist of a dentist, dental assistant, and dental hygienist")

[210] For example, MCC has two dentist vacancies. One vacancy is an IDOC position that has been unfilled for approximately two years. We were told that IDOC has asked Wexford to fill it.

increased dental staffing. We do not consider this in our assessment of dental staffing but recognize that this will have to be addressed as part of remediation.

## Dental: Facility and Equipment

**Methodology:** Toured dental clinics, radiology areas, and dental intake areas to assess cleanliness, infection control procedures, and equipment functionality. Reviewed the quality of x-rays and compliance with radiologic health regulations.

**First Court Expert Findings**

Much of the equipment was old, corroded, and badly worn. Cabinetry and countertops were generally badly worn, corroded, or rusted, broken, and not up to contemporary standards for disinfection.

**Current Findings**

Overall, facilities and equipment have deteriorated since the First Court Expert's Report. We concur that most of the equipment in the clinics is old and worn, with many chair and counter surfaces cracked and difficult to decontaminate. Four years have passed since that assessment, and while some equipment has been replaced, for the most part, equipment has deteriorated. In addition, we found that the most problematic deficiency to be the inadequate panoramic x-ray units and processor at NRC, which will be discussed in a later section. Not only are many panoramic x-rays clinically inadequate but the NRC clinic intraoral film processor been inoperative for three years and dentists at Dixon have not been able to take intraoral x-rays for several months. Similarly, the x-ray film processor in the MCC North clinic has been inoperative and exposed film must be carried to the radiology clinic for processing.

## Dental: Sanitation, Safety, and Sterilization/Autoclave Log

**Methodology:** Reviewed Administrative Directive 04.03.102. Toured dental clinics and dental intake examination areas. Observed dental treatment room disinfection. Interviewed dental staff. Observed intake dental examinations and patient treatment. Reviewed last two years of entries in autoclave log.

**First Court Expert Findings**

In several institutions, proper sterilization flow was not in place. At one institution, spore testing of the autoclaves was being performed monthly rather than weekly. At another institution, bulk storage of biohazardous waste was maintained in open, large cardboard boxes on pallets in the dental clinic. In none of the clinics were the sterilization area[211] and the radiology area posted with proper hazard warning signs. [212] Safety glasses were seldom worn by patients.

---

[211] CFR 1901.145(e)(4). ("The biological hazard warning shall be used to signify the actual or potential presence of a biohazard and to identify equipment, containers, rooms, materials, experimental animals, or combinations thereof, which contain, or are contaminated with, viable hazardous agents.")

[212] Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i). "Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words, 'CAUTION RADIATION AREA'". Emphasis in original.

**Current Findings**

Overall, sanitation, sterilization, and, safety have deteriorated since the First Expert's Report, primarily due to inadequate hand sanitation at NRC and MCC. However, autoclave log maintenance has improved at SCC and MCC. We concur with the First Court Expert's finding of lack of appropriate warning signs, patient protective eyewear and lead aprons with thyroid collars not used routinely,[213,214,215] and inadequate sterilization flow at several facilities. However, while the instrument flow was less than ideal, instruments could still be sterilized and stored adequately.

In addition, we found that surface decontamination was adequate but made challenging by the cracked and inadequate dental chair surfaces and countertops in many clinics. The most problematic issue (not found by the First Court Expert) was the inadequate infection control practices between intake exam patients at NRC, in which the patients were examined by a dentist who typically did not change gloves (or wipe them with alcohol between exams) and MCC (where the dentist did not wash his hands or disinfect them with alcohol wipes between changing gloves).[216] That this egregious breach of infection control could occur suggests inadequate monitoring by Wexford and the IDOC.

## Dental: Comprehensive Care/Removable Dental Prosthetics

Comprehensive or routine care (to include removable dental prosthetics) is non-urgent treatment that should be based on a health history, a thorough intraoral and extraoral examination, a periodontal assessment, and a visual and radiographic examination. A sequenced plan (treatment plan) should be generated that maps out the patient's treatment.

**Methodology:** Interviewed dental staff, reviewed dental charts of inmates who received non-urgent care to include removable prosthetics, observed dental treatment. Selected charts for

---

[213] Guidelines for Infection Control in Dental Health-Care Settings ---2003. MMWR, December 19, 2003/ 52(RR17):1:16; pp. 17-18. ("PPE [personal protective equipment] is designed to protect the skin and the mucous membranes of the eyes, nose, and mouth of DHCP [dental health care provider] from exposure to blood or OPIM [other potentially infectious materials]. Use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes creates a visible spray that contains primarily large-particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, DHCP, *or the patient*. The spray also might contain certain aerosols (i.e., particles of respirable size, <10 µm). Aerosols can remain airborne for extended periods and can be inhaled" and "Primary PPE used in oral health-care settings includes gloves, surgical masks, **protective eyewear**, face shields, and protective clothing (e.g., gowns and jackets). All PPE should be removed before DHCP leave patient-care areas (*13*). Reusable PPE (e.g., clinician **or patient protective eyewear** and face shields) […]"). Emphasis added. Moreover, eyewear protects eyes from objects or liquids accidentally dropped during the course of treatment.

[214] Why we Take Infection Control Seriously. UIC College of Dentistry. Viewed at https://dentistry.uic.edu/patients/dental-infection-control, viewed February 2, 2018 ("We use personal protective equipment […] *as well as provide eye protection to patients for all dental procedures*.") Emphasis added.

[215] While radiation exposure from dental radiographs is low, dentists should follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (*inter alia*), *use protective aprons and thyroid collars*. Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. ADA and FDA (2012), 14. Emphasis added.

[216] Centers for Disease Control and Prevention. *Summary of Infection Prevention Practices in Dental Settings: Basic Expectations for Safe Care*. Atlanta, GA: Centers for Disease Control and Prevention, US Dept of Health and Human Services; October 2016, p.7.

PTX193-0106

review randomly from Prosthetics List (patients with two partial dentures) and Daily Dental Reports (patients who received fillings and biennial examinations).

**First Court Expert Findings**

Routine care was almost always provided without a comprehensive examination, a treatment plan, a documented periodontal assessment, a documented soft tissue examination, and without bitewings or other radiographs diagnostic for caries.

There was seldom a dental prophylaxis or oral health instructions provided prior to routine restorative care to include removable prosthetics. Without these basic elements in place, quality routine care is almost impossible. As such, there is no real system in place to provide routine comprehensive Category 3 dental care.

The radiographs and examinations/treatment plans were so incomplete or vague that it could not be determined if all necessary care was completed prior to prosthetic impressions.

Blood pressures were not being taken on inmates with a history of hypertension.

**Current Findings**

Overall, comprehensive care is unchanged since the First Court Expert's Report. We concur that routine care (to include removable prosthetics) is inadequate and is provided without adequate x-rays, periodontal assessment, and documented oral hygiene instruction and a sequenced treatment plan.[217,218] Moreover, we agree that the biennial examination, as currently performed, is of little clinical value.

Rather than relying on intraoral x-rays, the accepted professional standard for routine examinations,[219] dentists base their charting for caries on the panoramic x-ray in conjunction with a visual exam. Not only is this insufficient to diagnose interproximal (between the teeth) decay but it ignores the existence of periodontal disease. Moreover, even when periodontal disease is occasionally categorized per Administrative Directive 04.03.102 (Dental Care for Offenders), there is no documented periodontal probing[220] and the location of the disease is

---

[217] Stefanac SJ. Information Gathering and Diagnosis Development. In Treatment Planning in Dentistry [electronic resource]. Stefanac SJ and Nesbit SP, eds. Edinburgh; Elsevier Mosby, 2nd Ed. 2007; pp. 11-21, *passim*.

[218] IDOC agreed that "[r]outine comprehensive care should be provided for through a comprehensive exam and treatment plans. The exam [should include] radiographs diagnostic for caries, a periodontal assessment, a soft tissue exam, and accurate charting of the teeth," and "hygiene care and oral health instructions are provided as part of the treatment process." IDOC Response, ¶XIII (5).

[219] Dentate or partially dentate adults who are new patients should receive an "[i]ndividualized radiographic exam consisting of posterior bitewings with panoramic exam or posterior bitewings and selected periapical images." Furthermore, recall patients [i.e., biennial exam patients] should receive posterior bite wing x-rays every 12 to 36 months based on individualized risk for dental caries. With respect to periodontal disease, "[i]maging may consist of, but is not limited to, selected bitewing and/or periapical images of areas where periodontal disease (other than nonspecific gingivitis) can be demonstrated clinically." Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and U.S. Food and Drug Administration, 2012. Table 1, pp. 5-6.

[220] Stefanac SJ. (A panoramic radiograph has insufficient resolution for diagnosing caries and periodontal disease. Intraoral radiographs (e.g., bite wings) and periodontal probing are necessary), p. 17. Also, (Periodontal Screening and Recording (PSR), an early detection system for periodontal disease, advocated by the ADA and the American Academy of Periodontology since

**PTX193-0107**

not noted.[221] As with most of the other patients who received comprehensive care including removable prosthetics, sequenced treatment plans and periodontal assessments that included documented probing were absent.

Biennial exams were scanty and of minimal clinical value since they were informed by neither bite wing x-rays nor documented periodontal probing. Documented oral cancer screening and sequenced treatment plans were rare.

Absent a sequenced treatment plan informed by intraoral x-rays[222] and periodontal probing, the dentist does not have sufficient information to make an informed decision. In the community, what is called a biennial exam is analogous to a periodic exam.[223] The biennial exam is cursory, and not substantially different from the inadequate exam performed at intake.

Not only is periodontal disease underdiagnosed but it is undertreated. In none of the dental charts reviewed was there a treatment plan that identified specific non-surgical periodontal procedures such as scaling and root planing. Moreover, the Daily Treatment Report that lists the treatment provided to each patient has no section for periodontal treatment.[224] The IDOC and Wexford dentists and dental hygienists we interviewed who were in private practice were familiar with the industry-standard dental procedure codes. However, there is no column for scaling and root planing (SRP)[225] and no way of knowing if it is performed. Similarly, dentists and dental hygienists knew what periodontal screening and recording (PSR) was but did not use it in IDOC, although many acknowledged using it in private practice.

The Wexford contract specifies that "[v]endor shall provide dental checkups to offenders every two years, or more often if clinically indicated, and evaluations must be provided within 14 days after the offender's request for routine care treatment." However, it is mute on the more critical issue, the maximum waiting time for *treatment*. So, under current dentist staffing, a prisoner who needs (for example) three fillings that require three appointments could conceivably wait more than three years for the last tooth to be filled. It is more likely than not that the teeth awaiting filling will become more difficult to fill or become non-restorable and require extraction and cause preventable pain.

---

1992, is an accepted professional standard.), pp. 12-14. See American Dental Hygiene Association. Standards for Clinical Dental Hygiene Practice Revised 2016, pp. 6-9. (Periodontal probing is also a standard of practice for dental hygiene).

[221] The only categories related to specifically periodontal disease are Ib ("acute periodontal abscess"), Ic ("acute periodontitis"), Ie ("acute gingivitis"), IIIb ("localized gingival involvement"), and Vb ("lack of visible gingival irritation"). *Id*. Attachment A.

[222] See NCCHC P-E-06 (Oral Care), ¶8 ("[r]adiographs are used in the development of the treatment plan".)

[223] The 'uniform record system' sponsored by the American Dental Association is the Code on Dental Procedures and Nomenclature. "In August 2000 the CDT Code was designated by the federal government as the national terminology for reporting dental services on claims submitted to third-party payers. The industry standard code for a periodic exam is D0120. It is defined as "[a]n evaluation performed on a patient of record to determine any changes dental and medical health status since a previous comprehensive or periodic examination. This includes an oral cancer evaluation, and periodontal screening where indicated, [...])"." American Dental Association Dental Procedure Codes, 2015, pp. 1, 5.

[224] The categories are "scale and prophylaxis," "gingivitis," and "periodontal." While "scale and prophylaxis" is mappable to ADA treatment code D1110 that has a standard profession-wide definition, "gingivitis" and "periodontal" are not directly mappable to an ADA code. The IDOC and Wexford dentists and dental hygienists we interviewed who were in private practice were familiar with the industry-standard dental procedure codes.

[225] ADA codes D4341 and D4342.

Wait times are most problematic at MCC, with April 2018 backlogs for fillings and dentures more than 15 months. While Wexford does not report periodontal treatment wait times, dental hygienist caseload (in number of patients) is reported in the monthly April 2018 CQI minutes. We imputed dental hygienist wait time to be approximately 16 months.[226] While a cleaning or prophy is not a periodontal procedure, it is often a precursor to periodontal treatment (if periodontal treatment has been prescribed by a dentist on the treatment plan). A wait of more than a year before periodontal treatment can begin, even if it is diagnosed, is unreasonable and such a treatment delay can result in preventable disease progression with concomitant bone loss.

While patients planned for removable prosthetics are not treated by outside specialists but rather onsite dentists, approval for dental prosthetics must be obtained from Wexford through a process referred to as "collegial review." The reviewer is Dr. Karanbir Sandhu, who serves on a part-time basis as a Wexford Prosthetic Advisory Dentist. Dr. Sandhu is not specialist in prosthodontics, or for that matter any other aspect of dentistry.

<u>Dental: Intake (Initial) Examination</u>[227]
**Methodology:** Reviewed dental records and panoramic x-rays of inmates who have received recent intake (initial) examinations. Reviewed Administrative Directive 04.03.102.

**First Court Expert Findings**
Although a review of records revealed that the IDOC followed its screening examination policy, oral health instructions are omitted as part of the process. Egregious deficiencies were observed at the NRC during the screening exam. The exam was extremely cursory and did not include an adequate head and neck, and soft tissue examination. The health history was sketchy and poorly documented. Radiology safety protocols were non-existent. Area disinfection and clinician hygiene between patients was very poor. Inappropriately, most dentists use the screening exam, the panoramic radiograph, and the charting as a treatment plan from which to deliver routine care.

Conditions that require medical attention were not red-flagged. Medical consultations were not documented in the dental record. The quality and consistency of the medical history in the dental record was inadequate.

**Current Findings**
Overall, the initial examination is unchanged since the First Court Expert's Report. We concur that the initial examination is inadequate and fails to include appropriate head, neck, and soft

---

[226] The April 2018 CQI minutes (based on March data) reported a dental hygienist caseload of 1018 patients and the March 2018 Dental Report noted that the hygienist performed 61 cleanings/prophylaxes. This equates to a more than 16-month backlog.

[227] The First Court Expert Report describes the examination performed at intake screening as a "Screening Examination;" however, Administrative Directive 04.03.102 describes it as a "complete dental examination." We use the terminology of the Administrative Directive and refer to the intake or initial dental examination as a complete dental examination.

tissue assessments. While the First Court Expert found that area disinfection was poor[228], there was no mention of the breaches of infection control by the NRC and MCC dentists described in previous reports. In addition, we found as follows.

The initial examination is governed by Administrative Directive 04.03.102 which states (*inter alia*) that

> Within ten working days after admission to a reception and classification center or to a facility designated by the Director to accept offenders with disabilities for a reception and classification center, each offender shall receive a **complete dental examination by a dentist**.[229]

While "complete dental examination" is not defined in Administrative Directive 04.03.102, the examination performed at the three R&C centers we visited is by no means "complete" because it is too brief and not informed by intraoral x-rays, a documented periodontal probing, and a consistently performed oral cancer screening.[230, 231] The deficiencies of this examination are particularly problematic, since it is used to classify treatment needs and determine treatment priority.

Notwithstanding the plain text of Administrative Directive 04.03.102, it is apparently IDOC's position that the dental examination performed at intake is a screening examination (citing NCCHC Oral Care Standard P-E-06) is cursory and need not be performed by a dentist. [232] However, compliance with Oral Care Standard P-E-06 (assuming IDOC adopts it as its standard) requires that in addition to an oral screening, an oral examination should be performed by a dentist within 30 days of admission.[233, 234, 235]

---

[228] Which we found at NRC.

[229] Administrative Directive 04.03.102 (¶II F 2) (emphasis added). Furthermore, the exam should include, "[c]harting of the oral cavity and categorization of status or treatment needs in accordance with the American Public Health Association's priorities delineated in Attachment A." *Id*. at (¶II F 2a).

[230] This is generally done by holding the anterior portion of the tongue with 2x2 gauze and reflecting the tongue with a mouth mirror. This is a professional standard for an oral examination. *See*, for example, National Institutes of Health. National Institute of Dental and Craniofacial Research. Detecting Oral cancer. A Guide for Professionals. Viewed 6/4/2018 at https://www.nidcr.nih.gov/sites/default/files/2017-09/detecting-oral-cancer-poster.pdf.

[231] Stefanac SJ. ("Evaluation of head and neck structures for evidence of tissue abnormalities or lesions constitutes an important part of a comprehensive examination."), p. 12. See also Shulman JD, Gonzales CK. Epidemiology/Biology of Oral Cancer. In Cappelli DP, Mosley C, eds. Prevention in Clinical Oral Health Care. Elsevier (2008) ("Regular, thorough intraoral and extraoral examination by **a** dental professional is the most effective technique for early detection and prevention of most oral cancers. [...]") p. 41.

[232] IDOC Response to First Expert Report, pp. 32-33.

[233] 2014 NCCHC Oral Care Standard P-E-06, p. 81 and 2018 NCCHC Oral Care Standard P-E-06, pp. 96-97.

[234] IDOC's selective invocation of the NCCHC Standard is inappropriate. If (as the IDOC Response maintains), initial dental examination is a screening and not a "complete dental examination" as set forth in the Dental AD, when does an IDOC prisoner receive an oral examination (that per NCCHC P-E-06 should be performed within 30 days of admission)?

[235] IDOC Response to First Expert Report, p. 33. ("Initial dental contacts between clinicians and offenders at IDOC reception centers constitute dental screenings, as defined by the NCCHC. Accordingly, the reception center dentist performs a "visual observation" and notes "obvious or gross abnormalities requiring immediate referral to a dentist." Subsequent referrals result in a dental examination, which comports with the NCCHC definition of "examination." Because its procedures meet NCCHC standards, IDOC believes they meet the minimum constitutional standard of adequacy.) They do not.

However, IDOC's assertion that since subsequent referrals result in a dental examination IDOC complies with the NCCHC Oral Care Standard ignores the plain text of P-E-06, since under IDOC's idiosyncratic interpretation, the only prisoners who would receive a dental examination would be those who were referred based on a screening that could be performed by a non-dentist or even the current inadequate intake examination performed by a dentist.

While IDOC does not define "complete dental examination," the definition of a comprehensive or complete dental examination is set forth by the American Dental Association (ADA) and the NCCHC.[236] The ADA defines a Comprehensive Oral Examination (Procedure Code D0150).[237] Similarly, a comprehensive clinical examination includes an intraoral and extraoral soft tissue examination (primarily screening for oral cancer); a periodontal examination using, at a minimum, Periodontal Screening and Recording (PSR); an examination of the teeth; and a radiographic examination using panoramic **and** intraoral x-rays.[238] Furthermore, as mentioned earlier, the ADA and Food and Drug Administration (FDA) recommend that intraoral x-rays should be part of a dental examination.

At two prisons (NRC and LCC), the dentists did not document a thorough soft tissue examination. For example, they did not visualize the lateral and posterior regions of the tongue, potential sites of squamous cell carcinoma. Performing a thorough soft tissue examination is critical for a new inmate, since unless the prisoner requests care within two years, the next exam will be biennial under current policy.[239]

We visited three prisons that performed intake screening; NRC, LCC, and MCC. The NRC has the largest volume, processing 15,942 prisoners in 2017. All inmates have a panoramic x-ray taken and receive a cursory direct-view oral examination that includes a scanty health history. Not only is the exam uniformly deficient, but the quality of the panoramic x-rays used is poor and documentation was deficient.[240] Furthermore, infection control was inadequate at two

---

[236] "Oral examination by a dentist includes taking or reviewing the patient's oral history, an **extraoral head and neck examination**, charting of teeth, and examination of the hard and soft tissue of the oral cavity with a mouth mirror, explorer, and adequate illumination." NCCHC Oral Care Standard P-E-06, 2018, p. 96. Emphasis added.

[237] "[This code is] [u]sed by a general dentist and/or a specialist when evaluating a patient comprehensively. This applies to new patients; established patients who have had a significant change in health conditions or other unusual circumstances, by report, or established patients who have been absent from active treatment for three or more years. It is a thorough evaluation and recording of the extraoral and intraoral hard and soft tissues. It may require interpretation of information acquired through additional diagnostic procedures. [...] This includes an evaluation for oral cancer where indicated, the evaluation and recording of the patient's dental and medical history and a general health assessment. It may include the evaluation and recording of dental caries, missing or unerupted teeth, restorations, existing prostheses, occlusal relationships, periodontal conditions (including periodontal screening and/or charting), hard and soft tissue anomalies, etc." American Dental Association Code on Dental Procedures and Nomenclature, 2015; p. 6.

[238] Stefanac SJ, pp. 12-15, *passim*. Emphasis added.

[239] This deficiency is compounded by the fact that dentists do not document soft tissue examinations at biennial exams (see infra).

[240] Of 20 panoramic x-rays from screening exams performed January 23, 2018, nine (45%) were clinically inadequate; characterized by poor contrast (washed out) or the presence of artifacts that interfered with interpretation. Our findings were confirmed by an SCC Quality Improvement Study in which intake screening charting was compared with the results of clinical examinations performed on the same patients. Of the 21 NRC charts, 62% had no charting of pathology (e.g., "abscessed teeth, teeth that needed extraction, [and] periodontal disease, (+3) mobility in teeth, grossly decayed teeth, impacted wisdom teeth in the maxillary sinus, and numerous visible dental caries"), with the remainder having only a partial charting.

PTX193-0111

facilities.[241,242]

The oral hygiene instructions (OHI) were inadequate at all prisons we visited. For example, at MCC, they consisted of consisted of saying, "make sure you brush and floss," and took no more than a minute.[243] This is not adequate oral hygiene instruction. Furthermore, while spooled dental floss is deemed contraband at MCC, the dentist did not mention the existence of (not to mention how to use) floss alternatives.

## Dental: Extractions

**Methodology:** Reviewed records of inmates who had extractions, randomly selected from Daily Dental Reports October 2017 through January 2018 and Dental Sick Call Logs. Interviewed dental staff.

**First Court Expert Findings**
Antibiotics were provided routinely after dental extractions at some institutions.

A proper diagnostic reason for extraction was seldom part of the dental record. Documentation was, overall, very poor.

**Current Findings**
Our finding that extraction care is adequate diverges from that of the First Court Expert which suggests that many of the previously identified deficiencies have been remedied. Moreover, we identified current and additional findings as follows.

With few exceptions, extractions were informed by adequate preoperative x-rays and were accompanied by signed consent forms. However, while the tooth to be extracted was identified, the reason for the extraction was rarely noted. On the other hand, most of the health history forms were not updated**.** Generally, patients with dental infections who were prescribed antibiotics had the tooth extracted timely,[244] that is within the therapeutic window of the antibiotic[245] (i.e., within 10 days – the duration of most of the antibiotic prescriptions).[246]

---

[241] The most egregious example was at NRC which we discuss in the NRC Report. "The dentist donned gloves, selected mouth mirrors from a bag of sterile mirrors that he opened and placed on a bracket table before the first exam. A standard dental light illuminated the patient's mouth. He reviewed the panoramic x-ray and took a cursory health history. He used one or two mirrors to reflect the cheeks and adjusted the light for optimal illumination. While his gloved hands did not always touch the patient, in approximately half the exams we observed, they touched the patient's face, lips, or mouth. He did not change gloves between patients consistently. In fact, there were several instances where he examined a patient wearing the gloves he used to touch a previous patient's mouth or face. He did not wash hands between patients because the exam room had no sink." Centers for Disease Control and Prevention.

[242] *Summary of Infection Prevention Practices in Dental Settings: Basic Expectations for Safe Care*. Atlanta, GA: Centers for Disease Control and Prevention, US Dept. of Health and Human Services; October 2016, p.7.

[243] Oral Hygiene Instructions (ADA Code D1330) "may include instructions for home care. Examples include tooth brushing technique, flossing, and the use of special oral hygiene aids." ADA Procedure Codes.

[244] MCC was particularly problematic. "Of the 11 who were prescribed antibiotics, all but one (91%) waited more than 10 days." MCC Report. *See* sick Call discussion *supra*.

[245] Shulman JD, Sauter DT. Treatment of odontogenic pain in a correctional setting. *Journal of Correctional Health Care* (2012) 18:1, 58 – 69; p. 68.

**PTX193-0112**

## Dental: Sick Call/Urgent Care / Treatment Provision

**Methodology:** Interviewed dental staff. Reviewed Dental Sick Call Logs and Daily Dental Reports. Reviewed randomly selected records of inmates who were seen on sick call. Reviewed recent intake examination records.

**First Court Expert Findings**

The SOAP format was not being used to document urgent care encounters.

The lag time between an Inmate Request Form for pain and alleviation of the pain was unacceptable. It often took four or more days for urgent care patients to be seen. Patients who are in pain should be able to access care within 24-48 hours.

**Current Findings**

Overall, urgent care has not changed materially since the First Court Expert's Report and remains inadequate. We concur with the First Court Expert that urgent care was generally untimely. In addition, we identified current and additional findings as follows.

Prisoners access dental care via submitting a written request, going on nurse sick call, or communicating their problem with staff. There is substantial variation in the wait time for prisoners with a painful dental condition who submit a sick call request or sign up for nurse sick call, with several prisons (e.g., MCC, SCC, and Dixon) having median times to be seen by a provider for dental pain of more than two days. Some prisons have a nurse sick call process where prisoners who state dental pain are assessed timely by a nurse using a "dental pain" protocol and are palliated and referred to the dental service.[247] At some prisons, requests for dental urgent care that are sent directly to the dental service are delayed due to an intervening weekend or when the dentist is not available  (e.g., NRC, Dixon), or a staff shortage (e.g., MCC).

When a patient with an urgent care complaint is seen by the dentist, the SOAP format is not consistently used for dental sick call progress notes (e.g., NRC, SCC) nor is the health history updated – a system wide problem.

## Dental: Orientation Handbook

**Method**: Reviewed the Orientation Handbook and other orientation documents.

**First Court Expert Findings**

---

[246] Makrides, N. S. et al.("[d]elayed dental treatment of the original focus of the [tooth-related] infection may turn a minor problem into a serious condition. Although infection is usually self-limiting and spatially-confined, it may spread because of a highly virulent organism. Complications could include Ludwig's angina, mediastinitis, cerebral abscess, maxillary sinusitis, chronic fistulous tracts, and infective endocarditis." (p. 559).

[247] At NRC, there is no process for nurses, when the dentist is not available, to perform a face-to-face examination on dental patients who state they have pain to identify pain and infection and provide analgesics and referral to a mid-level or advanced level provider if immediate treatment is necessary.

**PTX193-0113**

Access to care was inadequately detailed or not mentioned at all in most of the orientation manuals reviewed. Inmates do not receive adequate instructions on how to access urgent or routine care.

**Current Findings**

Overall, inmate orientation to dental care has improved since the First Court Expert's Report. While we concur with the First Court Expert that the orientation handbook could benefit from additional information about access to dental care, there was sufficient information provided about sick call in general for inmates to access dental care. Furthermore, dentists provided relevant information during the NRC, LCC, and MCC intake exams.

## Dental: Policies, Procedures, and Program Management

**Methodology:** Reviewed Administrative Directives that deal with the dental program. Interviewed dental staff. Reviewed dental charts. Toured dental clinical areas. Reviewed organizational charts.

**First Court Expert Findings**

Institutional Policy and Protocol Manuals were usually very incomplete, outdated, or not present at all. Dental programs were implemented and managed with few guidelines and little oversight. The IDOC Administrative Directives are incomplete and provide little guidance for developing and managing a successful dental program.

The Administrative Directives do not address quality of care issues, clinic management, record management, or staff oversight and responsibilities. Dentists are provided no orientation to the IDOC dental program or training on how to manage their institution's programs. This, in conjunction with inadequate quality assurance and peer review, suggests a lack of oversight on the part of the IDOC and Wexford. Moreover, there is no administrative dentist to oversee and manage the IDOC dental program.

The policy mandating biennial routine examinations does not seem beneficial. It takes up a great deal of administrative time. Inmates have full access to dental care. Dentists should use their time providing this care, especially considering the dental staffing guidelines.

**Current Findings**

Overall, policies, procedures, and program management have not improved materially, and we concur that they are inadequate. In addition, we identified current and additional findings as follows.

Administrative Directive 04.03.102 is flawed and should be rewritten. The components of the initial examination should be specified. Is it a "complete examination" per ¶ II F (2) or a "screening examination?" To remove ambiguity, all procedures should be defined to be consistent with the federally recognized ADA Procedure Codes.[248] So, for example, a complete

---

[248] The uniform record system sponsored by the American Dental Association is the Code on Dental Procedures and Nomenclature. "In August 2000 the CDT Code was designated by the federal government as the national terminology for

oral examination for a new patient (D0150) has a profession-wide definition, as does periodic oral examination for an established patient (D0120) that is analogous to a biennial examination.

As noted by the First Experts, Administrative Directives, and dental program guidance from IDOC are lacking.

The IDOC Medical Director stated that while he is responsible for the dental program, he relies on a Wexford dentist for oversight. He acknowledged that this was not a good arrangement and prefers a Chief of Dentistry who is a state employee as part of his regional team.[249]

In a response to a recommendation made in the First Expert Report, IDOC stated that it has committed to creating and filling a 0.25 FTE Statewide Dental Director position.[250, 251] After almost four years, no such position has been established.

## Dental: Failed Appointments

**Methodology:** Reviewed Dental Sick Call Logs. Interviewed dental staff. Reviewed Daily Dental Reports.

**First Court Expert Findings**
The broken appointment rate was above 10% at several institutions and as high as 40% at three institutions. The latter are alarming rates.

**Current Findings**
Overall, failed dental appointments have not improved materially since the First Court Expert's Report.[252] While the failed appointment rate appears to have improved compared to the First Expert Report, it could not be determined for NRC and Dixon. However, a scan of Dixon daily and monthly dental logs suggests that failed appointments may be a problem.

## Dental: Medically Compromised Patients

**Methodology:** Reviewed health history form and records from recent intake exams. Compared the health history in the dental chart to the medical problem list. Reviewed randomly selected charts of patients on Chronic Care Lists for diabetes and anticoagulant therapy.

**First Court Expert Findings**
The medical health history section of the dental record was sketchy and incomplete. Conditions that require medical attention were not red-flagged. Medical consultations were not documented in the dental record. The quality and consistency of the medical history in the

---

reporting dental services on claims submitted to third-party payers." American Dental Association Dental Procedure Codes, 2015, p. 1.
[249] Meeks Interview, ¶35.
[250] IDOC Response pp. 9, 31.
[251] IDOC should have at a minimum a 0.5 FTE position for a Statewide Dental Director to oversee the Wexford contract as it relates to dental care. Leaving dental oversight to the vendor is inviting the fox to guard the hen house.
[252] A facility that does not track and routinely report the failed appointment rate is deemed inadequate.

dental record was inadequate. Blood pressures were not being taken on inmates with a history of hypertension.

**Current Findings**

Documenting the health history of medically compromised patients has not changed materially and remains inadequate since the First Court Expert's Report. We concur with the First Court Expert's findings. In addition, we identified current and additional findings as follows.

The health history form is too limited and omits conditions relevant to dental care, for example, anticoagulant therapy. Moreover, there is insufficient room on the form for adding information. Health histories were not filled out or updated at the last visit in most charts. In addition, there was no documented periodontal assessment and request for follow-up for diabetics, which is particularly problematic given the relationship between periodontal disease and diabetes.[253]

## Dental: Specialists

**Methodology:** Interviewed dental staff, reviewed CQI documents, and reviewed dental charts of all inmates who were seen by an oral surgeon.

**First Court Expert Findings: None.**

**Current Findings**

Dental specialty referral has not changed materially since the First Court Expert's Report and remains adequate. We concur with the First Court Expert's findings. In addition, we identified current and additional findings as follows.

Approval for onsite or offsite oral surgery consultations requires the consent of the Wexford Regional Medical Director through a process referred to as "collegial review." The reviewer for oral surgery consultations is Dr. Karanbir Sandhu, who serves on a part-time basis as a Prosthetic Advisory Dentist. Dr. Sandhu is neither an oral surgeon nor a specialist in any other aspect of dentistry.

Several prisons have arrangements for local oral surgeons to provide care on site for less complex procedures and transport prisoners to the oral surgeon's practice for complex procedures. Other prisons send all prisoners who require oral surgery care off site. Oral surgery consultations we reviewed were appropriate, and appointments were made timely.

## Dental: CQI

**Methodology:** Reviewed CQI minutes and reports. Interviewed dental staff.

---

[253] See, for example, Herring ME and Shah SK. Periodontal Disease and Control of Diabetes Mellitus. *J Am Osteopath Assoc.* 2006; 106:416–421; Patel MH, Kumar JV, Moss ME. Diabetes and Tooth Loss. *JADA 2013;144(5);478-485* (adults with diabetes are at higher risk of experiencing tooth loss and edentulism than are adults without diabetes); and Teeuw WJ, Gerdes VE, and Loos BG. Effect of Periodontal Treatment on Glycemic Control of Diabetic Patients. *Diabetes Care* 3 (3) :421-427, 2010 (periodontal treatment leads to an improvement of glycemic control in type 2 diabetic patients).

**PTX193-0116**

**First Court Expert Findings**

The dental contribution usually was limited to monthly statistics. Most dental programs had no studies, assessments, or subsequent improvements in place. There is no peer review process in place within the IDOC dental program. There is little direction or meaningful oversight of the IDOC dental program to ensure that proper policies and protocols are in place and followed, and that dental standards of care are practiced.

**Current Findings**

The dental CQI program has improved marginally since the First Court Expert's Report but remains inadequate. We concur with the First Court Expert. In addition, we identified current and additional findings as follows.

CQI studies were limited in scope and follow up with corrective action plans was lacking.[254] For example, the 2016-2017 SCC CQI Report described study of compliance with the charting at the initial examinations at NRC. Among the findings from the NRC charts were that 62% had no charting of pathology, with the remainder having only a partial charting; for example, visible heavy tartar [calculus], and periodontal needs were never charted or indicated. Moreover, the panoramic radiographs from NRC varied in diagnostic quality. However, we were not provided with any corrective action plans.

The LCC 2017 Annual Governing Body Report described a quality improvement study on "[t]he time frames for dentures start to finish including healing. Is it within 3 months?" There were neither recommendations nor a planned follow up. The study was, at best, trivial. Given the inadequacy of the clinical aspects of the dental program described in this report, a 'study' of how long it takes to fabricate a denture ignores far more relevant issues, such as inadequate health histories, inadequate diagnosis of periodontal disease, and failure to use intraoral x-rays.

We were provided with a summary of two MCC studies. A study of 50 patients who were on the restoration (filling) list May 2015 to December 2015, with treatment dates ranging from August 2016 until September 2016, found that 94% had successful restorations without need of extraction. However, the actual study was not provided, just a five-line summary, so its validity cannot be assessed. Another MCC study summary, "Effects of lockdowns and dental coverage on filling numbers and backlog numbers," had no analysis,  just a recitation of findings.

<u>Peer Review</u>

We asked to see all peer reviews of dentists working at the eight facilities on our site visit schedule and were informed that dentists (unlike other practitioners) are not routinely peer reviewed. According to Attorney Ramage, speaking for Wexford,[255] neither the IDOC contract[256]

---

[254] While a study of the quality of SCC onsite oral surgery consultations and one follow-up was performed, the Root Cause Analysis recommended by Dr. Meeks was not performed. Furthermore, Dr. Meeks recommended that Dr. Funk and Mr. Mote monitor the oral surgeon's performance at other institutions. We requested the Root Cause Analysis and other follow-up material; however, they were not provided,

[255] Email from Andrew Ramage to Michael Puisis 3/29/2018.

nor Wexford policy requires that dentists be peer reviewed.[257] He further stated that "[r]outine peer reviews of dentists are not a mandatory standard of NCCHC;"[258] however, he is confuted by the NCCHC, which specifically includes dentist peer reviews in its Clinical Performance Enhancement Standard P-C-02.[259]

Moreover, "Wexford Health has never found a true dentist 'peer review' to be a productive means to determine clinical quality."[260] Finally, it is Wexford's position that the dentist peer reviews are not a part of the community standard.[261] While clinical peer review is not the community standard for dental care in a private practice environment, it is the community standard for organized dental practices such as the military, Department of Veterans Affairs, and Departments of Corrections that have recently emerged from federal monitoring (e.g., California and Ohio.)[262]

We were provided with peer reviews of Drs. Crisham (performed 12/30/15) and O'Brien (performed 1/16/17) who practiced at Dixon, and we were able to locate five of the 20 charts on which the peer review was based. Our findings were consistent with those of the reviewer; however, several critical elements were absent from the checklist, and were not evaluated. Consequently, many of the fundamental flaws we found in the dental care provided at Dixon, such as inadequate treatment plans, failure to use bite wing x-rays to inform caries diagnosis, and failure to diagnose and treat periodontal disease, were undiscovered. Dental peer review **as implemented by Wexford** is poorly designed and does not therefore determine clinical quality.

---

[256] The contract addresses "physician peer review," which applies to the onsite Medical Director, staff physicians, nurse practitioners, physician assistants, and psychiatrists; however, dentists and psychologists are excluded. Wexford Contract, ¶2.2.2.19 and ¶7.1.5.

[257] However, Wexford Clinical Performance Enhancement Policy P-403 states, "[a] minimum of one annual "peer review" [will be performed] whereby a practitioner's clinical performance is evaluated by a senior or supervising practitioner, and, when necessary, senior practitioners are evaluated by regional/corporate staff. […]" ¶III A3; and "[t]he senior dentist will complete a peer review for each dentist and ensure the completion of the biennial external review for those qualified. The Regional Medical Director will assign a peer reviewer for small contract locations having single or part-time dentists." Wexford Resp. RTP#5, Question 2, p. 0405.

[258] Ramage email, *id*.

[259] "In contrast [to an annual performance review], a clinical performance enhancement review focuses only on the quality of the clinical care that is provided. This type of review should be conducted only by another professional of at least equal training in the same general discipline. For example, an RN should evaluate other RNs and LPNs, a physician should review the work of a physician, and **a dentist should review the work of a dentist**;" and "[Clinical Performance the standard requires that the facility's direct patient care clinicians and RNs and LPNs are reviewed annually. Direct patient care clinicians are all licensed practitioners who provide medical, dental, and mental health care in the facility. This includes physicians, dentists, midlevel practitioners, and qualified mental health professionals (psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for mental health needs of patients). NCCHC recognizes that there are many other professions that have licensed practitioners (e.g., dental hygienists) who may be considered direct patient care clinicians. While it is good practice to include these professionals in the clinical performance enhancement process, technically it is not required by the standard." National Commission on Correctional Health Care, Clinical Performance Enhancement (https://www.ncchc.org/clinical-performance-enhancement-1) viewed 3/30/18 (emphasis added).

[260] Ramage e-mail, *id*.

[261] *Id*.

[262] California Department of Corrections Inmate Dental Services Program. September 2014, ¶ 4.3; Ohio Department of Corrections Policy 68-MED-12, ¶ VI B 3.

**PTX193-0118**

## Internal Monitoring and Quality Improvement

**Methodology:** Interview facility health care leadership and staff involved in quality improvement activities. Review the quality improvement meeting minutes and annual CQI reports.

### First Court Expert Findings

The First Court Expert found that the IDOC does not have the ability to monitor itself in part because it lacks data on key processes of care. For that reason, he recommended use of tracking logs to facilitate efficient review and data collection of quality performance measures. He found that data sources, including tracking logs, are not consistently used. He found that some facilities performed no quality improvement activity and other facilities collected data but did not measure the quality of performance against a standard. He was unable to find any facility they investigated that measured quality of performance against a standard. He also failed to find any facility that initiated any effort to improve the quality of the program. None of the quality improvement coordinators had any formal training in quality improvement methodology. He also noted that although his team found a high rate of lapses of care in mortality review, internal mortality review identified no lapses in care.

### Current Findings

We found there were some improvements since the First Court Expert's report. We did not confirm the finding that some of the facilities performed no quality improvement activity. Every facility we investigated had quality improvement meetings, produced quarterly and annual reports, and performed studies. We found, however, that annual reports and quality improvement studies were ineffective. We also did not find that facilities were not measuring quality against a standard. Some studies were undertaken that measured against Administrative Directive requirements as a standard. The First Court Expert failed to find any facility that initiated any effort to improve quality. We found that all facilities we investigated initiated effort, but these efforts were ineffective. The lack of experienced or knowledgeable CQI staff and the failure to integrate quality into the fabric of operations was significant and made the CQI programs ineffective. There was also an absence of evaluation of *clinical* quality, which contributes to preventable morbidity and mortality. The ineffectiveness of the CQI program, in our opinion, was a result of the following.

None of the facilities investigated had anyone who had expertise or knowledge of CQI methodology or implementation. CQI coordinators at NRC, SCC, and MCC are medical records personnel. None had any experience or training in CQI and had no knowledge of how to implement a CQI program. They were named CQI coordinators apparently because they could manage the paperwork requirements with respect to producing monthly minutes and annual reports. At two facilities, Dixon and MCC, the HCUAs were acting CQI coordinators by default because there was no one else available for this task. These individuals had no experience or training in CQI methodology. It did not appear that facilities understood how to design or implement an outcome study, and process studies failed to include any discussion or analysis of

variables involved in the process of care being studied. Outcome and process studies are required elements of the IDOC Administrative Directive on quality improvement.

None of the facilities had a reasonable CQI plan. An annual CQI plan needs to identify the major areas of investigation that the CQI committee is working on in the upcoming year. These plans should be based on the most important identified problems at the facility. Instead, the annual CQI plans at all facilities were generic and gave no formulation of the plan for the upcoming year's CQI work. The SCC and NRC plans were identical and copied one from the other, even though each site had separate types of problems. Problems were not identified and CQI studies did not match problems that existed at the facilities we visited.

None of the facilities had a Medical Director who participated meaningfully in CQI work. The absence of clinical medical leadership in quality improvement work is significant, as studies lack a clinical perspective necessary for medical CQI work.

Quality of physician care was not included in any CQI studies. The lack of physician quality reviews was significant. Mortality review is not performed. Peer review, as has been discussed, was ineffective and, in our opinion, did not accurately reflect the quality of provider care at the facilities we investigated. CQI studies evaluate mostly whether an intervention such as sick call or chronic illness clinic happened. But there is no evaluation as to whether it was adequately performed from a clinical basis.

All facilities had difficulty in identification of their key problems, indicating that a critical analysis of their processes of care was lacking. We view this as a lack of knowledge of how to implement CQI. When facilities were able to identify problems, they failed to thoroughly evaluate the problems. One facility, NRC, did identify medication errors as a problem, which we agreed with. However, there was no analysis of why the problem was occurring and no attempt to establish corrective action plans to correct the problem, so the problem persisted and was repeatedly reported in CQI meeting minutes. SCC identified that referral from nurse sick call to providers was not timely. This study was repeatedly performed without any evaluation as to why this was occurring with an attempt to fix the problem. The problem persisted.

We noted pervasive and systemic problems with preparing and administering medications. This process is not standardized across the system. Problems with administration of medication place inmates at risk of harm. We noted problems with failure to complete parts of the intake process. There is a problem with timely scheduling of specialty care and chronic care. There were problems with surveillance and tracking of infectious and contagious disease. There were problems with standardization of maintaining equipment and supplies. There was no standardized sanitation program. There is no system to monitor sentinel events or adverse clinical events. The IDOC lacks both a process to identify problems and lacks the ability to correct these systemic problems. In systems under Court supervision that we have monitored, a fundamental element of the exit strategy is the ability of the system to self-monitor by identifying problems and taking corrective action to fix the problem. The ability to self-monitor

is essential for a correctional health program but the IDOC currently does not demonstrate capacity to self-monitor.

Access to data useful for quality improvement purposes was poor at all facilities. The First Court Expert recommended that facilities utilize logs for various services as data sources to evaluate processes of care. This is still not in evidence at any facility. Data that is available is not useful for the purposes of quality improvement. The annual CQI reports give statistical data without any analysis that identifies problems or gives evidence that the system is performing as expected. The IDOC does not use data to measure adequacy of the program. Data is presented without analysis. The type of data provided give no indication of whether the program is in control.

Many "studies" were in areas that would be expected to yield good results. These were meaningless studies, as there was no effort to improve the program; instead, a study was designed so that it yielded a good result.

Review of primary source credentials of physicians at the annual meeting is not done. Instead, the site only verifies that the physician has a license. This affects the quality of physicians.

The Governing Body at SCC and NRC have three members, two of whom are custody trained staff; the Warden and the Regional Manager of Wexford. Half of the Governing Body at MCC are also custody staff. The Governing Body of the CQI program should be predominantly medical staff, as it is a medical program.

**PTX193-0121**

# Recommendations

We have listed below key recommendations from the Second Court Expert. These are followed by the verbatim First Court Expert recommendations with our comments on each placed in italics after the First Court Expert recommendation. We include our additional recommendations following the First Court Expert recommendations.

## Key Recommendations of Second Court Expert

**Current Recommendations**

1. Governance of the medical program must change. The medical program needs to be under medical control, not custody control. This would entail a restructuring of the medical program and Office of Health Services such that custody leadership are not responsible for medical operational control of the medical program. This will require an augmentation of the Office of Health Services so that it is capable of managing and monitoring clinical care. The health authority and responsible physician, if they are not the same person, need to be members of the Office of Health Services. The Office of Health Services needs regional physicians to monitor physician quality; an Infection Control physician and coordinator; a quality improvement coordinator; and sufficient data analysts to maintain data and statistical information necessary for operational management.

2. The medical program should have a budget that is managed by the health authority. Any vendor contracts should be under control and direction of the health authority.

3. IDOC should conduct a staffing analysis under the direction of medical, **not custody,** leadership that determines systemic staffing needs necessary to adhere to Administrative Directives and acceptable standards of medical and nursing care. This analysis needs to consider all levels of staffing and must include relief factors.

4. Physician staff must be properly trained, credentialed, and privileged. In order for this to happen, we strongly recommend that the IDOC negotiate with the state universities that have medical school programs to provide physician and possibly comprehensive care in the IDOC.[263] Physicians should be required to be credentialed similar to state university medical school requirements. Such a program should have an enhanced telemedicine component, including for specialty care.

5. The collegial review process should be immediately abandoned as a patient safety hazard. If a utilization program is re-instituted, the Office of Health Services should hire an additional board certified physician to perform prospective review.

6. The medical policies of the IDOC need to be augmented and refreshed and be made consistent with standards of the National Commission on Correctional Health Care. These policies should cover all aspects of a medical program and must be maintained by the IDOC, not the vendor.

---

[263] These universities might include University of Illinois Chicago; Southern Illinois University; and the Rockford School of Medicine.

7. The IDOC should negotiate with the Illinois Department of Public Health for IDOC to fund and maintain an infectious disease-trained physician and infection control coordinator who would jointly work with IDPH and IDOC and would coordinate, advise, and lead the infection control program in the IDOC. This can be pursued as an interagency agreement. The infection control coordinator should be a person with a master's training in public health nursing.

8. An analysis of geriatric and disabled patient needs in the IDOC needs to be done. The purpose would be to determine the numbers of individuals who require skilled nursing, supportive nursing, and infirmary levels of care. The IDOC needs to build or rehabilitate facilities to accommodate the current needs of these types of patients, with facilities that are appropriate for the level of need. Alternatively, if this cannot be done, the IDOC needs to find placement for the geriatric population in community facilities appropriate for their needs and properly licensed and managed in accordance with community standards.

9. The IDOC needs to have a statewide electronic medical record that includes physician order entry and electronic MARs. The implementation would include a device survey to determine the number of devices that need to be in place; a wiring survey to assess the capacity of existing communication wiring; access to an electronic medical reference system paired with the electronic record such as UpToDate®; and consideration to augment the current communication wiring to accommodate a more robust telemedicine program.

10. The IDOC needs to hire a statewide dental director, establish standardized statewide dental policies, and establish a monitoring system to ensure adequate dental services are provided.

11. The IDOC medical program needs to be able to effectively self-monitor all aspects of the medical care program. This will require knowledge of quality improvement methodology, data systems to obtain the necessary information to analyze and monitor care, and capable staff who can provide leadership.

12. The IDOC should develop combined medical and custody Administrative Directives that specify the participation of custody in ensuring that patients attend all scheduled medical appointments in the desired location and ensuring that custody collaborates with nurses so that nurses are able to properly administer medications.

## Organizational Structure, Facility Leadership, and Custody Functions

**First Court Expert Recommendations**

1. All Medical Directors must be board certified in a primary care field. The State has misread this, indicating that all physicians must be board certified. The investigative team has indicated that other primary care staff physicians should have completed an accredited residency training program in internal medicine or family practice, and be either board certified or becoming board certified within three years of employment. Only the State Medical Director could grant exceptions to this requirement based on his or her own assessment of the candidates. The basis for this recommendation is that in our experience and discussion with other State Medical Directors, there have been a disproportionate

number of preventable negative outcomes related to primary care services provided by non-primary care trained physicians. The investigative team does not believe that experience practicing in a field without the required training is adequate in mitigating the preventable negative outcome. *We generally agree with this recommendation. All physicians practicing primary care need to be trained in primary care. We believe that this recommendation will not be accomplished using the current contract process. See Key Recommendation #4 above.*

2. All clinicians should have access to electronic medical references at the point of care. *We agree with this recommendation.*

3. Every special medical mission facility must have its own Health Care Administrator. *We agree with this recommendation.*

4. The Director of Nursing position in all facilities is a full-time position whose time should not be taken away by corporate responsibilities. *We agree with this recommendation.*

5. Establish approved budgeted positions for SCC and the NRC which allow for each facility to function independently. *We agree with this recommendation.*

6. Provide a full-time Health Care Unit Administrator as well as a full-time Quality Improvement Coordinator/Infection Control Nurse for both SCC and NRC. *We agree that a full time HCUA should be budgeted at SCC and NRC. However, we recommend that every site have a full time CQI coordinator. The infection control nurse FTE equivalent should be determined based on the expected activities at that facility. For intake facilities the infection control nurse should be full time. For large facilities with any medical mission, infection control positions should also be full time.*

7. Each facility is to develop and implement a plan to insure registered nurse staff is conducting sick call. *We agree with this recommendation.*

8. Medical vendor health care staff assigned leadership positions, such as the director of nursing, supervisory nurse, or medical records director, will not be assigned corporate duties such as time keeping, payroll, or human resource activities. *This is similar to recommendation #4 above and we agree with this recommendation.*

9. IDOC [is] to develop and implement a plan which addresses facility specific critical staffing needs by number and key positions, and a process to expedite hiring of staff when the critical level has been breached. *We agree with this recommendation but note that this should be part of the staffing analysis recommended above in Key Recommendation #3.*

<u>First Court Expert's IDOC Office of Health Services Staffing Recommendations</u>

1. Immediately seek approval, interview, and fill the Infection Control Coordinator position. *We agree with this recommendation but add that the infection Control Coordinator can be a nurse consistent with Key Recommendation #7. This nurse needs to work collaboratively with an infectious disease trained physician. The Infection Control Coordinator should have a master's degree in public health nursing.*

2. *Establish and fill the position for a trained Quality Improvement Coordinator who will be responsible for directing the system wide CQI program. We agree with this recommendation. The required training for this position can be a systems engineer, nurse, or other person trained in CQI methodology (e.g. six sigma). Persons considered*

PTX193-0124

*for this position need to have CQI training prior to hiring. They should not learn on the job.*

3. Establish, identify, and fill the positions for three regional physicians trained and board certified in primary care who will report to the Agency Medical Director and perform at a minimum peer review clinical evaluations, death reviews, review and evaluate difficult/complicated medical cases, review and assist with medically complicated transfers, attend CQI meetings, and one day a week, within their region, evaluate patients. Resources for these positions could be taken from monies allocated to the medical vendor for regional physicians. *We agree with this recommendation.*

**Additional Recommendations**

1. IDOC custody should perform a staffing analysis to ensure that they have sufficient officer staff to ensure that medical programs can appropriately and effectively function. This is particularly true with respect to medication administration and ensuring that patients show up in required clinic spaces for appointments that are ordered. This study should include a survey of available transport van to ensure that IDOC has sufficient transportation vehicles to transport inmates for their scheduled appointments.

2. Contract monitoring needs to be improved to include meaningful operational metrics and must include quality of care for physicians, mid-level providers, and nurses.

3. Privileges for physicians should only be granted to doctors who have residency training in the service for which they are seeking privileges.

4. The physician performance evaluation component of peer review needs to be performed by persons trained in primary care and needs to be augmented to adequately reflect quality of care.

5. The sanctioning component of peer review needs to be started. Any physician committing grossly and flagrantly unacceptable care needs to undergo peer review for possible reduction of privileges.

## Use of University of Illinois

The First Court Expert had no recommendations related to UIC.

**Current Recommendations**

1. In addition to Key Recommendation #4 above, we strongly suggest that IDOC explore the possibility of utilizing the university programs to assist with respect to comprehensive medical care, dialysis, dental, nursing, and pharmacy programs.

## Clinic Space and Equipment

**First Court Expert Recommendations**

1. All sick call must take place in a designated area that allows sick call to be conducted in an appropriate space that is properly equipped and provides for patient privacy and confidentiality. *We agree with this recommendation. The existing spaces and conditions at NRC, Dixon, and some of the rooms at MCC are unacceptable for the performance of*

*sick call services, and to protect patient privacy and confidentiality. Non-functional or missing equipment and supplies were noted in clinical areas at almost all of the five facilities inspected. These deficiencies present barriers to the delivery of care and create an unprofessional work environment for both clinical and correctional staff.*

2. Equipment, mattresses, etc., which have an impervious outer coating must be regularly inspected for integrity and repaired or replaced if it cannot be appropriately cleaned and sufficiently sanitized. *We agree with this recommendation. Torn mattress coverings and/or uncovered foam cushions were noted at NRC, SCC, and MCC. Varying degrees of torn examination table upholstery were noted at SCC, LCC, and MCC. Frayed and ripped upholsteries on staff chairs in the clinical areas were noted at SCC and MCC. These deficiencies make it impossible to properly clean and sanitize the beds and examination tables, creating infection control risks and an unprofessional work environment for clinical staff.*

3. A paper barrier which can be replaced between patients should be used on all examination tables. *We agree with this recommendation. Varying degrees of absent changeable paper barriers on examination tables and no evidence of a suitable alternate method to sanitize examination tables between patients were identified at all of the facilities, with the exception of MCC. This deficiency creates an infection control risk for patients and staff.*

4. Handwashing and sanitizing must be provided in all treatment areas. *We agree with this recommendation. Sinks were lacking in all nurse sick call areas and one provider backup exam room at NRC,  one nurse sick call room at SCC, three nurse sick call rooms  at Dixon, one provider room at LCC, and one clinical exam room at MCC. Hand sanitizing gel was not consistently identified as available in treatment rooms lacking sinks.*

**Additional Recommendations**

5. All of the infirmaries must have sufficient numbers of hospital beds with adjustable heights, heads, and legs, and safety railings to meet the clinical and safety needs of the high-risk infirmary patient population. The infirmaries at NRC, SCC, and MCC lacked an adequate quantity of hospital beds.

6. Nurse call devices must be installed in all infirmaries. The infirmary at MCC was the only infirmary found to be lacking nurse call devices.

7. All facilities must have a sufficient number of examination rooms to accommodate all the nurses and providers who are simultaneously assigned to see patients. NRC, Dixon, and LCC do not have an adequate number of properly equipped examination rooms to accommodate all of their treating nurses and providers. This is a barrier to access to care at these facilities.

8. The showers in the infirmaries and other special housing units (geriatric, ADA, etc.) must have intact, non-slip floors, safety grab bars, shower chairs, and proper ventilation to assure the safety and health of the high-risk population assigned to these special housing units. Showers in special housing units in all of the facilities inspected had notable structural and safety deficiencies that put the health and safety of this compromised population at risk.

PTX193-0126

9. The physical condition of the hemodialysis unit at SCC must be immediately addressed by the contracted vendor, IDOC, and Wexford.
10. The flooring on all three floors of the health care building at Dixon must be immediately replaced. The vast number of cracked, missing, and loose floor tiles throughout the three-story health care building puts patients, medical staff, and correctional staff at risk for injury.

## Medical Records

**First Court Expert's Recommendations**
1. Problem lists should be kept up to date. *We agree with this recommendation but believe it is a physician practice issue not a medical record issue.*
2. Only providers should have privileges to make entries on the problem list. *We agree with this recommendation.*
3. The system of "drop filing" should be abandoned. *We agree with this recommendation.*
4. Medical records staff should track receipt of all outside reports and ensure that they are filed timely in the health record. *We agree with this recommendation. See also First Court Expert's recommendation #8 in specialty care below.*
5. Charts should be thinned regularly and MARs filed timely. *We agree with this recommendation.*
6. Consideration should be given to scanning specific important records into the new electronic system if possible. *It is our opinion that all medical record documents that are not electronic need to be scanned to the electronic record. This should not occur just "if possible;" it is required.*

**Additional Recommendations**
7. See Key Recommendation #9 above.
8. If paper records are continued, *all records* need to be located near by the medical records office so that any volume of the record can be easily obtained for clinical care.
9. The medical record must include dialysis records or summaries of dialysis records so that clinical staff understand the status of the patient's dialysis.
10. Medical records rooms need to be secured. Only medical record staff should pull or re-file medical records. Only authorized personnel should be permitted in a medical record room.
11. Records should be maintained in accordance with guidance from the Illinois Department of Human Services.
12. When records are pulled for use, an outguide should be used to identify that the record has been pulled and where the record is.
13. Policy for medical records needs to be revised to include the electronic medical record currently in use and should also address security and confidentiality of the medical record paper or electronic.

**PTX193-0127**

## Medical Reception

**First Court Expert Recommendations**

*We agree with the First Court Experts recommendations which include*:

1. Sufficient nursing and clinician staff to complete the reception evaluation in one week.
2. A process that ensures that a clinician reviews all intake data, including laboratory tests, TB screening, history and physical, etc., and develops a problem list and plan for each problem.
3. Forms to identify acute symptoms (i.e., a review of systems).
4. A requirement that clinicians, during the history, elaborate on all positives from the nurse screen.
5. A system of placing patients on hold in the midst of appointments or incomplete treatment.
6. A policy that requires the medical record to be well organized and the staff to ensure this is accomplished.
7. A quality improvement process that monitors completeness, timeliness, and professional performance, and is able to intervene in order to implement improvements.
8. A Medical Director trained in primary care.
9. A HCUA dedicated to NRC and appropriate supervisory resources.
10. A well-trained Quality Improvement Coordinator at each reception center and each facility dedicated to ensuring the timeliness, completeness, and appropriateness of clinical decisions.

*We disagree with the First Court Expert's recommendation to have a system that ensures relevant electronic data arrives with patients from Cook County Jail. While access to the electronic medical record is desirable, we find that provision of a paper medical transfer summary is adequate.*

**Additional Recommendations**

11. IDOC health care leadership should develop and implement an electronic medical reception tracking log that documents the timeliness of completion of all required medical reception transfer activities.
12. IDOC should amend medical reception forms to include a comprehensive review of systems (ROS) to identify serious medical conditions.
13. Providers need to take and document a medical history and not rely only on the nurse history.
14. At medical reception, medical records staff should initiate a green jacketed medical record for each patient, with documents filed under the correct tab, eliminating drop filing.
15. Examination rooms should be adequately equipped and supplied, including paper for examination tables to provide infection control barriers between patients. Furniture that is torn or in disrepair should be replaced.

16. At LCC, a microscope should be purchased for medical reception evaluations to diagnose vaginal infections.

17. Staff should change gloves and wash their hands between patients.

18. The IDOC Administrative Directive 04.03.101 should be revised to eliminate obtaining written consent for HIV testing given the opt-out policy that has been established.

19. Weight scales should be periodically calibrated (e.g., weekly).

20. At LCC, nurses should perform and document urine pregnancy testing on all women of child-bearing age.

21. Nurses should measure uncorrected and corrected visual acuity in each eye and document results in the medical record. If large Snellen charts are used, the nurse should ensure the patient stands the correct distance away from the chart. Consider smaller hand-held Snellen charts.

22. Use QuantiFERON testing to detect TB infection rather than tuberculin skin testing.

23. As long as TST is being performed, nurses should correctly read tuberculin skin tests via palpation and measurement of induration. This should be done in a medical setting, not through the food port.

24. Nurses should timely document tuberculin skin test results in the medical record (e.g., within 24 hours).

25. Providers should document review of medical transfer information sent by county jails.

26. Providers should perform a history to include pertinent review of systems for each chronic disease and/or significant illness.

27. Providers should order CIWA and/or COWS monitoring in accordance with current guidelines for patients withdrawing from alcohol, opiates, or other drugs.

28. Providers should provide continuity of medications unless there is a clinical indication for changing medication regimens (e.g., glargine to NPH insulin, etc.).

29. Providers should document all significant medical conditions onto the patient's problem list.

30. Nurses should transcribe all medication orders (i.e., KOP and nurse administered) onto a MAR at medical reception and document administration of KOP medications at the time they are administered to the patient.

31. Health care leadership should develop systems to ensure that all physician orders are timely implemented (e.g., EKG, blood pressure monitoring, etc.).

32. Providers should timely follow-up on all abnormal labs.

33. Providers should use a chronic disease form or document that they are evaluating the patient for chronic care when seeing patients for the first chronic disease appointment within 30 days.

34. Health care leadership should revise medical reception policies and procedures to provide sufficient operational detail to staff to adequately complete each step of the process.

35. Health care leadership should develop and monitor quality indicators related to each step of the medical reception process.

## Intrasystem Transfer

**First Court Expert Recommendations**
1. Custody must propose a list of transferring inmates to medical at least 24 hours prior to transfer.
2. Inmates with scheduled offsite services should be placed on medical hold until the service has been provided.
3. A nursing supervisor should regularly review a sample of transfer summaries of patients about to be transferred to ensure completeness of the data.
4. Office of Health Services should provide a guide as to how to efficiently review a record to identify important elements to be included in the summary.
5. When patients arrive, they must be brought to the medical unit and a nurse must be responsible for facilitating continuity of required services.
6. At least quarterly, this service must be reviewed by the QI program.

*We agree with these recommendations.*

**Additional Recommendations**
7. IDOC should develop an intrasystem transfer policy and procedure consistent with NCCHC standards, and that provides sufficient operational guidance to staff regarding each step of the process.
8. IDOC/Wexford should train staff regarding the revised policy.
9. Nurses should complete each element on the intrasystem transfer form and address all aspects of health care requiring continuity.
10. A system should be developed and implemented that provides sending facilities feedback when there are errors on the intrasystem transfer form.

## Nursing Sick Call

**First Court Expert Recommendations**
1. Each facility is to develop and implement a plan to ensure:
   a. Sick call is conducted in a defined space that is appropriately equipped and provides patient privacy and confidentiality.
   b. Sick call requests are confidential and viewed only by health care staff.
   c. The review/triage of sick call requests and conducting of sick call is performed by a licensed RN.
   d. Legitimate sick call encounters to include collecting a history, measurement of vital signs, visual observations, and a "hands on" physical assessment.
   e. There must not be arbitrary restrictions on the number of symptoms to be addressed at an encounter.
   f. Following Office of Health Services policy and procedure.
   g. Complete documentation.
   h. Implementation of a sick call log.
   i. Administration must ensure health care activities such as sick call are not routinely cancelled, as this results in unacceptable delay in health assessment.

**PTX193-0130**

*We agree with these recommendations.*

**Additional Recommendations**

2.  IDOC should revise its Administrative Directives on nursing sick call to provide adequate policy, operational, and procedural guidance regarding how to implement the policy.[264] The policy should include:

    a.  Designating what IDOC forms are used for inmates to submit written health requests and which staff are responsible for ensuring that they are available to inmates on a daily basis.

    b.  Developing a standardized paper or electronic Nursing Sick Call Tracking Log.

    c.  Installation of lockable Health Request form boxes that are accessed only by health care staff in each inmate housing unit.

    d.  Inmates must be permitted out of their cells on a daily basis to confidentially submit their health requests into health request boxes, except in restricted housing units where nurses collect health request forms.

    e.  Health care staff should collect health care request forms seven days per week.

    f.  Health care staff should legibly date and time receipt of health requests.

    g.  An RN should triage health requests and document a disposition on the form (e.g. urgent, routine). Nurses should legibly date, time, and sign the form, including credentials.

    h.  Each health request should be entered onto the Sick Call Log, including the urgency of the disposition.

    i.  A nurse should schedule patients to be seen in accordance with the urgency of their complaint.

    j.  Nursing sick call should be conducted in adequately lighted, equipped, and supplied rooms with access to a sink for handwashing. This includes a desk and chairs so the nurse and patient can be seated, and an examination table, otoscope, scale, etc. Consider installing lockable cabinets to store supplies (e.g., nurse protocol forms, gauze, tape, tongue blades, etc.).

    k.  Nurses should have the medical record available at the time of the sick call encounter.

    l.  An RN nurse should perform and document an assessment of each patient in accordance with treatment protocol forms and/or sound nursing judgement.

    m.  Nurses should refer patients to providers in accordance with the treatment protocol and in accordance with sound nursing judgment.

    n.  Health requests should be filed chronologically in the medical record.

    o.  At the regional and institutional level, health care leadership should develop and monitor quality indicators associated with each step of the sick call process.

3.  IDOC should standardize the nursing sick call process to all institutions.[265]

---

[265] Variances to the policy should only be granted to institutions that have demonstrated that access to care is timely and appropriate.

**PTX193-0131**

## Chronic Care

**First Court Expert Recommendations**

1. Patients should be seen in accordance with the degree of control of their diseases, with more poorly controlled patients seen more frequently and well controlled patients seen less frequently. *We agree with this recommendation.*

2. Chronic care forms and flow sheets should be updated and designed so that all chronic diseases are addressed at each visit. *We agree with this recommendation. We add that use of an electronic medical record can eliminate the problem of inadequate forms and the time wasted completing multiple forms for persons with multiple chronic illnesses.*

3. HIV patients should be followed regularly by IDOC providers in the chronic care program to monitor for medication compliance, side effects of therapy, and overall health status. *We agree that IDOC physicians should monitor patients between UIC telemedicine visits to address problems that occur.*

4. The Asthma Treatment Guideline should be replaced with a guideline on the treatment of pulmonary diseases to include COPD and chronic bronchitis as well as asthma. This guideline should be modeled after the NHLBI.[266] *We agree in part. It is our opinion that it is not efficient or productive for the IDOC to write chronic clinic guidelines, as they will not have the expertise or time to do this. Their guidelines should be confined to the timeliness and frequency of clinics, the required laboratory and other testing for inmates with chronic illness, and the conditions under which patients are referred for specialty management of a chronic illness. It is our opinion that the IDOC should refer providers to national standards of medical care in lieu of chronic disease guidelines. These should include at a minimum:*

   o *Standards of Medical Care in Diabetes, American Diabetes Association as found at http://care.diabetesjournals.org/content/38/Supplement_1/S1.full.*

   o *2014 Evidence-Based Guideline for the Management of High Blood Pressure in Adults, Report from the Panel Members Appointed to the Eighth Joint National Committee (JNC 8). As found at http://jama.jamanetwork.com/article.aspx?articleid=1791497.*

   o *Guidelines for the Diagnosis and Management of Asthma (EPR-3), National Heart, Lung, and Blood Institute as found at http://www.nhlbi.nih.gov/health-pro/guidelines/current/asthma-guidelines.*

   o *2013 American College of Cardiology/American Heart Association Guideline on the Treatment of Blood Cholesterol to Reduce Atherosclerotic Cardiovascular Risk in Adults as found at https://circ.ahajournals.org/content/early/2013/11/11/01.cir.0000437738.63853.7a.full.pdf.*

   o *Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC found at http://www.cdc.gov/mmwr/PDF/rr/rr5509.pdf*

---

[266] National Heart Lung and Blood Institute; Guidelines for the Diagnosis and Management of Asthma (EPR-3) published August 2007 as found at https://www.nhlbi.nih.gov/health-topics/guidelines-for-diagnosis-management-of-asthma.

PTX193-0132

- o *Global Initiative for Chronic Obstructive Lung Disease updated 2016 as found at http://www.goldcopd.org/uploads/users/files/WatermarkedGlobal%20Strategy%202016(1).pdf.*
- o *HIV/AIDS guidelines sponsored by National Institutes of Health found at https://aidsinfo.nih.gov/guidelines.*
- o *The Management of Sickle Cell Disease, National Institute of Health/National Heart, Lung, and Blood Institute as found at http://www.nhlbi.nih.gov/files/docs/guidelines/sc_mngt.pdf.*

*When a patient has a disease other than one supported by a referenced guideline, the IDOC should require that provider refer to UpToDate® as a reference.*

5. There should be a chronic clinic devoted to women's health to include specific guidelines on cervical and breast cancer screening as well as other issues unique to this population. *We agree with this, but note that IDOC has Administrative Directive guidance on initial and subsequent cervical and breast cancer screening. Even though there is an obstetrician available for pregnancy care, access of females to care for female care issues could be improved.*

6. The TB guideline should be updated to provide basic information regarding interferon gamma testing, including appropriate uses of this test. *It is our opinion as stated in Infection Control Recommendation 1.d. that interferon gamma testing should replace Mantoux skin testing for tuberculosis screening of all individuals.*

7. Policy should require that patients who miss medications repeatedly or for a significant period of time are referred to a provider to address the issue. *We agree with this recommendation.*

8. Copies of the current MAR should be available for the provider's review during chronic care clinic. *We agree with this recommendation.*

**Additional Recommendations**

9. All chronic illnesses should be monitored at every chronic disease clinic.

10. Consult with an endocrinologist or diabetes specialist to perform a comprehensive review, recommendations and training concerning the management of diabetes, and in particular, insulin-prescribed diabetes in the IDOC.

11. Implement and utilize current Center for Disease Control (CDC) age-based and disease-based standards for the administration of adult immunizations.

12. Implement and utilize current United State Preventive Services Task Force (USPSTF) guidelines for screening adults for cancer and other conditions. The IDOC should adopt the A and B recommendations of the USPSTF.

13. Calculate and document the ten year cardiovascular risk score on all appropriate adults to assist with the decision and timing to initiate HMG-CoA reductase inhibitors (statins).

14. Revise the current restrictive criteria and lengthy screening and approval process utilized to determine in order to expand the number of active hepatitis C patients are eligible for treatment and when treatment is initiated.

PTX193-0133

15. Particularly given the current configuration of physicians, when a physician has not been trained in residency training to manage an illness, the physician should refer that patient to a physician who is trained in managing that condition.

16. Increase access to specialty care throughout the IDOC by increasing the number of onsite specialty consultants, expanding the existing telehealth specialty program to include additional medical specialists to assist facility providers with the management of complex and common medical conditions including diabetes, hypertension, cardiology, dermatology, neurology, and non-HIV, non-hepatitis C infectious diseases, and establishing an e-consult program that would allow providers to readily consult with specialists about diagnostic and treatment questions.

17. Develop a plan to shift anticoagulation treatment from vitamin K antagonists (warfarin) to new types of anticoagulants that do not require frequent ongoing lab testing and frequent dose modifications to achieve an adequate state of anticoagulation.

## Urgent/Emergent Care

**First Court Expert Recommendations**

1. All facilities must track urgent/emergent services through using a logbook maintained by nursing which includes patient identifiers, the time and date, the presenting complaint, the location where the patient is seen, the disposition and when the patient is sent out, the return with the appropriate paperwork including an emergency room report, and appropriate follow up by a clinician. *We agree with this recommendation. All facilities, except NRC, provided a list of patients sent to the ED, but did not provide a log that contains a list of all unscheduled urgent/emergent encounters. Patients seen urgently, but not sent to the ED, are not consistently tracked on a log. The current list does not include the location the patient was seen (cell front, sick call area, trauma room, yard etc.), whether a report was returned with the patient, and the date the patient was seen by a provider for follow up after receiving offsite services. Existing logs should be modified to include this data.*

2. Assessments must be performed by staff appropriately licensed to be responsible for that service. *We agree with this recommendation. The use of CMT and LPNs to respond to medical emergencies is not within their scope of practice. Only registered nurses have a scope of practice that allows them to make independent decisions about whether to contact a clinician. There should be sufficient registered nurse staffing so that an RN is assigned to respond to evaluate patients with urgent/emergent complaints.*

3. Guidelines should be developed for nursing staff with regard to vital signs reflecting instability that require contacting a clinician. *We agree with this recommendation. We note that the IDOC issued a revised set of nursing treatment protocols in March 2017. The document does provide guidance to nurses on vital sign results among the determinants in contacting a provider. Ongoing review of urgent/emergent clinical performance using the criteria in the protocols would aid in improving nursing performance and is also useful in identifying revisions or additions that should be made to the protocols.*

**PTX193-0134**

4. When patients are sent offsite, work with hospitals to ensure that the emergency room report is given to the officer to return to nursing with the patient. *We agree with this recommendation. We found many examples of patient discharge instructions but few actual records from emergency room visits or hospitalizations. This was particularly true of hospitals in the local community. The First Court Expert recommended developing an understanding that payment for services included receiving at least the discharge summary from a hospital. We agree that this is one way to accomplish this.*

5. Patients returning from an emergency trip must be brought to a nursing area for an assessment and if not placed in the infirmary, scheduled for an assessment by an advanced level clinician. *We agree with this recommendation. The follow up by an advanced level clinician needs to be within three days (see recommendation #7 below). We found many instances of patients returning from offsite services who were not seen promptly upon return or not seen at all. We also found instances of patients returning from offsite services who should have been put in the infirmary, but instead were housed in general population.*

6. The Office of Health Services should provide guidance with regard to the types of clinical problems that require services beyond the capability of the infirmary, thus sending patients to the local hospital. *We agree with this recommendation.*

7. Insure that after the patient returns, he is seen by a clinician within three days where there is documentation of a discussion of the findings and plan as described in the emergency room report. *We agree with this recommendation. However, given the number of hospital visits where the patient is never seen, we suggest IDOC consider requiring patients sent off site in an emergency be admitted to the infirmary upon return to the facility until evaluated by a provider and a plan for ongoing care established.*

8. The QI program should monitor timeliness and appropriateness of professional responses. *We agree with this recommendation. All unscheduled urgent/emergent encounters should be reviewed by a nurse manager as soon as possible after the encounter but no longer than the next business day. The review by the nurse manager should include review of the nursing assessment for compliance with the relevant treatment protocol as well as timeliness of the response. These reviews should be documented, and an analysis given to the QI committee monthly, including recommended areas of improvement. The QI committee should direct corrective action or performance improvement plans and monitor implementation. In addition, a sample of patients sent to the ED should be reviewed at least quarterly to evaluate whether the care of the patients in the months preceding the offsite could have better addressed the clinical reason the patient required unscheduled urgent/emergent care. Examples of conditions which should be considered for review are seizures, hypoglycemia, ketoacidosis, infection, etc. The results of chart review should be analyzed to identify individual clinicians who would benefit from coaching or other performance improvement measures as well as systemic factors that would improve care. The analysis should be presented to the QI committee and the systemic factors discussed to identify corrective action to be taken.*

9. As an aspect of the QI program, review nursing and clinician performance to improve it. *We agree with this recommendation. See discussion of #8 above.*

PTX193-0135

**Additional Recommendations**

10. The Office of Health Services should standardize the equipment and supplies that are at the facilities for emergency response. This should include specifying the contents of the emergency bag, identifying the minimum number and location of AEDs and other equipment (oxygen tanks, suction, cervical collars, etc.) for each site, and whether one or more trauma or disaster bags are kept in addition to the emergency bags. The contents of the emergency bag (and if kept on-site, trauma and disaster bags) should be listed on the outside of the bag and include the expiration date of any medicine or other supplies. Every opening on the emergency bag (and trauma or disaster bags) should be sealed with a numbered, plastic seal or lock to indicate that the contents are undisturbed.

11. Emergency equipment and supplies should be checked each shift and documented on a standardized log. The log should list what specifically is to be checked (i.e., the expiration date of the electrodes on the AED, the pressure in the oxygen tank, etc.) and include the numbers of the tags on the sealed emergency bag. If the locks are intact, the bag does not have to be opened and checked. If the bag has been opened, it is removed from service until it has been replenished and a new seal applied. The log is checked daily by a nurse manager to ensure that equipment is being checked and is functional.

12. The Office of Health Services should monitor to ensure compliance with expectations for emergency response equipment and that drills are conducted per the AD. The Office of Health Services should also develop a template with criteria to be considered in the review and analysis of emergency response and mass disaster drills, and monitor the reporting and corrective action pursued through the facility CQI committees.

13. The Office of Health Services needs to incorporate in its quality improvement program review of sentinel events.[267]  These should be reviewed consistent with methodology used for mortality review in an attempt to discover correctible process errors or other errors.


## Specialty Consultations

**First Court Expert Recommendations**

1. The entire process, beginning with the request for services, must be tracked in a logbook, the fields of which would include date ordered, date of collegial review, date of appointment, date paperwork is returned and date of follow-up visit with clinician. There should also be a field for approved or not approved, and when not approved, a follow-up visit with the patient regarding the alternate plan of care. *We agree that offsite specialty care needs to be tracked and this system of tracking should continue if a prospective review process is continued. This tracking should be standardized across all IDOC facilities and directed and/or managed by IDOC.*

2. Presentation to collegial review by the Medical Director must occur within one week. *See Key Recommendation #5 above. We believe the collegial process should be abandoned as a patient safety hazard. Doing so makes this recommendation mute.*

---

[267] Sentinel events are unexpected events involving death or serious physical harm or risk of harm.

**PTX193-0136**

3. When a verbal approval is given, the authorization number must be provided within one business day to the onsite scheduler. *See Key Recommendation #5 above. We believe the collegial process should be abandoned as a patient safety hazard. Doing so makes this recommendation mute.*

4. When a scheduled routine appointment cannot be obtained within 30 days, a local resource must be utilized. *We generally agree with this recommendation. But we note that some referrals are meant to be longer than 30 days out. This recommendation relates to UIC referrals presumably and we agree that for routine appointments that are meant to occur as soon as can be reasonably scheduled local resources should be used when UIC cannot provide a timely appointment.*

5. Scheduling should be based on urgency. Urgent appointments must be achieved within 10 days; if emergent, there should be no collegial review and there should be immediate send out. Routine appointments should occur within 30 days. *We agree with this recommendation. But we note that some referrals are meant to be longer than 30 days out (e.g., a patient is referred by a cardiologist to be seen in follow up in six months)*

6. When the patient receives the service, the paperwork and the patient must be returned to the appropriate nursing area so that the nurse can identify what the needs are. *We agree with this recommendation.*

7. When the patient returns without a report, a staff member should be assigned to contact offsite services and obtain a report. *We agree in principle with this recommendation. However, it is our opinion that the root cause of this problem is a failure of the vendor to negotiate with contract hospitals and consultants in order to obtain reports. To force line staff to attempt to obtain reports is misplaced and is unlikely to succeed. The vendor must correct this problem systemically.*

8. Either a nurse or the scheduler must be assigned responsibility for retrieving offsite service paperwork timely and this should be documented in the offsite service tracking log. *We agree in principle with this recommendation. However, it is our opinion that the root cause of this problem is a failure of the vendor to negotiate with contract hospitals and consultants in order to obtain reports. To force line staff to attempt to obtain reports is misplaced and unlikely to correct the problem. The vendor must correct this problem.*

9. Nurses should contact clinicians for any orders. *We agree with this recommendation.*

10. When patients are scheduled for appointments, they should be put on hold for as long as clinically necessary to complete the appointment before being transferred. *We agree with this recommendation.*

11. When the paperwork is obtained, an appointment with the ordering clinician or Medical Director must be scheduled within one week. *We agree with this recommendation.*

12. That encounter between the patient and the clinician must contain documentation of a discussion of the findings and plan. *We agree with this recommendation.*

**Additional Recommendations**

13. See Key Recommendation #5 above.

14. We recommend that IDOC investigate and negotiate for expanded specialty coverage via telemedicine with UIC or SIU. Given the degree of underutilization, additional

PTX193-0137

specialty care resources will be indicated. To the extent possible (onsite providers, onsite radiography, etc.) IDOC will need to increase specialty care resources to attain adequacy. The extent to which unqualified doctors continue to be used, the expansion of specialty care necessary to attain adequacy will be considerable.

## Infirmary Care

**First Court Expert Recommendations**

1. It is our opinion a registered nurse should be readily available to address infirmary patient issues as needed. *We agree with this recommendation.*
2. In the large facilities, such as SCC, Pontiac, and MCC, where medical staff is assigned to work in multiple buildings/cell houses outside the main health unit where infirmary is located, it is recommended that at least one registered nurse is assigned at all times to the building where the infirmary is located. *We agree with this recommendation provided the analysis called for in Key Recommendations #3 and #8 are completed and this level of coverage is sufficient to ensure the safety and meet the needs of patients in the infirmary. We also have concerns that nurses in the building  but not on the infirmary will not hear the alarm unless they are present on the infirmary unit.*
3. At all other facilities, it is recommended at least one registered nurse is assigned to each shift. *We agree with this recommendation.*
4. The infirmary policy should include specific clinical criteria which are appropriate for infirmary care, and those criteria which exceed the level of care which can safely be provided in an infirmary setting and would indicate referral to the hospital. *We agree with this recommendation.*
5. The infirmary policy should provide criteria outlining when patients are stable enough to be discharged from the infirmary and require follow up after infirmary discharge. *We agree with this recommendation.*
6. Develop and implement a plan to open and operate the NRC infirmary. *The NRC infirmary was opened in 2016 and this recommendation is no longer necessary.*
7. Develop and implement a plan to insure a constant security presence in the infirmary. *We agree with this recommendation. Security staff are stationed at desks outside the SCC and Dixon infirmaries. During the day shifts, correctional officers were observed inside both of these infirmaries.*
8. Develop and implement a plan to insure each infirmary patient is provided a nurse call device. *We agree with this recommendation. Nurse call devices are in place in all patient rooms at the NRC and LCC infirmaries and in some infirmary rooms at SCC and Dixon. MCC's infirmary has not placed nurse call devices in any infirmary patient rooms.*
9. Develop and implement a plan of teaching/continuing education for nursing staff which addresses accurate and informative documentation. *We agree with this recommendation.*
10. The inconsistencies between IDOC and Wexford Infirmary policies should be rectified, specifically regarding the issue of 23-hour admissions/temporary placements. *We agree with the recommendation. Wexford policies were no longer in use at the time of our visits*

11. The infirmary policy should clarify for nursing staff those criteria that are appropriate for temporary observation vs. those that require evaluation by a provider prior to release from the infirmary. *It is our opinion that if a nurse believes that a patient needs to be placed on the infirmary for observation, a physician should examine the patient the following day. The rationale is that if a nurse judges a patient to have an urgent medical condition requiring infirmary admission, a physician should see the patient.*

12. Ensure that institutions with infirmaries have at least one registered nurse available onsite 24 hours a day. *We agree with this recommendation. See also recommendation #2 above.*

13. The infirmary policy should require follow up after discharge from the infirmary. *We agree with this recommendation.*

14. Develop and implement a plan to insure sufficient quality and quantities of infirmary bedding and linens. *We agree with this recommendation. We note that with the exception of NRC, a sufficient quantity of bedding and linens in reasonably good condition were available in the infirmaries inspected. This does not address the laundering of linens which is addressed in the Infection Control Recommendations below.*

**Additional Recommendations**

15. Health care leadership and the quality improvement committee should develop, monitor, and report quality indicators that measure and track provider and nurse adherence to the infirmary policy and the quality of the acute and chronic care provided to infirmary patients.

16. Problem lists in the infirmary charts must be complete and accurate.

17. Provider infirmary notes must be legible, communicate the rationale for modifications in treatment, list reasonable differential diagnoses, document pertinent physical findings and symptoms, record clear treatment plans, and include regular comprehensive progress notes that update the status of each and every acute and chronic illness.

18. Provider infirmary admission notes and progress notes should be performed in accord with the timeframes detailed in IDOC policy 04.03.120, Offender Infirmary Services.

19. Physical therapy services must be provided in the infirmary for those patients who cannot be readily moved to the physical therapy treatment rooms.

20. Patients whose clinical needs and support for their activities of daily living exceed the capability of the infirmaries must be transferred to a licensed skilled nursing facility in the community or to an infirmary in the IDOC that meets all the State of Illinois standards for licensure at a skilled nursing facility. See Key Recommendation #8.

21. Educate, encourage, and direct infirmary providers to expeditiously consult with surgical and medical specialists to address the care of complex infirmary patients.

# Pharmacy and Medication Administration

**First Court Expert Recommendations**

1. Following patient ingestion of medication, security staff should be responsible to check the mouth for contraband. *We agree with this recommendation. Some officers we observed do check for ingestion, but it was sporadic. See also Key Recommendation #12*

*which recommends that the IDOC develop, in collaboration with the Office of Health Services, an Administrative Directive that provides standardized guidance to custody staff on the expectations for safe delivery of medications. The IDOC should translate this into post orders at each site that explicitly detail correctional officers' responsibilities during medication administration. This should ensure that nurses are safe and can administer medication in accordance with established nursing standards.*

2. A security staff member must be assigned to accompany the nurse who performs medication administration. *We agree with this recommendation. See Key Recommendation #12. Correctional officer support is essential to complete medication administration swiftly and safely. This includes not just escort but also controlling movement and distractions in the environment (television, fights, etc.), accounting for missing inmates, and ensuring that inmates ingest medication that has been administered. Many facilities identify these duties in the officers' post orders as discussed in the recommendation above.*

**Additional Recommendations**

We provide detailed recommendations in the facility reports for improvements needed in pharmacy and medications services. They are so numerous and basic that they are not restated here. The five recommendations below are overarching and require the concerted and immediate attention of IDOC.

3. Pharmacy and medication services need to be completely redone to bring practices into conformance with standards of care. This should be accomplished by leadership from the Office of Health Services and managed as a comprehensive plan of change with clear targets, steps to proceed, timeframes, and outcomes.

4. IDOC Office of Health Services needs to establish more detailed operational guidance (See Key Recommendation #6) that specifies how medication is prescribed, how and by when treatment is initiated, how medication is to be administered safely and timely, including support to be provided by the facility, and establish how and by when documentation of medication administration takes place. At a minimum this should include:

   a. Nurses should timely transcribe medication orders onto a MAR;
   b. Nurses should have the MAR present at all times medication is administered to patients;
   c. Nurses should administer medications to patients directly from pharmacy-dispensed containers and contemporaneously document administration on the MAR.

5. Computerized provider order entry should be implemented at all facilities. This will resolve problems with legibility and, if a template is created, assist providers to write complete orders. The MAR should also be automated. Automation of the MAR will make information on medication orders and treatment available to providers, who can use this information to guide decisions about subsequent care. Automation will provide detailed and accurate statistical measures of medication administration and of compliance of medication by individual inmates. Automation will also provide staff and

managers with information which directs work and identifies outliers, which can be immediately resolved. See also Key Recommendation #9 above.

6. Facility operations need to provide sufficient access to inmates so that medications are administered safely. This may mean that schedules need to be renegotiated or additional personnel or equipment must be obtained. The compromise of widely accepted practices to administer medication is unacceptable. See Key Recommendation #12 above.

7. Health care programs at each facility should be expected to monitor the extent practices comply with the expectations of the Office of Health Services (as described in recommendation #4) and to report these results to the CQI committee. CQI committee meetings should document the analysis of root causes of systemic problems, develop corrective action plans, and monitor the results of corrective action. The Office of Health Services needs to monitor facility compliance with the comprehensive plan of change as well as performance criteria outlined in the operational guidelines.

## Infection Control

**First Court Expert Recommendations**

1. Each facility is to do the following:

   a. Develop a position description and name an Infection Control (IC)/Quality Improvement (QI) registered nurse (IC/QI-RN) and provide training on communicable and infectious disease recognition, monitoring and reporting, and the Quality Improvement process.

   *We agree, but would modify the recommendation as follows: The IDOC should develop the position description for an infection control nurse that includes the duties listed by the First Court Expert on page 35 of his report as well as responsibility for coordination of clinics and care for patients with HIV and HCV; the initiation and follow up of treatment for patients with tuberculosis; monitoring and managing vaccination programs for inmates and staff; managing and providing surveillance of infectious and contagious disease screening programs; monitoring and resolving problems with conditions of confinement that are known risks for communicable disease transmission; monitoring and managing Occupational Safety and Health Administration (OSHA) requirements to provide protection from infectious disease by delivering training, overseeing the availability and use of PPEs, and screening with vaccination of staff and inmates; and conduct surveillance, manage and report on resolution of communicable disease outbreaks in collaboration with the Illinois Department of Public Health. Each facility should be expected to fill this position and operate an infection control program consistent with the position description adopted by IDOC. This model is in place at MCC and should be used as a model for other facilities. It needs to be a dedicated position but does not have to be a nursing supervisor. We note that the First Court Expert recommends combining the infection control and quality improvement responsibilities.  It is our recommendation that*

*each of the infection control positions be a dedicated full time position and not combined with quality improvement responsibilities.*

*In addition, the IC-RN should report to the statewide Communicable and Infectious Diseases Coordinator for clinical performance.*

b.  Develop and implement a plan for the IC/QI-RN to conduct monthly documented safety and sanitation inspections, focusing at a minimum on the healthcare unit, infirmary, and dietary department, with monthly reporting to the Quality Improvement Committee (QIC).

*We agree with this recommendation and would amplify it as follows: Safety and sanitation inspections should monitor the condition, function, and annual certification of clinical equipment, the cleanliness and sanitation of clinical rooms, the integrity of all flat surfaces for sanitation, functionality of the negative pressure rooms, integrity of bed and chair upholstery including on infirmaries and ADA units, completion of medical cart and emergency response bag logs and ensuring proper sealing of these bags, the safety of shower areas used by special needs populations, the training of health care unit porters, and other health care issues. Reporting should include request and completion dates of all repair or replacement requests. Delays longer than 30 days should be reported to IDOC Office of Health Services for further efforts at resolution.*

c.  Develop and implement a plan for the IC/QI-RN to monitor food handler examinations and clearance for staff and inmates.

*We do not agree with this recommendation. A medical examination of persons to work as a food handler is not necessary because it only represents that individual's condition on the day of the exam and is not predictive of future illness or disease that would contradict working as a food handler. Instead, we recommend that staff and inmates working in food service be trained and pass an examination on proper food handling techniques, sanitation procedures, and what health conditions need to be reported to the food services supervisor. This training should be approved by the IDOC Communicable and Infectious Diseases Coordinator. In addition, food service supervisors should be trained and certified by IDOC or the IDPH in supervision of food handlers and prevention of food borne illnesses. The food services supervisor's job description should include responsibility to prevent food borne illnesses by monitoring workers' compliance with policy and procedures for food safety, and vigilance for health conditions that should exclude workers from food preparation and serving.*

d.  Develop and implement a plan for the IC/QI-RN to monitor compliance with initial and annual TB screening, with monthly reporting to the QIC and facility administration as needed.

*We agree with this recommendation and would amplify it to include the following: Monitoring shall include observation of TB screening practices as well as chart review. In addition, we recommend that IDOC replace skin testing with interferon gamma testing to screen for TB. We also recommend that each facility IC-RN complete training in TB control offered through the Southeastern National TB Center or online at the Centers for Disease Control.[268] The statewide Communicable and Infectious Diseases Coordinator should work with the Tuberculosis Control Section of the IDPH to determine rates of TB infection in the state correctional centers and establish parameters to monitor the quality and efficacy of TB screening, prevention and treatment.*

e.  Develop and implement a plan to aggressively monitor skin infections and boils, and work jointly with security and maintenance staff regarding cell house cleaning practices, with monthly reporting to the IC/QI-RN, QIC and facility administration as needed.

*We agree with this recommendation. Only one of the facilities we visited had implemented this recommendation. Given the poor conditions of the physical plant, particularly the showers and sinks, as well as the sanitation issues we observed with water temperatures and poor surface cleanliness, skin infection should be a major area of focus for infection control. Detailed records of each case should be kept on a log that identifies the housing and work assignments and places frequented by the inmate for programming. The log should be surveilled by the infection control nurse to identify cells and other locations to receive targeted deep cleaning. Finally, vigilance for skin infection referral needs to be broadly disseminated throughout the institution. Identification of possible skin and soft tissue infection needs to originate from sick call visits, provider visits, and use of urgent care, not just from the lab (culture) or pharmacy (antibiotics). Referrals from correctional officers to infection control of inmates with possible skin infection should be supported by the facility and health care program.*

*We also recommend that this tracking and monitoring include scabies and lice, two types of skin infection readily transmissible in correctional facilities and easily contained with astute and early intervention.*

f.  Develop and implement a plan to daily monitor and document negative air pressure readings when the room(s) is occupied for respiratory isolation and weekly when not occupied.

---

[268] https://www.cdc.gov/tb/education/professional-resources.htm, specifically the online course "TB 101 for Health Care Workers" and the Self Study Modules 1-9 as well as https://sntc.medicine.ufl.edu/home/index#/catalog, which provides a course "Arresting TB: Best Practices for Controlling TB in Corrections" and other seminars.

*We agree with this recommendation and would amplify it to include the following: Negative pressure rooms or alarm systems that are not functional after five days shall be reported to the Office of Health Services and a plan for correction established with the approval of the Office of Health Services. In addition, the statewide Communicable and Infectious Diseases Coordinator should establish, in consultation with the TB Control Section of the IPHD, the number of negative pressure isolation rooms that are needed and the location for each of these rooms based upon the population served.*

g.  Develop and implement a training program for healthcare unit porters which includes training on blood-borne pathogens, infectious and communicable diseases, bodily fluid clean-up, proper cleaning and sanitizing of equipment, infirmary rooms, beds, furniture, toilets, and showers.

*We agree with this recommendation and would supplement it with the following: Inmates shall not be assigned to work in the health care area until such training has been documented as received in the inmate's institution record. We would add that inmates will not be assigned work in the health care area until vaccinated for hepatitis A and B, a record of such vaccines has been documented in the inmate's record, and clearance for assignment to the health care area provided by health services is placed in the inmate's institution file.*

*In addition to the training, each facility should have procedures for the cleaning and sanitation of each area in the health care area to include proper use of PPEs. The policies and procedures at MCC should be considered an example once they have been updated.*

h.  Monitor all sick call areas to insure appropriate infection control measures are being used between patients, i.e., use of paper on examination tables which is changed between patients or a spray disinfectant is used between patients, examination gloves are available to staff, and hand washing/sanitizing is occurring between patients.

*We agree with this recommendation but would expand it to include all health care areas.*

i.  Develop and implement a plan to monthly monitor all patient care associated furniture, including infirmary mattresses, to assure the integrity of the protective outer surface, with the ability to take out of service and have repaired or replaced as needed.

*We agree with this recommendation and would supplement it with the following: Such monitoring shall include the condition, function, and annual certification of clinical equipment, the integrity of all flat surfaces for sanitation, integrity of bed,*

*chair, and other upholstery. Additionally, a record of each item found in disrepair, the date taken out of service, and the date repaired or replaced should be documented on a log. We would also recommend that IDOC establish the practice of recording the expected useable life and replacement date for each piece of patient care equipment with a replacement cost greater than $50 on a capital repair and replacement log. This log should be used to plan and requisition replacement equipment and furniture.*

j.   Interface with the County Department of Health and Illinois Department of Health, and provide reporting as required by each.

*See our Key Recommendation #7 above. We agree with this requirement and found that an individual at each facility had been designated with this responsibility. We did not evaluate if reportable conditions were being reported as required to the county and state health departments. There was evidence of collaboration between IDOC facilities and the county/state health departments.*

*However, this interface should be for more than just reportable conditions, as it is now. The relationship with county health departments and the state should include establishing prevalence rates for certain communicable diseases, validation of communicable disease screening processes and results, access to the state vaccine registry and to vaccines, assistance with monitoring environmental safety and sanitation, and so forth. The statewide Communicable and Infectious Diseases Coordinator should be principally involved in establishing these relationships and developing organizational relationships that translate Illinois' interests and goals for the health and safety of its citizens into the state prisons.*

k.   Develop and implement a plan for the proper sanitizing of healthcare unit linens.

*We agree with this recommendation. IDOC has known that linens are not adequately sanitized since at the least the First Expert's report and has not corrected it. This is an example of how pervasive and systemic the conditions for transmission of infection with communicable disease are in IDOC. The same could be said for the lack of protection provided during dialysis of patients with chronic hepatitis B. The fact that at SCC birds still fly through the kitchen and roost over the dining area today, after an outbreak of histoplasmosis at the Danville facility in 2013, is unfathomable except as a reflection of deliberate indifference to the health and safety of inmates.*

*These are problems that require the attention of infection control personnel who are trained and qualified in measures to prevent and control transmission of communicable disease in the prison setting. In addition to training and qualifications, the infection control nurse must have the authority to drive change in both institution and health care practices, with accountability to the Office of Health Services. In addition, a schedule for sanitation and disinfection for each area of the*

*institution should be established. The IC-RN should monitor compliance with the schedule as part of Safety and Sanitation rounds.*

2.  The Office of Health Services to fill the position of statewide Communicable and Infectious Diseases Coordinator.

*We agree with this recommendation. See Key Recommendation #7. There are obvious areas of infection control that should be dealt with at a statewide level. The first and most obvious is that the Administrative Directive related to communicable disease screening is not current with articulated policy, the Infection Control Manual is out of date, and the facility policies and procedures vary widely and are not up to date. Other areas of primary responsibility include establishing the job expectations and performance criteria for infection control at each of the state facilities, ensuring vaccination rates are compatible with age and disease related expectations, implementing policy for robust communicable disease screening, the standardization of policy and procedures for infection control practices, monitoring surveillance activities, acting as a point person with IDPH on contagious disease outbreaks, and analyzing statistics to identify and address areas of disease progression and infection control that are problems.*

*A problem cited at every facility was that the infection control reports made to the CQI committee did not contain any analysis of disease prevalence or trends in disease identification. In addition, we found at one facility that a TB conversion was not identified as such in the monthly report. The statewide Communicable and Infectious Diseases Coordinator must be responsible for establishing the methods and means for IC-RNs to analyze and trend infectious disease data correctly and meaningfully. This information needs to be reviewed and further analyzed at a statewide level by the Communicable and Infectious Diseases Coordinator. It should be used as a basis for decision making by the IDOC Medical Director on policy and program direction.*

*The statewide Communicable and Infectious Diseases Coordinator should be a masters prepared public health nurse and should be guided and supported by a part-time infectious disease physician specialist to advise on policy and updated recommendations for prevention and control of communicable disease. For example, while the IDOC does inconsistently offer pneumococcal 23 vaccine to a few individuals with high-risk conditions, it does not offer the pneumococcal vaccine 13 in accord with the CDC's aged and illness-based adult vaccination guidelines. IDOC also fails to provide meningococcal vaccine to individuals with immunodeficiency (e.g., HIV, etc.).[269] The infectious disease specialist would also design and carry out prevalence studies to monitor disease rates,*

---

[269]





2018 immunization
adult-combined-sche

*train and monitor quality of the work performed by the IC-RNs, evaluate the performance of disease monitoring clinics provided by UIC, and consult in treatment and prevention of communicable disease. We suggest that IDOC consider establishing this position within the IDPH. This would provide access to resources of the IDPH and support collaboration with the IDOC.*

## Mortality Reviews

**First Court Expert Recommendations**

1. All mortality review should be performed by an independent clinician. A regional nurse could do the initial review; those cases identified as potentially problematic and therefore requiring a secondary review should be evaluated by the central office regional physician, and not a "like" (i.e., Wexford) employee. *We do not completely agree with this recommendation. It is our opinion that under current circumstances an independent physician should review all deaths. Under circumstances of adequate IDOC central office staff (when and if that occurs), it is our opinion central office IDOC physicians and nurses can perform this review. We do not believe that regional nurses should be responsible for reviewing physician clinical care with respect to mortality review. That is currently what is occurring and as we note, regional nurses find no problems when significant problems exist. Physicians should review physician care in mortality review and nurses should review nursing care. Nurses should not review physician care.  We agree that IDOC physicians, not vendor physicians should conduct mortality review.*

2. Policy should provide more specific guidance for end of life care. Specifically, this should clarify the important differences between "DNR," palliative care and hospice/end-of-life care. *We agree that that an end-of-life policy needs to be developed. This policy needs to ensure that **informed** consent is specifically given and that when a person is not competent to provide informed consent that reasonable legal options are taken. This policy also needs to address the current practice of palliative sedation to ensure that it is not used merely to hasten death or engage in euthanasia. Palliative sedation also needs to follow strict guidelines with respect to informed consent. The policy should also address end of life pain management as this appears to be an area of deficiency in the medical program.*

**Additional Recommendations**

3. Morality review should be completed for all deaths. We recommend that this be done at a central office level when the central office is adequately staffed.

4. We recommend that the Office of Health Services (OHS) make a determination of preventability and track preventable, possibly preventable, and non-preventable deaths.

5. Mortality review should be structured and include:
   a. A brief summary of the care of the patient;
   b. A list of all of the patient's medical conditions;
   c. A list of all the patient's most current medications;
   d. The age, date of incarceration, current housing unit, and the location of death;

    e. The preliminary cause of death;

    f. The coroner's cause of death;

    g. A psychological autopsy in the event of a suicide;

    h. Inclusion of any administrative or custody reports of the death;

    i. A list of all problems identified on review of the death; and

    j. A summary of any corrective actions or referrals taken with respect to identified problems.

6. All deaths should include an autopsy.

7. All deaths should be tracked by the OHS and a summary report made at the end of the year. This report should be forwarded to the Director of the IDOC and reviewed at the statewide medical meeting. This should include reporting on the numbers of preventable deaths. Analysis of recommendations based on deaths should be provided at an annual statewide meeting.

## Dental Program

**First Court Expert Recommendations**

1. Screening [initial] examinations at the reception center should include a thorough, documented, intra and extra-oral soft tissue examination. *We note that per Administrative Directive 04.03.102, the examination performed at the R&C center should be a complete examination; however, it is not complete at all.*

2. The screening [initial] exam should not be used to develop treatment plans.

3. The examination should include radiographs diagnostic for caries, a periodontal assessment, a soft tissue exam, and accurate charting of the teeth.

4. Appropriate medical conditions should be red-flagged, and medical consultations and precautions should be documented in the dental record.

5. The health history should be more comprehensive, and appropriate conditions red-flagged. *We note that the health history form should be expanded in scope and reside on a separate page.*

6. Proper area disinfection and clinician hygiene should be implemented.

7. Proper radiology hygiene should be put in place. *We note that this includes, at a minimum, using a lead apron with a thyroid collar,[270] and posting radiological hazard signs in the areas where x-rays are taken.*

8. Routine comprehensive care should be provided from a thorough, comprehensive examination and treatment plan.[271]

9. Hygiene care and oral health instructions should be provided as part of the treatment process.

---

[270] While radiation exposure from dental radiographs is low, it is F to follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (*inter alia*), **use protective aprons and thyroid collars**. Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. ADA and FDA (2012), 14. Emphasis added.

[271] IDOC agreed that "[r]outine comprehensive care should be provided for through a comprehensive exam and treatment plans." The exam [should include] radiographs diagnostic for caries, a periodontal assessment, a soft tissue exam, and accurate charting of the teeth," and "hygiene care and oral health instructions be provided as part of the treatment process. IDOC Response, ¶XIII (5).

10. Removable partial dentures should be provided as the last step in the comprehensive care process.

11. All teeth should be restored, and the periodontium should be stable before partial denture impressions are taken.

12. A proper diagnosis should be part of the treatment process. *We note that except for NRC, the diagnoses were appropriate in most of the charts we reviewed.*

13. Inmates with urgent care needs should be provided care within 24-48 hours.

14. The SOAP format should be used to document emergency and urgent care contacts. *We note that the SOAP format was used consistently, except for NRC and SCC.*[272]

15. A proper diagnosis should be part of the treatment process. *We note that except for NRC, the diagnoses were appropriate in most of the charts we reviewed.*

16. The IDOC should develop a policy to ensure that each institution has a meaningful orientation manual to instruct inmates how to access acute and routine care.

17. The IDOC should insure that all institution dental programs have well-developed and thorough policy and protocol manuals that address all areas of the dental program.

18. All dental staff should be familiar with these policies and protocols.

19. Policies should be reviewed annually and amended as necessary.

20. An administrative dentist should be available to oversee the IDOC dental program. This person could remain in the field as a part-time practicing dentist.[273] *We feel the position should be 0.5 FTE. See Key Recommendation #10.*

21. The IDOC should insure that all dental programs follow current infection control guidelines as well-defined by the Centers for Disease Control, to include documented weekly spore testing of autoclaves.

22. Bulk biohazardous waste be properly stored outside the dental clinic.

23. Biohazard and radiology warning signs should be in place.

24. Patients should wear protective eyewear during treatment.

25. Every dental program should develop a robust and meaningful CQI program to include ongoing studies and corrective measures that address identified program weaknesses.

26. The IDOC should develop a clinically oriented peer review system and dentists should be available to provide these reviews, such that deficiencies in treatment quality or appropriateness can be corrected.

27. A systemwide evaluation of existing equipment should be performed and old, badly worn, rusted, corroded, and non-functional units, equipment, and cabinetry/countertops should be replaced. We agree and note that this should be part of a systemwide capital equipment replacement plan.

---

[272] IDOC agreed with the First Court Expert that "the SOAP format be used to document emergency and urgent care contacts." IDOC Response to First Expert Report, ¶ XIII (2).

[273] We note that Dr. Meeks, the IDOC Medical Director, opined that while he is responsible for oversight of the dental program, he relies on the Wexford Dental Director, which is not a good arrangement. He prefers a Chief of Dentistry, who is a state employee and part of his management team. Meeks Interview ¶¶35-36. Note that IDOC stated (in 2014) that it is committed to filling the statewide position of Dental Director, who would spend 25 percent of his time on statewide administrative duties and 75 percent of his time on facility dental practice. IDOC Response, p. 31.

PTX193-0149

28. Dental hygienists be hired ASAP at Henry Hill[274] and Dixon Correctional Centers. *While we did not visit Henry Hill Correctional Center, we note that all prisons should have dental hygienists on staff.*

*We agree with these recommendations.*

**Additional Recommendations**

29. Valid oral hygiene instructions should be provided, and if they are not, the dental chart should not record that they have been provided.

30. All inmates should have a comprehensive examination within 30 days of intake. This exam should use the criteria of the ADA Procedure Code D0150 (Comprehensive Oral Examination–New or Established Patient) and biennial exams should use the criteria of Procedure Code D0120 (Periodic Oral Examination).

31. Treatment performed should be reported using standard (ADA) definitions and procedure codes, or entries that can be mapped to the treatment codes. Similarly, dental statistics reported to the CQI Committee should use profession-standard definitions.

32. The health history should be updated at every examination and treatment.

33. The consent form should specify the tooth to be extracted and the reason for the extraction (i.e., the diagnosis).

34. When an antibiotic is prescribed for a tooth-related infection, the tooth should be extracted within the therapeutic window of the antibiotic. A follow-up appointment for the extraction should be made so that the tooth is extracted within 10 days.

35. When an antibiotic is prescribed, the reason for the prescription (i.e., the diagnosis) should be recorded.

36. The panoramic x-ray units and film processor at NRC should be replaced immediately. It is strongly recommended that all dental x-ray units be digital.

37. The dental CQI program (as well as all other components of the dental program) lacks guidance from a dentist with experience in corrections. This expertise should reside centrally at IDOC and not from a Wexford employee or contractor. IDOC should retain a 0.5 FTE dental director. See Key Recommendation #10.

38. IDOC should develop protocols for periodontal diagnosis that include the use of periodontal screening and recording, and appropriate intraoral radiographs.

39. All routine dental examinations should include a sequenced treatment plan.

40. All dental assistants should be capable of taking intraoral x-rays.

41. Nurses should triage all requests for dental care. Non-urgent requests (cleaning, routine exams, fillings, etc.) should be sent to the dental clinic for scheduling. All other dental complaints should be assessed at nursing sick call, treated for pain as needed, and referred to the dentist based upon clinical urgency.

42. Diabetics should be referred for a periodontal assessment that includes periodontal probing every six months, and those diagnosed with periodontal disease should be offered an oral prophylaxis every six months and non-surgical periodontal treatment

---

[274] Since we did not visit Henry Hill Correctional Center, we express no opinion about its staffing. However, as a general principle, all IDOC prisons should have a dental hygienist assigned.

**PTX193-0150**

(i.e., scaling and root planing) if clinically indicated. This should be part of the chronic care program.

## Internal Monitoring and Quality Improvement

**First Court Expert Recommendations**

1. A trained Quality Improvement Coordinator must be assigned to each facility. *We agree with this recommendation. This should be a dedicated position.*

2. Training for members of the line staff should also be provided. *We agree with this recommendation.*

3. Each facility's program should develop a calendar in which every major service is reviewed at least once a year. *This strategy is reasonable but it is more important that high priority problems be identified and resolved. See Key Recommendation #11. Instead of annual review of each area of service the program should develop standardized metrics that measure major areas of service on an ongoing basis. These should be regular reports to the QIC. We note that these metrics are difficult to attain with a paper medical record. Examples of these types of metrics could include:*

   a. *Percent of new medication orders that the patient receives within 24 hours.*
   b. *Percent of medications that are received by the patient. We note that this item is only possible if there were an electronic medical record.*
   c. *Percent of preventable hospitalizations.*
   d. *Percent of patients who fail to show up for a scheduled appointment.*
   e. *Percent of patients transferring from an intake facility who do not have a thorough therapeutic plan based on a list of all patient problems.*
   f. *Number and percent of nursing and physician clinical care episodes that are of poor quality- based on professional performance evaluations.*
   g. *Number of items remaining uncorrected on sanitation and safety inspection.*
   h. *Number of unfilled positions.*
   i. *Intake opt-out screening results.*
   j. *Emergency bags which are not in compliance.*
   k. *The number of examination rooms that are out of compliance with respect to space, equipment, supplies or sanitation as evidenced on monthly environmental inspections.*

4. When reviews are performed, they must utilize one or more of the eight quality performance measures.[275] *We agree that these measures are important and can form the basis of reviews. However, it is more important that the program focus on high priority deficiencies whether or not they include one of these eight measures.*

5. Each local quality improvement program should be measured on the basis of the extent to which the program facilitates improving the quality of services. *We agree with this recommendation.*

---

[275] These Joint Commission on Accreditation of Healthcare Organizations include Accountability, Availability, Effectiveness, Efficiency, Quality of Providers, Safety of Environment, Continuity and Timeliness.

PTX193-0151

6. The State should contract with one or more external quality reviewers for the mortality review process since the current process was extremely ineffective at identifying significant lapses in care and therefore ineffective in helping improve the quality of services provided. *Under current circumstances, we agree with this recommendation. Ultimately, mortality review can be conducted by IDOC OHS as described in recommendations 3-7 under Mortality Review above.*

7. Where the external reviews identify one or more lapses in care, the institution should be responsible for developing a corrective action plan which is provided to a regional nurse and the Medical Director. *We agree with this recommendation.*

**Additional Recommendations**

8. The IDOC needs to develop a system of identifying key problems. Mortality review and sentinel event reviews should be included in that system. See Key Recommendation #11.

9. The IDOC should hire a statewide CQI leader who has training qualifications in quality improvement (e.g., systems engineer, six-sigma blackbelt, etc.). See Key Recommendation #1.

**PTX193-0152**

## Chart Review Details

| Area of Record Review | Dixon | LCC | MCC | NRC | SCC | Totals | Totals |
|---|---|---|---|---|---|---|---|
| Medical Reception/ Intrasystem Transfer | 8 | 10 | 15 | 26 | 12 | 71 | |
| Nursing Sick Call | 29 | 22 | 15 | 11 | 27 | 104 | |
| Chronic Care | 14 | 14 | 14 | 3 | 13 | 58 | |
| Urgent Care | 5 | 4 | 5 | | 8 | 22 | |
| Hospitalization and Specialty care | 7 | 9 | 11 | 7 | 9 | 43 | |
| Infirmary Care | 7 | 8 | 7 | | 6 | 28 | |
| Medication Administration | 12 | | 11 | | 6 | 29 | |
| Infection Control | | | 7 | | | 7 | |
| Totals | | | | | | 362 | 362 |
| | | | | | | | |
| Death Reviews (12 Facilities) | 33 | | | | | | 33 |
| **Total Medical Records Reviewed** | | | | | | | **395** |
| | | | | | | | |
| **Dental Records Reviewed** | **Dixon** | **LCC** | **MCC** | **NRC** | **SCC** | **Total** | |
| Dental Comprehensive Care | 12 | 10 | 16 | 1 | 10 | 49 | |
| Dental Biennial Exams | 10 | 10 | 8 | | | 28 | |
| Dental Outside Oral Surgery | 2 | | 5 | | 4 | 11 | |
| Dental Medically Compromised Patients | 12 | 8 | 8 | | 10 | 38 | |
| Dental Extractions | 11 | 10 | 11 | 5 | 9 | 46 | |
| Dental Scheduled Extractions | | | 15 | | | 15 | |
| Dental Prosthetics | 8 | 6 | 4 | | 6 | 24 | |
| Dental Sick Call | 10 | 32 | 5 | 5 | 10 | 62 | |
| Dental Nurse Sick Call | | | 7 | | 7 | 14 | |
| Dental Peer Reviews | 5 | | | | | 5 | |
| Dental Intake (initial examination) | 11 | 20 | 10 | 20 | 10 | 71 | |
| **Total Dental Records Reviewed** | | | | | | 363 | **363** |

**PTX193-0153**

# Dixon Correctional Center

# 2nd Court Appointed Expert Report

# Lippert v. Godinez

Visit Date: April 2, 2018 – April 5, 2018

Prepared by the Medical Investigation Team

Mike Puisis, DO
Jack Raba, MD
Catherine Knox, MN, RN, CCHP-RN
Jay Shulman, DMD, MSPH

PTX193-0154

## Table of Contents

**Overview**.................................................................................................................. 2

**Executive Summary** ................................................................................................. 2

**Findings**................................................................................................................... 6
    Leadership, Staffing, and Custody Functions............................................................ 6
    Clinic Space .......................................................................................................... 10
    Sanitation ............................................................................................................. 16
    Medical Records.................................................................................................... 18
    Reception Processing and Intrasystem Transfer ................................................... 20
    Nursing Sick Call................................................................................................... 22
    Chronic Care......................................................................................................... 26
    Urgent/Emergent Care.......................................................................................... 46
    Specialty Consultations......................................................................................... 58
    Infirmary Care ...................................................................................................... 65
    Pharmacy and Medication Administration.............................................................. 72
    Infection Control ................................................................................................... 77
    Radiology Service ................................................................................................. 80
    Dental Program..................................................................................................... 82
    Internal Monitoring and Quality Improvement....................................................... 95

**Recommendations** .............................................................................................. 100
    Leadership, Staffing, and Custody Functions........................................................ 100
    Clinic Space ........................................................................................................ 100
    Sanitation ........................................................................................................... 101
    Medical Records.................................................................................................. 101
    Reception Processing and Intrasystem Transfer ................................................. 102
    Nursing Sick Call................................................................................................. 102
    Chronic Care....................................................................................................... 104
    Urgent/Emergent Care........................................................................................ 106
    Specialty Consultations....................................................................................... 107
    Infirmary Care .................................................................................................... 107
    Pharmacy and Medication Administration............................................................ 108
    Infection Control ................................................................................................. 110
    Radiology Service ............................................................................................... 111
    Dental Program................................................................................................... 111
    Internal Monitoring and Quality Improvement..................................................... 116

**Appendix A**.......................................................................................................... 118

# Overview

From April 2, 2018 through April 5, 2018, the Medical Investigation team visited the Dixon Correctional Center (DCC) in Dixon, Illinois.

DCC has a capacity for 2529 inmates. On the day of our visit there were 2298 inmates, with an occupancy of 90.4%. DCC is a low security prison. Only 5.5% of inmates are maximum security inmates, with 39% minimum security and 55% medium security. Sixty-seven percent of inmates have a sentence of five years or less. Thirty-one percent of inmates have a sentence of less than a year. DCC has a significant mental health mission and a significant elderly population. There are 761 (33%) inmates with a severe mental illness.

The nationwide average of inmates over 50 years of age in state and federal prisons is 19.2%.[1] In the IDOC, the percent of inmates over the age of 50 is 17.6%. At DCC, 26% of inmates are over 50 years of age. DCC has a 23-bed American Disabilities Act (ADA) unit, an 84-bed geriatric unit, and a 28-bed infirmary. Most of the ADA, geriatric, and infirmary units (135 beds) are filled with elderly. The remainder of the elderly population (472) is housed in general population. The health program at DCC is served by two local hospitals and one remote hospital. Katherine Bethea Hospital is within three miles and CGH Medical Center is in Sterling Illinois, about 14 miles away. University of Illinois Chicago (UIC) is used for the majority of hospitalizations and is over 100 miles away.

This report describes our findings and recommendations. During this visit, we:
- Met with custody and medical leadership
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents.

We thank Warden Varga and staff for their assistance and cooperation in conducting the review.

# Executive Summary

Based on a comparison of findings as identified in the First Court Expert's report, we find that the intrasystem transfer and sick call processes have improved since the First Court Expert Report but clinic space, medication administration, and the infirmary processes are worse, and the remainder are the same. Access to specialty care and physician quality of care were so poor that overall, we find that Dixon Correctional Center (DCC) is not providing adequate medical care to patients, and that there are systemic issues that present ongoing serious risk of harm to patients and result in preventable morbidity and mortality. The deficiencies that form the basis of this opinion are provided below.

---

[1] Prisoners in 2015, Bureau of Justice Statistics, US Department of Corrections.

Although a competent Health Care Unit Administrator (HCUA) is now in place, the remainder of the leadership team is either new or not in place. Leadership staff is still deficient. The Director of Nursing (DON) position is vacant but is to be filled by a State supervisory nurse. When that happens, two of three nurse supervisor positions will be vacant. The remaining nurse supervisor is deemed ineffective and spends considerable time on managing the onsite personnel matters for Wexford as opposed to actual nursing supervision. The Medical Director position is recently filled but the staff physician position is vacant. The HCUA acts as the HCUA, CQI Coordinator, supervisor of medical records, infection control coordinator, and as a supervisory nurse, including taking call. The new DON will also act as a supervisory nurse. Even if all positions were filled, it is our opinion that additional nursing staff is needed on the infirmary to provide the necessary level of care. Three supervisory nursing positions are inadequate given the population size and mission of this facility. Given the complexity of clinical care at this facility, it is our opinion that an additional physician is needed. Also, our opinion is that the lack of consistently filled physician positions over the years and lack of physicians with primary care training has contributed to preventable morbidity and mortality.

The physical plant is not well maintained. On the initial day of our visit both elevators in the three-floor medical unit were not functioning, and patients needed to be evacuated for safety reasons. Nursing examination rooms do not all have a standardized set of equipment, including examination tables. Privacy and confidentiality is not yet ensured for all nursing examination rooms. The ADA unit needs to be remodeled and refurbished, and beds need replacement. Equipment for the disabled needs to be present in shower areas. Infirmary beds are not all in acceptable condition. The infirmary needs to be refurbished by replacing cracked tiles, repairing missing and cracked plaster, removing peeling paint, and repainting. The geriatric unit needs refurbishing. Cracked and missing tile needs replacement to prevent falls in the elderly. Vents need to be cleaned. Showers need refurbishing to improve ventilation and remove mold. Otherwise, clinical areas were generally clean. The negative pressure room unit was functional and regularly inspected. Medical equipment is mostly regularly inspected.

Problem lists are not up to date in medical records. The medical record jackets are still too large to be effectively used; they come undone. Thinning records has been problematic due to lack of availability of funds to purchase medical record folders. Hospital and consultant reports are obtained for only about 10-15% of offsite visits. This adversely affects clinical care.

All inmates transferring into DCC are now brought to the dispensary for evaluation, which was not occurring during the First Court Expert's visit. Nurses are identifying new needs, taking vital signs, updating problems, and reconciling medications. The establishment of this process resolved a finding of the First Court Expert. However, chart reviews indicate that performance could be improved but is not being monitored effectively through the quality improvement program.

With respect to nursing sick call and access to care, we found that some of the problems identified by the First Court Expert have been resolved. Boxes have been put in place to receive health care requests and these are picked up daily. A log has been established. We found that

sick call requests were timely triaged. Because licensed practical nurses (LPNs) work in close proximity and under supervision of an RN, nursing sick call now conforms to the Illinois Nurse Practice Act requirements. Sick call is no longer done in the hall. Rooms are designated for this function, but rooms are not all equipped adequately. Other problems identified by the First Court Expert remain and there are new problems. Sick call requests are still not filed in the medical record. Nurse documentation is inconsistent or absent, and did not consistently give an indication of the assessment or plan of care. Quality review of nurse performance is not done. Medical records are not available in X house; patients there are seen without a medical record. Provider follow up on nurse referrals was not timely. Segregation inmates only have access to sick call once a week. We noted that care of dental patients with pain have their pain addressed inconsistently by medical staff until a dentist can evaluate the patient. This process should be standardized so that pain is timely addressed.

Emergency response equipment and supplies were available, properly sealed, and maintained. Equipment is regularly checked. Mass casualty drills are performed and are thorough, although critiques of the drills seldom find any problems. No strengths or weaknesses are found, and the quality improvement minutes do not reflect any discussion of these drills. Two of five patients sent out on an emergency basis had problematic care as described in the report.

Our review of records of persons hospitalized identified preventable hospitalization and preventable morbidity. It is our view that this is a result of systemic issues, including the inadequate physician staffing and inadequate credentialing of physicians.

There has been no improvement in management of specialty care. The tracking log does not accurately record the date of referral. Referrals, collegial reviews, and approvals are not consistently documented in the medical record. Providers do not update the status of the patient after consultations. There are significant and unacceptable delays in getting patients scheduled at UIC, which accounts for approximately 80% of specialty consultations. Delays to gastroenterology average 239 days and all UIC consultations average about six months. When significant delays occur, alternate consultants are not used. This results in harm to patients. Consultation reports were frequently unavailable, making it difficult to determine the clinical status of the patient. Record reviews identified that doctors did not document knowledge of the patient's status or condition after consultation visits. Care of patients before and after consultations was poor, as described in the specialty care section, and placed patients at significant risk of harm and possibly caused harm for several patients.

Medication rooms were clean, secured, and uncluttered. Medication refrigerators were well maintained. Narcotic counts were accurate. However, medication administration practices are unsafe and outdated. Medication orders are incomplete, and providers do not consistently document the decision to order medications or the rationale. There were problems with handwritten transcription of orders to medication administration records (MAR). Only 37% of MARs reviewed had complete documentation. Only 70% of new medication orders had the first dose administered within 24 hours. Nurses pre-pour medications. On the STC, mental health unit nurses use unsanitary envelopes to administer medication and do not have the MAR when

they administer medication. Medication administration is inconsistently documented at the time medication was actually provided. Continuity of medication for persons with chronic disease is not ensured and compliance with medication in chronic illness patients is not assessed. Reported medication errors are not analyzed to identify systemic causes or subjected to corrective action in order to improve care.

There have been no improvements in the infection control program since the First Court Expert's visit. There is no person with leadership and responsibility to effectively manage infection control. Safety and sanitation inspections are performed monthly, but deficiencies reported since September of 2017 have not yet been corrected. Infirmary porters were not offered hepatitis A vaccination and only one of two porters completed vaccination for hepatitis B. Communicable disease data collected for continuous quality improvement (CQI) is not analyzed or discussed. We noted, for example, four occupational exposures to blood borne pathogens in 2017. Three of these were needle stick injuries. There was no discussion of this in the CQI minutes. We were told that Wexford has not responded to address this issue. Not addressing this issue is an OSHA violation, as an employer must evaluate environmental and engineering controls to reduce exposure to blood borne pathogens.

Radiology services are inspected and current. Access to plain film x-rays is acceptable and turnaround time is good. The x-ray technician does not wear a dosimeter to measure radiation exposure, which may not be in accord with State regulations.

We found infirmary services worse than in the First Court Expert's report. Patients housed on this unit have needs that exceed the capacity of the program to manage. There are insufficient nurses and equipment to manage the population of patients requiring total or partial assistance with activity of daily living care or to manage those with skilled nursing care needs. There is no physical therapy on the unit. Provider notes contain limited clinical information or rationale for treatment plans and fail to document key history, physical findings, or treatment plan components. Provider admission notes and progress note timeliness and frequency do not meet IDOC policy standards.

Dental staffing is inadequate. A dental hygienist and an additional dentist should be hired immediately. The clinic is closed on Mondays due to inadequate dentist scheduling and should be open five days a week. Routine treatment is inadequate since it is not informed by a comprehensive oral examination (i.e., intraoral x-rays, a periodontal assessment, and a treatment plan). The failures of the dental program documented in this report place patients at risk of preventable pain and tooth loss by fostering widescale underdiagnosis and treatment of dental disease. Dentists consistently fail to update health histories, which is particularly problematic since the dental chart is separate from the medical record. The dental program has not changed materially since the First Court Expert Report, and the treatment provided to IDOC inmates remains substantially below accepted professional standards and is not minimally adequate.

The First Court Expert found an inactive CQI program. We found that the CQI program was in place but had not yet become effective. There is no CQI coordinator. The program does not have a CQI plan specific for DCC. The CQI program is not performing all IDOC required studies. Monthly meeting minutes are brief and lack discussion about existing problems. Most studies measure only that care was provided, not whether it was effective, of good quality, or whether it could be improved. Peer review was ineffective. Mortality review does not occur. There were 26 deaths over a two-year period of 2016-2017. We asked for charts for 13 deaths and reviewed six of these deaths. Of the six deaths reviewed, four were preventable in our opinion, and two were possibly preventable. We found systemic failures and grossly and flagrantly unacceptable clinical practice resulting in preventable death. This is an extraordinary number of preventable and possibly preventable deaths.

# Findings

## Leadership, Staffing, and Custody Functions

**Methodology:** We interviewed medical and custody leadership, reviewed staffing documents, and other pertinent documents.

### First Court Expert Findings
At the time of the First Court Expert's visit to DCC, the HCUA, DON, and Medical Director positions were all vacant. The Medical Director position was filled by a traveling Medical Director, but this person was not performing all duties typical of a Medical Director. The lack of a Medical Director dedicated to the program resulted in no continuity of medical authority. Both supervisory nurses were new to their positions, so there was a significant leadership gap. Because of the lack of leadership, there was a lack of monitoring of program effectiveness. The First Court Expert recommended prioritizing filling the Medical Director, HCUA, DON, nurse practitioner (NP), and seven RN positions. The First Court Expert also recommended reevaluation of total nursing positions to determine whether additional RNs should be added. He made this recommendation because non-RN nurses were involved in conducting sick call, which was outside the scope of their license.

### Current Findings
There have been changes since the First Court Expert's report, but the net result is only a minimal change in overall staffing and leadership. Currently, the HCUA position has been filled since 2015. The DON position is vacant. One of the current state nurse supervisors will fill this position beginning on 4/16/18. In 2014 the DON was vacant, but two of three nursing supervisor positions were filled. Now the DON will be filled but two of three nursing supervisor positions are vacant. In 2014 the Medical Director position was vacant, but the staff physician was filled. Currently, the Medical Director is filled, and the staff physician is vacant. The net effect of all these changes is not much change except for the HCUA, which will be discussed below. In comparison to the First Court Expert's report, there have been some improvements, but these are insufficient to create an adequate program. We agree with the First Court Expert's recommendations to reevaluate nursing positions.

We identified additional findings or confirm First Court Expert findings, including:

- There has been no effective change in budgeted staffing since 2014 with the exception of three additional staff assistants for medical records.
- The effective vacancy rate (long-term leave of absence and vacancies) is 23%, which is an improvement from the 28% vacancy rate in 2014. However, a 23% vacancy rate is an unacceptably high vacancy rate.
- There is a deficiency of nurse supervisory positions. The existing nurse supervisory positions are not filled, resulting in the DON and HCUA undertaking nurse supervision roles that detract from their ability to manage the program.
- The only consistent elements in physician staffing have been continual change of physicians and moving of physicians to other facilities. Quality of physician care has been poor. Insufficient time has passed to evaluate clinical quality of the new physician. Care we reviewed showed preventable morbidity and mortality.
- There are insufficient nursing staff managing patients on the infirmary unit.
- Given the population and numbers of complex geriatric patients, there needs to be an additional physician.

We provide a staffing table in Appendix A. What appears to be an increase in staffing as compared to the 2014 Court Expert's report is not really a staffing increase. There were always two state nursing supervisors and one Wexford nurse supervisor, but only one State nurse supervisor and one Wexford nurse supervisor were documented in the First Court Expert's report. There has been no increase in nurse supervisor positions since 2014. Also, we list 48 RN staff. This appears to be a significant increase in nurses compared to the 26 RNs in the 2014 report. But the total complement of RN staff has not changed. Twenty-two mental health nurses were moved to the medical program, making it appear as an increase when there was no increase. These 22 nurses were responsible for mental health programming and administration of medication to mental health inmates and will still be responsible for those tasks. This change was done to allow the DON to be more flexible in using nurses for various assignments. Thus, mental health nurses can work on medical units and medical nurses can pass medication on mental health units. Whether this will adversely affect nurse staffing for medical tasks is uncertain. The only increase in staffing from 2014 to 2018 is a permanent increase of a 0.5 FTE phlebotomy position and an increase of three staff assistants who assist in the medical records department.

One significant change is that the State has filled the HCUA position with a very capable person. She appears to have led changes that have resulted in improvements noted in this report. The HCUA has been in her position since 2015. This person has provided leadership, but she lacks nursing supervisors and a consistent Medical Director, and therefore the program still does not have adequate medical leadership. Also, because of staffing shortages, the HCUA serves as the CQI coordinator, supervisor of medical records, infection control coordinator, and acts as a supervisory nurse, including taking call. One person is incapable of effectively performing all of these roles.

Supervisory nursing positions are deficient. It is our opinion that three nurse supervisory positions (two state and one Wexford) are inadequate given the large population and mission to care for the elderly. There is one Wexford supervisory nurse who is also the Wexford Site Manager and supervises 10 LPNs and six CNAs. The HCUA and the Assistant Warden of Programs believe this individual is ineffective and is not performing at a level expected of a supervisory nurse. Wexford will not replace this person. Because this person is ineffective and because only one of three State supervisory nurse positions (DON and two nurse supervisors) are filled, the DON will be the only effective supervisory nurse responsible for the performance of 48 registered nurses. Therefore, the HCUA, who is a nurse, acts as a supervisory nurse, including taking call, and this detracts from her effectiveness as a HCUA. Because the DON has to act as a supervisory nurse, she too will be less effective in her role as DON, which includes establishing policy and procedure, response to grievances, monitoring of nursing practice, and implementing program improvement. Given the sizeable population of vulnerable patients in the mental health program, infirmary, ADA unit, and geriatric unit, additional nursing supervision is needed. It is our opinion that there should be a daytime inpatient and swing shift supervisor for the infirmary, ADA, and geriatric units; an outpatient daytime nursing supervisor; and an evening outpatient nursing supervisor. Given the large mental health population, it is our opinion that daytime and swing shift mental health nursing supervisors are needed. The lack of nursing supervision is significant and negatively affects the program.

The Medical Director position was not filled from the time of the First Court Expert's review in February of 2014 until July of 2015. It was then filled from July of 2015 until May of 2017. The position was unfilled from May of 2017 until a traveling Medical Director filled the position from July to October of 2017. Since October 2017, a new Medical Director has been in place. The new Medical Director works four 10-hour days. Because there is no staff physician, there is no onsite physician on Fridays. The Medical Director covers the infirmary and has administrative duties, leaving most of chronic care management to the nurse practitioners (NP). Also, the second physician position has not been consistently filled over the past four years. When this second physician position has been filled, according to the HCUA, it has been filled by less than qualified doctors. On multiple occasions Wexford was asked to replace these doctors on the basis of quality of care.

The infirmary and geriatric units in combination require more than a full-time physician, particularly if the Medical Director covers these units in addition to the other Medical Director duties. Currently, all medical care outside of the infirmary is managed by the two NPs. While it is uncertain what the situation would be like if all four medical provider positions (Medical Director, physician, two mid-level providers) were filled, it is our opinion that for a population of 2300 with a significant elderly population, an additional budgeted physician is indicated.

The frequent changes and lack of primary care trained physicians appears to have continued since the First Court Expert's report. We note that the new Medical Director has primary care training but has not been in place long enough to determine if quality will improve. The past lack of qualified physicians has resulted in a significant absence of quality of medical leadership and physician coverage. Based on chart reviews and death reviews we performed, we identified

preventable morbidity and mortality, which will be described later in this report. The lack of adequate and qualified physician coverage is causing harm and is the single most important factor in preventable morbidity and mortality in our opinion.

There are 93.8 health care employees.[2] There are 19 (20%) vacancies. Three staff are on long-term leave of absence. If these are added to the vacancies, the effective vacancy rate is 23%. This is a significant vacancy rate and contributes to an inadequate program. More than half of the state vacancies (52%) are RN positions. There are more RN vacancies now than there were in 2014, although it is uncertain what the effect has been with respect to combining mental health and medical nursing staff. There are 57 state employees and 36.8 Wexford employees in the medical program. The vacancy rates for state employees is 28% and for Wexford employees 17%. However, because the Wexford employees include physicians, the Wexford vacancies in the Medical Director and physician positions, over recent years, impact the program significantly more than any other position.

It is our opinion that there are insufficient numbers of budgeted positions in the nursing categories even if vacancies were filled. The infirmary unit is understaffed with nurses and nursing assistants. The geriatric unit on the third floor has people who should be on the infirmary and require a higher level of nursing care than is now being provided. These units attract elderly patients from all IDOC facilities, yet these units have insufficient staff to provide care at a necessary level based on our review of services on that unit. Inmates provide considerable assistance on these units. Services that require health trained personnel are either not provided or are provided at a level inadequate for the designed purpose of these units.

During this visit we were also able to interview the Wexford Regional Manager. This individual manages seven facilities. He has a background in criminal justice and has no formal training in any aspect of health care. He worked for the IDOC beginning in the 1990s and left IDOC in 2004, when he was a warden at Pontiac Correctional Center. He said that though he had no training in health care or health care management, he felt his administrative experience with the IDOC as a warden was sufficient to warrant his being a manager of a health care program. We disagree. Criminal justice training is not a sufficient background to obtain a high-level health care management position.

The Wexford Regional Manager said that he was not aware of any persistent problems at any of the sites we had visited. The problems at the three sites that he manages and that we visited are considerable. Failure to be aware of these ongoing problems demonstrates a level of disinterest or failure to understand how to manage a health care program. Both the Assistant Warden of Programs and the HCUA detailed year-long problems that they had brought to his attention, mostly involving the performance of physicians, filling positions, and performance of the Wexford supervisory nurse. The Wexford Regional Manager perceived his role as only administrative, which was difficult to understand. He stated that he referred any clinical issues to other clinical staff. However, as a manager of a health program he must be involved in

---

[2] See Appendix A.

clinical issues, as the program is a clinical medical program. He also has not meaningfully participated in quality improvement efforts at any of the facilities he manages. His lack of knowledge of ongoing problems at the facilities he manages and his lack of involvement in attempts to improve the program are demonstration of why a person with a criminal justice background should not be involved in managing a health care program.

## Clinic Space

**Methodology:** Accompanied by a correctional officer, the acting Director of Nursing, and the Wexford site administrator, we inspected the three-story medical building. Accompanied by the HCUA and the Assistant Warden, we separately visited the nurse sick call rooms and medication rooms in the X-building (Segregation Unit).

### First Court Expert Findings
The First Court Expert found the clinical areas at DCC reasonably clean and well maintained. The expert raised concerns about the metal beds on the third floor being taken apart to make weapons, contributing to musculoskeletal problems for the third floor's geriatric population, and being difficult to clean and sanitize.

### Current Findings
- The three provider exam rooms in the medical building are insufficient to accommodate the four budgeted clinical providers.
- The telehealth room used for UIC HIV and hepatitis C care, renal specialty consultation, and telepsychiatry is clean and adequately sized. The telehealth room is not shared with the clinical providers and thus there is no competition for this space.
- Nurse sick call rooms are not all properly equipped, and all do not provide for patient privacy and confidentiality.
- One of the two dedicated nurse sick call rooms on the first floor of the medical building has two exam tables; the other only a desk and chairs. Having two exam tables in one room and none in the other is a barrier to the delivery of care and does not allow for adequate patient privacy and confidentiality.
- When not in use, the optometry and telehealth rooms are used as backup nurse sick call rooms; neither of these backup rooms have an exam table.
- The location of a satellite nurse sick call room in a housing unit of the X building maximizes the segregated patient-inmates' access to sick call.
- The infirmary beds, ADA unit beds, and the geriatric beds were not all in acceptable condition. Broken beds need to be properly repaired or replaced.
- The low height and limited mattress support of the metal beds in the geriatric unit make it difficult for this aging patient population to effectively and safely utilize them.
- The negative pressure unit in the infirmary is regularly inspected. The unit was fully functional. The unit has documented inspections on a weekly basis. The unit should be regularly checked during the environmental rounds and the condition noted in the monthly Medical Safety and Sanitation Report.

- Both elevators in the three-floor medical building were non-functional on the first day of the site visit.
- Most but not all of the medical equipment and devices in the medical building had documentation of annual inspection by biomedical engineering.
- Multiple air vent covers were missing. Many air vents and air vent covers were rusted and cannot be fully sanitized.
- All three floors of the medical building had cracked and missing floor tiles. This is a safety, sanitation, and infection control concern for patient-inmates and staff who use these areas. This is a special concern for the high-risk-for-fall population that is housed on the second and third floor.
- All the showers in the medical building were poorly ventilated, had peeling ceilings, had musty odors, and evidence of mold. There were an insufficient number of shower chairs; the existing shower upholstery needs to the repaired or the chair replaced.

The medical unit contains three floors. The first floor outpatient clinical unit houses medical exam rooms, nurse sick call rooms, an urgent care center, physical therapy, dental clinic, telehealth rooms, x-ray suite, optometry clinic, mental health interview rooms, nurse medication preparation room, the pill call/KOP medication pick up window, medical records department, storeroom, health care administrative offices, provider and nurse work areas, and a conference room. The second floor houses the infirmary, the ADA housing unit, and mental health offices. The third floor houses the geriatric housing units.

With the exception of the nurse sick call held in the X building (segregation unit), all medical health care is provided on the first and second floors in the three-story medical building that is located in the central area of the expansive DCC campus. There are two elevators in the medical building. One has not been functional for a long time. On the day before the experts' site visit, the only operational elevator broke down. Patients housed on the second and third floor who were ambulatory were moved to backup housing in outlying buildings on the DCC campus. Non-ambulatory patients in the ADA unit and the infirmary were not moved. One elevator was fixed and operational by the end of the first day of the experts' visit. The second elevator remained non-operational during the entire visit and there was not a repair team working this elevator. Both elevators need to be operational, assuring that all patients residing on the second and third floors of the medical building can be safely and readily relocated in the case of environmental and medical emergencies. This is a significant life-safety and fire-safety issue.

The first floor of the medical building is the hub of the health care delivery services provided at DCC. It is separated into two sections, with the patient-inmate entrance to the building in the middle of the two sections. Inmates walk approximately 200-1000 feet to the medical building from multiple housing units located on two divided sides (general population and mental health) of the campus to pick up keep-on-person (KOP) medications and nurse administered medications just inside the entrance, and to receive ambulatory reception, medical, dental, limited specialty, diagnostic, and urgent care services. Mental health patients have their medication administered dose-by-dose in their housing units.

The west side of the first floor houses the medication preparation and medication storage areas, and the pill call window and medical supplies.

The east end of the first floor has three interconnected corridors. The main/central corridor houses the urgent care and procedure room, two centralized nurse desks, three provider exam rooms, a three-chair dental suite, three observation bays, physical therapy unit, medical records, conference room/backup telehealth room, and a waste disposal room. The north corridor has the plain film x-ray suite, an optometry suite, a telehealth room, and two nurse sick call rooms. When not in use, the optometry and telehealth rooms are also used by the sick call nurses. The north corridor houses the health administrative and provider offices, medical supply storeroom, and a conference/breakroom.

Although generally clean, there were cracked and missing floor tiles in all three corridors on the first floor of the medical building. This is a safety, sanitation, and infection control concern for patient-inmates and staff who use these areas.

The treatment and procedure room has one adjustable table with an intact mattress and paper barrier, a new ECG machine, oxygen tanks in racks, an AED with a current inspection sticker and pads that do not expire until 2019, a Gomco suction machine, nebulizers, three backboards, medical supplies, and an emergency response bag. The handwashing sink in the room is clean. The space is adequately sized to provide treatment and urgent care. The counters in this treatment room are congested with supplies, and the two alcoves used for storage are cluttered, with 10-15 wooden crutches leaning against one wall, and staff bags and coats. The slop sink in one alcove is crusted and not able to be fully sanitized.

Two desks in the main corridor serve as a nursing station where pre-visit interviews and vital signs are performed, and reception screening and transfer forms are completed by nursing personnel. This layout does not allow optimal audiovisual privacy for patient interviews.

Despite having four budgeted providers, there are only three provider exam rooms in proximity to the nursing desks. All three are clean, adequately sized, and similarly outfitted with exam tables with intact upholstery, a desk, two chairs, functional oto-ophthalmoscopes, medical supply cabinets, a handwashing sink, gloves, and paper towels. One exam table did not have a paper barrier, one sink was crusted with mineral deposits, a few paper memos without protective sleeves were taped on the walls, and a single box of fecal occult blood testing cards had expired in October 2017. A 23-year-old Physician Desk Reference (PDR) was found in one room; however, it was reported to the experts that the three providers had access to UpToDate® electronic medical reference on the computers in their offices in the adjacent administrative corridor.

Three curtained observation bays with flat beds are located in the main corridor. They are used for short term observation and nebulization treatments when the treatment room is occupied. There is no equipment or supplies kept in these bays. The bays are a few steps away from the nursing desks and in voice range but not in line of sight of the nurses. A large conference room

in the main corridor is used as the chronic care nurse office/computer workstation and serves as a backup telehealth room on the occasion when overlapping tele-specialists are scheduled. The telehealth unit in the conference room does not have an electronic stethoscope.

A three-chair dental suite is situated off the main corridor and will be described in the dental section of this report.

The physical therapy (PT) room with multiple stations, mats, and equipment is located at the west end of this corridor. Visual inspection did not identify any notable deficiencies. Every bit of space in the PT room is utilized; although crowded with equipment and mats, it is well organized.

On the north side of the central patient-inmate entrance is the T-shaped north corridor. The top section of this T houses four clinical rooms. Two rooms are designated exclusively for nurse sick call service. One nurse sick call room has two exam tables and two desks; the other has a desk and two chairs but no exam table or sink. The other two rooms house the telehealth room and the optometry service. The telehealth unit is located in a large room with the telehealth unit along one wall with a desk and a chair facing the monitor. The unit has an electronic stethoscope. Three part-time services (HIV/hepatitis C, renal, and psychiatry) use the telehealth room. The fourth room is the generously sized optometry clinic with storage cabinets, a variety of optometry instruments (none of which had inspection labels), a sink, a desk, and a chair. The optometry clinic is only in session eight hours per week. When the optometry and telehealth rooms are not in use, the rooms are used as additional nurse sick call rooms. Since only one of the four dedicated or part-time nurse sick call rooms has an exam table, nurses interview patients and bring them over to the room with two exam tables if further physical evaluation is required. This could result in a breach of privacy if two patients are examined in the same room at the same time. Two of the other rooms could readily accommodate an exam table and this should be done. Handwashing gel was noted in the rooms without a sink, or if not is brought in by the nurses when they use these rooms.

The x-ray suite is in the long arm of the north corridor. During the expert's visit, the existing and aging plain film radiology unit was removed and a used but updated non-digital unit was being installed. The interior space was adequate but could not be walked through due to the construction. The radiology technician has a work space at the entrance to the suite that is separated from the corridor by a floor-to-ceiling metal screen. There is limited foot traffic on this corridor.

The second floor of the medical building has three separate units: mental health staff offices, the medical infirmary, and an ADA housing unit for inmates with ambulatory deficits, including those requiring wheel chairs. There is a security station staffed by a correctional officer in front of the entrances to these three units on the second floor.

The mental health staff offices are used almost exclusively for administrative duties and functions. Only on a rare occasion are selective patients interviewed in this area.

The ADA housing unit is a 23-bed housing unit for patient-inmates with significant difficulties with ambulation. Many of the men on this unit use ambulation aides, including wheel chairs. On the day that this unit was toured, there were only eight men on the unit; 15 had been temporarily relocated to buildings 31 and 41 until the elevator was repaired. The men housed on this unit must be able to provide for all their activities of daily living. Some get intermittent limited assistance from inmate health aides. There are no nursing personnel assigned to this unit and clinical providers do not make rounds on the ADA area. Individuals seeking medical attention must submit a sick call request sheet to access non-urgent care. The ADA unit is a housing unit located with good proximity to 24-hour medical services in the building, but it is not a medical treatment unit. The beds are almost universally metal bed frames with metal wire mattress supports. Some of the wire supports have been separated from the metal legs and struts and held together with strands of ripped sheets. The separated metal wires had sharp ends and constitute a potential safety hazard. These beds are less than optimal for individuals with heightened risk for decubitus ulcers. Unoccupied metal beds were turned on end and this presented a notable safety risk. There are three showers on the ADA unit. Only two of the showers are functional; the ceiling paint in all three showers is peeling, and the ceiling light in front of the showers is not functioning. The single shower chair has ripped upholstery and needs to be sealed or replaced. The showers cannot accommodate wheelchairs; we were advised that some men are moved to the infirmary to bathe and shower. There are cracked and missing tiles in the patient rooms, the hallway, and in front of the showers; this is a significant safety hazard for this high-risk population and for staff. Many of the ceiling air vents are dirty and/or missing covers. The slop sink in the janitorial closet was dirty, rusty, and had constant running watering that could not be turned off. The floor in this closet was dirty. A correctional officer was on the unit at the time of the inspection.

The 28-bed U-shaped infirmary is located across from the ADA unit. The patient rooms have two to three beds per room. Most rooms appeared to have two beds per room. There were a few individuals who were housed alone. At the time of the expert visit 18 beds were occupied. Most of the beds were hospital beds with intact mattresses and adjustable heads. There are no electrical beds in the infirmary. Most of the hospital beds have been acquired from local hospitals as they upgraded their beds.

A central nursing station with glass on both sides has doors to each of the two side corridors. A shower and tub room also can be accessed from both sides of the unit. A dayroom with a TV is situated in the middle of each side of the infirmary; this room is also used for meals for some of the patient-inmates. A biohazard room is located on the unit; waste material is removed one to two times per day. There is a restraint room with a single impervious covered, cushioned four-point restraint bed; the room was clean, and the bed was intact. Call buttons were available in the patient rooms. Four were tested and the warning monitor in the nursing station appropriately lit up.

The restraint room (room 35) also serves as the negative pressure room; the exhaust was turned on and the tissue paper test demonstrated a high level of negative pressure. The negative pressure monitor in the nursing station has been non-functional for a long time; the

monitor is old, and it was reported that replacement parts are no longer available. The negative pressure log in the nursing station verified that the room was tested weekly for functionality. It was reported that the negative pressure had recently failed due to a blown fuse; the problem was corrected that day by the engineering team. The restraint room is directly across from the nursing station, allowing a moderate degree of direct observation.

The infirmary nursing staff checks and logs the results for the three glucometers on a daily basis and the negative pressure room functionality (tissue paper method) and the emergency response bag on a weekly basis. Inspection of the infirmary logs verified that these devices and equipment were being monitored as described. Oxygen tanks were full and kept in safety racks. Review of the equipment in the storage room or the nursing station identified that one of the three oxygen concentrators, one of three nebulizers, two of two IVAC pumps, two of two Gomco suction units, and the AED had a current bioengineering stickers. No explanation was provided on why some of the devices had not been inspected within the last year.

There are cracked and/or missing floor tiles throughout the infirmary, including the nursing station, the hallways, the patient rooms, the biohazard room, and the patient bathrooms. This creates a safety hazard for this very high-risk-for-fall patient population. A patient with dementia was occupying a broken bed in Room 33. Unrepaired cracks and missing plaster were noted in some of the patient rooms. Peeling paint was noted on the ceiling of the shared shower room. Room 29 had a dirty sink and a cracked electrical outlet cover with exposed live electrical connections. A number of ceiling vents were missing and/or rusty. The ceiling in the nursing station had rust stained tiles.

The third floor of the medical building is divided into two wings and serves as an 84-bed geriatric housing unit. Seventy-six patients were assigned to the third floor on the day of the inspection, but 26 had been temporarily relocated to building 41 due to the non-functional elevators. Patient rooms have two to three beds and a toilet with a sink. Similar to the ADA unit, the vast majority of the beds on the geriatric housing unit had non-adjustable fixed metal frames with an intertwined wire mattress support. The wires provide limited mattress support for this geriatric population. The wires on some beds were separated from the metal and were tied with ripped sheets to the frame. Unoccupied beds are flipped on end in the rooms, creating a risk for injury. The men must be able to independently manage their activities of daily living. Each room has a call buzzer next to the door. Inmates in three separate rooms were knowledgeable about the use of the call buzzer and demonstrated competency in its use. Many patients have their own TV sets at their bedside. There are dayrooms that are also used to eat meals and these have a TV.

Each side of the third floor had a shared five-cubicle shower room. One shower cubicle on each side was not functional. The showers emanated a musky odor, mold was noted in some of the showers, ceilings in both showers were peeling, the vents were rusty, and the shower space was humid and steamy when in use. The showers were poorly ventilated. Only one shower chair was noted in each of these two shower rooms. Cracked and missing floor tiles were noted throughout all areas of the third floor. This creates a safety risk for this aging population and is

a barrier to the effective cleaning and sanitation of the units. Missing and/or rusted ceiling vent covers were noted throughout the third floor. Some of the vents were blocked with medical chucks, others were clogged with dust.

There are no nurses assigned to the geriatric unit. Patients place a request in locked boxes on the floor to seek medical attention. Patients reported that their requests are screened by a nurse within 24 hours and, if needed, they are seen in two to three days in nurse sick call on the first floor.

There is a staging kitchen area on the west end of the third floor; food is served by inmate workers. Dirty trays are placed in different carts than those used to bring food to the floor. The temperature in the food refrigerator is checked and logged on the day and evening shifts; the recorded temperature was always less than or equal to 41°F.

In summary, the medical building was generally clean and organized; the exceptions are the infirmary, ADA, and geriatric units, which need refurbishing, including providing functional shower equipment, installing ventilation in the showers, fixing broken tiles, and fixing plaster and painting. This can be a safety issue for elderly and disabled patients. There are insufficient provider examination rooms. A number of physical plant and maintenance deficiencies were identified that have created safety, sanitation, and infection control risks. The metal beds used in the geriatric unit are not appropriate for use in this population. The nurse sick call rooms are not all adequately equipped nor do these rooms allow for patient privacy and confidentiality. All of the beds in the infirmary must be hospital-quality beds with adjustable sections.

We agree with the recommendations of the First Court Expert. We have additional recommendations found at the end of this report.

## Sanitation

**Methodology:** We inspected the infirmary rooms, the ADA unit, the geriatric floor, the first-floor health care unit, and the sick call rooms in the medical building and the X building. We interviewed nurses, correctional officers, infirmary patient-inmates, health care leadership, and inmate porters. The Safety and Sanitation reports for the months of September 2017 to February 2018 were reviewed.

**First Court Expert Findings**
The First Court Expert reported that the clinical spaces were generally well-maintained and made no specific recommendations about sanitation.

**Current Findings**
- Monthly safety and sanitation inspections and reports are being done by the health care team at DCC.

- The safety and sanitation reports fail to address the condition of the patient beds in the infirmary, ADA unit, and geriatric floor; the compliance with annual inspections of all clinical equipment and devices; and the lack of exam tables in all nurse sick call rooms.
- The clinical areas in the medical building and in the X building and the patient rooms in the infirmary, ADA unit, and the geriatric floor were generally clean.
- It is not possible to fully sanitize areas with rusted vents, broken or missing floor tiles, and cracked walls and peeling paint.

Safety and sanitation inspections (environmental rounds) are performed by the health care team on a monthly basis and reported by the HCUA to the Assistant Warden. September 2017 to February 2018 reports were reviewed by the experts. These rounds identified concerns, some of which appear to have been corrected or are being addressed. However, the inspection reports repeatedly noted a number of deficiencies, including cracked and missing tiles, mold in the showers, non-functional ceiling light fixtures, peeling paint, rusty ceilings, and non-functional showers that have not been corrected. During this site visit, the experts noted the same not yet addressed defective conditions throughout the entire medical building and in all the housing areas in the medical building. In addition, the experts identified missing and rusty vent covers and vents, a few sinks crusted with mineral deposits, 10-15 crutches leaning the treatment room wall, the shower chair in the ADA unit had torn upholstery, a broken bed being used by a demented patient in the infirmary, and oxygen concentrators and nebulizers that had not been inspected in the last year.

Sharps boxes, gloves, handwashing sinks, or sanitizing gel was found in all clinical areas. Inmate porters sweep and mop the floors of the infirmary rooms two to three times a week. They report that they spray and clean the toilets, sinks, and showers on a regular basis. They reported that they clean and spray beds of discharged patients prior to another patient being placed in that bed. Two infirmary porters were interviewed.[3] The first floor medical unit was generally clean. The rusty vents and vent covers noted in almost all areas of the medical building cannot be fully sanitized. As previously noted, the shower rooms on the second and third floor were poorly ventilated, and subsequently, musky odors and mold were noted in all the shower rooms, and the ceilings in the shower rooms had peeling paint. Although most sinks were clean, at least one sink on each floor was found be dirty or crusted with mineral deposits. We noted the broken and missing tiles on multiple areas in the Clinic Space section of this report. Broken and missing tiles make proper sanitation difficult.

In summary, although the First Court Expert had no findings with respect to sanitation, we noted several problems as described above. Overall, the cleanliness of the health care unit and patient housing areas is generally good except for the infirmary, ADA, and geriatric units. Monthly safety and sanitation inspections are being done in the health care areas. The rounds have appropriately identified problems with the maintenance of the physical plant but these problems are not consistently corrected. These inspections also must focus more attention on the beds and clinical equipment.

---

[3] Infirmary Patients #6 & 7.

## Medical Records

**Methodology:** Interview medical records staff, inspect the medical records room and filing system, and by way of record review, identify any problems.

### First Court Expert Findings

The First Court Expert noted that medical records were "overstuffed and in dire need of thinning." Because the paper records were so large, they were difficult to use and were deemed an obstacle to efficient delivery of care. Medication Administration Records (MARs) were often missing, making it difficult to determine if patients were receiving ordered medication. There were large backlogs of MAR documents that had not been filed. Also, the infirmary charts were on clipboards even when infirmary patients were permanently housed on that unit. This would make it difficult to follow the care of the patient because the paperwork was not organized.

The First Court Expert recommended that charts should be thinned regularly, MARs should be promptly filed, and problem lists should be kept up to date. He also recommended timely filing of all offsite medical reports.

### Current Findings

Since the First Court Expert's report, MARs appear now to be timely filed in the medical record. Three additional medical record staff have been added since the First Court Expert's visit in 2014, which has helped in this regard. However, the remaining problems identified by the First Court Expert have not been resolved. Our key findings include the following, which confirm problems identified by the First Court Expert and include an additional finding.

- We confirmed that problem lists are not up to date. This is a pervasive problem and has not been fixed.
- The infirmary use of clipboards as the medical record makes it harder to track paper documents relevant to each patient.
- The paper medical charts are too large to be effectively used. They come undone frequently. Chart thinning sometimes results in critical documents to be missing from active records.
- Consultant and hospital reports are obtained for only approximately 10-15% of offsite visits. In most cases, it is not clear what the status of the patient is from the perspective of the consultant. This makes it extremely difficult to impossible to provide adequate continuity of care.

Medical records are stored in a single room that connects the main and the administrative corridors. The medical record system is entirely paper. The records are stored on multi-tiered shelves in two double sided aisles with a central counter. The space is extremely cramped but well organized. The experts received every chart that was requested during the four-day visit.

A medical record director position and health information assistant position are vacant. The medical record director position has been vacant since 2005 and the HCUA serves as the

supervisor. There are now three additional staff assistant positions for medical record filing. The filing backlog, including for MARs, was negligible and total backlog of filing was less than a few inches. However, there are backlogs in copying records for legal purposes and when inmates request a copy of their medical record. This has been an improvement since the last visit.

However, the remaining findings of the First Court Expert are the same. Clipboards holding medical documents are still used on the infirmary. These clipboards contain documents that are periodically moved to the formal paper medical record binder. Documents in the clipboard are not in any sorted order. This makes it more difficult to manage patients.

Charts at DCC tend to be large. Thirty-three percent of the inmates at DCC have serious mental health conditions and 26% of inmates are over 50 years of age. This results in a large number of medical documents, as these populations are more frequent users of the medical program and have increased medical or mental health documents to file. Recent changes in the mental health program have resulted in a large increase in mental health documents to maintain. Patients at DCC, therefore, have large charts consisting of many medical record documents.

Chart folders consist of an accordion-like pressboard folder with a fixed plastic binder. The binder consists of two flexible plastic tubes of about an eighth of an inch in diameter that fit into a forked clip. The paper record documents have two holes punched that fit over the flexible plastic tubing. The plastic tubing can easily become dislodged from the plastic fork and papers can come loose from the binder. The accordion pressboard folder is approximately one and three quarters of an inch wide. But the volume of paperwork in most charts far exceeds this amount, so the charts become distended and put pressure on the plastic tubing, and it comes undone frequently when staff leaf through the record and when progress notes are written. Charts we reviewed were difficult to use without dislodging the plastic tubing from the paper documents. The program has not been able to adequately thin excessively large records because they are short of funds to purchase additional pressboard folders.

A chart is thinned when a nurse notifies medical records to thin the chart or when a medical record clerk believes the chart is too large for use. Chart thinning is also dependent on the availability of medical record folder stock. When a chart is thinned, the forward volume is required to contain the following information from the previous chart:
- One year of AIMS testing
- Any psychosexual evaluations
- All problem lists
- All intake and yearly physical evaluations
- Two years of documents in the "Lab" section
- Approximately a year of progress notes
- At least six months of mental health documentation
- Chronic illness flow sheets
- The general medical consent sheet if the inmate is under 18 years old

- Any existing living will
- A month of medication refusals
- One year of other refusals

Critical consultant reports and specialized tests (EEGs, pulmonary function tests, CT scans, etc.) are not required to be moved forward, but are often critical in understanding the clinical status of the patient. Without these documents, clinicians have a much more difficult time determining the existing problems of the patient, particularly since physicians change so frequently. In our own chart reviews, we frequently had to ask for a prior volume to obtain necessary information about the patient. Not having critical information readily available may be a reason for some of the problems with following clinical care that we identified on chart review. Also, this carry forward volume of documents can be substantial and newly thinned records therefore start with a fair-sized volume. Most patients have multiple chart volumes. Any clinician attempting to understand the clinical course of care would need to go back and review multiple old volumes to obtain necessary information about the existing problems of a patient, particularly since problem lists are so out of date. This lack of maintaining critical information in the existing volume in use and the difficulty in using the paper record make the paper record system a significant barrier to adequate care. An electronic medical record should be used.

Nurses in X house see patients without a medical record. When this occurs, they write their note on separate documents and present these documents later to medical records for filing. This is inappropriate and supports the implementation of a fully electronic medical record.

Unlike most IDOC facilities, DCC maintains its dental charts in the dental clinic, and not as a component of the health record.[4] While there are some advantages to this practice, it makes documenting a patient's health history in the dental chart critical, since the medical problem list will not be available unless it is requested.

## Reception Processing and Intrasystem Transfer

**Methodology:** To evaluate the medical screening of inmates received at DCC as transfers from other Illinois DOC facilities we interviewed health care staff, toured the dispensary where transfer screening takes place, reviewed the IDOC health status form, DCC Admission Checklist, the Health Care Unit (HCU) Operations Policy and Procedure P-118 Transfer Screening, and health records of inmates received at DCC.

### First Court Expert Findings

The previous Court Expert found that transfer screening was either not done at all or was significantly delayed, and when done was completed incorrectly. Inmates were not brought to medical for transfer screening; instead, nurses interviewed inmates on the housing unit (without the medical record or transfer summary) and attempted to address any critical

---

[4] DCC received a variance from AD 04.03.102 10/21/16.

medication needs they learned about from the interviews. Nurses were not familiar with the requirements for intrasystem transfer screening. There was no process in place to log and track intrasystem transfers so that the timeliness and appropriateness of this health care encounter could be monitored, and feedback provided to improve performance.[5]

**Current Findings**

The previous Court Expert's recommendation has been achieved. All transferred inmates are brought to the dispensary upon arrival at DCC. Nursing staff (RNs) review the transfer summary, take vital signs, and conduct a brief screening interview to identify any immediate medical needs and reconcile prescribed medications so that treatment can be continued. Each inmate receives an individual explanation from the nurse about how to request health care attention for urgent and routine medical needs. The next day these inmates are seen again by nurses who complete a lengthier interview using the intake screening questions and review the medical record. At this encounter the nurse checks to make sure the problem list is up to date, completes any screening not done at intake, and identifies any pending referrals or appointments. Inmates who have chronic diseases are enrolled in chronic care clinic, and medication, treatments, and labs are ordered. At this second encounter, the nurse answers any questions and confirms the inmates' understanding of how to request care, procedures to receive KOP and pill line medications, and obtain refills.

We reviewed eight charts of inmates arriving as an intrasystem transfer between May 19, 2017 and April 4, 2018. These eight charts were selected from lists of patients prescribed medications that cannot be missed. The transfer summary and documentation of continuing care (medication administration, enrollment in chronic care clinic, pending appointments, etc.) was reviewed. In two cases, the transfer summary did not include the name of the sending facility and information on tuberculosis screening.[6] In two cases the inmate was not scheduled for a chronic care appointment within 30 days of arrival for an initial evaluation.[7] Five patients had medications which were provided without dose interruption when received at DCC.[8] However, one of these ran out two weeks after the transfer and was not re-ordered.[9] It was a KOP medication. It was not possible to ascertain if the discontinuity was because the inmate did not know how to request a renewal, or the patient was lost to follow up. Two others were not taking medication at the time of transfer but were referred, and medication was ordered and administered within 24 hours.[10]

It appears that problems with intrasystem transfer at DCC that were identified by the First Court Expert have been resolved. However, the quality of these evaluations is not uniformly good quality. Given the number of errors and omissions in the information found in the chart review of intrasystem transfers that affect patient care, we recommend that health care

---

[5] Lippert Report DCC pp. 7-9.
[6] Intrasystem Transfer Patients #1 & 2.
[7] Intrasystem Transfer Patients #2 & 3.
[8] Intrasystem Transfer Patients #1, 2, 5, 6, 7, & 8.
[9] Intrasystem Transfer Patient #1.
[10] Intrasystem Transfer Patients #3 & 4.

leadership establish a process to monitor and provide feedback as part of the CQI program. When facilities send inaccurate or incomplete information on the intrasystem transfer form they should hear about the mistake from the receiving facility. Errors and omissions should be subject to focused study to improve the accuracy of transfer information and continuity of patient care.

## Nursing Sick Call

**Methodology:** Nursing sick call was evaluated by reviewing DCC Institutional Directive 04.03.103K Offender Health Care Services, HCU Operations Policies and Procedure P 103 Non-Emergency Health Care Requests and Services, and IDOC Treatment Protocols. We observed the boxes on the housing units where inmates put their health care requests, and observed nurses conducting sick call. We inspected the rooms used for sick call in the dispensary and X-house. We also reviewed tracking logs and used them to select records to review. Twenty-nine sick call requests were reviewed. Fifteen were selected from sick call logs from July 2017 through March 2018, with complaints of potentially serious conditions (chest pain, acute infection, shortness of breath, seizures, etc.), and their charts reviewed; three were observed at sick call on Tuesday April 3, 2018, and charting was reviewed. Eleven requests were selected for review because of complaints of dental pain; six were obtained from the dental clinic and five were selected from sick call logs for February 2018.[11]

### First Court Expert Findings

The previous Court Expert found that original sick call requests were discarded after triage and that no log was maintained to evaluate timeliness or responsiveness of nursing sick call. There also were significant breaches of medical confidentiality because sick call requests were handled through the general mail system. Unqualified personnel (LPNs) were assigned responsibility for sick call triage in the X-House and because these encounters took place "cell-side," an adequate examination of the inmate's complaint was impossible. In other parts of the facility the areas used for sick call were not adequately equipped, lacking an exam table; sometimes a hallway or other open area was used, with insufficient privacy. Also, inmates were limited to only one complaint per sick call request, which limits access. Nursing documentation was absent (times, dates, etc.) or not in SOAP format. Nursing treatment protocols were not used consistently. In segregation, nurses did not have access to the inmates' medical record and so left progress notes made during sick call encounters in the segregation log until they were released from segregation. Referrals to providers often did not take place, were not timely, were not documented, or the problem for which the patient was referred was not addressed at the provider appointment.[12]

### Current Findings

Our review found that some of the problems with sick call described in the previous Court Expert's report have been resolved. DCC has put specific boxes on each of the housing units

---

[11] Sick Call Patients #1-26.
[12] Lippert Report DCC pp. 9-15.

designated for inmates to put their sick call requests into. These requests are picked up by nursing staff seven days a week and triaged, so problems with confidentiality and delay have been resolved. DCC has also implemented a sick call log, so it is possible to monitor the timeliness and appropriateness of nursing triage and referral decisions. Documentation of timeliness in responding to sick call requests was evident from review of the sick call logs. Of 15 medical sick call requests, all were triaged within 24 hours and all were seen within 48 hours of receipt. Four urgent requests were seen the same day the request was received.[13] DCC nursing staff are assigned to monitor that the log is filled out. Undoubtedly, this helps to ensure that the log is current and timelines are being met.

For the month of March 2018, staffing assignments for nursing sick call were in accordance with the Illinois Nurse Practice Act. An LPN was assigned to do sick call along with an RN on two of the four Fridays in the month. The minimum number of staff assigned to sick call is two. Some days, three or four RNs are assigned to sick call. Practices at DCC are to assign an LPN to sick call only when it cannot be staffed with two or more RNs. When an LPN is assigned sick call, he or she works under the direction of the RN assigned to sick call. This information was verified by nursing staff who were interviewed while observing sick call. However, the use of LPNs to assist in conducting sick call risks patient harm and is an example of how RN vacancies (23%) affect quality of patient care.

Sick call assessment is no longer done in the hallway, cell side, or in rooms without access to an exam table. Rooms have been designated and equipped in the dispensary and in X-House to see patients requesting sick call attention. See the description of these areas in the previous section on Clinic Space. These rooms are not adequately equipped, lacking exam tables and examination equipment.

Four rooms in the dispensary area are used to perform nursing sick call. These are adjacent to each other or across a small hallway. One of the rooms has an exam table with paper. There also are two alcoves down the hall with beds and curtains that were also used for unclothed examination. The nurses share an otoscope and two weight scales. Each room has hand washing capacity and equipment to take vital signs. Forms and treatment supplies are kept in a locked medication cart in one of the rooms, which all of the nurses performing sick call can access. Nurses share the examination table and otoscope, which promotes lack of confidentiality and is disruptive of nursing services. Our opinion is that the sharing of examination tables is inappropriate and unreasonable. We do not endorse that practice for physicians and likewise do not endorse that practice for nurses. Each nurse should be afforded the equipment and supplies necessary to conduct their work.

The day sick call was observed (4/4/2018), an officer was stationed at a table in the hallway and managed inmate movement from the cell blocks to the waiting area and to the sick call nurses. The nurses had the inmate's sick call request and their health record at the time of the encounter. Nurses used the IDOC treatment protocols; assessments were appropriate to the

---

[13] Sick Call Patients #4, 7, 10, 12.

complaint and responsive to the patients' medical issues. Inmates were not limited to one complaint in the encounters we observed, or the records reviewed. Four registered nurses saw 29 patients from general population and four from the Special Treatment Center (STC).

In X-House, sick call requests are picked up daily and triaged by registered nurses. Registered nurses see patients for sick call Monday through Friday. Patients are seen for sick call in an examination room located at the front of the segregation unit. The room has an examination table with paper, a desk, chairs, scale, and examination light. Examination equipment and hand wash is brought to the room when sick call is conducted. This room is also used when the provider sees patients housed in this building.

Problems with sick call identified in the initial Lippert report that were still evident include:

- Original sick call requests are not filed in the inmate's medical record. It is an improvement that the nurse has the actual request at the time the patient is seen. However, there is no record of the patient's actual request for health care attention. Documentation of the patient's complaint on the nursing note is not verbatim; it is often shortened and interpreted by the nurse. This is not an accurate reflection of the patient's request for medical attention. Sick call requests should be filed in the patient's medical record.

- Nursing documentation was absent (times, dates, etc.) or not in SOAP format, and nursing treatment protocols were not used consistently to guide the assessment and plan of care. In the charts of 15 medical requests reviewed, there were 12 that resulted in a face-to-face nursing assessment. Of these, only six (50%) were adequately assessed and an appropriate plan of care developed. Either the assessment was incomplete,[14] the nursing protocol was not used,[15] the nurse did not address the complaint,[16] or did not follow up on significant symptoms.[17] A rate of 50% inaccuracy in the nursing assessment and follow-up of medical requests for potentially serious complaints (unexplained weight loss, numbness, chest pain, infection, etc.) puts patients at significant risk of harm.

- A quality improvement study of the use of nursing treatment protocols was included in the 2016 CQI Annual Review.[18] This QI tool only monitors whether nurses used a protocol, identified their credentials, and documented the date and time the patient was seen. There is no evaluation of the quality or completeness of the nursing assessment or the appropriateness of clinical decision making. In addition, the DCC Medical Director reviews two records of every nurse assigned sick call each month and reports these findings at the monthly CQI meeting. Performance of less than 80% on criteria used to evaluate sick call was reported month after month in CQI minutes reviewed.[19] The only corrective action was counseling and progressive discipline. No

---

[14] Sick Call Patient #14 complained of "bladder issues," and a urine dipstick was not done per the IDOC Nursing Treatment Protocol for Urinary Tract Symptoms.

[15] Sick Call Patients #4, 13.

[16] Sick Call Patients #4,10, 11.

[17] Sick Call Patients #10, 11, 15.

[18] Dixon Correctional Center Annual Governing Body Report, September 21, 2016 p. 19.

[19] Criteria include whether a full set of vital signs were taken, was the assessment thorough, was a treatment protocol used, etc. DCC CQI Minutes May 2016, July 2016, August 2016, January 2017, March 2017.

attempt has been made to trend problem areas or to analyze systemic factors that contribute to poor performance; instead, individuals are blamed.

- Medical records are not available in X-House. The IDOC Nursing Treatment Protocols state that "sick call evaluation using these protocols should be performed with a medical record."[20] Patients with medical complaints are evaluated without consideration of their problem list or medical history, which contributes to inadequate assessments and plans of care. Nurses document the sick call encounter on IDOC medical record forms which are kept in the nurses' office. This loose filing is incorporated into the inmate's medical file eventually.

- Inmates who were referred from nurse sick call were not seen or not seen timely by providers. Providers failed to follow up at intended intervals and treatment orders were not completed.

- In the charts of 15 medical requests reviewed, nine were referred to a provider. Two additional patients should have been referred by the nurse and were not.[21] Of those referred, three were referred urgently and all were seen within 24 hours (100%). Of the other six patients referred to a provider non-urgently,[22] only one was seen in less than 72 hours for higher level medical attention (16%).[23]

- Health Care Unit Policy and Procedure P-103 states that provider sick call for general population and the special treatment program takes place Monday through Friday from 8 a.m.to 4 p.m. However, in segregation, provider sick call only takes place once a week. The frequency of provider sick call and scheduling practices results in patients not being seen timely. Patients' medical conditions are at risk of deterioration when medical attention is untimely, and can result in harm.

A new problem identified by the Court Appointed Experts is a practice variation in how complaints of dental pain are handled. Sometimes nurses forward complaints about dental pain directly to the dental department and other times the patient is seen by nursing staff in sick call and then referred to the dentist. The problem with forwarding complaints about dental pain directly to the dental program is that it may be several days before the patient is seen. In the meantime, the patient's pain is untreated. The pain may also mask other more serious conditions, such as infection, that needs to be attended to immediately to prevent more serious consequences.

We were told by both nursing and dental staff that requests for dental care are routed to the dental program for triage and appointment. We used six sick call requests found in the dental clinic from patients who complained of having dental pain and looked at their medical records to see if the request had been triaged and assessed by nursing staff.[24] None of these patients had their complaint of dental pain triaged or assessed by nursing staff; instead, the request was routed directly to the dental program.

---

[20] IDOC Nursing Treatment Protocols p. 6.
[21] Sick Call Patients #4 and 11.
[22] Sick Call Patients #1, 8, 10, 13, 14, 15.
[23] Sick Call Patient #1.
[24] Sick Call Patients #24-D through 29-D.

The IDOC Nursing Treatment Protocols provide instruction to nurses in the assessment and treatment of dental complaints.[25] A toothache without fever or swelling is to be referred to the physician or dentist for evaluation within 24 hours. Using the nursing sick call log, we found five patients who had dental complaints in February 2018. Each of these patients had been triaged by nursing and a progress note written in the chart. Three patients agreed to be seen at nursing sick call and the nursing protocol was used to guide the assessment, urgency of referral, and to provide care in the interim until seen by the dentist.[26] In two of the three referrals, the patient was not seen for evaluation by a dentist or physician within 24 hours as specified in the protocol.[27]

We brought this practice variation to the attention of the IDOC Nursing Supervisor and did not receive any clarification about what nurses were expected to do when triaging complaints of dental pain. We recommend that an expectation be established that complaints of dental pain are assessed in nursing sick call, then referred to the dentist based upon urgency, and interim treatment options considered (use of OTCs or obtain a provider order).

The nursing treatment protocol for toothache/dental complaints should be revised by the IDOC. Separate protocols for dental decay, infection, and trauma to the oral cavity should be developed. Expectations for the assessment, directions on determining the urgency of referral provided, and the timeframe in which the dentist or physician is to see the patient should be specified. A review and revision of the treatment protocol can also delineate options for nurses to treat pain while the patient awaits appointment.

In summary, some of the problems with sick call identified in the previous Court Expert's reports have been corrected. Problems with sick call currently include:
- Sick call requests are not filed in the patient's medical record.
- Nursing assessments and documentation of sick call encounters are not adequate.
- Rooms used by nurses for sick call are not adequately equipped or supplied.
- Patient medical records are not used for evaluations in the X-House and cannot be used to reference the problem list, medical history, or orders when seeing patients.
- Patients referred to providers from sick call are not seen timely.
- Complaints of dental pain are not consistently triaged and assessed by nursing staff.

## Chronic Care

**Methodology:** The Chronic Care Nurse was interviewed about the chronic clinic processes and scheduling. The 2016-2017 and 2017-2018 chronic care clinic statistics, the current chronic care clinic annual schedule, and the chronic care patient lists were reviewed. The medical records of 14 patients with chronic medical illnesses and conditions were reviewed. The Office of Health Services Chronic Illness Treatment Guidelines dated March 2016 were reviewed as needed.

---

[25] IDOC Nursing Treatment Protocols p. 80.
[26] Sick Call Patients #20-D through 22-D.
[27] Sick Call Patients #21-D and 22-D.

PTX193-0180

**First Court Expert Findings**

The previous court expert noted that it was difficult to determine how many patients were enrolled in chronic care clinics, that the chronic care tracking system was inadequate, that patients with chronic illnesses were not all enrolled in a chronic care clinic, and some without chronic illnesses were erroneously registered in chronic care clinics. The expert stated that the chronic care clinic process was fragmented and disjointed. The absence of a single chronic care nurse to coordinate the chronic care clinics was a prominent contributing factor to the lack of an effective chronic care program. It was noted that DCC has established multiple illness clinics (MIC) that allows patients to have more than one chronic illness assessed and managed in a single visit.

**Current Findings**

DCC now has a single dedicated nurse coordinating chronic care. Patient are assigned and seen in chronic care clinics and patients are tracked and reported. The remaining problems identified by the First Court Expert have not been corrected. In addition, we identified additional findings and confirmed some of the First Court Expert's findings as follows:

- DCC now has a single, designated nurse to staff and coordinate the chronic care clinic program.
- Patients assigned to chronic care clinics are regularly seen in these disease specific clinic sessions. Chronic care patient lists identify the next scheduled appointments of the patients.
- Chronic care clinic statistics are tracked and reported.
- The names of patients enrolled in one chronic care (HIV) clinic list was compared to the HIV medication list. With the exception of four patients who had recently been transferred and one patient who had not yet been started on HIV medications, the two lists were in accordance.
- DCC has established biannual MIC clinics (two non-diabetes chronic illnesses) and MIC diabetes clinics (diabetes and at least one other chronic illness). This allows patients with more than one chronic illness to have their multiple chronic conditions managed in a single comprehensive clinic visit.
- The handwritten notes in the chronic care visits are generally legible; this is a notable improvement from the previous site visits.
- The current practice of not rescheduling chronic care patients who refuse to attend their scheduled appointment until the next chronic care clinic, which may be as long as six months later, is not in the best interest of the patient or the institution.
- Providers are primarily documenting changes in warfarin anticoagulation dosages on the INR lab report sheet but not in the progress notes. This important, even life affecting, information is inappropriately filed in the wrong section of the medical chart where it is likely to be undiscoverable.
- The chronic care clinic notes inconsistently contained needed clinical information, did not always indicate that needed examinations had been performed, did not universally document the rationale for clinical decisions and therapy modifications, and did not clearly outline the patient's treatment plan.

- The care of chronic illnesses (diabetes, hepatitis C, seizure, asthma, hyperlipidemia) and the provision of age-based routine health maintenance screenings are not in full accord with both the Office of Health Services Chronic Illness Treatment Guidelines and national standards of care.
- Asthmatic and COPD patients do not have documentation in their medical record that they have been educated and have demonstrated competency in the use of metered dose inhalers (MDI). Poor technique in the use of MDIs contributes to poor control of asthma/emphysema and increased morbidity.
- Asthmatic and COPD patients who present with respiratory symptoms to nurse sick call do not routinely have their peak expiratory flow rates (PEFR) measured. This is not in compliance with IDOC Asthma Treatment Guidelines.
- Diabetics at DCC were seen regularly, had HbA1C and urine microalbumin creatinine ratio testing performed at reasonable intervals, and received annual optometric screening for diabetic retinopathy. However, detailed foot exams, preventive pneumococcal vaccinations, and evaluation of 10-year heart disease and stroke risk scores that are recommended in the IDOC diabetes treatment guidelines and in national standards of diabetes care fail to be performed.
- The one chart of a patient 65 years of age or older whose chart documented a past history of tobacco use had no documentation in his record that he was offered one-time screening for aortic abdominal aneurysm as recommended by national standards of care.[28] DCC failed to screen all patients over 50 for colon cancer and repeat the screening at intervals based on the results and the methodology of screening utilized. The charts of seven patients 50 years of age or older were reviewed; six (86%) of the seven eligible patients had not been screened for colon cancer.[29] The one patient credited for being screened was not routinely screened for colon cancer but had a colonoscopy performed when he was 49-year-old to evaluate bloody stools.
- Nationally recommended vaccinations for adults are not consistently administered. Pneumococcal and meningococcal vaccinations were not offered or given as recommended by national age and disease-based guidelines.[30]
- Warfarin is the anticoagulation therapy provided at DCC. The monitoring of this modality of anticoagulation is staff intensive and logistically complicated, which makes it extremely difficult to maintain a safe level of anticoagulation. Patients are not adequately anticoagulated for a significant percentage of the time that they are on treatment.
- Uncontrolled chronic illnesses with problems that appear to be beyond the expertise of the DCC providers are not referred for specialty consultation.

---

[28] USPSTF AAA 2014.
[29] Chronic Care Patients #2,4,5,8,9,12,13.
[30] In references, CDC Recommended Immunization Schedule for Adults 19 Years or Older by Medical Conditions or Other Indications, 2018).

- The chronic care providers did not document any review of the MAR, the CBGs, the nursing and provider sick call notes and blood pressure readings when they saw patients in the disease-specific chronic care clinics or in the intervals between chronic care visits.
- The Medical Director reported that the providers have access provided by Wexford on their administrative office computers, but not in the infirmary or clinic exam rooms. Nurses do not have access to electronic medical references in the sick call exam rooms. This lack of ready access to current clinical diagnostic and therapeutic information is a barrier to the delivery of comprehensive, quality care at DCC.
- Chronic care scheduling in separate clinics for each individual disease is wasteful, without basis in contemporary medical primary care practice, and may be harmful to patients. On the basis of patient safety we recommend this practice be discontinued.

Two advanced practice nurses are assigned to staff the chronic care clinics. The single physician at DCC provides care to the infirmary patients and does administrative duties, but does not staff chronic care clinics.

Chronic care clinics at DCC are scheduled to be seen at specific monthly intervals that are inflexible.[31] These schedules are not based on the degree of control of the patient's illness. Patients need to be seen as frequently as is necessary to obtain control for their illness, not based on an inflexible schedule. The practice of seeing patients in disease specific chronic illness clinics encourages providers to ignore the implications of any one disease on another disease and to ignore the multitude of drug-drug interactions that exist in the practice of medicine. Many chronic illness are clinically interrelated. Metabolic syndrome, for example, is a condition that consists of obesity, diabetes, high blood lipids, and hypertension. Yet in the IDOC, each of these diseases (diabetes, high blood lipids, and hypertension) may be evaluated in a separate chronic clinic. In the IDOC, these disease specific clinics also do not include documentation that the provider evaluating the patient is aware of the patient's other clinical conditions. Each individual illness is documented on a separate medical record document, which makes it impossible to obtain a unified perspective with respect to therapeutic treatment planning. This redundant documentation is wasteful of time, unnecessary, and is clinically inappropriate. Unless a specialist is managing an individual disease, there is no legitimate clinical basis for this practice, which we believe should be discontinued on the basis of patient safety and elimination of waste.

For these reasons, patients with chronic medical conditions should be seen for all of their chronic medical conditions each time they are evaluated unless a specialist is managing their care. A patient in a primary care practice with six chronic conditions might be seen four times a year or more frequently if clinically indicated. In the IDOC, a patient with six chronic illnesses

---

[31] At DCC, asthma chronic clinic is scheduled in January and July. Diabetes chronic clinic is scheduled in April, August, and December. MIC/DM is scheduled in April, August, and December. Hepatitis C clinic is scheduled in June and December. High risk/HIV clinic is scheduled monthly. Hypertension/Cardiac clinic is scheduled in March and September. Seizure clinic is scheduled for February and August. Tuberculosis clinic is scheduled monthly. General Medicine clinic is scheduled May and November. Renal clinic is scheduled monthly via telehealth by a consulting nephrologist.

can have up to 24 chronic care documents in the medical record each having been developed in a separate clinic session.

The chronic care clinic enrollment and scheduling processes were reported as follows:

1. Within 24 hours of admission, the admitting RN documents names of patients and their chronic illnesses in the clinic log.
2. The chronic care nurse reviews the clinic log on a daily basis, adds patients to the appropriate chronic care list, arranges for the next chronic clinic visit based on the due date and the date of the previous visit, and arranges lab testing if the patient is to be seen within the next 30 days.
3. Within one week, an advanced practice nurse (APN) reviews the charts of all newly admitted individuals, identifies missed chronic illnesses, orders any needed labs, and if needed, sees patient within 30 days if a chronic illness baseline is required.
4. During the interval before the first chronic care visit at DCC, APNs will renew expiring medications.
5. The chronic care nurse reviews all patients to be seen in the upcoming month's chronic clinic, and arranges required lab tests to be drawn in advance.
6. Medical record staff generate the passes no less than the day before the clinic and a movement list/clinic schedule is printed and sent to the correctional staff. The chronic care nurse arranges the passes/list for the telehealth specialties (HIV, hepatitis C, renal).
7. Refusals for chronic care appointments (and treatments, dressings, nebulizer treatments, insulin injections) must be documented in person in the health care unit.

Medications will be renewed if needed for patients who refuse a chronic clinic appointment. But the patients who refuse an appointment will then be rescheduled at the next chronic illness clinic, which could be as long as six months later. This places the patient at risk for having a sustained period of lack of control without any clinical intervention unless their condition deteriorates to the level of causing clinical symptoms. We view this as indifferent. Patients at DCC include the mentally ill and many geriatric patients who have mental challenges. Refusals of care, particularly in this group of patients, must be viewed with the perspective that this group may have cognitive challenges. IDOC must therefore establish procedures that ensure that high-risk, non-cooperative, or non-compliant patients who refuse visits are rescheduled promptly based on their existing clinical need. In all other respects, monitoring of these patients must continue as ordered. On the other hand, as opposed to refusals, all no shows due to lockdowns, NP call-ins, offsite site writs, and hospitalizations are currently automatically rescheduled and seen shortly after the missed appointments.

There were 2,560 chronic care visits at DCC from July 2016 through June 2017. In the first eight months of FY 2017-18 (July 2017 to February 2018), 1,781 chronic care clinic visits were provided; this projects to a slightly higher annualized volume than the previous year.

**Chronic Care Clinic Statistics**
July 2017 – June 2018
Table 1

| Clinic | HTN | DM | Sz | Asth/COPD | Gen Med | Hep C | HIV | INH | MIC* | MICDM | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Pt. Roster | 307 | 28 | 59 | 173 | 238 | 129 | 27 | 1 | 96 | 128 | 1185 |
| Annual Visits | 605 | 85 | 113 | 356 | 501 | 256 | 80 | 12 | 196 | 368 | 2560 |
| Visits per patient/year | 2 | 3 | 1.9 | 2.1 | 2.1 | 2.0 | 3.0 | 2 | 2 | 2.9 | |
| % of DCC Population | 13.4% | 1.2% | 2.6% | 7.6% | 10.4% | 5.7% | 1.2% | 0 | 4.2% | 5.6% | |

*MIC includes patients with ≥2 conditions: hypertension, seizures, asthma/COPD, gen med. MIC DM includes patient with diabetes **and** ≥1 of these conditions: hypertension, seizures, asthma/COPD, or gen med.

Over 50% of all the patients at DCC have a chronic illness. Based on the data noted in Table One and the review of the medical records of 14 chronic care patients, most patients with chronic illnesses at DCC are seen by a provider approximately twice a year.

At the time of the site visit to DCC, 11 patients were receiving chronic anticoagulation using warfarin (Coumadin or Jantoven). Patients receiving warfarin treatment must have frequent International Normalized Ratio (INR) testing to assure that the level of anticoagulation is within a recommended therapeutic range. Lower than therapeutic range results predispose the patient to recurrent clots and possible pulmonary emboli; elevated levels create risks of serious bleeding. The experts had difficulty evaluating the care provided to this patient population who were at high risk for serious complications. The progress notes and chronic care clinic notes had limited if any documentation of INR results and clinical decisions to modify warfarin doses. Ultimately, the experts identified, albeit inconsistently, scribbled annotations at the bottom of lab reports buried amidst multiple lab results noting a change in warfarin dosage. This vital clinical decision and the rationale for dose modification must be documented in progress notes which providers and nurses commonly use to comprehend and verify the care provided to a patient. This must be expeditiously addressed by IDOC and DCC medical leadership. The utilization of INR testing was tracked on two patients receiving warfarin for chronic anticoagulation. One patient had 24 INRs in 16 months; nine (38%) were in the recommended therapeutic range, 11 (46%) above this range, and four (17%) below the therapeutic range.[32] The other had 43 INRs over 41 months; 31 (72%) in the therapeutic range, three (7%) above this range, and nine (21%) below the therapeutic range.[33] The varying levels of anticoagulation in these two patients resulted in multiple increases and decreases in the dosage of warfarin. Given the logistical difficulty in maintaining therapeutic levels of anticoagulation in the correctional setting, IDOC must strongly consider switching to the use of newer anticoagulants that do not require INR testing and the subsequent frequent adjustments of the anticoagulant dosages.

---

[32] Chronic Care Patient #7.
[33] Chronic Care Patient #10.

The documentation in the chronic care clinic notes does not consistently contain sufficient, pertinent clinical information needed to clarify and understand the status of a patient's chronic illness or justify a change in the treatment plan. This lack of consistent clinical documentation creates a barrier to the continuity and quality of care delivered to the DCC patient population. The experts found limited documentation that the chronic care providers had reviewed the MAR (refusals, compliance with prescribed medications), the CBGs, the previous nurse and provider sick call notes, and the blood pressure readings taken in the previous sick call visits when they assessed patients in the disease specific chronic care clinic visits. This failure to review and document the data and information that had been gathered between chronic care visits contributes to inappropriate clinical decisions for DCC's patient population.

The chronic care clinic notes are handwritten but were, for the most part, legible. The legibility of the chronic care handwritten notes was a notable improvement from the Experts' site visits to the previous two correctional facilities.

It was reported that the providers have access to the UpToDate® electronic medical reference on their administrative office computers, but this important access to current diagnostic, treatment, and clinical information is not available to providers or nurses in their clinical work areas (infirmary, nursing stations, exam rooms), making access to this information not available when it is needed.

Most of the chronic care patients had completed problem lists. However, four (29%) of the 14 charts reviewed had important diagnoses missing from the problem list and one had diagnoses that were either incorrect or no longer active problems.

The care provided to diabetics and patients on chronic anticoagulation, antihypertensive, and asthma/emphysema medications had deficiencies. The Office of Health Services Chronic Illness Treatment Guidelines were not fully adhered to: diabetics did not receive pneumococcal vaccines or have documented detailed foot examinations. Asthmatics did not receive pneumococcal vaccination and did not have pulmonary function tests performed when there was uncertainty about their diagnosis. Seizure patients did not have documentation of the occurrence of their most recent seizure. Hepatitis C patients did not have a baseline HCV RNA measured. Some diabetics, hypertensives, and patients on warfarin anticoagulation remained uncontrolled for lengthy periods of time, and detailed foot and lower extremity sensory exams are not documented in the diabetes chronic care notes. Recommended vaccines are not universally provided to patients whose age or disease warrant such vaccination. Compliance with prescribed medication is important for all chronic illnesses and the impact of not taking or receiving diabetic, hypertension, anticoagulation, and seizure medications can result in rapid deterioration and morbidity. There was no documentation in the chronic care provider notes that they were reviewing the MAR's or nursing notes to assess compliance with medication and initiating appropriate interventions as needed.

All 14 (100%) of the patient records had some degree of problems identified in the provision of care. The following patient summaries highlight the concerns and the findings noted above.

**Chronic Care Patient Summaries**

- This patient is a 49-year-old male with diabetes, hypertension, obesity, ETOH abuse, and paranoid schizophrenia, whose medications included glipizide 5mg, metformin 1000mg BID, fenofibrate 54mg/d, metoprolol 50mg BID, hydrochlorothiazide 25mg/d, and aspirin EC.[34] There was no documentation in the database of pneumococcal vaccination, which is recommended for all diabetics. He was followed in DCC's combined chronic (MIC DM) clinic. Lab testing in 2013 revealed cholesterol 206, LDL 95, TG 343 (45-150), and HbA1C 8.6%. In 2015, simvastatin was discontinued and fenofibrate was started due to an elevated TG (343). This is a questionable clinical choice, with only a mildly elevated TG. The national guidelines recommend statins for patients with high risk of cardiovascular disease. This patient's 10-year cardiovascular risk score was not assessed by the DCC providers, but we calculated his risk to be 20.5%, which warranted prescription of a statin.[35] His diabetic control improved and his HbA1C was maintained between 5.4 and 5.7%. He has chronic kidney disease (creatinine 1.77) but his urine microalbumin was within normal range. The optometry visit in March 2017 identified no findings of diabetic retinopathy. His blood pressure was controlled; however, in 2016 a prescription for lisinopril, an antihypertensive that is strongly indicated in diabetics with early kidney disease, was discontinued. The rationale for this decision was not noted. At none of his chronic care visits was there documentation that a detailed foot exam had been performed. At the 8/6/17 annual exam, his cognition was felt to be somewhat impaired, but the provider did not list any reasons or possible etiologies for the assessment of mild cognitive impairment. The patient lost 51 pounds over six years (311 lbs. in 2011 and 260 lbs. in October 2017). This may be due to exercise and better food choices, but there was no documentation by the provider that a wider differential (hyperthyroidism, cancer, malabsorption, etc.) was considered. This patient will be 50 years old later this year and consideration should be given to additional age-based screening (e.g., colon cancer screening). A review of recent MARs showed good administration and compliance with medications.

In summary, for the most part, this patient's diabetes (HbA1C's consistently in the 5 range) and hypertension have been well controlled for the last two years. The improvement in his diabetes may be due to his weight loss. Although the repeated HbA1C's in the 5 range put the patient at risk for hypoglycemia, the provider did not reassess the diabetes medications and did not consider discontinuing at least one of the two anti-glycemic medications (for example glipizide). His 10-year risk of heart disease and stroke was greater than 7.5%. Based on current standards and on the IDOC Chronic Illness Guidelines, this patient should have been prescribed a statin to lower his risk of cardiovascular events. Also, the providers failed to comply with the IDOC guidelines by not documenting a foot examination, and not ordering a pneumococcal 23 vaccination. The providers failed to identify, monitor, and evaluate the reason for the patient's

---

[34] Infirmary Patient #1.
[35] ACC/AHA Heart Risk Calculator.

notable 51-pound weight loss during his incarceration. This puts the patient at risk from potentially preventable morbidity and even mortality.

- This patient is a 53-year-old male with HIV infection, hyperlipidemia, hypertension, asthma, substance use disorder, and a past history of positive TB skin test.[36] His medications included lisinopril 20mg, QVAR MDI, albuterol MDI, pravastatin, Genvoya, and darunavir. The patient was transferred in September 2017 from Northern Reception Center (NRC)  to DCC. He was followed in the UIC HIV telehealth clinic and the MIC chronic care clinic. In the past 21 months he has been seen three times in the UIC HIV clinic while at NRC and DCC, three times in  the hypertension chronic clinic at NRC, and two times at the MIC clinic at DCC. His HIV has been stable on Stribild/darunavir and then Genvoya/darunavir, with viral loads <20 and CD4s ranging between 680 and 838. His HIV medications included protease inhibitors. The patient was on simvastatin from June 2016 to March 2017. Simvastatin is contraindicated in persons on protease inhibitors, which this patient was on, yet this contraindication was not recognized for 10 months.  He had been seen three times in the NRC hypertension chronic care clinic before this contraindicated medication was discontinued. There is no documentation in the chart that he was offered or administered the pneumococcal 13 or 23 or the meningococcal vaccinations. His asthma was well controlled with no exacerbations noted in the medical record, and his PEFRs ranged between 600 and 750 L/min. His blood pressure was controlled over the last 21 months. On 3/21/17, when simvastatin was discontinued at SCC, gemfibrozil was ordered without a rationale documented in the medical record. Gemfibrozil is not recommended for lipid lowering in the absence of high triglycerides. An elevated triglyceride level was not identified in the medical record. A different statin drug other than simvastatin should have been chosen. Labs on 7/20/17 showed a cholesterol of 251, LDL 173, TG 156. The patient transferred to DCC in late 2017. In March 2018, gemfibrozil was discontinued and an appropriate statin (pravastatin) was finally initiated. The decision to appropriately start statin medication was delayed by the providers' failure to calculate the patient's 10-year ASCVD risk score as is mandated in the IDOC diabetes treatment guidelines.[37]  This patient's estimated 10-year cardiovascular risk   was 9.7%; the national and IDOC guidelines recommend starting a statin when the 10-year risk is >7.5%.[38] This 53-year-old has not yet been screened for colon cancer; all individuals should be screened for colon cancer beginning at the age of 50.[39]

In summary, this patient was continually seen in HIV and chronic care clinics. His HIV, asthma, and hypertension were adequately controlled. Even though this patient was seen three times in an NRC/SCC chronic care clinic, for seven months he was left on a type of statin that has serious drug interactions with HIV medications before this contraindicated statin was recognized and discontinued. This delay put the patient at

---

[36] Chronic Care Patient #2.
[37] IDOC Chronic Illness Treatment Guidelines, Diabetes 2016.
[38] ACC/AHA Heart Risk Calculator.
[39] USPHS Taskforce.

risk and supports a recommendation that chronic care clinic providers need to be engaged and knowledgeable about the care provided in other chronic care and specialty clinics and in sick calls. There was no rationale documented in the medical record for starting gemfibrozil after the contraindicated statin was stopped; triglycerides were never more than mildly elevated. The providers failed to comply with the IDOC and national guidelines by not calculating the 10-year ASCVD risk and delaying the ordering of another statin that was not contraindicated for use with HIV medications. The providers failed to comply with national guidelines to offer screening for colon cancer to all individuals at the age of 50 years and to offer pneumococcal and meningococcal vaccination to this patient with HIV.

- This patient is a 29-year-old male with asthma. His only medication is levalbuterol MDI.[40] His database noted a negative PPD and hepatitis B vaccination series being administered in 2017. There was no documentation of pneumococcal or flu vaccines. In 2016, he was seen three times in nurse sick calls for upper respiratory infections and asthma exacerbations. The nurses did not measure peak expiratory flow rates (PEFR) but did measure oxygen saturations. The patient improved with increased use of the levalbuterol inhaler. The patient was seen in asthma chronic care clinics four times between July 2016 and January 2018. In the asthma clinic his peak flows ranged from 450 to 500 L/min. The providers did appropriately document the frequency of levalbuterol usage as one to three times per week when the weather was cold. There was no documentation in the medical record by nurses or providers that the patient's inhaler technique was reviewed and found to be appropriate. MARs reviewed in 9/2017 and 11/2017 documented the distribution of the KOP inhalers to this patient.

  In summary, the patient had very stable asthma that only required intermittent use of his rescue inhaler. He was seen regularly in the asthma chronic care clinic. There was no evidence in the medical record that he had been offered pneumococcal vaccination, as is nationally recommended for all asthmatics. The nurses did not measure PEFRs when the patient was seen in nurse sick calls for breathing issues. Nurses should measure and record PEFRs before and after treatment on all asthmatics who are evaluated in sick call or in the urgent care treatment rooms. Oxygen saturation testing has a place in the evaluation of symptomatic patients in respiratory distress or those not responsive to treatment, but does not replace the measurement of PEFRs. Asthmatic and COPD patients should have documented ongoing training and documented observation of their inhaler technique. This is not being done at DCC and should be incorporated into the standard care provided to all users of inhalers. Failure to do this puts the patient's health at risk.

- This patient is a 81-year-old male housed on the geriatric floor with diabetes, hypertension, hyperlipidemia, and decreased vision.[41] His medications include

---

[40] Chronic Care Patient #3.
[41] Chronic Care Patient #4.

simvastatin, metoprolol, furosemide, aspirin, lisinopril, and metformin. The patient was seen regularly in the diabetes/hypertension MIC chronic care clinic. His HbA1Cs have ranged from 5.4 to 5.7 for the last 2¾ years. His blood pressure was 178/90 on 1/12/16 and furosemide was added to this anti-hypertensive regimen. His blood pressure was also elevated (158/80) in December 2017, but no treatment modifications were made at this visit. There was no documentation in the medical record that this patient received the pneumococcal vaccines, which are indicated for all diabetics and every patient 65 years of age or older. He also was not screened for colon cancer, which is indicated for all patients 50 years of age or older.

Since 2015, this patient has been followed by the DCC optometrist for failing vision, worse in the right eye. He was referred the UIC cataract clinic in February 2017. On 3/8/17, the optometrist documented that the patient could only count fingers at five feet with his right eye and had visual acuity of 30/40 on the left. On 4/26/17, the optometrist noted that he was still looking into the request to get approval for cataract surgery. On 5/4/17, the optometrist found that the patient's vision deteriorated to a visual acuity of 20/100 on the left, and only finger counting on the right at five feet. The optometrist submitted another request for referral to UIC. On 10/11/17, eight months after the initial referral, the patient was seen at UIC, where retinal swelling was noted and drops in both eyes continued for glaucoma. A two week follow up was recommended. On 11/8/17, the optometrist found the patient's vision to be only finger counting at two feet in both eyes. The optometrist added a second eye solution and wrote "need to get back to retina specialist…will refer again." On 12/13/17, the intraocular pressure of both eyes was normal. The optometrist noted that the patient had a history of retinal swelling due to diabetic retinopathy and advised that the patient keep the eye appointment with the retinal specialist. No further visits to the UIC eye specialists were located in the medical record. The patient's MAR indicated compliance with all medications.

In summary, the patient was seen regularly in the chronic clinics and his diabetes appeared to be over treated because his HbA1C level was significantly below goal. The risk of hypoglycemia should have prompted reevaluating the need for metformin in this elderly patient. Failure to offer and administer pneumococcal 13 and 23 vaccines is not in compliance with community practice nor with IDOC diabetes treatment guidelines. Failure to screen this patient for colon cancer is also not in accord with national standards. The patient's vision was rapidly deteriorating. It took eight months before the visit to the UIC eye specialist was arranged. The optometrist had to submit a second request three months after his initial request. The patient was seen in October 2017 at UIC and was to return in two weeks; the optometrist wrote on 11/8/17 that the patient needed to see the retina specialist and re-submitted a referral request. As of 12/13/17, the patient had not yet been seen back at UIC. The patient's vision has notably deteriorated. There have been delays with the initial and follow-up appointments at UIC that may have contributed to his failing vision. The delays in obtaining specialty

ophthalmology consultation at UIC should have prompted DCC to consult with a local ophthalmologist. These delays place the patient at risk of loss of vision.

- This a 53-year-old male with hepatitis C, asthma, hyperlipidemia, and a psychiatric disorder.[42] His database noted PPD negative in 2017 and hepatitis A and B vaccination series in 2013-14. He was followed in the asthma and hepatitis C chronic clinics. His medications were levalbuterol and ciclesonide MDIs. There was no evidence in the medical record that he received the pneumococcal vaccine as is recommended for persons with asthma or emphysema. His last asthma attack was documented as occurring in 2013. Given he had infrequent asthma exacerbations, he had questionable need for inhaled steroid medication. His PEFRs ranged from 325 to 520 L/min, but the PEFR was not always recorded when he was seen at his chronic care visits. There was no evidence in the medical record of pulmonary function testing. This testing was needed to identify if this patient had asthma as opposed to emphysema. His lipid profile in September 2015 noted cholesterol 263, HDL 61, and LDL 159. His 10-year ACC/AHA cardiac risk was not assessed by the DCC providers, but we calculated this risk to be 10.8%. In spite of this elevated risk, his statin medication was discontinued without a clinical explanation in 2016. The patient was followed for hepatitis C infection since at least 2013. His liver enzymes were slightly elevated, and his platelet counts were within normal ranges. He was treated for oral thrush with Diflucan (fluconazole). There was no rationale given for why this patient developed an oral candida infection. Although the cause might have been the use of an inhaled steroid, oral thrush is rarely seen in patients who do not have AIDS or diabetes. He was not tested for HIV. His APRI was calculated to be 0.418, which is below the IDOC criteria for treatment. We were not able to identify lab testing for HCV quantitative RNA testing as is required in the IDOC Hepatitis C Guidelines 2017.[43] There was no documentation in the medical record that this over 50-year-old patient has been screened for colon cancer.

In summary, this patient was seen four times over 31 months in the asthma clinic. His respiratory condition was stable. He failed to receive necessary pulmonary function testing. There was no clinical justification in the medical record indicating that this patient needed to continue to use inhaled steroids. There was no documentation in the medical record that this patient was trained on the use of the MDI or successfully demonstrated proper technique during any of this asthma clinic visits. There was no evidence in the medical record that hepatitis C virus (HCV) RNA testing had been ordered as directed in the hepatitis C guidelines. The cause of oral thrush was not identified; HIV testing was clearly needed but was not ordered. This poses a significant risk to this patient. This patient was over 50 years old, yet has not received colon rectal screening, which is indicated by both national and community standards of care.

---

[42] Chronic Care Patient #5.
[43] Hepatitis C Guideline, December 2017.

- This patient is a 38-year-old male with hepatitis C infection, seizure disorder, and depression.[44] His database noted that he had received hepatitis A and B vaccination series in 2016-17. His medications included valproic acid 500mg BID. He was followed in the hepatitis C and seizure clinics. He was admitted to IDOC in July 2016 and was seen three times in the hepatitis C clinic. His liver enzymes were slightly elevated, his platelets were normal, and his APRI scores was less than 0.46, which meant that the patient could have significant fibrosis but was unlikely to have cirrhosis. There was no documentation in the medical record that he had been tested for HCV RNA as directed in the hepatitis C guidelines.[45] Based on current institutional criteria, he was not a candidate for hepatitis C treatment. In the 5/15/17 seizure clinic, it appeared that he had stopped or had not received his seizure medications and valproic acid was re-started. On 2/27/18, he was examined in the seizure clinic. His valproic acid  level was low 27.4 (50-100) and the ALT test result was 53. There was no mention about when he had his last seizure. Review of the MAR documented that he had received his KOP monthly supply of valproic acid from September 2017 to December 2017, but there is no documentation that he received valproic acid in January and February 2018. There is no indication or documentation that the provider in the seizure chronic care clinic reviewed the MAR and documented the most recent failure to receive his valproic acid. None of the seizure clinic notes document when the patient had his last seizure.

  In summary, there is no evidence in the medical record that this patient has ever had HCV RNA testing; this is not in accord with the system's hepatitis C guidelines. If the test showed that there was no active infection, the patient would no longer need to be followed and repeatedly examined and tested with respect to treatment of hepatitis C. The seizure clinic notes fail to document if the patient had any epileptic seizures since the previous visit. The failure to record this key clinical information poses a health risk for this patient. There was a question about the patient's ability or willingness to take his seizure medications, but he continued to be allowed to self-medicate his seizure treatment instead of placing him on nurse administered medication.

- This patient is a 44-year-old male whose problem list includes DVT since 2016 on chronic warfarin anticoagulant treatment, seizure disorder, NIDDM, congestive heart failure, and migraine headaches.[46] His medications include warfarin, levetiracetam, phenytoin, haloperidol, and levalbuterol and ipratropium MDIs. The problem list included no documentation that the patient had a mental health disorder yet, he was noted as receiving haloperidol, a psychotropic medication. The patient was receiving a rescue bronchodilator, but neither asthma nor COPD were noted on the problem list. Heart failure and diabetes were on his problem list, but he was not prescribed any medications for the treatment of either condition. During the past two years, the patient had no asthma attacks or emphysema exacerbations. Based on the inhalers

---

[44] Chronic Care Patient #6.
[45] Hepatitis C Guidelines.
[46] Chronic Care Patient #7.

being prescribed, it appears likely that this patient was being treated for emphysema, yet pulmonary function testing was never performed to verify the patient's actual diagnosis. His PEFRs ranged between 270 and 400. He attested to using his inhalers two to three times per week. There is no documentation in the record that this asthma/emphysema patient was offered pneumococcal vaccination in accord with national guidelines. While housed at Pontiac Correctional Center, his carbamazepine level was 2.6 (4-12) and his phenytoin level was 9.4 (10-20) both of which were below therapeutic levels. There was no comment in the clinical notes made about recent seizure activity nor about these low drug levels. The patient's history and physical exam notes were extremely limited to the point of being non-contributory. The patient was transferred to DCC and was seen in the asthma/seizure clinic on 6/2/16. A more thorough history noted that his last seizure was in May 2016 and that he was using his rescue MDI two to three times per week. His carbamazepine and phenytoin levels were now within therapeutic range; carbamazepine was discontinued and levetiracetam was started. At the 12/15/16 MIC clinic, he reported having a seizure one week ago; he was reported to have been noncompliant with his anti-seizure medication. At the 1/17/18 asthma/seizure clinic, the provider documented that there had been no seizures since the last visit and his phenytoin level was found in the therapeutic range. The management of this patient's chronic anticoagulation was complicated by the failure of the NPs providing chronic care to clarify in the medical record why this patient had to be prescribed long-term anticoagulation with warfarin or any other anticoagulant. From 8/14/15 through 12/21/16 (16 months), 24 INR tests were performed. Only nine (38%) were in the recommended therapeutic range;  11(46%) were high and put the patient at risk for serous hemorrhage; and four (17%) were low, creating the potential of new clot formation. Due to these varying levels of anticoagulation, the warfarin dosage had to be changed at least eight separate times. Warfarin was eventually discontinued because of the patient's propensity to self-mutilate. At one point, the patient developed anemia from bleeding from self-inflicted lacerations. At two clinical visits (7/30/17, 1/17/18), the provider's plans were "see orders" and "see RX." These short cut plans are an impediment to the effective communication to nurses and other providers about the treatment of this patient.

In summary, this patient's likely diagnosis was COPD, but the patient failed to have pulmonary function testing to make that determination.  The patient was never offered or administered the pneumococcal vaccines; this is not compliant with the standard of care in the community. The patient's anticoagulation treatment was in the therapeutic range only 38% of the time in 2015-2016. The provider's documentation at the 7/30/17 and 1/17/18 chronic care clinics to "see orders or RX" instead of documenting a therapeutic plan of care has the potential to disrupt the continuity of care for this patient and put the patient's health at risk.

- This patient is a 51-year-old male with hyperlipidemia.[47] He was followed in the general medicine chronic clinic. He was not on medication; simvastatin was discontinued in 2012 due to non-compliance. In 1/8/2007, initial labs showed cholesterol 280, HDL 33, LDL indeterminate and TG 461. One month later on 2/19/2007, repeat lipid testing revealed cholesterol 196, HDL 23, LDL 128, and TG 224. We were not aware whether the patient was on statin medication when this test was taken. At the general medicine clinic on 6/10/15, the patient's dyslipidemia was controlled with diet. There was no documentation in the record why and when the statin had been discontinued. The patient was subsequently seen four times in the general medicine clinic between November 2015 and November 2017. His weight decreased from 230 in 2014 to 219 on 11/12/17. He continued to be advised by the providers to exercise, increase dietary fiber, and eat a healthy diet. There was no documentation in his chart, as recommended in the IDOC Hyperlipidemia Guidelines 2016, that his 10-year risk for heart disease or stroke was calculated.[48] Using his most recent lipid profile, we calculated his 10-year ASCVD Risk to be 4.7% which does not meet the criteria for treatment with a statin medication. In 2015, the patient had an episode of bright red blood per rectum (BRBPR). He was evaluated twice by DCC providers and the bleeding was thought to be caused by an external hemorrhoid. He had a colonoscopy done at UIC on 9/2/15; a sessile polyp was removed. The patient is to have a repeat colonoscopy in 2020. He was not told about the colonoscopy results until eight months later, when he asked for this information.

  In summary, this patient was followed regularly in the general medicine chronic care clinic. He has had six chronic care clinic visits in the last 29 months. Although the 10-year ASCVD risk score was below the threshold to initiate anti-cholesterol medication, the providers failed to follow the IDOC hyperlipidemia guidelines by not regularly calculating this risk. The colonoscopy performed in 2015 to evaluate BRBPR fulfilled the age-based screening for colon cancer in this over 50-year-old patient.

- This patient is a 70-year-old male with COPD and a previous 50-year history of smoking tobacco.[49] His database noted a flu shot on 9/20/17 and a pneumococcal 23 vaccine. His medications included fluticasone and vilanterol inhaler, levalbuterol inhaler and ipratropium, and albuterol inhaler. He was seen seven to eight times in the asthma chronic care clinic from July 2015 through January 2018. His medications were modified on a number of occasions to address his respiratory status. His PEFRs were consistently low, 110-130 L/min, and his oxygen saturations ranged from 95 to 97%. He was admitted to the infirmary on two occasions (1/8-22/2016, 4/4-20/16) for exacerbations of his COPD. The patient was referred to UIC pulmonary clinic on 1/20/17, but there was no evidence in the medical record that this has been accomplished. His weight dropped from 125 on 7/17/15 to 116 on 2/21/17, but has remained stable through 1/17/18 at

---

[47] Chronic Care Patient #8.
[48] IDOC Treatment Guidelines Hyperlipidemia.
[49] Chronic Care Patient #9.

115 lbs. He initially refused cancer screening and lab screening on 2/21/17. A lipid profile performed in October 2017 showed cholesterol 179, HDL 59, LDL 103. We calculated the patient's 10-year ASCVD risk as 16.3% which warrants treatment with a statin. There is no documentation in the medical record that he has been offered or received pneumococcal 13 vaccine. Though the patient had COPD, a pulmonary function test was not evident in the medical record. Though the patient was a 70 year old ex-smoker, abdominal aortic ultrasound testing was not done to screen for an aortic aneurysm.[50] It is unclear which cancer screening he refused on 2/21/17. Given that the patient was recently allowing lab testing again, colon cancer screening should be revisited. There is no documentation in the medical record that colon cancer screening has been offered in the last 12 months.

In summary, this patient has been seen regularly in the COPD clinic and his medications have been adequately modified to include a corticosteroid, short-acting beta agonist, long-acting beta agonist, and an anticholinergic bronchodilator. He has never had a pulmonary function test to fully verify the clinical diagnosis of emphysema. His COPD is quite severe, and it is in his best interest that the pulmonary specialty appointment requested in January 2017 be resubmitted. Per IDOC hyperlipidemia guidelines, the providers should have (but have not been) calculating his 10-year ASCVD risk. His 16.3% 10-year risk indicates that he should have been offered a statin medication. This patient is not being offered nationally recommended age and risk-based tests to screen for abdominal aortic aneurysm and colon cancer. He also has not been offered and administered the pneumococcal 13 vaccine. The failure to offer these preventive and early detection screenings puts this patient's health at risk.

- This patient is a 43-year-old male with asthma, DVT on chronic anticoagulation with coumadin, psychiatric disorder, past history of seizure disorder (no longer on antiepileptic medications), traumatic brain injury (TBI) in 1999 due to MVA, and blindness in one eye**.**[51] His database noted a flu shot and HIV Ab negative test in 2017. His medications included levalbuterol and ciclesonide inhalers, and warfarin. He was followed semi-annually in the asthma chronic care clinic, with eight chronic care visits in the last 40 months. His PEFRs have ranged been 300 and 650 L/min, with a mean of 380-400. He has had no urgent care or ED visits for asthma attacks. The patient was prescribed warfarin for the past treatment of DVT. We could not find a comprehensive note in the medical record explaining why he is receiving chronic anticoagulation. On 8/13/17, the lead physician wrote that the NP primary care provider needed to determine if there was clinical justification to continue anticoagulation; the NP then only noted in the 10/16/17 progress note that a history of multiple DVTs was the reason for the ongoing warfarin treatment. Forty-three INR tests were done in the last 41 months: 31 (72%) were in the therapeutic range, nine (21%) below, three (7%) above this range. Warfarin doses were modified six times during this timeframe. The patient's

---

[50] USPSTF AAA 2014.
[51] Chronic Care Patient #10.

weights were recorded as 301 lbs. on 2/6/15, 291 on 8/11/15, 281 on 12/8/16, and 228 on 1/29/18. He lost 73 lbs. in 36 months. On 5/13/17, lab tests revealed a normal HbA1C and TSH, ruling out diabetes and hyperthyroidism. There is no documentation in the chart that discusses this notable weight loss. This patient needs to be fully evaluated to determine that the weight loss is not caused by an underlying medical condition.

In summary, the patient was seen regularly in the asthma chronic care clinic; he has not had any exacerbations and his PEFRs are stable. There was no evidence in the chart that he has been trained about the use of an inhaler and his technique verified to be competent. The patient continually received INR testing to assess the adequacy of anticoagulation for his past history of DVT(s). The patient was therapeutically anticoagulated only 72% of the time. The providers need to thoroughly review this patient's history of DVTs to ensure that anticoagulation was still necessary, as an adverse side effect of warfarin is serious risk of bleeding. The frequent lab testing and medication adjustments needed when warfarin is prescribed are logistically complicated and put patient-inmates at risk for poor outcomes. Utilizing newer anticoagulation medications that do not require frequent ongoing measurement of the level of anticoagulation should be strongly considered by the IDOC. The patient's significant weight loss has not been fully and comprehensively evaluated. The providers have not taken a careful history, performed a thorough physical exam, and ordered additional laboratory and diagnostic tests to evaluate the unexplained weight loss. This must be initiated immediately.

- This patient is a 40-year-old male with hypertension and a history of anemia.[52] His database noted a diphtheria/tetanus vaccine in 2013**.** His medications included diltiazem 240mg ER, metoprolol 50mg bid, losartan, and hydrochlorothiazide 12.5mg/d. He has been followed in the hypertension and general medicine chronic care clinic at Danville and DCC. From September 2016 through April 2018, he was seen seven times in the hypertension and general medicine clinics. His blood pressure was controlled until 10/2/17, when he ran out of his medications and his blood pressure was noted to be 165/109; his BP medications were renewed. On 10/20/17, he was transferred to DCC. His blood pressure at the 11/3/17 hypertension clinic was 150/100. At the 3/20/18 hypertension clinic, even though his blood pressure was 126/80, lisinopril was added to his blood pressure regimen. At the next hypertension clinic on 3/28/18, his blood pressure was 142/88. The lisinopril was stopped because of the development of a cough, and losartan was substituted. Over the next week, blood pressures ranged from 122/74 to 158/98. At the 4/4/18 hypertension clinic, the blood pressure was 130/90, with a follow-up pressure in two weeks.

On 7/10/17, while housed at Danville CC, the patient presented with a history of rectal bleeds, and he was found to be significantly anemic, with a hematocrit of 22.4%, hemoglobin of 6.3g/dl, and an MCV of 57. This was suggestive of an iron deficiency

---

[52] Chronic Care Patient #11.

anemia. A rectal exam was not performed. No additional workup was ordered or initiated. He was placed on iron tablets. At a follow-up visit on 7/27/17, his hemoglobin level had improved to 8.6g/dl, his bleeding had ceased, a rectal exam was deferred but hemorrhoids were noted as the cause of the blood loss. By 10/2/17, the blood counts had returned to normal ranges. The patient has voiced complaints of constipation. This serious bleed should have been but was not fully investigated. It would have been fully justified to have initially admitted the patient to the hospital to stabilize, monitor, and evaluate the etiology. The patient's investigations should have included additional blood tests and upper and lower endoscopies.

In summary, the patient has been prescribed four hypertensive medications and his BP control was not yet stabilized. The exchange of lisinopril for losartan was not fully explainable; both can cause dry cough and the patient's cough was under control on the day of the change. The use of four medications at less than optimal dosing is questionable. The Danville CC providers put this patient at risk by not hospitalizing and fully investigating his profound blood loss. The patient's health and life could have been in jeopardy if he had suffered further bleeding episodes at the prison. Upon transfer to DCC three months after the anemia had first been detected, the DCC providers should have initiated the warranted evaluations. They failed to do this even though they had received transfer information noting that one of his problems included anemia.

- This patient is a 76-year-old male with hypothyroidism, atrial fibrillation, type 2 diabetes, prostatic hypertrophy (BPH), glaucoma, and cataracts.[53] His medications included metformin, levothyroxine, metoprolol, aspirin, and terazosin. He had been in IDOC for at least seven years. He was not offered pneumococcal vaccination. He was followed in the diabetes/hypertension chronic care clinic. He had 10 visits to the chronic care clinic between March 2015 and December 2017. Without any reason being documented, his statin medication was stopped on 3/20/15. The patient was taking 250mg of metformin for his diabetes and multiple HbA1C's were between 5.1 and 5.5, all reflecting totally normalized blood sugars. This indicated that the patient may be too tightly controlled or might not even require any diabetic medications. Multiple thyroid stimulating hormone (TSH) tests were documented to be between 1.65 and 3.85 over the last two years. All of these thyroid tests are so close to normal and the dose of levothyroxine so low that it would in the best interest of the patient to further lower or discontinue this medication. Unneeded thyroid supplementation in this elderly patient's very mild underactive thyroid disease could stimulate an exacerbation of his atrial fibrillation. The patient's blood pressure was usually in the low normal range. He was taking two medications for reasons other than hypertension that could lower blood pressure: terazosin (BPH) and metoprolol (likely for heart rate control of atrial fibrillation). On 12/2/16, his blood pressure dropped to 90/62; the metoprolol and terazosin were appropriately discontinued. His levothyroxine was decreased to 25

---

[53] Chronic Care Patient #12.

mcg/d. Even though this is a very low dose of thyroid medication, the use of this medication puts the patient at risk of a possible exacerbation of atrial fibrillation.

In summary, this elderly patient should not be taking levothyroxine, metoprolol, and metformin. This is in accord with the standards of care in the community. His hypothyroidism does not require treatment, he no longer requires treatment for diabetes, and the discontinued low dose of metoprolol had very limited benefit for this patient. The patient's 10-year risk of cardiovascular disease is extremely high (>30%) and warrants consideration for the reinstitution of a statin and the continuation of aspirin. The preventive health maintenance of this patient has been ignored; he had not received either pneumococcal vaccination, and there is no evidence in his medical record that he has been screened for colon cancer.

- This patient is a 60-year-old male with diabetes, hypertension, hepatitis C, and bipolar disorder.[54] His medications included 70/30 insulin, metformin, nifedipine xl, and losartan. He was followed in the hepatitis C and the MIC diabetes/hypertension clinics. At NRC his blood pressure was elevated at 174/115, and his antihypertensive medications were switched to nifedipine xl and losartan. There was no rationale for these changes documented in the medical record. His initial diabetes medications were 70/30 insulin 40U BID, metformin 1000mg/d, and sliding scale regular insulin before breakfast and dinner. This insulin regimen contains two short acting insulins. One component of 70/30 insulin is regular insulin. The patient was also on a sliding scale insulin, which is regular insulin. There is a risk of hypoglycemia when simultaneously administering two short acting insulins. He was seen three times in the MIC diabetes/hypertension chronic care clinic between October 2017 and March 2018. His blood pressure control was never at goal of 130/80 and his HbA1C results have only modestly improved (9.85 to 8.8%). Even though his diabetes was not controlled, the 70/30 insulin dosages were lowered in October and December 2017. The reason for decreasing the insulin doses was not documented in the medical record, which would have been especially important to document, since the HbA1Cs indicated poor control. There were no documented instances of hypoglycemia and his capillary blood sugars in November and early December 2017 ranged between 80 and 354, with a mean in the mid-100s. The optometrist identified no evidence of diabetic retinopathy and the patient's urine microalbumin was normal. The March MAR noted "missed no insulin injections."

The patient was seen twice at the hepatitis C clinic in 2017. His liver enzymes, platelet counts, and coagulation studies were within normal limits. His APRI score was less than 0.3 and did not qualify him for treatment. There was no documentation in the medical record of HCV RNA testing. If this test were normal, this patient would not have active hepatitis C infection and would no longer need to be followed in the hepatitis C chronic

---

[54] Chronic Care Patient #13.

care clinic for purposes of treatment for hepatitis C. The failure to order HCV RNA is not in compliance with the IDOC hepatitis C guidelines.[55]

This elderly diabetic patient has not been offered pneumococcal vaccination or colon cancer screening as recommended in national age and disease-based prevention and screening guidelines. His 10-year ASCVD risk score has not been assessed by DCC providers, and was calculated to be 27.1%; but he has not been offered a high intensity statin medication.

In summary, after six months this patient's diabetes and hypertension are not yet adequately controlled. The decision to order two diabetic injections that can rapidly lower blood sugars puts the patient at increased risk for hypoglycemic episodes. HCV RNA viral load has not been drawn. If this test was negative, there would be no need for this patient to be followed in the hepatitis C clinic for hepatitis C treatment. DCC providers are not adhering to national standards of providing pneumococcal vaccines to all diabetics and those over 65 years old, and of offering colon cancer screening to individuals 50 years of age or older. The failure to assess the patient's 10-year risk of cardiovascular disease and to administer a statin is not in line with the practice of medicine in the community.

- This patient is a 49-year-old male with insulin requiring diabetes, hepatitis C, and psychiatric disorder.[56] His database noted flu shot on 9/27/17 and completion of hepatitis A and B vaccines, but not the administration of pneumococcal 23 vaccination. His medications include NPH insulin and sliding scale regular insulin. The patient's blood pressure was not elevated during his incarceration at DCC. Since March 2016, he was seen four times in the hepatitis C clinic; his liver enzymes were normal or minimally elevated, his APRI scores ranged between 0.258 and 0.519. HC RNA viral load levels had not been drawn. Per IDOC guidelines, the patient is currently not a candidate for hepatitis C treatment. He has been seen six times in the diabetes chronic care clinic. His HbA1Cs have been 9.1, 9.7, 9.2, 8.7, and 8.9%, and have not yet reached adequate control during his two-year incarceration. Due to early morning episodes of near hypoglycemic symptoms, his NPH insulin has been decreased from 28U/am and 26U/pm to 19U/am and 17U/pm. The optometrist visit on 3/2/17 identified trace diabetic background retinal changes; his creatinine is minimally abnormal (1.6) with a normal urinary microalbumin. The patient's morning and evening CBGs widely range from the 50s to 400. The MARs indicate that the patient is compliant with his prescribed regimen. Pneumococcal 23 vaccination has not been offered or provided to this diabetic as is nationally recommended.

In summary, after two years of incarceration, this patient's diabetes is not yet controlled. His insulin dosages have been deceased in spite of this lack of control. The

---

[55] Hepatitis C Guidelines.
[56] Chronic Care Patient #14.

episodes of near hypoglycemia occurred in the early morning hours and the provider efforts should have focused on correcting this issue rather than lowering both the morning and the evening doses. The ongoing difficulty of fully controlling this patient's diabetes warrants consultation with an endocrinology/diabetes specialist. Pneumococcal 23 vaccination should be offered to this diabetic patient. The failure to perform HCV RNA testing is not in accord with IDOC Hepatitis C Guidelines.

## Urgent/Emergent Care

**Methodology:** We interviewed the Nursing Supervisor (IDOC), toured the medical clinic, and assessed the availability and functionality of emergency equipment and supplies. We also reviewed emergency drills, CQI reports, written directives, and medical records. Medical records were selected from the list provided by DCC of emergency room visits beginning in January 2017. This list includes the reason for the ED visit. Records selected for review were those conditions sensitive to ambulatory care, such as seizure, withdrawal, infection, diabetic complications, abdominal pain, chest pain, etc. A total of five records were reviewed. We also reviewed six records of patients who were admitted to a hospital for conditions sensitive to ambulatory care to assess clinical quality of care.

### First Court Expert Findings
Emergency room reports or hospital records were absent in all the medical records reviewed. The emergency care of patients at DCC was inadequate, usually lacking a thorough assessment and failing to involve advanced level clinicians. Patients referred to a provider either were not seen or the problem was not addressed at the next provider appointment. No records of emergency response or transports to the emergency department were kept and there was no self-monitoring.[57]

### Current Findings
DCC does not have a crash cart. The institution performs basic CPR, applies the AED, and calls 911 for cardiac arrests. This is an acceptable option for responding to codes/cardiac arrests. DCC also provides first aid. There are two emergency response bags kept in the dispensary nursing office that contain first aid supplies, personal protective equipment (PPEs), stethoscope, blood pressure cuff, equipment and supplies to start an IV, and a few medications (i.e., glucagon, an EpiPen, aspirin). The contents of the bags are standardized,[58] and they are sealed with a lock to indicate that the bag is fully supplied and ready for use. An automatic external defibrillator (AED), stretcher with backboard and cervical splint, ambu bag, portable oxygen, EKG machine, suction, nebulizer, and oto-ophthalmoscopes are available in the urgent care room adjacent to the nursing office. AEDs and emergency equipment are also available in

---

[57] Lippert Report DCC pp. 22-23.
[58] Contents of emergency response bags



DCC list of
emergency supplies.

the infirmary and in X-House. The Nursing Supervisor (IDOC) said that there was no trauma bag as described in DCC's ID #04.03.108. Instead, a staff member is posted in the urgent care area to collect additional equipment and supplies if radioed from the scene that they are necessary.

The presence and functionality of the first aid equipment is checked each shift and documented on a log. We recommended to the Nursing Supervisor (IDOC) that the expiration date for each medication in the bag be added to the log so that it was apparent when it needed to be replaced. We checked the AED and other emergency equipment listed above and found all were functional. DCC ID #04.03.108 lists the contents and location of first aid kits available in housing units, program areas and vehicles, but we did not evaluate the accuracy of this information.

The DCC ID #04.03.108 and DCC Health Care Unit Policy and Procedure P-112 differ in the requirements for drills. The ID requires drills twice a year on each shift. One of these is to be a mass casualty drill involving multiple people with injuries. One is to be an emergency response drill and an actual emergency can be substituted. The Health Care Unit Policy and Procedure P-112 requires only one mass casualty drill annually and one emergency response drill on each shift annually. Actual practice appears to conform to P-112 rather that ID #04.03.108, in that one mass casualty drill is completed annually. We recommend revising the ID to conform to actual practice; it has not been updated since 2011. The mass casualty drills for 2016 and 2017 were reviewed and found to be thorough, with good multidisciplinary participation, and candid critique of strengths and weaknesses. However, no corrective action or plans to improve were developed as a result of these critiques. An incident report is written each time there is an emergency response and sometimes these are reviewed and critiqued. The report and critique are kept in binders available for review. We reviewed all emergency response reports and critiques in these binders from January 2017 to the present. Critiques are very complimentary and seldom identify needed improvement. Of the five medical emergencies selected for chart review, two were critiqued by DCC Health Care; no strengths or weakness in the response to either were identified. Emergency response is an item regularly on the agenda of the Quality Improvement Meetings. The minutes of these meetings do not reflect any discussion, analysis of issues, or plans for improvement in emergency response.

We reviewed the medical records of five patients sent to the ED in 2017 and found that the ED visit could have been prevented in two of the cases if the patients' care had been different in the preceding months. Information and recommendations from the ED were not obtained, or if they were, not incorporated into the patients' subsequent treatment plan. These findings are detailed in the following paragraphs.

- The first patient is also discussed in the hospital section below; his death was possibly preventable if care in the preceding months had been better.[59] This patient had returned to DCC on 11/19/17 after nearly a month of hospitalization. A physician described his discharge problems as COPD exacerbation, hypercalcemia, pleural

---

[59] Urgent/Emergent Patient #1 and Hospitalization and Specialty Care Patient #7.

effusion, post-chest tube, pneumonia, anemia, renal failure and DVT. However, what the doctor failed to acknowledge was that the patient had a large retroperitoneal mass, likely a malignant lymphoma, which was not addressed in the plan of care. The diagnosis was pending. While much of the hospital record was available, the physician only listed diagnostic possibilities and was not clear about the plan of care. The treatment plan consists of monitoring and comfort care only. The inbound note written by a nurse describes the patient's condition based upon a visual assessment only. The nurse did not document a review of the discharge instructions or contact the facility physician for orders as required by Health Care Unit Policy and Procedure P-104.[60]

There was no plan of care in place in the nine days immediately before his last hospitalization on 11/29/2017. In the meantime, nurses documented clear signs that the patient's condition was worsening, including bloody stools, diminished lung sounds, pitting edema of the legs, poor oxygenation, and low blood pressure (98/62). When the provider was contacted, the nurses were instructed to continue monitoring the patient and report if his condition worsens.

On 11/27/17, the physician documented an encounter and that the patient needed to be more compliant; the patient was demanding a change in his diet. Vital signs are described as stable and that he had better aeration and his lower legs seemed improved. The provider took no steps to definitively treat the patient and made no effort to uncover the diagnosis of the retroperitoneal mass. Instead, the doctor continued monitoring and comfort care. There is no documentation that the patient agreed to palliative or hospice care. The patient was not seen by a provider the next day even though he was bleeding from the mouth and had petechia on his trunk and upper extremities. This should have prompted immediate concern, since the patient was on anticoagulation. No action was taken until the following day, 11/29/17, when the provider saw the patient and mused about whether the dose of anticoagulant medication was correct. Ultimately, he ordered the patient transferred to the local emergency room. There is an outbound note written by a nurse on the intrasystem transfer form, but it does not contain all of the information relevant to the patient's ongoing care, and there is no specific statement of the reason higher level care was being sought. The patient was admitted to the hospital from the ED and died 20 days later.

Problems with the medical care of this patient post-hospitalization include: an inaccurate problem list (not updated since 1/2017); the nurse did not adequately examine and document her findings and did not summarize the discharge recommendations or contact the Medical Director for orders when he returned from hospitalization on 11/19/17; the physician did not incorporate information obtained from the hospital discharge records into the patient's plan of care; the physician did not see the patient as frequently as required by DCC Health Care Unit Policy and Procedure

---

[60] Continuity of Care During Incarceration pg. 6, II. G and III. A.

P-113[61] or as indicated by his deteriorating condition; and the note written to accompany his transfer to the emergency room on 11/29/17 did not contain all of the information relevant to the patient's ongoing immediate care.

- The next patient was hospitalized emergently on 5/31/17 because he was having signs of a stroke including slurred speech, inability to move or grasp with right arm, tongue deviated to the right side, and delayed thought processing.[62] He was 61 years old at the time. His problem list dated 6/23/16 included dyslipidemia, insulin dependent diabetes, CVA (2012), gunshot wound to the head, and degenerative disorder of the thoracic spine.

  There is no nursing treatment protocol for stroke; the nursing assessment included vital signs and blood glucose and the symptoms described above. The provider was contacted and ordered a transport to the emergency department. No orders were given to start O2 or an IV while awaiting transport, and there is no documentation of subsequent assessment of the patient while awaiting transport. No transfer note was written.

  There is no note summarizing recommendations from the hospital after he was returned to DCC on 6/14/17 with a diagnosis of cerebral vascular accident (CVA). The provider admitted the patient to the infirmary as an acute patient, ordered regular medications, and a physical therapy evaluation. No comment was made about discharge recommendations from the hospital and there was no documentation of the rationale for not implementing the recommendations.

  This patient's medical care in the months prior to the emergency room visit was problematic. First, he was transferred from Big Muddy Correctional Center 18 months earlier because of increasing blood glucose levels. He was received at DCC on 4/14/16. The receiving nurse noted that he also was followed in the hypertension clinic (HTN is not on his problem list), he had a diagnosis of sleep apnea and used a CPAP machine. Sleep apnea is not on the problem list and neither the diagnosis of sleep apnea nor the need for a CPAP machine are listed on the transfer summary. The CPAP machine was not in his property when transferred. The problem of sleep apnea was not identified or treated, and he never received a CPAP machine in the 18 months after being received at DCC. This may have been a factor contributing to the stroke this patient had in May 2017.

  He was seen in chronic care clinic for diabetes in August 2016, December 2016, and May 2017. HbA1C was elevated in December (9.9), so the provider ordered a nighttime dose of Lantus in addition to Metformin, with follow up in two weeks. The follow-up appointment did not take place. His HbA1C was still elevated when next seen in clinic on

---

[61] Infirmary Care III. 1. A. p. 25.
[62] Urgent/Emergent Patient #3.

5/4/17 (9.5) and 70/30 insulin twice a day was ordered; the Lantus and metformin were discontinued. Aspirin 81 mg. was also ordered at this visit. Medication for HTN and dyslipidemia were continued.

This patient was also being treated for wounds on his buttocks from August through October 2016. A note written by a provider on 8/9/16 indicates that this is related to the patient's paralysis, but the extent of his paralysis is never described. Another episode of skin breakdown on his left hip was being treated in May 2017. Undoubtedly his skin wounds affected his diabetes and vice versa, and yet this was never considered by providers who were treating him. This patient's diabetes was not managed to obtain good control and changes in the plan of care were slow and inadequate.

- Another patient was a 61-year-old man seen in the emergency room on 2/11/17 for chest pain.[63] His problem list contains diagnoses of insulin dependent diabetes with neuropathic pain in his feet, which is inaccurate given that the problems listed on the outbound transfer summary include hypertension, chronic obstructive pulmonary disease, asthma, and hepatitis C. The problem list also does not identify that he has a pacemaker.

The patient was brought to the health care unit. The nurse used the chest pain protocol to assess the patient, but did not describe precipitating factors or do an EKG. The provider was contacted and ordered transport to the ED. Oxygen and an IV were started before transport. A transfer note was written to give to the ED upon arrival. The patient was admitted and treated for congestive heart failure and thrombocytopenia until discharge on 2/14/17.

The hospital summary was reviewed by a physician the day after he was released from the hospital, 2/15/17. He does comment on the discharge recommendations. He put lisinopril and Aldactone on hold until the nephrologist approved resumption. There was no note that the nephrologist was contacted to make this decision. The Lisinopril was never restarted. He also held the patient's Lasix for four days. This was a KOP medication and there was no note that the patient was instructed to do this. He also ordered labs, which were drawn, but the results were never commented on. At the next chronic care appointment in April 2017, the provider did not comment on the patient's hospitalization in February.

While the emergency response was adequate, the fact that the problem list is grossly out of date makes treatment of the patient a guessing game. Even after the patient returned from hospitalization, the problem list was not updated to ensure its accuracy. There were several aspects of care ordered after the patient's return to DCC that were not followed up on, including the medications to be held and restarted, consultation with the nephrologist, and lab results. The failure to comment on the patient's recent

---

[63] Urgent/Emergent Patient #2.

hospitalization at the next chronic care visit is emblematic of episodic treatment rather than managed chronic care.

A 24-year-old man with no history of health problems was treated in the ED for chest pain on 7/19/17.[64] The emergency response was good, including use of the chest pain protocol and documentation. However, the patient returned from the emergency room with no treatment records and was not seen by a provider. While this man appears to be in good condition, he had been seen in January for chest pain and had an abnormal EKG at the time of the ED visit in July. Knowing what diagnostic and clinical work was done at the ED is essential for the provider to ensure that clinically appropriate care is continued after return to the prison. Not only is a provider visit required by the Health Care Unit Policy and Procedure P-104, it was clinically indicated.[65]

In summary, we concur with the First Court Expert's findings that ED reports were often absent in the medical records reviewed and the care of patients was problematic before the ED visit and after the patient's return to SCC. We agree with the First Court Expert's recommendations and make additional recommendations found at the end of this report.

We reviewed six patients who were hospitalized to assess for quality of care at the facility before and after admission to the hospital. We noted that hospital reports were inconsistently present in the medical record. We agree with the First Court Expert's recommendation in the Emergency Services section that after all offsite emergencies, a provider should see the patient to document a discussion of findings and a discussion of any changes to therapeutic plans. We found that while physicians generally evaluated patients after hospitalization, discussion of findings and a change of therapeutic plan were not well documented. We suspect that this was because providers do not appear to have the hospital report. Lacking the hospital report, clinicians do not know what occurred at the hospital and often appeared to be unaware of the status of the patient's clinical condition. This makes establishment of a therapeutic plan difficult to develop.

We found in the review of records of persons hospitalized that clinical care preceding hospitalization was poor and often resulted in a problem deteriorating and needing to be addressed on an emergency basis. There were preventable hospitalizations, preventable morbidity, and preventable mortality. These findings on record reviews are summarized below.

- One example was a patient with severe coronary artery disease that resulted in prior bypass surgery and multiple cardiac stents.[66] The patient also had peripheral artery disease, hypertension, high blood lipids, and diabetes, which were all risk factors for coronary artery disease. The patient had no problems documented on the problem list until March of 2017. The patient saw a provider on 6/29/16. The provider took no

---

[64] Urgent/Emergent Patient #5.
[65] Continuity of Care During Incarceration II. F and III. A. pp. 6-7.
[66] Hospitalization and Specialty Care Patient #4.

history with respect to angina but did note that the patient was to see the cardiologist soon. The patient saw a cardiologist at UIC on 7/6/16. There was no report. Brief comments on the referral form noted increased angina over the past two months. The cardiologist recommended titrating up nitrate medication (Imdur) for angina and noted that the patient needed "aggressive" medical management.

The patient did not see a physician timely after this appointment. On 7/22/16, a nurse saw the patient for chest pain and used an "Indigestion/Heartburn" protocol despite the patient complaining of three months of chest pain, "like getting stabbed in the chest [after] eating + when walking." This description is typical of angina. The nurse should have used a chest pain protocol. The nurse should also have obtained an EKG and should have immediately referred to a physician. Instead, the nurse noted that the patient had been on Pepcid and switched to Zantac, both of which are for acid reflux disease and neither of which were working. The nurse initially referred the patient to a physician urgently, but this was scratched out and a routine appointment was made. This was a serious error. This patient had significant angina, but a nurse assumed his complaint was for acid reflux disease. The patient was not properly referred, which placed him at significant risk of harm.

On 7/25/16, a nurse again evaluated the patient for chest pain, this time using the chest pain protocol. The nurse noted pressure-like chest pain and referred the patient to a doctor. An EKG was done. This EKG did not include an automated reading but showed ST elevation in lead III consistent with acute ischemia. Dr. Meeks, the Agency Medical Director, was at DCC on the day we were reviewing this record. He is an emergency medicine physician. He reviewed the record and agreed that this was an ST elevation consistent with ischemia. This should have resulted in immediate transfer to a hospital. Instead, the physician ordered Prilosec, a medication for acid reflux, and a follow up on 8/10/16. This was grossly and flagrantly unacceptable practice that placed the patient at risk of death.

On 7/28/16, a doctor saw the patient for the five-day follow up from the 7/6/17 cardiologist visit. The doctor noted that the cardiologist recommended increasing the Imdur, but the doctor took no history and failed to note the evaluation by the nurse four days earlier for what appeared to be typical angina, and more importantly failed to note the evaluation three days earlier with the EKG showing acute ischemia with typical symptoms of angina. The doctor documented referral to cardiology and ophthalmology but took no other action and did not update the status of the patient's therapeutic care. Since referrals to cardiology at UIC take on average 100 days, the patient should probably have been sent to a local cardiologist.

On 8/1/16, a doctor saw the patient because Zantac was not working for his presumed gastric reflux disease. The doctor took no history of the patient's pain and advised the patient to elevate the head of his bed without realizing that the patient's symptoms might be from his angina. The doctor failed to recognize the prior abnormal EKG. The

therapeutic plan was not evaluated or refreshed. This lack of knowledge about how to manage angina was significant.

On 9/16/16, the patient had an episode of chest pain walking up stairs which was relieved by nitroglycerin. The doctor recommended a "medical movement" pass and increased Prilosec, but did not increase anti-anginal drugs or order cardiac testing (EKG, stress testing, or cardiac catheterization). The doctor failed to properly treat angina and may have failed to recognize that the patient's symptoms were angina. The episode of care failed to follow generally accepted guidelines or usual practice.

On 10/27/16, a doctor saw the patient and noted that the patient had chest pain, but the doctor was not sure if the pain was related to "gas" or to angina. The doctor thought that the patient had lactose intolerance and prescribed a gas relieving medication and documented that he would "consider" increasing Imdur (the anti-anginal medication) if there was no improvement. This was a judgment error, in our opinion. Gastro-esophageal reflux disease (GERD) is not life-threatening. His angina was life threatening. The doctor was placing greater significance on a condition that was much less likely to cause harm. This was incomprehensible practice.

On 11/30/16, a practitioner noted that his chest pain "resolved" since eliminating dairy and assessed likely lactose intolerance and discussed elimination of lactose from his diet.

On 3/22/17, an NP saw the patient in chronic care clinic but took no history and noted that the patient offered no complaints. The NP did not address the chest pain, evaluate the prior EKG, and did not address the angina. Notably, the patient had peripheral vascular disease that was not being monitored.

On 3/24/17, a doctor noted that the patient complained of chest pain lying flat that was relieved by nitroglycerin. The patient also described chest pain when walking accompanied by calf pain when he walked. This description is consistent with angina and claudication, a condition of atherosclerosis of leg arteries. Although the patient's description of pain was consistent with angina and peripheral artery disease, the doctor prescribed Tums antacid and increased the dose of reflux medication. There was no examination of the pulses to assess the peripheral artery disease. The doctor noted that a cardiology appointment was pending and ordered a three-week follow up. The doctor did not increase anti-anginal medication. This was not generally accepted practice for treating angina.

On 4/17/17, an NP saw the patient and documented that the patient was waking up in the middle of the night with chest pain and difficulty breathing. The NP did not order an EKG and made an assessment of "chest pain/? GERD," and advised the patient to take Tums first when he got this pain, and if the pain was not resolved to take his nitroglycerin. The NP did not adjust the anti-anginal medication. This patient needed to

be diagnostically evaluated for ongoing unstable angina, but providers appeared ignorant of what should be done.

On 4/20/17, a nurse evaluated the patient for chest pain at 1:05 a.m. The patient had steady pressure in his chest with dyspnea. The nurse called a doctor and the patient was referred to a hospital where NSTEMI [myocardial infarction] was diagnosed. The patient had two stents placed.

The care for this patient was grossly and flagrantly unacceptable. The patient had multiple risk factors for heart disease and had established severe heart disease. A cardiologist recommended titrating up the anti-anginal medication for angina. Despite this, the providers at DCC treated his symptoms of angina with antacids on multiple occasions and never increased anti-anginal medication. On one occasion, the patient had evidence on EKG of acute coronary syndrome that was not addressed and unrecognized by a physician reviewing the EKG. The patient should have been referred much earlier for cardiac diagnostic assessment, including nuclear stress testing and/or cardiac catheterization, but this was not done until the patient had a heart attack. The hospitalization and heart attack may have been prevented if earlier diagnostic evaluation (cardiac catheterization) occurred. This is another case of underutilization, which will be discussed in the specialty care section.

- Another patient had HIV infection, high blood cholesterol, and prostate cancer.[67] He was 66 years old. On 8/25/16, the patient was evaluated in chronic clinic for high blood lipids. Although the doctor mentioned the patient's HIV infection and prostate cancer, the doctor did not address these conditions. A prior abnormal laboratory result (abnormal renal function) was not addressed. On 11/22/16, a doctor saw the patient again for chronic disease clinic. The patient asked the doctor about radiation treatment for his prostate cancer, but the doctor did not document a response. The kidney function was still abnormal (creatinine 1.78), but not addressed.

On 5/21/17, a doctor saw the patient for chronic disease clinic, but except for high blood lipids, none of the patient's other problems were addressed. The patient reported right flank pain, but the doctor took no further history of this and ordered no laboratory tests. We believe that all problems should be address at each chronic disease clinic visit. Under the current system, many chronic illnesses are never monitored.

On 6/7/17, a doctor saw the patient for abdominal pain with episodes of vomiting since the night before. The patient had anemia, but this was not addressed. The doctor admitted the patient to the infirmary for intravenous fluid but ordered no laboratory testing. Abdominal pain with vomiting warranted laboratory testing and possibly radiologic testing (CT scan or ultrasound), yet these were not done.

---

[67] Hospitalization and Specialty Care Patient #2.

The patient was evaluated on 6/8/17 by a doctor and still had abdominal pain, but the physician still ordered no diagnostic work up, instead diagnosing abdominal pain of unknown etiology, and prescribed Toradol. Prescribing pain medication for abdominal pain of unknown etiology was a failure to follow accepted standards of care, as the doctor did not know what the source of the pain was. The doctor should have initiated a work up of the abdominal pain.

On 6/9/17, a doctor ordered that the patient be given a regular diet the following day and then be discharged to general population. The following day, the patient complained to a nurse that he was weak and in a lot of pain. The nurse described the patient as "looks like he is in pain, squinting, and not moving, breathing slowly." The nurse documented that she would talk to the doctor about not discharging the patient. The patient was nevertheless discharged.

On 6/14/17, a doctor saw the patient, who had constant abdominal pain, weakness, and diarrhea. The patient had lost 11 pounds over approximately three months. The abdomen was tender, and the doctor noted an enlarged liver. The doctor admitted the patient to the infirmary and ordered laboratory tests but no diagnostic radiologic studies (ultrasound or CT scan). The patient exhibited dehydration (BUN 26), abnormal kidney function (creatinine 1.75), possible malnutrition (albumin 2.5), and altered liver function (AST 385 and ALT 368). Despite these significantly abnormal blood tests, no diagnostic radiologic testing was ordered. The patient should have had a CT scan or ultrasound of the abdomen on an immediate basis.

There was no infirmary note on 6/15/17, but the patient was sent offsite for an ultrasound. The patient should have been sent to an emergency room for this study. Instead, it was ordered as a consultation. The patient returned to the prison after the ultrasound, and on 6/16/17, the ultrasound report was unavailable. The doctor noted abdominal pain of unknown etiology and made no other effort to diagnose the patient's condition. This placed the patient at significant risk of harm. There were no physician notes on the infirmary from 6/16/17 through 6/21/17, even though the patient had an acute illness.

The ultrasound report, dated 6/15/17, appeared to have been faxed to the facility on 6/19/17. The report documented a perforated viscus with fluid around the dome of the liver. Cirrhosis was also present. These are life threatening findings, yet no one reviewed the report for two more days, when an NP noted the findings and described the patient as having severe abdominal pain with nausea. The patient was sent to a hospital, where he remained after surgery for a perforated viscus. Care for this patient was grossly and flagrantly unacceptable and placed him at risk of death. Earlier diagnostic intervention was indicated. Serious, potentially life-threatening symptoms were treated as a routine. There was a lack of physician follow up. Notably this was during a time when there was no physician on staff at the facility.

- Another patient had an annual physical examination on 2/15/16 and weighed 345 lbs.[68] The patient had anemia for over four years without a work up, which fails to follow generally accepted guidelines. This patient had high blood lipids, COPD/asthma, prior hip replacements, and GERD. In February of 2016, the patient was found to have carcinoma in situ of a rectal condyloma, a wart like condition. The patient had seven colorectal follow-up visits and one dermatology visit for his rectal lesion. Only two of the seven visits included a report, so the therapeutic plan was unclear. At a dermatology visit on 1/11/17, biopsies were done and follow up was requested pending biopsy results, but the biopsy results were never obtained or followed up by DCC physicians. It was not clear what the patient's clinical status was, as the doctors at DCC failed to review reports. On 1/18/17, a liver biopsy, EGD, and colonoscopy were approved in collegial review. It was not clear why these tests were recommended, as there was no progress note documenting the rationale. The consultation reports were almost all missing and the status of the patient was unclear. The patient refused a 4/5/17 colorectal appointment, but it was not clear why. The patient was not seen after this for over five months. The biopsies taken by dermatology on 1/11/17 were never checked on. The liver biopsy, EGD, and colonoscopy were never approved or completed. A physician never followed up with the patient about his rectal squamous cell cancer or on the failed appointment back to colorectal service.

On 7/11/17, blood tests done for unclear reasons showed persistent anemia and elevated alkaline phosphatase, a liver enzyme, but these were never followed up by a physician at the facility.

On 9/8/17, the patient developed difficulty breathing and was unable to get up off a chair. An NP admitted the patient to the infirmary and ordered tapering prednisone, antibiotics, a chest x-ray, CBC, and CMP.

A doctor covering at the facility discharged the patient from the infirmary on 9/11/17. The doctor documented reviewing the x-ray, which he perceived as normal. The x-ray report actually showed an elevated left diaphragm and left pleural effusion with left lower lobe atelectasis abnormalities that should have resulted in immediate physician examination and further radiological diagnostic studies (CT scan). The elevated diaphragm suggested something was pushing up on the diaphragm and this needed to be diagnostically resolved, but was not.

The radiologist x-ray report was not reviewed until 9/13/17. The doctor reviewing the report did not examine the patient, but documented that the patient was doing well and planned to repeat the x-ray in three weeks. This was unacceptable. The patient should have been examined and a CT scan should have been done promptly.

---

[68] Hospitalization and Specialty Care Patient #7.

The chest x-ray was repeated on 9/20/17 and showed a density in the left base, a possible combination of pleural effusion and infiltrate. A doctor again did not examine the patient, but wrote a note that he would schedule the patient and would *consider* repeating the x-ray. This was grossly and flagrantly unacceptable. The patient had an abnormal x-ray indicating a serious infection or other serious disease and to not examine the patient is unacceptable practice.

By 10/5/17, the patient told a nurse that he had not been able to walk for six weeks. The patient had come to the infirmary in a wheelchair from general population to take a shower. The patient was dizzy and was not able to independently transfer. The nurse noticed that he was wheezing. The nurse referred to a doctor for possible infirmary placement. The patient should have been evaluated promptly, yet was not seen for three days. This patient's serious medical condition was being neglected.

On 10/10/17, a doctor noted the prior abnormal chest x-ray and expiratory wheezing, and assessed COPD; a chest x-ray, prednisone, nebulizer treatment, and oxygen were ordered. No laboratory tests were ordered. The patient was ordered to the infirmary but was not admitted to the infirmary until 10/14/17, four days later. On admission to the infirmary the patient weighed 300 lbs. The patient had a 45-pound weight loss over 20 months, which was unrecognized. This is either a serious systemic deficiency or indifferent medical care or both. The infirmary admission note failed to acknowledge the abnormal chest x-ray or develop a plan for that. The doctor noted that the patient had COPD and a self-care problem. No other history was taken. The prior history of squamous cell carcinoma of the rectum was not recognized. The doctor ordered no diagnostic studies; a CT scan was indicated. No laboratory tests were ordered but should have been done. The patient should have been admitted to a hospital, but no diagnostic studies were done. Care was grossly and flagrantly unacceptable.

Even though the patient was admitted to the infirmary for COPD, the patient was not seen regularly. After the 10/14/17 infirmary admission note, a doctor did not see the patient until 10/27/17, almost two weeks later. The patient was not eating or drinking, and the doctor documented abdominal pain, decreased appetite, and that the patient appeared dehydrated. The patient should have been admitted to a hospital. Instead, the doctor documented that he would consider permanent placement and ordered a CBC and CMP. The failure to recognize acute and serious problems was grossly and flagrantly unacceptable medical practice.

The blood work reported 10/27/17 showed significant dehydration (BUN 69), renal failure (creatinine 2.46), a life-threatening serum calcium (16), and anemia (hemoglobin 11.9). *These life-threatening laboratory results were not reviewed for three days*, when the doctor next saw the patient. This was grossly and flagrantly unacceptable practice. The patient was sent to a hospital.

The patient was discharged from the hospital almost a month later, on 11/19/17. He had been diagnosed with hypercalcemia, pleural effusion requiring a chest tube, pneumonia, anemia, renal failure, bilateral deep vein thromboses, and an undiagnosed retroperitoneal mass thought to be lymphoma. His last two weeks at DCC are described above in the Urgent Care patient #1 record review. The patient died after a second hospitalization about a month later.

A coroner's report listed multi-organ failure and sepsis as the causes of death, but noted that the patient had lymphoma which had not been previously diagnosed. Remarkably, the autopsy documented that the retroperitoneum was "unremarkable" and the regional lymph nodes were "unremarkable," yet during hospitalization at UIC, a CT scan showed a large retroperitoneal mass and multiple lymph nodes. The coroner did document that the patient had lymphoma, and it was not clear if the coroner had the lymph node biopsy result, which the facility never obtained.

This patient's death was possibly preventable. Follow up of the patient's rectal cancer was poor and the patient was lost to follow up. A biopsy in January of 2017 was never followed up. Liver biopsy, EGD, and colonoscopy approved in collegial review in January of 2017 were never done. The patient had anemia that was not worked up for four years. Once the patient developed a pleural effusion in September, he was incompetently managed for almost two months, at which time his disease was so advanced that he could not be treated. Earlier diagnosis and treatment may have prevented his death.

## Specialty Consultations

**Methodology:** Review specialty tracking logs. Interview the scheduling clerk. Perform record reviews of persons who have had specialty consultation.

### First Court Expert Findings
The First Court Expert found lengthy delays in obtaining an appointment at UIC. The date of the order for consultation and the date of the appointment are not included on the DCC offsite tracking log. This made it very inefficient to track the timeliness of the appointment based on the order. On occasion, appointments are delayed so long that new referrals have to be made. The First Court Expert's opinion was that if a system wants to efficiently track whether offsite specialty consultations are timely, they must track the date of order, date of authorization, date of appointment, and date of primary care follow up for discussion of the consultation with the patient.

The First Court Expert recommended that delays in scheduled offsite appointments must be eliminated. He recommended that DCC obtain authorization from the UIC scheduling coordinator within seven days after approval of the consultation. When UIC cannot provide the service within 30 days, a local service needs to be used. He also recommended that immediately after the patient returns from the offsite service, a nurse review the paperwork

reports related to the consultation and, if unavailable, take steps to obtain these reports. After paperwork is obtained, a primary care appointment needs to be scheduled so the primary care clinician can review the report and discuss findings and recommendations with the patient. This discussion needs to be documented in the medical record.

**Current Findings**

The findings of the First Court Expert were confirmed by our review as still in existence. We agree with the First Court Expert's recommendations. We confirmed the First Court Expert's findings and identified additional problems as listed below.

- The scheduling log is not standardized from facility to facility and does not appear to be used to monitor timeliness of offsite consultations.
- At DCC, 22% of consultations on the scheduling log do not have a referral date. The collegial review appears to be the milestone used to establish the onset of a referral for care.
- Milestones, especially the referral and collegial review, are not consistently memorialized in the medical record.
- The five-day "writ return" visit occurs without a consultation report. Providers do not typically update the clinical status of the patient. The only information conveyed on the five-day writ return provider note is to document the recommendations of the consultant, if they are known. The diagnoses of the consultant are not included on the problem list or followed as part of the chronic illness program, and are not consistently documented as part of the five-day writ return review. In this respect, the provider is merely acting as a second scheduling clerk and not as a medical provider following the clinical status of the patient.
- Care before and after consultations was poor and resulted in preventable adverse events.
- There remain significant delays in getting patients scheduled at UIC. Yet even though delays are significant, alternate sources of consultation are not used. This results in delays of care that can be harmful.

Studying scheduled offsite events has been difficult at all IDOC facilities.[69] The referral process at DCC requires the doctor to write a referral on a form that is received by the scheduling clerk and discussed at the next collegial review.[70] The scheduling clerk transmits this information to the corporate UM doctors. After the collegial review, referrals that have been approved and are for local services are promptly scheduled. Referrals that are to go to UIC are placed in folders

---

[69] At NRC, we never received the scheduling tracking log we requested, even though the document we requested is apparently used by the scheduling clerk. We were not able to talk to her until after the visit. At SCC, we did not receive the scheduling tracking log we requested until after the visit. Before the visit, we requested a tracking log nonresponsive to our request. At DCC, we received a tracking log, but it did not contain information for a year as we had asked and was again nonresponsive to our request. We asked again for this information after the visit. We were then told that prior to August 2017, a tracking log for specialty care was not being used, which we verified as accurate.

[70] A collegial review is a Wexford utilization management process. Doctors from each correctional facility have a conference call with a Wexford corporate physician and every consultation referral is discussed. During this process, the Wexford corporate utilization physician either approves or denies the consultation request. These conference call meetings ostensibly occur weekly.

for the corresponding specialty service. The scheduling clerk has 21 folders for UIC referrals. The specialty services with the largest volume include cardiology, neurology, ophthalmology, orthopedic surgery, urology, rheumatology, and radiology. On the day of our visit there were 75 requests for service that had not yet received an appointment.

The scheduling clerk faxes the requests to a UIC scheduler, who arranges for appointments. The UIC scheduler permits 10 scheduled appointments a week. This amounts to 520 appointments a year. The arrangement with UIC is that IDOC is allowed 2160 outpatient visits a year at no cost. IDOC facilities allowed to participate in this arrangement include Stateville, Pontiac, Sheridan, and DCC. The 520 permitted visits a year at DCC approximates the average number of allowable visits for each of these four facilities (2160 divided by four). It appears therefore that consultation timeliness is predicated on the availability of free care and not on the need of the patient. By contract, Wexford is responsible for the cost of offsite medical care and should they choose to have the patient seen elsewhere, they would be responsible for the cost.[71] We were told that approximately 90% of offsite medical care goes to UIC, which is 100 miles away, as opposed to the 3-15 miles for local hospital providers.  By design, IDOC has placed the geriatric unit with many of the sickest patients at DCC. Yet, it has dramatically reduced access of this population to specialty services.  This has caused predictable morbidity and mortality.[72]

A quality improvement study in April 2017 showed that appointments were delayed for many services. The *average* time to see a consultant was as follows:
- 239 days for gastroenterology
- 225 days for rheumatology
- 187 days for urology
- 179 days for neurology
- 175 days for orthopedic surgery
- 172 days for radiology
- 147 days for oncology
- 137 days for pain clinic
- 134 days for endocrinology
- 133 days for infectious disease
- 100 days for cardiology

The criteria used by IDOC in this study was that urgent consults were to occur in a week and non-urgent consults were to occur within eight weeks based on the Wexford-IDOC contract. None of these averages meet contract requirements and probably most patients require an earlier appointment. These data show that the specialty care to UIC is significantly delayed and thereby fails to protect patients from harm.

---

[71] Exhibit 1, Schedule E, page 1 Non-Hospital Services states that Wexford is responsible for all professional services that are NOT in a hospital setting. Contract between State of Illinois, Department of Healthcare and Family Services and Wexford Health Services dated 5/6/11.

[72] We note in the mortality review section that there were six death records from DCC reviewed and all six were preventable. Many were related to lack of access to timely specialty care or other higher level services.

We were told by the Wexford attorney that prior to August 2017 there was no scheduling log at DCC. It appears that the scheduling log is a convenience log for the scheduler to coordinate scheduling with offsite consultants. It is not used as a log to determine if patients receive timely care. The only consistent item tracked on the offsite log is the collegial review date. It is present on all entries. Referral dates appear to be less important events. 172 of 785 (22%) appointments in the specialty tracking log do not have a referral date. It therefore appears that the key variable in a referral is when the referral is approved, not when it is referred.

The First Court Expert found that appointments to UIC are not consistently timely and that these appointments are not tracked. We found that 142 (18%) of referrals on the log (excluding refusals and denied referrals) do not have an appointment date and are therefore pending. Of 142 pending referrals, 32 (23%) have been waiting longer than three months. Of the 32 appointments pending longer than three months, seven (22%) do not have a referral date, so the length of time from referral to appointment cannot be tracked.

According to the HCUA, for a period of time when there was no physician at the site, collegial reviews were not done. The HCUA discovered piles of requests for offsite referrals, apparently from mid-level providers, that were not being evaluated in collegial review. The HCUA started demanding that selected referrals be immediately scheduled based on her clinical sense of the need and the scheduling clerk began scheduling patients at the direction of the HCUA.

With respect to documentation of specialty care which is required by IDOC Administrative Directives, we could not find evidence in progress notes of consistent documentation of referrals or collegial reviews. We could also not find evidence that doctors seeing the patients after consultation understood what had occurred at the consultation. This resulted in fragmented care, lack of continuity of care, and in some instances, preventable adverse events. Due to lack of funds, the number of transportation vans has been reduced over the years. In the past, the facility had as many as 42 cars for transportation and this has been reduced to 13. There is one functioning wheelchair van for use for the disabled. This van is borrowed by other facilities regularly, including from Illinois River, Stateville, Hill, and Sheridan. It was not possible to verify whether the lack of adequate transportation vehicles is a barrier to timely attendance for offsite consultation care, but it should be studied. Many patients, including those with significant disabilities, complained as documented in medical records about a black box. One inmate was injured when being transported while in a black box. The inmate did not appear to be secured with a seat belt. We were unable to review this during our visit and noticed this episode of injury on a chart review. But transportation for appointments should be evaluated by IDOC to ensure patient safety.

We confirmed the First Court Expert's finding that consultant reports were frequently unavailable. This had an adverse effect on patient care.

We reviewed four records that verified our findings and demonstrated poor clinical care. A summary of these is provided below.

- One patient had acute myeloid leukemia and was receiving chemotherapy and oncology care at UIC.[73] The patient went to chemotherapy five times from 2/27/17 to 3/28/17. There were no reports from UIC. For the five oncology visits there was only one five-day post writ follow up by a provider. That note did not document the problems of the patient or include a therapeutic plan update. The patient was apparently losing weight, but it was not being documented. On 3/9/17, the patient had a potassium of 6, which is a critical value, yet it was unnoticed at the facility. This level of potassium requires immediate attention, especially in someone with kidney disease, which this patient had. About a week after this critical value, UIC called about a treatment for elevated potassium noticed on one of their labs, but the nurse appeared to transcribe their directions inaccurately. The nurse documented that UIC recommended lactulose for an elevated potassium, which is not recommended therapy.

  Doctors at DCC failed to document all of the patient's problems in their notes and failed to document a therapeutic plan for the patient throughout the course of care we reviewed. The therapeutic plan of the oncologist was only known in its general terms and the only communication with the oncologist was by way of very brief recommendations on the referral form. The DCC physicians were not following laboratory values during chemotherapy, even though chemotherapy can cause significant deterioration of blood counts. About a week after a series of chemotherapy sessions, a DCC doctor saw the patient, but did not monitor laboratory values, did not document knowledge of the therapeutic plan, and did not document all problems. The patient was documented as having no complaints. The following day, the patient was emergently hospitalized for multi-lobe pneumonia with a critically low neutropenia (0.5), low platelets (9), and hypotension. The low white blood count was likely due to chemotherapy, and this was unrecognized and unmonitored by providers at DCC. This patient was basically unmonitored throughout this series of specialty consults, which placed him at risk of significant harm and may have resulted in a preventable hospitalization.

- Another example was a 48-year-old man who was transferred to DCC in February of 2015 with a diagnosis of metastatic colon cancer.[74] The thinned chart volume we reviewed was labeled volume three of three volumes, but we actually discovered that there were six volumes of medical records for this individual.[75] When the patient transferred to DCC, he was being followed by oncology and was on chemotherapy. The patient was to be scheduled for chemotherapy at the infusion center and also with the oncologist for clinic follow-up visits. We started review of this patient for a 1/3/17 chemotherapy visit. The patient was scheduled for nine chemotherapy visits, which appeared to occur timely. Only three of the nine visits included a report. There were recommendations for oncology clinic follow up on two occasions, but we could not

---

[73] Hospitalization and Specialty Care Patient #3.
[74] Hospitalization and Specialty Care Patient #1.
[75] This is yet another example of why an electronic medical record is necessary.

verify that these occurred. A recommended CT scan was done a month late and there was no report of the CT scan in the record. A recommended Doppler test was done two months late and there was no report of this test in the medical record. The five-day post-consultation physician visits seldom occurred. Moreover, it was not possible reviewing the progress notes of the DCC medical staff to understand the progress, status, or problems of the patient. The chemotherapeutic agents being used were not identified. A complication of chemotherapy (hand foot syndrome and response or non-response to chemotherapy) was not documented as known to DCC physicians and was not being monitored. It appeared that the scheduling clerk was managing this patient's care. This care was indifferent.

- Another patient had Crohn's disease, an inflammatory bowel disease.[76] The patient transferred to DCC from SCC. He was being followed at UIC for infusions of vedolizumab, a monoclonal antibody medication that is used as an alternative to tissue necrosis factor medication for moderate to severe Crohn's disease. On 1/31/17, while at SCC, the patient weighed 235 lbs. Crohn's disease is an intestinal disorder characterized by inflammation of the colon or small intestines causing pain, diarrhea, bloody stool, and weight loss. Between 2/8/17 and 4/24/17, the patient was treated with vedolizumab three times in the infusion clinic at UIC. Reports were not available for these visits. Doctors saw the patient after each of these visits, but we could not verify that a report was returned or was reviewed. The doctors did not take a history after these visits or note the status of the patient. The doctors would merely reschedule infusion therapy without monitoring the progress of the patient. At a five-day post-consultation visit on 3/28/17, a doctor documented that the patient complained of weight loss, but the doctor took no history, failed to verify the amount of weight loss, and merely stated, "doing well per GI and pt." This was despite the patient complaining of weight loss. On a nurse visit on 4/24/17, a nurse documented that the patient had abdominal discomfort. The patient weighed 190 lbs., which was a 45-pound weight loss since transferring from SCC on 2/2/17. This weight loss was unrecognized. The patient's disease was not being monitored. Reports from UIC were unavailable. UIC and DCC were not coordinating care. The patient may have been deteriorating and was apparently losing weight without being monitored. The DCC providers were indifferent to this patient's serious medical condition.

- Another patient had severe mental illness and hypertension.[77] He had persistent hyponatremia (low serum sodium) for more than three years, probably due to his psychotropic medication or mental illness, yet this was not documented as a problem and not documented as being monitored by medical staff. The patient had an inguinal hernia that progressively enlarged and was not treated for two and a half years, when it had enlarged into the scrotum. This patient also developed a pressure ulcer on his left hip on 6/14/17, which continues to affect the patient as of 4/4/18. The only staging of

---

[76] Hospitalization and Specialty Care Patient #5.
[77] Hospitalization and Specialty Care Patient #6.

the wound was on 7/26/17, when an NP diagnosed a stage II ulcer. An NP documented ordering DuoDERM on 7/26/17. When we asked the current physician at the site about this wound, he replied that the patient picks at the wound and is mentally ill. Neither of these explanations is documented in the medical record as an etiology of the persistence of the wound. The patient has had this wound for over eight months and should have evaluation for a chronic non-healing ulcer, which includes evaluation for osteomyelitis. Wound care was not well documented. This type of wound can result in systemic infection and should be managed more carefully. On 7/31/17, without explanation, the patient became disoriented, drinking shampoo, and vomiting. He was initially placed on mental health crisis watch but subsequently became disoriented and was talking to himself. He was referred to mental health and was then sent to a hospital. There were no medical notes prior to his transfer to the hospital.

Upon return to DCC, there were only limited notes from the hospital and no hospital discharge summary. The patient had four of four blood cultures in the hospital growing gram positive bacteria and the patient had rhabdomyolysis (breakdown of muscle) and bilateral hydronephrosis (enlarged kidneys typically from inability to drain urine). How this patient developed such a serious systemic infection at DCC is unknown because of the paucity of medical evaluations prior to hospitalization. It may very well have been due to his pressure ulcer. His care appeared neglectful. The patient was discharged from the hospital on 8/8/17. The DCC doctor noted that the patient had bilateral hydronephrosis and needed an ultrasound. The DCC doctor also noted that an infectious disease doctor requested weekly CBC and CMP with an infectious disease follow up in four weeks. The patient had a Foley catheter. The doctor at DCC did not document the diagnosis or the reason for the blood infection or the reason for the Foley catheter. Blood cultures were ordered for 10/1/17 and 10/2/17, after completion of antibiotics. An ultrasound was completed on 8/25/17, but the report was not obtained. The patient saw the infectious disease doctor on 9/8/17, but there was no report. The patient still had the Foley catheter and the infectious disease doctor recommended consulting the urologist about discontinuing the catheter. A doctor discontinued the Foley catheter without consultation with an urologist. An urologist saw the patient on 10/2/17. There was no report. The referral form had brief comments by the urologist recommending urine culture, ultrasound of the kidneys, continuing Flomax, and return in two to four weeks. When the intravenous antibiotics were completed the patient was sent to general population. An ultrasound was completed on 10/18/17, and showed bilateral hydronephrosis with distended urinary bladder, and large post void residual. This condition can cause permanent kidney damage if untreated. On 10/19/17, the patient was referred to urology. This referral was approved on 12/12/17 and approved again on 2/1/18. As of 4/4/18, the patient had still not seen a urologist. Uncorrected hydronephrosis can result in end-stage renal disease. This patient has been waiting over six months for a follow-up urology visit. We note that the average wait to see urology is 187 days. This person needed a more timely consultation, as he may sustain permanent kidney damage. The lack of reports was significant and made it impossible to

understand the status of the patient. It appeared that the lack of reports also made it difficult for DCC providers to understand how to manage this patient.

## Infirmary Care

**Methodology:** The clinic space and equipment in the infirmary was inspected, nursing staff were questioned, clinical charts audited, nurse logs reviewed, porters questioned, and patient-inmates interviewed. There was only limited contact with the infirmary physician.

### First Court Expert Findings
The First Court Expert noted that infirmary LPNs were working outside the scope of practice, patients were not seen by the provider at the minimum required intervals, an RN was not assigned to the infirmary on all shifts, the provider charting was limited in format and content, call buttons were not available in all rooms, there was insufficient equipment in the infirmary, and there were defective and/or insufficient sheets and pillows.

### Current Findings
With the exception of the finding that LPNs were working outside of their scope of practice, we agree with the findings of the First Court Expert's findings and we identified the following additional findings:
- Fifty percent of the patient-inmates housed in the infirmary were classified as requiring total or partial care with their activities of daily living.
- One long-term patient had developed contractures of all his limbs and stage 4 decubitus ulcers while housed in the infirmary.
- At least half of the infirmary patient population requires skilled nursing care; however, the infirmary is neither staffed nor equipped to provide this level of care.
- Physical therapy services are not provided in the infirmary.
- Provider admission and progress notes were brief and contained limited clinical information or rationale for treatment plans.
- Provider admission and progress notes did not meet the frequency and timeliness standards established by the IDOC.
- Admission RN notes are written in accord with the established timelines. Nurse notes are written daily and provide useful information on the clinical status of a patient.
- The quality of provider notes was inconsistent and failed to reflect key components of the patients' histories, physical findings, and the treatment plan.
- In spite of the high level of physical and mental impairment of the patients housed on the infirmary, there were no electric beds in the infirmary. This is a barrier to the delivery of needed care and put the staff at risk for injuries.

The infirmary is located on the second floor of the medical building across from the ADA housing unit. The infirmary has 28 beds; the census was 18 on the day of the inspection. The physical plant and layout is unchanged since the First Court Expert's report. Nurses reported that the provider is expected to write progress notes within 48 hours of admission and three

times a week for "acute" admissions, twice a week for "chronic" patients, and once a week for "permanent" patients. The provider concurred that acute admissions are to have thrice weekly notes, but chronic and permanent patients were only required to have weekly progress notes. IDOC Policy 04.03.120 Offender Infirmary Services[78] directed providers to write admission notes with 48 hours and progress notes no less than three times a week for acute patients and once a week for chronic patients. Review of five infirmary records verified that four of five provider admission notes were written within 48 hours or on the next working day. One record of an "acute" did not yet have a provider admission note or a progress note as of the sixth day of admission. The frequency of the provider progress notes for these five patients were: no note to date as of day six of stay,[79] one progress note five days after admission and then none for the next two weeks,[80] six progress notes in 21 days,[81] one note in 20 days,[82] and one note in nine days.[83] The timeliness of the progress notes was not found to be fully in compliance with this policy; four of the five infirmary records did not comply with this established policy. Nursing notes were consistently entered no less than daily and commonly on every shift.

It was reported that an RN is assigned to the infirmary on all shifts seven days a week. LPNs and CNAs provide added staffing in the infirmary. A number of inmate hospice workers supervised by the nursing staff assist with a variety of tasks.

Nine of the individuals in the infirmary were designated as requiring assistance with activities of daily living (seven partial assistance, two with total care); thus 50% of the infirmary patient population were unable to fully care for themselves. Included in this non-independent group were individuals with metastatic cancer, dementia with contracted limbs, post CVA, advanced multiple sclerosis, and dementia. The RN on duty stated that all nine would be permanently housed in a skilled nursing facility if they were not incarcerated.

We note that the IDOC acknowledges a lack of appropriate housing for the infirm and disabled elderly prisoners. In her deposition, the IDOC Agency Medical Coordinator[84] answered questions on this issue.

> "Q. What were you proposing in this e-mail of August 2nd, 2016?
> A. For them to consider an assisted living environment at Kewanee or in another facility or changes to a current facility.
> Q. And in this you say that you're writing to bring attention to the effect our aging population has on the facility infirmaries, right?
> A. Correct.

---

[78] Reference Offender Infirmary Services.
[79] Infirmary Patient #1.
[80] Infirmary Patient #2.
[81] Infirmary Patient #4.
[82] Infirmary Patient #3.
[83] Infirmary Patient #5.
[84] This nursing position reports to the Agency Medical Director and supervises the Regional Nurse Coordinators.

Q. And we are having problems placing offenders due to our infirmaries being full and this is only going to continue to get worse as the baby boomer population ages, right?

A. That's what I wrote, yes.

Q. Do you know if anything has come of this suggestion?

A. I do not know.

Q. Getting tired of having to figure out where to put aging and elderly prisoners?

A. I want to appropriately place them for care, for appropriate care, and meet the operational needs of our department."[85]

Although approximately half of the infirmary rooms had nurse call buttons, many of the patients were unable to utilize them due to their advanced mental and physical conditions. Only the restraint/negative pressure room has direct line of sight from the glass window in the nurse station.

We identified a number of concerns and deficiencies in the care provided to infirmary patients as noted below.

- This patient was admitted to the DCC infirmary on 3/30/18 upon transfer from Schwab Rehabilitation Center in Chicago.[86] The nurse admission note written on Thursday morning/early afternoon of 3/30/18 listed the diagnoses as neurogenic bladder, seizure disorder, and low back pain, and noted that the patient used a seizure helmet, wore a diaper due to urinary incontinence, was confused and disoriented, and walked with a cane. The admission nursing note failed to note that the patient had advanced multiple sclerosis. The patient was assigned to the "Acute" status. Nursing notes were written on every shift. As of 4/3/18, five days after admission, there was not a provider admission note or a progress note in the infirmary record. Five days after infirmary admission, this patient had not been seen by a provider. This is not in accord with IDOC policy.[87] One of the other DCC providers should have been scheduled to cover infirmary admissions during the vacation of the assigned provider.

- The next patient is a 35-year-old patient who was admitted to the infirmary on 11/22/17 with abdominal pain and weight loss.[88] Prior to admission to the infirmary he had been in nurse sick call on 10/25/17 for abdominal pain and constipation, and his weight was 165 lbs. He was seen again in five nurse sick calls in October and November 2017 for similar symptoms. His abdominal pain worsened with meals, he had nausea and vomiting, and was provided a variety of over the counter medications. On 11/8/17, his weight had dropped to 154 lbs.

On 11/22/17, nursing referred him to the NP because of knife-like abdominal pain for two weeks and a pulse of 120. The NP noted that the patient's weight was 144, a drop

---

[85] Deposition of Kim Hugo, April 11, 2018 pp. 69-70.
[86] Infirmary Patient #1.
[87] Reference #IDOC Policy 04.03.120 Offender Infirmary Services.
[88] Infirmary Patient #2.

of 21 pounds within one month. The NP admitted him to the infirmary for observation and a battery of stat tests (CBC, CMP, amylase, lipase, thyroid studies). The lab results showed urine ketones, mildly elevated total bilirubin (1.5), and mild electrolyte abnormalities. The infirmary nurse spoke with the physician, who advised continuation of the current management. On the same day, the patient voiced having pain near/behind his umbilicus. For the next few days he continued to have abdominal pain with poor appetite, and the hard marble sized spot above his umbilicus continued to cause pain. On 11/27 and 11/28/17, the physician examined the patient and felt that he had a non-reducible umbilical hernia. The physician sent the patient to the KSB Emergency Room on 11/28/17. An abdominal CT Scan at KSB showed no evidence of a hernia but showed terminal ileum inflammation. KSB recommended follow-up with a surgeon for a possible inflamed umbilical stump due to inflammatory bowel disease. At the patient's request he was discharged on 11/29/17 from the infirmary, and referrals for gastroenterology and general surgery consultations were submitted. Only an admission weight had been recorded during his eight day stay in the infirmary. No order was placed to repeat the abnormal comprehensive metabolic panel (total bilirubin) or to schedule an EGD and a colonoscopy.

The patient was seen by the NP 12/24/17 and had a weight of 141 lbs. Nurses saw the patient in nurse sick call on 12/24/17, 1/4/18, 1/8/18, 1/9/18 (141 lbs.) for abdominal pain. An NP saw the patient again on 1/12/18 for abdominal pain and a mass of unknown origin near the umbilicus. Nurses saw the patient again at nurse sick call on 1/14/18, 1/16/18 (130 lbs.), and 1/18/18 (130 lbs.) for abdomen pain and tenderness, left testes pain, and abdominal bloating. On 1/23/18 (123.7 lbs.), a nurse noted that the patient was jaundiced/icteric, and his abdomen was tender to the touch. On 1/25/18, the patient was sent to Town Square General Surgery for the consultation requested on 11/29/17. The patient returned with a diagnosis of significant jaundice. Stat labs drawn at the surgeon's office showed elevated total bilirubin of 14.9, alkaline phosphatase 509, ALT 327, and AST 136 with normal amylase and lipase levels.

On 1/26/18, the patient as transported to the UIC ED and admitted to the hospital. His 3/7/18 UIC discharge summary noted the diagnosis of mucinous producing adenocarcinoma/cholangiocarcinoma, biliary stents insertion, and s/p excision of an umbilical nodule. The patient was readmitted from the infirmary to UIC on 3/13/18 for weight loss and malnutrition. He was started on Gemcitabine chemotherapy and returned to DCC on 3/16/18 with the diagnosis of Metastatic Cholangiocarcinoma.

The patient was readmitted to the DCC infirmary on 3/16/18. The patient was transported to receive chemotherapy infusion at UIC on 3/20/18 and 3/27/18, and went to an oncology appointment on 3/24/18. Nursing notes were written on nearly every shift from 3/19/18 to 4/2/18. The patient's condition is determined to be terminal and chemotherapy is palliative. The patient's weight has decreased from 111 lbs. on 3/21/18 to 104 lbs. on 3/28/18.

Although the patient had multiple encounters with the DCC health care team between 10/25/17 and 1/25/18, including one admission to the infirmary and a referral to KSB emergency, they missed opportunities to more expeditiously and thoroughly evaluate this patient's symptoms and condition.

Following a month of unexplained abdominal pain, when the patient was noted on 11/22/17 to have lost 21 pounds and laboratory tests and a CT scan at KSB failed to identify a cause, he should have been admitted for additional diagnostic workup. EGD, colonoscopy and contrast CT were indicated. The general surgery consultation requested on 11/29/17 was not scheduled until 1/25/18, at which time the patient was already overtly jaundiced. This two-month delay for a surgical consultation in a continuously symptomatic patient was unacceptable. Although the total bilirubin performed on 11/22/17 was only mildly elevated, the comprehensive metabolic panel should have been repeated after his infirmary discharge on 11/29/17, especially since the patient continued to have abdominal pain and lost another 20 pounds over the next two months. All of these missed administrative and clinical opportunities to intervene and appropriately manage this patient's care resulted in avoidable delays that have negatively impacted on his care and his health.

- The next patient is an elderly patient with long standing dementia, history of pica,[89] hypertension, upper and lower extremity contractures, and deep decubiti ulcers.[90] He was thought to have Picks Disease (frontotemporal dementia). He has been housed in the infirmary for a number of years. The infirmary record reveals daily vital signs and nursing notes. He requires total care (feeding via gastric tube, bathing, diapers). His limbs are fully contracted, he remains in a fixed fetal position. He was observed being transferred to a tub by the CNA and a hospice worker. He has chronic decubitus ulcers (pressure sores) over his coccyx and left gluteus. These ulcers have required antibiotic treatment on at least two occasions in the past year (September 2017 and October 2017). The wounds are now emitting a foul-smelling discharge and one was noted as deeply tunneling toward bone. The nurses write no less than daily progress notes. On 3/15/18, the nurses noted that the coccyx ulcer was foul smelling and on 3/20/18 the nurse wrote that one of the ulcers had a putrid smell and was tunneling. She requested a consult from the infirmary provider. On 3/21/18, the provider saw the patient, advised continued local wound care, and submitted a referral request to the wound care clinic at CGH Hospital in Sterling, IL. This was the only note written by the provider between 3/15/18 through 4/3/18. A single provider note in nearly three weeks for this permanent resident of the infirmary with an infective decubitus ulcer is not in compliance with the IDOC Offender Infirmary Services guidelines.[91] The extreme contractures and the recurrent pressure sores in this patient are strong indications that the past and current level of care in the DCC infirmary does not meet the community

---

[89] Pica is an eating disorder typically defined as persistent eating of nonnutritive substances.
[90] Infirmary Patient #3.
[91] Reference IDOC Policy 04.03.120 Offender Infirmary Services.

standard of care. Contractures are preventable with ongoing physical therapy; decubitus ulcers are preventable with frequent repositioning of the patient in beds or wheel chair. The manifestation of these findings in this long-term patient indicates that the DCC infirmary is not able to provide a level of care that is expected to be provided in skilled nursing facilities. Once the patient started to develop contractures, he should have been transferred to a facility in the IDOC or in the community that could have provided the needed preventive care.

- The next patient is a 46-year-old who was admitted on 3/14/18 to the infirmary.[92] Nurse and provider admission notes were completed on the day of admission. His admitting diagnosis was right foot ulcer/cellulitis with a purulent discharge. Intravenous fluids and antibiotics were started. The patient also has a history of depression, schizophrenia, and cardiac murmur. There were nursing notes written at least once on every shift; dressing changes were performed multiple times a day. There were six provider notes from 3/14/18 through 4/2/18 (19 days). On 3/19/18, wound cultures grew MRSA, which is sensitive to the antibiotics being administered. The patient was placed in contact isolation, where he remained until isolation was discontinued on 4/1/18. Progress notes on 3/19/18 (improved), 3/20/18 (no drainage), 3/21/18 (granulating), 3/22/18 (healing), 3/27/18 (slow healing), and 4/1/18 (sanguineous discharge) documented the status of the infection. The care provided to this patient was deficient and did not meet the community standard of care. The failure of the provider to initiate investigations to identify an underlying, potentially correctable, etiology of this chronic foot ulcer of six-month duration was unacceptable.

  During this infirmary admission there was no reference to the previous treatment in September to December 2017 for an infection at the same site. This important clinical information would have raised the possibility that there was some underlying cause for this recurrent infection. A recurrent infection would have warranted further lab studies including blood glucose, HbA1C, CBCs and a careful examination for the adequacy of arterial circulation (pulse, arterial blood flow) and sensation in the involved foot. None of these indicated tests and examinations were performed. There was also no documentation that the patient's history of a cardiac murmur resulted in an examination of his heart. The cause of this recurrent infection was never evaluated nor explained, minimizing the opportunity to implement prevention measures and putting the patient at risk for another reoccurrence of this serious infection.

- The next patient is a 61-year-old with a history of hypertension, hyperlipidemia, BPH, psychiatric disorder, and atrial fibrillation.[93] He was admitted to the infirmary on 3/27/18 with dizziness. His medications on admission included Atorvastatin, aspirin, Flomax (Tamsulosin), Zoloft (sertraline), Cogentin, Haldol, and possibly Norvasc (amlodipine). A nurse admission note was recorded on 3/27/18. The nursing note on

---

[92] Infirmary Patient #4.
[93] Infirmary Patient #5.

3/28/18 documented orthostatic drops in blood pressure and the patient was placed on fall precautions. On 3/29/18, the first and only provider note stated that the patient was now off Norvasc (a medication for blood pressure) and that Midodrine was being administered TID. The provider note made no mention of the recent past history of atrial fibrillation, the recent history of admission to Karen Shaw Berea (KSB) hospital for similar symptoms and did not include a cardiac examination. Nursing notes were written almost on every shift with orthostatic blood pressure measurements performed twice daily. The patient was asymptomatic but had orthostatic drops in blood pressure of 20mmHg.

The patient had been admitted to KSB approximately 10 days prior with orthostatic hypotension with syncope. He was also found to have paroxysmal (intermittent) atrial fibrillation with a low-moderate CHADS-VASc[94] score for which anti-platelet treatment (aspirin) was initiated at this time. His hematocrit was 40 and hemoglobin 13.5; his echocardiogram revealed an ejection fraction of 60-65% with a moderately dilated left atrium and trace mitral valve regurgitation. None of this pertinent information was recorded on any of the progress notes during this infirmary admission.

There was only a single very limited provider note recorded from 3/27/18 to 4/3/18 (eight days) for this acute admission. This is not in accord with IDOC Policy,[95] which directed that acute admissions have three provider notes per week. The failure to even succinctly summarize the recent KSB admission and testing put the patient at risk for being inappropriately managed in the infirmary. The patient should have had a basic metabolic panel (glucose, BUN, electrolytes), CBC, and an ECG performed. The provider note did not indicate the cause of this patient's dizziness and persistent orthostatic hypotension nor document possible alternative etiologies. Consideration should have been given to a cardiac arrhythmia or side effects of some of the patient's other medications (Tamsulosin, sertraline) and to seeking specialty consultation for this patient's unexplained orthostatic hypotension.

In summary, a number of the patients admitted to the DCC infirmary require a higher level of care than can be delivered in the DCC infirmary. These high-risk patients need to be transferred to a skilled nursing facility in the community until this higher level of care can be provided in an IDOC facility. The provider notes in the infirmary failed to meet the IDOC standard for timeliness and do not adequately address the acute and chronic needs and illnesses of the each infirmary patient.

With the exception that since RN's are assigned to all shifts in the infirmary, we did not find that LPNs are working outside their scope of services, we agree with the recommendations of the First Court Expert and have additional recommendations that are found at the end of this report.

---

[94] The CHAD score determines whether a patient requires anticoagulation for atrial fibrillation.
[95] Reference #IDOC 02.04,120 Offender Infirmary Services.

## Pharmacy and Medication Administration

**Methodology:** We reviewed medication services by touring the medication room with the Nursing Supervisor (Wexford) who is also the vendor's Site Manager. We observed nurses as they prepared, administered, and documented medication administration. We reviewed medication administration records and corresponding medical records of 12 patients selected from lists of patients on medications that cannot be missed. We also reviewed medication room inspection reports, pharmacy reports, the Wexford–IDOC contract, Administrative Directives, and DCC operational policies and procedures.

### First Court Expert Findings

The system used and policies and practices described in the First Court Expert's report are unchanged today. Medications are provided by BosWell, a subcontractor to Wexford, using a "fax and fill" system. Pharmacy assistants are responsible for sending orders and requisitions for stock medication to be dispensed by BosWell. These same personnel receive shipments and verify medications received against those ordered. Once this is completed, the medications are moved to the medication room where they are prepared by nurses for administration. Medications were either administered by nursing staff to a line of patients waiting in line at the health care unit or were taken to the living units and administered through the food port at the cell door. A security officer escorted the nurse while administering medication cell side. Documentation of medication administered, refused, or not available is done on a paper Medication Administration Record (MAR) that is kept in a binder in the medication room for the current month and filed in the medical record the month after.[96]  The First Court Expert had no adverse findings with respect to medication administration.

### Current Findings

Medication administration has apparently deteriorated since the First Court Expert report. Medication administration at DCC is problematic and relies on outdated practices that are no longer considered safe from patient harm. These problem areas include:

- Handwritten and incomplete orders
- Inconsistent documentation by providers in the progress notes about the decision to order medication and clinical rationale
- Handwritten transcription of orders to the MAR
- Late transcription of orders
- Pre-pouring medication
- Use of unsanitary envelopes to administer medications in the Special Treatment Center[97] (STC)
- Not having the MAR available during medication administration in STC
- Not documenting administration of medication at the time it is given.

---

[96] Lippert Report DCC p. 21.
[97] This is a mental health unit at the DCC.

Chronic disease patients are not monitored to ensure continuity in treatment. Their compliance with prescribed treatment is not assessed. Prescription end dates do not coincide with chronic clinic appointments and require patients to request renewals via sick call.

In addition, we found that medication errors are documented and reported, but not analyzed to determine root causes or trended to identify problems and improve patient safety. Persistent problems with medication practices are not subject to corrective action or systematic quality improvement.

<u>Orders and Delivery of Medication</u>

Medications are obtained from BosWell Pharmacy Services, via subcontract with Wexford. Prescriptions are faxed to BosWell and filled in 30-day "blister packs" and then delivered to DCC. A pharmacy assistant at DCC receives and inventories the medications and then puts them into the medication room nurses use to prepare medication to give to patients. The lead pharmacy assistant reported that prescriptions faxed to BosWell by mid-afternoon are received the next day. Prescriptions faxed after that take another day to arrive. If medications are urgently needed, they can be obtained from a local pharmacy.

We toured the room used to administer medications to inmates housed in general population, the medication storage room where nurses work, and the area where the pharmacy assistants send and receive medication supply. These rooms were clean, uncluttered, well-lighted, and kept secure. There is a refrigerator with a thermometer and temperature log that was up to date. All other refrigerators used to store medications had thermometers and documentation of daily temperature checks. Of the logs inspected, temperatures were within the correct range. There was an opened bottle of lemon juice in the refrigerator that was undated. Multiple dose containers should always be dated when opened and not used for more than 30 days after opening. We also found four undated insulin vials of the 10 being used by nurses in the dispensary on Monday April 2, 2018 to give insulin to diabetic patients. Multidose vials should also be dated when opened. No outdated medication was found in the pharmacy/medication administration areas. We did find expired HIV rapid test material in the refrigerator in the dispensary, occult blood testing material, and eye wash solution in the nurses' room in X-House.

Issues with accountability of controlled substances were identified by facility audits of Institutional Directive (ID) #04.03.110 in the spring of 2016.[98] Accountability of controlled medications was also found in pharmacy inspections during that same time.[99] Corrective action was implemented and substantial compliance with ID #04.03.110 was found in performance by the fourth quarter of the year and was sustained in 2017.[100] On Monday April 2, 2018, we observed the count between day and evening shift, and verified that it was accurate. Other issues identified in the pharmacy inspection reports were pre-signing for medication

---

[98] Facility Review Report, April-June 2016, July-September 2016.
[99] Dixon Correctional Center Annual Governing Body Report, September 21, 2016 pp. 142-143.
[100] Facility Review Report, October 2016-December 2016, January-March 2017.

administered, outdated medications still being administered, patient specific blister cards used for stock, medication not stored correctly, and failure to document medication administered. The only corrective actions taken were education and counseling. There is no systemic analysis to determine root cause and develop solutions that support performance improvement or prevent human error.

Orders for prescription medication were often barely legible. The lead pharmacy assistant reported that BosWell seldom returns orders because they are unreadable. However, a nurse could not decipher a provider's handwriting when asked by the Expert during chart review. Only 73% of the orders reviewed were complete (signed, dated, and timed). Only 64% of the orders had a corresponding progress note. Sometimes there was a comment written on a lab or diagnostic study report indicating intent to order medication; however, there was no progress note. The providers need to document their decisions and rationale about treatment in the progress note, but at DCC this is not done consistently.

Nurses transcribe provider medication orders onto the patient's MAR. We did not find any transcription errors among the 12 charts reviewed. We did find that sometimes nurses handwrite the new order over an old order.[101] This is an alteration of the record and should be prohibited. We also found a consistent pattern of transcribing orders more than a day after the order was written.[102] This causes a delay in the initiation of treatment. In fact, only 70% of the medications ordered had the first dose administered within 24 hours of the start date.

Transcription errors are by far the most common type of medication error reported to the DCC CQI committee.[103] These errors are evaluated to document whether there was harm to the patient. There is no other documentation or other report that medication errors are trended or analyzed to identify systemic sources of error, nor has it been identified as a problem for possible improvement by the CQI committee.[104]

Medication errors have long been recognized as a substantial area of focus in improving the safety of patient care.[105] Handwritten orders and transcription have been eliminated in many correctional health care programs. An obvious solution is to install computerized provider order entry (CPOE). This eliminates transcription by hand. Labels generated from the computerized order after it has been reviewed by a pharmacist are affixed to the MAR.[106] Automated dispensing cabinets are also being used more often now to record the withdrawal of controlled substances and eliminate manual inventory control systems like that implemented at DCC because of non-compliance on the audit at DCC. Upgrading pharmacy services in this way

---

[101] Pharmacy/Medication Administration Patients #3 & 7.
[102] In four of 11 charts (36%), the order was transcribed more than eight hours later.
[103] DCC Annual Governing Body Report, September 21, 2016 p. 144.
[104] HCU Policies and Procedures P-129 p. 68 only requires analysis of individual events but does not analyze error trends. See also the DCC Annual Governing Body Report, September 21, 2016 p. 144. The report of medication errors made to the CQI committee does not include root cause analysis nor is there any discussion of change.
[105] Institute of Medicine (2000), To Err is Human: Building a Safer Health System. Washington DC: The Academies Press.
[106] Patient Safety Network. (2017) Medication Errors, Agency for Healthcare Research and Quality available at https://psnet.ahrq.gov/primers/primer/23/medication-errors.

requires capital expenditure and would only likely happen as a statewide decision made by IDOC. But if these pervasive problems are not identified, discussed, studied, or reported at the facility level, IDOC is without notice that there is a systemic issue that must be addressed statewide.

When the medication arrives from BosWell, a pharmacy assistant verifies the medication received against the order, which serves to identify dispensing errors. Once verified, the medication is put in the nurses' medication work room into boxes designated by the housing location of the inmate.

<u>Medication Administration</u>
There are two ways medications are administered at DCC. Inmates in general population come to the HCU and stand in line to receive their medication. In the STC, a mental health treatment program, medications are brought to the inmate by a nurse and administered cell-side. Practices of staff are problematic with both methods.

Nurses pre-pour all medication administered to inmates in general population. The only exception is "as needed" (PRN) medications. Pre-pouring entails multiple steps: looking at the MAR; selecting the right medication for the patient; and popping the pill out of the blister pack into a soufflé cup. The soufflé cups are placed in a tray with a card with the patient's name on it. If it is a medication that must be crushed, the nurse will crush it in advance as part of the pre-pour. If the patient had a pattern of not taking the medication, the nurse waits until the inmate appears at the window and indicates he will take it. Then the nurse obtains it from the blister pack, crushes it and administers it to the patient. We were told by the Nursing Supervisor (Wexford) that all controlled medications are crushed; any others are only crushed as a result of an order to do so. Blanket crushing policies such as this are not recommended. Any medication to be crushed should only be as a result of a provider order. We did not observe medication being floated. Documentation that medication was given takes place after all medications have been administered to the general population. The only exception to this practice is "as needed" medications, which are documented as given at the time administered.

Correctional officers supervise inmates waiting in line for medication. Inmates are called over by housing unit, so the line does not become too long. There is also an officer near the medication window who monitors the inmate's behavior during and immediately after medication is administered. Nurses use the name and photo on the inmate's identification card to verify that it is the right patient. When asked if they had ever had an inmate exchange identification cards, the nurses said no and were surprised to hear that it occurs with some regularity at other correctional facilities. Because of the window between the nurse and the patient, there is very little interaction that takes place. This barrier diminishes the opportunity for inmates to ask questions or voice concerns about the medication, side effects, or other symptoms they may experience. Nurses are also unable to observe more than the inmate's face and so cannot identify changes in the inmate's condition at these encounters.

Problems with this method of medication administration are:

- Pre-pouring defeats the purpose of patient specific packaging. As soon as the medication is taken out of the blister pack, verification that it is the correct medication, for the right patient, at the right time, and the right dose is not possible. This is a patient safety risk and unnecessarily exposes the patient to errors in administration (receiving the wrong drug). It is also a wasteful use of the cost of blister packaging.
- Nurses do not have a way to verify medication that is not taken. Visual identification of remaining medication is not accurate.
- Medication is not documented at the time it is given. This practice is a source of errors and omissions in documentation of patient care.

Medications administered to inmates in the STC are also pre-poured. Adjustments have been made in times when medication is administered to accommodate expectations for inmate treatment programming and the time available for any one medication pass is limited.

We accompanied a nurse escorted by a correctional officer during the midday medication pass in STC. The medications to be administered were in small envelopes with each inmates' name. The officer approached the cell door and the nurse called out the inmate's name as it was opened. Each cell had one or two inmates. The inmate stood in the doorway. The nurse asked to see the inmate's identification card but did not use a second identifier. The nurse poured the medication into the inmate's hand or, if the medication was "floated," into a glass of water that the inmate had. The nurse and the officer observed the inmate swallow the medication and checked his mouth afterward. If the inmate did not want to take a particular medication the nurse put it back in the envelope. One inmate questioned the identity of one of the medications he was to receive. Because the medication was not in its original container the nurse could not identify it. Instead, the inmate returned the medication to the nurse. She said that she would check and tell him what the medication was at the next medication pass. The interaction between the nurse, officer, and inmates was professional.

The MAR is not taken when the nurse administers medication in the STC and so the nurse did not document administration at the time the medication was given. The nurse is instead expected to document after returning to the nurses' medication work room.

Problems with medication administration in the STC are the same as those listed for the method used in general population and in addition include:
- Repeated use of the same envelopes is a source of transmission for infectious disease because they are handled multiple times.
- Crushed medications in the envelope contaminate other medication in the envelope and may cause an adverse interaction.
- The MAR is not available to the nurse at the time medication is administered and therefore is not used as a reference when there is a concern or question at the point of patient care.

Only 37% of the MARs selected for review were complete.[107] Documentation of doses given, refused, or not available was missing from five of eight charts reviewed. This is extremely poor performance and calls into question the accuracy of the MARs. Contemporaneous charting on the MAR at the time of administration is considered the nursing standard of practice. DCC does not meet this standard of professional performance.

KOP medications are delivered to inmates in general population once a day at a line designated for this purpose. There are no KOP medications in the STC.

When we shared feedback about our findings with the HCUA, we were told that the programming requirements of STC are such that the only way medications can be delivered is the method being used now. Similarly, she explained that they tried to administer directly from the patient specific blister packs in general population but that it took too much time, so they reverted to pre-pour. It is true that pre-pour reduces the amount of time the nurse is with the patient, but it significantly increases the risk of medication error and patient harm. Both arguments are another way of saying that facility operations are impeding nurse's ability to provide patient care safely and in accordance with contemporary standards of practice. This is dangerous and needs to be fixed.

<u>Renewal of Chronic Disease Medications</u>
Chronic disease medications are provided to patients monthly either as KOP or each dose is administered by a nurse. The scheduled appointments for chronic disease clinic do not coincide with the end date on medications ordered for chronic disease. Providers are to be notified of impending expiration dates.[108]

DCC HCU Policies and Procedures for Chronic Disease require providers to review current medications and ensure continuity of prescription medicines.[109] During our record review we identified several patients prescribed medication that required continuity who had lapses on their care.[110] Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed.

In summary, DCC medication services do not meet the standard of practice, they employ outdated methods that compromise patient safety, and they are not reviewed and analyzed to make improvements that prevent human error.

# Infection Control

**Methodology:** We interviewed the medical lab technician assigned to track and report on infection control. We also interviewed inmate-porters, reviewed the Infection Control Manual,

---

[107] Pharmacy/Medication Administration Patients #6, 7, 8, 9 & 12.
[108] HCU Policies and Procedures P-128 Medication Services p. 61.
[109] HCU Policies and Procedures P-107 p. 11.
[110] Intrasystem Transfer Patient #1, Pharmacy/Medication Administration Patients #1, 2 & 4, Infection Control Patient #1.

CQI minutes, and other documents related to communicable diseases and infection control. We also reviewed the charts of two patients who completed a course of TB prophylaxis.

**First Court Expert Findings**

The First Court Expert Report noted that there was no named infection control nurse at DCC. Two nursing supervisors shared responsibility for compliance with IDOC policy concerning communicable diseases, blood borne pathogens, and compliance with Illinois Department of Public Health reporting requirements. Inspection of the health care areas and inquiry about infection control practices revealed that personal protective equipment was available, and that infectious waste was properly disposed. He was unable to confirm that inmate porters assigned to work in the infirmary had received any training in cleaning and sanitation; the Nursing Supervisors had not addressed the issue with the porters.[111]

**Current Findings**

We agree with the findings of the First Court Expert's report. In addition, we identified additional findings and confirmed some of the findings of the First Court Expert's findings as follows:

- Paper barriers were noted to be used on most but not all examination tables.
- The floors and surfaces in the health care building, particularly the second and third floor, are dirty or have deteriorated to the extent that they are a medium for transmission of infectious disease.
- Inmate porters are allowed to work in the infirmary without being trained in proper cleaning procedures and personal protection.

When we asked the Nursing Supervisor (IDOC) to speak with the person responsible for infection control, we were directed to the medical lab technician (Wexford). The lab technician did not see herself as having responsibility for infection control. She does submit reports of infectious conditions as required to the state Health Department. She also tabulates the monthly infection control report that is presented at the CQI meeting. This report lists the number of patients placed in isolation, compliance with testing the room for negative pressure, cases reportable to Public Health, MRSA cases, and patients screened for, monitored, and treated for HIV, and HCV. She was knowledgeable of the facility's infection control manual, including control of infectious disease outbreak, and has assisted in several investigations including norovirus, chicken pox, and MRSA. She also has experience with the facility's approach to controlling influenza transmission. The chronic care nurse manages the HIV and HCV clinics. The HCUA stated that she has overall responsibility for infection control only because of the number of vacancies in her supervisory staff. There is no single person with leadership and responsibility for infection control. The lab technician has insufficient training to be responsible for the infection control program.

CQI Minutes and the 2016 Annual Report show that communicable disease data is collected and reported monthly. There is minimal to no discussion of the meaningfulness of the data

---

[111] Lippert Report DCC p. 33.

reported. CQI Minutes also report statistics regarding skin infections due to MRSA. Data does not include tracking of skin infections due to other pathogens. Equipment and instructions for prevention, response, and reporting of occupational exposures were readily available at the facility.

The IDOC Infection Control Manual was reviewed. It was last updated in 2012. While the material in the manual is thoughtful and many resources are provided, some of them are out of date. The manual should be updated at least every two years. An up to date and accurate infection control manual is critically important in guiding the work of staff assigned these duties in the absence of dedicated positions for trained infection control staff, as is the case at DCC. The IDOC Nursing Treatment Protocols, revised March 2017, were reviewed, and provide guidance to nurses in the care of common infectious diseases and infections such as scabies, urinary infection, rash, pediculosis, chicken pox, and skin infections.

We note in the Clinic Space and Sanitation sections of this report many infection control challenges and hazards that were observed during our site visit at the facility that need to be remedied to prevent spread of infection or safety hazards to patients, including elderly inmates at risk of falls.

The CQI minutes report four occupational exposures to blood borne pathogens in 2017.[112] The HCUA reported that three of these were needlestick injuries. She requested Wexford provide a different type of re-sheathing needle to help prevent additional injury. To date, Wexford has not responded to her request. At a minimum, Wexford should conduct an evaluation of the effectiveness of existing hypodermic needles and review of feasibility of instituting more advanced engineering controls as required by Occupational Safety and Health Administration (OSHA).[113] Further, the CQI committee should conduct a focused review of these injuries and determine what measures to implement in order to increase employee safety.

One porter had documentation in his medical record that he had received formal training on blood borne pathogens and had been vaccinated against hepatitis B. The other porter had not yet been trained concerning his duties in sanitizing patient rooms, showers, tub rooms, and showers, and had received only the first of the three required hepatitis B vaccination shots. He is reportedly scheduled to receive the required training. Neither porter had been offered hepatitis A vaccination, even though there is a higher risk of exposure to pathogens, and a more frequent and higher degree of sanitation is needed in the infirmary.

Tuberculosis screening is completed annually. We did not evaluate actual practices for TB screening. We reviewed the charts of two patients who completed prophylaxis. In one case, the

---

[112] DCC Infection Control Minutes August, September, and October 2017.
[113]



osha3161
preventing needlestick

inmate gave a history of a positive skin test and there was a record of a normal chest x-ray in 2006. In April 2017, a physician ordered the skin test and x-ray repeated. The x-ray was normal but no results for the skin test were recorded. Six months later at a chronic care clinic, the inmate requested TB prophylaxis. The NP documented that he was asymptomatic and had a normal chest x-ray and initiated treatment. Once initiated, the inmate was seen in TB clinic monthly for review of medication compliance and symptom review. Labs were drawn as ordered.[114]

The other patient received three TB skin tests in July and August 2017, all recorded as 20mm, which is considered positive. A chest x-ray was normal, and he was asymptomatic. TB prophylaxis was initiated shortly thereafter. He was seen by the nurse monthly in TB clinic for review of medication compliance and symptom review. Labs were drawn as ordered.

In both cases, initial tuberculosis skin testing and follow up was haphazard. Once treatment was initiated and the patient seen by the TB control nurse, monthly care was timely and appropriate.[115]

If tuberculosis prevention were managed by specifically designated nurses according to standardized protocol with provider consultation, the initiation of preventive treatment would be more timely and precise. We note as described in the Clinic Space section of this report that the negative pressure unit in Room 35 of the infirmary is tested, with results documented in a nursing log on a weekly basis.

Inmates may request HIV testing at any time and it is also offered to inmates just before release from incarceration. Inmates who are infected with HIV are managed as part of the chronic clinic program with oversight from UIC. Hepatitis C (HCV) disease is also managed via the chronic care clinic, with their work up and treatment directed by UIC.

## Radiology Service

### First Court Expert Findings
The First Court Expert's report did not include any findings about the radiology equipment or services.

### Current Findings
- The Illinois Emergency Management Agency (IEMA) radiation safety inspections and reports for the radiology units at DCC are current. The active x-ray equipment at DCC was found to be in compliance with the Radiation Protection Act of 1990.
- The access to plain film x-rays at DCC is acceptable.
- The turnaround time for radiologist readings and return of the reports is good.

---

[114] Infection Control Patient #1.
[115] Infection Control Patient #2.

- The system decision not to have the x-ray technician wear radiation exposure dosimeters may not be in accord with State of Illinois regulations and is definitely not in accord with community practice.

Plain film and fluoroscopy x-ray services are provided Monday-Friday during the daytime hours. A single radiology technician staffs and manages the unit. This technician also assists the management of the optometry clinic, which is located 20 feet from the radiology suite. Studies not provided at DCC are referred to UIC or two local hospitals. Patients requiring emergency x-rays are generally referred to the nearby Katherine Shaw Bethea Hospital (KSB) emergency room.

It was reported that there is not a waiting list for non-urgent onsite x-rays. Most x-rays are reported to be taken within one to two days after receiving the order. Weekend and holiday requests are completed on the next working day. The requests and the radiology log for four patients were reviewed. All four had films taken within one to three days of the request. All of the films were read within 24 hours, with a report faxed to DCC on the day after the reading. The films are read by a local contracted radiologist.

During the Expert's visit the existing and aging plain film radiology unit was removed, and a used but updated non-digital unit was being installed. The radiology technician has a work space inside the entrance to the radiology suite that has a locked door.

Although the Illinois Emergency Management Agency (IEMA) Division of Nuclear Safety, Certificate of X-ray Registration was not posted in the radiology suite, the x-ray technician produced the certificate, the IEMA list of active equipment, and a April 25, 2017 letter from IEMA stating that during the April 18, 2017 radiation safety inspection, that the DCC "radiation producing equipment and operative procedures reviewed by the inspector were in compliance with applicable Illinois radiation protection regulations."[116] The x-ray technician produced her current license that is valid through July 31, 2018.

The x-ray technician was noted not to be wearing a radiation exposure dosimeter badge. She stated she had been told by Wexford that the State of Illinois does not require the use of dosimeters. She communicated that she is required to wear separate dosimeters at two different medical facilities in the Rockford area where she works in her off hours.

In summary, the radiology services at DCC have reasonable access and turnaround time of reading and reports. The decision of the system to not provided radiation exposure dosimeter badges is not in accord with community standards and needs to be further reviewed by the IEMA.

The First Court Expert's report did not have any recommendations about the radiology services. We have noted recommendations that are noted at the end of the report.

---

[116] Reference IEMA Division of Nuclear Safety Certificate and Letter.

## Dental Program

### Dental: Staffing and Credentialing

**Methodology:** Reviewed staffing documents, interviewed dental and other staff, reviewed the Dental Sick Call Log and other documents.

**First Court Expert Findings**

- DCC has one full-time dentist, one 14-hour part-time dentist, two full-time assistants, and no dental hygienist, a serious omission. To expect the dentists to provide hygiene and periodontal care to 2300 inmates in addition to their expected dental workload is unrealistic and, in our opinion, cannot be done. It is also a poor use of a dentist's time and resources.
- CPR training is current on all staff, all necessary licensing is on file, and DEA numbers are on file for the dentists.

**Current Findings**

Dental staffing has not changed materially since the First Court Expert's Report. We agree with the First Court Expert that dental staffing is inadequate and the lack of a dental hygienist is a serious omission.[117] Moreover, we identified current and additional findings as follows.

Most dental personnel work 10-hour days (from 6 a.m. to 4 p.m.); however, patients are not treated until count ends, typically after 8 a.m.[118] Dentists are paid for two hours (6 a.m. to 8 a.m.) when patients are not available. The clinic has been closed Mondays for about a year, since Dr. O'Brien reduced his time by 10 hours, and Wexford has been unable or unwilling to find a dentist to work Mondays. The dental assistant is present on Mondays, the day there are no dentists present. This is a foolish waste of patient treatment time resources and should be corrected immediately.[119]

We were told that an IDOC dental assistant position vacated by a retirement two years ago has finally been advertised.[120] In addition, there is one dental assistant vacancy. The current (Wexford) dental assistant has not had formal dental assisting training and does not take x-rays,

---

[117] Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006). Correctional dental services. In M. Puisis (Ed.), Clinical Practice in Correctional Medicine (2nd ed., pp. 556-564). Philadelphia, PA: Mosby Elsevier, p. 557 ("In prisons where routine dental care will be provided, the basic dental team should consist of a dentist, dental assistant, and dental hygienist").

[118] Dr. Crisham: Wednesday 6 a.m. to 4 p.m. & Friday 6 a.m. to 10:30 a.m.; Dr. O'Brien: Tuesday, Wednesday & Friday 6 a.m. to 4 p.m.; and Dr. Schmidt: Friday: 6 a.m. to 4 p.m. There are 54.5 hours of dentist coverage Tuesday through Friday, or 1.36 full-time dentist equivalents (FTE). Of the 54.5 dentist hours, 12 (21%) are between 6 a.m. and 8 a.m., a period when patients are not available. This 'dead time' comprises 0.3 FTE, reducing the dentist FTEs available for treatment to 1.06 FTEs

[119] While a case can be made for one dental assistant arriving shortly before patient treatment begins to prepare the clinic for patients' arrival, two hours is too much time. Moreover, since the dental assistant leaves at 3:30 p.m., it is unlikely the dentists (whose day ends at 4 p.m.) are treating patients.

[120] "In need of a dental assistant. It has been vacant since 2016 and it is starting to effect productivity. Backlog numbers are starting to go up again." Dixon Correctional Center Quality Improvement Committee, August QI Meeting Minutes, September 2017, p. 1 (emphasis in original). That the position had not been filled at the time of our visit (April 2018) illustrates the indifference IDOC has shown to the Dixon dental program.

a critical deficiency. CPR is current on all dental staff. Licensure and DEA registration is current for all dentists.

## Dental: Facility and Equipment

**Methodology:** Toured the dental clinic and radiology area to assess cleanliness, infection control procedures, and equipment functionality. Reviewed the quality of x-rays taken at DCC and the reception centers. Reviewed compliance with radiologic health regulations. Observed clinical care.

**First Court Expert Findings**
- The clinic consists of three chairs and units with adequate free movement around them. Two dental units are two years old and in good repair. The third chair is old, worn, and does not work. There are no plans to repair this chair.
- There is a panoramic unit in the health services x-ray department in a dedicated room. It is old but functions adequately. The x-ray unit in the clinic works well. The autoclave is old but functions well. The compressor is in the basement and works well. The instrumentation is adequate in quantity and quality. The handpieces are old but well-maintained and repaired when necessary.
- The cabinetry is old and showing wear and corrosion and staining on work surfaces, but is functional, although this makes disinfection of surfaces more difficult. The ultrasonic works well.
- There was a separate sterilization area of adequate size and surface workspace. The staff office is large with a single desk. The dental records are maintained in this room. It also houses the dental laboratory with its equipment and workspace. There is adequate room for all. The clinic is adequate in size and function to meet the needs of the inmate population.

**Current Findings**
Dental facilities and equipment have not changed materially since the First Court Expert's Report and are adequate. While we concur with the First Court Expert, we identified current and additional findings as follows.

The clinic comprises three chairs and units, with adequate free movement around them. Dentists and assistants have adequate room to work unimpeded. Two dental units are in good repair. The third chair is old and has not worked for at least four years.[121] There are no plans to repair this chair. There is no ultrasonic scaler.

The foot pedal controls on three sinks are non-functional and are secured with clear packing tape. According to the dental assistant, a work order was placed approximately one year ago, and she was told that the parts are not available.

---

[121] The chair will have to be repaired or replaced to accommodate a dental hygienist, who should be hired immediately.

There is an old but functioning panoramic x-ray unit in the health services x-ray department. X-rays are taken by the x-ray technician. The intraoral x-ray unit, autoclave, compressor, and ultrasonic cleaner work well. The instrumentation is adequate in quantity and quality. The handpieces (drills) are old but well-maintained and repaired when necessary. The x-ray units have recently passed inspection by a health physicist.

The dental assistant said that they have not taken bitewing x-rays in months and dentists order panoramic x-rays for biennial exams if they feel the panoramic x-ray taken at the reception center is dated or clinically inadequate.[122]

## Dental: Sanitation, Safety, and Sterilization
**Methodology:** Reviewed Administrative Directive 04.03.102. Toured the dental clinic and observed dental treatment room disinfection. Interviewed dental staff and observed patient treatment.

**First Court Expert Findings**
- Adequate surface disinfection using proper disinfectants was performed between patients. Protective covers were used on some surfaces.
- Instruments were properly bagged and sterilized, with handpieces sterilized and in bags.
- The sterilization procedure was flawed because instrument flow was improper, since it did not go from dirty to sterile in a linear fashion.
- The ultrasonic was on the opposite side of the autoclave from the sink. It should flow from ultrasonic to sink to work area to autoclave without crossing its path.
- A biohazard label was not posted in the sterilization area and there was no warning sign where x-rays were being taken to warn of radiation hazards.
- Safety glasses were not always worn by patients.
- The clinic was neat and orderly.

**Current Findings**
Dental sterilization, safety, and disinfection has not changed materially since the First Court Expert's Report and are adequate. While we concur with the First Court Expert's findings, we identified current and additional findings as follows.

The clinic was neat and clean. Surface disinfection between patients was adequate and instruments were bagged and stored properly. The sterilization procedure was flawed because instrument flow did not go from dirty to sterile in a linear fashion. The ultrasonic cleaner was on the opposite side of the autoclave from the sink. Instruments should flow from ultrasonic to sink to work area to autoclave without crossing the ultrasonic cleaner's path.

A biohazard label was not posted in the sterilization area[123] and there was no warning sign where x-rays were being taken to warn of radiation hazards.[124]

---

[122] This is highly problematic and will be addressed in the section on comprehensive care.

Neither a stethoscope nor a sphygmomanometer was present. According to the dental assistant, dentists borrow them from nursing when they feel that patients have a problem, and often nurses will come to the clinic to take the blood pressure.

According to the dental assistant, patient eye protection is not used routinely;[125],[126] however, we noted that the dentist suggested a patient wear his own glasses for protection.

## Dental: Review Autoclave Log

**Methodology:** Reviewed the last two years of entries in autoclave log, interviewed dental staff, and toured the sterilization area.

**First Court Expert Findings**

- Spore testing was performed weekly and was documented, and no negative results were recorded.
- The past three years were reviewed and showed that autoclaving was accomplished weekly and documented.
- They utilize the Maxitest system through Henry Schein. A single negative result was documented, but corrected immediately with a retest, which was negative.

**Current Findings**

Autoclave log maintenance is unchanged since the First Court Expert's Report and is adequate. We agree with the First Court Expert's findings and note that the sterilization log for the past two years was in order. Testing was performed weekly and documented. No negative results were recorded.

## Dental: Comprehensive Care

---

[123] 29 CFR 1901.145(e)(4). "The biological hazard warning shall be used to signify the actual or potential presence of a biohazard and to identify equipment, containers, rooms, materials, experimental animals, or combinations thereof, which contain, or are contaminated with, viable hazardous agents."

[124] Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i). Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words, "CAUTION RADIATION AREA." Emphasis in original.

[125] Guidelines for Infection Control in Dental Health-Care Settings ---2003. MMWR, December 19, 2003/ 52(RR17):1:16; pp. 17-18. ("PPE [personal protective equipment] is designed to protect the skin and the mucous membranes of the eyes, nose, and mouth of DHCP [dental health care provider] from exposure to blood or OPIM [other potentially infectious materials]. Use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes creates a visible spray that contains primarily large-particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, DHCP, or the patient. The spray also might contain certain aerosols (i.e., particles of respirable size, <10 μm). Aerosols can remain airborne for extended periods and can be inhaled" and "Primary PPE used in oral health-care settings includes gloves, surgical masks, *protective eyewear*, face shields, and protective clothing (e.g., gowns and jackets). All PPE should be removed before DHCP leave patient-care areas (*13*). Reusable PPE (e.g., clinician *or patient protective eyewear* and face shields) [...]"). Emphasis added. Moreover, protective eyewear prevents injury from objects or liquids accidentally dropped by providers.

[126] Why We Take Infection Control Seriously. UIC College of Dentistry. Viewed at https://dentistry.uic.edu/patients/dental-infection-control, viewed February 2, 2018 ("We use personal protective equipment [...] *as well as provide eye protection to patients for all dental procedures*."} Emphasis added.

Comprehensive, or routine care[127] is non-urgent treatment that should be based on a health history, a thorough intraoral and extraoral examination, a periodontal examination, and a visual and radiographic examination.[128] A sequenced plan (treatment plan) should be generated that maps out the patient's treatment.

**Methodology:** Interviewed dental staff, reviewed randomly selected dental charts of an inmates who received non-urgent care based on Dental Reports.

**First Court Expert Findings**
- A review of 10 records revealed that no comprehensive examination was ever performed, and no treatment plans were developed.
- A periodontal assessment was not done in any of the records and no examination of soft tissues or periodontal assessment was part of the treatment process.
- Hygiene care and prophylaxis were never provided, and oral hygiene instructions were never documented.
- Bitewing or periapical x-rays were never taken to diagnose caries. Restorations were provided from the information from the panoramic radiograph. This radiograph is not diagnostic for caries.
- None of the record entries were time documented.

**Current Findings**
Comprehensive care has not improved materially since the First Court Expert's Report and remains inadequate. We concur with the First Court Expert's findings; however, we identified current and additional findings as follows.

Of 12 records reviewed, none had a periodontal assessment documented. All but one[129] had the treatment plan that consisted only of charting dental problems (primarily decay) with no mention of periodontal disease. In fact, the standard instrument pack for an examination contains a mirror and an explorer but lacks a periodontal probe.[130] Moreover, none of the treatment plans were informed by bitewing x-rays. Of 10 records of patients who received biennial exams, none was informed by a periodontal assessment or bitewing x-rays.[131,132] None had signed and updated health histories.

---

[127] Category III as defined in Administrative Directive 04.03.102.
[128] Stefanac SJ. Information Gathering and Diagnosis Development. pp. 11-15, *passim*.
[129] Comprehensive Care patient #9.
[130] This is consistent with the dental program's indifference to periodontal disease.
[131] While all had panoramic x-rays, it is below accepted professional standards to diagnose caries and periodontal disease with a panoramic x-ray alone. Furthermore, many of the x-rays were inadequate (Biennial Exam Patients #2, 5, 6, 8, 9, and 10).
[132] Dentate or partially dentate adults who are new patients receive an "[i]ndividualized radiographic exam consisting of posterior bitewings with panoramic exam or posterior bitewings and selected periapical images." Furthermore, recall patients should receive posterior bitewing x-rays every 12 to 36 months based on individualized risk for dental caries. With respect to periodontal disease, "[i]maging may consist of, but is not limited to, selected bitewing and/or periapical images of areas where periodontal disease (other than nonspecific gingivitis) can be demonstrated clinically." Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and U.S. Food and Drug Administration, 2012. Table 1, pp. 5-6.

Per the dental assistant, the dentists review charts of newly arrived prisoners using the panoramic x-ray taken at the reception center and decide whether to place the prisoner on a treatment list.[133] It takes approximately 90 days to be seen for routine care; however, once treatment commences, subsequent appointments are said to occur within a few weeks. Co-pay is not charged when the appointment is generated by the clinic (as opposed to a patient request).

Diagnosis and treatment of periodontal disease is nonexistent. Not only are comprehensive and biennial examinations not informed by periodontal probing and appropriate intraoral x-rays, but oral prophylaxis is not included in the exiguous treatment plans when present.[134,135] To illustrate the dental program's turning a blind eye to periodontal disease, the daily and monthly treatment logs do not have a category for oral prophylaxis and scaling and root planning, procedures that are essential to prevention and early non-surgical treatment of periodontal disease.[136]

Wait times for extractions, fillings, and dentures were four, eight, and 12 weeks, respectively.[137] However, since the dental program neither diagnoses nor treats periodontal disease and provides inadequate examinations for caries that are not informed by intraoral x-rays, the amount of dental disease that should be treated is understated substantially, and the wait times and backlogs are artificially deflated.[138]

## Dental: Intake (Initial) Examination[139]

**Methodology:** Reviewed 11 dental records of inmates that have received recent intake (initial) dental examinations and Administrative Directive 04.03.102 (Dental Care for Offenders).

**First Court Expert Findings**
- Reviewed 10 inmate dental records that were received from the reception centers within the past 60 days to determine if: 1) screening was performed at the reception center and 2) a panoramic x-ray was taken, to insure the reception and classification

---

[133] However, most of the panoramic x-rays taken at the NRC are clinically inadequate and even an adequate x-ray is insufficient to diagnose caries and periodontal disease.

[134] Stefanac SJ. Information Gathering and Diagnosis Development. A panoramic radiograph has insufficient resolution for diagnosing caries and periodontal disease. Intraoral radiographs (e.g., bitewings) and periodontal probing are necessary (p. 17). Also, Periodontal Screening and Recording (PSR), an early detection system for periodontal disease, advocated by the American Dental Association and the American Academy of Periodontology since 1992, is an accepted professional standard. *Id*., pp. 12-14. See American Dental Hygiene Association. Standards for Clinical Dental Hygiene Practice Revised 2016. Periodontal probing is also a standard of practice for dental hygiene.

[135] Makrides et al., p. 560 (Early diagnosis of periodontal disease is important since the disease is often painless and the prevalence of moderate to severe periodontal disease in correctional populations is high and often not associated with pain).

[136] These procedures can be performed by a dentist or dental hygienist, and a dental practice that does not provide these treatments is operating substantially below accepted professional standards.

[137] Dixon Correctional Center Quality Improvement Committee Minutes, October 12, 2017, p. 1.

[138] Providing x-rays for caries, and periodontal diagnosis and treatment consistent with accepted professional standards would require more treatment capacity or the waiting times would increase markedly.

[139] The First Expert Report describes the examination performed at intake screening as a "Screening Examination;" however, Administrative Directive 04.03.102 describes it as a "complete dental examination." We use the terminology of the Administrative Directive and refer to the intake or Initial Dental Examination as a complete dental examination.

policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC.

**Current Findings**

Dental intake examinations have not changed materially since the First Court Expert's Report and remain inadequate. The First Court Expert focused on the initial examination ***process*** (i.e., whether the clinic complied with the Directive 04.03.102), while we focused on the ***clinical domain*** (e.g., quality of the panoramic radiographs). We believe since the Directive 04.03.102 is inadequate, measuring DCC's compliance with it would be unproductive.

Of 11 charts recently received from reception centers, only one panoramic x-ray[140] was of diagnostic quality. Most were washed out, some contained artifacts, and others were improperly aligned. Two were classified IIa for oral surgery.[141]

## Dental: Extractions[142]

**Methodology:** Interviewed dental personnel and reviewed 11 dental and medical records randomly selected from Daily Dental Reports. In none of the 11 records reviewed was the medical history updated. While some medical history forms had markings (e.g., a vertical line suggesting no medical issues), none had the date last reviewed and the dentist's signature.

All the extractions relied on panoramic x-rays; several[143] were more than three years old.[144] Consequently, only five x-rays were clinically adequate.[145] Signed consent forms were present in all charts; however, they did not list the reason the tooth was to be extracted. Furthermore, the clinical progress note in one record did not document the reason for the extraction.[146]

**First Court Expert Findings**

- All dental treatment should proceed from a well-documented diagnosis. In none of the 10 records examined was a diagnosis or reason for extraction included as part of the dental record entry.
- In none of the records was a consent form available. When asked, I was told that it was just not a part of the treatment process for surgery at DCC. This is a serious omission and a major violation of a well-established standard of care.

**Current Findings**

---

[140] Dental: Intake (Initial) Examination Patient #2.
[141] Dental: Intake (Initial) Examination Patient #7: Teeth #3, 13, and 18 were charted IIa for oral surgery but the referral disposition box not marked. Patient #9: Tooth #17 was charted IIa for oral surgery, but referral disposition box not marked. Patient 10: Tooth #19 was charted IIa for oral surgery, but referral disposition box not marked.
[142] The dental assistant said that she requests the medical charts for all scheduled extraction patients.
[143] Extraction Patients #3, 4, 6, and 7.
[144] The only x-ray that shows the roots of #14 is a panoramic x-ray that has no date or other patient information on the label.
[145] Extraction Patients #1, 2, 9, and 11.
[146] Extraction Patient #5.

We concur with the First Court Expert's findings Expert and note that documentation associated with extractions has improved; however, it remains inadequate. Moreover, we identified current and additional findings as follows.

While the First Court Expert found that the diagnosis of the tooth that was extracted was not documented, and consent forms were not present, we found that all 11 records had signed consent forms and all but one chart[147] documented the reason for the extraction.

In none of the 11 records reviewed was the medical history updated. While some medical history forms had markings (e.g., a vertical line suggesting no medical issues), none had the date of last review and the dentist's signature.

All the extractions relied on panoramic x-rays; several[148] were more than three years old.[149] Consequently, only five x-rays were clinically adequate.[150]

## Dental: Removable Prosthetics

**Methodology**: Reviewed eight charts of patients who received partial dentures in the past year selected randomly from the Prosthetics List and interviewed dental staff.

### First Court Expert Findings

- In only two of the five records reviewed on patients receiving removable partial dentures were oral hygiene instructions provided.
- Periodontal assessment was not documented in any of the records. In two of the five records a prophylaxis and/or a scaling debridement was provided.
- Because comprehensive examinations and treatment plans were not documented in any of the records, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, is completed prior to fabrication of removable partial dentures.

### Current Findings

We concur with the First Court Expert and note that removable prosthetics care has not changed materially and remains inadequate. Moreover, we identified current and additional findings as follows.

Of eight patients who received partial dentures, none had a sequenced treatment plan. While the Treatment Needed portion of the chart was marked, there was no date or signature, nor was a treatment sequence indicated. Moreover, none of the treatment was informed by bitewing or periapical x-rays, or periodontal probing. This is not an adequate treatment plan. None had documented oral prophylaxis or oral hygiene instruction.

---

[147] Extraction Patient #5.
[148] Extraction Patients #3, 4, 6, and 7.
[149] The only x-ray that shows the roots of #14 is a panoramic x-ray that has no date or other patient information on the label.
[150] Extraction Patients #1, 2, 9, and 11.

<u>Dental: Sick Call/Treatment Provision</u>

**Methodology:** Interviewed dental staff; reviewed Dental Sick Call Logs, Daily Dental Reports, and reviewed records of 10 inmates who were seen on sick call for dental problems randomly selected from Daily Dental Reports and Sick Call Logs.

**First Court Expert Findings**
- Inmates access dental sick call through either a sick call sign-up process or via the inmate request form. The sick call sign-up takes place in the health services unit every morning. They sign up one day and are seen and evaluated the next day by an RN. The RN then refers the complaint to the dental program and the inmate is scheduled within four to five days.
- Request forms are received from the institution mail, evaluated by the dentist, and scheduled for an examination and evaluation within four to five days.
- No system was in place to attempt to see inmates with urgent care complaints within 24 to 48 hours from the date of the request form. Emergency call-ins from staff are seen the same day.
- In none of the records was the SOAP format used.
- Minimal diagnosis was available for any delivered care. Routine care was not being provided at sick call appointments. The chief complaint, as well as could be determined, was being addressed at sick call.

**Current Findings**
The dental clinic is now closed on Monday, reducing access to care markedly. We concur with the First Court Expert; however, we note that sick call treatment documentation has improved since the SOAP format is now used consistently. Moreover, we identified current and additional findings as follows.

Inmates seeking dental care place a request in a box in the housing unit, send it through prison mail, or communicate directly with staff. Written requests are screened by nursing and referred to the dental clinic for scheduling, and typically staff communicate directly with dental personnel. Since the clinic is closed on Mondays, patients with urgent care issues may have to wait four or five days to be seen by a dentist.

The SOAP format was used for all sick call entries; however, in none of the 10 charts reviewed was the health history updated. There were several instances where treatment was performed without adequate x-rays or a treatment plan.[151]

According to the dental assistant, the dentist reviews charts of newly arrived prisoners and, using the panoramic x-ray that is typically taken at the reception and classification center,

---

[151] Sick Call Patient #4: fillings (teeth #18, 19) done without intraoral x-rays or treatment plan. Patient #5 complained of pain in the right side. The dentist concluded there was no decay and treatment was not indicated. However, intraoral x-rays were not taken, and the most recent x-rays were almost three years old. This is insufficient data to base a diagnosis. Patient #7 had a fractured tooth that was scheduled to be filled without recent intraoral x-rays. The most recent x-rays were dated 4/30/10.

decides whether to place the prisoner on a treatment list. It takes approximately 90 days to be seen; however, once treatment commences, subsequent appointments are within a few weeks. Co-pay is not charged when the appointment is generated by the clinic (as opposed to a patient request).

## Dental: Orientation Handbook

**Methodology:** Reviewed Orientation Manual and related documents.

**First Court Expert Findings**

The Orientation Manual only mentions dental care in relation to co-pays. It describes medical sick call procedures, but no mention is made of dental sick call.

**Current Findings**

Inmate orientation to dental care has improved since the First Court Expert's Report. The First Court Expert found that the orientation manual did not describe how to access dental care. While there are now two orientation manuals for DCC, one for the General Population and for the Special Treatment Center, neither manual addresses access to dental care. There is, however, an adequate description of how to access health care via sick call.

## Dental: Policies and Procedures

**Methodology:** Reviewed Administrative Directives that deal with the dental program. Interviewed dental staff. Reviewed dental charts. Toured dental clinical areas. Reviewed DCC organizational chart.

**First Court Expert Findings**

The Policy and Procedures Manual and statements for DCC only paraphrase the Administrative Directives. It includes nothing specific for DCC and the running of the dental program. When asked, the dental director knew little of its existence and had never reviewed it.

**Current Findings**

Dixon policies and procedures have not changed materially since the First Court Expert's Report. We concur with the findings in the First Court Expert's Report that the Policy and Procedures Manual is inadequate and should be revised. We were provided with institutional directives covering several domains; however, none addressed dental care. There is a binder in the clinic that contains (inter alia) Administrative Directive 04.03.102 (Dental Care for Offenders), blank forms used by the dental program, and an outdated version of the *Illinois Dental Practice Act.* There was an untitled, undated, unsigned policy relating to dentures of uncertain provenance.

## Dental: Failed Appointments

**Methodology:** Reviewed Dental Sick Call log. Interviewed dental staff. Reviewed Daily Dental Reports.

**First Court Expert Findings**

A review of monthly reports and daily work sheets revealed a failed appointment rate of about 10.4%. All failed appointment inmates are required to sign a refusal form. They are all located and brought to the dental clinic to do so.

**Current Findings**

Failed appointments have remained unchanged since the First Court Expert's report. We concur with the findings in the First Court Expert's Report and note that failed appointments are not an area of concern at Dixon. Moreover, we identified current and additional findings as follows.

As noted in the First Expert report, inmates who fail to appear for a dental appointment are located and made to sign a refusal form. This is an excellent practice and should be employed by all IDOC dental programs.

Since the failed appointments are not reported to the CQI Committee or noted in the Daily and Monthly Dental Logs, it is difficult to determine retrospectively; however, it appears not to be a substantial problem.

## Dental: Medically Compromised Patients

**Methodology:** Reviewed health history form and records from recent intake exams. Compared the health history in the dental chart to the medical problem list.

**First Court Expert Findings**

- Because the dental record is maintained in the dental clinic separate from the medical record, identification of medically compromised patients relies on assessment by the clinician and on the history section on the cover of the dental record.
- Of the 10 records reviewed of inmates on anticoagulant therapy, only one was adequately red-flagged to catch the immediate attention of the provider. Four of the records did not indicate that the inmate was on anticoagulant therapy. Five of the records indicated anticoagulant therapy, but they were not sufficiently red-flagged. On one record, treatment was provided and was managed properly.
- When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Current Findings**

Health history documentation for medically compromised patients is unchanged from the First Court Expert's Report and we concur that it is inadequate. Moreover, we identified current and additional findings as follows.

Of the 12 records randomly selected of prisoners who were taking insulin or anticoagulant medication who appeared on the Chronic Care Program Report, the relevant medical condition was not noted in the health history in the dental charts of two patients.[152] There was no

---

[152] Medically Compromised Patients #1 and 11.

documented periodontal assessment and request for follow-up for the diabetics, which is particularly problematic given the relationship between periodontal disease and diabetes.[153,154] Of the patients on anticoagulant therapy,[155] all but one on anticoagulant therapy had it noted on the health history.[156] Health histories were not filled out or updated at last visit in most charts.[157]

## Dental: Specialists
**Methodology:** Interviewed dental staff, reviewed CQI documents, and reviewed dental charts of inmates who were seen by an oral surgeon.

**First Court Expert Findings**
The dental program utilizes the Joliet Oral and Maxillo-facial Surgery group. This case was the only one sent out in the past nine months. It was a large cyst of the body and ramus of the mandible, a very extensive surgery. All other surgeries, including impactions that require removal, surgical extractions, and lesion removals, are done by the dentists at DCC.

**Current Findings**
Oral surgery consultations have not changed materially since the First Court Expert's Report. We agree that oral surgery consultations appear to be adequate. We reviewed the charts of two inmates who were referred to the Joliet Oral and Maxillo-facial Surgery group within the past year. Both cases were extensive, and the referral and treatment provided appeared to be appropriate.

## Dental: CQI
**Methodology:** Reviewed CQI minutes and reports. Interviewed dental staff.

**First Court Expert Findings**
- The dental program contributes monthly statistics to the CQI committee.
- The waiting list for extractions and fillings is eight weeks and for dentures is 12 weeks. These are very reasonable lengths of time. No concern was expressed.
- The dental program recently completed a CQI study that evaluated percentage of required denture adjustments at the time of insertion. The study is under evaluation to see if any changes can be made in the construction or delivery process.
- No other studies are ongoing at the time of this report.

---

[153] Patients #1, 2, 3, 4, 5, 10, and 12. None of the records documented that an oral prophylaxis (prophy) was performed.
[154] See, for example, Herring ME and Shah SK. Periodontal Disease and Control of Diabetes Mellitus. *J Am Osteopath Assoc.* 2006; 106:416–421; Patel MH, Kumar JV, Moss ME. Diabetes and Tooth Loss. *JADA 2013;144(5);478-485* (adults with diabetes are at higher risk of experiencing tooth loss and edentulism than are adults without diabetes); and Teeuw WJ, Gerdes VE, and Loos BG. Effect of Periodontal Treatment on Glycemic Control of Diabetic Patients. Diabetes Care 3 3 :421-427, 2010 (periodontal treatment leads to an improvement of glycemic control in type 2 diabetic patients).
[155] Patient #6, 7, 8, 9, and 11.
[156] Medically Compromised Patient #11.
[157] Medically Compromised Patients #1, 2, 3, 4, 5, 6, 7, 8, 9, and 10.

**Current Findings**

The Dental CQI program has not improved since the First Court Expert's Report. Since dental peer review records and facility reviews were not available to the First Court Expert, it is difficult to compare our findings except with respect to the number of CQI reports.

<u>Peer Review</u>

We asked to see all peer reviews of dentists working at the eight facilities on our site visit schedule and were informed that dentists (unlike other practitioners) are not routinely peer reviewed. According to Attorney Ramage, speaking for Wexford,[158] neither the IDOC contract[159] nor Wexford policy requires that dentists be peer reviewed.[160] He further stated that "[r]outine peer reviews of dentists are not a mandatory standard of NCCHC;"[161] however, he is confuted by the NCCHC, which specifically includes dentist peer reviews in its Clinical Performance Enhancement Standard P-C-02.[162]

Moreover, "Wexford Health has never found a true dentist 'peer review' to be a productive means to determine clinical quality."[163] Finally, it is Wexford's position that the dentist peer reviews are not a part of the community standard.[164] While clinical peer review is not the community standard for dental care in a private practice environment, it is the community standard for institutional care; that is in the military and Department of Veterans Affairs, and Departments of Corrections that have recently emerged from federal monitoring, for example, California and Ohio.[165]

---

[158] Email from Andrew Ramage to Michael Puisis 3/29/2018.

[159] The contract addresses "physician peer review," which applies to the on-site medical director, staff physicians, nurse practitioners, physician assistants, and psychiatrists; however, dentists and psychologists are excluded. Wexford Contract, ¶2.2.2.19 and ¶7.1.5.

[160] However, Wexford Clinical Performance Enhancement Policy P-403 states, "[a] minimum of one annual "peer review" [will be performed] whereby a practitioner's clinical performance is evaluated by a senior or supervising practitioner, and, when necessary, senior practitioners are evaluated by regional/corporate staff. […]" ¶III A3; and "[t]he senior dentist will complete a peer review for each dentist and ensure the completion of the biennial external review for those qualified. The Regional Medical Director will assign a peer reviewer for small contract locations having single or part-time dentists." Wexford Resp. RTP#5, Question 2, p. 0405.

[161] Ramage email, *id*.

[162] "In contrast [to an annual performance review], a clinical performance enhancement review focuses only on the quality of the clinical care that is provided. This type of review should be conducted only by another professional of at least equal training in the same general discipline. For example, an RN should evaluate other RNs and LPNs, a physician should review the work of a physician, and *a dentist should review the work of a* dentist; and "[Clinical Performance the standard requires that the facility's direct patient care clinicians and RNs and LPNs are reviewed annually. Direct patient care clinicians are all licensed practitioners who provide medical, dental, and mental health care in the facility. This includes physicians, dentists, midlevel practitioners, and qualified mental health professionals (psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for mental health needs of patients). NCCHC recognizes that there are many other professions that have licensed practitioners (e.g., dental hygienists) who may be considered direct patient care clinicians. While it is good practice to include these professionals in the clinical performance enhancement process, technically it is not required by the standard. National Commission on Correctional Health Care, Clinical Performance Enhancement (https://www.ncchc.org/clinical-performance-enhancement-1) viewed 3/30/18 (emphasis added).

[163] Ramage e-mail, *id*.

[164] *Id*.

[165] California Department of Corrections Inmate Dental Services Program. September 2014, ¶ 4.3; Ohio Department of Corrections Policy 68-MED-12, ¶ VI B 3.

We were provided with peer reviews of Drs. Crisham (performed 12/30/15) and O'Brien (performed 1/16/17) and were able to locate five of the 20 charts on which the peer review was based. Our findings were consistent with those of the reviewer; however, several critical elements were absent from the checklist, and were not evaluated. Consequently, many of the fundamental flaws we found in the dental care provided at DCC, such as inadequate treatment plans, failure to use bitewing x-rays to inform caries diagnosis, and failure to diagnose and treat periodontal disease, were undiscovered. Dental peer review *as implemented by Wexford and countenanced by IDOC* is poorly designed and is not therefore determinative of clinical quality.

<u>Facility Reviews</u>

We were provided with several facility in which the dental program was deemed to be compliant with the Administrative Directive 04.03.102.[166] However, the Administrative Directive does not address clinical adequacy; so while the findings of the reviews may be useful, they omit the most important domain and provide a false sense of security considering the myriad clinical deficiencies reported by the First Court Expert and confirmed by our inspection.

## Internal Monitoring and Quality Improvement

**Methodology:** Interview facility leadership and staff involved in quality improvement activities. Review CQI Committee meeting minutes, including the Annual Meeting minutes.

### First Court Expert Findings

The First Court Expert found that the only data used for purposes of quality improvement were statistics that served no purpose with respect to quality improvement. There was no documented effort to investigate processes of care or professional performance with an intention of improving the program. The Acting CQI Coordinator had no experience in CQI. The First Court Expert described the CQI program as inactive. He also commented that there was a lack of data (specifically tracking logs) that could be used to determine the timeliness of scheduled services.

The First Court Expert recommended that the program needs CQI leadership that has training in quality improvement philosophy and methodology. He recommended that operational processes and professional performance must be studied. Studying grievances in a meaningful way was recommended. The First Court Expert recommended that this program be used to improve every operational process in the medical program. He recommended use of logbooks to track information for use in studying these processes. He recommended retraining the CQI leadership regarding quality improvement philosophy and methodology as well as study design and data collection. He recommended studying outliers in order to develop targeted improvement strategies.

### Current Findings

---

[166] December 2015 to May 2016, and June 2016 to November 2016. While these purport to be semi-annual reviews, we were not provided with reviews for 2017 and do not know whether the dental program was reviewed since November 2016.

While the First Court Expert described the quality improvement program as inactive, we would describe it as nascent. There has been an effort to initiate quality studies and the HCUA has a desire to improve the program. However, because she acts as the HCUA, CQI Coordinator, supervisory nurse, and director of medical records, she is spread thin and has less than necessary time to devote to this task. While there have been some small improvements, the quality improvement program has a considerable way to go.

There is no CQI coordinator. The HCUA has not had any training in CQI. No one at the site had experience in CQI methodology or implementation. The HCUA did have the IDOC CQI manual. This is the first facility to have this document, which is required in the AD on quality improvement.[167] This document was produced in 1992 and has not been modified since then. Despite its age, this document has some valuable information and gives reasonable instruction on how to set up and maintain a quality improvement program. Because this manual is already available it should be used in the CQI effort, but it is not. This manual should be updated. The apparent effort to train staff on CQI methodology appears nonexistent.

The CQI program is not performing all required studies as stipulated in the ADs. Primary source verification is not done except to verify an existing state license. Offsite services are not reviewed with respect to quality or appropriateness as required by the AD. There is no evidence of 100% review of denials of specialty care in CQI minutes.

Monthly CQI meeting minutes contain very little information. Most of the statistical data provided has no bearing on quality improvement. For example, while listing the number of persons seen in NP, physician, and nursing sick call is useful administratively, it gives no measure of the quality of those visits and gives no information as to whether there is a problem with these processes. The same could be said of most of the statistical information provided in this report. We noted in the Infection Control section of this report that needle sticks and blood borne pathogen data is provided but not analyzed. This misses an opportunity to protect employees and reduce unnecessary needle stick injuries.

As with the prior two IDOC facilities we have reviewed, the CQI plan is a generic plan that gives no specific information on the work that the CQI committee will be engaged in for the upcoming year. The short-range goals for the year were to fill vacancies and to develop an orientation program. Long-term goals were generic goals that did not include identification of problem prone areas of service. The CQI plan needs to be a site-specific plan on what the quality improvement program will be engaged in during the upcoming year with respect to improving care.

The 2016 annual CQI report provided to us contained nine medical studies. One study on diabetes care in mental health patients had no methodology and it was not clear what the

---

[167] AD 04.03.125 Quality Improvement Program page 2 of 10: II.F.1. "The Agency Medical Director shall develop, maintain, and distribute to the facility Health Care Unit Administrators a Quality Improvement Manual. The Health Care Unit Administrators shall maintain the Quality Improvement Manual locally."

study was measuring. Another study that studied 100 patients referred urgently for specialty care was intended to study how many had consultations completed within two weeks. The data was not included, and the results were therefore not provided.

Of the remaining seven studies, five were outcome studies and two were process studies. Four of the five outcome studies were:

- Two studies of whether x-rays were received back timely from the radiologist.
- A study of whether inmates who received education after evaluation for injury then re-injured themselves.
- A study of whether nurse referrals to providers were seen timely.
- A study of whether inmates with poorly controlled hypertension were improved after a year of routine management.

Two of these were true outcome studies; the other two were not outcome studies. Clinical outcomes are end point measures of health status; for example mortality, hospitalization, an HbA1C level of 7 or less, or normal blood pressure. An outcome study measures the effectiveness of interventions based on the ultimate outcome measure. An example would be to study the effect of colorectal cancer screening on colon cancer mortality or the effect of increasing the interval of chronic clinic visits on obtaining a normal blood pressure.

One of the studies at DCC that was an outcome study assessed whether education had an effect on the outcome of re-injury. This study showed that two of 13 individuals re-injured themselves after education. However, the study did not make any analysis of whether the education had an effect or not. The study drew no conclusions, so it was not clear what the purpose of the study was. Also, we question why this topic was chosen when there are so many other important problems at this facility. The second outcome study looked at 10 individuals who were in poor hypertension control. The study looked at their status after a year of typical management to assess whether their degree of control had improved with typical management. Four patients were improved. Four patients were discharged and two patients refused. There was no comment on this study. The sample was so small that its value is questionable. The remaining "outcome" studies were not outcome studies but were performance measures.

DCC studies were mostly measurements of performance. Performance measurement of typical processes are reasonable ways to study job performance, but these are not CQI outcome or process studies. More important, almost none of these studies looked at clinical outcomes or clinical performance, which remains unstudied.

The CQI program appears to make no effort to evaluate the clinical quality of care. We heard complaints from IDOC custody and IDOC health care leadership about the poor quality of physician care. We agree that physician quality is poor, based on mortality reviews and chart reviews. Yet there was no evidence of the CQI program monitoring for this.

The Wexford peer review program is supposed to be a method of evaluating for clinical quality of care. This program is an episode-of-care based system using a single episode of care to

answer up to 10 or 11 discrete questions to determine whether care was adequately provided. These episodes of care are randomly selected. There was one prior peer review of the former Medical Director and two peer reviews of NPs. Virtually all episodes of care were 100% adequate, which given our chart reviews does not accurately reflect what we would consider the status of quality of provider care at this facility.

The medical record documents that are used for these peer reviews are typically not provided. Also, it is not possible to know the context of care when evaluating a single episode of care. In death records that we have reviewed, we noted multiple patients who had considerable weight loss that was not identified, laboratory tests that were recently done that were not reviewed, medical conditions that were not identified or followed up, etc. These problems will not be identified by looking at a single episode of care because the prior orders and problems will not be available for review. We find that using single episodes of care does not work well for this system. Also, because so many physicians have inadequate primary care training, they will not be able to review primary care with a level of expertise that is equivalent to a typical community standard of care. Doctors not trained in primary care are often reviewing other doctors also not trained in primary care. It is not unexpected that few problems are identified.

There is no mortality review at DCC. Monthly and annual CQI minutes list the deaths. A Wexford physician, typically the doctor who cared for the patient, writes a death summary. This is a non-critical summary of events from the perspective of the Medical Director. There is no evidence that anyone is examining deaths to understand if there were quality issues or identified problems that should be addressed to prevent further deaths. Although no one is reviewing deaths in an attempt to prevent further death, we found that of six deaths we reviewed, four were preventable and two were possibly preventable. Details of these deaths are found in the mortality review section of the summary report. The high number of preventable deaths at DCC justifies a robust mortality review process performed by persons not associated with care of the patient.

We found serious problems with clinical medical care at DCC in these reviews, including:
- Multiple episodes of care that failed to follow generally accepted guidelines and multiple episodes of grossly and flagrantly unacceptable care.
- In multiple deaths, each patient lost significant amounts of weight without anyone recognizing that the patient was losing weight. In one of these cases the patient had lost 60 pounds.
- In several patients, significant life-threatening laboratory values were not timely addressed.
- Care for patients with mental health issues was not well coordinated with the mental health staff.
- On multiple occasions, patients who should have been hospitalized or sent to a specialist were not. This underutilization contributed to or resulted in death.

In most cases, these deficiencies related to physician quality; some might have been systemic deficiencies. Untimely specialty care and delayed hospitalization may be a result of  inadequate

physician training or barriers to use of these services by the vendor. The doctors who cared for the patient should not be documenting a death summary. Because they cared for the patient, they have a conflict in reviewing their own care and may be unlikely to find problems when problems exist. For that reason and under these circumstances, mortality review should be conducted by either the Office of Health Services or an external reviewer. The vendor should not be permitted to perform the only mortality review on their own services.

# Recommendations

## Leadership, Staffing, and Custody Functions

**First Court Expert Recommendations**

1. The First Court Expert recommended to make a priority of filling the vacant Medical Director, Health Care Unit Administrator, Director of Nursing, Nurse Practitioner, and seven Correctional Nurse I (RN) positions. *We agree with this. The Medical Director and Health Care Unit Administrator, Director of Nursing, and Nurse Practitioner positions have been filled. However, two nurse supervisor positions, the Director of Medical Records, staff physician, and multiple nursing positions are now vacant. All positions need to be filled. It is critical to fill supervisory positions, but that does not mean that staff positions can remain vacant. A vacancy rate of 23% is unacceptable.*

2. The First Court Expert's recommendation was as follows. Due to concerns regarding non-registered nurses conducting sick call and working outside of their educational preparation and licensed scope of practice, and when all the Correctional Nurse I positions are filled, total registered nursing positions should be evaluated as to the need for additional positions or a reconfiguring of current positions in order to provide an "all RN" conducted sick call process. *We agree with this recommendation, but believe that the nurse staffing, particularly on the infirmary and geriatric units, and the physician budgeted staffing are deficient. For this reason, it is our recommendation to perform a staffing analysis based on the existing service requirements of the program. Staffing should be augmented based on that analysis. The analysis should be based on policy requirements and clinical care requirements of the program.*

**Additional Recommendations**

3. Physicians receiving privileges to practice primary care at this facility must have completed residency in a primary care program. This needs to be inserted in the contract obligations of the vendor.

4. The IDOC contract needs to require that vendor health care managers have training in a health discipline appropriate for their management responsibilities.

5. The current vendor is unable to provide physicians of sufficient training and in sufficient numbers. The IDOC needs to explore alternate avenues to fill physician spots with qualified physicians.

6. This facility needs infection control and quality improvement positions.

## Clinic Space

**First Court Expert Recommendations**

1. Develop and implement a plan to replace the style of beds being used for geriatric patients on the third floor of the medical building.

2. Properly equip designated sick call rooms in the health care unit and X-house.

*We agree with these recommendations.*

**Additional Recommendations**

3. All medical equipment must be inspected, calibrated, and tagged no less than annually by a qualified bioengineering team.

4. Each room used for nurse sick call should be on the first floor of the medical building.

5. Each room must have its own exam table and be properly equipped. The use of two exam tables in the same open room is to be discontinued.

6. Both elevators must be operational at all times.

7. All the beds in the infirmary must be hospital beds with adjustable heights and sections.

8. At least one electrically adjustable hospital bed should be available in the infirmary.

9. The metal beds in the geriatric unit need to be replaced with beds that are safe, can be readily sanitized, and meet the needs of the geriatric population.

10. Additional shower chairs need to be provided in the patient housing areas of the medical building. Existing shower chairs with torn upholstery need to be repaired or replaced.

11. The cracked and missing floor tiles noted throughout the entire medical building are safety hazards for both patient-inmates and medical and correctional staff, and should be expeditiously repaired, replaced, and maintained.

12. The environmental rounds and the deficiencies noted in the monthly Medical Safety and Sanitation Report should be expanded to include the condition of the patient beds, the functionality of the negative pressure infirmary room, the compliance with annual inspection of medical devices, and other clinical space and equipment findings.

## Sanitation

**First Court Expert Recommendations**
The First Court Expert had no recommendations

**Additional Recommendations**

1. Safety and sanitation inspections need to include all areas of clinical space including infirmary beds, ADA units, the geriatric floor, annual inspection of clinical equipment and devices, and all other clinical areas.

2. Maintenance needs to be done to replace missing tiles, rusted vents, cracked walls, and peeling paint.

## Medical Records

**First Court Expert Recommendations**

1. Medical records staff should track receipt of all outside reports and ensure that they are filed timely in the health record. *We agree with this recommendation. This presumes that outside reports are all obtained. We strongly recommend that all outside reports be obtained timely and filed within timeframes required by the IDOC Administrative Directive.*

2. Charts should be thinned regularly, and MARs filed timely. *We agree with this recommendation if a paper record continues to be used.*

3. Problem lists should be kept up to date. *We agree with this recommendation.*

**Additional Recommendations**

4. An electronic medical record needs to be implemented in the IDOC. The difficulty in maintaining and finding paper documents in this system is a systemic barrier to care.

5. If a paper record continues to be used, thinning charts should include carrying forward key diagnostic studies and consultant reports that are important to track the status of the patient's conditions.

## Reception Processing and Intrasystem Transfer

The previous Court Expert's recommendation has been achieved. All newly transferred inmates are brought to the dispensary and screened upon arrival to identify immediate medical needs and reconcile prescribed medications so that treatment can be continued. The next day, these inmates are seen again by nurses who complete an in-depth interview, review the medical record, and initiate the plan of care.[168]

**Current Recommendations**

1. We recommend that health care leadership establish a process to monitor and provide feedback as part of the CQI program. Errors and omissions should be subject to focused study to improve the accuracy of transfer information and continuity of patient care.

2. Written directives of IDOC and Wexford be revised to add responsibility for the sending IDOC facility to accurately complete the Health Status Summary in advance of inmate transfer.[169]

3. When facilities send inaccurate or incomplete information on the intrasystem transfer form they should hear about the mistake from the receiving facility.

## Nursing Sick Call

**First Court Expert Recommendations**

1. Develop and implement a procedure for one style of sick call. *This recommendation has been implemented at DCC.*

2. Develop and implement a plan for an "all RN" sick call process. *We agree with this recommendation.*

3. Develop and implement a plan to assure non-medical personnel do not have access to inmate sick call requests. *This recommendation has been implemented at DCC.*

4. Develop and implement a plan to maintain inmate sick call requests on file. *We agree with this recommendation.*

---

[168] Lippert Report DCC p. 42.
[169] Documents to be revised include the IDOC-Wexford contract, Wexford Policy and Procedure P-118 Transfer Screening, and DCC HCU Policies and Procedure P-118 Transfer Screening.

5. Develop and implement a plan to initiate and maintain a sick call log. *This recommendation has been implemented at DCC.*

6. In the X-House, develop and implement a plan to conduct a legitimate sick call encounter, including listening to the patient complaint, collecting a history and objective data, performing a physical examination when required, making an assessment, and formulating a plan of treatment, rather than the current practice of talking to the patient through a solid steel door and basing treatment on the conversation only. *This recommendation has been implemented at DCC, but the medical record is still not available to the nurse to refer to during the sick call encounter. This must be corrected.*

7. Per Office of Health Service policy, assure sick call encounters are documented in the medical record in the Subjective-Objective-Assessment-Plan (SOAP) style. *We agree with this recommendation and found practices more consistent with this recommendation.*

8. Develop and implement a plan to assure the Office of Health Services' approved, preprinted treatment protocol forms are used at each sick call encounter. *We agree with this recommendation and found practices more consistent with this recommendation.*

9. Develop and implement a plan to ensure each of a patient's complaints are addressed during a sick call encounter, or a prioritization of needs to address future encounters is developed, rather than the current practice of allowing only one complaint per visit. *We agree with this recommendation and did not find any instances of patients being limited to only one complaint per encounter.*

10. Develop and implement a plan of education for all nursing staff which will be conducted by the Medical Director and addresses the following issues:

    a. Assure the patient's complaint is addressed at the time of the sick call encounter.

    b. Assure documentation is complete and, at a minimum, addresses the complaint, duration, history, pain level if applicable, location of pain, location of injury, etc., and collection of complete vital signs including weight, an examination if applicable, and an assessment and plan.

    c. Use of the Office of Health Services approved treatment protocols at each sick call encounter.

    d. When using the protocol, staff must comply with the OTC dosages, as increasing the strength or frequency may take the OTC dosage to an unauthorized prescription dosage.

*We found that there is still significant room for improvement in the quality of nursing sick call. We agree that sick call encounters should include elements a–d above. We do not agree that training conducted by the Medical Director is necessary to accomplish this level of performance. We recommend instead a trended analysis of specific areas that are problematic and a system review of process to identify structural or other barriers to desired performance.*[170]

---

[170] For example, are nurses distracted or rushed during sick call encounters? Do they have all of the equipment and supplies necessary to perform the work? Are the Treatment Protocols clear in guiding the nursing assessment and treatment plan?

11. The nursing department must implement a sick call logbook with fields including date, patient name, patient number, reason for visit, date of clinician appointment, and if cancelled, reason for cancellation and date for the rescheduled appointment. *A sick call log has been implemented. However, the problem of providers seeing patients timely when referred from nursing sick call still exits. Providers also failed to follow up at intended intervals and treatment orders were not carried out. We recommend filling vacant provider positions with qualified practitioners and adding physician positions as described in the recommendations under the heading Leadership, Staffing and Custody Functions.*

**Additional Recommendations**

12. The quality of nursing assessments and the plan of care should be monitored by nursing service as part of the peer review or quality improvement. This should replace Medical Director review.

13. Rooms used for nursing sick call should each have an exam table, equipment, and supplies to conduct a thorough physical assessment without having to move the patient or share equipment.

14. Medical records must be available when the nurse sees patients housed in X-House. This is one example of the benefit of having an electronic health record.

15. The sick call documentation forms should be revised to indicate if the referral is emergent, urgent, or routine. The indicated urgency should be used to schedule provider appointments.

16. Providers should see patients timely according to the urgency of the referral.[171]

17. Revise HCU Policy and Procedure P-103 so that patients in segregation are seen by providers according to the urgency of the referral rather than holding clinic on a single day of the week.

18. Require nurses to assess patients who request sick call for dental pain according to an IDOC Nursing Treatment Protocol.

19. Revise the IDOC Nursing Treatment Protocol for Toothache/Dental Complaints to clarify expectations regarding dental pain, particularly the assessment, factors in determining the urgency of referral, the timeframe to see the dentist, and options to treat pain until seen by a dentist. We suggest accomplishing this by developing separate protocols for dental infection, dental trauma, and dental pain.

# Chronic Care

**First Court Expert Recommendations**

1. There should be a single nurse assigned to the chronic care program to identify, enroll, monitor, and track patients in an organized and comprehensive way.

---

[171] Emergent referrals should be seen immediately, urgent referrals should be seen the same day, and routine referrals seen within 72 hours.

2. Patients with HIV should be enrolled and monitored in the chronic disease program. There should be a system in place to identify medication noncompliance (or other missed doses) and refer those patients to a provider timely.

*We agree with these recommendations.*

**Additional Recommendations**

3. Problem lists in the medical record must be complete and accurate.

4. The care of chronic illnesses must be in accord with national standards of care and the Office of Health Services Chronic Illness Treatment Guidelines.

5. Age-based routine health maintenance, including cancer screening and immunizations for patients with and without medical conditions, must be provided in accord with the United States Preventive Services Task Force (USPSTF) guidelines and other national standards of care.

6. Chronic care visits must address *at every visit* all interrelated medical conditions that impact on the treatment, control, and outcomes of that clinic's specific disease. Strictly focusing on a single specific disease and not addressing other associated clinical problems is not in the best interest of the patient and delays needed interventions.

7. The chronic care providers must regularly document the review of the MAR, the CBGs, nursing and provider sick call notes, and blood pressure readings when they see patients in the disease-specific chronic care clinics.

8. Nursing or quality improvement staff should do monthly medication compliance audits on all patient with HIV, diabetes, chronic anticoagulation, seizure disorders, and other chronic illnesses as needed. The results should be communicated to the providers and to the QIC.

9. The IDOC should develop a plan to shift anticoagulation treatments from Vitamin K antagonists (warfarin) to newer types of anticoagulants that do not require frequent ongoing lab testing to determine the adequacy of anticoagulation. The frequent lab testing and medication adjustments are logistically complicated and put patient-inmates at risk for poor outcomes. Utilizing newer anticoagulation medications that do not require frequent ongoing measurement of the level of anticoagulation should be strongly considered by the IDOC.

10. Patients with selected chronic illnesses including diabetes, hypertension, and hyperlipidemia should have the 10-year cardiovascular risk calculated to determine if they require a HMG CoA-reductase inhibitor (statin drug) at a proper dosage to minimize the risk of myocardial infarction, stroke, and other cardiovascular diseases.

11. Providers should be provided with access to electronic medical references and/or cell phones with internet capability that would allow clinical staff to readily access updated clinical information in their offices and in all clinical service areas. This is the standard of care in the community.

12. DCC and IDOC must establish a process to monitor the status of high-risk patients who refuse chronic clinic appointments during the interval between chronic care clinics. The current practice of not rescheduling chronic care patients who refuse to attend their scheduled appointment until the next chronic care clinic, which may be as long as six

months later, is not in the best interests of the patient or the institution. These patients should be promptly rescheduled based on the urgency of their medical condition.

13. Providers must document any modification of warfarin dosage and the INR result in the patient's progress notes, chronic care notes, or a warfarin log. The current practice of documenting changes in warfarin doses on the INR lab form is a barrier to continuity of care and the communication of this vital clinical decision.

14. Providers must consistently document key clinical information, the performance of indicated examinations, the rationale for clinical decisions and therapy modifications, and any modifications of the treatment plan in the chronic care progress notes.

15. DCC must develop a process to ensure that all patients 50 years of age or older are screened for colon cancer and men 65 years of age or older with a history of tobacco use are screened for abdominal aortic aneurysm (AAA).

16. Uncontrolled Chronic illnesses with problems that appear to be beyond the expertise of the DCC providers are to be referred for specialty consultation.

## Urgent/Emergent Care

**First Court Expert Recommendations**

1. A log book be maintained that contains fields for date, time, patient name, patient number, presenting symptom, where the assessment was performed, and the disposition, including if the patient was returned to the cellhouse or sent offsite. *We agreee with the previous Court Expert and found that such a log is maintained when inmates are sent to the Emergency Department. All onsite emergency response incident reports and critiques are maintained in a binder kept on site and reviewed in the monthly CQI meetings.*

2. When patients are sent offsite, a staff person be assigned responsibility to obtain either the emergency room report or, if the patient was admitted to the hospital, the discharge summary. *We agree with this recommendation.*

3. All patients sent offsite should be brought to the clinic for a nurse to review the relevant documents and ensure the required documents, if not available, are obtained (see recommendation #2) and the patient is scheduled for a follow-up visit with a primary care clinician. *We agree with this recommendation and recommend, in addition, that the follow-up visit be scheduled the next working day.*

4. At the primary care clinician visit, the clinician must document a discussion of the findings and plan. *We agree with this recommendation.*

**Additional Recommendations**

5. Determine if the Health Care Unit is to maintain a trauma bag for mass casualty disaster as specified in DCC ID #04.03.108.

6. Add the expiration dates of medications and solutions kept in the emergency response bags to the equipment checklist to identify products nearing expiration so that they can be replaced.

7. Revise DCC ID #04.03.108 to reduce the number of mass casualty drills required. It should conform to the HCU Policy and Procedure P-112.

8.  A corrective action or improvement plan should be developed based upon the critique of the annual mass casualty drill. Implementation of the plan should be monitored by the CQI Program.

9.  The process or persons assigned to critique emergency responses should be revised to provide meaningful feedback on strengths and weaknesses. This feedback should be reviewed by CQI for trends and areas identified for correction or improvement.

10. All emergency room visits should be reviewed with regard to timeliness, appropriateness of preceding care, accuracy of information in the health record, and continuity of care upon release back to the facility. This should be done by clinical leadership and the QI program.

11. Sentinel events resulting in hospitalization should be monitored by the Office of Health Services to ensure that quality of care is practiced and that the sentinel event was not preventable.[172]

12. Potentially preventable hospitalizations should be monitored by the Office of Health Services to ensure that quality of care is practiced.

## Specialty Consultations

**First Court Expert Recommendations**

1.  The delays in obtaining scheduled offsite services must be eliminated. Wexford must be required, within seven days after verbal approval, to have provided authorization to the UIC coordinator. If the UIC is assigning an appointment date greater than 30 days in the future, an effort must be made to obtain the service locally. After the service has been provided, the patient should be returned through the medical clinic and a nurse should review the paperwork or take steps to obtain it. After the paperwork is obtained, the patient must be scheduled for a follow-up visit with the primary care clinician, who must document the discussion of findings and plan. *We agree with this recommendation. However, certain adjustments should be made for those follow-up appointments that are requested for periods longer than 30 days (for example, when a consultant recommends a six month follow up).*

**Additional Recommendations**

2.  Given the existing problems with the Wexford system of obtaining offsite care, it should be abandoned. Patients are being harmed. Until a system is put in place that protects patients, all referrals by providers should be scheduled without utilization review.

3.  Senior management from Wexford or IDOC needs to obtain medical records from consultants and hospitals on a timely basis.

## Infirmary Care

**First Court Expert Recommendations**

---

[172] A sentinel event is any unanticipated event in a health care setting resulting in death or serious physical injury to a patient not related to the natural course of the patient's disease.

1. Staff the infirmary with a registered nurse 24 hours a day, seven days a week.
2. Educate nursing staff on the need for complete charting, which includes providing a thorough description of a patient's medical condition.
3. Develop and implement a plan to provide an accessible nurse call system for patients who are physically unable to access the current call system and provide for a credible system for those patient rooms with no nurse call system.
4. Establish minimum inventory levels for bedding, linens, and pillows and provide acceptable items which are not torn, threadbare, or frayed.
5. Provide a permanent manned security post within the infirmary.
6. Develop and implement a plan to obtain needed additional equipment as determined by the Medical Director, Health Care Unit Administrator, Director of Nursing, and a nursing staff representative who is routinely assigned to the infirmary.
7. Develop and implement a plan to provide additional institutional radios to the infirmary nursing staff.

*We agree with these recommendations.*

**Additional Recommendations**
8. Provider infirmary admission notes and progress notes should be performed in accord with the timeframes detailed in IDOC policy 04.03.120, Offender Infirmary Services.
9. Provider notes must communicate the rationale for modifications in treatment; list reasonable differential diagnoses; document pertinent histories, physical findings, and symptoms; record clear treatment plans; and write regular comprehensive progress notes that update the status of each and every acute and chronic illness.
10. All Infirmary beds must be functional hospital beds with the capability to adjust the height, head, and foot of the bed, and have operational safety railings. Non-functional infirmary beds put the safety of patient-inmates and staff at risk. At least one electrical bed should be available for use in the infirmary.
11. Physical therapy services must be provided in the infirmary for those patients who cannot be readily moved to the physical therapy treatment room on the first floor of the medical building.
12. Patients whose clinical needs and support of their activities of daily living exceed the capability of the DCC infirmary must be transferred to a licensed skilled nursing facility either in the IDOC or in the community.
13. Given the numbers of elderly patients and the skilled nursing needs that are not now provided, the IDOC should perform a statewide analysis of its geriatric needs and develop a plan that ensures safe housing in an appropriate level of care for this population. Based on a review of this facility it appears that IDOC needs a new skilled nursing unit. But this effort should not be undertaken before an analysis of the need is completed.

## Pharmacy and Medication Administration

The First Court Appointed Expert made no recommendations concerning pharmacy and medication administration.

**Current Recommendations**

1. Adopt a computerized provider order entry (CPOE) program to eliminate handwritten orders. Replace handwritten transcription of orders to the MAR with printed labels after the pharmacy has reviewed and verified the order. Medications which must be started urgently may be transcribed in handwriting onto the MAR. When the label arrives, it should be affixed to a new line on the MAR and documentation continued on the new line.

2. Evaluate continuity of care with respect to prescription medication for chronic illness.[173] Included in this review should be whether there is a progress note written to correspond with the order describing rationale and plan of care regarding prescription medication. The results of these reviews should be reported and analyzed in CQI. The Regional Medical Directors need to review these CQI efforts and provide coaching and feedback to the providers.

3. Order implementation should take place within 24 hours. Adopting CPOE eliminates delays in treatment resulting from not transcribing orders timely.

4. Medication should be administered in patient specific, unit dose packaging. The practice of pre-pouring should be eliminated in GP and STC, as well as the multiuse envelopes in STC.

5. The MAR should be used by the nurse to verify that the medication, dose, and route of administration is correct immediately before giving the medication to the patient. The nurse should have the MAR available to answer any questions or concerns the patient has about the medication.

6. Medication should be documented on the MAR at the time it is administered.

7. Printed labels should be provided to place on the MAR when a new order is dispensed. Orders should not be handwritten on the MAR unless it is a medication to be given immediately.

8. A system for timely renewal of chronic disease and other essential medications should be developed.

9. Nurses should refer any patient who does not receive three consecutive doses of medication critical in managing a chronic disease (insulin, Plavix, factor H, HIV medication, antirejection medications, etc.) to the treating provider. The treating provider should meet with the patient and determine if treatment can be modified to improve adherence.

10. Patient adherence with KOP medications prescribed to treat chronic disease should be monitored at regular intervals (monthly by nursing and by the provider at each chronic disease visit).

11. Revise the policy and procedure for medication administration to provide sufficient operational guidance to administer medications in accordance with accepted standards of nursing practice.

12. The CQI program should develop, implement, and monitor quality indicators related to pharmacy services and medication administration.

---

[173] National Commission on Correctional Health Care (2014) Standards for Health Services in Prisons. E-12 Continuity and Coordination of Care During Incarceration. p. 93.

13. Root cause analysis and corrective action plans should be used to target the causes of performance that is below expectations. Corrective action should consider system improvements such as computerized provider order entry, use of bar coding, patient specific unit dose packaging, EMAR, etc., to support desired performance.

# Infection Control

**First Court Expert Recommendations**

1. Develop a position description and name an Infection Control Registered Nurse (IC-RN). *We agree with this recommendation.*

2. Develop and implement a plan for the IC-RN to conduct monthly documented safety and sanitation inspections focusing at a minimum on the health care unit, infirmary, and dietary department, with monthly reporting to the Quality Improvement Committee (QIC). *We agree with this recommendation.*

3. Develop and implement a plan for the IC-RN to monitor food handler examinations and clearance for staff and inmates. *We do not agree with this recommendation. A medical examination of persons to work as a food handler is not necessary because it only represents that individual's condition on the day of the exam and is not predictive of future illness or disease that would contradict working as a food handler. Instead, we recommend that staff and inmates working in food service be trained and pass an examination on proper food handling techniques, sanitation procedures, and what health conditions need to be reported to the food services supervisor.*

4. Develop and implement a plan for the IC-RN to monitor compliance with initial and annual tuberculosis screening, with monthly reporting to the QIC and facility administration as needed. *We agree with this recommendation.*

5. Develop and implement a plan to aggressively monitor skin infections and boils, and work jointly with security and maintenance staff regarding cellhouse cleaning practices, with monthly reporting to the QIC and facility administration as needed. *This recommendation has been accomplished with regard to MRSA infection. Reporting and surveillance should be expanded to include skin infections in addition to MRSA.*

6. Develop and implement a plan to daily monitor and document negative air pressure readings when the room(s) are occupied for respiratory isolation, and weekly when not occupied. *This recommendation has been accomplished. However, the room air exchange monitor does not work, and parts are no longer available. Staff use the tissue test to monitor air flow. An HVAC expert should evaluate negative airflow in the room annually.*

7. Develop and implement a training program for healthcare unit porters which includes training on blood-borne pathogens; infectious and communicable diseases; bodily fluid clean-up; and proper cleaning and sanitizing of infirmary rooms, beds, furniture, toilets, and showers. *This recommendation has been partially accomplished. Apparently, training has been developed, but porters are assigned work before this training is completed. We agree that porters should be trained and vaccinated before being assigned work in the infirmary.*

8. Monitor all sick call areas to assure appropriate infection control measures are being used between patients, i.e., use of paper on examination tables which is changed between patients or a spray disinfectant is used between patients, examination gloves are available to staff, and hand washing/sanitizing is occurring between patients. *We agree with this recommendation.*

9. Develop and implement a plan to monthly monitor all patient care associated furniture, including infirmary mattresses, to assure the integrity of the protective outer surface, with the ability to take the furniture out of service and have repaired or replaced as needed. *We agree with this recommendation. Safety and sanitation inspections take place monthly, but items that need to be repaired or replaced are not taken out of service.*

10. Interface with the County Department of Health and Illinois Department of Health and provide reporting as required by each department. *This recommendation has been accomplished.*

**Additional Recommendations**

11. Infections and communicable disease data should be analyzed and discussed as part of the monthly and the annual CQI meetings. This should include discussion of trends, updates from the CDC, and review of practices. For example, employee exposures to blood borne pathogens, such as the needlestick injuries in 2017, should be analyzed by CQI with consideration of alternate systems, products, and methods to reduce potential injury.

12. Track and report skin infections due to all pathogens, not just MRSA, including infestations with scabies or body lice.

13. Update the IDOC Infection Control Manual now and at least every two years.

14. Airborne Infection Isolation (AII) rooms need to be regularly serviced, inspected by knowledgeable individuals, and monitored regularly. The maintenance of adequate air changes and pressure should be documented on a log specifically as part of the infection control program.

15. The cracked and missing floor tiles noted throughout the entire medical building interfere with the proper cleaning and sanitation and create infection control hazards for both patient-inmates and medical and correctional staff and should be expeditiously repaired, replaced, and maintained.

# Radiology Service

No recommendations.

# Dental Program

## Dental: Staffing and Credentialing
**First Court Expert Recommendations**

1. Hire a dental hygienist immediately. We agree with this and specify that the dental hygienist should be full-time. *We agree with this recommendation.*

**Additional Recommendations**
2. Dentist staffing should be increased to 2.0 FTEs.
3. Dental assistant staffing should be increased to 2.5 FTEs.
4. All dental assistants should be qualified to take intraoral x-rays.
5. The clinic should be open for patient treatment five days per week.
6. Dentists' hours should coincide with patient availability.
7. Dentist and dental assistant schedules should be coordinated so that dentists are not treating patients when an assistant is not available.

## Dental: Facility and Equipment
**First Court Expert Recommendations**
1. Repair or replace the chair and unit that is not working. *We agree with this recommendation.*

**Additional Recommendations**
2. Purchase an ultrasonic scaler.
3. Repair the faulty foot pedal controls on all sinks. If repair is not feasible, the sinks should be replaced.

## Dental: Sanitation, Safety, and Sterilization
**First Court Expert Recommendations**
1. Sterilization flow to the autoclave should be from dirty to sterile in a linear fashion; from ultrasonic to sink to work area to autoclave.
2. Safety glasses should be provided to patients while they are being treated.
3. That a biohazard warning sign be posted in the sterilization area.
4. A warning sign should be posted in the x-ray area to warn pregnant females of radiation hazards.

*We agree with these recommendations.*

**Additional Recommendations**
5. The clinic should obtain a stethoscope and a sphygmomanometer.

## Dental: Review Autoclave Log
**First Court Expert Recommendations:** None.

**Additional Recommendations**: None.

## Dental: Comprehensive Care
**First Court Expert Recommendations**

1. Comprehensive "routine" care should be provided only from a well-developed and documented treatment plan.
2. The treatment plan should be developed from a thorough, well documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. In all cases, that appropriate bitewing or periapical x-rays be taken to diagnose caries.
4. Hygiene care should be provided and documented as part of the treatment process.
5. Care should be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. All record entries should include date and time.

*We agree with these recommendations.*

**Additional Recommendations**

7. The health history should be updated and signed at all biennial exams.
8. A periodontal probe should be added to a mirror and explorer in all examination packs.
9. All prisoners who arrive from a reception center should receive a comprehensive exam within 30 days.
10. The daily and monthly log forms should be amended to include oral prophylaxis and scaling and root planing.

## Dental: Intake (Initial) Examination
**First Court Expert Recommendations**
Although no recommendations were made, the First Court Experts did not review the quality of the panoramic x-rays or the disposition of potential urgent care issues noted at intake.

**Additional Recommendations: None.**[174]

## Dental: Extractions
**First Court Expert Recommendations**
1. A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished through the use of the SOAP note format, especially for sick call entries. It would provide much detail that is lacking in most dental entries observed.
2. A consent form be developed and signed by the patient and the dentist. That the procedure and any potential complications be well explained to the patient. While all records contained signed consent forms, we recommend that the consent forms specify the reason for the extraction.

*We agree with these recommendations.*

**Additional Recommendations:**
3. The heath history should be updated before a tooth is extracted.
4. Teeth should not be extracted without clinically adequate x-rays.

---

[174] We address the inadequacy of the panoramic x-rays in the NRC report.

## Dental: Removable Prosthetics
**First Court Expert Recommendations**

1. A comprehensive examination and well-developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, precede all comprehensive dental care, including removable prosthodontics.
2. Periodontal assessment and treatment should be part of the treatment process and that the periodontium should be stable before proceeding with impressions.
3. That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

*We agree with these recommendations.*

**Additional Recommendations:** None.


## Dental: Sick Call/Treatment Provision
**First Court Expert Recommendations**.

1. Implement the use of the SOAP format for sick call entries. It will assure that the inmate's chief complaint is recorded and addressed, and a thorough focused examination and diagnosis precedes all treatment. *We note that all the sick call records we reviewed used the SOAP format.*
2. Daily dental sick call should be seen and evaluated by the dentist, rather than through the medical program. *We do not agree with this recommendation. Instead, we recommend that nurses triage all requests for dental care. Non-urgent requests (cleaning, routine exams, fillings, etc.) should be sent to the dental clinic for scheduling. All other dental complaints should be assessed at nursing sick call, treated for pain as needed, and referred to the dentist based upon clinician urgency.*
3. Requests from inmates with urgent care complaints should be scheduled for the next work day from receipt of the nursing referral from sick call. *We agree with this recommendation.*
4. Efforts should be made to see urgent care complaints via the request form in a timelier manner. They could easily be scheduled for the next day. Sick call sign-ups are seen the following day by RNs who have pain medication protocols available. Dental sick call signups should be scheduled directly by dental for the following day, rather than by the RN who then refers them to dental. *We do not agree that urgent complaints should be scheduled directly by the dental service. Only requests for routine (non-urgent) care should be scheduled by the dental service.*

**Additional Recommendations**

5. RNs should perform face-to-face examinations on patients with complaints that suggest pain or infection and refer or palliate per protocol. Nurses should refer patients to the dentist according to criteria for urgency established in the treatment protocol.
6. The health history should be updated at each clinical encounter.


## Dental: Orientation Handbook

**First Court Expert Recommendations**
1. Amend the orientation manual to include dental sick call procedures and instructions on how to access routine, urgent and emergency care. *The recommendation is moot since recent revisions adequately address sick call procedures and access to health care.*

**Additional Recommendations:** None.

Dental: Policies and Procedures
----

**First Court Expert Recommendations**
1. The dental program should develop a current detailed, thorough, and accurate policy and procedures manual that define show all aspects of the dental program are to be run, to include access to care, care provision, clinic management, infection control, etc. Once developed, it should be reviewed and updated on a regular basis and as needed for new policies and procedures. *We agree with this recommendation.*

**Additional Recommendations**
2. The Dental Program Binder should be reviewed and updated.

Dental: Failed Appointments
----

**First Court Expert Recommendations**
1. Failed appointment percentages are slightly high and should be watched. We agree with this recommendation.

**Additional Recommendations**
2. Failed appointment percentages should appear on the Monthly Dental Logs and be reported to the Quality Improvement Committee.

Dental: Medically Compromised Patients
----

**First Court Expert Recommendations**
1. The medical history section of the dental record should be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider. These would include medication allergies, anticoagulants, interferon therapy, pre-medicated cardiac conditions and any other health condition that would require medical intervention prior to dental treatment.
2. That blood pressure readings be routinely taken of patients with a history of hypertension, especially prior to any surgical procedure.

*We agree with these recommendations.*

**Additional Recommendations**
3. Diabetics diagnosed with periodontal disease should be offered an oral prophylaxis every six months and non-surgical periodontal treatment (i.e., scaling and root planing) if clinically indicated as part of the chronic care program.

<u>Dental: Specialists</u>
**First Court Expert Recommendations**

None. Specialists are available and utilized.

**Additional Recommendations:** None.

<u>Dental: CQI</u>
**First Court Expert Recommendations**
1. The CQI process should be used extensively to address the program deficiencies outlined in the body of this report. Policies and procedures should be developed from this process to ensure that measures are in place to maintain program continuity and improvement. *We agree with this recommendation.*

**Additional Recommendations**
2. Annual dentist peer reviews should be implemented immediately.
3. The dentist peer review form should be modified to focus on substantive aspects of clinical care such as diagnosis, treatment planning, the appropriate use of periodontal probing and x-rays, and the treatment of periodontal disease.
4. Facility reviews of the dental program should be performed semi-annually. They should encompass clinical aspects of the dental program and be reviewed by a disinterested dentist.

## Internal Monitoring and Quality Improvement

**First Court Expert Recommendations**
1. This program must be recreated and provided the leadership that has had training in quality improvement philosophy and methodology. The program should focus on both process improvement and professional performance improvement as well as grievance responses. The program must be used to improve intrasystem transfers, both nurse and provider sick call, the chronic care program, infirmary care, unscheduled services care, scheduled offsite services care, medication administration, grievances, infection control, dental services, and mental health services. This program requires the use of logbooks for tracking capabilities for both intrasystem transfers, sick call, infirmary care, chronic care, unscheduled services care, scheduled offsite services, and grievances.
2. The leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.
3. This training should include how to study outliers in order to develop targeted improvement strategies.
*We agree with these recommendations.*

**Additional Recommendations**

4.  We recommend that the current peer review program of Wexford be revised. The Office of Health Services or outside reviewers should monitor physician performance for sentinel event reviews and mortality reviews. Standardized professional performance evaluations by Wexford should focus on whether the patient's care over a span of time was adequate and resulted in an expected outcome. The professional performance evaluation should be related to privileges granted at re-credentialing.

# Appendix A

**DCC Staffing as of 4/5/18**

| Position | Budgeted positions | Vacancies | LOA long-term | Effective vacancies | State or Wexford |
|---|---|---|---|---|---|
| Health Care Administrator | 1 | 0 | 0 | 0 | State |
| Director of Nursing | 1 | 1 | 0 | 1 | State |
| Medical Director | 1 | 0 | 0 | 0 | Wexford |
| Medical Record Director | 1 | 1 | 0 | 1 | State |
| Physician | 1 | 1 | 0 | 1 | Wexford |
| Nurse Practitioner | 2 | 0 | 0 | 0 | Wexford |
| Nursing Supervisor | 2 | 1 | 0 | 1 | State |
| Nursing Supervisor | 1 | 0 | 0 | 0 | Wexford |
| RN | 48 | 10 | 1 | 11 | State |
| LPN | 10 | 2 | 1 | 3 | Wexford |
| Certified Nurse Assistant | 6 | 1 | 1 | 2 | Wexford |
| Pharmacy Tech | 1 | 0 | 0 | 0 | State |
| Medication Room Assistants | 3 | 0 | 0 | 0 | Wexford |
| Chief Dentist | 1 | 0 | 0 | 0 | Wexford |
| Dentist | 0.4 | 0 | 0 | 0 | Wexford |
| Dental Assistant | 1 | 1 | 0 | 1 | State |
| Dental Assistant | 1 | 0 | 0 | 0 | Wexford |
| Office Coordinator | 1 | 0 | 0 | 0 | State |
| Health Information Assistant | 1 | 1 | 0 | 1 | State |
| Staff Assistants | 7 | 0 | 0 | 0 | Wexford |
| Phlebotomist | 1 | 0 | 0 | 0 | Wexford |
| Optometrist | 0.2 | 0 | 0 | 0 | Wexford |

| | | | | | |
|---|---|---|---|---|---|
| Physical Therapist | 0.2 | 0 | 0 | 0 | Wexford |
| Physical Therapy Assistant | 1 | 0 | 0 | 0 | Wexford |
| Radiology Technician | 1 | 0 | 0 | 0 | Wexford |
| | 93.8 | 19 | 3 | 22 | |

*The Director of Nursing will be filled on 4/16/18.

**One of the filled nursing supervisor positions will be vacant beginning 4/16/18.

PTX193-0273

# Logan Correctional Center

# 2nd Court Appointed Expert Report

# Lippert v. Godinez

Visit Date:  April 23, 2018 – April 26, 2018

Prepared by the Medical Investigation Team

Mike Puisis, DO
Jack Raba, MD
Madie LaMarre MN, FNP-BC
Catherine Knox, RN, MN, CCHP-RN
Jay Shulman, DMD, MSPH

PTX193-0274

# Table of Contents

Overview ................................................................................................................................... 2

**Executive Summary** ................................................................................................................ 2

**Findings** ................................................................................................................................. 6
    Leadership, Staffing, and Custody Functions ................................................................. 6
    Clinic Space, Sanitation, and Support Services ............................................................. 8
    Sanitation ....................................................................................................................... 15
    Medical Reception ......................................................................................................... 16
    Nursing Sick Call ............................................................................................................ 18
    Medical Records ............................................................................................................. 21
    Urgent/Emergent Care .................................................................................................. 23
    Specialty Consultations ................................................................................................. 29
    Pharmacy and Medication Administration ................................................................... 38
    Infection Control ............................................................................................................ 42
    Radiology Services ......................................................................................................... 45
    Infirmary Care ................................................................................................................ 46
    Chronic Care ................................................................................................................... 53
    Women's Health ............................................................................................................ 66
    Dental Program .............................................................................................................. 70
    Internal Monitoring and Quality Improvement Activities ............................................ 83

**Recommendations** .............................................................................................................. 87
    Leadership, Staffing, and Custody Functions ............................................................... 87
    Clinic Space, Sanitation, and Support Services ........................................................... 87
    Medical Reception ......................................................................................................... 88
    Nursing Sick Call ............................................................................................................ 88
    Medical Records ............................................................................................................. 89
    Urgent/Emergent Care .................................................................................................. 90
    Specialty Consultations ................................................................................................. 90
    Pharmacy and Medication Administration ................................................................... 91
    Infection Control ............................................................................................................ 92
    Radiology Services ......................................................................................................... 93
    Infirmary Care ................................................................................................................ 93
    Chronic Care ................................................................................................................... 94
    Women's Health ............................................................................................................ 95
    Dental Program .............................................................................................................. 96
    Internal Monitoring and Quality Improvement ........................................................... 100

**Appendix A** ......................................................................................................................... 102

**Appendix B** ......................................................................................................................... 103

**Appendix C** ......................................................................................................................... 104

# Overview

From April 23 through April 26, 2018, the Court Expert team visited the Logan Correctional Center (LCC). This report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank the Warden and staff for their assistance and cooperation in conducting the review.

LCC is the woman's reception center for the State of Illinois. This facility was opened in 1978. LCC was meant to hold 1,106 individuals but now holds 1806 females and is at 163% of rated capacity. In 2013, Logan became a female-only facility.

# Executive Summary

Based on a comparison of findings as identified in the First Court Expert's report, we find that dental care is improved and there were improvements in access to care, but all other areas were either the same or worse than the First Court Expert's findings. Clinical care in all areas of record reviews appeared worse, and in some cases resulted in harm. Medication management was much worse than described in the previous report. Although there is an electronic medical record, it is incompletely implemented. We find that overall, the Logan Correctional Center (LCC) is not providing adequate medical care to patients and there are systemic issues that present ongoing risk of harm to patients and result in preventable morbidity. The deficiencies that form the basis of this opinion are provided below.

The Wexford supervisory nurse is dedicated to business duties related to the Wexford contract instead of being responsive to her role as supervisory nurse. This problem has been ongoing since the First Court Expert's report. The HCUA has too many responsibilities. Her responsibilities include HCUA at LCC, acting Regional Coordinator for the central region, infection control nurse, Continuous Quality Improvement coordinator, and nurse supervisor. LCC has only one supervisory nurse, making nurse supervision ineffective. This is compounded by lack of collaboration between IDOC leadership and Wexford leadership at this site. A physician position has been vacant for so long that it is now filled with a nurse practitioner position and the responsibilities of the Medical Director are such that she completes her notes at home after normal work hours. There have been five doctors at LCC over the past four years. Though there is only a 2% vacancy rate for the 53.15 positions, LCC had the lowest staffing rate per thousand inmates of all the facilities we visited. LCC had 30% less staffing per thousand inmates than NRC, the IDOC male intake facility, even though females require more testing evaluations than males.

**PTX193-0276**

Clinic space was inadequate. LCC used to be a medium security male facility and was not built with the intention of serving as the main female intake center and main female facility. As a result, there are inadequate numbers of examination rooms. There is insufficient equipment, including a lack of microscopes for analyzing specimens for yeast and trichomonas infections, a safe and functioning medical vehicle, a functioning colposcope, automated external defibrillators (AED), and physical therapy equipment. The health units were generally clean and well organized. Emergency response bags need to be inventoried and sealed. Negative pressure rooms need to be monitored and logs for this purpose need to be maintained. Safety and sanitation rounds need to include inspection of medical equipment, medical rooms including negative pressure rooms, emergency response bags, and the training of porters. This is not currently part of the sanitation rounds.

Intake evaluations do not include a thorough review of systems. The clinic where intake evaluations occur does not have a microscope, which limits the ability to perform a thorough examination related to vaginal infections. Because of the process of documenting medication administration, it is not clear whether medication ordered in the intake area is actually provided to the patient. Despite having identified these deficiencies, we found that the physician assistant working in this area performed very well. He was thorough and conscientious, and we were impressed with his work.

Access to care had some improvements, but some deficiencies identified by the First Court Expert remained. Many, but not all, patients had timely access to care; there are a high percentage of no shows and refusals to nurse sick call, without effort to determine the reason. Providers do not consistently evaluate patients with medical conditions identified by nurses. Instead, providers treat patients by remote orders without examining the patient. This is inappropriate.

LCC uses an electronic medical record, but this record was only partly implemented and is therefore ineffective in supporting the clinical program. Medication administration is not electronically recorded. Obstetrical records are maintained on paper and not integrated into the electronic record. Problem lists are improperly maintained. Problem lists include symptoms or undiagnosed findings, which are not diagnosed problems. Because of this, there is no official problem list we could identify used with this electronic medical record. There are insufficient computer terminals to log onto the medical record, particularly on the infirmary, and providers have to write their notes in an area where they are not examining the patient. This promotes bad practice. We also noted that the electronic medical record has a feature that transfers week-old vital sign information into a later note. This feature should be disabled, as all clinical encounters need *current* vital signs. The data in the electronic record has not been able to be used in obtaining data for quality improvement purposes. We also note that the electronic

medical record appears to have encouraged cut and pasted notes,[1] which is improper documentation.

Unscheduled nursing evaluations are now tracked on a nursing sick call log. We found that licensed practical nurses (LPN) and registered nurses (RN) were independently managing patient medical conditions when they should have referred to a physician. This included providing medications to patients and evaluating serious medical conditions that needed to be evaluated by a licensed provider.

We found in four of six hospitalized patients that there were delays in diagnosis because of untimely referral for higher level care. Two of these delays were extended (10.5 and 11 months). One likely resulted in dissemination of colon cancer. Four of six hospitalized patients did not have hospital records, so it was not possible to determine what occurred at the hospital.

We found that specialty care fails to protect patients and the current system of obtaining specialty care should be abandoned, based on patient safety concerns. Tracking of specialty consultations is not based on requirements of the IDOC. Referral dates are not tracked unless a consultation is completed. We noted multiple denials of referral, even when physicians did not appear to know how to manage the patient's problem. We noted one patient who appeared to not have rheumatoid arthritis, yet was being treated for several years with high dose steroid for presumed rheumatoid arthritis, medication that was causing harm. When the patient finally went to a rheumatologist, the rheumatologist noted no findings consistent with rheumatoid arthritis and recommended decreasing the steroid medication. This was not done and follow up with the rheumatologist stopped. We noted several other patients who sustained harm as a result of lack of follow up or referral to appropriate specialty care.

We found systemic issues related to pharmacy and medication administration. The medication room was dirty and there were opened yet undated vials of medications as well as expired medication. Medication assistants working in the pharmacy are unlicensed and were only provided on-the-job training, but deliver hundreds of keep-on-person (KOP) medications to patients on a daily basis, often without documenting onto a medication administration record (MAR). Observation of medication administration showed it was unhygienic. Similar to other facilities, nurses pre-pour medications into improperly labeled envelopes and administer medications without simultaneously recording administration. Patients are not positively identified by the nurse prior to administration of the medication. Keep-on-person (KOP) medications are delivered to patients without consistent documentation in the medical record. Some medication administration records (MAR) were absent in 10 of 10 records reviewed and several of these patients had MARs showing that they did not receive ordered medication. MARs are not timely scanned into the EMR. We found other deficiencies, including orders not

---

[1] Cut and pasted notes in an electronic medical record consist of copying a section or entire record of a prior note and pasting that copied section into a more current evaluation document. Every episode of care should be documented with information obtained during that episode of care.

being transcribed to the MAR, nurses documenting continuation of medication after it had been discontinued, and improper documentation on MARs.

LCC has no budgeted infection control staff. We noted that deficiencies identified on safety and sanitation reports are sometimes not addressed, repeatedly. Inmate porters have not received training and have no evidence of being vaccinated for hepatitis A or B. Negative pressure rooms were not functional on the first day of our visit, suggesting that they are not being routinely monitored. Paper barriers are not in evidence in all examination areas. The washer used to launder infirmary linen still operates with water below acceptable temperature.

Radiology services are timely and there is no backlog. Access to this service is good. Equipment appears to be in compliance with state regulations. We had concerns about the safety of the radiology technician with respect to panorex films, as this unit does not have typical shielding, and we question whether the technician is receiving unnecessary radiation exposure.

The infirmary was clean and organized. The infirmary lacked sufficient electronic devices for entering information into the electronic medical record. This forced some staff to write their notes at a later time or in other locations. The physician wrote some infirmary notes on a routine basis well after hours and in one case over a week after the clinical event. This is inappropriate and will lead to errors. Not all shifts on the infirmary were covered by an RN. Weights are not tracked well at LCC, resulting in delays in initiating diagnostic testing. Patients on the infirmary in need of specialty care often do not receive it. The use of antibiotics appears excessive and not in line with typical standards of care, and appear guided by presumptive diagnoses rather than an accurate diagnosis supported by diagnostic testing. We view this as a lack of ordering appropriate diagnostic testing and referral. We could not consistently find consultation reports for infirmary patients.

Chronic care patients are seen in a separate clinic encounter for each of their chronic illnesses. For primary care this is inefficient, results in duplicative documentation, promotes lack of attention to interactions between various diseases, and drug-drug interactions. Patients should be evaluated for all of their conditions at one time and based on the degree of control of their illness, not on an inflexible schedule. For hepatitis C, viral load testing is not performed in accordance with IDOC hepatitis C guidelines. As with other facilities, LCC does not adhere to contemporary standards of lipid management, immunization, or colorectal cancer screening. Providers lack access, at the point of care, to electronic references. We noted problems in record reviews related to chronic disease management.

There are insufficient providers to provide female specific care. Care of the pregnant females was generally of good quality. Of 11 records of pregnant females, only one had not been timely evaluated. However, we note that pregnancy has such high risk potential that all patients must be timely evaluated. Referral to a high-risk OB center was in place and appeared to function well. Screening Pap smears and mammograms were mostly done, but rates could be improved. We note that Pap smears for HIV infected women do not occur at the recommended frequency. We attribute lower than desired screening rates to insufficient staffing and monitoring.

Microscopy is not used in diagnosis of vaginal infections (trichomonas, yeast, and bacterial vaginosis). Presumably, this is done presumptively, which is not the standard of care.

The dental program has improved marginally since the First Expert Report due to the introduction of the electronic health record. Routine treatment is timely but inadequate, since it is not informed by a comprehensive oral examination (i.e., intraoral x-rays, a periodontal assessment, and a treatment plan). Adequate soft tissue oral cancer examinations are not performed at the reception screening and are not documented at biennial examinations. The failures of the dental program documented in this report place patients at risk of tooth loss by fostering widescale underdiagnosis and under-treatment of caries and periodontal dental disease. The program remains below accepted professional standards and is not minimally adequate.

The quality improvement program has no one who is trained in quality improvement methodology and no one specifically assigned to perform quality improvement work. The Quality Improvement Plan was inadequate. There was a lack of understanding of the difference between outcome and process studies. There was no critical evaluation of data obtained for the program. Mortality reviews did not include critical analysis and failed to identify correctable problems with care.

# Findings

## Leadership, Staffing, and Custody Functions

**Methodology:** We interviewed medical and custody leadership, reviewed staffing documents, and other pertinent documents.

### First Court Expert Findings
The Director of Nursing (DON) position was vacant, significantly impacting the workload of the Health Care Unit Administrator (HCUA). The HCUA and Medical Director positions were filled with capable persons. The First Court Expert found that there was a strong leadership team in place and the Warden was supportive. The Assistant Warden of Programs was a nurse. The Medical Director was conscientious. There were 62.21 positions, with a 6% vacancy rate. The HCUA was also acting DON and acted as the infection control nurse.

### Current Findings
There was no significant change compared to the findings of the First Court Expert. LCC now has a HCUA, Medical Director, and DON. The HCUA has been in her position since the time of the First Court Expert's visit. She is experienced, but similar to the First Court Expert findings, has too many responsibilities. She is the HCUA at LCC, is filling in as the IDOC Central Regional Coordinator, is the LCC Continuous Quality Improvement Coordinator, covers as the infection control nurse at LCC, and also provides some nurse supervision. It is not possible to effectively manage all those responsibilities.

Nursing supervision is inadequate. The Schedule E has no DON position, but recently a DON position was created and has been recently filled. Prior to this position being filled, the Wexford supervisory nurse was the only nurse supervisor. However, the supervisory nurse, according to the HCUA, spends much of her time performing business duties as the Wexford site manager and is not supervising nurses. For this reason, a DON position was created. The Schedule E nursing supervisor positions will apparently continue to perform business duties. The lack of participation in nursing supervision by the Wexford supervisory nurse has increased the work of the HCUA. This is made worse because the HCUA cannot schedule or discipline nurses, who are all Wexford staff. The HCUA told me that whichever nurse is assigned to respond to emergencies (referred to as the desk nurse) is the effective nurse supervisor. This is not effective supervision. The new Wexford DON and nursing supervisor were both ill and not present during our visit; therefore, we were unable to speak with them.

We were impressed by the enthusiasm and dedication to improvement of the HCUA and the direction she has provided to the program. However, her work has not yet been complemented by coordination with Wexford leadership staff. The reasons for this are unclear, but do appear to affect the program. The absence of apparent collaboration between the HCUA at this facility and Wexford management is a lost opportunity in making improvements.

There are two physician positions at LCC, the Medical Director, and a staff physician. The Medical Director has been in her position since May of 2016. The staff physician position has not been filled for some time. Because of the extended length of vacancy, the program has filled the vacant physician position with another nurse practitioner. The failure to fill the physician position with a qualified physician overburdens the Medical Director, who needs to see all infirmary patients and all complicated patients. Nurse practitioners manage all patients with chronic illness. The Medical Director cannot complete her work during daytime hours. In particular, admission and discharge notes for the infirmary have been a problem significant enough to study this issue as a CQI study. The Medical Director will see patients during the day and often completes her notes at night while at home. We found some notes written as late as midnight two days after the patient was apparently evaluated and one note written over a week after the episode of care. This is not a good practice and can lead to errors. The overwhelming clinical burden for the Medical Director also results in less available time to work with the HCUA in improving systemic problems at the facility.

As we will describe in the section of Women's Health later in this report, there are insufficient providers to handle the volume of female specific health needs. This should be addressed.

There has been considerable physician turnover at the LCC. Since 2014, there have been five doctors at LCC. The inability to consistently fill physician positions with qualified physicians has been an ongoing problem at this facility. The failure of Wexford to fill physician positions significantly impacts the program. We do not agree with the substitution of the staff physician with a nurse practitioner. The inability to recruit and retain physicians has resulted in the program reducing its physician coverage.

This facility has all Wexford staff except for the HCUA, who is a state employee. The Schedule E provided prior to our visit is not entirely accurate. The vacant staff physician position has been changed to a nurse practitioner position, and a DON position has been created. Given these changes, there are 53.15 positions in the medical program, of which only one is vacant.[2] This is a 2% vacancy rate, which is very good. Based on a population of 1806, there are 29.4 staff positions per 1000 inmates, which is the lowest staffing rate of all facilities we visited. NRC, the male intake facility, had 41 staff per 1000 inmates; LCC has 30% less staffing than NRC, even though female intake requires more work because of the additional examinations and testing needed. In our opinion, there are insufficient RN positions. LPNs perform independent evaluations, which they should not be doing. Vital signs are not obtained consistently for all clinical encounters and monitoring of infirmary patients could be more thorough. We do not agree with having a single physician at this facility, and the lack of ability to recruit physicians negatively affects clinical care of patients.

The LCC operational policies were last reviewed on September 15, 2016. However, the actual policies appear dated and are not completely pertinent to the current facility. The receiving screening policy gives no specific direction with respect to how reception screening at LCC is to occur. This policy is a generic policy which does not even list the requirements of testing or evaluations that are required by the Administrative Directives (AD). The medical records policy is still similar to generic IDOC policy with respect to the paper record, even though LCC now has a partial electronic medical record (EMR). The policy does not address down-time procedures for the electronic record, does not address how medication administration records (MARs) are placed into the electronic record or how offsite consultation reports are placed into the electronic record. This is important because, as we learned, medical record documents can be dated in the electronic record based on the date of scanning into the record or based on the date of service. This process should be established by policy so that it is clear to clinical staff when a clinical event occurred.

## Clinic Space, Sanitation, and Support Services

**Methodology:** Accompanied by a Wexford staff assistant, the experts inspected the single-story health care building, which housed the main medical care clinical unit, with medical exams rooms, nurse sick call rooms, one exam room/treatment room, dental clinic, telehealth rooms, x-ray suite, optometry clinic, medication storage room,  nurse medication preparation rooms, injectable medication (enoxaparin, insulin, etc.) administration windows, medical records department, infirmary, supply storeroom, health care administrative and clinician offices, and a conference room. Accompanied by the HCUA, we separately visited the housing unit #6, commonly referred to as the Americans with Disability Act (ADA) unit, and inspected patient rooms, showers and toilets, day room, and the physical therapy room. We also toured the clinical space in building X Reception and intake screening unit. We reviewed the Safety and Sanitation reports for the months of July, August, November, December 2017, and February 2018.

---

[2] See Appendix A for a staffing table for this facility.

**First Court Expert Findings**

The First Court Expert found the clinical areas at LCC reasonably clean and well maintained. The First Court Expert raised concerns that the noise level in the medical reception building made it difficult to properly interview and communicate with new admissions during the intake history and evaluations.

**Current Findings**

- The infirmary beds were all hospital beds in good condition with adjustable heights, heads, and legs. The three crisis room beds were elevated concrete slabs with mattresses.
- The battery powered nurse call devices located in the infirmary patient rooms were functional. The crisis rooms were located in direct line of sight from the infirmary nursing stations and did not have call devices.
- Only one of the infirmary's three negative pressure rooms was adequately functioning. The engineering staff corrected this problem during the site visit. The nursing staff had not noted nor reported this malfunction in their daily log.
- The five exam rooms in the medical building were not sufficient to accommodate the number of anticipated users. There is a Medical Director, four nurse practitioner positions, a part time obstetrician, and two sick call nurses. Each should have an open and fully equipped examination room. Based on the budget there is need for 7.5 examination rooms. It is our opinion that an additional physician is needed. The planned conversion of one nursing office in the outpatient clinic into an additional provider room will still not provide sufficient space for the number of anticipated users.
- The telehealth room used for monthly UIC HIV and hepatitis C care and infrequently scheduled renal specialty consultation, is also utilized by the OB-GYN specialist for obstetrical Doppler ultrasound evaluation and by a contracted general US technician for general ultrasonography exams. The room is clean and modestly, but adequately, sized. The telehealth room schedule is arranged so that there is no competition for this space.
- Most but not all of the medical equipment and devices in the medical building had documentation of annual inspection by biomedical engineering. However, the obstetrical Doppler ultrasound, the capillary blood glucose testing units, one oxygen concentrator, one Gomco suction machine, and one IVAC unit did not have current inspection labels.
- The colposcope has exceeded its functional life span, has broken parts that are not able to be repaired, and needs to be replaced.
- There was only one operational AED at LCC during the time of the site visit. A single AED at a correctional facility with the population and geographic size of LCC is not adequate to enable a timely and effective emergency response.
- The medical vehicle used to move emergency staff throughout the expansive campus needs to be replaced. Its doors were difficult to open.
- The two emergency response bags on the campus (one in the medical vehicle, the other in the outpatient clinic equipment room) were both unsealed.

- Monthly safety and sanitation inspections and reports are being done by the health care team at LCC. The current inspections focus on physical plant issues (toilets, infestations, mold/mildew, etc.) that must be addressed and corrected by the correctional leadership.
- The safety and sanitation reports do not include documentation of the condition, functionality, and certification of clinical equipment or adequacy of clinical space.

The vast majority of the inmate population is housed in multiple residential buildings, each of which are divided into small dormitories. There is a separate reception building (X-building) where all new admissions are housed until intake screening is fully completed. All medical health care for patient-inmates who have completed the intake screening and have been assigned to a sentenced housing unit is provided in the single story medical building that is located in the central area of the LCC campus. This medical unit is approximately 300 to 1000 feet from inmate housing. Inmates who cannot walk are pushed in wheelchairs by inmate workers or transported in a correctional van to the medical building for all of their care needs.

The single floor linear medical building is the hub of the health care delivery services provided at LCC; it is separated into two sections, with the patient-inmate entrance in the middle of the two sections. Ambulatory care services are located in one wing and the other wing houses the infirmary, biohazardous waste room, medication storage and preparation room, injectable and KOP medication delivery area, medical records, health care administration, optometry room, and dental services.

A correctional staff station is situated at the entrance in the medical building. At this security station there is a video monitor that receives live feed from the infirmary rooms. Correctional officers were at this station during the entire four-day visit of the Experts. Officers stated that they also do visual checks of the infirmary rooms at 30-minute intervals, but the experts seldom saw correctional staff in either wing of the medical building. Directly across from the security station was a patient-inmate waiting area with bench seating that could accommodate approximately 15 women.

The ambulatory care wing of the medical building has a centralized nurse station and five private exam rooms, a telehealth room, an equipment storeroom, a phlebotomy room, and two nurse offices. There is a centralized nursing station in the outpatient clinic area with an open counter, two chairs, computer monitors, and supply cabinets. The station was clean and organized.

Two of the exam rooms are used for nurse sick call; one of these rooms is shared with the OB-GYN specialist, who is onsite two to three days per week. The other three exam rooms are used by the physician and three nurse practitioners; one additional nurse practitioner position is vacant. There is an insufficient number of exam rooms. There are 5.5 budgeted providers and two sick call nurses. It is our opinion that an additional physician is needed. The five examination rooms are insufficient to accommodate the 7.5 budgeted staff who have need of an examination room.

Each exam room has an exam table, computer monitor, desk, two chairs, wall mounted oto-ophthalmoscope unit, liquid soap or sanitizer solution, paper hand towels, mounted sharps container, and a supply cabinet. Four of the five exam rooms had a sink with hot and cold water; the chronic care nurse practitioner room had hand sanitizer in the room without a sink. Three of the five exam tables had a paper barrier in place. The oto-ophthalmoscope was fully operational in four of five rooms; the ophthalmoscope head was not functional in one room. The exam tables were in good condition, but a few had unsealed minor tears that made the tables difficult to fully sanitize. Only one sink had a small amount of mineral deposit. Oxygen tanks were stored in the two exam rooms, but the tanks were only stored in safety racks in one of the rooms. The OB-GYN room had a gooseneck lamp and a cryosurgery unit with three cryosurgery/liquid nitrogen tanks; only one of the tanks were secured in a safety rack. Only one of the provider rooms has a functional microscope with slides, cover slips, and normal saline, but the microscope was dusty and appears to be infrequently used. A new nurse practitioner stated that she had not yet been trained to perform vaginal wet mounts[3]. This same room has disposable gynecology specula with a functional attachable light source and a supply of thin prep solution containers. The physician's exam room had a sealed medication cart that had documented daily inspections noted on a log. The exam rooms were generally clean and adequately organized.

The telehealth room has a chair, an exam table, and a telemonitor with a stethoscope attachment. UIC infectious disease specialists schedule monthly half-day sessions for the management of HIV and hepatitis C patients, and a Wexford contracted nephrologist provides teleconsultation on an infrequent "as needed" basis. LCC's contracted OB-GYN specialist uses this room to perform obstetrical Doppler ultrasonography on a weekly basis. Once a month a contracted ultrasound technician also does general ultrasonography studies in this room. The schedule for the utilization of this room accommodates the part-time needs of these four services. There is no sink or hand sanitizer in this room which should be present as clinical evaluations are performed.

The phlebotomy room is staffed by two phlebotomists who split their time between the reception center and the medical building. The lab room has a phlebotomy chair, a refrigerator, a sink with hot and cold water, soap and paper towels, a sharps box, a centrifuge, and a computer monitor. The refrigerator was empty and the freezer compartment needed to be defrosted. Lab specimens are sent to the UIC laboratory and result turnaround time was reported to be 24-48 hours. The room was clean and organized.

The radiology suite has chest x-ray and plain film units and a mammography machine in a shielded room. A panorex unit is located in an internal corridor that leads into the radiology technician work area. The suite is staffed by a radiology technician on Monday, Wednesday,

---

[3] Typically, female examination rooms in female centers, particularly intake centers, have microscopes in the examination rooms. These are used to examine vaginal specimens to identify yeast and trichomonas infections. A vaginal smear is applied to a microscope slide and examined under the microscope. Alternatives to this are to perform yeast culture or nucleic acid amplification tests (NAAT), which are expensive to perform. When microscopes are unavailable, there is greater propensity to guess regarding diagnoses, which is not appropriate.

and Friday. A contract mammography technician performs mammography studies on Tuesday and Thursday. (Further findings about the radiology services are detailed in the Radiology Services section.)

There were two nurse offices adjacent to the nursing stations. The chronic care nurse occupies one these rooms to arrange chronic care schedules and statistics. The other room was used by two nurses but will soon be converted into a sixth exam room.

An equipment room contained a back board, a tool control rack, and an emergency response bag. There was a log that tracked the tool count on each shift. The emergency response bag was unsealed and contained a very limited amount of medical supplies. It was communicated that this emergency response bag was the backup bag for the medical team. Injectable glucagon and EpiPen in the backup bag were current but will expire within the next few weeks. It is unacceptable to have an unsealed emergency response bag in the medical building. This bag would be of limited use in the case of an emergency at LCC. An automated external defibrillator (AED) used to be stored in this room but the unit was reported to be out for repairs. The only AED and fully stocked emergency response bag for the entire 1,700-bed institution is kept in the medical vehicle that is parked at the back door of the medical building. LCC does not have a crash cart. The institution performs basic CPR, applies the AED, and calls 911 for cardiac arrests. This is an acceptable option for responding to codes/cardiac arrests.

An ambulatory clinic nurse escorted the expert to inspect the medical vehicle, an aging four door Jeep-like vehicle. This vehicle is only used to transport clinical staff to the injured or ill patient-inmate. This vehicle is never used to transport patients. The rusted rear side and the trunk doors were extremely difficult to open. The emergency bag was stocked with supplies and equipment including a stethoscope, oral airways, ambu bag, bandage material, neck braces, glucagon, EpiPen, and a blood glucose monitor. A full oxygen tank, an operational AED, and current AED pads were in different sections of the vehicle. The emergency response bag was not sealed. The emergency response bag, equipment, and supplies were not stored in an organized, easily retrievable way in the vehicle. It was obvious that the bag was not easily accessible. A review of the inspection logs for February and March 2018 (April's log was missing) documented no deficiencies concerning the van's emergency response bag. However, the inspections were not done on 17 (28%) of the 59 days in these months. The unsealed, unchecked emergency response bag may not contain all the supplies, medications, and equipment needed to effectively respond to an emergency. The emergency response bag must be checked and sealed; the emergency equipment must be organized in the vehicle so that it can be readily accessed. The aging vehicle's doors must be repaired, or the vehicle must be replaced.

A single AED at a correctional facility the size of LCC is not adequate to enable a timely and potentially effective emergency response to a patient-inmate or a correctional or medical staff member who has a cardiac arrest. An AED must always be kept in the medical building to be able to expeditiously respond to emergencies in the high-risk infirmary and to the large number of acute and chronic patients being treated in the ambulatory clinic. Additional AEDs should be

placed in various locations on the LCC campus to minimize emergency response times. The HCUA advised the experts that a request has been or will be made for six additional AEDs.

A correctional transportation van was inspected. The van had two rows of seats; all the seats had seat belts. There was room in the first row to accommodate a wheel chair. A patient-inmate in building #6 who has had multiple offsite specialty visits communicated that vans had seat belts that she always used.

A few dated medical and pharmaceutical references were found in exam rooms. Providers stated that *they believe* that there was a way to access UpToDate electronic medical reference via the EMR, but they did not know how to do this. One nurse practitioner communicated that she uses the physician assistant's private purchase access codes to access UpToDate. The physician stated that she uses Google to access clinical information as needed. All medical and nursing staff at LCC should have ready access to current online medical reference systems such as UpToDate.

A two-chair dental suite is situated behind the correctional office station at the entrance to the medical building. (The physical space and the dental equipment will be addressed in the Dental Services section).

Building #6 is a single-floor structure that houses 131 women, many of whom have difficulty with ambulation or require ambulatory assistive devices (cane, crutches, wheel chairs, walkers). The entrance of the building opens into a large common dayroom with tables, chairs, and two flat screen televisions; the security desk is situated in the day room. Patient-inmates sign a sick call list, noting only their names, not their health care concern, when they seek non-urgent care. The list is kept at the security desk, picked up in the evening, and brought to the medical building. Four women were interviewed; they all stated that they are generally seen by a nurse on the next work day after they submit a sick call request. Women are housed in two wings that open into the dayroom in rooms with two, four, and six-bed rooms. Women have keys to their rooms. All the beds are bunk beds; women with disabilities or at risk for fall are assigned to the lower bunk. Each wing has a common shower and toilet area. The showers are handicap accessible with safety grab bars and shower chairs. At least one toilet in each shower/bathroom was wheelchair accessible. There was a large patch of tile missing in one of the bathrooms that would be difficult to adequately sanitize. It was reported to the Expert that a work order had been placed to replace the missing tile. That same bathroom had a section of frayed insulation of undetermined material wrapped around a pipe at about shoulder level height; this was communicated to the facility engineer, who said that he would correct this concern.

The physical therapy (PT) room is located in building #6 at the back of the dayroom. The PT room is moderately sized and is equipped with two exercise bicycles, one treadmill, a set of parallel bars, and two exercise tables. Locating the PT room in building #6 is quite appropriate and enhances access for the physically challenged population who are housed in this building. However, the PT room is sparsely equipped, even obviously underequipped, when compared to the physical therapy units serving the male populations at SCC and DCC. The physical therapist

also goes to the infirmary and building #14 (mental health) to provide physical therapy services as needed.

Because a partial electronic medical record is used, the medical record area consists of a single room used to manage MAR documents and other paper documents such as outside consultant reports. This room connects the dental, optometry, and supply storage areas with health care administrative offices, conference room, and staff locker room/breakroom.

The 15-bed infirmary is located at the opposite end of the medical building from the ambulatory care wing. The nursing station with an adjacent medication/supply/equipment room is located at the beginning of the infirmary corridor. Four patient rooms had two beds per room with a toilet in each two-person room. There were seven single-bed rooms; three of these single person rooms were crisis/negative pressure rooms located directly in front of the nursing station. Relatively new, excellent condition hospital beds with adjustable heights and head and lower extremity sections were in all the single (non-crisis) and two-person rooms. Nurse call devices were mounted on the walls next to each bed in the non-crisis rooms; four were tested and found to be functioning. The infirmary nurse quickly responded to an unannounced activated device. The three crisis/negative pressure rooms had concrete beds with a mattress. There were no nurse call devices in the crisis rooms. All patient rooms in the infirmary were clean, neat, and organized. The negative pressure monitor at the nursing station was turned on and indicated that at least one of the negative pressure units was not operational. Utilizing the tissue paper test used by the infirmary nursing staff, it was identified that two of the negative pressure units were not functioning properly. A review of the April 2018 infirmary logs noted that the negative pressure was not checked regularly but no deficiencies had been documented. The facility's engineer adjusted the control unit and all three negative pressure units were fully operational before the end of the Experts' visit.

A central infirmary nursing station had an open counter, computer monitor, and supply cabinets. An adequately sized medication preparation, medical supply, and equipment room was located immediately behind the nurse station. There were two Gomco suction machines, two IVAC units, and one oxygen concentrator in the storeroom. One Gomco, one IVAC, and the oxygen concentrator did not have current annual inspection labels. A single person shower room that could accommodate a wheelchair was situated near the nursing station. A biohazard room was located on the unit; the room was clean, waste material bagged, and sharps containers locked. It was reported that a biohazard waste vendor removes the material one to two times per week.

Monthly safety and sanitation inspections are being done in the health care areas, dietary, and housing units. The rounds have appropriately identified problems with the maintenance of the physical plant that could have a negative impact on the safety and health of the patient-inmates and the correctional and medical staff. However, these environmental rounds do not inspect or monitor the condition, function, and annual certification of clinical equipment, functionality of the negative pressure rooms, integrity of bed and chair upholstery, completion of medical cart and emergency response bag logs, the training of health care unit porters,  and

other health care issues. The safety and sanitation inspection should be expanded to focus more attention on the beds, clinical equipment, and the training of the infirmary and health care unit porters. Alternatively, separate healthcare-specific environmental rounds should be initiated. The findings of environmental rounds and the safety and sanitation inspections should be reported to the Quality Improvement Committee.

In summary, with the exception of the medication room, the medical building was generally clean and organized. The clinical space was generally adequate to address the needs of the LCC patient population with the exception of the five existing exam rooms which are not sufficient to accommodate the facility's 7.5 FTE clinical staff assigned to nurse and provider sick call, specialty care, and chronic care clinic. The facility has an inadequate number of AEDs to provide timely emergency response in the all clinical and housing units on the expansive LCC campus. The medical vehicle is defective and needs to be repaired and/or replaced. All medical equipment did not have evidence of current annual inspection. The emergency response bags were not sealed and not checked on a daily basis. The infirmary negative pressure room logs did not note that two of the negative pressure rooms were not functional and that the monitoring panel at the nurse station was not accurately indicating the lack of adequate negative pressure.

We agree with the recommendations of the First Court Expert. We have additional recommendations found at the end of this report.

## Sanitation

**Methodology:** The medical building, the physical therapy room in building #6, and the reception center in the X-building were inspected. Nurses, infirmary patient-inmates, and inmate porters were interviewed.

### First Court Expert Findings
The First Court Expert reported that the infirmary porters were provided with orientation to the health care unit that included proper cleaning and sanitation procedures.

### Current Findings
- The clinical areas in the medical building, building #6, and building X's reception center were generally clean. One exception was the medication room. Floor and countertops were dirty. The medication refrigerator was in need of cleaning. The staff food refrigerator was very dirty, with liquid spills and food debris. The room was notably cluttered and disorganized.
- One sink in the outpatient clinic and in the reception center has crusted mineral deposits.
- The shower on one wing of building #6 ADA housing unit had a large section of tile missing from the wall and a frayed insulation sleeve around an accessible water pipe. This deficiency makes it impossible to fully sanitize this area**.**

- There was no documentation that the three infirmary porters had been fully trained in the duties and risks of working on a health care unit with potential exposure to body fluids or had received hepatitis B vaccination.

Overall, the clinical areas at LCC were clean, organized and well maintained. A few exceptions were noted. One was the medication room used to store pharmaceuticals (see Pharmacy and Medication Administration Section). Another area was the common showers/bathrooms in building #6 had a large patch of missing tile on a wall. Although most sinks were clean, one sink in an exam room in the medical building and another in the reception center were crusted with mineral deposits. The shower wall and the crusted sinks are not able to be properly cleaned and sanitized.

Inmate porters clean, sweep, and sanitize all clinical areas at LCC. Three porters in the infirmary were interviewed. One had been the infirmary porter for a long period of time, the other two were recently assigned to the infirmary. In addition to cleaning the infirmary, they wash patient linens in the non-industrial washer and dryer in the infirmary and occasionally assist nurses with patient transfers in and out of beds/chairs. The experienced porter remembered having received some training in the past; the other two stated that they had only received some on-the-job-training. None were sure if they had been vaccinated against hepatitis B (or A). The EMRs of the three porters were reviewed; we found no evidence that they had received blood borne disease education or formal job duty training. There was no documentation in their medical records that they were immune to hepatitis B (or A) or if they had been vaccinated against hepatitis B (or A). The Wexford staff assistant who is responsible for the training of infirmary porters also was unable to provide documentation that the three porters had been trained or vaccinated.[4]

In summary, the sanitation of the health care units was adequate overall, but we identified problems as noted above.

The First Court Expert made no specific recommendations concerning sanitation. We have recommendations that are found at the end of this report.

## Medical Reception

**Methodology:** To assess medical evaluation of newly arriving inmates, we toured the medical reception area, interviewed health care staff, reviewed IDOC health record forms, and reviewed 10 health records.

### First Court Expert Findings
The previous Court Expert found that the medical reception process timely took place following the patient's arrival, but there were opportunities for improvement. The initial nurse intake screen took place in a noisy area that interfered with the nurse's ability to hear the patient.

---

[4] Infirmary Patients #5, 6, 7.

Patients arrived without medical transfer information from the jail. There were deficiencies in the quality of patient medical histories, problems with follow-up of medical conditions, and untimely follow up of patients with chronic diseases.

**Current Findings**

We found that the medical reception process has improved from the First Court Expert's report and we also found areas needing improvement.

Medical reception is performed in the B-Wing of X-building. The room where nurses perform intake screening has been moved from the main medical unit to B-Wing. The room is not optimal. It is small and has no sink, but did have hand sanitizer. The examination room used by the medical provider is larger and has an exam table and sink. The exam table cover is torn, preventing inadequate infection prevention, and should be repaired or replaced. The ophthalmoscope head is missing. The provider reported that he did not have a large blood pressure cuff. There is no microscope for the provider to use to diagnose vaginal infections. Both rooms had gloves, sharps, and biohazardous waste containers.

Medical records show that medical transfer information was sent with the patient and available for nurse and provider review. Medications were usually ordered on the day of arrival, but medication administration records (MARs) do not reflect that medications were received within 24 hours and in some cases, not at all. Nurses ordered intake labs according to protocols that were typically performed within a day or two of arrival. Lab reports were generally available at the time of the physical examination. A concern is that nurses do not consistently perform and document urine pregnancy testing in the medical record, which may lead to missed pregnancy.

A provider performed a physical examination in seven days or less in eight (80%) of 10 records reviewed (range=1-12 days). The provider generally addressed the patient's medical history but did not consistently perform a review of systems (ROS) to assess disease control at the time of arrival. The medical provider performed thorough physical examinations including pelvic exam and Pap smear. The provider tests patients with vaginal discharge for chlamydia and gonorrhea, but did not have a microscope to diagnose patients with other common infections, such as trichomonas, yeast, and bacterial vaginosis, and treated these infections empirically. However, due to problems related to inconsistent transcription of medication orders onto a MAR, nurses did not consistently document administration of medications for treatment of vaginal infections onto a MAR.

The provider developed an appropriate treatment plan for each medical condition and followed up on abnormal labs. Mammograms were ordered and completed in accordance with recommended guidelines. The provider referred patients to the chronic disease program and initial visits usually took place within 30 days. The medical provider initiated the problem list, but did not consistently include all pertinent medical diagnoses, including TB infection. Although there are opportunities for improvement, we were impressed with the physician assistant who performs physical examinations. His medical care is very thorough and conscientious.

## Nursing Sick Call

**Methodology:** We evaluated nursing sick call by reviewing IDOC Administrative Directive Offender Health Care Services, (04.03.103K), Wexford Non-Emergency Health Care Requests and Services (P-103), IDOC Treatment Protocols, and the Logan Offender Handbook. We also interviewed health care leadership, staff, and inmates, inspected areas where sick call is conducted, and reviewed tracking logs and health records.

### First Court Expert Findings

The previous Court Expert found that nursing sick call was conducted seven days per week. Inmates accessed sick all by submitting a health services request form that nurses triaged, and then the patient was scheduled to be seen by a nurse. In X-house where segregation, maximum security and reception inmates were housed, nurses conducted sick call cell-side, without privacy or performing an examination, despite there being an examination room where sick call could be performed. Licensed practical nurses (LPNs) performed independent nursing assessments, which is beyond the scope of practice for an LPN in the State of Illinois.

### Current Findings

Our review showed some improvements with respect to access to care and confirmed that certain conditions found by the First Court Expert remain.  The system does not yet ensure timely access to care.

Sick call is still conducted seven days per week. The process for inmates to access sick call has changed since the previous Expert's report. To access sick call, inmates sign up for sick call on a sheet of paper in the housing unit rather than submitting a written request with the nature of the complaint. The exception is segregation, where the officer maintains control of the sign-up sheet and writes the inmate's name on the sheet. Health care staff pick up the sign-up sheets each evening, but the replacement sign-up sheets are not delivered until the next morning. Therefore, there is an approximately 12-hour gap where inmates are unable to sign up for sick call. The Logan Offender Handbook has not been changed to reflect the new process.

Health care leadership reported that all inmates are supposed to be seen the day after signing up; however, our record review showed that in some cases, inmates were not seen for two days after they signed up. This is a concern because if health care staff cannot see all patients within 24 hours, they need to be able to triage patients according to the urgency of their complaint. However, this is not possible because inmates do not document the nature of the complaint on the sign-up sheet.

We reviewed inmate sign-up sheets and noted that there were missing sign-up sheets each month. For example, according to notes on the stacks of sign-up sheets, there were sign-up sheets missing for 2/21, 2/23, 2/25, 2/26, 2/27, 2/28, 3/1, 2/2, 3/3, and 3/4/18. This is significant because the sign-up sheet is the only documentation that the patient submitted a health request. If sign-up sheets are missing, there is no record that the patient requested care.

Review of available sign-up sheets show that on some days there were very high numbers of no shows or refusals. For example:

- On 1/5/18, 56 inmates signed up for sick call and there were 22 (39%) no shows or refusals;
- On 1/7/18, 62 inmates signed up and there were 35 (56%) no shows or refusals;
- On 1/26/18, 61 inmates signed up and there were 20 (33%) no shows or refusals; and
- On 3/6/18, 46 inmates signed up and there were 19 (41%) no shows or refusals.

These are extremely high no shows/refusal rates; however, these high no show/refusal rates have not been studied under the auspices of the CQI program to determine whether barriers to access to care exist. We interviewed staff and inmates as to why inmates no show for sick call. One reason given is that inmates sign up to meet other inmates for social reasons, and then do not come to sick call. Another reason given is that inmates wait long periods of time for their appointments. Staff and inmate interviews indicate that the sick call nurse responds to emergencies on the compound, and when this occurs, inmates waiting to be seen do not know how long the nurse will be unavailable and therefore return to their housing unit. At least on one occasion, a lockdown was a barrier to care. On 1/8/18, four patients were noted not to be seen due a lockdown. We reviewed each of these records and found that patients were not rescheduled for sick call and were not seen.

The HCUA reported that all inmates are escorted to an examination room to be assessed by a nurse, either in the main medical unit or housing units. However, in X-building where segregated inmates are housed, correctional officers do not escort inmates to a clinic area and nurses still perform cell-front assessments which does not permit an adequate assessment.

We reviewed 26 health requests in 22 records, which included four patients noted above not seen due to a lockdown (15%).[5] Of the remaining 22 health requests, we found that in 14 (54%) cases patients were seen the next day,[6] four (15%) patients were seen in two days,[7] and four (15%) patients were not seen due to no show, refusal, or unknown reason.[8] Thus, 69% of patients were seen in one to two days, but 31% were not seen due to lockdown, no show or refusal. Two of the patients seen by a nurse in two days were housed in segregation.

At LCC, both RNs and LPNs perform sick call using treatment protocols. In the State of Illinois, LPNs are to practice "under the guidance of a registered professional nurse, or an advanced practice registered nurse, or as directed by a physician assistant, physician…to include *conducting a focused nursing assessment and contributing to the ongoing assessment of the patient performed by the registered professional nurse*." LPNs may also collaborate in the development and modifications of the RN or APRN's plan of care, implement aspects of the plan of care, participate in health teaching and counseling, and serve as an advocate for the

---

[5] Sick Call Patients #5, 6, 7, and 8.
[6] Sick Call Patients #1, 2, 3, 4, 9, 12, 14 (four separate requests), 15 (two separate requests), 16, and #21 .
[7] Sick Call Patients #11, 19, 20, and 22.
[8] Sick Call Patients #10, 13, 17 and 18.

patient by communicating and collaborating with other health service personnel.[9]  However, Illinois scope of practice does not permit LPN's to perform assessments independent of a registered professional nurse or higher level professional, as is currently being done at LCC. Neither does the scope of practice permit LPNs to perform independent assessments according to protocols. LPNs do not have requisite education and training, including physical assessment skills needed to perform independent assessments.[10] *Thus, some LCC patients do not receive evaluations by health care staff licensed to perform independent assessments. This increases the risk of harm to patients.*

Record review showed that some patients who require a medical diagnosis are assessed only by a nurse and not medically evaluated by a provider and/or do not receive ordered medical treatment. The following examples are illustrative:

- A 28-year-old presented to a nurse on 1/16/18 for urinary frequency with foul-smelling urine.[11] The patient reported a history of urinary tract infections and that the nurse practitioner told her at intake she might have a yeast infection. A urine dipstick was normal. The nurse contacted a provider, who did not examine the patient but ordered Flagyl (which is not used to treat yeast infections). On 1/30/18, a registered nurse saw the patient again for the exact same complaint. The RN notified a provider, who did not see the patient but again ordered Flagyl. This patient did not receive a medical diagnosis for her condition.

- A 48-year-old woman with a history of left eye trauma and artificial eye was seen by an LPN, who noted the patient had swelling of the upper and lower eyelids for the artificial eye.[12] There is no documentation that the LPN contacted a provider, and a provider did not examine the patient. There was an order for topical and oral antibiotics, artificial tears, and referral to an eye doctor. On 1/18/18, an optometrist saw the patient and ordered another five days of oral antibiotics. There is no January 2018 medication administration record (MAR) in the record to show the patient received the medications. A provider has not seen the patient for follow-up for her eye infection.

- A 42-year-old woman signed up for sick call on 1/14/18 and a LPN saw her on 1/16/18. The patient complained of a herpes infection. The LPN did not perform an examination but called a provider, who ordered acyclovir. The medication order was not transcribed onto a medication administration record and there is no documentation the patient received the medication.[13]

---

[9] Illinois LPN Scope of Practice. Section 55-30.
[10] NCCHC defines Qualified Health Care Professionals to include nurses without distinguishing between registered and licensed practical nurses. However, RN and LPN practice must remain within their education, training and scope of practice for their respective state.
[11] Nursing Sick Call Patient #15.
[12] Nursing Sick Call Patient #12.
[13] Nursing Sick Call Patient #11.

- A 54-year-old woman signed up for sick call on 1/20/18, but not seen due to No Show. On 1/25/18, a nurse saw the patient, who stated that on 1/20/18 she fell on her left wrist and heard a "pop." It hurt to move her fingers and wrist. The nurse noted swelling to her wrist and hand. The nurse contacted a nurse practitioner, who did not see the patient but ordered ice, an Ace wrap and x-ray that was performed on 1/31/18 and showed no fracture. The patient had no follow-up for her wrist.[14]

- A 36-year-old woman signed up for sick call on 2/19/18 and a registered nurse saw the patient on 2/21/18. The patient complained of herpes simplex and the nurse contacted a provider, who did not see the patient but ordered acyclovir. There is no February 2018 MAR that shows whether the patient received the medication.[15]

These cases show a pattern of patients not being examined by a medical provider to establish a medical diagnosis or see the patient for follow-up to determine whether the patient's condition had improved. Several records show that there is no documentation that ordered medications were received.

In summary, while many patients have timely access to a nurse, not all patients are seen the following day, and there are a high percentage of no shows and refusals. In addition, patients requiring a medical diagnosis are not timely seen by a medical provider. Instead, providers treat patients remotely and do not schedule patients for follow up to assess whether their conditions have improved. This is a particular concern in light of the lack of documentation that patients receive ordered medications.

## Medical Records

**Methodology:** We reviewed multiple medical records and interviewed staff.

### First Court Expert Findings
The First Court Expert had no findings with respect to medical records. The First Court Expert did have three recommendations. The first was that medical records staff should track receipt of all outside reports and ensure that they are filed timely in the health record. The second recommendation was that charts should be thinned regularly, and MARs filed timely. The third was that problem lists should be kept up to date.

### Current Findings
This facility partially implemented the Pearl® EMR in 2014. The electronic record is an improvement, but the partial implementation of the record has created other problems and makes the electronic record ineffective in supporting the clinical program.

---

[14] Nursing Sick Call Patient #13.
[15] Nursing Sick Call Patient #19.

The electronic medication administration component has not been implemented. As a result, medication administration records are on paper. The First Court Expert's second recommendation that charts be regularly thinned is no longer pertinent. Many reports of outside consultants are still unavailable in the medical record. This is not a problem of the electronic record but is related to effort of Wexford management in obtaining these reports. The First Court Expert's recommendation to keep problem lists up to date has not been effectively addressed.

The EMR has interfaces with the pharmacy and with the laboratory vendor. Doctors write prescription orders electronically and these are received by BosWell, the pharmacy used by Wexford. These orders appear in the record. The current list of medications appears in progress notes. Laboratory results can be reviewed electronically and can be viewed in a flow sheet format. The same is not true of problems. Although problems can be entered into the database, these are not updated. Also, the list of problems includes items that are symptoms or undiagnosed findings, which are not problems. For example, "weakness" can be listed as a problem. Problems are medical diagnoses and weakness is not a diagnosis. Progress notes, including for chronic illness visits, do not include updated problem lists. It is not clear whether the software lacks this ability or whether it is not used. Also, the previously used paper problem list is no longer in use. Therefore, there is no official problem list that we could identify. Regardless, the electronic record system fails to include one of the major advantages of electronic records, which is to track all of a patient's problems and make those available to clinical staff when they evaluate patients. Because the problem list in the EMR is not maintained accurately, it is unusable for purposes of tracking or monitoring care. Clinicians do not use problem lists when evaluating patients even though a patient's problems can presumably be entered as data elements in the electronic record. Policy should guide who is to enter problems into the problem list and when they are to be entered and updated.

Because the problem lists are ineffective, the list of patients with chronic illness is not obtained from the electronic record. Instead, patients in chronic illness clinics have their chronic illness information manually entered into a security database. This security database is used by the chronic illness nurse to track chronic illness. This is duplicative, risks loss of data by manual entry operations, fails to make the patient's updated problems readily available, and potentially exposes health information to custody personnel. The electronic record should be utilized to track chronic illness.

There are insufficient devices, specifically terminals for use of the record, in some clinical areas, particularly on the infirmary. The providers go to their office to write their records. A device survey needs to be done to ensure that there are sufficient devices for the number of simultaneous users. The electronic record also includes a feature which is dangerous. This record defaults vital signs to the last vital signs obtained. If a patient has vital signs performed on January 1, 2018 and is evaluated on January 5, 2018, the vital signs from January 1, 2018 will present on the January 5, 2018 note unless new vital signs are obtained. Vital signs should be used only for the date and time for which they were obtained.

Remarkably, the program has been unable to obtain data out of the medical record to support the quality improvement effort. Visits, problems lists, laboratory data, and prescription data are all present in the database of the electronic record. Yet, the program does not have the ability to use these data in ways to measure performance. Implementation of an electronic record reduces the need for medical record clerks. Four to five staff are still assigned to medical records and involved with a variety of health information duties including offsite scheduling, obtaining hospital and specialty consultation reports, and providing court ordered records and release of information requests. However, to make the record effective, the program needs to have information technology staff capable of using appropriate data queries of the electronic record in order to obtain useful information on an ongoing basis for the purpose of measuring quality and for tracking clinical data.

We noted extreme difficulty in obtaining information regarding patient immunization. One of the advantages of an electronic record is to present immunization status so that preventive measures can be easily taken. It was not clear whether this feature is unavailable or unused in the current system. Nevertheless, it was easier for us to find immunization status in the paper record at other IDOC facilities than it was in the electronic record at LCC.

The electronic record is only used at the female facilities and is only partially implemented. Yet IDOC administrative directives do not address the electronic record or give guidance on its use or what to do in the event of outages. Adequate policy needs to be developed to guide use of this product.

Lastly, we note that the electronic record makes it easier to cut sections of a progress note from a prior note and copy the cut piece to another note as a way to produce a note without much writing. The problem is that every note must represent exactly the evaluation during the episode of care being documented. When cut and pasted notes are used, it appears that the doctor is using documentation from a prior episode of care to describe a current episode of care. This is inaccurate and unprofessional documentation. We noted cut and pasted notes for some patients on the infirmary that made it impossible to determine if they were an accurate representation of the patient's actual condition at the time of evaluation. We strongly recommend against cut and pasted notes, as they appear inaccurate and appear to misrepresent the actual condition of the patient.

## Urgent/Emergent Care

**Methodology:** We reviewed records of four patients who nurses evaluated for urgent care complaints. We also reviewed six patients who were hospitalized to assess whether the hospitalizations may have been preventable with timelier or improved primary care.

### First Court Expert Findings
The First Court Expert found that there was no log to track urgent calls from housing units or to track patient send outs on an emergency basis.

**Current Findings**

We found that nurses now track unscheduled evaluations on the nurse sick call log. We found that LPNs and RNs independently managed patients with urgent medical symptoms and did not notify a medical provider, increasing risk of harm to patients. LPNs exceed their scope of practice by performing independent nursing assessments. Even when notified, medical providers did not examine and evaluate patients with potentially serious medication conditions. The following cases are illustrative.

- A 51-year-old woman with a history of asthma, hypertension, and chronic hepatitis C infection was a code 3 on 1/22/18.[16] The patient reported burning in the center of her chest radiating to her throat and vomiting x 1. The chest pain protocol instructed the nurse to call the provider urgently for patients with a history of hypertension. The LPN did not refer the patient to a provider but instead ordered Pepcid. On 2/17/18, an LPN responded to a code 3. The patient was found sitting on the floor stating that she was dizzy. The nurse did not perform any cardiovascular review of systems (e.g., chest pain, SOB). The patient's vital signs were normal. The LPN determined that the patient should rest in her cell and did not contact a provider. On 2/19/18, an LPN responded to a code 3. The patient reported chest pain and dizziness. Again, the nurse performed no cardiovascular review of systems. Vital signs were normal. The patient's last EKG showed nonspecific T-wave abnormality. The LPN did not contact a provider. These LPNs independently managed this patient with dizziness and chest pain, which is well beyond their scope of practice. We discussed this case with the HCUA.

- This 53-year-old woman had a history of six hospitalizations for asthma as well as diabetes, hypertension, hyperlipidemia, and hypothyroidism.[17] On 12/6/17, the patient presented to the HCU stating, "I need a breathing treatment." A LPN evaluated the patient whose vital signs were blood pressure 140/90mm Hg and pulse=90/minute. The nurse did not ask about the frequency of symptoms. The patient had right lower lobe wheezing. The LPN did not measure peak flow expiratory rates (PEFR) or oxygen saturation. Apparently the LPN administered a nebulizer treatment and documented "no wheezing after treatment." On 12/9/17, a RN assessed the patient for shortness of breath. The patient told the nurse, "At home I use steroid, here I am not on one." The patient's PEFR's showed her asthma was poorly controlled (Before treatment PEFR=150/200/225). The patient had scattered faint wheezing throughout posterior bases. The treatment protocol indicates provider referral "if peak flow less than 300 does not improve with Albuterol." However, the nurse did not measure PEFR's after treatment and did not contact a physician for steroid inhaler or referral back to chronic disease program. On 12/10/17, the patient presented again with SOB. The nurse did not measure vital signs or PEFR. The oxygen saturation was 95% with wheezing upon expiration. It is unclear from the note if the nurse treated and if so, there was no post treatment assessment. On 12/19/17, a physician saw the patient and added prednisone,

---

[16] Urgent/Emergent Patient #3.
[17] Urgent/Emergent Patient #4.

inhaled steroid and Xopenex. On 1/22/18, an LPN assessed the patient as a code 3 with SOB. "I am having trouble breathing." The patient had wheezing auscultated in all lobes with oxygen saturation of 95%. No vital signs or PEFR were obtained. The LPN gave the patient a breathing treatment and did not assess the patient afterwards, documenting that the patient was to return to the clinic as needed. On 1/25/18, the patient presented with a two-week history of a cold. The temperature was 99.5°F and blood pressure was 158/100mm Hg. On 1/30/18, the NP saw the patient for chronic disease management; patient noting that she used her steroid inhaler (Alvesco) three to four times, and that the patient's asthma was in fair control. The NP scheduled her for follow up in six months. In this case, both LPNs and RNs performed inadequate assessments of a patient with asthma and exceeded their scope of practice by independently treating the patient and/or not timely referring the patient to a provider. The NP did not schedule the patient for follow-up in accordance with her disease control.

- A 45-year-old woman with a history of hypertension presented with chest pain on 1/3/18.[18]  An LPN saw the patient, whose vital signs were normal. The LPN performed an EKG that was read by a nurse practitioner, who did not examine the patient or medically evaluate the patient. On 2/6/18, the physician saw the patient and addressed her hypertension and chest pain. This was not timely care.

- A 23-year-old woman was seen by an LPN on Wednesday, 12/20/17 for sore throat, body aches, and nasal congestion.[19] The patient had a fever of 101.4°F with no other vital signs measured. The patient's throat was red with enlarged lymph nodes. The LPN planned to refer the patient to a provider but a medical provider did not examine the patient. An OB/GYN wrote an order for azithromycin the same day. It is unclear whether and when the patient received the medication. On Saturday 12/23/17, the patient presented urgently with sore throat and inability to swallow. A RN saw the patient and noted a swollen soft palate that was deviated to the left. The patient was unable to speak or able to swallow. The temperature was 100.5° F, the pulse was 125/minute, and the blood pressure was 130/83. A registered nurse contacted a NP, who ordered the patient sent to the hospital, where the patient underwent incision and drainage of a peritonsillar abscess. On 12/23/17, the patient was sent back to the facility on Augmentin and admitted to the infirmary for 24-hour observation. On 12/25/17, the physician reviewed the note from the hospital, but did not see the patient until 1/13/18, three weeks after she was hospitalized. A provider should have examined the patient on 12/20/17 and timely seen the patient following hospitalization.

In the six hospital records we evaluated, we noted delayed diagnosis in four of the six patients. These delays included:
- A three-month delay in evaluation of pancreatic cancer
- A 10.5-month delay in treatment of a sigmoid-vaginal fistula

---

[18] Urgent/Emergent Patient #2.
[19] Urgent/Emergent Patient #1.

- A two-day delay in hospitalization for a life-threatening drug overdose
- An 11-month delay in identification of colon cancer which likely resulted in dissemination of the cancer.

In four of six hospitalizations there were incomplete or no hospital records. The delays in treatment include systemic deficiencies, including:
- Failure to obtain records from transferring jails related to diagnoses of the patient and failure to act on information obtained in transfer documents
- Failure to timely obtain diagnostic studies for serious illness
- Failure to establish an appropriate and timely treatment plan for abnormal findings
- Failure to appropriately assess or act on laboratory findings.

We note some of these problems in cases below. We also note that several of these cases are discussed in the section on specialty care below.

- The first patient was incarcerated at LCC on 1/11/17.[20] The patient had a prior positive tuberculosis skin test and therefore received a screening chest x-ray. This x-ray showed a 6 mm nodule with streaking from the nodule and a small pleural effusion. The radiologist recommended obtaining a CT scan, as this was suspicious for cancer. A PA consulted a doctor, who told the PA instead of obtaining a CT scan to obtain a repeat chest x-ray in three months. This was not appropriate care as the nodule was suspicious for cancer. In three months, a repeat chest x-ray was done and showed a large right pleural effusion with a large consolidation on the right lung. The effusion was compressing the lung. The radiologist again recommended a CT scan. This patient should have been admitted to a hospital for diagnosis and evaluation of the large pleural effusion. Instead of admitting the patient to a hospital for a diagnosis, the doctor admitted the patient to the infirmary and ordered routine blood tests, antibiotics, presumably for pneumonia, and another chest x-ray. The radiologist had recommended a CT scan on the second x-ray report, but this was not done.

  Within four days of being on the infirmary the patient was short of breath, had unilateral leg edema, and was wheezing. The unilateral leg edema was suggestive of a deep vein thrombosis. This in combination with a large lung consolidation and pleural effusion, should have prompted immediate hospitalization to evaluate for pulmonary embolism and to perform thoracentesis for diagnosis of the pleural effusion. Instead, the doctor initiated treatment for deep vein thrombosis (Lovenox), treated for presumptive pneumonia, and ordered an urgent Doppler test and routine CT scan of the chest. This was dangerous for the patient, as the doctor did not have a diagnosis for a potentially life-threatening condition. Three days later, the urgent Doppler test had not yet been done and the doctor ordered another chest x-ray, which was unchanged. This resulted in the doctor finally admitting the patient to a hospital.

---

[20] Patient #1 Hospitalization and Specialty Care.

The patient had deep vein thrombosis, pulmonary embolism, adenocarcinoma of unknown primary, and disseminated cancer to pleura and peritoneum. The patient received the first cycle of palliative chemotherapy with a recommendation for follow-up chemotherapy. It was somewhat difficult to follow the course of care, as the doctor was writing notes not on the date of evaluation but at home from memory. The doctor was also using cut and pasted notes, which created an impression of identical notes being repeated, which may or may not have represented the actual condition of the patient or evaluation of the provider. The doctor at LCC also did not prescribe pain medication consistent with recommendations of the oncologist. Based on equivalency dosing, the patient was receiving less pain medication than recommended by the oncologist.

In summary, this patient's cancer diagnosis was delayed by about five months. It may not have made a significant difference in ultimate outcome. However, the patient did have a life-threatening presentation (pleural effusion, leg swelling, shortness of breath, and wheezing) and was not admitted to a hospital for four days. This placed the patient at significant risk of harm and is inconsistent with generally accepted guidelines for a pleural effusion.

- Another patient was a 43-year-old woman who had a history of HTN, COPD, and prior gastric surgery in the past for unstated reasons.[21] The intake history and physical examination on 7/5/17 failed to identify the reason for the gastric surgery. Intake laboratory results showed anemia and low white blood count. There was no follow up of these significant abnormal laboratory results.

The patient had a mental health condition and within a month of incarceration, a mental health staff member documented that the patient was not eating. The patient then began complaining about her stomach hurting and not wanting to eat because of this problem.

On 8/16/17, the patient was admitted to the infirmary by mental health for "failure to thrive, R/O medical vs. psychosis." Initial laboratory results showed pancytopenia.[22] The white count was low, and the absolute neutrophil count was 492, which is severe neutropenia and a critical level. The laboratory tests also showed a critical value of valproic acid at 154 (normal 50-100). This drug was being used to manage the patient's mental health conditions. The elevated valproic acid can be associated with pancytopenia. Valproic acid toxicity is also known to result in central nervous system dysfunction, low blood pressure, and liver dysfunction. The patient was not eating or drinking fluid and a doctor ordered intravenous fluid, but the intravenous line was not working well, and the IV fluid was not flowing. A doctor examined the patient on 8/17/17, and the patient had hypotension (94/81), which was unnoticed by the doctor.

---

[21] Patient #2 Hospital and Specialty Care.

[22] Pancytopenia is a low level of white blood cells, red blood cells and platelets. This is a serious problem that typically in all cases requires prompt referral to a hematologist for consideration of a bone marrow biopsy.

Hypotension can be caused by valproic acid toxicity and should have resulted in hospitalization, as it was unsafe to keep a patient with critical, severe neutropenia and hypotension on an infirmary unit. The patient was nevertheless kept on the infirmary for two days despite the critical valproic acid level and pancytopenia. The patient eventually began vomiting and developed altered mental status. She was lethargic, unable to answer questions, and was speaking unintelligibly. The patient was eventually sent to a hospital on 8/19/17, several days after critical blood pressure and pancytopenia in the context of valproic acid toxicity were identified. There was no hospital report and it was not clear what occurred at the hospital. Partial records documented elevated ammonia, pancytopenia, encephalopathy, and valproic acid toxicity as initial problems. There was no discharge summary, so the discharge plan was not available.

On return to LCC, a repeat blood count showed persistent pancytopenia. A doctor noted that because the absolute neutrophil count was 1.2 the patient was "stable." Pancytopenia is a serious condition, and because the etiology of the pancytopenia was uncertain, the patient should have been referred to a hematologist. There was no documentation of why the patient was hospitalized or what occurred in the hospital. The doctor did not address the pancytopenia in her assessment or plan. The weight was not monitored. There was not a plan for the patient's weight loss or pancytopenia.

The LCC Medical Director discharged the patient from the infirmary (when the doctor was at home) at midnight without documenting the discharge diagnosis from the hospital and without documenting a discharge plan to evaluate the pancytopenia. The discharge date was 8/31/17, but the note was written on 9/7/17. The doctor's note at midnight appeared to be a cut and pasted note taken from a prior mental health note. The only diagnosis was schizoaffective disorder. This is unacceptable documentation and care.

The patient had two subsequent blood counts, the latest of which was on 10/2/17. This test continued to show low white count, anemia, and absolute neutrophils of 760, which is moderate neutropenia. This continued problem in light of correction of the valproic acid toxicity warranted hematology consultation, but it was not addressed. The doctor noted that the patient was "stable" and could "come to sick call if problem." This was indifferent to the patient's serious medical condition. Low white count with anemia can reflect a serious problem including cancers, immune disorders, or other serious conditions.

- Another patient transferred from Cook County Jail with information that the patient had a pending appointment with colorectal surgery.[23] The intake history failed to identify why the patient had a pending colorectal surgery appointment. The patient gave a history of significant weight loss, but the weight loss was not included in the intake problem list and there was no diagnostic effort to evaluate for weight loss. This weight

---

[23] Patient #3 Hospital and Specialty Care.

loss could be verified because the patient had a prior incarceration in the IDOC, and in prior IDOC notes weighed 245 pound in 2014; the weight on admission on 5/18/16 was 189. The failure to address a verified 56-pound weight loss was unacceptable.

About three weeks later, on 6/6/16, a nurse practitioner took a history that the patient had prior tumors identified during a cystoscopy performed earlier that year. The patient also gave a history of a prior colonoscopy in December of 2015. The nurse practitioner did request old records, which showed that the patient had a CT scan in December of 2015 showing a posterior bladder wall mass of 3.4 cm. The patient was sent to an urologist and eventually that patient had a cystoscopy on 8/23/16, two months after intake. This procedure was normal.

In the meantime, on 7/8/16, the patient began complaining of stool coming out of her vagina. A doctor evaluated the patient on 7/25/16 and wrote that she would "consider" a CT scan. Lacking the prior CT scan, a new diagnostic study should have been done, as the patient had considerable weight loss, history of an abdominal mass, and stool coming out of her vagina. Instead, the doctor waited for the cystoscopy. This procedure was done on 8/23/16, but there was no report. There was also no report of a follow-up visit on 9/7/16 to the urologist except the urologist wrote on the referral form, "no malignancy in bladder… F/U prn [recommend] gyne eval."

A doctor saw the patient on 9/7/16 and obtained a history that the patient had stool coming out of her vagina for three months. On 9/15/16, a doctor referred the patient to a gynecologist, who saw the patient on 9/23/16 and recommended an ultrasound to rule out a recto-vaginal fistula. The ultrasound was done 10/3/16 and the radiologist recommended a CT scan. The CT scan was done on 10/25/16 and showed a suspected fistula between the sigmoid colon and the vagina. A doctor referred the patient to a colorectal surgeon on 11/3/16. Notably, when the patient transferred from Cook County Jail, the patient had a pending appointment to colo-rectal surgery which was ignored. The colorectal surgeon saw the patient on 11/28/16, but again there was no report in the medical record. The surgeon recommended an MRI and surgical exploration. On 12/12/16, the MRI was done, but there was no report. The patient had a colonoscopy on 12/30/16, but there was no report and it was not clear what happened. The patient went to colorectal surgery on 1/19/17 for follow up, but again there was no report. This patient eventually obtained surgery to repair a sigmoid colon-vaginal fistula on 3/28/17, but the failure to take an adequate history at intake regarding weight loss and to address the pending colorectal surgery appointment at the Cook County Jail resulted in a 10-month delay in treatment of the patient. The failure to obtain consultation reports impaired the ability of the providers to understand the status of the patient.

## Specialty Consultations

**Methodology:** We reviewed specialty care tracking logs, interviewed the scheduling clerk and performed record reviews of persons who received specialty care.

**First Court Expert Findings**

The First Court Expert found that when patients return from scheduled consultations, they are not brought to the health care unit. Review of paperwork, including recommendations, and scheduling of follow-up visits did not consistently occur, resulting in failed follow up. Also, the process of offsite scheduling begins with the collegial review, and the referral date by the clinician is not tracked. Record reviews showed that consultation reports were unavailable in the medical record. In a review of records, the First Court Expert found that in three of five records there was no follow up of the consultation by the primary care provider. Also, the First Court Expert reviewed care of 13 patients referred by an outside attorney. Of these 13 patients, six (46%) consisted of delayed or denied necessary specialty care.

**Current Findings**

Specialty care referrals are initiated via the electronic record. The scheduling clerk collects the referrals electronically on the Tuesday before collegial reviews from an inbox in the electronic record. The supporting data is obtained by the clerk and emailed to the Wexford UM reviewers. The referral is placed on the tracking log only when the referral is approved by the utilization reviewer. Referrals need to be placed into the medical record whether they are approved or not.

Review of specialty care continues to be difficult.[24] We examined the first month of specialty referrals for 2017. There were 62 referrals for care. Collegial reviews occurred within five days for 60 (97%) of referrals. However, we noted in a separate review of multiple consultations for a single patient that referrals in seven of eight consultations occurred close to a day before the approval, even when it appeared that the actual referral[25] occurred weeks before the approval indicating that the log is not accurately maintained. Fifty-five of these 62 (92%) referrals occurred within a month of the referral. The log used by the scheduling clerk and presented to us for our investigation does not contain all specialty referrals. In our interview with the scheduling clerk, we were told that only completed consultations are maintained on this log. Denials are not placed on the log. Though we were told that there are five or less denials in a year, there were 31 denials provided to us over an eight-month period or approximately 46 denials pro-rated over the past year.

We evaluated a series of consultations in the medical record of one patient to assess whether medical care was timely and appropriate.

---

[24] It has been very difficult to investigate this area of service. We asked for the tracking log as used by the scheduling clerk at the site in a spreadsheet format to include the name, Illinois Department of Corrections number, date of referral for specialty care, date of collegial review, date of approval, date of service, and the service referred for. We again did not receive what we asked for. We were sent a PDF file which could not be sorted. There were 39 pages of appointments not in chronologic order for any of the items. This made it very difficult to use. After receiving this list, we asked again for the spreadsheet used by the scheduling clerks at the site. I received an email on April 20, 2018 that the Wexford site team used the PDF file for tracking and did not use a spreadsheet. This PDF was too disorganized to effectively use. Once at the site, we discovered that the site did use a spreadsheet and asked for and received this document before we left. This delayed our ability to review this process.

[25] When a consultant recommends a follow up or specialized test, we view that recommendation as a date of referral. Many consultant recommendations do not appear to be evaluated timely and thus their new referrals for care may not be addressed for weeks. LCC apparently uses the collegial review episodes to coordinate referrals rather than the physician review of offsite consultation. This makes care appear more timely than it actually is.

- We examined a patient who had multiple consultations.[26] This patient had multiple sclerosis (MS). We examined eight of his consultations on the tracking log from 12/1/15 to 1/18/18, and three consultations occurring before the tracking log started. There were two denials for referrals to neurologists in late 2014 (8/14/14 and 12/29/14). The alternative treatment plan recommended was "conservative" therapy without any explanation of what this might be for someone with MS. The doctor appeared unsure of how to manage the patient. These denials prevented neurology consultation for MS, which is generally accepted medical care.

Of the eight consultations on the tracking log, there were only five consultation reports in the medical record. One of the reports was filed two months late. Six of eight referrals were timely based on the tracking log. However, one referral was to UIC with a recommendation for a four month follow up. This never occurred; instead the patient was sent to a local neurologist, even though the local neurologist recommended that the patient see a neurologist at a major medical center. Two of the eight referrals were late. One was one month late and the second was five months late. Two of the eight visits were for MRI tests. In neither was there documented evidence that a doctor had reviewed the results. For two of the six neurology consultations there was no evidence that a provider reviewed the consultation findings with the patient or reviewed what occurred at the consult. After another consultation visit, the findings were not reviewed for about six weeks after the consultation. After another consultation, a doctor saw the patient but did not document review or understanding of what occurred at the neurology consultation. After only two of the eight consultations was there evidence of understanding of what occurred at the consultations. Referrals were documented on the log on average about three weeks after the actual consultation was referred by the consultant or LCC provider. The actual log documents six of eight approvals as occurring the day following the referral, making it appear that the tracking log is maintained based on collegial review events rather than based on the clinical referral itself.

Doctors at LCC did not document understanding of what occurred at neurology visits or understanding of the MRI results. This lack of understanding of what occurred at the consultations was important because the patient's chronic condition was not being monitored well in chronic clinics. This patient was being followed in chronic clinic every six months, but providers were not consistently seeing the patient after neurology consultations or documenting understanding of the consultant's findings and recommendations. The providers did not perform adequate history or assessment of the patient's MS. Providers inconsistently documented the therapeutic plan of the neurologist and did not independently perform adequate assessments. Because it did not appear that physicians at LCC knew how to manage this disease, the patient needed to be followed by a neurologist. Indeed, physicians at LCC attempted to refer to neurologists on four occasions because the patient was not getting better on prescribed care. Yet, on four occasions when LCC physicians wanted to refer to a neurologist, the

---

[26] Patient #4 Hospital and Specialty Care.

Wexford utilization physician denied their referral. On two occasions the UM physician asked that the LCC physicians use "conservative" management without advising what this meant for this complex disease. On two other occasions, a neurologist wanted the patient to be sent to a tertiary care neurologist for management. These requests were also denied. These denials were not all tracked on the tracking log. The facility HCUA had to intervene to get the Agency Medical Director to overrule this UM decision.

When the patient was sent to the neurologist at the major medical center (UIC), the consultation took eight months to occur. The neurologist at UIC could only perform a limited examination because correctional officers kept the patient in restraints during the evaluation. The neurologist had no information available. MRI tests and ophthalmology reports, requested to be sent, were not sent with the patient. The neurologist stated that the patient might need a second line disease modifying agent. The consultant recommended an MRI, different disease modifying agents, and a follow up in four months, but this follow up never occurred and the patient was sent back to the local neurologist. This specialized consultation was ineffective due to lack of information and inability of the neurologist to perform an adequate examination.

The ineffective and inconsistent monitoring of the patient at the facility was compounded by an unprofessional attitude of one of the physicians. After the UIC neurology consultation, the LCC doctor believed that the patient was faking and failed to undertake the recommendations of the UIC neurologist. The LCC doctor wrote, "In my opinion voluntarily exhibits purposeful resistance to exam for secondary gain I see no neurological finding."

This patient appeared to deteriorate clinically over four years and had inconsistent neurology management. There were four denials of care when doctors at LCC deemed the level of care to be beyond their expertise. Wexford utilization physicians denied care without providing LCC physicians appropriate alternative therapeutic plans. A cynical and unprofessional attitude by one of the LCC physicians appeared indifferent to the patient's real and inconsistently treated disease.

We noted multiple episodes of care, which based on contemporary standards of care, should have resulted in diagnostic testing or consultations, which were not referred. In at least two cases, harm resulted to the patient. It is our opinion that this aversion to timely and appropriate referral is related to the utilization process. We had an opportunity to observe a "collegial review" process at LCC. The "collegial review" took only about five minutes and consisted of the utilization doctor reciting the offsite referrals and giving approval or asking for more information. There was little "collegial" discussion about the cases. This process appears to be an approval meeting as opposed to a collegial discussion about cases. Staff told us that this "collegial review" typically only takes a few minutes to conduct. Collegial review is a misnomer, as there is no meaningful collegial discussion of cases. It is an approval process and, in our opinion, does not contribute to patient safety. We continue to believe that this process should be abandoned to protect patient safety. In our limited chart reviews, we identified four

denials[27] in a single patient for necessary care for multiple sclerosis without any documented collegial discussion of alternative plans, a delayed diagnosis of colon cancer that likely resulted in unnecessary spread of the colon cancer,[28] failure to send a patient[29] with necrotic foot lesions to a podiatrist or to thoroughly evaluate for osteomyelitis, failure to evaluate a diabetic patient[30] with a draining ulcer over the tibia for MRI, bone biopsy, or infectious disease consultation to evaluate for osteomyelitis, and a failure to obtain pulmonary function testing in a patient[31] with COPD.

- Another patient was 50 years old.[32] Earlier in her incarceration, on 8/15/13, she weighed 250 pounds. On 12/1/16, the patient complained at an annual health evaluation of abdominal pain and bloody stool. The only diagnostic screening that was done was a rectal examination noting a guaiac negative stool.[33] The patient should have had a colonoscopy on the basis of symptoms and age.

  Subsequent blood counts showed that the patient had anemia. When a doctor saw the patient and took a history of bloody diarrhea for three months, the doctor ordered metronidazole, apparently treating the patient for colitis on a presumptive basis. The doctor failed to notice the weight loss. Also, bloody diarrhea warrants a CT scan of the abdomen and colonoscopy, which were not done.

  More than a month later, on 2/27/17, the doctor noted continued diarrhea and the stool was positive for blood. This warranted colonoscopy. But the doctor diagnosed hemorrhoids and prescribed hemorrhoidal cream. While the patient may have had hemorrhoids, the more serious potential diagnosis (colon cancer) should have been excluded with a colonoscopy. This was not done. The patient was not seen for over four months, when a different doctor saw the patient for an annual physical examination. The doctor performed a rectal examination but did not test stool for blood. The patient now weighed 215 pounds (35-pound weight loss) and the weight loss was noted by the doctor who wrote, "hemorrhoids, historically is a long-term problem without any red flags to indicate a more significant condition." This statement was grossly and flagrantly unacceptable. A 50-year-old person with 35-pound weight loss and blood per rectum with anemia needs to have a colonoscopy and possibly a CT scan of the abdomen. Instead nothing was done. The patient had red flags unrecognized by this physician.

  Two months later, the patient continued to lose weight and weighed 204 pounds. The patient had abdominal pain with blood in her stool. The doctor diagnosed non-specific pain and took no action. This also was grossly and flagrantly unacceptable practice.

---

[27] Patient #4 Hospitalization and Specialty Care as discussed above.
[28] Patient #5 Hospitalization and Specialty Care as discussed below.
[29] Patient 6 Hospitalization and Specialty Care as discussed below.
[30] Patient #7 Hospitalization and Specialty Care.
[31] Patient #8 Hospitalization and Specialty Care as discussed below.
[32] Patient #5 Hospitalization and Specialty Care.
[33] Digital rectal examination even with guaiac testing will miss 90% of colon cancers. A colonoscopy was indicated.

On 9/20/17, a nurse practitioner noted ongoing abdominal pain for the past seven months. The nurse practitioner ordered a pelvic ultrasound and blood count. A colonoscopy or abdominal CT scan were indicated, not a pelvic ultrasound.

On 9/26/17, the Medical Director saw the patient, who was complaining of abdominal pain, nausea, vomiting, and diarrhea. The patient had 48-pound weight loss. The doctor ordered blood tests and a plain abdominal x-ray, which is not a useful test when evaluating anemia, weight loss, and bloody stool. It appeared that there was either ignorance of an appropriate work-up or a reluctance to refer appropriately. We asked the Medical Director what she would do for someone in her private practice for colorectal cancer screening and she indicated that she would typically order colonoscopy. She had no answer to why this was not being done at LCC. This patient should have had prompt colonoscopy, but it was not done. Presumably the utilization process is a barrier to adequate care.

The ultrasound was done 9/29/17 and only showed stool. A pelvic ultrasound is not an appropriate diagnostic test to exclude colon cancer. Finally, on 10/7/17, the Medical Director ordered a CT scan of the abdomen. On 10/16/17, the CT scan showed a large circumferential thickening of the sigmoid and descending colon consistent with cancer. MRI and colonoscopy were recommended. On 11/10/17, a colonoscopy showed a large ulcerated rectosigmoid lesion suspicious for cancer. The scope could not be passed beyond the mass. The patient was referred to an oncologist and had surgery on 11/28/17, where stage IV disseminated colon cancer was diagnosed. The patient saw the oncologist on 12/28/17.

This patient had an 11-month delay in diagnosing colon cancer, likely resulting in unnecessary dissemination of the disease, which harmed the patient. The patient had symptoms consistent with colon cancer (weight loss, blood per rectum, abdominal pain, and anemia) on 12/1/16, yet did not have a colonoscopy until 11/10/17. Providers saw the patient seven times during that time interval and presumed a more innocent diagnosis, even though the patient's symptoms and findings were consistent with colon cancer.

- Another patient with diabetes, asthma, deep vein thrombosis, and hypertension was incarcerated at LCC on 8/10/17.[34] An intake nurse noted that the patient had recent surgery on her leg for an infection. The wound was open and draining. The intake physician assistant documented that the patient had repeated episodes of deep vein thrombosis and required life-long anticoagulation.

At a subsequent evaluation, a doctor noted that the patient had the leg wound for over two years and was told she had a bone infection by staff at Stroger Hospital in Chicago.

---

[34] Patient #7 Hospitalization and Specialty Care.

Osteomyelitis generally requires intravenous antibiotics. The prior record from Stroger Hospital was not obtained. An initial sedimentation rate was slightly elevated at 27 (nl < 20) and an x-ray of the leg was normal. This patient should have had osteomyelitis excluded unless prior records demonstrated that the patient was adequately treated.

Over the course of eight months the patient continued to have drainage from an ulcer on her tibia. This indicated that the osteomyelitis was likely still present. A draining ulcer over a bone in a person with diabetes must include exclusion of osteomyelitis. This did not occur for this patient. The patient was treated with multiple different antibiotics simultaneously, including, for example, Bactrim, Levaquin, metronidazole, and fluconazole. Fluconazole is an antifungal therapy. We could not determine for what reason this drug was being used. Treatment of osteomyelitis is typically intravenous antibiotics for an extended period. There was not a reasonable effort to evaluate for osteomyelitis.

The patient was hospitalized in late December of 2017 for a MRSA cellulitis of the leg, but the hospital record was unavailable, and it was unclear if the patient received evaluation for osteomyelitis. The patient continues to have drainage from the leg ulcer with brawny skin changes. The patient has never had a thorough evaluation (MRI of the leg, CRP, bone biopsy) for osteomyelitis. A doctor referred the patient to an infectious disease doctor, but this referral was denied. The alternate treatment plan was to perform another wound culture, which was unlikely to be useful in the contaminated wound. The patient needed MRI, bone biopsy, ankle brachial index, and CRP.

- Another patient was transferred to LCC from Jackson County Jail on 1/6/17 with a history of mitral valve heart disease.[35] The patient had a prior history of clusters of blisters on her feet during a prior incarceration in 2015. The patient experienced episodes of what sounded like a fugue state. A doctor saw the patient on 2/15/17 for an episode of "temporary amnesia." Without taking an adequate history and performing a neurological examination, the doctor documented the patient as "neuro normal," diagnosed epilepsy, and enrolled the patient in seizure clinic and started Depakote, an anti-epileptic drug. A nurse practitioner changed the Depakote to Keppra, another anti-epileptic drug, at a later date. The patient remains on anti-epileptic drugs without ever having a witnessed seizure and without having had an EEG, or CT scan. The latter tests are typically required diagnostic studies for all new onset seizures. In this case, there was little evidence that the patient had a seizure and no diagnostic evaluations to diagnose this condition. The patient should have been sent to a neurologist, as the facility providers did not appear to know how to evaluate a new onset seizure disorder and the patient may not have epilepsy.

In addition, this patient again developed blisters on her feet on 1/11/18. Initially, a doctor ordered Diflucan, an antifungal agent, and metronidazole by phone order,

---

[35] Patient #9 Hospitalization and Specialty Care.

without evaluation. The blisters worsened and eventually on 2/8/18 a doctor diagnosed "foot rot" between the toes. Vinegar soaks, metronidazole, Keflex, and fluconazole were ordered. None of these antibiotics or antifungal agents is typically used for initial treatment of skin and soft tissue infections which, in a prison, need to cover for MRSA.

A doctor continued to treat the patient with multiple antibiotics and Diflucan, an anti-fungal agent, for over three months. During our tour we evaluated the patient, who had necrotic black tissue covering the webs between all the toes of her foot. We were told that the HCUA pressured the Medical Director to obtain an infectious disease consultation, which is scheduled for 5/1/18. The providers have not debrided the necrotic tissue, which needs to be removed until healthy tissue is present. The depth of the ulcerations on the feet has not been determined. If, after debridement, the wound probes to bone, then evaluation for osteomyelitis needs to be initiated. The patient should be treated with antibiotics appropriate for the type of infection and we agree with the infectious disease consultation, which should have been initiated earlier in the course of the infection and was only initiated at the urging of the HCUA.

- Another patient was a 49-year-old with a history of diabetes, hypertension, prior deep vein thrombosis, and presumed rheumatoid arthritis with long-term oral steroid use to treat her presumed rheumatoid arthritis.[36] This patient was incarcerated at LCC prior to initiation of the EMR and her old record volume was inaccessible and could not be reviewed. The patient had apparently been evaluated by a Wexford telemedicine rheumatologist, although there were no documented notes of these encounters in the medical record. The first documented chronic clinic visit was on 5/23/14, and the doctor noted that the patient had been on prednisone for years and had not seen a rheumatologist since 2008. It was unclear when the patient was incarcerated. The patient was on 20 mg of prednisone a day, which is an extremely atypical therapy and is not currently recommended.[37] On 9/15/14, a doctor on the infirmary documented that the Wexford rheumatologist recommended decreasing the prednisone dose from 20 mg to 15 mg. This is still an exceedingly high dosage, likely to cause adverse effects.

On 5/14/15, the patient was finally referred to a rheumatologist. The rheumatologist noted that the patient had no evidence for synovitis, yet had diabetes and Cushingoid presentation. This was likely from excessive prednisone use. The rheumatologist recommended stopping the non-steroidal medication and tapering the patient off prednisone. The rheumatologist recommended blood tests to monitor the use of methotrexate. The patient returned to the rheumatologist once more on 10/9/15. This was two months later than recommended. The rheumatologist noted that the facility physician had increased the dose of prednisone and again noted that there was no

---

[36] Patient #6 Hospitalization and Specialty Care.

[37] While short courses of oral steroids are used for rheumatoid arthritis, long-term steroid use is not recommended. Use of disease-modifying anti-rheumatic drugs (DMARDs) are recommended. Use of glucocorticoids are recommended only as adjunct therapy. Chronic use of steroids can cause increased risk of adverse events including osteoporosis, fractures, gastrointestinal bleeding, diabetes, infections, cataracts, and impaired adrenal function.

synovitis.[38] Synovitis is a key feature of rheumatoid arthritis and not having synovitis suggested that the patient might not have rheumatoid arthritis. The patient was still on the non-steroidal medication and the rheumatologist recommended again to stop the non-steroidal medication and to decrease the prednisone dose to 10 mg. The rheumatologist recommended a six month follow up, with an accurate list of the patient's medications. There were no further rheumatology visits.

The patient was not referred back to a rheumatologist and yet was continued on relatively high doses of prednisone, contrary to recommendations of the rheumatologist. On 3/1/17, a nurse practitioner saw the patient in general medicine chronic clinic for her rheumatoid arthritis. The nurse practitioner referred the patient to a rheumatologist but sent the request via the Medical Director. This referral was never made by the Medical Director. The Medical Director subsequently obtained x-rays of the hands and ordered a sedimentation rate. The x-rays showed no evidence for rheumatoid arthritis, and the sedimentation rate was normal. There were no erosions and no evidence for rheumatoid arthritis. Thus, the patient had no evidence of rheumatoid arthritis, as the patient had no evidence of inflammatory arthritis of any joint and no residual bony defects (erosions) consistent with rheumatoid arthritis. Also, a rheumatologist previously stated that the patient had no evidence of synovitis in any joint.

Nevertheless, LCC physicians failed to refer this patient to a rheumatologist and continued to treat the patient as if she had rheumatoid arthritis, with prednisone, methotrexate, and eventually hydroxychloroquine, all of which had significant potential adverse reactions. The Federal Drug Administration has assigned multiple black box warnings[39] for methotrexate and describes a multitude of adverse actions related to prednisone. Hydroxychloroquine also has multiple potential adverse actions, especially retinal toxicity that can result in irreversible retinopathy. While it was unlikely that the patient had rheumatoid arthritis, the patient was experiencing multiple adverse consequences of the treatment for presumed rheumatoid arthritis including diabetes, elevated high triglycerides, and fatty liver; all consequences of prolonged high dose prednisone use. The fatty liver was unrecognized as a problem. The elevated triglycerides were initially treated with fenofibrate, which is not a first or second-line therapy for elevated triglycerides. This drug should be used with caution in persons with liver disease, but the fatty liver was unrecognized by the facility providers. Fenofibrate was started apparently in December of 2016 and was eventually stopped in April of 2017. The diabetes, likely caused by the unwarranted use of prednisone, caused additional problems.

---

[38] This suggested that the patient had no active manifestations of rheumatoid arthritis and probably did not have rheumatoid arthritis.

[39] According to the FDA, a black box warning is a warning designated to call attention to serious or life-threatening risks that can cause disability, be potentially life-threatening, and can result in hospitalization or death. As found at https://www.fda.gov/downloads/forconsumers/consumerupdates/ucm107976.pdf.

The patient also had diabetes with HbA1C levels demonstrating poor control as of April of 2018 (HbA1C 8.3). The poorly controlled diabetes likely caused the fatty liver and elevated triglycerides, which are a risk factor for heart disease. The patient also developed a diabetic foot ulcer, first noticed on 11/30/15. The diabetic foot ulcer was improperly treated, as the patient was allowed and even encouraged to walk on the foot, when recommended therapy is to not have the patient walk on the affected foot. The patient did have an evaluation for vascular insufficiency (ankle-brachial index) but did not have an evaluation for osteomyelitis despite having the ulcer for at least 15 months. We stopped review of this record in April of 2017 and were unsure whether the ulcer was present after this. A diabetic foot ulcer for 15 months needs evaluation for osteomyelitis, which was not done.

This patient appears to be treated with multiple drugs for a condition it does not appear that the patient has. If the patient has seronegative rheumatoid arthritis, there certainly does not appear to be any adverse outcome (joint disease or erosions). Given that, this patient should not be treated with high dose prednisone for years. The prednisone is causing harm to the patient. The harm being caused is likely to cascade and cause other problems. This patient needs to be evaluated by a rheumatologist to determine if indeed the patient has rheumatoid arthritis, which appears unlikely, as there is no evidence for this disease. If the patient still has a foot ulcer, the patient needs evaluation for osteomyelitis.

- Another patient is a 72-year-old woman who had a 10-year risk of heart disease or stroke of 29% and should have been on a moderate-intensity statin, but was on a low-intensity statin.[40] The patient had hypertension and an LDL cholesterol of 179, but instead of placing the patient on a moderate to high-intensity statin, the doctor added cholestyramine, a second line cholesterol medication, to a low-intensity statin dose. Later, the patient was also treated with fish oil, a marginal anti-lipid drug. The patient was never placed on standard treatment for her lipid disease. The patient had a diagnosis of chronic obstructive lung disease (COPD), but was monitored as if she had asthma. The First Court Expert made a recommendation that IDOC develop a guideline for COPD as opposed to asthma, but this has not been done. In this patient's case, monitoring in chronic clinic was for asthma but the patient had COPD. There was no evidence of the patient ever having a pulmonary function test, which is the cornerstone of diagnosis for COPD. Every patient with COPD should have a pulmonary function test, but this test is seldom done in IDOC for patients with COPD.

## Pharmacy and Medication Administration

**Methodology:** We conducted a comprehensive review of pharmacy and medication services from the time a medication order is written until medication is delivered to the patient. We met with health care leadership and staff involved in pharmacy and medication services, toured

---

[40] Patient #8 Hospitalization and Specialty Care.

pharmacy and medication administration areas, observed medication administration, and reviewed medication administration records.

**First Court Expert Findings**
The First Court Expert Report did not include findings or recommendations related to pharmacy practices or medication administration. The review did not appear to include a review of medication administration records.

**Current Findings**
This review showed systemic issues related to pharmacy and medication administration systems.

BosWell Pharmacy Services provides medication services at LCC through a "fax and fill" process. Providers enter medication orders directly into the EMR and the order is electronically transmitted to an offsite pharmacy. BosWell dispenses and ships prescriptions six days per week (not on Sundays). Medications are either patient-specific or for stock supply. When new medications arrive, medication assistants check medications received against a packing list of what was shipped.

The medication room is of adequate size for its purpose. The floors and countertops were dirty. The refrigerator used to store staff food was unlabeled (i.e., staff food) and filthy. The medication refrigerator required cleaning. We found an injectable medication that expired in January 2018 and two open insulin vials that were not labeled with the date of opening and expiration dates. In a nearby cabinet we also found two opened Lidocaine vials that were not labeled with the date of opening or expiration. A random check of sharps and controlled medications showed that counts were accurate.

According to the HCUA, the area is staffed by unlicensed and uncertified medication room assistants, not licensed pharmacy technicians or nurses. There is no formal training curriculum and staff are provided on-the-job (OJT) training. This raises safety concerns, as these staff deliver hundreds of KOP medications to patients on a daily basis. A major concern is that medication assistants deliver medications to patients and do not consistently document administration on the MAR. This is further described below.

Nurses administer medications to general population inmates in the chow hall, which is a centralized location near the medical building. Nurses prepare medications by transferring medications from pharmacy-dispensed, properly labeled containers into small white envelopes that do not contain the same information as on the blister-pack label. Nurses then place medication envelopes into small transport containers and carry them to the chow hall. Nurses do not bring MARs with them to document medication administration at the time medications are given.

We observed three nurses administer medications in the chow hall. Inmates arrived based upon work or housing status. Nurses stood behind a metal rail and inmates approached a nurse

based upon last name. Although inmates had identification badges, nurses did not positively identify each patient by looking at the badge or having the patient state her name and a second identifier (e.g., inmate number or DOB). Nurses did not use medication cups to administer medications. Instead, nurses took the medication envelopes and poured the medication into the patient's hand. One nurse was observed to touch an inmate's hands in multiple instances to steady it as she poured the medication. This was unhygienic and neither this nurse nor the other two nurses were observed to use hand sanitizer during any time in the course of administering medications. One nurse got Milk of Magnesia on her hands and wiped her hand on her pants.

As noted above, nurses did not bring MARs with them and did not document administration of medications at the time they were administered. This increases the risk of error in documenting medications.

In segregation, the nurse prepared medications in the same manner as in general population and did not bring MARs with her. We observed this nurse make a medication error by giving medication to the wrong patient. We interviewed the nurse, who reported that as she came into segregation, an officer was escorting an inmate back to the unit who was due for medication (Patient X). As this took place, another inmate approached her to receive her medication (Patient Y). The nurse did not positively identify the patient and stated that she was thinking of Patient X and retrieved and poured her medications into the hand of Patient Y. Patient Y stated, "These are not my medications," and gave them back to the nurse, who then gave Patient Y her scheduled medications. It is unclear what the nurse did with Patient X's medications, as they had already been poured into another patient's hand. This was a "near miss" medication error, in that the nurse gave the patient the wrong medication and it was only because of the patient's refusal that the medication error was not committed. It is clear that in both general population and segregation nurses do not positively identify patients prior to administering medications. These findings were discussed with the HCUA during the site visit.

Medication Administration Records
As noted above, review of MARs showed lack of documentation that patients received KOP chronic disease and other medications, sometimes for several months. Our interview with the HCUA revealed that medication room assistants deliver KOP medications to patients without consistently documenting administration onto the MAR. Instead, medication assistants note on the BosWell pharmacy inventory list that the medication was given to the patient; however, this is not part of the medical record. Therefore, in multiple records there is no documentation that the patient received ordered chronic disease and other essential medications. In addition, in many records previous months' MARs had not been scanned into the record, including July and August 2017 MARs.

For example, in 10 of 10 health records reviewed to assess the medical reception process, all records were missing some MARs, including January and February 2018. In addition, several patient MAR's showed that they did not receive chronic disease medications, sometimes for months. In addition, there were other documentation errors. The following cases are examples:

- An HIV patient who arrived in 10/18/17.[41] That patient's December 2017 MAR showed that she did not receive HIV medications. There was no January 2018 MAR in the record.

- A patient with hypertension and hyperlipidemia arrived on 1/5/18.[42] There is no documentation on her January and February 2018 MAR that she received Norvasc, metoprolol, and gemfibrozil. In addition, on 2/5/18, the medication order for her chronic disease medications expired and was not renewed until 2/20/18. As of 4/23/18, there was no March 2018 MAR scanned into the record.

- A patient with glaucoma and hypertension arrived on 11/21/17.[43] A November 2017 MAR does not show the patient received her chronic disease medications. On 12/7/17, a new order was written for glaucoma medication (Latanoprost), but there is no documentation that the patient received the medication in December 2017.

- A patient with hypothyroidism and hypertension arrived on 2/2/18.[44] On 2/3/18, a provider ordered the patient's medications. Her February 2018 MAR does not show that the patient received levothyroxine or Lisinopril. As of 4/23/18, there was no March 2018 MAR scanned into the record.

- A patient with a history of hypertension and two heart attacks arrived on 2/27/18.[45] She was taking the blood-thinner Plavix, metoprolol, isosorbide dinitrate, and atorvastatin. There is no February 2018 MAR to show that the patient received her medication. A March 2018 MAR shows that on 3/1/18 she received isosorbide dinitrate and on 3/3/18 she received her other chronic disease medications. In addition, although the patient was given metoprolol via KOP on 3/3/18, a nurse documented giving the patient the medication on 3/4/18 and 3/5/18 via nurse administration. Another nurse wrote on the MAR that the patient received the medication via KOP and not dose by dose, after which nurses stopped documenting they were giving her the medication daily.

- A patient with hypertension and mental health disorder arrived on 10/17/17.[46] A provider ordered her medications on 10/18/17. On 10/30/17, chronic disease medications were received. The November 2017 MAR does not show the patient received hydrochlorothiazide. The patient's January 2018 MAR does not show that the patient received hydrochlorothiazide and amlodipine. As of 4/23/18, a March 2018 MAR had not been scanned into the record.

---

[41] Medical Reception Patient #1.
[42] Medical Reception Patient #3.
[43] Medical Reception Patient #4.
[44] Medical Reception Patient #6.
[45] Medical Reception Patient #7.
[46] Medical Reception Patient #9.

- Another patient with diabetes and hypertension arrived on 7/19/17.[47] There is no July or August 2017 MAR scanned into the record. The patient's September 2017 MAR shows the patient did not receive glipizide or Lisinopril. The January 2018 MAR shows the patient did not receive any chronic disease medications, except inhalers.

We also found that not all medication orders were transcribed onto a MAR; therefore, except for the original order, there was no documentation that the patient was due to receive or had received the medication.

We found blank spaces indicating that nurses did not document the status (administered, refused, etc.) of medication administration for that dose, including for patients taking insulin. We found medication errors, in that nurses continued administering medications after a provider discontinued the order.

Review of MARs also shows inconsistency with how nurses document discontinuation of previous orders and new medication orders. When providers change or discontinue medication orders, standards of nursing practice are for nurses to draw a line on the date of discontinuation and write "Discontinued" or "D/C" after the line. If there is a new order for the medication, it should be transcribed onto a separate line on the MAR with new start and stop dates. However, we found that in some cases, nurses overwrite dates of a previous medication order with the date of the new order. This defaces the MAR, making the dates of the previous medication order illegible. It also increases the risk of medication error, as the provider may have changed the dose or frequency of administration of the medication, and not simply renewed the order.

In summary, our review showed systemic issues with medication administration that failed to ensure that the right patient received the right medication, at the right dose, by the right route at the right time. These issues included administration of KOP medications by unlicensed and untrained staff, failure to document administration of medications onto MARs, failure to timely scan MARs into the EMR, failure of nurses to document administration of medications at the time of administration, failure of nurses to document each scheduled dose of medication, and failure to properly discontinue and transcribe new medication orders.

## Infection Control

**Methodology:** We inspected the clinical areas in the medical building,  building #6's physical therapy room and patient common showers/bathrooms, and the #15/X-building's reception center. We interviewed nursing personnel, HCUA, facility engineer, Wexford staff assistant, and infirmary porters. We reviewed the safety and sanitation reports for the months of July, August, November, December 2017, and February 2018.

**First Court Expert Findings**

---

[47] Medical Reception Patient #10.

Our findings are consistent with the First Court Expert's findings. There is not a budgeted infection control position and infection control duties have not been formally assigned, although individual health care staff may perform duties such as completing public health forms for reportable diseases. he First Court Expert raised significant concerns about the water temperature in the infirmary's non-industrial washer. The expert noted that the health care unit laundry machines did not reach the required minimum temperature of 140 degrees with bleach or 160 degrees without bleach, and thus could not adequately sanitize infirmary linens. He noted that the infirmary porters are provided orientation to the health care unit which includes proper cleaning and sanitation procedures, blood-borne pathogen training, and communicable disease training.

**Current Findings**

We agree with the findings of the First Court Expert's report. In addition, we identified additional findings and confirmed some of the findings of the First Court Expert's findings as follows:

- Regular safety and sanitation inspections and reports are being done by the health care team at LCC.
- A number of the safety and sanitation deficiencies in the physical plant at LCC that have been reported, some repeatedly, since July 2017, including mold/mildew on ceilings and walls, failure to change ice machine filters, missing cold and hot water showers knobs, sinks that do not drain, infestations, and non-functional toilets in the housing areas. These problems constitute patient and staff safety, and infection control risks for patient-inmates and correctional and medical staff.
- There is no one formally assigned at LCC to the tasks of infection control.
- The three infirmary porters who were interviewed and whose medical records were reviewed had no documentation that they received the hepatitis B vaccination series or had been trained about blood borne pathogens prior to starting to provide sanitation services.
- The infirmary porters at LCC are not offered hepatitis A vaccination even though they will be cleaning the patient rooms and bathing areas where they will have a probability of the contact with fecal waste.
- Two of the three negative pressure rooms in infirmary were not fully operational on the first day of the site visit. The facility engineer had corrected this problem by the last day of the site visit.
- Paper barriers were noted to be used on most but not all examination tables.
- The temperature of the washer in the infirmary laundry room was found to be insufficient (120 F) to sanitize the infirmary patient linens**.**

Safety and sanitation inspections (environmental rounds) are performed by the health care team on a monthly basis and reported by the HCUA. A number of reports from July 2017 through February 2018 were reviewed by the experts. These rounds identified concerns, some of which appear to have been corrected or are being addressed. However, the inspection reports repeatedly noted a number of deficiencies, including mold/mildew on walls and

ceilings, missing cold and hot water knobs in common patient showers, and non-functional toilets that do not appear to have resulted in correcting the deficiency.

Sharps boxes, gloves, handwashing sinks, or sanitizing gel was found in all clinical areas. Paper barriers were being used on only three of the five examination tables in the outpatient clinic exam rooms. Small tears in exam tables and crusted mineral deposits in two sinks in health care areas make it difficult to fully sanitize these items.

Two of the three negative pressure rooms in the infirmary were not functional on the initial day of the site visit. The facility engineer was summoned, and all three negative pressure units were operational by the last day of the site visit.

Inmate porters perform sanitation duties. There is no schedule of routine clinic sanitation, and disinfection activities are not consistently performed in clinical areas. During this site visit, the pharmacy floors and countertops were dirty. The September 2017 CQI minutes include a Safety and Sanitation report that focused primarily on whether housing unit showers, sinks, and toilets are broken, but not on sanitation of clinical areas or housing units. We described the duties of the porters earlier in the Sanitation section of this report. We note, however, that there was no documentation in their medical records that they were immune to hepatitis B (or A) or if they had been vaccinated against hepatitis B (or A). The Wexford staff assistant who is responsible for the training of infirmary porters also was unable to provide documentation that the three porters had been trained or vaccinated. All infirmary porters must be trained and fully vaccinated prior to being assigned to duties in the infirmary, where there is higher risk of exposure to pathogens and a more frequent and higher degree of sanitation is needed.[48]

CQI meeting minutes contain reportable disease statistics, but no analysis of prevalence or incidence of new infections. As an example, there is no analysis of Methicillin-Resistant *Staphylococcus Aureus* (MRSA) infections to determine whether infections are clustered in certain housing units that might require further screening and intervention. LCC does not have an effective infection control program.

In summary, LCC does not have an infection control nurse, the function of the negative pressure rooms was not adequately monitored, the training of the infirmary porters about their job duties and exposure and prevention of blood-borne infections was not documented, there is no evidence that the infirmary porters had received hepatitis B (or A) vaccination or had immunity to hepatitis B (or A), some deficiencies noted on safety and sanitation rounds do not appear to be corrected, there are health care unit sinks with crusted mineral deposits, and exam tables with torn upholstery, and CQI minutes lack analysis of infection control data.

We concur with the recommendations of the First Court Expert on Infection Control. We have additional recommendations that are included at the end of the report.

---

[48] Infirmary Patients #5, 6, 7.

## Radiology Services

**Methodology:**  We inspected the radiology unit and reviewed x-ray logs.

**First Court Expert Findings**
The First Court Expert's report did not include any findings about the radiology equipment or services

**Current Findings**
- The Illinois Emergency Management Agency (IEMA) radiation safety inspections and reports for the radiology units at LCC are current. The active x-ray equipment at LCC was found to be in compliance with the Radiation Protection Act of 1990.
- The access to plain film x-rays at LCC is good.
- The turnaround time for radiologist readings and return of the reports is good.
- The lack of a shielded post to take panorex films has the potential for radiation exposure to  the radiology technician.
- The system decision not to have the x-ray technician wear radiation exposure dosimeters may not be in accord with State of Illinois regulations and is definitely not in accord with community practice.

IEMA inspected and certified the LCC radiology units in September 2017; this certification is valid through September 2019. The x-ray technician produced his current license, which is valid through July 31, 2018.

Plain film non-digital x-ray services and panorex studies are provided Monday, Wednesday, and Friday during the daytime hours by a single radiology technician who staffs and manages the unit. The technician estimated that 50 patients generating about 90 plain films receive x-rays on a weekly basis. Mammography studies are performed on Tuesday and Thursday by a contracted mammography technician. An intact lead apron to shield patients was inspected. Patients requiring advanced or emergency studies are referred to local hospitals in Springfield or occasionally to UIC Medical Center.

It was reported that there is not a waiting list for non-urgent onsite x-rays. Most x-rays are reported to be taken within one to two days after receiving the order. Weekend and holiday requests are completed on the next working day. The requests and the radiology log for 18 patients were reviewed. All 18 had films taken within one to four days of the request. Audits of films taken on April 13 and April 18, 2018 revealed that all of the films were read and returned to LCC in two to three days. Abnormal results are called in by the reading radiologist; most results are faxed on the day of or after the reading is completed. The films are read by a local contracted radiologist in Bloomington, Illinois.

The chest x-ray unit and the plain film table are in a room that has a shielded post for the technician to stand behind while the film is being taken. The radiology technician has a dark room and a work space immediately adjacent to the plain film suite. The panorex was added to

the LCC radiology services after the radiology room had been constructed. It was located in an interior hallway that connects to the other side of the technician's work space. There is not a shielded post that can be used when panorex films are taken; the technician has to stretch the trigger cord as far as he can and then stand behind a cabinet in the work space to minimize his risk of radiation exposure. He is not aware if IEMA or the IDOC has ever measured the radiation exposure generated when panorex films are taken.

The x-ray technician was noted not to be wearing a radiation exposure dosimeter badge. They stated they had been told by Wexford that the State of Illinois does not require the use of dosimeters. They communicated that they are required to wear a dosimeters at their other work site.

In summary, the radiology services at LCC have reasonable access to x-ray services and reasonable turnaround time of radiologist readings and reports. The location of the panorex and the absence of a shielded post to take panorex films raises concerns about the risk of radiation exposure. The decision of the system to not provide radiation exposure dosimeter badges is not in accord with community standards and needs to be further reviewed by the State of Illinois IEMA and possibly OSHA.

The First Court Expert's report did not have any recommendations about the radiology services. We have noted recommendations that are noted at the end of the report.

## Infirmary Care

**Methodology:** Accompanied by either the HCUA or the Wexford staff assistant, the Expert toured the infirmary, inspected the clinical space and equipment, and audited infirmary charts. Nursing staff, porters, and patients-inmates were interviewed.

### First Court Expert Findings
The First Court Expert noted significant concerns about the condition of the paper medical record in the infirmary. Information was kept in two files, reports and notes were loosely dropped in the chart binder, forms were not in chronological order, admission orders could not be found, consultation reports could not be located, and the SOAP charting method was not utilized. The expert also reported that there was not a nurse call system, nurse admission notes were inconsistently completed, and vital signs were not consistently performed. The expert reported that the provider notes were thorough and written at least daily.

### Current Findings
Since the visit of the First Court Expert, LCC has implemented an EMR system that addressed most of the deficiencies related to the poor organization of the former paper medical record and the inability to find clinical information. A nurse call system has been installed adjacent to all the non-crisis infirmary beds. Vital signs are regularly taken. We identified the following confirmatory and additional findings.
- The infirmary was clean and organized.

- An EMR has been implemented since the First Court Expert's visit but there are an insufficient number of devices to enter information into the EMR on the infirmary unit. There needs to be as many devices as the number of potential simultaneous users. This reflects on a poor EMR implementation process.
- A nurse call device was mounted next to each non-crisis infirmary bed. The system was verified as being operational. Patients demonstrated competency in activating the system.
- Nurse and provider admission and progress notes were written in accord with established timelines. We did note, however, on record reviews that the provider occasionally but routinely writes notes at home after work hours. Notes should be written at the time service is provided.
- There is a nurse assigned to the infirmary on every shift, seven days a week; however, not all of the infirmary shifts were covered by an RN.
- Vital signs in the infirmary were regularly taken and recorded.
- The failure of the health care system and the providers at LCC to monitor and track weights contributed to delays in initiating needed diagnostic testing.
- The failure of the infirmary provider to timely consult with medical and surgical specialists put infirmary patients at risk for disease progression and increased morbidity. The collegial referral system added little value and contributed to delays in accessing specialty consultation.
- The provider's use of antibiotics and antifungal agents was excessive and not in alignment with current practice of care, and put patients at risk for complications of antibiotics, superinfections, and resistance to antibiotics.
- Offsite specialty consultation reports were not consistently retrievable in the EMR.
- The utilization of warfarin for anticoagulation is logistically complicated and puts patients at risk for serious medical complications due to failure to consistently obtain therapeutic levels of coagulation. It is our opinion that the IDOC should consider newer alternatives to warfarin for anti-coagulation.

The infirmary is located at one end of the medical building. The unit consists of single and double bed rooms. There were three crisis/negative pressure rooms with large glass viewing panels situated directly in front of the nursing station. The physical plant appears to be unchanged since the First Court Expert's site visit in 2014. With the exception of the crisis rooms, hospital beds with adjustable heights and sections in good condition were universally deployed in all infirmary rooms. The crisis rooms had concrete beds with intact mattresses.

Nurse call devices were mounted on walls adjacent to each infirmary bed. The system was verified as being operational. Patients demonstrated full understanding of how to activate the nurse call device. There were no nurse call devices in the crisis rooms, but the rooms were in the line of sight and/or sound of the nursing station.

At the time of the visit, all of the patients housed in the infirmary were able to independently perform their personal activities of daily living (ADL). This was in marked contrast to the

infirmaries at previously inspected male IDOC facilities, where up to fifty percent (50%) required total or partial care with their ADLs.

IDOC Policy 04.03.120 Offender Infirmary Services[49] directed nurses to write admission notes at the time of admission and progress notes no less than daily for acute patients and weekly for chronic patients. Providers are to write admission notes within 48 hours and progress notes no less than three times a week for acute patients and once a week for chromic patients. Review of five current infirmary records with six infirmary admissions verified that each of these patients had nurse admission notes on the day of admission and no less than daily progress notes; most records had notes on each shift, on all patients. Provider admission notes were written on the six admissions within 48 hours and the five chronic patients had progress notes no less than weekly. The one acute admission was discharged on the day after admission. We did note on record reviews, however, that provider notes are sometimes entered late at night; sometimes around midnight. We were told that the provider will routinely write infirmary notes after hours. For one episode, a provider wrote a discharge note from home for a discharge that occurred 8 days earlier.[50] We found several examples of this and were told that it is a routine practice. As we noted in the medical record section, there are an inadequate number of devices on the infirmary to access the electronic medical record and this is one contributing factor. We also believe that there is inadequate physician staffing as this physician does not appear to have time to write all her notes at the time care is administered.

One nurse is assigned to the infirmary on every shift, seven days a week. Although RNs covered most shifts, LPNs were sometimes assigned to infirmary shifts. If the infirmary is near full occupancy or the patients' acuity level of care is higher, additional nursing personnel (LPN, CNA) would be needed to address patient care needs.

Although the frequency of provider progress notes and quantity of documentation was reasonable, we had a number of concerns about the quality of the provider's clinical judgement, accuracy of clinical diagnoses, rationale for therapeutic clinical decisions, and understanding of when to consult outside specialists or refer patients whose conditions warranted inpatient care. The provider ordered antibiotics or antifungal agents when there was no justification for their use. These medications were continued for durations of time that were not warranted by the patient's condition. The provider prescribed confusing combinations of antibiotics and antifungal agents that were not clinically justified which put the patient at danger of serious gastrointestinal infections and antibiotic resistance. Patients whose conditions warranted the early and ongoing involvement of specialists were treated in the infirmary by the primary care provider in lieu of referral. Doctors utilized presumptive diagnoses without obtaining diagnostic testing or consultative referral necessary to make a diagnosis. The diagnostic testing or consultation necessary for a definitive diagnosis were either

---

[49] Offender Infirmary Services.

[50] Patient #2 Hospitalization and Specialty Care. In this case, the doctor wrote a discharge note on 9/7/17 for a discharge that occurred on 8/31/17. This patient also had episodes in which the physician wrote notes at a later time for events that happened the day before. In this 9/7/17 episode, the doctor also appeared to have cut and pasted a portion of a mental health note to her note which made the note appear nonsensical.

not timely done or not done at all. We had a number of concerns about the care provided to infirmary patients which are provided below.

- The first example is a patient who had complaints of persistent lower abdominal pain, intermittent episodes of passing bright red blood from her rectum, and progressive weight loss for almost a year without timely work up.[51] She was noted as having anemia as early as January of 2017. The providers failed to note her weight loss; she was initially treated in January of 2017 for presumed diverticulitis without benefit of diagnostic studies (CT scan, ultrasound or follow up colonoscopy). A CT scan should have been done for a diagnosis of diverticulitis and colonoscopy should have been done for symptoms of abdominal pain, passing blood, anemia, and weight loss and for follow up screening for cancer if diverticulitis were diagnosed. From January to September of 2017 we noted 11 documented weights all showing progressive declining weight. Yet, only one provider note mentioned weight loss, and this was recorded seven months prior to her admission to the infirmary. In July of 2017 a provider noted that the patient had no "red flags" when at that visit the patient had a 28 pound weight loss. Eventually, on 9/26/17 the patient was admitted to the infirmary with nausea, vomiting, and abdominal pain. No diagnostic testing or consultation were ordered in the outpatient clinics.

  The initial therapeutic plan on the infirmary was to add ciprofloxacin to an ongoing prescription of metronidazole. The infirmary provider's plan was to continue antibiotics without ordering diagnostic testing (CT scan and white count), which is typically necessary to make a diagnosis of diverticulitis. Only after another 12 days in the infirmary did a provider note that the patient had lost a significant amount of weight and diagnostic testing was initiated. At this point the patient had lost 40 pounds. A CT scan was not done for about three weeks for what was an urgent medical problem. The CT scan showed a colon mass, likely cancer with metastases to lymph nodes and liver. Biopsy was done electively. Over two months after admission to the infirmary the patient was finally admitted to a hospital for surgery. Chemotherapy started a month later. This patient's complaints were not timely identified or evaluated, and resulted in late diagnosis and treatment of cancer that likely significantly harmed the patient. The metastases to the liver increased the probability of early death from this condition. The failure to link the weight loss to her symptoms indicated either incompetence, indifference, or negligence by the providers.

- Another patient had clinical history of transient ischemic attack, mitral valve replacement in 2006, severe tricuspid valve regurgitation, chronic atrial fibrillation, chronic kidney disease, COPD, left atrial appendage thrombus, chronic anticoagulation on warfarin, and chronic congestive heart failure (CHF), NYHA Class IV.[52] This patient was noted to have repeated episodes of bradycardia (slow heart rate) and multiple

---

[51] Infirmary Patient #1.
[52] Infirmary Patient #2.

itchy, draining skin lesions. The patient was admitted to the infirmary in September 2016 after hospitalization for heart failure and severe non-operable tricuspid regurgitation.

From October 2016 through April of 2018, the patient's level of anticoagulation was not therapeutic 29% of the time. Since July 2017, the patient had chronic itching with excoriated draining skin lesions which failed to resolve. Yet despite being unable to develop an adequate therapeutic plan or diagnosis, the patient was not referred to a dermatologist. We noted that the patient was on a medication (torsemide) which can cause a similar rash, yet this was unnoticed by providers. From July 2017 through March 2018, the patient had at least eight episodes of bradycardia. The slow heart rate was not noticed based on provider notes and there was no history or evaluation for associated symptoms of bradycardia. The patient was taking a medication (metoprolol) with a known side effect of causing bradycardia, but this medicine was not stopped nor was the dosage decreased. The provider did not document that any other heart condition was considered as the etiology of the slow heart beats, nor was consultation with a cardiologist requested.

In April of 2018, the patient was admitted to a hospital for tachycardia (130) and hypoxemia (oxygen saturation 88%). At the hospital, bradycardia (pulse in the 40s) was noted. Sick sinus syndrome[53] was identified and a pacemaker was inserted. On return from the hospital, the medication likely causing the rash was discontinued and the metoprolol dose was decreased. Doctors at LCC failed to adequately evaluate the patient's skin rash, failed to identify potential medication adverse reactions, failed to adequately identify or evaluate the slow heart rate with diagnostic testing, and failed to timely refer the patient to a cardiologist for slow heart rate in a patient with atrial fibrillation. These failures placed the patient at risk for harm.

- Another patient,  newly incarcerated at LCC, was admitted to the infirmary with severe damage to her toes from frostbite.[54] The patient was incarcerated on 1/30/18 and was noted to have a one month history of black, swollen toes. She was admitted to the infirmary and started on an antibiotic without documentation of the reason for initiating the antibiotic. A progress note on 2/20/18 documented gangrene and another antibiotic (cephalexin) was added to the metronidazole. On 3/6/18, fluconazole was added to metronidazole and cephalexin. The reason for this was not given and there was no apparent indication for adding an antifungal agent to the therapeutic plan, and the doctor did not document the infection resulting in the decision to start metronidazole or cephalexin. The 3/9/18 progress noted stated that right distal large phalanx was hard, dry, and black. On 3/12/18, 42 days after admission to LCC and 27 days after admission to the infirmary, the patient was seen by a general surgery consultant, who

---

[53] Sick sinus syndrome is a cardiac arrhythmia that results in a slow heartbeat. This arrhythmia typically requires a pacemaker. Notably this patient had a slow heartbeat for months which was not appropriately evaluated until emergency hospitalization occurred.
[54] Infirmary Patient #3.

recommended that the patient be referred to a podiatrist. This referral was not timely. Referral to surgical consultants with experience in managing frostbite needs to be prompt to prevent unnecessary amputation. The LCC doctor continued antibiotics without clear documentation of why they were being used. Cephalexin was discontinued on 3/12/18 and metronidazole stopped on 3/16/18, but fluconazole was ordered to be continued for another three weeks. On 3/23/18, metronidazole was reordered. A podiatry consultation appears to have been scheduled on 3/27/18, but may not have taken place (no consultation report, no provider progress note). On 4/14/18, the provider noted "no signs of infection," but cephalexin was added to metronidazole. The patient was seen by podiatry at Taylorville Podiatry on 4/19/18. The podiatrist recommended elective amputation. The podiatry consultation report was not located in the EMR. The doctor treated the patient with a changing and inexplicable array of antibiotics, including an oral anti-fungal agent for which there was no documented indication. The patient had black gangrenous toes and should have been either hospitalized or promptly referred to a foot specialist experienced in managing frostbite injury for early consultation to maximize the potential viability of her damaged toes. The first documented podiatry appointment occurred 66 days after her admission to the infirmary; the podiatrist immediately made arrangements to amputate one of her large toes. The excessive use of combinations of antibiotics and antifungal agents was unwarranted and exposed the patient to the risk of medication side effects. We note that the consultation reports were not found in the EMR. We also noted several late-night after-hours notes were written for this patient.

- Another patient is a 42-year-old patient had a history of total abdominal hysterectomy/ovarian cyst in 2010, and obesity.[55] She was admitted to the infirmary for observation on 9/7/17 for abdominal pain and a complaint of an enlarged abdomen, but was discharged the following day. She again complained of abdominal pain on 10/5/17 and was found to have mild anemia, for which iron was started without any other diagnostic testing except a normal plain abdominal x-ray, which has little utility in evaluation of abdominal pain. By January 2018, the patient still had abdominal pain and was admitted to the infirmary. For the five month period from September through January, we noted four evaluations for abdominal pain during which the weight loss of the patient was not noted. We noted a 13.5 pound weight loss since August 2017. A doctor initiated treatment for diverticulitis with ciprofloxacin and metronidazole, ordered an elective abdominal ultrasound, but discharged the patient the same day back to general population. This is an inappropriate therapeutic plan, as diverticulitis is an urgent problem. The patient should have remained on the infirmary until the conclusion of the diagnosis and the evaluation should have been promptly conducted. Instead, the ultrasound was not done for almost a month and showed a large pelvic mass. A subsequent CT scan showed an ovarian mass, possibly carcinoma. Approximately six weeks passed before the patient was hospitalized on 4/3/18 for exploratory surgery. This was a significant delay to diagnose and initiate treatment of

---

[55] Infirmary Patient #4.

the patient's condition. After return to the infirmary post-hospitalization, a final pathology report was not available in the medical record; a preliminary report indicated a benign condition. We remain concerned about the lack of attention to weight loss. This appears to be a systemic problem in the IDOC, as we have seen this on multiple record reviews at multiple sites, including on multiple death records. Whether this is due to indifference, lack of primary care training of providers, or some other reason is unclear, but the IDOC needs to address this issue.

- Another infirmary patient is a 28-year-old who had a history of four episodes of recurrent deep vein thrombosis (DVT) and pulmonary emboli since 2012 requiring continuous anti-coagulation therapy.[56] Since 2015, the patient had a right lower extremity ulcer. She had been on the infirmary for the past eight months for the non-healing, draining leg ulcer. The doctor ordered a confusing and changing combination of antibiotics without apparent indication. These included levofloxacin (9/20/17-10/25/17), doxycycline (12/18/17-1/23/18), trim-sulfamethoxazole (1/23/18 to 4/23/18), levofloxacin plus trim-sulfamethoxazole (2/28/18 to 4/23/18), fluconazole once weekly off and on, and metronidazole off and on for a number of courses. Over an eight month period, the provider failed to evaluate the patient for osteomyelitis despite the patient having a chronic draining ulcer over a bone. The doctor should have considered or ordered bone scan, bone biopsy, MRI, and blood tests (white count, blood cultures, CRP, or sedimentation rate). In March and April 2018, the provider submitted several referrals to an infectious disease doctor which were denied by Wexford utilization, even though it appeared that the doctor was uncertain how to manage this condition. This patient clearly needed specialty consultation due to the doctor being unable to diagnose the patient's serious medical condition, but these requests were denied without appropriate alternatives. With respect to anticoagulation for this patient, the INR levels were in the therapeutic range only 47% of the time. Her anticoagulant was modified 13 times in response to the high or low INRs. Given the inability of physicians to maintain therapeutic control and the logistics of warfarin anticoagulation in a correctional setting, newer alternative anticoagulants that are less complicated and safer to administer should be used. The lack of timely evaluation for osteomyelitis was a significant problem, as the patient has had the leg ulcer for over eight months. This places the patient at significant risk of harm.

In summary, with the exceptions noted in the first paragraph of the current findings section that the EMR had addressed many of the deficiencies in the medical record and nurse call devices had been installed in most infirmary rooms, we agree with the recommendations of the First Court Expert and have additional recommendations that are found at the end of this report.

---

[56] Infirmary Patient #5.

## Chronic Care

**Methodology:** The chronic care nurse was interviewed about the chronic care scheduling and tracking processes. The current chronic care annual schedule, the chronic care patient lists, and chronic illness medication lists were reviewed. The chronic care nurse practitioner was interviewed. The records of 15 patients with chronic care illnesses and conditions were reviewed. The Office of Health Services Chronic Illness Treatment Guidelines dated March 2016 and the IDOC Hepatitis C Guidelines December 2017 were reviewed as needed.

### First Court Expert Findings

The First Court Expert noted that the chronic care program at LCC lacked oversight and organization. The chronic care nurses' duty to compile lists of patients' degree of control was not being done. There was a very large backlog in scheduling patients for chronic care appointments. The part-time provider staffing the chronic care clinics only saw chronic care patients one day a week. This provider's notes were completely illegible. The Medical Director was seeing the majority of the chronic care patients in sick call sessions; this was decreasing patients' access to sick call and urgent care services. The expert noted that it was impossible to determine how many patients were enrolled in LCC's chronic care program.

### Current Findings

The First Court Expert's finding of not having an assigned nurse for chronic care has been resolved. Also, patients are now assigned to clinics and regularly seen. We identified current and additional findings as follows:

- An EMR has been implemented at LCC. This addressed the First Court Expert's strong concerns about the legibility of provider notes.
- LCC now has assigned a single, dedicated nurse to coordinate the chronic care program.
- Patients assigned to chronic care clinics are regularly seen in these disease specific clinics.
- The nurses pull the MAR's for patients' chronic care visits, but there is no documentation that the providers review this important clinic data about medication compliance and CBGs.
- The MAR is still completed manually by the nursing staff. Blank days, non-approved codes, and illegibility were noted for dose-by dose medications and varying methods of documentation were utilized for KOP medication delivery. The lack of accuracy of the MAR's is a barrier to verifying a patient's compliance with medications and determining the efficacy of the treatment.
- LCC does not reschedule chronic care appointments of patients who refuse a chronic care visit until four to six months later, when the next disease specific chronic clinic is held and does not have a process to monitor and track the status of these patients during the intervening months.
- LCC primary care providers and nurse do not have access to current, comprehensive, electronic medical references such as UpToDate in all clinical exam rooms and offices.
- LCC does not screen patients over 50 years of age or patients with high-risk clinical conditions for colon cancer as is recommended by national guidelines. None of the four

patients over 50 years of age whose records were reviewed had been screened for colon cancer.

- LCC does not calculate 10-year cardiovascular risks for adult patients as directed by the ACC/AHA and IDOC treatment guidelines.
- LCC does not administer age-based and disease-based adult preventive vaccinations, including pneumococcal 13 and 23, diphtheria, tetanus, and pertussis, meningococcal as recommended by the Center for Disease Control (CDC),[57] or routine health maintenance screening tests as recommended by the USPSTF.
- Only one (9%) of 11 patients with chronic illnesses, including asthma, CHF, COPD, HIV, diabetes, and cancer on chemotherapy had received pneumococcal 23 vaccination. The only patient over 65 years of age whose chart was reviewed had not received pneumococcal 13 or 23 vaccinations. Only one (33%) of three HIV patients had documentation of having received pneumococcal 23 vaccination; none of the three had received pneumococcal 13 or meningococcal vaccinations.
- The current disease specific chronic care schedule contributes to delays in achieving control of chronic illnesses.
- Providers at LCC inconsistently document the rationale for clinical decisions and diagnoses in the chronic care progress notes.
- HIV patient with active hepatitis C are not timely advanced toward the evaluation and initiation of hepatitis C treatment.
- The process to determine eligibility for hepatitis C treatment is excessively lengthy and a barrier to the initiation of treatment. It is not consistent with processes in other correctional facilities and public health systems.

With the exception of the general medicine clinic, the non-baseline chronic care clinics (asthma, cardiac/hypertension, diabetes, hepatitis C, high risk/HIV, seizure) are silos in which only a single disease is managed. The schedule for these clinics is inflexible and not based on the degree of control of a patient's illness.[58]  This has the potential to harm patients, as patients are evaluated on this schedule irrespective of the degree of control of their illness. Therefore, persons who need greater attention because their disease is poorly controlled may not receive it.

We view this as inefficient, wasteful, and potentially harmful. Patients should be evaluated as frequently as is necessary to establish disease control and not based on an inflexible schedule. Primary care doctors need to coordinate care for the patient, integrating treatment for all of the patient's conditions. When specialists manage a single illness, they typically list all of the

---

[57] CDC Recommended Immunization Schedule Adults 19 Years of Older, United States, 2018.
[58] LCC's chronic care clinic annual schedule is as follows: asthma (January and July,) diabetes (April, August, and December), cardiac/hypertension (A-L March and September; M-Z April and October), general medicine (May and November), hepatitis C (June and December), high risk/HIV (monthly), seizure (February and August), and TB (monthly, annual education). LCC has combined two conditions, diabetes/lipids and diabetes/hypertension, for simultaneous evaluation in the initial baseline clinic but not in the follow-up chronic care clinic session. Hepatitis C patients who have not yet met the IDOC criteria for treatment are seen in the June and December hepatitis C chronic care clinics. Other chronic illnesses (hyperlipidemia, anemia, cancers, multiple sclerosis, sickle cell disease, neurological disorders, etc.) are treated and monitored in the general medicine chronic care clinics.

patient's other medical conditions and medications, and consider the implication of all diseases on the condition being monitored. In the IDOC, every single disease is managed as if it is the only disease the patient has. Diseases are often interrelated such as metabolic syndrome.[59] Drug-drug interactions need to be considered in management of medications. Some illnesses have an effect on other illnesses. When IDOC providers evaluate patients in individual chronic care clinics, they do not list the patient's other illnesses and do not address any other conditions, even when a condition may not be in control or may have an impact on the condition being treated.

Some illnesses are managed in specialty clinics. All individuals with HIV and eligible patients cleared for treatment with hepatitis C are managed via telehealth by the UIC infectious disease telehealth clinic. UIC HIV telehealth clinics are held monthly. A monthly telehealth renal clinic staffed by a consulting nephrologist is scheduled as needed. This kidney specialist also provides telehealth consultation to other IDOC facilities.

The high risk/HIV chronic care roster was compared to the medication list to assess the accuracy of the chronic care roster. Five patients were not on the chronic care roster who were receiving HIV meds. Four of these five patients had recently been transferred to DCC; the other patient had only recently been started on HIV medications. It appears that the roster is accurate.

On April 6, 2018, the census of LCC was 1,617, with an additional 230 patients housed in Reception & Classification (R&C) and Segregation. The March 2018 Chronic Care Clinic Roster was as follows:

| Clinic | Patients | Percentage of ADC (1,617) |
|---|---|---|
| Asthma | 183 | 11.3% |
| Cardiac/Hypertension | 362 | 22.4% |
| Diabetes | 91 | 5.6% |
| General Medicine | 195 | 12.1% |
| Hepatitis C | 174 | 10.8% |
| High Risk/HIV | 16 | 1.0% |
| TB | 30 | 1.9% |
| Chronic Care roster | 1,141* | |

*Individual patients with more than one chronic illness are enrolled in a number of chronic care clinics.

These percentages reflect the prevalence of each chronic illness in the LCC population. The chronic roster of 1,141 patients was not further analyzed to determine how many unique women were on this roster. The percentage of individual women with chronic illnesses would be significantly less than 1,141.

---

[59] Metabolic syndrome is a combination of diabetes, hypertension, and high blood lipids. These inter-related conditions must be treated as a single disease. When kidney disease, retinopathy, or neuropathy exist with diabetes, they are also treated as diseases related to diabetes.

The chronic care clinic scheduling processes were reported as follows:

1. Providers and nurses enter chronic illnesses into the EMR.
2. EMR generates the baseline chronic care list, nurses review the list, order lab panels, and verify that labs are completed.
3. EMR sends a reminder for baseline appointments that are to be scheduled within 30 days, nurses manually enter the appointment in 360 (an IDOC program).
4. Chronic care clinic rosters are maintained by clinic in 360 (an IDOC program).
5. Nurse coordinator downloads and prints the next month's follow-up chronic care patient list from 360 and searches EMR to verify or order labs.
6. Once lab results are in EMR, nurse enters an appointment in the EMR.
7. A nurse schedules 13-15 patients per day for the chronic care provider (12-13 patients in the morning and 1-3 patients in the afternoon).
8. Appointment schedules are printed, and administrative staff fill out movement passes that are given to corrections 24 hours in advance.
9. IDOC transports patients to the clinic.
10. Nurses manually enter into 360 all no shows and patients seen; EMR also maintains and tracks patients seen, no shows, and refusals.

Patients who choose to refuse to be seen in a chronic care clinic are to be transported to the clinic to sign a refusal form; in practice, corrections is reluctant to force a patient to walk to the health care building to sign the refusal. When a patient does not arrive for a chronic care clinic session, nurses staffing the chronic care clinic call the officers in the housing units to remind them to move the patient. If the officer informs the nurse that the patient is refusing, no further action is taken. Providers are informed when a patient has refused a chronic care clinic visit. The provider reviews the new lab reports in the EMR and reorders or adjusts any ongoing medications for chronic clinic refusals. Even if the patient's chronic condition is not controlled, patients who refuse a visit will not be rescheduled until the next scheduled chronic care session, which is as long as six months later. We were informed that this is done to instill responsibility and accountability into the patient. The staff related that no focused review of vital signs or capillary blood sugars or medication compliance are done during the many month interim before the next disease-specific chronic care clinic to minimize the risk of clinical deterioration for patients who have refused the chronic care visit. Patients who refuse chronic care visits tend to fall into high-risk categories; many have mental health conditions. This current practice puts patients at risk. LCC must develop and implement a process to intermittently monitor patients who refuse chronic care appointments. Patients not brought to clinic because of lockdowns or correctional or weather issues are rescheduled to be seen within a week or two.

The chronic care clinics at LCC are primarily staffed by a full-time nurse practitioner, but the physician provider also sees a number of complicated or special interest chronic care patients. The nurse practitioner reported that her chronic care clinics run six hours per day and with up to 20 patient appointments scheduled per day. Two nurses support the chronic care clinics; scheduling patients, ordering labs, pulling medication administration records (MAR) mainly for CBG results, and doing vital signs. Although it was reported that MAR's are pulled for review at

chronic care visits, the experts did not find any documentation in the visit notes that this valuable information about medication compliance and CBG's on the MAR's were ever reviewed. It was reported that the physician annually reviews and makes clinical suggestions on all of the nurse practitioner's chronic care charts. The provider mentioned that there is a need for onsite podiatric consultation for foot and nail conditions that cannot be readily addressed by LCC's primary care staff. The physician stated that she did not have access to Up-to-Date but occasionally accesses some of the other online, less comprehensive medical references. One nurse practitioner and one physician assistant had access to personally purchased, comprehensive, current (UpToDate®) electronic medical references. Another nurse practitioner stated she did not have access to comprehensive electronic medical references.

In March 2018, 157 follow-up chronic care and 100 chronic care baseline visits were performed. Based on a review of chronic care medical records, most patients with chronic illnesses at LCC are seen by providers in the chronic care clinics approximately twice a year. Diabetic patients were found to have HbA1C testing on a regular basis, documented foot exams, urine microalbumin-creatinine ratio testing, and annual eye evaluations by an optometrist.

Providers were generally critical of the utilization management program that served as a barrier to timely care. One provider questioned the need for collegial requests/approvals for specialty consultation and to order onsite ultrasonography studies and non-formulary labs, in particular certain tests to monitor cancers that have been requested by specialists. This process delays access to these and other diagnostic studies and specialty consultations. We agree. One provider reported that, with the exception of breast and cervical cancer screening, no one does age-based routine health maintenance screening or age and disease-based vaccinations at LCC.[60] One provider stated that the current IDOC policy to perform rectal exams and a single fecal blood test is not a valid screening test for colon cancer. The provider also communicated that colon cancer screening using the three separate fecal occult blood cards methodology could be used but is not because of the institution's practice to make patients come to the health care unit to defecate to obtain the specimen was too cumbersome. This practice was reported to have been established because the women might tamper with the test if allowed to gather the specimen in the housing unit. The provider was not aware of the new fecal immunochemical test (FIT) that is available to screen for colon cancer. The failure of LCC to screen for colon cancer does not meet the national and community standards of care.

The care provided to a number of patients with chronic illnesses had deficiencies. The providers did not consistently document the rationale for clinical decisions, including the selection of medications, changes in medications, and modification of medication dosages. It was difficult to understand the reasoning for the treatment regimens that were being provided to some patients. Some patients needed specialty consultation but did not receive it. Consultants recommended additional diagnostic studies for a patient but there was no documentation in the medical record that these tests were ordered and there was no documented clinical rationale for not proceeding with the recommendations. Some patients were treated with

---

[60] CDC Adult immunization schedule 2018, reference # USPSTF Colorectal Cancer Screening June 2016.

medications without appropriate indication.  Fenofibrate was used to treat mild elevations of triglycerides in three patients, including two uncontrolled diabetics, when treatment was not indicated. Some patients had uncontrolled disease but the intervals of scheduled appointments were not appropriately shortened. Two patients with HIV and hepatitis C were not approved to begin evaluation for hepatitis C treatment until four and eight months respectively after admission to LCC. This is an excessive delay for HIV patients, who are considered at risk for accelerated deterioration and listed as priorities for treatment of hepatitis C. Patients with hepatitis C also do not receive HCV viral load testing as recommended in the IDOC Hepatitis C guidelines.[61] As recommended in the IDOC hyperlipidemia treatment guidelines,[62] LCC providers are not calculating the 10-year cardiovascular risk on older patients, diabetics, hypertensives, and those with hyperlipidemia. This has resulted in the failure to initiate statins, the proper dose of statins, or the proper intensity of statins on patients with a high risk of having a stroke or heart attack in the next 10 years. Diabetics, asthmatics, HIV patients, and patients over 65 years of age are not being offered protective pneumococcal vaccinations as is the national standard in the USA. Patients over 50 years of age or otherwise at high risk are not being screened for colon-rectal cancer; this is also not in accord with national standards of care. Many of these are systemic problems found at all facilities we have visited.

The following patient summaries highlight the concerns and the findings noted above.

**Chronic Care Patient Summaries**
- This patient is a 36-year-old with a history of HIV and hepatitis C who was admitted to LCC in July 2017 and followed in the UIC HIV telehealth clinic and the (LCC) hepatitis C clinic.[63] Her HIV viral load has been fully controlled and CD4 counts have ranged between 692 and 805. She had immunity to hepatitis A and B. Her HCV RNA was 639,892 IU/ml. Her last APRI was 0.89 in April 2017 and it was noted that she could now be worked up for hepatitis C treatment. This patient has not received pneumococcal 23, 13 or meningococcal vaccinations which are indicated for all patients with HIV. Her discharge date is March 2019. It took eight months before she was deemed eligible for the hepatitis C treatment process to begin. This delay put the patient at risk for complications of hepatitis C. In the United States, patients with hepatitis C and HIV are moved more expeditiously into hepatitis C treatment due to the more rapid progression of hepatitis C in patients co-infected with HIV.

- This 40-year-old patient has a history of HIV and hepatitis C.[64] She was admitted to LCC on 9/7/17; she did not agree to start HAART until 10/10/17. By 1/10/18, the viral load was <20 and the CD4 improved to 443. She was given pneumococcal-23 vaccine but not the meningococcal or pneumococcal 13 vaccines. At her first hepatitis C clinic visit on 9/28/17, vaccinations for Hep A and B were initiated. The HCV RNA was elevated, 7,727,120 IU/ml. In December 2017 the APRI score was 1.2 and at the 1/10/18 UIC HIV

---

[61] Hepatitis C Guidelines December 2017.
[62] Offender Health Services, Treatment Guidelines, Hyperlipidemia.
[63] Chronic Care Patient #1.
[64] Chronic Care Patient #2.

clinic, the provider recommended that she be evaluated for hepatitis C treatment as per IDOC protocol. As of 4/19/18, the patient has not started on hepatitis C treatment. In summary, the patient is seen regularly in the UIC HIV and the hepatitis C clinic. Her HIV is well controlled. She has not yet been offered meningococcal or pneumococcal 13 vaccinations. It took four months before she was deemed eligible for the hepatitis C treatment process to begin and another three months have passed and she has not yet started treatment. However, in many US medical centers, patients with hepatitis C and HIV have liver fibroscans ordered quickly and are moved more expeditiously into hepatitis C treatment due to the more rapid progression of hepatitis C in patients co-infected with HIV. Given that this patient did not start HIV treatment until October 2017, some time lag before initiating the evaluation for hepatitis C treatment was justifiable, but the delay to initiating treatment is excessive.

- This patient is a 35-year-old female with HIV.[65] Since 5/12/17, she was seen four times in the UIC HIV clinic. On 6/29/17, she agreed to start a new regimen of HIV meds. As of 12/18/17, she was still taking the meds; the viral load was undetectable and the CD4 817. There was no documentation in the UIC HIV notes reviewed that this patient had been offered or vaccinated with pneumococcal 13, pneumococcal 23, or meningococcal immunizations. She has not had a documented Pap smear since 7/28/15. In summary, this HIV patient is now fully controlled with an undetectable viral load and an excellent CD4 (817). She has not received pneumococcal 13, pneumococcal 23, or meningococcal vaccines. She has not received a Pap smear since 2015. The IDOC protocol states that women between 30-39 years of age are to have a Pap smear with HPV testing every three years. However, US guidelines state that HIV positive women must have three consecutive normal annual Pap smears before the testing interval is increased to three years. There was no documentation identified in the medical record that this patient previously had three normal annual Pap smears.

- This patient is a 38-year-old female with seizure disorder, chronic hepatitis C, and substance abuse.[66] She entered LCC on no medications. Her intake history was done on 11/21/17 and the physical exam on 11/22/17. She reported that she has had seizures occasionally accompanied by urinary incontinence since age 21. The seizures were treated in the community with Xanax (alprazolam). She reported that her most recent seizure occurred on 10/20/17. At that time the seizure was felt to have been precipitated by Xanax withdrawal or possibly opioid withdrawal (patient reported that she had stopped her methadone maintenance medications). LCC started the anticonvulsant Keppra (levetiracetam) 500mg BID at the time of the provider intake exam on 11/22/17. No additional workup was initiated to evaluate this history of seizure disorder. She was followed in the hepatitis C and seizure chronic care clinics. At the 12/22/17 hepatitis C chronic care clinic, lab results were noted as: hepatitis C antibody reactive, hepatitis A and B antibody positive (protective), liver enzymes elevated (AST

---

[65] Chronic Care Patient #3.
[66] Chronic Care Patient #4.

41, ALT 48), INR 1.1, and APRI 0.5. There was no record that the HCV RNA was performed as recommended in the system's hepatitis C guidelines.[67]  She was deemed not eligible for treatment at this time. She has been seen twice in the seizure chronic care clinic. In summary, this patient has been seen in the hepatitis C and seizure clinics. To date, her HCV RNA level has not been performed as directed by the Hepatitis C Guidelines. If this test is negative, her hepatitis C has resolved, and she would no longer need to be followed in the hepatitis C clinic. This test must be performed as per protocol. This patient's seizure disorder has not been appropriately evaluated. Based on the patient's history, her seizures have a high possibility of being caused by withdrawal from benzodiazepines (or possible opioid withdrawal) such as Xanax (alprazolam), not by underlying epilepsy. The decision to start an anticonvulsant is reasonable pending further investigation into her seizure history, obtaining past medical records, and consultation with a neurologist. However, consultation with a neurologist has not been requested and there is no documentation that additional tests (electroencephalogram or CT scan of the brain) or outside medical records were requested. Anticonvulsant medications have multiple serious side effects. It is in the patient's best interests to determine if she really requires taking an anticonvulsant. LCC has not adequately evaluated this patient's seizure disorder; the level of care for this patient does not meet the community standard of care.

- This patient is a 66-year-old whose problem list includes seizures, diabetes, and hypertension.[68] Her medications included aspirin, metformin 500mg/d, simvastatin 5mg/d, and lisinopril 10mg/d. Although seizures are listed on her problem list, this patient is not taking an anti-convulsive medication and there is no mention of seizures or epilepsy in her medical record. This erroneous problem list entry must be corrected or clarified. Pneumococcal 23 vaccine was administered in 2014. Her diabetes is very mild and is controlled (median HbA1C 6.2). Her blood pressure has been adequately controlled; so well controlled that she may not require the anti-hypertensive that she is currently being prescribed. The LCC providers have not done this patient's 10-year cardiovascular risk scores as recommended in the IDOC's hyperlipidemia treatment guidelines,[69] but it computes to 17.7%. She has been prescribed a very low dose (5mg) of simvastatin, a moderate intensity statin. Based on national standards and the IDOC hyperlipidemia treatment guidelines, a diabetic with high 10-year cardiac risk should be prescribed a high intensity drug such as atorvastatin 40-80mg. This 66-year-old patient has not been offered nor received age-based screening for colorectal cancer or preventive vaccination against pneumococcal 13.

In summary, this patient has been seen regularly in the diabetes and hypertension clinics. Both of these chronic illnesses are controlled with low doses of medication. Her problem list erroneously listed "seizures;" this inaccuracy must be corrected. The LCC

---

[67] Hepatitis C Guideline, December 2017.
[68] Chronic Care Patient #5.
[69] Office of Health Services, Chronic Illness Treatment Guidelines, Hyperlipidemia, March 2016.

providers are not adhering to IDOC and national guidelines by failing to calculate this patient's 10-year cardiovascular risk score. This failure has resulted in this patient not receiving the recommended high intensity statin medication that has the potential to minimize her future risk of heart attack and stroke. This patient has not been screened for colorectal cancer; national standards recommend that all patients 50 years of age or older should be regularly screened for this potentially preventable cancer. IDOC policy advises rectal exams for patients over age 40 as part of their periodic physical exams. Rectal examination (with or without a single fecal occult blood test) is not a recommended screening test for colon cancer. This patient had not received pneumococcal 13 vaccination as recommended for all patients 65 years of age or older.

- This patient is a 50-year-old female with diabetes and hypertension.[70] Her medications include 70/30 insulin 56U/am and 54U/pm, sliding scale regular insulin BID, metformin 1000mg BID, fenofibrate 54mg/d, amlodipine 10mg/d, glipizide 30mg/d, aspirin, lisinopril 40mg/d, and triamterene/hydrochlorothiazide. She is followed in the diabetes and hypertension clinics. Fourteen HbA1C tests have been done in the last four years; not a single one has reflected adequate control. The HbA1Cs have ranged from 8.8 to 12.5 with a median of 10.2. The dose of 70/30 insulin has been steadily increased and is currently 56U/am and 54U/pm. The patient is also prescribed a sliding scale dose of regular (short acting) insulin before breakfast and dinner; this is in addition to the 17U/am and 16U/pm regular insulin that is being injected in the 70/30 combination. Adding additional regular insulin to the 70/30 insulin is potentially dangerous and poses a heightened risk of hypoglycemia. The patient is also receiving a high dose (30mg) of the oral diabetic agent, glipizide, which has little practical value in this patient who is already injecting very high doses of 70/30 inulin twice a day. Review of the 2018 MARs indicates good compliance with the medication regimen. Capillary blood glucoses (CBG) in 2018 have been consistently over 200. This patient's diabetes has not been controlled for the past four years. Consultation with an endocrinologist is needed but has not been requested. The patient is receiving four anti-hypertensive medications but 50% of the blood pressures recorded at the diabetes and hypertension clinic visits were not controlled. The LCC providers have not calculated this diabetic, hypertensive patient's 10-year cardiovascular risk scores as recommended in the IDOC's hyperlipidemia treatment guidelines,[71] but it computes to 15.4%. The only anti-hyperlipidemia medication (fenofibrate) that she has been prescribed has limited if any cardio-protective value. Based on national standards and the IDOC hyperlipidemia treatment guidelines, a diabetic with high 10-year cardiac risk should be prescribed a high intensity statin. This has not been done and there is no documentation in the progress notes that this patient has any contraindications to the use of a statin. This 50-year-old patient has not been offered or received age-based screening for colon cancer or preventive vaccination against pneumococcal 23; vaccination that is recommended for all diabetics. In summary, for the last four years this patient's diabetes and hypertension have been

---

[70] Chronic Care Patient #6.
[71] Office of Health Services, Chronic Illness Treatment Guidelines, Hyperlipidemia, March 2016.

uncontrolled. She is taking very high doses of injectable 70/30 insulin and a high dose of glipizide (oral agent) which has not been able to control her blood sugars. Her HbA1Cs persistently are in the 9-11 range. The use of a sliding scale in a patient injecting 70/30 is potentially dangerous, creates a significant risk of hypoglycemia, and should be stopped. Adding high dose glipizide to this patient's diabetic regimen increases the risk of hypoglycemia and has limited if any added value to the treatment of this patient's diabetes. An endocrinologist should be consulted to assist with the management of this complex and uncontrolled diabetic patient. The patient should be prescribed a high dose statin to minimize her risk of heart attack and stroke. This patient's blood pressure is not controlled; consultation with the telehealth nephrologist should be solicited. This patient is not receiving a level of care consistent to what is provided in the community.

- This patient is a 38-year-old female whose problem list includes diabetes and elevated triglycerides.[72] Her current medications include 70/30 insulin 20U/am and pm, sliding scale regular insulin, metformin 500mg BID, and fenofibrate. She is followed in the diabetes and general medicine chronic care clinics. Since 2014 she has been seen 13 times in the diabetes clinic and five times in the general medicine clinic since 2016. The concomitant prescribing of 70/30[73] insulin and sliding scale regular insulin before breakfast and dinner puts the patient at risk for hypoglycemia. Metformin in varying doses has been started, stopped, and restarted. Glipizide was started and stopped. The 70/30 insulin dose of 20U/am and pm has not been increased since 2016 even though the four HbA1Cs in 2017-2018 have been 7.3 to 8.3. The provider's rationale for these changes or renewals were not documented in the progress notes. Her triglyceride level was 326 in 2014 when the HbA1C was 9.7 and 10.2. Her cholesterol was 226, HDL47, and LDL 152. Pneumococcal 23 vaccine has not been administered to this diabetic patient.[74]  In summary, this diabetic patient has been seen regularly in the diabetes and general clinic. There is no reason why her very straightforward lipid concern could not be simultaneously managed in the diabetes clinic. The provider's chronic care notes give limited if any history about the patient's status, symptoms, and CBG's since the last visit. This patient's diabetes is only moderately controlled. The provider should have modestly increased the 70/30 insulin dose at the 4/19/18 diabetes clinic; there was no documentation in the progress note if this was considered or why this was not done. There also was no written rationale for the changing doses and the prescription/discontinuation of the diabetic oral agents. The continued use of fenofibrate has limited indication. There is limited justification to have started and continued fenofibrate for a moderately elevated triglyceride level in a diabetes patient who was not adequately controlled at the time of the initial testing as out of control diabetes raises the triglyceride level. Treatment should have been considered when the

---

[72] Chronic Care Patient #7.

[73] 70/30 insulin is a combination of 70% isophane insulin and 30% regular insulin. When 70/30 insulin is used in combination with regular insulin, the dosage of regular insulin thereby increases. This combination can unknowingly result in higher doses of regular insulin than are realized.

[74] Office of Health Services, Chronic Illness Treatment Guidelines, Diabetes.

diabetes was under control. LCC providers have failed to administer pneumococcal 23 vaccine to this diabetic patient as is directed in the policies.

- This is a 50-year-old patient with non-insulin requiting diabetes and hypertension.[75] Her current medications include glipizide 20mg BID, metformin, lisinopril 10mg/d, metoprolol, simvastatin 40mg, and ferrous sulfate. She is followed in the diabetes and hypertension chronic care clinics. Since August 2016 she has been seen five times in the diabetes clinic and four times in the hypertension clinic. In 2016 and most of 2017, HbA1Cs were not at goal and ranged from 7.7 to 9.3. In December 2017, the HbA1C result was 6.9, which now reflected good diabetic control. Over the last two years the provider did increase, albeit belatedly, the doses of the oral diabetic medications. Seventy-five percent of the eight blood pressures recorded in the chronic care clinics in 2016-2018 were at goal. The provider's rationale to add a second BP medication, metoprolol, on 3/3/17 when this patient's BP was well controlled (123/83), was not documented in the progress notes. The use of metoprolol, a beta blocker that can mask the symptoms of hypoglycemia, is generally avoided in diabetics and no rationale for this decision was documented. Pneumococcal 23 vaccine has not been administered to this diabetic patient as recommended in the IDOC diabetes guidelines.[76] On 1/15/16, the patient (then 48 years old) was seen by the OB-GYN provider for heavy menses; the gynecologic exam was normal. An ultrasound on 5/14/16 reported the presence of uterine fibroids. The patient's hematocrit (red blood cell level) on 6/1/16 was 43.4%, hemoglobin 14.4, both normal levels. In November 2017, the now 50-year-old patient's blood counts (hematocrit/hemoglobin) had notably dropped to 24.5/7.0 and 24.3/6.9. Her MCV was microcytic consistent with iron deficiency anemia thought to be due to her menorrhagia (heavy menses). Iron supplementation was started, and the blood counts returned to normal (43.0/13.6) by 4/3/18. Although it is likely that the cause of the blood loss was heavy menses, this 50-year-old patient should have been investigated for other causes of blood loss, including gastrointestinal bleeding due to peptic ulcers or colon cancer. The failure to investigate alternate causes of blood loss was below standard of care. To date, this patient in her fifty-first year of age still has not been investigated or screened for colon cancer as is nationally recommend for all patient 50 years of age or older.

In summary, this patient was regularly seen in the diabetes and hypertensive clinics; there was no reason why these two conditions could not have been readily addressed in a single chronic care clinic. It should not have taken the chronic provider two years to get the patient's diabetes under control. The chronic care provider should have shortened the interval between visits and monitored CBGs in order to achieve control more quickly. The delay in advancing medications and doses was not justifiable. The LCC providers should have administered pneumococcal 23 vaccination to this diabetic as is recommended by national and IDOC guidelines. The failure of the providers in 2017 to

---

[75] Chronic Care Patient #8.
[76] Office of Health Services, Chronic Illness Treatment Guidelines, Diabetes.

consider alternate causes, such as gastrointestinal bleeding, for the patient's severe anemia put the patient's health and life at risk. All persons 50 years of age or older patients, should be screened for colon cancer. This has not yet been ordered.

- This patient is a 39-year-old female asthmatic.[77] Her current medications include levalbuterol inhaler and ciclesonide. Since early 2016 she has been seen five times in the asthma chronic care clinic. Her PEFRs (peak expiratory flow rate) have been between 340 and 450 L/min. Her asthma did not require any urgent care visits, emergency department visits or hospitalizations. Wheezes were never detected at any of her asthma clinic visits. At the 1/25/17 asthma clinic, she reported that she was having two asthma attacks per week and the provider added ciclesonide to her asthma regimen. On 7/25/17, the patient reported that when the weather was hot she would use the inhaler three to four times per night and that one inhaler only lasted for one month. The provider noted that the patient should continue levalbuterol and ciclesonide inhalers. However, the MARs for September 2017 through February 2018 do not list ciclesonide as one of this patient's medications. At her most recent asthma clinic visit on 1/25/18, she reported that she was still using about one inhaler canister per month. The review of the MARs (September 2017 – February 2018) indicated that the patient had not requested any refills of the inhaler during this five-month period. There is no documentation in the progress notes that the provider had reviewed the medication administration records (MAR). If the MARs had been reviewed, the provider would have been aware that the patient was not using one inhaler per month as reported on 7/25/17 and 1/25/18, but was more likely refilling her inhaler every six months. This asthmatic has not received the pneumococcal 23 vaccine as is recommended for all asthmatics.

In summary, this asthmatic patient is relatively stable. Her PEFRs were consistently between 340 and 450. An additional asthma medicine was added when the patient reported that she was having two attacks per week. The patient reported periods when she increased her use of metered dose inhaler from one canister every six months to one every month. The provider was not regularly reviewing the MARs. This resulted in the provider not knowing that the patient was actually using up her inhaler less frequently (every six months not every month) than she reported. This important clinical information would have allowed the provider to delve more carefully into the patient's history of asthma attacks and self-treatment, and possibly might have resulted in a decision to stop the use of one of her medications (ciclesonide). It is a national recommendation that asthmatics receive the pneumococcal 23 vaccine; this vaccine has not been offered to this patient.

- This patient is a 49-year-old female with multiple sclerosis and hypertension.[78] Her current medications include monthly injectable Copaxone (glatiramer), vitamin B12,

---

[77] Chronic Care Patient #10.
[78] Chronic Care Patient #15.

baclofen, oxybutynin, gabapentin, lisinopril, and fenofibrate. She has an unsteady gait, experiences urinary incontinence and blurry vision, and uses a walker. She is followed in the general medicine chronic care clinic mostly by the LCC physician and has had nine general medicine clinic visits in the last four years. The chronic care provider generally writes comprehensive notes commenting on the patient's condition, the neurologist consultations, and imaging reports. The LCC optometrist has seen the patient no less than yearly since 2014. Physical therapy has been provided to the patient at LCC since 2014. The patient has had six or seven neurology consultations since April 2014. The neurology specialist is managing the patient's multiple sclerosis treatment regimen. There have been possible MS flares in 2015 and 2017 that prompted the neurologist to order repeat MRI studies, which showed evidence of demyelinating disease with no active changes and cervical cord demyelinating plaques with a new lesion in the left pons, no active demyelination, and cervical spondylosis with severe left foraminal stenosis. Left C6 and C7 radiculopathy workup was advised but there is no documentation that this evaluation was ordered. Almost all of the neurology consultations were found in the EMR. The patient also saw a urology specialist for urinary incontinence on 8/19/15. The urology specialist initiated medication to treat the patient's sudden losses of urine and advised cystoscopy, renal US, and urodynamic studies. There is no evidence in the medical record that the urology procedures and tests had ever been done. The patient has developed mild hypertension for which she has recently been started on lisinopril, and she was given an appointment to the hypertension chronic care clinic. Fenofibrate was initiated at the 3/16/18 general medicine chronic care clinic; the rationale for this added medication was not documented. The patient's 10-year cardiovascular risk score was not done but calculated 10-year cardiovascular risk was determined to be 3.0%, below the threshold to initiate lipid therapy. The provider did not document why it had been determined that the patient warranted treatment, but the choice of medications would have been a statin, not a fibrate medication.

In summary, this multiple sclerosis patient has been seen regularly in the General Medicine chronic care clinic at LCC and by a St. John's SIU neurology specialist who manages the treatment of the patient's multiple sclerosis. MRIs have been done and medications provided as ordered by the neurologist. The neurologist ordered tests to evaluate cervical radiculopathy, but these tests were not done. A urology specialist was consulted to evaluate the patient's urinary incontinence. In 2015, the urologist recommended a variety of additional procedures including cystoscopy, urodynamic studies, and renal ultrasound; there is no evidence in the EMR that these tests/procedures were ever performed. When the patient developed hypertension, there was no reason that this additional chronic illness could not have been easily co-managed at the time of general medicine clinic appointments.

## Women's Health

**Methodology:** Nurse practitioners were interviewed about the women's health screening practices. The Guidelines for Inmate (Female) Periodic Physical Exams were reviewed. The list of current pregnant patients and the records of pregnant women were reviewed. The records of patient-inmates were audited for PAP and mammogram screening records.

### First Court Expert Findings
The First Court Expert noted that patients with or at high risk for women's health issues were not tracked in an organized way. Cervical cancer screening was not performed in a timely manner, high-risk patients were not screened as frequently as warranted, and abnormal Pap smears were not adequately followed up. The expert noted that the current staff (24 hours per week OB-GYN) assigned to the provision of women's health care was not adequate to meet the needs of the LCC population and the addition of a  women's health nurse practitioner was justified.

### Current Findings
We agree with the findings in the First Court Expert's report. We had additional findings that are as follows:
- At the time of the site visit there were 11 pregnant women at LCC.
- One pregnant woman has been in LCC for 64 days and has not yet been seen by the OB-GYN provider and her prenatal record has not been started. Prenatal labs, vital signs, Pap, and fetal ultrasound have been done. Prenatal vitamins and iron supplementation have been prescribed.
- Fourteen of 15 (93%) charts audited had a Pap smear that was done in the last three years as per IDOC protocol.
- Four of five (80%) charts audited of women over 45 years of age had a mammogram performed in the last two years as per IDOC protocol. In another record sample, 12 of 13 patients above age 50 were offered a mammogram.
- Two of the three (66%) HIV patient charts reviewed had a Pap in the last year or evidence of three consecutive negative annual Paps in medical record.
- The existing needs for female-specific care have not been adequately addressed in the past. Newly hired nurse practitioners are being assigned to women's health responsibilities. It was reported that the nurse practitioners will be soon be oriented by the OB-GYN provider to the provision of prenatal care. This would enhance the coverage of the prenatal clinic services. Additional provider staffing may be needed to cover the services needed by this large and high-risk female population, which also has a reception & classification center that requires gynecological screening of all patients.
- All providers do not have access to comprehensive online medical references at all clinical and administrative work areas.
- The nurse practitioners have not been trained to evaluate wet mounts of vaginal discharges and vaginal infections are treated presumptively. The single microscope is seldom, if ever, used.

The LCC women's health periodic physical exam guidelines recommend Pap smears every three years, without human papilloma virus (HPV) testing for women less than 30 years of age and with HPV testing for women over 30 years old. Pap smears can be stopped after age 65. Mammograms are to be done every two years beginning at 45 years of age through age 70. Pap smears are performed on all new admissions over 21 years of age as part of the reception and screening process and are updated per protocol at the annual physical exams. Mammograms are scheduled as indicated for patients over 45 years of age along with the annual physical appointment. The process to schedule annual physicals is as follows:

1. The Offender 360 IDOC program generates a list of all patients with birth dates in an upcoming month.
2. Nurse practitioners review the patients' medical records.
3. Women's health "to do" list is created.
4. Based on the "to do" list, appointments are scheduled with the two nurse practitioners.

Audits of 15 women's charts revealed that 14 (93%) have had Pap smears in the past three years. One patient had not had a Pap smear in over four years. Three woman were found to have abnormal Pap smears with low grade squamous intraepithelial lesions (LGSIL) and human papilloma virus positivity. One had a colposcopy with a biopsy in November 2017 and is scheduled for repeat colposcopy in May 2018. Another had colposcopy and biopsy in 2014, with improvement to atypical squamous cells of undetermined significance (ASCUS) smears in 2016 and 2017. A third was found to have LGSIL in March 2018 and will have repeat studies done after the delivery of her child in late May 2018.

Charts reviews showed that three of four (75%) women over 45 years of age had a mammogram in the last two years. One additional patient under 45 years of age also had a mammogram when she was 38 years old. One 49-year-old woman had not yet had this screening test performed four years after she was eligible for a screening mammogram.

In a separate sample of 13 records randomly selected from a list of patients above age 50, in 12 of 13 cases women were offered mammograms. In the lone woman who was not offered mammogram screening, the patient was admitted to LCC in early April 2018 and the mammogram was not ordered at intake. In 11 of 12 cases in which mammogram was offered, they were either completed or refused. In the remaining case there was an equipment failure and the mammogram needed to be rescheduled. We reported this to the HCAU.

All of the prenatal care is provided by the OB-GYN specialist (approximately 50% FTE) who provides onsite service and consultation. The OB-GYN provider uses a paper antepartum/postpartum record to record patients' progress, tests reports, vital signs, fetal heart tones, uterine measurements, etc. This patient form is maintained in a binder in the ambulatory clinic. A copy of the record is sent to the delivering hospital. This record is not incorporated into the electronic medical record but should be. The OB-GYN provider was soon to be temporarily away from LCC; a nurse practitioner reported that the OB-GYN provider will soon be orienting the nurse practitioners to the provision of prenatal care to allow coverage during the specialist's absence. Colposcopy and cervical biopsy, cervical cryosurgery, obstetrical

Doppler ultrasonography, pelvic ultrasound (contracted service), and mammography are provided onsite.

There were 10 pregnant women at LCC at the time of the Experts' visit. The charts of four currently pregnant women were reviewed. Two have very high-risk pregnancies (recurrent deep vein thrombosis with pregnancy, gestational diabetes); both have been appropriately referred to and jointly managed with St. John's SIU Medical Center's maternal and fetal medicine (MFM) specialists. No MFM consultation reports were found in the antepartum record or the EMR on one of these patients. Another pregnant woman has had two previous c-sections and has been appropriately monitored. The fourth pregnant patient was admitted to LCC on 2/22/18. Prenatal tests, Pap smear, fetal ultrasound, and vital signs have been done. Prenatal vitamins and iron supplementation was prescribed. The first appointment with the OB provider was scheduled for 4/6/18, but was cancelled due to provider absence. As of 4/26/18, 64 days after admission to LCC, this patient has not seen the OB provider and the antepartum record has not been started. If additional providers (nurse practitioners) were trained to provide basic prenatal care, this patient would have been fully evaluated by this time.

There is a functional microscope, but it was dusty and appeared not to be in use. It was reported that the nurse practitioners had not been trained to perform wet mounts to identify yeast, bacterial vaginosis, and trichomonas vaginal infections and thus were not using the microscope. Not all providers at LCC have access to a comprehensive electronic medical references such as UpToDate.

In summary, the provider staffing is not adequate to provide the volume of clinical work at this large women's facility and reception center. In the absence of the OB-GYN provider, there are no providers trained to provide prenatal care. At least one of the nurse practitioners should be trained and regularly assigned to prenatal clinic. Not all offsite specialty consultation reports are being returned with the patient or retrieved by the LCC support staff; this should be addressed. Women with HIV are not being screened for cervical cancer as frequently as is nationally recommended. Most women are receiving Pap smears and mammograms in accord with IDOC and national guidelines. It appears that a few women are not consistently being screened as directed in the IDOC guidelines. The following chart summaries highlight the concerns and findings noted above.

**Women's Health Charts**
- This patient is a 35-year-old female with HIV and genital HSV.[79] Her last Pap smear was done on 7/28/15; the result was negative. No repeat or previous Pap tests were identified in the record. In summary, this HIV patient should be having annual Pap smears until three consecutive annual tests have been performed; then the interval can be increased to three years. LCC is not following national guidelines concerning the frequency of cervical cancer screening in this higher risk HIV patient.

---

[79] Chronic Care Patient #3.

- This patient is a 66-year-old whose problem list includes seizures, diabetes, and hypertension.[80] Mammograms done in 2014 and 2016 were both reported to be Breast Imaging Reporting and Data System (BIRAD) II. A Pap smear in 2014 was negative and ASCUS/HPV negative in 2016. In summary, this patient has, to date, had mammograms at intervals recommended in national and IDOC protocols. Even though she is older than 65 years of age, she should have another negative Pap smear before cervical cancer screening is no longer recommended.

- This patient is a 34-year-old pregnant female with history of DVT during previous pregnancies, pre-eclampsia in the past, diet-controlled diabetes in the past, tobacco use, and substance use.[81] Her expected due date is 5/27/18. This patient was admitted to LCC on 3/9/18. The patient was pregnant seven times in the past and had DVTS with her pregnancies in 2010, 2012, and 2013, and at least one pulmonary embolus. She was listed as a high-risk pregnancy. She was treated with Lovenox (enoxaparin, subcutaneous blood thinner) during her prior pregnancies. Her intake Pap was read as LGSIL/HPV+; this abnormality had also been previously identified at some time in the past. The prenatal flow forms showed that the patient had seven visits with the LCC OB provider between 3/14 and 4/24/18. Prior to admission to LCC, ultrasounds at Northwestern Medical Center and Stroger Cook County Hospital revealed a single umbilical artery. Post entry to LCC, two additional ultrasounds (St. John's SIU Medical Center and LCC) revealed a normal fetus. The patient was referred to Maternal Fetal Medicine (MFM) at St. John's SIU Medical Center where she has had two, possibly three, visits to date, with two more visits prescheduled in May 2018. The visits are commented on in the prenatal flow forms, but consultation reports from St. John's MFM were not located in the EMR. The patient is scheduled for induction of labor on 5/21/18 at St. John's SIU Medical Center. In summary, this high-risk pregnancy has been closely monitored by the OB provider/team at LCC. Ongoing consultation with the MFM OB specialists at St. John's SIU Medical Center was initiated within two weeks of the patient's admission to LCC. Consultation reports from the specialist are not in the LCC EMR; this deficiency must be addressed and corrected.

- This patient is a 29-year-old pregnant female with diabetes who had taken insulin during previous pregnancies, and a psychiatric disorder.[82] An ultrasound on 3/19/18 showed FHT 140 and a fetal age of 26 weeks +/- 4 days. The prenatal tracking form documented OB provider/team encounters on 3/9, 3/19, 3/23/18. The patient was seen at the St. John's SIU Maternal Fetal Medicine (MFM) by specialists on 4/2/18; insulin was changed to NPH 15U/am, 5U/pm and Lispro insulin 5U-6U-8U with the three meals. St. John's requested that capillary blood glucoses (CBG) be sent weekly for their review. On 4/6/18, the patient was admitted to the LCC infirmary for closer monitoring due to CBGs above 300. On 4/20/18, the infirmary provider noted that CBG's were still in the 200s

---

[80] Chronic Care Patient #5.
[81] Chronic Care Patient #11.
[82] Chronic Care Patient #13.

and increased the NPH insulin dosage to 20U/am and 10U/pm. Some improvement of CBG's were reported on 4/13/18. On 4/17/18, it was noted that CBG results were sent to St. John's SIU MFM service. The patient was again seen at St. John's MFM on 4/18/18; ultrasound showed FHT 148 and a fetal age of 31 weeks +/- 4 days. The MFM providers recommended that the glucose treatment goals were fasting blood glucose (FBS) <90 and post prandial <120. In summary, this pregnant patient with gestational diabetes was quickly placed under the care of the LCC OB provider and St. John's SIU MFM specialists. She is being appropriately tested and monitored to date. CBG results have been communicated at least once to the MFM specialists.

- This patient is a pregnant 21-year-old female with a history of tobacco use and possible mental health disorder.[83] Labs were ordered, blood pressure was normal, and prenatal vitamins and ferrous sulfate prescribed. From 2/28/18 to 3/13/18, the patient was placed on mental health crisis watch. On 3/6/18, onsite ultrasound revealed FHT 168 and a fetal age of 10 weeks +/-2 days. The OB provider appointment on 4/6/18 had to be rescheduled by the provider, but a Pap smear was done on this date. As of 4/26/18, the patient has not yet been seen by the LCC OB provider. Sixty-four days after intake, the prenatal tracking form has not yet been initiated and the OB provider has not examined this first trimester/early second trimester patient. In summary, this first/early second trimester pregnant patient has had prenatal labs and tests performed, fetal ultrasound done, prenatal vitamins and ferrous sulfate prescribed, and blood pressure monitored. However, 64 days after admission to LCC, this patient has yet to be evaluated by the OB provider who had to cancel one scheduled appointment. LCC now has three advanced practice nurse practitioners (NP); it would be in the best interest of patient care if at least one of the NPs was assigned to staff the prenatal clinic with the OB provider and acquire skills and experience in managing OB patients in the absence of the OB specialist.

- This patient is a 49-year-old female with multiple sclerosis and hypertension.[84] She has been incarcerated since at least 2004 and transferred to LCC when it opened in 2013-14. She had a normal Pap in 2014 but there have been no Paps in last four years. No mammograms have yet been done even though the patient is over the age (45 years old) when IDOC recommends starting mammography screening. In summary, LCC is not following the IDOC Pap and mammography screening recommendations, which recommend Pap smears every three years and mammography starting at 45 years of age.

## Dental Program

<u>Dental: Staffing and Credentialing</u>

---

[83] Chronic Care Patient #14.
[84] Chronic Care Patient #15.

**Methodology:** Reviewed staffing documents, interviewed dental and other staff, reviewed the Dental Sick Call Log and other documents.

**First Court Expert Findings**
- LCC has two full-time dentists, two full-time assistants, and one full-time hygienist. This should be adequate to provide meaningful dental services for LCC's 2000 inmates.
- CPR training is current on all staff, all necessary licensing is on file, and DEA numbers are on file for the dentists.

**Current Findings**
We concur with the First Court Expert's findings that staffing is adequate. LCC has 2.0 dentist FTEs,[85] one full-time dental hygienist and three full-time dental assistants; an increase of one dental assistant.

## Dental: Facility and Equipment
**Methodology:** Toured the dental clinic to assess cleanliness, infection control procedures, and equipment functionality. Observed intake screening and clinical care. Evaluated the quality of x-rays taken at intake. Reviewed compliance with radiologic health regulations.

**First Court Expert Findings**
- The clinic is small, with equipment that is more than 20 years old. Provider and assistant had very little room to work. If both chairs were in use, the providers could interfere with each other.
- Loose wires were strewn on the floor and plugged into a loose metal junction box, upright on the floor next to the unit. It interfered with movement and was a real safety hazard.
- Several areas of rusted metal were evident, and the cabinetry is worn. The chairs have torn fabric and are not up to contemporary infection control standards.
- Metallic surfaces were rusty and stained, and corners were worn and frayed, which impeded adequate surface decontamination and disinfection.
- The intraoral x-ray unit was inoperative, a deficiency that interfered with the provision of dental care.
- The Panelipse [panoramic] radiographic unit was old and faded and the quality of x-rays was poor.
- An EMR is in the early testing phase at LCC.
- The handpieces and instruments were adequate.
- There was a separate sterilization and laboratory room of adequate size with a large work surface and a large sink to accommodate proper infection control and sterilization.
- Laboratory equipment was in a separate corner of the room. The staff had an office with two desks.

---

[85] Two dentists work four eight-hour days and one dentist works two eight-hour days.

- At the time of the visit, two additional units were being installed in another room adjacent to the clinic area to be used for hygiene and prosthetics and has an extra chair to accommodate patient overflow, e.g., emergencies and examinations.

**Current Findings**

Dental facilities and equipment have improved since the First Court Expert's Report and are adequate. We concur with the First Court Expert and note that that since then, the loose wires have been secured, the EMR has been implemented, and the dental hygiene area has been completed. We identified current and additional findings as follows.

There are two dental units in the main clinic and two in the dental hygiene area. The dental hygienist's unit is not in the dental clinic but rather in a small room in a corridor that is not contiguous with the dental clinic, isolating the hygienist from clinic activity.

The two chairs in the main clinic are old, and one has torn upholstery which interferes with surface disinfection. The light stanchion of the other unit was salvaged from another facility and is mounted askew. In addition, the bracket table is unstable and cannot be maintained in place, posing a hazard to patients and staff.

There are only four functioning high-speed handpieces (drills). Since two dentists are working most of the time and handpieces must be sterilized between patients, this is insufficient, since there are always some handpieces in various stages of sterilization that are unavailable for use.

There is one functioning intraoral x-ray unit mounted near one of the dental units. The dental hygienist's operatory does not have an x-ray unit. As a result, the hygienist, who is accustomed to taking bitewing x-rays on her patients, cannot do so feasibly.

There is no stethoscope and sphygmomanometer in the clinic and when dentists want to measure blood pressure, they borrow them from Nursing.

## Dental: Sanitation, Safety, and Sterilization

**Methodology:** Reviewed Administrative Directive 04.03.102. Toured the dental clinic and observed dental treatment room disinfection. Interviewed dental staff and observed patient treatment.

**First Court Expert Findings**

- The surface disinfection was performed between patients and was adequate. Protective covers were utilized on some surfaces.
- Instruments properly bagged, sterilized, and stored. Handpieces were sterilized and in bags.
- The sterilization procedures were adequate, and flow from dirty to clean was acceptable.
- Safety glasses were not always worn by patients.

**Current Findings**

Dental sanitation, safety, and sterilization are unchanged since the First Court Expert's Report and are adequate. However, we identified current and additional findings as follows. Surface disinfection performed between patients in the clinic was appropriate and protective covers were used on surfaces. Sterilization procedures and instrument flow were adequate. Instruments were properly bagged, sterilized, and stored. Patients did not always wear safety glasses[86],[87]. Sanitation at the intake dental examination was inadequate and will be discussed in the Initial Examination section, *infra*.

## Dental: Review Autoclave Log

**Methodology:** Reviewed the last two years of entries in autoclave log, interviewed dental staff, and toured the sterilization area.

**First Court Expert Findings**

- A review of the past two year's sterilization logs showed that autoclaving was accomplished weekly and documented. They utilize a service from Henry Schein called Crostex that does the testing and maintains the results. A spread sheet of the results is available and provided annually. A biohazard warning sign was not posted in the sterilization area.

**Current Findings**

Autoclave Log maintenance is unchanged since the First Court Expert's Report and remains adequate. We agree with the First Expert's findings. The sterilization log was in order.

## Dental: Comprehensive Care

Comprehensive, or routine care[88] is non-urgent treatment that should be based on a health history, a thorough intraoral and extraoral examination, a periodontal examination, and a visual and radiographic examination.[89] A sequenced plan (treatment plan) should be generated that maps out the patient's treatment. This plan should be updated after each treatment or examination.

---

[86] Why We Take Infection Control Seriously. UIC College of Dentistry. Viewed at https://dentistry.uic.edu/patients/dental-infection-control, viewed February 2, 2018 "We use personal protective equipment [...] **as well as provide eye protection to patients for all dental procedures**." (emphasis added).

[87] Guidelines for Infection Control in Dental Health-Care Settings ---2003. MMWR, December 19, 2003/ 52(RR17):1:16; pp. 17-18. ("PPE [personal protective equipment] is designed to protect the skin and the mucous membranes of the eyes, nose, and mouth of DHCP [dental health care provider] from exposure to blood or OPIM [other potentially infectious materials]. Use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes creates a visible spray that contains primarily large-particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, DHCP, **or the patient**. The spray also might contain certain aerosols (i.e., particles of respirable size, <10 μm). Aerosols can remain airborne for extended periods and can be inhaled" and "Primary PPE used in oral health-care settings includes gloves, surgical masks, **protective eyewear**, face shields, and protective clothing (e.g., gowns and jackets). All PPE should be removed before DHCP leave patient-care areas (*13*). Reusable PPE (e.g., clinician **or patient protective eyewear** and face shields) [...]"). Emphasis added. Moreover, protective eyewear prevents injury from objects dropped by the provider.

[88] Category III as defined in Administrative Directive 04.03.102.

[89] Stefanac SJ. Information Gathering and Diagnosis Development. In Treatment Planning in Dentistry [electronic resource]. Stefanac SJ and Nesbit SP, eds. Edinburgh; Elsevier Mosby, 2nd Ed. 2007, pp. 11-15, *passim*.

**Methodology:** Interviewed dental staff, reviewed dental charts of inmates who received non-urgent care randomly selected from Daily Dental Reports.

**First Court Expert Findings**
- A basic and essential standard of care in dentistry is that all routine care proceeds from a thorough, well-documented intra and extra-oral examination and a well-developed treatment plan, to include diagnostic x-rays. In none of the 10 records reviewed was any of this present.
- No comprehensive examination was performed, no treatment plans developed, and no hygiene care performed before routine care.
- No diagnostic x-rays for caries were available. Restorations were provided from the information from the panoramic radiograph and an inadequate screening exam. This radiograph is not diagnostic for caries.
- A periodontal assessment was not done, and oral hygiene instructions were not documented in the dental record as part of the treatment process.

**Current Findings**
Comprehensive care is materially unchanged since the First Court Expert's Report and we concur with the First Court Expert that it is inadequate. Moreover, we identified current and additional findings as follows.

Dr. Zielinski said that while he "likes to take bitewing x-rays every year" in private practice, he does not do so at LCC. The hygienist said that she would normally take bitewing x-rays; however, she does not have an intraoral x-ray unit in her operatory. To take x-ray, she would have to bring the patient to one of the dentist's chairs; however, this is not feasible since 1) typically, a dentist is seeing a patient and, 2) the dental hygiene operatory is separate from the dental clinic.

Biennial exams are scanty and of minimal clinical value. Neither x-rays nor periodontal probing are performed, and a sequenced treatment plan that involves periodontal treatment is not produced. Moreover, there is no documentation that a soft tissue examination for oral cancer is performed.[90]

The dental hygienist completes Dental Hygienist Progress Notes after treatment. The form is organized in the SOAP format; however, it does not document Periodontal Screening and Recording, a standard of care for dentistry and dental hygiene.[91] Furthermore, the assessment

---

[90] Appendix B shows the biennial examination form of Biennial Exam Patient #7 is typical of biennial exam entries. Other than a box indicating that treatment has not been requested, the examination is of little clinical value.

[91] Stefanac SJ. (A panoramic radiograph has insufficient resolution for diagnosing caries and periodontal disease. Intraoral radiographs (e.g., bitewings) and periodontal probing are necessary), p. 17. Also, (Periodontal Screening and Recording (PSR), an early detection system for periodontal disease, advocated by the American Dental Association and the American Academy of Periodontology since 1992, is an accepted professional standard.), pp. 12-14. See American Dental Hygiene Association. Standards for Clinical Dental Hygiene Practice Revised 2016, pp. 6-9. (Periodontal probing is also a standard of practice for dental hygiene).

is general and does not indicate the location and severity of the periodontal problem. Consequently, there is no way to monitor disease progression or reversal.

Of 10 inmates who received comprehensive (routine) care, all had treatment plans; however, the treatment plans were below accepted professional standards, since the sequence of the prescribed care was not specified, and they were informed by neither bitewing x-rays nor periodontal probing. As a result, caries and periodontal disease were underdiagnosed.

Oral hygiene instruction (OHI) was documented only in conjunction with treatment by a dental hygienist and the two patients who were not treated by the dental hygienist had no documented oral hygiene instruction. The Dental Hygiene Progress Note in the electronic health record[92] has several boxes corresponding to procedures that the hygienist can check: Scaling and Root Planing, Prophylaxis, Perio-Prophylaxis, Full Mouth Debridement, and Oral Hygiene Instruction.[93]

The dentists were unable to provide the definitions the clinic uses for these procedures and referred me to the dental hygienist.[94] The hygienist said that when she records "scaling and root planing" it means that she removed some calculus with either hand instruments or an ultrasonic scaler and a "perio-prophylaxis" is a deeper scaling for patients who have periodontal disease. These are idiosyncratic definitions that do not comport with standard dental terminology.

## Dental: Intake (Initial) Examination[95]

**Methodology:** Observed intake screening process. Reviewed dental records of inmates that have been screened recently. Reviewed Administrative Directive 04.03.102.

**First Court Expert Findings**
- The screening examination was performed within 10 days of arrival, and the intra and extra-oral examinations were adequate. Panoramic x-rays were taken at the dental clinic and APHA priorities were designated.
- In none of the records were oral hygiene instructions included. The examiner explained orally and had written instructions available on how to access dental care.

---

[92] Dental Hygiene Progress Note for Biennial Examination Patient #7 (Appendix C).

[93] American Dental Association procedure codes show that the definitions of scaling and root planing (D4341 and D4342) are clear and specify the scope of the procedure. This is not the definition used by the dental hygienist. In fact, her description more closely resembles the definition of an adult prophylaxis (D1110).

[94] This is problematic, since per the Illinois Dental Practice Act, dentists supervise dental hygienists and prescribe the treatments the dental hygienists provide. "General supervision means supervision of a dental hygienist requiring that the patient be a patient of record, that the dentist examine the patient in accordance with Section 18 prior to treatment by the dental hygienist, and *that the dentist authorize the procedures which are being carried out by a notation in the patient's record* [a treatment plan satisfies this requirement], but not requiring that a dentist be present when the authorized procedures are being performed." Illinois Dental Practice Act 225 ILCS 25/4). Viewed at http://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=1296&ChapterID=24 8/6/2018. Emphasis added.

[95] The First Court Expert Report describes the examination performed at intake screening as a "Screening Examination;" however, Administrative Directive 04.03.102 describes it as a "complete dental examination." We use the terminology of the Administrative Directive and refer to the intake or initial dental examination as a complete dental examination.

- The room where the panoramic x-ray was taken did not provide sufficient warning to pregnant females that the area was potentially hazardous. Additionally, no consent form was developed that explained the potential hazards and gave permission for the x-rays to be taken on female inmates who might be pregnant.

**Current Findings**

The dental intake examination has not changed materially since the First Court Expert's Report. We agree with the First Court Expert that the intake exams were timely, oral hygiene instructions were not documented, and that warning signs were not posted in the panoramic x-ray area. However, we find the most important problem (not addressed by the First Court Expert) to be the overall inadequacy of the initial examination. We identified current and additional findings as follows.

The dental intake examination is performed in a small room that has a dental chair and light. A dental assistant asks health history questions and records responses. The dentist is gloved; however, he does not wash hands or use alcohol wipes between changing gloves. No disposable barriers were used on dental lights. Exams employ adequate light, a mirror, and an explorer. A dental assistant records the charting. Oral hygiene instructions are not provided, although a handout and oral instructions are provided relating to how to access dental care at LCC.

The dentist does not perform a thorough soft tissue examination.[96] For example, he does not visualize the lateral and posterior regions of the tongue,[97] a site of squamous cell carcinoma. This is especially important at LCC, since "[s]uspect lesions in females younger than the age of 50 years, with no history of alcohol or tobacco use, have a greater risk of malignant potential and often behave more aggressively. Lesions in this population of patients must be treated [and *a fortiori*, diagnosed] very quickly and aggressively."[98] Performing a thorough soft tissue examination is critical at the initial examination, since unless the inmate requests care within two years, her next exam will be biennial.[99]

A dentist reviews the charting and panoramic x-ray later and records a treatment plan. This is inadequate because it is not informed by bitewing x-rays and a periodontal assessment. Twenty charts and panoramic x-rays of inmates who received oral screening examinations in the past month were reviewed. All the chartings were adequate; however, four x-rays (20%) were clinically inadequate.

---

[96] Stefanac SJ. ("Evaluation of head and neck structures for evidence of tissue abnormalities or lesions constitutes an important part of a comprehensive examination."), p. 12. See also Shulman JD, Gonzales CK. Epidemiology / Biology of Oral Cancer. In Cappelli DP, Mosley C, eds. <u>Prevention in Clinical Oral Health Care</u>. Elsevier (2008) ("Regular, thorough intraoral and extraoral examination by **a** dental professional is the most effective technique for early detection and prevention of most oral cancers. […]") p. 41.
[97] Shulman and Gonzales,  p. 31, Figure 3.7. This is generally done by holding the anterior portion of the tongue with 2x2 gauze and reflecting the tongue with a mouth mirror. This is a professional standard for an oral examination.
[98] Shulman and Gonzales, p. 41.
[99] This deficiency is compounded by the fact that dentists do not document soft tissue examinations at biennial exams. See section on Comprehensive Care, *supra*.

None of the 10 biennial examinations reviewed were informed by bitewing x-rays or periodontal probing. While seven patients[100] did not request treatment, there was no documentation of their treatment needs – if only to note that that no treatment was warranted. None of the patients who requested treatment had an updated treatment plan. There was no documented periodontal assessment or soft tissue exam for oral cancer. In short, the examinations are substantially below accepted professional standards.

## Dental: Extractions

**Methodology:** Interviewed dental personnel and reviewed 11 dental and medical records.

**First Court Expert Findings**
- A tenet of dentistry is that all treatment proceeds from a well-documented diagnosis. In none of the 10 records examined was a diagnosis or reason for extraction included as part of the entry. Too often, the dental record includes only the treatment provided with no evidence as to why that treatment was provided.

**Current Findings**
Dental extraction care has improved since the First Court Expert's Report and is adequate. We concur with the First Court Expert's findings but note that unlike those findings, of 10 records of inmates who had extractions, all extractions were informed by adequate panoramic x-rays. This aspect of the program has improved substantially since the First Expert's Report. All progress notes documented the reason for the extraction. We did, however, find that none of the charts documented that the health history had been updated. All extractions were accompanied by signed consent forms.

## Dental: Removable Prosthetics

**Methodology:** Reviewed eight charts of patients who received partial dentures in the past year that were randomly selected from the Prosthetics List and interviewed dental staff.

**First Court Expert Findings**
Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. The periodontal, operative [fillings], and oral surgery needs all should be addressed first.
- In none of the five records reviewed on patients receiving removable partial dentures were oral hygiene instructions provided.
- Periodontal assessment is never included, but in three of five records a prophylaxis and/or a scaling debridement was provided.
- Because there is no comprehensive examination, or any treatment plans documented in any of the records, it is almost impossible to ascertain that operative or oral surgery treatment is complete prior to fabrication of removable partial dentures.

---

[100] Biennial exam patients #1, 2, 3, 4, 5, 7, and 9.

PTX193-0351

**Current Findings**

Removable prosthetics care has not changed materially since the First Court Expert's Report. We agree with the First Court Expert's findings with respect to the inadequacy of the provision of removable prosthetics. We identified current and additional findings as follows.

Of six inmates who received partial dentures, all but one[101] received oral hygiene instruction.[102] All had extractions and fillings completed before the denture was fabricated. All but one inmate[103] had a periodontal assessment and received some treatment by a dental hygienist; however, the assessment was inadequate since it omitted periodontal probing (specifically, the PSR), a professional standard for dentistry and dental hygiene. Moreover, as discussed in the Comprehensive Care section *supra*, the putative procedures documented do not correspond to standard dental terminology; consequently, it is difficult to know what was done.

All had documented treatment plans; however, the Treatment Needed – Completed Restorations form produced by the EHR does not indicate the need for periodontal treatment, nor does it distinguish between the procedures that were planned and those that were completed.

## Dental: Sick Call/Treatment Provision

**Methodology:** We interviewed dental staff, reviewed dental sick call logs, daily dental reports, and reviewed records of 10 inmates who were seen on sick call.

**First Court Expert Findings**

- Inmates access sick call through an inmate request form or via a direct call from a staff member if it is perceived to be an emergency. The dental hygienist reviews all request forms the following day from the collection of the forms, triages the complaints, and schedules per the dentists' direction or as soon as possible.
- By policy, all inmates who submit a request form are to be seen by dental staff within 14 days. LCC was not compliant with this policy. Toothaches or infections can be called in from anywhere in the institution and the inmate will be seen that same day.
- In none of the dental records reviewed was the SOAP format used; as a result, treatment was usually provided with little information or detail preceding it.
- Routine care was often provided at these appointments, always without a comprehensive examination or treatment plan.
- The LCC dental department does not keep request forms; consequently, it was difficult to review sick call records from more than a month ago.

**Current Findings**

---

[101] Prosthetics Patient #4 did not receive documented oral hygiene instruction.
[102] The only documented oral hygiene instruction in the charts I reviewed was at the dental hygiene appointment. Dentists do not document the provision of oral hygiene instruction.
[103] Prosthetics Patient #4.

The dental sick call process has changed since the First Court Expert's Report and is adequate. Consequently, our findings diverge from those of the First Court Expert. Moreover, we found that the SOAP format was used consistently, which represents an improvement in documentation.

Inmates access dental care by checking the 'Dental' column on the nurse sick call signup form. Since the form does not indicate the nature of the dental issue (e.g., the existence of pain), dental staff pick up the forms daily and interview the inmates. Those with urgent care issues are seen by a dentist, typically, the next business day, and the others are scheduled for a routine visit, typically, within three weeks.

Inmates may also submit sick call requests (sick slips) which they place in locked boxes in the housing areas. These forms are collected daily by nursing personnel. Since the forms state the problem, dental staff call in those with urgent care issues and schedule the others for a routine appointment as they do for referrals from nursing sick call.

Of 10 records of inmates who were seen on dental sick call, all had a diagnosis documented in the chart; however, none had the health history reviewed or updated at the visit. The nursing sick call lists from April 1 thru April 8 had 32 inmates requesting dental care, of which 10 (31%) were either no-shows or refusals.

## Dental: Orientation Handbook
**Methodology**: Reviewed the Orientation Handbook.

**First Court Expert Findings**
Dental care is not addressed in the Offender Handbook and Orientation Manual. This omission should be addressed immediately. I was told that inmates were informed about the dental program and how to access care at the reception intake screening examination. This is inadequate.

**Current Findings**
Inmate orientation to dental care has not changed materially since the First Court Expert's Report. We concur with the First Court Expert with respect to the inadequacy of the Orientation Handbook. We identified current and additional findings as follows.

The Offender Handbook's only mentions of dental care are that dental care is available (p. 7) and that there is $5.00 co-pay for non-emergency dental services for non-indigent inmates (p. 70). While the dentist provides an orientation to accessing dental care at the intake screening, the information should appear in the Orientation Manual.

## Dental: Policies and Procedures

**Methodology:** Reviewed Administrative Directives that deal with the dental program. Interviewed dental staff. Reviewed dental charts. Toured dental clinical areas. Reviewed LCC organizational chart.

**First Court Expert Findings**
- The existing policy and procedure manual is old and outdated and does not address the current state of how the clinic is managed, nor does it fully address the areas concerned with managing a successful clinic.
- The policy addresses treatment plans, scheduling treatment, medications, dental care for inmates (directly out of the Dental Administrative Directive), copay, security of medication and needles, instruments, etc., infection control (from 1993), job description for dentists and dental assistants.
- It does a poor job of defining and directing the management and running of the dental program.

**Current Findings**
The Operations Policies and Procedures were last updated in 2016—after the First Court Expert report; however, we concur with the First Court Expert that the clinic management guidance is inadequate.

Oral Care Policy P-108, modeled on NCCHC Oral Care Policy P-E-06, specifies that newly admitted inmates will "will receive an oral screening during the Receiving Screening process and will include a visual observation of the teeth and gums noting any obvious abnormalities requiring immediate referral to the dentist."[104] Furthermore, "[…] a complete dental examination will be conducted within 30 days of admission (which will normally be provided while the inmate-patient is at the intake center) and will include: 1) [a] review of the patient's oral history, 2) [v]isual assessment of intra and extra oral condition, 3) [x]-rays when deemed necessary by the dentist, 4) [p]atients ability to or limitations of mastication, 5) [c]harting of presence/absence and condition of teeth, 6) [s]pecified priorities for treatment, [and] 7) [t]he results of the dental examination will be recorded on a specific uniform dental record system approved by the American Dental Association."[105]

LCC is noncompliant with Policy P-108. First, while an oral screening is performed, a ***complete*** examination is not performed within 30 days of admission, ***or for that matter, at any time***. The examination is far from being complete for reasons addressed earlier in this section; that is, inadequate oral soft tissue and periodontal examination, the absence of intraoral x-rays, and the absence of a sequenced treatment plan. Furthermore, the American Dental Association procedure codes are not used.

---

[104] *Id*. at ¶ II B.

[105] *Id*. at ¶ II D. The 'uniform record system' sponsored by the American Dental Association is the Code on Dental Procedures and Nomenclature. "In August 2000 the CDT Code was designated by the federal government as the national terminology for reporting dental services on claims submitted to third-party payers." American Dental Association Dental Procedure Codes, 2015, p. 1.

## Dental: Failed Appointments

**Methodology:** Reviewed dental sick call log. Interviewed dental staff. Reviewed daily dental reports.

**First Court Expert Findings**

- A review of monthly reports and daily work sheets revealed a failed appointment rate of about 17.5%. This is high and should be addressed. When asked, the staff related that it is often difficult for inmates to be released from the housing units to come to their appointment or there may be other program activities to prevent them from coming to the appointment. The staff did not feel it was a purposeful no-show on the inmates' part. A refusal form is signed if the inmate does not want to keep the appointment.

**Current Findings**

Failed appointments have not improved materially since the First Court Expert's Report. We concur with the First Court Expert that the failed appointment rate is too high. We identified current and additional findings as follows.

The nursing sick call lists from April 1 thru April 8 had 33 inmates requesting dental care, of which 10 (30%) were either no-shows or refusals.

## Dental: Medically Compromised Patients

**Methodology:** Reviewed health history form and records from recent intake exams. Compared the health history in the dental chart to the medical problem list. Reviewed randomly selected charts of patients on the Chronic Care list for diabetes and anticonvulsant therapy.

**First Court Expert Findings**

- The dental record is maintained with the medical file, so all medical information is available to the dental staff from the medical record. The health history on the dental chart is updated at the time of what is called an "initial examination" at this institution. This is a modified comprehensive examination from which a treatment plan is developed.
- This health history is inadequate and does not directly address all the compromised medical conditions that may affect how dental care is provided. There is no system in place to "red flag" patients with medical conditions that can affect dental care. The health history in the dental chart is poorly developed and not very thorough.
- When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Current Findings**

Documentation of the health history on medically compromised patients has not improved materially since the First Court Expert's Report. We concur with the First Court Expert that documentation of the health history of medically compromised patients is inadequate. We identified current and additional findings as follows.

Of eight patients with diabetes or receiving anticoagulant therapy, four[106] (50%) had dental treatment without an update of the health history. Of the six[107] diabetic patients, none had documented periodontal probing. Dentists neither properly assess periodontal disease nor develop an *explicit* treatment plan to address it.[108] Dentists are inconsistent in updating the health history at clinical encounters.[109]

## Dental: Specialists

**Methodology:** Interviewed dental staff, reviewed CQI documents, and reviewed dental charts of inmates who were seen by an oral surgeon.

**First Court Expert Findings**

Dr. Frederick Craig, an oral surgeon, is available on an as needed basis, usually once a month. He was scheduled for the near future to see a group of patients. A review of these consultation requests revealed that they were all referred to the oral surgeon for appropriate reasons. All were for difficult extractions and removal of wisdom teeth that were beyond the scope of the dentists' practice. Dr. Craig is used by several other IDOC institutions. Pathology services will be the same as for medical pathology. They will give the specimen to the appropriate medical person for processing.

**Current Findings**

We concur with the First Court Expert that oral surgery consultations are adequate. Unlike the finding by the First Court Expert, an oral surgeon does not provide care at LCC; rather, patients requiring oral surgery services that cannot be provided by the dental department are referred to a local oral surgery practice. This requires the approval of the Wexford Regional Medical Director through a process referred to as "collegial review." The reviewer for oral surgery consultations is Dr. Karanbir Sandhu, who serves on a part-time basis as a Prosthetic Advisory Dentist. Dr. Sandhu is neither an oral surgeon, a specialist in prosthodontics, or any other dental specialty.

## Dental: CQI

**Methodology:** Reviewed CQI minutes and reports. Interviewed dental staff.

**First Court Expert Findings**

The dental program only contributes monthly dental statistics to the CQI Committee. No CQI study was in place at the time of this review. A recent mission change at LCC allowed only two months of minutes to be reviewed.

**Current Findings**

---

[106] Medically Comprised patients #1 (anticoagulant), #2 (diabetes), #3 (diabetes), and #8 (diabetes).
[107] Medically Compromised patients #2, 3,4, 5, 6, and 7.
[108] It appears that dentists refer patients to the hygienist without an appropriate diagnosis and prescribed treatment plan and the dental hygienist determines the treatment *sua sponte*. See footnote 95 *supra*.
[109] For example, Medically Compromised Patient #1 (10/30/17); Patient #2 (7/14/16); Patient #8 (3/23/17 biennial exam).

We concur with the First Court Expert that the dental CQI program is inadequate. Moreover, it has not improved materially. We identified current and additional findings as follows.

As noted by the First Court Expert, there were no CQI studies ongoing. The 2017 Annual Governing Body Report reported a quality improvement study on "[t]he time frames for dentures start to finish including healing. Is it within 3 months?"[110] There were neither recommendations nor a planned follow-up. The study was, at best, trivial. Given the inadequacy of the clinical aspects of the dental program described in this report, a 'study' of how long it takes to fabricate a denture ignores far more relevant issues such as inadequate health histories, inadequate diagnosis of periodontal disease, and failure to use intraoral x-rays.

The dental service reports the total patients seen, the total procedures, backlogs and wait times, and number of referrals to an oral surgeon.[111] In addition, the monthly and annual total treatments.[112] The number of failed appointments was not reported.

## Internal Monitoring and Quality Improvement Activities

**Methodology:** Interview facility leadership and staff involved in quality improvement activities. Review CQI Committee meeting minutes, including the Annual Meeting minutes.

### First Court Expert Findings
The First Court Expert found that the minutes showed no effort to engage in quality improvement activity. The minutes consisted only of data collected on a variety of services. There was no documented discussion, analysis, or effort to improve quality.

### Current Findings
We do not completely agree with the First Court Expert's finding that the LCC CQI minutes showed no effort to engage in quality improvement activity. While the minutes mostly consisted of data collection on a variety of services, there were attempts on a few studies to evaluate for quality of services. However, these efforts fall short of demonstrating an effective CQI program. Largely, we view this as not having staff dedicated to quality, not understanding methodologies of performing quality studies, and not making quality improvement a system-wide program goal.

LCC does not have a CQI coordinator; the HCUA acts as the CQI coordinator. But her responsibilities are so wide ranging (HCUA, regional coordinator, CQI coordinator, infection control nurse, and nurse supervisor) that she is not effective in this role. LCC does not have a CQI plan specific to LCC. It merely paraphrases or repeats verbatim sections of the AD on CQI. This gives no indication of the CQI plan for LCC the upcoming year and is not a plan.

---

[110] Annual Governing Body, Logan Correctional Center. July 19, 2017, p. 25.
[111] Annual Governing Body, Logan Correctional Center, July 19, 2017, p. 299. (Annual governing 2017-2.pdf).
[112] For example, fillings, extractions, dentures, biennial exams, intake screenings, panoramic x-rays. Id. p. 301.

The First Court Expert was critical of the CQI program and found that there was no effort to engage in quality improvement activity. We found that there was an effort to engage in quality improvement, but the studies that were done either lacked understanding of how to perform a quality study or used the quality study as a proxy for supervision as opposed to an effort to create a systemic improvement. There were eight CQI studies pertaining to the medical program.

Like other facilities, there was a misunderstanding of what outcome studies are. Five studies were listed as being outcome studies. Clinical outcomes are end point measures of health status such as mortality, hospitalization, an HbA1C level of 7 or less, or normal blood pressure. An outcome study measures interventions based on the ultimate outcome measure. An example would be to study the effect of colorectal cancer screening on colorectal cancer mortality or the effect of increasing the interval of chronic clinic visits on obtaining a normal blood pressure. The studies listed as outcome studies were:
1. Whether ordered injections were given.
2. Are glasses received within six weeks?
3. Whether patients discharged from the infirmary were evaluated within 14 days.
4. Did a provider see a patient within five days after a medical furlough?
5. Does the Medical Director sign off on injury reports?
6. Whether nurse referrals to providers were medically indicated.

None of these includes a clinical outcome. These are all performance measures which assessed whether staff were performing their jobs. These are measures that are useful to analyze with respect to whether operations are performing as expected. However, they are not outcome studies. One study, signing off on injury reports, was listed once as a process study and once as an outcome study.

One study, listed as a process study, was actually an outcome study. This study asked a question; did HbA1C values improve at the next clinic after education was provided?  An intervention was studied as to whether it could affect an outcome – the HbA1C level. This study was a credible study and posed a valid hypothesis. It attempted to evaluate the value of current educational efforts to improve diabetic control. Over two months of study, the finding was that 11 patients had the same HbA1C level after education, 49 patients had an improved HbA1C, and 43 patients had worse HbA1C values. These findings appear to demonstrate that education had no effect on HbA1C values. However, there was no investigation of the reasons for the results associated with this finding. Only the data was given. This was an interesting finding but there was no study to determine why this result occurred. Was the study flawed? Does education have no value? Was the education flawed? This study can have value, but it was not thoroughly executed, apparently due to a lack of ability to conduct the analysis.

The remainder of the 2016-17 annual CQI report mostly gives statistics that have no inherent value with respect to quality improvement. This is consistent with comments of the First Court Expert, who stated that minutes consisted only of data collected on a variety of services. The monthly meeting minutes consist only of data without any analysis or study.

We also note that this facility does not perform some required studies as required by the IDOC AD, including:

- There is no evidence of primary source verification of physician credentials.
- There is no evidence of evaluation of quality or appropriateness of 100% of offsite referrals.
- Hospitalizations are listed but not reviewed with respect to quality.

We also note that there is no mortality review. The facility Medical Director writes a brief summary of the death but there is no analysis of death with a perspective of attempting to identify correctable problems in order to reduce preventable deaths or reduce problems that place patients at risk of harm.

We evaluated one death from LCC.[113] This is discussed in greater length in the mortality review section of this report. However, this patient had several problems. The patient had known pancreatic mass identified at Cook County Jail that was thought to be due to pancreatic cancer. The patient had significant abdominal pain and on transfer was on approximately 90 mg of morphine for pain control. On transfer to LCC, the patient had a pending follow up with the gastroenterologist at Stroger Hospital. Instead of following up with a gastroenterology consultation and obtaining or repeating a CT scan, LCC treated the pancreatic mass as a benign lesion and took no diagnostic action. Also, the patient was treated with only one Tylenol #3 tablet three times a day, a pain medication reduction of approximately 80%.

About a month after arrival to LCC a doctor obtained a tumor marker test that indicated a high probability that the patient had pancreatic cancer, a diagnosis suspected at Cook County Jail. The doctor ordered a CT of the abdomen and a routine GI consultation. The GI consultation did not occur until 3/21/17, four months after transfer from Cook County Jail. The biopsy was not done until 4/14/17, five months after transfer from Cook County Jail. The diagnosis was delayed for five months and should have been accomplished within a month of transfer.

The patient was undertreated for her increasing abdominal pain from the metastatic pancreatic cancer throughout her incarceration at LCC, but especially over the last two months of life. Despite being undertreated for pain throughout her five months at LCC, during the last two days of life the patient was treated with palliative sedation without a documented discussion in the medical record with the patient of what palliative sedation is or a consent for this process. The patient, given only the equivalent of 15 mg of morphine during the prior months, was given 120 mg morphine a day and 2 mg of a benzodiazepine every two hours by intravenous infusion during the last two days of life. This was a huge increase of dosage and was apparently unrelated to existing pain symptoms of the patient. Palliative sedation is a last resort measure at the end of life to relieve severe and refractory symptoms. However, treatment in excess of symptoms can be problematic, especially if the patient does not agree to the excess treatment. There can be ethical concerns using palliative sedation, including that it hastens death or is a

---

[113] Patient #21 Mortality Reviews.

form of euthanasia.[114] For this patient, the lack of adequate pain control with the sudden apparent excessive use of morphine with a sedative drug raises ethical concerns about the purpose of this prescription. Despite this, there was no documented discussion with the patient or consent of the patient that we could find.

These issues bring up three concerns with care of this patient that should have been identified in the mortality review and should have resulted in a quality investigation as to why the problem occurred with a goal of fixing the problem.

- There was a significant delay in continuation of the work up of a significant illness. It took five months to make a diagnosis that should have taken much less time. There should be a review as to why this occurred.
- There was a deficiency of pain management over the five months of incarceration. The patient complained repeatedly of pain and endured pain unnecessarily over several months despite having a likely untreatable cancer. The program should evaluate why pain management was inadequate and review how pain is managed.
- The patient was treated with palliative sedation without documented informed consent, which gives the impression of hastening death or engaging in euthanasia. The program should review their end-of-life procedures to ensure that patients are treated with respect and dignity.

The death summary documented that the patient "wish of DNR and the more recent wish of palliative care" could not be found in the medical record. The Mortality Review Worksheet found that there was no way to improve care. We disagree.

---

[114] From section on Palliative Sedation from UpToDate an online electronic medical text.

# Recommendations

## Leadership, Staffing, and Custody Functions

### First Court Expert Recommendations
1. Seek approval and fill the Director of Nursing position as soon as possible. *We agree with this recommendation.*

### Additional Recommendations
2. LCC needs to fill its physician positions instead of converting them to nurse practitioner positions.
3. A staffing analysis should be done to determine whether staffing is adequate for this facility.
4. Nursing supervision needs to increase so that there are always supervisory nurses present.
5. The IDOC needs to fill its central region nurse coordinator position so that the HCUA can function full time at LCC.
6. LPNs should perform within the scope of their licenses.
7. Policies should be reviewed and revised as needed.

## Clinic Space, Sanitation, and Support Services

### First Court Expert Recommendations
1. Implement a nurse call system for each infirmary patient. *This recommendation has been addressed with the installation of battery powered nurse call devices in all infirmary patient rooms with the exception of the crisis beds that are within sight and/or sound of the nursing station.*

### Additional Recommendations
2. Develop and implement a plan to daily monitor and document negative air pressure readings when the infirmary's negative pressure room(s) is occupied for respiratory isolation and otherwise on a weekly basis.
3. Create at least one additional provider exam room(s) in the ambulatory clinic in order to accommodate all of the current (and future providers) at the same time.
4. Implement a plan to assure that all medical equipment and devices have documented annual safety inspections.
5. Replace the existing colposcope.
6. Purchase sufficient quantity of additional automated external defibrillators (AED) in order to place AEDs in the infirmary, ambulatory clinic, reception and screening, ADA housing unit, emergency response bag(s) and other high-risk areas on the LCC campus.
7. Replace the deteriorating vehicle that is used to transport clinical staff and equipment to emergencies on the LCC campus.

8. Enforce and monitor the existing policy to keep all emergency bags sealed and inspect and restock emergency bags that have been unsealed.
9. Expand the scope of the current safety and sanitation rounds or create separate rounds to include focused inspections of clinical areas including clinical equipment, exam tables, negative pressure, expired supplies, and medications, etc. and report the findings to the Quality Improvement committee.

## Medical Reception

**First Court Expert Recommendations**
1. There should be a space on the intake physical form to document the breast examination.
2. There must be a more appropriate space where a nurse can interview a patient for the nurse screen or a nurse practitioner for the history and physical in which there is no auditory disturbance.
3. A system must be set up to insure that appropriate and timely follow-up from the reception process does occur.

*We agree with these recommendations.*

**Additional Recommendations**
4. Repair or replace equipment in disrepair (e.g., examination table) and purchase needed medical equipment (e.g., microscope, large blood pressure cuff).
5. Providers should order chronic disease and other essential medications on the day of the patient's arrival. Ensure that patients receive the first dose within 24 hours or sooner as clinically indicated (e.g., insulin for diabetics).
6. Nurses should perform and document urine pregnancy screening on all newly arriving inmates except those who are menopausal and/or documented tubal ligation or hysterectomy.
7. In addition to performing a past medical history, providers should perform a review of systems (ROS) for chronic diseases to determine urgency of referral to the chronic disease program.
8. Providers should document the patient's medical conditions onto the problem list, including a history of TB infection and previous surgeries.

## Nursing Sick Call

**First Court Expert Recommendations**
1. Develop a plan to implement an all "RN" sick call process.
2. In the X-house, develop and implement a plan to conduct a legitimate sick call encounter, including listening to the patient complaint, collecting a history and objective data, performing a physical examination when required, making an assessment, and formulating a plan of treatment, rather than the current practice of talking to the patient through a solid steel door and basing any treatment on the conversation only.

3. Per Office of Health Services policy, assure all sick call encounters are documented in the Subjective-Objective-Assessment-Plan (SOAP) style.
4. Develop and implement a plan to assure Office of Health Services approved, pre-printed treatment protocols are used at each sick all encounter.
5. Develop and implement a plan of education for all nursing staff to address negative attitudes towards inmates.
6. Develop and maintain logs for sick call.
7. Develop and implement a plan to ensure that daily wellness checks and the weekly nurse practitioner rounds are documented in the segregation log and in the inmate specific medical record if any treatment is provided.
8. Develop and implement a plan to conduct the daily segregation wellness checks between the hours of 0700 and 2300.

*We agree with these recommendations.*

**Additional Recommendations**

9. Staff collecting sick call sign-up sheets at night should leave a new sheet, so inmates are able to sign-up 24 hours per day.
10. Inmates in segregation should be able to sign-up for sick call in the same manner as in non-segregation and not require the officer to enter the inmate's name.
11. Officers must escort all inmates being evaluated for sick call to an adequately equipped examination room that provides privacy and access to handwashing.
12. Nurses should document notification to medical providers and the provider's response to the notification.
13. Medical providers should examine patients requiring a medical diagnosis and document the examination in the medical record. Providers should schedule patients for follow-up as clinically indicated.
14. Health care leadership should perform CQI studies regarding the high rates of no shows, or failure of correctional officers to escort inmates to medical appointments.
15. If health care staff are unable to see all sick call patients within one day, consider returning to a written health request system that enables staff to triage and see patients with urgent requests.
16. Revise the Offender Orientation Manual to reflect actual access to care practices.
17. Health care leadership should develop and monitor quality indicators associated with each step of the sick all process.

# Medical Records

**First Court Expert Recommendations**

1. There should be no loose filing inside the health records. Medical records staff should adopt a "touch it once" philosophy when it comes to filing loose documents.
2. Health service request forms should be filed in the health records.

*These recommendations are no longer pertinent because of the partial implementation of an electronic medical record.*

**Additional Recommendations**

3. An electronic medical record should be fully implemented.
4. The record should be unified to include prenatal care documents in the electronic medical record.
5. Sufficient devices need to be provided in all clinical areas that accommodate the possible number of simultaneous users.
6. The practice of using default aged vital signs should be stopped.
7. Providers should be responsible for entering problems into the problem list. Every patient should have an updated problem list that is accurate.
8. All hospital discharge summaries, specialty test reports, and consultation reports need to be available in the medical record.
9. The program needs to be able to track immunizations in the electronic record.
10. The program needs to have the capacity to obtain data from the electronic record for the purposes of quality review.

## Urgent/Emergent Care

**First Court Expert Recommendations**

1. A system of nursing supervision with feedback must occur so that errors with regard to the adequacy of the assessment or the appropriateness of the clinical decision making are reduced substantially.
2. The administrator should develop a log that can be used to track unscheduled offsite services. The log should have the time and date, patient identifiers, the presenting complaint, what the disposition was in terms of being sent offsite and whether the reports from the offsite service are retrieved.
3. There should be a method to track the follow-up visits with the primary care clinician and whether they documented the discussion with the patient of the findings and plan based on the offsite service report.

*We agree with these recommendations. The second recommendation has been resolved.*

**Additional Recommendations**

4. The program needs to develop a means of reviewing the quality of clinical care with an aim to preventing unnecessary hospitalization and preventable clinical errors.

## Specialty Consultations

**First Court Expert's Recommendations**

1. The policy should require that patients returning from scheduled offsite services are brought through the clinic area where a nurse receives the paperwork, interviews the patient, and ultimately insures that a timely follow-up visit with the primary care clinician does occur. *We agree with this recommendation.*

**Additional Recommendations**

2. The current system of "collegial review" should be abandoned on the basis of patient safety.
3. The program needs to monitor underutilization. All patients in need of specialty care need to receive it. We noted so many cases of patients who were either not referred or denied referral that underutilization was systemic and widespread. A root cause analysis needs to be completed regarding this and it needs to be corrected.
4. The IDOC should establish a tracking system to be used for monitoring the timeliness of specialty care. This should not be maintained by the vendor.
5. Quality of care for those needing offsite care needs to be monitored. The current system of monitoring fails to identify existing morbidity that results from the specialty care process.

## Pharmacy and Medication Administration

### First Court Expert Recommendations
The First Court Expert's report contained no recommendations regarding the pharmacy and medication administration. *We do not agree with this assessment, as this review demonstrated systemic issues regarding pharmacy and medication management.*

### Current Recommendations
1. A sanitation/disinfection schedule should be established for the medication room and staff assigned to monitor completion of sanitation activities, including scheduled cleaning of refrigerators.
2. Pharmacy inspections should be more accurately performed to identify expired medications and unlabeled open vials.
3. Eliminate the process of transferring medications from properly dispensed medication blister packs into white envelopes that are improperly labeled. Nurses should administer medications from pharmacy-labeled blister packs maintained in medication carts that are transported to the chow hall.
4. Medication administration records should be brought to medication administration.
5. Medication carts should contain supplies such as small medication cups and hand-sanitizer.
6. The medication administration process should be modified. Nurses should:
   a. Wash their hands prior to medication administration and use hand sanitizer during medication administration (e.g., after every fifth patient or if they contaminate their hands in any way);
   b. Positively identify patients with two identifiers, including the patient's ID badge and one other (e.g., date of birth). Have the patient state their name as they approach the nurse;
   c. Compare the MAR against medication blister packs to ensure the orders match.
   d. Pour medications into a cup and give it to the patient without touching the patient. Have the patient dispose of the cup in the presence of a nurse or officer;
   e. With the assistance of officers, perform oral cavity checks to ensure ingestion, preferably using a penlight;

     f.  Document administration or refusal of medication onto the MAR at the time medication is offered to the patient.

     g.  For medication administration in segregation, consider establishing a secure medication room for storage of a medication cart and MARs. Nurses would transport the medication cart and MARs into segregation/reception and inmates line up to receive medications.[115]

7. All medication orders should be transcribed onto a MAR, including medications ordered by a dentist.

8. Nurses or medical providers should document administration of all medications at the time they are administered to the patient.

9. All medications, including KOP medications, should be administered or delivered by licensed and trained personnel.

10. Healthcare leadership should retrain nurses regarding the procedure for transcribing and discontinuing medication orders.

11. Nurses should refrain from defacing previous medication orders on the MAR as a short cut for transcribing new orders.

12. Nurses should document discontinuation of previous orders and write new orders on a separate entry on the MAR.

13. Nurses should document administration status for each scheduled dose of medication at the time of administration.

14. Medical records personnel should timely scan patient MARs into the EMR within five business days of the end of each month.

## Infection Control

**First Court Expert Recommendations**
Develop and implement a post-description for an infection control nurse.

1. Assign a specific RN to the responsibilities of infection control.

2. Develop, implement, and maintain a plan to assure the proper laundering of infirmary bedding and linens.

*We agree with these recommendations.*

**Additional Recommendations**

3. Health care leadership should establish, implement, and monitor a schedule for sanitation and disinfection activities in all areas where health care is delivered.

4. All torn and cracked outer protective coverings of infirmary beds, wheelchairs, examination tables and gurneys should be repaired or replaced to permit adequate infection control.

5. An analysis should be performed of infectious/communicable disease statistics, including prevalence of TB, HIV and HCV infection among newly arriving inmates.

---

[115] When we went into segregation, several inmates were out of cell and congregating at tables, versus a policy that prohibits inmates from interacting with others.

PTX193-0366

6. Track and report skin infections due to all pathogens, not just MRSA, including infestations with scabies or body lice.

7. Infection control and CQI meeting minutes should analyze communicable diseases (e.g., MRSA) to determine whether there are clusters of infections occurring in certain housing units.

8. Fully train porters about blood borne pathogens, the proper methods of cleaning and sanitizing clinical areas, and initiate appropriate vaccinations before they are assigned to clean and sanitize patient rooms in the infirmary. The training should be documented and maintained in the porters' medical record.

9. Consider adding hepatitis A vaccination to the currently recommended Hepatitis B vaccination for all porters.

10. Monitor all sick call areas to assure appropriate infection control measures are being used between patients i.e., use of paper on examination tables which is changed between patients or a spray disinfectant is used between patients

11. Develop and implement a plan to monthly monitor all patient care associated furniture, including infirmary mattresses and exam tables, to assure the integrity of the protective outer surface with the ability to take out of service and have repaired or replaced as needed

12. Replace the cracked wall tiles in the ADA housing unit's shared shower room that interfere with proper cleaning and sanitation and create infection control hazards for both patient-inmates and medical and correctional staff.

13. The current tuberculosis skin test should be replaced with interferon gamma testing methodology.

## Radiology Services

**First Court Expert Recommendations**
The First Court Expert had no recommendations concerning the radiology services

**Current Recommendations**

1. IDOC and the health care vendor must jointly contact the Illinois Emergency Management Agency (IEMA) and Occupational Safety and Health Administration (OSHA) to review the reported decision that IDOC x-ray technicians do not need to use radiation exposure monitoring devices (dosimeters) while working in the IDOC radiology suites as outlined in Illinois Administrative Code 32 -340 510 and 520. This current practice is not in alignment with the radiation safety practices in the community.

2. Contract with a radiation safety expert to assess the safety for the panorex unit's current location in an unleaded interior corridor adjacent to the radiology suite without a shielded area for the technician to stand when panorex films are being taken.

## Infirmary Care

**First Court Expert Recommendations**

1. More bed space is needed in the infirmary.
2. Rethinking the physical plant to create a more therapeutic, less chaotic environment would be beneficial.
3. Develop and implement a plan to insure 24/7 RN staffing.
4. Implement a nurse call system for all infirmary patients.
5. Develop, implement, and maintain a plan for organization of infirmary medical records including but not limited to:
    a. the use of the infirmary record.
    b. permanent filing of all documents in the record.
    c. chronological filing of all documentation.
6. Develop and implement a plan of education for staff including but not limited to:
    a. Per IDOC Office of Health Services policy, documentation to be provided in the Subjective-Objective-Assessment-Pan (SOAP) format.
    b. all documentation to be provided chronologically as to date and time.
    c. documentation of vital signs as ordered by the physician
    d. physician and nursing admission and discharge documentation required for all infirmary patients.

*Since the First Court Expert's visit, the majority of the medical record related recommendations have been addressed by the implementation of an EMR in all clinical areas of LCC including the infirmary. We note that there are insufficient devices on the infirmary so the number of staff in the infirmary do not have access to a device on the infirmary resulting in having to go off the unit to write a note or review a record. This is addressed in the medical records sections. We also note that the use of dated vital signs needs to be stopped. All episodes of clinical care need current vital signs. This is also addressed in the medical records section. Nurse call devices have been installed in all infirmary patient rooms with the exception of the crisis beds which are within sight and sound of the nursing station and the infirmary bed space was now adequate. However, an occasional infirmary shift is still cover by LPNs.*

**Additional Recommendations**
7. Develop a plan to shift anticoagulation treatments from Vitamin K Antagonists (warfarin) to newer types of anticoagulants that do not require frequent ongoing lab testing to determine the adequacy of anticoagulation.

# Chronic Care

**First Court Expert Recommendations**
1. Consider assigning the Medical Director to the poorly controlled chronic disease patients, as this is clearly one of his strengths.
2. There should be a comprehensive tracking tool to monitor important indicators for this at-risk population. This tool should be used to identify areas of poor performance in the program to target interventions to improve quality.

3. The chronic disease nurse should rarely if ever be pulled to other duties. This position should be filled with a carefully chosen individual to actively track this at-risk population.
4. Patients should be seen according to their degree of disease control rather than the calendar month and all chronic diseases should be addressed at each chronic care clinic visit. These are statewide policy issues.
5. Patients with active women's health issues should be tracked in an organized manner, perhaps in a chronic disease program.
6. Patients with HIV infection should have yearly cervical cancer screening.

*We agree with these recommendations. Some of these recommendations have been addressed by the fulltime assignment of a nurse to coordinate and manage the scheduling of the chronic care patient appointments and the implementation of the IDOC 360 program and the EMR to assist with scheduling, tracking, and statistical reporting of chronic care clinics and annual physical exam clinics.*

**Additional Recommendations**

7. Providers seeing patients with chronic diseases need to be trained in primary care. When care needs exceed the training of the primary care provider, patients need to be referred to a higher level of care.
8. Initiate a process to manage all chronic care diagnoses in a single chronic care appointment. This should be done for all conditions unless the patient is being managed in a specialty clinic, e.g. HIV clinic, hepatitis C treatment clinic, pre-natal clinic, etc.
9. Revise the current practice of not rescheduling chronic care patients who refuse a chronic care visit until the next disease-specific chronic care clinic (four to six months later), reschedule these individuals based the status of their clinical problem, and implement a process to monitor and track the status of these patients during the many months before their next appointment.
10. Implement and utilize current Center for Disease Control (CDC) age-based and disease-based standards for the administration of adult immunizations.
11. Implement and utilize current United States Preventive Services Task Force (USPSTF) guidelines for screening adults for cancer and other conditions (abdominal aortic aneurysm, etc.).
12. Calculate and document the 10-year cardiovascular risk score on all appropriate adults to assist with the decision and timing to initiate preventive HMG-CoA reductase inhibitors (statins).

## Women's Health

**First Court Expert Recommendations**
The First Court Expert had no recommendations.

**Current Recommendations**
1. Improve provider staffing.

2. Ensure that at least one onsite full-time providers is trained and can substitute for prenatal care when the obstetrician is unavailable.

## Dental Program

### Dental: Staffing and Credentialing
**First Court Expert Recommendations:** None.

**Current Recommendations**
1. Dental staffing should be reviewed after dentists incorporate intraoral x-rays and periodontal probing into their practice.

### Dental: Facility and Equipment
**First Court Expert Recommendations**
1. The space that is used for the clinic proper and houses the two main dental units is too small to allow efficient care flow and any sense of privacy. Enlargement of this space should be considered for efficient care delivery and safety considerations. *We agree with this recommendation; however, we acknowledge that this is not feasible given the physical constraints of the clinic.*
2. All electric outlets should be wall-mounted or protected by the cover for the junction box at the foot of the chair. Loose wires should be neatly arranged and out of traffic flow. *This has been done; consequently, the recommendation is moot.*
3. All the units, chairs, and cabinetry should be replaced, and surface areas should be better able to accommodate disinfection. *We agree with this recommendation.*
4. Replace the radiograph unit in the clinic immediately with a wall-mounted unit capable of digital radiography. *We agree that the wall-mounted unit should be replaced; however, the replacement should be mounted **between** the dental chairs so it can be used by both dentists.*
5. The Panelipse radiograph unit should be replaced. This is critical for a reception center. *We agree with this recommendation.*

**Additional Recommendations**
6. An intraoral x-ray unit should be installed in the dental hygienist's operatory immediately.
7. The dental clinic should purchase four high-speed handpieces to supplement the four currently in use.
8. All new dental x-ray units should be digital.

### Dental: Sanitation, Safety, and Sterilization
**First Court Expert Recommendations**
1. The loose metal junction box on the floor should be wall-mounted where it does not interfere with traffic flow. Electric cords should be neatly arranged. *This problem has been resolved; consequently, the recommendation is moot.*

2. Patients should always wear eye protection during treatment. This is important for patient safety. *We agree with this recommendation.*
3. A biohazard warning sign should be posted in the sterilization area. *We agree with this recommendation.*

**Additional Recommendations:** None

## Dental: Review Autoclave Log
**First Court Expert Recommendations:** None.

**Additional Recommendations**: None.

## Dental: Comprehensive Care
**First Court Expert Recommendations**
1. Comprehensive 'routine' care should be provided only from a well-developed and documented treatment plan.
2. The treatment plan should be developed from a thorough, well-documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. Appropriate bitewing or periapical x-rays should be taken to diagnose caries.
4. Hygiene care should be provided as part of the treatment process.
5. Care should be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. Oral hygiene instructions should be provided and documented as part of the treatment process.

*We agree with these recommendations.*

**Additional Recommendations**
7. All inmates should have a comprehensive examination within 30 days of intake. This exam should use the criteria of the American Dental Association Procedure Code D0150 (Comprehensive Oral Evaluation).[116]
8. Oral prophylaxis and non-surgical procedures such as scaling, and root planing should comport with the definitions set forth in the American Dental Association Procedure Codes.
9. Biennial examinations should be informed by intraoral x-rays, a periodontal assessment that includes a PSR, and a soft tissue examination for oral cancer and use the criteria of Procedure Code D0120 (Periodic Oral Examination).

---

[116] "It is a thorough evaluation and recording of the extraoral and intraoral hard and soft tissues. [...] This includes an evaluation for oral cancer where indicated, the evaluation and recording of the patient's dental and medical history and a general health assessment. It may include the evaluation and recording of dental caries, missing or unerupted teeth, restorations, existing prostheses, occlusal relationships, periodontal conditions (including periodontal screening and/or charting), hard and soft tissue anomalies, etc."

**PTX193-0371**

## Dental: Intake (Initial) Examination
**First Court Expert Recommendations**
1. Oral hygiene instructions should be provided at the time of the screening [intake] examination.
2. The area where x-rays are taken should have warning signs posted that clearly warn of potential radiation hazards to pregnant females.
3. Consent form should be developed and used for pregnant females that explains radiation hazards and gives the examiner permission to take the x-ray.

*We agree with these recommendations.*

**Additional Recommendations**
4. Dentists should wash their hands or use an alcohol wipe between changing gloves.
5. Disposable infection control barriers should be used on the examination light and be changed between patients (as is done in the dental clinic).
6. The dentist should perform a soft tissue exam for oral cancer that includes holding the anterior portion of the tongue with 2x2 gauze and reflecting the tongue with a mouth mirror to visualize the posterior portion and lateral borders of the tongue.

## Dental: Extractions
**First Court Expert Recommendations**
1. A diagnosis or a reason for the extraction should be included as part of the record entry using the SOAP note format, especially for sick call entries. *This deficiency has been corrected since the EHR used at LCC forces dental providers to use the SOAP format.*

**Additional Recommendations:** None

## Dental: Removable Prosthetics
**First Court Expert Recommendations**
1. A comprehensive examination and well-developed and documented treatment plan, Including bitewing and/or periapical radiographs, should precede all comprehensive dental care, including removable prosthodontics.
2. Periodontal assessment and treatment should be part of the treatment process and that the periodontium should be stable before proceeding with impressions.
3. Oral hygiene instructions should be provided as a precursor to removable prosthodontic impressions.
4. All operative dentistry and oral surgery should be completed before proceeding with impressions.

*We agree with these recommendations.*

**Additional Recommendations:** None.

## Dental: Sick Call/Treatment Provision
**First Court Expert Recommendations**

1. Use the SOAP format for sick call entries. It will insure that the inmate's chief complaint is recorded and addressed, and a thorough focused examination and diagnosis precedes all treatment. *The EMR forces dental providers to use the SOAP format; consequently, the recommendation is moot.*
2. Inmate request forms should be retained in the dental record.
3. Provide only immediate or palliative care on sick call appointments. Do not use these appointments for routine care. Provide a dedicated schedule for these inmates.

*We agree with these recommendations.*

**Additional Recommendations**
4. The sick call failed appointment rate should be monitored and reported monthly.
5. The reasons for the high failed appointment rate should be studied by the Quality Improvement Committee.

## Dental: Orientation Handbook
**First Court Expert Recommendations**
1. Insure that information about the dental program and how to access dental care is included in the Offender Handbook and Orientation Manual. *We agree with this recommendation.*

**Additional Recommendations:** None.

## Dental: Policies and Procedures
**First Court Expert Recommendations**
1. The dental program should develop a detailed, accurate policy and procedure manual that defines how all aspects of the program are to be run and managed. Once developed, it should be updated on a regular basis and as needed for new policies and procedures. *We agree with this recommendation.*

**Additional Recommendations**
2. The "complete" examination should comport with the American Dental Association Code D0150 (Comprehensive Oral Examination – New or Established Patient). Revised policies should incorporate ADA procedure definitions.
3. The initial examination should comprise a complete oral cancer examination that includes an inspection of the lateral border and ventral surface of the tongue.

## Dental: Failed Appointments
**First Court Expert Recommendations**
1. The dental staff should investigate the reasons for failed appointments and then put in place corrective action to lower the rate.
2. A continuing quality improvement study would be a good methodological technique.

*We agree with these recommendations.*

**Additional Recommendations:** None.

## Dental: Medically Compromised Patients

**First Court Expert Recommendations**
1. The medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider.
2. Blood pressure readings should be routinely taken of patients with a history of hypertension, especially prior to any surgical procedure.[117]

*We agree with these recommendations.*

**Additional Recommendations**
3. Diabetic patients should receive thorough periodontal assessments by a dentist annually *as part of the chronic disease program* and those with periodontal disease should have a sequenced treatment plan with six-month follow-ups.

## Dental: Specialists

**First Court Expert Recommendations**
1. Thoroughly document in the dental record all findings and reasons that led to a referral to the specialist required. Provide all information pertinent to the condition being referred. *We agree with this recommendation and note that the dental referral requests we reviewed had all pertinent information.*

**Additional Recommendations**
2. The dental program should maintain an oral surgery log to include the date of the request for approval, the results of the collegial review (that is, approval or disapproval) the date of the appointment/treatment, the condition to be treated, and any post-surgical complications.

## Dental: CQI

**First Court Expert Recommendations**
1. Evaluate program deficiencies and needs as outlined in this report through ongoing continuous quality improvement studies that address these deficient areas. Develop corrective actions and procedures to improve those areas.

*We agree with this recommendation.*

**Additional Recommendations:** None.

# Internal Monitoring and Quality Improvement

**First Court Expert Recommendations**

---

[117] The dental clinic does not have a stethoscope and sphygmomanometer.

1. The staff should be trained in CQI methodology, specifically with regard to how to perform studies, how to identify subthreshold performance, how to analyze the data in order to determine the causes of subthreshold performance, and then how to develop improvement strategies based on the identified causes and finally how to restudy to determine whether the improvement strategy had the required effect.

2. The leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.

3. This training should include how to study outliers in order to develop targeted improvement strategies.

*We agree with these recommendations.*

# Appendix A

## Logan Staffing

| Position | Budgeted | Filled | Vacant |
|---|---|---|---|
| Health Care Unit Administrator | 1 | 1 | 0 |
| Medical Director | 1 | 1 | 0 |
| Director of Nursing | 1 | 1 | 0 |
| Medical Records Director | 1 | 0 | 1 |
| Registered Nurse Supervisor | 1 | 1 | 0 |
| Obstetrician | 0.5 | 0.5 | 0 |
| Nurse Practitioner/Physician Assistant | 4 | 4 | 0 |
| Registered Nurse | 5 | 5 | 0 |
| Licensed Practical Nurse | 18 | 18 | 0 |
| Medication Room Assistant | 3 | 3 | 0 |
| Dentist | 2 | 2 | 0 |
| Dental Assistant | 3 | 3 | 0 |
| Dental Hygienist | 1 | 1 | 0 |
| Licensed Physical Therapist | 0.25 | 0.25 | 0 |
| Certified Mammography Technician | 0.4 | 0.4 | 0 |
| Optometrist | 0.2 | 0.2 | 0 |
| Office Coordinator | 1 | 1 | 0 |
| Staff Assistants | 8 | 8 | 0 |
| Phlebotomists | 1.2 | 1.2 | 0 |
| Radiology Technician | 0.6 | 0.6 | 0 |
| | 53.15 | 52.15 | |

# Appendix B



# Appendix C



# Menard Correctional Center

# 2nd Court Appointed Expert Report

# Lippert v. Godinez

Visit Date:  May 21-24, 2018

Prepared by the Medical Investigation Team

Mike Puisis, DO
Jack Raba, MD
Catherine M. Knox RN, MN, CCHP-RN
Jay Shulman, DMD, MSPH

PTX193-0379

# Table of Contents

**Overview**.............................................................................................................................. **3**

**Executive Summary** ............................................................................................................... **3**

**Findings**................................................................................................................................. **7**

Leadership, Staffing, and Custody Functions........................................................... 7

Clinic Space ............................................................................................................... 9

Sanitation ................................................................................................................ 16

Radiology Service .................................................................................................... 17

Medical Records...................................................................................................... 18

Medical Reception and Intrasystem Transfer......................................................... 20

Nursing Sick Call ..................................................................................................... 22

Chronic Disease Management ................................................................................. 25

Urgent/Emergent Care ........................................................................................... 39

Specialty Consultations .......................................................................................... 51

Infirmary Care ........................................................................................................ 62

Pharmacy/Medication Administration ................................................................... 66

Infection Control ..................................................................................................... 71

Dental Program ...................................................................................................... 75

Internal Monitoring and Quality Improvement Activities ...................................... 90

**Recommendations** ............................................................................................................. **93**

Leadership, Staffing, and Custody Functions......................................................... 93

Clinical Space........................................................................................................... 93

Sanitation ................................................................................................................ 94

Radiology Services .................................................................................................. 94

Medical Records...................................................................................................... 94

Medical Reception and Intrasystem Transfer......................................................... 95

Nursing Sick Call ..................................................................................................... 95

Chronic Disease Management ................................................................................. 96

Urgent/Emergent Care ........................................................................................... 97

Specialty Consultations .......................................................................................... 98

Infirmary Care ........................................................................................................ 99

Pharmacy and Medication Administration ........................................................... 100

Infection Control ................................................................................................... 101

Dental Program .................................................................................................... 102

Internal Monitoring and Quality Improvement.................................................... 107

**Appendix A**........................................................................................................................ **108**

# Overview

From May 21 to May 25, 2018, the Medical Investigation team visited the Menard Correctional Center (MCC) in Chester, Illinois. MCC is a maximum security prison. MCC houses 3029 inmates. The capacity of the prison is 3812 and the prison is at 79% of capacity. Eighty-one percent of inmates are classified as maximum security. Approximately 10% of inmates are medium security and approximately 9% are minimum security. Only 49 (1.6%) inmates were in the reception housing unit on the day of our visit. MCC had an infirmary unit, which on the day of our visit housed eight patients.

This report describes our findings and recommendations. During this visit, we:
- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden and staff for their assistance and cooperation in conducting the review.

# Executive Summary

Based on a comparison of findings as identified in the First Court Expert's report, we find that except for minor improvements in nursing sick call and infection control, all areas were either the same or worse than the First Court Expert's findings. Clinical care in all areas of record reviews appeared worse and, in some cases, resulted in harm. Mortality review identified preventable and possibly preventable death. We find that overall, the Menard Correctional Center (MCC) is not providing adequate medical care to patients, and there are systemic issues that present ongoing risk of harm to patients and result in preventable morbidity and mortality. The deficiencies that form the basis of this opinion are provided below.

There are an extraordinary number of vacancies (33%) at this facility. This includes two physician positions, nurse practitioner positions, Director of Nursing, medical records director, Dental Director and 39% of nursing positions. It takes approximately 10 months to fill a state position, and the IDOC needs to reduce that timeframe or it will be unable to timely fill positions. The Medical Director does not provide clinical leadership at the facility. The Wexford regional team does not appear to participate in identification or resolution of operational problems. A staffing plan needs to be done, as it is unclear how many staff are necessary to provide services.

In order to accommodate custody, sick call and provider visits are conducted in housing units. But these housing unit examination rooms are not all appropriately equipped, were not well maintained, and were cluttered, making them inappropriate for clinical care. Some examinations occur with the patient in a chair. The panorex unit in intake is not shielded, which increases risk of radiation exposure to staff and other inmates. The infirmary has no examination room and

patient rooms have no nurse call devices. Equipment is not maintained or routinely inspected. Showers in the infirmary and in American for Disability (ADA) units were not well maintained and are in need of repair. There was a lack of automated external defibrillators. There was a lack of maintenance and repairs throughout all clinical areas, which we were told was a result of funding.

Most but not all examination tables had paper barriers. Sharps, gloves, sinks, and paper towels were available. Maintenance of equipment and physical plant was not being done. Sanitation rounds were being done but findings were not corrected. Environmental rounds need to include clinical equipment, electrical safety, emergency bags, negative pressure rooms, and clinical areas.

Radiology equipment, inspections, and safety were adequate except for the panorex in the reception area, which lacked shielding, making it a potential safety risk. Access to radiological services was adequate. The need for dosimeters should be reviewed with the State of Illinois Emergency Management Agency.

Medical records are properly thinned but the number of volumes of medical records is so large that additional storage space is needed to accommodate excess volumes. This makes access to a complete medical record extremely difficult. An electronic medical record is needed. Medical records are not available for nurses performing sick call in housing units. They write their notes on blank progress notes without access to review medical record information. Their notes are filed at a later date. All staff need to have access to a medical record for every clinical encounter. Any staff is authorized to pull or re-file medical records, which violates confidentiality and promotes loss of medical documents. Hospital and consultation reports are only available 50% of the time. This adversely affects clinical care.

Intake physical examinations are not timely; only 60% of new inmates have their intake physical examination within a week. As with NRC, although HIV testing is supposed to be opt-out, it still requires consent and may account for only 50% of incoming inmates being screened.[1] This is not trivial. We found on death reviews a man from MCC who was never screened for HIV despite having multiple risk factors. He died of unrecognized advanced AIDS and his death was preventable if he had been screened.[2] Although there were additional problems with the care of this patient, the lack of HIV screening was significant. The Center for Disease Control recommends opt-out screening as the optimal testing method for HIV in correctional centers and this should be put into place in the IDOC.[3] Follow up of tuberculin skin testing was not always done and occasionally is not administered. Follow up of abnormal findings was inconsistent. There is no system to monitor these deficiencies.

---

[1] In our experience, opt-out testing typically results in rates greater than 95% acceptance. This is borne out by the experience in Rhode Island Department of Corrections, which had a rate of acceptance of testing of 98%. This is found in the following article. Beckwith CG, Bazerman L, Cornwall AH, Patry E, Poshkus M, Fu J, and Nunn A: An Evaluation of a Routine Opt-Out Rapid HIV Testing Program in a Rhode Island Jail. AIDS Educ Prev June 23, 2011 23(30): 96-109 and found at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3734962/.

[2] Patient #22 Mortality Review.

[3] HIV Testing Implementation Guidance for Correctional Settings; Centers for Disease Control and Prevention, January 2009 as found at https://www.cdc.gov/hiv/pdf/group/cdc-hiv-correctional-settings-guidelines.pdf.

Since the First Court Expert's visit, MCC now has properly equipped rooms used to conduct nursing sick call evaluations. All sick requests we reviewed were seen timely, including urgent sick call requests. We verified this in interviews of inmates. Nurses failed to appropriately assess and examine patients in 20% of sick call requests we reviewed. We also found that licensed practical nurses independently perform sick call even though it is not within the scope of their license. This places inmates at risk of harm. Nurses also evaluate inmates for their requests without having the medical record with them during the evaluation. This violates IDOC protocols and MCC's policy. Only 20% of nurse referrals to providers occurred timely

About half of chronic illness patients are still managed in one-disease-only clinics. We examined hepatitis C chronic clinics at MCC and found that patients are unmonitored for ongoing harm of hepatitis C, including complications of cirrhosis and hepatocellular carcinoma. These failures have caused death.[4] The insertion of a Wexford corporate hepatitis C physician into the process of referral to UIC is an additional barrier that serves to delay treatment of patients with antiviral medication. Facility physicians are not adhering to IDOC hepatitis C guidelines and fail to obtain required testing necessary to evaluate patients for treatment. Physicians seeing patients in chronic care clinics failed to consistently document rationale for their treatment decisions, failed to document review of the medication records, failed to review blood glucose levels in diabetics, failed to refer diabetic patients for annual retinopathy screening, failed to prescribe statins based on current IDOC guidelines, failed to screen for colon cancer, and failed to vaccinate patients in accordance with current recommendations. We found many deficiencies on record reviews.

Emergency supplies and equipment are standardized but bags are not sealed. Emergency bags are routinely checked but we did find some outdated supplies in these bags. All automated defibrillators were routinely checked and were found functional. Emergency response drills are performed as required. Although critiques of these drills were adequate, there was no discussion of analysis or plans for improvements in CQI meetings. Tracking of emergency evaluations ceased in 2017. In records reviewed of nursing evaluation of urgent episodes of care and in physician care of persons hospitalized, there were numerous deficiencies of clinical care.

Specialty care was not tracked, so it was not possible to evaluate timeliness of care. MCC had the second lowest rate of referral of all facilities we reviewed but the highest rate of denials. We found that many denials were inappropriate. In record reviews we noted delayed specialty care, lack of follow up after consultations, including noting the status of the patients and failure to describe the therapeutic plan developed by the consultant, failure to timely schedule specialty care, and failure to obtain specialty care reports. Access to care appeared so poor that we recommend abandoning the collegial review program.

We found that some patients on the infirmary had conditions that required a higher level of care, such as a skilled nursing unit. Provider notes on the infirmary failed to include adequate history, examination, or plans, and had limited clinical information or rationale for treatment plans. Infirmary beds are inadequate for the type of patients housed on this unit. The infirmary had no

---

[4] Mortality Review Patient #23.

examination room. The fixed infirmary beds are so close to the ground that it was difficult to imagine how an adequate examination could be accomplished. There are no call devices on the infirmary and rooms had padlocks on them, creating an evacuation-safety hazard and making it impossible for bedridden patients to gain the attention of a nurse in an emergency.

We noted that medication rooms were clean and orderly, and that storage of medication was appropriate. Medication administration, however, is not safe and medication services do not meet standards of practice. We found that morning medication administration starts at three in the morning, which we find unwarranted. There are numerous transcription errors on medication records that can result in errors in providing medication. Pre-pouring of medication, including crushed and floated medication, is inconsistent with good nursing practice. There were numerous other problems with administration of medication that make this practice unsafe. The use of a list to prepare controlled substances and the placement of doses for multiple patients into a collective container is dangerous and should be stopped immediately. The MAR is not available during medication administration and therefore medication is not documented as given when the medication is actually administered. Instead, nurses document medication administration as given when they pre-pour the medication. We noted lapses of medication continuity in several patients and noted that chronic disease patients are not monitored to ensure continuity of prescribed medication.

There is a dedicated full-time nurse assigned to infection control, and important improvements have been made to the program. MCC tracks infectious disease and has the most advanced tracking of persons with infectious disease of all the facilities we have visited. This nurse could provide a better service if she worked in coordination with an infectious disease doctor so that her work could be guided by current infection control practices. Analysis of surveillance data needs attention, and repair and maintenance of clinical areas needs to improve.

Dental staffing is grossly inadequate; consequently, wait times for fillings and dentures is greater than 15 months. Patients who were prescribed antibiotics for dental infections do not have the teeth extracted timely. Two dentist positions should be filled immediately, and an additional 0.5 FTE dental hygienist position should be established. Routine dental treatment is inadequate since it is not informed by a comprehensive oral examination (i.e., intraoral x-rays, a periodontal assessment using probing, and a sequenced treatment plan). The failures of the dental program documented in this report place patients at risk of preventable pain and tooth loss by fostering widescale underdiagnosis and under-treatment of dental disease. The program has deteriorated markedly since the First Court Expert Report, and the treatment provided to IDOC inmates remains substantially below accepted professional standards, and is not minimally adequate.

The quality improvement program coordinator has no training in quality improvement and no knowledge of current quality improvement methodology. Half of the Governing Body of the quality improvement program consists of custody trained staff. This body needs to be predominantly medically trained. Staff performing studies did not appear to know the difference between outcome and process studies. CQI activities did not address major problems of the facility. Mortality review is not performed and there is currently no critical analysis of deaths,

even though we found that four of seven death records reviewed had preventable or possibly preventable mortality.

# Findings

## Leadership, Staffing, and Custody Functions

**Methodology:** We reviewed the Schedule E. We interviewed leadership staff and custody leadership.

### First Court Expert Findings

There were no primary care physicians on staff. The Medical Director was a surgeon and the two staff physicians included another surgeon and an ophthalmologist. The Health Care Unit Administrator (HCUA) also served as the Director of Nursing. One of the supervising nurse positions was vacant. This left a lack of supervisory nurse staff. The vacancy rate was approximately 9%.

### Current Findings

The medical leadership team is still incomplete. Currently, the Medical Director position is filled with a board-certified internist and the HCUA position has been filled by the same person since 2014. The Director of Nursing (DON) position, however, is vacant. There is no medical records director; a medical records technologist acts as the medical records director. The three supervisory nurse positions are all filled but two of these positions have been recently filled. The Dental Director position is vacant.

The HCUA position is filled by a nurse who is competent and well qualified for her position. Her effectiveness is diminished by not having a DON, an effective Medical Director, or a reliable quality improvement resource person knowledgeable in continuous quality improvement (CQI) methodology. There was no evidence of support by the vendor in improving programmatic deficiencies.

The Medical Director is not providing administrative clinical leadership. This position is filled by an internist who has been Medical Director since June of 2017. He sees patients on the infirmary and in the clinic, performs peer reviews for the nurse practitioners, addresses grievances, and attends the collegial review conference calls. There is no evidence of any participation in other administrative medical functions, particularly related to quality improvement or solving medical clinical problems. He was unaware of the plan for quality improvement and told us that the facility had no ongoing quality problems. He seemed unaware of any programmatic issues of the facility and saw his role with respect to quality improvement as providing good care. As an example, when asked if getting consultation reports was a problem he answered yes. His solution to this was to tell the scheduler about the lack of reports. He presumed that the Regional

Manager and Regional Medical Director knew of the problem but was unaware and not involved in any effort to correct this deficiency.

The IDOC Regional Nurse Coordinator was present for our visit. She does spend time at the facility and was aware of problems that the facility faced. However, she also serves as the full-time HCUA at Vandalia and does not spend full-time as the Regional Coordinator. She did indicate that she has trained staff at Vandalia to assume most of her functions at Vandalia; however, we were unable to verify the extent of time she spends in each of her positions.

The Wexford Regional Manager was present for our visit. She has been with Wexford for three years. She has no medical training or medical administration training. She previously worked as a warden in the IDOC. When asked what the top five problems were at MCC, she said that there were no problems at the facility and no areas of concern from her perspective as Regional Manager. She does not participate in quality improvement activity and has no role in mortality review. She said that no one has brought to her attention any problems with respect to mortality. She knew of no clinical issues with respect to the previous Medical Director, who was a surgeon. With respect to the current Medical Director, she knew that he needed additional training in order to be able to perform suturing of lacerations. From her perspective, operations worked well and were without problems. In our opinion, custody-trained personnel should not be hired to manage the medical program, as they have no experience or training in the provision of medical care.

The Wexford Regional Medical Director was not present for our visit. According to the HCUA, he rarely is present at the facility. He comes for annual Continuous Quality Improvement (CQI) meetings and rarely comes when there is a coverage issue. There was no evidence of his participation in clinical oversight at the facility based on documents we reviewed. He is available to the Medical Director by phone.

There are 91.1 staff positions at MCC. Sixty-six are state staff and 25.1 are Wexford staff. A table of staffing is present as an appendix to this report. There are 29 vacant positions and one long-term leave of absence, yielding approximately a 33% effective vacancy rate. This is a deterioration and a significantly higher vacancy rate than the 9% rate cited in the First Court Expert's report. This vacancy rate is extremely high and makes it impossible to effectively manage the program. State positions have a 33% (22 of 66) vacancy rate, most of which are nursing positions. Wexford has a 28% (7 of 25.1) vacancy rate. Both of these vacancy rates are extremely high. The vacancies for Wexford included the Dental Director, a dentist, and two physician positions, which are critical clinical positions. We were told that there have been applicants for many of the state vacant positions but that the state hiring process is so cumbersome that prospective employees take other positions before the state hiring process is completed. We were told that for a recent hire it took 10 months from the time of application to the time the employee started work.

Wexford has been unable to provide adequate physician coverage for this facility. The First Court Expert reported that all three positions were filled by non-primary care trained physicians and the Medical Director was a surgeon. This was deemed inadequate, which we agree with. The

current Medical Director is board certified in internal medicine, but the other two physician positions are vacant. We received a contract monitoring report covering seven months from June 2017 to December of 2017. This report documents that the physician position has been vacant since September of 2014. We were told that one of the two vacant physician positions was downgraded to a nurse practitioner position because it also could not be filled; this change is not evident in the Schedule E provided to us. That nurse practitioner position is currently vacant as well. The contract monitoring report for MCC shows that the Medical Director hours have mostly been filled. Only approximately 50% of the staff physician hours have been filled and only approximately 50% of nurse practitioner hours have been filled. Downgrading the physician position to the nurse practitioner position has apparently not resulted in additional provider staffing as expected. The current vacant physician position is partly covered by a coverage physician who received one year of a rotating internship and one year of a pathology residency in 1976. This facility still lacks adequate physician coverage and one of the coverage physicians has no primary care training. In terms of hours filled, physician coverage is worse than in 2014 but is slightly better with respect to coverage with primary care trained physicians. The lack of primary care physicians is evident in problems found in record reviews and mortality reviews, and this results, in our opinion, in preventable morbidity and mortality.

Nurse supervisory budgeted staffing is deficient. There are three nurse supervisory staff but there is no weekend or evening coverage. On-call nurses act as proxy evening and weekend supervisory staff. Nurse staffing is also deficient. Though 21 (39%) of 54 nurse positions are vacant, we believe that there remains a deficiency of budgeted nurse staff. The HCUA was unaware of any staffing plan developed for this facility. In addition to nursing positions, clerical positions also appear to be deficient. The number of medical appointments is large at this facility due to its size, and the one scheduling clerk is insufficient to adequately manage the paperwork and scheduling duties. As with other facilities, a staffing plan based on the expectations of the administrative directives with relief factor adjustments needs to be done to accurately determine staffing levels.

We did not review officer staffing. As with other facilities, we believe an officer staffing assessment needs to be done to ensure that all appointments timely occur, and officers assist nurses in a standardized manner when nurses administer medications.

## Clinic Space

**Methodology:** Accompanied by a correctional officer, a nurse manager, and occasionally the HCUA, the experts inspected the nurse and provider sick call rooms on the housing units, the three-story health care unit which housed medical exams rooms, telehealth room, treatment room, physical therapy, nurse medication preparation room, phlebotomy room, dental clinic, sterilization room, medical records department, health care administrative offices, and the infirmary,  optometry room, and radiology suite.

### First Court Expert Findings

The First Court Expert found that the then 30-year-old health care unit was well maintained but aging, the nurse and physician sick rooms in the cell houses lacked privacy and were not

adequately equipped, and the Reception and Classification Unit was small but appropriately equipped. He noted that all of the clinical areas in the cell houses should be renovated to provide clean, private clinical settings.

**Current Findings**
- The location of the nurse and provider sick calls in the housing units maximizes the patient-inmates' access to sick call and chronic care services.
- The provider and nurse sick call rooms in the cell houses are generally small; some were not well organized and not in good physical condition.
- The only two exam tables (one is actually a gurney) in one cell house (North) were cluttered with supplies and medical charts, and were not usable for patient examination. Exams, if needed, were performed while the patient was in a chair.
- All of the clinical rooms, including the nurse and provider exam rooms, in the cell houses were wired for computers, but none had computers.
- Some exam rooms in the cell houses had been recently painted but others had cracked paint and walls, frayed wall paper, an electrical outlet without a cover plate, and a missing ceiling vent cover.
- Torn upholstery was noted on three exam tables on the campus.
- Missing or non-functional oto-ophthalmoscopes were noted in four exam rooms on the campus.
- Only three of the 26 beds in the infirmary had adjustable head and leg sections. One was an aged metal bed and the other two were hospital beds.
- There are an inadequate number of adjustable hospital beds to meet the needs of the complicated patient-inmates admitted to the infirmary.
- There is not an exam room in the infirmary.
- The low level of the beds makes it difficult and unsafe for the clinical team to properly examine and transfer patients.
- There were no nurse call devices in the infirmary patients' rooms. The HCUA stated that consideration is being given to installing wall-mounted bedside audible alarms that are currently in use at LCC.
- Not all medical equipment had documentation of annual electrical safety inspections.
- Out-of-date medical references were found in a number of clinical areas.
- The group shower in South Lower used by older men, some with physical impairments, was in poor repair that created safety and sanitation concerns.
- The infirmary shower was poorly ventilated, had a clogged ceiling vent, a non-functional shower head, a rusted grab bar near the tub, and no safety grab bars near the functioning shower.
- The anterooms in both infirmary isolation rooms were dirty and cluttered.
- The negative pressure units in the infirmary isolation rooms were functional and had regular documented inspections.
- The layout of the radiology room in the Reception & Classification building predisposes the staff and patients to the potential risk of radiation exposure.

- There are no automated external defibrillators (AEDs) in the Reception & Classification building or in every cell house.

At the time of the site visit, MCC housed 2,580 maximum security male inmates on the main campus and an additional 440 men at its Medium Security Unit located a few miles from the main facility. MCC serves as the Reception and Classification Center for a number of detention centers and jails in southern Illinois, receiving 90-150 new admissions per month. It also accepts transfers from all of the IDOC facilities and directly from the North Reception Center (NRC) near Chicago.

The Reception and Classification Center is located in a separate building with an adjacent housing wing that temporarily houses 30-50 new admissions until their intake screenings have been completed. The clinical screening is provided in four rooms (medical, TASC, mental health, and dental) along a single corridor. The medical exam room has an exam table with torn upholstery, paper barrier for the exam table, a desk, two chairs, a scale, sink with eye washing attachment, and paper towels. The wall mounted oto-ophthalmoscope was not functional. Unprotected paper directives were taped on the wall; this is a fire safety hazard. Vital signs and clinical histories and exams are performed in this room. Dental screening is provided one day per month. Panorex x-rays are taken in an unshielded, unleaded room. Prior to taking an x-ray, the radiology technician has to stop foot traffic in the corridor and pull the trigger cord into the corridor to minimize the risk of radiation exposure. The radiology technician does not wear a radiation exposure dosimeter badge. An automated external defibrillator (AED) is not kept in the R&C building.

Men are housed in two long, multi-story housing structures that have been subdivided into seven cell houses. One structure houses North 2, North Lower, North Upper, South Lower, and South Upper cell houses; the other has the East and West cell houses. Each of cell houses has two galleys on each side, each galley had two tiers that are not connected. The cell houses hold from 250-400 patient-inmates. Each cell has a toilet, a sink, and a bunk bed with two men; some inmates are housed alone. The doors are barred. Large open showers are located on each floor. There are steep stairs to each of the upper levels, but there is also an elevator for those who are unable to navigate the stairs. Men are allowed access to the shower three times per week. The group shower in South Lower that is used by an older population, including some individuals with physical disabilities, was inspected. The shower room has five shower chairs, safety grab bars, and ramps to access the showering area. The area was poorly ventilated, the ceilings were peeling, the concrete floor had large cracks, and metal doors, fans, and vent covers were completely rusted. The cracked floors pose a safety risk to this aged patient-inmate population and to staff. The rusted metal fixtures and the peeling ceiling are not able to be fully sanitized and create a risk for mold and the growth of bacteria and fungi. The correctional staff stated that the state funding has been inadequate to perform routine maintenance and repair of this shower and other service areas on the campus.

Each of cell houses has a clinical space where nurse and provider sick call and chronic care clinics are held; these clinic spaces vary from cell house to cell house in size, privacy, equipment, and upkeep.

North 2 medical area is located on an upper floor and serves the cell house's segregation unit, a general population unit, and an older patient, some with disabilities, unit. The area has a 10-person waiting room. The space is relatively tight but has two medical exam spaces, a tele-psych room, a single chair dental suite, and three mental health interview rooms. This is the most expansive clinical space in the cell houses. A provider uses one of the medical rooms one to two days per week. This room has a gurney covered with medical charts that serves as the exam table, a desk, two chairs, no computer, a sink with soap and paper towels, and a blood pressure unit. This exam room did not have an oto-ophthalmoscope; it was reported that it was broken. There was 13-year-old Physician Desk Reference (PDR) in the room. When questioned about the availability of electronic medical references, the physician stated that he can access online clinical references from the computer in his office in the health care unit, but he was unable to list even one comprehensive online resource that he uses. The gurney that reportedly serves as the exam table was so completely covered with medical charts that it was unlikely that it would or could be used during this session. Nurse sick call is performed in an adjacent exam room with an exam table which has tears in the upholstery and is covered with medical supplies; this exam table could not be readily, if at all, used for patient examination. The room had paper barriers, scale, BP unit, peak expiratory flow rate (PERF) meter, pulse oximeter, sink, desk, two chairs, phone, sharps box, and a stair chair. There was a functioning otoscope. An unsealed emergency bag with an ambu bag, EpiPen, glucose gel, expired glucagon, Accu-Chek machine (no safety inspection label) was inspected. There was no AED in the bag: it was reported to be broken. The nurse reported that the bag is checked every shift, but a log could not be identified. There were 18 and 19-year-old PDR's on the nurse's desk; she stated she does not have access to online medical references. The nurse holds daily sick call and sees most patients within one to three days after a request is submitted.

The medical area in North 1 Upper (population 350-370) had a small waiting room and two small, clean, recently painted, similarly equipped exam rooms. Each had exam tables with intact upholstery, paper barriers, two fixed chairs, and no computer. There was not a sink in the rooms. In the atrium just outside the exam rooms was a scale, and a sink with soap and paper towels, and a locked medical cabinet with a functional oto-ophthalmoscope, PEFR meter, stethoscope, digital thermometer, and medical supplies.

North 1 Lower (population 247) sends its general population patients to North 1 Upper for sick call and chronic care clinics and its second floor medical area serves the protective custody patients (62 individuals) housed in this cell house. This clinic has only a single exam room with an exam table with intact upholstery, paper barrier on the table, desk, two chairs, phone, hand sanitizer, paper towels, a functional oto-ophthalmoscope, scale, BP unit, a stethoscope, and no computer. There was no PEFR meter or mouthpieces or a pulse oximeter or Accu-Chek unit in this clinical area. The paint was cracked on the wall and an electrical plate was missing just above the exam table.

South Lower (population 316) has two clinics. A clinic on the first floor serves an older population, some with physical disabilities, housed on the adjoined lower levels of this cell house. The clinic has a single exam room with an exam table with intact upholstery, a sink with soap, scale, BP

unit, stethoscope, pulse oximeter, gloves, desk, two chairs, phone, and no computer. Wallpaper in the clinic was frayed, preventing the walls being properly cleaned. South Lower also has a clinic on the second floor that serves a general population and a worker/porter housing unit. This clinic has a single exam room with an exam table with intact upholstery, paper barrier on the table, scale, eye chart, functional otoscope, BP unit, pulse oximeter, two PEFR meters, desk, two chairs, phone, and no computer.

West Cell House (406 population) has a second floor clinic with one small exam room with an exam table with intact upholstery, paper barrier on the table, functional otoscope, PEFR meter with mouthpieces, pulse oximeter, desk, two chairs, and hand sanitizer. The space was cluttered, unprotected paper directives were taped on the walls, paint was cracked, the ceiling vent did not have a cover, and cardboard boxes filled with toothpaste nearly touching the ceiling were piled on top of a file cabinet. The accompanying West Cell House correctional officer stated that he would have the boxes and the paper directives removed immediately. He stated that the state funding has slowed down the completion of non-urgent repairs throughout the campus. The boxes and paper taped on the walls posed a fire safety hazard. The cracked paint made it impossible to properly sanitize this clinic space and creates an unprofessional work environment for the clinical staff.

East Cell House (310 population) has a second floor clinic with a tele-psych room with a counter and one chair, and an additional exam room that is shared by medical and mental health staff. The exam room has an exam table, a desk, and two chairs. The exam room is cramped and cluttered due to the presence of three large correctional metal file cabinets, water damaged cardboard boxes stacked on top of these cabinets, and an ancient refrigerator used by correctional staff with a totally rusted front. These items should not be located in a clinical exam area. The East Cell House Major who joined our inspection stated that he will have the file cabinets, cardboard boxes, and refrigerator removed from the exam room.

Patient-inmates interviewed in the cell houses were all knowledgeable about the sick call request procedure. Most stated that they are seen by a nurse within a few days after they place a request in the locked box. If they were referred by the nurse to see a provider, it will take three to four days up to a few weeks before they were seen in a provider sick call.

The health care unit is a three-story building located in the central section of the MCC campus. The first floor has four exam rooms, one of which is used for HIV, hepatitis C, and renal telehealth consultation. Only the telehealth room is now actively used for the delivery of medical care. The other three exam rooms are primarily used as mental health interview rooms and by at least one LPN as a storage and staging area. Since the provider sick call and chronic care clinics were moved into the cell houses, three of these exam rooms are only occasionally, if ever, used by nurses for the delivery of sick call and after-hours care. All the exam rooms have desks, chairs, sinks, soap, paper towels, exam tables, and oto-ophthalmoscopes. A scale was identified in one exam room. The exam tables in two of the rooms had torn upholstery. Only two of the four oto-ophthalmoscopes were functional, and one lacked a currently safety inspection label. Some of

chairs had torn and frayed upholstery. Only the telehealth room appeared to be organized and optimally clean. Nineteen and 13-year-old PDR's were noted in one of the exam rooms.

The first floor also has a sterilization room that also stores trauma bags, crutches, transport cots, a backboard, two autoclaves with current safety inspection labels, a dental suite that will be reviewed in the dental care section, medication storage and preparation room, medication records, a lab room with a current CLIA certificate, a phlebotomy chair, four centrifuges with current safety inspection labels, and a treatment room. The treatment room serves as the urgent care center for the MCC campus. It has an adjustable gurney, three oxygen tanks, a Gomco suction machine, pulse oximeters, digital thermometer, Accu-Chek machines, ambu bag, AED, an ECG machine, a functional oto-ophthalmoscope, and a variety of medical supplies. An emergency bag with emergency supplies, medications, and equipment, and an AED with pads were kept in the treatment room. None of the medications inspected had expired. Two new stair chairs and a backboard are stored in this area, cluttering an already tight space. An oxygen storage room within the treatment care area was packed with large and small tanks; only the small tanks were held in safety racks. The unracked large tanks pose a safety risk to patient-inmates and staff. It was reported that the Accu-Cheks are calibrated daily, but this activity was not logged. The ECG machine did not have an electrical inspection tag. Two additional gurneys and one additional stair chair were kept in an alcove in an adjacent corridor. There was no crash cart in the treatment room. MCC does not have a crash cart; the institution performs basic CPR, applies the AED, and calls 911 for cardiac arrests. This is an acceptable option for responding to codes/cardiac arrests. The second floor of the health care unit houses physical therapy, optometry, radiology suite, and clinical administrative and provider offices. The physical therapy room is small and has two matted tables, a cold/hot pack unit, steps, exercise balls, door mounted pulleys, a desk, chairs, and a storage cabinet. The radiology suite performs non-digital plain film x-ray examinations and panorex studies (see radiology section for further information). The clinical administrative and provider offices have computers that have access to the internet.

The third floor of the health care unit houses the 26-bed infirmary. The infirmary offices and patient rooms were generally clean. Room 304 emitted a smell of urine. This room houses the only restraint bed in the infirmary. The porters were directed to buff the floor. Twenty-three of the 26 beds were low fixed-position metal beds. The infirmary beds are low to the floor and cannot be raised. The head of the beds cannot be elevated. There were only three adjustable beds; one was an aged metal bed and the other two were relatively new hospital beds. This is an insufficient number of hospital beds to meet the needs of the complicated patients that are admitted to the infirmary. There is no exam room in the infirmary; patients are examined in their beds. The low to the ground fixed-position metal beds make it difficult and even unsafe for the staff to properly examine and transfer patients into and out of the bed. The bed mattresses were relatively thin and covered with an intact cleanable covers. Because of a lack of appropriate beds, one patient, with fall risk, had his mattress placed on the floor. His mattress had an uncovered, deteriorating foam head rest that was impossible to sanitize. This patient should be assigned to an adjustable hospital bed with safety railings. There were two negative pressure/isolation rooms. The negative pressure units were turned on and demonstrated to be operational using both the pressure gauge and the tissue paper test. The negative pressure units are checked and

logged daily. There were no patients in the negative pressure rooms. Both negative pressure room anterooms were dirty and cluttered with gloves, chucks, and paper forms. Both rooms had full red waste bins. These anterooms had not been used in quite a long time and need to the cleaned and kept ready for use.

The floor of the shower and tub room was clean. One shower head was not functional. There were no safety grab bars in the shower; the grab bar near the tub was totally rusted. The ceiling ventilation covers were rusted and the return vent near the tub was densely clogged with debris. The staff directed the porter to clean the vent. It was reported that the more frail patients in the infirmary have live-in inmate aides who assist them with bathing and other activities of daily living.

The clean and soiled utility rooms and an equipment room were organized and clean. Only one of the two IVAC units in the equipment room had a current safety inspection label; it was reported that the other one was new. A scale that could accommodate a wheel chair was demonstrated to be functional. The laundry room has a non-boosted washer and a dryer. Bleach is added to all laundry loads; significantly soiled sheets are sent to the main laundry, which washes clothes at a higher temperature. Cleaned sheets in the laundry room were noted to be in good condition.

There a linear nursing station that connects into the two long corridors of the rectangular shaped infirmary. The doors at each end of the nursing station are kept closed. The patient rooms have solid metal doors with a small viewing window. There are no rooms that are in the direct line of sight to the nursing station and only a few are possibly within sound of the nursing station. Correctional officers are housed in the corner of one of the corridors. The officers also do not have direct line of sight into patient rooms from their desk. The nurse station has a long counter with two work areas, a medication cart, an operational AED with non-expired pads, oxygen tanks, ambu bag, functional Gomco suction machine, and a number of out of date nursing textbooks. An office at the entrance to the infirmary was soon be assigned to a nurse manager who provides oversight of the infirmary. This room has a computer with access to the internet.

In summary, the relocation of all nurse sick calls, provider sick calls, and chronic care clinics to the cell house allows for improved access to primary care services. The physical condition of the some of these exam rooms is deficient and needing of repair of cracked paint and wallpaper, and replacement of missing and rusty vents, and missing electrical plates. The correctional staff repeatedly commented that repairs of the clinical areas had been requested but were not readily done because of inadequate State of Illinois funding. The types of medical equipment and supplies varied between cell house clinics; all of the cell house clinical areas need to be equally equipped and stocked. The staff do not have ready access to current clinical references while they are providing care in the cell houses or in the health care unit; decades old textbooks and PDRs were noted in many clinical areas. This could be readily corrected by installing computers in the already wired exam rooms in the cell houses and health care unit. Two showers were inspected (South Lower and infirmary); both needed repairs and improved ventilation, and both create safety and sanitation risks for patient-inmates and staff.

## Sanitation

**Methodology:** The sick call and chronic care rooms on the housing units, the infirmary rooms, the health care unit, and the showers were inspected. Nurses, correctional officers, infirmary patient-inmates, and inmate porters were interviewed. Monthly Safety and Sanitation reports from January through April 2018 were reviewed.

### First Court Expert Findings
The First Court Expert reported that the facility was generally well maintained.

### Current Findings
We did not find that the facility was well maintained. We noted additional findings.
- The infirmary is generally clean with the exception of the anterooms in both isolation rooms, which were dirty and cluttered.
- Paper barriers were consistently used on most but not all examination tables throughout the facility.
- The upholstery on a number of exam tables in clinical areas had tears in their protective outer surfaces and could not be adequately sanitized.
- An uncovered foam head rest in one infirmary room could not be adequately sanitized.
- Physical plant deficiencies including peeling paint, cracked paint and walls, rusty and missing vents, frayed wall paper, missing electrical outlet cover plate, torn upholstery, rusted cabinets, and missing ceiling vent cover were noted in the clinical areas in the cell houses and the HCU. These deficiencies create a non-professional work environment for the clinical staff and make it impossible to adequately sanitize the clinical areas.
- Monthly Safety and Sanitation rounds and reports were being completed. Many of the same findings were noted and went unaddressed from January through April 2018.
- There are no environmental rounds that focus on the inspection and documentation of non-functional clinical equipment, the presence of current electrical safety inspections, and the completion of logs of inspections of clinical concerns, including emergency bags and equipment, negative pressure units, organization of clinical areas, etc.

The nurse and provider sick call and chronic care areas in the cell houses were generally clean, but the physical plant had a number of deficiencies (also noted in the Clinical Space section) that interfered with the ability to fully sanitize these areas. The reception and Classification clinical area had torn upholstery on an exam table. North 2 clinical area needed to be repainted. North 1 Lower had cracked paint and walls, and a missing electrical outlet cover plate just above the exam table. South Lower had frayed wall paper. West had cracked paint, no cover on the ceiling vent, and boxes stacked on top of file cabinets. East had the clinical space cramped with correctional file cabinets, deteriorating boxes with correctional logs and papers, and a totally rusted correctional staff refrigerator. The HCU was generally clean, with some missing ceiling tiles and uncleaned infirmary isolation anterooms. The showers in South Lower had peeling paint, cracked floors, rusted vents and metal doors, and poor ventilation. The infirmary had no safety hand grab bars, clogged ceiling vent, and poor ventilation. These physical plant deficiencies pose safety and infection control risks.

Inmate porters sweep, mop, and buff the floors of the infirmary rooms two to three times a week or more frequently as needed. They report that they spray with cleaning agent and bleach mixture. They clean the toilets, sinks, and showers on a regular basis.

In summary, the First Court Expert made a number of specific recommendations concerning sanitation and infection control. We have added recommendations that are found at the end of this report.

## Radiology Service

Methodology:  We reviewed the radiology unit.

**First Court Expert Findings**
The First Court Expert's report did not include any findings about the radiology equipment or services.

**Current Findings**
- The Illinois Emergency Management Agency (IEMA) radiation safety inspections and reports for the radiology units at MCC are current. The active x-ray equipment at MCC was found to be compliance with the Radiation Protection Act of 1990.
- The access to plain film x-rays at MCC is acceptable.
- The turnaround time for radiologist readings and return of the reports is acceptable.
- The lack of a shielded post to take panorex films in the Reception and Classification area has the potential for radiation exposure to the radiology technician and other staff.
- The system decision not to have the x-ray technician wear radiation exposure dosimeters may not be in accord with State of Illinois regulations and is definitely not in accord with community practice.

The radiology equipment had current IEMA inspection and certification. Plain film non-digital x-ray services and panorex studies are provided Monday through Friday during the daytime hours by a single full-time radiology technician who staffs and manages the unit. Patients requiring advanced or emergency studies are referred to the nearby Chester Memorial Hospital or to other health care systems, including Southern Illinois Health Care (SIHC).

It was reported that there is a three to five day waiting list for non-urgent onsite x-rays. The five x-rays ordered on 5/17/18 were being taken on 5/22/18, three working days after being ordered. Most x-rays are reported to be taken within one to two days after receiving the order. Weekend and holiday requests are completed on the next working day. The requests and the radiology log for eight patients who had films taken on 5/21/18 were reviewed. The waiting time for this small sample, between x-ray ordering and being taken, was 7.6 days, with a range of four to 10 days. Films are sent to a contracted radiologist in Bloomington, Illinois for reading. Reports are initially faxed back to MCC on the same or next day, with the hard copies sent within two to three days. Audits of films taken verified that the reading turnaround time was one to two days.

Onsite ultrasound exams are provided once a month by a contracted vendor. Ultrasound examinations must be reviewed and approved by the Wexford collegial review process. On the day of the inspection there were four patients on the ultrasound schedule. Some were awaiting Wexford approval.

The chest x-ray unit and the plain film table are in a second floor HCU room that has a shielded post for the technician to stand behind while the film is being taken. The radiology technician has a dark room and a work space immediately adjacent to the plain film suite. An additional panorex is located in an exam room in the Reception and Classification building. This room does not have a shielded post that can be used when panorex films are taken; the technician has to stretch the trigger cord as far as she can out the exam room door and into the main clinical hallway to minimize her risk of radiation exposure.

The x-ray technician was noted not to be wearing a radiation exposure dosimeter badge. She stated she had been told that the State of Illinois does not require the use of dosimeters as long as she was more than five to seven feet away from the unit. This radiology technician does not work at an outside medical center.

In summary, the radiology services at MCC have reasonable access to x-ray services and reasonable turnaround time of radiologist readings and reports. The location of the second panorex in a clinical exam room in the Reception and Classification building, which does not have a shielded post to take panorex films, raises concerns about the risk of radiation exposure. The decision of the system to not provide radiation exposure dosimeter badges is not in accord with community standards and needs to be further reviewed by the State of Illinois IEMA and possibly OSHA.

The First Court Expert's report did not have any recommendations about the radiology services. We have recommendations that are noted at the end of the report.

## Medical Records

**Methodology:** We inspected the medical records room, interviewed medical records staff, and reviewed multiple medical records.

### First Court Expert Findings
Charts were thinned so that the size of the medical record was manageable. Problem lists were cluttered with redundant information and with items that were not medical problems. The facility rarely received consultant reports or hospital reports. Sick call slips were not maintained in the medical record.

### Current Findings
All of the findings of the First Court Expert are still present. Paper medical records are used and were thinned to a reasonable size. The problem lists were still incomplete and filled with

unnecessary, redundant information. Hospital and consultant reports are still not consistently obtained and sick call requests are still not filed in the medical record.

MCC does not have a medical records director position in their budget, but a health information technologist is a licensed medical records professional and serves in that capacity. The medical records room is insufficiently sized to accommodate all volumes of records and only the most current volume of a record is kept in the medical records room. Additional warehouse storage spaces are used for additional volumes of the current records and for death records. During record reviews, when we wanted a particular consultant report or other document, we had to ask for the additional volume, which took some time to obtain. The delay would be significant for clinical interactions with active patients. The inability to easily obtain all volumes of a record during every clinical encounter was a problem and is a reason why an electronic medical record should be installed statewide.

We confirmed the First Court Expert's finding that medical record volumes are thinned. Whenever a volume reaches two inches in depth, medical record staff thin the volume, and for all charts we reviewed, volumes were thinned to two inches or less. Charts we used for medical record reviews came apart much less frequently than occurred at other sites, but this still occurred.

There was minimal filing backlog. For most record documents there was only approximately a half inch of back filing. For medication administration records (MAR), there was two to three inches. This is not a significant volume of backlog filing.

With respect to access to the record, medical records staff pulls medical records for provider scheduled appointments. Nursing sick call evaluations occur without the availability of a medical record, which is inappropriate and subjects the patient to risk. When nurses perform health request evaluations in remote sites, they need to know the conditions of the patient, recent problems, and medications. For health request evaluations, nurses write notes on a single progress note and bring these at a later time to the medical records office. Some nurses will file the progress note in the patient's chart and some nurses will give the documents to records staff to file. Any staff is authorized to pull or re-file a medical record. This violates medical record confidentiality and promotes loss of medical information. All clinical encounters should occur with the availability of the medical record.

The First Court Expert found that the facility rarely received consultation or hospital reports. Obtaining these is the responsibility of the scheduling clerk, who indicated that approximately 50% of reports were obtained. In our record reviews, consultation and hospital reports were not consistently present and providers did not consistently document the status of the patient after consultation. Based on record reviews, the lack of consultation and hospital reports appeared to significantly and adversely affect clinical care.

Sick call requests are not filed in the medical record. In our opinion, the patient requests for care have clinical information and are therefore a medical record document and need to be filed in the medical record.

The lack of timely access to medical record documents for clinical encounters and lack of timely access to a complete medical record support the need for an electronic medical record. Lack of timely and accurate documentation in the MAR, which will be described in the medication section of this report, also supports use of an electronic medical record with an eMAR function.

## Medical Reception and Intrasystem Transfer

**Methodology:** To assess medical evaluation of newly arriving inmates we toured the medical reception area, interviewed health care staff, reviewed IDOC health record forms, and reviewed 15 health records. Records were selected from a log documenting referral from the reception nurse to the provider due to a history of chronic disease, since October 2017.

**First Court Expert Findings**
The previous Court Appointed Expert found problems with the quality of the intake process, particularly the recognition and work up of abnormal findings.[5]

**Current Findings**
Our review showed that the quality of the intake process is still hampered by omissions in screening and failure to follow up on the information obtained. We also found that intake physical examinations were not completed timely. Finally, IDOC has adopted a policy of opt-out HIV testing, but the procedure still requires written consent for testing.

MCC receives an average of 86 inmates a month.[6] Intakes arrive generally Monday through Friday from county jails or directly from the community as parole violators. According to staff interviewed, usually they have several hours' notice of inmates who will arrive as new admissions. Parole violators may arrive without notice.

Intake screening takes place in three rooms on a corridor adjacent to the booking and holding cells. There is a dental examination room, a medical examination room, and a room to complete the mental health evaluation. Other offices in the corridor include classification, and alcohol and drug screening. The medical examination room is used by nurses to conduct receiving screening and collect lab samples. It is also used by a provider to complete physical examinations. This room was clean, well-lighted, properly equipped, and maintained.

Intake screening includes a medical history, tuberculosis symptom screen, height and weight, vital signs, visual acuity, and planting a tuberculin skin test (TST). According to a recent nursing schedule provided to the Court Appointed Expert, about half the time this responsibility is

---

[5] Lippert Report Menard pp. 8-9.
[6] Data provided in advance of the site visit to Menard for the time period April 2017 through April 2018.

assigned to an LPN and half the time it is assigned to an RN.[7] Nurses consistently contacted a provider to obtain telephone or verbal orders in order to continue medications inmates reported taking or those which were listed on the transfer summary from jail. Medication was provided as ordered the next time medications were due.[8] Patients were not always followed up to have the tuberculin skin test read, and in one case, the skin test was not administered.[9] These omissions were identified a few days later by the nurse completing the review of record prior to the physical exam; the test was administered again, and results obtained timely.

Lab tests performed as part of intake screening at MCC routinely include serum chemistry, syphilis, and opt-out HIV testing. Although HIV is supposed to be opt-out, the administrative directive (AD) requires that consent be obtained before drawing blood for HIV.[10,11] Opt-out testing is recommended by the Centers for Disease Control because it supports early identification and treatment. The AD should be revised to eliminate explicit written consent to be consistent with an opt-out policy.[12] Data reported to the CQI committee shows that on average only half the incoming inmates are tested for HIV, which is consistent with an opt-in rather than opt-out testing policy.

A medical history and physical examination are to be completed within seven working days of intake.[13] The medical history and physical examination by a physician, nurse practitioner, or physician's assistant took place within the first seven working days after admission in only 60% of the charts reviewed. Untimely physical exams were between nine to as many as 18 days after admission. As noted in the previous Court Expert report, the recognition and work up of abnormal findings was sometimes problematic. Providers did not consistently elaborate on positive findings noted by the nurse, and the history and physical examination were cursory and lacking in quality.[14] Enrollment of patients in the chronic care program has improved since the previous Court Expert's review. Inmates with chronic diseases were usually seen for their first chronic care appointment at the time of the intake physical exam. This initial visit includes a review of relevant lab results, amplification of the disease history, assessment of disease control, and initiation of a treatment plan.

There are no mechanisms in place to monitor timeliness of the intake process or to evaluate the quality of intake screening, the health history, or physical examination. There were no CQI studies provided that indicate intake screening is monitored for quality or timeliness. This is a high

---

[7] Nursing schedule 4-16-2018 through 4-28-2018.
[8] Medical Reception Patients #5, 6, 10, 11, 13.
[9] Medical Reception Patients #3 & 4.
[10] Opt-out testing means that testing will be performed unless the patient refuses the test. Opt-in testing means that the patient is offered testing and is performed only upon patient consent.
[11] Administrative Directive 04.03.11 Section5 II. F. 5. d.
[12] Centers for Disease Control and Prevention. HIV Testing Implementation Guidance for Correctional Settings. 2009: p. 8.



cdc-hiv-correctional
-settings-guidelines.p
[13] Administrative Directive 04.03.101, Section II. G. 2. a.
[14] Medical Reception Patients #12, 13 & 14.

volume, high-risk area of health care delivery in the correctional setting and should be regularly reviewed as part of the CQI program.[15]

We found errors in tuberculosis screening, and the intake physical examinations are not timely or sufficiently thorough to ensure continuity of care. The procedural direction to obtain consent or HIV testing in IDOC Administrative Directive 04.03.11 conflicts with the policy of opt-out HIV testing and needs to be corrected.

## Nursing Sick Call

**Methodology:** Nursing sick call was evaluated by:
- Reviewing Menard Institutional Directive 04.03.103 Offender Health Care Services, Health Services Policy and Procedure-Health Care Screening (Sick Call), and IDOC Treatment Protocols.
- Interviewing nursing and supervisory staff.
- Observing the boxes in each building where inmates put their health care requests.
- Inspecting the rooms used for sick call in each of the buildings, except MSU.
- Reviewing tracking logs, which were used to select records for chart review.
- Reviewing documentation of 15 sick call encounters. These were selected from Sick Call Logs from February 25, 2018 through May 9, 2018, with complaints of potentially serious conditions (chest pain, acute infection, shortness of breath, seizures etc.) and their charts reviewed.
- Reviewing the triage of 16 sick call requests that were picked up Thursday morning May 24, 2018 from the sick call box in North 1.

**First Court Expert Findings**

The previous Court Expert described the sick call system as one that relies on the inmate to submit a written request. These requests are picked up each morning and triaged by nursing staff. Each inmate was scheduled to be seen either that day if the problem was urgent or within the next 24 to 72 hours if the problem was routine. Inmates were seen by either LPNs or RNs who had been trained initially by a physician. Each month the charting of nursing sick call was reviewed by the facility Medical Director and the results discussed with individual nurses. The chart review results were also reported in the monthly CQI meeting. Most of the rooms used to conduct nursing sick call were inadequate, lacking privacy and appropriate equipment. Notable exceptions were North 2 and the renovations in East Cell House. The medical record was available to nursing staff conducting sick call, but the original requests were discarded after the sick call encounter had taken place. Chart review indicated that there were omissions in data collected during the assessment (incomplete vital signs, failure to indicate duration of the complaint, not documenting the precise location of injury).[16]

**Current Findings**

---

[15] National Commission on Correctional Health Care. 2014. Standards for Health Services in Prisons pp. 13-14.
[16] Lippert Report Menard pp. 10-11.

Our review found that some of the problems with sick call described in the previous Court Expert's report have been resolved. Most notably, the rooms used by nursing staff to conduct sick call are uniformly equipped with accurate weight scales, an otoscope, blood pressure cuff and stethoscope, peak flow monitor, pulse oximeter, and exam table with paper. Most have sinks to wash hands and those that do not had hand sanitizer available (in two rooms the hand sanitizer was empty). Each exam room had a flyer mounted on the wall reminding nurses to change paper between patients. Wall mounted oto-ophthalmoscopes did not work in most rooms but there were hand-held ophthalmoscopes in all the rooms. Many of the rooms have a plexiglass door which ensures auditory privacy during the sick call encounter.

Sick call requests may be written on any piece of paper and put into the designated sick call boxes in each building. Inmates may also give their request directly to nursing staff whenever they are on the gallery. The nurse then triages each request and determines whether the inmate needs to be seen at all, and if so, whether they should be seen that day because it is a problem of urgent nature or should be scheduled and seen the following day. Documentation of timeliness in responding to sick call requests was evident from review of the sick call logs. Of 15 medical sick call requests, all were triaged within 24 hours and all were seen within 48 hours of receipt. Eight urgent requests are seen the same day the request was received.[17] We also interviewed several inmates in the North and South buildings about access to care. They consistently reported that they were seen for sick call within two days after putting in a written request and saw a provider in about a week, if referred by the nurse. The Health Care Unit studied timeliness in responding to sick call requests, which demonstrated compliance with the Administrative Directive in 2016. There have been no more recent studies of timeliness in responding to sick call requests. Timeliness of nursing sick call should be monitored at least annually.[18]

We interviewed an LPN who had picked up 16 sick call requests from inmates in the North 1 building Thursday morning May 24, 2018. Of these, 15 were requests to refill keep-on-person (KOP) medications. There was one request for attention to a problem of blood in the urine with clots. The nurse was not familiar with the inmate and had not reviewed the inmate's medical file. The nurse's triage decision was that the complaint was not urgent, and he would be scheduled to be seen the next day. We disagree with the nurse's triage decision and would have seen the inmate that day.

IDOC Nursing Treatment Protocols guide the nurse's assessment of inmates' sick call complaints. Nurses appropriately assessed and examined the inmate in 12 of 15 sick call encounters reviewed (80%).[19] In one encounter, the nurse did not follow up on an inmate's elevated blood pressure and did not complete an opiate withdrawal screening (COWS).[20] In another encounter, the inmate complained of diverticulitis and gave a recent history of treatment for this disease. The nurse did not use the nursing treatment protocol for abdominal pain, choosing instead to use the

---

[17] Sick Call Patients #1-8.
[18] National Commission on Correctional Health Care. 2014. Standards for Health Services in Prisons. P. 14.
[19] Sick Call Patients #3, 6-11, 13-15.
[20] Sick Call Patient #12.

one for non-specific complaints.[21] In another encounter, there is no nursing assessment of the patient's urgent complaint, but only an outbound note that he was sent to the ED.[22]

LPNs are assigned to perform triage and sick call approximately half of the time.[23] Sick call is conducted in the housing unit and thus each sick call nurse acts independently and autonomously from any other health care staff. This assignment is outside the Illinois scope of practice for LPNs. LPNs are to practice "under the guidance of a registered professional nurse, or an advanced practice registered nurse, or as directed by a physician assistant, physician…to include *conducting a focused nursing assessment and contributing to the ongoing assessment of the patient performed by the registered professional nurse."* [24] The Illinois nurse practice act does not permit LPN's to perform assessments independent of a registered professional nurse or higher level professional, as is currently being done at MCC. Neither does the scope of practice permit LPNs to perform independent assessments according to protocols. We agree with the First Court Expert's finding that LPNs do not have the educational preparation or scope of practice to examine patients, make an assessment, and formulate a treatment plan.[25] *Thus, some patients at MCC do not receive evaluations by health care staff licensed to perform independent assessments. This increases the risk of harm to patients.*

Nursing sick call documentation is monitored by the facility Medical Director monthly. The results of these reviews are documented in the CQI minutes. The April 2018 CQI minutes include a table with results of these chart reviews for 11 months. This internal review appears to monitor important aspects of nursing sick call (complete vital signs taken, documentation of subjective complaint, observation of signs and symptoms, appropriateness and thoroughness of the assessment, appropriateness of referral, etc.). The results suggest that issues are seldom identified, especially the observation of signs and symptoms or appropriateness and thoroughness of the assessment. These findings differ from our chart review and suggest that the internal review is not objective or self-critical. This is an audit function that would be more appropriately done by expert clinical nurses employed by IDOC.

Two nurses, responsible for completing nursing sick call in the housing units, were interviewed. Neither reported having the patient's medical record with them when seeing patients. One said that it would be too cumbersome to carry the records to the nursing sick call room. However, there were several examples among the charts reviewed where the patient's previous medical history was relevant to the current sick call complaint.[26] The IDOC Nursing Treatment Protocols state that "sick call evaluation using these protocols *should be performed with a medical record."* [27] MCC's Health Services Policy and Procedure also states that the patient's medical record will be pulled the day prior and taken to medical area in the unit to document the findings

---

[21] Sick Call Patient #3.
[22] Sick Call Patient #4.
[23] Scheduled nursing assignments 4/16/2018 – 4/28/2018.
[24] Illinois LPN Scope of Practice. Section 55-30.
[25] Lippert Report Menard p. 43.
[26] Sick Call Patients #3, 4, 8, 12, 13.
[27] IDOC Nursing Treatment Protocols p. 6; *emphasis added*.

and treatment provided during the sick call encounter.[28] Practices at MCC do not comply with IDOC guidelines or their own policy and procedure for sick call. We discussed with the HCUA various ways it would be possible for nurses to have the record when seeing the patient.

An improvement since the First Court Appointed Expert's report is that the sick call request written by the inmate is filed chronologically in the Miscellaneous section of the Medical Record. Apparently other HCUAs have complained about this practice but the HCUA at MCC has persisted. The previous Court Expert recommended that the inmate's written request be filed in the health care record and we agree. The practice at MCC should be adopted at all the IDOC facility health care units.

Inmates who were referred from nurse sick call were not seen timely by providers. Referrals to providers were appropriately generated for each of the 15 sick call encounters reviewed, but only three were seen within 48 hours.[29] One patient was referred after being seen for smoke inhalation; he was not seen by a provider for 11 days.[30] Another was seen by the nurse for epigastric pain. The provider was called and ordered medication and follow up in the chronic care clinic. His next chronic care appointment was five months in the future.[31] Another patient was seen by a nurse after having a seizure. The nurse practitioner was contacted and directed that the patient be seen the next day. The expected appointment did not take place and was never re-scheduled.[32] One patient complained of a possible ankle fracture. The nurse contacted a provider by telephone, who ordered x-rays of the ankle, a splint, and a lay-in. The patient had a severe sprain and was not seen by a provider for two weeks.[33] Patients such as these are at risk of deterioration when medical attention is untimely, and the result can cause harm.

In summary, some of the problems with sick call identified in the previous Court Expert's reports have been corrected. Problems with sick call currently include:
- LPNs are assigned responsibility to perform sick call, which is outside the scope of practice in Illinois.
- Nursing assessments and examinations are inadequate.
- Nurses do not use the patient's medical record during the sick call encounter.
- Patients referred to providers from sick call are not seen timely.

## Chronic Disease Management

**Methodology:** The HCUA was interviewed about the chronic care scheduling processes. The current chronic care schedule, the chronic care patient lists, and the chronic illness medication lists were reviewed. The telemedicine nurse manager, the Wexford hepatitis C physician coordinator, and the UIC Telehealth (HIV and hepatitis) lead physician were interviewed. A

---

[28] V3-9 Health Care Screening (Sick Call).
[29] Sick Call Patients #5, 13, 14.
[30] Sick Call Patient #2.
[31] Sick Call Patient #3.
[32] Sick Call Patient #6.
[33] Sick Call Patient #7.

chronic care provider was briefly interviewed. The records of 17 patients with chronic care illnesses were reviewed. The Office of Health Services Chronic Illness Treatment Guidelines dated March 2016 and the IDOC Hepatitis C Guidelines December 2015 and 2017 were reviewed as needed.

**First Court Expert Findings**

The First Court Expert noted that there wasn't a scheduling backlog of chronic care patients. Combination clinics had been started in which all conditions can be addressed at the same visit. One of the two current providers assigned to the chronic care clinics was providing a high quality of care although overall care was not good.  The report stated that the providers were not consistently assessing the degree of control accurately. Thirty-four percent of the 66 patients in the hypertension clinic who were not in good control had no change in their plan of care.  Only 59% of 70 patients in less than adequate diabetes control had a change in their plan of care. Regardless of the type of insulin patients used as civilians they were all changed to NPH and regular insulin upon arriving at Menard which was described as inappropriate.  Three of four patients on anticoagulation had therapeutic anticoagulation levels.  Even though 15% of patients in pulmonary clinic had persistent symptoms, all were noted to be in good control which is contradictory as persistent symptoms is inconsistent with good asthma control.  Five records of patients in asthma clinic had a degree of control that was overestimated or medications were not adjusted appropriately.  Of six patients in seizure clinic who reported seizures since the last clinic only two had a change in therapy.  There were delays in care of four of six seizure cases reviewed.   Four of eight patients on latent tuberculosis treatment had converted their tuberculosis skin test while at Menard.[34] The HCUA presumed that this was a result of inaccurate tuberculosis skin testing and not conversions.  This is inappropriate infection control.  It was also noted that MCC was using a database that could be used to generate a variety of reports.

**Current Findings**

We had similar findings to the First Court Expert's findings. However, we identified current and additional findings as follows:

- Patients assigned to chronic care clinics are regularly seen in these clinics.
- MCC continues to utilize combination chronic care clinics, which allows some but not all chronic illnesses to be managed in a single clinic session.
- Problem lists occasionally are incomplete or inaccurate.
- Some providers' chronic care notes were illegible or partially legible; these difficult-to-interpret notes created barriers to the delivery of continuous, comprehensive care.
- Providers at MCC inconsistently document the rationale for clinical decisions and diagnoses in the chronic care progress notes.
- The MCC chronic care providers and nurses do not have access to current, comprehensive electronic medical references, such as UpToDate, in all clinical exam rooms. A few

---

[34] This implies that the patients acquired the disease while at Menard and that there was someone at Menard with active tuberculosis or that the skin tests were inappropriately done.  While it may be true that the skin tests were inappropriately done, an tuberculosis outbreak investigation should have been done.

administrative offices distant from the chronic care clinical locations have access to the internet.

- Uncontrolled chronic illnesses with problems that appear to be beyond the expertise of the MCC providers are not referred for specialty consultation.
- There was no documentation that the providers reviewed the MARs at the time of chronic care visits for important data about medication compliance and capillary blood glucoses (CBG).
- A hospitalized patient returned with a prescription for a direct factor Xa inhibitor anti-coagulation medication; the MCC providers immediately stopped this medication and started warfarin. MCC providers were unable to obtain therapeutic anticoagulation in patients we reviewed. This places patients at risk of harm. Newer direct factor Xa inhibitor drugs should be used.
- The practice of treating diabetics on 70/30 insulin (70% long acting and 30% short acting insulin) concomitantly with a sliding scale administration of another short acting insulin puts patients at risk for hypoglycemia.
- The MAR is still completed manually by the nursing staff. Blank months for KOP medication delivery were noted on some patients' MARs. The lack of accuracy of the MARs is a barrier to verifying a patient's compliance with medications and determining the efficacy of the treatment.
- MCC did not screen patients over 50 years of age or individuals with certain high risk clinical conditions for colon cancer as is recommended by all national guidelines. Not one of the 14 MCC patients 50 years of age or older whose records were reviewed had been screened for colon cancer.
- MCC did not calculate 10-year cardiovascular risks for adult patients as directed by the ACC/AHA and IDOC treatment guidelines. Patients with high risk for cardiovascular events were not administered the statin medications and dosages recommended by IDOC Treatment Guidelines and by the American College of Cardiology.
- MCC did not administer age-based and disease-based pneumococcal 13 and 23 and meningococcal adult preventive vaccinations as recommended by the CDC.
- Two (14.3%) of 14 at-risk patients had received pneumococcal 23 vaccination, zero (0%) of the eight at-risk patients had received pneumococcal 13 vaccination, and zero (0%) of the two patients had been administered meningococcal vaccination.
- None (0%) of the five diabetic charts reviewed had documentation that optometry screening for diabetic retinopathy had been performed within the previous year.
- The process to determine eligibility for hepatitis C treatment is excessively lengthy and a barrier to the initiation of treatment. It is not consistent with processes in other correctional facilities and public health systems.
- Only 1 (0.7%) of the 134 patients at MCC with hepatitis C has been treated.

MCC has 1,037 individual patients, or 34% of the prison's population, enrolled in chronic care clinics.[35] Forty-one percent of patients at MCC are seen in chronic illness clinics for a single disease. However, wherever possible, multiple chronic illnesses are combined into a single session at the next available chronic care clinic. The MCC Clinic Count report dated May 21, 2018, indicated that 59% of patients with chronic diseases have at least some of their visits in combination clinics. The chronic conditions of a number of patients continue to be managed in single disease chronic care sessions. As discussed in other reports, we find single disease chronic clinic visits inefficient, wasteful, and potentially harmful. This is also consistent with the opinion of the First Court Expert. Patients are seen based on an inflexible schedule as opposed to the degree of control of their illness and do not have their various diseases coordinated into a unified therapeutic plan.

During the week of the experts' visit, the MCC census was 3,036, including 440 patients housed in the nearby Medium Security Unit. The May 2018 Chronic Care roster was as follows:

| Chronic Care Clinic | Patients | Prevalence in ADC (3,036) |
| --- | --- | --- |
| Asthma | 275 | 9.1% |
| Cardiac/Hypertension | 431 | 14.3% |
| Diabetes | 136 | 4.5% |
| General Medicine | 403 | 13.3% |
| Hepatitis C | 134 | 4.4% |
| High Risk/HIV | 22 | 0.7% |
| Seizure | 68 | 2.2% |
| **Total non-unique patients** | **1,333** | |

During the time of the First Court Expert's visit, the chronic care clinics were primarily conducted in the exam rooms on the first floor of the health care building. With the creation of air-conditioned satellite clinics in all of the cell houses, all of the chronic care clinics have been relocated to the cell houses. The only exception is three telehealth specialty clinics: UIC High/Risk, UIC Liver Clinic, and Renal Clinic that continue to be held in the telemedicine exam room on the first floor of the health care building. Chronic care patients in the satellite clinics are seen intermixed with provider sick call and walk-in patients.

Two nurse practitioners and two providers (one is part-time) staff chronic care clinics. The charts of chronic care patients indicate that patients with chronic illnesses are seen regularly at MCC. None of the clinical areas at MCC have access to electronic medical references, although it was reported that a few of the administrative offices in the distant health care building have internet access. When one provider was asked which current electronic medical references he could access, he could not list a single online medical reference that he utilized. This partially explains

---

[35] MCC's chronic care clinic schedule was listed as follows: asthma (January and July), seizure (February and August), cardiac 1 (A-L) (March and September), cardiac 2 (M-Z) ( April and October), diabetes/combo (April, August, and December), general medicine (May and November), and hepatitis C (June and December).

some of the clinical decisions and medications prescribed that were not in accord with current national and community standards of care.

The chronic care nurse maintains spread sheets on patients being followed in each of the chronic care clinics, listing the last clinic date and the most recent laboratory test date. The spread sheets also rate the clinic status of each condition as good, fair, poor, and stable. This method of rating degree of control is very limited; it would be more useful if objective criteria were used.

Onsite specialty consultation is limited. Optometry examinations are provided in the health care building for 20 hours per week. UIC HIV infection, UIC liver (hepatitis B and C), and renal consultation and management are provided to MCC patients via the telehealth program. All other specialty consultations are provided at outside private practices and medical centers in southern Illinois and a few in St. Louis, Missouri.

A dedicated nurse manager is assigned to assist and coordinate the telehealth clinics. This nurse is present in the exam rooms during all the UIC High Risk/HIV clinic, UIC telemedicine liver clinic, and the renal telehealth clinic appointments. She coordinates the appointments for these three specialty clinics, manages the completion of hepatitis C pre-treatment database, and tracks the clinical status and lab results of the referrals to UIC liver clinic. This telehealth nurse manager maintains clinically useful spread sheets on patients being followed in the High Risk/HIV clinic that tracks the status of the preliminary workup and approval process for hepatitis C patients.

We examined care of hepatitis C patients at MCC. Patients with hepatitis C are followed in a hepatitis C chronic clinic. When a patient tests positive for hepatitis C, they are followed by facility providers and tested every six months for an APRI level.[36] When treatment of hepatitis C is deferred and when there is active virus present, there is a risk of ongoing harm to the patient and ongoing monitoring of liver disease is recommended.[37] Yet, except for continuing to obtain an APRI level, providers in hepatitis C clinic do not monitor for cirrhosis or its complications or other possible complications of hepatitis C infection. When patients develop cirrhosis, it is recommended that they receive a baseline EGD to screen for varices and every-six-month ultrasound or CT scan screening to evaluate for hepatocellular cirrhosis. This is seldom done, even when patients have significantly elevated APRI levels. We note that in four death reviews of patients at various facilities who died of complications of hepatitis C, the patients were not monitored with EGD, ultrasound or for their ascites.[38] One example at MCC was a patient who had APRI levels indicative of cirrhosis as early as 2012, but the patient failed to receive endoscopy until August of 2015.[39] The patient did not have screening for hepatocellular carcinoma until May of 2015. At that time, a liver mass was found on a CT scan but was not timely worked up. Edema

---

[36] An APRI test is the AST to Platelet Ratio Index. The AST is a liver enzyme and platelets are a blood element that are decreased in advanced liver disease. The ratio between the AST and platelets yield a number that correlates with the degree of liver fibrosis. When the APRI reaches > 0.7 there is a greater than 70% chance that there is significant fibrosis.

[37] HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C; Last Updated  May 24, 2018, American Association for the Study of Liver Diseases and Infectious Diseases Society of America as found at https://www.hcvguidelines.org/sites/default/files/full-guidance-pdf/HCVGuidance_May_24_2018a.pdf.

[38] Patients #6, 12, 23, and 28 in Mortality Reviews.

[39] Patient #23 Mortality Reviews.

and ascites are complications of cirrhosis. The patient had edema as early as 2012 and ascites was noted on the CT scan in May of 2015, yet the patient was not treated with a diuretic until he had massive ascites over a year later, in June of 2016. The patient ultimately died of complications of his cirrhosis (hepatocellular carcinoma) without ever having a diagnosis of the liver mass known for over a year and without being appropriately treated for the complications of his cirrhosis. It does not appear that physicians knew how to monitor for ongoing liver disease and the hepatitis C clinic does not include monitoring for ongoing liver damage. The purpose of this clinic appears to be to monitor the APRI until the provider refers the patient for treatment. This is inconsistent with IDOC hepatitis C guidelines and places patients at risk of harm, and has resulted in preventable or possibly preventable deaths.

The IDOC hepatitis C guideline states that workup of all hepatitis C positive patients, including the decision to refer to the UIC Liver Telemedicine Clinic, will be the sole responsibility of the IDOC providers at each individual IDOC facility.[40]  This does not occur, as Wexford has inserted an additional utilization barrier into this process. When the APRI is elevated above 1.0 or above 0.7 with low platelet counts or albumin, facility physicians are to refer patients to a Wexford corporate internist who makes the decision on whether to refer the patient to UIC.

After the facility physician refers the patient to the Wexford corporate hepatitis C internist, a pre-approval packet is also forwarded to the Wexford corporate internist, who reviews the database and orders pre-treatment tests. This Wexford corporate hepatitis C internist must approve all requests for diagnostic workups including EGD, ultrasound, fibroscan, additional lab tests, and the referral to the UIC Telemedicine Liver Clinic.[41] This physician stated that she only is involved with patients who are referred to her for approval to start the process for hepatitis C treatment; she does not track or receive any data on patients at MCC with hepatitis C who have not been referred to her office.

Based on mortality records and on case reviews we performed, it appears that referral to the Wexford corporate hepatitis C internist is significantly delayed. Because these referrals are not tracked through the normal utilization process and because facility providers do not always document when they are referring to the Wexford corporate hepatitis C internist, it is not clear when patients are referred based on the medical record. Because the Wexford corporate hepatitis C internist does not write notes to the medical record, it is also unclear what her therapeutic plan is for the patient. At MCC, a chronic care nurse maintains a spreadsheet tracking patients who have hepatitis C, including those with referrals to the Wexford corporate hepatitis C internist. Review of three hepatitis C referrals indicated that once the referral was received by the Wexford corporate hepatitis C internist, the required diagnostic testing was quickly approved. The Wexford corporate hepatitis C internist did state that she was aware that the current IDOC policy does not prioritize patients co-infected with hepatitis C and HIV for expedited treatment. She also stated that she was aware that co-infected patients in the community who

---

[40] Hepatitis C Guidelines, December 2017.

[41] The Wexford corporate hepatitis C internist does not have to go through the Wexford collegial process to obtain approval but is authorized to approve these tests directly.

have F2 fibroscans are advanced to treatment as opposed to IDOC's practice of treating only those with F3 and F4.

In April 2018, 134 men were on the Hepatitis Report maintained by the chronic care nurse. Only one (0.7%) had completed hepatitis C treatment. This is consistent with statewide data that shows that approximately 2.9 patients are treated per facility per year.[42]  Another 12 (9.0%) were in the process of being worked up. Even though IDOC guidelines[43] mandate testing of HCV viral load on all patients, 17 (12%) of the 134 hepatitis C patients have not yet had their HCV RNA viral load tested. 87.3% of the hepatitis C patients have not yet had a fibroscan performed, even though the IDOC Hepatitis C Guidelines mandate that all patients have fibroscans done as part of their initial evaluation. IDOC restricts HCV treatment to patients with APRI score greater than or equal to 1.0 or with APRI scores between 0.7 and 0.99 with additional abnormal labs and high risk conditions, or advanced liver disease. This threshold limits the number of patients who are eligible for treatment. The process of accessing UIC also has considerable barriers. These barriers limit the numbers of patients treated and cause unnecessary delays in treatment that harm patients.

**MCC Hepatitis C Report April 2018**

| Category | Number | % of MCC Population |
|---|---|---|
| Total Hepatitis C Patients | 134 | 4.4% |
| Total HCV Patients with HIV infection | 0 | 0% |
| Total HCV Patients currently on treatment | 0 | 0% |
| Total Completed HCV treatment | 1 | 0.7% |
| Total with HCV RNA viral load | 117 | 87.3% |
| Total without HCV RNA viral load | 17 | 12.7% |
| Total with a Fibroscan | 24 | 17.9% |
| Total without a Fibroscan | 110 | 82.1% |
| Total with APRI ≥ 1.0 | 10 | 7.5% |
| Total with APRI ≥1.0 in workup | 7 | 70% 3 release dates ≤ 12 mos. |
| Total APRI ≥1.0 with Fibroscans | 5 | 50% |
| Total with APRI ≥0.7 and ≤1.0 | 16 | 11.9% |
| Total with APRI ≥0.7 and ≤1.0 in workup | 3 | 19% 1 F3 with release date ≤ 12 mos. |
| Total APRI ≥0.7 and ≤1.0 with Fibroscans | 8 | 50% |
| Total in Workup | 10 | 7.5% |

A patient with new onset atrial fibrillation was started on a direct factor Xa inhibitor anticoagulant by the hospital. The MCC providers immediately changed the anticoagulant medication to warfarin, medication that requires frequent testing and dose modification. There was no justification written in the provider note about this change. Over the next 150 days, 92% of the patient's anticoagulation tests (INR) were either above or below the therapeutic range,

---

[42] Data we received from UIC is that for the three years 2015 through 2017 inclusive, 227 patients were treated for hepatitis C. This is approximately 2.9 patients per facility per year.
[43] Hepatitis C Guidelines December 2017.

resulting in nine dosage adjustments. At the time of the Experts' site visit, five patients were taking direct factor Xa inhibitors and 12 were prescribed warfarin. It was reported that direct factor Xa inhibitors are non-formulary and require a collegial approval. It is in the best interest of the patient and the institution that the preferred choice of oral anticoagulation be a medication in the direct factor Xa inhibitor class, especially in light of the inability of MCC providers to obtain therapeutic anticoagulation levels.

The clinical care provided to a number of patients at MCC with chronic illnesses had deficiencies and were not in accord with national standards of care. The providers did not consistently document the rationale for the selection of medications, changes in the dosages, and types of medications. The MCC provider progress notes are occasionally illegible; these difficult-to-interpret notes complicate the facility's ability to provide safe and quality care to its patient population. There was no documentation in any of the charts audited that the providers had reviewed the MAR for compliance of the prescribed medications or for the results of capillary blood glucose testing; clinical decisions were made without this important clinical data. In the charts of the five diabetics we reviewed, not a single one of these five patients have been screened by the facility's optometrist on an annual basis as mandated by the IDOC's diabetes treatment guidelines. This is the only one of the five IDOC facilities visited by the experts that was not meeting this IDOC diabetic retinopathy screening guidelines.

The primary and secondary prevention of arteriosclerotic cardiovascular disease (ASCVD) provided was not in alignment with current national and IDOC standards. The providers did not even once calculate patients' 10-year ASCVD risk score, which would have assisted them in determining the proper preventive medication and dosage. Patients were prescribed low intensity HMG-CoA reductase medications (statins) when high-intensity statins at higher dosages were indicated. Non-statin anti-hyperlipidemia (niacin, gemfibrozil) were prescribed without any documented clinical justification; these categories of medication have limited impact on the prevention or progression of cardiovascular disease. The providers concomitantly order 70/30 insulin and sliding scale short acting insulin before meals. The simultaneous use of these two types of short acting insulin puts diabetic patients at risk for hypoglycemic attacks. Fifty years of age and older patients are not regularly screened for colon cancer, putting patients at risk for the development of preventable cancer and delayed identification of potentially treatable colon cancer. Not one (0%) of 14 patients 50 years and older had been screened for colon cancer. The providers do not adhere to the CDC's recommendations for the vaccination of adults. MCC providers do not order pneumococcal 13 vaccinations for patients 65 years of age or older and immunocompromised individuals, or meningococcal vaccinations for HIV patients; or consistently order pneumococcal 23 vaccination for patients with chronic illnesses, patients 65 years of age or older, and those with immunocompromised conditions.

Many of the records of patients with chronic illnesses were found to have concerns about the clinical care provided. The following patient summaries highlight the concerns and the findings noted above.

PTX193-0410

- This patient is 73-year-old male whose diagnoses included hypertension, dyslipidemia, hepatitis C, and schizophrenia.[44] Due to the system's failure to order a HCV RNA viral load, which was found to be negative in 2018, he was erroneously diagnosed with ongoing hepatitis C infection for many years, resulting in multiple unnecessary lab tests and provider visits. His hypertension was adequately controlled but he inexplicably was not seen in the hypertension chronic care clinic for an 11 month period from September 2016 until August 2017. Based on his medication, it is likely that this patient was being treated for coronary artery disease and angina. He has had four episodes of chest pain in the last four months and he was prescribed nitroglycerin tabs. However, there was not a single mention of the etiology of his chest pain in the medical chart nor is angina listed on the patient's problem list. The progress notes about the chest pain were brief and did not adequately assess the clinical characteristics of the chest pain. His 10-year ASCVD risk score was not calculated by the MCC providers. (The score was determined to be an extremely high 21%). The providers have failed to prescribe a high-intensity statin as clearly indicated by his extremely high cardiac risk score and the presumptive diagnosis of angina. This patient is not receiving the same standard of care as would be received in the community. This 73-year-old has not been screened for colon cancer and has not been offered or administered nationally recommended adult immunizations (pneumococcal 13 and 23 vaccines). The failure of the providers to follow national preventive, treatment, and screening standards puts the health of this patient at risk.

- This 23-year-old with a history of seizure disorder had not initially provided IDOC providers with a complete history of his medical problems.[45] Once the patient told the MCC providers that he had previously taken anti-epileptic medications, even though he had not had a seizure in six to eight months; his seizure medications were restarted. Although drug levels were in the therapeutic range, the patient reported at the 2/3/18 chronic care visit that he was having one to two unverified seizures per month. This patient's history was complicated; additional past clinical history and treatment was needed to assure that this patient needs to be taking seizure medications and that the currently prescribed medication is appropriate. The MCC provider did not document that clinical records of the patient's care in the community were requested. The provider did not request consultation with a neurologist. The MARs document that the patient is taking only 30-50% of his seizure medication; yet the provider did not comment on this lack of compliance and likely did not even review this important clinical information during the chronic care clinic visits, nor comment on the presence of therapeutic carbamazepine drug levels in a non-compliant patient. The failure to monitor this patient's compliance with medication and seek neurology consultation jeopardizes the health of this complex individual.

---

[44] Chronic Care Patient #1.
[45] Chronic Care Patient #2.

PTX193-0411

- This patient is a 52-year-old male with a history of HIV infection, seizure disorder, and intravenous drug use.[46] HIs problem list also noted hypertension, but he was not on anti-hypertensive medications and his blood pressures were within acceptable range. MCC consulted with a neurologist when the patient's seizures were uncontrolled. The reports from two return visits to the neurologist in 2017 were not in the medical record. The latest visit to the clinic suggested the seizures were not fully controlled. The provider should have, but did not, order immediate drug levels of the anti-seizure medications. The patient's HIV was moderately well controlled; however, he has not been administered the nationally recommended pneumococcal 13 and 23, and meningococcal vaccinations. This 50-year-old patient has not been screened for colon cancer; this is not in accord with national standards of care. This patient has had lacunar infarcts of his brain, a sign of arteriosclerotic cerebrovascular disease. He should have been prescribed a high-intensity statin.

- This 69-year-old male with hypertension also had a Left Bundle Branch Block (LBBB) that was not noted on his problem list.[47] He had a number of biannual physicals but has never been screened for colon cancer, had never had his 10-year ASCVD risk calculated (it was extremely high 21.6%), and he had never been administered pneumococcal vaccinations. In spite of his elevated cardiac risk and LBBB, he has not been started on a high-intensity statin. This patient has not received a level of care that approaches that available in the community.

- This patient is a 43-year-old male with diabetes type II, hypertension, hyperlipidemia, and asthma.[48] He has been seen regularly in a combined chronic care clinic. His diabetes was not optimally controlled but the providers have appropriately initiated and increased the dosage of an additional medication (glipizide). There was no documentation that the patient's feet had been examined for sensory neuropathy. This diabetic patient has been housed at MCC for six months and has not yet been seen by an optometrist. This is an unacceptable delay for a patient at risk for diabetic retinopathy. Although recommended by the IDOC Treatment Guidelines, the providers did not calculate this patient's 10-year ASCVD risk score (it was determined to be 12.6 %). As recommended for diabetics with a high 10-year risk of a cardiovascular event, this patient should have been started on a high-intensity statin. The patient has not been administered the pneumococcal 23 vaccine, which is nationally recommended for all diabetics and asthmatics.

- This 33-year-old asthmatic who failed to tell IDOC that he had asthma was appropriately treated until he presented with an acute asthma attack.[49] The type of nebulization administered (two drugs) is generally used for COPD patients. A short burst course of prednisone and an inhaled corticosteroid inhaler in addition to albuterol should have been provided to this patient, who was at heightened risk for another exacerbation in the

---

[46] Chronic Care Patient #3.
[47] Chronic Care Patient #4.
[48] Chronic Care Patient #5.
[49] Chronic Care Patient #6.

near future. Montelukast is not recommended to be used in a patient whose asthma is not stabilized. The patient was not administered the pneumococcal 23 vaccine that is nationally recommended for all asthmatics.

- This 43-year-old patient had diabetes type II and two gunshot wounds (GSW).[50] The GSWs were not noted on his problem list. He had a HbA1C of 6.8% in June of 2015. Patients with HbA1C ≥6.5% are diagnosed as having diabetes. The providers failed to acknowledge this abnormal test and did not counsel the patient about lifestyle changes that might impact on the progression of diabetes, and did not initiate medication to address this newly diagnosed type II diabetes. Two year later, the HbA1C was repeated, again was found to elevated, and a diabetic oral agent was prescribed. The two-year delay was unacceptable and put the patient at risk for diabetic morbidity. The patient had an optometry visit on 6/15/17, but funduscopic exam of the retina for signs of diabetic retinopathy was not performed. National adult immunization guidelines recommend that all diabetics receive a pneumococcal 23 vaccine; this has not been done. The patient's 10-year ASCVD risk score should have been assessed, but it was not calculated. The 2018 MARs revealed that the patient was taking only one half of his KOP diabetic medication. The misunderstanding or non-compliance with this prescribed diabetic medication should have been noted in the February and April 2018 diabetes clinic. The chronic care providers are not routinely reviewing the MARs.

- This patient is a 48-year-old with diabetes and hypertension.[51] Diabetic medications were incrementally increased until an acceptable level of control was reached. However, there was a period of nine months (3/23/17 to 12/21/17) when his HbA1C's were 9.2% and 8.3% before the indicated increase in medications was ordered. Control would have been reached more quickly if medication adjustment had been made more expeditiously. Diabetics are to be screened annually for the diabetic retinopathy; inexplicably, this diabetic has not been screened for the last four years. In February 2018, the MAR indicated that the patient had not received his KOP diabetic and hypertensive medications; however, there was no comment on this potential lack of compliance or failure to deliver his medications in the progress notes. The failure to review this important clinical information in the MAR put the patient's health at risk. The MCC providers are not following national recommendations to administer a second pneumococcal 23 vaccine five years after the first vaccination.[52] The providers are not adhering to IDOC treatment guidelines and national recommendations to calculate the 10-year risk of ASCVD for adult patients with diabetes and, if the risk is greater than or equal to 7.5%, to initiate a high-intensity statin. His risk was determined to be greater than 20%, yet a high-intensity statin was not prescribed.[53] This patient's health care is not being properly protected.

---

[50] Chronic Care Patient #7.
[51] Chronic Care Patient #8.
[52] CDC Recommended immunization Schedule for Adults 2018.
[53] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.

- This patient is a 60-year-old with insulin-requiring diabetes and coronary artery disease who had only been at MCC for a few weeks.[54] The intake HbBA1C of 6.7% suggests that the patient's diabetes had been adequately treated prior to his incarceration. The decision to add additional short acting regular insulin (on a sliding scale) to this patient who was already receiving short acting insulin 19.5 units before breakfast and 18 units before dinner (30% of his 70/30 insulin, 65U/am and 60U pm, is short acting regular insulin) put the patient at increased risk of hypoglycemic episodes. The providers did not adhere to IDOC treatment guidelines by failing to prescribe a high-intensity statin in this diabetic with a documented history of coronary artery disease. They also failed to calculate his 10-year ASCVD risk (determined to be 19.1%), which should have led them to prescribe a high-intensity statin.[55] The providers missed an opportunity to administer the pneumococcal 23 vaccine to this diabetic as is recommended by both national adult immunization guidelines[56] and by IDOC treatment guidelines.[57]

- This patient is a 59-year-old with hypertension, hyperlipidemia, HIV infection, and a history of tobacco abuse.[58] His hypertension was only moderated controlled, but his medication had been increased. His HIV infection was well controlled; his medications have been thoughtfully modified. The patient was not given pneumococcal 13 and 23 and meningococcal immunizations. This is contrary to national guidelines.[59] The MCC providers did not calculate the patient's 10-year ASCVD risk score (determined to be 14.4%); this is not in accord with IDOC treatment guidelines.[60] There was no documented justification for the use of gemfibrozil; this patient should have been prescribed a high-intensity statin. The patient has received four biannual physicals since he was 50 years old yet he was not offered screening for colon-rectal cancer. National guidelines recommend that individuals aged 50 to 75 years should be screened for colon cancer.[61]

- This patient is a 57-year-old male with a history of coronary artery disease (CAD) with stent placements, paroxysmal atrial fibrillation on chronic oral anticoagulation, degenerative joint disease, fatty liver, and tobacco use.[62] The placement of coronary artery stents, fatty liver, and chronic anticoagulation were not noted on the problem list. Upon return from the hospital where he been prescribed apixaban anticoagulant on 11/6/17, the Graham providers switched the anticoagulation to warfarin 5mg/day. On 11/21/17, the patient was transferred to MCC. His anticoagulation treatment was poorly controlled on warfarin: 92% of his 13 INRs over the last five months (11/10/17 to 4/23/18) were non-therapeutic. On nine occasions, the warfarin medication was stopped or the dose changed. The providers' notes did not always document the reason for the dosage

---

[54] Chronic Care patient #9.
[55] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.
[56] CDC Recommended immunization Schedule for Adults 2018.
[57] IDOC Office of Health Services Treatment Guidelines Diabetes March 2016.
[58] Chronic Care Patient #10.
[59] CDC Recommended immunization Schedule for Adults 2018.
[60] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.
[61] USPSTF  Colorectal Cancer Screening June 2016.
[62] Chronic Care Patient #11.

adjustments or why/when anticoagulation was temporarily stopped or held. The lack of comprehensive progress notes made it extremely difficult to track the care that was being provided to this patient. It is risky to continue to treat this patient with warfarin. It would be in the best interest of the patient and the institution if he was prescribed a direct factor Xa inhibitor that does not require frequent testing and dose adjustment, especially since providers at MCC were unable to obtain therapeutic control. This patient should have been administered pneumococcal 23 vaccine[63] and should have been screened for colon cancer;[64] neither one of these were performed. The provider notes were rarely adequately informative and were occasionally illegible. This jeopardizes MCC's ability to provide continuity of care to this complex patient. There was no rationale in the progress notes documenting the clinical reason that this patient was receiving fenofibrate. He was also prescribed a high-intensity statin, but at a dose that is less than recommended for a patient with arteriosclerotic coronary health disease.[65]

- This is a 54-year-old patient with hypertension, diabetes-type II, hyperlipidemia, and an EKG suggestive of a previous myocardial infarction.[66] His diabetes and hypertension were adequately controlled. This was the only patient that we reviewed at five IDOC facilities that was appropriately administered two pneumococcal 23 vaccines. The MCC staff failed to calculate the patient's 10-year ASCVD risk score (determined to be 19.6%) or take into account his past history of a previous inferior wall MI when they prescribed a moderate-intensity rather than a high-intensity statin, as was recommended in the IDOC treatment guidelines.[67] The patient was prescribed niacin, presumably as part of the treatment of his hyperlipidemia, but there was no justification documented in the chart for the usage of this medication. The patient did not have an eye exam in the last two and a half years; diabetics are recommended to have annual exams for diabetic retinopathy.[68] This over 50-year-old patient was not screened for colorectal cancer.[69]

- This patient is a 55-year-old with a complicated to treat and difficult to control seizure disorder.[70] His medications were changed a number of times, with the phenytoin dose changing from 400mg/day to 500mg/day to 200mg BID, and his levetiracetam starting at 500mg BID and then increasing to 1000mg BID, then back to 500mg BID. His phenytoin levels were tested nine separate times; five exceeded the therapeutic range, one was below the therapeutic level, and three were at the recommended levels. Providers had difficulty in maintaining the phenytoin level in the therapeutic range. Consultation with a neurologist was clearly needed but was never requested. The provider and chronic care progress notes did not document or justify the reason for the medication adjustments. The lack of comprehensive provider notes made it difficult to understand the course of

---

[63] CDC Recommended immunization Schedule for Adults 2018.
[64] USPSTF  Colorectal Cancer Screening June 2016.
[65] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.
[66] Chronic Care Patient #12.
[67] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.
[68] IDOC Office of Health Services Treatment Guidelines Diabetes March 2016.
[69] USPSTF  Colorectal Cancer Screening June 2016.
[70] Chronic Care Patient #13.

care. A new provider would struggle to comprehend the care being provided to this patient. The MCC providers must request specialty consultation for patients with conditions that do not readily respond to initial treatment. National standards recommend that all patients over 50 years of age be screened for colon cancer using a validated screening methodology,[71] but this patient has never been screened. His 10-year ASCVD risk score has not been calculated by the MCC providers.[72]

- This patient is a 65-year-old with diabetes, hypertension, hyperlipidemia, obesity, and hypothyroidism.[73] His problem list did not note obesity and hypothyroidism. This recently incarcerated (1/28/18 admission) patient's diabetes and hypertension were moderately well controlled. To date, the patient was not evaluated for diabetic retinopathy. His statin was changed from atorvastatin 10mg/d to simvastatin 10mg/d, a low-intensity statin. The providers, in violation of the IDOC treatment guidelines, failed to calculate his 10-year ASCVD risk score (determined to be extremely high, 28.4%).[74] If they had done this, perhaps they would have prescribed a high-intensity statin to minimize his risk of stroke and heart attack. Contrary to national standards, this patient has not been administered pneumococcal 13 and 23 immunizations.[75] The patient has not been screened for colorectal cancer; this is not in accord with national guidelines that recommend that screening begin at 50 years of age.[76]

- This patient is a 58-year-old with hepatitis C who was unsuccessfully treated with interferon and ribavirin in 2009-2010.[77] Liver biopsy in 2009 revealed extensive peri-portal fibrosis and moderate bridging (stage 2). On 9/19/16, the hepatitis C clinic deemed this patient eligible for treatment; 20 months later, treatment had not yet been initiated. On 3/29/18, a fibroscan was read as F4 (advanced liver scarring, cirrhosis). Eighteen of the months of delay appear to have been due to internal delays at MCC. At least two months of the delay were due to the workup that is required by the UIC Hepatitis C clinic, which includes psychiatric evaluation and EGD. Psychiatric evaluation and EGD are not recommended evaluations prior to treatment with the newer anti-hepatitis C medications.[78] The HCV RNA viral load was not located in the medical record but was eventually located on the Hepatitis Report that is maintained by the telemedicine nurse manager. The lengthy wait to retreat this patient with advanced hepatitis C is unacceptable and puts the patient's health at risk. There is no documentation in the

---

[71] USPSTF Colorectal Cancer Screening June 2016.

[72] ACC/AHA ASCVD Risk Score.

[73] Chronic Care Patient #14.

[74] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.

[75] CDC Recommended immunization Schedule for Adults 2018.

[76] USPSTF  Colorectal Cancer Screening June 2016.

[77] Chronic Care Patient #14.

[78] Recommended Assessments Prior to Starting Antiviral Therapy as found in HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, last updated May 24, 2018: The American Association for the Study of Liver Diseases and the Infectious Diseases Society of America as found at: https://www.hcvguidelines.org/sites/default/files/full-guidance-pdf/HCVGuidance_May_24_2018a.pdf.

medical record that this patient was administered the pneumococcal 23 vaccination.[79] The patient was over 50 years old but had not been screened for colon cancer.[80]

- This patient is a 66-year-old with hepatitis C infection.[81] Sixteen months after having been deemed eligible for hepatitis C treatment, the patient's workup was still not completed. Twelve months of this delay was due to the internal processes at MCC. His liver fibroscan on 2/19/18 was read as F4 (advanced liver scarring, cirrhosis). The UIC Telemedicine Liver Clinic requested additional labs, EGD, liver ultrasound, and dermatology consultation, which also contributed to the long processing time. The EGD and liver US was pending collegial approval by Wexford, although the experts were informed that Wexford's Hepatitis C coordinator could directly approve these tests. Most institutions do not require such extensive pre-treatment diagnostic testing prior to treatment with the newer anti-hepatitis C medications. The lengthy wait to initiate treatment for hepatitis C puts this patient's health at risk. Colon cancer screening was not provided to this patient, who is over 50 years old.[82]

- This patient is a 50-year-old male with hepatitis C.[83] Twelve months after having been deemed eligible for hepatitis C treatment, the patient's workup was still not completed. His liver fibroscan on 3/29/18 was reported as F4 (advanced liver scarring, cirrhosis). The UIC Telemedicine Liver Clinic's request for a psychiatric consultation has prolonged the waiting time. Most institutions do not require such extensive pre-treatment diagnostic testing including psychiatric consultation prior to treatment with the newer anti-hepatitis C medications. Colon cancer screening has not been performed on this patient, who is over 50 years old.[84]

## Urgent/Emergent Care

**Methodology:** We interviewed the Nursing Supervisor (IDOC), toured the medical clinic, and assessed the availability and functionality of emergency equipment and supplies. We also reviewed emergency drills, CQI reports, written directives, and medical records. Medical records were selected from the list provided by MCC of emergency room visits beginning in January 2017. This list includes the reason for the ED visit. Records selected for review were those conditions sensitive to ambulatory care, such as seizure, withdrawal, infection, diabetic complications, abdominal pain, chest pain, etc. These were used to evaluate nursing response to emergencies. A total of five records were reviewed. We also reviewed records of five patients who were hospitalized for ambulatory sensitive conditions to assess whether their pre and post hospital physician care was adequate.

---

[79] CDC Recommended immunization Schedule for Adults 2018.
[80] USPSTF  Colorectal Cancer Screening June 2016.
[81] Chronic Care Patient #16.
[82] USPSTF  Colorectal Cancer Screening June 2016.
[83] Chronic Care Patient #17.
[84] USPSTF  Colorectal Cancer Screening June 2016.

**First Court Expert Findings**

The records of nine patients were reviewed, and more than half demonstrated significant deficiencies in patient care. These deficiencies included absence of important information from the hospital, inadequate assessments by nursing staff, untimely physician follow up, and failure to monitor or intervene.[85]

**Current Findings**

MCC provides basic CPR and first aid. Emergency response bags are kept in the first aid room in the main clinic, the armory between north and south buildings, and at the medium security unit. These bags can be transported by responding nursing staff to the site. This equipment and supplies are used to conduct an initial triage, provide first aid, and CPR. The first aid room, North II Medical Clinic, and MSU are equipped to provide space and equipment to treat medical emergencies. The nursing staff must make a clinical decision to transport a patient in a medical emergency to the first aid room in the main clinic, which has the most extensive emergency equipment, or to the use an outlying room.

The emergency bags contain first aid supplies, personal protective equipment, stethoscope, blood pressure cuff, cervical collar, equipment and supplies to start an IV, and a few medications (i.e., glucagon, an epi pen, aspirin). The contents of the bags are standardized but not sealed. We checked the contents of several of these bags and found them to be adequately supplied. We discussed with the nursing supervisor who accompanied us the advantages of using plastic numbered locks to indicate a bag that was fully stocked and ready for use. The first aid room has, in addition to the emergency bags, two transport chairs, an automatic external defibrillator (AED), crash cart, stretcher with backboard, portable ambu-bag, portable oxygen, EKG machine, suction, nebulizer, and oto-ophthalmoscopes. A mobile crash cart with AED is also available in the infirmary and in the MSU clinic. Disaster trunks which contain triage tags and more first aid supplies are located in the first aid room, the armory between north and south housing units, in the MSU clinic, and in the North II clinic area.

The presence and functionality of the emergency response equipment is checked each shift and documented on a daily equipment log. No outdated supplies were found in the emergency bags we checked, but we did find outdated material in the disaster trunk in the armory. We checked the AED and other emergency equipment and found all were functional. Menard Health Services Policy V1-25 lists the contents and location of first aid kits available in housing units, program areas, and vehicles, but we did not evaluate the accuracy of this information.

The Menard ID #04.03.108 and Menard Health Services Policy and Procedure V1-26 P-112 are consistent with one another. Both require emergency response drills twice a year on each shift. In addition, one mass casualty or disaster drill must be conducted annually. Actual practice appears to conform to these directives. The mass casualty drill for 2017 was reviewed and found to be thorough, with good multidisciplinary participation and candid critique of strengths and weaknesses. The results were presented to the CQI committee; however, there was no specific

---

[85] Lippert Report Menard pp. 23-24.

plan to improve areas that were considered weaknesses. We also reviewed the emergency response drills for 2017 and 2018. They are sufficient in number and there is some critique, although not very thorough. These are also presented to the CQI committee. The minutes of the CQI meetings do not reflect any presentation of trends, discussion, analysis of issues, or plans for improvement in emergency response.

Emergency responses are documented in a log that includes the date, time, inmate name and number, location, and diagnosis. Only two emergencies were listed for 2017. When we inquired about this, the HCUA said that the nurses had stopped documenting in the log. She discovered this when she asked for the urgent care log in February. Entries since then are much more numerous than those recorded for 2017. We selected five patient charts to review from the list provided by MCC of emergency room visits beginning in January 2017.

Incomplete or inadequate nursing assessments were discussed in the earlier section on Nursing Sick Call. Two of these patients were seen by nurses for urgent complaints. One was seen for abdominal pain and the nurse assessed the patient using the protocol for non-specific complaints.[86] The assessment of his condition would have been more thorough if the protocol for abdominal pain were used. This patient had been seen in the ED three days earlier and diagnosed with diverticulitis. The nurse contacted the provider and was given a verbal order for a liquid diet. The provider did not see the patient for six days after his return from the ED. The other patient was seen urgently for priapism and the only documentation is the outbound note that he was sent to the ED.[87] The nurse conducted no assessment and did not even take the patient's vital signs.

- The first patient was seen in nursing sick call on 4/16/2018 for a boil on his buttocks that had been present for one and a half weeks.[88] The nursing assessment was incomplete. He was referred to see the provider the next day. However, he was not seen for five days, at which point an antibiotic was ordered. No labs or wound care was ordered. The provider did order a follow-up appointment in four to five days. The patient was not seen for eight days and at this encounter was sent to the ED because he was having lower abdominal pain. There is an outbound note, but it contains minimal information. Upon his return, the inbound note documents the medications and dressing change recommendations that were on the patient discharge summary from the ED visit. He did not see a provider for another two days. The nursing assessment of this patient's condition was incomplete, access to definitive care was delayed, and he was treated symptomatically with antibiotics without a thorough work up. Documentation of the ED visit was not obtained from the hospital and he was not seen promptly upon his return to MCC. This is a patient whose condition deteriorated because it was not managed in a timely and clinically appropriate manner by providers at MCC.

---

[86] Sick Call Patient #4.
[87] Sick Call Patient #5.
[88] Urgent/Emergent Care Patient #1.

- Another patient whose ED visit could have been avoided on 4/23/2018 had been seen in the emergency room on 11/1/2017 because of acute urinary retention.[89] He was diagnosed with septicemia resulting from bladder infection. He returned to MCC three days later with an indwelling catheter and a recommendation to see a urologist in two to three weeks. The provider tried to remove the catheter twice only to have another one reinserted because the patient could not urinate. He was discharged to general population and returned three weeks later because the catheter was not draining and had clots of blood in the tubing. A new catheter was inserted. He saw the urologist the next day, or five weeks after it was recommended, rather than two to three weeks later. The urologist recommended cystography, dilatation, and bladder biopsy for a chronic urinary tract infection. None of these procedures were completed and he continued with an indwelling urinary catheter until 1/18/2018, when it was removed at his request. On 4/23/2018, he was unable to urinate and was sent to the ED. He was hospitalized, and a prostatectomy was done. His discharge diagnosis was sepsis secondary to urinary tract infection with underlying severe BPH and possible nephritis. A cardiology consult was recommended four weeks post discharge, but has not been done per direction from the facility Medical Director. There is no note documenting the rationale for not having a cardiology consult on the patient. This patient would have benefited from prostate surgery that was worked up and done as a planned procedure. The delay in scheduling urology consults and diagnostic procedures resulted in an avoidable emergency and unplanned surgery. The prolonged reliance on an indwelling catheter to relieve urinary retention harmed the patient because of the increased risk of infection.[90]

We also reviewed five patients who were hospitalized, in order to assess whether the hospitalization might have been prevented and whether follow-up care was appropriate. We, indeed, found preventable hospitalization and poor care in general. We found problems with all records reviewed.

- One patient had hypertension and elevated cholesterol as early as 2008.[91] However, due to his age (46), his 10-year heart disease risk did not warrant use of a statin in 2008. In 2008, the patient did have EKG findings (T wave abnormalities suggesting lateral ischemia), but these abnormal findings did not appear to result in follow-up investigation. On 10/21/17, the patient sustained a myocardial infarction with cardiac arrest, for which he was hospitalized. He was resuscitated and was found to have stenosis of his left main coronary artery, for which he received a stent. The patient was discharged on a high-intensity statin, Brilinta, a beta blocker, Lisinopril, and aspirin, all of which he received upon return to the facility. The Brilinta was changed to a formulary medication (Plavix),

---

[89] Urgent/Emergent Care Patient #5.

[90]

 

Managing Urinary      cauti-guidelines.pdf
Retention in Men - P

[91] Patient #1 Specialty Consultation and Hospitalization.

which is a reasonable substitution. A cardiologist saw the patient on 11/14/17 after the hospitalization. The cardiologist recommended follow up in three months, which did not occur. The specialty care tracking log documented the 11/14/17 visit, but no other referrals were documented. We could not find any documentation that the patient's heart condition was being monitored in chronic care visits. We could not locate the patient on the chronic illness roster provided to us by IDOC in preparation for our visit. A doctor did see the patient in follow up of the cardiology visit, but there were no further provider visits until 3/30/18. On that day, the doctor noted that the patient had a prior myocardial infarction. The doctor ordered no laboratory tests and did not enroll the patient in chronic care clinic. His coronary artery disease was not being monitored. We brought this to the attention of the HCUA, so he could be enrolled.

- Another inmate had problems listed as diabetes, hypertension, and asthma.[92] However, the patient actually had chronic obstructive lung disease (COPD). Asthma and COPD are different diseases and not managed in the same manner. The patient was described in multiple chronic care visits as having various stages of asthma (mild persistent, moderate persistent, etc.) when he actually had COPD based on radiologic examinations. These descriptions for asthma were not pertinent to his actual diagnosis. There was no evidence in the medical record that the patient had a pulmonary function test, the cornerstone of diagnosis and management for COPD and asthma.

  We reviewed the record for this patient for a two-year period. Over those two years the patient was seen on seven occasions for chronic care. The patient was diagnosed on all those occasions as having asthma, even though a chest x-ray on 10/26/17 showed hyperinflation and fibrotic changes consistent with COPD, and even though a CT scan of the abdomen incidentally showed fibrosis of the lung with emphysema consistent with COPD. The patient had wheezing on several occasions that were treated with steroids. Pulmonary function testing should have been ordered to clarify his diagnosis. Also, the wheezing may have been due to other conditions, including heart failure. Additional testing was indicated, specifically an echocardiogram. The patient should have been referred to a pulmonologist for clarification of his diagnosis so appropriate therapy could be provided, or MCC providers should have ordered a pulmonary function test. The patient was not on an anti-cholinergic inhaler, never had a pulmonary function test, had no assessment of exercise capacity, did not have an evaluation for the need for oxygen therapy (even though having an oxygen saturation of 85% on 1/9/17), and had no consideration for pulmonary rehabilitation.[93] This patient should also have been considered for evaluation of heart failure.

  The patient was 82 years old in 2015. In 2015, he had a 43% 10-year risk of heart disease and should have been on a moderate or high-intensity statin and aspirin. Additionally, the

---

[92] Patient #6 Specialty Consultation and Hospitalizations.
[93] Generally, persons with a room air oxygen saturation of less than 88% should be started on oxygen therapy. This person should at least have been tested to determine if oxygen supplementation was necessary. If the facility physicians were untrained in how to do this, referral to a pulmonologist was indicated.

patient had an EKG in 2013 that showed T wave abnormalities consistent with possible ischemia. Despite this, the patient was not on a statin or aspirin until 11/17/17, when he was started on a low-intensity statin. This placed the patient at risk of harm.

The patient weighed 208 pounds in a chronic clinic visit on 5/5/15. On 12/14/15 in chronic clinic, the patient weighed 182 pounds. This 26-pound weight loss was unrecognized. On 1/4/16, a doctor documented a 40-pound weight loss. The patient complained of abdominal pain, loss of appetite, diarrhea, and emesis. The doctor's only diagnostic evaluation was to order a blood count and abdominal x-ray. Despite having diabetes, the doctor did not check blood sugar values. The CBC showed anemia (hemoglobin 12.2) but no action was taken. GI symptoms with anemia and weight loss need to result in colonoscopy and other testing to determine if a serious medical condition is present. On 1/21/16, a doctor referred the patient for an abdominal CT scan. A plain abdominal CT scan is not adequate screening for colorectal cancer, but may be useful for other purposes. Specialized CT scanning for colorectal screening is called CT colonography. However, CT colonography was not ordered. This patient's CT scan showed emphysema, aortic atherosclerosis, hepatic cysts, renal cysts, infra-renal ectasia (abdominal aortic aneurysm), bilateral common iliac aneurysms, and compression fracture of the L1 vertebra. None of these problems were added to the problem list or monitored. The identification of aneurysms was of concern and should be monitored and referred, if indicated. The identification of aortic atherosclerosis in combination with diabetes, hypertension, and a greater than 40% risk of cardiovascular events should have prompted use of a statin drug, but this was not done at this time. There was no follow up of the CT scan or the problems identified on the CT scan. There was no follow up of the weight loss or anemia. The patient did not have a follow-up blood count until two years later on 1/19/18, and the hemoglobin was 9.9, a significant deterioration. At that time, the doctor ordered iron studies and gave the patient cards for fecal occult blood testing. Colonoscopy was not done.

On 11/4/16, the creatinine was 1.66, indicating chronic kidney disease. This was not added to the problem list and was not followed as a problem. Specifically, on 12/19/16, the patient was evaluated in diabetic and hypertension chronic clinics. The blood pressure was 142/84. For persons with chronic kidney disease and diabetes, the blood pressure should be controlled to less than 130/80, yet this was not done, and the chronic kidney disease was unrecognized as a problem. On several other occasions (9/10/15, 12/14/15, 5/3/16, 12/19/16, 11/17/17, 1/8/18), providers saw the patient with either a systolic pressure above 130 or a diastolic pressure above 80 without intervention or comment on why intervention was unnecessary.

On 1/9/17, a nurse evaluated the patient for shortness of breath and obtained an oxygen saturation of 85%, which improved with treatment with a beta agonist inhaler. Because of the patient's myriad problems, a physician examination was indicated; instead, a doctor presumed the etiology was asthma and ordered prednisone by phone. If the diagnosis was asthma, an oxygen saturation at this level would have been life-threatening

and the patient should have been admitted to a hospital. Even if COPD was the presumed diagnosis, an oxygen saturation of 85% should have prompted consideration of hospitalization for diagnostic evaluation. Treatment over the phone with prednisone without knowing the diagnosis or reason for the new hypoxemia was inappropriate.

HbA1C levels from 2015 through 2017 indicated good diabetic control. However, capillary blood glucose checks being done every other week started to show a rise in blood sugar values. These were not monitored. On 11/14/17, the blood sugar was 256. On 11/22/17, the blood sugar was 446. On 11/28/17, the blood sugar was 414. On 12/5/17, the blood sugar was 423. On 12/12/17, the blood sugar was 411. On 12/18/17, the blood sugar was 471. There were no interventions after any of these blood sugars which indicated out of control diabetes. On 12/19/17, a doctor saw the patient and noted that the most recent HbA1C value was 6.1, but that a recent blood sugar value was 460. The blood sugar had been significantly out of control for over a month. The doctor did not adjust medications; instead, they ordered that the patient be seen in the diabetic clinic in two weeks with an HbA1C test. On 12/23/17, a nurse practitioner saw the patient and documented that the patient had vomiting, agitation, and was not feeling well. The nurse practitioner did not check a blood sugar even though vomiting in an out of control diabetic can be caused by ketoacidosis. The nurse practitioner ordered a month follow up despite this being an acute problem. This patient should have had emergent blood testing and evaluation to determine if an acute medical problem was present. Instead, the patient was not seen again until the patient was sent to a local emergency room on 1/2/18, presumably for evaluation for possible diabetic ketoacidosis. There were no progress notes from MCC before the hospitalization, so it could not be determined why the patient was hospitalized. There was no hospital report, so it could not be determined what occurred at the hospital. When the patient returned to the prison, a nurse documented that the patient was to follow up with a provider in five days. The hospital patient instructions listed diabetes, vomiting, hyperglycemia, and abdominal aortic aneurysm as problems, but the patient instruction sheet had little information. If the admission was for diabetes, it was preventable. Poor management of the patient's out of control diabetes resulted in harm (hospitalization) to the patient. The problem of aneurysm was never addressed despite potentially being life threatening.

The patient was not seen in five days as ordered. On 1/8/18, a nurse saw the patient for chest pain. The pulse was 110 and blood pressure 140/88. A doctor did not write an independent note but wrote an annotation to the nursing note stating that the patient had numbness of his fingers for 10 years and had no chest pain. He documented that the EKG showed no acute changes. He diagnosed COPD and chronic numbness and took no action. He did not check a blood sugar or review the hospital record. The EKG showed non-specific STT changes with V2-6 T wave inversions that can be associated with ischemia.

On 1/9/18, a nurse notified a doctor about a blood sugar over 500. The doctor ordered regular insulin and increased metformin to 1-gram BID and ordered blood tests. The

doctor did not examine the patient. The patient was not evaluated after hospitalization until 1/13/18, 11 days after hospitalization. The doctor noted that the blood sugar control was poor but did not review the hospitalization or findings during hospitalization. A HbA1C on 1/19/18 was 11.4, indicating very poor diabetic control.

On 2/13/18, the patient was seen for his diabetes, hypertension and "asthma." The doctor took little history but did note that the patient was short of breath. The patient was started on an antibiotic without explanation of why. The patient was noted to be on Lantus insulin, but the recent hospitalization was not discussed. Many of the patient's problems were not addressed or even listed as medical problems, including anemia, prior weight loss, prior abdominal pain with vomiting, recent chest pain, abdominal aortic aneurysm, chronic kidney disease, renal and hepatic cysts, and atherosclerosis. The patient's COPD was still being managed as if it were asthma.

In summary, this patient had multiple chronic medical conditions, many of which were not being managed at all and some of which were managed inappropriately. It did not appear that clinicians knew how to manage this patient's medical problems. He was hospitalized, and it was not even clear, based on the medical record, that providers understood why he was hospitalized. Follow up of serious medical conditions (abdominal aortic aneurysm, anemia, renal and hepatic cysts, chronic kidney disease, atherosclerosis, and COPD) was non-existent. For most of these problems physicians appeared unaware that the patient even had the problem. This placed this patient at significant risk of harm.

- Another patient had a problem list that documented hypertension and asthma.[94] However, the patient also had hepatitis C, chronic kidney disease, and first-degree heart block, which were not being monitored.

  Although the patient's chronic kidney disease was not listed as a problem and was not being followed in chronic clinic visits, the patient saw a nephrologist for this on 6/1/17. The specialty care tracking log documented that the patient was again seen in nephrology clinic on 10/5/17, but there was no report of the 10/5/17 visit or documentation in the medical record that this appointment occurred, or what occurred at that appointment. On the 6/1/17 visit, the nephrologist had recommended a vitamin D level, PTH level, urine protein/creatinine ratio, and a four-month follow up.

  Based on a 12/23/17 chronic clinic visit, the patient had a 14% risk of heart disease and should have been on a moderate to high-intensity statin, but was not. He also should have been considered for aspirin therapy as primary prevention of cardiovascular disease. These were not provided to the patient and were not discussed with the patient.

  On 12/25/17, the patient was admitted to a local emergency room for fever and diarrhea. He was diagnosed with acute kidney injury secondary to dehydration and diarrhea. There

---

[94] Patient #7 Specialty Consultation and Hospitalizations.

was no documentation of a follow up of this hospitalization and it was not entirely clear what occurred at the hospital, due to a lack of a complete report. The next physician visit was not until 2/24/18, when the patient was seen in asthma and hypertension chronic clinics. The blood pressure was documented as 120/18, but this clearly was a data entry error and was unnoticed and uncorrected.

A doctor saw the patient in chronic clinic on 3/6/18, and noted that the patient was recently hospitalized, but did not document what occurred at the hospital. The doctor did note that the patient for hospitalized for fever, dehydration, and chronic kidney injury, but there was no other history.

Several of this patient's problems were not even identified or monitored as problems. The patient did not have reports of a consultation visit and a hospitalization. Doctors did not acknowledge what had occurred at the hospitalization and at one of the nephrology visits. Lack of review of consultation and hospital reports meant that the patient's clinical status was unknown to medical staff. The patient should have been on a statin and possibly aspirin, but doctors appeared unaware of this need.

- Another 28-year-old patient had a medical reception screening at MCC on 8/18/17.[95] The nurse took a history of congenital heart disease, but the specific details were not documented. The patient's actual condition was not identified. A doctor did note that the patient had a venous stasis ulcer on his right leg, but the type of heart disease was not identified. On the day following medical reception, 8/19/17, a CMT evaluated the patient for chest pain, shortness of breath, oxygen saturation of 82%, and atrial flutter. The patient was sent to a local hospital.

The hospitalization log provided to us by Defendants in preparation for our visit showed that the patient went to Chester Memorial Hospital on 8/19/17, and from there was transferred to Carbondale Memorial Hospital on 8/22/17. A discharge summary from Carbondale was not available, but an echocardiogram showed tricuspid atresia with a possible small clot in the right ventricle. The patient was started on Lovenox, an anticoagulant. A report from the local hospital noted that the patient had atrial fibrillation, a stage II stasis ulcer, prior ablation procedures for atrial fibrillation, and had tricuspid atresia[96] with surgical correction at age five. The lack of the hospital record was significant, as it was not clear from the medical record what the opinion of the cardiologist was regarding the patient's serious heart condition.

---

[95] Patient #8 Specialty Consultations and Hospitalizations.

[96] Tricuspid atresia is a congenital absence of the heart valve between the right atrium and right ventricle, impairing flow of blood to the lungs and preventing oxygenation of blood. This is typically corrected by a Fontan procedure which diverts blood appropriately to the lungs from the inferior vena cava. When this procedure is done, patients require lifelong follow-up with a cardiologist experienced with complex congenital heart disease. Annual evaluation is recommended at a minimum, as additional interventions may be needed. These patients can acquire a number of complications which require intervention, including venous stasis ulcers and venous insufficiency, protein losing enteropathy, cirrhosis, thromboembolic events, arrhythmias, heart failure, and restrictive lung disease.

The patient was sent to Barnes Jewish Hospital in St. Louis the following day on 8/25/17, but there was no discharge summary and it was not clear what the therapeutic plan was for the patient, except that the patient was on metoprolol, diltiazem, and Lovenox. Barnes Jewish Hospital recommended a two to three week follow up.

On return from the hospital, the patient was admitted to the infirmary. The admitting physician did not document a therapeutic plan or acknowledge what had been recommended at Barnes Hospital. The doctor noted problems as atrial fibrillation, tricuspid atresia, and hypoplastic right ventricle. The doctor prescribed metoprolol, diltiazem, and Lovenox, but it was not clear what the therapeutic plan was.

Between 8/25/17 and 9/27/17, the patient was evaluated by providers six times. On none of those occasions was an accurate description of the patient's problems documented. None of these notes documented a therapeutic plan for the patient's serious medical conditions. At several clinic appointments, the only assessment was "cardiac." When we asked the physician who wrote this assessment what he meant, he stated that the patient had some type of cardiac issue. On one note, a doctor ordered a benzodiazepine and referred to mental health for palpitations, when the patient actually had atrial fibrillation which was possibly the cause of the palpitations.

According to the hospital log provided to us, the patient was sent to Memorial Hospital of Carbondale on 9/27/17. It was not clear why the patient was sent to a hospital based on progress notes before the admission. There was no hospital report, so it was not clear what occurred. On 9/28/17, the patient developed abdominal pain with an oxygen saturation of 79%, and the patient was sent to Barnes Jewish Hospital. There was no hospital report for this admission. On 9/29/17, a nurse practitioner documented that the patient "apparently had scan of G bladder, CT of chest, labs, EKG, US of abd [with] a note 'fit for confinement.'" The therapeutic plan was not documented. This uninformed note failed to document the results of any of these tests.

On 10/4/17, a cardiologist at Barnes Jewish Hospital saw the patient on a consultation and documented that the patient had pulmonary and tricuspid atresia with atrial septal defect and had multiple complications of his surgery, including atrial arrhythmia with prior cardioversion and ablation, iliac vein obstruction with venous stasis ulcers, and atrial thrombus. The cardiologist recommended stopping Lovenox, starting Eliquis, a liver ultrasound, and referral to an electrophysiologist for possible ablation therapy.

On return from the cardiologist, the patient was seen twice by a doctor. On both occasions, the doctor did not document review of the report. The recommendations for referral for ultrasound and for electrophysiology were not documented as recognized and do not appear to have occurred.

Progress notes document that the patient went offsite for a medical furlough on 11/4/17, but the specialty consultation log documents this as occurring on 12/4/17. Progress notes

do not document what the patient went offsite for. There was no report. On 12/4/17, a scheduling clerk documented that the patient was discussed in collegial review and approved for follow up. The clerk did not specify what the referral was for. On 12/15/17, Wexford utilization approved a six-month follow up with cardiology. Progress notes document that on 12/22/17 the patient went to Prairie Cardiology, but the reason for this appointment was not clear. The specialty care tracking log does not have this appointment in the log. The medical record remarkably did not detail the ongoing care of the patient.

On 1/10/18, a doctor documented that the patient had been to a cardiologist but did not document what occurred. The only diagnosis was "cardiac." There was no therapeutic plan.

Between 1/10/18 and 5/11/18, the patient was evaluated on three occasions. One of these was a chronic clinic visit. On none of these visits did physicians document review of prior consultations. On 2/9/18, a doctor wrote, "He is planned to have a procedure? At SLUH." The doctor did not appear to know what the therapeutic plan was or what procedure the patient was scheduled for. The other notes, including the chronic clinic visit, do not document understanding of what occurred at consultation visits or what the therapeutic plan was.

On 5/11/18, the patient went offsite for a medical furlough. There was no report. The specialty care tracking log did not document a visit for this patient on this date. A nurse practitioner saw the patient on 5/17/18 and documented that the patient had been offsite but that there was no report and no action was taken.

Care for this patient was grossly and flagrantly unacceptable as providers at MCC, despite three consultations, did not identify all of the patient's conditions, did not document a therapeutic plan for the patient, and were not monitoring all of the patient's medical conditions in chronic care clinics. No one documented what had occurred at the consultations, including status of the patient or recommendations for further care. One doctor diagnosed the patient repeatedly as "cardiac," and did not appear to understand what the patient's conditions were. It appeared that at least two recommendations of the cardiologist (ultrasound of the liver and referral to an electrophysiologist) did not occur. Two of the consultations had no report and it was not clear what the patient was seen for. The patient had multiple abnormalities that were not documented as being monitored including:
o   Transformation of the EKG to first degree AV block with left atrial enlargement and STT wave changes
o   Thrombocytopenia of 79,000 and white count of 3.8 on 9/11/17
o   Bilirubin 1.3 on 2/5/18
o   The venous stasis ulcer

The tracking log failed to accurately document specialty care appointments. Post consultation visits failed to include documentation of understanding of what occurred at the consultation or hospitalization. Three of five hospitalizations did not include a report. Two offsite consultations did not include a report. It was not possible, reading the medical record of this patient, to understand what the patient's status was or what the therapeutic plan of the cardiologist was. The patient's serious medical condition was so poorly managed that he is placed at serious risk of ongoing harm.

- Another patient was 66 years old with a history of hypertension.[97] This patient's medical conditions were mismanaged over a two-year period. The patient had wheezing on 10 separate occasions from late 2016 until April of 2018 without a diagnosis being made. Although presumably treated for asthma, the patient was not diagnosed with asthma and was not in chronic clinic for this condition. The patient's wheezing occurred with cardiomegaly and a chest x-ray showing an enlarged heart. These are consistent with heart failure, yet when providers referred the patient to a pulmonologist and cardiologist, the Wexford utilization doctor denied the referrals without recommending an adequate plan of action. Echocardiogram and pulmonary function tests should have been done. The referrals to cardiology and pulmonary were appropriate but not permitted. A second cardiology referral was again denied without an adequate alternative treatment plan. A nurse practitioner again referred the patient for CT scan and a pulmonary consult, but the CT scan was denied, and although the pulmonary consult was approved, there was no evidence it ever occurred.

In early 2018, the patient developed shortness of breath, wheezing, and tachycardia, and was seen on three occasions (4/21/18 and twice on 4/22/18) by nurses who did not even refer the patient to a doctor. The patient should have been immediately referred and this placed the patient at life-threatening risk, as there was no diagnosis yet. When a nurse practitioner finally saw the patient on 4/23/18, the nurse practitioner treated the patient for an infection and apparently for asthma, even though this diagnosis had never been made and was not made at this evaluation. A chest x-ray was ordered and was consistent with heart failure. But when a nurse practitioner saw the patient on 4/27/18, the chest x-ray was not documented as being evaluated. On 5/4/18, the patient was admitted to the hospital for a supraventricular arrhythmia and was diagnosed with atrial fibrillation. An echocardiogram was consistent with heart failure. When the patient returned to the facility on 5/8/18, the patient did not receive two ordered medications (Lopressor and diltiazem) for two days. The patient was never documented as having heart failure and his wheezing remained undiagnosed, although it appears he was treated as having asthma.

Also, we noted that this patient had elevated alkaline phosphatase as high as 217 on 12/15/17 and had an elevation of this test dating from 12/18/15, yet it was never evaluated. He may have undiagnosed serious liver or bone disease. Also, the patient had

---

[97] Patient #9 Specialty Consultations and Hospitalization.

an elevated 10-year risk of heart disease dating from at least 2/24/16, yet was not treated with a moderate or high-intensity statin, which is recommended; or considered for aspirin treatment, which is also recommended, but was not done. The care placed the patient at continual risk of ongoing harm. The care of this patient was grossly and flagrantly unacceptable, particularly the denial for cardiology and pulmonary referral when the patient had undiagnosed symptoms of pulmonary disease or heart failure that were not diagnosed or monitored.

In summary, the deficiencies in Urgent/Emergent Care were similar in frequency and type to those reported by the First Court Appointed Expert. These include absence of important information from the hospital, inadequate assessments by nursing staff, untimely physician follow up, and failure to monitor or intervene. We found many additional deficiencies, including inappropriate denials of care by the Wexford utilization physician, failure to review or complete recommendations of consultants, ignorance of the status or therapeutic plan recommended by consultants, and failure to follow up on abnormal test results. Several episodes of care were grossly and flagrantly unacceptable, sufficient to typically result in peer review of the clinician caring for the patient. We agree with the First Court Appointed Expert's recommendations and make additional recommendations found at the end of this report.

## Specialty Consultations

**Methodology:** We reviewed 12 specialty consultations in four patients and reviewed other records. We spoke with the clerk who schedules specialty care. We reviewed the specialty care log and other documents.

### First Court Expert Findings
Providers do not explain alternate treatment plans to patients. Follow up was inconsistent and problematic. Consultant reports were frequently unavailable, making follow up difficult.

### Current Findings
We found that all of the First Court Expert's findings were still present. There was no documentation of a discussion by the primary care provider with the patient following consultation visits of the consultant's recommendations or after an alternative treatment plan was initiated. We found that the alternative treatment plans were occasionally described by the scheduling clerk in progress notes. However, alternative treatment plans were not being documented by the primary care provider. According to the scheduling clerk, consultation reports are present for only about half of the consultations. We also found that follow up of recommendations was inconsistent.

The process of obtaining specialty care was similar to all other facilities. The expectation is that there is to be a written referral for specialty care, an approval of the referral in a collegial conference call, a scheduled appointment, and a follow up of the appointment with the primary care provider. All of these events are to be documented in the medical record.

Specialty care referrals at MCC are not tracked on a log in a manner that accurately documents all steps of the referral process. Three hundred ninety-nine (44%) of 892 referrals in 2017 did not have a referral date documented in the specialty clinic tracking log. Of the 892 appointments, 877 (98%) had an approval date documented on the log, but only 469 (53%) had the date of the completed appointment documented on the log.

It was not possible, using the specialty care tracking log, to determine whether patients were timely receiving care. In chart reviews, the referral, approval, appointment, and follow up were not consistently documented in the medical record. This made it impossible to verify the timeliness or completeness of specialty care benchmarks using either the tracking log or the medical record. As with other facilities, the approval date was the most frequently documented item on the specialty care log, making it appear that approval of care is the most important tracked item.

There were a low number of referrals for specialty care and an extraordinary number of denials of care at MCC. The 2018 annual CQI report lists 994 referrals for care in fiscal year 2018.[98] This is the second lowest number of referrals per 1000 population of all five sites we have visited.[99] Despite having a very low rate of referrals, MCC also has the highest number and rate of denials of care of the five facilities we have visited.[100] The CQI report documents 237 (24%) denials of care. The five facilities we visited averaged 9.5% denials of referred cases. The CQI report did not analyze the reason for the high number of denials. We were told that the Medical Director was asked by patients for certain services which the Medical Director did not feel comfortable telling the patients were unnecessary. So, the Medical Director would refer the patient for a service knowing that the utilization physician would deny it. If this is accurate, this is a cynical misuse of a referral process, disrespectful of patients, and violates effective communication of the treating physician and the patient. We were told that this practice is no longer occurring. This practice does not explain the very low rate of referral. We were told that the Medical Director is also now taking referrals more seriously and preparing a rationale prior to the collegial reviews so that a greater number of referrals are approved. It is our opinion that, based on record reviews in this report, many persons who need specialty services are not referred. The lack of primary care physicians and the Wexford utilization process itself are likely the cause of this phenomena.

The program had a concern about the number of denials and initiated a CQI study on denials. The title of this study was Re-education in Amount of Medical Specialty Service Denials. The plan of the study was to decrease denials of specialty care by 30%. The hypothesis of the CQI study was that if a doctor reviewed documents being sent to the utilization physician prior to the collegial review conference call to ensure that all treatments and steps that should have been taken before referral were done and that all clinical information was available to the utilization physician, that the number of denials would decrease. The CQI study compared the usual referral process to a process with additional Medical Director preparation of referral documents. The

---

[98] The fiscal year in Illinois is July 1 through June 30.
[99] NRC was the lowest, at 144 referrals per 1000 population. MCC had 994 referrals a year or 328 referrals per 1000 inmates.
[100] We include a table of referrals and denials in the Specialty Care section of our Summary Report. Please refer to that section to review these data.

number of referrals for consultations was 578 in a six-month period prior to the Medical Director review of referral documentation material and 189 over a three-month period of study when the Medical Director reviewed documents in advance. There were 153 denials over the six-month period prior to the study and 55 denials in the three-month study period. This revised practice resulted in a decrease in both referrals and in denials.

Although the intention was to reduce denials, the most important result, in our opinion, was to reduce referral. Given that MCC has one of the lowest rates of referral for specialty care, we were concerned that this process will place inmates at greater risk of harm by further reduction of necessary referral.[101] Based on record reviews, including mortality reviews, we found that far fewer patients were referred for consultations than should have been. It is our opinion that under referral is a more important problem than over referral. It is also our opinion that if the collegial review process worked as designed, unnecessary denials should be eliminated in the collegial discussion. What can the Medical Director prepare the day in advance that could not be discussed the day of the "collegial" review discussion? We view the collegial review process as a barrier to specialty care and believe it should be eliminated as it currently exists.

The program does not track whether clinical staff document benchmark events of specialty care (referral, collegial review, appointment date, and five-day follow up) in the medical record. The tracking log is so poorly maintained that it was not possible to use it for this purpose. As discussed above, 44% of referrals and 53% of appointments listed on the log did not have a date associated with them. Based on record review, we found that these specialty care benchmarks are not consistently documented in the medical record. There was therefore no means to verify whether care was timely or was being followed up.

The attorney for Wexford communicated by email to us that we would need to review individual records to obtain the alternative treatment plan information, as it was not centrally maintained. On chart reviews we performed we were unable to locate alternative treatment plans for all denials. The scheduling clerk, but not the doctor, would sometimes document the alternate treatment plan, based presumably on information obtained on the collegial review calls.

For specialty consultations that were completed, we noted multiple problems. These included:
- Delayed specialty care due to the collegial process
- Lack of follow up of recommendations of the consultant
- Failure to timely schedule follow-up appointments
- Failure to obtain reports of consultation care
- Failure to appreciate the status of the patient as reported by the consultant
- Failure to monitor the clinical care of the patient as recommended by the consultant and
- Failure to refer patients for specialty care when it was clinically indicated.

---

[101] Referrals per 1000 inmates was 328 at MCC ,which was the second lowest number of the five sites we visited. This information is available in a table in the Summary Report section of the overall report.

We reviewed four records of patients who had multiple specialty visits. All four had significant problems. The following record reviews illustrate these problems.

- The first patient had hypertension, epilepsy, and asthma.[102] On three occasions in 2016, EKGs had T wave tracings consistent with possible ischemia. In April of 2016, he had over a 10% risk of heart disease but was not on a statin or on aspirin, both of which the patient should have been on. Eventually, in August of 2016 the patient was hospitalized for chest pain, and a cardiac catheterization showed 60% stenosis of the circumflex coronary artery and 15-20% stenosis of the left main coronary artery. It was recommended that he be aggressively medically managed, including with a high-intensity statin, and Brilinta, an anticoagulant.

On return to the facility from the hospital, medication was started as recommended. In November of 2017, the patient experienced chest pain and was again hospitalized. He had a myocardial infarction. A stent was inserted. The patient was documented as receiving two doses of medication at MCC during the times when he was hospitalized, indicating problems with documentation and medication administration. When discharged from the hospital, a cardiology consultation was recommended. This appointment occurred in December of 2017. The cardiologist recommended a follow-up cardiology consultation, but that referral never took place and there was no explanation in the record as to why the patient was not sent back to the cardiologist. The patient was on Brilinta, likely because of the myocardial infarction and because he had a stent. Some stents require use of a medication like Brilinta to prevent clotting in the stent. Yet in February of 2018, a doctor at MCC stopped the Brilinta without explanation and without substitution with a similar drug. This placed the patient at significant risk of stent clotting and further myocardial infarction. Based on documentation, it did not appear that the physician evaluating the patient reviewed the cardiology consult or understood the reason for being on Brilinta.

Problems with this patient's care included not being started on a statin drug or aspirin early in his disease, which placed the patient at higher risk for myocardial infarction. The patient was documented as receiving medication at MCC when he was hospitalized, which is a problem with documentation of medication administration. A recommended follow-up cardiology appointment never occurred and there was no explanation why. The post-cardiology physician visit at MCC was two months after the consultation and the doctor did not review the cardiology consultation report. Effectively, there was no follow-up medical appointment to determine the status of the patient's condition after the cardiology consultation. The doctor stopped the anticoagulant despite the patient having had a cardiac event and a recent stent. There was no explanation given for discontinuation of the medication. This placed the patient at significant risk of stent clotting and myocardial infarction.

---

[102] Patient #2 Specialty Consultations and Hospitalization.

- Another patient initially complained to a nurse of neck pain in March of 2016, and the nurse did not refer to a provider, but gave the patient ibuprofen by protocol.[103] In December of 2016, the patient again complained of a sore throat and swelling on the left side of his neck. The nurse evaluating the patient used an upper respiratory protocol, which was not an appropriate protocol to use. The nurse noted an enlarged lymph node on the left which was tender. No referral was made. This was inappropriate; the nurse should have referred to a provider.

  A CMT evaluated the patient again for sore throat on 1/6/17. The CMT noted an "enlarged lymph node" and gave the patient acetaminophen by protocol. A nurse practitioner saw the patient on 1/11/17 and noted that the left neck was swollen and "hard." The nurse practitioner diagnosed pharyngitis and ordered an x-ray and an antibiotic. No follow up was ordered. A hard neck swelling is not consistent with pharyngitis. Other work up (CT scan and lab tests) were indicated but not done.
  An LPN evaluated the patient on 2/7/17 for neck pain, which the patient described as having since December. The LPN noted a "large swollen lump under L side jaw." Presumably, the LPN referred the patient to a physician. On 2/15/17, a clerk documented that a doctor presented the patient at collegial review for a CT scan, which was denied by a Wexford utilization physician. The CT scan was appropriate and should have been approved, in our opinion.

  On 3/3/17, a CMT evaluated the patient again for neck pain and noted a large lump on the left side of the neck. The CMT described the lump as getting bigger and harder. On 3/8/17, a doctor again referred the patient for a CT scan, which was discussed in collegial review on 3/8/17 and again denied. The Wexford UM physician recommended a neck ultrasound as an alternative plan. Ultrasounds are useful tests to evaluate thyroid conditions, but hard neck masses are best evaluated with CT scan. Getting an ultrasound would only serve to delay the diagnostic effort.

  An ultrasound was done on 4/4/17 and showed a mass. The radiologist recommended a CT scan. The doctor at MCC referred the patient for CT scan on 4/12/17 and it was approved on 4/17/17. The CT scan was not done until 5/22/17 and showed a complex mass suspicious for malignancy.

  On 6/8/17, a doctor referred the patient to a general surgeon for biopsy, but in collegial review on 6/22/17, the Wexford utilization physician changed the referral to an Ear Nose and Throat (ENT) surgeon. The consultation with the ENT occurred on 7/31/17 and the surgeon recommended a biopsy. The biopsy was approved on 8/4/17 and done on 8/18/17. The biopsy showed squamous cell carcinoma of the tongue. This significant delay (eight months) in diagnosis of a head and neck cancer appeared to be caused by the collegial review process and inability of primary care doctors to timely evaluate a hard neck mass.

---

[103] Patient #3 Specialty Consultations and Hospitalization.

On 9/13/17, a doctor at MCC saw the patient but there was no report yet of the biopsy. A doctor saw the patient again on 9/27/17 and again there was no report. Apparently, the ENT surgeon working through the scheduler had multiple pre-operative appointments made at Barnes Jewish Hospital in St. Louis. The patient ultimately had surgery on 10/4/17 to remove an advanced disease tumor with metastases to lymph nodes. The patient was discharged with recommendation for speech therapy, a swallow study, and ENT and oncology follow up.

On 10/17/17, the patient went for an offsite appointment, but it was not clear what the patient was seen for. On 10/18/17, a doctor at MCC documented that the patient had a swallow study, but did not document what the therapeutic plan was for the patient regarding eating or follow up. A report of the swallow study noted that the patient could start eating with nutritional supplements and could upgrade the diet. Swallowing exercises were recommended during radiation therapy. These recommendations were not documented by MCC physicians as incorporated into the patient's therapeutic plan and it was not clear that they occurred. On 10/26/17, the patient was discharged from the infirmary without a documented therapeutic plan except that the patient was to start radiation therapy. Documentation was poor, and it was not clear whether the patient kept the ENT, oncology, or initial radiation therapy appointments.

Problems with this patient's care included a delay of eight months from the time the patient complained of a lump in his neck until the squamous cell carcinoma was definitively diagnosed and an additional two months until resection of the tumor occurred. The patient had advanced cancer and the delay may have contributed to its spread. The Wexford utilization physician made an improper decision in twice denying a CT scan for a hard neck mass. Consultant reports after surgery were not available in the medical record and doctors did not document understanding of the therapeutic plan except that the patient was to receive radiation therapy. There is no evidence in the records that some of the recommendations for follow up with consultants occurred or whether a recommendation for swallowing exercises was discussed with the patient. Also, there was no evidence we could find of a comprehensive dental examination, including of the oral cavity, that may have identified the oral cancer earlier. This speaks to the lack of comprehensive dental evaluations.

- Another patient had long standing hip pain.[104] On 8/22/08, an x-ray showed marked reduction of the left hip joint with sclerosis of the joint. The impression was severe osteoarthritis with no change since the last study. X-rays were taken again in 2009, 2011, 2013, and 2014, all showing continued deterioration. A 2015 x-ray showed "near obliteration of the joint space with prominent juxta-articular bone spurs and subcondylar cysts." Indications for hip replacement are failure of conservative management, debilitating pain, and significant decrease in activities of daily living. This patient appeared to have indications for hip replacement surgery as early as 2008.

---

[104] Patient #4 Specialty Consultations and Hospitalization.

On 3/8/16, a nurse saw the patient. Indications for hip replacement were present. The nurse documented that a physician requested a collegial review because the hip "comes out of joint when walking. Painful movements noted, appearance of possible foot drop." We could not find the collegial review for this patient around March of 2016 in the record. So, it is not clear if the collegial review happened or if it was denied or just not documented.

On 6/5/16, a nurse saw the patient and noted pain in the hip, unsteady gait, and difficulty in standing up, and requested a low bunk for that reason. There were a lack of physician evaluations documenting a thorough history and physical examination during this time period. However, the nurse sent the patient to a nurse practitioner, who saw the patient on 6/8/16 and referred the patient to the Medical Director for a consultation referral for the hip.

On 6/10/16, a doctor referred the patient to an orthopedic surgeon. On 6/15/16, a clerk documented that the patient was discussed in collegial review, but a final decision was pending. On 6/29/16, a clerk documented that the referral was denied. The clerk did not document the alternative treatment plan. There were no physician notes documenting the plan of care for the patient. However, it appears that the alternate treatment plan was to refer to a physical therapist.

On 7/22/16, the patient went to a physical therapist in Carbondale. The therapist noted that the patient had a hard time walking and was unstable when standing and had crepitance of the left hip. The therapist gave the patient exercises but noted that the patient probably needed hip replacement.

No action was taken based on the 7/22/16 therapy consultation until 11/11/16, when an MCC physician referred the patient to an orthopedic surgeon again. This referral was an appeal of the prior decision. Because it was an appeal, the IDOC was involved. The referral was approved on 11/22/16.

An orthopedic consultant saw the patient on 12/20/16. The consultant noted that the patient could not put weight on the joint and struggled to walk, and pain medication was no longer effective in relieving pain. The consultant recommended total hip replacement. The patient was now on tramadol for pain relief. Tramadol is an opioid pain medication.

The MCC doctor referred the patient for total hip replacement on 12/23/16. The procedure was approved by Wexford on 1/6/17. Despite the approval for hip replacement, the pre-operative evaluation was not approved until 2/20/17. The hip replacement was not performed until 3/20/17. The hospital's procedure for hip replacement was to start an anticoagulant and perform a Doppler study of the legs to rule out DVT in four weeks. During the entire post-operative period when the patient was on anticoagulation, the INR was not checked once even though it is standard practice to do so.

On 4/4/17, an orthopedic surgeon saw the patient and again recommended obtaining a venous Doppler study and, if negative, to stop the anticoagulation. However, when a doctor at MCC saw the patient on 4/13/17, about nine days after the consultation, the doctor ignored the recommendation for a Doppler study and just stopped the anticoagulant. The doctor did not document review of the orthopedic consultant note. The patient was not referred for physical therapy until July 2017.

Problems with this patient's care included a significant delay in hip replacement surgery. There was x-ray evidence of severe degeneration of the joint since 2008. Physician notes failed to document a thorough history or physical examination in any notes of the current volume. However, a nurse noted that the patient could not walk due to the joint problem. Even after a doctor referred the patient to an orthopedic consultant, it was initially denied. Referral to a physical therapist resulted in an opinion that hip replacement was needed. The patient ultimately went to an orthopedic consultant. But after a recommendation for hip replacement, the surgery was delayed for another three months. A recommendation by the orthopedic consultant to obtain a Doppler study to assess for thrombosis was ignored by MCC staff. It was not even clear that they reviewed the consultant report. Physical therapy was not initiated for four months after the surgery. While hip replacement is an elective procedure, the surgery was delayed apparently for years, resulting in pain and disability endured by the patient for an extended period of time.

- Another patient did not have appropriate management of his goiter or appropriate follow up of his rheumatoid arthritis.[105] On 10/23/15, a dentist told a CMT to refer the patient to a doctor for a goiter first noticed by the dentist. The goiter had been unrecognized previously by medical staff. The dentist ordered a thyroid panel and an antinuclear antibody test. The antinuclear antibody test is a test for autoimmune disease and is not a test typically ordered to evaluate a goiter. A doctor, not a dentist, should have been initiating care for the patient. A doctor did not initially evaluate the patient's goiter by taking a history or performing a physical examination of the goiter. Goiters should be evaluated to assess whether they are so large that they are obstructive and impinge on the trachea. The reason for the goiter should also be determined; some multi-nodular goiters are cancerous. The TSH ordered by the dentist was reviewed by a doctor and was elevated, indicating hypothyroidism. A doctor ordered Synthroid but did not document a discussion of this medication with the patient, did not perform an evaluation of the etiology of the goiter, did not evaluate for obstruction, and did not appear to see the patient.

About two months after the dentist referred the patient, a doctor apparently saw the patient on 12/15/15. The doctor did not take a history of the patient's condition or perform a physical examination, so it was not clear from the note whether the doctor evaluated the patient in person. Goiters may be caused by a variety of conditions or may

---

[105] Patient #5 Specialty Consultations and Hospitalization.

be large and cause obstruction of the trachea. The doctor failed to evaluate for the cause of the goiter, did not evaluate for obstruction, and merely noted that the patient was not taking the Synthroid. The doctor did not document a discussion with the patient about why the Synthroid was necessary. The doctor did not document a diagnosis. The doctor was treating the elevated TSH without establishing a diagnosis. The doctor was a surgeon and may not have understood how to properly evaluate a goiter. The patient, therefore, should have been referred to an endocrinologist.

The TSH remained elevated. On 1/21/16, a physician saw the patient. Again, there was no history or physical examination. The doctor noted that the rheumatoid factor test was elevated (348) and that the Synthroid was recently increased. No action was taken with respect to the elevated rheumatoid factor. A year earlier the patient had complained to a nurse about multiple joint pains, but this had not resulted in a physician evaluation of the joint pains. Also, no evaluation was initiated to evaluate the cause of the goiter. It appeared that the doctor did not know how to evaluate the patient's conditions and the patient should have been referred to someone who knew how to manage these problems.

Two months later, on 3/15/16, without explanation, the doctor referred the patient for an ultrasound of the thyroid gland. This test was an appropriate test for the goiter but should have been ordered four months earlier, when the goiter was first identified. The doctor's only history was that the patient still had polyarticular pain. The doctor, knowing that the rheumatoid factor was significantly elevated, took no other history of the joint pains and performed no examination of the patient's joints. The doctor took no history of symptoms of obstruction of the trachea and performed no examination of the goiter. The only actions taken were to refer for an ultrasound, to order a TSH, and to increase the Synthroid. The doctor did not appear to know how to manage this patient's polyarticular arthritis or goiter.

On 5/20/16, an ultrasound of the goiter showed an enlarged thyroid gland with multiple nodules. Multinodular goiter can be caused by multiple different conditions, which had yet to be determined.

On 5/25/16, a doctor saw the patient for joint pains and ordered x-rays of the elbows and wrists. Another rheumatoid factor test was ordered and was again elevated.

On 6/13/16, a different doctor noted the positive rheumatoid factor and that the patient had an enlarged thyroid gland with multiple nodules. This doctor, who was an internist, referred the patient back to the primary doctor, who was a surgeon, to consider referral for a thyroid nuclear scan. A thyroid nuclear scan would be indicated if the patient was hyperthyroid, but this patient was hypothyroid. A thyroid scan would not typically be recommended. What was necessary was to determine the cause of the multinodular goiter and to determine if the goiter was causing obstruction.

On 6/16/16, a doctor saw the patient and noted painful wrists, but did not document a thorough examination of the joints.

On 7/7/16, a doctor saw the patient and noted that the patient had multinodular goiter and that the TSH was still elevated, and increased the Synthroid. The doctor initiated no further evaluation to determine the cause of the multinodular goiter. The doctor did not evaluate the size of the goiter and did not determine if it was causing obstructive symptoms. The doctor did finally refer the patient to a rheumatologist.

A rheumatologist saw the patient on 12/16/16. The rheumatologist diagnosed likely rheumatoid arthritis and recommended a tapering steroid dose. He requested hepatitis tests and, if negative, would start methotrexate. A six to eight week follow up was recommended.

A nurse practitioner saw the patient on 12/16/16, the day of the rheumatology consultation. The patient had not been evaluated at MCC for his arthritis or goiter since July. Apparently, he was not enrolled in chronic clinics for these conditions. The nurse practitioner noted that the rheumatologist had recommended a tapering steroid dose for the arthritis and that a surgery consultation was also recommended. The reason for the surgery consultation was not stated. The nurse practitioner did not document review of the rheumatology note; apparently this had not yet been provided. A doctor saw the patient post-rheumatology visit on 12/22/16, but did not document review of the consultation except to note that the patient was on a tapering steroid dose. The doctor took no history, performed no physical examination, and did not make any assessment of any of the patient's conditions.

Although the rheumatologist recommended a six to eight week follow up, the patient did not return to the rheumatologist until 3/28/17, over three months later. A report of this visit was in the medical record. The rheumatologist diagnosed seropositive erosive rheumatoid arthritis and recommended methotrexate titrated up to a dose of 20 mg weekly. He recommended monthly CBC and CMP to monitor for methotrexate toxicity and a six to eight week follow up.

There was no follow up by an MCC physician after the rheumatology visit. Rheumatoid arthritis was not added as a problem and was not being followed in chronic illness clinic. A CBC and CMP were done on 4/6/17, but monthly follow-up tests were not documented as reviewed by physicians.

The follow up with the rheumatologist occurred in about three months, on 6/16/17, later than recommended. The rheumatologist noted that the requested CBC and CMP tests were unavailable and that requested x-rays of the hands and a TB skin test result were also not sent as requested. The rheumatologist tried to contact the MCC Medical Director but could not contact him. The rheumatologist added sulfasalazine and was considering adding hydroxychloroquine for the arthritis, but wanted an ophthalmology evaluation

before adding hydroxychloroquine. The consultant recommended a CBC, CMP every 30 days along with ESR and CRP tests, an ophthalmology evaluation, and return in six to eight weeks.

The patient was not evaluated by a physician post-rheumatology consultation. On 8/24/17, more than two months after the rheumatology visit, a doctor documented that the patient was recently seen by a rheumatologist and that the patient was on methotrexate and folate. There was no history, physical examination, or update on the patient's status. The doctor did not document review of the rheumatology note and appeared unaware that the rheumatologist had recommended sulfasalazine. There was no evidence in the medical record or on the specialty tracking log that an ophthalmology referral was made. The doctor did not document review of the CBC and CMP for methotrexate toxicity.

On 9/22/17, a doctor documented that the patient had seen a rheumatologist but that there was no report. The tracking log documented that the patient was seen by a rheumatologist on 9/22/17, but there was no report in the medical record and no evidence in the medical record that an appointment had occurred. The doctor at MCC did document prescribing sulfasalazine on 9/22/17. There was no history, physical examination, or updates on the status of the patient's conditions. The multinodular goiter was not addressed. The patient was not monitored with CBC or CMP for methotrexate toxicity and neither the multinodular goiter nor rheumatoid arthritis were not being followed in chronic clinics. Since there was no report, it was not clear if a follow up rheumatology consultation was recommended.

The patient was not seen again for these problems by a physician until 12/30/17, when a coverage doctor saw the patient. There was no history or physical examination. The rheumatology note was still not present. The doctor wrote, "Pt wants [treatment] for Crohn's prescribed by consultant." The doctor prescribed sulfasalazine. The sulfasalazine had expired without notice. Also, the doctor presumed that the patient was taking the sulfasalazine for Crohn's disease, when he was taking it for rheumatoid arthritis. The doctor took no history, performed no physical examination, did not review the rheumatology report, did not monitor the patient for methotrexate toxicity, did not document or understand the therapeutic plan for the patient, and did not even know what conditions the patient had. There was a complete absence of management or monitoring of this patient's serious medical conditions.

There were multiple problems with the care of this patient. The goiter was not appropriately evaluated, and a diagnosis was not made as to the etiology of the goiter. There was no evidence of a history or physical examination determining whether or not there were obstructive symptoms. Physicians did not document whether the ultrasound indicated that a biopsy was needed. Because the physicians appeared unable to appropriately evaluate this condition, the patient should have been referred to an endocrinologist. Also, the patient had long-standing pain in multiple joints. The patient

never had an adequate evaluation for this condition at MCC over two years. The patient was sent to a rheumatologist but return appointments were late. Recommended testing was not done or not provided to the rheumatologist. A recommendation by the rheumatologist for ophthalmology evaluation was unnoticed or ignored by MCC physicians. Consulting reports were not all available, and doctors and MCC did not document knowledge of the status of the patient's condition. Recommended medication was not timely prescribed. One doctor appeared unaware of the patient's actual diagnosis. Doctors appeared unaware of the treatment plan of the rheumatologist and were not monitoring the patient as recommended. The patient's rheumatoid arthritis and goiter were not identified as problems and were not being monitored in chronic illness clinic. The doctors at MCC did not appear to know how to manage the rheumatoid arthritis. Even though the patient was sent to a rheumatologist, the follow up was non-existent and placed the patient at risk of harm.

- Another patient was incarcerated on 3/3/17 at MCC.[106] The patient had a history of hepatitis C. The platelets were not initially done, but by 7/18/17 the platelets were 147 and AST was 141, which yielded an APRI score of 2.4, indicating likely cirrhosis. The patient was released on parole and re-incarcerated on 5/4/18. Despite having likely cirrhosis on APRI in March of 2017, the patient did not have an evaluation for cirrhosis, did not receive an upper endoscopy to screen for varices, and did not receive semi-annual ultrasound tests to screen for hepatocellular carcinoma. Patients in IDOC are not typically screened for cirrhosis, do not typically receive endoscopy when they have likely cirrhosis, and do not consistently receive screening for hepatocellular carcinoma. We have seen this repeatedly in IDOC. We note that the IDOC hepatitis C guidelines require a fibroscan for patients with an elevated APRI. This was not done for this patient. A fibroscan would have provided additional information as to whether the patient had cirrhosis.

- Another patient had an APRI score of 1.14 from at least 5/1/17, yet a year later, as of 5/16/18, the patient was still not referred to UIC for treatment of his hepatitis C.[107] The patient was evaluated in hepatitis C clinic twice. Yet when seen in this clinic, there was no evaluation for cirrhosis, no endoscopy to screen for varices, and no ultrasound to screen for hepatocellular carcinoma. This is significant underutilization that places the patient at risk of harm. We discuss deficiencies in hepatitis C care in the Chronic Care section of this report.

## Infirmary Care

**Methodology:** The clinic space and equipment in the infirmary was inspected, nursing staff were questioned, clinical charts audited, nurse logs reviewed, porters questioned, and patient-inmates interviewed. The infirmary physician was not interviewed.

---

[106] Patient #11 Specialty Consultations and Hospitalizations.
[107] Patient #10 Specialty Consultations and Hospitalizations.

**First Court Expert Findings**

The First Court Expert noted that the infirmary was staffed 24 hours a day and seven days per week with RN's. The infirmary patient rooms were padlocked and did not have nurse call devices. He commented that padlocked rooms created a serious barrier to the expedited evacuation of patient-inmates in the case of fire or other emergencies. The First Court Expert reported that the porters had not been trained about blood borne pathogens, infectious and communicable diseases, body fluid cleanups, the proper sanitation of the patient-inmate areas, and the confidentiality of patient information. Only four of the 26 infirmary beds were hospital beds and only one of these four hospital beds had functional safety rails. The infirmary bed linen was torn and ragged. The First Court Expert also noted that the infirmary linens were being cleaned in a residential level washing machine that did not achieve the temperature required to sanitize contaminated linen.

**Current Findings**

With the exception of the finding that the porters now had received documented training and the linens were generally good condition, we agree with the findings of the First Court Expert and we identified the following additional findings:

- Nearly half of the patient-inmates were permanently assigned to the infirmary.
- Two of the patients primarily require skilled nursing care that the infirmary is neither staffed nor equipped to provide.
- Provider admission and progress notes met the frequency and timeliness standards established by the IDOC.
- Admission RN notes are written in accord with the established timelines. Nurse notes are written daily and provide useful information on the clinical status of a patient.
- The quality of provider notes was inconsistent and failed to reflect key components of the patients' histories, physical findings, and the treatment plan.
- Provider admission and progress notes were brief and contained limited clinical information or rationale for treatment plans.
- The infirmary provider does not write intermittent comprehensive progress notes that summarize and update the patient's current condition and treatment plan.
- Only three of the 26 infirmary beds were hospital beds with adjustable heights and head and leg sections. In spite of the high level of physical and mental impairment of the patients housed on the infirmary, there were an insufficient number of adjustable hospital beds in the infirmary. The low level fixed metal beds make it difficult to examine and transfer patients. This is a barrier to the delivery of needed care and put the staff at risk for injuries.
- There is no exam room in the infirmary.
- None of the infirmary patient rooms have nurse call devices.
- The padlocked patient room doors are an obvious barrier to the infirmary's ability to safely evacuate patient-inmates in emergency situations.
- The level of nursing staffing, the type and quality of the beds, and the diligence of the infirmary provider are not adequate to provide the level of care needed by patients who require skilled nursing services and monitoring of complicated conditions.

The infirmary is located on the third floor of the health care unit. The infirmary has 26 beds; the census was six on the day of the inspection. The physical plant and layout is unchanged since the First Court Expert's report. Nurses reported that the provider generally makes rounds once a week and that most patients have a weekly provider note. A review of the charts revealed that nurse admission notes and vital signs were recorded on the day of admission. This is in accord with IDOC policy 04.03.120.[108] In-depth review of four infirmary records verified that all four had provider admission notes written within 48 hours of admission and, with one exception, there were at least weekly provider progress notes. Nursing notes were consistently entered no less than daily and commonly on every shift.

It was reported that an RN is assigned to the infirmary on all shifts seven days a week and that there are generally two nursing personnel on each shift. Patients who need additional assistance with activities of daily living (ADL) may have an inmate assistant who is assigned to a bed in the same room as the patient. At the time of the inspection, one of the six patients had a live-in inmate assistant. Three porters also live in a separate room in infirmary.

Three of the individuals in the infirmary were designated or soon to be designated as requiring assistance with some activities of daily living. Included in this non-independent group were two individuals with metastatic cancer, one of whom refused all further treatment and had signed a Do Not Resuscitate form (DNR). Another individual has severe spinal arthritis; the risk for fall was so high that his mattress was placed on the floor. This individual should have been assigned to the hospital bed that had functional safety railings.

None of the infirmary rooms had nurse call devices. The HCUA is aware of this problem and is working to purchase the same type of nurse call device that has been installed at LCC. None of the patient rooms at MCC's infirmary was in the direct line of sight from the nurse station or the correctional officer desk. Since the infirmary rooms are padlocked, patients stated that they would have to bang on their padlocked door and yell if they had an urgent condition. The condition of at least two of the patients precludes their capability to stand up, walk to the door, and bang for assistance. As noted during the First Court Expert's report, the patient rooms continue to be padlocked at all hours; this creates a significant safety risk if the floor needs to be evacuated during a fire.

A number of concerns and deficiencies in the care provided to infirmary patients was noted. We describe these concerns and deficiencies below.

- A 63-year-old patient's problem list failed to note that this patient had a stroke, deep vein thrombosis on chronic anti-coagulation medication, an inferior vena cava filter, and urinary incontinence.[109] This creates a barrier to the delivery of continuous care to this very complicated patient. The infirmary provider notes were generally extremely brief,

---

[108]Reference Offender Infirmary Services.
[109] Infirmary Patient #1.

with "no change" being the entire note. Providers did not write an intermittent comprehensive provider note that addressed all of the patient's clinical conditions with the current treatment plan. There were no formal consultant reports from the interventional radiologist in the medical record. There was a seven-month period of time during which the patient's anticoagulation level was subtherapeutic on five of seven (71%) lab tests before the provider finally increased the dosage of warfarin. The patient had an expressive aphasia that interfered with his ability to communicate, yet there was no documentation in the chart that he had ever received speech therapy or if the aphasia had worsened or improved. This patient with documented stroke and hypertension was at risk for a recurrent cerebrovascular accident (stroke) and a myocardial infarction, yet had not been prescribed a high-intensity statin. This is not in accord with national and IDOC guidelines.[110] The patient had a ASCVD risk of >15% which warranted therapy.

- Prior to his recent return from the hospital and admission to the infirmary, another patient, a 58-year-old with hyperlipidemia on a moderate intensity statin, was seen three times in nurse sick calls during the month of March 2018 for mid-abdominal and chest pain and pressure, neck and shoulder pain with vomiting, and for EKG review.[111] An EKG with new ST elevation was inaccurately interpreted as having no changes from an EKG in 2017. There is no documentation that the provider compared these two EKGs. The only notes were written by nurses. The patient saw the provider on 3/30/18 with exercise-related shortness of breath and chest discomfort; he was sent to the hospital, where he underwent a coronary artery bypass after being diagnosed with a heart attack. He was returned to MCC with a LifeVest due to increased risk of ventricular arrhythmia resulting from decreased LVEF (24%) and ischemic cardiomyopathy. Based on his symptoms and his abnormal EKG, he should have hospitalized at least 12-24 days prior to his heart attack. His pre-heart attack ASCVD risk score was elevated (>7.5%) but the MCC clinical team did not calculate this risk and did not prescribe a high-intensity statin. He was seen twice by the infirmary provider during the first week, but then was not seen for next 21 days. This high-risk patient (post-op, congestive heart failure, high-risk for ventricular arrhythmia) should be followed and monitored more closely by the infirmary provider. To date, MCC providers have failed to screen this over 50-year-old patient for colon cancer[112] and to vaccinate this patient against pneumococcal 23 as indicated by national adult immunization standards.[113]

- A 48-year-old patient with an abdominal cancer that has progressed while on treatment is being followed by medical oncology, radiation oncology, and urology specialists.[114] He had been in the infirmary for over a year. Although the chart had weekly provider notes, these notes are extremely brief and contain very little clinical information about the

---

[110] Office of Health Services, Treatment Guidelines, Hyperlipidemia, March 2016, and ACC/AHA Arteriosclerosis Cardiovascular Risk Estimator.
[111] Infirmary Patient #2.
[112] USPSTF Colon Cancer Screening 2016.
[113] CDC 2018 Vaccines for Adults.
[114] Infirmary Patient #3.

patient's status and treatment. There were no intermittent comprehensive progress notes that summarize the current status and treatment plan for this complicated patient. Reading only the provider notes, it was difficult to follow the care that is being provided to this complicated cancer patient. If another provider had to assume responsibility for the care of the infirmary patients, it would extremely difficult to comprehend the status of this patient's cancer and the plan of treatment. This puts the health of the patient at risk for errors. There is also no documentation that the patient has received pneumococcal 13 and 23 vaccinations.[115]

- The next patient is a 79-year-old with metastatic prostate cancer on heavy analgesia who was intermittently confused and had difficulty ambulating, who suffered a torn urethral meatus that was reported to have occurred when the patient (or another person) stepped on the tubing of the catheter that was dangling and laid on the floor.[116] This could have been prevented with proper nursing management of the tube and bag. This patient is dying; there is no documentation that he has been considered for compassionate release from the IDOC. There is no documentation that this patient had ever been previously screened for colon cancer[117] during times prior to his metastatic cancer or administered the age recommended pneumococcal vaccines.[118] The patient has never been treated for hepatitis C, but based on his current condition, he is not a candidate for treatment.

With the exception of the previous recommendations that have been addressed, we agree with the recommendations of the First Court Expert and have additional recommendations that are found at the end of the report.

## Pharmacy/Medication Administration

**Methodology:** We reviewed medication services by touring the medication room with the Nursing Supervisor (IDOC) and interviewed four of five nurses preparing medication for delivery the afternoon of Wednesday, May 23, 2018. They were documenting medication as having been given as it was prepared and put into envelopes or pill cups to be administered later. We observed the count of controlled substances in the trauma area between shifts on Monday May 21, 2018. We also observed a nurse count out controlled substances to administer that evening. We also toured the medication storage area and interviewed one of the pharmacy assistants. Medication administration was not observed. We reviewed medication administration records and corresponding medical records of 11 patients selected from lists of patients on medications that cannot be missed.

### First Court Expert Findings
The system used, and policies and practices described in the previous Court Expert's report, are mostly unchanged today. Medications are provided by BosWell, a subcontractor to Wexford,

---

[115] CDC 2018 Vaccines for Adults.
[116] Infirmary Patient #4.
[117] USPSTF Colon Cancer Screening 2016.
[118] CDC 2018 Vaccines for Adults.

using a "fax and fill" system. Pharmacy assistants are responsible for sending orders and requisitions for stock medication to be dispensed by BosWell. These same personnel receive shipments and verify medications received against those ordered. Once this is completed, the medications are moved to the medication room where they are prepared by nurses for administration. Medications are administered by nursing staff at the cell door. Documentation of medication administered, refused, or not available is done on a paper Medication Administration Record (MAR) that is kept in binders in the medication room for the current month and filed in the medical record the month after.[119]

**Current Findings**

Medication administration at MCC is problematic and relies on outdated practices that are no longer considered safe from patient harm. These problem areas include:

- Handwritten orders and transcription of orders to the MAR
- Late transcription of orders
- Pre-pouring medication, including medications that are crushed and floated
- Use of unsanitary envelopes to administer medications
- Not having the MAR available during medication administration
- Not documenting administration of medication at the time it is given.

Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed. Prescription end dates do not coincide with chronic clinic appointments and require patients to request renewals via sick call.[120]

In addition, we found that medication errors are not identified and/or not reported. One of the charts reviewed was a patient who had been hospitalized for several days and yet the MAR documents that nurses at MCC administered medication to him.[121] This is a significant documentation error that was not recognized or reported. Also, there is no accountability for the medications that were prepared but not administered to this patient.

In 23 months of CQI minutes provided for review, medication errors were reported only in four of those months.[122] Only once was there an attempt to categorize the types of errors reported. Pharmacy inspection reports are also not discussed at CQI meetings. There was no discussion or analysis to determine root causes of medication errors or trending to identify problems with the system to provide medications, or improve patient safety. Persistent problems with medication practices are not subject to corrective action or systematic quality improvement.

Medication errors have long been recognized as a substantial area of focus in improving the safety of patient care.[123] Handwritten orders and transcription have been eliminated in many correctional health care programs because of error and inefficiency. An obvious solution is to

---

[119] Lippert Report Menard pp. 21-22.
[120] Pharmacy/Medication Administration Patients #8-11.
[121] Patient #2 Specialty Consultation and Hospitalization
[122] MCC CQI agenda and minutes June 2016 – April 2018.
[123] Institute of Medicine (2000), To Err is Human: Building a Safer Health System. Washington DC: The Academies Press.

install computerized provider order entry (CPOE). This eliminates transcription by hand. Labels generated from the computerized order after it has been reviewed by a pharmacist are affixed to the MAR.[124] Automated dispensing cabinets are also being used more often now to record the withdrawal of controlled substances and eliminate manual inventory control systems like that implemented at DCC because of non-compliance on the audit at DCC. Upgrading pharmacy services in this way requires capital expenditure and would only likely happen as a statewide decision made by IDOC. But if these pervasive problems are not identified, discussed, studied, or reported at the facility level, IDOC is without notice that there is a systemic issue that must be addressed statewide.

Orders and Delivery of Medication

Medications are obtained from BosWell Pharmacy Services, via subcontract with Wexford. Prescriptions are faxed to BosWell and filled in 30-day "blister packs," and then delivered to MCC. A pharmacy assistant receives and inventories the medications in the medication storage area and then puts them into the room nurses use to prepare medication to give to patients. The pharmacy assistant we interviewed reported that prescriptions faxed to BosWell generally are received the next day. Delays in receiving medications were because the order needed clarification, a drug-drug interaction had to be addressed, or they required higher level approval (nonformulary). If medications are urgently needed, they can be obtained from a local pharmacy. The pharmacy technician stated that there is communication with the hospital before patients are discharged and if they are on medications that are not on formulary or will require time to obtain, the Medical Director will ask the hospital to keep the patient until the medication can be obtained from BosWell. Rarely is the back-up community pharmacy used.

We toured the medication storage room where the pharmacy assistants send and receive medication supply and the medication room where the nurses prepare medication for administration. These rooms were clean, uncluttered, well lighted, and kept secure. There is a refrigerator with a thermometer and temperature log that was up to date. All other refrigerators used to store medications had thermometers and documentation of daily temperature checks. Of the logs inspected, temperatures were within the correct range. No outdated medication was found in the medication storage or preparation rooms. On Monday May 21, 2018, we observed the count of controlled substances and instruments between day and evening shift, and verified that it was accurate.

Medication orders in the charts reviewed were complete and there was an accompanying progress note that indicated the reason for the order. Transcription of the order by a nurse to the MAR was delayed in two of the charts reviewed (82%); therefore, the delivery of either antiviral or anticoagulation medication to the patient was delayed. We also noted that one of the charts reviewed for sick call had an order that was not transcribed for five days after the patient was seen by the provider for constipation.[125] We also found an instance of a nurse who wrote

---

[124] Patient Safety Network. (2017) Medication Errors, Agency for Healthcare Research and Quality available at https://psnet.ahrq.gov/primers/primer/23/medication-errors.
[125] Pharmacy/Medication Administration Patient #1, 4 and Sick Call Patient #14.

the date of the new order over the old order, rather than writing the new order on a new line on the MAR.[126] This is an alteration of the record and should be prohibited.

When the medication arrives from BosWell, a pharmacy assistant verifies the medication received against the order, which serves to identify dispensing errors. Once verified, the medication is put in the nurses' medication work room into boxes designated by the housing location of the inmate.

Medication Administration

The morning medication pass is scheduled to take place between 3:00 a.m. and 5:00 a.m. and the evening medications are administered between 6:00 p.m. and 8:00 p.m.[127] Nurses pre-pour all medications administered to patients at MCC. We observed the preparation of medications, which is done in a large room in the health care unit that contains shelves with boxes for patients in each housing unit and three ring binders of MARs for the current month. Pre-pouring entails looking at the MAR, selecting the right medication for the patient, popping the pill out of the blister pack, and putting it into an envelope labeled with the patient's name and medication. The envelopes are re-used for the same patient.

We also observed a nurse prepare controlled substances for administration. Controlled substances are stored in a double locked cabinet in the trauma room. A list of inmates with orders for controlled substances is used to guide the nurse in removing individual doses for each inmate on the list. Once removed from the blister card and signed out on the controlled substances log, the medication is put into a collective cup. The nurse takes the cup to the medication room. The nurse then selects the correct medication for each patient from the collective medications in the cup and puts it into the envelope for the individual patient.

Once all the medications the patient is scheduled to receive are in the envelope, it is placed in a tray and into a bag that the nurse transports to the housing unit. If it is a medication that must be crushed, the nurse will crush it in advance as part of the pre-pour. We also observed a nurse prepare a medication that was crushed and then floated in liquid. This is kept in a medicine cup with a lid until it is delivered to the patient sometime in the next several hours.

We interviewed a nurse preparing medications in the medication room. She requests that the patient provide identification only when she does not recognize or know the inmate. We also asked what happened when a pill fell onto the floor when being given to a patient. She said that the patient can choose to pick it up and take it or give it to her and she will waste it. She did not offer to obtain another pill to replace the one that was wasted. This is consistent with what one of the chronic care patients complained about during our visit.[128]

---

[126] Pharmacy/Medication Administration Patient #3.
[127] Email communication dated May 17, 2018 from Nicholas Staley, AAG to Michael Puisis.
[128] Pharmacy/Medication Administration Patient #11.

Documentation that medication was given takes place at the time it is prepared rather than at the time it is given to the patient. If a patient refuses the medication or is not on the unit, the nurse will circle their initial on the MAR to indicate that the medication was not given after returning to the medication room in the clinic. Only 9% of the MARs selected for review were complete.[129] Documentation of doses given, refused, or not available was missing from 10 of 11 charts reviewed. This is extremely poor performance and calls into question the accuracy of the MARs.

Contemporaneous charting on the MAR at the time of administration is considered the nursing standard of practice. MCC does not meet this standard of professional practice.

None of the MARs reviewed contained the signatures and initials of nurses who administered medication. This practice violates MCC's own policy and procedure and demonstrates lack of supervision and oversight failure.[130] We asked the HCUA if a signature sheet was maintained and were told that at one time a signature sheet was kept but that it was not up to date. Therefore, it was not possible to identify any of the nurses who administered medication in the health record of a patient.

Problems with medication administration practices at MCC are:
- Pre-pouring defeats the purpose of patient specific packaging. As soon as the medication is taken out of the blister pack, verification that it is the correct medication, for the right patient, at the right time and the right dose is not possible. This is a patient safety risk and unnecessarily exposes the patient to errors in administration (receiving the wrong drug). It is also a wasteful use of the cost of blister packaging.
- Reuse of individual envelopes to hold medication is unsanitary.
- Use of a list rather than the MAR to select controlled substances for administration increases risk of medication error.
- Combining controlled substances for multiple patients into a single container and then selecting the right medication, in the right dose for the right patient by sight is an extremely risky practice and exposes patients to unnecessary harm from medication error.
- Crushing and floating medication in advance of administration is time consuming, but also dangerous because it changes the nature of the drug and can cause problems with absorption or irritation of the GI tract. The medication should instead be provided in another form (liquid or injectable).
- Two-part identification is not used to identify inmates before administration, greatly increasing the risk of giving the wrong medication to the wrong patient.
- When medication is dropped during administration, patients are not given replacement medication. It is cruel for nurses to make a patient choose between missing a dose or ingesting medication that has been dropped and unsanitary.

---

[129] The only MAR that was complete was Pharmacy/Medication Administration Patient #3.
[130] V4-1. Pharmacy Services p. 5.

- Nurses do not have a way to verify medication that is not taken. Visual identification of medication remaining after administration is not accurate.
- Medication is not documented at the time it is given. This practice is a source of errors and numerous omissions in documentation of patient care.

<u>Renewal of Chronic Disease Medications</u>

Chronic disease medications are provided to patients monthly either as "Keep on Person" (KOP) or each dose is administered by a nurse. The scheduled appointments for chronic disease clinic do not coincide with the end date on medications ordered for chronic disease.[131] Providers often order medications for patients with chronic conditions without seeing the patient.[132]

MCC's policy on provider visits is that the MAR is available with the medical record at the time of a provider visit.[133] We saw no evidence that current MARs were available at the time a patient saw a provider. If filing is up to date, the MAR from the previous month will be in the chart for the provider to review. However, MCC's policy and procedure on care of patients with chronic conditions makes no suggestion that the MAR be reviewed to evaluate patient adherence to prescribed treatment.[134] Further, MCC's policy is that if an inmate refuses medication twice in two days they are referred to a provider for evaluation and possible change in treatment.[135] There were multiple examples of patients not taking medication as prescribed in the charts we reviewed which were not referred for provider evaluation. The record review also identified several patients prescribed medication that required continuity who had lapses in their care.[136] Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed.

In summary, medication services at MCC do not meet the standard of practice, they employ outdated methods that compromise patient safety, and are not reviewed and analyzed to make improvements that prevent human error and harm to patients.


## Infection Control

**Methodology:** We interviewed the nursing supervisor responsible for infection control, reviewed the infection control procedures, CQI Minutes, tracking logs, and other documents related to communicable diseases and infection control. Infirmary porter training agenda and training materials were reviewed. We also reviewed the charts of patients treated for tuberculosis infection (two), HIV disease (three), and skin infection (two).


**First Court Expert Findings**

---

[131] Pharmacy/Medication Administration Patients #1,9.
[132] Pharmacy/ Medication Administration Patients #9, Sick Call Patients #1, 3, 8, 12.
[133] V3-11 Assisting Physician Call Lines page 1.
[134] V3-12 Medical Management of Offenders with Chronic Conditions.
[135] V4-1. Pharmacy Services p. 5.
[136] Pharmacy/Medication Administration Patients #6, #9; Sick Call Patient #1.

The First Court Appointed Expert Report found that MCC had a named infection control nurse (IC-RN). This individual was responsible for reporting infection to the Illinois Department of Public Health. The facility also had an aggressive program to monitor and treat skin infections. Monthly safety and sanitation infections were conducted by the IC-RN, as well as food handler screening, tuberculosis monitoring, and hepatitis vaccination for staff and inmate workers. The IC-RN also supervised the inmate peer education program.

Tours of the health care areas at the prison verified the availability of personal protective equipment (PPE). Puncture proof containers were available for disposal of needles, syringes, and other sharps in all areas where patient care took place. Problems identified with the infection control program were that there were no alarms on the negative air pressure rooms to indicate loss of pressure, porters had received no training and the water temperature used in the washing machine in the infirmary was too low to sanitize soiled linens, impervious vinyl on exam stools, tables and infirmary mattresses was torn or cracked, a paper barrier was not used between patients on the exam table, and there was no policy to clean the table between patients. Finally, one of the sick call rooms did not have a sink for handwashing.[137]

### Current Findings

MCC continues to dedicate one FTE to infection control. One of the Nursing Supervisors is responsible for infection control. Her responsibilities include all those described by the First Court Appointed Expert. In addition, she manages the HIV and HCV clinics. She was very knowledgeable of the facility's policies and procedures for infection control.

The IC-RN also tabulates the monthly infection control report that is reviewed at the CQI meeting. This report lists the number of patients placed in isolation, status of the negative pressure room, occupational exposures to blood borne pathogens, cases reportable to Public Health, skin infections treated, patients screened for, monitored, and treated for HIV and HCV, and results of tuberculosis skin testing. Review of CQI minutes from June 2016 through April 2018 reflect minimal analysis of the data reported. We also found an instance of incorrect data reporting on the monthly infection control report. This was a patient we reviewed who was positive on the annual tuberculin skin test (PPD) given in October 2017.[138] He should have been reported as a converter, since there were three prior PPDs that were documented as 0 millimeters, which is considered negative.[139] Neither the October 2017 or November 2017 infection control reports identify any TB converters.

The IDOC Infection Control Manual was reviewed. It was last updated in 2012. While the material in the manual is thoughtful and many resources are provided, some of them are out of date. The manual should be updated at least every two years. The IDOC Nursing Treatment Protocols, revised March 2017, were reviewed and provide guidance to nurses in the care of common

---

[137] Lippert Report Menard pp. 28-29.
[138] Infection Control Patient #4.
[139] Persons who have a previous negative skin test that becomes positive are labeled TB convertors. These are red-flag type infection control issues as they mean that the incarcerated person has acquired TB within the prison. These need to be tracked and investigated.

infectious diseases and infections such as scabies, urinary infection, rash, pediculosis, chicken pox, and skin infections. In addition, the Menard Health Services Policies and Procedures provide detailed instructions for infection control, sanitation, and patient education material for several common communicable diseases (syphilis, herpes, HIV, tuberculosis infection, etc.). The Health Services Policies and Procedures were last reviewed in 2015 and need to be brought up to date.

Puncture proof containers were available for disposal of needles, syringes, and other sharps in all areas where patient care took place. Menard Health Services Policies and Procedures include detailed instructions for sanitation in the health care areas.[140] Paper was present on all the exam tables and there were sinks in all but one exam room. Hand sanitizer containers were in all patient care areas, but two were empty.[141] Two of the infirmary porters were interviewed and the records of these two and one other infirmary porter were reviewed.[142] The porters were knowledgeable about their duties and stated that they had received formal training about their duties. Their records revealed that all three had received training in 2017 or 2018. All three had completed or initiated hepatitis B (and A for two) vaccination series. The infection control nurse manager provided copies of their training curriculum.

As noted by the First Court Expert, the infirmary washing machine does not attain a high enough temperature to adequately sanitize body fluid-contaminated linens. The infirmary has attempted to address this deficiency by directing the porters to place bleach in all loads of linens being washed and having a practice to separately bag and send obviously contaminated patient linen to the facility's industrial level laundry. This does not fully address the sanitation level required to fully sanitize all patient linen for this high-risk patient population, who have bladder catheters and issues with fecal and urine continence. We did not find among the Menard Health Services any policy and procedure for laundering patient linens in the infirmary. There are policies and procedures to clean, but nothing was found on laundry. We recommended to the HCUA that testing the water temperature be done periodically and that a booster on the hot water inlet could be used to increase temperature.

The IC-RN conducts Safety and Sanitation rounds monthly. The results of these inspections are reported to the CQI committee monthly. We reviewed these reports and note that action taken to correct identified problems is slow.[143] We suggested revisions to the items looked for during Safety and Sanitation rounds to incorporate items we were looking for during our site visit (vents, chipped paint, paper posted on walls, torn upholstery, working examination equipment, availability of hand wash, etc.).

---

[140] V4-64 through V4-69.
[141] North 1 Lower, South Lower.
[142] Infirmary patients #5, 6, 7.
[143]



Menard Safety and
Sanitation Inspection

PTX193-0451

Tuberculosis screening is completed annually. We did not evaluate actual performance of TB screening. We reviewed the charts of two patients who completed prophylaxis.

- In one case, at intake at NRC on 3/25/2018, the patient had a PPD of 10 millimeters, which is considered positive for tuberculosis infection.[144] The chest radiograph done on 3/26/2018 was normal. The health appraisal done at NRC on 4/6/2018 does not comment or elaborate on the patient's tuberculosis screening results and it is not noted on transfer screening. The screening results should have been documented on both the health appraisal and transfer summary. When the patient was received at MCC on 4/11/2018, tuberculosis screening was done again with a 12-millimeter induration and a second chest radiograph was done. He was seen promptly by the IC-RN and started on prophylaxis. He was also screened for HIV and syphilis. He had baseline labs done and has received medication as ordered. The secondary screening done when he transferred to MCC was unnecessary and could have been avoided if the results of screening at NRC had been apparent at the time of transfer.

- The other chart reviewed was the patient who was a tuberculosis test converter which was discussed earlier.[145] We suggested that the IC-RN consider calculating the rate of new conversions at MCC to assess risk on an annual or biannual basis per the CDC recommendations for prevention and control of tuberculosis in correctional facilities.[146]

Inmates may request HIV testing at any time and it is also offered to inmates just before release from incarceration. See the comments and suggestion regarding HIV opt-out testing made in the earlier section of this report on Medical Reception and Intrasystem Transfer. Inmates who are infected with HIV are managed by UIC. Three charts of patients seen by the UIC HIV clinic were reviewed. In all three records reviewed, medication was initiated timely and each patient was seen at scheduled intervals with labs done in advance. One patient did not receive medication daily as prescribed and there is no documentation on the MAR as to the reason.[147] See comments about incomplete charting of medication administration in the section of this report on Pharmacy and Medication Administration.

- Another patient was seen in the HIV clinic on 11/17/2017 and the specialist recommended that his dose of Metformin be reduced below 500 mg. because of an interaction with one of the HIV medications.[148] His primary care providers at MCC did not act on this recommendation. When the patient was next seen by the HIV specialist on 4/10/2018, he was still on the same dose of Metformin. This time the HIV provider noted the drug interaction and wrote the order to reduce the dose of Metformin. The patient went for five months taking Metformin at a dose that was contraindicated. The HIV specialist reduced the dose when his primary care provider failed to act on the

---

[144] Infection Control Patient #5.
[145] Infection Control Patient #4.
[146] https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5509a1.htm.
[147] Infection Control Patient #1.
[148] Infection Control Patient #3.

PTX193-0452

recommendation. This is an example of uncoordinated and contradictory care of a patient with multiple chronic conditions.

We also reviewed the charts of two patients with skin infection.

- The first was seen in nurse sick call for a complaint of having a boil for about a week.[149] The nursing documentation does not indicate what the nurse's action were to treat the complaint, but there is documentation by a nurse practitioner later that day. The nurse practitioner ordered an antibiotic (Bactrim) for 10 days. He saw the nurse practitioner 15 days later, who documented that the patient did not take the Bactrim because he did not know what it was. This patient's treatment was delayed because he misunderstood the treatment plan and none of the nurse's explained it to him.

- The second patient had surgery to repair a hernia on 4/4/2018.[150] Upon his return, he was cleared for general population, with a follow up with a provider in five days. On 4/10/2018, the provider saw the patient for follow up. He ordered daily dressing changes and an antibiotic (Levaquin) for 10 days. There is no documentation about the surgical site and whether it is infected. We suggested to the IC-RN that a review of post-surgical infections might result in a suggestion to use infirmary placement for a day or two after return to the institution to ensure the patient was capable of their own wound care.

Hepatitis C (HCV) disease is also managed via the chronic care clinic, with the work up and treatment of these patients directed by UIC.

The infection control program at MCC is managed by a dedicated nursing supervisor. Important improvements have been made in the sanitation and safety of health care delivery at MCC since the report of the First Court Appointed Expert. However, there are still areas that need attention, including the analysis of clinical information to prevent infection and improve patient care, updating of written directives, and the repair and maintenance of patient care areas and equipment. We also found examples of patient care that were delayed, unneeded repetition of screening and testing, and incomplete documentation that are consistent with systemic problems in the delivery of health care at MCC that are discussed earlier in this report.

## Dental Program

### Dental: Staffing and Credentialing
**Methodology:** Reviewed staffing documents, interviewed dental and other staff, reviewed the Dental Sick Call Log and other documents.

**First Court Expert Findings**

---

[149] Infection Control Patient #6.
[150] Infection Control Patient #7.

- MCC has a dental staff of three full-time dentists, one dental hygienist, and three full-time dental assistants. All are Wexford employees except one of the dentists. In addition, one PRN dentist and three PRN assistants are available if needed. This meets the Administrative Directive staffing guidelines and is adequate for MCC's 3700 inmates.
- All providers have current credentials on file and all the staff are current with their CPR certification.

**Current Findings**

While we agree with the First Court Expert that the number of authorized dental personnel positions is adequate, staffing has deteriorated materially since the First Expert's Report. When all positions are filled, the clinic is staffed by three dentists, three dental assistants, one dental hygienist, and one clerk. Currently, two dentist positions are unfilled[151] and wait times for routine care are approximately 15 months (see Figure 1 *infra*).

State positions are filled by a dental hygienist, a dental assistant, and a dental office associate. Per the HCUA, the state dentist position had been open for more than two years. It had been advertised several times, and there were applicants; however, the position expired (and had to be reposted). Due to the inability of IDOC to fill the position, it asked Wexford to fill it.

## Dental: Facility and Equipment

**Methodology:** Toured the dental clinic to assess cleanliness, infection control procedures, and equipment functionality. Observed intake screening and evaluated the quality of x-rays taken at intake. Reviewed compliance with radiologic health regulations.

**First Court Expert Findings**

- There are three clinics: a single chair clinic at North 2 that serves the segregation inmates and a general population housed in that unit. A single chair unit is in the Receiving and Classification clinic and is used for reception screening examinations. It contains a Panorex x-ray and developer. The third is a four-chair clinic located in the HSU and serves the rest of the institution. There is a 400-bed medium security satellite institution that does not have a dental clinic. This population is served by the clinic in the Health Service Unit. Both North 2 and R&C clinics have old and worn equipment.
- The chairs/units in the HSU clinic are only two years old and in excellent repair. There is a single x-ray unit for this entire clinic and it is very old, faded, and worn. There is a Panorex unit on the second floor of this building, above the dental clinic. The metal cabinetry is old, rusting, and has several areas of chipping paint. Proper disinfection is difficult.
- The x-ray developers in the North 2 clinic and the R & C clinic do not work and radiographs must be brought to the HSU clinic for developing. This is unacceptable, in that x-rays are often needed immediately, especially as a diagnostic tool in urgent care situations.
- The four chairs/units in the HSU are in small individual spaces. This space is barely adequate. The single chair clinics at North 2 and R&C are small but adequate. The lab and

---

[151] A Wexford dentist recently retired, leaving a vacancy.

sterilization area are large. The existing facility is adequate to meet the needs of the institution. The x-ray developers need to be replaced or repaired immediately.

**Current Findings**

We concur with the First Court Expert's findings with respect to the inadequacy of the dental facilities and equipment. Moreover, they have not improved materially. We identified current and additional findings as follows.

The panoramic x-ray unit in the R&C clinic does not have shielding between the unit and the door. Before an x-ray is taken, people in the corridor are asked to move away from the door. There is no x-ray processor in the North clinic because an inoperative unit was not replaced. Exposed film is processed in the radiology clinic. There is an area in the MSU health clinic designated for a dental clinic.

## Dental: Sanitation, Safety, and Sterilization

**Methodology:** Reviewed Administrative Directive 04.03.102. Toured the dental clinics and observed dental treatment room disinfection. Interviewed dental staff and observed patient treatment.

**First Court Expert Findings**

- Surface disinfection was performed between each patient and was thorough and adequate, and protective covers were utilized on most unit surfaces. Instruments were properly bagged and sterilized. All handpieces were sterilized and in bags.
- The sterilization procedures themselves at the Health Service Unit clinic were improper. Flow did not proceed from dirty to clean. The ultrasonic was on the wrong side of the sink, and a dental lathe and protective covers were situated between the sink and the autoclave.
- The R&C clinic used disposable instruments.
- The clinic at North 2 had a proper flow of sterilization from dirty to clean. Surface disinfection was adequate. Protective covers were used appropriately. No biohazard warning signs were posted in the sterilization areas. [152]
- Safety glasses were not always worn by patients. Eye protection is always necessary, for patient and provider. No warning signs were posted where x-rays were taken to warn of radiation hazard.

**Current Findings**

Sanitation, safety, and sterilization have deteriorated since the First Court Expert's Report. We concur with the findings and we observed inadequate hand sanitation by the dentist between initial examination patients (see Initial Examination section *infra*). We observed initial exams at the R&C clinic, and treatment at the North 2 and HSU clinics. Surfaces were disinfected

---

[152] CFR 1901.145(e)(4). "The biological hazard warning shall be used to signify the actual or potential presence of a biohazard and to identify equipment, containers, rooms, materials, experimental animals, or combinations thereof, which contain, or are contaminated with, viable hazardous agents.")

appropriately between patients and instruments were disinfected, bagged, and stored appropriately. The HSU and North 2 clinics have protective glasses for patients; however, we did not see them worn when we observed treatment at the HSU clinic[153].

## Dental: Review Autoclave Log

**Methodology:** Reviewed the last two years of entries in autoclave log, interviewed dental staff, and toured the sterilization area.

**First Court Expert Findings**

- Spore testing of the steam autoclaves was being accomplished only once a month. This is highly irregular and violates OSHA guidelines calling for weekly spore testing of autoclaves. The dry heat sterilizer is tested on an irregular, somewhat quarterly basis. These are egregious deficiencies that should be corrected immediately. Steam autoclaves and dry heat sterilizers should be tested weekly.

**Current Findings**

Autoclave log management has improved since the First Court Expert's Report and is adequate. We identified current and additional findings as follows.

The dry heat sterilizer in the HSU clinic has not been used for two years and is not subject to spore tests. Weekly spore tests for the steam sterilizers were documented, and the deficiencies noted by the First Experts have been remedied.

## Dental: Comprehensive Care

Comprehensive, or routine care[154] is non-urgent treatment that should be based on a health history, a thorough intraoral and extraoral examination, a periodontal examination, and a visual and radiographic examination.[155] A sequenced plan (treatment plan) should be generated that maps out the patient's treatment.

**Methodology:** Interviewed dental staff, reviewed dental charts of an inmates who received non-urgent care that were randomly selected from the Daily Dental Reports. Reviewed Daily and Monthly Dental Reports.

**First Court Expert Findings**

- A review of 10 records revealed that a comprehensive examination was not performed, and sequenced treatment plans were not developed. Examination of soft tissues for oral cancer was rarely documented and periodontal assessments employing probing was not part of the treatment process.

---

[153] Why We Take Infection Control Seriously. UIC College of Dentistry. Viewed at https://dentistry.uic.edu/patients/dental-infection-control, viewed February 2, 2018. "We use personal protective equipment […] *as well as provide eye protection to patients for all dental procedures*.". Emphasis added.
[154] Category III as defined in Administrative Directive 04.03.102.
[155] Stefanac SJ. Information Gathering and Diagnosis Development. In Treatment Planning in Dentistry [electronic resource]. Stefanac SJ and Nesbit SP, eds. Edinburgh; Elsevier Mosby, 2nd Ed. 2007, pp. 12-15, *passim*.

- Hygiene care and prophylaxis were never part of comprehensive care. Restorations were, in five of the charts, provided without appropriate diagnostic x-rays for caries. No hygiene treatment was part of any of the routine care provided.
- Oral hygiene instructions were never documented in the dental record as part of treatment.

**Current Findings**

We concur with the First Court Expert's finding that comprehensive care is inadequate. Moreover, it has not improved materially. We identified current and additional findings as follows.

Routine care is provided without adequate x-rays and periodontal assessment. Rather than relying on intraoral x-rays, the accepted professional standard, the dentist bases his charting for caries on the panoramic x-ray in conjunction with a visual exam.[156] Not only is this insufficient to diagnose interproximal (between the teeth) decay but it ignores periodontal disease. In fact, even when periodontal disease is occasionally categorized per Administrative Directive 04.03.102 (Dental Care for Offenders), there is no documented periodontal probing[157,158] and the location of the disease is not noted.[159] Dr. Assemeier stated that he occasionally does periodontal probing but does not record PSR; however, none of the records reviewed had documented probing. He said that he routinely did PSR on his military patients when he was in private practice and occasionally on his other patients, but not at MCC.[160]

Of 16 inmates who received comprehensive (routine) care, none had documented periodontal probing or a sequenced treatment plan. While 10 (56%) had a recent Treatment Needed form

---

[156] Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and U.S. Food and Drug Administration, 2012. Table 1, pp. 5-6. (Dentate or partially dentate adults who are new patients receive an "[i]ndividualized radiographic exam consisting of posterior bitewings with panoramic exam or posterior bitewings and selected periapical images." Furthermore, recall patients [i.e., biennial exam patients] should receive posterior bite wing x-rays every 12 to 36 months based on individualized risk for dental caries. With respect to periodontal disease, "[i]maging may consist of, but is not limited to, selected bitewing and/or periapical images of areas where periodontal disease (other than nonspecific gingivitis) can be demonstrated clinically.")

[157] Stefanac SJ. Information Gathering and Diagnosis Development. In Treatment Planning in Dentistry [electronic resource]. Stefanac SJ and Nesbit SP, eds. Edinburgh; Elsevier Mosby, 2nd Ed. 2007. A panoramic radiograph has insufficient resolution for diagnosing caries and periodontal disease. Intraoral radiographs (e.g., bite wings) and periodontal probing are necessary (p. 17). Also, Periodontal Screening and Recording (PSR), an early detection system for periodontal disease, advocated by the American Dental Association and the American Academy of Periodontology since 1992, is an accepted professional standard. *Id.*, pp. 12-14. See American Dental Hygiene Association. Standards for Clinical Dental Hygiene Practice Revised 2016. Periodontal probing is also a standard of practice for dental hygiene.

[158] Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006). Correctional dental services. In M. Puisis (Ed.), Clinical Practice in Correctional Medicine (2nd ed., pp. 556-564). Philadelphia, PA: Mosby Elsevier, p.560 (Early diagnosis of periodontal disease is important since the disease is often painless and the prevalence of moderate to severe periodontal disease in correctional populations is high and often not associated with pain).

[159] The only categories related to specifically periodontal disease are Ib ("acute periodontal abscess"), Ic ("acute periodontitis"), Ie ("acute gingivitis"), IIIb ("localized gingival involvement"), and Vb ("lack of visible gingival irritation"). *Id.* Attachment A.

[160] None of the dental charts reviewed at MCC documented periodontal probing.

completed,[161] five (31%) had the Treatment Needed assessment informed by bite wing x-rays,[162] and (38%)[163] had a cleaning (prophy or oral prophylaxis) that preceded treatment.[164]

Biennial exams are scanty and of minimal clinical value. Of eight patients who received biennial exams, none of the exams were informed by bite wing x-rays or documented periodontal probing, none had a sequenced treatment plan, and two had no documented oral cancer screening.[165]

While the dental examinations performed by the dentist did not document a periodontal assessment, the dental hygienist documented a periodontal assessment when she saw a patient. However, she did not document periodontal probing, a standard of care for dentistry and dental hygiene.

Absent a sequenced treatment plan informed by intraoral x-rays and periodontal probing, the dentist does not have enough information to make an informed decision. In the community, what is called a biennial exam is analogous to a periodic exam.[166,] To summarize, what is called a biennial exam is cursory, and not substantially different from the inadequate "complete" examination performed at intake.

Not only is periodontal disease underdiagnosed but it is undertreated. In none of the MCC dental charts reviewed was there a treatment plan that identified specific non-surgical periodontal procedures such as scaling and root planing. Moreover, the Daily Treatment Report that lists the treatment provided to each patient has no section for periodontal treatment.[167] Both the dentist and dental hygienist stated that they were in private practice and were familiar with the standard procedure codes which are required for billing third parties and are industry standard. However, there is no column for SRP and no way of knowing if it is performed.[168, 169] The hygienist said that the she classifies SRP as "periodontal;" however, she does not record the number of quadrants, nor are there details of the treatment (e.g., that a SRP procedure was performed, and which

---

[161] Comprehensive Care Patients #2, 6, 8, 9, 10, 11, 12, 13, 14, and 16.

[162] Comprehensive Care Patients #7, 10, 12, 14, and 15.

[163] Comprehensive Care Patient #1, 4, 11, 12, 14, and 16.

[164] Dr. Assemeier said that while he does not do a sequenced treatment plan, he often includes a treatment plan in his clinical progress notes.

[165] Biennial Exam Patients #1 and 8.

[166] The profession standard code for a periodic exam is D0120. It is defined as "[a]n evaluation performed on a patient of record to determine any changes dental and medical health status since a previous comprehensive or periodic examination. This includes an oral cancer evaluation, and periodontal screening where indicated, […]]." Dental Procedure Codes. American Dental Association, 2015.

[167] The categories on the form are "scale and prophylaxis," "gingivitis", and "periodontal." While the procedure "scale and prophylaxis" corresponds to American Dental Association treatment code D1110 that has a profession-wide definition and treatment, "gingivitis" and "periodontal" do not have a standard treatment. ADA Treatment Codes, 2015.

[168] The 'uniform record system' sponsored by the American Dental Association is the Code on Dental Procedures and Nomenclature. "In August 2000 the CDT Code was designated by the federal government as the national terminology for reporting dental services on claims submitted to third-party payers." American Dental Association Dental Procedure Codes, 2015, p. 1.

[169] ADA Treatment Codes D4341 and D4342.

teeth were treated). The hygienist also said that she does not document PSR, although she did so in some of the private practices where she worked.

## Dental: Intake (Initial) Examination[170]

**Methodology:** Observed intake examination process. Reviewed dental records of inmates that have been examined recently. Reviewed Administrative Directive 04.03.102.

**First Court Expert Findings**

- All records reviewed revealed that the exam was performed timely, a panoramic x-ray was taken, and the APHA categorization was completed.
- Screening was not observed; however, based on its description, it appeared to be procedurally adequate.
- Four panoramic x-rays were processed improperly and presented as an opaque negative. These radiographs are not acceptable for diagnostic use. This problem did not occur in later record reviews. I was told the developer in the reception clinic was not functioning properly. The radiographs were being developed in the main clinic.

**Current Findings**

The "Initial Examination" is governed by Administrative Directive 04.03.102 (¶II F 2), which states (*inter alia*) that

> Within ten working days after admission to a reception and classification center or to a facility designated by the Director to accept offenders with disabilities for a reception and classification center, each offender shall receive a ***complete dental examination by a dentist***.[171]

The initial examination process has not changed materially since the First Court Expert's Report and remains inadequate. While we agree that the initial examination was performed timely and the APHA categorization was completed, we find it to be inadequate nonetheless. We cannot compare our findings to those of the First Court Expert since the First Court Expert did not observe the exam.

MCC receives approximately 100 prisoners each month. The dentist (standing) examined a patient seated in a dental chair with a dental light. He performed a cursory oral exam using a mouth mirror, which lasted approximately five minutes, with a dental assistant acting as recorder. He used a mouth mirror to illuminate the lateral border, and the tongue and floor of the mouth. The dentist wore gloves and changed them between patients; however, he did not wash his hands (or disinfect them using alcohol wipes) between donning new gloves. This is a breach of infection control protocol.

---

[170] The First Expert Report describes the examination performed at intake as a "Screening Examination;" however, Administrative Directive 04.03.102 describes it as a "complete dental examination." We use the terminology of the Administrative Directive and refer to the intake or initial dental examination as a complete dental examination.

[171] Administrative Directive 04.03.102 (¶II F 2). Emphasis added. Furthermore, the exam should include, "[c]harting of the oral cavity and categorization of status or treatment needs in accordance with the American Public Health Association's priorities delineated in Attachment A. *Id*. at (¶II F 2a). Emphasis added.

In addition to the charting of existing and needed dental treatment, the record noted that OHI (oral hygiene instruction) was provided, and that an oral cancer screening (OCS) was performed and the results were negative or WNL (within normal limits). The "OHI" consisted of saying, "make sure you brush and floss" – and took no more than a minute.[172] This is not adequate oral hygiene instruction. Furthermore, while spooled dental floss is deemed contraband at MCC, he did not mention the existence of (not to mention how to use) floss alternatives.

Of 10 charts of inmates who had recent intake examinations, nine (90%) panoramic x-rays were clinically adequate. Since the panoramic x-rays are not available to inform the charting, the dentist completes the charting when the x-ray is available. Oral cancer screening was documented in all charts; however, no chart documented periodontal probing.

## Dental: Extractions

**Methodology:** Interviewed dental personnel and reviewed 11 dental records of patients who had teeth extracted selected from the Daily Dental Report and 14 charts of patients who were scheduled to have extractions.

**First Court Expert Findings**
- A review of 10 records of inmates who had dental extractions revealed that nine of the 10 were in full compliance with the aspects reviewed. The radiograph was over three years old in one of the records and the reason for extraction was not included in another. This does not rise to a level of concern. A quick scan of several other records of inmates who had teeth extracted did not reveal a repeat of these issues.
- In two of the records, non-restorable was provided as a diagnosis for pain. This problem was seen in other records reviewed in other areas.

**Current Findings**
Our findings diverge from those of the First Court Expert and suggest that the treatment of dental extractions has deteriorated since the First Court Expert Report. While the First Court Expert found documentation to be generally adequate, we found that while of 11 patients who had extractions, all were informed by adequate preoperative x-rays and were accompanied by signed consent forms, nine (82%) forms[173] listed the tooth number but not the reason the tooth was to be extracted, and nine (82%)[174] did not document an updated health history.

Of 12 patients who were scheduled for extractions, the wait time ranged from seven to 41 days, with a median of 26 days (see Figure 2 *infra*).[175] Of the 11 who were prescribed antibiotics, all but one (91%) waited more than 10 days.[176] This is problematic, since the tooth should be

---

[172] Oral Hygiene Instructions (D1330) "may include instructions for home care. Examples include tooth brushing technique, flossing, and the use of special oral hygiene aids." American Dental Association Codes extract.

[173] Extractions Patients #1, 2, 4, 6, 7, 8, 9, 10, and 11.

[174] Extractions Patients #1, 2, 3, 4, 5, 8, 9, 10, and 11.

[175] The patient was seen with a complaint of pain, palliated, and scheduled for an extraction appointment. Scheduled Extractions Patients #1, 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, and 15.

[176] Scheduled Extractions Patients #1, 2, 3, 6, 8, 9, 10, 11, 12, 13, 14, and 15.

extracted within the therapeutic window of the antibiotic,[177] which for these patients was 10 days.[178]

## Dental: Removable Prosthetics

**Methodology**. Reviewed four charts of patients who received partial dentures (selected from the Prosthetics List) in the past year and interviewed dental staff.

**First Court Expert Findings**
- Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. The periodontal, operative, and oral surgery needs all should be addressed first. In none of the records reviewed was a comprehensive examination and treatment plan developed prior to impressions for removable partial dentures.
- In none were oral hygiene care or oral hygiene instructions provided.
- Periodontal assessment and treatment were not provided in any of the records.
- Because there was no comprehensive examination, nor any treatment plans developed, it was impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, was completed prior to fabrication of removable partial dentures.

**Current Findings**
We concur with the First Court Expert that removable prosthetics treatment is inadequate. Moreover, it has deteriorated since the First Court Expert's Report, as wait times have increased (see Figure 1 *infra*). As with most of the other patients who received comprehensive care, none had a sequenced treatment plan or a periodontal assessment that included documented probing. Three (75%) had no documented oral hygiene instruction.

## Dental: Sick Call/Treatment Provision

**Methodology:** Interviewed dental staff, reviewed Dental Sick Call Logs, Daily Dental Reports, and reviewed records of 12 inmates who were seen on sick call.

**First Court Expert Findings**
- Sick call is accessed via the inmate request form or from staff referral if the perceived need is immediate. It takes five to 10 days for urgent care complaints to be seen. This is unacceptable; they should be seen within 24-48 hours.
- In all 10 records reviewed the SOAP format was used and the patient's complaint was addressed.

---

[177] Shulman JD, Sauter DT. Treatment of odontogenic pain in a correctional setting. *Journal of Correctional Health Care* (2012) 18:1, 58 – 69; p. 68.

[178] Makrides et al.("[d]elayed dental treatment of the original focus of the [tooth-related] infection may turn a minor problem into a serious condition. Although infection is usually self-limiting, and spatially-confined, it may spread because of a highly virulent organism. Complications could include Ludwig's angina, mediastinitis, cerebral abscess, maxillary sinusitis, chronic fistulous tracts, and infective endocarditis." (p. 559).

- The sick call appointment was not used for routine care. Treatment proceeded with a diagnosis in only two cases and an improper diagnosis in another. This lack of a proper diagnosis was seen in records reviewed in other areas that included sick call entries.
- An inadequate triage system is in place that prioritizes treatment needs. Inmate request forms are evaluated by the dental program by the following day and their treatment needs, based upon the request form, are prioritized. Urgent care needs are identified from the request form and seen ASAP, often taking five to 10 days. Others are scheduled accordingly or placed on the hygiene list if requested. All request forms are seen within 14 days.
- Inmates seek urgent care via the inmate request form or, if they feel they need to be seen immediately, by contacting staff, who can then call the dental clinic with the inmate's complaint. These inmates are seen at the dentists' discretion.
- Inmates with urgent care complaints (pain or swelling) from the request form often take five to 10 days to be seen. They should be seen with 24-48 hours from the date of the request. Mid-level practitioners at the units do not routinely see the inmate face-to-face to evaluate urgent care needs as indicated on the request form. If an inmate complains of a toothache, swelling, or pain to the nurse making rounds, the nurse can call the dental clinic with this information. They can provide over-the-counter pain medication.
- Some inmates are seen immediately if correctional staff can get the inmate to the dental clinic. There is no system in place to provide a face-to-face evaluation with medical/dental staff or inmates that complain of pain or swelling. This should be provided within 24-48 hours from the date of the request.
- Request forms from inmates seeking routine care are evaluated the next working day and the inmate given an appointment to be evaluated within 14 days. Inmates requesting to have their teeth cleaned are placed on a waiting list. Inmates for routine care are placed on a waiting list in sequential order. This list is approximately nine months long.

**Current Findings**

Dental sick call has deteriorated since the First Court Expert's Report. We concur with the findings of First Court Expert that dental sick call for urgent care issues is often untimely and the sick call triage system for dental problems is inadequate. We also identified current and additional findings as follows.

*Sick Call*

Prisoners access sick call by placing written requests (kites) in boxes in the cellhouses or by signing up for nurse sick call. Of five patients who submitted kites for dental sick call, the wait time ranged from five to 14 days, with a median of nine days. All progress notes were in the SOAP format.

Of seven entries in the nurse sick call log that suggested dental pain, all were referred to the dental service and five (71%) received face-to-face assessments by nursing. All those assessed received analgesics. Of six patients whose records document treatment, wait time to see a

dentist ranged from five to 14 days, with a median of six days.[179] Patients who signed up for nurse sick call were generally seen by nursing staff the next day.

*Timeliness of Care*

Figure 1 is a summary of patient wait times based on monthly dental reports from May 2017 to April 2018. The wait time for fillings is more than 60 weeks (15 months),[180] higher than it has been since May 2017. Moreover, with only one dentist available, the backlog will continue to grow. According to the April dental report, 45 extractions and 18 fillings were performed; a 2.5:1 ratio, which suggests that MCC has insufficient dentist staffing to provide needed routine care and instead must focus on urgent care needs.

Wait time for dentures seems to have stabilized at around 15 months as well. However, since the standard of care is to complete the needed fillings and periodontal treatment before the denture impressions are done, there may be an additional delay of several years before denture fabrication can begin.

**Figure 1. Wait Time for Filling and Denture Appointments**



The kite log from January through April 2018 comprises 413 entries, listed by service requested.[181] Before a prisoner may have a filling appointment, he must first have a "filling evaluation," to determine if a filling is an appropriate treatment. If a filling is deemed to be the

---

[179] Nurse Sick Call Patient #6 has no documented treatment for this episode.

[180] The First Court Expert reported that the routine care wait list was approximately nine months long (see *supra*), which shows that the MCC dental program has deteriorated markedly since then.

[181] Per memo from Colleen Runge to Gail Walls, HCUA, dated 5/21/18, the Dental Codes are O1 (written request), O2S (filling evaluation), O3S (filling evaluation), O4S (denture adjustment), O1x1 (extraction), O2x1 (filling), O3x1 (impressions), O6 (oral prophylaxis), O6x1 (dentist-referred prophylaxis), and O6D (Dilantin prophylaxis).

appropriate treatment, the patient is placed on the filling list.[182] Of the 39 entries for fillings on the kite log, 28 were for filling evaluations and 11 were for fillings.

The Wexford contract specifies that "[v]endor shall provide dental checkups to offenders every two years, or more often if clinically indicated, and evaluations must be provided within 14 days after the offender's request for routine care treatment."[183] However, it is mute on the more critical issue, the maximum waiting time for *treatment*.[184] So, under current dentist staffing, a prisoner who needs (for example) three fillings that require three appointments may wait more than three years for the last tooth to be filled. It is more likely than not that the teeth awaiting filling will become more difficult to fill and cause preventable pain.

While Wexford does not report periodontal treatment backlogs, dental hygienist caseload is reported in the in the monthly CQI minutes. The April CQI minutes (based on March data) reported a dental hygienist caseload of 1018 patients and the March 2018 Dental Report noted that the hygienist performed 61 cleanings/prophylaxes. This equates to a more than 16-month backlog. While a cleaning or prophy is not a periodontal procedure,[185] it is often a precursor to periodontal treatment (if periodontal treatment has been prescribed by a dentist on the treatment plan).[186] A wait of more than a year before periodontal treatment can begin, even if it is diagnosed, is unreasonable and a such a treatment delay can result in preventable disease progression with concomitant bone loss.

Figure 2 shows that while the wait time for extractions has decreased from its high of 12 weeks in August 2017, it is currently at an unacceptable level for reasons explained in the extraction section, *supra*.

---

[182] X-rays may be taken then, rather than at the biennial or initial exam. However, by delaying taking x-rays until the filling evaluation, valuable time may be wasted, and undiagnosed decay may progress to a point where the tooth becomes more difficult (or impossible) to fill.

[183] HFS# 2010-05-008, ¶ 2.2.6.1

[184] If the filling evaluations occur within 14 days, Wexford is deemed to be complying with the contract even if the queue for fillings is infinite. Similarly, if prisoners receive timely biennial examinations, Wexford is deemed to be in compliance even if the exams are incomplete and below accepted professional standards.

[185] The American Dental Association Classifies it as a preventive procedure (Code D1110).

[186] Treatment plans rarely prescribe periodontal treatment.

**Figure 2. Wait Time for an Extraction**[187]



## Dental: Orientation Handbook

**Methodology**:  Reviewed orientation manual and related documents.

**First Court Expert Findings**

The orientation manual is minimally but adequately developed for dental services and addresses types of care, access to care, and how treatment is scheduled.

**Current Findings**

We were not provided with an inmate orientation manual.

## Dental: Policies and Procedures

**Methodology**:  Reviewed Administrative Directives that deal with the dental program. Interviewed dental staff. Reviewed dental charts. Toured dental clinical areas. Reviewed DCC organizational chart.

**First Court Expert Findings**

The Dental Director was not aware of a policy and procedures manual. A review of the MCC Policy and Procedures Manual revealed a large section devoted to the policies and procedures for dental care. It was dated 1995, with no indication that it has been updated since then. This is not an adequate document from which to run the dental program.

**Current Findings**

---

[187] Wait time was not reported for February 2018.

The First Court Expert found that MCC dental policies and procedures were outdated and should be rewritten. This was done in 2015. However, the intake examination is still not consistent with the plain text of Administrative Directive 04.03.102.

The dental program is governed by Administrative Directive 04.03.102, amended 1/1/2012. It specifies that within 10 working days after admission to a reception and classification center, offenders shall receive "*a complete dental examination by a dentist*" (¶F2; emphasis added). The initial examination done at intake was not a complete examination by any reckoning and was in violation of IDOC policy.[188]

We reviewed three MCC policies that relate to dental care: V1-15 (dental reporting and statistics), V1-16 (dental radiography), and V1-17 (handling instruments). All were revised January 2015. The policies suffer from several problems. First, the versions we were provided were unsigned. Second, the previous Medical Director's signature block is present and there is no evidence that the current Medical Director is aware of (and approves of) these policies. Finally, there is no signature block for the Dental Director – the individual directly responsible for implementing the policies.

## Dental: Failed Appointments
**Methodology:** Reviewed dental sick call log. Interviewed dental staff. Reviewed daily dental reports.

**First Court Expert Findings**
- The failed appointment rate of about 40% is very high. Reasons included refusals, lockdowns, and "other." When asked, the dentists related that "other" usually meant security precedence and unavailability of escort staff.
- The percentage was very high for the month of April, when 362 appointments were missed because of a lockdown.
- When only failed appointments (inmate chose not to come to appointment) are included, the percentage drops to about 12%. In an older high security institution with multiple missions and security concerns such MCC, movement of inmates is a challenge. That does not excuse the problem. Every effort should be made to work with administrative and correctional staff to correct this issue.

**Current Findings**
We concur with the findings of First Court Expert that failed appointments are a problem, despite apparent improvement. However, the April 2018 failed appointment rate (15.2%) is the lowest it has been this year.[189] On the other hand, there were 31 refusals, almost a yearly high.

## Dental: Medically Compromised Patients

---

[188] See section on Comprehensive Care, *supra*.
[189] Source: Monthly Dental Reports.

**Methodology:** Reviewed health history form and randomly selected records of eight patients who were on Chronic Care Lists with diabetes or on anticoagulant therapy and had a dental encounter within the past two years.

**First Court Expert Findings**
- A review of the dental records of the four inmates on anticoagulant therapy revealed that two records made no mention of this in the health history section of the dental chart. It was indicated but not "red flagged" in the other two. No treatment was provided to any of these inmates.
- When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Current Findings**
Documentation of the health record of medically compromised prisoners has not improved materially since the First Court Expert Report and we concur that documentation of the health record of medically compromised patients is inadequate. However, we identified current and additional findings as follows.

Of eight charts reviewed, five (63 %) did not document an updated health history at the last encounter.[190] There was no documented periodontal assessment and request for follow-up for the diabetics,[191] which is particularly problematic given the relationship between periodontal disease and diabetes.[192]

## Dental: Specialists
**Methodology:** Interviewed dental staff, reviewed CQI documents, and reviewed dental charts of inmates who were seen by an oral surgeon.

**First Court Expert Findings**
- A local oral surgeon, Dr. Jay Swanson, is available and used for dental conditions such as trauma, removal of difficult wisdom teeth, and evaluation and removal of oral pathology. He has offices in Effingham and Mt. Vernon, Illinois. General anesthesia cases use the Effingham office.
- All records reviewed revealed proper case selection and good patient management, and good record documentation.

---

[190] Medically Compromised Patients #2 (anticoagulant therapy), #3 (diabetes), #5 (diabetes), #6 (anticoagulant therapy), and #7 (anticoagulant therapy).

[191] Medically Compromised Patients #3 (generalized bone loss noted but periodontal probing was not documented, and treatment plan was not revised to include non-surgical treatment), and #5 (dental hygienist performed a prophylaxis; however, periodontal probing was not documented).

[192] See, for example, Herring ME and Shah SK. Periodontal Disease and Control of Diabetes Mellitus. *J Am Osteopath Assoc.* 2006; 106:416–421; Patel MH, Kumar JV, Moss ME. Diabetes and Tooth Loss. *JADA 2013;144(5);478-485* (adults with diabetes are at higher risk of experiencing tooth loss and edentulism than are adults without diabetes); and Teeuw WJ, Gerdes VE, and Loos BG. Effect of Periodontal Treatment on Glycemic Control of Diabetic Patients. Diabetes Care 3 3 :421-427, 2010 (periodontal treatment leads to an improvement of glycemic control in type 2 diabetic patients).

**Current Findings**

Oral surgery consultations have not changed materially since the First Court Expert's Report and remain adequate and we concur with the First Court Expert's findings. Of five dental charts of patients sent to an offsite oral surgeon, all patients appear to have received appropriate treatment.

<u>Dental: CQI</u>

**Methodology:** Reviewed CQI minutes and reports. Interviewed dental staff.

**First Court Expert Findings**

- The dental program contributes monthly statistics to the CQI committee. The dental program conducted two studies, one in 2013 and another in 2014. One involved the effects of the medications Dilantin and Norvasc on the incidence of gingival hyperplasia. The other was a study of grievances as related to the different cellhouses within the institution. The results of each was presented and steps taken to address the findings.
- No studies were in place to address program weaknesses and problem areas.

**Current Findings**

The dental CQI program, has improved since the First Court Expert's Report and is adequate. We were provided with a summary of two studies.[193] We concur with the First Court Expert's findings that there is an ongoing dental CQI program. Moreover, current and additional findings follow.

A study of 50 patients who were on the restoration (filling) list May 2015 to December 2015, with treatment dates ranging from August 2016 until September 2016, found that 94% had successful restorations without need of extraction. However, the actual study was not provided – just a five-line summary, so its validity cannot be assessed.

Another study summary, "Effects of lockdowns and dental coverage on filling numbers and backlog numbers" had no analysis – just a recitation of findings.

# Internal Monitoring and Quality Improvement Activities

**Methodology:** We reviewed annual and monthly CQI meeting minutes. We interviewed the CQI coordinator. We reviewed multiple death summaries and death records.

**First Court Expert Findings**

There was no relationship between CQI activity and improvements in the quality of services provided.

**Current Findings**

We agree with the First Court Expert's finding. We were told in interviews that a medical records technologist is the CQI Coordinator. She has no training in CQI. Although she told us that she

---

[193] Since we were not provided with the actual studies, we have no basis to assess their validity.

spends half of her working hours on CQI work, this work is mostly paperwork and organizing data collection and combining that into the CQI report. There is no one at the facility with any expertise or training in CQI. No one with CQI experience or knowledge of CQI methodology is involved in developing the CQI studies.

Three of six persons on the CQI Governing Body are custody-trained personnel (The Warden, Assistant Warden of Programs and the Wexford Regional Manager who is an ex-warden). Our opinion is that a Governing Body for a medical CQI program should not be directed by custody personnel. The medical CQI program should have a majority of medical personnel. The three persons on the Governing Body who are health personnel are the Agency Medical Director, the HCUA who is a nurse, and the Wexford site Medical Director.

The CQI plan is a generic plan that is not specific to issues at MCC. The CQI plan lists administrative directive requirements of the CQI program but does not indicate what the specific plan for CQI is at MCC.

There were 10 CQI medical studies. There were six outcome studies and four process studies. The six outcome studies were:
- Whether medication renewal for chronic illness was renewed prior to expiration.
- Whether a viral load was performed for persons with a positive hepatitis C antibody test.
- The percent of x-ray appointments which actually were completed when scheduled.
- The percent of inmates referred to the health unit for injuries who needed to be sent to a higher level of care.
- Whether inmates were seen within five days of discharge from the infirmary.
- Whether inmates with diabetes had medications renewed prior to expiration.

None of these were outcome studies. Two of these studies were poorly defined and we did not understand what the study was meant to measure. One was a study of viral load testing for hepatitis C. The study purpose was not defined. Another outcome study consisted of measuring the number of persons requiring treatment outside of the facility after being evaluated for injury. We could not figure out the purpose of this study or what clinical outcome it was meant to measure. The remaining four studies were performance measures, not outcome studies. As with other sites, none of these outcome studies included a clinical outcome. While some of these performance measurement were useful, none appeared to be amongst the most serious clinical problems at this facility.

We have comments on two of the process studies. One study had a declared intention of reducing denials by 30%. The study did not study variables of the referral process with an intention of improving the quality of referrals, but there was an intervention. The study resulted in a reduction of 389 referrals and a reduction of 98 denials. The intervention resulted in a reduction of referrals of 33 per month and a reduction of denials of 18 per month. Our concern is that it appears that patients who need referral are not receiving it. The study did not evaluate whether the reduced referrals were necessary or not. It's only intent was to reduce denials. Improvement

of quality was not the intent of the study. Reduction of referrals and denials only improves quality if the referrals and denials are unnecessary, which was not evaluated.

One study reviewed 1637 inmates with chronic illness with an intent apparently of studying whether their chronic illness appointment was timely. This study identified every staffing deficiency or lockdown situation with the resulting backlog in chronic illness clinic appointments. However, the study did not map the process and did not draw conclusions, so it was not clear what was learned or what actions could be taken to improve chronic illness appointments.

The HCUA identified staffing, scheduling appointments, and utilization management as the top three problems at the institution. There was only one study reasonably related to these three highest priority problems. This was a study of specialty care denials. This study was described in the specialty care section of this report. The study was initiated as an attempt to reduce denials without an analysis of whether denials were appropriate. The outcome of the study intervention was a greater reduction in referrals than a reduction of denials. In our opinion, the major problems related to specialty care referral are the lack of qualified primary care physicians who understand when to refer patients for consultation care, and the specialty care process itself, which we view as a barrier to care. The collegial review process and the impact of primary care training on referrals was not evaluated. Our opinion is that patients are not referred for necessary specialty care, but the CQI process had no mechanism to evaluate that question.

Deaths were listed in the CQI 2018 Annual Report. Death summaries were included in the report, but the death summaries had no critical analysis of the deaths. There was no mortality review and no problems were identified in the death summaries. Performing critical mortality review is a way to identify systemic problems so that future deaths can be prevented. This is not currently done. We reviewed seven deaths from MCC. Of those seven deaths, two were preventable and two were possibly preventable. This is an extraordinary large number of preventable deaths. We identified problems on all of the death reviews we performed. Summaries of these death reviews are present in the mortality review appendix of this report.

# Recommendations

## Leadership, Staffing, and Custody Functions

**First Court Expert Recommendations**

1. Place a priority on filling the Director of Nursing and Supervising Nurse positions. *We agree with this but believe that a priority should be placed on all supervisory positions and include physician and dental positions.*

**Additional Recommendations**

2. All budgeted positions should be filled.
3. A staffing plan should be developed that ensures sufficient staff to adequately provide care and to ensure administrative directives are adequately accomplished. This plan should include appropriate relief factors and include budgeted staff for infection control and CQI activities.
4. Vendor regional leadership positions should be filled with persons trained in a health care field.
5. IDOC Regional Coordinator positions should be filled by full-time persons without other IDOC responsibilities.

## Clinical Space

**First Court Expert Recommendations**

1. Renovations in all the cell house sick call areas be completed.
2. All sick call areas be appropriately equipped.

*We agree with these recommendations.*

**Additional Recommendations**

3. Repairs (cracked walls, chipped and peeling paint, clogged vents, missing electrical outlet plates, etc.) and ongoing maintenance of the exam rooms in the cell houses and the medical building must be done to allow effective cleaning and create a safe patient care and professional environment.
4. Exam rooms and exam tables are not be used as storage spaces.
5. Replace all the non-adjustable infirmary beds with hospital beds with safety railings that have the capability to adjust the height, the head section, and the lower extremity sections. One of these beds should be an electrically adjustable bed.
6. Nurse call devices must be installed next to all infirmary beds.
7. Showers in the infirmary and geriatric housing units must be repaired and maintained to minimize the risk of falls.
8. Each cell house and the medical building must have an automated external defibrillator.
9. All clinical devices must have documented annual electric safety inspections.

## Sanitation

**First Court Expert Recommendations**

1. Critically monitor cell house sick call areas for cleanliness and the use of paper barrier between patients on examination tables, or assure that table tops are sanitized between patients and appropriate hand washing/sanitizing is occurring between patients. *We agree with this recommendation.*

**Additional Recommendations**

2. Expand environmental rounds and the monthly Medical Safety and Sanitation Report to include the condition of the infirmary beds and exam tables, the functionality of the infirmary's negative pressure rooms, the compliance with annual inspection of medical devices, and other clinical space and equipment findings. The findings should be presented to the Quality Improvement Committee.

## Radiology Services

**First Court Expert Recommendations**

The First Court Expert did not have any recommendations regarding radiology services.

**Current Recommendations**

1. IDOC needs to contact the Illinois Emergency Management Agency (IEMA) and Occupational Safety and Health Administration (OSHA) to review the reported decision that IDOC x-ray technicians do not need to wear radiation exposure devices (dosimeter badges) while working in IDOC radiology suites as outlined in Illinois Administrative Code 32-340 510 and 520. This current practice is not in alignment with the radiation safety practices in the community.
2. Contract with a radiation safety expert to assess the safety of the panorex (mandible films) unit's current location in an unleaded exam room in the MCC Reception and Classification building without a shielded area for the technician to stand when panorex films are being taken.

## Medical Records

**First Court Expert Recommendations**

There were no recommendations of the First Court Expert for Medical Records.

**Current Recommendations**

1. An electronic medical record should be initiated statewide. This record should include electronic medication administration capability.
2. When charts are thinned, carry forward documents should include critical consultation reports, hospital reports, and specialized test reports that have significant impact on patient care.

3. Only medical records staff should file documents in medical records and only medical records staff should refile medical records.
4. Sick call requests by inmates should be filed in the medical record, as they are medical record documents.

## Medical Reception and Intrasystem Transfer

**First Court Expert Recommendation**

1. The quality improvement program must utilize a clinician to review the records of patients who have recently gone through the reception process and for whom abnormalities have been identified in order to ensure that appropriate follow up occurs. This should be an ongoing part of the quality improvement program.[194] *We agree with this recommendation.*

**Additional Recommendations**

2. We recommend that the steps in the intake screening and reception process be monitored by adding data fields to the intake logs that indicate the timeliness of each step, including the physical examination, tuberculosis screening, etc.
3. The IDOC Administrative Directive 04.03.101 should be revised to eliminate obtaining written consent for HIV testing given the opt-out policy that has been established. HIV testing should be opt-out testing.

## Nursing Sick Call

**First Court Expert Recommendation**

1. *Transition to an all Registered Nurse triage and sick call system. Licensed Practical Nursing (LPN) staff is triaging sick call requests and may or may not perform an examination, make an assessment and then formulate a plan, which could be no treatment or treatment from approved treatment protocols or to refer to a provider. All of these actions are beyond the educational preparation and scope of practice for an LPN.*[195] *We agree with this recommendation.*

**Additional Recommendations**

2. Timeliness of nursing sick call should be monitored by CQI at least annually.[196]
3. The quality of nursing assessments and the plan of care should be monitored by nursing service as part of the peer review or quality improvement. This should replace Medical Director review.
4. Medical records must be taken to sick call and used by nurses when seeing patients. This is one example of the benefit of having an electronic health record.

---

[194] Lippert Report Menard p. 43.
[195] Lippert Report Menard p. 43.
[196] National Commission on Correctional Health Care. 2014. Standards for Health Services in Prisons. P. 14.

5.  Providers should see patients timely according to the urgency of the referral.[197]

# Chronic Disease Management

**First Court Expert Recommendation**

1.  Physicians should be trained and certified in a primary care field. Only primary care trained providers should be managing chronic illnesses.
2.  The chronic disease database should be used as a tool to identify areas in which the program is underperforming so that interventions can be targeted to improve.
3.  Providers should be implementing a change to the care plan when patients have suboptimal control of their disease.
4.  All providers need access to electronic references at the point of care.
5.  There were issues with the accuracy of evaluating the degree of disease control for patients enrolled in the pulmonary clinic. This is partly due to the language of the policy, which should be revised to be more consistent with the NHLBI guidelines.
6.  Providers should be familiar with alternative methods of TB testing, i.e., the interferon gamma assays and their appropriate use. Efforts should be made to confirm patient's reports of previous treatment for LTBI prior to committing them to treatment.
7.  The cell block clinics should be adequately equipped and present a professional clinical environment. Safety concerns among the providers need to be addressed.

*We agree with these recommendations.*

**Additional Recommendations**

8.  Update problem lists so that they include all current and significant past clinical conditions and procedures. Failure to develop a complete and accurate problem list puts patients' continuity of care at significant risk.
9.  Monitor the providers' documentation in the chronic care progress notes for the rationale for clinical decisions, diagnoses, and treatments.
10. Expand the existing telehealth and/or establish an e-consult specialty program to include additional medical specialists to assist primary care providers with the management of complex and common medical conditions including diabetes, hypertension, cardiology, dermatology, neurology, and infectious diseases.
11. Perform hepatitis C RNA viral loads and fibroscans on all patients with hepatitis C as required by IDOC policy.
12. Revise the hepatitis C Guidelines to increase the number of the patients who are eligible to receive treatment. It is the best interest of the patient-population, the institution, and the non-incarcerated community to treat all patients with hepatitis C. It is impossible to clinically and legally justify waiting for patients to develop cirrhosis before initiating treatment.

---

[197] Emergent referrals should be seen immediately, urgent referrals should be seen the same day and routine referrals seen within 72 hours.

13. Streamline the prerequisite testing required prior to initiating hepatitis C treatment to match the processes utilized in the community. The current lengthy pre-treatment testing and evaluation contributes to the unacceptably prolonged delays in hepatitis C treatment.
14. Implement and utilize current United States Preventive Services Task Force (USPSTF) guidelines for screening adults for cancer and other conditions (abdominal aortic aneurysm, etc.).
15. Implement and utilize CDC age-based and disease-based standards for the administration of adult immunizations.
16. Calculate and document the 10-year cardiovascular risk score on all appropriate adults to assist with the decision, timing, and medication selection for the prevention of cardiovascular disease.
17. Consult with endocrinologists/diabetologists to provide a comprehensive review and recommendations concerning the medical management and the frequency of CBG testing of type 1 and type 2 insulin-prescribed diabetics at MCC and in the IDOC system.
18. Develop a plan to change anticoagulation treatment from Vitamin K antagonists (warfarin) to newer types of anticoagulants that do not require frequent ongoing lab testing to determine the adequacy of anticoagulation. This should especially be considered when physicians are unable to obtain a therapeutic anti-coagulation level.
19. Provide all chronic care providers and nurses with access to current, comprehensive electronic medical reference services such as "UpToDate" in all clinical areas and clinical offices.

## Urgent/Emergent Care

**First Court Expert Recommendations**
1. Nursing staff must be retrained with regard to an appropriate assessment for a patient who has been sent to the hospital and returned to the infirmary. Specifically, the training should include what subjective and objective information to collect in relationship to the problems that were addressed at the hospital. *We agree with this recommendation.*
2. A clinically trained person should insure that all of the relevant offsite service reports for unscheduled offsite services are available within a few days, including discharge summaries, emergency room reports, operative reports, and catheterization reports, so that they can be discussed by the primary care clinician with the patient and a plan can also be discussed. *We agree with this recommendation.*
3. When a procedure or a visit is interrupted due to a lockdown, the Medical Director should be notified and must determine whether, despite the lockdown, it must occur or can wait and occur the following day[198.] *We agree with this recommendation. There were no instances of a procedure or visit being interrupted because of a lockdown among the charts we reviewed.*

**Additional Recommendations**

---

[198] Lippert Report Menard p. 44.

4. Each of the openings in the emergency response bag should be sealed with a numbered plastic tag. The integrity of the seal should be checked and documented on the emergency equipment log at the beginning of each shift.

5. A corrective action or improvement plan should be developed based upon the critique of the annual mass casualty drill. Implementation of the plan should be monitored by the QI program.

6. The critique of emergency responses should be reviewed by CQI for trends and areas identified for correction or improvement.

7. All emergency room visits should be reviewed with regard to timeliness, appropriateness of preceding care, accuracy of information in the health record, and continuity of care upon release back to the facility. This should be done by clinical leadership and the QI program.

8. IDOC medical supervisors should conduct reviews of sentinel events, including preventable hospitalizations. These reviews need to identify deficiencies and develop corrective actions. Providers who commit grossly and flagrantly egregious infractions should be referred to peer review and these actions should be reviewed with respect to their privilege renewal.

## Specialty Consultations

**First Court Expert Recommendations**

1. A clinically trained staff person should be responsible for ensuring that all relevant offsite service reports are available for the clinician to review with the patient within a week of the offsite service having been provided. *We agree with this recommendation but add that the responsibility for this rests on the vendor that establishes the contract with the consultant and hospital. They must be held accountable for this deficiency. A clinically trained staff at the facility can be responsible for getting reports but responsibility for the process resides with the vendor.*

2. When the scheduled offsite service reports are available, the physician must document a visit with the patient in which the findings and a plan are discussed. *We agree with this recommendation but add that the physician must review the offsite service report and key findings and recommendations, and discuss all of these with the patient in an effective manner so that the patient understands the therapeutic plan resulting from the consultation. A rationale for not accepting recommendations needs to be documented and discussed with the patient. This must be done timely. A week timeframe is acceptable.*

3. Services that cannot be scheduled for more than a month must be addressed by the Medical Director with the State Medical Director. *We agree with this recommendation.*

**Additional Recommendations**

4. The collegial review process should be abandoned because it is, in our opinion, a patient safety hazard.

5. Referral for hepatitis C to UIC should not be required to go through Wexford utilization review. IDOC physician should refer patients directly.

6. Referral to the Wexford infectious disease doctor for approval for ultrasound and EGD for persons with cirrhosis should be abandoned on the basis of patient safety. If a Wexford doctor is not primary care trained (board certified or board eligible in a primary care field), then all patients with APRI > 0.7 should be used as a benchmark to begin diagnostic screening for cirrhosis (upper endoscopy for varices and biannual ultrasounds to screen for hepatocellular carcinoma). Primary care trained doctors should document cirrhosis as a problem when it is identified and begin appropriate screening as recommended for cirrhosis (screening EGD as baseline and ultrasounds biannually for hepatocellular carcinoma).

7. Tracking specialty care should be standardized and under control of IDOC, not Wexford. IDOC should track whether hospital reports and all types of specialty care reports are received within five working days of the service date. Summary statistics on reports received later than five days after the service date need to be reported in CQI monthly and annual reports. This should be included in the contract as a monitored item associated with penalties for poor performance (e.g., <95% of reports available within five days).

## Infirmary Care

**First Court Expert's Recommendations**
1. Address life/safety concerns with infirmary patients padlocked in their rooms.
2. Train inmate health care unit porters in blood borne pathogens; infectious and communicable diseases; bodily fluid clean-up; the proper cleaning and sanitation of infirmary beds, furniture, and linens; and confidentiality of medical information.
3. Replace torn and ragged linens. Maintain an adequate supply of bedding and linens.
4. Sanitize infirmary bedding and linens through appropriate laundering methods.
5. Properly document in the patient medical record a medical acuity level, i.e., acute, chronic, housing, administrative placement.
6. Properly document in the patient medical record a medical assessment rather than a housing designation in the "assessment" portion of an infirmary patient SOAP notes.

*The First Court Expert's recommendations to train the infirmary porters and to maintain an adequate supply of linens have been addressed. We concur with the remaining recommendations of the First Court Expert.*

**Additional Recommendations**
7. Adjust the level of nurse staffing to assure that patient-inmates with significant physical and mental disabilities have their medical, physical, and safety needs met.
8. The IDOC needs to perform an assessment of housing for disabled, and elderly inmates who need skilled nursing care. IDOC needs to build or otherwise find acceptable housing for these inmates.
9. Transfer patients whose clinical needs exceed the capability of the MCC infirmary to a licensed clinical skilled-nursing facility either within IDOC or in the community.
10. Educate, monitor, and track the comprehensiveness of the provider infirmary notes to assure that progress notes adequately document the clinical status of the patient and the

current treatment plan. Failure to document this information puts the health of the patient at risk.

11. Educate, monitor, and track provider notes to assure that the clinical justifications and reasons for clinical decisions and treatments are documented. Failure to document this information puts the health of the patient at risk.

## Pharmacy and Medication Administration

**First Court Expert Recommendations**

The First Court Appointed Expert made no recommendations concerning pharmacy and medication administration.

**Current Recommendations**

1. Adopt a computerized provider order entry (CPOE) program to eliminate handwritten orders. Replace handwritten transcription of orders to the MAR with printed labels after the pharmacy has reviewed and verified the order. Medications which must be started urgently may be transcribed in handwriting onto the MAR. When the label arrives, it should be affixed to a new line on the MAR and documentation continued there.

2. Order implementation should take place within 24 hours. Adopting CPOE eliminates delays in treatment resulting from not transcribing orders timely.

3. Medication should be administered in patient specific, unit dose packaging. The practice of pre-pouring and the use of multiuse envelopes should be stopped.

4. The use of a list to prepare controlled substances and the placement of doses for multiple patients into a collective container should be stopped *immediately*.

5. Alternative forms of medication should be used rather than crushing and floating (liquid or injectable).

6. The MAR should be used by the nurse to verify the medication, dose, and route of administration is correct immediately before giving the medication to the patient. The nurse should have the MAR available to answer any questions or concerns the patient has about the medication.

7. When medication is dropped on the floor, the patient should be offered a replacement and not be forced to choose between going without or ingesting a medication that is unsanitary.

8. Medication should be documented on the MAR at the time it is administered. When medication is not given, the reason must be documented on the MAR.

9. Every MAR should have the signature and initials of every nurse who has administered medication to that patient. An electronic MAR would document the identity and credentials of any person administering medication automatically.

10. Printed labels should be provided to place on the MAR when a new order is dispensed. Orders should not be handwritten on the MAR unless it is a medication to be given immediately.

11. A system for timely renewal of chronic disease and other essential medications should be developed.

12. Nurses should refer any patient who does not receive three consecutive doses of medication critical in managing a chronic disease (insulin, Plavix, factor H, HIV medication, antirejection medications, etc.) to the treating provider. The treating provider should meet with the patient and determine if treatment can be modified to improve adherence.

13. Patient adherence with KOP medications prescribed to treat chronic disease should be monitored at regular intervals (monthly by nursing and by the provider at each chronic disease visit).

14. Revise the policy and procedure for medication administration to provide sufficient operational guidance to administer medications in accordance with accepted standards of nursing practice.

15. The CQI program should develop, implement, and monitor quality indicators related to pharmacy services and medication administration.

16. Root cause analysis and corrective action plans should be used to target the causes of performance that is below expectations. Corrective action should consider system improvements such as computerized provider order entry, use of bar coding, patient specific unit dose packaging, EMAR, etc., to support desired performance.

## Infection Control

**First Court Expert Recommendations**

1. Continue to aggressively monitor skin infections and boils. *We agree with this recommendation.*

2. Assure a practice of appropriately laundering and sanitizing infirmary bedding and linens either in the healthcare unit or institutional laundry. If laundering in the healthcare unit, water temperatures should be monitored and recorded daily to assure a 160°F or 140°F reading. *We agree with this recommendation and further recommend that a policy and procedure be written on how patient linens are laundered to include instruction to send linens soiled with body fluid to the institution laundry, that water temperature be tested and logged periodically, and that a booster be added to the hot water inlet on the washing machine.*

3. Train all healthcare unit porters in blood-borne pathogens, infectious and communicable diseases, and the proper cleaning and sanitizing of infirmary rooms, beds, furniture, toilets, and showers. *This recommendation has been accomplished.*

4. Since there are no visual or audible alarms for the infirmary negative pressure respiratory isolation rooms, when a patient is isolated due to respiratory infection, gauge readings should be monitored and recorded each shift. When the rooms are empty or being used for purposes other than respiratory infection, gauge readings should be monitored and recorded weekly. *Pressure is monitored and recorded consistent with this recommendation.*

5. Install, at a minimum, an audible alarm to immediately notify infirmary staff of the loss of negative pressure in respiratory isolation rooms. *Audible alarms are in place for the isolation rooms; therefore, this recommendation has been accomplished.*

6. Critically monitor cellhouse sick call areas for cleanliness, the use of a paper barrier between patients on examination tables or assure table tops are sanitized between

patients, and appropriate hand washing/sanitizing is occurring between patients. *This recommendation has been accomplished.*

7. Each month, critically inspect upholstered equipment and mattresses for any tears or holes in the outer cover and assure the items are taken out of service until repaired. *We agree with this recommendation and suggest that it be added to the Safety and Sanitation Rounds. We found numerous upholstered items which need to be removed and repaired.*

**Additional Recommendations**

8. Infections and communicable disease data should be analyzed and discussed as part of the monthly and the annual CQI meetings. This should include discussion of trends, updates from the CDC, and review of practices.
9. Update the IDOC Infection Control Manual now and at least every two years.
10. Update the Health Services policies and procedures that relate to sanitation and infection control now and at least every two years.

# Dental Program

## Dental: Staffing and Credentialing
**First Court Expert Recommendations:** None.

**Current Recommendations**

1. Hire two dentists immediately.
2. Until three full-time dentists are hired, and the backlogs are reduced, Wexford should provide one or more full-time PRN dentists.
3. An additional 0.5 FTE dental hygienist should be hired.
4. Dentist staffing should be revisited after dentists incorporate bite wing x-rays and periodontal probing into their examinations, since it is likely that additional pathology will be identified when examinations and treatment comport accepted professional standards.

## Dental: Facility and Equipment
**First Court Expert Recommendations**

Replace or repair the x-ray developers in the North 2 and R&C clinics immediately.

1. The space in the HSU clinic that houses the two main dental units is too small to allow efficient care flow and any sense of privacy, and enlargement should be considered for efficient care delivery and safety considerations.
2. All electric outlets should be wall-mounted or protected by the cover for the junction box at the foot of the chair. Loose wires should be neatly arranged and out of traffic flow. We note that this issue has been addressed.
3. All the units, chairs, and cabinetry should be replaced, and surface areas should be better able to accommodate disinfection.
4. Replace the radiograph unit in the clinic immediately with a wall-mounted unit capable of digital radiography.

5. The Panelipse [panoramic] radiograph unit should be replaced. This is critical for a reception center.

*We agree with these recommendations.*

**Additional Recommendations**

6. While the quality of the radiographs is adequate, given the age of the panoramic x-ray unit and the R&C mission of MCC, a replacement should be high in the capital equipment replacement list. Moreover, the replacement should be digital.

## Dental: Sanitation, Safety, and Sterilization

**First Court Expert Recommendations**

1. Sterilization at the HSU clinic is improper. MCC should develop a sterilization system that implements a proper flow from dirty to sterile. *We agree, but note that notwithstanding the inadequate design, the instruments were sterilized appropriately.*

**Additional Recommendations:** None.

## Dental: Review Autoclave Log

**First Court Expert Recommendations**

1. Spore test the autoclaves, and sterilizers should be tested on a weekly basis and proper logs should be maintained. We note that the previously identified deficiencies have been corrected.
2. Safety glasses should be provided to all patients receiving dental care.
3. Biohazard warning signs should be posted in the sterilization areas in the dental clinics.
4. Warning signs should be posted in the area where x-rays are taken to warn pregnant females of potential radiation hazards.

*We agree with these recommendations.*

**Additional Recommendations**

5. The dry heat sterilizer in the HCU clinic has been out of service for approximately two years and should be removed.

## Dental: Comprehensive Care

**First Court Expert Recommendations**

1. Comprehensive "routine" treatment should be provided only from a well-developed and documented treatment plan.
2. The treatment plan should be developed from a thorough, well documented intra and extra-oral examination, to include a periodontal assessment and thorough examination of all soft tissues.
3. In all cases, appropriate bite wing or periapical x-rays should be taken to diagnose caries.
4. Hygiene and periodontal care should be provided as part of the treatment process.
5. Care should be provided sequentially, beginning with hygiene services and dental prophylaxis.

6. Oral hygiene instructions should be provided and documented.

*We agree with these recommendations and emphasize that current MCC practice falls well below accepted professional standards.*

**Additional Recommendations**

7. Treatment performed should be reported using standard (American Dental Association) definitions and procedure codes or entries that can be mapped to the treatment codes.
8. Biennial exams should include a documented oral cancer examination.

## Dental: Intake (Initial) Examination

**First Court Expert Recommendations**

1. Oral hygiene instructions should be provided at the time of the initial examination.
   *We agree. However, the OHI provided at the intake screening was inadequate.*
2. The area where x-rays are taken should have warning signs posted that clearly warn of potential radiation hazards to pregnant females. *We agree with this recommendation.*
3. A consent form should be developed and used for pregnant females that explains radiation hazards and gives the examiner permission to take the x-ray. *This is moot since MCC is a male facility.*

**Additional Recommendations**

4. The oral hygiene instructions provided by the dentist should be more thorough, or in the alternative, they should be provided by other dental personnel.
5. The dentist should view the panoramic x-ray while the patient is being examined.
6. The dentist should wash hands before re-gloving or, in the alternative, use alcohol wipes.[199]
7. The initial exam should document Periodontal Screening and Recording (PSR), which is a professional standard.

## Dental: Extractions

**First Court Expert Recommendations**

1. A proper diagnosis should be part of the treatment process. *We agree with this recommendation; however, we note that the diagnoses were appropriate in the charts we reviewed.*

**Additional Recommendations**

2. When an antibiotic is prescribed for a tooth-related infection, the tooth should be extracted within the therapeutic window of the antibiotic. A follow-up appointment for the extraction should be made so that the tooth is extracted within 10 days.
3. The health history should be updated before a tooth is extracted.

---

[199] Centers for Disease Control and Prevention. *Summary of Infection Prevention Practices in Dental Settings: Basic Expectations for Safe Care*. Atlanta, GA: Centers for Disease Control and Prevention, US Dept of Health and Human Services; October 2016, p.7.

4. The consent form should specify the tooth to be extracted and the reason for the extraction (i.e., the diagnosis).

## Dental: Removable Prosthetics

**First Court Expert Recommendations**

1. A comprehensive examination and well developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, precede all comprehensive dental care, including removable prosthodontics.
2. Periodontal assessment and treatment should be part of the treatment process and that the periodontium should be stable before proceeding with impressions.
3. All operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

*We agree with these recommendations and note that **current** practice is substantially below accepted professional standards.*

**Additional Recommendations:** None.

## Dental: Sick Call/Treatment Provision

**First Court Expert Recommendations**

1. All treatment should proceed from a proper diagnosis.
2. A system should be implemented immediately that insures  that inmates  with urgent care complaints (pain and swelling) are seen and evaluated by medical/dental staff within 24-48 hours from the date on the request form. It is from this face-to-face evaluation  that scheduling, and treatment should proceed. The appropriate medical staff in the units should be utilized in this effort. We note that patients who sign up for nurse sick call with complaints of dental pain or swelling are seen within 48 hours by a nurse and are offered non-narcotic analgesics. Furthermore, patients who sign up for nurse sick call generally have timely face-to-face assessments and receive analgesics when appropriate.

*We agree with these recommendations.*

**Additional Recommendations**

3. Nurses should triage all requests for dental care. Non-urgent requests (cleaning, routine exams, fillings, etc.) should be sent to the dental clinic for scheduling. All other dental complaints should be assessed at nursing sick call, treated for pain as needed, and referred to the dentist based upon clinician urgency.
4. The Wexford contract should be amended to specify a maximum wait time for a routine care appointment to 90 days.

## Dental: Orientation Handbook

**First Court Expert Recommendations:** None.

**Additional Recommendations:** None.

## Dental: Policies and Procedures
**First Court Expert Recommendations**
1. The dental program should develop a current, detailed, thorough, and accurate policy and procedure manual that defines how all aspects of the program are to be managed. Once developed, it should be reviewed and updated on a regular basis and as needed for new policies and procedures. *We agree with this recommendation.*

**Additional Recommendations**
2. The Dental Director should sign the policies. Moreover, all dental personnel should sign a memo acknowledging having read the policies.

## Dental: Failed Appointments
**First Court Expert Recommendations**
1. Develop a comprehensive CQI study to evaluate reasons for missed appointments and seek remedies to correct the problem and improve getting inmates to their appointments. *We agree. Although the failed appointment rate has fallen to a yearly low, it is still worthwhile to see if there remains room for improvement. Furthermore, the refusal rate is worth studying.*

**Additional Recommendations:** None.

## Dental: Medically Compromised Patients
**First Court Expert Recommendations**
1. The medical history section of the dental record should be kept up to date and that medical conditions that require special precautions should be red-flagged to catch the immediate attention of the provider.
2. Blood pressure readings be routinely taken of patients with a history of hypertension, especially prior to surgical procedures.

*We agree with these recommendations.*

**Additional Recommendations**
3. Diabetics should be referred for a periodontal assessment that includes periodontal probing every six months.
4. Diabetic patients diagnosed with periodontal disease should be offered an oral prophylaxis and non-surgical periodontal treatment (i.e., scaling and root planing) every six months if clinically indicated. This should be part of the chronic care program.

## Dental: Specialists
**First Court Expert Recommendations:** None.

**Additional Recommendations**: None.

## Dental: CQI

**First Court Expert Recommendations**

1. Develop vigorous CQI studies that address the weaknesses presented in this report and put in place steps to correct the problems. *We agree with this recommendation.*

**Additional Recommendations**

2. IDOC should hire an individual experienced in health services research to guide the local CQI studies effort.

## Internal Monitoring and Quality Improvement

**First Court Expert Recommendations**

1. The QI policy and the training connected to it must be redone in order to facilitate quality improvement effectively occurring at each institution. This will entail a lengthy discussion. *We agree with this recommendation.*

**Additional Recommendations**

2. The paperwork requirements of putting together information for the annual CQI report need to be separated from the role of leading CQI efforts in improving care.
3. The Governing Body of the health care program needs to be predominantly medical personnel.
4. CQI plans need to be specific to the facility and address major concerns or problems at that facility.
5. A mortality review process needs to be initiated. This process should be managed and performed by non-vendor personnel under direction of the Office of Health Services. This group should review all deaths and sentinel events to identify problems and offer solutions that the facility CQI program addresses and responds to.

# Appendix A

| Staffing for Menard Correctional Center | | | | | |
|---|---|---|---|---|---|
| Position | State or Wexford | Filled | Vacant | LOA | Positions |
| HCUA | State | 1 | 0 | | 1 |
| DON | State | 0 | 1 | | 1 |
| Nursing Supervisor | State | 3 | 0 | | 3 |
| Office Coordinator | State | 2 | 0 | | 2 |
| Office Assistant | State | 1 | 3 | | 4 |
| Staff Assistant | Wexford | 1 | 0 | | 1 |
| Office Associate | State | 2 | 0 | | 2 |
| Clerk II | State | 1 | 0 | | 1 |
| Health Info Assoc | State | 2 | 0 | | 2 |
| RN | State | 18 | 10 | 1 | 28 |
| LPN | State | 12 | 8 | | 20 |
| LPN | Wexford | 4 | 2 | | 6 |
| Dental Director | Wexford | 0 | 1 | | 1 |
| Dentist | Wexford | 1 | 1 | | 2 |
| Dental Assistant | Wexford | 2 | 0 | | 2 |
| Dental Assistant | State | 1 | 0 | | 1 |
| Dental Hygienist | State | 1 | 0 | | 1 |
| Medical Director | Wexford | 1 | 0 | | 1 |
| Physician | Wexford | 0 | 2 | | 2 |
| NP | Wexford | 2 | 1 | | 3 |
| Wexford Site Manager | Wexford | 1 | 0 | | 1 |
| Med Room Asst | Wexford | 2 | 0 | | 2 |
| Radiology Tech | Wexford | 1 | 0 | | 1 |
| Phlebotomist | Wexford | 1 | 0 | | 1 |
| Optometrist | Wexford | 1 | 0 | | 1 |
| PT aide | Wexford | 1 | 0 | | 1 |
| Physical Therapist | Wexford | 0.1 | 0 | | 0.1 |
| Total | | 62.1 | 29 | 1 | 91.1 |

# Northern Reception and Classification Center
# 2nd Court Appointed Expert Report
# Lippert v Godinez

Visit Date: January 29-February 1, 2018

Prepared by the Medical Investigation Team

Mike Puisis, DO
Jack Raba, MD
Madie LaMarre MN, FNP-BC
Catherine Knox, MN, RN, CCHP-RN
Jay Shulman, DMD, MSPH

PTX193-0487

# Table of Contents

**Overview** ................................................................................................ 2

**Executive Summary** ............................................................................ 3

**Findings** ................................................................................................ 7

Leadership, Staffing, and Custody Functions........................................... 7
Clinic Space, Sanitation, Laboratory, and Support Services ........................ 15
Medical Records............................................................................... 22
Medical Reception ............................................................................ 27
Intrasystem Transfer ........................................................................ 34
Nursing Sick Call .............................................................................. 35
Chronic Care .................................................................................... 40
Urgent/Emergent Care....................................................................... 50
Specialty Consultations ..................................................................... 51
Infirmary Care .................................................................................. 56
Pharmacy and Medication Administration............................................. 62
Infection Control .............................................................................. 67
Dental Program ................................................................................ 68
Internal Monitoring and Quality Improvement...................................... 84

**Recommendations** ..........................................................................**94**

Leadership, Staffing, and Custody Functions......................................... 94
Clinic Space, Sanitation, Laboratory, and Support Services ..................... 95
Medical Records............................................................................... 95
Medical Reception ............................................................................ 96
Intrasystem Transfer ........................................................................ 98
Nursing Sick Call .............................................................................. 98
Chronic Care .................................................................................... 99
Urgent/Emergent Care...................................................................... 100
Specialty Consultations .................................................................... 101
Infirmary Care ................................................................................. 102
Pharmacy and Medication Administration............................................ 102
Infection Control ............................................................................. 104
Dental Program ............................................................................... 104
Internal Monitoring and Quality Improvement..................................... 110

**Appendix A** ....................................................................................**111**

**Appendix B** ....................................................................................**112**

**Appendix C** ....................................................................................**115**

PTX193-0488

# Overview

From January 29, 2018 through February 1, 2018, the Medical Investigation Team visited the Northern Reception and Classification Center in Joliet, Illinois. This report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured medical services areas and housing units
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden Randy Pfister and his staff for their assistance and cooperation in conducting the review. We had complete cooperation from the Illinois Department of Corrections (IDOC).[1]

The Stateville Northern Reception Center's (NRC) primary mission is a reception center where staff performs intake processing of new inmates before they are sent to other IDOC facilities within the state. It was built in 2004 and is the largest reception center in the state of Illinois. On 1/29/18, the first day of our visit, the NRC census was 1,493 inmates, with an additional 188 inmates housed in the minimum security unit (MSU), for a total of 1,681 inmates. The NRC population includes 53 inmates in segregation, and 15 inmates in boot camp.

In 2017, the NRC received 15,942 inmates or approximately 307 inmates a week. NRC has a 20-bed infirmary; 12 beds are assigned to medical and eight beds are assigned to mental health.

NRC is part of a two-facility complex that includes Stateville Correctional Center (SCC). SCC is the parent facility of this complex and a single Warden manages both facilities. Each of these facilities is a stand-alone facility; they are not physically connected. They are separated by security perimeters and one must drive a short distance and reenter a second security gate to enter the other facility.

The population design capacity for NRC is not calculated separately from SCC. For SCC and NRC combined, the population is currently 89% of design capacity. Twenty-nine inmates were housed at the facility greater than 90 days. We note that this is significantly fewer than the 587 individuals who remained at the facility greater than 60 days at the time of the First Court Expert's NRC report.[2] This implies that intake evaluations and transfers are occurring at a faster rate than previously. The 29 inmates who remain at NRC greater than 90 days include 12 inmates who remain at the facility for medical reasons. Of these, six have disabilities and are

---

[1] We did not experience complete cooperation from Wexford Health Sources. Their attorney required that he be present for interviews with Wexford staff but was unable to attend our tour, prohibiting some interviews with the Medical Director, physician assistant, offsite scheduler, and follow-up questions with the Director of Medical Records. We are in discussions about how to improve the cooperation with Wexford so that it does not impair our ability to conduct interviews with staff.
[2] Northern Reception Center (NRC) Report, January 21-23, 2014 prepared by the Medical Investigation Team.

awaiting ADA placement at other facilities. The remaining six individuals are on hold for medical reasons, mostly for continuing specialty medical treatment. NRC has a consistent mental health caseload of approximately 450 inmates and eight rooms designed for mental health watches. Inmates attending Court in the northern district are housed at both SCC and NRC. These are called WRITS. The combined population of WRITS at SCC and NRC is 55.

# Executive Summary

Based on a comparison of conditions as identified in the First Court Expert's report, we find that conditions appear to have deteriorated. We find that NRC is not providing adequate medical care to patients. There are systemic issues that present ongoing serious risk of harm to patients and result in preventable morbidity that could also result in mortality. The deficiencies that form the basis of this opinion are provided below.

Though NRC is a large facility with over 1400 inmates, it is still treated as part of SCC. NRC and SCC share a Warden, Assistant Warden of Programs, and medical staff. These facilities are unique facilities, each with a different mission; they need separate medical staff and need to operate independently due to their separate and unique missions.

While the leadership staff is now in place, they are all recently hired. The Medical Director is a nuclear radiologist and performs inadequately in primary care, and provides little to no clinical leadership. He has been with Wexford for years and has continued to perform poorly, and yet has been assigned to be a Medical Director. There is no evidence that Wexford performs any credentialing or privilege assessment except to ascertain that the provider has a license. This is below community standard of practice. Wexford has hired an ex-warden without formal medical training as Regional Manager, which in our opinion is unacceptable.

NRC has inadequate staffing. There is a 42% vacancy rate, which is extraordinarily high. The mixed staff of Wexford and IDOC employees creates confusion regarding supervisory lines of authority. The IDOC has not performed a staffing needs assessment. Some areas of service are understaffed or not staffed at all (e.g., infection control, quality improvement and clerical staff). Relief factors are not incorporated into projecting staffing needs. The numbers of custody staff appears inadequate to support the medical requirements of providing security to nurses as they administer medication and to transport inmates for clinical appointments.

We found that the conditions of confinement are a major impediment to the delivery of health care. At NRC, inmates are locked down 24 hours a day except for four hours per week. We have not observed the conditions of confinement found at NRC at any other correctional facility in the country except supermax prisons, where even these inmates are granted one hour out-of-cell time per day.

As a result, NRC inmates are unable to confidentially submit their health requests into locked boxes accessed only by health care staff because they are not allowed out of their cells. Nurses

do not adhere to standards of nursing practice with respect to medication administration due to the conditions of confinement. This has resulted in systemic medication errors and ongoing risk of harm to patients. (See Pharmacy and Medication Management).

NRC has a number of clinical space and sanitation problems. Inmates in the housing units are not brought to the health care unit for nursing sick call and these evaluations are performed in housing unit rooms unacceptable for clinical evaluations. The number of providers exceeds the number of examination rooms in the health care clinic, which results in prioritization of work schedules and promotes missed evaluations. In almost every clinical area, sanitation and maintenance of the physical plant was not at an acceptable level for provision of health care. Some equipment was non-operable, negative pressure rooms were not functioning, patient examination tables lacked paper barriers, examination tables and infirmary beds were nonadjustable, and sinks and faucets all had mineral deposits, making them harder to sanitize. Adequate clean linens were not in supply on the infirmary for incapacitated patients who frequently soil themselves. These deficiencies are typically addressed by a regular sanitation schedule and performance of environmental rounds, which do not happen at this facility.

Medical records are inadequate and promote poor clinical care. Because of the lack of staffing, NRC does not maintain the medical records in accordance with its own administrative directives. It also does not maintain medical records in accordance with guidelines from the Illinois Department of Human Services. Documents are not present in the medical record in an organized manner, making the record difficult to use. Laboratory and consultation reports are often not present in the medical record, making it difficult to provide adequate clinical care. The medical record room is undersized, cluttered, and not secure. There is no medical records tracking system to provide accountability for the location of medical records.

Although the timeliness of reception screening has improved since the First Court Expert's report, there are still numerous deficiencies. Equipment is not maintained or calibrated. Visual acuity testing is inaccurately performed and yields inaccurate results. Staff incorrectly read Tuberculin skin tests and inconsistently record results in the health record. HIV opt-out testing is inconsistently performed. Intake evaluations uniformly lack adequate history, and physical examinations are cursory. Providers do not consistently perform adequate assessments or order labs tests necessary to determine the patient's disease control. Providers often omit or change a patient's medications upon arrival without clinical indication. Nurses do not consistently initiate a medication administration record when giving patients stock medication in the reception area. Provider medical reception orders are inconsistently carried out. Provider follow up of abnormal reception laboratory tests is not consistently and timely performed.

Inmates are not provided access to approved health request forms and do not have a secure location to place these requests, which creates a barrier to access to care. Staff do not collect health requests daily and do not date-stamp requests when they receive them. Requests are not triaged within 24 hours and nurses do not indicate the urgency of follow up evaluations. Requests are evaluated without the patient's medical record. Nurses conduct health request evaluations in rooms that are inadequately equipped and supplied. Health requests are

PTX193-0491

inconsistently filed in the medical record. Correctional Medical Technicians/Licensed Practical Nurses perform assessments but are not licensed to perform independent assessments. A recently established sick call log does not adequately track the status of each patient request. The IDOC Administrative Directives provide insufficient operational guidance regarding nursing sick call.

NRC does not track persons with chronic disease because the nurse assigned to perform this task is typically pulled for other assignments. Because patients with chronic illness are not tracked, many are not followed for their chronic illness even when they remain at the facility for extended periods of time. The provider notes for patients with chronic illness are deficient. They lack adequate history, reasons for modifying treatment plans, and have inadequate physical examinations. Diabetes care, in particular, is not provided consistent with contemporary standards of care. There were significant gaps on medication records, making it appear that inmates do not receive ordered medications for their chronic illnesses. Patients with problems beyond the expertise of NRC providers were not referred for appropriate consultation.

The emergency response bags and equipment were disorganized and not sanitized. Emergency response drills were conducted but the critique was limited. When deficiencies were identified there was no corrective action plan. NRC does not track emergency response on a log so it is not possible for the program to evaluate its performance through the CQI program.

Planned staffing for the infirmary is appropriate but actual staffing shows lack of staffing and no RN coverage for some shifts. Provider notes are generally written on a weekly basis, even when patients had need for more frequent notes. The quality of physician care on this unit was inconsistent and often inadequate. Progress notes lack documentation of the rationale for therapeutic plan changes and fail to identify a differential diagnosis or clear treatment plan. There was no documentation that pertinent physical examinations were being performed. We noted that care of persons with diabetes was especially problematic. The level of provider care placed patients on this unit at risk of harm.

Medication administration is impaired because of lack of sufficient cooperation by security staff, which appears to be due to insufficient custody staff. Nurses do not administer medication consistent with accepted nursing practice. Administration is not hygienic. Nurses do not appropriately confirm the identity of the patient receiving medication. Doors are not opened for medication administration and nurses pass medication through cracks in the door and do not adequately visualize patients to confirm their identity. Nurses do not document on the medication administration records at the time they administer the medication to the patient. When inmates do not take medication there is no process to refer the patient to a provider for counseling. The nursing medication room is dirty, cluttered and disorganized. Process issues with the contract pharmacy result in nurses having to transcribe large numbers of medication orders onto new medication administration records (MARs) at the end of each month instead of the pharmacy providing preprinted MARs. This creates an enormous work load for nurses and results in documentation errors. CQI reports indicate that staff repeatedly

commit errors in medication administration, yet an effective correction action plan has not been developed.

NRC has no infection control program, and no one assigned for this work. Sanitation, disinfection, and environmental inspections are not done or are poorly performed. No one evaluates the effectiveness of infection control issues, including: TB skin test reading, effectiveness of intake infection control screening, or surveillance for contagious or infectious disease.

The dental clinic is small, with capital equipment approaching the end of its useful life cycle, and there is no replacement plan. While critical equipment has been repaired, recent history suggests that there are systemic problems in obtaining repairs. There is no documentation that the dental x-ray units have been inspected by a therapeutic radiological physicist per Illinois Administrative Code. Clinic disinfection and infection control are adequate; however, infection control at the intake screening exams is unacceptable and must be addressed immediately. Routine dental treatment occurs without a comprehensive oral examination (i.e., intraoral x-rays, a periodontal assessment, and a treatment plan), placing patients at risk of preventable pain and tooth loss. Clinical notes are inadequate. Antibiotics and analgesics are often dispensed without a diagnosis having been recorded, and the patient's chief complaint is rarely recorded. The dental sick call process is disorganized, and it is not possible to determine how long patients wait to be treated, or the failed appointment rate. There is no process for mid-level providers to triage and palliate patients whose sick call request states or suggests pain or infection when the dentist is not available. The dental program has not changed materially since the First Expert's Report. It represents a substantial departure from accepted professional treatment standards and is not minimally adequate.

Quality improvement is a critical form of self-monitoring and is necessary to identify and correct defective systemic issues. NRC did not have its own Continuous Quality Improvement (CQI) program until recently. It has not yet become effective. The Traveling Medical Director is an ineffective leader and ineffective in promoting quality improvement. No one at NRC has experience, training, or dedicated time to perform or lead the CQI effort. The NRC CQI plan is identical to the SCC CQI plan, even though these are different institutions. The CQI coordinator has no training in CQI, does not understand what CQI consists of, and has a full-time assignment that restricts her CQI to a few hours a month, which are mainly occupied in secretarial functions. The CQI program does not monitor for quality of clinical care. Peer review is ineffective and does not reflect the current status of clinical care. Mortality review and sentinel event reviews are not done. Data support for the CQI program is insufficient.

# Findings

## Leadership, Staffing, and Custody Functions

**Methodology:** We interviewed leadership of the health care program, the Warden and some of the Warden's staff. We evaluated staffing documents and discussed these with the leadership. We reviewed other selected documents.

### First Court Expert Findings

The First Court Expert found that leadership provided by the Medical Director and Health Care Unit Administrator (HCUA) was deficient and resulted in a program ill-organized to provide quality services. The HCUA was on leave and her absence left the facility bereft of administrative leadership. The lack of leadership resulted in the absence of performance review, lack of data provided by tracking logs, and disorganized medical records, which were ascribed to the lack of leadership. The HCUA was a position shared with SCC. Staff was shared between SCC and NRC, which made it difficult to know how many staff work at each of these facilities.

### Current Findings

Our review showed one improvement. NRC now has its own budgeted leadership team, including its own HCUA, Director of Nursing (DON), and Medical Director, even though these positions are not all filled.

The remainder of the problems cited in the First Court Expert's report persist. We identified additional findings, including:

- None of the leadership staff at NRC, including the Warden, was aware of or had read the 2014 First Court Expert's Lippert report. The leadership at NRC was not aware of the First Court Expert's recommendations or findings even when the IDOC agreed with the First Court Expert's findings or recommendations in their response to that report.
- The Medical Director position is vacant and filled by a "Traveling Medical Director" who does not adequately fill those responsibilities and who is poorly qualified to provide the type of medical care needed at this facility.
- The practical implementation of "Traveling Medical Directors" does not address the responsibilities required of a Medical Director.
- The Wexford Regional Manager for this facility is an ex-warden and has no formal training in health management.
- All leadership positions (HCUA, DON, Medical Director, and Director of Medical Records) are only recently filled. The HCUA is the longest tenured leadership position and this was filled nine months ago.
- NRC is understaffed, yet the program does not have a staffing plan that matches the medical needs at the facility.

PTX193-0494

- NRC still shares staff with SCC. There are not clear lines of authority in the table of organization with respect to assignment and supervision of staff that move between facilities. The hours shared-employees work at each facility are ineffectively tracked.
- A relief factor has not been used for staffing at NRC, which will result in understaffing.
- The budgeted staffing does not include clerical positions, quality improvement nursing hours, or infection control nursing hours.
- Budgeted positions do not appear to have been developed with respect to current workloads for many categories of employees, including physicians and mid-level providers, nurses, medical record clerks.
- There is no current document reflecting actual staffing at this facility.
- None of the senior staff at NRC participated in the development of the schedule E for this facility, indicating the lack of participation of local leadership in developing a needs assessment for the facility.
- There is a lack of custody staffing to timely assist nurses during medication administration. Inmates are not all brought timely for their medical appointments.

NRC no longer shares medical leadership with SCC, which is an improvement. This is consistent with one of the First Court Expert's recommendations. The HCUA, DON, and Director of Medical Records positions are all filled. The Medical Director position is now vacant, but this position was filled during the time of the First Court Expert's report. An NRC staff physician was recently promoted and is currently serving as the "Traveling Medical Director" at NRC, which is equivalent to a coverage position. The IDOC and Wexford both perform regional oversight of the medical program. The Northern Regional Coordinator, a nurse position for the IDOC, is filled. The Regional Manager and the Regional Medical Director for Wexford Health Services are both filled.

The Wexford Regional Manager was unable to be present for our tour. We learned from Wexford Vice President of Special Projects that the Wexford Regional Manager is an ex-warden by training.[3] We have concerns that a person with criminal justice training will not have the skills necessary to manage a clinical medical program. This was confirmed in our discussion with the HCUA, who thought that the Wexford Regional Manager did not always understand medical issues as presented in the quality improvement meetings and, as an example, did not understand that using drop files in medical records is inappropriate.

The Regional Coordinator for the northern district of the IDOC is an RN and has an additional Bachelor of Science in nursing. This well-qualified individual has been in his position for two years. He covers 10 facilities for the IDOC, which is a large span of supervision. He does participate in quality improvement meetings and appears to be an active participant in issues at NRC and was present and engaged during our tour.

NRC leadership positions have only recently been filled. The HCUA is an IDOC employee and started at NRC in April of 2017. She is a RN and was previously a nurse at the Sheridan facility

---

[3] Interview with Cheri Laurent 1/25/18.

and transferred as the HCUA at Pontiac before transferring to NRC as the HCUA. The HCUA told us that she inherited a facility that had not been properly managed for years. The DON, also an IDOC employee, started in September of 2017, only four months before our tour. The Medical Record Director, a Wexford employee, started two months ago in her position. The Medical Director position had been vacant for an extended time period. The physician assistant at NRC told us that over the past five years there have been seven Medical Directors. During the same five year period there was no Medical Director for a period of about 24 months. According to the HCUA, several months ago a physician moved from Dixon to serve as the NRC Medical Director. A few weeks ago, this physician, after being at NRC as Medical Director for only approximately three months, was moved to be Medical Director at SCC when its Medical Director died.

The NRC Medical Director position is now vacant but is filled by a "Traveling Medical Director." The HCUA was not pleased with the current Traveling Medical Director's lack of participation in leadership functions. The HCUA told us that she needed a strong medical leader in the Medical Director position and attempted to have the newly appointed SCC Medical Director remain at NRC but was unsuccessful.

The title of "Traveling Medical Director" is a misnomer, in our opinion. At NRC, the current Traveling Medical Director does not provide typical duties of a Medical Director based on our discussion with the HCUA. A full-time Medical Director knowledgeable in primary care medicine is needed. Furthermore, it appears from staffing documents provided to us from Wexford that physicians and Medical Directors are frequently moved from facility to facility.[4] The lack of coverage by a consistent Medical Director detracts from having effective guidance from a reliable physician with respect to clinical issues at the facility. The lack of a permanent Medical Director at NRC significantly impairs the ability of the leadership team to improve the program through active participation of a physician in quality improvement and other activities.

The newly appointed Traveling Medical Director at NRC was the Medical Director at the Hill facility during the last First Court Expert visit to that facility and was described in that report as not performing some administrative responsibilities, having "clinical concerns," and having interpersonal deficiencies. Also, a Wexford discipline report of 11/26/17 lists this physician as having been given a final warning on 2/16/16 for performance.[5] We also noted, in record reviews, our own clinical concerns for this physician. Given his history and lack of clinical proficiency, we have concerns that he will be successful in this new role.

The NRC is grossly understaffed. The lack of staffing is reinforced by NRC management in several comments in quality improvement meeting minutes, including:

---

[4] 40C0134-IL Physicians Report 9-19-14 key; 42P5643-IDOC Position History 7-1-2015 to 11-22-17 Bates #520-548; and 4253412-IDOC Physicians as of 1-25-18  Bates #124.

[5] Bates document #549, 42P5751 Discipline Report – Employees Disciplined between 7-1-15 to 11-26-17 for Misconduct or Performance.

- "Not enough nurses or staff assistants. [The IDOC Regional Coordinator] wants some numbers. [The Wexford Regional Manager] said to let him know and he'll get them. Breakdown of how many of each for every shift. Do staffing plan and review."[6]
- "Mandates causing mistakes because nurses are working a lot but they are getting good pay and can still lose their license for their actions."[7]
- "AWP says we are doing good with lack of staff...[Regional Coordinator] says things fall through because no nursing/staff or tracking issue."[8]
- "[Director of Nursing] was supposed to assign a nurse for 30-day assignment to be held accountable. There is not enough staff for accountability."[9]

Every individual we spoke with told us that staffing shortages were the most significant problem at this facility. However, an adequate and thorough staffing analysis based on need has not been done.

Staff is still shared between NRC and SCC. We were told that between September and October of 2017, the IDOC negotiated a labor agreement with the Illinois Nurses Association (INA) to have all registered nurse (RN) staff at five facilities (Menard, Pontiac, Dixon, Graham, and NRC) become state employees under the INA union contract and that all licensed practical nurses (LPNs) would be Wexford employees. For NRC this was intended to be part of a plan for NRC to function independently from SCC. The Vice President of Special Projects for Wexford, the Northern Regional Coordinator for the IDOC and the HCUA of NRC all told us that this arrangement was in planning stages but that there was no written agreement that they had seen.

Related to that negotiation, on October 6, 2017, only three months before our visit, the Regional Coordinator for the northern region estimated, for purposes of these negotiations, that NRC needed 33 nurses.[10] This analysis was given to us as a staffing needs assessment at the facility. This analysis did not take supervisory nurses into account and did not address special functions, such as chronic disease nursing, quality improvement, or infection control. The negotiation was with the nursing union and only nursing staff was addressed in the staffing analysis. More importantly, this analysis did not include a relief factor, which means that the number of necessary nurses may be 1.4 to 1.7 times (46-56 nursing positions) as high as the 33 nurses given in this analysis.[11] An adequate staffing analysis needs to be done to determine adequate staffing levels for all staffing categories required to accomplish tasks. Also, because many tasks are not now being performed, it will be difficult to perform this analysis until

---

[6] September 19, 2017 Quality Improvement Meeting minutes.
[7] September 19, 2017 Quality Improvement Meeting minutes.
[8] November 21, 2017 Quality Improvement Meeting minutes.
[9] August 15, 2017 Quality Improvement Meeting minutes.
[10] Email from Joseph Ssenfuma to Edward Jackson, Natalie Norther, Robin Best, Kim Hugo, and Steven Meeks on 10/6/17.
[11] A relief factor analysis determines how many hours of staffing does one post require for a year. The total coverage hours required for each position is divided by the number of hours each full-time employee is available to work. The number of hours each employee is available to work is calculated by the paid hours minus the hours off for vacation, holidays, weekends, sick leave, and training. In my management experience, each full-time post requires approximately 1.7 to 1.9 FTE employees.

leadership includes all tasks required by the administrative directives (AD) into a staffing analysis.

Because staff is shared between SCC and NRC, three different managers supervise NRC nursing staff: the NRC HCUA, the SCC Wexford DON, and the SCC HCUA. This results in supervisory conflicts that arise due to union contract rules. Wexford staff must be given assignments and have personnel actions given by Wexford supervisors. State employees must be given assignments and have personnel actions given by state supervisors. This means that when a Wexford employed staff works at NRC where there is no Wexford nursing supervisor, the staff at NRC does not have the ability to discipline or technically to make an assignment. The current table of organization does not provide clear lines of management authority and does not reflect this confusing supervisory structure. This makes managing NRC complicated, difficult, and can result in confusion.

SCC is the parent facility in its relationship to NRC. Since SCC and NRC are sharing staff, someone has to be responsible for making decisions on who is to get greater staffing, especially during times when staff is off sick or on vacation. This responsibility has not yet been assigned. We were told that the HCUAs of SCC and NRC are trying to work out a staffing schedule of shared staff and for assignment of nursing staff from SCC who will assist at NRC. Shared-staffing assignments appear to be an extemporaneous negotiation. When the SCC Wexford staff provides service at NRC, their hours are tracked by the Wexford management. The HCUA has complained to the Regional Manager of Wexford that the hours provided at NRC by the Wexford nursing staff from SCC are inaccurate. This shared staffing arrangement creates a "nightmare" as described by the HCUA.

The current schedule E provided to us by the IDOC is not accurate, as it does not reflect the recently negotiated changes in nursing staff at NRC and does not represent the portion of shared staff from SCC that can regularly be counted on to work at NRC. The HCUA could not provide me an official document that describes state medical employees and Wexford medical staffing at NRC. A table in Appendix 1 was based on the HCUA and the IDOC Regional Coordinator giving me the current configuration of staffing at NRC, which is not yet memorialized in a document. Shared staffing between NRC and SCC is not definitively apportioned in budget documents.

Our staffing table shows a total vacancy rate of 42%, although this reflects a large number of newly allocated positions. Still, this is an extraordinary vacancy rate. We note that this staffing level has not been developed with respect to staff needs at all levels. At best, it is a reflection of a recent analysis of nursing need without relief factor.

NRC provider staffing consists of two physician assistants, one staff physician, and a Medical Director. There are four budgeted providers but only three providers positions filled at NRC. We were told that all three providers work in the morning in the clinic, seeing patients for physical examinations, physician sick call, chronic care visits, and infirmary visits. At about noon, we

were told that all three providers go to intake to perform physical examinations. In the 2016-17 annual CQI the following statistics were provided:

| Intake evaluations | 17847 |
|---|---|
| PA sick call | 3062 |
| MD sick call | 2369 |
| MD urgent care | 616 |
| MD encounters | 6190 |
| Referred to MD | 1088 |
| Total | 31172 |

This amounts to 599 provider encounters per week or 119 encounters per day in a five-day work week. If there are four providers, each provider must see 29 patients per day. If there are three providers, each provider must evaluate 39 patients per day. At 29 patients per day, this is approximately four patients per hour if no lunch is taken. At 39 patients a day this is approximately five patients per hour if no lunch is taken. This does not include infirmary patients or review of labs, x-rays, collegial reviews, review of consultant reports, hospital reports, and quality improvement activity. This is consistent with the First Court Expert's report, which noted that providers may perform 25 or more physical examinations in three to four hours.[12] These are unrealistic patient loads not likely to promote quality care. This staffing pattern does not include a relief factor. This patient load is made worse given the lack of adequate support services, particularly poorly maintained medical records and failure to provide consultant reports to providers. This may account for an almost complete absence of adequate history taking and incomplete evaluations of many patients identified on record reviews.

An important aspect of physician staffing is physician credentialing. Administrative Directive 04.03.125 Quality Improvement Program requires one-time primary source verification be conducted by the vendor and presumably reviewed by the IDOC. Primary source verification is defined as verification from the original source of a specific credential to determine the accuracy of the qualification of an individual health care practitioner. Credentials include completion of medical school, training, licensure, and board certification if applicable. This would mean, for example, that one-time primary source verification would include:

- Query of the AMA Physician Masterfile for verification of US medical school graduation and postgraduate education completion. Alternatively, a letter from the medical school verifying graduation.
- Query of the Education Commission for Foreign Medical Graduates (ECFMG) for verification of a physician's graduation from a foreign medical school.
- A letter from a residency training program or hospital internship program regarding completion of internship or residency in part or in full.

---

[12] Northern Reception Center (NRC) Report, January 21-23, 2014, p. 9.

- The American Osteopathic Association (AOA) Physician Database for pre-doctoral education accredited by the AOA.
- The Federation of State Medical Boards for all actions against a physician's license or the National Practitioner Data Bank full report.
- A letter from fellowship programs for any fellowships completed.
- Query of the American Board of Medical Specialties (ABMS) for verification of a physician's board certification.

We agree with the requirement of the AD and believe this information should be available to the IDOC Agency Medical Director and Regional Coordinators so they can know whether the assignment of physicians by Wexford is appropriate from a clinical perspective.

Currently, in the IDOC, primary source verification is currently interpreted as including verification of only the physician's current medical license and DEA license. The HCUA and Regional Coordinator were unaware of the meaning of primary source verification in typical physician credentialing. The Medical Director at NRC told us that he completed three years of training in radiation oncology but did not finish the program. He then completed two years of nuclear medicine training and said he finished the program but never practiced in nuclear medicine. After finishing nuclear medicine training, this physician began working in the IDOC as a primary care physician. It is our opinion that this credential does not make this physician qualified to serve as a Medical Director or to obtain privileges to practice primary care medicine. When we spoke with the Agency Medical Director on January 19, 2018, we asked whether he would seek care from a nuclear radiologist if he had diabetes. He answered no and stated that using nuclear radiologists as primary care physicians in inconsistent with community standards. With respect to his prior emergency medicine business, he stated that he had never hired a nuclear radiologist and agreed that most Illinois residents seeking primary care would see a primary care trained physician.

There is no clerical support staff at NRC. The need for clerical staff needs to be taken into account in development of a staffing plan.

The schedule E is the staffing requirements of the existing vendor contract. Remarkably, none of the senior supervisory staff involved in the medical program we talked to are involved in the development of staffing needs that ultimately become incorporated into the schedule E. We understand that the last contract was developed well before any of the current leadership was in place. Nevertheless, current staffing needs are not reflected in the current schedule E. We asked the recent Vice President of Operations for Wexford, the Agency Medical Director, the IDOC Regional Coordinator, and the HCUA if any of them had input or created the schedule E staffing pattern. None of them had final authority or significant input into the schedule E. This means that the staffing needs of the facility are not brought to the attention of whoever is in charge of contracting for medical services or who is in charge of approving positions for the IDOC.

Though we did not review custody staffing, we heard complaints from supervisory staff that there are insufficient custody staff to escort patients to their appointments and to ensure that nurses have a custody escort when nurses administer medications to inmates. Because of lack of ability to bring segregation inmates for their appointments, doctors often go up to the segregation unit and see patients in a room not equipped for examinations and which only has a chair.

The Warden told us that there are no post orders for how officers are to assist nurses when they pass medications and no post orders or procedures for how inmates are to be scheduled and brought for their medical appointments. The health care program does not track how many people do not show up for appointments and there is no tracking of how often nurses encounter difficulties with respect to administration of medication. The Warden agreed that officers may monitor more than one housing unit due to staffing and that this was not their desired staffing arrangement. Medical staff told us that when that occurs, nurses have to wait for a custody escort, which delays medication administration. We were told that this is particularly problematic on the evening shift.

The CQI program should track the number of patients who fail to show up for all categories of appointments to determine if there is a problem with custody escorts. A custody staffing analysis should be done to determine if there is sufficient custody staff to ensure that patients are timely medicated and brought for ordered medical care.

With respect to a comparison of our findings with the findings and recommendations of the First Expert report, NRC now has its own leadership team, allocated in the budget, which was a recommendation of that report. There was a Medical Director in place at the time of the First Expert report. However, the Medical Director position is now vacant and is temporarily filled by an individual who is ineffective in that role and who has a history of clinical deficiencies and who Wexford has given a final warning with respect to clinical care. The First Expert report recommended a separate staffing grid for NRC. We agree with that recommendation but a staffing needs assessment and staffing allocation specific for NRC is still not in place. Staffing is still a combination of state and Wexford positions, which causes confusion and supervision problems.

The First Expert report found that the majority of problems could be traced to the lack of leadership at the facility. The condition does not appear to have improved, because the leadership team is only recently been formed and because the Traveling Medical Director does not provide clinical or administrative leadership in his role. Tracking logs and other data sources are still not reliable and therefore ineffective in analyzing processes of care. The leadership team also has not yet developed a plan of action, evidenced in their CQI plan, to correct systemic problems at the facility.

## Clinic Space, Sanitation, Laboratory, and Support Services

**Methodology:** Accompanied by a nurse supervisor, we inspected the intake reception area, housing units, mental health crisis unit, medical infirmary, and the outpatient clinic (exam rooms, interview room, treatment room, storage closets, and x-ray suite). Staff in these areas were interviewed.

### First Court Expert Findings
The First Court Expert found the reception space adequate and well maintained. At the time of the First Court Expert visit, the infirmary was not being used at NRC. The medical unit clinic had three examination rooms and an emergency care/urgent care/procedure room. The First Court Expert found the medical unit clinic clean and well maintained. The First Court Expert noted that there were no clinical spaces in the housing units to adequately perform sick call or physical examinations.

### Current Findings
We agree with the First Court Expert's finding that there are no adequately equipped and supplied clinical examination rooms in which to perform sick call within the housing units. We identified additional findings and confirmed some of the First Court Expert's findings as follows:
- Since the First Court Expert's report, the 12-bed medical infirmary has been opened.
- There are functional patient-activated call assistance devices on the wall next to each medical infirmary bed.
- Overall, the reception area is adequate in size and is acceptably maintained except for the provider examination rooms, which are unsanitary, cluttered, and have poorly maintained furnishings.
- There are two negative pressure rooms in the medical infirmary. The negative pressure monitor was not working at the time of the current visit. The vent in one of the two negative pressure rooms was taped shut, disabling the negative pressure capability of that room.
- The recently relocated nurse office/work station in the medical infirmary is cramped and does not have a sink, phone, computer, or electrical outlets.
- The designated clinical spaces in the housing units are unsuitable for the provision of sick call and physical examinations, lacking exam tables, appropriate chairs, desks, paper towels, and in some rooms, sinks for hand washing.
- The three exams rooms in the clinic are insufficient to accommodate all four providers, nursing staff, and the UIC telemedicine physician, who may need to see patients at the same time.
- The interview room used as an overflow exam room lacked an examination table and clinical equipment.
- The wall mounted oto-ophthalmoscopes were non-functional in all the exam rooms.
- There was broken equipment (scale and refrigerator) in the clinical area.
- The providers' desks in the health care unit examination rooms were poorly maintained.

- The exam tables were flat and nonadjustable. The head could not be raised. There was not an electric exam table in the clinic that could be used by non-ambulatory and disabled patients.
- All the health care unit and infirmary clinical and patient spaces were poorly maintained and inadequately sanitized.
- There were a number of infection control violations and safety hazards noted in the clinical areas.
- None of the examination tables in the clinic had paper barriers that could be changed after use by a patient. The gurneys in the treatment room did have paper barriers.
- The nurse sick call rooms in the housing units, the clinic examination rooms, storage spaces, the treatment room, and the infirmary beds and patient rooms are not properly cleaned, are poorly maintained, and disorganized, creating unprofessional and unacceptable work and patient care areas. Environmental and infection control rounds must be immediately instituted, and corrective actions aggressively pursued as indicated. There is no sanitation schedule for cleaning and sanitizing clinical medical areas.
- Sinks in multiple areas have mineral deposits in the sink bowl and on faucets.
- The quantity of linens was inadequate to meet the needs of the medical infirmary patient population.
- The lockdown practices of this facility force health care staff to conduct clinical interactions on the housing units (medication administration, reading TB skin tests, nurse sick call, and provider examinations) in conditions that are inappropriate for the clinical interaction and do not permit adequate care to occur.

The intake reception area is essentially the same as was described in the First Court Expert's report. The reception area is designed to perform a production line screening of all new admissions to the NRC. Once the security team has completed its intake process, new admissions are guided through a step-by-step clinical screening process including phlebotomy, dental, nurse history, and provider physical examinations. The phlebotomy area and nurse screening areas were clean and orderly. The examination rooms where providers perform examinations were dirty and furniture was in disrepair. Examination tables did not have paper to provide infection control between patients. There is accumulation of mineral deposits on faucets and in sinks, impeding sanitation and infection control.[13] There is no schedule of sanitation and disinfection practices to be carried out in these rooms.

The Minimum Security Unit (MSU) at NRC is a dormitory setting with a capacity of 272 beds housing inmate workers. The main NRC prison housing consists of 24 housing units A through X. A, B, and C are segregation units; the remainder are general population housing units. All the housing units at NRC are structurally the same. Each unit has three tiers with cells housing one or two individuals. The cells have a vertical glass slot and a chuck hole. We were told that the inmates on these units were allowed out of their cells for three showers a week and for two 2-

---

[13] NRC has "hard" water (i.e., high mineral content) which causes build-up of mineral deposits in pipes, faucets, and sinks. The institution needs a water-softening system; however, according to custody leadership, there is no funding for it.

hour yard sessions per week. During inclement weather, the yard sessions are cancelled, resulting in men not leaving their cells except for showers and medical care. There are no pill call lines. Nurses pass medications, read tuberculosis skin tests, and not uncommonly do sick call interviews cell by cell with the cell door locked. There is a correctional room/office on the first level of each unit with a sink/phone/desk and a cut-down tool and a first aid kit. Next to the security office, there is an approximately 8' x 10' room that is used by the nurses to do sick call when the inmates cannot be moved to the first level. None of the nurse rooms inspected had an exam table or a desk. Not all the rooms had a sink. There were two chairs in one of the rooms and four bolted metal chairs with shackles in another. The room on housing A had a sink with hot water but no soap or paper towels. There is no equipment in these rooms. We were told that nurses bring equipment with them when they use these rooms for sick calls. Providers also use these rooms for the completion of intake physical exams that were deferred during the reception process. We were also told that these rooms are occasionally used for chronic care clinic visits. Sanitation of these rooms was poor. Floors and sinks were dirty. Although these rooms are well situated to increase access of the inmates to sick call services and minimize inmate movement to the clinic, in their current condition they are unacceptable for the performance of sick call or provider clinical examinations.

The infirmary has a separate entrance from the main corridor and a short internal connecting hallway that links the infirmary with the clinic. Although the mental health crisis beds have been utilized for some time, the medical section was only opened in 2016. The medical infirmary was not opened during the First Court Expert's visit in 2014 and resulted in a recommendation to open and staff this unit. There is a wing with eight single cell mental health crisis beds and an adjoining corridor with 12 medical beds (six rooms, each with two beds). The nursing office was recently moved away from the mental health wing due to environmental concerns when mental health patient-inmates would flood their cells or MACE was used. The new office was previously a closet and has one desk, a dressing cart, a medication cart, a file cabinet, and a medical record holder in a very cramped space. There is no sink, no phone, no electrical outlets, and no computer. There were two unmounted sharps boxes in the room. It was reported that work orders have been submitted to address these deficiencies, which currently hamper the efficiency of the nursing staff. Unprotected paper memos and directives were taped on the walls, creating a fire safety issue.

The medical infirmary was inspected. Eleven of the 12 medical beds were occupied. There is a call buzzer at each bed. The buzzers were found to operational in all rooms that were tested, and the patient-inmates understood how to use this system. There were two negative airflow rooms (A-105-106), but the monitoring panel was not operational; the maintenance team was contacted and was working on this problem on the final day of our visit. The ceiling vent in A-106 was also taped over, interfering with the operation of the negative airflow system. Porters (inmate workers) were directed by a nurse supervisor to remove the tape.

The medical infirmary rooms were shabby. The beds are fixed in a flat position without the capability to raise the head or raise/lower the height of the bed. Most of the mattresses had open cracks and thus could not be adequately sanitized. One patient bed lacked a mattress and

had an uncovered porous foam egg crate full bed cushion that was dirty and absolutely could not be cleaned and sanitized. Even though two-thirds of the 11 individuals housed in the medical infirmary were chronically ill with issues of fragility, ambulation, self-care, disability, or continence, there were no adjustable hospital beds in the infirmary.

The mental health infirmary is generally for short-term crisis management. Three men were housed in the eight-bed mental health unit during the site visit. One of the individuals was smearing feces on the walls of his room.

The health care unit has administrative offices, a medical record room, a pharmacy/medication prep room, three examination rooms, one interview room, a single chair dental suite, a treatment room, a plain film x-ray room, a Panorex unit, and a central nursing station. Four providers are budgeted for doctor/provider sick call visits and chronic care clinics on Monday-Friday. A single provider also staffs a Saturday sick call. In the evening, nurse sick call is done. The clinic treats all urgent referrals in the treatment room. Each of the three exam rooms have non-adjustable upholstered tables without paper rolls, a sink, a wall mounted sphygmomanometer, and a desk. All of the desks no longer have veneer on the edges. Uncovered paper memos/directives/guidelines are taped on the walls. The mounted oto-ophthalmoscopes were missing electric cords and were non-functional in all the exam rooms. One room had a functional backup oto-ophthalmoscope placed on the exam table. There was not a single adjustable exam table or electric table in the clinic, making it extremely difficult to impossible to examine certain types of disabled patients. The sinks in the exam rooms were crusted with mineral deposits. One room lacked hand drying paper. A broken scale was in one room. Three crutches were stacked in the corner of one examination room for the entire site visit. There is an interview room with a desk and sink but without an examination table that is used by a provider when all four providers are on duty or one of the exam rooms is in use by the UIC Telemedicine specialty clinic. There were boxes on the floor and a broken desk-top refrigerator on a counter next to the desk. There were two closets in the interview room. One was stacked from the floor to almost the ceiling in violation of infection control and fire safety standards. The other closet was completely filled with oxygen tanks. Most were appropriately in security racks but six to seven were not; this is a safety hazard.

This clinic has an insufficient number of examination rooms. There are only four examination rooms and there are four providers. However, during morning sessions when all providers work in the health care unit, all rooms are occupied. There is then no space for a nurse to evaluate patients or for the UIC HIV/Hep C telemedicine clinic sessions. This lack of space results in prioritization and promotes failed appointments.

The treatment room had a suction unit, four secured oxygen tanks, two AEDS (one had an expired pad), crash cart, an EKG machine, two wall mounted oto-ophthalmoscopes without electric cords, and nebulization units. The crash cart is inspected on every shift; this was verified on the crash cart log. An emergency bag was inspected and was noted to have a variety of appropriate equipment (ambu bag, BP unit, stethoscope, dressings, ammonia capsules,

glucagon, thermometer, FSBG testing materials but not naloxone (Narcan). The treatment room was somewhat cluttered but operational.

In summary, we had additional findings as compared to the First Court Expert. We agree with the single recommendation of the First Court Expert that there should be a designated examination room in each housing unit appropriately equipped to conduct sick call. We have additional recommendations found at the end of this report.

<u>Sanitation Schedule</u>
**Methodology:** The reception screening area, the sick call rooms on housing units, the mental health crisis unit, the medical infirmary, and the clinic were inspected. Nurses, nurse supervisor, correctional officers, a sanitation sergeant, porters, and patients in the medical infirmary were interviewed.

**First Court Expert Findings**
The previous Court Expert reported that the clinical spaces were well maintained.

**Current Findings**
Although the First Court Expert had no findings with respect to sanitation, we noted multiple problems including:

- The level of sanitation in almost all the clinical areas has deteriorated since the visit of the First Court Expert.
- The cleanliness of the designated clinical spaces in the housing units, the mental health crisis unit, the medical infirmary, and the clinic was notably deficient, creating an unsanitary and non-professional clinical environment.
- The cleanliness of the reception screening was overall acceptable.
- Although requested, no documentation of training provided to the porters who sweep, mop, and sanitize the clinic and the infirmary beds was provided. The porters stated that they had received no environmental training and had learned their duties on-the-job. This may violate OSHA rules that govern exposures to blood borne pathogens.
- The porters wore surgical gloves that they did not change as they cleaned infirmary rooms/sinks/toilets and the clinical areas.
- Mattresses in the medical infirmary and the treatment room's gurneys' upholstery were torn and cracked.
- There was no documentation in the medical infirmary correctional log that beds and mattresses were sanitized before a new admission was assigned to a bed.
- There are no regular/monthly environmental or infection control rounds being performed at NRC.

NRC had posted a sanitation schedule in the clinic nursing station, but it does not specifically list the clinic and infirmary on the schedule. Interviews with a sanitation sergeant and two porters (inmate workers) related that the clinic and the infirmary are swept and mopped one to two times per week and as needed. The floors in both of these clinical areas are clearly not routinely

buffed. There is no record in the infirmary correctional log about the routine disinfection of occupied mattresses or after a bed has been vacated and before a new patient is assigned to that bed. The porters were noted not changing surgical gloves while they moved between infirmary rooms after cleaning sinks, toilets, and showers. They related that they had not received any training about their cleaning duties and the use of protective gear.

The porters are also responsible for the cleaning and disinfection of mental health crisis rooms that had been smeared with fecal material. They reported that there are Hazmat kits (gowns, face shields, gloves, booties) that they are to wear while cleaning body fluid on exposed floors/walls. However, the Hazmat kits are not always in stock. (Three Hazmat kits were found in the nursing supply area.) The sanitation sergeant stated that he did not know if there was any documented record/log about the sanitation training provided to the porters. The general uncleanliness of the infirmary and clinic is indicative of poorly trained and supervised workers.

The reception screening area was generally clean and in good condition except for the provider rooms. As noted in the Reception Screening section of this report, nursing staff sanitize their own work stations, but this service should be provided by porter staff in an organized manner for all areas, including provider examination rooms.

The overall cleanliness of the medical infirmary and mental health crisis unit was extremely poor. The sinks, toilets, and showers were functional but crusty and poorly cleaned. The floors in some of the infirmary rooms were painted, some were tiled. The painted floors were faded, and the blue color was discoloring the socks of the occupants. The edges of all the rooms had a rim of smudge and dirt. The wall in one medical room was splashed with some dried liquid material. Only one room (A-O6) was judged to be acceptably clean; this room was occupied by two more physically able patient-inmates who regularly clean their own space. The tile floor was shiny, the sink and toilet were not crusty, and the shower was clean. One vacant room in the mental health crisis unit was inspected; a section of the wall had a missing chunk of plaster, the floor was dirty and not been swept, the toilet had not been cleaned, the borders of the floor were dirty. The hallway in the mental health unit had missing and cracked tiles.

The edges of the clinic floors were smudged and dirty. The veneer on the sides of the providers' desks was missing, making it difficult to clean and sanitize. The supply cabinets in the clinic's exam rooms were cluttered and disorganized. Beverages/coffee were on the desks in two of the rooms. A provider's lunch was found in one of the cabinets.

The two gurneys in the treatment room had tears and cracks in the upholstery. The treatment room was disorganized and cluttered.

The infirmary and institutional sheets and bedding are washed in the central laundry. The plumbing staff maintains a log of the temperature of the hot water provided to these washing machines. The temperature logs from 10/1/17 to 1/29/18 noted 10 of the 121 days when the temperature was less than the 165 degrees (range 160-164 degrees) recommended in IDOC Administrative Directive 05.02.140.

In summary: The cleanliness and sanitation of nearly all of the clinical and patient care areas in NRC is notably deficient. There is an urgent need for the institution of vigilant, regular sanitation, and environmental and infection control rounds. The training of the inmate porters is nonexistent. Additional recommendations are noted at the end of this report in the Clinic and Sanitation and the Infection Control sections.

Environmental Rounds
**Methodology:** The HCUA, a nurse supervisor, nurses, and a sanitation sergeant were interviewed.

**First Court Expert Findings**
The First Court Expert did not address environmental rounds.

**Current Findings**
The NRC clinical leadership stated that routine environmental are not being done at NRC. Accordingly, there is no available documentation of such rounds. If the rounds were regularly performed, many of the deficiencies noted in the Clinic Space and Sanitation section would have been identified and corrective actions initiated. HCUA and nurse supervisors communicated that work orders are submitted for the repair or removal of broken equipment and furniture.

Radiology
**Methodology:** We toured the radiology unit and the radiology technician was interviewed.

**First Court Expert Findings**
The previous Court Expert did not comment on the radiology suite.

**Current Findings**
- There is no waiting list or backlog for plain x-ray studies at NRC.
- The turnaround time for the radiologist's reading and report is one to three days.
- During the upcoming visit to SCC, additional requests will be made to obtain any radiation physicist's reviews and certifications for NRC radiology units and discuss whether IDOC x-ray technicians are candidates for the use of monitoring devices as outlined in Illinois Administrative Code 32 -340 510 and 520.

NRC has a radiology suite in the clinic area that does non-contrast plain films. X-rays are performed Monday-Friday. A radiologist is onsite on Tuesday, Wednesday, Friday, Saturday, and Sunday to read films and write handwritten reports. The turnaround for receiving the radiologist's readings is one to three days. Six x-ray reports of films taken on 1/30/18 were audited; five were read within one day, and one was read in two days. There is no backlog and no waiting list for x-rays. Six patients were scheduled for studies on 1/31/18. Four had been x-rayed before noon; the arrival of other two men was awaited. It was reported that "no shows" are always rescheduled on the next working day.

It was not clear whether a Nuclear Radiation Physicist inspects the radiology unit in the clinic. There was not a certification posted in the suite. The administrative personnel who might have the certification was off duty during the four-day inspection. The x-ray technician stated that repairs are quickly done if so needed. The x-ray technician was not wearing a radiation exposure dosimetry monitoring device (badge); she was advised that this was not necessary at NRC.

In summary: Additional investigation is needed to verify whether the NRC Radiology unit is in compliance with the State of Illinois Radiation Safety regulations.

## Medical Records

**Methodology:** We interviewed medical records staff, toured the medical record room, and performed record reviews from which we determined the state of the medical records.

### First Court Expert Findings
The First Court Expert and his team had enormous difficulty in reviewing medical records because of "drop filing." The First Court Expert found that drop filing creates "chaos for clinicians" and that important information will not be located. The First Court Expert found that stapling intake documents together was not unreasonable. The First Court Expert also found that there was no system of logging and tracking medical records. The First Court Expert recommended drop filing should not be done for patients with significant problems and all patients at NRC for more than 30 days.

### Current Findings
We agree with all of the findings of the First Court Expert with one exception. We disagree with the practice of stapling intake medical documents together as a substitute for creating a medical record folder. We add the following additional findings:
- The medical records room is too small to accommodate the number of staff.
- Medical records are not maintained in accordance with IDOC requirements or in accordance with guidelines from the Illinois Department of Human Services.
- The medical record room is not secure. Unauthorized medical record staff can access the room at will. NRC fails to maintain privacy and confidentiality of the medical record.
- There is no tracking and accountability system for medical records. Because there is no sign-out process for medical records, it is not possible to know who has the medical record.
- Any staff member can pull and re-file medical records. This promotes loss of medical record documents and does not safeguard confidentiality or use by unauthorized persons.
- The intake packets of medical record documents include separate documents for dental, medical, and mental health. These are unified at a later date. There needs to be a unified medical record at the time a medical record is initiated.

The medical record at NRC is a paper record maintained in a green pressboard binder. There is a small medical record office in the health care unit to maintain and process the documents contained in the medical record. This office is too small for the number of staff. There are currently four medical record clerks and the room appears too small for this number of employees. Due to the inability to file records, five additional clerks have been added to this group. The space appears too small to accommodate nine employees and the volume of medical records. One wall of the records room is lined by file cabinets containing green medical record binders and manila folders containing individual inmate medical record documents. Opposite the file cabinets are a series of several desks used by medical records clerks to conduct their work. The space is extremely cramped and cluttered.

Medical records are not maintained in accordance with requirements of the IDOC Administrative Directives[14] or with the Illinois Department of Human Services requirements[15] for maintaining medical records. Medical records are so poorly maintained that the poorly maintained records are likely to adversely affect clinical care. This is similar to the finding in the First Expert report.

The Administrative Directive 04.03.100 Offender Medical Records gives requirements for how medical records are to be maintained. It states:
> "A medical record for each offender shall be established by the appropriate reception and classification center."

The AD describes the manner of maintaining a medical record, including:
- The tabbed sections of the medical record
- The tabbed section of the medical record that documents are kept in
- That medical records are confidential
- That every entry is legible
- That progress notes are filed within one day
- That reports from community health providers are filed within 14 days
- That consultation reports are filed within three days.

The IDOC AD on medical records requires use of a green binder for all inmates. This binder is a thick hard-backed pressboard folder with a medical record number. Each binder has nine tabs corresponding to the major types of documents including:
- Database
- Medical progress notes
- Consultations
- Mental Health Reports
- Dental/Vision
- Chronic clinic sheets/Flow sheets

---

[14] Illinois Department of Corrections Administrative Directive 04.03.100 Offender Medical Records.
[15] Illinois Department of Human Services website as found at http://www.dhs.state.il.us/page.aspx?item=40657.

- Medications
- Laboratory and X-ray reports
- Miscellaneous

The medical records at NRC are not maintained in accordance with the IDOC's AD on medical records. Many inmates housed at NRC do not have a green binder medical record. Those inmates at NRC who do have a green backed medical record have a record that is not maintained in accordance with AD requirements. Most files are loose paperwork in a manila folder or are loose paperwork placed in no particular order in a green binder. A significant number of files are merely an intake packet and any other medical record documents stapled together without any binder. The filing that occurs consists of placing medical record documents in a binder or stapling to a packet in no particular order. Documents are not separated into the pertinent section of a green binder. This situation has gone on for so long that this irregular and unacceptable medical record practice is institutionalized and accepted as normal.

For persons housed at NRC for extended periods and frequently seen for repeated treatments at UIC or John Stroger Hospital, their records become so disorganized that it is extremely difficult to find documents in the record. We noted on mortality reviews that two records of inmates who had been housed at NRC were missing medical record documents.  We note that the IDOC response to the First Court Expert's report stated that, "The IDOC disagrees that recommendations voicing preference for the manner in which record-keeping and administrative duties are performed rise to the level of constitutional obligations."[16] We disagree with this assertion. Not only does the manner of maintaining medical records violate the IDOC AD, but it also violates existing guidelines of the Illinois Department of Human Services. Also, significant risk of harm can arise when a medical record file is disorganized and fails to include all documents, as clinical staff may be unable to locate important documents. We note some problems in the specialty care section of this report whereby recommendations of consultants were not noted, possibly due to disorganized medical records and failure to provide consultation reports to clinical staff. We evaluated several patients who had large charts. These charts are unacceptable for routine use for clinical care. That clinical medical leadership has not objected to the state of these records reflects negatively on medical leadership.

The records process begins at intake. On each day of intake, a medical record clerk obtains the list of the number of arriving inmates and staples together a medical record packet for every inmate expected to arrive at NRC. Mental health and dental each have their own packets. The medical packets contain the sheets that are used in the intake process, including:
- A medical history form filled out by nursing
- A physical examination form filled out by a provider
- A problem list
- A progress note

---

[16] Pages 13-14; email letter to Dr. Shansky on 11/3/14 sent by William Barnes representing the IDOC.

- A transfer summary form
- An HIV counseling form
- An influenza vaccination form

A packet is made for each incoming inmate. Inmates who arrive from the Cook County Jail arrive with a packet of limited medical information from the jail that includes their medication. This information is attached to the packet for the corresponding inmate. Mental health and dental documents are not initially included with medical documents and are added to the record at a later date. All documents need to be maintained as a unified medical record. After conclusion of intake the packets are brought to medical records and maintained in vertical desk sorters by date. Each sorter contains all the packets for each day after intake. The sorters are kept on top of a file cabinet. The packets are kept in the vertical sorters until a physical examination is done. When the physical examination is done, the packet is placed in a basket. The packet is kept in a basket until the Mantoux skin test for TB is read. Once the Mantoux skin test is read, the intake packet is complete, the staple is removed and the documents are placed loosely in a green binder, not in chronologic order. Patients who are technical parole violators or are on Court Writs have their documents placed in a manila file folder in no chronologic or consistent order. Any subsequent medical record document is merely placed into the green binder in no particular order. Documents are not sorted into the nine types of tabbed document separators and filed into the corresponding tab section. Documents need to be sorted into the nine types of document tab section and within each tab filed in chronologic order. This does not occur until the medical record arrives at the destination IDOC facility. The reason for this was reported as lack of staffing.

The medical records room promotes non-confidential practices and promotes loss of medical record documents. This room is unlocked and the medical records are unattended by official medical record clerks for most of the day. Numerous staff wander into the room at will and take medical record documents without any documentation of what record they are taking or where they are taking it. Charts are not signed out when removed from the file room. Non-medical records staff also re-file medical records. There is no accountability for records removed from the medical records room. Medical record clerks work daytime hours. For the remainder of the day the room is open and staff walks in to obtain records as needed. This violates medical record practices, as unauthorized persons are to be excluded from the medical records storage area on the basis of confidentiality of the medical record. It is the practice at NRC that charts for all clinics (nurse sick call, PA sick call, MD sick call, and nurse treatment call) are pulled by nurses. Mental health staff pulls their own charts. Typically, non-medical record staff are considered unauthorized personnel and are not allowed to take or re-file a medical record without signing out a record. Given these practices, it would not be surprising that there would be a high volume of lost documents and records. While we were not able to investigate the number of lost documents and records, on the last day of our tour we listened to a senior staff in health care searching for a chart of a patient who was transferring, but the chart was lost.

The practices in this medical record program also fail to conform to Illinois Department of Human Services medical record guidelines, which require:

- Medical records are confidential and must be safeguarded against loss or use by unauthorized persons.
- Medical records rooms will be locked after regular work hours.
- The agency must have policies in place regarding the retention and destruction of medical records. For advice on record destruction, public agencies are to contact the Illinois Secretary of State's Illinois State Archives.
- Medical records must be maintained in accordance with accepted medical standards, including:
  - Readily accessible
  - Systematically organized and in chronological order
  - Confidential
  - Safeguarded against loss or use by unauthorized persons
  - Secured by lock when not in use.

We had an initial interview with medical record staff, including the Medical Record Director. We reviewed multiple records. All larger records were disorganized and were not in chronological order. These documents were so difficult to use that use of such a record would significantly prolong patient encounters unless providers failed to review the record appropriately. We believe the latter happens, based on record reviews. On record reviews, labs were often not reviewed during follow-up patient evaluations, consultation reports were not documented as reviewed at subsequent clinical encounters, and prior adverse clinical events were not noted. For several record reviews, we noted missing labs or notes which the records' department brought to us on the following day. These items were not timely filed.

We also noted that consultation reports and hospital discharge summaries are mostly not present in the medical record. Of a sample of 22 consultations and one hospitalization, only 36% of medical records included a report of those consultations. A physician assistant told us that consultation and hospital reports frequently did not make it into the medical record. In the IDOC response to the First Court Expert's report, the IDOC states that they have no control over hospitals and consultants and cannot be responsible for obtaining those reports.[17] Obtaining hospital and consultant reports is sometimes difficult. The IDOC is ultimately responsible to ensure that the reports are obtained. In our own experience in managing correctional programs, we sometimes have had to negotiate with hospitals and consultants but have always been able to obtain a hospital discharge summary and consultation reports of offsite services. The inability to do this is a reflection of the quality of management of Wexford. We note that the Regional Manager for Wexford is an ex-warden and lack of knowledge of how to do this may be an issue.

This medical record system is broken and unacceptable from a clinical medical perspective and violates Illinois Department of Human Services standards and the IDOC AD requirements. To fix

---

[17] Pages 21-23; email letter to Dr. Shansky on 11/3/14 sent by William Barnes representing the IDOC.

this system would require a complete overhaul. In the case of NRC, obtaining an electronic record would be an easier solution than attempting to fix the existing broken system. In any case, the current arrangement is unacceptable.

We confirmed all of the findings in the First Court Expert's report and had additional findings with respect to confidentiality and lack of adherence to the IDOC AD and state regulations. We disagree with the First Court Expert's recommendation that medical records should be maintained in the same manner as in permanent institutions but only for persons who remain in the MSU for greater than two weeks. All patients should have a properly maintained record beginning as soon as they arrive. It is our opinion also that NRC should conform to the IDOC AD on medical records and the Illinois Department of Human Services' requirements for maintaining clinical medical records. This would require that a green backed medical record file be initiated upon arrival at the facility and maintained throughout the stay at NRC. An easier fix to this problem would be to institute an electronic medical record. The First Court Expert also recommended that medical record staffing be sufficient to ensure that medical records are adequately maintained, and we agree with that recommendation. While additional staff has been budgeted, they have not yet been hired. The question as to whether the additional staff will resolve medical record problems identified in this report is not answerable at this time.

## Medical Reception

**Methodology:** To evaluate medical evaluation of newly arriving inmates we toured the medical reception area, observed the medical reception process, interviewed health care staff, reviewed IDOC health record forms, and reviewed 20 health records. Of the 20 records, 10 were selected from a log documenting referrals from the reception nurse to the provider. Ten records were selected from nursing sick call logs and from the list of inmates at NRC greater than 90 days.

### First Court Expert Findings
The previous Court Expert found substantial delays in medical processing of newly arriving inmates. Medical records were disorganized and inhibited the provision of adequate health care. IDOC forms used by nurses and medical providers did not include questions designed to elicit current symptoms (e.g., chest pain, shortness of breath, abdominal pain, etc.) that may indicate serious disease. Approximately 30% of records reviewed found lack of timely follow-up of abnormal labs and chronic diseases. Providers did not document significant medical diagnoses on the problem list.

### Current Findings
NRC's primary mission is to process and classify newly arriving inmates before transfer to other state institutions. In 2017, NRC received 15,942 inmates or approximately 307 a week.[18] Newly arriving inmates transfer from county jails and also arrive as parole violators. On Wednesdays, NRC receives inmate transfers from around the state who are on a writ to appear in Cook

---

[18] When the previous court expert evaluated the institution in 2014, the volume was approximately 500 inmates per week.

PTX193-0514

County court or inmates requiring medical services in the Northern Illinois area. These inmates are managed as intrasystem transfers and not medical reception inmates.

Our review showed that improvements have taken place with respect to the timeliness of completion of the medical reception process, including labs and provider physical examinations. Nurse and phlebotomy stations are clean and well organized. Medical providers document medical conditions on patient problem lists.

However, we found persistence of problems noted in the previous Court Expert's report as well as identified new problems. These include:

- Medical records are universally poorly organized with loose filing.
- Weight scales are not calibrated and are inaccurate.
- Nurses do not correctly measure visual acuity and do not consistently record results in the medical record.
- Nurses do not consistently record tuberculin skin test results in the medical record.
- Nurses do not change gloves or wash hands between patients.
- HIV opt-out testing is not being consistently performed.
- There is no schedule of sanitation and disinfection activities performed in medical reception. Instead of a system for routine sanitation and disinfection, the level of sanitation at each station is determined by the conscientiousness of individual staff.
- Provider examination rooms were filthy and furniture was in disrepair.
- Examination tables had no paper to provide an infection control barrier between patients.
- The dentist did not change gloves, wash hands, or change light-fixture infection control barriers between patient intake dental screening examinations.
- IDOC medical reception forms do not contain an adequate past medical history section and review of systems (e.g., chest pain, shortness of breath, abdominal pain, blood in stools, etc.) to detect recent or current symptoms of potentially serious medical conditions.
- Medical provider physical examinations are cursory and do not adequately explore the patient's medical history, including a pertinent review of systems, to determine whether a patient's chronic diseases are well or poorly controlled.
- Medical providers do not provide continuity of care with respect to patients' chronic disease medications, either omitting or changing medications (e.g., insulin types) without a clinical indication.
- Nurses transcribing provider medication orders do not initiate a medication administration record (MAR) when they have given the patient medications from stock supply.
- Medical providers do not consistently order chronic disease labs to be available at the initial visit (e.g., HbA1C).
- Medical provider orders (EKG, chest x-ray, blood pressure monitoring, etc.) are not consistently implemented by nurses.
- Medical providers do not timely address abnormal lab tests results.

- Medical providers do not complete the initial chronic disease form when seeing patients for follow-up.

<u>Observation of Medical Reception</u>

Medical reception is conducted in a large room, with inmates moving from station to station to complete each step of the process. The stations where nurses and phlebotomists work are clean and well-organized.[19] Staff had access to gloves and sharps containers.

As inmates begin the process, a phlebotomist collects blood for labs that include serum chemistry, syphilis, and opt-out HIV and hepatitis C antibody testing. Although HIV and hepatitis C testing are supposed to be opt-out, nurses consent inmates for HIV testing, which is an opt-in methodology.[20] Record review showed that HIV testing was not consistently performed even when patients requested HIV testing.[21] January 2018 CQI minutes showed that more than 1500 lab draws were performed that included 1300 hepatitis C tests, but only 278 HIV tests. This suggests that opt-out testing is not working as intended.

After phlebotomy, an RN performs a medical history, tuberculosis symptom screen, height and weight, vital signs, visual acuity, and tuberculin skin test (TST). Typically, there are two to four nurses assigned to this component of medical reception, depending on patient volume and/or nurse availability. Observation showed that the medical reception process went smoothly; however, we noted issues with the accuracy of clinical information. One of the court experts stepped on two different scales and found a 10-pound discrepancy in weight, indicating that the scales are not calibrated. Snellen charts to measure visual acuity are posted on the wall behind each nursing station with a piece of tape placed on the floor at approximately 20 feet away. However, nurses had patients read the Snellen chart sitting in a chair which was approximately 10 feet from the chart and at angle. Nurses also did not measure visual acuity in each eye by having the patient cover one eye at a time. Record review showed that nurses documented visual acuity in only 50% of the records, in most cases documenting 20/20 vision in both eyes which, given our observations, are likely not accurate. We observed that nursing staff did not consistently change gloves or wash hands between each patient.

Staff reads patient tuberculin skin tests (TST) 48-72 hours after administration by going cell to cell in the housing units. We interviewed staff, who reported that sometimes the officer opens up the food port slot to have the inmate stick out his arm for staff to read the TST and other times the inmate holds up his arm in the cell window and staff reads the TST through the window. The correct method of reading TSTs is to palpate the TST site for induration, which cannot be done by looking through a window. Thus, the current practice likely results in inaccurate reading of tuberculin skin tests and missed cases of TB infection. We also found that staff does not consistently document tuberculin skin tests in the health record. We interviewed

---

[19] There is no schedule of disinfection activities for the medical reception area. Nurses we spoke with made it their personal practice to organize and disinfect their work stations prior to seeing patients during medical reception.
[20] Opt-out testing means that testing will be performed unless the patient refuses the test. Opt-in testing means that the patient is offered testing and is performed only upon patient consent.
[21] Medical Reception Patients #1, 5, 19.

a staff person responsible for documenting test results who reported that she does it "if she has time." In several records we found that staff inexplicably documented planting the TST in January 2018 but reading the TST on 12/31/17.[22]

We note that the TST is a labor intensive and human error prone methodology to identify individuals who have tuberculosis infection or disease. Many correctional systems are switching to drawing blood for interferon-gamma release assays (IGRAs), which is more reliable and less error prone. Use of IGRA testing will free up a significant amount of nursing time that can be devoted to other clinical duties. This test would be especially useful at this facility, where officers do not open cell doors, so that nurses can appropriately read the Mantoux skin test.

Following the medical history, nurses immediately refer patients with acute conditions and/or chronic diseases to a medical provider. Staff reported that typically three medical providers are assigned to perform patient physical examinations and develop a treatment plan, including ordering medications. As noted in the previous Court Expert report, on days in which the volume of intakes is high, providers may perform 25 or more physical examinations in three to four hours, which was "unlikely to reflect an appropriate quality standard."[23]

The examination rooms where providers perform examinations were dirty and furniture was in disrepair. Examination tables did not have paper to provide barriers between patients. There is accumulation of mineral deposits on faucets and in sinks, impeding sanitation and infection control.[24] There is no schedule of sanitation and disinfection practices to be carried out in these rooms.

Depending on volume, one or two dentists perform oral screening at reception. We observed one dentist who did not change his gloves or wash his hands between patients, even when he incidentally touched the patient's lips while examining teeth and oral cavity.

<u>IDOC Medical Reception Forms</u>
We note that the IDOC Offender Medical History Past Medical History section of the form is limited with respect to chronic diseases and does not include chronic obstructive pulmonary disease (COPD), thyroid, kidney, liver, or autoimmune diseases, or cancer. The form also does not include a section for review of systems (e.g., chest pain, shortness of breath, abdominal pain, blood in stool, difficulty with urination, etc.) that are typically included in a comprehensive history and physical examination. *This poses a risk that important medical diagnoses or symptoms of serious illness will not be medically evaluated and missed, increasing risk of harm to the patient.* The IDOC Offender Physical Examination form (DOC 0099, Rev. 11/20/12) includes a section for substance abuse, risk factors for blood borne infections (e.g., HIV and HCV), and TB symptoms, but does not include a section for chronic disease review of systems

---

[22] Medical Reception Patients #5, 8.
[23] Lippert Report, p. 9.
[24] NRC has "hard" water (i.e., high mineral content) which causes build-up of mineral deposits in pipes, faucets, and sinks. The institution needs a water-softening system, however, according to custody leadership, there is no funding for it.

(e.g., chest pain, SOB, polyuria, polydipsia, neuropathy, etc.), which contributes to the assessment of disease control.

<u>Medical Provider Examinations</u>

With respect to provider history and physical examinations, we found them to be cursory and lacking in quality. Providers did not consistently elaborate on positive findings noted by the nurse. Providers took no additional medical history of the patient's chronic diseases, including a review of systems (ROS) to assess disease control at the time of admission. In many cases, a medical transfer summary was received by the sending institution, but providers did not document that they reviewed the information and, in some cases, missed important medical diagnoses (e.g., prostate cancer) or medications for high blood pressure (e.g., hydrochlorothiazide).

Providers wrote orders to enroll patients into the chronic disease program in 30 days and assigned patients low bunk/gallery status as clinically indicated. Providers also ordered diagnostic tests (e.g., chest x-ray, EKG) and labs for some chronic diseases (e.g., thyroid, anticoagulation), but did not order HbA1C for any diabetics. Providers usually ordered continuation of each chronic disease medication; however, in some cases they did not continue medications without documenting the clinical rationale for not providing continuity of care. In other cases, ordered medications were not timely received.

A clinical concern is that three patients were being treated for heroin withdrawal at the time of admission, but the provider did not order Clinical Opiate Withdrawal Scale (COWS) monitoring to assess whether the patients' symptoms were improving or worsening, and that may have required changes in medication withdrawal regimens.

Following provider physical examinations, nurses review and note provider orders, including medications. A concern is inconsistency among nurses with how medication orders are noted. Some reception nurses transcribe medication orders onto a medication administration record (MAR) and some do not. Thus, many patients receive medications for which there is no corresponding MAR documenting that they have received the medication. (See Pharmacy and Medication Management).

The following cases are illustrative of concerns noted above.

- This 58-year-old man arrived at NRC on 1/12/18.[25] His medical history includes diabetes, hypertension, asthma, seizures, BPH, prostate cancer, s/p total prostatectomy in 2008, latent TB infection, chronic alcohol abuse, depression, bipolar disorder, and PTSD. The provider did not elaborate on all positives noted on the nurses' medical history form or on the medical transfer form, including asthma, hypertension, alcohol abuse, or prostate cancer. The provider documented that the patient had a total prostatectomy but not prostate cancer. He did not order a HbA1c to assess diabetes control or PSA to assess for possible recurrence of prostate cancer.

---

[25] Medical Reception Patient #4.

- A 43-year-old man arrived at NRC on 1/8/18.[26] His medical history includes hypothyroidism, substance abuse, depression, and right ear surgery with tube placement in 2016. The provider did not document whether the patient still had a right ear tube. The physician ordered levothyroxine for the patient's hypothyroidism but there is no medication administration record that shows the patient received levothyroxine. Thyroid labs showed the patient's hypothyroidism was in poor control (TSH=19.1, normal=0.5-4.5). The physician reviewed the report, but as of 2/1/18 had not increased the patient's thyroid medication.

- A 56-year-old man arrived at NRC on 1/10/18.[27] His medical history includes diabetes, hypertension, hyperlipidemia, mitral valve replacement (MVR) and venous stasis. His medications included coumadin, metformin, metoprolol, losartan, and Pravachol. On the day of arrival, labs showed the patient's INR was therapeutic (INR=2.2, goal=2-3). On 1/18/18, eight days after arrival, a provider performed a physical examination. The provider ordered medications and an EKG. The provider did not order a HbA1C or enroll the patient into the chronic disease program. The EKG was not performed. On 1/25/18, a provider saw the patient for follow-up of MVR and venous stasis. He did not take a history of the patient's diabetes or MVR. He ordered an INR, EKG, and chest x-ray. As of 1/31/18, neither the EKG or chest x-ray had been performed.

- A 69-year-old man arrived at NRC on 1/19/18 following discharge from a hospital for pulmonary embolism.[28] His medical history also included hypertension, atrial fibrillation, hypothyroidism, COPD/asthma, and trigeminal neuralgia. The provider did not elaborate on the patient's recent medical history of atrial fibrillation and pulmonary embolism. The patient's hospital discharge medications included Pradaxa, but the provider changed it to Coumadin without documenting the clinical rationale. On 1/19/18, the patient's INR was subtherapeutic (INR=1.5, goal=2-3). On 1/24/18, a provider reviewed the report but did not increase the patient's Coumadin dosage. Labs also showed the patient was hyponatremic (Na=128, normal=135-146), most likely due to treatment with Trileptal, but as of 1/30/18 a medical provider had not addressed the abnormal lab report. We referred this record to the Nursing Director.

- A 56-year-old man arrived at NRC on 1/16/18.[29] The patient's medical history included diabetes and hypertension. Transfer information from Cook County Jail showed that he was prescribed Glargine Insulin 100 units every night and rapid-acting Insulin Aspart before meals. The physician changed the patient's insulin from long-acting glargine insulin to intermediate acting NPH insulin without documenting a clinical rationale for the change. The patient's blood sugar was 337 upon arrival but the provider did not note this high glucose level or order insulin coverage at that time. Reception labs showed the patient's syphilis test was positive with a titer of 1:2. On 1/27/18, the

---

[26] Medical Reception Patient #8.
[27] Medical Reception Patient #14.
[28] Medical Reception Patient #9.
[29] Medical Reception Patient #6.

physician saw the patient but took no syphilis history, except that the patient denied a history of syphilis. The physician did not stage the patient's syphilis (primary, secondary, latent, or late latent) and treated him with one dose of Bicillin, which would not be adequate treatment for late syphilis.

- This 46-year-old man arrived at NRC on 1/18/18.[30] His medical history includes diabetes and psychiatric history. The provider did not perform a history of the patient's diabetes or perform a diabetes or cardiovascular review of systems (ROS). The provider ordered Metformin, but his MAR showed the patient did not receive Metformin until 1/22/18.

- This 48-year-old man arrived at NRC on 1/11/18.[31] His medical history includes diabetes, myocardial infarction s/p stents in 2015, and high cholesterol. The provider did not perform a diabetes or cardiovascular ROS. The provider ordered medications including metformin, glipizide, Plavix, carvedilol, and gabapentin. There is no MAR showing the patient received keep on person (KOP) medications. Gabapentin was ordered on 1/12/18 but not received until 1/17/18. The provider ordered an EKG that was not performed. The patient consented to an HIV test, but it was not done. The patient's tuberculin skin test result was not documented in the health record.

- This 37-year-old man arrived at NRC on 12/22/17.[32] His medical history includes obesity, hypertension, opioid dependence, and sleep apnea with C-PAP machine. The patient accepted HIV testing, but it was not done. A physician saw the patient and ordered lisinopril, hydrochlorothiazide, and aspirin. There are no MARs in the record showing that he received these medications. On 1/19/18, the physician saw the patient for blood pressure follow-up. He did not complete a chronic disease form. The patient's hypertension was poorly controlled (BP=153/113 mm Hg.) The provider ordered one dose of clonidine 0.2 mg, increased Lisinopril to 20 mg twice daily and ordered blood pressure checks for seven days. The physician did not renew the patient's hydrochlorothiazide. On an unknown date, the patient wrote a health request that he was "supposed to have his blood pressure checked for 7 days….my pressure has been high plus I haven't been called to get it checked."

- This 37-year-old man who arrived at NRC on 12/28/17.[33] His medical history includes heroin use, seizure disorder, asthma, hypertension, multiple injuries secondary to suicide, s/p splenectomy 2004, and left hand infection. His medications included Dilantin, hydrochlorothiazide, enalapril, QVAR inhaler, Neurontin, and doxycycline. There is no documentation that the patient was given medications at medical reception. Five days later, on 1/3/18, the patient received Dilantin, ibuprofen and Robaxin. The provider did not document hypertension on the problem list. At intake, his Dilantin level was subtherapeutic (6.3, normal=10-20), but a provider did not follow-up on this

---

[30] Medical Reception Patient #3.
[31] Medical Reception Patient #1
[32] Medical Reception Patient #19.
[33] Medical Reception Patient #20.

abnormal report. On 1/24/18, the physician saw the patient and renewed Lisinopril, not hydrochlorothiazide. There are no physician order forms containing medication orders in the record. All medication orders were transcribed from provider progress notes, not physician order forms. On 1/30/18, a provider ordered Dilantin, Lisinopril, and Neurontin, but not hydrochlorothiazide.

- This 36-year-old man arrived at NRC on 1/19/18.[34] His medical history includes injection drug use, HIV infection, anxiety, and depression. The provider did not perform a HIV review of systems or order HIV labs in advance of the patient's chronic disease visit. Although HIV patients are treated by an outside provider, NRC providers should perform an evaluation to determine if the patient has any symptoms or lab test results warranting urgent referral.

In summary, although improvements have been made with respect to timeliness of the medical reception process, there are multiple systemic issues that create an ongoing risk of harm to patients.

## Intrasystem Transfer

**First Court Expert Findings**
The previous Court Expert reviewed 10 records of patients detained at NRC for >60 days and found that five patients with chronic diseases had not been enrolled into the chronic disease program.

**Current Findings**
Due to its mission as a reception center, NRC does not have a large volume of intrasystem transfer to NRC. Some inmates transfer to NRC to go out to court or to receive medical services in Cook County. Upon arrival, transferring inmates are subject to a process similar to medical reception.  We reviewed medical records of five inmates who transferred to NRC and/or had been at the facility for greater than 90 days. Two of five inmates had no medical conditions requiring follow up. One patient with COPD transferred to NRC on 10/19/17 and received a history and physical examination on 10/24/17.[35] The patient was not enrolled into the chronic disease clinic and a provider did not see the patient until 2/1/18.  In another record, the patient was timely processed in October 2017. In December 2017, a provider saw the patient for chronic disease management. The provider treated the patient for an exacerbation of asthma, for which the provider ordered prednisone 10 mg for three days; however, a nurse transcribed the order to be given for five days and the patient actually was given the medication for nine days due to a nurse's failure to properly transcribe the order. The provider did not timely see the patient for follow-up.

---

[34] Medical Reception Patient #10.
[35] Intrasystem Transfer Patient #23.

## Nursing Sick Call

**Methodology:** We evaluated nursing sick call by reviewing IDOC Administrative Directive Offender Health Care Services, (04.03.103K), Wexford Non-Emergency Health Care Requests and Services (P-103), IDOC Treatment Protocols, and the NRC Offender Handbook. We also interviewed health care leadership, staff, and inmates; inspected areas where sick call is conducted; and reviewed tracking logs and health records.

### First Court Expert Findings

The previous Court Expert Report found that there are no logs to track each health request and the corresponding staff response; inmates do not have the ability to confidentially submit health requests; health requests are not filed in the medical record; and there were problems with the quality of health assessments.

### Current Findings

Our review concurred with the findings of the previous Court Expert. We also found that the basic components of a nursing sick call program are not in place. At NRC, patients do not receive timely and adequate access to health care, creating a systemic risk of harm to the NRC population. These problems include:

1. Inmates are not provided approved health request forms to submit health requests; therefore, inmates submit requests on scraps of paper or generic Offender Request forms.
2. Inmates are not provided the opportunity to confidentially submit their health requests on a daily basis.
3. Health care staff does not collect health request forms on a daily basis.
4. Staff does not date, time, and sign when health requests are received.
5. Nurses do not triage patient health requests within 24 hours.
6. Nurses do not document the urgency of the disposition (e.g., urgent, routine).
7. Nurses do not assess patients with symptoms within 24 hours of triage.
8. Nurses do not have medical records available to them when seeing patients.
9. Nurses conduct sick call in inadequately equipped and supplied rooms in housing units without access to a sink for handwashing.
10. Health requests are not consistently filed in the medical record.
11. Correctional Medical Technicians/Licensed Practical Nurses perform sick call, exceeding their scope of practice that prohibits them from performing independent nursing assessments.
12. Nurses do not timely refer patients to providers in accordance with IDOC Treatment Protocols.
13. A Nursing Sick Call Log has been recently implemented and does not track the status of each patient request.
14. IDOC Administrative Directives provide insufficient guidance regarding implementation of Nursing Sick Call.

Information supporting these findings is described below.

Access to Care

Upon arrival to NRC, inmates are provided an orientation manual that states that "inmates are educated regarding the sick call process and provided with a nurse sick call slip (Offender Sick Call/Medical Services Request. STA 0202 Rev 4/2013) they can use to access care. Additional nurse sick call slips are available to offenders from nursing and security staff upon request." The slips are to be picked up twice daily during the morning and evening medication pass.[36] Health requests are to be triaged and seen within 24 hours of receipt and provider referrals in 72 hours or at the next scheduled physician clinic.[37]

However, actual practice shows that inmates are provided two generic Offender Request forms (DOC 0286, Rev. 4/2010) at intake and thereafter are not provided routine access to Medical Services or Offender Request forms. Instead, our review showed that inmates submit their health requests on scraps of paper they have in their possession or borrow from other inmates. Inmates may or may not have pens or pencils to write their health requests. Staff reported that inmates could borrow a pen from another inmate, but an officer commented to a court expert: "Yes, but it will cost them a lunch tray." We interviewed staff who confirmed that inmates are not provided Medical Request forms.

The previous Court Expert Report indicated that inmates were to submit their health requests in locked boxes accessed only by health care staff; however, we did not find that these boxes had been installed in the housing units.[38] Moreover, NRC inmates are locked down 24 hours a day except for four hours per week, and therefore do not have the ability to leave their cells to submit their requests on a daily basis.[39] _Thus, the institutional practice to lock offenders down 24 hours per day is a serious obstacle to access to care._

Instead, inmates submit their health requests by placing slips of paper through the cracks of their cell door. These slips are typically picked up by officers or health care staff; however, anyone walking by a cell door could pick up these health requests, including other inmates (e.g., inmate porters). When officers pick up the forms, some place them in an unsecured, open folder in the housing unit or deliver them to health care staff.[40] It is also possible that officers misplace health requests or otherwise fail to deliver them to health care staff. Nurses also collect health requests during medication pass, but if an inmate is not receiving medication, it is unclear that the inmate would be able to notify a nurse to request a health request form or deliver a completed form to a nurse.

---

[36] Offender Sick Call/Medical Services Request. STA 0202 Rev 4/2013.

[37] The IDOC administrative directive regarding sick call states that "Health care staff shall review offender sick call requests within 24 hours of receipt;" that "When appropriate health care staff will schedule an evaluation within 24 hours of receipt, 72 hours on weekends, or sooner, as clinically indicated;" and when a request results in a referral to a provider, the evaluation will "Take place within 72 hours or upon the next scheduled visit by a primary care physician."

[38] Although the IDOC Regional Medical Coordinator testified that these boxes had been installed in his region, this is not the case at NRC.

[39] We received conflicting information about how much out of cell time NRC inmates were provided. An officer and a nurse stated that they were allowed out of cell once a week for four hours at a time. A Superintendent said they were allowed out of cell twice a week for a total of four to five hours.

[40] However, an officer and nurse reported that not all officers will pick up the forms, as they do not see it as part of their duties.

Once collected, inmate health requests are transported to the medical clinic and placed in an open bin in the main medical clinic. We observed that it is possible for any person walking through the clinic to pick up these health requests, including officers and possibly inmates in the clinic area. Either a registered nurse or CMT/LPN is to triage the health requests within 24 hours to determine the urgency of the request (e.g. emergent, urgent, routine, etc.). *However, nurses/CMTs do not document when the health requests are received or when they are triaged.*

Once triaged, the nurse is to enter each request onto the nurse sick call log which is to be used to schedule patients the next day.[41] However, staff reported that until recently, not all of inmate written requests were retained, addressed, and filed in the medical record. Staff reported that some of the requests were thrown away. For example, staff reported that if a CMT/LPN triaging the request noted the patient had not yet had a physical examination, the request would be thrown away under the assumption that the complaint would be addressed at the time of the physical. Likewise, if the CMT/LPN noted that a provider saw the patient in the last day or two, the request would be thrown away under the assumption that the complaint had been addressed. We were informed that this practice was recently stopped and now all health requests are addressed and filed in the medical record. However, while this practice was in effect, some inmates did not have timely access to care. This was supported by our finding that inmates submitted forms in which they wrote that they had submitted multiple requests to have their health need addressed.

Either a registered nurse or CMT/LPN performs sick call. Nurses are to have the health record available to them for a sick call encounter, but during our tour, a nurse reported she was only able to locate three of 10 health records of patients she was scheduled to see. Staff performs sick call in housing unit cells that are not adequately equipped and supplied. The rooms do not have an examination table, exam table paper, chairs and desk for the nurse and patient to sit, or access to a sink for handwashing. Nurses bring some equipment and supplies with them to these rooms, including blood pressure cuff, stethoscope, thermometer, scale, alcohol wipes and some over-the-counter (OTC) medications. However, nurses do not have otoscopes available to examine ears, throat and oral cavity. We inspected a cart used to transport this equipment that was dirty, with tape residue stuck to the cart. *Thus, nurses do not have medical equipment and supplies to perform adequate patient assessments.*

At NRC, both RNs and LPNs perform sick call using Treatment Protocols. In the State of Illinois, LPNs are to practice "under the guidance of a registered professional nurse, or an advanced practice registered nurse, or as directed by a physician assistant, physician…to include *"conducting a focused nursing assessment and contributing to the ongoing assessment of the patient performed by the registered professional nurse."* LPNs may also collaborate in the development and modifications of the RN or APRN's plan of care, implement aspects of the plan of care, participate in health teaching and counseling, and serve as an advocate for the patient by communicating and collaborating with other health service personnel.[42] *However,*

---

[41] We were informed that the log was started in November or December 2017.
[42] Illinois LPN Scope of Practice. Section 55-30.

*Illinois scope of practice does not permit LPN's to perform assessments independent of a registered professional nurse or higher level professional, as is currently being done at NRC. Neither does the scope of practice permit LPNs to perform independent assessments according to protocols*. LPNs do not have the requisite education and training, including physical assessment skills, needed to perform independent assessments.[43] *Thus, some NRC patients do not receive evaluations by health care staff licensed to perform independent assessments. This increases the risk of harm to NRC patients.*

We reviewed the Nursing Sick Call Log for the Month of January 2018.[44] Staff does not completely fill the log out, including the date the request was received and including whether or not a nurse saw the patient. From 1/1/18 to 1/30/18, 282 requests were received, averaging approximately 10 per day. This is an extremely low number given the population of approximately 1400 inmates. On four days, no health service requests were noted as collected, and on seven days, less than five requests were collected. *This is consistent with inmates not having forms to fill out and/or staff not collecting health requests on a daily basis.*

We selected and reviewed 10 health records from entries on the Nursing Sick Call Log for the month of January 2018. In addition, we reviewed health requests found in medical reception records. The following cases are illustrative of problems noted above.

- This 31-year-old man arrived at NRC on 1/3/18.[45] His medical history includes seizure, asthma and bipolar disorder. On 1/25/18, the patient submitted an Offender Request (OR) form for back pain stating "this is the 10th time I have put in. I am almost out of my seizure medications." On 1/26/18, an RN saw the patient and did not assess his back pain, only that he was running out of seizure medications.

- This 20-year-old man arrived at NRC on 12/13/17.[46]  His medical history included drug use. On 1/9/18, he submitted an OR form for chest pain with deep breathing, laughing or coughing. "I have put in several slips but haven't gotten a response." On 1/25/18, he was listed on the nursing sick call log. On 1/26/18, an RN assessed the patient using the chest pain protocol. He complained of chest pain seven of 10 in severity. His vital signs were normal. The nurse did not notify a provider in accordance with the IDOC chest pain protocol, but referred the patient to a PA for 2/7/18, approximately 10 days later. This referral time frame is also not consistent with IDOC Administrative Directives for referral to take place in 72 hours.

---

[43] NCCHC defines Qualified Health Care Professionals to include nurses without distinguishing between registered and licensed practical nurses. However, RN and LPN practice must remain within their education, training, and scope of practice for their respective state.

[44] The log has undergone several revisions. At the beginning of 2018 the log included the name and ID number of the patient, complaint, date the request was written, date received, and date seen, treatment protocol used, whether the patient was referred to a provider, and a co-pay assessed. Later the log was changed so that the date the inmate submitted the request was not included, just the date the request was received and the date the patient was seen.

[45] Sick Call Patient #1.

[46] Sick Call Patient #2.

- This 56-year-old man arrived at NRC on 1/10/18.[47] He had a history of diabetes, hypertension, mitral valve replacement, and lower extremity venous stasis. On 1/23/18, the patient was listed on the sick call log for leg wounds. There is no health request form or nursing sick call visit in the health record. On 1/25/18, a provider saw the patient for follow-up of MVR and venous stasis.

- This 37-year-old man arrived at NRC on 11/30/17.[48] His medical history included seizures and anxiety. His medication was gabapentin. On 12/14/17, an RN saw the patient for complaint of not receiving gabapentin for neuropathy after two weeks. BP=145/85 mm hg. The nurse advised the patient that the provider would address his issues. On 12/18/17, the patient submitted a scrap of paper stating, "I was called to sick call yesterday morning but sent back due to crowding. I was told to come back but was never summoned. Please advise as my medication has still not been verified." An unsigned note documented "already seen," without documenting resolution of the complaint. On 1/17/18, he was listed on the sick call log for a rash and on 1/23/18, for possible urinary tract infection (UTI). On 1/23/18, a nurse saw the patient for the rash but did not address the UTI complaint.

- This 38-year-old man arrived at NRC on 1/4/18.[49] His medical history included pulmonary embolism. He was prescribed a blood thinner (Eliquis) since 2016. On 1/14/18, the patient signed a nursing sick call refusal form but there is no health request form in the record. On 1/19/18, the patient submitted a request complaining of having "blood clot cramps." There is no documentation on the form of when it was received or triaged by a nurse. On 1/26/18, a nurse completed a refusal form, stating that the patient refused to sign. On 1/27/18, the patient was scheduled to see the physician, but as of 1/31/18, there is no documentation in the record that the encounter took place.

- This 42-year-old man arrived at NRC on 11/9/17.[50] His medical history includes hepatitis C infection. On 12/13/17, a nurse saw the patient for back pain using the back-pain protocol.[51] The nurse documented no physical examination of any kind, only vital signs. The nurse treated the patient with ibuprofen. On 1/9/18, the patient was listed on the sick call log for dental pain. On 1/10/18, an RN saw the patient using the toothache protocol. The patient complained of exposed nerve pain for four to five months that was 10 of 10 in severity. The patient was afebrile. The exam showed bleeding and swelling. The nurse noted that the patient met the referral criteria for 24-hour referral; however, the nurse did not contact the dentist. The nurse gave the patient ibuprofen 200 mg 1-2 tablets three times daily.

---

[47] Sick Call Patient #4.
[48] Sick Call Patient #6.
[49] Sick Call Patient #7.
[50] Sick Call Patient #8.
[51] The credentials of the staff who assessed the patient are illegible.

- This 37-year-old man arrived at NRC on 12/22/17.[52] His medical history includes obesity, sleep apnea, hypertension, and opioid dependence. The patient submitted an undated piece of paper that said, "Blood in stools, please help." An unknown person wrote "refused" without date, signature and credentials. On 1/17/18, an RN saw the patient for constipation. The patient reported that on 1/16/18 that his stools were dark red and soft. The problem started in November 2017. The RN noted that he was being seen by GI and was previously scheduled for colonoscopy. The patients pulse was rapid (pulse=114/minute). The nurse documented a plan to refer the patient to the doctor if symptoms persisted for three days. On 1/19/18, a physician saw the patient for follow-up of his blood pressure (BP=153/113 mm Hg). The physician did not address the patient's complaint of blood in his stools. We referred this record to the Director of Nurses for follow-up with the provider.

In summary, at NRC the basic components of a system to access health care are not in place and patients do not have timely access to care for their serious medical needs. The practice of 24 hour lockdown is a serious obstacle to access to care. Inmates do not have the means to timely and confidentially submit their health requests. When submitted, staff does not timely respond. Patients are seen by CMT/LPNs who are not licensed to perform independent assessments, and therefore exceed their scope of practice whenever they perform independent assessments. Patients are not examined in a clinical setting with adequate lighting, equipment, supplies, and access to handwashing. Finally, nurse to provider referrals are not made when clinically indicated, and when made, they are not timely.

## Chronic Care

**Methodology:** The medical records of 13 patients with chronic medical illnesses and conditions were reviewed. There was limited opportunity to interview NRC providers due to restrictions imposed by Wexford. The Office of Health Services Chronic Illness Treatment Guidelines dated March 2016 was reviewed as needed.

### First Court Expert Findings
The previous monitor noted that a lower number than expected of individuals were enrolled in chronic care clinics, the chronic care form had not been revised for 12 years, and that not all eligible individuals had their first visit to a chronic care clinic within 30 days of admission to NRC. He noted concern that COPD was not included on the list of chronic care diseases and advised that asthma, COPD, and chronic bronchitis be cared for under a pulmonary disease clinic.

### Current Findings
We agree with all of the findings in the First Court Expert's report. In addition, we found the following problems:

---

[52] Sick Call Patient #9.

- Not all individuals with chronic illnesses are being evaluated in a chronic care clinic within 30 days of admission.
- Provider notes about the status of the chronic conditions, the reasons for modification of treatments, and the pertinent physical examinations are deficient. Quality of care, overall, was poor.
- The diabetic care at NRC fails to provide basic screening tests and vaccines that are recommended in the IDOC Diabetes guidelines (HbA1C, microalbumin-creatinine ratio, pneumococcal vaccination, foot exams). In addition, the guidelines should be revised to include routine screening for diabetic retinopathy and intake testing for HbA1C.
- Problem lists should be universally and accurately completed during the reception screening. Failure to complete the problem list puts the patient at risk for a disruption of care.
- The MARs demonstrated gaps (blanks spaces) in documentation of insulin administration. Insulin refusals are not regularly reported to the providers.
- There are unacceptable delays in obtaining specialty consultations and diagnostic tests.
- Patients with problems which appeared to be beyond the expertise of NRC providers were not referred for specialty care.

NRC has chronic care clinics for asthma, diabetes, hypertension, multiple sclerosis, seizure disorder, sickle cell disease, and tuberculosis. Individuals with human immunodeficiency virus (HIV) and hepatitis C are referred to the UIC infectious disease telemedicine consultation clinic. All other diseases are managed in a general medicine chronic clinic. The admission packets containing clinical information and medications from Cook County Jail or other correctional facilities in Illinois are rapidly reviewed by the NRC providers so that those new admissions with acute or chronic conditions are prioritized and seen more expeditiously during the reception screening.

During intake, a TB skin test is placed, and blood is drawn for HIV, hepatitis C, syphilis, and a basic metabolic panel (glucose, BUN, creatinine, electrolytes), and liver profile. These tests are meant to screen all inmates for potential infectious and certain chronic illnesses. However, if an inmate has a known chronic illness, there is no routine screening testing performed to ascertain the current status of the patient's chronic condition. Providers can ask the phlebotomists to add additional testing for some patients (e.g., HIV viral loads and immunodeficiency panels for HIV patients or International Normalized Ratio (INR) testing for those on anticoagulation). The lack of obtaining routine blood tests useful for determining the status of a patient's chronic illness is a major deficiency, as it delays identification of out-of-control status and delays initiation of a fully informed therapeutic plan. We noted this problem particularly for persons with diabetes, few of whom have a HbA1C test or microalbumin test obtained during the reception process. In part, it is our opinion that this deficiency is related to the order of reception steps. Phlebotomy is the first step of the medical process. The provider examination is typically the last step. If phlebotomy were the last step, then all tests necessary to determine the chronic disease status could be ordered by the examining provider and drawn before the inmate leaves the reception area in addition to the routine screening tests that are performed

on all persons coming through reception. In addition to blood screening, peak expiratory flow rates (PEFR) are measured on asthmatics, capillary blood glucose (CBG) point-of-care testing is done on diabetics, and viral load and immunodeficiency panels drawn for patients with HIV.

All new admissions with any chronic condition are to be seen no less than 30 days after admission to NRC. We were told that nurses performing reception screening record all individuals with chronic illnesses. At the conclusion of intake, a clinic nurse takes all intake paperwork and develops a list of all patients who have chronic illness and inserts newly identified patients onto a chronic illness roster. Because this nurse is so frequently pulled for other assignments, this task is mostly not done, resulting in extremely low numbers of patients enrolled in the chronic care program. Providers evaluating persons with chronic illness can also refer patients for a chronic care follow up. But this system is ineffective. Only nine of the 13 medical records reviewed documented that a chronic care visit had been scheduled or completed in <30 days and one within 60 days. Three of the 13 did not have a chronic care referral or a chronic care visit documented in the medical record.

We could only estimate the number of persons with chronic illness who are not tracked, but it appears to be more than the majority of patients. At NRC, there were 1493 inmates and 188 inmates at MSU, for a total of 1681 inmates on the NRC campus. There were only a total of 60 (4%) inmates on the chronic disease roster. We estimate the number of persons with chronic disease to be approximately 30%. This would mean that an estimated 504 (1681 X 0.3) inmates at NRC can be expected to have a chronic illness. Yet only 60 (12%) of inmates with chronic illness are on the chronic care list. A National Commission on Correctional Health Care study estimated chronic disease prevalence in state prison populations as 3.2% for heart disease, 16.7% for high blood pressure, 2.1% for diabetes, and 7.2% for asthma.[53] These are only for the more common conditions. This also excludes hepatitis C, which is estimated at above 10%. While some patients have multiple chronic illnesses, the rate of all unique individuals with any chronic illness is clearly higher than 4% of the NRC population.

As an example, there were 11 men on the diabetes chronic care list compared to 35 individuals on the list of patient-inmates being administered injectable insulin. This does not even include the many persons on oral diabetic agents. The diabetes chronic care list significantly underestimates the number of diabetics. This is consistent with the findings of the First Court Expert, who identified that not all individuals with chronic illnesses were being enrolled in chronic care clinics. This raises concerns that individuals with significant chronic illnesses could be delayed from receiving needed care or, at worst, could be lost to follow-up while at NRC.

The provider's documentation in the medical record is extremely brief and rarely contains clinical information needed to clarify the state of a patient's chronic illness or justify a change in the treatment plan. The only possible way to try to understand if a chronic condition was uncontrolled or over-controlled is to speculate. This lack of clinical documentation is a

---

[53] The Health Status of Soon-To-Be-Released Inmates, A Report to Congress, Volume 2, National Commission on Correctional Health Care, April 2002 as found as a PDF at https://www.ncchc.org/filebin/Health_Status_vol_2.pdf.

PTX193-0529

significant barrier to the continuity and quality of care. Because multiple providers see patients, the comprehensiveness of the previous clinical note is key to assuring that care delivered to a patient-inmate is coordinated and seamless.

Many of the charts reviewed had completed problem lists; however, records were reviewed that did not have a problem list and others had a serious chronic illness that was not noted on the problem list. Eight the 12 medical records reviewed had completed problem lists, two problem lists had not been completed, and two were incomplete (serious chronic illness not noted).

The care of diabetics was uniquely problematic. Without regard to the level of control or other needs of the patient, all insulin-requiring diabetics have their community or previous facility insulin types and dosages changed to twice a day NPH dosing accompanied by twice a day capillary blood glucose (CBG) testing.[54] Because patients have individual needs, this one-size-fits-all protocol has risks of deterioration of diabetes control and disrupts the continuity of care. Microalbumin-creatinine ratio, lipid profile, and HbA1C are not consistently drawn at the first provider visit as directed in the IDOC Office of Health Services Diabetes Treatment Guidelines (March 2016). Only one of the five diabetic charts reviewed had a HbA1C lab done, one had an order for this test, and three did not have an order or results in the chart. Pneumococcal vaccine was not being ordered. One of the five diabetics already had been vaccinated but four did not have a history of previously being vaccinated, nor was it ordered by NRC. The providers' notes do not detail their inspection and examination of the feet of the diabetics. On routine diabetic clinic visits, the providers check a box that lower extremity exam was done. Detailed notes about sensation, calluses, or the presence or absence of ulcers or other foot abnormalities are not documented in the medical record. None of the diabetic records reviewed had evidence that a retinal screening for diabetic retinopathy had been recently performed or had been ordered by NRC providers. The IDOC Office of Health Service's Offenders Diabetes Guidelines we received does not include a recommendation for routine retinal screening for diabetics; this is not in alignment with national USA standards of care. We believed that the IDOC Diabetic Chronic Care guideline was missing pages and we asked for but did not receive any further copies.

The medications for some new admissions were not ordered at intake, putting at risk the control of the chronic illness that is being treated. Lab reports are not always in the medical record. Medication administration records (MARs) and specialty consultation reports were not consistently found in the medical record. MARs have blanks where the nursing staff failed to note whether they administered insulin doses or refusals. The provider and nursing notes do not document that insulin refusals are regularly reported to the provider. Intake physical exams are not always done within seven days of admission.[55]

---

[54] These are point of care finger stick blood glucose tests that civilian diabetics perform themselves but in correctional facilities are often performed by nurses.

[55] IDOC Administrative Directive 04.03.101 Offender Physical Examination.

Eleven of 13 (85%) patient records reviewed had problems demonstrating quality of care issues. The following patient care summaries illustrate some of the concerns noted above.

- This patient was admitted to NRC on 1/4/18.[56] Medical and mental health screenings were done on 1/4/18 and dental screening was done on 1/5/18. The medical history included tobacco use, hypertension, and aortic valve replacement. A problem list was completed. Medications included amlodipine, hydrochlorothiazide, and warfarin. During the 26 days he was at NRC, three INRs had been performed. All were in the therapeutic range. His problem list was complete. He was scheduled for a chronic care clinic on 2/3/18. As of 1/29/18, almost a month after reception, his admission physical exam had not yet been performed.

- Another patient was admitted to NRC on 11/17/17.[57] Medical history, physical exam, mental health screening, and dental screening were done on 1/17/18. The patient had diagnoses of pituitary tumor, type 1 diabetes, hypertension, hypercholesterolemia, hypothyroidism, sleep apnea, and a urological problem (note illegible). The problem list was completed. Medications included metoprolol, amlodipine, aspirin, Lisinopril, metformin, insulin, and levothyroxine. A low TSH resulted in his thyroid medication being held. On 11/21/17, he passed out and suffered a forehead contusion which required four sutures; a finger stick CBG test was not done, an electrocardiogram (EKG) was not immediately done, and the provider did not comment on the cause of the syncope. At a chronic care clinic visit on 12/16/17, the provider noted that the patient was missing some medications and his EKG was normal. The same dose of insulin was continued. Depo Testosterone, which has a single FDA indication for hypogonadism, was initiated on 12/29/17 with no explanatory note by a provider. It was not clear what was wrong with the patient. He was next seen by a provider on 1/16/18. His CBG tests in the first two weeks of January 2018 ranged from 200-300 (poor control) and the provider increased the insulin dosage. His CBG tests from 1/17 to 1/30/18 continued to range from 200-300 but there were no further intervention/visit/notes as of 1/30/18.

  In summary, pneumococcal vaccine was not offered, HbA1C was not ordered, detailed foot exam was not done, retinal screening was not ordered. The response to the syncope and the ordering of additional testing were deficient. Although the insulin dosage was increased on 1/16/18, the CBG tests continued to be elevated (200-300) for the next two weeks with no further intervention and adjustment of insulin dosage. The patient was placed on testosterone without a documented indication.

- Another patient was admitted to NRC on 11/17/17.[58]  A nurse identified a history of type 2 diabetes. A physical examination was done. His medications were insulin, metformin, atorvastatin, aspirin, and Lisinopril. The admission glucose was 240, which is

---

[56] Chronic Care Patient #1.
[57] Chronic Care Patient #2.
[58] Chronic Care Patient #3.

elevated, yet a HbA1C test was not ordered on admission. CBG tests from 11/17/17 to 12/2/17 ranged from 130-339 (mean >200). This indicates poor control of his diabetes. The MAR for insulin administration during these dates had 11 blanks, indicating that the patient did not receive insulin, or the nurse did not document administration of insulin. At a chronic care visit on 12/2/17, the insulin dosage was not increased despite the poor control of his diabetes over the preceding month. The provider ordered a HbA1C and a follow-up clinic in eight weeks. CBG tests from 12/3/17 to 1/30/18 ranged from 126-236 (mean >150), and during this period the MAR for insulin had two blanks and 25 refusals. There was no intervention concerning the insulin refusals or elevated CBG tests. There was no provider visit from 12/2/17 until 1/30/18, the day of our visit.

In summary, there was no problem list, pneumococcal vaccine was not offered/administered, there was no detailed foot exam, retinal screening was not ordered, there was no HbA1C ordered on admission, and there was no referral to a physician for failure to take insulin.

- Another patient came into NRC on 1/19/18.[59] Medical history, physical, and dental screening were done on intake. The diagnoses included: type 2 diabetes, hypertension, asthma, BPH, seizures (not on anti-epileptic medication and no seizure since 2002). There was no problem list in the medical record. The medication list that transferred with the patient from Cook County Jail included glargine and regular insulin, metformin, albuterol/QVAR, atorvastatin, metoprolol, Tamsulosin, amlodipine, enalapril, and pneumococcal 23 vaccine given. A NRC provider switched the patient's insulin to NPH BID with sliding scale regular insulin, and metformin. Laboratory tests included a CBG test of 212, a hepatitis C test reactive, and serum glucose 234. The blood pressure was 136/57. A provider requested a chronic care clinic appointment for 2/17/18. The MAR for insulin from 1/19 to 1/30/18 had two blanks/two refusals, with CBG values ranging from 76-235 (mean>140).

In summary, there was no detailed foot exam, no microalbumin-creatinine ratio, retinal screening was not ordered, and no HBA1C was done on intake. The hepatitis C antibody positive status was not added to the problem list.

- Another patient was admitted to NRC on 11/20/17.[60] The patient was a 58-year-old man. The medical history, physical examination, and mental health screening were done on intake. The diagnoses included: type 2 diabetes, hypertension, asthma, chronic obstructive lung disease (COPD), and carotid stenosis. Carotid stenosis was not on the problem list. Medications included: insulin, Lisinopril, metoprolol, aspirin, and amlodipine; influenza vaccine was given at the Cook County Jail. The admission laboratory tests included: glucose 111. The blood pressure was 161/80, the peak expiratory flow rate (PEFR) was 330. A doctor saw the patient on 12/1/17. The blood

---

[59] Chronic Care Patient #5.
[60] Chronic Care Patient #6.

pressure was 159/78, which is high for a person with diabetes, and the CBG test was 200, which is high. The provider ordered amlodipine as it was not ordered at intake. On 12/5/17, the HbA1C was 7.0. On 12/14/17, at an RN visit the patient was "dizzy" with a blood pressure of 130/84 and a CBG value of 131. On 12/25/17, an RN evaluated the patient who was "dizzy" with blood pressure of 163/94 (elevated) and pulse was 82. On 12/16/17, a provider saw the patient and documented left carotid bruit. An ultrasound had been done at Weiss Hospital and the record from Weiss was requested. The provider started atorvastatin. At the 1/18/18 provider visit, the blood pressure was still elevated at 167/114. The provider administered an immediate single dose of blood pressure medication and increased routine blood pressure medications. On 1/20/18, the patient had "chest discomfort." The blood pressure was 177/105, which is very high. The EKG was negative. A provider only gave a once-only dose of clonidine, which is not an acceptable standard of treating elevated blood pressure. On 1/22/18, the medical record documented that the patient was "Not taking BP meds." On 1/28/18, the blood pressure was 161/88 (which is elevated), but was not addressed. The MAR for insulin 1/1/18 to 1/30/18 had seven blanks and two refusals, with CBG tests ranging from 95-227 (mean >150).

In summary, there was no pneumococcal vaccine offered/administered, blood pressure medication was not started at intake, there was no detailed foot exam, and retinal screening was not ordered. Additional evaluation for dizziness/syncope should have included a thorough history and neurologic examination, and depending on findings, further testing (Holter monitor) might have been indicated. The blood pressure was not controlled and yet providers did not appropriately adjust anti-hypertension medications. This was particularly important since the patient had diabetes and history of carotid artery diseases and was therefore at risk of stroke and other cardiovascular diseases. The carotid ultrasound report from Weiss Hospital requested on 12/16/17 was not yet received as of 1/30/18.

- Another patient was admitted to NRC on 1/23/18.[61] He was a 33-year-old. A medical history and physical examination were done on intake. Diagnoses included: type 2 diabetes, hypertension, and hepatitis C. Hepatitis C was not noted on the problem list. The medication list from Cook County Jail included: Lisinopril, metformin, and glipizide. The CBG was 153, which is high. The blood pressure was 177/94, which is also elevated. The TST was negative. A provider noted that the blood pressure was not controlled and referred the patient to chronic care clinic on 2/13/18. There were no lab reports in the chart.

In summary, there was no pneumococcal vaccine offered/administered, there was no definitive foot exam, no retinal exam ordered/done, and no HbA1C done on intake. The doctor evaluating the patient at intake should have evaluated whether the patient had

---

[61] Chronic Care Patient #7.

taken his blood pressure medication that day and considered adjusting the blood pressure medication.

- Another patient was admitted to NRC on 6/20/17.[62] He was a 29-year-old. Medical history, physical, dental, and mental health screening were done at intake. The diagnoses identified included: ankylosing spondylitis (HBL-27 reactive). A problem list was completed. A follow-up in medicine clinic was ordered. Medications included: prednisone and sulfasalazine. The laboratory tests ordered at intake included: BMP, CMP, liver profile, all of which were normal. Laboratory tests were repeated on 8/8/17, 11/13/17, and 12/27/17, and all tests were normal. At a six-month chronic care clinic visit, a doctor noted that prednisone was decreased to 10mg/d with a follow-up in six months.

  In summary, there was no documentation about presence/absence of symptoms or assessment of functional status with respect to ankylosing spondylitis. Pneumococcal vaccine was not offered/administered even though patient is on prednisone, a chronic immunosuppressive medication. Sulfasalazine does not have an FDA indication for ankylosing spondylitis and prednisone is not recommended for long-term use in ankylosing spondylitis, yet a thorough medication history was not obtained to understand why the patient was taking these medications; it did not appear that the providers understood how to manage ankylosing spondylitis and yet did not refer the patient to a specialist who typically manages this disease. We note that patients with ankylosing spondylitis typically are managed with tumor necrosis factor alpha antagonist medications, which was not offered to this patient.

- Another patient was admitted to NRC on 8/18/17.[63] He was a 49-year-old. Medical history, physical, mental health, and dental screening were done at intake. Diagnoses included: right ankle deformity secondary to a fracture in 2016 and motor vehicle accident in 2017, use of crutches to walk, left total knee replacement, hypertension, and asthma. A problem list was completed. PEFR tests were 200 and 290 and the blood pressure was 154/115, which is elevated. Medications included: amlodipine and albuterol. Intake laboratory tests were normal. On 8/21/17, an x-ray showed a severely fragmented ankle joint with a suggestion of osteomyelitis or Charcot joint. On 8/25/17, a blood count was normal. On 10/14/17 at a chronic care clinic visit, the blood pressure was 157/92 and 136/92, and the amlodipine was increased. The PEFR was 350-400. A repeat blood pressure was ordered in 30 days. On 11/2/17, an orthopedic consult apparently occurred after about two months at NRC, but there was no consultant report in the medical record. On 11/16/17, a CT scan was ordered and approved. There was no evidence that this CT scan was done as there was no return transfer note in chart upon return to NRC. On 12/12/17, a CT/MRI of the ankle was approved. On 12/29/17, the CT/MRI results were noted to be pending. On 1/2/18, an x-ray report showed right ankle

---

[62] Chronic Care Patient #9.
[63] Chronic Care Patient #10.

Charcot joint. Orthopedic recommendations included a fasting blood sugar, HbA1C and testing for lead/heavy metals and a podiatry referral. On 1/3/18, tests recommended by the orthopedic consultant were ordered. On 1/30/18, lead, copper, and heavy metal levels were not done due to cancellation. The patient's uncontrolled blood pressure was appropriately treated on 10/14/17 by increasing anti-hypertensive dose, but an order for repeat blood pressures ordered for mid-November was not done. There were no blood pressure values in the chart for the last three months.

In summary, this patient with severe ankle deformity was not seen by UIC Ortho until more than two months after NRC admission. The CT/MRI as recommended by the orthopedic consultant was not done for two months, and the results were not in the medical record. It is not documented why/who cancelled orthopedics' recommendation to do lead/copper/heavy metal levels to evaluate possible Charcot's joint. Patient has been in NRC for five months without completion of the evaluation of his damaged ankle. The patient had an elevated blood pressure at intake, yet blood pressure medications were not adjusted for about two months.

- Another patient was admitted to NRC on 7/3/17.[64] The patient was a 28-year-old. Medical history, physical, mental health, and dental screening were done at intake. Intake labs were normal. Diagnoses included: spastic paraplegia due to a prior gunshot wound, using crutches to walk, depression, and neurogenic bladder with use of catheters. The problem list was completed. Medications included; pain medication and medications for spasm. On 7/17/17, a urine culture and sensitivity was negative and a blood count was normal. On 8/11/17, the patient had abdominal discomfort. A rectal examination showed soft stool with a negative guaiac test. An abdominal x-ray was negative but suggested a possible ileus. On 8/16/17, a physician assistant note documented a normal white count and BUN test. The physician assistant ordered antacid. On 8/29/17, Imodium was ordered for diarrhea. On 8/31/17, a muscle relaxant and gabapentin were ordered. On 9/14/17, a urinalysis showed 6 WBC's and large leukocyte esterase which suggested infection; an antibiotic (ciprofloxacin) was started for UTI. On 10/21/17, a urine dipstick showed leukocyte esterase 70+. On 1/8/18, the patient fell out of bed and landed on his elbow with development of a new left wrist drop. An x-ray of the spine/elbow was negative for fracture and a support was provided (sling) and a urinalysis was ordered. On 1/10/18, the urine culture showed Klebsiella pneumonia >100,000. On 1/23/18, sensitivities were reviewed by the provider and Bactrim was ordered.

In summary, a provider completed an appropriate evaluation of patient's abdominal discomfort in August 2017. The patient had repeated colonization of his urine but for persons with neurogenic bladder, treatment is generally reserved for those who are symptomatic (fever, foul-smelling urine, incontinence, frequency, or dysuria). Initial management of left elbow trauma/l wrist drop was reasonable but there has been

---

[64] Chronic Care Patient #11.

unacceptably no follow-up as of 22 days post injury/wrist drop and no referral to Neuro/Ortho generated.

- Another patient was admitted to NRC on 12/12/17.[65] Medical history and physical examination were done at intake. Diagnoses included: HIV infection/high CD4, blindness in his right eye, and seizures (not on anti-epileptic meds; providers did not comment/address this serious history). The problem list was complete. Medications included: Genvoya. A viral load showed undetectable HIV, a CD4 716, and hematocrit of 43. On 1/23/18, a UIC Telehealth HIV consultant continued Genvoya, offered an influenza vaccine and scheduled a four month follow up. A MAR from December was not in chart as of 1/30/18, but on 1/11/18 KOP Genvoya was given; the quantity of pills was not listed.

In summary, the intake provider should have commented on the status of the patient's history/etiology of seizures and determined whether anti-epileptic meds were indicated or not. The HIV care was reasonable. The UIC HIV specialty appointment six weeks post admission was acceptable given the level of viral control documented on intake labs. The MAR should definitely document, as per established practice, the number of HIV pills given to the patient for KOP administration.

- Another patient was admitted to NRC on 11/30/17, and a medical history was done in reception.[66] Diagnoses included: HIV infection and asthma. There was no documentation in the 11/30/17 intake forms about whether the patient was on HIV meds. On 12/1/17, a provider performed a physical examination and ordered daily Bactrim x 30 days. Laboratory results included: VL 95462, CD4 88. No HIV medication was ordered nor was there any documentation about whether the patient was prescribed or taking HIV medication. On 12/6/17, the patient was given Bactrim six tabs KOP even though 30 days of medication was ordered. There was no justification in the chart for this discrepancy. On 1/5/18, a UIC Telehealth HIV consultant noted that the patient stopped HIV meds in October 2017. The HIV consultant ordered Genvoya and TMP/SX (Bactrim)/day. The consultant recommended repeat HIV labs in four weeks/UIC follow-up consult in six weeks. On 1/5/18, the MAR noted that Genvoya #30 KOP and Bactrim #15 KOP were given to the patient.

In summary, the intake medical history and physical should have clearly documented that the patient had not been taking his HIV meds prior to NRC admission. Laboratory tests reviewed in the 12/1/17 provider note revealed a severely uncontrolled and immunocompromised state, yet the UIC HIV consultation was not obtained until five weeks post admission. This was an unacceptable delay in access to much needed specialty consultation.

---

[65] Chronic Care Patient #12.
[66] Chronic Care Patient #13.

## Urgent/Emergent Care

**Methodology:** We interviewed health care leadership and staff involved in emergency response, toured the medical clinic, assessed the availability and functionality of emergency equipment and supplies, reviewed actual or emergency drills, and CQI reports.

### First Court Expert Findings

The First Court Expert Report noted that NRC had no useful logs to select records of patients being sent out for urgent or emergent conditions. A Nursing Telephone Urgent Care Log tracked only patients that were seen and not all notifications of patients reporting urgent complaints. The Court Expert recommended that NRC conscientiously use paper or electronic log books to document urgent/emergent care.

### Current Findings

We requested but were not provided an urgent care tracking log. We inspected emergency response equipment and found that it was poorly organized and maintained. Health care leadership has not implemented the SCC-NRC Machine/Equipment Check Log Sheet that requires daily checks of the medical unit for sanitation and equipment such as suction, oxygen tanks, automatic external defibrillator (AED), EKG machine, EKG electrodes and paper, backboards, stretchers, biohazardous waste, sharps containers, and trauma bags, etc.

The treatment room where patients with urgent conditions are assessed was dirty and disorganized. Stretchers in the treatment room were torn. Several oxygen tanks were placed into a corner; the one closest to the stretcher was empty.

Two AEDs and emergency response bags were not kept in the same location in the clinic. We inspected the AEDs and found that they were operational, but electrodes had expired in 2016 and in August 2017. Two emergency response bags were found open in the main clinic area on a countertop. We asked staff whether equipment and medications in the response bag were standardized, locked, and routinely inspected and we were informed they were not. A CMT stated that one of the bags was for her personal use and she kept glucagon and a thermometer in her lab coat pocket and not in the bag.

A mass disaster response bag covered in dust was located on top of cabinets in the medication room. The bag was not included on the equipment check log sheet as one of the items that needed to be checked daily.

Emergency events or drills were conducted and critiqued on 11/21/16, 4/11/17, and 5/3/17. A mass casualty drill was conducted on 5/19/17. The critique of the events was extremely limited. The mass casualty drill identified a number of weaknesses for which no corrective action plan was developed or implemented.

No emergency response drills have been conducted in the past eight months, which is not compliant with NCCHC standards.

**PTX193-0537**

In summary, we concur with the First Court Experts findings regarding urgent care. In addition, we found that NRC has not developed an adequate emergency response system through the proper maintenance and checking of emergency equipment. Emergency response drills have not been performed timely and they have not meaningfully identified areas for improvement.

## Specialty Consultations

**Methodology:** Interview HCUA. Review offsite tracking logs. Review selected medical records of persons having offsite consultations.

**First Court Expert Findings**
The First Court Expert found that specialty care for long-term NRC inmates is delayed. He also identified "problematic" clinical care in several patients who had specialty care. The First Court Expert recommended that NRC institute a tracking system for all scheduled offsite services and begin using logs for this purpose. The First Court Expert recommended that high-level security inmates be held at NRC until their specialty care has concluded.

**Current Findings**
We noted that of the seven patients we reviewed, several were being held at NRC while their specialty care was in progress. This was a recommendation of the First Court Expert. However, the lack of a tracking log made it impossible to verify this for a larger sample. There has been no improvement with respect to the other First Court Expert's findings. We identified the following additional findings:
- Medical record documents (referrals, verifications of collegial review, approvals, and consultation reports) were mostly not found in the medical record.
- Only 36% of consultations included a formal report.
- The HCUA who is a nurse evaluated denials of specialty care. This evaluation needs to be by a physician.
- The collegial review process fails to ensure that patients receive timely consultative specialty care.

IDOC policy requirements regarding specialty care are in two separate ADs.[67] The ADs require that all referrals for specialty care are sent to the Facility Medical Director. It is our opinion that these are medical record documents (physician orders) and they should be filed in the medical record. The Facility Medical Director is to make a determination regarding approval or denial of all referrals. If the Facility Medical Director approves the request, it is to be referred to Wexford's utilization management unit in writing or verbally. According to requirements in the ADs, verbal referrals must be documented in the medical record. A Wexford written response is to be made within five days and this response, according to the AD, is to be placed in the medical record. If the referral is denied by the corporate UM reviewer, the denial is to be referred to the HCUA. The HCUA is to "independently" review all denials and decide if the denial is medically appropriate. At NRC, the HCUA is a nurse. A nurse has insufficient training to

---

[67] 04.03.103 Offender Health Care Services and 04.03.125 Quality Improvement Program.

evaluate whether the consultation is medically necessary; a physician should be making this judgment. When the HCUA decides that a referral denied by the Wexford UM reviewer should be approved, the denial is referred to the Agency Medical Director. In this arrangement, the HCUA might agree with Wexford that some denied consults are appropriately denied when the Agency Medical Director might decide otherwise. A physician should review all of the denials. If the patient writes a grievance about a denial, the HCUA is also required to refer to the Agency Medical Director. The Wexford Regional Medical Director for the northern region told us that after a specialty consult it is recommended that the patient is to be seen in follow up in five days. In the IDOC response to the First Court Expert report, the IDOC stated that when a patient returns to the prison after an offsite visit, the practice in IDOC is to have a physician evaluate the patient within three to five days.[68] In that response, the attorney for the IDOC stated that a three to five day follow up meets constitutional adequacy.

Tracking specialty care is useful to monitor the effectiveness of the specialty care process and to ensure that specialty care consultations are carried out timely. The IDOC agreed[69] with the First Court Expert's recommendation that:

> "The entire process, beginning with the request for services, must be tracked in a logbook, the fields of which would include date ordered, date of collegial review, date of appointment, date paperwork is returned and date of follow-up visit with clinician. There should also be a field for approved or not approved, and when not approved, a follow-up visit with the patient regarding the alternate plan of care."[70]

We agree with the First Court Expert that this manner of tracking specialty care is needed. The IDOC stated, in their response to the First Court Expert's report, that there was a logbook currently in place for offsite services matching the requirements of the First Court Expert. We asked for but did not receive a logbook and were not given a logbook during our tour. In preparation for this visit we asked for a tracking log of onsite and offsite specialty care including the date of referral, date of collegial review, date of service, and the service the patient was referred for.[71] Our visit started Monday 1/29/18. On 1/25/18, we received by email a list of onsite appointments. This list did not contain the date of referral, the date of collegial review, and reason for referral. An offsite specialty list was sent to us by email on 2/1/18, the last day of our tour. We had no internet capability in the facility and were not able to see this document until after we left the facility. We were able to obtain the same list from the IDOC on the second day of our visit. However, the list that Wexford sent and also provided by IDOC only contains the patient name, IDOC number, the destination consultant, the reason for consultation and the date of service. We learned during the SCC visit that the NRC offsite scheduler maintains the type of log we had asked for but had not received. We also asked for but did not receive a list of denials of specialty care.

---

[68] Page 22, email letter to Dr. Shansky on 11/3/14 sent by William Barnes representing the IDOC.
[69] Page 24, email letter to Dr. Shansky on 11/3/14 sent by William Barnes representing the IDOC.
[70] Final Report of the Court Appointed Expert Lippert v. Godinez page 31 of main report.
[71] January 8, 2018 email to the Attorney General's representative.

When we visited SCC we had an opportunity to talk to the scheduling clerk from NRC. She indicated that she used the same spreadsheet as used at SCC. This SCC spreadsheet did not always have an accurate referral date but did contain the collegial date and date of the consultation. Some collegial reviews were documented as occurring before the referral was documented as having occurred. These tracking logs should be standardized so that the information can be used to measure adherence to administrative directive timelines. As well, referrals should be treated as physician orders and should be filed in the medical record as they occur, not after the consultation is completed.

Also, a key component of consultant care is that providers review the consultation report, review the findings of consultants, and evaluate all consultant recommendations including medications changes, further referrals for specialty care, and further recommendations for additional testing. The findings of these reports should be discussed with the patient. At NRC, review of consultation reports is ineffectively done and many consultant recommendations are either not reviewed or not carried out.

We reviewed a number of consultations to determine if the referral, collegial review, and approval were filed in the medical record. We also looked at specialty care follow-up to assess whether providers are carrying out the consultant's recommendations or documenting why they did not follow the recommendation. We found that specialty care is poorly documented in the medical record despite being required by the IDOC ADs. We reviewed seven patients who had 22 consultations and one hospitalization. Of the 22 consultations we found only 14 (63%) referral forms, only three (14%) collegial reviews, and only nine (41%) approvals in the medical record. Of the 22 consultations that occurred, only eight (36%) included a formal consultant report. Some consultations had a few brief lines written on the referral form giving recommendations, but these did not include information about the status of the patient and did not include a report of the evaluation. Particularly problematic was that 19 recommendations of consultants were not reviewed or carried out. Given that there were 19 recommendations not carried out in seven patients, there is a serious problem with clinical follow up of specialty appointments that represents a significant risk of harm to patients. These represent underutilization or not conducting necessary specialty care. The IDOC and Wexford have no current process to study underutilization even though it is a significant problem and patient safety issue. The Wexford collegial review process is so defective that, in our opinion, it is a patient safety issue and is likely causing harm to patients and therefore should be eliminated.

We looked for further evidence that Wexford or IDOC performed any audit or review of specialty care. We noted in the annual CQI report of September 26, 2017 documentation indicating that there were 273 collegial reviews and that 100% of patients who went offsite were seen within five days of the return to the facility. This was the only review of specialty care that we could find in the quality improvement documents provided to us.

Though the quality improvement report documented that 100% of persons were seen within five days of a specialty visit, our findings were different. Of 23 patients (22 consultations and

one hospitalization) we reviewed, only 15 (65%) were seen within five days after the consultation or hospitalization. We found that NRC providers failed to review or act on 19 consultant recommendations. This places patients at significant risk of harm. The report that 100% of patients who went off site being seen in five days misrepresents, in our opinion, the quality of offsite specialty care and fails to identify significant existing deficiencies in this service. In our opinion offsite specialty care is inadequately managed and places the patients at significant risk of harm.

In addition to these findings we noted poor care for six of seven patient records reviewed for specialty care, which is a similar finding of the First Court Expert. These reviews are as follows.

- One patient had lupus nephritis, hypertension, and history of pulmonary embolism.[72] In patients with lupus nephritis and significant amounts of protein in the urine, which this patient had, the blood pressure should be controlled to a level of 130/80. This patient saw providers 11 times when the blood pressure was elevated. On only one occasion did a provider adjust long-term anti-hypertension medication and on two occasions a one-time only dose of medication was given. One-time only doses of medication are not considered appropriate therapy. The lack of blood pressure control was likely to damage the patient's kidney function. Consultants recommended that this patient have laboratory tests monitored, but this was not effectively done. During clinic visits, laboratory tests that were done were not consistently reviewed. The patient had significantly low albumin (1.7) and anemia (HGB 11.7), but these problems were not addressed. These deficiencies placed the patient at risk of harm and may have harmed the patient.

- Another patient had primary sclerosing cholangitis, a condition of uncertain etiology which can lead to severe liver disease, including cirrhosis and hepatocellular carcinoma.[73] Although the patient had abnormal liver function tests and although a consultant recommended a hepatology consultation, the abnormal tests were not reviewed or noted and the referral to hepatology did not occur. This placed the patient at risk of harm. The patient had a cytology examination during a specialized procedure (ERCP) but the results were never checked.

- Another patient had prostate cancer.[74] Providers at NRC never documented the staging and status of the patient's condition. The patient had testicular and groin pain that a consultant felt was due to a vascular condition as opposed to the patient's cancer; consultants also documented peripheral vascular disease as a problem. A recommendation to refer the patient to a vascular specialist was not noticed or referred. The patient's peripheral vascular disease was never identified by NRC providers as a problem.

---

[72] Specialty Care Patient #1.
[73] Specialty Care Patient #2.
[74] Specialty Care Patient #3.

- Another patient had pancreatic cancer and was undergoing chemotherapy.[75] An oncologist noted that the patient had elevated liver function tests and should have an abdominal ultrasound to evaluate potential reasons for this abnormality. Indeed, abnormal liver function tests were available in the NRC record, and though signed as reviewed, nothing was done to evaluate for the abnormality. This patient never had an evaluation of the liver function abnormalities, even though the reason for the abnormal labs may have been related to the patient's cancer. This patient also experienced an episode of loss of consciousness and fell to the floor. The patient had an abnormal pulse (116) and low blood pressure (102/66). The nurse evaluating the patient did not consult a provider and did not refer the patient to a higher level of care for evaluation. This placed the patient at significant risk of harm.

- Another patient had keratoconus, a disabling condition of the cornea which results in a malformed cornea and can result in visual disturbances.[76] At intake, nurses recorded 20/20 visual acuity in both eyes. Several weeks later an optometrist identified 20/200[77] vision in one eye and did not record the visual acuity in the second eye. We noted problems with intake screening of visual acuity and this example demonstrates this problem. The patient was also on Plavix and aspirin, two drugs that can cause serious bleeding as a side effect of the medication. However, the reason for being on these medications was never determined and there was no corresponding problem listed as a reason for being on these medications. The patient had diabetes, hypertension, and high blood lipids but was seen in only one chronic clinic visit over a nine-month period. The patient had abnormal laboratory results (BUN 33; sodium minimally low at 134: WBC 12.5 and hemoglobin 11 indicating anemia). These abnormal laboratory results were not repeated, and providers did not attempt to determine the reason for the abnormalities. Though the patient was diabetic, the patient never received an HbA1C test even though this is required by chronic care guidelines for persons with diabetes. The patient's chronic illnesses were not being monitored or managed.

- Another patient had a history of pancreas and kidney transplants but the reason for these transplants was never identified or documented in the medical record.[78] History of the patient's illness was substandard. This patient had several consultations but because the reports were not available in the medical records, the providers at NRC failed to understand what the patient's clinical condition was and also failed to understand the status of the patient's conditions. We also could not determine the status of this patient because of lack of consultant reports. This places the patient at risk of harm. Because consultant reports are not filed in the medical record, when this patient transfers, subsequent providers will not understand how to care for this patient, who will be at risk of harm. The patient also had a hemoglobin of 12.7 on 10/5/17, which dropped to 8.9 on 12/21/17. This significant drop in hemoglobin was unnoticed

---

[75] Specialty Care Patient #4.
[76] Specialty Care Patient #5.
[77] 20/200 visual acuity is legal blindness.
[78] Specialty Care Patient #7.

and was not being monitored; it indicated a significant risk to the patient yet was unnoticed. The patient also was being treated for high blood lipids but was not being monitored for this condition.

We also note that in review of these records, the organization of the medical records was so poor that it was extremely difficult to discover what was happening to the patient. This was similar to the finding of the First Court Expert. Papers were merely placed in a folder, not sorted by type of document or placed in chronologic order. For larger records, examination of the record was so difficult that use of the record for routine care in a busy clinic would not be possible.

We were unable to evaluate the First Court Expert's recommendation that persons who require specialty care have that specialty care before they leave NRC because of a lack of tracking logs. We agree with this recommendation in principle, particularly when higher level care at UIC is needed, in that it ensures continuity of care.

With respect to findings of the First Expert, we agreed with the findings and recommendations regarding lack of tracking of specialty appointments. Specialty care needs to be tracked. The IDOC agrees with this recommendation as well. Yet the IDOC has not been able to provide evidence that this is done at this facility. The First Expert found two of three charts reviewed showed problems with care. We identified problems with care in six of seven records reviewed. Our review of medical records found similar findings to the First Expert report, including delays in perceiving the need for services, delays in following up abnormal results and problems with follow up. We had an additional finding that the IDOC has no current way to monitor the effectiveness of access to specialty care. In particular, underutilization or the lack of recognition of a necessary referral appears significant. For seven patients reviewed, there were 19 recommendations by consultants that were not carried out or determined to be unnecessary. This should be examined using a root cause analysis to determine why this is happening.

## Infirmary Care

**Methodology:** The clinical space and equipment was inspected, nursing staff schedules reviewed, clinical charts audited, nursing staff interviewed, correctional staff and porters questioned, and patient-inmates interviewed. There was only limited contact with the infirmary physician.

### First Court Expert Findings

The medical infirmary was not operational at the time of the First Court Expert's site inspection. Individuals requiring infirmary level services were housed in the nearby SCC infirmary. The infirmary charts of three of the four NRC patients in the SCC infirmary were found to be inadequate. The provider's notes were consistently illegible to the experts**.**

### Current Findings

The First Court Expert recommended opening the medical infirmary, which has since been done. We had several new findings, including:

- As recommended in the First Court Expert report, NRC opened the medical infirmary in 2016 and has assigned 24/7 coverage with nurses and correctional staff. However, nurse staffing plans show inconsistent coverage by a RN.
- Provider notes are generally written on at least a weekly basis.
- Infirmary admission notes are not always written by providers within 48 hours of admission.
- There continue to be problems with NRC providing the needed quantity of bed linens to the infirmary. This was also noted in the First Court Expert's report.
- The quality of care provided by the clinicians assigned to the infirmary is inconsistent and often inadequate.
- The provider progress notes lack documentation of the rationale for changes in treatment and fail to develop clear treatment plans and differential diagnoses.
- There is virtually no documentation of the status of patient's chronic illnesses.
- There was no documentation that any pertinent physical examinations were being performed.
- The care of diabetics is deficient.
- In its current state, the level of provider care in the NRC infirmary puts patients at risk.

The medical infirmary has been operational since December 16, 2016. Eleven of the 12 medical beds were occupied at the time of the site visit. Two-thirds of the patients were chronically ill individuals whose fragility, incontinence, and difficulty with ambulation and self-care precluded their assignment to regular housing units. The infirmary was reported to be staffed 24/7 by RNs with assistance of CNAs on most shifts. At the time of our exit from NRC, two nurse schedules for 1/29/18 to 2/4/18 were provided. One schedule had one to two RNs on all shifts assisted by CNAs on almost every shift; the second schedule had one to two RNs on the day shift with CNA coverage on six shifts, one RN on six of seven 3 p.m. to 11 p.m. shifts, and only one RN covering three 11 p.m. to 7 a.m. shifts without any CNA assistance. This lack of staffing is consistent with the lack of staffing at NRC and with the shared staffing between SCC and NRC. It was reported that there is a correctional officer assigned to the infirmary on each shift. During the site visit, one to two correctional officers were stationed in the medical infirmary and the adjoining mental health crisis beds.

There is a nurse call device/buzzer mounted on the wall next to each bed. The buzzers were found to be operational in all rooms that were tested, and the patient-inmates understood how to use this system. There were two negative airflow rooms (A-105-106) but, as noted in the Clinical Space section, the monitoring panel was not operational at the time of the inspection.

There are multiple deficiencies concerning sanitation and infection control in the infirmary and mental health crisis unit. The beds are fixed in a flat position without the capability to raise the head or raise/lower the height of the bed. Even though two-thirds of the 11 individuals housed in the medical infirmary were chronically ill with varying degrees of disability, there were no

PTX193-0544

adjustable hospital beds in the infirmary. The laundry was providing the infirmary with only 12 clean linen changes per week. The nursing staff reported that this quantity was insufficient to meet the needs of the infirmary patient population (incontinent, diapered elderly patients-inmates frequently soil their sheets) and the nursing staff's repeated requests for an ongoing additional stock of sheets had not been granted. We walked to the laundry and the nursing supervisor asked the laundry correctional officer for doubling of the weekly allotment, and this was verbally approved. This is a patient safety and sanitation issue.

All forms, notes, and reports generated after admission to the infirmary are kept in individual divided binders, with the clinical information placed in tabbed sections. This facilitates the review of the care provided in the infirmary. All care provided at NRC prior to the infirmary admission are in the same drop-filed loose paper arrangement as described in the medical records section of this report. This makes it difficult to assess the care provided prior to infirmary admission. The drop-file records are not all kept in the infirmary. The entire record of the patient needs to be available when the patient is evaluated.

IDOC Administrative Directive 04.03.120 Offender Infirmary Services has several requirements, including: admission to the medical infirmary must be authorized by a provider; nurses must complete admitting notes with vital signs upon admission; and admission notes by the providers are to be documented within 48 hours of admission. A review of four infirmary admissions found that nurse admission notes and vital signs were performed on the day of infirmary admission for all four individuals. Two of the four had provider admission notes written in less than 48 hours and the other two did not meet the timeliness standard, with provider admission notes written 11 days and 10 days post admission.

Acute care patients (rapid onset of symptoms, under treatment for acute illnesses, and post-operative status) are to be seen by a provider no less than three times per week and have daily provider notes. Patients with non-acute illnesses are to have a provider note no less than weekly. There were two patients (one post-operative and one with fluctuating mental status) who should have been initially given acute status, but they only had provider notes once a week.

There was a chronic disease patient who developed an acute serious eye problem and received an appropriately heightened amount of provider attention, including 14 provider notes in a 39-day period. However, the patient's diabetes status, with elevated CBG values, was not commented on once and did not include an adjustment of the patient's insulin. Most of the provider notes contained little, if any, clinical content, limited, if any, rationale for modifying treatment plans, a paucity of differential diagnoses about any set of symptoms, no notes about the control of patient's chronic illnesses, and only very brief, if any, comments about new or changing problems. Usually the only indication of a new concern was a new or changed order unaccompanied by an explanatory provider note. The paucity of the clinical content in the provider's notes would make it virtually impossible for a different NRC provider who was asked to cover the infirmary to understand the treatment plan or status of the patient. This puts the patient at risk. In addition, the provider's notes were very difficult to read and were mostly

illegible. These concerns were also raised in the First Court Expert's report. The nurse progress notes were generally more legible and contained more pertinent information of the condition of the patients.

The following summaries of the infirmary patients' records highlight the concerns noted above.

- This patient was admitted to NRC on 11/30/17.[79]  Physical exam on admission noted, "c/o pain in right great toe with discoloration." MD note: Right big toe ulcer with foul smell, surrounding erythema. The problem list noted: Diabetic R big toe ulcer, dime size, black x two months. Diagnoses: Diabetes, HTN, hyperlipidemia, renal insufficiency. MD ordered daily dressing changes, Rocephin 500mg/D. Intake lab: Syphilis/RPR 1:128. No dressing change log was found in medical. There is documentation that this patient's black toe was not evaluated or dressed as ordered until 12/5/17, when RN noted "in pain" and sent the patient to MD for evaluation. The right big toe was black with foul smell and erythema. He was sent to St. Joseph Hospital, was diagnosed as having right toe gangrene with abscess, his toe was amputated, he received treatment for sepsis, and he was discharged to NRC on 12/22/17 on IV antibiotics. On 12/22/17, he was admitted to the infirmary. The RN admission noted: IV antibiotics, UIC podiatry and vascular clinic referrals in one to two weeks. The MD infirmary admission note was written on 1/2/18, 11 days after admission. Post-hospitalization: Right big toe abscess/gangrene with sepsis, PICC line on IV antibiotics, angiography showed PVD, Meds Glipizide, Metformin, Lisinopril. On 12/5/17, RN note, "seen by MD, CPM." On 1/7/18, RN: red, swelling bottom of foot. 1/10/18, MD noted CPM [continue present management], but there was no physical exam. On 1/22/18, laboratory tests showed WBC 6.4, creatinine 0.87, RPR 1:64. On 1/27/18, five weeks after returning from a complicated hospitalization, the surgical (probably vascular) consultation was still pending and the podiatry appointment had not been scheduled. On 1/29/18, treatment for latent syphilis was finally ordered.

The pre-hospitalization care at NRC was deficient. The intake provider should have directly sent this diabetic with a black, foul smelling ulcer on his toe to the ED for emergency consultation and assessment for gangrene and osteomyelitis. NRC's failure to change dressings and re-evaluate the ulcer for seven days after reception minimized any opportunity to prevent amputation. The delay in transferring this patient to the ED contributed to the development of sepsis and jeopardized his life. The intake lab test identified syphilis; treatment should have been started during the seven days prior to hospitalization. Upon return to NRC, his abnormal syphilis test was not flagged for treatment and he was not treated until 1/29/18 (five weeks after his return from the hospital). The abnormal lab should have been quickly identified and treatment initiated immediately after his admission to the infirmary on 12/22/17. The infirmary physician clearly neglected to review the patient's previous test results upon admission to the infirmary. During his infirmary stay, the provider never once commented on the status

---

[79] Infirmary Patient #1.

of the amputation wound site nor documented an examination of his feet. As a post-hospital return, the physician should have been initially writing progress notes at least three times a week. Provider notes were only written weekly. His post-hospital course was neglectful. Five-and-a half weeks after his return to NRC, he still had not been seen by a podiatrist and a vascular surgeon as recommended on 12/22/17. During his infirmary stay, the provider never commented on the control of the patient's diabetes. HbA1C, microalbumin-creatinine ratio, retinal screening, and an examination of the other foot was not documented in the progress notes. Pneumococcal vaccination was not offered or administered. At every stage of this patient's care the standards of care in the community were not followed.

- This patient was hospitalized from 11/2 to 11/8/17 for altered mental status, falls, and post-procedure for burr holes.[80, 81] On 11/8/17, he returned to NRC and was admitted to the infirmary. MD admission note on 11/9/17. Diagnoses included type 2 diabetes, incontinence, decubitus ulcer, lymphoma on chemotherapy, and history of DVT, with IVC filter. On 11/28/17, lymphoma chemotherapy was completed. On 12/5/17, retinal vein occlusion was noted, urgent eye referral requested. On 12/7/17, MD called the eye consultant and had the patient's eye appointment moved up. On 12/11/17, the eye consultant recommended anti-VEGF injection, but the patient refused. On 12/15/17, anticoagulation was restarted. On 12/19/17, INR was 1.8, warfarin dose was increased. On 12/26/17, INR was 4.9, on 12/27/17, INR was held. On 1/2/18, INR was 2.1. On 1/18/18, the patient consented to treatment in eye clinic. On 1/20/18, the warfarin dose was increased; the rationale for this increase was not documented. On 1/27/18, INR was 6.6; the warfarin was stopped for three days. On 1/29/18, a repeat INR was ordered.

In summary, this patient with multiple chronic problems developed an eye problem. The infirmary provider appropriately advocated for an urgent eye appointment and helped convince the patient to accept treatment. The patient was successfully treated. Provider wrote 14 progress notes during the patient's 84 days in the infirmary addressing some more acute bladder, eye, and anti-coagulation concerns. However, it is very questionable to restart anticoagulation in a patient with an IVC filter who had a recent subdural hematoma and who was prone to falls. The provider's note did not provide any rationale for this decision. The INR test was performed five times between 12/9/17 and 1/29/18, two of which had results which were elevated. Since returning from the hospital, the provider did not comment about the control of the patient's diabetes, did not order a HbA1C, microalbumin-creatinine ratio, adjust the insulin dosage even though FSBG ranged from 70-273, and did not offer/administer the pneumococcal vaccine.

---

[80] Infirmary Patient #2.
[81] Burr holes are holes drilled through the skull to allow accumulated blood to be evacuated. These are typically done for persons who have subdural hematomas.

- This patient was admitted to NRC on 1/3/18.[82] Diagnoses: alcohol, cocaine, and hallucinogen abuse, Cryptococcal meningitis as a child that required a VP shunt. On 1/9/18, the patient reported that he was beaten by other inmates. On 1/11/18, he reported that he fell out of his upper bunk injuring his ribs, hand, and maybe his head. Mental health reported that he was delusional and grandiose. On 1/19/18, hand and rib x-rays were normal. The patient was placed on watch in the mental health crisis unit. On 1/20/18, he was transferred to a medical infirmary bed for altered mental status. MD note: r/o dementia, hypertension, and bipolar disorder. On 1/22/18, the RN noted that the patient had periods of confusion. On 1/23/18, a doctor noted that the patient was answering questions but had no dementia. On 1/24/18, an RN described the patient as incoherent. On 1/26/18, an RN described the patient as disoriented but pleasant. On 1/28/18, the patient was less confused. On 1/29/18, an RN described the patient as more alert. On 1/30/18, an RN stated that the patient had bruises on his forehead and top of his head.

  In summary, there is no documentation of a neurological exam on this confused and disoriented patient. Fluctuating mental status with transient episodes of confusion and disorientation in a patient with alcohol abuse, recent trauma, and a VP shunt clearly warranted a head imaging study (CT scan) to rule out an intracranial hematoma or increased intracranial pressure. The provider did not note the patient's recent history of trauma, the recent fall from his bed, the bruises on his head, or the VP shunt. It is clear that he did not review the patient's ambulatory medical record. The provider did not even consider these different possibilities. The care of this patient was deficient if not negligent.

- This patient was transferred from Hill Correctional Center.[83] He was admitted to the infirmary on 12/23/17. Diagnoses included recent fractured jaw with intramedullary fixation, insulin resistant diabetes mellitus on NPH, and sliding scale regular insulin. On 12/26/17, an oral surgery consultant rewired his jaw. On 1/2/18, a doctor wrote an infirmary admission note 10 days after admission to infirmary. On 1/10/18, a doctor documented low glucose and glucagon was ordered with a subsequent increase of the glucose to 378. On 1/13/18, a RN noted that the inmate was shaking and unresponsive; the blood sugar was 37 and glucagon and oral glucose were given. On 1/13/18, a doctor ordered that sliding scale insulin be held. On 1/14/18, an RN noted a blood sugar of 34. MD again ordered that sliding scale insulin be held. On 1/16/18, a nurse noted blood glucose of 42 and food was given. On 1/17/18, an RN noted blood glucose of 433 and a doctor was called. On 1/22/18, sliding scale insulin was resumed. On 1/23/18, a doctor decreased sliding scale insulin dosages. A urine test of protein was 150. On 1/24/18, the patient was referred to oral surgery. On 1/25/18, the NPH insulin dosage decreased. On 1/26/18, the NPH dosage increased.

---

[82] Infirmary Patient #3.
[83] Infirmary Patient #4.

In summary, this patient who is on insulin had intermixed episodes of hypo and hyperglycemia. His jaw was wired, and his nutritional intake was entirely liquid. Even though he was using a lower sugar content nutritional supplement, the calorie intake can widely vary. This puts him at risk for surges and drops in his glucose levels. The infirmary provider does not comment on this nor is a treatment plan developed that addresses the risks of giving sliding scale insulin to a patient with a wired jaw and unable to eat normally. Insulin dosages were increased and decreased without the provider commenting on the rational for each change. The provider's note does not comment on whether this patient has Type 1 diabetes mellitus (produces no insulin and is at risk for ketoacidosis) or Type II (produces insulin and is at decreased risk of ketoacidosis). There may be very limited risks of ketoacidosis and regular insulin may not be needed. The lack of a clear plan about caring for this diabetic who temporarily is unable to eat solids has put this patient at serious risk. The urinalysis reported an elevated level of protein. This test was not repeated nor was a microalbumin-creatinine ratio ordered to determine if this patient should be placed on an ACE inhibitor to protect his renal function. No routine labs were drawn. The patient's renal function was not evaluated. HbA1C was not ordered. Pneumococcal vaccine was not offered or administered. The IDOC diabetes guidelines are not being followed.

## Pharmacy and Medication Administration

**Methodology:** We conducted a comprehensive review of pharmacy and medication services from the time a medication order is written until medication is delivered to the patient. We met with health care leadership and staff involved in pharmacy and medication services, toured pharmacy and medication administration areas, observed medication administration, reviewed medication administration records and continuous quality improvement meeting minutes and reports.

### First Court Expert Findings
The First Court Expert Report noted that no security staff was initially available to escort nurses for medication administration. The report also noted that nurses transfer medications from a pharmacy dispensed blister-pack to small white envelopes that nurses use to transport medications to housing units. Officers were supposed to open up food ports so the nurse could administer medications, but this did not take place and medications were passed through a crack in the door. Neither nurses nor correctional staff performed oral cavity checks.

### Current Findings
Our review was consistent with the findings in the First Court Expert report. We found that pharmacy and medication administration practices do not assure the five "Rights" of medication administration: the right patient, the right medication, the right dose, the right route at the right time. Our review noted the following problems:
- At medical reception, nurses administer medications to patients from a stock supply, but do not consistently initiate a medication administration record (MAR) and document that medications were administered to the patient.

- Medical records do not contain physician order forms for all ordered medications.[84]
- The nursing medication room is dirty, cluttered, and disorganized. There is no schedule of sanitation and disinfection activities.
- Nurses transfer medications from a properly labeled pharmacy dispensed blister pack into a small white envelope that is not properly labeled.
- To prepare medications, nurses do not consistently compare the MAR against the medication blister pack to ensure that the medication matches the physician order; instead, nurses use white envelopes that are not properly labeled.
- The white envelopes are repeatedly used and not hygienic.
- Inmates are not requested to present their identification badges at the time of medication administration.[85]
- Nurses pass medications to patients through a crack in the cell door, not the food ports.
- Inmates do not have cups to fill with water to take their medications.
- Neither officers nor nurses perform oral cavity checks.
- If inmates are out of cell at the time of medication administration there is no procedure to go back later to administer the medication, even if it is a once a day medication.
- Nurses do not document administration of medications onto a MAR at the time they are administered.
- BosWell Pharmacy prints MARs for the following month for any prescription written by the 15th of the month, requiring nurses to handwrite MARs for all medications orders from the 16th to the end of the month, creating an enormous nursing workload and increasing the risk of transcription errors.
- Review of multiple MARs show numerous blank spaces, demonstrating that nurses do not document the administration status of each medication dose.
- Monthly pharmacy/CQI audits throughout 2017 show pervasive and systemic medication issues, including blanks on MARs, administering medications beyond stop dates, and pharmacy and nursing medication errors.
- Health care leadership has not developed or implemented an effective corrective action plan to address the systemic medication issues.

Information supporting these findings are noted below.

Pharmacy Services

BosWell Pharmacy Services is a national company that provides medication services to NRC through a "fax and fill" process. BosWell dispenses medications in blister packs that are either patient-specific or for stock supply. We interviewed two pharmacy technicians who reported that for prescriptions faxed to BosWell before 2:30 p.m. each day, medications are received within 24 hours via United Postal Services (UPS). Prescriptions faxed after 2:30 p.m. are

---

[84] Physicians write medication orders in two places: a physical examination form or progress note, and a physician order form that is used to fax the order to the pharmacy. We found that some records contained the medication order only on the progress note and there was no physician order form. It is unclear whether the physician did not write the order on the physician order form or whether it was not filed in the medical record.

[85] There are typically two inmates to a cell. Inmate ID badges are posted in the window of the cell rather than the inmate presenting his ID to a nurse.

received in two days. If medications are urgently needed, staff uses a local pharmacy, Jewel-Osco Pharmacy in Joliet, Illinois.

Transcription and Filling of Medication Orders

We toured the rooms where pharmacy technicians receive and sort medications. The rooms were clean and well organized. However, there is a faucet and sink covered with mineral deposits that impede sanitation and disinfection. Pharmacy technicians have established an accountability system for stock medications in which nurses sign out a stock medication blister pack for each patient. Narcotics are not stored in these medication rooms.

A large volume of prescriptions are generated at medical reception. Providers typically write orders onto a physical examination form as a component of the treatment plan and also onto a physician order form which is to be faxed to the pharmacy. However, we reviewed records in which the provider wrote the medication order only on the physical examination form and not a physician order form. *Since the physician order form is the document faxed to pharmacy, this poses a risk that the medication order will not be faxed to the pharmacy.*

After the provider writes the medication order, a reception nurse reviews it and determines whether it is a Keep on Person (KOP) medication available in stock supply in the medical reception area. If so, the nurse retrieves the medication from stock supply, writes the patient's name on it and delivers it to the patient. The nurse writes the number of tablets given to the patient beside the medication order on the physical examination form and/or physician order form. This enables a BosWell pharmacist to know not to fill the prescription. A concern is that when nurses give the patient stock medications, some nurses transcribe the medication order onto a MAR and document that the medication was administered and some nurses do not. *Therefore, some patients are administered medications for which there is no MAR documenting that the patient received the medications.*

Some medications are not administered to the patient in medical reception because it is not available in stock supply, is a nurse administered medication (e.g., psychotropic), or is non-formulary. Nurses do not transcribe these medication orders onto a MAR at reception. The prescription is forwarded to a pharmacy technician who faxes the order to BosWell. Because a nurse did not create a MAR at reception, if for any reason the medication order is not faxed to BosWell or the medication is not received from BosWell, medication nurses do not know to expect the medication and to follow-up if the medication has not been received.

When a medication delivery arrives from BosWell, a pharmacy technician checks off what medications were received along with corresponding BosWell generated MARs. A pharmacy technician separates KOP medications from Nurse Administered (NA) medications and determines the patient housing locations. Pharmacy technicians write MARs for some KOP medications from the blister pack, not the original provider order. A registered nurse does not review these MARs for accuracy with the original physician order. Medications and MARs are transported to the nursing medication room for storage in medication carts and subsequent administration to patients.

Medication Administration

The nurse's medication room is cramped, disorganized and dirty. Metal shelving used to store medical supplies is rusted with bent shelves. Medication cart surfaces are dirty, with tape residue on carts. The refrigerator containing insulin and other medications was not clean. There is no sanitation schedule for cleaning the room or refrigerator. Narcotics are double-locked.

Because inmates are locked down at NRC, nurses deliver medications cell to cell. We observed nurses preparing medications for administration in the medication room. Nurses compared MARs against medication blister packs to ensure the accuracy of the order and then pop medication out of the blister pack into their gloved hands. Nurses then placed medication(s) into a small white envelope that is labeled with the name of the patient, ID, housing location, and name of the medication. The envelope did not contain order start and stop dates. The same envelope is used repeatedly. Thus, nurses transferred medications from pharmacy dispensed properly labeled containers to improperly labeled containers. Nurses then placed medication envelopes into a clear plastic bag to take to the housing units. Nurses did not transport MARs to the housing unit along with the medications.

We accompanied a nurse escorted by a correctional officer to R unit. Each cell had one or two inmates. For each patient receiving medication, the nurse called out the inmate's name and informed him she had medication. The nurse did not identify the patient by having him state his name and a second identifier (e.g., date of birth, inmate ID number). Instead, the nurse looked at the inmate's identification badge taped to the window. The nurse then passed the medication envelope to the patient through a crack in the door rather than an open food port. The patient took the envelope, poured medication into his hand and passed the envelope back to the nurse through the door crack. Several inmates did not have cups of water to take their medications. The nurse asked patients if they had their juice carton from breakfast to fill with water to take medication. Some did and some did not. Neither the nurse nor the officer attempted to perform oral cavity checks.

The nurse did not document administration of the medication onto the MAR at the time she gave the medication. We asked the nurse what happens if the patient is out of cell when she came to the housing unit, and she replied that the patient would miss his medication for that dose. There is no procedure to determine where the patient is and make arrangements to deliver the medication at a later time, even if the medication is to be taken once daily. We reviewed nursing documentation on multiple MARs and found numerous blank spaces, indicating that nurses did not document the administration status of each dose of medication (e.g., given, refused, etc.).

The process we observed is problematic for several reasons:
- Repeated use of the same envelopes is not hygienic, particularly because they are handled by the patient and returned to the nurse.
- We observed torn envelopes which would allow one or more medications to fall out unnoticed.

- Inmates may refuse one or more of the medications, and if they are similar in appearance (both are a small white pill) the nurse will not know which medication to administer and which not to administer.
- In three cells, the light was not working and it was difficult to see and positively identify the patient.[86]
- Failure to perform oral cavity checks for high risk medications (e.g., narcotic, psychotropic, etc.) increases the risk of drug diversion or non-adherence.
- The failure of the nurse to have the MAR and document administration of medications at the time they are given does not meet standards of nursing practice.

Moreover, while we observed nurses preparing medications using the MAR and medication blister pack, CQI minutes show repeated medication errors because nurses used the medication envelope rather than the MAR to prepare medications. Medication audits and CQI minutes throughout 2017 also show pervasive problems with nurses' failure to document on the MAR for scheduled doses.

Changing Medication Administration Records Over at the End of the Month
At the end of each month, BosWell sends a pre-printed MAR for every prescription continuing into the next month that was written before the 15th of the month. The cutoff date of the 15th means that at the end of each month, nurses must handwrite MARs for all medication orders written from the 16th to the end of the month. This equates to hundreds of MARs and is a huge workload. Handwriting each medication order increases the risk of transcription errors with resulting medication errors.

We observed the impact of this practice during the site visit. On 2/1/18, staff reported that nurses on the evening and night shifts were unable to "flip" or transcribe the MARs to February. Several nurses were hurriedly transcribing the MARs and preparing medications for the morning pass, but stated that they would not be able to finish transcribing the MARs before passing medications. The nurses reported that completing transcription of the new MARs would take place on the evening shift. When we asked the nurses how they would document administration of medications given to patients that morning, they did not have an answer. NRC pharmacy technicians proactively suggested that if the cutoff date for BosWell to send pre-printed MARs was the 27th or 28th of each month, the nursing workload would be dramatically reduced, as well as the risk of transcription and medication errors.

Renewal of Chronic Disease Medications
There is not an effective system for timely renewal of chronic disease medications following arrival. At intake, providers write chronic disease medications for a duration of 30 days and refer the patient to the chronic disease program for follow-up. Nurses reported that they review MARs for expiring chronic disease medication orders to notify the provider. However, as

---

[86] The inmates in these three cells reported that the lights had been out in their cells since they arrived at NRC. In two cases the inmates had been at NRC for over a month, since 12/21/17. We reported the names of these inmates to the Superintendent. The following day we were informed that the inmates had been moved to other cells and that the cells were "condemned."

noted earlier in this report, nurses do not consistently transcribe MARs for chronic disease medications given to patients at intake. Therefore, there will be no MAR in the book to alert nurses that the medication order requires renewal. If the patient's chronic disease appointment is scheduled to take place prior to 30 days, providers can reorder medications to ensure continuity of medications; however, our review showed lapses in medication renewals.

Continuous Quality Improvement (CQI) Minutes and audits performed in 2017 show systemic and pervasive problems with pharmacy and medication administration at NRC.[87] These include:

- Pharmacy dispensing errors
- Medication carts that are not clean
- Nurses preparing medications using medication envelopes (with incomplete and incorrect information) instead of using the MAR, which is the legal order for the medication, using the wrong envelope
- Failure to transcribe medication orders onto the MAR
- Medication blister packs not matching the MAR
- Missing medications
- Nurses not documenting on MARs following medication administration
- Nurses not documenting medication order stop dates onto the MAR and administering medications beyond stop dates
- Shortages of sharps, insulin, and tramadol
- Open insulin and Tubersol vials with no documented opening and expiration dates
- Lack of timely tracking and response to medication errors

The 2016-2017 Annual CQI report showed that pharmacy made 14 errors and nursing staff made 66 errors during the review period. However, with respect to nursing performance, this is a gross underestimation of errors when failure to document medication administration is included as an error of omission. Monthly medication room and MAR audits were performed showing systemic problems with medication discrepancies and documentation on the MARs. Of particular concern is the frequency with which audits showed the medication was not available in the medication cart or medication orders had expired and were not discontinued. However, the CQI report does not include root cause analysis, corrective action taken, and reevaluation of performance to determine if the root causes of the problems were addressed.

In summary, the medication administration system creates a systemic risk of harm to patients at NRC. The conditions of confinement (i.e., 24-hour lockdown) are a major contributor to the systemic risk of harm.

## Infection Control

**Methodology:** We interviewed health care leadership, reviewed the Infection Control Manual and other documents maintained related to communicable diseases and infection control.

---

[87] NRC Annual CQI Report 2016-2017.

**First Court Expert Findings**

The First Court Expert Report noted that there were no budgeted infection control positions and that infection control duties were add-on duties rather than a primary assignment.

**Current Findings**

Our findings are consistent with the First Court Expert's findings. NRC does not have an established infection control program. There is not a budgeted infection control position and infection control duties have not been formally assigned. Leadership reported that a physician assistant has assumed responsibility for submitting case reports to the state health department.

There is no schedule of clinic sanitation and disinfection activities in clinical areas. We found many clinical areas to be dirty and disorganized. Stretchers and chairs were torn and in disrepair, inhibiting infection control. This increases the risk of infection to patients and staff.

As noted earlier in the report, staff reads tuberculin skin tests (TST) through cell windows instead of inmates being escorted to the medical clinic for staff to properly read TSTs by palpating patient arms and documenting the results in the patient's medical record. Medical record review showed that staff does not record TST results in the record. We interviewed a staff member who reported that she records results in the medical record "if she has time."

CQI Minutes and Annual Report shows that staff collects data regarding communicable diseases, including HIV and hepatitis C antibody test results. There is no assessment of HIV, HCV, and TB infection rates among newly arriving inmates. CQI Minutes also report statistics regarding skin infections due to methicillin-resistant staphylococcus aureus (MRSA), but there is no meaningful discussion regarding their significance and whether measures can be taken to reduce the incidence of infection. Data does not include tracking of skin infections due to other pathogens.

As noted earlier in this report, the water supply at NRC is hard, with a high mineral content, causing mineral deposit build-up in pipes, faucets, and sinks throughout the institution. This impedes effective infection control. The institution would benefit from a water softening system, but there is no money in the budget for this expenditure.

In summary, NRC does not have an effective infection control program.

# Dental Program

## Dental: Staffing and Credentialing

**Methodology:** Reviewed staffing documents, interviewed dental staff, reviewed the Dental Sick Call Log and other documents.

**First Court Expert Findings**

- NRC had one full-time dentist, one 20-hour part-time dentist, two full-time assistants, and a full-time dental hygienist.
- One dentist was employed by the IDOC and the rest of the dental staff were Wexford employees.
- CPR training was current on all staff, and all necessary licensing was on file.

**Current Findings**

We concur First Court Expert that CPR training was current and necessary licensing was on file; however, we identified current and additional findings as follows. Staffing has decreased since 2014; there is one full-time dentist and dental assistant who are both Wexford employees.[88] The dentist who was present when the First Court Expert visited NRC was replaced approximately three years ago. There is no dental hygienist.[89] Moreover, the part-time dentist who assists with intake exams is at NRC approximately one-half day, rather than the 20 hours per week in the First Court Expert Report. However, the true staffing is difficult to ascertain because of the free flow of dental personnel between NRC and SCC.

A dentist from SCC assists with intake exams at NRC on Thursday afternoons when it is expected that substantially more examinations will be performed. CPR training is current for dental staff and all necessary licensing is on file; however, the dentist's DEA number is not on file.[90]

There are several impediments to evaluating the adequacy of NRC dental staffing. First, there is no clear delineation of how many hours SCC dental personnel spend at NRC. Even assuming the current staffing is adequate, the one dentist and one dental assistant *officially* assigned to NRC understates the actual staffing, which cannot be determined until we have an accurate accounting of the hours SCC dental personnel spend supporting NRC.

Second, since NRC has only one dentist assigned, when that dentist is ill or is on vacation, is there adequate coverage? The reports provided to us suggest that there was a lapse in coverage in the four-month period for which we reviewed sick call logs ("no Dr. in clinic 8/31/17-9/8/17").[91] Not only did inmates with painful dental conditions have to wait as many as eight days; but given the eight-day backlog, treatment was likely delayed afterwards until the dentist caught up.

---

[88] According to the NRC Staffing Spreadsheet, there is a vacant dental assistant position.

[89] Unless the mission of the dental program has changed markedly since the First Court Expert Report, it is difficult to understand why NRC needed a full-time dental hygienist, since only the small number of MSU inmates are eligible for comprehensive care (that generally includes a cleaning). While the First Court Expert Report noted that there was a full-time dental hygienist at NRC, the position is absent in the current NRC staffing. Oral prophylaxes (cleanings) are performed by the dentist on the small number of MSU prisoners who request them. The dental hygienist said that she does not treat NRC patients but does assist in the intake examination process. Moreover, she stated that she does not provide oral hygiene instruction to inmates at intake.

[90] "N/A" rather than a DEA registration recorded (Training Records NRC – Stateville, p. 10). Since this information was not made available, we did not have the opportunity to find out whether the dentist has a DEA number that is not on file or has no DEA number.

[91] The first entry in the sick call logs provided to us for a request received 9/6/17.

PTX193-0556

Finally, it is difficult to determine patient waiting time; that is, the time from making a request to receiving care. This will be addressed in the section on Dental Sick Call.

## Dental: Facility and Equipment

**Methodology:** Toured the dental clinic, radiology area, and dental intake area to assess cleanliness, infection control procedures, and equipment functionality. Reviewed the quality of x-rays and compliance with radiologic health regulations. Observed clinical care.

**First Court Expert Findings**

- The clinic consists of a single chair and unit which is over 20 years old and showing wear and tear. Free movement around each unit is acceptable. Provider and assistant have adequate room to work. There are two closet-sized rooms adjacent to the clinic for storage, the dental lab, and for sterilization. Some corrosion, fading, and rust is evident. Cabinetry is similarly old and worn. The compressor is in good condition. Hand instruments are in good condition and adequate. The x-ray unit is old but in good repair. Hand pieces are old, and many are not functioning.
- Overall, the clinic was well enough equipped and the dentist felt all equipment was in good shape and functional. She expressed some difficulty in getting equipment repaired due to a lack of funds and administrative support.
- The Panelipse [panoramic] x-ray units are old but functional.

**Current Findings**

Facilities and equipment have deteriorated since the First Court Expert's Report, particularly the two inadequate panoramic radiograph units in the intake processing area that will be discussed *infra*. However, we identified current and additional findings as follows.

The dental clinic consists of a single chair and unit, and intraoral x-ray device that are approximately 20 years old.[92] All equipment is in working order except for the film processor, which was out of service for at least three years.[93] The dentist stated that it had been repaired recently but necessary chemicals were not on hand. Hand instruments are in good condition and hand pieces are old but functional. The counters are intact and can be disinfected adequately. There is no equipment replacement plan. This is particularly important for the panoramic x-ray devices, which are subject to heavy use due to the high volume of initial exams.

The First Court Expert noted that the equipment was old but serviceable, although many hand pieces were not functioning. Several years after those findings, a dentist reported that repairs were needed on the dental drill ("[w]e are working with 2 right now").[94] At the next meeting, he reported, "[n]eed repairs on drill and equipment. ASR is done. Referred to Ken Harris office

---

[92] We asked for documentation of the age of all dental capital equipment that has yet to be provided.
[93] The dentist did not feel that the lack of an intraoral film processor was a major problem, since in his opinion a panoramic x-ray is sufficient for diagnosing dental decay. This is highly problematic and will be addressed later in this report.
[94] August 15, 2017 NRC Quality Improvement Meeting Minutes, p. 1.

now. Need 2 new and 1 repaired. If all can be repaired, we don't need new."[95] The next month, he reported, "[n]o repairs on drill and equipment. Paperwork redone last Tuesday. It is over $500, so @Springfield level to approve (not Doug or Warden}. Joe making call to Ken Harris to update dental ASR. Less hands involved with ASR' s is needed."[96]

The dentist said that equipment maintenance was currently not a problem and that all his hand pieces had been repaired; however, given the recent problems with untimely repairs, there appears to be a systemic problem.

The two rooms adjacent to the dental treatment area are small and cluttered. There is an unserviceable autoclave on the floor under a counter in the sterilization room. We were informed that it will be disposed of when the appropriate approvals are obtained.

A panoramic x-ray unit is in the radiology area and is operated by the dental assistant. There was a lead apron in the radiology area; however, the dental assistant took a panoramic x-ray on patients who were not wearing an apron. [97]

While protective eyewear is available for patients, it is not used consistently because the dentist felt it was not necessary. [98,99] There is no sphygmomanometer or stethoscope in the clinic.

## Dental: Sanitation, Safety, and Sterilization

**Methodology:** Reviewed Dental Administrative Directives, toured the dental clinic and dental intake exam area, observed dental treatment room disinfection, interviewed dental staff, and observed initial examinations and patient treatment.

**First Court Expert Findings**
- Appropriate surface disinfection was performed between each patient.

---

[95] September 19, 2017 NRC Quality Improvement Meeting Minutes, p. 2.

[96] October 24, 2017 NRC Quality Improvement Meeting Minutes, p. 2.

[97] Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and Food and Drug Administration (2012), p. 14. (While radiation exposure from dental radiographs is low, it is the dentist's responsibility to follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (*inter alia*), use protective aprons and thyroid collars.)

[98] Guidelines for Infection Control in Dental Health-Care Settings ---2003. MMWR, December 19, 2003/ 52(RR17):1:16; pp. 17-18. ("PPE [personal protective equipment] is designed to protect the skin and the mucous membranes of the eyes, nose, and mouth of DHCP [dental health care provider] from exposure to blood or OPIM [other potentially infectious materials]. Use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes creates a visible spray that contains primarily large-particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, DHCP, *or the patient*. The spray also might contain certain aerosols (i.e., particles of respirable size, <10 μm). Aerosols can remain airborne for extended periods and can be inhaled" and "Primary PPE used in oral health-care settings includes gloves, surgical masks, *protective eyewear*, face shields, and protective clothing (e.g., gowns and jackets). All PPE should be removed before DHCP leave patient-care areas (*13*). Reusable PPE (e.g., clinician *or patient protective eyewear* and face shields) […]"). Emphasis added. Moreover, protective eyewear provides protection against objects or liquids accidentally dropped by the provider.

[99] Why we Take Infection Control Seriously. UIC College of Dentistry. Viewed at https://dentistry.uic.edu/patients/dental-infection-control, viewed February 2, 2018 ("We use personal protective equipment […] *as well as provide eye protection to patients for all dental procedures*."} Emphasis added.

- Protective covers were utilized on many of the surfaces and most instruments in cabinets were properly bagged and sterilized. The intake examination mirrors were bagged and sterilized in bulk. All hand pieces were sterilized and in bags.
- The sterilization area is in a small closet-like room that is unkempt and cluttered, adjacent to the dental clinic. It has inadequate work space to maintain proper sterilization flow from dirty to sterilized to storage. The ultrasonic cleaner sits between the sink and the autoclave. There was not a biohazard label posted in the sterilization area.[100]
- Safety glasses were not always worn by patients and warning signs were not posted where x-rays were being taken to warn pregnant women of possible radiation hazards.

**Current Findings**

Dental sanitation, safety, and sterilization have deteriorated since the First Expert's Report, primarily due to inadequate hand and surface sanitation by the dentist in the intake area (discussed *infra*). We concur with the findings in the First Court Expert's report. However, we identified current and additional findings as follows.

The dental treatment room was disinfected appropriately between patients and protective covers were used on all surfaces. Instruments were properly bagged and sterilized. All hand pieces were sterilized in bags.

The sterilization area is in a small cluttered room contiguous with the dental clinic. Because the room has inadequate counter space, it is difficult to configure the area to accommodate sterilization flow from dirty to sterilized to storage (as noted by the First Expert). The ultrasonic cleaner sits between the sink and the autoclave. As noted by the First Court Expert, safety glasses were not always worn by patients, and warning signs were not posted where x-rays were being taken. [101]

## Dental: Review Autoclave Log

**Methodology:** Reviewed the last two years of entries in autoclave log, interviewed dental staff, and toured the sterilization area.

**First Court Expert Findings**

- Spore testing was performed weekly and was documented. No negative results were recorded.

**Current Findings**

---

[100] CFR 1901.145(e)(4). "The biological hazard warning shall be used to signify the actual or potential presence of a biohazard and to identify equipment, containers, rooms, materials, experimental animals, or combinations thereof, which contain, or are contaminated with, viable hazardous agents.")

[101] Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i). "Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words, CAUTION RADIATION AREA". Emphasis in original.

Autoclave log maintenance had improved since the First Expert's Report and is adequate. The sterilization log for the past two years was in order. Testing was performed weekly and documented. No negative results were recorded.

## Dental: Comprehensive Care

**Methodology:** Interviewed dental staff, reviewed randomly selected dental charts of an inmates who received non-urgent care from Daily Dental Reports. Comprehensive, or routine care[102] is non-urgent treatment that should be based on a health history, a thorough intraoral and extraoral examination, a periodontal examination, and a visual and radiographic examination.[103] A sequenced plan (treatment plan) should be generated that maps out the patient's treatment.

**First Court Expert Findings**

- Because of the rapid turnover of inmates, most of the records reviewed were very recent from the transient, short-term population.
- Inmates who received non-urgent care received neither a comprehensive examination (to include examination of the soft tissues, a periodontal assessment, and bitewing or periapical x-rays). Nor was a treatment plan documented and they do not receive oral hygiene care as part of the treatment.
- Oral hygiene instructions were never documented. Restorations were provided from the information from the panoramic radiograph, which is not diagnostic for caries.
- There were many record entries that pain medication and/or antibiotics were provided with no documented examination or diagnosis. Many record entries also were "n/s" (no show) and/or reschedule.[104]

**Current Findings**

Comprehensive care is unchanged from the First Court Expert's Report and remains inadequate; and we concur with the First Court Expert. Moreover, we identified current and additional findings as follows.

While most of NRC inmates are assigned for classification and will be transferred to other facilities within several weeks, approximately 188 in the MSU who are housed at SCC and work at NRC are candidates for comprehensive care at NRC. However, the MSU inmates do not stay long; so, at any given time, there are relatively few dental charts of inmates who have received comprehensive care. Since NRC does not have an electronic health record, identifying inmates who have had comprehensive care was challenging and only one[105] such chart was located.

---

[102] Category III as defined in Administrative Directive 04.03.102.

[103] Stefanac SJ. Information Gathering and Diagnosis Development. In Treatment Planning in Dentistry [electronic resource]. Stefanac SJ and Nesbit SP, eds. Edinburgh; Elsevier Mosby, 2nd Ed. 2007, pp. 12-15, *passim*.

[104] This will be addressed in the discussion of failed appointments in a later section.

[105] Patient #1 had a composite restoration placed based solely on a panoramic x-ray and without a periodontal assessment or a treatment plan. Furthermore, the chart entry was not legible.

**PTX193-0560**

Most of the dentist's time is spent doing intake exams, which are scheduled for Monday, Tuesday, Thursday, and Friday, with the remainder of the dentist's time spent providing urgent care for the newly arrived inmates. A small amount of routine care (principally fillings) is provided to the MSU inmates.

Daily Dental Reports from October 2017 through January 18, 2018 document all dental procedures performed and show that most of the procedures were exams and palliative treatments related to urgent care.[106]

Dr. Gambla said that he did not perform a comprehensive examination and produce a treatment plan before providing routine care to MSU inmates because, in his opinion, that is not the mission of his clinic. He said that he bases his routine treatment on the panoramic x-ray from the initial exam and feels that it is sufficient for identifying the problems he treats.[107] In fact, he could not take intraoral radiographs, since the film processor in the clinic was inoperative for three years.

Just as he does not base routine treatment on intraoral x-rays, he stated that does not perform periodontal probing on patients for whom he provides routine care, although there are periodontal probes in the clinic.[108] Failing to perform a periodontal screening using probing is below accepted professional standards and can lead to under diagnosis of periodontal disease, delayed treatment, and preventable tooth loss.[109]

While the primary mission of the NRC dental program is performing intake exams and providing urgent care to a transient population, inmates who receive routine treatment should receive the same standard of care that they would receive at any other IDOC facility. That they do not is highly problematic and subjects these patients to risk of harm.[110]

---

[106] The Daily Dental Report summarizes the treatment provided to each inmate. It records the procedure (exam, filling, extraction, cleaning), as well as whether the procedure was palliative. Moreover, it records whether an analgesic or antibiotic was dispensed.

[107] Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and U.S. Food and Drug Administration, 2012. Table 1, pp. 5-6. (Dentate or partially dentate adults who are new patients receive an "[i]ndividualized radiographic exam consisting of posterior bitewings with panoramic exam or posterior bitewings and selected periapical images." Furthermore, recall patients should receive posterior bitewing x-rays every 12 to 36 months based on individualized risk for dental caries. With respect to periodontal disease, "[i]maging may consist of, but is not limited to, selected bitewing and/or periapical images of areas where periodontal disease (other than nonspecific gingivitis) can be demonstrated clinically.")

[108] Stefanac SJ. (A panoramic radiograph has insufficient resolution for diagnosing caries and periodontal disease. Intraoral radiographs (e.g., bitewings) and periodontal probing are necessary), p. 17. Also, (Periodontal Screening and Recording (PSR), an early detection system for periodontal disease, advocated by the ADA and the American Academy of Periodontology since 1992, is an accepted professional standard.), pp. 12-14. See American Dental Hygiene Association. Standards for Clinical Dental Hygiene Practice Revised 2016, pp. 6-9. (Periodontal probing is also a standard of practice for dental hygiene).

[109] Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006). Correctional Dental Services. In M. Puisis (Ed.), Clinical practice in Correctional Medicine (2nd ed., pp. 556-564). Philadelphia, PA: Mosby Elsevier, p. 560 (Early diagnosis of periodontal disease is important since the disease is often painless and the prevalence of moderate to severe periodontal disease in correctional populations is high and often not associated with pain).

[110] It is possible that the inadequate comprehensive care reflects insufficient dentist staffing. This should be considered when NRC dental staffing is revisited.

## Dental: Intake (Initial) Examination[111]

**Methodology:** Observed the initial examination process; reviewed 20 dental records of inmates that have been screened recently; reviewed Dental Administrative Directive; and reviewed NRC CQI Reports.

The "Initial Examination" is governed by Administrative Directive 04.03.102 (¶II F 2), which states (*inter alia*) that

> Within ten working days after admission to a reception and classification center or to a facility designated by the Director to accept offenders with disabilities for a reception and classification center, each offender shall receive a ***complete dental examination by a dentist***.[112]

**First Court Expert Findings**

- The dental screening [initial] examination is a cursory mirror and direct view examination of the intra-oral structures, a Panelipse [panoramic] radiograph, and a very sketchy health history. The teeth are charted for pathology from the direct examination and from the Panelipse x-ray. One dentist was there to screen over 70 inmates.
- The inmate was standing while being examined. The examiner's hands never entered the oral cavity. The exam was very quickly done, taking about 15 seconds. Lighting was poor. Mirrors came from a bulk package of sterilized mirrors from the NRC dental clinic. The Panelipse x-rays are taken two at a time in the same small room.
- The inmates wear no lead apron protection, nor are there any signs warning of radiation hazard. The radiographs are taken and developed by inmates from the MSU, a satellite of NRC.[113] They also reload the cassettes that hold the film. The films are developed, dated, and labeled with inmate information.

**Current Findings**

While aspects of the intake examination have improved marginally since the First Court Expert's Report, the improvement is more than outweighed by the dentist's inadequate hand sanitation and surface disinfection. Our findings with respect to the inadequacy of the intake examination are consistent with those of the First Court Expert; however, we observed patients examined while seated[114] using improved illumination rather than standing using poor lighting – only a marginal improvement. Unlike the First Court Expert, we did not observe radiographs taken by inmates; however, we did observe that panoramic x-rays were taken on inmates who were not

---

[111] The First Court Expert Report describes the examination performed at intake screening as a "Screening Examination;" however, Administrative Directive 04.03.102 describes it as a "complete dental examination." We use the terminology of the Administrative Directive and refer to the intake or initial dental examination as a complete dental examination.

[113] We did not observe an inmate taking the x-rays. Inmates taking x-rays would be in violation of the Illinois Dental Practice Act.

[113] We did not observe an inmate taking the x-rays. Inmates taking x-rays would be in violation of the Illinois Dental Practice Act.

[114] Dr. Orenstein, an SCC dentist who performs initial examinations, said that both he and the patient stand "because there is not enough time to seat the patient." A hurried dental examination performed on a standing patient is inadequate on its face and below accepted professional standards.

wearing a lead apron with a thyroid collar.[115] The intake examination has not changed materially and remains inadequate. Moreover, we identified current and additional findings as described below.

In 2017, NRC performed intake processing on 15,942 inmates. All inmates have a panoramic x-ray taken and receive a cursory direct-view oral examination that includes a taking scanty health history.[116]

The dental examination area is a small room with two panoramic x-ray devices set approximately four feet apart and two rooms that have non-functional dental chairs and working dental lamps. Neither room has a sink. Patients sit on straight-backed chairs or stand when they are examined.

Of 20 panoramic x-rays from initial exams performed January 23, 2018, nine (45%) were clinically inadequate,[117] characterized by poor contrast (washed out) or the presence of artifacts that interfered with interpretation.[118] The NRC dentist did not see this as an area of concern, since he felt that the films were adequate for his purposes (i.e., the initial exam) and if a film is not adequate, he has it retaken. The inconsistent quality was due to a combination of a failing x-ray unit and film processor, and inadequate operator technique.[119] There was no signage in the radiograph area warning of radiation hazard.[120]

Although Administrative Directive 04.03.102 requires that dentists chart the oral cavity, none of the intake records we reviewed contained such a charting.[121] Furthermore, the diagram for the charting is too small for the charting to be legible and should it be expanded substantially.

We observed Dr. Gambla perform initial examinations. Both he and the patient were seated; with the patient seated in a straight-backed chair. He worked without a dental assistant and did his own recording.[122]

---

[115] Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and Food and Drug Administration (2012), p. 14. (While radiation exposure from dental radiographs is low, it is the dentist's responsibility to follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (inter alia), use protective aprons and thyroid collars.)

[116] The health history taken at the exam (Appendix 3, Fig. 1) is inadequate because it is too abbreviated and omits information necessary for safe dental care.

[117] Dental: Intake (Initial) Examination Patients #1, 2, 3, 8, 9, 11, 12, 14, and 20.

[118] Our findings were confirmed by an SCC Quality Improvement Study in which intake examination charting was compared with the results of clinical examinations performed on the same patients. Of the 21 NRC charts, 62% had no charting of pathology (e.g., "abscessed teeth, teeth that needed extraction, [and] periodontal disease, (+3) mobility in teeth, grossly decayed teeth, impacted wisdom teeth in the maxillary sinus, and numerous visible dental caries"), with the remainder having only a partial charting. Furthermore, "in all the patients reviewed, visible heavy tartar [calculus] was never charted or indicated. The periodontal needs were never indicated" and "the dental radiographs from NRC varied in diagnostic quality"). Stateville Annual CQI 2016-2017_2, p. 32.

[119] We asked to see documentation that the panoramic x-ray devices had been calibrated or inspected by a therapeutic radiological physicist; however, none was produced.

[120] Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words, "CAUTION RADIATION AREA". Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i). Emphasis in original.

[121] ¶III F (2(b).

PTX193-0563

He donned gloves, selected mouth mirrors from a bag of sterile mirrors that he opened and placed on a bracket table before the first exam. A standard dental light illuminated the patient's mouth. He reviewed the panoramic x-ray and took a cursory health history. He used one or two mirrors to reflect the cheeks and adjusted the light for optimal illumination. While his gloved hands did not always touch the patient, in approximately half the exams we observed, they touched the patient's face, lips, or mouth. He did not change gloves between patients consistently. In fact, there were several instances where he examined a patient wearing the gloves he used to touch a previous patient's mouth or face. He did not wash hands between patients because the exam room had no sink. [123]

Even when he changed gloves between patients, he used the same (unsheathed) pen to perform his recording; a source of cross-contamination. Similarly, the handles used to position the dental light had no disposable covers and were a source of cross-contamination. Finally, when he reached into the pile of mirrors wearing gloves worn for a previous exam, he ran the risk of contaminating the other mirrors. The dentist performed initial exams the following day, examining at least seven patients without changing gloves.

The dentist did not perform a thorough soft tissue examination.[124] For example, he did not visualize the lateral and posterior regions of the tongue, a potential site of squamous cell carcinoma.[125] Performing a thorough soft tissue examination is critical at the initial exam, since unless the inmate requests care, his next exam will be biennial.[126]

Our nursing expert observed the dentist perform initial exams on 2/1/18 and reported that he did not change gloves between patients. ***In fact, he did not have a box of gloves in the room***.

All dental charts of inmates who receive an initial examination have a stamp that indicates that oral hygiene instructions were provided; however, this did not occur in the examinations we observed.[127] Moreover, the dental program reported 12,477 hygienist contacts at intake in

---

[122] The exam has improved somewhat since the First Court Expert Report: now the lighting comes from a dental operatory light; however, the exam is still grossly inadequate.

[123] Centers for Disease Control and Prevention. *Summary of Infection Prevention Practices in Dental Settings: Basic Expectations for Safe Care*. Atlanta, GA: Centers for Disease Control and Prevention, US Dept. of Health and Human Services; October 2016, p.7.

[124] Stefanac SJ. ("Evaluation of head and neck structures for evidence of tissue abnormalities or lesions constitutes an important part of a comprehensive examination."), p. 12. See also Shulman JD, Gonzales CK. Epidemiology/Biology of Oral Cancer. In Cappelli DP, Mosley C, eds. Prevention in Clinical Oral Health Care. Elsevier (2008) ("Regular, thorough intraoral and extraoral examination by a dental professional is the most effective technique for early detection and prevention of most oral cancers. [...]") p. 41.

[125] This is generally done by holding the anterior portion of the tongue with 2x2 gauze and reflecting the tongue with a mouth mirror. This is a professional standard for an oral examination. National Institute of Dental and Craniofacial Research. Detecting Oral Cancer. A Guide for Health Care Professionals.

[126] This deficiency is compounded by the fact that dentists do not document soft tissue examinations at biennial exams. See section on Comprehensive Care, *supra*.

[127] The 'uniform record system' sponsored by the American Dental Association is the Code on Dental Procedures and Nomenclature. "In August 2000 the CDT Code was designated by the federal government as the national terminology for reporting dental services on claims submitted to third-party payers." Oral hygiene instructions (Dental Procedure Code D1330) "may include instructions for home care. Examples include tooth brushing technique, flossing, the use of special oral hygiene aids." See Dental Procedure Codes, 2015, American Dental Association Dental Procedure Codes, 2015, pp. 1, 16.

**PTX193-0564**

2016-2017.[128] The SCC hygienist stated that she assists with the intake exams by charting from the panoramic x-ray or taking x-rays; however, she does not provide oral hygiene instruction. Furthermore, adequate oral hygiene instructions cannot be performed in the time allotted to the initial exam.

## Dental: Extractions

**Methodology:** We reviewed records of inmates that have had extractions, reviewed Daily Dental Reports October 2017 through January 2018, and interviewed the dentist.

**First Court Expert Findings**

- Documentation was poor. For example, none of the records examined had a diagnosis or reason for extraction included as part of the dental record entry.
- Antibiotics were provided to every patient post-operatively who had a dental extraction, even if not indicated.

**Current Findings**

Dental extraction care has not improved materially since the First Court Expert's Report and remains inadequate. Our findings with respect to inadequate documentation are consistent with those of the First Court Expert; however, we note that none of the patients had post-operative antibiotics prescribed. Moreover, we identified current and additional findings as follows.

Only seven patients had teeth extracted between October 2017 and January 18, 2018 as documented in the Daily Dental Reports for that period. Of five records of patients who had extractions, the quality of documentation was poor. None of the records documented the diagnosis of the tooth that was extracted.[129] All extractions were accompanied by a signed consent form that listed the tooth number; however, there was no diagnosis. For consent to be informed, the reason for the procedure must be clearly stated. None had post-operative antibiotics prescribed or dispensed. All patients had recent preoperative x-rays; however, patients #4 and #5 had teeth extracted based on panoramic x-rays that were clinically inadequate because they did not provide a clear view of the entire tooth.[130]

## Dental: Removable Prosthetics

**Methodology:** Reviewed Daily Dental Reports from October 2017 through January 18, 2018 and interviewed dental staff.

---

[128] The dental program consistently includes "hygienist contacts" or "hygienist contacts/intake." See, for example, NRC Annual CQI Report, 2016-2017, 2 (12,477), NRC Monthly Continuous Quality Improvement Meeting, January 16, 2018, 3 (870).

[129] Dr. Gambla said that he knows what the SOAP format is but does not use it.

[130] Extracting a tooth without an adequate preoperative radiograph deprives dentists of the ability to (1) determine that the case is beyond their skill level or unsuitable given the equipment limitations of the clinic, so the patient can be referred to an oral surgeon; (2) assess a potentially difficult procedure so they can adjust the surgical approach accordingly; and (3) ensure that the necessary equipment is available. Furthermore, an adequate pre-operative radiograph can serve as evidence of a potentially life-threatening condition such as a hemangioma.

**First Court Expert Findings**
- A comprehensive examination and treatment plan was never part of the treatment process.
- Periodontal assessment and treatment was not provided in any of the records. Because there is no comprehensive examination, or any treatment plans developed and documented in any of the records, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, is completed prior to fabrication of removable partial dentures.

**Current Findings**
We did not locate any records that documented the fabrication of complete or partial dentures. In fact, no dentures were fabricated between October 2017 and January 18, 2018 per the Daily Dental Reports for that period.

## Dental: Sick Call/Treatment Provision

**Methodology:** We interviewed dental staff; reviewed and randomly selected charts of patients listed in the Dental Sick Call Log from 10/3/17 through 1/22/18, reviewed Daily Dental Reports from 10/3/17 through 1/17/18, reviewed records of seven inmates who were seen on sick call, and reviewed recent intake examination records.[131]

**First Court Expert Findings**
- Inmate requests are logged into a large bound ledger indicating complaint, date of request and date of appointment. In none of the progress notes reviewed was mention made of the inmate complaint; the only entry was the provided treatment.
- The average appointment date was seven days from the date of the request. A review of several records revealed that they were often seen later than that due to the high no-show and reschedule rate. Many of the inmates had transferred out of NRC by the time of their appointment.
- Often the treatment was prescribing pain medication or an antibiotic with no documentation as to why they were prescribed. Approximately 50% of requests are complaints of pain, swelling, or toothaches.
- Routine care is accessed from the request form and the inmates are seen within 14 days and treatment started. There is no waiting list and reschedules are seen within 14 days.

**Current Findings**
Our findings are consistent with those of the First Court Expert and we noted no material improvement in dental sick call, which remains inadequate. Moreover, we identified current and additional findings as follows.

Inmates who want to see the dentist (or other health care provider) communicate the request on a piece of piece of paper which they pass through cracks in the cell door since no standard

---

[131] Dental Bates, pp. 40-46.

health care request forms are available.[132] These slips are typically picked up by officers or health care staff or given to nurses at medication pass. Once collected, inmate health requests are transported to the medical clinic and placed in an open bin in the main medical clinic. A more detailed description of the process is in the Sick Call section, *supra*.

Per dental staff, requests for dental care are placed in a basket on a counter across from the dental clinic and are recorded in a log kept in the dental clinic.[133] While the log records the date of request and the date the inmate was scheduled, it does not capture the date the inmate was treated. Consequently, waiting time for treatment cannot be determined without reviewing individual dental charts.

The Dental Sick Call Log from 10/3/17 through 1/22/18 contained 228 entries, approximately 90 percent of which stated pain or conditions that more likely than not were associated with pain. The median time from request to **scheduled appointment**[134] was two days. Requests received Monday through Wednesday had a median schedule time of two days while those received Thursday and Friday had a median of four days.

### Median Time for a Dental Sick Call Appointment

| Day Request Received | N | Median Wait Time (days) |
|---|---|---|
| Monday | 84 | 2 |
| Tuesday | 35 | 2 |
| Wednesday | 41 | 2 |
| Thursday | 46 | 4 |
| Friday | 22 | 3 |
| Monday-Wednesday | 160 | 2 |
| Thursday-Friday | 68 | 4 |
| All Days | 228 | 2 |

Among inmates whose request suggested a painful condition, one waited eight days, two waited seven days, seven waited six days, and nine waited five days to be scheduled. This is **not** time to treatment, which cannot be determined from the available data and is likely to be longer if patients are rescheduled.

There is no triage process, with routine care provided to inmates other than those in the MSU, who will be transferred shortly. Many inmates who are scheduled do not appear for their appointments.

---

[132] See discussion of Nursing Sick Call earlier in this report.

[133] The First Court Expert noted that the dental sick call requests were recorded in the Offender Request Log; however, this is not done consistently. The dental clinic keeps its own log which contains the inmate's name ID, nature of the request, date received by the dental clinic, and date the patient was scheduled.

[134] Since appointments were often rescheduled, the actual wait time for treatment for those inmates was longer.

There is no process for nurses, when the dentist is not available, to perform a face-to-face examination on a dental patient who states they have pain to identify pain and infection, and provide analgesics and referral to a mid-level or advanced level provider if immediate treatment is necessary.

Dr. Gambla said that when he sees patients with an urgent care need at intake screening, he tells them to submit a request for an appointment and will occasionally dispense antibiotics for patients with a dental abscess.[135] Of five records of these patients, all had inadequate documentation as to the diagnosis for which the antibiotic was dispensed.[136]

## Dental: Orientation Handbook
**Methodology**: Reviewed the Orientation Handbook.

**First Court Expert Findings**
- The NRC is included in the Stateville Offender Orientation Manual. It addresses the orientation screening exam, but in little detail. It states only that the inmate will receive one as soon as possible.
- It explains how to access emergency care but does not explain the requests form system for accessing urgent and routine care. It describes the hours of operation, partial dentures, appointments and cleanings.

**Current Findings**
Inmate orientation to dental care has improved marginally since the First Court Expert's Report. NRC now has its own orientation handbook, so the First Court Expert's findings are moot. However, we identified current and additional findings as follows.

NRC now has its own Orientation Handbook; however, it erroneously states that every reception offender will receive a ***complete*** dental exam at NRC.[137] As discussed supra, the initial examination performed at NRC is in no way a complete exam. Moreover, there is no explanation of the process for accessing urgent and routine dental care.

## Dental: Policies and Procedures
**Methodology:** Reviewed Administrative Directives that deal with the dental program, interviewed dental staff, reviewed dental charts, toured dental clinical areas, and reviewed NRC organizational chart.

**First Court Expert Findings:** None.

**Current Findings**

---

[135] The dental clinic has limited stock of antibiotics and non-narcotic analgesics.
[136] Progress note mentioned that the Patient #3 did not want the problematic tooth extracted, but there is no refusal in the record.
[137] NRC Offender Handbook, April 19, 2017, ¶IV B.

PTX193-0568

The IDOC dental programs are governed by Administrative Directive 04.03.102 (effective 2012). While the First Court Expert did not include this in the findings (although it was available for review), we nonetheless find that dental policies and procedures are inadequate for reasons stated below.

The NRC dental program is governed by Administrative Directive 04.03.102, amended 1/1/2012. It specifies that within 10 working days after admission to a reception and classification center, offenders shall receive "***a complete dental examination by a dentist***" (¶F2; emphasis added).[138] In addition, the dentist should chart the oral cavity.[139] The priorities are Category I (emergency),[140] Category II (urgent care),[141] Category III (comprehensive/routine care),[142] and Category IV (low-priority care).[143]

While Administrative Directive 04.03.102 mandates a charting of the oral cavity, the tooth diagram on the chart used for charting restorations and missing teeth (Appendix 3, Fig. 4) is too small. Furthermore, in none of the records reviewed was there evidence of its having been used.

The dentist did not have a thorough understanding of the classification priorities and did not have the Administrative Directive in the clinic. He said that he was "oriented to the Administrative Directive by Wexford." To illustrate this, Patient #15 had a tooth that was noted as IIa[144] (see Appendix 3, Fig. 2), yet no disposition was indicated (Appendix 3, Fig. 3).[145] The dentist should either treat the tooth at NRC or indicate on Figure 3 that it should be treated immediately at the receiving institution.

## Dental: Failed Appointments

**Methodology:** Reviewed the Dental Sick Call Log, interviewed dental staff, and reviewed Daily Dental Reports.

**First Court Expert Findings**

---

[138] Administrative Directive notwithstanding, in actual practice, the dentist at NRC performs a screening, not a complete examination (see discussion of comprehensive care *supra*). The NRC initial dental examination we observed contravenes the Administrative Directive. Either this was not noticed or was noticed and ignored in the semi-annual internal audits of the dental program per ¶C. Note that this error is also reflected in the ¶IV B of the NRC Offender Handbook.

[139] And document it in the dental chart (Appendix 3, Fig 4). The dental hygienist said that when she does a charting, it is not based on examining the patient's mouth but from the panoramic x-ray.

[140] Bleeding, pain, and acute infection.

[141] A condition, if left untreated, that would cause bleeding or pain in the immediate future (IIa); an oral infection or oral condition which, if left untreated (IIb), a condition that results in difficulty in chewing (IIc).

[142] A medium to large non-painful carious lesion (IIIa), localized gingival involvement (IIIb), tooth fractures (IIIc), deteriorated temporary, sedative, or intermediate restorations that have deteriorated extensively (IIId) and a broken or ill-fitting prosthetic device (IIIe).

[143] Small carious lesions (IVa), costly restorative procedure (IVb), severe non-functional bite and malocclusion (IVd).

[144] "An oral condition, if left untreated, that would cause bleeding or pain in the immediate future." Administrative Directive, Attachment A.

[145] There are three choices: 1) schedule immediately at R&C, 2) schedule routine exam at receiving institution, and 3) schedule immediately at receiving institution.

- For a randomly selected 23-day period, there were 409 scheduled appointments, of which 165 patients were seen, which is only 40% of those who were scheduled. The remainder were rescheduled, transferred, or no-showed.
- Of the patients who could have been seen (scheduled minus transferred), 43% failed their appointment. The 20% who were transferred reflect the time from when they were logged into the appointment book to when they were scheduled and the understandable high and rapid turnover rate at the NRC.

**Current Findings**
The failed appointment issue has not improved since the First Expert's Report. We concur with the First Court Expert's findings. However, we identified current and additional findings as follows.

The findings in the dental sick call section confirm that failed appointments are a problem; however, because of the disorganized sick call system and inadequate record keeping, it is not possible to accurately determine an actual failed appointment rate. This appears not to be a priority at NRC. For example, while the Dental Report in the January 16, 2018 QI minutes list refusals, no information about failed appointments is provided. Similarly, while the number of refusals is reported in the Dental Department Annual Summary, there is no mention of failed appointments.[146]

## Dental: Care of Medically Compromised Patients
**Methodology:** Reviewed health history form and records from recent initial exams, observed the dentist taking health history at the initial exam, and interviewed the dentist.

**First Court Expert Findings**
- There is no system to identify medically compromised patients and red flag those that may need medical consultation prior to dental procedures. The health history review is cursory from the NRC screening examination.
- The dentist does not routinely take blood pressures on patients with a history of hypertension.

**Current Findings**
Documentation of the health history of medically compromised patients has not changed materially since the First Court Expert's Report and remains inadequate. We concur with the findings in the First Court Expert's report. Moreover, we identified current and additional findings as follows.

The health history (Appendix 3, Figure 1) is too limited and omits conditions relevant to dental care, for example, anticoagulant therapy. There is insufficient room on the form for adding information and the dentist does not routinely update the medical history. Blood pressure is not routinely taken on patients who have a history of hypertension.

---

[146] NCR CQI 2016-2017 Annual Report, part 3, pp. 24-30.

Dental: Specialists
**Methodology:** Interviewed dental staff.

**First Court Expert Findings**
An oral surgeon is utilized by the NRC for oral surgery services. The inmates are scheduled and managed from SCC. More complicated cases, such as facial fractures and those requiring general anesthesia, are referred to Joliet Oral Surgeons, a local group. The information is maintained at SCC.

**Current Findings**
We concur with the findings in the First Court Expert's report. Moreover, we identified current and additional findings as follows. The dentist refers patients who require complex extractions to SCC, which schedules them for oral surgery. Since the details are not maintained at NRC, this issue will be pursued at the SCC visit and will withhold opinions as to the program's adequacy.

Dental: CQI
**Methodology:** We reviewed CQI minutes and reports and interviewed dental staff.

**First Court Expert Findings**
- The dental program contributes monthly statistics to the CQI committee. The NRC participates with the SCC CQI Committee meetings, as part of the entire dental program. These minutes are maintained at SCC.
- No studies were in place for the NRC at the time of this visit. In light of the number of program weaknesses, this is unacceptable.

**Current Findings**
The NRC dental CQI program has not improved materially since the First Court Expert's Report. We concur with the findings in the First Court Expert's report about the inadequacy of CQI studies and note that NRC now has an independent CQI committee. We were not provided with any CQI studies related to the dental program when we were at NRC.[147] With the many deficiencies identified by the First Court Expert and corroborated by this report, the dental program provides a fertile field for studies.

## Internal Monitoring and Quality Improvement

**Methodology:** Interview facility health care leadership and staff involved in quality improvement activities. Review the internal monitoring and quality improvement meeting minutes for the past 12 months.

**First Court Expert Findings**

---

[147] The NRC 2016-2017 CQI Calendar indicated that there was a dental study planned for January 2017. We were subsequently provided with reports of two studies at our SCC visit.

The First Court Expert found that the NRC and SCC quality improvement meetings were conducted as a single meeting, but that there were no NRC QI studies. Because there were no logs (reception, sick call, urgent care, emergency send-out log, and offsite specialty log) there was no data available to examine whether there was a problem. The First Court Expert recommended that the quality improvement program must be re-energized with knowledgeable leadership that has been provided specific training regarding quality improvement philosophy and methodology. The First Court Expert also recommended that the leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.

**Current Findings**
We agree with all findings of the First Court Expert. NRC now has its own CQI program with separate meetings, which is an improvement. The CQI program, however, remains ineffective. The remaining findings of the First Court Expert remain unresolved.

We identified new findings which include the following:
- The "Traveling Medical Director" provides no leadership for the CQI effort.
- No one in NRC leadership is familiar with current CQI methodology, study design, or data collection. The method of improving CQI at NRC as proposed by IDOC has not been effective.[148]
- The CQI coordinator has no training in CQI, does not understand how to perform or lead CQI work, and is so busy that CQI work is a low priority.
- The NRC CQI plan is generic and does not detail a year-ahead view of their CQI work. This is not a plan. The NRC and SCC CQI plans and Medical Director's reports are identical, indicating that these facilities are not yet performing their own quality improvement.
- NRC is not compliant with multiple requirements of their CQI AD, including:
  - NRC does not maintain a CQI manual onsite.
  - NRC does not monitor whether Wexford performs primary source verification of its physicians working at NRC.
  - NRC does not monitor offsite medical care for quality.
  - NRC does not perform the number of studies in accordance with requirements of the CQI AD.
  - There are no studies that review the quality of medical care.
- NRC fails to use data in a manner that identifies problems.
- Data presented in several studies appeared unreliable.
- The CQI report presents statistical data which has little value from a quality perspective.
- Half of the six studies NRC chose to perform were in areas where there were no problems, thus yielding 100% audit results. While it is useful to know areas that are working well, there were so many problem areas that attention should be given to problem prone areas.

---

[148] Page 5 in IDOC comments regarding First Court Expert's report in a letter to Dr. Shansky from William Barnes on 11/3/14.

- The annual CQI report repeatedly documents errors in medication administration yet there was no attempt to discover why this was occurring.
- Wexford's physician and physician assistant peer review differs significantly in comparison with our record reviews. We question its reliability.

The leadership at NRC has not effectively initiated a CQI program. The HCUA started nine months ago and inherited a facility that had not had a full-time and effective HCUA for years. The Medical Director position was vacant for a year before being filled for two months and then vacated again. The current Traveling Medical Director does not provide strong leadership. The HCUA told us that the DON position was vacant for years before being filled in September of 2017. Additionally, because quality improvement work was not being done when the HCUA arrived, she had to start from the beginning. While no quality improvement work was being done at the time of the First Court Expert's report, there has been some progress, but the CQI program is not yet operational or effective.

The IDOC AD requirement is that each facility develops a CQI program that provides "systematic, on-going objective monitoring and evaluation of the quality and appropriateness of offender care."[149] This is not being done. The Chief Administrative Officer is required by the IDOC AD to designate a CQI coordinator to lead that effort. The Warden is the Chief Administrative Officer. The person the Warden designated to be the CQI coordinator was the Director of Medical Records. That person left service sometime last year and the CQI position was vacant. Two months ago, the Warden appointed the newly hired Director of Medical Records to be the CQI coordinator. This person has undergraduate and master's degrees in Health Information Management, but she has no experience or specific training in quality improvement. The lack of knowledgeable leadership recommended in the First Court Expert's report is still not in place. It appears to us that this position is assigned to medical records staff because of the need to have someone organize the paperwork requirements of the CQI committee, including the mandated studies and the meeting minutes. While secretarial and organizational work is important, the main requisite of a CQI coordinator is someone who has the leadership capacity, skill, and expertise to identify problems and provide the leadership to solve the identified problems, and to ensure that the various disciplines are trained and enabled to perform quality improvement work. That is not a skill or expertise of the current CQI coordinator. This coordinator would not be able to train any staff on how to engage in CQI work. She is very well qualified to manage a medical record program but not a CQI program.

Except for attending CQI meetings, the new coordinator has not spent time performing or leading any CQI studies. The time she dedicates to CQI is a few hours a month reviewing data obtained for the CQI reports. Moreover, because the medical records program is in disarray, this person will not be able to dedicate much time to CQI work. She has not read the CQI AD yet and could not answer any questions with respect to the responsibilities of CQI. She did not have a plan of action and was not able to answer questions about how CQI was performed at NRC or how she might lead the CQI effort. The HCUA sat in on the interview with the CQI coordinator

---

[149] Administrative Directive 04.03.125 Quality Improvement Program policy statement.

on CQI activity and the HCUA responded to the questions, as the CQI coordinator did not know the answers.

The IDOC AD requires that the Agency Medical Director develop and maintain a CQI manual which the HCUA is to maintain locally. The HCUA did not have this manual onsite. The AD requires a CQI plan. The NRC CQI plan is present in the annual CQI report. The CQI plan has no specifics and lists only general goals such as improve quality, update programs, maintain standards, ensure patient rights, and work toward complying with NCCHC standards. These general goals do not constitute a CQI plan of action for the upcoming year. The plan does not state what it attempts to study over the upcoming year or discuss the main problems at the facility and how their CQI work will address those problems. The NRC plan is ineffective. It could be recycled year after year without modification and gives no indication of how the CQI program will be engaged in the upcoming year. We also note that the NRC and SCC CQI plans are identical. These are separate facilities and should have different plans. The Medical Director report for NRC is also identical to the SCC report, with the exception that the SCC report includes a sentence about accreditation.

Multiple requirements of the IDOC AD on the quality improvement program were not being accomplished at NRC. The AD requires a one-time primary source verification of credentials of licensed staff. NRC could provide no verification that this has occurred for their NRC physician. The annual CQI report verifies license and current DEA license, but this was done in 2016-17 and at that time the physicians listed were different from the current physician. In any case, this is not primary source verification of their credentials. Primary source verification is discussed in detail in the section on physician staffing in the section on Leadership, Staffing and Custody functions.

The IDOC AD requires that there is a monthly 100% review of appropriateness *and quality* of offsite medical care. Quality of care is not investigated at all based on CQI reports. Statistics about the number of referrals offsite is given, but there is no analysis or review with respect to quality. We were told by the HCUA that the Medical Director evaluates all hospitalizations and determines if they are appropriate. The HCUA or DON also send an email to the IDOC regional coordinator notifying them that a patient is going to be hospitalized. When the regional coordinator believes it is necessary, he/she may call the Agency Medical Director to determine whether the admission is appropriate. This process only evaluates hospital necessity. It does not evaluate, for example, the quality of care at NRC to determine if with adequate care the offsite or hospitalization could have been prevented. A mere statistical listing of hospitalizations and offsite consults fails to satisfy, in our opinion, the AD requirement to evaluate quality of care.

CQI studies are summarized in an annual CQI report. Studies performed in the CQI program are organized according to a schedule that is defined in the AD for CQI, which at NRC are memorialized in a calendar such that certain studies are done in certain months. NRC performed six studies in only four of the seven medical program areas required by the AD to be

studied on an annual basis. In the 2017 annual CQI minutes dated September 26, 2017, the studies (excluding mental health and injuries) performed to satisfy the AD included:

1. An outcome study that all laboratory results are received from UIC within 72 hours.
2. An outcome study on sick call that sick call slips are reviewed within 24 hours and treatment protocols are used.
3. A process study of chronic illness clinics that laboratory reports are received, signed, and dated within 24 hours and subsequently filed in the medical record correctly.
4. A process study of non-formulary medication that from the request to delivery of medication be less than four days.
5. An outcome study of whether the baseline clinic for a chronic illness problem is done within 30 days of arrival for all patients.
6. An outcome study of sick call that patients are evaluated at RN sick call and referred as per the AD.

None of the outcome studies performed included an acceptable clinical outcome. Clinical outcomes are end point measures of health status. These might be, for example, mortality, hospitalization, an HbA1C level of 7 or less, or normal blood pressure. An outcome study measures interventions that may affect the studied outcome. An example would be to study the effect of colorectal cancer screening on mortality or the effect of increasing the interval of chronic clinic visits on obtaining a normal blood pressure. The studies performed at NRC were not based on a clinical outcome but on performance measures. This demonstrates a lack of understanding of the meaning of outcome studies.

NRC should be credited with having started the CQI process. It is a step forward to have performed these studies. However, study choice and design is not meant to merely obtain a good audit result but is meant to identify problem prone areas, study them and attempt to improve quality of care. Also, this is a health care organization and there were no studies of clinical outcomes or quality of care. These studies have not yet reached that standard. We also note that one of the First Court Expert's findings is that because of the lack of adequate logs which track services, there is a lack of data available to understand whether a problem existed in any area of service. We agree with that finding. Limited data is available at NRC for use by the CQI program. The CQI studies did not appear to rely on adequate data needed to draw a conclusion with respect to the quality of service.

For studies 1, 3, and 4 listed above, it does not appear that these studies are problems at this facility. It is not unexpected that the results were all 100% or at goal. The First Court Expert report documented, for example, that labs were consistently drawn prior to chronic care. Yet one of the few studies done was to assess whether the lab reports were signed before a chronic care clinic. Notably this was 100%. With many known problems at the facility, why choose items which are known to not be problematic?

Study 2 was a study on whether sick call slips were reviewed within 24 hours and whether protocols were completed. We note in the section on nursing sick call that sick call slips have been destroyed and that sick call slips are not all retained. We question the reliability of data

used in this study based on our findings on the sick call process. Also, item 2 studies only whether a protocol was used, not whether the right protocol was chosen or whether the quality of nursing care was adequate. This study fails to critically address this process. Its value as a CQI study is limited. We could not evaluate item 6 because the methodology and data were not included in the annual CQI report.

Study 5 involved an issue that was brought up in the First Court Expert report and we agree with the concept of this study, which is a study of whether newly arrived patients with chronic illnesses are evaluated in a chronic illness clinic within 30 days.  As described in the section on chronic illness, NRC fails to enroll all inmates with chronic illness and places only approximately 10% of chronic illness patients on their chronic illness roster. This study was listed as an outcome study, which it is not. Enrollment of persons in chronic illness clinic is a process. Since only 10% of persons with chronic illness are identified at intake, only 10% of patients with chronic illness were assessed as to whether they were seen within 30 days. The 90% of patients not on the chronic care roster are more likely to not have chronic care follow up as required by the AD. These factors were not identified. Also, the study merely studies whether a doctor saw the patient but does not monitor if the quality of care of the chronic clinic was adequate. As we note in multiple medical chart reviews in this report, it is our opinion that the quality of chronic care evaluations is poor. This study would have been improved if it had studied the process of enrollment into chronic care, including how patients are identified as having chronic illness, how they are enrolled in the clinic program, and where patients get missed.

There was an absence of review of quality of clinical care of nurses, physicians, and mid-level providers. It is a requirement of the contract with Wexford that peer review is regularly done.[150] We asked for but did not receive Wexford's peer reviews until a month after our tour. The quality of care in all areas of our record reviews showed quality problems. Yet the peer reviews failed to demonstrate quality issues or, when quality issues were identified, there was no apparent corrective action and the results were not reported to the CQI committee.

The peer review of the Traveling Medical Director at NRC was performed by the Medical Director at SCC. The Traveling Medical Director is a nuclear radiologist performing primary care. He was noted by the First Court Expert to have "clinical concerns" and is on a final written warning by Wexford for clinical performance. We also noted significant clinical problems for this physician. Yet this doctor had a peer review performed by a surgeon who was clinically inadequate based on our record reviews including mortality reviews of preventable deaths. The peer review included reviewing 25 intake records. Ninety-six percent of questions reviewed were adequate and the remaining 4% were not applicable. This doctor, for whom we identified multiple problems, was scored as 100% adequate in this review. It is our opinion that this is ineffective peer review.

---

[150] Contract between Illinois Department of Healthcare and Family Services and IDOC and Wexford Health Services; Item 2.2.2.19 Participate in physician peer review program and any audit/peer review conducted by an outside review source to ensure compliance with accepted professional standards of performance, which includes, but not limited to, chart reviews; p. 6 of contract.

The nuclear radiologist Traveling Medical Director reviewed physician assistants at NRC. Sixty-five episodes of care were reviewed, 673 questions were answered, 193 questions were not applicable. Of the remaining 480 questions reviewed, 67 questions (13.9%) were found inadequate. Nevertheless, all 65 episodes of care reviewed were found adequate without further explanation. Two reviews stood out. In one review the doctor documented that six questions were not applicable. Four items were found to be inadequate, including:

- Does the plan of care logically follow the history and physical?
- Does the provider account for all positive responses noted on this screening history?
- Are all fill-in areas completed with appropriate responses?
- Is the signature with professional designation legible?

Only two items were found adequate, including:

- Is the problem list complete with medication allergies?
- Is the handwriting legible?

Yet this episode of care was found adequate. One questions how the signature was illegible but the handwriting legible. More important, based on only having a problem list and legible handwriting, the intake assessment was found adequate. This is a defective review.

In another review, the intake physical examination was deemed adequate because the problem list was complete, the provider accounted for positive responses on the history, and the handwriting was legible. On the same record, the reviewer found that the care plan did not follow the history and physical, the intake form was incompletely filled out, a digital rectal examination was not completed based on patient age, and "yes" responses on the history were not explained. These peer reviews appeared to be done only to provide evidence that a peer review occurred. Based on our record reviews of intake assessments and sick call visits in comparison to results of these peer reviews, we find these peer reviews are not identifying important deficiencies of clinical care.

The First Court Expert opined that lack of leadership was a key factor in a lack of CQI activity. The new leadership group has not yet developed a CQI philosophy or sense of purpose in its CQI work. It is our opinion that the lack of understanding on how to perform CQI work is resulting in supervisory staff appearing to blame staff for bad results when the bad result is a systemic problem unrelated to individual employees. This is a failure of leadership to know how to analyze or correct a problem. We note two comments in CQI minutes:

- "Were 18 med errors last month. Corrective action training was held. AW [name deleted] questioned 'at what point do we take nurses' license? There is a progressive pattern and adverse patient reaction.'"[151]
- With respect to medication errors, a comment was made that "Nurses are responsible for accuracy. No excuses."[152]

---

[151] August 15, 2017 Quality Improvement minutes.
[152] September 19, 2017 Quality Improvement minutes.

These two comments were related to failure of nurses to adequately document on the MAR and failure to appropriately administer medications. These types of medication errors were reported almost every month, as recorded in the annual CQI report. Despite statistically describing the problem, there were no studies or analyses to determine a root cause of why so many errors are being made. This is poor CQI, because employees were held responsible for systemic problems that were likely related to staffing or other process problems that are the responsibility of management. We note, for example, that when nurses administer medication, there is often no support officer. Management has the responsibility to uncover the root cause of the errors and to develop corrective actions to address the systemic issue. Blaming individuals for systemic problems is misguided in our opinion.

We reviewed the last annual CQI meeting report of September 26, 2017. This report consists largely of a report of activity statistics which do not provide useful quality metrics. Tables list the number of provider and nursing encounters without any other variables that would measure the effectiveness or quality of the program. These lists have some usefulness for managers to project staffing needs, but their utility of CQI is limited. NRC does not have performance measures that give an indication of the effectiveness of their programs. Examples of such measures might be:

- Percent of hospital and specialty consultant reports or hospital discharge summaries that are present in the medical record after a consultation or hospitalization.
- The numbers of patients who actually show up for their clinical appointments and the reasons why they do not show up.
- Percent of records sent to destination IDOC facilities which are not properly complete and organized.
- The percent of patients identified with a chronic illness at reception who are found on the chronic care roster.

These types of statistical measures give the program a performance benchmark. We do not see these types of useful measures embedded in the NRC CQI reports.

Another example is the medication report in the annual CQI report of September 19, 2017. This provides a list of the numbers of medication prescriptions for certain types of medications. This type of report is useful for financial management purposes, but it is not useful to assess whether the processes of the pharmacy and medication programs are effective. For example, studies that measure the effectiveness of the medication program might include:

- The number of persons receiving their first dose of medication within 24 hours of a prescription.
- The percent of doses of ordered medication that a patient actually received.
- The number of patients who had disruption of long term medication.

The annual CQI report contains two useful pharmacy studies. One is a monthly audit of the medication rooms. While we did not verify the accuracy or effectiveness of this study, we do

agree with the concept of this study and believe that such audits do promote regular monitoring of the program.

The pharmacy also performs a monthly audit of 20 medication administration records (MAR) in order to assess four items:
1. Whether the start and stop dates are present on the MAR.
2. Whether the drugs in the cart match the MAR.
3. Whether allergies are listed on the MAR.
4. Whether there is documentation of all doses given.

This is a useful audit. We have several comments. Systems that have an electronic medical record can audit 100% of item 4 and perform the audit electronically and more accurately than can be done with paper records. We note that in the annual CQI report, over the course of the year, there was a persistent problem with documentation on the MAR. This persistent problem continued into 2018. Despite this continued identification of this problem, there was no effort in the CQI program to discover why this persistent problem continued. This routine audit continued to identify a problem yet there was no attempt to resolve it.

We also noted in the pharmacy section of this report that many patients do not have a MAR initiated even when they have ordered medication. These significant patient safety problems should be studied in CQI to determine the root cause in order to eliminate the patient safety concern.

Mortality review is part of the CQI program. There were 11 deaths in 2015-16 and only one death in 2016-17. The one death in 2017 included only a death summary and did not include an analysis of the death. This, in our opinion, does not constitute mortality review.

The IDOC requires internal and external reviews of the medical program. We have asked for but have not received the internal and external reviews for NRC.

With respect to the First Court Expert's findings, there is now a CQI program at NRC that is independent of SCC, which is an improvement from the First Expert's report. However, the CQI program is not yet effective and is not performing in a manner that can identify and correct system problems. In part this is a result of not having a CQI leader who understands how to start and maintain a CQI program. The lack of a CQI leader was also a finding of the First Court Expert. Also, though the leadership staff, with the exception of the Medical Director, is eager to learn, they do not have a strong foundation in quality improvement and it will take considerable effort to overcome that deficiency. We believe that the First Court Expert's recommendation to have a full-time quality improvement coordinator is one option to address this problem. Also, we agree with the First Court Expert's finding that without accurate logs and other "structural elements," self-monitoring is impossible to perform. We expand on that finding to state that there is an absence of data useful in self-monitoring. Data used to self-

monitor must be accurate and intentionally maintained for purposes of self-monitoring. The NRC leadership has not yet identified what data is needed and how to use that data to monitor.

In his report, the First Court Expert recommended a full-time quality improvement coordinator at each site. The IDOC stated in its response to this recommendation that the IDOC was committed to improving the CQI process but questioned the need for a full-time CQI coordinator. Since so little has been done to improve CQI and since staffing levels are so low, it is unlikely that staff with other responsibilities are likely to be able to effectively lead the CQI program. Under the circumstances at this facility, we would agree with the recommendation of having a qualified full-time CQI coordinator.

# Recommendations

## Leadership, Staffing, and Custody Functions

**First Court Expert Recommendations**

1. *We agree with the First Court Expert's recommendation to have its own leadership team. The IDOC has now included a HCUA, Medical Director, and DON in NRC's budget allocation.*

2. *We agree with the First Court Expert's recommendation that NRC should have its own staffing grid that precludes use of shared staff. NRC should have sufficient staff to meet its staffing needs. We would add to that recommendation the following:*
   a. *A staffing needs analysis be completed that would be based on current need and to include a relief factor.*
   b. *The analysis needs to be based on realistic workload evaluations that ensure adequate quality of care, including for physician and physician assistants.*
   c. *The staffing at NRC needs to include sufficient clerical staff, a qualified nurse to manage infection control functions, and a qualified quality improvement leader.*

**Additional Recommendations**

3. The Medical Director should be permanently filled with a board certified primary care physician.

4. The use of "Traveling Medical Directors" should not be permitted to contractually fill a Medical Director position. Failure to have a permanent Medical Director should incur contractual penalties. Coverage physicians should be used as necessary but coverage physicians should not constitute a filled Medical Director position.

5. Senior staff at the facility (HCUA, DON, and Medical Director), the IDOC Regional Coordinator, and Agency Medical Director should participate in development of reasonable schedule E and state medical employee staffing documents.

6. A correctional officer staffing analysis should be completed to determine if there are sufficient custody staff to ensure that patients are timely brought for scheduled appointments and that nurses are timely and safely escorted during medication administration.

7. The Wexford Regional Manager should have training in a medical discipline or in medical administration. This should be a contract requirement.

8. An orientation for new health care leadership should be provided so that they are familiar with requirements and responsibilities of their assignments.

9. The facility must have a current staffing document listing all staff.

10. The span of control of the IDOC Regional Coordinator is too large to effectively manage. The span of control should be reduced to increase the onsite time at each facility.

11. Sharing of staff between NRC and SCC should stop.

12. Staffing loads for providers must be reduced so that reasonable time is given to complete a reasonable evaluation of all patients.

13. The physician at this site should not be permitted to provide primary care medical care, as he is a nuclear radiologist, appears unfamiliar with primary care clinical management, and shows repeated clinical concerns. His privileges should be confined to areas for which he has training.

## Clinic Space, Sanitation, Laboratory, and Support Services

### First Court Expert Recommendations

1. There should be a designated exam room in each housing unit appropriately equipped for conducting sick call. *We agree with this recommendation.*

### Additional Recommendations

2. All space used for clinical care must provide privacy, confidentiality, equipment (exam table, oto-ophthalmoscope, handwashing, access to record, light, paper barrier, sanitary equipment, tongue depressors, gloves, and minor equipment), adequate space, and waiting space. This should include segregation areas.
3. There need to be sufficient clinical examination rooms for the number of simultaneous staff (providers, nurses, psychologists, psychiatrists) who need them by shift. There needs to be clinic space for nurses to perform sick call in segregation and in all other areas of service.
4. Clinic examination areas including intake need to be cleaned and sanitized on a regular basis. A sanitation schedule needs to be developed to ensure that this happens.
5. There needs to be an inventory of equipment and a replacement schedule for equipment based on expected life of the equipment.
6. The scheduling system must support the needs of clinical care.
7. Adequate supplies must be available to support the functions of the clinical areas. A standardized system of re-supply must be put into place.
8. There need to be routine environmental rounds.
9. Environmental rounds should include the date, names of participants, findings, and actions taken. The findings should be tracked and monitored by the quality improvement committee.
10. The nurse sick calls rooms on the housing units should be included on the sanitation schedule and equipped with exam tables, desks, chairs, and hand washing and drying supplies.
11. Exam tables in the clinic should have adjustable foot and head sections.
12. Paper memos and announcements currently taped on the walls in the clinical areas should be enclosed in plastic sheaths or removed as a fire safety precaution.
13. Broken clinical and office equipment should be expeditiously repaired or replaced.

## Medical Records

### First Court Expert Recommendations

1. The medical records of patients at NRC who remain beyond two weeks or who are housed at the minimum security unit must be managed in exactly the same manner as

patients at any permanent institution. *We disagree with the First Court Expert's recommendation that a medical record can be initiated after a two-week period. We agree with the IDOC AD and contemporary medical record standards that a permanent medical record be initiated upon arrival at NRC.*

2. Medical records staffing must be adequate to insure that records of patients who stay more than two weeks or who are housed in MSU are maintained in the same manner per DOC policy as records at permanent institutions. *We agree with the First Court Expert's recommendation that medical records staffing be adequate.*

**Additional Recommendations**

3. Mental health and dental records need to be incorporated into the record when the record is first initiated, which should be on the day of arrival. A medical record jacket should be completed at the conclusion of intake screening.

4. Medical records should be maintained in accordance with the IDOC AD on medical records 04.03.100 and in accordance with Illinois Department of Human Services guidelines.

5. The medical record room must be enlarged to accommodate the number of staff and records in use at this facility. The room must be made secure. Unauthorized persons must not be allowed to enter, pull, or re-file medical records.

6. A system needs to be put into place of identifying that a medical record has been pulled and who has the record.

7. Given the disorganization of the medical record and inability to provide access to clinicians to a complete and organized medical record, we strongly recommend that an electronic medical record be installed.

8. Consultation reports and offsite hospital reports must be obtained and filed in the medical record within the time period specified in the IDOC AD on Medical Records. Lacking a consultation report, the providers must promptly communicate with the consultant to identify the result of the consultation, recommended therapeutic plans, new diagnoses, and updated status of the patient.

# Medical Reception

**First Court Expert Recommendations**

1. The policy approach to NRC is inconsistent with the reality of service demands. The assumption that patients have their medical intake completed within a week and then are transferred out is not applicable to a substantial number of patients. Therefore, this philosophy must be changed. This is especially true for patients with chronic diseases or who need scheduled offsite services.

2. The intake assessment by an advanced level clinician must include questions regarding current symptoms and include the development of a problem list and relevant plan.

3. Sufficient resources should be available such that the physical exams can be completed within one week of arrival.

4. NRC must begin conscientiously using logbooks, either paper or electronic, for intake processing.

*We agree with the First Court Expert findings regarding the medical reception process. The exception is that with respect to receiving electronic data from Cook County Jail, we find that printed medical transfer summaries are adequate.*

**Additional Recommendations**

5. Health care leadership should develop and implement a medical reception tracking log that documents completion of all medical reception/intrasystem transfer activities.

6. IDOC should amend medical reception forms to include a comprehensive review of systems (ROS) to identify serious medical conditions.

7. At medical reception, a station should be established so that at the completion of the process, medical records staff initiates a green jacketed medical record for each patient, with documents filed under the correct tab.

8. Examination rooms should be adequately equipped and supplied, including paper for examination tables to provide infection control barriers between patients. Furniture that is torn or in disrepair should be replaced.

9. Staff should change gloves and wash their hands between patients.

10. Perform HIV testing via opt-out methodology, not opt-in methodology, with written consent.

11. Weight scales should be periodically calibrated (e.g., weekly).

12. Nurses should measure uncorrected and corrected visual acuity in each eye and document results in the medical record. If large Snellen charts are used, the nurse should ensure the patient stands the correct distance away from the chart. Consider smaller hand-held Snellen charts.

13. Nurses should correctly read tuberculin skin tests via palpation and measurement of induration. This should be done in a medical setting.[153]

14. Given problems with tuberculin skin testing and inability to track results, TB screening should utilize interferon gamma blood testing as the primary screening test for tuberculosis. The Mantoux skin test is logistically complicated, and its interpretation is prone to human error. Conditions at this facility make it impossible to adequately read the Mantoux skin test.

15. Nurses should timely document tuberculin skin test results in the medical record (e.g., within 24 hours).

16. Providers should document review of medical transfer information sent by county jails.

17. Providers should perform pertinent review of systems and medical history for each chronic disease and/or significant illness.

18. Providers should order CIWA and/or COWS monitoring in accordance with current guidelines for patients withdrawing from alcohol, opiates, or other drugs.

19. Providers should provide continuity of medications unless there is a clinical indication for changing medication regimens (e.g., glargine to NPH insulin, etc.).

---

[153] We give recommendations for the existing program of using Mantoux skin testing but make a strong recommendation to move to interferon gamma blood testing which, in our opinion, would significantly improve the process of screening.

PTX193-0584

20. Providers should document all significant medical conditions onto the patient's problem list.
21. Nurses should transcribe all medication orders (i.e., KOP and nurse administered) onto a MAR at medical reception and document administration of KOP medications at the time they are administered to the patient.
22. Health care leadership should develop systems to ensure that all physician orders are timely implemented (e.g., EKG, blood pressure monitoring, etc.).
23. Providers should timely follow-up on all abnormal labs.
24. Providers should use a chronic disease form when seeing patients for the first chronic disease appointment within 30 days.
25. Health care leadership should revise medical reception policies and procedures to provide sufficient operational detail to staff to adequately complete each step of the process.
26. Health care leadership should develop and monitor quality indicators related to each step of the medical reception process.

## Intrasystem Transfer

**First Court Expert Recommendations**
1. The intrasystem transfer process must be designed to insure continuity of care for identified problems. *We agree with this recommendation.*

**Additional Recommendations**
2. IDOC should revise its Administrative Directives to create a statewide policy and procedure regarding intrasystem transfers consistent with NCCHC standards.
3. IDOC should include requirements for an Intrasystem Transfer Tracking log to enable staff to track the provision of required services, such as enrollment into the chronic disease program, medication continuity, tuberculin skin testing, and periodic physical examinations.

## Nursing Sick Call

**First Court Expert Recommendations**
1. Officers must be eliminated from the procedures that enable inmates to request health care services; thus, inmates must either place the requests in a lockbox or give them to health care staff.
2. There must be ongoing professional performance review of both nurse sick call and advanced level clinician sick call, which includes feedback on individual cases in order to improve professional performance.
3. NRC must begin conscientiously using logbooks, either paper or electronic, for sick call.
*We agree with these recommendations.*

**Additional Recommendations**

4. Health care staff should ensure that inmates have daily access to medical request forms and writing implements to submit their health requests.
5. Lockable health request form boxes that are accessed only by health care staff should be installed in each inmate housing unit.
6. Inmates must be permitted out of their cells on a daily basis to confidentially submit their health requests into the health request boxes.
7. Health care staff should collect health care request forms seven days per week.
8. Health care staff should legibly date and time receipt of health requests.
9. A registered nurse should triage health requests and document a disposition on the form (e.g., urgent, routine). Nurses should legibly date, time, and sign the form, including credentials.
10. Each health request should be entered onto the sick call log, including the urgency of the disposition.
11. Health requests should be filed chronologically in the medical record.
12. A nurse should schedule patients to be seen in accordance with the urgency of their complaint.
13. Nursing sick call should be conducted in adequately lighted, equipped and supplied rooms with access to a sink for handwashing. This includes a desk and chairs so the nurse and patient can be seated and an examination table, otoscope, scale, etc. Consider installing lockable cabinets to store supplies (e.g., nurse protocol forms, gauze, tape, tongue blades, etc.).
14. Nurses should have the medical record available at the time of the sick call encounter.
15. A registered nurse should perform and document an assessment of each patient in accordance with treatment protocol forms and/or sound nursing judgment.
16. Nurses should refer patients to providers in accordance with the treatment protocol and in accordance with sound nursing judgment.
17. Health care leadership should develop and monitor quality indicators associated with each step of the sick call process.
18. IDOC/Health care leadership should revise policies and procedures to provide sufficient operational detail regarding the sick call process.

## Chronic Care

**First Court Expert Recommendations**
1. The policy regarding chronic diseases must be that patients who remain beyond two weeks must have their initial chronic care visit at NRC before a total of 30 days have passed. This is clearly the case routinely for higher security inmates. *We agree with the First Court Expert's recommendation with a comment. It is our opinion that the initial intake evaluation should identify all chronic illnesses and establish an initial therapeutic plan for each patient with chronic illness. Waiting 30 days for this to occur will result in patients not receiving adequate continuity of care. It is our opinion that the initial intake evaluation needs to adequately identify and initiate an adequate therapeutic plan for all patients with chronic illness. We find this does not now occur. We agree that a follow up chronic illness visit should occur within 30 days.*

2. NRC must begin conscientiously using logbooks, either paper or electronic, for the chronic disease program. *We agree with this recommendation. The chronic disease program must have an accurate roster of persons with chronic illness. Our opinion is that this can be most effectively accomplished with an electronic medical record.*

**Additional Recommendations**

3. Patients should be seen in accordance with the degree of control of their diseases, with more poorly controlled patients seen more frequently and well controlled patients seen less frequently.

4. TB screening should utilize interferon gamma blood testing as the primary screening test for tuberculosis. The Mantoux skin test is logistically complicated, and its interpretation is prone to human error. Conditions at this facility make it impossible to adequately read the Mantoux skin test.

5. All NRC admissions with chronic illness should have laboratory tests performed at intake that are typically used to monitor the status of the patient's illness. As an example, persons with diabetes should have HbA1C drawn during the intake reception process.

6. Repeated failures to receive ordered medication due to refusal or other error need to result in intervention, to include, as necessary, a person to person evaluation by a provider. The timeline of referral to the provider must be dictated by the importance of the medication. For example, failure to take anti-rejection medication should result in a same day referral. Refusal to take insulin should result in a two or three day referral. Timelines for referral should be clear to providers and nurses and delineated in policy.

7. Health care leadership and the quality improvement committee should develop, monitor, and report quality indicators that measure and track the quality of care provided to patients with chronic diseases.

8. The provider progress notes should indicate the clinical status of the patient's condition and the rationale for any modification of treatment.

9. The current use of good and fair ratings of status on the chronic care form should be changed to well controlled, moderately controlled, poorly controlled, or undetermined.

10. The care of diabetes and adherence to existing guidelines should be a focus of the Quality Improvement Committee.

## Urgent/Emergent Care

**First Court Expert Recommendations**

1. NRC must begin conscientiously using logbooks, either paper or electronic, for urgent/emergent care. *We agree with this recommendation.*

**Additional Recommendations**

2. Health care leadership should implement an urgent/emergent care tracking log and monitor it to ensure that it is contemporaneously maintained.

3. The treatment room should be terminally cleaned and disinfected. Equipment in disrepair (e.g., torn stretchers) should be replaced.

4. Emergency equipment, including disaster and emergency response bags, AEDs, oxygen, etc., should be stored together in the main medical clinic.

5. Emergency response bags should be standardized with respect to equipment, supplies and medications. The bag should be secured with a plastic lock. When used, designated staff should replace all used supplies and replace the lock.

6. If emergency response bags contain medications (e.g., glucagon), a sheet is attached to the outside of the bag that notes medications and their expiration dates.

7. Emergency equipment should be checked each shift and noted on the SCC-NRC Machine/Equipment Check Log Sheet.
   a. When checking AEDs, ensure that electrode pads are not expired.
   b. When checking oxygen tanks, record how much oxygen is left and when tanks need to be replaced.
   c. Ensure that oxygen tanks have oxygen tubing and masks readily available.
   d. Ensure that EKG machines have paper.

8. Emergency response drills should be conducted and critiqued quarterly. Scenarios and critiques should be meaningful and identify areas for improvement. Corrective action plans should be implemented and monitored for effectiveness.

## Specialty Consultations

**First Court Expert Recommendations**

*1.* Patients whose problems require scheduled offsite services who are a higher level of security must have those scheduled while at NRC. *We agree in part with the First Court Expert's recommendation. We believe this recommendation should apply to all patients undergoing specialty care but only for higher level care that requires offsite referrals. Patients with other less critical specialty care appointments (podiatry, optometry, etc.) can have their appointment scheduled prior to transfer so that there is continuity of care.*

2. NRC must begin conscientiously using logbooks, either paper or electronic, for scheduled offsite services. *We agree with the First Court Expert's recommendation but have an addition to this recommendation. The IDOC, not Wexford, should develop a standardized offsite tracking log on an Excel spreadsheet that should be used at all sites. This tracking log should be used to report timeliness of referrals, collegial reviews, approvals, and appointments to the QI committee.*

**Additional Recommendations**

3. Wexford must begin placing specialty care documents, including referrals, verification of collegial review, and approvals into the medical record. Referrals for offsite care should be considered a physician order. The original referral form should be filed in the medical record on the date it was initiated by the provider. This should be done prior to the collegial review. Copies of this form can be used by the scheduler to manage scheduling.

4. The collegial review process should be abandoned. Medical providers should be permitted to send patients to offsite consultants without going through the collegial

review process on the basis of patient safety and inability to timely and effectively arrange ordered consultation care when using the collegial process.

5. Any denial of care needs to be documented in the medical record using documentation of the person who denied care.

6. At follow up provider visits after consultations, the provider should be required to document the results of the consultation, update the status of the patient, and update the treatment plan based on the consultation. If consultant reports are unavailable, the provider should use other communication efforts to discuss with the consultant what occurred at the consultation and document this discussion in the medical record.

7. An IDOC physician should review all denials of care, not the IDOC HCUA, who is a nurse.

8. Medical rounds or a "huddle" on offsite visits should occur every day. This huddle should consist of a meeting including the scheduling clerk with the providers as a group to discuss every patient who went offsite, where the report is, when the report will be obtained, what occurred, what follow up is indicated, and to schedule the patient to see the provider timely. These huddles should include review of the referral form that accompanies the patient which has consultant comments on the form. These huddles can be expanded at a later date to include other aspects of managing critical patients.

9. It is critical that consultation reports are all obtained and placed in the medical record within three days, consistent with the requirements of the IDOC AD on Offender Medical Records 04.03.100.

## Infirmary Care

### First Court Expert Recommendations
The First Court Expert had no recommendations on infirmary care in the NRC report.

### Current Recommendations
1. Health care leadership and the quality improvement committee should develop, monitor, and report quality indicators that measure and track provider and nurse adherence to the infirmary policy and the quality of the acute and chronic care provided to infirmary patients.

2. The provider progress notes should indicate the clinical status of the patient's condition and the rationale for any modification of treatment.

3. The quality and quantity of the bedding and linens should be monitored during the sanitation and environmental rounds.

## Pharmacy and Medication Administration

### First Court Expert Recommendations
1. Medication administration must include a designated officer to escort the nurse and ensure that patients appropriately identify themselves with their ID card, that they bring water in a container so as to ingest the medication, and so that the officer can do a mouth check after ingestion. *We agree with this recommendation.*

**Additional Recommendations**

2. At reception, physicians should document all medication orders onto a physician order form.

3. Nurses noting physician orders should transcribe all medication orders onto a medication administration record (MAR). Nurses should document on the MAR the administration of stock medications to the patient.

4. A schedule of sanitation and disinfection activities should be developed and implemented in all medication rooms.

5. The nurses' medication room must be kept clean and well-organized. Rusting shelves should be replaced.

6. Nurses should not transfer properly labeled and dispensed medications from the pharmacy into improperly labeled medication envelopes.

7. Medication carts should be clean, well-organized, and have adequate supplies to properly administer medications, including medication cups and hand sanitizer.

8. Custody leadership should ensure that sufficient officer escorts are available to escort and assist the nurse with medication administration.

9. Nurses should maintain standards of nursing practice with respect to medication administration, including:

    a. Using two identifiers to identify patients (e.g., ID card and date of birth, etc.).

    b. Washing hands prior to medication administration and using hand-sanitizer between patients.

    c. Comparing the medication blister pack against the medication administration record at the time of medication administration.

    d. Placing medications into disposable medication cups.

    e. Ensuring inmates have access to a cup and water to take medications.

    f. Observing inmates take medications, having the patient step aside and an officer performing oral cavity checks using a small penlight.

    g. Documenting administration of medications onto the MAR at the time of administration.

    h. If inmates are not in the housing unit at the time of medication administration, nurses should arrange for administration of the medication later in the shift.

9. In order for nurses to perform medication administration in accordance with standards of nursing practice as described above, conditions of confinement must permit inmates to come out of their cells to receive administration of medications.

10. The cutoff date for BosWell to print MARs for the following month should be later in the month (e.g., 27th or 28th) to reduce the number of MARs that nurses must transcribe at the end of the month.

11. Health care leadership should develop a system for timely renewal of chronic disease and other essential medications.

12. Health care leadership should revise the policy and procedure for medication administration to provide sufficient operational guidance to administer medications in accordance with accepted standards of nursing practice.

13. Health care leadership should develop, implement, and monitor quality indicators related to pharmacy services and medication administration.

14. Health care leadership should conduct a root cause analysis and develop a corrective action plan with strategies targeting the causes of performance that fall below expectations.

## Infection Control

The First Court Expert Report contained no recommendations regarding infection control. We include our recommendations below.

**Current Recommendations**
1. An infection control position should be established and budgeted.
2. Health care leadership should establish, implement, and monitor a schedule for sanitation and disinfection activities in all areas of the institution.
3. An analysis should be performed of infectious/communicable disease statistics, including prevalence of TB, HIV, and HCV infection among newly arriving inmates.
4. Track and report skin infections due to all pathogens, not just MRSA, including infestations with scabies or body lice.
5. Medical providers should be educated on the evaluation, staging, and treatment of syphilis infection.
6. Pending the hiring of an infection control nurse, document, monitor, and report to the Quality Improvement Committee and facility leadership the training provided by security to the inmate porters who clean and sanitize the clinical areas, including the infirmary patient rooms.
7. Inmate porters are to change gloves and wash their hands after sanitizing infirmary rooms and between sanitizing each patient's bed. Porters are not to leave infirmary rooms without removing gloves.
8. Protective clothing and gear are always to be worn by porters when cleaning body fluid exposed surfaces and walls.
9. All torn and cracked outer protective coverings of infirmary beds, wheel chairs, examination tables, and gurneys are to be repaired or disposed and replaced.

## Dental Program

### Dental: Staffing and Credentialing

The First Court Expert Report concluded that staffing was adequate and had no recommendations with respect to personnel. We found staffing to be inadequate and will be even more inadequate after necessary program changes have been made.

**Current Recommendations**
1. Perform a detailed analysis of the hours SCC dental personnel spend furthering NRC's mission and assign personnel to NRC accordingly.
2. Collect data on patient wait times and failed appointments to inform staffing schedule.

3. While staffing appears to be adequate for current operations, staffing should be re-evaluated if the intake screenings become more thorough and take more time (as we believe they should).

## Dental: Facility and Equipment
**First Court Expert Recommendations**
1. The chair and unit should be considered for replacement in the near future. Hand pieces should be repaired. *We add that there should be a replacement schedule for **all** dental equipment to inform budget preparation.*
2. The examination rooms for the screening exams should be better equipped. Patients should be seated, and lighting should be adequate for the exam. *We note that the lighting has been improved since the First Court Expert Report.*

*We agree with these recommendations.*

**Additional Recommendations**
3. Patients should routinely wear a lead apron with a thyroid collar when dental radiographs are taken.
4. The approval process for repairing dental equipment should be streamlined.
5. All x-ray devices should be inspected periodically by a therapeutic radiological physicist to ensure that patients are not subjected to unnecessary exposure to ionizing radiation.[154]
6. The clinic equipment should include a sphygmomanometer and stethoscope.
7. The panoramic x-ray units should be replaced immediately.

## Dental: Sanitation, Safety, and Sterilization
**First Court Expert Recommendations**
1. That the sterilization area be made neater and every attempt made to correct the sterilization flow. It may mean reconfiguring the space and the storage utilization therein.
2. That safety glasses be provided to patients while they are being treated.
3. That a biohazard warning sign be posted in the sterilization area.
4. A warning sign be posted in the x-ray area to warn of radiation hazards, especially pregnant females.

*We agree with these recommendations.*

**Additional Recommendations**: None.

## Dental: Review Autoclave Log
**First Court Expert Recommendations**: None.

---

[154] 32 Illinois Administrative Code 360 pdf, p. 47. Also, "[r]ecords of machine calibrations and quality assurance checks shall include identification of the x-ray therapy system, radiation measurements, the date the measurements were performed and the signature of the therapeutic radiological physicist who performed the measurements." *Id.*, p. 48.

PTX193-0592

**Additional Recommendations**: None.

## Dental: Comprehensive Care
**First Court Expert Recommendations**
1. Comprehensive "routine" care be provided only from a well-developed and documented treatment plan.
2. The treatment plan be developed from a thorough, well-documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. In all cases, appropriate bitewing or periapical x-rays be taken to diagnose caries.
4. Hygiene care be provided as part of the treatment process.
5. That care be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. That oral hygiene instructions be provided and documented.
7. Provide comprehensive, routine care only to the designated, long-term population.

*We agree with these recommendations.*

**Additional Recommendations**: None.

## Dental: Intake (Initial) Examination
**First Court Expert Recommendations**
1. *Provide a thorough soft tissue examination. This is the most important part of the screening exam and should include intra-oral palpation and a well-lighted examination of all soft tissue surfaces. We note that this will require that dentists allocate more time to each screening.*
2. Note pathology seen on the Panelipse radiograph. Do not diagnose small carious lesions from this radiograph.
3. Do not provide comprehensive routine care from this examination. This is a screening examination.
4. *Do not take the Panelipse radiograph simultaneously with inmates standing next to each other. This is a direct violation of radiation safety. Provide protective lead apron coverage to the inmate receiving the x-ray. We add that the apron should have a thyroid collar.*
5. Place signage in the radiograph area warning of radiation hazard.
6. Individually bag and sterilize the mouth mirrors or use disposable mirrors.
7. *Wash hands and change gloves between patients. We agree that gloves should be changed between patients but offer the alternative of using an alcohol-based hand rub before donning gloves.*
8. Take a more thorough health history and "red flag" health issues that require medical attention prior to dental treatment.

*We agree with these recommendations.*

**Additional Recommendations**

9.  The health history should be expanded and printed on a separate form.
10. The IDOC should ensure that dentists perform the charting required by Administrative Directive 04.03.102.
11. The portion of the form for charting is too small and should be increased substantially.
12. The panoramic x-ray units should be replaced immediately.
13. Infection control barriers be used on the light and changed between patients.
14. If the dentist does not have an assistant to record, an infection control barrier (i.e., a disposable pen sleeve) should be used on his/her pen.
15. Valid oral hygiene instructions should be provided and if they are not, the dental chart should not record that they have been provided.

## Dental: Extractions

**First Court Expert Recommendations**

1.  A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished using the SOAP note form at, especially for sick call entries. It would provide much detail that is lacking in most dental entries observed. Too often, the dental record includes only the treatment provided with no evidence as to why that treatment was provided.
2.  Provide antibiotics appropriately from a diagnosis and only when indicated.

*We agree with these recommendations.*

**Additional Recommendations**

3.  Clinically inadequate preoperative x-rays should not be used for tooth extractions.
4.  Consent forms should document the tooth number to be extracted as well as the reason for the extraction.
5.  All treatment refusals should be documented to include the reason for the recommended procedure and the consequences of declining the procedure.

## Dental: Removable Prosthetics

**First Court Expert Recommendations**

A comprehensive examination and well developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, precede all comprehensive dental care, including removable prosthodontics.

1.  That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions.
2.  That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

*We agree with these recommendations which represent the accepted professional standard for diagnosis and treatment planning.[155]*

**Additional Recommendations:** None.

---

[155] See, for example, Stefanac SJ.  pp. 11-15, *passim*.

## Dental: Sick Call/Treatment Provision

**First Court Expert Recommendations**

1. Implement the use of the SOAP format for sick call entries.
2. Develop a request/sick call system that insures that inmates complaining of pain/swelling/toothaches are seen by a provider and evaluated within 24-48 hours from receipt of the request.
3. Develop a system such that urgent care complaints (pain, swelling, toothaches) are seen in person for evaluation and triage by the next working day, and that care be provided expeditiously. Otherwise, these inmates are transferred and gone if too much time elapses. This should be a primary mission at NRC.
4. Provide routine comprehensive care to the designated MSU population only.

*We agree with these recommendations.*

**Additional Recommendations**

5. When the dental clinic is closed, or the dentist will not be available for 24 hours, a mid-level provider should perform a face-to-face examination for all inmates submitting a request that states or implies the existence of dental pain within 24 hours.
6. NRC should develop a standard health care request form that is available to all inmates.
7. All health care requests should be time-stamped and logged, and a record of when the inmate was seen by a provider and the disposition should be maintained.

## Dental: Orientation Handbook

**First Court Expert Recommendations**

1. Ensure that the orientation manual describes fully and accurately how inmates can access both urgent and routine care via the inmate request form system. *We agree with this recommendation.*

**Additional Recommendations**

2. Modify Administrative Directive 04.03.102, ¶IV B to reflect the fact that every offender at NRC receives a screening exam, and not a "complete dental exam."[156]

## Dental: Policies and Procedures

**First Court Expert Recommendations**: None.

**Current Recommendations**

1. The initial examination performed at intake should be in accordance with Administrative Directive 04.03.102 (¶F2), or the Administrative Directive be rewritten to reflect what IDOC decides should be done.
2. All Administrative Directives, policies, and protocols relevant to the dental program should be maintained in the dental clinic and the HCUA should ensure that dental personnel review them initially and after any changes.

---

[156] In most prison systems with which we are familiar, dental screenings are performed at intake and comprehensive examinations are performed typically within 30 days of arrival at the assigned prison.

PTX193-0595

3. Dental findings classified as Class II at the intake screening exam should be addressed at the NRC or immediately at the receiving institution.

## Dental: Failed Appointments
**First Court Expert Recommendations**
1. Every effort should be made to see inmates complaining of pain or swelling in a timely manner, within 24-48 hours. These inmates need not be scheduled for operative [routine] dentistry. Only palliative care need be provided.
2. A sick call system should be established that can accomplish this goal. Administration should be involved in this project and in assisting the dental program in getting inmates to the clinic or their appointment. The inmate handbook should make it clear who is eligible for routine care.

*We agree with these recommendations.*

**Additional Recommendations**
3. The failed appointment rate should be collected and reported as part of the CQI program with other dental program data.
4. Failed appointments should be a priority emphasis of the CQI program.

## Dental: Care of Medically Compromised Patients
**First Court Expert Recommendations**
1. The medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider.
2. That blood pressure readings be routinely taken of patients with a history of hypertension, especially prior to any surgical procedure.
3. The health history be addressed and updated on every patient and that consultation with medical be provided and documented when indicated. This issue is serious and needs to be corrected immediately.

*We agree with these recommendations.*

**Additional Recommendations**
4. The health history should be expanded and printed on a separate form.
5. There is not enough room on the chart to accommodate the tooth diagram used for charting restorations and missing teeth. The diagram should be substantially larger.

## Dental: Specialists
No recommendations.

## Dental: CQI
**First Court Expert Recommendations**
1. The CQI process should be used extensively and continuously to assist in correcting the deficiencies noted in the body of this report. A good starting point would be to focus on

addressing urgent care needs in a timely and efficient manner. *We agree with this recommendation.*

**Additional Recommendations**

2. The dental CQI program (as well as all other components of the dental program) lacks guidance from a dentist with experience in corrections. This expertise should reside centrally at IDOC and not depend on a Wexford employee or contractor.

# Internal Monitoring and Quality Improvement

**First Court Expert Recommendations**

1. The quality improvement program must be reenergized with knowledgeable leadership that has been provided specific training regarding quality improvement philosophy and methodology.
2. The leadership of the CQI program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.
3. Training should include how to study outliers to develop targeted improvement strategies.

*We agree with these recommendations.*

**Additional Recommendations**

4. The NRC quality improvement plan must be a practical year-ahead work plan for the upcoming year to work on and improve identified problems on a priority basis.
5. NRC must develop an effective methodology to review for quality of clinical care at all levels, including nursing and physicians.
6. NRC needs to re-evaluate its use of data. Data must be reliable and must measure processes determined to be essential services.
7. The CQI program at SCC must be separate from the CQI program at NRC. Annual reports must be uniquely developed. Reports used for NRC should not be used for SCC.
8. The Quality Improvement Committee should adhere to AD requirements including:
   a. Review primary source verification of physicians.
   b. Review 100% of offsite clinical events for quality and appropriateness. The review of quality should include whether the quality of care prior to and after the appointment was adequate and appropriate.
   c. Review of 100% of critical incidents including mortality, new or delayed diagnosis, use of isolation, IDPH reportable cases, and all staff evaluations for occupational exposures. This review should not consist of merely listing the number of these events but should be a critical review.
9. Sentinel event reviews and peer review on any non-primary care provider should be conducted by a non-Wexford physician.
10. NRC needs to develop a method of identifying problems with their processes of care.

**PTX193-0597**

# Appendix A

## NRC Staffing[157]

| Staff Type | Positions | Vacant | Supervising Authority |
|---|---|---|---|
| HCUA | 1 | 0 | NRC HCUA |
| DON | 1 | 0 | NRC HCUA |
| Nurse Supervisor | 2 | 0 | NRC HCUA |
| Med Room assistant | 1 | 0 | Wexford |
| Office Assistant | 1 | 0 | NRC HCUA |
| Medical Supply | 1 | 0 | NRC HCUA |
| Radiology Technician | 1 | 0 | NRC HCUA |
| CMT (shared SCC and NRC)* | 17 | 11 | SCC HCUA |
| RN | 21 | 5 | NRC HCUA |
| Certified Nurse Assistant | 6 | 5 | Wexford |
| Medical Records Director | 1 | 0 | Wexford |
| Dentist | 1 | 0 | Wexford |
| Dental Assistant | 1 | 0 | Wexford |
| Dental Technician | 1 | 1 | Wexford |
| Medical Director | 1 | 1 | Wexford |
| Staff physician | 1 | 0 | Wexford |
| Physician Assistant | 2 | 0 | Wexford |
| Medical Records staff** | 9 | 6 | Wexford |
| **Total** | **69** | **29** | |

*Five shared CMT staff out of 11 are on Leave of Absence and not working and are considered effectively vacant. These positions are shared between NRC and SCC and have been listed on both NRC and SCC's staffing tables.
**An adjusted service request (ASR) for five additional medical record clerks was just filed but these staff are not yet hired and therefore not listed on the grid provided by the Regional Coordinator.

---

[157] Based on a staffing grid provided by the IDOC Regional Coordinator via email to Expert on January 30, 2018.

Case: 1:10-cv-04603 Document #: 767-4 Filed: 11/14/18 Page 113 of 116 PageID #:12030

PTX193-0599

# Appendix B

## Review of Specialty Care[158]

| Type of referral | Referral present | Collegial present | Approval present | Formal report in record | Days to see Pt after consult | # of consultant recommendations not carried out | Recommendations of Consultant not carried out |
|---|---|---|---|---|---|---|---|
| Rheumatology Patient 1 Specialty Care (SC) | 0 | 0 | 0 | 1 | 12 | 2 | Check labs and refer to nephrology |
| Rheumatology Patient 1 SC | 1 | 0 | 0 | | 1 | 3 | Refer to nephrology, GI, and monitor labs |
| Hospitalization Patient 1 SC | | | | | | 6 | Recommended Renal biopsy, transrectal ultrasound, repeat CT scan of abdomen, cystoscopy with bilateral pyelograms, nephrology consult, urology follow up. There no meaningful review of these recommendations and referrals made for nephrology and urology but no collegial review or approval was present. There were no referrals to any of the other investigations. |
| ERCP procedure Patient 2 SC | 1 | 0 | 1 | 1 | 3 | 2 | Follow up cytology results, FU in GI clinic the following week |
| Urology Patient 3 SC | 0 | 0 | 0 | 1 | 19 | 0 | |
| Ultrasound Patient 3 SC | 1 | 0 | 0 | 0 | 9 | 0 | |
| Oncology Patient 3 SC | 0 | 0 | 1 | 0 | 5 | 2 | Vascular surgery, urology |
| CT scan Patient 4 SC | 1 | 1 | 0 | 0 | 10 | 0 | CT scan not reviewed |

---

[158] This data comes from review of patients 1 through 7.

| | | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|
| Oncology Patient 4 SC | 0 | 0 | 0 | 0 | 0 | 3 | 1 | No evidence of an ultrasound done as recommended. |
| Oncology Appt. with immediate hospitalization Patient 4 SC | 1 | 0 | 0 | 0 | 0 | 15 | | Because there were no reports it was unclear if recommendations were made. |
| Corneal clinic Patient 5 SC | 1 | 1 | 1 | 0 | | 1 | | Comments by the consultant on the referral form recommend contact lens clinic ASAP and surgery on the cornea. |
| Contact lens clinic Patient 5 SC | 1 | 1 | 1 | 0 | | 6 | 1 | Return to contact lens clinic was recommended on the referral form |
| Corneal surgery Patient 5 SC | 1 | 1 | 0 | 0 | | 4 | | |
| Corneal clinic Patient 5 SC | 0 | 0 | 0 | 0 | | 3 | | |
| Corneal clinic Patient 5 SC | 1 | 0 | 0 | 1 | | 2 | | |
| Corneal clinic Patient 5 SC | 1 | 0 | 1 | 1 | | 1 | | |
| Corneal clinic Patient 5 SC | 1 | 0 | 1 | 0 | | 1 | 1 | This patient's three month follow up was delayed and occurred only after the patient developed a complication. There was no evidence of a one week follow up at that clinic. |
| Orthopedic Patient 6 SC | 1 | 1 | 1 | 1 | | 1 | | |
| Outpatient surgery Patient 6 SC | 1 | 1 | 1 | 1 | | 1 | | |
| Transplant Center Patient 7 SC | 0 | 0 | 0 | 0 | | 4 | 1 | This consultation documented as having occurred in the medical record. Consultants recommended a hepatology consultation. There was a referral and approval for this but this consultation did not occur. |
| Burn Patient 7 SC | 0 | 0 | 0 | 0 | | 4 | | This consultation documented as having occurred in the medical record. |
| Transplant Center Patient 7 Sc | 1 | 0 | 0 | 0 | | 12 | | There was documentation in the record that the patient had a transplant clinic visit on 11/6/17 |

Case: 1:10-cv-04603 Document #: 767-4 Filed: 11/14/18 Page 115 of 116 PageID #:12032

**PTX193-0601**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | and there was a referral for a transplant follow up but there was no other information as to what occurred in the record. If there were recommendations, these were not present. |
| Transplant Center Patient 7 SC | 0 | 0 | 0 | 0 | Not seen | There was patient after-care paperwork for a 12/18/17 visit to Rush Presbyterian but there was no other information. If there were recommendations, these were not present. There was no provider follow up of this presumed visit. |
| Totals | 14 | 3 | 9 | 8 | | 19 |

# Appendix C



# Stateville Correctional Center

## 2nd Court Appointed Expert Report

## Lippert v. Godinez

Visit Date:  February 26, 2018 – March 1, 2018

Prepared by the Medical Investigation Team

Mike Puisis, DO
Jack Raba, MD
Catherine M. Knox RN, MN, CCHP-RN
Jay Shulman, DMD, MSPH

PTX193-0603

# Table of Contents

**Overview** ................................................................................................ 2

**Executive Summary** ............................................................................... 2

**Findings** ................................................................................................. 6

Leadership, Staffing, and Custody Functions ........................................ 6

Clinic Space, Sanitation, Laboratory, and Support Services ................. 9

Medical Records ................................................................................... 16

Intrasystem Transfer ........................................................................... 17

Nursing Sick Call .................................................................................. 19

Chronic Care ........................................................................................ 24

Urgent/Emergent Care ......................................................................... 38

Specialty Consultations ....................................................................... 48

Infirmary Care ..................................................................................... 50

Pharmacy and Medication Administration ........................................... 55

Infection Control .................................................................................. 59

Dental Program .................................................................................... 62

Internal Monitoring and Quality Improvement .................................... 75

**Recommendations** ............................................................................. 82

Leadership, Staffing, and Custody Functions ...................................... 82

Clinic Space, Sanitation, Laboratory, and Support Services ............... 83

Medical Records ................................................................................... 83

Intrasystem Transfer ........................................................................... 84

Nursing Sick Call .................................................................................. 84

Chronic Care ........................................................................................ 85

Urgent/Emergent Care ......................................................................... 87

Specialty Consultations ....................................................................... 87

Infirmary Care ..................................................................................... 88

Pharmacy and Medication Administration ........................................... 88

Infection Control .................................................................................. 89

Dental Program .................................................................................... 90

Internal Monitoring and Quality Improvement .................................... 95

**Appendix A** ......................................................................................... 97

**Appendix B** ......................................................................................... 99

PTX193-0604

# Overview

From February 26 to March 1, 2018, the Medical Investigation Team visited the Stateville Correctional Center (SCC) in Joliet, Illinois. This report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank the Warden and staff for their assistance and cooperation in conducting the review.

The SCC facility is one of three maximum security prisons in the IDOC. The Warden of SCC is also the Warden at the Northern Reception Center (NRC), a separate facility with a very different mission and needs. SCC opened in 1925 and is plagued by aging infrastructure. There have been attempts to close this aging facility, but political pressure kept the facility open.[1] In 2016, the "Roundhouse," a maximum security complex within SCC, was closed. In our introductory meeting, the Warden told us that several additional units have been closed.

SCC is located on a 2200-acre campus with 33-foot walls surrounding the perimeter. It has a population of 1183. SCC has three galleries on unit X for segregation housing with a capacity of 48. SCC has an infirmary unit of 32 beds. Units B, C, D, and E occupy a structure that is 420 feet long and 52 feet high. Each of these units has five floors, each with a housing "gallery." Inmates on these units are separated by levels of aggression. Dialysis patients are housed in Unit C. Unit E houses inmates with moderate to high aggression. This type of structure, in combination with maximum security classification, makes administration of medication and attendance for medical appointments exceedingly difficult.

The IDOC Agency Medical Director and IDOC Regional Coordinator were present for this tour. The Wexford Regional Manager and Regional Medical Director were not present for our tour.

# Executive Summary

Based on a comparison of conditions as identified in the First Court Expert's report, we find that some conditions appear to have improved by virtue of hiring a permanent Health Care Unit Administrator (HCUA) and improving access to sick call. Most other areas have either not improved or have deteriorated. We find that SCC is not providing adequate medical care to

---

[1] Stateville to Stay Open; Pontiac Prison to Close; Paul Meincke ABC Eyewitness News 5/5/08 as found at http://abc7chicago.com/archive/6123448/.

patients, and that there are systemic issues that present ongoing serious risk of harm to patients that result in preventable morbidity and mortality. The deficiencies that form the basis of this opinion are provided below.

The HCUA position is now filled with a capable full-time administrator. But the Medical Director position is now vacant and the Director of Nurses (DON) is new to the position. All supervisory nurse positions are vacant, resulting in the DON and HCUA having to perform direct line nursing supervision, which detracts from their ability to manage. Staff are still shared with Northern Reception Center (NRC) and the vacancy rate is high (32% including those on leave of absence), resulting in an apparent lack of staffing. A staffing analysis needs to be done and SCC needs its own staff that is not shared with NRC. The prior Medical Director was a surgeon and not appropriately trained in primary care medicine, likely accounting for the preventable morbidity and mortality we identified in record reviews. The lack of appropriately trained physicians was the single most important contributor to preventable morbidity and mortality in our opinion and must be corrected.

Clinic examination rooms were generally clean and appropriately equipped. There were some items in these areas that need to be addressed. Infirmary beds need repair or replacement. All rooms on the infirmary need to be sanitized uniformly and this unit needs pest control to remove cockroaches, flies, and gnats. Negative pressure rooms need to be repaired so they are fully functional and need to be regularly cleaned and inspected. The hemodialysis unit was in deplorable condition from a sanitation and physical plant perspective. This unit should be refurbished and properly sanitized. The inmate kitchen and dining area had birds living in the unit who deposited droppings in the area where inmates eat. This poses a health risk and these birds should be removed from inside the kitchen. The monthly environmental rounds now being performed are an improvement, but these should include the infirmary and hemodialysis unit.

Except for hospital and consultant reports, most documents are filed timely into the medical record. Offsite consultations and hospital records are often unavailable, which adversely affects clinical care. Confidentiality is a problem to a lesser degree than at NRC, but the medical records area needs to be continuously secured. We continue to find problems with use of the excessively large medical records. The problems with the use of the paper record and the clinical problems it causes prompt us to strongly recommend implementation of an electronic medical record.

We found that the intrasystem transfer process has improved since the First Court Expert's report. However, we did find that for approximately 30% of inmates transferring into SCC, their transfer information was incomplete or prescribed care was not continued. We do, however, agree with the First Court Expert's recommendation to initiate quality improvement monitoring of this area of service.

Access to care has significantly improved since the First Court Expert's report and problems identified in that report related to access to care have been resolved. We note, however, that

quality of care of nurses performing nursing sick call exhibit deficiencies that are not currently being monitored by the Continuous Quality Improvement (CQI) program or by nurse supervisory staff. In addition, Licensed Practical Nurses (LPN) continue to perform sick call when this task exceeds the scope of their license.

The chronic care program appears to have deteriorated since the First Court Expert's report based on chart reviews. Physicians appear to be ignorant of currently accepted care guidelines for a number of common medical conditions that adversely affected patients. It is our opinion that this ignorance is related to the defective hiring, credentialing, and privileging process of Wexford. Physicians do not consistently take adequate histories, perform adequate physical examinations, derive adequate assessments, or form appropriate therapeutic treatment plans. The structure of the chronic care management program as described by the First Court Expert contributes to fragmentation of care and this has not been corrected. Evidence of poor chronic illness management is present in record reviews for chronic illness, hospitalization, and mortality reviews. Evidence showed preventable morbidity and mortality that is significant.

With respect to urgent, emergent, and hospital care, first responder bags are not standardized and are inconsistently inspected and maintained. Many ER visits and hospitalizations were preventable and due to inadequate primary care management. With respect to hospitalizations, we identified a preventable stroke and heart attack. We also noted that a metastatic colon cancer may have been prevented or have been identified much earlier with a better result than the metastatic cancer that was identified because of a year delay in performing diagnostic studies. We found these significant problems having reviewed only six records.

Specialty care has not improved compared to the First Court Expert's report. Care at University of Illinois Chicago (UIC) is not timely, yet for patients whose consultative care is delayed, consultation with an alternate service provider is not obtained. We find that this has caused morbidity. Tracking of consultation services is extremely poor and appears inaccurate. We found, for example, that 70% of completed consultations in January of 2017 were dated as completed *before* the referral for the consultation was documented as submitted. It is our opinion that the Wexford collegial review utilization process is a barrier to timely care and should be abandoned. This program has become a patient safety issue.

Medication administration services appear to have deteriorated as compared with the First Expert's report. The current system of medication administration is unsafe and does not ensure that patients receive medication as ordered. Nurses administer medications in an unhygienic manner and fail to document administration at the time medication is administered. There are many errors related to medication administration that the SCC program is aware of. Yet there has been no effort through its CQI program to correct these systemic problems. Also, contract monitoring documents have documented continual violations concerning controlled substance medications, yet no penalties or corrective actions have been taken.

The First Court Expert had no concerns or findings with respect to infection control. We identified multiple findings. These include vermin in patient rooms on the infirmary unit, serious infection control and sanitation issues in the dialysis unit, and birds in the inmate dining room, all of which can promote disease transmission. Negative pressure units on the infirmary used for respiratory isolation in cases of active tuberculosis or other illnesses were not fully functional, cleaned, or regularly serviced. Tuberculosis monitoring was poor. Nurses were not accurately reading Mantoux skin tests. Because the infection control responsibilities were dispersed among several nurses, it is our opinion that a dedicated infection control nurse would be beneficial. This was also a recommendation of the First Court Expert.

The dental program has not changed materially since the First Court Expert Report. Routine treatment is timely; however, it often occurs without a comprehensive oral examination (i.e., intraoral x-rays, a periodontal assessment, and a treatment plan); placing patients at risk of preventable pain and tooth loss. Clinical notes are inadequate and often illegible. Antibiotics and analgesics were often dispensed without a diagnosis having been recorded and post-extraction antibiotics were prescribed without documented evidence of infection. The dental sick call process is disorganized, and it is not possible to determine how long patients wait to be treated, or the failed appointment rate. There is no process for mid-level providers to triage and palliate patients whose sick call request suggests pain or infection. The treatment provided to IDOC inmates remains substantially below accepted professional standards and is not minimally adequate.

While the First Court Expert found the quality improvement program "non-functioning," we found that the HCUA and his staff have initiated CQI activity, although it is nascent and not yet effectively functioning. The annual CQI plan and annual Medical Director Report at SCC are identical to the NRC CQI plan and Medical Director Report. Several requirements of the IDOC administrative directives (AD) are not performed by the CQI committee, including primary source verification of physician credentials and evaluation of 100% of offsite consultations and hospitalizations for quality and appropriateness. The CQI program does no evaluation of the quality of physician or nursing clinical care. Wexford peer reviews do not appear to identify or correct provider's unacceptable care. The CQI committee does not perform sentinel event or mortality reviews even though there was preventable morbidity and mortality that we uncovered in record reviews.

We have several recommendations at the end of this report and address the recommendations of the First Court Expert, most of which we are in agreement with.

# Findings

## Leadership, Staffing, and Custody Functions

**Methodology:** We interviewed leadership of the health program and the Assistant Warden of Programs. We evaluated staffing documents and discussed these with the leadership. We reviewed other selected documents.

### First Court Expert Findings

The First Court Expert found that staffing between NRC and SCC was combined and shared, making adequacy of staffing difficult to assess. Because all staff at SCC are assigned to NRC for part of their work hours, staffing at SCC is unreliable, making SCC out of compliance with policy requirements. Staffing schedules do not account for sickness and vacancies. Management must prioritize staff based on critical needs. Leave of absences and vacancies of state employees were significant. These vacancies are filled by Adjusted Staffing Requests (ASRs), accounting for 40 RN and LPN positions. A single HCUA manages both SCC and NRC and that position was functionally vacant due to prolonged medical leave. The SCC Medical Director was a surgeon who did not provide clinical management of the program.

The First Court Expert recommended that SCC have its own HCUA and staffing allocation, that only primary care trained physicians provide care, and that these physicians be board certified, and that all providers have access to electronic medical references.

### Current Findings

We agree with the First Court Expert's findings, although there have been several changes at SCC. We found additional problems.

- Newly appointed SCC leadership has not had an orientation to their positions and are learning on the job.
- There are no nursing supervisors, so the HCUA and DON act as supervisory nurses, making them less effective in their assigned positions.
- Staffing vacancies and sharing staff with NRC contribute to a perceived lack of staffing. Actual staffing needs have not been determined by way of a staffing plan. A staffing plan, including for providers, should be developed.
- Lack of physician credentialing and granting privileges to physicians to perform care in areas in which they have no training has resulted in preventable morbidity and mortality.
- Contract monitoring fails to adequately monitor for vendor quality of care and overall performance.

There have been some changes since the First Court Expert's report, but we agree with the main conclusions of his findings. SCC now has a dedicated HCUA, which was a recommendation of the First Court Expert. This is an improvement. However, this improvement is negated by the lack of a Medical Director. The Medical Director recently died and was replaced about two

months ago by the recently appointed NRC Medical Director. Two weeks after our visit, however, this physician resigned, leaving SCC without a Medical Director. Staffing is still shared between the two facilities and all staff from SCC goes to NRC on occasion to assist in the reception area on busy days. There has been a very recent increase in staffing at NRC which will reduce the need to send staff from SCC to NRC. However, the degree of staff sharing is not known but is still substantial. We did not find that staff vacancies are filled by ASR positions.

The leadership staff at SCC are all recently appointed. The HCUA has been in his position for about a year. The Director of Nursing (DON) has been in her position for about five months and was a staff nurse at SCC for about five years before taking the DON position. The HCUA and DON were both staff nurses prior to their current positions. The Medical Director was in his position for about two months before he resigned shortly after our visit. He had been with Wexford for two years and over those two years had been a Traveling Medical Director or Medical Director at five different facilities. According to a Wexford document, he was listed as Medical Director simultaneously at both NRC and Sheridan between 2/19/17 to 8/12/17.[2] Overall, this leadership group lacks management experience and is now lacking a Medical Director. However, the HCUA and DON are energetic and willing to learn their assignments.

The IDOC Regional Coordinator for this facility covers 10 facilities, which is a span of control too large to effectively supervise. He and the IDOC Agency Medical Director were present for part of our tour. Neither the Wexford Regional Medical Director nor the Wexford Regional Manager was present for our tour. The Wexford Regional Manager is an ex-warden and we have concerns that a person with criminal justice training will have the skills necessary to manage a clinical medical program.

None of the key leaders indicated receiving specific training for their new roles. All three inherited positions that were vacated and they have been learning on the job. In the case of the HCUA, his predecessor, as described in the First Expert report, was chronically absent and was not performing. He inherited a poorly functioning program. The Director of Nursing inherited the program from a nurse who had performed well. However, the prior DON did not have time before her departure for an orientation for the new DON. The Medical Director had just started in the position as Medical Director when he resigned.

Nursing supervision is significantly deficient. There are two nurse supervisor positions. One supervisor is on leave of absence and the other recently left service, making both positions effectively vacant. The DON and HCUA provide supervision during daytime hours, in addition to their management responsibilities, but there is no evening or night supervision. Having staff work without supervision is not an acceptable situation. The staff is a mixed IDOC/Wexford staff. Dialysis staff is supervised by Naphcare, the dialysis vendor. As with NRC, there are some supervision issues with respect to assignment and discipline when an IDOC employee assigns or supervises a Wexford nurse, or when the Wexford DON assigns or supervises an IDOC employee.

---

[2] Document 42P5643 – IDOC Position History 7-1-2015 to 11-22-2017 Bates #520-548 (Requests 1 & 2).

All three key leaders believe that staffing shortages are their number one problem. All staff at SCC can be shared with NRC. The amount of time SCC staff work at NRC is determined on an ad hoc basis by negotiation and discussion between the NRC and SCC HCUAs. Based on a discussion with the HCUA, the staffing at SCC includes 98 positions with 24 (24%) vacant positions and nine on leave of absence or injured.[3]  The effective vacancies total 33 (34%). This extraordinarily high vacancy rate is made worse by having to share staff with NRC, which results in prioritizing assignments to avoid crises as opposed to ensuring that all needed work is done. Despite these staffing deficiencies, there is no staffing plan that addresses actual needs at SCC. The current official Schedule E is not up to date. None of the existing leadership staff has participated in developing the Schedule E or existing staffing pattern at this facility.

Almost all provider notes lack adequate history, physical examination, assessments, and therapeutic plans. We could not determine whether this deficiency was due to practice issues or lack of staffing. The Medical Director's opinion was that an additional physician is needed. The Medical Director has clinical responsibilities in addition to management responsibilities. The annual CQI report for 2016-17 states that providers see approximately 20-30 patients daily.[4] The Medical Director's report in the 2016-17 annual CQI report notes that "Depositions and court appearances for pending litigation are continuing to increase. Due to this, provider's time is divided between depositions and patient care." We add that when NRC intake physicals are backlogged, providers from SCC are sent to NRC to assist. The statistics in the most recent annual CQI 2016-17 report list 14,321 provider contacts, which yields about 18 patients a day per provider without infirmary visits, assistance to NRC, or time needed for litigation concerns, which the prior Medical Director deemed significant. The Medical Director also told us that he has asked for extra time to see patients because the medical record documentation is so poor that it is difficult to determine what the patient's problems are. In a well-functioning prison program with 1200 inmates, three providers are typically adequate. Under current circumstances, particularly with the sharing of staff with NRC, it is not certain whether budgeted staffing is adequate. A staffing analysis is necessary.

Based on record reviews, the quality of physician care, particularly care provided by the recently deceased Medical Director, was substandard. This was a serious problem at this facility. We noted multiple cases of morbidity and harm that occurred as a result of poor care. Two death charts reviewed showed preventable mortality. This, in our opinion, is related to use of physicians without primary care training. The recently departed Medical Director was a surgeon who did not appear to know how to manage many primary care problems, resulting in harm to patients. The credentialing and privileging of physicians is inadequate and places inmates at risk of harm. The prior Medical Director had the worst performance on peer review of all providers at this facility (two of whom were nurse practitioners), yet he was assigned the most complex patients and oversaw clinical care. We were told that assignments of Medical Directors are made by the Wexford Director of Operations, Regional Manager, with input from the Regional Medical Director. The recently resigned SCC Medical Director stated that he

---

[3] Appendix A at the end of this report has the staffing grid for this facility.
[4] Medical Director Annual Summary, Medical Director section of annual 2016-17 CQI presentation.

received his assignment by the Director of Operations. Lay persons do not have the ability to review the qualifications of physicians. Assignment of physicians not trained in primary care to be in charge of primary care at a facility places inmates at risk of harm.

The Assistant Warden of Programs covers both NRC and SCC. According to the HCUA, there are monthly meetings conducted by the Assistant Warden of Programs at which custody impediments can be discussed.

The HCUA monitors the contract by use of a standardized contract monitoring spreadsheet. NRC and SCC are reported as a single facility with respect to contract monitoring. There are three main functions with respect to contract monitoring: bills being paid on time, staffing hours filled, and performance monitoring. With respect to the total number of hours filled, the HCUA lists any hours in excess of the Schedule E that the vendor provides. This is subtracted from the total hours not filled based on the Schedule E. This yields the hours not provided or the total excess hours provided by the vendor in excess of the Schedule E. For the seven months from June 2017 to December 2017, there were 17,681.15 unfilled hours or about 2526 unfilled hours a month or about 14 positions. This accelerated beginning in October 2017, presumably due to the addition of new staff positions which have yet to be filled. Nevertheless, this is a significant amount of unfilled positions.

Performance contract monitoring consists of adherence with both contract requirements and compliance with administrative directives. With respect to administrative directives, the HCUA lists each item of the administrative directives which are not being followed by the vendor. However, this is subjective and does not appear thorough. For the June of 2017 contract monitoring report, as an example, the only medical performance deficiencies reported for SCC were two items related to distribution and documentation of controlled substances. Many ADs do not appear to be followed. As examples, we noted several administrative directives that were not being followed including:

- Failure to file hospital reports in the medical records in three days
- Failure to assess appropriateness and quality of 100% of offsite medical care services
- Failure to perform a one-time primary source verification of physician credentials.

The contract monitoring, in our opinion, fails to identify key failures of the vendor, especially regarding quality of provider care, for which there appears to be virtually no effective monitoring.

## Clinic Space, Sanitation, Laboratory, and Support Services

**Methodology:** Accompanied by a correctional officer and the IDOC Medical Director, the IDOC Regional Coordinator, and the Health Care Unit Supervisor, we inspected the nurse sick call rooms on the housing units, the infirmary, and the main outpatient clinical area which housed medical exams rooms, nurse work areas, an urgent care center, physical therapy, hemodialysis unit, dental clinic, telehealth room, mental health interview rooms, nurse medication

preparation room, medical records department, health care administrative offices, conference room, the inmate cafeteria and dining areas, and the kitchen.

**First Court Expert Findings**

The First Court Expert found the clinical areas at SCC clean, well maintained, and environmentally comfortable. He recommended that designated exam rooms should be made available with appropriate equipment in cell houses B, E, and F to allow sick call to occur with reduced movement demands.

**Current Findings**

We had some different findings with respect to sanitation and equipment maintenance. Our findings included:

- The nurse sick call rooms in the housing units (B, C, D, E, X) are adequately sized and properly equipped. Their location in the housing units maximizes the patient-inmates' access to sick call.
- Five of the nurse sick call rooms in the housing unit have sinks with hot and cold water with hand washing supplies. Housing unit B's nurse room does not have a sink but has sanitizing gel.
- The first aid kits in the correctional officer rooms on the housing units are not regularly inspected and re-supplied. Two kits were inspected; the seal was broken on both and there were no gauze or bandages in the kit.
- The infirmary beds were in unacceptable condition. All of them need to be properly repaired or replaced. The low level of the beds makes it difficult and unsafe for the clinical team to properly examine and transfer patients.
- The cleaning and sanitation of the infirmary rooms must be uniformly done and should not vary based on the ability of the patient to assist the cleaning. Pest control must continue to be addressed in the infirmary.
- The negative pressure units in the infirmary are not regularly inspected or cleaned. The units were not fully functional. These units should have documented inspections on a weekly basis (daily if the room is occupied by a patient in respiratory isolation) and the filters changed on a monthly basis or as needed. The unit should be regularly checked during the environmental rounds and the condition noted in the monthly Medical Safety and Sanitation Report.
- The infirmary porters were verified to have received blood borne disease training and hepatitis A and B vaccinations.
- The physical plant, cleanliness, safety, and sanitation of the hemodialysis unit were unacceptable. The deficiencies and concerns noted in this section and the Infection Control sections must be immediately addressed.
- All medical equipment must be inspected and calibrated no less than annually by a bioengineering team. Only the AED and the UIC lab centrifuges had labels documenting inspections within the previous 12 months.

The main housing unit is a long rectangular building that has been subdivided into four quads, B, C, D, and E. Each of the quads houses approximately 260 inmates (capacity was reported to be 277). Each cell on these quads has two single beds with a toilet and a sink. The doors are barred. Large open showers are located on the second floor. The shower in Quad E was in good repair with no obvious mold. There was a plastic shower chair for use by patient-inmates with ambulation issues. There are no elevators in the housing units. All inmates with ambulation issues are housed on the entry level.

The nurse sick call rooms in Quads B, C, D, E, and in the X (disciplinary segregation and protective custody) building were inspected. The location of the nurse sick call rooms in the housing areas enhances the inmates' access to health care services. The sick call rooms have adequate space. Each has an exam table with disposable paper coverage, a blood pressure and vital sign unit, a temperature taking device, a medication cart, a wall mounted oto-ophthalmoscope, a privacy barrier, and a scale. Four of the five nurse sick call rooms had a sink for hand washing and paper towels. Quad B did not have a sink, but there were sanitizing wipes and gel for hand washing. The ophthalmoscopes in two of the sick call rooms (D, E) were not functional. The medication cart in one room was inspected; it was locked and sealed. The medication cart check list/log with a pill count was properly maintained. Although the floor in B was dirty and the sink in D was crusted with mineral deposits, the nurse sick call rooms were generally clean and organized. In a few rooms there were unprotected paper memos taped on the wall; this is considered a potential fire safety hazard.

The first aid kits in the correctional officers' rooms on Quad D and B were not sealed and did not have any gauze or bandages for emergency use. This was reported to the correctional supervisor.

Although there are locked boxes for sick call requests on the housing areas, inmates reported that they use a signup list on the first floor to request a nurse sick call visit. They are asked not to write their medical concerns on the list. All inmates interviewed stated that they are, almost always, seen by the sick call nurse within 24 hours. In the X facility, inmates have to tell the correctional officer or med nurse to sign them up; they also stated that they were seen on the next day. If the nurse referred them to a physician/physician assistant, there was a two to three day wait unless the problem was deemed urgent.

The infirmary has 32 beds; 26 were occupied during this visit. One of the wings has two beds per room and the other is predominantly single beds. Mentally ill individuals in crisis are housed in a single bed room. Nearly 70% of the current infirmary patients were chronically ill (post-CVA, dementia, encephalopathy, ataxia, paraplegia, difficulty with ambulation etc.), with most needing some level of assistance with activities of daily living.

Almost all of the beds in the infirmary need to be replaced. The infirmary beds are low to the floor and cannot be raised. The head of the beds cannot be elevated. Most of the beds had broken or non-functional railings. There were no electrical beds in the infirmary. One patient with dementia was noted in his bed with nearly half of his body hanging over the edge of the

bed. This is a significant safety risk. The condition of the infirmary beds creates a notable safety risk for staff and patient-inmates. There is no replacement plan for the infirmary beds. The mattresses were generally in good condition; the impervious covers were also either intact or taped. Only one mattress had a tear (across the entire end of the covering). The rooms on the two-bed wing had nurse call devices; a review of four rooms verified that the devices were functional. There are no call devices on the single bed wing.

The infirmary had two negative pressure rooms (124 and 126). Room 124 has two HEPA units; the filters in both units were caked with dust. One unit had 1/12/2016 written in magic marker on its surface; presumably this was the last date of inspection. The second unit was undated, had dusty and dirty intake and outflow vents, and when turned on moved a very limited amount of air. In addition, the ceiling air vent was taped over. There was a single HEPA unit in room 126; there were no dates of inspection on this unit. The filter was covered with dust. The nurses demonstrated how they test the negative pressure in these rooms by placing a sheet of toilet paper over the chuck hole to see if the paper is drawn into the room. The test failed in room 124 and had limited draw in room 126. The experts requested the inspection reports for the HEPA units but the reports, if they exist, were not provided. The facility management staff changed the filters that evening, and the tissue paper test demonstrated the presence of negative pressure on the following day.

Inmate porters sweep and mop the floors of the infirmary rooms two to three times a week. They report that they spray and clean the toilets, sinks, and showers on a regular basis. No printed cleaning schedule was provided. Two infirmary porters were interviewed.[5] They both stated that they had received formal training about their duties and had been vaccinated against hepatitis A and B. The Director of Nursing provided copies of their training curriculum, post-training test and vaccination records that confirmed the information provided by the porters. We did, however, note cockroaches, flies, and gnats on the infirmary unit. The patient rooms in the infirmary varied in degree of cleanliness and sanitation. Rooms in which the occupant participated or primarily did their own cleaning were reasonably clean. Infirmary room 124 was occupied by an individual with dementia; his room was filthy, with debris on the floor. His shower had not been recently cleaned. There were 20 small flies on the wall of the shower. He reportedly would tell the porters not to clean his room. The condition of this room created infection control and health hazards for the entire infirmary. Porters were directed to come in and sanitize this room.

The infirmary tub room in the wing with the two-bed rooms was virtually unusable, having no safety bars and large gaps and cracks in the floor tile. The floor drain does not fully drain. The adjacent shower room was clean with surrounding safety grab bars; however, the ceiling vent and wall towel hooks were completely rusted and thus impossible to sanitize.

The infirmary nurse station was centrally located between the two wings, with access to both hallways. The nurse station was adequately sized and clean. All the chairs in the nurse station

---

[5] Infirmary Patients #5 & 6.

were deteriorating, with torn fabric and cushions; these need to be replaced. There was a single box on an upper shelf that was less than 18 inches from the ceiling and this is considered a fire safety hazard.

The health care unit/clinic's exam rooms, nurse work rooms/offices, urgent care room, physical therapy room, telehealth rooms, mental health interview rooms, and phlebotomy/lab prep room were organized and clean. The large elevated exercise mat in physical therapy, a number of examination tables, and the optometry chair had tears in their outer protective surfaces. One of the provider exam rooms had numerous paperback reference books cluttering the desk and a file cabinet.

A large space next to the urgent care area had six rooms. There were two provider exam rooms, each with an exam table, sink, paper towels, desk, and two chairs. The exam tables were adjustable; both tables had tears in the upholstery. Only one table had a paper barrier. The room used by the physician assistant was cluttered with 20-25 paper backed reference texts, some outdated, and food sitting on ice was noted in the sink. Two other rooms with correctional computers were used by nurses to track inmate locations for medication passage. One of the nursing rooms was a former exam room with an exam table with untorn impervious upholstery. The fifth room was the phlebotomy/lab prep room. Two centrifuges owned by University of Illinois (UIC) had been inspected in December 2017. There was a taped biohazard box in the lab that had not yet been moved to the nearby biohazard waste room. The optometrist (two days/week) uses the sixth room; it has an optometry chair with a small tear, optometry equipment that is aging but was reported to be fully functional, a functioning ophthalmoscope, and a desk with a chair. The optometry room was clean, neat, and organized.

The urgent care room had two gurneys with intact mattresses and paper barriers. This room had a functional Gomco suction unit, Automatic External Defibrillator (AED), EKG machine, oxygen tanks, nebulizer units, ambu bag, and oto-ophthalmoscopes. The equipment was verified to have been checked daily on the 11 p.m. to 7 a.m. shift. On every shift, the urgent care nurses count and log the narcotics, sharps, and suture quantities. With the exception of the AED, none of the equipment had been recently inspected by a bioengineering vendor. The last bioengineering inspection of the nebulizer was dated 2005. SCC does not have a crash cart; the institution performs basic CPR, applies the AED, and calls 911 for cardiac arrests. This is an acceptable option for responding to codes/cardiac arrests. A plugged-in radio repaired with duct tape was on the treatment counter in the urgent care room; the condition of the radio rendered it unable to be sanitized. The staff was directed to remove the radio from the unit.

Hemodialysis is performed onsite via a contract with Naphcare, Inc. in a four-chair hemodialysis unit. Hemodialysis treatments are performed Tuesday, Thursday, and Sunday on the evening shifts but these sessions appear to continue into the night. A hemodialysis patient on a housing unit told the experts that he is always moved to dialysis sessions. The chairs were in good condition. The dialysis machines were clean but there were indelible stains (likely betadine) on the top of the machines. During sessions when a hepatitis B infected patient is being dialyzed, a hemodialysis chair is not used exclusively by hepatitis B infected patient(s) nor is a dedicated

dialysis technician/RN assigned to these patients. This is not in accord with Center for Disease Control standards.[6]

The hemodialysis room was in deplorable physical condition. The walls and paint were deteriorating and peeling, the floor was dirty and had not been buffed for a lengthy period of time, there was standing water in the water room, a number of unformed boxes were leaning against a wall, and a large, half-filled garbage container lacked a cover. The water room was cluttered and confused. Half of the water room was used to store deionization tanks, eight of which were unsecured, creating a safety hazard. The door of the refrigerator in the water room was rusted and deteriorating and cannot be effectively sanitized. The storeroom in the hemodialysis room had boxes on the floor and boxes stacked on shelves up to the ceiling. Hemodialysis units have high risk for blood borne contamination. The hemodialysis unit at SCC does not meet the community standards for hemodialysis centers. SCC maintenance staff, the vendor Naphcare, and the correctional health vendor must jointly work to address the physical plant, safety, and infection control issues in the hemodialysis unit.

The kitchen and dining areas were unsanitary and promoted infectious hazards. The inmate dining halls had sparrows flying above the tables and even landing on the cafeteria line serving counters. Bird droppings were noted on walls, the floor, and ceilings. There appeared to be a nest high on a wall in one of the inmate dining areas. The presence of birds and their droppings in the inmate dining and food serving areas exposes the inmates and staff to preventable risk of infection by bacteria, viruses, fungi, and ectoparasites that are known to be associated with birds, their droppings, and their nests.[7] Birds and their droppings in the SCC inmate dining and food serving areas is a health risk for the inmates and staff. The birds must be removed from the dining areas and the droppings cleaned using proper safety precautions. A registered sanitarian must be hired to fully inspect the kitchen and correct these deficiencies.

The tray, utensil, pots, and pan-washing and sterilization machine had been broken for three years. The meat freezer does not have rubber/plastic flaps at the entrance, allowing the temperature to rise above freezing temperatures when meat is being brought in and removed from the freezer. An environmental sanitarian should be brought in the fully inspect the kitchen.

The dish cleaning unit in the main kitchen has been broken for three years. Trays, pots, and pans are washed and dried by hand. It was reported that a new unit has been purchased and will be installed in 2018. The meat freezer in the kitchen does not have rubber flaps at the entrance, resulting in an unsafe rise in freezer temperatures above freezing (as noted on the freezer temperature log) in the early morning when frozen meat is moved to the defrost room. The current cleaning of the trays, pots, utensils, and pans is done manually.

---

[6] Centers for Disease Control and Prevention, Recommendations for Preventing the Transmission of Infections Among Chronic Dialysis Patients. MMWR, April 27, 2001/50 (RR05); pp. 1-43 as found at https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5005a1.htm.

[7] We note that IDOC had a histoplasmosis outbreak at the Danville facility thought to be due to bird droppings.

In summary, the First Court Expert made no specific recommendations concerning sanitation and infection control. We have recommendations that are found at the end of this report.

Environmental Rounds

**Methodology:** The HCUA was interviewed and copies of the Monthly Safety & Sanitation Reports (January-May, July-August 2017) and the Medical Safety and Sanitation Reports (September 2017-February 2018) were provided and reviewed.

**First Court Expert Findings**
The First Court Expert did not report on environmental rounds at SCC.

**Current Findings**
- Safety & Sanitation Reports were filed monthly from January through August 2017 (July was not provided). These reports were then replaced by the Monthly Medical Safety and Sanitation Report.
- Monthly Medical Safety and Sanitation rounds are being performed and have been reported from September 2017 through February 2018.
- The format of the Monthly Medical Safety and Sanitation report is notably improved. This report includes: 1) Location, 2) Identification of Standards Not Met, 3) Recommendations for Corrective Action, 4) Follow-up on Past and Present Discrepancies.
- The Health Care Unit, hemodialysis unit, and the infirmary have been reported in the monthly reports as having an ongoing pest control (insects, cockroaches, gnats) issues. Exterminators have been contracted. An exterminator was seen entering the facility on the first day of the experts' visit to SCC.
- Cleaning issues in the infirmary and the health care unit were cited in the report, including the cleaning of dirty vents.
- In January 2018 the hemodialysis unit was noted to be in compliance, but the February 2018 report cited water on the floor, cockroaches, and broken floor tiles that need to be repaired in the hemodialysis unit.
- The Clinic Space, Sanitation, and Infection Control sections in this report noted far more deficiencies in the health care unit, the hemodialysis room, and the infirmary than have been reported in the Monthly Medical Safety and Sanitation Reports. The rounds did note and repair mattresses in the infirmary that were in poor condition.

Monthly environmental rounds are being performed by the health care team at SCC. These rounds have identified concerns, some of which appear to have been corrected or are being addressed. The rounds must focus more attention on the beds in the infirmary, the cleaning and sanitation of the infirmary rooms, the repair of impervious covers of exam tables, chairs and patient mattresses, and the deplorable condition of the hemodialysis unit (water room, floors, walls, safety, and infection control standards).

In summary, the First Court Expert made no specific recommendations concerning sanitation and infection control. We have included recommendations that are found at the end of this report.

## Medical Records

**Methodology:**  We inspected the medical record room and interviewed staff. We also reviewed many medical records and had an opportunity to assess the organization of the medical record document.

**First Court Expert Findings**
The First Court Expert did not provide any findings with respect to medical records at SCC.

**Current Findings**
The medical records program has a Director of Medical Records who is a Registered Health Information Technologist (RHIT), which is appropriate training for this position. There are three IDOC employees and one Wexford employee working in medical records in addition to the Director of Medical Records.

The medical records room appears orderly but is cluttered, with very old carpeting and furnishings. There was insignificant backlog of filing. There is a procedure for filing records and for use of out guides. But these procedures are not always followed. For the most part, medical record staff pull and refile medical records. However, nurses pull some records and we were told that medical records staff re-file only about 80% of medical records. Medical record staff typically are to handle all medical record transactions, especially pulling records and refiling records. This is done in order to ensure confidentiality of the medical record. The medical record room is either occupied by medical record staff or is locked. During daytime hours, the medical record staff does secure the files. Certain staff, during off hours, have keys to the medical records room and can pull and refile records.

While there is no backlog of medical record documents to file, there are a significant number of offsite consultation reports that are not available. Consultation reports from UIC are not filed within three days of the consultation as required by the IDOC administrative directive on medical records. It appears that most reports are filed within three weeks of the consultation. This may account for the provider's lack of knowledge of the clinical status of the patient as represented in the medical record reviews. Some offsite consultants, including St. Joseph's Hospital, do not consistently provide a hospital discharge summary. Several records we reviewed had no information about when a patient was sent offsite and this made it impossible to determine the clinical course of care for these patients. In our discussion with the Medical Director, he stated that he asks the patient what transpired at their consultation visit. This is not a reliable method of understanding what the consultant found. Providers must have a consultation report.

For patients going for consultation at UIC, the program must get a patient release of information for the medical consultation report.[8] This results in a delay of one to three weeks before the consultation report is provided. Since the IDOC providers are required to evaluate the patient within five days of a return from offsite encounters, the providers almost always evaluate the patient without a consultation report. The referral form, which is available, usually has limited comments by the consultant. However, in our review of records, the lack of availability of the consultation report typically meant that the providers were uninformed with respect to the status of the patient. This appeared to create poor continuity of care for patients.

In using the paper records for our record reviews, we noted that many of the records are large documents. When using the record, the plastic binder holding the chart together frequently came apart. This happened repeatedly, and the current Medical Director expressed the same concern. If paper records are to be used, a better system needs to be developed so that the record is a functional and useable document. Records that come apart can result in misplaced or lost documents.

SCC serves as a dialysis facility; however, the dialysis records are maintained separately from the facility medical record. Medical records should be unified. Doctors at SCC are unaware of nephrologist's notes or recommendations or the status of the patient during dialysis because the records are not kept in the medical record.

We found the paper records very difficult to use. It is not possible to evaluate current medication records, as those are not placed in the record until several weeks after they are completed. Because most charts are multiple volumes, key information about patients was often in older volumes. Given the difficulties in using the paper record system, we strongly recommend implementation of an electronic record.  We note that in review of mortality records from SCC we could not make a determination whether the death was preventable in three of seven records reviewed because the medical record was missing documents.  This demonstrates a very broken system of maintaining medical records.

## Intrasystem Transfer

**Methodology:** To evaluate the medical screening of inmates received at SCC as transfers from other Illinois DOC facilities, we interviewed health care staff, toured the urgent care area where transfer screening takes place, reviewed the IDOC health status form, the SCC Operations Policy and Procedure P-118 Transfer Screening, and health records of inmates received at SCC.

**First Court Expert Findings**

---

[8] Typically, when a physician refers a patient to a consultant, the consultant sends a report to the referring physician. Why this does not occur in IDOC is not understandable. In our past experience, when situations like this arise, a discussion with the hospital administrator and hospital medical director have resulted in obtaining records. We view this problem as a failure of the Wexford leadership in conducting appropriate negotiations with the consultants.

The previous Court Expert found in more than half the charts reviewed that the transfer summary was incomplete or missing, inmates with chronic diseases were not referred for chronic care clinic, and vital signs were not recorded or not followed up when abnormal.

**Current Findings**

Transfers to SCC most often take place on Wednesday and average less than 50 per month. Inmates received on transfer are brought to urgent care in the health care area for screening before placement in population. The sending facility documents information about the inmate's health status and treatment on the Health Status Summary Record. This form and the medical record is reviewed by a nurse at SCC upon the inmate's arrival. The nurse also inquires if the inmate is currently receiving treatment or has any other immediate need for medical attention. The nurse then schedules the inmate for subsequent health care (i.e., enrollment in a chronic care clinic, initiation of medications, etc.) as needed. The nurse also provides a verbal explanation and handout about how to access health care at the facility.

SCC does not keep a log, list, or other method to track inmates received on transfer. The medical records department had filed the memos which listed the names of inmates to be received on transfer. Using these memos, the charts of all inmates received in January and February 2018 who were still at SCC as of the date of the site visit were reviewed. A sample of 12 records was obtained. Ten of these inmates had health care requirements that needed continuation at SCC. The transfer process was complete in seven of the 10 charts reviewed of inmates with ongoing health care needs. One transfer summary did not list psychotropic medications that were prescribed, but these were identified by the nurse upon review of the chart and continued.[9] In another, there was no transfer summary for an inmate with diabetes and hypertension. The nurse who reviewed the chart noted his medical history, enrolled him in chronic care and ensured that his medications were continued.[10] In another chart reviewed, an inmate on prescribed psychiatric medications was not scheduled to see a provider urgently and no other attempt was made to continue medication upon his arrival at SCC.[11]

Transfer screening at SCC has improved since 2014. However, the record review performed at this site visit revealed transfer information that was incomplete, or care that was not continued as prescribed for 30% of the inmates requiring continuity of care. Continuity of care upon transfer needs to be more reliable.

The First Court Appointed Monitor recommended, "The intrasystem transfer process needs to be appropriately addressed to effectively insure continuity of care for patients who enter with prior diagnosed problems. This should be monitored by the QI program."[12] CQI minutes and related material from SCC that were provided from January 2017 through December 2017 were reviewed. There were no reports monitoring the continuity of care after intrasystem transfers.

---

[9] Intrasystem Transfer Patient #11.
[10] Intrasystem Transfer Patient #12.
[11] Intrasystem Transfer Patient #10.
[12] Lippert Report, p. 38.

We agree with the First Court Appointed Expert's recommendation. SCC has not implemented the recommendation made by the First Court Appointed Expert in 2014. Inmates are at significant risk of discontinuity in their medical care and treatment resulting from incomplete or inaccurate transfer screening. These deficiencies should be addressed in documented corrective action plans and regular follow-up monitoring done until sustained improvement is demonstrated. We have additional recommendations found at the end of this report.

## Nursing Sick Call

**Methodology:** Nursing sick call was evaluated by reviewing SCC Institutional Directive 04.03.103K Offender Health Care Services, SCC Operations Policies and Procedure P 103 Non-Emergency Health Care Requests and Services, IDOC Treatment Protocols, and the SCC Offender Handbook. We also interviewed the Director of Nursing, nurses, and inmates; observed nurses conducting sick call, inspected the rooms used for sick call, and reviewed tracking logs and health records. The completed sick call log showing the reasons patients requested health care attention for the month of February 2018 was used to select charts to review. Seventeen sick call encounters were selected for chart review.[13]

### First Court Expert Findings

The First Court Appointed Expert found that sick call was available to inmates only a few days each week based upon their housing location. The rooms used by nursing staff were not equipped appropriately. There were delays in accessing sick call because it was not scheduled frequently enough and, at times, because security staff would not escort inmates to the nurse sick call room. Nurses failed to document the dates that sick call requests were received and triaged. Nurses also did not adequately assess or document evaluation of inmate health complaints. Inmates who were referred from nurse sick call were not seen or not seen timely by providers. Providers failed to follow up at intended intervals and treatment orders were not completed.[14] Two recommendations were made:

1. Custody issues should not interfere with timely provision of health care.
2. There should be no such thing as a "no show." Patients should be required to report to health care when scheduled. They may refuse care but only to a health care professional.[15]

### Current Findings

Our review found that problems with daily access to sick call have been resolved. Since SCC has implemented the sign-up log, patients are seen the next day. Documentation of timeliness and disposition of sick call requests is evident from review of the sick call logs. The rooms used to perform sick call are now adequately equipped. There was also no evidence of security staff failing to escort inmates to sick call as described in the First Court Expert's report.

---

[13] Sick Call Patients #1-17. We selected patients whose requests were potentially serious (chest pain, abdominal pain, seizure, vomiting, skin infection, diabetic complications, withdrawal, etc.).
[14] Lippert Report, pp. 9-12.
[15] Lippert Report, p. 38.

Problems with sick call identified in the First Court Expert's report that are still evidenced include:

- Nurses do not adequately assess or document evaluation of inmate health complaints.
- Inmates who were referred from nurse sick call were not seen or not seen timely by providers. Providers failed to follow up at intended intervals and treatment orders were not completed.

In addition, we had several additional findings:

- LPNs continue to be assigned to conduct sick call even though the stated practice at SCC is to assign RNs.
- Security practices in segregation do not provide sufficient privacy for patients during the sick call encounter.
- Nurses do not refer patients to providers in accordance with IDOC Treatment Protocols and do not document the urgency of the referral (e.g., urgent, routine).

When inmates arrive at SCC they are provided an orientation handout that states, "Inmate patients needing to see healthcare must sign up on the sick call call-out logs located within each housing unit. The day after you sign up, you will be called to the sick call room located within each cell house."[16] This information is consistent with SCC Operations Policies and Procedure P 103 Non-Emergency Health Care Requests and Services.[17]  We observed this process in several of the housing units. The log is prominently posted in the cell block. Inmates wanting to be seen write their name on the sick call log. The sick call logs are collected at night or early in the morning.

Inmates may also use the Medical Services Request form to request dental, eye and mental health services that are not urgent.[18] The inmate puts the request into a clearly labeled box mounted on the wall in each housing unit. Any requests in the box are picked up by CMTs daily when they make rounds of the cell blocks. These requests are then forwarded to the respective department (dental, mental health, optical, pharmacy) to address. Inmates may also use the sick call sign up log for dental, mental health, optical, or any other issues, and are seen at nursing sick call the next day.

The morning after the sick call lists are collected, nurses conduct sick call using the lists. Anyone who has signed up on the sick call log is seen by a nurse that day. The medical service requests are routed directly to the relevant department (dental, mental health, etc.) if the request is for a routine service such as an exam, medication refill, or supply item.

---

16 
Stateville Access to
Care Inmate Handout

17 SCC Operations Policies and Procedures, pp. 4-5.
18 STA 0202 (Rev 4/2103).

The day we observed sick call[19] each of the inmates seen had signed up on the sick call log the day before.[20] Of the 17 charts we reviewed, all documented sick call encounters with inmates who had signed up on the log the day before.[21] Five other inmates interviewed during the site visit confirmed that when they signed up for sick call they were seen the next day.[22]  Inmates appear to be able to access nursing sick call within 24 hours of signing up. None of the inmates interviewed or who agreed to be observed during sick call voiced complaints about the timeliness or responsiveness of nursing sick call.

According to the Director of Nursing, only registered nurses (RNs) are assigned to perform sick call on a regular basis. However, LPNs are assigned to sick call if there are not sufficient RNs available. Review of the daily assignment roster for the week of February 12, 2018 showed that RNs were assigned to sick call six of seven days.[23] According to the Director of Nursing, LPNs were assigned sick call on six days in January 2018 and eight days in February 2018. Of 17 sick call encounters reviewed in the chart review, five were completed by LPNs.[24] From these three sources, we conclude that LPNs are relied upon to complete 20 to 30% of sick call encounters. The Illinois scope of practice does not permit LPN's to perform assessments independent of a registered professional nurse or higher level professional, as is currently being done at SCC.[25] There are insufficient RN positions at SCC to conduct sick call. LPNs are assigned to do the work in lieu of available RNs but they are not qualified, and this assignment is not within their lawful scope of practice.

Nurses see inmates in a sick call room that has been established in each of the cell houses. The nurse brings the inmate's medical record to use during the sick call encounter. The sick call rooms are well lighted, generally clean, and capable of providing patient privacy. Each has an exam table with paper and a wall mounted oto-ophthalmoscope. See the description of these rooms in the section of this report on Clinic Space and Sanitation. The space, equipment, and supplies available to conduct sick call are adequate.

We observed three nurses (all RNs) as they were conducting sick call on Monday February 26, 2018. A total of five patients were seen, three of these were in segregation.[26] Each of the nurses' evaluation of the patients' complaints was thorough and appropriate. Nurses correctly used the IDOC treatment protocols and the plans derived for each patient were appropriate. The nursing assessment was pertinent to the complaint in 11 of the 17 charts reviewed (64% compliance). The plan of care was consistent with sound nursing judgement or that specified in the nursing treatment protocol in 12 of 17 charts reviewed (71% compliance). Based upon the

---

[19] Monday February 26, 2018.
[20] Sick Call Patients #17-22.
[21] Sick Call Patients #1-17.
[22] Sick Call Patients #23-27.
[23]

Stateville RN Staffing
for Sick Call.PDF

[24] Sick Call Patients #2, 4, 8, 9 & 12.
[25] Illinois LPN Scope of Practice, Section 55-30.
[26] Sick Call Patients #18-22.