E-FILED
Monday, 30 November, 2020  06:53:47 PM
Clerk, U.S. District Court, ILCD

# Exhibit G

pages 626-1201

results of the chart review, nursing assessment and planning care could be improved. However, the adequacy of nursing assessments and the plan of care are not monitored by nursing service as part of the peer review or CQI. We recommend that the adequacy of nursing evaluation and planning at sick call be an area of ongoing monitoring, training, and coaching.

The three patients we observed being seen in segregation were provided neither visual nor auditory privacy during the sick call encounter. One, or sometimes two officers, were at the doorway or just inside the room. They interacted with both the nurse and the inmate during the encounter. The officers also interacted with each other and other traffic passing through the corridor. In one case the officer helped the nurse obtain the patient's weight.[27] In another encounter, the officer resisted the nurse's request to remove one patient's arm from the shackles to obtain vital signs.[28] This was finally accomplished when a more senior officer arrived to assist. It is not possible to assess and evaluate inmate health concerns when custody staff intrude and impede the encounter in these ways. Custody staff should stand at a distance from the sick call room so that they can see the encounter but not hear the substance of the interaction. Custody staff should be prepared and available to remove restraints as requested by the nurse to complete the evaluation of a health complaint.

We were told by the Nursing Director that patients referred to the provider from sick call are to be seen within 72 hours unless it is more urgent. Based upon the charts reviewed, nurses do not document urgency when referring to a provider and there is no area on the nursing treatment protocols to indicate urgency. From observation of the nurses conducting sick call it was clear that they do make this determination, it just is not documented. The sick call documentation forms should be revised to indicate if the referral is emergent, urgent, or routine.

There were only two charts that documented an urgent referral from sick call; only one was seen within 24 hours of the referral. There were 13 sick call encounters that were referred non-urgently to a provider. Of these, only three patients were seen within 72 hours of the referral (23% compliance). Patients were not seen timely because either the appointment was scheduled out longer than 72 hours or the appointment did not take place and was rescheduled for a later date. CQI studies were completed to study timeliness of patients seen by providers when referred from sick call in December 2016, and January, March, and June 2017. Performance on this measure was less than 80% in four of five studies reported in the annual CQI report. The actions taken as a result of these studies was to repeat the study four times and, in June 2017, to educate the nurses on sick call procedures. Clearly, problems accessing providers persist if only 23% of the 13 referrals from sick call encounters in February 2018 were seen within 72 hours.

The following are examples from the chart review of problems found with sick call.

---

[27] Sick Call Patient #22.
[28] Sick Call Patient #21.

- The first patient was seen by an LPN in sick call on 2/13/2018 for a complaint of chronic diarrhea.[29] The nurse did not document an adequate assessment of the patient or develop a plan of care per the protocol for diarrhea.[30] From a review of the chart it was clear that the patient had been discharged from the infirmary 19 days earlier after a month long stay for treatment of salmonella. The nurse did not refer the patient to a provider and should have done so urgently.

- Another patient was seen at sick call on 2/8/2018 because he was experiencing shortness of breath at night.[31] The nurse did not assess the patient per the treatment protocol for shortness of breath.[32] The nurse provided no intervention and did not make a referral to a provider for further evaluation. This is a symptom of potentially serious cardiorespiratory disease that should have been more thoroughly assessed by the nurse. The assessment would likely have prompted a provider referral.

- Another patient was seen in sick call on 2/9/18 for a painful lump in his breast.[33] The nurse's assessment prompted referral to a provider. The provider appointment was scheduled to take place four days later but was subsequently cancelled. The appointment was re-scheduled for 2/26/18 but did not take place. This was a delay in care for evaluation of a potentially serious condition. After reviewing the chart, we asked that he be seen, so an appointment was scheduled for 2/28/18.

- Another patient was seen by an LPN on 2/13/18 for a skin rash.[34] The nurse did not assess the patient per the treatment protocol for rash.[35] There was no description of the rash nor did the nurse acknowledge that he had been seen previously for the same condition on 1/6/18 and 1/31/18. The nurse did refer the patient to a provider, but he was not seen promptly. An appointment was originally scheduled for 2/15/18 but did not take place until 2/21/18, or until eight days later.

- Another patient was seen in sick call for a complaint of dizziness on 2/15/2018.[36] The nurse referred the patient to a provider per the treatment protocol for dizziness.[37] The provider appointment was scheduled to take place five days later, on 2/20/18, but he was not seen. It was rescheduled to 3/2/18 or 14 days after the referral. The provider's evaluation of this patient's serious symptom of dizziness was not timely.

---

[29] Sick Call Patient #4.
[30] IDOC Nursing Treatment Protocols, (March 2017), p. 39.
[31] Sick Call Patient #6.
[32] IDOC Nursing Treatment Protocols, (March 2017), pp. 75-76.
[33] Sick Call Patient #7.
[34] Sick Call Patient #9.
[35] IDOC Nursing Treatment Protocols, (March 2017), p. 70.
[36] Sick Call Patient #10.
[37] IDOC Nursing Treatment Protocols, (March 2017), p. 40.

- Another patient complained of chest pain when seen on sick call 2/15/2018.[38] The nurse did not assess for cardiac risk factors per the treatment protocol.[39] The patient's blood pressure was elevated, he was overweight, and being treated for hypertension. The nurse did not confer with a provider per the instructions in the treatment protocol but scheduled him for an appointment four days later. This appointment did not take place until 2/22/2018, or seven days later. The provider documented that the patient had not been taking his medication for hypertension. An EKG done at that appointment revealed an abnormal cardiac rhythm. This patient should have been more thoroughly evaluated by the nurse and the provider notified urgently.

- Another patient was seen in sick call on 2/17/18 because of abdominal pain.[40] He gave a history of GERD and chronic diarrhea. The nurse scheduled the patient to a pre-existing appointment that was to take place 10 days later. It was poor nursing judgement to schedule a patient with this history and symptom presentation to a pre-existing appointment 10 days later.

- Another patient was seen in sick call 2/2/18 for a complaint of chest pain.[41] He was referred to a provider urgently and seen that same day. The provider ordered the patient's blood pressure to be checked twice a day for three days and then he was to be seen by the provider in follow up. None of the six expected blood pressure readings are recorded in the chart. Twice there is documentation that the patient refused to have his blood pressure taken. The other four times there is no documentation that his blood pressure was taken. The patient also was not seen in follow up by the provider. In this case, ordered care was not completed and the patient who was experiencing chest pain was not followed up.

In summary, we concur with the First Court Appointed Expert's recommendation that custody issues should not interfere with timely provision of health care, especially as it pertains to patient privacy in segregation. With the implementation of practices to see all inmates who sign up for sick call the next day, the other recommendation that refusals be seen by health care professionals has been accomplished. We have additional recommendations found at the end of this report.


## Chronic Care

**Methodology:** The medical records of 13 patients with chronic medical illnesses and conditions were reviewed. There was limited opportunity to interview SCC providers due to restrictions imposed by Wexford. The Office of Health Services Chronic Illness Treatment Guidelines dated March 2016 were reviewed as needed.

---

[38] Sick Call Patient #11.
[39] IDOC Nursing Treatment Protocols, (March 2017), pp. 30-31.
[40] Sick Call Patient #13.
[41] Sick Call Patient #17.

PTX193-0627

**First Court Expert Findings**

The previous court expert noted that chronic care patients should be scheduled in accord with their degree of disease control, not at the fixed intervals that a specific chronic disease clinic is scheduled. Diabetics' meals should be served on a predictable schedule to facilitate the timely coordination with insulin administration just prior to food consumption; Type 1 diabetics should receive short-acting insulin prior to each meal, not just at breakfast and dinner; HIV patients should also receive primary care provided by SCC providers; and the chronic care nurse should do no less than monthly medication compliance checks with HIV patients.

**Current Findings**

We agree with the findings in the First Court Expert's report. In addition, we identified additional findings and confirmed some of the First Court Expert's findings as follows:

- Problem lists occasionally are incomplete or inaccurate.
- Patients assigned to chronic care clinics are regularly seen in these disease specific clinic sessions.
- The chronic clinic visits contain very limited clinical information, do not indicate that appropriate examinations had been performed, do not document the rationale for clinical decisions and therapy modifications, do not modify treatment to attain generally accepted treatment goals, and do not document the patient's treatment plan.
- Management of chronic illnesses is not in accord with either the Office of Health Services Chronic Illness Treatment Guidelines or national standards of care.
- SCC fails to provide basic screening tests and vaccines that are recommended for diabetics in the IDOC Diabetes treatment guidelines and in national standards of diabetes care.
- Chronic care visits strictly focus on a single specific disease and do not address any other associated clinical problems. As examples, abnormal blood pressure values were not addressed in diabetic clinic. Elevated blood glucose was not addressed in hypertension clinic. Neither one of these clinics addressed hyperlipidemia. Managing each chronic care disease in a silo independent of the patient's other illnesses contributes to delays in modification or initiation of treatment for patients with multiple chronic illnesses and can contribute to increased morbidity.
- All patients over 50 need to be screened at regular intervals for colon cancer. The frequency of screening is based on patient characteristics and on the type of screening method used. The charts of seven 50 years of age or older patients were reviewed; only one had documentation in their medical record that they had been screened for colon cancer.[42]

---

[42] Screening for Colorectal Cancer, US Preventive Services Task Force Recommendation Statement, JAMA June 21, 2016; Volume 315, Number 23 as found at
https://www.uspreventiveservicestaskforce.org/Page/Document/UpdateSummaryFinal/colorectal-cancer-screening2?ds=1&s=colon%20cancer.

- Nationally recommended vaccinations for adults are not consistently administered. Pneumococcal, meningococcal, and hepatitis A and B vaccinations were not offered or given as recommended by national age and disease-based guideline.[43]
- Uncontrolled chronic illnesses that appear to be beyond the expertise of the SCC providers are not referred for specialty consultation.
- The chronic care providers do not document any review of the MAR, the capillary blood glucose tests (CBG), and the nursing and provider sick call notes and blood pressure readings when they see patients in the disease-specific chronic care clinics.

Chronic disease visits are conducted separately for each disease. If a person has three diseases, he will be seen in three separate clinics two or three times a year. This dramatically increases the number of visits. SCC has chronic care clinics for asthma (January & July), diabetes (April, August, & December), high risk (March & September), hypertension (March A-L, April M-Z, September A-L, & October M-Z), seizure disorder (February & August), and tuberculosis (January – December). Individuals with Human Immunodeficiency Virus (HIV) are referred to and managed by the UIC Infectious Disease Telehealth Clinic. All other chronic diseases including hepatitis C are managed by the general medicine clinic (May & November). One physician is assigned to staff all the chronic care clinics with backup (vacation, sickness, conference) by the other SCC providers.

The chronic care nurse manually prepares the provider's log-in sheet, noting the reason for the appointment (e.g. asthma clinic, MD sick call, or follow-up, etc.). Medical record staff types and sends this list to all the housing units. This list is used by the correctional officers in the housing units to move men to the health care unit. The chronic care RN hand writes on the list the time in and time out of those seen and those who have to be rescheduled (no show, no provider, refused).

There were 1,700 chronic care visits at SCC in 2015-2016; this number decreased to 1,384 in 2016-2017. There was a drop of 243 hypertension clinic visits. This reason for this drop in total visits was not able to be determined.

In January 2018, the chronic care provider was scheduled for 19 sessions (8 a.m.-2 p.m.); he only was able to staff 17 of these sessions. 400 patients (23.7/session) were scheduled for the month. The 400 patients were not limited to chronic care patients but included provider sick call appointments, add-ons, and 133 asthma chronic care appointments. 282 (71%) of the 400 scheduled patients were actually seen. The provider treated 17 patients per session or approximately 4.7 per hour. Seeing patients every 12 minutes allows limited time for a provider to evaluate chronically ill patients.

---

[43] CDC Recommended Immunization Schedule for Adults 19 years or Older by Medical Conditions or other Indications, 2018 as found at https://www.cdc.gov/vaccines/schedules/downloads/adult/adult-combined-schedule.pdf.

A review of the asthma chronic care clinic statistics for January 2018 showed:

| Scheduled Visits | 133 |
|---|---|
| Patients seen | 65 (52%) |
| Patients Already Seen | 4 (3%) |
| Rescheduled | 32 (25%) |
| Other | 31 (22%) |

This data indicates that approximately 55% of all asthma patients scheduled in January 2018 were actually seen on the scheduled visit day or had already been recently seen. It was unclear what the reason for the "Other" category was or whether they were also eventually rescheduled. Some may have refused, others may have been transferred or discharged. The chronic care nurse was not interviewed.

The providers' documentation in the medical record was extremely brief, commonly illegible, and seldom contained pertinent clinical information needed to clarify and understand the state of a patient's chronic illness or justify a change in the treatment plan. The experts found it extremely difficult to track the status of a patient's chronic illness and to comprehend the reasons for a modification of treatment. This lack of clinical documentation is a significant barrier to the continuity and quality of care delivered to the SCC patient population. The experts found no documentation that the chronic care providers had reviewed the MAR (refusals, compliance with prescribed medications), the CBG tests, the nurse and provider sick call notes, and the blood pressure readings taken in the sick call visits when they assessed patients in the disease specific chronic care clinic visits. This failure to review the data and information that had been gathered between chronic care visits contributed to flawed clinical decisions and delays in providing needed care to SCC patient-inmates.

Most of the chronic care patients had completed problem lists. However, four (31%) of the 13 charts reviewed were found to be missing important diagnoses on the problem, list including hypertension, hepatitis C, amputated thumb post human bite, and diabetic foot ulcer. Incomplete problem lists contribute to the failure to adequately monitor and treatment known chronic illnesses.

The care provided to diabetics and patients on chronic anticoagulation, hypertensives, asthma medications, and anti-epileptics was problematic. Diabetics, hypertensives, and patients on warfarin anticoagulation remain uncontrolled for lengthy periods of time, in part because their treatment may only be evaluated in chronic care clinics (two to three times per year) and not as frequently as their condition justifies. Diabetics are not routinely screened for urinary protein and even if they are found to have elevated urine protein, the appropriate medical intervention is not consistently prescribed. Detailed foot and lower extremity sensory exams are not documented in the diabetes chronic care notes. Recommended vaccines are not universally provided to patients whose age or disease warrants such vaccination. Compliance with prescribed medication is important for all chronic illnesses, but the impact of not taking or receiving diabetic, hypertension, anticoagulation, and seizure medications can result in rapid

deterioration and morbidity. There was no documentation in the chronic care provider notes that they were reviewing the MARs or nursing notes to assess compliance with medication and initiating appropriate interventions as needed.

All 13 (100%) of the patient records had problems identified in the provision of care. The following patient summaries highlight the concerns and the findings noted above:

- This is a 42-year-old patient with a problem list noting asthma who was being treated with Xopenex inhaler (beta-agonist), Singulair (Montelukast), and a Medrol Pack (methylprednisolone tabs).[44] He was transferred to SCC from Menard Correctional Center on 6/24/17. His database noted that he had received the pneumococcal-23 vaccine on 5/28/12. His asthma was not evaluated upon arrival at SCC. The RN incorrectly noted that he was taking Albuterol, did not check a PEFR, and referred the patient to the asthma chronic care clinic. Two months later, on 8/24/17, he was seen in the asthma clinic; his PEFR was 500 L/min, he was assessed as stable, and was referred to a January 2018 asthma clinic. Patient was seen again in the asthma clinic on 1/22/18, and his PEFR was 450-500. Although he had a normal exam and his asthma was controlled, the provider noted that he had bronchitis and ordered an oral antibiotic (amoxicillin). At neither asthma clinic visit did the provider note how frequently the patient was using his relief inhaler, or if was waking up at night with cough or whether the patient still had the pack of methylprednisolone that could be immediately taken by the patient in the case of an acute asthma attack. This patient is very stable, and he likely could be taken off Montelukast. At each asthma clinic the provider should be taking a more detailed history concerning any symptoms of bronchospasm and use of inhaler consistent with generally accepted asthma standards of care. The use of antibiotics to treat bronchitis in a stable asthmatic is against the national standard of care and was not indicated in this patient.[45] In summary, the failure to document an adequate history of inhaler use and symptoms indicative of bronchospasm was not in compliance with the Office of Health Services Chronic Disease Treatment Guidelines, Asthma.

- Another patient was a 62-year-old patient whose problem list noted insulin resistant diabetes mellitus (IRDM), hypertension, hyperlipidemia, and aortic arteriosclerosis.[46] His hepatitis C disease was not documented in the problem list. His database noted that he had received the pneumococcal 23 vaccine on 5/23/16 and hepatitis A and B #1 vaccines on 3/26/16. There is no documentation that he received, as required, hepatitis A vaccine #2 or hepatitis B vaccines #2 and #3. During the last 11 months of 2017, he was seen in hypertension clinic two times, in diabetes clinic three times, and semi-annual clinic two times. He also was seen by the optometrist two times. Many of the medical

---

[44] Office of Health Services, Chronic Treatment Guidelines, Asthma, March 2016.
[45] Chronic Care Patient #1.
[46] Chronic Care Patient #2.

PTX193-0631

provider notes were barely legible. The diabetes and hypertension chronic care notes contained little clinical information and no rationale for modifying or not changing treatment. Between February and December 2017, HbA1Cs were done monthly (in chronological order) 8.7%, 7.9%, 7.8%, 7.8%, 8.1%, 8.2%, 8.2%, 8.2%; none reflected that his diabetes was under control. NPH insulin was increased to 35UAM/20UPM (4/18/17 DM clinic) and again, eight months later at the next DM clinic to 50UAM/25U/PM (12/4/17 DM clinic). If there were any additional modifications in the insulin dosage it was not documented in the provider notes. Ten HbA1Cs were performed in 2017. The national diabetic standards state the HbA1Cs should be tested every three to four months; more frequent testing offers no valid clinical information to the care of diabetes. The providers are not knowledgeable about the recommended frequency of HbA1C testing and the value of this important diabetes test. There was no documentation that this diabetic had a single foot or sensory neuropathy exam in 2017; this does not meet the standard of diabetes care. Simvastatin 10mg was not increased even though this hypertensive, diabetic, elderly male had a >20% 10-year risk of having heart disease or stroke and should have been taking a high intensity statin drug per national standards of care.[47] The SCC providers are not able to calculate this risk because they are not allowed to bring in cell phones and do not have access to electronic references. The statin dose was inadequate for this patient's level of cardiovascular risk. This patient was given a diagnosis of hepatitis C, yet there were no tests done to support this diagnosis. This patient's hepatitis C was not being monitored in accord with national standards. At the two semi-annual clinic visits (6/5/17 and 12/19/17), the patient's hepatitis C was evaluated; no organomegaly, edema, or icterus were identified, and the elevated liver enzyme data were documented in the notes. However, the plan was only to return to clinic in six months; there was no estimate of fibrosis using laboratory tests and no order to do a liver ultrasound or a liver fibroscan to evaluate the stage of fibrosis in order to determine if the patient was a candidate for hepatitis C treatment. Episodes of difficulty breathing, propping his head up in bed to breath, waking up suffocating in October-November 2017, were not being adequately evaluated as of the end of January 2018. The initial provider assessment was sleep apnea, but no additional diagnoses (congestive heart failure (CHF), cardiac arrhythmia, COPD, asthma, coronary artery disease) were considered. There was no documented examination of the patient's heart or lungs and no additional tests were ordered (e.g., chest x-ray, echocardiography, CBC, BMP, EKG, pulmonary function test, sleep studies) to evaluate these repeated symptoms of difficulty breathing. This patient was over 50 years old, but he was not offered a colon cancer screening test during 2017 even though he had two semi-annual clinic visits.

In summary, this patient is not being properly monitored for complications of diabetes, including foot ulcers and sensory neuropathy. HbA1Cs are being ordered at an unjustifiably high frequency, indicating that the providers are not knowledgeable about the utilization of this important diabetic test. His diabetes has not been fully controlled

---

[47] ACC/AHA ASCVD Risk Calculator.

for over a year. His hepatitis C has not been assessed to determine the presence of liver fibrosis (cirrhosis) that would determine if he is a candidate for treatment. He is not being prescribed the proper dosage of a statin that is warranted by his 10-year risk of cardiovascular disease. The providers are not assessing 10-year cardiovascular risk in elderly patients with diabetes, hypertension, and hyperlipidemia. He was prescribed an antibiotic for the treatment of bronchitis. He has not been properly evaluated for his recurrent episodes of difficulty breathing. He is not being screened for colon cancer. The care provided to this patient is not in accord with national standards of care.

- Another patient is a 65-year-old with diabetes mellitus (DM), hypertension, and hyperlipidemia noted on his problem list.[48] The database noted that he had received pneumococcal 23 vaccine on 7/23/16 and had negative PPD on 12/10/16. His medications included NPH insulin 24U/10U, sliding scale regular insulin, Metformin 500mg/d, Lasix 40mg/d, Lisinopril, Simvastatin 40mg/d, Nifedipine 30mg/d, and ASA. He was seen every six months in the diabetes and hypertension clinics. He was seen at UIC Eye Clinic in July 2017 and did not have diabetic retinopathy. His blood pressure was generally at goal. Multiple HbA1Cs between August 2016 and November 2017 indicated excellent control, with all HbA1Cs under 6.0%. However, the CBG logs from October 2017 through January 2018 documented elevated glucose levels that were not consistent with the control indicated by the HbA1Cs; this important clinical discrepancy was not discussed at any of the diabetes clinics. This indicates that the diabetes chronic care providers are not regularly, if at all, reviewing the CBG tests or the MARs during the clinic sessions. Labs done on 3/21/17 reported a microalbumin/creatinine level of 60mg/L (normal range 0-30), but sick call and diabetes clinic providers did not comment on this abnormality and did not order, as is indicated for all diabetics, an ACE inhibitor to prevent further kidney damage. There was no documentation of a detailed foot or distal extremity sensory exam in any of the diabetes clinic notes.

  In summary, there are significant deficiencies (no detailed foot or sensory exam, failure to initiate an ACE inhibitor for proteinuria, no endocrine consultation to evaluate the discrepancy between the HbA1Cs and the finger stick blood glucoses[49]) in the care and screening of this elderly diabetic patient which do meet the ADA standard of care. This 65-year-old was not offered colon cancer screening during 2016-2017; this is not in accord with national age-based standards of care.

- This patient is a 69-year-old whose problem list noted hypertension and hyperlipidemia.[50] His database noted PPD positive 37mm since 2007, and did not note the administration of a pneumococcal vaccine in Volume II. His medications included Lisinopril, Nifedipine, spironolactone, metoprolol, and pravastatin. This patient had

---

[48] Chronic Care Patient #3.
[49] The HbA1C test used at SCC is a point of care test (iSTAT). When there is a question of accuracy of test results, a comparison of a same blood sample should be done at a known reliable laboratory comparing that test result with the iSTAT result. The iSTAT equipment typically needs regular calibration and this may have been not properly done.
[50] Chronic Care Patient #4.

been treated in the past for a positive TB test. He had negative chest x-rays in 2016 and 2017. He is followed in the hypertension clinic, with two visits in 2017. The patient is taking four antihypertensive medications, none of which were at maximum doses. Two of his blood pressure medications retain potassium. It would be safer for this patient if his diuretic was switched to one that did not have the risk of retaining potassium. There was no comment in the provider notes that there was a clinical reason that spironolactone was being prescribed. This hypertensive patient had markedly elevated blood pressure readings at every provider sick call visit (five visits), but perfectly normal blood pressures at the two hypertension clinics. At the 4/4/17 doctor sick call, the provider noted a blood pressure 192/107 but did not comment on the markedly elevated blood pressure and did not modify the blood pressure medication. The hypertension clinic providers made no comment about the elevated blood pressures at the sick call visits, did not document that they reviewed the blood pressures from other visits, or were even knowledgeable of these elevated blood pressures. This 69-year-old had no documentation in his record that he had been screened for colon cancer or had received the pneumococcal 23 vaccine.

In summary, the experts are concerned that chronic care providers do not review the findings or vital signs from other non-chronic care visits. The failure to utilize important clinical information or data from other visits puts the health of patients with chronic illnesses at risk. National age-based standards recommend that patients over 50 years receive colon cancer screening and those over 65 years old be administered both pneumococcal vaccines (13 and 23); there is no evidence that either of these screening and preventive measures were offered to him. The experts are concerned that prescribing of four antihypertensive medications with none at maximal dosage is putting this individual at risk and is not in accord with national standards of care.

- Another patient is 47-year-old whose problem list noted asthma, hypertension, and bilateral knee pain.[51] His database indicated that he received the pneumococcal vaccine on 1/17/16 and a flu shot on 11/30/17. His current medications include Xopenex inhaler, Alvesco 160mg I puff BID, Montelukast 10mg/d, and hydrochlorothiazide 50mg/d. From January 2016 through January 2018 he was seen four times in the asthma clinic, four times in hypertension clinic, and three times in the general medicine clinic. His PEFRs recorded in the asthma clinic were 500 on 1/9/17 and 825 on 7/1/17 and 1/26/18, all reflecting excellent control. At some point Montelukast was properly discontinued. The provider notes did not note any symptoms or any justification for the continuation of the steroid inhaler (Alvesco). The patient had eight normal blood pressure recordings from January 2017 to January 2018. He is taking hydrochlorothiazide 50mg/day. Hydrochlorothiazide 50mg has been known for years not to offer greater blood pressure control benefit than 25mg but has some greater risk for dehydration and hypokalemia. He should be given the lower dosage of hydrochlorothiazide. He had increased frequency of urination in June 2017 that was

---

[51] Chronic Care Patient #5.

clinically suspected to be benign prostatic hypertrophy (BPH), and he was placed on Flomax. The higher dose of the hydrochlorothiazide diuretic may have been contributing to his symptoms and, if decreased, might allow Flomax to be discontinued.

In summary, this patient has been regularly seen in three chronic care clinics. His asthma and hypertension are under good control and he should be monitored to see if any of his asthma medications can be decreased or discontinued. The providers should decrease the blood pressure medication to 25mg for the safety of the patient. The continued prescribing of hydrochlorothiazide 50mg has not been recommended for treatment of blood pressure in the last 15-20 years.

- Another patient is a 36-year-old whose problem list noted seizure disorder.[52] His database was empty. His medication was phenytoin (Dilantin). He was seen in the seizure chronic care clinic five times from February 2016 through February 2018. The patient had a seizure reported on 1/30/16. At the 2/2/16 seizure clinic he was noted to not have his seizure medications Keep-on-Person (KOP). On 4/26/16, he was reported to have had another seizure; the physician wrote that the patient's history was not consistent with a seizure disorder and Dilantin was ordered to be tapered off. Another seizure in his bed was noted by the RN on 7/17/16. On 7/29/16, the MD wrote "doubt seizure;" again the Dilantin level was sub-therapeutic (2.5). The 8/9/16 seizure clinic provider noted that the patient had seizures while sleeping and that the 7/29/16 Dilantin level was 2.5, but did not increase the dosage. The 2/7/17 seizure clinic wrongly stated that the patient's last seizure was on 1/6/16. A repeat Dilantin level was again sub-therapeutic (2.5) and Dilantin dose was increased to 300mg/d. The Dilantin level was again low (<2.5) on 2/23/17. Nursing noted on 3/17/17 that the patient was non-compliant with taking his seizure medications; there were three unused blister packs in his cell. The RN wrote on 4/2/17 that she had the patient take his AM dose in front of her and she recommended Watch-Take medications. Again on 5/18/17, the nurse stated that the patient was not compliant with taking his antiepileptic medication. There were no MD visits for the next two and a half months. The patient missed seizure clinic on 8/1/17 due to a security lockdown. He was seen in the seizure clinic on 8/12/17; the provider did not comment on the repeated nursing concerns of non-compliance and continued KOP Dilantin. A Dilantin level on 8/22/17 was for the fifth time in 20 months sub-therapeutic (<2.5). At 8/24/17 physician sick call, it was noted that the patient had another seizure "last night," and Dilantin was finally changed to Watch-Take medication administration; however, a loading dose was not given. This switch to Watch-Take occurred over four months after nurses had documented his non-compliance with his seizure medications. A repeat Dilantin level was 3.1, still sub-therapeutic, on 9/5/17. The 9/15/17 physician note was not legible. He was seen again in seizure clinic on 2/2/18. The provider again erroneously noted that "no seizures since January 2016," did not comment on the recent sub-therapeutic level, but continued the Watch Take. This provider clearly did not review the previous physician and nursing notes nor the recent

---

[52] Chronic Care Patient #6.

drug level; the Dilantin dose should have been increased or a new medication prescribed.

In summary, this epileptic patient with uncontrolled seizures and multiple repeat sub-therapeutic Dilantin levels was not being adequately treated. Physicians initially doubted that he was having seizures, then failed to expeditiously switch him from KOP to Watch-Take administration after repeated nursing notes documented non-compliance with his KOP medications. The four-month delay in changing the mode of medication administration jeopardized this patient's health. Even after Watch-Take medications were finally initiated, the drug level was not therapeutic, but no clinical action was taken (increased dose or new medication); this was not acceptable care. No repeat Dilantin levels have been tested since the last sub-therapeutic level five months ago. This patient with an unstable seizure disorder will not be followed up until August 2018. This is not acceptable and does not meet the community standard of care.

- Another patient had a problem list noting asthma, Crohn's disease, and hypertension.[53] The database noted a negative PPD on 8/20/17. His medications included hydrochlorothiazide 25mg/d, verapamil 180mg 2 tabs/d, and Delzicol (mesalamine equivalent) 400mg 2 tabs TID. He was seen in the hypertension clinic on 3/20/17 and 9/14/17; his blood pressures in the chronic care clinic and in a number of physician sick calls were well controlled. He was evaluated twice (5/16/17 and 11/21/17) in general medicine chronic care for his Crohn's Disease. The provider stated at both visits that the Crohn's disease was "stable." Labs performed four times during the last 12 months were normal. At the 8/10/17 provider sick call, the patient stated that he not received his Delzicol (Crohn's medication) for a month, he was passing blood in his stool, and his abdomen was benign. The assessment was acute flare-up of Crohn's due to no medications. The pharmacy was contacted, and the medications restarted. Patient was seen again in the provider sick call on 10/31/17, complaining of blood in bowel movement two times; a rectal exam was negative, CBC and FOBT was ordered. A physician note on 12/19/17 was illegible. A referral to GI was approved on 12/27/17, although there was no documentation in any notes that the patient was referred to GI. At physician sick call on 1/9/18, patient again reported that he had occasional blood in his stool and had occasional diarrhea. His abdomen was soft. The GI appointment had been scheduled for 3/8/18. Review of the MAR verified that the patient received his KOP supply of Delzicol in June 2017 and August 2017-January 2018, but not in the month of July 2017.

In summary, the failure to deliver his Crohn's medications in July 2017 triggered a flare-up of his disease which persisted intermittently for the next six months. The presence of blood in the stool can be caused by his inflammatory bowel disease and by other conditions, including cancer of the colon. The patient reported passing blood on 8/10/17, 10/31/17, and 1/9/18. Even though he is at high risk for colon cancer, he was

---

[53] Chronic Care Patient #7.

not scheduled to see GI until seven months after his first reported episode and five months after the second visit for blood in stool. This is an unacceptably long delay and does not meet the community standard of care. He was noted in November 2017 chronic clinic as having "stable" Crohn's disease even though he had had a recent exacerbation in August 2017.

- Another patient is a 51-year-old whose problem list included seizure disorder, hepatitis C, hyperlipidemia, and bipolar disorder.[54] His medications are Procardia (nifedipine) and Lopressor (metoprolol), both medications for hypertension, which is not on the problem list, and Keppra (levetiracetam) 250/d. He is followed in the hypertension and seizure chronic care clinics. He was seen in the seizure clinic four times and in the hypertension clinic two times in the last 13 months. His blood pressure is generally well controlled. His seizures were assessed as stable in 2017, but at his 2/21/18 seizure clinic it was noted that he had a seizure three weeks prior to the visit. There was no comment on the type of seizure or whether the patient was taking his seizure medications. The patient is being administered his seizure medications as Watch-Take. In September-November 2017 and January 2018, the MARs documented that he received 100% of his doses, but from December 17-30, 2017, he was documented as having received only four of the expected 14 doses. This was not commented on during his 2/21/18 seizure clinic visit, but may have been the reason that he had a seizure near the end of January 2018. By just reading the medical record it was very difficult to identify whether the patient had hepatitis C infection, had been treated for hepatitis C, or whether the disease was active. He was not being followed in the general medicine clinic or in sick call for his history of hepatitis C. The patient was interviewed, and he verified that he had been successfully treated in 2006 with Interferon/Ribavirin while in IDOC. Lab tests showed normal liver enzymes/liver studies but a low normal platelet count (125) was reported on 7/17/17. An abdominal ultrasound exam to screen for hepatosplenomegaly, liver fibrosis, and HCC was not performed in 2017. Patients with hepatitis C, especially those with cirrhosis, which can cause low platelet counts, are at increased risk for hepatocellular carcinoma. He was not being regularly screened with liver ultrasounds.

In summary, the problem list for this patient was incomplete, not noting the presence of hypertension nor indicating that hepatitis C had been successfully treated. This placed the patient at risk for disruption of his care and inadequate follow-up of these conditions. It was very difficult to verify the patient's history of hepatitis C, his previous treatment, and his current status. The patient should have a liver ultrasound performed to clarify the degree of liver fibrosis and to help determine whether he needs to be regularly screened for HCC. The medical record does not address why the MAR indicates that seizure medications were not consistently administered in December 2017 and whether this contributed to a seizure that occurred in late January 2018.

---

[54] Chronic Care Patient #8.

- Another patient is a 55-year-old whose problem list noted hepatitis C post-successful treatment, hepatosplenomegaly, low platelets, BPH, and kidney stones.[55] His medications included lactulose, finasteride, Tamsulosin, and betablocker. He was successfully treated (Harvoni) for hepatitis C at UIC Hepatology Clinic in 2014-2015. Between October and December 2017, he had an abdominal US, colonoscopy and esophagoscopy performed at UIC which did not identify liver masses/HCC, removed four colon polyps (repeat colonoscopy in 10 years), and found small esophageal varices for which a beta blocker medication was ordered. The liver ultrasound was repeated in January 2018 and showed no masses. Multiple lab tests in 2016-2017 showed low platelets, normal liver enzymes, normal INR, and intermittent mild elevations of total bilirubin. He has received hepatitis A and B vaccines but there is no documentation in the medical record that he has been administered/offered pneumococcal vaccinations. There are no notes by the providers at SCC concerning his cirrhosis and portal hypertension. The patient is not being followed in the SCC chronic care clinic. There are no notes about his mental and cognitive status even though he is taking lactulose for the treatment of hepatic encephalopathy.

  In summary, this patient was successfully treated while in IDOC for hepatitis C. He also has advanced cirrhosis. He is being followed by the Hepatology Service at UIC. It is not in the best interest of the patient or the institution that this patient is not jointly monitored in the chronic care clinic for his cirrhosis. SCC's clinical team must be continually aware of this patient's baseline status so that they can expeditiously and appropriately respond to any deterioration in his condition.

- Another patient is a 52-year-old whose problem list notes HIV infection and s/p GSW groin in 1986 with blood transfusions.[56] His database shows negative PPDs from 2010 to 2017. His medications include KOP Genvoya. There is no documentation that he has been administered pneumococcal or meningococcal vaccinations or had been screened for colon cancer. He has been seen twice by the UIC HIV telehealth specialists; the UIC ID specialist's notes are in the SCC medical record. On 3/20/17, UIC discontinued Atripla and started Genvoya, and his VL was undetectable on 2/6/17. Repeat labs on 4/15/17 (VL undetectable, CD4 851), 5/4/17 (Cholesterol 153, Hct 39.9), and 6/12/17 (VL undetectable, CD4 670) were good. The UIC HIV specialists assessed his HIV to be in good control on 6/22/17. Repeat labs on 10/3/17 (VL undetectable, CD4 687) again reflected good control. This patient is being regularly managed by the UIC telehealth HIV specialists; his HIV is under good control. There are no notes by the SCC providers about his HIV status or in regards to any of his age-based routine health maintenance needs.

  In summary, this 52-year-old should have been screened for colon cancer, should have documentation that pneumococcal and meningococcal vaccines had been provided, and should have been considered for a statin for prevention of cardiovascular disease. None

---

[55] Chronic Care Patient #9.
[56] Chronic Care Patient #10.

of these indicated interventions or screening have been done and all of these screening and preventive measures are the responsibility of the SCC primary care medical team. He has been at SCC for at least 11 months and he has not had an annual visit or a chronic care visit. SCC must continue to provide the routine health maintenance needs of all patients, even those with a condition that is closely monitored by offsite specialists.

- Another patient is 42-year-old whose problem list noted hypertension, seizure disorder, hyperlipidemia, and HIV infection.[57] His medications include Dulera (mometasone/formoterol) inhaler, Albuterol inhaler, hydrochlorothiazide, Lisinopril 20mg/d, Genvoya, gabapentin, Keppra, atorvastatin, and ASA. He was seen in the hypertension clinic one time, hypertension/seizure clinic one time, HIV Telehealth one time, diabetes clinic one time, diabetes/seizure clinic one time, and asthma clinic one time (refused one time) in 2017. His blood pressure is well controlled on his current regimen. He had two HbA1Cs (6.1 and 6.6), consistent with pre-diabetes on the first test and consistent with diabetes on the second test which was unrecognized. His glucoses ranged between 89 and 132 in 2017. The diabetes care provider encouraged lifestyle modifications to treat presumed pre-diabetes but failed to address the 2nd test which was diagnostic of diabetes. His last seizure was reportedly in early 2017, with no further seizures as of January 2018. He was assessed by the UIC HIV Telehealth Infectious Disease specialists on 6/22/17; his VL was undetectable and CD4 617. Repeat VL undetectable, CD4 624 on 10/3/17. His HIV is well controlled on Genvoya. In January 2018, the Genvoya was switched from DOT/Watch-Take to KOP, but the nursing staff continued to give daily doses for the rest of January, even though the patient had received a KOP supply of 30 tabs on 1/18/18. This created a potential risk for the patient of double dosing. It is unclear why the DOT order in the MAR was not discontinued. At the 7/1/17 asthma clinic, his PEFR was 325, and the patient refused to attend the 2/6/18 asthma session.

In summary, this patient's multiple chronic conditions were managed in silos of five separate chronic care or specialty clinics. This division of care has the potential of disrupting this patient's continuity and comprehensiveness of care. Excluding the UIC HIV Telehealth Clinic, the chronic care notes are extremely brief and provide very limited information on the patient's status or ongoing health care plan. There is no documentation anywhere in the asthma, diabetes, or HIV clinics that he had received or been offered the indicated pneumococcal or meningococcal vaccines. Any one of these three clinics could have provided the vaccine(s), but none of them did. There is no comment or rationale for the prescribing of gabapentin in this patient. There was no mention of peripheral neuropathy or nerve pain in the any of the provider notes. The seizure clinic also did not contain any documentation that gabapentin was being used as an epileptic medication in combination with Keppra. Gabapentin is not a benign medication; the provider notes should clarify why this medication is being prescribed.

---

[57] Chronic Care Patient #11.

The patient appeared to have an A1c test diagnostic of diabetes which appeared unrecognized.

- Another patient is a 46-year-old whose problem list noted deep vein thrombosis (DVT) secondary to GSW right leg (early 1990s) and hyperlipidemia. His database noted negative PPD on 3/9/17.[58] His medications include warfarin and Zocor (simvastatin). He was followed in the chronic care clinic (5/1/17, 11/3/17) in 2017. From 12/20/16 through 2/22/18, 12 INRs were performed to assess the level of anticoagulation; only one (11/8/17, 2.3) was in the therapeutic range. The providers did incrementally increase the warfarin dose from 7.5mg/d to 10mg/d over these 15 months. The latest increase was ordered on 10/1/17, but INRs have continued to be sub-therapeutic in December 2017 and January-February 2018. The MARs revealed 100% patient compliance with warfarin doses from November 2017 through January 2018. In summary, the level of anticoagulation for this patient is suboptimal. The frequency of INR testing and warfarin adjustment should have been accelerated. This patient is at risk for another DVT or thromboembolism. The providers at SCC do not seem to understand the urgency of achieving therapeutic levels of anticoagulation using warfarin. In this clinical environment, the use of newer anticoagulants that do not require INR testing and dose adjustments should be strongly considered. Also, DVT is typically treated for three months. This patient was being treated for over a year. While selected patients require long-term treatment, the rationale for long-term treatment needs to be documented in the record. If the patient was being treated unnecessarily, it places him at significant risk due to the potential adverse effects of warfarin.

- Another patient is a 62-year-old whose problem list noted diabetes and hepatitis C.[59] His database documented pneumococcal 23 vaccination in 2003 and 2011, and hepatitis A and B vaccinations in 2013. His medications include insulin 70/30, metformin 500mg/d, and gabapentin. He was seen in the diabetes clinic seven times and the hepatitis C clinic three times from 12/13/15 and 12/12/17. Over the last two and a half years, this patient's diabetes was never under optimal control, his HbA1C ranged from 7.7-8.7 with a minimum goal of less than 7.0, as in IDOC DM guidelines. His 70/30 insulin has remained at 50U/AM and 30U/PM for a number of months; it was unclear from the notes why and when the insulin dose was decreased from 65U/30U to 58U/30U to 50U/30U. He also takes metformin 500mg/d and on 1/8/18, glipizide 5mg/d was added to his regimen. Urine testing has demonstrated macroproteinuria since 2008 and high microalbumin/creatinine level (1017 mg), yet there is no evidence in the medical record that this patient had been prescribed an ACE inhibitor to minimize the risk of further kidney damage. This diabetic's cardiovascular 10-year risk was 20.2% but he has no documentation in the chart that he is taking a statin medication to decrease his risk of MI or CVA. His blood pressures have never been at goal of <140/90 as required in IDOC guidelines, yet it appears that he is not taking anti-hypertensive medications. There is

---

[58] Chronic Care Patient #12.
[59] Chronic Care Patient #13.

no comment in the chronic care clinic notes that the patient is taking an ACE inhibitor, a statin, or a hypertensive medication. This patient's diabetes is being poorly managed. The rationale for decreasing the insulin dosages was not documented in the progress notes of diabetes clinic. Elevated liver enzymes have been noted at three of the four hepatitis clinic visits. UIC did a liver fibroscan that revealed Stage 4 (advanced cirrhosis) on 11/15/17. A hepatitis C RNA test on 5/31/17 was elevated to 2,775,804. It has been determined that this patient is a candidate for hepatitis C treatment and a referral has been recently made (2/6/18) to Wexford's Dr. Paul for review and approval to treat.

In summary, this patient's diabetes has never been controlled. The treatment plan is unclear from the brief chronic care notes. This patient warrants a referral to endocrinology to establish a plan to optimize the diabetes treatment. It is inexplicable why this at-risk diabetic is not prescribed an ACE inhibitor, a HMG-CoA reductase inhibitor (statin), and a hypertensive medication. This 62-year-old patient should be screened for colon cancer and should have received a pneumococcal 23 vaccine, but there is no documentation in the medical record that these screening and preventive interventions have been done. We also note that referral for treatment for hepatitis C occurred when this patient already had cirrhosis or late-stage disease. This means that this patient will endure long-term risk of cirrhosis, including hepatocellular carcinoma, when earlier treatment may have avoided this complication.

## Urgent/Emergent Care

**Methodology:** We interviewed the Director of Nursing, toured the medical clinic, assessed the availability and functionality of emergency equipment and supplies, reviewed emergency drills, CQI reports, and medical records. Medical records were selected from the list of emergency department (ED) visits in 2017 provided by SCC. This list includes the reason for the ED visit. Records selected for review were those conditions sensitive to ambulatory care, such as seizure, withdrawal, infection, diabetic complications, abdominal pain, chest pain, etc. A total of eight records were reviewed.

### First Court Expert Findings
ER reports were absent in all the medical records reviewed and the care of patients was found to be problematic before the ED visit and after the patient's return to SCC. The First Court Appointed Expert recommended the QI program monitor and report results on the timeliness, appropriateness, and continuity of care of patients sent to the ED.

### Current Findings
SCC provides basic CPR and first aid. Emergency response equipment consists of first responder bags that contain first aid supplies, stethoscope, blood pressure cuff, cervical splint, and a few medications (i.e., glucagon). There are also two large duffel bags that are considered disaster bags. These contain larger quantities of supplies and equipment needed to respond to multiple injuries. The basic first responder bags and the disaster bags are not locked and there is no list

of contents and their location as required by SCC Operations Policies and Procedure.[60] An automatic external defibrillator (AED), ambu bag, portable oxygen, EKG machine, suction, nebulizer, and oto-ophthalmoscopes are available in the urgent care room in the clinic at SCC. The presence and functionality of the first aid equipment is checked daily by the night shift and documented on a log. We checked the AED and oxygen tanks and found both to be functional. First aid kits are in the offices on each of the cell blocks. These are not regularly inspected and re-supplied as required by SCC Institutional Directive.[61] Two kits were inspected; the seal was broken on both and there were no gauze or bandages in the kit.

Training records are maintained and nearly all health care staff are current in CPR. The few who are not current are noted on the record; these are staff on leave. SCC's Institutional Directive and Operations Policy and Procedure require that emergency drills be conducted twice a year on each shift. One of these is to be a mass casualty drill involving multiple people with injuries. The annual CQI report for 2016-17 lists the drills that have taken place. Based upon this list, SCC did not comply with either directive. Only one drill was conducted on the 7 a.m. to 3 p.m. shift, and only one mass casualty drill was completed rather than one on each shift. Also, the description of the mass casualty drill conducted on the night shift 8/23/2017 only involved one injured person, so does not meet the definition of a mass casualty drill. The written critiques of these drills are very brief.

We reviewed the medical record of eight patients sent to the emergency department (ED) in 2017 and found that ED visits were often preventable, information and recommendations from the ED were not obtained, or if it was, not incorporated into the patient's subsequent treatment plan. These findings are detailed in the following paragraphs.

- The first patient has a history of uncontrolled hypertension and end stage renal disease.[62] Documentation of the reason for sending the patient to the hospital emergently on 7/8/17 is very brief - shortness of breath and fluid overload. He was discharged three days later. There is no note summarizing the findings or treatment recommendations from the hospital. No records from the treating hospital were obtained. He was not seen in chronic care clinic following the hospitalization until November. This hospitalization was likely preventable if his chronic disease had been monitored and managed more often than every three to four months. There was no effort to review records from the hospitalization and incorporate this information into the treatment plan.

- The next patient was sent to the ED on 9/18/17 for severe facial swelling and confusion resulting from an assault.[63] His problem list includes quadruple coronary bypass, hypertension, and prostatic hypertrophy. The initial response to the facial injury was timely and appropriate. The ED took x-rays and diagnosed a zygomatic fracture and

---

[60] P112 Emergency Services, June 2017, p. 20.
[61] 04.03.108 K3 Response to Medical Emergencies May 1, 2016.
[62] Urgent/Emergent Patient #1.
[63] Urgent/Emergent Patient #2.

recommended tramadol for three days, twice a day for pain, and referral to an eye specialist. Upon return to SCC the provider made the referral to an eye specialist, but did not order the pain medication or document a rationale for deviating from the recommendation.

- The next patient was hospitalized emergently on 4/4/17 for abdominal pain, blood in stool and weight loss.[64] He is a 66-year-old and has diagnoses of hypertension, chronic obstructive pulmonary disease, GERD, and prostatic hypertrophy. He complained of black stool on 4/2/2017 and a sample was positive for blood. On 4/3/17, he was seen by a provider for skin breakdown on his right hip. The provider did not address the problem of blood in his stool. The provider noted that he should be scheduled for a follow-up appointment in one week for results of biopsies from a GI consult at UIC. No follow up appointment was scheduled. His care before the hospitalization and afterwards is episodic. The outbound note from SCC refers to the patient having had a previous stroke and yet this is not on his problem list. Treatment recommendations from the hospital were not followed and there is no documentation of a rationale for an alternative treatment plan.

- The next patient was sent to the ED on 2/9/2017 for severe anemia with shortness of breath and dizziness.[65] He had been seen at nursing sick call five days earlier for dizziness. He had a history of a gastrointestinal bleed and hypertension. The nurse referred him to a provider urgently on 2/4/2017 because of a rapid pulse (124) and elevated blood pressure (150/72). The provider ordered labs and an EKG. The EKG was not done because it was "broken," and labs were not resulted until 2/8/17. The provider's review of these results prompted the referral to the ED. Upon return from the ED the patient was not seen by a provider in follow up until 2/17/17. Recommendations from the ED were not acknowledged by the provider and there was no documented rationale for deviating from the recommended plan of care. This ED visit would likely have been avoided if the diagnostic labs had been accomplished more quickly and treatment initiated earlier.

- The next patient was sent to the ED on 9/30/17 for intractable low blood pressure.[66] There are no problems listed on the problem list and it has not been updated since 5/17. However, this patient was being seen by the Medical Director for chronic pain. The Medical Director referred the patient to the UIC chronic pain clinic on 8/9/17. The patient was taking clonazepam and lorazepam and reported these as being ineffective in relieving his back pain. The Medical Director documented that the patient was exhibiting drug seeking behavior. The patient asked for renewal of his medications on 8/30/17 and was scheduled to be seen on 9/5/17. He was not seen that day and made another request to have his medications renewed before they expired on 9/16/17. He

---

[64] Urgent/Emergent Patient #3.
[65] Urgent/Emergent Patient #5.
[66] Urgent/Emergent Patient #6.

was seen the day before his medications expired and they were renewed. He was seen again on 9/25/17 for back pain and x-rays were ordered. A Toradol injection was ordered on 9/28/17 and he was admitted to the infirmary when his blood pressure dropped from 137/85 at 6:00 p.m. to 114/71 four hours later. He continued to receive Toradol injections on 9/29/17 and 9/30/17. The patient continued to report significant pain and his blood pressure remained low, so the Medical Director sent him to the ED on 9/30/17. The patient returned from the ED with recommendations for Norco. The nurses contacted the Medical Director, who instructed them not to give the patient Norco and ordered clonazepam and lorazepam instead. The patient did not see a provider in follow up until three days after the ED visit on 9/30/17. This patient was not seen by the UIC pain clinic until 1/24/18. Diagnostic imaging of the lumbar and thoracic spine was recommended as well as trigger point injections for radicular and myofascial pain. Chronic pain or the underlying cause of the chronic pain is still not listed on the problem list. Had this patient's chronic pain been managed the ED visit would have been avoided. The referral to UIC took too long to effectuate.

- The next patient was sent to the ED on 8/22/17 for chest pain.[67] He is 66 years old and his problem list includes Crohn's disease, heart disease, and depression. However, he is not followed in the chronic disease clinic. He was seen for Crohn's disease on 7/25/17, and his blood pressure at that visit is recorded as 91/72. The provider did not remark on this low blood pressure and no additional follow up was ordered. On 8/22/17, he complained of chest pain, and after two hours of monitoring and treatment at SCC he was sent to the ED. At the ED he was diagnosed with esophagitis and GERD. Follow up with cardiology was recommended by the ED. He was not seen following the ED visit until 20 days later. No cardiology referral was made. He was scheduled for an enteroscopy in October 2017 and a follow up appointment for GERD in November 2017. This patient should be followed in a general medicine chronic disease clinic and abnormal vital signs should have been addressed by the provider who saw him in July 2017. In addition, he was not seen timely after returning from the ED and a cardiology referral should have been made.

- The final patient was sent to the ED on 5/4/17 for an acute infection on his right foot.[68] He was diagnosed with insulin dependent diabetes and hepatitis C. He was seen in both the diabetic and hepatitis C chronic disease clinics. He was seen in chronic clinic for diabetes on 12/1/16 and his HbA1C was noted to be 8.2 (poor control). He was seen again on 4/3/17 and his HbA1C was 8.7 (poor control). In February 2017 he was seen for swelling in his legs and a diuretic (Lasix) was ordered. His legs were documented as still swollen when he was seen by providers in March and April. Reduced sensitivity in his feet due to diabetes is documented by the provider who saw him 4/26/17. No changes were made in his treatment, and the frequency of chronic care appointments to manage his diabetes was not increased. This patient with poorly controlled diabetes and

---

[67] Urgent/Emergent Patient #7.
[68] Urgent/Emergent Patient #8.

neuropathy in his feet stubbed his toe on 5/3/17 sufficient to cause loss of a toenail and severe bruising of the foot. He requested health care attention the next day, was admitted to the infirmary and started on IV antibiotics, but later that day was sent to the ED for treatment. Upon his return to SCC, the recommendations from the hospital are noted and implemented. This ED visit was likely preventable if his diabetes had been more closely monitored and his condition treated more rigorously.

We also reviewed six medical records of patients who were hospitalized to assess their care before and after hospitalization. We found that, as with the persons going to the ED, patients returning from in-patient hospitalization do not consistently have a hospital discharge summary. We noted clinical management problems in all six records reviewed, including significant preventable or possibly preventable harm and risk of harm to patients who had delayed hospitalization, delayed specialty care, or lack of primary care of their underlying medical conditions. The lack of appropriate treatment of their underlying medical conditions resulted in deterioration and harm (myocardial infarction, stroke, and colon cancer) that was preventable if their conditions were treated appropriately. There appears to be a significant knowledge and practice deficit with respect to managing primary care problems, which we attribute to the use of a surgeon instead of a doctor trained in primary care. This is a credentialing and privileging problem. We also note that in two cases there appeared to be a lack of documentation of episodes of care immediately preceding hospitalization. All clinical episodes of care need to be documented in the medical record. We give summaries of these cases below.

- The first patient had listed problems including hypertension, asthma, type 2 diabetes, and GERD.[69] The patient had three major risk factors for coronary heart disease (hypertension, diabetes, and high blood lipids), but his high blood lipids were not recognized as a problem by facility physicians. Because this condition was unrecognized, he was not treated with anti-lipid medication, which is a standard of care. Providers saw the patient on 24 occasions, with elevated blood pressure dating from May of 2016 until January of 2017, but the blood pressure medications were only minimally adjusted on only two of the 24 episodes of care. The patient's blood pressure remained uncontrolled over the course of an entire year. Once when seen in hypertension chronic clinic and twice in diabetes clinic, the blood pressure was elevated but the only treatment was to add a diuretic (at only the hypertension clinic visit). Hypertension is a risk factor for stroke and coronary artery disease, and not treating blood pressure to an appropriate goal places the patient at increased risk for coronary events. The diabetes was also not well controlled.

On two occasions the patient had chest pain with elevated blood pressure. On one occasion the patient had exertional chest pain with blood pressure of 199/128 which constitutes hypertensive urgency. Exertional chest pain suggests acute coronary syndrome which requires an immediate EKG and evaluation. The nurse called a doctor,

---

[69] Hospitalization Patient #2.

but an EKG was not done, and the patient did not receive an evaluation for acute coronary syndrome. The doctor failed to follow generally accepted guidelines or usual standard of care, which should have included evaluation for acute coronary syndrome. On another occasion, a nurse called a doctor because the patient had chest pain with blood pressure of 188/102. The doctor ordered Ativan, nitroglycerin, and a single dose of clonidine, but did not order an EKG or send the patient to an ER. This also failed to follow generally accepted guidelines or usual standard of care to evaluate for acute coronary syndrome. Over the next hour, after this episode of chest pain, an LPN saw the patient four times. During one of those episodes, the patient described chest pain like "someone elbowing me in the chest." Shortly after that, the LPN documented a blood pressure of 204/93, an extremely high blood pressure that in combination with chest pain was a red flag sign. An LPN should not have been making these repeated evaluations, as they are not trained in assessments. As well, the patient did not have timely transfer to a higher level of care.

There were no further notes, but the patient was admitted to a hospital at some time unknown and diagnosed with a heart attack. All care needs to be documented in the medical record, but the episode of care resulting in the transfer was not documented in the medical record. The patient had a stent placed and returned from the hospital on a statin drug. Care for this patient demonstrated a lack of knowledge of primary prevention of heart disease and on treating angina, a common primary care problem. It was similar to care we noted in mortality reviews at a different institution which resulted in death. This heart attack was likely preventable if the blood pressure was treated and if he was placed on a statin drug. Failure of the on-call doctor to admit a patient with typical chest pain and elevated blood pressure placed the patient at significant risk of harm and was grossly and flagrantly unacceptable.

- Another patient with a history of smoking had elevated lipids with cholesterol 232, HDL 54, and LDL cholesterol 153.[70] The standard of care for these laboratory test results is treatment with a statin drug, which was not done. On 12/8/14, the patient had an elevated HbA1C of 6.6, which is diagnostic of diabetes. The standard of care for his diabetes would have been to treat the condition with an oral agent and to attempt weight loss. Diabetes with high lipids raised the risk for stroke and coronary heart disease, and treatment with a lipid drug was indicated. The patient had approximately a 20% 10-year risk for heart disease or stroke, yet remained untreated for high blood lipids or diabetes for years. Dating from 4/12/16, the patient had elevated blood pressure which was also not treated. Elevated blood pressure is also a risk factor for stroke. Thus, the patient had three major treatable risk factors for stroke for which he was not treated, which was significantly below standard of care. On 7/10/17, the patient developed a stroke. The patient was not treated for his elevated blood lipids or diabetes until after return from the hospital. The patient now has right sided weakness and aphasia (difficulty speaking). Care of this patient was grossly and flagrantly

---

[70] Hospitalization Patient #3.

unacceptable. This stroke was preventable if the patient was appropriately treated for his cardiovascular risk factors.

- Another patient had apparent COPD/asthma and obstructive sleep apnea.[71] Tests for these conditions were not evident in the medical record. The patient had no monitoring of his sleep apnea for a year. Also, on review of the current volume of medical records, there was no evidence that the patient had ever had a pulmonary function test, which is recommended as a cornerstone of diagnosis for both COPD and asthma. So, it was not clear that the patient had an accurate diagnosis of his medical condition. For a year, the patient had eight exacerbations of presumed asthma or COPD requiring use of tapering oral steroids. The patient had oxygen saturation at 88% or lower on 10 different occasions despite being on what appeared to be maximal medical therapy (Advair diskus, albuterol nebulization, Singulair, and Xopenex).[72] The standard of care with this level of oxygen saturation in persons with COPD is to obtain an arterial blood gas and assess whether the patient needs continuous oxygen therapy. Despite indications for oxygen therapy, the patient never received an arterial blood gas or evaluation for the need of oxygen therapy and did not receive continuous oxygen therapy. As well, on six occasions the patient had red flag abnormal vital signs signifying possible need for a higher level of care, but was not referred to a hospital or higher level of care, which placed the patient at significant risk of death. These episodes included:

  - On 5/15/17, the patient had productive cough, labored breathing, wheezing, and oxygen saturation of 82%. A doctor admitted the patient to the infirmary but did not obtain a chest x-ray or laboratory tests. An arterial blood gas should have been performed immediately. The patient should have been sent to a hospital because of the significant oxygen desaturation.
  - On 4/18/17, a nurse found an oxygen saturation of 80% with diffuse wheezing. Even though the oxygen saturation improved to 88% after treatment, a provider did not see the patient. This was a critically low oxygen saturation which should have been resulted in immediate hospitalization for further prompt evaluation.
  - A nurse evaluation for oxygen saturation of 86% and hypotension (blood pressure 81/49). The nurse took no action.[73]
  - A nurse evaluation for oxygen saturation of 84% with hypotension (blood pressure 88/41). The nurse took no action.
  - A nurse evaluation for oxygen saturation of 84% and hypotension (blood pressure 85/43). The nurse took no action.
  - A nurse evaluation for oxygen saturation of 86% with hypotension (blood pressure 95/43). The nurse took no action.

---

[71] Hospitalization Patient #4.

[72] An oxygen saturation of 88% is used by Medicare as the threshold for use of continuous oxygen therapy.

[73] Low blood pressure suggests but is not diagnostic of shock. Combined with severely abnormal oxygen saturation, this patient should have been sent immediately to a hospital for diagnosis and evaluation, yet the nurse took no action and did not even consult a physician. The nurse evaluating the patient was an LPN but did not document consulting with a supervising RN, which is required by Illinois nursing regulations when LPNs are involved in assessments.

This patient was eventually admitted to a hospital, but the hospital report was not in the medical record and the prison providers did not document knowledge of what occurred at the hospital or note any hospital recommendations. Providers did not appear to have an accurate diagnosis. If the patient had asthma, he should have been admitted to a hospital on multiple occasions for oxygen desaturation, but was not. If the patient had COPD or overlap syndrome, he should have had an arterial blood gas and considered for continuous oxygen therapy. If the patient had either asthma or COPD, the patient should have had pulmonary function tests. Care for this patient was grossly and flagrantly unacceptable. Providers did not appear to know how to care for this patient's disease and the patient should have been referred to a pulmonologist for better diagnosis and management. The failure to know how to manage this patient placed the patient at risk of harm.

- Another patient was 56 years old and was incarcerated at Graham on 9/15/15 before being transferred to SCC.[74] His initial weight was 213 pounds. Despite being over 50, there was no documented evidence of preventive screening for colorectal cancer, which is a standard of care. Colorectal cancer screening is recommended for all persons over 50 years of age but does not appear to routinely occur in the IDOC. On 11/8/16, a doctor saw the patient for complaint of blood in his stool. The doctor did a digital rectal examination and felt what he thought was a hemorrhoid. The stool was guaiac positive, which indicates blood. The doctor ordered hemorrhoid cream and a three-month follow up. The standard of care for a guaiac positive stool in a 56-year-old man is colonoscopy to rule out colon cancer or another source of the bleeding. On 11/29/16, a doctor ordered fecal occult blood tests and on 12/1/16, the tests were positive. On 1/4/17, a doctor ordered a GI consultation; the weight was 186 pounds, which was a 27-pound weight loss since incarceration. The doctor failed to document recognition of the weight loss and took no history about weight loss. The standard of care is to obtain timely colonoscopy because weight loss and blood per rectum in a 56-year-old requires exclusion of cancer. Instead, the doctor failed to take sufficient history and ordered a routine work up, which was significantly delayed. There is a known delay in getting GI consultation scheduled at UIC. Instead of obtaining this test at another center, the patient was allowed to wait with a condition that should have been evaluated much sooner.

Four months later, on 4/10/17, an annual history and physical examination of this 56-year-old did not include colorectal cancer screening. The GI consultation ordered on 1/4/17 was approved on 1/11/17 but did not occur until 7/7/17, about six months later. The GI consultant recommended colonoscopy and EGD, but this did not occur until 11/27/17, at which time the patient had locally invasive metastatic rectal cancer. The patient was admitted directly to the hospital from colonoscopy and when he returned to the prison with cancer pain, the pain was not addressed. This patient with need of colorectal screening failed to have it offered. The patient had documented weight loss

---

[74] Hospitalization Patient #6.

that was unrecognized for well over a year. When he showed signs of weight loss and bloody stools, it took over a year to obtain a work up for colon cancer. These delays in obtaining specialty care most likely resulted in dissemination and advancement of his colon cancer, which caused harm.

In addition to this event, the patient, who was on psychotropic medication for a mental health condition, developed a hand tremor on only one hand. A doctor diagnosed Parkinsonism without performance of a history or physical examination and started Cogentin, which has no indication for Parkinsonism. This is below standard of care with respect to diagnosis of Parkinsonism. Two weeks later the same doctor, without performing a history or physical examination, ordered Sinemet, a drug used for Parkinsonism. The doctor made the diagnosis without a history or physical examination supporting that diagnosis. Six months later, the patient was referred to a neurologist. The neurology consultation occurred nine months after the referral. When the neurologist saw the patient, he found no evidence of Parkinsonism and recommended tapering the patient off Sinemet. The doctors at SCC did not stop the Sinemet. The doctors at SCC failed to document sufficient history or physical examination to support their diagnosis and failed to follow a neurology recommendation to taper the patient off a possibly unnecessary drug. These two episodes of care for this patient were grossly and flagrantly unacceptable.

- Another patient had a history of gout.[75] He developed swollen joints and had multiple provider encounters for his complaints but did not have thorough history or physical examinations. Providers were treating the patient with bursts of steroids without having established a firm diagnosis of gouty arthritis and without addressing treatment of his uric acid, which is standard of care in treatment of gout. During two episodes of swollen joints, providers aspirated the joint for a joint _culture_ and treated the patient for gout without obtaining an analysis of the joint fluid for crystals, which is the standard of care for diagnosing gout. After initially treating the patient for gout, another provider started treating the patient as if the patient had rheumatoid arthritis without definitively establishing the diagnosis. It appeared that the providers did not understand how to diagnose either gout or rheumatoid arthritis, and the patient should have been referred to a rheumatologist for consultation. The patient developed redness on the front of the thigh encircling to the back of the thigh; the area was swollen. Despite an extensive area of possible infection, the nurse did not consult a physician, but referred the patient for a three-day follow up. Two days later, the patient developed fever to 103.6°F and a doctor started intravenous antibiotics. The following day the patient was sent to a hospital, where extensive debridement was necessary for an abscess. The referral by the nurse to a provider was not timely and most likely resulted in extension of the infection. The management of this patient's swollen joints failed to follow generally accepted guidelines.

---

[75] Hospitalization Patient #1.

- Another patient had a problem list at IDOC including diabetes, hypertension, and HIV infection.[76] Consultant notes indicated that the patient had hypertension, diabetes, dyslipidemia, HIV infection with AIDS, Bell's palsy, lower extremity neuropathy, and chronic thrombocytopenia. The patient was not being followed at IDOC for all of his medical conditions. The patient also had hypertension. The blood pressure goal for persons with diabetes is optimal when below 130/80. This patient had elevated blood pressure (>130/80) on five occasions when seeing a provider between January and May of 2017. On none of these occasions did the provider adjust the blood pressure medication. In May of 2017, the patient developed chest pain and was admitted to the hospital. There was no hospital discharge report in the record, so it was unclear whether the patient sustained a heart attack, but an IDOC doctor mentioned that the patient had coronary artery bypass surgery.

  When the patient returned to prison he was admitted to the infirmary. The patient had exertional chest pain and shortness of breath on two occasions on the infirmary which did not result in nurses calling a doctor. The patient told a nurse that he felt "jittery and my breathing is funny," yet a doctor discharged the patient from the infirmary to general population without evaluating the chest pain and shortness of breath. This is below standard of care, particularly in someone with a recent coronary event. A couple days after discharge from the infirmary a nurse charged the patient $5.00 to evaluate an episode for chest pain. The nurse cynically wrote that "I/M arrived in HCU for a CMT chest pain call and was more concerned with asking for a new wheelchair." The nurse did not consult a physician for a complaint of chest pain in a patient with recent coronary artery bypass surgery. On 6/8/17, the patient developed a temperature of 100.2°F with a pulse of 128. Documentation was poor, but it appeared that the patient was eventually sent to a hospital, where pulmonary embolism was diagnosed. The hospital record was not in the medical record. The evaluations by nurses on the infirmary and in general population were significantly deficient, as the patient had critical complaints, yet the patient was not referred to a provider and the nurse did not consult a provider. All episodes of care need to be documented in the medical record. The failure of the provider to evaluate the patient on discharge from the infirmary when the patient had complaints of difficulty breathing was below standard of care. The patient may have had pulmonary embolus when discharged from the infirmary which was unrecognized. This placed the patient at risk of harm.

In summary, we concur with the First Court Appointed Expert's findings that ED and hospital reports were often absent in the medical records reviewed and the care of patients was problematic before the ED and hospital visit and after the patient's return to SCC. We also found that SCC is not following its own written directives regarding the emergency response, first aid equipment and supplies, and the frequency and content of drills.

---

[76] Hospitalization Patient #5.

We agree with the First Court Appointed Expert's recommendation that the QI program monitor and report results on the timeliness, appropriateness, and continuity of care of patients sent to the ED and hospital. The lack of appropriate medical care before and after hospitalization supports our opinion about the lack of appropriately trained physicians in the IDOC.  We make additional recommendations found at the end of this report.

## Specialty Consultations

**Methodology:** We interviewed scheduling personnel, reviewed tracking logs, and reviewed medical records of patients who received specialty care. We reviewed care related to consultation requests.

### First Court Expert Findings
The First Court Expert found anecdotal evidence that it takes as long as a month before UIC receives information regarding an approval for a specialty consultation. Nine records were reviewed of patients scheduled for consultations or a procedure. Six of the nine records reviewed demonstrated problems. Problems included no reports and failing to follow recommendations of the consultant.

The First Court Expert recommended that the timeliness of access to specialty services needs to improve and that there needed to be a reliable method of communication between the scheduler and clinician to ensure timeliness of appointments based on urgency of need.

### Current Findings
We found no improvement in specialty services since the First Court Expert's report and noted significant problems in specialty care that caused harm to patients.

The procedure for specialty care is the same at SCC as at NRC. A provider is to write a referral *on the date the referral is requested*. Within five working days, a collegial review is to occur followed by approval and then a scheduled appointment. Of 11 consultations we reviewed with respect to this procedure, all 11 had a collegial review documented in the medical record, but only five of the 11 had this collegial review timely. The contract and administrative directive on specialty care calls for a collegial review in five days. We reviewed 35 consultations to assess whether a consultation report was present. Formal reports were present in the medical record in only 19 times (54%). This is similar to the First Court Expert's finding.

For every consultation, a provider is to see the patient to review the consultation results with the patient within five days. In 10 consultations we reviewed for this purpose, a provider saw the patient after all 10 consultations. The patient was evaluated timely in eight of 10 post-consultation visits. However, the quality of the evaluation was very poor. The provider documentation in the medical record did not give the status of the patient. In none was there a history updating the patient's condition with respect to the consultant's findings. In five of the 10 post-consultation provider visits, the doctor documented that he was seeing the patient for a post-consultation visit but failed to document what occurred at the consultation. On two

post-consultation visits the doctor failed to identify that a biopsy had been done, and these biopsy results were never noted in the IDOC medical record. In two post consultation visits, the consultant's recommendations were not addressed.[77]

The First Court Expert found that there was poor communication between the scheduler and the clinician with respect to scheduling. We agree.

Collegial reviews are not consistently timely. We inspected the tracking log for consultations completed from 1/1/17 to 3/31/17. There were 321 completed consultations during this time period. For 35 (11%) consultations, the collegial review was documented as occurring more than two weeks after the date of referral. We also note that referrals are not placed in the record until the consultation is completed, so doctors will not know from the record whether a referral was requested until after it is completed. Since the referral is a medical record document equivalent to a physician order, it is our opinion that these should be placed in the medical record at the time they are ordered to ensure that all referrals are visible to all providers.

The First Court Expert recommended the need to track specialty care steps to ensure timeliness of scheduled offsite consultations. The logs being used for this purpose do not reliably or accurately track this information. We found the tracking log to be unreliable with respect to ability to track the steps of a specialty consult, including the date of referral, the collegial review, the approval, the scheduled appointment date, and the completed appointment date. For the three-month period of study cited above, 22 (7%) of 321 collegial reviews were documented as occurring *before* the date of referral. This is not possible and suggests that the documented date of referral is not accurately provided or that some entries are post-dated. We reviewed the electronic tracking log for the month of January of 2017. There were 86 completed consultations in this log. Of these, 60 (70%) consultations were documented as being completed *before* the consultation was documented as having been referred. Since we received this document late we were not able to discuss this finding with the scheduling clerk.

The IDOC has an arrangement with UIC in which the IDOC is allowed 216 admissions to the UIC hospital and 2160 consultation visits annually free of charge. The incentive to obtain free care appears to result in some patients not receiving timely care, which causes harm. This is especially true for gastroenterology. For the 55 gastroenterology consults *completed* in 2016 and 2017, the average time from referral to completion of the consult was approximately six months. We note that since the referral dates are not accurately stated, these delays may be even longer. Some of these delays were for diagnostic studies which would result in harm if not timely accomplished.

There did not appear to be any effort to reschedule important consults to other centers so that timely care could be obtained. We were told that past due appointments are managed by Wexford and discussed at collegial reviews. We did not see evidence of this. We noted in the

---

[77] These consultations were from Specialty Care Patient #3 and included consultations from 3/23/16 through 9/8/17 inclusive.

hospital section of this report a case in which a patient with weight loss and bleeding from his rectum was not evaluated in gastroenterology clinic for over six months and did not receive a necessary colonoscopy for an additional four months, at which time an advanced cancer was noted. When any consultation is delayed beyond what is reasonable standard of care for a condition, the consultation should be scheduled with a different consultant. If Wexford is managing these cases, there needs to be evidence in the medical record of how they are doing this. The doctors in the case of this patient with rectal cancer did not appear aware of the delay in care and its urgency, and did not refer to a provider so timelier care could be obtained. There was no evidence in the medical record that Wexford corporate utilization management was following this delay or considering its effect on the patient. There was no evidence that this sentinel event was reviewed by the CQI committee except to list it as a delayed diagnosis.

The offsite scheduling log does not document in all cases whether a referral is to UIC or to a local provider. However, we were told that most referrals for off-site consultation are to UIC. The use of UIC in preference to local providers even when UIC appointments cannot be scheduled timely creates the appearance of saving money instead of protecting the interest of the patient. The offsite consultation process as it currently exists is a patient safety issue. Until it can be corrected, it should be abandoned, and doctors should be allowed to refer directly to consultants until Wexford can ensure patient safety.

Patients with need of specialty care referral were not always referred for care. We noted in the hospital reviews above a patient who should have received pulmonary consultations and pulmonary function tests who did not receive that care. One patient should have been referred to a rheumatologist to evaluate for his arthritis. This underutilization is not monitored by Wexford or IDOC but is a significant problem. We believe that this is another manifestation of the lack of proper credentialing and privileging of physicians.

## Infirmary Care

**Methodology:** The clinic space and equipment in the infirmary were inspected, nursing staff were questioned, clinical charts audited, porters questioned, and patient-inmates interviewed. There was only limited contact with the infirmary physician.

### Fist Court Expert Findings
The First Court Expert recommended that infirmary patients should be seen timely according to policy requirements, and if clinicians choose not to treat patients according to currently accepted recommendations and guidelines, the rationale for these decisions should be articulated in the health record. The expert noted concerns about the frequency, quality, and completeness of documentation.

### Current Findings
We agree with the findings of the First Court Expert concerning timely admission and progress notes, the lack of documented rationale for treatment decisions, and the quality and

completeness of the provider documentation in the infirmary. We identified additional findings and confirmed some of the First Court Expert's findings as follows:

- Admission RN and provider notes were generally written in accord with the established timelines.
- Provider progress notes are consistently written on a weekly basis for chronic infirmary patients. Nurse notes are written daily and commonly provide more useful information on the clinical status of a patient than did provider notes.
- Problem lists were found to be incomplete and even inaccurate.
- Provider notes were consistently illegible, often lacked the rationale for modifications in treatment, failed to list reasonable differential diagnoses, failed to develop clear treatment plans, and rarely documented the status of patients' chronic illnesses.
- The care in the infirmary is episodic and primarily focuses only on acute problems.
- There was little if any documentation that pertinent physical examinations were being performed by the providers.
- The quality of care provided by the providers assigned to the infirmary is inconsistent and often inadequate.
- For records we reviewed, throughout 2017 we found no comprehensive provider notes that updated the status and plan of treatment for all of a patient's problems. Only with the assignment of a new provider in 2018 were some comprehensive provider notes written that provided reasonable, readable, understandable documentation of both the current acute and chronic illnesses of patients.
- The care provided to patients on chronic anticoagulation is poor. The use of warfarin and the subsequent need for frequent INR testing creates logistical barriers that may not be adequately addressed in this correctional setting. The use of newer anticoagulation medications that do not require frequent ongoing measurement of the level of anticoagulation should be strongly considered by the IDOC.
- The condition of the patient beds (non-adjustable heads, inability to raise or lower the height of the beds, non-functional railings) interfered with the ability of the nursing and medical staff to provide proper examinations and perform needed treatments. The physical safety of the nurses who are involved with transferring patients from beds to wheelchairs is also put at risk by not having beds that can be raised or lowered. SCC needs to replace all of the current beds with hospital beds. At least one electrical bed is needed in the infirmary.

The infirmary has two wings; one wing has 11 two-bed rooms and the other, 11 single-bed rooms. The two wings are served by an enclosed central nursing station that has doors that open directly into each adjoining wing. It was reported that the infirmary has 24/7 nurse staffing, with at least one RN on each shift. Correctional officers were noted on both wings during the site visit. Patients are examined in their rooms; there is no examination room on the infirmary. There is no dayroom on the infirmary and TVs are not allowed on the unit. Inmates rarely leave their rooms except for testing/offsite consultations, but those whose physical condition allows have access via a ramp to a recreation yard. There are two negative pressure respiratory isolation rooms; neither of the patients in these rooms were in need of respiratory

isolation. Neither of the negative pressure units were fully functional on the first day of the site visit. A new physician, recently assigned to the infirmary within the last one to two months, makes rounds almost daily.

The infirmary has a capacity of 32 patients. During the site visit, 24 beds were occupied. The majority of patients on the unit had chronic conditions and have had or will have lengthy stays in the infirmary. A large number of the patients are disabled and need assistance with activities of daily living. The infirmary has the appearance of a long-term nursing home. There were functional nurse call devices in all of the 2-bed rooms, but some of the patient-inmates lacked the mental capacity or physical ability to use these devices. The nursing station had no capability of direct visual or audio monitoring of any of the patient rooms. Most of the railings on the beds are not operational. The combination of poor audiovisual monitoring capability, an at-risk-for-fall patient population, and non-functional railings creates a potentially unsafe environment for many men in the infirmary. We noted on a death review that a patient with dementia had 13 falls over a year and a half.[78]  Because there were no physical examinations by a physician it wasn't clear if the patient was physically injured.  Risk of injury is clearly present on this unit.  Only one patient (in restraints) had a correctional officer stationed outside his room for one-on-one observation. A number of the patient-inmates require one-on-one observation due to risk of falls.

IDOC Administrative Directive 04.03.120 Offender Infirmary Services has several requirements, including that nurses must complete admission notes with vital signs on admission and providers must write an admission note within 48 hours of admission. Acute level infirmary patients are to have at least three provider notes per week; chronic patients require only weekly notes. Four infirmary charts of chronic patients were audited (two were long-term patients and their charts had been pared down); the other two had nurse admission notes on the day of admission and provider notes on the next working day. All four of the infirmary charts reviewed had at least weekly provider progress notes and all had daily nursing notes and vital signs measured.

A number of concerns and deficiencies in the care provided to infirmary patients were noted. Two patients had diabetes listed on their problem list, but they were not on diabetic meds and their blood sugars were normal. Neither had HbA1C testing performed to confirm the diagnosis (and control if they indeed had diabetes). None of the provider progress notes ever commented on diabetes for these two individuals. One patient had a single note stating that Wexford replaced his CPAP machine, but sleep apnea was not on his problem list and his medical record and his infirmary chart did not have any provider notes from 2016-2018 addressing sleep apnea or CPAP use. This same patient had a history of significant deep vein thromboses with occlusion of three veins in his abdomen and left leg, yet he was not on blood thinners nor was there a provider comment providing the rationale for not using blood thinners. A patient blacked out on two occasions (blood pressure dropped to 90/60 on second occasion) within a three-week period and was seen three times by a physician without documented neurological or cardiac

---

[78] Mortality Review Patient #9.

exams. He was not assessed or tested for orthostatic hypotension, cardiac arrhythmias, or an atypical seizure. The provider notes contained no clinical information or possible cause for these episodes. The patient was eventually referred to UIC Neurology without a reason for referral; this referral could have been a routine follow-up for patient's seizure disorder. The care of patients on chronic oral anticoagulation therapy (warfarin) is inconsistent. One patient with recurrent DVTs on chronic anticoagulation was well controlled for many months, then the warfarin was discontinued without a justification recorded in the progress note. Another patient on warfarin was not adequately anticoagulated after nine weeks of treatment. INRs, all sub-therapeutic, were measured weekly and the warfarin dose was increased three times; however, the frequency of INR testing and pace of dosage augmentation should have expedited as per standard of care. One infirmary patient with hypertension had elevated blood pressure readings for 11 months but his medications were not increased to achieve control. The provider wrote regular very brief notes with little clinical information that were difficult to read and did not comment on why antihypertensive meds were not increased. It was only after a new provider was assigned to the infirmary that blood pressure meds were increased, and hypertension control achieved.

The provider notes on the audited charts were extremely brief, commonly illegible, and contained little clinical information. The lack of comprehensive provider notes made it difficult to understand the patients' current conditions and progress or deterioration. This created barriers to the delivery of adequate care for the nursing staff and providers who cover the unit when the infirmary provider is off duty. The quality and continuity of care provided in the infirmary did not meet the community standard of care. [79]

The following summaries of infirmary patients' records highlight the findings and concerns noted above.

- This patient is a 53-year-old whose problem list includes DM, recurrent DVT, on chronic anticoagulation, left ankle wound/ulcer, and chronic abdominal wound post-aorto-iliac bypass.[80] Blood sugars were normal and the patient was not on diabetic medication. HbA1C was never performed to confirm the diagnosis. On 1/30/18, the MD wrote that the patient denied a history of diabetes. It is likely that this patient does not have diabetes and this diagnosis should be removed from the problem list. Weekly INRs were performed to measure adequacy of anticoagulation, and warfarin dose was increased four times over nine weeks; all of the INR's were sub-therapeutic (1.1-1.4). Standard of care is to increase the warfarin dose quickly until a therapeutic level is achieved (2.0-3.0) and then decrease the frequency of testing. This patient is still at risk for a recurrent DVT after nine weeks of treatment. UIC specialists ordered warfarin be stopped and the

---

[79] We refer also to Mortality Review Patient #9 for another example of this. Over six months on the infirmary, a doctor wrote notes 19 times that stated, "No specific complaint, no change, dementia, continue same care" despite the patient having multiple falls and being hospitalized for heart failure. Then over a nine-month period, the same doctor wrote 30 notes stating, "No specific complaint. No change. Dementia, post colectomy for metastatic ca [cancer]. Continue same care." This was grossly and flagrantly unacceptable evaluation for a person with significant illness.
[80] Infirmary Patient #1.

anticoagulation switched to injectable low molecular weight heparin before the patient was transferred to UIC for surgical repair of a large post-op abdominal wound. The infirmary provider discontinued the oral warfarin but failed to order the injectable anticoagulation; this put the patient at risk for a clot.

- This patient is a 58-year-old with coronary artery disease post-percutaneous transluminal coronary angioplasty (PTCA), peripheral arterial disease s/p right Iliac artery stent, DVT, diabetes, seizure disorder, neurogenic bladder, and L-S disc disease.[81] He has regular provider notes and daily nursing notes with vital signs. He had a CPAP machine, but sleep apnea was not on the problem list nor was it ever addressed in any provider progress notes. The patient was on seizure medications, which were increased after he reported to UIC Neurology specialists that he had a seizure a few months prior to his visit. The provider notes never commented, even once, during his seven months in the infirmary, about the status or control of his seizure disorder. Even though the patient had a history of massive deep vein thromboses, the infirmary progress notes did not once comment on why this patient was not prescribed anticoagulation medications. There may be a valid reason for not ordering anticoagulants, but the progress notes failed to address this important, even life threatening, issue. The patient was noted to have blacked out on 12/10/17 and again on 12/31/17 (blood pressure dropped to 90/56); MD notes on 12/11/17 only noted that the patient had no complaints and continued present management, and on 12/19/17 stated no change. The patient was not assessed or tested for orthostatic hypotension, cardiac arrhythmias, or an atypical seizure. The provider notes contained no clinical information or possible cause for these episodes and the patient was eventually referred to UIC Neurology without a reason for referral; this referral could have been a routine follow-up for patient's seizure disorder. The patient had another episode on 1/13/18 in which he reported to the RN he might pass out. His blood pressure was again low (90/50). A new provider wrote a comprehensive note on 1/15/18 and referred the patient to Cardiology and Vascular Surgery at UIC. Again, the patient's blood pressure was low, 91/45, and no intervention was ordered by the provider. None of the five provider notes since the second blackout episode in which low blood pressure was recorded documented any consideration that the patient's current treatment included four to five meds that can lower blood pressure and should be pared down.

- This patient has a history of DVT on chronic anticoagulation, s/p total right replacement with joint infection, hypertension, and hyperlipidemia.[82] There was no problem list in the infirmary chart. The INRs were consistently therapeutic in 2017; warfarin was discontinued in August 2017. There was no provider note on the rationale for stopping anticoagulation. During the last third of 2017, swelling of his right knee was noted and antibiotics started with orthopedic consultation. The patient underwent surgical removal of the infected prosthesis and right knee fusion. On hospital return, the patient

---

[81] Infirmary Patient #2.
[82] Infirmary Patient #3.

was readmitted to the infirmary with an RN admission note on 1/26/18, and a physician admission on 1/29/18 (the next working day). The 11 provider notes between 9/18/17 and 1/15/18 contained so little clinical information that it was very difficult to understand the patient's diagnoses and previous surgeries, the reason for the knee joint infection, and the treatment plan. A number of the notes were illegible or so brief as to be uninformative. Unclear progress notes and plans interfere with the provision of quality care and put the health of the patient at risk.

- This 70-year-old patient was admitted to the infirmary on 1/24/17; RN and physician admission notes were on the day of admission.[83] The patient's diagnoses included atherosclerotic heart disease (ASHD), congestive heart failure, hypertension, stroke in 2005 with weakness and inability to walk, and benign prostatic hypertrophy (BPH). Nursing notes were written daily and vital signs taken daily. Provider notes were documented weekly, but they contained little clinical information. Some of the provider notes were totally illegible. The patient's blood pressure readings were repeatedly elevated except for the two times the patient attended the hypertension chronic care clinic, which did not comment on the elevated blood pressures taken in the infirmary and did not increase the hypertension medication. A new infirmary provider assumed care of this patient in January 2018 and noted on 1/1/18 that the blood pressure was not controlled; the hypertension medication dose was increased, and at a follow-up visit on 1/10/18, it was noted that there had been a good response to the increased dose and the blood pressure was controlled. On 2/16/18, the patient voiced a concern about increased urinary frequency, urgency, and hesitancy. The provider ordered a urinalysis (normal) and oxybutynin to treat this problem. It is disturbing that the previous infirmary provider failed to address the elevated blood pressure readings during 2017. The practice of SCC providers not addressing uncontrolled chronic conditions and shifting this responsibility to the single illness chronic care clinics resulted in an unjustifiable delay in treatment for this hypertensive patient who had already suffered a stroke. Elevated blood pressure is a risk factor for stroke.  Until January 2018, the provider notes were illegible and created a risk to the health of this infirmary patient.

In summary, the lack of quality, legible, comprehensive provider notes that address both the ongoing acute and chronic needs and illnesses of each infirmary patient puts the health and safety of all infirmary patients at risk. We agree with the recommendations of the First Court Expert and have additional recommendations that are found at the end of this report.

## Pharmacy and Medication Administration

**Methodology:** We reviewed medication services by meeting with the DON. We also toured the medication room and observed nurses as they prepared, administered, and documented medication administered. We reviewed medication administration records, medication room

---

[83] Infirmary Patient #4.

inspection reports, pharmacy reports delivered at the monthly CQI meetings, the Wexford–IDOC contract, Administrative Directives, and SCC operational policies and procedures.

**First Court Expert Findings**
The First Court Appointed Expert made no recommendations in the area of pharmacy/medication administration. The system used, policies, and practices described in that report are unchanged today.

**Current Findings**
The current system to provide patient medication is unsafe and does not assure the five "Rights:" the right patient, the right medication, the right dose, the right route at the right time. The following practices need to be stopped and safer practices and procedures adopted:

- Handwritten orders and transcription of orders to the MAR
- Pre-pouring medication
- Not using the MAR to document administration of medication at the time it is given.

Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed. Prescription end dates do not coincide with chronic clinic appointments and require patients to request renewals via sick call.

In addition, we found that medication errors are documented and reported, but not analyzed to determine root causes or trended to identify problems and improve patient safety. Persistent problems with medication practices are not subject to corrective action or systematic CQI.

Orders and Delivery of Medication
Medications are obtained from BosWell Pharmacy Services, via subcontract with Wexford. Prescriptions are faxed to BosWell and filled in 30-day "blister packs," and then transported to SCC. A pharmacy technician at SCC receives and inventories the medications and then puts them into stock supply or onto the medication cart. Staff reported that when prescriptions are faxed to BosWell before 2:30 p.m. each day, medications are received within 24 hours via United Postal Services (UPS). Prescriptions faxed after 2:30 p.m. are received in two days. If medications are urgently needed, staff uses a local pharmacy, Jewel-Osco Pharmacy in Joliet, Illinois.

We toured the medication room in the clinic and the room behind, where the pharmacy technician works, and where medication is stored until it is needed for administration. These two rooms were clean, uncluttered, well lighted, and kept secure. There is a refrigerator with a thermometer and temperature log that was up to date. We conducted a random count of controlled substances and found it to be accurate. Our observation is that the amount of controlled substances was larger than may be necessary, making accountability time consuming and increasing the chance of error and potential for diversion. We recommend that the responsible pharmacist review and perhaps adjust PAR stock levels for controlled substances.

After the provider writes the medication order, a nurse reviews it and if it is a nurse administered medication, transcribes it onto the patient's medication administration record (MAR). When the medication arrives from BosWell, a pharmacy technician checks off that it was received. The pharmacy technician separates Keep on Person (KOP) medications from Nurse Administered (NA) medications and determines the patient housing locations. Nurse administered medications are transported by the pharmacy technician to the medication room for storage in medication carts and subsequent administration to patients. Pharmacy technicians and/or medical technicians distribute KOP medications directly to inmates in the housing units. They also transcribe the KOP order onto the patient's KOP MAR. This was observed being done using the blister pack, not the original provider order. This practice is not sufficient to identify dispensing errors made by the pharmacy. We recommend that the original order be used when transcribing to the KOP MAR.

Transcription errors are by far the most common type of medication error reported to the SCC CQI committee.[84] These include not transcribing the order onto the MAR, transcribing orders incorrectly, not discontinuing medications on the MAR when ordered, not transcribing orders from one month to the next, or transcribing these incorrectly. While these errors have been reported, there is no documented evidence that this has been identified as a systems problem to be studied and examined for possible improvement.

We also reviewed monthly medication inspection reports completed by a BosWell pharmacist from March 2017 through February 2018. These inspections include verifying MAR documentation using a sample of 20 patients. We found medications not transcribed onto the MAR, medications that have an order to discontinue still being administered, and the medication being administered differing from that transcribed onto the MAR, as examples of problems in the care of individual patients that are documented each month. There is no documentation or other report that medication errors are trended or analyzed to identify systemic sources of error, nor has it been identified as a problem to be addressed by CQI.

The Contract Monitoring Reports provided note continuing violation of the AD concerning control of medications, but no penalty or corrective action is documented. When asked, the HCUA stated that the problem is that nurses do not accurately and completely sign out controlled medications and attributed this to distractions when busy with patient care. The October 2017 Contract Monitoring Report lists this as a violation of ADs and notes the vendor, Wexford, was notified of the problem on 12-14-16. Accountability for controlled substances is a high safety priority and systematic efforts to identify and limit risk of error as well as potential diversion should be in evidence. At SCC there is no documentation of attempts to investigate and revise systems, equipment, or processes to minimize or eliminate this as a source of error.

Medication errors have long been recognized as a substantial area of focus in improving the safety of patient care.[85] Handwritten orders and transcription have been eliminated in many

---

[84] SCC Annual CQI 2016-17, Pharmacy Services.
[85] Institute of Medicine (2000), To Err is Human: Building a Safer Health System. Washington DC: The Academies Press.

correctional health care programs because of error and inefficiency. An obvious solution is to install computerized provider order entry (CPOE) and eliminate transcription by hand using labels generated from the computerized order after it has been reviewed by a pharmacist.[86] Automated dispensing cabinets are being used more often now to record the withdrawal of controlled substances and eliminate handwritten controlled substances logs, such as that which is in use at SCC. Upgrading pharmacy services in this way requires capital expenditure and would only likely happen as a statewide decision made by IDOC. But if these pervasive problems are not identified, discussed, studied, or reported at the facility level, IDOC is without notice that there is a systemic issue that must be addressed statewide.

Medication Administration

Nurses administer medications to inmates in their cell. Medication administration is scheduled to begin at 7:30 a.m. and 7:30 p.m. and is completed within two hours. We observed nurses preparing medications for administration. Nurses compared MARs against medication blister packs to ensure the accuracy of the order and then popped medication out of the blister pack and put it into small while envelopes. Written on the envelopes is the name of the patient, ID, housing location, and names of the medications. The envelopes do not contain order start and stop dates.[87] Nurses then place medication envelopes into a clear plastic bag to take to the housing units. Nurses do not transport MARs to the housing unit along with the medications.

We accompanied a nurse escorted by a correctional officer to R unit. Each cell had one or two inmates. For each patient receiving medication, the nurse called out the inmate's name and informed him she had medication and asked to see his identification card, which includes a recent photo. The nurse then gave the medication envelope to the patient through the cell bars. The patient took the envelope, poured medication into his hand, and passed the envelope back to the nurse. If a patient did not want to take a particular medication he put it back in the envelope before returning it to the nurse. Sometimes the nurse performed an oral cavity check. She indicated that she did this for patients taking mental health medications and any others she had a concern about. We observed an inmate ask if he could take his medication later in the morning because he had an appointment to have lab drawn at the clinic. The nurse indicated that she would return later with his medication. The interaction between the nurses administering medication and inmates in the cells was outstanding in professionalism and respect.

The nurse did not document administration of the medication onto the MAR at the time the medication was given. After the nurse finished administering medications she returned to the clinic and documented on the MAR which medications had been administered using the white envelopes. Medication not taken by inmates was discarded.

Problems with medication administration at SCC include:

---

[86] Patient Safety Network. (2017) Medication Errors, Agency for Healthcare Research and Quality available at https://psnet.ahrq.gov/primers/primer/23/medication-errors.
[87] The SCC Operations Policies and Procedure, p. 128 states that "Medication envelopes will be utilized that will comply with state and federal requirements," but does not specify what those requirements are.

---

- Repeated use of the same envelopes is a source of transmission for infectious disease because they are handled by the patient and returned to the nurse.
- Nurses do not have a way to verify medication that is not taken. Visual identification is not sufficient.
- The MAR is not available to the nurse at the time medication is administered and therefore is not used as a reference when there is a concern or question at the point of patient care.
- Medication is not documented at the time it is given and contributes to errors and omissions in documentation of patient care.

Renewal of Chronic Disease Medications

Chronic disease medications are provided to patients monthly either as "Keep on Person" (KOP) or each dose is administered by a nurse. The scheduled appointments for chronic disease clinic do not coincide with the end date on medications ordered for chronic disease. Patients are expected to sign up for sick call to request medication renewal before the order expires and is subject to co-pay.[88] Diabetics taking insulin are expected to draw up and administer their own dose. Diabetic inmates complained that those who are newly diagnosed receive no education about their condition or how to administer insulin.[89]

There is no provision or written directive to regularly monitor continuity of medications or compliance with ordered medications as part of the chronic care program. We interviewed one inmate whose chronic disease medication was not provided for a month. It was only reinitiated when he sought care and finally saw a provider.[90] Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed.

# Infection Control

**Methodology:** We interviewed health care leadership and nursing staff assigned to infection control duties, reviewed the Infection Control Manual, CQI Minutes, and other documents related to communicable diseases and infection control.

**First Court Expert Findings**

The First Court Expert Report noted that a specific nurse had responsibility for compliance with IDOC policy concerning communicable diseases, blood borne pathogens, and compliance with Illinois Department of Public Health reporting requirements as well as the HIV and HCV clinics. Inspection of the health care areas and inquiry about infection control practices resulted in no concerns or recommendations from the First Court Appointed Expert.

**Current Findings**

---

[88] Institutional Directive #04.03.103K3.
[89] Medication Administration Patients #1-2.
[90] Medication Administration Patients #6.

Responsibility for infection control is dispersed amongst several staff nurses, the DON, and HCUA. The HCUA facilitates and monitors sanitation inspections and is diligent in following up on identified concerns until correction has been achieved. He also submits information required for reportable communicable diseases. One staff nurse is assigned responsibility for managing the HCV clinic and another nurse manages the HIV clinic. The DON has oversight responsibility for compliance with infection control procedures and works closely with the HCUA in this regard.

CQI Minutes and the 2016 Annual Report show that communicable disease data is collected and reported monthly. There is minimal to no discussion of the meaningfulness of the data reported. There has been no assessment of TB conversion at SCC to evaluate the risk for transmission of tuberculosis while in the prison. The Centers for Disease Control (CDC) recommends that such a study be conducted periodically to determine risk of transmission, which then guides prevention and surveillance activities specific to the level of risk.[91] CQI minutes also report statistics regarding skin infections due to methicillin-resistant staphylococcus aureus (MRSA). Data does not include tracking of skin infections due to other pathogens. Equipment and instructions for prevention, response, and reporting of occupational exposures were readily available at the facility. Inmates working in the health care area have received training in personal protective equipment and exposure control; they are also vaccinated for hepatitis A and B.

The IDOC Infection Control Manual was reviewed. It was last updated in 2012. While the material in the manual is thoughtful and many resources are provided, some of them are out of date. The manual should be updated at least every two years. An up-to-date and accurate infection control manual is critically important in guiding the work of staff assigned these duties in the absence of dedicated positions for trained infection control staff, as is the case at SCC. The IDOC Nursing Treatment Protocols, revised March 2017, were reviewed and provide guidance to nurses in the care of common infectious diseases and infections such as scabies, urinary infection, rash, pediculosis, chicken pox, and skin infections.

Many infection control challenges and hazards were observed during our site visit at the facility. These are detailed in the section of this report on Clinic Space and Sanitation. In particular, the Airborne Infection Isolation (AII) rooms were not functional, the equipment to manage airflow had not been serviced for years, and these are not inspected as part of the sanitation rounds. Also, the practices of the hemodialysis program do not comply with CDC recommendations to prevent infections, particularly hepatitis B, among chronic hemodialysis patients.[92] Finally, a lack of barrier protection on reusable surfaces was observed throughout the health care areas. Fabric covered chairs and tables were torn and sometimes repaired with duct tape, paper

---

[91] MMWR (2006) Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC.
[55] (RR09). Centers for Disease Control available at https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5509a1.htm.
[92] MMWR (2001) Recommendations for Preventing Transmission of Infections Among Chronic Hemodialysis Patients. Vol. 50/No. 99-5, Centers for Disease Control. See also Update to the 2001 Hemodialysis Recommendations available at https://www.cdc.gov/dialysis/guidelines/index.html.

covers were not available in one of the provider exam rooms, and patient care equipment was rusted and could not be cleaned. Environmental controls to prevent transmission of infection are inadequate and risk harm to patients cared for at SCC.

Tuberculosis screening is completed annually. Inmates who were previously positive for latent tuberculosis infection are screened using a questionnaire for symptoms of tuberculosis disease and are referred to a provider if symptomatic. All other inmates are screened using a Mantoux skin test. Symptom screening is not completed. We observed nurses reading skin tests while also administering medication at the cell front. The nurse did palpate the inmate's forearm for induration and documented the results contemporaneously on the skin of her hand to be transcribed to the chart after medication rounds were completed. Reading of the TB skin test should be done in a clinical setting with good lighting and a tool to measure induration, such as the nurse sick call rooms in the housing area. Nurses should not read TB skin tests cell side.

Inmates may request HIV testing at any time and it is also offered to inmates just before release from incarceration. Inmates who are infected with HIV are managed as part of the chronic clinic program with oversight from UIC. Currently 11 inmates are being followed at six-month intervals. Inmates may choose to have their medication given to them to keep and take or they may have the nurse administer it to them dose by dose. This later method is offered for those inmates who are concerned about maintaining the privacy of their medical information. Medications are written to coincide with their next scheduled HIV clinic appointment. The nurse managing the clinic draws the patient's blood before the appointment so that the results are available to the provider at the time of the follow-up appointment. Peer educators provide regular sessions on Thursdays for newly diagnosed inmates. They also provide pre-release education.

The inmate porters working in the infirmary had documentation that they had received training on blood borne pathogens in prison, including hepatitis B and HIV, restroom sanitation, and on their job description. The records of two infirmary porters were verified that both had been vaccinated or had immunity to hepatitis A and B.

Hepatitis C (HCV) disease is also managed via the chronic care clinic. IDOC physicians with some assistance from a Wexford infectious disease doctor manage the care of patients with hepatitis C. When an IDOC physician determines that the patient needs treatment of the hepatitis C, the patient is referred to a Wexford infectious disease doctor. When the Wexford infectious disease doctor determines that treatment is indicated the patient is referred via telemedicine for treatment with the UIC hepatitis team. All other hepatitis C care needs (cirrhosis management and screening for hepatocellular carcinoma) are managed by Wexford facility physicians. Forty-nine HCV patients are being followed currently; six have been treated and two have been referred for treatment. According to staff interview, the biggest challenge for HIV and HCV clinics is coordinating scheduling and access to the telemedicine equipment that is shared with the mental health program.

## Dental Program

### Dental: Staffing and Credentialing

**Methodology:** Reviewed staffing documents, interviewed dental staff, reviewed the Dental Sick Call Log and other documents.

**First Court Expert Findings**

- SCC has a dental staff of one full-time dentist, one 20-hour part-time dentist, two full-time assistants, and a full-time hygienist.
- Dr. Mitchell is employed by the IDOC and the rest of the staff are employed by Wexford.
- CPR training is current on all staff, all necessary licensing is on file, and DEA numbers are on file for the dentists.
- The number of dentists and hygienists is adequate to meet the needs of this institution.
- The lone assistant is overworked in a clinic with this number of dentists.
- Overall, this is a strong team that works well together to create a very busy and smooth-running clinic.

**Current Findings**

We agree with the First Court Expert with respect to clinic operations; however, as we noted in our NRC report, it is difficult to assess the adequacy of either NRC's or SCC's dental staffing independently, since personnel move between facilities.

SCC has one full-time dentist (Dr. Orenstein) who serves as Dental Director, two full-time dental assistants, and a full-time dental hygienist[93], who are all Wexford employees. In addition, there are two part-time dentists who are IDOC employees.[94] Dr. Orenstein and the dental hygienist routinely assist NRC with intake dental exams.

### Dental: Facility and Equipment

**Methodology:** Toured dental clinic, radiology area, and dental intake area to assess cleanliness, infection control procedures, and equipment functionality. Reviewed the quality of x-rays and compliance with radiologic health regulations.

**First Court Expert Findings**

- The clinic consists of four chairs and units in a spacious single room area. One unit is dedicated to hygiene care. The dental units were rather new and in good condition. Free movement around each unit was acceptable. Providers and assistants had adequate room to work, and none of the chairs interfered with each other.

---

[93] The Dental Department 2017 Annual Summary reported that, the "dental hygienist from Stateville comes here to assist with intake on Tuesday, Thursday, and Friday." NRC CQI Annual Report, 2016-2017, p. 23. Consequently, the dental hygienist does not contribute a full FTE to SCC.
[94] Each provides care 53 days/year per Don Mills, Health Care Unit Manager.

- The chairs were over 20 years old but were not torn or overly worn and functioned well. Cabinetry was very old and worn. Countertops were broken, corroded, and badly water damaged in one of the corners.
- There was extreme water damage in the cabinet under the sink. Work surfaces were badly pitted and catered from use. Plexiglas was placed over these surfaces to provide a smooth work surface capable of disinfection. The x-ray unit is in good repair and works well. The autoclave is rather new and functions well. The compressor is in good repair. The instrumentation is adequate in quantity and quality. The handpieces are old but well maintained and repaired when necessary.
- The ultrasonic unit was not working. I was told that a request for repair had been submitted.
- There was a separate, large sterilization and laboratory area of adequate size. It had a large work surface and a large sink to accommodate proper infection control and sterilization. Laboratory equipment was in a separate area of this space and did not interfere with sterilization. The staff had a separate small room for office space.

**Current Findings**

Facilities and equipment are unchanged from the First Court Expert's Report and remain adequate. We concur and note that the previously inoperative ultrasonic unit had been repaired. Moreover, we identified current and additional findings as follows.

The clinic is clean, and the chairs are spaced adequately. All equipment is operational. The countertop in the infection control area is cracked and cannot be disinfected properly. The cabinet under the sink shows signs of water damage. Another cracked countertop was covered with plexiglass; however, liquids seep under the plexiglass, creating an environment conducive to bacterial growth. Storage areas are clean and orderly. Antibiotics and analgesics are labeled and accounted for in a log.

There is a laboratory area; however, there is no lathe for model trimming. The dentist said that they send untrimmed casts to the dental laboratory. The infection control area has enough space; however, the sink is in the middle of the area, preventing optimal instrument flow. Despite this, instruments can be disinfected adequately.

## Dental: Sanitation, Safety, and Sterilization

**Methodology:** Reviewed Administrative Directive 04.03.102. Toured dental clinic. Observed dental treatment room disinfection. Interviewed dental staff. Observed screening examinations and patient treatment.

**First Court Expert Findings**

- Surface disinfection was performed between each patient and was thorough and adequate. Proper disinfectants were used. Protective covers were utilized on some surfaces. Unit recycling was thorough and adequate. The clinic was neat, clean, and orderly.

- All instruments were properly bagged, sterilized, and stored. No instruments were maintained in bulk. All handpieces were sterilized and in bags.
- The sterilization procedures were adequate and proper. Flow from dirty to clean to sterilized was improper, as bagging of instruments was done in front of the ultra-sonic unit. Cleaned instruments were passed back over the dirty area. The ultrasonic was not functioning. There was not a biohazard label posted in the sterilization area.
- Safety glasses were not always worn by patients. Eye protection is always necessary.
- There was no warning sign posted where x-rays were taken to warn pregnant women of possible radiation hazards.

**Current Findings**

Sanitation, safety, and sterilization have not changed materially since the First Court Expert's Report. We concur with the First Court Expert; however, we identified current and additional findings as follows.

Surface disinfection between patients was adequate although difficult due to cracked counter surfaces. Instrument sterilization procedures were adequate and proper. Flow from dirty to clean to sterilized was improper, as bagging of instruments was done in front of the ultrasonic unit. Cleaned instruments were passed back over the dirty area. There was not a biohazard label posted in the sterilization area. [95]

Safety glasses were not worn routinely but are worn only when large fillings were being removed. Eye protection is always necessary.[96, 97] There was no warning sign posted where x-rays were taken to warn pregnant women of possible radiation hazards, nor was a lead apron with a thyroid collar used consistently.[98,99] There is documentation that "those aspects of your

---

[95] CFR 1901.145(e)(4). "The biological hazard warning shall be used to signify the actual or potential presence of a biohazard and to identify equipment, containers, rooms, materials, experimental animals, or combinations thereof, which contain, or are contaminated with, viable hazardous agents.")

[96] "We use personal protective equipment […] *as well as provide eye protection to patients for all dental procedures*." We Take Infection Control Seriously. UIC College of Dentistry. Viewed at https://dentistry.uic.edu/patients/dental-infection-control, February 2, 2018. Emphasis added.

[97] Guidelines for Infection Control in Dental Health-Care Settings ---2003. MMWR, December 19, 2003/ 52(RR17):1:16; pp. 17-18. ("PPE [personal protective equipment] is designed to protect the skin and the mucous membranes of the eyes, nose, and mouth of DHCP [dental health care provider] from exposure to blood or OPIM [other potentially infectious materials]. Use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes creates a visible spray that contains primarily large-particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, DHCP, *or the patient*. The spray also might contain certain aerosols (i.e., particles of respirable size, <10 μm). Aerosols can remain airborne for extended periods and can be inhaled" and "Primary PPE used in oral health-care settings includes gloves, surgical masks, *protective eyewear*, face shields, and protective clothing (e.g., gowns and jackets). All PPE should be removed before DHCP leave patient-care areas (*13*). Reusable PPE (e.g., clinician *or patient protective eyewear* and face shields) […]"). Emphasis added. Moreover, protective eyewear protects against objects or liquids accidentally dropped by the provider.

[98] Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words, "CAUTION RADIATION AREA". Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i). Emphasis in original.

[99] While radiation exposure from dental radiographs is low, it is the dentist's responsibility to follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (*inter alia*), use protective aprons and thyroid collars. Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and Food and Drug Administration (2012), 14.

---

radiation producing equipment and operating procedures reviewed by the inspector were found to follow applicable Illinois radiation protection regulations;" however, neither the equipment's model and serial number(s) nor the operating procedures reviewed were specified.[100]

## Dental: Review Autoclave Log

**Methodology:** Review last two years of entries in autoclave log, interview dental staff, tour sterilization area.

**First Court Expert Findings**
- A review of spore testing logs revealed that a "Maxi-test" in office biological indicator system was in use. The incubator was maintained in the sterilization area. The results were logged weekly.
- There was a gap in logged results from the last week of January to the first week in April with no explanation provided. I was assured that the testing was done during this period. It is essential that these logs be accurately maintained over a long period of time.

**Current Findings**

Autoclave log maintenance has improved since the First Court Expert's Report and is adequate. Spore testing was performed weekly and documented. No negative results were recorded. Unlike the finding of the First Court Expert, there were no gaps in the sterilization record.

## Dental: Comprehensive Care

Comprehensive or routine care[101] is non-urgent treatment that should be based on a health history, a thorough intraoral and extraoral examination, a periodontal examination, and a visual and radiographic examination.[102] A sequenced plan (treatment plan) should be generated that maps out the patient's treatment.

**Methodology:** Interviewed dental staff, reviewed one dental chart of inmates who received non-urgent care, observed dental treatment, and reviewed Daily Dental Reports.

**First Court Expert Findings**
- One of the most basic and essential standards of care in dentistry is that all routine care proceeds from a thorough, well-documented intra and extra-oral examination and a well-developed treatment plan, to include all necessary diagnostic x-rays. A review of 10 records revealed no comprehensive examination was performed in three of the records and very minimal examinations were performed in three others.

---

[100] Letter from Illinois Emergency Management Agency to Walter Nicholson, Assistant Warden, Statesville Correctional Center dated July 21, 2017. CQI 2-16-2017_4. Pdf, p. 7.
[101] Category III as defined in Administrative Directive 04.03.102.
[102] Stefanac SJ. Information Gathering and Diagnosis Development. In Treatment Planning in Dentistry [electronic resource]. Stefanac SJ and Nesbit SP, eds. Edinburgh; Elsevier Mosby, 2nd Ed. 2007, pp. 11-15, *passim*.

---

- We reviewed 10 dental records of inmates in inactive treatment classified as Category 3 patients. In only four records did a meaningful comprehensive examination precede routine care. No examination of soft tissues or periodontal assessment was part of the treatment process.
- Hygiene care and prophylaxis were inconsistent, provided in six of the 10 patient records. A further review showed that bitewing radiographs were part of the treatment process in eight of the 10 records.
- Oral hygiene instructions (OHI) were not always documented in the dental record as part of the treatment process.
- Restorations were, in two of the 10 patients, provided from the information from the Panorex radiograph. This radiograph is not diagnostic for caries. A periodontal assessment was not done in any of the records.

**Current Findings**

Comprehensive care has not improved materially since the First Court Expert's Report. We concur with the First Court Expert; however, we identified current and additional findings as follows.

Administrative Directive 04.03.102 specifies that "within 10 working days after admission to a reception and classification center […] each offender shall receive a **complete** dental examination by a dentist" (¶IIF2, emphasis added). However, the NRC does not perform a complete (or comprehensive) examination.

When the inmates arrive at SCC, a comprehensive (routine) examination is not performed and a treatment plan is not produced unless a routine exam is requested by the inmate or the inmate is due for a biennial exam. Consequently, many inmates will not have a comprehensive exam and treatment plan for two years, if at all.[103]

This was not the practice reported by the NCCHC based on a site visit May 16-19, 2016.

The dentist also completes a **full dental examination** on every newly arrived inmate within one week and provides some oral instruction and written materials on proper oral hygiene and preventive oral education. […]. [104]

---

[103] Since the intake examination performed at NRC is so cursory and does not include bitewing x-rays or a periodontal probing, inmates may be unaware of existing dental disease, so they would not request a routine examination at SCC. Dentate or partially dentate adults who are new patients should receive an "[i]ndividualized radiographic exam consisting of posterior bitewings with panoramic exam or posterior bitewings and selected periapical images." Furthermore, recall patients should receive posterior bitewing x-rays every 12 to 36 months based on individualized risk for dental caries. With respect to periodontal disease, "[i]maging may consist of, but is not limited to, selected bitewing and/or periapical images of areas where periodontal disease (other than nonspecific gingivitis) can be demonstrated clinically." Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and U.S. Food and Drug Administration, 2012. Table 1, pp. 5-6.

[104] NCCHC Technical Assistance Report, p. 61. This practice was neither described by the First Court Expert nor found by our team. Furthermore, it is not set forth in Administrative Directive 04.03.102. It is, however, consistent with NCCHC Oral Care Standard P-E-06, which, in addition to requiring a screening within seven days of admission, requires that an oral examination be performed by a dentist within 30 days of admission. National Commission on Correctional Health Care, Standards for Health

---

Of 10 records of inmates who received routine care, all had recent bitewing or periapical x-rays, and none documented a soft tissue exam or periodontal assessment.[105] Four were without a treatment plan.[106] Treatment plans were scanty and not in a prioritized list format. In three records, treatment was not sequential.[107] Oral hygiene instruction was not documented in two records.[108] We found no evidence of extended wait times or backlog of services.

### Dental: Intake (Initial) Examination[109]

**Methodology:** Reviewed 10 dental records of inmates that have received intake (initial) examinations recently. Reviewed Administrative Directive 04.03.102. Reviewed SCC CQI Reports.

**First Court Expert Findings**
- Reviewed 10 inmate dental records that were received from the reception centers within the past 60 days to determine if: 1) screening was performed at the reception center and 2) a panoramic x-ray was taken, to insure the reception and classification policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC.

**Current Findings**
The dental intake exam has not changed materially since the First Court Expert's Report and remains inadequate. While the First Court Expert reported aspects of the intake examination *process*, we focused on a clinical measure – the quality of the panoramic radiograph and the adequacy of the charting and treatment plan. This explains our divergent findings. In addition, we identified current and additional findings as follows.

While the First Court Expert reported that "policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC", that finding overlooked the most important issue – the inadequacy of the intake examination.

---

Services in Prisons, 2014, p. 81. Emphasis added. See also National Commission on Correctional Health Care, Standards for Health Services in Prisons, 2018, p. 96, ¶6.

[105] Stefanac SJ. (A panoramic radiograph has insufficient resolution for diagnosing caries and periodontal disease. Intraoral radiographs (e.g., bitewings) and periodontal probing are necessary), p. 17. Also, (Periodontal Screening and Recording (PSR), an early detection system for periodontal disease, advocated by the ADA and the American Academy of Periodontology since 1992, is an accepted professional standard.), pp. 12-14. See American Dental Hygiene Association. Standards for Clinical Dental Hygiene Practice Revised 2016, pp. 6-9. (Periodontal probing is also a standard of practice for dental hygiene).

[106] That is, starting with an oral prophylaxis (cleaning) and proceeding with extractions, periodontal treatment, fillings, and prosthetics. Note that question #6 on the Wexford Peer Review Form for Dentists – PR-001C ("Is a plan for care documented?") addresses a treatment plan.

[107] Comprehensive Care Patients #3, 5, 7 and 10.

[108] Comprehensive Care Patients #8 and 9.

[109] The First Court Expert Report describes the examination performed at intake as a "Screening Examination;" however, Administrative Directive 04.03.102 describes it as a "complete dental examination." We use the terminology of the Administrative Directive and refer to the intake or Initial Dental Examination as a complete dental examination.

---

Of 10 records of inmates who received intake exams at the NRC, one had no dental information[110] and all but two of the remaining records (78%) had a clinically inadequate panoramic x-ray[111] that Dr. Orenstein attributed to the age of the x-ray and film processing units.

"Oral hygiene instructions" was stamped in all the charts. The SCC dental hygienist said that she does not provide OHI at the examinations. Furthermore, the exams occur so quickly, adequate OHI simply cannot be provided by the dentist.

Of the 10 records, only one documented that an initial examination and treatment plan was done.[112] Medical histories were filled out in all the records; however, Intake (Initial) Examination Patient #2 had hypertension noted in the problem list in the medical chart but not in the health history in the dental chart. One patient was noted as Classification IIa;[113] however, a recommended disposition[114] was not indicated. The inadequacies of the NRC intake dental exam were identified in a Quality Improvement Study report that is discussed the Dental Quality Improvement Committee section of our NRC report.

## Dental: Extractions

**Methodology:** Reviewed records of randomly selected inmates that have had extractions selected from Daily Dental Reports October 2017 through January 2018. Interviewed the dentist.

**First Court Expert Findings**
- Reviewed 10 dental records of dental surgical inmates to determine: 1) if recent pre-operative radiographs reflecting the current condition of tooth extracted (that is, showing apices of teeth); 2) the reason for extraction is documented; and 3) there is a signed consent form.
- In four of the 10 records reviewed, the reason for the extraction was not documented.
- In two of the records, a proper diagnostic x-ray was not present. This is a serious omission.
- Record entries are often very difficult to follow. Treatment at times seemed disjointed and lacking in continuity. The time between appointments can be long due to rescheduling associated with failed appointments.

---

[110] Intake (Initial) Examination Patient #6.

[111] The principal problem was inadequate contrast, especially in the middle portion of the face. In addition, several films had the number that links the film to an inmate chart superimposed over tooth roots.

[112] Dental: Intake (Initial) Examination Patient #2. The record noted that it had been reviewed 2/6/18; however, there was no clinical entry.

[113] "An oral condition, if left untreated, that would cause bleeding or pain in the immediate future." Administrative Directive, Attachment A.

[114] There are three choices: 1) schedule immediately at R&C, 2) schedule routine exam at receiving institution, and 3) schedule immediately at receiving institution. Since Classification II is urgent care, the problem should have been dealt with at the NRC or immediately upon arrival at SCC.

- Also, antibiotics were often given after extractions without a documented reason. They seemed to be provided prophylactically. This is not a standard of care. They should be prescribed only when indicated by a well-established diagnosis.

**Current Findings**

Extraction care has improved since the First Court Expert's Report but remains inadequate. We concur with the most of findings in the First Court Expert's report, but note that we found that (of nine charts reviewed) all charts had clinically adequate preoperative x-rays. However, we identified current and additional findings as follows.

We agree with most of the First Court Expert's findings although we found all charts had a signed consent form that identified the tooth number; however, five did not state the diagnosis, that is the reason the tooth was to be extracted.[115] Documentation was poor,[116] with a diagnosis not being reported for three patients.[117] There was no documentation that the health history was updated in four charts.[118] Post-extraction antibiotics were prescribed without documented evidence of infection.[119]

## Dental: Removable Prosthetics

**Methodology:** Reviewed Daily Dental Reports from October 2017 through January 18, 2018. Interviewed dental staff.

**First Court Expert Findings**

- We reviewed dental records of five patients who received completed partial dentures to determine if restorative procedures were completed prior to fabrication of partial dentures. Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. Continuity of care is important and the periodontal, operative, and oral surgery needs all should be addressed first.
- In only one of five records reviewed on patients receiving removable partial dentures were oral hygiene instructions provided.
- Periodontal assessment was not provided in any of the records, and in only one of five records was a prophylaxis and/or a scaling debridement provided. Because a comprehensive examination was part of only two records and treatment plans were very incomplete, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, is completed prior to fabrication of removable partial dentures.

---

[115] Extraction Patients #2, 3, 4, 6, and 7.

[116] For Extractions Patient #1 (Ext #24 7/14/17), chart entries for 9/15/17, 10/4/17, 10/20/17, 11/1/17, 11/15/17, 12/22/17, 12/28/17, and 2/26/18, were illegible. Similarly, the chart of Extraction Patient #5 had several illegible entries.

[117] Extraction Patients #1, 2 (illegible), and 4 (illegible).

[118] Extractions Patients #1, 3, 6, and 7.

[119] Comprehensive Care Patient #1 had teeth extracted 5/4/17 and 5/18/17, and Amoxicillin was prescribed without a documented infection. Similarly, Extraction Patients #3, 5, 7, 8, and 9 had post-extraction Amoxicillin prescribed without a diagnosed infection. Extractions Patient #5's chart contained many illegible entries. The patient returned from having tooth #1 extracted by Joliet Oral Surgeons 9/1/17 and was prescribed Amoxicillin without a diagnosis of infection.

---

**Current Findings**

Removable prosthetics care is unchanged from the First Court Expert's Report and remains inadequate. We concur with the First Court Expert; however, we identified current and additional findings as follows.

Of six records selected from a list of completed partial dentures, none of the removable partial dentures were fabricated based on a formal treatment plan. None of the charts documented a PSR; however, one chart[120] mentioned periodontal status. Two charts[121] did not document that an oral prophylaxis (cleaning) was performed and one patient[122] had a partial denture impression taken before restorative treatment was complete.

## Dental: Sick Call/Treatment Provision

**Methodology:** Interviewed dental staff. Reviewed Dental Sick Call Log from 10/3/17 through 1/22/18.[123] Reviewed Daily Dental Reports from 10/3/17 through 1/17/18. Reviewed records of seven inmates who were seen on sick call. Reviewed recent intake examination records.

**First Court Expert Findings**

- Inmates access sick call through an inmate request form or via a direct call from a staff member if it is perceived as an emergency, in addition to a "Request Log" that logs inmate request forms.
- An Emergency Log tracks patients seen as "emergency." These inmates are seen the same day as the request. For 2014, thus far, 12 inmates were seen as an emergency. All were toothaches, abscesses, or trauma.
- There is no real triage system in place to evaluate urgent care needs (toothaches, pain, swelling) from the request forms. Of the inmates placed in the Request Log, the average wait for an appointment was about 12 days. This is for all request forms. Of the requests logged in as toothaches, pain, or swelling, the average wait was approximately six to seven days. These inmates should be seen within 24-48 hours.
- In none of the dental records reviewed was the SOAP form used. As a result, treatment was usually provided with little information or detail preceding it. Sick call record entries often did not include clinical observations or diagnosis to justify provided treatment. Little continuity was established.
- In all records, the immediate complaint was addressed. Only emergency care was provided.

**Current Findings**

While some aspects of urgent care have improved since the First Expert's Report, it remains inadequate, and we concur with the First Court Expert's findings. However, we identified current and additional findings as follows.

---

[120] Prosthetics Patient #1. In addition, #1 and #2 were extracted (10/6/16) based on an inadequate and three-year-old panoramic x-ray. There was no consent form and Amoxicillin was prescribed without a documented infection.
[121] Prosthetics Patients #4 and 5.
[122] Prosthetics Patient #6.
[123] Dental Bates 40-46.

Inmates are informed that they can access health care (including dental care) as part of the SCC intake process.[124] In the alternative, they can submit a specific request for dental care on a form that is collected periodically and delivered to the dental clinic.

Dr. Orenstein's clinical progress notes are extremely difficult to read at best, and indecipherable at worst. A particularly egregious example of this is in the dental chart of Medically Compromised Patient 1, where the entire page comprising entries from 5/3/17 to 8/14/17 is located. There are many similar entries in this chart (as well as other charts).

Of 10 inmates who sought a dental appointment for painful conditions, one did not have a diagnosis documented,[125] one had the health history updated,[126] and five did not use the SOAP format.[127] Three patients received prescriptions for antibiotics although no infection was documented.[128]

Inmates can enter their names in a Sick Call Request Log. The January 2018 RN Sick Call Log contained 11 entries related to dental care, of which seven charts were available for review. All the inmates were seen by nursing and referred to dental; however, two encounters[129] did not have nursing notes. While most requests were for routine care, three[130] were for painful conditions.[131] Some nursing progress notes mention pain; however, the nursing protocol for toothache/dental pain was not used and analgesics were not dispensed. Patients #1, 5, and 6 were seen by a dentist in five, 15, and six days, respectively.

## Dental: Orientation Handbook
**Method:** Reviewed the Orientation Handbook and related documents.

**First Court Expert Findings**
A review of the "Offender Orientation Manual" for SCC and the NRC revealed that dental care was well represented and the instructions as it relates to access to care is adequate.

**Current Findings**
Inmate orientation to dental care has not changed substantially since the First Court Expert's Report and we agree with the First Court Expert that it remains adequate. Inmates are informed that they can access health care (including dental care) as part of the SCC intake

---

[124] SCC Access to Care document.
[125] Dental Sick Call Patient #1. This patient also had #16 extracted 12/4/17, but a consent form is not present.
[126] Dental Sick Call Patient #5.
[127] Dental Sick Call Patients #1, 2, 4, 8, and 10. Note question #5 on the Wexford Peer Review Form for Dentists – PR-001C ("Is the provider documenting in the SOAP format?").
[128] Dental Sick Call Patients #5 (Amoxicillin 12/12/17), #6 (Amoxicillin 12/22/17), and #7 (Clindamycin 12/19/17).
[129] Dental RN Sick Call Patients #2 and 3.
[130] Dental RN Sick Call Patient #1.
[131] Dental RN Sick Call Patients #1, 5, and 6.

PTX193-0674

process. In the alternative, they can submit a specific request for dental care on a form that is collected periodically and delivered to the dental clinic. [132]

Dental: Policies and Procedures

**Methodology:** Reviewed Administrative Directives that deal with the dental program. Interviewed dental staff. Reviewed dental charts. Toured dental clinical areas. Reviewed SCC organizational chart.

**First Court Expert Findings**

- A well-developed policy and procedures manual insures a dental program that is well understood and run with continuity. It addresses all aspects of the dental program to provide consistency of care and management.
- The policy and protocol manual for the dental program at SCC addresses only dental personnel and their duties and responsibilities. It only states that the dental program is responsible to provide dental care to the offender population. No specifics were provided on access to care, provision of care, clinic management, dental services provided, infection control, etc.
- The dental director said that this was developed by administration who thought it was sufficient.

**Current Findings**

Dental policies and procedures have not changed materially since the First Expert's Report and we agree that they are inadequate and should be expanded.


Dental: Failed Appointments

**Methodology:** Reviewed Dental Sick Call log. Interviewed dental staff. Reviewed Daily Dental Reports.

**First Court Expert Findings**

A review of monthly reports and daily work sheets revealed a failed appointment rate that averaged 40%. This is a very high percentage and reflects a serious problem in getting inmates to the clinic for their appointments. I was told that they shared my concern and were frustrated at the lack of success in addressing this problem. I was told that the reasons for failed appointments included the following: 1) inmates do not get their passes; 2) inmates go to other programs or appointments; 3) inmates go to recreation; 4) inmates go to commissary; and 5) inmates are in lockdown. The percentage does reflect lockdown days, which average about two a month. The problem is compensated for by overscheduling every day. As such, many inmates are seen every day, and a large number also fail to show.

The administrative staff, including the Warden, shared the concern and frustration of the dental staff and want to help them address the problem of failed appointments.

---

[132] Access to Care Document.

**Current Findings**

We concur with the First Court Expert that failed appointments have not improved materially since then and remain inadequate. Moreover, we identified current and additional findings as follows.

The failed appointment rate does not appear to be deemed an important measure by SCC leadership. For example, it did not appear on the six-page October, November, or December Dental Reports[133] as a key metric. Failed appointment rates are not reported by the dental department.

## Dental: Medically Compromised Patients

**Methodology:** Reviewed health history form and records from recent intake exams. Compared the health history in the dental chart to the medical problem list.

**First Court Expert Findings**

A review of six dental records of inmates who were on anticoagulant therapy revealed that three of the records had no health history documentation as part of the dental record. In the other three records, it was documented and red flagged. In all cases of provided dental care to these patients, medical staff was consulted, and anticoagulant therapy precautions were addressed and followed. When asked, the dental providers indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Current Findings**

Documenting the health history of medically compromised patients has deteriorated since the First Court Expert's Report. We concur with the First Court Expert that documentation of the health history of medically compromised patients was inadequate. Moreover, we identified current and additional findings as follows.

Several patients had chronic conditions important to dental treatment that were on the medical problem list and on the health history in the dental chart.[134] Other patients had problems noted on the medical problem list but not on the health history in the dental chart.[135] There was no documented periodontal assessment nor follow-up for the diabetics, which is particularly problematic given the relationship between periodontal disease and diabetes.[136]

---

[133] CQI Monthly Oct 2017_1.pdf, p. 7; CQI Monthly Nov_2.pdf, pp. 13-18; and CQI Monthly Dec 2017_2, pp. 13-18, respectively.

[134] Medically Compromised Patient #1 (Coumadin). The record reports that Coumadin therapy was (appropriately) stopped for two days before a planned extraction. Patient #10 (Coumadin). Patient #6, 8, and 9 (diabetes).

[135] Medically Compromised Patients #4 and 5 (diabetes); Patients #3 and 7 (Coumadin). Patient #7 received an intake screening 12/15/15 but did not receive a complete examination until his 1/11/18 biennial examination. Patient #3 was taking Warfarin 11/23/16 – 2/20/17 and Coumadin from 2/19/17 – 5/18/17 and 3/22/17 – 6/22/17; yet the health history was not updated, and anticoagulant use was not noted.

[136] See, for example, Herring ME and Shah SK. Periodontal Disease and Control of Diabetes Mellitus. *J Am Osteopath Assoc*. 2006; 106:416–421; Patel MH, Kumar JV, Moss ME. Diabetes and Tooth Loss. *JADA 2013;144(5);478-485* (adults with diabetes are at higher risk of experiencing tooth loss and edentulism than are adults without diabetes); And Teeuw WJ, Gerdes VE, and Loos BG. Effect of Periodontal Treatment on Glycemic Control of Diabetic Patients. Diabetes Care 3 3:421-427, 2010 (periodontal treatment leads to an improvement of glycemic control in type 2 diabetic patients).

---

## Dental: Specialists

**Methodology:** Interviewed dental staff, reviewed CQI documents, and reviewed dental charts of inmates who were seen by an oral surgeon.

### First Court Expert Findings

Dr. Frederick Craig, an oral surgeon, is available on an as-needed basis, usually once a month, sometimes twice. Dr. Craig is also used by several other IDOC institutions. The dental program also utilizes Joliet Oral Surgeons, a local oral surgery group, for more difficult cases and for general anesthesia. Pathology services are the same as for medical pathology. They give the specimen to the appropriate medical person for processing. All radiographs were current, and all record entries were adequate. The NRC utilizes these services through SCC.

### Current Findings

Oral surgery consultation has changed substantially since the First Court Expert's Report and is adequate. We concur with the First Court Expert's findings. Questions have been raised about the performance of the onsite oral surgeon and are addressed in the CQI section (*infra*). Dr. Craig has not provided onsite oral surgery services in the past year. SCC has recently located another oral surgeon willing to provide onsite services.

## Dental: CQI

**Methodology:** Reviewed CQI minutes and reports. Interviewed dental staff.

### First Court Expert Findings

The dental program contribution to monthly CQI includes a thorough documentation of dental statistics and productivity numbers. There is an ongoing CQI report for the dental program that seeks to improve the ability of segregation inmates to get to the dental clinic for their appointments. It is a study that looks at the reasons why they are not getting to the clinic. These findings must be used to develop procedures to improve this problem. Consideration should be given to conduct ongoing studies with the NRC.

### Current Findings

The dental CQI program has improved since the First Court Expert's Report. We agree with the First Court Expert that the dental CQI program should not be limited to reporting data and that studies must be used to drive changes in policy, procedures, and practices. Moreover, we identified current and additional findings as follows.

The SCC Annual CQI Report 2016-2017 mentioned two dental issues. The first was a discussion of the Oral Surgery Study which addressed problems associated with Dr. Craig, an oral surgeon who treats inmates onsite at several IDOC prisons.[137]

---

[137] Stateville Annual CQI 2016-17_1.pdf, p.15. pdf p. 15. Dr. Craig is no longer being referred patients from SCC (although he was still seeing patients at other IDOC prisons) due to "performing the wrong procedure and talked patients out of procedures" (*id.*).

A clinical outcome review of 56 inmates referred to Dr. Craig for onsite oral surgery found that he performed the wrong procedure on one patient; 17 patients were sent offsite for their procedure; several patients were sent to an offsite oral surgeon for the procedure or a complication of the onsite procedure; 10 patients refused when informed of potential complications; and 13 were evaluations, follow-ups, or reschedules.[138] The committee recommended that the issue should continue to be monitored (*id.*). A follow-up study was reported 9/29/17, and another follow-up was planned in six months.[139] Dr. Meeks recommended a Root Cause Analysis be performed on Dr. Craig. NRC AWP Konopka asked if a Peer Review was performed. Dr. Meeks also suggests that Dr. Funk and Mr. Mote monitor Dr. Craig's progress at other institutions. Dr. Funk commented that Dr. Craig is still employed at Pontiac C.C. and a few other facilities. Dr. Craig is performing minimal surgery procedures, keeping patients onsite per Dr. Funk. Doug Mote will investigate further and report findings to Dr. Meek and Dr. Funk (*id.*, p. 15).[140]

The other study focused on compliance with aspects of the Dental Administrative Directive based on dentists' review of dental charts, primarily from NRC.[141] Among the findings from the NRC charts were that 62% had no charting of pathology, with the remainder having only a partial charting.[142] Furthermore, "in all the patients reviewed, visible heavy tartar [calculus] was never charted or indicated. The periodontal needs were never indicated" and "the dental radiographs from NRC varied in diagnostic quality."[143] (*Id.*)

## Internal Monitoring and Quality Improvement

**Methodology:** Interview facility health care leadership and staff involved in CQI activities. Review the internal monitoring and CQI meeting minutes for the past 12 months.

### First Court Expert Findings

The First Court Expert found that there were no CQI meetings since October 2013 (the visit was in February 2014) and no minutes since July of 2013. The minutes contained no narrative, no analysis of the data presented, and no studies. This program was described as "non-functioning." The grievance process was stated to be "non-functioning" because there was no interview of the grievant.

---

[138] Stateville Annual CQI 2016-17_2.pdf, p. 34.

[139] CQI Monthly Oct 2017_3.pdf, pp. 15-20.

[140] We requested of IDOC and Wexford 1) the root cause analysis that Dr. Meeks recommended; 2) any focused peer review that may have been performed on Dr. Craig; 3) any documentation related to Dr. Funk or Mr. Mote's monitoring of Dr. Craig; and 4) any actions taken re Dr. Craig at the other IDOC prisons where he sees patients (e-mail from Dr. Puisis to Nicolas Staley dated 3/9/18). They have yet to be provided.

[141] Specifically, 1) whether a complete dental exam with charting of the oral condition was performed within 10 days of arrival at Reception and Classification Center; 2) whether a diagnostic panoramic radiograph was taken on each inmate; and 3) whether inmates' treatment needs were classified appropriately. Quality Improvement Study. Of 24 charts, 21 were from NRC.

[142] "The missed pathology included abscessed teeth, teeth that needed extraction, [and] periodontal disease, (+3) mobility in teeth, grossly decayed teeth, impacted wisdom teeth, wisdom teeth in the maxillary sinus, and numerous visible dental caries" (*id.*).

[143] Seven of the Panorex x-rays were of poor quality and unable to obtain any diagnostic information, or 33%" (*id.*).

---

The First Court Expert recommended reinvigoration of the CQI program. He recommended professional performance reviews with feedback to the clinician and nurses with respect to the sick call process. He recommended that leadership of the CQI program must be retrained regarding CQI philosophy and methodology along with design and data collection, and that the training include how to study outliers in order to develop targeted improvement strategies.

**Current Findings**
The First Court Expert found that the CQI program was non-functioning. We found that the CQI program was functioning but functioning so poorly that it was effectively non-functioning. We did not evaluate the grievance process because we did not receive the CQI minutes until the Wednesday evening during our tour, too late to evaluate the grievances presented in that report.

The CQI program at SCC was ineffective for the following reasons:
- The Annual CQI Plan has no goals or objectives related to problems areas at the facility.
- The Annual CQI Plan is a generic plan which is a word-for-word duplicate of the plan used at NRC, even though NRC and SCC are different facilities with different missions. The Annual CQI Plan failed to identify the upcoming year's agenda of CQI work.
- Credential *and privilege* reviews of physicians are performed by nurses who do not have the capacity to review physician privileges.
- Review of credentials fails to include one-time primary source verification. The CQI coordinator and HCUA did not understand what primary source verification meant even though it is an administrative directive requirement.
- The Governing Body of the CQI committee consists of the Warden, an ex-warden, and the Agency Medical Director. Health trained staff are underrepresented on the CQI Governing Body.
- The CQI studies do not investigate quality of care or appropriateness of care even when this is required by administrative directives, for example with respect to offsite services.
- The leadership does not appear to understand the difference between outcome and process studies. Outcome studies were not based on a clinical outcome and most outcome studies appeared to be performance measures instead of outcome studies.
- Mortality review is not performed. Instead, a death summary is done by a physician involved in provision of care. This summary fails to include a critical review of the death and does not identify problems in order to prevent further mortality. Though we have found preventable deaths in our death reviews, there is no evidence that the system is attempting to identify problems so that these deaths can be prevented.
- Infection control data appears inaccurate.
- The Medical Director summary in the annual CQI report from NRC is an identical word-for-word duplicate of the Medical Director summary from SCC with the exception of a single sentence about NCCHC accreditation, which NRC is not engaged in. These are different facilities with different missions and should have a different summary by the Medical Director.

- While the concept of internal audits is sound and potentially useful, five of six audits did not include the reported findings. Also, these audits only focus on process issues and should also include quality of care.

The purpose of SCC CQI was not to identify and solve problems in order to improve care. This appears to be a result of lack of leadership. The Director of Medical Records is the CQI Coordinator. She has no training in CQI. She is well trained for her work as a Director of Medical Records but poorly trained for her assignment to be CQI Coordinator. Her knowledge of CQI is to "follow the ADs." She stated that her role as Coordinator is to set the calendar of studies required by the IDOC, to remind staff to complete their studies, and to manage the paper flow. For this purpose, she spends about four hours a month. She is not involved in developing a CQI plan and stated that the Governing Body (the Warden, an ex-warden, and the Agency Medical Director) develops the plan with the IDOC Regional Coordinator. She believes that all studies required by the AD on CQI are completed. She failed to understand the meaning of some of the required studies. There is no method by which SCC identifies problems. None of the other leaders of the medical program have had any training in CQI.

SCC does not maintain a manual of CQI as required by the AD. The Annual CQI Plan is a generic plan that contains no identified problems and has no specific plans for the upcoming year's CQI projects. This is inconsistent with the requirements of the AD.[144] The plans from NRC and SCC were identical even though the institutions have different missions and different sets of problems. The plans do not include an agenda for the past or upcoming year with respect to CQI projects that have been identified from problem prone areas. The summary of the annual CQI meeting failed to discuss the prior year's plan, major findings, or accomplishments based on identification of problems and corrective actions undertaken.

The HCUA and vendor Director of Nursing (both nurses) are responsible for reviewing all professional credentials *and privilege sheets,* but as nurses they are not capable, in our opinion, of reviewing credentials or privileging of the physicians. The CQI AD states that one-time primary source verification is to be done.[145] The CQI AD states that the vendor is to do this. Neither the CQI Coordinator nor the HCUA could tell us what primary source verification meant. There was no evidence that this was done. The CQI plan states that the program reviewed 100% of credentials. Yet for physicians, verification consisted only in verifying that they had a license.

Medical program staff are underrepresented on the Governing Body. The Governing Body of the CQI committee is the Warden, the vendor Regional Manager and the Agency Medical Director. The vendor Regional Manager is an ex-warden with no prior formal training in health care management or in a health care discipline. This means that the controlling votes of the

---

[144] AD 04.03.125 Quality Improvement Program, item II.F.b. states, "Annually develop or update a Quality Improvement Plan based on a program that *identifies problems and opens channels of communication for appropriate resolution of identified concerns.*" [our emphasis]

[145] AD 04.03.125 Quality Improvement Program item II.I.h. states, "A one-time primary source verification shall be conducted by the comprehensive health care vendor for all licensed contractual staff."

Governing Body is a current Warden and an ex-warden who works for the vendor. This is unlikely to result in effective direction for the CQI program and also means that two individuals with criminal justice training control the medical CQI program.

An AD requirement to monitor the quality and appropriateness of offsite care is not being done.[146] The annual report merely lists the number of offsite visits, without any evaluation of appropriateness or quality. We discussed a case of delayed diagnosis of colon cancer in the hospital section of this report. This same patient is mentioned in the December 2017 CQI report as a delayed diagnosis. Yet there was no discussion as to why the diagnosis was delayed and no attempt to remedy the root cause problem to prevent these types of delays in order to prevent morbidity and mortality. The AD requires that all UM denials are monitored to ensure that necessary and appropriate care is provided.[147] This task is assigned to the HCUA, who is a nurse. It is our opinion that a nurse is incapable of determining if physician or other provider referrals for offsite care are necessary or appropriate. This should be done by a physician. We noted that aside from providing the numbers of individuals who obtained offsite services, there was no evidence of any monitoring or evaluation for quality of care or appropriateness. To merely list these visits is not evidence of quality of care or appropriateness.

We asked for but did not timely receive the list of denials of offsite care for SCC and were not able to review these before we ended the tour. However, it is not clear from the CQI data presented that the denials were appropriate. These data merely list the number of events that occurred without any evidence that the quality or appropriateness was evaluated or was adequate.

The section of the annual CQI report on offsite services states that over 95% of individuals are evaluated within five days of their offsite appointment without any evidence that the quality of these evaluations is adequate. As we discuss in the specialty care section, post offsite physician evaluations are not of adequate quality. At some of these visits, doctors did not have the consultant report and in others, the doctor did not document what had occurred at the consultation or during hospitalization. Some recommendations of consultants were not addressed. It is insufficient to merely state that a doctor saw the patient.

The CQI studies included two process studies and four outcome studies. Clinical outcomes are end point measures of health status such as mortality, hospitalization, an HbA1C level of 7 or less, or normal blood pressure. An outcome study measures the effectiveness of interventions based on the ultimate outcome measure. An example would be to study the effect of colorectal cancer screening on colon cancer mortality or the effect of increasing the interval of chronic

---

[146] AD 04.03.125 II.I.2.b Off-Site Offender Care Services item II.I,2. j. states, "A monthly review of the quality and appropriateness of care of 100% of the following cases not to exceed a total of 50 cases in each area shall be conducted by health care staff. A standard comparison and analysis of the current month to the previous month and the current month to the same month one year earlier shall be provided."

[147] AD 04.03.125 Quality Improvement Program item II.I.2.j. Utilization Review states, "A weekly review of 100% of all Utilization Review denials shall be conducted by the Health Care Administrator to ensure offenders are receiving necessary and appropriate care."

clinic visits on obtaining a normal blood pressure. The studies performed at NRC were not based on a clinical outcome, with one exception. SCC studied whether one inmate treated with Harvoni had a sustained virologic response. While this is an outcome, it is not a good study, for two reasons. First, there was only one patient. Secondly, studies have already been done with Harvoni showing its effectiveness with respect to sustained response. This study adds no value to patient care. None of the remaining studies included a clinical outcome. These studies included:

- Whether the pharmacy changed the duration of a non-formulary medication without notice.
- Whether UIC laboratory results were received within 48-72 hours.
- Whether an injury report was signed by a provider.

These are all performance measures and not outcome studies.

None of the individual CQI studies in the annual report evaluated for quality of care. The RN sick call study found that 74% of a sample of nurse sick call appointments was referred timely to a physician. This study did not consider whether the nurse evaluation or physician evaluation was of adequate quality. Also, although the study identifies a problem, it does not investigate causes as to why 26% of patients were not seen timely and did not propose a solution. Half of the patients not seen did not even have a note in the medical record. There was no comment on identification of possible causes for these poor results and no solution except to monitor the providers. A month later this study was repeated, and only 76% of patients referred by a nurse to a provider were seen within 72 hours. The question why this occurred was not answered even though the result was nearly identical to the prior month. The proposed solution was to repeat the study. The study was repeated in March, two months later and 91% of inmates were timely referred. Three months later the study was repeated and only 72% of patient referred by a nurse to a physician were seen within the specified 72 hours. Again, there was no analysis of why this occurred and there was no proposed solution to improvement. This study did not consider the quality of the nurse or physician evaluations. This study was repeated numerous times showing similar poor results without any effort to identify the root cause of the problem or any attempt to seek resolution of the problem.

The laboratory section of the annual CQI report lists the number of phlebotomies done per month. The only important quality metric in this data is the number of re-draws. However, month to month this process seems to be in control. While it is useful to monitor to ensure maintaining control, efforts should be redirected to problem prone areas. We noted that abnormal laboratory tests were often not followed up, patients with abnormal laboratory tests requiring treatment were not followed up, and patients were not always treated. This led to preventable morbidity in two cases (myocardial infarction and stroke). This type of problem should be investigated.

Mortality review is not done. The Medical Director, who may have been responsible for care of patients who die, provides a summary of the death which gives no indication as to whether any problems were identified. This is not a mortality review. It draws no conclusions as to the

quality of care and gives no information as to whether problems exist or improvements are needed. We note that at this facility the physician performing the mortality reviews is a surgeon and does not have the training to adequately perform analysis to determine if care for the primary care problems was adequate.

The data for MRSA do not seem credible. For 2016-2017, only seven persons were treated for MRSA infection at SCC. This does not seem credible, as MRSA is an extremely common infection. In a subsequent email exchange with the HCUA we were told that there was only one positive MRSA culture in 2017, with nine suspected cases. This seems extraordinarily low and may reflect lack of cultures of patients being treated. It would be appropriate for an infection control study to investigate how many patients are currently being treated for this infection at this facility and to investigate whether there is underreporting of this infection.

There were six internal audits done at SCC presented in the annual CQI report. Three of these audits were done on the same day. These audits included:
- Chronic illness clinic is completed in the appropriate month.
- A progress note is completed for all individuals engaging in a hunger strike.
- All inmates have a physical examination as per administrative directive requirements and problem lists are updated.
- A staff signature is present on all admissions to the infirmary. Nurses will complete a nursing admission note and vital signs will be recorded as required.
- The Medical Director reviews the treatment protocols.
- Only a physician discharges a patient from the infirmary.

None of the internal audits reviewed the quality of care. These audits reviewed process items related to administrative directives. These audits are useful to ensure that processes of care are carried out in accordance with requirements. However, they do not assess whether the care provided was of adequate quality. Only one of the six audits included the data and it is therefore unclear whether these audits were actually done. The audit of Offender Infirmary Services noted that in two of 10 files reviewed, a physician, psychiatrist, or dentist did not discharge the patient from the infirmary as required. The remainder of the internal audits did not include any data to verify that the audit had actually been done.

Clinical performance enhancement is a method of periodic evaluation of the clinical performance of individual practitioners. For this purpose, Wexford, as required by their contract with IDOC, performs peer review of its physicians. We were told that Medical Directors perform these reviews for all staff physicians and mid-level providers at their facility and that Medical Directors from another facility perform the review for the Medical Director.

There are four standardized formatted questionnaires used for peer review, which are found in Appendix B. These questionnaires include infirmary, chronic care, sick call, and laboratory/x-ray utilization. There are several questions related to quality of care, particularly related to the plan of care being adequate, but most questions are process related. A single episode of care is used

for each patient and the questionnaire is repeated multiple times for each area of service in which the provider engages.[148]

For the physician assistant at SCC there were two reviews, which consisted of reviews of 15 episodes of care for provider sick call and 10 episodes of care for laboratory/x-ray utilization. In total, 328 questions were asked. 327 (99.69%) were found adequate. One question (0.30%) was inadequate. No problems were identified.

For the staff physician, 341 questions were asked and 338 (99.1%) were adequate. The remaining three questions were not applicable. No problems were identified.

The recent Medical Director had two peer reviews by different physicians. In total, 465 questions were asked. 361 (77.6%) were adequate, 55 (11.8%) were not applicable, and 49 (10.5%) were inadequate. The inadequacies consisted of:
- Failing to write notes
- Failing to document clinical correlation to the complaint
- Failing to document clinically significant findings
- Failing to ensure timely follow up
- Failing to document a targeted physical examination
- Failing to have an appropriate plan of care
- Failing to document patient education.

The clinical performance of the Medical Director, a surgeon, was worse than the physician assistant. In our own record reviews, we found many more inadequacies than were found in these reviews. The Medical Director rarely took an adequate history, rarely performed an adequate physical examination, and seldom included an adequate assessment or plan of care. We identified morbidity and mortality as a result of poor care. Yet the peer reviews purport to demonstrate nearly 100% adequate care. We find these peer reviews less than adequate in describing the extent of problems with quality of care. There are no peer reviews of sentinel events, including death.[149] This fails to protect patients from risk of ongoing harm. We noted in the hospital section of this report multiple instances of harm (myocardial infarction, stroke, delayed diagnosis of colon cancer) that resulted from inadequate care and find that the lack of sentinel event reviews results in increasing the risk of harm to patients. The review of clinical care needs to include sentinel events, including appropriately performed mortality review.

---

[148] An episode of care is a single unique provider-patient visit.

[149] The Joint Commission defines a sentinel event as unanticipated events in a healthcare setting resulting in death or serious physical injury or risk of injury to the patient not related to the natural course of the patient's illness. These events call for immediate investigation and response.
As found at https://www.jointcommission.org/assets/1/6/CAMH_2012_Update2_24_SE.pdf.

PTX193-0684

# Recommendations

## Leadership, Staffing, and Custody Functions

### First Court Expert Recommendations

1. Stateville requires its own Health Care Unit Administrator position. *We agree with the First Court Expert's recommendation that SCC have its own HCUA. This has been accomplished.*

2. Stateville requires its own staffing allocation specifically to meet the Stateville service demands. *We agree with the First Court Expert's recommendation. We add that in order to ensure the staffing allocation is adequate, a staffing analysis be performed as listed in recommendation 5 below.*

3. Only trained primary care clinicians (Internal Medicine and Family Practice) should be providing primary care to this population. Physicians should be board certified in a primary care field. *We partly agree with the First Court Expert's recommendation. We would find board eligible physicians acceptable at facilities with a low percentage of high acuity patients.[150] Facilities housing complex patients should have a board certified primary care physician.*

4. All health care providers should have access to electronic medical references. *We agree with the First Court Expert's recommendation. We suggest universal access to UpToDate®.[151]*

### Additional Recommendations

5. A staffing plan should be developed that includes appropriate relief factors and that evaluates for expected service requirements.

6. Health care leadership staff need to receive an orientation to their positions that reasonably informs them of the expected assignments.

7. The use of "traveling medical directors" should not be permitted to contractually substitute as filling a Medical Director position. Failure to have a permanent Medical Director should incur contractual penalties. Coverage physicians should be used as necessary, but coverage physicians should not constitute a filled Medical Director position.

8. An additional IDOC Regional Coordinator should be added to reduce the span of control for this individual.

9. Review of physician credentials and privileges needs to be performed by a physician.

10. Privileging of physicians must include verification of residency training for the services expected to be provided. Physicians should not be allowed to be privileged to perform services for which they have no formal training.

---

[150] Board eligible is a physician who has completed training in a residency but has not yet received certification. In this case, board eligible would mean that a physician has successfully completed residency training in internal medicine, family practice or emergency medicine.

[151] UpToDate® is a clinical decision support resource that can be accessed over the Internet or from a dedicated server. It has pharmacy information and clinical decision support for general medical practice.

11. Contract monitoring should include evaluation of quality of care as provided by the vendor.

## Clinic Space, Sanitation, Laboratory, and Support Services

### First Court Expert Recommendations

1. Designated exam rooms should be made available with appropriate equipment in cell houses B, E, and F to allow sick call to occur with reduced movement demands. *We agree with this recommendation.*

### Additional Recommendations

2. The first aid kits in the correctional officer rooms on the housing units should be regularly inspected and re-supplied after each use.
3. The infirmary beds need to be properly repaired or replaced with hospital beds so that the height of the bed can be modified, the head adjusted, and the railings are operational.
4. A quantity of electrical beds that meet the needs of the infirmary patient population should be purchased.
5. Continue to conduct monthly documented safety, sanitation, and infection control inspections/environmental rounds, focusing at a minimum on all health care areas, the infirmary patient rooms including the negative pressure rooms, the hemodialysis unit, and the dietary department, with monthly reporting to the CQI Committee.
6. Pest control must continue to be addressed in the infirmary.
7. The safety and sanitation defects in the infirmary tub room floor must be corrected.
8. The birds in the inmate dining and food serving areas must be removed and the area properly sanitized.
9. A sanitarian should be hired to review sanitation issues including the washing of cooking and eating instruments, the maintenance of required temperatures in the meat freezer, vermin, pests, and other potential environmental sanitation hazards.
10. Develop and implement a plan to daily monitor and document negative air pressure readings when the room(s) is occupied for respiratory isolation, and weekly when not occupied.
11. All medical equipment must have no less than annual documented inspections and calibrations by a bioengineering team. Each individual piece of medical equipment must have a current date of inspection label.

## Medical Records

The First Court Expert had no recommendations.

### Current Recommendations

1. Install an electronic medical record. Include at the point of care access to UpToDate® for all staff.

---

2. If an electronic medical record is not used, modify or improve the paper record files so that they do not come apart during routine use.
3. Negotiate with local consultants and hospitals to timely obtain consultation and hospital reports, as this is a major patient safety and liability issue.
4. When records from consultants are unavailable, the providers need to communicate with consultants to timely obtain necessary information about the consultation to protect patient safety.
5. Create a unified record that includes nephrology consultations and necessary information about dialysis, including laboratory testing if done.

## Intrasystem Transfer

### First Court Expert Recommendations
1. The intrasystem transfer process needs to be appropriately addressed to effectively ensure continuity of care for patients who enter with prior diagnosed problems. This should be monitored by the QI program. *We agree with this recommendation.*

### Additional Recommendations
2. Health care leadership develop and implement a tracking log that documents completion of all intrasystem transfer activities and identifies instances of incomplete transfer information.
3. Written directives of IDOC and Wexford be revised to add responsibility for the sending IDOC facility to accurately complete the Health Status Summary in advance of inmate transfer.[152]

## Nursing Sick Call

### First Court Expert Recommendations
1. Custody issues should not interfere with the provision of timely health care. *We agree with the First Court Appointed Expert's recommendation that custody issues should not interfere with timely provision of health care, especially as it pertains to patient privacy in segregation.*
2. There should be no such thing as a "no show" in a prison. Patients may refuse care but should be required to report to the health services area when scheduled. *This recommendation has been implemented and all inmates who have signed up for sick call are seen by nursing staff and may refuse the encounter at that time.*

### Additional Recommendations

---

[152] Documents to be revised include the IDOC-Wexford contract, Wexford Policy and Procedure, p. 118 Transfer Screening, and SCC Operations Policies and Procedure, p. 118 Transfer Screening.

2. IDOC Institutional Directive 04.03.103K Offender Health Care Services be revised to incorporate the procedure and practices for sick call as reflected in the SCC Operations Policy and Procedure P103 Non-Emergency Health Care Requests and Services.

3. Sufficient numbers of RNs need to be employed so that LPNs are not assigned to conduct sick call.

4. RNs should perform and document an assessment of each patient in accordance with treatment protocol forms and/or sound nursing judgement.

5. RNs should refer patients to providers in accordance with the treatment protocol and in accordance with sound nursing judgment. The urgency of the referral should be documented and used to schedule provider appointments.

6. The sick call documentation forms should be revised to indicate if the referral is emergent, urgent, or routine.

7. The adequacy of nursing assessments and the plan of care should be monitored by nursing service as part of the peer review or CQI.

8. Custody staff should stand at a distance from the sick call room in segregation so that they can provide visual security but not hear the substance of the interaction.

9. Custody staff should remove restraints without delay when requested by the nurse to complete the evaluation of a health complaint.

10. Providers should see patients timely according to the urgency of the referral.[153]

11. Health care leadership should develop and monitor quality indicators associated with each step of the sick call process. There should be evidence of steps taken to address areas of improvement needed for performance that does not meet the quality indicators.


## Chronic Care

**First Court Expert Recommendations**

1. Patients should be scheduled in accordance with their degree of disease control, with more frequent visits when disease control is poor and less frequent visits for those under good control. This is a statewide policy issue which needs to be corrected.

2. For diabetes clinic:
   a. Meals should be served on a predictable schedule to facilitate the coordination of insulin administration with food consumption.
   b. Type 1 diabetics should have access to physiological insulin replacement with three to four injections per day.

3. For HIV clinic:
   a. Patients with HIV infection should be formally enrolled in the chronic care program just as patients with other diseases are.
   b. Facility clinicians should be providing primary care to this population. This would include actively monitoring this high-risk population for medication compliance, side

---

[153] Emergent referrals should be seen immediately, urgent referrals should be seen the same day and routine referrals seen within 72 hours.

effects, and the primary care complications related to the disease and its treatment, such as hyperlipidemia, diabetes, and cardiovascular disease.

c.   The chronic care nurse should be doing medication compliance checks with HIV patients at least monthly.

d.   Problem lists in the medical record must be incomplete and accurate.

*We agree with these recommendations.*

**Additional Recommendations**

4.   Chronic care provider progress notes must be legible, communicate the rationale for modifications in treatment, list reasonable differential diagnoses, document pertinent physical findings and symptoms, and record clear treatment plans.

5.   The Office of Health Services should use national standards of care for their chronic illness guidelines.  A Chronic Care procedure should specify timelines for clinic intervals and laboratory testing.

6.   Age and gender based routine health maintenance, including cancer screening and immunizations for patients with and without medical conditions, must be provided in accord the United States Preventive Services Task Force (USPSTF) guidelines and other national standards of care.  A and B rated guidelines of the USPSTF should be used for the annual health examination.

7.   Disease specific chronic care clinic visits should end.  Chronic care visits must address all medical conditions of the patient. Strictly focusing on a single specific disease and not addressing other associated clinical problems is not in the best interest of the patient and delays needed interventions.

8.   The chronic care providers must regularly document the review of the MAR, the CBG tests, the nursing and provider sick call notes, and blood pressure readings when they see patients in the disease-specific chronic care clinics.

9.   Nursing or CQI staff should do monthly medication compliance audits on all patients with HIV, diabetes, chronic anticoagulation, seizure disorders, and other chronic illnesses as needed. The results should be communicated to the providers and to the CQI Committee.

10.   The IDOC should develop a plan to shift anticoagulation treatments from Vitamin K antagonists (warfarin) to newer types of anticoagulants that do not require frequent ongoing lab testing to determine the adequacy of anticoagulation. The frequent lab testing and medication adjustments are logistically complicated and put patient-inmates at risk for poor outcomes. Utilizing newer anticoagulation medications that do not require frequent ongoing measurement of the level of anticoagulation should be strongly considered by the IDOC.

11.   Patients with selected chronic illnesses including diabetes, hypertension, and hyperlipidemia should have the 10-year cardiovascular risk calculated to determine if they require a HMG CoA-reductase inhibitor (statin drug) and the proper dosage to minimize the risk of myocardial infarction, stroke, and other cardiovascular diseases.

**PTX193-0689**

## Urgent/Emergent Care

**First Court Expert Recommendations**

1. The urgent/emergent program requires review and feedback both with regard to timeliness, appropriateness, and continuity of care. This should be done by clinical leadership and the QI program. *We agree with this recommendation.*

**Additional Recommendations**

2. Establish a list of supplies and equipment to be included in each of the first response bags and the disaster bags, and to identify where each is located in the bag. This list should be used to resupply any bag after use and to conduct a monthly inventory.

3. Each of the openings in the bag should be sealed with a numbered plastic tag. The integrity of the seal should be checked and documented on the emergency equipment log at the beginning of each shift.

4. Healthcare leadership should review actual practices against the SCC ID # 04.03.108 K3 and the Healthcare Operations Policy and Procedure P112 and identify deviations. Revisions to the written directive should be considered and/or a corrective action plan implemented to bring actual performance into compliance with written directives.[154]

5. Because clinical leadership does not appear to understand when a clinical situation is a problem, the IDOC should engage outside medical consultants to examine the quality of care for sentinel events to give feedback and assist in monitoring the clinical care.

6. When the provider at the facility fails to know what diagnosis the patient is or how to manage the patient's problem, that patient needs to be referred to another provider, possibly a consultant, who does know how to manage the patient's clinical problem. This is a particular problem in the IDOC because of the large number of physicians without primary care training.

## Specialty Consultations

**First Court Expert Recommendations**

1. Scheduled offsite services need to be improved with regard to timeliness of access to these services as well as follow up after the service is provided.

2. There should be a reliable method of communication between the scheduler and the clinicians to ensure that patients who require specialty consultation are scheduled commensurate with the urgency of their need.

*We agree with these recommendations.*

**Additional Recommendations**

3. If the current process of utilization of offsite care is to be used, the IDOC, not the vendor, should develop a standardized offsite tracking log on an Excel spreadsheet that should be used at all sites. This tracking log should be used to report timeliness of collegial reviews, approvals, and appointments to the QI committee.

---

[154] For example, the number of drills required at SCC exceeds that required by NCCHC.

4. Referrals for offsite care should be first documented as a physician order in the medical record. The original referral form should be filed in the medical record on the date it was initiated by the provider. Copies of this form can be used by the scheduler to manage scheduling.

5. Medical providers should be permitted to send patients to offsite consultants without going through the collegial review process on the basis of patient safety.

6. When UIC specialty care is significantly delayed, e.g., gastroenterology, an alternate local consultant should be used to obtain care.

7. Any denial of care needs to be documented *in the medical record* using documentation of the person who denied care.

8. At follow up provider visits after consultations, the provider should be required to document the results of the consultation, update the status of the patient, and update the treatment plan based on the consultation. If consultant reports are unavailable, the provider should use other communication efforts to determine what occurred at the consultation.

## Infirmary Care

**First Court Expert Recommendations**

1. Patients should be seen timely according to policy requirements while in the infirmary.

2. If clinicians choose not to treat patients according to currently accepted recommendations and guidelines, the rationale for these decisions should be articulated in the health record.

*We agree with these recommendations.*

**Additional Recommendations:**

3. Problem lists in the infirmary charts must be complete and accurate.

4. Provider notes must be legible, communicate the rationale for modifications in treatment, list reasonable differential diagnoses, document pertinent physical findings and symptoms, record clear treatment plans, and write regular comprehensive progress notes that update the status of each and every acute and chronic illness.

5. As noted in the Clinic Space section, the infirmary beds need to be properly repaired or replaced with hospital beds so that the height of the bed can be modified, the head adjusted, and the railings are operational. A number of electrical beds should be purchased for the infirmary. The condition of the infirmary beds puts at risk the safety of patient-inmates and staff.

## Pharmacy and Medication Administration

The First Court Appointed Expert made no recommendations concerning pharmacy and medication administration.

**Current Recommendations**

1. Consider reducing the volume of controlled medications in stock.

2.  The original order should be used when transcribing the order onto the MAR; the blister card should not be used.
3.  Medication should be administered in patient specific, unit dose packaging. The practice of pre-pouring should be eliminated.
4.  The MAR should be used by the nurse to verify the medication, dose, and route of administration is correct immediately before giving the medication to the patient. The nurse should consult the MAR before answering any questions or concerns the patient has about the medication.
5.  Medication should be documented at the time it is administered.
6.  Printers should be provided so MARs can be printed at the facility at the end of the month and when a new order is written.
7.  A system for timely renewal of chronic disease and other essential medications should be developed.
8.  Nurses should refer any patient who does not receive three consecutive doses of nurse administered medication prescribed for a chronic disease to the treating provider. The treating provider should meet with the patient and determine if treatment should be modified to improve adherence.
9.  Patient adherence with KOP medications prescribed to treat chronic disease should be monitored at regular intervals (monthly by nursing and by the provider at each chronic disease visit).
10. Revise the policy and procedure for medication administration to provide sufficient operational guidance to administer medications in accordance with accepted standards of nursing practice.
11. The CQI program should develop, implement, and monitor quality indicators related to pharmacy services and medication administration.
12. Root cause analysis and corrective action plans should be used to target the causes of performance that is below expectations. Corrective action should consider software and mechanical means to improve patient safety, such as computerized provider order entry, use of bar coding, patient specific unit dose packaging, etc.

## Infection Control

**First Court Expert Recommendations**

1.  The First Court Expert had no specific recommendations for infection control for SCC. However, The First Court Expert recommended that each facility have a specific nurse assigned responsibility for infection control, and because SCC did have such a designated nurse at that time, no recommendations regarding infection control were made. SCC no longer has a single designated nurse assigned to infection control. There were important infection control issues identified during our site visit but no one at SCC had identified that these were issues that needed attention. We concur with the First Court Expert's recommendation that each facility, now including SCC, have a designated infection control nurse responsible for compliance with IDOC policy concerning communicable diseases, blood borne pathogens, and compliance with Illinois Department of Public Health reporting requirements as well as the HIV and HCV clinics.

**Additional Recommendations**

2. SCC should have a designated infection control nurse responsible for compliance with IDOC policy concerning communicable diseases, blood borne pathogens, and compliance with Illinois Department of Public Health reporting requirements as well as the HIV and HCV clinics. This infection control nurse should also be responsible for monitoring and prevention of communicable disease outbreaks.

3. Infections and communicable disease data should be analyzed and discussed as part of the monthly and the annual CQI meetings. This should include discussion of trends, updates from the CDC and review of practices. The risk for transmission of TB infection is one example of a periodic review and analysis that should be done by the infection control program at SCC.

4. Track and report skin infections due to all pathogens, not just MRSA, including infestations with scabies or body lice.

5. Update the IDOC Infection Control Manual now and at least every two years.

6. Airborne Infection Isolation (AII) rooms need to be regularly serviced, inspected by knowledgeable individuals, and monitored regularly. The maintenance of adequate air changes and pressure should be documented on a log specifically as part of the infection control program.

7. Also, the practices of the hemodialysis program need to be brought into compliance immediately with CDC recommendations to prevent infections, particularly hepatitis B, among chronic hemodialysis patients.[155]

# Dental Program

## Dental: Staffing and Credentialing

**First Court Expert Recommendations**

1. Serious consideration should be given to hiring a second dental assistant. The lone assistant has too many duties to perform and the dentists are often left working without an assistant. This recommendation is moot since a second dental assistant has been hired.

2. All surgeries should be performed with an assistant. We agree with this recommendation.

*We agree with these recommendations.*

**Additional Recommendations**

3. NRC and SCC dental staffing should be realigned to reflect the mission of each institution.

---

[155] MMWR (2001) Recommendations for Preventing Transmission of Infections Among Chronic Hemodialysis Patients. Vol. 50/No. 99-5, Centers for Disease Control. See also Update to the 2001 Hemodialysis Recommendations available at https://www.cdc.gov/dialysis/guidelines/index.html.

---

4.  Staffing should be increased to accommodate performing comprehensive dental exams on all prisoners either at intake or within 30 days of arrival from a reception and classification center.

## Dental: Facility and Equipment
**First Court Expert Recommendations**

1.  Replace the cabinetry and countertops, as they are very old, worn and irreversibly damaged. Proper infection control is almost impossible on these surfaces. We agree. The countertops should be replaced.

*We agree with this recommendation.*

**Additional Recommendations**

2.  Patients wear lead aprons with thyroid collars when dental radiographs are taken.[156]
3.  There should be an equipment replacement plan to inform budget preparation.
4.  The clinic equipment should include a sphygmomanometer and stethoscope.

## Dental: Sanitation, Safety, and Sterilization
**First Court Expert Recommendations:** None

**Additional Recommendations:** None

## Dental: Review Autoclave Log
**First Court Expert Recommendations**

1.  That the sterilization spore testing log be accurately maintained and kept on record indefinitely.
2.  That safety glasses be provided to patients while they are treated.
3.  That a biohazard warning sign be posted in the sterilization area.
4.  A warning sign be posted in the x-ray area to warn of radiation hazards, especially pregnant women.

*We agree with these recommendations.*

**Additional Recommendations:** None

## Dental: Comprehensive Care
**First Court Expert Recommendations**

1.  Comprehensive "routine" care should be provided only from a well-developed and documented treatment plan based on a thorough, well-documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.

---

[156] While radiation exposure from dental radiographs is low, it is the dentist's responsibility to follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (*inter alia*), use protective aprons and thyroid collars. Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and Food and Drug Administration (2012), 14.

2. In all cases, appropriate bitewing or periapical x-rays be taken to diagnose caries.
3. Hygiene care be provided as part of the treatment process.
4. Care be provided sequentially, beginning with hygiene services and dental prophylaxis.
5. That oral hygiene instructions be provided and documented.

*We agree with these recommendations.*

**Additional Recommendations**
6. An examination and sequenced treatment plan should be offered to all inmates within 30 days of transfer from a reception and classification center.
7. IDOC should develop protocols for periodontal diagnosis that include the use of Periodontal Screening and Recording and appropriate radiographs.
8. All routine dental examinations should include a sequenced treatment plan.

## Dental: Intake (Initial) Examination

**First Court Expert Recommendations:** None.

While the First Court Expert found the records in compliance with their evaluation criteria,[157] they did not address the more critical issues relating to the ***quality*** of the screening that are addressed below.

**Current Recommendations**
1. The reason(s) for the inadequate quality of the panoramic x-rays should be investigated immediately and the equipment replaced if necessary.
2. Since there is insufficient time at the screening to provide proper oral hygiene instruction, it should not be stamped in the dental chart.

## Dental: Extractions

**First Court Expert Recommendations**
1. A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished through the use of the SOAP note format, especially for sick call entries. We note that this is a peer review evaluation criterion.[158]
2. Proper diagnostic x-rays be available for every surgical procedure.
3. Prescribe antibiotics only as necessary. Prescribing routinely after extractions is not a standard of care. We agree with this recommendation. Antibiotics should be prescribed after an extraction only when justified clinically and the reason for the prescription documented in the record.

*We agree with these recommendations.*

**Additional Recommendations**
4. Consent forms should state the reason for the extraction.

## Dental: Removable Prosthetics

---

[157] Whether screening was performed at the reception center and a panoramic x-ray was taken.
[158] Wexford Peer Review Form for dentists – PR-001C.

**First Court Expert Recommendations**
1. A comprehensive examination and well-developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, proceed all comprehensive dental care, including removable prosthodontics.
2. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions.
3. All operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

*We agree with these recommendations.*

**Additional Recommendations:** None

## Dental: Sick Call/Treatment Provision
**First Court Expert Recommendations**
1. Use the SOAP format for sick call entries. It will assure that the inmate's chief complaint is recorded and addressed, and a thorough focused examination and diagnosis precedes all treatment.
2. Develop a triage system that insures that inmates with urgent care complaints are seen in a timelier manner, 24 to 48 hours.

*We agree with these recommendations.*

**Additional Recommendations**
3. When the dental clinic is closed, or the dentist will not be available for 24 hours, a mid-level provider should perform a face-to-face examination for all inmates submitting a request that states or implies the existence of dental pain.
4. All face-to-face assessments should be documented in nursing progress notes.
5. The nursing protocol for Toothache/Dental Pain should be used where clinically appropriate.
6. All requests for dental care should be time stamped and logged and a record of when the inmate was seen by a provider and the disposition should be maintained.
7. The quality and legibility of dentists' progress notes should be addressed in peer reviews.

## Dental: Orientation Handbook
**First Court Expert Recommendations:** None.

**Additional Recommendations:** Pending - To date we have not received the handbook.

## Dental: Policies and Procedures
**First Court Expert Recommendations**
1. Develop a thorough and detailed Policy and Procedures manual that describes and guides all aspects of the dental program. We agree with this recommendation.

---

**Additional Recommendations:** None.

## Dental: Failed Appointments
**First Court Expert Recommendations**
1. Work with the institution administration to develop and implement strategies to address this problem.
2. Utilize a vigorous CQI process to address this problem. Use these findings to implement procedures to continually improve this high rate of failed appointments.

*We agree with these recommendations.*

**Additional Recommendations**
3. Require the failed dental appointment rate to be reported to the CQI Committee monthly.

## Dental: Medically Compromised Patients
**First Court Expert Recommendations**
1. The medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red-flagged to catch the immediate attention of the provider.
2. That blood pressure readings be routinely taken on patients with a history of hypertension, especially prior to any surgical procedure.

*We agree with these recommendations.*

**Additional Recommendations:** None.

## Dental: Specialists
**First Court Expert Recommendations:** None.

**Additional Recommendations:** None.

## Dental: CQI
**First Court Expert Recommendations**
1. Because of the number of deficiencies noted in the dental program, a more vigorous CQI program should be implemented to address these deficiencies. From the CQI process, policies and procedures should be established that will continually correct these deficiencies to develop a stronger program. We agree with this recommendation.
2. Include the NRC in this invigorated CQI process. Many areas need to be addressed for improvement at that institution. This recommendation is moot since the NRC has a separate CQI Committee.

**Additional Recommendations**

3. The dental CQI program (as well as all other components of the dental program) lacks guidance from a dentist with experience in corrections. This expertise should reside centrally at IDOC and not from a Wexford employee or contractor. [159]

## Internal Monitoring and Quality Improvement

**First Court Expert Recommendations**

1. The CQI program, which should have identified many of these programmatic deficiencies, must be reinvigorated with leadership that has had appropriate training with regard to CQI philosophy and methodology.
2. There should be professional performance reviews with feedback, both for the advanced level clinicians and nurses, with regard to the sick call process.
3. The leadership of the CQI program must be retrained regarding CQI philosophy and methodology, along with study design and data collection.
4. This training should include how to study outliers in order to develop targeted improvement strategies.

*We agree with these recommendations.*


**Additional Recommendations**

5. The CQI program needs to develop methods of identification of problems with respect to both process and clinical quality of care.
6. The CQI program at SCC must be separate from the CQI program at NRC. Annual reports must be uniquely developed. Reports used for NRC should not be used for SCC.
7. Primary source verification should be verified by the IDOC in conjunction with their AD on quality improvement. Whenever a new doctor is utilized at the facility for coverage or permanent placement, the primary source verification for that provider should be reviewed by the Agency Medical Director and local leadership to ensure that the candidate has primary care credentials.
8. The Governing Body of the facility with respect to the medical program should have majority representation of persons trained in a medical discipline.
9. Quality of care and appropriateness of care need to be incorporated into the CQI program.
10. Mortality review and sentinel event reviews need to be included in the CQI program.
11. Internal audits should be performed by medical personnel and need to include the data used to draw their conclusions. These should include a quality of care component.
12. Provider peer reviews should increase emphasis on quality of care.

---

[159] Dr. Meeks does not have a dentist on his staff and relies on Dr. Sandhu (a Wexford consultant) for dental advice. He would like a dental director on his staff, since relying on a vendor's employee is problematic. See also Dr. Meeks's 1/19/18 interview by Dr. Michael Puisis ("[Question] Is he [Dr. Meeks] responsible for the dental program? Response: He said yes, he is responsible. But he said this with an expression of frustration. [Question] How does he provide that oversight? Response: Basically, he relies on the Wexford Dental Director for this oversight. He acknowledged that this was not a good arrangement and prefers that he have a Chief of Dentistry who is a state employee and part of his regional team." (*id.* questions #35, 36).

Case: 1:10-cv-04603 Document #: 767-5 Filed: 11/14/18 Page 97 of 101 PageID #:12130

13. External reviewers not associated with the vendor should be used for all mortality reviews, all sentinel event reviews, and peer reviews of all non-primary care trained physicians.

# Appendix A

## SCC Positions

| Position Title | Budgeted positions | Vacant Positions | Leave of Absence | Effective Vacancies | Employer |
|---|---|---|---|---|---|
| Health Care Unit Administrator | 1 | 0 | 0 | 0 | IDOC |
| Medical Director | 1 | 1 | 0 | 0 | Wexford |
| Physician | 1 | 0 | 0 | 0 | Wexford |
| Physician Assistant | 1 | 0 | 0 | 0 | Wexford |
| Medical Record Director | 1 | 0 | 0 | 0 | Wexford |
| Director of Nursing | 1 | 0 | 0 | 0 | Wexford |
| Supervisory Nurse | 2 | 1 | 1 | 2 | Wexford |
| Registered Nurses | 28 | 11 | 1 | 12 | Wexford |
| Licensed Practical Nurses | 12 | 2 | 0 | 2 | Wexford |
| CMT* | 17 | 5 | 6 | 11 | IDOC |
| Certified Nurse Assistant | 6 | 1 | 1 | 2 | Wexford |
| Health Information Associate | 2 | 1 | 0 | 1 | IDOC |
| Office Associate | 3 | 1 | 0 | 1 | IDOC |
| Staff Associate | 3 | 0 | 0 | 0 | Wexford |
| Medical Supply Supervisor | 1 | 0 | 0 | 0 | IDOC |
| Pharmacy Technician | 1 | 0 | 0 | 0 | IDOC |
| Med Room Assistant | 1 | 0 | 0 | 0 | Wexford |
| Assistant Site Manager | 1 | 0 | 0 | 0 | Wexford |
| Dental Director | 1 | 1 | 0 | 1 | IDOC |
| Dentist | 1 | 0 | 0 | 0 | Wexford |

| | | | | |
|---|---|---|---|---|
| Dentist** | 1 | 0 | 0 | 0 | IDOC |
| Dental Assistant | 1 | 0 | 0 | 0 | Wexford |
| Dental Assistant | 1 | 0 | 0 | 0 | IDOC |
| Dental Hygienist | 1 | 0 | 0 | 0 | Wexford |
| Dialysis Registered Nurse | 6 | 0 | 0 | 0 | Naphcare |
| Dialysis Technician | 3 | 0 | 0 | 0 | Naphcare |
| **Totals** | **98** | **24** | **9** | **33** | |

*CMTs are either medical technicians or licensed practical nurses (LPN). All newly hired CMT staff are LPNs.

** IDOC hired dentists work half time and are counted and paid as a full-time position.

**PTX193-0701**

# Appendix B

**Provider Peer Review Questions**

The sick call questions were:
1. Was the patient seen within 72 hours?
2. Does the encounter reflect the reason why the referral was made?
3. Is the recorded history comprehensive and relevant for the patient's Chief Complaint?
4. Is a targeted physical exam with pertinent findings documented?
5. Was appropriate and comprehensive testing done?
6. Were laboratory and diagnostic tests documented and addressed?
7. Is the plan of care appropriate and documented?
8. Is pertinent patient education documented?

Laboratory/X-ray Utilization questions were:
1. Was the lab test/x-ray appropriate for diagnosis or clinic?
2. Was the lab test result received within 24 hours and x-ray result received within 72 hours?
3. Was the lab test/x-ray result initialed and dated by a physician within 72 hours of receipt?
4. Were clinically significant findings documented in the progress notes?
5. Was plan, as indicated, carried out?
6. When follow-up care was requested, was this carried out in a timely manner?

Chronic Disease questions include:
1. Is the subjective portion comprehensive for clinic (including interval activity for seizure and asthma clinic)?
2. Does the clinic include pertinent vital signs?
3. Is a targeted physical exam with pertinent findings documented, including OHS chronic clinic requirements?
4. Were relevant laboratory parameters documented and acted upon when indicated?
5. Was treatment appropriate for this visit (including additional referrals, additional testing, medication adjustment, ACE inhibitor use, etc.).
6. Was appropriate education for this encounter documented?
7. Was the level of disease delineated?

Infirmary admissions questions:
1. Is an infirmary admission note completed with diagnosis?
2. Does the admission history and physical as documented adequately described this patient's condition?
3. Is indication for admission and type of admission (chronic vs. acute) clearly specified?
4. Are three weekly visits for acute admissions and weekly visits by an MD documented?

5. Is the plan of care appropriate for admission diagnosis?
6. Is MD response to significant nursing entries evident?
7. Is a discharge note with follow-up care evident?

Case: 1:10-cv-04603 Document #: 767-6 Filed: 11/14/18 Page 1 of 64 PageID #:12135

# Mortality Reviews

# 2nd Court Appointed Expert Report

# Lippert v. Godinez

August 2018

**Prepared by Michael Puisis DO**

**PTX193-0704**

# Introduction

We reviewed 33 medical records of patients who died. For each death we assigned a designation of preventable, possibly preventable, or not preventable. Parts of five records were missing and we therefore could not determine whether the death was preventable or not. Of the 33 records, 12 were preventable, seven were possibly preventable, nine were not preventable, and five had missing record documents making determination of preventability not possible.

Definitions we use for these designations are as follows:

**Not preventable death** – A death that could not have been prevented or significantly delayed despite identified opportunities for improvement in the medical care.

**Possibly preventable death** – A death wherein opportunities for clinical intervention or errors related to care delivery were identified that MIGHT have prevented or significantly delayed the patient's death.

**Preventable death** – A death wherein opportunities for clinical intervention or errors related to care delivery were identified that WOULD have prevented or significantly delayed the patient's death.

# IDOC Mortality Reviews 2018
## Patient List

Patient #1  Danville; Possibly Preventable...................................................................... 3

Patient #2  Sheridan; Preventable ......................................................................... 4

Patient #3  East Moline; Not Preventable .................................................. 6

Patient 4  East Moline; Not Preventable ..................................................... 7

Patient 5  East Moline; Not Preventable .................................................... 7

Patient 6  Decatur; Possibly Preventable............................................... 8

Patient 7  Dixon; Preventable ........................................................... 9

Patient #8  Dixon; Possibly Preventable ........................................ 10

Patient #9  Stateville; Not Preventable ............................................. 12

Patient #10  Stateville; Preventable......................................................... 15

Patient #11  Stateville; Insufficient Chart Information to Determine Preventability.................. 17

Patient #12  Stateville; Insufficient Chart Information to Determine Preventability.................. 18

Patient #13  Stateville; Preventable...................................................... 20

Patient #14  Stateville; Not Preventable ................................................. 23

Patient #15  Dixon; Preventable ......................................................... 23

Patient #16  Stateville; Insufficient Chart Information to Determine Preventability.................. 26

Patient #17  Dixon; Preventable .......................................................... 27

Patient #18  Dixon; Possibly Preventable .......................................... 30

Patient #19  Dixon; Preventable .......................................................... 32

Patient #20  Logan; Not Preventable.................................................... 34

Patient #21  Menard; Possibly Preventable............................................ 36

Patient #22  Menard; Preventable........................................................ 37

Patient #23   Menard; Possibly Preventable........................................ 40

Patient #24  Menard; Not Preventable ................................................ 42

Patient #25  Menard; Preventable....................................................... 43

Patient #26  Menard; Not Preventable................................................. 45

Patient #27  Menard; Preventable...................................................... 46

Patient #28  Western; Not Preventable................................................ 49

Patient #29  Taylorville; Possibly Preventable....................................... 52

Patient #30  Hill; Preventable .......................................................... 54

Patient #31  Illinois River; Insufficient Chart Information to Determine Preventability ............ 57

Patient #32  Pinckneyville; Insufficient Chart Information to Determine Preventability............ 58

Patient #33 Robinson; Preventable ...................................................... 60

**Patient #1  Danville**

This patient was 56 years old. Current standards of care recommend colorectal cancer screening beginning at age 50.[1] However, at IDOC annual examinations, the providers only provide an offer of a digital rectal examination with guaiac testing for the purpose of evaluating the prostate and apparently for colorectal cancer screening. Even if the digital rectal examination were done with guaiac testing, this would be inadequate, as an annual colorectal cancer screening will miss more than 90% of colon abnormalities.[2] The patient was offered a digital rectal exam on 1/5/15 but not during 2016.

The patient began losing weight, first documented on 9/30/15 (six pounds based on a 3/9/15 visit compared to the 9/20/15 visit). The patient transferred from WICC to IRCC on 1/16/17 and the weight was 152 pounds, which was an 18-pound weight loss since 3/9/15. The weight loss was unrecognized until 4/21/17, when a doctor documented a 19-pound weight loss. The patient apparently had been losing weight for about a year and a half, but it had been unrecognized.

An abnormal albumin level was present since at least 2/11/16. The alkaline phosphatase was elevated and total protein low on 4/20/17, yet these abnormal labs were never evaluated. On 4/20/17, the patient also had a hemoglobin of 6, which is extremely low. The patient was sent to an ER, where EGD was done 4/22/17 showing gastritis. Colonoscopy was recommended but not done until 6/15/17. In the interim, on 5/17/17 the patient developed unilateral leg swelling but was not evaluated for this. Generally accepted guidelines for unilateral leg swelling include exclusion of leg thrombosis. This was not done and as a result placed the patient at significant risk of harm.

Advanced colon cancer was identified on 6/15/17. Colorectal surgery follow up was recommended in two weeks, but did not occur for a month. In the meantime, the patient was again evaluated for unilateral leg swelling. The doctor presumably thought that the patient might have a deep vein thrombosis, because he ordered a D-dimer test, a test to evaluate for thrombosis. This condition is life threatening, yet the patient was not admitted to a hospital and the D-dimer test was not done. Instead, the doctor only gave diuretics. This was grossly and flagrantly unacceptable.

The patient was admitted to the infirmary for severe edema on 8/3/17. Aside from prescribing a diuretic, there was no attempt to evaluate why the patient had edema. Two days later the patient was admitted to a hospital, where advanced metastatic colon cancer with ascites and anasarca due to the cancer was noted. The patient had malnutrition (consistent with the low albumin), severe ascites, and non-curable colon cancer. The patient was too high a risk to

---

[1] U.S. Preventive Services Task Force colorectal cancer screening as found at https://www.cancer.org/cancer/colon-rectal-cancer/detection-diagnosis-staging/acs-recommendations.
[2] American Cancer Society Recommendations for Colorectal Cancer Early Detection as found at https://www.uspreventiveservicestaskforce.org/Page/Document/RecommendationStatementFinal/colorectal-cancer-screening2#tab.

perform surgery. The patient expired 8/16/17, nine days after admission to the hospital. We identified 49 errors of care from 1/5/15 until his death on 8/17/17. There were 13 episodes when nurses should have referred to a provider but did not. Key deficiencies were lack of colorectal cancer screening; failure to recognize weight loss; failure to timely refer for evaluation of weight loss, anemia, fever, and abdominal pain; and failure to timely refer to exclude deep vein thrombosis in a person with unilateral leg swelling.

The patient was not offered colorectal cancer screening consistent with contemporary standards. **This death was therefore possibly preventable.** The current standard is to perform colorectal cancer screening for early diagnosis and prevention of colon cancer and cancer death. Failure to perform this service results in preventable death. The colonoscopy was not timely.

## Patient #2  Sheridan

This patient was 30 years old. He had repair of a Tetralogy of Fallot[3] as a child. He had a late complication of that pediatric surgery (pulmonic valve regurgitation) and was in the process of medical evaluations for replacement of his pulmonic valve prior to his incarceration. Pulmonic regurgitation gives rise to atrial and ventricular heart arrhythmias with risk of morbidity and mortality. In May of 2015, the patient apparently experienced blood clots resulting in a stroke and was taking anticoagulation for that purpose. The patient became incarcerated in the midst of a work up regarding his valve replacement. While at the Stephenson County Jail in Freeport, Illinois, the patient's cardiologist communicated with the jail on 8/26/15, telling them what work up was remaining prior to valve replacement. The jail continued the work up. An MRI angiography, the final diagnostic study prior to surgery, was scheduled for 12/3/15, but the patient was transferred to the IDOC on 11/5/15.

An NRC physician assistant did an intake physical examination on 11/5/15, but failed to take an adequate history and did not attempt to contact the patient's cardiologist or to obtain old records. Despite the Stephenson County Jail having knowledge of the patient's condition, the IDOC apparently did not know the patient's condition, and other than referring to UIC cardiology, made no attempt to find out the patient's diagnosis. The patient's civilian cardiologist's letter to the Stephenson County Jail was in the patient's IDOC medical record but it is not clear when it arrived in the record or whether it was reviewed. The physician assistant at NRC reception made the wrong diagnosis of aortic stenosis, without supporting evidence. The physician assistant took no history and only relied on the nursing history. The physician assistant examination documented a systolic murmur, when pulmonic regurgitation is a diastolic murmur. Although the physician assistant's note documented that an urgent follow up

---

[3] Tetralogy of Fallot is one of the most common congenital heart conditions. The surgery to repair this anomaly can result, later in life, in abnormalities of the pulmonic valve resulting in incompetence of the pulmonic valve. This can result in dyspnea and other symptoms. Cardiac arrhythmias are common when this occurs. When pulmonic regurgitation occurs as a complication, replacement of the valve may be indicated, as it was in this individual.

PTX193-0708

with a physician was requested, this did not occur. If the diagnosis was unclear, a prompt echocardiogram should have been done.

The patient transferred to Sheridan on 11/18/15, but the transfer form failed to indicate that the patient had pending surgery. A doctor did not evaluate the patient until 12/10/15, a month later. The doctor documented that the patient was to have balloon valvuloplasty surgery prior to incarceration, but made no attempt to contact the patient's cardiologist. Balloon valvuloplasty is a procedure performed on a stenotic heart valve like aortic stenosis but is not used for pulmonic incompetency. The patient was not scheduled for balloon valvuloplasty. The doctor made no attempt to discover what valve was affected. Without documenting the current status of the patient or the urgency of surgery, the doctor referred the patient to UIC cardiology as a routine visit for evaluation of symptomatic *aortic* stenosis, not pulmonic regurgitation. The valve involved could have been identified by performing echocardiogram at a local hospital which should have been done.

As a civilian, the patient was being managed by a pediatric cardiologist due to the nature of his condition, but the doctor sent the patient to a regular cardiologist. The doctor also did a physical examination documenting an irregular heart rhythm with a murmur, and wrote a differential diagnosis of atrial fibrillation with aortic stenosis. The doctor ordered an EKG. There were two EKGs in the chart, both undated and both with sinus rhythm. The patient did not have atrial fibrillation. The doctor ordered metoprolol without giving a reason. Presumably, it was for aortic stenosis with atrial fibrillation, but the patient did not have either of these conditions. This was a potential problem, because metoprolol can cause atrial conduction abnormalities causing arrhythmias, which this patient was at risk for because of his pulmonic regurgitation. The patient's blood pressure was normal, the patient was not in heart failure, and the patient's pulse was 92. Thus, there was no indication for this medication, but it had potential for significant adverse effects. The doctor did not make an appropriate diagnosis and did not base the diagnosis on sufficient diagnostic information. The Wexford physicians did not contact the patient's civilian cardiologist or read his letter, which was in the medical record. Metoprolol carries a warning for its potential to cause heart block, and increases the potential for conduction disturbances. This patient's pulmonic regurgitation already placed the patient at risk for cardiac arrhythmias, and prescribing metoprolol could make this worse and may have been the cause of his death, which was cardiac arrhythmia.

The patient saw a UIC cardiologist on 1/13/16. The cardiologist at UIC was unable to identify a more specific history than the patient was supposed to have repeat surgery on one of his heart valves. The UIC consultation was by a cardiology fellow, who recommended that the facility obtain records from the treating cardiologist, get an echocardiogram to evaluate which valve was involved, and to schedule a follow up. An echocardiogram was done on 2/9/16 and showed severe pulmonic regurgitation but no aortic stenosis. The echocardiograph cardiologist recommended a stress EKG test, and if poor, referral to cardiovascular surgery for pulmonic valve replacement. Doctors did not order the stress test until 4/25/16, almost three months

later; it was approved on 4/27/16. The Sheridan doctor did not call the UIC cardiologist or the echocardiologist to identify urgency.

On 3/24/16, a doctor saw the patient and noted that the patient had his echocardiogram, but the report was unavailable almost two months after the procedure, so the doctor did not know the results of the echocardiogram. There had also been no attempt to call the patient's civilian cardiologist. The blood pressure was low, at 98/62. Despite the low blood pressure, and the patient complaint of having "near falls," and lack of indication, the doctor continued the metoprolol. The patient's symptoms may also have been due to his pulmonic regurgitation, but the IDOC doctors failed to identify his diagnosis despite the recent evidence on echocardiogram. This was the last in-person evaluation of the patient before he died and there are no further in-person evaluation notes.

There is an autopsy indicating that the patient died on 4/28/16, but there are no antecedent notes for the time period immediately before death, so it is unclear where the patient died or what the circumstances of the death were. The coroner listed the cause of death as cardiac arrhythmia. In our opinion, this was likely due mostly to his pulmonic regurgitation, but also possibly due to use of metoprolol.

**This death was preventable**. A proper history and communication with the patient's civilian cardiologist should have resulted in earlier intervention and valve replacement, which is typically very successful in this condition, particularly in a 30 year old otherwise healthy man. Remarkably, the true diagnosis of the patient was unknown to IDOC medical staff for the entire IDOC incarceration of almost six months, even though the patient's treating cardiologist was collaborative with jail staff at the Stephenson County Jail and even though his letter explaining the treatment plan was in the IDOC file. Also, an echocardiogram identified a critical valve problem but for several months the echocardiogram was not reviewed. As well, the use of metoprolol without clear indication placed the patient at risk of cardiac conduction abnormalities that already affected the patient due to his pulmonic valve disorder. This may have contributed to the patient's arrhythmias, which the coroner said caused his death. The quality of care of physicians was below standard of care with respect to obtaining an accurate history and communicating with a treating physician and with respect to use of metoprolol without a diagnosis or indication. Also, the absence of medical records around the time of death reflects poor medical record keeping or documentation. Over the approximate six months of incarceration in the IDOC, there were 10 errors we identified, principally not following up after consultation, not developing an appropriate treatment plan, and not obtaining an adequate history.

## Patient #3  East Moline

This was a 47-year-old man admitted to IDOC with a history of hypertension. The patient transferred to East Moline on 2/8/17. This patient had significant problems identified over the course of several months, including: anemia (hemoglobin as low as 8.9), persistent cough with

decreased peak expiratory flow rates, increased heart size with possible pericardial effusion, elevated sedimentation rate (69 and 98), elevated C-reactive protein of 43.8 (nl <8), and weight loss. While it is our opinion that hospital referral should have been offered as soon as 10/13/17 (for difficulty breathing, 30 pound weight loss, anemia, elevated sedimentation rate, and globular heart on x-ray suggestive of pericardial effusion), a doctor ultimately offered transfer to the hospital on 10/23/17. The patient refused hospital admission. The patient declined and died at EMCC on 11/3/17. An autopsy was not done.

**This death was not preventable** largely because the patient refused referral to a hospital. However, the there was a significant delay in offering to send the patient to a hospital, and the patient was kept at the facility with evidence of a life-threatening condition on 10/13/17.

## Patient #4  East Moline

This was a 43-year-old with no history of medical problems who had a sudden collapse and died of a pulmonary embolism. **This death was not preventable.**

## Patient #5  East Moline

This was a 75-year-old man who had his reception screening at NRC on 8/8/17. The patient had history of diabetes, hypertension, coronary artery disease, glaucoma, asthma/COPD, sleep apnea, and umbilical hernia. The NRC history was very poor, and though documenting prior cardiac surgery and stent placement, the details were not specified. The patient was on two medications (Brilinta and oxybutynin) for which no indication was given. Although the Brilinta may have been used for the stent, it was not clear, and the date of the stent was beyond the time for which this type of anticoagulant is used.

The patient transferred to East Moline Correctional Center on 8/22/17, and was confused when he arrived. For that reason, he was housed in the health care unit. This apparently was new onset of confusion, as the patient had not been confused at NRC. Despite confusion, the doctor did not order tests to evaluate for this for several days. The patient never had a CT scan, which is often performed for persons with new onset of confusion. On 8/28/17, the patient apparently bit his tongue sufficient to create a large laceration of the tongue, which bled profusely. The patient was on a powerful anticoagulant, which may have contributed to the bleeding. The patient's tongue and lips were swollen, and the patient could not swallow.

The patient was timely sent to a hospital, where the patient died not long after arrival. Doctors judged that the patient had angioedema from being on Lisinopril. The patient should have had an autopsy but did not. It is not clear if the recent confusion was at all related to the cause of death and whether the death may have been due to bleeding rather than angioedema. While the hospital diagnosis was likely, an autopsy should have been performed. **This death was not preventable.**

## Patient #6  Decatur

This patient had known cirrhosis, type 2 diabetes being treated with insulin, hypertension, and a long-standing skin disorder. The skin disorder was such that it caused itching and scratching, and became infected. Doctor-directed treatment of the skin rash failed to resolve the problem over a period of at least eight months. Doctors did not make a definitive diagnosis and did not appear to know what the rash was, yet did not refer the patient to a dermatologist for a definitive diagnosis. At autopsy, the pathologist documented that the patient had diffuse psoriatic-like skin lesions.

The patient also had cirrhosis due to hepatitis C. Though the patient had a high level of fibrosis and appeared to pass from compensated to decompensated liver disease under care of the IDOC, the patient was not documented as having been offered treatment for hepatitis C. Though physicians knew that the patient had cirrhosis, they also did not offer generally accepted care for cirrhosis, such as endoscopy screening for esophageal varices, beta-blocker medication to reduce complications of varices, or screening for hepatocellular carcinoma, which is recommended to be done by ultrasound examination every six months. It is not clear why this patient was not sent to the UIC hepatitis C consultants. Doctors also failed to recognize decreasing HbA1C levels, with episodes of hypoglycemia that was likely due to the patient being on insulin and having advanced liver disease. This placed the patient at risk of significant hypoglycemia.

The patient developed fever, abdominal pain, and hypotension consistent with septic shock, but was not sent to the hospital for evaluation for two days. The hospital record was not in the record for this first hospitalization. The patient returned to the facility and was housed on the infirmary. Apparently based on a second hospital admission, the patient was found to have possible cholecystitis with stones and advanced cirrhosis, making surgery too high-risk. The patient returned to Decatur Correctional Center.

On the day of return, the patient began vomiting blood[4] repeatedly and was hypotensive, indicating shock. Nurses called a physician several times, but the doctor did not send the patient to a hospital until he came into the facility about five hours later. This was grossly and flagrantly unacceptable. The doctor eventually came to the facility and sent the patient to the hospital. Prior to sending the patient to the hospital and during the time the patient was in shock, the doctor obtained a do-not-resuscitate/do-not-intervene status and communicated this to hospital personnel, who then did not attempt interventions. The patient signature on the DNR document was disorganized and unlike the patient's typical signature. The patient died in the hospital not having received aggressive care.

The coroner listed the cause of death as bleeding esophageal varices. **The patient's death was possibly preventable.** If the patient had generally accepted care (including treatment of the

---

[4] Vomiting blood in a person with cirrhosis strongly suggests esophageal varices. When this occurs, immediate hospitalization is indicated. If the patient had been on prophylactic beta blocker medication, this may have been avoided.

hepatitis C, endoscopy surveillance with treatment of esophageal varices, and preventive beta blocker treatment for the varices) early in the course of her disease, her death may have been preventable or delayed. The patient should have been under care of the UIC hepatology group, but was not. Aggressive treatment in the hospital may also have delayed death. The method of obtaining "informed consent" during the time that a patient is in shock should call for an internal review of the IDOC practices of obtaining informed consent.

## Patient #7  Dixon

This patient was a 51-year-old man with history of obesity, hypertension, and high blood lipids. He also was deaf and did not have medical examinations consistently with an interpreter. He was given hearing aids, but these were malfunctioning for periods of time. The patient also had a history of alcoholism and elevated liver function tests, but these were not followed at least since 2014. The patient had minimal elevation of blood glucose levels. Given his significant obesity (as high as 292 pounds), hypertension, and high blood lipids, screening for diabetes would have been good practice. The patient did receive routine metabolic panels, but it was not clear that the glucose tests being done were fasting. In any case, doctors appeared unaware of the risk for diabetes.

The patient developed cough, tachycardia, and low blood pressure. The blood pressure had recently been elevated. On 10/27/16, the blood pressure was 160/96 and was 98/62 on 11/11/16. This significant and unanticipated drop in blood pressure went unnoticed. The pulse was 112. Despite the abnormal vitals, the nurse did not refer to a provider. Two days later, a nurse referred the patient to a nurse practitioner for vomiting. The patient was deaf and the nurse assisting the nurse practitioner documented that the patient did not understand the nurse's questions, so the nurse was unable to obtain an accurate history. The nurse practitioner documented that the patient had several days of fever, sore throat, headache, and vomiting. The patient had tachycardia (116). Based on these constellation of symptoms that included fever, unrecognized weight loss, hypotension, tachycardia, and vomiting, the NP diagnosed pharyngitis and dehydration. This was grossly and flagrantly unacceptable and made worse by fact of not having an appropriate translator for this deaf patient. The NP took no history with respect to the vomiting and failed to order any laboratory tests despite the patient not having eaten in four to five days, and having vomiting and dehydration. The NP started an intravenous antibiotic (Ancef) for pharyngitis, which is not typical standard of care. Vomiting and not eating are not associated with pharyngitis and should have resulted in investigation of another diagnosis. Further diagnostic work up was indicated but not done.

The patient was admitted to the infirmary on 11/13/16. A physician saw the patient on 11/14/16, but took no history of the patient's symptoms of vomiting, not eating, or dehydration. The doctor merely continued the same care as the NP, but ordered next day laboratory tests to assess the dehydration. These lab tests were never done. These tests should have been immediately done.

The patient deteriorated. On 11/14/16, the patient became hypothermic, with temperature of 94.9°F with altered mental status. This new red-flag finding was consistent with sepsis and the patient should have been immediately hospitalized or immediately assessed with diagnostic studies, but the doctor failed to address these problems. Later that same day, the patient became unresponsive. An unresponsive patient, with history of vomiting, dehydration, and hypothermia should be immediately hospitalized. No action was taken, which was grossly and flagrantly unacceptable.

On 11/15/16, the patient was found kneeling and lying on the floor. The nurse did not take his vital signs and did not consult a physician. Despite the patient's altered mental status and weakened status, a doctor did not see the patient on the infirmary unit on 11/15/16. Ordered labs were not done. On 11/15/16, the patient was not talking. This level of altered mental status should have resulted in immediate hospitalization. This was grossly and flagrantly unacceptable care.

On 11/16/16, the patient opened his eyes only to stimulus and was unable to feed himself. At 7:53 a.m. on 11/16/16 the patient was still unresponsive, and the blood pressure was 68/palpable. The patient was in shock and the patient was transferred to a hospital. At the hospital, diabetic ketoacidosis was diagnosed, which had been unrecognized at the prison. The patient was severely dehydrated and had significant abnormalities of his liver function. The patient died the day of arrival.

**This death was preventable.** On multiple occasions, he should have been sent to a higher level of care for laboratory testing and better monitoring than was available at the prison. The patient had vomiting, abnormal vital signs for three days, and altered mental status for two days, yet was not appropriately evaluated. The patient had vomiting, hypothermia, tachycardia, lower than normal blood pressure, dehydration, and altered mental status. The failure to admit to a hospital earlier in the course of care was grossly and flagrantly unacceptable practice.

## Patient #8  Dixon

This was a 45-year-old with a history of smoking and mental illness who brought to medical attention a lump on the neck on 2/5/16. A nurse practitioner and then a doctor saw the patient, but the doctor noted that the 2 by 2 centimeter mass was likely a lymph node and ordered a six month follow up. The neck mass was described as hard. A hard 2 cm neck mass should be considered cancer until proven otherwise. The patient was evaluated multiple times, but the hard neck mass was not evaluated for cancer despite that this presentation must exclude cancer. The patient began losing weight on 3/29/16, but it was unnoticed by physicians. A doctor saw the patient again for a neck mass and swollen uvula on 4/29/16, and started antibiotics for a presumed infection. On 5/9/16, a nurse practitioner identified increased throat swelling and ordered a different antibiotic. The patient had lost weight, but it was unnoticed. The patient was repeatedly evaluated by doctors and nurse practitioners and the neck mass increased to a golf ball size, but it was diagnosed as infectious. The patient was finally sent to a

hospital on 5/15/16, three months after initial symptoms, and a CT scan showed a neck mass, likely a tumor. This could have been diagnosed three months earlier.

The patient continued to lose weight and the patient eventually went to UIC for evaluation, but reports were not obtained and doctors at Dixon failed to document the status or progress of the patient's specialty care. Chemotherapy and radiation therapy apparently started in mid-September 2016, about four months after the initial CT scan showing a likely cancer and seven months after identification of the neck mass. During chemotherapy there were no reports and doctors at Dixon failed to document the progress of the patient's therapy.

The patient continued to lose weight, yet even when described as cachectic, the doctor did not perform a nutritional assessment, and failed to determine whether the patient was able to eat or what he could eat, given his cancer. When the oncologist was preparing the patient for chemotherapy, a doctor at Dixon told the patient to "fatten up," without any evaluation with respect to whether the patient was able to eat, or what his nutritional status was. Except for giving Boost, no action was taken until, when hospitalized for chemotherapy, the patient had a gastrostomy tube inserted.

The patient developed pressure ulcers. Repeatedly, doctors failed to evaluate the ulcers. On two occasions, the patient had an irregularly irregular heartbeat. After the first episode, an EKG was not done but should have been done. On the second occasion, a routine EKG was noted showing premature atrial contractions.

In early September, the patient passed out and had hypotension (60/40). This level of blood pressure is compatible with shock. The patient also had altered mental status. Instead of sending the patient to a hospital, the doctor placed the patient on an infirmary for 23-hour observation. The following day, a doctor presumed the patient had a seizure without ordering or having any diagnostic tests (CT brain, EEG, EKG, laboratory tests) to confirm his diagnosis. Instead of ordering diagnostic testing, the doctor released the patient to general population without any plan except to tell the patient to use a wheelchair.

The patient was hospitalized in November for chemotherapy, but after hospitalization a doctor did not document the therapeutic plan of the patient. Three days after release from the hospital the patient was not responding, was lethargic, and was found on the floor. Instead of sending the patient to a hospital or obtaining an immediate EKG, the doctor ordered neuro checks and asked to be called if the patient became unresponsive. Doctors should not wait until someone becomes unresponsive after a potential syncopal episode; they need to send the patient to a hospital or perform immediate tests to determine the cause of the syncope. The following day, a nurse noted that the patient had unequal pupils. A doctor saw the patient, and although noting that the patient experienced a fall, the doctor failed to perform a neurologic examination and did not order an EKG. This was grossly and flagrantly unacceptable care. The following day, the patient was unresponsive and was sent to a hospital. The patient had experienced cardiac arrest and had atrial fibrillation, but died after arrival to the hospital.

There were multiple missing reports from consultants. The patient had first signs of malignancy in February of 2016, but did not have an appropriate diagnostic CT scan until May of 2016. A biopsy was done sometime in May, but there was no report and it was not clear when this occurred. A PET scan was not done until late June 2016. Chemotherapy and radiation therapy did not start until sometime in mid to late September. Treatment was not started until seven months after first symptoms. Treatment at the facility after chemotherapy and radiation therapy were at times grossly and flagrantly unacceptable. The patient had an irregularly irregular pulse and experienced syncope, but was not sent to a hospital. Three weeks later, a doctor ordered a routine EKG, which appeared to show premature atrial contractions. A radiation oncologist recommended that Dixon evaluate the patient's premature atrial contractions, but there was no report to identify what the concern was. The patient was found to be unresponsive and lethargic, and was on the floor. The nurse called a doctor in the evening and the doctor, instead of sending the patient to a hospital, ordered neuro checks and to call him back if the patient was unresponsive. The following day the patient had unequal pupils, yet the doctor still did not admit the patient to a hospital or evaluate the patient for his syncopal episode. The following day, the patient was admitted to a hospital after being found unresponsive. The patient had atrial fibrillation, developed cardiac arrest, and died. Because of the delay in diagnosis, delay in treatment, failure to evaluate multiple potentially life threatening events (unequal pupils, syncope, and altered mental status), **this death was possibly preventable.**

## Patient #9  Stateville

This 79-year-old patient had hypertension, chronic kidney disease, and dementia from an unknown cause. The medical records lacked information to such an extent that it was not possible, on review of the prison records, to determine the status of the patient's conditions at almost any point in his two year stay on the infirmary at Stateville. The only reliable source of documentation was from offsite hospital reports, but these reports were not consistently filed in the medical record. The only partly reliable onsite source of information was from nursing notes.

The patient was apparently a full-time resident of the infirmary since at least 2014. Dating from December of 2013 until June of 2014, the doctor's progress notes, 19 in number, were identical and stated in their entirety, "No specific complaint, no change, dementia, continue same care."

That was the extent of the note which was repeated over and over. There was no effort to monitor the patient for any of his medical conditions until the patient deteriorated and needed to be hospitalized. The nurses were the only health care staff who appeared to be monitoring the patient.

On 6/28/14, the patient was confused, with low oxygen saturation, and was sent to a hospital. The hospital discharge summary was not in the medical record except for an echocardiogram that showed severe left heart dysfunction, an ejection fraction of 30%, and pulmonary

hypertension. This echocardiogram is consistent with significant cardiac and pulmonary disease. When the patient returned from the hospital the patient was on oxygen, but the doctor did not review what had occurred in the hospital, except to note that the patient had a stroke and had respiratory failure. The patient's capacity for performing routine daily activity was not discussed in the patient's therapeutic plan and not addressed. The status of the patient's condition was not described. Despite documenting that the patient had a stroke, the only neurological examination documented was a confusing two word statement which was, "alert, confused," which was unintelligible. None of the findings on the echocardiogram were included in the problem list and none of these findings were followed clinically. The stroke was not clarified, and the status of the patient's neurological status was not established.

After return from the hospital on 7/16/14, the patient started falling in his room. For a year, from 7/24/14 until 7/13/15, the patient fell seven times. Although a doctor ordered x-rays on one occasion, the doctor failed to perform an examination of the patient after any of these falls. There was no documented attempt by the providers to protect the patient, who had a history of stroke and dementia, from injury due to these falls. After return from the hospital on 7/16/14, the patient was on continuous oxygen therapy for unspecified reasons. The doctor eventually documented on 8/27/14 that the patient was doing well without use of CPAP. The doctor discontinued the CPAP and ordered CPAP use "PRN" or as needed. How would a confused demented patient know when to use oxygen? It also appeared that the doctor used the word CPAP when he probably meant BiPAP. CPAP is a device used in sleep apnea but BiPAP is a form of oxygen delivery. There was no evidence that the patient had sleep apnea.

Beginning in July of 2014, after return from the hospital, the doctor again began writing notes that were identical or near identical to previous notes. Many of these were verbatim identical. These notes were similar to the note quoted above. This incompetent documentation continued even when problems occurred, such as a patient fall.

Beginning in May of 2015, nurse documentation revealed that the patient's status was changing. The patient began experiencing diarrhea and became progressively more confused. When nurses called the doctor stating that the patient was confused, the doctor gave a phone order for long-term Ativan, a sedative and anti-anxiety agent. This occurred twice. This drug carries a warning that it may impair mental abilities and must be used cautiously when performing tasks requiring mental alertness. Use in an elderly demented patient with history of falls was bad judgment at best and carries a manufacturers warning to use *extreme caution* when using in patients at risk of falls. The patient was kept on Ativan for over a year despite repeated subsequent falls. This placed the patient in direct risk of harm.

The patient's confusion worsened. On 5/15/15, a nurse described the patient as unresponsive and lethargic. On 5/23/15, the patient was described as walking unsteadily and appearing agitated and confused. The doctor again prescribed Ativan by phone for 30 days without examination of the patient. This was grossly and flagrantly unacceptable care. The patient began complaining of stomach pains and the doctor ordered lab tests by phone twice, which

were not done. Through all of these episodes the doctor continued to write nearly identical notes, which did not represent symptom findings as documented in nursing notes. The doctor never documented a thorough examination of the patient. Most of his examinations were documented as "no change."

By 7/11/15, a nurse described the patient as "very weak" and "declining." On 7/12/15, a nurse documented that the patient was not able to feed himself and was not eating. The doctor was notified but took no action. Later that day the patient was incontinent, and a doctor ordered blood tests, which finally were done. The laboratory called the prison because the labs were of critical value, with hemoglobin of 6. The patient was sent to a hospital.

At the hospital, an intra-abdominal abscess was identified, and a laparotomy was done, and a large invasive colon cancer was identified requiring a partial colectomy with an ileostomy. The cancer was so advanced that it was not able to be resected. Given the patient's dementia, hospice care was recommended.

When the patient returned from the hospital, the doctor continued to write the same notes with nearly identical words from July of 2015 until the patient died in April of 2016. These notes stated, "No specific complaint. No change. Dementia, post colectomy for metastatic ca [cancer]. Continue same care."

The patient did not appear to receive any specialized care or hospice care. The doctor made no attempt to identify whether the patient was in pain or to assess the comfort level of the patient. The patient fell six more times, based on documentation. The doctor's notes were the same even after patient falls and episodes of increased confusion or agitation. Despite repeated falls, the patient was kept on Ativan, which carries a warning to use extreme caution in persons at risk of falls. The doctor ordered no labs to monitor the clinical status of the patient. Nutritional status was not documented as monitored by the physician. Comfort measures were not documented by the doctor as taken. The patient soiled himself frequently and pulled off his colostomy bag and soiled the bed and his clothes. During one of these episodes of fecal accidents, a nurse documented that the patient was combative. The nurse wrote, "need more staff to help change."

The doctor wrote nearly identical notes over 30 times from July of 2015 until April of 2016, giving no updated status of the patient. On 11/23/15, a second doctor was covering the infirmary and diagnosed a pustular otitis media with a tympanic perforation, but on the same day as this episode the doctor wrote his typical identical note without assessing the patient's ear.

In late November 2015, the patient became lethargic and had diarrhea. A nurse called a doctor and the patient was sent to a hospital, where a urinary tract infection was identified. Blood tests at the hospital indicated that the patient was significantly dehydrated (BUN 56), indicating

lack of attention to nutrition and fluid consumption. When the patient returned from the hospital, the same irrelevant, identical notes were written by the doctor.

On 4/18/16, the doctor wrote one of his typical identical, irrelevant notes. The following day, a nurse noted that the patient was diaphoretic, listless, pale, and was lying in bed without sheets or covers, and appeared to be in pain but was unresponsive. After about five hours and three nursing evaluations, the patient was sent to a hospital. Although the hospital discharge summary was not available, the patient died of sepsis. The autopsy describes the body as having dirty finger and toenails and multiple scars on his extremities and back, apparently from scratching himself.

In summary, this patient received insufficient nursing care likely due to lack of staffing. Nurses were the only clinical staff paying attention to the patient and they appeared less than adequately staffed in performing their tasks. This placed the patient at risk from falls, infections, and lack of attention to nutrition. The Medical Director wrote nearly identical notes over two years despite a changing clinical status of the patient. The notes were nearly identical, even before and after hospitalizations. Significant clinical events (falls, ear infections, change in mental status, alteration of bowel habits, etc.) were either ignored or not commented on by the doctor. The patient's actual clinical status, including nutritional status, was not monitored by the doctors at all. The lack of attention to the patient's pain status and comfort measures by the physician were absent despite a recommendation for hospice care by the oncologist. We identified 255 errors in the patient's care over the two years of record review. Many included failure to take adequate history, perform adequate physical examination, and make an appropriate assessment, due to use of identical documented progress notes despite changes in the patient's status. The patient's medical conditions, which included hypertension, chronic kidney disease, dementia, COPD, and eventually colon cancer, were never monitored during physician visits. **Care was negligent. Careful attention to this patient would probably have prolonged his life to a small extent but the death was not preventable**. More important was the lack of humane care by the physician, which was incompetent, and grossly and flagrantly indifferent. The care of this patient also demonstrates the effect of lack of sufficient nurse staffing on the Stateville infirmary.

## Patient #10  Stateville

This 68-year-old inmate from Stateville had hypertension, diabetes, and back pain. He had elevated lipids and carried above a 50% 10-year risk of cardiovascular events or stroke[5] based on American College of Cardiology criteria, yet this was unrecognized for the entire incarceration and the patient remained untreated for this disorder. Blood pressure was not at control (140/90) on six occasions, but doctors failed to adjust medications   Failure to properly

---

[5] The American College of Cardiology and American Heart Association guidelines on lipid therapy recommend that when the 10-year risk of heart disease or stroke is over 7.5% that patients be started on statin medication. A simple calculator for identifying risk is available at http://www.cvriskcalculator.com/.

treat the hypertension and lipid disorder placed the patient at risk of cardiovascular events and stroke.

The patient had back pain and was on ibuprofen, a nonsteroidal medication, for almost the entire period of record review without adequate monitoring. This drug carries two black box[6] warnings; one for increased risk of serious (and potentially fatal) adverse cardiovascular thrombotic events, including fatal MI and stroke, and an increased risk of serious gastrointestinal inflammation, ulceration, bleeding, and perforation (may be fatal). This latter risk is increased in the elderly. The nonsteroidal medication can also exacerbate hypertension or cause renal damage. Despite these serious and significant warnings, doctors routinely and continuously prescribed this medication without considerations of the risk to the patient and without discussing those risks with the patient.

On 4/15/16, the patient experienced an episode of emesis and nausea after awakening. An EKG showed STT wave changes that could be consistent with ischemia. A doctor diagnosed possible nonsteroidal gastritis or angina, both of which were possible in this patient. The doctor did stop the non-steroidal medication and started omeprazole, an anti-ulcer medication, but the doctor did not take action with respect to the potential for angina. The doctor ordered a hemoglobin and it was 10.3, significantly lower that the last hemoglobin of 13.7, yet there was no follow up of this abnormal lab. The patient should have been referred for endoscopy. Also, the doctor stopped the ibuprofen and ordered only a single nitroglycerin tablet, and failed to order anti-anginal medication longer term. Because the patient had such high risk for cardiovascular disease, a stress test or cardiac catheterization should have been done. Yet there was no follow up of this problem. Endoscopy and colonoscopy should also have been done to evaluate the recent anemia and abdominal symptoms.

A different doctor restarted the ibuprofen about two weeks after the episode of 4/15/16 without reviewing the abnormal hemoglobin and without recognizing the black box warnings or the recent dramatic drop in hemoglobin. A week later, the ibuprofen was changed to naproxen, another nonsteroidal medication with the same risks and same black box warnings. Doctors ordered non-steroidal medications six times without consideration of the black box warnings for gastrointestinal bleed, which the patient likely had as manifested by his acute anemia and prior episode of vomiting "black stuff" as early as 2013. The doctors also ignored the potential for cardiovascular thrombotic events with use of non-steroidal medication, likely because they appeared ignorant of the patient's high-risk cardiovascular status. This was likely incompetence.

On 2/5/17, the patient collapsed. CPR was initiated at the facility, but the patient died at the hospital. An EKG done at the facility was consistent with an acute coronary event (MI). A coroner listed the cause of death as atherosclerosis contributed to by gastrointestinal hemorrhage.

---

[6] According to the Food and Drug Administration website at
https://www.fda.gov/downloads/forconsumers/consumerupdates/ucm107976.pdf   boxed warnings appear on a prescription drug's label and are designed to call attention to serious or life threatening risks.

**This death was preventable.** Providers failed to evaluate for peptic ulcer even though the patient had symptoms or signs of this condition (anemia, vomiting, and apparently bloody emesis). The patient's anemia was never properly evaluated despite being suggestive of peptic ulcer disease. Despite potential for ulcer disease and cardiovascular disease providers kept the patient on non-steroidal medication for years despite warnings from the manufacturer regarding risk for gastrointestinal bleeding and myocardial infarction. Providers failed to treat the patient for high blood lipids despite significant risk. Providers failed to manage blood pressure to a level considered a goal for diabetics. Lipid therapy and adequate blood pressure control are modifiable risks for cardiovascular disease. When a doctor on 4/15/16 documented that the patient might have had a coronary event there was inadequate follow up. There were signs on EKGs of ischemic cardiovascular disease (changing patterns of STT wave changes) that indicate possible ischemic cardiac disease. There were multiple modifiable factors for cardiovascular disease yet the patient did not receive evaluation for this disease. Although the patient appeared to the provider to have had an angina episode, follow up stress testing or angiography were not done, and the patient was not treated with anti-anginal medication. If earlier interventions in these areas were undertaken the death would have been preventable. We note that appended to the death summary was a Wexford Mortality Review Worksheet in which the Medical Director who participated in care of the patient opined that earlier intervention was not possible and that there was no way to improve patient care. We disagree for the reasons cited above. We noted 50 errors of management in this patient's care.

## Patient #11  Stateville

The records sent for this patient consisted of 20 PDF files which were not in order and were disorganized, making evaluation extremely difficult. This 73-year-old lost about 20 pounds from 2014 to 2015 without anyone noticing or initiating an evaluation. On 10/6/15, the patient developed dysphagia to solid food and a right neck mass was identified. On 10/20/15, an ultrasound showed a likely malignancy. The diagnosis of invasive squamous cell carcinoma of the tongue was not made until 1/8/16, almost three months later.

Few offsite consultation reports were available. Some referral forms were present that had a few scribbled notes by the consultant written on them. The patient started radiation therapy sometime in late February, almost five months after symptoms started. The notes by the SCC doctor were so poor that it could not be determined what the status of the patient was and whether care was appropriate. Most of the doctor's notes stated, "No specific complaint [objective] no change [assessment] throat ca on radiation chemo [plan] continue same care."

This identical note was repeated over and over, giving no update on the status of the patient's chemotherapy or radiation therapy. The patient had hypertension, hyperlipidemia, apparent COPD, and head and neck cancer. Except for the head and neck cancer, none of the physician notes over the last seven months of the patient's life included mention of the patient's other conditions. Almost no notes over the same time period gave an updated status of the head and neck cancer, and the existing therapeutic plan. The patient did not appear to receive care

except by UIC consultants. Since not all of the consultation reports were in the medical record, it was not possible to review whether the therapeutic plan of the oncologists was being carried out. The patient apparently completed chemotherapy and radiation therapy, but a follow-up PET scan was not in the record. The patient had episodes of shortness of breath in July that were not diagnosed. The patient was found unresponsive on the toilet, apparently taken to a hospital, and apparently died. We say apparently because there were no notes documenting what happened to the patient.

The coroner listed the cause of death as hypertensive heart disease. A recent echocardiogram was normal and did not show hypertensive heart disease. The coroner performed an autopsy but the IDOC was unable to find it. The coroner made no mention on the death certificate of the patient's head and neck cancer. This appears to be a mistake.

There were **insufficient medical records to determine if the death was preventable,** as consultation notes were not all available, SCC physician notes were poor, and the autopsy was unavailable. We identified 170 separate errors. Most were combinations of failure to take a history, perform a physical examination, make an assessment, and develop a therapeutic plan. These occurred when the doctor who was the Medical Director wrote notes repeatedly that contained the phrase quoted above. There were multiple errors of not having a medical report available. However, we were unable to determine how many reports were not present, as it appeared that the patient had many more consultations, radiation, and oncology treatments than are documented in the medical record. It was not surprising that there were also multiple episodes of failure to follow up appropriately after a consultation. Because so many consultation reports were not in the record, many more of these were probably also not followed up on. There were few episodes of care documenting review of the consultant's care noting recommendations. Documentation was so poor that it was not possible to determine the course of care for this patient, even to determine whether death was preventable.

### Patient #12  Stateville

This patient was incarcerated at Graham Correctional Center on 8/11/15. The patient was transferred to Western Correctional Center. After the intake evaluation at Graham, there is a gap, and medical records for the next year were missing. The record resumes in August of 2016, when the patient was transferred from Western Correctional Center to NRC for a writ at UIC for treatment of liver cancer. After transfer from Graham to NRC, most physicians treating the patient were from NRC, but in February they were from SCC. It was unclear during this time period where the patient was actually housed. The missing record documents from Graham and Western were compounded by multiple missing record documents from NRC. At NRC, most specialty referrals and specialty reports were not in the record, and it was not possible to determine the course of care based on the available record. Also, there were no progress notes for this patient from 1/20/17 until 2/15/17, almost a month. During this time, the patient had life-critical laboratory results and it was not possible to review care for that period. To give a final opinion on this patient with this chart is not possible because the chart is incomplete. We

PTX193-0722

had asked for two years of the record but only received one year, and there were missing documents in the record we received. Over the entire period at NRC/SCC, doctors did not document understanding of the therapeutic plan of UIC consultants. Because of the lack of reports in the record, it was not clear what that plan was. Despite providers, on multiple occasions, stating that they were waiting for reports and expressing not knowing what the plan was, these reports were not obtained. This took place between August of 2016 and February of 2017, when the patient died. This does reinforce our opinion about the medical record system at NRC, which is completely broken.

The missing record from Western would be important to review with respect to an opinion on preventability. A UIC consultant documented that hepatocellular carcinoma was identified on CT scan in January of 2016, yet the patient was not referred for treatment until August of 2016. It was unclear if earlier knowledge of the diagnosis was available. A biopsy done in May of 2016 showing apparent hepatocellular carcinoma was requested by UIC multiple times but was never provided. This patient did not apparently have timely evaluation or treatment of his condition and his death may have been delayed or prevented given timely and appropriate care. But we will not make that designation without the ability to review the record, which was not present. Because of these missing medical record documents, **there is insufficient medical records to determine whether this death was preventable.**

Despite being unable to determine whether this death was preventable, we did note significant problems with his care. We noted 40 errors; 15 were related to lack of available reports from consultants, which resulted in at least five episodes of lack of follow up. It was not clear if the patient ever went back to UIC for follow up after treatment of his hepatocellular cancer.

There were four episodes of medication error. In one case the patient was started on spironolactone, but the patient had prior and recent hyperkalemia, which required kayexalate. When the spironolactone[7] was started, monitoring of potassium was not done, although recommended by UIC. This was the first medication error. Almost three months later the patient developed life-critical potassium elevation. This potassium (6.9) was reported by phone by UIC at 5:30 a.m. on 2/11/17, but the patient was not evaluated with an EKG or clinical evaluation, and kayexalate was not given until 2/12/17, in the evening. This was grossly and flagrantly unacceptable practice. The second error was that it was not realized that the patient was still on spironolactone until 2/14/17, when it was stopped. The third error was that the patient had ascites and his diuretics expired and this was not noticed for almost four weeks, at which time the patient had significant ascites and apparent anasarca. The fourth error related to an abnormal laboratory result. At one point, a stat laboratory result was called in from a local hospital. The platelets were 22,000. Thrombocytopenia is characteristic of cirrhosis and no treatment is indicated except to prevent bleeding and to eliminate drugs that may cause

---

[7] Spironolactone is a diuretic medication that can cause elevation of the potassium level. A potassium level above 6.5 is considered critical and life-threatening. Immediate evaluation is indicated, along with an EKG to assess whether immediate intravenous medication needs to be given. In this case, the patient was treated casually and not for a day and a half after notification of the abnormality.

bleeding. The Medical Director, who was a surgeon, receiving the report from a nurse by phone incompetently ordered high dose injected steroids and a three-day course of high dose prednisone, apparently thinking that the patient had immune thrombocytopenia, a different disease. This placed the patient at risk of harm, as the drug was unnecessary and given the patient's, condition placed him at higher risk of bleeding and infection.

The patient developed severe ascites with decompensated cirrhosis. UIC had recommended him to return if this occurred, yet doctors failed to know the therapeutic plan of UIC because reports were unavailable, so the patient was not returned to UIC. Also, the patient was not seen for about six weeks despite having new onset ascites and life-critical laboratory results, including BUN 149, sodium 125, creatinine 3.88, and potassium 6.9. This lack of access to a physician despite life-critical laboratory results was indifferent.

We note that despite UIC diagnosing and treating the patient for hepatocellular carcinoma, the Medical Director at SCC, a surgeon, wrote the death summary and stated that the patient died of cholangiocarcinoma, a cancer of bile ducts. This diagnosis was nowhere present in the medical record and could not have reasonably been presumed based on a review of the medical record. The coroner listed liver cancer, and UIC physicians documented that the patient had hepatocellular carcinoma. Cholangiocarcinoma and hepatocellular carcinoma are different cancers. This inaccuracy was not corrected as apparently no one reviewed the death critically.

## Patient #13  Stateville

This patient was a 38-year-old man with a history of hypertension and on renal dialysis for kidney failure. The reason for being on dialysis was not documented in the medical record and was unclear, but it appeared to be from hypertension. This is a very young age to have kidney failure from high blood pressure, yet the etiology of the renal failure was not documented in the record.

The patient transferred from Graham to Stateville on 9/24/14. The patient was at Stateville 18 months. During that entire 18 months the blood pressure was not controlled. There were 16 episodes of care in the medical record during which a doctor (staff physician or contract nephrologist) saw the patient. At all of these episodes the blood pressure was not at goal and was sometimes significantly elevated. On only three occasions did a doctor modify or increase blood pressure medication. During this time period the patient had only two chronic care visits. The lack of attention to the patient's ongoing high blood pressure was indifferent.

On six occasions, the serum potassium was above 6.7. Three of these values were above seven (7.1, 7.2, and 7.6) and one of the values was extraordinarily high (8.5). All of these values are critical values and require immediate intervention. When the potassium is above 7, the patient is susceptible to cardiac conduction abnormalities (e.g. sinus arrest, idioventricular rhythms, ventricular tachycardia or fibrillation, and asystole) which can cause death. Yet on all of these occasions no actions were taken. On one occasion, when the UIC laboratory called Stateville at

4:00 a.m. for critical potassium level of 8.5, the nurse took no action except to note that the morning nurse would follow up. That did not occur. At 1:30 p.m. that same day, a nurse notified a doctor and the plan was to have the patient followed up the next morning. There was no documentation that this occurred. These were critical values that typically require immediate attention, and the lack of attention to this was grossly and flagrantly unacceptable practice and placed the patient at risk of harm.

Both a vascular surgeon and the nephrologist recommended work up of a murmur. The Stateville doctor referred the patient to cardiology. Wexford denied the cardiology consult but approved an echocardiogram. The patient had an echocardiogram consistent with significant hypertensive heart disease and multiple abnormalities. When the doctor at Stateville saw the patient after this test, the doctor did not review the test or take any action. No one followed up on the murmur or the echocardiogram and the patient never saw a cardiologist. At the same visit the blood pressure was 178/113, but the doctor took no action to improve blood pressure control. The echocardiogram showed cardiac effects of prolonged poorly controlled hypertension. A cardiologist should have been consulted because the Stateville doctor did not review the test or appear to know how to manage the patient's high blood pressure.

The patient was being dialyzed late evenings to early mornings. We do not consider dialysis in the early morning appropriate, particularly when breakfast is also served early morning. Also, when problems occur during dialysis there are no doctors present to evaluate the patient. At about 2:00 a.m. on 1/9/16, the patient was brought by the dialysis nurse to the clinic with nausea, vomiting, profuse sweating, and elevated blood pressure as high as 189/113. This constellation of signs should have prompted a provider evaluation with immediate EKG and laboratory tests or the patient should have been sent to a hospital. Acute coronary syndrome should have been considered. Instead, the patient was given antacids, observed for several hours, and sent back to his housing unit.

On another occasion, the patient had shortness of breath, lightheadedness, fast heart rate (126), weakness, and diaphoresis. An EKG was done and did not have an automated reading on it but appeared to have peaked T waves indicative of possible hyperkalemia. The EKG rate was approximately 145-150. The patient should have been sent to a hospital. Instead, a nurse called a doctor, who ordered a single dose of atenolol and sent the patient back to his housing unit without any follow up. The patient was not evaluated for hyperkalemia. Care was grossly and flagrantly unacceptable.

On another occasion, a doctor saw the patient for not feeling well. The blood pressure was 150/96 and the oxygen saturation was 88%, which suggests significant hypoxemia. These values warrant hospitalization. The doctor referred the patient to the health care unit but there is no documentation in the record that this visit occurred. This placed the patient at risk. There may have been a problem with medical record paper work getting filed.

On another occasion the patient had fever (101.4°F) with elevated blood pressure (170/95) and felt nauseous with chills. The nurse called a doctor, who prescribed Tylenol and an anti-emetic without provider follow up.

All of these cases demonstrate an indifferent attitude to the patient's serious conditions.

On 3/22/16, the patient experienced shortness of breath, elevated blood pressure, elevated pulse, and elevated respirations, and within minutes of being evaluated sustained cardiac arrest and was taken to a hospital, where he was pronounced dead.

The Wexford Mortality Review Worksheet documented that earlier intervention was not possible, there was no way to improve medical care, and the medical response could not be improved.

**This death was preventable**. The coroner listed the cause of death as hypertensive heart disease. The patient had long standing hypertension. His blood pressure at Stateville was uncontrolled throughout his entire 18 month stay and the system was indifferent to his uncontrolled blood pressure. He was seen in chronic clinic for his hypertension only twice, which is not consistent with IDOC guidelines. Approximately 80% of the time, when a doctor saw the patient with elevated blood pressure no action was taken to modify the patient's medication. According to a four-month sample of medication administration records, the patient received only 60% of his medication. The reasons for this were not clear and there was no counseling or history by providers to determine why this was occurring.

The patient was repeatedly placed at risk of arrhythmias due to hyperkalemia. The monthly nephrology checks in dialysis clinic do document the nephrology prescription of Kayexalate, a binding agent for hyperkalemia. But the episodes of extremely high potassium required additional steps to lower the potassium. The lack of concern for extremely high potassium levels was extraordinary and unacceptable, and appears to demonstrate a lack of basic primary care medical knowledge or indifference to the patient's critical need. The patient had an echocardiogram showing significant hypertensive heart disease, but the test was not even reviewed. The providers appeared indifferent to the patient's serious medical condition, which ultimately caused his death. It is our opinion that improved treatment of his high blood pressure would have prevented or significantly delayed his death from hypertensive heart disease. We do note that the patient's phosphorous, BUN, and PTH were repeatedly elevated. Because the dialysis records are not incorporated into the medical record, the course of dialysis care was not clear. Given the continuously elevated blood pressure, high BUN, and phosphorous, it is possible that the patient was not being dialyzed for sufficient time. We would recommend that the IDOC have an outside nephrologist (from UIC) review this case to evaluate the nephrology care to ensure that dialysis treatment times were adequate.

We noted 44 apparent errors in care for this patient. Most (16) related to not addressing out of control hypertension. Twelve errors related to not timely reviewing abnormal labs (high

potassium) and not instituting prompt action for critically elevated potassium levels. Three errors related to not sending the patient to a higher level of care when apparently indicated. Two errors related to the patient not receiving medication, including a survey of several months of medication record indicating that the patient missed 40% of medication doses over four months.

## Patient #14  Stateville

This patient had 33 documented seizures over a four year period or about eight seizures a year. This is not good control. It did not appear that the physician knew how to manage this condition. There was no evidence of an EEG or CT scan, even though these should be done for diagnostic purposes. We only reviewed two years of the record, so these tests may have been done earlier. However, there was no reference to these tests. The doctors did not evaluate for side effects of medication at chronic clinic visits. Failure to control seizures and to know how to monitor this condition is an indication to refer the patient to a neurologist which should have been done.

The patient had a presentation of atypical chest pain with an equivocal EKG, but was not followed up for this. The patient had high blood cholesterol and in 2015 and 2016, his 10-year risk for heart disease or stroke was 26% and 14% respectively. He should have been on a higher dose of statin, but was not. This placed the patient at risk for coronary artery disease.

Shortly after one of the patient's seizures, he became unresponsive. The patient sustained cardiac arrest and died. The coroner listed the cause of death as coronary atherosclerosis, although the autopsy was not available. The patient did not have a myocardial infarction, apparently. Having died from coronary atherosclerosis during a seizure indicates that the seizure may have precipitated an acute coronary event because of the rise in blood pressure and pulse. This is difficult to be certain of and for that reason alone **we determine that this death was not preventable**. However, patients with seizure are at risk for sudden death, a condition known as unexpected death in epilepsy (SUDEP). This condition can have a cardiogenic etiology. It was therefore a significant failure in not referring this patient to a neurologist for accurate diagnosis and management of his epilepsy, because onsite physicians were not able to bring the patient's seizures under control, as evidenced by 33 seizures and inability to obtain control.

We noted 57 errors of management. Most (14) were related to the patient having seizures, with the nurse not consulting a physician. An additional 12 errors were related to not ordering therapeutic drug levels after a seizure.

## Patient #15  Dixon

This patient was a 24-year-old man with severe mental illness. He was incarcerated on 8/12/16. He weighed 207 pounds. In the past he had multiple psychiatric hospitalizations. The patient

became unstable when not on medication and would frequently refuse medications. These refusals apparently did not result in referrals to mental health professionals. According to an administrative review, when this patient did not take his medication he became more psychotic with delusions, paranoia, and hallucinations. These episodes of psychosis resulted in multiple crisis watches, often for self-harm. The self-harm included foreign body ingestion, which on two occasions resulted in hospitalization.

On 7/12/17, a nurse documented that an officer observed the patient swallowing two sporks, which are a plastic combination spoon and fork. The nurse documented that the patient "will have no complication from swallowing a foreign object." The nurse did not refer to a doctor. This was grossly and flagrantly unacceptable care. On 7/13/17, another nurse notified a doctor that the patient had swallowed a spork; the doctor ordered an x-ray but did not evaluate the patient. The x-ray showed no radiopaque foreign body. On 7/16/17, the patient told a nurse that he went on hunger strike "because no one cares about the spork I swallowed." The nurse did not consult a doctor. On 7/24/17, a nurse saw the patient on sick call for stomach pain. The patient requested of the nurse, "Don't put any pressure on my stomach." The nurse assessment was "ineffective coping" and abdominal pain of unknown etiology. The nurse did not refer to a doctor.

On 9/27/17, a psychiatrist saw the patient. The psychiatrist documented that the inmate was frustrated with "what he perceives to be indifferent medical attention." The patient told the psychiatrist that he had swallowed two sporks and was not receiving medical attention. The patient was correct.

On 10/2/17, a nurse practitioner saw the patient, who told the NP that he had swallowed two sporks and wanted them removed. The patient weight was 174 pounds, which was a 33-pound weight loss since his incarceration a year ago; the weight loss was unrecognized. The NP documented a soft abdomen. The patient had also embedded an object in his forearm. The NP ordered an x-ray of the forearm but did not address the ingested spork. The NP assessment included that the patient had a foreign body in his GI tract. To not evaluate for the swallowed spork was grossly and flagrantly unacceptable care.

The patient complained to a licensed clinical professional counselor (LCPC) on 10/12/17 that he had stomach pain and wanted to see the nurse practitioner. He said he was only eating snacks because of stomach pain. There was no referral. This was indifferent.

On 10/18/17 the LCPC saw the patient, who again reported that no one was taking care of his medical needs. He complained of vomiting, diarrhea, and weakness and was not eating because he was nauseous. The LCPC documented that he would follow up the next day regarding a sick call request, "given he still had not submitted one per medical." It appeared that the medical program was not going to see the inmate unless he submitted a request. The following day, the patient did not show up for his mental health appointment. The note documented, "He is sick."

On 10/20/17 a nurse saw the patient, who complained of abdominal pain after swallowing sporks months ago. The patient weighed 150 pounds, a 24-pound weight loss over the past month and a 57-pound weight loss since incarceration. The nurse failed to acknowledge the weight loss and appeared unaware that weight loss had occurred. The patient did not complain of black tarry stool or bleeding, but had nausea, diarrhea, and abdominal pain, and it hurt when he ate. The nurse noted pain on palpation in the center of the abdomen. The nurse did not consult a physician. The patient was sent back to his housing unit. This was indifferent, and grossly and flagrantly unacceptable care. The next morning, at morning medication pass, the inmate was found dead in his cell.

On autopsy, the coroner found two sporks in the inmate's duodenum, with deep lacerations of the duodenum and superficial lacerations of the proximal esophagus with blood in the stomach. The death was attributed to a gastrointestinal bleed from lacerations caused by a foreign body.

An IDOC administrative review found no problems with medical care. The report noted that the nurse on 10/20/17 had used the proper nursing protocol and that there was nothing in the nursing assessment indicating an emergency. The review found problems with the inmate not taking his medication and recommended that nursing staff notify a mental health professional if an inmate refused medication on three consecutive days. However, no issues were found with medical.

**This death was preventable.** On four occasions in July, nurses evaluated the patient for a complaint of having swallowed a spork. Only once did a nurse consult a physician. On that occasion, the physician ordered an abdominal x-ray but did not see the patient, and there was no documented follow up of the x-ray. Three months later on 10/2/17, a nurse practitioner saw the patient, who complained of swallowing a spork. The nurse practitioner took no action. Notably, the patient had lost 33 pounds over the past year, which was unrecognized by the nurse practitioner.

The patient complained to a psychiatrist and a licensed counselor that he had swallowed sporks and was not receiving care. This did not result in referrals to a physician.

On the day before his death a nurse saw the patient, who complained of stomach pain, nausea, diarrhea, and inability to eat because of the stomach pain. The nurse did not refer to a doctor. At this point the patient had lost 57 pounds, which was unrecognized by the nurse. The next day the patient died.

The most common features of an ingested foreign body are dysphagia, problems with eating, and regurgitation of ingested food. The patient appeared to have all of these symptoms for months. The patient had weight loss and multiple complaints of inability to eat normally. Pain in the setting of an ingested foreign body suggests perforation and endoscopic evaluation is indicated. The patient complained of pain repeatedly, yet these symptoms were not properly

evaluated in the context of a foreign body ingestion. Endoscopic evaluation is often necessary, even in the setting of negative x-rays. Plastic often does not show up on plain radiographs and failure to locate an object on a plain radiograph does not preclude presence of a foreign body. Since the spork has sharp prongs on the fork end, urgent endoscopy was indicated, but the patient did not see a physician for over three months. In the only nurse practitioner evaluation, the NP did not appropriately refer the patient. The NP also failed to recognize significant weight loss. Care for this severely mentally ill patient was indifferent, and grossly and flagrantly unacceptable.

We noted nine errors in this death review. Eight were related to either nurses or mental health staff not referring to a provider for a serious medical complaint. Two were related to providers not evaluating the patient related to significant complaints. And one related to failure of the nurse practitioner to initiate a work up for an ingested spork that had not been eliminated for over three months.

## Patient #16  Stateville

This was a 54-year-old man with a history of hypertension and asthma. The patient was at Menard. On 8/29/16, while at Menard, pulmonary embolism was diagnosed, and the patient was started on warfarin with a recommendation to continue anticoagulation for six months.

While at Menard, providers failed to treat the patient with a statin drug despite an 8-13% 10-year risk for heart disease or stroke. He also had seven episodes of chest pain while at Menard. Some of these were typical for angina, but for most of these episodes of chest pain the history was inadequate and it could not be determined if it was angina. Nevertheless, providers did not start a statin despite the elevated cardiovascular risk, did not start antianginal medication, and did not refer for possible stress testing.

In late December 2016, the patient was again hospitalized at Chester Memorial Hospital from Menard for respiratory failure. Studies for pulmonary embolism were negative and no DVT was present.

The patient transferred to Stateville on 2/4/17, still on warfarin anticoagulation. On transfer, the patient had a pending sleep study and had diagnoses of hypertension, diabetes, asthma, and pulmonary embolism on anticoagulation. On 2/23/17, a blood count showed anemia (HGB 9.3) and on 3/1/17, a doctor stopped the warfarin. A colonoscopy was ordered but there was no evidence it was ever done. On 4/5/17, the patient asked for a breathing treatment, but the nurse had a dispute with the inmate and no treatment was given. On 5/10/17, the patient developed chest pain and the Medical Director noted that an EKG was normal, but there was no EKG present in the record; it appeared to be missing. On 5/19/17, the patient again experienced chest pain and an EKG showed subendocardial injury. The patient went into cardiac arrest and died. The Medical Director's report documented the cause of death as

subendocardial injury. A death certificate listed the cause of death as pulmonary embolism and documented that an autopsy was done, but the autopsy was not made available to me.

If the EKG apparently done on 5/10/17 was abnormal, the death may have been preventable. The autopsy needs to be obtained. If the patient died from pulmonary embolism, the death was likely not preventable. **The determination of preventability cannot be made pending obtaining the autopsy result and finding the missing EKG**. The missing EKG of 5/10/17 is significant with respect to evaluation of preventability.

We noted 30 errors in this patient's care. Most had to do with failing to make an accurate diagnosis and develop an appropriate therapeutic plan related to not starting statin drugs. This appears to be a systemic issue in IDOC. The evaluation of chest pain was poor. Histories were inadequate, risk factor analysis was not done to determine cardiovascular risk, and management was not consistent with standards of care.

## Patient #17  Dixon

This patient was a mentally ill patient. His problems were not monitored well. The patient had Barrett's esophagus, history of esophageal and duodenal ulcer disease, hepatitis C infection, aortic valve replacement, and mitral valve prolapse noted on the problem list. Heart failure, history of prior atrial flutter, history of thoracic aortic aneurysm, and possibly COPD were not on the problem list and we could not find chronic illness clinics for these illnesses over the two year period of review.

The problem list documented Barrett's esophagus as early as 2002. This disease is an erosive disease of the distal esophagus and has a propensity for malignant transformation. For this reason, surveillance endoscopy is recommended. The timing of surveillance depends on the histology of biopsy specimens, but it is recommended at least every three to five years. There was no evidence that the patient was receiving this surveillance or that it was considered or discussed with the patient. The patient was taking omeprazole to reduce gastric acidity, which is necessary for persons with Barrett's esophagus. During one hospitalization, the patient had a life-threatening bleed from his esophagus and stomach, and hospital physicians noted that the facility had stopped his omeprazole because the patient did not show up for medication on several occasions. This should never occur. The medication records for the relevant month were not present in the medical record. The patient had two episodes of gastrointestinal bleeding since 2014. We reviewed two months of medication administration. During June and July of 2015, the patient refused 30 (25%) of 122 doses. Because he was mentally ill, doctors and mental health staff should have met with the patient to determine why he was not taking the medication. This did not occur.

The patient had a scheduled cardiology visit in March of 2014 which did not occur until May. The patient had follow up gastroenterology appointments after the two serious and life-threatening episodes of GI bleeding. Neither of these follow up gastroenterology visits were

**PTX193-0731**

documented as having occurred. We did find a Wexford approval for one of these consults, but could not find evidence that it occurred. The patient had life-threatening hyponatremia as low as 114, but there was no attempt to determine why the patient had hyponatremia. It was likely due to mental health medication, but there was no monitoring for this.

The patient weighed 193 pounds on 6/2/14 but began losing weight. The patient told a doctor that he was losing weight on 9/21/15, but the doctor took no history and did not weigh the patient that visit. On 11/5/15, the patient weighed 145 pounds, which was a 48-pound weight loss over about 17 months, but the patient was being seen for weight gain because he had weighed 133 pounds on 8/5/15. No one acknowledged the dramatic weight loss. When a doctor saw the patient on 11/17/15 and the patient weighed 144 pounds, the doctor documented that the "weight gain not a worry." The weight loss was never worked up. Doctors appeared indifferent to the patient's weight loss.

The patient had mental illness and for uncertain reasons started a fast in late November 2015. The patient weighed 133 pounds on 12/31/15 without any acknowledgement by medical staff of the 60-pound weight loss. A telepsychiatry encounter occurred 1/11/16. The psychiatrist restarted the patient on antipsychotic medication and ordered a follow up the following week, but there were no further psychiatry notes that we could find in the record reviewed and there was no evidence that the patient received the antipsychotic medication. Apparently, the patient refused this medication. Despite the psychologist documenting that the patient was unstable, there was no evidence of further psychiatrist's notes. A request for enforced medication was not initiated until 1/27/16, after the patient had been on his fast for well over a month. There was reference to a request for enforced psychotropic medication on 1/26/16 and a note by a psychologist that the patient was on the infirmary and was being considered for forced feeding, but there were no medical notes or evaluations. On 1/28/16, a psychologist documented that enforced medications were approved.

During more than a month of fasting, there was no blood testing or medical evaluations documented in the medical record. A doctor wrote a note on 1/7/16, and documented that a chaplain should talk to the inmate about his fast. There was one further physician note on 1/8/16 documenting that the doctor told the inmate that he might have to be force fed with a gastric tube. This note was incomplete; the full note was not present in the medical record and there were no further notes from physicians or nurses that we could find in the record we reviewed. There were no further weights documented in progress notes after the weight was documented as 137 pounds during a nurse practitioner evaluation on 12/31/15. The patient weighed 193 pounds on 6/2/14 and had therefore lost 56 pounds, yet this was not acknowledged. At this level of weight loss, blood tests to monitor his electrolytes, liver function tests, and nutritional status were indicated but were not done.

On 1/27/16, stat labs were apparently ordered and sent to a local hospital. These labs indicated severe sepsis, significant dehydration, infection, and included a serum sodium of 150, BUN 89, creatinine 2.12, magnesium 2.8 (1.6-2.3), and WBC 16.7 with a left shift. These laboratory tests

should have resulted in immediate hospitalization. The labs were signed as reviewed on 1/28/16, but the patient apparently was not sent to a hospital, as mental health notes continued to be present in the medical record. The patient was apparently hospitalized on 1/31/16, although there are no medical progress notes present in the medical record that we could find. On 1/31/16, two sets of blood cultures were obtained and subsequently grew gram negative rods; these results were reported 2/1/16. The patient died 1/31/16 in the hospital. We can only infer this because there was an x-ray evaluating an endotracheal tube placement after intubation. There was no hospital report in the medical record. There was no death summary, no death certificate, no autopsy, and no documentation in the medical record that the patient died.

**This death was preventable.** Early and appropriate medical attention to the patient would have prevented his death. As a result of the patient's psychosis, the patient was engaging in a fast that caused dramatic weight loss and eventually cause life-threatening metabolic changes. Despite this medical staff appeared indifferent to his medical conditions. The patient had dramatic loss of weight (60 pounds) dating from August of 2014, yet was not being monitored for this. It was not until the patient began fasting and after the patient had already lost approximately 50 pounds that weight loss was even recognized. During more than a month of not eating, medical staff failed to timely and regularly monitor blood tests to determine the health status of the patient and did not even evaluate the patient. After more than a month of not eating, laboratory tests were done. These tests had life threatening laboratory tests values showing extreme dehydration (sodium 150 and BUN 89), renal failure (creatinine 2.12), and signs of systemic infection (WBC 16.7), which were signed as reviewed on 1/28/16. Yet the patient did not appear to be sent to the hospital for three days. Care appeared to be indifferent, incompetent, and inhumane.

We also note that many medical record documents were not sequentially filed and appeared not to be in chronological order. Many documents appeared to be missing. We asked the Attorney General to check for these documents, but have not received any new documents. The IDOC needs an electronic medical record.

We also noted 35 five errors over the period of record review. The most common (six) were related to lack of hospital records or records being disorganized. There were five medication errors. Two of these were related to a provider prescribing an opioid without even taking a pain history or examining the patient to determine if the patient had pain and whether the pain was severe enough to warrant an opioid. Three were related to not receiving omeprazole, medication for his ulcer. It was not surprising that the patient had two hospitalizations for gastrointestinal bleeding, as he was not receiving/taking the medication, which was not being monitored.

PTX193-0733

**Patient #18  Dixon**

This Dixon patient was 70 years old. His problem list did not contain all of the patient's medical problems and the patient was not followed in chronic care clinics for many of his problems, including his cardiac arrhythmias, pacemaker functioning, presumed heart failure, cirrhosis, hyperlipidemia, diabetic nephropathy, or anticoagulation. The patient had a mechanical heart valve and was on anticoagulation, but the anticoagulation goal was not noted in the record. If the goal (typical for mechanical valves) was 2.5 to 3.5, then the patient had sub-therapeutic anticoagulation for more than two years. Twenty-one of 27 INRs noted in the record showed an INR of less than 2.5. The patient also had macrocytic anemia that was mistaken for microcytic anemia, which is a serious and fundamental lack of primary care knowledge. The macrocytic anemia, elevated bilirubin, and low platelets were not investigated for over two years. A B12 and folate level was eventually drawn after two years, but a diagnosis was not made. These laboratory results suggested that the patient had alcoholic cirrhosis, which was never identified. The patient also had chronic kidney disease which was unrecognized for over two years. Failure to investigate these abnormalities was grossly unacceptable and demonstrated a lack of primary care knowledge.

The patient had a serious cardiac arrhythmia (atrial fibrillation) with ventricular bradycardia that required a pacemaker. After the pacemaker was inserted, a cardiology follow up was recommended but never occurred. This failure to follow up with cardiology was never noted and neither the pacemaker nor the arrhythmia was monitored in chronic care clinics. Typically, pacemakers require a check which can be done remotely but needs to be done to ensure they are functioning. In 2015, the patient began developing shortness of breath and edema that were attributed to COPD, but the patient was not adequately evaluated for this. Later in 2015, the patient developed chest pain. Doctors evaluating the chest pain failed to take an adequate history and failed to evaluate the pacemaker function.

The patient had a 25% 10-year risk of heart disease and stroke yet was not placed on anti-lipid medication. On 11/30/15, the patient experienced left-sided chest pain that felt like a pulled muscle. The doctor did not initiate anti-anginal medication and failed to note that the patient had failed to keep his cardiology appointment. The complaint was consistent with angina and the patient should have had a higher level of investigation, including evaluation for coronary syndrome. The following day a doctor evaluated the patient for nausea, but failed to take a history of chest pain that may have been associated with the nausea.

On 12/17/15, a doctor saw the patient for chronic care follow up but failed to address the arrhythmia, possible heart failure, or anticoagulation. Abnormal labs indicating chronic kidney disease and possible alcoholic cirrhosis were not evaluated, except to order a B12 and folate level after two years of having a macrocytic anemia. The arrhythmia and pacemaker function were not addressed. The patient's prior chest pain, shortness of breath, and nausea were not addressed.

A doctor saw the patient on 12/22/15 for a hypoglycemic episode (blood glucose 48), orthopnea, leg edema, shortness of breath, and left chest pressure. The doctor ordered a change in insulin and ordered lab tests with a week follow up. A chest x-ray and EKG were not ordered. Although the doctor's assessment was "COPD vs cardiac? Not exertional," the doctor took insufficient history. The patient should have been hospitalized, given his chest pain with symptoms of heart failure or angina.

On 12/29/15, a doctor saw the patient for edema, shortness of breath, and orthopnea. The patient had a heart rate in the 40s and the doctor questioned whether the pacemaker was malfunctioning. The BUN was 42, creatinine 1.77 and BNP 712, indicating renal failure, possible dehydration, and possible heart failure. The elevation of BNP could have been associated with heart failure, renal failure, valvular heart disease, pulmonary hypertension, or coronary artery disease. The doctor diagnosed exacerbation of heart failure and ordered a diuretic change and blood tests. However, given his symptoms and underlying conditions, the standard of care would have been to admit the patient to a hospital.[8]  Normal pacemaker functioning would have kept the pulse above a set-point, which typically would be about 70 beats per minute. When the heart rate falls below the set rate, it indicates that the pacemaker is not functioning. Keeping this patient at the prison was grossly and flagrantly unacceptable.

On 12/30/15, a nurse at the prison did a pacemaker check that showed two alerts, one of which was that the ventricular pacing was greater than the expected limit. No action was taken. The patient had a pulse in the 40s, which should not occur with a pacemaker.

On 12/31/15, the patient saw a nurse for a nebulizer treatment and told the nurse, "it's not my lungs, it's my heart." A doctor saw the patient the following day but did not take a thorough history and did not note the prior history of chest pain. The doctor assessed heart failure exacerbation and re-started Aldactone. No chest x-ray was taken, and the pacemaker function was not reviewed after the prior day's pacemaker check.

The following day the patient was found dead in his cell. There was no death assessment, no death certificate, and no autopsy in the medical record. The mortality list documented his cause of death as cardiac arrhythmia.

**This patient's death was possibly preventable.** Although the cause of death was not determined, the death was possibly preventable had the patient been admitted to a hospital. He had multiple conditions that were not followed. He had a pacemaker placed but no follow up with cardiology. Prison doctors were not monitoring the pacemaker. A doctor believed that the pacemaker was malfunctioning and it appeared that it was, since on a couple of occasions the pulse was in the 40s, which is not expected with a functioning pacemaker. At that time, the

---

[8] Heart Failure Society of America guidelines as found at http://www.hfsa.org/heart-failure-guidelines-2/ recommend that patients with suspected heart failure should be hospitalized when they have decrease in renal function, a hemodynamically significant arrhythmia, worsening congestion, comorbid conditions, and a pacemaker with repeated defibrillator firings, all of which this patient had.

patient had chest pain and symptoms of heart failure, yet he was not admitted to the hospital for evaluation. It is likely that his death was preventable if he had been followed by cardiology and if he had been admitted to a hospital for exacerbation of heart failure, bradycardia, pacemaker check, and chest pain.

We identified 62 errors. Twelve were related to failure to follow up on abnormal laboratory results. Twelve errors were related to failure to take an adequate history and twelve errors were related to failure to develop an appropriate treatment plan. Notably, this appeared related to failure to monitor many of the chronic diseases of the patient that were not in the main categories of chronic illness clinics. Providers failed to follow any condition not related to a major disease category. There were also seven episodes of nurses failing to consult a physician for serious illnesses beyond the ability of a nurse to manage.

## Patient #19  Dixon

This 75 year old man had underlying ulcerative colitis. He experienced weight loss and had anemia and yet doctors failed to order a colonoscopy, which is below standard of care and placed the patient at risk of harm. The patient had pancytopenia, and then anemia and thrombocytopenia, but was never worked up for these problems except to order iron studies. This was below standard of care. The patient also experienced weight loss, was underweight, and had low albumin, which indicates malnutrition. Yet there was no evaluation for this.

This patient had a prosthetic leg due to an amputation from a prior episode of osteomyelitis. The prosthetic leg did not fit well, and Wexford did not replace the prosthetic leg but tried to repair it, and the patient was not able to use it due to developing ulcers on the stump. As a result, the patient was confined to a wheelchair.

In using the wheelchair, the patient developed a pressure ulcer on his coccyx. A thorough assessment of the patient's activities of daily living was not done to determine how to prevent the ulcer and promote healing. The ulcer was first noted on 6/17/16. At the time of first noticing the ulcer, it appeared from the description to be a stage two ulcer with open blisters and wounds surrounded by erythema. The patient initially was not provided adequate pain medication. By 6/24/16, the wound appeared to be infected. Although a nurse practitioner started antibiotics, the NP failed to order any blood tests or radiological tests to assess for underlying osteomyelitis, which is standard of care. Because of frailty and debility, the patient needed housing on a higher level of care. This could possibly have been an infirmary, but the needs were so great that a skilled nursing unit was indicated, yet the patient remained in general population.

The patient continued to lose weight and by 6/27/16 weighed 127 pounds, which was a 15-pound weight loss over two years. Referral to a nutritionist was not done and the doctor did not complete a nutritional assessment. Adequate nutrition is imperative for healing of pressure ulceration, but this patient never had an adequate nutritional assessment. The doctor ordered

blood tests, and these were abnormal (albumin 2.3; hemoglobin 10; platelets 145; and sedimentation rate 60). This suggested possible osteomyelitis and the doctor reviewed these tests, but apparently did not understand the implications of these laboratory tests and took no actions on these abnormal tests. The doctor appeared not to know how to treat this patient's conditions. An MRI was indicated; blood and or bone cultures were indicated, and it appeared that intravenous antibiotics were indicated. Yet, no action was taken. The patient should have had osteomyelitis ruled out and should have been admitted to a hospital as early as 6/30/16. This was not done. Care was grossly and flagrantly unacceptable.

The patient continued to deteriorate. Aside from adding Boost nutritional supplement, no other action was taken. The wound worsened with tunneling, which was described as deep and was indicative of stage 3 ulceration. The wound deteriorated with no change in treatment. There was no referral for debridement. The patient remained in general population housing and apparently was still in his wheelchair. Eventually, on 7/25/17, bone was visible to a nurse. On 8/2/16, a doctor, shortly after a nurse identified visible bone, described the wound as "healthy." Visible bone usually indicates osteomyelitis or significant infection, especially with a sedimentation rate of 60. Yet the patient was still not sent to a hospital. The doctor's description of a wound with visible bone as "healthy" was grossly and flagrantly unacceptable.

By 8/8/16, the patient started developing altered mental status, first with memory loss. The patient was unable to care for himself. On 8/11/16, the patient urinated on himself while having a dressing change. Despite this and despite increasing evidence of sepsis, the patient was kept in general population and not sent to a hospital. Ultimately a roommate told a nurse that the patient had not eaten in two days and had not voided in days. The patient was so dehydrated that an IV line could not be started. The patient was not responsive and was finally admitted to a hospital on 8/13/16, five days after developing alteration of mental status.

At the hospital, the patient had bacteria and fungus growing in his blood thought to be due to his decubitus ulcer. The patient was extremely dehydrated (BUN 92 and sodium 153) and malnourished (albumin 2.7) on admission. In our opinion, the patient's presentation at the hospital was evidence of neglect at the facility in the weeks prior to admission. The patient was discharged from the hospital on 8/19/16 as a hospice patient. The doctor placed the patient on palliative sedation[9] on 8/19/16 without documentation of a discussion with the patient's family about palliative sedation. The patient was not capable of making his own decisions. Criticism of palliative sedation includes that it hastens death and can be perceived as a form or euthanasia. Use of this practice should be done with an open and frank conversation with the patient, which in this case was not documented as being done. In lieu of a discussion with the patient, a discussion with the family is recommended. The IDOC should address this on a statewide basis to ensure ethical standards of practice. The patient died on 8/21/16.

---

[9] Palliative sedation is a measure of last resort used at the end of life to relieve severe and refractory symptoms. It is performed by the administration of sedative medications in monitored settings and is aimed at inducing a state of decreased awareness or absent awareness (unconsciousness). As quoted from Palliative Sedation section in UpToDate, an online medical reference. The typical palliative sedation combination is a narcotic with a benzodiazepine, which is the combination this patient was on.

**This patient's death was preventable**. It appeared that doctors did not know how to manage a decubitus ulcer, which is a primary care problem. This is especially problematic because Dixon houses so many geriatric patients who are susceptible to decubitus ulcers. Care appeared indifferent, neglectful, and incompetent, and on one occasion, grossly and flagrantly unacceptable. It is our opinion that early management and treatment of the decubitus ulcer would have prevented or significantly delayed his death.

We noted 68 errors in management of this patient. There were seven to eight errors each of lack of appropriate history, examination, and development of an appropriate therapeutic plan. There were seven errors of providers not ordering appropriate laboratory testing and nine errors of not ordering imaging or other diagnostic testing. On eight occasions it was our opinion that the patient should have been sent to a higher level of care for management. The ultimate delay in hospitalization was mostly responsible for the patient's death, in our opinion. Keeping an 82-year-old patient with altered mental status, incontinence, and unable to care for himself in general population prison housing challenges the boundaries of what it means to be a professional.

## Patient #20  Logan

This patient was a 62-year-old woman who had a pancreatic mass identified in 2015 while she was in Iowa. She failed to follow up as a civilian. She became incarcerated and was in Cook County Jail; she was hospitalized for a work-up in October of 2016. A large pancreatic mass was identified. A stent was placed in the pancreatic duct. Unfortunately, a biopsy consisted of an inadequate specimen. The patient was discharged with pathology pending. The patient was on 90 mg of morphine a day for pain management. When the patient left the hospital, the diagnosis was likely pancreatic cancer. The patient was scheduled for a follow up with a gastroenterologist at Stroger Hospital when she transferred to Logan.

Instead of completing the diagnostic work-up of the pancreatic mass, the doctor at Logan initially did nothing, believing that the mass was benign despite the hospital documenting that the mass was likely pancreatic cancer. Also, the doctor at Logan dramatically reduced the pain medication from approximately 90 mg of morphine a day (15 mg SR BID and 15 mg IR Q 4 hour as needed) to one Tylenol #3 pill three times a day. The patient suffered pain throughout most of her incarceration with inadequate pain management.

After about a month after arrival at Logan, the doctor obtained a marker test for pancreatic cancer and it was positive. The doctor referred the patient for an ERCP and biopsy. Wexford denied this test; instead, they sent the patient to a gastroenterologist on a routine basis for evaluation. There was no clinical justification for this denial as this served only to delay evaluation. The patient went to the gastroenterologist in on 2/15/17, almost three months after arrival to Logan. The gastroenterologist recommended a biopsy. This did not occur until late April, approximately five months after arrival to Logan. The patient's diagnosis was therefore significantly delayed, largely as a result of the Wexford utilization process.

In addition to the delay in diagnosis, treatment of the patient's pain was indifferent and bordered on cruelty. Pancreatic cancer is known to cause significant pain. When the patient transferred from Cook County Jail to Logan, the patient was on up to 90 mg of morphine a day. A doctor promptly and dramatically decreased the dose of 90 mg of morphine to one Tylenol #3 tablet three times a day. A Tylenol #3 has 30 mg of codeine, which has an equivalency of about 5.5 mg of morphine. Thus, the pain medication reduction was approximately 80%. Based on nursing notes, the patient did not have adequate pain control, yet this was not adequately monitored or addressed by physicians. When the patient saw a gastroenterologist consultant on 3/21/17, the consultant prescribed a fentanyl patch for pain control. This was not authorized by the Logan physician. The patient remained in severe pain. The doctor did not initiate narcotic pain relief for about five months, until just before the patient died. Three days before the patient died, the doctor prescribed palliative sedation using a combination of morphine every two hours with a benzodiazepine every two hours. A criticism of palliative sedation is that it can be perceived as a form of euthanasia[10]. This appears to be a legitimate criticism in this case because of the lack of morphine use or adequate pain management until just before death and because we could find no discussion of palliative sedation with the patient. This raises ethical concerns, particularly because of the lack of pain medication in the preceding five months before the patient died.

We also note in this case significant problems with the medical record. There were multiple episodes of clinical care when identical vital signs were used repeatedly. The medical record software defaults to use of the last recorded vital signs. But it appears to result in nurses and physicians using vital signs from previous encounters even when vital signs are indicated. One episode of using the same vital signs from a previous encounter lasted longer than a week. In one series of episodes, the temperature was listed as 82.7°F, which is a temperature incompatible with life. The patient was documented as having this identical temperature on three separate clinical visits over a period of over a month. No one noticed this unusual temperature. Vital signs should be recorded at the time they are done and only used for the time period of the clinical event when the vital sign is taken. To do otherwise is a significant patient safety concern. This medical record defect needs to be stopped immediately on the basis of patient safety.

While **this patient's death may not have been preventable**, there were serious concerns, including unnecessary delays in consultation care, unacceptable lack of pain management in a patient with an extremely painful condition, and possible inappropriate use of palliative sedation without discussion with the patient. Use of palliative sedation is not governed by policy but was used on patients in three of the 33 deaths we reviewed.[11]   Because of the potential for misuse or perceived misuse, this practice should be strictly regulated within the IDOC.

---

[10] This is described in the article on palliative sedation in UpToDate.
[11] Mortality Review Patients #19, 20, and 28.

We noted 159 errors in the record review over a six month period. Fifty-two were related to the medical record use of dated vital signs and nurses not using appropriate vital signs even when the patient was being evaluated for a new problem. Twenty were related to nurses not consulting a physician for a significant complaint (pain, vomiting, etc.). Eighteen were related to physician therapeutic plans, mostly related to pain management, which appeared significantly below standard of care. The lack of appropriate attention to nutrition, pain management, and fluid and electrolyte management was so poor that during the last month the patient was neglected, resulting in dehydration and electrolyte disturbances from lack of medical attention. The patient should have been sent to a skilled nursing care unit for management because the patient was not receiving appropriate care at the prison.

### Patient #21  Menard

This patient had diabetes, hypertension, and prostate cancer, for which he took hormonal therapy with an oncologist. The patient had a very high risk (as high as 47% 10-year risk of heart disease or stroke) of heart disease, yet was not treated with a statin drug. This happened repeatedly and is a systemic problem in IDOC.

From 3/13/16 until 11/3/16, the patient was evaluated five times for abdominal pain, for which inadequate history and physical examinations took place. Although the patient was losing weight, this was unnoticed. Weight loss with abdominal pain suggests a potentially serious medical condition. On 11/3/16, the patient was sent to an emergency room, where a CT scan showed a large retroperitoneal mass consistent with a lymphoma. The hospital called a Menard physician to advise of this and to recommend follow up. The hospital report was not initially available, and the abdominal mass was not addressed until the patient went for his scheduled oncology appointment for his prostate cancer on 11/21/16. The oncologist noted the abnormal CT scan and recommended a CT guided biopsy and CT scan of the brain ASAP with a three week follow up. This follow up never occurred. Although the biopsy and CT scan of the brain were approved, they were never done. By 12/5/16, a doctor noted that the patient had lost 50 pounds. On 12/29/16, a nurse documented that the patient had 3+ leg edema with a pressure ulcer on his hip and could not walk on his own to the health care unit. The doctor did not admit the patient to the infirmary even though it appeared that the patient was unable to care for himself such that he was developing a pressure ulcer. This was grossly and flagrantly unacceptable care.

The patient appeared lost to follow up until 2/2/17 when security officers complained to a nurse about the patient being unable to care for himself in general population. The patient was admitted to the infirmary by a nurse. The patient was unable to stand on his own without assistance, did not respond appropriately, and did not know what time it was. The following day, a doctor noted that the patient was confused. Nurses noted that the patient was incontinent and appeared delirious as he was talking to people in his cell that were not there. A doctor referred the patient to mental health but did not conduct an evaluation for medical causes of delirium. This was grossly and flagrantly unacceptable care. For five days, the patient

was kept on the infirmary even though he exhibited signs of delirium and should have been immediately hospitalized. By 2/7/17, the patient had become lethargic and confused, yet a doctor who saw the patient did not admit him to a hospital until later in the day when the patient became lethargic with unequal respirations. There were multiple episodes of grossly and flagrantly unacceptable care during the patient's stay on the infirmary. The patient apparently died in the hospital. There was no autopsy or death summary.

**This patient's death was possibly preventable.** The patient had abdominal pain with weight loss for seven months without adequate evaluation, including adequate diagnostic testing. The weight loss was unrecognized. After an abdominal mass was finally identified on a CT scan, a diagnostic work up was not initiated for three months. The patient died without a diagnosis. The recommendation for an urgent evaluation as recommended by an oncologist was not done over the remaining two months of the patient's life. Though the patient appeared unable to care for himself and had developed a pressure ulcer, the patient was kept in general population and not monitored. Almost three months after the abnormal CT scan, the patient was brought to the attention of a nurse by security staff because the patient could not care for himself. The patient was confused, delirious, had significant edema, and had a pressure ulcer. Despite the new onset of confusion, the patient was kept on the infirmary without adequate evaluation until he became lethargic and was breathing abnormally. The patient was sent to the hospital where apparently he died without a diagnosis. Earlier identification of the abdominal mass and timely treatment of the likely lymphoma could possibly have prevented his death. Care for this patient was grossly and flagrantly unacceptable and demonstrated neglect and indifference.

We identified 83 errors in his care. Most were related to failure to take adequate history, perform adequate examinations, and develop adequate therapeutic plans. We noted that on nine occasions the patient had a serious presentation (shortness of breath, confusion, delirium, diarrhea, and inability to care for himself) and yet the nurse did not consult a physician. We identified nine separate occasions when the patient should have been sent to a higher level of care. A few of these related to not being housed on an infirmary unit when the inmate was unable to care for himself. In other cases, the patient should have been immediately transferred to a hospital but was not.

## Patient #22  Menard

This patient was a 46-year-old man with a known history of hypertension, diabetes, and obesity. The annual history and physical evaluation on 7/18/13 identified prior sexually transmitted disease (gonorrhea) and the biannual evaluation on 10/26/15 identified blood transfusions, multiple sexual partners, and prior history of gonorrhea as risk factors. The patient had multiple risk factors for HIV, yet was not offered HIV screening, which is standard of care.[12] That the histories were different on different biannual evaluations was also a problem.

---

[12] Screening for HIV: U.S. Preventive Services Task Force Recommendation Statement; Annals of Internal Medicine Volume 159, Number 1; pp. 51-60; July 2, 2013. This was an A recommendation, which is that there is high certainty that the net benefit is substantial.

The patient then had low white blood count (1.8) with low lymphocytes (0.6) as early as 8/6/13 which were not followed up on. Low lymphocytes should have prompted evaluation, including whether the patient had HIV infection. This was not done.

On 9/5/15, the patient developed altered mental status with fever. He was a 46 year old man who was urinating on himself. The patient did not have an adequate evaluation for alteration of mental status. He was not provided an adequate history or physical examination for his condition. He should have had a CT scan and other diagnostic testing. Instead, the patient was merely monitored on the infirmary with blood tests. The doctor made a diagnosis of fever of unknown origin. This diagnosis presumes that causes of the fever have been ruled out, which had not been done in this case, as little diagnostic evaluation was performed. The patient should have been hospitalized for his condition but was not. Care was grossly and flagrantly unacceptable.

The doctor presumed that the patient had lupus, but the patient did not have immunologic criteria to qualify for this diagnosis. The providers failed to evaluate for HIV, a common condition in this population and one that the patient had risk factor for (multiple sexual partners, prior gonorrhea, transfusions) and blood tests suggestive for (low white blood count with lymphocytopenia).

Lupus is an uncommon condition in this population as compared to HIV. The diagnosis of lupus depends on satisfying multiple clinical and laboratory criteria which often require experienced clinical diagnosis. Typically, a specialty referral is indicated. The patient did not satisfy immunologic laboratory criteria for lupus; nevertheless, the doctor maintained this diagnosis without searching for more obvious causes of the patient's problem. The patient continued to have high sedimentation rate, intermittent fever, weight loss, confusion, and low white blood counts, sometimes including pancytopenia.[13] Despite considering lupus, the doctor did not refer the patient to a rheumatologist for five months. On 2/26/16, a rheumatologist would not accept the patient for referral because the patient did not have immunologic criteria for lupus. Still, the doctor failed to screen the patient for HIV, despite the patient having multiple risk factors and suggestive laboratory and clinical findings. The doctor remained steadfast in maintaining lupus as a possible diagnosis for over a year without obtaining immunological tests required for the diagnosis and without excluding other more common diseases (e.g., HIV). This was grossly and flagrantly unacceptable care.

The patient's mental status deteriorated. From September of 2015 through October of 2016, the patient exhibited altered mental status, but was inadequately evaluated for this and was mostly housed in general population, where he appeared unable to adequately care for himself. His care was neglectful and bordered on cruelty. On 3/15/16, a psychiatrist documented that the patient was incontinent of urine and feces while wearing his clothes and noted delusional

---

[13] Pancytopenia is low white count, low red blood cell count, and low platelets. These are the three cellular components of blood. This is consistent with numerous conditions, many of which are serious and require immediate attention, sometimes including referral to a hematologist for bone marrow biopsy. In this case, an HIV test would have been a first diagnostic step.

thinking. The psychiatrist believed that the patient had psychosis from a medical condition. Yet, doctors did not pursue further evaluation (CT scan or MRI of brain, possibly lumbar puncture, exclusion of infection including HIV, etc.). No diagnostic action was taken except to monitor the patient and obtain routine blood tests. The patient remained intermittently confused, delusional, and delirious for the remainder of his life. The patient had disordered cognitive function for approximately 13 months without having an evaluation for the cause. This was grossly and flagrantly unacceptable care.

About a year after initially suspecting lupus, a rheumatology consult was finally obtained on 9/28/16. The rheumatologist found no obvious systemic complaints to suggest lupus but ordered additional testing. By accident, apparently, the rheumatologist sent with the patient a prescription for methotrexate with the wrong patient's name on it. This was not identified by staff and the patient received methotrexate inappropriately, which has side effects including decreased blood counts, which already affected the patient. The rheumatologist's type written note did not include prescription of methotrexate. This may have harmed the patient, as shortly after this the patient developed sepsis, a possible complication of using methotrexate in an immune compromised patient.

The patient was admitted back to the infirmary in July of 2016 for inability to care for himself. He was weak, incontinent, and unable to perform routine hygiene for himself. He also developed fever on 7/22/16, yet there was little evaluation for the cause of fever except to order a urine test and blood count. The patient was unable to walk without assistance, and mostly lay in bed. He developed a large (6 inch by 6 inch) pressure ulcer which was identified by nurses but not recognized or evaluated by physicians. He lost a significant amount of weight (>50 pounds) yet the weight loss was unrecognized. Eventually, the patient became hypotensive (90/66) and had hypoxemia, and was sent to a hospital, where he was found to be in septic shock due to complications of HIV infection. The patient died in the hospital.

**This patient's death was preventable.** The patient had multiple risk factors for HIV infection yet was never screened for this infection. The patient had altered mental status for over a year but never had a diagnostic evaluation for this. The patient had low lymphocytes and low white counts since 2013 but was never evaluated adequately for this. The patient had fever but was never properly evaluated for this. The patient's confusion resulted in inability to take care of his hygiene, but the patient was neglected, resulting in a large, unrecognized pressure ulcer and significant unrecognized weight loss. Care was indifferent, neglectful, and grossly and flagrantly unacceptable. Early diagnosis of HIV should have been made and this would have prevented his death. We note that the physician caring for this patient was a surgeon without primary care expertise. It is our belief that the doctor's lack of training significantly contributed to this patient's death.

We noted 117 errors in care for this patient in slightly over a year of record review. Most were related to inadequate history, examination, or development of a therapeutic plan. It is our opinion that on 18 occasions the doctor should have sent the patient to a hospital but did not.

We also noted that for long periods of time the patient was housed in general population status when he was confused, incontinent, and unable to care for himself. When he ultimately went to the hospital, he had evidence of neglect including severe malnutrition, significant weight loss, multiple pustular sores, and pressure ulcers that were unrecognized at the facility. His care was grossly and flagrantly unacceptable.

## Patient #23  Menard

This patient had APRI[14] scores indicating cirrhosis as early as 2012, but was not referred to UIC hepatology for treatment of the hepatitis C in 2012 or 2013. In 2014 and in January of 2015, the patient signed a refusal for care for hepatitis C, but it was not clear what explanation was given to the patient. When he ultimately was evaluated by UIC in April of 2016, he did not even know that he had advanced liver disease or cirrhosis, but he agreed to treatment of his hepatitis C. It does not appear that effective communication with the patient occurred at Menard.

Though the patient had cirrhosis since 2012, he did not receive a screening upper endoscopy to evaluate for varices until 8/7/15. He also did not receive every six month screening for hepatocellular carcinoma until 5/8/15. These are standard recommendations for patients with cirrhosis. That he ultimately died with likely hepatocellular carcinoma is problematic, as he was improperly screened for this condition.

Despite having cirrhosis at least as early as 2012, the patient did not have appropriate management of his ascites. Edema was evident as early as 10/4/12, when a doctor noted 2+ edema on a chronic clinic evaluation. The doctor did not initiate a diagnostic work up for the edema. On 1/4/15, a nurse practitioner identified bilateral leg edema without taking action except to order Ted hose. A CT scan on 5/28/15 documented ascites, which was not documented as a problem, monitored, or treated. An MRI on 10/22/15 showed large ascites yet this was not identified or monitored as a problem. The MAR shows that Aldactone was started on 11/23/15 but discontinued on 11/30/15. There was no progress note on either date, so the reasoning for these actions was not known. Despite evidence of significant ascites in October 2015, doctors did not monitor this or treat the patient. Doctors did not start a diuretic until 6/22/16 when the patient had tense ascites. It appeared that the providers did not know how to manage cirrhosis with ascites.

Though the patient should have been screened for hepatocellular carcinoma every six months beginning in 2012, the patient was not screened for hepatocellular carcinoma until May of 2015, when an ultrasound showed a mass worrisome for a malignancy which was confirmed on a CT scan later that month. Although the ultrasound and CT scan showed a possible malignancy in May of 2015, the patient was not referred for biopsy until 8/25/15. A Wexford utilization

---

[14] APRI is an AST to Platelet Ratio Index. This score uses common blood tests to estimate the probability of fibrosis and cirrhosis and is used as a means to identify persons with greater degrees of fibrosis. This is currently used for identifying persons at higher need of treatment for their hepatitis C. IDOC does not initiate treatment for hepatitis C until the patient has a fibrosis level nearly equivalent to cirrhosis and the APRI is used as a benchmark for referral.

doctor initially denied the biopsy, instead recommending referral to Dr. Paul, the Wexford hepatitis C doctor. She apparently referred the patient for an MRI, which was done in late October of 2015, showing a wedge shaped fibrotic lesion in the liver. According to a subsequent UIC note, the MRI was to include a liver biopsy, but this did not occur because MCC did not send the ultrasound and CT scan results with the patient. Another liver ultrasound was done on 12/18/15 showing a 2.1 cm liver mass with a recommendation for follow up MRI or CT scan. No action was taken. The patient appeared to have died with or because of possible cancer which was never biopsied for over a year.

On 4/28/16, the patient was referred to UIC for hepatitis C treatment. We believe that the patient should have been referred to UIC in 2012 for treatment, as providers at Menard did not appear to understand the complications of cirrhosis or management of hepatitis C, and treatment options should be explained by a person knowledgeable in treatment of the condition. The UIC consultant documented that biopsy was not done in 2015 because prior ultrasound and CT scans were not provided to the radiologist, and that the patient had a liver lesion suspicious for cancer. The UIC consultant also noted that the patient did not understand that he had complications of liver disease (cirrhosis, varices, and ascites). If the doctors at Menard had not explained the complications of the patient's liver disease to him, what discussion took place with respect to treatment of his hepatitis C? The patient was willing to accept treatment when the UIC doctors discussed treatment with him. Prior to initiating treatment, the UIC doctors recommended a biopsy. This was not documented as done.

The patient was sent for an MRI on 6/22/16, but it was not clear if this was for a biopsy. Upon return to the prison, the patient was noted to have fever (100.4°F), hypotension (96/64), and hypoxemia (oxygen saturation 79%) with tense ascites. The patient had signs of sepsis and should have been admitted to a hospital for paracentesis and blood cultures. Instead, a nurse admitted the patient to the infirmary for observation, but a physician did not examine the patient. This was grossly and flagrantly unacceptable care, as the patient had signs of sepsis.

The following day the patient had fever to 100.8°F with massive ascites. Instead of admitting the patient to a hospital, the doctor only ordered Aldactone 25 mg BID, Lasix 40 BID, and an oral antibiotic (Levaquin) without taking a history and performing only limited examination. This was grossly and flagrantly unacceptable care, as the patient was at risk of death.

The following day the patient again became hypoxic (oxygen saturation 84%), hypotensive (88/60), and had trouble breathing. The doctor sent the patient to a hospital, where he died.

**This death was possibly preventable for the following reasons:**
1. The patient was not screened for complications of cirrhosis for three years. This was the likely cause of death. Hepatocellular cancer screening is recommended every six months for persons with cirrhosis. Screening, early identification of complications, and treatment for these might have prevented or significantly delayed the death.

2. The patient had a liver mass suspicious for cancer identified in May of 2015 but until his death in June of 2016, the mass was not evaluated with a biopsy and remained undiagnosed. The delay in diagnosis of a possible hepatocellular carcinoma likely contributed to his death and earlier diagnosis and treatment might have prevented or significantly delayed the death.

3. The patient developed tense ascites, fever, hypotension, and severe hypoxemia on 6/22/16 and should have been immediately hospitalized. Instead, the patient was placed on the infirmary for observation without any diagnostic testing on the first day. This was grossly and flagrantly unacceptable care and placed the patient at risk for death. On the second day the patient still had fever. Oral antibiotics and routine blood tests were ordered when the patient should have been hospitalized. This delay may have resulted in his death. Care was grossly and flagrantly unacceptable. On the following day a doctor did not evaluate the patient, but the patient was sent to a hospital for extremely unstable vital signs.

4. We note that the patient told a UIC consultant that he was unaware that he had complications of hepatitis C (ascites, varices, cirrhosis). Although the patient signed a refusal for treatment of hepatitis C, it is unclear how hepatitis C treatment was explained to him if he did not even understand that he had cirrhosis. We question whether effective communication occurred. The patient accepted treatment from the UIC consultant but not the providers at Menard. It is our opinion that once cirrhosis was evident in 2012, the patient should have been referred directly to UIC. The current collegial process of using a Wexford doctor as a gateway for therapy and for testing related to cirrhosis clearly caused delays in care (for treatment of hepatitis C and diagnosis of the liver mass) that resulted in his death. Earlier treatment of his hepatitis C would likely have prevented or significantly delayed death.

We noted 56 apparent errors in the care of this patient. Thirteen were related to lack of referral for evaluation for hepatitis C treatment. We question the effectiveness of communication with patients and believe that their hepatitis C treatment decision should be discussed with an expert, not physicians and other providers in IDOC who do not apparently understand how to manage cirrhosis or hepatitis C. Consent and refusal of consent needs to be informed and this requires a physician who understands the treatment and the consequences. There were 17 apparent errors in not obtaining screening tests for cirrhosis (EGD and ultrasound).

## Patient #24  Menard

This 46-year-old man developed abdominal pain. He was evaluated by a nurse on 5/17/17, 5/22/17, and again on 5/31/17. The nurse found no problems, but on 5/31/17 the nurse referred the patient to a physician. The physician saw the patient on 5/31/17. The physician took virtually no history. The doctor documented that the patient had an umbilical hernia and said "it is small. He won't let me touch it or push it back in." Without any other evaluation, the doctor prescribed Tylenol for six months. No diagnostic studies were done. This was not appropriate follow up for a painful condition that was incompletely evaluated.

A month later on 6/30/17, a LPN wrote that her supervisor asked her to evaluate the inmate because his family had called concerned that he needed to see the Medical Director. The LPN did an assessment using a diarrhea protocol stating that the patient had diarrhea four to five times a day with abdominal pain and had lost his appetite. The abdomen appeared rigid and distended to the nurse. The blood pressure was 150/118. The nurse apparently called a doctor, who sent the patient to a local hospital.

At the hospital, an omental/peritoneal mass was identified. A biopsy was performed along with colonoscopy and the patient was discharged on 7/6/17 with a diagnosis of carcinomatosis or disseminated cancer in the abdominal cavity. On 7/10/17, the doctor referred the patient to an oncologist, noting that final pathological reports were pending. During his infirmary stay the patient had repeated pain, but the doctor notes did not address the patient's pain adequately. When the patient went to the oncologist on 7/26/17, inadequate information was sent, and the oncologist did not understand why the patient was being referred. The oncologist asked for a two week follow up with CT scan reports from the hospital, along with additional records.

The patient remained on the infirmary as a chronic admission but was infrequently examined or questioned by doctors regarding his pain, which was complicated by constipation. Physician evaluations included virtually no current history or examination and inadequately addressed pain. Eventually, on 8/9/17 the patient became confused, unable to answer questions and was sent to a hospital where, apparently, he died. There was no autopsy or death summary for this patient.

**This patient's death was not preventable,** yet there were a few problems. The initial evaluation of the patient on 6/30/17 was indifferent. The patient had complained of several weeks of abdominal pain, yet no history was taken, and little examination was performed. To give a patient Tylenol without having a diagnosis is inadequate and indifferent care. No diagnostic tests were ordered.

The patient's pain on the infirmary was inadequately evaluated as evaluations seldom included a history or physical examination. This also was indifferent.

When the patient went to the oncologist, inadequate medical records were sent with the patient, resulting in a failed appointment. Communication with specialists is critical to coordinated care.

We noted 10 apparent errors in care, mostly related to inappropriate therapeutic plans.

## Patient #25  Menard

This 65-year-old patient was recently successfully treated for hepatitis C. During a dental examination, the dentist found an abnormal lesion in his mandibular bone found on x-ray. On

4/14/17, the dentist referred the patient for evaluation. A consultant saw the patient in mid-June and did a biopsy, which on 6/22/17 was positive for B cell lymphoma.

The patient was referred to oncology and after some tests was started on chemotherapy in late August. The chemotherapy regimen was CHOP, which included prednisone and also included rituximab. This regimen can severely depress the white blood cells and platelets, and cause severe life threatening infection. For that reason, the oncologist recommended a drug to increase the white count. This drug, Granix, was to be administered after each episode of chemotherapy. The manufacturer recommends that during the time Granix is used that white counts be checked twice weekly. This was not done at Menard for this patient.

The oncology reports were not all present in the medical record and the blood work done at the oncology office was not typically available to the site. On 11/22/17, the patient received chemotherapy and on return became hypotensive; he went to a local ER and was diagnosed with dehydration. The white count at the hospital was normal.

On 11/26/17, the patient developed a fever to 101.6°F and was too weak to stand up. The nurse did not consult a physician but should have, as fever in a potentially neutropenic patient can represent life-threatening risk. The nurse did place the patient on a special housing unit. Not to call the physician was grossly and flagrantly unacceptable care. The patient should have had immediate white count and/or immediate referral to a hospital for evaluation for infection.

A doctor did not see the patient for two days, until 11/28/17. The patient had fever to 101°F. The patient should have been immediately hospitalized. The patient needed evaluation unavailable at the prison. The patient needed immediate blood cultures, intravenous antibiotics and diagnostic evaluation and monitoring for neutropenic infection. Instead, the doctor ordered an oral antibiotic without identifying a source of infection. The failure to order a white count or hospitalize the patient was grossly and flagrantly unacceptable care in a potentially neutropenic patient on chemotherapy. The doctor also did not check to ensure that the patient had received the Granix medication. We could find no evidence on MARs available in the record that the patient received Granix, significantly increasing the potential for neutropenia.

The following day on 11/29/17, the patient developed hypotension, diarrhea, and felt sick. The doctor stopped blood pressure medication and did order a white blood count, but it was not ordered stat and was never done. Hypotension in the context of neutropenia, especially in someone on prednisone which was part of this patient's chemotherapy, can indicate infection. Failure to immediately check for neutropenia or hospitalize the patient was grossly and flagrantly unacceptable.

On 11/30/17, the doctor noted that the patient had pus coming from his ear and diagnosed otitis externa and changed the oral Levaquin to intravenous Rocephin, another antibiotic. The patient now had an infection and again should have been sent immediately to the hospital. Care was grossly and flagrantly unacceptable.

On 12/1/17, pus was still coming out from the patient's ear and the doctor again did not send the patient immediately to a hospital. The white count was never drawn. Care was grossly and flagrantly unacceptable.

The patient was not seen the following day by a physician which is unacceptable in a potentially neutropenic patient. On 12/3/17, the patient was found unresponsive with blood on his mouth and draining from his penis, with a fever of 101.2°F; and in shock with blood pressure 96/60, pulse 120, and respiration as high as 42. He appeared to be bleeding due to probable loss of platelets likely due to chemotherapy related pancytopenia. The patient was sent to the hospital. The hospital record was unavailable, but the doctor's death summary stated that the patient developed pancytopenia, sepsis, and pneumonia; and died due to sepsis and pancytopenia on 12/12/17.

**This death was preventable**. Timely treatment with Granix would have prevented the neutropenia would have prevented or significantly delayed death. Timely treatment of the neutropenic sepsis would have, at a minimum, have significantly delayed death. The medical record was disorganized, many consultation reports were not in the record, and information was not available. It appeared that coordination with the consultant was poor. The patient was at high risk for neutropenic infection and was to receive a medication, Granix, which it appeared he did not receive. After developing fever, a sign of neutropenic syndrome, the physician response over a three-day period was incompetent, demonstrated failure to properly manage a potentially neutropenic patient, and was grossly and flagrantly unacceptable. We noted 23 apparent errors in medical care. Seven errors involved not ordering timely blood counts to monitor infection. Five involved inappropriate therapeutic plans, mostly involving treatment of a potentially neutropenic patient.

## Patient #26  Menard

This patient was incarcerated in 2008. He died in 2017 when he was 68 years old. He had no medical problems. At annual health evaluations he was not offered colorectal screening, though he did refuse a digital rectal examination, which is inadequate as colorectal screening. He also was not treated for primary prevention with a statin for coronary artery disease for years. In the 2008 reception screening and at every biannual screening dating from 2012 to his death, he had greater than a 7.5% 10-year risk for heart disease and should have been offered statin medication, but was not. This is a systemic issue, as providers under Wexford do not use contemporary risk calculation to determine use of primary prevention for coronary artery disease.

On 3/20/17, a doctor saw the patient for shortness of breath. There was no other history and the doctor did not utilize a full set of vital signs. The only examination was that the patient was very pale with cold hands. The doctor assessed anemia without having a blood count to make that assessment. This was an inadequate evaluation without adequate history or physical examination. The doctor ordered a stat CBC and CMP. Later that day, the doctor wrote that the

labs were normal but that the patient was short of breath. Again, without adequate physical evaluation or history, the doctor ordered a routine chest and abdominal x-rays, and urine test.

The following day a nurse practitioner (NP) noted that the patient had possible pneumonia. The patient had a critical respiratory rate of 38-40 and blood pressure of 152/100. The NP ordered an EKG and sent the patient to a hospital. The hospital was a very small (25-bed) hospital. Atrial fibrillation with heart failure and pleural effusion was diagnosed. The patient had a chest x-ray showing bilateral pleural effusions, possible pneumonia, and compression of the lungs by the pleural effusions. The hospital called the NP, who accepted the patient back to the facility with a plan to order a cardiology follow up. This, in our opinion, was not safe for the patient under these conditions due to the age of the patient, the new onset of the fibrillation, possibility of pneumonia, and significant pleural effusions and heart failure. Given the uncertainty, return to Menard was a poor clinical choice. That decision was made apparently by a nurse practitioner, according to the hospital record.

The patient was admitted to the infirmary. The following day the patient was incontinent of stool and was in shock (86/60), with edema and high respiratory rate (30), and was sent to another hospital.

The patient had myocardial infarction, heart failure, sepsis, ischemic colitis, and developed hospital acquired pneumonia. Due to the heart failure and myocardial infarction, further surgery could not be done. The patient returned to the facility after several weeks at the hospital and died two days after return.

**This patient's death was not preventable**. However, several errors were made. The patient received no colorectal cancer screening, though contemporary standards recommend this for persons over age 50. Since 2012, the patient had a consistent 10-year heart disease risk greater than 7.5% and should have been on a statin. These are systemic problems in IDOC and should be corrected.

The patient's atrial fibrillation likely was responsible for the ischemic colitis. The initial evaluation of the patient by a physician on 3/20/17 was inadequate. The patient had a serious medical complaint (shortness of breath) yet received no history or physical examination adequate for the complaint. Also, this patient should not have been taken back from the hospital on 3/21/17, as his complicated medical condition (new-onset atrial fibrillation, large bilateral pleural effusions, heart failure, possible pneumonia, and age >65) warranted hospitalization.

## Patient #27  Menard

This 48-year-old man had difficult to control blood pressure. For the entire two years of record review, the blood pressure was uncontrolled. The blood pressure was significantly out of control and as high as 260/130. The blood pressure was above 180/120 which is considered a

hypertensive urgency on 15 separate occasions over a two year period. When the patient was evaluated with hypertensive urgency, the evaluations were inappropriate as they did not include evaluations for ongoing end-organ damage.[15]

The patient had HbA1C of 7.3, which was documented as known by a provider on three occasions. This is diagnostic of diabetes, but the doctor did not enroll the patient in chronic care, did not include diabetes as a problem, and did not initiate treatment. It was not clear if the doctor understood that an HbA1C of 7.3 was diagnostic of diabetes.

The patient also had a persistent need for statin treatment which was unrecognized. In 2014, at a chronic clinic visit, we calculated the 10-year heart disease risk was 28%, warranting a moderate to high intensity statin, but no treatment was offered. At a 3/9/16 hypertension chronic clinic, a statin was not recommended. We calculated a 10-year heart disease risk of 47%; the increased risk partly due to the new diabetes which was, however, unrecognized. The untreated hyperlipidemia is a risk for cardiovascular disease.

The patient developed symptoms of episodic shortness breath on 2/4/15 and was admitted to a hospital. At the hospital, the patient had an echocardiogram that showed thickening of the LV and concentric hypertrophy but normal systolic function, verifying hypertensive cardiovascular disease. The patient had a diagnosis at the hospital of hypertensive urgency and hypokalemia, and blood tests were drawn to exclude hyperaldosteronism and pheochromocytoma. The discharge summary included recommendations to follow up with a nephrologist and cardiologist in two weeks to complete a work up for hyperaldosteronism and resistant hypertension. The tests did show an elevated normetanephrine test that suggested pheochromocytoma. This needed to be worked up but was intentionally not done.

Upon return to Menard, the Medical Director, who was a surgeon, did not refer to nephrology or cardiology as recommended and did not undertake an evaluation for pheochromocytoma or hyperaldosteronism. A month later, on 3/6/15, another doctor saw the patient and reviewed the hospital summary, and noted that the hospital referred the patient to nephrology and cardiology. This doctor also noted that the Medical Director made no referral. The doctor did not refer the patient and the patient was never referred.

Notably, the patient had "anxiety attacks" on a number of occasions. On 3/5/14, a doctor noted that the patient was short of breath, which he attributed to anxiety. This was sufficient for the doctor to refer the patient to a psychiatrist. That appointment never occurred. A nurse took a history on 3/27/14 that the patient thought his blood pressure elevations were related to anxiety. The nurse also noted that the patient noticed skipped heart beats. On 4/22/14, the

---

[15] End-organ damage in hypertensive urgent episodes includes neurologic symptoms such as delirium, agitation or visual disturbances; focal symptoms consistent with stroke; hemorrhages of the retina; signs of increased intracranial pressure; chest discomfort consistent with myocardial ischemia or dissection; symptoms of aortic dissection; and symptoms of pulmonary edema. In addition to evaluations for these various symptoms, additional testing is indicated including EKG, chest radiograph, UA, electrolytes including creatinine, cardiac biomarkers, CT or MRI of the brain or chest.

patient told a nurse that he thought his elevated blood pressure was related to stress. On 8/30/14, a doctor noted that the patient had anxiety and referred the patient to a psychiatrist, but this referral did not occur because the patient refused to be seen. On 10/22/14, a doctor documented that the patient had anxiety and referred the patient again to a psychiatrist, which did not occur. On 10/23/15, a doctor assessed anxiety and referred the patient to mental health, which did not occur. We mention these many references to anxiety because this is associated potentially with pheochromocytoma, which hospital laboratory tests in February of 2015 suggested that the patient might have. The referral to nephrology never occurred and the patient was never worked up for this potential secondary cause of hypertension which he may have had.

Also, the patient had long-standing low potassium, which in the context of difficult to control high blood pressure suggests hyperaldosteronism. Hospital physicians recommended work up for this condition as well, but this never occurred. The potassium was low on six separate occasions. The lowest was a level of 3. Despite a low level of potassium, doctors at Menard never worked up the patient for hyperaldosteronism. Toward the end of his life the patient was on spironolactone, a diuretic that tends to increase serum potassium.

On 10/3/16, officers brought the patient to a nurse for unsteady gait and a near fall off his bunk. The nurse referred to a doctor. The patient was a no-show to clinic twice; on the second occasion he was described as refusing care, but we could not find a signed refusal in the record. The patient died about a month after this. The patient was on five drugs in March of 2015, but by November of 2016, the patient was only on three medications: diltiazem, metoprolol, and spironolactone. The patient continued to have significantly elevated blood pressure.

The autopsy found atherosclerotic coronary arteries with 95% occlusion of one of the coronary arteries. The cause of death was arteriosclerotic and hypertensive cardiovascular disease. There were 113 errors we identified in the care of this patient. Most were related to failure to assess a patient with hypertensive urgency[16] and to ensure timely follow up. We noted that on multiple chronic clinic visits for hypertension, the patient should have been referred to a consultant to exclude secondary hypertension.

**This patient's death was preventable.** It is our opinion that if the patient's blood pressure were controlled he would not have died from hypertensive heart disease. Part of this failure was a failure to refer for evaluation of possible secondary hypertension and part was a failure to manage hypertensive medication therapy. He had unrecognized and untreated diabetes for over a year which increased his risk for cardiovascular heart disease. He had high risk for cardiovascular disease and yet was not treated with a statin which increased his risk for

---

[16] When blood pressure is above 180/120, the patient is said to have hypertensive urgency. When this occurs, the provider should evaluate the patient for end-organ damage, and lower the blood pressure below 160/100. This can be done in correctional facilities by observation on the infirmary with frequent checks of blood pressure and modification of blood pressure medications. There should be follow up after this episode to ensure the blood pressure has improved. Tests should be done to assess renal function and evaluation should be done to exclude heart failure.

cardiovascular mortality. He had recognized hypokalemia, but it was not adequately investigated. A hospital recommended referral to a nephrologist to rule out hyperaldosteronism and secondary causes of hypertension, but prison doctors intentionally did not act on this recommendation. A hospital test found elevated normetanephrines and the patient had frequent episodes of anxiety and episodic shortness of breath consistent with possible pheochromocytoma, yet the patient was not referred for work up. Medication administration records were not all in the medical record, but those that were recorded that the patient received his KOP medications. The medication compliance was not frequently addressed. The patient appeared to have symptoms of unsteady gait and a near fall off his bed in November, but was not evaluated and referrals to a doctor did not occur. He was said to have refused a visit, but there was no signed refusal.

## Patient #28  Western

This patient was an 81-year-old man with a history of hepatitis C, diabetes, mild heart failure, prior amputation of the forefoot from osteomyelitis, peripheral vascular disease, and diabetic neuropathy. He was being housed on the infirmary at Western Illinois Correctional Center.

The patient fell off his bed on the infirmary and sustained an open dislocation of the middle finger. The patient was sent to a small local emergency room of a 22-bed hospital where full services were unavailable. The laceration was sutured. However, the dislocation was not corrected. The finger remained swollen, yet an orthopedic referral was not initiated. A doctor referred the patient for an urgent wound evaluation, but this was denied by Wexford. This was grossly and flagrantly unacceptable, as the patient had the equivalent of an open joint injury and it needed to be repaired. By the second week after the injury, the wound was draining pus. By the third week, the patient was unable to flex the finger, and finally the doctor obtained approval from Wexford for orthopedic referral. The patient did not go to the orthopedic doctor until 3/30/15, approximately a month after the injury. The orthopedic doctor wrote "I am uncertain as to why this was not reduced prior to now but at any rate would recommend [the hand surgeon] address this issue." The patient had osteomyelitis and eventually had open reduction and internal fixation of the open dislocation that was now infected. This delay resulted in a non-functional finger. There was no orthopedic follow up after this delayed surgery.

The patient had pancytopenia.[17] This was not properly diagnosed. Yet the patient also had iron deficiency anemia. The hemoglobin was as low as 7.7, which is very low. Iron studies showed that this was iron deficiency anemia. This was evident as early as December of 2014. Even with pancytopenia, iron deficiency anemia should prompt evaluation for colon cancer with

---

[17] Pancytopenia is a condition when all three blood elements are low including red cells, white cells, and platelets. This is a serious condition and typically requires a bone marrow study to determine the cause. This condition can be caused by cirrhosis. On one episode a doctor mentioned that the pancytopenia was caused by cirrhosis. Yet the patient did have iron deficiency anemia. This condition requires investigation as to its cause even when pancytopenia exists. The patient did not receive upper or lower endoscopy to evaluate for this condition.

colonoscopy. Also, because the patient had cirrhosis, the patient should have had upper endoscopy to screen for varices and liver ultrasound to screen for hepatocellular cancer. None of these tests was offered to the patient even though it is a standard of care.

The patient was evaluated four times in hepatitis C clinic (9/9/14, 12/22/14, 6/16/15, and 12/3/15). Despite the patient having cirrhosis at least as early as November of 2014 but probably earlier, cirrhosis was not documented as a problem in the medical record during this time period. We only started review of the record beginning in late 2014. Cirrhosis was not identified as a problem until shortly before he died. The cirrhosis was not managed, including at hepatitis C clinic visits. It is recommended that patients with cirrhosis receive a screening upper endoscopy to rule out varices and semi-annual ultrasound or CT screening for hepatocellular carcinoma. Providers also need to monitor the patient for complications of cirrhosis, including ascites and encephalopathy. The patient did not receive management of any of these conditions.

The patient had cirrhosis and a high level of fibrosis (F4), and was referred for interferon treatment in 2010 but refused interferon. The newer hepatitis C drugs are much safer with significantly less adverse reactions and are better tolerated. The patient should have been offered treatment with the newer hepatitis C drugs as they became available,[18] but was not. A doctor on 6/16/15 documented that the patient was not to be treated because of frailty, anemia, and because the Wexford infectious disease doctor decided that the patient was not a treatment candidate. None of these are contraindications for hepatitis C treatment based on newer agents and the patient should have been referred for treatment.

The patient also developed a diabetic foot ulcer on 12/8/15. Doctors allowed the patient to walk on the foot, failed to probe the wound, did not evaluate footwear, and did not properly evaluate for infection or osteomyelitis. The patient had known neuropathy and peripheral vascular disease and had previously lost his fore foot to amputation with osteomyelitis. In a patient with diabetes and known peripheral vascular disease, an ankle brachial index[19] is indicated, but was not done. The patient never had adequate evaluation to exclude osteomyelitis and was never properly treated for a diabetic foot. The treatment of the foot ulcer was not consistent with current recommendations for a diabetic foot. On 1/13/16, a doctor started an oral antibiotic (clindamycin) and then, based on a wound culture, started Rocephin and clindamycin by intravenous route. Unless the wound is debrided and cleaned, a wound culture is not a useful test. The wound did not improve, and the doctor referred the patient to a wound care specialist, which Wexford denied. This was grossly and flagrantly unacceptable, as the facility doctor did not know how to manage this condition and apparently neither did the Wexford UM doctor. An x-ray and another wound culture were recommended. Within two days of the denial, the patient was admitted to a local hospital for shock (BP 74/35)

---

[18] Newer hepatitis C anti-viral medications became approved by the Food and Drug Administration in 2013 and 2014.

[19] An ankle brachial index (ABI) measures the arterial blood flow to the lower extremity to determine if it is adequate. In a diabetic with a foot ulcer, an ABI gives an indication if surgery is necessary to correct insufficient blood flow, without which diabetic foot ulcers fail to heal.

PTX193-0754

and lethargy. Even though the patient had low albumin and low vitamin B12, the patient was not evaluated for his nutritional status with pre-albumin or dietary history.

At the hospital, a 2 cm liver mass was noted with ascites. Colitis was diagnosed but a discharge summary could not be located, and it was not clear what the hospital course was. The lack of hospital records affected care of this patient, as the facility physicians did not understand what had occurred to the patient in the hospital and neither did we. At this point, the patient's unmonitored cirrhosis eventually developed into decompensated cirrhosis and the liver mass was consistent with hepatocellular carcinoma, although the hospital records were incomplete. The patient returned to the prison and developed fever, weight loss, diarrhea, and severe edema. The patient developed worsening swelling from the cirrhosis, fevers, decreased mental status, and abdominal pain, and for a time refused hospitalization. However, it appeared that during the time the patient refused hospitalization, his mental status was abnormal, and his decision capacity was unclear. The patient was ultimately hospitalized again and returned with a diagnosis of liver cancer, cirrhosis, and pressure ulcers. The hospital report was again unavailable. The patient was given palliative sedation with Ativan and narcotics, and died. There was no evidence we could find of a thorough explanation of palliative sedation with the patient; nor was there informed consent. This appeared to be an inappropriate use of palliative sedation and gives the appearance of hastening death without the patient being aware. The death summary documented that the patient was diagnosed with liver cancer and had refused treatment, which is not entirely accurate based on our interpretation of the record. An autopsy showed the cause of death to be hypertensive cardiovascular disease and severe stenosis of the LAD. The autopsy, remarkably, did not list cirrhosis or liver cancer even though cirrhosis and a liver mass were evident on radiologic tests from the hospital.

There were numerous problems with the care of this patient. Many problems were related to lack of appropriate referral for consultative services, including timely orthopedic referral, referral for EGD for someone with cirrhosis, referral for biannual ultrasound for evaluation for hepatocellular carcinoma, referral for ABI to evaluate vasculature in a diabetic foot, referral for wound care, referral for nutritional consultation in someone with a healing diabetic foot, and most important, referral for treatment of hepatitis C. We view **this death as not preventable.** However, the basis of the not-preventable was based on the patient probably having dementia which may not have warranted treatment of his hepatitis C. The patient should have been screened for hepatocellular carcinoma and for varices as early as 2014, but since the patient had symptoms of dementia in 2014, the need for treatment of hepatitis C was less certain and it is on this basis that we determine it was not preventable.

We noted 140 errors in care over the two years of record reviews. Most errors were related to the repeated failure to recognize cirrhosis and to thereby screen for esophageal varices and hepatocellular carcinoma, the ultimate cause of the patient's death. There were 13 episodes we identified when the patient was not timely referred to a consultant and four episodes when he was not referred to a hospital for significant deterioration of his medical status. Several of the denials of care by Wexford were grossly and flagrantly unacceptable. We also note that the

physician initiated palliative sedation in a demented patient without fully informed consent of the patient or his family. This had the appearance of hastening death, which may or may not have been the desire of the patient. This practice needs to be evaluated by the IDOC with respect to its ethical and legal implications.

## Patient #29  Taylorville

This was a 66-year-old man with known diabetes and asthma. He was followed in hypertension, diabetes, and asthma chronic clinics. We asked for two years of the patient's record but appeared to receive only one year of record. Nevertheless, the patient was only seen three times for asthma, hypertension, and diabetes. Based on laboratory data, the patient also had diabetic nephropathy and hyperlipidemia. Though these were not documented or followed as problems, the patient did receive treatment, though inadequate, for the hyperlipidemia and was provided an ACE inhibitor.

Based on the January 2014 MAR, the patient was treated with 10 mg simvastatin at least from January 2014 until 3/7/15, when the dose was changed to 20 mg simvastatin. In 2014, the patient had a 10-year risk of heart disease or stroke of 46% (66 years old, diabetic, HTN, smoker, African American) and on 3/4/15 the patient had a 10-year risk of heart disease or stroke of 54%. Yet prior to 2015, the patient was on only 10 mg of simvastatin and after 2015 only 20 mg of simvastatin. His cardiovascular risk called for a high intensity statin, but the patient was only prescribed a low intensity statin. He was not even on a moderate intensity statin. This placed the patient at risk for heart disease.

Persons with diabetes and nephropathy, which this patient had, should have their blood pressure controlled to 130/80. This was not done. Though the patient did not have significantly elevated blood pressure, it was not controlled to 130/80 and medication was not adjusted when it was above that goal. This placed the patient at risk for cardiovascular disease and for further damage to his kidney function.

The patient also had diabetes. The diabetes was very poorly controlled. The HbA1C was 10.4 on 3/21/14 and remained at 10 or above, until it was 9.4 on 7/22/15. The HbA1C declined to 8.4 on 11/25/15, but even this was not good control. During this time, doctors made only minimal changes to improve blood glucose control and the lack of control placed the patient at risk of cardiovascular disease.

Thus, the patient had multiple risk factors for coronary artery disease (age, ex-smoker, high blood lipids, diabetes, and hypertension). His controllable risk factors were not managed well by prison physicians, thus placing the patient at increased risk for cardiovascular mortality.

The patient had asthma. However, the patient did not have evidence of spirometry or pulmonary function tests, which are recommended on all patients with asthma. The patient had several episodes of shortness of breath which were atypical of asthma. Since patients with

diabetes can have asymptomatic or atypical presentations for angina, the shortness of breath should have been considered as a possible angina equivalent. On 1/15/15, a doctor saw the patient in asthma clinic and documented that the patient described shortness of breath. The doctor wrote, "difficult to judge SOB [shortness of breath] etio [etiology] –likely multifactorial, obesity? Sleep apnea?" Indeed, other causes should have been sought. The doctor's acknowledgement that the etiology of the shortness of breath was uncertain required additional diagnostic testing. A stress echocardiogram and pulmonary function test or some equivalents should have been considered. At a minimum, the patient should have had pulmonary function testing at this point but did not. Angina should have been considered especially in light of his diabetes and multiple cardiovascular risk factors but was not.

On 4/21/15, a doctor evaluated the patient for an episode of shortness of breath with exertion. He had no chest pain. An EKG was done, but the tracing was of very poor quality and should have been repeated. It showed non-specific STT wave changes, which can be consistent with angina. However, the quality of the tracing was poor. The patient was not treated for angina; nor was diagnostic testing done for this condition, even though the patient's symptoms were consistent with angina and even though the patient had multiple risk factors. At a minimum, pulmonary function testing and a stress echocardiogram or equivalent tests should have been done.

On 7/13/15, the patient again developed shortness of breath. The doctor wrote, "deteriorating SOB [shortness of breath] but not so sure is asthma contributory." The doctor ordered a chest x-ray, which showed an enlarged heart. But the doctor did not order diagnostic testing (echocardiogram) to determine if the patient had heart failure. Instead, the doctor added Lasix presumably to treat for heart failure without determining if this was the patient's diagnosis. An echocardiogram should have been done.

The patient continued to have shortness of breath and dyspnea on exertion. On 1/28/16, the patient developed chest pain at 4:30 a.m., with an order from a physician to see the patient routinely in physician clinic during working hours. Someone with chest pain should be immediately evaluated, not as a routine. At 9:00 a.m., a physician saw the patient. The blood pressure was 169/94 and the pulse 100. An EKG was done. The doctor documented that there were no acute changes. The EKG in the medical record for this date was a very poor tracing and should have been repeated. One segment appeared to show ST segment elevation in V1-2 but only for one portion. This test should have been repeated, but the existing tracing suggested possible acute coronary syndrome, enough that with the symptoms the patient should have been referred for diagnostic evaluation (e.g. stress testing). The doctor told the patient that *he would need a treadmill test when he was discharged*. This was indifferent care. If the patient needed evaluation of coronary artery disease, it should have been promptly done, as the patient was at very high risk and EKGs seem to suggest this possibility.

Five weeks later on 3/6/16, the patient experienced acute shortness of breath at about 3:00 a.m. The oxygen saturation was 85% and decreased to the 60s. The nurse called an ambulance.

About 40 minutes after the episode started the ambulance arrived but the patient experienced cardiac arrest while transferring to the ambulance. The patient died at the hospital.

The coroner found that the patient died from acute coronary atherosclerosis with a right coronary artery plague that showed rupture and hemorrhage consistent with acute coronary syndrome. The patient also had hypertensive cardiovascular disease and kidney damage. Pulmonary edema was noted.

**This patient's death was possibly preventable.** He had very high risk for coronary artery disease, yet his modifiable risks were not properly treated. His blood pressure was under-treated; his diabetes was never under control and poorly managed; and he was treated with only a low intensity statin when he required a high intensity statin.

In addition, the patient had multiple possible atypical presentations of angina that were unrecognized. During one episode of chest pain, the doctor ordered a routine next day visit instead of sending the patient to an emergency room. At the subsequent day evaluation, the EKG was an inadequate tracing but was nevertheless suspicious for acute coronary syndrome. The doctor recommended that the patient get a stress test on discharge from prison, but he took no immediate action to determine if the patient had angina and did not start anti-anginal medication. This was indifferent to the patient's serious medical need. If angina was suspected enough to recommend treadmill testing on discharge from prison, the doctor should have taken timely action to evaluate for cardiac ischemia and treated the patient presumptively for angina. If the patient was treated appropriately for his cardiovascular risk factors and had appropriate diagnostic evaluation of his angina, his death might have been prevented or significantly delayed.

## Patient #30  Hill

This 43-year-old patient had an incomplete problem list. The problem list documented seizure disorder with a VP shunt,[20] deep vein thrombosis (DVT), and cerebrovascular accident, although there was no clear evidence for a cerebrovascular accident on subsequent notes. The patient was being treated for hypothyroidism, which was not on the problem list. The history of his problems could only be gleaned by piecing together strands from various notes, including hospital discharge summaries. The patient apparently had a serious brain injury in 1993 requiring a ventriculo-peritoneal (VP) shunt and subsequently developed seizures from the injury. Although the patient was described as having hemiparesis on an annual examination in 2012, there was no documented thorough neurological examination in the record that I could find that confirmed this condition. The history of the DVT was never clearly documented, even

---

[20] Normally, cerebrospinal fluid circulates in the ventricles of the brain. Due to injury or congenital abnormalities, there may be defects which cause the cerebrospinal fluid to accumulate, causing excess pressure on the brain. In order to resolve this, a drainage system is created to drain cerebrospinal fluid from the brain to the peritoneal cavity. This ventriculo-peritoneal (VP) shunt is subject to blockage and when a person has a VP shunt, any alteration of mental status should prompt evaluation of the shunt by brain imaging to ensure that excess fluid is not accumulating in the brain.

on chronic illness notes. It was not clear when the DVTs started. The patient appeared to be on life-long anticoagulation, but it was not clear why. Notably, the patient had an inferior vena cava (IVC) filter for his DVT. Typically, patients on an IVC filter are not also anticoagulated. When anticoagulated, the reason why should be clear. One can only speculate as to the reason for the IVC filter and anticoagulation. Persons with severe seizure disorder are prone to injury. In particular, a fall to the head during a seizure while on Coumadin can be life threatening. While this may be why he had an IVC filter, it is not clear why he was still on Coumadin. Also, the patient was on aspirin for an unknown reason. There was no documented reason to be on aspirin, Coumadin, and have an IVC filter. The rationale for these prescriptions was not evident in the medical record or in chronic clinic notes. Keeping someone on Coumadin and aspirin together without indication places this type of patient at life-threatening risk. This evidences incompetence on the part of the surgeon caring for the patient at Menard and the radiologist caring for the patient at Hill.

The patient was seen infrequently for his chronic illness when at Menard. When seen, there was often no history and few meaningful physical examinations. The status and rationale for the continued anticoagulation was not made clear. The patient remained on aspirin and Coumadin with an IVC filter throughout 2015 without explanation. Also, the patient had breakthrough seizures despite being on three antiepileptic drugs. This patient was a very complex patient because of his prior brain injury and VP shunt; and because he had repeated breakthrough seizures on three medications, he should have been managed by a neurologist, but there is no evidence of neurology consultation.

The patient transferred from Menard to Hill on 12/17/15. Before the patient transferred he was living in population and appeared to be able to care for himself. The day of arrival at Hill, the patient had multiple seizures and was evaluated only by a nurse. A doctor gave a phone order for Ativan "for continuous seizure activity" and to "send out if unresponsive to therapy and continuous seizures." The patient apparently continued to have seizures and was sent to a local hospital, intubated, and sent to a regional hospital where an electroencephalogram was performed while in the ICU. The patient demonstrated presumed seizure activity without any waveform on the EEG indicating epileptiform activity. The patient was discharged with diagnoses of seizures and pseudoseizures.[21] The medications were not changed.

When the patient returned to Hill Correctional Center, the patient was admitted to the infirmary. Apparently, the patient was discharged from the hospital with a subclavian central venous line, but this was never noticed by providers at Hill. Nurses did not bring this to the attention of providers, apparently thinking it was necessary and began using the port to draw blood from. This unnecessary intravenous line placed the patient at risk of infection and moreover speaks to a significant lack of examination of the patient. How could a central venous line be unnoticed for three weeks?

---

[21] Pseudoseizures are episodes that resemble seizures but are psychological in origin as they have no origin in abnormal brain activity.

The patient was admitted to the infirmary after the hospitalization for ataxia[22] and frequent seizures. Nurses documented that the patient had ataxic gait. An initial NP infirmary admission note documented that the patient had ataxia and unequal pupils. Unequal pupils are a serious sign of central nervous system disorder and needs to be promptly evaluated. The patient had a CT scan at the local hospital by report before transfer to the reference hospital. Nevertheless, unequal pupils and ataxia in the context of a VP shunt requires immediate imaging studies with CT or MRI. This was not done.

Over the course of the next two and a half months the patient continued to have unequal pupils, had progressively deteriorating mental status, and became progressively unable to care for himself. The patient could not walk without support. Instead of sending the patient to a hospital for an evaluation of why he couldn't walk, the NP ordered that his mattress be placed on the floor. Over time the patient was unable to communicate effectively, did not consistently respond to questions or commands, became incontinent of urine and feces, did not consistently eat food or drink, and was unable to care for himself. Despite a dramatic deterioration of neurological status in the context of a VP shunt, the patient never had a thorough neurological examination or had an imaging study (CT scan or MRI) of his brain. The deteriorating condition of the patient combined with the lack of physical examination or care by providers for the patient was indifferent, and grossly and flagrantly unacceptable care.

Over time the patient developed bruising, first noted on his elbows but then on his back, thighs, legs, and elbows. Despite being on Coumadin and aspirin and having bruising, the provider did not order an INR to assess whether he had supratherapeutic levels of anticoagulants. Supratherapeutic levels of anticoagulation would result in bleeding or bruising. This is a dangerous sign and calls for immediate action to prevent life-threatening harm. The doctor did not assess why the patient was on aspirin, as he had no clinical indication for this drug. Keeping the patient on both drugs and failure to assess the INR was a life-threatening danger to the patient and grossly and flagrantly unacceptable medical care. Eventually the patient began passing frank blood from his urine and stool. The nurse told the doctor, who only ordered ciprofloxacin for a presumed urinary tract infection without evaluating the INR to assess anticoagulation status. This was grossly and flagrantly incompetent care.

During this two month period the patient had a significant deterioration in his mental status and had evidence of bleeding. Despite unequal pupils and ataxia, deterioration of mental status, and bleeding while on anticoagulants, the doctor never performed a thorough history or a thorough neurological examination, including examination of his pupils. The doctor never ordered an INR.

Eventually, the patient became unresponsive and was sent to a hospital. The patient had an INR of 10, which is a life-threatening value. The patient also had a major intracranial bleed as a

---

[22] Ataxia is a non-voluntary lack of coordination of movement that results in gait abnormalities. It is often a sign of central nervous system disorder.

PTX193-0760

result of the excessive anticoagulation that shifted the brain and caused herniation of the brain, which caused the patient's death. The death was attributed to supratherapeutic anticoagulant levels.

**This patient's death was preventable**. Care for this patient was grossly and flagrantly unacceptable. The death summary was performed by the doctor caring for the patient and no problems were identified. This doctor is a nuclear radiologist and clearly does not have fundamental medical knowledge sufficient to practice general primary care medicine, and should not be allowed to do so. This is a doctor identified on the First Court Expert report as having performed poorly. Yet he continues to practice. Notably, the hospital notes document questioning why the patient was on anticoagulation. The fact that the patient was at Hill for almost three months and providers failed to identify that the patient had a central venous intravenous line was remarkable. Apparently, this device was inadvertently left in the patient when discharged from the hospital in December but no one at Hill even asked why it was necessary. Also, no one at Menard or Hill apparently knew that the patient had an IVC filter. The medical care was indifferent, and grossly and flagrantly unacceptable.

We noted 110 errors in the care of this patient. The most frequent error was the repeated error of failing to identify the medical indication for the use of both aspirin and Coumadin. This was particularly egregious because the patient had an IVC filter, which makes both Coumadin and aspirin unnecessary. On 16 occasions, the patient had serious, even life-threatening presentation, yet nurses failed to consult a physician. Physician history and physical examination were frequently inadequate and, particularly in the latter stages of the patient's life, failed to further investigate obvious conditions such as bruising and altered mental status that would have been obvious to a layman.

## Patient #31  Illinois River

This patient had a history of diabetes, hypertension, and substance use. There were no progress notes in the medical record from 5/27/15 until the patient was diagnosed with squamous cell cancer of the tongue on 9/20/16. This record was incomplete. It was not clear if the patient was not evaluated for a year and a half or whether the record was missing. It appeared that the patient may have been in a transition center, but it was unclear. The initial diagnosis in September of 2016 was squamous cell cancer of the tongue with multiple enlarged metastatic lymph nodes in the neck, and locally invasive cancer. The cancer was stage IV on diagnosis. The patient was admitted to the infirmary after the cancer was diagnosed and died in hospice on 12/2/16.

Based on the record, **it was difficult to determine if the death was preventable or not preventable, as there was a significant part of the record missing.** If the patient was at a transition center and had adequate care and access, then the death would be not preventable. But this is based on speculation. We noted only two errors, both related to lack of medical records.

### Patient #32  Pinckneyville

This patient was admitted to NRC on 12/6/16. The patient had hypertension, heart failure, COPD, diabetes, and idiopathic thrombocytopenic purpura (ITP).[23] The patient was on danazol for his ITP. The patient had his spleen removed due to the ITP. The patient's initial laboratory results show that the patient had chronic kidney disease (creatinine 1.87) and low albumin, indicating possible poor nutrition. The patient was incarcerated approximately five months before he died. The diabetes was poorly controlled during the entire approximate five months of incarceration.

The patient's record of treatment of his ITP was not identified at NRC. Old records were not obtained. His prior treating oncologist was not contacted. It was not clear what his therapeutic plan was. The patient was on danazol for his ITP on transfer from a local jail. This drug has a black box warning with respect to causing thromboembolism, some of which can be fatal, and which ultimately apparently caused this patient's death. This drug also is contraindicated in patients with markedly impaired renal function and is noted to worsen diabetic control. This patient had chronic kidney disease. None of these potential problems were monitored by IDOC physicians.

The patient transferred to Pinckneyville from NRC on 1/4/17 without having had his therapeutic plan verified. Doctors at Pinckneyville were unaware of how to manage his ITP. ITP causes destructions of platelets, a blood element that is involved in clotting. His initial platelets were 60,000. Normal platelets are 150,000 to 450,000. The goal in chronic ITP is to keep platelets above 20,000. When the patient arrived at Pinckneyville he was not on danazol, an off label[24] medication used for ITP that he had been taking. On 1/9/17, the patient placed a health request, complaining that he was not receiving danazol and had not seen a doctor yet for his ITP. He was upset that his medication was discontinued without having spoken to a doctor about this change.

A doctor saw the patient on 1/17/17, and restarted the danazol without noting a review of contraindications which included markedly impaired renal function. The renal function was not monitored, and doctors did not acknowledge the potential for worsening diabetes control from this medication. While the patient's renal function was abnormal, it was not clear if renal function had deteriorated to a level that made the medication dangerous. Yet the doctor did not initially refer the patient to someone expert in managing ITP, like a hematologist.

In early February, a doctor started large doses of prednisone for the ITP. A major problem with this patient is that his prior treatment program was never identified. Typically, initial treatment of ITP is different from treatment of chronic ITP. Initial treatment included steroids and intravenous immune globulin (IVIG). Treatment of chronic disease utilizes splenectomy, which

---

[23] ITP is a disease in which platelets are destroyed, often from unknown reasons. Platelets are necessary to properly clot blood and lack of platelets can result in life-threatening bleeding. This disease is typically managed by a hematologist.
[24] Off label medications are medications not approved by the FDA for the stated purpose. While these medications are often useful, the FDA has not identified sufficient scientific evidence of their value.

this patient already had, and other medications, sometimes in combination with steroids. After the danazol was started, a creatinine was 2.05, a deterioration, and concerning with respect to the potential for complications.

The patient was sent to a local hospital for an injection of IVIG, but at the hospital the patient received no therapy and left with a recommendation to see a hematologist in his office. At some point around this time, a doctor wrote an undated message to apparently the Wexford Regional Medical Director asking, "What should we do?"  There was no plan after return to the prison to send the patient to a hematologist.

About a month later, the patient told a nurse "I'm going to die." The nurse had brought the patient to the health care unit because the platelet count was 6,000, a critical value that placed the patient at risk of life-threatening bleeding. A doctor sent the patient to a hospital. The patient was discharged from the emergency room on high dose steroids again with a recommendation to follow up with a hematologist.

After this second hospitalization on 3/23/17, the Pinckneyville physician referred the patient to a hematologist. The patient was evaluated by the hematologist on 3/30/17, but the report was not in the medical record and it was not clear what the hematologist findings were. Brief comments by the hematologist on the referral form recommended prednisone 100 mg daily with a return in two weeks. It was not clear if the hematologist knew that the patient was on danazol because the consultant note was not present. When a doctor followed up after the hematology consult, the doctor did not document what the hematologist's findings were or what the therapeutic plan was.

On 4/5/17, the white count was 23,200, which may have been a result of the use of high dose prednisone, but could also be from infection. No one evaluated this abnormal test. On 4/6/17, the patient developed abdominal pain, had not been eating, and had not been able to have a bowel movement for two days. The patient was referred to a local hospital, but transferred to a tertiary hospital because he had an ischemic bowel with perforation. Ischemic bowel is often caused by thromboembolism, which is one of the complications of danazol. It is unclear whether the hematologist knew that the patient was on danazol and felt it was necessary. Because the patient was so malnourished and weakened he was not a surgical candidate and the patient also declined having an external ostomy placed. As a result, the patient was sent back to the facility with a recommendation for hospice.

The patient returned from the hospital on 4/14/17 and died on 4/19/17. He was scheduled to see the hematologist on 4/18/17, but the ADA van was unavailable and therefore the appointment was rescheduled.

In summary, coordination of this patient's complex medical condition with consultants was extremely poor. For several months, the patient was not referred. When the patient was referred, the consultation report was not available, and it was not clear what the patient's

status was. Because consultant reports are unavailable, **there is insufficient information to assess preventability.**

We identified 20 errors on this record. The most serious ones were never understanding the therapeutic plan for the patient's serious medical condition or whether the danazol was indicated. A side effect of the danazol likely caused the patient's death, but it was not clear whether the hematologist intended the patient to continue this drug. There were six errors in lack of timely referral to a hematologist for management of a life-threatening condition.

## Patient #33 Robinson

This 58-year-old man was at the Robinson Correctional Center and had hypertension and high blood lipids, which were both untreated for eight months of record review. These are both risk factors for heart disease. On 3/16/16, he developed chest pain with atrial fibrillation. The blood pressure was 200/118 and the pulse was 129. The electrocardiogram also showed marked ST depression indicating acute coronary syndrome, a life-threatening event portending a heart attack. The automated reading recommended, "immediate clinical assessment of this individual is strongly advised." He should have been hospitalized immediately for cardiac catheterization and management of his atrial fibrillation. Instead, a nurse evaluated the patient and consulted a doctor, who only ordered 23-hour observation on the infirmary and gave one-time only doses of clonidine and propranolol. This was grossly and flagrantly unacceptable care and placed the patient at risk of death and demonstrated a profound deficit of primary care knowledge.

The following day, a doctor ordered aspirin and statin medication, but failed to refer to a cardiologist and failed to refer for catheterization despite the prior day's EKG result, which was signed as reviewed. Aside from aspirin, anticoagulation due to atrial fibrillation was not considered. These actions placed the patient at risk of death.

The doctor continued to fail to appropriately manage this patient's life-threatening condition. The doctor continued the patient on high doses of non-steroidal medication despite a box warning[25] regarding risk for cardiovascular thrombotic events including myocardial infarction and stroke with use of this drug. The doctor eventually began treatment of the patient's high blood pressure with Norvasc, a drug that carries a warning of increased angina or myocardial infarction in persons with obstructive coronary disease, which the patient appeared to have. Eventually, the patient's family called the HCUA because the patient was having chest pain while walking to the dining hall and could not walk without chest pain. The HCUA wrote that the patient was "not in any distress but complains he is unable to walk to dietary." The HCUA referred routinely to a doctor for an appointment five days later. This was indifferent as the patient's need was urgent not routine.

---

[25] A box warning is the strictest warning put in the label of prescription medication by the Food and Drug Administration when there is reasonable evidence of an association of a serious hazard with the drug.

PTX193-0764

The patient again developed typical chest pain which was helped by nitroglycerin. An electrocardiogram showed moderate ST depression consistent with ischemia. This is consistent with acute coronary syndrome and the patient should have been transferred immediately to a hospital. Instead, a nurse saw the patient and consulted a doctor, who ordered 23-hour observation but no further treatment. At this point, aside from nitroglycerin, the patient was not on antianginal medication. This was grossly and flagrantly unacceptable and placed the patient at risk of death. This was the second episode of acute coronary syndrome which was inappropriately managed.

The patient was seen after this second electrocardiogram verifying acute coronary syndrome and a doctor referred the patient for an elective stress test. Wexford would not approve the stress test and instead recommended as an alternative plan to refer the patient to a cardiologist. This was done on an elective basis though the patient had an urgent need. The cardiologist saw the patient a month after the referral and recommended a cardiac catheterization "in the near future."

The catheterization was ordered, but a week later the patient again developed chest pain. The electrocardiogram showed atrial fibrillation. Our reading shows ST depression is several leads. Chest pain with recurrent atrial fibrillation and acute coronary syndrome should have resulted in immediate hospitalization for evaluation, catheterization, and consideration for anticoagulation. Instead, a nurse consulted a doctor, who ordered 23-hour observation with a next day electrocardiogram. Six hours later the patient was found unresponsive. Cardiopulmonary resuscitation was started, and the patient transferred to a hospital, where he died.

This patient had repeated episodes of acute coronary syndrome and two episodes of atrial fibrillation, each of which should have resulted in hospitalization, which did not occur. The angina was inappropriately treated and was never under control. Cardiac catheterization was not done over three months despite the patient having three episodes of apparent acute coronary syndrome. The atrial fibrillation was never appropriately assessed, and the patient was not anticoagulated despite having atrial fibrillation and acute coronary syndrome on three occasions. The patient's cause of death was listed as coronary atherosclerosis and stroke, both of which were preventable with timely and appropriate treatment. **Therefore, this death was preventable.**

The death summary noted no problems and noted that earlier intervention was not possible. We strongly disagree.

We noted 46 errors in the care of this patient from the time he was transferred to Robinson on 8/21/15 until his death on 6/10/16. These errors included not taking adequate history, not performing a needed physical examination, and not developing an appropriate treatment plan. Additional errors included not treating elevated blood pressure from August of 2015 until March of 2016 despite continuously elevated blood pressure. Despite being 58 years old, this

patient's 10-year cardiovascular risk was apparently not calculated. The patient had blood in his stool and was 58 years old but was not referred for colorectal screening. He had blood in his stool but was kept on non-steroidal medication without investigation. The patient was also prescribed medication that was likely to harm him (non-steroidal anti-inflammatory drugs and Norvasc) without recognition of the potential for harm. The most serious errors, however, were the failure to immediately hospitalize the patient after repeated episodes of acute coronary syndrome and atrial fibrillation, and lack of awareness and acknowledgement of the seriousness of these conditions.

# IDOC Mortality Error Classification

| Description of Error | Error type | Number having that error |
|---|---|---|
| Apparently did not obtain pertinent history and/or findings from examination. | 1 | 276 |
| Apparently did not make appropriate diagnoses and/or assessments. | 2 | 249 |
| Apparently did not establish and/or develop an appropriate treatment plan for a defined problem or diagnosis which prompted this episode of care (excludes laboratory and/or imaging and procedures and consultations). | 3 | 228 |
| Apparently did not carry out an established plan in a competent and/or timely fashion (e.g. omissions, errors, of technique, unsafe environment). | 4 | 44 |
| Apparently did not appropriately assess or act on changes in clinical/other results. | 5 | 7 |
| Apparently did not provide appropriate personnel and/or resources, including getting hospital reports. | 6 | 87 |
| Apparently did not refer or timely schedule for a procedure that was indicated (other than lab or imaging). | 7 | 95 |
| Apparently did not obtain timely appropriate laboratory tests and/or imaging results. | 8 | 119 |
| Apparently did not develop and initiate appropriate discharge from infirmary or failed to follow up after infirmary or hospital discharge. | 9 | 4 |
| Apparently did not follow up appropriately after consultation or health care visit. | 10 | 45 |
| Apparently did not provide appropriate personnel and/or resources, including getting hospital reports. | 11 | 138 |
| Apparently did not order timely, appropriate specialty consultation. | 12 | 81 |
| Apparently did not follow up on patient's noncompliance. | 13 | 4 |
| Apparently failed to timely refer to a higher level of care including hospitalization, skilled nursing unit, or infirmary. | 14 | 93 |
| Apparently failed to follow up on significant findings. | 15 | 28 |
| Apparently, nurse failed to consult/refer timely to a higher level medical staff (provider). | 16 | 143 |
| Apparently did not develop and initiate appropriate discharge from infirmary or failed to follow up after infirmary or hospital discharge. | 17 | 79 |
| Failed to see a patient with potential serious illness. | 18 | 37 |
| **Total** | | **1757** |

**PTX193-0767**

PTX193-0768

Patient #1

1/2/2015 Cholesterol 194; TG 60; HDL 55; LDL 127.

1/5/2015 An annual history evaluation at WICC for this 56 year old. The weight was 184. This nurse evaluation was not performed on the same day as the physical examination.

1/6/2015 A nurse saw the patient because he passed out according to his cell mate. The blood pressure was 162/93. The weight was listed as 166 pounds. The nurse noted that the patient had an appointment the next day so didn't refer the patient or consult a doctor. An EKG was not done.

16   Syncope is a critical sign and requires immediate evaluation. The nurse needed to consult a provider promptly.

1/7/2015 The cholesterol was 194; TG 60; HDL 55; LDL 127.

1

PTX193-0769

Patient #1

1/7/2015  An annual health examination showed BP 149/98, weight was listed as 168, which is 16 pounds different from two days before. The NP documented that the patient refused a digital rectal examination for purposes of prostate screening but did not offer colorectal screening (fecal occult blood tests or colonoscopy). On the physical examination form, the rectal examination is listed as a test of the prostate in males over 40 years old. Lack of colorectal screening is inconsistent with contemporary standards of care. The refusal of the digital rectal examination states he refuses performance of a "prostate - digital rectal exam." There was no discussion of colorectal cancer.

7, 15  The nurse noted the day before that the patient would be seen for "passing out" but the NP did not address this. Two days before a nurse documented the weight as 184 pounds. At this visit the weight was recorded as 168 pounds, a 16 pound difference. The differences in weight were so significant as to make weights unreliable. The patient was 56 and should have had colorectal cancer screening. The patient was offered only a digital rectal examination. This examination was offered for prostate screening. Current recommendations of the American Cancer Society state that digital rectal examination is insufficient as a stand-alone test for colorectal cancer. This type of cancer screening will miss 90% of colon abnormalities. The patient should have been offered fecal occult blood testing (not from a digital rectal examination or colonoscopy). This lack of colorectal screening was significant. Care failed to follow generally accepted guidelines or usual practice.

1/12/2015  A doctor saw the patient and noted that the patient reported a right testicle mass which was not appreciated on an NP examination on 1/7/15. The doctor examined the patient and documented an epididymal cyst. The weight was 164.

2/9/2015  Cholesterol 201; HDL 56; LDL 135.
2/19/2015  The cholesterol was 201; TG 48; HDL 56; LDL 135.

2

Patient #1

3/9/2015 The patient was evaluated for HTN clinic. The BP was 148/93. Weight was listed as 170 pounds. No change in BP meds was made; the doctor noted the patient missed his BP meds that morning. The cholesterol was 201; HDL 56; LDL 135. The patient was an ex-smoker. The patient had a 22% 10-year risk of heart disease or stroke and should have been on a moderate to high statin dose.

3 The statin dose probably should have been increased to 40 mg of Zocor. The BP meds should have been increased. Care could reasonably have been expected to be better.

9/30/2015 A doctor saw the patient for HTN chronic care. The weight was 164. Blood pressure was 124/73. Lipids were not addressed.

2/11/2016 Lab showed normal metabolic panel except for albumin 3.3. AST/ALT and alkaline phosphatase were normal. Cholesterol was 161, TG 46, HDL 56, LDL 96.

3/1/2016 A doctor saw the patient in HTN chronic clinic. The weight was 164 pounds. The BP was 115/65. The doctor noted a cholesterol of 161 and triglycerides of 46. The LDL was not noted. The albumin was 3.3 which is low but the doctor did not initiate any work up. The patient was on lisinopril, Zocor, aspirin, Hytrin and another medication [illegible].

6 The albumin was low yet the doctor took no action to investigate. Care failed to follow generally accepted guidelines.

7/5/2016 BUN, creatinine and electrolytes were normal.

7/7/2016 This was to be the next physician visit after 3/1/16. The patient weighed 158 pounds. The blood pressure was 119/77. A rescheduled visit for 7/26/16 didn't take place.

9/2/2016 BUN, creatinine and electrolytes were normal.

9/13/2016 A doctor saw the patient for a hypertension clinic. The weight was 156 pounds. The patient was 5 foot 5 inches tall. The doctor checked the box that education was given regarding weight loss. The blood pressure was 140/77. The patient was on aspirin, lisinopril, Zocor, Hytrin and Proscar. No other history was taken.

1 Depending on which weight was used, based on the history (1/5/15) and physical examination (1/7/15) the patient had lost either 28 pounds or 10 pounds. In either case the doctor was not monitoring the weight of the patient. Presumably the purpose of taking weight is to monitor it, but this wasn't done. Care could reasonably have been expected to be better.

3

PTX193-0770

Patient #1

| | | |
|---|---|---|
| 1/16/2017 | The patient transferred from WICC to IRCC. Hypertension and high blood cholesterol were listed as problems. The blood pressure was 150/100 but not addressed. The weight was 152 pounds. On the 1/5/15 annual history the patient weighed 184 pounds. On a health request on 1/6/15, a nurse documented that the patient weighed 166 pounds. | 1,16 | Nurses failed to address abnormal vital signs. On transfer the nurse failed to appreciate a weight loss of 14 or 32 pounds depending on which weights from January of 2015 were used. What is the purpose of taking the weight? Care failed to follow generally accepted guidelines, as intake screening should be a summary screening of the patient's conditions including weight, and the nurse should have referred abnormal blood pressure to a physician. |
| 2/2/2017 | The albumin was 3.1; AST, ALT, alkaline phosphatase and bilirubin were normal. | | |
| 2/10/2017 | A doctor performed a general medicine clinic for high blood lipids and prostatic hypertrophy. The weight was 155 pounds. The doctor noted that the patient had nocturia twice a night but took no other history related to the BPH or high blood lipids. The cholesterol level was not documented. The doctor ordered a fasting lipid panel. The doctor failed to address a low albumin. | 1, 5, 6 | The doctor failed to acknowledge an abnormal lab or follow up. The doctor failed to acknowledge a 11 or 29 pound weight loss since the annual history and physical examination from January 2015. Care failed to follow generally accepted guidelines or usual practice. |
| 3/14/2017 | A NP saw the patient for an annual HTN clinic. The NP took no history except to note "no complaints F/U altercation." The weight was 155. Labs were not reviewed. | 5 | The NP failed to note weight loss. Care failed to follow generally accepted guidelines. |
| 3/26/2017 | A nurse saw the patient for right sided flank and back pain that was constant. The blood pressure was 152/94 and pulse was 119. The nurse assessed that there were no contusions or swelling but there was pain to palpation. The nurse noted "acute severe discomfort" and called a doctor who ordered Toradol 60 mg IM and Ultram 150 mg BID for three days. | 15 | The patient had abnormal vital signs with back pain yet there was no follow up with the primary care physician. Care failed to follow generally accepted guidelines. |
| 4/20/2017 | The total protein was 5.7 (6-8); albumin 2.3 (3.4-5) and alkaline phosphatase 167 (40-125). The hemoglobin was 6 (13.2-18). | | |

PTX193-0771

Patient #1

4/21/2017  An LPN documented that the hemoglobin was 6 and the patient had abdominal discomfort. The patient was lightheaded and dizzy for the past month and had nausea and vomiting for a month. The nurse referred to a doctor.

4/21/2017  A doctor saw the patient and noted weight loss, night sweats. The doctor noted anemia, 19 pound weight loss over a month and night sweats. The doctor ordered the patient transferred to a hospital via state vehicle for evaluation.

4/21/2017  ER report from Graham Hospital from the 4/21/17 hospitalization showed hemoglobin of 7.5. The report included a report of an EGD that showed extensive inflammatory changes in the distal esophagus with some ulceration suggestive of Barrett's esophagus. The stomach was essentially normal. The biopsy reported 4/25/17 showed mild reflux changes, chronic gastritis and helicobacter pylori.

This EGD should not have accounted for a hemoglobin of 6.

4/22/2017  The patient returned from the hospital and was placed on the infirmary.

4/22/2017  A doctor noted that the patient had a history of anemia and received two units of blood The doctor took no other history. The doctor failed to note the hospital diagnoses. The doctor noted that the patient's hemoglobin was 6 in the ER but didn't note what the current hemoglobin was. The doctor kept the patient on aspirin, started iron, but ordered no laboratory tests and no evaluation for a critical anemia. Despite the patient just being diagnosed with a GI bleed and esophagitis, the doctor kept the patient on aspirin and did not start a proton pump inhibitor or H2 blocker medication.

1,3,17   The doctor failed to take a history of the current hemoglobin and did not note the weight loss and abdominal pain and failed to make an assessment of what the patient might have. There was no plan for the significant anemia and weight loss. The doctor continued aspirin therapy in someone with recent GI bleed, gastritis, and esophagitis. Care failed to follow generally accepted guidelines.

5

PTX193-0772

Patient #1

| 4/24/2017 | The patient told a nurse that he had constant pain below his right rib with inspiration and when he laid on his right side. | The nurse should have consulted a physician. |

4/25/2017 A nurse practitioner saw the patient, who weighed 138 pounds, which was somewhere between a 28 to 46 pound weight loss over two years. The NP noted lower quadrant abdominal pain and ordered a CBC and referred for colonoscopy.

4/25/2017 A referral form from Illinois River documented that the patient had a hemoglobin of 6 and a negative EGD in an ER and that outpatient colonoscopy was recommended. This referral form was not approved.

| 4/26/2017 | The temperature was 100.6 at 4:00 am and 103.4 at 8:00 pm on the graphic flow sheet. | 16 | The nurse should have consulted a physician. |
| 4/26/2017 | At 5:10 am a nurse documented that the patient had a fever but did not document calling a doctor. | 16 | The nurse should have consulted a physician. |
| 4/27/2017 | The temperature was 103.6 at noon. | 16 | The nurse should have consulted a physician. |
| 4/27/2017 | At 8:30 am a nurse documented that the patient vomited and had a temperature of 102.7 The nurse gave the patient Tylenol but did not call a doctor. | 16 | The patient had weight loss, anemia, and fever and should have been admitted to a hospital but the nurse didn't even call a doctor. |
| 4/27/2017 | A nurse noted that the patient had abdominal pain but did not refer to a doctor. | 16 | The nurse should have consulted a physician. |
| 4/28/2017 | The temperature was 101.4 at 4:00 pm | 16 | The nurse should have consulted a physician. |
| 4/28/2017 | At 4:00 pm a nurse noted that the patient had fever of 101.5 but only gave the patient Tylenol without consulting a physician. | 16 | The nurse should have consulted a physician. |
| 4/29/2017 | The temperature was 100.4 at noon. | 16 | The nurse should have consulted a physician. |
| 5/1/2017 | The temperature was 102.4 at 4:00 pm. | 16 | The nurse should have consulted a physician. |

6

PTX193-0773

Patient #1

| | | |
|---|---|---|
| 5/1/2017 | A nurse called the NP about whether the blood should be drawn and received an order to draw the CBC in the morning. The temperature was 102.4. | 14 | This patient should have had a stat CBC upon return from the hospital and then a few days later to assess the hemoglobin level. Because of the fever the patient needed prompt evaluation for his anemia, weight loss, abdominal pain and fever or should have been sent to a hospital for evaluation. Care failed to follow generally accepted guidelines or usual practice. |

5/2/2017  The temperature was 101.4 at 4:00 am and 100 at noon.   16   The nurse should have consulted a physician.

5/2/2017  An NP saw the patient and noted that the patient had abdominal pain, fever. Remarkably, the NP documented that the patient had not been losing weight; the weight was not documented but the patient had actually lost somewhere between 28 to 46 pounds since January of 2015. The NP ordered a stat CBC but should have referred to a hospital for possible acute colitis or other condition causing weight loss, fever, abdominal pain.

1, 14   The NP should have admitted the patient to a hospital because of fever, weight loss, and abdominal pain. The NP history was wrong that the patient did not have weight loss. Fever, anemia, weight loss and abdominal pain are indications for an immediate evaluation. Care failed to follow generally accepted guidelines or usual practice.

5/2/2017  A doctor noted that colonoscopy was approved in collegial review. The doctor noted that a colonoscopy would be scheduled after transfer to Danville. It wasn't clear why the patient needed transfer to Danville for a colonoscopy. Because the patient had fever, abdominal pain and weight loss, a prompt colonoscopy and/or CT abdomen were indicated. This may have required hospitalization.

12, 14   The delay in specialty care was significant and reflects on the collegial review process. Care failed to follow generally accepted guidelines.

5/2/2017  At 2:15 pm the patient was transferred to Danville. On arrival at Danville the weight was 140 pounds or a 24 pound weight loss over nine months and a 26 or 44 pound weight loss since January 2015.

5/2/2017  Hemoglobin was 8.3 (13-16.9).

7

PTX193-0774

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 8 of 431 PageID #:12206

Patient #1

| | | |
|---|---|---|
| 5/3/2017 | An LPN noted that the patient came to the health care unit inquiring about the decreased hemoglobin. The nurse talked to a doctor who said that a CBC would be done on 5/5/17. The doctor noted that unless the hemoglobin was less than 7 the patient was to follow up next week. | 7 | Danville did not understand the urgency of the patient's problems. A nurse reviewing the patient on transfer scheduled the patient for a routine PCP visit. The physician ordered a routine CBC for a patient with weight loss, fever and abdominal pain. Care failed to follow generally accepted guidelines. |

| 5/3/2017 | An approval for colonoscopy referral received on 5/2/17 from Wexford UM. | | |

| 5/10/2017 | A nurse said that the patient would be rescheduled because the labs were not yet done. | 7 | This was a delay in evaluating a serious medical condition. |

| 5/11/2017 | The total protein was 5.8 (6-8); albumin 2.3 (3.4-5); alkaline phosphatase 213 (40-125); AST 41 (10-40); hemoglobin 7.9. | | These were abnormal labs but were not addressed. Care failed to follow generally accepted guidelines or usual practice. |

| 5/17/2017 | Last dated problem list: hypertension, high blood lipids and prostatic hypertrophy. | | |

| 5/17/2017 | An NP saw the patient for semi-annual general medicine clinic. The NP took a history of right leg swelling and pain in his abdomen. The NP noted a hemoglobin of 6 on 4/20/17 with a hemoglobin of 8.3 on 5/2/17. The NP noted that the inmate weighed 150 pounds and was "very cyanotic" with right leg swelling from the knee to the foot. The NP noted that colonoscopy was approved. The only diagnosis was anemia. The blood pressure was 121/79. The NP decreased the Zocor and lisinopril without giving a reason. There were no additional orders. | 6, 8 | Unilateral leg swelling is a significant finding. DVT should have been excluded; this was potentially life-threatening. Recent abnormal lab tests were not acknowledged except for the anemia. Care was grossly and flagrantly unacceptable. |

| 5/18/2017 | A doctor wrote a brief note without seeing the patient stating that a GI note from 4/22/17 documented that the patient had chronic gastritis and possible Barrett's esophagus and started triple therapy with follow up in 2-3 weeks with a repeat CBC the next visit. | 4 | The patient was over 50 with weight loss, fever, anemia, and abdominal pain and needed an evaluation for this. The doctor did not perform an adequate evaluation of the patient and initiated a treatment plan without evaluation of the patient. Care failed to follow generally accepted guidelines or usual practice. |

8

PTX193-0775

3:17-cv-03112-JES-JEH   # 263-10   Page 153 of 577

Patient #1

6/5/2017   Hemoglobin was 7.9.

6/14/2017  A doctor wrote that the patient's symptoms had improved "tremendously" and that the patient was scheduled for colonoscopy. The doctor did not note what the hemoglobin was. The doctor noted that the colonoscopy prep was to be started that day. The doctor diagnosed chronic gastritis.

1,2   The doctor did not obtain an adequate history and did not examine the patient. Previously abnormal labs were not followed up. The weight loss, anemia, low albumin, elevated alkaline phosphatase were inconsistent with chronic gastritis. Care failed to follow generally accepted guidelines.

6/15/2017  A colonoscopy report documented an infiltrative partially obstructing large mass was in the ascending colon. The mass was circumferential. Biopsies were taken. The endoscopist recommended a CT scan, CEA, referral to a colorectal surgeon, a recommendation to screen 1st degree relatives at age 40. The consultant said to "watch for signs of bowel obstruction as the mass was almost completely obstructing the lumen." The consultant recommended a CT scan of the abdomen and pelvis, tumor markers and referral to a colo-rectal surgeon within two weeks.

6/15/2017  A pathology report documented invasive moderately differentiated adenocarcinoma.

6/20/2017  A doctor noted that the colonoscopy results showed an obstructing mass in the ascending colon. The doctor ordered CBC, CEA, CMP, KUB, and follow up with colorectal surgery.

6/21/2017  A referral form on this date referred the patient to colorectal surgery. This was checked as an urgent consult but was not signed as approved.

6/22/2017  Wexford UM approved a colorectal surgery evaluation.

9

PTX193-0776

PTX193-0777

Patient #1

| Date | Description | # | Comment |
|---|---|---|---|
| 7/5/2017 | A doctor noted that the patient had swelling of the right lower extremity and that oncology follow up was pending. The patient had 2+ pitting edema of the right leg from mid-thigh to "distal extremity." The doctor ordered a D-dimer, and other tests and ordered ted hose and gave the patient a cane. The blood pressure was elevated at 134/99 and pulse was 113. The doctor still did not document the hemoglobin. The doctor increased HCTZ. To treat suspect DVT with HCTZ was below standard of care. The doctor ordered a "PRN" follow up. | 4, 8, 15 | The doctor apparently thought of pulmonary embolism or DVT because he ordered a D-dimer. If the doctor believed the patient might have a DVT, immediate transfer to a hospital for Doppler was indicated. The doctor did not address the possible etiology of unilateral leg swelling with an abdominal mass-known to be likely cancer. To order a diuretic for unilateral leg swelling without excluding DVT is incompetent. The doctor ordered "PRN" follow up for a potentially life-threatening problem. Care was grossly and flagrantly unacceptable. |
| 7/5/2017 | The nurse was unable to draw all labs and rescheduled the D-dimer test. The doctor was not notified. | 8 | This was a significant test and the delay should have resulted in a call to a physician. |
| 7/5/2017 | The BUN was 23 (6-20); albumin 2.2 (3.4-5); alkaline phosphatase 301 (40-125); AST 82 (10-40); WBC 14.6 (3.9-12); hemoglobin 9.1. | | |
| 7/10/2017 | An LPN documented that approval was needed for a D-dimer test and did not draw it. The infirmary nurse was notified and was asked to check with the infirmary doctor. | 8 | A D-dimer test is a test for a potential emergency condition (DVT or PE). This test had been delayed five days due to bureaucratic obstructions. The patient should have been admitted to a hospital for a Doppler but even the D-dimer test was significantly delayed. |
| 7/10/2017 | Serum iron was <10 (50-180); transferrin 100 (200-400); iron binding capacity 140 (250-450); INR 1.4 (0.9-1.2). | | |
| 7/12/2017 | A colorectal surgeon saw the patient. The patient told the surgeon that he lost 50 pounds in the past 3-4 months. The surgeon palpated a left upper quadrant mass suspected to be his liver with a fluid wave consistent with ascites. This note was incomplete and did not include the assessment or plan. | 14 | This visit was two weeks late. Care could reasonably have been expected to be better. |

Patient #1

7/14/2017 A CT scan showed small left pleural effusion; large metastasis in the liver of 16 by 17 cm. There was a large mass involving the ascending colon. There was a large amount of ascites exerting a mass effect and suspicious for pseudomyoma peritonei. There was a large metastasis in the anterior abdomen with peritoneal nodules and a lymph node in the area of the pancreas. The hemoglobin was 7.8. The CEA was 2185 (0-3)

8/3/2017 The patient was admitted to the infirmary for "severe LE edema" to both legs over the past two weeks. The doctor noted 3+ edema in both legs and in the penis and scrotum and started Lasix and ordered CBC, CMP and elevation of the leg and a Foley catheter. The patient was now unable to walk. The provider failed to include in the history that the patient had weight loss, and recent fevers. The doctor noted that the patient had recently diagnosed colon cancer but did not apparently associate the colon cancer with the edema. The doctor provided only symptomatic treatment of the edema without making a diagnosis. It did not appear that the doctor reviewed the hospital record.

1, 2,3    Starting a Foley catheter without indication can lead to infection. It was not made clear that the penile edema was causing difficulty urinating. As well, the doctor failed to associate the colon cancer recently identified and the edema. The doctor was treating the patient without having a diagnosis for a potentially life-threatening problem. This failure placed the patient at risk of harm.  Care was grossly and flagrantly unacceptable.

8/3/2017 A nurse noted that the Foley catheter could not be placed due to penile edema.  The doctor was also unable to insert the Foley catheter but was able to insert a straight catheter. Ultimately, doctor and nurse gave up and gave the patient a urinal.

8/4/2017 The patient vomited approximately 100 CC of yellow bilious vomit with bloody streaks.  The nurse called a doctor who advised to send the patient to a hospital.

8/4/2017 A chest and abdominal x-ray showed basilar atelectasis and gas overlying the rectum.

11

Patient #1

8/7/2017 A therapeutic paracentesis was performed at Carle Clinic. 6 liters of serosanguinous fluid was drained. A PET scan showed metastatic involvement of right lower abdomen involvement with adjacent lymph nodes, liver involvement with central necrosis.

8/7/2017 A hospital note documented that the patient was admitted for severe ascites, nausea, vomiting and abdominal pain with malnutrition and hypoalbuminemia. The assessment was noncurable metastatic colon cancer. The colorectal surgeon was consulted as was an oncologist. Palliative surgery was suggested but because of malnutrition, he was a surgical risk. He had ascites from the low albumin from malnutrition.

8/17/2017 There were no further notes we could locate. But the patient was listed as dying on 8/17/17 of metastatic colon cancer. There was no death summary or autopsy.

12

PTX193-0779

Patient #2

8/26/2015 A letter to a nurse at the Stephenson County Jail in Freeport Illinois from a Pediatric Cardiologist from UI @ Peoria in Rockford IL stating that the patient had repair of Tetralogy of Fallot during childhood and had residual defects. A case conference recommended that he obtain a magnetic resonance angiography of the heart and pulmonary vessels at St. Francis Medical Center in Peoria and a Holter monitor. If the studies confirm their impression they would recommend replacement of his pulmonic valve to resolve his severe pulmonary regurgitation. Next to the inmate's name was written his IDOC number indicating that the IDOC probably had this letter. On the bottom of the letter dated 9/18/15 is a brief note stating "Reviewed PLS schedule tests as recommended." The patient obtained the Holter monitor, but the scheduled MRI was not done as ordered.

This patient had a serious congenital heart disease and his cardiologist was planning to replace his pulmonic valve when the patient became incarcerated.

10/13/2015 The patient had a Holter monitor for a preoperative evaluation at the Children's Hospital. The patient had right bundle branch block. 1509 supraventricular ectopic beats. There were 1.4% premature atrial contractions.

11/5/2015 Intake labs included bilirubin 1.5; ALT 9; AST 25; Alk phos 65; hepatitis C negative; syphilis non-reactive; INR 2.1; an EKG showed NSR with possible left atrial enlargement, right bundle branch block, possible inferior infarct and T wave abnormality-consider lateral ischemia.

Pulmonic regurgitation associated with Tetralogy of Fallot is a diastolic murmur.

11/5/2015 The patient arrived at NRC. A nurse took a history of past cardiac surgery as a child and "pending surgery for leak in heart;" blood clots in the past and currently on coumadin. The patient told the nurse that the was on Plavix since July. The patient was 6 foot tall and weighed 135 pounds.

13

PTX193-0780

Patient #2

| | |
|---|---|
| 11/5/2015 | A PA saw the patient in NRC for his reception physical examination. The PA noted that the patient had a prior stroke in May of 2015 and was on Plavix but switched to Coumadin and that he had cardiac surgery as a child. The PA did not take a more in depth history but did note that the cardiac surgery was in the 1980s at Swedish American Hospital in Rockford and the CVA was treated at Freeport Memorial Hospital in Freeport IL. The PA documented a systolic murmur II-III/VI. The assessment was history of childhood cardiac surgery, prior stroke, and rule out aortic stenosis. The PA started Coumadin 5 mg and ordered a physician follow up. The PA discussed the case with a doctor who recommended the doctor follow up urgently. The PA did not request old records. | 1, 2, 12 | The patient was in the midst of a valve replacement due to complications of his pulmonic regurgitation and the PA failed to take an adequate history to uncover this. |
| 11/18/2015 | The patient transferred from NRC to Sheridan. The transfer document listed rule out aortic stenosis and post stroke as his two medical conditions. No follow up care or specialty referrals were indicated. The Sheridan nurse scheduled the patient for a routine general medicine clinic and noted that the patient gave a history of having a small valve in his heart with a hole in his heart. | 15 | The transfer did not include that the patient had pending cardiology work up. |
| 12/3/2015 | The patient was scheduled for an MRI at Children's Hospital of Illinois in Peoria. | | |

14

PTX193-0781

Patient #2

| | | |
|---|---|---|
| 12/10/2015 | The patient was seen in chronic care at Sheridan for cardiology clinic. The blood pressure was 118/80, which is normal. The doctor listed warfarin as the only medication. The doctor noted that the patient had childhood cardiac surgery and a prior stroke in 2015 which the doctor wrote was "due to likely embolization of blood clot in heart." The doctor failed to contact the patient's pediatric cardiologist. The doctor failed to obtain a prior record or call the cardiologists. The doctor did write that the history was uncertain and that the patient was not clear on dates. The doctor noted that the patient was supposed to have surgery for balloon valvuloplasty prior to incarceration. On physical examination the doctor documented an irregular heart rhythm with a murmur but did not order a stat EKG. The doctor wrote in the examination space "suspicious for A fib" with aortic stenosis. Despite knowing that the patient was supposed to have surgery, the only plan was to continue warfarin, order a routine EKG, start metoprolol for a year; drew labs, submitted a referral to UIC cardiology and ordered a follow up after the cardiology visit. The indication for metoprolol was not stated. The patient had elevation of blood pressure. Metoprolol is known to increase conduction disorders when they exist and can cause heart block. The patient had known conduction abnormalities due to his pulmonic regurgitation. This unnecessary medication placed the patient at risk of harm. The doctor did not call the patient's cardiologist or continue the plan the patient had prior to incarceration and the doctor made no attempt to find | 1, 4, 7, 12 | The doctor presumed the patient had aortic stenosis with atrial fibrillation without verifying with an EKG or echocardiogram. The doctor should have contacted the patient's cardiologist to determine the status of the patient. Instead, the doctor presumed that the patient was stable. The doctor did not refer the patient to the correct consultant (pediatric cardiothoracic surgeon) which would ultimately delay the surgery. The doctor started metoprolol, a beta blocker, which can increase the potential for conduction disorders in a patient at significant risk for conduction disorders which this patient had as a result of the pulmonic valve disease. This may have been responsible for the patient's death. |
| 12/15/2015 | A doctor noted that the patient was approved in collegial for UIC cardiology. | | |
| 12/16/2015 | Wexford UM approved a cardiology consult at UIC. | | |

15

PTX193-0782

Patient #2

12/18/2015  A doctor evaluated the patient for Coumadin clinic. The doctor noted significant cardiac disease. The doctor's heart examination was regular rate and rhythm with no murmur. The doctor noted that the patient had a cardiology appointment in 2-3 weeks.

12/23/2015  The patient was evaluated by a physician after a code 3 [emergency] for sudden onset of mid-sternal chest tightness. The patient had dizziness. An EKG showed RBBB with possible inferior infarct, left atrial enlargement and T wave abnormality consistent with ischemia. The doctor's only examination was documented as "CVS - chest-" implying no findings, yet the patient had a known significant murmur. The doctor assessed angina vs [something illegible]. The doctor ordered ibuprofen and noted that the patient had a UIC appointment in 2-3 weeks.

14  For symptoms consistent with angina in a person with dizziness and a known valvular heart condition and with an EKG suggestive of ischemia, the patient should have been referred to a higher level of care. Instead the patient was not treated with antianginal medication but was noted to have a routine appointment. The care was grossly and flagrantly unacceptable.

16

PTX193-0783

Patient #2

1/13/2016 The patient was seen at UIC cardiology. The UIC cardiology fellow did not know what the patient had. The patient had DOE and told the cardiologist that he had two surgeries, one to fix a hole in his heart and the second to correct a dysfunctional valve. The patient didn't know if the valve was stenotic or regurgitant. In May 2015 the patient had a stroke treated at Freeport Memorial hospital. He was started on warfarin. The patient knew his cardiologist (Dr. Foran) at Rockford Children's Hospital. The patient told the cardiologist that he was supposed to have repeat surgery on his valve. The doctor wanted the records from Rockford Children's Hospital and Freeport Memorial hospital and ordered an echocardiogram to evaluate which valve was involved. A four-month follow up was recommended. On the referral form, the cardiology fellow recommended obtaining the records from the prior cardiologist, obtaining an echocardiogram, and to return to the clinic after the echocardiogram.

1/14/2016 A doctor at Sheridan saw the patient after the UIC cardiology visit. The doctor noted that the patient had sinus rhythm at UIC and documented that UIC recommended getting old records and to get echocardiogram. The patient had occasional episodes of dyspnea, palpitations, and presyncope and had irregular rhythm with III/VI systolic murmur. The doctor submitted a referral to UIC for echocardiogram. The doctor did not attempt to get the old medical record or to attempt to find out which cardiologist had cared for the patient.

1/14/2016 A referral to UIC cardiology for follow up was ordered on this date but cancelled on 4/28/16, the day the inmate died.

17

PTX193-0784

Patient #2

1/19/2016  A doctor noted that the UIC echocardiogram was approved in collegial review.

1/19/2016  Wexford UM approved an echocardiogram.

2/9/2016  An echocardiogram was done showing normal LV, ejection fraction of 55-60%, diastolic flattening of the septum, mild to moderate enlargement of the right ventricle, moderately reduced RV systolic function and severe pulmonic valve regurgitation with PA systolic pressure not assessed due to inadequate tricuspid insufficiency. An EKG treadmill was recommended to assess exertional capacity and if poor would refer for surgical correction of the pulmonic valve.

10    2/10/2016  A doctor wrote a note that the patient had congenital heart disease with prior surgery and had a history of stroke with cardiac arrhythmia.  The doctor noted that the patient had a pending echocardiogram which had been approved.

    The doctor did not have the echocardiogram report and failed to note the abnormality.

10    2/18/2016  A doctor wrote a note without seeing the patient stating he received a communication from a clinical pharmacist regarding a potential drug interaction between Coumadin and ibuprofen. The doctor stopped the ibuprofen and ordered a FU after the echocardiogram at UIC.

    The doctor did not have the echocardiogram report and failed to note the abnormality.  This was a week after the test.  The doctor wasn't even aware that the patient had the test already.

2/19/2016 INR was 2.3.

10    3/7/2016  A doctor wrote a note without seeing the patient, noted that the patient was on Coumadin for anticoagulation because of a congenital heart defect and post stroke. The INR was 2.4. There was no evaluation of the patient.  The doctor continued the Coumadin.

    Almost a month after the echocardiogram, its results were not reviewed.  The results, recommending surgery, were unnoticed.

3/21/2016 INR was 3.0.

18

PTX193-0785

3:17-cv-03112-JES-JEH   # 263-10   Page 163 of 577

PTX193-0786

Patient #2

3/24/2016 A doctor saw the patient and noted that the patient was requesting follow up of his cardiology visit. The doctor noted that the patient had his echocardiogram at UIC but that the report was unavailable. The doctor documented that UIC cardiology would follow up on the results. The patient had irregular rhythm with a II/VI systolic murmur. The doctor made no assessment other than that the patient had a UIC cardiology appointment for follow up of the echocardiogram. The doctor ordered a follow up with UIC and continued the metoprolol. The patient weighed 144 pounds and had a blood pressure of 98/62. The patient asked for a low bunk saying he loses his grip and couldn't pull himself up and has "near falls." The doctor ordered a low bunk but did not address the hypotension, and continued metoprolol.

3, 10    The patient had near syncope, low blood pressure, and valvular heart disease yet there was no urgency in the evaluation despite alarming signs (low blood pressure and irregular heart rate). The referral to cardiology was routine. The echocardiogram, which was abnormal, was not obtained. Almost two months after the echocardiogram, the report was not present in the record. The doctor was therefore unaware of the diagnosis or the recommendation for stress test and surgery. Care was grossly and flagrantly unacceptable as the system was indifferent to the patient's serious medical need by not even providing to physicians a critical test (echocardiogram) for almost two months. During the four months in IDOC the diagnosis of the patient or the impending need for valvular heart surgery was unknown to IDOC staff.

4/11/2016 INR was 3.6

4/12/2016 A doctor wrote a note without seeing the patient and noted that the patient was on coumadin for a prior stroke secondary to a blood clot in his heart since 12/31/15. The doctor noted the most recent INR on 4/11/16 was 3.6. The doctor held the Coumadin and restarted the next day with an INR in a week.

4/18/2016 INR was 1.9.

4/25/2016 A doctor wrote a brief note without seeing the patient, stating to schedule the patient for cardiology and ordered an EKG ASAP with an addendum to cancel the EKG.

19

PTX193-0787

Patient #2

4/25/2016   A doctor referred the patient to UIC cardiology for a treadmill test as recommended presumably by the echocardiographer. The doctor did document a note on this date but didn't document review of the echocardiogram.

4/25/2016   A notice of furlough in the medical record indicated that the patient had a cardiology appointment at UIC on 5/3/16.

4/27/2016   Wexford UM approval for exercise stress EKG and Echo at UIC scheduled for 5/3/16. The patient already had the echocardiogram.

4/29/2016   An autopsy was done for the death, which occurred on 4/28/16. The autopsy showed an enlarged heart, there was a patent foramen ovale and no valvular abnormalities. There was minimal atherosclerosis. The diagnoses were pulmonary edema, pulmonary anthracosis, post repair of congenital anomaly, endocardial fibrosis, and patent foramen ovale. The death was determined to be from cardiac arrythmia.

6/1/2016   These labs were from the wrong patient: total cholesterol 176; TG 94; HDL 61; LDL 96.

20

PTX193-0788

Patient #3

8/14/2015 The 47 year old  patient had reception history at NRC.  A nurse documented that the patient had hypertension, and was on Norvasc, aspirin and HCTZ.  The BP was 133/87.  The provider physical examination included no further history.  The doctor said that the patient refused a DRE.  The doctor started the patient on his medication.  The weight was 200.

6   There was no follow up of these abnormal tests.   Care failed to follow generally accepted guidelines.

8/14/2015 Intake labs included a total protein of 8.1; bilirubin of 1.7; hepatitis C was negative.  Reactive syphilis titer.  The syphilis EIA was unconfirmed.  The lab recommended to retest in a month.

8/28/2015 The patient was transferred to IRCC.  On arrival the BP was 146/80.

9/7/2015 AST 90 (10-40); alt 77 (10-50); calcium 9.2; sodium 138.

9/16/2015 Total cholesterol 267; TG 132; HDL 32 and LDL 209, hemoglobin was 14.1.

9/23/2015 At chronic care clinic the doctor noted that the patient had cholesterol of 267; TG 132; HDL 32; and LDL of 204.  The doctor ordered zocor and continued HCTZ, Norvasc, aspirin.  The weight was 200 pounds.

4   The patient had a 10-year cardiovascular risk of 9.7% and should have been placed on a moderate to high intensity statin.  Instead, the doctor ordered a low intensity statin, which the patient never received.  Over the following two years, no one recognized that he wasn't receiving the statin medication.

12/30/2015 A nurse saw the patient for back pain.  The blood pressure was 148/90.  There was no referral.

2/9/2016 The bilirubin was 0.7; total protein 7.3; total cholesterol 232; TG 97; HDL 38; and LDL 175.

PTX193-0789

Patient #3

3/17/2016 An NP saw the patient for HTN chronic clinic. The patient was on HCTZ, Norvasc, and aspirin. The NP did not mention Zocor. The weight was 205. The NP documented that the inmate wanted to try lifestyle modification instead of using a statin drug, although zocor had already been prescribed in 2015.

4/14/2016 The patient asked about his medications. The blood pressure was 140/90.

7/25/2016 The patient saw an RN and asked to see the NP because he had headaches on and off with "pressure behind his eye" leading him to take the Norvasc twice a day instead of once. The BP was 128/80. The nurse took no action and charged the patient $5.

8/16/2016 Bilirubin 1.1; potassium 3.3; total protein 7.3.

9/19/2016 An NP saw the patient at IRCC for HTN. The weight was 200 pounds. The BP was normal. No changes were made.

2/8/2017 The patient transferred to East Moline CC. The transfer form listed hypertension as his only problem. He was on Norvasc 10, aspirin, HCTZ and KCL.

2/15/2017 Blood glucose 156; bilirubin 1.4; anion gap 13; total cholesterol 216; TG 132; HDL 38; LDL 152.

2/16/2017 A doctor noted that the blood sugar was 156 so he ordered an A1c and RBS. But the doctor failed to note the elevated bilirubin or cholesterol.                                                              6  The doctor failed to act on elevated bilirubin.

2/27/2017 A1c 5.2 and glucose 100.

3/9/2017 A doctor saw the patient for HTN clinic at EMCC. The weight was 212. BP was 144/84. No changes were made.                           5  The blood pressure was elevated but the doctor took no action.

PTX193-0790

Patient #3

6/6/2017 A nurse saw the patient for upper respiratory symptoms. The patient had headache, cough, and stuffy nose. The temperature was 100.1; pulse 109; and BP 112/60. The nurse gave the patient cold tablets and did not refer.

6/19/2017 The patient saw the nurse for a persistent cough that he had for about 10 days. The temperature was 98.6; pulse 102; BP 126/78. The nurse scheduled a physician visit for the following day.

6/20/2017 A doctor saw the patient for cough and headache. Some of the note was illegible. The pulse was 108 and temperature 99.9 with an oxygen saturation of 94%. Parts of the physical examination were illegible. The doctor did not order follow up.

1, 3    Chronic cough with previous low grade fever should have prompted a better history and evaluation including a chest x-ray. The doctor did not evaluate the TB status of the patient. Care did not follow generally accepted guidelines.

7/18/2017 A nurse saw the patient for headache, sore throat, cough, and runny nose. The pulse was 104, temperature 98.4 and BP 124/86. The nurse advised salt water gargles but did not refer to a provider.

8/1/2017 A nurse saw the patient for cough, chest pain and cold sweats. The temperature was 99.1; pulse 100; and blood pressure of 126/58. The weight was 200. The nurse referred the patient to doctor sick call on 8/3/17.

8/4/2017 A doctor saw the patient and ordered a chest x-ray for the chronic cough. The physical examination was normal. The chest x-ray returned and the doctor diagnosed pneumonia and started azithromycin for five days.

8/4/2017 A chest x-ray showed linear atelectasis in lung bases with no consolidation or heart enlargement.

23

PTX193-0791

Patient #3

8/11/2017 A doctor saw the patient for FU. The patient had complained of night sweats and cough. The doctor documented that the x-ray was reported as clear with atelectasis. The doctor assessed cough and cold sweats and ordered a CBC, CMP, ESR with a follow up.

8/16/2017 The hemoglobin was 10.9; with microcytic indices. The ALT was 8 and AST 9 which were both low. The sedimentation rate was 69.

8/18/2017 A doctor didn't see the patient but noted that the hemoglobin was 10.9 with a sedimentation rate of 69. The doctor ordered a RF, ANA, iron panel, ferritin and stool for occult blood x 3 with a follow up.

7, 8   The patient had significant anemia with elevated sedimentation rate. Endoscopy should have been considered and CT scan of the chest and abdomen were indicated because the reason for the elevated sedimentation rate and anemia were not known. FOBT was appropriate.

8/21/2017 The patient refused the stool for occult blood.

8/22/2017 The doctor saw the patient, who refused blood tests and stool tests. The doctor's note was partly illegible. The patient felt the cough was better.

9/6/2017 The sodium was 133; glucose 115; anion gap 122; CO2 was 23.

9/14/2017 A doctor saw the patient for HTN chronic clinic. The patient was on aspirin, zestoretic (combination of lisinopril and HCTZ), and amlodipine. Weight was 191 and BP was 138/66 and pulse 110. The doctor noted cough and weight loss and noted that the patient refused further testing.

10/3/2017 The hemoglobin was 8.9 with microcytic indices. The platelets were 357 and WBC 8.

24

PTX193-0792

Patient #3

10/13/2017 A nurse saw the patient for flank pain.  The pulse was 109; respiratory rate 24; BP  120/48 and the weight was 181, a 19 pound weight loss. The nurse also saw the patient for upper respiratory symptoms.  The patient complained of cough, SOB, yellow phlegm.  The patient had PEFR of 325/350/400 with a oxygen saturation of 97%.  The nurse referred to a physician that day.

10/13/2017 A doctor saw the patient who said he "can't breathe." The patient had cough and dyspnea on exertion.  The doctor noted that the patient had lost about 30 pounds in five months.  But the doctor took no history with respect to the weight loss, such as whether he was able to eat, swallow, had diarrhea, constipation, and normal bowel movement or whether he had abdominal or any other pain.  The patient permitted a digital rectal examination that was negative for occult blood.  The doctor ordered a chest x-ray; CBC, CMP, RF, ANA, TSH, T4, and urine culture and analysis.  The doctor placed the patient on the infirmary for 23 hours observation.

1, 7, 8   The doctor took inadequate history.  Given symptoms, weight loss, and elevated sedimentation rate, a CT scan of the chest and abdomen were indicated due to a lack of a diagnosis.  Endoscopies were still indicated.

10/13/2017 A chest x-ray showed enlarged heart in a globular shape; pericardial effusion could not be excluded.

25

Patient #3

10/14/2017 A nurse saw the patient on the infirmary and noted that the pulse was 116 with a blood pressure of 132/58. The weight was 179 pounds. The nurse documented talking to the doctor who ordered the patient released from the infirmary with instructions to complete the stool for occult blood. The doctor asked for the laboratory tests for 10/16/17 with FU the same day and to notify staff if any changes occurred. On the same day, a nurse documented one stool was negative for occult blood.

10/16/2017 A doctor saw the patient. The pulse was 107; BP was 122/46 and temperature 98.4. The patient felt better. The doctor took no history. The patient had a 2/6 systolic murmur. The doctor didn't know what the patient had except for iron deficiency anemia. The blood tests had apparently not returned. Given the murmur, further work up (echocardiogram) was indicated. Because the doctor didn't know what the patient had, he should have been admitted to a hospital for evaluation. The doctor started iron supplements and ordered follow up in a week.

14    The patient should have been referred to a hospital. He had possible pericardial effusion, significant weight loss, elevated sedimentation rate, new murmur, and anemia. A stat echocardiogram was indicated. Additional testing CT scans and endoscopies were also indicated as the patient had serious illness and no diagnosis.

10/16/2017 The PSA was 0.1; T4 8.9 (5-12); TSH 1.24 (0.35-4); sedimentation rate 98 (0-10); ANA non-detectable and RF <10.

10/19/2017 The doctor noted that the PSA was 0.1; the TSH, T4, ANA, and RF were all negative. The doctor didn't see the patient but ordered a CBC and CRP.

10/20/2017 The CRP was 43.8 (<8). WBC was 9.6 with hemoglobin 8.3.

26

PTX193-0793

3:17-cv-03112-JES-JEH  # 263-10   Page 171 of 577

PTX193-0794

Patient #3

| | | |
|---|---|---|
| 10/23/2017 | The doctor saw the patient.  The weight was 178 pounds.  The pulse was 119 and temperature 97.3.  The only history was the doctor statement that the patient felt fine.  The doctor was not tracking any symptoms of the patient.  The patient has a systolic murmur and anemia.  The doctor noted that the patient had anemia and "possible pericardial effusion," although it wasn't clear how the doctor came to that conclusion.  The doctor wanted to admit the patient to an ER but the patient refused. | 1 | The history was poor but the decision to admit to a hospital was appropriate, but the patient refused. |
| 11/3/2017 | A doctor saw the patient, who had pulse of 118; BP 154/82 and weighed 174 pounds.  The only history was that the patient wasn't eating because he had no appetite.  The patient had a 3/6 systolic murmur.  The patient again refused to go to the ER or have blood work done.  A mental health referral was submitted. | 1 | The history was poor but the decision to admit to a hospital was appropriate.  This patient should have been sent to a hospital and allowed to refuse at the hospital. |
| 11/3/2017 | At 10:30 am the patient was diaphoretic with pulse of 114 and BP 80/40.  The heart rhythm was irregular. | | |
| 11/3/2017 | At 8:17 pm the patient was unresponsive.  CPR was initiated.  The patient died at 8:20 pm. | | |
| 11/3/2017 | The death certificate documented that an autopsy was not done. | | |

27

Patient #4

5/27/2016 The patient had his NRC history.  The patient had prior pelvis
surgery after a motorcycle accident in 1992.  The patient had
no identified problems except for mental health problems.

5/27/2016 A psychiatrist note documented that the patient was on
Depakote, Risperdal, and Remeron.

5/27/2016 The creatinine was 1.51; the other components of the
metabolic panel were normal.

6/8/2016 Total cholesterol 164; TG 151; HDL 41; LDL 93.  CBC was
normal.

6/13/2016 The patient was transferred to BMR.

11/15/2016 The patient had reception history but the location wasn't
documented.  The patient had no problems identified except
for mental illness.  This was an apparent re-incarceration.

11/15/2016 CMP was normal.  Creatinine was 1.22 (0.5-1.5).

11/17/2016 The patient had a reception physical examination.  No
additional medical history was taken except for drug use.  The
patient had no medical problems identified except for mental
health with a prior suicide attempt.

11/29/2016 The patient transferred from NRC to EMCC.  The patient was
on Remeron.

12/2/2016 Total cholesterol 196; TG 100; HDL 43; LDL 133.

28

PTX193-0795

PTX193-0796

Patient #4

3/22/2017 A nurse assisted the patient at 4:23 pm.  He said he was dizzy and had just collapsed.  The patient was responsive to questions.  The nurse didn't take the patient's vital signs and noted that the patient was able to respond.  While the nurse started to take vital signs the patient began seizing.  The patient had foam coming out of his mouth and the nurse turned the patient on his side.  The patient became combative and seized again.  The patient was again rolled on his side. The nurse told custody to call an ambulance.  The patient then said he couldn't breath and oxygen was initiated.  The BP was 80/40; pulse 82 and respirations 24 and saturation 90%. The patient tried to remove the oxygen mask when paramedics arrived and the patient again began seizing.  The nurse checked for a pulse but could not obtain one so medics began CPR and continued until the patient left for the hospital. There was no timeline for the terminal event.

3/23/2017 A death summary noted that the patient died on 3/22/17 at a hospital.  The patient suddenly collapsed, got up, then collapsed again, going into seizure like activity.  CPR was initiated after the ambulance arrived but the patient was pulseless.  The patient was pronounced dead at the hospital.

3/24/2017 The autopsy showed large bilateral pulmonary emboli with pulmonary congestion.  Death was due to pulmonary emboli.

29

PTX193-0797

Patient #5

8/8/2017 A nurse completed a reception history. The reception form is defective. It has only a few diseases and nurses do not record problems in the explanation section and only list problems in the assessment. The age of the inmate was not on the form. The CBG was 148. The only history boxes checked were for cardiac. The patient was noted to be on metformin and glargine but the diabetes box wasn't checked. The nurse gave no explanation of his cardiac/HTN problem. In the surgery section, the nurse noted that the patient had history of unspecified open heart surgery in 2012 and had a stent "L side" (it wasn't clear what this meant). In the assessment the nurse documented IDDM, sleep apnea, and glaucoma but did not state what his heart condition was. The patient weighed 220 pounds yet the nurse listed the patient as an IDDM, which did not appear accurate. The patient most likely had type 2 diabetes. The blood pressure was 119/67. The nurse noted that the patient was oriented x 3. This was a very poor history. The nurse made no entries commenting on any alteration of mental status.

1    The history was inadequate as it did not identify all of the patient's problems.

30

PTX193-0798

Patient #5

| | | |
|---|---|---|
| 8/8/2017 | A doctor performed the reception physical examination. The doctor took no history and given the lack of nursing history, the patient ultimately receive inadequate history. The doctor recorded a totally normal examination, mostly checking boxes as normal. The doctor did not assess mental status. The assessment was IDDM, HTN [illegible but looks like HTN], CAD with open heart surgery for unspecified reasons in 2013; post stent placement; glaucoma; asthma; sleep apnea; umbilical hernia. The doctor started a number of medications but they were illegible. The MAR documented that the patient received KOP meds including Ventolin, oxybutynin, folate, omeprazole, atorvastatin, hydralazine, and Brilinta. On a different MAR the patient was started on NPH insulin 14 units BID with a sliding scale regular insulin. The MAR includes eight refusals over a 13 day period for the NPH. The regular insulin was only given twice a day (to accommodate custody) and the patient refused seven times.  The reasons for use of oxybutynin was not documented in the record and none of the listed problems were an indication for oxybutynin.  The reason for the Brilinta was also unclear. It wasn't clear that the patient had a STEMI in the past, which is an indication for Brilinta.  It is clear that the patient was on this medication because of prior stent placement or possibly CABG.  This was an extremely poor history and assessment, as it wasn't clear why the patient was using some of his medications. | 1, 3 | The doctor took an inadequate history of the patient's conditions and did not develop an adequate treatment plan for the patient's problems.  Specifically, the doctor documented medication (oxybutynin and Brilinta) without an indication.  The doctor modified an established treatment plan (diabetes) without appropriate documentation of the reason for the change or discussing the change with the patient.  Care failed to follow generally accepted guidelines or usual practice. |

31

Patient #5

8/8/2017 A doctor different than the one who performed the physical examination ordered Coreg, Norvasc, Zestril, hydralazine, atorvastatin folate, and aspirin. A month supply of aspirin, Coreg, Norvasc and Zestril were given to the patient but these were not documented on the MAR.

8/8/2017 BUN was 26 (6-20); creatinine 1.79 (0.5-1.5); these abnormal tests were not evaluated at NRC.

6   The doctor did not follow up on this abnormal lab result indicating renal disease which was not a current patient problem.

8/22/2017 The patient wasn't seen again at NRC and on 8/22/17 at 8 pm the patient transferred to EMCC. The problems listed on the transfer sheet included IDDM, HTN, CAD, glaucoma, and asthma. The patient was listed as being on albuterol, NPH and regular insulin, atorvastatin, latanoprost, ticagrelor and an illegible eyedrop, Coreg, Norvasc, Zestril, metformin, oxybutynin. The blood pressure was 150/an illegible number. The patient was referred to chronic care.

8/22/2017 At 8:30 pm a nurse documented that the patient was placed overnight in the HCU because the patient was confused. The patient answered questions with "obscure answers" and was unable to walk to the health care unit by himself. The nurse wrote he was "very confused on where he is and why." The medication that was issued as KOP were removed from his control for his safety. The nurse didn't call a physician.

14, 16   A new diagnosis of confusion in a patient without any condition that includes confusion as a symptom should have resulted in an immediate consultation with a physician and referral to a hospital for evaluation.

8/23/2017 At 4:40 am the patient refused to have an AccuChek and refused his insulin. The nurse referred the matter to the HCUA and DON but did not call the doctor. The nurse returned later and the inmate accepted insulin.

32

PTX193-0799

Patient #5

8/23/2017 A doctor saw the patient. The temperature was 97.5; pulse 53; BP 140/74, and oxygen saturation 99%. The doctor noted that the patient was 75 years old with a history of DM, CAD, sleep apnea, asthma/COPD, glaucoma, GERD, HTN. The doctor noted that the patient used to use a CPAP machine but hadn't use one for two weeks. The doctor noted that the patient had been confused for the past week but took no other history of this problem. The doctor documented that the patient used albuterol twice a week. There was no other history remarkably. On examination the doctor documented that the patient was somewhat forgetful and documented the patient was "A + O" presumably meaning alert and oriented but the doctor didn't perform a mental status examination. The doctor did not perform a neurological examination, examine the cranial nerves or an in depth mental status assessment. The doctor assessed asthma/COPD, HBP, CAD, glaucoma, DM, and OSA, and ignored the confusion. There was no history, physical examination, or evaluation for the recent onset of confusion. The doctor housed the patient in the health care unit without ordering any diagnostic testing.

1, 2, 8, 14   The patient had relatively new onset of confusion. The doctor failed to take adequate history or perform adequate examination. The patient should have been referred for diagnostic testing including possible CT scan, and prompt laboratory testing including for toxicology. This did not occur for five days. Care failed to follow generally accepted guidelines.

8/28/2017 BUN 23 (6-20); B12 283 (181-914); creatinine 1.53 (0.5-1.5); A1c 6.4; cholesterol 122; TG 97; HDL 33; LDL 70; T3 (80-178); hemoglobin 11.2 (13.2-18).

33

PTX193-0801

Patient #5

9/2/2017 A nurse wrote that the inmate was bleeding from his mouth. The patient had a laceration of the left side of his tongue. There was a flap still attached with gross swelling. The inmate was unable to speak secondary to the swelling. The patient was unable to swallow. The nurse wrote "confusion present as normal for inmate." The patient was sent to an ER. On 9/2/17 the facility was notified that the patient died.

9/2/2017 A nurse wrote an incident report documenting that the patient bit his tongue and that it was lacerated and swollen with gross bleeding. There was no evidence of assault. The patient had difficulty swallowing.

9/2/2017 A nursing progress note from the hospital documented that the patient was able to state his name and birthdate but that it was difficult to understand what the patient was saying. The BP was 160/90 with pulse between 90-100. Photos were taken of the swollen tongue and lips. The doctor attempted to intubate the patient but was unable to visualize the vocal cords. The patient suddenly stopped breathing. An ICU doctor assessed that the patient had ACE related angioedema.

9/2/2017 Unfortunately, there was no autopsy for this patient. The recent new onset of confusion is troubling and was not thoroughly worked up with history, physical examination, or CT scan. It is not clear if this contributed to the patient's death.

9/5/2017 The death summary documented that the patient was on the medical unit and developed a swollen tongue for which he was sent to the hospital, where he died suspected of having angioedema from lisinopril.

34

Patient #6

1/6/2016 A doctor wrote a brief note noting that the patient had multiple scratches on the skin from the inmate scratching herself. The doctor wrote an order to schedule the inmate to come to clinic Tuesday for a femoral phlebotomy that he would perform. There was no evaluation of the inmate. The doctor re-ordered minerin creme.

1/8/2016 Hemoglobin 11.1; platelets 91.

1/9/2016 INR 1.4.

1/11/2016 A1c 7.6.

1/20/2016 Optometry exam for retinopathy.

2/3/2016 The patient complained bitterly about her treatment. She said that she had the skin problem for months and "I already done the cream you put up inside you once and I have had this problem for months and no one will do anything about it... I have been complaining about it for months and I come over here and pay and nothing gets done." Apparently the patient was going to the HCU for her skin cream.

This patient had likely cirrhosis and should have had screening endoscopy and screening for hepatocellular carcinoma on a semi-annual basis.

35

PTX193-0802

PTX193-0803

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 36 of 431 PageID #:12234

Patient #6

| Date | Note | Codes |
|---|---|---|
| 2/9/2016 | A doctor noted that the patient had back "boils." The patient was asking for pain medication. The patient had a raised indurated area on her back with scarring from previous lesions. The doctor noted that the patient could stand and sit without difficulty. There was no other examination. The doctor assessed a "back boil with a few smaller indurated red spots in a diabetic patient." The doctor started minocycline. There was no follow up ordered. The doctor failed to evaluate recent laboratory results indicating that the patient had cirrhosis and anemia. | 1, 2, 3 The doctor did not take an adequate history or establish a coherent treatment plan for the rash. The doctor had not established a diagnosis for the problem. With respect to the skin disorder, without a diagnosis, the doctor should have referred to a dermatologist. The patient had cirrhosis but the doctor did not refer for an EGD to screen for varices or an ultrasound to screen for hepatocellular carcinoma. These screening tests are recommended for persons with cirrhosis. Those patients with varices are recommended to start a beta blocker to prevent variceal bleeding. Care failed to follow generally accepted guidelines as the doctor had been trying various creams without effect. |
| 2/12/2016 | A nurse noted that the patient had a rash that was unchanged with multiple sores in various stages of healing with no active drainage but with bloody spots on her shirt. Her clothes appeared filthy and had odor and the inmate was unkempt. | |

PTX193-0804

Patient #6

2/26/2016 Albumin 2.4; bilirubin 2.8; alk phos 429; AST 116; ALT 57; hemoglobin 12; platelets 96; total cholesterol 54 (100-200); TG 89; HDL 10; LDL 26 (50-129).

These labs were not followed up. The APRI score was 3.021 indicating likely cirrhosis. The patient had a significantly elevated alkaline phosphatase and it wasn't clear if this was due to liver or gall bladder disease. The cholesterol levels were so low as to be of concern. This may have been due to malabsorption, malignancy, chronic infection, or severe illness. Yet none of these abnormalities were evaluated. The liver functions yielded fibrosis scores that warranted hepatitis C treatment but there was no evidence of referral to UIC for evaluation for treatment. This care failed to follow generally accepted guidelines or usual practice.

Patient #6

3/3/2016 A doctor saw the patient in hypertension chronic clinic. The blood pressure was 117/77; weight 139 pounds; pulse 98. The doctor took no history. Problems listed included cirrhosis, chronic hepatitis C, diabetes, weight loss, HTN, amenorrhea, and dermatitis. The only medications listed included lisinopril and NPH and regular insulin and minerin cream. Compliance was listed as poor without any explanation. The "pulses" were listed as "wnl." The entire examination was "lungs wnl, heart wnl and edema none; fundoscopy not seen; others multiple spots from dermatitis and micro infected sites- just finished antibiotics; BMI 24." The patient was listed as in good control. The doctor started minocycline apparently for the infected dermatitis. The doctor took no history of the skin problem, no history of the cirrhosis. No labs were evaluated. The diabetes and cirrhosis were not addressed. The hepatitis C was not addressed and it wasn't clear if the patient was treated despite the patient having advanced fibrosis qualifying for treatment. Recent blood tests were not reviewed.

1, 6, 7    The doctor did not act on the recent laboratory tests which had significant abnormalities. This included not taking an adequate history or making an appropriate diagnosis or acting on abnormal lab results. Because of the history of cirrhosis the patient should have had an EGD to screen for varices, liver ultrasound to screen for HCC, which were not done. Because of the elevated alkaline phosphatase the patient should have had evaluation of the gallbladder and pancreas by ultrasound or CT scan. The care failed to follow generally accepted guidelines.

3/16/2016 A doctor wrote a note that the patient had diarrhea while on an antibiotic. The doctor took no history and wrote that the patient was not seen. The doctor ordered stool for ova and parasites and for c difficile.

1    The doctor took action based on anecdote and did not take a history of the patient. It wasn't clear how the doctor obtained the information that led to the change in therapy. The doctor did not inform the patient of the change in therapy.

PTX193-0805

PTX193-0806

Patient #6

3/23/2016 A doctor saw the patient in hypertension chronic clinic.  The blood pressure was 122/79 and pulse 102.  The patient said that she had loose stools from the antibiotic.  The doctor took no other history.  The examination was brief and consisted of the lungs being "wnl" fundoscopy "not see" and edema "non" with a note "BM was solid light brown and difficult to produce...C diff is not a consideration."  The doctor's assessment in its entirety is given verbatim with formatting and spelling mistakes included "Bp is good control and IM stopped taking the minocycline stating trthat someonetold her she might have C. Diff. stool collections set were for ova and parasites and cdiff was not formulary and md wanted to see a specimen today which did not remotely resembel a c diff stool nor did th patient history so no specail non formulary will be done to look for c diffe. the IM was told to restart the minocycline but her skin lesions have improved already so if she refuses again there will be no further orders for this at this time."  This assessment was not coherent.  This assessment does not include evaluation of the patient's diabetes, cirrhosis, or hepatitis C.  There was no examination of the patient's skin.  The patient was documented as having no edema.  The doctor noted that the stool was solid light brown inconsistent with C difficile.  The doctor did not address any of the patient's other problems.

4

Based on the documented note, it appeared that the physician either has a typing problem or was incoherent for a different unexplained reason.  The therapeutic plan was not competently described.

4/1/2016 A1c 6.8.

39

3:17-cv-03112-JES-JEH   # 263-10   Page 184 of 577

PTX193-0807

Patient #6

| | | |
|---|---|---|
| 4/7/2016 | A doctor saw the patient for diabetes chronic clinic. The pulse was 109 and blood pressure 120/82. The weight was 138 pounds. The problems listed included a number of symptoms which were not problems including "screening for depression," "pruritis," and other events which were not problems, including "well woman examination." Other listed problems were unqualified items such as "loss of weight" and "Np boils." The boxes hypo/hyperglycemia were checked both yes and no without explanation. There was no history for any of the patient's medical conditions. The A1c was 6.8. The examination documented multiple hyperpigmented areas from scratching without open lesions. The fundus was not examined. The remaining examinations were documented as "wnl." Aside from the A1c, no laboratory values were addressed including for blood lipids or liver function tests. The doctor did not address the hepatitis C, cirrhosis, the skin disorder, and ordered a four-month follow up. The doctor noted that the patient had annual diabetic eye screening in January of 2016. The doctor did not address the fast pulse. | 1, 2, 6, 12 | The doctor again documented skin lesions but took no history, performed inadequate examination, and made no attempt to diagnose or establish a thorough therapeutic plan. The doctor failed to address the patient's other problems. The care failed to follow accepted guidelines, as an undiagnosed skin lesion would normally be referred to a dermatologist. The lack of history was striking and also fails to follow usual practice. The doctor did not evaluate CBG test results which were not available or not done. |
| 4/9/2016 | A nurse saw the patient two days after the chronic care visit of 4/7/16. The vital signs of the nurse were identical to the vital signs on the chronic care visit and it appeared that the vital signs defaulted from the prior note. This is improper, as it does not represent an honest representation of what occurred. The identical vital signs were documented on a 4/10/16 nursing note; a 4/12/16 nursing note; a 4/13/16 nursing note; a 4/17/16 nursing note; and a 4/18/16 nursing note. | | This is a problem in that the medical record permits false vital signs to be incorporated into the medical record. |
| 4/19/2016 | A nurse saw the patient for a progress note. The vitals recorded at this visit were identical to vital signs used on the subsequent note of 4/20/16. | | |
| 5/13/2016 | INR 1.4. | | |

40

Patient #6

5/13/2016 Bilirubin 1.7; BUN 9; glucose 57 (65-110); albumin 2.5; bilirubin 2.8; alk phos 445; AST 123 (10-40); ALT 69 (10-50). Hemoglobin 12.6 (11.7-16) platelets 78 (150-450).

These labs were mostly abnormal. The low blood glucose was significant, as hypoglycemia occurs frequently in liver disease. Since this patient had cirrhosis, the hypoglycemia should have prompted reduction of insulin so that her glucose was above 65. Failure to do this can result in significant hypoglycemia. The abnormal liver function tests demonstrated cirrhosis and the patient should have been treated for hepatitis C but was not. The patient should also have been screened for varices and HCC but was not. The care failed to follow generally accepted guidelines or usual practice.

PTX193-0808

PTX193-0809

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 42 of 431 PageID #:12240

Patient #6

| | | |
|---|---|---|
| 5/31/2016 | A doctor saw the patient because she had "sores" over her body and had pruritis and that the hydroxyzine helped. The doctor took no history of the patient's condition. The only examination was that the patient was oriented, walked and stood without difficulty, and had many hyperpigmented spots mixed with open sores. The assessment was patchy eczema which the doctor attributed to the advanced liver disease. The doctor also documented that the diabetes could be contributing "some yeast component. a mixed dermatitis." The doctor documented he would evaluate the patient "next month" in hepatitis C clinic and ordered hydroxyzine, hydrocortisone cream, and athlete foot cream presumably all for the skin condition. Patient had a pruritic diffuse skin condition which apparently resulted in scratching and excoriations. Whether this was due to her liver condition or to psoriasis, which the coroner surmised, is unclear. But she did not have adequate evaluation for the condition. The doctor did not competently evaluate the skin condition and did not refer to a dermatologist. The doctor also did not evaluate recent abnormal labs. | 1, 2, 6, 12 | The patient was not responding to treatment and the doctor was not obtaining appropriate history, performing adequate examination, or making apparent adequate diagnoses. The patient should have been referred to a dermatologist but was not. The doctor also did not act on abnormal laboratory results recently obtained which should have resulted in radiologic studies of the upper abdomen. The care failed to follow generally accepted guidelines or usual practice. |
| 6/9/2016 | A doctor wrote a note to renew a low concentrated sweet diet for six months. The doctor did not see the patient. Vital signs for this visit were identical to a 6/7/16 nurse note. | | |

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 43 of 431 PageID #:12241

Patient #6

| | | |
|---|---|---|
| 6/21/2016 | A doctor saw the patient for hepatitis C clinic. The doctor did not document whether the patient had received hepatitis B or A vaccines. The only examination was to document multiple laboratory values without dates. The doctor performed no examination, listed labs without dates, and concluded that the patient had advanced cirrhosis. His comment about treatment was "advanced cirrhosis in a patient with other unstable issues (DM) and who was consistently noncompliant during her sentence and is not stable with her itching dermatitis has not been a candidate for treatment prior and shows little interest in treatment even as i try to talk to her today about follow up at Stroger." The doctor wrote Harvoni on a piece of paper and gave it to her and told her to ask Fantus clinic to treat her for her hepatitis C. The doctor documented that the patient was to be discharged in three months. The doctor stated that the patient was more interested in cream for her dermatitis. The doctor performed no examination, did not assess for edema, did not order typical studies for someone with cirrhosis including ultrasound of the liver to screen for HCC, EGD, use of beta blocker for variceal control, or assessment of complications of cirrhosis. The doctor documented that the patient was not a candidate for Interferon-Ribavirin but gave no reason even though the electronic form requested a reason. | 1, 2, 5, 7, 8 | The patient had cirrhosis and needed hepatitis C treatment but was not referred; apparently because of discharge within a year. A refusal was not evident. There was no documentation that treatment was discussed with the patient. The doctor documented that the patient was non-compliant but it wasn't clear what the patient was non-compliant with. As well, the patient had cirrhosis but was not referred for EGD, HCC screening, and did not have a beta blocker started as prevention for varices. The doctor seemed unprofessional. The patient was upset with a persistent skin condition for which there was no clear diagnosis. The doctor took inadequate history, failed to examine the patient or make an adequate assessment of the skin condition, failed to act on laboratory values indicative of cirrhosis, failed to order EGD, and failed to order screening ultrasound for hepatocellular carcinoma. The care failed to follow generally accepted guidelines or usual practice. |

43

PTX193-0810

PTX193-0811

Patient #6

| | | |
|---|---|---|
| 7/18/2016 | A doctor saw the patient for her skin rash. The doctor noted that the patient was to parole in 1-2 months and had a chronic rash being treated with steroids. The main problem was a chalazion of the left eyelid. The doctor noted an extensive rash over the trunk "likely eczema" and diagnosed "chronic rash" and prescribed hydrocortisone cream, minerin cream, and hydroxyzine. | 12 | The patient had rash for at least over seven months with resolution. The doctor was not successful in treating the patient yet continued the same care that wasn't working. He failed to establish an adequate treatment plan as the plan being used was not working. The patient should have been referred to a dermatologist. Care failed to follow generally accepted guidelines or usual practice. |
| 7/29/2016 | A1c 5.9. | | This A1c was normal but for this person indicated that the patient was possibly being overtreated due to complications of her liver disease. The insulin doses should have been decreased. |
| 8/10/2016 | A doctor saw the patient for diabetes chronic clinic. The doctor noted an A1c of 5.9 with no date and noted hypoglycemia 1-2 times per month. There was no history except to document hypoglycemia. The only examination was to state that the patient was alert, had normal pulses and had clear lungs. The patient was documented as in good control. The patient had an A1c of 6.8 at the prior diabetes clinic now at 5.9 and had cirrhosis. The doctor did not express concern that the cirrhosis was affecting the diabetes and did not consider lowering the insulin dosages especially since the patient was experiencing hypoglycemia. The doctor did not review CBG results. | 1, 4, 6 | The history of hypoglycemia with an A1c of 5.9 warranted decreasing the insulin doses as the patient's cirrhosis (liver failure) was apparently making the patient hypoglycemic. The doctor failed to review any CBG results. The doctor failed to take adequate history. Care failed to follow generally accepted guidelines or usual practice. This placed the patient at risk of harm including mortality. |

Patient #6

| Date/Time | Code | Description |
|---|---|---|
| 8/23/2016 At 5:20 pm a nurse evaluated the patient who had malaise and fever and was not feeling good. The temperature was 101.8; pulse 120; and BP 88/50. The nurse noted periorbital swelling such that the patient was unable to open eyes fully. The nurse called a doctor and received orders to admit the patient to the infirmary, push fluids, give Tylenol, perform a urine dipstick, and start Bactrim after the urine dipstick. The doctor indicated that he would consider labs and a chest x-ray in the morning. | 2, 14 | This patient had fever, tachycardia, periorbital swelling, and hypotension indicative of sepsis yet the doctor, without evaluating the patient, started oral antibiotics for a presumed infection (urinary tract infection) that had not yet been diagnosed and for which there was no basis. This patient should have been referred to a hospital. The patient was also on lisinopril for hypertension and it should have been discontinued as the patient was hypotensive. Care was grossly and flagrantly unacceptable. |
| 8/23/2016 A nurse wrote an infirmary admission note at 6:53 pm. The patient had abdominal distention and fever. | 16 | The nurse should have consulted a physician because of the additional component of abdominal distention. |
| 8/23/2016 At 6:57 pm a nurse documented that the patient had fever of 100.7; pulse 112; and BP 88/58. | 16 | The nurse should have consulted a physician. The patient appeared to be in septic shock. |
| 8/23/2016 At 9:00 pm a nurse noted that the pulse was 96 and BP 94/56. | 16 | The nurse should have consulted a physician. The patient appeared to be in septic shock. |
| 8/23/2016 At 11:34 pm a nurse documented the patient complaint that "I just don't feel good at all." The BP was 88/52 and the nurse documented a distended abdomen and abdominal pain. | 16 | The nurse should have consulted a physician. The patient appeared to be in septic shock. |
| 8/24/2016 At 1:48 am a nurse documented moderate periorbital swelling. | | |

45

PTX193-0812

3:17-cv-03112-JES-JEH   # 263-10   Page 190 of 577

PTX193-0813

Patient #6

| | | |
|---|---|---|
| 8/24/2016 | A doctor documented an infirmary admission note documenting that the patient had fever, malaise, and right upper quadrant pain. The doctor documented a moderately distended abdomen tender in the RUQ without rebound. The doctor diagnosed advancing liver failure. The doctor did not review any labs including the elevated alkaline phosphatase previously recorded. The doctor ordered a CMP and CBC for a PM pickup. The doctor diagnosed fever without any other assessment. | |
| 8/24/2016 | BUN 13; creatinine 1.38; albumin 1.9; bilirubin 4.4; alkaline phosphatase 376; AST 78; and Alt 37.  WBC 14.7; hemoglobin 10.9 and platelets 67. | |
| | | 5, 14 The doctor now knew that the patient had fever **and** right upper quadrant pain with hypotension.  Immediate hospitalization was indicated.  Instead the doctor ordered labs that would not be available until the next day.  Care was grossly and flagrantly unacceptable. |
| | | Because of the patient's complaint of right upper quadrant pain with fever these labs indicate infection, blood loss, and possible biliary obstruction, which is a life-threatening.  These labs should have been immediately addressed. |
| 8/25/2016 | At 3:06 pm a nurse documented a temperature of 98.6, pulse 92 and BP 94/56.  The patient apparently was transferred to DMH ER. | |
| 8/25/2016 | At 3:13 pm a doctor wrote a referral to a local hospital ER documenting that the albumin was 1.9; alkaline phosphatase was 376; ALT 37; AST 78; bilirubin 4.4. The doctor was unable to get access for IV fluids and the patient's blood pressure was dropping to 60 systolic.  The doctor sent the patient to the hospital for hypotension.  Notably the patient's ALT was 56 and AST 99 with a bilirubin of 2.2 in November of 2015.  She should have been treated for hepatitis C at that point but apparently was not. | This was a significant delay in referral to an ER. The patient was sent to an ER two days after developing fever, abdominal pain, and hypotension.  Care was grossly and flagrantly unacceptable.   The patient went to the ER but there was no hospital report in the record. |
| 8/27/2016 | The patient had returned from the hospital but there was no report.  It wasn't clear what the status of the patient was; this was dangerous.  At 5:35 am a nurse documented no temperature but a pulse of 115 and BP of 72/48.  The nurse didn't refer to a physician. | 16, 18 The nurse should have consulted a physician as the patient was hypotensive. This was dangerous and placed the patient at significant risk of harm. |

Patient #6

| | | |
|---|---|---|
| 8/27/2016 At 1:32 am a nurse documented that the patient vomited more than 300 cc of reddish brown emesis.  The blood pressure was 78/52 but other vitals were not taken.  The nurse did not contact a physician. | 16 | The patient with cirrhosis had apparent bloody emesis with hypotension but the nurse did not call a physician.  This was dangerous and placed the patient at significant risk of harm. |
| 8/27/2016 At 2:20 am a nurse documented pulse of 110 and BP of 75/48 and noted that the patient vomited more than 500 cc of dark red color emesis.  The nurse documented calling the physician.  But received no orders except to "CPM" [continue present management]. | 14 | The patient was in shock and had bloody emesis yet the doctor did not send the patient to a hospital.  Care was grossly and flagrantly unacceptable. |
| 8/27/2016 At 2:51 am a nurse documented that the patient had a large amount of bloody emesis of approximately 300 cc.  The blood pressure was 75/48 and pulse 110.  The nurse assessed "throat cancer." | 16 | The nurse made an inaccurate assessment but bloody vomiting with shock needs to be referred to a physician.  This was dangerous and placed the patient at significant risk of harm. |
| 8/27/2016 At 3:58 am a nurse documented that the patient had a fourth bloody emesis "this shift."  The nurse called the doctor who asked to be called if the patient vomited blood again.  The vital signs of pulse 115 and BP 72/48 were identical to prior other nursing encounters on this night. | 14 | The patient was in shock and had bloody emesis yet the doctor did not send the patient to a hospital.  Care was grossly and flagrantly unacceptable. |

47

PTX193-0814

Patient #6

8/27/2016 At 5:28 am a doctor at DCC wrote a referral to the ER stating that the patient had advanced liver disease with esophageal varices and DM and was recently sent to the ER on 8/25/16. The patient was vomiting frank dark blood. The patient was hypotensive and the doctor documented he asked the patient if she wished a living will DNR. The doctor documented that the patient was oriented x 3 and declined. The patient was then sent to the hospital. The document that the patient signed had a signature that was disorganized and unlike her prior signatures. Given that the patient was in shock, it is not appropriate to obtain consent for no intervention unless the patient is coherent. This consent was questionably obtained.

8/27/2016 At 8:48 am a note was entered stating that at 6:15 am the patient left by ambulance to the hospital.

8/27/2016 The patient asked for morphine instead of being sent out to the hospital.

8/27/2016 At 6:02 am the doctor wrote a brief note. The patient's vital signs were 72/48 with pulse of 115. The doctor noted that the patient signed a living will "tonight" and was vomiting blood and needed sclerosing of her varices and sent the patient to the ER.

This transfer was significantly delayed.

48

PTX193-0815

Patient #6

8/27/2016  The patient was sent to the hospital. According to hospital records the patient was sent to the hospital to evaluate for end-of-life care to be placed in hospice. The hospital noted that the patient had a history of psoriasis, hepatitis C, DM, and HTN and had "continued" swelling and ascites. The hospital physician documented that the facility physician told the hospital that the patient was DNR with a living will. The facility physician documented that the patient would accept morphine and fluids but no invasive procedures. The history was limited given the condition of the patient. The patient was initially alert but became obtunded. The hemoglobin was 6.2 and INR 3.4. The hospital record documented that the patient had been in the hospital two days previous. The hospital noted that two days ago the patient was seen in the ER with RUG pain and diarrhea. A CT scan showed cirrhosis, hydrops GB with cholelithiasis and cholecystitis, but surgery said the risk of surgery was too great and the patient was sent back to DCC for comfort measures. At the current ER visit the hospital doctors talked to the DCC physician who clarified the full supportive measures should be attempted unless she codes because she was DNR, DNI. The patient had vomited blood several times at the facility since Tuesday. The patient needed levophed at the hospital to sustain blood pressure. The blood pressure was 47/22 with pulse of 110. The patient had ascites. The patient was arousable and oriented to person place and time. The patient was deemed to have cirrhosis with hypotension and was DNR. The doctor at the hospital documented that the patient had a living will at DCC and was DNR. This was discussed with the physician at DCC. The patient died at 12:55 in the hospital without interventions except fluids. The hemoglobin in the hospital was 6.3 with a WBC of 16.

At this point and even two days previous the patient had such end-stage liver disease that interventions were unlikely to significantly prolong life. However, earlier interventions including treatment of hepatitis C and particularly screening for varices (which is indicated for persons with cirrhosis) should have been done and may have prolonged her life. In this respect her death was possibly preventable.

8/27/2016  The patient signed a living will but the signature is so disorganized and different from other signatures of the patient that it does not appear that she was capable of physically signing at the time of signature. Whether she was of sound mind is not clear as she was in shock. The will was cosigned by a nurse and a doctor.

This appears to be an inadequately obtained informed consent. The patient should have been treated but was not.

49

PTX193-0816

PTX193-0817

Patient #6

8/28/2017 Autopsy showed that the patient experienced a gastrointestinal bleed filling the stomach. The patient also had evidence of end-stage cirrhosis, ascites, pulmonary edema, congestion of the spleen, cerebral edema, anasarca, diffuse psoriasis, history of HIV, and diabetes. The patient was said to have died from a ruptured esophageal varices.

50

PTX193-0818

Patient #7

9/30/2003 The patient had increased liver enzymes documented on the problem list without more specificity. The patient also had a history of obesity, alcohol abuse, peptic ulcer disease, and sickle cell trait.

3   The patient had a history of alcoholism and elevated liver functions documented but these were not followed up regularly and this problem was lost to follow up. Care failed to follow generally accepted guidelines or usual practice.

7/16/2014 An NP saw the patient for an annual evaluation. The weight was 262 pounds. The patient was 49 years old. The NP noted problems as high blood lipids and HTN and noted that the patient had elevated liver function tests but wasn't more specific. The NP did note alcoholism. The patient was noted to be deaf. The NP documented that the patient voiced no problems but the patient couldn't hear and it wasn't clear how a history was taken. The patient did not have investigation regarding the elevated liver function tests.

3   The patient had a history of alcoholism and elevated liver functions documented but these were not followed up regularly and this problem was lost to follow up. Care failed to follow generally accepted guidelines or usual practice.

11/7/2014 The patient was deaf and asked for headphones. The NP wrote "headphones NSD" but it wasn't clear what that meant.

11   The patient was deaf. His deafness was not accommodated with respect to obtaining history and physical examinations. The patient did not receive functioning hearing aides or sign translators who could assist in obtaining an adequate history. Care failed to follow generally accepted guidelines or practice.

11/12/2014 A doctor saw the patient. The blood pressure was 120/70. High blood pressure and high blood lipids were listed as problems. The patient was on HCTZ 25, metoprolol 100 BID, Lisinopril 40, Zocor, and aspirin.

11   The patient was deaf. His deafness was not accommodated with respect to obtaining history and physical examinations. The patient did not receive functioning hearing aides or sign translators who could assist in obtaining an adequate history.

51

PTX193-0819

Patient #7

11/17/2014 Someone wrote that interpreter services with provider would be scheduled for the inmate to address his medical concerns.

11/19/2014 An NP saw the inmate with an interpreter in the "blue room." The inmate stated that his knee gives out. The inmate also had cough with an irritated throat at night. The NP ordered a knee brace and cough syrup.

2/24/2015 Glucose 112 (65-110), potassium 3.4; cholesterol 188; triglycerides 204; HDL 35; LDL 112.

8     The patient had an elevated glucose and a risk factor (obesity) and should have received a hemoglobin A1c. Care could reasonably have been expected to be better.

3/16/2015 A doctor documented that the patient walked out of the clinic during the encounter and documented that the patient does not want to listen to advice. But the patient was deaf and probable did not hear the doctor. The blood pressure was 128/89. The potassium was 3.4 and the doctor added potassium.

11     The doctor failed to document that appropriate accommodation was provided to the patient, given his deafness.

7/9/2015 A nurse saw the patient for athlete's feet. The nurse noted that the patient was taking diabetic medication and blood pressure medication. The weight was 255 pounds.

4     The nurse documented that the patient was on diabetic medication but the patient was NOT on diabetic medication. This raises the concern that the patient could not hear the nurse, leading to an inaccurate history.

7/28/2015 Someone [title not provided] wrote that the patient had bilateral hearing aids and was given a permit to purchase headphones for use indefinitely. The weight was 247.

9/30/2015 Potassium 3.7.

PTX193-0820

Patient #7

10/13/2015 At HTN chronic clinic the patient complained of back pain and requested pain medication.  The doctor prescribed Naprosyn 375 BID as needed for three months.  There was no other history.  The blood pressure was 120/68.  The doctor documented the patient in good control and continued current medication, stating that high blood lipids were also in good control.

1, 3     The history was inadequate and treatment was therefore based on a symptom without establishing a diagnosis.

11/9/2015 An NP saw the patient for a low bunk renewal.  The patient weighted 264 pounds.

2/18/2016 Glucose 98; potassium 3.4; cholesterol 149; TG 126; HDL 37; LDL 87.

3/8/2016 A doctor saw the patient in HTN clinic.  The blood pressure was 124/86.  The weight 240.  The doctor took no history.  The doctor did a brief examination and documented the hypertension and high blood lipids in good control.  The doctor continued the same medications.  The doctor did not note any labs.

1     The history was inadequate.

4/28/2016 A nurse  practitioner saw the patient with an interpreter.  The patient had cough.  The lungs were clear.  The NP said the cough might be from the ACE inhibitor but ordered cough medication.  Weight was 265.

6/23/2016 The patient was evaluated in the "blue room" and complained of sore throat and cough.  The patient said the hearing aid didn't work well.  The throat was red.  The NP ordered amoxicillin without a culture or other tests.  The NP requested a repair of the hearing aids.  Vital signs were not taken even though the patient was treated for an infection.

PTX193-0821

Patient #7

7/6/2016 Glucose 113 (65-110); potassium 3.8; cholesterol 148; TG 186 (45-150); HDL 30; LDL 81.

The elevated glucose and triglycerides should have prompted a hemoglobin A1c test to screen for diabetes. Care failed to follow generally accepted guidelines or usual practice.

7/27/2016 An NP did another annual evaluation. Again, a nurse obtained history, noted elevated liver enzymes but nothing more specific. The weight was 277 pounds. The NP took a history of drinking "a lot." Even though the patient was 51, colorectal screening was not done. The NP did write that the inmate declined a digital rectal examination. No laboratory tests were evaluated. The patient's prior elevated liver function tests had not been evaluated for two years even though the patient had a history of alcoholism.

7, 8   The patient was over 50 and should have received colorectal screening but did not. The patient had a history of alcoholism with elevated enzymes but there was no follow up. The glucose was previously elevated and the NP should have ordered an A1c. Care failed to follow generally accepted guidelines or usual practice.

8/23/2016 Glucose 105; potassium 4.1.

9/9/2016 A nurse practitioner saw the patient for hypertension clinic. The NP documented that the patient had a cough. The BP was 148/100. The patient said he had just taken his medication and didn't want to change medications. The NP did not evaluate lipid values. The NP made no changes in medication. The NP ordered BP checks two times a week for three weeks.

9/11/2016 Blood pressure was 152/88.
9/13/2016 Cholesterol 155; TG 131; HDL 29; LDL 100.
9/14/2016 Blood pressure was 148/90.
9/18/2016 Blood pressure was 152/98.
9/21/2016 Blood pressure was 158/98.
9/25/2016 Blood pressure was 150/100.
9/28/2016 Blood pressure was 158/98.

54

Patient #7

10/5/2016 An NP saw the patient and noted that the blood pressure was high (186/106) The patient weighed 292 pounds. The NP increased lisinopril to 40 mg BID and scheduled a follow up for 11/1/16.

10/9/2016  Blood pressure was 150/82.
10/12/2016 Blood pressure was 158/88.
10/16/2016 Blood pressure was 162/100.
10/19/2016 Blood pressure was 140/80.
10/23/2016 Blood pressure was 138/88.
10/26/2016 Blood pressure was 130/80.

10/27/2016 An NP saw the patient. The BP was 160/96. The weight was 255. This would have been a 37 pound weight loss over three weeks. The patient complained that his headphones are broken and he couldn't afford a second set. The NP sent the patient to the ADA coordinator about the headphones. The NP continued naproxen for six months without a clear indication despite the HTN and without addressing the high blood pressure.

1, 4    Based on weights in the medical record, the patient had a 37 pound weight loss over three weeks. While this is probably due to a malfunctioning scale or inaccurate weights, the NP should have inquired about this but no history was taken and the patient's weight was not checked. Also, the blood pressure was elevated but the NP did not modify treatment. Care failed to follow generally accepted guidelines or usual practice.

11/1/2016 An NP saw the patient for elevated blood pressure. The blood pressure was 148/88. The NP ordered a PRN follow up but took no action regarding the elevated blood pressure. The weight was listed as 265, a 10 pound weight gain in four days but a weight loss over the past month.

1, 4    The blood pressure was elevated but the NP took no action. The patient had documented weight loss but no history was obtained. Was the patient's deafness an issue? Care failed to follow generally accepted guidelines or usual practice.

PTX193-0822

PTX193-0823

Patient #7

| | | |
|---|---|---|
| 11/11/2016 | A nurse saw the patient for "upper respiratory infection." The patient had cough. The pulse was 112 and the blood pressure was 98/62 without change in medication. The oxygen saturation was 93%. The nurse did not refer the patient despite the patient having tachycardia and low blood pressure, especially given the patient's recent elevated blood pressures. A provider should have been consulted. The nurse documented that the patient would be referred to the NP in the "blue room" apparently where sign language assistance could be provided. However, this referral didn't take place. | 16 | The patient had abnormal vital signs and given the patient's complaint, a provider should have evaluated the patient. The blood pressure had been elevated and had dropped significantly and was now hypotensive without any intervention. This should have prompted consultation with a physician but this didn't occur. Care failed to follow generally accepted guidelines or usual practice. |
| 11/13/2016 | A nurse saw the patient at 1:25 pm but the nurse couldn't take an adequate history. The nurse wrote, "patient deaf, does not speak, communicates by writing notes, short words, does not understand all the nurses questions." The patient was vomiting. The patient had a "musty" odor from his mouth with sore throat for four days. The patient was drinking "lots" of water. The temperature was 96.3, pulse 116; BP 120/70 and oxygen saturation 98%. The patient hadn't eaten in 4-5 days. The nurse told the NP about the patient's condition. | 11 | The patient was vomiting, had tachycardia, and hadn't eaten in 4-5 days. The nurse appropriately referred the patient to a provider but the inability to take an adequate history because of the deafness needed to be addressed or referred to a higher level of care. |

56

Patient #7

| | | |
|---|---|---|
| 11/13/2016 | An NP saw the patient at 2:00 pm who complained of being sick for several days. The patient had headache, fever, and vomiting. The NP used the nurses prior vitals. The throat was beefy red. The NP diagnosed pharyngitis and dehydration and placed the patient on the infirmary. The NP ordered IV fluid of 500 cc bolus and then 250 cc per hour, with vital signs every four hours and intravenous Ancef 1 gram every six hours for five days. The NP did not order any labs. | 1, 8, 14 | The patient had fever, vomiting, unrecognized weight loss, low blood pressure, tachycardia, and hadn't eaten in days. It is not clear how a diagnosis of pharyngitis was made given the patient's symptoms and presentation. This appears incompetent. Pharyngitis is not generally treated with intravenous antibiotics. Since the NP diagnosed dehydration and started IV antibiotics, laboratory tests were indicated to assess the degree of dehydration (particularly since the patient hadn't eaten in 4-5 days) but were not ordered. This patient should have been sent to a hospital. Care was worse by virtue of being unable to obtain a history because the patient was deaf and staff as documented by the nurse earlier were unable to obtain a history. Care was grossly and flagrantly unacceptable. |
| 11/13/2016 | The NP ordered a 500 cc bolus followed by 250 cc/ hour for two hours then at 125 cc hourly for 1 liter then to just maintain the IV. | | |
| 11/13/2016 | At 9:00 pm the patient said he was thirsty. The patient had "abdominal distress" at 4:00 pm and refused medication. The patient had a large liquid BM and then took oral meds. The temperature was 97.9; pulse 85; BP 118/64. The patient had voided 700 cc of urine. | 16 | The patient was known to be dehydrated and told the nurse he was thirsty. In addition to abdominal distress the patient had diarrhea. The nurse should have referred the patient to a provider or consulted a provider. |

57

Patient #7

| | | |
|---|---|---|
| 11/14/2016 | The patient had sore throat and was admitted to the infirmary the evening before for observation. The doctor wrote that the patient had headache, fever, and vomiting for several days and documented that the exam was consistent with pharyngitis and dehydration. The doctor did not obtain a history with respect to the vomiting, or clinical course. This may have been due to the patient being deaf. The BP was 120/70; pulse 116; respirations 18; and temperature 96.3. On examination the throat was described as red with tender submandibular area but no other abnormalities. The doctor diagnosed pharyngitis, hay fever, and dehydration. The doctor noted that the patient was on intravenous antibiotics (Ancef) and had received 2 liters of intravenous fluid. The doctor ordered a CBC, CMP and ESR in the morning. These apparently were not done. | 1, 2, 14 Vomiting, fever, not eating, and dehydration are inconsistent with pharyngitis. This diagnosis was not competently made. Notably, the patient was deaf and couldn't give a good history. The doctor failed to take a history of the patient's problems. Stat labs were indicated because the patient hadn't eaten in five days and had vomiting. Orthostatic blood pressure should have been obtained. Since the patient had recent elevated blood pressure, the low blood pressure should have been cause for concern. The patient should have been referred to a hospital because of lack of ability to obtain a history and need for immediate blood tests (metabolic panel, CBC, lipase, amylase). Care was grossly and flagrantly unacceptable. |
| 11/14/2016 | At 8:25 am a nurse described the patient as lethargic with temperature of 95.9. The nurse documented stated that the blood pressure was faint and difficult to hear and that "possible reading 118/78." The assessment was "weakness." The nurse consulted a doctor, who didn't feel that the patient needed to be sent out. | 14 Altered mental status with the patient's other symptoms of vomiting, diarrhea, dehydration, and fever warranted hospitalization. The doctor should have sent the patient to a hospital. Care was grossly and flagrantly unacceptable. |
| 11/14/2016 | At noon the temperature was 94.9, pulse 68, and blood pressure 114/68. | |
| 11/14/2016 | At 4:00 pm a nurse wrote an admission note to the infirmary. The patient wasn't responding to questions. The temperature was 94.9. The patient was still on aspirin, HCTZ, Lisinopril, metoprolol, KCL, Ancef and Tylenol. | 14,16 The patient now had hypothermia in addition to lethargy, dehydration, fever, and diarrhea. The patient needed hospitalization. The nurse failed to refer to a provider and the patient should have been sent to a hospital. |

58

PTX193-0825

Patient #7

| | |
|---|---|
| 11/14/2016 | BUN 32; sodium 130; calcium 8.2; albumin 2.3; bilirubin 3.3; alk phos 472; AST 165; ALT 119. |
| 14 | An unresponsive patient with lethargy, dehydration, vomiting, hypothermia, diarrhea, and low blood pressure is consistent with sepsis. Because the nurse was having trouble recently obtaining a blood pressure, the patient may also have been in shock. The patient should have been immediately transferred to a hospital. Care was grossly and flagrantly unacceptable. Giving the patient additional fluid without having immediate lab access placed the patient at significant risk of harm. |

11/14/2016 A doctor ordered IV fluid NS at 125 cc per hour for 4 liters. This was equivalent to about two and a half liters a day.

11/14/2016 At 11:50 pm a nurse noted that that the patient was lying in bed but did not document vital signs.

11/15/2016 A nurse noted that the patient was not talking but "no s/s of distress." The assessment was weakness without being more specific. Vital signs were not noted.

11/15/2016 At 4:00 am the temperature was 95.2, respiratory rate 14, and BP 116/90.

| | |
|---|---|
| 11/15/2016 At 8:30 am a nurse noted that the patient wasn't talking. The nurse documented temperature of 95.2. The nurse took no action despite the low temperature. | 16  If the patient wasn't talking and unable to communicate, a physician should have been consulted. The patient should have been referred to a hospital. |

11/15/2016 At 6:20 pm a nurse noted that the patient wasn't talking.

PTX193-0826

3:17-cv-03112-JES-JEH   # 263-10   Page 204 of 577

PTX193-0827

Patient #7

11/15/2016 At 8:40 pm a nurse noted that the patient's cell mate said that the patient was kneeling on the floor and laid on the floor. The patient was placed back in bed but the nurse didn't take the inmate's vital signs.

14, 16    This gives an impression of disorientation or delirium. Despite significant deterioration on 11/15/16 with respect to the patient's mental status, a doctor did not evaluate the patient. The lack of physician evaluation was grossly and flagrantly unacceptable.

11/16/2016 At 7:20 am a nurse noted that the patient opened his eyes to severe stimulus. The patient took fluids with "coaching" and swallowed AM med. The patient was unable to eat his breakfast on his own and was waiting for a porter or CNA. The nurse assessment was "weak."

14, 16    The patient was unable to eat independently. He was dehydrated, hadn't eaten in days, was vomiting, had diarrhea, and was hypothermic. Why was he not sent immediately to a hospital. Care was grossly and flagrantly unacceptable.

11/16/2016 A nurse wrote that the inmate was unresponsive at 7:53 am. An apical pulse was 52 and the BP 68/palpable and the blood sugar was "high" times two. A second IV line was started by a nurse practitioner. An ambulance was called and the patient left grounds at 8:25 am, unresponsive.

11/16/2016 At the hospital the patient had rales bilaterally, 1+ edema and a small RLL infiltrate. The initial assessment was DKA, ARF, hyperkalemia, and respiratory failure due to pneumonia. The patient was in septic shock and unresponsive. The initial blood work included WBC 11.9; hemoglobin 12.2; platelets 102; glucose 606; potassium 6.8; BUN 106; creatinine 5.01; albumin 2.3; ALT 650; ALT 1441; INR 1.6; and CPK 1404. The bicarbonate was 12. Later the glucose rose to 790 with a $CO_2$ of 8. The patient was intubated.

60

3:17-cv-03112-JES-JEH   # 263-10   Page 205 of 577

PTX193-0828

Patient #7

11/17/2016 The Medical Director from Dixon wrote a death summary stating that the patient was admitted to the infirmary with sore throat, headache, and vomiting for several days. The doctor noted that the patient was hypothermic on admission and that the patient developed increased weakness, recurrence of hypothermia, and decreased responsiveness on the night of the 15th and was sent to the hospital on the morning of the 16th. The doctor noted that the patient was in DKA and had prior normal fasting blood sugars [which is not accurate]. The patient died on 11:20 pm on 11/16/16 with presumptive cause of death diabetic ketoacidosis. The doctor said an autopsy wasn't available.

PTX193-0829

Patient #8

1/23/2015  The patient had an annual history and physical examination. The patient was a smoker and had mental illness. His weight was 159 pounds. The patient was noted to weigh 165 in 2013 but 160 in 2010. The patient was noted to have a "good" oral examination.

6/26/2015  The patient weighed 160 pounds on a nurse evaluation.

2/5/2016  An NP saw the patient for an enlarged lump on the neck. The weight was 157 pounds. The lump was tender. The NP diagnosed parotiditis and prescribed antibiotics for seven days. Lymphadenopathy was a consideration.

12  The parotid gland is on the face in front of the ear. When infected, swelling can occur from the pre-auricular area to the angle of the jaw. The parotid gland is not in the neck and it is incompetent to diagnose parotiditis based on neck swelling. The patient should have been referred to an ENT surgeon for biopsy.

2/10/2016  The NP saw the patient in follow up of the neck mass. The patient still had a hard lump about 3 cm in size. The NP took no action and ordered a two week follow up.

12  Neck masses in adults can be congenital, inflammatory, or neoplastic in origin. In adults, the potential for malignancy should be excluded before a benign diagnosis is given. A 3 cm sized hard mass suggests malignancy and should be referred to an ENT specialist.

2/23/2016  A doctor saw the patient for the left sided neck mass. The doctor noted a "likely enlarged 2 x 2 cm non-tender LN [lymph node]." The doctor took no action and ordered a six month follow up to "monitor likely a chronically enlarged lymph node."

4, 12  The patient had a neck mass for at least a month. The doctor did no evaluation to identify a source of infection which should have been present if this was a lymph node. Malignancy should have been excluded in an adult with a neck mass. A six month follow up for a neck mass was indifferent and incompetent or both. Because of the size the patient should have been referred to an ENT doctor. Care was incompetent.

62

PTX193-0830

Patient #8

3/29/2016 The patient saw a doctor.  The weight was 152 pounds which was an eight pound weight loss.  The doctor took no history regarding the neck mass except that it resolved according to the patient.  The doctor examined the neck and indicated that there was no further mass noted.  The doctor did not address the weight loss.

The doctor failed to take history of weight loss.  It is unlikely that a 2-3 cm mass in the neck resolved and likely that the doctor incompetently examined the patient but based on the documented examination

4/9/2016 A nurse saw the patient who complained of a sore throat especially when he swallowed.  The nurse noted a right sided neck mass.  The nurse called a physician who ordered prednisone by phone.

4, 12   The doctor started prednisone tapering over 10 days.  There was no diagnosis and we could not even imagine what the doctor might have been thinking by prescribing prednisone for painful swallowing with a neck mass.  The patient should have been referred to an ENT specialist or to a hospital for evaluation.  Care was incompetent.

4/29/2016 A nurse saw the patient for an upper respiratory infection.  The patient complained of cough, headache, fever, and swollen glands.  The weight was 150 pounds, a 10 pound weight loss.  The nurse noted a swollen uvula and a swollen lymph node on the right.  A doctor saw the patient the same day.  The doctor started antibiotics and 10 day follow up.  The weight loss was not addressed.

12   The patient had a neck mass noted for over two months.  Moreover, the patient was losing weight.  Weight loss with a neck mass is most likely malignancy.  Neck masses in adults may be infectious but malignancy need to be excluded before other diagnoses are maintained.  The doctor should have referred to an ENT consultant.  Care was incompetent.

5/9/2016 An NP saw the patient in follow up.  There was increased swelling of the right side of the throat.  The weight was 148 pounds.  The patient was afebrile.  There was "notable swelling to the [right] pretonsillar area."  The NP diagnosed tonsillitis. The NP started a different antibiotic and ordered a follow up visit.

12   This patient had neck swelling for three months with weight loss.  This was very unlikely to be tonsillitis.  A swollen lymph node or mass is unlikely to be trivial when it is present for three months.  The patient should have been referred to a surgeon for biopsy.  Care was incompetent.

63

Patient #8

5/11/2016 An NP saw the patient in follow up.  The right neck was described as firm and was painful.  The NP documented that the tonsillitis was worsening and admitted the patient to the infirmary.  The doctor's infirmary admission history and physical documented starting clindamycin and Levaquin, two antibiotics.  Ironically, the nurses documented that the patient had a mass on the right side of the neck the size of a golf ball.  The doctor only documented a firm nodule at the angle of the right jaw.  The patient's weight was not taken on admission to the infirmary and the weight loss was unrecognized.

8, 12   A firm neck mass is unlikely to be tonsillitis.  A golf ball sized lesion is unlikely related to tonsillitis.  The patient should have been referred to an ENT specialist.  Because the mass was worsening a prompt CT scan should have been performed.  Care failed to follow generally accepted guidelines or usual practice.

5/13/2016 A doctor saw the patient and noted that the patient didn't feel better.  The doctor noted no fever yet the diagnosis was peritonsillar cellulitis vs. abscess.  The doctor ordered salt water gargle, increased Naprosyn, and added tramadol.

8,12   A firm neck mass is unlikely to be tonsillitis.  A golf ball sized lesion is unlikely related to tonsillitis.  If an abscess was considered the patient should have had a CT scan or referral for incision and drainage.  The presentation was not of an abscess as there was no fever.  The doctor also did not order a white count.  The patient should have been referred to an ENT consultant.  Care failed to follow generally accepted guidelines or usual practice.

5/15/2016 The patient asked a nurse, "are you going to let me die?"  The nurse referred to a NP.  The NP saw the patient and diagnosed bilateral peritonsillar abscess despite that there was no fever.  The NP sent the patient to the ER for "airway management and management of the peritonsillar abscesses."

5/15/2016 The patient returned from the hospital the same day.

64

PTX193-0831

Patient #8

| | | |
|---|---|---|
| 5/15/2016 | A hospital WBC 4.8 and hemoglobin 14 (14-18). Sodium was 131; BUN 7, a CT of the neck showed a neck mass likely a cancer. The mass was 4 by 2.4 by 2.8 cm. The mass was worrisome for metastatic lymphadenopathy. The was also an ill-defined 3 by 3.7 by 3.5 soft tissue mass worrisome for a neoplastic process. There were several lymph nodes worrisome for metastatic lesions. | The neck mass was not evaluated appropriately for over three months. |
| 5/15/2016 | At 10:00 pm a nurse noted that the patient no longer wanted to have an IV and IV antibiotics, wanting to see the doctor saying, "I don't want that IV it's not working." He requested a new treatment plan. | |
| 5/16/2016 | A doctor saw the patient. The patient had diarrhea. The patient wasn't eating solid food. The doctor noted a serum sodium of 131; potassium 3.9; WBC 4.8; and hemoglobin 14. The doctor documented that the ER documented that a CT scan was more consistent with a tumor. The doctor ordered an ENT consult. | |
| 5/18/2016 | A doctor told the patient that a CT scan was consistent with cancer. | |
| 5/18/2016 | The patient was approved for UIC ENT on this date which was prior to the referral. | |
| 5/19/2016 | The patient went to UIC ENT but there was no report in the record. | |
| 5/20/2016 | A doctor noted that the patient said a biopsy was recommended. The doctor documented that the report was unavailable. The doctor told the patient to wait for the ENT recommendations. | 11 Care was delayed because there was no report from UIC ENT. It is not clear whether a biopsy was done. |
| 5/23/2016 | The doctor noted that the ENT report was still unavailable. The doctor discharged the patient from the infirmary with a 1-2 week follow up pending review of the ENT report. | 11 Care was delayed because there was no report from UIC ENT. |

65

PTX193-0832

Patient #8

| | | |
|---|---|---|
| 6/1/2016 | A doctor saw the patient, who now weighed 136 pounds. The ENT report was still unavailable and the doctor asked for the ENT report. The doctor said that a biopsy was done and they were awaiting results. | 3, 11 | Care was delayed because there was no report from UIC ENT. The doctor also took no action to evaluate the nutritional status of the patient, who was losing weight quickly. |
| 6/9/2016 | A doctor wrote a note stating that he would contact the scheduler to obtain the biopsy results. | 11 | Care was delayed because there was no report from UIC ENT. |
| 6/16/2016 | A nurse saw the patient and documented a weight of 128 pounds. The patient said he couldn't swallow and was losing weight. The nurse consulted an NP, who ordered boost a nutritional supplement. | 8 | The NP should have ordered lab tests, albumin, pre-albumin, blood count, and metabolic panel to assess the nutritional status of the patient. Boost may have been insufficient. |
| 6/21/2016 | An approval for a full body PET scan at Rush Copley. | 11 | There was no ENT report and it was unclear what the therapeutic plan was. It had been a month for the patient to obtain a PET scan and yet a therapeutic plan for the patient's head and neck cancer wasn't clearly documented. It was possible that the biopsy showed cancer but this was unclear. Care failed to follow generally accepted guidelines or usual practice. This is so because there was no documented plan and it appeared that delays in treatment were related to not having notes from the ENT consultant. |
| 6/30/2016 | A doctor saw the patient. The weight was 122 pounds. The doctor noted that the patient was losing weight. The doctor did not document what the biopsy results were but documented that the plan was to await a PET scan at Rush. The diagnosis was still a "neck mass" without diagnosis. | 4, 8 | The patient had the neck mass for over four months and a metastatic cancer was known for six weeks and a diagnosis was still not made. The patient had lost so much weight that a nutritional assessment was indicated, including a survey of what the patient was eating or able to eat. In this assessment, laboratory tests should have been ordered. This was not done. |

66

PTX193-0833

PTX193-0834

Patient #8

| | | |
|---|---|---|
| 7/11/2016 | | The patient went for a test on this date but it was unclear what test the patient was undergoing. It was unclear from documentation in the record what the diagnosis of the patient was and what the therapeutic plan was. |
| 7/11/2016 | | The PET scan showed soft tissues in the neck consistent with malignancy and cervical lymph nodes consistent with metastatic lesions. The left hip was suggestive of metastasis. |
| 7/27/2016 | 4, 8, 11 | A doctor saw the patient. The patient weighed 120 pounds. The doctor documented that a PET scan was consistent with metastatic cancer. The doctor did not have a clear plan except for follow up with UIC ENT or oncology. |
| 8/5/2016 | 1, 2, 4, 8, 14 | A doctor saw the patient. The doctor noted seeing the patient the day before when he was found on the floor bleeding from the nose. Notably the patient did not have a documented note from the previous day. The doctor documented that the patient felt weak and fell. The doctor noted that the patient had a follow up with ENT the following week and ordered a wheelchair. The doctor did not take a history except that the patient said his legs got weak and wobbly when he was walking and he fell. The history was inadequate, the examination only included listening to the heart and lungs, and the only assessment was generalized weakness. The doctor did not have a diagnosis. |

Reports were not in the record and therefore the therapeutic plan was not documented. — 11

This is an incompetent system of care when a patient with known cancer since 5/15/16, over two months ago, still had no diagnosis or therapeutic plan. The patient's weight loss was even worse, yet the doctor still did not perform a nutritional assessment or order labs for that purpose. Care failed to follow generally accepted guidelines or usual practice.

The patient had an apparent syncopal episode the day before yet the doctor failed to take an appropriate history, perform an appropriate examination, or make a diagnosis. Diagnostic lab tests or EKG were not ordered. There was no effort to make a diagnosis for the patient's syncope. The only intervention was to give the patient a wheelchair for long distances, which failed to address the patient's problem. This was indifferent to the patient's serious medical need. Care was grossly and flagrantly unacceptable. The patient should either have been sent to an ER or had multiple blood tests and EKG.

| 8/5/2016 | | An approval for follow up with ENT after the PET scan. |

67

PTX193-0835

Patient #8

8/11/2016 A brief note on a referral form to ENT documented complete involvement of the oropharynx with invasion of the larynx and bilateral nodal disease. The recommendation was for chemotherapy and radiation therapy.

12    The ENT consult occurred three months after cancer was diagnosed on CT scan and six months after initial symptoms. This delay was significant and unacceptable. Care failed to follow generally accepted guidelines or usual practice.

8/18/2016 A doctor saw the patient, who now weighed 117 pounds. The doctor noted that the patient had a metastatic oropharyngeal cancer and was cachectic. Yet the doctor took no action to determine if the patient's nutritional status was adequate. The doctor documented that chemo and radiation therapy was to follow at UIC.

4, 8    The doctor failed to order laboratory tests to assess nutritional status or to modify therapy so that nutritional status was adequate despite documenting that the patient was cachectic. This was indifferent.

8/23/2016 A doctor saw the patient and noted that chemotherapy and radiation therapy were planed and advised the patient to "fatten up." The doctor noted that the patient had two pressure ulcers on the buttock and one on the hip, yet did not place the patient on the infirmary or order wound care. The only order for the pressure ulcers was to order an egg-crate mattress.

4    This was indifferent. Advising the patient to "fatten up" without making an evaluation of what the patient was able to eat, how much he was eating, and what his current nutritional status is indifferent. This patient had head and neck cancer and in the past said he was unable to swallow, yet the doctor made no attempt to determine what the patient was able to eat. The doctor also failed to competently address three pressure ulcers. Care was incompetent.

8/30/2016 A doctor saw the patient and discussed upcoming chemo/radiation therapy but did not indicate when this was to occur. The doctor did not address the pressure ulcers but did note that the patient hadn't received his egg crate mattress yet.

4    The doctor failed to develop a timely or thorough treatment plan. It wasn't clear whether reports were available or whether the doctor was simply indifferent to the patient's serious medical illness. The doctor failed to pay any attention to the pressure ulcers if they still existed except to note that the mattress hadn't yet arrived. Care failed to follow generally accepted guidelines or usual practice.

8/31/2016 Chemotherapy and radiation therapy was approved.

PTX193-0836

Patient #8

| | | |
|---|---|---|
| 9/5/2016 | A nurse saw the patient for dizziness. The nurse documented blood pressure of 94/62 with irregular pulse. Yet, the patient was not referred to a provider. | 16 |

The patient had a significant symptom and abnormal vitals with an irregular pulse. Not sending the patient to a provider placed the patient at risk of harm.

9/8/2016 A nurse saw the patient who had "blanked out." The nurse used a seizure protocol. The blood pressure was 60/40. The nurse documented that the plan was to call a physician. When the physician saw the patient, he did not order an EKG, order blood tests or perform orthostatic blood pressure. The doctor documented, "When I initially saw pt. I was asking him how he felt, + he looked at a distant + started losing consciousness [with] mild body shaking no hx of sz." Notably the doctor didn't even examine the patient with blood pressure consistent with shock. The plan was to put the patient on the infirmary for 23 hour observation and to observe for loss of consciousness. The doctor's assessment was loss of consciousness without known etiology, possible seizure, and possible brain metastasis. Yet the doctor did not refer to a higher level of care.

1, 2, 14   The patient had syncope and hypotension at a level consistent with shock, yet the doctor failed to take adequate history, ordered no blood tests or EKG, and failed to thoroughly evaluate the patient who should have been sent to a hospital as the doctor felt that the patient might have had brain metastases; a CT of the brain was indicated. The BP was consistent with shock. Care was grossly and flagrantly unacceptable and most likely reflected incompetent or poorly trained physicians.

9/9/2016 A doctor saw the patient and said that the patient felt fine and wanted to return to his housing unit. The doctor did not check the blood pressure. The doctor told the patient to use a wheelchair. The doctor noted that the patient had experienced possible loss of consciousness and he suspected a seizure. Because the diagnosis was uncertain a CT brain was indicated. The doctor discharged the patient back to general population. Notably the doctor did not check the patient's pressure ulcers.

4, 8, 11   Because the patient had prior possible loss of consciousness and because the doctor did not have a diagnosis, a CT brain and EKG were indicated. The doctor sent the patient back to his housing unit without assessment of the patient's pressure ulcers or without assessing the patient's nutritional status. This was indifferent care. The doctor did not document what the therapeutic plan was and it was not clear exactly what the plan of the oncologist and radiation therapist was.

Patient #8

9/15/2016 An oncologist wrote a brief note on the referral sheet stating that inpatient admission for high dose cisplatin chemotherapy and radiation therapy needed to be scheduled.

11, 12   There were no consultant reports so the status of the patient was unclear.  It had been 4 months since it was known that the patient had cancer and 7 months since first symptoms yet he had not yet started therapy.  This was a significant delay that placed the patient at risk.

9/19/2016 Approval for change of the G tube placement.

9/19/2016 Radiation therapy was approved. Apparently the patient went for a radiation oncology visit.

9/22/2016 A doctor saw the patient and noted that the patient saw  UIC oncology on 9/12 and they recommended admission for chemotherapy.  A dental evaluation and radiation therapy were also recommended.  Consultant reports were not available.  The doctor documented that the patient "saw UIC (Onc or ENT)."  The doctor did not know the current therapeutic plan because reports were unavailable. The doctor noted that the patient had an on-site dental evaluation scheduled for 9/19/16.  The doctor noted that the staff was checking on the admission dates for chemo and radiation therapy.  The doctor documented that the patient had an irregular pulse and the doctor ordered an EKG within the next seven days.

2, 8, 11,   The patient had an irregular pulse which could reflect atrial fibrillation.  An immediate EKG should have been promptly obtained, yet the doctor ordered an EKG as a routine.  This placed the patient at life threatening risk.  The doctor failed to examine the pressure ulcers or verify that they had resolved.  The lack of reports significantly contributed to fragmented care, resulting in lack of knowing what the treatment plan was.  Care was grossly and flagrantly unacceptable.

9/26/2016 An EKG showed multiple premature atrial beats that probably accounted for the irregular pulse previously noted.

10/17/2016 A doctor noted that the patient had received five radiation treatments so far.

12   The patient started receiving treatment for his cancer after five months, which placed the patient at risk.  Care failed to follow generally accepted guidelines or usual practice.

10/26/2016 A nurse documented that the patient remained at UIC after a scheduled visit and would be admitted.

70

Patient #8

10/24/2016 A radiation oncologist recommended six cans of Boost daily, increased pain medication, and evaluation of the patient's premature atrial contractions.

11/11/2016 During the hospitalization it was noted that the patient had an unresectable tumor and that the patient had significant weight loss and cachexia and that a PEG tube was placed 10/27/16. The patient had multiple laboratory abnormalities which on return to Dixon were not noted.

12    It is not clear whether the five month delay in treating the patient resulted in a possibly treatable cancer becoming untreatable. Doctors at Dixon failed to evaluate the patient's nutritional status. Ultimately the patient needed a feeding tube. Whether this was avoidable is uncertain, yet doctors at Dixon were indifferent to this with respect to appropriate evaluation and treatment. Care failed to follow generally accepted guidelines or usual practice.

11/12/2016 The patient was discharged from the hospital.

11/14/2016 The patient was admitted to the infirmary after return from UIC where he was admitted for chemotherapy and a PEG tube. This was not discussed in physician notes previously. The doctor noted that the hospitalization was complicated by a tube leak, free air leak, electrolyte abnormalities, and pneumonia. The patient required transfusion. Remarkably, the doctor did not document what the laboratory abnormalities were and did not order any lab tests. The patient also had mucositis for which an antiviral agent was prescribed. The doctor noted 2+ edema without assessing why the patient had edema. The only assessment was oropharyngeal cancer and dysphagia. The patient had multiple problems that the doctor did not assess. From this note, the extent of the patient's problems were not known. This placed the patient at risk.

4    An appropriate treatment plan was not documented. The hospital report was available but the doctor didn't document all of the patient's problems or document the plan for the patient's problems. The extent of the patient's problems and therapeutic plans were unknown to the prison doctor. This placed the patient at risk. Care failed to follow generally accepted guidelines or usual practice.

11/15/2016 The patient left for radiation therapy.

PTX193-0838

Patient #8

| | | |
|---|---|---|
| 11/15/2016 | At 8:00 pm a nurse noted that the patient was not responding verbally and was found on the floor. The patient was lethargic. A doctor was called but instead of sending the patient to a hospital ordered neuro checks and to call him if the patient became unresponsive. | 14 | The patient was unresponsive yet the doctor failed to evaluate the patient and did not refer to a higher level of care. Care was grossly and flagrantly unacceptable. The patient had a serious condition and the doctor should have referred the patient to a hospital. |
| 11/16/2016 | At 8:00 am a nurse documented that the patient had a left dilated pupil and was scheduled for a writ. The patient had bilateral leg swelling. The nurse called a doctor, who ordered morphine for an unclear reason. The patient was apparently scheduled for a medical appointment but there was no evidence in the record that this appointment took place. | 14 | A unilateral dilated pupil and bilateral leg swelling were not evaluated. The doctor should have evaluated the patient, as a dilated pupil indicates a serious life-threatening problem. Care was grossly and flagrantly unacceptable. |
| 11/16/2016 | A doctor saw the patient and noted that the patient had requested pain medication and increased the morphine sulphate, but the history of pain was not taken and the extent of pain was not clear. The doctor noted that the patient had a fall the night before. The doctor documented that there was no serious injury. There was no evidence on his examination that the pupil was examined. Neurologic examination was not done, an EKG wasn't done, the doctor didn't evaluate the pressure ulcers, the doctor didn't document what the treatment plan was. | 1, 2, 4 | The patient had a fall yet the doctor didn't determine why the patient fell or if this was due to complications of his illness or other condition such as cardiac abnormality. Failure to address this placed the patient at risk of harm. The doctor failed to address the abnormal pupil, and failed to inquire as to why the patient fell. Care was indifferent. |
| 11/16/2016 | At 7:00 pm a nurse performing neuro checks identified a dilated right pupil. The nurse did not document calling the doctor. | 16 | The nurse should have notified the doctor. |

PTX193-0839

PTX193-0840

Patient #8

11/17/2016 A nurse found the patient unresponsive.  The patient was sent to a hospital. The hospital performed an EKG that documented that the patient was in atrial fibrillation.  A CT scan of the brain showed mild atrophy but no masses or acute intracranial abnormality.

73

PTX193-0841

Patient #9

12/24/2013 A doctor wrote a note stating "no specific complaint, no change [assessment] dementia [plan] continue same care."

| 1, 2, 4 | This doctor wrote identical notes multiple times without documenting a history, physical examination, or appropriate assessment. This is indifferent. The doctor was a surgeon and did not appear to know how to manage primary care problems. |

12/30/2013 A doctor wrote an identical note to the 12/24/13 note.

| 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |

1/3/2014 The patient fell after taking a shower. A doctor saw the patient and noted no problems.

| 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |

1/16/2014 A doctor wrote an identical note to the 12/24/13 note.

| 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |

Patient #9

| | | |
|---|---|---|
| 1/20/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan.  The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status.  This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |
| 1/22/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan.  The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status.  This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |
| 2/5/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan.  The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status.  This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |
| 2/11/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan.  The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status.  This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |

PTX193-0842

PTX193-0843

Patient #9

| | | |
|---|---|---|
| 2/19/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |
| 2/24/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |
| 3/4/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |
| 3/12/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |

PTX193-0844

Patient #9

| | |
|---|---|
| 3/19/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |
| 3/27/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |
| 4/15/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |
| 4/23/2014 A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |

Patient #9

| Date | Note | Code |
|---|---|---|
| 5/7/2014 | Calcium 7.9; sodium 136; potassium 4.6. No LFTs done. | |
| 5/21/2014 | A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 |
| | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. | 1, 2, 4 |
| 6/9/2014 | A doctor wrote an identical note to the 12/24/13 note. | 1, 2, 4 |
| | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. | |
| | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. | |
| 6/28/2014 | A nurse documented finding the patient in bed with his left face swollen, weakness of the right arm, and confusion with oxygen saturation of 89%. The patient was sent to a hospital. | |
| | The repeated failure to monitor this patient was grossly and flagrantly unacceptable care. | |
| 6/28/2014 | The patient was admitted to the hospital. On 7/14/14, the patient had an echocardiogram showing moderate LV enlargement, severe LV dysfunction with EF 30%, mitral and tricuspid regurgitation, and moderate to severe pulmonary hypertension. This hospital record was incomplete and only included the echo. | 11 |
| | The hospital discharge summary was not available and placed the patient at risk of harm. | |
| 7/16/2014 | The patient returned from the hospital. The patient was on oxygen therapy. He was admitted to the infirmary. | |

78

PTX193-0845

Patient #9

| | | |
|---|---|---|
| 7/17/2014 | A doctor wrote an infirmary admission note documenting that the patient had a stroke with subsequent respiratory failure. The therapeutic plan was brief, stating to continue all discharge medications. The doctor did not discuss oxygen therapy or the need for it. Activity of daily living monitoring was not mentioned. The doctor did not document a neurological examination except "confused alert," which was a very confusing statement. The patient's neurological status had not been clarified with respect to activity of daily living monitoring. A blendarized diet was prescribed but nutritional status not identified. | 1, 2, 4 | The doctor failed in his history to document what the therapeutic plan upon discharge from the hospital was. The examination was inadequate and the plan was incompetently performed. |
| 7/18/2014 | The inmate was found on the floor by his bed. The nurse found no injury but it was not witnessed how the inmate came to be on the floor. Blood pressure was 96/54. A doctor didn't see the patient but co-signed the form on 7/21/14. | 16 | The patient was hypotensive and appeared to have had a syncopal episode shortly after hospitalization for stroke. The nurse should have consulted a doctor. |
| 7/21/2014 | A doctor noted that a cardiology consult at UIC was approved at collegial. | | |
| 7/22/2014 | A doctor saw the patient and noted that the patient had no specific complaint. The only documented examination documented was "alert confused." The doctor ordered oxygen saturation daily for two weeks. | 1, 2, 3 | The history and physical examination were inadequate particularly since the patient experienced an apparent syncopal episode four days previous. |
| 7/22/2014 | A Wexford approval for cardiology post hospitalization. | | |
| 7/24/2014 | The patient was found by a nurse on the floor in front of his chair. The nurse noted no injuries. A doctor co-signed the injury report on 7/24/14. The nurse documented that the inmate was not able to explain how the fall happened and wrote ("as normal for I/M"). | 1, 2, 3 | The patient experienced a fall. A doctor signed an incident report but did not examine the patient. The nurse documentation presumed that falling was a normal event for the inmate. Care was indifferent. |

PTX193-0846

Patient #9

| Date | Note | Number |
|---|---|---|
| 8/5/2014 | A doctor's note included "S. No specific complaint, takes diet well, [objective] no acute finding [assessment] post CVA [plan] continue same care". | 1, 2, 4 |
| | The doctor failed to document an adequate history, physical examination, or plan. This was especially problematic because the patient had two falls since his stroke and the doctor did not evaluate why the patient fell. | |
| 8/13/2014 | A doctor noted no specific complaints. There was no history. The only physical examination was to state the lungs were clear. The only assessment was dementia. The doctor ordered to give oxygen PRN when the oxygen saturation was below 91%. The doctor did not order pulse oximeter checks. | 1, 2, 4 |
| | The history and physical examination were inadequate. The plan was incompetent. To give oxygen "as needed" when the saturation was below 91% gave unclear direction to the nurse. What conditions would qualify as "as needed?" This order was confusing and not competently written. | |
| 8/21/2014 | A nurse completed an injury report that the inmate was found on the floor. The nurse noted that the inmate was confused and was wrapped in a cover. The patient was evaluated by a CN 2. A doctor co-signed this injury report on 8/26/14. | 16 |
| | The nurse should have referred a confused patient who just fell to a physician for immediate examination. | |
| 8/21/2014 | BUN 35; creatinine 1.59; albumin 2.7; cholesterol 195; TG 129; HDL 31; LDL 138; hemoglobin 11.3; MCV 77. | |
| 8/21/2014 | A nurse found the patient on the floor at 2:30 pm wrapped in a cover and confused. | |
| 8/21/2014 | A doctor saw the patient at 4:00 pm. The entire note was "S: no complaint alert [objective] no change [assessment] dementia [plan] continue same regimen." The doctor didn't evaluate whether there were injuries in the recent fall. | 1, 2, 4, 6 |
| | The patient just had a fall. Yet the doctor did not evaluate the patient. This appeared indifferent or incompetent. The doctor also failed to assess recent abnormal laboratory test results. | |
| 8/27/2014 | A different doctor saw the patient and noted that the patient was doing well without use of CPAP. To date, it wasn't clear that the patient was on CPAP. The only assessment was post-CVA, dementia, and COPD. This was the first mention of COPD. The doctor ordered CPAP as needed. This is an inappropriate plan, as how would a patient know he needed CPAP during sleep. | 4 |
| | This was an incompetent plan. CPAP is used during sleep for sleep apnea which is not a condition that requires as needed use. The doctor appeared to not know how to treat sleep apnea. | |

80

PTX193-0847

Patient #9

| | |
|---|---|
| 9/4/2014 A doctor wrote a note identical to the 12/24/13 note. | 1, 2, 4 The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status.  This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |
| 9/17/2014 A nurse completed an injury report.  During rounds a nurse found the inmate on the floor.  The treatment plan was to encourage the patient to call staff for help. | 16 The nurse should have referred the patient to a doctor. |
| 10/9/2014 A doctor wrote that the patient had no complaint and that the patient was not using oxygen and was breathing "normal" without BiPAP.  This patient had dementia and it was unclear how it was determined that the patient was consciously not using the oxygen or whether the patient was just demented and didn't know he was supposed to use it.  The plan was to continue the same care.  This patient was confused and apparently unable to care for himself.  The patient was incapable apparently of intentionally deciding to use or not use oxygen.  The doctor made no attempt to objectively discover whether the patient needed oxygen therapy.  The doctor did not document oxygen saturation, did not stress the patient and check oxygen saturation, and the doctor did not even document why the patient was initially placed on oxygen so it wasn't clear why the oxygen should be stopped. | 1, 2, 4 The doctors history, examination, and plan were not competent and failed to determine whether use of oxygen was still necessary. |
| 10/23/2014 The inmate fell to the floor while eating breakfast on his bed.  A doctor co-signed the injury report on 10/29/14. | 16 The nurse should have referred the patient to a doctor. |

81

PTX193-0848

Patient #9

| | | |
|---|---|---|
| 10/29/2014 A doctor wrote a note identical to the 12/24/13 note, except the doctor added that the lungs were clear. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. |
| 11/10/2014 A doctor wrote a note identical to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. |
| 12/29/2014 BUN 24; creatinine 1.52 (0.5-1.5); albumin 3; cholesterol 174; TG 127; HDL 30; LDL 119. | | |
| 12/31/2014 A doctor wrote an identical note to the 12/24/13 note except to add that the patient "takes diet well." | 1,2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. |
| 1/24/2015 An identical doctor note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. This doctor was a surgeon and did not appear to have knowledge on appropriate evaluation of patients. |
| 1/31/2015 An identical doctor note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. |
| 3/19/2015 An identical doctor note to the 12/24/13 note. | 1, 2, 4 | The doctor didn't document an adequate history, physical examination, or plan. The doctor wrote the identical brief note 24 times without any specificity regarding changes in the patient's status. |

82

PTX193-0849

Patient #9

| | | |
|---|---|---|
| 4/6/2015 | An injury report documented the patient fell and asked, "help me please, it hurts." The doctor was called and ordered an x-ray but did not examine the patient. An ADA van was unavailable and the patient didn't go for the x-rays until 4/10/15, four days later. | 11, 19 | The patient had a potential serious medical condition after a fall. The doctor neglected to evaluate the patient and the x-ray was delayed four days. This is indifferent treatment. |
| 5/5/2015 | The patient developed diarrhea noted by a nurse but not addressed by a provider. | 19 | The doctor neglected the patient's condition. |
| 5/15/2015 | The patient had been progressively more confused. On this day the patient stated he needed to get out the back door which made no sense. The nurse documented that the patient was very confused and called the doctor. Instead of an evaluation, the patient was medicated by phone order with Ativan, which was ordered every 12 hours for seven days without a physical examination. Later that day the doctor ordered a CMP and CBC. These tests were not done. | 1, 2, 3, 11, | While the confusion may have been due to the patient's dementia, an evaluation was indicated. The doctor performed no history, performed no examination, and the treatment plan of Ativan actually placed the inmate at risk of harm. The manufacturer recommends *extreme caution* when using in persons at risk of falls. This patient had multiple falls. To prescribe this drug over the phone without fall precautions is dangerous and placed the patient at risk of harm. The lack of an ADA van placed the patient at risk of delayed diagnosis. The ordered labs were never done. Care was grossly and flagrantly unacceptable. |
| 5/15/2015 | A nurse follow up note documented that the patient was sitting in the chair unresponsive except to sternal rubs. He was described as slightly lethargic. The nurse did not call a doctor. There was no nursing note the following day. | 16 | The prescription of Ativan may have adversely affected the patient. A patient who is unresponsive needs to be evaluated. The nurse should have called the doctor. |
| 5/23/2015 | At 10:00 am the patient was agitated and confused. The nurse called a doctor who ordered Ativan IM every eight hours for agitation for 30 days *without evaluation of the patient.* | 8, 19 | The patient was a fall risk and this drug needs to be given with extreme caution for those with fall risk. Also, the doctor had not made a diagnosis of the patient's confusion and agitation and diagnostic (labs, CT scan brain) evaluation was indicated, but the doctor did not even evaluate the patient. This was indifferent care and grossly and flagrantly unacceptable. |

83

PTX193-0850

Patient #9

| Date | | Notes |
|------|------|-------|
| 5/23/2015 | | A nurse documented that the patient was ambulating unsteadily and appeared agitated and confused. When the nurse approached the patient he fell. The pulse was 120. The nurse noted no injuries. The nurse called the doctor, whose only order was to monitor the patient. |
| | 8, 19 | The patient likely had a change in status (confusion and agitation). Additional testing was indicated including labs and CT scan. Instead, nothing was done. The doctor failed to recognize that his prescription of Ativan may have worsened the patient's condition. |
| 5/24/2015 | | A nurse documented that the patient appeared more confused than usual. There was no referral or physician examination. |
| | 16 | The nurse should have referred the patient to a doctor. |
| 5/26/2015 | | A doctor saw the patient and wrote that the patient had no specific complaint despite the patient being unable to give a history. The doctor noted that the patient was agitated and confused and that mental health was to evaluate the patient. The only examination was to document, "no acute findings." A diagnosis of Alzheimer's disease was made without any objective assessment of the patient. The plan was to "continue same care." |
| | 1, 2, 4 | The doctor attempted no history. The doctor performed no neurologic examination or mental status examination. The doctor ordered no laboratory tests to determine if the patient had a reason for the confusion. CT scan should have been considered. The doctor did not evaluate the potential for falls given his prescription of Ativan. Care was indifferent and incompetent. |
| 5/26/2015 | | The patient complained that his stomach didn't feel well. The nurse informed the doctor, who gave a phone order for a CMP and CBC. There was no documented follow up of these tests and it appeared that they were not done. |
| | 11, 19 | Ordered tests were not done. The patient needed evaluation but no examination was done. |
| 6/23/2015 | | A doctor hadn't documented a note for a month. The doctor wrote an identical note to the 12/24/13 note. |
| | 1, 2, 4 | The history, physical examination and assessments were inadequate. |

84

PTX193-0851

Patient #9

| Date | Description | |
|---|---|---|
| 7/8/2015 | A nurse saw the patient at 6:30 am and wrote that the patient couldn't get up to eat. The nurse noted that the patient was totally dependent for activities of daily living including feeding and that his condition "is declining." He was missing his dentures and needed a dental referral. A doctor saw the patient at 9:35 am and wrote that there was no change in status and that the patient needed help in ambulation. The only examination documented "no change." The plan was to "continue same care." | 1, 2, 4, 19 |
| | If there were no change in status, how was it that the patient needed help in ambulation unless his need had previously been ignored. Since the doctor determined that the patient needed help with ambulation, a change in therapy was indicated but the doctor documented "no change." He did not initiate how to help the patient with ambulation. Care was indifferent. | |
| 7/11/2015 | A nurse documented that the patient appeared "very weak" and that his condition was "declining." It wasn't clear what the nurse perceived as wrong but no referral was made. | 16 |
| | The nurse should have referred to a physician. | |
| 7/12/2015 | A nurse documented that the patient was very weak and needed to be held up to be fed and ate only a few spoonfuls of breakfast. The nurse documented notifying the doctor. | |
| 7/12/2015 | At 1:35 pm the patient was incontinent of bladder and bowel. The nurse notified a doctor, who ordered CBC, CMP, UA with culture in the morning. The blood was actually documented as drawn that day and at 6:35 pm a nurse documented that the hospital called that the hemoglobin was 6.1. The doctor was called and the doctor ordered the patient to be sent to the hospital. | |
| 7/12/2015 | WBC 20.4; hemoglobin 6.1. | |
| | These tests were significant and indicate possible infection and significant blood loss and required immediate action. | |
| 7/13/2015 | Patient admitted to UIC for anemia. | |
| 7/16/2015 | Surgical path report indicating terminal ileum indicating infiltrating poorly differentiated adenocarcinoma. The size of the specimen was 15 by 8 by 5.6 cm. | |

85

PTX193-0852

3:17-cv-03112-JES-JEH   # 263-10   Page 230 of 577

PTX193-0853

Patient #9

7/24/2015 A final report documented that the patient was transferred from OSH to UIC after a hemoglobin of 6 was found. At UIC the hemoglobin was 5.5. After transfusion a RLQ mass was palpated. A CT scan found a RLQ mass concerning for malignancy. The patient developed fever. A laparoscopic study found abscess with necrosis and biopsy found poorly differentiated adenocarcinoma. A partial colectomy with ileostomy were performed. The patient had poorly differentiating adenocarcinoma arising from a tubular adenoma infiltrating through the ileum and muscularis adenocarcinoma.

UIC physicians were able to palpate an abdominal mass which was unidentified at Stateville likely because either the doctor did not examine the patient or because the doctor could not appreciate the mass. It appeared based on notes that the doctor did not examine the patient.

7/24/2015 An oncology consultation in the hospital documented that the patient had a history of chronic kidney disease, HTN and was admitted for a hemoglobin of 6 and a RLQ mass. The oncologist noted that a biopsy was positive for cancer and that the patient had 12/14 lymph nodes positive for metastases. The oncologist stated that the patient did not have the capacity for decision making regarding treatment options. Chemotherapy was not planned due to the patient's condition. Nutritional support was recommended.

7/27/2015 The patient was discharged from the hospital. In the hospital the patient developed fever and was treated for an intraabdominal abscess. The patient had exploratory laparotomy with ileocecotomy and ileostomy. Pathology on the specimen yielded poorly differentiated adenocarcinoma arising in a tubular adenoma. Due to the advanced stage of the malignancy no chemotherapy was planned.

7/27/2015 A nurse documented that the patient had staples on his 14 inch abdominal wound and that the patient had liquid stool covering the wound and under the patient's nails. The patient was described as confused.

86

Patient #9

7/27/2015   When discharged from the hospital, the hospital recommended to perform calorie counts and follow up with nutrition recommendations for diet.

7/28/2015   A doctor ordered a pureed diet for six months.

4   The hospital had recommended a calorie count and nutritional follow up. Instead the doctor ordered a pureed diet without consideration of its nutritional content.

7/29/2015   A doctor admitted the patient to the infirmary post colon resection. The patient was on aspirin, and Norvasc. The doctor took no history of what had occurred in the hospital including the recommended therapeutic plan. The patient's current condition was documented as "healing wound abdomen good condition." The doctor ordered a general diet and activity "as tolerated" despite repeated past falls and inability to care for himself. The doctor's physical examination was that the patient was alert and oriented x 4. The doctor documented that the patient was functioning well.

1, 2, 4   The doctor performed an incompetent history and physical examination and appeared unaware of the patient's existing status. This was indifferent to the patient's serious medical condition. The doctor did not assess the patient's nutritional status or ensure that the patient was safe and protected despite his grim prognosis.

8/1/2015   A nurse documented that the patient was very combative and "need more staff to help change." The colostomy bag had come off and the nurse described the inmate "in a total mess."

11   This patient needed a skilled nursing unit or hospice care but it was clear that there were insufficient staff to care for the patient.

8/2/2015   The nurses were changing the colostomy bag and the patient swung at two nurses with two correctional officers present. The nurse called a doctor who ordered an increase of the Ativan to 1 mg IM every six hours *for 60 days!*

4   The patient was at risk of falls. The Ativan was dangerous. The doctor made no attempt to discover what was causing the agitation. Care was grossly and flagrantly unacceptable.

PTX193-0854

PTX193-0855

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 88 of 431 PageID #:12286

Patient #9

| Date | # | Description |
|------|---|-------------|
| 8/3/2015 | 1, 2, 4 | A doctor wrote a brief note stating "confused returned from med writ. Had skin staples removed. Recommendation consult oncology." The only examination was "no change healing abdominal wound." The plan was to "continue same care." Despite the patient being confused, the doctor continued the Ativan order. | The doctor failed to take any history by way of review of nursing notes or other documents, documented minimal examination, and continued the same care which included Ativan for agitation even though the patient continued to experience falls. |
| 8/3/2015 | 16 | Later that day a nurse found the patient on the floor. The patient's cell mate said that the patient attempted to get out of bed and fell. | The nurse did not refer to a doctor. |
| 8/3/2015 | 19 | On a referral form to the surgeon at UIC seen for follow up, the surgeon noted that the staples were removed and recommended to review the pathology and oncology recommendations. A CEA baseline was recommended which was not done. The doctor appeared to ignore or not review the oncology recommendations. | Doctors at UIC made recommendations which were ignored. |
| 8/4/2015 | | Collegial review approved an oncology visit. | |
| 8/4/2015 | | Wexford approved an air mattress. | |
| 8/4/2015 | | Wexford approved an oncology appointment. | |
| 8/6/2015 | 4 | The doctor wrote "spells of agitation and restlessness. Violent behavior toward nurses." The only documented examination was "confused restless." The assessment was Alzheimer dementia and the doctor prescribed Ativan for 30 days. | The doctor made no attempt to identify risk factors for the delirium including hydration, medication side effects, and supportive care measures. The use of a benzodiazepine for Alzheimer's delirium has a limited role. The risk of falls in this patient should have led the doctor to choose a neuroleptic drug and to check for metabolic problems and supportive care measures. This treatment was harmful to the patient, as it placed him at continued risk for falls and may have been responsible for worsening of the agitation. |

88

3:17-cv-03112-JES-JEH   # 263-10   Page 233 of 577

PTX193-0856

Patient #9

| | | |
|---|---|---|
| 8/10/2015 | The doctor note was virtually the same documenting "no specific complaint. Confused. [objective] no change [assessment] dementia Alzheimer, post colectomy [plan] same care." | 1, 2, 4 | The doctor's continued failure to document a reasonable history, physical examination, and assessment appeared indifferent. |
| 8/19/2015 | At 4:00 am a nurse documented that the patient was in acute distress and was agitated and refused ileostomy care and diaper change. The nurse documented that additional help was needed to change the patient, who remained "uncooperative" during care. The patient was wearing mittens apparently to prevent disrupting the ileostomy. | | |
| 8/19/2015 | The doctor noted that the patient had no specific complaint and that there was a good response to Ativan. The doctor's plan was to continue same care. There was no examination except a statement that the ileostomy was functioning. | 1, 2, 4 | The doctor failed to note prior nursing notes that the patient at 4:00 am was agitated and uncooperative. The doctor was not incorporating nursing information into his assessments despite the patient's inability to give a history. |
| 8/25/2015 | An injury report documented that the patient fell to the floor getting out of bed. The nurse noted no injuries and stated, "no medical treatment necessary." A provider did not examine the patient. | 16 | A doctor should evaluate the patient after a fall. There was no assessment given the use of Ativan. |
| 8/26/2015 | An injury report documented that the patient fell to the floor attempting to get up out of chair. The nurse said there were no injuries and declared that no treatment was needed. A doctor did not examine the patient. The nurse documented that a doctor would follow up as needed. | 16 | A doctor should evaluate the patient after a fall. There was no assessment given the use of Ativan. |
| 8/26/2015 | A doctor documented the same note except adding that the patient had metastases. There was no other comment. The plan was to continue same care. The doctor failed to note that the patient had two recent falls. | 1, 2, 4 | The doctor did not document new findings in the history, or document a reasonable examination or assessment, and failed to note that the patient had recent falls. Care was indifferent. |

89

Patient #9

| | | |
|---|---|---|
| 8/31/2015 | A different doctor saw the patient and wrote a very brief note stating that the patient had an erythematous coccyx without skin breakdown, which is an early decubitus.  The doctor made no changes to prevent a decubitus ulcer. | 3 | The doctor should have ensured that preventive measures were taken to prevent pressure ulcers. |
| 9/1/2015 | At 3:30 am a nurse documented that when they removed the ileostomy bag the patient's clothes and bed linens were full of feces. The patient had been scratching around his ileostomy. | | |
| 9/1/2015 | At 7:35 am a doctor saw the patient.  The entire note was "no specific complaint [objective] no change [assessment] dementia post colectomy for metastatic ca [plan] continue same care."  The doctor failed to note the patient's pruritis and interference with the ileostomy causing contamination with feces.  The doctor failed to review the nursing notes. | 1, 2, 4 | The doctor failed to note significant patient management problems apparently due to indifference to nursing management problems complicating patient care. |
| 9/6/2015 | A nurse found the patient with feces all over his bed linen. The patient had pulled off the ileostomy bag.  The patient had mittens placed on his hands but he had removed these as well. | | |
| 9/9/2015 | The doctor wrote an identical note to the 9/1/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 9/14/2015 | The doctor wrote an identical note to the 9/1/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 9/22/2015 | The doctor wrote an identical note to the 9/1/15 note. | 1,2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 9/25/2015 | The patient fell off the toilet.  A nurse documented that the patient fell while trying to transfer off the toilet.  The nurse documented that the patient was confused. | 16 | The nurse should have referred to a physician. |

90

Patient #9

| | | |
|---|---|---|
| 10/5/2015 | A different doctor wrote documenting that the patient was confused. The doctor did not update the patient's status, perform any examination except to note confusion and a colostomy, and did not update the status of the patient. | 1, 2, 4 | The patient was having repeated falls. There was no evaluation of medications, attempts to protect the patient, or evaluate the patient's metabolic status. |
| 10/26/2015 | A doctor wrote an identical note to the 9/1/15 note. | 1,2,4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 10/29/2015 | A doctor wrote an identical note to the 9/1/15 note. | 1,2,4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 11/2/2015 | A doctor wrote an identical note to the 9/1/15 note. | 1,2,4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 11/9/2015 | A doctor wrote an identical note to the 9/1/15 note. | 1,2,4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 11/16/2015 | A doctor wrote an identical note to the 9/1/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 11/23/2015 | A different doctor saw the patient for pus coming from the ear. The doctor noted a perforated TM with pus and diagnosed otitis media and started Bactrim for seven days. | | |
| 11/23/2015 | Remarkably, a couple hours later the usual doctor (Medical Director) saw the patient and wrote an identical note to 9/1/15 not noting the otitis media. | 1, 2, 4 | This was clearly indifferent. |
| 11/24/2015 | The patient was sent out on a writ. | | |

91

PTX193-0858

PTX193-0859

Patient #9

11/24/2015  This oncology appointment was approved 8/4/15 and didn't take place for more than three months. The oncologist write a brief note on the referral form. There was no report. The note said that given the advanced dementia and extensive malignancies, no treatment was recommended. Hospice/palliative care was recommended. No follow up was recommended.

11/26/2015  A doctor ordered a clear liquid diet for 24 hours based on a nurse call that the patient had liquid stool draining from the ostomy site.

11/27/2015  A nurse noted that the patient was lethargic and had diarrhea. The patient was sent to a hospital.

11/29/2015  The patient returned to the infirmary from the hospital. There was a nurse admission note to the infirmary but no physician note. The first physician evaluation was on 12/3/15 when the doctor wrote an identical note to the 9/1/15 note.

11/29/2015  The patient was discharged from UIC on 11/29/15 after an 11/27/15 admission. The patient was admitted for altered mental status. The patient was treated with antibiotics and improved. A urinary infection was diagnosed. C difficile was negative. Chest x-ray was negative. Patient was transitioned to Bactrim. The patient's initial BUN was 56 and improved with hydration. So the patient was significantly dehydrated on arrival. X-rays of the abdomen and chest showed no acute problems.

12/3/2015  This was the first note after hospitalization and the doctor wrote an identical note to the 9/1/15 note.

1, 2, 4  Care was indifferent, as the doctor failed to even review hospital notes, note the status of the patient, or assess whether the patient had improved or not after hospitalization. Care was grossly and flagrantly unacceptable.

92

Patient #9

| 12/7/2015 | A doctor's note was identical to the 9/1/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 12/14/2015 | A doctor's note was identical to the 9/1/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 12/23/2015 | A doctor wrote that the patient had no specific complaints. The examination was "no change" and the assessment was "dementia post metastatic ca colon resection." The plan was "continue same care." | 1,2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 12/29/2015 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 1/5/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 1/11/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 1/18/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 1/25/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 2/2/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 2/8/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 2/15/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |

93

PTX193-0860

Patient #9

| | | |
|---|---|---|
| 2/16/2016 | At 6:00 am a nurse found the inmate on the floor who asked, "help me." The nurse identified no injuries. | 16 | The nurse should have referred to a physician. |
| 2/23/2016 | A nurse found the inmate on the floor yelling "help me." A doctor saw the patient and wrote, "IM fell again today." The doctor assessed no injuries. | 4 | The doctor wrote that fall precautions should be used but didn't specify what these were.  The doctor wrote to continue the present management.  It appeared that the patient was still on Ativan. |
| 2/29/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 3/7/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 3/14/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 3/21/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 3/28/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 4/5/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 4/11/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |
| 4/18/2016 | A doctor wrote a note that was identical to the 12/23/15 note. | 1, 2, 4 | The doctor was indifferent to the status of the patient and unaware of what was happening to the patient. |

PTX193-0861

PTX193-0862

Patient #9

4/19/2016 At 1:30 am a nurse noted that the patient was listless and notified a doctor. The patient was pale, diaphoretic, and listless. He was lying in bed without any sheets or covers and appeared to be in pain and was not responding as usual.

4/19/2016 At 3:00 am a nurse documented that the patient was in bed and condition was unchanged since 1:40 am. The doctor was notified and ordered the patient sent to the hospital.

4/19/2016 At 6:25 am a nurse noted that the patient was sent to a hospital and had acute encephalopathy, hyperkalemia, and elevated troponin.

4/21/2016 An autopsy was done. Fingernails were medium length and dirty, the patient had multiple scars on the extremities and back. The toenails were dirty. The cause of death was sepsis.

It was clear that the patient's status had not been monitored at the facility.

Based on the autopsy, it appeared that the patient had been neglected at the facility.

95

PTX193-0863

Patient #10

| | | |
|---|---|---|
| 1/7/2013 | | Patient was seen at HTN chronic clinic.  The presence of risk factors line was blank even though the patient had multiple risk factors. |
| 7/1/2013 | 7, 16 | The patient complained to a CMT that he was "throwing up black stuff and also defecating black stool all day.  I haven't eaten anything all day cause of my vomiting."  The CMT documented referring the patient to a doctor the following day.  This referral did not occur.  There was no evidence of evaluation of this potential GI bleed. | The patient had symptoms of gastrointestinal bleeding and was on a NSAID and aspirin and should have had endoscopy.  Instead, the patient wasn't even referred to a provider.  Subsequent providers failed to identify these symptoms.  Care failed to follow generally accepted guidelines or usual practice. |
| 7/16/2013 | 1, 2, 8 | A doctor saw the patient in diabetes chronic clinic.  The doctor did not address the patient's very recent complaint of possible GI bleeding.  The doctor took no history.  The doctor also saw the patient for hypertension clinic and noted no chest pain.  The blood pressure was 106/84.  Lipids were not addressed. | The doctor failed to take history of the very recent possible GI bleed.  The patient should have been referred for endoscopy.  The doctor also did not assess lipid therapy in a 68-year-old male with multiple cardiovascular risk factors.  Care failed to follow generally accepted guidelines or usual practice. |
| 10/9/2013 | 2, 4 | A provider saw the patient for HTN chronic care clinic.  Blood pressure was 120/68; pulse was 92.  The patient was lightheaded.  The patient was on Vasotec 20 BID, HCTZ 25, 120, ASA.  The provider decreased the verapamil from 120 to 80 mg daily despite the blood pressure being in good control.  This was done because the patient was lightheaded.  The patient was not listed as having high blood lipids despite very high risk and contemporary recommendations for high dose of statin. | The provider failed to assess lipids.  The patient had multiple cardiovascular risks and should have been assessed for lipid disorder.  Because of age and multiple risk factors, the patient likely needed to be on a statin medication, but this was not done.  Care failed to follow generally accepted guidelines or usual practice. |

Patient #10

| | | |
|---|---|---|
| 1/15/2014 | The patient was seen in HTN chronic clinic. The blood pressure was 139/82 which is considered elevated for a diabetic. The doctor assessed good control but didn't increase the medication. Lipids were not addressed. | 2, 3 | The provider assessed good BP control when control was questionable. A reasonable goal is 130/80 or less especially with cardiovascular risk factors. Although the goal is 140/90, consideration of the patient's cardiovascular risks should have been made. The doctor did not assess whether the patient had lipid disorder in a patient at high risk of cardiovascular disease. Blood pressure medication should have been considered to be adjusted and a statin drug should have been started. |
| 1/28/2014 | A doctor wrote a chart note documenting review of labs. The doctor documented "control of hyperlipidemia fair" but did not institute treatment. | 2 | The doctor diagnosed fair lipid control but it is unclear what this meant. The patient probably needed treatment with a statin drug but this was not done. Care failed to follow generally accepted guidelines or usual practice. |

97

PTX193-0864

**PTX193-0865**

Patient #10

| | | |
|---|---|---|
| 5/6/2014 | A PA saw the patient in diabetes chronic clinic. The blood pressure was 140/80. The PA documented that the patient was on Motrin without addressing why. The blood pressure was listed as in good control when it was elevated for a person with diabetes. The PA listed the total cholesterol of 161 and HDL of 41. According to the American Heart Association 10 year risk calculator the patient had a 53% 10 year risk of heart disease or stroke and should have been recommended a high intensity statin drug. The PA did not address lipid treatment apparently not understanding the risk factors of the patient. | 2, 17 | The PA failed to appreciate the cardiovascular risk to the patient. Ibuprofen (Motrin) carries a FDA black box warning for serious cardiovascular thrombotic events. The warning states, "Nonsteroidal anti-inflammatory drugs (NSAIDS) cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal. This risk may occur early in treatment and may increase with duration of use. Ibuprofen is contraindicated in the setting of coronary artery bypass graft (CABG) surgery." A second black box warning is that Ibuprofen can increase risk of serious gastrointestinal (GI) adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal. These events can occur at any time during use and without warning symptoms. Elderly patients and patients with a prior history of peptic ulcer disease and/or GI bleeding are at greater risk for serious GI events." Motrin can also exacerbate hypertension and can cause renal disease and carries a warning to use with caution in persons with hypertension. |
| 12/17/2014 | A doctor renewed Motrin for six months at 800 mg a day without an evaluation. The doctor did not note the Black box warnings or HTN. This was an error. | 17 | Care failed to follow generally accepted guidelines or usual practices. |
| 1/26/2015 | A1c 7.1; cholesterol 190; TG 79; HDL 44; LDL 130; HGB 14.9. | | |
| 2/7/2015 | The patient had an annual physical examination. Colorectal screening was not offered but a digital rectal examination was done, which was guaiac negative. | 7 | The patient should have had colorectal cancer screening consistent with contemporary guidelines. This was especially true since the patient had prior episode of GI bleeding. |

98

Patient #10

| | | |
|---|---|---|
| 4/17/2015 | Diabetes chronic clinic. BP 163/89, weight 203; A1c documented as 7.3. The doctor did not address the elevated blood pressure. The patient was on NPH 20 units and metformin 850 BID. On a different HTN chronic clinic form the HTN was addressed. The doctor documented good hypertension control even though it was not, and fair high blood lipid control even though the patient was no on anti-lipid therapy. The doctor did increase the verapamil from 80 to 120 mg. The patient was also on lisinopril, metformin, NPH insulin, HCTZ, verapamil, aspirin, and 800 mg Motrin once daily. The use of Motrin should not be continuous as it was because of the risk for kidney disease and risk for thrombotic events. The doctor documented the LDL cholesterol as 133 which is high. | 2, 4 | The doctor failed to make an accurate diagnosis of the blood pressure control. The doctor assessed good control when it was poor control; yet medication was increased. This patient had an American Cardiology 10-year risk of heart disease or stroke of 65%. There should have been aggressive treatment of cardiovascular risk factors including addition of a statin drug and the Motrin should have been discontinued. Care failed to follow generally accepted guidelines or usual practice. |
| 4/30/2015 | Sodium 134; A1c 7.3; cholesterol 191; TG 71; HDL 44; LDL 133; HGB 16.3 | | |
| 7/22/2015 | A1c 7.1. | | |
| 8/13/2015 | A provider saw the patient for HTN clinic. The blood pressure was 158/95. A repeat was 146/85. The blood pressure was listed as in good control and blood lipids were listed as in good control. There was no change of medication despite the elevated blood pressure. The A1c was listed as 7.1. The doctor ordered an EKG. The doctor noted that the creatinine was 1.48. The patient was still on Motrin yet the doctor did not identify why the patient was taking this medication and that it might be damaging his kidney. | 2, 4, 6 | The doctor failed to make an accurate diagnosis of the blood pressure control. The doctor assessed good control when it was poor control; medication should have been increased. This patient had an American Cardiology 10-year risk of heart disease or stroke of 65%. There should have been aggressive treatment of cardiovascular risk factors including addition of a statin drug and the Motrin should have been discontinued. Also, the doctor noted an elevated creatinine but did not review use of the Motrin. Care failed to follow generally accepted guidelines or usual practice. |

99

PTX193-0867

Patient #10

8/23/2015   An EKG shows non-specific STT wave changes that could be consistent with ischemia.

6   This EKG could have been consistent with ischemia yet was not documented as reviewed with respect to the patient's clinical picture.

11/22/2015   A1c 6.7.

12/21/2015   A provider saw the patient for a periodic semi-annual diabetic evaluation.  The blood pressure was 151/87.  The doctor did not address the elevated blood pressure.  The doctor renewed Motrin for three months, restricting the patient to 10 tablets a month.

17   Blood pressure medication should have been adjusted.  Same comments as above related to treatment with a statin and use of Motrin.  However, the doctor did decrease the amount of Motrin the patient was given.

2/24/2016   Total cholesterol 172; TG 82; HDL 42; LDL 114.

3/17/2016   Diabetes chronic clinic  BP 163/89, weight 203; A1c documented as 7.3.  The doctor did not address the elevated blood pressure.  The patient was on NPH 20 units and metformin 850 BID.  On a different HTN chronic clinic form the HTN was addressed.  The doctor documented good hypertension control even though it was not, and fair high blood lipid control even though the patient was no on anti-lipid therapy.  The doctor did increase the verapamil from 80 to 120 mg.  The patient was also on lisinopril, metformin, NPH insulin, HCTZ, verapamil,  aspirin, and 800 mg Motrin once daily.  The use of Motrin should not be continuous as it was because of the risk for kidney disease.  The doctor documented the LDL cholesterol as 133 which is high.

4   The blood pressure was adjusted but was done with verapamil.  Since the patient had prior angina, a beta blocker should have been considered.  The doctor did not address lipid risk.  The patient had a 45% 10-year risk of heart disease or stroke based on recent labs.  He should have been on a high intensity statin.  The doctor ordered Motrin when it placed the patient at significant risk of thrombotic events.   Care failed to follow generally accepted guidelines or usual practice.

3/23/2016   Microalbumin/creatinine ration 37 (0-30); A1c 8; cholesterol 175; TG 88; HDL 47; LDL 110.

Patient #10

4/14/2016  A doctor saw the patient for annual diabetic clinic.  The doctor noted that the A1c was 8 but said the lipids were "OK" which they were not.  The blood pressure was 139/88.  The doctor wrote that he discussed statin coverage with the patient who wanted to defer starting.  The doctor wrote that he referred the patient to Dr. Obaisi.  The doctor increased NPH insulin to 26 units HS but did not address the elevated blood pressure.

4       The blood pressure was not considered elevated but because the patient had high cardiovascular risk, medication increase should have been considered.  The doctor did not address lipid risk and treatment, and ordered Motrin when it placed the patient at significant risk.  Care failed to follow generally accepted guidelines or usual practice.

4/15/2016  An EKG shows non-specific STT wave changes that could be consistent with ischemia.  The changes are different from the previous EKG of 8/23/15.

101

PTX193-0868

PTX193-0869

Patient #10

4/15/2016 A doctor saw the patient who complained of waking up feeling nauseous and became cold and clammy and vomited. The doctor noted that an EKG showed sinus tachycardia. [The EKG showed also non-specific STT wave changes that could be consistent with ischemia]. The blood pressure was 112/74, which is low for this patient and the heart rate 92. The doctor took no other history. The doctor's assessment was diabetes R/O coronary event or NSAID gastritis and dehydration. These assessments appeared to be accurate. However, the plan and follow up was below standard of care. The doctor ordered CBC, CMP, troponin, CK-MB, stopped Motrin, and started omeprazole for a week and gave a liter of fluid and gave the patient a dose of NTG. The doctor did not take a history usual for angina. The CBC was drawn and showed hemoglobin of 10.3, which is very low but was never followed up. This was consistent with a GI bleed, as the patient had a prior normal hemoglobin. The patient had a prior normal hemoglobin of 13.7. The CMP, CK-MB, and troponin were not done or were unavailable in the medical record. The doctor also only prescribed a single nitroglycerin tablet but did not order long-term anti-anginal medication. The omeprazole was only ordered for seven days. The doctor did not follow up. Given the high risk of this patient, a possible anginal event should have prompted a stress test or cardiac catheterization.

4/18/2016 An EKG shows resolution of STT wave changes from 4/15/16. This is significant because it supports a suggestion of ischemia. Given the patient's history a stress test or cardiac catheterization were indicated.

14    On this day, especially given the drop in blood pressure, the 10-year risk of heart disease or stroke was 38%. If the blood pressure of 4/14/16 (139/88) was used, the patient had a 10-year risk of heart disease or stroke of 52%. This was a very high risk patient. The doctor failed to take an adequate history for acute coronary syndrome but did acknowledge the possibility. Also, the patient was on long-term Motrin which carries a black box warning for cardiac thrombotic events. Since the EKG was abnormal and suggested ischemia, the patient should either have been referred to a hospital to rule out MI or been placed on regular anti-anginal medication and referred for urgent stress test or angiography. Ordering tropinin levels in a prison is not a good idea because if positive, the prison could not reasonably treat the patient appropriately and the patient's access to hospital care would be delayed. After this lack of referral, subsequent physicians did not order routine cardiology referral, increase anti-anginal drugs, or order stress testing or cardiac catheterization. This patient had multiple risk factors for a cardiac event (smoker, HTN, diabetes, high blood lipids, male sex, age). Care failed to follow generally accepted guidelines or usual practice. This place the patient at risk of cardiac thrombotic event.

Patient #10

| | | |
|---|---|---|
| 4/18/2016 Hemoglobin 10.3. | 6 | There was no evidence in the progress notes of follow up of this significantly abnormal test. |
| | | This significant laboratory finding was not acted on, placing the patient at significant risk. The patient should have been referred for upper endoscopy. Care failed to follow generally accepted guidelines or usual practice. |
| 4/18/2016 A doctor saw the patient for follow up of the dehydration. The blood pressure was 101/61. The patient was able to eat. The doctor took no history typically used for angina. The doctor repeated the EKG but did not comment on it. The EKG was now normal when on the 15th it showed STT changes consistent with ischemia. This reversal of ischemic changes is significant and demonstrates that the patient had ongoing angina. | 1, 7 | The doctor should have obtained a history given the recent event on 4/15/16. The doctor failed to document review of the EKGs in sequence and assess in light of the patient's cardiovascular risks. Because of the reversal of EKG changes, the patient should have been referred for stress testing. Care failed to follow generally accepted guidelines or usual practice. |
| 5/5/2016 The Medical Director saw the patient. The blood pressure was 149/83 and the pulse 98. The doctor did not discuss the recent possible anginal episode. The doctor addressed back pain but took no history, diagnosed chronic back pain, and prescribed 600 mg Motrin twice a day for 60 days despite the elevated blood pressure. The doctor did not discuss the blood pressure or evaluate the recent lab showing a significant drop in hemoglobin. | 1, 2, 3, 7, 17 | The doctor failed to review the abnormal hemoglobin of 10.3. The doctor failed to adjust medication for elevated blood pressure. The doctor failed to assess the patient's recent possible anginal episode in light of the patient's risk factors. The doctor prescribed Motrin despite a possible recent anginal episode and despite the black box warning for risk of thrombotic cardiac events. The patient should have been referred for stress testing. Care failed to follow generally accepted guidelines or usual practice. |
| 7/20/2016 A1c 6.7 | | |
| 8/1/2016 A doctor saw the patient for diabetic clinic. The blood pressure was 135/82 which is not elevated blood pressure for persons with diabetes but is considered possibly elevated for persons with diabetes and cardiovascular disease. The A1c was 6.7. The doctor made no changes to therapy and did not address the blood pressure. | 2, 3 | The doctor should have considered adjustment of blood pressure medication but did not. The doctor should have initiated lipid therapy or discussed with the patient but did not. Same comments as above for statins and Motrin. The abnormal hemoglobin was unnoticed. Care failed to follow generally accepted guidelines or usual practice. |

103

PTX193-0870

PTX193-0871

Patient #10

8/3/2016 Cholesterol 157; TG 99; HDL 42; LDL 95; hemoglobin 12; MCV 71 (80-99);

8/12/2016 A doctor wrote a very brief illegible note.  A nurse took blood pressure of 142/95 but it was not addressed.

2, 3    The blood pressure was elevated but medications were not adjusted.  The doctor did not address lipid risk despite a 36% 10-year risk of heart disease and ordered Motrin when it placed the patient at significant risk.  Same comments as about these issues.  Care failed to follow generally accepted guidelines or usual practice.

9/5/2016 A doctor saw the patient for HTN chronic clinic.  The blood pressure was 150/87 and a retake was 133/83.  The doctor assessed "good" HTN control but the control was questionable.  The doctor made no changes.

2, 3    The blood pressure was initially elevated but medications were not adjusted.  The doctor did not address lipid risk and treatment and ordered Motrin when it placed the patient at significant risk.  Same comments as about  these issues.  Care failed to follow generally accepted guidelines or usual practice.

11/30/2016 A1c 7.

12/6/2016 A doctor saw the patient for diabetic clinic.  The blood pressure was 145/91.  The A1c was 7.  The doctor made not changes and did not adjust the blood pressure medication.

2, 3    The blood pressure was elevated but medications were not adjusted.  The doctor did not address lipid risk and treatment and ordered Motrin when it placed the patient at significant risk.  Same comments as about these issues.  Care failed to follow generally accepted guidelines or usual practice.

1/6/2017 Sodium 134; cholesterol 167; TG 77; HDL 39; LDL 113; hemoglobin 13.7 MCV 72.7 (80-99).

PTX193-0872

Patient #10

| | | |
|---|---|---|
| 1/6/2017 | 4, 17 | A nurse saw the patient for back pain.  The blood pressure was 151/97.  The nurse referred to a doctor who saw the patient the same day.  The doctor addressed the back pain and increased the Motrin at 800 BID without addressing the elevated blood pressure and without recognizing the prior episode of decrease in hemoglobin.  This needed to be considered because both Motrin and aspirin can cause GI bleeding which the patient appeared to have sustained.    The Motrin was prescribed at a high dose 800 mg BID but apparently for two weeks. | The doctor failed to treat elevated blood pressure.  The doctor failed to note the prior abnormal hemoglobin and failed to appreciate black box warnings for Motrin which placed this patient at significant risk.  Care failed to follow generally accepted guidelines or usual practice. |
| 1/10/2017 | 17 | A doctor discontinued the Motrin and started Naprosyn another NSAID at a dose of 500 mg BID.  The patient had received 28 Motrin tablets as a KOP medication on 1/9/17 and received the Naprosyn on 1/23/17 which was when the Motrin would have been completely used up if taken as prescribed.  Nevertheless, giving the patient another NSAID when the patient was on aspirin and had a recent presumed GI bleed was problematic.  The doctor apparently failed to appreciate the Black Box warnings for this drug as well as its effect on hypertension. | The doctor failed to appreciate black box warnings for a NSAID in light of this patient's risk factors.   Care failed to follow generally accepted guidelines or usual practice. |
| 1/13/2017 | | A doctor wrote an illegible note.  A nurse obtained blood pressure was 102/70 and the pulse was 101. | |
| 1/16/2017 | | The inmate was not seen in eye clinic due to lock down. | |
| 1/18/2017 | | The patient was not seen by a nurse because of lock down. | |
| 1/19/2017 | | The patient was not seen by a doctor due to lock down. | |
| 1/26/2017 | | The patient was not seen by a doctor due to lock down. | |

Patient #10

1/31/2017 An annual physical examination was done.  A digital rectal examination included a negative guaiac test.  It appears that this constitutes colorectal cancer screening, which is inadequate screening.

7, 8 The patient should have had colorectal cancer screening consistent with contemporary guidelines.  This was especially true since the patient had prior episode of GI bleeding.  The patient should have had screening for lipid disorder but doctors did not appear to appreciate the patient's risk for heart disease.

2/5/2017 A nurse was asked to emergently assess an inmate but on arrival the inmate was lying face down on the floor.  The patient was unconscious and not breathing.  CPR was started and the patient was sent to a hospital, where he died.  An EKG on this date showed acute ischemia.

2/5/2017 A death certificate documented that an autopsy was done but it wasn't in the record.  The death certificate listed the cause of death as coronary atherosclerosis with gastrointestinal hemorrhage as a secondary cause of death.

2/6/2017 A Death Summary by the Medical Director at Stateville documented that the patient had 90% occlusion of a coronary artery and "limited patchy gastrointestinal hemorrhage."  In a Wexford Mortality Review Worksheet the doctor documented that earlier intervention was not possible and that there was no way to improve care.

106

PTX193-0873

PTX193-0874

Patient #11

3/11/2014 Total cholesterol 176; TG 71; HDL 42; LDL 120; hemoglobin 14.1; MCV 101.1.

4/5/2014 The patient was evaluated in HTN chronic clinic.  The weight was 180.  The blood pressure was 106/69.

3  The patient had a 10-year risk of heart disease or stroke of 16.6% and should have been on a moderate to high intensity statin.

7/3/2014 Total cholesterol 178; TG 136; HDL 35; LDL 116; hemoglobin 14.5; MCV 101.7; platelets 148.

7/10/2014 The patient was evaluated in HTN chronic clinic.  Blood pressure was 120/73.  The weight was 173, a seven pound weight loss over seven months.  This was not addressed.

3  The patient had a 10-year risk of heart disease or stroke of 22% and should have been on a moderate to high intensity statin.

11/11/2014 Total cholesterol 189; TG 117; HDL 38; LDL 128.  CBC was normal.

11/25/2014 The patient was evaluated in HTN chronic clinic.  The weight was 178. Blood pressure was 120/75.

3  The patient had a 10-year risk of heart disease or stroke of 22% and should have been on a moderate to high intensity statin.

2/12/2015 Potassium 3.4; cholesterol 166; TG 107; HDL 36; LDL 109.

5/16/2015 A doctor saw the patient the weight was 171 pounds.

6/3/2015 A doctor saw the patient for a cold.  The weight was 160 pounds.  The pulse was 117.  Neither the 20 pound weight loss nor the tachycardia was addressed.

1, 2, 3  The doctor failed to take adequate history regarding weight loss and did not evaluate adequately for the tachycardia.  The treatment plan should have contained evaluations to determine why the patient had tachycardia and weight loss.

6/12/2015 Potassium 3.4; cholesterol 155; TG 123; HDL 36; LDL 94.

8/24/2015 BMP was normal.

107

Patient #11

| | | |
|---|---|---|
| 10/6/2015 | A doctor saw the patient for dysphagia for solid food. The doctor took no history. The weight was 163 and the patient had lost 17 pounds since 4/5/14. The doctor noted that the patient had a right neck mass. The doctor ordered an antibiotic and follow up in 10 days. | 7, 8 |

Neck mass and dysphagia is consistent with carcinoma which needs to be ruled out before more benign conditions are considered. It wasn't clear what infection the doctor was considering but a simultaneous EGD and/or neck CT were indicated.

| | |
|---|---|
| 10/16/2015 | The doctor saw the patient in follow up. The neck mass was still there and was described as the size of a golf ball. The dysphagia was worse. The doctor noted a 17 pound weight loss over seven months. The doctor ordered an ultrasound with a follow up with the Medical Director in 4-6 weeks. |

Ultrasound is not a preferred test for evaluation of neck mass but was an option. A 4-6 week follow up was too long.

| | |
|---|---|
| 10/20/2015 | An ultrasound showed nodular densities on the right side of neck question of adenopathy or neoplasm. |
| 10/27/2015 | A collegial review approved an ultrasound. This was a low value test for this condition. The patient needed a biopsy. A CT scan would have been reasonable. |
| 10/28/2015 | The Medical Director saw the patient. The only note was "U/S [presumably ultrasound] neck masses R neck, CXR this week." This patient needed a prompt biopsy of the mass. |
| 10/28/2015 | A US of neck was approved for right neck mass with dysphagia. The patient had already had the test. |

| | | |
|---|---|---|
| 10/30/2015 | A chest x-ray showed diffuse emphysema, COPD, tortuous aorta. | 2 |

These abnormalities were not incorporated into the assessment of the patient and were not managed.

| | |
|---|---|
| 11/10/2015 | A collegial review approved a UIC oncology visit. |
| 11/18/2015 | The Medical Director saw the patient. The doctor noted that the patient had a fixed neck mass and assessed throat neoplasm and appeared to order a local ENT consultant. |

PTX193-0875

Patient #11

11/30/2015  A Joliet ENT doctor saw the patient and noted a neck mass and recommended a PET scan, laryngoscopy with biopsy, bronchoscopy, and esophagoscopy.

12/3/2015  The Medical Director saw the patient and noted that the patient returned from a writ. The Medical Director noted that the patient has a tumor on the posterior tongue and was to have endoscopy, laryngoscopy, bronchoscopy, and biopsy.

3  The doctor did not mention a PET scan which had been recommended.

12/8/2015  A collegial review approved a PET scan and laryngoscopy with biopsy.

12/18/2015  The patient returned from a PET scan.  His weight was 154 pounds.  The pulse was 128 but not addressed.

12/18/2015  A PET scan was consistent with malignancy on the right side of the tongue with nodal metastases.

12/22/2015  A doctor saw the patient, who now weighed 151 pounds.  The doctor noted that the PET scan showed metastatic tongue cancer and that the inmate was scheduled for chemotherapy and radiation therapy.

12/30/2015  The patient complained to a nurse that he was coughing up blood.  The pulse was 113.  The nurse referred to a doctor.  The Medical Director saw the patient.  The doctor documented that there was no change in the neck mass, the lungs were clear.  The doctor assessed cough with bloody sputum "once".  The doctor ordered a chest x-ray and prescribed Claritin an antihistamine.

2, 3  Cough with bloody sputum in a patient with head and neck malignancy should prompt concern that there was an open wound in the area of the cancer, but this was not a concern apparently.

1/4/2016  A chest x-ray was reported as "negative study."
1/8/2016  The patient had a laryngoscopy and biopsy.  The heart rate was 107.

1/8/2016  A tongue biopsy showed invasive squamous cell cancer moderately differentiated.

7  It was three months since the patient first had symptoms of a neck mass and dysphagia until the time of diagnosis.  The diagnosis was not timely.

109

PTX193-0876

PTX193-0877

Patient #11

| | | |
|---|---|---|
| 1/13/2016 | The Medical Director saw the patient and noted that the patient had laryngoscopy, bronchoscopy, and EGD. The patient needed follow up with ENT in a week. | |
| 1/21/2016 | ENT consultant on a referral form wrote that the biopsy showed squamous cell carcinoma and needed chemotherapy and radiation therapy with follow up in two months after completion of radiation therapy. | |
| 1/26/2016 | The Medical Director stated that ENT at UIC was approved. The Medical Director had stated on 1/13/16 that the ENT follow up was to occur in a week. | |
| 2/1/2016 | A doctor wrote a note but it was illegible. | |
| 2/4/2016 | The patient went to radiation oncology. They recommended chemoradiation. The PET scan images were requested. Medical oncology was to see the patient on 2/11/16. A 1-2 week follow up was recommended for a simulation. | |
| 2/8/2016 | The Medical Director saw the patient post write at UIC radiation oncology who wanted a PET scan. The patient already had a PET scan on 12/18/15 but apparently it was ordered again. The doctor didn't order follow up. | |
| 2/9/2016 | The PET scan, medical oncology, dental, and radiation oncology appointments were approved at collegial review. | |
| 2/11/2016 | The patient went to radiation oncology and radiation therapy was to start in two weeks at UIC. The doctor ordered a CBC and CMP. | |

11   If the patient had bronchoscopy and EGD, the results were not found.

10   The patient had already seen the ENT doctor but the Medical Director didn't note the therapeutic plan. It was unclear if he understood what the ENT had recommended.

10   The doctor failed to understand the radiation oncology note which asked for the PET scan images since they only had a report. The doctor instead ordered another PET scan.

110

Patient #11

2/16/2016 The Medical Director saw the patient after a writ but didn't
say what the writ was for or what occurred. It wasn't clear
what the treatment plan was.

10, 11 The therapeutic plan and ongoing treatment of the
patient were unclear based on progress notes. It was
not possible to determine from the medical record what
therapy the patient was receiving and when he received
it.

2/16/2016 A CT scan of the neck was approved in collegial.

2/17/2016 Potassium 3.4; cholesterol 130; TG 50; HDL 38; LDL 82;
hemoglobin 12 (13.2-18); platelets 160.

2/22/2016 A nurse wrote that the patient just returned from UIC
radiation oncology. The nurse noted that the patient needed
a CT scan which did not appear accurate. Since there was no
report it wasn't clear what happened.

10, 11 There was no report. The plan was unclear and follow
up didn't occur.

2/22/2016 There was no report but radiation oncology noted that a CT
planning scan was done.

11 There was no report.

2/25/2016 The patient went to head and neck oncology clinic. The
patient had a T2N3M0 stage IVb tongue cancer. Laryngoscopy
was done. The plan was radiation and chemotherapy with
cisplatin. A port was placed. An echocardiogram was
scheduled for 2/29/16. The note documented that radiation
oncology wanted a CT scan to assess a lung lesion. The patient
was to follow up in 2-3 weeks in head and neck oncology and
was to start cisplatin with medical oncology and also receive
radiation therapy.

2/29/2016 The patient went to UIC for an echocardiogram. It wasn't clear
from Stateville doctor's documentation that an
echocardiogram was to be done. The report of the
echocardiogram showed normal LV function and normal EF.

111

PTX193-0878

PTX193-0879

Patient #11

| Date | | Description |
|---|---|---|
| 2/29/2016 | | The Medical Director wrote that the patient needed cardiology clearance for chemotherapy and radiation therapy. An as needed follow up was ordered. It wasn't clear what was occurring, as the doctor did not document what occurred at recent UIC visits. |
| | 10, 11 | The doctor was not reviewing consultation reports and the therapeutic plan was not described. Since there were no formal reports it wasn't clear exactly what the plan was. |
| 3/1/2016 | | A radiation oncologist wrote a brief note stating that Chest CT and pulmonary consult were indicated because there were suspicious LN on CT simulation performed for radiation treatment purposes only. Bronchoscopy was indicated to evaluate these LNs to exclude malignancy, infection, granulomatous disease. |
| | 10, 11 | It was three months since the patient first had symptoms of a neck mass and dysphagia until the time of diagnosis. The diagnosis was not timely. The recommendation for pulmonary and bronchoscopy were not done. There was no evidence of a report. |
| 3/2/2016 | | A staff physician saw the patient and noted that the patient had a Port-a-Cath in his right chest and was getting chemotherapy. This was the first mention that the patient had actually received chemotherapy. It wasn't clear what the therapeutic plan was for the patient. |
| | 10, 11 | Hospital records were unavailable and the doctor didn't know what occurred at the hospital. Follow up of oncology was not being done. They had recommended return if the patient decompensated, which had occurred. |
| 3/7/2016 | | There was no report but the oncology clinic referral form had comments written on the bottom and noted that the patient received cisplatin and would need daily RT M-F for six and a half weeks. They noted that the patient had received radiation the day before. The patient was to return daily for radiation M-F and weekly for chemotherapy. The actual note was not present. |
| | 11 | There was no report. |
| 3/8/2016 | | A nurse documented that the patient went for radiation therapy and was to return the following day for the next dose of radiation. |
| 3/9/2016 | | The patient went for radiation therapy. |

112

Patient #11

| | | | |
|---|---|---|---|
| 3/10/2016 | The patient received another PET scan. The lesion was mildly increased since the last PET scan. Cervical lymph nodes were also mildly increased but there were otherwise no changes from the prior study. | 10, 11 | This was an unnecessary PET scan. The oncologist wanted the PET scan film not a repeat PET scan but the report was not present and the doctor did not correctly review the recommendations on the referral comments. |
| 3/14/2016 | A medical oncologist saw the patient for cisplatin. The recommendation was to encourage fluids and administer an antiemetic for nausea and to return in a week. | | |
| 3/21/2016 | The patient was given radiation therapy. The medical oncologist noted that the patient had mucositis. The radiation oncologist recommended to increase Boost to six times a day with a teaspoon of salt as the patient had lost eight pounds over the past week due to dysphagia. A PEG feeding tube was recommended. The also recommended morphine 10 mg every three hours. They mentioned something illegible about blood pressure medication noting that the BP was normal. | 11 | We couldn't find the prescription as the record was so disorganized. |
| 3/21/2016 | The Medical Director documented that the patient had pain and UIC oncology recommended morphine and to keep on the infirmary. The doctor admitted to the infirmary and started morphine. The doctor had not been monitoring the patient's pain or status other that when told by UIC what to do. | 10 | The doctor was not documenting a careful review of consultants or documenting their complete therapeutic plan but was only documenting certain items. |
| 3/21/2016 | The patient was admitted to the infirmary. He weighed 149 pounds. The patient was on a soft diet and the doctor ordered two additional cans of Boost three times a day. The nurse documented that the patient was having increasing dysphagia and losing weight and was admitted to the infirmary to monitor this. The patient was still on Cardura and dyazide for hypertension. | | |

113

PTX193-0880

PTX193-0881

Patient #11

| | | |
|---|---|---|
| 3/26/2016 | The Medical Director wrote a note. The entirety of the note was "S: no specific complaint  O: no changes  A: oral ca on radiation P: continue same care." This gave no information as to the status or progress of the patient. | 1, 2, 3, The doctor was taking no history, not performing adequate examination, or documenting a plan consistent with one recommended by the consultants. It isn't clear from documentation that the doctor understood the status of the patient. The doctor did not update any of the patient's other medical conditions or monitor for them. |
| 3/28/2016 | The doctor wrote a note stating "S: no specific complaint, O: no changes, A: oral cancer on radiation P: continue same care." This note failed to identify the therapeutic plan or recent consultant recommendations and did not address whether the patient was still in pain. The doctor did not address the mucositis or pain or evaluate the weight or whether the patient could eat. | 1, 2, 3 The doctor was taking no history, not performing adequate examination, or documenting a plan consistent with one recommended by the consultants. It isn't clear from documentation that the doctor understood the status of the patient. |
| 3/30/2016 | The patient asked a nurse for more Boost. The nurse did not refer the patient. | |
| 3/31/2016 | The patient went to radiation. They noted that the patient had difficulty swallowing due to thrush. The patient had lost six pounds. Continued treatment for oral thrush was recommended. Boost was recommended eight times a day and salt water and baking soda mouth wash. Liquid Pepcid or famotidine were recommended for reflux. These recommendations were unnoticed at the prison. | The doctor appeared to be treating ITP. Prednisone is not indicated in thrombocytopenia from cirrhosis. This was incompetence and demonstrated lack of knowledge of primary care by this surgeon. The diagnosis and treatment were therefore inappropriate and placed the patient at risk. |
| 3/31/2016 | UIC recommended in a letter to Stateville that an x-ray of his knee should be taken as the patient complained of knee pain. | |
| 4/4/2016 | The patient wasn't able to get chemotherapy due to low platelets of 67. He did receive normal saline presumably due to dehydration. There was no report but this information was on the referral form. | |

114

PTX193-0882

Patient #11

| | | |
|---|---|---|
| 4/5/2016 | The doctor wrote that the patient was at UIC hospital under oncology care but it wasn't clear what was happening to the patient. The doctor did not review UIC notes or document understanding what the status of the patient was. The doctor hadn't seen the patient since 3/28/16. | 1, 10 | The patient failed to review prior UIC recommendations or note the updated status of the patient. The UIC recommendation for a knee x-ray wasn't noted. The doctor didn't appear to prescribe additional Boost and MARs did not show that the patient received additional nutritional supplement. |
| 4/8/2016 | The patient returned from the hospital and a nurse documented that the patient received a G-tube. On admission to the infirmary the nurse noted that the patient had failure to thrive. The patient was still on six cartons of Boost a day instead of the eight recommended. The hospital note was not located. | 11 | The report was not available and it wasn't clear what occurred at the hospital. |
| 4/8/2016 | A nurse documented that the patient insisted on feeding himself through his G-tube. He was angry and accused the Medical Director of "putting him in the condition he is in now. He stated the MD ignored him 6 years ago." | | |
| 4/11/2016 | The patient was seen in oncology clinic. The patient was dehydrated and hypotensive with WBC 1.2 and ANC of 0.7. The recommendation was to watch for petechial rash and take neutropenic precautions by separation from general population. The patient was to shower daily and give saltwater and baking soda mouth wash for mouth soreness. | | |

115

Patient #11

4/11/2016 The Medical Director documented seeing the patient at 4:00 pm, although based on hospital notes it appeared that the patient was at the hospital from 4/11/16 to 4/12/16. The doctor documented that the patient had difficulty swallowing and was on a liquid diet by the oncologist. The doctor didn't obtain the weight or document understanding of the nutritional status or caloric intake of the patient. The only examination was documented as "no change." The plan was "continue same care." It appeared that the doctor documented the wrong date.

The doctor appeared to document a note when the patient was hospitalized.

4/12/2016 The patient returned from the hospital for hypotension. It was noted that the patient's blood pressure was 78/50. The patient was found to have gout of the right toe and was started on a tapering prednisone dose. Fluconazole was started for the thrush.

4/18/2016 The Medical Director noted that the patient left for radiation therapy. The examination was documented as "no changes." The plan was "continue same care." The doctor failed to see the patient since his hospitalization for hypotension and gout and did not acknowledge the mucositis.

10   The doctor failed to review the recent hospitalization failing to note that the patient was treated for gout, hypotension and had thrush. The doctor was ignorant of the patient's status.

4/21/2016 The oncologist wrote on a referral form that the patient received IV hydration with magnesium and that a CT/PET scan needed repeating in three months. A month follow up was requested. A report of this visit was present in the record.

4/25/2016 The Medical Director note stated "S:no complaint  O: no change  A: Ca throat on chemo  P: continue same care."  He did not note the recent oncology note or document the plan.

10   The doctor failed to review the consultation notes and failed to note the current status of the patient.  He also failed to update the patient's ongoing medical conditions.

116

PTX193-0883

Patient #11

4/29/2016 A staff physician saw the patient for chest pain and feels acid reflux in his throat. The doctor continued Pepcid, added metoclopramide and advised the patient to take smaller portions of liquid when feeding. It wasn't clear if the patient continued to feed himself.

5/2/2016 The Medical Director note stated "S:no complaint O: no change A: Ca throat on chemo P: continue same care."   **1,2,3**   The Medical Director documented no knowledge or recognition of the patient's status and did not document evaluation of the patient.

5/9/2016 The MD note stated "S: no specific complaint O: no change A: throat ca P: continue same care."   **1,2,3**   The Medical Director documented no knowledge or recognition of the patient's status.

5/16/2016 The doctor wrote a note stating "S: requests medical shower O no change A: throat ca P: medical shower 3x a week x 3 months."   **1,2,3**   The Medical Director documented no knowledge or recognition of the patient's status.

5/19/2016 A radiation oncologist wrote comments on a referral form stating that Boost needed to continue and the patient needed a restaging CT PET scan in two months and should follow up with medical oncology. Massage of the neck was recommended post radiation.

5/23/2016 The doctor documented that the patient had no specific complaint but then wrote "discomfort neck post radiation UIC - massage." The examination stated "no acute findings" and the doctor ordered PT to massage the neck once a week.

6/1/2016 A staff doctor noted that the patient was waiting for re-staging. The patient had less dysphonia and dysarthria.

6/6/2016 The Medical Director wrote "S:no specific complaint O: no change A: throat ca on radiation chemo P: continue same care." There was no monitoring of weight or ability to eat, the gout, or any of the patient's other problems.   **1, 2, 3**   The doctor failed to address any of the patient's chronic conditions, took no history, failed to document examination, and failed to establish a plan of care.

117

PTX193-0884

Patient #11

| | | |
|---|---|---|
| 6/13/2016 | The Medical Director wrote that the patient still had dysphagia and had burning in the chest. The examination was documented as "no change." The doctor ordered Carafate suspension. | 1,2,3 |
| 6/20/2016 | The doctor documented that the patient was feeling better but that the swelling in the anterior upper neck was less and the patient was able to swallow better. There was no examination except to state "no change" and the plan was "continue same care." | 1,2,3 |
| 6/27/2016 | The doctor noted that the patient was swallowing better but needed more viscous lidocaine. The examination was documented as "no change." The doctor ordered viscous lidocaine. | 1,2,3 |
| 7/5/2016 | The doctor noted that the patient's feeding tube was partly clogged. The examination was "no acute findings" and the plan was to irrigate the feeding tube as needed. | |
| 7/5/2016 | Albumin 2.8 BUN 15 creatinine 0.8. | |
| 7/6/2016 | WBC 3.2; HGB 9.2; MCV 104. | |
| 7/10/2016 | A nurse wrote that the patient couldn't breathe and was audibly wheezing. The nurse called a doctor who ordered prednisone and albuterol without evaluation. The respiratory rate was 20; P 88; BP 146/87 and oxygen saturation 97%. | |
| 7/12/2016 | The doctor wrote "S: no specific complaints O: no change A: post radiation tongue ca P: continue same care." | 1,2,6 |
| | The doctor failed to address any of the patient's chronic conditions, took no history, failed to document examination, and failed to establish a plan of care. Abnormal labs were not addressed. The doctor even failed to address the patient's difficulty breathing that occurred two days previous. The doctor failed to mention that the patient was on prednisone and albuterol. | |

The doctor failed to update any of the patient's other problems.

The doctor failed to update any of the patient's other problems.

The doctor failed to update any of the patient's other problems.

PTX193-0885

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 119 of 431 PageID #:12317

Patient #11

| Date / Event | # | Analysis |
|---|---|---|
| 7/25/2016 The doctor wrote the patient had "same cough + SOB." The only examination was the statement "lung breath sounds diminished." The doctor ordered a nebulizer and albuterol BID. | 1,2,3,8 | The doctor took no history, performed no examination, and the plan of a nebulizer was based on no clear diagnosis. The doctor ordered no labs or x-rays but should have. |
| 7/27/2016 At 4:30 pm the patient complained to a nurse that he was having trouble breathing and was coughing and having trouble getting sputum up. The doctor was notified who ordered a DuoNeb. | 2, 3 | The doctor was treating the patient based on no specific diagnosis. The assessment was therefore uncertain and the treatment plan was apparently a guess. |
| 7/27/2016 At 8:00 pm the patient complained that he couldn't breathe. The oxygen saturation was 99%, BP 133/88, P 113, and respirations 26. The Medical Director was notified and ordered DuoNeb therapy. Stat labs were ordered but it wasn't clear what labs were done. | 1, 2, 3 | There was no history, the doctor did not examine the patient and the plan was made without a diagnosis. |
| 7/27/2016 At 10:50 pm a nurse documented labs as glucose 108; BUN 17; HGB 10.9. | | |
| 7/27/2016 Lab results from St Joseph Medical Center showed WBC 4.3; HGB 10.9; MCV 100; platelets 123; but there was no hospital report. | | |
| 7/28/2016 The Medical Director documented that the patient returned from ENT and a PET scan was recommended for three months. | 10, 11 | There was no evidence of an ENT consultation. There were labs from the St Joseph Medical Center but we could not locate an ENT consultation. Reports were not available. |
| 7/31/2016 At 1:30 am the patient complained that he couldn't breathe. The BP was 126/94; P 120 R 22 and O2 sat 98%. The nurse received a phone order for Rocephin. | 1,2,3 | The doctor was ordering parenteral antibiotics without taking a history, performing an examination, making a diagnosis. This was an inappropriate way to make a therapeutic plan. |
| 7/31/2016 At 3:10 am the patient was short of breath. The temperature was 99.3; P 125; R 22; BP 121/66 and oxygen saturation 98%. The doctor ordered Vistaril. | 3 | Vistaril is not a medication for shortness of breath. |

PTX193-0886

PTX193-0887

Patient #11

7/31/2016 At 5:30 am a nurse documented vitals of temperature 99; P 113; BP 143/90; oxygen saturation 94%. Based on these vitals the doctor ordered the patient to be sent to a hospital.

| | |
|---|---|
| 11 | There was no report from the hospital and it wasn't clear what happened. |

8/5/2016 The patient returned from the hospital. It wasn't clear what occurred.

| | |
|---|---|
| 1 | The history was so poor it wasn't clear that the treatment plan was appropriate. The doctor as usual did not address any of the other problems of the patient. |

8/5/2016 A doctor wrote an infirmary admission note. The doctor noted that the patient was treated for pneumonia but didn't document any other detail of what occurred in the hospital.

| | |
|---|---|
| 1, 2, 3 | The history was inadequate. The doctor didn't evaluate any of the patient's other problems and the therapeutic plan only addressed the morphine. |

8/8/2016 A doctor noted that the patient was requesting to stop morphine as it didn't agree with him. The examination was "no change." The doctor started Vicodin. The doctor didn't take history or assess the patient's pain or ask why he didn't want the morphine.

| | |
|---|---|
| 1, 2, 3 | The history, physical examination, assessment, and plan were inadequate as the doctor did not address any of the patient's main problems. |

8/15/2016 A doctor wrote that the patient wanted renewal of Tums. The examination was "no change" and the plan was to order Tums two tabs three times a day as needed for six months. There was no other history, physical examination, assessment, or documentation of a therapeutic plan for his problems

8/16/2016 Sodium 134; albumin 3.

| | |
|---|---|
| 1, 2, 3 | The history, physical examination, assessment and plan were inadequate as the doctor did not address any of the patient's main problems. |

8/22/2016 A doctor noted that the throat pain was worse and that Norco was not relieving the pain. The patient was requesting morphine. The doctor ordered morphine. The only examination was "no change."

| | |
|---|---|
| 1, 2, 3 | The doctor again failed to take history, perform examinations, or make assessments based on the patient's problems. |

8/29/2016 The doctors note was identical to the 6/6/16 note.

Patient #11

| | | |
|---|---|---|
| 9/6/2016 | The doctor wrote that the patient had no specific complaint except dandruff. The doctor noted that the PET scan showed no sign of recurrence. The only examination was "no acute finding." The plan was to order tar shampoo. | 1, 2, 3, 11 | The PET scan report wasn't found in the medical record. The doctor failed to take history, perform examinations, or document the therapeutic plan of the patient. |
| 9/13/2016 | The doctor's note was identical to the 6/6/16 note. | 1, 2, 3 | The doctor again failed to take history, perform examinations, or make assessments based on the patient's problems. |
| 9/19/2016 | The doctor's note was identical to the 6/6/16 note. | 1, 2, 3 | The doctor again failed to take history, perform examinations, or make assessments based on the patient's problems. |
| 9/25/2016 | The doctor's note was identical to the 6/6/16 note. | 1, 2, 3 | The doctor again failed to take history, perform examinations, or make assessments based on the patient's problems. |
| 9/27/2016 | The doctor wrote that the patient had a leak around the feeding tube. The examination was "small amount of leak." The assessment was that the doctor was to address the G-tube leak after the PET scan on 9/29/16. What was unusual is that the doctor wrote on 9/6/16, only 23 days earlier, that the PET scan showed no recurrence. This wasn't clear and there were no reports in the record. | 1, 2, 3 | Aside from assessing the G-tube, the doctor took no history and performed no other examination. The doctor made no assessments of the patient's main problems. The doctor did not assess the nutritional status of the patient. |
| 9/28/2016 | The patient was found non-responsive on the toilet. He was unresponsive and CPR was started and he was transferred to a hospital taken by local paramedics. The patient expired at the hospital. | | |

121

PTX193-0888

PTX193-0889

Patient #11

9/28/2016 The coroner's certificate of death on 9/28/16 listing the cause of death as hypertensive cardiovascular disease.

While the patient had hypertension, an echocardiogram was normal less than a year before the patient's death. It seems extremely unlikely to have a normal echocardiogram and yet die of hypertensive cardiovascular disease. Notably, the coroner made no mention of the head and neck cancer.

Patient #12

8/11/2015  The patient was incarcerated at Graham CC.  The reception history documented Huntington's disease and hepatitis C.  The weight was 203 pounds.  The physical examination did not explain the Huntington's disease or hepatitis C.  The rectal exam was refused.  All exam boxes were checked normal.  The plan was illegible.

8/18/2015  An intake physical examination was done.  The PA documented hepatitis C, but did not document a history of Huntington's disease as documented on the history.  Some of the assessment was illegible.

6/13/2016  The patient was at WCC.

7/22/2016  AST 90 (10-40); alt 77 (10-50); calcium 9.2; sodium 138.

7/28/2016  The patient was at Western and there was a note documenting that the patient was scheduled with medical oncology at UIC and the patient would transfer to Stateville NRC for appointments.

7/28/2016  There was a note at WCC that the patient was being transferred to NRC for a UIC oncology appointment.

8/2/2016  The patient transferred from WCC to NRC on writ status.

8/4/2016  Comments from oncology on the referral form stated that the patient had hyperkalemia, HCC, and HCV.  The patient was given kayexalate with directions to NRC to manage the hyperkalemia.  It was recommended to get a triple phase CT scan, with a follow up in two weeks.  The potassium was 5.5.  The oncologist prescribed 15 gram of kayexalate rectal suppository for two days with recommendation to repeat the BMP in two days.

11     There was a gap of a year in the medical record.

11     There was no consult report.

123

PTX193-0890

PTX193-0891

Patient #12

8/5/2016   A doctor at NRC documented that the patient was there for a writ to go to UIC oncology.  The problems listed included hepatitis C, hyperkalemia, and dry eyes.  The doctor noted that he would check with manager to clarify recommendation with Barbara at UIC.  The doctor asked the unit manager to follow up with UIC to clarify the next steps of management.

10, 11   There was no consultation report.  This led to not knowing the therapeutic plan.

8/23/2016  Wexford UM wrote an approval that a surgical appointment on 8/4/16 and oncology FU on 8/11/16 were rescheduled to 8/30/16.  A requested referral was not yet received.  This means that Wexford obtains the referral after the appointment is scheduled.

8/29/2016  Wexford approved a CT scan and follow up oncology visit. The referral was still not received by Wexford UM.  This was very late, as the oncologist requested a two week follow up and the CT scan had yet to be done.

12   The recommended CT scan was not timely performed.

8/30/2016  The CT chest and pelvis were done, showing hepatocellular carcinoma.

9/1/2016   A doctor saw the patient post-UIC writ.  The doctor documented that the patient had a CT scan.  The doctor noted that the report was to follow.  The doctor noted no follow up date on the consult with oncology.

10, 11   There was no report and the doctor didn't know the follow up date.  Follow up after the consultation was not informed.

9/8/2016   EKG normal sinus rhythm.

9/12/2016  The patient was admitted to the hospital for two days and discharged on 9/13/16.  hepatic angiogram was done and lipidol and chemotherapy was administered in the hepatic artery for hepatocellular carcinoma.  They recommended CMP drawn on 9/15/16 and faxed to coordinator at clinic and to start calcium carbonate.  A PA wrote an order for waist chains and leg irons during movement.

Patient #12

9/14/2016 A doctor noted that the patient returned from the hospital post embolization. The patient told the doctor he would need blood tests but the doctor didn't know what these were. The doctor didn't have prior IDOC medical records or the report from the recent UIC hospitalization and asked the unit manager for these.

10 ,11 Records were unavailable from UIC. This resulted in not knowing the therapeutic plan and failing to follow up on recommendations from UIC.

9/19/2016 Calcium 7.9; sodium 136; potassium 4.6. No LFTs done.

9/21/2016 Wexford approved a request for interventional radiology for FU of TACE.

9/21/2016 Wexford approved a CT abdomen.

9/22/2016 The patient returned from UIC post chemoembolization.

9/22/2016 The patient went to radiology. A note on the referral form recommended comfort measures with a two month follow up. There was no report. A one year prognosis was given. The diagnosis was hepatocellular carcinoma.

9/23/2016 A doctor noted that the patient returned from UIC. The patient told the doctor he had six months to live. The doctor did not document what had occurred to the patient at UIC. The doctor noted a repeat CT scan was needed in two months.

11 Records from UIC were unavailable. The doctor did not know the status of the patient.

9/26/2016 Calcium 8.5 (8.6-10.6); PTH 14 (12-88); Vit D 17 (20-80).

9/30/2016 A doctor noted that the patient had recent chemoembolization at UIC and was seen for an abnormal lab-a low vitamin D level. The doctor noted that the patient had a liver tumor and had recent chemoembolization. The doctor started calcium carbonate, vitamin D, and repeated a PTH, BMP, and vitamin D in three weeks.

PTX193-0892

3:17-cv-03112-JES-JEH  # 263-10   Page 270 of 577

PTX193-0893

Patient #12

| | | |
|---|---|---|
| 10/5/2016 | The patient went to liver clinic.  There were a few brief lines on the referral form.  Further treatment was pending a discussion with oncology.  The report documented that the patient had compensated cirrhosis.  They recommended continuing with embolization and if the disease worsened to consider hospice.  They recommended return to clinic if hepatic decompensation occurred.  Waist chains and leg irons were ordered for movement. | 11 | The report was not available only comments on the referral form.  It is not clear anyone was aware of these recommendations. |
| 10/7/2016 | A doctor noted that the patient was seen by GI at UIC and has FU pending with oncology.  The doctor noted that the patient had advanced HCC/ cirrhosis.  The doctor did not assess any labs or note what the plan was at UIC. | 11 | The doctor did not document review of the report. |
| 10/11/2016 | The patient went to radiology.  There were a few brief lines on the referral form.  A two month follow up was recommended.  A procedure was recommended in 45 days.  They recommended a CMP.  There was a oncology note in the record that summarized the patient care.  It said that HCC was found January 11, 2016 found on ultrasound screening.  A CT scan was done on 2/26/16 noting cirrhosis and 3 cm hypodense lesion in the lateral lobe; an MRI 3/23/16 showing a large infiltrative mass of the L lobe ; in April 2016 the AFP was elevated; and a CT guided biopsy was done not until 5/24/16 and a PET scan was done 5/26/16.  The patient wasn't seen at UIC until 8/4/16 and the patient didn't have treatment of the HCC until 9/12/16.  The note documented that the CT guided biopsy results from 5/24/16 were requested multiple times but not received. | 12 | The oncology note documents that HCC was identified in January of 2016 but treatment wasn't given until September of 2016, a nine month delay.  Repeated requests for biopsy results were not heeded.  This was a significant delay in access to necessary care.  Also, it is not clear what occurred at the Western facility and whether there was delay there as well. |

126

PTX193-0894

Patient #12

10/21/2016 Glucose 115; Calcium 8.5; albumin 2.5; alk phosphatase 186 (40-125); AST 126 (10-40); ALT 58 (10-50); platelets 112

11/12/2016 WBC nl platelets 181; glucose 102; creatinine 0.6; sodium 133; potassium 4.4.; albumin 2.8; AST 89; ALT 40; alk phos 214; bilirubin 1.6; calcium 8.2.

11/13/2016 A CMT wrote a note that Provena St Joseph's Lab called with stat lab results. When the call was returned  no personnel in the labs were present to take the call.

11/14/2016 CT abdomen done.  Liver tumor invasion of vein was worsened.  Leg irons and waist chains were ordered for movement.  The CT scan showed cirrhosis with infiltrative tumor on the left lobe with tumor thrombosis, hepatic and retroperitoneal adenopathy.  This was consistent with hepatocellular carcinoma.

11/15/2016 A PA wrote the  patient went to UIC on 11/14/16.  The PA noted a fluid wave and noted labs including albumin 2.8; alk phos 214; bilirubin 1.6; sodium 133 and potassium 4.4.  The PA ordered 40 mg of Lasix for 30 days and Aldactone 50 mg daily for a month. The patient had an MRI but results were pending.  The PA wrote she would try to get an earlier GI appointment than the 12/10/16 appointment.  Lasix 40 and spironolactone 50 were ordered for 30 days.  The PA failed to know that consultants at UIC had noted that on 8/4/16 the patient needed kayexalate for hyperkalemia.  Spironolactone exacerbates hyperkalemia and when used the manufacturer recommends monitoring potassium, which was not done.

10, 11, 17     The patient apparently had a CT scan not an MRI.  The PA did not have the CT results and didn't know that the patient went for a CT not an MRI.  The lack of reports caused confusion and created an unsafe condition of practice.  The PA started spironolactone in a patient with prior recent hyperkalemia without establishing monitoring parameters.

Patient #12

| | | |
|---|---|---|
| 11/21/2016 | A PA followed up with the patient. The MRI results were still pending. The patient had lost five pounds. The PA documented that the patient had abdominal ascites and peripheral edema. The PA said that patient had end-stage hepatic coma but the PA didn't perform a mental status exam and didn't note that the patient had encephalopathy. The PA requested the MRI result and noted that GI FU was pending. | 2, 11 | The PA diagnosed hepatic coma but the patient did not have evidence for encephalopathy or coma. The failure to receive reports continued. The PA believed that the patient had an MRI when the patient had a CT scan. |
| 11/30/2016 | A MAR for November documents that the patient received a two week supply of KOP meds on November 30, 2016. A nurse documented that a new order was needed for these meds. | 17 | The medication renewal process didn't work and the patient's medication stopped in mid December and wasn't started again until 1/8/17, about 3-4 weeks later. |
| 1/8/2017 | A nurse wrote an infirmary admission note documented that the patient complained that he couldn't breathe and for that reason was apparently admitted to the infirmary. There was no provider notes. There was a telephone order for Lasix 40 and spironolactone 50 daily. | | The patient couldn't breathe and should have been seen by a provider. The patient had significant ascites on 11/21/16 but hadn't been seen in over six weeks. Care was grossly and flagrantly unacceptable. |
| 1/9/2017 | BUN 36; sodium 130; potassium 5.4; albumin 2.5; bilirubin 3.7; alk phos 696; AST 305; ALT 173; WBC 13.7 platelets 202. | 6 | These labs did not appear to be reviewed based on progress notes. |
| 1/9/2017 | A doctor admission to the infirmary noted that the patient had increased abdominal girth and shortness of breath and was on Lasix and spironolactone but that this medication expired about four weeks ago. The doctor ordered a CBC, CMP, chest x-ray, and asked for the oncology notes from the last visit which were still not present. The doctor increased the spironolactone to 100 mg daily. | 11, 19 | Reports were not present. The patient had been lost to follow up for six weeks and missed critical medication for 3-4 weeks resulting in exacerbation of ascites. |
| 1/10/2017 | A nurse documented the doctor as saying that he would arrange to pull the fluid out [presumably ascites]. | | |

128

PTX193-0895

PTX193-0896

Patient #12

1/11/2017 A nurse documented that the patient had "gross" edema of both legs. The nurse called a PA who saw the patient, diagnosed decompensated liver disease and liver coma and sent the patient to St. Joseph Hospital. Although the patient said he couldn't breathe the vital signs were normal. The patient did have ascites. There is a St. Joseph hospital prescription on a patient information form indicating that the patient was in the hospital on 1/11/17.

1/11/2017 A PA evaluated the patient but did not review labs from 1/9/17. The PA sent the patient to the hospital for paracentesis.

1/14/2017 The patient was discharged from the hospital. The discharge summary was not available but the discharge instructions noted that the patient had ascites, hyponatremia, and liver cancer with instructions to follow up at UIC ASAP for paracentesis.

1/14/2017 A nurse admitted the patient to the infirmary post hospitalization.

1/15/2017 A nurse called Boswell pharmacy twice for Aldactone which was apparently unavailable.

1/16/2017 The doctor noted that the patient had paracentesis at the hospital. The doctor referred the patient for repeat paracentesis. The oncology records were still not present. The recent hospital records were also unavailable. The doctor ordered spironolactone to 50 mg daily and titrate as needed. Aside from getting a paracentesis the doctor did not know what had occurred at the hospital. The doctor ordered a CMP on 1/18/17. The doctor documented that the patient would probably need repeat paracentesis. The status of the HCC was unknown.

11    A hospital report was not available.

11    UIC records were still not present and providers did not know recommendations for care. The hospital records were also unavailable so the status of the patient wasn't known.

129

Patient #12

1/17/2017 A chest x-ray showed an elevated diaphragm consistent with ascites.

1/17/2017 An incident report documented transferring the patient to the hospital.

1/18/2017 BUN 32; sodium 130; calcium 8.2; albumin 2.3; bilirubin 3.3; alk phos 472; AST 165; ALT 119.

1/19/2017 A doctor noted that the abdominal girth was 44 inches. The patient had 2+ edema. The doctor documented that the records were still pending and that the patient had a history of HCC but the plan wasn't apparently known. The doctor didn't know what had occurred at the hospital.

| | |
|---|---|
| | 10, 11 |

Hospital records were unavailable and the doctor didn't know what occurred at the hospital. Follow up of oncology was not being done. They had recommended return if the patient decompensated, which had occurred.

1/20/2017 There is a gap in progress notes from 1/20/17 until 2/15/17. Labs, MARs, prescriptions were present but there were no progress notes.

| | |
|---|---|
| | 11 |

The absence of a record was significant. It is unclear what happened to this patient and it appeared that he was ignored for a month although this is unverifiable. It wasn't clear if the patient was evaluated by providers over this time period.

2/1/2017 Lactulose was started but it wasn't clear who ordered it or why. To date the patient did not have evidence, documented in the record of hepatic encephalopathy. Ciprofloxacin, lactulose, Levaquin and 60 mg of Lasix were ordered by phone order but there was no note.

| | |
|---|---|
| | 19 |

It appeared that the patient was treated for infection by phone without physician evaluation. The lack of medical records was significant.

2/2/2017 A referral form was present signed 2/2/17 for UIC emergency room for paracentesis.

2/10/2017 BUN 149; potassium 6.9; sodium 127; creatinine 3.88; CO2 17; anion gap 12; albumin 12; bilirubin 8.1; alk phos 397; AST 173; ALT 158; WBC 15.9; hemoglobin 12.2; platelets 133; INR 1.9.

| | |
|---|---|
| | 6, 17 |

2/11/2017 Glucose 33; creatinine 4; sodium 125; potassium 6.6.

2/12/2017 Glucose 44; BUN 138; creatinine 3.9; sodium 124; potassium 6.8.

| | |
|---|---|
| | 6 |

The patient was in hepatorenal syndrome and the diuretic should have been adjusted. The potassium was critical and should have been addressed.

130

PTX193-0897

PTX193-0898

Patient #12

| Date | Description | Ref |
|---|---|---|
| 2/14/2017 | Glucose 47; BUN 157; potassium 6; sodium 130; creatinine 4.18. | 6 |
| | The patient was in hepatorenal syndrome and the diuretic should have been adjusted. The potassium was critical and should have been addressed. | |
| 2/15/2017 | The patient signed an agreement to participate in the Hospice Program. | |
| 2/17/2017 | Glucose 95; BUN 164; potassium 3.9; sodium 128; creatinine 3.8; calcium 8.2; albumin 2.2; bilirubin 6.5; alk phos 304; AST 199; ALT 145. | 6 |
| | The labs were significantly abnormal but there was no evidence of review. | |
| 2/20/2017 | Hemoglobin 11.4; glucose 64; creatinine 3.2; sodium 123; potassium 2.8; calcium 7.8; WBC 12.6; hemoglobin 11.4; platelets 22. | 6 |
| 2/20/2017 | A doctor saw the patient. This was the first visit since 1/19/17, a month ago despite the patient having a life threatening condition. The doctor failed to take any history or give an update of the status. The only history was "no specific complaint." The only examination was to note that the patient had greater abdominal girth and petechiae on the skin. The assessment was hepatic cancer with metastases. The only plan was "continue same care" without specifying what the care was. The patient's plan was unknown. | 1, 2, 3 |
| | The doctor failed to take adequate history, failed to adequately evaluate or diagnose the patient's condition and failed to develop a proper therapeutic plan. The patient was in hospice but the doctor did not address any comfort issues with the patient. Care was indifferent. | |
| 2/20/2017 | A nurse documented receiving a call from St Joseph hospital for a lab result. Platelets were 22,000 and WBC 12.6. The nurse notified Dr. Obaisi who ordered depomedrol 80 mg IM stat and prednisone 60 mg daily for three days by phone order. | 2, 17 |
| | The doctor appeared to be treating ITP. Prednisone is not indicated in thrombocytopenia from cirrhosis. This was incompetence and demonstrated lack of knowledge of primary care by this surgeon. The diagnosis and treatment were therefore inappropriate and placed the patient at risk. | |
| 2/25/2017 | A doctor ordered to measure the sacral wound weekly and to clean the sacral wound with saline and apply wet to dry dressings. | |
| 2/26/2017 | A doctor ordered a stat dose of Lasix by phone. | |

PTX193-0899

Patient #12

2/27/2017  A death certificate documented the cause of death as liver cancer.  An autopsy was performed.  The secondary cause of death was cirrhosis.

2/28/2017  A Wexford Mortality Review worksheet documented cholangiocarcinoma as the cause of death but it appears to have been hepatocellular carcinoma from his hepatitis C.  The form documented that earlier intervention was not possible.

Patient #13

7/9/2010 The problem list included alcohol and tobacco abuse, stage II hypertension, and stage IV chronic renal disease.

This patient had chronic kidney disease at a very young age. It wasn't clear why he had kidney disease.

5/8/2014 PTH 576 (12-88)

6/6/2014 BUN 55 Creatinine 14.58; ferritin 355; phosphorous 8; hemoglobin 11.4; PTH 648

Treatment goal for phosphate is 3.5-5.5; calcium < 9.5; and PTH less that 2-9 times the upper limit of the lab. However, PTH levels >400 have a higher risk of bone turnover disorders (osteitis fibrosa and mixed uremic osteodystrophy). African Americans may be more vulnerable to bone disease at lower PTH levels. For the UIC lab the normal limits are 12-88, so the goal would be < 792. Dialysis patients with a phosphate > 5.2 have a 1.34 greater mortality risk.

7/3/2014 PTH 500.

7/3/2014 BUN 55; creatinine 13.5; ferritin 359; cholesterol 116; TG 65; HDL 42; LDL 61; phosphorous 5.3; hemoglobin 10.2; MCV 105.9, hepatitis BsAg negative.

7/4/2014 Hepatitis C negative, hep B Ab +

7/21/2014 HTN clinic; BP 159/98. The doctor documented fair control but did not adjust medication.

3     The patients blood pressure was elevated but not treated. Given that the patient had end-stage renal disease this was not competent care. Care failed to follow generally accepted guidelines or usual practice.

7/31/2014 A nephrologist wrote a few brief lines on a referral form and recommended increasing labetalol to 400 mg BID. The blood pressure was not documented.

8/7/2014 PTH 949; BUN 61; creatinine 14.87; ferritin 311; hemoglobin 11.8.

3     The PTH and BUN were both high, indicating possibly insufficient dialysis time. This apparently was not checked.

133

PTX193-0900

Patient #13

8/20/2014 A nephrologist wrote a few brief lines on a referral form and recommended changing sessipor to 60 mg daily and obtaining a fistulogram.

9/4/2014 BUN 61; creatinine 14.79; ferritin 343; phosphorous 6.7; hemoglobin 11.8; MCV 106.3; PTH 963 (12-88)

3  The phosphorous and PTH were high indicating possibly insufficient dialysis time. This apparently was not checked.

9/8/2014 Wexford approval of fistulogram.

9/18/2014 A nurse documented the patient going out on writ. The blood pressure was 168/100. Later the same day a nurse documented blood pressure of 171/109. No referral was made.

16  The nurse should have consulted a physician.

9/19/2014 The patient obtained a fistulogram.

9/22/2014 A doctor saw the 38 year old patient in follow up of the fistulogram. The blood pressure was 175/108. The doctor noted that the fistulogram was working. The doctor did not address the elevated blood pressure.

3  The doctor failed to address the elevated blood pressure.

9/24/2014 The patient transferred from Graham to Stateville. The patient had hypertension and was on dialysis.

9/24/2014 A nurse took a phone order for kayexalate 15 gm Wednesday and Sunday for three months.

9/25/2014 A prescription for kayexalate and four other medications was not signed or noted as a phone order.

10/8/2014 Apparently a nephrologist wrote a brief note stating will adjust BP meds if not improved by next visit.

10/29/2014 BUN 52; potassium 5.4; creatinine 13.07; calcium 11; hemoglobin 10.6; MCV 101.6

11/4/2014 A doctor noted that the patient returned from UIC. The patient told the doctor he had six months to live. The doctor did not document what had occurred to the patient at UIC. The doctor noted a repeat CT scan was needed in two months.

2  The assessment of good control of blood lipids without evaluation of the lipids is inappropriate and not based on objective findings.

PTX193-0901

Patient #13

11/9/2014 Apparently a nephrologist wrote he would recheck the patient next visit. The documented blood pressure appeared to be 152/88.

3    The BP medication was not adjusted.

11/19/2014 B12 577 (180-914); folate 11.9 (>5.8); potassium 5.5

12/4/2014 Apparently a nephrologist documented that the patient had hyperkalemia. The nephrologist recommended kayexalate as needed but did not adjust blood pressure medication.

1/15/2015 BUN 19; creatinine 5.2.

3/18/2015 BUN 46; potassium 7.1; creatinine 13.04; hemoglobin 11.3; MCV 106.8;

6, 19    The BUN should have prompted concern for inadequate dialysis time. The elevated potassium was at a critical level as levels above 7 can cause cardiac conduction abnormalities, cardiac arrhythmias, including sinus arrest, idioventricular arrhythmias, ventricular fibrillation and asystole all of which can cause death. There was no evidence in the record that someone evaluated the patient for this. Typically, an EKG is done and prompt treatment initiated. Care was grossly and flagrantly unacceptable.

PTX193-0902

Patient #13

3/26/2015 HTN clinic; the BP was 135/88; the patient had a 2/6 diastolic murmur. The doctor assessed good control for both blood pressure and lipids and continued the same medications. The provider did not discuss in the history whether the patient was receiving medication. It appeared that the patient was only receiving 64% of his medication.

1, 7   The patient had a murmur and should have had an echocardiogram ordered. For persons on dialysis, it is recommended by UpToDate consultants that blood pressure be maintained to a goal of 130/80. The pressure was not at a good goal for a dialysis patient and medication should have been adjusted. Also, examination of the MAR showed that the patient was not receiving his medication timely and had only received approximately 64% of his medication from December through April of the current time period. Yet the doctor was not obtaining this history from the patient. Care failed to follow generally accepted guidelines or usual practice.

4/2/2015 Apparently a nephrologist wrote that the blood pressure was 157/104. The doctor increased lisinopril to 40 mg and increased clonidine to 0.3 mg and recommended referral to UIC vascular surgeon to evaluate a pseudoaneurysm.

4/22/2015 Wexford approved a vascular surgery evaluation at UIC.

5/22/2015 Apparently a nephrologist saw the patient. The BP was 183/103. The consultant noted that the patient was out of blood pressure medication and therefore did not change dosages.

17   The patient had not been receiving his medication and the nephrologist should have brought this up with prison nurses and doctors to address.

6/3/2015 A RN received a call from UIC lab about a critical potassium of 6.7. This lab was not in the medical record.

6, 19   The potassium was a critical level but no one addressed it. This is systemic failure and care was grossly and flagrantly unacceptable, as the program should have a system to respond to hyperkalemia given the dialysis population.

136

PTX193-0903

**PTX193-0904**

Patient #13

| | |
|---|---|
| 7/8/2015 | A RN received a call from UIC lab about a critical potassium of 7.2. The nurse informed the Medical Director. There were no orders. This lab was not in the medical record. |
| | The potassium was a critical level but no one addressed it. This is systemic failure and care was grossly and flagrantly unacceptable as the program should have a system to respond to hyperkalemia given the dialysis population.  **6, 19** |
| 7/17/2015 | Apparently a nephrologist saw the patient. The blood pressure was not noted. Kayexalate was recommended once a week. |
| | The nephrologist was the first doctor to address the high potassium that occurred repeatedly recently. |
| 8/19/2015 | The patient returned from a writ. The blood pressure was 169/96. The nurse noted that the patient had a medical director appointment on 8/24/16. Nothing was done to address the increased blood pressure. |
| | The nurse should have consulted a physician.  **16** |
| 8/19/2015 | Vascular surgery saw the patient at UIC over four months after referral. The blood pressure was 164/94. The surgeon said that no intervention was indicated. The vascular surgeon noted that there was a 4/6 murmur radiating to the neck that warranted further work up. |
| 8/22/2015 | A dialysis nurse took a phone order from a nephrologist for kayexalate 15 gm Wednesday and Sunday for six months. |
| 8/24/2015 | The Medical Director saw the patient for a post-writ visit. The doctor noted that the patient went to UIC access clinic which indicated no need for revision of the shunt. There was no other history. The examination was "no change" the assessment was "post med writ" and the plan was "FU prn." The doctor did not address the elevated blood pressure of 168/103. The doctor also failed to note the surgeon's recommendation to evaluate the murmur. |
| | This is indifferent care to have elevated blood pressure but not address it. Care failed to follow generally accepted guidelines or usual practice.  **3** |
| 9/1/2015 | Collegial review approved an echocardiogram. |
| 9/2/2015 | Wexford approved an echocardiogram. |

PTX193-0905

Patient #13

9/2/2015  Wexford denied a cardiology visit to evaluate the murmur but approved an echocardiogram. This presumed that there was someone at Stateville who could evaluate a murmur. When the echocardiogram was completed no one at Stateville documented reviewing its results.

9/4/2015  UIC lab reported BUN 62; potassium 6.6 creatinine 13.09, albumin 3.8; alk phos 139; Ferritin 923; transferrin 186 (200-400); cholesterol 111; TG 114; HDL 39; LDL 49, hemoglobin 10.6.

6, 19  The BUN should have prompted concern for inadequate dialysis time. The elevated potassium was also high and should have been promptly evaluated. It appears that no one did anything about these lab results. Prompt provider evaluation should have occurred.

9/10/2015  Apparently a nephrologist saw the patient. Blood pressure was 155/97 and potassium 6.6. The doctor did not address the elevated BP documenting that the patient just took clonidine. The nephrologist stopped kayexalate and started a different medication.

3  The blood pressure had been elevated for over a year and the potassium was high, there was no apparent consideration or documentation of dialysis time or adjustment of blood pressure medication. The dialysis record was not available so it is difficult to determine the nephrologist's thinking.

10/10/2015  A doctor saw the patient who complained of not feeling good. The blood pressure was 148/88 and oxygen saturation was 88%. A recheck of BP was 150/96. The only history pertinent to his complaint was that the patient was in no acute distress and that the patient had difficulty breathing. The lungs were clear. The assessment was "dyspnea [with] HTN + dialysis". The patient was sent to the health care unit but there were no further notes indicating that the patient was examined in the health unit.

2, 14  The patient had significant findings with hypoxemia, shortness of breath. The patient needed to have a diagnosis made, should have had an x-ray, and should have had further evaluation including with laboratory testing. Yet there is no evidence in the record that the patient was evaluated. The patient should probably have been sent to a hospital. Care failed to follow generally accepted guidelines or usual practice.

Patient #13

| 10/28/2015 | At 4:00 am a nurse noted that UIC lab called about a critical 8.5 potassium level. The nurse took no action except that the am nurses would follow up with the doctor. At 1:30 pm the same day a nurse documented that a doctor was notified about the critical lab. The nurse documented that the patient would follow up in following morning. This lab was not in the medical record. | 6, 19 | A potassium of 8.5 is life threatening and required immediate attention yet it was treated as a routine. There was no evidence that this test was evaluated. Care was grossly and flagrantly unacceptable. |
|---|---|---|---|
| 10/28/2015 | Apparently a nephrologist saw the patient. The BP was 168/95. The doctor did not address the elevated blood pressure. | 3 | The doctor did not adjust blood pressure medication or apparently ordered increased dialysis time. |
| 11/6/2015 | At 3:00 am a nurse noted that UIC lab called about a critical potassium of 7.6. The dialysis nurse notified the am nurse to follow up. | 6, 19 | The potassium was a critical level but no one addressed it. This is systemic failure and care was grossly and flagrantly unacceptable as the program should have a system to respond to hyperkalemia given the dialysis population. |
| 11/27/2015 | Apparently a nephrologist saw the patient. The BP was 150/84. The potassium was 5.9 and the doctor increased kayexalate. The doctor did not address the elevated blood pressure. | 3 | The doctor did not adjust blood pressure medication or apparently ordered increased dialysis time. |

139

PTX193-0906

Patient #13

12/1/2015  A nurse evaluated the patient for non-specific discomfort. The blood pressure was 143/89. The nurse called a doctor who ordered a stat only dose of atenolol. The patient had shortness of breath, lightheadedness, tachycardia (126), weakness and diaphoresis. An EKG was done but there was no documentation of the results. Notably the EKG is not an automated machine so it has no interpretation and the nurse, being unable to evaluate the EKG could not inform the doctor of the results. One EKG showed a rate of about 145 with non specific STT wave changes. T waves appeared peaked. The patient should have been sent to a hospital to evaluate for acute coronary syndrome.

14  Ordering a stat dose of atenolol under these circumstances is incompetent. The patient should have been admitted to a hospital for evaluation. A stat potassium should have been obtained. The T wave did appear peaked which may have been consistent with hyperkalemia. The patient had Care was grossly and flagrantly unacceptable.

1/3/2016  Apparently a nephrologist saw the patient.  The BP was 170/107 and potassium 5.8.  The doctor increased labetalol to 400 mg BID.  And gave a stat dose of clonidine.

1/9/2016  A medical staff [unclear if this was a nurse or doctor] documented an evaluation.  The patient was brought to the clinic at 1:50 am by the dialysis nurse with nausea, vomiting profuse sweating and abnormal vital signs including P 96; oxygen saturation 90; BP 178/105.  The temperature was 94.6, which is hypothermia.  The BP increased to 189/113.  The patient was monitored for several hours, given Tums, and eventually the BP came down to 161/98 and the patient was sent to his housing unit. If this was a nurse evaluation a doctor was not called.  The nurse gave the patient his am medication apparently about 1:30 am.

14,16  It seems inappropriate to conduct dialysis at 1:30 am when breakfast is only a couple hours later.  It wasn't clear if this note was from a doctor or a nurse.  In either case, the patient had vomiting, diaphoresis, hypothermia and significantly elevated blood pressure. These signs are consistent with sepsis or possibly acute coronary syndrome which should have been ruled out. The patient should have had stat laboratory tests and an EKG but instead nothing was done except to give him TUMS. The patient should have been sent to a hospital. It appears that dialysis is being done in the early morning.   Care was grossly and flagrantly unacceptable.

PTX193-0907

PTX193-0908

Patient #13

1/14/2016  The patient received the echocardiogram requested more than four months previously. The echocardiogram showed mild to moderate increased left ventricle, elevated left atrial and ventricular end diastolic pressures, EF of 60-65%, diastolic dysfunction, severely dilated left atrium, moderately dilated right atrium, elevated pulmonary artery pressure,

This echocardiogram was not timely. This is not a difficult test to obtain. The echocardiogram showed significant hypertensive heart disease.

1/18/2016  The Medical Director saw the patient. This note was brief stating "post echocardiogram at UIC, report pending, no complaint O no acute findings A post med writ P FU prn." The blood pressure was 178/113 but not addressed by the doctor. The doctor did not evaluate the results of the echocardiogram and, based on notes, no one ever reviewed these results.

3, 10  The doctor failed to review the echocardiogram results which were abnormal and showed significant hypertensive heart disease. The doctor also failed to modify blood pressure medication despite significantly elevated blood pressure. Care failed to follow generally accepted guidelines or usual practice.

2/4/2016  Apparently the nephrologist saw the patient. The BP was 178/82. The nephrologist recommended a vascular surgery visit. Blood pressure was not addressed.

3  The doctor failed to modify medication for elevated blood pressure. The dialysis sessions may have needed to be longer.

2/9/2016  The Medical Director noted that Wexford approved an appointment with the UIC fistula clinic.

2/21/2016  At 10:15 am nurse saw the patient for a cold. The temperature was 101.9 and the BP 160/102. The nurse documented "to UC for eval" but it wasn't clear what this meant.

141

PTX193-0909

Patient #13

| | | |
|---|---|---|
| 2/21/2016 | At 10:30 pm a nurse noted that the patient felt nauseous and he had chills. The temperature was 101.4 and BP 170/95. The patient said he was sent up from sick call for increased temperature and blood pressure. The nurse notified a doctor and received orders for Tylenol, Compazine and to monitor the temperature for two days. There was no evidence of monitoring. There was no follow up. | 1, 2, 3, 19 | The patient had fever, elevated blood pressure, and nausea. There was inadequate history. At a minimum, the patient should have been placed on the infirmary for an ASAP chest x-ray and blood work. Instead, the doctor only gave the patient something to reduce nausea. The patient should have been examined in person but was not. Care failed to follow generally accepted guidelines or usual practice. |
| 3/8/2016 | Apparently a nephrologist saw the patient. The potassium was 6.2; BP 198/102. The doctor made no change to BP medication. | 3 | The doctor failed to modify medication for elevated blood pressure. The dialysis sessions may have been needed to be longer. |
| 3/22/2016 | A RN saw the patient in his cell and the inmate complained of shortness of breath. The BP was 160/86 and pulse 114 with respiratory rate 28-32. A CMT escorted the inmate to the health unit in a wheelchair. | | |
| 3/22/2016 | A nurse saw the patient at 10:35 am. The inmate was wheezing with pulse 116; R 32 and BP 160/80. Within two minutes the patient collapsed and CPR was initiated. Within 15 minutes paramedics arrived and the patient was intubated and transferred to a hospital. | | |
| 3/22/2016 | The Wexford Mortality Review Worksheet documented that earlier intervention was not possible, there was no way to improve medical care, and the medical response could not be improved. | | |
| 3/23/2016 | A death certificate lists the cause of death as hypertensive heart disease. An autopsy was done. The anatomic diagnoses were concentric LV hypertrophy, cystic granular kidneys, pulmonary edema, and cerebral edema. The cause of death was hypertensive heart disease. | | |

Patient #13

| | | |
|---|---|---|
| 3/22/2018 | A review of the MARs for five months from December 2014 through April 2015 for hypertension medication only revealed that the patient received only 3/5 monthly packets of Labetalol; 5/5 packets of lisinopril; 3/5 packets of nifedipine; 2/5 packets of Furosemide and 3/5 packets of hydralazine. The total % received was 16/25 packets or 64% of his medication. | 17 | The patient was not receiving medication as ordered. No one was monitoring this. |

143

PTX193-0910

PTX193-0911

Patient #14

| | | |
|---|---|---|
| 1/11/2013 | The Medical Director documented that the patient had a gran mal seizure and hadn't had one in several months. The doctor sent the patient back to his cell house and ordered serum dilantin and Tegretol levels next week. No follow up was ordered. | 10 | The doctor should have ordered follow up after a seizure. |
| 3/2/2013 | The patient had a seizure. The BP was 162/98. The nurse sent the patient to the ER but there was no evidence that the patient was seen in the ER. | | |
| 4/2/2013 | A PA noted that the patient had a seizure. The PA ordered dilantin and Tegretol levels and referral to the doctor's clinic. | | |
| 4/11/2013 | Annual seizure clinic. The patient said he had seizures once a month. The patient also described repetitive stereotypical behavior. The patient was on Dilantin 200 BID and Tegretol 600 BID watch take. The doctor documented that the patient had absence seizures and complex partial seizures. The doctor documented that the anticonvulsant levels were therapeutic. The doctor documented poor seizure control but the doctor made no changes. This patient should have been referred to a neurologist. The doctor also saw the patient for HTN clinic. The patient wanted to go off statin medication. The blood pressure was 136/97 with a repeat blood pressure of 130/100 but the doctor made no change of blood pressure medication and stopped the statin. The doctor documented that the patient didn't want to change his blood pressure medication at this time. | 12 | Drug levels were not in the medical record. The patient had three seizures over the past three months. There was no evidence that the patient had ever had brain imaging or an EEG. There was also no evidence that the patient was ever evaluated by a neurologist. The patient had poor seizure control but was not referred. Care failed to follow generally accepted guidelines as the patient should have been referred to a neurologist. |
| 4/11/2013 | Cholesterol 152; HDL 40; LDL 95. | | |
| 4/17/2013 | The patient had an unwitnessed seizure. The doctor was notified and the patient sent to his cell house. | 8 | Therapeutic drug levels should have been ordered. |
| 5/29/2013 | The patient had a seizure. The LPN took no action; did not notify a doctor and sent the patient back to his housing unit. | 8 | Therapeutic drug levels should have been ordered. |

144

Patient #14

6/6/2013 The patient had a seizure and was evaluated by a CMT. The CMT referred the patient to a doctor since the patient had three seizures since 4/11/13. No provider evaluated the patient.

16   The CMT should have consulted a doctor.

6/7/2013 A doctor ordered a dilantin and Tegretol level but did not see the patient.

6/29/2013 A doctor saw the patient for follow up of seizures. The doctor noted that the patient had uncontrolled seizures. The doctor noted that the patient had therapeutic blood levels. The doctor added Keppra 500 BID. The blood pressure was 162/101 but the doctor noted that the patient hadn't taken his medication yet so he made no changes.

1   The history failed to contain mention of medication monitoring. Notably, drug levels were not in the medical record. The patient was not monitored for side effects of his medications.

8/6/2013 A doctor saw the patient for seizure clinic and noted that the patient didn't have a seizure for two months and kept the patient on the same medication.

9/26/2013 A nurse saw a patient after a seizure. The BP was 151/100. The nurse called a doctor who ordered a next day follow up. The next day instead of seeing a doctor an LPN saw the patient and documented that the patient would follow up with a provider on 10/3/13 and therapeutic drug levels would be drawn.

1, 3, 15   The history was inadequate and failed to address the seizure and therefore there was no follow up of this. The patient's recent seizures were not addressed by the physician; therapeutic drug levels should have been drawn. The recent elevation of blood pressure wasn't addressed.

10/3/2013 The Medical Director saw the patient but didn't address the seizures. He addressed a leg discrepancy and ordered a shoe lift.

11/20/2013 The inmate had a seizure and was seen by a CMT who encouraged the patient to increase his fluid intake and would schedule the patient for a 11/25/13 visit.

16   The referral to a provider never occurred.

11/27/2013 A PA saw the patient for shoulder pain but did not address the seizure disorder.

Patient #14

| | | |
|---|---|---|
| 12/3/2013 | The patient had a seizure.  The blood pressure was 166/95 and pulse 103.  A doctor was notified but the patient was sent back to his housing unit. | 8 | The doctor should have ordered a therapeutic drug level |
| 12/5/2013 | The patient had a seizure.  The note was extremely brief.  It stated, "Presents to HCU for follow up s/p seizure.  Has been on Keppra, Tegretol + Dilantin.  Hadn't had a seizure in a few months but he had a couple since then."  That was the extent of the evaluation.  There was no review of therapeutic drug levels, no examination, and no order of drug levels. | 2, 6, 8 | The doctor failed to make an adequate assessment after a seizure.  There was no evaluation of prior drug levels and the doctor didn't order drug levels after a seizure. |
| 12/11/2013 | A doctor wrote a note without seeing the patient reminding a nurse apparently to check drug levels for follow up in seizure clinic. | | |
| 12/26/2013 | The patient had a seizure.  A CMT referred the patient to the HCU where a nurse saw the patient.  The nurse did not consult a physician. | 16 | The nurse should have consulted a physician. |
| 12/31/2013 | A nurse completed a seizure clinic database.  The blood pressure was 140/100.  The nurse noted that the patient was on Dilantin 200 BID, Tegretol 600 BID, and Keppra 500 BID.  The nurse apparently ordered a repeat dilantin level and ordered follow up in 2-3 weeks.  There did not appear to be consultation with a physician.  A doctor apparently signed the note but a nurse appeared to write the note.  The nurse or doctor did not document seizure frequency or compliance with medication or describe a history of when the seizures occurred or what may have precipitated the seizures.  There was another note on the same day for HTN clinic.  The BP was elevated but the doctor took no action to adjust medication or to note compliance except to state that medication compliance was reviewed.  The doctor did note that the dilantin was subtherapeutic but took no action.  A repeat Dilantin level was ordered with follow up in 2-3 weeks. | 11 | It appeared that the nurse was completing a seizure clinic note instead of a doctor.  This constituted performing out of the scope of one's license. |

146

PTX193-0913

PTX193-0914

Patient #14

2/14/2014 A doctor wrote that the patient said he hadn't had a seizure for "a good while." The blood pressure was 140/98. The doctor increased the lisinopril to 30 mg daily.

4/24/2014 The patient was seen in HTN clinic. The blood pressure was 129/91 and 103/79. The doctor made no changes. The doctor noted that the last seizure was four months ago. The patient was on Dilantin, Keppra and Tegretol. No change was made. The doctor didn't document drug levels.

5/18/2014 A nurse documented that the patient was brought to the health unit after a seizure. The blood pressure was 226/109 and the pulse 121. The patient was confused. The nurse notified a doctor but no actions were taken. A half hour later the blood pressure had decreased to 132/84 with pulse 105. The patient was discharged to his housing clinic.

8    Drug levels should have been obtained. Old levels should have been reviewed.

5/19/2014 A nurse saw the patient. The blood pressure was 150/86. No action was taken.

6/18/2014 The patient had a seizure and was seen by an LPN. The nurse took no action.

16   The nurse should have consulted a physician.

7/4/2014 The patient apparently had a seizure. A nurse saw the patient and documented BP of 151/90 and 148/87. The Medical Director was notified and sent back to his housing unit.

8    Drug levels should have been obtained. Old levels should have been reviewed.

8/7/2014 A doctor saw the patient in HTN clinic. The blood pressure was 126/76. The doctor noted that the Dilantin level was 7.7 on 7/10 and 8.2 on 7/28. The Tegretol was 5.2. The doctor noted that the last seizure was between 3-12 months ago even though the patient had at least two seizures since 6/18/14. The doctor increased Dilantin to 300 mg BID.

Patient #14

| | | |
|---|---|---|
| 9/22/2014 | A doctor saw the patient and noted that the patient said Dilantin 300 mg was too much as he was groggy and uncoordinated, so the patient decreased the dosage to 200 BID. The doctor did not examine for nystagmus or ataxia and decrease the Dilantin to 100 BID then 100 daily and then discontinue. The doctor noted that the Dilantin had been subtherapeutic since 7/4/14. | |
| 11/21/2014 | A nurse saw the patient for post seizure. The blood pressure was 158/90. The patient refused to go to the HCU. The Medical Director was notified. | 8 | Drug levels should have been obtained. Old levels should have been reviewed. |
| 11/29/2014 | A doctor saw the patient and noted that the patient had a seizure two weeks ago. The doctor documented "coindental discontinuation dilantin." The doctor continued the Keppra and Tegretol but did not obtain drug levels and wrote "no need to adjust meds." | |
| 1/15/2015 | The Medical Director saw the patient. The blood pressure was 158/85. The doctor saw the patient for a leg discrepancy and ordered an x-ray of the pelvis, lumbar spine, and left knee but did not address the elevated blood pressure or epilepsy. | |
| 1/22/2015 | Wexford approved an orthopedic appointment. | |
| 2/2/2015 | A CMT saw the patient post seizure. The CMT was told by the patient that he had a seizure a month ago. The CMT noted that the last Dilantin level was 8.2 but the patient was no longer on Dilantin. The CMT did not consult a physician but noted that the patient was scheduled to see the Medical Director on 2/3/15 and ordered a Dilantin level for 2/2/15. | 16 | The nurse should have consulted a physician. |

PTX193-0915

Patient #14

| | | |
|---|---|---|
| 2/3/2015 | The Medical Director saw the patient and noted that the patient had his hip x-ray which showed severe degenerative arthritis of the left hip and an old subcapital fracture. The entire examination was documented as "no change." The doctor told the patient that he was scheduled for orthopedic clinic. The doctor did not address the seizure disorder. | 2, |
| | The x-ray showed severe arthritis with an old fracture yet the doctor failed to properly examine the patient | |
| 2/3/2015 | A doctor saw the patient in seizure clinic. The patient was noted to have a seizure the day before. The doctor took no other history. The drug levels were not checked. The doctor did order a Tegretol level and noted that the patient was on Keppra 500 am and 1000 hs. The patient was also evaluated for HTN. The BP was 121/78. The doctor made no changes. | 1,6 |
| | The doctor failed to take an adequate history including review of prior therapeutic drug levels. | |
| 2/21/2015 | The patient experienced a seizure. The BP was 194/92. The patient has several superficial lacerations to the neck, R cheek and chin. The Medical Director was called and he prescribed 50 mg of atenolol stat and sent the patient back to his housing unit. | 2, 3 |
| | The patient had elevated blood pressure after a seizure which typically occurs. The doctor treated this with a single dose of atenolol which was inappropriate. If the doctor had waited until the post-ictal state resolved no treatment probably would be indicated. If the blood pressure remained elevated, long term medication adjustment would be indicated not a stat dose of medication. This doctor was a surgeon who did not appear to know how to treat this problem. | |
| 3/17/2015 | A nurse saw the patient for dizziness and lightheadedness. The blood pressure was 160/92. No action was taken. | 16 |
| | The nurse should have consulted a physician. | |
| 4/26/2015 | The patient was seen post seizure. The blood pressure was 210/99. The Medical Director was called and prescribed clonidine0.2 mg with his hs medication. It was 8:25 pm. The nurse documented that the patient would be seen by the Medical Director on 5/4/15 but this visit never occurred. | 2, 3, 10 |
| | Stat medication for post-ictal high blood pressure is not indicated. The patient should have been re-evaluated after the post-icatal state resolved. There was also failure to follow up. | |

149

PTX193-0916

PTX193-0917

Patient #14

5/21/2015 A doctor wrote an extremely brief note. The blood pressure was 150/83. The doctor increased the Procardia to 60 mg a day with follow up in HTN clinic. There was no history, no history of medication compliance, and no examination other than vital signs.

7/28/2015 Wexford approved a CT of the hip.

8/5/2015 The Medical Director saw the patient post writ and noted that a CT scan of the L hip was recommended. The doctor took no history, there was no examination and no documented plan. 10 Consultant recommendations were not followed up.

8/6/2015 Cholesterol 217; HDL 35; LDL 154.

8/20/2015 A doctor saw the patient in HTN clinic. The patient was on Procardia 60, aspirin, Zocor 20, HCTZ, and lisinopril. The BP was 141/91 but no changes were taken. With respect to seizures, the history was that the last seizure was 2 months ago. Tegretol level was noted to be 9.3. The doctor ordered tapering Tegretol to discontinue. The doctor noted that the patient was responding to Keppra. 3 The patient's 10-year risk of heart disease or stroke was 26%. He should have been on a moderate to high dose statin. He should have been on 40 mg of Zocor. His blood pressure medication should probably have been adjusted.

8/23/2015 A nurse saw the patient post seizure. The BP was 199/101 and pulse 109. The nurse called a doctor who ordered a single dose of Keppra. 3 A single dose of Keppra after a seizure is incompetent care.

9/3/2015 A doctor saw the patient and noted that the patient had a seizure three days after his Tegretol was decreased. The patient was on a Tegretol taper and was currently on 100 mg of Tegretol BID. Despite the recent seizure, the plan was to continue the planned taper of Tegretol with a physician follow up the following week. That visit didn't occur. 3, 10 The plan of tapering Tegretol appeared to have resulted in a seizure. Scheduled follow up did not occur.

Patient #14

| | |
|---|---|
| 9/15/2015 | A doctor noted that the inmate had "erratic mental status change" attributed to seizures. He was found on the floor unconscious. The doctor noted that the patient developed seizures five years ago. The doctor noted that there had been no formal diagnosis by a neurologist. The doctor noted that most seizures were unwitnessed and no one had reported generalized tonic clonic movements. The patient was disoriented and had an expressive aphasia but no repetitive motor movements. The doctor had a differential diagnosis of R/O organic causes, dementia, or schizophrenia. The doctor ordered blood cultures x 3, CBC, CMP, folate, RPR, TSH, ESR, ANA, Tegretol level, urine drug screen, and mental health referral and then discharged the patient with a month follow up. There was no follow up of these labs and these lab results were not found in the medical record. It did not appear that the patient received the blood tests. |
| | |
| 9/22/2015 | BUN 32; sodium 130; calcium 8.2; albumin 2.3; bilirubin 3.3; alk phos 472; AST 165; ALT 119. |
| 9/22/2015 | A CT of the hip was done. There was chronic deformity of the femoral head and neck with superimposed severe osteoarthritis which was thought to be due to a developmental etiology (slipped capital femoral epiphysis) vs acquired trauma. |
| | |
| 9/28/2015 | A doctor noted that the CT scan results were not in the medical record. The doctor took no action. |
| | |
| 9/30/2015 | A CMT saw the patient post seizure. The blood pressure was 180/120 with pulse of 122. A nurse documented receiving orders but it wasn't clear what these orders were. |

| | |
|---|---|
| 8, 10 | A different doctor saw the patient and wanted to re-evaluate the patient's apparent seizures. Ordered laboratory tests were not done and ordered follow up did not occur. |
| | |
| 10, 11 | A report was unavailable. The result was not followed up. Based on the x-ray report the patient probably needed evaluation for hip replacement but this did not appear to occur. |

PTX193-0918

PTX193-0919

Patient #14

| Date | Note | # |
|---|---|---|
| 10/10/2015 | A nurse saw the patient post seizure. The nurse noted that the inmate had an appointment with the Medical Director on 10/12/15. No consultation was made and no further action occurred. | 16 | The nurse should have consulted a physician. |
| 10/11/2015 | The patient had another seizure. The nurse noted that the patient had an appointment the next day with the Medical Director. | 16 | The nurse should have consulted a physician. |
| 10/12/2015 | The Medical Director saw the patient. The patient had BP of 104/69. The doctor noted that the patient was having repeated epileptic seizures ever since Tegretol was stopped. The only documented examination was "no change." The patient agreed to an increase of Keppra, which was increased to 1500 mg BID for six months with a one month clinic follow up. | 2 | The doctor failed to examine the patient. We view a comment "no change" as no examination. |
| 10/15/2015 | A doctor saw the patient and noted that the patient had no new seizure events. The doctor continued Keppra. | | |
| 11/12/2015 | The Medical Director noted that the Keppra was controlling the seizures. The patient signed a release of information to obtain the CT scan result. The doctor took no action. | | |
| 11/17/2015 | The Medical Director noted that ortho clinic was approved by collegial review. | | |
| 11/18/2015 | The patient had another seizure. The Medical Director was notified and a next day FU with the Medical Director was scheduled. | 16 | The nurse should have consulted a physician. |
| 11/18/2015 | Wexford approved an orthopedic appointment. | | |
| 11/19/2015 | The Medical Director saw the patient and documented "sustained epileptic seizure yesterday." The doctor performed no examination, drew no therapeutic drug level, and increased the Keppra to 2000 pm 1500 am. | 2, 8 | The doctor performed no examination and did not obtain therapeutic drug levels despite raising the medication. Therapeutic levels should have been reviewed. |
| 11/20/2015 | The patient had another seizure. The pulse was 115 and BP 154/81. The nurse notified a doctor, who took no action. | 8 | Therapeutic drug levels should have been ordered. |

152

Patient #14

11/25/2015  The Medical Director saw the patient post medical writ.  The blood pressure was 98/61.  The patient had gone to orthopedic clinic but the doctor did not document what occurred at the ortho clinic.  The doctor did not address the seizure disorder.

12/16/2015  An orthopedic surgeon saw the patient.  The consultant wanted medical clearance before surgery could be done to replace his hip.

12/24/2015  Wexford approved surgery for L hip joint replacement.

1/4/2016  LFT's normal CBC normal; carbamazepine <2

1/8/2016  The patient presented to the health care unit after a seizure.  A doctor ordered Ativan stat.  The blood pressure was 170/98 but not addressed.  A doctor saw the patient, who was described by the doctor as delirious, incoherent, and disoriented.  The blood pressure was retaken and was 150/90 with pulse of 120.  The doctor ordered that the patient remain in the ER until the heart rate and blood pressure normalized.  A doctor saw the patient later.  The BP was 114/70 and the pulse 130.  The inmate was oriented and coherent.  The doctor released the patient with a follow up with the Medical Director on Monday.

1/29/2016  An x-ray showed very advanced degenerative arthritis with marked loss of joint space.

1/30/2016  A LPN went to the cell house for a report of the inmate having a seizure.  The patient was alert and oriented.  An RN didn't evaluate the patient and the LPN took no history.  The LPN noted that the patient was oriented and asked staff to contact the HCU if the patient had any issues.

16    The nurse should have consulted a physician.

153

**PTX193-0920**

PTX193-0921

Patient #14

| 2/2/2016 | Seizure annual clinic. The patient was on Keppra 1500 mg am and 2000 mg pm. The doctor noted that the patient had been on 3.5 gram of Keppra per day since Nov 2015 with occasional breakthrough seizures. The doctor documented 2-3 urgent care episodes since the last visit, presumably for seizures. The only examination was to state that the patient walked with a crutch and "neuro intact," whatever that meant. The doctor noted that the patient had monthly seizures "but so far not compromising ADL." The doctor noted that the Keppra was "supramaximal dose-will adjust and monitor." The idea is to not compromise. At this point, referral to a neurologist would be appropriate as the patient had continued seizures, did not have a clear seizure type documented, and was unable to be controlled. Despite monthly seizures, the doctor reduced the Keppra to 3 grams a day and return in two weeks. | 12 | The doctor should have referred to a consultant, as the doctors were unable to control his seizures. |

| 2/11/2016 | A doctor saw the patient after the patient had a seizure after Keppra was reduced. The BP was 128/89. The patient was noted to be stable after medication changed. The patient needed clearance for upcoming hip surgery and the doctor said he would talk to the medical director about this. |

| 2/11/2016 | The Medical Director noted the patient was approved for hip joint replacement. |

| 3/5/2016 | The patient was brought to the health unit post seizure. The BP was 154/85 and pulse 121. Ativan 2 mg IM and Dilantin 300 mg was given stat by phone order. The patient was initially confused but after 30 minutes the patient was oriented and sent back to his housing unit. | 8 | Therapeutic drug levels should have been ordered. |

PTX193-0922

Patient #14

3/10/2016 The Medical Director saw the patient for shoulder pain. The only examination was "abduction 90 degrees only," the assessment was "seizure DID L shoulder." The plan was to schedule the patient for a steroid injection next week.

3/28/2016 A PA wrote a note that the patient was scheduled for a shoulder injection on 3/16/16, but that appointment didn't happen due to time constraints and was rescheduled for 3/21, which didn't happen and was rescheduled for 3/20/16.

3/29/2016 CMP normal; total cholesterol 178; TG 182; HDL 31; LDL 111.

3/30/2016 A doctor performed a shoulder injection.

4/4/2016 At 4:30 am a nurse saw the patient for left chest pain "like my muscle down there is sore." The blood pressure was 170/102. An EKG was done and the Medical Director was notified. The Medical Director ordered clonidine 0.2 mg stat, NTG SL, and Tylenol with an order to monitor the patient for an hour. If the pain persisted the nurse was to call him back. If the pain resolved the patient was to be released with a morning follow up. The nurse didn't ask again about the chest pain but the vitals were better with BP 142/88 and pulse 74 and the patient was sent back to his housing unit.

4/4/2016 At 9:30 am a doctor saw the patient. The doctor noted that there were no EKG changes and the pain was not responsive to NTG. The patient had point tenderness over the back and left shoulder. The doctor assessed gastritis secondary to NSAID and ordered Zintec 150 hs.

4/4/2016 An EKG automated reading read atrial flutter, but a doctor overrode this and wrote normal sinus rhythm. There were five EKGs, none of which appeared to show atrial flutter. Four of the five EKGs did not include automated readings.

155

Patient #14

| | | |
|---|---|---|
| 4/25/2016 | The doctor saw the patient for annual chronic clinic for hypertension. The patient was on Zocor 20 mg, lisinopril 30 and aspirin. The blood pressure was 130/85. The doctor documented that the patient's labs were all "WNL." The labs weren't documented in the doctor's note. | 3 | The patient had a 10% 10-year risk of heart disease and stroke but was only on a low intensity statin. |

| 4/26/2016 | A LPN saw the patient on the housing unit after a reported seizure. The inmate was on the floor "playing with his T shirt. No seizure activity noted." The LPN sent the patient to the health care unit. The patient was observed in the health unit for 40 minutes and then sent back to his housing unit. | 16 | The nurse should have consulted a physician. |

| 4/30/2016 | A nurse saw the patient for a suspected seizure. The BP was 181/105 and pulse 121. The patient was drooling and confused. The inmate was sent to the health care unit. There were no notes from the health care unit. | 16 | The nurse should have consulted a physician. |

| 5/10/2016 | The Medical Director noted an orthopedic appointment at UIC was approved. | | |

| 5/11/2016 | Wexford approved a UIC ortho appointment for DJD of the hip for a slipped femoral epiphysis. | | |

| 5/26/2016 | The patient apparently had a seizure. The pulse was 106 and BP 146/88. The patient was confused and had garbled speech post-ictal. The Medical Director was called who ordered a one week follow up. | 10 | Sooner follow up was indicated. |

| 6/2/2016 | The Medical Director documented that the inmate was inquiring about his hip surgery. The doctor appeared to tell the patient that the surgery would be soon. There was no examination. | | |

| 6/21/2016 | The patient went to UIC ortho but pre-operative laboratory tests didn't accompany the patient so the appointment was rescheduled. | | |

156

PTX193-0923

Patient #14

6/21/2016 A brief comment by UIC ortho on the referral form stated that the patient had hip osteoarthritis and needed pre-op labs and paperwork before surgery could take place. They recommended return to clinic when these had been done. The report by the orthopedic service stated that the patient needed the prison doctor to medically clear the patient and that pre-op labs had to be done.

6/23/2016 The Medical Director saw the patient post writ and noted that the patient needed lab work and paperwork. The doctor did not evaluate the patient for his seizures despite recent seizures.

6/28/2016 CMP normal except CO2 21 and anion gap 13. CBC normal.

7/16/2016 The patient had an unwitnessed seizure. BP was 152/91. The nurse took no action.                                                        16   The nurse should have consulted a physician.

8/2/2016 Phenytoin 3.3 (10-20); CBC normal.

8/9/2016 A doctor saw the patient in semi-annual seizure clinic. Much of the note was illegible. The patient had no urgent care episodes, presumably seizures. The Dilantin level was 3.3 and the Keppra level was pending. It isn't clear how the patient got on Dilantin and the history didn't explain the change in therapy. The doctor noted that the patient was on Dilantin 300 mg and Keppra 1000 mg BID. A follow up in two weeks with serum drug levels was ordered.

8/16/2016 An EKG without a legible date was signed as reviewed on this date. Was NSR with septal infarct age indeterminate.

8/24/2016 A nurse saw the patient for an apparent seizure. The pulse was 114 and BP 132/81. The patient was given his seizure medication and sent back to his housing unit.            16   The nurse should have consulted a physician.

10/2/2016 EKG sinus bradycardia with voltage criteria for LVH.

157

PTX193-0924

PTX193-0925

Patient #14

10/6/2016  Metabolic panel normal except CO2 23; cholesterol 133; TG 83; HDL 33; LDL 83.

10/17/2016  A doctor saw the patient in semi-annual HTN clinic. The patient was on HCTZ, Procardia, aspirin, lisinopril and Zocor 20. The BP was 111/76. An EKG was ordered with follow up in six months.

10/18/2016  Glucose 118; Cholesterol 158; TG 115; HDL 27; LDL 108. CBC normal.

3          These lipid values with the 10/17/16 BP values yield a 13.6% 10-year risk of heart disease or stroke. A moderate to high intensity statin was indicated.

12/14/2016  The Medical Director documented that orthopedic follow up was approved. This was based on the June UIC ortho pre-operative surgery appointment that was cancelled because the patient didn't come with pre-operative laboratory tests.

12/14/2016  Wexford just received the request for orthopedic follow up and approved an orthopedic appointment. This was six months after the prior ortho visit.

1/10/2017  A nurse saw the patient for a seizure. The pulse was 128 and BP 190/97. The pulse came down to 112 and BP 155/91. After the confusion improved the Medical Director was notified. No orders were given and the patient was sent back to his housing unit.

8          Drug levels should have been obtained. Old levels should have been reviewed.

1/10/2017  The orthopedic clinic documented that the patient needed to get medical clearance from APEC. Apparently this is a UIC unit.

1/11/2017  The Medical Director saw the patient post UIC ortho write. The patient needed medical clearance. The doctor had no plan.

1/13/2017  A doctor saw the patient for seizures. The doctor noted that the patient was taking Dilantin and Keppra. The only examination was to note that the patient was alert and "PE [physical examination] unremarkable." The doctor ordered a Dilantin and Keppra level and a follow up.

158

Patient #14

1/26/2017 A doctor saw the patient to follow up on lab work. However, the tests were not done and the doctor ordered follow up when the lab tests were done.

1/26/2017 Phenytoin 5.3 (10-20).

1/28/2017 At 11:56 am a nurse noted that the patient was brought to the ER after a seizure. The BP was 184/96 and pulse 96. The patient was unable to follow directions and had a laceration on his chin. A few minutes later the patient was alert and responding. A doctor placed three sutures in the chin and wrote a note. The doctor noted that the patient was alert with confusion initially but became alert. The only neurologic examination was to note the pupils were equal and reactive. The doctor placed sutures, dressed the wound, and ordered a Dilantin and Keppra level but did not order any medication. The doctor ordered follow up in two days.

1/28/2017 At 5:30 pm a LPN was called to a cell house for the patient having a seizure. The patient was unresponsive and sustained a cardiac arrest. CPR was started and apparently continued until paramedics arrived. The patient was pronounced dead at the hospital at 6:16 pm.

1/29/2017 The death certificate listed coronary atherosclerosis as the cause of death. The death certificate indicated that an autopsy was done but the autopsy report was not in the medical record.

The patient was on Lisinopril 30; HCTZ 25; Nifedipine 60; simvastatin 20; ASA, Keppra 1500 BID; Dilantin 300 QD.

PTX193-0926

PTX193-0927

Patient #14

2/1/2017 A death summary was completed by Dr. Obaisi.  He stated that the patient was incarcerated 25 years previously and was on treatment for hypertension and epilepsy.  Medications at the time of death included lisinopril, HCTZ, Nifedipine, simvastatin 20 mg, ASA, Keppra, Dilantin, alendronate 70 mg weekly, oscal 1000 mg daily and famotidine 20 mg.  He noted that the patient was scheduled for hip replacement.  The only remaining discussion was the day of his death in which the patient experienced seizures twice.

The goal of epilepsy management is to derive an accurate diagnosis, measure of seizure frequency, monitor medication side effects, and evaluate for disease related psychosocial problems.  UpToDate states it is usually appropriate to refer to a neurologist to make the diagnosis and formulate a treatment strategy.  Referral to an epilepsy specialist may be necessary if there is doubt about the diagnosis and/or if the patient continues to have seizures.  Drugs are typically designed for the seizure type.  Keppra is a drug used for a broad range of seizures; phenytoin and Tegretol treat a narrow range of seizure types. Keppra is used for myoclonic, partial onset and tonic-clonic seizures.  For Keppra the patient should be monitored for ataxia, abnormal gait, psychiatric or behavioral symptoms with CBC if patients experience fever or recurrent infection. Tegretol levels should be checked every two months until levels are constant.

PTX193-0928

Patient #15

8/12/2016  The patient was admitted to NRC from Cook County Jail.  He weighed 207 pounds and was identified with mental illness.

1/13/2017  An x-ray of the chest and abdomen showed a metallic density in the right lower pelvis suggesting a foreign body.

6/2/2017  There was a rectangular foreign body in the left upper quadrant extending to the left upper mid abdomen measuring up to 19 cm.  Recommend continued follow up.

7/12/2017  At 5:30 pm a nurse noted that an officer witnessed the patient swallowing a spork.  The nurse documented that the inmate "denies need for medical @ this time."  The nurse did not consult a doctor.  The nurse noted, "Will have no complication from swallowing a foreign object."  There was no referral to a doctor.

16  |  Care was grossly and flagrantly unacceptable.  Swallowing a foreign body such as a spork with a sharp end is potentially life-threatening and to state that the patient denies a need for medical care when the

7/13/2017  At 12:40 pm a nurse documenting notifying a doctor that the inmate said he swallowed another spork.  The nurse called a doctor, who ordered an abdominal x-ray.

7, 19  |  The doctor should have examined the patient.  A plastic item will not show up on x-ray and the patient should have been followed, and if the item was not retrieved in the stool then

7/13/2017  No radiopaque foreign body is seen in the abdomen or pelvis.

7/16/2017  A nurse saw the patient who said, "I went on hunger strike because no one cares about the spork I swallowed."  The nurse did not address the complaint of having swallowed a spork.

19  |  The complaint was ignored and a physician should have evaluated the patient.

7/23/2017  A nurse evaluated the patient with a laceration noted on his right arm.  The patient said he did it with a spork.  The pulse was 148.  The nurse described the laceration as 10 by 3 cm, which is large.  The nurse placed steristrips but did not refer the patient despite a large laceration and a significant tachycardia.

16  |  The nurse should have consulted a physician.

PTX193-0929

Patient #15

7/24/2017 At 9:15 pm a nurse saw the patient for abdominal pain.  The patient asked to be put on sick call.  The nurse documented the patient saying, "Don't put any pressure on my stomach."  The pulse was 104 and the temperature was 100.  The nurse assessment was "ineffective coping; pain R/T unk etiology ABD C/O abdominal pain."  The nurse did not refer the patient to see a physician.  The patient was on a crisis watch.

16  The nurse should have consulted a physician.

8/7/2017 The patient refused sick call.

9/27/2017 The inmate had a discussion with a psychiatrist that he had swallowed sporks and wasn't receiving medical attention.  The psychiatrist said the inmate was frustrated with "what he perceives to be indifferent medical attention."  The psychiatrist discussed "some of the motivations for self-harm."  The psychiatrist did not refer the patient to medical.

16  The psychiatrist should have consulted a physician

9/29/2017 The patient was evaluated for suicide potential by a licensed mental health staff.  The patient complained that he was concerned about being refused sick call and wanted to go to an outside hospital.  The patient was angry and wanted to see a doctor.  The licensed staff wrote that the last suicide attempt was on June 12th and June 13th when the inmate swallowed sporks.  However, the more recent episode of swallowing a spork was not mentioned.  There was no referral to medical.

16  It is unclear whether the mental health staff knew that the patient had swallowed a spork. If so, the patient should have been referred to a physician.

10/2/2017 The patient saw a nurse practitioner and complained that he had swallowed "sporks" a long time ago and wanted surgery to have these removed.  The patient weighed 174 pounds, which was a 33 pound weight loss over the past year.  The NP documented a soft non-tender abdomen with normal bowel sounds.  The patient had a history of self harm.  The patient also said he had pain from a piece of a nail clipper embedded in his forearm.  A palpable lump was present on the forearm.  The NP ordered an x-ray of the arm but took no action about the spork.  The NP noted in the assessment that the patient had a foreign body in the GI tract.

7  The NP failed to properly evaluate for an ingested spork.  An ingested item failing to evacuate should have resulted in referral for endoscopy.  Care was grossly and flagrantly unacceptable.

Patient #15

| 10/12/2017 | A licensed clinical professional counselor (LCPC) saw the patient who complained of stomach pain and wanted to see the nurse practitioner today. He said he was not satisfied that surgery had been refused and that he was only eating snacks due to stomach pain. The patient was not referred. | 16 | The mental health staff should have referred the patient to a provider. |

| 10/12/2017 | The patient was scheduled for a foreign body removal on the arm but was "inappropriate and argumentative" and signed a refusal. The patient was referred to mental health. | | |

| 10/18/2017 | The LCPC who saw the patient on 10/12/17 saw the patient again. The patient reported that no one was taking care of his medical needs. The patient reported vomiting and diarrhea and was weak. The inmate wasn't eating because he was nauseous. The LCPC spoke to a nurse who "agreed to take vitals." The LCPC spoke with a nurse who agreed to evaluate the patient for his complaints. The LCPC documented that he would follow up 10/19/17 regarding a sick call request "given he still had not submitted one per medical." | 16 | The patient wasn't referred to a provider despite legitimate complaints. |

| 10/19/2017 | A Mental Health Progress Note stated, "Mr. Page did not attend Co-Occurring group. He is sick." | | |

| 10/20/2017 | A nurse saw the patient for a complaint of swallowing sporks "months ago." The patient's weight was 150 pounds, which is a 24 pound weight loss over the past month and 57 pound weight loss over the past year. The patient complained that about a week ago he started having abdominal pain that was sharp and burning. The patient did not notice black or tarry stool and didn't think he had any bleeding. The patient had nausea, diarrhea, and pain in the center of his abdomen. It hurt when the patient ate. The nurse noted pain on palpation in the center of the abdomen. The nurse did not consult a physician and gave the inmate Pepto-Bismol. | 16 | The patient had significant weight loss, abdominal pain, and history of ingestion of an object. The patient should have been immediately referred to a physician. Care was grossly and flagrantly unacceptable. |

PTX193-0930

PTX193-0931

Patient #15

10/21/2017  At sometime around 7:00 am a nurse noted during medication pass that the inmate was in bed unresponsive.  The patient had no respirations or pulse and no signs of life.  The patient was stiff and in apparent rigor mortis.  The patient had blood tinged drainage from his mouth.  There was blood in the toilet.  CPR was started.  Paramedics arrived.  It is not clear a doctor was on the scene but the nurse documented that the patient was declared dead by 7:40.  It isn't clear if this was the paramedics or a doctor.

12/1/2017  An autopsy reported that there were two sporks in the proximal duodenum and the mucosa was deeply lacerated.  The patient had deep lacerations of the proximal duodenum with 20 ounces of clotted blood present in the stomach with superficial lacerations of the proximal esophagus.  The death was attributed to a GI bleed caused by ingestion of foreign objects (two sporks).

The most common features in history of foreign body ingestion are dysphagia, refusal to eat, and regurgitation of undigested food.  Perforation of the mid or distal esophagus may result in severe chest or upper abdominal pain.  Endoscopic evaluation is required even in the setting of negative radiographs.  Plastic is not readily seen on plain films so failure to locate an object on radiographic examination does not preclude its presence.  In patients with persistent symptoms, an endoscopic evaluation should be performed even if the radiographic examination is negative.  A sharp pointed object in the duodenum or stomach require urgent endoscopy.

PTX193-0932

Patient #15

1/5/2018 An administrative death review was completed. This review found that the inmate had an autopsy that showed two sporks inside his stomach that had lacerated the small intestines which was determined to have caused the death. The administrative review found that the patient had an x-ray on 7/14/17 that showed no foreign body.  The review also noted that the inmate had been seen in nursing sick call on 10/20/17 for abdominal pain and diarrhea. During the assessment the patient complained of having swallowed sporks two months ago.  The review documented that the nurse assessed a soft and non-tender abdomen, vital signs were normal, and that a proper protocol had been chosen and that there was nothing in the nursing assessment that indicated an emergency.  The review noted that he had a number of crisis watch placements for episodes of self harm including swallowing objects.  He was sent to a hospital twice (5/3/17 and 6/2/17) for swallowing objects.  He swallowed a wire on the 6/21/17 admission but there was no hospital report.  No problems with medical care were identified on this review. The review noted that his medication compliance was sporadic at best.  It appeared on quick review that the inmate would refuse as much as nearly half of his medication.  The review noted that his symptom intensity was related to his medication compliance with more hallucinations, paranoia and delusions when not taking his medications.  The review also noted that the patient was concerned about not receiving proper medical care and that he also discussed swallowing two sporks. The review did make a recommendation that psychiatrist should make referrals for enforced medication if a patient showed inconsistent compliance that resulted in crisis watches, disciplinary infractions, and increased symptoms and that nurse should refer patients to a mental health professional when a patient refused medication for three consecutive days.

PTX193-0933

Patient #16

11/16/2012 Problem list documented HTN and asthma; no other diseases were listed.

6/5/2013 An EKG showed a normal sinus rhythm

8/20/2014 A chest x-ray showed clear lungs. The heart was not enlarged. There was no active pulmonary disease.

12/29/2014 An EKG showed a normal sinus rhythm.

1/24/2015 The patient was seen in asthma clinic at Menard. The PEFRs was 550 and the patient was described as mild persistent. The patient was using Xopenex only. There was no history

2/2/2015 Cholesterol 115; HDL 40; LDL 70.

3/17/2015 The patient was seen in HTN clinic at Menard. The blood pressure was 142/80; weight was 350. There was no history. Cholesterol was 115; HDL 40; and LDL 70. The patient was on HCTZ and amlodipine.

7/22/2015 A doctor saw the patient and noted that the patient was being seen for chest pain amongst other items. The doctor noted that an EKG was normal. The doctor noted "to be up and about and walking," "initially he was not able to walk but later he walked OK No chest pain No chest pain No SOB." The doctor prescribed Motrin 200 mg 1-2 tabs TID prn; 18 tabs were given.

7/23/2015 A nurse saw the patient for chest pain. The patient had the pain for about an hour. The pain was sharp and felt like tightness. The patient had dyspnea, dizziness, and had pain in the arm. An EKG was done. The pulse was 86 with BP 108/70. The nurse referred the patient to a physician.

7/30/2015 The patient was seen in asthma and HTN clinic at Menard. The BP was 130/80 and PEFR was 550/550. The patient was listed as mild persistent. There was no history noted for either disease. The patient was on Norvasc and HCTZ.

17    Because the patient was a smoker, he had a 10-year risk of heart disease and stroke of 10% and should have been placed on a moderate to high intensity statin. This did not occur.

11, 17    We could not locate the EKG in the record.  Notably, Motrin can increase risk of serious cardiovascular thrombotic events.  Use of this drug should have been considered in a patient with multiple cardiovascular risk.

11, 16    We could not locate the EKG in the record.  Referral to a physician should not be routine for chest pain.

17    The patient had an 8.6% 10-year risk of heart disease or stroke and should have been prescribed a moderate to high intensity statin.

Patient #16

| | |
|---|---|
| 10/21/2015 | Patient was seen in HTN clinic at Menard. BP 120/84; pulse 108; the patient had 3+ pitting edema. The patient was on Norvasc, HCTZ, Lasix; and KCL. The patient was noted in good control. 3+ edema is of concern but was not addressed. It may have been due to the Norvasc. | 2 | The doctor did not evaluate why the patient had edema. |
| 12/2/2015 | Cholesterol 134; HDL 40; LDL 84. | | |
| 1/20/2016 | Menard asthma and HTN chronic clinics. Weight 387; BP 138/86; pulse 107; PEFR 560/500; noted as in good control for HTN on Lasix 40; Norvasc 5; HCT2 25; KCL 25. | | |
| 2/26/2016 | A nurse saw the patient for chest pain that was stabbing in nature lasting 3-4 minutes. The blood pressure was 170/68 with pulse 100. The nurse did not appear to consult a physician but a chest x-ray was ordered along with Tylenol and CTM. It appeared that a physician signed this note. | 19 | A physician should have evaluated the patient and an EKG should have been done. The patient had chest pain with abnormal pulse and blood pressure. |
| 3/1/2016 | A chest x-ray showed bilateral hilar prominence may be due to lymphadenopathy. Findings may be due to sarcoidosis. For more complete evaluation, CT study of the chest with contrast is suggested. | | |
| 3/16/2016 | A doctor noted that a chest x-ray showed hilar adenopathy. A referral was made for a CT scan. | | |
| 4/7/2016 | CT of chest was normal without enlarged lymph nodes. | | |
| 4/14/2016 | A doctor noted that the patient had a CT scan but the results weren't available. The blood pressure was 154/100 and the doctor noted that the patient had been off his BP meds for three days. The patient was given reassurance. | | |
| 6/9/2016 | Glucose 118. | | |
| 6/18/2016 | A doctor noted that the CT scan suggestive of sarcoidosis-recommendation was CT with contrast. | | |
| 7/1/2016 | Glucose 93; albumin 3.2 (3.4-5); cholesterol 120; TG 58; HDL 36; LDL 72. | | |

PTX193-0934

Patient #16

| | | |
|---|---|---|
| 7/25/2016 | Asthma and HTN clinics; weight 410; BP 132/64; PEFR 540/500; the patient had 3-4+ edema with pitting and listed in good control. The patient was on Lasix 40; Norvasc 5; HCTZ 25; and KCL with ASA started for a year. | |
| 8/11/2016 | A doctor saw the patient for chest pain when walking, increased with deep breathing. Some of the note was illegible but it appeared that the patient was short of breath. The doctor diagnosed atypical chest pain and ordered an EKG. The EKG was not reviewed but showed inferior infarct age undetermined. The actual tracing was poorly copied and we were unable to review accurately. The rest of the note was illegible. | 2 |
| 8/11/2016 | A nurse documented a nurse protocol for chest pain. The nurse documented shortness of breath with exertion and experienced chest pain while walking and it felt like tightness. The nurse referred to a doctor, who saw the patient and diagnosed atypical chest pain. | |
| 8/29/2016 | A nurse noted that the patient was dizzy and short of breath. A doctor saw the patient who was short of breath and diaphoretic. The doctor sent the patient to a hospital. | |
| 8/29/2016 | An EKG showed normal sinus rhythm with possible inferior infarct age indeterminate | |
| 8/29/2016 | The patient was admitted to Memorial Hospital in Chester IL. The patient was admitted for shortness of breath and diagnosed with pulmonary emboli. The patient was also diagnosed with new onset diabetes with hemoglobin A1c of 7. The patient was placed on coumadin. The etiology of the emboli were not determined. The recommendation was anticoagulation for six months. The patient had a hemoglobin in the hospital of 11.1 | |

The doctor did not evaluate why the patient had edema.

The patient had symptoms consistent with angina but was diagnosed with atypical chest pain. The patient had multiple risk factors for coronary artery disease including being a smoker, hypertension, elderly, and male. His cardiovascular risk was around 10% and he should have been on a statin. It appeared that the doctor made an inaccurate assessment based on the history the patient provided.

168

PTX193-0935

PTX193-0936

Patient #16

8/29/2016 The patient's annual examination at Menard listed obesity, GERD, HTN, history of rectal bleed, and questionable hilar nodes as problems.

8/29/2016 A nurse documented that the patient returned from the hospital with a diagnosis of pulmonary embolism and was on anticoagulation.

8/29/2016 A D-dimer test in the hospital was 8.25 (0-0.5) protein C or S or lupus anticoagulant were not done.

8/30/2016 Chest angiography showed bilateral pulmonary emboli within segmental and subsegmental RLL, lobar, and RUL and LUL and LLL segmental branches.

8/30/2016 The patient asked a nurse when he would get his medication for his blood clots. The nurse documented that the patient would see a doctor in the morning.

8/30/2016 The patient was admitted to the infirmary and listed as on coumadin and Lovenox.

9/6/2016 INR 2.56

9/6/2016 INR 2.56

9/7/2016 A doctor noted an INR of 2.56. There had been no history or physical examination since the admission note. The patient was discharged with a diagnosis of bilateral pulmonary emboli. Notably, at the hospital there was no evaluation what the etiology of the bilateral emboli was. There was no echocardiogram, no lab tests for clotting diseases.

9/13/2016 An EKG showed normal sinus rhythm with possible inferior infarct age indeterminate

9/14/2016 Gen Medicine clinic at Menard. BP 134/90. The weight was 380. The doctor started or continued coumadin 8 mg for bilateral pulmonary embolism with "fair control." There was no history of the pulmonary embolism and it was unclear when this started. There was no history at all.

9/15/2016 A1c 7.5; INR 2.3

10, 17   The patient wasn't seen for a week after a hospitalization for pulmonary embolus. Follow up was inadequate. Based on the recent diagnosis of diabetes the 10 year risk of heart disease or stroke was 16% and the patient should have been on high intensity statin.

Patient #16

9/21/2016 A NP saw the patient and noted that the patient had no abnormal bleeding and had new diagnosis of diabetes and was on coumadin. The patient was on coumadin 8 mg and metformin 500 BID.

10/11/2016 INR 2.5.

10/19/2016 An EKG showed normal sinus rhythm with nonspecific ST abnormality

10/19/2016 A NP saw the patient for chest pain with shortness of breath. The NP took virtually no history of the chest pain except that the patient had no diaphoresis. An EKG was done and the NP documented that it was normal; it was not. It showed non-specific STT wave changes. The NP documented that the patient was laughing and making "joke with staff." The NP documented normal assessment. The NP ordered a chest x-ray and follow up with a physician.

1, 2, 3   The NP failed to take an accurate history. The history that was taken of chest pain with shortness of breath is not inconsistent with angina. The EKG was interpreted as normal by the NP but actually showed nonspecific STT wave changes which is consistent with ischemia. The patient also had multiple risk factors for ischemic heart disease including diabetes, hypertension, smoker, male and elderly and had a 16% 10 year risk of heart disease or stroke. The patient also had repeated episodes of similar pain which appeared to be angina. The NP should have placed the patient on anti-anginal drugs and a high intensity statin and referred for exercise stress testing, stress echo or catheterization.

10/21/2016 A doctor wrote a note that the patient had chest pain but took no history, performed no examination and only noted an INR of 2.6 and ordered a chest x-ray and ordered Tylenol.

1, 2, 3   The doctor failed to take a history, did not perform an examination, and made no assessment of the chest pain. The only plan was to order Tylenol and refer for a chest film. Care was indifferent.

11/1/2016 In November the patient missed two doses of coumadin

11/16/2016 INR 2.

12/1/2016 In December the patient missed eight doses of coumadin; he was at a hospital for several days.

12/16/2016 Glucose 115; calcium 8.5; albumin 3.3; cholesterol 129; HDL 40; LDL 80; INR 2.7.

170

PTX193-0937

PTX193-0938

Patient #16

12/20/2016 A chest x-ray showed borderline heart size is seen with haziness in the perihilar region. This may indicate mild pulmonary vascular congestion. Please correlate clinically.

12/20/2016 An EKG showed normal sinus rhythm.

12/20/2016 A nurse evaluated the patient using a chest pain protocol. The blood pressure was 132/84 and pulse 88. The patient had ronchi noted in the R lung. An EKG was documented as RRR. The patient had numbness radiating to the arm without shortness of breath or nausea. The nurse consulted a physician who made orders but these were not documented in the note.

12/20/2016 A NP saw the patient for chest pain and shortness of breath since the morning. The chest pain radiated to the left arm. The patient had cough. The NP documented the EKG as normal; it was normal. URI was diagnosed. Cough syrup was prescribed and a chest x-ray was ordered.

1, 2, 3   The history with respect to the chest pain was inadequate. The patient had multiple cardiovascular risk factors and a 13% 10 year cardiovascular risk. The patient also had multiple episodes of chest pain. He should have been placed on a statin, antianginal drug and referred for possible stress test or cardiac catheterization.

12/21/2016 An NP saw the patient in follow up. The patient had no improvement but diagnosed URI and ordered a follow up as ordered.

12/21/2016 A nurse saw the patient for shortness of breath since last night. The patient was on Xopenex. The patient had cough. PEFR were 380/400/390 and oxygen saturation was 97% and the patient had ronchi. A physician was not consulted and prn follow up was ordered.

12/23/2016 Chest x-ray from Memorial Hospital in Chester IL shows placement of an endotracheal tube.

12/23/2016 A nurse saw the patient for shortness of breath. The patient had a pulse of 110 and BP of 138/90 with PEFR 250 and oxygen saturation of 94-97. The nurse consulted a doctor who ordered the patient sent to a local hospital.

171

PTX193-0939

Patient #16

12/24/2016 A chest x-ray showed an endotracheal tube was removed. The heart and lungs were normal.

12/25/2016 A CT scan showed discoid atelectasis and ground glass nodular opacity in the right upper lobe. There was a 12 mm nodule in the left adrenal gland. A repeat CT scan in 12 months was recommended. The study was non-diagnostic for pulmonary embolism.

12/26/2016 A chest x-ray was normal at Memorial Hosp in Chester.

12/26/2016 Duplex scan was negative for DVT in both legs.

12/27/2016 The patient returned from the hospital with diagnoses of respiratory failure; asthma exacerbation. The patient was on Ceftin 250 BID and azithromycin 250 daily both for three more days, a prednisone taper, Lasix 60 mg for 30 days and continuation of other medications.

12/28/2016 A doctor wrote a very brief note stating, "SOA no Cs denies SOB chest clear" The plan was to discharge the patient to his cell with follow up in a week.

1,3    The doctor's documented history was inadequate. It wasn't clear he reviewed the hospital note and it wasn't clear what the therapeutic plan was for this patient at this time.

1/1/2017 The patient received all doses of coumadin.

1/7/2017 A NP saw the patient for the hospital follow up. The NP noted that the patient was doing well and noted that the patient was referred for sleep study. The NP did not document what occurred at the hospital.

1    The history was inadequate and it wasn't clear what happened at the hospital.

1/17/2017 INR 2.4.

1/18/2017 The patient was approved for a sleep study.

2/1/2017 The MAR showed that the patient refused seven doses of coumadin. The patient missed six of the first eight doses after transfer from Menard.

2/4/2017 The patient transferred to Stateville. The patient was documented as having HTN, asthma, PE, and DM. The patient was listed as being on Tylenol, Lasix, aspirin, Coumadin, HCTZ, Glucophage, Norvasc, Pepcid, and Mobic.

172

PTX193-0940

Patient #16

2/16/2017 A PA saw the patient and noted that he was a new patient to Stateville.  The PA noted that the patient had HTN and was due to have a sleep study.  The PA noted that the patient was already referred to chronic clinic.  The PA noted morbid obesity, HTN, type 2 DM,asthma and history of PE in August of 2016.  The PA ordered a PT,PTT, CMP, CBC, and Lasix.

2/21/2017 A sleep study showed very severe sleep disordered breathing. CPAP was recommended.  Or referral to ENT for possible surgery.

2/23/2017 Hemoglobin 9.4; MCV 69.5; MCH 20; MCHC 28.8; INR 1.2 This was the first CBC in the record at an IDOC facility.  The patient had a hemoglobin of 11.1 at a hospital in Chester IL in August 2016.

3/1/2017 A normal chest x-ray was reported.

3/1/2017 The Medical Director noted that the patient was post sleep study and was to be presented to collegial for a CPAP device. The doctor wrote that the patient had a history of pulmonary emboli and was on coumadin.  The doctor ordered an EKG, chest x-ray, CBC, CMP A1c and follow up in a month.  The blood pressure was 151/84 and pulse 94.  The doctor did not address the elevated BP.  The doctor did not check the INR or note the significant anemia while on coumadin.  This was the first physician visit at Stateville.

3/1/2017 The MAR showed that the patient received coumadin until 3/9/17, when it was discontinued.  The patient received no further doses.

3/3/2017 A doctor saw the patient. The patient had back and neck pain. The note was partly illegible.  The doctor ordered an x-ray of the neck and back and ordered Robaxin with follow up when the x-ray was done.

3/5/2017 An EKG showed normal sinus rhythm.

3/7/2017 A1c 7.2; hemoglobin 9.2 with microcytic indices.

6      The doctor failed to take note of the recent abnormal hemoglobin and subtherapeutic INR.  This placed the patient at significant risk.

173

3:17-cv-03112-JES-JEH  # 263-10  Page 318 of 577

Patient #16

3/10/2017 The Medical Director saw the patient and noted that the hemoglobin was 9.2 and ordered fecal occult blood for a week. The doctor noted that a rectal examination noted a mass in the rectum and diagnosed anemia with GI bleeding and a rectal polyploid lesion. The Medical Director stopped the coumadin and aspirin and requested ferritin and serum iron and an INR, folate and B12 with follow up in a week. The doctor gave no reason for stopping the coumadin. It appeared that this was done due to the anemia and the apparent bleeding in the rectum. The pulse was 121. The doctor did not document the most recent INR. The doctor made no attempt to evaluate the status of the pulmonary embolism. The patient had received six months of warfarin, but follow up on this should have occurred.

3/14/2017 B12 445 (180-914); folate 16 (>5.8); iron 20 (50-180); iron binding capacity 402 (250-450); transferrin 287 (200-400); INR 1.2.

3/14/2017 A collegial review approved a GI referral.

3/16/2017 A PA saw the patient. The patient asked for a refill of his Lasix. The PA performed virtually no examination but assessed HTN, pretibial edema, and sleep apnea. The blood pressure was 135/93. The PA ordered a HTN chronic clinic but did not adjust BP medication or address the INR result.

3/17/2017 A doctor saw the patient for follow up of neck pain. The BP was 141/82. The neck was better. The rest of the note was illegible.

174

PTX193-0941

PTX193-0942

Patient #16

| | | |
|---|---|---|
| 3/28/2017 | HTN clinic at Stateville. Patient on Lasix 40; Norvasc 5; HCTZ 25; KCL; BP 138/57 weight illegible; note illegible; HCTZ was discontinued ASA was continued. | 2, 3 | The patient had a 13% 10-year cardiovascular risk with repeated episodes of angina yet was not started on a statin drug. Also, unappreciated was that the patient was on a non-steroidal drug with significant cardiovascular risk. Yet this was not considered. |

3/29/2017 The Medical Director noted that the patient had a collegial review and had blood testing. The exam was "no change" and the assessment was only "GI bleeding" without comment on the pulmonary embolism. The patient was informed he would soon see GI. There was no other plan or evaluation of the patient's other problems.

4/3/2017 A doctor referred the patient for colonoscopy and hemorrhoid banding.

4/3/2017 The Medical Director saw the patient post writ and said that the patient was to have a colonoscopy and possible hemorrhoid banding. The GI note was not in the record. The doctor made no other comment.

4/5/2017 The patient asked the nurse for a breathing treatment. The patient didn't have wheezing but the nurse took no history but did note no shortness of breath. The nurse wouldn't give the patient a treatment and the patient became angry and left.

4/11/2017 The Medical Director noted that colonoscopy was approved.

PTX193-0943

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 176 of 431 PageID #:12374

Patient #16

| 5/10/2017 | The patient developed left sided chest pain and was noted by a nurse to be in mild distress. Though the patient was walking when the pain started according to the nurse note, the nurse documented that the pain was not exertional. The Medical Director saw the patient and noted that the patient developed pain when walking. The doctor noted that the pain was pressure like and lasted about a half hour. The doctor noted that an EKG was normal. This EKG was not in the chart and I asked the Attorney General's office to locate it but the HCUA could not locate the EKG. The doctor assessed "chest pain resolved" and ordered Coreg for six months, a CBC and CMP. |

5/16/2017 Glucose 116; hemoglobin 8.7; with microcytic indices; platelets 487 (150-450).

5/19/2017 An EKG showed sinus tachycardia with ST depression, consider subendocardial injury or digitalis effect.

5/19/2017 The patient felt chest pain, dizziness, cold and clammy going to the dining hall and was brought to the health care unit. An EKG was performed showing acute subendocardial ischemia. The patient then experienced cardiac arrest and CPR was started and the patient was transferred to a hospital where he died.

3   The doctor did start a beta blocker. But high intensity statin was indicated. Also, depending on the EKG tracing, hospitalization may have been indicated.

176

Patient #16

5/25/2017  The Medical Director filed a death summary.  The patient's diagnoses were listed as acute coronary syndrome with fatal cardiopulmonary arrest; severe asthmatic COPD with acute pulmonary failure in 2016; severe OSA; pulmonary sarcoidosis; GI bleeding with low iron and rectal mass; type 2 DM, HTN, GERD, but the summary failed to document prior pulmonary embolism.  The document stated that the patient transferred to Stateville on 2/8/17 and at Stateville was found to have blood in the stool with anemia; a rectal mass was identified in the rectum and the patient had a guaiac + test and was seen 4/3/17 by GI and was scheduled for colonoscopy.  The doctor noted that the patient had a subendocardial injury on EKG. At the time of death the patient was on carvedilol, amlodipine, aspirin, Lasik, HCTZ, Prilosec, and metformin.

5/27/2017  The coroner filed a death certificate. The certificate states that the cause of death was pulmonary embolism secondary to deep vein thrombosis. The certificate documents that an autopsy was done but it was not present in the medical record.

177

PTX193-0944

Patient #17

3/6/2001 The problem list documents an esophageal stricture.

4/12/2001 The problem list documents duodenal ulcer and esophageal ulcer.

This problem was not being monitored on chronic disease visits.

8/12/2002 The problem list documents mitral valve prolapse.

11/12/2002 The problem list documents Barrett's esophagus and PUD

These problems were not monitored.  There was no surveillance for the Barrett's esophagus.

3/14/2011 The problem list documents aortic valve replacement

6/19/2013 An annual physical examination was refused but the doctor documented the problems as aortic valve replacement, hepatitis C, Hx of CAD and heart failure, history of esophageal bleeding, history of atrial flutter, GERD and duodenal ulcer, history of thoracic aortic aneurysm with aortic root repair at the same time of his aortic valve replacement, atrial flutter with ablation at UIC, old compression fx of L4

2  There was no monitoring of the Barrett's esophagus. Multiple problems of this patient were not being followed consistently including aortic valve replacement, thoracic aortic aneurysm, atrial flutter, and COPD

2/11/2014 A doctor noted review of the EKG showing prolonged PR interval and L atrial abnormality.

2/19/2014 An LPN wrote that the inmate wanted a heart test that had been scheduled after surgery for aortic valve replacement. The patient complained of dizziness when he walked.  The patient stated, "Stateville wouldn't order test."  The nurse referred the patient to the doctor.  The patient didn't see a doctor for this.

3/10/2014 A writ to UIC cardiology was cancelled but there was no explanation why.

3/13/2014 The patient complained of getting winded walking to chow. The nurse documented that the inmate was anxious and breathing "hard and fast" and with "pursed lips."  The nurse took no vital signs and the only comment was "pursed lip breathing no change."

178

PTX193-0945

Patient #17

3/14/2014 A nurse saw the patient for shortness of breath. The respiratory rate was 32. The oxygen saturation was 83% on room air. The nurse noted shortness of breath when walking. The nurse noted that the patient's cardiology clinic was cancelled by UIC. The nurse observed the patient in the infirmary on oxygen and referred to a doctor but it wasn't clear when. Later a nurse practitioner saw the patient and noted increasing SOB over the past few weeks. The NP ordered 40 mg of Lasix stat and admission to the infirmary and oxygen to keep the saturation above 90%.

3/14/2014 A NP infirmary admission note documented history of GERD, Barrett's esophagus, aortic stenosis with prior valve replacement with heart failure, atrial flutter ablated in 2011, and aortic aneurysm repair in 2011. The NP did not order a chest x-ray but did order a CBC but no CMP. An EKG was not ordered. There was no referral for echocardiogram. The NP noted that the oxygen saturation was 83%.

3/14/2014 On the 3-11 shift a nurse documented that the patient had audible expiratory wheezes with dyspnea on exertion and an oxygen saturation of 88% on 2 liters of oxygen, so the nurse increased the oxygen to 2.5 liters and the oxygen saturation increased to 91%.

3/15/2014 A nurse noted that the patient's oxygen saturation was 80% off oxygen and was 92% on oxygen. No action was taken.

3/18/2014 A nurse noted that after walking short distances the oxygen saturation dropped to 88% but was above 90% on oxygen.

This patient needed a stat blood gas and chest x-ray and should have been sent to an emergency room for this.

179

PTX193-0946

PTX193-0947

Patient #17

3/20/2014 The patient wanted to go back to his housing. He had oxygen saturation of 93% on room air. There had not been a documented physician note since admission on 3/14/14.

3/21/2014 A physician saw the patient for the first time on the unit. The doctor documented that the patient did not get hemoccult test as ordered on 3/15/14. The doctor did not document review of the CBC or even note that it had been done. The doctor listened to the chest and noted a few rales and a murmur and discharged the patient with a 3 day follow up with the NP. A metabolic panel was ordered. The diagnosis was heart failure. The NP didn't see the patient for 10 days.

3/22/2014 Sodium 137; AST 39; ALT 27; hemoglobin 13.2; platelets 459.

3/31/2014 The NP noted that the patient had been on the infirmary for respiratory distress. The NP noted clear lungs and assessed that the shortness of breath resolved without documenting a presumed diagnosis. No diagnostic tests had been done in the infirmary to ascertain the reason for the shortness of breath. The NP continued the higher 40 mg dose of Lasix and started Ultram 150 BID for four months for unclear reasons. A CMP was ordered for six weeks with follow up in eight weeks. The NP did not document review of the CMP; it appeared as if it was not done. The weight was 181.

Patient #17

4/3/2014 A doctor saw the patient and noted that the patient said he was to have an echocardiogram and Holter at UIC but it hadn't been done at Stateville. The doctor reassured the patient that he had an upcoming appointment at UIC.

5/8/2014 Sodium 133; AST 57; ALT 57.

5/12/2014 A NP saw the patient for increasing shortness of breath in the evening and at night. The NP noted a few rales in the bases and 1+ pedal edema. The NP increased the Lasix to 40 am and 20 pm for four months but did not order a chest x-ray or EKG or CMP.

6    The NP failed to review recent abnormal laboratory findings.

5/22/2014 The patient went to UIC. But the report was not in the medical record. A referral form had comments from the cardiologist, who noted that a stress test was negative and an echocardiogram showed 55-60% EF with NL function. Since the EF was normal the findings on exam might be symptoms of overload vs COPD. The consultant recommended increased diuresis, lung x-ray to monitor progress and if not better consider CXR and referral to pulmonary for PFT to rule out COPD.

11    Failure to obtain reports results in not knowing the status of the patient.

181

PTX193-0948

Patient #17

| | | |
|---|---|---|
| 5/29/2014 | A doctor documented that the patient had been seen in cardiology, who recommended increasing the diuretic and if no improvement get a pulmonary function test and follow up in six months. The doctor ordered a CMP and started Lasix 60 mg in the morning and 20 in the evening for two months with follow up with the NP in 3-4 weeks. The weight was 180. The doctor did not document review of the report and it wasn't clear what the status of the patient was based on the report. The weight was 180 pounds. The doctor took no history and did not perform a physical examination. The only assessment was heart failure. | 1, 2 | The doctor took inadequate history and performed no physical examination post-UIC visit. |
| 6/2/2014 | The patient saw a NP. The patient asked to be pushed in a wheelchair because it was hard to get to chapel. The weight was 193. The NP documented that the Lasix had been recently increased and that the patient had a murmur but no peripheral edema. The problems listed were CAD/CHF/valve replacement. The patient asked for renewal of Norco but the NP took no history, no examination, and no assessment of the status of pain. The NP noted that the patient had a follow up scheduled for 3-4 months and that the should follow up sooner if needed. The NP did not note the 13 pound weight gain over the past several days. The NP prescribed Norco without evaluation for pain. | 17 | Prescribing an opioid without clarifying whether the patient had pain or the degree of the pain is extremely poor practice and promotes opioid addiction. |
| 6/3/2014 | Potassium 5.4; sodium 125; chloride 97; AST 63 ALT 42 (10-50). | | |

182

PTX193-0949

Patient #17

6/4/2014 A doctor wrote a brief chart review note on reviewing labs. The doctor noted that the potassium was 5.4 and that sodium was 125 with chloride of 97. The doctor continued the Lasix of 60 am and 20 pm and decreased the potassium to 20 mcf "OD" apparently meaning either daily or every other day. The doctor wrote for fluid restriction "30-40 oz /day" and ordered repeat electrolytes in two weeks.

6/23/2014 Potassium 4.5; sodium 131.

7/8/2014 A NP saw the patient. The BP was 110/56 and the weight 190. The inmate reported SOB with walking but no edema of legs. He had pain in his feet. The patient had no SOB or cough at night. The NP documented considering COPD and ordered a chest x-ray as recommended by UIC about two months earlier in May. The NP ordered a wheelchair for long distance with a three week follow up.

8/22/2014 A NP saw the patient, whose weight was 197 pounds. The patient was being seen for review of a chest x-ray. The patient still had shortness of breath walking long distances. The chest film was documented as showing "mild changes of CHF + emphysema." The assessment was CHF with mild emphysema and bioprosthetic aortic valve. Because of the potential for having both heart failure and COPD, PFTs should have been done for diagnostic reasons and to establish the baseline for this patient.

7    Pulmonary function testing should have been ordered. This was suggested by the cardiologist and we concur.

183

PTX193-0950

PTX193-0951

Patient #17

9/17/2014 A NP saw the patient for renewal of Norco. The NP noted an open sore on the great toe. The NP changed the Norco to Tylenol #3 for 30 days. It wasn't clear what pain was being treated and what the status of the pain was. The NP gave the patient eight bandages for his ulcer. Weight was 183.

10/14/2014 A NP saw the patient. The weight was 186 and BP 110/60. The patient requested renewal of Tylenol #3. the patient had a quarter sized lesion on his toe. The NP advised the patient to tie his shoes [presumably this was thought to have caused the ulcer].

10/15/2014 Sodium 134.

12/15/2014 Sodium 140 potassium 4.5.

1/4/2015 A partly illegible mental health professional note documented that the patient was on a religious fast and hadn't eaten for several days.

1/9/2015 A PsyD saw the patient and noted that the patient was being seen daily since he began "fasting" on 12/24/15. The patient appeared delusional but denied hallucinations and there was no evidence for auditory or visual hallucinations. The insight and judgment were "poor." The assessment was "appeared mentally unstable."

1/15/2015 BUN 22; sodium 137; creatinine 1.8; hemoglobin 12.1 (13.2-18); platelets 211; AST 26; ALT 19

17      It is bad practice to prescribe narcotics without taking a history of the pain or performing a physical exam to document the extent and severity of the pain.

These lab tests document kidney disease and mild anemia. These tests were not documented as reviewed in the progress notes.

184

PTX193-0952

Patient #17

3/2/2015  The patient was admitted to Katherine Shaw Bethea Hospital for bleeding rectally and vomiting blood and discharged 3/5/15.  His heart rate was 130s.  The doctor documented that because the patient was absent from the med line his anti-ulcer medication was discontinued after 2/12/15.  The doctor told the facility physician and a nurse that a refill check that failed should end and that the chart should be flagged that he never go off the PPI due to having had multiple life threatening GI bleeds.  The patient was discharged with acute upper GI bleed with anemia secondary to blood loss, diastolic heart dysfunction, hepatitis C, and antral ulcer.  The hospital recommended never to stop the PPI.  The patient had endoscopy showing a deep antral ulcer treated with electrocautery, hiatal hernia, duodenal erosions, and fibrinous material in esophagus, probably acid reflux disease.  The patient was transfused four units of blood.  The patient had a diagnosis of Barrett's esophagus, porcine aortic valve replacement, mitral valve prolapse, CAD, HTN, CHF, schizophrenia.

3/10/2015 Sodium 141; potassium 4.2; AST 54 (10-40); ALT 60 (10-50).

3/13/2015 Hemoglobin 11.8; platelets 384.
3/15/2015 Hemoglobin 11.4; platelets 306.
3/24/2015 A doctor saw the patient for cardiac chronic clinic for the aortic valve replacement and Barrett's esophagus.  The doctor noted that the patient was on Prilosec but did not discuss surveillance of the Barrett's esophagitis.  The doctor noted that the ulcer was not currently bleeding.

3   The doctor should have had a plan for surveillance of Barrett's esophagus.

185

Patient #17

4/2/2015 A doctor saw the patient for hepatitis C clinic.  The doctor noted that the patient had hepatitis C since 2003 and was seen by Dr. Paul in the past via telemedicine.  This was the Wexford ID doctor.  However, the patient did not see the UIC hepatitis doctor.  The doctor noted that the patient had no RUQ pain and noted that the ALT was 60 and AST 54 and platelets 384 with an APRI of 0.35.  The doctor ordered a six month follow up.

5/7/2015 BUN 23; creatinine 1.73; bilirubin 1.8; AST 28; ALT 18; hemoglobin 11.7; platelets 224

5/28/2015 Total protein 8.1 (6-8); hemoglobin 12.5

6/1/2015 The patient refused omeprazole 13 of 60 doses.  Ten of the refusals were the evening dose.

17 Since omeprazole was so important for this patient, a physician should have been notified and discussed the refusal with the patient.

6/4/2015 BUN 27; creatinine 1.92; cholesterol 114; HDL 31; LDL 65

7/1/2015 The patient's MAR showed that the patient refused omeprazole 17 of 62 doses.

17 Since omeprazole was so important for this patient, a physician should have been notified and discussed the refusal with the patient.

7/8/2015 A1c 4.8.

7/17/2015 Sodium 137; total protein 8.2; AST 43 (10-40); ALT 37 (10-50).

8/9/2015 The weight was 152.  A doctor saw the patient.  The doctor noted that the patient had an appointment with GI.  The doctor ordered a CBC and CMP to check the sodium.

8/14/2015 The patient developed a boil on his buttock and a nurse ordered warm compresses but did not refer the patient.

16 The nurse should have referred to a physician.

186

PTX193-0953

Patient #17

8/17/2015 An NP saw the patient for a sore on his L great toe and left buttock. Apparently a doctor gave a phone order for Bactrim on 8/14/15. The PA continued the antibiotic and offered the inmate a different pair of shoes which he declined. The patient had a dime sized lesion on his toe on top of the left great toe and a 3 cm buttock boil.

8/20/2015 A mental health progress note documented that the patient was in segregation for having been in possession of razor blades. The patient questioned why he was in segregation when he "should be in INF placement given medication condition." The patient had refused a visit with his psychiatrist. The patient was argumentative.

8/27/2015 A NP saw the patient and documented that the patient said he saw a doctor two days ago even though there wasn't a note in the record. The buttock "sore" was healing but the patient still had sores on both feet. The patient also had a swollen lymph node. The NP recommended to clean his wounds with soap and water and observe for drainage.

8/31/2015 A mental health note. The patient was not seen. He was in segregation but there was no officer for escort so the patient wasn't seen.

9/3/2015 A mental health note. The patient was still in segregation. He said he would refuse mental health medication and refuse to see the psychiatrist. The mental health worker documented that his paranoia was less.

187

PTX193-0954

PTX193-0955

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 188 of 431 PageID #:12386

Patient #17

| | | |
|---|---|---|
| 9/10/2015 | The patient stated "I'm a Christian. I can heal without meds." The patient intended to refuse psychotropic medication. Based on the note, the patient appeared psychotic. On the same day another mental health note documented that the patient left segregation status. | |
| 9/13/2015 | An RN saw the patient at 7:30 am. The oxygen saturation was 89%. The nurse took no history of why the patient was being seen but noted that the inmate "doesn't know how he fell." The nurse documented BP 160/80; pulse 113; and weight 150. The patient felt weak. The nurse additionally used a contusion protocol but the history was so poor that it couldn't be determined what precisely happened based on the note. The nurse documented 30 cc of blood but it wasn't clear what this was from. The nurse placed the patient on the infirmary for observation. It wasn't clear if a doctor was consulted but the nurse wrote to do neuro checks every six hours and notify the doctor of any changes. | 16 | The nurse should have referred to a physician immediately. Placement on the infirmary might normally be appropriate but this patient had unstable vitals with hypoxemia and tachycardia with possible altered mental status and should have been immediately evaluated. |
| 9/13/2015 | Hospital admission sodium 114; chloride 81; BUN 42; creatinine 0.87; ALT 74; AST 130. | | |
| 9/13/2015 | At 8:30 pm a nurse documented that the blood pressure was 88/46 and that a doctor was notified, who recommended increased fluid. At 10:00 pm a nurse wrote another note and noted that a doctor was called and ordered to start 0.9 NS via IV. Apparently the patient was sent to a hospital, although notes are lacking. | 11 | Either documentation was poor or the medical record is missing documentation. It wasn't clear how the patient was sent to a hospital. |

188

Patient #17

9/14/2015  At 6:35 there was a movement form that included documentation that the inmate fell the day before with a head injury and fell again this day that was unwitnessed. The patient's blood pressure was 78/40; pulse 92; oxygen saturation 92; and there was blood in the patient's stool. It isn't clear what happened to the patient.

9/14/2015  At 11:00 am a doctor wrote an admission note to the infirmary. The doctor noted that the patient fell and had a head injury on 9/13. The sodium was 114. The doctor noted that the patient was admitted over the weekend. The doctor started IV fluid without specifying the type of fluid 100 cc /hour. Notably the doctor did not perform a neurological examination despite a sodium of 114.

2, 14    Typically, altered mental status with gait disturbance in a patient with severe hyponatremia requires hypertonic saline not normal saline. Typically it is safer to admit this type of patient to a hospital and this should have been done.

9/14/2015  At 2:30 am the pulse was 117 and blood pressure 114/60.

9/14/2015  At 6:10 a nurse noted that the patient was on the floor and was incontinent of bowel and bladder. The patient was weak and unsteady and his stool was positive for blood. The nurse called a doctor who ordered the IV opened full open and sent the patient to a hospital.

189

PTX193-0956

PTX193-0957

Patient #17

| | | |
|---|---|---|
| 9/14/2015 | A hospital consultation note from a GI consultant in the hospital noted that the patient had history of hepatitis C, Barrett's esophagus, CAD, HTN, aortic stenosis, Mitral valve prolapse, CHF, and schizophrenia. The patient was noted to have been found passed out in his cell with blood around him and had a hemoglobin of 4.2 in the emergency room. The patient's INR was 1.2. The patient had a known bleed in March of 2015. The patient had a serum sodium of 117 and was in atrial fibrillation. An upper endoscopy showed a coffee ground bezoar in the stomach with a healing ulcer. Protonix was recommended. The hospital noted that he had not received the omeprazole as prescribed at the prison [that the patient refused so it was discontinued]. The patient required multiple transfusions. A repeat endoscopy and colonoscopy were recommended. The hemoglobin corrected to 8.5 on discharge with a platelet count as low as 149. On admission the BUN was 48 with a serum sodium of 117, chloride of 89, AST 161, ALT 74, albumin 2.4. Remarkably the creatinine was 0.66. The EKG was sinus tachycardia with rightward axis and NSSTT changes. | 17 | The patient failed to receive ordered protonix or refused and no one evaluated him for this despite his mental health condition. This is indifferent. The severe hyponatremia speaks to lack of monitoring while on psychotropic medication. |
| 9/16/2015 | The patient returned from the hospital. The doctor didn't appear to see the patient until 9/18/15. | | |
| 9/18/2015 | The patient was on the infirmary but it wasn't clear how he got there. There were no notes in sequence related to the hospital discharge. | | |
| 9/18/2015 | The doctor noted that the patient was transfused four units of blood and noted the EGD findings. The doctor noted the follow up with GI in six weeks for EGD and colonoscopy. | 6 | Since the patient had severe hyponatremia, serum sodium should have been ordered. |

Patient #17

9/20/2015 The patient told a nurse that he was in the hospital. The infirmary admission notes were not present in sequence for this patient. The chart was disordered. The patient had a wound on top of his forehead.

9/21/2015 Hemoglobin 9.6; sodium 136; BUN 6.

9/21/2015 A doctor saw the patient and noted that the patient was "feeling OK." The doctor noted no blood in stool. Vital signs were normal. The patient had trace leg edema, a systolic murmur. The doctor assessed HTN, CAD, hep C, GERD, PUD, thoracic aortic aneurysm, AVR, CHF, and psych disorder. The doctor also assessed "GIB" apparently gastrointestinal bleed and noted that the 9/18/15 RN note should be reviewed. The doctor ordered a CBC. The doctor also noted hyponatremia and ordered another sodium. The doctor documented "? WT [weight] loss- per pt." but took no history and did not document the weight. Indeed the patient had lost weight. The doctor restarted Lasix at 40 mg in the morning and ordered daily weights. This was the last infirmary note so the admission and discharge infirmary notes were in a different PDF of this chart.

11   Records were not in order.

191

PTX193-0958

PTX193-0959

Patient #17

9/22/2015 A psychiatrist saw the patient via telemedicine.  The psychiatrist noted the patient saying "Patient indicated he was admitted on medical furlough for community inpatient endoscopy and transfusion due to GI bleed.  It's my fourth, I'm used to it'." The psychiatrist stated that the patient was "fully oriented" and "thoughts were well organized, logical, and sequential.  No current symptoms, No odd or bizarre thoughts and no preoccupations evident." The psychiatrist noted no acute or gross psychopathology evident.  The doctor noted that there were no records of his recent medical furlough nor mental health records relating to the past few weeks so he requested these with a two week follow up.

9/23/2015 Albumin 2.9; sodium 136; AST 40; ALT 47; hemoglobin 10.4.

9/23/2015 A doctor wrote a discharge summary and noted that the patient was admitted to the infirmary on 9/13/15 and had sodium 114 with hemoglobin 8.5 and he was admitted  where hemoglobin was 4.2 and sodium 117 .  It wasn't clear when the patient was admitted.  The records were disorganized, with July 2015 and September 2015 mixed together.  The doctor noted that the patient needed follow up with GI in five weeks for EGD and colonoscopy.  The doctor ordered a next week follow up.

9/24/2015 The patient was described by a mental health worker as taking all of his mental health medications.

9/29/2015 Sodium 127; chloride 96; hemoglobin 10.1.

10/6/2015 The psychiatrist stopped prolixin and artane, two of the patient's psychotropic medications.

11      Hospital reports were unavailable.

192

Patient #17

10/8/2015 A MAR documented that Prolixin and Artane were discontinued on 10/8/15.

10/11/2015 A physician assistant saw the patient for hepatitis C clinic. The PA noted that the patient had ALT of 97 and AST 40 with platelets 357 for an APRI of 0.28 and was stable. A six month follow up was ordered.

8 The PA failed to review important abnormal blood test results including albumin 2.9, sodium 127 and hemoglobin 10.1.

10/12/2015 Wexford approved a colonoscopy and EGD. There was no evidence that this occurred.

7 There was failure to complete a recommended procedure.

10/14/2015 The patient signed an "affidavit" that he would refuse contact with his telemedicine psychiatrist and preferred a face to face contact which allowed more interaction.

10/17/2015 The patient complained to a nurse of weight loss and burning in his stomach. The nurse told the patient to avoid "trigger" foods.

16 The nurse should have referred to a physician especially given the history of Barrett's esophagus and prior GI bleeds.

10/23/2015 A doctor saw the patient for HTN clinic. The note was incomplete. One of the sheets was not in order and couldn't be located.

11 Records were not in order.

10/27/2015 Sodium 130; iron 33 (50-180); transferrin 274 (200-400); IBC 384 (250-450); % transferrin saturation 9 (20-50); hemoglobin 13.2.

11/1/2015 A MAR documented that the patient started refusing Clonazepam around 11/11/05. The patient was not on any ordered mental health medication until prolixin and artane were ordered as enforced medication on 1/28/16.

11/4/2015 AST 25; ALT 20; hemoglobin 12.9.

11/4/2015 The patient told a mental health staff that he wanted to sign a consent to again see the telemedicine psychiatrist. The mental health staff told the patient that he was already scheduled to see the telemedicine psychiatrist and the patient asked to see him earlier.

193

PTX193-0960

Patient #17

11/5/2015  A doctor saw the patient, who now weighed 145 pounds. Ironically, the patient was being seen for a chief complaint of "weight gain." Someone documented that the patient weighed 133 on 8/5/15. The patient wanted Tylenol #3. The doctor took no history related to his medical conditions but did document "Happy about WT gain." The patient asked about getting his medication KOP. The doctor took no history, documented a very brief physical examination and documented that his note was continued on the next page, but this page was not present in the medical record.

11/16/2015 A telepsychiatrist saw the patient. The patient was described as alert, engaged, cooperative, well kempt with fair insight and fair judgment. The thoughts were organized and there were no delusions or bizarre content. The summary was that there was no acute or gross psychopathology. A six week follow up was ordered.

11/17/2015 A doctor saw the patient. The weight was 144 pounds. The doctor noted that the patient was recently hospitalized for transfusion and had esophageal varices and Barrett's esophagitis. Except for documenting that the patient said he was OK there was no history. The doctor noted that the hemoglobin was 12.9 and that the patient signed a refusal for his PM medication including Prilosec- the following line was illegible. The doctor documented that "weight gain not a worry"- however the patient had lost significant weight over the past two years. The doctor advised the patient not to refuse his Prilosec. The patient verbalized understanding. The doctor ordered a CBC in six weeks.

2    The patient did not have varices but had a GI bleed from ulcers.

194

**PTX193-0961**

PTX193-0962

Patient #17

| | | |
|---|---|---|
| 12/29/2015 | The patient was seen while on hunger strike. The patient said it was religious fasting. The licensed social worker who saw him documented that he was not delusional and his thought processes were "linear." | |
| 12/31/2015 | A NP saw the patient. The weight was 137 pounds; the inmate was still fasting. The patient was drinking fluid. The NP ordered the nursing staff to asses daily urine dipstick. The NP scheduled a visit the following Monday 1/4/16 but did not order any labs. | 8 | The patient had weight loss and was fasting. Baseline labs should have been obtained. |
| 1/5/2016 | The patient refused to see the NP. The NP noted that the cell smelled of urine. | |
| 1/7/2016 | A doctor documented that at a care conference it was agreed to ask the chaplain to see the patient and to obtain a competency evaluation by mental health. | |
| 1/7/2016 | A mental health note documented that the patient was "in segregation where he continues to reside following refusal of housing after an initial IDR while residing on HCU-3. The patient refused to "cuff up to come to interview room." An assessment occurred in the cell with security present. The purpose of the contact was to request further explanation from the patient regarding his "fast." The patient denied any hallucinations. The patient's judgment and insight were "questionable as pt.'s decision making is affecting general health." | |
| 1/8/2016 | A doctor documented that the patient was refusing to eat and told the patient that if he continued to refuse food he would be force fed. This note was incomplete and the full note was not in the medical record. There were no further medical notes on this patient. | 8 | The doctor should have ordered laboratory tests because of the fast. |

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 196 of 431 PageID #:12394

PTX193-0963

Patient #17

1/10/2016 A licensed counselor saw the patient and noted that the patient was not eating because of religious convictions. The patient was described as unstable and the counselor's plan was to "consider appt. w/ [the psychiatrist] if appropriate."

1/11/2016 A psychiatrist saw the patient via telemedicine. The psychiatrist dictated his note but this dictated note was not present in the medical record we reviewed. The psychiatrist did write a brief note documenting that the MAR was not present and no primary care mental health records were present. The psychiatrist re-started Prolixin and continued Klonopin. There were no MARs indicating that the patient received Prolixin. A next week follow up was ordered but did not take place.

1/13/2016 A licensed counselor saw the patient at the request of an officer. The patient was "remarking that the room vents were suffocating him. His speech was pressured, he had paranoia, and his behavior was disorganized. The patient was assessed as unstable.

1/14/2016 The patient was on 30 minute checks and asked how many meals he has to eat before he could move "upstairs." It wasn't clear if the patient was eating.

1/15/2016 A mental health staff documented that the patient was told that if he ate a meal he could get his clothes back. The inmate said he hadn't eaten because "this was a lie."

1/16/2016 A QMHP saw the patient and documented that the inmate "smells like puke." No referral was made.

196

PTX193-0964

Patient #17

1/21/2016   Although the patient was being seen daily, on this day the patient was observed lying on his bed completely covered by a security blanket. The patient refused to answer questions. The counselor was unable to fully assess the patient. The patient was also unable to be assessed on 1/22/16 and 1/23/16 for the same reasons.

1/24/2016   A PsyD saw the patient and noted that the patient said he had not eaten food since Christmas for spiritual reasons. The patient was apparently drinking water. The patient was not weighed. The PsyD documented that the patient said he was not taking psych meds but this was not checked vs the MAR. The patient was assessed as unstable.

19   Not eating for almost a month is significant and should have resulted in a physician evaluation and laboratory testing which were not done. This is lack of access and indifferent.

1/25/2016   A QMHP saw the patient and documented that the patient refused to move the blanket from his face, refused breakfast and medication, and was no longer drinking water and would not speak to his psychiatrist. Remarkably there were no psychiatrist evaluations documented on this severely ill patient.

1/26/2016   A QMHP saw the patient and noted that the patient refused to remove the blanket which was over his face. The patient was refusing food, liquids, medication, and assessment. The QMHP was unable to assess the patient and documented the patient as unstable.

1/26/2016   A form requesting emergency involuntary administration of psychotropic medication was initiated. The patient was documented as being on the infirmary.

197

Patient #17

| | | |
|---|---|---|
| 1/27/2016 | Labs in KSB Hospital sodium 150; BUN 89; creatinine 2.12; AST 35 (8-33); ALT 24; bilirubin 1.9; magnesium 2.8 (1.6-2.3); WBC 16.7 with left shift; hemoglobin 15.2; platelets 161. These labs were signed as reviewed on 1/28/16. | 6, 14 | These labs were critical and indicated severe dehydration causing renal failure, liver damage, and indicated infection (WBC 16.7 with left shift). These should have been reviewed promptly and the patient should have been hospitalized. |
| 1/27/2016 | A licensed counselor saw the patient and documented, "we are aware pt. is being considered for 'forced feeding.' We are aware pt. is scheduled for enforced medication 1/28. He is currently administered psych med under emergency enforced [illegible] (prolixin). The plan was to "assess staff [with] assessment for 'forced feeding.'" | |
| 1/28/2016 | A psychologist documented that the treatment review committee concurred for enforced medication and notices were made. | |
| 1/29/2016 | A QMHP documented that security said the patient was more cooperative but was unstable and that dayroom privileges were approved. | |
| 1/31/2016 | A PsyD documented that the patient said he was OK. It was not clear if the patient was eating. | |
| 1/31/2016 | Blood cultures collected on 1/31/16 were reported 2/1/16 and showed 2 bottles were growing gram negative rods. Results were called to a nurse in the DOC and the lab was told that the patient had been transferred to St. Anthony's hospital but had expired. | 11, 19 | It is not clear what happened because documentation was so poor. While this may have been due to record keeping, a physician should have been seeing the patient daily under the circumstances but this did not appear to be happening. |
| 1/31/2016 | A note from a hospital documented that the patient had a post intubation x-ray so it appeared that the patient was not hospitalized until 1/31/16. | |

198

PTX193-0965

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 199 of 431 PageID #:12397

PTX193-0966

Patient #17

199

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 200 of 431 PageID #:12398

PTX193-0967

200

Patient #17

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 201 of 431 PageID #:12399

PTX193-0968

Patient #17

201

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 202 of 431 PageID #:12400

PTX193-0969

202

Patient #17

PTX193-0970

Patient #17

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 204 of 431 PageID #:12402

PTX193-0971

Patient #17

204

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 205 of 431 PageID #:12403

PTX193-0972

205

Patient #17

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 206 of 431 PageID #:12404

PTX193-0973

206

Patient #17

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 207 of 431 PageID #:12405

PTX193-0974

Patient #17

207

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 208 of 431 PageID #:12406

PTX193-0975

Patient #17

208

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 209 of 431 PageID #:12407

PTX193-0976

Patient #17

209

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 210 of 431 PageID #:12408

Patient #17

210

PTX193-0977

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 211 of 431 PageID #:12409

PTX193-0978

Patient #17

211

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 212 of 431 PageID #:12410

PTX193-0979

212

Patient #17

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 213 of 431 PageID #:12411

PTX193-0980

Patient #17

0.3

213

Patient #18

10/14/2015 The problem list documented hypertension, diabetes, COPD, anemia, prostatic hypertrophy, and reflux disease.

The problem list did not document prosthetic heart valve, atrial fibrillation, alcoholic cirrhosis, chronic kidney disease, and diabetic nephropathy.

10/10/2013 Ammonia was 165 (<56); hemoglobin 11.4; MCV 106.3; INR 2.

These values are consistent with alcoholic liver disease which had yet to be diagnosed and was not on the problem list.

11/12/2013 Hemoglobin 10.9 MCV 100.9; platelets 136; INR 1.9.
12/9/2013 BUN 28; creatinine 1.53; bilirubin 2.2; cholesterol 123; HDL 53; LDL 58; folate >25 (>5.8); hemoglobin 11.7; MCV 101.5; platelets 147; AST 34; ALT 20; INR 2.
1/10/2014 BUN 33; creatinine 1.55; bilirubin 1.5; A1c 6.5; hemoglobin 10.2; MCV 102; platelets 128; INR 2.3.

6    These values show chronic kidney disease, possible dehydration, and anemia consistent with cirrhosis from alcoholic liver disease yet these labs were not evaluated.  Kidney disease was not a diagnosis.  The reason for the anemia was not on the problem list.

2/11/2014 Hemoglobin 11; MCV 102.8; platelets 138; INR 2.1.
3/10/2014 Hemoglobin 10.7; MCV 97.2 (80-99); platelets 145; INR 1.8.

3/20/2014 A nurse saw the patient for trouble breathing.  The patient had audible wheezing, a pulse of 40 and respiratory rate of 24 with a PEFR of 350.  The nurse noted that a doctor was seeing the patient that day.

3/20/2014  A doctor saw the patient as a writ return and noted that the patient was evaluated by cardiology and noted that the cardiology recommended to increase the hydralazine and to obtain an echocardiogram and event monitor.  The doctor ordered a month follow up and requested the echocardiogram. The doctor didn't evaluate the shortness of breath. The doctor did not conduct a physical examination of the patient.

1, 2,  6,
19
The doctor did not evaluate the multiple serious significant laboratory abnormalities.  The doctor did not evaluate the patient's shortness of breath even though that was the presumed reason for the visit.  The doctor took no history, failed to examine the patient, and failed to make an assessment with respect to the shortness of breath.  Care failed to follow generally accepted guidelines or usual practice.  Abnormal labs and symptoms of trouble breathing should have resulted in an evaluation to determine the cause.

214

PTX193-0981

PTX193-0982

Patient #18

3/26/2014 A doctor noted that an event monitor was approved in collegial.

4/3/2014 EKG showing atrial fibrillation with LAD, probably old inferior infarct, anterior fasciculare block and bradycardia 47.                                                                                          Notably atrial fibrillation was not on the problem list.

4/4/2014 Wexford approved an echocardiogram.

4/4/2014 Wexford approved a 30 day event monitor from UIC cardiology.

4/8/2014 An NP saw the patient and noted that bumex was on ordered and would bridge this pending order with Lasix.

4/30/2014 INR 3.1.                                                                                                                      Illegibility is a reason for an electronic medical record.

5/9/2014 A nurse wrote a note that the patient was placed on the infirmary. The note was partly illegible. The patient was placed on IV fluid but it wasn't clear why.

5/10/2014 A nurse noted that the patient was having a hard time       19   The doctor should have evaluated the patient in person.
breathing and had respiratory rate of 28. The nurse gave
the patient a wedge to put under his mattress. In a later
note a nurse documented notifying Dr. Sood. A nurse noted
that the patient was receiving IV fluid but it wasn't clear
why.

5/12/2014 BUN 30; creatinine 1.52; bilirubin 1.6; GFR 55; TSH 1.31; A1c    6    These labs again showed possible dehydration, chronic kidney
5.9; hemoglobin 10.1; MCV 104; platelets 103; INR 2.3.                          disease, and macrocytic anemia with low platelets consistent
                                                                               with alcoholic liver disease.

5/14/2014 A NP saw the patient for a swollen left finger. The NP noted        Despite significant abnormal labs and leg edema with shortness
that the patient also had leg edema and reported not taking               of breath, the NP failed to form an appropriate assessment of
his water pill at night because he became incontinent when                the abnormal labs and new symptoms. Care failed to follow
he did. The NP ordered a hand x-ray and requested a Texas                 generally accepted guidelines as those abnormal labs and
catheter. The NP did not consider giving the Lasix in the                 symptoms should have been evaluated.
morning. The NP did not address the prior episode of
shortness of breath and since ordering a hand x-ray failed to
include a chest x-ray to assess for heart failure.

215

3:17-cv-03112-JES-JEH   # 263-10   Page 360 of 577

PTX193-0983

Patient #18

6/10/2014 Hemoglobin 11.5; MCV 101; platelets 130; INR 2.3.

6/26/2014 A doctor saw the patient for HTN, DM, and COPD/asthma. The BP was 120/70 . The doctor noted that the patient had heart sounds of regular sinus rhythm despite the patient having long standing atrial fibrillation. The patient had mild expiratory wheezes and PEFR of 350. The doctor took no history with respect to COPD/asthma but diagnosed moderate persistent asthma and made no changes to therapy. The doctor noted that labs were reviewed but made no comment about these. The patient's anticoagulation or cardiac rhythm disturbances were not addressed.

7, 17   The doctor failed to establish a reasonable treatment plan in evaluation of the patient's lung symptoms. A chest x-ray, consideration of pulmonary function testing, and evaluation for heart failure should have been done. The patient also had a 26.4% 10 year risk of heart disease or stroke and a high intensity statin was indicated. Care failed therefore to follow generally accepted guidelines.

7/11/2014 Hemoglobin 10.7 MCV 106.1; platelets 130; INR 3.

7/17/2014 At a hospital, hemoglobin 12.3; MCV 96.9 (80-94); platelets 124; INR 3.2; BUN 39; creatinine 1.44; AST 40 (8-33); bilirubin 2.2.

7/17/2014 A doctor saw the patient and was feeling "out of it." The doctor took no more in depth history. The doctor noted that the patient was oriented to person place and time. The doctor noted facial symmetry and no weakness. The doctor made no assessments, did not evaluate for the prior episodes of shortness of breath. The doctor ordered a CBC, CMP, INR and ammonia. The doctor made several addendums to this note. The doctor added that the patient "can't think." On a later note the doctor documented that a nurse told the doctor that the patient was scheduled for a dental appointment and faked being sick, cancelling the dental appointment so that he could go to commissary.

1, 6   The doctor failed to take adequate history. Prior blood tests were not evaluated. Care failed to follow generally accepted guidelines or usual practice.

8/8/2014 An echocardiogram was done as requested on 3/20/14 and approved on 4/4/14.

216

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 217 of 431 PageID #:12415

Patient #18

8/8/2014 A doctor noted that the patient went to UIC for a cardiology appointment and had a 30 day monitor attached. The doctor noted that the patient had an echocardiogram.

8/11/2014 Hemoglobin 11.2; MCV 102.7; platelets 106; INR 3.

8/12/2014 A doctor noted reviewing the echocardiogram results and that the patient had an event monitor placed.

8/27/2014 Echocardiogram showed right atrium and ventricle mildly dilated; left atrium moderately dilated but L ventricle normal size but moderately thickened. Moderate concentric hypertrophy with 50% EF; normal appearing prosthetic AV with trace regurgitation, moderate tricuspid regurgitation. Diastolic dysfunction and severely elevated pulmonary artery pressure.

9/3/2014 A doctor noted that the patient was approved for a cardiology appointment in collegial review.

9/8/2014 The patient went to cardiology for the 30 day event monitor more than five months after the collegial. The referral for this was dated 3/20/14.

9/12/2014 EKG showing idioventricular rhythm with nonspecific intraventricular block and inferior and anterolateral infarcts age indeterminate.

9/12/2014 The patient was evaluated in EP clinic for scheduled follow up. The cardiologist stated that the patient was seen two months ago for a fib/flutter with slow ventricular response. The plan was to hold all AVN blocking agents. The cardiologist reviewed the echocardiogram and last Holter from 2013. The cardiologist recommended a pacemaker and that this should be done in the hospital.

9/12/2014 Hemoglobin 11.4; MCV 104.4; platelets 135; INR 3.4.

217

PTX193-0984

Patient #18

9/17/2014  A doctor noted that the patient was discussed in collegial and approved for admission for pacemaker placement.                                    6    Abnormal labs were not followed up.

9/18/2014  Wexford approval of hospitalization management prior to pacemaker placement.

9/26/2014  EKG showing irregular rhythm with no p waves [looks like atrial fibrillation] with intraventricular block and PVCs

9/26/2014  The patient told a nurse that he was not feeling well.  The pulse was 41.  The patient was sent to a local ER via ambulance.

9/28/2014  The patient returned from the hospital but the nurse did                           11   The hospital report was not available.
           not note what had occurred at the hospital or whether
           there were new orders.

9/29/2014  A doctor noted that the patient returned from the hospital
           for shortness of breath and stated that "they didn't adjust
           meds or do anything but hold coumadin for upcoming
           procedure." The upcoming procedure wasn't specified so it
           wasn't clear whether this was the pacemaker placement or
           another procedure.

10/3/2014  INR 1.5.

10/14/2014 INR 1.4.

10/15/2014 A doctor wrote a brief chart review note stating that the
           INR was 1.4 and increased the coumadin to 7 mg daily with
           an INR in seven days.

218

PTX193-0985

Patient #18

| Date | Description | |
|---|---|---|
| 10/17/2014 | The patient was seen for diabetic clinic. The BP was 124/58 and the A1c was documented as 5.6. The doctor took no history with respect to any disease and noted an irregular heart rhythm and expiratory wheezes. The diabetes was listed as in good control. The doctor did not address whether the patient had hypoglycemia, especially given the low A1c. Anticoagulation and the cardiac arrhythmia were not addressed. Despite the asthma/COPD being described as moderate persistent, the doctor had taken no history and made no changes to therapy. | 1, 2, 6, 12 | The doctor failed to evaluate many of the patient's existing problems including atrial fibrillation, high blood lipids, heart failure, diabetic nephropathy, anticoagulation, and cirrhosis and the doctor failed to evaluate the prior abnormal labs. The doctor failed to adequately evaluate the pulmonary symptoms presumably assigning these to asthma/COPD when they may have been due to heart failure, or liver failure. The patient should have been referred to a cardiologist. Care failed to follow generally accepted guidelines or usual practice. |
| 10/22/2014 | A doctor renewed an order for a Texas catheter but it wasn't clear on prior notes that the patient was using this device. | | |
| 10/22/2014 | BUN 33; creatinine 1.71; bilirubin 1.7; hemoglobin 11; MCV 105; platelets 113; AST 32; ALT 18; INR 1.6. | 6 | These abnormal laboratory values were not followed up on. They appeared to show cirrhosis from alcoholic liver disease, chronic kidney disease and dehydration which were all unidentified. Care failed to follow generally accepted guidelines or usual practice. |
| 10/22/2014 | INR 1.6. | 6 | Patients with most mechanical heart valves require an INR between 2.5 to 3.5. Certain valves (On X valves) require an INR of 1.5-2.5. This patient's valve type or anticoagulation goal was never documented but was presumed to be 2.5 to 3.5. The type of valve and anticoagulation goal needed to be documented in the record. |
| 10/23/2014 | A doctor wrote that he called UIC heart center as the patient was on coumadin and a pacemaker was planned for 10/27/14. The INR was 1.6. | | |
| 10/24/2014 | At 9:20 am a nurse documented telling the inmate that coumadin was to be held from this day through 10/27/14. | | |

219

PTX193-0986

3:17-cv-03112-JES-JEH   # 263-10   Page 364 of 577

PTX193-0987

Patient #18

| | | |
|---|---|---|
| 10/24/2014 | | at 5:20 pm a PA documented that a nurse from UIC cardiology called to say that the cardiologist recommended NOT stopping the coumadin and wanted the INR close to 2. The PA ordered to continue the coumadin at 7 mg. |
| 10/27/2014 | | A pre-EP procedure history and physical at UIC noted non-obstructive CAD with COPD, HTN, HLD, DM, mechanical AVR in 1995, chronic a fib/flutter with junctional escapes in for permanent pacemaker. A pacemaker was placed St Jude PM 1240 VVI. A two week follow ups was recommended. | 10 | The two week follow up with cardiology never occurred and was unrecognized as not occurring. Care failed to follow generally accepted guidelines or usual practice. |
| 10/29/2014 | A doctor noted that the patient had a pacemaker installed on 10/27/14 and had some pain and ordered Tylenol. The pacemaker function wasn't checked. The hospital report was not reviewed and follow up was not identified. | 10 | The doctor failed to follow up on the UIC report. Care failed to follow generally accepted guidelines. |
| 10/30/2014 | Apparently a physician reviewed written paperwork and noted that a two week follow up with cardiology was recommended. | 10 | The doctor did not ensure that the patient was referred to cardiology. Care failed to follow generally accepted guidelines or usual practice. |
| 11/5/2014 | The patient was approved for follow up of the pacemaker. There were no progress notes following this visit for some time. | | Though this referral was approved, there was no evidence that it occurred. Care failed to follow generally accepted guidelines or usual practice. |
| 11/14/2014 | Hemoglobin 10.1; MCV 104.1; platelets 110; INR 2.4. | | |
| 12/10/2014 | Hemoglobin 11.3; MCV 101; platelets 130; A1c 5.7; INR 1.8. | | |
| 1/12/2015 | Hemoglobin 11.8; MCV 102.3; platelets 126; INR 2. | | |
| 2/9/2015 | Hemoglobin 11.4; MCV 101.8; platelets 123; INR 2.3. | | |
| 2/27/2015 | A nurse evaluated the patient using the shortness of breath protocol. The oxygen saturation was 95% and respiratory rate of 12. The patient was listed as being on Xopenex, albuterol, Atrovent and Alvesco inhalers. PEFRs were 250/200/250. The nurse took no action except to give the patient a nebulization treatment. | 16 | The nurse should have consulted a physician. |

220

Patient #18

3/3/2015 A doctor saw the patient because a nurse wanted evaluation of the baclofen. The patient wanted Neurontin discontinued. The doctor wrote that the patient had no spinal injury or MS and that the patient was using the baclofen because his left leg became spastic. The doctor stopped both baclofen and Neurontin and ordered a follow up. The doctor took no history of why the patient was put on these medications and did no physical examination. The doctor did not address any problems. The patient hadn't been seen since return from the hospital for his pacemaker and the doctor did not address whether the patient had his cardiology follow up.

6, 15    The doctor failed to review any of the prior abnormal lab results and failed to follow up on the patient's recent symptoms or problems. Care failed to follow generally accepted guidelines or usual practice.

3/10/2015 Hemoglobin 11.6; MCV 103.7; platelets 143; INR 2.1.

4/6/2015 A PA saw the patient for follow up of discontinuation of baclofen and Neurontin. The PA noted that the patient complained of hip pain and LLE "shakiness." The physical examination documented "shakiness" but it wasn't clear what that meant. The plan was to monitor the shakiness and "jerkiness," continue physical therapy and Tylenol for pain.

6    The PA failed to follow up on the abnormal labs dating from 11/14/14 which had not been reviewed.

4/25/2015 A nurse evaluated the patient using the shortness of breath protocol. The respiratory rate was 14. The PEFR were 250/300/300 . The nurse took no action and the patient returned to his housing unit.

16    The patient had a serious complaint and the nurse should have referred the patient to a provider.

221

PTX193-0988

Patient #18

5/13/2015  A doctor saw the patient for HTN, DM and COPD chronic clinics.  No history was taken.  The A1c was 5.7.  The heart was described as regular rhythm and the lungs clear.  PEFR wasn't taken.  The was no history of symptoms.  Though the patient had mild pitting edema, there was no assessment.  The assessment listed anemia but it was not addressed.  There was no change in plan.  The conduction abnormalities or anticoagulation were not addressed.  The status of the patient wasn't clear from this note.

1, 2, 3, 6  The doctor failed to address all of the patient's serious medical problems including his anticoagulation, follow up with cardiology after the pacemaker, recent shortness of breath and current edema, diabetic nephropathy, heart failure, high blood lipids, to address or develop a plan for the anemia.  History for these conditions was not taken, the patient wasn't examined for these conditions and there was no therapeutic plan.  If the patient had suspected cirrhosis, an ultrasound should have been done.  The patient's pacemaker function was not addressed.

6/5/2015  A NP saw the patient for constipation and ordered Colace.  None of the other patient problems were addressed.

8/8/2015  An annual history was completed by a nurse.  The nurse documented that the patient was on apresoline, coumadin, proscar, cozaar, Xopenex, Aldactone, fibertabs.  Problems were listed as heart failure, type 1 diabetes, aortic stenosis, prior valve replacement, and prior TURP.  A provider physical examination added no further history.  Though the patient was 70 years old colorectal cancer screening was not offered.  The provider listed HTN, type 1 diabetes, AV replacement with pacemaker for atrial fibrillation, heart failure and peptic ulcer disease.  No changes to treatment were made.

1, 2, 3, 7  The nurse obtaining this history, examination, and plan failed to address all of the patient's problems including the anemia, atrial fibrillation and cardiac conduction abnormality, peptic ulcer disease.  The doctor following up with a physical examination failed to make a diagnosis related to the anemia, failed to acknowledge or follow up on the cardiac arrhythmia, and failed to note that the patient had missed cardiology follow up at UIC.  The patient was not offered colorectal cancer screening despite this being a current standard of care.  Care failed to follow generally accepted guidelines or usual practice.

8/10/2015  A doctor saw the patient.  The doctor noted that the patient was on lactulose for constipation and was having diarrhea.  The doctor continued the lactulose if the patient needed disimpaction for his constipation.  The doctor did not address any of the patient's other problems.

8/12/2015  The patient experienced a fall.  The nurse documented writing an injury report but there was no progress note for this problem.

16  The nurse should have consulted a physician.

222

PTX193-0990

Patient #18

| | |
|---|---|
| 8/25/2015 | The patient asked for a breathing treatment. |
| 8/26/2015 | The patient asked for a breathing treatment. |
| 8/27/2015 | A nurse saw the patient using a shortness of breath protocol and noted that the patient was out of his Atrovent for two months. The PEFR was 200. The nurse sent the patient for a breathing treatment and strongly recommended that the patient pick up his Atrovent at medline. | 16 | The patient had a serious complaint and the nurse should have referred the patient to a provider. |

| | |
|---|---|
| 9/15/2015 | A doctor noted that the INR was 2.2 and increased the coumadin to 8. There was no evaluation of the patient. |
| 9/22/2015 | A doctor noted that the INR was 2.7 and he maintained the coumadin at 8. |
| 10/14/2015 | A doctor saw the patient for HTN, DM, and COPD chronic clinics. The doctor noted that the patient was on coumadin for AVR and had microcytic anemia but the reason for this was not provided. The only history was that the patient was "generally well, got here in his wheelchair. Taking his meds + coming for AccuChecks + insulin BID." That was the only history. PEFRs were 230/230/240. The A1c was listed as 6.1. HTN, DM, and COPD were all listed as in good control. The doctor did not address the anemia, anticoagulation or arrhythmia. There was no change to therapy. | 1, 2, 3 | The doctor noted that the patient had a microcytic anemia when the patient had a macrocytic anemia. The doctor failed to establish a diagnosis for the anemia and failed to acknowledge other abnormal labs including chronic kidney disease, and laboratory evidence suggestive of cirrhosis. The doctor did not address the anemia, anticoagulation, or arrhythmia despite the patient having recent shortness of breath. The patient had multiple recent episodes of shortness of breath that were not addressed. Care failed to follow generally accepted guidelines or usual practice. |
| 10/14/2015 | The problem list was updated and documented HTN, DM, COPD, *microcytic anemia* BPH and GERD. Multiple diseases weren't included. | | This demonstrates a significant gap in knowledge related to primary care. |
| 11/19/2015 | A doctor didn't evaluate the patient but noted that the INR was 1.9 and increased the coumadin to 8.5 mg. |
| 11/25/2015 | A nurse evaluated the patient for nausea for 2-3 weeks duration. The patient was not vomiting. The nurse took no action. | 16 | Vomiting is a serious condition in a diabetic and the nurse should have referred the patient to a provider. |

Patient #18

11/30/2015  EKG showing pacemaker spikes with underlying atrial fibrillation and IVCD.  QRS consistent with septal infarct probably old.

11/30/2015  A nurse evaluated the patient for chest pain.  The patient was rushing getting ready for commissary.  The pain felt like a pulled muscle.  The nurse ordered an EKG and a doctor saw the patient.

11/30/2015  A doctor noted that the patient developed L chest pain while rushing to go to commissary that felt like a pulled muscle.  The patient had no diaphoresis or shortness of breath.  The doctor documented that there was a tender area on his chest with palpation.  The doctor noted an irregular heart rhythm and reviewed the EKG, noting that it showed irregular rhythm, PVCs and pacing.  The plan was that if the chest pain didn't resolve over 3-6 weeks he would see the patient in sick call.  The doctor ordered an overread of the EKG but did not order an antianginal medication.  The doctor failed to note that the patient failed to have follow up with the cardiologist.

1, 3, 7,  The patient with a serious cardiac arrhythmia and chest pain that
12        was consistent with angina was not adequately evaluated.  The doctor failed to take a risk factor assessment but the patient had multiple cardiovascular risk factors including diabetes, hypertension, age, male sex, and had a 10-year heart disease risk of about 25%.  His risk was therefore considerable.  While the doctor felt that this was atypical chest pain, the patient's history required a higher level of investigation.  The doctor ordered no anti-anginal medication and to give a 3-6 week follow up in sick call was indifferent.  The patient should have been referred for stress testing or cardiac catheterization to evaluate for acute coronary syndrome.  At a minimum the patient should have been started on a statin and anti-anginal medication and referred to a cardiologist.  Care failed to follow generally accepted guidelines or usual practice.

12/1/2015  A doctor saw the patient for a complaint of nausea.  The patient was taking Prilosec.  The doctor took no history with respect to chest pain.  The doctor diagnosed nausea from Prilosec and stopped the Prilosec and started Zantac.  Zantac can result in cardiac conduction abnormalities and should have been used with caution in this patient with know severe conduction abnormalities.

1          The doctor failed to take a thorough history.  Nausea can be an anginal equivalent.  The doctor failed to note the prior complaints of chest pain and this was not investigated.  Care could reasonably expected to be better.

PTX193-0991

PTX193-0992

Patient #18

| | | |
|---|---|---|
| 12/17/2015 | A doctor saw the patient for HTN, DM, chronic clinics. The doctor mentioned that the patient was on coumadin and had COPD. The doctor took no history to determine the status of the patient's progress with respect to any of his diseases. The A1c was documented as 6.6. PEFR was documented as 240/230/230. The last INR was documented as 1.9. BP was 122/64 and the pulse 93. The doctor noted that the patient had a macrocytic anemia and appeared to order a B12 level but the note was illegible. The patient's COPD, cardiac arrhythmia, were not addressed. The doctor made no changed to therapy. | 1, 3 |
| | | The doctor failed to take a thorough history of the patient's conditions. The doctor failed to address the patient's COPD or cardiac arrhythmia. Even though these were chronic medical conditions, they were not being followed in chronic care clinics. The doctor noted the macrocytic anemia and ordered a B12 level but failed to associate the macrocytic anemia with the abnormal bilirubin, and thrombocytopenia which can be associated with cirrhosis. The doctor failed to address the patient's prior episodes of chest pain even though the patient had history of cardiac arrhythmias and history of coronary artery disease. The patient had a 25% risk of heart disease and was not started on a statin. | |
| 12/22/2015 | At 10:10 am the patient complained to a nurse of leg swelling and shortness of breath with pitting edema. The nurse notified a doctor. | |
| 12/22/2015 | At 10:40 am a nurse noted that the patient was lightheaded and had a blood glucose of 48. The patient was nauseated cold and clammy. The nurse gave the patient juice and checked him in 15 minutes and his blood sugar was 102. | |

PTX193-0993

Patient #18

| 12/22/2015 | A doctor saw the patient subsequent to the hypoglycemic episode. The doctor said he was seeing the patient for low blood sugar and leg edema with shortness of breath. The doctor noted orthopnea, and left chest pressure that lasted 10 minutes with gradual onset and no resolution. The doctor noted 1-2+ lower extremity edema. The doctor decreased the 70/30 insulin from 25 to 20 units, restarted the alvesco and ordered a CBC, BNP, BMP and INR and ordered follow up in a week. The doctor did not order an EKG. The assessment of the chest pain was "COPD vs cardiac? not exertional" but the doctor didn't take a history sufficient to exclude this. The leg edema did not include rule out diagnoses. Although the doctor documented shortness of breath and a history of heart failure a chest x-ray was not done. | 1, 8 | The doctor failed to take adequate history with respect to leg edema and shortness of breath. The "chest pressure" was not addressed adequately as it may have been due to angina. The patient's possible cirrhosis may have resulted in the hypoglycemic episode but this was unrecognized. Though the patient had chest pressure the doctor did not order an EKG or assess the patient for angina. Though the doctor documented non-exertional chest pain, the history was insufficient to draw this conclusion. The doctor failed to establish potential diagnoses that may have caused the leg edema. Despite shortness of breath and history of heart failure a chest x-ray was not done. Care failed to follow generally accepted guidelines or usual practice. |
| 12/26/2015 | A nurse saw the patient who said, "I don't know what's wrong with me but something isn't right. I can't sleep cause I'm so short of breath." The nurse recommended that the patient rest and hydrate. Later that day a pacemaker check was done. | 16 | The patient had a serious complaint and the nurse should have referred the patient to a provider. |
| 12/28/2015 | EKG showed aberrant intraventricular conduction with ventricular escape complexes with WPW pattern type A. Overread was requested. | | |
| 12/29/2015 | EKG showing aberrant intraventricular conduction with PVCs and WPW pattern and rightward axis. | | |

PTX193-0994

Patient #18

| | | |
|---|---|---|
| 12/29/2015 | A doctor saw the patient and noted that the patient went to UIC for pacemaker check in the past and had the pacemaker placed two years ago.  The doctor failed to note that follow up with cardiology never occurred.   The doctor did note that the patient had leg edema and his weight had increased by 17 pounds over the past week and that the BNP was 712 and hemoglobin of 9.1 with an INR of 3.3.  The doctor noted increased shortness of breath, orthopnea, and edema.  The doctor questioned whether the pacemaker was malfunctioning,  and noted that the heart rate was in the 40s.  The doctor noted a heart rate of 44, which is significant bradycardia.  The doctor noted recent labs as BUN 42; creatinine of 1.77; BNP 712.  The doctor diagnosed heart failure exacerbation and increased the bumex to 2 mg and stopped the hydralazine and zantac and restarted omeprazole.  The doctor wanted to admit the patient to the infirmary but he was "averse" and the doctor recommended decrease of salt.  The doctor did not order a chest x-ray.  An EKG showed aberrant intraventricular conduction with ventricular escape.  The tracing appears to show 3 pace maker firings.  The doctor's plan included a cardiology evaluation if his plan failed.  However, the patient had multiple indications for hospital admission based on Heart Failure Society of America guidelines for admission to a hospital. | 1, 14 | The patient had 17 pound weight gain over a week with elevated BNP and leg edema suggestive of heart failure. The doctor failed to obtain a chest x-ray. The doctor failed to ask the patient about chest pain. The doctor ordered an EKG but didn't document evaluation of the EKG. The EKG showed aberrant ventricular complexes that made it difficult to evaluate for angina. The EKG showed three pacemaker firings with a slow heart rate. The doctor noted a heart rate of 44. The heart rate shouldn't be 44 if the pacemaker was functioning but this apparently was unrecognized. The doctor failed to recognize that the patient had never had cardiology follow up after the pacemaker set up. The patient had ventricular escape complexes with apparent pacing spikes.  The doctor assessed exacerbation of heart failure but did not order a chest x-ray, a repeat BNP, or repeat metabolic panel. Laboratory tests were noted which were not present in the medical record showing renal failure and elevated BNP. Given the number of serious cardiopulmonary problems, heart failure under these circumstances should be admitted to a hospital. This was particularly true because the doctor documented that he thought the pacemaker might be malfunctioning. Under these circumstances, the patient needed to be evaluated by a cardiologist in a hospital especially in the context of heart failure and possible angina. http://www.hfsa.org/heart-failure-guidelines-2/Care was grossly and flagrantly unacceptable. |
| | | |
| 12/30/2015 | Pacemaker check indicated two alerts: one was a high ventricular rate (40) was detected and the ventricular percent pacing greater than limit.  The pacemaker was functioning normally. | | A greater pacing rate with heart failure should have resulted in hospitalization. |

227

Patient #18

| | | |
|---|---|---|
| 12/31/2015 | A nurse saw the patient who said, "It's not my lungs, it's my heart." The patient was being seen for a nebulizer treatment. The nurse noted that the edema was already addressed by a doctor on 12/29/15. Although the patient complained of a heart problem, the nurse took no history and continued the same care and referred to a doctor the following morning. | 16 | The patient had chest pain but was not referred to a doctor. The nurse should have referred the patient to a doctor. |
| 12/31/2015 | A doctor saw the patient and noted that the patient felt better. The doctor took no history related to the patient's chest complaint. The doctor assessed heart failure exacerbation and restarted spironolactone and scheduled the patient for 1/6/16 with labs. | 1, 3, 6 | The doctor failed to review the pacemaker check alerts including high ventricular pacing. The doctor failed to take an adequate history of the patient's history that same day of chest pain. Care was grossly and flagrantly unacceptable. |
| 1/1/2016 | A nurse noted receiving a phone call from an officer that the inmate was not responding. The patient had died and was in rigor mortis on arrival at 4:30 am. Medics brought the patient to a hospital where he was pronounced dead. | | |

PTX193-0995

Patient #19

10/25/2000  The problem list documented alcohol abuse and chronic diarrhea secondary to prior surgery for peptic ulcer disease.

1/4/2002  The problem list documented hypertension.

3/6/2014  A chronic care flowsheet documented that the patient weighed 142 pounds.

6/30/2014  A chronic care flowsheet documented that the weight was 133 pounds.

6/30/2014  The patient was evaluated in hypertension and diabetes clinics but he did not have either disease. The blood pressure was 104/60. The A1c was 5.5 and the patient was not on any medication for blood pressure of diabetes. The NP seeing the patient documented that the patient did not have diabetes or hypertension and switched the patient to general medicine chronic clinic. The NP noted that the patient had ulcerative colitis but took no history and evaluated no labs. The NP did not note the nine pound weight loss.

1  The NP failed to note the weight loss despite the patient having ulcerative colitis.

10/8/2014  BUN 27; cholesterol 119; HDL 53; LDL 52 (50-129); Albumin 3.5 (3.4-5)

10/15/2014  A nurse documented that it was not possible to take the weight since the patient couldn't stand.  The patient was 81 years old.

10/17/2014  A PA saw the patient for his prosthetic leg. The weight was 133 pounds.  The PA noted that the patient had a poor fitting prosthetic and referred the patient for orthotic evaluation.  Presumably the weight was taken with the prosthetic.

10/21/2014  A nurse noted that the weight was approximately 133 and was deferred.

PTX193-0996

PTX193-0997

Patient #19

10/28/2014 An annual history and physical examination documented prior back surgery, prior cholecystectomy, alcohol abuse as medical problems. The history documented dietary restrictions but did not document what these were or why the patient needed dietary restrictions. The nurse taking the history documented that the patient said he had cataracts and couldn't read the eye chart. The doctor completing the physical examination added that the patient had prior surgery for peptic ulcer disease without specifying what was actually done and noted that the patient had prior osteomyelitis without more specificity. The assessment documented that the patient had a below knee amputation but didn't state why the patient had an amputation. The doctor noted that the patient had diabetes in 2012 but wasn't now being treated for this. The patient refused rectal examination. Colorectal screening was not done. The weight was 136.

7    The patient wasn't offered colon cancer screening. The patient was 81 but screening should stop when the estimated life expectancy is less than 10 years. Estimated risk should have been done as part of the annual assessment. Care failed to follow generally accepted guidelines or usual practice.

11/10/2014 The patient's weight was 136.

1/27/2015 The patient developed a lesion on the right stump and saw a doctor. The weight was 134. There was a 1 cm ulcer. DuoDERM was ordered.

2/2/2015 A nurse noted changing the dressing on the stump that had a moist wound on the stump with a foul odor.

4/23/2015 A PA saw the patient for a stump wound. The PA noted that the prosthetic didn't fit "right." There was a 2 cm lesion with "irritation" on the stump. The PA referred the patient to the orthotic specialist.

4/29/2015 Wexford approved an evaluation by Rockford Ortho for refitting of right artificial leg.

230

Patient #19

5/13/2015  The patient went to ophthalmology clinic and it was noted that he was using a wheelchair. The transfer note also documented that he was on a mechanical soft diet with no bread and had to sit up straight when he ate and that he had chronic diarrhea.

5/14/2015  Rockford ortho saw the patient. There was no report except for comments on the referral form. Those comments noted that the prosthesis was causing re-occurring sores and skin breakdown. They believed that the socket no longer fits adequately and would continue to cause problems. They recommended a socket replacement for the prosthesis.

6                What was the patient supposed to do? The prosthesis was broken. This should have been fixed.

6/1/2015  Wexford denied a new socket until a price quote was available.

11

6/3/2015  A nurse evaluated the patient for a toothache and documented a weight of 129.

6/11/2015  Wexford again denied a new socket until a price quote was available.

231

PTX193-0998

Patient #19

| | |
|---|---|
| 6/15/2015 | The patient was seen in General Medicine chronic clinic for ulcerative colitis, GERD and BPH.  The patient weight estimated at 129 pounds on the flow sheet.  The patient was 5 foot 11 inches.  There was no history of any of the patient's medical conditions on the progress note.  The BMI was not calculated on the note but was 18, which is considered underweight.  The nurse practitioner made no mention of this.  Without any history or documentation of status on any of the patient's conditions, the NP prescribed Lomotil for diarrhea as needed, Colace, fiber, milk of magnesia, terazosin, zantec, Tylenol and Maalox.  It wasn't clear why the patient needed these medications as there was no history.  The assessment was ulcerative colitis "controlled," GERD controlled, and anemia.  The etiology of the anemia was not documented and apparently was not understood.  The NP failed to review labs that showed that the patient had malnutrition with low albumin.  The thrombocytopenia was not acknowledged and the anemia not worked up. |

1, 2, 7  The patient had ulcerative colitis, weight loss, and anemia yet a colonoscopy wasn't done.  This was especially important since risk of colon cancer is higher in persons with ulcerative colitis.  Also the patient had pancytopenia that was unrecognized.  A bone marrow should have been considered.  At a minimum a repeat CBC should have been done.  The low albumin in addition to the ulcerative colitis and weight loss suggested malnutrition but no evaluation was done. The doctor did not address the broken prosthesis.   Care failed to follow generally accepted guidelines or usual practice.

| | |
|---|---|
| 6/25/2015 | The patient obtained a new socket for his prosthesis. |
| 7/9/2015 | The patient signed a "living will" that if he had an incurable and irreversible disease judged to be terminal that procedures that would prolong the dying process be withheld or withdrawn. |
| 7/23/2015 | Vit B12 674 (180-914); Iron 21 (50-180); ferritin 23 (10-259); folate 18.4 (>5.8). |

232

PTX193-0999

PTX193-1000

Patient #19

| Date | Description | |
|---|---|---|
| 8/5/2015 | A doctor saw the patient for review of labs and hemoccult. The weight was 134 pounds. The doctor noted that the patient was pale. The doctor noted a history of ulcerative colitis and documented that the patient didn't want a hemoccult done. The hemoglobin was 9.6 and the B12 and folate were normal and serum iron was low. The doctor diagnosed iron deficiency anemia and started iron supplements. The doctor noted that the patient had no diarrhea or black stool and had a history of constipation. The doctor did not order a colonoscopy. The doctor did not note the possible malnutrition. | 2, 3, 7, 12 — The doctor should have ordered a colonoscopy given anemia, ulcerative colitis, and weight loss. The patient had low albumin which was unrecognized and should have had an evaluation for malnutrition. The doctor should have considered referral to hematology for pancytopenia. |
| 8/6/2015 | UIC ophthalmology noted "visually significant cataracts both eyes" and recommended surgery with the right eye first. | |
| 8/10/2015 | UIC performed right cataract surgery. | |
| 8/12/2015 | A doctor saw the patient for follow up of a medical writ. The weight was 124 pounds, which was a 18 pound weight loss which the doctor did not notice. The doctor noted that the patient had cataract surgery and needed follow up at UIC in a week. The doctor did not address any of the patient's other problems. | 1 — The doctor failed to notice the weight loss. Care could reasonably have been expected to be better. |
| 8/18/2015 | The patient saw ophthalmology at UIC. They recommended cataract surgery in both eyes. A Dixon physician documented that the patient would need approval "but does not have DMZ so don't think he meets criteria." | |

233

PTX193-1001

Patient #19

| | | |
|---|---|---|
| 8/21/2015 | A doctor saw the patient.  The weight was 123 pounds.  The doctor noted that the weight was 142 pounds on 3/14 and was 123 pounds "today."  The doctor also noted that the patient had a hemoglobin of 9.6.  The history was that the patient had prior osteomyelitis of his right leg which presumably accounted for the amputation.  The doctor assessed a 19 pound weight loss over 17 months. The doctor also noted the albumin of 3.2.  Despite the anemia and weight loss the doctor assessed that the weight loss was due to needing dentures.  The doctor ordered a CMP, TSH, iron, ferritin, CBC, but did not order colonoscopy or order a nutritional inventory with a nutritionist.  The doctor also noted anemia and prior pancytopenia and documented that the patient might have a dyscrasia but did not refer to a hematologist.  The doctor ordered a two week follow up. | 2, 7 | The doctor concluded that low albumin, weight loss, and anemia were due to needing dentures without conducting other evaluations.  The patient needed a colonoscopy and needed a nutritional survey to determine if the patient was getting sufficient nutrients and food.  Care failed to follow generally accepted guidelines or usual practice. |
| 8/25/2015 | BUN 23; sodium 133; albumin 3.5 (3.4-5); iron 34 (50-19-80); Ferritin 48 (10-259); TSH 3.26 (0.35-4); WBC 7 (3.9-12); hemoglobin 11.1; platelets 135. | | The labs still showed anemia, borderline albumin and thrombocytopenia but there was no follow up.  Care failed to follow generally accepted guidelines or usual practice as abnormal labs were no followed up. |
| 9/8/2015 | Patient had follow up for his cataract surgery and UIC noted that the second cataract was scheduled for 9/5/15. | | |
| 9/17/2015 | A doctor saw the patient who now weighed 120 pounds.  The doctor documented that corrected vision in the post surgical eye was only 20/80 and he re-referred the patient for cataract surgery on the second eye.  The doctor failed to address the hematologic abnormalities identified on the 8/21/15 note.  The doctor failed to note the continued weight loss. | 1, 6 | The medication renewal process didn't work and the patient's medication stopped in mid December and wasn't started again until 1/8/17, about 3-4 weeks later. |
| 10/5/2015 | Wexford denied removal of the 2nd cataract as patient "does not meet criteria" for removal.  The denial was appealed and then approved on 10/2/15. | | |

234

Patient #19

11/2/2015  Glucose 129; BUN 27.

11/2/2015  The patient weighed 131 pounds wearing his prosthesis.

11/4/2015  A NP saw the patient who had a "nickel" sized pressure ulcer on the stump.  The patient weighed 130 pounds.  The NP ordered dressing changes for the wound.

11/8/2015  A NP saw the patient in chronic clinic for ulcerative colitis, GERD and BPH.  The NP documented that the patient got up 3-4 times a night to urinate.  The NP also did not review any symptoms related to the GERD or ulcerative colitis.  The weight was 127 pounds which was a weight loss of  15 pounds since March of 2014.  Yet the NP did not note this and did not discuss this especially in the context of the ulcerative colitis.  The only labs reviewed were a glucose of 129; BUN 27 and creatinine 1.03.  The recent anemia, thrombocytopenia were not evaluated.  The latest low albumin indicating malnutrition was also not evaluated.  The GERD and ulcerative colitis were assessed as "stable" without having taken any history and without evaluation of the anemia, thrombocytopenia, weight loss or low albumin indicative of malnutrition.

1, 3, 6, 7  The NP failed to note the weight loss despite the patient having ulcerative colitis.  The NP also failed to note abnormal labs.  Given the anemia and ulcerative colitis, the patient should have been offered a colonoscopy.  The NP also failed to identify the previously abnormal albumin with respect to the patient's nutrition and ulcerative colitis.  The nutritional status should have been evaluated.  To assess the ulcerative colitis as stable was not correct as the patient was losing weight and the doctor took no history to verify stable ulcerative colitis.  Care failed to follow generally accepted guidelines or usual practice.

11/16/2015  A doctor saw the patient and addressed the orthotic and stump ulcer but did not address the anemia or malnutrition.

12/9/2015  A doctor saw the patient post orthotic visit.  The weight was 128.  The doctor did not address the weight loss or abnormal blood test.

Care could reasonably have been expected to be better as the doctor might have noted the weight loss.

235

PTX193-1002

PTX193-1003

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 236 of 431 PageID #:12434

Patient #19

| | |
|---|---|
| 3/1/2016 | A nurse saw the patient for nausea. The patient described feeling weak, vertigo. He was going to the bathroom when he fell to the floor and became nauseous. He didn't vomit. The blood pressure was 98/50 but orthostatic blood pressure was not taken; the nurse documented that she was unable to assess this for unexplained reasons. The nurse consulted a doctor who ordered compazine for seven days without scheduling an evaluation or without ordering lab tests. |
| 14, 19 | The doctor should have seen the patient to assess the patient for syncope, low blood pressure, nausea, and a fall as these were serious problems. Failure to see the patient was indifferent. If this was after hours, the patient should have been sent to a hospital. Care failed to follow generally accepted guidelines or usual practice. |
| 4/25/2016 | A nurse documented a brief note stating that the prior evening the patient had sudden weakness, dizziness, and problems walking but these had resolved and the patient didn't want to be seen. The nurse didn't take vital signs or refer to a physician. |
| 16 | The nurse should have referred the patient to a physician. |
| 5/6/2016 | A NP saw the patient in chronic illness clinic for GERD, ulcerative colitis, and BPH. The NP documented dizziness but the only history was that the "only med on that may affect that is Hytrin." The NP documented adequate hydration and only rare diarrhea. The weight was 130, a 12 pound weight loss over two years. The patient also had low albumin indicative of malnutrition which was not acknowledged or reviewed. The NP did not discuss diet and nutrition with the patient despite the significant weight loss with ulcerative colitis. The BMI was documented as 19 but with a weight of 130 and height of 5 foot 11 inches, the BMI was 18.1, which is underweight. This would be significant in a person with ulcerative colitis. The anemia, thrombocytopenia, and hypoalbuminemia were not acknowledged. The blood pressure was 98/58, which is low but was not evaluated. The NP assessed the patient as in good control and continued the same medications. |
| 1, 2, 7, 8, 12 | The NP failed to take adequate history or perform adequate examination for the dizziness. An EKG should have been done. The patient's weight loss and anemia and UC warranted a colonoscopy but this was not done. The patient was underweight and had low albumin and his nutrition should have been evaluated by someone who understood how to do this. The thrombocytopenia should have been evaluated. Care failed to follow generally accepted guidelines or usual practice. |

236

PTX193-1004

Patient #19

6/17/2016 A doctor saw the patient. The weight was 130 pounds. The doctor noted that the patient had a blister formation on his coccyx and was experiencing pain. The doctor noted that the inmate was "thin" and used a wheelchair much of the time. The doctor noted that the patient had a donut for use but had redness and thin sensitive skin over the coccyx with a blister and a small open ulceration without sign of infection. The doctor diagnosed a "superficial pressure irritation and blister" on the coccyx. The doctor ordered daily cleaning of the affected area and advised the patient to sleep on his side as much as possible. The doctor recommended avoiding sitting for long periods of time to relieve buttock and back pressure. However, the patient needed a wheelchair, presumably due to an ill fitting prosthetic. The doctor did not address whether the patient could walk, had a good fitting prosthesis, or the extent to which the patient was using the wheelchair. This should have been done. The doctor did not assess nutritional status.

1, 3    The doctor failed to take an adequate history with respect to risk for decubitus in this patient and failed to take other protective measures. This patient was 81 years old, frail, malnourished, with underlying ulcerative colitis. He appeared to need housing on a specialized medical unit. Care failed to follow generally accepted guidelines or usual practice.

6/20/2016 Wexford approved UIC ophthalmology for pre-op cataract removal visit.

6/20/2016 BUN 32; sodium 130; calcium 8.2; albumin 2.3; bilirubin 3.3; alk phos 472; AST 165; ALT 119.

6/22/2016 The patient complained to a nurse of needing something for pain. The nurse didn't acknowledge what the pain was from. The nurse assessment was "knowledge deficit" and the nurse referred the patient to the doctor line for pain medication.

16    The patient now had a decubitus ulcer and was mostly confined to a wheelchair and should have been referred to a physician.

Patient #19

6/23/2016 The patient was evaluated in UIC ophthalmology. A brief comment on the referral form documented that the patient needed to take AREDS2 vitamins and needed both cataracts removed. A 7/11/16 follow up was requested. AREDS 2 vitamins are a combination vitamins prescribed for reducing risk of age related eye disease.

6/23/2016 A doctor saw the patient to evaluate for flex cuffs but did not see the patient for the coccyx wound.

6/24/2016 A NP was asked by a nurse to see the patient for the coccyx wound. The patient said, "I am in so much pain, I can't stand it." The patient said the DuoDERM falls off and he had drainage from the wound. The NP noted that the patient was a thin and "fragile" man with two pressure sores on his coccyx; one was 3 by 3 cm and the other 1.5 by 1 cm with surrounding inflammation. There was serous and purulent drainage. The NP ordered Augmentin, Toradol, Ultram and recommended that the patient not lay on his back or sit for long periods but did not admit to the infirmary.

1, 2, 8, 14    The NP failed to assess the stage of the ulcer. The NP failed to assess the nutritional status of the patient. Although the NP started antibiotics, the NP failed to order appropriate tests to assess the level of infection or to rule out osteomyelitis. The NP failed to identify or treat the extension of the ulcer. The patient should have been placed on an infirmary or skilled nursing unit. Care failed to follow generally accepted guidelines or usual practice. This care should have been familiar to staff given that it housed the geriatric unit.

6/27/2016 A doctor saw the patient for the pressure sores. The doctor noted that the tramadol helped with the pain and that the patient was getting daily wound care. The doctor noted decreased appetite with nausea. The doctor noted extensive bruising of the wrists from cuffing. The patient weighed 127 pounds and the doctor noted weight loss of five pounds from 10/2/15. The doctor added that the patient lost three pounds since 6/17/16 and would add "Boost" if meets UM or weight [loss] criteria." The patient was referred for an air mattress and ordered labs (CBC, CMP and ESR) and ordered flex cuffs and Compazine. The doctor did not note that the patient was taking antibiotics and did not document examination of the coccyx wounds.

1, 2, 7, 8, 12, 14    The doctor failed to take adequate history, failed to order nutritional assessment or order appropriate nutritional supplement; failed to adequately examine the patient or assess the depth of the ulcer and did not order radiologic testing to assess for osteomyelitis. He should have been placed on an infirmary. Care failed to follow generally accepted guidelines or usual practice.

238

PTX193-1005

PTX193-1006

Patient #19

6/28/2016 A nurse documented that the patient complained of a leaking wound; the patient was wearing diapers. There was no evidence of daily dressing changes. The drainage was yellow in color and the nurse documented a plan to continue to do dressing changes.

6/29/2016 Glucose 116; BUN 22; calcium 7.8 (8.6-10.6); Total protein 5.7 (6-8); albumin 2.3 (3.4-5); WBC 4.2 (3.9-12); hemoglobin 10; platelets 145 (150-450); sedimentation rate 60.

6/29/2016 The patient complained "it's really draining." The nurse noted yellow exudate on his pants and underwear. The nurse noted that a NP assessed the patient who now had a 5 cm coccyx ulcer with yellow tissue present.

6/29/2016 A NP saw the patient for dressing changes. The NP noted that the patient continued to have serous drainage from the sound and thought that the wounds were improved.

6/30/2016 A doctor wrote a lab review in the record documenting that the ESR was 60; hemoglobin 10; and albumin 2.3. The doctor ordered boost one can TID. The doctor took no action about the hemoglobin or especially the ESR of 60 which indicated probable infection and possible osteomyelitis.

7, 8, 12, The laboratory results indicated serious infection or
14         even osteomyelitis. The patient should have had a CT scan, probing of the wound, and possibly bone culture. IV antibiotics should have been considered. Since this appeared beyond the expertise of local doctors the patient should have been referred to and infectious disease specialist, wound care specialist or both. The doctor took no action. The doctor failed to address significant low albumin and anemia. The patient should have been considered for hospitalized as this doctor did not know how to manage this patient. The doctor did not appear to have adequate primary care experience, especially for a geriatric population. Care was grossly and flagrantly unacceptable.

239

PTX193-1007

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 240 of 431 PageID #:12438

Patient #19

6/30/2016 The patient told a nurse that the coccyx wound was draining a large amount and the abdomen was soaked with drainage. The nurse described the upper coccyx wound a 5 cm in diameter and the lower wound 1.5 cm with boggy tissue covering both wounds.

The boggy tissue implied that debridement was necessary but was unnoticed by doctors.

7/5/2016 A doctor saw the patient for a pressure sore that was larger. The doctor wrote "pt has no 'vaseline.'" The doctor noted that the patient had no fat and that the patient was having a difficult time staying on his side. The doctor noted a whitish pressure ulcer. The doctor's plan was to order an egg crate mattress while waiting for an air mattress. The doctor ordered daily wound care. The doctor failed to review the laboratory tests.

6, 11, 12, 14 The doctor did not appear to competently evaluate the stage of the ulcer and develop a competent plan to manage it. The doctor failed to evaluate prior abnormal labs including the elevated sedimentation rate. The patient should have been referred to a surgeon for debridement, to a wound care center, and/or to a hospital for evaluation and treatment with IV antibiotics and evaluation for osteomyelitis. Resources to manage this pressure ulcer were apparently unavailable but should be as Dixon has a geriatric unit. As an alternative to transfer to a skilled nursing hospital, infirmary care was indicated

7/8/2016 A doctor noted that the nurse doing the dressing changes noted tunneling of the pressure wound toward the buttock. The doctor noted that the wound was being packed with 1/2 inch iodoform gauze. The doctor referred the patient to the UIC wound clinic but ordered no labs, x-rays, or MRI to evaluate for osteomyelitis and did not initiate antibiotic treatment despite the elevated sedimentation rate or 60. There was no referral to wound clinic in the medical record.

8, 12, 14 The wound appeared to be at least a stage 3 ulcer with a sedimentation rate of 60, should have resulted in evaluation for osteomyelitis. This did not occur. The doctor appeared to have referred the patient to a wound care center but this never occurred. IV antibiotics appeared indicated. Care was grossly and flagrantly unacceptable and appeared to result from ignorance on how to manage the patient. This may be a credentialing issue.

7/8/2016 A nurse described the wound as being covered with green flesh-like material. The nurse described tunneling on both wounds

This wound should have been debrided.

Patient #19

7/9/2016   The patient signed a living will on a preprinted formatted document which stated that if he had incurable or irreversible illness and that death was imminent he directed that any procedures that would prolong the dying process should be withheld.

7/11/2016   Wexford approved a UIC ophthalmology evaluation the day it was requested.

7/11/2016   A nurse described that the patient had diarrhea and had only three more days of Boost.

7/14/2016   The patient told a nurse that "It's totally worthless." The nurse described a creamy drainage.

7/14/2016   A nurse documented that the patient had diarrhea and presumed it was from the Boost. The nurse consulted a doctor, who wasn't sure how to treat. The doctor recommended continuing the boost and to "work around diarrhea."

   The wound appeared infected.

8, 12, 14   The doctor didn't know how to treat the patient and should have referred to a higher level of care. The patient needed laboratory testing because of the diarrhea and needed a level of expertise unavailable at the prison. Care failed to follow generally accepted guidelines or usual practice.

7/18/2016   A brief note on the referral form from UIC ophthalmology documented that the patient needed to see anesthesiology two weeks prior to his scheduled surgery date and would also need to be seen the day after surgery or later the same day.

7/19/2016   The patient complained of a painful wound. The nurse noted deep tunneling of the wound with large thick yellow drainage.

7/22/2016   Wexford approved UIC anesthesiology pre-op evaluation.

PTX193-1008

PTX193-1009

Patient #19

7/22/2016 A doctor saw the patient on writ return from UIC ophthalmology. The doctor mentioned that the patient had some tunneling of the coccyx decubitus. The doctor noted that the patient had diarrhea. The doctor performed no physical examination. Remarkably, the doctor wrote, "Please notify me next week when in wound care so I can see wounds." The doctor could have and should have removed the bandages to inspect the wound. The doctor ordered Imodium and increased tramadol. The doctor ordered no blood tests or radiological tests. Vital signs were not taken.

2, 3, 7, 8 This was indifferent. The doctor should have removed the bandage and inspected the wound. Appropriate laboratory and radiologic testing was not done. The plan of care was inadequate. IV antibiotics should have been considered. Care failed to follow generally accepted guidelines or usual practice.

7/24/2016 The patient was evaluated in anesthesiology. A brief note by the anesthesiologist documented that the patient had bradycardia but that the patient could proceed with surgery.

7/25/2016 A nurse noted that bone was visible within the wound with a moderate amount of green exudate.

This indicates a stage 4 ulcer. Osteomyelitis should have been promptly ruled out.

7/27/2016 A nurse documented visible bone with tunneling 7 cm deep.

8/1/2016 A nurse noted that the doctor was present to see the wound and ordered to discontinue packing and to start wet to dry dressings only. The doctor did not document a note.

The doctor should have documented a note.

8/2/2016 A doctor saw the patient. The temperature was 96.8. The doctor noted that the patient was cleared for cataract surgery. The doctor noted that the wounds on his back appeared "healthy" without erythema or significant drainage. The patient noted that the patient was approved for cataract surgery. However, the doctor had no treatment plan for the decubitus. The doctor ordered no labs or imaging studies.

2, 14 The nurses had documented visible bone. To inspect such a wound and to describe it as "healthy" appears incompetent. The patient needed hospitalization to rule out osteomyelitis. Care was grossly and flagrantly unacceptable.

242

Patient #19

8/8/2016 A nurse noted that the air mattress was leaking. The nurse also noted that the patient was losing weight and not taking his medication. The weight was listed as 100 pounds and the nurse noted that this was a 27 pound weight loss [it appeared to be a 42 pound weight loss over two years]. The patient lacked appetite and was "forgetful." The nurse assessment was "self care deficit." The plan was to schedule the patient to see the doctor. The patient was unable to care for himself and should have been placed on the infirmary or should have been hospitalized.

16, 19   The patient had lost 42 pounds, had malnutrition, a stage 4 decubitus ulcer with a sedimentation rate of 60. The patient was now showing signs of altered mental status which suggested serious sepsis. Care was negligent. The nurse should have immediately contacted a doctor but it appeared that doctors didn't know how to care for the patient.

8/11/2016 A nurse noted that during a dressing change the inmate urinated foul smelling urine on the table. The inmate stated, "I can't help it." The nurse noted that the inmate was unable to put on his underwear or pants and that he needed a roommate to assist him with activities of daily living. The nurse wrote "poss infirmary placement."

16,19   The altered mental status was of serious concern and suggested sepsis. The nurse needed to refer the patient immediately to a physician.

8/12/2016 A nurse noted that the wounds were draining purulent material.

8/13/2016 At 3:30 am a nurse noted that the patient fell and the nurse wrote an injury report. The nurse did not document an assessment in the progress note or consult a physician.

16   This was a serious problem and the nurse needed to consult a physician.

243

PTX193-1010

PTX193-1011

Patient #19

8/13/2016  At 5:30 pm an nurse noted that the patient's roommate reported that the patient hadn't eaten in two days and hadn't voided.  The nurse described the patient as weak.  The nurse placed the patient on the infirmary and called the doctor, who ordered a CBC and CMP and UA and IM Rocephin for seven days without evaluating the patient.  The doctor also ordered an IV but the nurse was unable to start an IV secondary to what the nurse perceived was dehydration.  At 7:45 pm the nurse noted that the patient responds to pain.  At 7:50 pm a nurse noted a temperature of 100.1 a pulse of 115 and blood pressure 100/50.  The patient wasn't responsive and the nurse called a doctor, who ordered the patient to a local hospital.

8/13/2016  A hospital blood culture documented gram positive cocci growing in two bottles.  These were identified as Beta strep Group A and diphtheroid.  There was light growth of methicillin resistant Staph aureus and streptococcus agalactiae- Group B strep.  The WBC was 15.8.

8/14/2016  A hospital lab report showed BUN 92; creatinine 2.06; sodium 153 (137-145); chloride 116 (98-110); albumin 2.7.

8/14/2016  A hospital history and physical noted that the patient had been lethargic for 2-3 days and had low grade fever and mental status changes.  The admitting diagnoses were mental status changes, dehydration, acute kidney injury, stage 3 pressure ulcer, and sepsis.  The hospital was told that the patient was DNR as communicated to them by the Dixon physician.  The patient was described as lethargic for 2-3 days.

8/15/2016  A hospital lab report showed a blood culture growing budding yeast on gram stain with the aerobic bottle positive.

8/17/2016  A hospital lab report showed WBC 4.9, hemoglobin 8.5; platelets 55.

Patient #19

8/18/2016  A doctor spoke with the hospitalist who indicated that the
patient had positive blood cultures with bacteria and fungus
with the source likely from his back.  The patient was being
returned to the prison for comfort measures only.  The
discharge summary indicated that the hospital contacted the
daughter who agreed with nonaggressive care.  The patient
was not fully oriented.  The patient was returned to the prison
for hospice.

8/19/2016  The patient was admitted to the infirmary on discharge from
the hospital.  The doctor ordered Ativan, morphine, and
atropine only.  The doctor documented confirming that the
daughter had agreed with hospice care.  The doctor did not
discuss palliative sedation with the daughter.  On admission
the nurse noted that the patient was crying in pain.

8/21/2016  The patient was discharged from the hospital.  The discharge
summary documented that the patient had sepsis from
infected decubitus.  The patient was very "debilitated" and the
daughter noted how "much he had gone downhill since she
had seen him last and opted for nonaggressive care."  The
patient needed debridement but the daughter opted against
this.  The patient was sent back without antibiotics and on
morphine.

8/21/2016  The patient died on the infirmary.

245

PTX193-1012

Patient #20

10/28/2016  The patient was discharged from Stroger hospital.  The patient was discharged on 15 mg of morphine every four hours for pain.  The patient reported losing about 80 pounds since the diagnosis.  The diagnosis was likely pancreatic cancer.  This hospital report was printed on 11/9/16, so this report likely went with the patient to Logan.

11/9/2016  The patient was transferred from Cermak HS on Tylenol, albuterol, amlodipine, docusate, metoprolol 25 BID; morphine 15 SR BID **and** 15 mg IR Q 4 hours for pain, olanzapine, trazodone, pantoprazole 40 mg.  Hepatitis A, B, and C were all positive yet were repeated in IDOC.  The patient had an upcoming appointment at GI on 11/17/16

11/9/2016  The patient was admitted to Logan CC.  The patient was 5 foot 5 inches tall and weighed 152 pounds.  The nurse history documented that the patient had asthma, a prior positive TB skin test but never completed therapy, was a smoker, had a prior biopsy of her pancreas on October 27th and had a stent in the liver.  The reason for the biopsy of the pancreas or stent were not explained.  The nurse performing the intake screening scheduled a routine examination though the patient had a serious problem (liver stent with undiagnosed pancreatic problem).  The nurse did not list medications on the intake screening.  Also, there was no evidence of an order for medication.  This screening was performed by a LPN.

1   The history was poor.  The patient had HTN but it was unrecognized.  The patient had a high likelihood of pancreatic cancer and it was unrecognized.  The patient was on morphine but the patient didn't receive it.  Instead the patient received one Tylenol #3 TID instead of 30 mg SR morphine and 90 mg of IR per day.  The three Tylenol #3 tablets had a morphine equivalency of only 15 mg of morphine whereas the patient was receiving 120 mg of morphine.  No pain history was taken.  Care failed to follow generally accepted guidelines or usual practice.

246

PTX193-1013

PTX193-1014

Patient #20

| 11/9/2016 | A nurse admitted the patient to the infirmary. The reason for admission was not stated. Under subjective the nurse wrote "colon cancer" without any other explanation. The blood pressure was 146/107. The weight was listed as 152 pounds. The examination section allowed for checking boxes as normal; the entire examination was normal by checking boxes as so. The assessment was "alteration in comfort r/t colon cancer." | 1 | The nurses failed to understand the patient's problems. The failure to take a history of HTN resulted in no BP medication for the first day. |

| 11/9/2016 | GGT 341 (6-60); amylase 55 (25-125); lipase 17 (22-51); CMP normal except albumin 3.3 bilirubin 3 and alk phos 182 (40-125). | | |

| 11/10/2016 | A nurse wrote a brief note documenting blood pressure of 158/93. The patient asked for pain pills for a headache. The patient stated asked for diapers for leakage of bowels. The nurse assessment was colon cancer. | 1 | The patient had diarrhea yet the nurse failed to ask why. To use diapers for diarrhea is a significant problem and should have resulted in questioning about why this was occurring. |

| 11/10/2016 | A nurse saw the patient for pain in her head and stomach. The blood pressure was 145/105. The nurse documented "continue current plan" although the plan was not specified and it wasn't clear if the patient was on pain medication. | | The patient was abruptly discontinued from morphine and not provided adequate substitute. |

Patient #20

| Date | | Comments |
|------|------|----------|
| 11/10/2016 | 2, 7,12 | Comments from oncology on the referral form stated that the patient had hyperkalemia, HCC, and HCV. The patient was given kayexalate with directions to NRC to manage the hyperkalemia. It was recommended to get a triple phase CT scan, with a follow up in two weeks. The potassium was 5.5. The oncologist prescribed 15 grams of kayexalate rectal suppository for two days with recommendation to repeat the BMP in two days. | The patient transferred with notes from Cook County Hospital and Jail documenting that the patient likely had pancreatic cancer. The patient had a follow up at Stroger hospital the second week of November and was on up to 90 mg of morphine a day. The doctor failed to continue the work up for the pancreatic mass. Ultimately, this was delayed such that a diagnosis did not occur for five months. The patient had a pancreatic mass for which there was no diagnosis. Because the biopsy was inadequate, the doctor presumed that the patient had a benign tumor? The patient should have been sent for a diagnostic ERCP.  Moreover, the patient had pain and the doctor significantly decreased pain medication without even performing a pain assessment. This was indifferent.  The doctor took no action for a patient that had likely pancreatic cancer. The doctor failed to document review of the discharge hospital summary.  It was unclear why the doctor took these actions as they were clearly not in the best interest of the patient and were below standard of care for someone with an undiagnosed pancreatic mass. |
| 11/10/2016 | 16 | At 10:21 pm a nurse noted that the patient was complaining of pain and diarrhea.  The blood pressure was 167/126. The nurse administered ordered medication but did not call a provider. | The nurse should have called a provider. |
| 11/11/2016 | | At midnight the BP 147/91; the nurse called a doctor, who increased metoprolol to 50 mg.  The patient had been on amlodipine when she came in.  The nurse noted that the patient had colon cancer. | |

248

PTX193-1015

PTX193-1016

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 249 of 431 PageID #:12447

Patient #20

11/11/2016 At 4:21 am the BP was 143/96.  The patient had breakfast.

11/11/2016 At 1:56 pm the BP was 130/97.  The patient had pain and was given a "pain" pill.  The nurse did not document medication given except described as "pain meds."

11/11/2016 A doctor saw the patient and documented consideration of a CT guided biopsy when "she is stronger."  The doctor wrote to repeat LFTs next week.  The doctor took no history including of pain.  The doctor performed no exam.

4    This was nothing but a delay in initiating a work up.  The patient had likely pancreatic cancer.  The pain was not likely to improve and the patient not likely to get stronger.  A work-up should have been started.  The doctor was indifferent to the patient's pain.

11/11/2016 The BP was 170/114.  Metoprolol increased to 50 BID.

11/12/2016 A doctor wrote a note only documenting lab values.  Again there was no history.  The hemoglobin was 9.4; WBC 5.9; ferritin 615; normal B12 and folate.  Anemia of chronic disease diagnosed.

1    The doctor again failed to determine the history of the patient.

11/12/2016 Metoprolol was ordered 25 mg.  The order stated that the medication would need to be reordered or discontinued in Pearl.

11/14/2016 The patient was discharged from the infirmary with a diagnosis of pancreatic mass, biliary duct obstruction, anemia of chronic disease, and HTN.  Though the patient had elevated bilirubin and known biliary duct obstruction, the doctor did not order an urgent CT scan to determine the whether there was still obstruction or to determine what the diagnosis was.  The only plan was a CBC & CMP  and a low bunk for a year.  There was no imaging study.

8    The doctor failed to obtain an imaging study (CT scan) in lieu of obtaining a history.  The staff discharged the patient from the infirmary without establishing her actual status.

11/14/2016 Amlodipine ordered 5 mg BID; the order was electronically signed on 11/17/16.

PTX193-1017

Patient #20

| | |
|---|---|
| 11/16/2016 | A PA saw the patient for an initial examination. The PA documented that the patient had a history of a pancreatic mass and had lost 70 pounds of weight from Dec 2015 to June of 2016. The PA noted that the patient had an ERCP and bile duct stent on 10/27/16. The PA noted HTN and hepatitis C infection. Despite having taken this history the PA checked the weight loss box as "no." The PA checked all examination boxes as "normal." The blood pressure was 115/88. The electronic record allows the examiner to check a box "normal" for the examination. This is a defective record system as it does not record the examinations performed. The assessment was pancreatic mass "benign ERCP biopsy (sub-optimal)," HTN, + PPD, and substance abuse. The PA did not list hepatitis C as a problem even though he documented this in the subjective section. The PA did not address the nurse finding of asthma as a history. The plan was to complete gonorrhea and chlamydia testing, a mammogram, and scheduling for the general medicine and hypertension clinics. The pancreatic mass was to be addressed in the general medicine clinic. The PA referred the patient to hepatitis C clinic but did not include hepatitis C as a diagnosis in the assessment. The PA did not mention labs in the record but did make oblique reference to elevated GGT when referring to the patient's hepatitis C. There was no physician admission note for this patient. |

| | |
|---|---|
| 1, 2 | A 70 pound weight loss with a pancreatic mass requiring a liver stent is not indicative of a benign problem. This patient's old records should have immediately been obtained and radiologic imaging performed to identify and serious pancreatic or liver problems. The assessment was inaccurate. |

250

PTX193-1018

Patient #20

| | | |
|---|---|---|
| 11/22/2016 | At 8:22 pm a nurse saw the patient. The blood pressure was 82/59. The patient was found on the floor having "fell out." She fell a second time. Remarkably, the nurse took no action except to tell the patient not to take "sleeping medication." The patient was on omeprazole, metoprolol, Tylenol #3, amlodipine, trazadone, and lamotrigine. The nurse did not call a provider. | 16 | The patient lost consciousness and should have been examined by a doctor. This was grossly and flagrantly unacceptable care. |
| 11/22/2016 | A doctor saw the patient. The hemoglobin was 10.8; creatinine 0.76; BUN 8; albumin 3.3; bilirubin 2. The doctor did not take a history, perform an exam, or develop a treatment plan. The doctor noted that the liver function tests were improved. No action was taken. | 1, 2, 3, 6 | The patient had a serious medical condition but the doctor failed to take any action to address the problem. The doctor also failed to address labs. |
| 12/8/2016 | A doctor saw the patient. The patient weighed 149 pounds. The doctor took little history except that the patient had increase in pain and was having normal bowel movements. Remarkably, the doctor did not take a history of the patient's illness. The doctor didn't qualify the pain. The doctor noted that the patient had decreased appetite. The doctor still took no action with respect to the pancreatic mass except to order a CMP and "observe" the patient. | 1, 2, 3 | The patient had a serious medical condition but the doctor failed to take any action to address the problem. |
| 12/8/2016 | Tylenol #3 1 tab TID was prescribed for three months. | | |
| 12/9/2016 | BUN 8 (6-20); albumin 3; CA 19-9 220 (0-37). | | This test showed that the patient likely had pancreatic cancer. |

251

Patient #20

| | | |
|---|---|---|
| 12/12/2016 | The patient was seen in hepatitis C clinic. This note had questions about contraindications to interferon even though interferon is not used. There was little history, viral load was not checked. The AST was 22, INR 2, and platelets of 183 were noted. The patient was determined to be immune to hepatitis A and B. The NP documented that the patient "needs sober for 6 months." | 1, 3, 6 | The NP failed to take an appropriate history with respect to hepatitis C. Being "sober for 6 months" is not a contraindication for hepatitis C treatment by the UIC protocol. The NP failed to note the CA-19-9 test which was abnormal and indicated likely cancer. |
| 12/13/2016 | A doctor wrote a brief note without seeing the patient. The doctor noted that the CA19-9 marker was 220 which was high. The doctor wrote she would consider a CT guided biopsy of the mass and would discuss in collegial. There was no evidence of a collegial review and no evidence of a collegial review in the tracking log. | 6 | This test shouldn't have been "considered," it should have been done. The CA 19 test indicated that the patient had likely pancreatic cancer and given the history a work up should have been continued. |
| 12/15/2016 | A NP saw the patient in HTN chronic clinic. The temperature was 82.7 with P 67; R 18; BP 128/92 and weight 150. The NP took little to no history and documented a normal examination. The BMI was documented as 25. The NP ordered a six month FU but did not address the pancreatic mass or asthma. The NP did not address the clearly abnormal temperature or the anemia which she documented on the record. | 3, 11 | This demonstrated a systemic problem with the medical record. This record is defective. It allows dated vital signs to be re-used in an inappropriate manner. Vital signs should be documented when they are done. If old vitals are to be used, it should be noted as such. To do otherwise is a significant patient safety issue. This ridiculous example gives a temperature which is incompatible with life. Yet it wasn't recognized and was re-used. The NP failed to develop an appropriate treatment plan for the pancreatic mass. |

PTX193-1019

**PTX193-1020**

Patient #20

| | | |
|---|---|---|
| 12/21/2016 | A Wexford authorization form. The patient had come from CC Jail with a recommendation for a repeat ERCP with biopsy. The CA 19 was elevated. The approval stated, "no definitive results of path report were noted in records sent-decided will send this patient to GI to eval and make recommendations as to plan of care." This would only delay the diagnosis. It couldn't be clearer what the patient needed. The patient was approved for a GI consult. Below this in the medical record was a denial of a CT scan with FNA biopsy based on insufficient information. What information was required?!!!. They stated, "records sent in by site and no definitive results of path report were noted in records sent." Notably, although this information was present on a referral form, it was not documented in the medical record as a request. This gives the appearance that physicians are improperly not working patients up when the fault lies with the vendor who is denying requested care. | 7 | This referral occurred six weeks after intake. Now the biopsy would be delayed again until the patient went for the GI consult. This acts only as a delay of care. The Wexford collegial review system is a systemic barrier to care and a significant patient safety issue and needs to be abandoned. |
| 1/1/2017 | A nurse noted that the patient was called to the health care unit for two health requests but didn't show up. The nurse did not check on the patient. | | |
| 1/4/2017 | An unsigned referral to GI was written on this date by the doctor. | | |
| 1/5/2017 | On an optometry note the patient had temperature 82.7 with P 72, R18, BP 122/86 with weight 150. These vital signs were identical to those from 12/15/16. | 11 | The medical record has systemic deficiencies that is a patient safety issue. This record should immediately fix this problem or consider return to paper. |
| 1/13/2017 | On a dental visit were listed as temperature 82.7!! The vitals were identical to 1/5/17 vitals done for optometry. But not addressed. | 11 | The medical record has systemic deficiencies that is a patient safety issue. This record should immediately fix this problem or consider return to paper. |

**PTX193-1021**

Patient #20

1/24/2017 The patient went offsite for an appointment but the nurse didn't document where the patient went.

1/24/2017 A GI consultant saw the patient on this day. The consultant noted that an EGD was done on 10/27/16 with a balloon dilation of the CBD and a stent was placed with a small sphincterotomy. The patient complained of diarrhea and abdominal pain. The consultant recommended a CT scan ASAP and might require ERCP. The doctor noted that the patient had been on Tylenol #3 but this was changed to Motrin because of a tooth infection.??? The patient complained of weight loss up to 70 pounds in the last several months.

1/25/2017 A doctor wrote a note without seeing the patient. The doctor noted that the patient saw a GI consultant and had diagnoses of obstructive jaundice, pancreatic mass, and diarrhea. The doctor did not document review of a report. The doctor started pancreaolipase and ordered a CT scan with contrast.

1/25/2017 A CT scan was requested by the doctor but NOT on an urgent basis despite the recommendation for an ASAP test.

7    Doing this as a routine test was inconsistent with the recommendation to perform the CT scan ASAP.

1/31/2017 A doctor wrote a handwritten note. The patient had weakness. The patient weighed 143 pounds. The patient was still on only one Tylenol #3 pill BID prn. The doctor noted that the patient was to get a CT scan and GI follow up for probable ERCP and biopsy. The doctor noted that the patient was found cheeking Tylenol #3.

3    Pain medication was poorly addressed. Liquid medication can be given under observation to avoid cheeking. It was likely that the patient had untreated pain.

2/1/2017 A CT scan was approved on collegial review.
2/2/2017 Amylase 88 (25-125); albumin 2.8.
2/3/2017 Hemoglobin 10.8; platelets 148.

254

**PTX193-1022**

Patient #20

2/15/2017 A CT scan was done.  Only part of the report was available.
The CT scan noted diffuse anasarca and ascites.  There was a
4.7 pancreatic mass with encasement and occlusion of
multiple veins resulting in varices.  The findings were
consistent with unresectability.

2/16/2017 A doctor saw the patient.  The patient weighted 146 pounds.
The doctor noted a nine pound weight gain, but this was
unclear.  The doctor noted that the albumin was 2.8 with
anemia of chronic disease.  The doctor noted that the CT scan
showed a mass in the head of the pancreas of 4.7 cm with
encasement of the splenic vein causing varices by virtue of
encasement of splenic and superior mesenteric veins and
collaterals.  The mass was apparently unresectable based on
the doctor's comments.  The doctor noted that "will need
tissue biopsy if chemotherapy is indicated.  In view of all her
varices, not sure it is amenable to EGD US guided biopsy."  The
doctor referred to an oncologist.

2/21/2017 A doctor saw the patient and noted that the diarrhea was
better on pancreaze.  The doctor noted that pain was
controlled with Tylenol #3.  The plan was to refer to GI for a
biopsy and then to an oncologist.

2/21/2017 A doctor wrote a referral for a GI follow up as a routine.

2/24/2017 A nurse saw the patient after a fall.  The BP was 119/72.  The
patient passed out.  The patient fell on her face.  The nurse
called a doctor, who admitted the patient to the infirmary.

2/24/2017 A nurse documented an infirmary admission note.  There were
no orders.  The nurse documented that the patient had signed
a DNR that day.

12      The patient should have had an urgent referral.

255

Patient #20

| | | |
|---|---|---|
| 2/24/2017 | A doctor wrote an admission note. The doctor took no history of the pain, ability to eat, comfort measures, or ability to function. | 3 | The plan for the patient was insensitive to actual needs and lacked professionalism. The patient was on blood pressure medication but passed out, yet the doctor did not evaluate blood pressure medicine to determine if these were still necessary. |
| 2/24/2017 | At 8:48 pm the patient asked for extra Tylenol due to pain. The nurse documented that there was no order for additional Tylenol so none was given. The patient was still listed as weighing 146 pounds. | 3 | Not treating the patient's pain was below standard of care. |
| 2/27/2017 | A nurse saw the patient. The weight was 136 pounds. It appears that the weight on 2/24/17 was not accurate. The blood pressure was 97/70. | 3 | The blood pressure is so low that blood pressure medication needed to be lowered. |
| 2/28/2017 | A nurse saw the patient. The vital signs were identical to the vitals from 2/27/17. This medical record function needs disabling. | 11 | The medical record falsely records vital signs and weights. |
| 2/28/2017 | Albumin 2.7; cholesterol 89 (100-200); TG 71; HDL 28; LDL 47 (50-129). | | |
| 3/1/2017 | A nurse saw the patient. The vital signs were identical to the vitals from 2/27/17. This medical record function needs disabling. | 11 | The medical record falsely records vital signs and weights. |
| 3/2/2017 | A doctor saw the patient. The vital signs and weight were identical to 2/27/17. Yet the doctor noted that the patient had lost weight since coming into the infirmary. The doctor noted that the abdominal pain was controlled with Tylenol #3 since it was increased to TID. The patient had no place to stay after discharge from prison in June. The doctor noted that the patient had a follow up GI consultation and "May need CT guided bx." The doctor discontinued the amlodipine and noted that metoprolol was changed to propranolol. | 7, 11 | The medical record falsely records vital signs and weights. The patient had been at Logan for almost three months and had yet to obtain a biopsy of her pancreatic mass. This is an unacceptable delay. |

256

**PTX193-1024**

Patient #20

| | | |
|---|---|---|
| 3/3/2017 | A nurse saw the patient. The vital signs were identical to vitals from 2/27/17. | 11 |
| 3/5/2017 | A nurse saw the patient. The vital signs were identical to vitals from 2/27/17. | 11 |
| 3/6/2017 | A nurse saw the patient. The blood pressure was 61/52. A nurse noted that the patient almost fell getting on an examination table. The nurse documented calling the chronic care nurse to clarify blood pressure medication as pressure was very low. The nurse documented notifying the doctor but did not take any orders. | 19 |
| 3/6/2017 | The GI referral from 2/21/17 was approved as a routine. | |
| 3/6/2017 | A NP saw the patient in HTN clinic. The BP was 102/75. The NP took no history outside of the check box format, including the box "if obese advise to lose weight" even though the patient had pancreatic cancer and had lost over 80 pounds. The NP took no other history of the patient's other medical problems. | 1, 2, 3 |
| 3/7/2017 | A nurse saw the patient. BP 130/95. The nurse documented "acute pain" but no pain assessment was done. | |
| 3/8/2017 | At 4:22 am a LPN saw the patient. The blood pressure was 120/89. The patient complaint was "Still the same old stabbing pains at times on my right side." The nurse noted that the patient was on one tablet of Tylenol #3. The nurse documented that the patient reported that the pain medication was effective. | |
| 3/8/2017 | At 2:48 pm a nurse saw the patient. The vital signs were identical to the 4:00 am vital signs. | |

The medical record falsely records vital signs and weight.

The medical record falsely records vital signs and weight.

The patient had blood pressure consistent with shock, yet the doctor ignored the patient. This was indifferent.

The NP failed to take appropriate history. The patient had extremely low blood pressures previously and needed medication lowered or discontinued. The NP did not address the patient's pancreatic mass and update the status of the workup.

Patient #20

| | | |
|---|---|---|
| 3/8/2017 | At 3:34 pm a doctor saw the patient. The vital signs were identical to those done at 4:00 am. The doctor noted abdominal pain and that it was hard to sleep. The plan was to follow up with GI for possible biopsy. Labs were noted showing albumin of 2.7, and HGB 10.8 but these abnormalities were not addressed. The doctor did not adjust the pain medication. The assessment included likely pancreatic cancer but the biopsy was still being delayed. The doctor documented anemia and moderate malnutrition but no action was taken. | 6, 11, 12 | The medical record falsely records vital signs. Abnormal labs were noted but no action was taken. The doctor took no action to determine how to improve nutrition or even establish the degree of malnutrition. The doctor did not evaluate for pain. The GI consult was significantly delayed. |
| 3/9/2017 | A nurse saw the patient and the vitals were identical to those from 3/8/17. The patient complained of pain and asked if there was another pain medication order. The nurse told the patient that there was no new order for pain medication. The assessment was "acute pain." The nurse documented a plan to inform the doctor of the pain. | 11 | The medical record falsely records vital signs. |
| 3/10/2017 | The MAR shows patient received amlodipine. Instead of giving the patient morphine, Tylenol #3 was ordered one tablet TID for only two weeks. But there was no discussion of why this was done. The patient was on 15 ER morphine BID and 15IR Q four hours as needed. Substituting Tylenol #3 1 TID is a significant reduction in pain control. | | |
| 3/10/2017 | A nurse saw the patient. The vitals were identical to 3/8/17. The patient asked for pain medication. There was no pain assessment. | 11 | Vital signs were identical. |
| 3/11/2017 | A nurse saw the patient. The vitals were identical to 3/8/17. The patient had pain but there was no pain assessment. | 11 | Vital signs were identical. |
| 3/12/2017 | A nurse saw the patient. The vitals were identical to 3/8/17. | 11 | Vital signs were identical. |

258

PTX193-1025

PTX193-1026

Patient #20

| | | |
|---|---|---|
| 3/13/2017 | A nurse saw the patient. The BP was 121/93; the temperature and respiratory rate were identical to 3/8/17. The weight was listed as 140 pounds. | 11 | Vital signs were identical. Notably, these vital signs do record the date they were done but what this means is that vital signs are not refreshed when patients are seen and dated vital signs are used for evaluations. |
| 3/14/2017 | A doctor wrote a brief note without seeing the patient. The doctor noted that the KUB showed an unremarkable gas pattern with gallstones in the CBD stent. | | |
| 3/14/2017 | A nurse saw the patient. The vitals were identical to 3/13/17. Pain assessment was not done as usual. | 11 | Vital signs were identical. |
| 3/15/2017 | A nurse saw the patient. The vitals were identical to 3/13/17. | 11 | Vital signs were identical. |
| 3/15/2017 | A doctor saw the patient. The vitals were identical to 3/13/17. No pain assessment was done. The plan was still to follow up with GI. The doctor ordered tramadol but only one tablet daily. The doctor added Boost one can daily. | 11 | Vital signs were identical. |
| 3/16/2017 | A nurse saw the patient. The vitals were identical to 3/13/17. The nurse documented that the patient had stomach pain and asked for pain medication. | 11 | Vital signs were identical. |
| 3/17/2017 | A nurse saw the patient. The vital signs were identical to 3/13/17. The weight was 140. The patient had pain. The patient's pain improved after tramadol. | 11 | Vital signs were identical. |
| 3/18/2017 | Identical vital signs. | 11 | Vital signs were identical. |
| 3/19/2017 | Identical vital signs. | 11 | Vital signs were identical. |
| 3/20/2017 | The patient complained of abdominal pain. The vitals were T 97.9; P 79; R 18; BP 120/80 and weight 137. The nurse took no action about the pain. | 16 | The nurse should have called a provider. |
| 3/21/2017 | The patient complained of pain. T 98.3; P 90; R 16; BP 104/79. The nurse did not address the pain. | 16 | The nurse should have called a provider. |

PTX193-1027

Patient #20

| | | |
|---|---|---|
| 3/21/2017 | A GI doctor saw the patient. The doctor noted that the patient had been diagnosed with a pancreatic mass in Iowa in 2015 but was lost to follow up and subsequently was seen at County hospital in Chicago where the FNA was nondiagnostic. The patient had abdominal pain with significant weight loss. The liver on the CT scan showed cirrhosis. The consultant scheduled an ERCP and FNA. On hand written notes the doctor prescribed Fentanyl patch 25 mcg/hr. | The consultant clearly disagreed with the use of Tylenol #3. He was the second consultant to weigh in on pain management. |
| 3/22/2017 | At 11:40 am the patient complained of pain. T 98.3; P 90; R 16; BP 104/79. The nurse did not address the pain. | 16 | The nurse should have called a provider. |
| 3/22/2017 | At 1:39 pm the patient told a doctor that the Tylenol #3 helped better than tramadol. The patient was in pain and asked for better pain control. The doctor stopped the tramadol and started one tablet of Tylenol #3 four times a day. The vital signs were identical to the 3/21/17 vitals. | 3, 11 | This bordered on cruelty. Pancreatic cancer pain is significant and pain management should have included a narcotic. Apparently for a physician visit, dated vitals were used. |
| 3/24/2017 | A nurse saw the patient. The vitals were identical to the 3/21/17 vitals. The patient had stomach pain and asked for pain medication. The nurse did not contact a doctor about the pain. | 11, 16 | Vitals were dated, the nurse needed to refer to a doctor for pain management. |
| 3/24/2017 | A nurse saw the patient. Temperature not taken; P 67; R 18; BP 152/92. No pain history taken. | | |
| 3/25/2017 | A nurse saw the patient. Vitals identical to 3/24/17. The patient complained of pain. | 11 | Dated vitals used |
| 3/26/2017 | A nurse saw the patient. Vitals identical to 3/24/17. The patient complained of pain. | 11 | Dated vitals used. |
| 3/27/2017 | A nurse saw the patient at 1:15 pm. Vitals T 98; P 66; R 16; BP 140/88; weight 140. The patient had no complaints. | | |
| 3/27/2017 | A nurse saw the patient at 3:39 pm. Vitals were identical to two hours before. | 11 | Dated vitals used. |

260

PTX193-1028

Patient #20

3/28/2017 A nurse saw the patient who complained of abdominal pain. The vitals were identical to 3/27/17.   The pain was not addressed.

11, 16   The nurse needed to call a provider and dated vitals were used.

3/29/2017 A nurse saw the patient who complained of abdominal pain. The vitals were identical to 3/27/17.

11, 16   The nurse needed to call a provider and dated vitals were used.

3/30/2017 A doctor saw the patient at 1:27 pm.  The vitals were identical to 3/27/17.  The doctor wrote "Saw GI who mentioned about biopsy and planned to change plastic biliary to metallic stent."  The doctor did not document review of the report.  The doctor documented without taking a pain history that the pain was controlled with Tylenol #3.  The doctor documented she would discuss a biopsy and replacement of the stent at collegial review.

1, 3, 11   It is hard to believe that the patient, who had complained of pain to a consultant and to nurses six times over the past two weeks was pain free.  The pain plan was not addressing the pain.  The vital signs were dated.

3/30/2017 A nurse saw the patient at 10:01 pm and the patient said that "My back and stomach have been hurting all day."  The vitals were identical to 3/27/17.

11, 16   The nurse needed to call a provider and dated vitals were used.

3/30/2017 A doctor referred the patient for an ERCP for biliary stent exchange and a follow up GI appointment.

3/31/2017 A nurse saw the patient.  The vitals were identical to 3/27/17.  The patient asked for pain medication.

11, 16   The nurse needed to call a provider and dated vitals were used.

3/31/2017 Albumin 2.3; total protein 5.7 (6-8); CA 19-9 564 (0-37).

4/1/2017 The patient complained of pain all over.  The vital signs were identical to 3/27/17.  The nurse gave pain meds as ordered but did not discuss the pain with the doctor.

11, 16   The nurse needed to call a provider and dated vitals were used.

4/2/2017 A nurse documented the patient saying "I am doing OK only have belly pain I always have it."  The vital signs were identical to 3/27/17.

11, 16   The nurse needed to call a provider and dated vitals were used.

4/3/2017 A nurse documented temperature of 98.1; P 75; R 18; BP 123/86 with a weight of 144.

Patient #20

4/4/2017   The nurse documented that the patient said, "I just have the back pain and pressure like I always do nothing new to me." The vital signs were identical to 4/3/17. The nurse took no action.

4/5/2017   A doctor saw the patient. The vital signs were identical to 4/3/17. Without much history the doctor wrote "Pain is fair controlled with Tylenol #3." The albumin was 2.3. The doctor noted that GI was going to change stents and that the patient had no metastases.   1, 11, 12   The doctor used dated vital signs for an evaluation. The pain history was not consistent with the patient's ongoing complaints of pain to nurses. The doctor failed to refer to assess nutritional status. The delay in evaluation was significant.

4/5/2017   An ERCP and biopsy were approved by Wexford.

4/6/2017   A nurse saw the patient. The vital signs were identical to 4/3/17. The patient stated, "just the same old aches and pains in my stomach."   11, 16   The nurse needed to call a provider and dated vitals were used.

4/7/2017   A nurse saw the patient. The vital signs were identical to 4/3/17.   11   Vital signs were dated.

4/7/2017   A doctor prescribed Tylenol #3 1 tab BID for a month.

4/8/2017   A nurse saw the patient. The vital signs were identical to 4/3/17.   11   Vital signs were dated.

4/9/2017   A nurse documented that the patient had stomach pain. The vital signs were identical to 4/3/17. No action was taken.   11, 16   The nurse needed to call a provider and dated vitals were used.

4/10/2017   A nurse documented T 97.8; P 81; R 16; BP 139/103; weight 142.

4/11/2017   A nurse documented that her stomach hurt "like it always does." The vital signs were identical to 4/10/17. No action was taken.   11, 16   The nurse needed to call a provider and dated vitals were used.

4/12/2017   A nurse documented identical vitals from 4/10/17.   11   Vital signs were dated.

4/13/2017   A nurse documented identical vitals from 4/10/17.   11   Vital signs were dated.

PTX193-1029

**PTX193-1030**

Patient #20

| | | |
|---|---|---|
| 4/13/2017 | A doctor saw the patient. The vitals were identical to 4/10/17. The Tylenol #3 was causing constipation and the doctor decreased the dose to TID. The patient was documented as anicteric. There was no change to the plan except the decrease of pain medication. | 1, 2, 3 — Given complaints of pain to nurses, a decrease in pain medication seemed cruel. The doctor did not appear to appreciate the degree of pain the patient was in and didn't assess for this. |
| 4/14/2017 | A nurse documented identical vitals from 4/10/17. The patient apparently was to go offsite for a FNA biopsy and biliary stent exchange. | |
| 4/14/2017 | At 9:24 pm a nurse documented T 87.5; P 81; R 16; and BP 93/65. The nurse took no action regarding the low blood pressure. The weight was 142 pounds. | 16 — The nurse should have called a provider. |
| 4/14/2017 | A doctor prescribed Tylenol # 3 one tab TID for two months. | |
| 4/16/2017 | A nurse noted that the patient complained that the medications weren't working and she was having breakthrough pain. The vitals were identical to 4/14/17. Remarkably, the nurse wrote to continue the current orders and did not talk to a physician. | 16 — The nurse should have called a provider. |
| 4/17/2017 | A nurse documented that the patient was having discomfort in her abdomen and had nausea and vomiting "this weekend." The T 97.9; P 95; R 14; BP 128/74 and weight 128 pounds. | 16 — The nurse should have called a provider. |
| 4/17/2017 | Albumin 2.9; BUN 5; potassium 3.1 (3.5-5.3). | |
| 4/18/2017 | A nurse saw the patient, who complained that she had vomited twice since the night before. The patient couldn't eat without pain. The nurse remarkably used the identical vitals since the day before even though the patient had been vomiting. The patient had diarrhea, vomiting, and wasn't eating. The nurse told a doctor about the vomiting and weight loss. | 11, 19, 8 — Dated vitals used. Apparently the doctor didn't evaluate the patient for diarrhea, vomiting, and not eating. This was indifferent, as the doctor was ignoring serious medical conditions. Laboratory tests should have been ordered due to the vomiting to assess for dehydration. |

PTX193-1031

Patient #20

4/19/2017  A nurse saw the patient.  The vital signs were identical to 4/17/17.  The nurse documented that the patient couldn't move without pain and that if she ate she vomited the food.  Remarkably, though in the narrative note, the nurse documented that "increased rate of respirations noted" even though the vital signs documented were identical to 4/17/17 and the respiratory rate was 14, which is normal.

11, 16, 8  The nurse used dated vitals and failed to call a physician for serious medical conditions.  Labs should have been ordered because of the vomiting.

4/19/2017  At 10:01 pm a nurse documented that the patient was having "foul smelling vomiting."  The nurse noted that a doctor saw the patient and that mag citrate and Zofran were ordered.  The vitals were identical to the vitals from 4/17/17.

11, 16, 8  The patient had a serious event and the nurse used dated vitals. The nurse should have consulted a doctor and labs should have been ordered.

4/19/2017  At 11:31 pm a doctor documented a note.  The patient complained of vomiting since her procedure 4-5 days ago. The doctor noted identical vitals to 4/10/17.  The doctor reviewed labs from 4/18/17.  The potassium was 3.1.; the alkaline phosphatase was 300; albumin 2.9.  The BUN was not given.  The doctor documented that the stent "exchange was attempted but unsuccessful per verbal report 4/14/17."  The doctor ordered a CMP and advised to decrease narcotics until symptoms improve.  Zofran was ordered along with an abdominal x-ray.

11, 14, 8  There was no report from the GI consultant.  The patient had four days of vomiting with abnormal labs from the day before. The patient was in pain yet the doctor discontinued pain medication. The doctor did not attempt to obtain orthostatic vitals to assess for dehydration.  Under these circumstances admission to a hospital was indicated.  Instead, the doctor stopped pain medication, ordered an antiemetic, and an abdominal x-ray.  Intravenous fluid was indicated as the patient was unable to take by mouth.  The doctor should have ordered labs.  Care was grossly and flagrantly unacceptable.

4/20/2017  At 5:11 pm a nurse saw the patient.  The patient hadn't been seen since the night before. The vital signs were identical to the 4/10/17 note.  The patient had significant pain and couldn't eat or drink.

11, 16, 8  The nurse used dated vitals and failed to call a physician for serious medical conditions.  Labs should have been ordered due to not eating.

264

Patient #20

| | |
|---|---|
| 4/20/2017 At 11:04 a nurse saw the patient. The vital signs were identical to the 4/10/17 note. The nurse noted that the patient vomited 200 cc. There was no assessment or consult with a doctor. At 11:05 a nurse wrote a second note using the same vital signs. The nurse documented the patient saying that the patient was "25." There was no assessment or plan. | 11, 16, 8 The nurse used dated vitals and failed to call a physician for serious medical conditions. Labs should have been ordered due to vomiting. |
| 4/21/2017 A doctor prescribed 15 mg morphine every six hours. | |
| 4/21/2017 A doctor saw the patient. The vitals were identical to 4/10/17. The doctor told the patient that the biopsy showed adenocarcinoma. This diagnosis was five months after incarceration. The patient was sad and crying. The patient had a June out date. She had two sons and 15 grandchildren. The patient was agreeable to stronger pain medication. The doctor documented that she would assist the patient with application for compassionate release and consult the oncologist for prognosis and would maximize pain management. But the pain medication order was not in this note and it was unclear what maximize pain management meant. The doctor did not order additional pain medication. | 11, 8 The doctor evaluated the patient but used dated vitals. The doctor started morphine only after obtaining a diagnosis. There was no therapeutic plan for this patient. Due to the recent vomiting labs should have been ordered. |
| 4/21/2017 A nurse saw the patient. The vital signs were identical to the 4/10/17 note. The patient was now on a fentanyl patchy which was "helping with the pain." The patient had constipation. The patient was given Miralax. | |
| 4/21/2017 Albumin 3.4; potassium 2.9 (3.5-5.3); alk phos 239. | |
| 4/21/2017 A morphine fentanyl patch was prescribed for four days. | |
| 4/21/2017 A doctor prescribed 0.5 mg morphine QID at 11:09 am. | |
| 4/21/2017 A doctor prescribed 5 mg morphine QID at 11:16 am. | 3 This is an extremely low dose. The morphine should have been titrated to the patient's pain. |

265

PTX193-1032

Patient #20

| | | |
|---|---|---|
| 4/21/2017 | | The MAR showed that the patient received a single fentanyl patch on 4/21/17. This was good for 72 hours. The medication was discontinued on 4/24/17. |
| 4/22/2017 | 11 | A doctor wrote a note that the hypokalemia was worse from 3.1 to 2.9 and that the patient was refusing potassium supplementation. The doctor wrote that she was unable to enter orders since the computer was locked by the nurse. The nurse left the infirmary and the computer was unable to be used. | To have an electronic medical record that locks because another individual is using it is unacceptable. |
| 4/22/2017 | | An LPN saw the patient. The patient was able to sleep a little since the fentanyl patch. The patient wasn't eating. The patient said the fentanyl patch was helping quite a bit. The patient was able to tolerate liquid Boost. | |
| 4/22/2017 | | Morphine was prescribed 15 mg Q 6 hours but this was stopped on 4/24/17. | |
| 4/22/2017 | | A MAR showed the patient received one day of 15 mg morphine every six hours. | |
| 4/23/2017 | 11 | A nurse saw the patient. The vitals were identical to 4/10/17. The patient still had pain despite the fentanyl patch. | Vitals were dated, the nurse needed to refer to a doctor for pain management. |
| 4/23/2017 | 11 | A nurse noted that the patient wasn't talking much and the patient was very weak. The vitals were identical to 4/10/17. At 2:48 pm the patient was sent to a hospital. It wasn't clear why. | Vitals were dated. |
| 4/23/2017 | | At 10:16 pm a nurse noted that the patient returned from the hospital and ordered to discontinue the patch. The temperature was 93.6; pulse 120; BP 122/96. The assessment was hypotension although the blood pressure was not low. | |

266

**PTX193-1033**

PTX193-1034

Patient #20

| Date | | Description |
|---|---|---|
| 4/23/2017 | | The patient was sent to a hospital. The discharge diagnoses were hypokalemia, cancer pain, and dehydration. |
| | 4 | Given dehydration and hypokalemia, it is clear that providers at the facility were not appropriately monitoring the patient's condition. She had vomiting and did not have laboratory monitoring to assess whether the vomiting was affecting her electrolyte status. |
| 4/24/2017 | | A nurse documented identical vitals from the day before. The patient was too weak to sit up. The patient wasn't speaking and only nodded her head in response to questions. Tylenol #3 was given for pain. | 
| | 4 | The patient needed to be on a stronger narcotic. |
| 4/24/2017 | | At 1:02 pm the patient told a nurse "I need more pain meds I hurt so bad." The blood pressure was 84/52. The patient vomited. Morphine was crushed and given in pudding but the patient vomited after eating. An IV was started and Zofran was given IV. |
| | 14 | The facility was unable to care for this patient who needed skilled nursing care and a doctor who understood pain management and end-stage cancer management. She needed transfer to a higher level of care. |
| 4/24/2017 | | At 6:38 pm a doctor saw the patient. The vitals from 1:00 pm were used on the note. The patient was now on morphine sulfate 10 mg every two hours. Family had come for a visit. The doctor added lorazepam every two hours. |
| | 4 | The patient was placed on palliative sedation with morphine and lorazepam but it wasn't clear that the patient was involved in the decision and should have been. |
| 4/24/2017 | | A nurse saw the patient at 11:41 pm and noted identical vital signs from early that day. |
| | 11 | Vital signs were identical |
| 4/24/2017 | | Morphine sulphate was ordered 10 mg every four hours at 3:44 pm. |
| 4/24/2017 | | Morphine sulphate was ordered 10 mg every two hours at 6:12 pm. |
| 4/24/2017 | | Lorazepam 2 mg IM was ordered every two hours for seven days at 12:55 pm. |
| | 4 | This was an extraordinary dose of lorazepam intravenously. This was clearly palliative sedation and needed to be discussed with the family and patient, but it wasn't clear that this occurred. |
| 4/24/2017 | | Lorazepam 2 mg IV push every two hours was ordered for three days. The order was at 6:52. |

**PTX193-1035**

Patient #20

4/24/2017  A doctor prescribed morphine 10 mg every 2 hours PRN and
lorazepam 2 mg IV every two hours.

4/24/2017  A doctor prescribed .25 mg morphine every six hours.  This
was discontinued the same day.

4/24/2017  A doctor prescribed 5 mg morphine every six hours.

4/25/2017  Just after midnight a nurse noted identical vital signs from the
day before.  Ativan was given IV.

4/25/2017  At 3:45 am a nurse saw the patient.  The vital signs were
identical to the day before.  Ativan was being given every two
hours.  At 7:00 am the patient was lethargic.  Vital signs
continued to be from the day before.  At 3:54 pm the patient
expired.

11   Vital signs were identical.

268

Patient #21

11/2/2011 Annual health examination documents prostate cancer, DM, and HTN as problems. The weight was 174. Refused rectal examination.

6/26/2012 EKG showing NSR but looks like flat ST segment in lateral leads.

10/23/2013 Annual health examination documents prostate cancer, DM, and HTN as problems. The weight was 194. Rectal examination deferred.

2/4/2014 PSA 10.9 (0-3.9).

3/4/2014 Microalbumin 7 (0-30); glucose 121; A1c 6.1; total cholesterol 181; TG 101; HDL 40; LDL 121; TSH 0.73; creatinine 1.02.

5/13/2014 PSA 2.4; creatinine 0.89.

8/4/2014 A doctor saw the patient in diabetes and HTN chronic clinics. The weight was 174 pounds. The blood pressure was difficult to read but appeared to be 131/84. The doctor noted that the LDL was 121 and the most recent A1c was 5.6. The doctor took no history and did not address what medications the patient was taking except to note that the patient had a current prescription for Lopressor until 1/25/15. The doctor assessed the patient in good diabetic control. The doctor did not address apparent weight loss of 20 pounds since the 2013 annual exam. The diabetic medication apparently was discontinued in July but no mention was made of this. The doctor did not check recent CBGs . The recent A1c was about the time the medication was discontinued. The doctor did not order any follow up. The patient had a 44% 10-year risk of heart disease and stroke yet was not placed on a statin drug.

1, 17   The history was poor. The plan did not include use of a statin despite high risk. Weight loss was not evaluated.

11/4/2014 PSA 8.7; creatinine 0.89.

269

PTX193-1036

Patient #21

12/30/2014  A doctor saw the patient for diabetes and HTN chronic clinics. The weight was 182. The BP was 131/70. The doctor took no history. He noted the recent LDL of 121 and A1c of 5.5. Only a brief examination was done. The only assessment was good hypertension and diabetes control. The doctor didn't discuss medications. Apparently diabetic medication was discontinued in July but the doctor didn't mention this.

1, 17  The history was poor. The plan did not include use of a statin despite high risk. Weight loss was not evaluated.

3/3/2015  Microalbumin 34; A1c 6.5; cholesterol 199; TG 131; HDL 43; LDL 130; PSA 1.4; testosterone 23 (300-720); creatinine 0.9.

3/10/2015  EKG showing sinus rhythm with moderate ST depression.

3/17/2015  BUN 21; PSA 1; testosterone 20.

4/17/2015  A NP saw the patient for diabetes and HTN chronic clinics. The BP was 120/70. The weight was 192. The NP noted a recent LDL of 130 with cholesterol 199 and HDL 43. The NP noted that medication for diabetes had been discontinued on 7/15/14. The NP noted that the patient was on Lopressor and ASA but did not mention a statin drug.

3, 6, 17  The patient had a recent EKG with ST depression and high cardiovascular risk but these were unnoticed. The patient had a 39% 10-year risk of heart disease or stroke and should have been offered high intensity statin.

7/5/2015  A nurse evaluated the patient for generalized weakness. The weight was 193.

7/13/2015  A1c 8.3.

7/31/2015  A nurse saw the patient for medication refill. The weight was 189.

PTX193-1037

Patient #21

| Date | Code | Note |
|---|---|---|
| 8/20/2015 | 1, 17 | A doctor saw the patient for diabetes and HTN chronic clinics. The weight was 187. The blood pressure 128/64. The doctor took no history. The doctor did note that the recent LDL was 130 and A1c was 8.3. The doctor noted that the patient was taking HCTZ, Lopressor ASA and metformin 1000 mg BID. At the last chronic disease clinic the patient had been on no diabetes medication. The doctor started glipizide 5 mg daily. The doctor did not address the lipids. | The patient had high cardiovascular risk but these were unnoticed. The patient had a 39% 10-year risk of heart disease or stroke and should have been offered high intensity statin. The NP should have taken a history of chest pain or angina equivalents. |
| 8/28/2015 | | A1c 7.9; cholesterol 172; TG 145; HDL 34; LDL 105; creatinine 0.9. | |
| 9/1/2015 | | Hepatitis C negative; cholesterol 168; TG 129; HDL 37; LDL 109. | |
| 9/22/2015 | | PSA 3.4. | |
| 10/23/2015 | 7 | Annual health examination documents HTN, DM, prostate cancer, and blindness in L eye. Weight is 182.8. No offer of rectal examination. | Colorectal screening was not offered. |
| 11/3/2015 | | A1c 5.7; creatinine 0.79. | |
| 12/6/2015 | 1, 17 | A doctor saw the patient for diabetes and HTN chronic clinics. The BP was 138/72, recent LD 109; and recent A1c 5.7. The doctor took no history and did a brief exam and continued HCTZ, ASA, Lopressor, metformin, and glipizide. | The patient had a 10-year risk of heart disease or stroke of 47% and should have been offered a statin drug. The doctor did not ask about any problems with the new diabetic medication. |
| 1/6/2016 | | A clerk documented that the patient was presented to collegial review for an oncology follow up. | |
| 1/7/2016 | | PSA 3.3; creatinine 0.96; hemoglobin 14.3. | |
| 1/12/2016 | 10 | A doctor noted that the patient returned from Lupron injection. There was no history, exam, review of the report, discussion of the status of the patient or discussion with the patient. | The doctor didn't follow up appropriately after the consultation. The report wasn't reviewed and the doctor didn't discuss with the patient. |

Patient #21

1/17/2016 The patient complained of weakness and being wore out. The patient complained of night sweats but no weight loss. The weight was 186 pounds. The nurse took no action except to give the patient allergy medication and cough syrup even though the patient did not complain of upper respiratory symptoms.

2/4/2016 A doctor saw the patient for shortness of breath. The patient weighed 181. The note was mostly illegible. The doctor appears to have diagnosed upper respiratory infection and bronchitis and prescribed amoxicillin for 10 days with an as needed follow up.

3/13/2016 The patient saw a nurse for a complaint of abdominal pain. The weight was 179. The patient thought he had possible blood in his stool. The patient complained also of weakness. The nurse referred the patient to a physician.

3/16/2016 A clerk documented that the patient was presented to collegial for an oncology follow up.

3/16/2016 A doctor wrote a brief note stating that the patient had abdominal pain and constipation. The doctor noted that the patient was moving his bowel and that there was no bright red blood. The doctor noted that the patient refused a rectal exam. There was no other history or examination. The doctor ordered milk of magnesia and stool softener but no other diagnostic tests. The doctor did not ask about ability to eat or identify whether the patient lost weight.

7    The patient had blood in his stool but since there was no active bleeding the doctor took no action. The patient was 72 years old and had abdominal pain and blood per rectum and should have had a colonoscopy.

4/5/2016 Cholesterol 191; TG 114; HDL 42; LDL 126; creatinine 0.91.

5/19/2016 The patient went to the oncology follow up appointment.

272

PTX193-1039

PTX193-1040

Patient #21

5/19/2016 A nurse saw the patient after his oncology appointment. The blood pressure was 160/90.

5/25/2016 A NP saw the patient post-oncology visit. The NP documented review of the oncology notes and started antibiotics as recommended by the oncologist.

6/20/2016 A nurse saw the patient for upper respiratory symptoms. The patient had a cough. The nurse documented a weight of 174.8. The nurse failed to notice the weight loss. The nurse gave the patient CTM and ibuprofen by protocol without referral.

7/3/2016 A nurse saw the patient for abdominal pain. The patient described "occ constant pain" which seems inherently contradictory. The patient said he had the pain for several weeks. The weight was 177 pounds. The nurse referred the patient to a provider.

7/6/2016 A1c 5.3; creatinine 0.92.

7/14/2016 A doctor saw the patient and wrote an extremely brief note. The doctor wrote that the patient had "burning sensation upper abd R>L postprandial." That was the entire history. The doctor did not obtain a weight, determine the quality or intensity of pain, determine whether the patient was able to eat normal, had diarrhea, or constipation. The history was inadequate. There was no assessment or differential. The doctor stopped Pepcid and started Prilosec with a follow up in two weeks.

| | |
|---|---|
| 16 | The patient had respiratory symptoms for several months with cough. The nurse should have consulted a physician. |
| 1, 2, 7 | The history and evaluation were inadequate. The patient had abdominal pain for five months. Without adequate evaluation the doctor ordered an anti-acid medication. Due to age, prior blood per rectum, and abdominal pain for five months, colonoscopy was indicated. |

Patient #21

7/29/2016 A NP saw the patient in follow up for the abdominal pain. The only history was that the patient had recently been started on Prilosec and was "some" better but the patient still had pain. The NP documented that the patient had normal bowel movements. The NP exam was that the abdomen was firm, with "sluggish" bowel sounds. Based on this limited history the NP diagnosed "?ulcer" and ordered a KUB with follow up in two weeks. The blood pressure was 148/80, but the NP did not address this.

1, 7, 8   The history was inadequate. The severity and duration of pain was not obtained. Associated symptoms were not obtained. Precipitants, quality, temporal elements, and radiation were not obtained. The physical examination was extremely brief. No laboratory tests were ordered. A KUB was ordered but this would unlikely be of clinical value with the patient's complaint. The NP failed to establish an appropriate treatment plan and failed to obtain appropriate laboratory tests (CBC, CMP) or colonoscopy.

8/19/2016 An NP saw the patient. The blood pressure was 170/90. The weight was not taken. The NP noted that there was no x-ray report yet. The film had been done on 8/8/16. The NP took no history regarding the patient's symptoms. The only examination was to state "abd soft - No reddened skin." The NP ordered no follow up without even asking if the patient still had symptoms. The weight wasn't checked. The NP did ask that the blood pressure be checked twice a week for two weeks.

3, 15   The NP failed to modify BP meds despite significant elevation of blood pressure. The NP failed to follow up on the abdominal pain which the patient had for over five months and didn't order follow up despite not reviewing the x-ray.

8/26/2016 A CMT noted that the patient's BP had four blood pressure checks including: 146/74; 150/82; 138/84; and 144/76. All of these were not at goal for a diabetic except for one.

8/29/2016 A CMT BP was 148/78.

9/2/2016 A CMT saw the patient for a dry cough and shortness of breath for 5-6 days. The weight was 174. The nurse used an upper respiratory protocol and identified no problems. The nurse gave the patient over-the-counter medication and sent the patient back to his unit.

16   The CMT should have called a doctor as the patient had a serious condition beyond the scope of practice of a CMT to address.

Patient #21

10/5/2016 A CMT saw the patient for weakness, fatigue and cough. The patient weighed 172 pounds. The blood pressure was 150/80. The patient complained of shortness of breath. The patient had weight loss, fatigue, and weakness. He also had prior abdominal pain that was not worked up and the nurse didn't ask about this. The CMT gave the patient Tylenol with no referral.

16 The CMT should have consulted a provider.

10/30/2016 A NP saw the patient for weight loss. The patient weighed 160 pounds. The blood pressure was 140/74. The only NP history was that that patient lost weight. The only physical examination was that the patient could walk to the scale, had a soft abdomen and clear lungs. The assessment was weight loss. The NP plan was to give the patient a lay in permit with a slow walk permit. The NP ordered weekly weights for three months and ordered CMP, CBC and UA with another KUB and chest x-ray.

1, 2, 3 The NP took inadequate history and made an inadequate assessment. The patient had recent shortness of breath and more remotely abdominal pain which were not considered. Abdominal x-ray is unlikely to be useful in an evaluation of weight loss. Colonoscopy was indicated. CT of the abdomen should have been considered. The other labs and chest film were appropriate.

11/3/2016 X-ray showing punctate density over lower pole of left kidney likely representing a stone. US recommended.

11/3/2016 Microalbumin 79; BUN 24 (0-20); sodium 134; creatinine 1.31 (0.5-1.5); A1c 5.6 (4-6); hemoglobin 12.3 (13.2-18).

11/3/2016 An NP wrote that the patient presented to the ER with abdominal pain with 12 pound weight loss over the past month. The NP noted that the recent KUB showed stool. The NP sent the patient to a hospital for right lower quadrant pain.

PTX193-1043

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 276 of 431 PageID #:12474

Patient #21

11/3/2016 An incident report documents that the inmate was sent to Chester Memorial Hospital. There was a CT scan report which documented a large retroperitoneal mass suspicious for lymphoma. The hospital documented speaking with Dr. Siddiqui who in coordination with Dr. Trost and the NP would coordinate further care.

11/3/2016 A NP noted that the patient returned from the hospital and had an abdominal mass. The NP sent the patient back to his cell and ordered a follow up with a doctor on 11/7/16. The patient's weight was 152 pounds. The NP didn't ask the patient whether he was eating or about any symptoms.

11/7/2016 The weight was listed as 153.6.

11/8/2016 Security did not bring the patient for his physician follow up appointment.

11/9/2016 A clerk documented that the patient was to be presented at collegial for his oncology follow up for his prostate cancer. Wexford UM cancelled the collegial call for the week. UM was going to make a decision on their own.

11    Patients should be transported for their appointments.

11/11/2016 An NP saw the patient. The weight was 149 pounds. The NP noted that the patient was scheduled for a follow up of an offsite visit from Memorial Hospital. The NP noted that there were no notes from the hospital in the chart yet. The NP noted that the patient could walk to the scale and get up out of the chair and had a good BM after taking magnesium citrate. That was the extent of the examination. The NP documented that labs were pending from the hospital. The NP noted that the patient was to follow up with the doctor.

10, 11   Follow up of the hospital report was not done because there was no report. The NP did not address the weight loss.

11/14/2016 A CMT took a weight of 148.2 pounds.

276

Patient #21

| | | |
|---|---|---|
| 11/17/2016 | A doctor saw the patient and the patient was anorexic and felt weak. The doctor noted that the patient lost 26 pounds over the past three months. The doctor documented that the CT scan was noted. There was no history, no evaluation as to whether the patient was able to function on his housing unit, whether he was able to eat, or whether he needed a higher level of care. There was no assessment. The only plan was a collegial referral to oncology. The weight was 146 pounds. The patient had lost six pounds over the past two weeks and should have been considered for infirmary care and had an expedited evaluation for biopsy. | 1, 3, 8 | The doctor took no history and failed to establish a plan that protected the patient and addressed his needs. Nutritional status was not obtained. It wasn't clear whether the patient could function in population. The doctor ordered no labs to determine the metabolic status of the patient. |
| 11/21/2016 | The patient was seen at Illinois Oncology Inst for his six month follow up of prostate cancer. They noted that the patient had been increasingly fatigued over the past few months and was only able to walk seven feet before getting fatigue. He had constipation and only had one BM a week and was drinking only 20 ounces of water a day. He had low back and abdominal pain intermittently. They noted that a recent CT scan showed a large mass in his abdomen. They described the mass as 10.7 by 9.9 cm in the upper abdomen extending into the right renal bed and retroperitoneum involving the periaortic lymph node region with right hydronephrosis. They recommended a CT guided biopsy ASAP or in the next two weeks to test for non-Hodgkin's lymphoma. They also recommended a CT of the brain ASAP. They noted "if his physical condition deteriorates at the correctional center, I do recommend transfer him to the infirmary and start him on IV fluid." They also recommended a three week follow up. | | |

PTX193-1044

PTX193-1045

Patient #21

| | | |
|---|---|---|
| 11/21/2016 | An NP noted that the patient returned from oncology. The NP documented that orders were noted and that paperwork was sent to med furlough. It wasn't clear what this meant. The NP ordered a follow up in five days, allopurinol, Pepcid, dexamethasone, Reglan, ensure, and senakot. The patient should have been placed on the infirmary. | 10, 11, 14 | The NP failed to review the oncology notes for a biopsy and CT brain. The NP also failed to appreciate the note about hydration and infirmary placement. |
| 11/26/2016 | An NP documented that the patient was being seen for medical furlough return. The weight was 141.6. The NP took no history and noted that the patient appeared pale. There was no exam except to note that bowel sounds were hypoactive. The NP ordered a CBC, CMP and two week follow up. There was no mention of the CT findings. | 10, 11, 14 | The NP failed to review the oncology notes for a biopsy. The NP also failed to appreciate the note about hydration and infirmary placement. It appeared that the patient may have had a CT of the brain but there was no report and it wasn't clear what happened. |
| 11/28/2016 | A CMT took the weekly weight, which was 141.2. No action was taken. | | |
| 11/30/2016 | BUN 28; sodium 134; creatinine 2.06; albumin 3.7; hemoglobin 12.1; platelets 287. | | |

278

PTX193-1046

Patient #21

| | | |
|---|---|---|
| 12/3/2016 | A nurse practitioner saw the patient for a quarterly chronic clinic for diabetes and hypertension. The weight was 132. The nurse noted that the recent A1c was 5.6 and was improved. The NP noted that the patient was in good control and decreased glipizide to 2.5 mg daily from 5 mg daily and metformin to 500 BID from a gram BID. The NP made no mention of the significant weight loss and did not address the retroperitoneal mass. With respect to hypertension clinic, the blood pressure was 110/70. The NP noted that recent LDL was 126. The NP noted keeping the patient on Lopressor 25; HCTZ 25; and ASA 81 daily. The NP did not address the elevated cholesterol. More critically, the NP made no mention of the significant retroperitoneal mass which had not yet been biopsied. | 1, 3, 6, 10 | The NP failed to take adequate history or review the oncology notes. As a result, the plan was inadequate. Based on recent labs which were not reviewed, the patient appeared mildly dehydrated and had worsening kidney function and had persistent anemia, which were unnoticed. |

279

PTX193-1047

Patient #21

| | |
|---|---|
| 12/3/2016 | An NP saw the patient. The weight was 132.  The NP noted that the patient had a recent oncology visit. The NP noted that the patient had a 15-20 pound weight loss, had poor appetite. The NP noted that the diabetic medication had been decreased and that the A1c was now 5.6. The NP took no other history, did not determine whether it was safe to be in general population and made no effort to determine why the patient was losing so much weight. The NP documented that the patient was to follow up with a doctor "regarding code status - and inmate's concern of life /death options." This was remarkable given that a diagnosis had yet to be made. There was no concern about the urgency of the diagnosis. The NP ordered a CBC, CMP, UA, vitamin D level, A1c and decreased the glipizide to 2.5 mg daily, continuing the metformin at 500 BID. The NP wrote "referral Dr Trost - code status (CANCER)." Remarkably, the NP did not initiate any diagnosis and was presuming it was a cancer. | The NP was more concerned about code status than about getting a necessary biopsy of an abdominal mass. The delay in biopsy was significant and unnecessary. The patient should have been considered for a higher level of care (infirmary). |
| | 7, 14 |
| 12/3/2016 | A CMT took a weight of 139.2. | |
| 12/5/2016 | A CMT documented that the patient felt better.  The CMT documented that the patient was to be starting on ensure. The weight was documented as 146.6. | |
| 12/5/2016 | A doctor saw the patient but the note was extremely brief. The doctor noted that the patient had anorexia, was weak, and had lost 50 pounds.  The doctor noted no nausea or vomiting or abdominal pain.  The only plan was to issue permits.  The doctor noted that the patient was to go out soon for oncology. | The doctor failed to review the oncology note or recommendations. |
| | 10 |

Patient #21

12/5/2016  A doctor referred the patient for a CT of the brain and CT guided biopsy. There was an approval for a CT of the brain and another approval for a CT guided biopsy, both dated 12/5/16.

12/8/2016  A doctor presented the patient to collegial for oncology follow up. Wexford UM cancelled the collegial call and the note by the clerk documented that UM would make the decision on this case.

12/14/2016  A clerk documented that the patient was approved for oncology follow up as authorization # 465355597.

12/15/2016  A doctor saw the patient and noted GERD symptoms. The weight was 138 pounds. The doctor performed no examination and took no history except for GERD symptoms. The doctor noted that the patient was to go out for a CT scan and biopsy of the mass. The doctor ordered two cans of Boost for six months.

1, 2    The history and exam were inadequate. The doctor didn't determine whether the abdominal mass might be the cause of the symptoms.

12/28/2016  A nurse saw the patient, who said that he was unable to urinate except to dribble. The patient needed to be taken to the health care unit in a wheelchair. The nurse noted that the patient had 3+ leg edema and had a stage II pressure ulcer on his hip. The nurse placed the patient on the doctor's sick call for 12/29/16. This patient should have been seen that day.

14, 19   A doctor should have seen the patient.  The patient clearly couldn't care for himself in general population and was debilitated.  He needed to see a doctor and needed higher level of housing, neither of which occurred.

12/29/2016  A doctor saw the patient, who weighed 150 pounds. The doctor noted that the patient had an ulcer on his hip. Much of the note was illegible. The doctor ordered a UA, Flomax, with a follow up in two weeks. The patient was getting edema but this wasn't evaluated. The doctor did not admit the patient to the infirmary even though the patient was clearly unable to care for himself to the extent of developing a decubitus ulcer. This was neglect.

1, 2, 3  Care was grossly and flagrantly unacceptable. The patient had serious problems and complications causing debility and inability to care for himself, which were ignored. This was indifferent care.

281

PTX193-1048

PTX193-1049

Patient #21

12/30/2016 Creatinine 1.47 (0.5-1.5); albumin 3.3; AST 16; ALT 29; alk phos 113; hemoglobin 10.4; platelets 488; normochromic.

1/9/2017 The weight was 160. The large weight gain was likely fluid due to edema but it appeared unrecognized except by a nurse.

1/23/2017 The weight was 162.
1/30/2017 The weight was 170.

2/2/2017 A nurse saw the patient for diarrhea that was reported to medical staff by the patient's cellie. The patient had been neglected and should have been on the infirmary. The LPN noted a pulse of 113; BP 150/96. Remarkably, the nurse took no action and did not refer the patient.

2/2/2017 A nurse admitted the patient to the infirmary as a chronic patient based on decline in status based on security complaint. The nurse documented a weight of 180, which was clearly inaccurate. The BP was 152/94. The nurse noted 2-3+ edema of both legs. The nurse did not document review of the decubitus ulcer.

2/2/2017 An NP performed an admission note to the infirmary. The NP noted decrease in activity of daily living functioning. The NP did not take further history of what was problematic or what the patient was unable to do or why this recent change in status. The NP examination was significantly abnormal. The NP only noted that the patient was unable to stand without assistance, was oriented to person and place, but had a slow response to knowing what time it was.

2/3/2017 A doctor saw the patient. The entire note was SOA No c/o's confused ambulates OK P [plan] CPM [continue present management].

16          The nurse should have consulted a physician.

            It was remarkable that lay custody officers and the nurse as opposed to a doctor recognized infirmary care need. It speaks to the deficiency of the provider staff.

1, 2, 3     The NP failed to take adequate history, failed to perform adequate exam, and did not establish a reasonable therapeutic plan based on the patient's condition.

1, 2, 3     There was inadequate history, physical examination, or plan based on the patient's condition. Care was grossly and flagrantly unacceptable.

PTX193-1050

Patient #21

| | | |
|---|---|---|
| 2/4/2017 | A nurse saw the patient and noted that the patient was confused. The nurse wrote that the patient had altered mental status but a physician did not evaluate the patient. | 16, 19 | The nurse should have consulted a physician. Confusion is a significant finding and required immediate attention. |
| 2/5/2017 | At midnight a nurse saw the patient, who was still confused. The nurse noted that the patient was incontinent. Despite this, the patient was not admitted to a hospital. | 14, 16, 19 | The nurse did not consult a physician. A physician needed to immediately evaluate the patient. The patient needed to be hospitalized. None of these happened. Care was grossly and flagrantly unacceptable. |
| 2/5/2017 | At 4:15 am a nurse documented the patient stating "come on guys. Aw come on." The nurse noted that the patient was apparently talking to people in his cell who weren't there. The nurse noted that the patient was incoherent. The nurse assessed alteration in thought process and referred the patient to mental health without discussing the altered mental status with a physician. | 14, 16, 19 | The patient appeared delirious. Instead of referring to a doctor, the nurse referred to mental health. The patient needed admission to a hospital. Care was grossly and flagrantly unacceptable. |
| 2/6/2017 | A nurse noted that the patient was confused, incontinent, and was scheduled to see mental health. | | |
| 2/6/2017 | At noon a nurse saw the patient, who was confused with 3+ edema of his legs. The nurse noted a wound on the hip. It was not clear that there were orders for monitoring or dressing this as the nurses did not mention the decubitus ulcer. | 14, 16, 19 | Altered mental status, edema in a patient with a known abdominal mass should have prompted physician evaluation and admission to a hospital, which did not occur. |
| 2/7/2017 | A nurse saw the patient who was still confused with 2-3+ edema. The nurse noted no wounds and apparently the decubitus was not being evaluated. | 14, 16, 19 | Altered mental status, edema in a patient with a known abdominal mass should have prompted physician evaluation and admission to a hospital,which did not occur. |

283

Patient #21

| 2/7/2017 | A doctor noted that the patient was lethargic, confused, and mumbling unintelligibly and had a superficial decubitus ulcer on his hip. The doctor noted that the patient was having rapid clinical decline and apparently ordered daily dressing changes. The doctor took no action with this patient who had altered mental status, new onset edema, decubitus ulcer, and undiagnosed abdominal mass. Care was grossly and flagrantly unacceptable. | 14 | The plan of this doctor was incompetent. The patient needed immediate hospitalization but was ignored. Care was grossly and flagrantly unacceptable. |

| 2/7/2017 | At 10:30 am a nurse cleaned the hip ulcer described as a three and a half wide area with 1/2 inch deep. | | This speaks to the neglect of this patient. |
| 2/7/2017 | At 11:35 am the patient was described by a nurse as lethargic with uneven respirations and tachycardia although vital signs were not documented. The patient was sent to a hospital. | | |

PTX193-1051

**PTX193-1052**

Patient #22

2/27/2013  The patient transferred to Menard from Pontiac.  The patient was on enalapril 20; Procardia XL 30; Lopressor 25; ASA.

5/1/2013  Total protein 8.2 (6-8).

6/19/2013  The patient was evaluated by a doctor referred by the optometrist for an elevated blood glucose of 130.  The doctor failed to note that the patient had fever.  The BP was 156/102 and the temperature 100.8.  The doctor said that the patient didn't take his blood pressure medication.

2  The doctor failed to note or evaluate an abnormal vital sign.

6/19/2013  A1c 6.4.

6/26/2013  Diabetes and HTN chronic clinic; weight 255; temperature 99.4; BP 144/89; A1c 7.9; Procardia was increased to 60 mg.

7/3/2013  RN notes BP 160/98.

7/16/2013  BP 156/86.

7/18/2013  Annual examination weight 250 pounds.  No identified problems.  Notably history of IV drug use, prostitution, multiple partners, blood transfusions, and homosexual activity were all checked "no."  Although the patient did have gonorrhea in 1986.

7/23/2013  BP 170/100.

7/26/2013  BP 160/98.

8/6/2013  A1c 6.4; WBC 1.8; HGB 13.5 (13.2-18); neutrophils 0.9 (1.3-7.5); lymphocytes 0.6 (1.3-4.2).

8/18/2013  Chronic clinic flowsheet documents a weight of 260.

8/19/2013  BP 146/84; weight 260; temperature 98.6; chronic clinic for diabetes and HTN.  No changes to medications.  No review of CBGs; most recent A1c 6.4.

1, 2, 3, 6  The doctor failed to adjust medications for high blood pressure.  The doctor failed to review significantly abnormal white count of 1.8 and took no history and failed to evaluate.

11/13/2013  A1c 6.1.

PTX193-1053

Patient #22

12/4/2013 Diabetes and HTN chronic clinic; weight 247; temperature 99.4; BP 126/88; Patient now on 90 of Procardia.  A1c 6.1.

3/5/2014 Total protein 8.8 (6-8); A1c 6.2.

4/23/2014 Diabetes and HTN chronic clinics weight 238; BP 136/90; no changes to medication.

7/2/2014 A1c 6.1.

8/1/2014 Diabetes HTN chronic clinics. BP 137/76 weight 240; 5 foot 10 inches.  A1c 6.1.  No changes made.

11/9/2014 A1c 6.1.

11/18/2014 CMT note documents weight 230 and BP 136/70.

1/8/2015 Diabetes HTN chronic clinics.  BP 124/90 weight 240; most recent A1c 6.1; no changes made.

3/20/2015 Total protein 8.6 (6-8); A1c 6.2.

5/25/2015 Diabetes HTN chronic clinics.  BP 100/70; weight 240; A1c 6.2; no changes made.

6/5/2015 Hepatitis A ab negative; hepatitis B core negative; hepatitis B ab negative; hepatitis C antibody negative; total protein 8.1 (6-8).

7/17/2015 A1c 6.3.

9/5/2015 At 3:30 am an RN saw the  patient, who was lying on floor having urinated on himself.  He was weak for the past 3-4 days and said he ate some bad food.  The pulse was 120; temperature 103 and BP 146/90. The nurse called a doctor who ordered stat CBC, CMP and UA; IV fluid and observation on the infirmary.

9/5/2015 WBC 8.7; HGB 11.4; platelets 151; total protein 7.4 (6.6-8.7); urine culture grew e Coli.

286

PTX193-1054

Patient #22

9/8/2015   A doctor wrote a discharge note to the infirmary.  The doctor noted fever of unknown origin and the diagnosis was R/O lupus.  The patient had been treated with Septra but had an unexplained fever and a facial rash.  The plan was to work the patient up for lupus or connective tissue disease.  Notably there was no history or physical examination for this admission.  A week follow up was ordered.

9/16/2015   A nurse saw the patient.  The temperature was 102.6, pulse 110, and BP 105/70.  The nurse noted that the patient was brought to the HCU with confusion, was incontinent and was weak. The nurse referred to a doctor urgently.

9/16/2015   A doctor saw the patient because of mental status changes. Remarkably the doctor took virtually no history.  The only examination was that the patient had warm dry skin and apparently normal cranial nerves 1-7.  The temperature was 104.  The doctor assessed an E coli urinary tract infection and ordered a chest x-ray, urine culture, blood culture, RPR, and CBC.  The doctor started levofloxacin.  The patient should have been admitted to a hospital.

9/16/2015   A nurse practitioner wrote the admission note to the infirmary.  There was little history.  The patient had fever of 102.6 with pulse 110.

1, 2, 12   This was a 45 year old man.  Incontinence was not expected.  The patient had anemia, prior leukopenia and fever.  The diagnosis of lupus had no basis.  The patient should have been referred to a infectious disease specialist as the doctor appeared incapable of making a diagnosis.  In this population, HIV should have been excluded.  Care was grossly and flagrantly unacceptable.

1, 2, 14   The doctor took inadequate history, performed inadequate physical examination, and the plan was inadequate.  The patient had confusion and fever and should have been admitted to a hospital.  He was 45 years old.  Starting outpatient antibiotics in a confused man with fever without a diagnosis was grossly and flagrantly unacceptable care.

1, 14   The history was inadequate.  The therapeutic plan for fever was inadequate.  The patient should have been hospitalized.

287

PTX193-1055

Patient #22

| | | |
|---|---|---|
| 9/17/2015 | 1, 2, 8, 12 | The doctor discharged the patient on 9/17/15 without any review of labs. There was no history and no physical examination. The doctor noted that the patient was admitted with UTI, fever, and dehydration. The doctor noted that IV fluid was given with Levaquin. The doctor ordered a week follow up and discharge diagnoses of UTI, fever, and ?lupus. Yet the doctor did not order tests to evaluate for lupus. The doctor did not note the discharge temperature | The history was inadequate. The therapeutic plan for fever was inadequate. The evaluation was inadequate. Additional labs should have been drawn to exclude infections common in this population including HIV, blood cultures should have been considered. The patient's problems were beyond the expertise of this physician and he should have referred the patient to an ID expert. |
| 9/17/2015 | 1, 2, 12 | A doctor noted that the temperature was 103 but took little history except that the patient was voiding. The doctor took no relevant history and did not examine the patient; and reviewed no labs stating that he believed the fevers were not related to a UTI but possible lupus. The doctor noted that the patient had fevers for "years." The doctor discharged the patient without any evaluation. This patient should have been referred to an infectious disease consultant as the physician didn't know how to evaluate the patient. The doctor did not evaluate any lab results. | This was incompetent. To presume that fever for years was normal is incompetent. The history, examination, and plan was inadequate and the patient's problem was beyond the expertise of this doctor and he should have referred to an ID specialist. Care was grossly and flagrantly unacceptable. |
| 9/17/2015 | 14 | The patient had returned to his cell and was feeling so weak he ate sitting on the floor. His pulse was 127 and temperature 102.8. The nurse sent the patient back to the infirmary for 23 hour observation. | At this point the patient needed a higher level of care, as the facility did not know how to manage his care. Care was grossly and flagrantly unacceptable. |
| 9/17/2015 | | Chest x-ray negative. | |
| 9/17/2015 | 6 | ANA none detected; creatinine 1.11 (0.5-1.5); total protein 7.7 (6-8); WBC 3.5 (3.9-12); HGB 10.9 (13.2-18); sedimentation rate 88. There was no documentation by a provider of review of these tests. | The patient had anemia and low white count with a significantly elevated sedimentation rate but these were not reviewed. |

288

Patient #22

9/18/2015  A nurse noted that the patient felt better.  The temperature was 98.9 and BP 146/92 with P 70.  The patient was kept on the infirmary until 9/21/15 and was afebrile during that time.

9/18/2015  A doctor admitted the patient to the infirmary.  There was no history except that the patient was being admitted with high fever.  The only examination was that the patient was alert, oriented, had clear lungs, and had a soft, non-tender abdomen.  The doctor remarkably ordered no diagnostic studies yet the admitting diagnosis was UTI and "fever of unknown origin; ? lupus."

1, 2, 8, 12, 14  The doctor failed to examine the patient appropriately for someone with unexplained fever.  The doctor should have ordered RF, HIV, blood cultures, Quantiferon test or TB skin test, ANA, SPE, and obtained CT scans of the abdomen and chest.  Because of the altered mental status a CT brain was indicated.  The patient should have been admitted to a hospital and/or referred to an ID specialist.  Care was grossly and flagrantly unacceptable.

9/21/2015  A doctor wrote a note stating that the patient was afebrile for 72 hours.  The only documented history was that the patient had no complaints.  There was no examination, no review of laboratory tests and no orders for diagnostic studies.  The doctor discharged the patient to his cellhouse with follow up in a week.  On a separate note the doctor noted that the workup would proceed as an "outpatient."

12  The doctor had no planned "workup" and appeared to not know what to do.  The patient should have been referred.

10/12/2015  The patient wasn't seen in a week as scheduled.  On 10/12 a CMT wrote that there was a level 1 lockdown and a doctor appointment was cancelled.

11  Lockdowns shouldn't prevent scheduled doctor's appointments.

10/26/2015  Annual examination weight 235 pounds.  Problems HTN, DM, history of smoking and drug use but no IV drugs.  On this annual examination the reviewer documented multiple sexual partners and prior blood transfusions which were not documented on prior annual history and physical evaluations.  Given prior transfusions.

PTX193-1056

Patient #22

| | | |
|---|---|---|
| 10/26/2015 | Diabetes HTN chronic clinics  BP 164/90; weight 232; last A1c 6.3.  No changes made. | 3 | The blood pressure was elevated and medication should have been adjusted. |
| 10/26/2015 | The annual physical examination documented that the patient did not use IV drugs but did have multiple sexual partners and the patient had gonorrhea in the past. | 1, 8 | In light of this updated history the prior history of fever should have prompted HIV testing. |
| 11/22/2015 | A CMT wrote the that the patient said he wanted his blood pressure medication changed because it made him feel "different."  The patient said he wasn't taking his medication. The blood pressure was 160/100. | | |
| 12/7/2015 | Diabetes HTN chronic clinics BP 140/80, temperature 99.8 weight 225; last A1c 5.6. HGB noted to be 10.9.  No changed in medication.  CBC, CMP, LDH, ferritin, B12, folate and stools for occult blood ordered. | | |
| 12/14/2015 | A doctor saw the patient and noted that the patient had anemia with low ferritin and B12 and a "butterfly" rash on his face.  The ANA test was negative.  The doctor noted that the patient had low grade fever and that the white count was 2.1. There was no history, no physical examination and the doctor referred the patient to Dr. Trost (apparently the Medical Director) to consider a colonoscopy.  This patient needed an ID evaluation,as it appeared that the physicians didn't know how to evaluate the patient. The patient was started on vitamin B12 injections. | | |
| 12/14/2015 | Ferritin 268 (10-259); WBC 2.1; HGB 12 (13.2-18); platelets 169; neutrophils 1.1 (1.3-7.5); lymphocytes 0.7 (1.3-4.2); B12 125 (180-914). | | |
| 12/15/2015 | Stool negative for occult blood times 3. | | |

290

PTX193-1057

PTX193-1058

Patient #22

| Date | | Notes |
|---|---|---|
| 1/12/2016 | 1, 8, 12 | A doctor saw the patient and again took no history and performed no physical examination. The doctor noted that the patient was feeling better but "still believe he may have lupus." The doctor ordered a B12 level, CBC, CMP, sedimentation rate and rheumatoid factor with a return in two weeks as he was going to present something at collegial review. | The doctor failed to note or take a history obtained at the annual physical that the patient had multiple sex partners and prior gonorrhea and should have ordered an HIV test. The doctor did not have the expertise to manage this patient and should have referred. The leukopenia with lymphocytopenia with anemia is characteristic of HIV infection yet was unrecognized. ID referral was indicated but the doctor didn't have the sense to do this either. |
| 1/12/2016 | | A doctor referred the patient to a rheumatology consultant. This was approved on 1/22/16. | |
| 1/19/2016 | | B12 1104 (180-914); sed rate 73. | |
| 1/22/2016 | | The scheduling clerk documented that a rheumatology referral was approved. | |
| 1/25/2016 | 4 | A doctor wrote an extremely brief note documenting only that lab tests were pending and scheduled a week follow up. The blood pressure was elevated at 148/100 but no action was taken. | The patient had no evidence of lupus serologically |
| 1/29/2016 | 3 | A doctor saw the patient and noted that the sedimentation rate was elevated [either 23 or 72]. The blood pressure was 120/98 but the doctor didn't address the elevated BP. The doctor ordered an ANA test and scheduled a four month follow up. | Blood pressure medication should have been adjusted. |
| 2/2/2016 | 1, 8 | ANA not detected; BUN 33; creatinine 1.52 (0.5-1.5); A1c 6.4. | The doctor should have adjusted blood pressure medication. HIV testing was indicated. A 4 month follow up was too long given the patient's problems. |
| 2/26/2016 | | A rheumatology clinic note documented that the patient wouldn't be scheduled for rheumatology to evaluate for lupus because the ANA was negative. The sedimentation rate was presumed to be from a urinary tract infection. If there was concern for the skin rash a referral to dermatology was recommended for biopsy. | |

PTX193-1059

Patient #22

3/14/2016 A nurse wrote that the patient was scheduled to see a physician but "for some reason MD denied request."

3/15/2016 A nurse noted a blood pressure of 170/102, pulse of 116, and temperature of 99.8. The nurse noted that the patient appeared confused as he didn't give correct response when asked about his medical issues. The nurse documented referring to a doctor.

3/15/2016 A psychiatrist saw the patient and documented that the patient was incontinent of urine and feces and was incontinent while wearing his clothes. The psychiatrist also noted delusional thinking. The assessment was psychotic disorder due to medical condition.

3/15/2016 A doctor saw the patient and noted that the patient was admitted [presumably to the infirmary] for psychosis of new onset and "connective tissue disorder." The only history was that the patient had "no lateralizing symptoms." The doctor admitted the patient for 23 hour observation and that mental health was going to monitor the patient.

1, 2, 14   The patient had confusion, was incontinent, had prior fevers, had low white count and anemia with elevated sedimentation rate and the doctor had no plan. HIV testing was indicated but apparently beyond the expertise of the doctor. A CT brain was immediately indicated. The patient should have been hospitalized for diagnosis. Care was grossly and flagrantly unacceptable.

3/15/2016 A nurse noted vital signs of temperature 99.4, pulse 110, BP 148/96, and a weight of 212 pounds. Though this was approximately a 40 pound weight loss it was unrecognized.

3/15/2016 At 11:45 pm a nurse documented that the patient said, "You don't understand, I'm a confidential informant. These people in here are not listening to me!"

16   The patient appeared delirious and should have been referred to a physician.

3/16/2016 A nurse documented being unable to take the patient's temperature but documented a pulse of 132 with blood pressure of 126/70. The patient was unable to answer questions appropriately. The patient told the nurse that he was not well but didn't elaborate.

16   The nurse should have consulted a physician.

292

PTX193-1060

Patient #22

3/16/2016 A nurse documented that the inmate was escorted off the infirmary by security to be taken to an outside medical furlough. The patient was brought back the same day.

3/16/2016 A nurse documented that the patient was delusional.

3/16/2016 The patient was seen in the Belleville Memorial Hospital emergency room for mental status changes. The WBC was 2.5; hemoglobin 11.8; and platelets 144. BUN was 25; creatinine 0.9; globulin 3.9. The ER documentation noted that the patient was delusional but answered questions appropriately.

The records in the chart indicate that the patient was seen in Belleville Hospital for mental status changes and that he was delusional. Their history was that the patient denied fever. They apparently thought that the patient was delusional for mental health reasons. There was no comment on their part regarding the low white count.

3/17/2016 A nurse documented that the patient was "very delusional" and that it took considerable effort to get the inmate to take his food tray and medications. The nurse referred the patient to mental health but a doctor did not examine the patient.

3/17/2016 A doctor wrote an extremely brief note documenting that the patient was "alert, delusional, tearful at times." There was no history, no examination, and the doctor ordered no diagnostic tests. The only plan was "admit."

3/18/2016 A doctor admitted the patient to the infirmary. There was no history except "new onset acute psychosis R/O SLE." The only examination was "alert, delusional butterfly rash on face, chest clear BS [normal] cardiac RRR." The only orders were for an ANA and for mental health to see the patient.

1, 7, 8   The doctor was fixated on lupus as a diagnosis but the patient had no serologic evidence for this condition. A CT brain and HIV test were indicated but not done. The patient should have been hospitalized. Care was grossly and flagrantly unacceptable.

3/18/2016 A doctor wrote a very brief note stating "no c/os mentation improved." The only plan was ANA.

Patient #22

3/20/2016  A nurse documented that the patient was "laying in bed yelling out intermittently" and "yells and curses for unknown reason." The inmate refused to converse with staff.

3/21/2016  ANA not detected.

3/23/2016  A doctor saw the patient and wrote an extremely brief note stating "remains delusional. Medically stable P. ANA."     12     The doctor kept ordering an ANA test but it was done and was negative. The doctor should have referred the patient.

3/25/2016  A doctor wrote another very brief note which consisted of "SOA [apparently meaning subjective objective and assessment] Delusional. Alert P. mental health to see."     8     The doctor had not excluded physical causes of altered mental status. A CT of the brain had not been done.

3/28/2016  A doctor's note consisted of "SOA delusional alert in NAD. P vitals daily."

3/28/2016  A psychiatrist saw the patient and noted that the patient was intermittently delusional and stated, "medical etiology unknown at this time," implying that the patient did not have a mental health problem as the source of his delirium. The psychiatrist plan was to note that "medical working to find underlying medical problem" and "suggest serum iron level."     12     The psychiatrist confirmed that a mental condition was not the cause of the patient's confusion and delirium. Because the doctor, who was a surgeon, did not have expertise or training in this area he should have referred to another physician.

3/29/2016  A doctor saw the patient. The only note was to acknowledge review of the mental health note and to order an iron study and to discontinue iron supplementation.     12     The doctor was following the recommendation of a psychiatrist. Both the psychiatrist and surgeon had no training in evaluation of confusion with leukopenia, anemia, elevated sed rate, and fever. The patient should have been referred.

3/31/2016  A doctor wrote another very brief note stating that the patient was alert and delirious. The plan was to continue present management.     14     The patient should have been admitted to a hospital. Care was grossly and flagrantly unacceptable.

4/1/2016  A doctor wrote another brief note stating "face [with] dry skin." The doctor prescribe a lotion for his dry skin.

PTX193-1061

PTX193-1062

Patient #22

4/4/2016  A doctor wrote a brief note that the patient had no complaints and was alert and in "NAD." The doctor didn't examine the patient and discharged him to his cellhouse with follow up in a week. The doctor had not completed an evaluation for the patient's delirium. The doctor noted on the discharge summary that the patient's delirium had "resolved." However, there was no history, no physical examination, and no documentation of diagnostic studies related to this problem. The doctor wrote, "Mental health evaluated patient and felt he had delirium. Delirium ?etiology cleared."

14  It was not competent to send a delirious patient with altered mental status to general population, as he had not exhibited ability to care for himself. The patient needed a diagnosis and higher level of care housing and should have been hospitalized for a diagnosis. Care was grossly and flagrantly unacceptable.

4/6/2016  A nurse saw the patient, was stated he couldn't walk. The weight was 200 pounds. The nurse placed the patient on the infirmary for 23 hour observation.

4/6/2016  At 4:30 a nurse documented that the patient was delusional with respect to his conversation with the nurse.

4/7/2016  A doctor wrote a very brief note stating "alert, Thought process organized. Able to ambulate. P. security hold." In a subsequent note a nurse documented that the patient was discharged from the medical third floor and was made a security hold. The patient was not medically monitored while on security hold, although it appeared that the patient remained on the infirmary unit.

4/28/2016  Diabetes HTN chronic clinics. BP 130/82; weight 212; last A1c 6.4; No changes made.

4/30/2016  A doctor wrote a very brief note stating, "Butterfly skin rash face, Refer to Dr. Trost for eval of connective tissue disease." That was the entirety of the note.

PTX193-1063

Patient #22

5/12/2016 Dr. Trost wrote I/M seen for above.  P.  Collegial referral."  It wasn't clear what the doctor was referring to.

5/12/2016 Dr. Trost referred the patient to rheumatology for elevated sed rate of 88 to rule out lupus.

6/21/2016 An NP wrote that the patient was not brought to the clinic for a B12 injection.  The NP ordered a CBC with B12 level with two week follow up.

6/24/2016 WBC 2.6; HGB 10.5; platelets 131; B12 609 (180-914); lymphocytes 0.6 (1.3-4.2).

7/8/2016 An NP wrote that ordered labs were not in the chart.  The patient weighed 188.  The NP wrote a ? after the weight but did not investigate the 60+ pound weight loss.  The NP rescheduled the patient "when lab results avail."

6    It was two weeks since the labs were reported yet were not in the record.

7/15/2016 BUN 23 (6-20); sodium 148 (135-145); potassium 3.9; A1c 5.8.

7/17/2016 A nurse documented that the patient told her, "I need help I can't hold my bowels."  The nurse noted that the patient was unable to ambulate without assistance.  The nurse referred the patient to a doctor.

7/18/2016 A doctor saw the patient.  There was no history, no physical examination, and no assessment.  The doctor ordered labs (CBC, CMP, CRP, and sedimentation rate) and ordered an x-ray of the LS spine and ordered Motrin, ointment, iron supplements and a steroid cream all for four months without documenting why he was ordering these items.

1, 2, 6,   The patient was so disordered that he was incontinent.
14          The doctor took no history, performed no exam, failed to note recent labs showing pancytopenia.  The patient should have been sent to a hospital.  Care was grossly and flagrantly unacceptable.

296

Patient #22

| | | |
|---|---|---|
| 7/22/2016 | A different doctor saw the patient, who had a temperature of 101.2. The doctor noted that the patient might have "probable SLE." The doctor noted that the patient wasn't "doing personal hygiene." The doctor did not review labs or assess the weight. The doctor admitted the patient for 23 hour observation and ordered a UA, CBC, and ordered Levaquin for 10 days without specifying what infection he was treating. | 2, 14 | The diagnosis of lupus cerebritis would require exclusion of other causes of psychosis and would require serologic evidence of lupus, which this patient did not have. If the doctor thought that the patient had lupus the patient should have been admitted to a hospital for CT, MRI, and possibly LP to confirm the diagnosis. Furthermore, if the lupus was this significant, treatment should have been immediately initiated and for that reason as well the patient should have been referred to a tertiary care hospital, as this condition was beyond the expertise of these physicians. Care was grossly and flagrantly unacceptable. |
| 7/24/2016 | A nurse documented that the patient was brought to the infirmary in a wheelchair and showered with "much assistance." | | |
| 7/25/2016 | A nurse documented that the patient needed assistance to sit up in bed. The patient was voiding dark amber urine in small amounts. | | |
| 7/25/2016 | Dr. Trost saw the patient but wrote an extremely brief note writing, "c/o weakness, alert, in NAD. P admit observe labs." On the same day the same physician wrote an infirmary admission note. The history was only that the patient had generalized weakness. The physical examination only documented, "alert in NAD; moves all extremities; facial rash." The assessment was weakness and fever of unknown origin. On the nurses admission note the temperature was 99.8. | 1, 2, 14 | This surgeon had no expertise in managing this type of condition and did not take an adequate history, failed to perform, and adequate examination and the therapeutic plan was incompetent. The patient should have been admitted to a tertiary care hospital. Care was grossly and flagrantly unacceptable. |
| 7/26/2016 | BUN 16; potassium 3.4; WBC 3.1 (3.9-12); HGB 10.1; platelets 139 (150-450); lymphocytes 0.4 (1.3-4.2) neutrophils normal; sed rate 51 (0-10). | | |

297

Patient #22

7/27/2016 Dr. Trost saw the patient and again wrote an extremely brief note documenting "no c/os; alert in NAD, oriented P. labs CPM." Notably, nursing noted were describing that the patient couldn't move from his bed and needed assistance to even sit up.

7/29/2016 Dr. Trost saw the patient. His only note was "requesting shower stable. P. CPM."

| | |
|---|---|
| 1,2, 6, 14 | The patient had pancytopenia. The doctor failed to take adequate history, performed inadequate examination, and had an incompetent plan. The doctor failed to note pancytopenia and confusion. The patient should have been referred to a tertiary care hospital. Care was grossly and flagrantly unacceptable. |

8/2/2016 Dr. Trost saw the patient. The only note was "No c/os Labs [change] status to chronic."

| | |
|---|---|
| 1, 2, 6, 14 | The patient had pancytopenia. The doctor failed to take adequate history, performed inadequate examination, and had an incompetent plan. The doctor failed to note pancytopenia and confusion. The patient should have been referred to a tertiary care hosp. Care was grossly and flagrantly unacceptable. |

8/3/2016 Dr. Trost saw the patient, who complained of right sided abdominal pain with deep breaths. There was no other history. The only examination was "face [with] dry skin abd nontender." "P CPM."

| | |
|---|---|
| 1, 2, | The doctor failed to take adequate history for the complaint, failed to conduct adequate examination, and made no diagnosis. |

8/5/2016 A nurse documented that the patient stated he couldn't get up out of bed. The nurse noted that the patient was observed by staff to be up out of bed. The patient refused to come to the door for his meds and food tray and the nurse had the patient sign a refusal.

| | |
|---|---|
| 16 | The nurse assumed that the patient was malingering. This was indifferent care. |

8/8/2016 Quarterly DM, HTN chronic clinic. Weight not taken. BP 130/80. Last A1c 5.8. No change in medication.

PTX193-1065

PTX193-1066

Patient #22

8/9/2016  Dr. Trost saw the patient and wrote a brief note stating "I/M requesting wheelchair P. CXR." Why the doctor ordered a chest x-ray is unclear as the doctor documented no history, physical examination, or assessment.

1, 2, 14  The doctor didn't even ask why the patient was requesting a wheelchair. There was no examination and no diagnosis. Apparently the patient couldn't walk. There was no diagnosis or plan except to give the patient a wheelchair and a chest x-ray for inexplicable reasons. The patient should have been referred to a hospital. Care was grossly and flagrantly unacceptable.

8/11/2016  Chest x-ray negative.

8/17/2016  Dr. Trost saw the patient and wrote a very brief note documenting "alert, in NAD, no c/o's facial skin dry flaky P. CPM."

1, 2, 14  The doctor again failed to take any history, performed inadequate exam, made no diagnosis, and failed to refer to a hospital.

8/24/2016  Dr. Trost wrote a very brief note documenting "no c/o's P. obtain assistive device for ambulation."

1, 2, 14  The doctor again failed to take any history, performed inadequate exam, made no diagnosis, and failed to refer to a hospital.

8/31/2016  Dr. Trost wrote a brief note documenting "exam unchanged P. rheumatology consult." This was a strange note as Dr. Trost had almost never examined the patient so it wasn't clear what "exam unchanged" meant.

1, 2, 14  The doctor again failed to take history, examine or diagnose the patient and referred the patient incompetently to a rheumatologist for confusion, pancytopenia, incontinence, and weight loss. There was no evidence of a rheumatologic disease. The patient should have been referred to a hospital.

9/7/2016  Dr. Trost wrote a brief note documenting "exam unchanged P. rheumatology consult." This was a strange note as Dr. Trost had almost never examined the patient so it wasn't clear what "exam unchanged" meant.

1, 2, 14  The doctor again failed to take history, examine, or diagnose the patient and referred the patient incompetently to a rheumatologist for confusion, pancytopenia, incontinence, and weight loss. There was no evidence of a rheumatologic disease. The patient should have been referred to a hospital.

9/7/2016  The scheduling clerk noted that the inmate was scheduled for a rheumatology consultation on 9/28/16.

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 300 of 431 PageID #:12498

Patient #22

9/28/2016 Dr. Trost documented that the patient was requesting a
wheelchair but didn't say why. There was no history and the
only physical examination was "alert in NAD weak dry scaly
skin on face. P. CPM."

9/28/2016 A rheumatologist saw the patient.  There was an order sheet
and some prescriptions. The rheumatologist ordered CMP,
CBC, CK, TSH, free T4, sedimentation rate, CRP, RF, anti-CCP
antibody, ANA, DS DNA, SSA and SSB antibodies, RNP
antibodies, Smith antibodies, SCL 70 (scleroderma) antibodies,
and LDH. The rheumatologist also ordered an EMG of the
right upper extremity based on diagnosis of neuropathy.
There was a prescription for methotrexate but it was for a
different patient. This was not picked up and Dr. Trost
ordered methotrexate and the patient inappropriately
received this medication for the first weekly dose.

PTX193-1067

Patient #22

9/28/2016 A rheumatologist saw the patient and denied any joint swelling but had tingling in his hands and nonspecific pain in his legs. The patient complained of numbness in his fingers and had non-specific weakness. The patient arrived at the clinic in a wheelchair. The patient had excoriated lesions on his hands and face, had no obvious synovitis, no significant joint tenderness with palpation, and mild decreased strength in his lower extremities. The rheumatologist diagnosed polyarthralgias and myalgias that were nonspecific. The possible etiologies were inflammatory myositis vs. inflammatory arthritis including RA or other connective tissue disorders such as lupus or lupus like illness "however at this point I do not see any obvious systemic complaints to suggest this." The doctor ordered labs and EMG and asked for a follow up in a month to determine if further treatment was warranted.

9/29/2016 A nurse documented that the patient said, "they think I have lupus." The patient had gone on a furlough the day before.

10/3/2016 A nurse took a verbal order from Dr. Trost for methotrexate 12.5 mg weekly with a CMP, CBC, CK, TSH, free T4, sedimentation rate, CRP, RF, anti-CCP antibody, ANA, LDH.

10/3/2016 Dr. Trost referred the patient to neurology for neuropathy and a month follow up with rheumatology. The rheumatology follow up was initially denied but then approved, "since symptoms persist." The neurology evaluation and EMG was denied. The UM reviewer asked for the typed rheumatology notes before proceeding.

17   The facility received an inaccurate prescription for a different patient and gave methotrexate to a patient with pancytopenia, which place him at significant risk of harm.

PTX193-1068

301

PTX193-1069

Patient #22

10/4/2016 RF normal; albumin 3.2; CPK normal; CRP 6.6 (0-0.8); WBC 11.8; HGB 9.6; platelets 193; lymphocytes 20 (25-45); sed rate 37 (0-10).

These lab results are not consistent with lupus.

10/5/2016 Dr. Trost saw the patient. He did not document review of the rheumatology note. He wrote a brief note documenting, "weakness unchanged Tol PO [apparently tolerating oral fluid] exam unchanged P. rheumatology eval in progress."

1, 2, 14   The doctor again failed to take history, examine, or diagnose the patient and referred the patient incompetently to a rheumatologist for confusion, pancytopenia, incontinence, and weight loss. There was no evidence of a rheumatologic disease. The patient should have been referred to a hospital.

10/11/2016 A nurse documented that the patient was "still refusing to sit up, demanding to have a wheelchair." The nurse noted that the inmate had a stage 2 open ulcer to his lower back about 6 by 6 inches that was cleaned with saline. The doctor wasn't notified.

10/11/2016 A nurse documented that the patient was becoming increasingly weaker. The nurse noted that the oxygen saturation was in the 70% range on room air and was 90-% on 4 liters of oxygen. The pulse was 128 and blood pressure 90/66. Dr. Trost was notified and the patient was sent to a local hospital.

302

Patient #22

10/12/2016 An ID consult at Barnes Jewish Hospital noted that the patient was transferred from another hospital with HIV infection-newly diagnosed with respiratory distress and skin lesions. The patient told the ID consultant that he had night sweats and weight loss over the past 3-4 months. The patient had oxygen saturation of 77% on room air. At the local hospital in Chester Illinois, the patient was in shock with BP 60/40 with pulse 128 and temperature of 90.9! He was diagnosed with septic shock. Blood cultures were growing gram positive organisms. The creatinine was 4.28. The patient was transferred to Barnes Hospital. Blood cultures grew Meth Sensitive Staph aureus. The ID consultant noted that the patient had a pustular lesion on the left leg and right foot, abrasions on the hip and shoulder, an ulcer on the right hip, a shallow ulceration on the penis, and macerated skin in the left groin. None of this was noted at Menard only two days previous. There were scattered small nodules in the lungs, some of which appeared cavitary. These were thought to possibly be septic emboli or metastatic lesions. The consultant initially thought that the patient had septic emboli from staph septicemia, possibly pulmonary TB or other fungal infection. Further work up was needed. The consultant thought that the patient's encephalopathy might be due to HIV encephalopathy vs. opportunistic infection or septic brain emboli.

10/12/2016 A dermatologist at Barnes Hospital saw the patient. A biopsy from that date showed focal parakeratosis that in the context of methotrexate "could represent medication-related toxicity."

Initial presentation at the hospital show that the patient was in a state of neglect when he arrived. He was in shock, hypothermic, and in renal failure with multiple lesions on his body apparently unrecognized by providers at the facility. He also had unrecognized severe malnutrition. Overall care at the facility was grossly and flagrantly unacceptable. On multiple episodes the patient had confusion with intermittent fever and neutropenia and needed acute care hospitalization, yet this did not occur. These were grossly and flagrantly unacceptable care.

303

PTX193-1070

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 304 of 431 PageID #:12502

**PTX193-1071**

Patient #22

10/12/2016 A Jewish Hospital note documented that the patient has severe malnutrition.

10/15/2016 An MRI of the brain had findings consistent with HIV encephalitis. Incidentally noted was an intramuscular ring enhancing right sternocleidomastoid mass which was consistent with an intramuscular abscess or Kaposi's sarcoma.

10/16/2016 A note from the hospital noted that the patient had a CD4 count of 46. The patient has started on azithromycin and Bactrim for prophylaxis. Lesions from the lungs grew MSSA and culture of the decubitus ulcer grew MRSA.

10/17/2016 The patient had a cardiac arrest and a Doppler test was done and identified an acute DVT in the common femoral vein on the right. The patient also had an abnormal EEG post-cardiac arrest.

10/20/2016 A chest x-ray showed the patient was still intubated and had collapse of the right middle and lower lobes. The patient apparently died on this day. There was no autopsy or death summary.

304

Patient #23

3/23/2012 The patient was incarcerated at NRC. The initial weight was 220 pounds. The patient had a history of prior lung cancer with surgeries and radiation in the late 1990s; hypertension and hepatitis C.

3/23/2012 AST 82; ALT 66.

5/2/2012 The patient was transferred from NRC to Menard. The problem list documents only hypertension, DM, prior lung cancer, and hepatitis C as problems. Cirrhosis was not listed as a problem.

5/8/2012 A hepatitis C progress note performed by a nurse documented that further laboratory testing was needed including CBC, CMP, INR, and HIV tests. There was no history or physical examination. The status of the patient wasn't documented.

5/23/2012 AST 99; ALT 78; platelets 121.

6/1/2012 AST 96; ALT 72; platelets 129.

6/11/2012 A NP saw the patient in hepatitis C clinic. The patient's projected release date was > 18 months. The platelets were documented as 129; AST 96 and ALT 72. This yielded a FIB 4 score of 4.91 likely consistent with cirrhosis. The APRI score was 1.86, likely significant fibrosis with possible cirrhosis. Except for noting that hepatitis A and B vaccinations were done, no action was taken. This patient had probable fibrosis and cirrhosis, should have been referred for treatment and should have had routine cirrhosis screening performed including every six month ultrasound, EGD to screen for varices, and possible institution of a beta blocker.

6/15/2012 Hepatitis C genotype and viral load was ordered.

7, 8, 12  The APRI was 1.86 indicating likely significant fibrosis with possible cirrhosis.

The patient had APRI indicating cirrhosis. The NP did not discuss or offer treatment. There was no evaluation for complications of cirrhosis (i.e. every six months ultrasound and EGD to screen for varices and treatment of other complications of cirrhosis). The NP should have referred the patient to UIC for EGD and ultrasound as lab testing indicated significant fibrosis with possible cirrhosis. Care failed to follow generally accepted guidelines or usual practice.

PTX193-1072

Patient #23

6/15/2012 A NP filled out a Wexford Initial Hepatitis work sheet. The NP documented faxing the form "again" to Dr. Paul on 8/26/12 and documented referring to an MD for "discussion of Tx if he will maintain compliance." It wasn't clear what maintaining compliance meant.

12 | The patient had cirrhosis and should have been referred to UIC. The referral to Dr. Paul had no purpose. We view this as a delay in necessary treatment. The meaning of maintaining compliance was confusing. What compliance were they discussing? Care failed to follow generally accepted guidelines or usual practice.

7/2/2012 AST 96; ALT 74; platelets 125; hepatitis C genotype 1A; quantitative HCV 2,111,740.

8/5/2012 A NP wrote that information was to be submitted to Dr. Paul for evaluation for hepatitis C treatment.

12 | The APRI was 1.92 indicating significant fibrosis with possible cirrhosis.

We view these referrals as delays in referral to UIC. What purpose does Dr. Paul play? The patient has laboratory evidence of cirrhosis. Why delay referral? The patient should have been referred to UIC. Care failed to follow generally accepted guidelines or usual practice.

9/21/2012 AST 108; ALT 91.

9/26/2012 An RN noted that according to Dr. Paul, the patient could be referred when he agreed to compliance with therapy. A nurse documented a history of refusal, but what was refused was not documented.

10/1/2012 A doctor obtained a signed release for medical records from Cook County Hospital for treatment of his lung cancer. The doctor did not address the hepatitis C infection.

12 | When the patient was ultimately referred to UIC he apparently agreed to treatment. Was the purpose of treatment explained to the patient. This was never documented.

10/4/2012 A doctor saw the patient for hypertension and diabetes chronic clinic. The blood pressure was 150/104. The doctor increased the Vasotec. The last A1c as documented as 6.2. The patient was not on medication and it wasn't clear that the patient had diabetes. The doctor noted that the patient had 2+ pedal edema. The etiology of the edema was not addressed.

1, 2, 7 | The patient had unexplained edema which was not evaluated. Given that the patient had possible cirrhosis, the patient should have other diagnostic work up including for cirrhosis and heart failure. Additional testing was indicated including ultrasound of the liver and possible echocardiogram. These should have been based on history, which was inadequate.

306

PTX193-1074

Patient #23

1/3/2013  A provider saw he patient for HTN chronic clinic.  The BP was 134/87 and weight was 225 pounds.  No changes were made.

1/3/2013  An NP saw the patient for hepatitis C chronic clinic.  A high viral load was documented with genotype 1A.  Treatment was not addressed; there was no reason given for not pursuing treatment.  The patient's likely cirrhosis was not evaluated or monitored.

1/3/2013  A provider saw the patient for diabetes clinic.  The A1c was documented as "ordered."  The status wasn't clear.

1/10/2013 AST 112; ALT 85.

4/8/2013  A PA noted that the inmate wanted to hold off treatment at this time.  It appeared that the patient didn't want treatment for his hepatitis C at this time.

4/8/2013  The patient signed a refusal for hepatitis C treatment and workup.

4/11/2013 A doctor saw the patient in hepatitis C clinic.  The doctor noted ALT 85 and AST 111.  The FIB4 or APRI scores were not documented but the patient already had probable cirrhosis on prior tests.  There was no monitoring of the patient's cirrhosis.  The patient was noted to have signed a refusal for treatment and "conservative follow up" was the plan.

4/11/2013 A doctor saw the patient in hypertension chronic clinic.  The blood pressure was 136/88.  The patient was also seen in diabetic chronic clinic.  The A1c was 6.2 and the patient was not on medication.  This A1c level is not diagnostic of diabetes.  There was no change in therapy.

8/27/2013 Albumin 3.3; AST 94; ALT 71; platelets 97.

7, 8, 12  The patient should have been referred to UIC where treatment could be explained to him.  He should have had EGD and ultrasound of the liver.  Care failed to follow generally accepted guidelines or usual practice.

7,8  The patient had APRI indicating cirrhosis.  The NP did not discuss or offer treatment.  There was no evaluation for complications of cirrhosis (i.e. every six months ultrasound and EGD to screen for varices and treatment of other complications of cirrhosis).

Patient #23

8/29/2013 A doctor saw the patient in hypertension and diabetes chronic clinics. The blood pressure was 132/82. The weight was 225. The most recent A1c was 6.3. No change in therapy was made.

8/29/2013 A doctor saw the patient for hepatitis clinic. The platelets were 99; AST 94; and ALT 71. This yielded an APRI score of 2.37 and FIB4 score of 6.31, both indicating likely cirrhosis, yet the patient was not evaluated or monitored for cirrhosis. It was documented that the patient refused treatment, but it is not clear what was explained to the patient with respect to treatment. There was no referral to UIC to discuss treatment. Conservative follow up was the plan but the patient wasn't treated for his cirrhosis. The doctor noted trace edema of the lower extremity. No action was taken with respect to the edema. Treatment wasn't explained to the patient. At this time new hepatitis C drugs were on the market and made treatment significantly easier.

12   The patient should have been referred to UIC where treatment could be explained to him.

11/8/2013 Albumin 3.2; alk phos 136 (40-125); AST 113; ALT 81; platelets 106.

12/21/2013 A NP saw the patient for hepatitis C clinic. Platelets were 113, AST 113, and ALT 81, yet the patient wasn't monitored for cirrhosis. No action was taken except "conservative follow up."

7, 8, 12   The patient should have been referred to UIC where treatment could be explained to him. The NP should also have ordered an EGD and ultrasound or CT scan of the liver as blood tests were consistent with cirrhosis.

The increasingly abnormal albumin and alkaline phosphatase indicated more severe liver disease that was not evaluated.

12/29/2013 A NP saw the patient for hypertension and DM chronic clinic. The BP was 130/62. The last A1c was 6.3. No changes to therapy were initiated.

308

PTX193-1075

Patient #23

3/7/2014 Platelets 98; albumin 3.1; bilirubin 1.6 (0-1.2); alk phos 144 (40-125); AST 102; ALT 69.

The increasingly abnormal albumin and alkaline phosphatase indicated more severe liver disease that was not evaluated.

4/22/2014 A NP saw the patient for hypertension and DM chronic clinic. The PP was 134/82. The last A1c was 6.2. The weight was 235.

4/24/2014 An NP saw the patient in hepatitis clinic. Platelets were 16; AST 102; and ALT 69. Yet the patient wasn't evaluated for cirrhosis complications. Treatment wasn't discussed.

7, 8, 12   The patient should have been referred to UIC where treatment could be explained to him. The NP should also have ordered an EGD and ultrasound or CT scan of the liver, as blood tests were consistent with cirrhosis. Newer drugs were now available which made treatment significantly easier.

6/17/2014 The patient signed a refusal for hepatitis C treatment and workup but it wasn't clear what was explained to the patient.

7/23/2014 The patient was transferred to Stateville CC.

9/10/2014 The patient was transferred from SCC to Menard.

9/16/2014 Albumin 3.1; total bilirubin 1.2 (0-1.2); Alk phos 132 (40-125); AST 132; ALT 67; MCV 100.2; platelets 91.

The low albumin, elevated alkaline phosphatase and elevation of bilirubin indicated deterioration of liver function that was not evaluated. The patient should have had an ultrasound or CT scan of the liver.

9/24/2014 An NP saw the patient in hepatitis clinic. The APRI was calculated as 3.10. There was no monitoring of the patient's cirrhosis. One NP referred to another NP for the increased APRI. "Conservative follow up" was the plan.

7, 8. 12   The patient should have been referred to UIC where treatment could be explained to him. The NP should also have ordered an EGD and ultrasound or CT scan of the liver.

9/24/2014 The patient was seen for hypertension and diabetes chronic clinics. The BP was 130/94. The weight was 230. The latest A1c was 6.1. No changes were made to therapy.

309

PTX193-1076

Patient #23

10/1/2014 Albumin 3.2; alk phos 133 (40-125); AST 161; ALT 91.
11/5/2014 Platelets 79.
11/25/2014 The patient returned to Menard after a writ return.

1/14/2015 An annual physical examination showed a weight of 180 or a 40 pound weight loss since incarceration in 2012. The patient had HTN, DM, lung cancer, and hepatitis C as problems. A provider found a stool that was guaiac positive. Cards for guaiac testing were given. The NP also documented in the assessment that the patient had 2+ pitting edema of both legs. The NP ordered Ted hose but did not start a diuretic and did not document ascites as a problem so it could be monitored.

1,2,3    The provider failed to take a history of the weight loss. Indeed it was unrecognized. The patient should have had a thorough history, physical examination, and plan for the weight loss. A diagnosis was not made for the edema and it was possible that the patient had cirrhosis.

1/14/2015 An NP saw the patient for hepatitis clinic and noted that the patient had APRI of 3.22 but was ineligible for treatment at this time due to a refusal of treatment on 1/14/15. The explanation of the refusal was not documented and it wasn't clear that the patient understood what he was refusing.

7, 8, 12    The patient should have been referred to UIC. The NP should also have ordered an EGD and ultrasound or CT scan of the liver.

1/14/2015 A NP saw the patient for hypertension clinic. The blood pressure was 136/84. No changes were made to therapy.

1/14/2015 The patient signed a refusal for hepatitis C treatment and workup but it wasn't clear what was explained to the patient.

12    The patient should have been referred to UIC. IDOC personnel failed to document what was discussed with the patient. Because of new drugs, treatment was significantly improved and it is unclear whether this was understood by IDOC personnel.

3/20/2015 Albumin 2.9; bilirubin 1.4 (0-1.2); alk phos 138 (40-125); AST 134; ALT 76.
4/13/2015 A NP saw the patient for hypertension clinic. The BP was 126/84. No changes to therapy were initiated.

6    Recent significant lab abnormalities were not reviewed.

PTX193-1077

3:17-cv-03112-JES-JEH   # 263-10   Page 455 of 577

PTX193-1078

Patient #23

5/1/2015   Albumin 3; bilirubin 1.8; alk phos 144; AST 173; ALT 83; platelets 83.

5/4/2015   Apparently Dr. Paul wrote a note without seeing the patient and documenting that the patient had an APRI of 5.21. Dr. Paul recommended having him called over to discuss his decision to refuse HCV treatment and have him sign a refusal. A liver ultrasound and EGD were recommended.

12   The patient should have been referred to UIC to have treatment adequately explained to him.

5/6/2015   Wexford approved an EGD with comments that the patient had an APRI of 5.21. In addition to EGD, Dr. Paul recommended yearly discussion of treatment with the patient and liver ultrasound to R/O HCC.

5/6/2015   Wexford approved an abdominal ultrasound.

5/8/2015   An ultrasound of the liver showed cirrhosis, a 2.5 cm mass "worrisome for a possible malignant lesion" and a second mass in the right lobe of the liver measuring 2.35 cm. There was also splenomegaly.

The patient had a liver lesion possibly HCC but this was not evaluated with biopsy.

5/14/2015   A NP wrote an email to Dr. Paul that the EGD was delayed as the doctor who typically performed EGDs was out after an accident.

5/15/2015   Dr. Paul wrote an email to an NP at Menard recommending a CT scan of the abdomen to evaluate an abnormal US.

3   If a CT scan were ordered it should have been an interventional radiology test so that biopsy could be done. This would only serve to delay evaluation of the lesion.

5/15/2015   A CT scan was referred.   This was approved on 5/18/15.

5/19/2015   A doctor saw the patient and informed him of the ultrasound results. The weight was 224.   The doctor notified the patient of a pending CT scan.

5/27/2015   A nurse documented a weight of 230 pounds.

311

Patient #23

| | | |
|---|---|---|
| 5/28/2015 | A CT scan report documented a hypodense lesion in the right lobe of the liver measuring 6.2 cm. This was suspicious for malignancy. Cirrhosis of the liver was also found with ascites and splenomegaly. | The patient had a liver lesion possibly HCC but this was not evaluated with biopsy. |
| 6/17/2015 | An NP saw the patient for hepatitis C clinic.  The NP documented that the APRI was 5.3 and the NP documented that the patient refused therapy on 1/14/15.  The NP documented that the CT results were given to the patient.  There was no evaluation for complications of cirrhosis. | 7, 17 — The patient should have been sent for his EGD.  The patient should have been considered for a diuretic due to ascites. |
| 6/22/2015 | A nurse documented a weight of 219 pounds. | 1 — The weight loss was unrecognized.  As the patient's cirrhosis worsened, the weight increased likely as a result of ascites.  This may have been ascites or an error. |
| 8/4/2015 | A nurse documented a weight of 240 pounds. | |
| 8/6/2015 | A doctor documented seeing the patient in follow up of a CT scan.  The note was partly illegible but appeared to refer the patient to hepatitis clinic. | |
| 8/7/2015 | The patient had endoscopy showing grade II esophageal varices.  The recommendation was to start beta blocker medication. | |
| 8/14/2015 | Albumin 2.5; bilirubin 2.5; AST 67; ALT 34; MCV 101; platelets 71; INR 1.3 (0.9-1.2). | |
| 8/25/2015 | The scheduling clerk documented that the Wexford UM physician decided to refer a referral matter to Dr. Paul.  The specific referral was not documented. | |
| 8/25/2015 | Dr. Trost documented that the patient EGD showed varices with possible hepatic tumor.  The doctor referred to collegial for an unknown referral but did not start a beta blocker. | 17 — The doctor should have started a beta blocker due to the varices. |
| 8/25/2015 | Dr. Trost referred the patient for interventional radiology biopsy of a liver mass. | |

PTX193-1079

Patient #23

| | | |
|---|---|---|
| 8/31/2015 | Wexford UM physician did not approve a liver biopsy but requested that the referral be sent to Dr. Paul | 7 | This was a significant delay in evaluating a possible liver mass. |
| 9/10/2015 | Inderal 20 mg BID was ordered. | | |
| 9/22/2015 | BUN 4; chloride 110 (98-108); MCV 101.8; platelets 81. | | |
| 9/24/2015 | Dr. Trost referred the patient for interventional radiology biopsy of a liver mass. | 6, 7 | This was four months from the abnormal ultrasound. This delay was excessive.  Significantly abnormal labs were not reviewed. |
| 9/25/2015 | MRI was approved by collegial.  The approval noted that the radiologist recommended an MRI. | | |
| 10/22/2015 | An MRI showed right lower lobe pneumonitis, large ascites, splenomegaly, varices, wedge shaped confluent hepatic fibrosis of right hepatic lobe. | | |
| 10/26/2015 | An MRI was done. | 11 | A biopsy was ordered but the patient received an MRI. |
| 10/30/2015 | BUN 4; calcium 8.3; albumin 2.3; bilirubin 1.7; alk phos 151; AST 81; ALT 34; MCV 100.9; platelets 59; INR 1.4 (0-1.2). | | |
| 11/23/2015 | A doctor saw the patient for hypertension clinic.  The BP was 142/90.  The patient weighed 224.  The patient asked the doctor about a liver transplant.  The doctor noted edema and added Aldactone.  The doctor noted that the patient was on propranolol 20 mg BID. | 6 | Significantly abnormal labs were not addressed. |
| 11/25/2015 | A MAR documented that the inderal was on hold.  It wasn't clear why. | 17 | The patient should have been on a beta blocker due to his varices. |
| 12/1/2015 | Dr. Trost wrote a note.  There was no history or physical examination.  The note stated "I/M inquiring about liver transplant.  Process including need for matching donor, finding, etc.  All D/W I/M" P. F/U HRC." | | |

313

Patient #23

| | | |
|---|---|---|
| 12/3/2015 | A doctor saw the patient in hepatitis chronic clinic. The doctor noted that the patient had a hepatic mass found in May of 2015. The doctor noted that the APRI was 6.3. The doctor concluded that the patient had liver cirrhosis and a questionable liver mass. The doctor referred the patient to Dr. Trost, the Medical Director. | 12 | The patient should have been referred to UIC or to another hepatologist for treatment as it appeared beyond the expertise of the surgeon who was Medical Director. |
| 12/7/2015 | Wexford approved an abdominal ultrasound. Notably Wexford UM also approved this same procedure on 12/8/15. | | |
| 12/14/2015 | Dr. Trost saw the patient. The entire note was "RIH on exam, reducible. P. observe." | 1, 2, 3 | Given the condition of the patient, the history, examination, and plan were all inadequate. The doctor did not appear to know how to care for the liver mass and cirrhosis. |
| 12/18/2015 | An ultrasound of the liver showed cirrhosis, a possible 2.1 cm liver lesion, and ascites. An MRI or CT surveillance was recommended to evaluate for hepatocellular carcinoma. | | |
| 12/24/2015 | Dr. Trost saw the patient. The entire note was "No c/o's Unclear why I/M scheduled. P. F/U PRN." | | |
| 2/18/2016 | A nurse noted that an email was sent to UIC with appointment sheet and paperwork. | | |
| 3/24/2016 | INR 1.6; albumin 2.1; bilirubin 2.2; alk phos 204; AST 76; ALT 30; MCV 100; platelets 65. | | |

314

PTX193-1081

Patient #23

4/28/2016 A UIC consultant saw the patient and noted that the patient deferred treatment in the past because "tumor eat you faster." Notably, the patient was unaware that he had any associated liver disease.  The patient said he was first diagnosed with hepatitis C at Stateville in 2012 and had genotype 1A with a RNA level of 2,111,740 on 7/2/12.  The UIC consultant noted that the patient was unaware of having any complication of his liver disease.  The UIC consultant noted that varices were diagnosed 8/7/15 but that the patient wasn't treated for these, though a nurse found a prescription for propranolol that the patient had not picked up.  The doctor noted that a CT guided biopsy was not done "because images from US and CT were not provided to guide the biopsy in 2015."  The failed biopsy was documented as not occurring on 8/28/15.  The consultant documented that the US showed an ill-defined 2.5 cm mass in the liver.  A CT scan on 5/28/15 showed no enhancing lesions, although there was an ill-defined hypodensity in the right lobe of the liver.  The ill defined lesion was suspicious for malignancy.  The CT scan also showed cirrhosis, ascites, and splenomegaly.  The patient agreed to treatment.  The consultant recommended a liver biopsy, the MRI results, and after the biopsy to have the patient return to clinic for treatment.

Notably, the patient agreed to treatment at UIC.  The patient was unaware of his liver disease, making it appear that there had been ineffective communication with the patient.  The patient was sent without the MRI.

4/28/2016 A doctor saw the for annual hypertension clinic.  The BP was 110/80.  The doctor found no abnormalities on physical examination and made no changes to therapy.

Patient #23

| | | |
|---|---|---|
| 4/28/2016 | A doctor saw the patient for hepatitis clinic. The doctor noted that the patient was ineligible for treatment because of low APRI. The APRI was 2.92, likely representing cirrhosis and warranted treatment. Nevertheless, the doctor documented he would refer to Dr. Trost to refer the patient to the telemedicine clinic for hepatitis C. | 4 | This doctor did not appear to know what the guidelines were. |
| 5/25/2016 | Dr. Paul referred the patient for an MRI. This was approved on 5/31/16. | | The use of Dr. Paul caused delays and confusion in therapy. It was understandable that she was involved because the doctors didn't know how to manage hepatitis C, but a different system should have been established. |
| 6/1/2016 | The scheduling clerk documented that an MRI of the abdomen was scheduled for 6/21/16. | | |
| 6/7/2016 | Albumin 2.1; bilirubin 3.5; alk phos 149; AST 79; ALT 27. | | |
| 6/21/2016 | The patient returned from an offsite MRI. A nurse practitioner saw the patient. The patient was short of breath and had oxygen saturation of 79%. The patient was started on oxygen and admitted to the infirmary for observation. There was no effort by the NP to identify why the patient had hypoxemia. Care was grossly and flagrantly unacceptable. The patient should have been admitted to a hospital. The NP did not document a complete set of vital signs. A nurse note on the same infirmary admission documented a blood pressure of 96/64. | 14 | The patient had significant hypoxemia with hypotension of new onset and should have been admitted to a hospital. |
| 6/21/2016 | A nurse on the infirmary noted that the BP was 96/64 and the oxygen saturation 93% on oxygen. Hypoxemia and hypotension of unknown etiology warranted hospitalization. | | |

316

PTX193-1083

Patient #23

| | | |
|---|---|---|
| 6/22/2016 | At 5:45 am a nurse documented that the patient had fever (100.4). There was no physician referral but the nurse placed the patient on the infirmary for observation. | 16 | Fever, hypoxemia, and hypotension warranted hospitalization. This nurse didn't refer to a physician. |

6/22/2016 At 8:30 am a doctor admitted the patient to the infirmary for decompensated cirrhosis, massive ascites and hypoxemia. There was no investigation to determine the cause of the hypoxemia except to order routine labs, and this remained undiagnosed. The doctor took no other history. The physical examination documented decreased breath sounds and massive ascites and 3-4+ peripheral edema. The only diagnoses were HTN and HCV yet the doctor's plan was to initiate Levaquin and antibiotic for unnamed reasons. The doctor ordered a CBC, CMP, and chest x-ray. The doctor failed to acknowledge the fever, which should have prompted admission to a hospital for possible sepsis. The doctor did not even take vital signs, but a nursing note at the same time documented temperature of 100.8, oxygen saturation 93% presumably on oxygen with BP 115/78.

1, 14   Care was grossly and flagrantly unacceptable. The patient should have been admitted to a hospital. The history and therapeutic plan were inadequate.

6/23/2016 Dr. Trost wrote a brief note documenting that the patient was still short of breath. The exam was very brief, noting decreased breath sounds and unchanged edema. There was no history, limited physical examination, no review of laboratory tests, no acknowledgement of fever the day before, and no assessment. The doctor increased the Aldactone but did not review labs or initiate any diagnostic work up for the patient's serious illness.

6/23/2016 Albumin 1.4; AST 63; ALT 24; bilirubin 2.4; hemoglobin 10.3; MCV 103.6; platelets 41.

317

PTX193-1084

PTX193-1085

Patient #23

6/24/2016 A late entry note for 7:00 am documented at 1:30 pm documented that the patient's respiratory rate was 28, BP 88/60, and oxygen saturation of 84% on 4 liters of oxygen. The nurse documented talking to Dr. Trost, who advised admission to a hospital. The patient wasn't transferred for 45 minutes.

6/24/2016 At 3:30 pm a nurse documented that the patient appeared "to be breathing [with] accessory muscles." This note appeared inaccurately dated as the patient was already hospitalized at this time and date.

318

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 319 of 431 PageID #:12517

**PTX193-1086**

Patient #24

9/11/2014 HTN chronic clinic; weight 160; BP 132/88; LDL 122. The patient was on lisinopril 10.

2/6/2015 Cholesterol 189; HDL 77; LDL 106.

3/9/2015 HTN chronic clinic; weight 178; BP 132/84; cholesterol 189; HDL 77; LDL 106.

4/17/2015 Hepatitis A, B, and C negative. CMP normal; cholesterol 152; HDL 57; LDL 90.

6/15/2015 Annual history evaluation; no risk factors identified. Was 46 years old. Vaccinations not updated.

8/14/2015 CMP normal.

10/16/2015 Varicella IgG antibody negative.

10/26/2015 The patient developed a generalized rash and was admitted to the infirmary with apparent varicella zoster. The patient had a temperature of 99.8.

10/27/2015 The patient had fever of 100.8.

10/30/2015 The patient was afebrile for 48 hours and discharged the patient to general population. The doctor noted that varicella titer was negative.

11/13/2015 A nurse saw the patient for symptoms of chicken pox. The patient had temperature of 99. The nurse noted no rash.

11/14/2015 A nurse saw the patient for symptoms of chicken pox. The patient had temperature of 98.8. The nurse noted no rash.

11/15/2015 A nurse saw the patient for symptoms of chicken pox. The patient had temperature of 98.6. The nurse noted no rash.

11/16/2015 A nurse saw the patient for symptoms of chicken pox. The patient had temperature of 98.6. The nurse noted no rash.

Patient #24

11/18/2015 A nurse saw the patient for symptoms of chicken pox. The patient had temperature of 98.8. The nurse noted no rash.

11/19/2015 A nurse saw the patient for symptoms of chicken pox. The patient had temperature of 98.8. The nurse noted no rash. The patient wasn't referred to a doctor.

11/20/2015 A nurse saw the patient for symptoms of chicken pox. The patient had temperature of 98.6. The nurse noted no rash.

11/21/2015 A nurse saw the patient for symptoms of chicken pox. The patient had temperature of 98.8. The nurse noted no rash. The patient was seen 11/22/15; 11/24/15; 11/25/15; 11/26/15; 11/27/15; 11/287/15; 11/29/15; 11/30/15.

2/24/2016 CMP normal; cholesterol 192; HDL 72;LDL 113.

3/9/2016 Chronic clinic for HTN. Cholesterol 192; HDL 72; LDL 113; BP 122/82.

9/6/2016 HTN chronic clinic; BP 118/82; recent LDL 123.

2/17/2017 Cholesterol 179; HDL 62; LDL 110.

5/12/2017 Cholesterol 194; HDL 63; LDL 121.

5/17/2017 A nurse saw the patient for abdominal pain. The pain was described as constant of 4-5 days duration. The nurse gave the patient ibuprofen by protocol with no referral.

5/22/2017 A nurse saw the patient for abdominal pain for the past week. The patient noticed no bleeding or black stool. The vitals were normal. The abdomen was soft. The nurse gave the patient antacids by protocol with no referral.

320

PTX193-1087

PTX193-1088

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 321 of 431 PageID #:12519

Patient #24

5/31/2017  The patient complained of abdominal pain which he said he had since 5/11/17.  The pain felt like a knife.  There was no bleeding.  The blood pressure was 140/110 with a pulse of 76.  This was an elevated BP for this patient who previously had normal blood pressures.  The nurse noted that the abdomen was "rigid" around the umbilicus with guarding.  The nurse documented no plan but apparently referred to a doctor.

5/31/2017  A doctor saw the patient.  The doctor noted that the patient had an umbilical hernia.  The doctor wrote "It is small.  He won't let me touch it or push it back in."  There was no other history or examination.  The doctor gave the patient Tylenol for six months with no other intervention.

3  A painful abdomen with the patient not allowing anyone to touch the abdomen needs to be evaluated.  To give the patient six months of Tylenol without diagnostic evaluation (ultrasound or CT scan) and without follow up was inappropriate.

6/19/2017  Annual history evaluation; no risk factors identified.  Was 46 years old.  Vaccinations not updated.

6/19/2017  HTH chronic clinic; BP 120/72; weight 176.

6/30/2017  At 8:00 am an LPN wrote a note stating that her supervisor directed her to examine the inmate because the family was calling concerned that the inmate needed to see the Medical Director.  The nurse wrote that the inmate had been seen multiple times in nurse sick call and refused part of the physician's examination.  The nurse assessment was "risk for dehydration" and noted that the patient already had an appointment for 7/6/17.  The inmate complained of diarrhea 4-5 times daily with abdominal pain 8/10.  The patient had lost his appetite.  He weighed 176 pounds, which was his usual weight.  The pulse was 95 and blood pressure 150/118.  The abdomen appeared distended and rigid to the nurse.

**PTX193-1089**

Patient #24

6/30/2017  At 4:45 pm a LPN noted that the patient was being transferred to Carbondale Memorial Hospital. There was no clinical note related to this communication. The patient remained hospitalized until 7/6/17.

7/5/2017  A CT scan showed peritoneal/omental masses extending into the umbilical hernia.

7/6/2017  A nurse documented that the patient returned from the hospital. The blood pressure was 168/100. The weight was documented as 177. The nurse did not document the hospital diagnosis but did document that the patient had a colonoscopy.

7/6/2017  A biopsy of a descending colonic polyp showed tubular adenoma with high grade features possibly with atypia.

7/7/2017  A doctor saw the patient and noted that the patient had biopsy and colonoscopy. Some of the note was illegible. The doctor admitted the patient to the infirmary and started hydralazine, Pepcid, and Zofran. On the infirmary admission note the doctor wrote also that the patient had a CT biopsy. Much of the note was illegible. The assessment appeared to state abdominal pathology but it was unclear.

7/8/2017  The blood pressure was 160/100. The nurse noted that the patient had an abdominal dressing. A band-aid was applied. Later that day at 4:00 pm the patient had blood pressure of 110/78 with temperature of 99.9.

7/9/2017  The patient asked the nurse for pain medication. The blood pressure was 140/88. The nurse noted that the patient had pain in the stomach area and that the patient had a large abdominal mass "R/O CA." Later that day the patient asked "when will I get to see a doctor?" The nurse assessed newly diagnosed cancer.

322

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 323 of 431 PageID #:12521

Patient #24

7/10/2017 A doctor saw the patient and wrote that the patient had slight abdominal pain.  The doctor noted that the patient had abdominal carcinomatosis.  There was no examination.  The doctor noted that oncology appointment was recommended in collegial.  The patient was discharged from the infirmary; the doctor stated that the final pathology report was pending.  The patient was to follow up in doctor clinic.  The nursing discharge note documented a blood pressure of 140/100 but it was unnoticed by the doctor.  The doctor did not address pain medication.  The doctor also did not summarize the hospital course or document what occurred in the hospital.

7/13/2017 A clerk documented that the patient was approved for oncology.

7/17/2017 A doctor wrote an admission to the infirmary for a chronic patient.  The doctor noted that a CT scan showed peritoneal metastases but a needle biopsy showed no malignant tissue.  The plan was a CEA, CA-19; CBC, CMP, and await the oncology consultation.

7/18/2017 A nurse documented on her note that the heart was irregular but took no action.

7/20/2017 A doctor wrote an extremely brief note.   The entire note was "No pain abd carcinomatosis Had requested CA-19 CEA Awaiting onc consult."

7/21/2017 CEA 0.7 (<3); albumin 3.1; hemoglobin 11.6; CA-19 4 (0-37).

7/23/2017 The patient complained of abdominal pain 6/10.  The nurse documented being given a phone order for Norco on a prn basis.

323

**PTX193-1090**

Patient #24

7/24/2017  The patient complained of stomach pain to a nurse.  The inmate was afraid to take the pain medication because of constipation.  The doctor did not evaluate the patient.

7/26/2017  The patient went for an oncology appointment.

7/26/2017  An oncologist saw the patient.  The oncologist wrote that the patient was a poor historian and "no records that we have received from the prison is a 60 document was 2 pages of labs and four pages of handwritten physician documentation."  The patient told the doctor he had cancer.  The CT scans were unavailable to the oncologist.  The patient had massive tense ascites.  The oncologist stated that he would request the CT scans from the hospital and would try to get more records.  A two week follow up was requested with more information.

11  Adequate information needed to be sent with the patient for his appointment.

7/27/2017  A doctor saw the patient and noted that there was no oncology report.  The doctor noted that the CEA and CA-19 were negative.  The doctor took no history of the patient and did not examine the patient.  He noted that the patient had abdominal carcinomatosis '? no Path prognosis very poor, refer to Carbondale for repeat Bx.(initial Dx no tumor seen)."

11  Hospital records were unavailable and the doctor didn't know what occurred at the hospital.  Follow up of oncology was not being done.  They had recommended return if the patient decompensated, which had occurred.

7/30/2017  The patient told a nurse "I'm hurting" but the nurse took no further history.

8/1/2017  The patient told a nurse, "What do I need to do to get some help. I'm deteriorating." The nurse did not refer to a physician and a physician had not seen the patient for almost two weeks.  The patient complained of stomach pain.

324

PTX193-1091

PTX193-1092

Patient #24

| | | |
|---|---|---|
| 8/2/2017 | A doctor wrote that the patient had abdominal carcinomatosis but that there was no pathological diagnosis. The needle biopsy done in Carbondale was not diagnostic and "have requested for repeat bx for path diagnosis abd remains distended tense with umbilical hernia." That was the entire note. There was no history from the patient and no updated laboratory or physical examination. | 1, 2, 3 | The doctor failed to take history, evaluate the patient, or make a plan consistent with the patient's pain. The patient had not been seen for a couple weeks and the doctor did not even evaluate the patient. |
| 8/2/2017 | The patient told the nurse he was "worn out." The nurse noted that his pain was unrelieved but that he didn't want his prn pain medication at this time. | | |
| 8/4/2017 | A nurse documented the patient saying, "You gotta help me. These pain pills don't work." The nurse noted severe pain despite Norco. A doctor was notified that the patient had a large abdomen that was tender to touch. The patient was sent to a hospital. | | |
| 8/4/2017 | A clerk documented that Dr. Siddiqui's referral for repeat CT guided biopsy was approved. A second referral for oncology follow up was approved as well. | | |
| 8/8/2017 | The patient was readmitted to the infirmary as a chronic patient. The doctor admission noted that the patient had a repeat needle biopsy and that CA-19 and CEA were negative. The patient was on hydrocodone 7.5 mg QID and Zofran. The doctor noted that the biopsy results were pending. | | |
| 8/8/2017 | A doctor noted receiving a call from the surgeon who told him that the biopsy needle may have hit a small bowel loop. The doctor noted an abdominal x-ray [ordered at Menard] showed no free air. The doctor noted that the patient had an oncology appointment in two days. | | |

325

PTX193-1093

Patient #24

| | | |
|---|---|---|
| 8/9/2017 | The patient told a nurse that the pain medication wasn't helping and that he had trouble breathing. The nurse noted that she had difficulty listening to his lungs due to the patient making noise. The nurse called a doctor who ordered an additional dose of Norco. | 19 | The doctor should have evaluated the patient who stated he couldn't breathe. |
| 8/9/2017 | A doctor wrote that the patient still had abdominal pain and constipation. He ordered MS contin and Vicodin and Miralax. | 1, 2, 3 | The doctor did not apparently evaluate the patient and instituted a plan without evaluation of the patient. The patient's trouble breathing was not evaluated. |
| 8/9/2017 | A nurse wrote that the inmate was mumbling, was confused and unable to answer questions. The patient was sent to a hospital. | | |

326

Patient #25

4/14/2017  The dentist saw the patient and documented referral for evaluation of radiolucency.

4/17/2017  A referral for evaluation of a radiolucency of the left jaw by a dentist. The dentist diagnosed dentigerous cyst r/0 ameloblastic changes of the L mandible.

6/22/2017  Pathology reported Diffuse large B cell lymphoma with bone involvement

6/27/2017  A referral form to oncology noting that a left mandibular cyst showed diffuse large B cell lymphoma with bone involvement.

6/29/2017  A scheduling clerk noted that Dr Siddiqui presented at collegial for oncology for a mandibular cyst. The referral was approved.

7/3/2017  A scheduling clerk noted that an appointment was scheduled with Illinois Oncology on 7/7/17.

7/7/2017  Part of an oncology note was present. The oncologist recommended CT scan chest, abdomen, pelvis, PET scan, MUGA.

7/13/2017  A scheduling clerk noted that Dr. Siddiqui referred the patient for bone scan, CT scan and MUGA scan. These were approved.

7/14/2017  A Wexford approval for a bone scan, MUGA scan, CT of neck, thorax, abdomen and pelvis.

7/25/2017  CT chest abdomen and pelvis showed no lymphoma.

7/31/2017  An US of the abdomen was not done due to lockdown.

8/4/2017  Wexford approved a referral to oncology.

8/8/2017  A MUGA scan showed uptake only in the mandible.

8/11/2017  An oncologist stated that he would start CHOP which would start on 8/18/17. The patient was to receive six cycles every three weeks of cyclophosphamide, doxorubicin, vincristine and prednisone. The regimen included use of pegfilgrastin after chemotherapy.

12   It took over two months to get a biopsy of an abnormal bony lesion.

12   It took four months to start chemotherapy. This could have been more timely.

327

**PTX193-1094**

Patient #25

8/17/2017 A scheduling clerk noted that chemotherapy was approved for every three weeks.

8/18/2017 WBC 5.9; HGB 15.6; platelets 189.

8/25/2017 WBC 7.1; HGB 15.5; platelets 188; HCV undetectable.

8/31/2017 An untitled note documented that an oncologist ordered cipro for 10 days, Ativan, prednisone on days 1-5 of each 21 day cycle, and Compazine. The oncologist also ordered Rituxan every three weeks. The oncologist also ordered neulasta 6 mg after each CHOP treatment as directed and asked that the oncologist be notified if approved.

It appeared that the patient received chemotherapy on this day but we could not find all chemotherapy reports in the record.

9/1/2017 A NP wrote that Boswell was substituting Granix for Neulasta and ordered it daily for seven days every three weeks after "treatment," presumably chemotherapy for three months.

There was no evidence we could find in the record that the patient received Granix although it was on the MAR.

9/8/2017 A nurse wrote that the patient returned from chemotherapy. There was an order for ciprofloxacin.

8, 6,    A doctor did not see the patient post chemotherapy and the white count post chemotherapy was not checked.

9/8/2017 WBC 0.4; HGB 13.2; platelets 69; and the ANC was 100 which was critical.

These labs were from the oncology office.

9/11/2017 A nurse evaluated the patient for abdominal pain post chemotherapy. The patient said he had bright red blood in his stool. The patient was apparently on Motrin. A nurse noted that the patient was unable to stand and had a distended abdomen which was hard and painful to touch on the left side.

9/11/2017 A nurse noted that the patient was brought to the HCU for abdominal pain and received a verbal order for an abdominal x-ray, a UA for culture, with orders for fiberlax and MOM with a PRN follow up.

9/21/2017 The patient returned from chemotherapy.

PTX193-1095

PTX193-1096

Patient #25

| | |
|---|---|
| 10/3/2017 | A doctor noted that the patient had NHL and was being treated with CHOP and the next chemotherapy was 10/12/17. There was no status update for the patient. The note was extremely brief. There was no physical examination. The doctor wrote "?CBC." The doctor noted that the patient was to start prednisone for five days. The doctor didn't review blood counts or the oncology report. |
| 10/12/2017 | The patient returned from a medical furlough. |
| 10/13/2017 | A nurse documented that the patient returned from a medical furlough. The oncologist note documented that on 11/2 the patient was to receive Rituxan and neulasta. |
| 10/31/2017 | The October MAR listed Granix but there was no evidence that it was administered. |
| 11/1/2017 | A doctor noted that the patient was seen by oncology for chemotherapy. The doctor did not update the status of where in treatment the patient was. |
| 11/2/2017 | A oncology order documented that the patient would return 11/22/17 for the next chemotherapy infusion. |
| 11/9/2017 | The patient told a nurse he was concerned about adverse effects of prednisone. |
| 11/11/2017 | A doctor saw the patient. The note was illegible but brief. |
| 11/21/2017 | WBC 6.7; hemoglobin 10.4; platelets 221. |
| 11/22/2017 | On return from chemotherapy the blood pressure was 86/56 and a nurse notified a doctor who sent the patient to a hospital. |

6, 1, 11 — The doctor failed to review the history of what happened in oncology clinic and did not review the report. We could not find an oncology report for this date. The doctor failed to check the white count despite that this was critical as the patient was subject to neutropenia.

6, 8 — The doctor did not order or review CBC counts to ensure the patient wasn't neutropenic.

This was a pre-chemotherapy CBC.

Patient #25

11/22/2017  The patient went to Chester Memorial Hosp for weakness, dizziness, and diaphoresis.  The hospital note documented that the patient was on amlodipine, filgrastim 480 mcg, ibuprofen, metoprolol, prednisone, prochlorperazine and ondansetron. The WBC was 6; HGB 9.7; platelets 196.  The patient was diagnosed with dehydration and sent back to Menard.

11/26/2017  A nurse saw the patient for nausea. The temperature was 101.6.  The patient was too weak to stand.  The nurse placed the patient "on the third floor."

1, 8  The patient had a fever to 101.6 which if present in a neutropenic patient constitutes a neutropenic fever.  It was imperative for the doctor to take a history to identify any signs of infection and to obtain a stat CBC to determine if the patient was neutropenic.  This error was grossly and flagrantly unacceptable.

11/28/2017  A doctor saw the patient and noted that the patient was on chemotherapy and had nausea and diarrhea which had resolved.  The doctor assessed dehydration and ordered IV fluid and Levaquin. The patient had a 101 fever and a pulse of 113.  Without an diagnostic effort the doctor ordered Levaquin.  There was no diagnosis and it wasn't clear what the doctor was treating.  The doctor did not order a white count or ensure that the patient was receiving gramix. The doctor ordered Levaquin daily for five days, stopped amlodipine and metoprolol, started IV saline and Zofran.

8  The patient still had fever of 101.  It was imperative to exclude neutropenia, which the doctor did not do.  Care was grossly and flagrantly unacceptable.

11/29/2017  A nurse noted that the patient had blood pressure 90/60 and temperature 98.  The patient felt sick and had diarrhea.

PTX193-1097

Patient #25

| | | |
|---|---|---|
| 11/29/2017 | At 8:00 am doctor wrote an infirmary admission note and noted that the BP was 90/60. The doctor noted that the patient had dehydration after developing nausea and vomiting after chemotherapy. The doctor noted that the blood pressure medication was discontinued. | 8 | Hypotension in the context of possible neutropenia can indicate infection, particularly if the patient is on prednisone, which this patient was taking. It was imperative for the doctor to order an immediate white count to ensure the patient wasn't neutropenic. Care was grossly and flagrantly unacceptable. |
| 11/29/2017 | At 9:00 am the patient said his ear hurt and the nurse notified the doctor. The nurse documented that there was drainage from the ear which was painful. The nurse admitted the patient to the infirmary. The temperature was 99.8 and pulse 102. This was not noted by a doctor. The doctor ordered a CBC and CMP. | 16 | The nurse should have notified the doctor even though the doctor had just seen the patient. |
| 11/30/2017 | A doctor noted that the patient had pus coming from the left ear and changed the Levaquin to IV, but since Levaquin was unavailable, he started Rocephin. The diagnosis was Otitis externa. | 8, 14 | The doctor should have obtained an immediate CBC to ensure that the patient was not neutropenic or send the patient to a hospital. |
| 12/1/2017 | A doctor noted that there was still pus from the ear and did not change therapy. | 8, 14 | The doctor should have obtained an immediate CBC to ensure that the patient was not neutropenic or send the patient to a hospital. |
| 12/3/2017 | A NP saw the patient who was found unresponsive with blood on his mouth, and blood draining from his penis. The NP sent the patient to a hospital. The patient had fever of 101.2, BP 96/60; pulse 120, respirations as high as 42. | | |

PTX193-1098

PTX193-1099

Patient #26

8/26/2008 Cholesterol 158; HDL 47; LDL 99; ACA 10-year risk 7.1 % and no indication for a statin.

9/3/2008 An NRC reception physical examination documented no medical problems except alcohol use.

9/3/2008 The patient was transferred to Menard.

1/27/2010 Cholesterol 158; HDL 47; LDL 99; ACA 10-year risk 7.1 % and no indication for a statin.

2/24/2010 A doctor saw the patient and noted that the patient passed out and fell but said, "I was informed that I was hit in the face by a guard." The doctor ordered a facial x-ray that showed no fractures or dislocations. The doctor ordered ibuprofen for pain. The doctor apparently presumed that the patient sustained blunt trauma and did not pass out. No other diagnostic studies were performed (EKG, Holter monitor, glucose).

7, 8   The patient passed out and should have had an EKG and glucose test. The doctor should have considered a Holter monitor.

3/13/2012 Total cholesterol 134; HDL 29; LDL 96.

3/13/2012 Cholesterol 134; HDL 29; LDL 96; ACA 10-year risk 7.6% and indication for moderate to high intensity statin.

1/27/2014 Cholesterol 144; HDL 40; LDL 95.

1/27/2014 Cholesterol 144; HDL 40; LDL 95.  ACA 10-year risk 9.2% and moderate to high intensity statin indicated.

12/31/2014 Dr. Trost wrote that the "I/M [without] S/S of chickenpox.  P. RTC prn." It wasn't clear what this meant as there was no history or physical examination.

17   Since 2012 the patient had a 10-year risk of heart disease of at least 7.5% and should have been offered statin therapy to reduce cardiovascular risk.

12/14/2015 Albumin 3; cholesterol 168; HDL 42; LDL 117.

12/14/2015 Cholesterol 168; HDL 42; LDL 117; ACA 10-year risk 10.8% and indication for moderate to high intensity statin

**PTX193-1100**

Patient #26

1/23/2016  The patient had biannual examinations in 2010; 2012; 2014; and on this date in 2016.  At each of these the patient was not offered standard colorectal screening.  The patient did refuse a digital rectal exam which apparently was being offered as colorectal screening.  The patient was above 50 years old at each of these examinations and the patient was 67 years old at this examination.

7, 17  The patient was not offered colorectal screening consistent with contemporary guidelines and was not offered a statin medication.

3/20/2017  A doctor wrote that the patient was short of breath.  There was no other history.  The doctor wrote "vitals questionable.  Patient very pale, hands cold."  That was the entire examination.  The vitals were not documented except a oxygen saturation of 97% and a number 199 which was unintelligible.  The assessment was "anemia" and the doctor ordered a CBC and CMP stat.  In a later note the doctor noted that the labs "are within an acceptable limit.  However patient gets extremely fatigued with any type of physical exertion."  The assessment was shortness of breath.  The doctor ordered a chest x-ray and abdomen x-ray and UA.

3/21/2017  The problem list documented heart failure and atrial fibrillation.  No other problems were listed on the problem list.

3/21/2017  A NP noted that the patient was an add on to clinic.  The NP documented that the chest x-ray showed "?pneumonia."  The BP was 152/100 and respiratory rate 38-40 with a temperature of 96.2.  The NP ordered a stat EKG.

333

Patient #26

3/21/2017 An EKG showed atrial fibrillation with a rate of 91. A chest x-ray showed moderate sized pleural effusion right with a smaller pleural effusion left. Patchy opacities are seen perihilar regions suggesting heart failure or pneumonia.

3/21/2017 The patient was admitted to Memorial Hospital in Chester IL, a 25-bed hospital. The evaluation in the ER was that the patient had an irregular heart rate with 2+ pitting edema and bilateral trochanteric ulcers worse on the right. The BUN was 25; CK MB was 7.3 (1-7); troponin <0.01; albumin 2.7; hemoglobin 13.7; WBC 6.4; INR 1.31; an EKG showed atrial fibrillation with a ventricular rate of 93; bilateral pleural effusions, cardiomegaly, bibasilar infiltrates and heart failure. The hospital note documented consulting with a primary care provider and the NP at Menard who sent the patient, and the NP agreed to accept the patient back to the facility. The patient was in heart failure with new onset atrial fibrillation and the patient should have been sent to a regional center for management, as it was not safe to accept the patient back at the facility. The only diagnostic testing done was a chest x-ray that showed "large bilateral pleural effusions and there is mild to moderate bilateral compression atelectasis caused by the effusions." There was a 14 mm hypodense nodule in the thyroid gland and there was a prominent suprahilar node. The heart was enlarged. Pneumonia couldn't be excluded.

14    The NP accepted a patient back to the prison when it was not safe to do so. The patient had pneumonia, pleural effusions, heart failure, and new onset atrial fibrillation.

334

Patient #26

3/21/2017 A NP admitted the patient to the infirmary for dyspnea and anemia. The examination only noted that the patient was pale, dyspneic, without breath sounds on the right. The NP noted that the patient was sent to a hospital in the morning and had a diagnosis of atrial fibrillation, heart failure, and decubitus ulcer. The NP noted that the patient was on Eliquis, lisinopril, and Lasix. The NP ordered a CXR, CBC, CMP, HIV, hep C, RPR, Hep panel, FLP, AFT, sed rate, CRP, magnesium, TSH, B121 and referral for cardiology, and CT of abdomen. The pulse was 108; respirations 16; and BP 130/82. The NP did not discuss the EKG or perform another EKG.

3/21/2017 A NP referred the patient to a cardiology consultation for A fibrillation. The NP also referred the patient for a CT of the chest and abdomen because the patient appeared thin.

3/22/2017 A nurse noted that the patient was incontinent of stool. The patient had a respiratory rate of 30 with blood pressure of 86/60 with 2 + pitting edema and was short of breath with exertion. The patient was sent to a hospital.

3/22/2017 AFP 0.9 (<9); CRP 0.6 (0-8); cholesterol 127; HDL 36; LDL 84; magnesium 1.5 (1.8-2.4); TSH 4.12 (0.35-4); sedimentation rate 68 (0-10); HIV negative; syphilis non reactive.

3/22/2017 Cholesterol 127; HDL 36; LDL 84. The ACA 10-year risk was 13.1% and indication for moderate to high intensity statin.

PTX193-1102

PTX193-1103

Patient #26

3/23/2017 The patient was hospitalized at Memorial Hospital in Carbondale, a 125-bed facility. The patient had an NSTEMI and had systolic heart failure with renal failure and low albumin and required bowel resection with colostomy for ischemic bowel. The surgery included partial colectomy with colostomy, splenectomy, and construction of a stoma. The patient developed sepsis due to aspiration pneumonia. A venous Doppler was done showing no evidence of a deep vein thrombosis. The patient had MGUS. The bone was negative for lytic lesions and the urine was sent for electrophoresis. A chest x-ray showed a slight improvement in both lung bases with mild decrease in the infiltrates. There was mild cardiomegaly and perihilar markings were still prominent. Pneumonia could not be excluded. Based on hospital records, it appears that the ischemic bowel was identified on 3/28/17 after developing GI bleeding on 3/26/17. It is uncertain when the ischemic bowel started. The ischemia was in the rectosigmoid area.

3/28/2017 Wexford UM denied the cardiology consultation and CT chest and abdomen because the patient was currently in the hospital.

4/18/2017 The Wexford Regional Medical Director wrote a note that the patient was in preparation for hospital discharge. The doctor wrote a list of medications that the patient was on, including lisinopril, pantoprazole, Lasix, Eliquis, docusate, MS , ondansetron, lorazepam, and hold scopolamine patch.

336

PTX193-1104

Patient #26

4/19/2017 The patient was admitted to the infirmary from the hospital for comfort care. The admitting diagnoses were ischemic colitis, atrial fibrillation, acute renal failure and a comment "*see additional list." The orders were for oxygen, condom catheter, turn the patient every two hours, follow up with Dr. Gonzales in 1-2 weeks, keep the incision clean and dry and colostomy care.

4/19/2017 An undated note a nurse wrote a discharge note. This was immediately after the admission note on 4/19/17. The note had no vital. The discharge summary was s/p hospital stay ischemia colitis, ARF, CHF. The objective note was "I/M discharged dlt death." The discharge location was "funeral home." This note appears to have been written before the inmate died.

4/20/2017 A nurse entered his room at 3:55 am to find the patient unresponsive.

337

Patient #27

2/4/2005  EKG showed moderate voltage criteria for LVH and inf infarct age indeterminate

1/24/2011  On this annual physical examination the blood pressure was 130/80.

1/31/2014  Amlodipine 10, carvedilol 50 BID, HCTZ 50, losartan 50 BID, spironolactone 50 daily, terazosin 7 mg.

2/12/2014  Potassium 3.7 (3.5-5.3); cholesterol 165; HDL 34; LDL 110.

2/31/14  Amlodipine 10, carvedilol 50 BID, HCTZ 50, losartan 50 BID, spironolactone 50 daily, terazosin 7 mg.

3/5/2014  HTN chronic clinic BP 210/140. The doctor noted shortness of breath which the patient attributed to anxiety. The doctor did not check for end-organ damage despite the significantly elevated blood pressure. The doctor added Cozaar to Norvasc, Aldactone, and Coreg and stopped HCTZ and Hytrin. The doctor referred to psychiatry. The doctor did not order follow up to ensure that the blood pressure returned to a reasonable level.

3/18/2014  A doctor saw the patient. The blood pressure was 180/110. The doctor did not examine the retina, or check for renal damage. The doctor discontinued Norvasc and documented that the patient was on nifedipine 120, Aldactone 100, HCTZ 50, carvedilol 50BID, Cozaar 50 BID, minoxifil 2.5 mg daily, and Hytrin 10 mg daily. The nifedipine and minoxidil appeared to be added to the regimen but the doctor didn't reflect this in his note.

3/27/2014  A nurse saw the patient and noted that the patient complained of his heart skipping beats.

1, 2, 8, 12, 15  The blood pressure was significantly elevated The doctor did not evaluate for encephalopathy or renal damage. Although the doctor made a change in therapy, the doctor did order a timely follow up for this degree of hypertension and did not ensure that the patient's blood pressure was lowered to a safe level. The doctor took no history of compliance.  The patient was on five antihypertensive medications with extremely high blood pressure.  The patient should have been sent for evaluation of secondary hypertension to a specialist.

338

PTX193-1105

3:17-cv-03112-JES-JEH   # 263-10   Page 483 of 577

PTX193-1106

Patient #27

3/27/2014 The patient complained to a nurse that his blood pressure of 234/140 was related to anxiety. A doctor saw the patient but didn't document a change in therapy.

| 15 | The blood pressure was significantly elevated. The doctor did not ensure that the blood pressure was lowered to a safe level. The doctor did not evaluate the patient for end organ damage and did not schedule the patient for follow up in a few days to ensure that the patient was safe. The doctor took no history of compliance. |

3/31/2014 Carvedilol 50 BID, losartan 50 BID, Aldactone 100, HCTZ 50, BID, minoxidil 7.5 daily, Hytrin 10 Q day.

4/22/2014 A doctor increased minoxidil but took no history and no physical exam.

4/22/2014 The patient told a nurse that his blood pressure of 210/140 was related to stress.

| 16 | The patient should have been referred to a doctor due to the extremely elevated blood pressure. |

4/23/2014 Dr. Trost wrote an extremely brief note and referred the patient to on outside hypertension clinic. The blood pressure was 170/104.

4/24/2014 Dr. Trost noted that at collegial he was to give all meds DOT.

4/28/2014 Wexford denied referral to an outside hypertension clinic based on "insufficient information." A recommendation for DOT was made and to represent if needed.

| 12 | This patient had clear indication for evaluation for secondary hypertension and should have been approved for that. |

5/3/2014 The inmate complained about getting DOT medication.

5/18/2014 Calcium 7.9; sodium 136; potassium 4.6. No LFTs done.

5/22/2014 Wexford denied a visit to HTN clinic asking that medication be DOT and to represent in a few weeks if needed. The reason for denial was insufficient information. This was appealed and apparently approved on this date.

5/31/2014 Carvedilol 50 BID, losartan 50 BID, Aldactone 100, HCTZ 50, Cozaar 50 BID, minoxidil 7.5 daily, Hytrin 10 Q day, Nifedipine 120 daily.

6/4/2014 Potassium 3.1; BUN 5.

PTX193-1107

Patient #27

6/15/2014 The inmate refused medication, not wanting to take DOT medication.

6/25/2014 Dr. Trost documented that the patient would review medication if not DOT. The doctor noted BP 220/120, resumed KOP meds and referred the patient to an outside HTN clinic.

6, 17    The doctor did not note the prior low potassium. Low potassium in the context of difficult to control blood pressure should lead to an evaluation for secondary hypertension. Medication should have been adjusted. Because of the extremely high blood pressure the doctor should have scheduled follow up in a few days to assess whether it returned to normal.

6/30/2014 Carvediol 50 BID, losartan 50 BID, Aldactone 100, HCTZ 50, BID, minoxidil 7.5 daily, Hytrin 10 Q day, Nifedipine 120 daily.

7/10/2014 An NP saw the patient for HTN chronic clinic. The BP was 226/142. The NP took little history and noted that the patient was scheduled to see a hypertension specialist. The patient refused to take Norvasc so the NP made no changes and referred to Dr. Trost. A statin should have been started but was not. Medication compliance was not discussed.

1, 2, 3, 8, 12,15, 17    The 10-year risk of heart disease was 29% and a statin should have been started. The patient had hypertensive urgency and should have been assessed for end-organ damage and monitored in the clinic until the blood pressure returned to a lower level or a couple day follow up was indicated. Modification of blood pressure regimen was indicated. The patient should have been referred for evaluation of secondary hypertension.

7/16/2014 Dr. Trost noted that the patient was taking BP medication. The BP was 230/126. There was no history or physical examination. The plan was to refer to HTN clinic consultant.

1, 2, 8, 12, 15    Given the blood pressure the consultant visit should have been sooner. The patient had hypertensive urgency and apparently was taking medication yet the doctor did not add medication or monitor the patient until the blood pressure returned to a lower level. The doctor ordered no follow up to ensure that the blood pressure returned to a lower level. The doctor did not take history or perform examination to exclude end-organ damage.

**PTX193-1108**

Patient #27

7/31/2014 Carvedilol 50 BID, losartan 50 BID, Aldactone 100, minoxidil 7.5 daily, HCTZ 50, spironolactone, Terazosin 10.

8/27/2014 The patient went to an outside HTN consultant at Barnes Hospital.

8/27/2014 The patient went to Barnes Hospital HTN clinic. The doctor had no labs available. The doctor documented that the patient stated that he was anxious. The BP was 212/147. The doctor noted that the patient wasn't currently taking medication. The doctor recommended that the patient start back on HCTZ, spironolactone, and to add other medications back slowly. The doctor said she would try to call to discuss.

11 | The labs were not sent with the patient specifically the low serum potassium was not known to the consultant.

8/30/2014 A doctor saw the patient after the Barnes consultant visit. The blood pressure was 208/156. The doctor noted that the patient had anxiety problems and that the consultant would speak with Dr. Trost but that there were no notes about these communications in the chart. The doctor referred the patient to psychiatry to evaluate his anxiety. The doctor did not evaluate for end-organ damage by history or physical examination. The doctor did not adjust blood pressure medication or ensure that a follow up was ordered to ensure that the blood pressure safely was reduced.

1, 2, 3, 8, 10, 13, 15 | The doctor did not document review or did not talk to the consultant about care. Referral to psychiatry was a questionable strategy. The patient had hypertensive urgency yet the doctor did not evaluate for end-organ damage or ensure that the blood pressure was reduced to a safer level. The doctor should have added blood pressure medication and assessed for compliance.

8/31/2014 Carvedilol 50 BID, HCTZ 50, Losartan 50 BID, Minoxidil 7.5 mg daily, Aldactone 50.

9/12/2014 A NP documented that the patient was only taking Aldactone and HCTZ. The NP took no action and blood pressure wasn't taken.

9/17/2014 A NP noted the BP was 204/104. The NP did not assess for end-organ damage or ensure that the blood pressure was lowered before discharging the patient. The NP consulted the Medical Director but no action was taken. Compliance was not checked.

1, 2, 3, 8 the NP should have checked compliance, evaluated for end-organ damage, and scheduled a follow up to ensure 15 | blood pressure was coming down.

341

Patient #27

9/20/2014 A doctor noted the patient would refuse all medication until something was found that works. The BP was 210/124. The doctor referred the patient to Dr. Trost. The doctor stopped all treatment. — 1, 2, 3, 8,15 — The patient had hypertensive urgency but the doctor took no history and performed no examination to exclude end-organ damage. The doctor did not ensure follow up would occur to safely follow up on this patient with extremely elevated blood pressure. Probably, the patient should have been placed on the infirmary.

9/30/2014 HCTZ 50, Aldactone 100, Hytrin 10 mg, minoxidil 7.5, Cozaar 50 BID, carvedilol 50 BID. — The medication renewal process didn't work and the patient's medication stopped in mid December and wasn't started again until 1/8/17, about 3-4 weeks later.

10/1/2014 Potassium 4.1.

10/11/2014 A psychiatrist documented the patient saying he didn't need to see a psychiatrist and felt fine. The psychiatrist documented no follow up.

10/22/2014 A doctor saw the patient for elevated BP 178/124. The doctor noted that the patient needed to see a psychiatrist for his anxiety. The doctor assessed anxiety reaction. — 13

10/22/2014 A provider saw the patient for HTN clinic. The BP was 178/124. No history was taken. The doctor documented referral to psychiatry and made no changes to medication. Medication compliance was not discussed. — 1, 2, 3, 8, 12, 17 — The doctor failed to assess for end organ damage in a patient with hypertensive urgency. The doctor did not assess for compliance. The 10-year risk of heart disease was 24% and a moderate to high intensity statin should have been started. The BP meds should have been adjusted as the blood pressure was elevated. This patient should have been referred for evaluation of secondary hypertension.

11/1/2014 A MAR documented that the patient was on Remeron at night, which he remained on although the patient mostly refused this medication.

12/10/2014 Potassium 3.5 (3.5-5.3); BUN 6; creatinine 1.07; cholesterol 178; HDL 32;LDL 119.

342

PTX193-1109

Patient #27

| 1/20/2015 | On this annual physical examination the blood pressure was 130/88. | | The 10-year risk of heart disease or stroke was 15% and the patient should have been started on a moderate to high intensity statin. |
| 2/4/2015 | Dr. Trost sent the patient to a hospital for "exercise intolerance and PND." He documented that the EKG showed SVT for which there was no evidence. | 2 | The doctor misdiagnosed an EKG tracing. |
| 2/4/2015 | An EKG showed st flattening but sinus rhythm with rate of about 100. | | |
| 2/4/2015 | Potassium 3.7; cholesterol 180; HDL 36; LDL 117 urinary glucose 300; serum glucose 110. | | |
| 2/4/2015 | EKG showed possible LAE and LAD. | | |
| 2/4/2015 | EKG showed sinus rhythm with PVCs; LAD and voltage criteria for LVH. | | |
| 2/5/2015 | The patient returned from Carbondale Hospital. | | |
| 2/5/2015 | A discharge instruction sheet from the hospital recommended an appointment for cardiology and nephrology in two weeks but a written comment on this document states that "no F/U request per Trost." | | Hospital records were unavailable and the doctor didn't know what occurred at the hospital. Follow up of oncology was not being done. They had recommended return if the patient decompensated, which had occurred. |

Patient #27

2/5/2015  A hospital note documented an elevated glucose of 115 and 120; potassium of 3.1; elevated troponins.  The patient felt short of breath and had similar episodes but there was never a work up according to the hospital chief complaint.  There was no chest pain.  The patient was a former smoker.  The patient described stopping anti-hypertension medication because they were not helping him.  The discharge summary documented diagnoses of hypertensive urgency with mild troponinemia due to hypertensive urgency and episodes of shortness of breath due to HTN, hypokalemia, and resistant hypertension with hypokalemia concerning for hyperaldosteronism.  Labs were sent out.  An echocardiogram showed concentric hypertrophy and thickened LV wall.  A follow up with nephrology to rule out hyperaldosteronism was recommended.  The aldosterone was in normal range but the patient was on Remeron, though mostly refusing it.  The renin was normal.  The normetanephrine was elevated to 1.13 but not over 2 x normal (0-0.89).  In the hospital the cholesterol was 148; HDL 23 and LDL 96.

2/5/2015  EKG showed possible LAE and nonspecific STT changes.

2/6/2015  Dr. Trost saw the patient post hospital return and sent the patient back to his cellhouse but failed to make referrals to cardiology and nephrology as recommended and did not make note of the hypokalemia or elevated metanephrines.

3/5/2015  A doctor saw the patient in hypertension clinic and the blood pressure was 200/140.  The doctor presumed that the blood pressure elevation was due to anxiety and referred the patient to a psychiatrist.  The doctor stopped HCTZ and Hytrin but started Cozaar.

10    The doctor failed to review the hospital notes failing to note the recommendation to refer to nephrology to rule out hyperaldosteronism and to cardiology.

344

PTX193-1111

Patient #27

3/6/2015 A doctor saw the patient for his elevated BP of 170/108. The doctor mentioned that Carbondale hospitalists recommended referral to cardiology and nephrology in two weeks and that Dr. Trost made no referral. However the doctor took no action.

3/7/2015 A psychiatrist documented that the patient was a no show to clinic and rescheduled the patient.

3/8/2015 The KCL supplement was discontinued.

3/16/2015 A doctor saw the patient for HTN clinic. BP was 190/128. The cholesterol was documented as 180, HDL 36, and LDL 117, but a statin was not started despite a 27% 10-year risk of cardiovascular disease. The doctor checked the retina but did not evaluate for other potential end-organ damage. The doctor referred to Dr. Trost. The doctor noted that the hospital recommended referral to nephrology and cardiology but that this didn't happen. Medication compliance was not addressed.

3/31/2015 Benicar 40 daily, diltiazem 180, hydralazine 75 TID, isordil, metoprolol 25 BID, KCL, spironolactone 25 daily.

4/16/2015 An EKG showed rate of 68 with nonspecific STT changes.

4/31/15 Aspirin, diltiazem 180 daily, hydralazine 75 TID, isordil, metoprolol 25 BID, spironolactone 25 daily. The Benicar was stopped.

5/31/15 Aspirin, diltiazem 180, hydralazine 75 TID, isordil, metoprolol 25 BID, spironolactone 25 daily.

6/31/15 Aspirin, diltiazem 180, hydralazine 75 TID, isordil, metoprolol 25 BID, spironolactone 25 daily.

7/1/2015 The Remeron appears to have stopped.

7/13/2015 The patient wrote a note to health care on a piece of paper saying he might have a bronchial infection with "shortness of breath attacks."

10   The doctor decided not to refer as recommended to a nephrologist and cardiologist.

1, 2, 3, 8, 10, 17   The doctor did not assess for end-organ damage except for a retinal examination. The patient's blood pressure medication should have been adjusted. The doctor did not assess for compliance. The doctor should have ensured that the blood pressure was lower prior to discharge from the clinic or admitted the patient to the infirmary. The patient should have been started on a statin. The doctor should have documented why the referrals to cardiology and nephrology were not done.

345

PTX193-1112

Patient #27

| | | |
|---|---|---|
| 7/14/2015 | A doctor saw the patient and noted that the patient was short of breath. BP 190/118 but oxygen saturation 94%. The doctor wanted to rule out heart failure and ordered an EKG, chest x-ray CMP and BNP but these were not done stat and a week follow up was ordered. The patient wasn't seen in a week and wasn't evaluated until a NP saw the patient apparently on 10/9/15. | 1, 2, 3, 8, 10, 14, 15 | The doctor did not evaluate for end-organ damage or appropriately manage hypertensive urgency. The patient should have had stat testing and been placed on the infirmary. The patient appeared lost to follow up for 3 months and ordered tests weren't done. The doctor failed to modify blood pressure medication. |

7/14/2015  Potassium 3.3; glucose 114; BNP 13 (<100).

| | | |
|---|---|---|
| 7/31/2015 | Hemoglobin A1c 7.3. | 6 | A provider signed this lab as reviewed on 8/5/15 but took no action. The lab result indicated that the patient had diabetes but the patient was never treated for this. |

7/31/2015  Aspirin, diltiazem 180, isordil, hydralazine 75 TID, metoprolol 25 BID, spironolactone 25.

8/24/2015  Potassium 3 (3.5-5.3); glucose 139.

8/31/2015  Aspirin, diltiazem 180, hydralazine 75 TID, isordil, metoprolol 25 BID, spironolactone 25 daily.

9/20/2015  The patient wasn't seen in cardiac clinic because of the doctor coming in late.

9/30/2015  Aspirin, diltiazem 180, hydralazine 75 TID, isordil, metoprolol 25 BID, spironolactone 25 daily.

| | | |
|---|---|---|
| 10/9/2015 | An NP saw the patient for shortness of breath. BP was 220/120 and pulse 87. The NP noted a potassium of 3. The NP ordered an EKG which showed nonspecific STT changes and PVCs. A chest x-ray was not done. The retina weren't checked. The patient had no edema. | 1, 2, 3, 6, 8, 15 | The blood pressure indicated hypertensive urgency. Even though the patient had shortness of breath, the NP did not evaluate thoroughly for heart failure. No other end-organ evaluations occurred. The NP did not monitor the patient until the BP improved and did not house the patient on the infirmary.  the NP did not adjust medication. noted the low potassium but took no action. The NP failed to note an A1c of 7.3 indicating diabetes which was therefore untreated. |

10/9/2015 An EKG showed nonspecific STT changes with PVCs.

10/9/2015 Potassium 3.2; glucose 169.

346

PTX193-1113

PTX193-1114

Patient #27

10/19/2015  Cardiac chronic clinic was cancelled because the MD was not in.

10/23/2015  Blood pressure was 164/88.  A doctor noted that the patient had anxiety and referred the patient to mental health.  The doctor noted that a chest x-ray was negative and the A1c was now 7.3.  The doctor took no action on the elevated A1c.  This was the same doctor who saw the patient on 7/14/15 but was following up three months late.

3, 6    The doctor failed to note the low potassium which suggested secondary hypertension.  The patient had diabetes and the doctor took no action to treat which is inappropriate.

10/25/2015  A doctor referred the patient to cardiology.

10/25/2015  A provider saw the patient in HTN clinic.  BP 200/130.  The doctor took no history but wrote that cardiology needs to follow the patient and referred to cardiology and increased metoprolol and added diltiazem.  Medication compliance was not addressed.

12    The diltiazem increased to 360 daily, the referral to cardiology never occurred.

10/31/2015  Aspirin, diltiazem 360, Lopressor 50 BID (10/25), hydralazine 75 TID, isordil, spironolactone 25.  Diltiazem was increased.

11/30/2015  Aspirin, diltiazem 360, Lopressor 50 BID (10/25), hydralazine 75 TID, isordil, spironolactone 25.

12/30/2015  Aspirin, diltiazem 360, Lopressor 50 BID (10/25), hydralazine 75 TID, isordil, spironolactone 25.

1/6/2016  Dr. Trost saw the patient in HTN chronic care.  There was no history.  The BP was 140/100.  No change to therapy was made.  The patient was not on a statin.

1, 2, 17    The doctor took no history, did not make an adequate assessment, as he failed to diagnose or treat diabetes, failed to note the low potassium which can be associated with hyperaldosteronism, and failed to start a statin despite a high 10-year risk of heart disease.

3:17-cv-03112-JES-JEH   # 263-10   Page 492 of 577

PTX193-1115

Patient #27

| 1/28/2016 | A doctor noted that the BP was 212/140.  The patient refused observation housing. The doctor referred to Dr. Trost, the Medical Director.  The patient refused clonidine.  The doctor increased the hydralazine to 100 TID and Lopressor to 150 BID.  The doctor noted that the A1c was 7.3 but took no action.  The doctor did not assess the patient for end-organ damage but did try to place the patient on protected housing. | 1, 2, 6, 8, 17 | The doctor failed to assess for end-organ damage by history, physical examination or lab testing.  The doctor noted a hemoglobin A1c of 7.3 but did not treat the patient for diabetes. |

1/31/2016 Aspirin, diltiazem 360, hydralazine 100 TID, Lopressor 150 BID (1/28/16); Aldactone 25.

2/24/2016 Potassium 3.1; glucose 97; cholesterol 174; HDL 32; LDL cholesterol.

2/28/2016 Aspirin, diltiazem 360, hydralazine 100 TID, Lopressor 150 BID spironolactone.

| 3/9/2016 | An NP saw the patient in HTN clinic.  The retina was not examined.  The patient was not assessed for end-organ damage with labs.  BP was 201/110.  The NP added Maxide but stopped hydralazine.  The potassium was noted to be 3.1 but no action was taken.  The cholesterol was 174; HDL 32 and LDL 120, yielding a 49% 10-year risk of heart disease and stroke.  Apparently the patient was compliant with medication as the medication compliance box was checked. | 1, 2, 6, 3, 12, 15,17 | The therapeutic plan was inappropriate.  The patient had a low potassium and in the context of difficult to control hypertension, hyperaldosteronism should have been ruled out.  The patient should have been referred to a nephrologist for better blood pressure control and for possible hyperaldosteronism, and the patient should have been on a high intensity statin because of high risk for heart disease.  Also, the patient had diabetes which was unrecognized and untreated.  The NP failed to evaluate for end-organ damage despite hypertensive urgency.  The NP failed to ensure that the blood pressure came down before leaving clinic, did not admit to the infirmary or ensure the patient had follow up.  Starting maxide in a person with hypokalemia without adding potassium supplement was an error also. |

3/9/2016 Maxide was started despite hypokalemia.  There was no potassium supplement.

348

Patient #27

| 3/29/2016 | A nurse saw the patient for an episode of shortness of breath that resolved. BP 240/140. The nurse called Dr. Trost, who took no action. | 3 | The doctor should have adjusted medication. |
| 3/31/2016 | The MAR showed that the patient was on aspirin, diltiazem 360 ER daily, isosorbide, spironolactone 25 daily (stopped in March), Maxide 75/50, metoprolol 25 BID. | | |
| 4/29/2016 | An NP saw the patient for BP 260/130. The NP gave a couple stat doses of clonidine, increased metoprolol, and documented consulting with Dr. Trost. The blood pressure came down to 170/118, but the NP should have ensured the blood pressure came down further before discharge. The NP did not assess for end-organ damage except to note that the patient had no headache. An elective EKG was ordered. A two week follow up was ordered, although this interval should have been less due to the degree of elevation of the blood pressure. | 1,2,3, 8, 15, | The NP did not evaluate for end organ damage or ensure that blood pressure was reduced to a reasonable level before discharge or did not admit to the infirmary. The NP did not order timely follow up given his blood pressure level. He should have been admitted to the infirmary. |
| 5/25/2016 | A NP noted BP 230/110 and wrote "cardiologist visit before that has not helped." The NP started clonidine 0.1 BID which the inmate subsequently refused. The NP took an appropriate history for end-organ damage but ordered no tests, (renal function). The NP ordered an EKG but did not review. The NP should have placed the patient on the infirmary. The follow up in a week was insufficient given a blood pressure of 230/110. | 8, 15 | |
| 5/31/2016 | The patient was on 180 Diltiazem daily, isordil, metoprolol 50 BID, Maxide 75/50, started clonidine 0.1 BID 4/26. | | Hydralazine was stopped. |
| 6/1/2016 | The patient refused to take clonidine and a nurse referred him to a physician clinic. | | |
| 6/2/2016 | An EKG showed marked sinus arrhythmia with probable old inf wall infarct. | | |

349

PTX193-1117

Patient #27

| | | |
|---|---|---|
| 6/3/2016 | An NP documented that the BP was 150/100. The NP wanted to give the patient stat clonidine but he refused. A two week follow up with Dr. Trost was ordered. The NP ordered a GFR and TSH. | |
| 6/6/2016 | A nurse obtained blood pressure of 220/110 but did not consult a provider. | 16 — The nurse should have consulted a doctor |
| 6/7/2016 | The BP was 200/100 but the nurse did not consult a physician | 16 — The nurse should have consulted a doctor. |
| 6/10/2016 | A nurse documented BP 200/100 but did not consult a physician | 16 — The nurse should have consulted a doctor. |
| 6/10/2016 | Creatinine 1.24. | |
| 6/12/2016 | A nurse documented that the patient was refusing medication. This was later documented as clonidine. | |
| 6/14/2016 | An NP noted the BP was 170/100 The NP reviewed the MAR and noted that the inmate was refusing only clonidine because it was DOT. | |
| 6/16/2016 | An NP documented that BP was 234/138. The NP noted that he refused clonidine, so she increased the metoprolol. The NP documented that the inmate refused infirmary admission. The history and lack of testing was inadequate for evaluation of end-organ damage. | 1, 2, 3, 8, — The NP should have evaluated for end-organ damage (renal function, EKG, better history and examination of retina). |
| 6/21/2016 | Dr. Trost note stated in its entirety "BP same as always." The BP was 220/120. He ordered a "prn" follow up. | 1, 2,3, 8,13, — This was indifferent care. The doctor did not evaluate for end-organ damage. The blood pressure needed control and the doctor should have referred to a higher level consultant to manage the patient. The doctor failed to rule out hyperaldosteronism and failed to discuss the degree of noncompliance and it possible impact on blood pressure control. |
| 6/31/16 | Aspirin, diltiazem 180, metoprolol 50 BID increased to 100 Bid on 6/16, Maxide 75/50, clonidine stopped 6/16/16, Aldactone 50 BID started 6/16. | |

350

PTX193-1118

Patient #27

| | |
|---|---|
| 7/30/2016 | Aspirin, clonidine 0.1 BID, diltiazem 180 daily, metoprolol 100 BID, Maxide 75/50, Aldactone 50 BID. |
| 8/12/2016 | Potassium 3.3; glucose 96. |
| 8/30/2016 | Maxide, aspirin, diltiazem 180 , metoprolol 100 BID, spironolactone 50 BID. |
| 10/3/2016 | Officers brought the patient to nursing sick call for a low bunk gallery because the patient was unsteady and was almost falling off his bunk.  The BP was 250/140.  The inmate refused to go to the health care unit and the nurse made a referral to a doctor. |
| 10/13/2016 | The patient was no show to a doctor clinic. |
| 10/19/2016 | The patient was a no show to clinic.  The CMT wrote that the inmate refused. |
| 11/11/2016 | The patient was unresponsive.  CPR was started but the patient died.  There was no timeline of CPR. |
| 11/12/2016 | An autopsy found normal adrenal glands, no disease of the pancreas, or GI tract.  The coronary arteries showed varying degrees of atherosclerosis including 75% RCA, LAD 95%; 50% circumflex.  The cause of death was atherosclerotic and hypertensive cardiovascular disease. |

16    The nurse should have consulted a doctor and have the patient brought to the clinic.

PTX193-1119

Patient #28

| | | |
|---|---|---|
| 8/6/2014 | A doctor noted that the patient had been in the infirmary since 8/6/14 due to falling in general population and decreased mobility. The patient had no medical issues listed. The patient apparently was in a wheelchair. The doctor did not list the patient's medical problems. | 1, 2, | The doctor didn't take a history or make an assessment even though the patient was on the infirmary. |
| 8/10/2014 | A nurse stated that the patient was alert but thought it was September when it was August. The one consistent item nurses monitored was whether the patient fell. | | |
| 8/14/2014 | A doctor saw the patient but noted none of the patient's medical problems so it was not possible to know what was wrong with the patient. The doctor wrote "see MD note 4/10/14 for HP infirmary and PMHx." But that note was not available. | 1,2 | The doctor didn't take a history or make an assessment even though the patient was on the infirmary. |
| 8/15/2014 | A nurse noted that the patient was up for his insulin. So I could know that he had diabetes, but neither nursing notes nor physician notes list his problems. Nurses do not document vitals or CBGs on their notes. | | |

Patient #28

| | | |
|---|---|---|
| 8/20/2014 | A doctor's note was more informative. The assessment documented that the patient had been in the infirmary since 1/28/13 [this contradicts the note from 8/6/14 although written by the same doctor] due to falls in population. The patient had multiple falls using a cane and walker and was said to be "noncompliant" with the walker and "resisting instructions in correct use" and "in late May 2013 put himself in an empty wheelchair subsequently refusing walker entirely." The patient had a special needs placement form for handicapped prison done 1/28/13 but apparently there was no place for him to go. The doctor listed problems as type 2 DM, mild heart failure, HCV, knee arthritis, and post-amputation of right fore foot from osteomyelitis and ASPVD and neuropathy. The doctor did not monitor sugars or note any clinical benchmarks for this patient. | 3   There was no therapeutic plan for this patient. |
| 8/27/2014 | A doctor saw the patient but noted no problems. There was no history, no assessment of existing problems, and no documented therapeutic plan. | |
| 9/2/2014 | Albumin 2.8; alk phos 171 (40-125); ast 53 (10-40); WBC 3.3; HGB 8; platelets 144 (150-450); A1c 6.1. | |
| 9/2/2014 | A doctor saw the patient but documented no problems. There was no assessment of problems and no therapeutic plan. | |

353

PTX193-1120

Patient #28

| | | |
|---|---|---|
| 9/9/2014 | A doctor saw the patient apparently for hepatitis C clinic. The doctor noted that HCV was diagnosed in 2007 at Stateville. The doctor noted that the patient consistently declined interferon therapy but made no mention of whether the patient wanted or didn't want treatment with the newer antiviral medications. The doctor noted that the patient had been vaccinated for hepatitis A and B. The APRI was 0.92. The doctor noted that the patient had cirrhosis, type 2 diabetes, mild heart failure, HTN, degenerative arthritis, post forefoot amputation in 1995 from osteomyelitis, macrocytic anemia with low body weight but the anemia had become microcytic. The doctor noted that the patient still did not want interferon and was discontinued from HCV telemedicine clinic since September of 2010. The doctor ordered stool for guaiac three times. These cards were completed and negative according to nursing notes. The doctor did not refer to Dr. Paul, did not refer to UIC telemedicine clinic, did not order an EGD or US for the cirrhosis. | 2, 6, 7, 8, 12  The patient had likely cirrhosis with an APRI of 0.92, a low albumin, elevated alk phos, low platelets, low white count, and anemia. The doctor did not document whether the patient had an EGD or ultrasound to screen for varices or hepatocellular carcinoma. the patient should have been referred to UIC telemedicine clinic unless there were contraindications. |
| 9/15/2014 | Doctor note addressed no medical issues. A brief examination was done. But the only assessment was that the patient was an infirmary patient since 2013 and referred to a 8/20/14 note for details. | |
| 9/17/2014 | A nurse noted that the patient was incontinent of urine. | This demonstrates altered mental status. |

354

PTX193-1121

Patient #28

| | | |
|---|---|---|
| 9/22/2014 | A doctor saw the patient in diabetic clinic. The patient was noted to be 81 years old and had been on insulin since age 60 and was now on NPH 14 am and 8:00 pm with 4 Reg TID after meals with metformin 500 mg pm. The doctor noted that the patient refused a diuretic for mild heart failure and HTN, and had macrocytic anemia with low B12 levels. BP was 123/62 and weight 179. The doctor could not feel the distal pulses and the patient could not feel the monofilament. Not clear if the patient ever had ABI. The doctor noted that the recent A1c. was 6.1 and that the patient had good control. The meds were insulin, metformin, aspirin, lisinopril, B12, and vit B6. The doctor didn't document recent lipid values, recent microalbumin level, recent creatinine. | 1, 7 | If the patient could not feel a monofilament test the patient should have had ABI to evaluate the distal vasculature. It was not clear what the patient's mental status was. The doctor made no mention of the incontinence in his note. It appeared that the patient might have dementia that was unrecognized. |
| 9/30/2014 | A nurse noted that the patient was alert but thought that Thanksgiving was two weeks away. | 1 | The patient appeared to have some degree of dementia but it wasn't documented in the record and did not appear to be tracked. |
| 10/2/2014 | A doctor saw the patient. The assessment did not include an assessment of his problems. No problems were listed. The doctor performed an examination but made no assessment of existing problems. These evaluations appear to be every two week evaluations that are not clinically relevant. | | |
| 10/17/2014 | A doctor saw the patient and repeated the same assessment virtually verbatim, stating that the inmate was in the infirmary since 1/28/13 due to falls in population with a cane and that he was "non-compliant" with a walker in the infirmary and had no acute issues. The doctor referred to prior notes for the past medical history. The doctor as usual did not address any interval status of the patient's clinical problems. | | |

355

PTX193-1122

Patient #28

| | | |
|---|---|---|
| 11/4/2014 | Albumin 2.8; alk phos 205; AST 47 (10-40); cholesterol 104; HDL 59; LDL 39 (50-129); HCV 2,050,457. | |
| 11/17/2014 | Fibrosure score indicative of cirrhosis at 0.77 (0-0.21). | |
| 12/4/2014 | A1c 6.2. | |
| 12/8/2014 | A nurse evaluated the patient using a "cough" protocol for congestion and appearing drowsy all day. The temperature was 98.1. The nurse gave the patient OTC medications by protocol. | |
| 12/11/2014 | A doctor saw the patient. As usual the doctor wrote a descriptive history of the patient's reason for being on the infirmary but did not address any of the patient's medical issues. The doctor noted that a special needs placement form was completed 1/28/13 but apparently hadn't yet been addressed. The patient needed a nursing home but there was no where to go so he remained on the infirmary. | 1,2, 3, 6, 7, 8 — The doctor did not take an adequate history or assess the patients problems. The doctor did not address recent labs. If the patient had cirrhosis, EGD should have been done and every six months ultrasound to screen for hepatocellular carcinoma. The albumin was low and there was no assessment of nutritional status. The alkaline phosphatase was elevated but not addressed. It was not clear why the patient was not referred to UIC for treatment. |
| 12/22/2014 | A nurse documented that Dr. Paul saw the patient in hepatitis C clinic and referred to her progress notes. | |

356

Patient #28

| | | |
|---|---|---|
| 12/22/2014 | A hepatitis C chronic clinic. Dr. Paul saw the patient and noted that a fibrosure was done on 11/17/14. The provider noted that the hep C viral load was 2,050,457 and the A1c was 6.2. The doctor noted the recent labs including albumin of 2.8; alk phos 171; INR 1.2; WBC 3.3; HGB 8; platelets 144; and assessed F4 fibrosis. The provider noted that the patient was anemic since 2013 and "needs anemia FU ACAP → T/C C-scope but patient frail." The provider [presumably a NP] stated the it was for Dr. Bauer [presumably the Medical Director] to decide if anemia precluded HCV treatment or work up. Dr Paul said, "will need EOD liver ultrasound once anemia resolved." The anemia was persistent for years. The patient had fibrosis consistent with cirrhosis but this wasn't diagnosed and the patient wasn't scheduled for EGD and semi-annual ultrasound or CT scan to evaluate for HCC. The patient certainly should have been referred to UIC hepatology but it wasn't clear who was to do this. | 7,8,12 | The patient had cirrhosis but wasn't being provided typical care. For reasons not stated the patient didn't receive EGD, ultrasound, or colonoscopy to work up his anemia. The statement that he was frail is not an indication not to work up his anemia. The statement that he had anemia since 2013 demonstrated significant delay. The statement that liver ultrasound would be done when the anemia was resolved but then to not work up the anemia was making excuses for not working the patient up. This was all a significant delay in colonoscopy, ultrasound, and EGD. Also the patient should have been referred to UIC. |
| 12/29/2014 | Diabetic chronic clinic. There were no changes to medications. The weight was 160; BP 137/62; the doctor noted a right fore foot amputation. The form contains a preprinted recommendation that ABI is indicated when pulses are low. This was true at a prior evaluation but ABI was not ordered. The pulses and feet were not checked at this visit. | | |

Patient #28

| | |
|---|---|
| 12/30/2014 | The doctor at this visit documented history and some additional assessment based on a review of the 12/22/14 Dr. Paul note. The doctor noted macrocytic anemia with low B12 and B6. The doctor noted that the patient was "referred by Dr. Paul for anemia since 2013." It wasn't clear what that meant. The doctor noted that the patient "denies sources of blood loss. Refused /AMA for DRE 11/12/12 and 11/14/14, will recheck CBC." The doctor noted that the patient had prior pancytopenia due to hepatitis C. The plan was to get three stool samples for guaiac, CBC reticulocytes, iron studies and other tests. The doctor wrote down all the CBC results dating from March of 2012; there were 12 all showing anemia with the lowest hemoglobin 8 and the highest 10.9. Yet the patient hadn't had a colonoscopy!! |
| 7,8, 12 | The doctor was using DRE as screening for colorectal cancer, which is inappropriate. The patient should have been scheduled for colonoscopy since he had anemia. The patient also should have had ultrasound screening and EGD since he had cirrhosis. The patient should have been referred to UIC telemedicine clinic. |
| 12/30/2014 | Iron 13 (49-181); TIBC 454 (250-450); WBC 2.2; HGB 7.7; platelets 108; neutrophils 35% or 0.8 (1.3-7.5); vitamin B12 74 (70-180) whole blood. |
| 1/5/2015 | B12 135 (180-914) plasma. |
| 1/9/2015 | The doctor noted that the patient had pancytopenia WBC 2.2, hemoglobin 7.7, and platelets 108. The serum iron was low and TIBC high; three hemocult cards were negative. The doctor documented that labs were consistent with iron deficiency anemia but because three hemocult cards were negative there was no source of blood loss. The only treatment was to prescribe iron supplementation. This is inconsistent with standards as the patient should have had endoscopies. To say that there was no source of blood loss without looking for it diagnostically was inaccurate. |
| 2, 6, 7, 8 | The patient had pancytopenia yet the doctor made no diagnosis and came to no conclusion why the patient had pancytopenia. The patient had iron deficiency anemia yet the doctor did not order colonoscopy and endoscopy. The doctor should also have ordered an ultrasound of the abdomen to screen for hepatocellular carcinoma. The only treatment was to order iron supplements. |

358

PTX193-1125

**PTX193-1126**

Patient #28

| | | |
|---|---|---|
| 2/9/2015 | A new doctor saw the patient and didn't follow up on the anemia and listed only two problems: DM and ID [it wasn't clear what ID was]. This doctor took no history and made no assessment of the status of any condition. | 1, 2, 3 | The doctor took no history, made no assessment and no plan. The doctor failed to follow up on the pancytopenia and iron deficiency anemia and addressed none of the patient's problems. |
| 2/10/2015 | Iron 13 (49-181); TIBC 470 (250-450); WBC 3.4;  HGB 7.7; platelets 143; neutrophils 50.8%. | | |
| 2/19/2015 | A doctor saw the patient and documented all problems including anemia/pancytopenia without documenting an updated status and  plan for any problem except CHF, noting that the patient was on diuretic and lisinopril. | 2, 3 | The doctor made no diagnosis based on abnormal labs and no therapeutic plan for the given abnormal labs. |
| 2/26/2015 | A doctor saw the patient and noted that the hemoglobin was still 7.7 with microcytic indices.  The doctor noted that the patient still had pancytopenia (3.4; 7.7; 143) and stated that there was "no source" of bleeding found.  The doctor documented the low reticulocyte count.  The doctor wrote that though the patient was taking B12 and B6 supplements the B12 was still low and he wrote "?absorption?" and wrote that he would try B12 injections.  The doctor added vitamin C to the iron to try to increase absorption.  The doctor did not refer for a colonoscopy or upper endoscopy. | 7, 8 | This did not appear competent.  The patient had pancytopenia and iron deficiency anemia yet the doctor did not refer for endoscopy and colonoscopy.  Because of the cirrhosis, ultrasound screening should have been done. |
| 3/2/2015 | The patient fell off the bed onto his hand.  The patient had a 2.5 cm laceration on the palmar surface of the phalanx with visible tendon.  The right middle PIP was deformed and subluxed.  An X-ray showed a dislocated PIP but "no acute fracture seen."  The patient couldn't flex his right finger.  The doctor assessed a laceration and dislocation and sutured the finger but could not reduce the dislocation, so sent the patient to an ER.  The patient returned from the ER with instructions to return in 10 days to remove sutures. | | |

359

**Patient #28**

| 3/2/2015 | The patient was seen in the ER at the Sarah Culbertson Memorial Hospital. An x-ray showed a subluxation of the third finger on the right; fracture was not definitively seen. The wound was sutured and the patient returned to the prison. | | A subluxed finger requires reduction of the subluxed finger. This required follow up with an orthopedic surgeon for possible surgical reduction. |

| 3/2/2015 | X-ray of the right third finger showed dorsal dislocation without obvious fracture. | | |

| 3/4/2015 | A doctor saw the patient and noted that there were no ER records; he asked for them to be obtained. The doctor did not document knowing what was diagnosed or done in the ER. | 11 | The failure to obtain records resulted in clinical deficiency |

| 3/9/2015 | A doctor saw the patient whose hand was now swollen. The doctor documented a verbal report from the ER that the patient did not have a dislocation but stated that the x-ray report showed a 6 mm subluxation. The doctor prescribed empiric treatment with Keflex for 10 days and a repeat x-ray. It wasn't clear if the patient had seen a hand surgeon or orthopedic surgeon. Blood tests were not done. | 12 | The doctor needed to consult an orthopedic surgeon as the patient had a subluxation. A subluxation with swelling indicates possible infection. |

| 3/11/2015 | A doctor noted that the right middle finger was still dislocated with the middle phalanx subluxed. The doctor documented he would discuss in collegial review but didn't state for what reason. | 12 | The doctor needed to consult an orthopedic surgeon as the patient had a subluxation. |

| 3/12/2015 | A doctor noted that the finger was still swollen and that there was some drainage in the morning. No changes were made. | | |

| 3/13/2015 | Wexford denied referral for urgent wound clinic evaluation. Wexford asked to get foot x-rays and wound culture if not done and re-present the patient in the next collegial review. | 12 | The Wexford utilization decision was grossly and flagrantly unacceptable. The patient had an subluxation with infection and this needed immediate attention. Because the wound was open and sutured, it appeared to be the equivalent of an open fracture. |

360

Patient #28

| 3/16/2015 | A nurse documented a "grossly swollen" right middle finger. Later that day five sutures were removed from the finger by a nurse. Later, a doctor saw the patient and noted that the finger was swollen and that the patient was unable to flex the finger. The doctor documented that he referred the patient to orthopedic or hand surgery for closed reduction. This was approved. | 12 | The referral was two weeks after the injury. The delay likely resulted in extension of the infection. The referral needed to be immediate, not even urgent, as the patient was likely infected. |

3/16/2015   A doctor referred the patient to an orthopedic surgeon for closed reduction of the finger.

3/20/2015   A Wexford doctor approved the orthopedic surgeon visit.

3/26/2015   Ferritin 28 (10-259); iron 29 (50-180); WBC 3.7; HGB 8.8; platelets 158; B12 1049 (180-914).

3/27/2015   A nurse noted some yellow discharge from the finger wound.

3/30/2015   A doctor noted that the patient was at the hand surgeon's office and spoke with the surgeon who said that the patient had an open dislocation with pus coming from an open wound. The joint was visible. Surgery was indicated "tonight." The patient had surgery and returned on vancomycin IV on the infirmary upon return.

| 3/30/2015 | An orthopedic doctor wrote in the ER that the patient sustained an open dislocation of the finger and said, "I am uncertain as to why this was not reduced prior to now but at any rate would recommend [the hand surgeon] address this issue." Surgery was done that evening. | 12 | The referral was delayed almost a month for an open dislocation. The UM process was grossly and flagrantly unacceptable and resulted in osteomyelitis, a preventable condition. |

361

Patient #28

| | |
|---|---|
| 4/1/2015 | A doctor noted that the patient had ORIF of the finger [apparently there was a open fracture with pus]. The patient needed six weeks of treatment for osteomyelitis. Osteomyelitis was diagnosed. |
| 4/2/2015 | A doctor referred the patient for post-op follow up orthopedic visit. |
| 4/6/2015 | A post operative follow up was approved in collegial review. |
| 4/9/2015 | A doctor noted that the hand surgeon wanted to see the patient in the ER for a follow up visit, which the doctor noted couldn't be done. The doctor noted anemia was improved and the HGB now 8.8 from 7.7. No action was taken except to continue iron and B12 supplements. |
| 6, 7, 10 | Follow up of the anemia was unacceptable. The patient had iron deficiency anemia and colonoscopy and EGD were indicated but not done for undocumented reasons. Follow up with the surgeon was also indicated and not done because apparently IDOC would not take the patient to the ER. |
| 4/15/2015 | A nurse documented soaking the affected finger in a solution of Epson salts for 20 minutes. Not sure if this was ordered treatment. |
| 4/16/2015 | Urine microalbumin 140; albumin 2.9; alk phos 202; AST 69 (10-40); A1c 5.3; cholesterol 118; HDL 61; LDL 47 (50-129). |
| 4/20/2015 | The patient sustained an open fracture dislocation of this right middle finger and was being seen in the ED for a suture removal. The fracture was healing adequately. |
| 4/20/2015 | A doctor noted that the patient was seen post orthopedic visit but that the notes were unavailable. The pins were reportedly removed and the patient had a follow up in a month. The doctor asked medical records to obtain a dictated report. |
| 11 | The doctor was unable to determine the status of the patient because consultant notes were unavailable. |
| 4/20/2015 | A hand surgeon saw the patient in the ER and removed sutures and the patient was discharged. |

PTX193-1130

**Patient #28**

| 4/22/2015 | A doctor reviewed the orthopedic notes that the sutures were removed and the wound healing. | |
| 4/22/2015 | A doctor renewed medications as NPH 14 am and 8:00 pm with aspirin, lisinopril 5 mg daily, metformin 500 with dinner B12 and B6 supplements. | |
| 4/22/2015 | Diabetic chronic clinic.  The doctor noted mild CHF, DM, chronic hep C, anemia, and mobility disorder.  BP was 142/86; a foot exam was done but did not take off his shower shoes.  The A1c was 6.2.  The patient was documented as in good control and no action was taken. | |
| 4/27/2015 | Glucose 59 (65-110). | |
| 4/29/2015 | A doctor saw the patient and noted that the patient still had anemia.  The doctor noted that the last CBC on 3/26/15 showed HGB of 8.8 and that he would continue the same therapy. | 7 |
| 5/6/2015 | Iron 30 (50-180); % transferrin 8 (20-50); WBC 2.9; HGB 9.2; platelets 105. | |
| 5/13/2015 | Dr. Baker referred the patient to a hand surgeon after a failed closed reduction.  The patient was unable to flex the right middle finger at all. | 1, 2, 6, 7, |
| | The patient's recent labs showed pancytopenia with iron deficiency anemia.  The doctor should have referred for EGD, colonoscopy, and ultrasound of the liver to screen for hepatocellular carcinoma.  The doctor appeared to fail to review the labs. | |
| 5/13/2015 | A doctor noted that the patient completed the vancomycin and that referral was made for ortho follow up. | |
| 5/13/2015 | A doctor referred the patient to the hand surgeon for follow up. | |
| 5/22/2015 | The patient told a doctor he couldn't bend the finger.  The doctor took no action. | |

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 364 of 431 PageID #:12562

Patient #28

5/28/2015     A doctor noted that weight was 158; did not address any labs and noted that the patient still needed to be scheduled for ortho follow up.  The doctor didn't address any of the patient's other problems.

6/4/2015      A doctor saw the patient but didn't address any of his problems.

6/8/2015      An orthopedic surgeon saw the patient.  The patient had intra-articular fracture of the third PIP on the right.  There was advanced DJD of the DIP and PIP joints.  The orthopedic surgeon stated that he needed to investigate options for the patient and might need to refer to a hand surgeon.  The patient said the finger was useless and he would rather have it amputated than continue in the current situation.  The x-ray showed residual irregularity of the joint; infection could not be excluded.

6/8/2015      The hand surgeon saw the patient.  The doctor noted that the patient had pins removed from the ORIF several months ago.  The patient said he wanted amputation of the finger instead of other care.  The surgeon said he needed to investigate options and would get back to the prison.

6/9/2015      Glucose 313; albumin 3; alk phos 214; AST 55 (10-40); ALT 38 (10-50); WBC 2.9; HGB 10.8; platelets 108.

6/10/2015     A doctor saw the patient and noted that the patient saw the surgeon and told the surgeon to cut off the finger as it was not useful.  The surgeon said he would get back to them.  The surgeon report wasn't available so the doctor asked for it.

6/16/2015     A doctor saw the patient and documented that he documented a hepatitis C note that day but it was not in the medical record chronologically.

364

PTX193-1131

3:17-cv-03112-JES-JEH   # 263-10   Page 509 of 577

PTX193-1132

Patient #28

| | | |
|---|---|---|
| 6/16/2015 | | A doctor saw the patient for hepatitis C clinic. The doctor said that the patient was followed by Dr. Paul in HCV telemedicine clinic and was last seen 12/22/14. The doctor noted that the WBC was 2.9; HGB 10.8; platelets 108, and APRI 1.27. The doctor stated that the patient would not be treated because of frailty, anemia, and was followed by Dr. Paul, who decided the patient wasn't a treatment candidate. The doctor noted that Dr. Paul was to see the patient "this month?" Though the patient had cirrhosis, the doctor did not assess this. Nor did the doctor order EGD or screening ultrasound for HCC. |
| | 12, 7, 8 | The patient should have been referred to UIC for assessment. Frailty is not a contraindication to treatment. In any case, the patient should have received EGD to screen for varices, and ultrasound or CT scan to screen for hepatocellular carcinoma. The patient had iron deficiency anemia and should have received colonoscopy. The pancytopenia was likely a result of the cirrhosis but is of concern. |
| 7/1/2015 | | A doctor said that the orthopedic surgeon would research options for a nonfunctional finger and get back to them. |
| 7/9/2015 | | A doctor wrote a note with considerable history about the finger issue but failed to address any of the patient's other problems. The patient's injured finger was tender and the doctor empirically treated with Bactrim even though there was no sign of infection. A1c 8.2. |
| 8/11/2015 | | |
| 8/12/2015 | | As of this date the doctor stated that the orthopedic doctor had not gotten back to him with options. The doctor did not address any of the patient's other issues except through chronic clinic notes, including the pancytopenia or cirrhosis. Cirrhosis wasn't even documented as a problem. |
| | 12 | The doctor failed to refer the patient to an orthopedic surgeon. There was no attempt to determine how the finger affected ability to function. This was a preventable injury. |
| 8/21/2015 | | The patient had a runny nose with cough and the doctor prescribed CTM. |

365

PTX193-1133

Patient #28

| Date | | Description |
|------|---|-------------|
| 8/26/2015 | | A doctor saw the patient in diabetic clinic. The A1c was 8.2. The doctor increased the metformin to 500 BID and increased NPH to 16 am and 10:00 pm. |
| | 7, 8 | The doctor did not address the pancytopenia, anemia, cirrhosis, or other conditions. The patient should have been referred for colonoscopy, EGD and ultrasound. |
| 9/7/2015 | | The patient thought it was close to Halloween.   The patient was encouraged to change clothes and shower.  The nurse noted that the patient's pants smelled of urine. |
| 9/22/2015 | | A different doctor began seeing the patient and wrote an extremely brief note noting that the patient now agreed to take metformin. There was no assessment. |
| | 1, 2, 3 | The doctor failed to review nursing notes and address the patient's incontinence.  If this was due to dementia it was unrecognized.  If it was due to something else it was undiagnosed. |
| 9/29/2015 | | The new doctor saw the patient and noted that the patient had DM and an "ortho foot problem [secondary] to falls."  The doctor did not address any of the other patient problems including pancytopenia, cirrhosis, CHF, or low albumin. |
| | 1, 2, 7, 8 | The doctor was a new doctor for this patient yet failed to establish a reasonable plan for his cirrhosis and anemia. They took inadequate history, made no assessment of the patient's problems, and failed to establish a reasonable plan.  The doctor failed to refer the patient for EGD and colonoscopy and ultrasound. |
| 10/6/2015 | | The new doctor saw the patient and noted that the patient had DM and  "ortho foot problems."  The doctor did not address any of the other patient problems including pancytopenia, cirrhosis, CHF, or low albumin.  The doctor noted 1-2+ edema on exam but made no assessment or plan for this. |
| | 1, 2, 7, 8 | The patient had apparent new onset edema yet the doctor took no history, made no attempt at diagnosis, and failed in the assessment to address any of the patient's conditions.  The doctor should have referred for EGD, colonoscopy, ultrasound, and considered an echocardiogram based on the history. |
| 10/13/2015 | | A doctor saw the patient and noted that the patient had DM and a "ortho foot problem."  The A1c was documented as 8.2. The doctor ordered a CMP and A1c with a week follow up. |
| 10/14/2015 | | A1c 8.2. |

366

Patient #28

| | | |
|---|---|---|
| 10/20/2015 | A doctor saw the patient and noted elevated A1c 8.2 and increased the metformin to a gram BID, which was a significant increase. | |
| 11/3/2015 | A1c 8.5. | |
| 11/4/2015 | A doctor saw the patient and noted that the last A1c was 8.2 on 10/14; a repeat had not returned yet. Without evaluating CBG levels the doctor increased metformin to 850 TID. For an elderly man this was a large increase. | |
| 11/11/2015 | A doctor saw the patient and ordered another A1c and said he would add another drug if the A1c was still high. No other problems were addressed. | |
| 11/13/2015 | A nurse documented that the patient had periods of forgetfulness without any evaluation. | |
| 11/14/2015 | Annual physical examination documents hepatitis C, mild CHF, ASPVD, DM, arthritis of knees, and the weight was 162. | 1, 7, 8 | The provider failed to review the nursing history of forgetfulness and prior incontinence and integrate that information into the problem list. The provider failed on the annual physical to obtain an EGD, colonoscopy, or ultrasound. Nutritional assessment was not done. The patient's functional capacity was not assessed. |
| 11/18/2015 | A doctor saw the patient. The doctor noted that the A1c was 8.5 but that the patient refused any increase of insulin. The doctor addressed no other problems. | |
| 11/18/2015 | A1c 8.6. | |
| 11/25/2015 | A doctor saw the patient and noted only diabetes, fall risk, and a partial foot amputation as problems. | |
| 11/25/2015 | Albumin 2.9; alk phos 231; AST 57; ALT 37; phosphorus 2.9; WBC 3.1; HGB 11.3; platelets 115. | |
| 12/3/2015 | A doctor saw the patient and noted that the patient had hepatitis C and diabetes. The doctor referred the patient to the hepatitis C clinic with BMP, T4 and TSH. | |

367

PTX193-1134

**PTX193-1135**

Patient #28

| | | |
|---|---|---|
| 12/3/2015 | A doctor saw the patient in hepatitis C clinic. The doctor noted albumin 3; HGB 10.8; platelets 108; AST 55 and ALT 38. The doctor didn't note that the patient had cirrhosis and referred the patient to see Dr. Paul in hepatitis C clinic. Ironically, the doctor was seeing the patient in hepatitis C clinic. It appeared that the doctor didn't know how to manage cirrhosis. | 12, 7, 8 | The patient hadn't seen doctor Paul for a year. The patient had cirrhosis. He should have been referred to UIC to determine whether treatment was indicated. He should have been referred for EGD, colonoscopy, and ultrasound. |
| 12/8/2015 | A doctor noted that the patient had a "skin tear" on the bottom of his left foot and was walking using shoes. The doctor noted a 2 1/2 cm tear on the skin and ordered betadine soaks of the left foot with daily dressing changes and tetanus update. The doctor did not off-load the foot. | 3 | The patient was diabetic. A foot wound in a diabetic is cause for concern and typically needs off-loading to reduce use of the foot. This was not done and exposed the patient to continued damage to the foot. |
| 12/9/2015 | A doctor saw the patient and noted that he was disoriented and confused. There was no history with respect to the altered mental status. The doctor noted that the patient didn't have pain and had a tear on the foot with no evidence of infection. The plan was only antibiotic ointment. The patient continued to walk on the foot. | 1, 2, 7, 8, 14 | The patient was confused but the doctor failed to take a history and performed no examination with respect to the altered mental status. The doctor should have obtained a metabolic panel, ammonia level, and probably obtain a CT brain. Alternatively, the patient should have been sent to a hospital. |
| 12/9/2015 | A1c 8.7. | | |
| 12/15/2015 | A nurse noted that the patient had a "scant" amount of drainage and that the tissue between the toes was white with an odor and that there was an open area on the side of the foot that "remains swollen slightly and discolored." | | |

368

Patient #28

| 12/15/2015 | A doctor saw the patient and continued the antibiotic ointment. The doctor noted that the wound was healing well. | |
|---|---|---|
| 12/16/2015 | The patient had a diabetic foot with pus. The doctor should have probed the wound, obtained sedimentation rate and CRP test, and x-ray or CT scan to assess for osteomyelitis. The patient should have been off-loaded. Although the patient was in a wheelchair, he should not have been walking on the foot. Antibiotics should have been started. | 2, 3, 7, 8 |
| 12/16/2015 | A nurse noted that the patient was forgetful when it comes to the time of day. The patient asked what time it was after saying that it was night. A doctor saw the patient that day and noted that the foot was healing well. The doctor continued wound care. | |
| | The patient had altered mental status but it was unrecognized. The doctor didn't review the nursing note or take any history of the patient. No diagnosis of the altered mental status was made. The patient should have had a serum ammonia, CMP, and CT scan. | 1, 2, 8 |
| 12/16/2015 | A1c 8.5. | |
| 12/22/2015 | A doctor saw the patient and noted that the foot was healing and that the patient had DM with neuropathy and a healing wound. The doctor didn't check the distal pulses, order an ABI, or probe the wound. No labs were ordered. No change in therapy. | |
| 12/23/2015 | A doctor saw the patient in diabetic clinic. The A1c was documented as 8.5. The patient was listed as having type 1 diabetes, which he didn't have. The doctor did not document a change in medication. The doctor noted that the A1c was 8.5 and that the patient refused any increase in insulin. Except for noting no edema, the foot wound wasn't examined. The doctor assessed only type 1 diabetes and ordered a BMP. | |
| | The patient had a diabetic foot with pus. The doctor should have probed the wound, obtained sedimentation rate and CRP test and x-ray or CT scan to assess for osteomyelitis. The patient should have been off-loaded. Although the patient was in a wheelchair, the plan should have been to completely off-load the foot. | 3, 7, 8 |
| 12/24/2015 | A nurse noted that the inmate had periods of forgetfulness. | |
| 12/29/2015 | A1c 8. | |

**Patient #28**

| 12/30/2015 | | A doctor noted that the weight was 158 and increased NPH to 16 units in the am and pm, which was a significant increase. The only assessment was DM with neuropathy. The doctor made no comment about blood sugars. The doctor documented that there were no ulcers on the L foot or R stump even though the patient had a diabetic foot. | | The doctor appeared to follow up a diabetic foot for which the patient was being treated. This did not appear to be a competent evaluation. | 4, 15 |

1/5/2016    A1c 7.8.

| 1/6/2016 | | A doctor saw the patient. The BP was 143/53. The A1c was 8 decreased from 8.5 on 12/29/15; the patient had 2 + edema but the doctor didn't examine the foot with the tear. The doctor ordered weights every visit and added HCTZ and ordered an EKG and BMP. | | The doctor failed to follow up on the diabetic foot. The doctor noted 2+ edema but did not document a foot examination. It appeared that the diabetic foot problem was lost to follow up. | 4, 15 |

1/6/2016    HCTZ was started at 25 mg.

| 1/8/2016 | | A nurse noted after a shower that the inmate had an open ulcer with peeling edges on the left foot and reported it to an NP. An NP saw the patient and documented a dime sized ulcer with no drainage and 2 + pulses. The patient told the NP that the wound "just won't heal." Left foot ulcer was diagnosed but no action taken except wet to dry dressings. | | The patient had a non-healing diabetic ulcer for over a month. The NP should have probed the wound. Although pulses were palpated, an ABI was indicated due to the non-healing nature of the wound. The patient should have been off-loaded. Sed rate, CRP, blood count, and x-rays or MRI should have been done to exclude osteomyelitis. Antibiotics should have been started. | 1, 2, 3, 7, 8 |

1/8/2016    A nurse noted that the inmate had periods of forgetfulness.

1/9/2016    A nurse noted that the inmate smelled of BM and urine and was advised to take a shower. The ulcer was dressed.

1/10/2016    A nurse noted slight drainage from the ulcer.

1/11/2016    A nurse noted that the patient was washing soiled sweatpants and had periods of confusion.

1/13/2016    A nurse noted that the inmate had unsteady gait.

PTX193-1137

PTX193-1138

Patient #28

| Date | | Notes |
|---|---|---|
| 1/13/2016 | 1,2, 7, 8 | A doctor saw the patient. The doctor noted that the patient had an ulcer on the right foot of the metatarsal area and heel and ordered a culture, BMP and CBC and clindamycin BID with follow up in a week. The patient had recent episodes of forgetfulness and incontinence which were not even noted. The patient should have been worked up for altered mental status. The patient should have had ABI, and radiologic study to evaluate for osteomyelitis. |
| 1/13/2016 | | WBC 3.75; HGB 11.3; platelets 128; a wound culture showed many proteus susceptible to Rocephin and Clindamycin. But this was a wound culture. |
| 1/14/2016 | | A nurse noted unsteady gait and periods of confusion and that the left foot had scant drainage. |
| 1/15/2016 | | A nurse noted that the patient took off the left foot dressing and there was an open area. |
| 1/21/2016 | 1, 2, 3, 7, 8 | A doctor noted that the patient had a plantar ulcer on the first metatarsal area and that it was not healing; he ordered a BMP, A1c, CBC, and follow up. The patient had recent episode of confusion and unsteady gait. The doctor took no history, performed no pertinent examination, and did not order appropriate diagnostic testing (ammonia, CT brain). The doctor also did not probe the bone, order sedimentation rate or CRP, or order x-rays or MRI to exclude osteomyelitis. |
| 1/27/2016 | | A doctor referred the patient with a diabetic foot ulcer resistant to normal care for wound care. There was extension of the wound. The doctor documented prior amputation for a prior diabetic foot ulcer. |
| 1/27/2016 | | A nurse called a doctor in to see the wound which had scant drainage with peeling edges. |
| 1/27/2016 | | A1c 7.6; WBC 3; HGB 10.6; platelets 115. |
| 1/28/2016 | 12 | Wexford denied referral for urgent wound clinic evaluation. Wexford denied referral for a diabetic wound when the local doctor did not know how to care for the wound. Wexford asked to get foot x-rays and wound culture if not done and re-present the patient in the next collegial review. Care was grossly and flagrantly irresponsible. |

PTX193-1139

Patient #28

| | | |
|---|---|---|
| 1/28/2016 | | A clerk documented denial of urgent wound care referral with alternative plan an x-ray and wound culture. |
| 1/28/2016 | | A doctor noted that there was no osteomyelitis on x-ray. |
| 1/28/2016 | 11 | A doctor apparently ordered Rocephin because a nurse administered this drug, but there was no physician note. Later that day at 6:00 pm the Rocephin was changed to gentamycin. Again there was no note documenting why. On later notes it appeared that the patient was receiving both gentamycin and Rocephin without documented reason. Apparently it was for the foot ulcer. |
| 1/28/2016 | | Medical records wrote a note that urgent wound care was denied and x-ray and wound culture was recommended. |
| 1/30/2016 | | At 7:30 am the patient came for meds in his wheel chair and he was lethargic and unable to wheel himself with slurred speech. The blood pressure was 74/35 and the patient was sent to a hospital. |
| 1/30/2016 | | The patient was referred from Rushville for hypotension (74/35) and lethargy to a hospital. |

Plain x-rays may not show osteomyelitis until late in the course of osteomyelitis. Also, wound culture of an open wound is not useful, as the culture will likely be contaminated.

This is a documentation problem. It wasn't clear why IV Rocephin was started as there was no documentation in the medical record.

Patient #28

| | |
|---|---|
| 1/30/2016 | Magnesium 1.6 (1.8-2.4); BNP 473; WBC 2.2; HGB 10.5; platelets 83; neutrophils 89.2%. Sedimentation rate 29 (0-15); PO2 63 (80-100); HCO3 12 (22-26); PCO2 19 (35-45); glucose 146; calcium 7.5; Total protein 6.1 (6.4-8.2); albumin 2.4; ALT 41 (16-63); AST 76 (15-37); ALK PHOS 237; total bili 1.2 (0-1) and blood cultures at four days were negative. These labs were done at the hospital. The patient was admitted with altered mental status and hypotension. A CT scan showed colitis- colonoscopy was recommended. CT of the brain showed no acute process but small vessel ischemic changes. EKG showed right atrial enlargement. |
| 1/31/2016 | A doctor in the hospital wrote a consultant note documenting that he was asked to see the patient for lactic acidosis and CT scan showing colitis. The patient had profound lactic acidosis with HCO3 of 8.8; the patient refused colonoscopy and it was recommended to continue cipro and flagyl. The patient had no masses in the liver on a CT scan but the CT scan was without contrast. |
| 2/4/2016 | At St John's Hospital an abdominal ultrasound showed a 2 cm hypoechogenic lesion which "may represent a cyst or other etiologies are not entirely excluded," diffusely coarse echotexture of the liver with nodular surface and moderate ascites. |
| 2/6/2016 | The inmate returned from the hospital and had a Foley catheter. The assessment was colitis. |
| 2/7/2016 | A nurse documented that the patient had 1+ edema. A doctor had yet to see the patient on return from the hospital. It wasn't clear what the discharge diagnoses were. |

373

Patient #28

| | | |
|---|---|---|
| 2/7/2016 | A nurse called a doctor who ordered blood cultures by phone and ordered Levaquin by phone. A doctor had yet to see the patient and it wasn't clear what the patient's diagnoses were. In a later note a nurse noted that Levaquin wasn't available so the doctor ordered IV Rocephin by phone. It wasn't made clear why the doctor was prescribing IV antibiotics. | |
| 2/7/2016 | A nurse noted that the patient's temperature remained above 100.4 after Tylenol. The doctor was called and the nurse documented that blood cultures were drawn | |
| 2/8/2016 | A doctor wrote an admission note to the infirmary. The doctor noted that the patient had cellulitis of the foot and had diarrhea and 10 pound weight loss. The doctor did not acknowledge what occurred at the hospital. The patient had 3+ edema of both legs. New medications included Lasix, Levaquin, nebulization treatments, Rocephin. The admitting diagnosis was heart failure but it wasn't clear what occurred at the hospital or why the patient was being treated with two different antibiotics. It may have been the foot cellulitis. but it wasn't clear. The problem list was incomplete. | 3, 11 | There was no hospital report and the doctor didn't understand what occurred at the hospital or understand the therapeutic plan. The doctor was unable, therefore, to develop a therapeutic plan. |
| 2/8/2016 | A nurse noted 2-3+ edema of the leg, blistered areas with discoloration of the right lower leg. | |
| 2/8/2016 | A doctor wrote an additional note that the patient had tachypnea, shortness of breath, and orthopnea. The doctor noted rales in the base and 3-4+ edema. The doctor assessed heart failure and UTI. The doctor ordered IV push Lasix, nebulization with albuterol, decreased salt intake, and BNP and BMP and EKG. | 8 | The doctor should have added a chest x-ray. |
| 2/8/2016 | Lasix 20 mg BID was started. | |

374

**Patient #28**

| Date | Note | Ref |
|---|---|---|
| 2/9/2016 | A doctor noted that the patient was breathing easier. The doctor noted no wheezing, a protuberant abdomen, swollen scroum and 3-4+ leg edema. The diagnoses were cellulitis of the foot, heart failure, ascites and COPD. The doctor increased Lasix and ordered BNP. | 1, 2, 8, 11, 14 |
| 2/9/2016 | A nurse wrote that the patient had 1+ edema of the hand, was incontinent of bowel, the scrotum was swollen and the abdomen was distended. COPD and heart failure were the diagnoses as documented by a nurse. | |
| 2/9/2016 | BUN 22; sodium 134 (135-145); potassium 3.2; creatinine 1.58 (0.5-1.5). | |
| 2/10/2016 | A nurse noted that the patient was forgetful and on fluid restriction. The patient refused to wear his oxygen cannula. The nurse documented that the patient had open areas on the buttock without drainage and the scrotum was swollen. Later the patient needed to be assisted to the bathroom and had a liquid BM. | |
| 2/11/2016 | A doctor saw the patient. The doctor still did not document the summary from the hospital. The doctor noted DM and cellulitis of the right leg. The doctor noted that the patient had generalized abdominal pain. The patient refused to go to the hospital. In the assessment, the doctor noted ascites with cirrhosis and a mass on the liver and cellulitis of the right leg. | The patient had altered mental status and should have been sent to a hospital as he could not be cared for at the prison and he appeared to no be competent to make his own decision. (ref: 14) |
| 2/11/2016 | BUN 34; sodium 134; CO2 19; creatinine 1.93; WBC 6; HGB 10.3; platelets 178; BNP 75 (<100). | |
| 2/13/2016 | The patient was incontinent of liquid stool. | |

Additional note (2/9/2016, ref 1,2,8,11,14): The failure to obtain records resulted in the doctor not knowing what occurred at the hospital. The patient now appeared to have anasarca probably from his cirrhosis. Diuretics were appropriate, but because the doctor didn't know the diagnosis, higher level of care-admission to a hospital, was indicated. The doctor should also have ordered stat BMP.

375

PTX193-1143

Patient #28

| | | |
|---|---|---|
| 2/14/2016 | When taking a shower, the patient was incontinent of stool, which was bloody. This was noted on three separate notes, and on one note a nurse noted that it was guaiac positive. A doctor wasn't notified. | |
| 2/15/2016 | CK MB 4 (0-3.6); A1c 7.9; HGB 8.7; WBC 5; platelets 167; BUN 43; creatinine 2.2; albumin 1.8. | |
| 2/15/2016 | A doctor saw the patient and noted that the patient had some abdominal pain and noted that the patient had blood in the stool twice the day before but no gross blood in the stool now. The doctor noted that the patient was DNR and wanted to die. The doctor noted that the patient had wheezes, abdominal tenderness and bruises on the abdominal wall, and a distended abdomen. The doctor stopped IVs, ordered a CBC, INR, BMP, and amylase. The doctor ordered a week follow up even though it appeared that the patient was acutely ill. | 14 The patient was seriously ill and should have been sent to a hospital. DNR status was not documented in any progress note. We couldn't locate the document. But this doctor did not appear to have read the recent hospital report or understand all of the patient's conditions. Under the circumstances as represented in this note the doctor should have admitted the patient. |
| 2/15/2016 | At 4:35 pm a doctor saw the patient. The patient had left pleuritic chest pain with hemoptysis but no shortness of breath or hypoxia. The patient didn't want to go to the hospital. The patient was sent to a hospital for a CT to assess for a pulmonary embolism. The oxygen saturation was 97% on room air. | |
| 2/15/2016 | Amylase 57 (25-125); BUN 38 (6-20); potassium 5.5 3.5-5.3); CO2 17; creatinine 1.99; anion gap 12 (3-11); INR 1.3; WBC 4.7; HGB 10.5; platelets 183. | |

The nurses should have consulted a physician. — 16

Patient #28

| 2/22/2016 | There were patient discharge instructions stating that the patient was hospitalized for hemoptysis, cirrhosis, chronic hepatitis C, diabetes, HTN, urinary retention, chronic indwelling Foley catheter, normochromic anemia, peripheral vascular disease, stage 2 sacral pressure ulcer, acute blood loss anemia, and liver mass. This was not a discharge summary but a summary for the patient. There was no discharge summary. | 11 | There was no hospital report, making it very difficult to manage the patient. |
| 2/22/2016 | A doctor admitted the patient to the infirmary and noted that the patient had diagnoses of liver cancer and upper GI bleed. The patient was on DNR status. The admission note had virtually no history and no physical examination. The assessment was hepatitis C, cirrhosis, and hepatic cancer. None of the patient's other problems was addressed. | 11, 10, 1, 2, 3 | The doctor failed to review the hospital note and therefore follow up was poor. The doctor did not understand all of the patient's problems and the therapeutic plan was there fore deficient. The patient had an indwelling Foley catheter and open sacral decubitus, for example, but there were no orders for this. |
| 2/22/2016 | A nurse noted that the patient had a 10 cm open area between the gluteal folds and multiple open areas on the buttock. The nurse noted that the scrotum was swollen and irritated. | | |
| 2/23/2016 | A nurse noted that the patient was back from the hospital and wrote down the hospital diagnoses, which was the first time these diagnoses were listed. They included: hemoptysis, hepatitis C, cirrhosis, hepatic cancer, diabetes, hypertension, decubitus ulcer of the foot, urinary retention, anemia, peripheral vascular disease, acute blood loss post-GI bleed, sacral pressure ulcer, hepatic cancer. The doctor ordered comfort measures. | | |
| 2/23/2016 | Inderal was started at 10 mg TID. | | |
| 2/23/2016 | BUN 16; creatinine 1.17; total protein 5.5 (6-8); albumin 2; alk phos 143; AST 59; ALT 34; WBC 4.9; HGB 9.6; platelets 56. | | |

377

PTX193-1144

3:17-cv-03112-JES-JEH   # 263-10   Page 522 of 577

PTX193-1145

Patient #28

| | | |
|---|---|---|
| 2/28/2016 | Ativan 1 mg TID was started. | 17 | The doctor was starting palliative sedation but there was no discussion with the patient documented in the record that we could find. This is inappropriate, as this action needed to be fully discussed with a cooperative patient and family if needed. |
| 2/28/2016 | Fentanyl patch was started 12 mcg per hour. | 17 | The doctor was starting palliative sedation but there was no discussion with the patient documented in the record that we could find. This is inappropriate, as this action needed to be fully discussed with a cooperative patient and family if needed. |
| 2/29/2016 | A doctor added Aldactone, and stopped HCTZ. | | |
| 3/1/2016 | Lisinopril, potassium, vitamin B12 were discontinued. | | |
| 3/3/2016 | Aspirin, furosemide, Inderal, metformin, Zofran, insulin, and Cardizem were held. | | |
| 3/7/2016 | A doctor stopped Lasix and added Ativan IM for "restlessness." | 17 | Restlessness is not an indication for Ativan. The doctor appeared to be using palliative sedation without a discussion with the patient, which has significant ethical concerns. |
| 3/8/2016 | Oxycontin 5 mg every four hours was started. | | |
| 3/9/2016 | Fentanyl patch 50 mcg patch was started to be used every third day with Ativan 1 mg every six hours. | | |
| 3/11/2016 | The patient died. | | |
| 3/16/2016 | Dr. Butler, the Medical Director, wrote a death summary stating that the patient had known hepatitis C, DM, and cellulitis. The doctor said that the patient developed hematemesis and was sent to a hospital and had liver cancer diagnosed. The doctor said the patient refused treatment and was DNR. | | |

378

PTX193-1146

Patient #28

3/18/2016     A death certificate documented that an autopsy was done and
showed hypertensive cardiovascular disease, severe stenosis
of the LAD, and thin renal cortices with pulmonary edema.
The death certificate made no mention of the patient's liver
mass or cirrhosis.

PTX193-1147

Patient #29

3/15/2013 An EKG had wandering baseline but showed NSSTT changes.

1/31/2014 The January 2014 MAR documents that the patient was on only 10 mg simvastatin; 60 units NPH am and 30 units pm with sliding scale insulin 5 mg Lisinopril, amlodipine; Xopenex, furosemide 40 BID.

3/21/2014 Urine microalbumin 256; BUN 23; creatinine 1.76; A1c 10.4; cholesterol 157; HDL 37; LDL 102.

7/22/2014 A1c 10.

11/5/2014 BUN 21; creatinine 1.64; A1c 10.4; Total cholesterol 170; HDL 39; LDL 111.

11/10/2014 An annual health visit documented BP 128/64; weight 236 with height of 5 foot 6 inches.  The only problem listed was diabetes even though the patient had high blood lipids, HTN, nephropathy, and heart failure.  The doctor noted that the patient needed to lose weight and increased insulin to 64 am 34 pm NPH.  The patient was 66 years old and was a smoker and African American.

12/3/2014 Insulin was changed to 66 u NPH am and 34 units pm.

1/13/2015 A doctor referred the patient for a sleep study.

1/14/2015 The doctor noted the patient had approval at collegial review for a sleep study.

1/15/2015 Asthma chronic clinic.  The doctor noted that the age of onset wasn't know except it was thought to be when he was an adult. The patient had a prior history of smoking.  The patient had BP 155/85; PEFRs were 350/370/300.  The patient was described wheezing at times.  The doctor took insufficient history to determine the status, but diagnosed intermittent asthma and stated, "difficult to judge SOB etiol - likely multifactorial  obesity? sleep apnea."  The patient was diagnosed with good control and the doctor said he would refer for a sleep study.  The patient did not have pulmonary function testing.

17  Minimal increase of insulin but no follow up of diabetes in significantly out of control patient.  The patient's 10-year risk of heart disease or stroke for a 66 year old African American smoker with diabetes and hypertension was 46%.  He needed a high intensity statin but was on a low intensity statin drug.

7  Given the patient's age, and long-standing hypertension, the doctor could have considered heart failure.  In any case, the patient should have had pulmonary function tests to clarify his diagnosis.

380

3:17-cv-03112-JES-JEH   # 263-10   Page 525 of 577

PTX193-1148

Patient #29

1/20/2015 Wexford approved a sleep study.

1/21/2015 BUN 21; creatinine 1.81; cholesterol 168; HDL 39; LDL 98.

1/27/2015 The sleep study result was very severe sleep disordered breathing. The recommendations were to utilize a CPAP device but to refer to ENT to reduce risk of mortality. The patient had irregularity of the pulse rate and suggested "if clinically appropriate, further cardiac evaluation is suggested."

1/28/2015 The sleep study was completed at the prison.

2/5/2015 A doctor referred the patient for a CPAP device.

6    The doctor failed to review labs which showed chronic kidney disease and cholesterol levels consistent with a 46% 10-year risk of heart disease or stroke. The doctor should have changed the statin to a high intensity statin.

2/18/2015 Wexford approved a CPAP machine.

2/20/2015 Calcium 7.9; sodium 136; potassium 4.6. No LFTs done.

2/25/2015 A CPAP unit was provided to the patient.

2/26/2015 Creatinine 1.72; cholesterol 156; HDL 35; LDL 97.

3/4/2015 HTN chronic clinic. The doctor documented that the patient just started with a CPAP machine. The BP was 145/76. The creatinine was documented as 1.72 and urinary protein was noted. The doctor noted fair control and increased lisinopril to 10 mg daily. The doctor did not mention blood lipids.

17   At this point based on recent labs, the patient had a 54% 10-year risk of heart disease and should have been on a high intensity statin. This was not done. The patient had chronic kidney disease and the doctor increased the lisinopril. Caution should have been documented and the creatinine and potassium should have been monitored more closely when starting the increased dose.

Simvastatin 20 mg is not a high intensity statin. It is not even a moderate intensity statin.

3/7/2015 Simvastatin was increased to 20 mg daily and lisinopril was increased to 10 mg daily.

Patient #29

| | | |
|---|---|---|
| 3/17/2015 | A doctor saw the patient for the annual HTN clinic. This was only two weeks after the last HTN chronic clinic visit, both of which were documented as annual visits. The doctor noted that the patient was now on CPAP. The BP was 140/68. The doctor took little history and noted that the blood pressure was in good control when it was not good control for a diabetic. The doctor noted that the patient was on 10 mg of simvastatin but made no evaluation of lipids or changed the dose to a proper dose for this patient. The creatinine was noted to be 1.72 but the patient wasn't diagnosed with nephropathy. Because of both diabetes and nephropathy the blood pressure should have been lowered to 130/80. | With diabetes, hypertension and nephropathy a blood pressure of 130/80 is typically the goal. Being on Lisinopril with nephropathy was a concern. The patient should have been on a high intensity statin. |
| | | 3, 17 |
| 4/9/2015 | Urine microalbumin 678; creatinine 1.64; A1c 10.2; cholesterol 144; HDL 34; LDL 93. | |
| 4/15/2015 | NPH increased to 68 am and 36 pm. | |
| 4/15/2015 | A doctor saw the patient for annual diabetic clinic. The doctor took no history with respect to diabetes. The BMI was 41.5. The doctor did check the box that the patient had no hypoglycemia episodes. The A1c was listed as 10.4; the creatinine was listed as 1.64 which was elevated, the urine microalbumin was 678. The lipids were listed as in good control because the LDL was <100. The doctor diagnosed poor control but added "control stable." The doctor made a minor increase to insulin to 68 NPH am and 36 pm. | The doctor did not utilize a high intensity statin. |
| | | 17 |
| 4/20/2015 | The patient complained to a nurse of shortness of breath. The nurse referred to a doctor. | |

Patient #29

4/21/2015  A doctor saw the patient for shortness of breath.  The blood pressure was 148/75.  The patient complained of three weeks of shortness of breath making him stop and rest on his way to the dining hall.  He had no chest pain and was using his CPAP regularly.  The doctor diagnosed "CHF?" and ordered only a CXR, EKG, BNP and increased Lasix to 40 BID with a follow up in two weeks.  The doctor did not order an echocardiogram.

4/22/2015  BNP 139 (<100).

4/23/2015  A chest x-ray showed mild to moderate cardiomegaly.

4/27/2015  An EKG was done.  The tracing was technically very poor and should have been repeated.  It showed NSSTT wave changes indicating possible lateral ischemia.

4/29/2015  A nurse saw the patient using a "cold" protocol.  The patient had productive cough for 10 days with some shortness of breath.  The nurse auscultated wheezing and assessed a complication of asthma and referred to a physician.

4/29/2015  A doctor saw the patient and noted that he had cough for nine days.  No additional history was taken beyond what the nurse obtained.  The doctor noted that the patient had a recent chest x-ray and noted that there was cardiomegaly.  The doctor noted that the BNP was not significantly elevated.  The doctor started Augmentin for 10 days.

5/7/2015  A doctor saw the patient in follow up and the patient was improved.  No additional steps were taken.

5/7/2015  For unclear reasons the doctor discussed a "living will" with the patient who told the doctor that his brother had power of attorney and he wished a no code status.  A DNR was filled out.

5/15/2015  Alvesco was started for asthma added to Xopenex.

7  The patient could have had angina or heart failure.  An echocardiogram should have been considered and stress testing should have been considered given the patient's risk profile and symptoms.

7  Given the patient's symptoms and chest film, a stress echocardiogram and pulmonary function testing should probably have been done as the doctor did not know the diagnosis and apparently was working on hunches.

383

PTX193-1150

PTX193-1151

Patient #29

5/15/2015 A doctor saw the patient. The BP was 153/78. The patient had shortness of breath with exertion but no chest pain. The patient was using Xopenex regularly. The patient had a history of smoking. The doctor diagnosed dyspnea due to obesity and deconditioning. The doctor ordered a BMP and added Alvesco.

7 The doctor should have ordered pulmonary function testing and echocardiogram. Stress testing should have ben considered.

5/15/2015 Creatinine 1.62.

7/6/2015 A nurse saw the patient using a "cold" protocol. The nurse documented cough and sore throat. The BP was 132/71; oxygen saturation was 96%. The nurse gave the patient cold tablets by protocol.

7/13/2015 Oral prednisone was started at a tapering schedule.

7/13/2015 A doctor saw the patient for asthma chronic clinic. The doctor noted that the patient was on Alvesco and Xopenex and described increased shortness of breath 2-3 days. The BP was 140/75. The breath sounds were decreased with wheezing. The PEFRs were 275/150/150. The doctor diagnosed moderate persistent asthma and added "deteriorating SOB but not so sure is [secondary] asthma contributory." The doctor ordered a chest x-ray and ordered a tapering prednisone dose.

7 The doctor should have ordered pulmonary function testing and echocardiogram. Stress testing should have ben considered. The doctor did not appear to know the condition of the patient.

7/20/2015 A chest x-ray showed enlarged heart and haziness in perihilar regions possibly indicative of mild heart failure.

7/22/2015 A1c 9.4.

7/23/2015 A doctor saw the patient for follow up. BP was 145/78; PEFRs were 300/285/250. The doctor had started prednisone and mentioned that "prednisone helped." The patient was "breathing heavy" and had shortness of breath. The patient said it was seasonal. The doctor ordered prednisone every other day for two weeks and increased the Alvesco dose.

1, 7 The doctor took inadequate history about the shortness of breath. He should have obtained pulmonary function testing and echocardiogram as the doctor didn't appear to understand the diagnosis of the patient. The doctor diagnosed asthma but other evidence (CXR) was consistent with heart failure. The history may have helped but was not done.

8/8/2015 Lasix increased to 60 BID; atenolol started 25 mg daily.

384

Patient #29

8/8/2015   The patient was admitted to the infirmary for shortness of breath at rest and with exertion. The doctor thought he heard an S3 heart sound and there were basilar crackles in the lungs. There was 1+ bilateral pitting edema. The doctor diagnosed heart failure and ordered Lasix increased to 60 mg BID but did not order an echocardiogram, a basic diagnostic evaluation of persons with heart failure. The BP was 136/74; pulse 90; R 20 and oxygen saturation 92%.

8/8/2015   A doctor saw the patient in diabetes clinic. The patient had used insulin for 29 years. The doctor noted retinopathy, nephropathy, and neuropathy. The BP was 136/74 and BMI 42.9. The doctor noted that the patient had a chest x-ray showing cardiomegaly. The doctor examined the feet, noted that the optometrist had seen the patient, noted an A1c of 9.4 and LDL of 93 and creatinine of 1.62 with urine protein of 678. The doctor ordered an EKG, TSH, and admitted the patient to the infirmary for heart failure and increased the Lasix to 60 BID. Remarkably, there was no history with respect to why the doctor thought the patient had acute heart failure. The doctor did not change the statin dose. The doctor noted that the patient was in poor diabetic control but made no change to therapy. The doctor documented good lipid control and fair HTN control but did not change medication.

8/10/2015   An EKG was done. The tracing was poor quality and should have been repeated. It showed NSSTT changes.

8/13/2015   Without seeing the patient on the infirmary, a doctor discharged the patient on 8/13/15. The doctor documented that the edema was decreased, ordered a BMP and told the patient to stop using Ramen noodles.

7   The patient likely had heart failure but the doctor did not order an echocardiogram a basic diagnostic test for this condition.

385

**PTX193-1153**

Patient #29

8/13/2015 An EKG was done. The tracing was very poor and none of the limb leads were present. The automated reading stated that inferior infarct could not be ruled out.

8/13/2015 BUN 25; creatinine 1.97.

8/29/2015 A doctor saw the patient. The BP was 150/64. The doctor said that the patient was doing better. The doctor assessed heart failure, stopped Norvasc and started atenolol.

7    The doctor should have referred the patient for echocardiogram.

9/26/2015 A doctor saw the patient and the BP was 138/76.. The doctor noted no chest pain. The doctor noted that the hypertension was "controlled" and that the patient had no exercise intolerance. No changes were made.

10/1/2015 BUN 21; creatinine 1.88; glucose 304.

10/14/2015 A doctor saw the patient for HTN clinic and noted that the patient also had heart failure, DM, and sleep apnea. The doctor noted that the patient had dyspnea on exertion and shortness of breath. The blood pressure was 139/72. The creatinine was 1.88; glucose 304 and cholesterol 144. The patient was listed as in good hypertension control.

7, 17    The doctor failed to order echocardiogram, pulmonary function tests and stress testing. The doctor did not start a high intensity statin.

11/25/2015 A doctor saw the patient. The BP was 152/89. PEFRs were 200/175/150. Oxygen saturation was 94%. The patient had shortness of breath and DOE. The patient wanted to change back to Norvasc. The patient's DNR status was changed at his desire to attempt resuscitation. The doctor stopped atenolol and restarted Norvasc at 5 mg a day.

7    The doctor should have ordered echocardiogram and PFT and stress testing.

11/25/2015 A1c 8.4.

12/29/2015 A doctor saw the patient for diabetes chronic clinic annual. There was virtually no history except to check a few of the formatted boxes. The blood pressure was 136/76. The A1c was listed as 8.4. The diabetes was documented as fair control; lipids in good control and BP in good control. There was no change in therapy.

17    The doctor should have started high intensity statin.

PTX193-1154

Patient #29

1/15/2016  Lisinopril was changed to 20 mg daily.

1/15/2016  A doctor saw the patient in asthma chronic clinic.  The doctor noted daytime symptoms but no night time symptoms.  The blood pressure was 138/78.  PEFRs were 225/225/230.  The patient had bilateral ronchi.  The doctor diagnosed moderate persistent asthma.

1/28/2016  A doctor saw the patient for chest pain which occurred at night when he was lying in bed.  The blood pressure was 169/94 with pulse 100.  The chest pain was described as right sided without radiation, not pleuritis, without shortness of breath, and without prior similar episodes.  The patient had previously told a nurse that exertion relieved the pain.  The doctor noted a prior family history of CAD.  The patient had 1+ edema.  The doctor documented review of an EKG and noted "no acute changes."  Remarkably, the doctor told the patient that, "He will need a treadmill when discharged."  Yet the doctor did not discuss getting a treadmill currently for the patient's acute symptoms.  If the doctor thought that the patient needed a treadmill he should have ordered it.  The doctor increased the Norvasc to 10 mg and recommended decreasing salt.

7, 14  The patient was very high risk for heart disease and had a questionable history of angina.  The doctor should have ordered stress testing and echocardiogram.  He was 66 years old, smoker, diabetic, with hypertension and abnormal lipids.  This panel of conditions is very high risk for heart disease.  The EKG supported ischemia sufficient to warrant evaluation.  The doctor should have considered sending the patient to a hospital for evaluation.  To tell the patient to get a treadmill test on discharge was indifferent.

1/28/2016  An EKG on this date was a poor tracing and should have been repeated.  It showed NSSTT changes but the limb leads were technically poorly traced and unreadable and this study should have been repeated.  V1 and V2 showed ST elevation on one portion.  This should have been repeated but should otherwise have been considered consistent with possible ischemia.

PTX193-1155

Patient #29

3/6/2016 At 3:10 am a nurse saw the patient for "sudden" shortness of breath. The patient had 2+ edema. The nurse did not take BP but the pulse was 107 and the pulse oximeter reading was 85%. The nurse called a doctor. Oxygen was started. The doctor ordered IM Lasix by phone. The oxygen saturation decreased to the 60s and the doctor ordered the nurse to send the patient to a hospital. The ambulance arrived at 3:40 am. As ambulance personnel were transferring the patient he experienced cardiac arrest and CPR was initiated but the patient was pronounced dead at the hospital.

3/7/2016 A Wexford death summary documented a brief death summary without any critical evaluation. The doctor noted that "The last time I saw the patient 12/28/15 and his ECG was normal." No problems were identified.

It was not accurate that the EKG was normal. The tracing was poor but showed STT wave changes that could be interpreted as acute ischemia.

3/24/2016 A coroner concluded that the patient died from coronary atherosclerosis contributed to by hypertensive cardiovascular disease and diabetes mellitus. There was "marked" edema in the lungs. Cross sections of coronary arteries showed 75-100% stenosis of the RCA with mid segment plaque and focal acute rupture and hemorrhage. The "left sided coronary arteries show between 75-85% stenosis with atherosclerotic plaque." Cardiomegaly with hypertrophy were diagnosed and sclerosis of the kidneys consistent with hypertensive cardiovascular disease. Pulmonary edema was noted.

388

Patient #30

7/10/2012 The problem list was updated indicating seizure with VP shunt; DVT, CVA.

10/15/2012 An annual physical documented that the patient had DVT, hemiparesis, seizure disorder, and hydrocephalus with VP shunt in 1993. It didn't document why the patient had a VP shunt or hemiparesis. The patient was documented as DNR.

9/25/2014 The patient was evaluated for seizure and general medicine clinics at Menard. The doctor documented two seizures and documented that the INR was 1.8. There was virtually no history. The doctor listed hyperthyroidism and DVT as problems. The TSH was listed as 2.16. There was no change to medication.

1, 3, 17  There was no history so it couldn't be determined what was wrong with the patient. The patient had history of DVT but the INR was subtherapeutic, yet the doctor made no attempt to modify medication. The patient had two seizures which is not good control, yet the doctor did not modify medication. The patient was on both aspirin and coumadin yet had repeated seizures. There was no documented clinical reason for being on aspirin. It placed the patient at significant risk, especially since he had a VP shunt.

10/22/2014 An annual physical exam listed seizures, history of DVT on anticoagulation, and VP shunt for unspecified reasons.

11/30/2014 A NP saw the patient for general medicine chronic clinic. There was no history, no physical examination, and the only relevant data was documentation of a TSH of 2.16.

1, 2, 3, 17  There was no history or examination and therefore the anticoagulation, VP shunt, and prior CVA were inadequately addressed and therefore, the therapeutic plan was inadequate. The NP failed to address why the patient was on aspirin *and* coumadin. There was no clinical indication for both drugs. It placed the patient at risk.

PTX193-1156

Patient #30

1/8/2015 CT scan showed left sided VP shunt with no evidence of ventricular dilation
and no cerebral edema.

1/8/2015 The patient was sent to Chester Memorial Hospital for a seizure.  The hospital
noted that he had a VP shunt and was on multiple seizure medications and had
uncontrolled seizures.  A CT scan did not reveal unusual problems.  Laboratory
studies were "unremarkable."  The patient did have a hemoglobin of 9.  He was
admitted for observation and discharged on 1/9/15.

1/8/2015 A nurse noted that the patient had seizure.  The patient was sent to Chester
hospital from Menard.

1/15/2015 Hemoglobin 9; MCV 70.7 (80-99); platelets 321; Keppra 26 (12-46).

1/15/2015 A nurse noted that the patient had repetitive seizures, apparently witnessed,
called a doctor.  The doctor ordered Ativan, Tegretol, Keppra, and
phenobarbital levels in the morning and send-out to Chester hospital.  The
nurse noted that the patient had a subclavian port-a-cath but it wasn't clearly
stated why the patient had the central line catheter.  There was no mention of
this in progress notes.

1/16/2015 Carbamazepine 8.6 (4-12); phenobarbital 18.4 (15-40); phenytoin <2.5 (10-20).

Patient #30

| | | |
|---|---|---|
| 1/16/2015 | The inmate told a nurse he had a seizure. A doctor saw the patient later and there was no history and the only examination was "neuro intact." No action was taken. | 1, 2, 12, 17 | The history and physical examination were inadequate. The patient had repetitive seizures and had a VP shunt. The patient should have been referred to a neurologist because the facility physician was unable to get the seizures under control and the patient had a complicated case, having a VP shunt. The patient had a microcytic anemia yet the doctor took no history of whether there was blood loss and did not initiate a work up for this. The doctor should have noted why the aspirin was indicated, as in combination with coumadin placed the patient at significant risk with respect to his seizures. |

1/18/2015 The patient had an unwitnessed seizure and was admitted to the infirmary for observation.

| | | |
|---|---|---|
| 1/19/2015 | A doctor wrote an admission note but took no history. The only neurological exam was "neuro intact." No new actions taken. The same day the doctor discharged the patient without follow up. Later on the same day a doctor noted microcytic hypochromic anemia and the only plan was to order iron and stool for fecal occult blood x 3. | 1, 2, 6, 8, 17 | The doctor took no history and the examination was inadequate. The doctor should have ordered iron laboratory studies but did not. Obtaining fecal occult blood tests was appropriate and starting iron was reasonable. But the doctor needed further work up for the anemia. The doctor also failed to assess prior therapeutic drug levels. The doctor also failed to indicate why the patient was on both aspirin and coumadin. Since the patient had seizures, this placed him at significant risk. |

PTX193-1158

Patient #30

1/22/2015 INR 3; carbamazepine 8.7 (4-12); Keppra 24 (12-46).

2/2/2015 A doctor noted that the patient had no seizures. Aside from stating no seizures there was no history and no physical examination. The doctor ordered an INR. The doctor made a comment that seizure med levels were "OK."

1, 2, 3, 6 The doctor took no history and performed no examination. The doctor made no assessments or plan. The doctor noted that the seizure medication levels were OK. Recent labs from 1/22/15 were normal but labs from 1/16/15 showed a subtherapeutic dilantin level which was unnoticed.

2/21/2015 A doctor saw the patient for seizure disorder. The doctor noted that the patient had >6 seizures since the previous clinic and noted normal drug levels. There was virtually no history. The doctor diagnosed the patient as having "stable" disease. Despite normal drug levels and multiple breakthrough seizures, a prior history of significant brain injury and a VP shunt, the patient was not referred to a neurologist. There was no change in therapy despite the breakthrough seizures.

1, 7, 17 The doctor took inadequate history. Since the patient had a complicated seizure problem and the facility doctor (who was a surgeon) couldn't control the inmate's seizures, the doctor should have referred to a neurologist. The doctor should have noted why the aspirin was indicated as in combination with coumadin placed the patient at significant risk with respect to his seizures.

3/22/2015 A nurse documented that the patient had a seizure. The nurse took an order from the doctor to leave the inmate in his cell.

3/23/2015 INR 2.8.

4/24/2015 INR 2.3; hemoglobin 12.9; MCV 83; MCH 25.8 (26-35); MCHC 31 (32-37).

T

PTX193-1159

Patient #30

6/7/2015 The patient was evaluated apparently in general medicine clinic. There was no history, no examination, and the only documentation was that the TSH was 3.29. The patient was listed as stable and in good control but his condition was not documented, although presumably he was being seen for hypothyroidism. — 1, 2, 3, 17 — There was no history, physical examination or assessment of the patient's multiple problems including epilepsy, VP shunt or anticoagulation. The patient still had anemia which had not been worked up appropriately. The doctor should have noted why the aspirin was indicated as in combination with coumadin placed the patient at significant risk with respect to his seizures.

6/17/2015 INR 2.3.

7/7/2015 INR 2.2; phenobarbital 19.6 (15-40); Keppra 27 (12-46).

7/17/2015 A nurse saw the patient for a seizure. The nurse tried to call a doctor 3xs but was unsuccessful and admitted the patient to the infirmary.

7/18/2015 The doctor noted that the patient's last seizure was four months ago. The doctor did not order therapeutic drug levels. A doctor wrote that the patient could return to the housing unit. The doctor didn't take an adequate history and there was no change of plan. — 1, 8, 17 — The doctor took inadequate history and should have ordered therapeutic drug levels. The doctor should have noted why the aspirin was indicated as in combination with coumadin placed the patient at significant risk with respect to his seizures.

7/23/2015 Hemoglobin 14 (13.2-18); MCHC 31.8 (32-37).

8/5/2015 INR 2.9.

393

PTX193-1160

Patient #30

| | | |
|---|---|---|
| 9/8/2015 | A NP saw the patient for seizure chronic clinic. The last documented seizure was two months ago. The patient was documented as having no signs of bleeding and was documented as on coumadin. The Keppra and phenobarbital levels were documented. The only medications documented were Keppra and Tegretol. The patient was on aspirin and coumadin which in combination, particularly because of the seizures, was potentially dangerous. The INR wasn't mentioned. There was insufficient information in this note to give a sense of the current management or the future therapeutic plan for the patient. | 6, 17 | The NP failed to check the INR and did not note that the patient was on both coumadin and aspirin which, given his seizure disorder, placed the patient at risk. |
| 9/10/2015 | INR 3.3. | | |
| 10/1/2015 | INR 1.5. | | |
| 10/1/2015 | A nurse documented that the patient had dizziness, blurred vision and lethargy. The nurse noted that the patient still had a subclavian catheter and that it was accessed for a blood draw. | | |
| 10/17/2015 | A nurse noted that an officer witnessed the patient having a seizure. The nurse called a doctor who ordered drug levels in the morning. The nurse documented that cellies and officers witnessed the event. | 15 | The doctor failed to see the patient or follow up after a seizure. |
| 10/19/2015 | A nurse noted that the subclavian catheter flushed but could not be aspirated. The next day the nurse was able to obtain blood from the port. | | |
| 10/20/2015 | INR 3.9; carbamazepine 10.4 (4-12); Keppra 25 (12-46). | | The medication renewal process didn't work and the patient's medication stopped in mid December and wasn't started again until 1/8/17, about 3-4 weeks later. |

394

PTX193-1161

PTX193-1162

Patient #30

| 10/22/2015 | Dr. Trost saw the patient and noted that the INR was 3.9. There was no history, no examination, and no assessment. The coumadin was held for seven days and then resumed at 4 mg daily. | 17 | The doctor did not indicate why the patient was receiving aspirin. The doctor should have noted why the aspirin was indicated, as in combination with coumadin, placed the patient at significant risk with respect to his seizures. |
| 10/25/2015 | The NP noted a supratherapeutic INR but did not adjust medication and did not note that the patient was on both coumadin and aspirin which, given his seizure disorder, placed the patient at risk. The history was inadequate for seizure disorder and anticoagulation and the NP asked no questions about the VP shunt. | 1, 17 | The NP noted a supratherapeutic INR but did not adjust medication and did not note that the patient was on both coumadin and aspirin which, given his seizure disorder, placed the patient at risk. The history was inadequate for seizure disorder and anticoagulation and the NP asked no questions about the VP shunt. |
| 10/30/2015 | A nurse noted that the patient had a reported seizure and was brought to the health unit in a wheelchair. The patient had headache. The nurse called Dr. Trost, who sent the patient back to his cell with follow up as needed with nurses. | 15 | The doctor should have seen the patient and should have ordered follow up as a seizure is a significant event. |
| 11/3/2015 | A nurse noted that the patient had seizure. Dr. Trost gave a phone order for the patient to return to his cell. | 15 | This was indifferent. The doctor should have evaluated the patient. |
| 11/20/2015 | INR 2.4. | | |
| 11/22/2015 | A nurse saw the patient for an unwitnessed seizure. The nurse documented calling a doctor but did not document what the doctor ordered. The patient was sent back to his cell. Later that day a doctor saw the patient. The doctor documented an episode of convulsion for four minutes. The doctor documented no abnormalities on exam and sent the patient back to his cell. | | |
| 11/29/2015 | A nurse saw the patient for a seizure. The patient was returned to his cell. | | |
| 12/14/2015 | INR 2. | | |

Patient #30

12/17/2015 The patient transferred to Hill from Menard. The transfer summary documented seizures and VP shunt as problems. The reason for either of these was not mentioned.

12/17/2015 Shortly after the patient transferred to Hill he had a seizure. A nurse witnessed the seizure for an hour. The nurse called Dr. Sood, and Ativan was repeatedly given. Dr. Sood wrote an order to give Ativan 2 mg IM stat for "continuous seizure activity" the "send out if unresponsive to therapy and continuous seizures." After multiple injections of Ativan the patient was sent to a hospital. The patient went to Cottage ER. From the local hospital the patient was transferred to OSF St. Francis Hospital in Peoria.

12/22/2015 The patient returned to the Hill facility and a doctor saw the patient. The doctor did not document what occurred at the hospital. The doctor reviewed the patient instructions. The doctor noted that the patient had history of ataxia [presumably from the hospital] but documented no ataxia. The doctor initiated the patient's seizure meds (Depakote and phenobarbital) and apparently sent back to his cell.

12/22/2015 At 6:29 pm a nurse documented that the inmate's cell mate noted that the inmate was having a seizure. Dr. Sood ordered IM Ativan 2 mg. The nurse noted two further seizures, after which Dr. Sood ordered IM Ativan. After the fourth seizure the patient was sent to a hospital.

12/22/2015 At 10:56 pm a nurse documented that the hospital stated that the inmate was having non-epileptic convulsions, was not having seizures and would return to Hill.

12/22/2015 The patient was admitted to a local hospital and transferred to a regional hospital in Peoria. He transferred from the local hospital intubated but was extubated the same day. He had EEG leads in the ICU and while having "seizures" there was no EEG activity and ultimately was determined to have pseudoseizure activity. The INR was 2. The hospital noted that at the local hospital a CT scan showed no acute bleed.

11    The lack of review of reports is a serious problem. The physician did not know what occurred at the hospital or the basis of the therapeutic plan.

PTX193-1164

Patient #30

12/23/2015 A nurse noted drawing blood from the central IV port which was in for the past year without clear indication.

12/23/2015 The patient was admitted to the infirmary post hospitalization. The reason for admission was frequent seizures and ataxia. The nurse documented that the patient had ataxic gait.

12/23/2015 An NP performed an infirmary admission note. The NP documented that the patient fell twice on the infirmary on 12/23/15 due to ataxic gait. The NP noted that the left pupil was larger that the right and that the patient had delayed speech and repeated himself. The NP did not examine for ataxia. The NP noted that the patient had a VP shunt and that the epilepsy was not well controlled and that the patient had ataxia with falls. The NP ordered to have the mattress placed on the floor, neuro checks every shift, and for Dr. Sood to evaluate the patient.

2, 14, 17 The patient was said to have ataxia but there was no examination for this. Ataxia and unequal pupils in a person with VP shunt requires immediate hospitalization for brain imaging. To merely place a mattress on the floor was grossly and flagrantly unacceptable care. Also the staff did not assess why the patient was on aspirin as the combination of aspirin and coumadin placed the patient at risk of significant harm.

12/23/2015 At 4:30 pm a nurse documented that the patient was incontinent of urine. The nurse documented that the hospital would fax the neurology report and discharge note.

16

12/23/2015 At 7:30 am a nurse documented that the patient fell twice. The nurse noted that the patient's Lt pupil was larger than the right. On a later note at 3:00 pm, a nurse documented that the patient fell twice today.

16 These were all red-flag type symptoms and signs and the patient should have been referred to a physician immediately. Care was grossly and flagrantly unacceptable.

12/24/2015 INR 3.1.

12/24/2015 At 6:20 pm the patient rang the emergency call light. When the nurse arrived the patient was off the floor mattress and was incontinent of urine. The nurse presumed that the patient had a seizure. The nurse apparently called a doctor but there were no orders documented.

Patient #30

| | | |
|---|---|---|
| 12/24/2015 | Dr. Sood saw the patient on rounds and noted that the staff said the patient had incontinence of urine. The doctor documented good eye contact, that the patient was sitting on the mattress. The doctor did not perform an adequate neurological examination. The assessment was intractable seizures. The doctor did not assess why the patient had incontinence. The doctor did not assess the unequal pupils or ataxia. The patient was to continue the same management. | 1, 2, 4, 17 | The doctor's history failed to determine why the patient was incontinent or whether he had a seizure. There was inadequate neurological examination. The doctor did not assess the pupils; apparently the patient still had unequal pupils. The doctor did not assess the ataxia. The doctor had no plan for the incontinence, ataxia, unequal pupils, or abnormal behavior. The doctor did not assess why the patient was on both aspirin and coumadin. Care was grossly and flagrantly unacceptable. |

398

PTX193-1165

PTX193-1166

Patient #30

| | | |
|---|---|---|
| 12/24/2015 | A nurse documented that the inmate was attempting to stand but needed assistance. The nurse described the inmate as able to swallow water and making intermittent eye contact but was not otherwise interacting in conversation and was uncooperative with the neuro examination. No action was taken. On a later note at 4:00 pm, a nurse documented that the patient was attempting to sit up without assistance. His pulse was 122. The patient was not responsive to commands but was responsive to painful stimuli. The nurse documented unequal pupils. The patient was staring out without being responsive. The nurse applied oxygen but it wasn't sure there was an order for this. The nurse noted that the patient had urinated on the bedsheets. Three people were required to assist the patient in getting up. The nurse applied diapers. The nurse documented that the patient had a seizure but it appeared that the patient was continuously disorganized, lethargic, and confused. The nurse didn't document consulting a doctor. Later at 5:00 pm, the patient's cellie called the nurse back to the room because the inmate was trying to get up again. This was not normal behavior and should have been immediately evaluated. The patient should have been sent to a hospital. The nurse diagnosed post-ictal status. But the behavior had been ongoing for two hours. The nurse documented that the patient was still not responding to commands and since he wasn't drinking water, she held his oral medication. At 7:00 pm, the patient was in a reclining chair and earlier had drinking some water but the nurse noted that he hadn't eaten. At 8:00 pm, the patient took his meds with some pudding. At midnight with assistance of two inmates the patient was placed on the floor and was noted to be incontinent. | 16 | Nursing assessments without referral were grossly and flagrantly unacceptable. The patient should have had a better history, a thorough examination, and should have been sent to a hospital. The nurse needed to consult a physician. |

399

Patient #30

| Date | Description | Ref |
|---|---|---|
| 12/25/2015 | The patient wasn't responsive, barely moving legs and opening his eyes just a slit. He wasn't answering questions. The nurse noted that the left pupil was larger than the right. The assessment was post ictal. At 9:30 am the patient was incontinent. The patient needed assistance to get off the mattress and was unable to drink with a straw. Later a nurse reported to Dr. Sood and was instructed to continue to observe the patient. At 4:15 pm a nurse noted that the inmate responded to tissue being moved across his eyes. The nurse documented that Dr. Sood was made aware of the patient's condition. Later at 8:30 pm the patient was incontinent. | 14, 15 | The patient showed several red-flag signs of significant life-threatening illness including unequal pupil, altered mental status, and lack of responsiveness. The doctor should have sent the patient immediately to a hospital and immediately evaluate the patient. |
| 12/26/2015 | At midnight the patient was still unresponsive and was incontinent. The nurse described the patient as "post-ictal like state." The patient was not drinking. By 8:00 pm the patient was responding verbally to questions and his speech was sluggish but intelligible. The patient ate some food. Nurses continued to document unequal pupils. | 16 | The patient had red-flag signs of significant life-threatening illness. The nurse should have consulted a physician. |
| 12/27/2015 | At 3:00 am the inmate was trying to get up out of bed but was unsteady. He was incontinent of urine. At 5:20 am the inmate was found on the floor and placed back in bed. At 6:00 am the patient was found with his chair on top of him. The patient was now eating. At 4:30 pm a nurse documented that there was bruising on both elbows and the left elbow with a 3 by 3 cm purple area that was pliable. Since the patient was on coumadin the patient should have been promptly evaluated for bleeding problems and there was concern for a CNS bleed. A stat INR should have been obtained. At 8:00 pm a nurse noted that the patient ate 100% of his dinner. | 16 | |
| 12/28/2015 | A nurse noted that the patient was incontinent and the bedding was saturated with urine. At 7:15 am the patient was noted to be responding to commands but slow to follow orders. | 16 | The patient had red-flag signs of significant life-threatening illness. The nurse should have consulted a physician. |

400

PTX193-1167

Patient #30

| | | |
|---|---|---|
| 12/28/2015 | Dr Sood saw the patient. The only history was that the patient was responding to commands. Dr. Sood noted that the patient was sitting on the floor and that according to staff he had eaten yesterday and took all of his medication. The doctor didn't assess for ataxia, didn't assess the unequal pupils, and performed no neurological examination. The doctor assessed seizure recurrence. There was no plan. | 1, 2, 8, 14, 17 | The doctor failed to take an adequate history. The doctor failed to note bruising identified by nurses earlier. The doctor failed to document a neurologic examination despite being called several times for altered mental status. The doctor failed to assess why the patient was on aspirin and coumadin or check an INR despite bruising. Altered mental status and bruising in someone with a VP shunt and on Coumadin and aspirin should have resulted in hospitalization for immediate brain imaging. The lack of history and examination was indifferent and grossly and flagrantly unacceptable care. The doctor did not address why the patient was on aspirin despite the bruising. |
| 12/28/2015 | A nurse noted that the patient had constipation. The patient was still incontinent of urine. | | |
| 12/29/2015 | Dr. Sood saw the patient. The doctor noted that the patient was sleeping on the mattress. Dr. Sood noted that the patient's bloody elbows were resolving with decreased swelling. The doctor changed the patient's status to chronic. The doctor had yet to examine the patient's eyes, perform a neurologic examination, or evaluate the patient for problems with anticoagulation in light of the patients severe altered mental status and recent bruising. The doctor made no changes except to lower the acuity status of the patient. | 1, 2, 8, 14, 17 | The doctor again failed to take adequate history or try to discover how the patient developed bloody elbows. The doctor failed to adequately examine the patient or order an INR to assess anticoagulation despite the patient having a bruising problem. The doctor failed to ask why the patient was on aspirin and coumadin. There was no clinical indication for the aspirin. The patient should have been sent to a hospital. |

PTX193-1168

PTX193-1169

Patient #30

| | | |
|---|---|---|
| 12/29/2015 | A nurse noted that the patient was climbing up and down out of the reclining chair. He ate some food. He was answering yes and no questions. At 11:00 pm the patient was incontinent of stool and was again unresponsive to verbal stimuli. | |
| 12/30/2015 | Carbamazepine 4.8 (4-12); phenobarbital 34.7 (15-40); valproic acid 38.1 (50-100). | |
| 12/30/2015 | The patient was incontinent of stool at 6:45 am. At 3:30 pm a nurse noted that the patient had bruising on his right arm and was on blood thinners. No action was taken. | 16 | The patient had red-flag signs of significant life-threatening illness. The nurse should have consulted a physician. |
| 12/31/2015 | The patient was still incontinent. At 2:00 pm a nurse noted bruising on both elbows and to bilateral knees, and lower back. There was no evaluation for supratherapeutic INR or excess anticoagulation. The inmate did ask to use the commode but did not have a bowel movement. | 16 | The patient had red-flag signs of significant life-threatening illness. The nurse should have consulted a physician. |
| 1/1/2016 | The patient was incontinent of urine. At 8:30 pm a nurse noted that he was sometimes responsive and sometimes unresponsive. The nurse noted persistent bruising on various areas of the body including the elbows. | 16 | The patient had red-flag signs of significant life-threatening illness. The nurse should have consulted a physician. |
| 1/1/2016 | Notably the patient was on 4 mg of coumadin and 81 mg of aspirin throughout his stay at Menard and Hill without any indication of why he needed aspirin or why he was on coumadin when he had an IVC filter. The IVC filter was apparently not known to staff. | 16 | The patient had red-flag signs of significant life-threatening illness. The nurse should have consulted a physician. |
| 1/2/2016 | The patient knew that he was in prison. The nurse noted large ecchymoses on his arms and thighs. Yet there was no evaluation of INR level. | 16 | The patient had red-flag signs of significant life-threatening illness. The nurse should have consulted a physician. |
| 1/3/2016 | At 4:30 am the nurse responded to an emergency call light and the patient was standing naked in the middle of the cell saying he had to go to the bathroom. The nurse assisted him to the toilet with a gait belt. At 5:30 am the nurse responded to the call light and the inmate was sitting on the floor saying he was hungry. | 16 | The patient appeared to manifest altered mental status and the nurse should have consulted a physician. |

Patient #30

| | | |
|---|---|---|
| 1/4/2016 | At 6:05 am a nurse noted that the patient was sitting naked in the chair with his diaper on the floor. There was urine on the floor. The nurse noted that the inmate was confused as to the source of the liquid. | 16 | The patient had red-flag signs of significant life-threatening illness. The nurse should have consulted a physician. |
| 1/4/2016 | Dr Sood saw the patient. He noted that the inmate was sitting in the chair. Dr. Sood noted that the patient made "good eye contact" but didn't evaluate the pupils which were described previously as unequal. Dr. Sood noted that the patient was responding to commands. He performed no neurological examination except to note that the patient was responding to commands. He did note examine the bruises or initiate evaluation for excessive anticoagulation or evaluate the obvious altered mental status of this patient. No labs or diagnostic tests were ordered. | 2, 8, 14, 17 | The doctor's physical examination was inadequate and he failed to note obvious abnormalities identified by nurses, especially the bruising and altered mental status. An INR should have been immediately done. The doctor should have identified why the patient was on aspirin and coumadin; the bruising was life-threatening and unrecognized by the doctor. The patient should have been sent to a hospital. Care was grossly and flagrantly unacceptable. |
| 1/4/2016 | At 1:30 pm the patient was incontinent of stool. The patient was walked in the hall and had unsteady gait. At 6:40 pm a nurse saw the patient standing in his cell door with blood on his nose and in front of his gown. The inmate didn't know what happened but blood was on the wall and beside the toilet at head height. The inmate had a 2.5 cm laceration to the bridge of his nose. The INR wasn't checked. Dr. Sood was notified that it was hard to get the bleeding stopped. He did not order an INR. Later a nurse noted that the pupils were still unequal. The nurse noted bruising to the right buttock about 8 cm in diameter, on the lower back and noted "assorted bruising in various stages of healing to bilateral arms and legs." The nurse also noted unequal hand grips. | 14 | The patient had significant bruising and difficulty to control bleeding with altered mental status and the doctor should have immediately transferred the patient to a hospital. Care was grossly and flagrantly unacceptable. |

403

PTX193-1170

PTX193-1171

Patient #30

| | |
|---|---|
| 1/5/2016 At 6:50 am a nurse documented giving a report to the MD nurse regarding seepage of blood from the wound and red-tinged urine and bruising to back. Dr Sood saw the patient at 8:00 am. The only history was that he was seeing the patient because a nurse documented seeing the patient bleeding. There was no other history. His examination was poor. He noted that the patient was sitting in a chair responding to commands with conversation. He noted that there was active bleeding and ecchymosis on the buttock, lower back, and bilateral arms. The doctor sutured the nasal laceration but remarkably did not check an INR level to assess for potential for bleeding. The doctor made no evaluation of the altered mental status and performed no neurological examination but did order nasal bone x-rays. | 1, 2, 8, 14, 17   The doctor failed to take adequate history and failed to perform an adequate examination particularly a neurological examination. The doctor failed to assess an INR despite numerous bruises and difficult to control bleeding. The patient had altered mental status and there was no evaluation. The doctor failed to assess why the patient was on aspirin and coumadin. The patient should have been sent to a hospital. Care was grossly and flagrantly unacceptable. |
| 1/5/2016 At 7:30 am a nurse noted that the patient still had unequal pupils. Notably Dr. Sood never evaluated this once. A nurse noted blood in the stool. At 7:02 pm a nurse noted moderate amount of blood in the toilet. The nurse called Dr. Sood and was awaiting a call back. | 15   A physician should have seen the patient. |
| 1/6/2016 X-ray showed no evidence of nasal fracture. | |
| 1/6/2016 A nurse showed Dr. Sood the urinal where the nurse noted "gross blood." Dr. Sood did not check the INR but ordered ciprofloxacin for five days and ordered a repeat dipstick urine. Later a nurse noted unsteady gait. | 4, 14, 17   The patient was on coumadin and aspirin and had gross blood in his urine yet the doctor treated the patient with antibiotics for a presumed urine infection without checking an INR. The doctor failed to associate the coumadin and aspirin with bloody urine. This was incompetent and grossly and flagrantly unacceptable care. The patient should have been sent to a hospital. |

1/6/2016 UA showed 3+ blood.

1/7/2016 The inmate was able to feed himself with minimal assistance and complained he had been up all night and had "a lot of migraines."

PTX193-1172

Patient #30

| | | |
|---|---|---|
| 1/7/2016 | Dr. Sood saw the patient and noted he was watching TV but took no history. It was difficult to read the note due to legibility but it did not appear that the doctor performed a neurologic examination. The assessment was pseudoseizure and DVT. Even though assessing DVT, Dr. Sood did not order an INR to evaluate for excess anticoagulation despite bruising, bleeding in his urine and in his BM. He took no action. | 1, 2, 8, 14, 17 | The doctor failed to take adequate history and failed to perform an adequate examination particularly a neurological examination. The doctor failed to assess an INR despite numerous bruises and difficult to control bleeding. The patient had altered mental status yet was not evaluated for this. The doctor failed to assess why the patient had bleeding while on coumadin and aspirin. The doctor failed to address why the patient was on aspirin. The patient should have been sent to a hospital. Care was grossly and flagrantly unacceptable. |
| 1/7/2016 | At 4:30 pm a nurse noted a moderate amount of blood in his urine. No action was taken. | 16 | The patient had red-flag signs of significant life-threatening illness. The nurse should have consulted a physician. |
| 1/8/2016 | At 9:30 am a nurse noted that the patient had bruises in both eyes. There was blood in his urine and he had bruises in various stages of healing. At 3:40 pm a nurse obtained urine for a UA and gross hematuria was observed. At 7:00 pm the patient had a BM and there was blood in the toilet. | 16 | The patient had red-flag signs of significant life-threatening illness. The nurse should have consulted a physician. |
| 1/8/2016 | At 11:50 pm a nurse noted that the inmate was standing at the door yelling "can you help me" and when asked what help he needed he said "I don't need any help." The nurse noted "some confusion." No action was taken. | 16 | The patient had red-flag signs of significant life-threatening illness. The nurse should have consulted a physician. |
| 1/8/2016 | UA showed 3+ blood. | | |

405

Patient #30

1/9/2016 At 7:15 am the inmate was making sounds but didn't understand and needed assistance with gait. There was a new purple bruise on his right hip and the top of his head had dried blood. Dr. Sood was called and said to monitor the patient. At 11:00 am Dr. Sood ordered the patient sent to a hospital in another hour if there was no change. At 2:00 pm there was no change in the patient's condition. His pupils were fixed bilaterally based on a nurse evaluation. There was no response to sternal rub. An EKG was done and an ambulance took the patient off to the hospital at 2:15 pm.

1/10/2016 The patient died.
1/10/2016 A hospital record documented that the patient arrived at the hospital unresponsive. He had an INR of 10 and the CT scan showed a massive herniation and massive right sided subdural hematoma with a 16 mm shift of the brain across midline. Pupils were fixed and dilated. At the hospital they noted that it wasn't certain why he was on anticoagulation. On examination the patient had fixed dilated pupils, a contusion and laceration on top of the head. The WBC was 17.9; hemoglobin 9.3; INR 10; potassium 3.4. The diagnosis was hypercoagulable state secondary to coumadin with large subdural hematoma with brain herniation. The patient was not recoverable under admitting conditions. A CT scan of the abdomen and pelvis showed a possible contusion/hematoma overlying the right greater trochanter without fracture. Notably the hospital noted that the patient had a right central venous line in place with an implantable port. It was not clear why the patient had this device as he was not on chemotherapy.

14, 15   The patient had further bruising, was confused, and needed assistance to walk. The doctor should have immediately sent the patient to a hospital. Care was grossly and flagrantly unacceptable.

The patient had a brain bleed due to over anticoagulation while on both coumadin and aspirin. The patient had repeated manifestations of excessive anticoagulation and repeated manifestations of altered brain function yet was not appropriately evaluated. Care was grossly and flagrantly unacceptable.

406

PTX193-1173

PTX193-1174

Patient #30

1/12/2016 Dr. Sood wrote a death summary stating that he was transferred from Menard to Hill on 12/17/15 with a history of seizure disorder secondary to a craniotomy in 1996.  The patient had multiple DVTs and PE in the past and had LV shunt placement in 1996 secondary to hydrocephalus.  The patient developed bacterial meningitis in 2001.  In 2005 the patient had an IVC placed for unclear reasons.  Dr. Sood said that the patient had a chronic left subdural hematoma in 2001.

407

PTX193-1175

Patient #31

6/24/2013 Problem list documents DM, HTN, substance abuse, umbilical hernia.

8/1/2013 The patient was transferred from NRC to Taylorville.

8/13/2013 HTN and DM clinics documented BP 135/68 with weight of 300 pounds. The patient also had diabetes and therefore the blood pressure was not at recommended goal yet the patient was listed as "in control." The patient had 1-2+ edema. The doctor noted that the patient had diabetes and added aspirin and simvastatin. The patient was also on metformin, lisinopril, and HCTZ.

11/15/2013 A nurse saw the patient at the request of the Warden who asked to evaluate a large growth on his left ear that was bleeding.

11/19/2013 A doctor noted that the patient had a left ear growth. The doctor referred the patient to an ENT consultant.

11/19/2013 A doctor referred the patient for removal of a growth.

11/30/2013 The ENT referral was denied; instead the patient was sent to plastic surgery.

1/7/2014 A nurse saw the patient. The BP was 153/79. The patient was off for a medical writ but the nurse didn't document what occurred.

1/7/2014 An ENT doctor recommended removal of the ear and cheek growths and correction of the ectropion.

1/17/2014 CMP and CBC normal.

1/31/2014 An annual examination was done. The BP was 151/81.

2/6/2014 A doctor noted that the patient was scheduled for an outpatient surgery appointment on 2/10/14.

Of note, there is not much difference in referral to a plastic surgeon vs an ENT surgeon for this condition. It merely depends on access in the community.

408

Patient #31

2/10/2014 The patient had outpatient surgery to remove the ear mass apparently. The return note did not document what occurred.

2/10/2014 A biopsy of the left ear was a basal cell carcinoma. The surgical margins were negative for tumor.

2/17/2014 A doctor saw the patient and noted that the growth had been removed. The doctor did not document what the pathological diagnosis was. A PRN follow up was ordered. The blood pressure was 144/81.

8/29/2014 CMP normal; cholesterol 171; TG 158; HDL 33; LDL 106.

9/3/2014 A progress note documented that the patient was seen in HTN and diabetic clinic but there was no note.        11        We could not locate a note.

11/18/2014 A1c 5.8.

12/9/2014 A progress note documented that the patient was seen in diabetic clinic but there was no note.        11        We could not locate a note.

2/18/2015 CMP normal; cholesterol 122; TG 121; HDL 33; LDL 65.

4/10/2015 CMP normal; cholesterol 131; TG 117; HDL 35; LDL 73.

4/29/2015 A doctor saw the patient for follow up of blood pressure. The blood pressure was 169/77 but the doctor made no changes. The doctor noted that the patient recently started Festeritic.

5/8/2015 BUN 21; glucose 126; cholesterol 127; TG 155; HDL 34; LDL 62.

5/14/2015 An annual examination was done. The BP was 156/76. The weight was 315. Aside from diabetes and HTN no other problems were mentioned. Apparently, a doctor re-did the blood pressure, which was 138/80.

5/22/2015 CMP normal; CBC normal.

409

PTX193-1176

Patient #31

5/27/2015 A doctor saw the patient. The blood pressure was 130/80. The weight was 310. The only examination was to record the blood pressure. There was no history except that the patient felt OK and had decreased caloric intake, was tolerating the ace inhibitor, had no chest pain and no dyspnea. That was the last note until the patient was diagnosed with squamous cell cancer.

6/5/2015 A discharge medical summary was written from Taylorville. There were no further notes and it wasn't clear where the patient went. It appeared that the patient was transferred to an adult transition center. The patient didn't come back to the prison until after a hospitalization where cancer was diagnosed. It is not clear what care the patient received in the adult transition center.

9/20/2016 An OSF Health care note. A CT scan was done. The history was that the patient had a right tongue mass for the past 2-3 months with right ear pain. The CT scan showed an ulcerated mass in the right anterior oral tongue measuring 4.7 cm with multiple abnormal lymph nodes and a left orbital intraconal mass between the lateral rectus muscle and the optic nerve sheath.

10/3/2016 An MRI showed an oral cavity squamous cell carcinoma on the right side of the tongue with multiple lymph nodes suspicious for metastatic adenopathy. A PET scan was recommended.

10/5/2016 A PET scan showed large malignancy of the right tongue with multiple lymph nodes. There were multiple pulmonary nodules suspicious for malignancy.

PTX193-1177

PTX193-1178

Patient #31

10/28/2016 An oncologist saw the patient and noted stage IV squamous cell cancer of the tongue. Radiation therapy was not an option. The oncologist recommended palliative chemotherapy. The patient had hyperkalemia. The patient weighed 242 pounds.

11/10/2016 A doctor admitted the patient to the infirmary for a history of oral squamous cell cancer with metastases. The doctor did not document a history of the patient's recent treatment.

11/17/2016 Glucose 167; T protein 5.7 (6-8); albumin 2.5 (3.4-5); WBC 18.6; hemoglobin 11.7 (13.2-18); platelets 561.

12/2/2016 The patient died while in hospice care at the facility.

411

3:17-cv-03112-JES-JEH   # 263-10   Page 556 of 577

PTX193-1179

Patient #32

12/6/2016  The patient was admitted to NRC. The medications on entry were not listed and there was no evidence of what the patient said he was taking. A PA did an initial physical examination and documented asthma, HTN, heart failure, COPD, diabetes, and ITP. There was no history of the ITP except that the patient had prior splenectomy. A blood glucose was 154. The patient's medication was listed as insulin NPH38 am and 20 pm with sliding scale regular insulin. Lisinopril, Coreg, Lasix, Zocor, and Flomax. Two other drugs were prescribed but the names were illegible.

12/6/2016  A transfer summary from the Lake County Jail documented that the patient was on NPH insulin, olanzapine, gabapentin, regular insulin QID, albuterol inhaler, carvedilol, ciclesonide inhaler, danacrine 600 BID, Lasix 40 Bid, ipratropium inhaler, lisinopril, tamsulosin, atorvastatin. Danocrine is danazol.

12/6/2016  BUN 23; glucose 157; creatinine 1.87 (0.5-1.5); albumin 2.9.

12/7/2016  A1c 9.4; cholesterol 136; HDL 29; LDL 96; WBC 14.6; platelets 60.

12/14/2016  Creatinine 1.36 (0.5-1.5).

12/28/2016  A nurse saw the patient for constant hip pain radiating to his back. The nurse plan was not clearly documented.

1/4/2017  The patient was transferred from NRC to Pinckneyville. It does not appear that blood tests had been done at NRC. The transfer form listed HTN, diabetes, asthma, and thrombocytopenia with prior splenectomy as problems. A blood sugar wasn't done on transfer.

1    ITP is a serious medical illness. The history of this condition was inadequate with respect to medication and current status and treatment. Old records should have been obtained.

412

PTX193-1180

Patient #32

1/6/2017 A doctor did a chart review to review medications. The doctor stopped Atrovent, danazol, ciclesonide, Zocor; increased ellipta, kept the patient on Neurontin and ordered chronic clinic as needed. The doctor also renewed insulin. Notably, it did not appear that the patient had a chronic clinic visit to date.

3    The doctor stopped a medication being used for ITP without documenting a therapeutic plan for the ITP. Old records should have been requested.

1/6/2017 Danazol was discontinued.

1/9/2017 An LPN wrote that the patient complained of not getting his medication and said that he hadn't seen a doctor yet and said that his hematologist had ordered his medication. The patient was upset that his medications were discontinued without having spoken with a doctor. The nurse noted that old records were needed. The nurse referred to a doctor.

1/17/2017 A doctor saw the patient who was concerned about not receiving Danazol, a drug he was previously prescribed. The doctor said the patient was taking this drug for low platelets in the past and that the last platelet count was 60 on 12/8/16. The doctor couldn't find a reference source that this drug was indicated for the patient's condition. The doctor documented that he would start the danazol and request old records. Danazol was started at 300mg BID for six months. This drug has an FDA box warning for thromboembolism, thrombotic, and thrombophlebitic events including life threatening or fatal strokes. The manufacturer also warns to use with caution in persons with diabetes as insulin requirements may increase. They recommend careful monitoring. Liver and renal function and hematologica and lipids are recommended to be monitored.

12    The doctor was using a medication without clear knowledge of use of the drug.  The medication had multiple side effects.  The doctor should have referred the patient promptly to a hematologist for management because the patient's condition was beyond the management ability of the physician.

413

Patient #32

1/18/2017 Danazol was re-started.

12, 17    The patient had elevated renal function in the past. Danazol is contraindicated in persons with markedly impaired renal function, so it needed to be monitored. The patient was on a fairly high dose of Danazol which had a black box warning for thromboembolism, thrombotic and thrombophlebitic events, and life-threatening or fatal strokes have been reported. The doctor should have referred the patient to a hematologist.

1/18/2017 Urine 300 mg/DL protein; microalbumin 1303 (0-30).

1/25/2017 A doctor saw the patient in hypertension chronic clinic. The blood pressure was 131/68. Renal function was not noted. The doctor stopped lisinopril, started Cozaar, and continued Pravachol, Lasix, and Coreg. The only problem noted was hypertension. There was no history related to chronic kidney disease or heart failure or the patient's other medical conditions except that dyslipidemia was noted. There was also a diabetic chronic clinic for this date. The patient was documented as having prior hyper and hypo glycemia without being more specific. The doctor noted that the patient had diabetic neuropathy but did not mention the nephropathy. The blood sugar wasn't checked and the A1c wasn't documented. The doctor continued the same diabetes medication. The doctor also saw the patient for "asthma" documenting on a separate note for this. The doctor documented daytime and nighttime symptoms. The PEFRs were 225/200/200. The doctor noted that the patient was on Xopenex and increased Ellipta.

1, 12    The doctor did not monitor all of the patient's medical conditions. The doctor should have referred the patient to a hematologist because the ITP wasn't being monitored by someone who knew how to manage this disease.

414

PTX193-1181

PTX193-1182

Patient #32

| Date | Description | Notes |
|---|---|---|
| 2/7/2017 | A doctor wrote a brief note without seeing the patient. He documented that the platelets were 50 and therefore he was going to start prednisone, which he started at 60 mg daily tapering over a month and stopping at 10 mg. | 12 | The doctor should have referred the patient to a hematologist to manage the ITP. The doctor should also have attempted to obtain old records for this patient. |
| 2/14/2017 | BUN 29; sodium 133; glucose 548; creatinine 2.05; albumin 2.7; A1c 9.4; WBC 17; platelets 10. | | |
| 2/16/2017 | A doctor documented discussing the problems with low platelets with a hematologist, who recommended giving the patient IVIG. The doctor sent the patient to a hospital in Carbondale who agreed to give the patient IVIG in the ER. The doctor referred to the ER. The patient should have been referred to a hematologist for evaluation. The doctor did not discuss the Danazol. | 6, 12 | The doctor failed to note recent extremely high blood glucose and other lab abnormalities. The doctor should have referred the patient to a hematologist instead of attempting to manage a disease he was uncertain about. |
| 2/17/2017 | The doctor documented that the patient went to the ER and that platelets were 10 and that repeat platelets were 34. The doctor noted that no treatment "per hematology." The doctor's plan was to continue present therapy and returned the patient to general population. The doctor did not document whether hematology saw the patient. | 10, 11 | Apparently, when the patient went to the ER, the ER doctor called a hematologist, but the IDOC physician failed to review what the hematologist said because there was no record. There was no follow up. |
| 2/17/2017 | The patient was seen at SIU Hospital ER. The WBC was 21, and platelets were 34 K. The albumin was 2.9; glucose 351; BUN 27; creatinine 1.5 (1.3). The ER note documented that the ER doctor consulted the hematologist who didn't see the patient. The doctor noted that the hematologist would see the patient in his office. | | |

PTX193-1183

Patient #32

| | | |
|---|---|---|
| 2/20/2017 | The doctor at Pinckneyville wrote an undated note to Steve, presumably the Wexford Regional Medical Director. The note stated that the patient had a history of thrombocytopenia "(?ITP)" and that he was transferred to Pinckneyville and was off medication for weeks which were resumed on arrival. The doctor noted that the patient was on Danazol. The doctor noted that the last platelet count was 10K and the "release date 2/20/17." The doctor asked, "What should we do?" | 12 | The doctor clearly didn't know how to manage the patient and should have referred the patient promptly to a hematologist. |

2/20/2017 WBC 17.5; platelets 60.

3/17/2017 A doctor apparently in chart review wrote "dental caries [with] thrombocytopenia." The doctor ordered a visit the following week with a blood count.

3/22/2017 Urine microalbumin 615 (0-30); BUN 22; glucose 348; creatinine 1.72 (0.5-1.5); albumin 2.3; A1c 13.9; platelets 6; WBC 11.8. The platelets of 6 were noted by the lab to be a critical level.

3/23/2017 At 8:00 am the patient told a nurse "I'm going to die." The nurse documented that the patient was brought to the health care unit for a platelet count of 6. The nurse consulted a doctor, who ordered the patient to be sent to the hospital.        6

3/23/2017 The patient was sent to Memorial Hospital in Carbondale. He was discharged from the ER on 50 mg prednisone twice a day with instructions to follow up with a hematologist with a diagnosis of chronic ITP.

3/23/2017 At noon a nurse documented that the patient just returned to the facility from a furlough and was placed on 23 hour observation. A doctor ordered prednisone 50 mg BID "x 30 tabs" with follow up in the morning with a doctor and for collegial and infirmary discharge.

**PTX193-1184**

Patient #32

3/23/2017 BUN 22; glucose 348; creatinine 1.72; calcium 8.3; albumin 2.3; T protein 5 (6-8); WBC 11.8; platelets 6.

3/24/2017 A doctor admitted the patient to the infirmary as an acute admission. The doctor noted that the platelets were recently 6 and that prednisone was started. The patient was still on 300 mg Danazol BID. The assessment was very low platelets. There was no documented plan to see a hematologist.

3/24/2017 A doctor referred the patient to a hematologist for follow up. This was a routine appointment. But the Wexford UM documented the request as urgent.

3/25/2017 Lisinopril was restarted.

3/28/2017 A clerk wrote that the patient had an appointment with a hematologist on 3/30/17.

3/30/2017 A hematologist saw the patient. The consultant wrote comments on the referral form that the patient had ITP with splenectomy and now with relapse and without active bleeding. The consultant recommended continuing prednisone 100 mg with return in two weeks with a blood count. The hematologist did not document that the patient was on Danazol.

11  There was no report so it was unclear what transpired with the hematologist.

3/30/2017 A doctor referred the patient for hematology follow up on 3/30/17 for a two week follow up.

3/31/2017 A doctor documented that a hematology consultation was approved at collegial review.

3/31/2017 A nurse wrote that the patient had a high glucose but didn't document the value.

16  The nurse should have referred the patient to a physician.

417

Patient #32

| | | |
|---|---|---|
| 4/1/2017 | A doctor saw the patient.  The note was partly illegible but appeared to state that the patient saw a hematologist without stating what occurred.  The assessment was thrombocytopenia and the plan was to continue the current plan and that the patient was waiting to see a hematologist. | 10 | The doctor did not have a report and therefore didn't appear to know what transpired at the hematologist consultation and what the therapeutic plan was. |
| 4/3/2017 | The patient had a blood sugar of "hi" and the nurse administered 15 u regular insulin apparently as sliding scale.  The patient didn't want vital signs. | 16 | The nurse should have referred the patient to a physician. |
| 4/5/2017 | A nurse documented a blood sugar of 347.  This was the first blood sugar documented on infirmary progress notes.  The nurse took no action. | | |
| 4/5/2017 | Wexford UM approved  follow up hematology. | | |
| 4/5/2017 | WBC 23.2; platelets 10. | | |
| 4/6/2017 | A nurse documented that the patient had pain in his "waist."  The nurse noted that the patient was refusing insulin because he wanted to leave the infirmary.  The nurse referred to a doctor ASAP.  A doctor didn't see the patient.  Vital signs and glucose values were not documented. | | |

418

PTX193-1185

PTX193-1186

Patient #32

4/7/2017   Pinckneyville Comm Hosp EKG showed recent anterolateral
infarct with ST elevation V4-5. This hospital found that the
patient had air fluid levels in the bowel with findings
suspicious for enterocolitis. There was no free air on plain film
but a CT scan showed free air indicating perforated viscus with
findings reflecting ischemic bowel. The creatinine was 3.52
with GFR of 17.6; BUN 93; potassium 6.1 and glucose 357.
Platelets were 29; WBC 18. The patient was transferred to
Barnes Hospital and discharged 4/13/17. The patient had
ischemic bowel with perforation. The patient was not a
surgical candidate due to comorbidities, high dose steroids
and severe malnutrition. The patient wanted to stop
treatment and was sent back to the prison.

4/7/2017   At 5:00 am a nurse documented that the patient had stomach
pain and was grimacing. The abdomen was distended. The
patient said his last bowel movement was two days ago and
that he hadn't been eating. The patient refused vital signs due
to pain. The nurse noted that the patient was to see a doctor
that day.

4/7/2017   At 8:23 am a doctor saw the patient. The doctor noted that
the patient complained of abdominal distention over the past
three days with vomiting and watery diarrhea. The patient
had shortness of breath with difficulty taking a deep breath.
The patient was only able to eat a little breakfast. The patient
had no bleeding and was unable to speak full sentences. On
examination the abdomen was markedly distended with a
fluid wave. The doctor referred the patient to a local hospital.

PTX193-1187

Patient #32

4/13/2017  At noon a nurse documented that the patient returned from the hospital and had a Texas condom catheter in place.

4/14/2017  A nurse documented that the patient was incontinent and that his clothes were changed.  The patient was incontinent three more times during the day.

4/14/2017  At 9:10 am doctor wrote a note that the patient returned from the hospital with diagnosis of perforated bowel which was ischemic. The doctor documented that the patient was without significant abdominal pain. But it wasn't clear what the patient's pain status was. The patient agreed to sign a DNR. The doctor continued insulin and ordered a tapering prednisone dose and continued the Danazol.  The patient was on plain Tylenol for pain.

4/14/2017  At 9:15 am a nurse saw the patient immediately after the doctor saw the patient and asked if he could have something for pain. The nurse gave the patient the plain Tylenol that was ordered for him.

4/15/2017  At 11:30 pm a nurse noted that the patient said, "I hurt bad." The nurse noted that she would call the doctor about the pain. The nurse then took a phone order for Tylenol #3 1-2 tablets every four hours for pain.

4/16/2017  At 8:00 am the patient complained of pain.  A nurse gave the patient Tylenol #3.

4/18/2017  Custody cancelled a medical furlough to Carbondale to apparently the hematologist because the ADA van was unavailable.  The appointment was rescheduled for 4/27/17.

4/19/2017  A nurse assisted the patient to sit up and he became unresponsive and died.

Patient #33

8/21/2015  The patient transferred from Graham to Robinson CC.  The BP was 147/81 and weight was 236.  No problems were noted except knee pains.  Despite the elevated blood pressure the patient wasn't referred.

8/27/2015  A nurse saw the patient for knee pain and blood per rectum.  The blood pressure was 143/82 but there was no referral.  The nurse on a "hemorrhoid" protocol noted that the patient had blood on toilet paper and had occasional rectal pain.  The nurse noted no protrusion of a hemorrhoid yet presumed that the patient had hemorrhoids.  The nurse referred to a physician.  Since the patient was 58, he should have had colonoscopy.

8/31/2015  A doctor saw the patient for hernia, knee pain, and hemorrhoids.  The blood pressure was 154/74.  The only history regarding hemorrhoids was that the patient complained of hemorrhoids.  The doctor noted knee pain for five years but took no other history of the knee pain.  The doctor noted crepitance.  The doctor did not perform a rectal examination or perform guaiac testing; did not order a blood count and did not refer for colorectal screening.  The doctor ordered ibuprofen and hemorrhoid pads without having taken a history or performed an examination.  The doctor didn't treat the elevated blood pressure even though the patient had elevated blood pressure at least three times.  The doctor prescribed 600 TID of ibuprofen.

1, 2, 3, 7,   The patient had elevated blood pressure that was not
8, 17          treated.  The doctor presumed that the patient had hemorrhoids for a patient complaint of blood per rectum without examination.  The doctor took inadequate history and performed inadequate physical examination.  The treatment plan failed to include treatment of blood pressure and diagnostic studies (blood count, fecal occult blood testing, colonoscopy) which were indicated for his complaint.  Use of a NSAID in someone with possible rectal bleeding without evaluating the source is inappropriate since NSAID can increase bleeding risk.  Also the patient had high blood pressure and NSAID should be used with caution in persons with hypertension.  The dose of the NSAID was also quite high.

9/1/2015  The patient was on ibuprofen 600 TID for the month.
10/1/2015  The patient was on ibuprofen 600 TID for the month.
11/1/2015  The patient was on ibuprofen 600 TID for the month.

Page 421

421

PTX193-1188

Patient #33

| | | |
|---|---|---|
| 1/28/2016 | A doctor saw the patient who was still complaining of rectal bleeding. The doctor noted that the patient had rectal bleeding for over two years. The doctor did not examine the rectum, did not order a blood count or refer the patient for colonoscopy. The blood pressure was 166/91, but the doctor did not start antihypertensive medication. The doctor noted that the patient had a torn knee cartilage and had prior surgery, and reviewed an x-ray which he documented showed osteoarthritis. | 1, 2, 3,7, 17 | The patient still had rectal bleeding but there was inadequate history, inadequate physical examination, and no diagnostic studies ordered. The doctor failed to treat hypertension. Colonoscopy should have been ordered. The patient was 58 years old with history of blood per rectum. The patient was on NSAID and had GI bleeding but the doctor failed to adjust medication or evaluate the bleeding. |
| 2/1/2016 | The patient was on ibuprofen 600 daily for a month. | | |
| 2/3/2016 | A nurse saw the patient for knee pain. The blood pressure was 167/91. The nurse gave the patient ibuprofen by protocol but did not refer the patient for hypertension. | 16 | The blood pressure was elevated but the nurse didn't consult a physician. |
| 2/5/2016 | A doctor saw the patient to renew ibuprofen. The blood pressure was 145/94. The doctor took no history and recommended reduction of salt, exercise, and weight loss but did not start blood pressure medication. The doctor also ordered ibuprofen. | 3, 17 | The doctor failed to treat the high blood pressure and ordered long-term NSAID that should be used with caution in persons with high blood pressure because long term NSAID can result in renal damage. |
| 2/22/2016 | A doctor saw the patient for a refill of ibuprofen. The blood pressure was 150/80 but the doctor did not start antihypertensive medication. The doctor did renew ibuprofen. | 3, 17 | The doctor failed to treat hypertension and failed to assess renal function when prescribing a NSAID to a person with hypertension. |
| 2/26/2016 | A doctor saw the patient for follow up of knee x-rays. The blood pressure was 155/98 but it was unrecognized and not treated. The doctor started Mobic 7.5 mg daily for six months. | 3 | The doctor failed to treat the hypertension. |
| 3/1/2016 | Ibuprofen was discontinued on 3/8/16 and Mobic 7.5 mg daily was started for six months. | | |

PTX193-1189

PTX193-1190

Patient #33

|   | |
|---|---|
| | 3/7/2016 A doctor saw the patient for follow up of a knee x-ray. The blood pressure was 155/98. The doctor noted that the x-ray showed osteoarthritis. The doctor prescribed Mobic but failed to address the high blood pressure. |
| | 3/10/2016 The patient had a periodic examination. |
| | 3/11/2016 Cholesterol 238; HDL 39; LDL 166. |

3, 17   The doctor failed to treat hypertension and continued NSAID without having evaluated the patient's history of GI bleeding.

This patient had a 10-year risk of heart disease or stroke of 23% (BP 155/98 untreated, lipids as given, age 58 in a smoker) and should have been started on a moderate to high intensity statin and aspirin. Notably, the NSAID he was using was a cardiovascular risk for serious adverse cardiovascular thrombotic events including MI and stroke.

3/16/2016 At 5:03 pm an EKG showed atrial fibrillation with rapid ventricular response (rate 142) and *marked* ST depression with subendocardial injury. The automated read which was accurate, recommended "immediate clinical assessment of this individual is strongly advised." This was signed as reviewed.

Patient #33

3/16/2016 A nurse saw the patient for chest pain at about 6:00 pm. The patient had dyspnea and nausea and increased pain with movement. The blood pressure was 200/118 and the pulse was 129. The nurse documented that the patient had chest pain since 5:50 pm but an EKG done at 5:03 pm showed marked ST depression consistent with subendocardial injury. The automated reading stated, "immediate clinical assessment of this individual is strongly recommended." The nurse called Dr. Vipin Shah who gave a phone order for Inderal 20 mg and clonidine 0.1 mg stat and recheck the blood pressure in 30 minutes and to call back if the pressure was elevated. The nurse placed the patient on the infirmary for 23 hour observation. The nurse did not discuss the EKG. A doctor signed the EKG as reviewed but the date wasn't legible.

7, 12, 14 The EKG showed evidence of acute ischemia and new onset atrial fibrillation with unstable vital signs. The patient should have immediately been transferred to a hospital. Care was grossly and flagrantly unacceptable. Failure to send the patient to a hospital, refer to a cardiologist or refer for cardiac catheterization placed the patient at risk of death. The treatment only with stat doses of clonidine and Inderal was grossly and flagrantly incompetent. This patient had atrial fibrillation with probable acute coronary syndrome and should have been anticoagulated and should have been hospitalized for testing including echocardiogram and cardiac catheterization.

3/16/2016 At 7:10 pm a nurse noted that the pulse was irregular and the blood pressure was 152/78. The nurse called the doctor, who ordered to recheck the BP every four hours. At 11:16 pm the blood pressure was 133/80 and at 3:30 am the blood pressure was 110/74.

PTX193-1191

PTX193-1192

Patient #33

| | |
|---|---|
| 3/17/2016 | At 7:30 am Dr. Shah saw the patient and noted that the patient had chest pain the prior evening. He noted that the patient had pain when he walked and that it occurred with nausea and shortness of breath. The pain was described as squeezing in the upper chest. He noted no history of heart problems and said that the patient was not on BP or cholesterol medication. He noted that the patient was a smoker. The blood pressure was 126/65. The doctor reviewed an EKG done at 6:25 am and noted RBBB. The doctor did not review the EKG from the evening before. The assessment was chest pain and the doctor started Zocor and aspirin but no antianginal drug and did not refer for cardiac catheterization. Beta-blocker was not started. The doctor did not stop the NSAID. The doctor enrolled the patient in cardiac clinic. |
| 6, 7, 14, 15 | The doctor failed to review the EKG from the previous day. The patient described symptoms of typical angina, which given the prior day's EKG, should have resulted in prompt cardiac catheterization and referral to a hospital and/or referral to a cardiologist promptly. The doctor did start a statin and aspirin but did not start anti-anginal medication. The doctor did not stop the NSAID despite the manufacturer's black box warning about cardiovascular thrombotic events resulting in possible MI or stroke. The patient had recent atrial fibrillation. Though the CHAD score was 1, the patient had recent acute coronary syndrome and should have been anticoagulated. Anticoagulation wasn't even considered. Care was grossly and flagrantly unacceptable. The doctor clearly did not know how to manage this patient's condition. The patient was placed at risk of myocardial infarction and/or stroke. |

3/17/2016 At 6:25 am an EKG showed sinus bradycardia with incomplete RBBB. There appeared to be some flattening of the ST segment of V4-6 but not specific. The rate was normal sinus rhythm. This was signed as reviewed.

3/17/2016 At 12:30 pm a nurse documented that the patient had BP of 162/87 and documented that the doctor noted the results and started lisinopril. At 2:15 pm the inmate was sent back to his housing unit from the infirmary.

Patient #33

3/24/2016 A doctor saw the patient in follow up of chest pain and requested pain medication. The doctor noted that the patient had a "code 3" on 3/16/16 but had no more chest pain. The BP was somewhat illegible but appeared to be 180/101. The doctor started Mobic, a NSAID and increased lisinopril. The patient was still not on an antianginal drug. Mobic has a black box warning for cardiac events.

17    The doctor started a NSAID (which has a black box warning regarding risk for cardiovascular thrombotic events including MI and stroke) in a patient with angina and ischemic heart disease.

3/31/2016 The HCUA received a call from the family stating that the patient was having pain when walking and because of having pain when walking was not going to the dining hall. A counselor also called and stated that the inmate couldn't walk to these and was "having heart issues." The HCUA wrote that the patient was "not in any distress but complains he is unable to walk to dietary." The HCUA placed the patient on the doctor line on 4/4/16 to evaluate cardiac related issues.

5, 16    The patient had continued chest pain sufficient that his family called. Since the complaint was serious (angina) and placed the patient at risk of death, the patient should have been referred immediately to a physician.

PTX193-1194

Case: 1:10-cv-04603 Document #: 767-7 Filed: 11/14/18 Page 427 of 431 PageID #:12625

Patient #33

| | | |
|---|---|---|
| 4/4/2016 | Vipin Shah saw the patient for baseline hypertension clinic. He documented angina but failed to include the recent history of ischemia. The blood pressure was 194/84 and 185/106. The assessment was fair stable control. This was presumably of HTN but it wasn't clear. The doctor added Norvasc. Lipids were not discussed. The doctor ordered a wheelchair for long distance (gym and chow). | 4, 7, 15, 17 | The patient had angina. The doctor did not start antianginal medication; instead offered the patient a wheelchair. Presumably, wheeling himself would likely constitute exertional strain similar to walking. The patient had angina and elevated blood pressure. The doctor started Norvasc. This drug carries a warning the increased angina or myocardial infarction have occurred with initiation of this drug in patients with obstructive coronary disease especially when beta blockers are not used. The doctor was treating the patient with potentially harmful drugs without realizing it. This was incompetent management. The patient should have had prompt catheterization. Care was grossly and flagrantly unacceptable. |
| 4/5/2016 | At 9:35 am a nurse evaluated the patient for chest pain while walking which improved while sitting then began again when he walked to the health care unit. The blood pressure was 174/82. The nurse noted a "normal" EKG. The nurse noted 1+ leg edema. The patient said his chest just hurt but there was no tightness, squeezing, pressure or shortness of breath. The nurse referred emergently to a doctor. | | |

Page 427
427

Patient #33

4/5/2016   The patient went to radiology. There were a few brief lines on the referral form. A two month follow up was recommended. A procedure was recommended in 45 days. They recommended a CMP. There was a oncology note in the record that summarized the patient care. It said that HCC was found January 11, 2016, found on ultrasound screening. A CT scan was done on 2/26/16 noting cirrhosis and 3 cm hypodense lesion in the lateral lobe; an MRI 3/23/16 showing a large infiltrative mass of the L lobe; in April 2016 the AFP was elevated; and a CT guided biopsy was done not until 5/24/16 and a PET scan was done 5/26/16. The patient wasn't seen at UIC until 8/4/16 and the patient didn't have treatment of the HCC until 9/12/16. The note documented that the CT guided biopsy results from 5/24/16 were requested multiple times but not received.

14, 17   The patient had prior acute coronary syndrome and had recurrent angina. The doctor diagnosed chest wall pain but started NTG and Norvasc. The patient should have been placed on a beta blocker. Norvasc carries a warning of myocardial infarction in patients with obstructive coronary disease. The patient was not referred to a cardiologist or for cardiac catheterization.

4/6/2016   An EKG showed normal sinus rhythm. This was signed as reviewed.

4/13/2016   Wexford denied request for wheelchair. This had been requested because of severe osteoarthritis and new cardiac diagnosis with elevated cholesterol needing the wheelchair for long distance travel.

Wheelchairs are not appropriate therapy for angina in the absence of appropriate medical therapy.

4/15/2016   An EKG showed ST depression of the lateral leads suggesting anterolateral ischemia. Clinical correlation was advised. This was signed as reviewed.

PTX193-1195

Patient #33

| | |
|---|---|
| 4/15/2016 | At 2:50 pm a nurse saw the patient for chest pain on an emergency basis. The patient had pain for about 10-20 minutes and occurred while working in the laundry. The patient had diaphoresis with the chest pain. The patient took a nitroglycerin and it helped "a lot." The pulse was 102 and BP 151/77. The nurse called Dr. Shah, who ordered 23 hour observation but no further orders were given. An EKG was done and showed "moderate ST depression rule out anterolateral ischemia." Clinical correlation was advised. The ST depression was in the anterolateral leads V3-6. The nurse didn't specifically document review of the EKG but under heart rhythm wrote "normal sinus regular." The nurse advised the patient that if he has difficulty walking to chow or working he should try to get a different assignment to avoid precipitating chest pain. |

5, 6, 14   The patient had chest pain with EKG findings of acute ischemia consistent with acute coronary syndrome. He should have been immediately referred to a hospital for cardiac catheterization. Instead the doctor only ordered 23 hour observation and the nurse advised the patient to get a different job. Care was grossly and flagrantly unacceptable. Care was also indifferent.

| | |
|---|---|
| 4/15/2016 | At 11:20 pm a nurse saw the patient on the infirmary. The blood pressure was 154/82. |
| 4/16/2016 | At 8:00 am the patient said he had no pain and was ready to leave. The blood pressure was 157/82. The nurse contacted a doctor who discharged the patient without seeing him. |

9   The patient had unrecognized acute coronary syndrome and without a doctor evaluating the patient, the doctor discharged the patient from the infirmary.

| | |
|---|---|
| 4/19/2016 | A doctor referred the patient for a *routine* stress test because of frequent chest pain and shortness of breath. The doctor wrote that the patient had a history of heart disease and a new diagnosis of high blood cholesterol. The doctor also noted that the EKG was normal, which it was not. |

Patient #33

4/19/2016  A doctor saw the patient for follow up of the code 3. The doctor noted that the patient had chest pain 2-3 times a day and was using the nitroglycerin. The pain was substernal with diaphoresis. The blood pressure was 143/70. The doctor documented that the 4/15/16 EKG was normal. The doctor referred the patient to cardiology for a stress test. The doctor did not address the elevated blood pressure.

4/25/2016  The doctor documented that the patient was approved in collegial for a cardiology appointment.

5/24/2016  A cardiologist saw the patient and recommended adding Imdur and to arrange for a cardiac catheterization at Carlisle Hospital in Urbana.

5/24/2016  A cardiologist saw the patient.  His report documents the progressive angina.  His report also reviewed EKGs showing atrial fibrillation with ST segment depression on 3/16/16; the EKG of 4/15/16 showing ST segment depression in V3-6.  The consultant assessed worsening chest pain suggestive of progressive angina and recommended adding Imdur and a cardiac catheter "in the near future."

5/31/2016  A doctor (Vipin Shah) referred the patient for cardiac catheterization on an urgent basis.

5/31/2016  A doctor saw the patient post cardiology visit and noted that the cardiologist wanted to do "some tests." The assessment was "cardiac." The plan was illegible as was much of the note.

6/1/2016  Wexford approved cardiac catheterization.

6/7/2016  The doctor noted that the cardiac catheterization was approved in collegial the day before.

4  The patient had two episodes of acute coronary syndrome, one with atrial fibrillation, yet the doctor referred the patient for a routine stress test.  The patient should have been referred promptly for cardiac catheterization, as the patient still had ongoing chest pain. Beta blockers were not prescribed.  The treatment plan was not competently carried out.

Patient #33

6/10/2016  An EKG showed atrial fibrillation with incomplete RBBB. Although the automated reading did not indicated it, there appeared to be ST depression in several lateral leads.

6/10/2016  At 1:30 pm a nurse evaluated the patient for chest pain. The nurse appears to have seen the patient earlier, as an EKG was done just after noon. The pulse was 98 and the BP 129/89. The nurse documented that an EKG showed "A fib same as previous." The patient noted the pain while working in the laundry. There were no associated symptoms. The nurse called Dr. Shah, who recommended 23 hour observation and an EKG the following morning. At 3:05 pm the patient was without complaints but the nurse did not perform vital signs. At 5:00 pm the BP was 143/74 and pulse 57 and the nurse noted that the patient "feels fine." At 7:25 pm the patient was found laying face down on the floor by his bunk with a small amount of vomit and small amount of blood on the forehead. The patient had no pulse or respirations. CPR was started until an ambulance removed the patient to a hospital.

5, 6, 14  The patient had return of atrial fibrillation with chest pain. The patient had prior ischemic changes and acute coronary syndrome and should have been immediately referred to a hospital, anticoagulated, and had a cardiac catheterization. To place the patient on 23 observation was incompetent as the doctor did not appropriately evaluate the change in status. Care was grossly and flagrantly unacceptable and likely resulted in the patient's death.

6/19/2016  Vipin Shah completed the death summary. The death summary was inaccurate, as it did not state that the EKG on 3/16/16 showed anterolateral ischemia but did state that the patient had atrial fibrillation. He documented that the EKG on 4/15/16 showed ST depression and that cardiology was requested. Apparently an autopsy was not done. The cause of death was listed as atherosclerotic heart disease and temporal lobe infarction. It was not clear if an autopsy was done.

Either the doctor failed to recognize an EKG finding of acute ischemia or was not being accurate. This physician should not have reviewed a death in which he was the treating physician.

PTX193-1198

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DON LIPPERT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No.  10-cv-4603 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| JOHN BALDWIN, et al., | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING

To:    All counsel of record.

PLEASE TAKE NOTICE that on November 14, 2018, **the Report of the Second Court-Appointed Expert** was filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, at the U.S. Courthouse, 219 S. Dearborn St., Chicago, IL 60604.


DATED: November 14, 2018                      Respectfully submitted,

                                             By: /s/ Camille E. Bennett
                                             *One of Plaintiffs' attorneys*

Alan Mills                                   Benjamin S. Wolf
Uptown People's Law Center                   Camille E. Bennett
4413 North Sheridan                          Lindsay S. Miller
Chicago, IL 60640                            Roger Baldwin Foundation of ACLU, Inc.
                                             150 N. Michigan Ave., Ste. 600
                                             Chicago, IL 60601


Harold C. Hirshman
Dentons US LLP
233 S. Wacker Drive, Ste. 5900
Chicago, IL 60606

**PTX193-1199**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on November 14, 2018, she caused a copy of the above and foregoing **Report of the Second Court-Appointed Expert** to be served on all counsel of record via the Court's electronic filing system (CM/ECF):

/s/ Camille E. Bennett

PTX193-1200