E-FILED
Monday, 30 November, 2020  06:53:48 PM
Clerk, U.S. District Court, ILCD

# Exhibit I



# 207 Days

**12/19/15 –**
Blood in Mr. Dean's urine

**12/23/15 –** Dr. Nawoor says
kidney stones or cancer

**1/7/16 –**
Dr. Einwohner suggests
"re-imaging" and urology
evaluation

**1/13/16 –**
Collegial Review
approves renal ultrasound

**2/2/16 –**
Renal ultrasound

**3/10/16 –** Mr. Dean sees
urologist Dr. Severino

**3/22/16 –** Collegial Review
approves cystoscopy

**3/30/16 –** Collegial Review
approves CT scan

**4/12/16 – CT scan shows cancer**

**4/20/16 –** Collegial Review
approves cancer surgery

**5/16/16 –**
Mr. & Mrs. Dean press
for surgery

**207 DAYS**

**7/19/16 –**
**Surgery**

DEC 2015 | JAN 2016 | FEB | MAR | APR | MAY | JUN | JUL



## What happened (207 days) v. What should have happened (47 days)

**12/19/15 –** Blood in Mr. Dean's urine

**12/23/15 –** Mr. Dean presents with gross Hematuria; Dr. Nawoor says kidney stones or cancer  (PTX084)

**1/7/16 –** Dr. Einwohner suggests "re-imaging" and urology evaluation (PTX061)

**1/13/16 –** Collegial Review approves renal ultrasound (PTX084-0004; PTX027)

**2/2/16 –** Renal ultrasound (PTX060)

**3/10/16 –** Mr. Dean sees urologist Dr. Severino  (PTX066-006)

**3/22/16 –** Collegial Review approves cystoscopy  (PTX093-0001)

**3/30/16 –** Collegial Review approves CT scan  (PTX093-0002)

**4/12/16 – CT scan shows cancer**  (PTX084-0013)

**4/20/16 –** Collegial Review approves cancer surgery (PTX084-0024)

**5/16/16 –** Mr. & Mrs. Dean press for surgery

**7/19/16 – Surgery** (PTX032)

**207 DAYS**

DEC 2015    JAN 2016    FEB    MAR    APR    MAY    JUN    JUL

**47 DAYS**

**1/6/16 –** Mr. Dean has appointment with urologist with CT scan and cystoscopy

**1/8/16 –** Mr. Dean is diagnosed with cancer

**2/8/16 –** Mr. Dean has surgery

# Diagnostic Collegial Review Delays

| | Service | Date Recommended | Time Elapsed | Collegial Review | Time Elapsed | Date of Service | Total Time Elapsed |
|---|---|---|---|---|---|---|---|
| 1. | Urology referral | 12/23/15 (Nawoor) (PTX084) 1/7/16 (Einwohner) (PTX061) | 49 days | 2/10/16 (PTX084-0007; PTX028) | 29 days | 3/10/16 (PTX060) | 78 days |
| 2. | Re Imaging | 1/7/16 (Einwohner) (PTX061) | 6 days | 1/13/16 (PTX084-0004; PTX027) (Ultrasound – Ritz) | 20 days | 2/2/16 (PTX060) | 26 days |
| 3. | Cystoscopy | 3/10/16 (PTX066-006) | 12 days | 3/22/16 (PTX093-0001) | N/A | N/A | N/A |
| 4. | CT Scan | 3/10/16 (PTX066) | 20 days | 3/30/16 (PTX093-0002) | 13 days | 4/12/16 (PTX084-0013) | 33 days |



# Delays

| | |
|---|---|
| **Urologist** | 78 DAYS |
| **Ultrasound** | 26 DAYS |
| **Cystoscopy** | 35 DAYS |
| **CT Scan** | 33 DAYS |
| **Surgery** | 96 DAYS |
| **Chest X-Ray** | 8 DAYS |
| **Cardiology Clearance** | 2 DAYS |
| **CT Scan** | 7 DAYS |
| **Urologist** | 8 DAYS |
| **Vascular Surgeon** | 7 DAYS |
| **Cardiology Clearance** | 22 DAYS |
| **Urologist (post-surgery)** | 14 DAYS |
| **Cardio-Thoracic Surgeon (post-surgery)** | 29 DAYS |
| **Oncologist** | 15 DAYS |
| **CT Scan/Bone Scan** | 14 DAYS |
| **Oncologist** | 27 DAYS |
| **Liver Biopsy** | 38 DAYS |
| **Oncologist** | 5 DAYS |
| *(Chemo Drug)* **Votrient®** | 28 DAYS |
| **Oncologist** | 49 DAYS |
| *(Chemo drug)* **Opdivo®** | 20 DAYS |
| *(Chemo drug)* **Torisel®** | 1 DAY |

Legend:
- ● Date treatment was **recommended**
- ▼ **Collegial Review**
- ■ Date treatment was **given**

AVERAGE LENGTH OF TIME:
*from* Date treatment was **recommended**
*to* Date treatment was **given**
**= 25.5 days**

DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY

## Nurse Mincy Email Re: "MD Problems"

**Problems**

[redacted] –Seizures on Valporic Acid and level was low had issues with tremors almost tardive dyskinesia actions-Valporic Acid increased lab repeated range within normal limits but low no follow up lab to

<u>Dean N21885</u>-mass on kidney has pacer again no order for CXR from surgeon written to r/o lung mass, but MD signed off on returning referral form.  HCUA took it to the MD to write the order & was told that he would write it Friday because that is when the Rad Tech is here to do it. Order was written after HCUA insisted.  If the order had been written on this offender by the previous Friday the CXR would have been completed on Monday or that very same day.  This CXR was to r/o a lung mass.

[redacted] –refusing HTN medications and MD has now written for Nitro s/l and issued them to an offender that does not speak English and

Dean v. Wexford, et al. (17-3112) IDOC No.: 000678

PTX395-0002

5



## Dr. Nawoor and Dr. Einwohner Recommend Urologist



# Dr. Nawoor Trial Testimony

13    Q.  In December of 2015 and January of 2016, did
14    you believe you were responsible for Mr. Dean's
15    medical care?
16        A.  Of course.
17        Q.  You understand what it means to be
18    responsible for medical care; right?
19        A.  Yes, yes.  Of course I do.
20        Q.  And you understand that world
21    responsibility?
22        A.  Right.
23        Q.  You understand how it applies in the medical
24    context; right?
25        A.  Correct.

1     Q.  Do you know that in this lawsuit, you and
2     the other Wexford defendants deny that they were
3     responsible for his care?
4         A.  I wasn't even aware of that.

*Nawoor Trial Tr. 50:13-51:4*

3

# Dr. Nawoor Trial Testimony

20     Q.  Doctor, please, I'm talking -- ultrasound

21  doesn't happen until February 20th.  That's three

22  more weeks up the road.  I'm talking about

23  February 2nd.  Between December 23rd and

24  February 2nd, that six week period --

25     A.  Okay.

1     Q.  -- you go nothing to rule out cancer?

2     A.  No, we didn't do anything then because we

3  just going through the motion here about what we do

4  over there when people come with whatever.  And we

5  have to talk to them and then decide whether they

6  need to go somewhere having something done.  And

7  that's exactly what we do.

*Nawoor Trial Tr. 55:20-56:7*

4

## Dr. Nawoor Trial Testimony

22     Q.  But under the circumstances here that Mr. --

23  for Mr. Dean's situation, Dr. Severino has real

24  limitations, doesn't he, sir?

25     A.  In regard to what?

1      Q.  Well, he can't do anything that isn't

2   approved by Pittsburgh?

3      A.  Basically, yeah.

4      Q.  That's a little unusual, isn't it?

5      A.  Well, I didn't make the policy, they make

6   their own policy.  I'm just a hired medical doctor

7   there.

*Nawoor Trial Tr. 51:22-52:7*

6

## Dr. Nawoor Trial Testimony

1      Q.  Are you starting to think that that

2   eventually on the urologist maybe should be today?

3      A.  Not today.  Again, you know, in private

4   practice what I would do, but the way we have to do

5   it in Wexford system, I have to go to collegial.  I

6   can't just say, "Well, I'm gonna send you to

7   urologist."

*Nawoor Trial Tr. 63:1-7*

# Dr. Nawoor Trial Testimony

14    Q.  That appointment is now occurring two and a

15  half months after Mr. Dean first presented with

16  grossly bloody urine?

17    A.  Mm-hmm.

18    Q.  It's one and a half months after the

19  ultrasound that was wholly inconclusive; right?

20    A.  Mm-hmm.

21    Q.  And what prevented this from happening

22  faster, your view, was it was the system that

23  prevented you from getting an earlier appointment?

24    A.  Well, that's true.

25    Q.  Because you can't do anything to expedite

1  the process without talking to Pittsburgh?

2    A.  That's right.

*Nawoor Trial Tr. 89:14-90:2*

## Dr. Nawoor Trial Testimony

3     Q.  Four days after he goes to Dr. Severino, you

4  don't see him until the 14th?

5     A.  We are supposed to see them within five

6  days.

7     Q.  Did you think given the concern about the

8  cancer here that maybe you should have saw him the

9  first day he came back?

10     A.  I had no control on this.  When this come

11  through depends on the schedule, when they put the

12  patient to see me.

13     Q.  In any event, you approved that they should

14  do a CT scan and a cystoscopy?

15     A.  Right.

16     Q.  But again, your approval really almost isn't

17  worth anything because it's no good unless it's

18  approved by Pittsburgh?

19     A.  Well, that's true.          *Nawoor Trial Tr. 102:3-19*

## Dr. Nawoor Trial Testimony

1   that call, do we?
2       A. Not me, I know that.
3       But Dr. Hazelrigg did see the patient, so it
4   was approved.

15      Q.  Am I correct, sir that for every decision on

16   what to do between March 10th, when the patient,

17   Mr. Dean, sees Dr. Severino, and July 19th, when he

18   has his surgery, the decision on what to do and what

19   to approve was made by Pittsburgh and not you?

20      A.  Correct.

22   decisions?
23       A. Right.
24       Q. Those are things that cost Wexford extra
25   money; right?

KATHY J. SULLIVAN  CSR  RPR  CRR
OFFICIAL COURT REPORTER

*Nawoor Trial Tr. 129:15-20*

## Dr. Nawoor Trial Testimony

A. I don't remember if I see that then.

Q. What was Dr. Einwohner recommending be done at the collegial?

A. The -- we wanted to see collegial and to do a workup from the hematuria.

Q. She wanted him to be sent to a urologist?

11    Q.  The kidney specialist recommending urologist

12  isn't even invited to the collegial?

13    A.  That's not my problem.  Pittsburgh should

14  invite her.  They failed, that was -- and they never

15  do that.

*Nawoor Trial Tr. 44:11-15*

between December 23rd and January 13th, there is no entry saying you do anything, is there, sir?

A. Yeah, that's correct.

Q. There's no indication that you reviewed anything in his historical notes, is there?

A. Historical notes.  What do you mean?

KATHY J. SULLIVAN, CSR, RPR, CRR
OFFICIAL COURT REPORTER

## Dr. Nawoor Trial Testimony

Q. Isn't it true that in this case, there
wasn't any approval for cystoscopy, and you had to

```
 7       Q.  And if you had looked at this when you got

 8  it sent back to you and noticed that inconsistency,

 9  you could have said, "Hey, Pittsburgh, what's going

10  on?  We approved a cystoscopy."

11       A.  Yeah.

12       Q.  You didn't do that?

13       A.  No, I didn't -- because that's their fault,

14  not mine.
```

And I did recommend certain dishes for them and they

KATHY J. SULLIVAN  CSR  RPR  CRR
OFFICIAL COURT REPORTER

*Nawoor Trial Tr. 63:7-14*

12

## Dr. Nawoor Trial Testimony

```
14        Q.  Well, your total what you wrote down for
15   January 13th is two lines?
16        A.  That's correct.
17        Q.  That's everything you talked about?
18        A.  No, that's not what we talk about.  We talk
19   about what was approved.  So that's what we talk
20   about.
21        Q.  And there's no document that shows us what
22   was sent to Mr. Ritz, is there?
23        A.  I don't -- they misplaced the paper, it's
24   not my fault.
```

# Dr. Einwohner Trial Testimony

6    Q.   So your recommendation with respect to

7  January 7th was to suggest that Mr. Dean should see

8  a urologist; correct?

9    A.   Correct.

10    Q.   And your recommendation was also to suggest

11  that there should be some appropriate images of his

12  kidney and urinary track taken; correct?

13    A.   Correct.  Some type of imaging.  I didn't

14  know which would be yet --

15    Q.   For the urologist to decide?

16    A.   I would hope so.  I wanted the patient to

17  get to the urologist and UM was the way to do it.

18    Q.   So your view and your recommendation as a

19  nephrologist and somebody who had seen Mr. Dean for

20  probably three years by then was to send him to a

21  urologist; correct?

22    A.   Correct, urology.

*Einwohner Trial Tr. 32:6-22*

14

## Dr. Einwohner Trial Testimony



```
 1   not something I did, those were onsite scheduling
 2   issues.
 3        Q.  Onsite medical issues with a primary care
 4   physician as well; correct?
 5        A.  Could be.  And there could be scheduling
 6   things with the site.
 7        Q.  So let me ask you this:  On the 7th, were
 8   you convinced -- you that that email.  were you
 9   absolutely convinced that the right suggestion was
```

```
17        Q.  Your medical judgment was to recommend that
18   he go see a urologist; right?
19        A.  Yes.
```

*Einwohner Trial Tr. 44:17-19*

```
18   he go see a urologist; right?
19        A.  Yes.
20        Q.  You stand by that on January 7th I assume
21   you stand by it today?
22        A.  I thought the appropriate care was to get
23   him to a urologist.
24        Q.  And the collegial review process and
25   Dr. Nawoor, along with Dr. Ritz, decided not to do
```

KATHY J. SULLIVAN, CSR, RPR, CRR
OFFICIAL COURT REPORTER

# Dr. Einwohner Trial Testimony

8    Q.  So, Doctor, let me ask you a question about

9    that.  You're there to support and assist with

10   regard to the diagnosis.  Mr. Dean comes in on the

11   23rd, and then it takes until the 14th of April to

12   diagnose his kidney cancer; right?

13        A.  Yes.

14        Q.  So do you believe you bear any

15   responsibility with regard to the delays that we've

16   heard about in the diagnosis of Mr. Dean's kidney

17   cancer?

20        A.  I think my role when this came up was seeing

21   that something was beyond the scope of chronic

22   teleclinic, an acute condition, and trying to

23   encourage UM to review this and get the patient to

24   urology.  The scheduling and the delays and getting

25   those things there to other specialists, that was

1    not something I did, those were onsite scheduling

2    issues.

*Einwohner Trial Tr. 43:8-44:2*

16

# Wexford IDOC Contract

## 3.1.1    Schedule E Monthly Payments and Adjustments

**CY1: $113,209,327**
**CY2: $121,254,395**
**CY3: $126,104,570**
**CY4: $128,626,661**
**CY5: $133,771,727**

## 3.2    TYPE OF PRICING:  Pricing under this contract is

☐ Firm _____

☒ Estimated _____$1,363,436,031_____

PTX137-0025

PTX137-0027

17

## 2014 Wexford Utilization Management Policies and Procedures



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER IN DEAN V. WEXFORD, COIL 17-3112

**II.  PROCEDURE**

A.  The Site Medical Director reviews all *Referral Request* forms.

   1.  If the Site Medical Director disagrees with the request, the form is marked "Disagreed" and signed by the Site Medical Director. A notation is made in the medical record.

   2.  If the Site Medical Director agrees with the request, a collegial review ensues, during which the following guidelines should be followed:

     a.  Referrals for baseline mammograms and EEGs can be forwarded to the UM Department without collegial review.

     b.  The Site Medical Director contacts the UM physician at the scheduled time for the collegial review.

     c.  A collegial discussion concerning an appropriate treatment plan will occur between the Site Medical Director and the designated UM physician for medically necessary services. A recommendation for care should result from this discussion.

     d.  The physicians will discuss the inmate's condition and the appropriate plan of treatment during a collegial review. The medical record is available to the site physician to provide information concerning the inmate's medical history. The site physician documents the discussion in the medical record.

B.  The site should complete a *Referral Request Form* and submit it to the UM Department.

C.  All referral requests submitted to the UM Department must signed and dated by the Site Medical Director.

D.  The *Referral Request Form* should explain the service and provider being requested (e.g., initial/follow-up, on-site, off-site, surgery, etc.).

E.  To prevent a delay in services, it is imperative that all applicable areas on the *Referral Request Form* are completed. The supporting documentation, such as diagnostic reports, risk factors, current medications, height and weight, consultation reports, focused history, and objective physician exam findings, should be attached to the referral.

# 2016 Wexford Utilization Management Guidelines



6. Upon completion of the Collegial Review, the Site Medical Director is to document a note in each chart, the note is to be titled "Collegial Review" and should have the appropriate date and time. Each note must at a minimum contain the following:

    a. The name of collegial reviewer (e.g., Dr. Smith)

    b. Detailed documentation of agreed upon plan of care, including additional on-site management, alternative plans of care and/or off-site diagnostic and consultative services required.

    c. *A statement as to the inmate being placed on medical hold should be included if required by the state or county.*

    d. If there are any orders, which need to be done prior to the consultation or off-site visit, these should be documented and written on the physician order sheet, then the order sheet should be flagged in the record.

    e. Document any information, which needs to be brought with the patient to consultant (e.g., radiological films, copies of lab work).

*Daily Activity Report (DAR) (SAMPLE)... Page 25*
*Launch Report (SAMPLE)... Page 27*
*Non-Approval/Appeal Letter... 31*
*Approval Letter... 32*
*Pre-Certification Notification (SAMPLE)... Page 34*
*Preferred Provider List (SAMPLE)... Page 35*
*Referral Request Form (SAMPLE)... Page 37*
*UM Offsite Care Scheduling Log (SAMPLE)... Page 41*
*Specialty Appointment Document Request Form (SAMPLE)... Page 40*

PTX102-0010

PTX102-0011

19

# Final Report of the Court Appointed Expert

# Lippert v. Godinez

December 2014

## Ron Shansky, MD

PTX194-0001



During the collegial review, the Pittsburgh-based physician either approves the service or suggests an alternate plan. We have been told by several sites that this rate of approval varies dramatically based on which Pittsburgh-based physician happens to be receiving the phone call.

During our review of records, we found breakdowns in almost every area, starting with delays in identification of the need for the offsite services, delays in obtaining an authorization number, delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork and delays or the absence of any follow-up visit with the patient. Additionally, although some of the facilities were tracking these steps fairly conscientiously, others were not, creating much less dependable outcomes.

PTX194-0029

21

**Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services**

**Report of the 2nd Court Appointed Expert**

**Lippert v. Godinez**

October 2018

# Mike Puisis DO

Catherine M. Knox RN, MN, CCHP-RN
Jay Shulman, DMD, MSPH

PTX193-0001

22

The collegial review process of accessing specialty care is a patient safety hazard and should be abandoned until patient safety is ensured.

Specialty care is not tracked with respect to whether it is timely. The Wexford system of utilization management is ineffective and for many patients is a barrier to timely care.

Patients are not consistently referred for specialty care when it is warranted. We view this as a problem of hiring unqualified physicians and as a problem of the utilization process itself.

The chronic disease system promotes fragmentation of care and fails to adequately address all of a patient's problems from the perspective of the patient. Patient problems are lost to follow up or are not addressed in the context of a patient's complement of diseases.

The chronic care disease guidelines need to be updated. Alternatively, contemporary existing guidelines by major specialty organizations should be used in lieu of IDOC specific chronic care

PTX193-0011

23



There is a lack of guidance in policy with respect to specialty care. The IDOC-Wexford contract has no specifications with respect to timeliness of specialty care. There is no administrative directive (AD) on specialty care, including timeliness of care. AD 04.03.103 Offender Health Care Services describes the requirements of obtaining specialty care. With the exception of a requirement that the vendor Utilization Management Unit will review all referrals within five working days, there are no timelines associated with obtaining specialty care. None of the facilities tracked timeliness of specialty consultations.

Medical records we reviewed did not consistently contain documentation of all benchmark events including referral, collegial review, alternate treatment plans, appointment, or follow up, even though documentation in the medical record is either required or implied because these benchmarks are medical events that need to be documented in the medical record. This made verification of specialty care impossible.

PTX193-0065

24



. They maintain that Wexford has implemented a system which provides the Medical Director with reliable and timely information so that appropriate care is provided. We did not find that this was accurate. There is no evidence in the five day follow up to consultations or in the follow up after hospitalizations that doctors consistently understood what occurred during the offsite event. If they did, they did not document it.

PTX193-0068

**From:** Neil Fisher
**Sent:** Monday, March 13, 2017 11:30 AM
**To:** Becky Adams
**Cc:** Stephen Ritz
**Subject:** RE: Dean, William N21885 from Taylorville CC DOB 8/29/1960 in: 2010 outdate: 2021

I think the case should be discussed at collegial.

It will help with deciding what we are trying to accomplish in this case.... Hospice care may be possibly more appropriate but we should be discussing the options and the status of the Patient.

Neil

Dr. Neil A. Fisher, M.D., CCHP
Corporate Medical Director Quality Management and Pharmacy Services
Wexford Health Sources, Inc.
8900 North Central Avenue
Suite 307
Phoenix, AZ 85020

PTX181-0004

26

Utilization Review RN, BSN
Wexford Health Sources
Foster Plaza 4
501 Holiday Drive
Pittsburgh, PA 15220
Direct Dial: 1-412-937-5204
1-877-939-2854 ext 207

From: Helen Feinstein
Sent: Monday, October 24, 2016 9:09 AM
To: Becky Adams
Cc: Neil Fisher
Subject: FW: Votrient Dean N21885 Taylorville

Becky,
Please, add to the collegial for sometime early next week.  This is a new order, not a continuation of therapy.  In reviewing the information, it appears that the patient will benefit more from palliative care at this time, then aggressive treatment with the background of multiple organ metastases and other chronic co-morbidities.

The NCCN Guidelines and Up to Date break down treatment recommendations into categories of clear cell histology or non-clear cell histology. It is not clear from the information we have which type this patient has.

In a phase III trial described in NCCN, progression free survival was significantly increased with

PTX406-0002

| | |
|---|---|
| **From:** | Stephen Ritz |
| **Sent:** | Thursday, January 08, 2015 3:22 PM |
| **To:** | Jim Reinhart |
| **Cc:** | Nick Little; Elaine Gedman; Thomas Lehman; Pat Casey; John Froehlich; Darius Holmes; Rodney Jones; Dan Conn; Cheri Laurent; Karen Mullenix |
| **Subject:** | RE: Illinois Executive Clemency |
| **Attachments:** | Illinois Top Pts for poss release - Revised 1.8.15.xlsx |
| | |
| **Categories:** | Red Category |

Jim, attached is the top 165 that were compiled based upon an aggregate for total offsite care. These cases are often the most complex, end stage and the very sickest patients, hence their utilization rates.

The cases highlighted in yellow have a Cancer or other  diagnosis and may be candidates for consideration earlier rather than later

Those highlighted in yellow with red font are the top 32 for consideration if we are decide to submit something quickly.

Will update and expand this document if it is decided to pursue this process further with the new Administration.

PTX367-0001

28